United States District Court
Southern District of Texas
FILED

MAR 1 9 2003

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DINO CHAVEZ | § | |
| | § | |
| vs. | § | |
| | § | |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT and NOE SAUCEDA, | § | CIVIL ACTION NO. B-02-128 |
| | § | |
| | § | |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT | § | |
| | § | |
| vs. | § | |
| | § | |
| AMERICAN FAMILY LIFE ASSURANCE | § | |
| COMPANY OF COLUMBUS | § | |
| | § | |

**DEFENDANT BROWNSVILLE INDEPENDENT SCHOOL DISTRICT'S
ADDITIONAL OBJECTIONS TO PLAINTIFF'S MOTION FOR LEAVE TO FILE
SECOND AMENDED ORIGINAL PETITION FOR RE-JOINDER OF MARILYN DEL
BOSQUE-GILBERT AND RANDY DUNN AS DEFENDANTS**

TO THE HONORABLE JUDGE OF SAID COURT:

**COMES NOW,** the BROWNSVILLE INDEPENDENT SCHOOL DISTRICT, one of the

named Defendants in the above-styled and numbered cause and files and serves this its Additional

Objections to Plaintiff's Motion for Leave to File Second Amended Original Petition for Re-

Joinder of Marilyn Del Bosque-Gilbert and Randy Dunn as Defendants, and would show the Court

the following:

Defendant Brownsville I.S.D.'s Additional Objections to Plaintiff's Motion for Leave to File
Second Amended Original Petition for Re-Joinder of Marilyn Del Bosque-Gilbert and Randy Dunn
23028 - Mtn Add Obj MtnLeave.wpd

**PAGE 1**

**I.**

1.     Defendant Brownsville Independent School District (Brownsville I.S.D.) would continue to urge the denial of Plaintiff's Motion for Leave to Joining Marilyn DelBosque-Gilbert and Randy Dunn and would show that the re-joinder of these parties is mere harassment and unfounded.

2.     Defendant would show that the deposition of Plaintiff Dino X. Chavez was taken on March 4, 2003.  During his deposition, Dino X. Chavez was specifically asked about the allegations he raised in his proposed Second Amended Original Petition against Ms. Del Bosque-Gilbert and Mr. Dunn.  Specifically, Chavez was questioned regarding paragraph 11 of Plaintiff's proposed Second Amended Original Petition, where the pleadings set out serious and damaging allegations against both Ms. del Bosque-Gilbert and Mr. Dunn.  Mr. Chavez alludes to the fact that they had been bribed by Mr. Chavez's competitor in the form of campaign contributions and then in turn conspired and persuaded Dr. Sauceda to make Mr. Chavez's compete for the TPA and exclude Mr. Chavez from being allowed to sell his products on the Brownsville I.S.D. property.  The following is his testimony relating to this was contained in pages 120 through 156 which states:

> 10     Q.  And this information that's contained in your
> 11     lawsuit that says, during this time period -- this is
> 12     in Paragraph 11.  During this time period, the BISD
> 13     board of trustees was considering litigation against
> 14     Sweezey Construction because mold had been found in
> 15     buildings they constructed.  You know this from what
> 16     people told you; is that correct?
> 17     A.  Yes, ma'am.
> 18     Q.  Who were the people that told you that?

**Defendant Brownsville I.S.D.'s Additional Objections to Plaintiff's Motion for Leave to File**                **PAGE 2**
**Second Amended Original Petition for Re-Joinder of Marilyn Del Bosque-Gilbert and Randy Dunn**
23028 - Mtn Add Obj MtnLeave.wpd

19    A. Again, I don't know.
20    Q. You don't know. Trustee Del Bosque-Gilbert's
21  husband was a supervisory employee at Sweezey
22  Construction at that time. Do you know that to be
23  true?
24    A. Yes.
25    Q. At what time? At the time the litigation was
Page 144
1   being considered in 2001?
**Deposition of Dino Chavez, p.144, L.10 - p.145, L.1 (Exhibit "I")**

13    Q. Okay. Trustee Del Bosque-Gilbert therefore
14  reached an agreement with Superintendent Sauceda to the
15  effect that if no recommendation was made by him to
16  pursue litigation against Sweezey Construction, she
17  would go along with his plan to appoint Mr. Olivarez as
18  BISD's agent of record. And this is something that you
19  were told by someone, or something that you just
20  surmised?
21    A. This is something that I was told.
22    Q. And who told you that?
23    A. Again, I don't know.
24    Q. You don't have any idea who told you that?
25    A. No, ma'am, I don't.
**Deposition of Dino Chavez, p.145, L.13-25 (Exhibit "I")**

8    Q. Continuing with Paragraph 11 of the Exhibit 2,
9   you stated that, Trustee Dunn also reached an agreement
10  with Superintendent Sauceda to have Dunn's wife,
11  Deborah Dunn, reinstated to her former position as
12  secretary to Superintendent Sauceda, along with a
13  $10,000 raise. Who told you this?
14    A. Who told me which part?
15    Q. Okay. That part of what I just read to you.
16    A. Again, I don't remember who told me.
17    Q. You don't have any idea who told you?
18    A. No.
**Deposition of Dino Chavez, p.149, L.8 -18 (Exhibit "I")**

**Defendant Brownsville I.S.D.'s Additional Objections to** Plaintiff's Motion for Leave to File        **PAGE 3**
**Second Amended Original Petition for Re-Joinder of Marilyn Del Bosque-Gilbert and Randy Dunn**
23028 - Mtn Add Obj MtnLeave.wpd

12    *Q. Who told you that, that there was an agreement*
13    *between Dunn and Sauceda to have Deborah reinstated to*
14    *the former position as secretary to Superintendent*
15    *Sauceda, along with a $10,000 raise?*
16    *A. I don't think anybody told me because it was*
17    *public information.*
18    *Q. So you surmised that there was an agreement*
19    *between Dunn and Sauceda for this to happen?*
20    *A. I think that, along with, again, people telling*
21    *me that that was what was happening behind the scenes.*
22    *Q. And who told you that?*
23    *A. I don't know.*
24    *Q. Who told you it was happening behind the*
25    *scenes?*
*Page 151*
1    *A. Again, I told you I don't know.*
2    *Q. Was it a board member?*
3    *A. It's possible it was.*
4    *Q. Which board member would it have been?*
5    *A. I don't know.*
6    *Q. You don't have a clue? Of the seven board*
7    *members, you don't know which one it was?*
8    *A. I don't know.*
9    *Q. Did you talk to more than one about it?*
10    *A. I don't know.*
**Deposition of Dino Chavez, p. 150, L.12 - p. 151, L.10  (Exhibit "I")**

11    *Q. Okay. Were you aware that there was a lawsuit*
12    *by Deborah Dunn against BISD?*
13    *A. No.*
14    *Q. You didn't know that?*
15    *A. No.*
16    *Q. Were you aware that as a result of the*
17    *settlement agreement Deborah Dunn was reinstated to*
18    *Dr. Sauceda's position?*
19    *A. No.*
20    *Q. It's your position that this occurred because*
21    *there was an agreement reached between Trustee Dunn and*
22    *Superintendent Sauceda for this to occur?*
23    *A. Yes.*
**Deposition of Dino Chavez, p.151, L.11,-23 (Exhibit "I")**

Defendant Brownsville I.S.D.'s Additional Objections to Plaintiff's Motion for Leave to File    **PAGE 4**
Second Amended Original Petition for Re-Joinder of Marilyn Del Bosque-Gilbert and Randy Dunn
23028 - Mtn Add Obj MtnLeave.wpd

4      *Q. Okay. Let's continue with the rest of that*
5   *sentence. And to have his girlfriend, Elizabeth Parra,*
6   *placed in a position in the BISD insurance department*
7   *at a substantial salary. And you're talking about*
8   *Randy Dunn's girlfriend, Elizabeth Parra?*
9      *A. Yes.*
10     *Q. Who told you that Randy Dunn's girlfriend was*
11  *Elizabeth Parra?*
12     *A. Again, I don't know.*
13     *Q. You don't know the name of one person that told*
14  *you that?*
15     *A. No.*
16     *Q. You can't think of the name of one trustee,*
17  *one, you know, citizen?*
18     *A. At this moment, I don't know.*
19     *Q. Okay. So, again, that part of that sentence is*
20  *based on hearsay and speculation?*
21     *A. I don't know that legal terminology.*
22        *MR. STEELE: Speculation?*
23     *Q. You don't know what speculation is?*
24     *A. Speculation? Okay. In legal terms, I don't*
25  *know but in --*
Page 153
1         *MS. LEEDS: It means the same thing in*
2   *English.*
3         *THE WITNESS: In English, yeah, I guess*
4   *so.*
5      *Q. Okay. And hearsay means it was based on what*
6   *people told you, these unnamed people. Right?*
7      *A. Yes, that's correct.*
8      *Q. Okay. The next sentence is, In order to*
9   *receive the consideration they were seeking, Defendants*
10  *Del Bosque-Gilbert and Dunn had to agree to*
11  *Superintendent Sauceda's plan to appoint Arnulfo*
12  *Olivarez as BISD's agent of record for all BISD's*
13  *insurance policies. Who told you that?*
14     *A. Again, I don't know.*
15     *Q. Again, that's based on unknown people telling*
16  *you this --*
17     *A. Yes.*
18     *Q. -- and your speculation; is that correct?*
19     *A. That's correct.*

**Deposition of Dino Chavez, p. 152, l.4 - p. 153, L.19 (Exhibit "I")**

**Defendant Brownsville I.S.D.'s Additional Objections to Plaintiff's Motion for Leave to File**        **PAGE 5**
**Second Amended Original Petition for Re-Joinder of Marilyn Del Bosque-Gilbert and Randy Dunn**
23028 - Mtn Add Obj MtnLeave.wpd

3.     This testimony clearly evidences that Mr. Chavez had no basis for making these slanderous and libelous remarks that are outlined in paragraphs 11 of the proposed Second Amended Original Petition. Mr. Chavez's sole basis for this allegation was rumor and hearsay from unknown persons. When repeatedly asked by counsel to identify the names of the persons who told him this information, Dino Chavez could not name a single individual. The fact that Plaintiff is trying to rejoin these individuals based on such slipshod evidence clearly demonstrates that the true reason to rejoin the individuals is because they had sued Mr. Chavez in state court as outlined below. Mr. Chavez gave the following testimony relating to the state court case:

```
14      Q.  You have a lawsuit pending against you in state
15   court; is that correct?
16           MR. AGUILAR:  The one -- you can answer.
17           MS. LEEDS:  Has he been sued?
18      Q.  Do you have a lawsuit pending against you in
19   state court?
20      A.  Against me?
21      Q.  Yes.
22      A.  Yes.
23      Q.  You are a named defendant?
24      A.  Yes.
25      Q.  And who is suing you?
Page 155
1      A.  It is Marilyn Del Bosque and Randy Dunn.
2      Q.  And what is the basis of that lawsuit, if you
3   know?
4           MR. AGUILAR:  Object to form.
5      Q.  Not anything that your attorney told you, but
6   have you read the pleadings?
7           MR. AGUILAR:  Objection to the extent the
8   documents would speak for themselves, but you can
9   explain your understanding.
10      A.  I think it says slander.
11      Q.  Slander?
12      A.  I believe that's what it says.
13      Q.  That you have made false claims?  Is that what
14   you understand that to be?
15      A.  I believe so.
```

**Defendant Brownsville I.S.D.'s Additional Objections to Plaintiff's Motion for Leave to File**      **PAGE 6**
**Second Amended Original Petition for Re-Joinder of Marilyn Del Bosque-Gilbert and Randy Dunn**
23028 - Mtn Add Obj MtnLeave.wpd

> 16    *Q. And you are aware that Marilyn Del*
> 17    *Bosque-Gilbert and Dunn were originally named in this*
> 18    *lawsuit that we are here on today; is that right?*
> 19        *MR. AGUILAR: Objection; calls for a legal*
> 20    *conclusion and mischaracterizing the evidence.*
> 21    *Q. Let me repeat it to make sure I didn't say*
> 22    *something that was privileged.*
> 23        *MS. NEALLY: Well, can you read it back to*
> 24    *us please, and let me make sure that I --*
> 25        *(The requested portion was read)*
>
> Page 156
>
> 1    *Q. And just to clarify, that you are aware that*
> 2    *Marilyn Del Bosque-Gilbert and Randy Dunn were*
> 3    *originally named as defendants -- in other words,*
> 4    *parties you were suing -- in the lawsuit that we are*
> 5    *here on today?*
> 6        *MR. AGUILAR: Same objections.  Go ahead.*
> 7    *A. Yes.*
> 8    *Q. And you are aware that they were dismissed from*
> 9    *the lawsuit?*
> 10       *MR. AGUILAR: Same objections.  Go ahead.*
> 11    *A. Yes.*

**Deposition of Dino Chavez**, p. 154, L.14 to p.156, L.11. (**Exhibit "1"**)

4.    As was indicated in the deposition, Mr. Chavez has chosen only to sue Marilyn

DelBosque-Gilbert and Randy Dunn, the two individuals who sued him.  He did not sue Mr.

Emerson, even though Mr. Emerson voted for his competitor as the Third Party Administrator for

the time period in question and allegedly received bribes by Mr. Chavez's competition in the form

of campaign contributions.

> 24    *Q. Did you regard Mr. Emerson as a friend?*
> 25    *A. Yes, I did.*
>
> Page 185
>
> 1    *Q. He voted for Olivarez, didn't he?*
> 2    *A. Yes.*

**Defendant Brownsville I.S.D.'s Additional Objections to** Plaintiff's Motion for Leave to File                **PAGE 7**
**Second Amended Original Petition for Re-Joinder of Marilyn Del Bosque-Gilbert and Randy Dunn**
23028 - Mtn Add Obj MtnLeave.wpd

3    *Q. Do you still regard him as a friend?*
4    *A. No.*
5    *Q. Why didn't you sue him?*
6      *MR. AGUILAR: Objection to the extent it*
7    *calls for attorney/client privileged discussions. If*
8    *you have any other reasons that you want to disclose,*
9    *feel free to. Just don't discuss anything that we*
10   *talked about.*
11     *A. I don't know. I can't answer that. I don't*
12   *know.*
**Deposition of Dino Chavez**, p. 184, L.24 to p.185, L.14. (**Exhibit "1"**)

14     *Q. Okay. So which board members did he bribe?*
15     *A. Let me just go back just a second. A bribe is*
16   *only considered a bribe, in my opinion or my knowledge,*
17   *if you are giving something to somebody in return for*
18   *doing something for me in a public official capacity.*
19   *That's my opinion of what a bribe is. However, a bribe*
20   *is not -- if I give you money for your campaign that*
21   *isn't a large dollar amount, I don't think that's*
22   *considered a bribe, because I think Texas is one of the*
23   *few states that doesn't have a limit to how much you*
24   *can donate to somebody, in cash or otherwise. So what*
25   *I have been told regarding a bribe, as I call it, that*
**Page 133**
1    *he had donated a large amount of money to Marilyn Del*
2    *Bosque and to Randy Dunn and to Hugh Emerson.*
3      *Q. How much do you mean by a large campaign*
4    *contribution?*
5      *A. In the area of 5- to $10,000.*
**Deposition of Dino Chavez**, p. 132, L.24 to p.133, L.5. (**Exhibit "1"**)


The deposition testimony of Plaintiff Dino Chavez clearly demonstrates how weak and unsupported the allegations raised against Marilyn Del Bosquez-Gilbert and Randy Dunn really are. Defendant's Motion for Leave should be denied and Plaintiff's Second Amended Original Petition be struck.

Defendant Brownsville I.S.D.'s Additional Objections to Plaintiff's Motion for Leave to File    **PAGE 8**
Second Amended Original Petition for Re-Joinder of Marilyn Del Bosque-Gilbert and Randy Dunn
23028 - Mtn Add Obj MtnLeave.wpd

**WHEREFORE, PREMISES CONSIDERED,** Defendant Brownsville Independent School District respectfully prays that this Court deny Plaintiff's Motion for Leave to file its Second Amended Original Petition, and for such other and further relief as is just and equitable.

Respectfully submitted,

**ROERIG, OLIVEIRA & FISHER, LLP**
855 West Price Road, Suite 9
Brownsville, Texas 78550
Telephone: (956) 542-5666
Facsimile: (956) 542-0016

Attorney    for    Defendant    **BROWNSVILLE INDEPENDENT SCHOOL DISTRICT**

By: _____
Elizabeth G. Neally
State Bar No. 14840400
Federal Adm. No. 8044
Ricardo Morado
Federal ID No.1213
State Bar No. 14417250

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that a true and correct copy of the foregoing **DEFENDANT BROWNSVILLE INDEPENDENT SCHOOL DISTRICT'S ADDITIONAL OBJECTIONS TO PLAINTIFF'S MOTION FOR LEAVE TO FILE SECOND AMENDED ORIGINAL PETITION FOR REJOINDER OF MARILYN DEL BOSQUE-GILBERT AND RANDY DUNN AS DEFENDANTS** has been served via United States Postal Service to the Counsel of Record, as follows:

J. Arnold Aguilar
**Law Office of J. Arnold Aguilar**
Artemis Square, Suite H-2
1200 Central Boulevard
Brownsville, TX 78520

Defendant Brownsville I.S.D.'s Additional Objections to Plaintiff's Motion for Leave to File
Second Amended Original Petition for Re-Joinder of Marilyn Del Bosque-Gilbert and Randy Dunn
23028 - Mtn Add Obj MtnLeave.wpd

**PAGE 9**

Eileen Leeds
**Willette & Guerra**
3505 Boca Chica Boulevard, Suite 460
Brownsville, TX  78521

C. Brian Cassidy
Buddy Steel
**Lock, Laddell & Sapp, L.L.P.**
100 Congress Avenue, Suite 300
Austin, TX  78701

on this _19_ day of March, 2003.

ELIZABETH G. NEALLY

**Defendant Brownsville I.S.D.'s Additional Objections to** Plaintiff's Motion for Leave to File
**Second Amended Original Petition for Re-Joinder of Marilyn Del Bosque-Gilbert and Randy Dunn**
23028 - Mtn Add Obj MtnLeave.wpd

**PAGE 10**

# EXHIBIT "1"

## DEPOSITION TRANSCRIPT

## DINO CHAVEZ

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ            )(
                         )(
VS.                      )(  B-02-128
                         )(
BROWNSVILLE INDEPENDENT  )(
SCHOOL DISTRICT, NOE     )(
SAUCEDA, MARILYN DEL     )(
BOSQUE-GILBERT and       )(
RANDALL DUNN             )(

ORAL DEPOSITION OF
DINO X. CHAVEZ
MARCH 4, 2003

ORAL DEPOSITION OF DINO X. CHAVEZ, produced as

a witness at the instance of the DEFENDANT, taken in

the above styled and numbered cause on MARCH 4, 2003,

from 9:17 a.m. to 12:15 p.m. to 1:46 p.m. to 5:03 p.m.

before LOU ZUNIGA, Certified Court Reporter No. 2198,

in and for the State of Texas, at the offices of J.

Arnold Aguilar, 1200 Central Boulevard, Suite H-2,

Brownsville, Texas, pursuant to the Federal Rules of

Civil Procedure and the provisions stated on the record

or attached therein.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

                                    ING

Appearances ....................................  2

DINO X. CHAVEZ
Examination by Ms. Neally ......................  4
Examination by Mr. Steele ...................... 110
Examination by Ms. Neally ...................... 120

Changes and Signature Page ..................... 223

Reporter's Certificate ......................... 225

Attached to the end of the transcript: Stipulations

EXHIBITS
                                        PAGE
NUMBER  DESCRIPTION                          IDEN.

1    Appointments                    88

2    Plaintiff's Second Amended Original
     Complaint                      121

3    Cafeteria plan comparison      157

4    Letter to Kathy Wilkinson      187

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

2
APPEARANCES

FOR THE PLAINTIFF:

J. ARNOLD AGUILAR
LAW OFFICES OF J. ARNOLD AGUILAR
Artemis Square, Suite H-2
1200 Central Boulevard
Brownsville, Texas 78520

FOR THE DEFENDANT BROWNSVILLE INDEPENDENT
SCHOOL DISTRICT:

ELIZABETH G. NEALLY
ROERIG, OLIVEIRA & FISHER, L.L.P.
855 West Price Road, Suite 9
Brownsville, Texas 78520

FOR THE DEFENDANTS NOE SAUCEDA, MARILYN DEL
BOSQUE-GILBERT and RANDALL DUNN:

EILEEN LEEDS
WILLETTE & GUERRA
3505 Boca Chica Boulevard, Suite 460
Brownsville, Texas 78520

FOR THE DEFENDANT AMERICAN FAMILY LIFE ASSURANCE
COMPANY OF COLUMBUS:

WILLIAM B. STEELE, III
LOCKE, LIDDELL & SAPP
100 Congress, Suite 300
Austin, Texas 78701

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

4

1                  DINO X. CHAVEZ,
2      having been duly sworn, testified as follows:
3                    EXAMINATION
4      BY MS. NEALLY:
5          Q.  Could you please state your full name for the
6      record?
7          A.  Dino Xavier Chavez.
8          Q.  Mr. Chavez, have you ever had your deposition
9      taken before?
10         A.  Never.
11         Q.  You know that everything today is the same as
12     if we were in front of a judge and jury?
13         A.  Yes, ma'am.
14         Q.  You are sworn to tell the truth?
15         A.  Yes, ma'am.
16         Q.  If at any time I ask you a question you don't
17     understand, you need to let me know.  Otherwise, I'm
18     going to assume you are understanding all of my
19     questions.  Okay?
20         A.  Okay.
21         Q.  If you need to take a break, let me know, okay,
22     and I will stop.
23         A.  That's fine.
24         Q.  Are you taking any medication today?
25         A.  No.

HILL & ROMERO
CERTIFIED COURT REPORTERS

5

00:00 1     Q.  There's nothing that you're *...ing* that would
00:00 2  impair your ability to answer my questions?
00:00 3     A.  Vitamins.  But, no, I wouldn't say that would
00:00 4  impair my ability to answer questions.
00:00 5     Q.  One of the others things is you need to let me
00:00 6  finish my question before you make your answer because
00:00 7  she's taking a record, and she can't record us both
00:00 8  talking at the same time.
00:00 9     A.  Okay.
00:00 10    Q.  And you need to let me complete the whole
00:00 11 question, even if you think you know what I'm going to
00:00 12 ask.  Okay?
00:00 13    A.  Okay.
00:00 14    Q.  And you need to answer yes or no or in some
00:01 15 verbal manner, as opposed to going uh-huh or huh-uh or
00:01 16 some other manner.  Okay?
00:01 17    A.  Okay.
00:01 18    Q.  How old are you?
00:01 19    A.  I am 38.
00:01 20    Q.  And your date of birth, sir?
00:01 21    A.  11-26-64.
00:01 22    Q.  Where do you reside?
00:01 23    A.  I reside at 14 Kathryn Lane here in
00:01 24 Brownsville.
00:01 25    Q.  And how long have you lived there?

HILL & ROMERO
CERTIFIED COURT REPORTERS

6

00:01 1     A.  I have lived there approximately eight years.
00:01 2     Q.  And who lives there with you?
00:01 3     A.  My wife and my four kids.
00:01 4     Q.  What's your wife's name?
00:01 5     A.  My wife's name is Odelia S. Chavez.
00:01 6     Q.  Okay.  And does she work?
00:01 7     A.  No.  She works very hard at work -- at being a
00:01 8  homemaker at home.
00:01 9     Q.  When was the last time she worked outside the
00:01 10 home?
00:01 11    A.  I can't recall the exact date, but it was
00:01 12 several years ago.
00:01 13    Q.  Okay.  More than three?
00:01 14    A.  I would say about three.
00:01 15    Q.  What did she do when she was working?
00:01 16    A.  She was a school teacher.
00:01 17    Q.  And where did she teach?
00:01 18    A.  Here, BISD.
00:02 19    Q.  What was the last year she taught?
00:02 20    A.  The last year?
00:02 21    Q.  Yes.
00:02 22    A.  I can't recall exactly when, but it's been
00:02 23 about three years.
00:02 24    Q.  So approximately 1999?
00:02 25    A.  I would say that's a good guess.

HILL & ROMERO
CERTIFIED COURT REPORTERS

7

00:02 1     Q.  Okay.  And you have four children?
00:02 2     A.  Yes, ma'am.
00:02 3     Q.  And what are their names and ages?
00:02 4     A.  Daniel is 11, and Dino II is nine, Alexandra is
00:02 5  three-and-a-half, and we have a newborn.  His name is
00:02 6  Dominique.
00:02 7     Q.  Okay.  Have you ever filed a lawsuit before?
00:02 8     A.  No, ma'am.
00:02 9     Q.  Have you ever been arrested before?
00:02 10    A.  No, ma'am.
00:02 11    Q.  Where did you go to high school?
00:02 12    A.  I went to high school here in Brownsville at
00:02 13 James Pace.
00:03 14    Q.  Okay.  What year did you graduate?
00:03 15    A.  I graduated in '83.
00:03 16    Q.  After you graduated, what did you do?
00:03 17    A.  I went to school at Texas Southmost College for
00:03 18 a year.
00:03 19    Q.  And then what?
00:03 20    A.  And then I continued at The University of Texas
00:03 21 at Austin.
00:03 22    Q.  Did you graduate?
00:03 23    A.  I did graduate.
00:03 24    Q.  What year?
00:03 25    A.  I graduated in '88.

HILL & ROMERO
CERTIFIED COURT REPORTERS

8

00:03 1     Q.  With a degree in what?
00:03 2     A.  With a bachelor's degree in real estate.
00:03 3     Q.  Okay.  Did you work during college?
00:03 4     A.  Yes, I did.
00:03 5     Q.  What did you do?
00:03 6     A.  I worked for the Texas Employment Commission.
00:03 7     Q.  Doing what?
00:03 8     A.  I was -- I don't know exactly what the term
00:03 9  was, but administrator, part-time.
00:03 10    Q.  Doing what?
00:03 11    A.  We would process people's claims, help them
00:04 12 process their claims for unemployment.
00:04 13    Q.  Okay.
00:04 14    A.  And help people on their job search.
00:04 15    Q.  Okay.  And then once you graduated in '88, did
00:04 16 you continue with any more college?
00:04 17    A.  I continued in college in 1990.
00:04 18    Q.  Okay.  And what degree were you working on
00:04 19 then?
00:04 20    A.  On a master's degree in business.
00:04 21    Q.  Did you complete that?
00:04 22    A.  Yes, I did.
00:04 23    Q.  What year?
00:04 24    A.  I graduated in 19 -- when was it?  I have my
00:04 25 dates wrong.  I graduated in '90, so I'm going to

HILL & ROMERO
CERTIFIED COURT REPORTERS

9

1  subtract what I said before. I graduated in -- yeah, I
2  graduated in '90. So I started college in '88, which
3  means I went to school -- yeah, my dates are wrong by a
4  couple of years because I graduated in '90. I started
5  in '88.
6      Q. Where did you graduate from?
7      A. From University of North Texas in Denton.
8      Q. Okay. And you graduated with a master's in
9  business?
10     A. Yes, ma'am.
11     Q. In 1990?
12     A. In 1990.
13     Q. When did you start, two years prior?
14     A. I believe in '88.
15     Q. Okay. So from '88 to '90 you were in school?
16     A. Yes.
17     Q. Did you sit out between your undergrad and your
18  postgrad?
19     A. I did sit out, in the sense that I wasn't in
20  school.
21     Q. Right. For how long?
22     A. For about a year.
23     Q. Okay. So for one year. So you graduated with
24  a bachelor's from UT in about '87?
25     A. Yes, ma'am.

HILL & ROMERO
CERTIFIED COURT REPORTERS

10

1      Q. Okay.
2      A. That would be correct.
3      Q. I'm sorry?
4      A. That would be correct.
5      Q. What did you do for the one year when you
6  weren't going to college?
7      A. I taught at the college, taught at Texas
8  Southmost College.
9      Q. Okay. What did you teach?
10     A. I taught in the English literacy department.
11     Q. You had a degree in real estate and you taught
12  in English literacy?
13     A. Yes.
14     Q. Okay. So when you graduated in 1990, what did
15  you do?
16     A. When I graduated in 1990, I was hired by Texas
17  Instruments.
18     Q. Where?
19     A. Up in the Dallas area.
20     Q. And what were you hired to do?
21     A. I was a consultant in a program that Texas
22  Instruments used to upgrade the job skills of their
23  work force.
24     Q. Okay. And how long did you do that?
25     A. I did that for about three years.

HILL & ROMERO
CERTIFIED COURT REPORTERS

11

1      Q. This takes us to about 1993?
2      A. Yes, ma'am.
3      Q. And then did you change jobs?
4      A. No. Actually, I moved back home.
5      Q. Okay. Did you resign or were you fired from
6  Texas Instruments?
7      A. That was the -- no, I didn't get fired. If
8  anything, I was laid off because they were having a
9  reduction in force. And I volunteered to be a person
10  to be taken off because I had a desire to come back
11  home.
12     Q. Okay. So in 1993 you moved back to
13  Brownsville?
14     A. Yes, ma'am.
15     Q. And what did you do when you moved back?
16     A. I studied to -- studied for the insurance exam.
17  And consequently, I took the exam to get an insurance
18  license and that's what I started doing.
19     Q. When did you first get your insurance license?
20     A. I believe that was in May of '94.
21     Q. Was there a period where you were unemployed?
22     A. There was a brief period, yes, there was.
23     Q. When?
24     A. That was probably January through May.
25     Q. Of 1994?

HILL & ROMERO
CERTIFIED COURT REPORTERS

12

1      A. Yes, ma'am.
2      Q. Once you -- had you sold any insurance prior to
3  receiving your license in May of 1994?
4      A. No. I couldn't have done so. I didn't have a
5  license to do that.
6      Q. Okay. And what type of license did you get?
7      A. It was a -- called a Group 1 license.
8      Q. Which allows you to sell what type of
9  insurance?
10     A. Health and life.
11     Q. Okay. Did you have any other licenses for
12  insurance at this point?
13     A. No.
14     Q. Do you still have a Group 1 license?
15     A. Yes, ma'am.
16     Q. So you waited until after you got your license
17  in May of '94. And then what did you do as far as
18  employment?
19     A. I was an independent insurance agent.
20     Q. You had never done anything like that before;
21  is that right?
22     A. In the insurance field, no.
23     Q. Okay. So when you were an independent
24  insurance agent, what did you do to solicit business?
25     A. I would contact people at their homes and try

HILL & ROMERO
CERTIFIED COURT REPORTERS

00:09 1   to set up appointments to primarily ... life
00:09 2   insurance.
00:09 3       Q. How long did you do that?
00:09 4       A. I did that for probably about four to five
00:09 5   months.
00:09 6       Q. Then what happened?
00:09 7       A. I was asked to join AFLAC.
00:09 8       Q. Who asked you to join AFLAC?
00:09 9       A. An uncle of mine who had recently become
00:09 10  appointed with them.
00:09 11      Q. What was your uncle's name?
00:09 12      A. My uncle's name is Rudy Infante.
00:09 13      Q. During the four to five months when you were
00:09 14  selling insurance, who did you sell for?
00:10 15      A. I can't recall the names of all the companies,
00:10 16  but the one company that I did sell for was Combined
00:10 17  Underwriters.
00:10 18      Q. Did you receive appointments from all of these
00:10 19  insurance companies during that time period?
00:10 20      A. Well, that's what the law prescribes, yes.
00:10 21      Q. Okay. And then you were asked to join AFLAC by
00:10 22  your uncle, Rudy Infante. Right?
00:10 23      A. He's the one who suggested it, uh-huh.
00:10 24      Q. Okay. And then what did you do? You contacted
00:10 25  the company?

00:11 1   been soliciting?
00:11 2       A. The life insurance policies that I did prior,
00:11 3   that was basically going to somebody's home and meeting
00:12 4   somebody at their home and individually scheduling
00:12 5   appointments with them at their home. AFLAC is done
00:12 6   primarily at the work site. So instead of contacting
00:12 7   people's homes, we would concentrate on contacting
00:12 8   businesses.
00:12 9       Q. Okay. When you say "we," what do you mean by
00:12 10  we at that point in time?
00:12 11      A. I would say some of the other people that may
00:12 12  have been contracted with AFLAC at the time.
00:12 13      Q. Was that here in Brownsville?
00:12 14      A. No. There was nobody in Brownsville that I can
00:12 15  recall.
00:12 16      Q. Okay. So when you say "we," did you take
00:12 17  people that were like your uncle or other people?
00:12 18      A. It's possible that -- my uncle. It's possible
00:12 19  there was other people who were new, like myself. And
00:12 20  so that it wasn't so intimidating, we would maybe go
00:12 21  together.
00:12 22      Q. And who can you recall having gone with back in
00:12 23  '94, '95 --
00:12 24      A. I can't recall anybody.
00:12 25      Q. -- that were new people?

14

):10 1    A. I met with the people who were in charge of the
00:10 2   Valley area.
00:10 3       Q. Who were they?
00:10 4       A. Two people by the name of -- a husband and wife
00:10 5   team. One is Mario Davila, and the other one is
00:10 6   Antonia Davila.
00:11 7       Q. Where are they out of?
00:11 8       A. They office out of McAllen.
00:11 9       Q. At that time, AFLAC had other people that were
00:11 10  associated in the Brownsville office; is that right?
00:11 11      A. They didn't have a Brownsville office.
00:11 12      Q. They had no Brownsville office?
00:11 13      A. No.
00:11 14      Q. Where was your uncle selling?
00:11 15      A. He lives up in the Lyford, Willacy County area.
00:11 16      Q. Okay. And you were appointed with AFLAC in
00:11 17  October of '94?
00:11 18      A. I believe that's correct.
00:11 19      Q. October 3rd, 1994?
00:11 20      A. That's about correct.
00:11 21      Q. And then what did you start doing that was
00:11 22  different from what you had been doing in the past?
00:11 23      A. We started soliciting AFLAC policies.
00:11 24      Q. Okay. And how was that different than
00:11 25  soliciting the life insurance policies that you had

16

00:13 1       A. I can't recall anybody.
00:13 2       Q. Who is the first person you can recall that
00:13 3   joined up -- that was appointed by AFLAC that was in
00:13 4   the Brownsville area after you?
00:13 5       A. I can't recall they appointed anybody in the
00:13 6   Brownsville area until I was -- until I became a
00:13 7   manager with them.
00:13 8       Q. Okay. Did you have people working for you,
00:13 9   working under you?
00:13 10      A. I would say with me, sure, and I was their
00:13 11  coordinator. But I was learning the business as I went
00:13 12  as well.
00:13 13      Q. What did AFLAC do to teach you the business?
00:13 14  How did you learn to do this?
00:13 15      A. You know, I don't think they taught me
00:13 16  anything. I think they maybe just showed me, hey, this
00:13 17  is a system that can work, and that's about it. And I
00:13 18  just tried to follow that system, and it did work.
00:13 19      Q. Okay. What was the system?
00:14 20      A. Well, it was basically contacting people at
00:14 21  their place of business and offering voluntary products
00:14 22  on a supplemental side of the business.
00:14 23      Q. Tell me the voluntary products on the
00:14 24  supplemental side of the business that you were
00:14 25  offering to people.

17

00:14 1    A. There's a bunch of them, but -- I wouldn't say
00:14 2 a bunch, but there's a few of them. There was cancer
00:14 3 policies, there were hospital indemnity policies, there
00:14 4 were accident policies, life insurance, and disability,
00:14 5 intensive care. And that's about what I can remember.
00:14 6    Q. Okay. And these policies were in addition to
00:14 7 the policies that the employees already had,
00:15 8 supplemental?
00:15 9    A. They were all considered supplemental. That
00:15 10 was the name that people would give it, but having
00:15 11 another policy was not a requirement.
00:15 12    Q. They could be primary policies?
00:15 13    A. Not very good primary policies, but, yeah, they
00:15 14 could be primary if somebody didn't have any other
00:15 15 thing.
00:15 16    Q. Now, you weren't restricted from selling these
00:15 17 products -- going to the work site? You could do the
00:15 18 same thing? You could call people and go to their
00:15 19 house also if you chose to do that. Right?
00:15 20    A. Not exactly.
00:15 21    Q. Why not?
00:15 22    A. Not all the policies that AFLAC sold were
00:15 23 available outside of payroll. As a matter of fact,
00:15 24 most of them were available only on payroll.
00:15 25    Q. And what do you mean by that?

HILL & ROMERO
CERTIFIED COURT REPORTERS

18

00:15 1    A. Well, if somebody didn't buy it at their place
00:15 2 of business, they couldn't buy it.
00:15 3    Q. Why couldn't they buy it?
00:15 4    A. That was the company's guidelines or their
00:15 5 rules for the purchase of a policy.
00:15 6    Q. What was the rule?
00:16 7    A. I don't know. I mean, it was just you couldn't
00:16 8 do it outside of payroll.
00:16 9    Q. On all of those policies?
00:16 10    A. On the majority of them, yes.
00:16 11    Q. Which ones could you do outside of payroll?
00:16 12    A. I think the only one that you could is the
00:16 13 cancer policy, and it was at a higher price also.
00:16 14    Q. Okay. And that was just AFLAC guidelines; is
00:16 15 that right?
00:16 16    A. Yes, ma'am.
00:16 17    Q. Did you ever question it?
00:16 18    A. No.
00:16 19    Q. Okay. So what was the first account -- or the
00:16 20 first work site that you went to where you were allowed
00:16 21 to go in and enroll these people?
00:17 22    A. I would say it was the Lyford Independent
00:17 23 School District.
00:17 24    Q. And that was in conjunction with your uncle?
17 25    A. Yes.

HILL & ROMERO
CERTIFIED COURT REPORTERS

19

00:17 1    Q. Okay. And that was back in 1994?
00:17 2    A. Yes, ma'am.
00:17 3    Q. Okay. Is that where you kind of learned the
00:17 4 ropes?
00:17 5    A. Pretty much, yes.
00:17 6    Q. And then what was the next work site that you
00:17 7 were allowed to go to?
00:17 8    A. I don't remember. But if I had to state one,
00:17 9 it was probably McAllen Independent School District.
00:17 10    Q. That was in conjunction with someone else?
00:17 11    A. That was in conjunction with the Davilas, who I
00:17 12 mentioned earlier.
00:17 13    Q. Okay. How about after that?
00:17 14    A. I would say the County of Hidalgo.
00:17 15    Q. Again, with the Davilas?
00:17 16    A. Uh-huh.
00:18 17    Q. Is that yes?
00:18 18    A. Yes.
00:18 19    Q. When was the first time you started with
00:18 20 somebody in the Brownsville area, in Cameron County,
00:18 21 besides Lyford?
00:18 22    A. Started in what sense?
00:18 23    Q. You went to a work site and you talked to these
00:18 24 people.
00:18 25    A. I don't recall the date. I don't know when.

HILL & ROMERO
CERTIFIED COURT REPORTERS

20

00:18 1    Q. '94, '95, were you just working for AFLAC or
00:18 2 were you continuing to sell life insurance through
00:18 3 those other companies that you had appointments with?
00:18 4    A. I was continuing to work for other carriers, so
00:18 5 I wasn't doing AFLAC full time.
00:18 6    Q. Did there come a point where you did start
00:18 7 doing AFLAC full time?
00:18 8    A. Yes, ma'am.
00:18 9    Q. When was that?
00:18 10    A. That was -- I believe it was in 1999. It was
00:19 11 the first year that we did the school district,
00:19 12 Brownsville ISD.
00:19 13    Q. Prior to working full time with AFLAC, did you
00:19 14 go to BISD and sell products at times?
00:19 15    A. No.
00:19 16    Q. Before 1999, you never sold any products at
00:19 17 BISD?
00:19 18    A. No, ma'am.
00:19 19    Q. What were you doing before 1999 to make a
00:19 20 living? Who were you selling to?
00:19 21    A. A combination of what I was doing before
00:19 22 joining AFLAC, which was selling individual policies of
00:19 23 different types and also doing AFLAC enrollments.
00:19 24    Q. Okay. Were your -- and your AFLAC enrollments
00:20 25 made up how much of -- like say in 1998, how much

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 21

00:20 1 percentage of your income was from ... LAC enrollments?
00:20 2      A.  In 1998, I would say -- I would say the
00:20 3 majority of it.  I couldn't -- I really honestly
00:20 4 couldn't tell you exactly how much, but if I just had
00:20 5 to guess, I would say probably 60 to 70 percent.
00:20 6      Q.  And the remainder was doing individual
00:20 7 policies?
00:20 8      A.  Group health insurance and then policies of all
00:20 9 types within the family of health and life.
00:20 10      Q.  Okay.  That was the other 30 to 40?
00:20 11      A.  Yes, ma'am.
00:20 12      Q.  Who did you -- who were you doing AFLAC
00:20 13 enrollments with in 1998?
00:20 14      A.  I was doing them with just me, myself, and I.
00:20 15      Q.  I understand you were doing that alone, but
00:20 16 what companies were you going to?
00:21 17      A.  We were going to -- I can name a few of them.
00:21 18 I can name Brownsville Zoo, Luke Fruia Motors, Don
00:21 19 Johnson Motors, Brownsville Community Health Center.
00:21 20 And that's what I can -- that's what I can remember.
00:21 21      Q.  Okay.  In 1999, when you became -- that's when
00:21 22 you became the TPA, or that's when AFLAC became the
00:21 23 TPA.  Right?
00:21 24      A.  I believe so.
00:21 25      Q.  Is that correct?  Besides BISD, what other

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 22

0:21 1 companies were you going to for enrollment in '99?
00:21 2      A.  I believe that's when we also started the City
00:22 3 of Brownsville.
00:22 4      Q.  Okay.  So you had the four places that you
00:22 5 named in 1998 plus the City of Brownsville and BISD in
00:22 6 1999?
00:22 7      A.  Uh-huh.
00:22 8      Q.  Is that a yes?
00:22 9      A.  Yeah.  There were others.  Those are just the
00:22 10 ones I can remember.
00:22 11      Q.  And how about in 2003?  What companies are you
00:22 12 doing enrollments for for AFLAC?
00:22 13      A.  None.
00:22 14      Q.  Okay.
00:22 15      A.  None.  No, I take that back.  We did do an
00:22 16 enrollment for the City of Brownsville, but that was --
00:22 17 that was at the end of 2002.
00:22 18      Q.  Okay.
00:22 19      A.  In 2003, I don't believe I have done any AFLAC
00:22 20 enrollments.
00:22 21      Q.  How about in 2002?  Did you do anybody besides
00:22 22 the City of Brownsville?
00:22 23      A.  I can't recall that I did.
00:22 24      Q.  What about the Brownsville Zoo?
2 25      A.  No.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 23

00:23 1      Q.  Luke Fruia Motors?
00:23 2      A.  No.
00:23 3      Q.  Don Johnson?
00:23 4      A.  No.
00:23 5      Q.  Brownsville Community Health Center?
00:23 6      A.  I believe, yes, on that one.
00:23 7      Q.  And that was with AFLAC?
00:23 8      A.  That was AFLAC in conjunction with other
00:23 9 carriers as well.
00:23 10      Q.  Let's see.  1999, I asked you about.  2000, who
00:23 11 were you doing enrollments with, what companies?
00:23 12      A.  In 2000?
00:23 13      Q.  Yes.
00:23 14      A.  Just BISD.
00:23 15      Q.  That's it?
00:23 16      A.  My job was different.
00:23 17      Q.  Okay.
00:23 18      A.  In -- when I became a full-time AFLAC agent,
00:24 19 truly full-time is when I was a regional manager with
00:24 20 them.
00:24 21      Q.  And when were you appointed as regional
00:24 22 manager?
00:24 23      A.  That happened right prior to the signing on of
00:24 24 Brownsville ISD, or it pretty much coincided with that
00:24 25 time.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 24

00:24 1      Q.  So that was in 1999?
00:24 2      A.  I believe so, ma'am.  And we actually did the
00:24 3 enrollment, I believe, in '98, which was -- the time
00:24 4 frame was the November/December time frame of '98.  But
00:24 5 policies began, I believe, January the 1st of '99.
00:24 6      Q.  Okay.  And what changed?  How did your job
00:24 7 change?
00:24 8      A.  My job function was not doing the opening of
00:25 9 new groups, but it was supervising agents and creating
00:25 10 growth to our group of -- to our region.
00:25 11      Q.  Okay.  Up until 1998 you were the only agent;
00:25 12 is that right?
00:25 13      A.  In Brownsville?
00:25 14      Q.  Yes.
00:25 15      A.  No.  No.  I would be lying if I told you that,
00:25 16 because I knew there were some other people.  I just
00:25 17 can't recall who they were.
00:25 18      Q.  You didn't work with them at all?
00:25 19      A.  Very little, if any.  I can name you one
00:25 20 gentleman whose name I remember.  His name was Italo
00:25 21 Zarate.
00:25 22      Q.  Okay.
00:25 23      A.  And he was part-time.
00:25 24      Q.  And then something changed when -- after you
00:25 25 started doing the cafeteria plan for BISD; is that

HILL & ROMERO
CERTIFIED COURT REPORTERS

25

```
00:28  1   right?
00:28  2       A.  Yes.
00:26  3       Q.  And you got more agents?
00:26  4       A.  Well, no.  BISD consumed probably 90 percent of
00:26  5   my time, if not more, so my job was to pretty much make
00:26  6   sure that everything was handled correctly at BISD as
00:28  7   far as what we did for them.  So my job -- my focus
00:28  8   changed.
00:29  9       Q.  But you said you were supervising other agents.
00:28 10   Where were these other agents from?
00:26 11       A.  They were agents that were throughout the
00:26 12   Valley.
00:26 13       Q.  It wasn't just in Brownsville?
00:26 14       A.  No.
00:26 15       Q.  Okay.  And these are agents that would come in
00:26 16   to do the enrollments; is that right?
00:26 17       A.  Yes.  Some of them, if I chose to invite them,
00:26 18   yes, they were invited to attend the enrollments.
00:26 19       Q.  You had a say-so on who came down and who
00:27 20   didn't?
00:27 21       A.  Yes.
00:27 22       Q.  That was left to your discretion?
00:27 23       A.  Pretty much, yes.
00:27 24       Q.  You could choose to say, okay, you can come
00:27 25   down, and you can't come down; is that right?
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

26

```
:27  1       A.  Because it was my account and my personal
00:27  2   responsibility, yes, I could do that.
00:27  3       Q.  Okay.  And it was the account that you had been
00:27  4   assigned to by AFLAC.  Right?
00:27  5       A.  No.  It was an account that I initiated for
00:27  6   AFLAC.
00:27  7       Q.  Okay.  So you -- okay.  When you say
00:27  8   "enrollments," can you define that for me?  What do you
00:27  9   mean by you were doing enrollments?
00:27 10       A.  Enrollments would mean the presentation of the
00:27 11   AFLAC products to employees.
00:27 12       Q.  Okay.  You're going to have to bear with me.
00:27 13   What's the difference between the AFLAC products and
00:27 14   the cafeteria plan?  Is that the same thing?
00:27 15       A.  No, not exactly.
00:28 16       Q.  Well, let's -- differentiate it for me.
00:28 17       A.  Okay.  The cafeteria plan is a part of the
00:28 18   internal revenue code called Section 125.  And what it
00:28 19   means when you do a cafeteria plan enrollment is that
00:28 20   you give employees an explanation as to what a
00:28 21   cafeteria plan is and how it works and what are the
00:28 22   pros and cons of signing up for a cafeteria plan.  And
00:28 23   it's also a collection of paperwork that we need to do
^0:28 24   on every employee to comply with the regulations.
  :9 25       Q.  Which say what?
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

27

```
00:29  1       A.  I couldn't tell you verbatim what it says, but
00:29  2   it says that you -- employers need to make an attempt
00:29  3   every year to disseminate Section 125 information to
00:29  4   every employee and to collect necessary paperwork on
00:29  5   every employee.
00:29  6       Q.  Okay.  And that's something that the employers
00:29  7   need to comply with?
00:29  8       A.  That is something that, if an employer decides
00:29  9   to participate in the cafeteria plan, to set one up for
00:29 10   the benefit of their employees, that they make an
00:29 11   attempt every year to do so.
00:29 12       Q.  Well, you still haven't told me what a
00:29 13   cafeteria plan is.
00:29 14           MR. AGUILAR:  Objection; argumentative and
00:29 15   mischaracterizing the evidence.  Go ahead.
00:29 16       Q.  No.  I don't understand what a cafeteria plan
00:29 17   is.  I mean, based on what you said, why is that
00:29 18   different than the supplemental insurance that you have
00:29 19   described to me as the AFLAC products?
00:29 20       A.  Okay.  If we went to an employer to help
00:30 21   service their cafeteria plan, we would do all the
00:30 22   explaining.  We would do all the collection of
00:30 23   paperwork, and not necessarily sell products for the
00:30 24   type that might be available under a cafeteria plan.
00:30 25   For instance, if you bought health insurance at your
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

28

```
00:30  1   employment, or through your employer, and you paid
00:30  2   something out of your pocket for it, then we would ask
00:30  3   you, through the collection of paperwork on a yearly
00:30  4   basis, if you wanted to put that under your cafeteria
00:30  5   plan.  And so we would have to document that with every
00:30  6   employee.  That's the first thing.
00:30  7           The second thing is that there's two other
00:30  8   facets to a cafeteria plan that are even more
00:30  9   complicated.  Basically, a cafeteria plan is just
00:30 10   pre-taxing the -- some of the benefits that are
00:30 11   available to be pre-taxed under your payroll system.
00:31 12   And two of the most common would be your health and
00:31 13   your dental insurance.  Two other areas that are also
00:31 14   available are something called the dependent care and
00:31 15   the unreimbursed medical.  And those -- again, we would
00:31 16   have to explain what those things were and then collect
00:31 17   information on those things to deliver to the employer.
00:31 18       Q.  Okay.  When you are doing that, you are not
00:31 19   necessarily making any money on enrollments?
00:31 20       A.  Nothing.
00:31 21       Q.  Okay.
00:31 22       A.  Nothing.  We would do that as a courtesy in
00:31 23   exchange for allowing us to sell our voluntary
00:31 24   products.
00:31 25       Q.  The supplemental insurance that you described
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

**29**

1  to me earlier?
2      A.  Yes, ma'am.
3      Q.  Okay.  For instance, when you went to Lyford,
4  the first place you went to, how did you go about doing
5  this?  Was this mandatory presentations or
6  non-mandatory?
7      A.  They are -- we didn't do the cafeteria plan at
8  Lyford.
9      Q.  Okay.  Where is the first place that you did a
10  cafeteria plan?
11      A.  I can't remember.  I can't tell you.
12      Q.  Was it before BISD?
13      A.  Oh, yes, definitely.
14      Q.  Was it in McAllen?
15      A.  Honestly, I can't tell you.  I don't remember.
16      Q.  How long ago was it?
17      A.  It was probably within a year of starting with
18  AFLAC.
19      Q.  Okay.
20      A.  Within my first year.
21      Q.  So in approximately 1995 or 1996.  You don't
22  remember how -- how about City of Brownsville?  Did you
23  do the cafeteria plan for them?
24      A.  Yes, we sure did.
25      Q.  And that was prior to BISD.  Right?

**30**

1      A.  I don't remember the date, but it was around
2  the same time as BISD.
3      Q.  How did you present this information to the
4  employees there?
5      A.  We would hold meetings with employees when
6  possible.  And if that was not possible, we would just
7  set up in some area that the City would ask us to set
8  up, and we would talk to employees on a one-to-one
9  basis and explain what their current benefits were and
10  what a cafeteria plan was and, in addition, what were
11  the other supplementals that we had to offer.
12      Q.  Okay.  And that's what you also did for BISD.
13  Right?
14      A.  Yes, ma'am.
15      Q.  Who was doing it before you?
16      A.  I believe it was a company called National Plan
17  Administrators.
18      Q.  Do you know how many years they had done it?
19      A.  No, ma'am.
20      Q.  Who was the agent that they used there?
21      A.  I believe it was a gentleman by the name of
22  Arnie Olivarez.
23      Q.  Okay.  Do you know how many years -- you don't
24  know how many years Mr. Olivarez had been doing it?
25      A.  No, I don't.

**31**

1      Q.  And I gather from your discovery you believe
2  Mr. Olivarez was being paid for his services as TPA?
3      A.  I believe so.
4      Q.  Okay.  How much do you believe he was being
5  paid?
6      A.  I can't recall the amount.  If I had to -- if I
7  had to say, it was probably $30,000 or so.
8      Q.  But you don't know the amount?
9      A.  No, ma'am.
10      Q.  And that was on a yearly basis that it was
11  supposedly paid to him?
12      A.  It wasn't paid to him.  It was paid to National
13  Plan Administrators.
14      Q.  Because that's the TPA, National Plan
15  Administrators?
16      A.  Yes, ma'am.
17      Q.  Not the agent?
18      A.  Not the agent, correct.
19      Q.  Okay.  And you don't know the amount, if any,
20  that was paid to them?
21      A.  I don't remember the exact amount, no.
22      Q.  Okay.  And then you came in in 1998 and you
23  submitted a bid for this or a quote?
24      A.  I don't know if it was a bid or a quote, but it
25  was -- we submitted a proposal.

**32**

1      Q.  A proposal?
2      A.  Based on their request to accept proposals.
3      Q.  And instead of taking Mr. Olivarez, they went
4  with AFLAC; is that right?
5      A.  My understanding was Mr. Olivarez no longer
6  wanted that position.
7      Q.  Okay.  So your company got it, AFLAC got it.
8  Right?
9      A.  I got it.
10      Q.  Well, if we look at the proposal, does the
11  proposal say Dino Chavez or does it say AFLAC?
12      A.  It says both.
13      Q.  Okay.  Well, you weren't selling -- you didn't
14  have any products yourself, you had products through
15  AFLAC; is that right?
16      A.  Yes, ma'am.
17      Q.  Okay.  So they went with AFLAC, and I'm a new
18  employee at the district.  What would you have done for
19  me?
20      A.  Okay.  Well, first of all, they didn't go with
21  AFLAC.  They went with me.
22          MS. NEALLY:  Object to the responsiveness
23  of the answer.
24          MS. LEEDS:  Join.
25          MR. AGUILAR:  Objection; argumentative.

33

00:35 1    MS. NEALLY: Objection, .gumentative?

00:35 2    MR. AGUILAR: Yes.

00:35 3    MS. NEALLY: He's being argumentative.

00:36 4    MR. AGUILAR: When you're characterizing

00:36 5  something a certain way that he disagrees with, and he

00:36 6  clarifies your characterization --

00:36 7    MS. NEALLY: That wasn't my question.

00:36 8    MR. AGUILAR: -- and then you argue

00:36 9  back --

00:36 10    MS. NEALLY: If you read back my question,

00:36 11  Mr. Aguilar, you will find that --

00:36 12    MR. AGUILAR: If I could --

00:36 13    MS. NEALLY: He's being argumentative.

00:36 14  And he's been argumentative throughout this entire

00:36 15  thing. I've been very polite, but I would like to get

00:36 16  on with this deposition.

00:36 17    MR. AGUILAR: Let me know when you're

00:36 18  finished, because I would like to finish mine.

00:36 19    MS. NEALLY: That's fine.

00:36 20    MR. AGUILAR: I was saying why you were

00:36 21  being argumentative, because you challenged my

00:36 22  characterization. I'm explaining that for the record,

00:36 23  and that is what I was saying he was doing. He was

00:36 24  explaining his characterization -- or your

00:36 25  characterization of what he was saying. He's entitled

HILL & ROMERO
CERTIFIED COURT REPORTERS

34

:38 1  to do that. And when you come back and challenge him

00:36 2  and chastise him by saying argumentative -- or I'm

00:36 3  mischaracterizing, that's where I'm saying you're being

00:36 4  argumentative. He's allowed to testify to what he

00:36 5  believes. With that --

00:36 6    MS. NEALLY: You know, up until now I have

00:36 7  not said a word about him being argumentative. I

00:36 8  didn't bring up the word "argumentative." You did.

00:36 9    MR. AGUILAR: Okay.

00:36 10    MS. NEALLY: Okay? And so when we have

00:36 11  this discussion, and when he is disagreeing with my

00:36 12  characterization, I just did a formal objection for the

00:37 13  record, where I said, object to the responsiveness of

00:37 14  the answer. That is a standard objection. And I'm not

00:37 15  going to have my questioning interrupted with you

00:37 16  saying argumentative when the question that I asked had

00:37 17  nothing whatsoever to do with the characterization of

00:37 18  him. I said, I'm a new client at the district. Please

00:37 19  tell me what you would tell me about your product.

00:37 20  That has nothing to do with characterizing whether it

00:37 21  was him or AFLAC that had the contract. So I'm going

00:37 22  to -- you know, if we're going to do that, we're going

00:37 23  to go off the record and we'll just stop the

00:37 24  deposition.

7 25    MR. AGUILAR: If you want to stop the

HILL & ROMERO
CERTIFIED COURT REPORTERS

35

00:37 1  deposition, that's fine. If I feel I need to object,

00:37 2  I'm going to object. All I said was, objection;

00:37 3  argumentative --

00:37 4    MS. NEALLY: Well, that's --

00:37 5    MR. AGUILAR: -- and that's where we took

00:37 6  it --

00:37 7    MS. NEALLY: Let's just --

00:37 8    MS. LEEDS: Hang on. She objected to

00:37 9  nonresponsive. That's a proper objection. A

00:37 10  nonresponsive objection is not an argumentative

00:37 11  objection. Okay? You can object to her question as

00:37 12  being argumentative. You cannot object to her

00:37 13  objection. And we're going to go on forever if we do

00:38 14  this. So let's just get on with it.

00:38 15    MR. AGUILAR: And I appreciate your

00:38 16  instructing me on the law. Really, I do. But I have

00:38 17  to make my objection based on what I feel is

00:38 18  appropriate. We're not going to get an answer today.

00:38 19    MS. LEEDS: Obviously.

00:38 20    MR. AGUILAR: I have to submit my

00:38 21  objections.

00:38 22    MS. LEEDS: But this is going to go

00:38 23  forever if you two are going to get into it all --

00:38 24    MS. NEALLY: And it's going to go forever

00:38 25  if your client continues to be argumentative. I have

HILL & ROMERO
CERTIFIED COURT REPORTERS

36

00:38 1  not addressed him as being argumentative. Just answer

00:38 2  the question. That's all I'm trying to do.

00:38 3    MR. AGUILAR: He's answering the questions

00:38 4  as best he can.

00:38 5    MS. LEEDS: He doesn't have to stick stuff

00:38 6  in there. That's when we have to object. When he

00:38 7  sticks stuff in there, we object.

00:38 8    MR. AGUILAR: And if you feel you have a

00:38 9  need to object, you object. If I feel I have a need to

00:38 10  object, I object. All I said is one --

00:38 11    MS. LEEDS: I hope you're planning to stay

00:38 12  a long time.

00:38 13    MR. AGUILAR: -- word, and I didn't mean

00:38 14  to draw this out. If you would like to continue, feel

00:38 15  free to.

00:38 16    Q.  I'm a new client. You have got the account.

00:38 17  Right?

00:38 18    A.  (Moving head up and down).

00:38 19    Q.  AFLAC has the account. Whatever you want to

00:38 20  say about it, however you want to do it. Let's just

00:38 21  have a standing understanding that when I say AFLAC has

00:39 22  the account, you're going to think that it's -- Dino

00:39 23  Chavez has got the account. Okay?

00:39 24    A.  Okay.

00:39 25    Q.  That's your impression. My impression is

HILL & ROMERO
CERTIFIED COURT REPORTERS

37

A. AFLAC. Okay? Can we have that agreement?

A. That's understood.

Q. Okay. So you come in, AFLAC comes in, TPA, 1998. You're enrolling me for BISD. What are you going to tell me? I'm a teacher there.

A. I'm going to tell you exactly what I just said a little while ago, which we are going to sit down with you and we are going to explain to you what a cafeteria plan is and how it could benefit you and answer your questions as to what you -- what your questions are about a cafeteria plan, how it works, et cetera.

Q. Okay. What's a cafeteria plan?

A. What I just explained to you earlier.

Q. No. I'm an employee. I mean, tell me. I still don't understand really what a cafeteria plan is. What you told me earlier -- and I don't want to go into that. I want you to tell me. I don't understand. What's a cafeteria plan?

A. Okay. Well, first of all, I don't mean to be argumentative. I mean, if I'm coming across that way, I'm not trying to be. I just want to make sure you know the facts as I know them. And if you would go back and repeat the question, you did say AFLAC. And so just to correct you, I was saying that. I don't mean any -- to be argumentative.

HILL & ROMERO
CERTIFIED COURT REPORTERS

38

MS. LEEDS: Objection; nonresponsive.

MS. NEALLY: Objection; nonresponsive.

A. I can explain to you once again what a cafeteria plan is. It is basically the pre-taxing of some of the benefits that are available to you at work.

Q. And what's that? What is that pre-taxing of the benefits that are available to me at work? What are the benefits that are available to me?

A. If, for instance, you were paying $100 for your health insurance, and you said, put that under the cafeteria plan for me, you would end up saving -- whatever your marginal tax rate was, you would save about that much on the cost of your health insurance.

Q. I'm a teacher in 1998. I make $30,000 with BISD. What's the benefit to me for this pre-taxing? What's pre-taxing?

A. Okay. If you'd like, I can show it to you, but of course that's not going to show up on here, but I --

Q. Sure it is.

A. -- can show you on paper.

Q. We'll attach it as an exhibit. Is that how you would do it with me if I was an employee?

A. Yes, what would.

Q. That's what I want you to think of me, as an employee.

HILL & ROMERO
CERTIFIED COURT REPORTERS

39

A. We had actual paperwork that had it already detailed, and then we would add maybe any examples that were pertinent to that person. But I can show you a for instance.

Q. Okay.

A. If a person was making $1,000 a paycheck, just to have a simple amount --

Q. Okay.

A. -- that person would pay approximately 25 percent in tax, their Medicare tax, FICA tax, withholding, et cetera. So everything together, a person would roughly pay about 25 percent of tax if they were at the lower tax rate. So on $1,000, a person would pay $250 in taxes.

Q. Okay.

A. Okay? Now, we would be left with $750. If that person was spending $100 currently on their dental or their health insurance or any insurance that was available under the cafeteria plan, then we would subtract the $100 from the amount after we deducted the taxes. So in this example, if we subtracted 250, we are left with 750. Then we subtract another $100 for insurance. We would be left with $650 in take-home pay. Now, the difference, under a cafeteria plan, is that that $1,000 that we start off with as total income

HILL & ROMERO
CERTIFIED COURT REPORTERS

40

is reduced by whatever you are spending in qualifying benefits that are -- that can be put under a cafeteria plan. So in this example, it's $100 I can put under the cafeteria plan because that's what I'm spending in health insurance. I would subtract that from 1,000 and then my taxable income would now become $900 instead of $1,000 on the prior example. So at the same tax rate of 25 percent, now my taxes are only 225, as compared to 250 without a cafeteria plan. And when you do the math, you end up taking home $675 instead of $650. And as I said earlier, what you are saving is about what your marginal tax rate is as a function of your insurance costs. So if you're spending $100, your marginal tax rate is 25, you end up saving about $25, which is the amount that your take-home pay goes up, from 650 to 675. And I can give you --

Q. Okay. What's the downside of that for my -- as an employee?

A. The downside of it is that you have to abide by the guidelines, which say that you cannot cancel any policy that you put under a cafeteria plan unless there's a qualifying event to do so.

Q. Like what?

A. Like, for example, there's a death in the family, there's a birth in the family, there is a

HILL & ROMERO
CERTIFIED COURT REPORTERS

**41**

00:44 1  change in job status for your spouse.
00:44 2      Q.  Okay.
00:44 3      A.  And so that's about the only downside.  The
00:44 4  other downside is it does reduce your Social Security
00:44 5  benefits by a tad, a very small fraction, which is
00:44 6  really insignificant, but that would be another
00:44 7  downside.
00:44 8      Q.  Like how much does it reduce my Social
00:44 9  Security?
00:44 10     A.  You would have to ask an actuary to find out
00:44 11 the right amount, but was it very, very, very small.
00:44 12         MS. LEEDS:  Can the insurance company
00:44 13 cancel?
00:44 14         THE WITNESS:  Can what insurance company
00:44 15 cancel?
00:44 16         MS. LEEDS:  The ones that you're -- I'm
00:44 17 sorry.  We did this in the other one.  But just to be
00:44 18 easier here, the ones that you are paying for me, that
00:44 19 $100 goes to insurance companies.  Right?
00:44 20         THE WITNESS:  The $100 is an example of
00:44 21 that's what you were spending out of your pocket --
00:44 22         MS. LEEDS:  Correct.
00:44 23         THE WITNESS:  -- for the coverage.
00:44 24         MS. LEEDS:  And who do you pay that to?
00:44 25         THE WITNESS:  You pay that to your

HILL & ROMERO
CERTIFIED COURT REPORTERS

**42**

:45 1  employer.  And the employer, in turn, pays the bill to
00:45 2  the insurance company when they submit a bill for that
00:45 3  coverage.
00:45 4          MS. LEEDS:  Right.  So can that -- I can't
00:45 5  cancel.  Can that insurance company cancel?
00:45 6          THE WITNESS:  I suppose they could, but I
00:45 7  know there's guidelines in Texas that say you can't do
00:45 8  certain things.
00:45 9      Q.  Okay.  Here's what I don't understand.  What's
00:45 10 in it for you?  If I opt to go with the cafeteria plan,
00:45 11 what's in it for you?  What's in it for AFLAC?
00:45 12     A.  Well, the only thing that's in it for us is the
00:45 13 ability to talk to employees.
00:45 14     Q.  About the supplemental benefits?
00:45 15     A.  Correct.
00:45 16     Q.  There's no benefit for you or for AFLAC with
00:45 17 the cafeteria plan itself?  Because the cafeteria plan
00:45 18 is actually the plan that the school district has
00:45 19 elected to give to its employees; is that correct?
00:45 20     A.  That is correct.
00:45 21     Q.  All right.
00:45 22     A.  That's correct.  And the only other benefit to
00:45 23 me as a salesperson is the notoriety of doing one of
00:45 24 the largest accounts for AFLAC in the State of Texas.
8 25  So the notoriety of doing it enables us to do more

HILL & ROMERO
CERTIFIED COURT REPORTERS

**43**

00:46 1  business in the Valley area because of that connection.
00:46 2      Q.  Okay.  Now --
00:46 3          MR. STEELE:  Can I jump in with one
00:46 4  clarifying point?
00:46 5          MS. NEALLY:  I'll -- go ahead.
00:46 6          MR. STEELE:  I think it may help out.
00:46 7  With regards to the $100 that's set aside from an
00:46 8  employee's pay who has elected a cafeteria plan, if I
00:46 9  understand correctly, that can also be used to pay for
00:46 10 dependent child care and unreimbursed medical expenses.
00:46 11 Correct?
00:46 12         THE WITNESS:  Yes and no.  If I could
00:46 13 clarify that point.
00:46 14         MR. STEELE:  Okay.
00:46 15         THE WITNESS:  I said earlier that there
00:46 16 was a very simple example to show you, and that's
00:46 17 basically just taking your insurance premiums and
00:46 18 deducting them from your pay to circumvent taxes.  You
00:46 19 can also do that for dependent care and for
00:46 20 unreimbursed medical.
00:46 21     Q.  And those are supplemental benefits.  Right?
00:46 22     A.  Those are not supplemental benefits.  They are
00:46 23 just elections that people make.  And they say -- for
00:47 24 instance, if you had children in day care, you could
00:47 25 say, well, I want to put away X amount of dollars to

HILL & ROMERO
CERTIFIED COURT REPORTERS

**44**

00:47 1  pay for my day care, and I want my employer to subtract
00:47 2  it from my paycheck so that I can circumvent taxes.
00:47 3  The whole reason for participating in a cafeteria plan
00:47 4  is to circumvent taxes.  You can -- you could write off
00:47 5  100 percent of what you are spending in day care.  So
00:47 6  if you were spending $1,000 in day care and you told
00:47 7  your employer to take it out of your check, and then
00:47 8  you got reimbursed as you paid the expense, you would
00:47 9  save whatever -- your marginal tax rate on your day
00:47 10 care expense, so about $250 out of every 1,000.
00:47 11     Q.  Okay.
00:47 12         MR. STEELE:  And if you don't use that
00:47 13 kitty for the dependent child care and unreimbursed
00:47 14 medical expenses that you have set aside, you lose it
00:47 15 at the end of the year; is that correct?
00:47 16         THE WITNESS:  That is correct.  That is
00:47 17 correct.  So the explanation that we would give
00:47 18 employees had to be pretty detailed, especially when it
00:47 19 came to that part of the cafeteria plan.  They would
00:47 20 have to understand if I don't use this, I lose it.  So
00:48 21 we had to be real cautious as to how much they
00:48 22 allocated to those pots of money.
00:48 23         MR. STEELE:  For our purposes, in the
00:48 24 instance that you just testified to regarding the $100,
00:48 25 that $100, if I understand correctly, represented

HILL & ROMERO
CERTIFIED COURT REPORTERS

45

00:48 1   solely insurance premiums. Correct.
00:48 2              THE WITNESS: Yes, sir.
00:48 3              MR. STEELE: So if that's paid out,
00:48 4   obviously you are going to use it. So you won't lose
00:48 5   it. Correct?
00:48 6              THE WITNESS: Yeah. There's nothing to
00:48 7   lose by putting insurance premiums on a cafeteria plan
00:48 8   because there's not a use-it-or-lose-it rule. You
00:48 9   know, if you don't use your insurance, well, so what?
00:48 10  The company keeps the money anyway, regardless if it's
00:48 11  on the cafeteria plan or not.
00:48 12             MR. STEELE: That's to pay the premiums
00:48 13  for the insurance. Correct?
00:48 14             THE WITNESS: Correct. Yes, sir.
00:48 15             MS. LEEDS: If you pay extra on what he
00:48 16  was talking about, who keeps that money?
00:48 17             THE WITNESS: If you pay extra on?
00:48 18             MS. LEEDS: The child care.
00:48 19             MS. NEALLY: The child care.
00:48 20             THE WITNESS: Child care? If you don't
00:48 21  use -- if you allocate too much money to that fund and
00:48 22  you don't use all that money by the end of the year,
00:48 23  your employer gets to keep that money.
00:48 24             MR. AGUILAR: Health insurance is actually
00:49 25  a better example. On child care, you are going to use

46

00:49 1   it because you don't --
00:49 2              MS. LEEDS: Well, no, I understand that,
00:49 3   but the insurance premium is -- you know, it's gone
00:49 4   regardless, but the child care is --
00:49 5              MS. NEALLY: BISD would keep the child
00:49 6   care and --
00:49 7              MR. STEELE: Essentially, BISD would keep
00:49 8   the child care and the --
00:49 9              THE WITNESS: The unused portion.
00:49 10             MR. STEELE: -- unreimbursed medical.
00:49 11             THE WITNESS: Any amount that wasn't
00:49 12  claimed within 90 days of the end of the claim year
00:49 13  would become BISD funds, and it would pretty much just
00:49 14  remain in that kitty. And they could do whatever they
00:49 15  wanted to do with it. Usually it would stay in that
00:49 16  kitty and it would just roll over to the next year.
00:49 17             Q. And the amount that's not claimed -- it has to
00:49 18  be claimed by a medical provider or by a child care
00:49 19  provider? It can't be claimed by the employee?
00:49 20             A. No, it is claimed by the employee. In order
00:49 21  for you to get your money back, if you were the
00:49 22  employee, you would submit a receipt showing your
00:49 23  employer --
00:49 24             Q. But I'm saying you have to submit a receipt?
00:49 25             A. Correct.

47

00:49 1             Q. You can't just say, give it back to me, I
00:49 2   didn't spent it. Or can you?
00:49 3             A. No. No. No, you couldn't do that.
00:49 4             Q. Okay.
00:49 5             A. It had to be for a justifiable reason that you
00:49 6   were getting reimbursed.
00:49 7             Q. Okay. In 1998, when you first started working
00:50 8   with BISD, how did you approach the employees there?
00:50 9             A. The same way we approach them anytime we do a
00:50 10  cafeteria plan. We would do our best to put together
00:50 11  either employee meetings or sit in their lounges and
00:50 12  wait for employees to come see us during their free
00:50 13  time.
00:50 14             Q. Okay. And the employee meetings, are those
00:50 15  after hours?
00:50 16             A. Employee meetings would be held generally
00:50 17  during school hours. I don't recall anything happening
00:50 18  after hours.
00:50 19             Q. Okay. Were they mandatory?
00:50 20             MR. AGUILAR: Objection; vague.
00:50 21             A. The -- in some cases, they were probably
00:50 22  mandatory, to where a principal would say, hey, you
00:50 23  need to show up to come do this. In other cases, it
00:51 24  would be, hey, you need to go and fill out your
00:50 25  cafeteria plan paperwork, so if you have time, go by

48

00:51 1   and do it. And principals of the school would
00:51 2   generally say, hey, these people are going to be here
00:51 3   for two or three days during these hours. Go and make
00:51 4   sure you get it done. However, BISD didn't make it
00:51 5   mandatory for every single person to complete.
00:51 6             Q. When you say that BISD did not make it
00:51 7   mandatory for every person to complete, do you mean
00:51 8   that they didn't make it mandatory to go to a meeting
00:51 9   or they didn't make it mandatory for you to complete
00:51 10  your paperwork?
00:51 11             A. Correct. They wouldn't make it mandatory for
00:51 12  you to complete your paperwork.
00:51 13             Q. So what happens if they don't have all the
00:51 14  paperwork, because didn't you tell me that they had to
00:51 15  be in compliance under the act?
00:51 16             A. Yeah. And that was, I guess, a point of
00:51 17  contention that we had with BISD. We would tell them,
00:51 18  hey, you need to make this mandatory for everybody to
00:51 19  come and complete. However, they didn't want to do
00:51 20  that. They would say, look, we have never done it like
00:51 21  that in the past. We want to just make it -- tell
00:52 22  everybody they've got to go and complete their
00:52 23  paperwork and whoever goes, goes.
00:52 24             Q. So for instance, in 1998, when you did your
00:52 25  first enrollment of the cafeteria plan, what was the

49

51

00:52 1  completion rate?

00:52 2  A. I would probably say 60 percent or 70 percent.

00:52 3  Q. Did that completion rate change as you -- over

00:52 4  the years or did it stay constant?

00:52 5  A. It may have changed a tiny bit upwards, but it

00:52 6  generally was 60 to 70 percent most of the time.

00:52 7  Another rule, if I could add to that, of the cafeteria

00:52 8  plan is that if you don't make any changes to whatever

00:52 9  your elections were the prior year, they just roll over

00:52 10  to the next year except for unreimbursed medical care

00:52 11  and dependent care.

00:52 12  Q. So they will stay the same for the insurance

00:53 13  premiums but --

00:53 14  A. The insurance that you had pre-tax the prior

00:53 15  year would roll over to the next year. Dependent care

00:53 16  and unreimbursed medical, those allocations would go

00:53 17  down to zero for the preceding years if you didn't make

00:53 18  a new election.

00:53 19  Q. Okay. In 1998, when you first went to BISD,

00:53 20  how many agents did you use during that time period?

00:53 21  MR. STEELE: Is this for enrollment?

00:53 22  MS. NEALLY: For enrollment.

00:53 23  A. I would probably say I used about 20 people

00:53 24  maybe.

00:53 25  Q. Okay. And these 20 people, were they all

HILL & ROMERO
CERTIFIED COURT REPORTERS

00:55 1  1998, when you first did the enrollment, was it over a

00:55 2  set period of time?

00:55 3  A. It was -- from what I recall, it was like the

00:55 4  last week in November and like the first two weeks in

00:55 5  December.

00:55 6  Q. And then what happened after that? You were

00:55 7  completely prevented from being able to go on campuses,

00:55 8  or what?

00:55 9  A. After the cafeteria plan enrollment was

00:55 10  completed?

00:55 11  Q. Right.

00:55 12  A. BISD didn't allow people to purchase any

00:55 13  policies, period.

00:56 14  Q. You mean through payroll?

00:56 15  A. Yes, correct, through payroll. They wouldn't

00:56 16  allow people to purchase policies through payroll

00:56 17  unless they were a new employee.

00:56 18  Q. How about before the last week in November?

00:56 19  Could you do it before the last week in November, from

00:56 20  August until November?

00:56 21  A. No. It was only during the time that we did

00:56 22  the enrollments. That's it. Anytime prior or anytime

00:56 23  after was not allowed.

00:56 24  Q. How about in 1999? Was it the same time period

00:56 25  that you were allowed to do enrollments?

HILL & ROMERO
CERTIFIED COURT REPORTERS

50

52

.54 1  already appointed with AFLAC?

00:54 2  A. Yes.

00:54 3  Q. Did that number change over the years?

00:54 4  A. It stayed about 20, but it might have increased

00:54 5  to maybe 30. It was somewhere between 20 and 30 most

00:54 6  years.

00:54 7  Q. How many of them were from Brownsville?

00:54 8  A. The first year that we did it, I would say

00:54 9  maybe one or two people. And I know you asked me prior

00:54 10  who were they. I can't remember who they were, but I

00:54 11  know there was at least one or two people from here in

00:54 12  Brownsville --

00:54 13  Q. Okay.

00:54 14  A. -- that I assisted.

00:54 15  Q. How about in 1999?

00:54 16  A. In 1999, there were probably more people from

00:54 17  here in Brownsville. There was probably five, six,

00:54 18  seven, in that range.

00:55 19  Q. How about in 2000?

00:55 20  A. Same -- same thing.

00:55 21  Q. About five to seven?

00:55 22  A. Yes.

00:55 23  Q. And how about in 2001, if you know?

00:55 24  A. I don't know.

25  Q. What changed -- well, one more question. In

HILL & ROMERO
CERTIFIED COURT REPORTERS

00:56 1  A. Yeah. Every year, it was generally the same

00:56 2  time period.

00:57 3  Q. So while you were the regional manager for

00:57 4  AFLAC it was the same period?

00:57 5  A. Yes, ma'am.

00:57 6  Q. Okay. It was that three-week period, the last

00:57 7  week in November, first two weeks in December?

00:57 8  A. Pretty much. There could have been two or

00:57 9  three days prior to that time period, two or three days

00:57 10  after that time period, just depending on, you know,

00:57 11  weekends, et cetera.

00:57 12  Q. How did you become aware of what the time

00:57 13  period would be?

00:57 14  A. BISD would go out for proposals on the issue

00:57 15  and --

00:57 16  Q. The TPA proposals?

00:57 17  A. Correct, to go out to look for cafeteria plan

00:57 18  services provider. And usually the time period for

00:57 19  that -- they would wait very, very late in the year to

00:57 20  make a decision on the matter. And so we were just --

00:57 21  we were at the mercy of whatever the school district

00:58 22  would tell us.

00:58 23  Q. Okay. Was it specified in the proposals when

00:58 24  the time period would be --

00:58 25  A. I don't --

HILL & ROMERO
CERTIFIED COURT REPORTERS

53

00:58 1   Q. -- or after you were actually selected?
00:58 2   A. I don't believe it was specified in the
00:58 3   proposals. I think it was after we were selected.
00:58 4   Q. For the three years that you were involved as
00:58 5   regional manager for AFLAC, was there a TPA proposal
00:58 6   every single year that they went out for or did they
00:58 7   ever roll it over?
00:58 8   A. Every year, my recollection is that the school
00:58 9   district did go out for proposals.
00:58 10  Q. And you don't recall how you became aware of
00:58 11  the time period, whether it was before or after you
00:58 12  were actually appointed?
00:58 13  A. Well, I can tell you some circumstances that
00:58 14  impacted that time period. The --
00:58 15  Q. No, no, wait, wait. Let's answer my question
00:59 16  that I asked.
00:59 17  A. Okay.
00:59 18  Q. You don't recall whether you were told before
00:59 19  or after you were actually appointed as to when the
00:59 20  time period would be?
00:59 21        MR. STEELE: Time period for what?
00:59 22        MS. NEALLY: For the enrollments.
00:59 23  A. Either before or after --
00:59 24        MR. AGUILAR: Objection; vague.
00:59 25  A. No. I can't recall that I was told that.

HILL & ROMERO
CERTIFIED COURT REPORTERS

54

:59 1   Q. For any year?
00:59 2   A. No, ma'am.
00:59 3   Q. These supplemental products that AFLAC sells,
00:59 4   you said that like cancer was not one of the ones that
00:59 5   went through payroll? Is that right? I can't remember
00:59 6   which ones you told me.
00:59 7   A. I believe -- the cancer policy, I think, was
00:59 8   the only policy that a person could purchase outside of
00:59 9   the payroll process.
01:00 10  Q. Okay. Did you continue to do that, to try to
01:00 11  sell those products during the rest of the year?
01:00 12  A. We would do that for non-BISD employees.
01:00 13  Q. How would you do that?
01:00 14  A. Just people would say, hey -- we would be doing
01:00 15  an enrollment, for instance, at some place of business.
01:00 16  And they would say, could my -- can my mother or my
01:00 17  father or my brother or sister buy this policy? And
01:00 18  they would -- we would give them our phone number and
01:00 19  they would contact us and we would sell them this
01:00 20  policy outside of payroll, because they weren't
01:00 21  eligible because they didn't work at a place that had
01:00 22  AFLAC.
01:00 23  Q. Okay. Okay. So what did you do for the rest
01:00 24  of the year? I mean, I know that you were, you know,
01:01 25  tied up with getting the TPA as regional manager for

HILL & ROMERO
CERTIFIED COURT REPORTERS

55

01:01 1   AFLAC, okay, for part of the school year.
01:01 2   A. Uh-huh.
01:01 3   Q. And then you were tied up with doing the
01:01 4   enrollments. What did you do for the rest of the year
01:01 5   to generate income?
01:01 6   A. Me, personally, I was responsible for two
01:01 7   accounts that were my -- that were my personal
01:01 8   accounts. And the two that I gave my personal
01:01 9   attention were the school district and the City of
01:01 10  Brownsville. Throughout the remainder of that year, my
01:01 11  job was to basically manage our independent agent work
01:01 12  force.
01:01 13  Q. Okay.
01:01 14  A. And so my income was a function of an overwrite
01:02 15  system that AFLAC had in place.
01:02 16  Q. Okay. When you managed the independent work
01:02 17  force --
01:02 18  A. Yes, ma'am.
01:02 19  Q. -- what do you mean by that?
01:02 20  A. It was my job to hold weekly meetings with the
01:02 21  managers that reported to me. It was my job to
01:02 22  implement contests or programs or what have you to
01:02 23  generate production for AFLAC.
01:02 24  Q. Okay. What else, as far as implementing
01:02 25  your -- what did you call it? You said managing your

HILL & ROMERO
CERTIFIED COURT REPORTERS

56

01:02 1   independent work force. What else did you do?
01:02 2   A. I would have to communicate with my manager,
01:02 3   who would instruct me to just do whatever was necessary
01:03 4   to create production for the company. And that
01:03 5   generally meant having meetings, having contests,
01:03 6   communicating with our managers -- with our district
01:03 7   managers, et cetera.
01:03 8   Q. Okay. Who was your independent work force?
01:03 9   A. There were a lot of people.
01:03 10  Q. How many?
01:03 11  A. I would say that there was probably 100 to
01:03 12  120 people who were contracted with AFLAC. But not all
01:03 13  of them were active on a regular basis.
01:03 14  Q. Okay. Define active for me.
01:03 15  A. Active would mean selling AFLAC policies on a
01:03 16  weekly basis.
01:04 17  Q. These 100 to 120 people, where were they
01:04 18  located?
01:04 19  A. Throughout the Valley.
01:04 20  Q. And when you say "Valley," what do you mean by
01:04 21  that?
01:04 22  A. Throughout Brownsville, Harlingen, Donna,
01:04 23  Weslaco, McAllen, Mission, Edinburg, Lyford. I think I
01:04 24  had maybe a few agents also up in the Houston area that
01:04 25  also reported to me.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 57

01:04 1    Q.  How were these people ass___ed to you?

01:04 2    A.  They were either assigned to me because they

01:04 3 were already with the company before I started with the

01:04 4 company, or before I became a regional manager.  But

01:04 5 the majority of them were recruited by me, were either

01:04 6 interviewed by me, recruited by me, and brought and

01:04 7 contracted with AFLAC through me.

01:04 8    Q.  Okay.  What was your region?

01:05 9    A.  I don't understand the question.

01:05 10    Q.  You said you were the regional manager.  Well,

01:05 11 what was your region?

01:05 12    A.  The cities that I just named to you.

01:05 13    Q.  Okay.  It wasn't known as South Texas, Rio

01:05 14 Grande Valley?

01:05 15    A.  It was Brownsville.

01:05 16    Q.  Okay.  Well --

01:05 17    A.  The Brownsville region, if I had to give it a

01:05 18 name.

01:05 19    Q.  Okay.  And it was Cameron, Hidalgo County, and

01:05 20 a few people in Houston?

01:05 21    A.  Cameron, Hidalgo, Willacy.  I can't recall.  I

01:05 22 think I might have had some agents in Starr County as

01:05 23 well.  And then there was one or two that were outside

01:05 24 the Valley area.

01:05 25    Q.  Okay.  Of these 100 to 120 people, how many of

## 59

01:07 1    A.  One of them is Danny Sanchez.  Another one is

01:07 2 his wife, Sandy Sanchez.  Another one was Raul Viada.

01:07 3 Who else was there?  That's all that I can recall.

01:08 4    Q.  Okay.  Those are the three people that you

01:08 5 would define as being active?

01:08 6    A.  Those were active.  And then there was other

01:08 7 people that were somewhat active.

01:08 8    Q.  Well, tell me those.

01:08 9    A.  Okay.  Steve Andrus, and there was Fernando de

01:08 10 Pena, there was Valentin Paz, there was Romero Chapa.

01:08 11 And that's all I can recall at this moment.

01:08 12    Q.  And then you said there were 15 to 20 people in

01:08 13 Brownsville.  So who were the people that were

01:09 14 inactive?

01:09 15    A.  I couldn't tell you.  I'm sorry.  I couldn't --

01:09 16 I can't --

01:09 17    Q.  You can't think of any other names in

01:09 18 Brownsville of people that were recruited by you?

01:09 19    A.  That were inactive?

01:09 20    Q.  Well, that fell in some other category besides

01:09 21 active or somewhat active.

01:09 22    A.  There was a woman by the name of Myela Garcia,

01:09 23 and she was, again, in the somewhat active category.

01:09 24 People who were not active at all, honestly, I can't

01:09 25 remember their names.

## 58

1:05 1 them did you recruit and how many were assigned?

01:05 2    A.  I would say the majority of them, I recruited.

01:05 3 I couldn't tell you an exact number and be correct

01:05 4 about it.  But if I had to just guesstimate, I would

01:05 5 say probably 100 out of 120.

01:06 6    Q.  How many of those people were actually in

01:06 7 Brownsville?

01:06 8    A.  Maybe 15 to 20 maybe.

01:06 9    Q.  How many of those 15 to 20 people were active?

01:06 10    A.  A handful; maybe four or five, six.

01:06 11    Q.  Earlier, you defined active for me as somebody

01:06 12 that sells on a weekly basis?

01:06 13    A.  Uh-huh.

01:06 14    Q.  How is it possible to sell AFLAC policies on a

01:06 15 weekly basis if they were required to go through

01:06 16 payroll?

01:06 17    A.  Our agents were trained to make many, many,

01:07 18 many contacts with employers on a weekly basis.  So

01:07 19 there was always some company whose decision was

01:07 20 pending to do business.

01:07 21    Q.  Okay.  So they weren't necessarily selling as

01:07 22 much as contacting?

01:07 23    A.  They were doing a lot of contacting.

01:07 24    Q.  Okay.  Okay.  Now, these four to five people

7 25 that were active, what are their names?

## 60

01:09 1    Q.  Of the nine people that you have named -- I'm

01:09 2 sorry, eight people that you have named, how many of

01:09 3 these people during -- from 1998 until 2001 were --

01:10 4 this was their sole source of income was selling AFLAC

01:10 5 products or selling insurance?

01:10 6    A.  I would say that the three people that I

01:10 7 mentioned first, Danny and Sandy and Raul, I believe.

01:10 8 I mean, I wouldn't know unless you asked them, but I

01:10 9 would believe that that would be their sole source of

01:10 10 income.

01:10 11    Q.  Okay.  So the rest of the 100 people that you

01:10 12 recruited, besides these people that you have named,

01:10 13 were outside of the Brownsville area; is that right?

01:10 14    A.  Yes, ma'am.

01:10 15    Q.  How would you recruit them?

01:10 16    A.  We would have recruiting meetings, we would

01:10 17 have recruiting breakfasts, recruiting dinners, we

01:11 18 would have ads in the paper.

01:11 19    Q.  Throughout the Valley?

01:11 20    A.  Throughout the Valley area.  We would send out

01:11 21 flyers through mailing lists.

01:11 22    Q.  You're saying "we" here.  What do you mean by

01:11 23 "we"?

01:11 24    A.  Me and my team.  Yeah, we.

01:11 25    Q.  The team is the three people that you named

61

1  pretty much?
2      A. Well, no. Those people -- we had different
3  categories of people. Another -- a category that I
4  mentioned earlier was a district manager.
5      Q. Okay.
6      A. We had some district managers as well. And
7  those district managers also had teams of people in
8  their respective areas that worked with them.
9      Q. Okay. Who were the district managers that you
10  had that reported to you?
11      A. Danny Sanchez was a district manager. My
12  uncle, Rudy Infante, was a district manager. Lynn
13  Davis was a district manager. Dennis Escobar was also
14  a district manager.
15      Q. From '98 to 2001 what other large clients --
16  not large clients, large accounts as regional manager
17  were you responsible for in the area?
18      A. Personally responsible for, just those two --
19      Q. Okay.
20      A. -- that I was personally responsible for.
21      Q. What ones were you supervising or overseeing?
22      A. There was a lot of other ones, but just a
23  couple that come to mind was Texas State Banks, Mission
24  ISD, Harlingen ISD, Lyford ISD, Willacy County, I think
25  the El Pato restaurants, and I know there's a bunch

HILL & ROMERO
CERTIFIED COURT REPORTERS

62

1  more. Those are just the ones that I can remember.
2      Q. Any other cities?
3      A. Any other cities? The City of Elsa. I believe
4  the City of Lyford, the City of Hidalgo. And, again, I
5  know there's more, but that's just all that I can
6  remember.
7      Q. Okay. How about any other counties?
8      A. That I was personally responsible for?
9      Q. No, not that you were personally responsible
10  for.
11      A. No, I'm sorry. That I had -- that some people
12  on my team opened. Any other counties? No, I don't
13  think so.
14      Q. Any other school districts?
15      A. Mission ISD.
16      Q. I know. You said Mission, Harlingen, Lyford.
17      A. Lyford. I think that's it.
18      Q. Okay. Did you make money off of any of these
19  other accounts?
20      A. Of course.
21      Q. How did you make money off of those accounts?
22      A. I received an overwrite from the sale of
23  business for -- from any of the agents that were in my
24  region.
25      Q. Okay. So any of the 100 to 120 agents that

HILL & ROMERO
CERTIFIED COURT REPORTERS

63

1  were in your region?
2      A. Yes.
3      Q. And those agents, those are called like your
4  managers?
5      A. No. There were my managers, and then there
6  were agents --
7      Q. Okay.
8      A. -- that reported to them.
9      Q. And your managers also got an overwrite; is
10  that right?
11      A. Yes.
12      Q. So what was your overwrite?
13      A. It varied by product. It varied by age of the
14  person. There was a lot of variances in it, but
15  generally it was five to eight percent, five to
16  nine percent, in that range. And that was from first
17  year commissions.
18      Q. Okay.
19      A. And then there was also renewals.
20      Q. Okay.
21      A. And on the renewal side, there was probably
22  anywhere from one to three percent in renewals in terms
23  of my renewal overwrite on that book of business as
24  well.
25      Q. People had to renew every year; is that right?

HILL & ROMERO
CERTIFIED COURT REPORTERS

64

1      A. They didn't have to. It was voluntary.
2      Q. But, I mean, you had to actually sign
3  something --
4      A. No.
5      Q. -- to renew?
6      A. No. It automatically renewed.
7      Q. That was my question.
8      A. Correct. It automatically renewed. The
9  policies automatically renewed unless people would
10  cancel them.
11      Q. Okay. That's what I was talking about.
12      A. Okay.
13      Q. If you had an enrollment period and the
14  employee opted not to come in, the supplemental policy
15  that he had the year before would continue into the
16  next year?
17      A. Yes, ma'am. Yes.
18      Q. Okay. Give me some examples of the types --
19  what your percentage would be, for instance, if I
20  decided I wanted to get --
21          MR. AGUILAR: Supplemental health
22  insurance.
23      Q. -- supplemental health insurance.
24      A. Well, all the policies were considered
25  supplemental health.

HILL & ROMERO
CERTIFIED COURT REPORTERS

65

Q. Okay. Well, let's -- what's the most common one of the cancer, hospital indemnity, accident, life insurance, disability, and intensive care? What's the most common one that people would elect for?

A. Probably the accident plan and the cancer plan.

Q. Okay. But the cancer is a little bit of a different animal, from the standpoint that you don't have to do it through payroll. Right?

A. The majority of the business that was sold was on payroll, so even though you could purchase it outside of payroll, it still fell into the same pool of products because that's how we did the business. That's how we did business.

Q. Okay. Well, let's say that I'm 40 years old. I elect to do cancer and accident. What's my premium going to be?

A. That's a difficult question to answer for you, because there's other -- there's other variables that go into computing your price.

Q. Tell me what else I need to --

A. The variables are, there were some options within the cancer policy. For instance, there was something called a building benefit that would add value to the policy over time. There was another -- there was another rider called a dreaded disease

67

premium. Okay. So the annualized premium would be $300, or 25 times 12.

Q. Okay.

A. Generally, the commission for the agent who sold the policy would be 40 percent of that $300, or $120.

MR. STEELE: Is that the first year?

THE WITNESS: That's the first year, correct.

Q. Okay. So the agent gets 120?

A. Yes.

Q. Okay. Then who else gets money off of that?

A. The district manager would make some money, and the regional manager would make some money, and the state manager would make money, and the state trainer would make money, and AFLAC would make money. There was lots of different levels of people.

Q. Okay. How much would the --

MS. LEEDS: Where does the insurance premium go?

MR. STEELE: You are counting on nothing happening the first year.

MS. LEEDS: Okay.

THE WITNESS: Yeah. Generally, the first year everybody would make money. And then preceding

HILL & ROMERO
CERTIFIED COURT REPORTERS

66

benefit rider, where you could add additional benefits for selected diseases other than cancer.

Q. Okay.

A. There was variables of ages.

Q. How about accident? Is accident more simple?

A. Oh, no. It's more -- even more complicated than that. Under the accident policy, there were different industry codes depending on the riskiness of the industry. There was --

Q. Okay. Give me one of yours that's more -- that's more simple to compute.

A. Well, the simplest of all of them would probably be the accident policy.

Q. Okay.

A. Generally, the commission rate for the accident plan was 40 percent commission. And then, I believe, if I remember correctly, it's seven percent renewals.

Q. What does that mean?

A. Well, that meant that if you purchased a policy from me that ran $25 a month --

Q. Is that normal?

A. That's normal.

Q. Okay. 25 a month?

A. Uh-huh, 25 a month. And you multiply that times 12, you would get what we call an annualized

HILL & ROMERO
CERTIFIED COURT REPORTERS

68

years, that would not be the case.

MR. AGUILAR: Succeeding.

Q. How much would the district manager make?

A. The district manager would make about 11 percent, if I remember correctly.

Q. So the agent is making 40 percent. Right?

A. Yes, ma'am.

Q. The district manager gets 11 percent. So he gets $33?

A. Yes.

Q. Okay. You would have gotten --

MR. STEELE: As regional.

A. I believe it was about seven percent.

Q. The regional manager gets seven percent, so he gets $21?

A. Yes.

Q. The state manager gets?

A. I believe the state manager got five percent.

Q. Okay. So he gets $6? No.

A. 15.

Q. 15.

MR. AGUILAR: 15.

Q. The state trainer gets?

A. I'm not exactly sure, but I think the state trainer was like half of a percent.

HILL & ROMERO
CERTIFIED COURT REPORTERS

1    Q.  So he gets $1.50?  I don't know.  He gets
2  something.  And then AFLAC gets how much?
3    A.  I don't know, but I guess the remainder.
4         MR. STEELE:  63-1/2 minus 100.
5         THE WITNESS:  That --
6         MS. NEALLY:  What's .05 of 300?
7         MS. LEEDS:  .05?
8         MS. NEALLY:  Well, .5.  It's $1.50.
9  Right?
10        MS. LEEDS:  Yeah.
11        MR. STEELE:  A buck and a half.
12        MS. NEALLY:  That's right.  Okay.  Not my
13  forte.
14    Q.  Okay.  Now, on a renewal, what's the renewal
15  going to be, the same amount, $25 a month?
16    A.  I don't know the exact amounts, but I can just
17  kind of guesstimate it for you.
18    Q.  Okay.
19    A.  The agent was at about seven percent.
20    Q.  Okay.
21    A.  The district manager was at about two to
22  three percent.
23    Q.  Okay.
24    A.  The regional manager, my level, was anywhere
25  from -- on the cancer policy, it was about two percent,

HILL & ROMERO
CERTIFIED COURT REPORTERS

1  cancer policy.
2    Q.  The cancer policy that's $25 a month?
3    A.  Correct.
4    Q.  Okay.  And then the renewals on a cancer policy
5  at $25 a month, an agent, seven; district managers, two
6  to three?
7    A.  Uh-huh.
8    Q.  Regional manager is two?
9    A.  Uh-huh.
10    Q.  How about the state manager?
11    A.  I couldn't tell you, but it was probably about
12  one percent.
13    Q.  The state trainer?
14    A.  I don't think he got renewals.
15    Q.  Okay.  And then AFLAC, the rest?
16    A.  Yes.  And that was for all years into the
17  future for as long as the person kept the policy.
18    Q.  Okay.  That's for all years in the future?
19    A.  Yes, ma'am.
20    Q.  What's the average life for somebody to keep a
21  policy, if you know?  Have you seen any type of -- do
22  you know?
23    A.  I don't know.
24    Q.  Have you seen any type of literature that would
25  indicate that?

HILL & ROMERO
CERTIFIED COURT REPORTERS

70                                    72

1  if I remember correctly.
2    Q.  Okay.
3         MR. STEELE:  We are talking about
4  accident.  Can we stay with accident?
5         THE WITNESS:  No.  She -- we're talking
6  about cancer right now.
7         MR. STEELE:  Oh, I didn't know that.
8         MS. NEALLY:  No.  I thought we were
9  talking about accident.
10        MS. LEEDS:  Accident.  You said that was
11  on accident.  I have accident down also.
12        THE WITNESS:  I'm sorry.  I thought we
13  were talking about the cancer policy.
14    Q.  You said it's $25 annualized is $300 for an
15  accident policy.  Is it different for cancer?  Because
16  I'm going to go over each one of these.
17    A.  We can do all of them if you want to.
18    Q.  Yeah.  I want to go over all of them.
19    A.  But what I'm giving you right now is the cancer
20  policy.
21        MR. STEELE:  And that's true for the
22  previous numbers you gave us, the 40, the 11, the
23  seven, the five?
24        THE WITNESS:  The 40, the 11, the seven,
25  and the five, and the 1/2 percent.  That's all for the

HILL & ROMERO
CERTIFIED COURT REPORTERS

1    A.  No, ma'am.
2    Q.  And that's on any kind of supplemental policy
3  that AFLAC sells?
4    A.  Yeah.  I don't know.
5    Q.  And you're not aware of any literature that
6  would indicate what the average length is for someone
7  to hold a policy?
8    A.  If I researched it, I could probably find out,
9  but I don't know.
10        MS. NEALLY:  Object to the responsiveness
11  of the answer.
12    Q.  You're not aware of any literature as we sit
13  here today?
14    A.  No.
15    Q.  That's correct?
16    A.  That's correct.
17    Q.  So tell me about accident.  What is it for
18  accident on a $25 -- is that $25 average for an
19  accident policy?
20    A.  The accident policy is probably a little less.
21    Q.  Okay.  So what would you say, 20, 15?
22    A.  The average price on an accident policy was
23  probably $18.
24    Q.  Okay.
25        MR. STEELE:  Is that per month?

HILL & ROMERO
CERTIFIED COURT REPORTERS

73

01:25 1    THE WITNESS: That was ... month. And,
01:25 2 again, this is just individual.
01:25 3    Q. Okay.
01:25 4    A. If somebody purchased it for their children or
01:25 5 their family, et cetera, then the price would go up.
01:25 6 And about 50 percent of the time the price did go up.
01:25 7    Q. What do you mean, 50 percent of the time the
01:25 8 price would go up?
01:25 9    A. Well, it would go up because they would add
01:25 10 dependents to that.
01:25 11    Q. Oh, on the $18?
01:25 12    A. Correct. So that $25 example that I said
01:25 13 before, it's pretty accurate for the accident plan,
01:25 14 too, if you add dependents.
01:25 15    Q. Okay. So we'll say $25 with dependents?
01:25 16    A. Yes, ma'am. Uh-huh.
01:25 17    Q. Let me ask one more question. When you do the
01:25 18 renewals, and you originally do -- you buy a cancer
01:25 19 plan, and then your renewals go -- the policy
01:26 20 increases, it will increase without the permission of
01:26 21 the policyholder; is that correct?
01:26 22    A. If the premium goes up?
01:26 23    Q. Right.
01:26 24    A. It will go up without the permission of the
01:26 25 policyholder

HILL & ROMERO
CERTIFIED COURT REPORTERS

74

:26 1    Q. Yes.
01:26 2    A. Yes, that's correct.
01:26 3    Q. And can the person elect to discontinue the
01:26 4 policy at any time?
01:26 5    A. Yes.
01:26 6    Q. Okay. So we're talking about an accident
01:26 7 policy, $25 a month with dependents. What's the
01:26 8 percentage for the agent?
01:26 9    A. On the accident policy?
01:26 10    MR. STEELE: This is first year. Right?
01:26 11    MS. NEALLY: First year, uh-huh. Yes.
01:26 12    A. Okay. Again, to answer your question, I would
01:26 13 need to know additional information, because it was a
01:26 14 function of the industry. The school district -- you
01:26 15 generally made the most commission at the school
01:26 16 district because it was the safest industry. And then
01:26 17 in other industries, like the Port of Brownsville, for
01:27 18 instance, which was another customer of ours, they --
01:27 19 there were less commissions because of the riskiness of
01:27 20 the industry. And that was just how AFLAC did it.
01:27 21    Q. Okay. Give me the range.
01:27 22    A. A high of -- I believe at BISD the commission
01:27 23 rate was 37-1/2 percent.
01:27 24    Q. Okay.
  25    A. And the low would probably be about 28 percent.

HILL & ROMERO
CERTIFIED COURT REPORTERS

75

01:27 1    MR. STEELE: In a risky industry?
01:27 2    THE WITNESS: In a risky industry.
01:27 3    MR. STEELE: But for purposes of the
01:27 4 school industry, 37-1/2?
01:27 5    THE WITNESS: I believe that's correct,
01:27 6 37-1/2 percent.
01:27 7    Q. So we are talking about BISD again. So the
01:27 8 agent's share would be 37.5?
01:27 9    A. I believe that's correct, yes, ma'am.
01:27 10    Q. How about the district manager?
01:28 11    A. The district manager was about -- without
01:28 12 looking at the commission schedule I couldn't tell you
01:28 13 exactly, but I could kind of, again, just more or less
01:28 14 guesstimate that it was about -- it was about eight.
01:28 15    Q. Okay. The regional manager?
01:28 16    A. That was about five.
01:28 17    Q. State manager?
01:28 18    A. State manager, I do not know.
01:28 19    Q. Do you know if they got any?
01:28 20    A. Oh, they definitely got some.
01:28 21    Q. And the state trainer?
01:28 22    A. Again, I think the state trainer was just half
01:28 23 a percent.
01:28 24    Q. And then AFLAC got the rest?
01:28 25    A. Yes, ma'am.

HILL & ROMERO
CERTIFIED COURT REPORTERS

76

01:28 1    Q. How about on renewals for accident policies?
01:28 2    A. Renewals for the agent, it was -- I believe it
01:28 3 was like five-and-a-half percent. And for the district
01:28 4 coordinator or the district manager, it was about --
01:29 5 something like about two percent. And the regional
01:29 6 manager was about one-and-a-half percent, and the state
01:29 7 manager, I do not know, but, again, it's probably about
01:29 8 one percent.
01:29 9    Q. And then for the state trainer?
01:29 10    A. And nothing for the state trainer because I
01:29 11 don't think he got paid on renewals.
01:29 12    Q. Okay. And you said earlier that accident and
01:29 13 cancer were the two most common supplemental insurance
01:29 14 policies that were sold?
01:29 15    A. For AFLAC, yeah.
01:29 16    Q. Do you have any idea how many accident policies
01:29 17 were sold in 1998 to BISD employees?
01:29 18    A. No, ma'am. I couldn't tell you off the top of
01:29 19 my head.
01:29 20    Q. For any year, do you have any idea?
01:29 21    A. No. I would have to research that.
01:29 22    Q. How would you research it? What would you look
01:29 23 at?
01:29 24    A. I would have to get ahold of a copy of a
01:29 25 billing, a statement.

HILL & ROMERO
CERTIFIED COURT REPORTERS

77

01:30 1    Q. A billing statement?
01:30 2    A. A billing statement.
01:30 3    Q. And who would have possession of that billing
01:30 4 statement?
01:30 5    A. Probably AFLAC.
01:30 6    Q. Okay. How about for hospital indemnity
01:30 7 policies?
01:30 8    A. Hospital indemnity, the commission level was, I
01:30 9 believe, exactly the same as the cancer policy.
01:30 10    Q. Okay. So for the cancer policy, we can put
01:30 11 also hospital indemnity?
01:30 12    A. I believe that's correct.
01:30 13    Q. The same percentages?
01:30 14    A. Uh-huh.
01:30 15    Q. How about life insurance?
01:31 16    A. Life insurance? We did not sell a whole lot of
01:31 17 life insurance, so I couldn't tell you. Except I could
01:31 18 tell you that it was more than what we got paid on the
01:31 19 cancer policy. I know that we got paid somewhere in
01:31 20 the area of about 50 to 55 percent at the agent level
01:31 21 for life insurance. But in terms of what the district
01:31 22 manager and the regional manager and all the levels made, I
01:31 23 couldn't tell you off the top of my head.
01:31 24    Q. Not even for regional manager?
01:31 25    A. I couldn't tell you. I would have to, again,

HILL & ROMERO
CERTIFIED COURT REPORTERS

78

:31 1 research that.
01:31 2    Q. What percentage of the policies sold were life
01:31 3 insurance, would you say?
01:31 4    A. Of all the policies that we sold throughout the
01:31 5 year, maybe ten to 15 percent.
01:32 6    Q. What percentage was cancer?
01:32 7    A. Cancer was probably about 30 percent.
01:32 8    Q. 33?
01:32 9    A. Probably 30, maybe even as much as 40;
01:32 10 somewhere between 30 and 40 percent.
01:32 11    Q. Hospital indemnity?
01:32 12    A. Same thing. It was probably in the
01:32 13 ten percent, 15 percent range.
01:32 14    Q. Accident?
01:32 15    A. Accident? That's the policy we sold the most
01:32 16 of. That was probably 40 percent.
01:32 17    Q. You said life insurance was ten to 15?
01:32 18    A. Life -- it was maybe even less than that, but
01:32 19 15 at the most.
01:32 20    Q. Okay.
01:32 21    A. It was more likely about ten.
01:32 22    Q. Okay. And how about intensive care?
01:33 23    A. Less than five percent.
01:33 24    Q. How about disability?
3 25    A. Disability was probably -- see, we had

HILL & ROMERO
CERTIFIED COURT REPORTERS

79

01:33 1 disability on a stand-alone policy, and then we had
01:33 2 disability as an add-on to the accident policy, like at
01:33 3 BISD. Disability as a stand-alone policy, I would say,
01:33 4 again, probably maybe ten percent, maybe 15, in that
01:33 5 area.
01:33 6    Q. If it was an add-on, it just goes onto the
01:33 7 accident?
01:33 8    A. Yes, ma'am.
01:33 9    Q. Okay. What was the percentage for the -- that
01:33 10 the agent will receive on disability?
01:33 11    A. It was -- I believe it mirrored the same
01:34 12 commission level as the accident plan.
01:34 13    Q. Okay. And how about intensive care?
01:34 14    A. Intensive care was the same as cancer.
01:34 15    Q. Do you have trailers? Did you also receive
01:34 16 trailers?
01:34 17    A. Trailers were just our renewals.
01:34 18    Q. Okay. When you use trailers, you would use it
01:34 19 synonymously with renewals?
01:34 20    A. Renewals, yeah.
01:34 21    Q. There's no distinction for you?
01:34 22    A. No. Trailers generally are in the world of
01:34 23 annuities.
01:34 24    Q. It doesn't really apply to cafeteria plans or
01:34 25 supplemental benefits?

HILL & ROMERO
CERTIFIED COURT REPORTERS

80

01:34 1    A. No.
01:34 2    Q. Okay. Besides these overwrites that you got as
01:35 3 district manager, what other sources of income did you
01:35 4 have -- I mean, regional manager. As regional manager,
01:35 5 what other sources of income did you have besides the
01:35 6 overwrites?
01:35 7    A. Besides the first year commissions that I sold
01:35 8 and renewals that I sold were the overwrites I received
01:35 9 on the sale from other people. But other compensation
01:35 10 would be like bonuses.
01:35 11    Q. Okay.
01:35 12    A. Both end of the year bonuses and stock bonuses.
01:35 13    Q. Any other sources of income?
01:35 14    A. Not monetary, but there were other things, like
01:35 15 trips and prizes.
01:35 16    Q. Okay. And did you get those only with being
01:35 17 the regional manager or did you also get that as an
01:36 18 agent for AFLAC?
01:36 19    A. The end of the year bonus was -- the only
01:36 20 people who were eligible for that were the district
01:36 21 manager, the regional manager, and the state managers.
01:36 22 Stock bonuses, I believe every level of agent could
01:36 23 participate in the stock bonuses.
01:36 24    Q. And the trips and prizes?
01:36 25    A. Same thing. It was -- all levels were eligible

HILL & ROMERO
CERTIFIED COURT REPORTERS

81

01:36 1  for that.
01:36 2      Q.  Okay.  Prior to becoming the regional manager
01:36 3  in, you said, 1998, were you a district manager?
01:36 4      A.  Yes, I was.
01:36 5      Q.  Okay.  When were you a district manager?
01:36 6      A.  I was a district manager -- I joined -- I
01:36 7  joined AFLAC in '94.
01:36 8      Q.  As an agent?
01:36 9      A.  As an agent.  And I was made a district manager
01:36 10 just shortly thereafter.  So I became a district
01:37 11 manager with some time in probably November of '94,
01:37 12 and I joined them probably in September of '94.  So
01:37 13 shortly thereafter, I mean, just one or two months into
01:37 14 it, with no experience whatsoever, I became a district
01:37 15 manager with them.
01:37 16     Q.  At which point you were able to get bonuses at
01:37 17 the end of the year?
01:37 18     A.  I believe at that time they didn't have bonuses
01:37 19 for district managers when I first joined.  I don't
01:37 20 think the bonus system was something that came into
01:37 21 play, I think, until I became a regional manager.  I
01:37 22 think that's when the company began doing that.
01:37 23     Q.  Okay.  When you were removed as regional
01:37 24 manager, you went down to just being an agent again
01:37 25 or an assistant manager?

HILL & ROMERO
CERTIFIED COURT REPORTERS

82

1:37 1      A.  An agent.
01:37 2      Q.  And that took place in January of 2002?
01:38 3      A.  Actually, I got fired on December 3rd of 2001.
01:38 4      Q.  Okay.  What type of bonuses did you receive
01:38 5  with AFLAC?
01:38 6      A.  I don't understand your question.
01:38 7      Q.  Okay.  Well --
01:38 8      A.  Are you referring to the amount?
01:38 9      Q.  Right.
01:38 10     A.  My bonus that I received for production in
01:38 11 2001, which was given to me in February of 2002, was --
01:38 12 I believe it was about 28,000.
01:38 13     Q.  That was your end of the year?
01:38 14     A.  That was my end of the year bonus.
01:38 15     Q.  And tell me about the stock that you own in the
01:38 16 company.  Right?
01:38 17     A.  Yes.
01:38 18     Q.  How much stock do you own in the company?
01:38 19     A.  Currently, I probably own somewhere in the
01:39 20 neighborhood of about 70 to 80,000.
01:39 21         MR. STEELE:  Dollars or shares?
01:39 22         THE WITNESS:  Dollars.
01:39 23     Q.  Have you sold any?
01:39 24     A.  No.
19 25      Q.  Okay.  How much did you own in '99?

HILL & ROMERO
CERTIFIED COURT REPORTERS

83

01:39 1      A.  I don't know.
01:39 2      Q.  How about when you left AFLAC in December 3rd,
01:39 3  2001?
01:39 4          MR. AGUILAR:  Object to form; vague.
01:39 5      Q.  How much stock did you own?
01:39 6      A.  Again, I apologize.  I don't -- I don't know.
01:39 7      Q.  Has it increased?
01:39 8      A.  A little bit.
01:39 9      Q.  Okay.  Has it increased, you know, ten percent?
01:39 10     A.  Less than ten percent it's increased.
01:40 11     Q.  Okay.  And you are still an agent with AFLAC,
01:40 12 so you haven't got any bonuses since the end of the
01:40 13 year for 2001; is that correct?
01:40 14     A.  The bonus that I mentioned to you was for 2001.
01:40 15     Q.  I know.  So since the end of the year 2001,
01:40 16 have you got any bonuses from AFLAC?
01:40 17     A.  No.
01:40 18     Q.  Have you received any additional stock from
01:40 19 AFLAC?
01:40 20     A.  Yes.
01:40 21     Q.  How much?
01:40 22     A.  I don't know.
01:40 23     Q.  Have you continued to receive renewals?
01:40 24     A.  Yes.
01:40 25     Q.  How much did you earn in renewals from AFLAC

HILL & ROMERO
CERTIFIED COURT REPORTERS

84

01:40 1  for 2002?
01:40 2      A.  I don't know.
01:40 3      Q.  How would we find that out?
01:40 4      A.  Through AFLAC.  You'd have to ask them.
01:40 5      Q.  Well, don't you get --
01:41 6          MS. LEEDS:  Commissions.
01:41 7      Q.  -- commissions from them, some kind of
01:41 8  statement from them?
01:41 9      A.  We get a statement.  And I would have to
01:41 10 research it to be able to give you that answer.
01:41 11     Q.  And what would I -- what would you call that
01:41 12 document, a commission statement?
01:41 13     A.  Yes.
01:41 14     Q.  What would you call -- how do you become aware
01:41 15 that you are getting stock benefits?
01:41 16     A.  It's also on the commission statement.
01:41 17     Q.  It's on the commission statement?
01:41 18     A.  Yes, ma'am.
01:41 19     Q.  Any other -- okay.  For instance, you said you
01:41 20 still sell AFLAC to Brownsville -- the City of
01:41 21 Brownsville, is that right, AFLAC products?
01:41 22     A.  Yes.
01:41 23     Q.  So would that also show up on your commission
01:41 24 statement or on something else?
01:41 25     A.  It should show up on the commission statement,

HILL & ROMERO
CERTIFIED COURT REPORTERS

85

1 yes.

2     Q. How much did you get -- how much commissions
3 did you get from the City of Brownsville last year,
4 2002?

5     A. For this previous enrollment that we just
6 completed -- we completed an enrollment, I believe, in
7 October of 2002. I probably received maybe $5,000.

8     Q. Okay. And you said you just did another one?

9     A. That's the one that we just did in October of
10 2002, that we completed in October of 2002.

11     Q. How often does the City of Brownsville do
12 enrollments?

13     A. Once a year.

14     Q. For how long?

15     A. Again, it's just about a two-week period,
16 similar to the school district.

17     Q. Okay.

18          MS. LEEDS: I'm sorry. Is that 5,000 in
19 stock?

20          THE WITNESS: No. That was in
21 commissions. And that was in first year commissions,
22 not renewals.

23     Q. How much do you get in renewals from the City
24 of Brownsville?

25     A. Same thing. You would have to do the math. I

HILL & ROMERO
CERTIFIED COURT REPORTERS

86

1 couldn't tell you off the top of my head, but --

2     Q. It would show up on your commission statement?

3     A. It should.

4     Q. How often do you get commission statements?

5     A. Once a month.

6     Q. Do you get a summary at the end of the year?

7     A. We get a 1099 at the end of the year.

8     Q. What was your 1099 for last year from AFLAC?

9     A. I think it was something like 120,000.

10     Q. That would be for the 2002 year?

11     A. Yes, ma'am.

12     Q. How about for 2001? What was your 1099 from
13 AFLAC?

14     A. I don't remember.

15          MS. LEEDS: Was that 1099 just from AFLAC,
16 the 120?

17          THE WITNESS: Yes.

18     Q. Who else did you get 1099s for in 2001?

19     A. There were other insurance companies that I
20 also had contracts with, and that -- I couldn't name
21 them to you, but you have a copy of something I saw
22 right there in front of you that showed you some of the
23 other companies that I'm appointed with.

24     Q. Okay. If I give you this, would it help
25 refresh your memory as to which one of them you got

HILL & ROMERO
CERTIFIED COURT REPORTERS

87

1 1099s?

2     A. No, ma'am. Honestly, I couldn't tell you. I
3 could get that for you, but I don't know that off the
4 top of my head.

5     Q. How could you get that for me?

6     A. Through my accountant, I'm assuming.

7     Q. Okay. So you could request your 1099s for the
8 past years?

9     A. I'm assuming that my accountant has a record of
10 that.

11     Q. How many 1099s do you think you got for 2001?

12     A. Maybe ten.

13     Q. How about for 2000, similar amount?

14     A. Yeah. I would say generally about the same.

15     Q. Okay. And how about 2002? How many 1099s did
16 you get?

17     A. For 2002, maybe five.

18     Q. What would the five be for 2002?

19     A. I'm sorry. I just don't remember what those
20 are. I can remember receiving some, but I haven't met
21 with my accountant yet this year so I don't know.

22     Q. What companies did you sell predominantly for
23 in 2002?

24     A. I sold for -- there was a company called Best,
25 and it's on that report there that you're looking at.

HILL & ROMERO
CERTIFIED COURT REPORTERS

88

1     Q. Okay. And I will be glad to give this to you
2 if it will help refresh your memory.

3     A. It might.

4     Q. We'll mark that as Exhibit 1. That's a list of
5 the appointments that you presently hold; is that
6 correct?

7     A. Yes, ma'am.

8     Q. And I think it's dated February of 2003?

9     A. 2-28-2003. It's public information on the TDI
10 website.

11     Q. Right.

12     A. Allianz, I know that I got some money from
13 them. That's Allianz Life. I did mention already Best
14 Life and Health. I did receive some commission from
15 them. I think I did receive some commission from Old
16 Line Life.

17     Q. Line?

18     A. Old Line Life. I believe I received some
19 commission from Prudential. I received some commission
20 from State Mutual. And I believe that's all from this
21 list. I also received commissions from a couple of
22 people that I do business with, and that is the agency
23 that I work with now, which is The Teachers' Agency.
24 And so they wrote me a 1099 check.

25     Q. Okay.

HILL & ROMERO
CERTIFIED COURT REPORTERS

89

01:48 1    A. And I also work with a gentleman that I
01:48 2 mentioned before. His name is Raul Viada.
01:48 3    Q. Your uncle?
01:48 4    A. No. That's not my uncle.
01:48 5    Q. Who is Viada?
01:48 6    A. Raul Viada, which is an agent that I mentioned
01:48 7 to you earlier as --
01:48 8    Q. Out of Brownsville?
01:48 9    A. Brownsville. And we do some business together,
01:48 10 and he writes me a check. So he gives me a 1099 at the
01:48 11 end of the year.
01:48 12    Q. Okay.
01:48 13    A. And that's probably about it.
01:48 14    Q. What would you say your earnings were for 2002?
01:48 15    A. I couldn't tell you, ma'am. Honestly, I
01:48 16 couldn't tell you.
01:48 17    Q. Okay. You said you got a 1099 for about
01:48 18 120,000 from AFLAC?
01:48 19    A. Uh-huh.
01:48 20    Q. Is that yes?
01:48 21    A. Yes.
01:48 22    Q. How about from Teachers' Agency? What was your
01:48 23 1099?
01:48 24    A. I think it was about $7,000.
01:49 25    Q. Okay. And you said you got one from Raul

90

01:49 1 Viada?
01:49 2    A. Uh-huh.
01:49 3    Q. Is that yes?
01:49 4    A. I haven't received it from him yet.
01:49 5    Q. What do you sell for him?
01:49 6    A. I don't sell for him. We -- we have some
01:49 7 groups that we do together, and the commissions need to
01:49 8 be paid to somebody. And so instead of the commissions
01:49 9 being paid to me, they get paid to him, and then he
01:49 10 pays me my share. And we handle the groups together.
01:49 11    Q. What are the groups that you do together?
01:49 12    A. For instance, just some that come to mind is
01:49 13 like the Donna Housing Authority.
01:49 14    Q. And are you doing a TPA cafeteria plan, or are
01:49 15 you just supplemental health?
01:49 16    A. No, just the group health.
01:49 17    Q. Group health.
01:49 18    A. Group health insurance.
01:49 19    Q. With whom?
01:49 20    A. With Raul Viada.
01:49 21    Q. What company?
01:49 22    A. What company? I believe it's Aetna.
01:49 23    Q. Okay. And you said Donna Housing. What other
01:50 24 groups?
01:50 25    A. Brownsville Community Health Center. I know

91

01:50 1 that we share that group. And there's another one.
01:50 2 It's called Interlube. They are a company out of the
01:50 3 port. I know there's maybe two or three more. I just
01:50 4 can't remember them.
01:50 5    Q. Okay. Of these other companies that you named,
01:50 6 Best Life, what percentage of your income from 2002
01:50 7 came from sales commissions from them, approximately?
01:50 8    A. My 1099 from them was probably in the
01:50 9 neighborhood of $5,000.
01:51 10    Q. Okay. How about Allianz?
01:51 11    A. Allianz, again, was probably -- probably about
01:51 12 another $5,000.
01:51 13    Q. How about Old Line?
01:51 14    A. Less than $500.
01:51 15    Q. Prudential?
01:51 16    A. Prudential was probably maybe 1,000 to 2,000.
01:51 17    Q. State Mutual?
01:51 18    A. State Mutual, probably about -- maybe $1,500.
01:51 19    Q. And how about -- going back to Raul Viada, can
01:51 20 you guess what your 1099 will be in the neighborhood
01:51 21 of?
01:51 22    A. In the neighborhood of maybe -- it's going to
01:51 23 be somewhere between ten and 15,000.
01:52 24    Q. Okay. Of the 120,000 1099 you got from AFLAC,
01:52 25 how much of that was new sales and how much of that was

92

01:52 1 renewals?
01:52 2    A. For what year?
01:52 3    Q. 2002.
01:52 4    A. 2002? I would say new sales was just the City
01:52 5 of Brownsville, which I mentioned earlier. I think I
01:52 6 said about 5,000 maybe.
01:52 7    Q. Okay. And the remaining 115 was for
01:52 8 non-renewals -- I mean renewals?
01:52 9    A. For renewals, yes, ma'am.
01:52 10    Q. Okay. So your earnings for 2002, based on what
01:52 11 you told me, would be approximately 140 to 150,000,
01:53 12 would you say?
01:53 13    A. That's probably about right.
01:53 14    Q. Okay.
01:53 15    MS. NEALLY: I think now is a good time to
01:53 16 take a break and decide whether or not we want to let
01:53 17 these people continue with this line.
01:53 18    MR. AGUILAR: No. I'd prefer to just go
01:53 19 ahead and -- I mean, we can take a break, but I would
01:53 20 prefer instead of hopping back and forth like that that
01:53 21 you go ahead and complete all of your questioning.
01:53 22    MS. NEALLY: Okay.
01:53 23    MR. STEELE: That's fine.
01:53 24    MR. AGUILAR: Do you want to take a break?
01:53 25    MS. NEALLY: Yes.

93

02:12 1      (Brief recess).
02:12 2      Q. Okay. We just got done talking about your
02:12 3   earnings in 2002. I don't know if you filed late or
02:12 4   what, but I didn't get 2001 tax records. Do you know
02:12 5   what your earnings were for 2001, more or less?
02:12 6      A. Let me see. I can tell you probably gross
02:13 7   income was somewhere about 180,000.
02:13 8      Q. Okay. And when we were talking about the
02:13 9   earnings that you outlined for me of about 140 to 150
02:13 10   in 2002, those were gross. Right?
02:13 11      A. Yes.
02:13 12      Q. Okay. So from 1099s?
02:13 13      A. Yes.
02:13 14      Q. And in 2001, your gross income would have come
02:13 15   from 1099s?
02:13 16      A. Yes.
02:13 17      Q. And you told me that it would be approximately
02:13 18   from -- no, I didn't ask you 2001 -- yeah, ten
02:13 19   companies. Is that right?
02:13 20      A. I believe so, yes, ma'am.
02:13 21      Q. Looking at this list in 2001, what companies
02:13 22   would you have -- do you think you got 1099s from?
02:13 23      A. I would say Best Life, Mid-Continent Life, Old
02:14 24   Line Life, I think Principal Life, Prudential, I think
02:14 25   Southwestern Life, State Mutual, I believe Statesman

HILL & ROMERO
CERTIFIED COURT REPORTERS

94

2:14 1   National also. I think American United Life, I think
02:14 2   Unicare. And there may be one or two other ones that
02:15 3   aren't even on this list anymore that I may not have an
02:15 4   appointment with anymore.
02:15 5      Q. Okay. That brings me to one of my questions I
02:15 6   was going to ask you. Have you ever been -- had an
02:15 7   appointment revoked or rescinded?
02:15 8      A. Due to non-production, yes.
02:15 9      Q. Okay.
02:15 10      A. Meaning I just didn't do any business with them
02:15 11   after getting appointed.
02:15 12      Q. That's the only reason you have ever had any
02:15 13   revoked?
02:15 14      A. Nothing due to any other reason, like what's
02:15 15   happening now. No, never.
02:15 16      Q. The dates on Exhibit 1, where it says, active,
02:15 17   is that the year that you became active for these
02:15 18   companies, when you received your appointment?
02:15 19      A. I believe that's correct.
02:15 20      Q. Okay. And one of the ones you didn't mention,
02:15 21   but I assume in 2001 you also got a 1099 from, is
02:16 22   AFLAC; is that right?
02:16 23      A. Of course.
02:16 24      Q. And why did -- you said you dropped down to
16 25   five 1099s for this year, approximately, and you just

HILL & ROMERO
CERTIFIED COURT REPORTERS

95

02:16 1   named off 11 companies for 2001?
02:16 2      A. Uh-huh.
02:16 3      Q. Is that yes?
02:18 4      A. Yes.
02:18 5      Q. Why did you reduce the number of companies that
02:16 6   you were selling for?
02:16 7      A. All of -- for pretty much all of 2002, I was --
02:16 8   I don't know how to phrase this, but I was just not in
02:16 9   the mood to do any business, period. I just was really
02:16 10   devastated by what happened to me.
02:17 11      Q. Okay. So it was a voluntary choice not to sell
02:17 12   those products; is that right?
02:17 13      A. In part it was -- yeah, I would say in part it
02:17 14   was voluntary.
02:17 15      Q. Okay. Tell me, in the 1099s that you got in
02:17 16   2001, how much did you get from Best Life?
02:17 17      A. The number that I gave you before.
02:17 18      Q. About the same amount?
02:17 19      A. Yeah.
02:17 20      Q. Okay. AFLAC was your top 1099. Right?
02:17 21      A. Yes.
02:17 22      Q. How much did you get from them in commissions
02:17 23   for 2001?
02:17 24      A. I -- I don't know. I can't tell you. I could
02:17 25   get you that information, but I don't know off the top

HILL & ROMERO
CERTIFIED COURT REPORTERS

96

02:17 1   of my head.
02:17 2      Q. What would you say the percentage was?
02:18 3      A. Of?
02:18 4      Q. For 2001, how much of your percentage of income
02:18 5   came from AFLAC?
02:18 6      A. I would say probably 90 percent probably.
02:18 7      Q. Okay. For instance -- okay, let's see. We
02:18 8   know that for AFLAC, 115,000 of that was for -- for
02:18 9   2002, 115,000 of that was for renewals. 5,000 was for
02:18 10   new sales. Right?
02:18 11      A. Yes.
02:18 12      Q. Okay. How about in 2001? What percentage of
02:18 13   the commission that you got in 2001 was from new sales
02:18 14   versus renewals?
02:18 15      A. I can't tell you, but I can tell you -- I can
02:18 16   tell you what we sold, and I can tell you what my
02:18 17   commission was, like what we just discussed. And then
02:18 18   we can do the math and figure that out.
02:19 19      Q. Okay.
02:19 20      A. But I just couldn't tell you.
02:19 21      Q. What did you sell?
02:19 22      A. We -- in 2001, I believe that my team had
02:19 23   $1.7 million in sales.
02:19 24      Q. Okay. And when you say your team --
02:19 25      A. All the people that were part of my region or

HILL & ROMERO
CERTIFIED COURT REPORTERS

02:19 1   part of my organization.
02:19 2       Q.   The 120 agents?
02:19 3       A.   Correct.
02:19 4       Q.   Okay.  And that was new sales?
02:19 5       A.   Yeah, new sales.
02:19 6       Q.   Okay.  And that was 1.7 million.  Okay.  Is
02:19 7   that right?
02:19 8       A.   That's correct.
02:19 9       Q.   What would your percentage have been of that?
02:19 10      A.   If we look back at the numbers that we
02:19 11  discussed earlier, generally about seven percent in
02:19 12  first year commissions and two percent in renewals.
02:19 13      Q.   Okay.  You said 90 percent of the $180,000 that
02:20 14  you made in 2001 -- and that's your gross income.
02:20 15  Right?
02:20 16      A.   Yes, ma'am.
02:20 17      Q.   And the rest of it went for what?
02:20 18      A.   That 180?  I think it was more than 180, now
02:20 19  that I'm thinking.  I'm thinking it was maybe closer to
02:20 20  200, but -- I'm sorry.  What was your question?
02:20 21      Q.   Well, okay.  I'm no math wizard, but between
02:20 22  two and seven percent of the 1.7 million --
02:20 23      A.   Uh-huh.
02:20 24      Q.   -- would have been commissions to you?
02:20 25      A.   Seven percent was my first year on

02:21 1   formula to con...te, but --
02:22 2       Q.   Okay.  The eleven-month signing period that
02:22 3   you're talking about, the 37 percent is paid monthly
02:22 4   over that 11 months?
02:22 5       A.   Yes, ma'am.  As a customer -- as a group makes
02:22 6   a payment, AFLAC receives the payment.  And then they
02:22 7   release one-eleventh of the remaining 37 percent that
02:22 8   they still owe you.
02:22 9       Q.   Okay.  So for 2002, some of that $120,000 that
02:22 10  you received wasn't really renewals?
02:22 11          MS. NEALLY:  Is that right?
02:22 12          MS. LEEDS:  No, because he would get it
02:22 13  all --
02:22 14      A.   That's correct.  That's correct, what you're
02:22 15  saying.
02:22 16      Q.   When you tell me 115,000, 37 percent of that --
02:22 17      A.   Not exactly, because it would depend on when
02:22 18  the policy was sold.  If you sold it on -- if you sold
02:23 19  it in December or January, then, yeah, 37 percent is
02:23 20  accurate.
02:23 21      Q.   Oh, that's right.
02:23 22      A.   However, if you sold it in June or July, part
02:23 23  of that 37 percent was already paid to you.  And then
02:23 24  the remaining of it is not called renewals.
02:23 25      Q.   Okay.  Let's go back to the 120 that you got in

2:20 1   1.7 million.
2:20 2       Q.   Right.
02:20 3       A.   So if you had to do the math, you would say
02:20 4   1.7 million times seven percent.
02:20 5       Q.   I can't do that in my head.  She's got a
02:20 6   calculator so we'll let her.
02:20 7           MR. STEELE:  119.
02:20 8           MS. NEALLY:  Thousand?
02:21 9           MS. LEEDS:  Uh-huh, 119,000.
02:21 10      Q.   So your share of that would be 119,000?
02:21 11      A.   In first year commission.
02:21 12      Q.   Okay.
02:21 13      A.   Now, before you write that down, also another
02:21 14  variable in computing that is that AFLAC wouldn't pay
02:21 15  you that full amount up front.  They wouldn't say, hey,
02:21 16  you sold 1.7 million so we are going to give you
02:21 17  119,000.  They would pay you that over time.  They
02:21 18  would pay you 63 percent of that 119 up front --
02:21 19      Q.   Okay.
02:21 20      A.   -- within the first 30 days of the policy being
02:21 21  sold.  Okay?  And then the remainder, the other
02:21 22  37 percent, would be paid to you over an eleven-month
02:21 23  time period.  Whenever a customer made a payment on
02:21 24  that policy, you would receive one-eleventh of the
21 25  remainder of that 37 percent.  So it's a difficult

02:23 1   2002.  How much of that was derived from BISD
02:23 2   enrollments?
02:23 3       A.   Enrollments that we had done in the past?
02:23 4       Q.   Right.  Well, we know 5,000 of it.  So it's
02:23 5   115,000.  Of the 115,000, how much of that was derived
02:23 6   from BISD enrollments in the past?
02:23 7       A.   I could not tell you.
02:23 8       Q.   Can you even tell that from the commission
02:23 9   sheets?
02:23 10      A.   You might be able to derive that from the
02:23 11  commission sheets, maybe.  On the commission sheets,
02:23 12  there's group numbers.  And if you look at the group
02:24 13  number, it will tell you how much you are getting paid
02:24 14  for that group.  So you might be able to tell that from
02:24 15  a commission sheet, from a commission statement.
02:24 16      Q.   What's the group number for BISD?  Do you know?
02:24 17      A.   I know one of the group numbers is L5864.  That
02:24 18  was their main number.
02:24 19      Q.   Why do they have more than one?
02:24 20      A.   Because they had a -- for some reason, they had
02:24 21  a separate billing for the people who didn't get paid
02:24 22  all year, I believe.  There were some people that only
02:24 23  got paid over nine months, like the maintenance people
02:24 24  and the cafeteria workers, for instance.  And I believe
02:24 25  that group number was U2181.

101

02:25 1     Q. So that would be more like ... at-will
02:25 2 employees?
02:25 3     A. I believe so, yes.
02:25 4     Q. Got an idea what the percentage would be of
02:25 5 that 115,000 that would have been derived from BISD
02:25 6 enrollments in the past?
02:25 7     A. No, ma'am, I don't know. Honestly, I don't
02:25 8 know.
02:25 9     Q. No idea?
02:25 10     A. I don't know.
02:25 11     Q. So obviously, you can't tell me how much of
02:25 12 that money was from the new sales?
02:25 13     A. No. I don't know.
02:25 14     Q. Okay. Okay. So the 119,000 wasn't paid up
02:25 15 front for the 1.7 million that your group in the Rio
02:25 16 Grande Valley, the 120 agents, produced. Right?
02:26 17     A. Correct.
02:26 18     Q. Can you tell me, of that 119,000, how much of
02:26 19 that would have been derived from BISD?
02:26 20     A. Of the 120,000 that I received as a 1099 for
02:26 21 2002, how much?
02:26 22     Q. No.
02:26 23     A. I'm sorry. I lost you.
02:26 24     Q. You said that you got --
02:26 25         MS. NEALLY: Six percent?

HILL & ROMERO
CERTIFIED COURT REPORTERS

102

02:26 1         MS. LEEDS: Seven percent.
02:26 2     Q. -- seven percent from 1.7 million generated
02:26 3 from new sales for the year 2001 from your group as the
02:26 4 regional manager for AFLAC?
02:26 5     A. Yes.
02:26 6     Q. And somebody did the math for me, and it's
02:26 7 119,000.
02:26 8     A. Yes.
02:26 9     Q. And of that, you get 63 percent up front?
02:26 10     A. Yes.
02:26 11     Q. Okay. And that, you would have generated in
02:26 12 2001?
02:26 13     A. Yes.
02:26 14     Q. Okay.
02:27 15         MS. LEEDS: Now, how much of that --
02:27 16         MS. NEALLY: Yeah.
02:27 17     Q. How much of that was derived from BISD
02:27 18 enrollments? You can't tell us that?
02:27 19     A. No, ma'am. I'm sorry. I can't.
02:27 20     Q. You don't have any idea?
02:27 21     A. No.
02:27 22     Q. You couldn't even tell us a percentage? You
02:27 23 can't even tell me a percentage of how much of that was
02:27 24 derived from BISD?
:27 25     A. No.

HILL & ROMERO
CERTIFIED COURT REPORTERS

103

02:27 1     Q. Do you ...ve any idea of what percentage of the
02:27 2 120 employees -- agents that you had, how much of it
02:27 3 was non-BISD? You don't have an idea?
02:27 4     A. Oh, yeah. That, I can tell you.
02:27 5     Q. Okay, tell me.
02:27 6     A. That, I can tell you. At BISD, I believe we
02:27 7 wrote about -- I believe it was about 500,000 of that
02:27 8 1.7 million.
02:27 9     Q. Okay. And of that, you would have gotten seven
02:27 10 percent from new sales?
02:28 11     A. Of the?
02:28 12     Q. 500,000.
02:28 13     A. No. Of that, I was entitled to 40 percent
02:28 14 commission. Yeah. That was my personal account.
02:28 15     Q. Even though other agents may have enrolled
02:28 16 people?
02:28 17     A. The way we would do it with other agents
02:28 18 participating is we would split commissions.
02:28 19     Q. Okay. So how did that work?
02:28 20     A. So if an agent went to go enroll, they would
02:28 21 split commissions with whoever the originating agent
02:28 22 was of the group.
02:28 23     Q. What would the split be?
02:28 24     A. It would vary. It would vary anywhere from
02:28 25 50/50 to 70/30.

HILL & ROMERO
CERTIFIED COURT REPORTERS

104

02:28 1     Q. Okay. Who got 50/50 and who got 70/30?
02:28 2     A. The originating agent --
02:28 3     Q. Which was you?
02:28 4     A. Correct. And that was just customary across
02:28 5 all AFLAC accounts -- would get anywhere from
02:28 6 30 to 50 percent of the commissions from the agent
02:29 7 level.
02:29 8     Q. Okay.
02:29 9     A. And in addition, the normal commissions that I
02:29 10 would receive as a regional manager, which was my
02:29 11 overwrite on the entire book of business.
02:29 12     Q. Okay. So how did you know if you were going to
02:29 13 get 30, and how did you know if you were going to get
02:29 14 50?
02:29 15     A. That was at my discretion.
02:29 16     Q. Who got 30 and who got 50? Or -- I'm sorry,
02:29 17 who got 50 and who got 70?
02:29 18     A. For years before 2001, like for 1998, when we
02:29 19 did the first enrollment, it was 50/50.
02:29 20     Q. Okay.
02:29 21     A. Meaning that the agent who wrote the business
02:29 22 received 50 percent of the agent commissions, and I
02:29 23 received 50 percent of the agent commissions.
02:29 24     Q. And plus your seven percent?
02:29 25     A. And plus -- correct. Plus my seven percent on

HILL & ROMERO
CERTIFIED COURT REPORTERS

105

02:29 1 the whole thing.
02:29 2    Q. Okay. It wasn't necessarily seven percent? It
02:30 3 varied?
02:30 4    A. It varied. Plus my stock bonus, plus my end of
02:30 5 the year bonus.
02:30 6    Q. Okay. And then 1999?
02:30 7    A. I believe we did a 60/40 split, meaning that
02:30 8 the agent who enrolled received 60 percent of the
02:30 9 commissions, and then I received 40 percent of the
02:30 10 commissions.
02:30 11    Q. So you got 40 percent of 40 percent. Correct?
02:30 12    A. Yes, that's correct.
02:30 13    Q. Okay. And then how about in 2000?
02:30 14    A. In 2000, I believe we -- I believe it was
02:30 15 70/30.
02:30 16    Q. Okay. So all the agents who enrolled got
02:30 17 70 percent?
02:30 18    A. Yes.
02:30 19    Q. And you got 30 percent --
02:30 20    A. Yes, ma'am.
02:30 21    Q. -- of 40 percent?
02:30 22    A. Correct.
02:30 23    Q. Okay. So of the 500,000 that you claim was
02:31 24 sold to BISD for supplemental products by AFLAC, you
02:31 25 got 30 percent of 40 percent of that amount in

HILL & ROMERO
CERTIFIED COURT REPORTERS

107

02:32 1 premiums?
02:32 2       THE WITNESS: No, in premium.
02:32 3       MR. STEELE: 20,000 in premium?
02:32 4       THE WITNESS: Correct.
02:32 5       MS. NEALLY: What's 12 percent of 500,000?
02:32 6       MR. STEELE: Six grand -- no, 60 grand.
02:33 7    Q. And so if 12 percent is the correct amount of a
02:33 8 30 percent of 40 percent share, you would have gotten
02:33 9 60 percent as your agent share; is that right?
02:33 10    A. I didn't understand the question.
02:33 11       MR. AGUILAR: Did you mean to say 60,000?
02:33 12       MS. NEALLY: What did I say?
02:33 13       MR. AGUILAR: Six percent.
02:33 14    Q. Let me do this again. If 12 percent is what
02:33 15 30 percent of 40 percent equals, which I have no idea,
02:33 16 but I have been told by my math wizards that's right.
02:33 17    A. That's correct.
02:33 18    Q. So 12 percent of 500,000, if that, in fact,
02:33 19 equals $60,000, that would have been your agent share
02:33 20 for 2000 enrollment; is that right?
02:33 21    A. Yes, ma'am.
02:33 22    Q. Okay. Plus seven percent?
02:33 23    A. Seven percent on?
02:33 24    Q. Of the 500,000.
02:33 25    A. Yes, ma'am.

HILL & ROMERO
CERTIFIED COURT REPORTERS

106

2:31 1 commissions, plus an additional seven percent; is that
02:31 2 correct?
02:31 3    A. Yes, that is correct.
02:31 4       (Off-the-record discussion).
02:31 5       THE WITNESS: I got cut at that time. I
02:31 6 didn't get anything for --
02:31 7       MS. NEALLY: Object to the responsiveness
02:31 8 of the non-question.
02:31 9       MS. LEEDS: So 30 percent of 40 percent of
02:31 10 sales by other people.
02:31 11       MS. NEALLY: Of the $500,000? If somebody
02:31 12 can do the math, I can't. No way.
02:32 13       MR. STEELE: It's 12 percent of 500 grand.
02:32 14       MS. NEALLY: You're just like a
02:32 15 calculator.
02:32 16       (Off-the-record discussion).
02:32 17    Q. Did you sell any of the 500,000 so that you got
02:32 18 a full 40 percent of that?
02:32 19    A. Yes, I did.
02:32 20    Q. How much percent would you say?
02:32 21    A. I would say I probably sold maybe 20,000 of it
02:32 22 myself.
02:32 23    Q. 20,000 of it yourself?
02:32 24    A. 20,000 of the --
2 25       MR. STEELE: In commissions versus

HILL & ROMERO
CERTIFIED COURT REPORTERS

108

02:33 1       MR. STEELE: Plus, if I understand
02:33 2 correctly, of the 500,000, 20,000 you sold directly,
02:33 3 and you got 40 percent of that.
02:34 4       THE WITNESS: Yes, that's correct.
02:34 5       MR. STEELE: Which is 8,000 smackers.
02:34 6       THE WITNESS: Yes, that's correct.
02:34 7       MS. NEALLY: What's seven percent of
02:34 8 500,000?
02:34 9       MS. LEEDS: 35,000. You said that was
02:34 10 8,000?
02:34 11       MR. STEELE: Uh-huh.
02:34 12       MS. NEALLY: So $103,000 of the
02:34 13 approximately --
02:34 14       MS. LEEDS: $119,000.
02:34 15       MS. NEALLY: -- $119,000?
02:34 16       MS. LEEDS: That was his 1099.
02:34 17    Q. That was your 1099 for the year 2000? 103,000
02:35 18 of that came from BISD?
02:35 19    A. I -- I lost you.
02:35 20       MR. AGUILAR: Objection; vague.
02:35 21    Q. Okay. Earlier, we did some math and you said
02:35 22 you had $1.7 million of sales in 2000.
02:35 23    A. No. That was for 2001.
02:35 24    Q. I'm sorry, for 2001. What were your sales in
02:35 25 2000? Because we need to be talking about 2000.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**109**

02:35 1  Right?

02:35 2     A.  For 2000, it was about 1.2 million.

02:35 3     Q.  Okay.  So the commissions -- no, I'm sorry.

02:35 4  The sales, actual sales of insurance products -- right?

02:35 5     A.  Uh-huh.

02:35 6     Q.  -- was $1.2 million in 2000?

02:35 7     A.  That's correct.

02:35 8     Q.  Okay.  And that's for the whole -- your whole

02:35 9  district?

02:35 10     A.  Yes.

02:35 11     Q.  As regional manager.  Right?

02:35 12     A.  For the whole region, yes.

02:35 13     Q.  Okay.  And in 2000, which is the last time you

02:36 14  did an enrollment for BISD -- correct?

02:36 15     A.  Yes.

02:36 16     Q.  -- you just described to us that your share of

02:36 17  that was about $103,000?

02:36 18        THE WITNESS:  Is that what the math came

02:36 19  out to?

02:36 20        MS. LEEDS:  I think the math would be

02:36 21  different, because the 500 was the percentage of the

02:36 22  1.7, which was 2001.  So if we're working with --

02:36 23        MS. NEALLY:  But 2001 is actually an

02:36 24  enrollment in 2000.

02:36 25        MS. LEEDS:  Correct.  But this is the

**110**

2:38 1  number that we worked these percentages out of.

02:38 2        MR. STEELE:  Time out.

02:38 3        MS. NEALLY:  Time out.  Off the record.

02:43 4        (Off-the-record discussion).

02:43 5            EXAMINATION

02:44 6  BY MR. STEELE:

02:44 7     Q.  Okay.  Mr. Chavez, back on the record.  We had

02:44 8  been talking earlier about total premiums to AFLAC for

02:44 9  the calendar year of roughly 1.7 million for all of

02:44 10  agents within your region.  Correct?

02:44 11     A.  Uh-huh.  Yes.

02:44 12     Q.  And of that 1.7 for calendar year 2001, roughly

02:44 13  $500,000 of those premium dollars were attributable to

02:44 14  the BISD policies.  Correct?

02:44 15     A.  No, that's not correct.

02:44 16     Q.  Okay.  The 500,000 was written in 2000 -- okay.

02:44 17  Let's go back just a second to make this clear.  When

02:44 18  you say the 500,000 in premiums was written in 2000,

02:44 19  again, we're talking about 500,000 in premiums

02:45 20  associated with the BISD account.  Correct?

02:45 21     A.  Uh-huh.

02:45 22     Q.  And you would enroll BISD through the cafeteria

02:45 23  plan and sell policies in roughly the late November,

02:45 24  December time frame each year.  Correct?

5 25     A.  Yes.

**111**

02:35 1     Q.  So in December and November of 2000, it's your

02:35 2  belief and recollection that you sold policies that

02:35 3  resulted in roughly 500,000 in premiums being

02:35 4  generated?

02:35 5     A.  500,000 was generated in December of 2000,

02:35 6  that's correct.

02:35 7     Q.  Okay.  But those premiums are paid and deducted

02:35 8  from employee paychecks during the calendar year 2001.

02:35 9  Correct?

02:45 10     A.  That is correct.

02:45 11     Q.  Okay.  So for purposes -- just to make sure

02:45 12  it's clear, of the 1.7 million in premiums that your

02:45 13  group generated for AFLAC in the calendar year 2001,

02:45 14  $500,000 of those premiums came from BISD?

02:46 15     A.  No.  No, that's not right, because the

02:46 16  500,000 -- the 500,000 that you are speaking of, that

02:46 17  500,000 was not chunked into the 1.7 million.  That was

02:46 18  part of 2000's premium.

02:46 19     Q.  Because earlier, you had said about

02:46 20  500,000 of it.  So -- all right.  So of the

02:46 21  1.7 million --

02:46 22     A.  Yes.

02:46 23     Q.  -- in 2001 --

02:46 24        MS. NEALLY:  2001?  He didn't sell any in

02:46 25  2001.

**112**

02:46 1        MR. AGUILAR:  Let him finish his question.

02:46 2     Q.  Let's talk about premiums to AFLAC.  I'm not

02:46 3  talking about commissions to your agents.  Okay?

02:46 4     A.  Correct.

02:46 5     Q.  Forget about that.  Premiums to AFLAC.  Am I

02:46 6  correct that from your region in the calendar year

02:46 7  2001, approximately 1.7 million in premiums were

02:46 8  generated to AFLAC?

02:46 9     A.  In new sale premiums.

02:47 10     Q.  In new sale premiums?

02:47 11     A.  Yes, that's correct.

02:47 12     Q.  Oh, okay.  Now, was any of that 1.7 million for

02:47 13  the calendar year 2001 attributable to new sales to

02:47 14  BISD employees?

02:47 15     A.  Yes.

02:47 16     Q.  How much?

02:47 17     A.  I can't tell you.

02:47 18     Q.  Okay.

02:47 19     A.  I can guesstimate and tell you that probably

02:47 20  about $50,000 -- $50,000 of the 1.7 million, and I'm

02:47 21  just guesstimating.

02:47 22     Q.  Was attributable to new sales to BISD

02:47 23  employees?

02:47 24     A.  That's correct.

02:47 25     Q.  For calendar year 2001?

113

**02:47 1** A. Yes.

**02:47 2** Q. Okay. Let's go back.

**02:47 3** MR. AGUILAR: You might ask him how before

**02:47 4** you go on.

**02:47 5** MR. STEELE: Yes.

**02:47 6** Q. How did you determine or guesstimate 50,000?

**02:47 7** A. The people who were on my -- in my region, some

**02:48 8** of those people were allowed to participate in the

**02:48 9** enrollment. And because my contract hadn't terminated

**02:48 10** yet, a portion of what they produced was lumped into

**02:48 11** that $1.7 million bucket.

**02:48 12** Q. And when you say you weren't terminated yet,

**02:48 13** what do you mean?

**02:48 14** A. I was fired on December 3rd, but I believe that

**02:48 15** my contract terminated in January because of a rule

**02:48 16** that AFLAC has to give you a 30-day notice. And as a

**02:48 17** consequence, some of the people who worked with me on

**02:48 18** my team were invited to participate in the enrollment.

**02:48 19** And so even though I didn't get to generate agent

**02:48 20** commissions, I did get to participate in the RSC

**02:49 21** commissions, that seven percent. Okay? But only a

**02:49 22** portion because in previous years it was just my team

**02:49 23** who enrolled.

**02:49 24** Q. But in 2001, people from outside your region

**02:49 25** helped with the enrollment of BISD?

HILL & ROMERO
CERTIFIED COURT REPORTERS

114

**:49 1** A. Yes.

**02:49 2** Q. Okay. And you only get overwrites if those

**02:49 3** sales agents come under the Dino Chavez region?

**02:49 4** A. That is correct.

**02:49 5** Q. Did the rest -- well, where did the 1,650,000

**02:49 6** in premiums originate for the year 2001?

**02:49 7** A. They were just too numerous of accounts to

**02:49 8** mention to you. I mean, but they were just new

**02:49 9** accounts, small accounts, little accounts, big

**02:49 10** accounts. I mean, they were all kinds of accounts that

**02:49 11** were opened throughout the year by my agents.

**02:50 12** Q. Let's go back to 2000 again. Earlier, you had

**02:50 13** said 500,000 of the 1.7 million total came from BISD.

**02:50 14** A. No, that's incorrect. I wasn't -- if I said

**02:50 15** that, I was not correct in saying that.

**02:50 16** Q. So in terms of the 1.7 million from your

**02:50 17** region, you are saying only 50,000 of that came from

**02:50 18** folks within Dino Chavez's region -- '

**02:50 19** A. Yes, sir.

**02:50 20** Q. -- for the year 2000?

**02:50 21** MR. AGUILAR: To BISD.

**02:50 22** Q. Attributable to BISD. What I don't understand

**02:50 23** is, are there any premium dollars -- the 1.7 in 2001,

**02:51 24** are any of those premium dollars attributable to the

**  25** enrollment done in 2000 for BISD?

HILL & ROMERO
CERTIFIED COURT REPORTERS

115

**02:51 1** A. It's pos.    .. It's possible that a small --

**02:51 2** that some --

**02:51 3** Q. And explain how that is possible.

**02:51 4** A. Just like I said earlier, if we were to submit

**02:51 5** business at the end of December or at the middle of

**02:51 6** December, sometimes because of a backlog at AFLAC,

**02:51 7** business would not get --

**02:51 8** MR. AGUILAR: Credited?

**02:51 9** A. -- credited until the following year. So it's

**02:51 10** possible that a portion -- it's probable that a portion

**02:51 11** of that business got allocated into the next year's

**02:51 12** bucket in terms of production. It's possible. How

**02:51 13** much of it, I couldn't tell you. I have no idea.

**02:52 14** MR. AGUILAR: Got it?

**02:52 15** Q. So in 2000, I believe you told us gross

**02:52 16** premiums for your entire region for the calendar year

**02:52 17** 2000 totaled 1.2 million?

**02:52 18** A. That is right.

**02:52 19** Q. Of that 1.2 million, how much of those gross

**02:52 20** premiums were attributable to policies sold to BISD

**02:52 21** employees?

**02:52 22** A. I can tell you of the 1.2 million that we got

**02:52 23** credit for for the year 2000, we wrote about 500,000 in

**02:52 24** December of 2000. How much of it actually got paid and

**02:53 25** credited for 2000, I don't know, because a portion of

HILL & ROMERO
CERTIFIED COURT REPORTERS

116

**02:53 1** it is probable that it got credited into the next

**02:53 2** year's bucket for 2001.

**02:53 3** Q. So let me understand something because this

**02:53 4** is -- I have, based on what I have heard earlier,

**02:53 5** assumed the following, and perhaps it was wrong. In

**02:53 6** fact, it was wrong if what you are saying now is

**02:53 7** correct. Even though the employees' paycheck

**02:53 8** deductions for the calendar year 2001 -- strike that.

**02:53 9** For the calendar year 2001, an employee will have a

**02:53 10** certain dollar amount deducted from his paycheck every

**02:53 11** month if he has elected to purchase through payroll

**02:53 12** deduction AFLAC insurance policies. Correct?

**02:53 13** A. Yes.

**02:53 14** Q. Those premiums, then, will not get actually

**02:53 15** paid to AFLAC until the calendar year 2001. Correct?

**02:54 16** A. Yes. That is correct.

**02:54 17** Q. Okay. But those same deductions for an

**02:54 18** employee for the calendar year 2001 were elected by the

**02:54 19** employee the previous December 2000. Correct?

**02:54 20** A. Yes.

**02:54 21** Q. And what you're telling us today is your team

**02:54 22** is credited with having sold policies for that total

**02:54 23** amount of premium dollar that won't be received by

**02:54 24** AFLAC until 2001, but your team is credited with those

**02:54 25** dollars as part of your sales in December 2000,

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

117

02:54 1 roughly, assuming there's no backl..
02:54 2    A. Assuming there's no backlog, yes, that's
02:54 3 correct. However, there was always a backlog in
02:54 4 December.
02:54 5    Q. Okay. Do you know, then, what percentage of --
02:55 6 as a general rule of the BISD enrollments were credited
02:55 7 during the actual year, the December, of enrollment?
02:55 8    A. No, sir, I don't. I could just take a guess at
02:55 9 it, but it would just be a guess.
02:55 10        MR. AGUILAR: I have to instruct you not
02:55 11 to guess.
02:55 12        THE WITNESS: Okay.
02:55 13        MR. AGUILAR: If you can give an estimate
02:55 14 that you feel is somewhat appropriate, you can do that,
02:55 15 but don't just guess.
02:55 16    A. I don't know. I don't know.
02:55 17    Q. Okay. What percentage of your region's
02:55 18 business enrolled employees during the last quarter of
02:55 19 each calendar year?
02:55 20    A. What percentage?
02:55 21    Q. I'm talking about from any employer source.
02:58 22 How much of your business was in the last calendar
02:58 23 quarter of each year?
02:58 24    A. The majority of it. I don't know the
02:58 25 percentage, but more than 25 percent.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

119

02:57 1        MS. ...ALLY: The 13th month.
02:57 2        MR. AGUILAR: Objection; vague. One
02:57 3 person asking a question at a time, because you're
02:57 4 mixing questions.
02:58 5    Q. Maybe I am, perhaps, confused. Would you get
02:58 6 paid commissions on renewals each month?
02:58 7    A. Yes.
02:58 8    Q. So in terms of the money going into your
02:58 9 pocket, you didn't really have to keep track of when a
02:58 10 particular policy renewed?
02:58 11    A. No.
02:58 12    Q. It would automatically renew. You would get a
02:58 13 portion of your paycheck associated with the renewals
02:58 14 each month?
02:58 15    A. Yes.
02:58 16    Q. And to maintain that business, you just simply
02:58 17 had to service the account and make sure the client was
02:58 18 happy with his claims and answer his questions.
02:58 19 Correct? Well, tell me what you did to service that
02:58 20 account.
02:58 21        MR. AGUILAR: Hang on. You are starting
02:58 22 to get off the particular issue that you were talking
02:58 23 about.
02:58 24        MR. STEELE: All right.
02:58 25        MR. AGUILAR: Let's let Ms. Neally finish

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

118

.56 1    Q. That's less than the majority. Was it more
02:58 2 than 50 percent?
02:58 3    A. Which --
02:58 4    Q. By premium dollars as opposed to --
02:58 5    A. I know. I know. I would say 40 to 45 percent
02:58 6 of all business that we did during the year was in the
02:58 7 months of October, November, December.
02:58 8    Q. And when you say business done during the year,
02:58 9 you are saying selling new policies. Correct?
02:58 10    A. That's correct.
02:58 11    Q. And with regard to renewals, that occurs
02:57 12 annually at the expiration of each policy. Correct?
02:57 13    A. Renewals occur -- yeah, as soon as the policy
02:57 14 enters its 13th month, it's considered a renewal. So
02:57 15 your commissions drop from the normal 40 down to seven,
02:57 16 and that starts on the 13th month of a policy.
02:57 17    Q. So your renewals are typically hitting, the
02:57 18 majority of them, that last quarter as well. Correct?
02:57 19    A. No.
02:57 20    Q. Why not?
02:57 21    A. No. I mean, you have to pay renewals
02:57 22 throughout the year.
02:57 23        MS. LEEDS: No. The actual time that it
02:57 24 renewed, the moment it renewed.
7 25        THE WITNESS: The time the policy --

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

120

02:58 1 her questioning, and then we can move on.
02:58 2        MS. LEEDS: It's 12:20. Are we breaking?
02:58 3        MR. STEELE: Well, maybe we can group and
02:58 4 figure out more direct questions that make more sense
02:59 5 and we can clear up some of these problems.
02:59 6        MR. AGUILAR: Do you have more that you
02:59 7 want to ask on this line before we break?
02:59 8        MS. NEALLY: Huh-uh. No.
02:59 9        MR. AGUILAR: Okay. Then let's go ahead
02:59 10 and take a lunch break.
02:59 11        (Lunch recess)
02:59 12        EXAMINATION
04:28 13 BY MS. NEALLY:
04:28 14    Q. I'm going to ask you some questions about
04:28 15 Plaintiff's Second Amended Original Complaint. Have
04:28 16 you had an opportunity to look at a copy of this?
04:28 17    A. I'm sure I have.
04:28 18    Q. You know what I'm talking about. Right?
04:28 19    A. No. I don't know what that language means.
04:28 20    Q. It's the petition that gets filed in a lawsuit
04:28 21 that is the basis for your claims in the lawsuit.
04:28 22    A. Okay.
04:28 23    Q. And your attorney has asked for leave to file a
04:28 24 second amended original complaint. Okay? And I've got
04:28 25 many notes on this, so I'm not going to attach this

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

121

04:29 1 copy, but we can attach a clean cop, , it. I'm going
04:29 2 to need you to look at one.
04:29 3     MR. AGUILAR: I will go ahead and give him
04:29 4 mine.
04:30 5     MS. NEALLY: If we can, I'd like to get a
04:30 6 clean copy of it and mark it as Exhibit 2. If we can
04:30 7 make a copy of that one, I'll make a copy of mine.
04:30 8 Okay?
04:30 9     MR. AGUILAR: In a while.
04:30 10     MS. NEALLY: Yeah.
04:30 11     Q. The first thing I'd like you to look at is
04:30 12 Paragraph 9. First -- let me ask you first, have you
04:30 13 seen the second amended original complaint before?
04:30 14     A. I'm sure I have, yes.
04:30 15     Q. Okay. Now, if you look at Paragraph 9, it
04:30 16 says, thereafter on August 14, 2001, Chavez received
04:30 17 information from BISD board member Randy Dunn
04:30 18 indicating an attempt by him and BISD to hire an agent
04:30 19 of record to provide all services, et cetera. So that
04:30 20 first paragraph. What information did you receive?
04:30 21 What happened on August 14, 2001?
04:30 22     A. I believe that was the date that I asked to
04:30 23 meet with Mr. Dunn, and it was my understanding that he
04:31 24 was the head of the board insurance committee. And as
04:31 25 the bid or as the RFP was written, it would potentially

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

122

04:31 1 exclude me from being able to participate in the
04:31 2 proposal.
04:31 3     Q. Why?
04:31 4     A. Because of the way it was worded. I don't
04:31 5 remember the exact wording, but I remember the wording
04:31 6 said something to the effect that they wanted not only
04:31 7 a cafeteria plan administrator, but also a -- I think
04:31 8 it's a 403(b) annuity administrator.
04:31 9     Q. Okay.
04:31 10     A. And because AFLAC was not in the business of
04:31 11 doing 403(b) administration, and neither was I, because
04:31 12 I was full-time with AFLAC, that was going to
04:32 13 potentially exclude me from being able to participate
04:32 14 in the bidding process. So that was my concern.
04:32 15     Q. Okay.
04:32 16     A. So at my initiation, Mr. Dunn agreed to meet
04:32 17 with me. And when we met --
04:32 18     Q. And that was August 14, 2001?
04:32 19     A. I believe that date is correct.
04:32 20     Q. And you had already gotten the TPA -- the RFP
04:32 21 for TPA on August 14, 2001?
04:32 22     A. I believe it had already been published or just
04:32 23 recently published before that date.
04:32 24     Q. Okay.
32 25     A. And so as of the date that I met with him --

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

123

04:32 1 obviously, that . .hy I wanted to meet with him, to
04:32 2 discuss that. And at the time of my meeting --
04:32 3     Q. Where did you meet?
04:32 4     A. We met -- I believe it was at the -- I think it
04:32 5 was at the pancake house.
04:32 6     Q. Okay.
04:33 7     A. I-Hop. I think it's called I-Hop Pancake
04:33 8 House.
04:33 9     Q. Who met, just you and he?
04:33 10     A. Just me and Mr. Dunn.
04:33 11     Q. Okay. You were saying at the time that you
04:33 12 met.
04:33 13     A. At the time of my meeting, it was basically
04:33 14 just to express to him my concern that I had been doing
04:33 15 this for three years and that I was not going to be
04:33 16 able to even be considered to be kept on because of the
04:33 17 wording. And at that point, he told me he didn't want
04:33 18 AFLAC being offered at the district any longer. And I
04:33 19 asked him why. And he said because people had a lot of
04:33 20 complaints about the disability plan that employees had
04:33 21 through the district. And that was a surprise to me,
04:33 22 because we didn't offer a disability plan for the
04:34 23 district. And obviously, he was confused with another
04:34 24 agent's disability product, which is -- I believe the
04:34 25 company is called Unum.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

124

04:34 1     Q. Unum?
04:34 2     A. I believe it's called Unum, which is the
04:34 3 current disability carrier for the district.
04:34 4     Q. Was that the current -- was that the carrier on
04:34 5 August 14, 2001?
04:34 6     A. I believe so, yes.
04:34 7     Q. Okay.
04:34 8     A. And they have been the carrier for years.
04:34 9     Q. Okay.
04:34 10     A. Okay. So when I corrected his assumptions, he
04:34 11 apologized to me, and he said, well, he says, obviously
04:34 12 I'm mistaken. I haven't received a single complaint
04:34 13 about AFLAC, and it was only about the disability
04:34 14 insurance. So he kind of retracted what he had said,
04:34 15 and he said, okay, well, then, I have no problem with
04:34 16 AFLAC then.
04:34 17     Q. Okay.
04:34 18     A. Okay. And that was the first part of the
04:34 19 conversation. The second part of the conversation
04:35 20 was -- involved him asking me if I did -- if I could do
04:35 21 all the different types of insurance policies that were
04:35 22 available at the district. And I said that I was only
04:35 23 limited by whatever AFLAC could offer.
04:35 24     Q. Okay.
04:35 25     A. Because, again, of my loyalty to AFLAC. At

HILL & ROMERO
CERTIFIED COURT REPORTERS

125

04:35 1   that time, he also mentioned to me, I knew a
04:35 2   gentleman by the name of Arnie Olivarez. And I said,
04:35 3   yes, I had known the gentleman, and in my opinion he
04:35 4   didn't have a very highly-regarded reputation. Again,
04:35 5   that's just my opinion because of news stories and news
04:35 6   articles that had been published about him throughout
04:35 7   the Valley area. At that point, he also asked me if I
04:38 8   wouldn't mind working with Arnie Olivarez. And I saw
04:38 9   no reason that I should have to work with him, since I
04:38 10  had taken care of the account by myself for the last
04:38 11  three years. So I saw no reason to share commissions
04:38 12  or work with Mr. Olivarez, so I declined at that time.
04:38 13      Q. What did you tell him?
04:38 14      A. I told him I would prefer not to be associated
04:38 15  with that individual.
04:38 16      Q. And what did he say?
04:38 17      A. He didn't say much of anything, other than he
04:38 18  said he would like to have one agent do everything for
04:38 19  the district.
04:38 20      Q. Okay. What did you tell him when he said that?
04:38 21      A. Well, I told him I could do everything for the
04:38 22  district as long as it included things that I could
04:38 23  offer through AFLAC.
04:38 24      Q. What did you perceive him as wanting to
04:38 25  offer -- well, for instance, disability insurance.

HILL & ROMERO
CERTIFIED COURT REPORTERS

126

04:38 1      A. Uh-huh.
04:37 2      Q. AFLAC didn't have disability insurance?
04:37 3      A. AFLAC sells disability insurance. Yes, they
04:37 4   do. However, there's a difference between the product
04:37 5   that's currently being offered at the district now and
04:37 6   the product that AFLAC offers.
04:37 7      Q. What's the difference?
04:37 8      A. Well, the difference is that the current
04:37 9   product is a group-underwritten product, as compared to
04:37 10  an individually-underwritten product.
04:37 11      Q. Okay.
04:37 12      A. And if you know anything about insurance, group
04:37 13  products are generally less in cost, and they have more
04:37 14  restrictions, and there's less underwriting to be able
04:37 15  to qualify for coverage.
04:37 16      MS. LEEDS: Can you explain that? Less
04:37 17  underwriting?
04:37 18      THE WITNESS: Less underwriting, yes,
04:37 19  ma'am. If a person was applying for disability
04:37 20  coverage on an individual policy, I would basically
04:37 21  need to ask you everything regarding your health
04:37 22  history. I would have to find out if you were -- you
04:38 23  know, if you were this or you were that, et cetera. On
04:38 24  a group policy, I would also have to ask you
38 25  potentially about your health history but, for example,

HILL & ROMERO
CERTIFIED COURT REPORTERS

127

04:38 1   it would be lin... ed to, have you been hospitalized in
04:38 2   the last six months? No. Okay, you qualify. Done.
04:38 3   So the type of questions you need to answer are a lot
04:38 4   less.
04:38 5      MS. LEEDS: Okay.
04:38 6      THE WITNESS: Additionally, some other
04:38 7   differences between the two types of disability are
04:38 8   that on an individual plan, you can generally take it
04:38 9   with you when you leave employment. On a group plan,
04:38 10  you can't. It ends. And because of those
04:38 11  restrictions, there's no way that an individual plan
04:38 12  can be competitive with a group plan.
04:38 13      Q. It's like a health insurance?
04:38 14      A. Exactly.
04:38 15      Q. What other types of policies did AFLAC not
04:38 16  offer that other companies offered?
04:38 17      A. There was life insurance, same thing. AFLAC
04:38 18  offered individually-underwritten life insurance, and
04:38 19  the product that BISD had was a group life insurance.
04:38 20  So the same thing would apply. It would be much easier
04:39 21  for somebody to sign up for a group plan as compared to
04:39 22  an individual plan.
04:39 23      Q. Which is why with your life insurance -- you
04:39 24  did sell life insurance?
04:39 25      A. Oh, sure. We did sell it.

HILL & ROMERO
CERTIFIED COURT REPORTERS

128

04:39 1      Q. Yeah.
04:39 2      A. We did sell it, but we didn't do it for the
04:39 3   district.
04:39 4      Q. Who had BISD's group life insurance?
04:39 5      A. The person who still has it, a gentleman by the
04:39 6   name of Rudy Espinoza, who is an agent here in
04:39 7   Brownsville.
04:39 8      Q. What other types of policies were there out
04:39 9   there, other insurance coverage?
04:39 10      A. There was dental insurance, and I believe at
04:40 11  the time AFLAC had just started offering dental
04:40 12  insurance.
04:40 13      Q. And that was individual?
04:40 14      A. Again, all of AFLAC's products are individual.
04:40 15      Q. Right.
04:40 16      A. And I believe that the district's plan was a
04:40 17  blue plan.
04:40 18      Q. Okay. Who was the dental policy with? Do you
04:40 19  know?
04:40 20      A. I think the carrier is called Delta Dental.
04:40 21      Q. How about the life insurance?
04:40 22      A. The one I just mentioned to you. Life
04:40 23  insurance was --
04:40 24      Q. Oh, Rudy Espinoza?
04:40 25      A. The carrier, I believe, is TransAmerica.

HILL & ROMERO
CERTIFIED COURT REPORTERS

129

04:40 1    Q.  Can you think of any other.

04:40 2    A.  The cancer policy.  The cancer policy was the

04:40 3 one that Mr. Olivarez sold at the district.

04:40 4    Q.  Does he continue to have it?

04:40 5    A.  Excuse me?

04:40 6    Q.  Does he continue to have it?

04:40 7    A.  He continues to have the policy, yes.

04:40 8    Q.  What company carries that?

04:40 9    A.  I believe it's called Hartford.

04:40 10   Q.  Any others?

04:40 11   A.  Let me write them down.  There was cancer,

04:40 12 there was disability, there was dental --

04:41 13        MR. AGUILAR:  Accident.

04:41 14   A.  -- life.  There was a product called prepaid

04:41 15 legal.

04:41 16        MS. LEEDS:  That's a racket.

04:41 17        THE WITNESS:  AFLAC didn't offer that.

04:41 18        MS. LEEDS:  Right.

04:41 19   A.  Besides that -- and then the AFLAC products

04:41 20 that we sold.

04:41 21   Q.  Okay.

04:41 22   A.  And I believe that was all of the supplemental

04:41 23 products that employees could participate in other than

04:41 24 the annuities.

04:41 25   Q.  How long did your conversation with Mr. Dunn

130

:41 1 last?

04:41 2    A.  I would say probably an hour, maybe an hour and

04:41 3 15 minutes.  I think we probably ordered breakfast or

04:41 4 something and ate breakfast together.

04:42 5    Q.  Was he hostile towards you in this

04:42 6 conversation?

04:42 7    A.  No, not at all.  He was hostile to me at the

04:42 8 beginning, when he first thought that AFLAC was the

04:42 9 district's disability carrier.

04:42 10   Q.  Okay.

04:42 11   A.  But when I corrected him, his tone changed

04:42 12 completely.  He said, oh, okay.  Well, then, it's my

04:42 13 mistake, my fault.  I didn't know that.  So after that,

04:42 14 we had no problem until he mentioned Arnie Olivarez.

04:42 15 And when he mentioned that, that's when -- I wouldn't

04:42 16 say I was hostile, but I said, no, I don't want to be

04:42 17 -- I don't want to do anything with this gentleman.

04:42 18   Q.  When he mentioned working with Olivarez, did he

04:42 19 tell you he wanted you to pay commissions to Olivarez?

04:42 20   A.  His words were if I minded working with him.

04:42 21   Q.  Okay.

04:42 22   A.  And that's all he said.

04:42 23   Q.  That's the sum total of how he explained what

04:43 24 he wanted you to do with Olivarez?

: 25   A.  Yes.  He didn't say, will you pay commissions

131

04:43 1 to him, or will you give him dollars.  He said, will

04:43 2 you work with him.  And I took that to imply, you are

04:43 3 going to have to share some of your commissions with

04:43 4 this guy.

04:43 5    Q.  But that was your assumption?

04:43 6    A.  That was my assumption, yes, ma'am.

04:43 7    Q.  Now, when you said earlier you didn't want to

04:43 8 work with Olivarez because of his reputation from news

04:43 9 articles you read, what are you talking about?

04:43 10   A.  If you will get on -- I guess on the Internet

04:43 11 nowadays, we have access to all that information.  He's

04:43 12 a gentleman that just has a reputation for doing

04:43 13 business the wrong way.  Again, those are just, in

04:43 14 lawyer language, hearsay.  People have told me that and

04:43 15 so I --

04:43 16   Q.  Uh-huh.  What have people told you?

04:43 17   A.  People -- what people have told me is that he

04:43 18 bribes people, that he will bribe officials to get the

04:44 19 business.

04:44 20   Q.  And where has he been accused of doing that?

04:44 21   A.  Just to name a few, I think San Benito ISD,

04:44 22 Edinburg ISD, the County of Hidalgo.  I think also

04:44 23 maybe Weslaco ISD, and I think Corpus Christi ISD.

04:44 24   Q.  Do you know if he's been arrested, indicted or

04:44 25 anything?

132

04:44 1    A.  No.  He's never been indicted, not to my

04:44 2 knowledge.

04:44 3    Q.  Have you heard that he's tried to bribe

04:44 4 officials at BISD?

04:44 5    A.  Yes.

04:44 6    Q.  And what have you heard?

04:45 7    A.  What I've heard is that he bribed some of the

04:45 8 board members and top level administrators.  Again,

04:45 9 this was just stuff I heard.  I don't know it to be

04:45 10 accurate.

04:45 11   Q.  Okay.  And you put that in the past tense, that

04:45 12 he had already done this; is that correct?

04:45 13   A.  I believe, yes.

04:45 14   Q.  Okay.  So which board members did he bribe?

04:45 15   A.  Let me just go back just a second.  A bribe is

04:45 16 only considered a bribe, in my opinion or my knowledge,

04:45 17 if you are giving something to somebody in return for

04:45 18 doing something for me in a public official capacity.

04:45 19 That's my opinion of what a bribe is.  However, a bribe

04:45 20 is not -- if I give you money for your campaign that

04:45 21 isn't a large dollar amount, I don't think that's

04:48 22 considered a bribe, because I think Texas is one of a

04:48 23 few states that doesn't have a limit to how much you

04:48 24 can donate to somebody, in cash or otherwise.  So what

04:48 25 I have been told regarding a bribe, as I call it, that

133

04:46 1    he had donated a large amount of n.    .y to Marilyn Del
04:46 2    Bosque and to Randy Dunn and to Hugh Emerson.
04:46 3        Q.  How much do you mean by a large campaign
04:46 4    contribution?
04:46 5        A.  In the area of 5- to $10,000.
04:46 6        Q.  Did he do it in his name?
04:46 7        A.  I don't know.  Again, it's just what people
04:46 8    have told me.  I don't know what the facts are.
04:46 9        Q.  Who told you this?
04:46 10       A.  Other insurance agents probably.  I couldn't
04:46 11   tell you who, but just the rumor mill, people telling
04:46 12   me.
04:47 13       Q.  Well, what's the rumor mill of people telling
04:47 14   you?  I mean, you are choosing not to tell me who told
04:47 15   you this.
04:47 16           MR. AGUILAR:  Objection; mischaracterizing
04:47 17   the witness's testimony and argumentative.  You can
04:47 18   answer.
04:47 19       A.  Honestly, ma'am, I don't know.  I don't know
04:47 20   who told me specifically.
04:47 21       Q.  Were you told this by any other board members?
04:47 22       A.  It's possible that I was told by other board
04:47 23   members that that had occurred or that had happened.
04:47 24   That's possible, yes.
04:47 25       Q.  And which board members told you that?
                    HILL & ROMERO
            CERTIFIED COURT REPORTERS

134

:47 1        A.  I don't know.  Honestly, I don't know.
04:47 2        Q.  Did you report this to any law enforcement
04:47 3    official?
04:47 4        A.  No, I didn't.
04:47 5        Q.  When were you told this?
04:47 6        A.  About the same time that I had a meeting with
04:47 7    Mr. Dunn.
04:47 8        Q.  So August of 2001; is that right?
04:47 9        A.  Yes, ma'am.
04:48 10       Q.  What were the bribes to top level board
04:48 11   members -- I mean top level administrators?
04:48 12       A.  I was told that Dr. Sauceda, Noe Sauceda, was
04:48 13   going to be given a $10,000 raise after being on the --
04:48 14   being hired, just months into his contract, in exchange
04:48 15   for favors that he provided to board members.
04:48 16       Q.  What does this have to do with Mr. Sauceda -- I
04:48 17   mean Mr. Olivarez?
04:48 18       A.  Well, in exchange for favors to the board
04:48 19   members, or bribes that board members took,
04:49 20   Dr. Sauceda, in exchange, agreed to recommend Arnie
04:49 21   Olivarez's company, which turned out to be true.
04:49 22       Q.  What turned out to be true?
04:49 23       A.  The fact that -- the rumor was that Dr. Sauceda
04:49 24   was going to recommend Arnie Olivarez's proposal.
:25        Q.  Okay.  You said the fact that the rumor was
                    HILL & ROMERO
            CERTIFIED COURT REPORTERS

135

04:49 1    that he was go..    .o recommend Olivarez's proposal.
04:49 2    Did he recommend Olivarez's proposal?
04:49 3        A.  Yes, he did.
04:49 4        Q.  And who did he recommend the proposal to?
04:49 5        A.  To the board for approval.
04:49 6        Q.  When?
04:49 7        A.  I believe that was on November 20th.
04:50 8        Q.  Okay.  And that was supposed to be the TPA?
04:50 9        A.  Correct.  Basically do what I was doing.
04:50 10       Q.  Okay.  But that's not who was selected; is that
04:50 11   correct?
04:50 12       A.  That's who was recommended by Sauceda.
04:50 13       Q.  Okay.
04:50 14           MS. LEEDS:  Objection; nonresponsive.
04:50 15           MR. AGUILAR:  Go ahead and finish
04:50 16   answering.
04:50 17       A.  That -- Arnie Olivarez's company, National Plan
04:50 18   Administrators, was the company that was being
04:50 19   recommended on, I believe, the November 20th board
04:50 20   meeting for approval, as recommended by Sauceda and the
04:50 21   administration.
04:50 22           MS. LEEDS:  Objection; nonresponsive.
04:50 23           MS. NEALLY:  Objection; nonresponsive.
04:50 24       A.  Okay.  I'm sorry.
04:50 25       Q.  And Mr. Olivarez's company wasn't selected?
                    HILL & ROMERO
            CERTIFIED COURT REPORTERS

136

04:50 1        A.  He eventually got the business.
04:50 2        Q.  But that wasn't -- my question to you was, but
04:50 3    that wasn't who was selected.  And then you went into
04:50 4    this --
04:50 5        A.  Yeah.  On November 20th, nobody was selected.
04:50 6        Q.  Okay.  Who was eventually selected?
04:51 7        A.  The proposal that I submitted through AFLAC was
04:51 8    selected.
04:51 9        Q.  What date were they selected?
04:51 10       A.  I believe it was the 29th of November.
04:51 11       Q.  How much were you told that Olivarez's company
04:51 12   contributed to Marilyn Del Bosque-Gilbert's campaign?
04:51 13       A.  How much money?
04:51 14       Q.  Yes.
04:51 15       A.  $10,000.
04:51 16       Q.  And the same thing for Dunn and the same thing
04:51 17   for Emerson?
04:51 18       A.  No.  For Dunn and Emerson, I was told it was
04:51 19   somewhere between 5- and $10,000.
04:51 20       Q.  But you don't know who told you this?
04:51 21       A.  No, ma'am, I don't.
04:51 22       Q.  You can't tell me the name of one person who
04:51 23   told you this?
04:51 24       A.  No, ma'am, I can't.
04:51 25       Q.  You can't tell me the name of one person who
                    HILL & ROMERO
            CERTIFIED COURT REPORTERS

## 137

1 told you that?

2     A.  No, ma'am, I can't.

3     Q.  You can't tell me the name of one person who

4 told you that Dr. Sauceda was going to be given a

5 $10,000 raise in exchange for favors to BISD, in

6 exchange for him agreeing to recommend Arnie Olivarez's

7 company on the November 20th meeting?

8     A.  No.  I can't tell you who that was.

9     Q.  Were you told by more than one person?

10     A.  Yes.

11     Q.  And you can't tell me the names of anyone?

12     A.  (Shook head negatively.)

13     Q.  Is that correct?

14     A.  That's correct.

15     Q.  What was your understanding of why Dr. Sauceda was

16 given the $10,000 raise was a payback to those three

17 trustees for their getting the contributions that had

18 already been made to their campaigns; is that right?

19     A.  No.

20     MR. AGUILAR:  Objection;

21 mischaracterizing.

22     Q.  What was your understanding that was for?

23     A.  No.  My understanding was that the people

24 who -- the board members who I mentioned earlier were

25 going to vote for Arnie Olivarez to receive one or more

## 139

1     A.  Whenever they ran for election, yes.

2     Q.  Okay.  And Dr. Sauceda was going to get this

3 $10,000 raise --

4     A.  Uh-huh.

5     Q.  -- is that right?

6     A.  Correct.

7     Q.  Okay.

8     A.  But that's not all.

9     Q.  What else was Dr. Sauceda going to get?

10     A.  Dr. Sauceda wasn't the person that was going to

11 be getting something.  It was going to be also the

12 board members who were getting something in addition to

13 the campaign contributions.

14     Q.  What were they getting in addition?

15     A.  I was told that there was a pending lawsuit on

16 Sweezey Construction, which Marilyn's husband was a

17 manager in, and that they would not be sued for the

18 mold damage that occurred in some of the school

19 districts that they participated in building.  That was

20 one thing.

21     Q.  Who told you this?

22     A.  Again, I --

23     Q.  You can't remember; is that right?

24     A.  Yes, ma'am.  I can't remember.

25     Q.  You realize you have made many very serious

## 138

1 of the insurance contracts that he was going to -- the

2 school district was going to go out for proposals on.

3 In addition, again, what I was told was that

4 Dr. Sauceda would recommend the carrier or the agent

5 that would be most favorable to some of the board

6 members, and in addition, that some of the board

7 members, specifically the ones that I mentioned, were

8 going to be granted some favors.

9     MS. NEALLY:  Object to the responsiveness

10 of the answer.

11     MS. LEEDS:  Yeah.  I know he just changed

12 it.

13     Q.  Earlier, you testified that the bribes that

14 were received by Marilyn, Dunn, and Emerson were their

15 campaign contributions that they got; is that correct?

16     A.  That's how I understand it, yes.

17     Q.  Okay.  And that in exchange for those campaign

18 contributions they told Dr. Sauceda, we'll give you a

19 $10,000 raise in exchange for you recommending

20 Olivarez's company to be the TPA?

21     A.  Yes.  That is correct.

22     Q.  Okay.

23     A.  Uh-huh.

24     Q.  And these are campaign contributions that these

25 individuals already got back in May?

## 140

1 allegations against Mrs. Del Bosque-Gilbert?

2     A.  Yes, ma'am.

3     Q.  Do you know Mrs. Del Bosque-Gilbert?

4     A.  She used to be a friend of mine.

5     Q.  And when was she a friend of yours?

6     A.  Before she ran for election.

7     Q.  After she ran for election, did she continue to

8 be a friend of yours for some period of time?

9     A.  I would say an acquaintance, yes.

10     Q.  Okay.  When you described her as a friend

11 earlier, what did you mean by that?

12     A.  I was president of The University of Texas Exes

13 Association here in Brownsville, and she was a member

14 of the UT Exes and so she would attend some of our

15 functions.

16     Q.  Okay.

17     A.  And they were just social functions so that's

18 how I got to know her and become a friend of hers, the

19 way I saw it.

20     Q.  How long have you known her?

21     A.  Probably two or three years maybe.

22     Q.  Two to three years before you became TPA or two

23 or three years what?

24     A.  Two or three years from today.

25     Q.  So you have known her --

04:57 1   A.  Probably three years.

04:57 2   Q.  At the same time that she was elected?  Is that

04:57 3   when you got to know her or you knew her before she was

04:57 4   elected?

04:57 5   A.  No.  I knew her before she was elected.

04:57 6   Q.  And she was elected in May 2001; is that right?

04:57 7   A.  I don't know, but that's probably right.

04:57 8   Q.  Okay.  But you knew her a couple of years

04:57 9   before that?

04:57 10   A.  I think so, yes.

04:57 11   Q.  Okay.  When did you decide she was not your

04:57 12   friend?

04:57 13   A.  When the proposition to give the business to

04:58 14   Arnie Olivarez was being considered, or on the agenda

04:58 15   to be voted on, I called Marilyn.  And I said, Marilyn,

04:58 16   I have sent you information about my proposal through

04:58 17   AFLAC and I have three years of very satisfactory

04:58 18   experience with the district.  I told her, I'm not

04:58 19   looking for any favors from you.  I'm not looking for

04:58 20   any kind of -- anything special from you because I know

04:58 21   you or because you are my friend.  I'm just asking you

04:58 22   to be honest and do the right thing.  And at that

04:58 23   point, the tone of her voice kind of -- I don't know.

04:58 24   I just felt something when I was talking to her.  And

04:58 25   at that point, I believe her words were, well, the best

142

4:59 1   I can do is abstain on the motion.  And that's what she

04:59 2   said.  And I said, well, I'm not asking you to do

04:59 3   anything.  Again, I don't want to tell you to do

04:59 4   anything that's against your morals or unethical to do,

04:59 5   but please take a look at my proposal if you haven't

04:59 6   done so already, because it is in the best interest of

04:59 7   the district.  And when she told me that, the best I

04:59 8   can do is abstain, there was just something in her tone

04:59 9   of voice that led me to believe that there's something

04:59 10   up here.  There's just --

04:59 11   Q.  On November 29th -- no, November 20th, you said

04:59 12   that they voted on the proposal.  Right?

04:59 13   A.  Yes, ma'am.

04:59 14   Q.  What was the vote?

04:59 15   A.  I believe the vote was three to three to one

04:59 16   abstention.

04:59 17   Q.  Who abstained?

04:59 18   A.  I believe it was Joe Colunga, who was the board

05:00 19   president.

05:00 20   Q.  Okay.  And the three votes for are the three

05:00 21   people that you have named earlier, Emerson, Dunn, and

05:02 22   Del Bosque-Gilbert?

05:00 23   A.  Uh-huh.  They were the three that were in favor

05:00 24   of Arnie's proposal.

10 25   Q.  When was Mrs. Del Bosque-Gilbert's husband a

05:00 1   supervisory employee at Sweezey Construction?

05:00 2   A.  I don't know.

05:00 3   Q.  You don't have any idea?

05:00 4   A.  No, I don't.  I knew during the time I knew her

05:00 5   as a friend that he was employed by Sweezey

05:00 6   Construction, but I don't know when he got hired or

05:00 7   when his employment terminated.

05:00 8   Q.  You have no idea?

05:00 9   A.  No, ma'am, I don't.

05:00 10   Q.  And this information that's contained in your

05:00 11   lawsuit that says, during this time period -- this is

05:00 12   in Paragraph 11.  During this time period, the BISD

05:01 13   board of trustees was considering litigation against

05:01 14   Sweezey Construction because mold had been found in

05:01 15   buildings they constructed.  You know this from what

05:01 16   people told you; is that correct?

05:01 17   A.  Yes, ma'am.

05:01 18   Q.  Who were the people that told you that?

05:01 19   A.  Again, I don't know.

05:01 20   Q.  You don't know.  Trustee Del Bosque-Gilbert's

05:01 21   husband was a supervisory employee at Sweezey

05:01 22   Construction at that time.  Do you know that to be

05:01 23   true?

05:01 24   A.  Yes.

05:01 25   Q.  At what time?  At the time the litigation was

144

05:01 1   being considered in 2001?

05:01 2   A.  At some point, he was a supervisor -- a manager

05:01 3   for that company.  I don't know the exact dates.

05:01 4   Q.  Okay.  So you don't know the exact dates?

05:01 5   A.  No, ma'am.

05:01 6   Q.  So during the time that litigation was being

05:01 7   considered, you don't know whether he was still an

05:01 8   employee?

05:01 9   A.  I don't know for a fact, but --

05:01 10   Q.  Okay.  Well, that's what I'm asking.  I'm

05:01 11   asking you what you know.  Do you know that for a fact?

05:01 12   A.  No, I don't, not for a fact.

05:01 13   Q.  Okay.  Trustee Del Bosque-Gilbert therefore

05:01 14   reached an agreement with Superintendent Sauceda to the

05:02 15   effect that if no recommendation was made by him to

05:02 16   pursue litigation against Sweezey Construction, she

05:02 17   would go along with his plan to appoint Mr. Olivarez as

05:02 18   BISD's agent of record.  And this is something that you

05:02 19   were told by someone, or something that you just

05:02 20   surmised?

05:02 21   A.  This is something that I was told.

05:02 22   Q.  And who told you that?

05:02 23   A.  Again, I don't know.

05:02 24   Q.  You don't have any idea who told you that?

05:02 25   A.  No, ma'am, I don't.

145

05:02 1    Q. Okay. So this is based -- thi_ ...tement is
05:02 2    based specifically on hearsay by people you don't even
05:02 3    know who they are?
05:02 4         MR. AGUILAR: Objection -- my objection --
05:02 5    I'm trying to figure out what the right objection would
05:02 6    be. You are asking him questions about -- you are
05:02 7    assuming this is all based on his information. He's
05:02 8    giving his understanding of what he knows. The
05:02 9    petition itself doesn't necessarily have to be based
05:02 10   just on his information. Okay? Those are facts, and I
05:02 11   just want to -- he's saying what he knows. And I don't
05:03 12   know if it's multifarious, if it's mischaracterizing
05:03 13   the evidence --
05:03 14        MS. NEALLY: Well, maybe -- okay. You
05:03 15   made an objection. Okay.
05:03 16   Q. Let me ask you something else, too. On
05:03 17   November 20th, was the proposal for Mr. Olivarez to be
05:03 18   appointed as the agent of record or be appointed as a
05:03 19   TPA, the same as what you were?
05:03 20   A. It was to be the TPA and the agent of record.
05:03 21   Q. Okay. So the proposals were changed when AFLAC
05:03 22   was actually appointed on November 29th?
05:03 23   A. Was changed in what way?
05:03 24   Q. The bid. The bid was changed.
05:05 25   A. But in what way? How was it changed?

HILL & ROMERO
CERTIFIED COURT REPORTERS

146

5:03 1    Q. Was the agent of -- were you the agent of
05:03 2    record for BISD?
05:03 3    A. I was the agent of record for AFLAC business,
05:03 4    but not for all policies of BISD, which is different
05:03 5    than what he was asking for.
05:03 6    Q. And that's shown in what documents?
05:04 7    A. You can probably research it and find a table
05:04 8    or a comparison chart that was put together by some
05:04 9    administrators that shows that.
05:04 10   Q. Okay. So it's your testimony that on
05:04 11   November 20th, Mr. Olivarez's proposal was to be the
05:04 12   agent of record for all insurance policies for BISD?
05:04 13   A. All supplemental insurance policies for BISD.
05:04 14   Q. Okay. And that was more expansive than what
05:04 15   you were able to offer with AFLAC, since you could only
05:04 16   offer AFLAC products; is that correct?
05:04 17   A. That's correct.
05:04 18   Q. Is that against the law?
05:04 19   A. To be an agent of record?
05:04 20   Q. No. For the proposal that was submitted on
05:04 21   November 20th in the manner it was submitted, is it
05:04 22   your position that that was against the law?
05:04 23   A. I don't understand.
05:04 24        MR. AGUILAR: When what was against the
)5 25   law?

HILL & ROMERO
CERTIFIED COURT REPORTERS

147

05:05 1        MS. ...ALLY: The proposal.
05:05 2        MR. AGUILAR: Objection to the extent you
05:05 3    are asking for a legal conclusion, but he can explain
05:05 4    his understanding.
05:05 5    Q. The proposal that was submitted November 20th
05:05 6    when he was proposing to be the agent of record, was
05:05 7    that against the law as you were aware of it at that
05:05 8    point in time?
05:05 9    A. The proposal that was submitted by Arnie
05:05 10   Olivarez --
05:05 11   Q. For the -- that was being voted on
05:05 12   November 20th.
05:05 13   A. I believe it was.
05:05 14   Q. Okay. And why do you believe that?
05:05 15   A. Because of an Attorney General's opinion.
05:05 16   Q. So this is based on the Attorney General's
05:05 17   opinion --
05:05 18   A. Yes.
05:05 19   Q. -- that you submitted in other documents; is
05:05 20   that right?
05:05 21   A. Correct.
05:05 22   Q. Okay. And you continue to maintain that what
05:05 23   was submitted on November 20th was against the law?
05:05 24   A. Yes.
05:05 25   Q. Okay.

HILL & ROMERO
CERTIFIED COURT REPORTERS

148

05:05 1        (Off-the-record discussion).
05:06 2    Q. Do you know what the motion was on that
05:06 3    November 20th meeting --
05:06 4    A. No.
05:06 5    Q. -- for Mr. Olivarez?
05:06 6    A. No.
05:06 7    Q. If the motion was for him to be appointed as
05:06 8    the TPA for the 403(b) and 125 section plans, is that
05:06 9    your statement, that that's against the law?
05:06 10   A. I don't know what the motion was.
05:06 11   Q. No. You're not answering my question. Okay?
05:06 12   I'm just saying if the motion was, that it was to be
05:06 13   the TPA for the 403(b) and 125 -- the Section 125
05:06 14   insurance policies, was that against the law?
05:06 15        MR. AGUILAR: Again, just objecting to the
05:06 16   extent it calls for a legal conclusion. If you
05:06 17   understand the question --
05:06 18   A. With being an agent of record?
05:06 19   Q. Yeah. If that was the motion.
05:06 20   A. Without being an agent of record --
05:06 21   Q. Right.
05:06 22   A. -- then I would guess, no, that wouldn't be
05:06 23   against the law.
05:06 24   Q. Have you read the minutes for the November 20th
05:06 25   meeting?

HILL & ROMERO
CERTIFIED COURT REPORTERS

149

```
05:06 1      A. I don't think I have.
05:06 2      Q. So you don't know whether it was as the agent
05:07 3   of record?
05:07 4      A. No, but I read the proposal. That, I did read
05:07 5   in detail.
05:07 6         MS. NEALLY: Object to the responsiveness
05:07 7   of the answer after the word "no."
05:07 8      Q. Continuing with Paragraph 11 of the Exhibit 2,
05:07 9   you stated that, Trustee Dunn also reached an agreement
05:07 10  with Superintendent Sauceda to have Dunn's wife,
05:07 11  Deborah Dunn, reinstated to her former position as
05:07 12  secretary to Superintendent Sauceda, along with a
05:07 13  $10,000 raise. Who told you this?
05:07 14     A. Who told me which part?
05:07 15     Q. Okay. That part of what I just read to you.
05:07 16     A. Again, I don't remember who told me.
05:07 17     Q. You don't have any idea who told you?
05:08 18     A. No.
05:08 19     Q. You can't give me one name of anybody that told
05:08 20  you that?
05:08 21     A. No, other than just that she did get put back
05:08 22  in the position and that Ms. Parra was hired.
05:08 23     Q. That's not -- we're not going into Ms. Parra.
05:08 24  We're talking about Deborah Dunn. Reinstated to her
05:08 25  former position as secretary to the superintendent,
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

150

```
5:08 1   along with the $10,000 raise.
05:08 2      A. Who told me that was going to happen?
05:08 3      Q. No.
05:08 4      A. Who told me that it did happen?
05:08 5      Q. Trustee Dunn -- no. Let's read the sentence
05:08 6   again. Okay? Trustee Dunn also reached an agreement
05:08 7   with Superintendent Sauceda to have Dunn's wife,
05:08 8   Deborah Dunn, reinstated to her former position as
05:08 9   secretary to Superintendent Sauceda, along with a
05:08 10  $10,000 raise.
05:08 11     A. Uh-huh.
05:08 12     Q. Who told you that, that there was an agreement
05:08 13  between Dunn and Sauceda to have Deborah reinstated to
05:08 14  the former position as secretary to Superintendent
05:08 15  Sauceda, along with a $10,000 raise?
05:08 16     A. I don't think anybody told me because it was
05:08 17  public information.
05:08 18     Q. So you surmised that there was an agreement
05:09 19  between Dunn and Sauceda for this to happen?
05:09 20     A. I think that, along with, again, people telling
05:09 21  me that that was what was happening behind the scenes.
05:09 22     Q. And who told you that?
05:09 23     A. I don't know.
05:09 24     Q. Who told you it was happening behind the
30 25   scenes?
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

151

```
05:09 1      A. Again, I told you I don't know.
05:09 2      Q. Was it a board member?
05:09 3      A. It's possible it was.
05:09 4      Q. Which board member would it have been?
05:09 5      A. I don't know.
05:09 6      Q. You don't have a clue? Of the seven board
05:09 7   members, you don't know which one it was?
05:09 8      A. I don't know.
05:09 9      Q. Did you talk to more than one about it?
05:09 10     A. I don't know.
05:09 11     Q. Okay. Were you aware that there was a lawsuit
05:09 12  by Deborah Dunn against BISD?
05:09 13     A. No.
05:09 14     Q. You didn't know that?
05:09 15     A. No.
05:09 16     Q. Were you aware that as a result of the
05:09 17  settlement agreement Deborah Dunn was reinstated to
05:09 18  Dr. Sauceda's position?
05:09 19     A. No.
05:09 20     Q. It's your position that this occurred because
05:09 21  there was an agreement reached between Trustee Dunn and
05:09 22  Superintendent Sauceda for this to occur?
05:09 23     A. Yes.
05:10 24     Q. And that's your position, and it's based on
05:10 25  what you heard from people?
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

152

```
05:10 1      A. Correct.
05:10 2      Q. But you don't know the names of the people?
05:10 3      A. Correct.
05:10 4      Q. Okay. Let's continue with the rest of that
05:10 5   sentence. And to have his girlfriend, Elizabeth Parra,
05:10 6   placed in a position in the BISD insurance department
05:10 7   at a substantial salary. And you're talking about
05:10 8   Randy Dunn's girlfriend, Elizabeth Parra?
05:10 9      A. Yes.
05:10 10     Q. Who told you that Randy Dunn's girlfriend was
05:10 11  Elizabeth Parra?
05:10 12     A. Again, I don't know.
05:10 13     Q. You don't know the name of one person that told
05:10 14  you that?
05:10 15     A. No.
05:10 16     Q. You can't think of the name of one trustee,
05:10 17  one, you know, citizen?
05:10 18     A. At this moment, I don't know.
05:10 19     Q. So, again, that part of that sentence is
05:10 20  based on hearsay and speculation?
05:10 21     A. I don't know that legal terminology.
05:10 22        MR. STEELE: Speculation?
05:10 23     Q. You don't know what speculation is?
05:10 24     A. Speculation? Okay. In legal terms, I don't
05:11 25  know but in --
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

152

```
05:11  1        MS. LEEDS:  It means t... ...ame thing in
05:11  2   English.
05:11  3        THE WITNESS:  In English, yeah, I guess
05:11  4   so.
05:11  5        Q.  Okay.  And hearsay means it was based on what
05:11  6   people told you, these unnamed people.  Right?
05:11  7        A.  Yes, that's correct.
05:11  8        Q.  Okay.  The next sentence is, In order to
05:11  9   receive the consideration they were seeking, Defendants
05:11 10   Del Bosque-Gilbert and Dunn had to agree to
05:11 11   Superintendent Sauceda's plan to appoint Arnulfo
05:11 12   Olivarez as BISD's agent of record for all BISD's
05:11 13   insurance policies.  Who told you that?
05:11 14        A.  Again, I don't know.
05:11 15        Q.  Again, that's based on unknown people telling
05:11 16   you this --
05:11 17        A.  Yes.
05:11 18        Q.  -- and your speculation; is that correct?
05:11 19        A.  That's correct.
05:11 20        Q.  And when you say there, Olivarez as agent of
05:11 21   record for all BISD's insurance policies, is that what
05:12 22   the proposal said?
05:12 23        A.  I believe it said all ancillary products.
05:12 24        Q.  And how do you define ancillary products?
05:12 25        A.  Supplemental products.
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

154

```
 :12  1        Q.  Like the policies we have already discussed?
05:12  2        A.  Correct.
05:12  3        Q.  The last sentence, Del Bosque-Gilbert and Dunn
05:12  4   therefore agreed to allow Defendant Sauceda to violate
05:12  5   Plaintiff Chavez's rights in order to receive their own
05:12  6   personal paycheck -- payback.  I'm sorry.  This is,
05:12  7   again, based on your speculation and what these unknown
05:12  8   people told you; is that right?
05:12  9        A.  Uh-huh.
05:12 10        Q.  Is that yes?
05:12 11        A.  Yes, ma'am.
05:12 12        MR. AGUILAR:  Objection to the extent it
05:12 13   calls for a legal conclusion.
05:12 14        Q.  You have a lawsuit pending against you in state
05:12 15   court; is that correct?
05:13 16        MR. AGUILAR:  The one -- you can answer.
05:13 17        MS. LEEDS:  Has he been sued?
05:13 18        Q.  Do you have a lawsuit pending against you in
05:13 19   state court?
05:13 20        A.  Against me?
05:13 21        Q.  Yes.
05:13 22        A.  Yes.
05:13 23        Q.  You are a named defendant?
05:13 24        A.  Yes.
     25        Q.  And who is suing you?
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

155

```
05:13  1        A.  It is Ma... ,n Del Bosque and Randy Dunn.
05:13  2        Q.  And what is the basis of that lawsuit, if you
05:13  3   know?
05:13  4        MR. AGUILAR:  Object to form.
05:13  5        Q.  Not anything that your attorney told you, but
05:13  6   have you read the pleadings?
05:13  7        MR. AGUILAR:  Objection to the extent the
05:13  8   documents would speak for themselves, but you can
05:13  9   explain your understanding.
05:13 10        A.  I think it says slander.
05:13 11        Q.  Slander?
05:13 12        A.  I believe that's what it says.
05:13 13        Q.  That you have made false claims?  Is that what
05:13 14   you understand that to be?
05:13 15        A.  I believe so.
05:13 16        Q.  And you are aware that Marilyn Del
05:14 17   Bosque-Gilbert and Dunn were originally named in this
05:14 18   lawsuit that we are here on today; is that right?
05:14 19        MR. AGUILAR:  Objection; calls for a legal
05:14 20   conclusion and mischaracterizing the evidence.
05:14 21        Q.  Let me repeat it to make sure I didn't say
05:14 22   something that was privileged.
05:14 23        MS. NEALLY:  Well, can you read it back to
05:14 24   us please, and let me make sure that I --
05:14 25        (The requested portion was read)
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

156

```
05:14  1        Q.  And just to clarify, that you are aware that
05:14  2   Marilyn Del Bosque-Gilbert and Randy Dunn were
05:14  3   originally named as defendants -- in other words,
05:14  4   parties you were suing -- in the lawsuit that we are
05:14  5   here on today?
05:14  6        MR. AGUILAR:  Same objections.  Go ahead.
05:14  7        A.  Yes.
05:15  8        Q.  And you are aware that they were dismissed from
05:15  9   the lawsuit?
05:15 10        MR. AGUILAR:  Same objections.  Go ahead.
05:15 11        A.  Yes.
05:15 12        Q.  Let me continue with your next paragraph,
05:15 13   Paragraph 12.  Thereafter, Mr. Chavez received word
05:15 14   that his proposal had been misquoted by Defendant
05:15 15   Sauceda and his staff.  How did you become aware that
05:15 16   Dr. Sauceda had misquoted your proposal?
05:15 17        A.  I was given a copy of the chart that
05:15 18   administration put together comparing all the different
05:15 19   plans that was given out to the insurance committee.
05:15 20        Q.  Do you know who prepared the chart?
05:15 21        A.  I don't know for a fact, but I was told that
05:15 22   Errisuriz and Sauceda put it together.
05:15 23        Q.  Okay.  And you disagreed with what was stated
05:16 24   in the chart; is that right?
05:16 25        A.  Sure, yes.
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

157

05:16 1    Q. And is that the extent of t    misquoting that
05:16 2  you're talking about, is that chart?
05:16 3    A. Yes.
05:16 4    Q. You have supplied that chart in response to
05:16 5  your Request for Production. I think I have --
05:16 6    A. Yes, I have.
05:17 7    Q. -- a copy of it. Let me get it out real fast.
05:17 8  Is this the document you are referring to?
05:17 9    A. Yes, ma'am, it is.
05:17 10    MR. STEELE: For the record, could you
05:17 11  read those Bates numbers on the bottom corners?
05:17 12    THE WITNESS: Right here?
05:17 13    MR. STEELE: Yeah.
05:17 14    THE WITNESS: 001058 and 001059 and
05:17 15  001060.
05:18 16    MS. NEALLY: Okay. If we could get a copy
05:18 17  of that, and we'll mark that as Exhibit 3.
05:18 18    Q. It's your understanding that Mr. Errisuriz and
05:18 19  Dr. Sauceda prepared that document; is that correct?
05:18 20    A. Yes.
05:18 21    Q. How did you get a copy of it?
05:18 22    A. I think it was dropped off at my office by
05:18 23  somebody.
05:18 24    Q. You don't know who dropped it off?
05:18 25    A. No, ma'am.

HILL & ROMERO
CERTIFIED COURT REPORTERS

158

5:18 1    Q. And did you talk to anybody at the district
05:18 2  about it?
05:18 3    A. I can't recall that I did.
05:18 4    Q. You don't think you did?
05:18 5    A. I don't think I did.
05:18 6    Q. And you said that chart is how you believe you
05:18 7  were misquoted by Dr. Sauceda?
05:19 8    A. Yes.
05:19 9    Q. And that's the basis for that paragraph -- I
05:19 10  mean, that sentence in Paragraph 12?
05:19 11    A. Yes, ma'am.
05:19 12    Q. Who do you believe that chart was given to?
05:19 13    A. To all insurance committee members.
05:19 14    Q. And when you say "committee members," do you
05:19 15  mean just the trustees or do you also mean the people
05:19 16  from the different campuses?
05:19 17    A. I didn't know.
05:19 18    Q. Okay. Did you talk to anybody about who it was
05:19 19  given to?
05:19 20    A. No.
05:19 21    Q. Did you talk to anyone that had received a copy
05:19 22  of it?
05:19 23    A. I believe I probably talked to one or two board
05:19 24  members.
19 25    Q. Which board members?

HILL & ROMERO
CERTIFIED COURT REPORTERS

159

05:19 1    A. I believe   talked to Otis Powers and Pat
05:19 2  Lehmann, and I told them that that report was
05:20 3  definitely inaccurate.
05:20 4    Q. Did you know Dr. Sauceda before he came on
05:20 5  the -- I mean, before he became superintendent?
05:20 6    A. No.
05:20 7    Q. When did you first meet him?
05:20 8    A. The night of the insurance committee meeting.
05:20 9    Q. Which insurance committee meeting?
05:20 10    A. I believe the date of it was October 30th.
05:20 11    Q. October 30th?
05:20 12    A. I believe so.
05:20 13    Q. That was the first time you met him?
05:20 14    A. Yes.
05:20 15    Q. Did you try to meet with him before then?
05:20 16    A. No.
05:20 17    Q. When do you believe that the document that you
05:21 18  have supplied to us was disseminated to the insurance
05:21 19  committee?
05:21 20    A. Right around October 30th.
05:21 21    Q. Okay. Now, there's writing on this document.
05:21 22    A. Uh-huh.
05:21 23    Q. Is that your handwriting?
05:21 24    A. Yes, it is.
05:21 25    Q. There is also, at the bottom, some plus signs

HILL & ROMERO
CERTIFIED COURT REPORTERS

160

05:21 1  with boldface type. Is that your boldface type and
05:21 2  plus signs?
05:21 3    A. Yes, it is, ma'am.
05:21 4    Q. Okay. And is this revised version a document
05:21 5  that you supplied to insurance committee members?
05:21 6    MR. AGUILAR: Objection; vague. But go
05:21 7  ahead and answer.
05:21 8    A. Did I supply this to insurance committee
05:21 9  members? Yes. Yes, it is.
05:21 10    Q. Okay. And when did you give them this
05:21 11  document?
05:21 12    A. Shortly after somebody dropped it off at my
05:21 13  office.
05:21 14    Q. Okay. So before the October 30th meeting?
05:22 15    A. No, no, after the October 30th meeting.
05:22 16    Q. Okay. But the copy that you got that was
05:22 17  dropped off by this mysterious person was not -- did
05:22 18  not have any of your revisions on it or the boldface
05:22 19  type at the bottom; is that correct?
05:22 20    A. Correct.
05:22 21    Q. Okay. The notes that you have made and the
05:22 22  boldface type is your view of the discrepancies or the
05:22 23  misquotes for this document; is that correct?
05:22 24    A. Yes, ma'am.
05:22 25    Q. Okay. Are there any additional misquotes that

HILL & ROMERO
CERTIFIED COURT REPORTERS

DINO X. CHAVEZ

161

05:22 1 you think are made in this docum...?

05:22 2     A. Are there any additional misquotes besides what
05:22 3 I already corrected?

05:23 4     Q. That's right.

05:23 5     A. No.

05:23 6     Q. Okay. Did you talk to any administrator about
05:23 7 this document before you disseminated it with your
05:23 8 corrections?

05:23 9     A. No.

05:23 10     Q. Did you talk to any administrator with BISD
05:23 11 after you made your corrections?

05:23 12     A. No.

05:23 13     Q. Did you meet with Dr. Lopez?

05:23 14     A. I may have met with Dr. Lopez, but I'm not sure
05:23 15 I did.

05:23 16     Q. Okay. How about with -- how about with
05:23 17 Mr. Errisuriz?

05:23 18     A. No.

05:23 19     Q. Had you ever met with Mr. Errisuriz before the
05:23 20 October 30th meeting?

05:23 21     A. Yes.

05:23 22     Q. When did you meet with Mr. Errisuriz?

05:24 23     A. Sometime around the time period that I met with
05:24 24 Mr. Dunn.

05:24 25     Q. Okay. In August?

HILL & ROMERO
CERTIFIED COURT REPORTERS

163

05:25 1     Q. Was he polite?

05:25 2     A. Oh, yeah. Yes.

05:25 3     Q. Did you know Mr. Errisuriz before you met with
05:25 4 him?

05:25 5     A. I personally did not, no.

05:25 6     Q. Okay. What else did you-all talk about?

05:25 7     A. He asked me to explain to him what the AFLAC
05:25 8 products were. And so we got into the details of the
05:25 9 products and --

05:25 10     Q. Okay. Did you meet with anybody else besides
05:25 11 Mr. Dunn and Mr. Errisuriz about your concerns about
05:25 12 the August meeting?

05:25 13     A. I wasn't finished with the prior answer.

05:25 14     Q. Okay.

05:25 15     A. Mr. Errisuriz also asked me if I couldn't do
05:25 16 all the insurances for the district.

05:25 17     Q. Okay.

05:25 18     A. Again, I was taking that to mean all the
05:25 19 supplemental insurances.

05:26 20     Q. What did you tell him?

05:26 21     A. I told him that as much as I'd like to do it,
05:26 22 that it was probably not in the best interest of
05:26 23 employees because of differences in policies.

05:26 24     Q. Okay. And what did he say to that?

05:26 25     A. Nothing, really. We just continued our

HILL & ROMERO
CERTIFIED COURT REPORTERS

162

5:24 1     A. Yes, ma'am.

05:24 2     Q. And what did you meet with him about?

05:24 3     A. For the same concern that I had that I
05:24 4 expressed to Mr. Dunn, which was basically the wording
05:24 5 of the proposal.

05:24 6     Q. The wording of what proposal?

05:24 7     A. The wording of the proposal, the RFP, that came
05:24 8 out that said they wanted a cafeteria plan and 403(b)
05:24 9 administrator. The same concern that I had with
05:24 10 Mr. Dunn, I also met with Mr. Errisuriz to express that
05:24 11 concern.

05:24 12     Q. And what did you-all talk about? How long did
05:24 13 your meeting last?

05:24 14     A. Maybe 30 minutes.

05:24 15     Q. Okay. And who else was present?

05:24 16     A. Just me and him.

05:24 17     Q. Okay. And this occurred sometime in August?

05:24 18     A. In that same time frame, around August 14th, I
05:24 19 believe.

05:24 20     Q. Okay. And what did you discuss with him?

05:24 21     A. That because of the wording of the proposal
05:24 22 that we were going to be excluded from consideration.

05:25 23     Q. What did he say to that?

05:25 24     A. He said he would look into it and try to
25 25 resolve the matter.

HILL & ROMERO
CERTIFIED COURT REPORTERS

164

05:26 1 conversation.

05:26 2     Q. Okay. What else did you talk about?

05:26 3     A. Again, we just talked about the AFLAC policies
05:26 4 as far as the policy details, what they covered and
05:26 5 didn't cover and prices and premiums and that kind of
05:26 6 stuff. That's about it.

05:26 7     Q. In talking to Mr. Errisuriz and when you
05:26 8 conveyed to him it wasn't in the best interest of the
05:26 9 employees, did you feel like you were educating him
05:26 10 about this?

05:26 11     A. He seemed to already know what policies we sold
05:26 12 and what we had to offer. But I feel, yeah, I was
05:26 13 educating him a little bit.

05:26 14     Q. Did he seem like he was receptive?

05:26 15     A. Yes.

05:26 16     Q. Okay.

05:26 17     A. Yes.

05:26 18     Q. Did you have any other meetings with
05:27 19 Mr. Errisuriz after that?

05:27 20     A. No, not to my recollection.

05:27 21     Q. Have you talked to him since then?

05:27 22     A. No. Oh, yes, I have. I take that back.

05:27 23     Q. When did you talk to him?

05:27 24     A. I talked to him -- I can't remember the date
05:27 25 that I talked to him, but he sent me a questionnaire to

HILL & ROMERO
CERTIFIED COURT REPORTERS

165

```
05:27  1    complete. And the questionnaire in... .ed questions
05:27  2    regarding the cafeteria plan, as far as how we were
05:27  3    going to conduct our enrollment and what we did and
05:27  4    didn't do. And then it also had some questions
05:27  5    about -- that related to cancer policies. And when he
05:27  6    sent me the questionnaire, I called him and I said,
05:27  7    what does a cancer policy have to do with the cafeteria
05:27  8    plan? You guys aren't going out for proposals on the
05:28  9    cafeteria plan. What does that have to do with
05:28 10    anything? And he really couldn't answer me.
05:28 11        Q.  Okay.
05:28 12        A.  And interestingly, when I read the questions
05:28 13    about the cancer policy, his questions were -- on his
05:28 14    questionnaire were specifically questions related to
05:28 15    things related to cancer that AFLAC does not cover.
05:28 16            MS. NEALLY:  Object to the responsiveness
05:28 17    of the answer.
05:28 18            MS. LEEDS:  Join.
05:28 19        Q.  Okay. So you said that you --
05:28 20            MS. NEALLY:  After the word interestingly
05:28 21    enough.
05:28 22        Q.  You said that you asked him about the cancer,
05:28 23    and he couldn't answer that?
05:28 24        A.  Correct.
05:28 25        Q.  Anything else to that conversation?
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

167

```
05:30  1        A.  I think ... was the keeper of the proposals.
05:30  2        Q.  Did you talk to him about it?
05:30  3        A.  We chatted a little bit about it.
05:30  4        Q.  What did you talk about?
05:30  5        A.  Why they were trying to give the business to
05:30  6    Arnie.
05:30  7        Q.  Okay.
05:30  8        A.  And he was hesitant to talk to me. He didn't
05:30  9    want to say much. But what he did say to me, he said,
05:30 10    if it was my choice, we wouldn't change because we are
05:31 11    perfectly happy where we are at. However, if somebody
05:31 12    hears me say that, it could cost me my job, so that's
05:31 13    off the record.
05:31 14        Q.  What did you ask him? Did you say, why are you
05:31 15    trying to give this job to Arnie?
05:31 16        A.  We probably just chitchatted about it, and I
05:31 17    knew he wasn't in a position to be able to answer that
05:31 18    question for me. So I didn't try to -- I didn't try to
05:31 19    put him on the spot, ask him anything. Basically, the
05:31 20    purpose of meeting there was to look at the proposals.
05:31 21        Q.  How many times -- you said you met with him
05:31 22    once or twice?
05:31 23        A.  Once, maybe twice.
05:31 24        Q.  What was the second time? You met with him
05:31 25    once to look at the proposal. What was the other
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

166

```
5:28  1        A.  That was it. He asked me just to complete the
05:28  2    questionnaire.
05:28  3        Q.  Was that after October 30th or before
05:28  4    October 30th?
05:29  5        A.  I don't remember.
05:29  6        Q.  Did you have any other conversations with any
05:29  7    other administrators regarding the request for
05:29  8    proposal?
05:29  9        A.  The only other person I met with was Dr. Lopez.
05:29 10        Q.  And how often did you meet with Dr. Lopez?
05:29 11        A.  Maybe once or twice.
05:29 12        Q.  And when would that have been?
05:29 13        A.  It was that same time period, but I -- I don't
05:29 14    know.
05:29 15        Q.  In August, September, October?
05:29 16        A.  It was sometime between -- after meeting with
05:29 17    Mr. Dunn and prior to the award of the proposal;
05:29 18    probably sometime in November.
05:30 19        Q.  Okay. What did you meet with Dr. Lopez about?
05:30 20        A.  I wanted to look at a copy of Arnie's proposal.
05:30 21        Q.  Okay.
05:30 22        A.  And so I looked at it just to verify that --
05:30 23    what it said or didn't say, so that I could see it with
05:30 24    my own eyes. And so he allowed me to do that.
  30 25        Q.  Okay.
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

168

```
05:31  1    meeting?
05:31  2        A.  It was probably just once that I met with him.
05:31  3    I can't remember why I would have met with him a second
05:32  4    time.
05:32  5        Q.  Did you know Dr. Lopez prior to him becoming
05:32  6    head of the insurance department?
05:32  7        A.  No. I knew his wife, Elia.
05:32  8        Q.  Okay.
05:32  9        A.  Judge Cornejo-Lopez.
05:32 10        Q.  How did you know her?
05:32 11        A.  She was a friend of mine also from the
05:32 12    Brownsville Texas Exes.
05:32 13        Q.  Let me just ask you, Dr. Sauceda, you never met
05:32 14    with him; is that right?
05:32 15        A.  I can't -- no, I have not.
05:32 16        Q.  Have you ever had any telephone conversations
05:32 17    with him?
05:32 18        A.  No, I have not.
05:32 19        Q.  Did you ever try to talk to him?
05:32 20        A.  I don't think I did. Usually, in my line of
05:32 21    business, it was dealing with all the paperwork and
05:33 22    dealing with all the technical aspect of the insurance
05:33 23    department and the payroll department that would be
05:33 24    interacting with me. The superintendent was not
05:33 25    anybody that I ever dealt with.
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

169

05:33 1  Q. In the year prior, did you me.. with Hector
05:33 2  Gonzalez ever?
05:33 3  A. Never.
05:33 4  Q. How about --
05:33 5          (Off-the-record discussion).
05:33 6  Q. -- Mr. Jackson?
05:33 7  A. Never met with him either.
05:33 8  Q. Okay. I'd like you to look at Exhibit 3. This
05:33 9  comparison that was done, the first thing that you have
05:33 10  on here that's in your writing is set up fees,
05:33 11  implementation fees. It's got $450 down. That's not
05:34 12  correct?
05:34 13  A. That's not correct.
05:34 14  Q. Do you know where that information would have
05:34 15  come from?
05:34 16  A. No, I don't.
05:34 17  Q. Had it been done in the year prior?
05:34 18  A. It had never been done.
05:34 19  Q. And by NC, it's --
05:34 20  A. No charge.
05:34 21  Q. Right. Okay. Drop down to monthly fee per
05:34 22  participant. Had there ever been a fee charged?
05:34 23  A. Never.
05:34 24  Q. Okay. Postage, had you ever charged for
05:34 25  postage?

HILL & ROMERO
CERTIFIED COURT REPORTERS

170

05:34 1  A. Never.
05:34 2  Q. And flexible bank account, you did have one; is
05:34 3  that right?
05:34 4  A. Yes.
05:34 5  Q. What is a flexible bank account? What does
05:34 6  that mean?
05:34 7  A. I believe it's a bank account where you can
05:34 8  keep fees for the flexible spending account monies.
05:34 9          MR. AGUILAR: Day care stuff?
05:34 10          THE WITNESS: The unreimbursed medical and
05:34 11  the dependent care monies.
05:34 12  Q. Okay. How about on the postage? You see where
05:35 13  they have got the asterisks for First Financial and
05:35 14  Flex Source? Was there any type of condition there
05:35 15  that your company had to be selected to provide and
05:35 16  market certain things for there not to be a charge?
05:35 17  A. Could you repeat the question?
05:35 18  Q. Was there any type of comparable requirement
05:35 19  under the postage, as is indicated by First Financial
05:35 20  and Flex Source with the asterisks? For instance,
05:35 21  First Financial. If it's -- okay. They are not going
05:35 22  to charge fees if they are selected to provide and
05:35 23  market the tax qualified and other financial products
05:35 24  to employees. Same thing with --
35 25  A. Okay. And you're asking me?

HILL & ROMERO
CERTIFIED COURT REPORTERS

171

05:38 1  Q. Would it be the same kind of condition, or just
05:38 2  no charge no matter what the postage was?
05:38 3  A. No, there's no charge.
05:38 4  Q. Okay.
05:38 5  A. There's no charge for postage.
05:38 6  Q. Okay. Renewal fees. When you say there's no
05:38 7  charge, there's no charge to whom, the employee?
05:38 8  A. To either the employee or the employer.
05:38 9  Q. Okay. Tax sheltered annuity administration.
05:38 10  That's something that you could not offer. Right?
05:38 11  That's something we talked about before?
05:38 12  A. That's something that AFLAC didn't do.
05:38 13  Q. Okay. And you were exclusive to AFLAC, is that
05:38 14  right, at that time?
05:38 15  A. Pretty much so, yes.
05:38 16  Q. And what's the -- and the annual audit per
05:38 17  participant is also something that was not available;
05:38 18  is that right?
05:38 19  A. I believe that refers to annuities and, again,
05:38 20  it was NA.
05:38 21  Q. Okay. And you don't know where the information
05:38 22  that -- for instance, charge for postage, $3.00, 4.50,
05:38 23  you don't know where that was generated?
05:37 24  A. I don't know.
05:37 25  Q. And you never spoke with anybody at

HILL & ROMERO
CERTIFIED COURT REPORTERS

172

05:37 1  administration with BISD about where those figures were
05:37 2  from?
05:37 3  A. No.
05:37 4  Q. Did you ever speak with any of the trustees
05:37 5  about where the information was from?
05:37 6  A. No. When I called -- or when I spoke to Otis
05:37 7  Powers and Pat Lehmann, who I mentioned earlier, they
05:37 8  didn't know where it came from either.
05:37 9  Q. But you never called anybody at the district to
05:37 10  find out where they got that information?
05:37 11  A. No.
05:37 12  Q. And what you did to correct this is you sent
05:37 13  this document to the insurance committee?
05:37 14  A. Yes, I did. I believe I sent it to all board
05:37 15  members and the insurance committee.
05:37 16  Q. Did you send it to anybody in administration?
05:38 17  A. I don't recall.
05:38 18  Q. Looking at Page 2 of this document --
05:38 19          MR. AGUILAR: 3, you mean?
05:38 20          MS. NEALLY: Page 2 of the document.
05:38 21          MR. AGUILAR: You had just been looking at
05:38 22  Page 2.
05:38 23  Q. Page 3 of the document, No. 10, cooperate and
05:38 24  consult with BISD's insurance committee on plan
05:38 25  operation. Where it says, no, you don't know where

HILL & ROMERO
CERTIFIED COURT REPORTERS

173

1   that information came from?
2       A.  No.  I don't know why it would say no.
3       Q.  And again, assist administration in determining
4   that district policy is adhered to in product
5   distribution, where that says, no, you believe that
6   should have been yes; is that right?
7       A.  That was ongoing.
8       Q.  And assist in the development of programs which
9   will best serve the employees' needs, you don't know
10  where that came from either?
11      A.  Don't know.
12      Q.  You said you talked to Otis Powers and Pat
13  Lehmann --
14      A.  Uh-huh.
15      Q.  -- about this document?
16      A.  Yes.
17      Q.  Did you talk to them after you made these
18  revisions to the document and supplied that to them?
19      A.  I talked to them when I first received it in my
20  office.
21      Q.  Okay.  Had they already gotten a copy of it?
22      A.  I believe they had, yes.
23      Q.  Where did they get it from?
24      A.  Probably from administration.
25      Q.  You don't know?

HILL & ROMERO
CERTIFIED COURT REPORTERS

174

1       A.  From administration, I believe.
2       Q.  Okay.  Then evaluation and selection, you felt
3   like that should be 50 years, is that correct, for
4   firm's experience?
5       A.  No.  I was referring to AFLAC's experience at
6   processing things on cafeteria plans.
7       Q.  For 125?
8       A.  Yes.
9       Q.  Okay.  You don't know, where that's worded
10  firm's experience, whether or not that meant 403(b)?
11      A.  Didn't know.
12      Q.  And then where it has, availability and
13  accessibility of firm's key personnel to meet with BISD
14  on short notice and to respond quickly to inquiry, it
15  says, yes, local agent, for yours.  And you have
16  written in, Brownsville office; is that right?
17      A.  Yes, ma'am.
18      Q.  Okay.  And the, yes, local agent, that's
19  correct, is that right, where that's written there?
20      A.  It defines how you interpret local agent.
21      Q.  But you don't know how these people were
22  defining it because you didn't talk to them, so you
23  don't know who drew up the plan?
24      A.  That's correct.
25      Q.  Okay.  Going back to your proposed second

HILL & ROMERO
CERTIFIED COURT REPORTERS

175

1   amended origi... complaint, the next sentence of
2   Paragraph 12 says, Although Mr. Chavez had complied
3   with all district regulations relating to his proposal
4   for insurance products and services, Defendants
5   Sauceda, Del Bosque-Gilbert, Dunn, and BISD were
6   attempting to circumvent those procedures in an attempt
7   to prevent Mr. Chavez from being awarded the contract,
8   in spite of his having submitted the proposal most
9   favorable to BISD and its employees.  And that's what
10  occurred in your opinion; is that right?
11      A.  Yes, ma'am.
12          MR. AGUILAR:  What paragraph was that
13  again?
14          MS. LEEDS:  12.
15          MS. NEALLY:  12.
16      Q.  And you say, Defendant Sauceda's apparent
17  purpose for submitting such false information was to
18  promote the plan offered by Arnulfo Olivarez for
19  National Plan Administrators.  When you're speaking of
20  false information in there, you are talking about this
21  chart; is that right?
22      A.  Yes, ma'am.
23      Q.  Are you aware of any other false information?
24      A.  No.
25      Q.  And then the next paragraph, where you say,

HILL & ROMERO
CERTIFIED COURT REPORTERS

176

1   once he was able to convince Defendants Del
2   Bosque-Gilbert, Dunn, and the other board members to
3   cooperate with his plan for their own selfish purposes,
4   their own selfish purposes are what you outlined in
5   Paragraph 11, is that right, that we have already
6   discussed?  You believe that they were trying to --
7   that they gained from this; is that right?
8       A.  Yes, ma'am.
9       Q.  And you've already outlined how they gained in
10  your prior testimony; is that correct?
11      A.  That's correct.
12      Q.  You don't have anything you want to add as far
13  as selfish purposes?
14      A.  No.
15      Q.  And then you say, Defendant Sauceda began to
16  implement his plan to award the contract to
17  Mr. Olivarez and his company, National Plan
18  Administrators.  Do you believe that Dr. Sauceda had
19  something of his own to gain from Olivarez and National
20  Plan Administrators, other than what you have already
21  outlined to me?
22      A.  I don't know.
23      Q.  You don't -- as we sit here today, you don't --
24  for instance, you have indicated that Mr. Olivarez had
25  been accused of bribing other officials; is that

HILL & ROMERO
CERTIFIED COURT REPORTERS

177

05:43 1  correct?
05:43 2      A. Yes.
05:43 3      Q. And do you have any information that indicates
05:43 4  that he tried to bribe Dr. Sauceda or any other
05:43 5  administrators at BISD?
05:43 6          MR. AGUILAR: Aren't you asking about
05:43 7  Dr. Sauceda?
05:43 8          MS. NEALLY: Excuse me?
05:43 9          MR. AGUILAR: You asked if Dr. Sauceda
05:43 10  tried to bribe Dr. Sauceda? Did I misunderstand that
05:43 11  question?
05:43 12          MS. NEALLY: I have no idea.
05:43 13          MS. LEEDS: She asked if --
05:44 14      Q. Do you have any information that Mr. Olivarez
05:44 15  tried to bribe -- and I'm talking about bribing
05:44 16  directly -- Dr. Sauceda or any other BISD employees?
05:44 17      A. No.
05:44 18      Q. Paragraph 13, first sentence. During the
05:44 19  course of deliberation over the various proposals,
05:44 20  Mr. Chavez received word that BISD was still
05:44 21  considering retaining Mr. Olivarez as agent of record
05:44 22  to provide all ancillary available insurance policies
05:44 23  and products for BISD employees. How did you receive
05:44 24  word of this?
05:44 25      A. I don't know.

HILL & ROMERO
CERTIFIED COURT REPORTERS

178

5:44 1      Q. You don't know?
05:44 2      A. No, ma'am.
05:44 3      Q. You don't know who told you?
05:44 4      A. No.
05:45 5      Q. You don't have any idea, as we sit here, what
05:45 6  person or persons told you or wrote you that this was
05:45 7  going to occur?
05:45 8      A. No, other than the agenda for the meeting where
05:45 9  he, in fact, did propose Arnie get the business.
05:45 10      Q. Okay.
05:48 11          MS. NEALLY: Let me regroup a little bit.
05:48 12  Let's take a short break.
05:48 13          (Brief recess).
06:04 14      Q. Did you ever meet with Marilyn Del
06:04 15  Bosque-Gilbert after she became a trustee other than
06:04 16  that one phone call that you had with her? And when I
06:04 17  say meet, did you ever speak with her, either on the
06:04 18  phone or in person?
06:04 19      A. I don't think so.
06:04 20      Q. Okay. How about Joe Colunga?
06:04 21      A. No. I may have met him at a party or two, just
06:04 22  occasionally spoken to him.
06:04 23      Q. What kind of a party?
06:04 24      A. There is a group called the LCA Group, and they
16 25  have quarterly parties and get-togethers, and it's

HILL & ROMERO
CERTIFIED COURT REPORTERS

179

06:05 1  possible that I saw him at one of these parties. I
06:05 2  think he's a member.
06:05 3      Q. What does LCA stand for?
06:05 4      A. It's Los Compadres Association.
06:05 5      Q. Do you have to go to Los Compadres for that?
06:05 6      A. No. You go to a compadre's house.
06:05 7      Q. So you might have met him there?
06:05 8      A. Correct.
06:05 9      Q. What is this Los Compadres Association? Where
06:05 10  have I heard that?
06:05 11          MR. AGUILAR: Charro Days?
06:05 12          MS. NEALLY: Charro Days?
06:05 13      A. It has nothing to do with Charro Days. It's
06:05 14  just a little social club.
06:05 15      Q. Do they do some kind of good works or
06:05 16  something?
06:05 17          MS. LEEDS: Drink.
06:05 18      A. Drink and eat.
06:05 19      Q. Okay. Are any of the other board members
06:05 20  members of that Los Compadres Association?
06:05 21      A. Most of the city commissioners, most of the
06:05 22  BISD trustees, port commissioners, judges, et cetera.
06:05 23  They are members of this club and they attend the
06:08 24  parties; maybe not every party, but on occasion.
06:08 25      Q. You said most of the BISD trustees. Compadres,

HILL & ROMERO
CERTIFIED COURT REPORTERS

180

06:06 1  does it mean male and female?
06:06 2      A. Men only.
06:08 3      Q. Okay. Is Mr. Dunn a member?
06:08 4      A. No.
06:08 5      Q. Is Mr. Powers?
06:08 6      A. Yes.
06:08 7      Q. Is Mr. Lehmann?
06:08 8      A. Yes.
06:08 9      Q. And Mr. Emerson?
06:08 10      A. Yes.
06:08 11      Q. Who was on the board before Marilyn? Do you
06:08 12  remember?
06:08 13          MR. AGUILAR: Joey.
06:08 14      A. Peter Gilman -- Peter Gilman was on the board.
06:08 15  Joey Lopez was on the board.
06:08 16      Q. Are they members?
06:07 17      A. Joey Lopez is and, I believe, Peter Gilman was
06:07 18  as well.
06:07 19      Q. What do you have to do to become a member, run
06:07 20  for something?
06:07 21      A. You just pay your annual dues.
06:07 22          MS. LEEDS: You have to be a boy.
06:07 23      Q. Okay. So other than meeting with Mr. Colunga
06:07 24  at one of -- one or two of these parties, you didn't
06:07 25  have any meetings with him?

HILL & ROMERO
CERTIFIED COURT REPORTERS

05:43 1   correct?

05:43 2   A. Yes.

05:43 3   Q. And do you have any information that indicates

05:43 4   that he tried to bribe Dr. Sauceda or any other

05:43 5   administrators at BISD?

05:43 6   MR. AGUILAR: Aren't you asking about

05:43 7   Dr. Sauceda?

05:43 8   MS. NEALLY: Excuse me?

05:43 9   MR. AGUILAR: You asked if Dr. Sauceda

05:43 10   tried to bribe Dr. Sauceda? Did I misunderstand that

05:43 11   question?

05:43 12   MS. NEALLY: I have no idea.

05:43 13   MS. LEEDS: She asked if --

05:44 14   Q. Do you have any information that Mr. Olivarez

05:44 15   tried to bribe -- and I'm talking about bribing

05:44 16   directly -- Dr. Sauceda or any other BISD employees?

05:44 17   A. No.

05:44 18   Q. Paragraph 13, first sentence. During the

05:44 19   course of deliberation over the various proposals,

05:44 20   Mr. Chavez received word that BISD was still

05:44 21   considering retaining Mr. Olivarez as agent of record

05:44 22   to provide all ancillary available insurance policies

05:44 23   and products for BISD employees. How did you receive

05:44 24   word of this?

05:44 25   A. I don't know.

---

5:44 1   Q. You don't know?

05:44 2   A. No, ma'am.

05:44 3   Q. You don't know who told you?

05:44 4   A. No.

05:45 5   Q. You don't have any idea, as we sit here, what

05:45 6   person or persons told you or wrote you that this was

05:45 7   going to occur?

05:45 8   A. No, other than the agenda for the meeting where

05:45 9   he, in fact, did propose Arnie get the business.

05:45 10   Q. Okay.

05:46 11   MS. NEALLY: Let me regroup a little bit.

05:46 12   Let's take a short break.

05:46 13   (Brief recess).

08:04 14   Q. Did you ever meet with Marilyn Del

08:04 15   Bosque-Gilbert after she became a trustee other than

08:04 16   that one phone call that you had with her? And when I

08:04 17   say meet, did you ever speak with her, either on the

08:04 18   phone or in person?

08:04 19   A. I don't think so.

08:04 20   Q. Okay. How about Joe Colunga?

08:04 21   A. No. I may have met him at a party or two, just

08:04 22   occasionally spoken to him.

08:04 23   Q. What kind of a party?

08:04 24   A. There is a group called the LCA Group, and they

15 25   have quarterly parties or get-togethers, and it's

---

08:05 1   possible that I    him at one of these parties. I

08:05 2   think he's a member.

08:05 3   Q. What does LCA stand for?

08:05 4   A. It's Los Compadres Association.

08:05 5   Q. Do you have to go to Los Compadres for that?

08:05 6   A. No. You go to a compadre's house.

08:05 7   Q. So you might have met him there?

08:05 8   A. Correct.

08:05 9   Q. What is this Los Compadres Association? Where

08:05 10   have I heard that?

08:05 11   MR. AGUILAR: Charro Days?

08:05 12   MS. NEALLY: Charro Days?

08:05 13   A. It has nothing to do with Charro Days. It's

08:05 14   just a little social club.

08:05 15   Q. Do they do some kind of good works or

08:05 16   something?

08:05 17   MS. LEEDS: Drink.

08:05 18   A. Drink and eat.

08:05 19   Q. Okay. Are any of the other board members

08:05 20   members of that Los Compadres Association?

08:05 21   A. Most of the city commissioners, most of the

08:05 22   BISD trustees, port commissioners, judges, et cetera.

08:05 23   They are members of this club and they attend the

08:06 24   parties; maybe not every party, but on occasion.

08:06 25   Q. You said most of the BISD trustees. Compadres,

---

08:06 1   does it mean male and female?

08:06 2   A. Men only.

08:06 3   Q. Okay. Is Mr. Dunn a member?

08:06 4   A. No.

08:06 5   Q. Is Mr. Powers?

08:06 6   A. Yes.

08:06 7   Q. Is Mr. Lehmann?

08:06 8   A. Yes.

08:06 9   Q. And Mr. Emerson?

08:06 10   A. Yes.

08:06 11   Q. Who was on the board before Marilyn? Do you

08:06 12   remember?

08:06 13   MR. AGUILAR: Joey.

08:06 14   A. Peter Gilman -- Peter Gilman was on the board.

08:06 15   Joey Lopez was on the board.

08:07 16   Q. Are they members?

08:07 17   A. Joey Lopez is and, I believe, Peter Gilman was

08:07 18   as well.

08:07 19   Q. What do you have to do to become a member, run

08:07 20   for something?

08:07 21   A. You just pay your annual dues.

08:07 22   MS. LEEDS: You have to be a boy.

08:07 23   Q. Okay. So other than meeting with Mr. Colunga

08:07 24   at one of -- one or two of these parties, you didn't

08:07 25   have any meetings with him?

181

06:07 1    A.  Not that I recall.

06:07 2    Q.  Did you have any meetings or discussions with

06:07 3  him where you actually discussed insurance?

06:07 4    A.  Not that I recall, no.

06:07 5    Q.  How about with Mr. Lehmann?  You said you met

06:07 6  with Mr. Lehmann to discuss this chart that was

06:07 7  provided to you.

06:07 8    A.  I discussed it with him over the phone.

06:07 9    Q.  Okay.

06:07 10    A.  And I just told him that it was inaccurate and

06:07 11  I wanted to know who prepared it.  And he said that to

06:08 12  his knowledge, Mr. Errisuriz and Mr. Sauceda --

06:08 13  Dr. Sauceda prepared it together.  That was the extent

06:08 14  of my conversation with him.

06:08 15    Q.  And that occurred sometime in --

06:08 16    A.  Sometime after October 30th.

06:08 17    Q.  Okay.  Did you have any other discussions with

06:08 18  Mr. Lehmann during the 2001/2002 school year regarding

06:08 19  insurance?

06:08 20    A.  No.  Again, just in social circles.  He

06:08 21  probably just asked me how are things going or is

06:08 22  everything going okay; nothing specific.

06:08 23    Q.  Did you ever talk with him about your concerns

06:08 24  regarding Mr. Olivarez?

06:08 25    A.  I probably did discuss that with him.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

182

6:09 1    Q.  When would that have been?  On more than one

06:09 2  occasion?

06:09 3    A.  That was probably -- it was probably before and

06:09 4  after the October 30th meeting.

06:09 5    Q.  And what did you discuss with him?

06:09 6    A.  If there was any chance that what I was hearing

06:09 7  about Arnie getting the business, if that was going to

06:09 8  occur.

06:09 9    Q.  And what did he tell you?

06:09 10    A.  He said he didn't know.

06:09 11    Q.  Did he tell you that he was opposed to it?

06:09 12    A.  No.  He didn't tell me he was for or against

06:09 13  it.

06:09 14      MS. LEEDS:  I'm sorry.  Who was this?

06:09 15      MS. NEALLY:  Mr. Lehmann.

06:09 16    Q.  How many times would you think you talked to

06:09 17  him?

06:09 18    A.  In a year time frame?  Is that what we're

06:09 19  talking about, in a year time frame or --

06:09 20    Q.  From August until -- well, let's say August

06:10 21  until January 2002 -- August 2001 to January 2002.

06:10 22    A.  Maybe ten times.

06:10 23    Q.  And was that on the phone?

06:10 24    A.  That was either on the phone or in person or at

10 25  one of these LCA get-togethers.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

183

06:10 1    Q.  And how ... out with Mr. Powers?

06:10 2    A.  Probably more so with Mr. Powers.  I have

06:10 3  probably spoken more to him.

06:10 4    Q.  You spoke more to him?

06:10 5    A.  Probably, just regarding my concern that if the

06:10 6  rumors were true that I was going to be losing that

06:10 7  book of business.

06:10 8    Q.  And how many times would you say you spoke with

06:10 9  him?

06:11 10    A.  In that time frame, maybe if I said about ten

06:11 11  to Mr. Lehmann, probably 11 or 12 times.  Sometimes

06:11 12  they were just minute conversations.

06:11 13    Q.  When you say "minute conversations," what do

06:11 14  you mean by minute conversations?

06:11 15    A.  Again, my concern was that -- the rumor was

06:11 16  that Arnie was going to be given the business.  And I

06:11 17  would just ask him, have you heard anything different.

06:11 18  And the response was, I don't know.

06:11 19    Q.  How about Mr. Emerson?  Did you talk with

06:11 20  Mr. Emerson?

06:11 21    A.  I did speak with Mr. Emerson maybe once by

06:11 22  phone and maybe once in person.

06:12 23    Q.  And what did you talk to him about?

06:12 24    A.  The same issues.

06:12 25    Q.  And what was his response to you?

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

184

06:12 1    A.  Again, I don't know.

06:12 2    Q.  What do you mean you don't know?

06:12 3    A.  No.  That he didn't know.  That he didn't know

06:12 4  if there was any truth to that or not.

06:12 5    Q.  So you talked to Lehmann, Powers, Emerson --

06:12 6    A.  That's correct.

06:12 7    Q.  -- about whether there was any truth to them?

06:12 8    A.  Correct.

06:12 9    Q.  And all of them told you they didn't know?

06:12 10    A.  Correct.

06:12 11    Q.  Anything else that Mr. Emerson told you --

06:12 12    A.  No.

06:12 13    Q.  -- relevant to your concerns?

06:12 14    A.  No.

06:12 15    Q.  Did he disclose any information to you about

06:12 16  what was going on with Olivarez?

06:12 17    A.  No, ma'am.

06:12 18    Q.  Did you relate to Mr. Emerson that you believed

06:12 19  that Mr. Olivarez had made campaign contributions to

06:12 20  him, or you heard he made campaign contributions to

06:13 21  him?

06:13 22    A.  No.  I didn't think it was appropriate for me

06:13 23  to say that to him.

06:13 24    Q.  Did you regard Mr. Emerson as a friend?

06:13 25    A.  Yes, I did.

HILL & ROMERO
CERTIFIED COURT REPORTERS

185

```
06:13  1    Q. He voted for Olivarez, didn't
06:13  2    A. Yes.
06:13  3    Q. Do you still regard him as a friend?
06:14  4    A. No.
06:13  5    Q. Why didn't you sue him?
06:13  6        MR. AGUILAR: Objection to the extent it
06:13  7    calls for attorney/client privileged discussions. If
06:13  8    you have any other reasons that you want to disclose,
06:13  9    feel free to. Just don't discuss anything that we
06:13 10    talked about.
06:13 11    A. I don't know. I can't answer that. I don't
06:13 12    know.
06:13 13    Q. How about Linda Salazar? Did you ever talk to
06:14 14    her about your concerns about anything having to do
06:14 15    with the insurance issues that were raised?
06:14 16    A. I met with her one time for lunch.
06:14 17    Q. When was that?
06:14 18    A. It was -- I don't know the date, but it was in
06:14 19    the October 30th time frame, either before or after the
06:14 20    meeting, the insurance meeting. It was probably after
06:14 21    the meeting.
06:14 22    Q. And what did you meet with her about?
06:14 23    A. The same issues, that I had heard that Arnie
06:14 24    was going to be recommended for the business and if she
06:14 25    knew if there was any truth to that. And again, she
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

186

```
06:14  1    also said she didn't know.
06:14  2    Q. Anything else that -- any other information
06:14  3    that she gave you, anything else you learned from her
06:14  4    regarding this issue?
06:14  5    A. No, ma'am.
06:14  6    Q. And the issues that are subject to this
06:14  7    lawsuit?
06:14  8    A. No. She -- if I could answer that, she did
06:15  9    make a statement at a board meeting.
06:15 10    Q. I'm not asking about that. Okay.
06:15 11    A. You're not referring to that. Okay.
06:15 12    Q. I'm asking about your meetings with her where
06:15 13    you met with her specifically to discuss insurance.
06:15 14    A. No. No.
06:15 15    Q. And you said that happened one time, sometime
06:15 16    around October 30th, for lunch?
06:15 17    A. That time frame, yes, ma'am.
06:15 18    Q. Okay. You have provided in your responses to
06:15 19    the Request for Production various correspondence that
06:15 20    you sent to either members of the insurance committee,
06:15 21    the board of trustees, or the school district in
06:18 22    general during this time period --
06:18 23    A. Uh-huh.
06:18 24    Q. -- is that correct?
06:18 25    A. Yes.
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

187

```
06:16  1    Q. Is that    everything that you have
06:16  2    provided in response to the Request for Production --
06:16  3    let me rephrase that. Are there any other documents
06:16  4    that you provided to the insurance committee, employees
06:16  5    for the school district, trustees for the school
06:16  6    district, officers, other than what you provided in the
06:16  7    Request for Production? Are there any other documents
06:16  8    out there?
06:16  9    A. I don't believe so.
06:17 10    Q. Let me show you what we'll mark as -- it's your
06:17 11    Bates stamp 001002.
06:17 12        MS. NEALLY: We'll mark this as Exhibit 4.
06:17 13    And I have another copy someplace, but I don't know
06:17 14    where.
06:18 15        MR. AGUILAR: Do you want to look at this?
06:18 16        MR. STEELE: That's okay.
06:18 17    Q. That's a document that you sent to your AFLAC
06:18 18    people; is that right?
06:18 19    A. Yes.
06:18 20    Q. Okay. I need to see it back because it's the
06:18 21    only copy I've got.
06:18 22        MR. STEELE: I'll share this one with you.
06:18 23        MS. NEALLY: Okay.
06:18 24    Q. This is dated August 10th, 2001. Right?
06:18 25    A. Uh-huh.
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

188

```
06:18  1    Q. Is that yes?
06:18  2    A. Yes.
06:18  3    Q. And at that point, you already had the formal
06:18  4    request for quotes from BISD; is that right?
06:18  5    A. Yes.
06:18  6    Q. Okay. And you indicate in here, in the third
06:18  7    sentence, due to the political process that occurs from
06:18  8    year to year in most public entities, the proposal may
06:19  9    be worded in such a way as to exclude us from competing
06:19 10    to keep the business. Okay. Was the proposal worded
06:19 11    so that it excluded you from keeping the business?
06:19 12    A. The way it was originally worded, yes.
06:19 13    Q. Was it reworded?
06:19 14    A. Yes.
06:19 15    Q. Later?
06:19 16    A. Yes.
06:19 17    Q. Right? Okay. And this was your memo to Kathy
06:19 18    Wilkinson. Right?
06:19 19    A. Uh-huh.
06:19 20    Q. Yes?
06:19 21    A. Yes.
06:19 22    Q. What did you mean by the political process that
06:19 23    occurs from year to year in most public entities?
06:19 24    A. I was probably referring to the fact that
06:19 25    politicians sometimes receive donations from people,
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

189

08:19 1 and may be obligated to vote their _ when it comes to
08:19 2 making decisions on matters.
08:19 3   Q.  Okay.  And you said this happens in most public
08:20 4 entities.
08:20 5   A.  There is -- it is --
08:20 6       MS. NEALLY:  Object to the responsiveness
08:20 7 of the answer.
08:20 8   Q.  And you said in most public entities; is that
08:20 9 right?
08:20 10   A.  That's what it says.
08:20 11   Q.  Okay.  Then the next sentence says, my contacts
08:20 12 with the school district will be attempting to get the
08:20 13 RFP reissued with different terminology so as not to
08:20 14 exclude us due to the fact that we do not offer 403(b)
08:20 15 annuity service.
08:20 16   A.  Uh-huh.
08:20 17   Q.  Who were your contacts?
08:20 18   A.  One of them was that meeting that I had
08:20 19 scheduled with Mr. Dunn on the 14th, and the other one
08:20 20 was probably the meeting that I had -- either had
08:20 21 already or was already scheduled with Mr. Errisuriz.
08:20 22   Q.  Okay.
08:20 23   A.  The ones I disclosed earlier.
08:20 24   Q.  And sometime after those meetings that you had
08:20 25 with Dunn and with Mr. Errisuriz, they did reword the

HILL & ROMERO
CERTIFIED COURT REPORTERS

190

3:20 1 proposal -- the request for quotes.  Right?
08:20 2   A.  Yes, they did.
08:20 3   Q.  Okay.  They didn't limit it just to -- that you
08:21 4 had to do both 403(b) and 125?
08:21 5   A.  Correct.
08:21 6   Q.  Okay.  And then you said in the next sentence,
08:21 7 however, in the event that I cannot get the RFP
08:21 8 changed, I need your assistant to come up with an
08:21 9 alternate plan of action that may include the services
08:21 10 they are asking for offered properly through Ceridian
08:21 11 or Paylogix.
08:21 12   A.  Yes.
08:21 13   Q.  What were those companies, companies that
08:21 14 offered annuities?
08:21 15   A.  Those were companies that may have worked with
08:21 16 AFLAC in the administration of the 403(b)'s.
08:21 17   Q.  Okay.  For annuities.  Right?
08:21 18   A.  Yes.
08:21 19   Q.  So there have been times in the past where
08:21 20 AFLAC had used these companies that offered 403(b)
08:21 21 administration plans?
08:21 22   A.  I don't know that to be true.  However, they --
08:22 23 I believe it was advertised in an AFLAC magazine or
08:22 24 something about some relationship they had with them.
2 25 I believe that's where I read it.

HILL & ROMERO
CERTIFIED COURT REPORTERS

191

08:22 1   Q.  Okay.  \_ know, what I really want here is I
08:22 2 want to know what documents you supplied to AFLAC --
08:22 3 not to AFLAC -- what correspondence you provided to
08:22 4 BISD.  I want you to identify from the Request for
08:22 5 Production of the documents you have given me what
08:22 6 documents you provided to BISD, its employees,
08:22 7 officers, or agents in your request -- in responses to
08:22 8 the Request for Production.  Can I ask you to do that
08:22 9 so I can make sure that we know -- we are clear on what
08:22 10 documents you actually are relying on as correspondence
08:23 11 you provided to --
08:23 12   A.  What did I supply?
08:23 13   Q.  Uh-huh.
08:23 14   A.  The letters that I provided to the insurance
08:23 15 committee members and the letters that I provided to
08:23 16 the board members.  That's what I provided.
08:23 17   Q.  Okay.  Well, the first one I've got is dated
08:23 18 September 6th, 2001.  Was there one before that?
08:23 19   A.  I'm not sure of the dates, but you are probably
08:23 20 right.
08:23 21       MS. NEALLY:  My problem is these aren't
08:23 22 worded like you've got in the Request for Production,
08:23 23 but it's 001036 is your Bates stamp.
08:23 24       MR. AGUILAR:  Did we stamp that?
08:23 25       MS. NEALLY:  Yeah, you stamped it.

HILL & ROMERO
CERTIFIED COURT REPORTERS

192

08:23 1       MR. STEELE:  1036?
08:23 2       MS. NEALLY:  Uh-huh.
08:23 3       MR. AGUILAR:  You're asking whether he
08:23 4 provided these documents to somebody at BISD?
08:23 5       MS. NEALLY:  No.  I want him to identify
08:23 6 of all the documents that you supplied to us in Request
08:24 7 for Production, which one of those documents were
08:24 8 actually supplied to the school district.
08:24 9       MR. AGUILAR:  You want him to go through
08:24 10 each one of these documents right now and identify
08:24 11 which ones were provided to the district?
08:24 12       MS. NEALLY:  Uh-huh.  Either the district
08:24 13 or the employees.  The district, the employees, the --
08:24 14       MR. AGUILAR:  Anybody at BISD?
08:24 15       MS. NEALLY:  Anybody at BISD.  Officer,
08:24 16 trustee, any documents that were provided to BISD.
08:24 17 And we can identify them by Bates stamp.
08:24 18       MR. AGUILAR:  She's asking what you
08:24 19 provided to BISD or anybody over there.
08:24 20   Q.  Yeah.  You or at your direction, if there's
08:25 21 something that you directed be provided.
08:25 22   A.  This document, 001022, I did provide it to
08:26 23 Kenneth Lieck.
08:26 24       MS. LEEDS:  Do you want him to go through
08:26 25 them all right now?

HILL & ROMERO
CERTIFIED COURT REPORTERS

06:26 1    MS. NEALLY: Yeah.

06:26 2    Q. So 001022. Okay.

06:26 3    MR. AGUILAR: By the numbers, that will be

06:26 4    easier.

06:26 5    A. 001023, 001024, 001025, 26, 27, 28, 29, 30, 31,

06:26 6    32, 33, 34, and 35. These were all provided also.

06:26 7    Q. Okay.

06:26 8    A. Document 001036 was also sent out.

06:27 9    Q. To whom?

06:27 10   A. To all BISD insurance committee members. These

06:27 11   letters from just various employees, 001037, 38, 39,

06:27 12   40, 41, 42, they were all sent to board members.

06:27 13   001043 was sent to Hugh Emerson. 001044 was sent to

06:28 14   Otis Powers. 001045 was sent to Pat Lehmann. 001046

06:28 15   was sent to Marilyn Del Bosque-Gilbert. 001047 was

06:28 16   sent out to all board members. 001048 was sent to Joe

06:28 17   Colunga. 001049 was sent out to Linda Salazar.

06:28 18   001050 was sent out to all board members.

06:28 19   Q. I'm sorry, 50?

06:28 20   MS. LEEDS: 1050.

06:28 21   A. 1050. I believe 001051 was sent out to all

06:28 22   insurance committee members.

06:29 23   MR. AGUILAR: You sent that to all

06:29 24   insurance committee members?

06:29 25   THE WITNESS: I believe I did. Let me

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

194

5:29 1    backtrack. Let me look at this again. No, I didn't

06:29 2    send out -- I didn't send this out to anybody.

06:29 3    A. 001053, 1054, 1055, that was sent out to all

06:29 4    insurance committee members and board members. 01058,

06:30 5    1059, and 1060 were sent out to all board members and

06:30 6    insurance committee members. 1061 and 1062, 1063,

06:30 7    1064, 1065, 1066 was sent out to all insurance

06:30 8    committee members. 1067, 1068, 1069, I don't believe

06:31 9    those went to anybody. 1076, 1077, 1078, 1079, 1080,

06:31 10   that went out to all insurance committee members.

06:32 11   1086, 1087, 1088, 1089, 1090, 1091, 1092, 1093, 1094,

06:32 12   that went also out to all insurance committee members.

06:32 13   And I believe this is just a duplication. 1096, 1097,

06:32 14   1098, 1099, 1100, 1101, 1102 is the same duplication as

06:33 15   the previous papers, but it's in here, and that also

06:33 16   went out to all insurance committee members. 1115 was

06:34 17   sent out by my attorney at my request.

06:34 18   Q. To who?

06:34 19   MR. AGUILAR: Do you want to say to who?

06:34 20   A. That was to Dr. Sauceda and all board members.

06:34 21   1116 was a cover page to that. I believe that's it.

06:43 22   Q. So the first document that was sent was 001022

06:43 23   and that was sent to Mr. Lieck; is that right? That's

06:43 24   the one that's dated June 21st from Wendy Herndon?

:3 25     A. Yes.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

195

06:43 1    MS. ALLY: You don't have a copy of

06:43 2    these?

06:43 3    MR. AGUILAR: Not handy.

06:43 4    MS. NEALLY: I have only got one copy, and

06:43 5    I'm having them bring me another copy. But in the

06:43 6    meantime we're going to going to be, you know, going back --

06:43 7    MR. AGUILAR: Let me see if I can grab

06:43 8    mine.

06:44 9    Q. Before I ask you that, I just want to clarify

06:44 10   that you're not aware of any other documents that you

06:44 11   or anyone at your direction has sent to Brownsville

06:44 12   Independent School District, its employees, officers,

06:44 13   trustees?

06:44 14   A. Other than the actual proposals, no.

06:44 15   Q. Okay. How about -- have you sent any documents

06:44 16   to the -- to TV stations, the Brownsville Herald,

06:44 17   relating to these issues?

06:44 18   A. No, ma'am.

06:44 19   Q. Have you sent any documents to -- other than to

06:44 20   your attorney, that had to do with this issue that

06:44 21   aren't included in these documents?

06:45 22   A. Have I sent out any other documents other than

06:45 23   to my attorney or --

06:45 24   Q. No, other than -- besides BISD but on this

06:45 25   issue to anybody else.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

196

06:45 1    A. I sent --

06:45 2    MR. AGUILAR: Clarification. What issue?

06:45 3    MS. NEALLY: The issues involved in this

06:45 4    lawsuit.

06:45 5    MR. AGUILAR: Okay.

06:45 6    A. I sent an entire packet of documents to AFLAC.

06:45 7    Q. Okay. And were the documents that -- were they

06:45 8    different than what's in here?

06:45 9    A. I don't believe so, no.

06:45 10   Q. Okay. This first document, 1022, does this

06:45 11   have any -- does this document have anything to do with

06:45 12   the claims made that are the subject of this lawsuit?

06:45 13   MR. AGUILAR: Objection; vague.

06:45 14   A. It may.

06:45 15   Q. To what extent?

06:46 16   A. We had guaranteed premiums for a three-year

06:46 17   period. And this information, I don't believe, was

06:46 18   ever disclosed to anyone at the district. It just kind

06:46 19   of died. It was a non-issue. And I thought it should

06:46 20   have been an issue.

06:46 21   Q. Did you bring it up?

06:46 22   A. I brought it up, I believe, at some point in my

06:46 23   discussions with maybe the board members.

06:46 24   Q. Which board members?

06:46 25   A. The ones I spoke to most often were Pat Lehmann

HILL & ROMERO
CERTIFIED COURT REPORTERS

1    and Otis Powers, as I disclosed ear
2    Q.  Okay.  So it would have been in talking to the
3    two of them?
4    A.  Yes.  And I believe I also mentioned it to
5    Mr. Errisuriz when I met with him.
6    Q.  Okay.
7    A.  And I believe I also mentioned it to Mr. Dunn
8    when I met with him because I thought it was relevant.
9    Q.  Okay.
10          MS. LEEDS:  I'm sorry.  I wasn't
11   listening.  You mentioned what?
12          MS. NEALLY:  The contents of this.
13          MS. LEEDS:  Okay.
14   Q.  Right?
15   A.  Yes, that's correct.
16          MR. STEELE:  1022.
17          THE WITNESS:  1022.
18   Q.  Okay.  And the next one is a fax to you from
19   Wanda Sweeney and it includes 13 pages; is that right?
20   A.  Yes, ma'am.
21   Q.  Okay.  Who is Wanda Sweeney?
22   A.  Wanda Sweeney is somebody who I believe works
23   in the flex department of AFLAC.  And the flex
24   department is the department that deals specifically
25   with the reimbursement of cafeteria funds.

HILL & ROMERO
CERTIFIED COURT REPORTERS

198

1    Q.  Okay.  And this document was -- so it was a
2    document prepared by AFLAC?
3    A.  That's correct.
4    Q.  And it was sent to you?
5    A.  Yes.
6    Q.  Okay.  It says it's a reimbursement services
7    agreement; is that right?
8    A.  Yes, ma'am.
9    Q.  Okay.  And this was the agreement that was
10   proposed to be between Brownsville and AFLAC?
11   A.  Yes.
12   Q.  For the 2002 period?
13   A.  I believe it was for the -- it was for the 2002
14   period, and it was also for the 2001 period.  I believe
15   I presented this on two occasions.
16   Q.  Okay.  So this was -- is it dated?
17   A.  I was looking for a date, and I couldn't find a
18   date anywhere.
19   Q.  Okay.  And this was the document that you had
20   presented in the prior year?
21   A.  At my request, there was a new program that was
22   available at AFLAC called fronting of funds.  And I
23   asked them to forward me information so I could bring
24   this to BISD's attention, that this would be in their
25   best interest.

HILL & ROMERO
CERTIFIED COURT REPORTERS

199

1    Q.  When?
2    A.  I believe it was sometime in the year 2000,
3    and then, once again, it was in the year 2001.
4    Q.  Okay.  And you presented the identical
5    reimbursement services agreement?
6    A.  I believe so, yes, ma'am.
7          MS. LEEDS:  In 2001?
8          THE WITNESS:  Uh-huh.  2001, the time
9    period when --
10   Q.  At issue?
11          THE WITNESS:  -- the district was looking
12   for proposals.
13   Q.  Okay.  And this document, there's no date on it
14   anywhere for us to tell like when it was sent to you;
15   is that right?
16   A.  I couldn't find one myself, no, ma'am.
17   Q.  Okay.  And you said this was a document that
18   was provided to Mr. Lieck?
19   A.  I know I gave it to Mr. Lieck, and I believe I
20   also shared it with -- maybe not the contents of the
21   whole document, but the concept, I shared it with
22   Mr. Errisuriz, I shared it with some board members.  I
23   also shared it with Mr. Dunn.
24   Q.  Okay.  But I'm talking about the document
25   itself right now.

HILL & ROMERO
CERTIFIED COURT REPORTERS

200

1    A.  The document itself?
2    Q.  I want to limit it to the document itself.
3    A.  The document itself was only given to
4    Mr. Lieck.
5    Q.  You don't have any cover letter where it was
6    conveyed to Mr. Lieck, anything like that?
7    A.  There may be a letter, but I can't recall.  I
8    just can't remember.
9    Q.  In 2000, was this agreement ever entered into
10   between BISD and AFLAC?
11   A.  No.  They just ignored it.
12   Q.  In 2001, was this agreement ever entered into
13   between --
14   A.  No.  They just ignored it.
15   Q.  Let me finish my question, please.
16   A.  I'm sorry.
17   Q.  Was this agreement ever entered into between
18   AFLAC and BISD?
19   A.  No.  They just ignored it.
20          MS. NEALLY:  I'm going to object to the
21   responsiveness of the answer.
22   Q.  What's the -- what's your claim about the
23   advantage of this agreement as opposed to what was
24   actually entered into between BISD and AFLAC?
25   A.  The advantage of fronting of funds is that an

HILL & ROMERO
CERTIFIED COURT REPORTERS

201

1    employee would get paid for a claim ...ch faster.
2    Q.  Who fronts the funds?
3    A.  AFLAC will.
4    Q.  Did you present this with your TPA, your quote?
5    A.  I believe it was in the quote.
6    Q.  But the board of trustees did not adopt this?
7    A.  Like I said, it was just ignored.  No.
8         MS. NEALLY:  Object to the responsiveness
9    of the answer.
10    Q.  Okay.  Did you ever discuss this with anyone --
11    I'm sorry.  You said you discussed this with various
12    people at different times?
13    A.  Yes.
14    Q.  Do you remember any specific time that you
15    discussed it with them?
16    A.  I can't remember.  No, I can't remember a date.
17    Q.  And you said you talked to board members about
18    it?
19    A.  Yes.
20    Q.  Which board members did you talk to?
21    A.  Mr. Dunn, Mr. Lehmann, Mr. Powers,
22    Mrs. Del Bosque.
23    Q.  When did you talk to Mrs. Del Bosque?
24    A.  I probably mentioned it in the phone call that
25    I had with her, that one phone call.  That was probably

HILL & ROMERO
CERTIFIED COURT REPORTERS

202

1    when I talked about it.
2    Q.  Okay.  And how about with administrators?  Did
3    you talk to Mr. Errisuriz about this agreement?
4    A.  Yes.  I did mention it.
5    Q.  When you met with him the one time?
6    A.  Yes.
7    Q.  Dr. Lopez, did you talk to him about it?
8    A.  Yes.
9    Q.  Okay.  And this is something that you felt was
10    advantageous to BISD's employees; is that right?
11    A.  Yes.
12    Q.  Okay.  In the request for quotes, did it
13    specifically ask for a fronting of funds agreement?
14    A.  No.
15    Q.  Did it make any reference to a reimbursement of
16    services agreement?
17    A.  No.
18    Q.  Okay.  The next document you said that you
19    produced was the 1036 correspondence.
20    A.  Uh-huh.
21    Q.  Is that yes?
22    A.  Yes.
23    Q.  It's dated September 6, 2001; is that correct?
24    A.  Yes, ma'am.
25    Q.  And this was sent to all insurance committee

HILL & ROMERO
CERTIFIED COURT REPORTERS

203

1    members; is th...ght?
2    A.  Yes, ma'am.
3    Q.  How many insurance committee members were
4    there?
5    A.  There was at least one at every campus, so
6    there was probably about 50 or so.
7    Q.  Okay.  Did you send it to the board of
8    trustees?
9    A.  I think I did.
10    Q.  Do you have any evidence supporting that you
11    did send it to the board of trustees?
12    A.  No.
13    Q.  How about the administrators?
14    A.  No.  I didn't send it to them.
15    Q.  You didn't send it to any administrators?
16    A.  I don't believe I did, no.
17    Q.  Why didn't you send it to any administrators?
18    A.  I guess probably because of the rumors I had
19    heard that I thought to be true regarding Dr. Sauceda.
20    Q.  Which were what?
21    A.  That he was trying to give the business to
22    Arnie Olivarez.  So I thought sending him any
23    correspondence would be just fruitless.
24    Q.  So you purposely did not send this to
25    Dr. Sauceda because you thought it would be frivolous?

HILL & ROMERO
CERTIFIED COURT REPORTERS

204

1    A.  No, not frivolous.  Fruitless.
2    Q.  Fruitless.  Because you thought it would be
3    fruitless?
4    A.  I thought it had no bearing.
5    Q.  So the date of this is September 6, 2001, and
6    by September 6th, 2001 you had made up your mind that
7    sending Dr. Sauceda any correspondence would be
8    fruitless because of the rumors you had heard; is that
9    correct?
10         MR. AGUILAR:  Objection; mischaracterizing
11    the witness's testimony.  You can answer.
12         THE WITNESS:  Yes.
13    Q.  And this was 1036.  Did it include the
14    documents attached, 1037 to 1042?
15    A.  You are asking if it included 1037 through
16    1042?
17    Q.  Right.  Or was it just a single document that
18    you sent?  You just sent that one page, 1036?
19    A.  I believe it was just this one document.
20    Q.  Okay.  And then the rest of these, the 1037 to
21    1042, were sent just to the board members?
22    A.  I think that is correct, yes.
23    Q.  It says in the letter -- I'm not trying to
24    argue, but it says in the letter, as an expression of
25    customer satisfaction we have received many letters

HILL & ROMERO
CERTIFIED COURT REPORTERS

205

06:57 1  from BISD's employees over the last    y years. A few
06:57 2  recent ones have been included as an attachment to this
06:57 3  letter as an example of our qualifications to keep your
06:57 4  business. Does my reading of that Paragraph 4 refresh
06:57 5  your memory that these documents were actually
06:57 6  attached?
06:57 7      A. Yes, ma'am.
06:57 8      Q. These are documents that you sent both to the
06:57 9  board members and to the insurance committee members?
06:57 10     A. I believe so, now that you're reading that
06:57 11  part. Yes.
06:57 12     Q. Okay. And the next document is dated
06:57 13  September 10th, 2001. 1043, 1044, 1045, 1046, and
06:58 14  1048, 1049, these are identical documents, right, that
06:58 15  you just sent to five of the board members?
06:58 16     A. Yes, ma'am.
06:58 17     Q. No. I'm sorry, six of the board members.
06:58 18  Right? You didn't send one to Mr. Dunn?
06:58 19     A. No.
06:58 20     Q. This was dated September 10, 2001; is that
06:58 21  right?
06:58 22     A. Correct.
06:58 23     Q. Why didn't you send one to Mr. Dunn?
06:58 24     A. Again, I thought my attempts to send him
06:58 25  anything would be fruitless because of what I had

HILL & ROMERO
CERTIFIED COURT REPORTERS

206

06:59 1  already heard about him.
06:59 2      Q. Because of rumors you had heard about Mr. Dunn,
06:59 3  you decided not to send this to him?
06:59 4      A. Correct. In addition, I had already met with
06:59 5  him.
06:59 6      Q. And that's the meeting you told me about that
06:59 7  occurred on August 14; is that right?
06:59 8      A. Yes, ma'am.
06:59 9      Q. Okay. And then 1050 and 1047 are just Page 2
06:59 10  of this identical letter that we have already gone
06:59 11  over; is that right?
06:59 12     A. That's correct.
06:59 13     Q. And this is a document where -- well, what are
06:59 14  you trying to do in this document?
06:59 15             MR. AGUILAR: Which document?
06:59 16             MS. NEALLY: 1040 --
06:59 17             MS. LEEDS: 43.
06:59 18     Q. 1043 to 1050.
06:59 19     A. What I'm trying to do is just state some facts
07:00 20  that may not be known.
07:00 21     Q. Okay. About your product?
07:00 22     A. Correct.
07:00 23     Q. The AFLAC company; is that correct?
07:00 24     A. That's correct.
00 25     Q. Let me ask you about 1052. Is this your

HILL & ROMERO
CERTIFIED COURT REPORTERS

207

07:00 1  handwriting on    e?
07:00 2      A. No.
07:00 3      Q. How did you get a copy of this document?
07:00 4      A. Honestly, I don't know.
07:01 5      Q. Okay. 1053 to 1055, you said was sent out to
07:01 6  all insurance committee members and board members; is
07:01 7  that right?
07:01 8      A. Say those numbers again.
07:01 9      Q. 1053 to 1055.
07:01 10     A. Yes, ma'am.
07:01 11     Q. Okay. When you said that you had been sending
07:01 12  things to all board members, does that include Mr. Dunn
07:01 13  or at this point had you decided not to send him
07:01 14  information?
07:01 15     A. 1053 to 1054, the ones you just stated --
07:01 16  1055.
07:01 17     A. Through 1055? I'm not sure that I sent this to
07:01 18  board members. I am sure that I sent it to insurance
07:01 19  committee members.
07:01 20     Q. Okay. Did you send a copy of it to
07:01 21  administration?
07:01 22     A. No.
07:02 23     Q. No one in administration?
07:02 24     A. No, ma'am.
07:02 25     Q. You just sent this solely to insurance

HILL & ROMERO
CERTIFIED COURT REPORTERS

208

07:02 1  committee campus representatives?
07:02 2      A. I believe so, yes.
07:02 3      Q. How about the insurance committee that was
07:02 4  appointed by the board, board members that were in
07:02 5  charge of the insurance committee?
07:02 6      A. I don't believe I sent it to them.
07:02 7      Q. Attached to this document was the cafeteria
07:02 8  plan comparison chart with your revisions; is that
07:02 9  correct?
07:02 10     A. Yes, ma'am.
07:02 11     Q. It's not attached to this document right now,
07:02 12  but what we have marked as Exhibit 3 was attached to
07:03 13  the 1053 to 1054 Bates stamped documents; is that
07:03 14  right?
07:03 15     A. Yes, ma'am.
07:03 16     Q. And you sent that out to the insurance
07:03 17  committee campus representatives; is that right?
07:03 18     A. Yes, ma'am.
07:03 19     Q. You indicated in Paragraph 2, before this time,
07:03 20  BISD employees spent well over $30,000 annually for
07:03 21  this service. Is that what your -- that's what --
07:03 22  based on what information that you had?
07:03 23     A. It was based on documentation that I had at
07:03 24  some point in time that showed that.
07:03 25     Q. You don't have that document anymore?

HILL & ROMERO
CERTIFIED COURT REPORTERS

209

07:03 1    A. No, ma'am.

07:04 2    Q. Was it based on somebody telling you something?

07:04 3    A. No. It was based on actual documentation that

07:04 4    I had.

07:04 5    Q. Okay.

07:04 6        MR. AGUILAR: That's part of the documents

07:04 7    we had requested.

07:04 8        MS. NEALLY: I'm just trying to find it.

07:04 9    It doesn't exist so far.

07:04 10    Q. Okay. What is 1056? Who is -- Adriana Chavez

07:05 11    is your wife?

07:05 12    A. No, that's my mother.

07:05 13    Q. That's your mother?

07:05 14    A. She was my office administrator.

07:05 15    Q. Okay. And this was attached to 1057; is that

07:05 16    right?

07:05 17    A. Yes. Correct.

07:05 18    Q. Okay. 1058 to 1060 is what we have marked as

07:05 19    Exhibit 3, right, and what was attached to 1053 to

07:05 20    1055. Right?

07:05 21    A. Yes.

07:05 22    Q. Okay. And then you said 1061 to 1066 is a

07:05 23    duplicate of 1053 to 1055; is that correct?

07:05 24    A. I said what again?

07:05 25    Q. 1061 to 1066 was a duplicate, and it's actually

HILL & ROMERO
CERTIFIED COURT REPORTERS

211

07:07 1    it to Pat Lehman and Otis Powers.

07:07 2        Q. Okay. So you think you sent 1061 to 1066 to

07:07 3    Pat Lehman and Otis Powers only; is that right?

07:07 4    A. Yes, ma'am.

07:07 5    Q. But nobody else at BISD other than the

07:07 6    insurance committee campus representatives?

07:07 7    A. No. I did present 1064 through 1066 -- I

07:08 8    presented it at the board meeting on November 13th and

07:08 9    at the board meeting on November 20th, during the

07:08 10    public audience session of the meeting.

07:08 11        MS. NEALLY: Object to the responsiveness

07:08 12    of answer.

07:08 13    Q. Did you provide this document --

07:08 14    A. Yes, I did.

07:08 15    Q. -- to anyone else at BISD?

07:08 16    A. Yes, I did.

07:08 17    Q. And you provided it to whom?

07:08 18    A. To all board members --

07:08 19    Q. Okay.

07:08 20    A. -- and administrators who were in attendance at

07:08 21    the meeting.

07:08 22        MS. LEEDS: And we are talking about 1064?

07:08 23        THE WITNESS: And the document I'm

07:08 24    referring to is 1064 to 1066.

07:08 25    Q. 1064 through 1066?

HILL & ROMERO
CERTIFIED COURT REPORTERS

210

:05 1    a duplicate of 1053 to 1055; is that right?

07:06 2    A. No.

07:06 3    Q. It's a different document?

07:06 4    A. Yes.

07:06 5    Q. What is a duplicate?

07:06 6    A. I believe it --

07:06 7    Q. No, it doesn't. The duplication is 1096.

07:06 8    Sorry.

07:06 9    A. Yeah.

07:06 10    Q. Okay. Now, 1061 was, again, sent to BISD

07:06 11    insurance committee campus reps?

07:06 12    A. That's correct.

07:06 13    Q. Okay. You previously sent one November 9th,

07:06 14    2001, right, that's 1054 -- the 1053 to 1055 document.

07:06 15    Right?

07:06 16    A. Yes, ma'am.

07:06 17    Q. November 12th, 2001, you send the 1061 to 1066

07:06 18    document to all insurance committee campus

07:06 19    representatives; is that right?

07:06 20    A. That's correct.

07:06 21    Q. Did you send this to the board members?

07:07 22    A. I don't believe I did.

07:07 23    Q. Okay. Did you send it to anybody in

07:07 24    administration?

7 25    A. No. No, I take that back. I think I did send

HILL & ROMERO
CERTIFIED COURT REPORTERS

212

07:08 1    A. Yes, ma'am.

07:08 2    Q. Okay. Did you also provide that information to

07:09 3    the campus reps?

07:09 4    A. I believe -- yes, I did.

07:09 5    Q. What do you have that evidences that you

07:09 6    actually provided that to the campus reps, the 1064

07:09 7    through 1066? I don't see any reference to it in your

07:09 8    letter Bates stamped 1062. Plus the next one is dated

07:09 9    November 20th and this 1062 was prepared November 12th,

07:10 10    2001.

07:10 11    A. I don't have proof of that, other than if you

07:10 12    look at 1053. The number of pages that I faxed out was

07:10 13    six.

07:10 14    Q. For the November 9th?

07:10 15    A. The November 9th fax I sent out was six pages,

07:11 16    which included 1054 and 1055.

07:11 17    Q. You already told me it included 1058 through

07:11 18    1060.

07:11 19    A. One, two, three --

07:11 20        MR. STEELE: It doesn't make sense. It's

07:11 21    out of order.

07:11 22    A. I don't know when I sent this out. I'm

07:11 23    referring to 1064 through 1066.

07:11 24    Q. You don't have any cover letter that

07:11 25    corresponds evidencing that that document was actually

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 212

1 sent out to the campus representative.

2    A. No, ma'am, unless I asked some of the committee
3 members to show me copies of their correspondence that
4 I sent them.

5    MS. NEALLY: Objection to the
6 responsiveness of the answer.

7    Q. As you sit here today, you don't have any
8 evidence that you actually sent this document out to
9 the committee members?

10    A. That's correct.

11    Q. You can't find any corresponding document
12 evidencing that this was sent to the committee members?

13    A. No.

14    Q. And how about 1063? Who was 1063 provided to?

15    A. 1063 was provided by Dr. Sauceda to the members
16 of the board.

17    Q. When?

18    A. At the meeting of November 20th.

19    Q. So that's not a document that you provided to
20 others? That was a document that you actually got from
21 someone?

22    A. I believe I did send this out, but I'm not sure
23 when I sent it. If you give me a second. I don't know
24 when I sent it out.

25    Q. Okay.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 214

1    A. I think I did send it out sometime after the
2 November 20th meeting. I did send it out. I sent it
3 out on November 27th.

4    Q. Okay.

5    A. And I'm referring to document 1063.

6    Q. 1063?

7    A. I'm referring to document 1063.

8    Q. Okay. But how do you know you sent it out on
9 November 27th?

10    A. 1086.

11    Q. Okay, we'll get to that in a minute. Okay.
12 The next document you said that you sent out was 1076
13 to 1080. And it's dated November 19th, 2001, and you
14 said you sent it to all insurance committee members?

15    A. Yes, ma'am.

16    Q. Did you send it to any board members?

17    A. I don't think I did.

18    Q. Okay. Any administrators or other BISD
19 employees?

20    A. I don't believe I did.

21    Q. Okay. The next one is 1086. Okay. And this
22 one is dated November 27th, and this is when you
23 indicate that you think you sent the documents Bates
24 stamped 1063 to 66; is that right?

25    A. You said 1063 to 1066?

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 215

1    Q. What do you think -- on Page 1087, it says, the
2 flyer handed out at the meeting is attached for your
3 review. What was the flyer handed out at the meeting?

4    A. Where are you reading that?

5    MS. LEEDS: Top of Page 1087.

6    MR. AGUILAR: What's the question?

7    MS. LEEDS: What's the flyer.

8    THE WITNESS: The flyer was document 1066.

9    Q. That was the document dated 1066 -- Bates
10 stamped 1066?

11    A. Yes.

12    Q. 1066 was sent with 1086; is that right?

13    A. Yes, ma'am.

14    Q. Okay. Let me ask you a couple of questions
15 about this document.

16    MR. AGUILAR: Which one?

17    MS. NEALLY: 1086.

18    Q. In Paragraph 2, second sentence, you state, you
19 have proven that good can conquer evil when enough good
20 people get together and shout the message together.

21    A. Yes, ma'am.

22    Q. What did you mean by that statement?

23    A. I guess I was referring to that there's good
24 things in the world and there's bad things in the world
25 probably. That's all I can recall.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## 216

1    Q. That's all you meant by that statement?

2    A. I believe so.

3    Q. Well, what was the evil in the context of this
4 letter? Just the evil of the world, like hunger and
5 homeless people or --

6    A. I didn't want to accuse somebody of doing
7 things illegal, like what was rumored. And so I didn't
8 want to call anybody anything negative, and so I used
9 that terminology.

10    Q. Because at this point, all you had were rumors?
11 Actually, at this point all you have is rumors.
12 Right? What did you mean on this one, still on
13 Paragraph 2? On the other hand, the rest of the board
14 who voted for the agenda item also deserve a phone call
15 from you to let them know that your fellow employees
16 will not put up for the total disrespect they have for
17 your opinions and input. What do you mean by total
18 disrespect?

19    A. At the meeting of November 20th when board
20 members were debating the plans, employees were booing
21 the fact that some board members were favoring Arnie
22 Olivarez's plan. And I believe it was Marilyn Del
23 Bosque who even made a statement something to the
24 effect that, those people in the audience aren't even
25 our employees. They are probably just insurance

HILL & ROMERO
CERTIFIED COURT REPORTERS

217

07:22 1   agents. She said something to that ... ct.
07:23 2   MR. AGUILAR: I think it was Joey.
07:23 3   MS. NEALLY: Object to the sidebar.
07:23 4   THE WITNESS: Marilyn made that statement,
07:23 5   and Joey Lopez also reiterated that statement.
07:23 6   Q. Well, Joey Lopez isn't a trustee. Right?
07:23 7   A. No, but he was working with Arnie Olivarez.
07:23 8   MS. NEALLY: Objection to the
07:23 9   responsiveness of the answer after the word "no."
07:23 10  Q. And that was the total disrespect you were
07:23 11  talking about?
07:23 12  A. Yes, ma'am.
07:24 13  Q. What did you mean by this statement: Also,
07:24 14  please be vigilant of the fact that you are not
07:24 15  suddenly removed from the insurance committee you are
07:24 16  on for unknown reasons.
07:24 17  A. At that time, Dr. Sauceda was attempting to
07:24 18  remove people who were on the insurance committee and
07:24 19  replace them with people of his choosing.
07:24 20  Q. Okay. Who did he attempt to remove?
07:24 21  A. I can name you at least one person. His name
07:24 22  is Beto Medrano.
07:24 23  MS. LEEDS: Beto what?
07:24 24  THE WITNESS: Medrano. Beto Medrano.
07:24 25  Q. Did Mr. Medrano sell insurance of some type?

HILL & ROMERO
CERTIFIED COURT REPORTERS

218

17:24 1   A. No.
07:24 2   Q. Was Mr. Medrano removed?
07:24 3   A. I don't know. I know he told me that he was
07:25 4   trying to be removed.
07:25 5   Q. Anyone else that you know of that told you
07:25 6   that?
07:25 7   A. I believe there was a gentleman by the name of
07:25 8   George Borrego.
07:25 9   Q. Does he sell insurance of some type?
07:25 10  A. He may offer insurance on a part-time basis,
07:25 11  yes. I know he has an AFLAC appointment.
07:25 12  Q. He has an AFLAC appointment?
07:25 13  A. He has an AFLAC appointment, but he's never
07:25 14  written any business with AFLAC. There's also -- I
07:25 15  believe Elizabeth Johnson could also give you some
07:25 16  input in that.
07:25 17  Q. Does she sell insurance?
07:25 18  A. No.
07:25 19  Q. Does anyone in her family sell insurance?
07:25 20  A. Not to my knowledge.
07:25 21  Q. Anyone else?
07:25 22  A. I believe there's also somebody by the name of
07:26 23  Pat Shumacher.
07:26 24  Q. Does he or she sell insurance?
26 25     A. No.

HILL & ROMERO
CERTIFIED COURT REPORTERS

219

07:26 1   Q. Is it a h...   she?
07:26 2   A. It's a she.
07:26 3   Q. Does anyone in her family sell insurance?
07:26 4   A. Not to my knowledge.
07:26 5   Q. Anyone else?
07:26 6   A. I can't recall all the people, but there was
07:26 7   numerous people that were complaining that they were
07:26 8   being attempted to remove -- be removed.
07:26 9   Q. Were they removed? Were any of these people
07:26 10  removed to your knowledge?
07:26 11  A. It's possible, yes, but not to my knowledge.
07:26 12  MS. NEALLY: Object to the responsiveness
07:26 13  of the answer.
07:26 14  Q. The answer is, no, you don't know whether any
07:26 15  of these people were removed?
07:26 16  A. Not to my knowledge.
07:26 17  Q. Okay. And how were they being attempted to be
07:26 18  removed?
07:27 19  A. I believe they were being asked to fill out
07:27 20  some questionnaire of some sort, and they were being
07:27 21  told that they were going to be removed and then a new
07:27 22  committee was going to be assembled.
07:27 23  Q. By whom?
07:27 24  A. By Dr. Sauceda and Mr. Errisuriz.
07:27 25  MS. LEEDS: They were being told by them

HILL & ROMERO
CERTIFIED COURT REPORTERS

220

07:27 1   or that the committee was going to be named by them
07:27 2   THE WITNESS: Both.
07:27 3   Q. Did you ever see the questionnaire?
07:27 4   A. No, ma'am.
07:27 5   Q. Do you know what the questionnaire had to do
07:27 6   with?
07:27 7   A. No, ma'am.
07:27 8   Q. Do you know whether or not the questionnaire
07:27 9   had to do with conflicts of interest?
07:27 10  A. No, ma'am.
07:27 11  Q. 1088 to 1090 is a duplicate of -- hold on.
07:28 12  MR. AGUILAR: I have to object to this
07:28 13  line of questioning just to the extent that it seems to
07:28 14  be dragging on the deposition.
07:28 15  MS. LEEDS: That's a new one.
07:28 16  MS. NEALLY: Well, that's a good one.
07:28 17  Q. Okay. 1088 is a duplicate, right? Am I right?
07:28 18  A. No, it's not.
07:28 19  MS. LEEDS: The duplicates are 97.
07:28 20  MS. NEALLY: But 1088 -- okay.
07:28 21  Q. Okay. 1088 is dated November 27th and 10 --
07:29 22  I'm sorry. 1089 is dated November 27th, and 1086 is
07:29 23  dated November 27th. Right?
07:29 24  A. Yes.
07:29 25  Q. And they appear to be the same?

HILL & ROMERO
CERTIFIED COURT REPORTERS

221

| Time | Line | Text |
|---|---|---|
| 07:29 | 1 | A. Yes. I believe they are. |
| 07:29 | 2 | Q. Right? Okay. So it's a duplicate also? |
| 07:29 | 3 | A. I think they are just duplicates. |
| 07:29 | 4 | Q. Well, except that the paragraph format is |
| 07:29 | 5 | different. |
| 07:29 | 6 | A. 1088 through 1095 were all sent together. |
| 07:29 | 7 | Q. Okay. Through 1094. Right? |
| 07:29 | 8 | A. No, it was through 1095. 1098 through 1095. |
| 07:29 | 9 | Q. You sent the first page of that agenda? |
| 07:29 | 10 | A. Yes. |
| 07:29 | 11 | Q. Okay. Then 1096 is the duplication. Right? |
| 07:30 | 12 | Yeah. It's the same thing. |
| 07:30 | 13 | A. Correct. |
| 07:30 | 14 | Q. Okay. So you actually have three copies of |
| 07:30 | 15 | that? |
| 07:30 | 16 | A. I believe so. |
| 07:30 | 17 | MR. AGUILAR: Can we take a break? |
| 07:30 | 18 | MS. NEALLY: Sure. |
| 07:44 | 19 | (Brief recess). |
| 07:44 | 20 | Q. Okay. You had one more document that you said |
| 07:44 | 21 | was sent to BISD, and that's 1115 and 1116. And these |
| 07:44 | 22 | documents were actually sent by your attorney, |
| 07:45 | 23 | Mr. Rodriguez, at the time; is that right? |
| 07:45 | 24 | A. Yes, ma'am. |
| 07:45 | 25 | Q. And this was a document that was sent to |

HILL & ROMERO
CERTIFIED COURT REPORTERS

222

| Time | Line | Text |
|---|---|---|
| 07:45 | 1 | Dr. Sauceda and the trustees; is that right? |
| 07:45 | 2 | A. Yes, ma'am. |
| 07:45 | 3 | Q. Of all the documents that you have produced in |
| 07:45 | 4 | your Request for Production, this is the only document |
| 07:45 | 5 | that was actually sent to Dr. Sauceda; is that correct? |
| 07:45 | 6 | A. Yes, ma'am. |
| 07:45 | 7 | MS. NEALLY: We are going to reserve the |
| 07:45 | 8 | remainder of our questions until we reconvene to |
| 07:45 | 9 | continue the deposition. |
|  | 10 | (Recessed) |
|  | 11 | |
|  | 12 | |
|  | 13 | |
|  | 14 | |
|  | 15 | |
|  | 16 | |
|  | 17 | |
|  | 18 | |
|  | 19 | |
|  | 20 | |
|  | 21 | |
|  | 22 | |
|  | 23 | |
|  | 24 | |
|  | 25 | |

HILL & ROMERO
CERTIFIED COURT REPORTERS

CHANGES AND SIGNATURE PAGE

| Line | |
|---|---|
| 1 | |
| 2 | PAGE LINE CHANGE          REASON |
| 3 | _____ |
| 4 | _____ |
| 5 | _____ |
| 6 | _____ |
| 7 | _____ |
| 8 | _____ |
| 9 | _____ |
| 10 | _____ |
| 11 | _____ |
| 12 | _____ |
| 13 | _____ |
| 14 | _____ |
| 15 | _____ |
| 16 | _____ |
| 17 | _____ |
| 18 | _____ |
| 19 | _____ |
| 20 | _____ |
| 21 | _____ |
| 22 | _____ |
| 23 | _____ |
| 24 | _____ |
| 25 | _____ |

HILL & ROMERO
CERTIFIED COURT REPORTERS

224

1    I, DINO X. CHAVEZ, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.

4              _____
               DINO X. CHAVEZ
5

6

7

8  THE STATE OF TEXAS

9  COUNTY OF CAMERON

10   BEFORE ME, _____, on this day
   personally appeared DINO X. CHAVEZ, known to me or
11  proved to me to be the person whose name is subscribed
   to the foregoing instrument and acknowledged to me that
12  said witness executed the same for the purposes and
   consideration therein expressed.

13   Given under my hand and seal of office this _____
14  day of _____, 2003.

15           _____
16       Notary Public in and for the State of Texas

17
18
19
20
21
22
23
24
25

HILL & ROMERO
CERTIFIED COURT REPORTERS

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ              )(
                           )(
VS.                        )(  B-02-128
                           )(
BROWNSVILLE INDEPENDENT    )(
SCHOOL DISTRICT, NOE       )(
SAUCEDA, MARILYN DEL       )(
BOSQUE-GILBERT and         )(
RANDALL DUNN               )(

REPORTER'S CERTIFICATION
DEPOSITION OF DINO X. CHAVEZ
MARCH 4, 2003

I, LOU ZUNIGA, Certified Court Reporter in and for

the State of Texas, do hereby certify that the above

and foregoing contains a true and correct transcription

of the oral deposition of DINO X. CHAVEZ;

I further certify that I am neither counsel for,

related to, nor employed by any of the parties or

attorneys in the action in which this proceeding was

taken, and further that I am not financially or

otherwise interested in the outcome of the action.

HILL & ROMERO
CERTIFIED COURT REPORTERS

---

226

Certified to by me this _____ day of

_____, 2003.

_____
LOU ZUNIGA, Texas CSR 2198
Expiration Date: 12-31-03
Hill & Romero
5415 North McColl, Suite 107
McAllen, Texas 78504
(956) 994-8898

HILL & ROMERO
CERTIFIED COURT REPORTERS





| Appointments | |
|---|---|
| **DINO X CHAVEZ** | |
| **Company** | **Active** |
| ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA | 03/29/2002 |
| AMERICAN FAMILY LIFE ASSURANCE COMPANY OF COLUMBUS | 10/03/1994 |
| AMERICAN GENERAL LIFE INSURANCE COMPANY | 08/27/2002 |
| AMERICAN UNITED LIFE INSURANCE COMPANY | 01/22/1998 |
| AMERITAS LIFE INSURANCE CORP. | 04/04/1995 |
| ANNUITY INVESTORS LIFE INSURANCE COMPANY | 09/11/2002 |
| BANKERS COMMERCIAL LIFE INSURANCE COMPANY | 05/23/1997 |
| BEST LIFE AND HEALTH INSURANCE COMPANY | 06/10/1996 |
| BLUE CROSS AND BLUE SHIELD OF TEXAS, A DIVISION OF HEALTH CARE SERVICE C | 03/07/2002 |
| COLONIAL LIFE AND ACCIDENT INSURANCE COMPANY | 11/20/2002 |
| FIRST NATIONAL LIFE INSURANCE COMPANY | 09/09/1994 |
| GOLDEN RULE INSURANCE COMPANY | 05/15/1998 |
| GREAT AMERICAN LIFE INSURANCE COMPANY | 09/11/2002 |
| GUARANTEE LIFE INSURANCE COMPANY | 11/02/1998 |
| LIFE INSURANCE COMPANY OF THE SOUTHWEST | 02/04/2003 |
| MID-CONTINENT LIFE INSURANCE COMPANY | 04/15/1996 |
| MONUMENTAL LIFE INSURANCE COMPANY | 09/12/2002 |
| NEW YORK LIFE INSURANCE COMPANY | 06/17/1998 |
| OLD LINE LIFE INSURANCE COMPANY OF AMERICA, THE | 05/19/1997 |
| PRINCIPAL LIFE INSURANCE COMPANY | 06/10/1997 |
| PROVIDENT INDEMNITY LIFE INSURANCE COMPANY | 05/11/1995 |
| PRUDENTIAL INSURANCE COMPANY OF AMERICA, THE | 04/10/1997 |
| SECURITY LIFE INSURANCE COMPANY OF AMERICA | 06/10/1998 |
| SOUTHWEST TEXAS HMO, INC. | 07/29/2002 |
| SOUTHWESTERN LIFE INSURANCE COMPANY | 03/30/1998 |
| STATE MUTUAL INSURANCE COMPANY | 12/23/1997 |
| STATESMAN NATIONAL LIFE INSURANCE COMPANY, THE | 01/12/1995 |



EXHIBIT NO. 1
3-4-03
Hill & Romero

| | |
|---|---|
| TEXAS GULF COAST HMO, INC. | 05/03/2002 |
| TRANSAMERICA ASSURANCE COMPANY | 09/12/2002 |
| UNICARE LIFE & HEALTH INSURANCE COMPANY | 02/18/1998 |
| UNION BANKERS INSURANCE COMPANY | 06/17/1996 |
| UNITED AMERICAN INSURANCE COMPANY | 10/25/1996 |
| UNITED TEACHER ASSOCIATES INSURANCE COMPANY | 06/05/2002 |
| USG ANNUITY & LIFE COMPANY | 08/26/1996 |
| WELLCARE HEALTH PLANS OF TEXAS, L.L.C. | 04/14/1998 |

To return to the previous screen, use the 'Back' feature of the browser.

Otherwise use [ **<< Back to Beginning** ]

Disclaimer link  |  Security and Privacy Policy link

For technical assistance, you can contact us 24 hours a day, 7 days a week toll free at 1-877-452-9060.

© 2000 TexasOnline; ALL RIGHTS RESERVED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

DINO X. CHAVEZ                              §
                                           §          CIVIL ACTION NO.
     VS.                                 §
                                           §          **B - 02 - 128**
BROWNSVILLE INDEPENDENT                     §
SCHOOL DISTRICT, NOE SAUCEDA,               §
MARILYN DEL BOSQUE-GILBERT                  §
and RANDALL DUNN                            §

---

## PLAINTIFF'S SECOND AMENDED ORIGINAL COMPLAINT

---

TO THE HONORABLE U. S. DISTRICT COURT:

COMES NOW **DINO X. CHAVEZ**, Plaintiff herein, complaining of Brownsville Independent School District, Noe Sauceda, Marilyn Del Bosque-Gilbert and Randall Dunn, and for such cause would respectfully show unto the Court and jury the following:

### I.

### JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter in controversy in this action, and the claims are within the jurisdictional limits of this Court. Venue is also proper in this Court because all or a substantial part of the events or omissions giving rise to the claims herein occurred in Cameron County, and the Defendants' residence at the time the causes of action accrued was in Cameron County, Texas.



## II.

## PARTIES

2.    Plaintiff **DINO X. CHAVEZ** is a resident of Brownsville, Cameron County, Texas.

3.    Defendant **BROWNSVILLE INDEPENDENT SCHOOL DISTRICT (BISD)** is an independent school district organized under the laws of the State of Texas. This Defendant has already been served and appeared herein.

4.    Defendant **NOE SAUCEDA** is an individual resident of Brownsville, Cameron County, Texas, at all relevant times herein. This Defendant has already been served and appeared herein.

5.    Defendant **MARILYN DEL BOSQUE-GILBERT** is an individual resident of Brownsville, Cameron County, Texas, at all relevant times herein. Service may be had upon this Defendant by serving her at 544 Calle Retama, Brownsville, Texas 78521.

6.    Defendant **RANDALL DUNN** is an individual resident of Brownsville, Cameron County, Texas, at all relevant times herein. Service may be had upon this Defendant by serving him at his office address, 1900 W. Price Road, Brownsville, Texas 78520.

## III.

## FACTUAL BACKGROUND AND ALLEGATIONS

7.    Plaintiff **Dino X. Chavez** was at all material times herein an independent insurance agent, originally appointed to represent American Family Life Assurance Company of Columbus (AFLAC) on September 6, 1994. After working for a number of years with AFLAC, Mr. Chavez was appointed as a Regional Sales Coordinator. As an independent insurance agent, and on behalf of AFLAC, on April 30, 1998, Mr. Chavez submitted a proposal to BISD to act as its Third Party

Services Provider for its § 125 cafeteria insurance plan, in exchange for the opportunity to offer additional optional insurance products with BISD's § 125 Cafeteria Plan to BISD employees. Although prior Third Party Services Providers would traditionally charge various fees for their services, Mr. Chavez's proposal provided that he would charge no fees to either BISD or its employees. That proposal was later approved by Defendant BISD on November 3, 1998, at which time Mr. Chavez's proposal was awarded the § 125 Cafeteria Plan Services Contract to act as BISD's Third Party Services Provider, along with the opportunity to offer additional AFLAC products in exchange for providing free administration of BISD's cafeteria plan.

8.       During November and December 1998, Mr. Chavez planned, coordinated and conducted Defendant BISD's entire cafeteria plan enrollment for over 6,000 employees as a service to BISD, thus saving BISD considerable expense. During the following year, from January through December 1999, Mr. Chavez provided BISD with additional administrative assistance and technical advice on a daily basis to insure compliance with § 125 guidelines, in addition to handling all inquiries and necessary paperwork relating to claims, policy questions and other matters relating to those policies. Thereafter, BISD advertised for proposals on the same products for the 1999-2000 and 2000-2001 years. During both years, no changes were made to BISD's proposal and the District chose to continue utilizing Mr. Chavez's services and allowing him to offer the additional voluntary AFLAC products. As part of his duties, Chavez continued to provide administrative services through the years 2000 and 2001. As a result of Mr. Chavez's efforts, the provision of insurance services was streamlined for all BISD employees, at no additional cost to BISD or its employees, but rather at considerable savings.

9.       Thereafter, on August 14, 2001, Chavez received information from BISD Board Member Randy Dunn indicating an attempt by him and BISD to hire an "agent of record" to

provide all services and policies to BISD and its employees, including all supplemental policies, although this would not necessarily be in the best interests of BISD employees. Dunn also indicated an interest that any insurance products should go through an agent named Arnulfo Olivarez, although Mr. Olivarez had previously only provided the District's voluntary cancer plan, since January 1999. During this meeting, Dunn also inquired as to Mr. Chavez's being able to work with Mr. Olivarez and his company, National Plan Administrators. During the prior 3-years, Mr. Chavez had not worked with Mr. Olivarez, and there would be no need for Mr. Chavez to seek any assistance from Mr. Olivarez. Any working relationship with Mr. Olivarez, however, would likely involve the payment to Mr. Olivarez of some additional funds or commissions that would otherwise be due to Mr. Chavez.

10.    Notwithstanding Mr. Dunn's suggestions, on September 6, 2001, Mr. Chavez submitted his AFLAC proposal for consideration to continue the existing 3-year relationship, with essentially no changes in fees or services, and without reliance on the services of Mr. Olivarez. On September 10th, Mr. Chavez submitted a letter to each Board Member outlining the advantages of his proposal, the most significant of which included that he would be charging no fees, he had a local servicing office, and he had 3-years of proven customer satisfaction with BISD employees. He thereafter presented his proposal to the BISD insurance committee on October 30, 2001. Other members of that committee included Defendant Noe Sauceda and Board Members Marilyn Del Bosque-Gilbert, Randy Dunn, and Hugh Emerson, Jr.

11.    During this time period, the BISD Board of Trustees was considering litigation against Sweezy Construction because mold had been found in buildings they constructed. Trustee Del Bosque-Gilbert's husband was a supervisory employee of Sweezy Construction at that time. Trustee Del Bosque-Gilbert therefore reached an agreement with Superintendent

Sauceda to the effect that if no recommendation was made by him to pursue litigation against Sweezy Construction, she would go along with his plan to appoint Mr. Olivarez as BISD's "agent of record." That lawsuit was in fact prevented. Trustee Dunn also reached an agreement with Superintendent Sauceda to have Dunn's wife, Deborah Dunn, reinstated to her former position as secretary to Superintendent Sauceda, along with a $10,000.00 raise, and to have his girlfriend, Elizabeth Parra, placed in a position in the BISD Insurance Department at a substantial salary. In order to receive the consideration they were seeking, Defendants Del Bosque Gilbert and Dunn had to agree to Superintendent Sauceda's plan to appoint Arnulfo Olivarez as BISD's "agent of record" for all BISD insurance policies, even though the Texas Attorney General had previously concluded that such designation was illegal. Del Bosque-Gilbert and Dunn therefore agreed to allow Defendant Sauceda to violate Plaintiff Chavez's rights, in order to receive their own personal paybacks.

12.    Thereafter, Mr. Chavez received word that his proposal had been misquoted by Defendant Sauceda and his staff, in an effort to award the contract to someone other than Mr. Chavez. Although Mr. Chavez had complied with all District regulations relating to his proposal for insurance products and services, Defendants Sauceda, Del Bosque-Gilbert, Dunn and BISD were attempting to circumvent those procedures in an attempt to prevent Mr. Chavez from being awarded the contract, in spite of his having submitted the proposal most favorable to BISD and its employees. Defendant Sauceda's apparent purpose for submitting such false information was to promote the plan being offered by Arnulfo Olivarez for National Plan Administrators. Once he was able to convince Defendants Del Bosque-Gilbert, Dunn and the other board members to cooperate with his plan for their own selfish purposes, Defendant Sauceda began to implement his plan to award the contract to Mr. Olivarez and his company, National Plan Administrators.

13.    During the course of deliberation over the various proposals, Mr. Chavez received word that BISD was still considering retaining Mr. Olivarez as "agent of record" to provide all ancillary available insurance policies and products for BISD employees. Therefore, during the public input section of the BISD board meeting on November 6, 2001, Mr. Chavez notified the Board of information located on the Texas Attorney General's web-site and an opinion that granting "agent of record" status was illegal. Thereafter, Mr. Chavez continued to submit letters and charts to BISD's Insurance Committee Campus Representatives reflecting these matters. In spite of Mr. Chavez's statements and representations, and the information from the Texas Attorney General, the agenda for the November 13, 2001 BISD board meeting had removed any reference to any proposed cafeteria plan such as that proposed by Mr. Chavez. At that meeting, Mr. Chavez again spoke of the "agent of record" issue and presented information on that issue, discussing the legality of an "agent of record," the cost difference between AFLAC and the plan being promoted by Defendants Sauceda and BISD and National Plan Administrators (NPA), the difference in claim service, the difference in flexibility and the difference in local servicing offices. At that meeting, Board Member Linda Salazar raised concerns that board members "should not profit from his/her position in any manner, [and] a board member should not take advantage of his/her position to broker deals." The appearance of impropriety was enhanced on November 16, 2001, when the BISD board meeting agenda was posted, recommending approval of NPA as the BISD "agent of record" for all policies.

14.    Not willing to idly accept BISD's apparent illegal appointment of an "agent of record," Mr. Chavez sent a letter to all BISD Insurance Committee Campus Representatives to notify them that a decision on the Cafeteria Plan was on the agenda for the BISD meeting of November 20, 2001. At the November 20th meeting, Mr. Chavez again provided copies of the

Attorney General's opinion concerning the illegality of an "agent of record," and he again presented his concerns to the Board. In spite of the points raised by Mr. Chavez, Defendants Sauceda and Del Bosque-Gilbert argued for the selection of NPA as an "agent of record." During that discussion, however, Board Member Linda Salazar raised concerns as to why the employees' insurance committee had not been given the opportunity to voice their opinions on the matter. As a result, that measure failed.

15.    Thereafter, Mr. Chavez's proposal for insurance services was placed on the agenda for the BISD Insurance Committee meeting set for November 29, 2001, along with NPA and another organization to make presentations. On the morning of November 29, however, Mr. Chavez was notified by his AFLAC supervisor, Frank La Femina, that he had been informed by Defendant Sauceda that AFLAC was being removed from consideration and that BISD was terminating their current contract with AFLAC for cafeteria plan services. Defendant Sauceda apparently explained that the reason for taking these actions was because of the letters Mr. Chavez had written to insurance committee members describing his products and the illegality of an "agent of record," speech protected by the First Amendment to the U.S. Constitution. When Mr. La Femina suggested using another representative, Defendant Sauceda agreed that if another representative were to replace Mr. Chavez, he would agree to allow AFLAC to continue its services for BISD.

16.    Later that morning, Defendants Sauceda and BISD delivered a letter to Mr. Chavez, providing him with a 30-day notice of BISD's intent not to renew his services as their Third Party Services Provider and that his proposal for renewal of the contract had been rejected as allowed under BISD's policies. At no time was Plaintiff Chavez provided with notice of Defendants' Sauceda's and BISD's intention to disqualify him from participating in his chosen profession, or an

opportunity to be heard, before he was disqualified. This letter also accused Mr. Chavez of "continuous inappropriate correspondence," "conduct...unprofessional, unethical, and against expected customer-service provider relations," memos that were "in [his] opinion, both slanderous and libelous," accusing Mr. Chavez of putting himself and AFLAC "in a legally liable situation," and asserting that "it is obvious that [he is] not working in the best interest of BISD...." At no time did Defendant Sauceda identify any authority that would indicate the Texas Attorney General's Opinion was incorrect or did not apply to his attempts to hire Mr. Olivarez as an "agent of record." Defendant Sauceda and BISD further directed Mr. Chavez to cease and desist all contact with school personnel during school business hours," and he was notified that "[c]ampus administration [would] be directed to contact security services if [he] or any of [his] associates [were] found to be on school-district property." The clear tone of Defendant Sauceda's and BISD's letter was to prevent Mr. Chavez from being able to continue his services as Third Party Services Provider, to acquire any future work with BISD, or to sell any policies to BISD employees, thus excluding him from participation in the bidding and selection process and denying him due process and the equal protection of the laws in being able to compete along with other service providers for the sale of these policies.

17.     Defendants Sauceda and BISD further attempted to prevent Mr. Chavez from conducting any business with, or making any sales to, BISD employees regarding the cafeteria plan by submitting a copy of this letter to Mr. Chavez' supervisor at AFLAC, advising that "this administration will consider AFLAC as a future product provider," only if a "corporate officer...personally apologize[d] to each board member, the board as a whole, myself, and my administrators publicly," and if "written assurance [was provided] that appropriate, ethical conduct will be exercised in the future by any and all AFLAC representatives," and only lastly "[p]rovided

however, that Mr. Chavez could participate in any of those enrollments.

20.    In addition, following the Insurance Committee Meeting and discussion, no action was taken by BISD Trustees to reverse the dictates in Defendant Sauceda's letter of November 29, 2001, thereby adopting its provisions.  As a result, Plaintiff Chavez was prevented from further speaking on the matters of public importance previously raised, and he was prevented from enjoying or participating in his chosen profession.  Because greater than 95% of all AFLAC sales of ancillary insurance products are made between the last two weeks of November and the first 3 weeks of December, Defendants' prohibition of Plaintiff on any campus grounds during this time period without an opportunity to be heard prevented him from engaging in his livelihood.  Because Defendant Sauceda had previously notified Mr. Chavez that he was not allowed on BISD campuses, Mr. Chavez was not allowed to participate in those enrollments, and thus lost all income from any new enrollments.  These actions were specifically designed to interfere with Plaintiff Chavez's ability to earn a living by entering into contracts with BISD employees for the provision of insurance products, and as a result, Mr. Chavez was in fact prevented from doing so.

21.    As a result of Defendants' actions, Plaintiff Dino Chavez was removed from the handling of the proposal he had submitted to BISD for AFLAC products, and he was thereafter terminated from his regional sales coordinator position with AFLAC.  Although Mr. Chavez had spent years establishing his relationship with AFLAC and with BISD employees, including the provision of numerous services for both, Mr. Chavez was summarily terminated by AFLAC because Defendants refused to work with Mr. Chavez.  Although Mr. Chavez acted within his rights at all times, Defendants acted contrary to law and deprived Mr. Chavez of his rights.  Defendant Sauceda never identified any specific actions taken by Mr. Chavez that were inappropriate, and all of Mr. Chavez's actions in the present application process, as well as in his

that the products are of the best quality, service and price." Again, no notice or opportunity to be heard was provided to Plaintiff Chavez before he was denied the right to follow his specific chosen profession.

18.    As a result of Defendant Sauceda's correspondence and telephone conferences, Mr. Chavez was not allowed to attend the employees' insurance committee meeting on November 29th, although Mr. Olivarez on behalf of NPA and a third representative on behalf of a third company were allowed to make presentations to the board and the employees' insurance committee. Another AFLAC representative was instead allowed to present the AFLAC proposal previously drafted and submitted by Mr. Chavez. During that presentation, BISD Board Member Herman Otis Powers acknowledged receipt of Defendant Sauceda's letter and expressed surprise at Defendant Sauceda's request for an apology, explaining that there was no need for such and that Sauceda had no right to write any such letter and include the Board Members' names, explaining that Defendant Sauceda had abused his power by writing this letter.

19.    At the conclusion of the presentations and questions, the employees' insurance committee voted, and their votes were put into a box. In order to further his part of the conspiratorial plan with Defendant Sauceda, Defendant Dunn attempted to delay counting of the ballots by proposing that the ballots be taken to the police station's safe for safe-keeping, knowing that there was no such safe because as a retired police sergeant he was aware that the safe was removed during his tenure. That attempt was thwarted when the committee insisted instead on an immediate count. As a result, the proposal submitted by Mr. Chavez on behalf of AFLAC won by a margin of 44-1. A significant part of the reason for the success of the AFLAC proposal was Mr. Chavez's history of providing service to BISD employees. As a result, Defendant Sauceda notified the audience that AFLAC could begin enrollment the following day. Sauceda did not indicate,

prior years in servicing BISD employees, were proper, authorized and according to law.

## IV.

## CAUSES OF ACTION

### A.    Brownsville Independent School District

22.     The facts alleged in Section III above are incorporated as though fully set out herein. As set out in therein, the actions of Defendant BISD caused a deprivation of Plaintiff Chavez's constitutional rights to free speech and to due process of law, of which he was deprived without justification or excuse, and for which he now sues pursuant to 42 U.S.C. § 1983. Defendant's actions against Plaintiff were in retaliation for his legitimate exercise of his free speech rights, guaranteed by the First Amendment to the U.S. Constitution. Defendant's actions were in retaliation for Mr. Chavez's legitimate speech relating to the illegality of the use of an "agent of record" and other matters relating to the contract for insurance services. Defendant's actions further violated Plaintiff's rights to due process, liberty, and to the equal protection of the laws, protected by the Fifth and Fourteenth Amendments to the U.S. Constitution, by depriving him of the right to hold specific private employment, to follow a chosen profession free from unreasonable governmental interference, and to participate in the enrollment process, as further set out above.

23.     Defendant BISD's actions in depriving Mr. Chavez of his rights to free speech and to the due process and equal protection of the laws were conducted and implemented as part of the customs, policies and/or practices of Defendant BISD, or were made by those with policy-making authority in that area of BISD's business, for which Defendant BISD is now liable. Defendant's actions were deliberately intended to cause harm to Mr. Chavez, and the resulting harm to him was severe. As a result of Sauceda's and BISD's actions, Mr. Chavez suffered

extreme shame, humiliation, embarrassment, loss of reputation, injury to his reputation, worry, anxiety, sleeplessness and damage to his personal health.

24.    Plaintiff would further show that the deprivation of his rights to free speech, to due process, and to the equal protection of the laws by Defendant BISD was conducted as part of the custom and policy established by this Defendant, or alternatively, through the actions of its policymaker, Superintendent Noe Sauceda.  Because Defendant Sauceda was the policymaker of Defendant BISD, his actions are imputed to Defendant BISD.  In addition, the actions of BISD's Board of Trustees was such as to adopt the actions of Defendant Sauceda as part of its custom and policy by refusing to reverse the dictates of Defendant Sauceda after notice, and through the trading of special favors between the Trustees and Defendant Sauceda. *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984)(On Petition for Rehearing)(en banc)(per curiam), *cert. denied*, 472 U.S. 1016, 105 S.Ct. 3467, 87 L.Ed.2d 612 (1985).  Had Defendant BISD's policy or custom been otherwise, it would have prevented Sauceda from violating Plaintiff's rights or taken action to remedy those violations timely.

25.    Defendant BISD may not rely on the defense of qualified or sovereign immunity under state law, because no state claims have been raised against this Defendant, and because Defendant Sauceda himself is not entitled to qualified immunity under state law.  In addition, Defendant BISD may not relay on the defense of qualified or sovereign immunity under federal law, because the violation of Plaintiff's constitutional rights was through a policy "decision officially adopted and promulgated by [BISD's] officers" or was "pursuant to governmental `custom' even though such a custom [had] not received formal approval through [BISD's] official decision making channels." *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690-91, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978).  Accordingly, Defendant BISD is not entitled to

qualified or sovereign immunity based on its own customs or policies, or on the immunity of one of its employees or representatives, even if one or more of them were entitled to immunity.

**B.    Noe Sauceda**

26.    The facts alleged in Section III above are incorporated as though fully set out herein. As set out therein, the actions of Defendant Sauceda constitute tortious and intentional interference with the business relationship between Plaintiff Dino Chavez and his employer American Family Life Assurance Company of Columbus (AFLAC), on a matter on which he did not have discretion, in such a manner as to constitute fraud on Plaintiff Chavez and BISD employees, as well as malice and an intentional infliction of emotional distress on Plaintiff Chavez, in violation of state law. The actions of Defendant Sauceda were such as to deliberately interfere with, or to prevent, Plaintiff's business relationships with AFLAC and with BISD employees, and were deliberately intended to cause loss and damages to Mr. Chavez by doing so. Such actions were taken by Defendant Sauceda without privilege or justification and caused Plaintiff the damages for which he now sues. Defendant Sauceda's written and spoken comments were also intended to, and did, disparage Plaintiff and his reputation in his business and community. Such comments were with malice and made without regard to their truth and were in fact false, and thus constitute libel and slander, for which this Defendant is individually liable. Plaintiff would further assert that the actions of Defendant Sauceda were such as to constitute malice for which Plaintiff is entitled to the recovery of exemplary damages pursuant to Texas Civil Practice and Remedies Code § 41.001, *et seq*. In particular, Defendant Sauceda had a specific intent to cause substantial injury to Mr. Chavez, and the acts he committed involved an extreme degree of risk that Mr. Chavez would lose all income from the proposal he had submitted on behalf of AFLAC, considering the probability and

magnitude of potential harm. Defendant Sauceda had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to Mr. Chavez's rights or welfare.

27.    Defendant Sauceda's actions further caused a deprivation of Plaintiff Chavez's federal constitutional rights to free speech and to due process of law, of which he was deprived without justification or excuse, and for which he now sues pursuant to 42 U.S.C. § 1983. Defendant's actions against Plaintiff were in retaliation for his legitimate exercise of his free speech rights, guaranteed by the First Amendment to the U.S. Constitution. Defendant's actions were in retaliation for Mr. Chavez's legitimate speech relating to the illegality of the use of an "agent of record" and other matters relating to the contract for insurance services. Defendant's actions further violated Plaintiff's rights to due process and to liberty, protected by the Fifth and Fourteenth Amendments to the U.S. Constitution, by depriving him of the right to hold specific private employment, to follow a chosen profession free from unreasonable governmental interference, and to participate in the enrollment process, and deprived him of his right to equal protection of the laws, as further set out above.

28.    Defendant Sauceda is not entitled to qualified immunity because his actions in retaliating against Plaintiff because of his speech and preventing him from speaking further, as well as in depriving him of his rights to due process, liberty and the equal protection of the laws by preventing him from participating in the enrollment process and in prejudicing his ability to make a living without giving him an opportunity to be heard, violated Plaintiff's clearly established constitutional rights of which a reasonable person would have known. Defendant's actions were deliberately intended to cause harm to Mr. Chavez, and the resulting harm to him was severe. As a result of Sauceda's and BISD's actions, Mr. Chavez suffered extreme shame, humiliation, embarrassment, loss of reputation, injury to his reputation, worry, anxiety, sleeplessness and

damage to his personal health.

### C. Marilyn Del Bosque-Gilbert and Randall Dunn

29.    The facts alleged in Section III above are incorporated as though fully set out herein.  As set out therein, Defendants Del Bosque-Gilbert's and Dunn's actions caused a deprivation of Plaintiff Chavez's federal constitutional rights to free speech, of which he was deprived without justification or excuse, and for which he now sues pursuant to 42 U.S.C. §1983. Defendant's actions against Plaintiff were in retaliation for his legitimate exercise of his free speech rights, guaranteed by the First Amendment to the U.S. Constitution.  Defendants' actions were in retaliation for Mr. Chavez's legitimate speech relating to the illegality of the use of an "agent of record" and other matters relating to the retention of a Third Party Administrator and purchases of contracts for insurance services.  These Defendants, while acting in their personal capacities for their own selfish purposes, conspired to use their official positions for personal gain, and in the process violated Plaintiff's free speech rights.  Their actions were deliberately intended to cause harm to Mr. Chavez, and the resulting harm to him was severe.  The actions of Defendants Del Bosque-Gilbert and Dunn constitute civil conspiracy under state law, for which they are each liable, jointly and severally. Defendants' actions further violated Plaintiff's rights to due process, liberty, and to the equal protection of the laws, protected by the Fifth and Fourteenth Amendments to the U.S. Constitution, by depriving him of the right to hold specific private employment, to follow a chosen profession free from unreasonable governmental interference, and to participate in the enrollment process, as further set out above.  As a result of Del Bosque-Gilbert's and Dunn's actions, Mr. Chavez suffered extreme shame, humiliation, embarrassment, loss of reputation, injury to his reputation, worry, anxiety, sleeplessness and damage to his

personal health, for which he now sues.

30.     The actions of Defendants Del Bosque- Gilbert and Dunn were also such as to constitute malice, for which Plaintiff is entitled to the recovery of exemplary damages pursuant to Texas Civil Practice and Remedies Code §41.001, *et seq*.   Defendants Del Bosque-Gilbert and Dunn had a specific intent to cause substantial injury to Mr. Chavez, and the acts they committed involved an extreme degree of risk that Mr. Chavez would lose all income from the proposal he had submitted on behalf of AFLAC, considering the probability and magnitude of potential harm.    These Defendants had an actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to Mr. Chavez's rights or welfare.

31.     Defendants Del Bosque-Gilbert and Dunn are not entitled to qualified immunity because their actions in retaliating against Plaintiff because of his speech and preventing him from speaking further, as well as in depriving him of his rights to due process, liberty and the equal protection of the laws by preventing him from participating in the enrollment process and in prejudicing Plaintiff's his ability to make a living without giving him an opportunity to be heard, violated Plaintiff's clearly established constitutional rights of which a reasonable person would have known. Defendants' actions were deliberately intended to cause harm to Mr. Chavez, and the resulting harm to him was severe.  As a result of Del Bosque-Gilbert's and Dunn's actions, Mr. Chavez suffered extreme shame, humiliation, embarrassment, loss of reputation, injury to his reputation, worry, anxiety, sleeplessness and damage to his personal health.

## V.

## DAMAGES

32.     As a direct and proximate result of the facts made the basis of this lawsuit, Plaintiff sustained personal injuries and damages, and those injuries and damages were proximately caused

by the acts and/or omissions of Defendants, for which Plaintiff now seeks recovery. Such damages include a loss of wages and wage earning capacity, loss of income and income opportunities, loss of past and prospective earnings, and mental pain, suffering and anguish in the past and in the future. In sum, Plaintiff seeks all actual and compensatory damages to which he may be entitled under the law. Plaintiff also seeks recovery of his reasonable and necessary attorney's fees and expenses, pursuant to 42 U.S.C. §1988. Plaintiff further seeks the recovery of punitive or exemplary damages from Defendants Sauceda, Del Bosque-Gilbert and Dunn, in amounts to be determined entirely by the discretion of the jury.

## VI.

## CONDITIONS PRECEDENT

33.     All conditions precedent to the filing of this suit and the recovery of the damages prayed for herein have occurred and have been performed.

## VII.

## JURY TRIAL REQUEST

34.     Plaintiff **DINO X. CHAVEZ** requests that a jury of his peers be convened to determine the facts made the basis of this lawsuit.

WHEREFORE, PREMISES CONSIDERED, Plaintiff **DINO X. CHAVEZ** respectfully prays that the Defendants be cited to appear and answer herein, and that upon final hearing of this action, that judgment be entered for Plaintiff against Defendants for all actual and compensatory damages suffered by Plaintiff, in an amount within the jurisdictional limits of this Court, together with all pre-judgment and post-judgment interest at the maximum rate allowed by law, reasonable attorneys' fees and expenses incurred by Plaintiff, and costs of court, as well as

punitive or exemplary damages against Defendants Sauceda, Del Bosque-Gilbert and Dunn, as well as all other further relief to which Plaintiff may show himself to be justly entitled, whether special or general, at law and in equity.

      Signed on this the 10th day of February, 2003.

                Respectfully submitted,

                  **LAW OFFICE**
                  **J. ARNOLD AGUILAR**
                Artemis Square, Suite H-2
                1200 Central Boulevard
                Brownsville, Texas 78520
                Telephone   : (956) 504-1100
                Facsimile    : (956) 504-1408

By:                                           
                J. Arnold Aguilar
                State Bar No. 00936270
                Federal Adm. No. 6822

                Attorney for Plaintiff,
                DINO X. CHAVEZ

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing **PLAINTIFF'S SECOND AMENDED ORIGINAL COMPLAINT** has on this the 10th day of February, 2003, been forwarded via certified mail, return receipt requested to:

Ms. Elizabeth G. Neally
Mr. Ricardo Morado
ROERIG, OLIVEIRA & FISHER, L.L.P.
855 W. Price Rd., Suite 9
Brownsville, TX 78520

Mr. Charles V. Willette, Jr.
Ms. Eileen M. Leeds
WILLETTE & GUERRA, L.L.P.
International Plaza, Suite 460
3505 Boca Chica Boulevard
Brownsville, TX 78521


J. Arnold Aguilar

001058

# CAFETERIA PLAN COMPARISON

EXHIBIT
Choice
3-1 v2 3

001059

| FEES | AFLAC | Benefit Alliance | 1st Financial Administrators | Flex-Ben Corp. | Fisc Source Inc Source Ben. Corp. | National Plan Administrator |
|---|---|---|---|---|---|---|
| • Set up fee (Implementation Fee) | + N/C | $450 | N/C | $500 | ** | N/C |
| • Documentation Design Fee | | $125 | N/C | $250 | N/C | N/C |
| • Enrollment Fee | | N/C | N/C | N/C | N/C | N/C |
| • Employee Enrollment Kit | | N/C | N/C | $1.00 | ** | $5.00*** |
| • Monthly Fee per Participant (Flexible Spending Account) | + N/C | $3.00 | $3.75 | $3.35 | ** | $3.00 |
| • Monthly IRS Maintenance and Compliance Fee | | N/C | N/C | N/C | ** | N/C |
| • Verbal Communications (In-service) | | N/C | N/C | N/C | ** | N/C |
| • Telephone | | N/C | N/C | $50/hr. | ** | N/C |
| • Postage | | Cost | Cost | Cost | ** | N/C |
| • Copies | + N/C | Cost | Cost | Cost | ** | N/C |
| • Mileage | | N/C | N/C | Cost | ** | N/C |
| • Preparation of Annual IRS Form 5500 | | N/C | N/C | $150 | ** | $75.00 |
| • Premium Only --- | | N/C | N/C | N/C | ** | .50/PP/PM |
| • Flexible Bank Account (Control of Funds) | + YES | Fee Based | | ? | ** | ? |
| • Renewal Fees | + N/C | | | $200 | ** | - |
| • Tax Sheltered Annuity (TSA) (per participant) | + N/A | - | - | - | - | $1.00 |
| • Annual Audit per participant | + N/A | - | - | - | - | $1.00 |

## LEGEND

AFLAC is BISD's current product vendor.

? = Unknown      N/C = No Charge

+ = No fees are charged if their marketing company; First Financial Capital Corporation, is selected to provide and market the tax qualified and other financial products to employees. The carriers remunerate Fist Financial Capital, who, in turn, reimburses First Financial Administrators for services to the District.

* = No fees are charged if their marketing company; Colonial Life & Accident, is selected to provide and market the tax qualified and other financial products to employees.

** = No fees are charged if their marketing company; Colonial Life & Accident, is selected to provide and market the tax qualified and other financial products to employees. Flex Source would therefore be compensated from the sale of these products.

*** = The enrollment fee will be waived if Insurance Associates of the Valley are selected as agent of record, and the Hartford Cancer remains in effect, and the School District selects the Accident, Heart/Stroke, and Disability Plans.

---

+  There are no fees associated with AFLAC's cafeteria plan services. BISD does not pay a fee. Employees do not pay a fee. We have three years of experience at BISD as proof.

+  Flexible Spending Account (FSA) contributions are held in a BISD bank account. Any and all funds may be removed at anytime at the request of BISD. AFLAC has check writing authority in this bank account only for the purpose of reimbursing employee's FSA claims. BISD maintains full control over all funds.

+  AFLAC is not involved in the sale or administration   annuities.

030100

# Criteria for Cafeteria Plan...

| | AFLAC | Benefit Alliance | 1st Fiscal Administrators | Flex-Ben Corp. | Flex Source/ One Source Ins. Corp. | National Plan Administrator |
|---|---|---|---|---|---|---|
| Work directly with BISD design & maintain a Cafeteria Plan. | Yes | Yes | Yes | Yes | Yes | Yes |
| Make arrangements to meet all Legal requirements of IRC section 125. | Yes | Yes | Yes | Yes | ? | Yes |
| Educate BISD on Cafeteria Plan. | Yes | Yes | Yes | Yes | ? | Yes |
| Responsible for enrolling all employees at all BISD sites (campuses). | Yes | No | No | No | Yes | Yes |
| Keep employees informed on latest news (In-service). | Yes | Yes | Yes | Yes | ? | Yes |
| Assists in processing all claims. | Yes | Yes | Yes | Yes | ? | Yes |
| Investigate delays on processing of claims. | Yes | Yes | Yes | Yes | ? | Yes |
| ...sists Administration with resolution of employee problems as they arise. | Yes | Yes | Yes | Yes | ? | Yes |
| ...vides BISD with a staff that is accessible | Yes | No | No | No | ? | Yes |
| 10. Cooperate & consult with BISD's Insurance Committee on plan operation. | + No Yes | Yes | Yes | Yes | ? | Yes |
| 11. Assist Administration in determining that District policy is adhered to in product distribution. | + Yes | Yes | Yes | Yes | ? | Yes |
| 12. Assume responsibility for all needed forms & document. | No | Yes | Yes | Yes | ? | Yes |
| 13. Assist in the development of a program, which will best serve the Employee's needs. | + Yes No | Yes | Yes | Yes | Yes | Yes |

# Evaluation & Selection...

| | AFLAC | Benefit Alliance | 1st Fiscal Administrators | Flex-Ben Corp. | Flex Source/ One Source Ins. Corp. | National Plan Administrator |
|---|---|---|---|---|---|---|
| Firm's experience | 50 Yrs. | 30 Years | 33 Years | ? | ? | 27 Years |
| Expertise as TPA of 403(B) 403(B)(7) | NOT A TPA | Yes | Yes | Yes | ? | Yes |
| Availability & Accessibility of firm's Key personnel to meet with BISD on short notice & To respond quickly to inquiry. | Yes LOCAL AGENT | No | Yes Weslaco | Yes | ? | Yes LOCAL AGENT |
| Ability to communicate info clearly and concisely Orally & In writing. | Yes | Yes | Yes | Yes | Yes | Yes |

(BROWNSVILLE OFFICE)  —  HARLINGEN OFFICE

+ No other Cafeteria Plan Services provider has provided the level of service that we have at BISD. No one comes close. Our local office bears the burden of all paperwork, annual enrollments, and total customer satisfaction. In addition, we also handle the daily phone calls and the weekly paperwork for employees who wish to make changes or have questions.

+ We will gladly work with the employee or board insurance committee members to insure total customer satisfaction.

+ AFLAC's business is to provide advice and services as they pertain to Section 125 Cafeteria Planning. We have advised the district over the past three years on legal and administrative issues. As proof, we recently advised BISD that they should allow employees the opportunity to make changes to their electric premium.



# AFLAC

## *Rio Grande Valley Regional Sales Office*
*905 E. Los Ebanos Blvd., Suite A  *  Brownsville, Texas 78520*
*Phone (956)982-3998  *  Fax (956)982-0931*

Date:   August 10, 2001
To:     Kathy Wilkinson, WWHQ Marketing - Bids & Proposals
From:   Dino X Chavez, MBA - Regional Sales Coordinator

Re:     Brownsville ISD - RFQ

Attached, please find a formal RFQ request from Brownsville ISD.  Their current account numbers are L5864 and U2181.  The deadline is September 6.  Brownsville ISD is currently an existing Eduflex account that bills at over $600,000 annually.  Due to the political process that occurs from year to year in most public entities, the proposal may be worded in such a way as to exclude us from competing to keep the business.  My contacts at the school district will be attempting to get the RFQ reissued with different terminology so as not to exclude us due to the fact that we do not offer 403b annuity services.  However, in the event that I cannot get the RFQ changed, I need your assistance to come up with an alternate plan of action that may include the services they are asking for offered possibly through Ceridian or Paylogix.  Fred Schladensky in our marketing department has already begun working on this possibility.  Please contact him before starting on the RFQ.

Please contact me immediately with any questions.  Thank you for your help and cooperation.

copy:   Fred Schladensky, WWHQ Marketing
        Frank LaFemina, SSC  TXC



001002