IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DINO CHAVEZ,<br>　　　　Plaintiff, | §<br>§<br>§ | United States District Court<br>Southern District of Texas<br>FILED |
| vs. | §<br>§ | SEP 2 5 2003 |
| BROWNSVILLE INDEPENDENT<br>SCHOOL DISTRICT and NOE SAUCEDA,<br>　　　　Defendants, | §<br>§<br>§<br>§ | Michael N. Milby<br>Clerk of Court |
| ------------------------------------------------<br>BROWNSVILLE INDEPENDENT SCHOOL<br>DISTRICT,<br>　　　　Third-Party Plaintiff, | §<br>§<br>§<br>§ | CIVIL ACTION NO. B-02-128 |
| vs. | §<br>§ | |
| AMERICAN FAMILY LIFE ASSURANCE<br>COMPANY OF COLUMBUS (AFLAC),<br>　　　　Third-Party Defendant. | §<br>§<br>§<br>§ | |

**AFLAC'S MOTION TO STRIKE OR, IN THE ALTERNATIVE,
MOTION TO STAY PROCEEDINGS AND COMPEL ARBITRATION**

TO THE HONORABLE UNITED STATES DISTRICT COURT:

NOW COMES Third-Party Defendant American Family Life Assurance Company of Columbus ("AFLAC") and files this, its Motion to Strike the "Notice of Clarification of Plaintiff's Claims" or, in the alternative, Motion to Stay these proceedings and Compel Arbitration, and in support thereof would respectfully show as follows:

I.
**Motion to Strike**

On July 7, 2003, Plaintiff Dino Chavez ("Plaintiff" or "Chavez") filed an instrument entitled "Notice of Clarification of Plaintiff's Claims" (referred to herein as the "Notice"). In it, Chavez purports to possess a claim against AFLAC for discrimination, but he admits that he "has not yet alleged or asserted a cause of action against AFLAC." *See* Notice, Page 2. Notably,

**Motion to Strike – Page 1**

Chavez's Notice stops short of asserting any claim against AFLAC — for discrimination, breach of contract, or otherwise. In fact, Chavez has not filed a claim against AFLAC in this or any other forum.

Because Plaintiff's Notice does not assert a claim or otherwise constitute a complaint against AFLAC, it is not a "pleading" allowed under the Federal Rules of Civil Procedure. Federal Rule of Civil Procedure 7 denominates the pleadings allowed in a civil action in this Court. Such pleadings include a complaint, an answer, a counterclaim, a cross-claim, a third-party complaint, and answers or replies thereto. Fed. R. Civ. P. 7(a). "No other pleading shall be allowed, except that a court may order a reply to an answer or a third-party answer." *Id.* Chavez's Notice does not fall within any of the pleadings allowed. Accordingly, it should be stricken.

By his Notice, Chavez tries to keep AFLAC in this suit as a third-party defendant without any legally cognizable pleading to which AFLAC can respond. If, in fact, Plaintiff claims to have suffered damages as a result of AFLAC's alleged discrimination, then he should so allege in a proper pleading against AFLAC so that AFLAC may respond. Failing such a pleading, those allegations in his Notice are not properly before the Court and cannot be considered because AFLAC has no way of responding to Plaintiff's improper Notice. AFLAC has no way of defending against this unfounded charge of discrimination. In short, Chavez's Notice is not a proper pleading allowed in this Court, cannot form the basis for a third-party claim of contribution, and should be stricken.

## II.
## Alternative Motion to Stay

The mischief Chavez is trying to work is clear. Chavez knows that he is required to arbitrate any claim he may have against AFLAC. He seeks to avoid his obligation to arbitrate by

filing his Notice of a claim against AFLAC, rather than filing a complaint joining AFLAC, as required by the Federal Rules of Civil Procedure. For, if he truly has a claim against AFLAC and if he asserts that claim, then it must be arbitrated. Thus, if this Court determines not to strike Chavez's Notice and decides to give it consideration, then, in the alternative, AFLAC submits that this Court should stay these proceedings and compel Chavez to arbitrate his claim against AFLAC.

A.  **The Agreement to Arbitrate**

If Chavez claims to have suffered discrimination at AFLAC's hands such that AFLAC should contribute to his damages with defendants BISD and Sauceda, then Chavez must arbitrate his claims — because he agreed to do so. When Chavez first joined AFLAC as an agent, he agreed that "[a]ny dispute arising under this Agreement, *to the maximum extent allowed by applicable law*, shall be subject to arbitration, and prior to commencing any court action *the parties agree that they shall arbitrate all controversies.*" See ¶ 15 of Chavez's Associate's Agreement, a true and correct copy of which is attached hereto as Exhibit A.[1] When Chavez was promoted to a Regional Sales Coordinator in November of 1998, he agreed in his Regional Sales Coordinator's Agreement ("RSC Agreement") that all of the provisions in his Associate's Agreement, including the agreement to arbitrate, "shall continue to be of full force and effect," and he ratified and reaffirmed "all the provisions of said Associate's Agreement with AFLAC as fully and effectually as though the provisions thereof were set forth herein verbatim." *See* ¶ 7,

---

[1] Concurrently with the filing of this Motion to Strike or Alternatively to Stay, AFLAC is also filing its Motion for Summary Judgment. Attached to the Motion for Summary Judgment is the Affidavit of Janet P. Baker ("Baker Affidavit"), an AFLAC Vice President. In Ms. Baker's affidavit, she provides evidence necessary to lay the evidentiary foundation for this Court's consideration of Chavez's agreements with AFLAC, which are operative documents in this matter, including his Associate's Agreement and Regional Sales Coordinator's Agreement. The Baker Affidavit is incorporated herein by reference.

RSC Agreement, a true and correct copy of which is attached hereto as Exhibit B. Thus, the arbitration provision carries over and applies to Chavez's RSC Agreement.

It is this RSC Agreement that Chavez claims Sauceda interfered with and that Chavez, in his Notice, claims was breached by AFLAC because Chavez is Hispanic. Accordingly, if this Court does not strike Chavez's Notice, then it should allow AFLAC to defend itself against the alleged discrimination claim in the arbitration forum agreed to by Chavez. Accordingly, AFLAC moves alternatively to compel arbitration and stay the proceedings herein against AFLAC until the resolution of such arbitration.

**B.   Argument and Authorities**

Under both Texas and Federal law, a court is required to compel arbitration if a party to an arbitration agreement refuses to abide by the agreement. *See* 9 U.S.C. § 4; Tex. Civ. Prac. & Rem. Code §171.021 (Vernon Supp. 2001).

The Federal Arbitration Act ("FAA") provides that an arbitration clause "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The purpose of the FAA is to "reverse the longstanding judicial hostility to arbitration agreements . . . and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991).

Guided by the FAA's animating purpose, the Supreme Court has repeatedly held that arbitration agreements are to be read liberally to effect their purpose. *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 (1983); *see also Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 90 (2000); *Mastrobuono v. Shearson Lehman Hutton*, 514 U.S. 52, 63 (1995); *Gilmer*, 500 U.S. at 24. As the Supreme Court held in *Mastrobuono*, when a court

interprets an arbitration provision, "due regard must be given to federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause must be resolved in favor of arbitration." *Mastrobuono,* 514 U.S. at 62. Indeed, arbitration should not be denied "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582-83 (1960); *see also Pennzoil Exploration & Production Co v. Ramco Energy Ltd.,* 139 F.3d 1061, 1067 (5th Cir. 1998); *Dallas Cardiology Associates v. Mallick,* 978 S.W.2d 209, 212 (Tex. App.—Texarkana 1998, pet. denied)(applying Texas Act).

Under the FAA, an arbitration agreement is presumed to be "valid ... and enforceable." *See Shearson/American Express v. McMahon,* 482 U.S. 220, 226 (1987) (quoting 9 U.S.C. § 2); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 626-27 (1985). In determining whether a dispute falls within the scope of an agreement to arbitrate, Texas and Federal courts alike recognize the strong public policy favoring arbitration. *Moses H. Cone Memorial Hospital v. Mercury Construction Corp,* 460 U.S.1, 24-25 (1983); *Prudential Securities, Inc. v. Marshall,* 909 S.W.2d 896, 898 (Tex. 1995).

It is well settled that a party resisting arbitration bears the burden of showing that the arbitration provision does not encompass the claims at issue, or that the clause is invalid. *Green Tree,* 531 U.S. at 92. Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. *Prudential Securities,* 909 S.W.2d at 899; *Moses H. Cone,* 460 U.S. at 25. "The policy in favor of enforcing arbitration agreements is so compelling that a court should not deny arbitration '*unless it can be said with positive assurance* that an arbitration clause is *not* susceptible of an interpretation which would cover the dispute at issue'." *Prudential Securities,*

909 S.W.2d at 899 (emphasis in original; citations omitted). Here, Chavez can make no such showing. The agreement to arbitrate is in writing and was agreed to by Chavez.

In deciding whether a dispute falls within the scope of an arbitration agreement, a court is not bound by labels given to the claims of the plaintiff and instead should "focus on the factual allegations of the complaint, rather than the legal causes of action asserted." *Prudential Securities*, 909 S.W.2d at 900; *Grigson v. Creative Argists Agency*, 210 F.3d 524, 526 (5th Cir. 2000). The Fifth Circuit has held that such language in an arbitration provision must be read expansively, and "reach[es] all aspects of the relationship" between the parties. *Nauru Phosphate Royalties, Inc. v. Drago Daic Interests, Inc.*, 138 F.3d 160, 165 (5th Cir. 1998); *see also Pennzoil Expl.*, 139 F.3d at 1067 (broad arbitration clauses, which use language such as "arise under," "in connection with," or "relating to," reach "all disputes between the parties having a significant relationship to the contract...."). *See also Sweet Dreams Unlimited, Inc. v. Dial-a-Mattress Int'l, Ltd.*, 1 F.3d 639, 642 (7th Cir. 1993) ("'[A]rising out of' reaches all disputes having their origin or genesis in the contract, whether or not they implicate interpretation or performance of the contract per se."); *Becker Autoradio U.S.A., Inc. v. Becker Autoradiowerk GmbH*, 585 F.2d 39, 44 (3d Cir. 1978) (arbitration agreement including phrase "arising out of and about" encompasses matters that "ar[ise] in the course of and during the on-going relationship ... created and governed . . ." by the contract containing the arbitration provision). With a broad arbitration provision such as this one, the dispute need not arise out of, but must simply "touch" the matters covered by the underlying agreement. *Mitsubishi Motors Corp.*, 473 U.S. at 624 N.13; *Hou-Scape, Inc. v. Lloyd*, 945 S.W.2d 202, 205 (Tex. App.— Houston [1st Dist.] 1997, no pet.).

Further, the arbitration proceedings are not limited to resolution of contract claims. If a statutory or tort cause of action is found to be "inextricably enmeshed" or "factually intertwined" with facts underlining the arbitration agreement, it, too, is properly submitted to arbitration. *Hou-Scape, Inc. v. Lloyd,* 945 S.W.2d at 205; *Valero Energy Corp. v. Wagner and Brown, II,* 777 S.W.2d 564, 566 (Tex. App.—El Paso 1989, writ denied); s*ee also Grigson,* 210 F.3d at 526 (compelling arbitration of a tortious interference with contract claim against a non-signatory to the contract where the plaintiff's claims were inextricably intertwined with the contract). "The test should be based on a determination of whether a particular tort claim is so interwoven with the contract that it could not stand alone or, on the other hand, is a tort completely independent of the contract and could be maintained without reference to the contract." *Valero Energy Corp.,* 777 S.W.2d at 566.

The scope of Plaintiff's arbitration agreement is quite broad: "[a]ny dispute arising under [the Regional Sales Coordinator's and/or Associate's] Agreement, *to the maximum extent allowed by applicable law, and* . . . the parties agree that they shall arbitrate *all controversies.*" (Associate's Agreement, Exhibit A ¶ 15 (emphasis added).) Accordingly, it encompasses Chavez's claim (if, in fact, he asserts a claim in his Notice). In other words, his claim of discrimination "touches" the agreement. Further, as a review of the factual allegations in his amended petition shows, Plaintiff's entire lawsuit is based upon the decision to terminate his Regional Sales Coordinator's Agreement. Had there been no termination, there would be no dispute. Clearly, Chavez's dispute, whatever the labels given or causes of action asserted, arises under his agreements with AFLAC and, hence, is arbitrable.

## III.
## Conclusion

For the reasons set forth above, Third-Party Defendant AFLAC respectfully prays that the Court enter an order granting its Motion to Strike the Notice of Clarification of Plaintiff's claims or, alternatively, compelling arbitration of Plaintiff's claims against AFLAC and staying all proceedings against AFLAC pending the resolution of the arbitration proceedings, and granting it such other and further relief to which it may be justly entitled.

Respectfully submitted,

William B. Steele III, Attorney In Charge
So. Dist. No. 8019
State Bar No. 19107400
Of Counsel:
LOCKE LIDDELL & SAPP LLP
100 Congress Ave., Suite 300
Austin, Texas 78701
(512) 305-4700
(512) 305-4800 (Fax)

Valorie C. Glass
So. Dist. No. 15303
State Bar No. 00784135
Of Counsel:
ATLAS & HALL, L.L.P.
P.O. Box 3725
McAllen, Texas 78502
(956) 682-5501
(956) 686-6109 (Fax)

**ATTORNEYS FOR THIRD-PARTY DEFENDANT AMERICAN FAMILY LIFE ASSURANCE COMPANY OF COLUMBUS**

## CERTIFICATE OF SERVICE

I hereby certify by my signature below that a true and correct copy of the above and foregoing has been served via first class U.S. mail, on this 24th day of September, 2003, to all counsel of record listed below:

J. Arnold Aguilar
Artemis Square, Suite H-2
1200 Central Boulevard
Brownsville, Texas  78520

Elizabeth G. Neally
Roerig, Oliveira & Fisher, LLP
855 West Price Road, Suite 9
Brownsville, Texas  78550

Eileen Leeds
Willette & Guerra
3505 Boca Chica Boulevard.
Suite 460
Brownsville, Texas  78521

_____
William B. Steele III

## CERTIFICATE OF CONFERENCE

This is to certify that the undersigned counsel for third-party defendant AFLAC conferred with counsel for plaintiff Dino Chavez on September 24, 2003, regarding AFLAC's Motion to Strike or, in the Alternative, Motion to Stay Proceedings and Compel Arbitration, and was informed that plaintiff opposes said motion.

_____
William B. Steele III

Ex. A

# American Family Life Assurance Company
## of Columbus (AFLAC)
Worldwide Headquarters: Columbus, Georgia 31999

## Associate's Agreement

American Family Life Assurance Company of Columbus, a Georgia corporation (hereinafter "AFLAC"), and the undersigned person (hereinafter "Associate") agree as follows:

### PARAGRAPH ONE: Authority of Associate

(a) **Independent Contractor.** The relationship of Associate to AFLAC shall be that of an independent contractor, rather than employee and employer, and nothing contained herein shall be construed as creating any other relationship.

(b) **Unauthorized Acts.** Associate is not authorized to make any contract or incur any debt in the name of AFLAC, nor shall Associate modify or amend any application for insurance or any policy of insurance, interpret or construe policy language, extend the time for making any payment which may become due on any policy, nor waive any of AFLAC's rights or privileges under its policies or applications.

(c) **No Implied Authority.** Associate shall have no authority other than that expressly granted herein, and no forbearance or neglect on the part of AFLAC shall be construed as a waiver of any of the terms of this Agreement or imply the existence of any authority not expressly granted herein.

### PARAGRAPH TWO: Duties of Associate

(a) **Procure and Maintain Licenses.** Associate shall be responsible for procuring and maintaining any resident license, non-resident license and appointment, if applicable, that any State may require for soliciting applications for insurance policies offered for sale by AFLAC. Associate shall also be responsible for renewing and maintaining any such license(s) or appointment(s). This Agreement is contingent upon the issuance and maintenance of valid license(s) or appointment(s) to sell insurance by the Insurance Department of the State of Associate's residence, and of the State from which Associate may have a non-resident license or appointment, if any.

(b) **Solicit Applications.** Associate shall solicit applications for insurance policies offered for sale by AFLAC within the states where Associate is duly licensed to solicit such insurance applications. Associate is free to exercise Associate's own judgment as to time and place of solicitation.

(c) **Service Accounts.** Associate shall service all payroll deduction accounts ("accounts") that Associate initially sells or that are assigned to the Associate by AFLAC. Associate agrees that the first-year and renewal commissions paid to Associate in accordance with the terms herein constitute full payment for soliciting the application that resulted in the insurance policy being issued, and the performance of all other duties by Associate. AFLAC reserves the absolute right to reassign any account for servicing and to designate who may solicit applications from persons in the account in its sole discretion. Upon such reassignment, Associate shall continue to be paid renewal commissions on policies which Associate sold to persons in the account prior to reassignment, provided Associate is otherwise entitled to commissions in accordance with this Agreement. However, Associate will not be paid commissions on policies which are sold to persons in the account by another associate after the account has been reassigned by AFLAC.

(d) **Other Duties.** Associate shall use only promotional material which is furnished to Associate by AFLAC or which has been approved in writing from a Vice President of AFLAC. Associate shall pay all expenses incurred by Associate in the sale and service of insurance policies offered by AFLAC. Any administrative service fees which any group or franchise account may charge for handling premium payroll deduction shall be considered an expense of the Associate. Any such expenses which AFLAC advances on Associate's behalf shall be a debt to AFLAC and shall be reimbursed by deducting them from the commissions which become due to Associate. Associate shall carefully evaluate all applications for insurance and make full and accurate disclosure to AFLAC of all material facts and circumstances which might affect the underwriting of the risk, and shall promptly forward all applications for insurance policies to AFLAC at its Worldwide Headquarters in Columbus, Georgia. Associate shall additionally collect the initial premium that may be due on applications and promptly remit the same to AFLAC along with applications, Associate shall promptly deliver policies and claim documentation sent to the Associate.

(e) **Return Policies and Monies.** Associate shall return to AFLAC on demand all undelivered policies, premium receipts, negotiable papers, or monies due AFLAC and all documents or other property belonging to AFLAC. Associate agrees to be responsible for all monies collected by Associate under the terms of this Agreement.

### PARAGRAPH THREE: Confidential Information;
### Ownership of Accounts, Records and Confidential Information

Associate agrees that the following information, to-wit: 1) payroll deduction account information, 2) names and addresses of all AFLAC policyholders, associates and coordinators, 3) account or premium invoices, 4) payroll account servicing documents,

Form A-13510-94

R(01/94)

# EXHIBIT A

AFL 2923

5) claimant data, including payment sheets or letters, 6) training and educational manuals, 7) administrative manuals, 8) policy expiration data, and 9) prospective policyholder leads developed by AFLAC and furnished to associates and/or coordinators (e.g., "lead cards"), in whatever form, whether computer or electronically accessible, "on-line," or not, are confidential information and, as such, are information competitively advantageous to AFLAC, and Associates have no property right, vested interest or ownership interest in said confidential information.

Associate hereby agrees that all accounts and records, including but not limited to the confidential information above referred to, are and shall remain the property of AFLAC exclusively, both before and after the termination of this Agreement, and the Associate shall have no property rights therein. Associate further covenants to make no copies, in whatever form, of any of said records nor any part of them, and that none of them, in any form, is to be removed from the custody of Associate, except in the performance of duties hereunder. Associate further agrees to return to AFLAC all such accounts, records and confidential information at the termination of this Agreement or upon demand, whichever first occurs.

### PARAGRAPH FOUR: Duties and Rights of AFLAC

(a) **Duties.**
  (1) **Provide Sales Materials.** AFLAC shall provide Associate with standard promotional and informational material to be used in the sale and service of insurance policies offered by AFLAC. All such materials and information shall remain the property of AFLAC and shall be promptly returned upon demand or upon the termination of this Agreement.
  (2) **Underwrite Policies.** AFLAC shall consider each application submitted by Associate and approve or reject the same. If approved, a policy of insurance shall be issued to the applicant in accordance with the amount and type of insurance for which application was made. All underwriting decisions are to be made solely by AFLAC and it reserves its right to prescribe rules regarding the requirements for eligibility of applicants for insurance.
  (3) **Pay Commissions.** On policies issued upon applications submitted by Associate and as full compensation for Associate's services, sales commission will be paid as follows:
    (i) **First-Year Commissions.** So long as Associate is authorized to represent AFLAC, a first-year sales commission may be advanced by AFLAC on premiums earned in accordance with the terms of the applicable Schedule of Commissions. No first-year sales commissions will be paid to Associate after Associate's termination, unless Associate is otherwise entitled to the payment of renewal commissions. AFLAC shall have the right to apply all or part of the first-year sales commissions or registration fees to Associate's indebtedness to AFLAC. AFLAC may charge a registration fee at the time of sale which will be credited to Associate's monthly accounting statement. AFLAC may charge policyholders a policy processing fee. Associate shall not be entitled to any commission based upon such a policy processing fee.
    (ii) **Renewal Commissions.** A renewal commission is defined as that commission which is paid on premiums as earned by AFLAC on an insurance policy previously produced by Associate, commencing with the thirteenth (13th) month's premium and such renewal commission shall be based on an amount not greater than the annualized premium amount applicable at the time a policy is initially issued. A renewal commission as provided by the Schedule of Commissions will be paid as earned pursuant to the terms and subject to the conditions of Paragraphs 5, 6 and 8 of this Agreement.
  (4) **Provide Monthly Statements.** AFLAC shall, provided Associate is entitled to receive commissions hereunder, furnish Associate with a monthly accounting statement. Upon the receipt of such statement, Associate agrees to notify AFLAC within thirty (30) days in writing of any mistakes or discrepancies in the statement. Failure of Associate to so notify AFLAC shall constitute acceptance of AFLAC's statement as rendered, and Associate waives all rights to any claims against AFLAC to the contrary, and such claims shall be forever barred.
(b) **Rights.** With respect to the foregoing duties, AFLAC shall have the following rights:
  (1) **Assignment to Coordinator.** AFLAC may assign Associate to a sales coordinator for purposes of assisting Associate in training and marketing. Associate may be reassigned to a different sales coordinator in AFLAC's discretion. It is expressly understood and agreed that AFLAC can function only through its agents, and its decisions through its officers, agents and sales coordinators, and other associates, shall be deemed to be made in the due course, and within the scope, of managing the business of AFLAC. For any mistake, neglect, abuse of discretion, or other action taken, not amounting to willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise a presumption of conscious indifference to consequences, in making and enforcing AFLAC's decisions relating to Associate and Associate's performance of the duties under this Agreement, liability, if any, of AFLAC and liability, if any, of its officers, agents, sales coordinators and other associates, individually, if any, each and all, for damages shall be limited to a claim for breach of contract, and Associate's sole remedy shall be for breach of contract, and damages shall be assessed accordingly.
  (2) **Advancement of Commissions.** AFLAC shall have the right to advance commissions to Associate. Any sums advanced to Associate shall create a liability to AFLAC on the part of Associate, and shall be payable on demand without notice, and shall create a liability to AFLAC and any amounts, indebtedness or liability owed to AFLAC by Associate may be charged back and offset against all amounts credited or to be credited to Associate's account. First-year sales commissions shall be credited to Associate on a pro rata basis as the entire first year's premium becomes earned by AFLAC. AFLAC shall have the right to apply all or part of the first year's sales commission or renewal commissions to Associate's indebtedness to AFLAC.
  (3) **Service Charge.** AFLAC may charge one-half of one percent interest per month on any outstanding negative balance on Associate's monthly statement. AFLAC may also charge a COD penalty fee for issuing policies where the initial premium is not paid in full as set out on the applicable Schedule of Commissions.
  (4) **Notice to Insurance Commissioner or Other Regulatory Authorities of Certain Information, Absolutely Privileged.** Upon receipt of, or discovery of, information by AFLAC which reasonably brings in question the validity of Associate's license or appointment, or which suggests fraudulent or criminal activity on the part of Associate, AFLAC shall have the right to give notice of said information to the Insurance Commissioner or other regulatory authority involved, and to give notice of same to Associate, and shall further have the right to terminate Associate's authority to represent AFLAC immediately, pending determination of the question involved, and all said notices shall be absolutely privileged. Associate specifically and expressly

AFL 2924

authorizes the release of said information to the Commissioner or other regulatory authority, and AFLAC shall have no liability for so doing.

(c) **Schedules of, and Provisions Governing Commissions** (Hereafter Schedule of Commissions). All commissions shall be paid in accordance with the terms of the applicable Schedules of Commissions published by AFLAC. Associate acknowledges receipt of the current applicable Schedules of Commissions at the time of the execution of this Agreement. Said schedules are incorporated herein by reference and are a part of this Agreement. AFLAC may change the terms of said schedules, but any change in commissions shall not affect those commissions due or to become due to Associate on policies issued which had an effective date prior to the date of the change. When changes in the schedules are made they are incorporated herein by reference and become a part of this Agreement. AFLAC shall furnish Associate written notice of any change in the schedules at least thirty (30) days prior to the effective date of such change.

### PARAGRAPH FIVE: Contingent Payment of Renewal Commissions
### Prior to Termination of this Agreement

Prior to termination, AFLAC's obligation to pay renewal commissions (as defined herein) shall be contingent upon Associate's faithful performance or observance of his or her obligations and covenants hereunder, and Associate shall be entitled to be paid renewal commissions prior to termination ONLY under conditions as follows:

(a) **Monthly Production.** In order to receive renewal commissions on premiums from policies produced by Associate, Associate must produce during that month $750 in annualized premium on new policies issued by AFLAC. To be produced, the policies sold by Associate must be properly and timely submitted to the AFLAC Headquarters for processing and must be accepted by the AFLAC Headquarters in accordance with Headquarters underwriting procedures.

(b) **Temporary Disability.** If Associate is temporarily disabled to the extent of not being able to meet the monthly production requirements for renewal commissions, AFLAC shall pay such renewal commissions as earned for a period of up to three (3) months during which the disability continues subject to AFLAC's determination that Associate was and is disabled, provided that, and as a condition precedent thereto, Associate shall notify AFLAC in writing of Associate's disability within sixty (60) days from the date of the onset of the disability. Any claim for renewal commissions not in compliance with this paragraph shall be waived.

(c) **Permanent Disability.** After two (2) years of service with AFLAC, if Associate becomes totally disabled while still active with AFLAC, Associate shall have a vested right to receive all renewal commissions on policies Associate produced for as long as Associate remains totally disabled. Associate shall be totally disabled only if Associate meets the disability requirements of the Social Security Act; provided that, and as a condition precedent thereto, Associate shall notify AFLAC within sixty (60) days in writing after he or she becomes totally disabled. Any claim for renewal commissions not in compliance with this paragraph shall be waived. Renewal commission payments made pursuant to the provisions of subparagraph (b) or (c) are not disability benefits, and the Associate may incur taxes thereon.

(d) **Annual Production.** Upon the production by Associate of at least $10,000 of annualized premium on all new policies issued by AFLAC during a calendar year, Associate shall be entitled to receive renewal commissions on premium payments received by AFLAC for the remainder of that year and for the following calendar year on the in-force policies produced by Associate, as long as a minimum of $10,000 in annualized premium on new policy sales used to qualify for this provision remains in force during that year and the following calendar year. If the annualized premium on new policy sales used to qualify for this provision subsequently falls below $10,000, then the means of qualification provided herein shall be suspended.

(e) **Vesting After 10 Years.** After ten (10) years of service with AFLAC, Associate shall have a vested right to receive 100% of the renewal commissions as earned payable on policies Associate produced, irrespective of the production requirements of subparagraphs (a) and (d) above, until termination of this Agreement or unless forfeited as provided in this Agreement.

(f) **Conditions to Payment of, and Right to Receive, Renewal Commissions.** Associate shall be entitled to receive renewal commissions payable under the terms of this Agreement unless Associate who is otherwise entitled to receive renewal commissions engages in any of the conduct prohibited under Paragraph Eight, or should Associate engage in conduct in the performance of Associate's duties and covenants hereunder involving moral turpitude, dishonesty, fraud, deceit, willful misrepresentation, or willful concealment of material facts. Should Associate who is otherwise entitled to receive renewal commissions engage in any such conduct, then, and in such event, the renewal commissions which would otherwise be payable to Associate hereunder shall immediately and automatically become non-payable, and Associate forever forfeits any right to receive the payment of any renewal commissions as provided under this Agreement.

### PARAGRAPH SIX: Contingent Payment of Renewal Commissions
### At and After Termination of this Agreement

Upon the effective date of termination and after termination of this Agreement, AFLAC's obligation to pay renewal commissions (as defined herein) shall be contingent upon Associate's faithful performance or observance of his or her obligations and covenants hereunder, and Associate shall be entitled to be paid renewal commissions at and after termination ONLY under conditions as follows:

(a) **Vesting After Two Years.** After two (2) years of service with AFLAC, Associate, upon termination, shall have a vested right to receive 50% of the renewal commissions as earned payable on policies Associate produced so long as a minimum of $25,000 in annualized premium on policies written by Associate remains in force, for life, unless forfeited as hereinafter provided.

(b) **Vesting After Five Years.** After five (5) years of service with AFLAC, Associate, upon termination, shall have a vested right to receive 75% of the renewal commissions as earned payable on policies the Associate produced, for life, unless forfeited as hereinafter provided.

(c) **Vesting After 10 Years.** After ten (10) years of service with AFLAC, Associate shall have a vested right to receive 100% of the renewal commissions as earned payable on policies the Associate produced, for life, unless forfeited as hereinafter provided.

(d) **Death.** If the Associate dies while receiving renewal commissions, effective with policies issued January 1, 1994 and after, one-hundred percent (100%) of the renewal commissions to which Associate would have been entitled to receive at or after termination shall be payable as follows:

    (1) **Surviving Spouse.** To Associate's surviving spouse solely during the surviving spouse's lifetime.

    (2) **Surviving Children.** If no spouse survives and there is a surviving child or children of the deceased Associate under the age of

twenty-three (23) years, to such child or children under twenty-three (23) until the youngest child reaches the age of twenty-three (23) years. If Associate's spouse survives Associate, but dies before all of Associate's children reach the age of twenty-three (23), to such child or children under twenty-three (23) until the youngest child reaches the age of twenty-three (23). Renewal commissions shall be paid only to the child's legally appointed guardian unless such child has reached the age of majority in his or her state of residence. No renewal commissions are payable to any child or children who are twenty-three (23) or older. Children under the age of twenty-three (23) shall share equally.

(3) **No Surviving Spouse or Children.** If no spouse survives and there are no surviving children of the deceased Associate under the age of twenty-three (23) years, to the Associate's estate for a period equal to the number of months of the Associate's service with AFLAC, not to exceed thirty-six (36) months.

(e) **Conditions to Payment of, and Right to Receive, Renewal Commissions.** Associate shall be entitled to receive renewal commissions payable under the terms of this Agreement unless forfeited in accordance with Paragraph 5(f) above.

### PARAGRAPH SEVEN: Limited Assignment of Benefits

Associate may not assign to a third party any right to receive renewal commissions which Associate has under this Agreement during Associate's lifetime without AFLAC's prior written consent; provided, however, Associate may assign and surrender all rights to renewal commissions, without the approval of anyone, to AFLAC for such valuable consideration as mutually agreed upon by Associate and AFLAC. Further, Associate may pledge and assign any rights Associate may have to renewal commissions to AFLAC to secure the repayment of any loan or indebtedness which Associate may owe to AFLAC. Further, Associate grants to AFLAC a security interest against, and AFLAC reserves a lien upon, all of Associate's rights to receive first-year commissions and renewal commissions to secure the payment of any indebtedness which Associate may owe AFLAC. Any assignment by Associate to a third party shall be subject to the provisions of this paragraph, and shall always be subject to AFLAC's prior right of offset and its prior security interest.

### PARAGRAPH EIGHT: Prohibited Conduct

(a) During the term of this Agreement, Associate shall not (1) engage in any conduct in the performance of Associate's duties and covenants hereunder involving moral turpitude, dishonesty, fraud, deceit, willful misrepresentation or willful concealment of a material fact; (2) wrongfully misappropriate or withhold any funds, policies, premiums, receipts, vouchers or other property belonging to AFLAC or to an applicant for insurance; (3) violate any insurance laws or regulations of any state, the violation of which involves moral turpitude; or (4) make or knowingly allow to be made any false or misleading statements on any applications or claim or other documents submitted to AFLAC.

(b) During the term of this Agreement and for a period of two (2) years after its termination, Associate covenants that, within a 100-mile radius of his or her business address, as shown at the end of this Agreement (except Subparagraph 8(b)(3) herein which is not subject to any territorial limitation), **Associate shall not, directly or indirectly:**

(1) Induce or attempt to induce other associates or sales agents or coordinators of AFLAC who reside within the 100-mile radius to terminate their agreements with AFLAC, or to become contracted or associated with another insurance or indemnity company which engages in the sale of insurance policies which directly competes with the policies then sold by AFLAC; or

(2) Induce or attempt to induce policyholders or accounts of AFLAC located within a 100-mile radius of Associate's address, which Associate solicited, sold or serviced while this Agreement was in effect, to relinquish, cancel or surrender their policies or accounts, provided this shall not prohibit a direct unsolicited contact of the Associate by the policyholder and a subsequent sale based on such unsolicited contact; or

(3) Divulge, use or make available to anyone other than those within AFLAC authorized to receive such information, payroll deduction account information, names and addresses of any AFLAC policyholders, associates and coordinators, account or premium invoices, payroll account servicing documents, claimant data, including payment sheets or letters, training and educational manuals, administrative manuals, policy expiration data and prospective policyholder leads developed by AFLAC and furnished to associates and/or coordinators (e.g., "lead cards"), in whatever form, whether computer or electronically accessible, "on-line," or not, all of which is agreed to constitute confidential information and information competitively advantageous to AFLAC.

(4) The foregoing covenants shall not apply in the event AFLAC, its successor or assigns, ceases to do business as an insurer, or ceases to do such business within the applicable territory involved.

(c) Associate shall not change his business address for purposes of this Agreement without the prior consent of the company and the execution of a new Associate's Agreement specifying his new business address. In the event of such change, the territorial limitation herein specified shall continue to apply to Associate for a period of one year next subsequent to the change, at which time it shall automatically self-destruct and cease to exist. During such one-year period, the covenants herein contained relating to a territorial limitation shall apply not only to the preceding business address, but also to the new business address specified in the succeeding Associate's Agreement.

(d) **Provisions of Covenants Are Reasonable and Necessary.** Associate recognizes that AFLAC has a valid need to protect its interests by prohibiting Associate from engaging in any of the activities described in this paragraph. Associate acknowledges and agrees that the time period and the geographic area are reasonable and necessary to protect AFLAC's business, and that the prohibited activities are described with reasonable certainty, and are understood by Associate.

(e) **Forfeiture of First-Year and Renewal Commissions Upon Breach.** Should Associate engage in any of the conduct described in this paragraph, the first-year commissions and renewal commissions which would otherwise be payable to Associate or Associate's survivors shall immediately and automatically become non-payable, and Associate forever forfeits any and all rights to be paid any commissions from AFLAC.

### PARAGRAPH NINE: Termination of Agreement

(a) **Termination for Cause.** AFLAC shall have the right to terminate this Agreement immediately, and the termination shall be considered as being for cause, if Associate engages in any of the following:

(1) Wrongfully misappropriates or withholds any funds, policies, premium receipts, vouchers or other property belonging to AFLAC or to an applicant for insurance; or

(2) Violates any insurance laws or regulations of any state, the violation of which would result in the revocation of Associate's license; or

(3) Pleads guilty or nolo contendere to, or is convicted of, a crime (whether felony or misdemeanor) involving moral turpitude; or

4

AFL 2926

(4) Makes or knowingly allows to be made any false or misleading statements on any application or claim or other document submitted to AFLAC; or

(5) Engages in any of the prohibited conduct in Paragraph Eight; or

(6) Associate ceases to hold a valid license to sell insurance policies offered by AFLAC.

(b) **Termination by Notice Without Cause.** Either party may terminate this Agreement at will, without cause, upon giving thirty (30) days prior written notice to the other party.

(c) **Termination Upon Death or Permanent Disability of Associate.** This Agreement shall terminate upon the death or total disability of Associate, unless sooner terminated.

### PARAGRAPH TEN: Treatment of Associate and Associate's Responsibilities Under Federal Tax Laws

Associate shall be treated as an independent contractor and not as an employee as concerns all applicable tax laws with respect to services performed under this Agreement, and Associate is hereby advised as an independent contractor that Associate must report all sales commissions to the Internal Revenue Service on the appropriate income tax form and pay any federal income taxes due with respect to these amounts. Additionally, Associate must report all sales commissions on the appropriate self-employment tax form and pay any self-employment ("S.E.C.A.") taxes with respect to these amounts. To assist Associate in complying with these requirements, AFLAC will, after the close of each calendar year, furnish Associate with a copy of the Form 1099 Income Statement that AFLAC is also required to send to the Internal Revenue Service.

### PARAGRAPH ELEVEN: Legal Proceedings, Attorneys' Fees and Litigation Expenses

(a) **Legal Proceedings.** The Associate shall not institute legal proceedings in the name of AFLAC against any party for any cause unless such action shall have been approved in advance in writing by a Vice President of AFLAC. Should a claim be brought by a third party against either the Associate or AFLAC as a result of some alleged action by the Associate, the Associate shall hold AFLAC harmless from and indemnify it for any attorneys' fees and court costs which it may incur in defending the claim and for any damages which it suffers either through settlement of the claim or by judgment being rendered against it. In the event AFLAC shall invoke its rights under this paragraph, AFLAC shall notify Associate in writing of its intent. AFLAC shall have the right to apply all or any part of Associate's first-year and/or renewal commissions toward the damages caused to it hereunder. AFLAC may, in its sole discretion, determine whether to defend or settle any such claim, and the amount of any such settlement.

(b) **Attorneys' Fees and Litigation Expenses.** Should AFLAC institute legal action against Associate to recover for indebtedness of Associate to AFLAC, Associate covenants to pay AFLAC the reasonable attorneys' fees and litigation expenses which AFLAC may incur, in addition to principal, interest and damages.

### PARAGRAPH TWELVE: Prior Contracts Superseded

This Agreement supersedes and replaces all previous contracts between the parties, but all rights accrued up to the date of execution of this Agreement shall not be affected or impaired, except as modified by this Agreement. For policies issued prior to January 1, 1994, renewal commissions at death will be paid in accordance with the Associate's preceding Agreement.

### PARAGRAPH THIRTEEN: Modifications

This Agreement may not be orally modified. No modification is binding upon AFLAC unless it is in writing and signed at its Headquarters by its President, a Vice President, or its Secretary, for a substantial valuable consideration other than the performance of services by Associate, except as expressly provided in this Agreement.

### PARAGRAPH FOURTEEN: Severability

If any one or more of the provisions, words or phrases contained in the paragraphs and subparagraphs of this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provisions, words or phrases were not contained herein.

### PARAGRAPH FIFTEEN: Arbitration

(a) Any dispute arising under this Agreement, to the maximum extent allowed by applicable law, shall be subject to arbitration, and prior to commencing any court action the parties agree that they shall arbitrate all controversies.

(b) **Procedure.** The arbitration shall be pursuant to the terms of the Federal Arbitration Act. The parties shall notify each other of the existence of an arbitrable controversy by certified mail and shall attempt in good faith to resolve their differences within fifteen (15) days after the receipt of such notice. Notice to Associate shall be sent to Associate's address as it appears in AFLAC records and notice to AFLAC shall be sent to: Arbitration Officer, American Family Life Assurance Company of Columbus (AFLAC), Worldwide Headquarters, Columbus, Georgia 31999. If the dispute cannot be resolved within said fifteen-day period, either party may file a written demand for arbitration with the other party. The party filing such demand shall simultaneously specify his, her or its arbitrator, giving the name, address and telephone number of said arbitrator. The party receiving such notice shall notify the party demanding the arbitration of his, her or its arbitrator, giving the name, address and telephone number of said arbitrator within five (5) days of the receipt of such demand. The arbitrator named by the respective parties need not be neutral. The Senior Judge of the Superior Court of Muscogee County, Georgia, on request by either party, shall appoint a neutral person to serve as the third arbitrator, and shall also appoint an arbitrator for any party failing or refusing to name his arbitrator within the time herein specified. The arbitrators thus constituted shall promptly meet, select a chairperson, fix the time and place of the hearing, and notify the parties. The majority of the panel shall render an award within ten (10) days of the completion of the hearing, and shall promptly transmit an executed copy of the award to the respective parties. Such an award shall be binding and conclusive upon the parties hereto, in the absence of fraud or corruption. Each party shall have the right to have the award made the judgment of a court of competent jurisdiction.

Associate _(signature)_ _(signature)_

### PARAGRAPH SIXTEEN: Headings

The headings of this Agreement are for reference only, and shall not limit the language used in this contract.

5

AFL 2927

## PARAGRAPH SEVENTEEN: Completely Integrated Agreement

These seventeen (17) paragraphs, along with the Schedules of Commissions, and any supplement of any district sales coordinator, regional sales coordinator, or state sales coordinator, contain the entire and complete agreement between the parties, and each of the parties hereto agrees that there are no prior or contemporaneous agreements, promises or representations that are not set forth herein.

WITNESS the hand and seal of Associate and the execution by a duly authorized officer of AFLAC.

WITNESS: _[signature]_

BY: _[signature]_ X (L.S.)
Associate's Signature
8/8/94
Date

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
Social Security Number

Associate's Current Writing Number
(For Administrative Purposes Only)

0007757985
Associate's License Number

Licensed for: Life ✓   A&H ✓

BUSINESS ADDRESS:
345 Honey Dr.
Street & No. (REQUIRED)
Brownsville      TX.      78520
City             State         Zip Code

HOME ADDRESS (IF DIFFERENT)

_____
P. O. Box No. (if any)

_____
City         State         Zip Code

(210) 546-9358
Associate's Telephone No.           (HOME)

(210) 982-0832
Associate's Telephone No.           (BUSINESS)

Associate's Mailing Address PLEASE PRINT

DINO X. CHAVEZ
Name
345 Honey Dr.
Street
Brownsville, TX. 78520
City/State/Zip

AMERICAN FAMILY LIFE ASSURANCE
COMPANY OF COLUMBUS (AFLAC)

BY: _[signature]_
TITLE: ASST. VICE-PRESIDENT
EFFECTIVE DATE: 9-6-94

FOR OFFICE USE ONLY
WORLDWIDE HEADQUARTERS

Form A-1351 [DEPARTMENT AGENT LICENSE stamp]

AUG 1 9 94

RECEIVED

6

AFL 2928

Exh. B

# American Family Life Assurance Company of Columbus (AFLAC)
Worldwide Headquarters: Columbus, Georgia 31999

## Regional Sales Coordinator's Agreement

WHEREAS, the undersigned is now an Associate with American Family Life Assurance Company of Columbus ("AFLAC") under an Associate's Agreement (the terms of which are incorporated in this Agreement by reference), and the parties hereby desire to execute this additional Agreement in order to set forth the terms and conditions of the respective covenants, duties, and obligations of the undersigned as Regional Sales Coordinator, hereafter "RC."

NOW, THEREFORE, AFLAC and the undersigned RC do hereby covenant and agree as follows:

### Paragraph One: APPOINTMENT

AFLAC appoints the undersigned as Regional Sales Coordinator to serve in the region or territory assigned to the RC in writing by AFLAC, and RC covenants to serve as RC in the said region or territory in accordance with the terms and conditions hereafter set forth.

### Paragraph Two: RELATIONSHIP

(a) **Independent Contractor.** The relationship of the RC to AFLAC shall be and shall continue to be that of an independent contractor rather than employer-employee, and nothing contained herein shall be construed as creating any other relationship.

(b) **Relationship of Others.** It is understood and agreed that associates assigned to the RC are independent contractors, and the district sales coordinator who may be assigned to the RC is an independent contractor, and the state sales coordinator to whom the RC is assigned may be an independent contractor in their relationships with AFLAC. The RC shall at all times respect that relationship in the performance of the RC's duties hereunder.

(c) **Expenses.** All expenses incurred by the RC shall be the sole responsibility of the RC. The RC has no authority to rent any office or telephone, open any bank account, or make any expenditures, obligation or commitment for any purpose in the name of AFLAC without specific written authorization from the president, a vice president, or secretary of AFLAC.

### Paragraph Three: DUTIES

The RC shall recruit and train associates for the sale of all AFLAC insurance policies and coordinate the activities of the associates and the district sales coordinators assigned to the RC in writing by AFLAC. For the purpose of maximizing the sales efforts of AFLAC, the RC should cooperate with the associates and district sales coordinators assigned to the RC, and the state sales coordinator to whom the RC is assigned.

### Paragraph Four: ASSIGNMENT

AFLAC may, in its sole and absolute discretion, assign and reassign associates and district sales coordinators to the RC. The RC shall be paid renewal override commissions on all AFLAC insurance policies that are sold by associates and district sales coordinators while assigned in writing to the RC. The RC understands and agrees that he or she may be assigned to a state sales coordinator for purposes of assisting the RC in training, recruiting and marketing. The RC may be reassigned to a different state sales coordinator at AFLAC's discretion.

### Paragraph Five: FIRST-YEAR AND RENEWAL OVERRIDE COMMISSIONS; RSC MPI PROGRAM

As full compensation for the performance of the RC's duties, the RC shall be paid first-year and renewal override commissions on sales of all AFLAC insurance policies made by the RC, and by district sales coordinators, and associates while assigned in writing to the RC.

(a) **First-Year Override Commissions.** First-year override commissions shall be advanced on sales credited to the RC. Said compensation shall be paid in accordance with each policy's Schedule of Commissions (at the RSC MPI Participant Rate) in effect at the time of the sale.

(b) **Renewal Override Commissions.** Renewal override commissions shall be credited to the RC in accordance with eac[h] policy's Schedule of Commissions (at the RSC MPI Participant Rate) in effect at the time of the sale.

(c) **Schedules of Commissions.** The official Schedule of Commissions for the applicable AFLAC insurance policies ar[e] incorporated herein by reference. The commission for situations that are non-standard or not contemplated by th[e]

M-0806

M0806

**EXHIBIT B**

001154

Schedule of Commission shall be governed by AFLAC's then-current rules, rates and practices. Any special or unique commission arrangement or commission splits requiring new or special sit_____ codes shall be controlled by and paid in accordance with AFLAC's then-current rules, rates and practices. RC acknowledges and agrees that AFLAC, upon thirty (30) days written notice to RC, may change the Schedules of Commissions and conditions with respect to (a) any policies issued and in force on or after the date of the change, and (b) any policies issued before the date of the change but in force after such date if there has been a change in federal, state or other laws mandating an increase in loss ratios. When changes in the schedules are made, they are incorporated herein by reference and become a part of this Agreement.

(d) MPI Bonus; Qualification. RC may also qualify for and be paid an annual production bonus under and in accordance with the terms and conditions of the RSC MPI Program in effect at the time of the sale and his or her Regional Sales Coordinator's Agreement. The official RSC MPI Program for the applicable policies is incorporated herein by reference. Upon thirty (30) days written notice, AFLAC may change the terms and conditions of the RSC MPI Program with respect to any policies issued and in force on or after the date of the change.

### Paragraph Six: VESTING CONDITIONS

(a) Prior to Termination. During the term of this Agreement, first-year and renewal commissions shall be paid pursuant to Paragraph Five herein. No production or premium minimum is required as a condition for payment.

(b) After Termination. After termination of this Agreement, vesting of renewal commissions shall be paid in accordance with the conditions set forth in said Associate's Agreement.

### Paragraph Seven: AGREEMENT TO REAFFIRM

All of the provisions of the RC's Associate's Agreement with AFLAC shall continue to be of full force and effect, and shall govern this contract in all respects except as expressly modified herein. The RC hereby ratifies and reaffirms all the provisions of said Associate's Agreement with AFLAC as fully and effectually as though the provisions thereof were set forth herein verbatim.

### Paragraph Eight: SUBSTITUTION OF DISTRICT SALES COORDINATOR'S AGREEMENT

This RC's Agreement completely supersedes and replaces any existing District Sales Coordinator's Agreement between the parties. During the term of this RC's Agreement, no District Sales Coordinator's Agreement between the parties shall be valid unless specifically authorized in writing by the president, a vice president, or the secretary of AFLAC.

### Paragraph Nine: TERMINATION OF APPOINTMENT AS REGIONAL SALES COORDINATOR

This Agreement may be terminated without having any effect on said Associate's Agreement. Any such termination shall be subject to the termination conditions set forth in said Associate's Agreement. This expressed provision shall not affect the general governing provisions set forth in Paragraph Seven, above.

IN WITNESS WHEREOF, the parties have hereto affixed their respective signatures.

WITNESS: _____  BY: _____
                                          RC Signature

                                          11/13/98
                                          Date

---

**AMERICAN FAMILY LIFE ASSURANCE COMPANY OF COLUMBUS (AFLAC)**

APPROVED

BY: _Daisy W. Lee_

TITLE: 2nd VICE-PRESIDENT

DATE: 11/19/98

For Office Use Only
Worldwide Headquarters

---

M-0806                                                                                                          M0806.1

001155