67

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DINO CHAVEZ,<br>            Plaintiff, | §<br>§<br>§ | |
| vs. | §<br>§ | United States District Court<br>Southern District of Texas,<br>FILED<br><br>SEP 2 5 2003<br><br>Michael N. Milby<br>Clerk of Court |
| BROWNSVILLE INDEPENDENT<br>SCHOOL DISTRICT and NOE SAUCEDA,<br>            Defendants, | §<br>§<br>§ | |
| ------------------------------------------------<br>BROWNSVILLE INDEPENDENT SCHOOL<br>DISTRICT,<br>            Third-Party Plaintiff, | §<br>§<br>§<br>§ | CIVIL ACTION NO. B-02-128 |
| vs. | §<br>§<br>§ | |
| AMERICAN FAMILY LIFE ASSURANCE<br>COMPANY OF COLUMBUS (AFLAC),<br>            Third-Party Defendant. | §<br>§<br>§<br>§ | |

**THIRD-PARTY DEFENDANT AFLAC'S**
**MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT THEREOF**

TO THE HONORABLE UNITED STATES DISTRICT COURT:

NOW COMES Third-Party Defendant American Family Life Assurance Company of

Columbus ("AFLAC") and, subject to its Motion to Strike or, in the Alternative, Motion to Stay

Proceedings and Compel Arbitration, files this Motion for Summary Judgment and in support

thereof would respectfully show the Court as follows:

**I.**
**SUMMARY OF THE ARGUMENT**

AFLAC, as a third-party defendant, is entitled to summary judgment on two separate

grounds. First, Third-Party Plaintiff BISD has no legally recognizable claim for contribution or

indemnity against AFLAC. AFLAC has previously moved to dismiss BISD's Third-Party

Petition. AFLAC respectfully refers the Court to its Motion to Dismiss and related briefs in

support thereof.[1]  To the extent AFLAC's Motion to Dismiss may require the Court to consider matters outside the pleadings, then AFLAC requests that its Motion to Dismiss be treated as one for summary judgment.

As to its second ground, AFLAC is entitled to summary judgment because Dino Chavez, the plaintiff herein, agreed to the very conduct about which he now complains.  That is, Chavez expressly agreed that AFLAC has the sole and absolute right to determine who shall solicit and service payroll deduction accounts and that AFLAC may reassign any account for servicing and designate who may solicit applications from persons in the account.  That is exactly what happened here.  BISD, through Noe Sauceda, asked AFLAC to reassign another agent to service its payroll deduction account.  AFLAC agreed to that request and substituted another servicing agent in the stead of Chavez.  Chavez claims that such conduct was somehow wrongful.  But, having expressly agreed to allow the reassignment of the BISD account, Chavez cannot now complain.

In addition, Chavez agreed that either he or AFLAC could terminate his Regional Sales Coordinator's Agreement, without cause, upon thirty days written notice.  AFLAC exercised that right, a right Chavez acknowledged AFLAC possessed.  Accordingly, AFLAC cannot be liable, in contribution or indemnity, for exercising its express right to terminate Chavez's Agreement.  Because AFLAC cannot be liable to Chavez for either (1) reassignment of the BISD account or (2) termination of his RSC Agreement, then AFLAC cannot be liable for contribution or indemnity as a third-party defendant.

---

[1] AFLAC respectfully refers the Court to Third-Party Defendant Amaerican Family Life Assurance Company of Columbus's Motion to Dismiss and Brief in Support filed-stamped by this Court on April 9, 2003 together with AFLAC's Reply to BISD's Response to AFLAC's Motion to Dismiss file-stamped by this Court on May 8, 2003, both of which are incorporated by reference as if set forth fully herein.

**Motion for Summary Judgment – Page 2**

## II.
## ISSUES TO BE RULED UPON BY THE COURT

AFLAC respectfully submits to this Court that:

1)      AFLAC is entitled to summary judgment as a matter of law because Third-Party Plaintiff BISD has no legally recognizable claim for contribution or indemnity against AFLAC; and

2)      AFLAC is entitled to summary judgment as a matter of law because Dino Chavez, the plaintiff herein, agreed to the very conduct about which he now complains.

Summary judgment is appropriate when the pleadings and evidence show that no genuine issue exists as to any material fact and that the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Slaughter v. Southern Talc Co.*, 949 F.2d 167, 170 (5th Cir. 1991). Disputes concerning material facts are genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Douglass v. United Svcs. Auto Ass'n.*, 79 F.3d 1415, 1429 (5th Cir. 1996) *(en banc)* (citation omitted). In a summary judgment proceeding, the movant must make a prima facie showing that he is entitled to the relief sought. *Celotex v. Catrett*, 477 U.S. 317, 323-324 (1986). Once the movant satisfies his burden, the burden shifts to the non-movant to show that there is a genuine factual dispute requiring a trial. *Duckett v. City of Cedar Park*, 950 F.2d 272, 276 (5th Cir. 1992).

A non-movant's response must set forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e). A mere scintilla of evidence will not defeat a properly supported motion for summary judgment. *Davis v. Chevron, U.S.A., Inc.*, 14 F.3d 1082, 1086 (5th Cir. 1994). A summary judgment motion must be granted if the movant satisfies his burden and the non-movant fails to show that a genuine issue exists as to a material fact. FED. R. CIV. P. 56(c); *Campbell v. Sonat Offshore Drilling*, 979 F.2d 1115, 1119 (5th Cir. 1992).

## III.
### AFLAC REURGES ITS MOTION TO DISMISS THIRD-PARTY COMPLAINT AS A BASIS FOR THIS COURT TO GRANT SUMMARY JUDGMENT

AFLAC moved to dismiss the Third-Party Complaint filed by BISD against it. Without restating the arguments at length, AFLAC reurges those grounds in this Motion and, to the extent the Court may consider matters outside the pleadings, asks that the Court treat the Motion to Dismiss as one for summary judgment.

As noted in AFLAC's Motion to Dismiss and related briefs, only one of Chavez's claims against BISD remains in this suit, the claim that BISD breached Chavez's First Amendment rights in violation of 42 U.S.C. § 1983. BISD seeks contribution or indemnity from AFLAC in the event BISD is found liable to Chavez for Chavez's Section 1983 claim against BISD. BISD has no right to contribution or indemnity under 42 U.S.C. §§ 1983 or 1988, however. *See Wright v. B.J. Reynolds,* 703 F. Supp. 583, 591-92 (N.D. Tex. 1988); *Mason v. City of New York*, 949 F. Supp. 1068, 1079 (S.D.N.Y. 1996). BISD has not cited a single case to the contrary. Thus, BISD's third-party petition must be dismissed or, in the alternative, the Court should grant AFLAC summary judgment on BISD's third-party claims for contribution and indemnity against AFLAC.[2]

## IV.
### AFLAC IS ENTITLED TO SUMMARY JUDGMENT BECAUSE CHAVEZ AGREED TO THE CONDUCT ABOUT WHICH HE NOW COMPLAINS

AFLAC is also entitled to summary judgment because the undisputed material facts show that Chavez agreed, more than once, that AFLAC had the sole and absolute right to reassign an account and to determine which AFLAC agent would solicit applications from persons in an account. The undisputed facts also show that AFLAC had the right to terminate Chavez's

---

[2] In similar fashion, the Court should deny Defendant Noe Sauceda's Motion for Leave to File a Third-Party Petition against AFLAC. As stated in AFLAC's Response in Opposition to Defendant Noe Sauceda's Motion for Leave to file Third-Party Complaint against AFLAC, Sauceda, too, lacks any recognizable claim for contribution or indemnity against AFLAC.

agreement with AFLAC at will, without cause, upon thirty-days written notice. Because Chavez agreed that AFLAC had the right to reassign the BISD account and the right to terminate his agreement, AFLAC cannot be held liable for exercising its express contractual rights.

## A.   Undisputed Facts

The undisputed facts upon which AFLAC is entitled to Summary Judgment are as follows:[3]

In 1994, when Chavez first became an AFLAC agent, he and AFLAC entered into an Associate's Agreement.  (Chavez Depo., Vol. 2, p. 14, 1.12-20; Depo. Exhibit 9)  In his Associate's Agreement, a copy of which is attached as Exhibit A to the Baker Affidavit, Chavez agrees that "all accounts and records . . . are and shall remain the property of AFLAC exclusively, both before and after the termination of this Agreement, and the Associate shall have no property rights therein." (Baker Aff. ¶ 3, Exh. A ¶ 3.)  Chavez also agrees that AFLAC has "the absolute right to reassign any account for servicing and to designate who may solicit applications from persons in the account in its sole discretion." *Id.*

In 1998, Chavez was elevated to Regional Sales Coordinator when he and AFLAC entered into his Regional Sales Coordinator's Agreement ("RSC Agreement"), a copy of which is attached as Exhibit B to the Baker Affidavit.  (*See also* Chavez Depo., Vol. 2, p. 11, 1.1-7; p. 32, 1. 1-8; depo. Exh. 11)  Chavez's new duties included the recruiting and training of associates. (Baker Aff. Exh. B at ¶ 3; Chavez Depo., Vol. 2, p. 28, 1. 1-6)  Nonetheless, all of the provisions of his Associate's Agreement continue "to be of full force and effect, and shall govern this [RSC] contract in all respects except as expressly modified herein," and Chavez "ratifies and reaffirms all the provisions of said Associate's Agreement with AFLAC as fully and effectually as though

---

[3] The Affidavit of Janet P. Baker ("Baker Affidavit") is attached hereto as Exhibit 1 and incorporated herein by reference.  Attached as Exhibit 2 is a true and correct copy of relevant portions of Dino Chavez's deposition testimony.  Each of the undisputed material facts are set forth either in Ms. Baker's affidavit or Mr. Chavez's deposition, or both.

the provisions thereof were set forth herein verbatim." (Baker Aff. ¶ 4, Exh. B ¶ 7; Chavez Depo., Vol. 2, p. 32, l. 17- p.33, l.15) Accordingly, the provisions regarding AFLAC's absolute right to reassign accounts and to determine who will service an account remained with AFLAC when Chavez became a Regional Sales Coordinator.

AFLAC also has adopted certain policies and procedures regarding the servicing and transfer of AFLAC accounts, which are set forth in Bulletin No. 99-279, dated September 7, 1999, attached as Exhibit C to the Baker Affidavit. (Baker Affidavit ¶ 5, Exh. C.) These policies and procedures are available for all AFLAC agents such as Chavez to view on AFLAC's website. *Id.* ¶ 5. Like Chavez's Associate's Agreement and RSC Agreement, the servicing guidelines provide, "AFLAC may, in its sole and absolute discretion, terminate an OSA's account designation and transfer an Account to another associate or agent for servicing." *Id.* Chavez was the Original Servicing Agent, or OSA, on the BISD account until AFLAC reassigned it at the request of BISD. *Id.*

When Chavez set up the BISD account for AFLAC in November of 1998, he submitted to AFLAC the Insurance Program Acknowledgement Payroll Deduction form, which he signed as the OSA on the BISD account. *Id.* ¶ 6. In this form, attached as Exhibit D to the Baker Affidavit, Chavez states "I acknowledge that AFLAC has the sole and absolute right to determine who shall solicit and service payroll deduction accounts, and AFLAC may reassign any account for servicing and designate who may solicit applications from persons in the account." *Id.* ¶ 6, Exh. D.

In the Associate's Agreement entered into by Chavez and AFLAC, Chavez agrees that either he or AFLAC may terminate the agreement at will, without cause, upon giving thirty days prior written notice to the other party. (Baker Aff. ¶ 3, Exh. A ¶ 9(b); Chavez Depo., Exh. 9, ¶ 9(b))

In Chavez's Regional Sales Coordinator's Agreement ("RSC Agreement") with AFLAC, Chavez expressly agrees that the RSC Agreement may be terminated "subject to the termination conditions set forth in [Chavez's] Associate's Agreement."  (Baker Aff. ¶ 4, Exh. B ¶ 9; Chavez Depo., Exh. 11)  Accordingly, the right to terminate without cause upon thirty day's prior written notice carries over to Chavez's RSC Agreement.

Dino Chavez's RSC Agreement was terminated in January of 2002 after he was given thirty days written notice.  (Baker Aff. ¶ 4; Chavez Depo., Vol. 2, p. 67 l. 19 – p. 68 l. 9; Chavez Depo., Exh. 39)  Chavez's Associate Agreement is still in effect.  (Baker Aff. ¶ 4; Chavez Depo. Vol. 2, p. 15 l. 8-11.)

**B.    Argument and Authority**

In this case, Chavez complains that the BISD account "was taken away from him" and that AFLAC terminated his RSC Agreement.  In both instances, Chavez agreed that AFLAC could do exactly what it did.

As noted above, Chavez agreed at least three different times that AFLAC had the right to reassign an account and to determine who would service that account and solicit applications in that account.  Chavez first agreed in his Associate's Agreement that all accounts belong to AFLAC and that AFLAC could determine the servicing agents for the accounts.  He reiterated and ratified that Agreement when he became a Regional Sales Coordinator in 1998.  Then, for the third time, when he signed up the very BISD account that forms the basis of this lawsuit, he acknowledged "that AFLAC has the sole and absolute right to determine who shall solicit and service payroll deduction accounts, and AFLAC may reassign any account for servicing and designate who may solicit applications from persons in the account."

Further, Chavez was aware of and had access to the AFLAC bulletin that sets forth its policies and procedures regarding servicing of accounts.  This bulletin also clearly states that

AFLAC may in its sole and absolute discretion terminate a servicing agent's account designation and transfer an account to another associate or agent for servicing.

Thus, it is abundantly clear that AFLAC owns the BISD account and has the right to determine who shall service it. In this instance, at the request of defendant Sauceda, who had a falling out with Chavez, AFLAC reassigned the account to another agent. AFLAC had the absolute right to do so, a right which Chavez expressly acknowledged time and again. Therefore, Chavez has no claim that AFLAC violated its agreement with Chavez when AFLAC was merely exercising an express right that Chavez acknowledged belonged to AFLAC. It goes virtually without saying that a party cannot be liable for exercising its express contractual rights. *See, e.g., Johnson v. Hospital Corp. of America*, 95 F.3d 383, 394 (5th Cir. 1996) (finding that if a defendant had a legal right to interfere with a contract then the defendant has conclusively established the justification defense, and defendant's motivation in exercising right is irrelevant); *Niemeyer v. Tana Oil and Gas Corp.*, 39 S.W.3d 380, 389 (Tex. App.—Austin 2001, pet. denied).

In similar fashion, Chavez agreed that he or AFLAC could terminate his RSC Agreement at will, without cause, by simply providing the other party with thirty-days prior written notice. AFLAC exercised that right, terminating Chavez's RSC Agreement in January of 2002. Again, AFLAC cannot be held liable for exercising its contractual rights.

An action for contribution is derivative in nature—a defendant's right to contribution only arises where the plaintiff would also have a cause of action against the contribution defendant. *Shoemake v. Fogel, Ltd.*, 826 S.W.2d 933, 935 (Tex. 1992); *Eslon Thermoplastics v. Dynamic Sys.*, 49 S.W.3d 891, 902 (Tex. App.—Austin 2001, no pet.) (citing *Shoemake*). As shown above, where a party is merely exercising its right under a contract, it cannot be held liable for interfering with that contract. Because AFLAC is not liable to Chavez for exercising AFLAC's

contractual rights—which Chavez acknowledged AFLAC had a right to do—AFLAC cannot be held liable as a third-party defendant to BISD.

WHEREFORE, PREMISES CONSIDERED, Third-Party Defendant AFLAC respectfully prays that the Court grant its Motion for Summary Judgment dismissing all claims against it with prejudice and granting it such other and further relief to which it may be justly entitled.

Respectfully submitted,

William B. Steele III, Attorney In Charge
So. Dist. No. 8019
State Bar No. 19107400
Of Counsel:
LOCKE LIDDELL & SAPP LLP
100 Congress Ave., Suite 300
Austin, Texas 78701
(512) 305-4700
(512) 305-4800 (Fax)

Valorie C. Glass
So. Dist. No. 15303
State Bar No. 00784135
Of Counsel:
ATLAS & HALL, L.L.P.
P.O. Box 3725
McAllen, Texas 78502
(956) 682-5501
(956) 686-6109 (Fax)

**ATTORNEYS FOR THIRD-PARTY
DEFENDANT AMERICAN FAMILY LIFE
ASSURANCE COMPANY OF COLUMBUS**

## CERTIFICATE OF SERVICE

I hereby certify by my signature below that a true and correct copy of the above and foregoing has been served via first class U.S. mail, on this ___ day of September, 2003, to all counsel of record listed below:

J. Arnold Aguilar
Artemis Square, Suite H-2
1200 Central Boulevard
Brownsville, Texas  78520

Elizabeth G. Neally
Roerig, Oliveira & Fisher, LLP
855 West Price Road, Suite 9
Brownsville, Texas  78550

Eileen Leeds
Willette & Guerra
3505 Boca Chica Boulevard.
Suite 460
Brownsville, Texas  78521


_____
William B. Steele III

#1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DINO CHAVEZ, | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT and NOE SAUCEDA, | § | |
| Defendants, | § | |
| ----------------------------------------------------- | § | CIVIL ACTION NO. B-02-128 |
| BROWNSVILLE INDEPENDENT SCHOOL | § | |
| DISTRICT, | § | |
| Third-Party Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| AMERICAN FAMILY LIFE ASSURANCE | § | |
| COMPANY OF COLUMBUS (AFLAC), | § | |
| Third-Party Defendant. | § | |

**AFFIDAVIT OF JANET P. BAKER IN SUPPORT OF
AFLAC'S MOTION FOR SUMMARY JUDGMENT**

| | |
|---|---|
| THE STATE OF GEORGIA | § |
| | § |
| COUNTY OF MUSCOGEE | § |

BEFORE ME, the undersigned notary public, on this day personally appeared Janet P.
Baker who, upon her oath, deposed and stated as follows:

1.      My name is Janet P. Baker.  I am over the age of twenty-one, have never been
convicted of a felony, suffer from no civil disabilities, and am fully competent to make this
Affidavit.  All of the facts stated herein are within my personal knowledge and are true and
correct.

2.      I am an employee of AFLAC, one of the defendants in this matter.  My title is
Vice President, Account Implementation Management.  As part of my job, I am familiar with the
agreements that are entered into between AFLAC and AFLAC's sales associates and its sales

**Affidavit of Janet Baker – Page 1**

**Exhibit 1 to Motion for Summary Judgment**

coordinators, including the district, regional and state sales coordinators. Further, I am familiar with AFLAC's policies and procedures regarding the servicing of AFLAC accounts and the transfer of AFLAC accounts.

3.    Attached hereto as Exhibit A is a true and correct copy of the Associate's Agreement that was entered into by and between Dino X. Chavez, the plaintiff in the above-entitled and numbered cause, and AFLAC.  Paragraph 2(c) of this Associate's Agreement provides in relevant part, "AFLAC reserves the absolute right to reassign any account for servicing and to designate who may solicit applications from persons in the account in its sole discretion."  Paragraph 3 of the Associate's Agreement, regarding confidential information and ownership of accounts, provides in pertinent part, "Associate hereby agrees that all accounts and records . . . are and shall remain the property of AFLAC exclusively both before and after the termination of this Agreement, and the Associate shall have no property rights therein." Paragraph 9(b) of the Associate's Agreement provides that either party may terminate the agreement at will, without cause, upon giving thirty days prior written notice to the other party.

4.    Attached hereto as Exhibit B is a true and correct copy of the Regional Sales Coordinator's Agreement by and between Dino Chavez and AFLAC ("RSC Agreement"). Paragraph 7 of the RSC Agreement provides as follows:

> "All of the provisions of [Chavez's] Associate's Agreement with AFLAC shall continue to be of full force and effect, and shall govern this contract in all respects except as expressly modified herein.

Agreement was terminated in January of 2002 after he was given thirty days written notice. Dino Chavez's Associate's Agreement is still in effect.

5.      Attached hereto as Exhibit C is AFLAC Bulletin No. 99-279, dated September 7, 1999, regarding account service guidelines.  This bulletin, which is provided to AFLAC's agents and is published on AFLAC's web-site, sets forth the policies and procedures adopted by AFLAC regarding the servicing and transfer of AFLAC accounts. These policies and procedures are applicable to all of its sales associates and its district, regional and state sales coordinators, including Dino Chavez.  The guidelines define an Original Servicing Agent  ("OSA") as "an associate, coordinator or other appointed agent who personally (1) sets up an AFLAC account, (2) submits to worldwide headquarters the signed Insurance Program Acknowledgement Payroll Deduction form (M-0135R) and (3) promptly conducts the initial enrollment of AFLAC products in the account." Exhibit C, page 1.  The definition of an OSA goes on to say, "This agent may remain the OSA until AFLAC, in its sole discretion, transfers the account and assigns it to another associate for servicing."  Dino Chavez set up the Brownsville Independent School District account in November of 1998 and was the OSA on that account until AFLAC reassigned it at the request of BISD.  The account service guidelines provide that "AFLAC may in its sole and absolute discretion, revoke or terminate an OSA's account designation and transfer an account to another associate or agent for servicing." Exhibit C, page 5.

6.      Attached hereto Exhibit D is AFLAC form M-0135R, the Insurance Program Acknowledgement Payroll Deduction form, for the BISD account.  It reflects that it was signed by Dino Chavez on or about November 9, 1998, acknowledging that he agreed with the statements made in the form.   Immediately above Mr. Chavez's signature, it states, "I acknowledge that AFLAC has the sole and absolute right to determine who shall solicit and

service payroll deduction accounts, and AFLAC may reassign any account for servicing and designate who may solicit applications from persons in the account."

FURTHER AFFIANT SAYETH NOT.

_____
Janet P. Baker

SWORN TO AND SUBSCRIBED before me on this 19th day of September, 2003, to certify which witness my hand and seal of office.

_____
Notary Public, State of Georgia

**Affidavit of Janet Baker – Page 4**

Ex. A

# American Family Life Assurance Company
## of Columbus (AFLAC)
### Worldwide Headquarters: Columbus, Georgia 31999

## *Associate's Agreement*

American Family Life Assurance Company of Columbus, a Georgia corporation (hereinafter "AFLAC"), and the undersigned person (hereinafter "Associate") agree as follows:

### PARAGRAPH ONE: Authority of Associate

(a) **Independent Contractor.** The relationship of Associate to AFLAC shall be that of an independent contractor, rather than employee and employer, and nothing contained herein shall be construed as creating any other relationship.

(b) **Unauthorized Acts.** Associate is not authorized to make any contract or incur any debt in the name of AFLAC, nor shall Associate modify or amend any application for insurance or any policy of insurance, interpret or construe policy language, extend the time for making any payment which may become due on any policy, nor waive any of AFLAC's rights or privileges under its policies or applications.

(c) **No Implied Authority.** Associate shall have no authority other than that expressly granted herein, and no forbearance or neglect on the part of AFLAC shall be construed as a waiver of any of the terms of this Agreement or imply the existence of any authority not expressly granted herein.

### PARAGRAPH TWO: Duties of Associate

(a) **Procure and Maintain Licenses.** Associate shall be responsible for procuring and maintaining any resident license, non-resident license and appointment, if applicable, that any State may require for soliciting applications for insurance policies offered for sale by AFLAC. Associate shall also be responsible for renewing and maintaining any such license(s) or appointment(s). This Agreement is contingent upon the issuance and maintenance of valid license(s) or appointment(s) to sell insurance by the Insurance Department of the State of Associate's residence, and of the State from which Associate may have a non-resident license or appointment, if any.

(b) **Solicit Applications.** Associate shall solicit applications for insurance policies offered for sale by AFLAC within the states where Associate is duly licensed to solicit such insurance applications. Associate is free to exercise Associate's own judgment as to time and place of solicitation.

(c) **Service Accounts.** Associate shall service all payroll deduction accounts ("accounts") that Associate initially sells or that are assigned to the Associate by AFLAC. Associate agrees that the first-year and renewal commissions paid to Associate in accordance with the terms herein constitute full payment for soliciting the application that resulted in the insurance policy being issued, and the performance of all other duties by Associate. AFLAC reserves the absolute right to reassign any account for servicing and to designate who may solicit applications from persons in the account in its sole discretion. Upon such reassignment, Associate shall continue to be paid renewal commissions on policies which Associate sold to persons in the account prior to reassignment, provided Associate is otherwise entitled to commissions in accordance with this Agreement. However, Associate will not be paid commissions on policies which are sold to persons in the account by another associate after the account has been reassigned by AFLAC.

(d) **Other Duties.** Associate shall use only promotional material which is furnished to Associate by AFLAC or which has been approved in writing from a Vice President of AFLAC. Associate shall pay all expenses incurred by Associate in the sale and service of insurance policies offered by AFLAC. Any administrative service fees which any group or franchise account may charge for handling premium payroll deduction shall be considered an expense of the Associate. Any such expenses which AFLAC advances on Associate's behalf shall be a debt to AFLAC and shall be reimbursed by deducting them from the commissions which become due to Associate. Associate shall carefully evaluate all applications for insurance and make full and accurate disclosure to AFLAC of all material facts and circumstances which might affect the underwriting of the risk, and shall promptly forward all applications for insurance policies to AFLAC at its Worldwide Headquarters in Columbus, Georgia. Associate shall additionally collect the initial premium that may be due on applications and promptly remit the same to AFLAC along with applications, Associate shall promptly deliver policies and claim documentation sent to the Associate.

(e) **Return Policies and Monies.** Associate shall return to AFLAC on demand all undelivered policies, premium receipts, negotiable papers, or monies due AFLAC and all documents or other property belonging to AFLAC. Associate agrees to be responsible for all monies collected by Associate under the terms of this Agreement.

### PARAGRAPH THREE: Confidential Information;
### Ownership of Accounts, Records and Confidential Information

Associate agrees that the following information, to-wit: 1) payroll deduction account information, 2) names and addresses of all AFLAC policyholders, associates and coordinators, 3) account or premium invoices, 4) payroll account servicing documents,

# EXHIBIT A

AFL 2923

5) claimant data, including payment sheets or letters, 6) training and educational manuals, 7) administrative manuals, 8) policy expiration data, and 9) prospective policyholder leads developed by AFLAC and furnished to associates and/or coordinators (e.g., "lead cards"), in whatever form, whether computer or electronically accessible, "on-line," or not, are confidential information and, as such, are information competitively advantageous to AFLAC, and Associates have no property right, vested interest or ownership interest in said confidential information.

Associate hereby agrees that all accounts and records, including but not limited to the confidential information above referred to, are and shall remain the property of AFLAC exclusively, both before and after the termination of this Agreement, and the Associate shall have no property rights therein. Associate further covenants to make no copies, in whatever form, of any of said records nor any part of them, and that none of them, in any form, is to be removed from the custody of Associate, except in the performance of duties hereunder. Associate further agrees to return to AFLAC all such accounts, records and confidential information at the termination of this Agreement or upon demand, whichever first occurs.

### PARAGRAPH FOUR: Duties and Rights of AFLAC

(a) Duties.

    (1) **Provide Sales Materials.** AFLAC shall provide Associate with standard promotional and informational material to be used in the sale and service of insurance policies offered by AFLAC. All such materials and information shall remain the property of AFLAC and shall be promptly returned upon demand or upon the termination of this Agreement.

    (2) **Underwrite Policies.** AFLAC shall consider each application submitted by Associate and approve or reject the same. If approved, a policy of insurance shall be issued to the applicant in accordance with the amount and type of insurance for which application was made. All underwriting decisions are to be made solely by AFLAC and it reserves its right to prescribe rules regarding the requirements for eligibility of applicants for insurance.

    (3) **Pay Commissions.** On policies issued upon applications submitted by Associate and as full compensation for Associate's services, sales commission will be paid as follows:

        (i) **First-Year Commissions.** So long as Associate is authorized to represent AFLAC, a first-year sales commission may be advanced by AFLAC on premiums earned in accordance with the terms of the applicable Schedule of Commissions. No first-year sales commissions will be paid to Associate after Associate's termination, unless Associate is otherwise entitled to the payment of renewal commissions. AFLAC shall have the right to apply all or part of the first-year sales commissions or registration fees to Associate's indebtedness to AFLAC. AFLAC may charge a registration fee at the time of sale which will be credited to Associate's monthly accounting statement. AFLAC may charge policyholders a policy processing fee. Associate shall not be entitled to any commission based upon such a policy processing fee.

        (ii) **Renewal Commissions.** A renewal commission is defined as that commission which is paid on premiums as earned by AFLAC on an insurance policy previously produced by Associate, commencing with the thirteenth (13th) month's premium and such renewal commission shall be based on an amount not greater than the annualized premium amount applicable at the time a policy is initially issued. A renewal commission as provided by the Schedule of Commissions will be paid as earned pursuant to the terms and subject to the conditions of Paragraphs 5, 6 and 8 of this Agreement.

    (4) **Provide Monthly Statements.** AFLAC shall, provided Associate is entitled to receive commissions hereunder, furnish Associate with a monthly accounting statement. Upon the receipt of such statement, Associate agrees to notify AFLAC within thirty (30) days in writing of any mistakes or discrepancies in the statement. Failure of Associate to so notify AFLAC shall constitute acceptance of AFLAC's statement as rendered, and Associate waives all rights to any claims against AFLAC to the contrary, and such claims shall be forever barred.

(b) Rights. With respect to the foregoing duties, AFLAC shall have the following rights:

    (1) **Assignment to Coordinator.** AFLAC may assign Associate to a sales coordinator for purposes of assisting Associate in training and marketing. Associate may be reassigned to a different sales coordinator in AFLAC's discretion. It is expressly understood and agreed that AFLAC can function only through its agents, and its decisions through its officers, agents and sales coordinators, and other associates, shall be deemed to be made in the due course, and within the scope, of managing the business of AFLAC. For any mistake, neglect, abuse of discretion, or other action taken, not amounting to willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise a presumption of conscious indifference to consequences, in making and enforcing AFLAC's decisions relating to Associate and Associate's performance of the duties under this Agreement, liability, if any, of AFLAC and liability, if any, of its officers, agents, sales coordinators and other associates, individually, if any, each and all, for damages shall be limited to a claim for breach of contract, and Associate's sole remedy shall be for breach of contract, and damages shall be assessed accordingly.

    (2) **Advancement of Commissions.** AFLAC shall have the right to advance commissions to Associate. Any sums advanced to Associate shall create a liability to AFLAC on the part of Associate, and shall be payable on demand without notice, and shall create a liability to AFLAC and any amounts, indebtedness or liability owed to AFLAC by Associate may be charged back and offset against all amounts credited or to be credited to Associate's account. First-year sales commissions shall be credited to Associate on a pro rata basis as the entire first year's premium becomes earned by AFLAC. AFLAC shall have the right to apply all or part of the first year's sales commission or renewal commissions to Associate's indebtedness to AFLAC.

    (3) **Service Charge.** AFLAC may charge one-half of one percent interest per month on any outstanding negative balance on Associate's monthly statement. AFLAC may also charge a COD penalty fee for issuing policies where the initial premium is not paid in full as set out on the applicable Schedule of Commissions.

    (4) **Notice to Insurance Commissioner or Other Regulatory Authorities of Certain Information, Absolutely Privileged.** Upon receipt of, or discovery of, information by AFLAC which reasonably brings in question the validity of Associate's license or appointment, or which suggests fraudulent or criminal activity on the part of Associate, AFLAC shall have the right to give notice of said information to the Insurance Commissioner or other regulatory authority involved, and to give notice of same to Associate, and shall further have the right to terminate Associate's authority to represent AFLAC immediately, pending determination of the question involved, and all said notices shall be absolutely privileged. Associate specifically and expressly

AFL 2924

authorizes the release of said information to the Commissioner or other regulatory authority, and AFLAC shall have no liability for so doing.

(c) **Schedules of, and Provisions Governing Commissions** (Hereafter Schedule of Commissions). All commissions shall be paid in accordance with the terms of the applicable Schedules of Commissions published by AFLAC. Associate acknowledges receipt of the current applicable Schedules of Commissions at the time of the execution of this Agreement. Said schedules are incorporated herein by reference and are a part of this Agreement. AFLAC may change the terms of said schedules, but any change in commissions shall not affect those commissions due or to become due to Associate on policies issued which had an effective date prior to the date of the change. When changes in the schedules are made they are incorporated herein by reference and become a part of this Agreement. AFLAC shall furnish Associate written notice of any change in the schedules at least thirty (30) days prior to the effective date of such change.

## PARAGRAPH FIVE: Contingent Payment of Renewal Commissions
### Prior to Termination of this Agreement

Prior to termination, AFLAC's obligation to pay renewal commissions (as defined herein) shall be contingent upon Associate's faithful performance or observance of his or her obligations and covenants hereunder, and Associate shall be entitled to be paid renewal commissions prior to termination ONLY under conditions as follows:

(a) **Monthly Production.** In order to receive renewal commissions on premiums from policies produced by Associate, Associate must produce during that month $750 in annualized premium on new policies issued by AFLAC. To be produced, the policies sold by Associate must be properly and timely submitted to the AFLAC Headquarters for processing and must be accepted by the AFLAC Headquarters in accordance with Headquarters underwriting procedures.

(b) **Temporary Disability.** If Associate is temporarily disabled to the extent of not being able to meet the monthly production requirements for renewal commissions, AFLAC shall pay such renewal commissions as earned for a period of up to three (3) months during which the disability continues subject to AFLAC's determination that Associate was and is disabled, provided that, and as a condition precedent thereto, Associate shall notify AFLAC in writing of Associate's disability within sixty (60) days from the date of the onset of the disability. Any claim for renewal commissions not in compliance with this paragraph shall be waived.

(c) **Permanent Disability.** After two (2) years of service with AFLAC, if Associate becomes totally disabled while still active with AFLAC, Associate shall have a vested right to receive all renewal commissions on policies Associate produced for as long as Associate remains totally disabled. Associate shall be totally disabled only if Associate meets the disability requirements of the Social Security Act; provided that, and as a condition precedent thereto, Associate shall notify AFLAC within sixty (60) days in writing after he or she becomes totally disabled. Any claim for renewal commissions not in compliance with this paragraph shall be waived. Renewal commission payments made pursuant to the provisions of subparagraph (b) or (c) are not disability benefits, and the Associate may incur taxes thereon.

(d) **Annual Production.** Upon the production by Associate of at least $10,000 of annualized premium on all new policies issued by AFLAC during a calendar year, Associate shall be entitled to receive renewal commissions on premium payments received by AFLAC for the remainder of that year and for the following calendar year on the in-force policies produced by Associate, as long as a minimum of $10,000 in annualized premium on new policy sales used to qualify for this provision remains in force during that year and the following calendar year. If the annualized premium on new policy sales used to qualify for this provision subsequently falls below $10,000, then the means of qualification provided herein shall be suspended.

(e) **Vesting After 10 Years.** After ten (10) years of service with AFLAC, Associate shall have a vested right to receive 100% of the renewal commissions as earned payable on policies Associate produced, irrespective of the production requirements of subparagraphs (a) and (d) above, until termination of this Agreement or unless forfeited as provided in this Agreement.

(f) **Conditions to Payment of, and Right to Receive, Renewal Commissions.** Associate shall be entitled to receive renewal commissions payable under the terms of this Agreement unless Associate who is otherwise entitled to receive renewal commissions engages in any of the conduct prohibited under Paragraph Eight, or should Associate engage in conduct in the performance of Associate's duties and covenants hereunder involving moral turpitude, dishonesty, fraud, deceit, willful misrepresentation, or willful concealment of material facts. Should Associate who is otherwise entitled to receive renewal commissions engage in any such conduct, then, and in such event, the renewal commissions which would otherwise be payable to Associate hereunder shall immediately and automatically become non-payable, and Associate forever forfeits any right to receive the payment of any renewal commissions as provided under this Agreement.

## PARAGRAPH SIX: Contingent Payment of Renewal Commissions
### At and After Termination of this Agreement

Upon the effective date of termination and after termination of this Agreement, AFLAC's obligation to pay renewal commissions (as defined herein) shall be contingent upon Associate's faithful performance or observance of his or her obligations and covenants hereunder, and Associate shall be entitled to be paid renewal commissions at and after termination ONLY under conditions as follows:

(a) **Vesting After Two Years.** After two (2) years of service with AFLAC, Associate, upon termination, shall have a vested right to receive 50% of the renewal commissions as earned payable on policies Associate produced so long as a minimum of $25,000 in annualized premium on policies written by Associate remains in force, for life, unless forfeited as hereinafter provided.

(b) **Vesting After Five Years.** After five (5) years of service with AFLAC, Associate, upon termination, shall have a vested right to receive 75% of the renewal commissions as earned payable on policies the Associate produced, for life, unless forfeited as hereinafter provided.

(c) **Vesting After 10 Years.** After ten (10) years of service with AFLAC, Associate shall have a vested right to receive 100% of the renewal commissions as earned payable on policies the Associate produced, for life, unless forfeited as hereinafter provided.

(d) **Death.** If the Associate dies while receiving renewal commissions, effective with policies issued January 1, 1994 and after, one-hundred percent (100%) of the renewal commissions to which Associate would have been entitled to receive at or after termination shall be payable as follows:

(1) **Surviving Spouse.** To Associate's surviving spouse solely during the surviving spouse's lifetime.

(2) **Surviving Children.** If no spouse survives and there is a surviving child or children of the deceased Associate under the age of

Form A-13510-94

3

**AFL 2925**

twenty-three (23) years, to such child or children under twenty-three (23) until the youngest child reaches the age of twenty-three (23) years. If Associate's spouse survives Associate, but dies before all of Associate's children reach the age of twenty-three (23), to such child or children under twenty-three (23) until the youngest child reaches the age of twenty-three (23). Renewal commissions shall be paid only to the child's legally appointed guardian unless such child has reached the age of majority in his or her state of residence. No renewal commissions are payable to any child or children who are twenty-three (23) or older. Children under the age of twenty-three (23) shall share equally.

(3) **No Surviving Spouse or Children.** If no spouse survives and there are no surviving children of the deceased Associate under the age of twenty-three (23) years, to the Associate's estate for a period equal to the number of months of the Associate's service with AFLAC, not to exceed thirty-six (36) months.

(e) **Conditions to Payment of, and Right to Receive, Renewal Commissions.** Associate shall be entitled to receive renewal commissions payable under the terms of this Agreement unless forfeited in accordance with Paragraph 5(f) above.

## PARAGRAPH SEVEN: Limited Assignment of Benefits

Associate may not assign to a third party any right to receive renewal commissions which Associate has under this Agreement during Associate's lifetime without AFLAC's prior written consent; provided, however, Associate may assign and surrender all rights to renewal commissions, without the approval of anyone, to AFLAC for such valuable consideration as mutually agreed upon by Associate and AFLAC. Further, Associate may pledge and assign any rights Associate may have to renewal commissions to AFLAC to secure the repayment of any loan or indebtedness which Associate may owe to AFLAC. Further, Associate grants to AFLAC a security interest against, and AFLAC reserves a lien upon, all of Associate's rights to receive first-year commissions and renewal commissions to secure the payment of any indebtedness which Associate may owe AFLAC. Any assignment by Associate to a third party shall be subject to the provisions of this paragraph, and shall always be subject to AFLAC's prior right of offset and its prior security interest.

## PARAGRAPH EIGHT: Prohibited Conduct

(a) During the term of this Agreement, Associate shall not (1) engage in any conduct in the performance of Associate's duties and covenants hereunder involving moral turpitude, dishonesty, fraud, deceit, willful misrepresentation or willful concealment of a material fact; (2) wrongfully misappropriate or withhold any funds, policies, premiums, receipts, vouchers or other property belonging to AFLAC or to an applicant for insurance; (3) violate any insurance laws or regulations of any state, the violation of which involves moral turpitude; or (4) make or knowingly allow to be made any false or misleading statements on any applications or claim or other documents submitted to AFLAC.

(b) During the term of this Agreement and for a period of two (2) years after its termination, Associate covenants that, within a 100-mile radius of his or her business address, as shown at the end of this Agreement (except Subparagraph 8(b)(3) herein which is not subject to any territorial limitation), **Associate shall not, directly or indirectly:**

(1) Induce or attempt to induce other associates or sales agents or coordinators of AFLAC who reside within the 100-mile radius to terminate their agreements with AFLAC, or to become contracted or associated with another insurance or indemnity company which engages in the sale of insurance policies which directly competes with the policies then sold by AFLAC; or

(2) Induce or attempt to induce policyholders or accounts of AFLAC located within a 100-mile radius of Associate's address, which Associate solicited, sold or serviced while this Agreement was in effect, to relinquish, cancel or surrender their policies or accounts, provided this shall not prohibit a direct unsolicited contact of the Associate by the policyholder and a subsequent sale based on such unsolicited contact; or

(3) Divulge, use or make available to anyone other than those within AFLAC authorized to receive such information, payroll deduction account information, names and addresses of any AFLAC policyholders, associates and coordinators, account or premium invoices, payroll account servicing documents, claimant data, including payment sheets or letters, training and educational manuals, administrative manuals, policy expiration data and prospective policyholder leads developed by AFLAC and furnished to associates and/or coordinators (e.g., "lead cards"), in whatever form, whether computer or electronically accessible, "on-line," or not, all of which is agreed to constitute confidential information and information competitively advantageous to AFLAC.

(4) The foregoing covenants shall not apply in the event AFLAC, its successor or assigns, ceases to do business as an insurer, or ceases to do such business within the applicable territory involved.

(c) Associate shall not change his business address for purposes of this Agreement without the prior consent of the company and the execution of a new Associate's Agreement specifying his new business address. In the event of such change, the territorial limitation herein specified shall continue to apply to Associate for a period of one year next subsequent to the change, at which time it shall automatically self-destruct and cease to exist. During such one-year period, the covenants herein contained relating to a territorial limitation shall apply not only to the preceding business address, but also to the new business address specified in the succeeding Associate's Agreement.

(d) **Provisions of Covenants Are Reasonable and Necessary.** Associate recognizes that AFLAC has a valid need to protect its interests by prohibiting Associate from engaging in any of the activities described in this paragraph. Associate acknowledges and agrees that the time period and the geographic area are reasonable and necessary to protect AFLAC's business, and that the prohibited activities are described with reasonable certainty, and are understood by Associate.

(e) **Forfeiture of First-Year and Renewal Commissions Upon Breach.** Should Associate engage in any of the conduct described in this paragraph, the first-year commissions and renewal commissions which would otherwise be payable to Associate or Associate's survivors shall immediately and automatically become non-payable, and Associate forever forfeits any and all rights to be paid any commissions from AFLAC.

## PARAGRAPH NINE: Termination of Agreement

(a) **Termination for Cause.** AFLAC shall have the right to terminate this Agreement immediately, and the termination shall be considered as being for cause, if Associate engages in any of the following:

(1) Wrongfully misappropriates or withholds any funds, policies, premium receipts, vouchers or other property belonging to AFLAC or to an applicant for insurance; or

(2) Violates any insurance laws or regulations of any state, the violation of which would result in the revocation of Associate's license; or

(3) Pleads guilty or nolo contendere to, or is convicted of, a crime (whether felony or misdemeanor) involving moral turpitude; or

AFL 2926

(4) Makes or knowingly allows to be made any false or misleading statements on any application or claim or other document submitted to AFLAC; or

(5) Engages in any of the prohibited conduct in Paragraph Eight; or

(6) Associate ceases to hold a valid license to sell insurance policies offered by AFLAC.

(b) **Termination by Notice Without Cause.** Either party may terminate this Agreement at will, without cause, upon giving thirty (30) days prior written notice to the other party.

(c) **Termination Upon Death or Permanent Disability of Associate.** This Agreement shall terminate upon the death or total disability of Associate, unless sooner terminated.

## PARAGRAPH TEN: Treatment of Associate and Associate's Responsibilities Under Federal Tax Laws

Associate shall be treated as an independent contractor and not as an employee as concerns all applicable tax laws with respect to services performed under this Agreement, and Associate is hereby advised as an independent contractor that Associate must report all sales commissions to the Internal Revenue Service on the appropriate income tax form and pay any federal income taxes due with respect to these amounts. Additionally, Associate must report all sales commissions on the appropriate self-employment tax form and pay any self-employment ("S.E.C.A.") taxes with respect to these amounts. To assist Associate in complying with these requirements, AFLAC will, after the close of each calendar year, furnish Associate with a copy of the Form 1099 Income Statement that AFLAC is also required to send to the Internal Revenue Service.

## PARAGRAPH ELEVEN: Legal Proceedings, Attorneys' Fees and Litigation Expenses

(a) **Legal Proceedings.** The Associate shall not institute legal proceedings in the name of AFLAC against any party for any cause unless such action shall have been approved in advance in writing by a Vice President of AFLAC. Should a claim be brought by a third party against either the Associate or AFLAC as a result of some alleged action by the Associate, the Associate shall hold AFLAC harmless from and indemnify it for any attorneys' fees and court costs which it may incur in defending the claim and for any damages which it suffers either through settlement of the claim or by judgment being rendered against it. In the event AFLAC shall invoke its rights under this paragraph, AFLAC shall notify Associate in writing of its intent. AFLAC shall have the right to apply all or any part of Associate's first-year and/or renewal commissions toward the damages caused to it hereunder. AFLAC may, in its sole discretion, determine whether to defend or settle any such claim, and the amount of any such settlement.

(b) **Attorneys' Fees and Litigation Expenses.** Should AFLAC institute legal action against Associate to recover for indebtedness of Associate to AFLAC, Associate covenants to pay AFLAC the reasonable attorneys' fees and litigation expenses which AFLAC may incur, in addition to principal, interest and damages.

## PARAGRAPH TWELVE: Prior Contracts Superseded

This Agreement supersedes and replaces all previous contracts between the parties, but all rights accrued up to the date of execution of this Agreement shall not be affected or impaired, except as modified by this Agreement. For policies issued prior to January 1, 1994, renewal commissions at death will be paid in accordance with the Associate's preceding Agreement.

## PARAGRAPH THIRTEEN: Modifications

This Agreement may not be orally modified. No modification is binding upon AFLAC unless it is in writing and signed at its Headquarters by its President, a Vice President, or its Secretary, for a substantial valuable consideration other than the performance of services by Associate, except as expressly provided in this Agreement.

## PARAGRAPH FOURTEEN: Severability

If any one or more of the provisions, words or phrases contained in the paragraphs and subparagraphs of this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provisions, words or phrases were not contained herein.

## PARAGRAPH FIFTEEN: Arbitration

(a) Any dispute arising under this Agreement, to the maximum extent allowed by applicable law, shall be subject to arbitration, and prior to commencing any court action the parties agree that they shall arbitrate all controversies.

(b) **Procedure.** The arbitration shall be pursuant to the terms of the Federal Arbitration Act. The parties shall notify each other of the existence of an arbitrable controversy by certified mail and shall attempt in good faith to resolve their differences within fifteen (15) days after the receipt of such notice. Notice to Associate shall be sent to Associate's address as it appears in AFLAC records and notice to AFLAC shall be sent to: Arbitration Officer, American Family Life Assurance Company of Columbus (AFLAC), Worldwide Headquarters, Columbus, Georgia 31999. If the dispute cannot be resolved within said fifteen-day period, either party may file a written demand for arbitration with the other party. The party filing such demand shall simultaneously specify his, her or its arbitrator, giving the name, address and telephone number of said arbitrator. The party receiving such notice shall notify the party demanding the arbitration of his, her or its arbitrator, giving the name, address and telephone number of said arbitrator within five (5) days of the receipt of such demand. The arbitrator named by the respective parties need not be neutral. The Senior Judge of the Superior Court of Muscogee County, Georgia, on request by either party, shall appoint a neutral person to serve as the third arbitrator, and shall also appoint an arbitrator for any party failing or refusing to name his arbitrator within the time herein specified. The arbitrators thus constituted shall promptly meet, select a chairperson, fix the time and place of the hearing, and notify the parties. The majority of the panel shall render an award within ten (10) days of the completion of the hearing, and shall promptly transmit an executed copy of the award to the respective parties. Such an award shall be binding and conclusive upon the parties hereto, in the absence of fraud or corruption. Each party shall have the right to have the award made the judgment of a court of competent jurisdiction.

Associate _____

## PARAGRAPH SIXTEEN: Headings

The headings of this Agreement are for reference only, and shall not limit the language used in this contract.

AFL 2927

## PARAGRAPH SEVENTEEN: Completely Integrated Agreement

These seventeen (17) paragraphs, along with the Schedules of Commissions, and any supplement of any district sales *coordinator*, regional sales coordinator, or state sales coordinator, contain the entire and complete agreement between the parties, and each of the parties hereto agrees that there are no prior or contemporaneous agreements, promises or representations that are not set forth herein.

WITNESS the hand and seal of Associate and the execution by a duly authorized officer of AFLAC.

WITNESS: _____

BY: _____ (L.S.)
Associate's Signature

8/8/94
Date

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
**Social Security Number**

_____
Associate's Current Writing Number
(For Administrative Purposes Only)

0007757985
Associate's License Number

Licensed for: Life ✓      A&H ✓

BUSINESS ADDRESS:
345 Honey Dr.
Street & No. (REQUIRED)

Brownsville          TX.          78520
City          State          Zip Code

HOME ADDRESS (IF DIFFERENT)

_____

_____

P. O. Box No. (if any)

_____
City          State          Zip Code

(210) 546-9358
Associate's Telephone No.          (HOME)

(210) 982-0832
Associate's Telephone No.          (BUSINESS)

AMERICAN FAMILY LIFE ASSURANCE
COMPANY OF COLUMBUS (AFLAC)

BY: _____

TITLE: ASST. VICE-PRESIDENT

EFFECTIVE DATE: 9-6-94

FOR OFFICE USE ONLY
WORLDWIDE HEADQUARTERS

**Associate's Mailing Address PLEASE PRINT**

DINO X. CHAVEZ
Name

345 Honey Dr.
Street

Brownsville, TX. 78520
City/State/Zip

Form A-1351 DEPARTMENT
AGENT LICENSE

AUG 1 9 94

RECEIVED

6

AFL 2928

Exh. B

# American Family Life Assurance Company
## of Columbus (AFLAC)

Worldwide Headquarters: Columbus, Georgia 31999

# *Regional Sales Coordinator's Agreement*

**WHEREAS,** the undersigned is now an Associate with American Family Life Assurance Company of Columbus ("AFLAC") under an Associate's Agreement (the terms of which are incorporated in this Agreement by reference) and the parties hereby desire to execute this additional Agreement in order to set forth the terms and conditions of the respective covenants, duties, and obligations of the undersigned as Regional Sales Coordinator, hereafter "RC."

**NOW, THEREFORE,** AFLAC and the undersigned RC do hereby covenant and agree as follows:

### Paragraph One: APPOINTMENT

AFLAC appoints the undersigned as Regional Sales Coordinator to serve in the region or territory assigned to the RC in writing by AFLAC, and RC covenants to serve as RC in the said region or territory in accordance with the terms and conditions hereafter set forth.

### Paragraph Two: RELATIONSHIP

(a) **Independent Contractor.** The relationship of the RC to AFLAC shall be and shall continue to be that of an independent contractor rather than employer-employee, and nothing contained herein shall be construed as creating any other relationship.

(b) **Relationship of Others.** It is understood and agreed that associates assigned to the RC are independent contractors, and the district sales coordinator who may be assigned to the RC is an independent contractor, and the state sales coordinator to whom the RC is assigned may be an independent contractor in their relationships with AFLAC. The RC shall at all times respect that relationship in the performance of the RC's duties hereunder.

(c) **Expenses.** All expenses incurred by the RC shall be the sole responsibility of the RC. The RC has no authority to rent any office or telephone, open any bank account, or make any expenditures, obligation or commitment for any purpose in the name of AFLAC without specific written authorization from the president, a vice president, or secretary of AFLAC.

### Paragraph Three: DUTIES

The RC shall recruit and train associates for the sale of all AFLAC insurance policies and coordinate the activities of the associates and the district sales coordinators assigned to the RC in writing by AFLAC. For the purpose of maximizing the sales efforts of AFLAC, the RC should cooperate with the associates and district sales coordinators assigned to the RC, and the state sales coordinator to whom the RC is assigned.

### Paragraph Four: ASSIGNMENT

AFLAC may, in its sole and absolute discretion, assign and reassign associates and district sales coordinators to the RC. The RC shall be paid renewal override commissions on all AFLAC insurance policies that are sold by associates and district sales coordinators while assigned in writing to the RC. The RC understands and agrees that he or she may be assigned to a state sales coordinator for purposes of assisting the RC in training, recruiting and marketing. The RC may be reassigned to a different state sales coordinator at AFLAC's discretion.

### Paragraph Five: FIRST-YEAR AND RENEWAL OVERRIDE COMMISSIONS; RSC MPI PROGRAM

As full compensation for the performance of the RC's duties, the RC shall be paid first-year and renewal override commissions on sales of all AFLAC insurance policies made by the RC, and by district sales coordinators, and associates while assigned in writing to the RC.

(a) **First-Year Override Commissions.** First-year override commissions shall be advanced on sales credited to the RC. Said compensation shall be paid in accordance with each policy's Schedule of Commissions (at the RSC MPI Participant Rate) in effect at the time of the sale.

(b) **Renewal Override Commissions.** Renewal override commissions shall be credited to the RC in accordance with each policy's Schedule of Commissions (at the RSC MPI Participant Rate) in effect at the time of the sale.

(c) **Schedules of Commissions.** The official Schedule of Commissions for the applicable AFLAC insurance policies are incorporated herein by reference. The commission for situations that are non-standard or not contemplated by the

M-0806

M-0806.1

# EXHIBIT B

001154

Schedule of Commission shall be governed by AFLAC's then-current rules, rates and practices. Any special or unique commission arrangement or commission splits requiring new or special situation codes shall be controlled by and paid in accordance with AFLAC's then-current rules, rates and practices. RC acknowledges and agrees that AFLAC, upon thirty (30) days written notice to RC, may change the Schedules of Commissions and conditions with respect to (a) any policies issued and in force on or after the date of the change, and (b) any policies issued before the date of the change but in force after such date if there has been a change in federal, state or other laws mandating an increase in loss ratios. When changes in the schedules are made, they are incorporated herein by reference and become a part of this Agreement.

(d) **MPI Bonus; Qualification.** RC may also qualify for and be paid an annual production bonus under and in accordance with the terms and conditions of the RSC MPI Program in effect at the time of the sale and his or her Regional Sales Coordinator's Agreement. The official RSC MPI Program for the applicable policies is incorporated herein by reference. Upon thirty (30) days written notice, AFLAC may change the terms and conditions of the RSC MPI Program with respect to any policies issued and in force on or after the date of the change.

### Paragraph Six: VESTING CONDITIONS

(a) **Prior to Termination.** During the term of this Agreement, first-year and renewal commissions shall be paid pursuant to Paragraph Five herein. No production or premium minimum is required as a condition for payment.

(b) **After Termination.** After termination of this Agreement, vesting of renewal commissions shall be paid in accordance with the conditions set forth in said Associate's Agreement.

### Paragraph Seven: AGREEMENT TO REAFFIRM

All of the provisions of the RC's Associate's Agreement with AFLAC shall continue to be of full force and effect, and shall govern this contract in all respects except as expressly modified herein. The RC hereby ratifies and reaffirms all the provisions of said Associate's Agreement with AFLAC as fully and effectually as though the provisions thereof were set forth herein verbatim.

### Paragraph Eight: SUBSTITUTION OF DISTRICT SALES COORDINATOR'S AGREEMENT

his RC's Agreement completely supersedes and replaces any existing District Sales Coordinator's Agreement between the parties. During the term of this RC's Agreement, no District Sales Coordinator's Agreement between the parties shall be valid unless specifically authorized in writing by the president, a vice president, or the secretary of AFLAC.

### Paragraph Nine: TERMINATION OF APPOINTMENT AS REGIONAL SALES COORDINATOR

This Agreement may be terminated without having any effect on said Associate's Agreement. Any such termination shall be subject to the termination conditions set forth in said Associate's Agreement. This expressed provision shall not affect the general governing provisions set forth in Paragraph Seven, above.

IN WITNESS WHEREOF, the parties have hereto affixed their respective signatures.

WITNESS: _____     BY: _____

                                                              RC Signature

                                                              11/13/98

                                                              Date

AMERICAN FAMILY LIFE ASSURANCE
COMPANY OF COLUMBUS (AFLAC)

APPROVED

BY: _____

TITLE: 2nd VICE-PRESIDENT

DATE: 11/19/98

**For Office Use Only**
**Worldwide Headquarters**

M-0806

M0806.1

001155

Exh. C



**No. 99-279**                                          **September 7, 1999**

(Bulletin 96-471 dated October 8, 1996, and all previous communications on this subject are hereby rescinded.)

SUBJECT:    ACCOUNT SERVICE GUIDELINES (the "Guidelines")

## DEFINITIONS

ACCOUNT [Account(s)]
An employer payroll account or other approved non-employer account (e.g., credit unions) that has signed an Insurance Program Acknowledgment Payroll Deduction form (M-0135-R) authorizing AFLAC to offer insurance to its employees (or members) under an arrangement where the Account will deduct the applicable insurance premium from each policyholder's wages or funds. All Accounts are, and shall remain, the property of AFLAC exclusively and nothing stated herein shall amend or change such provision. AFLAC has the absolute right to determine who shall solicit and service Accounts in its sole discretion.

ORIGINAL SERVICING AGENT (OSA)
The OSA is an associate, coordinator or other appointed agent who personally  (1) sets up an AFLAC Account, (2) submits to worldwide headquarters the signed Insurance Program Acknowledgment Payroll Deduction form (M-0135R), and (3) promptly conducts the initial enrollment of AFLAC products in the Account. The OSA for group Medicare supplement for an Account's retirees may be different from the OSA for the employer's account for its employees as determined by AFLAC in its sole discretion. Worldwide headquarters will recognize only one name submitted on the insurance program acknowledgment form as the OSA. If the name of more than one associate or coordinator appears on the form, worldwide headquarters will designate the first name listed as the OSA. This agent may remain the OSA until AFLAC, in its sole discretion, transfers the Account and assigns it to another associate for servicing.

**EXHIBIT C**                                              **AFL 2934**

American Family Life Assurance Company of Columbus (AFLAC)
Worldwide Headquarters:  1932 Wynnton Road, Columbus, Georgia 31999-0001, 706 / 323-3431

ASSIGNED SERVICING AGENT (ASA)
An ASA is an AFLAC associate, coordinator or other appointed agent who has accepted the assignment by AFLAC of an Account for servicing in accordance with the terms and conditions of the Guidelines and who agrees to participate in the Assigned Account Servicing Program. On the servicing copy, the designation *HQ/John Doe* will identify the ASA.

ASSIGNED ACCOUNT
Any Account that has been reassigned to an ASA for servicing purposes.

SERVICE OF AFLAC ACCOUNTS (Service)
AFLAC defines Service of its Accounts as: (1) a visit, in person, by the designated OSA or ASA with the Account and its employees during which information is exchanged regarding new products or services available to the Account and/or its employees; (2) upgrades in coverage, re-enrollments, and assistance with claims, billing, policy matters, FLEX ONE® and other related service issues.

ASSIGNED ACCOUNT SERVICING PROGRAM (PROGRAM)
A Program in which AFLAC associates, coordinators and other agents participate in providing service as an ASA to Assigned Accounts. Participation in the Program is voluntary and there is no obligation to accept the Assignment of an Account. AFLAC has no obligation to assign Accounts to participants in the Program. The Program and its terms and conditions apply to the ASA in the servicing of Accounts that were assigned to the ASA by AFLAC either before or after the date of implementation of the Program. AFLAC may in its sole and absolute discretion revoke or terminate the Assignment of all such Accounts to an ASA and transfer said Accounts at will without cause, reason or prior notice. The Assigned Account Servicing Program and its terms and conditions do not apply to an OSA for those Accounts for which he/she is the designated OSA. The acceptance and service of an Assigned Account constitutes the ASA's agreement with the terms and conditions of the Guidelines as they apply to ASAs.

## GUIDELINES

The following Guidelines must be adhered to by OSAs and ASAs for effective service of AFLAC's Accounts. In providing account servicing guidelines, AFLAC does not waive any rights or interests provided in other agreements between the associate and the company. The associate acknowledges that these Guidelines are not intended to limit free exercise of business judgment as to who will be solicited or the time and place of solicitations. AFLAC has and reserves the absolute right to reassign any account for servicing and to designate who may solicit applications from persons in the account. AFLAC may amend or add to these guidelines at any time.

1.  Payroll account business (sales and service) should be conducted in an efficient, courteous, competent, professional and authorized manner. It shall be conducted in compliance with applicable laws.

**AFL 2935**

2.      The OSA/ASA should **personally** visit each Account every four to six months to ensure that the relationship at all levels (owner/president, ·finance and administration/payroll) remains in good standing.  Some Accounts (such as those participating in AFLAC's FLEX ONE® program) may require servicing on a more frequent basis; therefore, worldwide headquarters may set more frequent servicing guidelines.

3.      The OSA should personally visit all newly established Accounts within the first billing period to assist the payroll administrator in understanding AFLAC's billing system and to ensure that all deductions are correct.

4.      Activity in an Account is defined as new business, conversions or reinstatements. Activity will also include the submission of a completed AFLAC Payroll Account Service Evaluation (M-0006) to worldwide headquarters.  An Account will be considered **inactive** if none of the above takes place for 12 or more months.

5.      If participation by the benefit-eligible employees in an Account falls below the level deemed adequate by AFLAC, then the Account will be deemed to have inadequate and/or ineffective Service.

6.      All new services (i.e., FLEX ONE®) and new products should be offered to Accounts within 12 months of their approval for sale within a state.

7.      Communication must be maintained with the Account and its employees to avoid policyholder disputes, to avoid delay in effecting coverage, to avoid premium remittance errors, to expedite claim payments, and to provide effective Service.

8.      If an OSA or ASA transfers to another state, the override commission on new business in an established Account will continue to be paid to the coordinator hierarchy that was in place prior to such transfer, unless changed with the written approval of AFLAC.

9.      The states sales coordinator must ensure that each Account has a designated OSA or ASA effectively servicing the Account.

**Worldwide headquarters activities may include but are not limited to:**

1.      A representative from worldwide headquarters or a coordinator designated by headquarters may contact any Account to determine that proper Service has been and will continue to be provided to meet the needs of the Account.

2.      Worldwide headquarters or a coordinator may require that a service call be made at any time and that an AFLAC Payroll Account Service Evaluation (M-0006) be completed and submitted.

**AFL 2936**

3.    If it comes to the attention of worldwide headquarters that an Account is requesting a new servicing associate, AFLAC may contact the Account to verify and investigate the request.

4.    If an OSA/ASA believes that another associate, coordinator or agent has improperly added business to an Account assigned to him/her, he/she shall promptly notify the state sales coordinator of his/her state in writing, including sufficient information to identify the Account and the associate, coordinator or agent involved. Upon receipt of such a complaint, AFLAC may conduct an appropriate inquiry into the matter. If AFLAC finds that business was improperly added to the Account, AFLAC will make whatever adjustments it deems necessary, including possibly transferring commissions and production credit to the designated OSA/ASA or terminating the individual's appointment with AFLAC.

## ACCOUNT TRANSFERS

### Transfers From ASA

A transfer recommendation may be submitted to the appropriate state sales coordinator for an Account to be transferred from an ASA. If the state sales coordinator approves the recommendation, a transfer request may be submitted to headquarters on a Payroll Account Transfer Form (M-0110). If headquarters approves the request, a letter stating the effective date of the Account transfer will be mailed to the ASA at least 30 days before the Account is transferred except in the following situations: prior notice of the Account transfer will not be given to an ASA that was a sales coordinator at the time the Account was assigned to him/her. If waiting 30 days will jeopardize the Account's compliance with IRS regulations in regard to their cafeteria plan, the decision to shorten the notification time may be made. In such cases the ASA will be notified of the transfer by express mail, and any objection to the transfer must be sent overnight to headquarters within the stated time.

The ASA may object to the transfer of an Account by submitting a written objection, which must include a statement of facts and documentation supporting the objection, to Payroll Account Management at worldwide headquarters. The objection must be received by headquarters before the effective date of the Account transfer. If an objection in proper form is received in a timely manner, the transfer will be reviewed in committee by worldwide headquarters and a final decision on the objection and transfer will be made within 15 business days from the date the objection is received.

AFLAC may, in its sole and absolute discretion, revoke or terminate the assignment of an Account to an ASA and transfer an Account at will without cause or reason.

**AFL 2937**

**Transfers From OSA**

A transfer recommendation may be submitted to the appropriate state sales coordinator for an Account to be transferred from an OSA. If the state sales coordinator approves the recommendation, a transfer request may be submitted to headquarters on a Payroll Account Transfer Form (M0110). A transfer request must be submitted along with adequate documentation to support the transfer of the Account. Worldwide headquarters will consider the extent of the OSA compliance with these guidelines and any amendments or additions thereto. If it has been determined by AFLAC that Service of the Account is inadequate or ineffective, that the Account is inactive or that any one of the first seven Guidelines has not been complied with then a letter stating the effective date of the Account transfer will be mailed to the OSA at least 30 days before the Account is transferred. If waiting 30 days will jeopardize the Account's compliance with IRS regulations in regard to their cafeteria plan, the decision to shorten the notification time may be made. The OSA from which the Account is being transferred will be notified by express mail, and any objection to the transfer should be sent overnight to headquarters within the stated time.

The OSA may object to the transfer of an Account by submitting a written objection, which must include a statement of facts and documentation supporting the objection, to Payroll Account Management at worldwide headquarters. The objection must be received by headquarters before the effective date of the Account transfer. If an objection in proper form is received in a timely manner, the transfer will be reviewed in committee by worldwide headquarters and a final decision on the objection and transfer will be made within 15 business days from the date the objection is received.

AFLAC may, in its sole and absolute discretion, revoke or terminate an OSA's Account designation and transfer an Account to another associate or agent for servicing.

**Arbitration**

Any claim, controversy or dispute arising between the parties with respect to the assignment, servicing or transfer of an Account, including any alleged tort related thereto, to the maximum extent allowed by applicable law and irrespective of the form of relief sought, shall be submitted to and resolved by arbitration. The arbitration shall be conducted in accordance with the Arbitration provision contained in the agent agreement.

**AFL 2938**

Ex-D

**American Family Life Assurance Company of Columbus**
Worldwide Headquarters: 1932 Wynnton Road, Columbus, Georgia 31999
Toll-Free 1-800-99-AFLAC (1-800-992-3522)
Insurance Program Acknowledgment Payroll Deduction

11-13-58
L 5864

AFLAC is authorized to offer this insurance program to our officers and employees. I understand that payments will be deducted from wages and remitted by my organization to AFLAC.

Name of Account: _Brownsville Independent School District_
Type of Business: _Public School_ Tax ID#: _1-74-6000 418_
Payroll Clerk or Contact Person: (X) Mr. ( ) Mrs. ( ) Ms. _Kenneth Lieck / Purchasing Director_
Mailing Address: _1900 Price Rd._
City: _Brownsville_ State: _TX_ Zip: _78521-2417_
Location Address: _1900 Price Rd._
City: _Brownsville_ State: _TX_ Zip: _78521-2417_
Telephone Number: _(956) 548-8000_ Fax Number: _(956) 548-8010_
Number of Employees: _6,500_ Date of 1st Invoice: _2-1-98_

An Employer Authorization to include Disability Insurance (✓ is ( )is not) part of this agreement.

Authorizing Officer's Name/Title: _Kenneth Lieck / Purchasing Director_

Authorizing Officer's Signature: X _[signature]_ Date: _11-9-98_

Note: AFLAC assumes that if you advance the first premium, you will suffer no loss of the amount advanced for any employee who terminates before you can deduct the premium. In this event, we will reimburse you without question. AFLAC also agrees to hold you harmless from any claim arising against you due to any disagreements between your employees and our company with respect to the coverage provided under our insurance policies issued to your employees except for any misconduct or negligence committed by you or any of your employees.

Is this a Cafeteria Plan? ( )No (✓)Yes If yes, plan start month: _1/1_
Is this a Flex One® Plan? ( )No (✓)Yes If yes, plan start month: _1/1_
Enrollment period: ( ) 30 days (X) 60 days (X) 90 days (X) Other: _As instructed - this year_
Is this benefit paid by the employer? (X) No ( ) Yes If yes, percent: _____

Billing Frequency: Date of 1st deduction: _1/25_ Number of deductions: _12_
(X) Monthly (12 invoices) ( ) Quarterly (4 invoices) ( ) Semiannual (2 invoices)
( ) Annual (1 invoice) ( ) 6-Month (6 invoices)* ( ) 9-Month (9 invoices)*
( ) 10-Month (10 invoices)* *No Invoice Months: _____
If one of the above is checked, you must indicate the 1st or the 15th: (X) 1st ( ) 15th
Model Billing: ( ) Weekly (52 invoices) ( ) Semi-monthly (24 invoices)
( ) 14-day (26 invoices) ( ) 28-day (13 invoices)

Billing Format: (X) Alphabetic ( ) Social Security Number
( ) Employee Number ( ) Department Number

**(FOR ASSOCIATE'S USE ONLY)**
1. Premium Deduction Authorization Forms have been/will be given to account on ~~12/5~~ 12/5 (date).
2. Contract Status: ( ) General Agent ( ) Non-Soliciting Broker
   If either checked above, Broker Name: _____ Broker #: _____ Level: _____
3. Geographical Code: _I 0777_ Master Account Number: _____ (if applicable)

I acknowledge that AFLAC has the sole and absolute right to determine who shall solicit and service payroll deduction accounts, and AFLAC may reassign any account for servicing and designate who may solicit applications from persons in the account.

Associate's Signature: _[signature]_ Resident State: _TX_

Writing Number: _R0981_ Sit. Code: _0_ Date: _11-9-98_

Form M-0135R M0135R.2

"..G1...AA."

# EXHIBIT D

**AFL 2918**

# 2

IN THE UNITED STATES DISTRICT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ                )(
                             )(
VS.                          )(   B-02-128
                             )(
BROWNSVILLE INDEPENDENT       )(
SCHOOL DISTRICT, NOE         )(
SAUCEDA, MARILYN DEL         )(
BOSQUE-GILBERT and           )(
RANDALL DUNN                 )(

_____

ORAL DEPOSITION OF
DINO X. CHAVEZ
VOLUME 2
MARCH 19, 2003

_____

        ORAL DEPOSITION OF DINO X. CHAVEZ, produced as

a witness at the instance of the DEFENDANT BROWNSVILLE

INDEPENDENT SCHOOL DISTRICT, taken in the above styled

and numbered cause on MARCH 19, 2003, from 8:53 a.m. to

12:40 p.m., before LOU ZUNIGA, Certified Court Reporter

No. 2198, in and for the State of Texas, at the offices

of J. Arnold Aguilar, 1200 Central Boulevard, Suite

H-2, Brownsville, Texas, pursuant to the Federal Rules

of Civil Procedure and the provisions stated on the

record or attached therein.

**Exhibit 2 to Motion for Summary Judgment**

HILL & ROMERO
CERTIFIED COURT REPORTERS



APPEARANCES

FOR THE PLAINTIFFS:

        J. ARNOLD AGUILAR
        LAW OFFICES OF J. ARNOLD AGUILAR
        Artemis Square, Suite H-2
        1200 Central Boulevard
        Brownsville, Texas  78520

FOR THE DEFENDANT BROWNSVILLE INDEPENDENT
SCHOOL DISTRICT:

        ELIZABETH G. NEALLY
        ROERIG, OLIVEIRA & FISHER, L.L.P.
        855 West Price Road, Suite 9
        Brownsville, Texas  78520

FOR THE DEFENDANTS NOE SAUCEDA, MARILYN DEL
BOSQUE-GILBERT and RANDALL DUNN:

        EILEEN LEEDS
        WILLETTE & GUERRA
        3505 Boca Chica Boulevard, Suite 460
        Brownsville, Texas  78520

FOR THE DEFENDANT AMERICAN FAMILY LIFE ASSURANCE
COMPANY OF COLUMBUS:

        WILLIAM B. STEELE, III
        LOCKE, LIDDELL & SAPP
        100 Congress, Suite 300
        Austin, Texas  78701

08:59  1    A.   I believe so, yes.   That would be correct.

08:59  2    Q.   So if you spoke it was after August 2001 when

08:59  3   school started?

08:59  4    A.   Yes, ma'am.

08:59  5    Q.   Okay.   And you had never spoken before that?

08:59  6    A.   Not to my recollection.

08:59  7    Q.   How about -- have you ever spoken at any other

08:59  8   public audiences or public forums for any cities or

08:59  9   other school districts?

08:59  10    A.   I made a presentation at City of Brownsville

08:59  11   once.

08:59  12    Q.   Okay.   When you said you made a presentation,

08:59  13   were you in public audience or were you actually making

09:00  14   a presentation of some kind because you were on the

09:00  15   agenda?

09:00  16    A.   I believe once I was asked to present some

09:00  17   information concerning the cafeteria plan at the City

09:00  18   of Brownsville, and the second time I was assisting the

09:00  19   -- there was a consultant who was presenting

09:00  20   information on the different plans that were available

09:00  21   or the different providers who provided plans to the

09:00  22   city for consideration, and I spoke for a few minutes

09:00  23   to clarify some points about our proposal.

09:00  24    Q.   Okay.   Was that on public audience or was that

09:00  25   on the agenda?

09:02 1    Q.  Mr. Chavez, my name is Buddy Steele.  We met

09:02 2  earlier.  I'm representing AFLAC in this lawsuit.  I

09:02 3  have some questions for you, too.  And just so it's

09:02 4  clear, I'm going to assume the same agreements are in

09:02 5  effect that you had with Elizabeth, okay?

09:02 6    A.  Okay.

09:02 7    Q.  Great.

09:02 8        MR. STEELE:  I'm going to just jump right

09:02 9  in and get you to mark three --

09:02 10       (Discussion off record).

09:04 11       (Exhibit Nos. 9 - 11 marked).

09:04 12   Q.  Mr. Chavez, let me hand you what has been

09:04 13  marked as Exhibit 9 and ask if you can confirm that

09:04 14  that is the Associate's Agreement that you entered into

09:04 15  with AFLAC back in I believe 1994, if memory serves me

09:04 16  well.  We can look at that last page.

09:04 17   A.  Yes, sir, it is.

09:04 18   Q.  And that's a true and correct copy of that

09:04 19  agreement; is that correct?

09:04 20   A.  I believe so, yes.

09:04 21   Q.  Let me show you another document that's been

09:04 22  marked as Exhibit No. 10 and ask if you can confirm

09:04 23  that that is a true and correct copy of your District

09:04 24  Sales Coordinator's Agreement with AFLAC?

09:04 25   A.  Yes, sir.

09:04 1    Q.  And, finally, let me show you Exhibit 11 and

09:04 2  ask if you can confirm that that is your Regional Sales

09:05 3  Coordinator's Agreement with AFLAC?

09:05 4    A.  Yes, sir, it is.

09:05 5    Q.  And you signed each of these agreements and

09:05 6  AFLAC also countersigned, correct?

09:05 7    A.  Yes, sir.

09:05 8    Q.  Now, I just want to ask you, at this time your

09:05 9  associate's agreement, Exhibit No. 9, is still in

09:05 10  effect, correct?  That has not been terminated, has it?

09:05 11    A.  That's correct.

09:05 12    Q.  And in that associate's agreement, I'm going to

09:05 13  point out a couple of things here to you if I could.

09:05 14  If you look at Paragraph 1-A, there it states that you

09:05 15  are an independent contractor, correct?

09:05 16    A.  Yes, it does.

09:05 17    Q.  And you consider yourself an independent

09:05 18  contractor for AFLAC; do you not?

09:05 19    A.  Yes, I do.

09:05 20    Q.  So there's no question in your mind that you're

09:05 21  an employee of AFLAC -- you are definitely an

09:05 22  independent contractor and not an AFLAC employee,

09:06 23  correct?

09:06 24    A.  I can't say with 100 percent certainty that I

09:06 25  am an independent contractor because of the things that

09:20 1      Q.  Okay.  In terms of your role as a district

09:20 2  manager and then later as a regional manager, in

09:20 3  recruiting and training new sales associates, it was up

09:20 4  to you, was it not, to decide who to recruit for AFLAC?

09:20 5      A.  As a regional manager, it was -- yes, I would

09:20 6  say that it was almost my entire job to do that.

09:20 7  Sometimes we would get what we call leads from the

09:20 8  company so in some cases it wasn't me who did the

09:21 9  recruiting, it was that they called the company for

09:21 10  information and then the company would say, hey, call

09:21 11  these people or call this person.  They're interested

09:21 12  in contracting with AFLAC.  So take care of it.

09:21 13      Q.  I see.  So they had heard the AFLAC name,

09:21 14  called the home office, the home office gave them your

09:21 15  name to contact, and then it was up to you to talk to

09:21 16  them and see if they wanted to become a sales associate

09:21 17  for AFLAC?

09:21 18      A.  That's correct.

09:21 19      Q.  And in other instances, you yourself may have

09:21 20  identified folks within the Valley area who may be

09:21 21  appropriate candidates to sell as a sales associate for

09:21 22  AFLAC, correct?

09:21 23      A.  That's correct.

09:21 24      Q.  Other than these leads -- well, even with the

09:21 25  leads, it was up to you to go to the lead and determine

09:25    1        Q.   Now, you eventually became a regional sales

09:25    2    coordinator, correct?

09:25    3        A.   Yes, sir.

09:25    4        Q.   Take a look at that next exhibit that we have

09:26    5    marked.   You became a regional sales coordinator, by

09:26    6    looking at the second page, in November of '98,

09:26    7    correct?

09:26    8        A.   Yes, sir.

09:26    9        Q.   And this was right around the time that you

09:26   10    succeeded in landing the BISD account, correct?

09:26   11        A.   That is correct.

09:26   12        Q.   Was it as a result of landing that account that

09:26   13    you became a regional sales coordinator?

09:26   14        A.   Honestly, I couldn't tell you.   It probably had

09:26   15    something to do with it, but because I wasn't the one

09:26   16    who made the offer, I couldn't tell you.

09:26   17        Q.   Fair enough.   Understood.   Again, let's take a

09:26   18    look at the top paragraph of that exhibit.   Again, it

09:26   19    refers to the associate's agreement and states that

09:26   20    those terms are incorporated by reference to the

09:26   21    regional sales coordinator's agreement, correct?

09:26   22        A.   Yes, sir.

09:26   23        Q.   And if you look at Paragraph 7 of the regional

09:26   24    sales coordinator agreement on Page 2.   It again refers

09:27   25    to the associate's agreement and states that it shall

09:27  1   continue to be in full force and effect and in terms of

09:27  2   -- governed this regional sales coordinator in all

09:27  3   respects unless they're modified by the regional sales

09:27  4   coordinator's agreement, correct?

09:27  5       A.  Yes, sir.

09:27  6       Q.  And then Paragraph 8 indicates that the

09:27  7   regional sales coordinator's agreements is the

09:27  8   substitution for and supersedes and replaces the

09:27  9   district sales coordinator's agreement, correct?

09:27  10      A.  Yes, sir.

09:27  11      Q.  So while you're a regional sales coordinator,

09:27  12  you were then being subject to and governed by the

09:27  13  terms of both the regional sales coordinator's

09:27  14  agreement and the associate's agreement, correct?

09:27  15      A.  That's correct.

09:28  16      Q.  And, Mr. Chavez, in the motion that was filed

09:28  17  by your attorney called Motion for Reconsideration of

09:28  18  Dismissal of Plaintiff Due Process Claims, he attached

09:28  19  your affidavit.  This is the only copy I have.  I'm not

09:28  20  going to make it an exhibit, but do you see that

09:28  21  affidavit that's attached to that pleading?

09:28  22          MS. NEALLY:  We can make a copy.

09:28  23          MR. STEELE:  I think I can make the record

09:28  24  clear but I'm happy to make a copy if you-all want one.

09:28  25      Q.  You made the sworn statement that you're an

10:19    1    A.    Had I told anyone else other than an attorney?

10:19    2    Q.    That you were contemplating suing someone?

10:20    3    A.    I can't recall that I did, sir.  No, I can't

10:20    4    recall that I did.

10:20    5    Q.    Wouldn't you agree that when you have been done

10:20    6    wrong, in your words, one of the first things you would

10:20    7    want to do is put it right?

10:20    8    A.    You would want -- yeah, I would agree with

10:20    9    that.

10:20    10    Q.    So would it not follow that putting it right

10:20    11    would involve suing somebody perhaps?

10:20    12        MR. AGUILAR:   Objection; argumentative.

10:20    13    A.    Not necessarily, sir.

10:20    14        MR. AGUILAR:   Not everyone thinks like a

10:20    15    lawyer.

10:20    16        THE WITNESS:   True.

10:20    17        MS. LEEDS:   Objection to the sidebar.

10:20    18    Q.    Let me ask you what you have been doing since

10:21    19    -- your regional sales coordinator's agreement was

10:21    20    terminated under the 30-day no fault clause, correct?

10:21    21        MR. AGUILAR:   Objection to the extent it

10:21    22    calls for a legal conclusion.  You can answer with your

10:21    23    understanding.

10:21    24    A.    I know that it was canceled sometime mid

10:21    25    January of 2002.

10:21  1      Q.   And you received a letter sometime in December

10:21  2   notifying you that it would be terminated after 30 days

10:21  3   and it was actually terminated sometime in mid January,

10:21  4   correct?

10:21  5      A.   I believe I received a letter sometime in

10:21  6   December, yes, I did.

10:21  7      Q.   Notifying you it would be terminated in 30

10:21  8   days, correct?

10:21  9      A.   I believe that's correct.

10:21  10      Q.   And as I recall from your testimony last time,

10:21  11   for much of 2002 you didn't do a whole lot of

10:22  12   solicitation of insurance for anybody?

10:22  13      A.   For 2002, I didn't do very much of anything,

10:22  14   no, sir.

10:22  15      Q.   Eventually, however, you did team up with Steve

10:22  16   Andrus, did you not?

10:22  17      A.   Yes, I did, sir.

10:22  18      Q.   And that's The Teachers' Insurance Agency?

10:22  19      A.   It's The Teachers' Agency.

10:22  20      Q.   I'm sorry, Teachers' Agency.  Are you a partner

10:22  21   with Steve Andrus?

10:22  22      A.   Yes, I am.

10:22  23      Q.   What percentage of the partnership do you own?

10:22  24      A.   40 percent.

10:22  25      Q.   So if -- let's say Mr. Andrus bids on an

1                    CHANGES AND SIGNATURE PAGE

2      PAGE  LINE    CHANGE                                    REASON

3      23    5       Downey "change to" Dannelly              correct spelling

4      27    22      were basically not invited to be
                     "change to" would do the inviting        clarification

5      41    24      Ramiro Luis "change to" Ramiro Ruiz      correct spelling

6      42    1       Criselda Perez "change to" Griselda Perez correct spelling

7      124   2       ever since "change to" every year        clarification

8      134   10      I have no doing "change to"
                     I have nothing to do                     clarification

9      141   8       I believe Mr. Ron Levine "change to"
                     I believe Mr. Ron Levine, my wife, my
10                   mom, Toni Davila, Ted Rodriguez          clarification

11     141   20      28th or 29th, the day before "change to"
                     29th, the day                            clarification

12     141   25      mutual coordinator "change to"           clarification
13                   regional coordinator

14     142   15      the 28th or maybe even on the 29th       clarification
                     "change to" the 29th

15     _____

16     _____

17     _____

18     _____

19     _____

20     _____

21     _____

22     _____

23     _____

24     _____

25     _____

```
 1        I, DINO X. CHAVEZ, have read the foregoing
    deposition and hereby affix my signature that same is
 2  true and correct, except as noted above.

 3

 4                    DINO X. CHAVEZ

 5

 6

 7

 8  THE STATE OF TEXAS

 9  COUNTY OF CAMERON

10       BEFORE ME, ____FRANCES PENA_____, on this day
    personally appeared DINO X. CHAVEZ, known to me or
11  proved to me to be the person whose name is subscribed
    to the foregoing instrument and acknowledged to me that
12  said witness executed the same for the purposes and
    consideration therein expressed.

13
         Given under my hand and seal of office this  16th
14  day of ____April_____, 2003.

15  _____
         Notary Public in and for the State of Texas
16

17

18

19

20

21

22

23

24

25
```

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ                    ) (
                                  ) (
VS.                               ) (    B-02-128
                                  ) (
BROWNSVILLE INDEPENDENT           ) (
SCHOOL DISTRICT, NOE              ) (
SAUCEDA, MARILYN DEL              ) (
BOSQUE-GILBERT and                ) (
RANDALL DUNN                      ) (


REPORTER'S CERTIFICATION
DEPOSITION OF DINO X. CHAVEZ
MARCH 4, 2003
Volume 2

      I, LOU ZUNIGA, Certified Court Reporter in and for
the State of Texas, do hereby certify that the above
and foregoing contains a true and correct transcription
of the oral deposition of DINO X. CHAVEZ;


      I further certify that I am neither counsel for,
related to, nor employed by any of the parties or
attorneys in the action in which this proceeding was
taken, and further that I am not financially or
otherwise interested in the outcome of the action.

Certified to by me this _2nd_ day of
_April_ , 2003.


LOU ZUNIGA, Texas CSR 2098
Expiration Date: 12-31-03
Hill & Romero
5415 North McColl, Suite 107
McAllen, Texas  78504
(956) 994-8898

# Chavez Deposition Exhibit 9

# American Family Life Assurance Company
## of Columbus (AFLAC)
### Worldwide Headquarters: Columbus, Georgia 31999

Chavez
EXHIBIT NO.
9
3-19-03
Hill & Romero

# Associate's Agreement

American Family Life Assurance Company of Columbus, a Georgia corporation (hereinafter "AFLAC"), and the undersigned person (hereinafter "Associate") agree as follows:

## PARAGRAPH ONE: Authority of Associate

(a). **Independent Contractor.** The relationship of Associate to AFLAC shall be that of an independent contractor, rather than employee and employer, and nothing contained herein shall be construed as creating any other relationship.

(b) **Unauthorized Acts.** Associate is not authorized to make any contract or incur any debt in the name of AFLAC, nor shall Associate modify or amend any application for insurance or any policy of insurance, interpret or construe policy language, extend the time for making any payment which may become due on any policy, nor waive any of AFLAC's rights or privileges under its policies or applications.

(c) **No Implied Authority.** Associate shall have no authority other than that expressly granted herein, and no forbearance or neglect on the part of AFLAC shall be construed as a waiver of any of the terms of this Agreement or imply the existence of any authority not expressly granted herein.

## PARAGRAPH TWO: Duties of Associate

(a) **Procure and Maintain Licenses.** Associate shall be responsible for procuring and maintaining any resident license, non-resident license and appointment, if applicable, that any State may require for soliciting applications for insurance policies offered for sale by AFLAC. Associate shall also be responsible for renewing and maintaining any such license(s) or appointment(s). This Agreement is contingent upon the issuance and maintenance of valid license(s) or appointment(s) to sell insurance by the Insurance Department of the State of Associate's residence, and of the State from which Associate may have a non-resident license or appointment, if any.

(b) **Solicit Applications.** Associate shall solicit applications for insurance policies offered for sale by AFLAC within the states where Associate is duly licensed to solicit such insurance applications. Associate is free to exercise Associate's own judgment as to time and place of solicitation.

(c) **Service Accounts.** Associate shall service all payroll deduction accounts ("accounts") that Associate initially sells or that are assigned to the Associate by AFLAC. Associate agrees that the first-year and renewal commissions paid to Associate in accordance with the terms herein constitute full payment for soliciting the application that resulted in the insurance policy being issued, and the performance of all other duties by Associate. AFLAC reserves the absolute right to reassign any account for servicing and to designate who may solicit applications from persons in the account in its sole discretion. Upon such reassignment, Associate shall continue to be paid renewal commissions on policies which Associate sold to persons in the account prior to reassignment, provided Associate is otherwise entitled to commissions in accordance with this Agreement. However, Associate will not be paid commissions on policies which are sold to persons in the account by another associate after the account has been reassigned by AFLAC.

(d) **Other Duties.** Associate shall use only promotional material which is furnished to Associate by AFLAC or which has been approved in writing from a Vice President of AFLAC. Associate shall pay all expenses incurred by Associate in the sale and service of insurance policies offered by AFLAC. Any administrative service fees which any group or franchise account may charge for handling premium payroll deduction shall be considered an expense of the Associate. Any such expenses which AFLAC advances on Associate's behalf shall be a debt to AFLAC and shall be reimbursed by deducting them from the commissions which become due to Associate. Associate shall carefully evaluate all applications for insurance and make full and accurate disclosure to AFLAC of all material facts and circumstances which might affect the underwriting of the risk, and shall promptly forward all applications for insurance policies to AFLAC at its Worldwide Headquarters in Columbus, Georgia. Associate shall additionally collect the initial premium that may be due on applications and promptly remit the same to AFLAC along with applications, Associate shall promptly deliver policies and claim documentation sent to the Associate.

(e) **Return Policies and Monies.** Associate shall return to AFLAC on demand all undelivered policies, premium receipts, negotiable papers, or monies due AFLAC and all documents or other property belonging to AFLAC. Associate agrees to be responsible for all monies collected by Associate under the terms of this Agreement.

## PARAGRAPH THREE: Confidential Information;
### Ownership of Accounts, Records and Confidential Information

Associate agrees that the following information, to-wit: 1) payroll deduction account information, 2) names and addresses of all AFLAC policyholders, associates and coordinators, 3) account or premium invoices, 4) payroll account servicing documents,

Form A-13510-94

R(01/94)

001146

Associate hereby agrees that all accounts and records, including but not limited to the confidential information above referred to, are and shall remain the property of AFLAC exclusively, both before and after the termination of this Agreement, and the Associate shall have n___ property rights therein. Associate further covenants to make no copies, in whatever form, of any of said records nor any part of them, and ___her agrees to return to AFLAC all such accounts, records and confidential information at the termination of this Agreement or upon demand, whichever first occurs.

## PARAGRAPH FOUR: Duties and Rights of AFLAC

(a) Duties.

(1) **Provide Sales Materials.** AFLAC shall provide Associate with standard promotional and informational material to be used in th___ sale and service of insurance policies offered by AFLAC. All such materials and information shall remain the property of AFLA___ and shall be promptly returned upon demand or upon the termination of this Agreement.

(2) **Underwrite Policies.** AFLAC shall consider each application submitted by Associate and approve or reject the same. ___ approved, a policy of insurance shall be issued to the applicant in accordance with the amount and type of insurance for whic___ application was made. All underwriting decisions are to be made solely by AFLAC and it reserves its right to prescribe rule___ regarding the requirements for eligibility of applicants for insurance.

(3) **Pay Commissions.** On policies issued upon applications submitted by Associate and as full compensation for Associate's ser___ vices, sales commission will be paid as follows:

   (i) **First-Year Commissions.** So long as Associate is authorized to represent AFLAC, a first-year sales commission may b___ advanced by AFLAC on premiums earned in accordance with the terms of the applicable Schedule of Commissions. No firs___ year sales commissions will be paid to Associate after Associate's termination, unless Associate is otherwise entitled to th___ payment of renewal commissions. AFLAC shall have the right to apply all or part of the first-year sales commissions or regis___ tration fees to Associate's indebtedness to AFLAC. AFLAC may charge a registration fee at the time of sale which will b___ credited to Associate's monthly accounting statement. AFLAC may charge policyholders a policy processing fee. Associa___ shall not be entitled to any commission based upon such a policy processing fee.

   (ii) **Renewal Commissions.** A renewal commission is defined as that commission which is paid on premiums as earned b___ AFLAC on an insurance policy previously produced by Associate, commencing with the thirteenth (13th) month's premiu___ and such renewal commission shall be based on an amount not greater than the annualized premium amount applicable ___ the time a policy is initially issued. A renewal commission as provided by the Schedule of Commissions will be paid as earne___ pursuant to the terms and subject to the conditions of Paragraphs 5, 6 and 8 of this Agreement.

(4) **Provide Monthly Statements.** AFLAC shall, provided Associate is entitled to receive commissions hereunder, furnish Associa___ with a monthly accounting statement. Upon the receipt of such statement, Associate agrees to notify AFLAC within thirty (3___ days in writing of any mistakes or discrepancies in the statement. Failure of Associate to so notify AFLAC shall constitute accep___ tance of AFLAC's statement as rendered, and Associate waives all rights to any claims against AFLAC to the contrary, and su___ claims shall be forever barred.

(b) **Rights.** With respect to the foregoing duties, AFLAC shall have the following rights:

(1) **Assignment to Coordinator:** AFLAC may assign Associate to a sales coordinator for purposes of assisting Associate in trainin___ and marketing. Associate may be reassigned to a different sales coordinator in AFLAC's discretion. It is expressly understoo___ and agreed that AFLAC can function only through its agents, and its decisions through its officers, agents and sales coordin___ tors, and other associates, shall be deemed to be made in the due course, and within the scope, of managing the business ___ AFLAC. For any mistake, neglect, abuse of discretion, or other action taken, not amounting to willful misconduct, malice, frau___ wantonness, oppression, or that entire want of care which would raise a presumption of conscious indifference to consequence___ in making and enforcing AFLAC's decisions relating to Associate and Associate's performance of the duties under th___ Agreement, liability, if any, of AFLAC and liability, if any, of its officers, agents, sales coordinators and other associates, indivic___ ally, if any, each and all, for damages shall be limited to a claim for breach of contract, and Associate's sole remedy shall be ___ breach of contract, and damages shall be assessed accordingly.

(2) **Advancement of Commissions.** AFLAC shall have the right to advance commissions to Associate. Any sums advanced ___ Associate shall create a liability to AFLAC on the part of Associate, and shall be payable on demand without notice, and shall c___ ate a liability to AFLAC and any amounts, indebtedness or liability owed to AFLAC by Associate may be charged back and off___ against all amounts credited or to be credited to Associate's account. First-year sales commissions shall be credited ___ Associate on a pro rata basis as the entire first year's premium becomes earned by AFLAC. AFLAC shall have the right to ap___ all or part of the first year's sales commission or renewal commissions to Associate's indebtedness to AFLAC.

(3) **Service Charge.** AFLAC may charge one-half of one percent interest per month on any outstanding negative balance ___ Associate's monthly statement. AFLAC may also charge a COD penalty fee for issuing policies where the initial premium is ___ paid in full as set out on the applicable Schedule of Commissions.

(4) **Notice to Insurance Commissioner or Other Regulatory Authorities of Certain Information, Absolutely Privileged.** Up___ receipt of, or discovery of, information by AFLAC which reasonably brings in question the validity of Associate's license ___ appointment, or which suggests fraudulent or criminal activity on the part of Associate, AFLAC shall have the right to g___ notice of said information to the Insurance Commissioner or other regulatory authority involved, and to give notice of same ___ Associate, and shall further have the right to terminate Associate's authority to represent AFLAC immediately, pending det___ mination of the question involved, and all said notices shall be absolutely privileged. Associate specifically and expres___

2

001147

for so doing.

(c) **Schedules of, and Provisions Govern — Commissions** (Hereafter Schedule of Commissions). All commissions shall be paid in accordance with the terms of the applicable Schedules of Commissions published by AFLAC. Associate acknowledges receipt of the current applicable Schedules of Commissions at the time of the execution of this Agreement. Said schedules are incorporated herein by reference and are a part of this Agreement. AFLAC may change the terms of said schedules, but any change in commissions shall not affect commissions due or to become due to Associate on policies issued which had an effective date prior to the date of the change. If changes in the schedules are made they are incorporated herein by reference and become a part of this Agreement. AFLAC shall furnish Associate written notice of any change in the schedules at least thirty (30) days prior to the effective date of such change.

## PARAGRAPH FIVE: Contingent Payment of Renewal Commissions
### Prior to Termination of this Agreement

Prior to termination, AFLAC's obligation to pay renewal commissions (as defined herein) shall be contingent upon Associate's faithful performance or observance of his or her obligations and covenants hereunder, and Associate shall be entitled to be paid renewal commissions prior to termination ONLY under conditions as follows:

(a) **Monthly Production.** In order to receive renewal commissions on premiums from policies produced by Associate, Associate must produce during that month $750 in annualized premium on new policies issued by AFLAC. To be produced, the policies sold by Associate must be properly and timely submitted to the AFLAC Headquarters for processing and must be accepted by the AFLAC Headquarters in accordance with Headquarters underwriting procedures.

(b) **Temporary Disability.** If Associate is temporarily disabled to the extent of not being able to meet the monthly production requirements for renewal commissions, AFLAC shall pay such renewal commissions as earned for a period of up to three (3) months during which disability continues subject to AFLAC's determination that Associate was and is disabled, provided that, and as a condition precedent thereto, Associate shall notify AFLAC in writing of Associate's disability within sixty (60) days from the date of the onset of the disability. Any claim for renewal commissions not in compliance with this paragraph shall be waived.

(c) **Permanent Disability.** After two (2) years of service with AFLAC, if Associate becomes totally disabled while still active with AFLAC, Associate shall have a vested right to receive all renewal commissions on policies Associate produced for as long as Associate remains totally disabled. Associate shall be totally disabled only if Associate meets the disability requirements of the Social Security Act; provided that, and as a condition precedent thereto, Associate shall notify AFLAC within sixty (60) days in writing after he or she becomes totally disabled. Any claim for renewal commissions not in compliance with this paragraph shall be waived. Renewal commission payments made pursuant to the provisions of subparagraph (b) or (c) are not disability benefits, and the Associate may incur taxes thereon.

(d) **Annual Production.** Upon the production by Associate of at least $10,000 of annualized premium on all new policies issued by AFLAC during a calendar year, Associate shall be entitled to receive renewal commissions on premium payments received by AFLAC for the remainder of that year and for the following calendar year on the in-force policies produced by Associate, as long as a minimum of $10,000 in annualized premium on new policy sales used to qualify for this provision remains in force during that year and the following calendar year. If the annualized premium on new policy sales used to qualify for this provision subsequently falls below $10,000, then the qualification provided herein shall be suspended.

(e) **Vesting After 10 Years.** After ten (10) years of service with AFLAC, Associate shall have a vested right to receive 100% of the renewal commissions as earned payable on policies Associate produced, irrespective of the production requirements of subparagraphs (a) and (d) above, until termination of this Agreement or unless forfeited as provided in this Agreement.

(f) **Conditions to Payment of, and Right to Receive, Renewal Commissions.** Associate shall be entitled to receive renewal commissions payable under the terms of this Agreement unless Associate who is otherwise entitled to receive renewal commissions engages in any of the conduct prohibited under Paragraph Eight, or should Associate engage in conduct in the performance of Associate's duties and covenants hereunder involving moral turpitude, dishonesty, fraud, deceit, willful misrepresentation, or willful concealment of material facts. Should Associate who is otherwise entitled to receive renewal commissions engage in any such conduct, then, and in such event, the renewal commissions which would otherwise be payable to Associate hereunder shall immediately and automatically become non-payable, and Associate forever forfeits any right to receive the payment of any renewal commissions as provided under this Agreement.

## PARAGRAPH SIX: Contingent Payment of Renewal Commissions
### At and After Termination of this Agreement

Upon the effective date of termination and after termination of this Agreement, AFLAC's obligation to pay renewal commissions (as defined herein) shall be contingent upon Associate's faithful performance or observance of his or her obligations and covenants hereunder, and Associate shall be entitled to be paid renewal commissions at and after termination ONLY under conditions as follows:

a) **Vesting After Two Years.** After two (2) years of service with AFLAC, Associate, upon termination, shall have a vested right to receive 50% of the renewal commissions as earned payable on policies Associate produced so long as a minimum of $25,000 in annualized premium on policies written by Associate remains in force, for life, unless forfeited as hereinafter provided.

b) **Vesting After Five Years.** After five (5) years of service with AFLAC, Associate, upon termination, shall have a vested right to receive 75% of the renewal commissions as earned payable on policies the Associate produced, for life, unless forfeited as hereinafter provided.

c) **Vesting After 10 Years.** After ten (10) years of service with AFLAC, Associate shall have a vested right to receive 100% of the renewal commissions as earned payable on policies the Associate produced, for life, unless forfeited as hereinafter provided.

d) **Death.** If the Associate dies while receiving renewal commissions, effective with policies issued January 1, 1994 and after, one-hundred percent (100%) of the renewal commissions to which Associate would have been entitled to receive at or after termination shall be payable as follows:

**Surviving Spouse.** To Associate's surviving spouse solely during the surviving spouse's lifetime.

**Surviving Children.** If no spouse survives and there is a surviving child or children of the deceased Associate under the age of

twenty-three (23) years, to such c ... or children under twenty-three (23) until the ... ngest child reaches the age of twenty-three (23) years. If Associate dies bec... Does Associate, but dies before a b... at Adds 09/25/children rea... the age of twenty-three (23), to such child or children under t ... ty-three (23) until the youngest child reaches ... age of twenty-three (23). Renewal commissions shall be paid only to the child's legally appointed guardian unless such child has reached the age of majority in his or her state of residence. No renewal commissions are payable to any child or children who are twenty-three (23) or older. Children under the age of twenty-three (23) shall share equally.

(3) **No Surviving Spouse or Children.** If no spouse survives and there are no surviving children of the deceased Associate under the age of twenty-three (23) years, to the Associate's estate for a period equal to the number of months of the Associate's service with AFLAC, not to exceed thirty-six (36) months.

(e) **Conditions to Payment of, and Right to Receive, Renewal Commissions.** Associate shall be entitled to receive renewal commissions payable under the terms of this Agreement unless forfeited in accordance with Paragraph 5(f) above.

## PARAGRAPH SEVEN: Limited Assignment of Benefits

Associate may not assign to a third party any right to receive renewal commissions which Associate has under this Agreement during Associate's lifetime without AFLAC's prior written consent; provided, however, Associate may assign and surrender all rights to renewal commissions, without the approval of anyone, to AFLAC for such valuable consideration as mutually agreed upon by Associate and AFLAC. Further, Associate may pledge and assign any rights Associate may have to renewal commissions to AFLAC to secure the repayment of any loan or indebtedness which Associate may owe to AFLAC. Further, Associate grants to AFLAC a security interest against, and AFLAC reserves a lien upon, all of Associate's rights to receive first-year commissions and renewal commissions to secure the payment of any indebtedness which Associate may owe AFLAC. Any assignment by Associate to a third party shall be subject to the provisions of this paragraph, and shall always be subject to AFLAC's prior right of offset and its prior security interest.

## PARAGRAPH EIGHT: Prohibited Conduct

(a) During the term of this Agreement, Associate shall not (1) engage in any conduct in the performance of Associate's duties and covenants hereunder involving moral turpitude, dishonesty, fraud, deceit, willful misrepresentation or willful concealment of a material fact; (2) wrongfully misappropriate or withhold any funds, policies, premiums, receipts, vouchers or other property belonging to AFLAC or to an applicant for insurance; (3) violate any insurance laws or regulations of any state, the violation of which involves moral turpitude; or (4) make or knowingly allow to be made any false or misleading statements on any applications or claim or other documents submitted to AFLAC.

(b) During the term of this Agreement and for a period of two (2) years after its termination, Associate covenants that, within a 100-mile radius of his or her business address, as shown at the end of this Agreement (except Subparagraph 8(b)(3) herein which is not subject to any territorial limitation), **Associate shall not, directly or indirectly:**

(1) Induce or attempt to induce other associates or sales agents or coordinators of AFLAC who reside within the 100-mile radius to terminate their agreements with AFLAC, or to become contracted or associated with another insurance or indemnity company which engages in the sale of insurance policies which directly competes with the policies then sold by AFLAC; or

(2) Induce or attempt to induce policyholders or accounts of AFLAC located within a 100-mile radius of Associate's address, which Associate solicited, sold or serviced while this Agreement was in effect, to relinquish, cancel or surrender their policies or accounts, provided this shall not prohibit a direct unsolicited contact of the Associate by the policyholder and a subsequent sale based on such unsolicited contact; or

(3) Divulge, use or make available to anyone other than those within AFLAC authorized to receive such information, payroll deduction account information, names and addresses of any AFLAC policyholders, associates and coordinators, account or premium invoices, payroll account servicing documents, claimant data, including payment sheets or letters, training and educational manuals, administrative manuals, policy expiration data and prospective policyholder leads developed by AFLAC and furnished to associates and/or coordinators (e.g., "lead cards"), in whatever form, whether computer or electronically accessible, "on-line," or not, all of which is agreed to constitute confidential information and information competitively advantageous to AFLAC.

(4) The foregoing covenants shall not apply in the event AFLAC, its successor or assigns, ceases to do business as an insurer, or ceases to do business within the applicable territory involved.

(c) Associate shall not change his business address for purposes of this Agreement without the prior consent of the company and the execution of a new Associate's Agreement specifying his new business address. In the event of such change, the territorial limitation herein specified shall continue to apply to Associate for a period of one year next subsequent to the change, at which time it shall automatically self-destruct and cease to exist. During such one-year period, the covenants herein contained relating to a territorial limitation shall apply not only to the preceding business address, but also to the new business address specified in the succeeding Associate's Agreement.

(d) **Provisions of Covenants Are Reasonable and Necessary.** Associate recognizes that AFLAC has a valid need to protect its interests by prohibiting Associate from engaging in any of the activities described in this paragraph. Associate acknowledges and agrees that the time period and the geographic area are reasonable and necessary to protect AFLAC's business, and that the prohibited activities are described with reasonable certainty, and are understood by Associate.

(e) **Forfeiture of First-Year and Renewal Commissions Upon Breach.** Should Associate engage in any of the conduct described in this paragraph, the first-year commissions and renewal commissions which would otherwise be payable to Associate or Associate's survivors shall immediately and automatically become non-payable, and Associate forever forfeits any and all rights to be paid any commissions from AFLAC.

## PARAGRAPH NINE: Termination of Agreement

(a) **Termination for Cause.** AFLAC shall have the right to terminate this Agreement immediately, and the termination shall be considered as being for cause, if Associate engages in any of the following:

(1) Wrongfully misappropriates or withholds any funds, policies, premium receipts, vouchers or other property belonging to AFLAC or to an applicant for insurance; or

(2) Violates any insurance laws or regulations of any state, the violation of which would result in the revocation of Associate's license; or

(3) Pleads guilty or nolo contendere to, or is convicted of, a crime (whether felony or misdemeanor) involving moral turpitude; or

4

001149

(6). Associate ceases to hold a valid lic    to sell insurance policies offered by AFLAC.

(b) **Termination by Notice Without Cause.** Either party may terminate this Agreement at will, without cause, upon giving thirty (30) days rior written notice to the other party.

(c) **Termination Upon Death or Permanent Disability of Associate.** This Agreement shall terminate upon the death or total disability f    iate, unless sooner terminated.

## PARAGRAPH TEN: Treatment of Associate and Associate's Responsibilities Under Federal Tax Laws

Associate shall be treated as an independent contractor and not as an employee as concerns all applicable tax laws with respect to services erformed under this Agreement, and Associate is hereby advised as an independent contractor that Associate must report all sales commis- ions to the Internal Revenue Service on the appropriate income tax form and pay any federal income taxes due with respect to these amounts. dditionally, Associate must report all sales commissions on the appropriate self-employment tax form and pay any self-employment ("S.E.C.A.") xes with respect to these amounts. To assist Associate in complying with these requirements, AFLAC will, after the close of each calendar ear, furnish Associate with a copy of the Form 1099 Income Statement that AFLAC is also required to send to the Internal Revenue Service.

## PARAGRAPH ELEVEN: Legal Proceedings, Attorneys' Fees and Litigation Expenses

(a) **Legal Proceedings.** The Associate shall not institute legal proceedings in the name of AFLAC against any party for any cause unless uch action shall have been approved in advance in writing by a Vice President of AFLAC. Should a claim be brought by a third party gainst either the Associate or AFLAC as a result of some alleged action by the Associate, the Associate shall hold AFLAC harmless from nd indemnify it for any attorneys' fees and court costs which it may incur in defending the claim and for any damages which it suffers ther through settlement of the claim or by judgment being rendered against it. In the event AFLAC shall invoke its rights under this par- raph, AFLAC shall notify Associate in writing of its intent. AFLAC shall have the right to apply all or any part of Associate's first-year and/or newal commissions toward the damages caused to it hereunder. AFLAC may, in its sole discretion, determine whether to defend or settle y such claim, and the amount of any such settlement.

(b) **Attorneys' Fees and Litigation Expenses.** Should AFLAC institute legal action against Associate to recover for indebtedness of ssociate to AFLAC, Associate covenants to pay AFLAC the reasonable attorneys' fees and litigation expenses which AFLAC may incur, in ddition to principal, interest and damages.

## PARAGRAPH TWELVE: Prior Contracts Superseded

This Agreement supersedes and replaces all previous contracts between the parties, but all rights accrued up to the date of execution of is Agreement shall not be affected or impaired, except as modified by this Agreement. For policies issued prior to January 1, 1994, newal commissions at death will be paid in accordance with the Associate's preceding Agreement.

## PARAGRAPH THIRTEEN: Modifications

Agreement may not be orally modified. No modification is binding upon AFLAC unless it is in writing and signed at its Headquarters r    resident, a Vice President, or its Secretary, for a substantial valuable consideration other than the performance of services by ssociate, except as expressly provided in this Agreement.

## PARAGRAPH FOURTEEN: Severability

If any one or more of the provisions, words or phrases contained in the paragraphs and subparagraphs of this Agreement shall, for any reason, held to be invalid, illegal or unenforceable, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement, d this Agreement shall be construed as if such invalid, illegal or unenforceable provisions, words or phrases were not contained herein.

## PARAGRAPH FIFTEEN: Arbitration

(a) Any dispute arising under this Agreement, to the maximum extent allowed by applicable law, shall be subject to arbitration, and prior commencing any court action the parties agree that they shall arbitrate all controversies.

(b) **Procedure.** The arbitration shall be pursuant to the terms of the Federal Arbitration Act. The parties shall notify each other of the istence of an arbitrable controversy by certified mail and shall attempt in good faith to resolve their differences within fifteen (15) days ter the receipt of such notice. Notice to Associate shall be sent to Associate's address as it appears in AFLAC records and notice to FLAC shall be sent to: Arbitration Officer, American Family Life Assurance Company of Columbus (AFLAC), Worldwide Headquarters, olumbus, Georgia 31999. If the dispute cannot be resolved within said fifteen-day period, either party may file a written demand for arbi- ation with the other party. The party filing such demand shall simultaneously specify his, her or its arbitrator, giving the name, address and lephone number of said arbitrator. The party receiving such notice shall notify the party demanding the arbitration of his, her or its arbitra- r, giving the name, address and telephone number of said arbitrator within five (5) days of the receipt of such demand. The arbitrator med by the respective parties need not be neutral. The Senior Judge of the Superior Court of Muscogee County, Georgia, on request by her party, shall appoint a neutral person to serve as the third arbitrator, and shall also appoint an arbitrator for any party failing or refusing name his arbitrator within the time herein specified. The arbitrators thus constituted shall promptly meet, select a chairperson, fix the time d place of the hearing, and notify the parties. The majority of the panel shall render an award within ten (10) days of the completion of the aring, and shall promptly transmit an executed copy of the award to the respective parties. Such an award shall be binding and conclu- e upon the parties hereto, in the absence of fraud or corruption. Each party shall have the right to have the award made the judgment of court of competent jurisdiction.

Associate _____     AFLAC _____

## PARAGRAPH SIXTEEN: Headings

The headings of this Agreement are for reference only, and shall not limit the language used in this contract.

001150

Case 1:01-cv-00128    Document 56    Filed in TXSD on 09/25/2003    Page 55 of 60

WITNESS the hand and seal of Associate and the execution by a duly authorized officer of AFLAC.

JESS: _Kiley S. Kjab_

BY: _[signature]_ (L.S.)

Associate's Signature

8 / 8 / 94

Date

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

**Social Security Number**

Associate's Current Writing Number
(For Administrative Purposes Only)

000775 7985

Associate's License Number

Licensed for: Life _____ A&H _____

BUSINESS ADDRESS:

345 Honey Dr

Street & No. (REQUIRED)

Brownsville Tx          78520

City                State              Zip Code

HOME ADDRESS (IF DIFFERENT)

_____

_____

P. O. Box No. (If any)

_____

City                State              Zip Code

(210) 546-9358

Associate's Telephone No.                    (HOME)

(210) 982-0832

Associate's Telephone No.                  (BUSINESS)

RECEIVED
AUG 1 9 '94
AGENT LICENSE DEPARTMENT

AMERICAN FAMILY LIFE ASSURANCE
COMPANY OF COLUMBUS (AFLAC)

BY: _[signature]_

TITLE: **ASST. VICE-PRESIDENT**

EFFECTIVE DATE: _9-6-94_

FOR OFFICE USE ONLY
WORLDWIDE HEADQUARTERS

Associate's Mailing Address PLEASE PRINT

DINO X. CHAVEZ

Name

345 Honey Dr.

Street

Brownsville, Tx. 78520

City/State/Zip

Form A-13510-94

6

001151

**Chavez Deposition Exhibit 11**

Chavez
EXHIBIT NO. 11
3-19-03
Hill & Romero

# American Family Life Assurance Company of Columbus (AFLAC)

Worldwide Headquarters: Columbus, Georgia 31999

## Regional Sales Coordinator's Agreement

**WHEREAS,** the undersigned is now an Associate with American Family Life Assurance Company of Columbus ("AFLAC") under an Associate's Agreement (the terms of which are incorporated in this Agreement by reference) and the parties hereby desire to execute this additional Agreement in order to set forth the terms and conditions of the respective covenants, duties, and obligations of the undersigned as Regional Sales Coordinator, hereafter "RC."

**NOW, THEREFORE,** AFLAC and the undersigned RC do hereby covenant and agree as follows:

### Paragraph One: APPOINTMENT

AFLAC appoints the undersigned as Regional Sales Coordinator to serve in the region or territory assigned to the RC in writing by AFLAC, and RC covenants to serve as RC in the said region or territory in accordance with the terms and conditions hereafter set forth.

### Paragraph Two: RELATIONSHIP

(a) **Independent Contractor.** The relationship of the RC to AFLAC shall be and shall continue to be that of an independent contractor rather than employer-employee, and nothing contained herein shall be construed as creating any other relationship.

(b) **Relationship of Others.** It is understood and agreed that associates assigned to the RC are independent contractors, and the district sales coordinator who may be assigned to the RC is an independent contractor, and the state sales coordinator to whom the RC is assigned may be an independent contractor in their relationships with AFLAC. The RC shall at all times respect that relationship in the performance of the RC's duties hereunder.

(c) **Expenses.** All expenses incurred by the RC shall be the sole responsibility of the RC. The RC has no authority to rent any office or telephone, open any bank account, or make any expenditures, obligation or commitment for any purpose in the name of AFLAC without specific written authorization from the president, a vice president, or secretary of AFLAC.

### Paragraph Three: DUTIES

The RC shall recruit and train associates for the sale of all AFLAC insurance policies and coordinate the activities of the associates and the district sales coordinators assigned to the RC in writing by AFLAC. For the purpose of maximizing the sales efforts of AFLAC, the RC should cooperate with the associates and district sales coordinators assigned to the RC, and the state sales coordinator to whom the RC is assigned.

### Paragraph Four: ASSIGNMENT

AFLAC may, in its sole and absolute discretion, assign and reassign associates and district sales coordinators to the RC. The RC shall be paid renewal override commissions on all AFLAC insurance policies that are sold by associates and district sales coordinators while assigned in writing to the RC. The RC understands and agrees that he or she may be assigned to a state sales coordinator for purposes of assisting the RC in training, recruiting and marketing. The RC may be reassigned to a different state sales coordinator at AFLAC's discretion.

### Paragraph Five: FIRST-YEAR AND RENEWAL OVERRIDE COMMISSIONS; RSC MPI PROGRAM

As full compensation for the performance of the RC's duties, the RC shall be paid first-year and renewal override commissions on sales of all AFLAC insurance policies made by the RC, and by district sales coordinators, and associates while assigned in writing to the RC.

(a) **First-Year Override Commissions.** First-year override commissions shall be advanced on sales credited to the RC. Said compensation shall be paid in accordance with each policy's Schedule of Commissions (at the RSC MPI Participant Rate) in effect at the time of the sale.

(b) **Renewal Override Commissions.** Renewal override commissions shall be credited to the RC in accordance with each policy's Schedule of Commissions (at the RSC MPI Participant Rate) in effect at the time of the sale.

(c) **Schedules of Commissions.** The official Schedule of Commissions for the applicable AFLAC insurance policies are incorporated herein by reference. The commission for situations that are non-standard or not contemplated by the

M-0806

M0806.1

RECEIVED
SEP 16 ... PM ...
001154

Schedule of Commission shall be governed by AFLAC's then-current rules, rates and practices. Any special or unique commission arrangement or commission splits requiring new or special situation codes shall be controlled by and paid in accordance with AFLAC's then-current rules, rates and practices. RC acknowledges and agrees that AFLAC, upon thirty (30) days written notice to RC, may change the Schedules of Commissions and conditions with respect to (a) any policies issued and in force on or after the date of the change, and (b) any policies issued before the date of the change but in force after such date if there has been a change in federal, state or other laws mandating an increase in loss ratios. When changes in the schedules are made, they are incorporated herein by reference and become a part of this Agreement.

(d) **MPI Bonus; Qualification.** RC may also qualify for and be paid an annual production bonus under and in accordance with the terms and conditions of the RSC MPI Program in effect at the time of the sale and his or her Regional Sales Coordinator's Agreement. The official RSC MPI Program for the applicable policies is incorporated herein by reference. Upon thirty (30) days written notice, AFLAC may change the terms and conditions of the RSC MPI Program with respect to any policies issued and in force on or after the date of the change.

## Paragraph Six: VESTING CONDITIONS

(a) **Prior to Termination.** During the term of this Agreement, first-year and renewal commissions shall be paid pursuant to Paragraph Five herein. No production or premium minimum is required as a condition for payment.

(b) **After Termination.** After termination of this Agreement, vesting of renewal commissions shall be paid in accordance with the conditions set forth in said Associate's Agreement.

## Paragraph Seven: AGREEMENT TO REAFFIRM

All of the provisions of the RC's Associate's Agreement with AFLAC shall continue to be of full force and effect, and shall govern this contract in all respects except as expressly modified herein. The RC hereby ratifies and reaffirms all the provisions of said Associate's Agreement with AFLAC as fully and effectually as though the provisions thereof were set forth herein verbatim.

## Paragraph Eight: SUBSTITUTION OF DISTRICT SALES COORDINATOR'S AGREEMENT

his RC's Agreement completely supersedes and replaces any existing District Sales Coordinator's Agreement between the parties. During the term of this RC's Agreement, no District Sales Coordinator's Agreement between the parties shall be valid unless specifically authorized in writing by the president, a vice president, or the secretary of AFLAC.

## Paragraph Nine: TERMINATION OF APPOINTMENT AS REGIONAL SALES COORDINATOR

This Agreement may be terminated without having any effect on said Associate's Agreement. Any such termination shall be subject to the termination conditions set forth in said Associate's Agreement. This expressed provision shall not affect the general governing provisions set forth in Paragraph Seven, above.

IN WITNESS WHEREOF, the parties have hereto affixed their respective signatures.

WITNESS: _____    BY: _____
                                                RC Signature

                                          _____
                                                Date

```
AMERICAN FAMILY LIFE ASSURANCE
  COMPANY OF COLUMBUS (AFLAC)

                          APPROVED
BY: _____

TITLE:  2nd VICE-PRESIDENT

DATE:  1/19/98

        For Office Use Only
      Worldwide Headquarters
```

M-0806

M0806.1

001155

# Chavez Deposition Exhibit 39

American Family Life Assurance Company of Columbus (AFLAC)
Worldwide Headquarters: 1932 Wynnton Road • Columbus, Georgia 31999-0001
1-800-99-AFLAC (1-800-992-3522) • www.aflac.com
1-800-742-3522 en español

Ilulilullultululltlulululululliltllulululltlullll

Dino X Chavez                                                    12/28/01
905 Los Ebanos Blvd. #a
Brownsville TX 78520-8720                                        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
                                                                R0981

Re:  Change in Status Effective Date:  01/27/02
     From:  REGIONAL SALES COORDINATOR'S AGREEMENT
     To:    ASSOCIATE'S AGREEMENT

Dear Coordinator:

This letter is an official 30-day notice of the above listed change in status.  We will be unable to pay you any override commission for associates reporting to you who produce business after the effective date of this change.

If you have any questions, please contact your state sales coordinator.

Sincerely,

*F. Karl Douglass*

F. Karl Douglass
Second Vice President
Associate's Licensing Department

FKD/L19

W3809 Frank D Lafemina

AL028



EXHIBIT NO. 39
379-03
Hill & Romero

001249