IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

SEP 2 5 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| DINO X. CHAVEZ | § | |
|     Plaintiff | § | |
| | § | |
| VS. | § | |
| | § | |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT AND | § | |
| NOE SAUCEDA | § | |
|     Defendants | § | |
| --------------------------------------------- | § | CIVIL ACTION NO.  B-02-128 |
| | § | JURY REQUESTED |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, | § | |
|     Third-Party Plaintiff | § | |
| | § | |
| VS. | § | |
| | § | |
| AMERICAN FAMILY LIFE ASSURANCE | § | |
| COMPANY OF COLUMBUS (AFLAC) | § | |
|     Third-Party Defendant | § | |

## DEFENDANT NOE SAUCEDA'S MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, NOE SAUCEDA, named Defendant in the above-styled and numbered cause and files this his Motion for Summary Judgment and in support thereof, would respectfully show unto the court as follows:

**I.**

## SUMMARY JUDGMENT EVIDENCE

Exhibit "A-1"       Original Request for Qualifications

02-156 CHAVEZ:  MSJ
PAGE 1

| | |
|---|---|
| Exhibit "A-2" | Amended Request for Qualifications |
| Exhibit "A-3" | Final Amended Request for Qualifications |
| Exhibit "B" | Chavez letter dated September 6, 2001 |
| Exhibit "C" | Chavez letter dated September 10, 2001 |
| Exhibit "D" | Chavez letter dated November 9, 2001 |
| Exhibit "E" | Chavez letter dated November 12, 2001 |
| Exhibit "F" | Chavez letter dated November 19, 2001 |
| Exhibit "G" | Chavez letter dated November 27, 2001 |
| Exhibit "H" | Transcript of public audience of BISD Board of Trustee meeting of November 13 and November 20, 2001 |
| Exhibit "I" | Sauceda letter dated November 29, 2001 |
| Exhibit "J" | Chavez responses to Requests for Admissions |
| Exhibit "K" | Deposition of Dino Chavez, Vol. II |
| Exhibit "L" | Comparison Chart for Cafeteria Plan |
| Exhibit "M" | Excerpts of Deposition of Noe Sauceda |

## II.

## STATEMENT OF THE CASE

Plaintiff Dino Chavez sued Dr. Noe Sauceda under 42 U.S.C. §1983 alleging a violation of his First and Fourteenth Amendment rights. This Court has dismissed the claims under the Fourteenth Amendment, but carried the claim under the First Amendment and the tort claims. Defendant Sauceda is entitled to immunity for the constitutional claims and the state tort claims. Moreover, the facts of this case do not support a claim for a violation of Plaintiff's First Amendment rights.

## III.

## FACTUAL BACKGROUND

Plaintiff was an independent agent selling various insurance products when he proposed AFLAC as the third party administrator (TPA) for the §125 Cafeteria Plan provider in 1998 for the Brownsville Independent School District (hereinafter "BISD"). In the summer of 2001, Dr. Sauceda was advised that the District had to go out for bids for the TPA once again. A Request for Qualifications (RFQ) was created and sent out. Originally the District sought to have one TPA for both the §125 Cafeteria plan and the §403(b) tax sheltered annuities. Eventually the RFQ was changed to request providers for both or either of these products. (Exhibits "A1-3")

During the period of time between the RFQ and the decision on the selection of the TPA, Mr. Chavez wrote board members and Campus Insurance Committee members numerous letters and memos which contained alarmist language insinuating that the administration was not acting in the best interest of the employees. (Exhibit "B"- "G".) Mr. Chavez also spoke at the public audience section of two Board of Trustees meetings. (Exhibit "H".) In November, Dr. Sauceda was made aware of the negative campaign Mr. Chavez had been waging and was presented a letter in which Mr. Chavez was implying that Board members and the administration were breaking the law. (Exhibit "F".) This letter prompted Dr. Sauceda to write to AFLAC terminating the relationship with them as TPA and withdrawing their proposal from consideration for the RFQ, unless Mr. Chavez was removed from the account and from BISD. (Exhibit "I".) AFLAC did as requested and eventually was awarded the TPA for the 2002 fiscal year.

There is no monetary value in being the TPA for AFLAC. (Exhibit "J".) They would receive no money for administering any claims. The value of being TPA is that during the enrollment

period, during which all 6,000+ BISD employees were to speak with an enroller, the persons conducting the enrollment had the opportunity to peddle their wares. In other words, they had a captive audience for the period of enrollment to which they tried to sell AFLAC supplemental insurance products. BISD incurred no costs during this period. The District purchased no products, individual employees purchased voluntary products.

At no time did Mr. Chavez attempt to talk to Dr. Sauceda or any other person in the central administration about his past performance and to try to resolve any misunderstandings or misinterpretations. (Exhibit "K" p. 132, 142-3, 146-7.)

## IV.

## **LEGAL STANDARD**

Federal Rule of Civil Procedure 56(c) provides that a summary judgment shall be rendered if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). By its very terms, the rule permits summary judgment even if the parties disagree as to some facts. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986). Summary judgment is precluded under Rule 56(c) only when the facts in dispute might affect the outcome of the suit under governing law and the dispute is genuine. *Id.* at 248. Should it appear that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law, the district court should grant summary judgment. *Speaks v. Trikora Lloyd P.T.*, 838 F.2d 1436, 1438-39 (5th Cir. 1988).

The movant need not disprove the non-moving party's claims in order to secure a summary judgment. Summary judgment is proper whenever the movant demonstrates "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *accord*

*Slaughter v. Allstate Ins. Co.*, 803 F.2d 857, 860 (5th Cir. 1986). Thus, the defendant is entitled to summary judgment when the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to the plaintiff's case, and on which [the plaintiff], will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (the burden is not on the moving party to produce evidence showing the absence of genuine issue of material fact). *See also Reese v. Anderson*, 926 F.2d 494, 498 (5th Cir. 1991); *International Ass'n of Machinists and Aerospace Workers No. 2504 v. International Mfg. Co.*, 812 F.2d 219, 222 (5th Cir. 1987) ("[M]ere conclusory allegations are not competent summary judgment evidence, and they are therefore insufficient to defeat or support a motion for summary judgment"); *Anderson*, 477 U.S. at 249-50 (holding that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party . . . If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.").

## V.

## <u>QUALIFIED IMMUNITY</u>

Dr. Sauceda is entitled to qualified immunity. "Government officials performing discretionary functions have qualified immunity from liability for actions that do not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, &3 L.Ed.2d 396, 410 (1982). An officer is entitled to qualified immunity when he has acted in good faith, believing that his actions were within his lawful authority, when his belief was objectively reasonable, based on circumstances at the time he acted. *See Douthit v. Jones*, 619 F.2d 527, 534 (5th Cir. 1980); *Barker v. Norman*, 651

F.2d 1107, 1121 (5th Cir. 1981).

There should be no question that the decision to terminate the relationship between BISD and AFLAC and request that Mr. Chavez be removed from servicing the account because of his unprofessional behavior was a discretionary act, as it was a decision made by Dr. Sauceda in his role as superintendent in response to a problem brought to his attention. His decision was prompted by Mr. Chavez unfounded accusations of Board members and the administration, and his belief that Mr. Chavez' behavior was unprofessional. (Exhibit "I".)

When a defendant pleads qualified immunity to a §1983 claim, the burden of proof shifts to the plaintiff to show that (1) the conduct violated a constitutionally protected right; (2) that the right was clearly established; and (3) that the conduct was objectively unreasonable in light of the clearly established right. *Rheaume v. Texas Dept. of Public Safety*, 666 F.2d 925 (5th Cir. 1982); *Barker* 651 F.2d at 1121; *Christian v. City of Dallas*, 64 F.Supp.2d 617, 626 (1999). The Plaintiff must also show that a) that the speech or conduct was constitutionally protected, and b) that it was a motivating factor in the adverse action taken against him. *Alcorn v. Vaksman,* 877 S.W.2d 390 (Tex.App.-Hous. [1st Dist.] 1994) citing *Mt. Healthy City Sch. Dist. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

Furthermore, the Plaintiffs burden is to show that the Defendants' conduct rose to the level of deliberate indifference as to the rights of Plaintiffs. *Doe v. Dallas Independent School District,* 220 F.3d 380, 382 (5th Cir. 2000); *Alton v. Texas A&M University,* 168 F.3d 196, 200 (5th Cir. 1999); *Doe v. Taylor Independent School District,* 15 F.3d 443, 452 (5th Cir. 1994); *Hinshaw v. Doffer,* 785 F2d 1260, 1262 (5th Cir. 1986). "The standard of deliberate indifference is high. *See Doe v. Dallas Indep. Sch. Dist.,* 153 F.3d 211, 218 (5th Cir.1998). Actions and decisions by officials

that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity. *Alton,* 168 F.3d at 200.

Also, Plaintiffs must disprove the official's immunity by showing the official lacked good faith. *Barker,* 651 F.2d at 1121. Good faith consists of both subjective and objective components. *Id.; Bogard v. Cook,* 586 F.2d 399 (5th Cir. 1978), cert. denied, 444 U.S. 883, 100 S.Ct. 173, 62 L.Ed.2d 113 (1979). The subjective element of good faith "requires that a plaintiff show that the official's action, although labeled as "reckless" or "grossly negligent," falls on the actual intent side of those terms, rather than on the side of simple negligence." *Bogard,* 586 F.2d at 412; *Garris v. Rowland,* 678 F.2d 1264, (5th Cir. 1982). In other words, Plaintiffs must have evidence that Dr. Sauceda made this decision in order to intentionally cause Plaintiff harm.

Not only is Plaintiff's speech not protected under the facts of this case, there is no evidence that Dr. Sauceda acted intentionally, with gross negligence or deliberate indifference as to the rights of Plaintiff when he decided to terminate the relationship with AFLAC and remove Mr. Chavez from the BISD campuses. Thus, he is entitled to qualified immunity.

## VI.

## PROFESSIONAL IMMUNITY

In addition to qualified immunity, Dr. Sauceda is entitled to immunity under the Texas Education Code. To the extent that Dr. Sauceda has been sued in his official capacity, the tort claims asserted against him are barred by §101.056 of the Texas Civil Practices and Remedies Code. The state tort claims are all intentional torts and as such cannot be maintained against Dr. Sauceda in his official capacity. To the extent Dr. Sauceda has been sued in his individual capacity, he is still entitled to complete immunity. As a professional employee of a school district, he is entitled to the

immunity provided by §22.051 Tex. Ed. Code.

> (a) A professional employee of a school district *is not personally liable for any act that is incident to or within the scope of the duties of the employee's position of employment and that involves the exercise of judgment or discretion on the part of the employee,* except in circumstances in which a professional employee uses excessive force in the discipline of students or negligence resulting in bodily injury to students."

§22.051 Texas Education Code (emphasis added.)

The actions of which Plaintiff complains, although their veracity is vehemently disputed, were within the scope of Dr. Sauceda's duties. By its very nature of being a decision, it was within his discretion regardless of Plaintiff's attempts to assert that somehow the decision was ministerial.

The immunity provided by the TEC is very broad. It applies to intentional torts and negligence claims, as the statute does not limit the extent of the immunity. *Test Masters Educational Services, Inc. v. Houston Independent School Dist.,* 2003 WL 21911120, (Tex.App.-Houston [14 Dist.] 2003) (breach of contract, negligent misrepresentation and conversion.); *Kobza v. Kutac,* 109 S.W.3d 89 (Tex.App.-Austin 2003) (negligent and intentional infliction of emotional distress, defamation, negligence.); *Davis v. Education Service Center,* 62 S.W.3d 890 (Tex.App.-Texarkana 2001) (intentional infliction of emotional distress); *Deaver v. Bridges,* 47 S.W.3d 549 (Tex.App.-San Antonio 2000) (defamation); *Chesshir v. Sharp,* 19 S.W.3d 502 (Tex.App.-Amarillo 2000) (negligence); *Enriquez v. Khouri,* 13 S.W.3d 458 (Tex.App.-El Paso 2000) (defamation); *Williams v. Chatman,* 17 S.W.3d 694 (Tex.App.-Amarillo 1999) (negligence).

Dr. Sauceda is entitled to summary judgment if he proves as a matter of law that: (1) he was a professional employee; (2) his actions were incident to or within the scope of his duties; (3) his duties involved the exercise of judgment or discretion; and (4) he did not use excessive force or negligence in disciplining a student. §22.051 Texas Education Code. In the instant case, there is no

dispute that Dr. Sauceda was a professional employee and his actions were within the scope of his duties. In his letter, Dr. Sauceda even refers to the authority given him by virtue of his position to make a decision such as the one he did when he regards an individual who is not acting in the best interests of the District. There is also no dispute that the facts of this case do not involve student discipline.

Because of the broad nature of the immunity provided by §22.051, Dr. Sauceda is entitled to dismissal of all of the tort claims asserted against him. These include slander, tortious interference and intentional infliction of emotional distress, and any other tort claim less artfully articulated in Plaintiff's complaint.

## VII.

## CONSTITUTIONAL VIOLATIONS

**Freedom of speech.** The only live constitutional claim left is for a violation of the First Amendment. Plaintiff claims Sauceda violated his rights to free speech. According to his pleading, Plaintiff addressed the BISD Board and the Insurance Committee. In order to determine whether his rights have been violated the Court must analyze the "balance between the interests of the [Plaintiff], as a citizen, in commenting upon matters of public concern and the interest of the [Sauceda], as an [Superintendent], in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811. In this case, though, Plaintiff is not an employee. He is an independent insurance salesman, but since his relationship with the BISD was, according to him, one of years, the analysis the Supreme Court used in *Board of County Commissioners, Wabaunsee County, Kansas v. Umbehr,* 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843, is appropriate, even though it did not include first

time bidders. The Court reasoned that the *Pickering* balancing test can be adjusted to take into consideration the different roles each is playing.

In any event, the first consideration in a First Amendment freedom of speech analysis is for the Court to determine whether the speech is constitutionally protected. In order to maintain a claim under the First Amendment, Plaintiff must show that his speech was on a matter of public concern. This inquiry is one of law, not fact. *Id.* at 148. To do this, the Court must consider the content, form and context of the speech. *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct.1684, 1690, 75 L.Ed.2d 708. Even if the speech may touch on a matter of public concern, as in *Umbehr*, the Court must take all aspects into consideration.

In this case, Plaintiff's speech entailed speaking as a member of the public audience at a school board meeting and writing a letters to the Campus Insurance Committee member and the Board members. There is no evidence Dr. Sauceda saw any of the letters except that dated November 27, 2001. (Exhibit "G".)

The transcripts of Plaintiff's comments during the Board meetings do not entail any subject which could be construed as a matter of public concern. (Exhibit "H") The comments made on November 13, 2001 are merely self-serving promotion. The comments made on November 20, 2001 mention that to select another bidder would be illegal because of what that bidder is requesting in its proposal. He makes mention of an Attorney General opinion, but he does not accuse the District or the Board or Administration of committing an illegal act, to the contrary. His statements are once again directed at self-promotion and how selecting him and his company would be most beneficial to BISD.

Plaintiff's letter dated November 27, 2001, (Exhibit "G") when analyzed as to form and

content does not reveal a matter of public concern, but rather a private concern regarding his selection as the next TPA. Plaintiff's comments are directed towards keeping his employment, and being selected as the TPA for the §125 Cafeteria Plan. His own pleading sets forth the purpose in speaking at all, to convince the Insurance Committee and the Board to chose AFLAC as the insurance provider over his competitor. Plaintiff was clearly not speaking out as a citizen, but as a salesman trying to pitch himself and his product.

Plaintiff must first show that his speech entailed a matter of public concern. It is clear when taken in context and as a whole, all of Plaintiff's speech had one goal, that of winning the bid to become TPA for the §125 Cafeteria Plan. As in *Connick*, even if there may be some mention of topics that under other circumstances could form the basis of a matter of public concern, the Court must analyze the speech as a whole. Doing that in this case, there is no question that Plaintiff's speech does not meet the first prong of a First Amendment claim.

Moreover, Plaintiff himself has admitted that other than Dr. Sauceda's letter of November 27th, his entire claim against Dr. Sauceda is based on his erroneous belief that a document that he obtained which contained errors as to his proposal, and which contained language regarding a competitor's desire to become an "agent of record" was produced by BISD. (Exhibit "L".) There is no evidence that anyone at BISD created the document at issue. (Exhibit "M", p. 29-30.) If BISD did not prepare the document, Plaintiff's entire basis of liability as to Dr. Sauceda is misplaced. No person at BISD prepared that document, thus no one at BISD committed the errors claimed by Plaintiff. Likewise, no one at BISD intended to hire anyone as an agent of record. Plaintiff has no evidence to the contrary. Therefore, all claims against Dr. Sauceda should be dismissed.

WHEREFORE, PREMISES CONSIDERED, Defendant NOE SAUCEDA prays that this

Court grant this motion and dismiss all Plaintiff's claims as against his person with prejudice and

for all other relief to which he may be entitled.

Respectfully submitted,

Willette & Guerra, L.L.P.
International Plaza, Ste. 460
3505 Boca Chica Blvd.
Brownsville, Texas 78521
Telephone: (956) 541-1846
Facsimile: (956) 541-1893

By: _____ *Eileen Leeds* _____
      Eileen M. Leeds
      State Bar No. 00791093
      USDC Adm. No. 16799

**ATTORNEYS FOR DEFENDANT
NOE SAUCEDA**

## CERTIFICATE OF SERVICE

I hereby certify that on this the 25th day of September, 2003, a true and correct copy of the above and foregoing instrument has been forwarded to all counsel of record as noted hereunder.

**VIA CM/RRR # 7002 2030 0007 0887 7845**
Mr. J. Arnold Aguilar
Law Offices of J. Arnold Aguilar
Artemis Square, Ste. H-2
1200 Central Blvd.
Brownsville, Texas 78520

**VIA REGULAR MAIL**
Ms. Elizabeth G. Neally
Roerig, Oliveira, & Fisher, L.L.P.
855 W. Price Road, Ste. 9
Brownsville, Texas 78520

**VIA REGULAR MAIL**
Mr. William B. Steele, III
Locke, Liddell & Sapp, L.L.P.
100 Congress Ave., Suite 300
Austin, Texas 78701

_____
Eileen M. Leeds

# Exhibit

# "A-1"

BROWNSVILLE INDEPENDENT SCHOOL DISTRICT
PURCHASING DEPARTMENT

012-02
REQUEST FOR QUALIFICATIONS (RFQ'S) FOR TPA TO ADMINISTER BISD'S
CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES

Sealed RFQ'S will be received by the Brownsville Independent School District at the office of **MR. KENNETH LIECK, ADMINISTRATOR OF PURCHASING, 1900 PRICE RD., BROWNSVILLE, TEXAS 78521-2417 (956) 548-8361 for REQUEST FOR QUALIFICATION (RFQ'S) FOR TPA TO ADMINISTER BISD'S CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES**. The RFQ'S will be received until **Thursday, Sep 6, 2001, 1:30 pm**, Central Daylight Time (CDT). Interested proposers may obtain specifications and information for proposing at the **B.I.S.D. Purchasing Department.**

1. **RFQ OPENING**: Proposers are invited to attend the RFQ opening at the office of the Director of Purchasing on **Thursday, Sep 6, 2001, at 1:45 pm,** Central Daylight Time (CDT) at which time the RFQ'S will be opened. Proposers presence is not mandatory.

2. **RFQ SUBMISSION**: RFQ'S should be submitted on this form and continued on any attached list(s) of RFQ items and submitted in Brownsville I.S.D. RFQ envelopes. Each RFQ shall be placed in a separate envelope, sealed and properly identified with the RFQ title, RFQ number and date to be opened. The District will not be held responsible for missing, lost or late mail. Brownsville Independent School District will not accept any facsimile on sealed RFQ'S.

3. **TENTATIVE AWARD DATE:** Sep 18, 2001.

4. **REPRESENTATIVE:** The successful vendor agrees to send a personal representative with binding authority for the company to the district upon request to make adjustments and/or assist with coordination of all transactions as needed.

5. **SIGNING OF RFQ:** Failure to manually sign RFQ will disqualify it. Person signing RFQ should show title or authority to bind their firm to a contract.

6. **EEOC GUIDELINES:** During the performance of this contract, the contractor agrees not to discriminate against any employee or applicant for employment because of race, color, national origin, age, religion, gender, marital or veteran status, or handicapping condition.

7. The Brownsville Independent School District has the right to reject or rebid if only one bid/RFQ is received by "submission date" or extend the submission date by two (2) weeks.

PAGE 1 OF 7

001003

The Brownsville Independent School District reserves the right to reject any/or all RFQ'S and to make awards as they may appear to be advantageous to the School District, to hold RFQ for 60 days from submission date with out action, and to waive all formalities in proposing. The proposer must indicate "all or none" in the RFQ if the above-stated condition is not acceptable.

Vendor must provide Federal Identification Number and/or Social Security Number in order to be considered as a qualified vendor.

The RFQ for the **TPA TO ADMINISTER BISD'S CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES** shall be delivered to the Brownsville Independent School District, Brownsville, Texas 78520. A contract for the **TPA TO ADMINISTER BISD'S CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES** will be placed into effect after final approval by the Board of Trustees.

**Mr. Kenneth Lieck**
**Administrator of Purchasing**
**Brownsville Independent School District**                          **RFQINV**

001004

BROWNSVILLE INDEPENDENT SCHOOL DISTRICT

REQUEST FOR QUALIFICATIONS
THIRD PARTY ADMINISTRATOR

## I. SCOPE AND INTENT

The Brownsville Independent School District, here after referred to as BISD, desires to solicit qualified agents/agency to prepare and solicit request for qualifications for Third Party Administrators to administer BISD's Cafeteria Plan (IRC Section 125) and administer the tax deferred annuity, custodial plan under Section 403b and 403(b)(7) deferred compensation plans and custodial plans.

The purpose of this Request for Qualifications (RFQ) is to evaluate respondents experience relative to the stated plans. Strict adherence to the points outlined in the RFQ is necessary.

It is the intent of BISD to transfer the responsibility to the Agent/Agency to solicit the individual products available under Section 125 and present such products to the BISD employee insurance committee for selection of carriers.

## II. FACTS AND STATISTICS

At present, BISD operates      elementary schools, seven middle schools and five high schools. This District employs approximately 6200 employees.

## III. TERMS OF SERVICE

The cafeteria plan commences on January 1, it is expected to have the agent/agency thirty days before that. The agreement may be either terminated by either party thereto at the end of the initial three year provided by written notice to this effect sent to the other party at least sixty (60) days prior to the end of the initial one year period. Automatic periods of renewal and extension shall continue until either party thereto gives the other written notice of termination of the agreement and in such event the agreement shall terminate ninety (90) days after such notice has been sent to the other party.

01005

## IV. SCOPE OF SERVICES REQUIRED

A.  Cafeteria Plan
   1.  Work directly with District staff and Insurance Committee to design and/or maintain a Cafeteria Plan
   2.  Make arrangements to meet all legal requirements of IRC Section 125.
   3.  Educate BISD employees on concept of Cafeteria Plan.
   4.  Be responsible for enrollment of employees on all campuses.
   5.  Provide up-to-date information to employees
   6.  Assist in processing of all claims.
   7.  Investigate delays on properly submitted claims.
   8.  Enroll and in-service
   9.  Assist Administration with resolution of employee problems as they arise.
   10. Provide BISD with a staff that is easily accessible.
   11. Cooperate and consult with the BISD's Insurance Committee on plan operation.
   12. Assist Administration in determining that District policy is adhered to in product distribution.
   13. Assume responsibility for all needed forms and documents.
   14. Assist in the development of a program which will best serve the employees needs.

B.  Evaluation and Selection

   1.  Each proposal will be reviewed and evaluated on the basis of the following criteria:
       a.  Assessment of the firm's experience and expertise as T.P.A. of Cafeteria Plans, Section 403(b) and 403(b)(7).
       b.  Availability of the firm's key personnel to meet with BISD personnel and to respond promptly to requests for information and/or analysis, often on short notice.
       c.  Ability of the individuals to communicate information clearly and concisely, both orally and in writing.

001006

BROWNSVILLE INDEPENDENT SCHOOL DISTRICT

TERMS AND CONDITIONS

1. The school district reserves the right to accept or reject any and or all offers or any part thereof, and to waive any or all formalities. The competency and responsibility of all offers shall be taken into consideration in the awarding of the contract for this proposal. If the offerors are unknown to the school district, or their competency questioned, it shall be understood that they will, upon request, file with the school district reliable data and reference for investigation as it deems necessary to determine the ability of the efferor to provide the contents of this proposal. Acceptance is to be confirmed by purchase order issued by BISD.

2. The school district reserves the right to revise and amend the specifications prior to the date set for the opening. Such revisions or amendments, if any, will be announced by agenda or amendments to these specifications. Copies of these agenda so issued will be furnished to all prospective offerors.

3. Offer sheets, specifications and necessary information are attached or may be obtained as stated on the RFP advertisement sheet.

4. All contract obligations shall prevail for at least 90 days after the effective date of the contract. After such period, for the protection of both parties, this contract may be cancelled in whole or impart by either party, giving 60 days prior notice, in writing to the other party. Such notice by the contractor shall in no way be construed as taking away the right of the District to cancel for unsatisfactory performance or other due cause.

5. Any deviation from the specifications set forth herein must be clearly pointed out; other, otherwise it will be considered that services offered are in strict compliance with these specifications and the successful offeror will be held responsible thereof. Deviations shall be explained in detail.

6. Offerors are to furnish all information requested and in the spaces provided on the Request for Proposal Form. Further, as may be specified elsewhere, each offeror must submit descriptive literature and complete specifications covering the services requested. Reference to literature submitted previously does not satisfy this provision. Offers not in compliance with these requirements will be subject to rejection.

7. Neither the contract nor payments may be assigned except by the written approval of the BISD Board of Trustees.

8. The contractor agrees to protect the District from claims involving infringement of patents or copyrights.

9. The Third Party Administrator must be in compliance with all local, state and federal laws that govern third party administrators with regard to Sections 125.403(b) and 403(b)(7) or any of the pertinent laws. Also must comply with any changes to these sections while this contract is enforce.

Page 5 of 7

001007

**BROWNSVILLE INDEPENDENT SCHOOL DISTRICT**
**PURCHASING DEPARTMENT**

1900 E. PRICE RD. BROWNSVILLE TX. 78521
TELEPHONE NUMBER (956) 548-8361
TELEFAX NUMBER (956) 548-8367

RFQ NUMBER 012-02

REQUEST FOR QUALIFICATIONS (RFQ'S) FOR TPA TO ADMINSTER BISD'S
CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES

CHECK LIST

## PLEASE MAKE SURE THAT YOU HAVE DONE THE FOLLOWING:

1. YOU MUST SIGN THE LAST PAGE                    ___YES ___NO


2. YOU MUST INCLUDE INSURANCE WITH THE
   RFQ (IF REQUIRED)!                              ___YES ___NO

3. YOU MUST INCLUDE ANY SAMPLES THAT ARE REQUIRED?      ___YES ___NO

4. YOU MUST INCLUDE ANY STATE CERTIFICATE OR LICENSE
   WITH THE RFQ (IF REQUIRED)?                     ___YES ___NO

5. YOU MUST VERIFY UNIT PRICE TO TOTAL PRICE?      ___YES ___NO

6. IF YOUR COMPANY IS NOT BIDDING ON THIS BID/RFQ, PLEASE STATE
   THE REASON.

_____

_____

_____


Please return this page with your rfq


PAGE _6_ OF _7_                    01008

# BROWNSVILLE INDEPENDENT SCHOOL DISTRICT
## PURCHASING DEPARTMENT

**1900 E. PRICE RD. BROWNSVILLE TX. 78521**
**TELEPHONE NUMBER (956) 548-8361**
**TELEFAX NUMBER (956) 548-8367**

### RFQ NUMBER 012-02

### REQUEST FOR QUALIFICATIONS (RFQ'S) FOR TPA TO ADMINSTER BISD'S CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES

The undersigned proposer, by signing and executing this RFQ, certifies and represents to the Brownsville Independent School District that proposer has not offered, conferred or agreed to confer any pecuniary benefit, as defined by |1.07(a)(6) of the Texas Penal Code, or any other thing of value, as consideration for the receipt of information or any special treatment or advantage relating to this RFQ; the proposer also certifies and represents that the proposer has not offered, conferred or agreed to confer any pecuniary benefit or other thing of value as consideration for the recipient's decision, opinion, recommendation, vote or other exercise of discretion concerning this RFQ; the proposer certifies and represents that proposer has neither coerced nor attempted to influence the exercise of discretion by any offer, trustee, agent or employee of the Brownsville Independent School District concerning this RFQ on the basis of any consideration not authorized by law; the proposer also certifies and represents that proposer has not received any information not available to other bidders so as to give the undersigned a preferential advantage with respect to this RFQ; the proposer further certifies and represents that proposer has not violated any state, federal, or local law, regulation or ordinance relating to bribery, improper influence, collusion or the like and that proposer will not in the future offer, confer, or agree to confer any pecuniary benefit or other thing of value of any officer, trustee, agent or employee of the Brownsville Independent School District in return for the person having exercised their person's official discretion, power or duty with respect to this RFQ; the proposer certifies and represents that it has not now and will not in the future offer, confer, or agree to confer a pecuniary benefit or other thing of value to any officer, trustee, agent, or employee of the Brownsville Independent School District in connection with information regarding this RFQ, the submission of this RFQ, the award of this RFQ or the performance, delivery or sale pursuant to this RFQ.

I have read all of the specifications and general RFQ requirements and do hereby certify that all items submitted meet specifications.

COMPANY: _____

AGENT NAME: _____

AGENT SIGNATURE: _____

ADDRESS: _____

CITY: _____

STATE: _____ ZIP CODE: _____

TELEPHONE: _____ TELEFAX : _____

FEDERAL ID#: _____ AND/OR SOCIAL SECURITY #: _____

DEVIATIONS FROM SPECIFICATIONS IF ANY :

_____

_____

_____

_____

PAGE _7_ OF _7_

Exhibit

"A-2"

 Case 1:02-cv-00128   Document 88   Filed in TXSD on 09/25/2003   Page 23 of 177

**Brownsville Independent**
**Purchasing Department, Rm. #1**
1900 E. Price Road, Brownsville, Texas 78521
(956) 548-8361   Fax (956) 548-8357

Kenneth J. Lieck
Administrator                                     August 14, 2001

TO:   ALL VENDORS

Subject: *Addendum #1 for RFQ # 012-02, REQUEST FOR QUALIFICATION (RFQ'S)
FOR TPA TO ADMINISTER BISD'S CAFETERIA PLAN (SECTION 125) AND
TAX DEFERRED ANNUTIES

Dear Sirs:

PLEASE BE ADVISED OF THE FOLLOWING CHANGE(S):

1.   The NAME OF THE RFQ HAS BEEN CHANGED TO THE NEW TITLE LISTED BELOW:

FROM:   REQUEST FOR QUALIFICATIONS (RFQ'S) FOR TPA TO ADMINISTER
BISD'S CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES

TO:   REQUEST FOR QUALIFICATIONS (RFQ'S) FOR TPA TO ADMINISTER
BISD'S CAFETERIA PLAN (SECTION 125) AND/OR TAX DEFERRED
ANNUTIES

The signature of the company agent, for the acknowledgement of this
addendum, shall be required in order to be considered in the final
evaluation and award of this rfq.

I hereby acknowledge receipt of Addendum #1, rfq 012-02, REQUEST FOR
QUALIFICATION (RFQ'S) FOR TPA TO ADMINISTER BISD'S CAFETERIA PLAN
(SECTION 125) AND TAX DEFERRED ANNUTIES.

Company: _____

Agent Name: _____

Agent Signature: _____

Address: _____

City: _____ State: _____ Zip: _____

If you have any further questions about the rfq, call 956-548-8361.

Kenneth J. Lieck
Administrator of Purchasing                           M401202

―――――――――
**"The Brownsville Independent School District is an Equal Opportunity Employer, M/F/H"**

Exhibit

"A-3"

# Brownsville I.S.D.
## Purchasing Department, Rm. #...
1900 E. Price Road, Brownsville, Texas 78521
(956) 548-8361   Fax (956) 548-8367

**Kenneth J. Lieck**
Administrator

August 15, 2001

TO:   ALL VENDORS

Subject: "Addendum #2 for RFQ # 012-02, REQUEST FOR QUALIFICATION (RFQ'S)
FOR TPA TO ADMINISTER BISD'S CAFETERIA PLAN (SECTION 125) AND
TAX DEFERRED ANNUTIES

Dear Sirs:

**PLEASE BE ADVISED OF THE FOLLOWING CHANGE(S):**

1.  The NAME OF THE RFQ HAS BEEN CHANGED TO THE NEW TITLE LISTED BELOW:

   FROM:  **REQUEST FOR QUALIFICATIONS (RFQ'S) FOR TPA TO ADMINISTER
   BISD'S CAFETERIA PLAN (SECTION 125) AND/OR TAX DEFERRED
   ANNUTIES**

   TO:  **REQUEST FOR QUALIFICATIONS (RFQ'S) FOR TPA TO ADMINISTER
   BISD'S CAFETERIA PLAN (SECTION 125) AND/OR TAX DEFERRED
   ANNUTIES AND ALL OTHER ALTERNATIVES WILL BE CONSIDERED**

The signature of the company agent, for the acknowledgement of this
addendum, shall be required in order to be considered in the final
evaluation and award of this rfq.

I hereby acknowledge receipt of Addendum #2, rfq 012-02, REQUEST FOR
QUALIFICATION (RFQ'S) FOR TPA TO ADMINISTER BISD'S CAFETERIA PLAN
(SECTION 125) AND TAX DEFERRED ANNUTIES.

Company: _____

Agent Name: _____

Agent Signature: _____

Address: _____

City: _____ State: _____ Zip: _____

If you have any further questions about the rfq, call 956-548-8361.

Kenneth J. Lieck
Administrator of Purchasing

jd01202

**"The Brownsville Independent School District is an Equal Opportunity Employer, M/F/H"**

001016

# Exhibit

# "B"

# *AFLAC*

*Rio Grande Valley Regional Sales Office*
*905 E. Los Ebanos Blvd., Ste A  *  Brownsville, Texas  78520*
*Phone (956)982-3998  *  Fax (956)982-0931*

Date:    September 6, 2001
To:       Brownsville ISD Insurance Committee Members
From:    Dino X Chavez, *MBA* - Regional Coordinator

Re:      Request for Qualifications - Section 125 Cafeteria Plan Services

Our local office has served as the point of contact for BISD's section 125 cafeteria plan services for almost three years. We have worked diligently at doing our best from the beginning to educate employees with simple explanations to an otherwise complicated subject. In addition, during this time period, our local office has had well over 10,000 walk-in visits from employees who required assistance of some sort. As our largest customer in the Brownsville area, most of these visits have been from BISD employees. They would have had to travel somewhere outside of Brownsville for in-person service had our office not been local.

The claim payments we have made to our policyholders and flexible spending account participants have been the fastest in the industry. Our policyholders can vouch for that. Moreover, as an example of our commitment to employee satisfaction, the time we spent at each campus during the annual enrollment period doubled and, in some cases, quadrupled the time previous cafeteria plan services providers spent on campus.

Also, as a sign of our continuing efforts to always do more than what the customer expects, in February 2001, we offered to begin "fronting funds" to flexible spending account participants so that employees would not have to wait for your payroll department to cut us a check every month to get reimbursed. In addition, in June 2000, we made an offer to have existing free rates locked-in for three years, without conditions. Both issues are still pending, as we have not received a reply.

As a reflection of customer satisfaction, we have received many letters from BISD employees over the last three years. A few recent ones have been included as an attachment to this letter as an example of our qualifications to keep your business.

You may contact me directly with any questions or comments. Thank you for your consideration.

*AFLAC* – Named: the # 1 insurance company in the world by *Forbes Global* magazine, Jan.1999;
one of the best overall companies to work for *three years in a row* by *Fortune* magazine, Jan.1999, 2000, & 2001;
one of America's Most Admired companies by *Fortune* magazine, Feb.2001;
one of the 100 best places to work for Latinos by *Hispanic* magazine, Apr.2001;
with over 178,000 accounts worldwide, also recognized as # 1 at workplace marketing by *National Underwriters*.

# Exhibit

# "C"

# *AFLAC*

### Rio Grande Valley Regional Sales Office
905 E Los Ebanos Blvd, Ste A * Brownsville, Texas 78520
Phone (956)982-3998 * Fax (956)982-0931

Marilyn Del Bosque-Gilbert, Trustee
Brownsville ISD
544 Calle Retama
Brownsville, Texas 78521

Re: AFLAC - IRS Section 125 Cafeteria Plan Services Proposal

September 10, 2001

Dear Marilyn,

**As a friend, I am asking for your support on the issue at hand.** On September 18, you will be voting on a Section 125 Cafeteria Plan Services provider for the district. You can feel assured that your vote in our favor is a vote not due to friendship, but a vote for what is best for BISD and it's employees.

Several key advantages in choosing AFLAC include:

1) AFLAC has provided the district with the service for three years. We have a proven track record of satisfied customers. Our letter and a few recent letters from customers which were included in the proposal are attached for your review.

2) AFLAC will continue to provide all cafeteria plan services at **no charge** to the district or it's employees, as long as we can continue to offer our **voluntary** supplemental insurance products. Before our time, BISD and it's employees spent well over $30,000 annually for this service. **Over the last three years, we have saved BISD and it's employees $90,000.**

3) **One of the biggest advantages is that our office is local.** Employees walk in the door for service or questions. They do not have to deal with 1-800 numbers or with agents that are hardly accessible from out-of-town offices. This is especially critical for employees who have hard times dealing with insurance matters over the phone and prefer in-person contact.

4) Because we are local, **new employees also benefit** from one-on-one cafeteria plan explanations when they are hired. If they choose, they meet with us at our office or at their campus. Before our time, employees had to wait until the following year's enrollment to get an in-person explanation.

001046

# *AFLAC*

*Rio Grande Valley Regional Sales Office*
*905 E Los Ebanos Blvd, Ste A  *  Brownsville, Texas  78520*
*Phone (956)982-3998  *  Fax (956)982-0931*

Pat Lehman, Trustee
Brownsville ISD
PO Box 6281
Brownsville, Texas  78523

Re:  AFLAC  - IRS Section 125 Cafeteria Plan Services Proposal

September 10, 2001

Dear Pat,

**As a friend, I am asking for your support on the issue at hand.**  On September 18, you will be voting on a Section 125 Cafeteria Plan Services provider for the district.  You can feel assured that your vote in our favor is a vote not due to friendship, but a vote for what is best for BISD and it's employees.

Several key advantages in choosing AFLAC include:

1)  AFLAC has provided the district with the service for three years.  We have a proven track record of satisfied customers.  Our letter and a few recent letters from customers which were included in the proposal are attached for your review.

2)  AFLAC will continue to provide all cafeteria plan services at **no charge** to the district or it's employees, as long as we can continue to offer our **voluntary** supplemental insurance products. Before our time, BISD and it's employees spent well over $30,000 annually for this service. **Over the last three years, we have saved BISD and it's employees $90,000.**

3)  **One of the biggest advantages is that our office is local.**  Employees walk in the door for service or questions.  They do not have to deal with 1-800 numbers or with agents that are hardly accessible from out-of-town offices.  This is especially critical for employees who have hard times dealing with insurance matters over the phone and prefer in-person contact.

4)  Because we are local, **new employees also benefit** from one-on-one cafeteria plan explanations when they are hired.  If they choose, they meet with us at our office or at their campus.  Before our time, employees had to wait until the following year's enrollment to get an in-person explanation.

001045

# AFLAC

### *Rio Grande Valley Regional Sales Office*
*905 E Los Ebanos Blvd, Ste A  *  Brownsville, Texas  78520*
*Phone (956)982-3998  *  Fax (956)982-0931*

Otis Powers, Trustee
Brownsville ISD
1642 E Price Rd, Ste 101
Brownsville, Texas  78521

Re:  AFLAC - IRS Section 125 Cafeteria Plan Services Proposal

September 10, 2001

Dear Otis,

    **As a friend, I am asking for your support on the issue at hand**.  On September 18, you will be voting on a Section 125 Cafeteria Plan Services provider for the district.  You can feel assured that your vote in our favor is a vote not due to friendship, but a vote for what is best for BISD and it's employees.

    Several key advantages in choosing AFLAC include:

1)  AFLAC has provided the district with the service for three years.  We have a proven track record of satisfied customers.  Our letter and a few recent letters from customers which were included in the proposal are attached for your review.

2)  AFLAC will continue to provide all cafeteria plan services at **no charge** to the district or it's employees, as long as we can continue to offer our **voluntary** supplemental insurance products. Before our time, BISD and it's employees spent well over $30,000 annually for this service. **Over the last three years, we have saved BISD and it's employees $90,000**.

3)  **One of the biggest advantages is that our office is local**.  Employees walk in the door for service or questions.  They do not have to deal with 1-800 numbers or with agents that are hardly accessible from out-of-town offices.  This is especially critical for employees who have hard times dealing with insurance matters over the phone and prefer in-person contact.

4)  Because we are local, **new employees also benefit** from one-on-one cafeteria plan explanations when they are hired.  If they choose, they meet with us at our office or at their campus.  Before our time, employees had to wait until the following year's enrollment to get an in-person explanation.

001044

# *AFLAC*

*Rio Grande Valley Regional Sales Office*
*905 E Los Ebanos Blvd, Ste A  *  Brownsville, Texas  78520*
*Phone (956)982-3998  *  Fax (956)982-0931*

Hugh Emerson, Trustee
Brownsville ISD
3201 Central Blvd.
Brownsville, Texas  78520

Re:  AFLAC - IRS Section 125 Cafeteria Plan Services Proposal

September 10, 2001

Dear Hugh,

**As a friend, I am asking for your support on the issue at hand.**  On September 18, you will be voting on a Section 125 Cafeteria Plan Services provider for the district.  You can feel assured that your vote in our favor is a vote not due to friendship, but a vote for what is best for BISD and it's employees.

Several key advantages in choosing AFLAC include:

1)  AFLAC has provided the district with the service for three years.  We have a proven track record of satisfied customers.  Our letter and a few recent letters from customers which were included in the proposal are attached for your review.

2)  AFLAC will continue to provide all cafeteria plan services at **no charge** to the district or it's employees, as long as we can continue to offer our **voluntary** supplemental insurance products. Before our time, BISD and it's employees spent well over $30,000 annually for this service. **Over the last three years, we have saved BISD and it's employees $90,000.**

3)  **One of the biggest advantages is that our office is local.**  Employees walk in the door for service or questions.  They do not have to deal with 1-800 numbers or with agents that are hardly accessible from out-of-town offices.  This is especially critical for employees who have hard times dealing with insurance matters over the phone and prefer in-person contact.

4)  Because we are local, **new employees also benefit** from one-on-one cafeteria plan explanations when they are hired.  If they choose, they meet with us at our office or at their campus.  Before our time, employees had to wait until the following year's enrollment to get an in-person explanation.

001043

# *AFLAC*

*Rio Grande Valley Regional Sales Office*
*905 E Los Ebanos Blvd, Ste A  *  Brownsville, Texas  78520*
*Phone (956)982-3998  *  Fax (956)982-0931*

Joe Colunga, Trustee
Brownsville ISD
80 Fort Brown
Brownsville, Texas  78520


Re:  AFLAC  - IRS Section 125 Cafeteria Plan Services Proposal

September 10, 2001

Dear Joe,

On September 18, you will be voting on a Section 125 Cafeteria Plan Services provider for the district.  I am asking you for your support on the matter.  You can feel assured that your vote in our favor is a vote for what is best for BISD and it's employees.

Several key advantages in choosing AFLAC include:

1)  AFLAC has provided the district with the service for three years.  We have a proven track record of satisfied customers.  Our letter and a few recent letters from customers which were included in the proposal are attached for your review.

2)  AFLAC will continue to provide all cafeteria plan services at **no charge** to the district or it's employees, as long as we can continue to offer our **voluntary** supplemental insurance products.  Before our time, BISD and it's employees spent well over $30,000 annually for this service.  **Over the last three years, we have saved BISD and it's employees $90,000.**

3)  **One of the biggest advantages is that our office is local.**  Employees walk in the door for service or questions.  They do not have to deal with 1-800 numbers or with agents that are hardly accessible from out-of-town offices.  This is especially critical for employees who have hard times dealing with insurance matters over the phone and prefer in-person contact.

4)  Because we are local, **new employees also benefit** from one-on-one cafeteria plan explanations when they are hired.  If they choose, they meet with us at our office or at their campus.  Before our time, employees had to wait until the following year's enrollment to get an in-person explanation.

5)  All AFLAC cafeteria plan enrollment materials are available in both **English and Spanish**.  This is especially gratifying for those employees that prefer seeing and signing things in their

001048

5) All AFLAC cafeteria ̣ ̣  ̄ ̄rollment materials are available in ̣  ̄English and Spanish. This is especially gratifying fȯ. those employees that prefer seeing anȯ ̣igning things in their native language. We also use local, certified, bilingual associates to do the actual enrollment. And, AFLAC's home office maintains a dedicated 1-800 number for Spanish speakers who choose to call the home office for information.

6) **AFLAC is the most experienced.** AFLAC has assisted over 70,000 employers nationwide in establishing a section 125 flexible benefits plan for their employees. In addition, we are the world's largest provider of guaranteed-renewable supplemental health insurance plans, insuring over 40 million people worldwide. **There is no one larger or more experienced at what we do.**

All in all, continuing with AFLAC will offer your employees better value and better service. You will keep business in Brownsville and continue saving money at the same time. Please call me with any questions. Thank you for your support and continuing friendship.

Sincerely,


Dino X Chavez, MBA
Regional Sales Coordinator


001047

Exhibit

"D"

# *AFLAC*

## *RIO GRANDE VALLEY REGIONAL SALES OFFICE*
*905 Los Ebanos Blvd., Suite A * Brownsville, Texas 78520*
*Phone (956)982-3998 * Fax (956)982-0931*

## FAX TRANSMISSION

Date: November 9, 2001                    Pages: 6 (including cover page)

Time: Friday Morning / Early Afternoon                    From: Dino X Chavez

## URGENT
### ------Please deliver immediately ------

To:   **BISD Insurance Committee Campus Representative**

RE:   SECTION 125 CAFETERIA PLAN PROPOSAL

MESSAGE:

**Your board members are about to make a decision that may be detrimental to you and your pocketbooks. Please read our attached memorandum. Your input is needed!!**

**If you do not receive the number of pages listed above, please notify us immediately.**

The information contained in this facsimile is privileged and confidential information intended for the use of the addressee listed above. If you are neither the intended recipient nor the employee or agent responsible for the delivery of this message, you are hereby notified that any disclosure, copying, distribution, or taking of any action in reliance on the contents of the telecopied information is strictly prohibited. If you receive this fax in error, please notify us immediately by telephone to arrange for the return of the original document. Thank you.

001053

*AFLAC - Named the # 1 insurance company in the world by Forbes magazine and the # 1 insurance company to work for by Fortune magazine, January 1999; with over 178,000 accounts worldwide, also recognized as # 1 at workplace marketing.*

# *AFLAC*

### *Rio Grande Valley Regional Sales Office*
*905 E Los Ebanos Blvd, Ste A  *  Brownsville, Texas  78520*
*Phone (956)982-3998  *  Fax (956)982-0931*

### **\*\*\*\*\*\*\*\*\*\*URGENT\*\*\*\*\*\*\*\*\*\*\***

November 9, 2001
Re:  IRS Section 125 Cafeteria Plan Services Proposal

Dear **Insurance Committee Campus Representative**,

　　Here we go again!!  Some of your elected board members and hired administrators are about to make an insurance decision that could be detrimental to you.  **The change in the group health coverage that was made recently was made without your approval and was made to the detriment of your pocketbooks. This may be about to happen again!**  There have been several misrepresentations of the truth said and written about us recently.  This is our attempt to set the record straight directly with the people who should have control over the say so of employee benefits - employees.  Attached, are cafeteria plan comparison charts that were handed out to board members and administration to help decide on the matter.  They were prepared without our knowledge or consultation and are very inaccurate.  Those of you who have dealt with us for the past three years know better.  We have penciled in our corrections for your review.

　　As your campus's representative, please be aware and make others aware that a decision concerning the Section 125 Cafeteria Plan Services and Annuity Administration is tentatively scheduled to be made at the next school board meeting on November 13, 2001.  Please let your fellow employees know that their opinions should be heard.  For your information, there are several key advantages in keeping us as your Section 125 Cafeteria Plan Services provider:

1) **There is no one larger, more experienced, or more recognized at what we do!**  AFLAC has assisted over 70,000 employers nationwide in establishing a section 125 flexible benefits plan for their employees.  In addition, we are the world's largest provider of guaranteed-renewable supplemental health insurance plans, insuring over 40 million people worldwide.  Moreover, AFLAC has provided the district with this service for the past three years.  We have a proven track record of thousands of satisfied BISD employees.  Our voluntary products (accident, specified health event, and hospital indemnity) have increased the amount of voluntary choices for employees that were not available on payroll deduction before our time.

2) **Over the last three years, we have saved BISD employees well over $90,000.**  AFLAC will continue to provide all cafeteria plan services at **no charge** to the district or it's employees, as long as we can continue to offer our **voluntary** supplemental insurance products (accident, specified health event, and hospital indemnity).   Before our time, BISD employees spent well over $30,000 annually for this service.

3) **One of the biggest advantages is that our office is local.**  Employees walk in the door every day for service and / or questions.  They do not have to deal with 1-800 numbers or with agents that are

401054

hardly accessible from out-~ n offices. This is especially critical ~mployees who have had a times dealing with insurance matters over the phone and prefer in-person contact. To our knowledge, no other cafeteria plan proposal has a Brownsville office.

4) **Other cafeteria plan service providers process claims monthly or, at best, semi-monthly. Not AFLAC! We process claims daily. People have said we are the fastest in the industry.** We want to insure that you get access to your money immediately. Additionally, please be aware that back in February 2001, we offered the district the option to have us "front funds" to employees who need their flexible spending account money before the district actually writes us a check for the deduction they subtract from their pay. Much to our dismay, the decision to accept this benefit for employees at absolutely no cost has been not been made and is still pending on someone's desk. **If we are chosen to continue, we will do everything possible to insure that the district accepts this fronting of funds proposition so that employees can have access to their money even quicker.** To our knowledge, no other proposal contains this type of provision.

5) We do not offer annuities and therefore we do not offer annuity administration. **However, some experts in this field have informed us that the district's proposition to suddenly have an annuity administrator after not having one for the last several years may have an adverse effect on you by limiting your choices to only those annuities offered by or through the chosen annuity administrator.** In addition, if for some reason you are still given a choice, the chosen annuity administrator can make it cumbersome for you to purchase annuities from the open market. Moreover, employees will have to begin paying an additional monthly and/or annual fee to have an annuity administrator, thereby reducing their "real" rate-of-return. Our opinion is that the district's current system of open choice is not broken. Implementing an annuity administrator would not be smart from an employee's perspective.

6) **Lastly, the premiums for our voluntary products and for our free cafeteria plan services have remained unchanged for the last three years, making us the most stable company BISD has dealt with in recent memory.** Over the last five years, every insurance provider the district has dealt with has raised their rates or diminished their benefits in some form or fashion. **AFLAC has not and will not. Moreover, if the district is willing to accept our contract, we are willing to guarantee no changes in fees or prices for an additional two years.**

The choice is yours, but all in all, continuing with AFLAC will offer employees the best possible value and the best possible service. In addition, you will keep business in Brownsville and continue saving money. No other provider has contacted you directly to attempt to keep you informed. No other provider values your business and your friendship as much as we do! Please call me with any questions. Thank you for your support and consideration.

Sincerely,

Dino X Chavez, MBA
Regional Sales Coordinator

PS - It has been said and witnessed that there is power in numbers !!!!

001055

# Exhibit

# "E"

# *AFLAC*

*Rio Grande Valley Regional Sales Office*
*905 E Los Ebanos Blvd, Ste A  *  Brownsville, Texas  78520*
*Phone (956)982-3998  *  Fax (956)982-0931*

### **\*\*\*\*\*\*\*\*\*\*URGENT\*\*\*\*\*\*\*\*\*\*\***

November 12, 2001
Re:  IRS Section 125 Cafeteria Plan Services Proposal  -  *UPDATE*

**Dear Insurance Committee Campus Representative,**

On Friday of last week, we faxed you notification that a decision on the matter was tentatively scheduled to made at the school board meeting on Tuesday, November 13, 2001.  We have just learned that the item was removed from the agenda.  We do thank you for the dozens of calls we received in support of *AFLAC* and our continued relationship with BISD.  However, our concern now is that a decision on the matter has once again been postponed.  **If a cafeteria plan services provider is not officially chosen immediately, employees will be forced to make cafeteria plan decisions with little or no notice, similar to what happened recently with the group health coverage.  Employees deserve better !!**

As your campus's representative, please be aware and make others aware that a decision concerning the Section 125 Cafeteria Plan Services and Annuity Administration is yet to be made and that their opinions on the matter deserve to be heard.

Please be reminded that continuing with *AFLAC* will offer employees the best possible value and the best possible service.  In addition, you will keep business in Brownsville and continue saving employees money.  No other provider has contacted you directly to attempt to keep you informed.  No other provider values your business and your friendship as much as we do!  Please call me with any questions.  Thank you for your support and consideration.

Sincerely,

Dino X Chavez, *MBA*
Regional Sales Coordinator

*AFLAC* – Named: the # 1 insurance company in the world by *Forbes Global* magazine, Jan.1999;
one of the best overall companies to work for *three years in a row* by *Fortune* magazine, Jan.1999,2000, & 2001;
one of America's Most Admired companies by *Fortune* magazine, Feb.2001;
one of the 100 best places to work for Latinos by *Hispanic* magazine, Apr.2001;
with over 178,000 accounts worldwide, also recognized as # 1 at workplace marketing by *National Underwriters*

001062

# Exhibit

## "F"

# AFLAC

## RIO GRANDE VALLEY REGIONAL SALES OFFICE
*905 Los Ebanos Blvd., Suite A  *  Brownsville, Texas  78520*
*Phone (956)982-3998  *  Fax (956)982-0931*

## FAX TRANSMISSION

Date:  November 19, 2001

Pages:  5  (including cover page)

From:  Dino X Chavez

## URGENT
### ------Please deliver immediately ------

To:    **BISD Insurance Committee Campus Representative**

RE:    **SECTION 125 CAFETERIA PLAN PROPOSAL**

MESSAGE:

This is part of our continuing effort to keep you informed of the facts.  Please call me with any questions.  A decision on the matter is scheduled to be made at the school board meeting on Tuesday, November 20, 2001.

**If you do not receive the number of pages listed above, please notify us immediately.**

The information contained in this facsimile is privileged and confidential information intended for the use of the addressee listed above.  If you are neither the intended recipient nor the employee or agent responsible for the delivery of this message, you are hereby notified that any disclosure, copying, distribution, or taking of any action in reliance on the contents of the telecopied information is strictly prohibited.  If you receive this fax in error, please notify us immediately by telephone to arrange for the return of the original document.  Thank you.

001076

*AFLAC - Named the # 1 insurance company in the world by Forbes magazine and the # 1 insurance company to work for by Fortune magazine; with over 178,000 accounts worldwide, also recognized as # 1 at workplace marketing.*

# AFLAC

*Rio Grande Valley Regional Sales Office*
*905 E Los Ebanos Blvd, Ste A  *  Brownsville, Texas 78520*
*Phone (956)982-3998  *  Fax (956)982-0931*

**\*\*\*\*\*\*\*\*\*\*URGENT\*\*\*\*\*\*\*\*\*\*\***

November 19, 2001
Re:  IRS Section 125 Cafeteria Plan Services Proposal

Dear **Insurance Committee Campus Representative,**

As was communicated to you by fax on November 9, BISD is about to make an insurance decision that could be detrimental to you. **The change in the group health coverage that was made recently was made without your approval and was made to the detriment of your pocketbooks. This may be about to happen again!**

Attached, for your review, is a partial copy of the agenda for the next school board meeting scheduled for Tuesday, November 20, 2001. Please see Item #24, "Recommend approval to award RFQ #012-02 to National Plan Administrators / Insurance Associates of the Valley for Third Party Administrators to administer BISD's Cafeteria Plan (IRC Section 125) and administer the tax deferred annuity, custodial plan under section 403b and 403(b)(7) deferred compensation plan and custodial plans. Agent / Agency to solicit the individual products available." **If this item is approved, it will definitely not be in the best interest of employees.**

As your campus's representative, please be aware and make others aware that their opinions need to be heard before it is too late. For your information, there are several key differences between the AFLAC and the National Plan Administrators' (NPA) proposals:

1) **AFLAC has provided the district with cafeteria plan services for the past three years. We have a proven track record of thousands of satisfied BISD employees.** Our voluntary products (accident, specified health event, and hospital indemnity) have increased the amount of voluntary choices for employees that were not available on payroll deduction before our time. We have no desire to take over **all** employee benefits, unless that is what the insurance committee wants. **If NPA / Insurance Associates of the Valley is chosen, all supplemental choices will have to go through them, thereby eliminating all local agents that currently provide their services to the district.**

2) **Over the last three years, we have saved BISD employees well over $90,000.** AFLAC will continue to provide all cafeteria plan services at **no charge** to the district or its employees, as long as we can continue to offer our **voluntary** supplemental insurance products (accident, specified health event, and hospital indemnity). **If NPA is chosen, collectively, BISD employees will be assessed nearly $30,000 in fees annually for cafeteria plan services. In addition, BISD employees could be assessed an additional $20,000 in enrollment fees.** This does not make sense at all.

3) **AFLAC maintains a local regional office in Brownsville.** Employees currently walk in the door every day for service and / or questions. They do not have to deal with 1-800 numbers or with agents that are hardly accessible from out-of-town offices. This is especially critical for employees who have a

001077

hard time dealing with insur~~~~ matters over the phone and prefer in~~~ son contact. **NPA / Insurance Associates of the Valley's office is in Harlingen. Employees will have to drive out-of-town if they want to see someone face-to-face.**

4) **AFLAC processes claims daily. People have said we are the fastest in the industry.** We want to insure that you get access to your money immediately. Additionally, please be aware that back in February 2001, we offered the district the option to have us "front funds" to employees who need their flexible spending account money before the district actually writes us a check for the deduction they subtract from their pay. Much to our dismay, the decision to accept this benefit for employees at absolutely no cost has not been made and is still pending on someone's desk. If we are chosen to continue, we will do everything possible to insure that the district accepts this "fronting of funds" proposition so that employees can have access to their money even quicker. **To the best of our knowledge, NPA processes claims monthly. Please see the attachment copied from the NPA website.**

5) We do not offer annuities and therefore we do not offer annuity administration. **However, some experts in this field have informed us that the district's proposition to suddenly have an annuity administrator after not having one for the last several years may have an adverse effect on you by limiting your choices to only those annuities offered by or through the chosen annuity administrator.** In addition, if for some reason you are still given a choice, the chosen annuity administrator can make it cumbersome for you to purchase annuities from the open market. Moreover, employees will have to begin paying an additional monthly and/or annual fee to have an annuity administrator, thereby reducing their "real" rate-of-return. By our estimates, this would cost employees nearly $39,000 in fees annually in addition to the cafeteria plan fees outlined in #2 above.

6) **Lastly, the premiums for our voluntary products and for our free cafeteria plan services have remained unchanged for the last three years, making us the most stable company BISD has dealt with in recent memory.** Over the last five years, every insurance provider the district has dealt with has raised their rates or diminished their benefits in some form or fashion. AFLAC has not and will not. Moreover, if the district is willing to accept our contract, we are willing to guarantee no changes in fees or prices for an additional two years. **As an example, we have been notified that the district's cancer plan offered by Hartford through Insurance Associates of the Valley will undergo a rate increase this year.**

The choice should be yours. Make your opinions heard. AFLAC's proposal offers employees the best service at the best possible price. Accepting the NPA / Insurance Associates of the Valley proposal will force employees to drive out of town for service on top of paying nearly $50,000 in cafeteria plan fees plus nearly $39,000 in annuity fees. Keeping AFLAC means no fees whatsoever and local attention to your needs. Once again, no other provider has contacted you directly to attempt to keep you informed. No other provider values your business and your friendship as much as we do! Please call me with any questions. Thank you for your support and consideration.

Sincerely,

Dino X Chavez, *MBA*
Regional Sales Coordinator

061078

# Exhibit

## "G"

*11/27 Hand dx*

# AFLAC

*Rio Grande Valley Regional Sales Office*
*905 E Los Ebanos Blvd, Suite A * Brownsville, Texas 78520*
*Phone (956)982-3998 * Fax (956)982-0931*

### **********URGENT**********

November 27, 2001
Re: IRS Section 125 Cafeteria Plan Services Proposal

Dear **Insurance Committee Campus Representative,**

This memorandum is part of our continuing effort to keep you informed of the facts. We are hand delivering this memorandum, in lieu of faxing it because it was brought to our attention that some previous faxes we sent out to you may have been intercepted and not delivered to you.

**First and foremost, THANK YOU so much for your input and support at last week's board meeting**. You have proven that good can conquer evil when enough good people get together and shout the message together. **For the record, please be reminded that board members Linda Salazar, Otis Powers, Pat Lehman, and Joe Colunga all supported your cause by not voting for the agenda item that would have taken the power to make the decision out of your hands**. They deserve a phone call or a pat on the back to thank them for their support. On the other hand, the rest of the board, who voted for the agenda item, also deserve a phone call from you to let them know that your fellow employees will not put up for the total disrespect they have for your opinions and input. One board member even had the audacity to tell the audience that they did not represent BISD's 6,500 employees, when in fact, many of BISD's insurance committee members were the ones in the audience who were booing at the comments being made by the board members who did not support AFLAC.

Furthermore, please be advised that whether legal or not, NPA / Insurance Associates of the Valley submitted a last minute letter at the meeting where they waived all cafeteria plan fees because they feared that employees would revolt. Despite this sudden change in price, the letter said nothing about waiving annuity fees or about setting up a local office, or about processing claims on a daily basis, or about "fronting funds" so that employees can get paid even quicker. **AFLAC maintains a distinct advantage in these and all other areas.** The letter also says nothing about relinquishing their demand for agent of record status, which we discovered to be illegal by legal opinion of the Texas Attorney General's office (opinion #JC-0205, dated April 4, 2000). Because so, we believe

001086

# AFLAC

*Rio Grande Valley Regional Sales Office*
*905 E Los Ebanos Blvd, Suite A * Brownsville, Texas 78520*
*Phone (956)982-3998 * Fax (956)982-0931*

**\*\*\*\*\*\*\*\*\*\*URGENT\*\*\*\*\*\*\*\*\*\***

November 27, 2001
Re: IRS Section 125 Cafeteria Plan Services Proposal


Dear **Insurance Committee Campus Representative,**

This memorandum is part of our continuing effort to keep you informed of the facts: **First and foremost, THANK YOU so much for your input and support at last week's board meeting**. You have proven that good can conquer evil when enough good people get together and shout the message together. **For the record, please be reminded that board members Linda Salazar, Otis Powers, Pat Lehman, and Joe Colunga all supported your cause by not voting for the agenda item that would have taken the power to make the decision out of your hands**. They deserve a phone call or a pat on the back to thank them for their support. On the other hand, the rest of the board, who voted for the agenda item, also deserve a phone call from you to let them know that your fellow employees will not put up for the total disrespect they have for your opinions and input. One board member even had the audacity to tell the audience that they did not represent BISD's 6,500 employees, when in fact, many of BISD's insurance committee members were the ones in the audience who were booing at the comments being made by the board members who did not support AFLAC.

Furthermore, please be advised that whether legal or not, NPA / Insurance Associates of the Valley submitted a last minute letter at the meeting where they waived all cafeteria plan fees because they feared that employees would revolt. **Despite this sudden change in price, the letter said nothing about waiving annuity fees or about setting up a local office, or about processing claims on a daily basis, or about "fronting funds" so that employees can get paid even quicker. AFLAC maintains a distinct advantage in these and all other areas.** The letter also says nothing about relinquishing their demand for agent of record status, which we discovered to be illegal by legal opinion of the Texas Attorney General's office (opinion #JC-0205, dated April 4, 2000). Because so, we believe AFLAC still represents the best choice for employees. The flyer handed out at the meeting is attached for your review.

For the record and contrary to our knowledge of Robert's Rules of Order, we were told that Joey Lopez, ex-board member, was given time to speak to the board after the

AFLAC still represents the best choice for employees. The flyer handed out at the meeting is attached for your review.

For the record and contrary to our knowledge of Robert's Rules of Order, we were told that Joey Lopez, ex-board member, was given time to speak to the board after the audience had left the building. He stated that everything AFLAC had said about the NPA / Insurance Associates of the Valley's proposal were lies and he demanded that a re-vote take place that evening, even after the measure had already been voted down. Moreover, it seems strangely coincidental that a decision on this matter has been postponed for this long and now that Joey Lopez received his new insurance license, administration is ready to make a decision. We believe that Ms. Linda Salazar's bold statement that "the appearance that bribery and corruption is running rampant among administration and board members" may have merit.

For your information, we were also told directly by Superintendent Sauceda that AFLAC still could not enroll. He said that he would finally allow the insurance committee to make the decision at its meeting re-scheduled to take place on **November 29 - 5:30pm at the boardroom.** Please verify the date and time of this meeting and be vigilant of any last minute changes that may occur and not be communicated to you by your administration. Also, please be vigilant of the fact that you are not suddenly removed from the insurance committee you are on for unknown reasons. The board meeting where the actual vote will be taken is scheduled for **Tuesday, December 4**.

Once again, no other provider has contacted you directly to attempt to keep you informed. No other provider values your business or friendship as much as we do! Please call me with any questions. Thank you, once again, for your continued support and consideration.

Sincerely,

Dino X Chavez, MBA
Regional Sales Coordinator

Exhibit

"H"

# BROWNSVILLE INDEPENDENT SCHOOL DISTRICT

*BOARD OF TRUSTEES*

*REGULAR BOARD MEETING*

---

*PUBLIC AUDIENCE EXCERPTS*

*NOVEMBER 13, 2001*
*NOVEMBER 20, 2001*

---

*JUDITH HENNIGH, C.S.R.*

*1505 DEBBY LANE*

*MISSION, TEXAS*

*956/580-3575  956/330-6726*

## VII.  PUBLIC AUDIENCE

### November 13, 2001

(a).  SPARKY ESPARZA:

Mr. Esparza:  Mr. President, then my time was cut to two minutes?

MR. CHAIRMAN:  In order to accommodate all of the --

Mr. Esparza:  May I present this as a  whole, and so it can be printed in public audience.  This is the second time I've been cut, if not the third, and I appreciate everybody that is speaking.  But let me start a little bit and then I just present the whole thing.

First of all, Dr. Sauceda, Mr. President, members of the Board and those present and not present.  I pray that peace my abound in the world and lives be spared in any sphere of conflict.  Please, Board members, stand united as one, but respect differences of office.  Remember the plight of my soldiers off the field as they struggle with their paycheck insurance.

In all fairness to the superintendent, I have been to his office many a time just before 5:00 p.m., and he was engaged in long meetings while his faithful secretaries were executing their duties.  This is truly dedication.

I, for one, have faith in our young students from all schools, that they too shall continue in the spirit of patriotism and build a wall of strength and unity.  But

first we need to set the example.  We need to care for each other as a family.

I pray that our children will never taste of war, but if duty calls, I'm certain that they shall march proudly to defend their homeland, just as our forefathers have done so in the past.

In war there is no substitute for courage, no compassion to those who have fallen.  In the hostility of battle the price of unselfish sacrifice is as crucial as victory.  It is not a theoretical postulate, but a truism; when the need arise, we are one in loyalty, one in arms and one in spirit.

Also I want to thank the University of Texas for remembering their veterans as well as BISD.  At James Pace High School, Sylvia Rivera should be thanked for generating the Veterans Appreciation Day there, and Ms. Williams for cementing this beautiful concept into reality.  Those veterans honored at James Pace High School, Jesus Rodriguez, Juan C. Castillo, Joe Pena, Robert Rivera, Ruben Rocha, Juan ?,  Roman Salazar, Joe R. Martinez, Daniel ? Flores, Robert Hinojosa, Roberto Huerta, Richard Hernandez, Yolanda Garcia, Armando Gonzalez, Jerry ?.

And not only these, but all the veterans from all the schools should be honored.  I regret that I did not have time to complete, but nevertheless I obey your

instructions and orders.

Thank you.

MR. CHAIRMAN:  I respectfully request that Sparky's attachment be included in our minutes and made an integral part thereof.

Next, Judy Rodriguez, subject Lopez Lobos.


(b).  JUDY RODRIGUEZ:

I knew I should have taken speedreading, but since I didn't, let me start.

Good evening, Mr. Colunga, Board President, Board members, Dr. Sauceda, various superintendents, colleagues and committee members.  My name is Judy Rodriguez, an extremely proud member of the Lopez High School faculty.

As you are aware, this is the year of the Lobo. Our students have outdone themselves in many areas, and we are very proud of them.  Therefore, when you have a board meeting where the conference presentation includes saluting the students, seriously think about placing Lopez High School on its own, or your board meeting will linger forever.

Why?  Because the first three months of the school year at Lopez, the Lopez students have accomplished and accumulated so many accolades, accolades, that we'll

need the whole agenda to ourselves.

To name a few accomplishments, our increased parental involvement with our neighborhood meetings.  Haley Burkhart, National -- excuse me -- National Merit Scholarship.  Two students selected to the Leadership Conference, Mr. Bueller and Ms. Gonzalez, we just got those names today.

18 students selected to Migrant Leadership Conference.  Tennis team, first time to Regionals.  Band, 5th in State, 1st in Brownsville.  The first time, David Ramirez, 4th place in trumpet completion, All-State Jazz Band.  Incidently, David did a superior job playing Taps at our Veterans Day ceremony at Lopez.

Regan Messenger selected 4th chair Tenor 2, I think that's how you say it, Tenor 2, in the Regional choir, and of course, history in the making, a State Ranking and District Championship for our Lobos and their coaches.

And by the way, Happy Birthday today to Coach Valentin Montemayor, 29 today.  What a birthday gift from your young men and your coaching staff.

And that is the main reason I'm here tonight.  Ms. Gutierrez, our instruction leader, her administrative staff, coaches, faculty, staff and most important, our students, cordially invite all the board members, area superintendents and the whole community to join us and Ms.

Rachel Ayala, our area superintendent, at its game against the Alice Coyotes Friday night.   Remember to wear blue and gold.

Thank you, and we'll see you at the game.   Oh, and also, thank you for Items #18, #19 and #38 in today's agenda -- 18, 19 and 38.

MR. CHAIRMAN:  Thank you, Judy.

Next Beto Medrano, subject insurance.

(c).  BETO MEDRANO:

Don't start timing me yet, but I have something to talk to you about that you-all talked a lot and you don't say a thing, so shame on you-guys.  And also, that it should be ? the beginning and not when you're all tired and want to go home to eat.  ?? remember that.  Ever since that Lopez Lobo, I've been to all the games of the Hanna Eagles, also for being here shortly district trophies that both of those schools should be commended.  and ? Insurance thing again I found out that -- I don't believe in rumors, but I found out later that you-all had planned another meeting someplace else.  ? I haven't got an answer yet.  But when I was in the army we called that divide and conquer, but I'm not going to call it that here tonight, because I know you better than that.

You're not going to divide us, because we've very united, you can see, about the insurance.  The last

time you-all did the insurance I was assured by you that everything was going to be real neat.  And I told you before the salary increase, give a salary increase, but don't let suffer the insurance.  I was assured by you folks that you were going to do the best.

Okay, now I'm asking you, not only my own campus, DLC but I also have contacts with Hanna people, Central people and a lot of other teachers out there that are very upset about it.  Do not -- do not, understand it clear, do not touch the Cafeteria Plan, do not help us, again, please don't help us, we don't need help on disability plan, we don't need your help.

The last time you helped me I went to the pharmacy right after the meeting and I told my wife, "Oh, it won't be more that $100.00" for her medicine and mine.  She said, "Are you sure?"  "I guarantee it won't be no more that 150," and when I came out I said, "Did I say 150?"  She said "Yes."  "Well, it's 218.95."  I still have a record from the credit union.  And then I told her, "We gotta go home, we're not going out to eat, we're going home."  We went to eat taquitos because we couldn't afford it, because I didn't get ??

MR. CHAIRMAN:  You have one minute left.

MR. MEDRANO:  One minute, okay, good.  Thank you very much, Mr. Chairman.

You have the right -- you don't have to listen
to the attorney, you have the right to judge people on what
they're saying.  And that's very good Mr. Chairman, you
don't have to.  The Donna ISD, they're seeing real good
thing to keep you going more and more.  Now, as a member of
PSJA I've been to a lot of school board meetings, more than
all of you here, and they do have a habit of focusing on
Number 1.

Okay.  All I want to say is we're not
negotiating with anybody, it's just say no to your friends,
when you do in church, just say no to your friends.
(Applause).  Folks, save -- I want to save you all
embarrassment with TEA when they get here ?? on insurance
check, do not compromise your principle.  You have an oath
of office to pay.  You must represent people involved, do
not compromise your principles, you'll be taken to court.
And I'm telling you, I'm not making this up, you will be
paying for the consequences if you increase the insurance --
don't change the plan, please help us, do not change --
don't do any favors for us, we don't need any favors.

MR. CHAIRMAN:  Thank you.

Next, Mike Saldana on Legal Services Contract.
(d).  MIKE SALDANA:

BOARD MEMBER:  Mr. Colunga, since you're the
presiding Board president, I think it's only fair that you

judge who should take more two minutes to five minutes,
since this is your office, this is your forum, and if you
allow them to go to three to five minutes.  We ask people to
vote for us, well, let's hear them out.

MR. SALDANA:  Mr. President --

MR. CHAIRMAN:  If I could also at this time
determine whether an item is addressing an officer any kind
of comment about the officer that would require closed
session.

MR. SALDANA:  Mr. President, I wish to publicly
discuss the items that were discussed on conference
presentation concerning the legal contract.  I will be as
brief as possible.  Like Mr. Medrano says, you are the
presiding officer and you have, under local policy, the
right to extend time, not only the individual time, but the
total time that you may allow for public comment.

MR. ROERIG:  Let me address that.  That's a
Board policy and subject to the majority vote of the Board
to suspend the policy, not the prerogative of the President.

MR. SALDANA:  If I can go on without being
interrupted, Mr. President, and I'd like to address Mr. Dunn
also and inform him that I am licensed to practice law, and
I am also an officer of the court.

The allegations that I bring forth here today
are extremely serious and I would require your attention.  I

have provided to you a packet.  Contrary to the advice that you have been receiving from Mr. Roerig, and perhaps from Mr. Sauceda -- Dr. Sauceda, only the Board can contract --

MR. ROERIG:  Mr. President, this clearly involves both an officer and an employee of the District and should be moved into Executive Session.  He's already invoked both names and stated his intention.

MR. CHAIRMAN:  If we can get a clarification, Mr. Saldana, if that is --

MR. SALDANA:  I am only going to discuss those matters that were discussed already in public conference items, and I remind you again that you do have the power, and your decision is final here, Mr. President.

May I proceed?

MR. ROERIG:  Mr. President, I do understand that the law as it is and what the procedures are, and I understand as well, and all I ask is that everybody abide by the same rules.  There are certain items -- the Board is responsible for the maintenance of its forum, the same way that a newspaper is responsible for its letters to the editors section, and that's allowed the opportunity to address the Board in a private session is provided if it involved employees such as Dr. Sauceda, officers such as myself.  If the speaker wishes to hold a news conference out front, he's entitled to do so.  But he's not entitled to use

the Board's meeting as that forum, and that's why we have rules about it.

MR. MEDRANO:  Mr. President, if I may address that.  I will only address those matters that have already been discussed in conference items, talked about here.

And if I may remind Mr. Roerig, he's not an officer of this board, he is a contracted independent individual.

MR. CHAIRMAN:  If you would limit your remarks to not referring to officers of this District, you may proceed.  Otherwise, we will have to schedule for a closed session.

MR. MEDRANO:  Thank you.  Pursuant to, I believe, is Chapter 11 of the Education Code, only the Board can contract for a independent school district.  That is by majority of the vote, the contracts do not have to be signed, but they do have to be approved by the Board in open session.

There is an exception to that in local policy in which the Superintendent can contract and disburse up to $10,000.00 in funds.  Any other contract that is signed or approved by this District must be approved by a majority of four members of the Board.  That is straight out of the Education Code.

If you would look at Exhibit A, this is the item

that was presented on the agenda and is the contract of Mr. Roerig and his law firm of Roerig, Oliveira and Fisher. As you can see, it provides a signature for the Board president, yourself, Mr. Joe Colunga. This was the contract that was voted on by the Board, 6-to-1 approving Mr. Roerig's services for the Board. This is an official government document.

If you will look at Exhibit B that I have provided for you, it is a different document. This document I received through the Public Information Office at BISD through a public information request that was made by me. This is the document that was presented by the administration as being the current contract in effect between Mr. Roerig's firm and this District.

This contract has been altered, ladies and gentlemen of the Board. This contract now has a significant change in that it now provides that Mr. Roerig shall be the exclusive Board member -- Board attorney. That was not approved by you-all under any circumstances, yet this was presented as a public document as the current contract that is in effect.

This contract, ladies and gentlemen of the Board, was not approved by you all, yet it is being presented publicly as being the contract between BISD and Mr. Roerig's firm. It has never been approved. Any time --

12

I sat on this Board for four years.  Any time there was any type of change to any contract, those contract changes came back for the Board, because they significantly altered or --

MR. CHAIRMAN:  One minute, Mr. Saldana.

MR. SALDANA:  And therefore this contract has been altered and presented to the public and it has never been approved by the Board.

Exhibit number C, also a governmental document, that I -- it's my contract that I presented to the Board. And I negotiated with Dr. Sauceda.  As you can see, my cover letter and my fax letter is there, and I'm indicating to Dr. Sauceda if he has any changes to please contact me so that we can further negotiate.  That is the only time I discussed my contract, or my proposed contract with Dr. Sauceda.

Exhibit D is a contract that was presented to the Board as being my contract.  This contract was never seen by me, it was never approved by me, it was never -- I was never called on it.  Mr. Roerig substituted my name on the bottom part of this contract without my approval.  As a result, this contract was voted down because Mr. Lehmann had questions about the fact that the contract had been altered.

Exhibit 5 is some law that I think you-all should be aware of that.

MR. CHAIRMAN:  Thank you very much, time has expired.

MS. CATALINA GARCIA:  I will donate my time to you, Mr. Saldana, so if you want to continue, you can continue.

MR. SALDANA:  Thank you, that's all I have to say.

Mr. Dunn, I do take these things very seriously, and when the Board approves of these basically shenanigans or what in the vernacular would be known as the "old switcheroo," which was not only done once, but done twice. It's a reflection on each and every one of you that would tolerate that type of conduct.

Thank you.

MR. CHAIRMAN:  Thank you.

Next Catalina Garcia, subject, Administration of BISD.

MR. ROERIG:  Does the chairman wish to reinstitute the normal rules?

MS. GARCIA:  Oh, I know, I won't refer to individuals.

MR. CHAIRMAN:  In order to expedite the rest of the speakers --

(e).  CATALINA GARCIA:

I'm here for a couple of items, Mr. President. Good evening, everybody, I don't have much time, so I have

14

to get this real quick.

Mr. President and community and everybody else here in this building, let me read to you a letter that was sent to me from TEA.  And it's referring to case #200-20088. "Please be informed that your letter regarding the Brownsville Independent School District has been forwarded to the Commission ? for any action that may be required for concerns you have with the Agency.  If it is determined that intervention  I have already followed up with them and that's one of my issues.  I have an issue with Individual A, and you have that document.  That individual was hired with the District in September --

MR. ROERIG:  Mr. Chairman, it is not permitted for the school district to allow individual complaints broadcast over a television channel, when presented in this manner at a public session.  Those are the rules.

MS. GARCIA:  This individual was asked to report to work on September --

MR. CHAIRMAN:  The policy on individuals or employees --

MS. GARCIA:  But I'm not naming anybody.  This individual could be anybody, even somebody here in the building.

MR. ROERIG:  Mr. Chairman, this is an individual complaint --

MS. GARCIA: -- time you shut me up.

MR. ROERIG: Everybody has to do this, follow the rules, and as I explained, anybody can have their own private press conference, but the District is responsible because it provides both the forum and the television broadcast of it. It is very clear that you cannot talk about individuals whether the name is mentioned or just defined by the circumstances or position.

MS. GARCIA: Do you want me to say "subject"?

MR. CHAIRMAN: The comments cannot involve the individual or an employee that is in any way identified.

MS. GARCIA: Well, can I just say okay, let's pretend that I was hired on this date and I automatically got a check that was cut out on the same day I reported to work September the 4th, that check was cut out to me in the amount of 3,742. That check came out of the --

MR. ROERIG: It's very clear that this is a employee complaint about an individual.

MR. CHAIRMAN: If you would like to schedule that for closed session, we can do it.

MS. GARCIA: You see, in the past this has happened, Mr. President, and they just overlook the issue that I want to complain about these things? I'm a taxpayer, I think I have the right just like anybody else. And these things have been brought to my attention -- (Applause). I

have facts here, and facts don't lie.  And I'm tired of
seeing all these facts and yet people keep just lying about
it.  I am not lying about these facts.  I have them in black
and white, Mr. President, I just want --

       MR. CHAIRMAN:  I understand, but the fact that
it's involving individuals, moving it to a different forum
that would be the closed meeting.  But we can certainly
schedule that for the next Board meeting.

       MS. GARCIA: For the next Board meeting?  Okay,
and I'm not going to call anybody either, because the last
time I called and they overlooked me having to go to closed
session.

       Okay.  Now, Mr. Powers, I believe this
information has been kept from you because now the Board has
to go to public information.  Never, never had this been
done before.  I think it's getting out of control, I think
something needs to be done.  Before Board members used to
get the information from Administration.  Now it's gotten
out of control.

       2.  Yes, the President needs to have his
signature on every contract.  I worked in maintenance and
facilities and we dealt with numerous contracts.
Architects, engineers, contractors, it always had to have
the president's signature on there, or the administrator.

       MEMBER:  Pardon me.  May I direct administration

to go ahead and have Mrs. Catalina Garcia be present at the next executive session. Would that be acceptable to you, ma'am?

MS. GARCIA: Yes, sir, as long as they don't forget and overlook it.

MR. CHAIRMAN: Next is Bazavilbazo, hiring practices.

(f). MELISSA SERNA:

Good evening, President and Board members. My name is Melissa Serna. I'm speaking on behalf of Enrique Bazavilbazo. He has exhausted all efforts with the BISD administration in order to be re-hired as a bus driver. As Board members, you are obligated to insure that the District policies are in place and that administration hire the most qualification experience personnel for any open position in the District. Mr. Bazavilbazo worked for the BISD previously. He also worked for Brownsville Urban System, and he's presently working for the Los Fresnos CISD.

He has four outstanding recognition awards for his work as a bus driver. He was designated for a bus driver during the Governor Conference in 1998. He was -- worked as a bus driver since 1989. Mr. Bazavilbazo applied for a job opening as a bus driver with BISD. He was never called for an interview. He was never sent a letter,

although he inquired about his status.  He sent our administrators letters to try to visit with one of the top administrators, however, he refused to see him.  By the way, Mr. Bazavilbazo applied for a job over a year and a half ago.  Mr. Bazavilbazo was one of the many potential candidates for employment with the ISD.  Without the need of training, his poses enough experience to do a good job.  However, the District chooses to spend thousands of dollars in training and hiring people with no experience.  That practice is against district policies and against the best interest of the taxpayers in the District.

        For many years the District followed the old practice of hiring their relatives or the friends of Board members and administrators.  If that practice is in existence today it must be stopped.  It is time ?  In closing, Mr. Bazavilbazo asks for an opportunity to work for the District --

        MR. CHAIRMAN:  You have 30 seconds left.

        MS. SERNA:  -- if he meets the qualifications for the bus driver.  Thank you very much.

        MR. CHAIRMAN:  Thank you.

        MR. CHAIRMAN:  I wanted to ask Mr. Barrera if he has a complaint on a specific --

        MR. BARRERA:  If I have a complaint?

        MR. CHAIRMAN:  If there is a complaint against

an officer of the District it would be appropriate ??

       MR. BARRERA:  All right, Counsel, so let me know if I'm going the wrong way, all right.  You got Mexican time or American time make it the longest time.

(g).  DAGOBERTO BARRERA:

       Honorable Superintendent, honorable Board members, ? and brothers and sisters in the field of education.  I'm here tonight not as a foe, but as a patriotic American to remind all of those present of that ugly day of September 11 when faceless powers hurt our nation by murdering 6,000 Americans.  America has been awakened, and this sleeping giant will chase them down, will smoke them out and will bring them to justice or justice, we're going to take it to them.

       Also tonight I will remind you of taxpayer injustice that I think were done by this Board some weeks ago.  They opted ? that instead of being "united we stand," we are divided instead.  ? a few Board members to give our adopted son, Noe, a $10,000.00 increase over his $150 salary was misguided and probably a bad decision.

       Let me tell you why, people.  Mr. Barrera, she said, you are an employee in our administration.  Number 2, he had accepted the job that he agreed to on a salary.

       Number 3, why is our Board, those four individuals so loosely with our taxpayer's money.  It's bad

for Noe, my brother, because you you and --

      MR. CHAIRMAN:  You have 30 seconds.

      MR. BARRERA:  will probably walk on water one of

these days, you put him in the hot seat?  It split the

Board, it split the people into different factions ?? that

TEA might have to send a monitor, which is bad for us.  Look

what happened to Raymondville.

      Number 10, this young man cannot walk on water,

not yet, not yet, but he could probably do it?.  If he has

done a good job, I'm all for that increase.   Ladies and

gentleman, I don't know what can be done, not it's too late.

?? and I do say his friend, because I knew his papa, and if

he was here I'm sure his papa would stand with his son.  If

he cannot live on 150,000 bucks, then I have to call -- to

supplement his salary.

      MR. CHAIRMAN:  Thank you.

      MR. BARRERA:  Let me just say this, Mr. Hugh

Emerson, I was going to make you to give you the bank as a

CEO.

      MR. CHAIRMAN:  Dag, he didn't raise the taxes

this year.

      MR. BARRERA:  Mr. Randy Dunn, I'm going to

suggest to Mr. Bush to make you assistant to Governor Ridge

of Homeland Security.

      That beautiful lady Marilyn, master's in

business administration, I would recommend you to be assistant to Dr. ? Garcia at the College, but I won't do it now. Thank you very much.

MR. CHAIRMAN: Next Dino Chavez, Cafeteria Plan.


(h).  DINO CHAVEZ:

It's kind of hard to follow that gentleman.

My name is Dino Chavez, I live here in Brownsville, I work in Brownsville, I office in Brownsville, I went to school in Brownsville.  I'm ashamed at the extreme politics that goes on at the Board level.  It goes on at the administration level, and it's all to the detriment of employees.  Employees are the people who pay taxes, who live in our community, who elected you to your positions.  Your duty is to them.

As a taxpayer of this community, I'd like to make everybody aware and set the record straight of just a few important facts that are currently going on with the insurance.

In August you-all went out for proposals on the Cafeteria Plan.  I met with someone, not anyone in particular, who told me that the only reason they were going out for Cafeteria Plan is that they were dissatisfied with the disability carrier.  When I spoke to that individual that I had nothing to do with the disability carrier for the

District, he said "Well, sorry, that's my fault, I must have made a mistake."

I asked him why is it that you-guys are going out for proposals on the Cafeteria Plan and nothing else? He really couldn't answer my question. At the end of August, beginning of September, proposals were submitted for consideration. At the end of September the group health insurance policy was changed. Employees were given two days to make a very important decision in their lives.

At that time, as your Cafeteria Plan administrator, we recommended about a week and a half of these mini enrollments so that we could document the changes that happened as they relate to Section 125.

Guess what. We were told "You got two days, and we want you to set up here in the office here in the administration building. We don't want you to go to all the campuses." So all the phone calls that I received were misplaced with anger toward me, because it's nothing that I did.

On October 30th, 60 days after the proposals were in your hands, you finally had an insurance committee meeting to hear presentations from the various vendors, including ourselves. This meeting was held, co-incidentally, at the same time that the employees insurance committee was also called to meet. Somebody said

"divide and conquer."  I don't know if there's any truth to that.

MR. CHAIRMAN:  You have 30 seconds.

MR. CHAVEZ:  They didn't get to hear our presentation, the employees I'm talking about.  The decision on the matter was tabled and scheduled to be made at this meeting.  Once again the decision has been postponed and pulled off the agenda by someone.  I'd like to know who that someone is.  I think everybody deserves to know who that someone is.

In the interest of accountability, the public deserves to know.  And finally, I'm not addressing this to any particular person, but as the head of our insurance committee, whoever that might be, I ask you to please be expeditious in making this decision.  Employees are the people who are going to be suffering.  That's all.

MR. CHAIRMAN:  Stephen Andrus, Letter of Intro for 403(b) solicitation.

(i).  STEPHEN M. ANDRUS:

For the record, my name is Stephen Andrus, I'm the owner and general manager of Teachers Agency of Texas, owner/general manager of Marketing 101 Insurance Services of California, owner/general manager of Teachers Agency of Western Wyoming, and registered representative of MacMar Investment Corporation.

On October 18th, I sent a letter to every board member, and I carbon-copied it to the appropriate people, including the insurance commissioner of the State of Texas, showing how I had been denied my privileges which I have for five years to solicit 403 and 403(b) selling products in this district.

I come here tonight because the Board is the highest authority of decision making, at least I thought that before this evening. Because I never had any success with other levels, so why I'm actually here for is to ask your approval to let me solicit my products on school time, mandatory presentations, everybody is required to be there. And I'd also would like to request that I can use the school district's mail system to solicit my products.

And why would I have such a strange request? Ladies and gentlemen, my competitor was granted these privileges. They are using the school mail system to solicit their 403(b) products, yet I am told that I am not allowed to be here, that it's a direct violation of the law.

MR. CHAIRMAN: You have 30 seconds.

MR. ANDRUS: Okay. I don't want to mention a name, but area superintendent number 4, granted meetings in her cluster to allow these people to libel all the other solicitors in the District, and she did nothing to stop it.

I've got a letter here which was approved --

E.E. Jr., I do not know who that is -- to go through the public mail system.

        MEMBER: Mr. President, it's obvious that by him mentioning initials that he is making allegations to an employee of the District, and I ask him please either cease or to come to the next meeting.  Thank you.

        MR. CHAIRMAN:  Well, time has expired, time up.

        MR. ANDRUS:  Okay, I just want to mention one more thing.  I'll pass these out without mentioning any names.  This article referred to a 1970 act called the Rico Act --

        MR. ROERIG:  The time of the gentleman is up and he's expressing that he wants everybody to be careful, follow the law, so the law is your time is up.

        MR. ANDRUS:  Thank you.

        MR. CHAIRMAN:  Francisco Sifuentes.

(j).  FRANCISCO SIFUENTES:

        Board members, Superintendent, ladies and gentlemen, my name is Francisco Sifuentes, I'm the representative for Texas school at-will employees.  I was reading recently a very, very thick book on national transportation of school buses.  In there I saw the importance of the bus drivers and what training do they need to transport these children.

        And then recently I explained my topic, I put

administration and it was no more space to put administration failure to see that these bus drivers are very, very important. They hold a very important job within the District as other employees do. And most of your employees are employed by the district.

I was told that the salary increase they would receive was not given to them because of our fault that we can here and did not accept the recommendation on the first proposal that ? did. Both of them were not correct, were not proper but they had to be done because of the time limitation. One of them was giving employees 5, 6, 7 cents increases. There is no way in the world we were going to accept that. There were many --

MR. CHAIRMAN: Thirty seconds.

MR. SIFUENTES: -- at that level. And now we see salary increases of 11, 12, $13,000.00, and so forth. So the administration needs to look at the drivers in the future and to see the importance and to upgrade their Level to 3 -- I'm sorry, Level 5 instead of Level 4, because of the importance of their job.

Thank you.

MR. CHAIRMAN: Thank you.

Patrick Hammes, current events.

(k). PATRICK HAMMES:

At the last meeting when we had ?talking bus we

27

had two kids getting awards and we had Ronnie Zamora talking, speed talking basically, about there's no way we can upstage that one tonight it surprised me.

I want to talk about three things quickly, very quickly.  The first one is we had out teacher insurance meeting on October the 30th.  We had an outstanding turnout, we probably had at least 60 people there, all campuses represented, special services, food services.  We have another one coming up on the 27th, we hope the Board members will make it.

The two things that I took from the evening, we had a spirited dialogue with administration representatives. The Teacher Insurance committee definitely tried to make the point we want to involve in the process, we don't want to be the entire process, we want to have input into the decision making.  We want to be a part of the whole process.

The concern we had was that the Board insurance committee was meeting separately from us the same night, and we would like to meet with you together.

The second one, and I can't do as good a job as Dagoberto did earlier.  Dr. Sauceda, I don't know you personally, I've come to your welcome to Brownsville, I've seen you come in and out of the building, I think I've shaken your hand.  You know, the concern in the District was with the Board's increasing your salary.  And I know for a

person to be in your position is that you must have a
positive belief in yourself and a can-do attitude, otherwise
you would not have achieved the position that you have.

       MR. CHAIRMAN:  You have 30 seconds.

       MR. HAMMES:   Okay.  I'm only going to get two
of the issues then.  And what I would like to make the
request for is, since I know you have such a belief in your
ability and to make a positive statement to the employees in
this district is that at this time, if you go back into
Executive Session, that you tell the Board members that at
this time you decline your increase because you're sure that
when we review you in the spring that you will earn that
salary increase.  Think of the positive impact it would make
to the employees here if you had the belief that you're
looking at the fact that we took a loss on health insurance,
that you'll sacrifice for yourself.

       Now, in saying that, if someone gave me
$10,000.00 you'd probably have to pry it out of my cold dead
fingers to get it away from me, so my other suggestion is to
the Board members who approved this is -- as a taxpayer --
I'm not the employee speaking, but put your money where your
mouth is.  We have a bad history in this district of
superintendents not fulfilling their contracts.  If for any
reason Dr. Sauceda is either not able to fulfill your
contract for whatever reasons, that the Board members who

approved this tell the community that they will pay the 10,000, 20,000 or $30,000.00 that they've given you. That would show a strong faith to the community and also their belief in you.

Finally, my father is a veteran of World War II, Korea and Viet Nam. He was wounded in the first two, and luckily he was not wounded in the third.

I've been an employee of this district, this is my 18th year. And we have yet, yet in those 18 years to have a Veteran's Day off or a Memorial Day off. Nowadays ? When we make plans and we know a lot of what -- you know, the kids are going to learn a lot more from watching us and what we do than sometimes what we tell them. I think as a community and as representatives and as positive educators we need to look at the school calendar and honor our veterans by having holidays. I personally don't mind working two extra days coming into May or June if it's going to honor our veterans and people who sacrificed their lives for our country.

Thank you.

MR. CHAIRMAN: Humberto Garcia on board issues.

(1). HUMBERTO GARCIA:

Good evening, Board members. My name is Humberto Garcia. Mr. Colunga, Board members, Mr. Sauceda, I'm a representative for ? Local 66 I am here as a taxpayer

and as a parent with my children attending BISD campuses. I'm also here as a representative of several employees working for the BISD in its different departments.  For the past two weeks I have read several articles from the Brownsville Herald and one that really concerned me is the one that I have on my hands right now in which you stated that you sent a message -- a message of what?

       The only message that I got was that

       MR. CHAIRMAN:  You have 30 seconds.

       MR. GARCIA:  -- once again divided board members playing politics.  Enough is enough.  Let me remind you that there is enough ways to skin a cat.  I hope you got the message because the way you hold that chair, the same way you can lose it.  We can do the correct channels to make the -- In order to make work, please work together.

       Thank you.

       MR. CHAIRMAN:  Javier Barbosa?  Robert Uresti. Open-door policy.

(m).  ROBERT URESTI:

       Board members, Dr. Sauceda, I came here for one reason.  When I worked with Dr. Jackson as assistant ?, his door was open to me.  When Mr. Gonzalez was interim superintendent the door was open for me too, but when I sent two letters to Dr. Sauceda on the concerns of my child, I think File 13 was the appropriate place for these.

I'm very disappointed, as a taxpayer, very disappointed. Yes, an apology was sent by Dr. Garcia and he's been helping a great deal with my wife and I about my child. But if that's the way you have your door open, with locks --

MR. ROERIG: Mr. Chairman, this is clearly a complaint against an officer of the District. And there certainly is an appropriate forum for it and the Board will be glad to listen to it in Executive Session.

MR. CHAIRMAN: Let's see if we can schedule that.

MR. URESTI: You mean I get to go behind closed doors?

MR. CHAIRMAN: Yes.

MR. URESTI: I'd like to talk to the superintendent, yes, behind the closed door, yes, I'm not afraid. Okay. Thank you. I will be for next week. Thank you, thank you, Board members, and the $10,000.00, I think I have some change here.

MEMBER: -- said that these people are notified they are on the November 20.

MR. CHAIRMAN: Okay, George Borrego, miscellaneous.

(n). GEORGE BORREGO:

Is there anything left to say? Well, yes, there

is.  We did very well on the DEC visit, I would like to
thank -- getting us ready for DEC.  I don't think it's been
done publicly and I'd like to do that.  I would also like to
say that Porter won three games this year.  ?? Seriously, we
are losing our focus, we are ?? various issues, and I'm very
concerned.  During the summer I saw a board that was working
together.  I saw a superintendent that was working with the
board, there were no problems, there was only a future, a
good bright future; we stumbled.

        And I don't want to blame anybody, but we do
need to get back on track.  And if it means that board
members have to hug each other in public, then so be it.  If
it means that I have to have a healing session from you-all
to get back on track, so be it.  Thank you for 18, 19 and
38.  I hope it's within our budget.

        I would like to ask the Board a question.  Are
our janitors and para-professionals going to be off on
Thursday after Thanksgiving like the rest of the BISD
workers.  And finally, on employee insurance, we need to get
together because the insurance committee is ?  Right now, as
it appears, we have three weeks left to enroll for a
Cafeteria Plan that Mr. Roerig should be aware is a federal
? that requires all the employees to be visited by the
individual, and we're talking about more than 6,000, and
we're talking about three weeks before Christmas.  We need

to get started on that right away.  No changes, leave our
employee insurance alone.  If you want to make changes, then
let's talk, put it up on the table and let's discuss it.  ?
ourselves, we're to changes, but there's two problems right,
and if they're better than what we have we're not going to
vote against ourselves, we'll go with the changes.  But
there's two problems we're working on right now.  We need to
get the people enrolled --

   MR. CHAIRMAN:  You've got about 30 seconds.

   MR. BORREGO:  We need to get the people
enrolled.  Thank you.

   MR. CHAIRMAN:  Thank you.  Mr. Trevino.

(o).  ORLANDO TREVINO:

   Mr. Board President, Mr. Sauceda, Board members,
administrators and all public bodies.  I normally speak with
high regards, and right now, I don't.  I've got my daughter
who was going to come and speak here because of the problem
at Aiken's.  She's sick so she's got to be taken to the
doctor.  I'm not saying it's the problem of the school, I'm
saying there's a problem.  When you've got certain areas
cordoned off, you know there's a problem.

   But getting aside from that, I'm tired of also
hearing a change in the school board calendar.  Because I
got notified about being here one day, and I notified a lot
of people, the ones that are concerned, to accommodate one

person.  How about everybody else?  How about our children's parents, how about the employees?

Second of all, I'm sick and tired of seeing four fingers dangling.  I've said it once before, it's time for everybody to work together, nobody is working together.  I also see pay raises for a few and crumbs for the rest.  I think I talked before -- when it comes to insurance, when it comes to pay raises, it affects my child, yes, it does affect my child.  When you've got employees have to worry about theirselves, they're not going to worry about my child.  I had my child go in today, and she said "I got an earache."  That problem was taken care of, but she was told, "You know what, there's kids sicker than you."  I was not very appreciative, but I took care of that.

Basically what I'm trying to tell you is -- we've got a lot of employees, you've got a lot of people.  I see a lot of influential people here too, so these board meetings might be important.  I think it's about time that you-all stopped changing meetings to accommodate yourselves, one person or two.  I think it's about time you started scheduling meetings that accommodate the people that are out there, they are the ones that ?.  As a taxpayer, as a voter and as a parent, I think it's about time you-all started working together.  I'm talking all seven Board members with the rest of the administrators.  Thank you very much.

MR. CHAIRMAN:  Next is Linda Salazar.

(p).  LINDA SALAZAR:

Dr. Sauceda, Mr. President, members of the Board, ladies and gentlemen, I have chosen to address you during the public forum section of the agenda because prior to being a Board member, I am a citizen of Brownsville, of this community.  I want to address a few concerns that are important to me, and I believe, to the rest of the Brownsville community.

Number 1, no member of the Board trustees should profit from his or her position in any manner.

Number 2, a board member should not take advantage of his or her position to broker deals from which he or she benefits.  In fact, the law and our own policy prohibit this conduct.  I specifically refer to BBE Local, our policy titled Board Members' Ethics.  And I'm to short it down to you, I have probably a minute and a half, or a minute.  If a trustee is required to file a Conflict of Interest affidavit and disclosure and does not do so, that trustee is in violation of law.  It is a prohibited act and abuse of office for a trustee to obtain a benefit or to misuse District property or personnel.

It is an abuse of power for a trustee to refer a company for business when that trustee is set to get a commission from the business transaction.  This action falls

under the bribery statute that reads as follows.  A trustee
shall not knowingly offer, confer on any or benefit --  I
believe that a trustee received a commission from a land
sold us by a real estate company for which the trustee
works.  I find this action to be ? and I believe that the
trustee should pay that money back to the school district.
I do not make any money off this district, especially if I
can run this platform.  Thank you.


PUBLIC AUDIENCE

NOVEMBER 20, 2001


PAT SCHUMACHER, RE:  INSURANCE AT LOPEZ CAMPUS

        Good evening, Mr. Colunga, Board members, Dr.
Sauceda, administrators and other people in the audience.  I
am here tonight to represent the Lopez High School staff.  I
have been elected to represent them in matters dealing with
insurance.

        At issue is the proposal on tonight's agenda to
change the Cafeteria plan to NPA.  According to the
information available to me, this new plan would increase
out-of-pocket expenses to the employees at a minimum of
$5.00 enrollment and $3.00 monthly to administer the plan.

        Time after time school district employees have
stood at this podium asking for our insurance cost to not be

increased.  Why are we being ignored?  Who is making this
decision?  In the event that my information is not correct,
why, as campus insurance representative, can I not be
informed.  I am very aware that an important meeting
regarding insurance will be held November the 29th.  Is this
not after the fact for the Cafeteria Plan?

Will employees have time to ponder the financial
affects of the proposed plan to make informed decisions
regarding where to place their insurance dollars?

Thank you.


MR. CHAIRMAN:  Thank you.

We continue with Isabel Benavidez speaking as a
parent.

We continue with Carlos and Maria Barrera,
parents of Carlos and --

Next on the list, Norma Guzman.  Norma Guzman.

And continuing with the next person, Sparky, a
few words.

SPARKY ESPARZA, RE:  FEW WORDS

Dr. Sauceda, members of the Board and all
present and not present.  I pray that all will enjoy this
Thanksgiving festivity, and may each remember those bereaved
Americans whose loved one is resting in Eternity until our
Redeemer arrives.  Let us be grateful for all the

blessings received.

We should pray for our national leaders as well as those in danger of life-threatening realities.  We should also include our Board members, superintendent and all teachers, students, administrators as well as all involved in the educational processes.  May any and all who travel near or far be safe in their journey.

When so many Americans are laid off, we should be grateful to BISD for our present employment.  Often how sharper than a serpent's tooth when we have a thankless employee.  When soldiers of the field murmur or display their discontent over various discrepancies, please keep in mind the first amendment freedom of speech.

At times the application of the scorned word may appear tactless and unprofessional as well as accusatory. Nevertheless, the right to express inner thoughts is indeed crucial to the architectural design of our written constitution.

I pray that patience will persevere as we walk through the valley of --

MR. CHAIRMAN:  You have one minute.

MR. ESPARZA:  -- scheduling.  Whether you select modified block or the 55 minute format, consider not the political repercussions, but rather, our students.  In my humble opinion, continuous exposure is the critical mass of

success.

In conclusion, may Christ continue to bless all of His people, and may we grow in peace.

Thank you.

MR. CHAIRMAN:  Thank you, Sparky.

Next, Catalina Garcia, subject red ribbon.

CATALINA GARCIA:  RE:  RED RIBBON

Good evening, Mr. President, Superintendent, esteemed Board members, administration and public audience.

I am here today to question the Red Ribbon rally.  It was supposed to have been rescheduled, but apparently this event was canceled because there was an administration in our district that was out of town.

I'd like to let you know that our children and teachers worked very hard to make this event a great success.  However, if our model is "We're all about children," then let's prove it to our children, our teachers in this community that we are about children.  It has not been rescheduled as of yet.

Also, once again let me remind you, if the District makes any changes level changes and salary increases with retro pay, please make sure that it is equally done district-wide, and that it's done because there's a budget already set aside for it and that the Board has approved it.

40

Let me remind you that our budget has been depleting very rapidly in this district.

Thank you.

MR. CHAIRMAN:  Thank you.

Next, Dagoberto Barrera on the proposed state income tax.

DAGOBERTO BARRERA, RE:  PROPOSED STATE INCOME TAX

So you can see I'm not against your work, I'm going to give you your Christmas ahead of time.

Honorable President, Board members, my fellow Americans, and my colleague teachers.  What a lunatic suggestion, lunatic suggestion came out during a state finance school committee meeting on raising taxes, a state income tax.  The worse thing about it is that our own adopted son, my beloved adopted son, Noe Sauceda, and another ex-employee of Brownsville, administrator Lisandro Ramos, who is now the superintendent in Lyford, also suggested an income tax for Texas.  Also, our own representative Rene Oliveira, suggested a state income tax.

This liberal and radical sock-it-to-us, our taxpayers, and they came from ?, ? of San Antonio.

MR. CHAIRMAN:  One minute remaining.

MR. BARRERA:  One minute.  A hotbed of radicals in the poorest district in the state of Texas.  They also

brought the suit that brought us the Robin Hood system of financing.  Texas is one of the few, and I think very few states that have no income tax.  These ultra-liberal people have never filed a government spending program that they don't like.

Just imagine when our president and our congress is trying to put together a stimulus package of relief for us taxpayers, you come around and try to raise our taxes and putting your hands in our pocket again.

The Robin Hood method of taking from the rich and giving to the poor is a very unjust type of system.

MR. CHAIRMAN:  Time --

MR. BARRERA:  The bus drivers, and now the teachers that have to pay more premiums on the medical insurance ought to be up in arms when they mention a state income tax.  The people that got a 3%, they ought to be up in arms when other income tax -- raise the taxes.

MR. CHAIRMAN:  Time has expired, Mr. Barrera.

MR. BARRERA:  Time is up?

MR. CHAIRMAN:  See if you can conclude --

MR. BARRERA:  Conclude it.  The people that have high-paying salaries probably don't care about paying more taxes.  The highly paid administrators, it is okay for them because they already got more goodies from somebody else's pocket.  My lesson to you is this.  My fellow Americans,

42

beware of the politicians and do-gooders that say that they care for you.  You don't help the needy by destroying the middle classes.  This lunatic suggestion will never fly in Texas as long as the Republican conservative public state officials remain in office.

Thank you very much.

MR. CHAIRMAN:  Thank you, Mr. Barrera.  Next is Gloria Zapata, subject new middle school.


GLORIA ZAPATA:  RE:  MEW MIDDLE SCHOOL

Mr. President, Dr. Sauceda, members of the Board, my concern tonight is the hiring of the principal for Juliet Garcia Middle School.  My concern is that when you select this person it should be a person that will work with the teachers and consider the school a project to succeed with everyone involved, and not be a "me" project by the principal to where there is constant remarks, "This is my school," "I did this," and "I did that."

Please let it be someone that will work together with the teachers.  Try to select a principal that has not been already moved from one school to another.  And finally, talk to your teachers from wherever this person has worked, and ask them about the principal or the person you're going to choose, and find out what kind of person he is.  Does he get along with the teachers, the students.  Is he a

motivator, a people person.  It's very, very, very important in order for a school to run right.

Thank you.

MR. CHAIRMAN:  Thank you.  Next Dino Chavez, subject Cafeteria Plan.


DINO CHAVEZ:  RE:  CAFETERIA PLAN

Board members, my name is Dino Chavez, I represent Aflac.  We are the District's current Cafeteria Plan administrator.  Our office is here in Brownsville, all live in Brownsville, our agents are Brownsville and Valley agents.

I'm here tonight to explain to you five reasons why you should choose Aflac.  Legality, which is the most important one.  I'm not an attorney, and I don't claim to be, but according to the Texas Attorney General's Office in their legal opinions dated May 8th, 1987 and April 4th, 2000, Granting an Agent of Record designation to an insurance agent or agency is illegal when the value of the contract is more than $10,000.00.  Moreover, granting an individual an Agent-of-Record letter for the purpose of soliciting optional retirement investments or annuities is also illegal.

Approving agenda item number 24, that reads "Recommend approval to award RFQ No. 012-02 to National Plan

Administrators, Insurance Associates of the Valley, would be illegal, as their proposal calls for an agent-of-record designation.

MR. CHAIRMAN: One minute remaining.

Number 2, cost. All of Aflac's Cafeteria Plan services are totally free of charge to the District and to its employees. We've already saved the District employees over $90,000.00 in the last three years. NPA's proposal would cost employees over $30,000.00 in annual Cafeteria fees, plus over $32,000.00 in enrollment fees, plus another $39,000 in annuity fees. Cumulatively, employees would be forced to pay approximately $101,000.00 in first-year fees alone for something that we provide totally free of charge.

Service. Claims turnaround. Our FSA claims are processed daily, and have a turnaround time of 24 to 48 hours. In addition, as we proposed in February of 2001, we can front funds to BISD employees so that they do not have to wait for the District to write us a check before they can request reimbursement for un-reimbursed medical claims.

According to NPA's proposal, they process claims monthly. Employees will be forced to wait much longer for their FSA claim reimbursements.

Number 4, flexibility. We do not require specificity for all the District's supplemental products, as was rumored. We will place under the Cafeteria Plan

whichever products or companies are chosen by the District's insurance committee.

    MR. CHAIRMAN:  You have about ten seconds.

    MR. CHAVEZ:  NPA, Insurance Associates of the Valley, requires an Agent-of-Record letter.  As per the opinions issued by the Texas Attorney General's Office dated April 4th, 2000, I quote, "Because the use of a designated broker of record will necessarily limit the number of companies from which the District may purchase insurance, it may foreclose the District's access to the most advantageous rates and returns."

    And lastly, number 5, local agents, local office and local service.  Employees currently will walk in our door daily for service and questions.  They do not have to deal with telephone numbers or agents that are hardly accessible from out-of-town offices.  Many employees who have a hard time dealing with insurance matters over the phone prefer in-person contact.

    NPA Insurance Associates of the Valley do not have a Brownsville office.  Employees who need service would need to drive to Harlingen.

    Thank you.

    MR. CHAIRMAN:  Next, Adriana Chavez?  Daniel Sanchez, Guillermo Morin?  Pat Hammes, insurance.

PAT HAMMES, RE:  INSURANCE.

Mr. Colunga, Board President, Dr. Sauceda, members of the Board, esteemed audience.  First of all I'd like to wish all of you an upcoming peaceful and happy Thanksgiving holiday that you hopefully will enjoy with your family.  Take a chance to rest and relax before you come back to school next week.

I'm also looking forward to hopefully seeing many of you at the insurance meeting on the 29th here.  As I stated at the last meeting, we're looking forward to working together with the Board.

It was brought to my attention this past week that there was a concern that some of the teacher representatives may be using the position -- teacher insurance representatives may be using their position politically.  I wanted to bring to you -- this is a copy -- the copy that I gave you was a copy of the notice that I gave to all the employees on my campus, based on the last meeting.

The second page is the seven questions that were submitted by the deadline for -- to be presented at the next insurance meeting.  I do not know if I was one of the persons that was in mind on this.  I do want to say for the record that I am a political person in the fact that I do vote, and that's the limit to my politics.

I do not indorse people publicly, I've not gone out and represented any of you.  I have voted for five of you.  But I did want to show on the questions, and I was talking to some lovely woman after dinner last night, not my wife, who was also present, though, and one of the concerns that I expressed to -- it was a fellow employee, is that there's a lot of rumor and innuendo going out throughout the district about insurance.  I believe it's best to get all these, you know, to get all the questions answered, to put all things there.  Hopefully no questions are there to embarrass anybody, because there should not be any embarrassing questions.

If there is something out there, you know, let's put it out.  I know at the last insurance meeting one of the administrative representatives, and it's in my notes on the first page, was asked a question about qualifications.  The gentleman had the integrity to answer the question, and at least on my campus, since then, there have been no questions about this, or concern.

So anything else, I mean if you look at the seven questions, I think --

MR. CHAIRMAN: You have one minute remaining.

MR. HAMMES:  Well, I should have a little more time because we had seven cancellations this evening.

MR. ROERIG:  There were two gone, so it's up to

the Chair, but these two, that would be an additional minute.

THE CHAIRMAN:  Proceed.

MR. HAMMES:  Thank you, sir, thank you, Mr. Roerig.

The first five questions, I think, are good. They are definitely related to insurance.  The sixth question is one of the rumors that is going around that I would like to put behind us so that we can move on with the insurance business for the District.

And the last question is a follow-up question to two questions, based on them, and this question was asked at the last insurance meeting.  We were told, "We're not going to go there."  Again, I feel we were better off served if we have nothing to hide, get information out, let's go forward, let's work together and let's make the decision for the employees of this District for insurance.

Thank you for your time.

MR. CHAIRMAN:  Thank you.  Next Abel Moreno -- I'm not sure about the last name --

FRANCISCO SIFUENTES RE: FEW CONCERNS
(Not able to understand this guy).

Board members, I have a couple of concerns.  -- What happens if one of the members want to get out tomorrow

or next week, six months.  I said, well, you tell me what we can do.  against his will to deduct from his wages, so if comes next week he wants to get out, we have to allow him to get out.  Also another district is Mission.  They do not hold people to stay with the district at any time.  They can get out at any time, because they told me it was illegal to hold them against their will.  And Brownsville is doing that.  many not being allowed to get out.  they should be able to get out, but they didn't have that because of

Another concern I have is that grievances, conferences are not being respected by administration. They've been to long to compensate discuss with that person go back to level one which it should be -- it's taking the District's time and our time also.  It took three months we filed a level 3 grievance and a level 2

# Exhibit

## "I"



# Brownsville Independent School District

1900 Price Road   Brownsville, Texas 78521-2417   (956) 548-8000   Fax: (956) 548-8019

*Noe Sauceda, Ph.D.*
*Superintendent of Schools*

*M. Lafemina*
**FAXED**
512/479-8...

17 pages
956/548.8012

HAND DELIVERED

November 29, 2001

Dino Chavez, MBA
Regional Sales Coordinator
905 Los Ebanos Blvd., Suite A
Brownsville, Texas 78520

Dear Mr. Chavez,

Please accept this correspondence as my official 30-day notice of our intent to non-renew your services as our Third Party Administrator for our Cafeteria plan. I must also inform you that your proposal for renewal of the contract has been rejected as allowed under BISD Policy CH (Legal) and CH (Local).

Your continuous inappropriate correspondence is troublesome since appropriate channels were not followed. I consider the content of your letters and your conduct as unprofessional, unethical, and against expected customer-service provider relations. I am directing you to cease and desist all contact with school personnel during school business hours. Campus administration will be directed to contact security services if you or any of your associates are found to be on school-district property.

I must caution you that the content of the memos you disseminated to BISD staff are, in my opinion, both slanderous and libelous and can place both you and your corporation (AFLAC) in a legally liable situation. I will be contacting Mr. Frank Lafemina in the Austin Office and expressing to him my disappointment with your treatment of my Board and staff since it is obvious that you are not working in the best interest of BISD, your client.

Your supervisors will be advised that this administration will consider AFLAC as a future product provider under the following conditions:

    a.    A corporate officer must personally apologize to each board member, the board as a whole, myself, and my administrators publicly.

    b.    A written assurance that appropriate, ethical conduct will be exercised in the future by any and all AFLAC representatives wishing to serve BISD.

    c.    Provided that the products are of the best quality, service and price.

Sincerely,

Noe Sauceda, Ph.D.
Superintendent of Schools.

Attachments: Correspondence from Dino Chavez, Section 125 Cafeteria Plan Proposal
               Policies CH (Legal and Local)

cc:     BISD Board of Trustees
        Frank Lafemina (via facsimile: 512/479-5968)
        AFLAC State Office
        1801 LaVaca, Suite 108
        Austin, Texas 78701

*"The Brownsville Independent School District is an Equal Opportunity Employer, M/W/D/V"*

# Exhibit

## "J"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DINO X. CHAVEZ | § | |
| | § | |
| VS. | § | |
| | § | CIVIL ACTION NO. |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, NOE SAUCEDA, | § | B - 02 - 128 |
| and RANDY DUNN, MARILYN DEL | § | |
| BOSQUE-GILBERT and HUGH EMERSON, | § | |
| JR., in their official capacities as Board | § | |
| Members of Brownsville Independent | § | |
| School District | § | |

---

**PLAINTIFF'S ANSWERS/RESPONSES TO DEFENDANT NOE
SAUCEDA'S FIRST SET OF INTERROTATORIES, REQUESTS FOR
PRODUCTION AND REQUEST FOR ADMISSIONS**

---

TO:    NOE SAUCEDA, Defendant,
       by and through his attorney of record:

       Ms. Eileen M. Leeds
       WILLETTE & GUERRA, L.L.P.
       International Plaza, Suite 460
       3505 Boca Chica Boulevard
       Brownsville, TX 78521

COMES NOW **DINO X. CHAVEZ**, Plaintiff in the above styled and numbered cause
and pursuant to Rules 33, 34 and 36 of the Federal Rules of Civil Procedure, serves and files
Plaintiff's Answers/Responses to Defendant Noe Sasuceda's First Set of Interrogatories, Requests
for Production and Request for Admissions, attached hereto.

Signed on this the _____ day of March, 2003.

Respectfully submitted,

**LAW OFFICE**
**J. ARNOLD AGUILAR**
Artemis Square, Suite H-2
1200 Central Boulevard
Brownsville, Texas 78520
Telephone    : (956) 504-1100
Facsimile    : (956) 504-1408

By: _____
J. Arnold Aguilar
State Bar No. 00936270
Federal Adm. No. 6822

Attorney for Plaintiff,
DINO X. CHAVEZ

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing **PLAINTIFF'S ANSWERS/RESPONSES TO DEFENDANT NOE SAUCEDA'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION AND REQUEST FOR ADMISSIONS** has on this the 21ˢᵗ day of March, 2003, been forwarded via certified mail, return receipt requested to:

Ms. Eileen M. Leeds
WILLETTE & GUERRA, L.L.P.
International Plaza, Suite 460
3505 Boca Chica Boulevard
Brownsville, TX 78521

and via First Class Mail to:

Ms. Elizabeth G. Neally
ROERIG, OLIVEIRA & FISHER, L.L.P.
855 W. Price Rd., Suite 9
Brownsville, TX 78520

Mr. William B. Steele, III
LOCKE, LIDDELL & SAPP, L.L.P.
100 Congress Avenue, Suite 300
Austin, TX 78701

:

J. Arnold Aguilar

## PLAINTIFF'S ANSWERS/RESPONSES TO DEFENDANT NOE SAUCEDA'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION AND REQUEST FOR ADMISSIONS

***INTERROGATORY NO. 1:***    Identify yourself by stating you (sic) full name (including all other names by which you are or have been known, if applicable); date and place of birth; all social security numbers ever held by you; all driver's licenses, types, numbers, and by whom issued, held by at any time; your address or addresses for the last five years, giving the street, street number, city and state; the name and last known street, city and state address of each person, if any, to whom you have ever been married, either ceremonially, or by a common law marriage; the name, birth date birth place and street, and street (sic) of each of your children.

ANSWER:  Dino Xavier Chavez
DOB: November 26, 1964, Raymondville, TX
SS#: 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
TDL#: 10286511, Class C
14 Catherine Lane, Brownsville, TX
Odelia S. Chavez
Children: Danielle Chavez (08/01/91)
Dino X. Chavez, II (05/28/93)
Alexandra Chavez (10/21/99)
Dominic Chavez (12/23/02)

***INTERROGATORY NO. 2:***    Please identify by name, address and phone number, all persons known to you, your attorney, or other agents who have or are believed to have knowledge of relevant facts, and state the knowledge each possesses.

ANSWER:
Dino X. Chavez, Plaintiff
c/o Law Office J. Arnold Aguilar
1200 Central Blvd., Suite H-2
Brownsville, TX 78520
(956) 504-1100

Noe Sauceda, Defendant
c/o Willette & Guerra, L.P.
3505 Boca Chica Blvd., Suite 460
Brownsville, TX  78521
(956) 541-1846

Otis Powers, President
Board of Trustees / Brownsville Independent School District
1900 Price Road
Brownsville, TX  78520
(956) 548-8000

Pat Lehmann, Vice President
Board of Trustees / Brownsville Independent School District
1900 Price Road
Brownsville, TX  78520
(956) 548-8000

Joe Cadriel, Secretary
Board of Trustees / Brownsville Independent School District
1900 Price Road
Brownsville, TX  78520
(956) 548-8000

Hugh Emerson, Jr., Assistant Secretary
Board of Trustees / Brownsville Independent School District
1900 Price Road
Brownsville, TX  78520
(956) 548-8000

Marilyn del Bosque-Gilbert, Member
Board of Trustees / Brownsville Independent School District
1900 Price Road
Brownsville, TX  78520
(956) 548-8000

Joe Colunga, Member
Board of Trustees / Brownsville Independent School District
1900 Price Road
Brownsville, TX  78520
(956) 548-8000

Randy Dunn, Member
Board of Trustees / Brownsville Independent School District
1900 Price Road
Brownsville, TX  78520
(956) 548-8000

Kenneth Lieck
1900 Price Road
Brownsville, TX  78520

Berta Peña
1900 Price Road
Brownsville, TX  78520

Hector Gonzalez
1900 Price Road
Brownsivlle, TX  78520

Johnny Piñeda
1900 Price Road
Brownsville, TX  78520

Rachel Ayala
1900 Price Road
Brownsville, TX  78520

German Castillo
1900 Price Road
Brownsville, TX  78520

Leo Lopez
1900 Price Road
Brownsville, TX  78520

Eddie Errisuriz, Jr.
1900 Price Road
Brownsville, TX  78520

Marta Barrera
c/o Central Middle School
Brownsville, TX  78520

Arnulfo Olivarez
521 S. 77 Sunshine Strip
Harlingen, TX  78550
(956) 423-0490

Lynn G. Barnson
225 E. Ft. Union Blvd., Suite 125
Midvale, UT 84047

Frank La Femina
1801 Lavaca, Suite 108
Austin, TX 78701
(512) 476-6661

Ron Levine
2027 Price Road, Suite E
Brownsville, TX 78521
(956) 547-7717

Daniel Sanchez
700 Paredes Line Road, Suite 209
Brownsville, TX 78521
(956) 571-5117

Antonia Davila
4900 N. 23rd Street
McAllen, TX 78504
(956) 630-1900

**INTERROGATORY NO. 3:**    Please describe in detail and identify any and all promises, contracts, work commitments, oral or written, between you and Dr. Noe Sauceda relating to your employment; including all evidence, facts, or information that supports such promise, contract, or agreement.

ANSWER:  Defendant objects to this discovery request as being overly broad and vague on the basis that it fails to describe or identify the information or documents requested with reasonable particularity or specificity, and inquires into matters that go beyond what is relevant to the parties' claims or defenses.  See Fed.R.Civ.P. 26(b)(1)-(2).

Without waiving this objection, I had no such agreements with Defendant Sauceda.

**REQUEST FOR PRODUCTION NO. 1:**    Please provide any and all documents relating to any promises, contracts, work commitments, between you and Dr. Noe Sauceda relating to your employment.

RESPONSE:    None.

***INTERROGATORY NO. 4:***    In your response to Interrogatory No. 8 of Defendant BISD's First Set of Interrogatories to you, you state the Defendant Sauceda made numerous public comments about you and the products you were selling that intended to, and did, disparage you and your reputation in your business and the community. Please identify each and every public comment Dr. Sauceda made, whether oral or written, that you contend disparaged you and your reputation in your business and the community.

ANSWER:  Defendant objects to this discovery request as being overly broad and vague on the basis that it fails to describe or identify the information or documents requested with reasonable particularity or specificity, and inquires into matters that go beyond what is relevant to the parties' claims or defenses.  See Fed.R.Civ.P. 26(b)(1)-(2).

Without waiving the foregoing objection, please see comments made by Defendant Sauceda in the BISD Board Meetings of November 13 and 20, 2001, BISD Insurance Committee Meetings of October 30, 2001 and November 29, 2001, conference between Defendant Sauceda and Frank La Femina on or about November 29, 2001, and documents previously provided.

***REQUEST FOR PRODUCTION NO. 2:***    Please produce any and all documents and/or evidence of the public comments Dr. Sauceda made that you contend disparaged you and your reputation in your business and the community.

RESPONSE:    See documents and tapes previously provided by Plaintiff and Defendant BISD.

***INTERROGATORY NO. 5:***    Please identify what Dr. Noe Sauceda did that you allege was fraudulent.

ANSWER:  Defendant Sauceda represented to BISD Trustees and employees that Plaintiff Chavez's proposal had aspects or characteristics that it in fact did not have, as set out in the documents previously provided, in order to coerce Defendant BISD and its insurance committee to reject Plaintiff's proposal.  Defendant Sauceda also represented to Plaintiff Chavez that the selection of the Third Party Administrator was an open process, to be awarded to the best bid, when in fact he was attempting to award the selection to his preselected designee.

**REQUEST FOR PRODUCTION NO. 3:**    Please produce any and all documents that support your allegation that Dr. Noe Sauceda's actions were fraudulent.

RESPONSE:        See documents previously provided.

**INTERROGATORY NO. 6:**    Please state what Dr. Noe Sauceda did that constituted tortious and intentional interference with your business relationship to AFLAC.

ANSWER:  Defendant objects to this discovery request as being overly broad and vague on the basis that it fails to describe or identify the information or documents requested with reasonable particularity or specificity, and inquires into matters that go beyond what is relevant to the parties' claims or defenses.  See Fed.R.Civ.P. 26(b)(1)-(2).

Without waiving the foregoing objection, Defendant wrote the November 29, 2001 letter and provided a copy to Plaintiff's state coordinator, Frank La Femina, spoke to Mr. LaFemina, and spoke to BISD Trustees and employees, misrepresenting Plaintiff and his products and attempted (successfully) to have Plaintiff removed from his position and ability to sell AFLAC products.

**REQUEST FOR PRODUCTION NO. 4:**    Please produce any and all documents that support your contention that Dr. Noe Sauceda's actions constituted tortious and intentional interference with the business relationship between you and AFLAC.

RESPONSE:        See documents previously provided.

**REQUEST FOR PRODUCTION NO. 5:**    Please identify each spoken or written speech which you claim forms the basis of your First Amendment complaint.  As to each instance of speech identified, please state the time, place and circumstance of each incident and what was said or written.  As to each instance of speech identified, state the source of information on which you relied to make your statements.

RESPONSE:        Defendant objects to this discovery request as being overly broad and vague on the basis that it fails to describe or identify the information or documents requested with reasonable particularity or specificity, and inquires into matters that go beyond what is relevant to the parties' claims or defenses.  See Fed.R.Civ.P. 26(b)(1)-(2).

Without waiving the foregoing objection, see documents previously provided and documents and tapes provided by Co-Defendant BISD.

**REQUEST FOR PRODUCTION NO. 6:**    Please produce any and all documents that support your contention that Dr. Noe Sauceda retaliated against because you exercised your First Amendment right to free speech.

RESPONSE:        See documents previously provided.

**REQUEST FOR PRODUCTION NO. 7:**    Please produce any and all documents that show that the information Dr. Sauceda submitted to BISD employees regarding your September 6, 2001 proposal was not true and correct information.

RESPONSE:        See documents previously provided.

**INTERROGATORY NO. 7:**    What evidence do you rely on to allege that Dr. Noe Sauceda or BISD attempted to hire an agent of record.

ANSWER:  Defendant objects to this discovery request as being overly broad and vague on the basis that it fails to describe or identify the information or documents requested with reasonable particularity or specificity, and inquires into matters that go beyond what is relevant to the parties' claims or defenses.  See Fed.R.Civ.P. 26(b)(1)-(2).

Without waiving the foregoing objection, see documents previously provided and documents and tapes provided by Co-Defendant BISD.

**REQUEST FOR PRODUCTION NO. 8:**    Please produce any and all documents and/or evidence that Dr. Noe Sauceda or BISD attempted to hire and (sic) agent of record.

RESPONSE:      Defendant objects to this discovery request as being overly broad and vague on the basis that it fails to describe or identify the information or documents requested with reasonable particularity or specificity, and inquires into matters that go beyond what is relevant to the parties' claims or defenses.  See Fed.R.Civ.P. 26(b)(1)-(2).

Without waiving the foregoing objection, see documents previously provided and documents and tapes provided by Co-Defendant BISD.

***INTERROGATORY NO. 9(sic):***    In your First Amended Complaint, Section 15, you state that Dr. Noe Sauceda acted "on a matter on which he did not have discretion." What evidence do you have that Dr. Sauceda was not acting within the scope and discretion of the superintendent's duties?

ANSWER: Defendant objects to this discovery request as being overly broad and vague on the basis that it fails to describe or identify the information or documents requested with reasonable particularity or specificity, and inquires into matters that go beyond what is relevant to the parties' claims or defenses. See Fed.R.Civ.P. 26(b)(1)-(2).

Without waiving the foregoing objection, see documents previously provided and documents and tapes provided by Co-Defendant BISD.

***REQUEST FOR PRODUCTION NO. 9:***    Please produce any and all documents and/or evidence that Dr. Noe Sauceda acted on a matter on which he did not have discretion.

RESPONSE:    Defendant objects to this discovery request as being overly broad and vague on the basis that it fails to describe or identify the information or documents requested with reasonable particularity or specificity, and inquires into matters that go beyond what is relevant to the parties' claims or defenses. See Fed.R.Civ.P. 26(b)(1)-(2).

Without waiving the foregoing objection, see documents previously provided and documents and tapes provided by Co-Defendant BISD.

***INTERROGATORY NO. 8(sic):***     What evidence do you have that would have lost any employee already insured AFLAC by not being awarded the Cafeteria Plan.

ANSWER:  Defendant objects to this discovery request as being overly broad and vague on the basis that it fails to describe or identify the information or documents requested with reasonable particularity or specificity, and inquires into matters that go beyond what is relevant to the parties' claims or defenses.  See Fed.R.Civ.P. 26(b)(1)-(2).

Without waiving the foregoing objection, Plaintiff would refer Defendant to all employees to whom policies were sold or not renewed during the 2001 enrollment, and each enrollment thereafter.

***REQUST FOR PRODUCTION NO. 10:***     Please produce any and all documents and/or evidence that show that you would have lost any employee already insured by not being awarded the Cafeteria Plan.

RESPONSE:     Defendant objects to this discovery request as being overly broad and vague on the basis that it fails to describe or identify the information or documents requested with reasonable particularity or specificity, and inquires into matters that go beyond what is relevant to the parties' claims or defenses.  See Fed.R.Civ.P. 26(b)(1)-(2).

Without waiving the foregoing objection, Plaintiff would refer Defendant to all employees to whom policies were sold or not renewed during the 2001 enrollment, and each enrollment thereafter.

***INTERROGATORY NO. 9(sic):***     How many policies did you sell in 1999, 2000 and 2001 to BISD employees.  Please provide the range and median of coverage and the range and median of the premium.

ANSWER:  Defendant objects to this discovery request as being overly broad and vague on the basis that it fails to describe or identify the information or documents requested with reasonable particularity or specificity, and inquires into matters that go beyond what is relevant to the parties' claims or defenses.  See Fed.R.Civ.P. 26(b)(1)-(2).

Without waiving the foregoing objection, Plaintiff would represent that he does not have this specific information, but would refer Defendant to AFLAC, which should be able to compile it.

***INTERROGATORY NO. 10:***  Please explain how losing the Cafeteria Plan prevented you from selling the AFLAC products to BISD personnel.

ANSWER: Defendant Sauceda specifically prohibited me and my agents from being on campus, where the Cafeteria Plan enrollments and AFLAC sales are made.

***INTERROGATORY NO. 11:***  Please explain in your own words how you calculate your lost economic damages.  Please do not produce AFLAC expectations or projections.

ANSWER: As of the present time, I calculate my damages in the manner established by Frank La Femina and AFLAC set out in the attached explanation.

***REQUEST FOR PRODUCTION NO. 11:***  Please produce all photographs, slides, movies, films, videotapes, audio recordings, or similar recorded material in your possession, custody, or control which are in any manner whatsoever connected with or related in any way to the lawsuit.

RESPONSE:    Defendant objects to this discovery request as being overly broad and vague on the basis that it fails to describe or identify the information or documents requested with reasonable particularity or specificity, and inquires into matters that go beyond what is relevant to the parties' claims or defenses.  See Fed.R.Civ.P. 26(b)(1)-(2).

Without waiving the foregoing objection, see documents, tapes, and other items previously provided.

***REQUEST FOR PRODUCTION NO. 12***:  Please produce authorizations for your social security records.  For your convenience, an authorization for your signature is attached to this request.

RESPONSE:     No authorization form was submitted by Defendant Sauceda for Plaintiff to sign.

**REQUEST FOR PRODUCTION NO. 13:** Please produce authorizations for your wage and income information. For your convenience, an authorization for your signature is attached to this request.

RESPONSE:        No authorization form was submitted by Defendant Sauceda for Plaintiff to sign.

**REQUEST FOR PRODUCTION NO. 14:** Please produce copies of your income tax returns with W-2 forms attached for the last five years or an original signed authorization to obtain the same. For your convenience, a form is attached to this request.

RESPONSE:        No authorization form was submitted by Defendant Sauceda for Plaintiff to sign.    See documents previously provided.

**REQUEST FOR ADMISSION NO. 1:**        Admit that you make no income from administering the Cafeteria Plan.

RESPONSE:        Admit.

**REQUEST FOR ADMISSION NO. 2:**        Admit that you would still have received the commissions on renewals without selling a single new policy in 2001-2002.

RESPONSE:        Admit.

**REQUEST FOR ADMISSION NO. 3:**        Admit that you do not get commission on renewals.

RESPONSE:        Denied.

**REQUEST FOR ADMISSION NO. 4:**        Admit that your agent commission rate for BISD business was for the sale of AFLAC policies not for administering the Cafeteria Plan.

RESPONSE:        Admit.

***REQUEST FOR ADMISSION NO. 5:***    Admit that you arduously disagreed with how AFLAC handled BISD account.

RESPONSE:    Defendant objects to this discovery request as being overly broad and vague on the basis that it fails to describe or identify the information or documents requested with reasonable particularity or specificity, and inquires into matters that go beyond what is relevant to the parties' claims or defenses. See Fed.R.Civ.P. 26(b)(1)-(2).

Without waiving the foregoing objection, I admit I disagreed with my termination from AFLAC and its treatment of me. I have no personal knowledge, however, of how AFLAC handled the BISD account.

***REQUEST FOR ADMISSION NO. 6:***    Admit that you accused AFLAC of robbing you of the BISD account.

RESPONSE:    Admit.

***REQUEST FOR ADMISSION NO. 7:***    Admit that school employees were not prevented from renewing their insurance policies with AFLAC.

RESPONSE:    Although diligent inquiry has been made, because I have no personal knowledge of this information, I can neither admit nor deny this request.

***REQUEST FOR ADMISSION NO. 8:***    Admit that you could conduct business with school employees and contact school employees regarding their policies after school business hours.

RESPONSE:    Denied.

***REQUEST FOR ADMISSION NO. 9:***    Admit that your services agreement with BISD to administer their third party Cafeteria Plan was only for three years.

RESPONSE:    Denied.

***REQUEST FOR ADMISSION NO. 10:***    Admit that BISD did not have to renew your services as their third party administrator of their Cafeteria Plan.

RESPONSE:    Admit.

ATTACHMENT TO ANSWER TO

INTERROGATORY NO. 11

(1) My agent commission rate for BISD business was approximately 38% + 3.5% stock bonus + 6.9% RSC override + .7% RSC stock bonus + approximately 1.6% RSC bonus = 50.7%. The approximate amount of business written during the enrollment that I was excluded from was: $600,000. **$600,000 x 50.7% = $304,200.** This figure does <u>not</u> include renewals. Renewal commissions are an additional approximately **9% per year** for the lifetime of the policy. I would expect that customers would renew their policies for at least ten years, if not more. **$600,000 x 9% x 10 years = $540,000. Total BISD losses: $304,200 + $540,000 = $844,200 for one year of lost business.**

(2) Compensation for my RSC duties consisted of first year and renewal override commissions and bonuses on my team's total production; 6.9% RSC override + .7% RSC stock bonus + approximately 1.6% RSC performance bonus = 9.2.% first year compensation; 2% per year renewal override for the lifetime of the policy. My team produced $673,640, $1,132,423 and $1,668,501 in 1999, 2000 and 2001, respectively. This represents an average growth rate of 57.7% per year. Please see the attached spreadsheet for a conservative approximation of my estimated losses over the next twenty-five years (RSC Income Example Worksheet).

(3) Mental pain, suffering and anguish and punitive damages to be determined by the discretion of the jury.

(4) Attorney's fees and expenses to be determined by the court.

(5) Court costs to be determined by the court and clerk.

# VERIFICATION

STATE OF TEXAS                    §
                                 §
COUNTY OF CAMERON                 §

BEFORE ME, the undersigned authority, a Notary Public, on this day personally appeared **DINO X. CHAVEZ**, who being by me duly sworn on his oath deposed and said that he is duly qualified and authorized in all respects to make this affidavit; that he has read the above and foregoing amended answers to Interrogatories; that every statement contained in the amended answers is within his knowledge are true and correct.

_____
DINO X. CHAVEZ

SUBSCRIBED AND SWORN TO BEFORE ME by the said **DINO X. CHAVEZ** on this the _3rd_ day of March, 2003, to certify which witness my hand and official seal.

_____
Notary Public, State of Texas

My Commission Expires:

_03-27-07_

Exhibit

"K"

IN THE UNITED STATES DISTRICT

SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

DINO X. CHAVEZ                    ) (

                                     ) (

VS.                               ) (   B-02-128

                                     ) (

BROWNSVILLE INDEPENDENT            ) (

SCHOOL DISTRICT, NOE              ) (

SAUCEDA, MARILYN DEL             ) (

BOSQUE-GILBERT and                ) (

RANDALL DUNN                     ) (

---

ORAL DEPOSITION OF

DINO X. CHAVEZ

VOLUME 2

MARCH 19, 2003

---

ORAL DEPOSITION OF DINO X. CHAVEZ, produced as a witness at the instance of the DEFENDANT BROWNSVILLE INDEPENDENT SCHOOL DISTRICT, taken in the above styled and numbered cause on MARCH 19, 2003, from 8:53 a.m. to 12:40 p.m., before LOU ZUNIGA, Certified Court Reporter No. 2198, in and for the State of Texas, at the offices of J. Arnold Aguilar, 1200 Central Boulevard, Suite H-2, Brownsville, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached therein.

Page 2

APPEARANCES
FOR THE PLAINTIFFS:
J. ARNOLD AGUILAR
LAW OFFICES OF J. ARNOLD AGUILAR
Artemis Square, Suite H-2
1200 Central Boulevard
Brownsville, Texas 78520

FOR THE DEFENDANT BROWNSVILLE INDEPENDENT
SCHOOL DISTRICT:
ELIZABETH G. NEALLY
ROERIG, OLIVEIRA & FISHER, L.L.P.
855 West Price Road, Suite 9
Brownsville, Texas 78520

FOR THE DEFENDANTS NOE SAUCEDA, MARILYN DEL
BOSQUE-GILBERT and RANDALL DUNN:

EILEEN LEEDS
WILLETTE & GUERRA
3505 Boca Chica Boulevard, Suite 460
Brownsville, Texas 78520

FOR THE DEFENDANT AMERICAN FAMILY LIFE ASSURANCE
COMPANY OF COLUMBUS:
WILLIAM B. STEELE, III
LOCKE, LIDDELL & SAPP
100 Congress, Suite 300
Austin, Texas 78701

Page 4

| 17 | E-mails | 56 |
| 18 | Letter dated 12-5-01 | 62 |
| 19 | List of accounts | 78 |
| 20 | Handwritten notes | 92 |
| 21 | Memo dated 8-10-01 | 108 |
| 22 | Memo dated 8-14-01 | 109 |
| 23 | Memo dated 8-15-01 | 110 |
| 24 | Memo dated 8-15-01 | 111 |
| 25 | Letters to trustees | 112 |
| 26 | Memo dated 11-5-01 | 113 |
| 27 | Memo dated 11-9-01 | 114 |
| 28 | Memo dated 11-12-01 | 115 |
| 29 | Letter dated 11-20-01 | 116 |
| 30 | Letter dated 4-4-00 | 117 |
| 31 | Document written by Mr. Chavez | 121 |
| 32 | Letter dated 11-19-01 | 123 |
| 33 | Memo dated 11-27-01 | 125 |
| 34 | Letter to AFLAC from Otis Powers | 127 |
| 35 | Letter to Dan Amos dated 12-2-01 | 128 |
| 36 | E-mails | 132 |
| 37 | Memo dated 12-3-01 | 134 |
| 38 | Letter dated 12-4-01 | 134 |
| 39 | 30-Day Notice Letter | 136 |

Page 3

INDEX

PAGE
Appearances ...................................... 2

DINO X. CHAVEZ
Examination by Ms. Neally ..................... 5
Examination by Mr. Steele ..................... 13
Examination by Ms. Leeds ...................... 83
Examination by Mr. Steele ..................... 108
Examination by Ms. Leeds ...................... 108
Examination by Ms. Neally ..................... 147
Examination by Ms. Leeds ...................... 156
Changes and Signature Page .................... 158
Reporter's Certificate ........................ 160
Attached to the end of the transcript: Stipulations

EXHIBITS
PAGE

| NUMBER | DESCRIPTION | IDEN. |
| 5 | 1997 Income tax return | 5 |
| 6 | 1998 Income tax return | 5 |
| 7 | 1999 Income tax return | 5 |
| 8 | 2000 Income tax return | 5 |
| 9 | Associate's agreement | 14 |
| 10 | District sales coordinator's agreement | 14 |
| 11 | Regional sales coordinator's agreement | 14 |
| 12 | Fax cover letter dated 12-7-01 | 34 |
| 13 | Form 1099s, 1996-2002 | 41 |
| 14 | Memo dated 12-1-01 | 43 |
| 15 | Letter dated 12-19-01 | 47 |
| 16 | E-mail dated 12-2-01 | 51 |

Page 5

```
 1      (Exhibit Nos. 5 - 8 marked)
 2
 3              DINO X. CHAVEZ,
 4   having been duly sworn, testified as follows:
 5              EXAMINATION
 6   BY MS. NEALLY:
 7      Q.  Mr. Chavez, my name is Elizabeth Neally.  I was
 8   doing your questions the last time.  You remember when
 9   we were deposing you, right?
10      A.  Yes.
11      Q.  You understand that we are continuing your
12   deposition?
13      A.  Yes.
14      Q.  And I'd like to have the same agreements I hd
15   with you before.  If you don't understand my question,
16   you'll let me know?
17      A.  Understood.
18      Q.  And all the others.  If you need a break, let
19   us know.  We understand you have a plane to catch so
20   I'm going to go real quick, okay?  And I need you to
21   help me with that by answering my question, okay?
22      A.  Yes.
23      Q.  Mr. Chavez, let me ask you first, what campaign
24   contributions have you made to any of the trustees or a
25   candidate for trustees for the Brownsville Independent
```

Page 6

1  School District in the last year?
2    A. None.
3    Q. How about the last five years?
4    A. None.
5    Q. Okay. You personally have not?
6    A. Correct.
7    Q. Do you know if AFLAC has made any?
8    A. Not to my knowledge.
9    Q. At least not while you were regional
10  manager, right?
11   A. Correct.
12   Q. Or working for them?
13   A. Correct.
14   Q. How about The Teachers' Agency?
15   A. Not to my knowledge, no.
16   Q. Okay. Let me show you what I have marked as
17  Exhibit 5. I represent to you that's what we received
18  from the IRS and that's your tax returns for 1997. If
19  you could look at the page that's got your signature or
20  the signature of -- did you prepare that yourself or
21  did you have an accountant do it?
22   A. I believe I had an accountant do this.
23   Q. And what accountant would have done it in 1997?
24   A. That was Carlos de la Rosa.
25   Q. Okay. Is he still your accountant?

Page 7

1    A. No.
2    Q. Who is your accountant now?
3    A. I cannot -- let me think of her name. I can't
4  remember her name. She's the one that's located on Los
5  Ebanos Boulevard and --
6    Q. Marilyn?
7    A. No. She has an office right at the corner of
8  Los Ebanos Boulevard and Correa.
9    Q. Los Ebanos Boulevard and Correa?
10   A. Yeah. The name is escaping me right now. If
11  you said it, I would remember.
12   Q. Okay. Well, we'll try to look it up or we can
13  leave a space in your deposition. If you can, fill
14  that in for us.
15   A. That's fine.
16   Q. And how long have you been using her?
17   A. Probably about two or three years.
18   Q. Okay. Valda?
19   A. Rispoli.
20   Q. Rispoli.
21   A. Valda Rispoli.
22   Q. And that's your signature -- that's your tax
23  return for 1997?
24   A. Yes, ma'am.
25   Q. Okay. And let me show you Exhibit 6. Same

Page 8

1  question. Look at your signature. Is that your tax
2  return for 1998?
3    A. Yes, ma'am.
4    Q. Okay. And is this your -- this is Exhibit 9 --
5  7. I'm sorry. Exhibit 7, is that your tax return for
6  1999?
7    A. Yes, ma'am.
8    Q. Okay. And Exhibit 8, is this your tax return
9  for the year 2000?
10   A. Yes, ma'am.
11   Q. And I'm assuming you filed tax returns for
12  2001?
13   A. For 2001, yes.
14   Q. 2002, you haven't filed?
15   A. I haven't done 2002.
16   Q. Do you plan on filing 2002 in April or are you
17  going to extend?
18   A. No, I'm going to extend.
19   Q. Let me ask you about any public forums that you
20  have attended. We know that you spoke at one of the
21  public audiences at BISD on I believe November 13th?
22   A. Yes, I did.
23   Q. 2001?
24   A. That's correct.
25   Q. Have you spoken at any other public audiences

Page 9

1  at the Brownsville Independent School District?
2    A. I spoke on November 20th of 2001.
3    Q. And that was at a BISD board meeting?
4    A. Yes, ma'am.
5    Q. Okay. Any other times?
6    A. I have. I just can't -- I couldn't recall the
7  dates or times.
8    Q. Okay. How many times do you think you have
9  spoken at a public audience of a Brownsville
10  Independent School District board meeting?
11   A. Maybe once or twice other than those two days
12  but honestly I couldn't remember when.
13   Q. Can you remember the years? Was it in the last
14  five years?
15   A. It was -- it was during 2001.
16   Q. During 2001, you spoke one or two other times?
17   A. I could have. I'm not positive I did, but I'm
18  thinking that I did speak maybe once or twice.
19   Q. But you don't remember the months?
20   A. No, ma'am, I don't.
21   Q. But they would have been during the year 2001?
22   A. I believe so, yes.
23   Q. Did you speak at all in 2002?
24   A. No, I can't recall that I did.
25   Q. Okay. So if you spoke any additional times

Page 10

1  besides November 13th and November 20th, it would have
2  been during 2001?
3      A.  Yes, ma'am.
4      Q.  Okay.  What was the subject of your five
5  minutes or however many minutes you actually ended up
6  getting?
7      A.  Probably something related to what was
8  transpiring.
9      Q.  Something related to the subject of this
10 lawsuit?
11     A.  Yes, ma'am.
12     Q.  Okay.
13     A.  And it's possible that I have my information
14 incorrect but I believe I did.  I just can't be for
15 sure.  I think I did, but I'm not sure.
16     Q.  But you don't have any idea what dates they
17 were?
18     A.  No, ma'am, I don't.
19     Q.  Okay.  Would it have been during the 2001/2002
20 school year?
21     A.  It was in the year 2001.
22     Q.  But would it have been during the 2001/2002
23 school year?  I believe you said that these events that
24 are the subject of this lawsuit started in August of
25 2001 which would have been the 2001/2002 school year.

Page 11

1      A.  I believe so, yes.  That would be correct.
2      Q.  So if you spoke it was after August 2001 when
3  school started?
4      A.  Yes, ma'am.
5      Q.  Okay.  And you had never spoken before that?
6      A.  Not to my recollection.
7      Q.  How about -- have you ever spoken at any other
8  public audiences or public forums for any cities or
9  other school districts?
10     A.  I made a presentation at City of Brownsville
11 once.
12     Q.  Okay.  When you said you made a presentation,
13 were you in public audience or were you actually making
14 a presentation of some kind because you were on the
15 agenda?
16     A.  I believe once I was asked to present some
17 information concerning the cafeteria plan at the City
18 of Brownsville, and the second time I was assisting the
19 -- there was a consultant who was presenting
20 information on the different plans that were available
21 or the different providers who provided plans to the
22 city for consideration, and I spoke for a few minutes
23 to clarify some points about our proposal.
24     Q.  Okay.  Was that on public audience or was that
25 on the agenda?

Page 12

1      A.  I was not on the agenda but I was given
2  permission to speak during the -- when the consultant
3  spoke.
4      Q.  Who was the consultant?
5      A.  I can't remember his name.
6      Q.  What company was he with?
7      A.  That, I can't remember.  You would have to ask
8  the city.
9      Q.  What year was that?
10     A.  It was probably in '98 as well, if I had to
11 guess.
12     Q.  When you say it was probably in '98 as well,
13 was the other time that you spoke where you gave a
14 presentation regarding the cafeteria plan in '98?
15     A.  Well, '98, I was referring to when I first got
16 the proposal at BISD and I'm thinking that the city
17 coincided with that same time that I got the proprosal
18 at BISD, so that's what I meant by saying also or at
19 that time.
20     Q.  When you say that you got the proposal at the
21 city, was that with AFLAC products?
22     A.  Yes, ma'am.
23     Q.  Okay.  And that was in '98?
24     A.  I believe that's correct.
25     Q.  And that's when you made the first

Page 13

1  presentation?
2      A.  I believe that's correct, yes, ma'am.
3      Q.  And that's when you also assisted the
4  consultant in presenting the different products?
5      A.  Well, I shouldn't have said assisting the
6  consultant.  I should have said clarifying some of the
7  points he was making about our proposal.
8      Q.  So that was also in 1998?
9      A.  Yes, ma'am, I believe so.
10     Q.  And you don't think either one of those were
11 where you signed up for public audience?
12     A.  No.  I'm sure I didn't sign up for a public
13 audience.
14     Q.  Have you ever spoken at any other public
15 audiences for any cities or school districts?
16     A.  No, ma'am, not to my recollection.
17     Q.  Okay.  Have you ever spoken at any public
18 audiences for any governmental entity like an open
19 meeting?
20     A.  I don't believe I ever have.
21     Q.  Okay.
22         MS. NEALLY:  Thank you.  I'll pass the
23 witness.
24         EXAMINATION
25 BY MR. STEELE:

Page 14

1    Q. Mr. Chavez, my name is Buddy Steele. We met
2    earlier. I'm representing AFLAC in this lawsuit. I
3    have some questions for you, too. And just so it's
4    clear, I'm going to assume the same agreements are in
5    effect that you had with Elizabeth, okay?
6    A. Okay.
7    Q. Great.
8        MR. STEELE: I'm going to just jump right
9    in and get you to mark three --
10       (Discussion off record).
11       (Exhibit Nos. 9 - 11 marked).
12   Q. Mr. Chavez, let me hand you what has been
13   marked as Exhibit 9 and ask if you can confirm that
14   that is the Associate's Agreement that you entered into
15   with AFLAC back in I believe 1994, if memory serves me
16   well. We can look at that last page.
17   A. Yes, sir, it is.
18   Q. And that's a true and correct copy of that
19   agreement; is that correct?
20   A. I believe so, yes.
21   Q. Let me show you another document that's been
22   marked as Exhibit No. 10 and ask if you can confirm
23   that that is a true and correct copy of your District
24   Sales Coordinator's Agreement with AFLAC?
25   A. Yes, sir.

Page 15

1    Q. And, finally, let me show you Exhibit 11 and
2    ask if you can confirm that that is your Regional Sales
3    Coordinator's Agreement with AFLAC?
4    A. Yes, sir, it is.
5    Q. And you signed each of these agreements and
6    AFLAC also countersigned, correct?
7    A. Yes, sir.
8    Q. Now, I just want to ask you, at this time your
9    associate's agreement, Exhibit No. 9, is still in
10   effect, correct? That has not been terminated, has it?
11   A. That's correct.
12   Q. And in that associate's agreement, I'm going to
13   point out a couple of things here to you if I could.
14   If you look at Paragraph 1-A, it states that you
15   are an independent contractor, correct?
16   A. Yes, it does.
17   Q. And you consider yourself an independent
18   contractor for AFLAC; do you not?
19   A. Yes, I do.
20   Q. So there's no question in your mind that you're
21   an employee of AFLAC -- you are definitely an
22   independent contractor and not an AFLAC employee,
23   correct?
24   A. I can't say with 100 percent certainty that I
25   am an independent contractor because of the things that

Page 16

1    I was asked to do or perform that were similar to an
2    employee, so from a legal standpoint, I couldn't tell
3    you.
4    Q. Well, let's go through those then just to make
5    sure I have a good understanding of what you were doing
6    and what you were asked to do. In terms of an office,
7    you set up your own office, correct?
8    A. I was required to do so, yes.
9    Q. Right. And who signed the lease for that
10   office space?
11   A. I did.
12   Q. And who paid for that rent?
13   A. I did.
14   Q. Who arranged to have phone service at that
15   office?
16   A. I did.
17   Q. And you paid for that phone service, correct?
18   A. Yes, I did.
19   Q. And all utilities, water, gas, electric were
20   things that you arranged for that office, correct?
21   A. Yes, sir.
22   Q. And paid for, correct?
23   A. Yes, sir.
24   Q. And AFLAC didn't reimburse you for any of those
25   utility or rent expenses to run your office, did they?

Page 17

1    A. No.
2    Q. And as far as clerical help at your office, you
3    had clerical help there, correct?
4    A. Yes, sir, I did.
5    Q. And you paid for that clerical help, too; did
6    you not?
7    A. Yes, I did.
8    Q. And AFLAC didn't reimburse you for that, did
9    they?
10   A. No, they did not.
11   Q. And as far as any computers or office
12   equipment, such as copiers, that equipment you also
13   procured yourself; did you not?
14   A. Yes, I did.
15   Q. And AFLAC didn't reimburse you for that office
16   equipment, did they?
17   A. Actually, they did reimburse me in part.
18   Q. Tell me about that.
19   A. AFLAC had an agreement with most associates who
20   purchased computers through AFLAC to reimburse them for
21   the cost of those computers through a payback of -- for
22   every policy that was issued that you wrote through the
23   computer, they would pay you a three or $4 allowance on
24   your cost of that computer.
25   Q. Okay. So in order to get paid by AFLAC for a

Page 18

1  portion of the cost of the computer you had to sell
2  policies on behalf of AFLAC, correct?
3      A. That's correct.
4      Q. And in selling those policies, AFLAC did not
5  pay you a salary according to the hours you worked, did
6  they?
7      A. No.
8      Q. You only got paid if you sold a policy and you
9  got paid a commission for that sale, correct?
10     A. That is correct.
11     Q. In fact, your whole compensation was based on
12  commissions, was it not?
13     A. Yes, it was and bonuses.
14     Q. And bonuses. Fair enough.
15     A. Correct.
16     Q. Bonuses also were based on the number of
17  policies that you sold on behalf of AFLAC, correct?
18     A. And those sold by the people who reported to
19  me, yes, that's correct.
20     Q. When was the entire structure when you were both a
21  sales associate, a district sales coordinator and a
22  regional sales coordinator was based upon the sales of
23  AFLAC policies which resulted in commissions to the
24  associate or overwrite commissions to you as district
25  or regional sales coordinator, correct?

Page 19

1      A. That's correct.
2      Q. So the entire structure was a commission
3  structure as opposed to a salary structure in terms of
4  compensation to those working for AFLAC, correct?
5      A. That's correct.
6      Q. And in terms of the office hours, it was up to
7  you to determine what hours your office was open,
8  correct?
9      A. Not exactly.
10     Q. Explain that.
11     A. Mr. LaFemina would require us to have our
12  office open during certain hours of the day and he
13  specifically asked us to open our office at 9:00
14  o'clock in the morning and have it open until 5:00
15  o'clock in the afternoon. You know, we complied by
16  that.
17     Q. Wasn't that something that was good business
18  practice so if you had customers who needed assistance
19  they could come in during normal business hours?
20     A. I would agree with that.
21     Q. And even if Mr. LaFemina hadn't suggested those
22  hours, as a businessman who wants to serve his
23  customers, Mr. Chavez, wouldn't you agree that it's
24  prudent business practice to keep your office hours
25  open from 9:00 to 5:00 on weekdays?

Page 20

1      A. If we can afford to do that, yes.
2      Q. Well, as I understand, you were making a fair
3  amount of money from AFLAC and you were able to afford
4  -- to do that, were you not?
5      A. I did the best I could, yes.
6      Q. And it was up to you to determine what
7  customers to call on, correct?
8      A. Yes.
9      Q. And it was up to you to determine when to call
10  on those customers, correct?
11     A. That's correct, sir.
12     Q. And it was up to you to determine exactly what
13  hours you wanted to work. Of course, that was
14  influenced by how much money you wanted to make. So
15  the more hours you worked visiting customers, obviously
16  the chances for making money were greater, but in the
17  end it was up to you, is it not, to decide what hours
18  a day you would work?
19     A. Most of the time, yes, sir.
20     Q. When was it not up to you?
21     A. When we had mandatory meetings that we had to
22  attend that were either here in the Valley or outside
23  of town that we were required to attend.
24     Q. And those mandatory meetings were meetings with
25  Mr. LaFemina, correct?

Page 21

1      A. In most cases it was Mr. LaFemina that required
2  us to be there, yes.
3      Q. And what were the purpose of those meetings?
4      A. There were basically sales meetings to talk
5  about our goals, our objectives, to talk about
6  planning, things along those lines.
7      Q. So these were meetings in order to basically
8  help the sales force organize their I guess targets and
9  make sure they reached their goals and that sort of
10  thing?
11     A. The required meetings, yes, sir, were generally
12  for regional managers like myself. At times there were
13  also district manager meetings that we were invited in
14  conjunction with the regional manager meetings. And,
15  yes, what you're saying is correct. They were intended
16  to review all those things.
17     Q. But other than that, it was up to you, Dino
18  Chavez, to determine what hours a day you would work
19  and who you would call upon, that sort of thing,
20  correct?
21     A. Yes, sir.
22     Q. And you located your office where you chose.
23  It was not dictated -- that location was not dictated
24  by AFLAC; is that correct?
25     A. That's correct.

Page 22

1    Q. And if you didn't sell AFLAC policies, you
2  didn't get paid even if you put in a 40-hour week,
3  correct?
4    A. During the time that I was with AFLAC, I did
5  have contracts with other carriers and businesses that
6  I had sold prior to being with AFLAC, so, yes, I would
7  derive commissions from other companies because of past
8  relationships that I had had.
9    Q. And I appreciate that clarification. Thank
10  you. But in terms of your relationship with AFLAC, if
11  you put in 40 hours a week selling AFLAC policies but
12  didn't close the sale, you didn't get paid, correct?
13    A. I wouldn't get paid.
14    Q. By AFLAC?
15    A. I wouldn't get paid any -- for new sales. I
16  would just get paid my renewals.
17    Q. Fair enough.
18    A. Correct.
19    Q. Again, you weren't paid a salary, you were paid
20  commissions?
21    A. Yes, sir.
22    Q. And in terms of your expenses that you incurred
23  in making sales calls such as lunches, entertainment,
24  use of your car, those are all expenses that you, Dino
25  Chavez, were responsible for, correct?

Page 23

1    A. I would get reimbursed on occasion.
2    Q. And tell me about those occasions.
3    A. Before Mr. LaFemina became the state sales
4  manager, there was another manager who was in his
5  position named Gene Downey, and we would get reimbursed
6  for our -- for our mileage when we attended these
7  mandatory meetings. In addition, we would get paid our
8  hotel room when we would have to travel.
9    Q. So when you were asked by the state sales
10  coordinator to attend a meeting that he called, he
11  would reimburse you for your hotel and travel expenses
12  to attend a meeting that AFLAC called of the other
13  regional or district sales coordinators; is that
14  correct?
15    A. Yes, sir, that's correct.
16    Q. But in terms of your sales calls or customers
17  around the Valley, if you bought them lunch, that was
18  an expense that came out of your pocket, correct?
19    A. Yes, sir.
20    Q. And the gas money and the time spent traveling
21  in your car for a sales call was a cost that you Dino
22  Chavez paid, correct?
23    A. That's correct.
24    Q. And AFLAC did not reimburse you for those type
25  of expenses, did they?

Page 24

1    A. No, they did not.
2    Q. And I don't know if you take a regular
3  vacation. I know some professional people have a hard
4  time getting away. But did you take regular vacations
5  while you were an independent contractor for AFLAC?
6    A. The vacations that are memorable to me were the
7  ones that I was invited to attend by AFLAC, and there
8  were numerous vacations that I attended. And I may
9  have taken other vacations that were non-AFLAC, they
10  were just not anything like the ones that AFLAC sent us
11  to.
12    Q. On the non-AFLAC vacations, the cost of those
13  came out of your own pocket; you weren't given any paid
14  vacation time by AFLAC for that, were you?
15    A. No, sir.
16    Q. And when you were paid by AFLAC, they didn't
17  withhold any money from your commission checks for
18  Social Security or income tax, did they?
19    A. No, they did not.
20    Q. You didn't get a car allowance from AFLAC, did
21  you?
22    A. Not other than what I just mentioned to you,
23  which was the reimbursement for travel.
24    Q. When you were attending a meeting called by
25  your -- an AFLAC state sales coordinator?

Page 25

1    A. That's correct.
2    Q. With regard to local advertising, do you
3  purchase local advertising either in radio or newspaper
4  media here in the Valley?
5    A. During my time as an AFLAC regional manager,
6  yes, we did purchase some newspaper articles and I
7  can't remember if we did any radio or TV, but it was
8  pretty much either newspaper articles or flyers that we
9  sent out to licensed insurance agents.
10    Q. And did you pay for those newspaper ads?
11    A. It was usually a 50/50 deal from my
12  recollection where I would pay 50 percent and AFLAC
13  would pay me 50 percent or that would come from Frank
14  LaFemina's pocket.
15    Q. And Frank LaFemina at that time was the state
16  sales coordinator for AFLAC, correct?
17    A. That's correct.
18    Q. And you know, do you not, that Frank LaFemina
19  is also an independent contractor for AFLAC?
20    A. Yes, sir.
21    Q. And certainly in these tax returns that we have
22  identified earlier, let me just point out, for example,
23  in the latest one we have, your 2000 tax return, when
24  you look at the schedule -- if I can find it. Bear
25  with me. Profit and loss from a business, that

Page 26

1  indicates that you were running your own business,
2  correct?
3      A. Yes, sir.
4      Q. And you would deduct expenses for running your
5  own business, correct?
6      A. Yes, sir.
7      Q. And you also have attached here a form
8  regarding self-employment tax, correct?
9      A. That's correct.
10     Q. All right. And in your role as a district
11 sales coordinator albeit -- well, let's talk about that
12 a second. You were I guess promoted in a sense from a
13 sales associate to a district coordinator, correct?
14     A. Yes.
15     Q. And as a district sales coordinator, you were
16 still an independent contractor for AFLAC, correct?
17     A. That's correct.
18     Q. And your primary job, as I understand it, and
19 correct me if I'm wrong, was to recruit sales
20 associates to also work for AFLAC as independent
21 contractors to sell insurance, correct?
22     A. In part, yes, sir.
23     Q. And also to train them on how to sell, correct?
24     A. Yes, sir.
25     Q. But then you did continue, even as a district

Page 27

1  sales coordinator, to service and help enroll accounts
2  that you brought in such as the BISD account, correct?
3      A. Not exactly, sir.
4      Q. Okay. Tell me where I'm wrong.
5      A. Normally we would service accounts by getting
6  an opportunity to go enroll them and accounts were
7  either opened by an active associate or were opened by
8  somebody who was no longer active with AFLAC.
9      Q. Okay.
10     A. If the account was a no longer active account
11 because the associate who opened it was no longer with
12 AFLAC for whatever reason, then those accounts would be
13 serviced by whoever the regional manager designated
14 them to be serviced by. So sometimes before I was a
15 regional manager when I was a district manager and then
16 associate, I would be invited to go enroll a certain
17 account that I had nothing to do with. I was just
18 invited to go help enroll.
19     Q. I see.
20     A. When we initiated the account, either as an
21 associate or a district manager or regional manager,
22 then we were basically not invited to be, that was our
23 privilege. That was our decision to do and then we did
24 the inviting of other associates if we needed them to
25 attend.

Page 28

1      Q. Okay. In terms of your role as a district
2  manager and then later as a regional manager, in
3  recruiting and training new sales associates, it was up
4  to you, was it not, to decide who to recruit for AFLAC?
5      A. As a regional manager, it was -- yes, I would
6  say that it was almost my entire job to do that.
7  Sometimes we would get what we call leads from the
8  company so in some cases it wasn't me who did the
9  recruiting, it was that they called the company for
10 information and then the company would say, hey, call
11 these people or call this person. They're interested
12 in contracting with AFLAC. So take care of it.
13     Q. I see. So they had heard the AFLAC name,
14 called the home office, the home office gave them your
15 name to contact, and then it was up to you to talk to
16 them and see if they wanted to become a sales associate
17 for AFLAC?
18     A. That's correct.
19     Q. And in other instances, you yourself may have
20 identified folks within the Valley area who may be
21 appropriate candidates to sell as a sales associate for
22 AFLAC, correct?
23     A. That's correct.
24     Q. Other than these leads -- well, even with the
25 leads, it was up to you to go to the lead and determine

Page 29

1  that this guy would make a good insurance salesman,
2  correct?
3      A. That's correct.
4      Q. So it was ultimately your decision whether to
5  recommend them as a sales associate to AFLAC, correct?
6      A. That's correct.
7      Q. Take a look at the associate's agreement that
8  is still in effect and let's look at Paragraph 2-B.
9  And if you look at that second sentence there, it
10 states that associate -- and that's you, correct?
11     A. Yes, sir.
12     Q. -- is free to exercise associate's own judgment
13 as to time and place of solicitation. Did I read that
14 correctly?
15     A. Yes, you did.
16     Q. So, again, the associate's agreement is
17 confirming what we just talked about, that it's up to
18 you to determine when and where to solicit new AFLAC
19 accounts, correct?
20     A. Yes, sir.
21     Q. And then look at Paragraph C under service
22 accounts. If you look at -- I believe it's the second
23 sentence. It says AFLAC reserves the absolute right to
24 reassign any account for servicing and to designate who
25 may solicit applications from persons in the account in

8 (Pages 26 to 29)

Page 30

1  its sole discretion. Did I read that correctly?
2      A. Yes, sir.
3      Q. So this agreement provides, does it not, that
4  it's up to AFLAC to determine who will service
5  accounts, correct?
6      A. That's what it says.
7      Q. Take a look at other duties.
8          MR. AGUILAR: What paragraph?
9          MR. STEELE: Subparagraph D under
10  Paragraph 2.
11      Q. If you look at the second sentence, again, this
12  confirms something that we have been talking about.
13  Associate shall pay all expenses incurred by associate
14  in the sale and service of insurance policy offered by
15  AFLAC. Isn't that correct?
16      A. Yes, sir.
17      Q. And, in fact, in practice that's what was done,
18  correct?
19      A. Yes, sir.
20      Q. Okay. Take a look at your district sales
21  coordinator's agreement. I believe that's -- Mr.
22  Chavez, what exhibit does that say at the bottom?
23      A. 10.
24      Q. Okay. Exhibit 10. Now, this was entered into
25  just a few short months after you became an associate,

Page 31

1  correct?
2      A. Yes, sir.
3      Q. In December of '94?
4      A. Yes, sir.
5      Q. And if you look at that -- as a district sales
6  coordinator, you then are not only going to continue to
7  call on accounts but you are now going to also recruit
8  and train new associates, correct?
9      A. That's correct.
10      Q. And also keep track of the associates that are
11  working under you to see that they have the support
12  that they need?
13      A. That's correct.
14      Q. Okay. Take a look at the very first paragraph
15  of that district sales coordinator. It refers to the
16  associate's agreement that we have been talking about,
17  correct?
18      A. Yes.
19      Q. And it states that the terms are incorporated
20  in this district sales coordinator agreement, correct?
21      A. Yes, sir.
22      Q. And, again, it reiterates there in Paragraph 2,
23  relationship to A, that your relationship with AFLAC is
24  as an independent contractor, correct?
25      A. Yes, sir.

Page 32

1      Q. Now, you eventually became a regional sales
2  coordinator, correct?
3      A. Yes, sir.
4      Q. Take a look at that next exhibit that we have
5  marked. You became a regional sales coordinator, by
6  looking at the second page, in November of '98,
7  correct?
8      A. Yes, sir.
9      Q. And this was right around the time that you
10  succeeded in landing the BISD account, correct?
11      A. That is correct.
12      Q. Was it as a result of landing that account that
13  you became a regional sales coordinator?
14      A. Honestly, I couldn't tell you. It probably had
15  something to do with it, but because I wasn't the one
16  who made the offer, I couldn't tell you.
17      Q. Fair enough. Understood. Again, let's take a
18  look at the top paragraph of that exhibit. Again, it
19  refers to the associate's agreement and states that
20  those terms are incorporated by reference to the
21  regional sales coordinator's agreement, correct?
22      A. Yes, sir.
23      Q. And if you look at Paragraph 7 of the regional
24  sales coordinator agreement on Page 2. It again refers
25  to the associate's agreement and states that it shall

Page 33

1  continue to be in full force and effect and in terms of
2  -- governed this regional sales coordinator in all
3  respects unless they're modified by the regional sales
4  coordinator's agreement, correct?
5      A. Yes, sir.
6      Q. And then Paragraph 8 indicates that the
7  regional sales coordinator's agreements is the
8  substitution for and supersedes and replaces the
9  district sales coordinator's agreement, correct?
10      A. Yes, sir.
11      Q. So while you're a regional sales coordinator,
12  you were then being subject to and governed by the
13  terms of both the regional sales coordinator's
14  agreement and the associate's agreement, correct?
15      A. That's correct.
16      Q. And, Mr. Chavez, in the motion that was filed
17  by your attorney called Motion for Reconsideration of
18  Dismissal of Plaintiff Due Process Claims, he attached
19  your affidavit. This is the only copy I have. I'm not
20  going to make it an exhibit, but do you see that
21  affidavit that's attached to that pleading?
22          MS. NEALLY: We can make a copy.
23          MR. STEELE: I think I can make the record
24  clear but I'm happy to make a copy if you-all want one.
25      Q. You made the sworn statement that you're an

Page 34

1  independent contractor -- I'm sorry -- an independent
2  insurance agent, correct?
3     A. That's correct.
4     Q. So you're indicating there that you're not an
5  employee for AFLAC rather you're an independent
6  contractor working as an agent for AFLAC, correct?
7     A. That's correct.
8     Q. And then you also make the statement that there
9  are no -- there are no AFLAC employees in the Rio
10  Grande Valley area, correct?
11     A. To my knowledge, yes, that's correct.
12     Q. And you would include yourself, would you not,
13  in that group of not being an employee for AFLAC?
14     A. That's correct.
15        (Exhibit No. 12 marked).
16     Q. Mr. Chavez, I'm going to hand you what's been
17  marked Exhibit 12. This is a fax cover letter to which
18  is attached a letter that was sent to your then
19  attorney Ted Rodriguez by me, correct?
20     A. Yes, sir.
21     Q. And it appears from the fax cover letter that
22  your attorney, Mr. Rodriguez, sent this to you it looks
23  like on December 7th of 2001, correct?
24     A. Yes, sir.
25        MR. AGUILAR: You're not making yourself a

Page 35

1  witness, are you?
2        MR. STEELE: No, wouldn't dare to dream of
3  that.
4     Q. I just want to ask you a couple of things about
5  it. Take a look at the first page of that letter and
6  put this into context. This letter dated December 7th
7  was sent after you had received notification from Noe
8  Sauceda that he did not want you servicing the BISD
9  account or enrolling folks in the BISD accounts,
10  correct?
11     A. That's correct.
12     Q. And of course you protested that, thought that
13  was wrong and were trying to get back into servicing
14  the BISD accounts back then, in late November, early
15  December 2001, correct?
16     A. That's correct.
17     Q. And there had been some correspondence back and
18  forth about that subject, correct?
19     A. Yes, sir.
20     Q. So that puts this letter in context that was
21  sent to your attorney, Mr. Rodriguez, correct?
22     A. Yes, sir.
23     Q. Look at the third paragraph on the first page.
24  If you look at Paragraph 2-C -- I'm sorry. If you look
25  at the sentence that starts out in Paragraph 2-C, you

Page 36

1  see that, it's kind of in the middle of that paragraph?
2     A. Yes.
3     Q. And it says that -- it's referring to your
4  associate's agreement, correct?
5     A. Yes, sir.
6     Q. And in that letter it says, Paragraph 2-C.
7  Basically provides, quote, AFLAC reserves the absolute
8  right to reassign any account for servicing and to
9  designate on the basis of the application for persons
10  in the account in its sole discretion, close quote.
11  Did I read that correctly?
12     A. Yes, sir.
13     Q. It goes on to say, in addition, Mr. Chavez
14  acknowledges, in Paragraph 3, that the accounts and
15  records, which would include the BISD account, shall
16  remain the property of AFLAC exclusively and that Mr.
17  Chavez has no property rights to AFLAC accounts. Did I
18  read that correctly?
19     A. I see that, yes.
20     Q. Now, let me just ask you about those two
21  sentences. After Mr. Rodriguez sent this to you, did
22  you read it?
23     A. I believe I did, yes, sir.
24     Q. And at that time did you direct Mr. Rodriguez
25  to send a letter to anyone at AFLAC or counsel for

Page 37

1  AFLAC refuting these statements, that those were in
2  fact not true?
3        MR. AGUILAR: Hang on a second. I'm going
4  to instruct you not to discuss anything you have
5  discussed with your attorney, but if you discussed
6  anything with anybody else, you can discuss that.
7     A. Could you ask the question again?
8        MR. STEELE: Could you read it back?
9        (Requested portion was read).
10        MR. AGUILAR: Again, I have to instruct
11  you --
12     A. Under my attorney's advice, I can't answer
13  that.
14     Q. Let me ask it a different way. After you got
15  this letter, did you contact anyone at AFLAC to refute
16  these statements regarding ownership of the accounts
17  and the right to designate who may service them?
18     A. I believe I did, yes, sir.
19     Q. And whom did you contact about that?
20     A. I believe I wrote to Mr. Dan Amos.
21     Q. Okay. After you received this December 7th
22  letter -- wasn't that letter before?
23     A. I believe I wrote Mr. Amos for the first time
24  on December 2nd or December 3rd, I believe.
25     Q. Right.

Page 38

1     A. The 2nd or 3rd, and then I sent another
2  follow-up letter I believe after that time.
3     Q. And I believe that was dated December 4th if
4  memory serves me. It's the second letter, is it not?
5  Is that not the first letter that you wrote to Dan
6  Amos?
7     A. Yes, sir.
8        MR. AGUILAR: Do you want to make that an
9  exhibit?
10        MR. STEELE: Not yet.
11     Q. And I remember that there was another letter to
12  Dan and it's dated December 4th, correct?
13     A. That's correct.
14     Q. Again, you're saying in essence the gist of
15  your letter to Mr. Amos is, I should not be taken off
16  the account. This is my account. It belongs to me,
17  correct?
18     A. Yes, sir.
19     Q. Among other things?
20     A. That's correct.
21     Q. Now, let me ask you my question again. The
22  letter we have been talking about in Exhibit 12 is
23  dated December 7th, correct?
24     A. Yes, sir.
25     Q. And the facsimile cover sheet indicates that it

Page 39

1  was sent to you on December 7th, correct?
2     A. That's correct.
3     Q. So let me ask my question again. Did you call
4  or write anyone on or after December 7th protesting
5  that these statements about AFLAC's ownership of the
6  account and right to assign the account were untrue?
7     A. After December 7th?
8     Q. Correct.
9     A. I may have, sir, but I can't remember
10  specifically that I did. I know that I e-mailed or I
11  mailed Lynn Barnson at some point but I can't recall
12  exactly when that was. It may have been towards the
13  middle or end of December.
14     Q. If you had communicated in such a fashion in
15  writing, via e-mail or by letter to AFLAC refuting
16  these statements, that's something that you would keep
17  in your file, correct?
18     A. I should have kept a copy of it, yes, sir.
19     Q. And if you kept a copy of it, you would have
20  given it to your attorney to produce in this
21  litigation, would you not?
22     A. I believe I would have, yes, sir.
23     Q. So if in fact there was such a letter refuting
24  the statements referred to in Exhibit 12 made by you or
25  at your direction by someone else, those would have

Page 40

1  been produced and we should have copies of those,
2  correct?
3     A. Yes, sir.
4        MR. AGUILAR: And I will look for any
5  documents I may have regarding AFLAC and provide them
6  if I haven't already.
7        MS. NEALLY: Then I need to reserve my
8  right to question Mr. Chavez on any other documents you
9  may produce.
10        MR. AGUILAR: You can reserve any rights
11  you like. I reserve to right to limit the deposition
12  to seven hours.
13     Q. And then, Mr. Chavez, let's just kind of close
14  this line of questioning out with this last sentence
15  that starts at the bottom of Page 1. As noted above
16  the BISD account belongs to AFLAC. AFLAC decides who
17  shall service it and Mr. Chavez has no authority,
18  expressed or implied, to continue to deal with the BISD
19  account either directly or indirectly. Did I read that
20  correctly?
21     A. Yes, sir, you did.
22     Q. Okay. And, again, my same questions, on or
23  after December 7th, do you have any documentation that
24  indicates that you or someone at your direction
25  contacted AFLAC to refute these statements?

Page 41

1     A. I don't have anything that I can recall, sir.
2  No.
3     Q. Okay.
4        (Exhibit No. 13 marked).
5     Q. Mr. Chavez, I'm going to hand you what's been
6  marked as Exhibit 13, and I'll represent to you that
7  this is a one, two, three, four, five, six, seven --
8  seven form 1099s that were prepared by AFLAC that
9  states the income that AFLAC paid to you from 1996
10  through 2002 inclusive; is that correct?
11     A. Yes, sir, it appears to be correct.
12     Q. Do you have any reason to believe these 1099
13  forms are incorrect?
14     A. No, sir.
15     Q. I want to ask you about some of the folks that
16  are in your group of associates that worked with you
17  for AFLAC. I think you identified some of those folks
18  the last time we were here and I understand -- tell me
19  again who were some of the agents that were working for
20  you.
21     A. I could tell you there was Danny Sanchez, Sandy
22  Sanchez, his wife, there was Susan Lynn Davis, Dennis
23  Escobar, there was Raul Viada, there was Stephen
24  Andrus, Fernando de Pena, Valentin Paz, Ramiro Luis,
25  Patricia Medrano, Rodolfo Infante, J.R. Infante, Edward

Page 42

1  Saenz. There was Criselda Perez and there was a host
2  of other people, but those were probably the most --
3  the most active.
4      Q. And you mentioned Danny and Sandy Sanchez at
5  the beginning. Would you consider Danny Sanchez to be
6  someone you mentored?
7      A. You would have to ask Danny that question, but,
8  in my opinion, I would say yes.
9      Q. And in your opinion from your knowledge of
10  Danny, would you believe that Danny is loyal to you?
11          MR. AGUILAR: Objection; specificity.
12      A. I couldn't say that to be true. I would say
13  somewhat loyal.
14      Q. Okay. And by somewhat loyal, what do you mean?
15      A. Well, his loyalty is to his family and whatever
16  Danny needs to do to provide for his family, that's
17  what his loyalty is. And he specifically stated that
18  to me verbally and in writing, that that's where his
19  loyalty remains, to his family. But we were friends
20  and so, yes, I considered myself to be his mentor but I
21  considered a lot of the people that worked with me to
22  be their mentors if they were new in the business.
23      Q. Did you rely on Danny to -- strike that. When
24  the issue came up regarding the servicing of the BISD
25  account and you received a letter from Noe Sauceda on

Page 43

1  November 29th, 2001 notifying you he wanted you off the
2  account, did you contact Danny Sanchez to help you in
3  any way?
4      A. No.
5      Q. Did you ask him to keep you informed about what
6  was going on in the servicing and the enrollment of the
7  BISD account in 2001?
8      A. I believe I asked him to keep me informed as
9  best as he could, yes.
10      Q. And why did you choose Danny as opposed to
11  these host of other folks that you have named?
12      A. Danny was a district manager under me here in
13  Brownsville and he was my only district manager here in
14  Brownsville so just by default it would have been Danny
15  and nobody else.
16      Q. Had Danny helped you enroll at BISD in previous
17  years?
18      A. Yes.
19      Q. So he was familiar with that process, I take
20  it?
21      A. Yes.
22          (Exhibit No. 14 marked).
23      Q. Let me show you a document marked Exhibit 14.
24  I will represent to you this was produced by your
25  lawyer in this case. Do you recognize that memo?

Page 44

1      A. Yes.
2      Q. This was written to you by Daniel Sanchez dated
3  December 1st, 2001, correct?
4      A. That is correct.
5      Q. And in that first paragraph, the first sentence
6  it states, as per your instructions, I have spent the
7  morning coordinating with our AFLAC agents regarding
8  the upcoming BISD enrollment, correct?
9      A. That's correct.
10      Q. What were your instructions to Daniel Sanchez?
11      A. I asked him to please cooperate with Mr. Ron
12  Levine and I asked him to please contact our set of
13  agents to make sure they were informed as to when the
14  meetings we were going to have. We would usually have
15  enrollment meetings prior to a large enrollment like
16  this so that everybody would be on the same page. So I
17  asked him, you know, to please make sure we have enough
18  supplies, make sure we have enough et cetera to start
19  getting the ball rolling.
20      Q. Okay. And then it appears from this memo, he's
21  telling you the results of his contacting folks and
22  getting ready for the enrollment, correct?
23      A. Correct.
24      Q. In that second paragraph, first sentence that
25  starts, I informed Mr. Levine of what I thought we

Page 45

1  would need to get our team up to speed on EMS. What is
2  EMS?
3      A. EMS is an enrollment management system that
4  allows us to efficiently enroll a group.
5      Q. Is that something that's on software on a
6  computer?
7      A. I believe it's proprietary stuff on the AFLAC
8  software on our computers.
9      Q. For the purpose of, I guess, enrolling accounts
10  that are going to utilize the AFLAC cafeteria plan?
11      A. Yes, and not necessarily. What it allows us to
12  do is collect people's pertinent information like their
13  name, address, phone number, et cetera, ahead of time
14  and have it available on EMS so that when we're taking
15  somebody's application we are not delayed by having to
16  collect that information. In other words, it's done
17  ahead of time for us and we just point and click and
18  drag and drop and take a person's app.
19      Q. And they are essentially enrolled via
20  electronic process in the computer?
21      A. Correct, by asking them the necessary
22  questions, et cetera.
23      Q. Okay. At the end of this document it says or
24  Daniel Sanchez says, please contact me at your
25  convenience with questions or concerns. Did you

Page 46

1  contact Daniel Sanchez after you received this memo?
2      A. I believe I did.
3      Q. And what did you say to him?
4      A. I believe I told him at the time just to keep
5  me informed with what was going on and that I would
6  take up any concerns or problems with Mr. LaFemina.
7      Q. Okay. With regard to Mr. Sanchez' position as
8  district sales coordinator, did you recommend to AFLAC
9  that he be made a district sales coordinator?
10     A. Yes, I did.
11     Q. How long have you known Danny Sanchez?
12     A. I probably met Danny back in 1999. It's
13  whenever he got contracted with AFLAC and I can't
14  remember, but '98, '99 time frame.
15     Q. That's about the time you first met Danny?
16     A. Yes, sir. And I didn't recruit him. He was
17  recruited by another district coordinator that I had at
18  the time. And so I just kind of met him because he was
19  brought on by somebody else that was on my team.
20     Q. He was first brought on as an associate,
21  correct?
22     A. That's correct.
23     Q. And as a result of his good work as an
24  associate, you recommended he be elevated to the
25  district sales coordinator position?

Page 47

1      A. He was actually elevated to a position called
2  like a CIT or a coordinator in training and he was a
3  coordinator in training for probably about a year, a
4  year time period, around a year, and then he was made a
5  full district sales coordinator.
6      Q. Okay. And you recommended in both instances
7  that those elevations be made, correct?
8      A. Those recommendations were made by me and by
9  his current district coordinator, yes.
10     Q. Okay.
11     (Exhibit No. 15 marked).
12     Q. Mr. Chavez, let me show you what's been marked
13  as Exhibit 15. I'll represent to you that based on the
14  Bates stamps at the bottom this was also produced by
15  your attorney in this case. Is this not a letter dated
16  December 19th to Frank LaFemina from Daniel Sanchez?
17     A. Yes, sir.
18     Q. So since you produced this from your files, is
19  it safe to assume that Danny Sanchez sent you a copy of
20  this letter?
21     A. Yes, that's correct.
22     Q. Okay. And did Danny Sanchez speak to you about
23  what he was going to write in this letter or in fact
24  wrote in this letter before he sent it out?
25     A. No, sir, not at all.

Page 48

1      Q. Did he consult with you at all about writing to
2  Frank LaFemina before he wrote to Frank LaFemina?
3      A. No, sir, not at all.
4      Q. Now, eventually did Danny Sanchez play any role
5  in servicing the BISD account in that November,
6  December 2001 time frame?
7      A. He was allowed to participate in the enrollment
8  but not in the capacity that I wished for him to
9  participate in.
10     Q. What capacity did you want him to participate
11  in?
12     A. I wanted him to basically coordinate the
13  enrollment as he had done the year prior, which meant
14  doing all the scheduling, finding all the people, doing
15  the classes for the enrollment, et cetera, to put
16  everything together so to speak. He was my choice.
17     Q. And did you choose him -- I guess one reason is
18  because he was one of the district coordinators within
19  your region, correct?
20     A. That's correct, and because he had done it the
21  year prior.
22     Q. Who in fact coordinated and managed the
23  enrollment for BISD that year?
24     A. I believe that was Mr. Ron Levine.
25     Q. What role, to your knowledge, did Danny Sanchez

Page 49

1  play in the 2001 enrollment for BISD?
2      A. I believe he was just an enroller.
3      Q. In years past, prior to 2001, did you also
4  participate -- scratch that. In years past, on the
5  BISD account prior to the 2001 enrollment, when -- did
6  Daniel Sanchez take part in those enrollments?
7      A. Yes, he did.
8      Q. And what years would that be, 2000 --
9      A. I can't recall. I know for sure the prior year
10  because he's the person who, like I said earlier,
11  coordinated the thing for me.
12     Q. Okay.
13     A. The year prior to that, I'm not sure whether he
14  participated in it. And the year prior to that, I'm
15  not sure that he was contracted with us.
16     Q. So in 2000 you're confident that he
17  participated in the enrollment. In fact, I believe you
18  stated a minute ago you believe he actually headed up
19  the coordination of the enrollment?
20     A. Yes, sir.
21     Q. But in '99 you're not certain whether he took
22  part?
23     A. That's correct.
24     Q. In 2000 when Danny Sanchez took part in the
25  BISD enrollment, did he split his commissions with you?

Page 50

1    A. Yes.
2    Q. And do you remember what that split was?
3    A. No, sir, I can't recall what that was.
4    Q. You believe it was 50/50?
5    A. I think that it was 60/40. I think that's what
6   it was.
7    Q. Meaning 60 percent to Mr. Sanchez and 40
8   percent to you?
9    A. I believe that's correct.
10    Q. What role, if any, did his wife, Sandy Sanchez,
11   play in the 2001 BISD enrollment?
12    A. I couldn't tell you, sir, other than I believe
13   that she enrolled. She was an enroller just like Danny
14   was. That's about all I'm aware of and that's if she
15   was licensed at the time. I'm not sure that she was
16   even licensed. I know she went through a period of
17   time where she received a temporary license and then
18   the temporary license expired and so there was a period
19   of time where she was studying to take the exam again
20   until she passed it. So I'm not sure that my facts are
21   correct about that. I don't know.
22    Q. So you're not certain if she took part in the
23   2001 enrollment?
24    A. I'm not sure, no.
25    Q. And she is Danny Sanchez' wife, correct?

Page 51

1    A. That is correct.
2    Q. Is it your understanding that she is also a
3   sales associate with AFLAC?
4    A. Yes, she is.
5    (Exhibit No. 16 marked).
6    Q. Mr. Chavez, I'm going to show you what's been
7   marked as Exhibit 16, and again represent to you, based
8   upon the Bates label, this was something your lawyer
9   produced. Is this a copy of an e-mail that you
10   received from Frank LaFemina, the state sales
11   coordinator for AFLAC on or about December 2nd, 2001?
12    A. Yes, sir.
13    Q. And did you read this e-mail?
14    A. Yes, I did.
15    Q. Now, I want to talk about some of the things
16   that -- it appears to me from reading over this that
17   you and Frank LaFemina spoke at least once about
18   Sauceda's request to have you removed from the account,
19   correct?
20    A. Frank and I -- Mr. LaFemina spoke about what I
21   believe was Dr. Sauceda's attempt to give the business
22   to somebody else other than me and AFLAC, and that's
23   what we had spoken about. I hadn't spoken to Frank
24   about being removed from any account until Dr. Sauceda
25   wrote that letter.

Page 52

1    Q. Right. On November 29th of 2001?
2    MS. NEALLY: Object to the responsiveness
3   of the answer.
4    Q. But in terms of -- until Sauceda wrote the
5   letter on November 29th, there had been no suggestion
6   by anyone that you be taken off the BISD account,
7   correct?
8    A. That is correct.
9    Q. But then on that -- on November 29th, which I
10   believe was a Thursday, Sauceda hand-delivers a letter
11   to you that basically says, I don't want you showing up
12   on BISD campus to enroll anybody for AFLAC, among other
13   things, correct?
14    A. That's correct.
15    Q. And you're aware, are you not, that Sauceda
16   eventually contacted LaFemina about the same thing,
17   correct?
18    A. That's correct.
19    Q. So after Sauceda contacted LaFemina about
20   removing you from the account, you talked to LaFemina
21   about that same subject, correct?
22    A. Yes, sir.
23    Q. And from Exhibit 16 it appears that Mr.
24   LaFemina is writing you this e-mail after the two of
25   you have spoken, correct?

Page 53

1    A. I think that is correct, yes, sir.
2    Q. Look in this -- it's about a third of the way
3   down. It's part of the second paragraph, it says, "To
4   begin with, if I were you I would more than likely feel
5   exactly as you do regarding the entire situation," and
6   then he goes on to acknowledge that things you have
7   covered -- to acknowledge that there's no contention
8   about those things?
9    A. I lost you, sir. I don't know where you're at.
10    Q. I'm sorry. Look at this second paragraph, to
11   begin with.
12    A. To begin with, okay.
13    Q. And he's going over, is he not, what you have
14   told him about the situation with BISD and the attempts
15   to take that business away from AFLAC, correct?
16    A. Yes.
17    Q. And he states near the end of that paragraph,
18   additionally, I believe that you may even pursue this
19   situation legally and may win your case based upon the
20   documentation you have. Did I read that correctly?
21    A. Yes, sir.
22    Q. So based upon that, is it -- had you told Frank
23   LaFemina that you were considering a lawsuit?
24    A. No, sir.
25    Q. What had you told Mr. LaFemina that indicated

14 (Pages 50 to 53)

Page 54

1  -- he said you may win your case?
2      A. I don't know why he would have written that in
3  there.
4      Q. Okay. Had you told Mr. LaFemina that you're
5  considering making a demand on someone, a legal demand
6  of some kind?
7      A. I don't believe I did, sir.
8      Q. Had you told Mr. LaFemina that you're
9  considering making a legal claim against someone?
10     A. I don't believe I did, sir.
11     Q. So you're saying that you did not tell him that
12  you were considering suing BISD?
13     A. I don't believe as of the date of this letter
14  that I had said anything regarding that, no, sir.
15     Q. Did you -- are you saying you did not tell him
16  you were contemplating a lawsuit against board
17  members or Noe Sauceda?
18         MR. AGUILAR: Objection; asked and
19  answered.
20     Q. You can go ahead and answer.
21     A. I'm sorry. I didn't hear the question.
22     Q. Are you saying you did not tell him that you
23  were contemplating a lawsuit against BISD, certain
24  board members or Noe Sauceda?
25     A. As of the date of that letter, is that what

Page 55

1  you're referring to, sir?
2      Q. Right.
3      A. I don't believe I did, no, sir.
4      Q. As of the date of Exhibit 16, you're saying you
5  had not?
6      A. I believe that's correct, sir.
7      Q. You also mention in here that -- I'm sorry. In
8  response to the conversation you had with Mr. LaFemina,
9  Mr. LaFemina in that same sentence refers to the
10  documentation you have. Do you see that in that same
11  sentence we were talking about?
12     A. Yes. Yes, I do.
13     Q. What documentation is that?
14     A. I believe that was the comparison chart and it
15  was probably also the copy of the board agenda that was
16  published on the 20th, November 20th. I believe that
17  was the documentation that I might have been referring
18  to. That's the only documentation that I would think
19  that I would have --
20         MR. STEELE: The comparison chart I
21  believe has previously been marked in his deposition as
22  Exhibit 3, correct?
23         MS. LEEDS: I think that's correct.
24     A. I don't have a copy of it so I don't know. I
25  don't know what it's marked but, yes, that's the

Page 56

1  comparison chart.
2         MR. AGUILAR: For simplicity it's Bates
3  No. 4058.
4         (Off the record).
5      Q. Did you tell Mr. LaFemina prior to this
6  December 2nd e-mail that you were considering suing
7  AFLAC if AFLAC removed you from the account?
8      A. No, sir.
9         (Exhibit No. 17 marked).
10     Q. Mr. Chavez, let me show you what's been marked
11  as Exhibit 17.
12         MR. AGUILAR: Have you provided us with a
13  copy of this yet?
14         MR. STEELE: No. I just got this. I
15  don't believe anyone sent me a Request for Production
16  of documents.
17         MR. AGUILAR: Rule 26.
18         MS. NEALLY: We have an extension.
19         MR. STEELE: My Rule 26 didn't -- this
20  will obviously be part of it.
21         Why don't you let your client look at that
22  as you look at it, too, if you don't mind, Arnold? And
23  it may make more sense if you start with the -- you
24  know, from the bottom, the e-mail that's dated --
25         MS. NEALLY: Can we go off the record

Page 57

1  while we look at that?
2         (Off the record).
3      Q. If you look at the November 2nd --
4      A. Okay, I vaguely remember.
5      Q. Okay.
6         MR. AGUILAR: It's marked 17.
7      Q. Let's put Exhibit 17 into context. If you look
8  I believe it's at the bottom of Page 1. It says on
9  Tuesday, November 20th, Dana Sieg writes and she has
10  written you about making arrangements for a seminar in
11  January, correct?
12     A. Yes, sir.
13     Q. And then the next e-mail up is your reply to
14  Dana; is that correct?
15     A. That's correct.
16     Q. And the gist of your reply is, you have spoken
17  with Toni Davila about this and you have suggested that
18  Dana and Toni Davila contact each other to get details
19  about this seminar, correct?
20     A. Yes, that's correct.
21     Q. And then the next e-mail up, on Monday,
22  December 3rd at 11:00 in the morning, Dana e-mailed you
23  saying she's not heard anything from Toni and asks
24  about booking a flight to McAllen for January 9th,
25  correct?

Page 58

1    A. That's correct.
2    Q. So she's inquiring about what she should do.
3  And then the very top e-mail is your reply to Dana,
4  correct?
5    A. Yes, it is, sir.
6    Q. You apologize for the problems she's having
7  with contacting Toni. And then you say, "But I am not
8  in a position currently to comment about anything
9  relating to AFLAC due to potential litigation,"
10  correct?
11    A. That's correct.
12    Q. And that's what you wrote to Dana, correct?
13    A. That's correct.
14    Q. Did you reply on or about December 3rd?
15    A. I don't know when I replied. I don't think it
16  was December 3rd. I think it was after December 3rd
17  but I couldn't tell you if it was a week later or a few
18  days later. I couldn't tell you. I don't remember.
19    Q. Probably within -- do you think it would have
20  been within, say, a week? More than likely, wouldn't
21  it?
22    A. I couldn't say that to be true, sir.
23    Q. Would it have been --
24    A. There's no date that's up here. There's dates
25  on everything else but there's not a date on my reply.

Page 59

1    Q. Do you save your e-mails on your computer?
2    A. I used to but my computer crashed so I lost all
3  my e-mails that I had.
4    Q. We may be able to actually find out from Dana
5  when you replied to her. We'll worry about the date
6  later. I guess what I'm most interested in is that
7  sentence that says, I'm not in a position currently to
8  comment on anything relating to AFLAC due to potential
9  litigation. What potential litigation were you talking
10  about?
11    A. Not being allowed to offer AFLAC products at
12  the school district.
13    Q. And who was the potential litigation going to
14  be against?
15    MR. AGUILAR: Objection just to the extent
16  it's calling for attorney/client privileged
17  information. As far as that's concerned don't discuss
18  what you talked to your attorney about but you can
19  discuss whatever you were considering.
20    A. I can't answer that question based on my
21  attorney's advice.
22    Q. Well, let me ask you this. I believe you can.
23  Who were you considering -- before you talked to a
24  lawyer, who were you considering suing at this time?
25    A. Before I contacted an attorney? I don't have

Page 60

1  knowledge of the laws --
2    Q. I understand.
3    A. -- like attorneys do, but before I contacted an
4  attorney, I probably considered that AFLAC did me
5  wrong, that BISD did me wrong, Frank LaFemina did me
6  wrong and Dan Amos did me wrong by not replying to my
7  correspondence to him. So those were just a few people
8  or few entities that I probably considered, not being
9  an attorney.
10    Q. But you considered suing those entities and
11  people you just named?
12    A. I considered that I had some potential matters
13  that were of a legal nature against those people or
14  individuals, yes, sir.
15    Q. Okay. So before you contacted an attorney, you
16  were upset because you had been removed, you thought
17  you had been done wrong as you said, so you were
18  considering suing Frank LaFemina, AFLAC, BISD and Dan
19  Amos?
20    MR. AGUILAR: Objection; specificity. Did
21  you say before he was removed?
22    A. I didn't hear the question either.
23    Q. Let's start over. When you wrote this e-mail
24  -- you stated a second ago these are the people that
25  did you wrong. With regard to those people, in your

Page 61

1  mind did you believe you would sue them?
2    MR. AGUILAR: Objection; speculation.
3    A. I can't answer that, sir. I don't know.
4    Q. Okay. I'm just trying to get what the
5  potential litigation is. And, again, I'm not saying --
6  I'm not asking you for a legal conclusion. I'm not
7  asking you to tell me why or what your attorneys told
8  you about who you could and could not sue.
9    A. Yes.
10    Q. I'm just trying to find out about this
11  potential litigation in your mind.
12    A. In my mind if someone does me wrong, as I said
13  earlier, I would have potential litigation against that
14  individual or entity.
15    Q. Okay.
16    A. But not being an attorney, I couldn't decide if
17  I did or did not have that authority or ability to do
18  that.
19    Q. But in your mind because they had done you
20  wrong you believed you had a potential lawsuit against
21  the individuals and entities you just named?
22    MR. AGUILAR: Objection; asked and
23  answered.
24    A. Yes, sir.
25    Q. After you sent this, do you know if Dana called

Page 62

1  you up to ask you about this e-mail?
2      A. I can't recall that she did.
3      Q. Did you -- when you spoke to Frank LaFemina --
4  or did you speak to Frank LaFemina sometime after you
5  sent this e-mail to Dana about this whole situation?
6      A. No.
7      Q. Did you speak to anyone at AFLAC about the
8  situation involving BISD at or after the time you wrote
9  to Dana?
10     A. Because I don't know the time that I wrote to
11  Dana, I couldn't comment on that.
12     Q. Did you talk to anyone at AFLAC about the BISD
13  situation on or after December 3rd, 2001?
14     A. Talk to or -- you're referring to a phone
15  conversation?
16     Q. Right.
17     A. The only person that I ever spoke to after
18  December 3rd, to my knowledge, the person was Lynn
19  Barnson.
20     Q. And I believe in your interrogatories you
21  indicated you had that conversation sometime in
22  February 2002, correct?
23     A. That's correct.
24         (Exhibit No. 18 marked).
25     Q. Let me show you an exhibit that's been marked

Page 63

1  as 18. And, again, this is something produced by your
2  attorney in this lawsuit.
3      A. No, this was produced by AFLAC's attorney.
4         MR. AGUILAR: We provided it for them
5  after we got it.
6      A. I misunderstood.
7      Q. Was it from your files produced in this
8  lawsuit?
9      A. Okay.
10     Q. But it is in fact a letter dated December 5th
11  to you from AFLAC's in-house counsel, Jeff Willis,
12  correct?
13     A. Yes, sir.
14     Q. And in Paragraph 2 -- I'm sorry, strike that.
15  In Paragraph 1, this letter, to put it in context, is a
16  follow-up to a telephone conversation you had earlier
17  that day with Mr. Willis, correct?
18     A. That's correct.
19     Q. And in Paragraph 2 he's confirming that you
20  told him that you would not attend the annual meeting
21  of state and sales -- and regional sales coordinators,
22  correct?
23     A. That's what he says. That's not what occurred.
24     Q. Are you saying you told him that you were
25  planning on attending?

Page 64

1      A. I told him that I had every intention to attend
2  but that I would do whatever AFLAC asked me to do as
3  far as my attendance was concerned. He advised me at
4  that time that it would probably not be appropriate for
5  me to attend the sales meeting that I actually should
6  have been invited to. And so I said, if that's what
7  you're asking me to do, that's what I will do. So when
8  I received this letter stated this way, I wasn't in
9  agreement with what he wrote in it but I said, okay,
10  whatever.
11     Q. In any event, you determined at AFLAC's behest
12  not to attend that Atlanta meeting, correct?
13     A. That's correct.
14     Q. And then in light of the situation involving
15  the BISD account they concur in your decision. But he
16  also says, and due to the fact that you have made the
17  decision instituting litigation. What had you told Mr.
18  Willis about instituting litigation?
19     A. I had not told him anything regarding
20  litigation. I believe that the information regarding
21  litigation was given to him by Frank LaFemina and I
22  never once mentioned any litigation against anyone. So
23  anything about litigation came from Frank LaFemina, not
24  from me.
25     Q. So you're saying you never ever suggested that

Page 65

1  you may sue someone as of December 5th, 2001?
2      A. I believe that's correct, yes.
3      Q. Do you believe that you had suggested to
4  anybody, say by January 3rd of 2002, that you were
5  contemplating litigation?
6         MR. AGUILAR: Again, I have to instruct
7  you not to talk about any discussions you had with any
8  attorney, but with regard to anybody else you spoke to,
9  go ahead and explain that.
10     A. I can't answer that question, sir, based on my
11  attorney's advice.
12     Q. I'm not asking what you told your attorneys.
13  I'm asking you, as of January 3rd, 2002, this is almost
14  a month -- over a month after you were removed from the
15  BISD account, did you tell anyone associated with AFLAC
16  that you were contemplating litigation?
17     A. I don't believe I had, sir, no.
18     Q. When did you --
19         MR. AGUILAR: What is that date, January
20  what?
21         MR. STEELE: January 3rd.
22         (Off the record).
23     Q. So you're saying on November 29th after you
24  were removed from the account and after you had sent a
25  letter on December 2nd to Dan Amos to keep you on the

Page 66

1   account and after you even had your attorney, Ted
2   Rodriguez, write a letter to the BISD board demanding
3   that you be put back on the account, and on December
4   5th when AFLAC's attorney Jeff Willis wrote and said,
5   no, we're not putting you back on the account, you're
6   saying, despite all that, you had not told anyone in
7   response to any of those demands that you were
8   contemplating suing somebody?
9       MR. AGUILAR:  Anyone at AFLAC?
10      MR. STEELE:  Right.
11   A.  I believe that's correct, sir, yes.  I had not
12   told anyone.  That's correct.
13   Q.  Weren't you mad as hell when you were taken off
14   the account?
15   A.  I was devastated, sir.
16   Q.  You were devastated.  And at that time you felt
17   you had been done wrong, correct?
18   A.  Yes, sir.
19   Q.  But you're telling me despite being devastated
20   and feeling you had been done wrong, you didn't tell a
21   single soul at AFLAC or associated with AFLAC, such as
22   Frank LaFemina, that you were contemplating a lawsuit?
23   A.  That's correct, sir.
24   Q.  I'm talking about anyone else other than an
25   attorney.

Page 67

1   A.  Had I told anyone else other than an attorney?
2   Q.  That you were contemplating suing someone?
3   A.  I can't recall that I did, sir.  No, I can't
4   recall that I did.
5   Q.  Wouldn't you agree that when you have been done
6   wrong, in your words, one of the first things you would
7   want to do is put it right?
8   A.  You would want -- yeah, I would agree with
9   that.
10   Q.  So would it not follow that putting it right
11   would involve suing somebody perhaps?
12      MR. AGUILAR:  Objection; argumentative.
13   A.  Not necessarily, sir.
14      MR. AGUILAR:  Not everyone thinks like a
15   lawyer.
16      THE WITNESS:  True.
17      MS. LEEDS:  Objection to the sidebar.
18   Q.  Let me ask you what you have been doing since
19   -- your regional sales coordinator's agreement was
20   terminated under the 30-day no fault clause, correct?
21      MR. AGUILAR:  Objection to the extent it
22   calls for a legal conclusion.  You can answer with your
23   understanding.
24   A.  I know that it was canceled sometime mid
25   January of 2002.

Page 68

1   Q.  And you received a letter sometime in December
2   notifying you that it would be terminated after 30 days
3   and it was actually terminated sometime in mid January,
4   correct?
5   A.  I believe I received a letter sometime in
6   December, yes, I did.
7   Q.  Notifying you it would be terminated in 30
8   days, correct?
9   A.  I believe that's correct.
10   Q.  And as I recall from your testimony last time,
11   for much of 2002 you didn't do a whole lot of
12   solicitation of insurance for anybody?
13   A.  For 2002, I didn't do very much of anything,
14   no, sir.
15   Q.  Eventually, however, you did team up with Steve
16   Andrus, did you not?
17   A.  Yes, I did, sir.
18   Q.  And that's The Teachers' Insurance Agency?
19   A.  It's The Teachers' Agency.
20   Q.  I'm sorry, Teachers' Agency.  Are you a partner
21   with Steve Andrus?
22   A.  Yes, I am.
23   Q.  What percentage of the partnership do you own?
24   A.  40 percent.
25   Q.  So if -- let's say Mr. Andrus bids on an

Page 69

1   account on behalf of Teachers' Agency and lands that
2   account and is paid a commission by an insurance
3   carrier for that account, do you share in that
4   commission?
5   A.  I share in overwrites similar to what I had
6   with AFLAC.  I don't share directly in the commissions
7   but in an overwrite capacity.
8   Q.  So you share in the overwrites of commissions
9   that come to Mr. Andrus as part of The Teachers'
10   Agency?
11   A.  Yes, sir.
12   Q.  Who gets that first year commission if Mr.
13   Andrus makes the sale?  Does he get all of it?
14   A.  Yes, sir.
15   Q.  You don't get any percentage of it?
16   A.  No, sir.
17   Q.  Does part of his commission go -- of the first
18   year sales go to pay for the overhead of running The
19   Teachers' Agency office?
20   A.  Can you ask that question again, sir?
21   Q.  Yeah.  Again, if Mr. Andrus brings in an
22   account to The Teachers' Agency and is paid a
23   commission for that, does a portion of his commission,
24   as with any of his commissions, help pay for the
25   overhead of running the office?

1    A. The overwrite on the business would pay for the
2  overhead, yes, sir.
3    Q. And do you share also in paying the overhead of
4  The Teachers' Agency office?
5    A. The overwrites pay for that overhead, yes, sir.
6    Q. So the overwrites that you get pay for the
7  overhead?
8    A. The overwrites that the agency gets, yes.
9    Q. So how do you-all -- do you-all have an
10  understanding that first year commissions, those belong
11  to the person who brought the business in?  If it's
12  you, you get the first year commission in its entirety
13  and if it's Mr. Andrus, he gets the first year
14  commission in the entirety?
15    A. We are all independent agents so when we write
16  business, we keep the commissions but because we're
17  contracted through the agency's hierarchy, the
18  hierarchy -- the agency receives an overwrite on
19  whatever business either the partners write or any of
20  the agents that we have contracted writes.
21    Q. I see.  Bear with me one second.
22        MR. AGUILAR:  Do you want to take a break
23  to gather your stuff?
24        MR. STEELE:  Yeah.  Let's go ahead and
25  take a break.  We have been at it for a while.

1        (Brief recess).
2    Q. Mr. Chavez, we have previously marked as
3  Exhibit 1 a list of companies with whom you are
4  licensed, and I believe it shows the date you obtained
5  those licenses, correct?
6    A. Yes, sir.
7    Q. And to your knowledge are most of those
8  licenses still in effect for those various carriers?  I
9  believe that was dated February 28th of this year.
10    A. The licenses?
11    Q. I'm sorry.  Licenses is the wrong word.  I
12  guess the state licenses you but then how do you --
13  what type of documentation do you get in order to be
14  approved to write insurance for a particular carrier?
15    A. You have to I guess complete whatever paperwork
16  they ask you to complete to be registered with them or
17  appointed by them.
18    Q. Okay.  So would these be all the carriers with
19  whom you are currently appointed?
20    A. I believe that's right.
21    Q. Okay.  And I notice a lot of these you have
22  been appointed, you know, sometime ago while you were
23  still working with AFLAC as a regional sales
24  coordinator or district sales coordinator; is that
25  correct?

1    A. That's correct.
2    Q. And, again, with regard to these carriers, you
3  also worked for them as an independent contractor,
4  independent agent, correct?
5    A. That's correct.
6    Q. Now, could you tell me for the last -- well,
7  let me ask it this way.  I believe you testified that
8  you enrolled the City of Brownsville on behalf of AFLAC
9  back in the fall of 2002, correct?
10    A. I did my job there which was to do the
11  cafeteria plan and the same thing applied as to what I
12  had at BISD, I submitted the proposal through AFLAC
13  and, yes, we did an enrollment sometime in the fall of
14  2002.
15    Q. Aside from that enrollment involving the City
16  of Brownsville had you been -- in the last -- let's say
17  in 2002 and up to the present, had you been actively
18  soliciting the sales of policies on behalf of AFLAC?
19    A. I can't say I have, sir.
20    Q. Who have you been soliciting insurance on
21  behalf of?
22    A. I can't say that I've been doing very much
23  soliciting policies on behalf of anybody.
24    Q. Have you made -- have you tried to sell any
25  insurance for the last 15 months, from January 1, 2002

1  to the present?
2    A. I have sold some policies, yes, sir.
3    Q. And have you attempted to sign up any employers
4  under a cafeteria plan in that time period?
5    A. I cannot recall, sir.
6    Q. With regard to those policies that you have
7  sold, on whose behalf were they sold?  Who were the
8  carriers?
9    A. Like I said, I can't recall selling very many
10  policies, however --
11        MR. AGUILAR:  Go ahead and finish your
12  answer.
13    A. I can remember selling some for Allianz, doing
14  some annuity business and maybe a life insurance policy
15  through Old Line Life who was also called AIG, but I
16  haven't written very much personal business at all.
17        MR. AGUILAR:  Before you go on, he
18  mentioned he hadn't done any others, but there's one
19  cafeteria proposal that he did submit.  You might have
20  forgotten about it.  I think you did submit one the
21  following year to BISD.
22    A. The proposal that was submitted to BISD in 2002
23  was on behalf of our agency.
24    Q. Is that The Teachers' Agency?
25    A. Yes, that's correct.

Page 74

1    Q. And what carrier would have written that?
2    A. It wasn't a -- it wasn't a carrier, it was just
3  a -- it was a TPA.
4    Q. Okay. Meaning you would be a third-party
5  administrator of the cafeteria plan and might represent
6  several different carriers in terms of the products
7  that the employees might be able to enroll for?
8    A. Exactly.
9    Q. Okay.
10        MR. STEELE: I hope that came out right.
11        MS. LEEDS: It did. Very good. It sounds
12  like you know it.
13    Q. And that was this past year, 2002, that you
14  solicited that business on behalf of The Teachers'
15  Agency?
16    A. That's right.
17    Q. And that was from BISD, correct?
18    A. That's correct.
19    Q. Now, you said you haven't sold much. Have you
20  solicited much insurance that simply didn't result in a
21  sale?
22    A. Not really, sir, no.
23    Q. Now, I'm going to go down a list just to kind
24  of put bookends on this and close it out.
25    A. Okay.

Page 75

1    Q. I'm going to ask you if you've solicited
2  insurance products from any of these potential
3  customers.
4    A. Okay.
5    Q. Lyford Independent School -- and this is in the
6  past let's just say 15 months to put the time frame,
7  from January 1, 2002 to the present.
8    A. Okay.
9    Q. Have you solicited any insurance products or a
10  cafeteria plan on behalf of any of these people; Lyford
11  Independent School District?
12    A. Not to my recollection.
13    Q. McAllen ISD?
14    A. Not to my recollection.
15    Q. Hidalgo County?
16    A. Not to my recollection.
17    Q. Brownsville Zoo?
18    A. Not to my recollection.
19    Q. Let me just go ahead and ask them all in serial
20  fashion. If any of these come to mind that you have
21  solicited, tell me.
22        MR. AGUILAR: Or stop you.
23    Q. Stop me. Very good. Luke Fruia Motors, Don
24  Johnson Motors, Brownsville Community Health Center --
25    A. Brownsville Community Health Center, we did do

Page 76

1  an enrollment there.
2    Q. And was that for The Teachers' Agency?
3    A. That was me and a person I worked with on that
4  group called Raul Viada.
5    Q. And what kind of product?
6    A. We sold some policies that were group
7  disability and group life insurance.
8    Q. But no individual supplemental insurance of the
9  type that AFLAC sells?
10    A. Not to my recollection.
11    Q. Okay. Continuing along the same line of
12  questioning. City of Brownsville?
13    A. The only thing we --
14    Q. You mentioned the enrollment in 2002. I'm
15  sorry. I should have stated that. Anything else with
16  the City of Brownsville?
17    A. We -- I believe we submitted a proposal on
18  their health insurance and on their dental insurance,
19  their group dental. We didn't get the proposal on
20  their health, and the proposal on their dental is
21  currently pending.
22    Q. All right. Is the proposal on the dental to
23  the City of Brownsville being underwritten by AFLAC or
24  a different carrier?
25    A. It's not being underwritten by AFLAC. It's a

Page 77

1  different carrier.
2    Q. Does AFLAC carry dental insurance or offer
3  dental insurance?
4    A. Only on an individual basis.
5    Q. Was the City of Brownsville a group basis?
6    A. I believe so, yes.
7    Q. Continuing on regarding solicitations in the
8  last 15 months. Texas State Bank?
9    A. No, sir.
10    Q. Mission Independent School District?
11    A. No, sir.
12    Q. Harlingen Independent School District?
13    A. No, sir.
14    Q. Willacy County?
15    A. No, sir.
16    Q. El Pato Restaurants?
17    A. No, sir.
18    Q. City of Elsa?
19    A. In the last 15 months? I may have done an
20  AFLAC enrollment there, a very small one because
21  there's a bunch of current policyholders already so we
22  were just kind of servicing the cafeteria plan
23  enrollment deal.
24    Q. Okay. What about the City of Lyford?
25    A. No.

Page 78

1    Q. I don't know if this is -- this is probably
2 County of Hidalgo?
3    A. No.
4         MR. STEELE: Is Lyford a county or city?
5         MR. AGUILAR: I think you had already
6 mentioned Hidalgo County.
7         MR. STEELE: I had, hadn't I?
8         (Exhibit No. 19 marked).
9         MR. AGUILAR: I guess this another
10 document you haven't produced for us yet.
11         MR. STEELE: Since they are not due, that
12 is correct.
13    Q. Mr. Chavez, I will represent to you this is a
14 list of accounts that I believe might be identified as
15 AFLAC house accounts. Just confirm if that is a
16 correct understanding. And by house accounts, I mean
17 accounts that were AFLAC accounts that you personally
18 did not initiate the sale of; i.e., you didn't bring
19 them in, some other agent brought them in but these
20 accounts were assigned to you to service; is that
21 correct?
22    A. If you will, give me one second.
23    Q. Sure.
24    A. I'll finish looking at the list. These appear
25 to be accounts, what we call orphan accounts.

Page 79

1    Q. Okay.
2    A. Which were of the type that like BISD is now
3 where an associate is removed from the account through
4 some process or they're not working with AFLAC anymore
5 and they become what we call an orphan account and
6 those accounts are then given to a regional manager to
7 decide who services them.
8    Q. Fair enough. In Exhibit 19, at one time these
9 orphan accounts were given to you to service as the
10 regional manager, correct?
11    A. That's correct.
12    Q. And sometime in the past year since you are no
13 longer a regional coordinator, those accounts have been
14 reassigned to someone else within AFLAC, correct?
15    A. I believe that to be correct, yes, sir.
16    Q. Let me ask you with regard to that list of
17 accounts, in the last 15 months, have you solicited any
18 of those accounts to purchase insurance?
19    A. To do business with them, in other words?
20    Q. Exactly.
21    A. I don't believe I have, sir, no.
22    Q. Why not? How come you haven't approached those
23 folks or any of the other folks that we just talked
24 about to buy insurance from you?
25    A. Honestly? I just don't -- I don't want what

Page 80

1 happened to me with AFLAC to happen again and so I'm
2 very cautious to do business with anybody, honestly.
3    Q. You mean you don't want, say, Colonial or
4 Allianz to pull an account from you that you solicited;
5 that is what you are saying?
6    A. I'm still very devastated by what happened to
7 me and I am guilty of not reading the contract that I
8 signed with AFLAC back when I was a rookie, an
9 associate. And so I'm very cautious as to what
10 contracts I sign now. If the terms are not something
11 that I agree to, I would rather just not do business so
12 that I don't have to go through this again, dedicate X
13 amount of years of my career to have it taken away from
14 me.
15    Q. Okay.
16    A. To answer your question.
17         MS. LEEDS: Objection; nonresponsive.
18    Q. Let me ask you about one thing that you
19 testified to last time we were here. I want to make
20 sure I understand it. You were talking about at the
21 time enrolling BISD in 1998, which I believe was the
22 first year that you enrolled on behalf of AFLAC,
23 correct?
24    A. That's the first year I enrolled, yes, sir.
25    Q. And eventually, as I understand it, BISD

Page 81

1 limited your ability to enroll and sell policies to
2 anyone other than new employees; is that correct?
3    A. I didn't understand your question.
4    Q. Okay.
5         MR. AGUILAR: Can you just let him read it
6 to put it in context?
7         MR. STEELE: Yeah, that's fine.
8    Q. Forgive me. That was very awkward. I'm going
9 to read it to you just to save time.
10    A. Okay.
11    Q. Actually, this was in the context, starting on
12 Page 50, about enrolling BISD. And the question was,
13 in 1999 there were probably more people here in
14 Brownsville. There was probably five, six, seven, in
15 that range. And, again, the question is about how many
16 people were enrolling BISD, okay?
17    A. Uh-huh.
18    Q. And then the question, how about 2000, and your
19 answer was, same thing.
20         Question, about five to seven?
21         Answer, yes.
22         Question, how about 2001, if you know?
23         The answer, I don't know.
24         Question, what changed -- well, one more
25 question. In 1998 when you first did the enrollment

1  was it over a set period of time?
2       Answer, it was -- from what I recall, it
3  was like the last week in November and the first two
4  weeks in December.
5       Question, and then what happened after
6  that?  You were completely prevented from being able to
7  go on campus or what?
8       Answer --
9       After the cafeteria plan enrollment was
10  completed -- that's a question -- right, was the
11  question.
12      The answer, BISD didn't allow people to
13  purchase any policies, period.
14      Question, you mean through payroll?
15      Answer, yes, correct, through payroll.
16  They wouldn't allow people to purchase policies through
17  payroll unless they were a new employee.  Okay?
18      A.  That's correct.
19      Q.  Now, tell me was this a policy that BISD handed
20  down in '98, '99, 2000, 2001, when?
21      A.  I don't know when they started that policy, but
22  when I started working with them in '98, they advised
23  me that that's the way they did things.
24      Q.  So from '98 forward when you went to AFLAC as
25  the cafeteria plan administrator and enrolled people

1  in, is my understanding correct that you were limited
2  in selling AFLAC insurance policies to new employees
3  only?
4       A.  Yes, we were limited to selling to new
5  employees only outside of the enrollment window.
6       MR. AGUILAR:  After the enrollment.
7       A.  After the enrollment was over, we could only
8  sell to new employees when they were hired.
9       Q.  During the enrollment then, are you saying you
10  were able to sell insurance to an existing employee?
11      A.  Yes.
12      Q.  Okay, I see.
13      MR. STEELE:  I'll pass the witness.
14          EXAMINATION
15  BY MS. LEEDS:
16      Q.  Good morning, Mr. Chavez.  We're back again.
17  I'm going to go over a few things that we talked about
18  at the beginning of your deposition last time because I
19  want to clarify some things.  I believe you told us
20  your wife did not work, correct?
21      A.  She works -- she doesn't have a job outside the
22  house.
23      Q.  Okay.  She works as a homemaker?
24      A.  She works as a homemaker and she works in
25  assisting me with my business.

1       Q.  Okay.  In what capacity?
2       A.  She helps me administer whatever I need done.
3  She does paperwork for me, she completes forms, she
4  completes applications, she assists me in an
5  administrative and clerical capacity.
6       Q.  Okay.  Does she have a license?
7       A.  Yes, she does.
8       Q.  When did she get her license?
9       A.  I believe she got her license sometime in 2001.
10      Q.  Before or after your proposal for the BISD TPA
11  cafeteria plan?
12      A.  Before the proposal that we submitted in 2001?
13      Q.  Correct.  Did she get her license before or
14  after the 2001 proposal?
15      MR. AGUILAR:  Was submitted.
16      A.  I believe she received it sometime in September
17  of 2001.
18      Q.  Okay.  And your mother works for you, too,
19  right?
20      A.  She did.
21      Q.  All right.  Anybody else in your family work
22  for you?
23      A.  Not on a permanent basis.
24      Q.  Okay.  How many cafeteria third-party
25  administrative accounts did you have prior to BISD?

1       A.  It's difficult for me to answer that, but to my
2  recollection there was one that I established at the
3  City of Elsa.
4       Q.  Was that before BISD?
5       A.  Yes, ma'am.
6       Q.  Okay.
7       A.  There was one that I established at the City of
8  Hidalgo.
9       Q.  Okay.
10      A.  There was one that I established at an entity
11  called Valley Frozen Foods.  There was one that I
12  assisted with at Brownsville Zoo.  There was one that I
13  established at Luke Fruia Motors.
14      Q.  Okay.  You had not previously mentioned the
15  City of Hidalgo or Valley Frozen Foods in response to
16  the questions that Mr. Steele asked you.  Have you
17  solicited with them since then at all?
18      A.  No, ma'am.
19      Q.  Why not?
20      A.  Again, for the same reason that I mentioned
21  earlier.
22      Q.  No.  I'm sorry.  He asked you after -- I mean
23  since -- let's put it this way.  How many years did you
24  serve as their TPA?
25      A.  We provided the cafeteria plan services for the

Page 86

1  City of Elsa for probably six, seven years.
2      Q.  Okay.
3      A.  For the City of Hidalgo, I personally did it
4  the first year and then I transferred that
5  responsibility to one of my district coordinators who
6  took it from there.
7      Q.  Who?
8      A.  That was Lynn Davis, Susan Lynn Davis.
9      Q.  Okay.  What about Valley Frozen Foods?
10     A.  Valley Frozen Foods I believe I did that for
11 maybe three or four years as well.
12     Q.  Where are they?
13     A.  Valley Frozen Foods is located in Monte Alto,
14 Texas.
15     Q.  Okay.  What about Luke Fruia?
16     A.  Luke Fruia Motors I believe is still being
17 handled by Danny Sanchez.
18     Q.  So you never lost that account?
19     A.  I no longer do business with them personally.
20     Q.  Okay.
21     A.  But that account, again, I established it as a
22 cafeteria plan account then I transferred it over to a
23 district coordinator.
24     Q.  Okay.
25     A.  I believe it's still a cafeteria plan account

Page 87

1  and I believe Danny Sanchez does that.
2      Q.  Anybody else that you think is still a viable
3  account that you established before BISD?
4      A.  Not to my recollection, ma'am.
5      Q.  Okay.
6      A.  I take that back.  You stated what other
7  accounts.  We do -- I mentioned in my earlier testimony
8  the previous day that we met the Housing Authority --
9  the Donna Housing Authority, I believe.
10     Q.  Right.  Is that still --
11     A.  That's still an account that we work with.
12     Q.  Okay.
13     A.  I don't have any interaction with them.  Raul
14 Viada does that.
15     Q.  Okay.
16     A.  And we have an account by the name of
17 Interlube.
18     Q.  Right.
19     A.  And Interlube is an account that also Raul
20 handles.  There is one other account and it's a pretty
21 big one and that is the Diocese of Brownsville
22 conglomeration.  I established that cafeteria plan as
23 well.  It is an account that's mentioned here in this
24 list that was shown to me prior in Exhibit 19.
25     Q.  Okay.

Page 88

1      A.  The Diocese of Brownsville was an orphan
2  account, meaning I had one policy with one person who
3  had a policy there.  When I solicited the cafeteria
4  plan there, it enabled us to do the cafeteria plan not
5  only for the Diocese but for every entity that's
6  attached to the Diocese, which is about 70, 80
7  different churches, schools, et cetera.
8      Q.  Okay.
9      A.  So that's another one that I established.
10     Q.  Before BISD?
11     A.  I believe that was after BISD, ma'am.
12     Q.  After BISD?
13     A.  I believe that was after BISD.
14     Q.  Okay.  And is that with AFLAC products?
15     A.  Yes, it is.
16     Q.  Who has that account now?
17     A.  I assigned that account to Raul Viada to take
18 care of personally and he did so.  But my understanding
19 is that AFLAC has removed him from that account as
20 well, from all the accounts, the 70 or 80 different
21 accounts.
22     Q.  Okay.  Do you receive any overwrites from any
23 of these people anymore?
24     A.  I believe I do.  I receive what we call renewal
25 overwrites.

Page 89

1      Q.  Renewal overwrites?
2      A.  Yes, ma'am.
3      Q.  Okay.
4      A.  From anything that was AFLAC.
5      Q.  Right.
6      A.  From the Donna Housing Authority, for instance,
7  the Interlube that's not an AFLAC account.
8      Q.  Okay.  What other companies other than The
9  Teachers' Agency have you established or gone in for
10 cafeteria plans -- forget that question.  Non-AFLAC
11 cafeteria plans, what other -- have you gone -- you've
12 obviously gone in to do cafeteria plans that are
13 non-AFLAC?
14     A.  Since my --
15     Q.  Hang on.  Is Donna since?
16     A.  Donna Housing Authority is not a cafeteria
17 plan.  We do their group health insurance for them.
18     Q.  Okay.  What about Interlube?
19     A.  Interlube, we just do the group health
20 insurance for them.
21     Q.  Okay.  Well, let me ask you this.  Cafeteria
22 plans non-AFLAC, have you done any non-AFLAC cafeteria
23 plans?
24     A.  I believe we did one.
25     Q.  Where?

Page 90

1    A. That was Brownsville Community Health Center.
2    Q. Okay. And that's since?
3    A. Yes.
4    Q. Okay. Have you done any non-AFLAC cafeteria
5   plans before 1998 at BISD?
6    A. No.
7    Q. But you do go in and do group -- group
8   insurance sales to employers?
9    A. Since that time very, very few, like I
10   mentioned earlier.
11    Q. Okay. But you had before, too, or not?
12    A. Before that time any -- the agreement that I
13   had with Frank LaFemina, who was my immediate
14   supervisor, was that any groups that I had prior to
15   becoming a regional sales coordinator, that I could
16   maintain them, and so I made arrangements with Raul
17   Viada to make sure that he took care of those. And in
18   exchange Raul would continue to give me a part of the
19   commission.
20    Q. Okay. But did you feel it was like not real
21   kosher for you to continue doing those since they were
22   not AFLAC?
23    A. Well --
24    Q. Because you mentioned several times the last
25   time that you owed your allegiance to AFLAC.

Page 91

1    A. It's not that it's kosher or not. I thought it
2   was curious that AFLAC called you an independent
3   contractor but they told you you couldn't do certain
4   things. For instance, they said you couldn't work for
5   anybody else other than AFLAC during my regional
6   manager contract.
7    Q. Right. During the regional manager, but before
8   you were regional manager you could still do these
9   group enrollments, could you not?
10    A. I could.
11    Q. Okay.
12    A. Yes.
13    Q. But you chose not to; you chose to focus on
14   AFLAC?
15    A. Before I became a regional coordinator, I did
16   solicit business with health carriers, the ones that
17   you see listed on my license.
18    Q. Okay. Now, if you recall last time you were
19   making some notations when we were talking about how
20   much you sold in any particular year. Did you happen
21   to bring that with you? You had a little list that you
22   were referring to of the different sales that you made
23   in '98, '99, that 1.5 million kind of thing or 1.7
24   million?
25    A. Uh-huh.

Page 92

1    Q. Could I see that real quick?
2    A. Yes. Yes, you can.
3    Q. Okay. Do you mind if we make this an exhibit
4   so that you can explain it because --
5    A. No.
6    Q. -- I think that may be easier than me asking
7   you all the questions again.
8    A. I don't mind you taking it; however, I don't
9   know those figures to 100 percent accurate.
10    Q. I understand that. I understand that. But
11   it's better than what we had.
12    A. Yes, that's fine.
13    MR. AGUILAR: I will go ahead and make a
14   copy of this so we can --
15    (Off the record).
16    (Exhibit No. 20 marked).
17    Q. Okay. After the enrollment at BISD you
18   mentioned that what your work would consist of
19   primarily is managing the agents and this is after you
20   were regional manager, right?
21    A. (Moving head up and down).
22    Q. And let me get this straight. You became
23   district manager in December of '94?
24    A. I believe that's correct.
25    Q. And regional manager in November of '98?

Page 93

1    A. I believe that's correct.
2    Q. And that was right after you got the BISD
3   account?
4    A. That is correct.
5    Q. Okay. So after the enrollment you would manage
6   your agents primarily, right?
7    A. Yes, that's correct.
8    Q. Rather than sell policies?
9    A. I didn't have any agents, but that was my job.
10    Q. Okay.
11    A. At that point.
12    Q. You didn't have any agents?
13    A. No.
14    Q. Okay.
15    A. I was made a regional manager in title but I
16   had no agents that reported to me at that point.
17    Q. Okay. What about in -- all right. That was
18   '98, '99, right?
19    A. Yes, ma'am.
20    Q. What about in '99, 2000, did you have agents?
21    A. Well, I started to accumulate agents over that
22   period of time after I became a regional manager.
23    Q. Okay.
24    A. And that was just the recruiting process.
25    Q. Now, my understanding from your -- well, let's

Page 94

1  go back to this. During the questioning of how many --
2  how much sales you had in the different years, I
3  believe that's when you started making this list,
4  correct, at your deposition the first time?
5      A. Yes, ma'am.
6      Q. Okay. And in 1998 I believe you -- let me see
7  if I interpret your list correctly. You believe -- and
8  I'm saying you believe because I'm not holding you
9  strictly to these numbers but around, you believe you
10  made sales to BISD of around 250,000?
11      A. I believe that's right.
12      Q. Okay. In 1998 total sales for you were
13  700,000?
14          MR. AGUILAR:  '99.
15          MS. LEEDS:  What did I say?
16          MR. STEELE:  You said '98.
17      Q. Oh, 1999, the next year, total sales were
18  700,000 and you believe 350 of that was from BISD?
19      A. Yes, ma'am.
20      Q. Okay. And your team over on the right-hand
21  side, you're talking about those are the people that
22  worked directly under you during the enrollment?
23      A. I believe by saying my team, that was a portion
24  of the business that was written by people in my
25  hierarchy where I got to overwrite the business.

Page 95

1      Q. Okay. So in 1998 since you didn't have
2  anybody, your team really didn't write all the
3  business, it only wrote half of it?
4      A. None of my team wrote it.
5      Q. Okay.
6      A. But because it was a 50/50 split with people,
7  then I got to overwrite --
8      Q. Got you.
9      A. -- my portion of the business and if we wrote
10  250 then 125 was considered my team.
11      Q. Okay. In 2000, total sales was 1.2 million,
12  500 of that was from BISD and your team wrote all of
13  it?
14      A. Yes, ma'am.
15      Q. Okay. In 2001, you think your total sales was
16  1.7, 600 of which was BISD, and your team, because of
17  what happened, wrote 50?
18      A. I believe that to be correct.
19      Q. Okay. What did you mean by 40 to 45 percent
20  last quarter? Is that when you got paid the
21  commissions?
22      A. I don't know what I meant by the notes there.
23      Q. That's okay.
24      A. I think your question was when did you write
25  the business or how much was written each quarter or --

Page 96

1      Q. Okay. I didn't know if that 40 to 45 percent
2  had anything to do with the part above it.
3      A. No.
4      Q. And real quickly if you could go -- since it's
5  the same subject, if you could go to the letter that
6  has been marked Exhibit 15 right here. On the second
7  page, the first full paragraph, it says, if we were to
8  lose this account, and then the next one says, should
9  this occur, AFLAC would be forced to give chargebacks
10  to every agent who wrote the more than 300,000 in AP in
11  this enrollment. What's AP?
12      A. Annualized premium.
13      Q. Okay. Is that related at all to the numbers
14  that are on your little chart?
15      A. What Mr. Sanchez is referring to is that there
16  was $300,000 of AP that was written I believe in 2001.
17      Q. Right.
18      A. But I know that that figure is not correct.
19      Q. Okay. But is your number, 600 here, is that
20  the same thing as an AP?
21      A. Yes, ma'am.
22      Q. Would it be the same thing?
23      A. Yes, ma'am.
24      Q. So the 300 is of the sales in his numbers?
25      A. Correct.

Page 97

1      Q. Are the sales that were made during the
2  enrollment?
3      A. Yes, that's correct.
4      Q. Okay. Now, is this statement related to what
5  you were telling us last time about how AFLAC pays the
6  commissions before they even receive the premiums?
7      A. You are referring to which statement?
8      Q. The statement about the chargebacks.
9      A. Should this occur, AFLAC would be forced to
10  give chargebacks to every agent who wrote more than
11  300,000 in this enrollment. I believe what Danny is
12  referring to there is that AFLAC advanced commissions
13  to you.
14      Q. Yeah, that's what I'm talking about.
15      A. On the commission of business they would pay
16  you 63 percent of your full year's commissions really
17  within the first seven to 14 days.
18      Q. Right. So what he's talking about is the
19  commissions have already been paid but we haven't
20  gotten any from it? AFLAC hadn't really gotten the
21  money from it yet?
22      A. I believe that's correct, yes.
23      Q. Okay. What would a chargeback be?
24      A. A chargeback would be if you purchased a policy
25  from me and AFLAC advanced me 63 percent of my

1  commission and you canceled it after a month or two,
2  well, then I only earned 1/12th or 2/12ths of my
3  commission.
4      Q.  Right.
5      A.  But I actually got paid 63 percent of it so the
6  portion that I didn't earn would be charged back to me
7  against my monthly statements.
8          MR. AGUILAR:  The difference.
9      Q.  So you would owe AFLAC money?
10     A.  Correct.
11     Q.  Okay.  Have you been to any type of medical
12 health professionals at all as a result of what you
13 claim happened to you at BISD?
14     A.  Ma'am, the only doctor I went to was a doctor
15 by the name of Dr. Alameda and it was for pains that I
16 had in my foot.  I can't say that they were as a result
17 of what happened or not.
18     Q.  Okay.
19     A.  I have not sought any other medical attention.
20     Q.  You have not received any psychological
21 counseling of any kind?
22     A.  Not from a licensed provider.
23     Q.  Okay.  Have you ever sought psychological
24 counseling?
25         MR. AGUILAR:  Objection; specificity.

1      A.  No, ma'am.
2      Q.  Okay.  Have you ever taken any kind of
3  psychoactive drug prescribed by a physician for
4  depression or any kind of mental health illness?
5      A.  No, ma'am.
6      Q.  And you're not on anything today?
7      A.  Just vitamins.
8      Q.  Okay.  Mr. Steele was asking you about the
9  business to date and I believe you said you own 40
10 percent.  Of what do you own 40 percent?
11     A.  Of not much yet.
12     Q.  Okay.  But of what?
13     A.  I own 40 percent of The Teachers' Agency.
14     Q.  Okay.
15     A.  But because we haven't done very much
16 business --
17     Q.  In fact you're not yet fully established?
18     A.  We're not really fully established, so to
19 speak, in terms of our contracts with different
20 insurance carriers, et cetera.
21     Q.  Okay.
22     A.  We are established in some areas.  Like in the
23 annuity business, we do have very strong contracts and
24 we're looking for contracts in other facets of the
25 business.

1      Q.  Okay.  But this Teachers' Agency is now a
2  corporation?
3      A.  We just became incorporated.
4      Q.  Several weeks ago?
5      A.  Yes.
6      Q.  Okay.
7      A.  Yes.
8      Q.  And you have decided -- who owns the other 60
9  percent of Teachers' Agency?
10     A.  Stephen Andrus owns 40 percent, Fernando de
11 Pena owns six percent and Valentin Paz owns 14 percent.
12     Q.  Okay.  What has your -- what is your draw --
13     A.  We have no draw.
14     Q.  -- from the agency?  Haven't you-all decided
15 that you're going to be paid a particular salary from
16 the agency?
17     A.  We agreed that we would give ourselves a salary
18 when income started coming in.
19     Q.  Okay.
20     A.  But since income hadn't started coming in, we
21 haven't paid ourselves a salary.
22     Q.  Okay.  But what's the salary you agreed on?
23     A.  I believe we just tentatively agreed at $2,000
24 a month.
25     Q.  Okay.  Now --

1      A.  Plus bonuses.
2      Q.  Okay.  You will still earn the commissions you
3  make on first year sales or will all commissions go to
4  The Teachers' Agency?
5      A.  We haven't determined that yet.
6      Q.  Okay.
7      A.  We had discussed writing all business and
8  assigning it to The Teachers' Agency from here on
9  forward but that hasn't occurred yet because we just
10 became incorporated.
11     Q.  Okay.  So as it stands now, any business you
12 write, the split of the commissions is what?
13     A.  If I were to write some business it's basically
14 my business.
15     Q.  Okay.
16     A.  I participate in the overwrites of the
17 business, okay.
18     Q.  Yes.
19     A.  And --
20     Q.  Wait.  The overwrites of the business, what
21 would that be?
22     A.  Well, if I can define that.  When we contract
23 with a carrier like Allianz, for instance, Allianz will
24 put us at a certain commission schedule and, just for
25 discussion purposes, let's say they put us at a 15

Page 102

1  percent commission schedule.  Then we put our team
2  coordinators on a 13 percent commission schedule and
3  our agents who are trained by them are put at maybe an
4  11 or 12 percent commission schedule.
5      Q.  Okay.
6      A.  So the overwrite that the agency makes is that
7  difference between the team coordinator and the agency
8  which in this example was two percent.
9      Q.  Okay.
10     A.  And that two percent gets paid to the agency
11  and then the agency uses that money to pay all the
12  expenses of the office.
13     Q.  Right.
14     A.  If there's any money left over, then we get to
15  participate based on our ownership of the business.
16     Q.  Okay.  So you're saying that you would get a
17  percentage of any profit that's made?
18     A.  Yes.
19     Q.  Okay.  So it's not really an overwrite, right?
20     A.  Well, the overwrite is in the sense that if one
21  of our agents wrote the business and then the team
22  coordinator received a portion of their overwrite --
23     Q.  Right.
24     A.  -- then our agency would receive an overwrite.
25     Q.  Well, I understand that.  I understand where --

Page 103

1  the money is coming from an overwrite.
2      A.  Correct.
3      Q.  Okay.  But what would happen, the monies you
4  would get would be any profits that are left over from
5  the overwrites that --
6      A.  After expenses.
7      Q.  Exactly.
8      A.  Yes, ma'am.
9      Q.  Okay.  Okay, I understand.  You mentioned in
10  the first part of your deposition that you had heard
11  that Arnie Olivarez had bribed board of trustee members
12  and persons in higher administration and then you went
13  on to explain that to you a bribe included campaign
14  contributions.
15     A.  That's what I said.
16     Q.  Okay.  Have you heard that Arnie Olivarez has
17  directly bribed any board of trustee member, meaning
18  giving them money?
19     A.  Have I heard that?
20     Q.  Yes.
21     A.  Yes, of course I have.
22     Q.  Okay.  Who are the board of trustee members who
23  have supposedly received cash from Arnie Olivarez?
24     A.  I had heard that Hugh Emerson, Marilyn Del
25  Bosque, Randy Dunn, Hugh Emerson -- I already mentioned

Page 104

1  Hugh Emerson.  I meant to say Joey Lopez when he was
2  president, when he was on the board in the past.
3      Q.  Okay.  And who told you this?
4      A.  I can't remember who told me but I can -- I can
5  tell you that there was some people who I spoke to on a
6  regular basis or somewhat regular basis and even though
7  I can't tell remember specifically who told me, I can
8  tell you the people I spoke to.
9      Q.  Please.
10     A.  Okay.  One of them was Otis Powers, one of them
11  was Pat Lehmann, both board members.  Another one was
12  Stephen Andrus, Fernando de Pena, Catalina Garcia.
13     Q.  Who is she?
14     A.  She is a person who ran for the board against
15  Marilyn Del Bosque when Marilyn ran.
16     Q.  Okay.
17     A.  There's other people that I can't recall them
18  but those are the people that I know for sure that I
19  had spoken to.
20     Q.  Okay.  When you are -- these are -- if I
21  understood you correctly, the people that you just
22  listed are the people that you spoke to on a regular
23  basis that you think these may have been the people
24  that told you that Hugh Emerson, Marilyn, Randy and
25  Joey Lopez took bribes?

Page 105

1      A.  Yes.
2      Q.  Now, when you're talking -- when we're talking
3  about Arnie Olivarez giving them cash, what kinds of
4  money are you talking about?  Amounts of how much?
5      A.  I don't know, ma'am.
6      Q.  Okay.
7      A.  I believe in my earlier testimony that I said
8  somewhere in the area of five to $10,000.
9      Q.  You said that in terms of campaign
10  contributions.  Are you now changing your testimony?
11     A.  Well, I don't know whether they were campaign
12  contributions or not because I guess a campaign
13  contribution has to be registered with the State, so I
14  don't know whether they were registered with the State.
15  You would have to look at campaign records to know
16  that.
17     Q.  I'm just asking you what you heard these bribes
18  were, either they were campaign contributions or cash
19  to them.  What did you hear?
20     A.  Cash to them.
21     Q.  Okay.  So did you hear that the bribe consisted
22  of a campaign contribution?
23     A.  I heard that they may be possibly disguised as
24  a campaign contribution.
25     Q.  Okay.  Now, how about top administrators?  Have

27 (Pages 102 to 105)

Page 106

1  you heard that top administrators received bribes?
2      A.  I can't say that anybody told me that.
3      Q.  Okay.
4      A.  To my recollection.
5      Q.  Okay.  You also told us about how the risk of a
6  particular job would change the amount of commission
7  you may make.  Did I get that right?
8      A.  (Moving head up and down).
9      Q.  In other words, you will -- I'm sorry.  Was
10 that a yes?
11     A.  Did the --
12     Q.  Did I get it right?
13     A.  Not exactly.
14     Q.  Okay.  Let me see if I can say it better.  The
15 example you gave us was that your commissions will be
16 less at the Port of Brownsville than at BISD?
17     A.  That's correct.
18     Q.  Okay.  And that had to do with the risk of the
19 employment?
20     A.  Yes.  It's called an industry classification.
21     Q.  Okay.  And is that one of the reasons you chose
22 to target BISD, because your commissions would be
23 higher?
24     A.  No.
25     Q.  Okay.  Do you go to the Port of Brownsville or

Page 107

1  Port Isabel and those types of places to -- have you
2  gone to try to sell products?
3      A.  Yes.  And now that you're asking me that
4  question, that's another group that I established a
5  cafeteria plan at and that was at the -- what's it
6  called -- the Brownsville Navigation District.
7      Q.  Okay.
8      A.  I established a cafeteria plan.  It was already
9  an existing account with AFLAC and I went in there and
10 I established the cafeteria plan.
11     Q.  Is that still with AFLAC?
12     A.  I believe it is, yes.
13     Q.  Okay.  Now, you talked a lot about Arnie
14 Olivarez in your first deposition.  He does not work
15 for NPA, correct?
16     A.  No.
17     Q.  Okay.  What companies -- when you were doing
18 your cafeteria plan, you were primarily proposing AFLAC
19 products, right?
20     A.  Yes.
21     Q.  Okay.  What products does he sell?
22     A.  Does Arnie Olivarez sell?
23     Q.  Yes.
24     A.  I couldn't tell you what he sells.
25     Q.  Okay.

Page 108

1      A.  No, I couldn't tell you.
2          MR. STEELE:  Eileen, can I ask one
3  follow-up question?
4          MS. LEEDS:  Sure.  Go ahead.
5              EXAMINATION
6  BY MR. STEELE:
7      Q.  What insurance products would or does The
8  Teachers' Agency offer; in other words, do they offer
9  similar types of insurance products that AFLAC offers
10 or do they represent carriers that offer the same type
11 of products that AFLAC offers?
12     A.  Yes.
13     Q.  So you could be the TPA third party
14 administrator for a particular account on behalf of The
15 Teachers' Agency, you could also offer the same types
16 of supplemental insurance from some other carrier
17 that's similar to what AFLAC offers?
18     A.  Yes, that's possible.
19          MR. STEELE:  And that's all I needed.
20         (Exhibit No. 21 marked)
21             EXAMINATION
22 BY MS. LEEDS:
23     Q.  Mr. Chavez, let me hand you what's been marked
24 as Exhibit No. 21, which is also -- I'm sorry, Bates
25 stamp 1002 and ask you if you recognize that document?

Page 109

1      A.  Yes, I do.
2      Q.  That was a document from you to Ms. Wilkinson
3  at AFLAC, right?
4      A.  Yes, ma'am.
5      Q.  And in that document you are requesting that
6  they help you basically to try to get a proposal that
7  would comply with the RFQ that was in effect at the
8  time, right?
9      A.  Yes, ma'am.
10     Q.  Okay.  And you were basically asking, you know,
11 about can we do something with the 403(B) product part?
12     A.  Yes, that's correct.
13     Q.  And I yellowed the part about, I need your
14 assistance to come up with an alternate plan.  Is that
15 what I just said, the alternate plan was to be able to
16 include 403(B) products?
17     A.  Not the products, but the administration.
18     Q.  Okay, the administration.
19     A.  Yes, that's correct.
20     Q.  Okay.  And you know that the RFQ was changed,
21 do you not?
22     A.  Yes, it was.
23         (Exhibit No. 22 marked).
24     Q.  Let me show you what's been marked as Exhibit
25 No. 22 and ask you if that is one of the changes when

Page 110

1  they changed it to and/or deferred annuities.
2      A. Yes, ma'am, it is.
3      Q. And it was changed after that, too, right?
4          MR. AGUILAR: Again, you mean?
5          MS. LEEDS: Yes.
6      A. I believe it was changed again. I believe
7  there was an addendum.
8          (Exhibit No. 23 marked).
9      Q. Let me show you what has been marked as Exhibit
10  No. 23 where it says and/or tax-deferred annuities and
11  all other alternatives; is that correct?
12      A. Yes, ma'am.
13      Q. Okay. Now, in your testimony last week you
14  mentioned that you spoke to Mr. Dunn on August -- yes,
15  August 14th, correct? Do you recall today that you
16  mentioned that?
17      A. I think it was correct. I think August 14th is
18  correct.
19      Q. Okay. And your concern at that time was that
20  you were going to be prevented from submitting a
21  proposal?
22      A. That's correct.
23      Q. And in fact, the very next day the RFQ was
24  changed so that you would not be prevented from
25  submitting a proposal; is that correct?

Page 111

1      A. Yes, ma'am.
2      Q. Okay.
3      A. The dates on this -- I don't remember the dates
4  on these particular things --
5      Q. Right.
6      A. -- but if the dates are correct, yes, then that
7  would be correct.
8      Q. Okay. Did Mr. Dunn tell you that that was
9  going to be changed?
10      A. He told me he would take care of that.
11      Q. Okay. Do you know if he's the one responsible
12  for this change?
13      A. I don't know that.
14          (Exhibit No. 24 marked).
15      Q. Okay. Let me hand you what has been marked
16  Exhibit No. 24 and this is another document that you
17  prepared to Kathy Wilkinson, correct?
18      A. That's correct.
19      Q. Okay. And this is dated August 15th?
20      A. That's correct.
21      Q. And in there you mention the RFQ has been
22  changed, do you not?
23      A. I don't remember. I don't have it in front of
24  me. Where does it say that?
25      Q. No, I'm sorry. There's another one that says

Page 112

1  that. Okay. In that one you are asking her to include
2  certain points in the proposal, correct?
3      A. Yes, ma'am.
4      Q. Okay. Was Kathy preparing the proposal?
5      A. I believe at that point, yeah, she had
6  something to do with preparing it.
7      Q. Okay. In fact, you include in that letter some
8  stuff -- well, you point out that you believe that
9  Colonial and First Financial were your primary
10  competitors?
11      A. Yes.
12          (Exhibit No. 25 marked).
13      Q. Okay. We talked about these last time and this
14  is a -- this group of documents has been listed or
15  marked as Exhibit No. 25, and it is primarily a
16  two-page document that you wrote to the trustees, the
17  second page being the last page, but to some of the
18  trustees that you wrote as a friend and to some you did
19  not, correct?
20      A. Yes, ma'am.
21      Q. And that is the only difference in those sets
22  of documents?
23      A. I believe that's correct.
24      Q. But it's -- basically the body of the letter is
25  the same?

Page 113

1      A. That's correct.
2      Q. Okay. And this letter written on September
3  10th was primarily indicating to the trustees that it
4  was -- you were trying to promote your product?
5      A. Yes.
6          (Exhibit No. 26 marked).
7      Q. Exhibit No. 26 is a document that was provided
8  to us by your attorney and it is an agenda for an
9  insurance committee meeting and I'm going to ask you if
10  you know who wrote the note that's in handwriting down
11  there?
12      A. No, ma'am, I don't know who wrote that. I
13  don't even know where I got this from.
14      Q. Okay. That appears to be an internal
15  memorandum, right?
16      A. Yes, ma'am.
17      Q. But you do not know who wrote the note,
18  recommendation was made prior to meeting even after
19  meeting had been scheduled?
20      A. Huh-uh.
21      Q. You do not recognize that handwriting?
22      A. No, ma'am.
23      Q. Okay. And you do not remember how you got it?
24      A. I don't.
25      Q. Do you know who could have given that document

Page 114

1  to you?
2      A.  Honestly, I don't even know how I got it.
3      Q.  Okay.
4      A.  I don't know.
5          (Exhibit No. 27 marked).
6      Q.  And that was 1052.  Let me hand you what has
7  been marked as Exhibit No. 27 and ask you if that is
8  another document you prepared?
9      A.  Yes, ma'am, it is.
10     Q.  Okay.  And in this document -- this was written
11 to the insurance committee, was it not?
12     A.  Yes, ma'am.
13     Q.  In this document dated November 9th, Ms. Neally
14 asked you several questions about this, about the fact
15 that misrepresentations of the truth were said and that
16 is when you told her you were talking about that
17 cafeteria plan comparison chart?
18     A.  I believe that's right.
19     Q.  And I believe your testimony is that you never
20 tried to contact Dr. Sauceda -- you believe that was --
21 the comparison chart was made by somebody in
22 administration?
23     A.  Yes.
24     Q.  Is that correct?  Do you know who?
25     A.  I can tell you what I was told but I don't know

Page 115

1  for a fact that that's true.
2      Q.  Okay.  Pat Lehmann told you that Mr. Errisuriz
3  had made it?
4      A.  I believe Pat may have been the person that

Page 116

1          (Exhibit No. 29 marked).
2      Q.  With the document 1062, do you remember if you
3  had any attachments?
4      A.  I don't think I did, no.
5      Q.  Okay.  Do you recall if you sent out what's
6  been marked as Exhibit No. 29 to the campus
7  representatives?
8      A.  I think I did.
9      Q.  Did you circle the "all"?
10     A.  I think that's the way it was when I got it.
11     Q.  When you got the letter.  Do you know how you
12 got that letter?
13     A.  No, ma'am, I don't.
14     Q.  Okay.  And why did you circle the "all," or why
15 do you think "all" was circled?
16     A.  You know what?  I think I do remember how I got
17 this letter.
18     Q.  Okay.
19     A.  I believe on November 20th, the date of that
20 board meeting, I believe this letter just all of a
21 sudden popped up on November 20th at the board meeting
22 and I think Dr. Sauceda's secretary, during the middle
23 of the meeting, she came to him and gave him that
24 letter or that stack of letters and then I think it was
25 disseminated after that.

Page 117

1      Q.  Okay.
2      A.  I think that's where I got it.
3      Q.  Now, this letter is not written by Arnie
4  Olivarez, is it?

1  opinion came out and one of the topics of discussion
2  was this opinion?
3      A.  No, ma'am.
4      Q.  You have never spoken to Mr. Olivarez about the
5  opinion with your boss present?
6      A.  I don't believe so, no.
7      Q.  Okay.  Have you read this opinion?
8      A.  Yes.
9      Q.  All right.  And isn't it true that you
10  understand that this opinion refers to insurance
11  contracts that districts are going to buy?
12      A.  It's written in some kind of legalese so I
13  don't know.
14      Q.  I'm asking what your understanding is.
15      A.  My understanding is that it applied to the
16  value of a contract.
17      Q.  Okay.  The value of a contract that a district
18  is going to buy?
19      A.  Not necessarily that a district would buy but
20  that a district would be involved in.
21      Q.  Is that what your understanding says?
22      A.  Yes, ma'am.
23      Q.  Okay.  Just read that sentence that's
24  underlined, would you, please?
25      A.  Out loud?

1      Q.  Yes.
2      A.  "We conclude that a junior college district may
3  not use a designated broker of record to purchase
4  insurance contracts with premiums of an aggregate value
5  of $10,000 or more for each 12-month period."
6      Q.  Okay.  And is that what you are basing your
7  complaint of illegality on as to BISD?
8          MR. AGUILAR:  That -- and, again,
9  objection to the extent it calls for a legal
10  conclusion.
11          MS. LEEDS:  I'm not asking for a legal
12  conclusion.
13      Q.  I'm asking what you base your complaint on.
14          MR. AGUILAR:  Hang on.  And to the extent
15  you're asking for a legal conclusion for the complaint.
16  In the complaint, that's where we're saying, objection;
17  legal conclusion.
18          MS. LEEDS:  I'm not asking about a
19  complaint.
20          MR. AGUILAR:  To the extent that you're
21  asking about his understanding, that's fine.
22      Q.  Mr. Chavez, you wrote all these things about
23  it's illegal, it's wrong, whatever, right?
24      A.  Yes, ma'am.
25      Q.  No attorney did that?

1      A.  No, ma'am.
2      Q.  Okay.  Are all the things you wrote in here and
3  the stuff you said about being illegal, is it based on
4  that statement?
5      A.  There were a lot of contentions that I thought
6  that I deserved the business or I expected the
7  business.  This was one of them.
8      Q.  Okay.
9          MS. NEALLY:  Objection to the
10  responsiveness of the answer.
11      Q.  The fact that you're talking about something
12  illegal about an agent of record, is this what you were
13  basing it on?
14      A.  Yes.
15      Q.  Okay.  The fact that -- and I won't say college
16  because it applies to school districts -- may not use a
17  designated broker of record to purchase insurance
18  contracts with premiums of an aggregate value of
19  $10,000 or more, correct?
20      A.  Uh-huh.
21      Q.  Now, it says purchase there, right, does it
22  not?
23      A.  Yes, it does.
24      Q.  Okay.  So is it your understanding that
25  purchase doesn't mean purchase?

1      A.  My understanding is that purchase refers to the
2  entering of a contract with --
3      Q.  Somebody?
4      A.  -- an agent to do something with the district.
5      Q.  Well, it says to purchase insurance contracts,
6  right?
7      A.  Correct.
8      Q.  Was BISD purchasing any insurance contracts?
9      A.  They were not purchasing the insurance
10  contract.
11      Q.  Okay.  Thank you.  Let's don't go any further
12  into that one.
13          MR. STEELE:  For clarification, what we
14  have been talking about is Exhibit 30, correct?
15          MS. LEEDS:  30, yes.
16          (Exhibit No. 31 marked).
17      Q.  Okay.  And part of the enclosures that you sent
18  to the campus was Exhibit No. 31, correct?
19      A.  I believe I sent this out to campuses.
20      Q.  Did you write that?
21      A.  Yes, ma'am.
22      Q.  Okay.  And at the top when you talk about
23  legality, you write that it's illegal when the value of
24  the contract is more than $10,000.  Moreover, granting
25  an individual an agent of record letter for the purpose

Page 122

1  of soliciting optional retirement investments or
2  annuities is also illegal. What do you base that on?
3      A. The first part of it was that, right there.
4          MR. STEELE: And you're referring to
5  Exhibit 30?
6          THE WITNESS: Exhibit 30, correct.
7      Q. Okay.
8      A. And then, moreover granting an agent an
9  individual -- an agent of record for the purpose of
10  these optional retirement investments or annuities is
11  also illegal because my understanding is that in the
12  state of Texas any agent can solicit a 403(B) annuity
13  from a -- from an employee and a district cannot deny
14  them. And by designating an agent of record for the
15  purpose of doing so, that I would be denied the
16  opportunity to do that.
17      Q. Okay.
18      A. That's my understanding.
19      Q. So that's where that statement comes from?
20      A. Yes, ma'am.
21      Q. Now, you told us before that you do not know
22  whether or not NPA actually charged BISD 30,000?
23      A. Can I see that?
24      Q. Sure.
25      A. Okay. And then -- I'm sorry. But your

Page 123

1  question again was related to this?
2      Q. Yeah. You mentioned in your testimony last
3  time that you believed NPA was charging the district
4  $30,000 for being a TPA?
5      A. Cumulatively, yes, that would be correct for
6  one portion of -- yeah, of what was being done.
7      Q. Okay. And we asked you, where did you get that
8  information?
9      A. This information I got directly by reading the
10  proposal that the NPA submitted.
11      Q. The proposal that they were submitting for the
12  year 2001?
13      A. That's correct.
14      Q. Okay. But where did you get the information
15  that they had charged that amount before? In your
16  documents, if you recall correctly, the stuff that you
17  were giving out to the insurance committee, you were
18  talking about the fact that you had saved --
19          MS. LEEDS: Let's mark this.
20          (Exhibit No. 32 marked).
21      Q. I'll hand you what's been marked as Exhibit No.
22  2 -- 32 and just show you right quick where you talk
23  about that AFLAC had saved the district over $90,000.
24  Where did you get the information that NPA had charged
25  30,000 per year before 2001?

Page 124

1      A. I had submitted proposals in the past to BISD
2  for probably ever since I first started with AFLAC back
3  in '94, and I don't recall -- I think I submitted one
4  or two, maybe even three proposals prior to actually
5  getting the business. And I had witnessed
6  documentation obviously that told me what they were
7  paying because that was part of the proposal
8  specifications that were released. So that's where I
9  got the information from, from BISD's actual proposals.
10      Q. Okay. Do you know for a fact that NPA ever
11  charged BISD anything?
12      A. Yes, I do.
13      Q. Okay. And where do you get that information
14  from?
15      A. I can't tell you. I don't know.
16      Q. Well, you just told me you do know.
17      A. Oh, okay.
18      Q. How is it that you do know?
19      A. Because I saw it with my own eyes on proposals
20  that BISD released prior to 1998.
21      Q. Okay. A proposal is something that is
22  submitted before the fact, correct?
23      A. I'm sorry? To the request for proposals, the
24  RFP.
25      Q. Okay. So you're saying the RFP --

Page 125

1      A. Yes.
2      Q. -- contained information that NPA had charged
3  $30,000 in the past?
4      A. It did.
5      Q. Okay.
6      A. In addition.
7      Q. Do you remember what year you saw that?
8      A. Honestly, I couldn't tell you.
9      Q. Okay.
10          MR. AGUILAR: Can we go off the record for
11  just a second?
12          MS. NEALLY: No.
13          MS. LEEDS: No, not --
14      A. Was that a good enough answer for you?
15      Q. Yeah. No, that's all I wanted to know is where
16  you got the information.
17          (Off the record).
18          (Exhibit No. 33 marked).
19      Q. Mr. Chavez, let me hand you what's been marked
20  as Exhibit No. 33. That's another letter you sent the
21  insurance committee, right?
22      A. Yes, ma'am.
23      Q. Okay. And in there -- actually you sent two of
24  those letters, did you not? If you look at the letter
25  behind it, it's another copy of that same letter?

Page 126

1    A. Yes.
2    Q. Is it not?
3    A. Uh-huh.
4    Q. What information did you get -- I mean
5    basically you're saying I'm sending this to you
6    personally because I understand that faxes haven't
7    gotten to you?
8    A. Yes.
9    Q. Where did you get that information?
10   A. From insurance committee members that gave me
11   that information.
12   Q. They said that they had not gotten a letter
13   that you had sent out?
14   A. After I would send them something, I would
15   follow-up with phone calls to maybe some people, and I
16   can't recall who I followed up with, but I would call
17   and just say, hey, I just wanted to make sure you
18   received the fax I sent you. And I was told, no, I
19   never got anything.
20   Q. Okay. So that's why you sent the other letter?
21   A. Correct.
22   Q. Okay. And this is the letter in which you talk
23   about the fact that people in the audience were booing
24   and good can conquer evil, right?
25   A. Yes, ma'am.

Page 127

1           (Exhibit No. 34 marked).
2    Q. Let me hand you what's been marked as Exhibit
3    No. 34, which was also produced by your attorney. That
4    is a letter written by Mr. Powers to AFLAC, right?
5    A. That is correct.
6    Q. Okay. And in there it mentions that he has
7    personally contacted -- this is written January 16th,
8    right?
9           MR. AGUILAR: Dated.
10   Q. Dated January 16th?
11   A. Dated January 16th.
12   Q. It mentions that he has personally contacted
13   Mr. LaFemina, correct?
14   A. That's correct.
15   Q. Did Mr. Powers tell you what his conservation
16   with Mr. LaFemina was about?
17   A. I can't tell you verbatim what it was but I can
18   tell you in general terms.
19   Q. Tell me.
20   A. He said that he called Mr. LaFemina to tell him
21   that Mr. Sauceda -- that Dr. Sauceda didn't have the
22   authority to do what he did and that I had done nothing
23   wrong and that he would request that I be reassigned to
24   the duties that I had prior.
25   Q. How long have you known Mr. Powers?

Page 128

1    A. As an acquaintance, I have known him for
2    probably seven, eight years.
3    Q. Okay. How long have you been a member of Los
4    Compadres?
5    A. I think it's been in existence for three to
6    four years and I was one of the first members.
7    Q. Mr. Powers was one of first members, too,
8    right?
9    A. I don't know.
10   Q. Okay. Did you ask Mr. Powers to write this
11   letter?
12   A. No, I did not.
13   Q. Did you ask Mr. Powers to contact Mr. LaFemina?
14   A. No, I did not.
15        MS. LEEDS: I don't know if this has
16   already been marked. Did the December 2nd letter get
17   marked to Dan Amos?
18        MS. NEALLY: Well, let's just mark it
19   again.
20        (Exhibit No. 35 marked).
21   Q. Let me hand you what's been marked as Exhibit
22   No. 35 which may have already been discussed, but
23   that's a letter you wrote to the president of -- AFLAC
24   president?
25   A. The president.

Page 129

1    Q. Of AFLAC, right?
2    A. Yes, ma'am.
3    Q. And in that letter you are discussing basically
4    what has happened to you and your discontent with what
5    has happened to you, correct?
6    A. Yes, ma'am.
7    Q. On the second page you tell him that Mr. Powers
8    is willing to talk to him about it, right?
9    A. That's correct.
10   Q. Okay. Had you asked Mr. Powers to do this on
11   your behalf?
12   A. No, ma'am, I did not.
13   Q. Okay. How did you know that he was willing to
14   talk to him, then?
15   A. I believe Mr. Powers either contacted me or I
16   contacted him, and I think probably what he said was
17   I'm willing to accept any phone calls from whoever it
18   is at AFLAC to discuss the matter.
19   Q. Okay. And in this letter you are blaming Mr.
20   LaFemina for taking the account away from you, correct?
21   A. Yes, ma'am.
22   Q. And you also talk about the fact that there
23   have been similar documented situations where Mr.
24   LaFemina has acted in a similar manner. What were
25   those?

33 (Pages 126 to 129)

Page 130

1    A. I couldn't tell you. I couldn't give you
2  specific examples of what those were.
3    Q. You don't remember?
4    A. It's not that I don't remember. I just don't
5  know what specific situations I was referring to there.
6    Q. Okay.
7    A. Mr. LaFemina, he was a --
8    Q. Was or is?
9    A. He probably still is. I don't know him today,
10  but I know he was very hot-headed individual and he did
11  things that I was not in total agreement with. And he
12  did them not only to me but to other people in my
13  capacity, other coordinators. And sometimes just in
14  conversation they would tell me, you know what, he did
15  this to me, he did this, et cetera.
16    Q. Okay. But you don't have any documentation to
17  that effect?
18    A. No, I do not.
19    Q. Okay. Aside from having Mr. Powers intercede
20  on your behalf, did any other board members attempt to
21  write -- I know that other board members wrote to AFLAC
22  about the letter that Dr. Sauceda wrote, correct?
23    A. Yes.
24    Q. Did they do that at your request?
25    A. They did not.

Page 131

1    Q. Okay. Isn't it true, Mr. Chavez, that the
2  majority of the board members would have put you back
3  in charge of that account?
4    A. I would think so, yeah.
5    Q. Okay.
6    A. I would think that to be true.
7    Q. But AFLAC didn't want you to?
8    A. That's -- I believe that's totally correct.
9  There's something -- again, I'm not an attorney but
10  there's something called governance that I think Mr.
11  Powers mentioned to me one time. He said, I can't go
12  and tell Dr. Sauceda to put you back on there because
13  that would be governance. He said, you have to go
14  through the normal process of whatever you have to do
15  to get it done.
16    Q. Okay. So Mr. Powers told you you had to go
17  through the administration to get things done, right?
18    A. He told me, have your attorney contact somebody
19  -- contact the district.
20    Q. Mr. Powers did?
21    A. I believe Mr. Powers did.
22    Q. Okay. Did he?
23    A. Did he what?
24    Q. Did you do that? Did you have your attorney
25  contact the district?

Page 132

1    MR. AGUILAR: Hang on a second. Objection
2  just to the extent that you're getting into
3  attorney/client privileged information. But to the
4  extent of anything that you're aware of your attorney
5  doing with somebody else, explain that.
6    A. I believe that the letter that Ted Rodriguez
7  wrote for me.
8    Q. Okay. So in terms of time Mr. Powers told you
9  to do that before Mr. Rodriguez wrote that letter?
10    A. He was the one who suggested it.
11    Q. Okay. But you yourself never attempted to go
12  to administration to resolve any of the problems that
13  you were claiming you were having with them, correct?
14    A. Not after I got the letter from Dr. Sauceda,
15  no, ma'am.
16    Q. Okay. But before that, in terms of the wrong
17  information on the plan or anything else they were
18  doing, you didn't ever try to go to them and correct
19  things, did you?
20    A. No, ma'am, I did not.
21    (Exhibit No. 36 marked).
22    Q. Okay. Let me hand you Exhibit No. 36 and ask
23  you if -- that's part of the e-mails between you and
24  Mr. LaFemina, right -- or that is an e-mail from Mr.
25  LaFemina, correct?

Page 133

1    A. Yes.
2    Q. Is it correct that regional sales managers are
3  not supposed to have personal production?
4    A. That was Mr. LaFemina's rule. That's not an
5  AFLAC rule.
6    Q. Okay.
7    A. Mr. LaFemina, as you know, was an independent
8  contractor just like myself.
9    Q. Right. But he was over you in terms of AFLAC
10  hierarchy?
11    A. He was over me, correct.
12    Q. Okay.
13    A. And we had discussed this in the past.
14    Q. Okay. Were you not engaging in personal
15  production while you were regional sales manager?
16    A. Yes, I was.
17    Q. You were?
18    A. Yes, I was.
19    Q. Okay. And did Mr. LaFemina know that?
20    A. Yes, he did.
21    Q. Okay. Did he have a problem with that?
22    A. He would bring it up as an issue but after we
23  discussed it, he would say, okay, no problem.
24    Q. Okay. But that's not an AFLAC rule?
25    A. No, it's not.

Page 134

1  Q. That was No. 36.
2      (Exhibit No. 37 marked).
3  Q. Let me hand you what's been marked as No. 37.
4  That was also produced by your attorney. Do you
5  recognize that document?
6  A. Yes, I have seen that.
7  Q. Okay. Now, you told us that BISD did not make
8  it mandatory for people to attend the cafeteria plan
9  but that letter says it is mandatory, right?
10  A. Well, I have no doing with that letter.
11  Q. I'm not asking that.
12  A. That's what the letter says.
13  Q. That's what it says, right?
14  A. Yes, ma'am.
15      (Exhibit No. 38 marked).
16  Q. Okay. Let me hand you what's been marked as
17  Exhibit No. 38. And this is a letter -- another letter
18  you wrote to Mr. Amos, president of AFLAC, in which you
19  mention that Mr. LaFemina threatened you and your
20  family with physical harm?
21  A. Yes, ma'am.
22  Q. What did he say?
23  A. His words to me on December 3rd, when he fired
24  me over the phone, he told me that if I ever brought
25  him into a lawsuit that he would spend every last penny

Page 135

1  that he had to make sure that I had -- that me and my
2  family had a miserable life.
3  Q. And you took that to be a physical threat?
4  A. Yes, ma'am, I sure did.
5  Q. Okay. You also mention that Mr. Sauceda openly
6  supported NPA. How is it that he openly supported your
7  competitors?
8  A. By his recommendation of their proposal on
9  November 20th.
10  Q. Anything else?
11  A. And by the comparison chart that was made.
12  Q. Anything else?
13  A. No, ma'am.
14  Q. Any statements made by him?
15  A. Statements that were made maybe during a board
16  meeting.
17  Q. Okay. But other than related to the
18  recommendation that he had, anything else?
19  A. He may have -- no, he discussed it on November
20  20th.
21  Q. Correct.
22  A. And he supported it through his discussions.
23  Q. Okay.
24  A. But that's it.
25  Q. That was in a board meeting, right?

Page 136

1  A. That's correct.
2  Q. All right. Anything other than in a board
3  meeting during the part where he was recommending NPA
4  for the TPA?
5  A. No, ma'am.
6  Q. What day were you fired? What date were you
7  fired by Mr. LaFemina?
8      MR. AGUILAR: Objection; specificity. He
9  will explain.
10      MS. NEALLY: On the phone.
11  Q. What date did Mr. LaFemina fire you on the
12  phone?
13  A. December 3rd.
14  Q. Okay. Were you fired any other time?
15  A. The actual firing that happened to me was on
16  December 3rd; however, I didn't receive documentation
17  about such until probably the end of December.
18      (Off the record).
19      (Exhibit No. 39 marked).
20  Q. This is the documentation you're referring to,
21  Exhibit No. 39, right?
22  A. Okay. This is the official letter from AFLAC
23  that gives me 30-day notice; however, I believe in one
24  of the letters that we went through here earlier, I
25  believe AFLAC's attorney, Jeff Willis, wrote me

Page 137

1  something where it stated that prior to this.
2  Q. Okay.
3      MS. NEALLY: Let me see that.
4  Q. What did Mr. LaFemina say to you when he talked
5  to you on December 3rd where he fired you?
6  A. The entire body of the conversation, is that
7  what you're asking?
8  Q. Yeah, more than just you're fired.
9  A. Okay. He told me that an agreement that he had
10  made with me prior was -- that he was not going to be
11  able to hold to the agreement that he had made with me
12  prior.
13  Q. What agreement was he talking about?
14  A. Well, you guys never asked me about that.
15  Q. Now I am.
16  A. Okay. On November 29th, I believe, when Dr.
17  Sauceda wrote the letter, he also picked up the phone
18  and called Mr. LaFemina. And at that time he basically
19  told him, he just reiterated everything that was in the
20  letter that he wrote. From what Mr. LaFemina told me,
21  he told him that if I was removed from the district,
22  then AFLAC possibly would be considered. And so Mr.
23  LaFemina called me and asked me to remove myself and at
24  which point I disagreed. I said, no, there is no way
25  that I'm going to remove myself. So, again, we talked

Page 138

1  quite at length.
2       Finally he convinced me and he says, look,
3  if you remove yourself and let somebody else be the
4  figurehead in terms of the contact person for AFLAC, we
5  can allow everything to remain the same in the
6  background. You will continue to receive the
7  commissions you normally receive, you will get --
8  everything will be the same. Your office will continue
9  to service BISD, nothing will change. And I agreed to
10 it simply because I was going to lose nothing and let
11 Dr. Sauceda win, let the BISD win and everything would
12 still be win, win, win for everyone.
13      However, the point that I disagreed with
14 AFLAC was that he asked me in exchange for allowing
15 somebody else to be the figurehead that that person,
16 singular, that one individual, would be allowed to come
17 and write business at BISD and not have to split any of
18 it with me, and I agreed to that. I said, okay, that's
19 reasonable. It will still be win, win, win for
20 everyone.
21      But on December 3rd when I talked to him
22 and then I believe he wrote me an e-mail that -- I
23 think it's in one of these exhibits as well. He stated
24 at that point, he says, we're not going to be able to
25 abide by that agreement after all because Mr. Ron

Page 139

1  Levine wants a split off of the entire case. At that
2  point I said, well, it's not Mr. Ron Levine's case and
3  that's not what we agreed to earlier, so, no, I'm not
4  in agreement with that.
5       On December 3rd, it basically came to the
6  head of things because -- I believe on Sunday, the day
7  prior, which is December 2nd is when I had received
8  Frank's e-mail where he tells me that, hey, this is how
9  it's going to be and I don't care about what agreement
10 we had prior. This is how it's going to be. So I
11 said, well, just put it to me in writing then.
12 Obviously, you're my boss and there's nothing I can do
13 about it. Put it in writing, so he did.
14      So I prepared my letter to Dan Amos just
15 in case I couldn't convince Frank on December 3rd -- on
16 the morning of December 3rd that, hey, this was not
17 going to happen. And so when I spoke to Frank and he
18 says, no, this is how it's going to be. These are my
19 rules. This is how it is. I said, well, I need to
20 tell you that I just sent a letter to Dan Amos
21 requesting his assistance. So that's the entire story.
22      Q. At what point in this conversation did it get
23 ugly, that he threatened you?
24      A. When I told him that I contacted Dan Amos for
25 assistance, I believe his words were, you're fired. He

Page 140

1  said, that's it. You're fired.
2       Q. How original.
3       A. Yeah.
4       Q. And then what?
5       A. And then he -- the conversation was real short
6  after that. I mean, he said, you're fired. And he
7  basically said, if you bring me into any lawsuit, I
8  ensure you that I will spend every last money -- every
9  last dime I have to ensure that you and your family
10 have a miserable life.
11      Q. Where did he get the idea that you were going
12 to file a lawsuit?
13      A. You know, I don't know. I can just guess as to
14 what his intentions were. AFLAC -- I believed I would
15 receive some help from AFLAC's headquarters. I
16 believed Dan Amos would give me some assistance.
17 However, the moment you mention any litigation to them,
18 all doors are shut. So by Frank calling his superior
19 and saying, hey, Dino Chavez threatened litigation, all
20 doors are going to be shut to me. And that's
21 effectively what happened.
22      Q. Okay.
23      A. AFLAC wouldn't talk to me anymore.
24      Q. Had you threatened any litigation?
25      A. I had not.

Page 141

1       Q. Okay.
2       MS. NEALLY: Can we go off the record for
3  just a second?
4       MR. AGUILAR: Sure.
5       (Off the record).
6       Q. Were there any conversations with any other
7  AFLAC persons other than Mr. LaFemina regarding a deal?
8       A. I believe Mr. Ron Levine.
9       Q. You spoke with him?
10      A. No. I didn't speak to Ron directly. He had
11 knowledge of the deal.
12      Q. Okay. How do you know that?
13      A. Because he told me that he had spoken to Ron
14 about the terms.
15      Q. Who is he?
16      A. Mr. LaFemina.
17      Q. Okay.
18      A. Had spoken to Ron -- to Ron Levine about the
19 terms and Ron Levine had agreed. And I believe on the
20 28th or 29th, the day before I actually received the
21 letter -- it may have even been that day.
22      MR. AGUILAR: Of November?
23      THE WITNESS: Of November 29th.
24      A. I was even at Toni Davila's office. Toni
25 Davila is Ron Levine's mutual coordinator.

36 (Pages 138 to 141)

Page 142

1   Q.  Okay.
2   A.  So I went to their office to give them all the
3   background information, all the documentation, to give
4   them everything I had to basically know -- give them
5   the history of everything that had been going on.  My
6   understanding is that Mr. Ron Levine hadn't even been
7   with AFLAC for more than 60 days.
8   Q.  Okay.
9   A.  So he was not only a rookie, he had no
10  knowledge about anything.  So I was very, very worried
11  that they were going to give Ron Levine this big old
12  case to do when he had only been with us for 60 days.
13  Q.  And what date was that meeting again?
14  A.  I'm not sure but I believe I met with him on
15  the 28th or maybe even on the 29th.  And this is prior
16  to me getting -- no, it had to have been after.  Let me
17  think about the dates.  Dr. Sauceda's letter was
18  written on the 29th, correct?
19  Q.  Correct.
20  A.  If it was written on the 29th, I met with -- I
21  must have met with Ron probably that same day.
22  Probably that same day or the day -- it wouldn't have
23  been the day prior.  It would have probably been that
24  same day.
25  Q.  Okay.  Did you -- after you got Mr. Sauceda's

Page 143

1   -- Dr. Sauceda's letter, did you ever attempt to call
2   him to patch things up or ask him what you could do to
3   fix things?
4   A.  No, I did not.
5   Q.  Okay.  Did you ever try to go through any
6   grievance procedures at the school district?
7   A.  I wasn't aware that I was entitled to any.  No.
8   Q.  Okay.  So if I understand you correctly, on the
9   day you got the letter, you spoke with Mr. LaFemina and
10  he basically told you everything is cool, you're going
11  to still get everything except that let's have somebody
12  else be a figurehead?
13  A.  Yes.
14  Q.  Okay.  And somewhere along the line that broke
15  down?
16  A.  Mr. Ron Levine disagreed with that --
17  Q.  Okay.
18  A.  -- after -- it was after the November 29th
19  meeting.  Because on November 29th --
20  Q.  When he made his presentation?
21  A.  Correct, correct.
22  Q.  Okay.
23  A.  It was after the meeting that the deal changed.
24  Q.  And Mr. LaFemina allowed him to change the
25  deal?

Page 144

1   A.  Apparently so.  And that's when I disagreed
2   with it and I asked him to put it in writing.
3   Q.  Okay.  Mr. LaFemina is above Mr. Levine?
4   A.  Yes, he is.
5   Q.  Okay.  Did Mr. LaFemina ever put in writing the
6   deal that he had come to agreements on with you?
7   A.  No, he did not.  Unless I submitted it to
8   you-all, I don't believe he did.
9   Q.  Okay.  After you spoke to Mr. LaFemina on
10  December 3rd, did you talk to him again after he fired
11  you?
12  A.  No.
13  Q.  All right.  Did you ever speak to anybody else
14  at AFLAC after that period of time?
15      MR. AGUILAR:  I assume you mean not some
16  of the associates within his group or --
17      MS. LEEDS:  No, no, no.
18  Q.  At AFLAC, hierarchy above you?
19  A.  I believe I spoke to -- well, Lynn Barnson who
20  I mentioned earlier.
21  Q.  Okay.
22  A.  And that was probably in February.
23  Q.  February.  Anybody else?
24  A.  I'm not sure when Jeff Willis wrote me a letter
25  but one of the letters that we received here.  I spoke

Page 145

1   to him either that day or the day prior.
2   Q.  Okay.  But what about somebody from AFLAC, not
3   an attorney.
4   A.  Anybody else?
5   Q.  You did not follow-up a conversation with Dan
6   Amos or anybody else you wrote to?
7   A.  He wouldn't call me back or take my calls.
8   Q.  You tried to talk to him?
9   A.  I believe I tried to call him after I sent my
10  letters and I was just kind of shut out.
11  Q.  Okay.  You didn't mention in any of your
12  letters this deal you had had with Mr. LaFemina, did
13  you?
14  A.  I don't know if I mentioned it or not.
15  Q.  Well, I haven't seen it before.
16  A.  Okay.
17  Q.  So you probably didn't, did you?
18  A.  Probably not.
19  Q.  Okay.
20      (Off the record).
21  Q.  Mr. Chavez, did you find some place in the
22  letter where you may have mentioned your agreement with
23  Mr. LaFemina?
24  A.  On Exhibit 35 on the second page, second
25  paragraph, I make mention that, "He is also attempting

Page 146

1  to give this individual a ten percent split of this
2  year's enrollment and rejecting my request to split 30
3  percent of the case with my wife who uses the proceeds
4  to pay for all the manpower and other expenses that are
5  required throughout the year to give this group the
6  level of service it has grown accustomed to." That's
7  the only place that I mentioned anything that I am in
8  disagreement with that.
9    Q.  Okay.  But you did not write to him saying, you
10  know, on the day of this letter Mr. LaFemina entered
11  into an agreement with me saying that basically all
12  we're going to do was have a figurehead and everything
13  else was going to remain the same?
14    A.  I didn't put that in there, no.
15    Q.  Okay.
16    A.  I was waiting for him to call me back so we
17  could discuss all the details.
18    Q.  Okay.  Is it safe to say, Mr. Chavez, that your
19  complaint against Dr. Sauceda is based almost entirely
20  on what you call the misrepresentations in the
21  comparison plan chart?
22    A.  No.
23    Q.  Okay.  What else are you complaining about?
24    A.  And his letter that he wrote on November 29th
25  releasing me from a duty that he didn't have the

Page 147

1  authority to do so.
2    Q.  Obviously, you're in disagreement with the
3  letter of the 29th, right?
4    A.  Yes, ma'am.
5    Q.  Okay.  Other than that letter and the
6  comparison plan, do you have any other complaints of
7  anything else Dr. Sauceda did to you?
8    A.  No, ma'am.
9    MS. LEEDS:  Can we go off the record real
10  quick?
11    MS. NEALLY:  Or you can pass the witness.
12    MS. LEEDS:  Can we go off the record and
13  get organized, just to make sure we have covered
14  everything?
15    (Off the record).
16    MS. LEEDS:  I'm passing the witness.
17    EXAMINATION
18  BY MS. NEALLY:
19    Q.  Mr. Chavez, I have just a couple more
20  questions.  The first one is, on Exhibit 35, which is
21  the December 2nd letter from you to Mr. Amos -- and let
22  me give it back to you.  Okay.  Let me refer you to the
23  third paragraph.
24    A.  Yes, ma'am.
25    Q.  Okay.  And it's the second -- I mean third

Page 148

1  sentence.  "I have been advised by several members of
2  the board of trustees that I have properly complied
3  with all procedures."  Which board members were those?
4    A.  I believe that was Pat Lehmann and Otis Powers.
5    Q.  How about Mr. Colunga or Linda Salazar?
6    A.  I'm not sure whether I had spoken to Linda or
7  Joe Colunga about this.
8    Q.  Okay.  "In addition, they have advised me that
9  the vote that was taken and the phone call that was
10  made to Frank LaFemina's office to award us the
11  business last Friday afternoon" -- and that would have
12  been November 29th?
13    A.  Yeah, I believe so.  Yes.
14    Q.  -- "essentially reverses whatever request the
15  superintendent made prior to the vote."  And that would
16  have been by Mr. Lehmann and Mr. Powers?
17    A.  That's right.
18    Q.  Okay.  And that would mean that you could
19  return to BISD according to these board members?
20    A.  That's right.
21    Q.  Okay.  And that's what you meant by that,
22  right?
23    A.  Yes, ma'am.
24    Q.  Okay.  And in this letter you indicate that
25  there are two attachments, the e-mails from Frank

Page 149

1  LaFemina dated 12-1-01 and 12-2-01.
2    A.  Okay.
3    Q.  So that -- 12-2-01 was --
4    MS. NEALLY:  The 29th would have been
5  Friday so the 1st would be Sunday.  Do you have a
6  calendar?
7    MR. AGUILAR:  And just to be clear, what
8  paragraph are you looking at?
9    MS. NEALLY:  I'm looking at the last page
10  and it says attachments.
11    MR. AGUILAR:  Right.
12    A.  This calendar doesn't go back.
13    Q.  It refers to a December 1 and a December 2nd.
14  I have got two e-mails -- copies of e-mails dated --
15  one of them is Exhibit 16 and one of them is Exhibit
16  36, that are both -- that are both December 2nd.  Do
17  you have another e-mail from Frank LaFemina that you
18  sent with this letter dated the 1st?
19    A.  I can't recall that I do, ma'am.
20    Q.  You did at that time, right?
21    A.  It's possible that I confused the date of these
22  and put 12-2 meaning 12-2 and 12-2 but --
23    Q.  So you think it's these two letters, Exhibit 36
24  and Exhibit 16?
25    A.  I think so.

Page 150

1    Q. Okay. And do you know what the phone call was?
2    It said, in addition they have advised me that the vote
3    that was taken and the phone call that was made to
4    Frank LaFemina's office. What phone call? That --
5    last Friday afternoon, which actually would have been
6    the 30th.
7    A. Where are you reading?
8    Q. I'm back on that first page. Do you know who
9    made the phone call?
10   A. What paragraph are you on?
11   Q. Last paragraph and it's the last sentence
12   there. Is that the one Dr. Sauceda made to Mr.
13   LaFemina, or do you know? Or was there another one?
14   A. Give me one second.
15   Q. Sure.
16   A. Okay.
17   Q. Do you know what phone call you're talking
18   about?
19   A. I believe that Dr. Sauceda -- yeah, this is
20   correct. Dr. Sauceda made a second phone call to Frank
21   LaFemina.
22   Q. When was the first phone call? On the day of
23   the vote?
24   A. I believe it was the 29th.
25   Q. Prior to the vote being taken?

Page 151

1    A. I believe the same date that the letter is
2    dated that Dr. Sauceda wrote me, that was the first
3    phone call.
4    Q. Okay. And then a second phone call was made?
5    A. I believe there possibly was a second phone
6    call that I was talking about here.
7    Q. But you weren't part of that phone call, right?
8    A. No, ma'am.
9    Q. This is just something you heard about from Mr.
10   LaFemina?
11   A. I may have heard it from Mr. LaFemina or
12   somebody else.
13   Q. You're not sure?
14   A. No. I wish I had a calendar so I could have my
15   dates in order.
16   Q. Well, sir, I'll tell you Thursday was the 29th,
17   Friday was the 30th, the 1st was Sunday, the 2nd --
18   Saturday -- the 2nd was Sunday.
19   A. Thursday was the 29th?
20   Q. Yeah.
21   A. Okay. Friday was the 30th. What was that
22   Monday?
23   Q. December 3rd.
24   A. December 3rd, okay. It was probably Friday
25   that he called him.

Page 152

1    Q. That's what you said here, Friday afternoon,
2    last Friday afternoon?
3    A. Yes.
4    Q. Okay. But you don't know who told you talked
5    to -- who told you?
6    A. No.
7    Q. Okay. Going back to that e-mail, the one from
8    Frank to you where you say that he withdrew the prior
9    agreement that he made with you where everything stayed
10   the same, that Levine would just be a different
11   figurehead. He says that he spoke to you, in that very
12   first sentence, I think. "Since I last spoke to you."
13   A. "I have not rested well since I last spoke to
14   you".
15   Q. Right. When did you last speak with him?
16   That's dated the 2nd which was Sunday.
17   A. If Sunday was the 2nd, then I believe I spoke
18   to him on Saturday the 1st.
19   Q. Okay. And on Saturday the 1st, is that when he
20   told you about the agreement that he had that he would
21   keep you as the figurehead, or was it earlier, actually
22   on the 29th?
23   A. I think on the 29th is when he first spoke to
24   me and he told me what he would like to do and that's
25   to assign somebody else as figurehead. And I believe

Page 153

1    that was on the 29th.
2    Q. And did he change that between then and the
3    2nd, what the deal was going to be?
4    A. Between that time and I believe it was Saturday
5    when I spoke to him. I believe Saturday is when I
6    spoke to him at my home and he called me and we had a
7    lengthy conversation.
8    Q. How long did you talk?
9    A. We probably talked an hour, hour-and-a-half.
10   And that's when he told me that -- what I discussed
11   with you earlier about letting Ron split the entire
12   case and I not get anything but I would still be stuck
13   with servicing it like I had in the past.
14   Q. That happened on the 3rd?
15   A. No, on the 3rd is when we spoke again. And on
16   the 3rd is I believe when he told me, hey, I just want
17   to make sure that you received my e-mail and that you
18   are ready to play the game the right way, et cetera.
19   And that's when I told him, no, Frank, I'm not ready,
20   and as a matter of fact I wrote a letter to Dan Amos
21   that I need to tell you about.
22   Q. Okay. Now I'm confused.
23   A. Okay.
24   Q. You did say December 3rd and it coincides with
25   what that e-mail says because that e-mail -- it looks

39 (Pages 150 to 153)

Page 154

1 to me like an e-mail he -- that's when he's withdrawing
2 the prior agreement?
3     A. December 1st is when I spoke to him by phone.
4     Q. Okay. And when you spoke to him by phone, at
5 that point you still had the agreement that there was
6 going to be a different figurehead?
7     A. No, on December 1st -- yeah, we still agreed.
8 Well, on December 1st when he called me, at that point
9 that's when he told me, no, this is the way we agreed
10 to prior, that's not how it's going to be. This is how
11 it's going to be.
12     Q. And then he told you the information that's
13 contained in Paragraph 4 of this --
14     A. On December 2nd.
15     Q. -- December 2nd letter, right?
16     A. Since I disagreed with him on December 1st,
17 Saturday December 1st, I told him, look, since you're
18 my boss and there's nothing I can do, give it to me in
19 writing and that's about all I can do, give it to me in
20 writing. So he complied by sending me an e-mail and
21 giving me in writing.
22     Q. That was on December 2nd?
23     A. Which was on December 2nd, right. And then I
24 didn't speak to him on December 2nd. I didn't speak to
25 him until December 3rd.

Page 155

1     Q. Okay. Well, wasn't there another agreement in
2 there that you refer to in this December 2nd letter
3 that's in Paragraph 4?
4         MS. LEEDS: To Dan Amos.
5     Q. Take a look at Paragraph 4. And I mean, I'm
6 not -- hopefully, this will refresh your memory. It
7 looks to me like maybe on December 1st he told you this
8 agreement and then in the e-mails when you wanted -- it
9 was another agreement.
10     A. No, on this paragraph, on this letter that's
11 dated December 2nd, Exhibit 35, is where I'm writing
12 Mr. LaFemina -- not Mr. LaFemina -- Mr. Amos for relief
13 on the decision that Frank made.
14     Q. On December 1st?
15     A. On the decision that he verbally made to me or
16 gave me on December 1st and then followed it up in
17 writing with an e-mail dated December 2nd.
18     Q. And you wrote that letter after you got the
19 December 2nd e-mail?
20     A. When I got the e-mail from him?
21     Q. Yes.
22     A. I said, well, obviously, not only has he told
23 me verbally but now he has put it in writing so I'm out
24 of options here. The only thing I can do is contact
25 Mr. Amos and see if I can get some relief that way.

Page 156

1     Q. And November 29th, November 30th, you thought
2 you had an agreement where there was going to be
3 another figurehead but everything was going to stay the
4 same?
5     A. Yes.
6     Q. And you were in agreement with that, right?
7     A. Yes, I was.
8     Q. Until AFLAC pulled the plug?
9     A. That's correct, when Mr. LaFemina pulled that
10 plug.
11         MS. NEALLY: That's all the questions.
12             EXAMINATION
13 BY MS. LEEDS:
14     Q. Now, I just have a follow up now because when
15 we were talking about the letter and I had asked you
16 whether or not you had written to Mr. Amos telling him
17 anything about the agreement with LaFemina, you had
18 pointed out that paragraph, but this letter that you
19 wrote to Dan Amos was written after you found out that
20 Mr. LaFemina was not going to stand up to the
21 agreement?
22         MR. AGUILAR: Go ahead.
23     A. I wrote this letter in response to the
24 conversation that I had with Mr. LaFemina on the 30th
25 -- I mean, not on the 30th -- on the 1st where I

Page 157

1 disagreed with him not giving me a split of the
2 business --
3     Q. Okay.
4     A. -- and then again with the e-mail that I
5 received on --
6     Q. I understand. I understand.
7     A. Okay.
8     Q. So you never wrote to Mr. Amos telling him,
9 look, Mr. LaFemina and I had entered into an agreement?
10     A. I never told him that.
11     Q. Okay. And that paragraph you pointed out
12 before was not that, it was in reference to Mr.
13 LaFemina pulling the plug?
14     A. Well, the paragraph right here basically just
15 states what he's trying to do, which is attempting to
16 give ten percent of the business to somebody else and
17 rejecting my request to keep 30 percent of it like I
18 had done, you know, the year prior.
19     Q. Right. So basically that is after -- your
20 letter of December 2nd is after Mr. LaFemina pulled the
21 plug?
22     A. Pulled the plug meaning?
23     Q. He took away the account.
24     A. No, he took away the agreement that we had.
25     Q. The agreement?

40 (Pages 154 to 157)

Page 158

1    A. Yes, right.
2        MS. LEEDS: That's all I have. I will
3  reserve the rest of our questions.
4        MS. NEALLY: We'll reserve the rest of our
5  questions.
6        MR. AGUILAR: And I will reserve all
7  questions.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 160

1    I, DINO X. CHAVEZ, have read the foregoing
   deposition and hereby affix my signature that same is
2  true and correct, except as noted above.
3
4  _____
   DINO X. CHAVEZ
5
6
7
8  THE STATE OF TEXAS
9  COUNTY OF CAMERON
10   BEFORE ME, _____, on this day
   personally appeared DINO X. CHAVEZ, known to me or
11  proved to me to be the person whose name is subscribed
   to the foregoing instrument and acknowledged to me that
12  said witness executed the same for the purposes and
   consideration therein expressed.
13
   Given under my hand and seal of office this _____
14  day of _____, 2003.
15  _____
   Notary Public in and for the State of Texas
16
17
18
19
20
21
22
23
24
25

Page 159

1        CHANGES AND SIGNATURE PAGE
2  PAGE LINE CHANGE                REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25

Page 161

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ        )(
                      )(
VS.              )( B-02-128
                      )(
BROWNSVILLE INDEPENDENT   )(
SCHOOL DISTRICT, NOE     )(
SAUCEDA, MARILYN DEL     )(
BOSQUE-GILBERT and       )(
RANDALL DUNN            )(

REPORTER'S CERTIFICATION
DEPOSITION OF DINO X. CHAVEZ
MARCH 4, 2003
Volume 2

    I, LOU ZUNIGA, Certified Court Reporter in and for
the State of Texas, do hereby certify that the above
and foregoing contains a true and correct transcription
of the oral deposition of DINO X. CHAVEZ;

    I further certify that I am neither counsel for,
related to, nor employed by any of the parties or
attorneys in the action in which this proceeding was
taken, and further that I am not financially or
otherwise interested in the outcome of the action.

Page 162

Certified to by me this _____ day of
_____, 2003.

_____
LOU ZUNIGA, Texas CSR 2198
Expiration Date: 12-31-03
Hill & Romero
5415 North McColl, Suite 107
McAllen, Texas  78504
(956) 994-8898

Exhibit

"L"

# CAFETERIA PLAN COMPARISON

001053

| FEES | AFLAC | Benefit Alliance | 1st Financial Administrators | FlexBen Corp. | Flex Source/Inc Source Bus. Corp. | National Plan Administrator |
|---|---|---|---|---|---|---|
| • Set up fee (Implementation Fee) | + N/C | $125 | N/C | $500 | ** | N/C |
| • Documentation Design Fee | N/C | N/C | N/C | $250 | N/C | N/C |
| • Enrollment Fee | N/C | N/C | N/C | N/C | N/C | $5.00*** |
| • Employee Enrollment Kit | N/C | N/C | N/C | $1.00 | ** | N/C |
| • Monthly Fee per Participant (Flexible Spending Account) | + N/C $3.00 | $3.75 | * | $3.35 | ** | $3.00 |
| • Monthly IRS Maintenance and Compliance Fee | N/C | N/C | * | N/C | ** | N/C |
| • Verbal Communications (In-service) | N/C | N/C | * | $50/hr. | ** | N/C |
| • Telephone | N/C | N/C | * | Cost | ** | N/C |
| • Postage | + N/C Cost | Cost | * | Cost | ** | N/C |
| • Copies | N/C | N/C | * | Cost | ** | N/C |
| • Mileage | N/C | N/C | * | Cost | ** | N/C |
| • Preparation of Annual IRS Form 5500 | N/C | N/C | * | $150 | ** | $75.00 |
| • Premium Only --- | N/C | N/C | * | N/C | ** | .50/PP/PM |
| • Flexible Bank Account (Control of Funds) | + YES | Fee Based | * | ? | ** | ? |
| • Renewal Fees | + N/C | - | * | $200 | ** | - |
| • Tax Sheltered Annuity Administration (TSA) (per participant) | + N/A | - | - | - | - | $1.00 |
| • Annual Audit per participant | + N/A | - | - | - | - | $1.00 |

### LEGEND

AFLAC is BISD's current product vendor.

? = Unknown   N/C = No Charge

* = No fees are charged if their marketing company, First Financial Capital Corporation, is selected to provide and market the tax qualified and other financial products to employees. The carriers remunerate Fist Financial Capital, who, in turn, reimburses First Financial Administrators for services to the District.

** = No fees are charged if their marketing company, Colonial Life & Accident, is selected to provide and market the tax qualified and other financial products to employees. Flex Source would therefore be compensated from the sale of these products.

*** = The enrollment fee will be waived if Insurance Associates of the Valley are selected as agent of record, and the Hartford Cancer remains in effect, and the School District selects the Accident, Heart/Stroke, and Disability Plans.

+ There are no fees associated with AFLAC's cafeteria plan services. BISD does not pay a fee. Employees do not pay a fee. We have three years of experience at BISD as proof.

+ Flexible Spending Account (FSA) contributions are held in a BISD bank account. Any and all funds may be removed at anytime at the request of BISD. AFLAC has check writing authority in this bank account only for the purpose of reimbursing employee's FSA claims. BISD maintains full control over all funds.

+ AFLAC is not involved in the sale or administration    annuities.

001059

| Criteria for Cafeteria Plan... | AFLAC | Benefit Alliance | In Finacial Administrator | FlexBen Corp | Flex Source/One Source Bus Corp | National Plan Administrator |
|---|---|---|---|---|---|---|
| 1. Work directly with BISD design & maintain a Cafeteria Plan. | Yes | Yes | Yes | Yes | Yes | Yes |
| 2. Make arrangements to meet all Legal requirements of IRC section 125. | Yes | Yes | Yes | Yes | ? | Yes |
| 3. Educate BISD on Cafeteria Plan. | Yes | | Yes | Yes | ? | Yes |
| 4. Responsible for enrolling all employees at all BISD sites (campuses). | Yes | Yes | Yes | No | Yes | Yes |
| 5. Keep employees informed on latest news (In-service). | Yes | Yes | Yes | Yes | Yes | Yes |
| 6. Assists in processing all claims. | Yes | Yes | Yes | Yes | ? | Yes |
| 7. Investigate delays on processing of claims. | Yes | Yes | Yes | Yes | ? | Yes |
| 8. Assists Administration with resolution of employee problems as they arise. | Yes | No | No | No | ? | Yes |
| 9. Provides BISD with a staff that is accessible | Yes | Yes | No | No | ? | Yes |
| 10. Cooperate & consult with BISD's Insurance Committee on plan operation. + YES | No | Yes | Yes | Yes | ? | Yes |
| 11. Assist Administration in determining that District policy is adhered to in product distribution. + No Yes | No Yes | Yes | | Yes | ? | Yes |
| 12. Assume responsibility for all needed forms & document. | Yes | Yes | Yes | Yes | ? | Yes |
| 13. Assist in the development of a program, which will best serve the Employee's needs. + YES | No | Yes | Yes | Yes | Yes | Yes |
| **Evaluation & Selection...** | | | | | | |
| • Firm's experience | 50 YRS. | 30 Years | 33 Years | ? | ? | 27 Years |
| • Expertise as TPA of 401(B) / 401(B)(7) | NOT A TPA | Yes / No | Yes / Yes / Weslaco | Yes | ? | Yes |
| • Availability & Accessibility of firm's Key personnel to meet with BISD on short notice & • To respond quickly to inquiry. | Yes LOCAL AGENT (BROWNSVILLE OFFICE) | Yes | Yes | Yes | | Yes LOCAL AGENT (HARLINGEN OFFICE) |
| • Ability to communicate info clearly and concisely • Orally & • In writing. | Yes | Yes | Yes | Yes | Yes | Yes |

+ No other Cafeteria Plan Services provider has provided the level of service that we have at BISD. No one comes close. Our local office bears the burden of all paperwork, annual enrollments, and total customer satisfaction. In addition, we also handle the daily phone calls and the weekly paperwork for employees who wish to make changes or have questions.

+ We will gladly work with the employee or board insurance committee members to insure total customer satisfaction.

+ AFLAC's business is to provide advice and services as they pertain to Section 125 Cafeteria Planning. We have advised the district over the past three years on legal and administrative issues. As proof, we recently advised BISD that they should allow employees the opportunity to make changes to their election due to the tremendous increase in the group health insurance premium.

001060

Exhibit

"M"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,           )(
FERNANDO DE PENA,            )(
VALENTIN PAZ and ANDRUS      )(
& PAZ, A Partnership         )(
                             )(
VS.                          )(   B-02-143
                             )(
BROWNSVILLE INDEPENDENT      )(
SCHOOL DISTRICT, NOE         )(
SAUCEDA, and EDDIE           )(
ERRISURIZ, JR.               )(

*********************************************************

IN THE UNITED STATES DISTRICT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ               )(
                             )(
VS.                          )(   CIVIL ACTION NO. B-02-128
                             )(
BROWNSVILLE INDEPENDENT      )(
SCHOOL DISTRICT, NOE         )(
SAUCEDA, MARILYN DEL         )(
BOSQUE-GILBERT and           )(
RANDALL DUNN                 )(

_____

ORAL AND VIDEOTAPED DEPOSITION OF
NOE SAUCEDA
VOLUME 2
JUNE 17, 2003

_____

COPY

1       A.  No, sir.

2       Q.  Okay.  Do you remember during that meeting Mr.

3  Powers asked about this particular document?

4       A.  I don't remember.

5       Q.  Okay.  My recollection of -- in seeing the tape

6  of that meeting, my recollection is that you -- Mr.

7  Powers held it up and was asking you who drafted this

8  document, and you responded that your staff did, Mr.

9  Errisuriz -- I think you said Mr. Errisuriz and his

10  staff, something like that.  Do you recall that part of

11  the conversation?

12      A.  No, sir.

13      Q.  Okay.  This is a plan comparison with the

14  different companies involved there.  Do you recall

15  looking at this document before today?

16      A.  Have I seen it before today?

17      Q.  Yes.

18      A.  Yes, I have.

19      Q.  Do you recall when you first saw it?

20      A.  Probably six to eight weeks ago.

21      Q.  Okay.  In other words, during the meeting, do

22  you remember seeing this document?

23      A.  Oh, no.  No, I do not.

24      Q.  So you can't tell us who put it together,

25  right?

Page 30

```
 1        A.   Well, I was just reading through it and it's

 2   obvious that one of the vendors -- to me that one of

 3   the vendors put this together.

 4        Q.   Okay.

 5        A.   And in particular, the last page of the

 6   original part, the last bullet or the triple bullet.

 7        Q.   Uh-huh.

 8        A.   The district wouldn't be able to make that

 9   claim.

10        Q.   "Ability to communicate info clearly and

11   concisely," that?

12        A.   No, no, no.  The three bullet deal down.

13        Q.   Let me see what you're pointing to.

14        A.   On the last page there's a --

15        Q.   That's the second page.

16        A.   Well, it's the last page.

17             MS. LEEDS:  The last page.

18        Q.   Could I see yours a second, please?

19             MS. LEEDS:  The underlined part, right

20   there in front of you, the red.

21        Q.   I have that as the second page, though.

22        A.   Well, yeah, if you don't cover the -- count the

23   cover.

24        Q.   In any case.

25        A.   That three bullet.
```

Page 282

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,           )(
FERNANDO DE PENA,            )(
VALENTIN PAZ and ANDRUS      )(
& PAZ, A Partnership         )(
                             )(
VS.                          )(   B-02-143
                             )(
BROWNSVILLE INDEPENDENT      )(
SCHOOL DISTRICT, NOE         )(
SAUCEDA, and EDDIE           )(
ERRISURIZ, JR.               )(
*********************************************************

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ               )(
                             )(
VS.                          )(   B-02-128
                             )(
BROWNSVILLE INDEPENDENT      )(
SCHOOL DISTRICT, NOE         )(
SAUCEDA, MARILYN DEL         )(
BOSQUE-GILBERT and           )(
RANDALL DUNN                 )(

REPORTER'S CERTIFICATION
DEPOSITION OF NOE SAUCEDA
VOLUME 2
JUNE 17, 2003

    I, LOU ZUNIGA, Certified Court Reporter in and for
the State of Texas, do hereby certify that the above
and foregoing contains a true and correct transcription
of the oral deposition of NOE SAUCEDA;

Page 283

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this _____ day of _____, 2003.

LOU ZUNIGA, Texas CSR 2198

Expiration Date: 12-31-03

Hill & Romero

5415 North McColl, Suite 107

McAllen, Texas  78504

(956) 994-8898

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DINO X. CHAVEZ | § | |
|     Plaintiff | § | |
| | § | |
| VS. | § | |
| | § | |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT AND | § | |
| NOE SAUCEDA | § | |
|     Defendants | § | |
| ----------------------------------------------- | § | CIVIL ACTION NO.   B-02-128 |
| | § | JURY REQUESTED |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, | § | |
|     Third-Party Plaintiff | § | |
| | § | |
| VS. | § | |
| | § | |
| AMERICAN FAMILY LIFE ASSURANCE | § | |
| COMPANY OF COLUMBUS (AFLAC) | § | |
|     Third-Party Defendant | § | |

## ORDER GRANTING DEFENDANT NOE SAUCEDA'S
## MOTION FOR SUMMARY JUDGMENT

On this the _____ day of _____, 2003, came on for consideration Defendant Noe Sauceda's Motion for Summary Judgment. Having examined same and considered the arguments of counsel, this Court is of the opinion that said Motion should be GRANTED.

IT IS THEREFORE ORDERED that Defendant Noe Sauceda's Motion for Summary Judgment is GRANTED. It is further ORDERED that all of Plaintiff's claims be and are DISMISSED with prejudice.

SIGNED on this _____ day of _____, 2003.


_____
JUDGE PRESIDING


Copies to:

Eileen M. Leeds, Willette & Guerra, L.L.P., 3505 Boca Chica, Ste. 460 , Brownsville, Texas 78521
J. Arnold Aguilar, 1200 Central Blvd., Ste. H-2, Brownsville, Texas 78520
Elizabeth G. Neally, Roerig, Oliveira, & Fisher, L.L.P., 855 W. Price Road, Ste. 9, Brownsville, Texas 78520
William Steele, Lock, Laddell & Sapp, L.L.P., 100 Congress Ave., Suite 300, Austin, Texas 78701

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ                              §
    Plaintiff                              §
                                           §
VS.                                        §
                                           §
BROWNSVILLE INDEPENDENT                     §
SCHOOL DISTRICT AND                         §
NOE SAUCEDA                                 §
    Defendants                             §
----------------------------------------   §     CIVIL ACTION NO.   B-02-128
                                           §     JURY REQUESTED
BROWNSVILLE INDEPENDENT                     §
SCHOOL DISTRICT,                            §
    Third-Party Plaintiff                  §
                                           §
VS.                                        §
                                           §
AMERICAN FAMILY LIFE ASSURANCE             §
COMPANY OF COLUMBUS (AFLAC)                 §
    Third-Party Defendant                  §

## ORDER SETTING HEARING ON DEFENDANT NOE SAUCEDA'S MOTION FOR SUMMARY JUDGMENT

On this the _____ day of _____ 2003, came on to be considered

Defendant Noe Sauceda's Motion for Summary Judgment. After considering same, the Court is of

the opinion that a hearing should be held.

IT IS THEREFORE ORDERED, ADJUDGED and DECREED that Defendant Noe

Sauceda's Motion for Summary Judgment be and is hereby set for hearing on the _____ day

of _____, 2003 at _____ o'clock in this Honorable Court.

SIGNED FOR ENTRY on this the _____ day of _____, 2003.


_____
JUDGE PRESIDING

Copies to:

Eileen M. Leeds, Willette & Guerra, L.L.P., 3505 Boca Chica, Ste. 460 , Brownsville, Texas 78521
J. Arnold Aguilar, 1200 Central Blvd., Ste. H-2, Brownsville, Texas 78520
Elizabeth G. Neally, Roerig, Oliveira, & Fisher, L.L.P., 855 W. Price Road, Ste. 9, Brownsville, Texas 78520
William Steele, Lock, Laddell & Sapp, L.L.P., 100 Congress Ave., Suite 300, Austin, Texas 78701