IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DINO CHAVEZ, | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT and NOE SAUCEDA, | § | |
| Defendants, | § | |
| ------------------------------------------------------ | § | CIVIL ACTION NO. B-02-128 |
| BROWNSVILLE INDEPENDENT SCHOOL | § | |
| DISTRICT, | § | |
| Third-Party Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| AMERICAN FAMILY LIFE ASSURANCE | § | |
| COMPANY OF COLUMBUS (AFLAC), | § | |
| Third-Party Defendant. | § | |

**MOTION TO CORRECT FACTUAL STATEMENTS IN
ORDER DATED SEPTEMBER 30, 2003**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Third-Party Defendant American Family Life Assurance Company of Columbus ("AFLAC") files this Motion asking the Court to correct certain factual statements in the Court's Order dated September 30, 2003 (filed October 1, 2003), and in support thereof would respectfully show the Court as follows:

**I.**

AFLAC does not ask the Court to change its ruling in its September 30, 2003 Order, in which the Court denied plaintiff's motion to reconsider dismissal of his due process claims. Rather, AFLAC only asks that the Court correct two statements made at the bottom of page 6 and top of page 7 of the Order, where the Court states, "Plaintiff was an employee of AFLAC. He was not an independent contractor and received no direct payment or formal benefits from

**Motion for Correction - Page 1**

BISD because he was not employed by the school district." The statements about plaintiff being an AFLAC employee and not an independent contractor are not material to the Court's ruling, nor are they supported by the discovery to date. Accordingly, AFLAC asks the Court to correct and clarify the referenced statements to read as follows, "Plaintiff was an *insurance agent authorized by* AFLAC *to sell its policies.* He received no direct payment or formal benefits from BISD because he was not employed by the school district *or an independent contractor to the district.* " (changes in italics). Correcting these factual statements as suggested will have no material bearing on the Court's reasoning, will not require any modification of the relief granted in the Court's September 30 Order, and it will accurately reflect the facts in this case.

## II.

Absent this correction, there is danger of misuse of the Court's statements that plaintiff was an AFLAC employee and not an independent contractor. For, plaintiff has argued that he has a claim—as yet unasserted—against AFLAC for discrimination. *See* "Notice of Clarification of Plaintiff's Claims", filed July 7, 2003. AFLAC denies that plaintiff has suffered discrimination, but his alleged discrimination claim, if asserted, will be impacted by plaintiff's legal status as an independent contractor versus an employee. An independent contractor has no claim for discrimination under Title VII, only an employee may bring such a claim. *Diggs v. Harris Hospital – Methodist, Inc.*, 847 F.2d 270, 272 (5th Cir. 1988); *Broussard v. L. H. Bossier, Inc.*, 789 F.2d 1158, 1159 (5th Cir. 1986). Thus, this Court's statement regarding plaintiff's relationship with AFLAC as an employee, as opposed to an independent contractor, if deemed conclusive could materially impact any discrimination claim plaintiff eventually asserts.

AFLAC is not asking the Court to make a finding that plaintiff is an independent contractor to AFLAC, even though the evidence points overwhelmingly to such a finding, as discussed below. That factual issue may be addressed in another hearing, if it remains in dispute.

Allowing the September 30 Order to stand uncorrected, however, risks the application of issue preclusion or "law of the case", potentially barring AFLAC from a full and fair hearing on the independent-contractor-versus-employee issue, which would have a substantial impact on any discrimination claim plaintiff eventually files.

Plaintiff will not be prejudiced by the suggested correction because it leave the issue open. AFLAC only asks that plaintiff be identified as an insurance agent authorized to sell AFLAC policies. This leaves the issue of his status as an independent contractor or employee open, to be decided another day, and keeps the parties on a level playing field, should plaintiff make his relationship with AFLAC an issue.

## III.

The suggested correction will leave the Court's well-reasoned opinion intact. The Court's opinion that plaintiff's due process claim is too tenuous rests on plaintiff's interaction with BISD, as opposed to his status with AFLAC. That is, the basis of plaintiff's due process claim is that BISD prevented plaintiff from making a proposal to BISD's insurance committee and from selling AFLAC products to BISD employees. That interaction between plaintiff and BISD is the same, whether plaintiff is deemed an employee of AFLAC or an independent contractor to AFLAC. In either event, the denial of access to BISD's insurance committee and employees, the basis of plaintiff's claims, simply does not give rise to a due process violation. By correcting the record, the Court need not alter its ruling.

## IV.

The Court did not have the benefit of discovery when it was presented with the briefing on plaintiff's motion to reconsider, which also preceded AFLAC's appearance in this case when it filed its answer as a third-party defendant on March 4, 2003. Since that time, discovery has

shown that plaintiff is not an employee of AFLAC, but is an independent contractor.  Thus, the facts militate against any finding that plaintiff was an employee of AFLAC.

When plaintiff joined AFLAC in 1994, he signed an Associate's Agreement, wherein he acknowledged in writing that he is an independent contractor.[1]  Chavez Deposition, p. 14, l.12 – p. 15, l.16; Ex. 9 thereto.  He reiterated that acknowledgement when he signed the Regional Sales Coordinator Agreement in 1998, again recognizing his status as an independent contractor.  *Id.* p. 32, l.1 – p. 34, l. 14; Ex. 11 thereto.  Plaintiff even admits that he is an independent contractor.  *Id.* p. 15, l.17-19; p. 33, l. 16- p. 34, l.7.  Plaintiff, at his own cost, located and rented his own office space, hired his own staff, paid his staff's salaries, procured his own office equipment, paid his office's utilities, and ran his office as his own business.  *Id.* Pp. 16 to 34.  Plaintiff sets his own hours and decides whom to solicit for the sale of insurance policies.  *Id.*  Plaintiff was not paid a salary, but was paid a commission only if he sold an AFLAC policy.  *Id.*  Plaintiff paid his expenses incurred, without reimbursement from AFLAC, when he solicitied sales.  *Id.*  AFLAC did not withhold income taxes from plaintiff's compensation, and plaintiff paid his self-employment tax each year.  *Id.*

AFLAC believes plaintiff's status as an independent contractor should be undisputed.  That issue may remain open at this time, however.  AFLAC simply requests that the statement in the Court's September 30 Order that plaintiff is an AFLAC employee be corrected.

**V.**

In conclusion, AFLAC requests that the Court modify its September 30 Order by changing the sentences at the bottom of page 6 and the top of page 7 to read as follows, with the changes shown in italics:  "Plaintiff was an *insurance agent authorized by* AFLAC *to sell its policies*.  He received no direct payment or formal benefits from BISD because he was not

---

[1] Attached hereto as Exhibit A are relevant excerpts from plaintiff's deposition.

employed by the school district *or an independent contractor to the district*." The requested change will not prejudice plaintiff or any other party's rights in this case. Nor will it effect the Court's ruling or its reasoning in making that ruling. Accordingly, AFLAC respectfully requests that this change be made to accurately reflect the facts and allegations in this case.

Respectfully submitted,

William B. Steele III, Attorney In Charge
So. Dist. No. 8019
State Bar No. 19107400
Of Counsel:
LOCKE LIDDELL & SAPP LLP
100 Congress Ave., Suite 300
Austin, Texas  78701
(512) 305-4700
(512) 305-4800 (Fax)

Valorie C. Glass
So. Dist. No. 15303
State Bar No. 00784135
Of Counsel:
ATLAS & HALL, L.L.P.
P.O. Box 3725
McAllen, Texas  78502
(956) 682-5501
(956) 686-6109 (Fax)

**ATTORNEYS FOR THIRD-PARTY
DEFENDANT AMERICAN FAMILY LIFE
ASSURANCE COMPANY OF COLUMBUS**

## CERTIFICATE OF SERVICE

I hereby certify by my signature below that a true and correct copy of the above and foregoing has been served via first class U.S. mail, on this _7th_ day of October, 2003, to all counsel of record listed below:

J. Arnold Aguilar
Artemis Square, Suite H-2
1200 Central Boulevard
Brownsville, Texas  78520

Eileen Leeds
Willette & Guerra
3505 Boca Chica Boulevard.
Suite 460
Brownsville, Texas  78521

Elizabeth G. Neally
Roerig, Oliveira & Fisher, LLP
855 West Price Road, Suite 9
Brownsville, Texas  78550

_____
William B. Steele III

## CERTIFICATE OF CONFERENCE

This is to certify that the undersigned counsel for third-party defendant AFLAC conferred with counsel for defendants BISD and Noe Sauceda on October 6, 2003, regarding AFLAC's Motion to Correct Factual Statements, who agree with the relief requested, and that counsel for plaintiff Dino Chavez and was not available, and therefore AFLAC presents this Motion for the Court's consideration.

_____
William B. Steele III

IN THE UNITED STATES DISTRICT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ            ) (
                                ) (
VS.                     ) (  B-02-128
                                ) (
BROWNSVILLE INDEPENDENT   ) (
SCHOOL DISTRICT, NOE       ) (
SAUCEDA, MARILYN DEL        ) (
BOSQUE-GILBERT and          ) (
RANDALL DUNN               ) (

---

ORAL DEPOSITION OF
DINO X. CHAVEZ
VOLUME 2
MARCH 19, 2003

---

ORAL DEPOSITION OF DINO X. CHAVEZ, produced as
a witness at the instance of the DEFENDANT BROWNSVILLE
INDEPENDENT SCHOOL DISTRICT, taken in the above styled
and numbered cause on MARCH 19, 2003, from 8:53 a.m. to
12:40 p.m., before LOU ZUNIGA, Certified Court Reporter
No. 2198, in and for the State of Texas, at the offices
of J. Arnold Aguilar, 1200 Central Boulevard, Suite
H-2, Brownsville, Texas, pursuant to the Federal Rules
of Civil Procedure and the provisions stated on the
record or attached therein.

# EXHIBIT A



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ                 ) (
                               ) (
VS.                            ) (    B-02-128
                               ) (
BROWNSVILLE INDEPENDENT        ) (
SCHOOL DISTRICT, NOE           ) (
SAUCEDA, MARILYN DEL           ) (
BOSQUE-GILBERT and             ) (
RANDALL DUNN                   ) (


REPORTER'S CERTIFICATION
DEPOSITION OF DINO X. CHAVEZ
MARCH 4, 2003
Volume 2

    I, LOU ZUNIGA, Certified Court Reporter in and for
the State of Texas, do hereby certify that the above

and foregoing contains a true and correct transcription

of the oral deposition of DINO X. CHAVEZ;


    I further certify that I am neither counsel for,

related to, nor employed by any of the parties or

attorneys in the action in which this proceeding was

taken, and further that I am not financially or

otherwise interested in the outcome of the action.

Certified to by me this *2nd* day of

*April* , 2003.


LOU ZUNIGA, Texas CSR 2098
Expiration Date: 12-31-03
Hill & Romero
5415 North McColl, Suite 107
McAllen, Texas  78504
(956) 994-8898

```
 1                 CHANGES AND SIGNATURE PAGE

 2     PAGE  LINE   CHANGE                          REASON

 3     23    5      Downey "change to" Dannelly     correct spelling
               ───────────────────────────────────────────────────
 4     27    22     were basically not invited to be
                    "change to" would do the inviting   clarification
               ───────────────────────────────────────────────────
 5     41    24     Ramiro Luis "change to" Ramiro Ruiz   correct spelling
               ───────────────────────────────────────────────────
 6     42    1      Criselda Perez "change to" Griselda Perez  correct spelling
               ───────────────────────────────────────────────────
 7     124   2      ever since "change to" every year   clarification
               ───────────────────────────────────────────────────
 8     134   10     I have no doing "change to"
                    I have nothing to do            clarification
               ───────────────────────────────────────────────────
 9     141   8      I believe Mr. Ron Levine "change to"
                    I believe Mr. Ron Levine, my wife, my
10                  mom, Toni Davila, Ted Rodriguez   clarification
               ───────────────────────────────────────────────────
11     141   20     28th or 29th, the day before "change to"
                    29th, the day                   clarification
               ───────────────────────────────────────────────────
12     141   25     mutual coordinator "change to"   clarification
13                  regional coordinator
               ───────────────────────────────────────────────────
14     142   15     the 28th or maybe even on the 29th   clarification
                    "change to" the 29th
15
16
17
18
19
20
21
22
23
24
25
```

```
 1        I, DINO X. CHAVEZ, have read the foregoing
    deposition and hereby affix my signature that same is
 2  true and correct, except as noted above.

 3

 4                         DINO X. CHAVEZ

 5

 6

 7

 8  THE STATE OF TEXAS

 9  COUNTY OF CAMERON

10        BEFORE ME, _____FRANCES PENA_____, on this day
    personally appeared DINO X. CHAVEZ, known to me or
11  proved to me to be the person whose name is subscribed
    to the foregoing instrument and acknowledged to me that
12  said witness executed the same for the purposes and
    consideration therein expressed.

13
          Given under my hand and seal of office this __16th__
14  day of ____April_____, 2003.

15
          Notary Public in and for the State of Texas
16

17

18

19

20

21

22

23

24

25
```

09:02  1       Q.  Mr. Chavez, my name is Buddy Steele.  We met

09:02  2   earlier.  I'm representing AFLAC in this lawsuit.  I

09:02  3   have some questions for you, too.  And just so it's

09:02  4   clear, I'm going to assume the same agreements are in

09:02  5   effect that you had with Elizabeth, okay?

09:02  6       A.  Okay.

09:02  7       Q.  Great.

09:02  8           MR. STEELE:  I'm going to just jump right

09:02  9   in and get you to mark three --

09:02  10          (Discussion off record).

09:04  11          (Exhibit Nos. 9 - 11 marked).

09:04  12      Q.  Mr. Chavez, let me hand you what has been

09:04  13   marked as Exhibit 9 and ask if you can confirm that

09:04  14   that is the Associate's Agreement that you entered into

09:04  15   with AFLAC back in I believe 1994, if memory serves me

09:04  16   well.  We can look at that last page.

09:04  17      A.  Yes, sir, it is.

09:04  18      Q.  And that's a true and correct copy of that

09:04  19   agreement; is that correct?

09:04  20      A.  I believe so, yes.

09:04  21      Q.  Let me show you another document that's been

09:04  22   marked as Exhibit No. 10 and ask if you can confirm

09:04  23   that that is a true and correct copy of your District

09:04  24   Sales Coordinator's Agreement with AFLAC?

09:04  25      A.  Yes, sir.

09:04  1      Q.  And, finally, let me show you Exhibit 11 and

09:04  2  ask if you can confirm that that is your Regional Sales

09:05  3  Coordinator's Agreement with AFLAC?

09:05  4      A.  Yes, sir, it is.

09:05  5      Q.  And you signed each of these agreements and

09:05  6  AFLAC also countersigned, correct?

09:05  7      A.  Yes, sir.

09:05  8      Q.  Now, I just want to ask you, at this time your

09:05  9  associate's agreement, Exhibit No. 9, is still in

09:05  10  effect, correct?  That has not been terminated, has it?

09:05  11      A.  That's correct.

09:05  12      Q.  And in that associate's agreement, I'm going to

09:05  13  point out a couple of things here to you if I could.

09:05  14  If you look at Paragraph 1-A, there it states that you

09:05  15  are an independent contractor, correct?

09:05  16      A.  Yes, it does.

09:05  17      Q.  And you consider yourself an independent

09:05  18  contractor for AFLAC; do you not?

09:05  19      A.  Yes, I do.

09:05  20      Q.  So there's no question in your mind that you're

09:05  21  an employee of AFLAC -- you are definitely an

09:05  22  independent contractor and not an AFLAC employee,

09:06  23  correct?

09:06  24      A.  I can't say with 100 percent certainty that I

09:06  25  am an independent contractor because of the things that

09:06 1    I was asked to do or perform that were similar to an

09:06 2    employee, so from a legal standpoint, I couldn't tell

09:06 3    you.

09:06 4        Q.   Well, let's go through those then just to make

09:06 5    sure I have a good understanding of what you were doing

09:06 6    and what you were asked to do.  In terms of an office,

09:06 7    you set up your own office, correct?

09:06 8        A.   I was required to do so, yes.

09:06 9        Q.   Right.  And who signed the lease for that

09:06 10   office space?

09:06 11       A.   I did.

09:06 12       Q.   And who paid for that rent?

09:06 13       A.   I did.

09:06 14       Q.   Who arranged to have phone service at that

09:06 15   office?

09:06 16       A.   I did.

09:06 17       Q.   And you paid for that phone service, correct?

09:06 18       A.   Yes, I did.

09:06 19       Q.   And all utilities, water, gas, electric were

09:06 20   things that you arranged for that office, correct?

09:06 21       A.   Yes, sir.

09:06 22       Q.   And paid for, correct?

09:06 23       A.   Yes, sir.

09:06 24       Q.   And AFLAC didn't reimburse you for any of those

09:07 25   utility or rent expenses to run your office, did they?

09:07 1      A.   No.

09:07 2      Q.   And as far as clerical help at your office, you

09:07 3   had clerical help there, correct?

09:07 4      A.   Yes, sir, I did.

09:07 5      Q.   And you paid for that clerical help, too; did

09:07 6   you not?

09:07 7      A.   Yes, I did.

09:07 8      Q.   And AFLAC didn't reimburse you for that, did

09:07 9   they?

09:07 10     A.   No, they did not.

09:07 11     Q.   And as far as any computers or office

09:07 12  equipment, such as copiers, that equipment you also

09:07 13  procured yourself; did you not?

09:07 14     A.   Yes, I did.

09:07 15     Q.   And AFLAC didn't reimburse you for that office

09:07 16  equipment, did they?

09:07 17     A.   Actually, they did reimburse me in part.

09:07 18     Q.   Tell me about that.

09:07 19     A.   AFLAC had an agreement with most associates who

09:07 20  purchased computers through AFLAC to reimburse them for

09:07 21  the cost of those computers through a payback of -- for

09:07 22  every policy that was issued that you wrote through the

09:07 23  computer, they would pay you a three or $4 allowance on

09:08 24  your cost of that computer.

09:08 25     Q.   Okay.  So in order to get paid by AFLAC for a

09:08 1   portion of the cost of the computer you had to sell

09:08 2   policies on behalf of AFLAC, correct?

09:08 3      A.  That's correct.

09:08 4      Q.  And in selling those policies, AFLAC did not

09:08 5   pay you a salary according to the hours you worked, did

09:08 6   they?

09:08 7      A.  No.

09:08 8      Q.  You only got paid if you sold a policy and you

09:08 9   got paid a commission for that sale, correct?

09:08 10      A.  That is correct.

09:08 11      Q.  In fact, your whole compensation was based on

09:08 12   commissions, was it not?

09:08 13      A.  Yes, it was and bonuses.

09:08 14      Q.  And bonuses.  Fair enough.

09:08 15      A.  Correct.

09:08 16      Q.  Bonuses also were based on the number of

09:08 17   policies that you sold on behalf of AFLAC, correct?

09:08 18      A.  And those sold by the people who reported to

09:08 19   me, yes, that's correct.

09:08 20      Q.  So the entire structure when you were both a

09:08 21   sales associate, a district sales coordinator and a

09:08 22   regional sales coordinator was based upon the sales of

09:08 23   AFLAC policies which resulted in commissions to the

09:08 24   associate or overwrite commissions to you as district

09:08 25   or regional sales coordinator, correct?

09:09  1       A.   That's correct.

09:09  2       Q.   So the entire structure was a commission

09:09  3   structure as opposed to a salary structure in terms of

09:09  4   compensation to those working for AFLAC, correct?

09:09  5       A.   That's correct.

09:09  6       Q.   And in terms of the office hours, it was up to

09:09  7   you to determine what hours your office was open,

09:09  8   correct?

09:09  9       A.   Not exactly.

09:09  10      Q.   Explain that.

09:09  11      A.   Mr. LaFemina would require us to have our

09:09  12  office open during certain hours of the day and he

09:09  13  specifically asked us to open our office at 9:00

09:09  14  o'clock in the morning and have it open until 5:00

09:09  15  o'clock in the afternoon.  You know, we complied by

09:09  16  that.

09:09  17      Q.   Wasn't that something that was good business

09:09  18  practice so if you had customers who needed assistance

09:09  19  they could come in during normal business hours?

09:09  20      A.   I would agree with that.

09:09  21      Q.   And even if Mr. LaFemina hadn't suggested those

09:09  22  hours, as a businessman who wants to serve his

09:09  23  customers, Mr. Chavez, wouldn't you agree that it's

09:09  24  prudent business practice to keep your office hours

09:09  25  open from 9:00 to 5:00 on weekdays?

HILL & ROMERO
CERTIFIED COURT REPORTERS

09:10 1    A.  If we can afford to do that, yes.

09:10 2    Q.  Well, as I understand, you were making a fair

09:10 3  amount of money from AFLAC and you were able to afford

09:10 4  -- to do that, were you not?

09:10 5    A.  I did the best I could, yes.

09:10 6    Q.  And it was up to you to determine what

09:10 7  customers to call on, correct?

09:10 8    A.  Yes.

09:10 9    Q.  And it was up to you to determine when to call

09:10 10  on those customers, correct?

09:10 11    A.  That's correct, sir.

09:10 12    Q.  And it was up to you to determine exactly what

09:10 13  hours you wanted to work.  Of course, that was

09:10 14  influenced by how much money you wanted to make.  So

09:10 15  the more hours you worked visiting customers, obviously

09:10 16  the chances for making money were greater, but in the

09:10 17  end it was up to you, was it not, to decide what hours

09:10 18  a day you would work?

09:10 19    A.  Most of the time, yes, sir.

09:10 20    Q.  When was it not up to you?

09:11 21    A.  When we had mandatory meetings that we had to

09:11 22  attend that were either here in the Valley or outside

09:11 23  of town that we were required to attend.

09:11 24    Q.  And those mandatory meetings were meetings with

09:11 25  Mr. LaFemina, correct?

09:11  1      A.   In most cases it was Mr. LaFemina that required

09:11  2  us to be there, yes.

09:11  3      Q.   And what were the purpose of those meetings?

09:11  4      A.   There were basically sales meetings to talk

09:11  5  about our goals, our objectives, to talk about

09:11  6  planning, things along those lines.

09:11  7      Q.   So these were meetings in order to basically

09:11  8  help the sales force organize their I guess targets and

09:11  9  make sure they reached their goals and that sort of

09:11 10  thing?

09:11 11      A.   The required meetings, yes, sir, were generally

09:11 12  for regional managers like myself.  At times there were

09:12 13  also district manager meetings that we were invited in

09:12 14  conjunction with the regional manager meetings.  And,

09:12 15  yes, what you're saying is correct.  They were intended

09:12 16  to review all those things.

09:12 17      Q.   But other than that, it was up to you, Dino

09:12 18  Chavez, to determine what hours a day you would work

09:12 19  and who you would call upon, that sort of thing,

09:12 20  correct?

09:12 21      A.   Yes, sir.

09:12 22      Q.   And you located your office where you chose.

09:12 23  It was not dictated -- that location was not dictated

09:12 24  by AFLAC; is that correct?

09:12 25      A.   That's correct.

Q.  And if you didn't sell AFLAC policies, you didn't get paid even if you put in a 40-hour week, correct?

A.  During the time that I was with AFLAC, I did have contracts with other carriers and businesses that I had sold prior to being with AFLAC, so, yes, I would derive commissions from other companies because of past relationships that I had had.

Q.  And I appreciate that clarification.  Thank you.  But in terms of your relationship with AFLAC, if you put in 40 hours a week selling AFLAC policies but didn't close the sale, you didn't get paid, correct?

A.  I wouldn't get paid.

Q.  By AFLAC?

A.  I wouldn't get paid any -- for new sales.  I would just get paid my renewals.

Q.  Fair enough.

A.  Correct.

Q.  Again, you weren't paid a salary, you were paid commissions?

A.  Yes, sir.

Q.  And in terms of your expenses that you incurred in making sales calls such as lunches, entertainment, use of your car, those are all expenses that you, Dino Chavez, were responsible for, correct?

HILL & ROMERO
CERTIFIED COURT REPORTERS

09:13  1      A.   I would get reimbursed on occasion.

09:13  2      Q.   And tell me about those occasions.

09:14  3      A.   Before Mr. LaFemina became the state sales

09:14  4  manager, there was another manager who was in his

09:14  5  position named Gene Downey, and we would get reimbursed

09:14  6  for our -- for our mileage when we attended these

09:14  7  mandatory meetings.  In addition, we would get paid our

09:14  8  hotel room when we would have to travel.

09:14  9      Q.   So when you were asked by the state sales

09:14  10  coordinator to attend a meeting that he called, he

09:14  11  would reimburse you for your hotel and travel expenses

09:14  12  to attend a meeting that AFLAC called of the other

09:14  13  regional or district sales coordinators; is that

09:14  14  correct?

09:14  15      A.   Yes, sir, that's correct.

09:14  16      Q.   But in terms of your sales calls or customers

09:14  17  around the Valley, if you bought them lunch, that was

09:14  18  an expense that came out of your pocket, correct?

09:14  19      A.   Yes, sir.

09:14  20      Q.   And the gas money and the time spent traveling

09:14  21  in your car for a sales call was a cost that you Dino

09:14  22  Chavez paid, correct?

09:14  23      A.   That's correct.

09:15  24      Q.   And AFLAC did not reimburse you for those type

09:15  25  of expenses, did they?

09:15  1      A.  No, they did not.

09:15  2      Q.  And I don't know if you take a regular

09:15  3  vacation.  I know some professional people have a hard

09:15  4  time getting away.  But did you take regular vacations

09:15  5  while you were an independent contractor for AFLAC?

09:15  6      A.  The vacations that are memorable to me were the

09:15  7  ones that I was invited to attend by AFLAC, and there

09:15  8  were numerous vacations that I attended.  And I may

09:15  9  have taken other vacations that were non-AFLAC, they

09:15 10  were just not anything like the ones that AFLAC sent us

09:15 11  to.

09:15 12      Q.  On the non-AFLAC vacations, the cost of those

09:15 13  came out of your own pocket; you weren't given any paid

09:15 14  vacation time by AFLAC for that, were you?

09:15 15      A.  No, sir.

09:15 16      Q.  And when you were paid by AFLAC, they didn't

09:15 17  withhold any money from your commission checks for

09:16 18  Social Security or income tax, did they?

09:16 19      A.  No, they did not.

09:16 20      Q.  You didn't get a car allowance from AFLAC, did

09:16 21  you?

09:16 22      A.  Not other than what I just mentioned to you,

09:16 23  which was the reimbursement for travel.

09:16 24      Q.  When you were attending a meeting called by

09:16 25  your -- an AFLAC state sales coordinator?

09:16  1      A.  That's correct.

09:16  2      Q.  With regard to local advertising, do you

09:16  3  purchase local advertising either in radio or newspaper

09:16  4  media here in the Valley?

09:16  5      A.  During my time as an AFLAC regional manager,

09:16  6  yes, we did purchase some newspaper articles and I

09:16  7  can't remember if we did any radio or TV, but it was

09:16  8  pretty much either newspaper articles or flyers that we

09:16  9  sent out to licensed insurance agents.

09:16 10      Q.  And did you pay for those newspaper ads?

09:16 11      A.  It was usually a 50/50 deal from my

09:17 12  recollection where I would pay 50 percent and AFLAC

09:17 13  would pay me 50 percent or that would come from Frank

09:17 14  LaFemina's pocket.

09:17 15      Q.  And Frank LaFemina at that time was the state

09:17 16  sales coordinator for AFLAC, correct?

09:17 17      A.  That's correct.

09:17 18      Q.  And you know, do you not, that Frank LaFemina

09:17 19  is also an independent contractor for AFLAC?

09:17 20      A.  Yes, sir.

09:17 21      Q.  And certainly in these tax returns that we have

09:17 22  identified earlier, let me just point out, for example,

09:17 23  in the latest one we have, your 2000 tax return, when

09:17 24  you look at the schedule -- if I can find it.  Bear

09:17 25  with me.  Profit and loss from a business, that

09:17  1    indicates that you were running your own business,

09:18  2    correct?

09:18  3         A.  Yes, sir.

09:18  4         Q.  And you would deduct expenses for running your

09:18  5    own business, correct?

09:18  6         A.  Yes, sir.

09:18  7         Q.  And you also have attached here a form

09:18  8    regarding self-employment tax, correct?

09:18  9         A.  That's correct.

09:18  10        Q.  All right.  And in your role as a district

09:18  11   sales coordinator albeit -- well, let's talk about that

09:18  12   a second.  You were I guess promoted in a sense from a

09:18  13   sales associate to a district coordinator, correct?

09:18  14        A.  Yes.

09:18  15        Q.  And as a district sales coordinator, you were

09:18  16   still an independent contractor for AFLAC, correct?

09:18  17        A.  That's correct.

09:18  18        Q.  And your primary job, as I understand it, and

09:18  19   correct me if I'm wrong, was to recruit sales

09:18  20   associates to also work for AFLAC as independent

09:18  21   contractors to sell insurance, correct?

09:18  22        A.  In part, yes, sir.

09:18  23        Q.  And also to train them on how to sell, correct?

09:19  24        A.  Yes, sir.

09:19  25        Q.  But then you did continue, even as a district

09:19  1    sales coordinator, to service and help enroll accounts

09:19  2    that you brought in such as the BISD account, correct?

09:19  3        A.  Not exactly, sir.

09:19  4        Q.  Okay.  Tell me where I'm wrong.

09:19  5        A.  Normally we would service accounts by getting

09:19  6    an opportunity to go enroll them and accounts were

09:19  7    either opened by an active associate or were opened by

09:19  8    somebody who was no longer active with AFLAC.

09:19  9        Q.  Okay.

09:19 10        A.  If the account was a no longer active account

09:19 11    because the associate who opened it was no longer with

09:19 12    AFLAC for whatever reason, then those accounts would be

09:19 13    serviced by whoever the regional manager designated

09:19 14    them to be serviced by.  So sometimes before I was a

09:19 15    regional manager when I was a district manager and then

09:20 16    associate, I would be invited to go enroll a certain

09:20 17    account that I had nothing to do with.  I was just

09:20 18    invited to go help enroll.

09:20 19        Q.  I see.

09:20 20        A.  When we initiated the account, either as an

09:20 21    associate or a district manager or regional manager,

09:20 22    then we were basically not invited to be, that was our

09:20 23    privilege.  That was our decision to do and then we did

09:20 24    the inviting of other associates if we needed them to

09:20 25    attend.

09:20 1      Q.  Okay.  In terms of your role as a district

09:20 2  manager and then later as a regional manager, in

09:20 3  recruiting and training new sales associates, it was up

09:20 4  to you, was it not, to decide who to recruit for AFLAC?

09:20 5      A.  As a regional manager, it was -- yes, I would

09:20 6  say that it was almost my entire job to do that.

09:20 7  Sometimes we would get what we call leads from the

09:20 8  company so in some cases it wasn't me who did the

09:21 9  recruiting, it was that they called the company for

09:21 10  information and then the company would say, hey, call

09:21 11  these people or call this person.  They're interested

09:21 12  in contracting with AFLAC.  So take care of it.

09:21 13      Q.  I see.  So they had heard the AFLAC name,

09:21 14  called the home office, the home office gave them your

09:21 15  name to contact, and then it was up to you to talk to

09:21 16  them and see if they wanted to become a sales associate

09:21 17  for AFLAC?

09:21 18      A.  That's correct.

09:21 19      Q.  And in other instances, you yourself may have

09:21 20  identified folks within the Valley area who may be

09:21 21  appropriate candidates to sell as a sales associate for

09:21 22  AFLAC, correct?

09:21 23      A.  That's correct.

09:21 24      Q.  Other than these leads -- well, even with the

09:21 25  leads, it was up to you to go to the lead and determine

09:21 1    that this guy would make a good insurance salesman,

09:21 2    correct?

09:21 3        A.  That's correct.

09:21 4        Q.  So it was ultimately your decision whether to

09:21 5    recommend them as a sales associate to AFLAC, correct?

09:22 6        A.  That's correct.

09:22 7        Q.  Take a look at the associate's agreement that

09:22 8    is still in effect and let's look at Paragraph 2-B.

09:22 9    And if you look at that second sentence there, it

09:22 10   states that associate -- and that's you, correct?

09:22 11       A.  Yes, sir.

09:22 12       Q.  -- is free to exercise associate's own judgment

09:22 13   as to time and place of solicitation.  Did I read that

09:22 14   correctly?

09:22 15       A.  Yes, you did.

09:22 16       Q.  So, again, the associate's agreement is

09:22 17   confirming what we just talked about, that it's up to

09:22 18   you to determine when and where to solicit new AFLAC

09:22 19   accounts, correct?

09:22 20       A.  Yes, sir.

09:22 21       Q.  And then look at Paragraph C under service

09:22 22   accounts.  If you look at -- I believe it's the second

09:22 23   sentence.  It says AFLAC reserves the absolute right to

09:23 24   reassign any account for servicing and to designate who

09:23 25   may solicit applications from persons in the account in

09:23 1  its sole discretion.  Did I read that correctly?

09:23 2      A.  Yes, sir.

09:23 3      Q.  So this agreement provides, does it not, that

09:23 4  it's up to AFLAC to determine who will service

09:23 5  accounts, correct?

09:23 6      A.  That's what it says.

09:23 7      Q.  Take a look at other duties.

09:23 8          MR. AGUILAR:  What paragraph?

09:23 9          MR. STEELE:  Subparagraph D under

09:23 10 Paragraph 2.

09:23 11     Q.  If you look at the second sentence, again, this

09:23 12 confirms something that we have been talking about.

09:23 13 Associate shall pay all expenses incurred by associate

09:23 14 in the sale and service of insurance policy offered by

09:24 15 AFLAC.  Isn't that correct?

09:24 16     A.  Yes, sir.

09:24 17     Q.  And, in fact, in practice that's what was done,

09:24 18 correct?

09:24 19     A.  Yes, sir.

09:24 20     Q.  Okay.  Take a look at your district sales

09:24 21 coordinator's agreement.  I believe that's -- Mr.

09:24 22 Chavez, what exhibit does that say at the bottom?

09:24 23     A.  10.

09:24 24     Q.  Okay.  Exhibit 10.  Now, this was entered into

09:24 25 just a few short months after you became an associate,

09:24   1    correct?

09:24   2        A.  Yes, sir.

09:24   3        Q.  In December of '94?

09:24   4        A.  Yes, sir.

09:24   5        Q.  And if you look at that -- as a district sales

09:24   6    coordinator, you then are not only going to continue to

09:24   7    call on accounts but you are now going to also recruit

09:25   8    and train new associates, correct?

09:25   9        A.  That's correct.

09:25  10        Q.  And also keep track of the associates that are

09:25  11    working under you to see that they have the support

09:25  12    that they need?

09:25  13        A.  That's correct.

09:25  14        Q.  Okay.  Take a look at the very first paragraph

09:25  15    of that district sales coordinator.  It refers to the

09:25  16    associate's agreement that we have been talking about,

09:25  17    correct?

09:25  18        A.  Yes.

09:25  19        Q.  And it states that the terms are incorporated

09:25  20    in this district sales coordinator agreement, correct?

09:25  21        A.  Yes, sir.

09:25  22        Q.  And, again, it reiterates there in Paragraph 2,

09:25  23    relationship to A, that your relationship with AFLAC is

09:25  24    as an independent contractor, correct?

09:25  25        A.  Yes, sir.

09:25 1      Q.  Now, you eventually became a regional sales

09:25 2   coordinator, correct?

09:25 3      A.  Yes, sir.

09:25 4      Q.  Take a look at that next exhibit that we have

09:26 5   marked.  You became a regional sales coordinator, by

09:26 6   looking at the second page, in November of '98,

09:26 7   correct?

09:26 8      A.  Yes, sir.

09:26 9      Q.  And this was right around the time that you

09:26 10  succeeded in landing the BISD account, correct?

09:26 11     A.  That is correct.

09:26 12     Q.  Was it as a result of landing that account that

09:26 13  you became a regional sales coordinator?

09:26 14     A.  Honestly, I couldn't tell you.  It probably had

09:26 15  something to do with it, but because I wasn't the one

09:26 16  who made the offer, I couldn't tell you.

09:26 17     Q.  Fair enough.  Understood.  Again, let's take a

09:26 18  look at the top paragraph of that exhibit.  Again, it

09:26 19  refers to the associate's agreement and states that

09:26 20  those terms are incorporated by reference to the

09:26 21  regional sales coordinator's agreement, correct?

09:26 22     A.  Yes, sir.

09:26 23     Q.  And if you look at Paragraph 7 of the regional

09:26 24  sales coordinator agreement on Page 2.  It again refers

09:27 25  to the associate's agreement and states that it shall

09:27  1    continue to be in full force and effect and in terms of

09:27  2    -- governed this regional sales coordinator in all

09:27  3    respects unless they're modified by the regional sales

09:27  4    coordinator's agreement, correct?

09:27  5        A.   Yes, sir.

09:27  6        Q.   And then Paragraph 8 indicates that the

09:27  7    regional sales coordinator's agreements is the

09:27  8    substitution for and supersedes and replaces the

09:27  9    district sales coordinator's agreement, correct?

09:27  10       A.   Yes, sir.

09:27  11       Q.   So while you're a regional sales coordinator,

09:27  12   you were then being subject to and governed by the

09:27  13   terms of both the regional sales coordinator's

09:27  14   agreement and the associate's agreement, correct?

09:27  15       A.   That's correct.

09:28  16       Q.   And, Mr. Chavez, in the motion that was filed

09:28  17   by your attorney called Motion for Reconsideration of

09:28  18   Dismissal of Plaintiff Due Process Claims, he attached

09:28  19   your affidavit.  This is the only copy I have.  I'm not

09:28  20   going to make it an exhibit, but do you see that

09:28  21   affidavit that's attached to that pleading?

09:28  22            MS. NEALLY:  We can make a copy.

09:28  23            MR. STEELE:  I think I can make the record

09:28  24   clear but I'm happy to make a copy if you-all want one.

09:28  25       Q.   You made the sworn statement that you're an

| | | |
|---|---|---|
| 09:28 | 1 | independent contractor -- I'm sorry -- an independent |
| 09:28 | 2 | insurance agent, correct? |
| 09:28 | 3 | A.   That's correct. |
| 09:28 | 4 | Q.   So you're indicating there that you're not an |
| 09:28 | 5 | employee for AFLAC rather you're an independent |
| 09:28 | 6 | contractor working as an agent for AFLAC, correct? |
| 09:28 | 7 | A.   That's correct. |
| 09:28 | 8 | Q.   And then you also make the statement that there |
| 09:29 | 9 | are no -- there are no AFLAC employees in the Rio |
| 09:29 | 10 | Grande Valley area, correct? |
| 09:29 | 11 | A.   To my knowledge, yes, that's correct. |
| 09:29 | 12 | Q.   And you would include yourself, would you not, |
| 09:29 | 13 | in that group of not being an employee for AFLAC? |
| 09:29 | 14 | A.   That's correct. |
| 09:29 | 15 | (Exhibit No. 12 marked). |
| 09:29 | 16 | Q.   Mr. Chavez, I'm going to hand you what's been |
| 09:29 | 17 | marked Exhibit 12.  This is a fax cover letter to which |
| 09:29 | 18 | is attached a letter that was sent to your then |
| 09:29 | 19 | attorney Ted Rodriguez by me, correct? |
| 09:30 | 20 | A.   Yes, sir. |
| 09:30 | 21 | Q.   And it appears from the fax cover letter that |
| 09:30 | 22 | your attorney, Mr. Rodriguez, sent this to you it looks |
| 09:30 | 23 | like on December 7th of 2001, correct? |
| 09:30 | 24 | A.   Yes, sir. |
| 09:30 | 25 | MR. AGUILAR:  You're not making yourself a |

# American Family Life Assurance Company
## of Columbus (AFLAC)
### Worldwide Headquarters: Columbus, Georgia 31999

Chavez
EXHIBIT NO. 4
5-19-03
Hill & Romero

# Associate's Agreement

American Family Life Assurance Company of Columbus, a Georgia corporation (hereinafter "AFLAC"), and the undersigned person (hereinafter "Associate") agree as follows:

## PARAGRAPH ONE: Authority of Associate

(a) **Independent Contractor.** The relationship of Associate to AFLAC shall be that of an independent contractor, rather than employee and employer, and nothing contained herein shall be construed as creating any other relationship.

(b) **Unauthorized Acts.** Associate is not authorized to make any contract or incur any debt in the name of AFLAC, nor shall Associate modify or amend any application for insurance or any policy of insurance, interpret or construe policy language, extend the time for making any payment which may become due on any policy, nor waive any of AFLAC's rights or privileges under its policies or applications.

(c) **No Implied Authority.** Associate shall have no authority other than that expressly granted herein, and no forbearance or neglect on the part of AFLAC shall be construed as a waiver of any of the terms of this Agreement or imply the existence of any authority not expressly granted herein.

## PARAGRAPH TWO: Duties of Associate

(a) **Procure and Maintain Licenses.** Associate shall be responsible for procuring and maintaining any resident license, non-resident license and appointment, if applicable, that any State may require for soliciting applications for insurance policies offered for sale by AFLAC. Associate shall also be responsible for renewing and maintaining any such license(s) or appointment(s). This Agreement is contingent upon the issuance and maintenance of valid license(s) or appointment(s) to sell insurance by the Insurance Department of the State of Associate's residence, and of the State from which Associate may have a non-resident license or appointment, if any.

(b) **Solicit Applications.** Associate shall solicit applications for insurance policies offered for sale by AFLAC within the states where Associate is duly licensed to solicit such insurance applications. Associate is free to exercise Associate's own judgment as to time and place of solicitation.

(c) **Service Accounts.** Associate shall service all payroll deduction accounts ("accounts") that Associate initially sells or that are assigned to the Associate by AFLAC. Associate agrees that the first-year and renewal commissions paid to Associate in accordance with the terms herein constitute full payment for soliciting the application that resulted in the insurance policy being issued, and the performance of all other duties by Associate. AFLAC reserves the absolute right to reassign any account for servicing and to designate who may solicit applications from persons in the account in its sole discretion. Upon such reassignment, Associate shall continue to be paid renewal commissions on policies which Associate sold to persons in the account prior to reassignment, provided Associate is otherwise entitled to commissions in accordance with this Agreement. However, Associate will not be paid commissions on policies which are sold to persons in the account by another associate after the account has been reassigned by AFLAC.

(d) **Other Duties.** Associate shall use only promotional material which is furnished to Associate by AFLAC or which has been approved in writing from a Vice President of AFLAC. Associate shall pay all expenses incurred by Associate in the sale and service of insurance policies offered by AFLAC. Any administrative service fees which any group or franchise account may charge for handling premium payroll deduction shall be considered an expense of the Associate. Any such expenses which AFLAC advances on Associate's behalf shall be a debt to AFLAC and shall be reimbursed by deducting them from the commissions which become due to Associate. Associate shall carefully evaluate all applications for insurance and make full and accurate disclosure to AFLAC of all material facts and circumstances which might affect the underwriting of the risk, and shall promptly forward all applications for insurance policies to AFLAC at its Worldwide Headquarters in Columbus, Georgia. Associate shall additionally collect the initial premium that may be due on applications and promptly remit the same to AFLAC along with applications, Associate shall promptly deliver policies and claim documentation sent to the Associate.

(e) **Return Policies and Monies.** Associate shall return to AFLAC on demand all undelivered policies, premium receipts, negotiable papers, or monies due AFLAC and all documents or other property belonging to AFLAC. Associate agrees to be responsible for all monies collected by Associate under the terms of this Agreement.

## PARAGRAPH THREE: Confidential Information;
## Ownership of Accounts, Records and Confidential Information

Associate agrees that the following information, to-wit: 1) payroll deduction account information, 2) names and addresses of all AFLAC policyholders, associates and coordinators, 3) account or premium invoices, 4) payroll account servicing documents,



form, whether computer or electronically a ...ible, "on-line," or not, are confidential inform. ...on and, as such, is information competitively advantageous to AFLAC, and Associates have no property right, vested interest or ownership interest in said confidential information.

Associate hereby agrees that all accounts and records, including but not limited to the confidential information above referred to, are and shall remain the property of AFLAC exclusively, both before and after the termination of this Agreement, and the Associate shall have no property rights therein. Associate further covenants to make no copies, in whatever form, of any of said records nor any part of them, and none of them, in any form, is to be removed from the custody of Associate, except in the performance of duties hereunder. Associate .ther agrees to return to AFLAC all such accounts, records and confidential information at the termination of this Agreement or upon demand, whichever first occurs.

## PARAGRAPH FOUR: Duties and Rights of AFLAC

(a) Duties.

   (1) **Provide Sales Materials.** AFLAC shall provide Associate with standard promotional and informational material to be used in th sale and service of insurance policies offered by AFLAC. All such materials and information shall remain the property of AFLAC and shall be promptly returned upon demand or upon the termination of this Agreement.

   (2) **Underwrite Policies.** AFLAC shall consider each application submitted by Associate and approve or reject the same. approved, a policy of insurance shall be issued to the applicant in accordance with the amount and type of insurance for whic application was made. All underwriting decisions are to be made solely by AFLAC and it reserves its right to prescribe rule regarding the requirements for eligibility of applicants for insurance.

   (3) **Pay Commissions.** On policies issued upon applications submitted by Associate and as full compensation for Associate's ser vices, sales commission will be paid as follows:

      (i) **First-Year Commissions.** So long as Associate is authorized to represent AFLAC, a first-year sales commission may t advanced by AFLAC on premiums earned in accordance with the terms of the applicable Schedule of Commissions. No firs year sales commissions will be paid to Associate after Associate's termination, unless Associate is otherwise entitled to th payment of renewal commissions. AFLAC shall have the right to apply all or part of the first-year sales commissions or regi tration fees to Associate's indebtedness to AFLAC. AFLAC may charge a registration fee at the time of sale which will t credited to Associate's monthly accounting statement. AFLAC may charge policyholders a policy processing fee. Associa shall not be entitled to any commission based upon such a policy processing fee.

      (ii) **Renewal Commissions.** A renewal commission is defined as that commission which is paid on premiums as earned t AFLAC on an insurance policy previously produced by Associate, commencing with the thirteenth (13th) month's premiu and such renewal commission shall be based on an amount not greater than the annualized premium amount applicable the time a policy is initially issued. A renewal commission as provided by the Schedule of Commissions will be paid as earne pursuant to the terms and subject to the conditions of Paragraphs 5, 6 and 8 of this Agreement.

   (4) **Provide Monthly Statements.** AFLAC shall, provided Associate is entitled to receive commissions hereunder, furnish Associa with a monthly accounting statement. Upon the receipt of such statement, Associate agrees to notify AFLAC within thirty (3 days in writing of any mistakes or discrepancies in the statement. Failure of Associate to so notify AFLAC shall constitute accep tance of AFLAC's statement as rendered, and Associate waives all rights to any claims against AFLAC to the contrary, and suc claims shall be forever barred.

(b) **Rights.** With respect to the foregoing duties, AFLAC shall have the following rights:

   (1) **Assignment to Coordinator.** AFLAC may assign Associate to a sales coordinator for purposes of assisting Associate in trainin and marketing. Associate may be reassigned to a different sales coordinator in AFLAC's discretion. It is expressly understoo and agreed that AFLAC can function only through its agents, and its decisions through its officers, agents and sales coordin tors, and other associates, shall be deemed to be made in the due course, and within the scope, of managing the business AFLAC. For any mistake, neglect, abuse of discretion, or other action taken, not amounting to willful misconduct, malice, frau wantonness, oppression, or that entire want of care which would raise a presumption of conscious indifference to consequence in making and enforcing AFLAC's decisions relating to Associate and Associate's performance of the duties under th Agreement, liability, if any, of AFLAC and liability, if any, of its officers, agents, sales coordinators and other associates, indivi ally, if any, each and all, for damages shall be limited to a claim for breach of contract, and Associate's sole remedy shall be breach of contract, and damages shall be assessed accordingly.

   (2) **Advancement of Commissions.** AFLAC shall have the right to advance commissions to Associate. Any sums advanced Associate shall create a liability for AFLAC on the part of Associate, and shall be payable on demand without notice, and shall c ate a liability to AFLAC and any amounts, indebtedness or liability owed to AFLAC by Associate may be charged back and off against all amounts credited or to be credited to Associate's account. First-year sales commissions shall be credited Associate on a pro rata basis as the entire first year's premium becomes earned by AFLAC. AFLAC shall have the right to ap all or part of the first year's sales commission or renewal commissions to Associate's indebtedness to AFLAC.

   (3) **Service Charge.** AFLAC may charge one-half of one percent interest per month on any outstanding negative balance Associate's monthly statement. AFLAC may also charge a COD penalty fee for issuing policies where the initial premium is r paid in full as set out on the applicable Schedule of Commissions.

   (4) **Notice to Insurance Commissioner or Other Regulatory Authorities of Certain Information, Absolutely Privileged.** Up receipt of, or discovery of, information by AFLAC which reasonably brings in question the validity of Associate's license appointment, or which suggests fraudulent or criminal activity on the part of Associate, AFLAC shall have the right to g notice of said information to the Insurance Commissioner or other regulatory authority involved, and to give notice of same Associate, and shall further have the right to terminate Associate's authority to represent AFLAC immediately, pending det mination of the question involved, and all said notices shall be absolutely privileged. Associate specifically and expres

) **Schedules of, and Provisions Governi** **Commissions** (Hereafter Schedule of Comr ons). All commissions shall be paid in rdance with the terms of the applicable Schedules of Commissions published by AFLAC. Associate acknowledges receipt of the cur- applicable Schedules of Commissions at the time of the execution of this Agreement. Said schedules are incorporated herein by refer- e and are a part of this Agreement. AFLAC may change the terms of said schedules, but any change in commissions shall not affect e commissions due or to become due to Associate on policies issued which had an effective date prior to the date of the change. nges in the schedules are made they are incorporated herein by reference and become a part of this Agreement. AFLAC shall fur- ociate written notice of any change in the schedules at least thirty (30) days prior to the effective date of such change.

## PARAGRAPH FIVE: Contingent Payment of Renewal Commissions
## Prior to Termination of this Agreement

rior to termination, AFLAC's obligation to pay renewal commissions (as defined herein) shall be contingent upon Associate's faithful ormance or observance of his or her obligations and covenants hereunder, and Associate shall be entitled to be paid renewal commis- s prior to termination ONLY under conditions as follows:

) **Monthly Production.** In order to receive renewal commissions on premiums from policies produced by Associate, Associate must uce during that month $750 in annualized premium on new policies issued by AFLAC. To be produced, the policies sold by Associate be properly and timely submitted to the AFLAC Headquarters for processing and must be accepted by the AFLAC Headquarters in rdance with Headquarters underwriting procedures.

) **Temporary Disability.** If Associate is temporarily disabled to the extent of not being able to meet the monthly production require- s for renewal commissions, AFLAC shall pay such renewal commissions as earned for a period of up to three (3) months during which disability continues subject to AFLAC's determination that Associate was and is disabled, provided that, and as a condition precedent to, Associate shall notify AFLAC in writing of Associate's disability within sixty (60) days from the date of the onset of the disability. Any n for renewal commissions not in compliance with this paragraph shall be waived.

) **Permanent Disability.** After two (2) years of service with AFLAC, if Associate becomes totally disabled while still active with AFLAC, ciate shall have a vested right to receive all renewal commissions on policies Associate produced for as long as Associate remains y disabled. Associate shall be totally disabled only if Associate meets the disability requirements of the Social Security Act; provided and as a condition precedent thereto, Associate shall notify AFLAC within sixty (60) days in writing after he or she becomes totally dis- d. Any claim for renewal commissions not in compliance with this paragraph shall be waived. Renewal commission payments made uant to the provisions of subparagraph (b) or (c) are not disability benefits, and the Associate may incur taxes thereon.

) **Annual Production.** Upon the production by Associate of at least $10,000 of annualized premium on all new policies issued by AC during a calendar year, Associate shall be entitled to receive renewal commissions on premium payments received by AFLAC for emainder of that year and for the following calendar year on the in-force policies produced by Associate, as long as a minimum of 000 in annualized premium on new policy sales used to qualify for this provision remains in force during that year and the following cal-

r. If the annualized premium on new policy sales used to qualify for this provision subsequently falls below $10,000, then the qualification provided herein shall be suspended.

**Vesting After 10 Years.** After ten (10) years of service with AFLAC, Associate shall have a vested right to receive 100% of the nal commissions as earned payable on policies Associate produced, irrespective of the production requirements of subparagraphs (a) d) above, until termination of this Agreement or unless forfeited as provided in this Agreement.

**Conditions to Payment of, and Right to Receive, Renewal Commissions.** Associate shall be entitled to receive renewal commis- payable under the terms of this Agreement unless Associate who is otherwise entitled to receive renewal commissions engages in any e conduct prohibited under Paragraph Eight, or should Associate engage in conduct in the performance of Associate's duties and nants hereunder involving moral turpitude, dishonesty, fraud, deceit, willful misrepresentation, or willful concealment of material facts. ld Associate who is otherwise entitled to receive renewal commissions engage in any such conduct, then, and in such event, the val commissions which would otherwise be payable to Associate hereunder shall immediately and automatically become non-payable, ssociate forever forfeits any right to receive the payment of any renewal commissions as provided under this Agreement.

## PARAGRAPH SIX: Contingent Payment of Renewal Commissions
## At and After Termination of this Agreement

on the effective date of termination and after termination of this Agreement, AFLAC's obligation to pay renewal commissions (as d herein) shall be contingent upon Associate's faithful performance or observance of his or her obligations and covenants hereunder, ssociate shall be entitled to be paid renewal commissions at and after termination ONLY under conditions as follows:

**Vesting After Two Years.** After two (2) years of service with AFLAC, Associate, upon termination, shall have a vested right to receive of the renewal commissions as earned payable on policies Associate produced so long as a minimum of $25,000 in annualized premi- policies written by Associate remains in force, for life, unless forfeited as hereinafter provided.

**Vesting After Five Years.** After five (5) years of service with AFLAC, Associate, upon termination, shall have a vested right to receive of the renewal commissions as earned payable on policies the Associate produced, for life, unless forfeited as hereinafter provided.

**Vesting After 10 Years.** After ten (10) years of service with AFLAC, Associate shall have a vested right to receive 100% of the al commissions as earned payable on policies the Associate produced, for life, unless forfeited as hereinafter provided.

**Death.** If the Associate dies while receiving renewal commissions, effective with policies issued January 1, 1994 and after, one-hun- ercent (100%) of the renewal commissions to which Associate would have been entitled to receive at or after termination shall be s follows:

**Surviving Spouse.** To Associate's surviving spouse solely during the surviving spouse's lifetime.

, **Surviving Children.** If no spouse survives and there is a surviving child or children of the deceased Associate under the age of

twenty-three (23) years, to such child or children under twenty-three (23) until the youngest child reaches the age of twenty-three (23) years. If Associate's spouse survives Associate, but dies before all of Associate's children reach the age of twenty-three (23), to such child or children under twenty-three (23) until the youngest child reaches the age of twenty-three (23). Renewal commissions shall be paid only to the child's legally appointed guardian unless such child has reached the age of majority in his or her state of residence. No renewal commissions are payable to any child or children who are twenty-three (23) or older. Children under the age of twenty-three (23) shall share equally.

(3) **No Surviving Spouse or Children.** If no spouse survives and there are no surviving children of the deceased Associate under the age of twenty-three (23) years, to the Associate's estate for a period equal to the number of months of the Associate's service with AFLAC, not to exceed thirty-six (36) months.

(e) **Conditions to Payment of, and Right to Receive, Renewal Commissions.** Associate shall be entitled to receive renewal commissions payable under the terms of this Agreement unless forfeited in accordance with Paragraph 5(f) above.

## PARAGRAPH SEVEN: Limited Assignment of Benefits

Associate may not assign to a third party any right to receive renewal commissions which Associate has under this Agreement during Associate's lifetime without AFLAC's prior written consent; provided, however, Associate may assign and surrender all rights to renewal commissions, without the approval of anyone, to AFLAC for such valuable consideration as mutually agreed upon by Associate and AFLAC. Further, Associate may pledge and assign any rights Associate may have to renewal commissions to AFLAC to secure the repayment of any loan or indebtedness which Associate may owe to AFLAC. Further, Associate grants to AFLAC a security interest against, and AFLAC reserves a lien upon, all of Associate's rights to receive first-year commissions and renewal commissions to secure the payment of any indebtedness which Associate may owe AFLAC. Any assignment by Associate to a third party shall be subject to the provisions of this paragraph, and shall always be subject to AFLAC's prior right of offset and its prior security interest.

## PARAGRAPH EIGHT: Prohibited Conduct

(a) During the term of this Agreement, Associate shall not (1) engage in any conduct in the performance of Associate's duties and covenants hereunder involving moral turpitude, dishonesty, fraud, deceit, willful misrepresentation or willful concealment of a material fact; (2) wrongfully misappropriate or withhold any funds, policies, premiums, receipts, vouchers or other property belonging to AFLAC or to an applicant for insurance; (3) violate any insurance laws or regulations of any state, the violation of which involves moral turpitude; or (4) make or knowingly allow to be made any false or misleading statements on any applications or claim or other documents submitted to AFLAC.

(b) During the term of this Agreement and for a period of two (2) years after its termination, Associate covenants that, within a 100-mile radius of his or her business address, as shown at the end of this Agreement (except Subparagraph 8(b)(3) herein which is not subject to any territorial limitation), **Associate shall not, directly or indirectly:**

(1) Induce or attempt to induce other associates or sales agents or coordinators of AFLAC who reside within the 100-mile radius to terminate their agreements with AFLAC, or to become contracted or associated with another insurance or indemnity company which engages in the sale of insurance policies which directly competes with the policies then sold by AFLAC; or

(2) Induce or attempt to induce policyholders or accounts of AFLAC located within a 100-mile radius of Associate's address, which Associate solicited, sold or serviced while this Agreement was in effect, to relinquish, cancel or surrender their policies or accounts, provided this shall not prohibit a direct unsolicited contact of the Associate by the policyholder and a subsequent sale based on such unsolicited contact; or

(3) Divulge, use or make available to anyone other than those within AFLAC authorized to receive such information, payroll deduction account information, names and addresses of any AFLAC policyholders, associates and coordinators, account or premium invoices, payroll account servicing documents, claimant data, including payment sheets or letters, training and educational manuals, administrative manuals, policy expiration data and prospective policyholder leads developed by AFLAC and furnished to associates and/or coordinators (e.g., "lead cards"), in whatever form, whether computer or electronically accessible, "on-line," or not, all of which is agreed to constitute confidential information and information competitively advantageous to AFLAC.

(4) The foregoing covenants shall not apply in the event AFLAC, its successor or assigns, ceases to do business as an insurer, or ceases to do such business within the applicable territory involved.

(c) Associate shall not change his business address for purposes of this Agreement without the prior consent of the company and the execution of a new Associate's Agreement specifying his new business address. In the event of such change, the territorial limitation herein specified shall continue to apply to Associate for a period of one year next subsequent to the change, at which time it shall automatically self-destruct and cease to exist. During such one-year period, the covenants herein contained relating to a territorial limitation shall apply not only to the preceding business address, but also to the new business address specified in the succeeding Associate's Agreement.

(d) **Provisions of Covenants Are Reasonable and Necessary.** Associate recognizes that AFLAC has a valid need to protect its interests by prohibiting Associate from engaging in any of the activities described in this paragraph. Associate acknowledges and agrees that the time period and the geographic area are reasonable and necessary to protect AFLAC's business, and that the prohibited activities are described with reasonable certainty, and are understood by Associate.

(e) **Forfeiture of First-Year and Renewal Commissions Upon Breach.** Should Associate engage in any of the conduct described in this paragraph, the first-year commissions and renewal commissions which would otherwise be payable to Associate or Associate's survivors shall immediately and automatically become non-payable, and Associate forever forfeits any and all rights to be paid any commissions from AFLAC.

## PARAGRAPH NINE: Termination of Agreement

(a) **Termination for Cause.** AFLAC shall have the right to terminate this Agreement immediately, and the termination shall be considered as being for cause, if Associate engages in any of the following:

(1) Wrongfully misappropriates or withholds any funds, policies, premium receipts, vouchers or other property belonging to AFLAC or to an applicant for insurance; or

(2) Violates any insurance laws or regulations of any state, the violation of which would result in the revocation of Associate's license; or

(3) Pleads guilty or nolo contendere to, or is convicted of, a crime (whether felony or misdemeanor) involving moral turpitude; or

4

001149

(5) Engages in any illegal act prohibited in Paragraph Eight; or
(6) Associate ceases to hold a valid license to sell insurance policies offered by AFLAC.

(b) **Termination by Notice Without Cause.** Either party may terminate this Agreement at will, without cause, upon giving thirty (30) days or written notice to the other party.

(c) **Termination Upon Death or Permanent Disability of Associate.** This Agreement shall terminate upon the death or total disability of Associate, unless sooner terminated.

## PARAGRAPH TEN: Treatment of Associate and Associate's Responsibilities Under Federal Tax Laws

Associate shall be treated as an independent contractor and not as an employee as concerns all applicable tax laws with respect to services performed under this Agreement, and Associate is hereby advised as an independent contractor that Associate must report all sales commissions to the Internal Revenue Service on the appropriate income tax form and pay any federal income taxes due with respect to these amounts. Additionally, Associate must report all sales commissions on the appropriate self-employment tax form and pay any self-employment ("S.E.C.A.") taxes with respect to these amounts. To assist Associate in complying with these requirements, AFLAC will, after the close of each calendar year, furnish Associate with a copy of the Form 1099 Income Statement that AFLAC is also required to send to the Internal Revenue Service.

## PARAGRAPH ELEVEN: Legal Proceedings, Attorneys' Fees and Litigation Expenses

a) **Legal Proceedings.** The Associate shall not institute legal proceedings in the name of AFLAC against any party for any cause unless such action shall have been approved in advance in writing by a Vice President of AFLAC. Should a claim be brought by a third party against either the Associate or AFLAC as a result of some alleged action by the Associate, the Associate shall hold AFLAC harmless from and indemnify it for any attorneys' fees and court costs which it may incur in defending the claim and for any damages which it suffers either through settlement of the claim or by judgment being rendered against it. In the event AFLAC shall invoke its rights under this paragraph, AFLAC shall notify Associate in writing of its intent. AFLAC shall have the right to apply all or any part of Associate's first-year and/or renewal commissions toward the damages caused to it hereunder. AFLAC may, in its sole discretion, determine whether to defend or settle any such claim, and the amount of any such settlement.

b) **Attorneys' Fees and Litigation Expenses.** Should AFLAC institute legal action against Associate to recover for indebtedness of Associate to AFLAC, Associate covenants to pay AFLAC the reasonable attorneys' fees and litigation expenses which AFLAC may incur, in addition to principal, interest and damages.

## PARAGRAPH TWELVE: Prior Contracts Superseded

This Agreement supersedes and replaces all previous contracts between the parties, but all rights accrued up to the date of execution of this Agreement shall not be affected or impaired, except as modified by this Agreement. For policies issued prior to January 1, 1994, renewal commissions at death will be paid in accordance with the Associate's preceding Agreement.

## PARAGRAPH THIRTEEN: Modifications

This Agreement may not be orally modified. No modification is binding upon AFLAC unless it is in writing and signed at its Headquarters by its President, a Vice President, or its Secretary, for a substantial valuable consideration other than the performance of services by Associate, except as expressly provided in this Agreement.

## PARAGRAPH FOURTEEN: Severability

If any one or more of the provisions, words or phrases contained in the paragraphs and subparagraphs of this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provisions, words or phrases were not contained herein.

## PARAGRAPH FIFTEEN: Arbitration

a) Any dispute arising under this Agreement, to the maximum extent allowed by applicable law, shall be subject to arbitration, and prior to commencing any court action the parties agree that they shall arbitrate all controversies.

b) **Procedure.** The arbitration shall be pursuant to the terms of the Federal Arbitration Act. The parties shall notify each other of the existence of an arbitrable controversy by certified mail and shall attempt in good faith to resolve their differences within fifteen (15) days after the receipt of such notice. Notice to Associate shall be sent to Associate's address as it appears in AFLAC records and notice to AFLAC shall be sent to: Arbitration Officer, American Family Life Assurance Company of Columbus (AFLAC), Worldwide Headquarters, Columbus, Georgia 31999. If the dispute cannot be resolved within said fifteen-day period, either party may file a written demand for arbitration with the other party. The party filing such demand shall simultaneously specify his, her or its arbitrator, giving the name, address and phone number of said arbitrator. The party receiving such notice shall notify the party demanding the arbitration of his, her or its arbitrator, giving the name, address and telephone number of said arbitrator within five (5) days of the receipt of such demand. The arbitrator selected by the respective parties need not be neutral. The Senior Judge of the Superior Court of Muscogee County, Georgia, on request by either party, shall appoint a neutral person to serve as the third arbitrator, and shall also appoint an arbitrator for any party failing or refusing to name his arbitrator within the time herein specified. The arbitrators thus constituted shall promptly meet, select a chairperson, fix the time and place of the hearing, and notify the parties. The majority of the panel shall render an award within ten (10) days of the completion of the hearing, and shall promptly transmit an executed copy of the award to the respective parties. Such award shall be binding and conclusive upon the parties hereto, in the absence of fraud or corruption. Each party shall have the right to have the award made the judgment of a court of competent jurisdiction.

Associate _____    AFLAC _____

## PARAGRAPH SIXTEEN: Headings

The headings of this Agreement are for reference only, and shall not limit the language used in this contract.

5

001150

These seventeen (17) paragraphs along with the Schedules of Commissions, and any Supplement of any district sales coordinator, regional sales coordinator, or state sales coordinator, contain the entire and complete agreement between the parties, and each of the parties hereto agrees that there are no prior or contemporaneous agreements, promises or representations that are not set forth herein.

WITNESS the hand and seal of Associate and the execution by a duly authorized officer of AFLAC.

ESS: _Kathryn A. Lynb_

BY: _(signature)_ (L.S.)
Associate's Signature

8/8/94
Date

**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**
Social Security Number

Associate's Current Writing Number
(For Administrative Purposes Only)

**000775 7985**
Associate's License Number

Licensed for: Life ___✓___ A&H ___✓___

BUSINESS ADDRESS:

**345 Honey Dr.**
Street & No. (REQUIRED)

**Brownsville TX 78520**
City          State          Zip Code

HOME ADDRESS (IF DIFFERENT)

_____

_____

P. O. Box No. (If any)

_____
City          State          Zip Code

**(210) 546-9358**
Associate's Telephone No.                    (HOME)

**(210) 982-0832**
Associate's Telephone No.                    (BUSINESS)

RECEIVED
AUG 19 '94
AGENT LICENSE DEPARTMENT

AMERICAN FAMILY LIFE ASSURANCE
COMPANY OF COLUMBUS (AFLAC)

BY: _(signature)_

TITLE: **ASST. VICE PRESIDENT**

EFFECTIVE DATE: **9-6-94**

FOR OFFICE USE ONLY
WORLDWIDE HEADQUARTERS

Associate's Mailing Address PLEASE PRINT

**DINO X. CHAVEZ**
Name

**345 Honey Dr.**
Street

**Brownsville, TX. 78520**
City/State/Zip

Form A-13510-94

6

001151

# American Family Life Assurance Company
## of Columbus (AFLAC)
### Worldwide Headquarters: Columbus, GA 31999

## *District Sales Coordinator's Agreement*

WHEREAS, the undersigned is now an Associate with American Family Life Assurance Company of Columbus ("AFLAC") under an Associate's Agreement (the terms of which are incorporated in this Agreement by reference) and the parties hereby desire to execute this additional Agreement in order to set forth the terms and conditions of the respective covenants, duties, and obligations of the undersigned as District Sales Coordinator, hereafter "DC".

NOW, THEREFORE, AFLAC and the undersigned DC do hereby covenant and agree as follows:

### Paragraph One: APPOINTMENT

AFLAC appoints the undersigned as DC in the district, territory, or region assigned to the DC in writing by AFLAC, and DC covenants to serve as DC in the said district, territory, or region in accordance with the terms and conditions hereafter set forth.

### Paragraph Two: RELATIONSHIP

(a) **Independent Contractor.** The relationship of the DC to AFLAC shall be and shall continue to be that of an independent contractor rather than employer-employee, and nothing contained herein shall be construed as creating any other relationship.

(b) **Relationship of Others.** It is understood and agreed that Associates assigned to the DC are independent contractors, and the Regional Sales Coordinator to whom the DC may be assigned is an independent contractor, and the State Sales Coordinator to whom the DC is assigned may be an independent contractor in their relationship with AFLAC. The DC shall at all times respect that relationship in the performance of the DC's duties hereunder.

(c) **Expenses.** All expenses incurred by the DC shall be the sole responsibility of the DC. The DC has no authority to rent any office, telephone, open any bank account, or make any expenditures, obligation or commitment for any purpose in the name of AFLAC without specific written authorization from the President, a Vice President, or Secretary of AFLAC.

### Paragraph Three: DUTIES

The DC shall recruit and train Associates for the sale of all AFLAC insurance policies and coordinate the activities of the Associates assigned to the DC in writing by AFLAC. For the purpose of maximizing the sales efforts of AFLAC, the DC should cooperate with the Associates assigned to the DC, and the Regional Sales Coordinator and the State Sales Coordinator to whom the DC is assigned.

### Paragraph Four: ASSIGNMENT

AFLAC may, at its sole discretion, assign and reassign Associates to the DC. The DC shall be paid renewal override commissions on all AFLAC insurance policies which are sold by Associates while assigned in writing to the DC. The DC understands and agrees that he or she may be assigned to a Regional Sales Coordinator or a State Sales Coordinator, or both, for purposes of assisting the DC in training, recruiting and marketing. The DC may be reassigned to a different Regional or State Sales Coordinator at AFLAC's discretion.

### Paragraph Five: FIRST YEAR AND RENEWAL OVERRIDE COMMISSIONS

As full compensation for the performance of the DC's duties, the DC shall be paid first year and renewal override commissions on sales of all AFLAC insurance policies made by the DC, and by Associates while assigned in writing to the DC.

(a) **First Year Override Commissions.** First year override commissions shall be advanced on sales credited to the DC. Said compensation shall be paid in accordance with each policy's Schedule of Commissions in effect at the time of the sale.

(b) **Renewal Override Commissions.** Renewal override commissions shall be credited to the DC in accordance with each policy's Schedule of Commissions in effect at the time of the sale.

(c) **Schedules of Commissions.** The official Schedule of Commissions for the applicable AFLAC insurance policies are incorporated herein by reference. AFLAC may change the terms of said schedules, but any change in commissions shall not affect those commissions due or to become due to the DC on insurance policies issued which had an effective date prior to the date of the change. When changes in the schedules are made, they are incorporated herein by reference and become a part of this Agreement. The DC will receive at least thirty (30) days written notice of any change in the schedules.

Form A-12720-DC-1-89

**EXHIBIT**

Chavez Depo.

10

**Paragraph Six: VESTING CONDITIONS**

(a)  **Prior to Termination.** During the term of this Agreement, first year and renewal commissions shall be paid pursuant to Paragraph Five herein. No production or premium minimum is required as a condition for payment.

(b)  **After Termination.** After termination of this Agreement, vesting of renewal commissions shall be paid in accordance with the conditions set forth in said Associate's Agreement.

**Paragraph Seven: AGREEMENT TO REAFFIRM**

All of the provisions of the DC's Associate's Agreement with AFLAC shall continue to be of full force and effect and shall govern this contract in all respects except as expressly modified herein. The DC hereby ratifies and reaffirms all the provisions of said Associate's Agreement with AFLAC as fully and effectually as though the provisions thereof were set forth herein verbatim.

**Paragraph Eight: TERMINATION OF APPOINTMENT AS DISTRICT SALES COORDINATOR**

This Agreement may be terminated without having any effect on said Associate's Agreement. Any such termination shall be subject to the termination conditions set forth in said Associate's Agreement. This expressed provision shall not affect the general governing provisions set forth in Paragraph Seven, above.

**IN WITNESS WHEREOF,** the parties have hereto affixed their respective signatures.

WITNESS: _____    BY: _____
                                                                    DC Signature

                                                          12-1-94
                                                          Date

AMERICAN FAMILY LIFE ASSURANCE
COMPANY OF COLUMBUS (AFLAC)

                          APPROVED
BY: _____

TITLE: ASST. VICE-PRESIDENT

EFFECTIVE DATE: 12-15-94

For Office Use Only

Form A-12720-DC-1-89

AGENT LICENSE
DEPARTMENT

DEC 6 '94

RECEIVED

Chavez
EXHIBIT NO. 11
3-19-03
Hill & Romero

# American Family Life Assurance Company
## of Columbus (AFLAC)
### Worldwide Headquarters: Columbus, Georgia 31999

# *Regional Sales Coordinator's Agreement*

**WHEREAS,** the undersigned is now an Associate with American Family Life Assurance Company of Columbus ("AFLAC") under an Associate's Agreement (the terms of which are incorporated in this Agreement by reference) and the parties hereby desire to execute this additional Agreement in order to set forth the terms and conditions of the respective covenants, duties, and obligations of the undersigned as Regional Sales Coordinator, hereafter "RC."

**NOW, THEREFORE,** AFLAC and the undersigned RC do hereby covenant and agree as follows:

### Paragraph One: APPOINTMENT

AFLAC appoints the undersigned as Regional Sales Coordinator to serve in the region or territory assigned to the RC in writing by AFLAC, and RC covenants to serve as RC in the said region or territory in accordance with the terms and conditions hereafter set forth.

### Paragraph Two: RELATIONSHIP

(a) **Independent Contractor.** The relationship of the RC to AFLAC shall be and shall continue to be that of an independent contractor rather than employer-employee, and nothing contained herein shall be construed as creating any other relationship.

(b) **Relationship of Others.** It is understood and agreed that associates assigned to the RC are independent contractors, and the district sales coordinator who may be assigned to the RC is an independent contractor, and the state sales coordinator to whom the RC is assigned may be an independent contractor in their relationships with AFLAC. The RC shall at all times respect that relationship in the performance of the RC's duties hereunder.

(c) **Expenses.** All expenses incurred by the RC shall be the sole responsibility of the RC. The RC has no authority to rent any office or telephone, open any bank account, or make any expenditures, obligation or commitment for any purpose in the name of AFLAC without specific written authorization from the president, a vice president, or secretary of AFLAC.

### Paragraph Three: DUTIES

The RC shall recruit and train associates for the sale of all AFLAC insurance policies and coordinate the activities of the associates and the district sales coordinators assigned to the RC in writing by AFLAC. For the purpose of maximizing the sales efforts of AFLAC, the RC should cooperate with the associates and district sales coordinators assigned to the RC, and the state sales coordinator to whom the RC is assigned.

### Paragraph Four: ASSIGNMENT

AFLAC may, in its sole and absolute discretion, assign and reassign associates and district sales coordinators to the RC. The RC shall be paid renewal override commissions on all AFLAC insurance policies that are sold by associates and district sales coordinators who were assigned in writing to the RC. The RC understands and agrees that he or she may be assigned to a state sales coordinator for purposes of assisting the RC in training, recruiting and marketing. The RC may be reassigned to a different state sales coordinator at AFLAC's discretion.

### Paragraph Five: FIRST-YEAR AND RENEWAL OVERRIDE COMMISSIONS; RSC MPI PROGRAM

As full compensation for the performance of the RC's duties, the RC shall be paid first-year and renewal override commissions on sales of all AFLAC insurance policies made by the RC, and by district sales coordinators, and associates while assigned in writing to the RC.

(a) **First-Year Override Commissions.** First-year override commissions shall be advanced on sales credited to the RC. Said compensation shall be paid in accordance with each policy's Schedule of Commissions (at the RSC MPI Participant Rate) in effect at the time of the sale.

(b) **Renewal Override Commissions.** Renewal override commissions shall be credited to the RC in accordance with each policy's Schedule of Commissions (at the RSC MPI Participant Rate) in effect at the time of the sale.

(c) **Schedules of Commissions.** The official Schedule of Commissions for the applicable AFLAC insurance policies are incorporated herein by reference. The commission for situations that are non-standard or not contemplated by the

M-0806

RECEIVED NOV 1 6 PM 12:54 U.S. DISTRICT CLERK

**EXHIBIT**
Chavez Depo.
11

M0806.1

001154

commission arrangement or commission splits requiring new or special situat...  ...odes shall be controlled by and paid in accordance with AFLAC's then-current rules, rates and practices. RC acknowledges and agrees that AFLAC, upon thirty (30) days written notice to RC, may change the Schedules of Commissions and conditions with respect to (a) any policies issued in and in force on or after the date of the change, and (b) any policies issued before the date of the change but in force after such date if there has been a change in federal, state or other laws mandating an increase in loss ratios. When changes in the schedules are made, they are incorporated herein by reference and become a part of this Agreement.

(d) **MPI Bonus; Qualification.** RC may also qualify for and be paid an annual production bonus under and in accordance with the terms and conditions of the RSC MPI Program in effect at the time of the sale and his or her Regional Sales Coordinator's Agreement. The official RSC MPI Program for the applicable policies is incorporated herein by reference. Upon thirty (30) days written notice, AFLAC may change the terms and conditions of the RSC MPI Program with respect to any policies issued and in force on or after the date of the change.

## Paragraph Six: VESTING CONDITIONS

(a) **Prior to Termination.** During the term of this Agreement, first-year and renewal commissions shall be paid pursuant to Paragraph Five herein. No production or premium minimum is required as a condition for payment.

(b) **After Termination.** After termination of this Agreement, vesting of renewal commissions shall be paid in accordance with the conditions set forth in said Associate's Agreement.

## Paragraph Seven: AGREEMENT TO REAFFIRM

All of the provisions of the RC's Associate's Agreement with AFLAC shall continue to be of full force and effect, and shall govern this contract in all respects except as expressly modified herein. The RC hereby ratifies and reaffirms all the provisions of said Associate's Agreement with AFLAC as fully and effectually as though the provisions thereof were set forth herein verbatim.

## Paragraph Eight: SUBSTITUTION OF DISTRICT SALES COORDINATOR'S AGREEMENT

his RC's Agreement completely supersedes and replaces any existing District Sales Coordinator's Agreement between the parties. During the term of this RC's Agreement, no District Sales Coordinator's Agreement between the parties shall be valid unless specifically authorized in writing by the president, a vice president, or the secretary of AFLAC.

## Paragraph Nine: TERMINATION OF APPOINTMENT AS REGIONAL SALES COORDINATOR

This Agreement may be terminated without having any effect on said Associate's Agreement. Any such termination shall be subject to the termination conditions set forth in said Associate's Agreement. This expressed provision shall not affect the general governing provisions set forth in Paragraph Seven, above.

IN WITNESS WHEREOF, the parties have hereto affixed their respective signatures.

WITNESS: _____

BY: _____
RC Signature

11/13/98
Date

AMERICAN FAMILY LIFE ASSURANCE
COMPANY OF COLUMBUS (AFLAC)

APPROVED

BY: Daisy W. Lee

TITLE: 2nd VICE-PRESIDENT

DATE: 11/19/98

**For Office Use Only**
**Worldwide Headquarters**

-0806

M0806.1