

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

**OCT 2 2 2003**

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| DINO CHAVEZ | § | |
| | § | |
| vs. | § | |
| | § | |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT and NOE SAUCEDA, | § | CIVIL ACTION NO. B-02-128 |
| | § | |
| | § | |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT | § | |
| | § | |
| vs. | § | |
| | § | |
| AMERICAN FAMILY LIFE ASSURANCE | § | |
| COMPANY OF COLUMBUS | § | |

---

**DEFENDANTS BROWNSVILLE INDEPENDENT SCHOOL DISTRICT'S
AND NOE SAUCEDA'S
RESPONSE TO THIRD-PARTY DEFENDANT AFLAC'S MOTION FOR SUMMARY
JUDGMENT**

---

TO THE HONORABLE JUDGE OF SAID COURT:

**COME NOW,** the BROWNSVILLE INDEPENDENT SCHOOL DISTRICT("BISD")

and NOE SAUCEDA, Defendants in the above-styled and numbered cause and file and serve this

their Response to Third Party Defendant AFLAC's Motion for Summary Judgment, and would

show the Court the following:

**I.**

On September 29, 2003, AFLAC filed with the court and served on Defendants it's

Motion to Strike or, in the Alternative, Motion to Stay Proceedings and Compel Arbitration and

it's Motion for Summary Judgment.

AFLAC had previously filed a Motion to Dismiss pursuant to FRCP Rule 12 (b)(6) and while AFLAC is correct that contribution is not recoverable under 42 USC Section 1983 for constitutional violations, BISD would show that it's employee, Noe Sauceda, who has tortious causes of action pled against him, is entitled to contribution under Texas law. Specifically, Plaintiff has sued Dr. Sauceda for libel, slander and tortious interference with a business.

All of these causes of action were connected with communication between AFLAC and Dr. Sauceda, as such there are fact questions involved as to AFLAC's involvement in the subsequent damages to Plaintiff. But for AFLAC's demotion of Plaintiff, Plaintiff would not have suffered the damages he claims.

Dr. Sauceda has filed a Motion for Leave to file a Third Party petition against AFLAC. However, this was not necessary since AFLAC has already been joined as a party by BISD and therefore, for the purposes of this Reply, Dr. Sauceda shall be presumed as having been allowed to file it's petition against AFLAC. With the exception of a footnote in it's Motion for Summary Judgment, AFLAC has conveniently ignored the pleadings against it by Dr. Sauceda. See AFLAC's Motion for Summary Judgment, Footnote 2.

Plaintiff, Dino Chavez, has pled in his First Amended Original Complaint that he has suffered lost wages, wage earning capacity, loss of income and income opportunities, lost earnings. See Paragraph 19 of Plaintiff's First Amended Complaint. It is undisputed that Plaintiff was an Associate or Regional Sales Coordinator with AFLAC at the time of the actions complained of. See AFLAC's Motion for Summary Judgment, and Plaintiff's First Original Complaint.

Since it is undisputed that Plaintiff has never been an employee of BISD and that Plaintiff is not claiming that he ever received any earnings or remuneration directionally from BISD, then it logically proceeds that any loss of earnings came not from this Defendant or Dr. Sauceda but from AFLAC.

Further, Plaintiff filed on July 7, 2003, a Notice of Clarification of Plaintiff's claim in which he specified claims under 42 USC §1981(a), wherein he claims AFLAC violated his rights: "by restricting his ability to make and enforce contracts and by denying him the full and equal benefit of all laws and proceeds for the security of persons and property as is enjoyed by White citizens." See Exhibit "A", Notice, p. 2.

## II.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P. 56); Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). Once the moving party has made an initial showing, the party opposing the motion must offer evidence sufficient to demonstrate the existence of the required elements of the party's case. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). All evidence and inferences to be drawn "must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655,

*8 L. Ed. 2d 176, 82 S. Ct. 993 (1962); Marshall v. Victoria Transp. Co., 603 F.2d 1122, 1123 (5ᵗʰ Cir. Tex. 1979).* Finally, in reviewing the summary judgment evidence, the Court has no duty to search the record for triable issues; rather, it need rely only on those portions of the submitted documents to which the nonmoving party directs its attention. *See Guarino v. Brookfield Township Trustees, 980 F.2d 399, 403 (6ᵗʰ Cir. Ohio 1992).*

## III.

In this case there has been testimony solicited by the parties against AFLAC's independent agents, including Frank LaFemina, the State Sales Coordinator for Texas, Lynn Barnson, the Vice President, West Territory, and Ron Levine, Regional Sales Coordinator for Brownsville.

These witnesses have testified that Dino X. Chavez was demoted from Regional Sales Coordinator of Brownsville at the direction of AFLAC agents. The testimony by AFLAC's independent agents indicates that this decision was made not because of the letter written by Dr. Sauceda, but because AFLAC believed that Mr. Chavez had acted inappropiately and unprofessionally in his dealings with BISD and that Mr. Chavez's refusal to cooperate with Mr. LaFemina's plan to handle the 2002 enrollment for BISD in December, 2001 resulted in his demotion. See deposition of Frank LaFemina, Exhibit "B", Vol II, p. 173, l. 25 - p. 174, l. 16; p. 261, l. 22 - p. 267, l. 8.

Exhibit "B" - Deposition of Frank LaFemina, Vol II p. 174 , 6-10:

Q      (by Mr. Aguilar): Why were you recommending his demotion?

A      Because he wouldn't comply with the arrangement that I was trying to put together to preserve the business in BISD and to keep him compensate and to keep Dr. Sauceda happy with AFLAC.

Had AFLAC continued to retain Mr. Chavez as the Regional Sales Coordinator, Mr. Chavez would not have suffered the losses that he has claimed. In order to make Mr. Chavez whole, AFLAC should remain as a party to this suit.

Not satisfied with receiving a summary judgment from BISD, AFLAC has also requested summary judgment against Chavez, who has not sued AFLAC directly. AFLAC states because it has a contract with Chavez it can not be sued by Chavez. However, Chavez has indicated to the court and testimony elicited at the deposition of Lynn Barnson, taken on September 30, 2003 that Chavez believes he was demoted because he is a Mexican-American. Mr. Barnson was unable to identify any other Regional Sales Coordinators who were demoted as the result of only one single complaint by a customer. In the deposition of Lynn Barnson he testified that he could not recall any other instance where this had occurred. See deposition of Lynn Barnson, Exhibit "C", P. 134, L. 7 - P. 136, L. 9.

BISD and Dr. Sauceda are entitled, to joinder of a responsible third party pursuant to Tex. Civ. Prac. & Rem. Code §33.015 based on the possibility of recovery against them because of their demotion of Dino Chavez either for breach of contract or under 42 USC §1981.

Texas Rules of Civil Procedure §33 applies to any cause of action based on tort in which a defendant, settling person, or responsible third party is found responsible for a percentage of the harm for which relied is sought. See T.R.C.P. §33.002(a). Generally, a defendant may be liable to a claimant only for the percentage of damages found by the trial of fact equal to the defendant's percentage of with respect to the harm for which damages are allowed. T.R.C.P. §33.013(a).

A liable defendant is a defendant against whom a judgment can be entered for at least a portion of the damages awarded to the claimant.  See T.R.C.P. §33.016(b), 33.011(3) *Pacesetter Pools, Inc. v. Pierce Homes, Inc., 86 S.W.3d 827, 831 (Tex. App. - Austin 2002).*

In the case *Elson Thermoplastics v. Dynamic Systems, Inc.,* relied in by AFLAC to assert that the Plaintiff could not recover from AFLAC the court reversed a summary judgment for the Defendant, Elson.  The Court held because there was a fact question as to whether Dynamic Systems was also entitled to summary judgment on the contribution claim brought by Elson against it.  The court held that because it reversed the summary judgment against Elson there were fact questions at issue as to Dynamic Systems liability and therefore it reversed the summary judgment against Elson by Dynamic Systems.  The court concluded that third party plaintiff, Elson had met its burden in informing third party defendant, Dynamic Systems of the factual and legal bases against it.  *Elson v. Dynamic Systems, Inc., 49 S.W.3d 891, 901-902 (Tex. App. - Austin 2001).*

As the contractor of Dino Chavez, AFLAC was solely in the position to cause damage to Plaintiff.  AFLAC chose to demote Dino Chavez separate and apart from BISD and Dr. Sauceda and as such should remain a party to this suit.

Because fact questions exist as to AFLAC's culpability to Chavez and whether AFLAC contributed to the tortious acts alleged against Defendant Sauceda, AFLAC's Motion for Summary Judgment should be dismissed.

**WHEREFORE, PREMISES CONSIDERED,** Defendant Brownsville Independent School

District respectfully prays that this Court deny AFLAC's Motion for Summary Judgment and for

such other and further relief as is just and equitable.

Respectfully submitted,

**ROERIG, OLIVEIRA & FISHER, LLP**
855 West Price Road, Suite 9
Brownsville, Texas 78550
Telephone: (956) 542-5666
Facsimile: (956) 542-0016
Counsel for Defendant,

**Attorneys for Defendant BROWNSVILLE INDEPENDENT SCHOOL DISTRICT**

By: _____
       Elizabeth G. Neally
       State Bar No. 14840400
       Federal Adm. No. 8044
       Ricardo Morado
       Federal ID No.1213
       State Bar No. 14417250

**WILLETTE & GUERRA, L.L.P.**
International Plaza, Suite 460
3505 Boca Chica Boulevard
Brownsville, Texas 78521
Telephone: (956) 541-1846
Facsimile: (956) 541-1893

**Attorneys for Defendant NOE SAUCEDA**

By: _____
       **EILEEN M. LEEDS**
       State Bar No. 00791093
       Federal Bar No. 16799
       **CHARLES WILLETTE, JR.**
       State Bar No. 21509700
       Federal Bar No. 1937

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify, pursuant to Texas Rules of Civil Procedure, that a true and correct copy of the foregoing **DEFENDANTS' RESPONSE TO AFLAC's Motion for Summary Judgment** has been served via certified mail, return receipt requested, to all Counsel of Record, as follows:

J. Arnold Aguilar
**Law Office of J. Arnold Aguilar**
Artemis Square, Suite H-2
1200 Central Boulevard
Brownsville, Texas 78520

Eileen Leeds
**Willette & Guerra**
3505 Boca Chica Boulevard, Suite 460
Brownsville, Texas 78521

Buddy Steele
**Lock, Laddell & Sapp, L.L.P.**
100 Congress Avenue, Suite 300
Austin, Texas 78701

on this 22nd day of October, 2003.

Elizabeth E. Neally

EXHIBIT "A"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DINO X. CHAVEZ | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. |
| | § | |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, NOE SAUCEDA, | § | B - 02 - 128 |
| and RANDY DUNN, MARILYN DEL | § | |
| BOSQUE-GILBERT and HUGH EMERSON, | § | |
| JR., in their official capacities as Board | § | |
| Members of Brownsville Independent | § | |
| School District | § | |

## NOTICE OF CLARIFICATION OF PLAINTIFF'S CLAIMS

TO THE HONORABLE U.S. DISTRICT COURT:

COMES NOW **DINO X. CHAVEZ,** Plaintiff herein and files this his Notice of Clarification of Plaintiff's Claims alleged by Third-Party Defendant AFLAC in its Reply to BISD's Response to AFLAC's Motion to Dismiss, and for such clarification, would respectfully show unto the Court the following:

I.

Third-Party Defendant AFLAC alleges that "Chavez's only possible claim against AFLAC is for breach of contract based upon the termination of his Regional Sales Coordinator Agreement..." See AFLAC's Reply to BISD's Response to AFLAC's Motion to Dismiss, p.3. Such an assertion misstates and mischaracterizes both the facts and the law. Although Plaintiff

JUL - 8 2003

has not yet alleged or asserted a cause of action against AFLAC, he maintains a viable claim for violation of his equal rights under the law, for which he may still maintain an action pursuant to 42 U.S.C. §1981(a).  That section provides

> [a]ll persons with the jurisdiction of the United States shall have the same right
> in every State and Territory to make and enforce contracts...and to the full and
> equal benefit of all laws and proceedings for the security of persons and property
> as is enjoyed by White citizens....

Plaintiff would show that the actions of Third-Party Defendant AFLAC violated his rights under §1981(a) by restricting his ability to make and enforce contracts and by denying to him the full and equal benefit of all laws and proceeds for the security of persons and property as is enjoyed by White citizens.  To that end, Plaintiff would show that Plaintiff, a Hispanic citizen, was denied the benefits and protections that were otherwise provided to White citizens, by AFLAC. Plaintiff would show that the breach of his contract by Third-Party Defendant AFLAC was based in part on Plaintiff's race, and that no other White citizen at Plaintiff's management level in Texas had ever been prohibited from participating in the terms of his contract as Plaintiff was, nor had any White citizen at Plaintiff's management level in Texas ever had his contract terminated in the same or a similar manner as Plaintiff's contract was terminated.  Such actions caused or contributed to Plaintiff's damages herein.  AFLAC would therefore be liable to Plaintiff for his actual, compensatory and punitive damages resulting from such acts.

WHEREFORE, PREMISES CONSIDERED, Plaintiff **DINO X. CHAVEZ** would respectfully request that the Court take notice of Plaintiff's viable tort claims against Third-Party Defendant AFLAC in ruling on AFLAC's Motion to Dismiss.

Signed on this the 7th day of July, 2003.

Respectfully submitted,

**LAW OFFICE**
**J. ARNOLD AGUILAR**
Artemis Square, Suite H-2
1200 Central Boulevard
Brownsville, Texas 78520
Telephone     :  (956) 504-1100
Facsimile     :  (956) 504-1408

By:    _____
J. Arnold Aguilar
State Bar No. 00936270
Federal Adm. No. 6822

Attorney for Plaintiff,
DINO X. CHAVEZ

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing **NOTICE OF CLARIFICATION OF PLAINTIFF'S CLAIMS** has on this the 7th day of July, 2003, been forwarded via certified mail, return receipt requested to:

Ms. Elizabeth G. Neally
ROERIG, OLIVEIRA & FISHER, L.L.P.
855 W. Price Rd., Suite 9
Brownsville, TX 78520


Ms. Eileen M. Leeds
WILLETTE & GUERRA, L.L.P.
International Plaza, Suite 460
3505 Boca Chica Boulevard
Brownsville, TX 78521


Mr. William B. Steele, III
LOCKE, LIDDELL & SAPP, L.L.P.
100 Congress Avenue, Suite 300
Austin, TX  78701

J. Arnold Aguilar

v:\fp\motions\258-02-1.ntc

PAGE 4

EXHIBIT "B"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ            )
                         )
VS.                      )
                         )
BROWNSVILLE INDEPENDENT  )
SCHOOL DISTRICT, NOE     )
SAUCEDA, AND RANDY       )     CIVIL ACTION NO.
DUNN, MARILYN DEL        )     B - 02 - 128
BOSQUE-GILBERT AND       )
HUGH EMERSON, JR.,       )
IN THEIR OFFICIAL        )
CAPACITIES AS BOARD      )
MEMBERS OF BROWNSVILLE   )
INDEPENDENT SCHOOL       )
DISTRICT                 )

*****************************************

ORAL AND VIDEOTAPED DEPOSITION OF

**FRANK D. LAFEMINA**

AUGUST 21, 2003

VOLUME 2

*****************************************

CONDENSED TRANSCRIPT AND KEYWORD INDEX

COPY

**ACUSCRIBE**
**COURT REPORTERS**

750 NORWOOD TOWER
114 WEST 7TH STREET
AUSTIN, TEXAS 78701
info@acuscribe.com

TELEPHONE: (512) 499-0277
TOLL-FREE: (800) 497-0277
FAX: (512) 499-0298
www.acuscribe.com

# STIPULATIONS

ORAL DEPOSITION(S) OF: _Frank Cafemura_

The attorneys for all the parties present stipulate and agree to the following checked items:

**Objections:**

____ Texas Rules of Civil Procedure.

_X_ Federal Rules of Civil Procedure.

____ Other: _____

**Delivery for signature and changes:**

The witness, or the witness's attorney, will return the signed deposition to the court reporter within _30_ days of the date of submission. If the original of the deposition is not signed, or made available, an unsigned copy may be used as though signed.

_X_ The original transcript will be submitted to the witness's attorney.

____ The original transcript will be submitted to the witness at the following address:

_____

____ Signature waived.

The attorney asking the first question will be responsible for the timely payment of all costs in connection with the original deposition transcript.

I hereby agree to the above and foregoing marked items and request that AcuScribe Court Reporters furnish me with the items checked below. Unless otherwise requested, I will receive copies of all exhibits. My firm and I will be responsible for the timely payment of any original or copies and/or exhibits as indicated below that I may request. I agree that if I have no prior credit arrangement with AcuScribe Court Reporters, the transcript(s) stated above may be delivered on a COD basis. If any indebtedness due and owing is not paid as agreed, the undersigned agrees to pay reasonable attorneys fees, plus all costs of collection and all other costs and expenses which may be incurred by AcuScribe Court Reporters relative to collection of the indebtedness due and owing, whether suit be instituted or not.

Executed this the _21st_ day of _August_, _2003_

_Eileen Leeds_ _____  Attorney for: _____

[X] Copy & Mini   [ ] Mini only*   [ ] No copy   [ ] CD w/E-Transcript & Exhibits*   [ ] E-Transcript* _____

**FORMAT:** [ ]ASCII*   [ ] Summation*   [ ] Amicus*   [ ] Other*  **ON**  [ ] 3 ½" Floppy **OR** [ ] CD-Rom

_W. B. Steele_ _____  Attorney for: _AFLAC_

[✓] Copy & Mini   [ ] Mini only*   [ ] No copy   [ ] CD w/E-Transcript & Exhibits*   [ ] E-Transcript* _____

**FORMAT:** [ ]ASCII*   [ ] Summation*   [ ] Amicus*   [ ] Other*  **ON**  [ ] 3 ½" Floppy **OR** [ ] CD-Rom

*Will be charged the regular copy rate, if ordered without a copy of the transcript.

_____ Attorney for: _____

[ ✓ ] Copy & Mini   [ ] Mini only*   [ ] No copy   [ ] CD w/E-Transcript & Exhibits*   [ ✓ ] E-Transcript*  *on dish*

**FORMAT:**   [ ] ASCII*   [ ] Summation*   [ ] Amicus*   [ ] Other*   **ON**   [ ] 3 ½" Floppy **OR** [ ] CD-Rom


_____ Attorney for: _____

[ ] Copy & Mini   [ ] Mini only*   [ ] No copy   [ ] CD w/E-Transcript & Exhibits*   [ ] E-Transcript*_____

**FORMAT:**   [ ] ASCII*   [ ] Summation*   [ ] Amicus*   [ ] Other*   **ON**   [ ] 3 ½" Floppy **OR** [ ] CD-Rom


_____ Attorney for: _____

[ ] Copy & Mini   [ ] Mini only*   [ ] No copy   [ ] CD w/E-Transcript & Exhibits*   [ ] E-Transcript*_____

**FORMAT:**   [ ] ASCII*   [ ] Summation*   [ ] Amicus*   [ ] Other*   **ON**   [ ] 3 ½" Floppy **OR** [ ] CD-Rom


_____ Attorney for: _____

[ ] Copy & Mini   [ ] Mini only*   [ ] No copy   [ ] CD w/E-Transcript & Exhibits*   [ ] E-Transcript*_____

**FORMAT:**   [ ] ASCII*   [ ] Summation*   [ ] Amicus*   [ ] Other*   **ON**   [ ] 3 ½" Floppy **OR** [ ] CD-Rom


_____ Attorney for: _____

[ ] Copy & Mini   [ ] Mini only*   [ ] No copy   [ ] CD w/E-Transcript & Exhibits*   [ ] E-Transcript*_____

**FORMAT:**   [ ] ASCII*   [ ] Summation*   [ ] Amicus*   [ ] Other*   **ON**   [ ] 3 ½" Floppy **OR** [ ] CD-Rom


_____ Attorney for: _____

[ ] Copy & Mini   [ ] Mini only*   [ ] No copy   [ ] CD w/E-Transcript & Exhibits*   [ ] E-Transcript*_____

**FORMAT:**   [ ] ASCII*   [ ] Summation*   [ ] Amicus*   [ ] Other*   **ON**   [ ] 3 ½" Floppy **OR** [ ] CD-Rom


_____ Attorney for: _____

[ ] Copy & Mini   [ ] Mini only*   [ ] No copy   [ ] CD w/E-Transcript & Exhibits*   [ ] E-Transcript*_____

**FORMAT:**   [ ] ASCII*   [ ] Summation*   [ ] Amicus*   [ ] Other*   **ON**   [ ] 3 ½" Floppy **OR** [ ] CD-Rom


_____ Attorney for: _____

[ ] Copy & Mini   [ ] Mini only*   [ ] No copy   [ ] CD w/E-Transcript & Exhibits*   [ ] E-Transcript*_____

**FORMAT:**   [ ] ASCII*   [ ] Summation*   [ ] Amicus*   [ ] Other*   **ON**   [ ] 3 ½" Floppy **OR** [ ] CD-Rom


*Will be charged the regular copy rate, if ordered without a copy of the transcript.

## Page 109

```
( 1)              IN THE UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DISTRICT OF TEXAS
( 2)                     BROWNSVILLE DIVISION
( 3)
( 4)  DINO X. CHAVEZ                    *
( 5)     VS.                            *
                                        *
( 6)  BROWNSVILLE INDEPENDENT           *
      SCHOOL DISTRICT, MOE              *
      SAUCEDA, and RANDY                *   CIVIL ACTION NO.
( 7)  DUNN, MARILYN DEL                 *    B - 02 - 128
      BOSQUE-GILBERT and                *
( 8)  HUGH EMERSON, JR.,                *
      in their official                 *
( 9)  capacities as Board               *
      Members of Brownsville            *
(10)  Independent School                *
      District                          *
(11)
(12)  ***********************************************
(13)
(14)          ORAL AND VIDEOTAPED DEPOSITION OF
(15)                  FRANK D. LaFEMINA
                       AUGUST 21, 2003
(16)                      VOLUME 2
(17)  ***********************************************
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

## Page 110

```
( 1)              ORAL AND VIDEOTAPED DEPOSITION OF
( 2)  FRANK D. LaFEMINA, produced as a witness at the
( 3)  instance of the Plaintiff and duly sworn, was taken in
( 4)  the above-styled and numbered cause on the 21st day of
( 5)  August, 2003, from 9:12 a.m. to 11:41 a.m. and from
( 6)  1:02 p.m. to 2:47 p.m., before GERRI C. BARKER,
( 7)  Certified Shorthand Reporter in and for the State of
( 8)  Texas, reported by machine shorthand, at the offices
( 9)  of Locke, Liddell & Sapp, L.L.P. 100 Congress Avenue,
(10)  Suite 300, Austin, Texas 78701, pursuant to the
(11)  Federal Rules of Civil Procedure and the provisions
(12)  stated on the record or attached hereto.
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

## Page 111

```
( 1)                    APPEARANCES
( 2)
( 3)  FOR THE PLAINTIFF:
( 4)
          MR. J. ARNOLD AGUILAR
( 5)      LAW OFFICE OF J. ARNOLD AGUILAR
          Artemis Square, Suite H-2
( 6)      1200 Central Boulevard
          Brownsville, Texas  78520
( 7)      956-504-1100/956-504-1408 (fax)
( 8)
      FOR THE DEFENDANT, BROWNSVILLE INDEPENDENT
( 9)  SCHOOL DISTRICT:
(10)      MS. ELIZABETH G. NEALLY (Via Telephone)
          ROERIG, OLIVEIRA & FISHER, L.L.P.
(11)      855 West Price Road, Suite 9
          Brownsville, Texas  78520
(12)      956-542-5666/956-542-0016 (fax)
(13)
      FOR THE DEFENDANT, MOE SAUCEDA:
(14)
          MS. EILEEN LEEDS
(15)      WILLETTE & GUERRA, L.L.P.
          International Plaza, Suite 460
(16)      3505 Boca Chica Boulevard
          Brownsville, Texas  78521
(17)      956-541-1846/956-541-1893 (fax)
(18)
      FOR AFLAC AND THE WITNESS:
(19)
          MR. WILLIAM B. STEELE, III
(20)      LOCKE, LIDDELL & SAPP, L.L.P.
          100 Congress Avenue, Suite 300
(21)      Austin, Texas  78701
          512-305-4749/512-305-4800 (fax)
(22)
```

## Page 112

```
( 1)
( 2)
( 3)  REMOVE THIS PAGE AND INSERT STIPULATIONS SHEET HERE
( 4)
( 5)
( 6)
( 7)
( 8)
( 9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

## Page 113

```
( 1)                        INDEX
( 2)                                              PAGE
( 3)
( 4)  Appearances................................    111
( 5)  Stipulations..............................     112
( 6)
( 7)  FRANK D. LaFEMINA (VOLUME 2)
( 8)      Examination (Continued) by Mr. Aguilar.....  115
          Examination by Ms. Neally.................    243
( 9)      Examination by Ms. Leeds..................    270
          Further Examination by Mr. Aguilar........    301
(10)      Further Examination by Ms. Leeds..........    312
          Further Examination by Mr. Aguilar........    314
(11)
(12)  Changes and Corrections....................    317
(13)  Signature..................................     318
(14)  Reporter's Certificate....................     319
(15)
(16)                      EXHIBITS
(17)
(18)  NO. DESCRIPTION           PAGE / LINE REFERENCED
(19)
      3.....................................     138 / 5
(20)      E-mail dated 12-2-01 from Frank LaFemina
          to Dino Chavez
(21)
      4.....................................     172 / 24
(22)      Change in Status Form, dated 12-4-01
(23)  5.....................................     201 / 18
          E-mail dated 12-19-01 from Frank LaFemina
          to Lynn Davis
(24)
(25)
```

## Page 114

```
( 1)                    EXHIBITS (Cont'd)
( 2)
( 3)  NO. DESCRIPTION           PAGE / LINE REFERENCED
( 4)
( 5)  6.....................................     213 / 25
          Letter dated 9-11-02 from Frank LaFemina
( 6)      to Daniel Sanchez, with attachment
( 7)  7.....................................     220 / 18
          Letter dated 9-16-02 from Daniel Sanchez
( 8)      to Frank LaFemina
( 9)  8.....................................     245 / 9
          Reimbursement Services Agreement
      9.....................................     248 / 8
(10)      Terms outlined for Mr. Chavez
(11)
      10....................................     259 / 5
(12)      E-mail dated 12-4-01 from Dino Chavez
          to Lynn Barnson
(13)
      11....................................     261 / 5
(14)      E-mail dated 6-19-02 from Dino Chavez
          to Lynn Barnson
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

Page 115

(1) FRANK D. LaFEMINA,
(2) having been first duly sworn, testified as follows:
(3)
(4) EXAMINATION (CONTINUED)
(5) QUESTIONS BY MR. AGUILAR:
(6)     Q.     Mr. LaFemina, we're here to continue your
(7) deposition which we had originally begun on May 22 of
(8) 2003. It is now August 21. Are you prepared to
(9) continue?
(10)    A.     I am, sir.
(11)    A.     Great. I don't know if I got into this last
(12) time, but let me ask you again anyway if I did. Can
(13) you explain for us just generally what the procedure
(14) is for submitting a request for AFLAC to put together
(15) a proposal to respond to an RFQ?
(16)    A.     I would refer to that, first of all, as an
(17) RFP, or request for proposal. Is that what you're
(18) asking about?
(19)    Q.     I think it's the same thing, yes.
(20)    A.     It's my understanding that you, as an
(21) insurance representative, can be added to a list for
(22) request for a bid. That bid is then sent to you if
(23) you're on that list, and you send it directly to AFLAC
(24) after you've completed whatever it is they're asking
(25) for.

Page 116

(1)     Q.     Okay. And then AFLAC gets documentation, the
(2) information they need for the RFP or the RFQ, they put
(3) together the AFLAC information for that, and then they
(4) submit it through the agent in that manner, right?
(5)     A.     Typically, I would imagine that's what
(6) happens. I'm sure it happens other ways. It may go
(7) directly to the client as well.
(8)     Q.     Okay.
(9)     A.     But typically, I think you would be right.
(10)    Q.     What if two agents submit a request for a
(11) proposal; in other words, request for information –
(12) to be able to submit a response to a request for
(13) quotes or request for proposals? Who gets the bid?
(14) Who gets to submit the AFLAC bid?
(15)    A.     It's my understanding that the corporate
(16) policy is to recognize the first bid received
(17) in-house.
(18)    Q.     Okay. So whichever agent submits it first is
(19) the one to actually get to be the agent to submit that
(20) proposal to that – to that company or organization
(21) that's requesting the bids?
(22)    A.     It's my understanding that that's the company
(23) policy, yes.
(24)    Q.     Okay. Is there a difference between whether
(25) it's an associate or an RSC or a DSC that's submitting

Page 117

(1) the bid – the two bids?
(2)     A.     I'm sure AFLAC would recognize the bid
(3) submitted by any appointed representative, regardless
(4) of title.
(5)     Q.     Okay. So it doesn't matter, for example, if
(6) the associate submits the bid – the request for bid
(7) first before an RSC, for example, or a DSC, then AFLAC
(8) policy would be to let the associate be the one to
(9) submit that bid to the organization?
(10)    A.     I think my response to you initially on that
(11) was the first one received is the first one honored.
(12)    Q.     And it doesn't matter if it's an RSC versus
(13) an associate or a DSC versus an associate?
(14)    A.     Not to my knowledge, it does not matter.
(15)    Q.     And how long has that been AFLAC's policy?
(16)    A.     As long as I've been with the company, which
(17) would be 15 years.
(18)    Q.     In 2000 – for the 2003 year, Mr. Chavez
(19) submitted a bid or a request to AFLAC to submit his bid
(20) to do the cafeteria plan proposal for Brownsville
(21) Independent School District. However, that bid was
(22) not allowed to be submitted through him; instead it
(23) went through, I believe it was Mr. Levine. Can you
(24) tell us why that happened?
(25)    A.     Actually, I think that – give me the dates

Page 118

(1) again to begin with. I think you said 2000 and then
(2) 2003.
(3)     Q.     Right.
(4)     A.     So why don't you just ask me the question?
(5)     Q.     And let me put it in perspective first.
(6)     A.     Okay.
(7)     Q.     What we've been talking about before, about
(8) the letter, for example, that Dr. Sauceda had
(9) submitted to Dino and to AFLAC and everybody else, was
(10) November of 2001.
(11)    A.     Uh-huh.
(12)    Q.     Each year, when bids are requested, they're
(13) done in one year to take effect for the following
(14) year.
(15)    A.     Uh-huh.
(16)    Q.     So, for example, when Mr. – Dr. Sauceda
(17) submitted that letter, it was in 2001 regarding the
(18) 2002 year. What I'm asking about is the following
(19) year. Mr. Chavez submitted a request to AFLAC to be
(20) allowed to submit his bid in 2002 for the 2003 year.
(21) However – and I believe he submitted his bid proposal
(22) request before Mr. Levine did. Can you tell us why it
(23) is that Mr. Chavez was not allowed to submit that bid
(24) for AFLAC?
(25)    A.     I can't.

Page 119

(1)     MS. LEEDS:     I object to improper
(2) predicate.
(3)     MR. AGUILAR:     Okay.
(4)     Q.     (By Mr. Aguilar) You just have no idea?
(5)     A.     I can't answer.
(6)     Q.     Okay. Did you have any involvement in that
(7) decision?
(8)     A.     Absolutely not.
(9)     Q.     Do you know who would have?
(10)    A.     Someone in marketing.
(11)    Q.     And do you know who that would have been?
(12)    A.     Not specifically.
(13)    Q.     Okay. The best of your understanding would
(14) just be somebody in marketing would have been the one
(15) to have done that; is that right?
(16)    A.     Yes.
(17)    Q.     And don't forget, all the instructions I gave
(18) you last time apply here as well.
(19)    A.     (Moves head up and down.)
(20)    Q.     You have to answer out loud for starters.
(21) When we took a break last time, I was talking to you
(22) about what's marked as LaFemina Exhibit No. 2, which I
(23) brought a copy for you. Do you recall this document?
(24)    A.     I do.
(25)    Q.     Okay. We talked, I think, about the top part

Page 120

(1) of it. We hadn't had a chance, I don't think, to talk
(2) about the bottom part yet. So let me ask you a little
(3) bit about that. You indicate, this information is
(4) being provided to clarify – and this was an e-mail
(5) that you had sent to your team, right?
(6)     A.     Specifically, and to the best of my
(7) recollection, to Mr. Chavez and to Mr. Levine.
(8)     Q.     Okay. It was only to those two?
(9)     A.     I can't say that for sure, but I believe that
(10) to be true.
(11)    Q.     Who else would have been on your team?
(12)    A.     Well, there's several hundred of them –
(13)    Q.     Okay.
(14)    A.     – that may be on my team. But this, I
(15) believe – there should be – if this is an e-mail,
(16) there should be a copy available as to who it was sent
(17) to.
(18)    Q.     Okay.
(19)    A.     So rather than me verify it, I think we might
(20) depend upon that information.
(21)    MR. STEELE:     Arnold, do you not have the
(22) first page of this e-mail?
(23)    MR. AGUILAR:     This is the extent of what
(24) I got regarding this e-mail. Was there more to it
(25) than this?

Page 121

(1)   MR. STEELE:   Uh-huh.
(2)   MR. AGUILAR:   You mean a cover sheet or
(3)   something?
(4)   MR. STEELE:   Yeah.
(5)   THE WITNESS:   Just the header.
(6)   MR. STEELE:   Right.
(7)   MR. AGUILAR:   Okay. No, this is all I
(8)   got.
(9)   THE WITNESS:   The header would tell us
(10)  where it went to.
(11)  MR. AGUILAR:   Are you talking about
(12)  those little lines of information at the very top of
(13)  the page?
(14)  MR. STEELE:   Right.
(15)  THE WITNESS:   The addressee. The "sent
(16)  to" addressee is not here. So I don't know exactly
(17)  who it was sent to. I know that it was more than
(18)  likely sent to the parties that would be directly
(19)  involved here, which would be Mr. Chavez and
(20)  Mr. Levine, for sure.
(21)  Q.   (By Mr. Aguilar) What I was asking, though,
(22)  is when you're referring to your team, for example, in
(23)  the Valley, who else would have been on your team?
(24)  MR. STEELE:   Just so the record is
(25)  clear, you didn't specify the Valley in the previous

Page 122

(1)   question.
(2)   MR. AGUILAR:   I understand.
(3)   MR. STEELE:   His team is much larger.
(4)   Q.   (By Mr. Aguilar) And when you're saying team
(5)   here, which team would you be talking about, the
(6)   Valley team or the larger team?
(7)   A.   I'm not sure how to answer the question
(8)   because I have – would have associates and I would
(9)   have brokers and I would have management team. So –
(10)  Q.   And I apologize.
(11)  A.   Do you want to know what I'm referring to
(12)  here?
(13)  Q.   (If I may, the copy I made you, I just
(14)  realized I'm not even – I'm not sure where I got
(15)  this. It must have been from the copy of our last
(16)  depo. Cut off the word team here at the top. That's
(17)  all it says right here.
(18)  A.   Oh, I had it.
(19)  Q.   It says team.
(20)  A.   Okay.
(21)  Q.   That's why – I just realized that that was
(22)  something you don't have on your copy. But in any
(23)  case –
(24)  A.   In that context – not to be evasive in
(25)  answering the question, but in that context, I would

Page 123

(1)   be probably referring to the team of management people
(2)   involved with this particular issue.
(3)   Q.   And that would have been just Dino and
(4)   Mr. Levine?
(5)   A.   I believe that to be true.
(6)   Q.   Okay. Now, as we were saying, towards the
(7)   bottom, you indicate, "The following information is
(8)   being provided to clarify the reasons for these
(9)   changes, which ultimately may be temporary. Dino
(10)  Chavez is the associate who secured this account for
(11)  AFLAC." Can you explain what you meant by that?
(12)  A.   The interruption of the normal course of
(13)  business, which is where Dino had been handling this
(14)  particular account all along, was interrupted due to a
(15)  letter sent to my office by Dr. Sauceda. And what I'm
(16)  saying by "this could change" is that if Dr. Sauceda
(17)  or if the powers to be, whoever they may have been,
(18)  that elected to have Dino removed as a result of his
(19)  actions, which they deemed to be detrimental to their
(20)  organization, if that went away, then I wouldn't have
(21)  seen any reason personally that Dino wouldn't have had
(22)  the opportunity to go back and do what he had been
(23)  doing all along.
(24)  Q.   Okay. And in fact –
(25)  MS. NEALLY:   Object to the

Page 124

(1)   responsiveness of the answer.
(2)   Q.   (By Mr. Aguilar) And in fact, you did get
(3)   some letters from the board members – some of the
(4)   board members saying, look, I don't think Dino had
(5)   done anything wrong. Do you remember that?
(6)   A.   I remember some form of correspondence from
(7)   some board member other than Dr. Sauceda.
(8)   MR. STEELE:   Arnold, let me object to
(9)   the foundation that you laid. I believe that assumes
(10)  facts not in evidence. I believe those letters were
(11)  sent to Janet Baker.
(12)  Q.   (By Mr. Aguilar) Did you get those letters,
(13)  also? Do you know which letters I'm talking about?
(14)  A.   I don't recall ever getting a letter –
(15)  Q.   Okay.
(16)  A.   – specifically, unless you have something
(17)  that's addressed to me that you have a copy of in the
(18)  file.
(19)  Q.   No, these were not addressed to you. Your
(20)  attorney is right. These were addressed to Ms. Baker.
(21)  What I'm saying is that these letters were sent to
(22)  AFLAC addressed to Ms. Baker from Linda Salazar, Otis
(23)  Powers, Joe Colunga, and I believe there was one
(24)  other. I could show you these letters. You're
(25)  welcome to look at them.

Page 125

(1)   A.   I've never seen them.
(2)   Q.   Okay. If those letters were sent to
(3)   Ms. Baker or to AFLAC generally, is that the type of
(4)   information that you were talking about, that if
(5)   things changed, in other words, if you got the
(6)   indication that it would have been okay for Dino to go
(7)   back, then he could have come back?
(8)   MR. STEELE:   Object to the form of the
(9)   question.
(10)  MS. LEEDS:   Join.
(11)  MR. STEELE:   He said he's never seen
(12)  those letters.
(13)  Q.   (By Mr. Aguilar) Let me give you a chance to
(14)  look at the letters so that you're not confused by
(15)  what I'm asking about. And I'll just keep them on the
(16)  tabs. That's one there from Ms. Linda Salazar marked
(17)  Sauceda Exhibit 18. You're welcome to read it if you
(18)  would like. This is Powers Exhibit 7 from Mr. Powers.
(19)  You're welcome to look at that. This is Sauceda
(20)  Exhibit 19 from Mr. Colunga. And the fourth was
(21)  Sauceda Exhibit 17 from Mr. Lehman. Each of which
(22)  basically say – let me just represent to you for
(23)  simplicity sake, basically say that they didn't think
(24)  Dino did anything wrong in telling Ms. Baker that she
(25)  didn't think he did anything wrong.

Page 126

(1)   A.   And your question is?
(2)   Q.   My question is, is that the type of
(3)   information that you were telling me where you just
(4)   said, if things changed, if you got information that,
(5)   in fact, Dino had – the powers that be were okay with
(6)   Dino coming back, that he could have come back. Is
(7)   that the type of information you would have been
(8)   looking for?
(9)   A.   No.
(10)  Q.   Okay. What would you have been looking for?
(11)  A.   For Dr. Sauceda to rescind his previous
(12)  request to have Dino removed.
(13)  Q.   Okay. Other than Dr. Sauceda rescinding that
(14)  request, outside of that, you couldn't – or you don't
(15)  feel AFLAC could have considered anything else; is
(16)  that right?
(17)  MS. LEEDS:   Object to the form.
(18)  THE WITNESS:   I couldn't answer on
(19)  behalf of AFLAC.
(20)  Q.   (By Mr. Aguilar) But that's based on your
(21)  understanding? I'm just asking, your understanding
(22)  would be then that's the type of information you were
(23)  looking for, something from Dr. Sauceda and not
(24)  necessarily from the board members?
(25)  MS. LEEDS:   Object to the form.

Page 127

(1)   Q.   (By Mr. Aguilar) Is that what you're saying?
(2)   A.   No.
(3)   Q.   Okay. Tell me what you meant right now when
(4)   you said you were looking for something from
(5)   Dr. Sauceda.
(6)   A.   Exactly what I said, nothing more.
(7)   Q.   Okay. You go on in the letter, the second
(8)   sentence, you reference some bad feelings between Dino
(9)   and the superintendent. In fact, the superintendent
(10)  is requesting Dino's removal from any AFLAC business
(11)  with the school district. Can you explain what you
(12)  meant by bad feelings?
(13)  A.   I think that I'd like to refer to an e-mail
(14)  that we have.
(15)  THE WITNESS:   May I see that, please?
(16)  MR. STEELE:   I don't have it.
(17)  Q.   (By Mr. Aguilar) Are you talking about the
(18)  November 29th?
(19)  A.   No. This is an e-mail that I sent to Dino.
(20)  And my position has not changed as far as that's
(21)  concerned. Dino shared with me all of what he assumed
(22)  to be the facts related to what was going on between
(23)  he, Dr. Sauceda and the board. No question about it.
(24)  And I never -- as a matter of fact, in that e-mail, I
(25)  indicated that not only was I in support of him, that

Page 128

(1)   I believed that he probably had done quite a bit of
(2)   research and felt very confident that the facts that
(3)   he had gathered were, in fact, to be true. And I
(4)   never did dispute that. All I did was support Dino in
(5)   terms of trying to make sure that he was still in the
(6)   loop in terms of his compensation and at the same time
(7)   followed Dr. Sauceda's request.
(8)   Q.   You go on to say, "It is Dino's belief that
(9)   this has been done by the superintendent without
(10)  proper justification." Then you say, "Based on what I
(11)  know, Dino has done nothing wrong to prompt this
(12)  decision by the superintendent." Is that what you
(13)  were just talking about?
(14)  A.   Absolutely.
(15)  Q.   Okay. So you still agree Dino had done
(16)  nothing wrong to prompt the decision by the
(17)  superintendent?
(18)  MS. LEEDS:   Object to the form;
(19)  speculation.
(20)  THE WITNESS:   Would you restate the
(21)  question?
(22)  Q.   (By Mr. Aguilar) Sure. My question to you
(23)  is -- you had said Dino had done nothing wrong to
(24)  prompt the decision by the superintendent. I'm asking
(25)  you, is that still your understanding?

Page 129

(1)   MS. LEEDS:   Same objection.
(2)   THE WITNESS:   My understanding is that
(3)   prior to correspondence that Dino may have sent to
(4)   members of the board or employees of the school
(5)   district, prior to that time, I don't think Dino had
(6)   done anything improper. As a matter of fact, I think
(7)   he did a fine job.
(8)   Q.   (By Mr. Aguilar) Okay. Did you help him
(9)   challenge -- did you help Dino challenge the
(10)  superintendent's decision any?
(11)  A.   It was not my place to do so.
(12)  Q.   So that means no?
(13)  A.   It means it wasn't my place to do so.
(14)  Q.   I'm not asking about your place. I'm asking
(15)  whether you did anything to help Dino challenge the
(16)  superintendent's decision.
(17)  A.   It work with yes. No.
(18)  Q.   Thank you. You go on to say, "In the event
(19)  that circumstances change and Dino regains his working
(20)  relationship with the district as before, then he and
(21)  his team will immediately reassume the lead role in
(22)  this account." That never happened, right? He never
(23)  reassumed his lead role in the account?
(24)  A.   I think we're talking about a window of time
(25)  between the 29th of November and sometime in early

Page 130

(1)   January or late December. And during that time frame,
(2)   as a result of Dr. Sauceda's letter and the
(3)   controversy, he did not resume -- what I was referring
(4)   to is that if that set of circumstances changed, Dino
(5)   would have continued at the same capacity he always
(6)   worked in with that particular account.
(7)   Q.   You're saying, if the situation had changed
(8)   between November of 2001 and the end of January, 2002;
(9)   is that what you're talking about?
(10)  A.   That's not what I'm saying. What I'm saying
(11)  is there was a situation that we're all aware of that
(12)  occurred between the 29th of November, I believe, and
(13)  the end of that year, 2001, I believe to be the year.
(14)  If that set of circumstances was not present, there
(15)  would be no change whatsoever in anything that Dino
(16)  was doing --
(17)  Q.   You mean --
(18)  A.   -- as it relates to this account.
(19)  Q.   You mean if nothing ever happened, correct?
(20)  A.   No.
(21)  Q.   What you said here, though, is, in the event
(22)  that circumstances change and Dino regains his working
(23)  relationship with the district as before, then he and
(24)  his team will immediately assume the lead role in this
(25)  account. What my question was -- is, Dino never did

Page 131

(1)   get to reassume the lead role in this account, did he?
(2)   A.   He did not.
(3)   Q.   You go on to say, "BISD is the largest active
(4)   account in Texas and it is your job to preserve the
(5)   business first and foremost." Can you explain what
(6)   you meant by that? First of all, as far as the
(7)   largest active account in Texas Central --
(8)   A.   Correct.
(9)   Q.   -- explain how big Central Texas is. Explain
(10)  the area.
(11)  A.   It's a geographical area that runs north and
(12)  south from Temple, Texas to Brownsville and east and
(13)  west from Bryan-College Station to Laredo.
(14)  Q.   Okay. And it's the -- you said BISD was the
(15)  largest active account in that area?
(16)  A.   In Texas Central, yes.
(17)  Q.   Okay. So Dino was able to actually -- and
(18)  Dino, you said, was the one who secured the account?
(19)  A.   I could not verify that because I was not
(20)  Dino's immediate supervisor at the time that the
(21)  account was secured.
(22)  Q.   Well, I thought you had said up here
(23)  somewhere --
(24)  A.   It's my understanding, but I couldn't verify
(25)  that that's what took place other than it was my

Page 132

(1)   understanding that he secured the account.
(2)   Q.   Okay.
(3)   A.   I'm not going to dispute that.
(4)   Q.   It was through Dino's work that that account
(5)   was secured and that account being the largest account
(6)   in Texas Central?
(7)   A.   Again, I was not there when the account was
(8)   secured.
(9)   Q.   Okay.
(10)  A.   It's my understanding that Dino secured the
(11)  account, but I was not involved with Dino on a working
(12)  relationship at that time.
(13)  Q.   Okay. Being the biggest account in -- was
(14)  Texas Central the region you worked in?
(15)  A.   Texas Central is a state -- is a part of
(16)  Texas, but its own independent state, and that is the
(17)  one that I work with, yes.
(18)  Q.   Are you in charge of the entire state of
(19)  Texas or just Texas Central?
(20)  A.   Just Texas Central.
(21)  Q.   Okay. So Dino's account was the largest
(22)  account in your district? Or your region, I think.
(23)  A.   State.
(24)  Q.   Your state?
(25)  A.   Yes, sir.

Page 133

(1)    Q.   Okay. So obviously it was very important for
(2) you and AFLAC to maintain that business no matter what
(3) it took?
(4)    A.   Probably more important for Dino and AFLAC
(5) than it was for me personally.
(6)    MS. LEEDS:   Object to form.
(7)    Q.   (By Mr. Aguilar) Because they got more money
(8) than you did out of it?
(9)    A.   Well, I had only been involved with it,
(10) truly, one year at that point in time. And the group
(11) itself had been secured for several years.
(12)    Q.   Okay. And you saw it as your job to make
(13) sure, first and foremost, that that account did not
(14) get lost to AFLAC?
(15)    A.   My job is to preserve the company's business
(16) regardless of the account size or renewing premium.
(17)    Q.   And regardless of how it might affect Dino,
(18) even?
(19)    A.   That wasn't a question.
(20)    MS. LEEDS:   That's true.
(21)    THE WITNESS:   That was a statement.
(22)    MS. LEEDS:   You've got good grammar.
(23)    Q.   (By Mr. Aguilar) The question is, is that
(24) true?
(25)    A.   Would you put it in the form of a question,

Page 134

(1) please?
(2)    Q.   Sure. You said your job, first and foremost,
(3) was to preserve the business for AFLAC even if it
(4) eventually injured Dino –
(5)    MR. STEELE:   Objection.
(6)    Q.   – isn't that true?
(7)    A.   No.
(8)    MS. LEEDS:   Object to the form.
(9)    Q.   (By Mr. Aguilar) It was, first and foremost,
(10) your job to preserve the business?
(11)    A.   That's correct.
(12)    Q.   Okay. And the consequences of preserving the
(13) business, if it meant Dino had to step out, then that
(14) was a sacrifice you were willing to make?
(15)    A.   No.
(16)    Q.   Well, that is what happened, isn't it?
(17)    A.   Actually, my attempt was to circumvent that
(18) completely. I had been asked by Dr. Sauceda, who is
(19) the only person that I knew at the school district and
(20) he was the superintendent, to remove Dino. I complied
(21) with his request, but unbeknownst to Dr. Sauceda, my
(22) plan was to, A, preserve the business so Dino would
(23) continue to receive his renewal income that was in his
(24) favor; B, preserve the business and the ongoing
(25) relationship so that Dino would continue to be

Page 135

(1) compensated at some degree for future sales that were
(2) made in that case, and build and develop his renewals,
(3) as opposed to the reverse of that, which would have
(4) cost him a considerable amount of money because when a
(5) group is secured, and you would have to check the
(6) company record, it's typical for the annualized
(7) premium that's sold to decrease over the years, not
(8) increase, even though new sales are made. And so
(9) Dino's income, had he not been involved at that
(10) capacity, which I was trying to put together, would
(11) have continually decreased over the years.
(12)    MR. AGUILAR:   Objection; nonresponsive.
(13)    Q.   (By Mr. Aguilar) My question had to do with
(14) to what extent you were going to try to – to what
(15) extent it was more important to save the account than
(16) to help Dino to save the account?
(17)    A.   It was more important to save the account for
(18) Dino Chavez and for AFLAC than it was for Frank
(19) LaFemina.
(20)    Q.   Okay.
(21)    A.   However, the decision was made – made based
(22) on Dr. Sauceda's request.
(23)    Q.   Okay. However, Dino was pulled out of this
(24) account by December 4, 2001, right?
(25)    A.   I can't verify the date.

Page 136

(1)    Q.   Do you remember talking to Dino on or about
(2) December – the first week of December, December 1
(3) through December 7?
(4)    A.   I think we probably had two or three
(5) conversations.
(6)    Q.   Do you remember telling him to step out of
(7) the account, step out of working on the account?
(8)    A.   I asked him to honor Dr. Sauceda's request.
(9)    Q.   Okay. And shortly after that, Dino got a
(10) letter of termination from AFLAC on that account,
(11) didn't he?
(12)    A.   I wouldn't have sent it out, so I don't know.
(13)    Q.   You just don't know?
(14)    A.   If he got a letter, I don't know who sent the
(15) letter. I don't know when it was received. It
(16) would be handled by corporate. I'm sure he got a
(17) letter.
(18)    Q.   To what extent did you ever make any effort
(19) to go to Dr. Sauceda and say, look, we need Dino on
(20) this account? Did you ever do that?
(21)    A.   I never made an attempt to talk to
(22) Dr. Sauceda because what I tried to accomplish, which
(23) is outlined very clearly here and in all my
(24) correspondence to Dino, was to honor Dr. Sauceda's
(25) request – there was an obvious problem there or a

Page 137

(1) challenge or a personality conflict – and to keep
(2) Dino from losing his compensation and for AFLAC from
(3) losing the group.
(4)    Q.   Did you ever go to anyone else and say, look,
(5) we need to keep Dino on this account?
(6)    A.   I did not.
(7)    Q.   Okay. You go on to say, last two sentences,
(8) "I will not hesitate to request a termination of
(9) anyone who attempts to undermine my plan as it relates
(10) to this case. Please follow through properly." What
(11) did you mean by that?
(12)    A.   I think it's self-explanatory.
(13)    Q.   You were willing to terminate anybody who
(14) interfered with your ability to first and foremost
(15) preserve the business?
(16)    MS. LEEDS:   Object to the form.
(17)    THE WITNESS:   Anybody that would have
(18) circumvented the agreement that I made with
(19) Dr. Sauceda, which was to honor his request and have
(20) Dino and his team removed from the campus and
(21) discontinue any professional function with them as a
(22) representative of AFLAC.
(23)    Q.   (By Mr. Aguilar) Okay.
(24) (Exhibit No. 3
(25) (marked for identification.

Page 138

(1)    Q.   (By Mr. Aguilar) I hand you what I've marked
(2) as Exhibit 3. Do you recognize that document?
(3)    A.   I do.
(4)    Q.   Can you tell us what it is?
(5)    A.   It's an e-mail that I sent to Mr. Chavez
(6) after we had a fairly lengthy conversation about this
(7) entire situation.
(8)    Q.   It's dated December 2, 2001, right?
(9)    A.   Uh-huh. I believe that's Sunday,
(10) December 2nd, 2001. That's correct.
(11)    Q.   Is this the memo you were talking about
(12) earlier? You said you thought there was some other –
(13) something else that could put the first memo,
(14) Exhibit 2, that we were talking about, in perspective.
(15)    A.   No, I think that the previous memo that we
(16) discussed or e-mail pretty much outlines the plan that
(17) I had for preserving the business and moving forward.
(18) And this is correspondence which is personally from
(19) myself directly to Dino.
(20)    Q.   Okay. Now, you had just referenced another
(21) e-mail earlier.
(22)    A.   That's the one I was talking about.
(23)    Q.   Okay. You start off the letter saying, "I
(24) have not rested well since I last spoke to you." Can
(25) you tell us why that happened?

**Page 139**

(1) A. Because I felt to Dino. I was sympathetic
(2) to his situation.
(3) Q. Which was?
(4) A. It's clearly stated in the other document. I
(5) don't think he did – I don't think that Dino did
(6) anything wrong prior to the confrontation with the
(7) school board to bring this about.
(8) Q. You go on in the next paragraph to say, "To
(9) begin with, if I were you I would more than likely
(10) feel exactly as you do regarding this entire
(11) situation. I believe you and I believe in you.
(12) Knowing you as I do leaves little doubt in my mind
(13) that your research and persistence, coupled with your
(14) meticulous nature, have led you to the conclusions and
(15) others." Have you always known Dino to be thorough
(16) and meticulous, I guess as you say, in his research
(17) and meticulous, I guess as you say, in his research
(18) and investigation?
(19) A. I know what I said here. And that's what I
(20) meant.
(21) Q. You go on – towards the middle of this
(22) e-mail, and you say, "In the end, if that becomes the
(23) case, you will have won the battle and lost the war.
(24) Your name in the community will have controversy
(25) attached to it and all those that listen will get an

**Page 140**

(1) earful from your adversaries, thus worsening the
(2) situation for you in the future. You and I both know
(3) that if these people are the type of people you claim
(4) they are, they will stop at nothing." Can you explain
(5) what you meant?
(6) A. It's self-explanatory.
(7) Q. What did you mean by, he will have won the
(8) battle and lost the war?
(9) A. I think that although I believed that Dino
(10) was probably on the right track, which was assumptive
(11) on my part, that even though he may have proved his
(12) point, he would have weakened his position overall.
(13) And that, again, was assumptive on my part as well.
(14) Q. Okay. You go in the next paragraph to say,
(15) "You may even persuade all those involved that you are
(16) right and they are wrong but you will gain nothing. I
(17) cannot and AFLAC cannot condone you badgering these
(18) individuals with their own employee population." What
(19) did you mean by, I cannot and AFLAC cannot condone him
(20) badgering the individuals with their employees?
(21) A. Again, I can't really speak on behalf of
(22) AFLAC, but what I meant by that was that myself and I
(23) believe the company in unison with me would not
(24) condone an individual that's appointed with us
(25) rallying the rank and file against the upper

**Page 141**

(1) management or board of directors. And it was my
(2) understanding that that's what was taking place.
(3) Q. Okay. You go on to say, "You are caught in a
(4) terrible catch-22 and I do not admire your position.
(5) You are being driven by principle which can be
(6) dangerous." What's the catch-22 that you saw it?
(7) A. The catch-22 is the fact that, you know, I
(8) think –
(9) Q. What you just explained, in other words?
(10) A. I believe Dino had a good point, you know. I
(11) just think he was pursuing it in a way that could have
(12) been handled differently.
(13) Q. Okay. Dino had the largest account in Texas
(14) Central and it was being taken away from him, right?
(15) MS. LEEDS: Object to the form.
(16) THE WITNESS: I'm not sure how to answer
(17) that question. I think – I think Dr. Sauceda was
(18) asking that he not no longer handle the account.
(19) Q. (By Mr. Aguilar) And the account did get
(20) taken away from him, right?
(21) A. The account was reassigned to AFLAC's
(22) headquarters.
(23) Q. Okay. If you were in Dino's situation, would
(24) you have tried to do whatever you could to try to get
(25) that account back to try to hold on to your job?

**Page 142**

(1) MS. LEEDS: Objection; speculation.
(2) THE WITNESS: No.
(3) Q. (By Mr. Aguilar) You wouldn't have?
(4) A. I wouldn't have done anything.
(5) Q. You would have just said, oh, well?
(6) A. No. I would have done what I thought was
(7) necessary, but I wouldn't have done just anything,
(8) which I believe is the question you asked.
(9) Q. Okay. You had gone on to say, "If you only
(10) knew how much we are alike when it comes to this sort
(11) of thing it would frighten you. I am speaking to you
(12) from firsthand experience." What's the firsthand
(13) experience you were referring to?
(14) A. I've let my pride get in the way of good
(15) long-term decisions in the past in my professional
(16) career.
(17) Q. Okay. You go on to say, "I have a job to do.
(18) That job consists first and foremost of protecting the
(19) client and AFLAC, the corporation. I will not
(20) disrespect my obligations to either." Basically, you
(21) didn't think Dino had done anything wrong, right?
(22) MR. STEELE: Objection; misstates his
(23) testimony.
(24) MS. LEEDS: Join.
(25) Q. (By Mr. Aguilar) You can answer the

**Page 143**

(1) question.
(2) A. Ask it again, please.
(3) Q. You didn't think Dino did anything wrong, did
(4) you?
(5) MS. LEEDS: Object to the form.
(6) THE WITNESS: Not prior to the –
(7) Q. (By Mr. Aguilar) Prior to November 29th?
(8) A. Correct.
(9) MR. STEELE: Prior to – I believe what
(10) he said was prior to the conversation –
(11) Q. (By Mr. Aguilar) To the extent the
(12) conversation is reflecting on whatever it is you might
(13) want to talk about. I'm just saying the date is prior
(14) to November 29th?
(15) MS. LEEDS: Object to side bar.
(16) THE WITNESS: No, I'm not going to agree
(17) to that date.
(18) Q. (By Mr. Aguilar) Okay. Why not? Because of
(19) what your attorney just told you?
(20) A. No. Because I don't know when the trouble
(21) started, if there was. I don't know when it started.
(22) I know that I got a letter on November 29th. The
(23) letter was the result of some trouble that had to be
(24) prior to that time.
(25) MR. STEELE: Right.

**Page 144**

(1) Q. (By Mr. Aguilar) So prior to what time are
(2) you talking about that you don't think he did anything
(3) wrong?
(4) A. To some time prior to my receiving the
(5) letter. Okay?
(6) Q. What's the – at what point do you think Dino
(7) did do something wrong?
(8) A. I don't know when that was. I know that he
(9) sent correspondence to board members and he sent
(10) correspondence to other people that may have been of
(11) some influence within the Brownsville Independent
(12) School District, and I know that that's what got the
(13) superintendent upset and that's what generated the
(14) letter.
(15) Q. Okay.
(16) A. I can't tell you when or how.
(17) Q. Okay. That's good enough. What I was going
(18) to ask is, what you saw him doing wrong was sending
(19) the letters?
(20) A. I didn't see him doing that wrong.
(21) Dr. Sauceda saw him doing it wrong.
(22) Q. You didn't think there was anything wrong
(23) with that, but Dr. Sauceda –
(24) A. I didn't condone it one way or the other.
(25) Had I known those letters were going out, I would have

**Page 145**

(1) told Dino to seek legal counsel from AFLAC.
(2) Q. And even though you didn't see him doing
(3) anything wrong, basically you had to push him aside
(4) and –
(5) MR. STEELE: Objection.
(6) MR. AGUILAR: If I could ask my
(7) question, please.
(8) Q. (By Mr. Aguilar) Even though you didn't see
(9) him having done anything wrong, Dino had to be pushed
(10) aside so that the AFLAC account could be saved; isn't
(11) that correct?
(12) MR. STEELE: Objection.
(13) MS. LEEDS: Object to form.
(14) MR. STEELE: Misstates the testimony.
(15) Continues to misstate his testimony. Because you're
(16) leaving critical statements that this witness has
(17) made, Arnold, purposely leaving them out, trying to
(18) mislead this witness. You know that's wrong. I'm
(19) tired of putting up with it. He's continued now three
(20) different questions three different ways to say, I
(21) didn't say that. Up to a point in time when Dino sent
(22) out letters to campus representatives that he caused
(23) the trouble. Put that in your question and I won't
(24) object. But when you leave out critical evidence,
(25) that's misrepresenting your position and your role in

**Page 146**

(1) front of this court. I don't appreciate it and I'm
(2) sick of it happening and that's my objection. Thank
(3) you.
(4) MR. AGUILAR: Buddy, you don't have
(5) to – just ask him the questions you want.
(6) MS. LEEDS: Join.
(7) MR. AGUILAR: And when I'm done asking
(8) him questions, you can rephrase it, have him clarify
(9) any questions as you want. For now, I'm entitled to
(10) ask him the questions as I feel. And I'm trying to
(11) get certain information from him, not from you.
(12) MR. STEELE: I completely understand
(13) what you're trying to do and it's not as you say
(14) because you continue to misstate his testimony in the
(15) precedent – in the predicate you're setting in your
(16) question. I'm going to take a break and go cool off
(17) because I don't appreciate that tactic.
(18) MR. AGUILAR: And since you're walking
(19) out of the door right now, I'll go ahead and stop the
(20) deposition at this time.
(21) MR. STEELE: Thank you.
(22) (Brief Recess)
(23) Q. (By Mr. Aguilar) Okay. Before we took a
(24) break, I was asking you about Dino's position at
(25) AFLAC. My question is, if it was necessary to push

**Page 147**

(1) out Dino in order to keep the BISD account, were you
(2) willing to do so?
(3) MS. LEEDS: Object to form.
(4) MR. STEELE: Objection; form.
(5) THE WITNESS: I would never push anybody
(6) out, Dino included.
(7) Q. (By Mr. Aguilar) Well –
(8) A. Dr. Sauceda pushed Dino out.
(9) Q. Okay. And you just had to go along with that
(10) decision?
(11) A. I complied with the request of the
(12) superintendent of the school district.
(13) MS. NEALLY: Object to the
(14) responsiveness of the answer.
(15) Q. (By Mr. Aguilar) How long has BISD been an
(16) AFLAC insurance consumer?
(17) A. To the best of my knowledge, since 1998.
(18) Q. How many times have you visited with any of
(19) the BISD administration prior to December of 2001?
(20) A. I don't know that I ever did.
(21) Q. How many times have you ever handled any
(22) problem involving BISD prior to December of 2001?
(23) A. Ask the question again, please.
(24) Q. Sure. How many times did you ever handle any
(25) problems involving BISD prior to 2001?

**Page 148**

(1) A. Possibly once or twice.
(2) Q. And what kind of problems would those have
(3) been?
(4) A. I'm not sure that they would be categorized
(5) as problems, just issues.
(6) Q. Just more like an issue, like somebody has a
(7) question on one of their policies, what's covered,
(8) what's not covered?
(9) A. No, no. This would be internal. I never –
(10) I never dealt with the policyholders.
(11) Q. Okay. How many times has any other AFLAC
(12) personnel visited with BISD to handle any problem
(13) prior to December 2001?
(14) Q. Can you be specific about the personnel?
(15) Q. Any kind of personnel. Well –
(16) A. I'm sure that Dino has.
(17) MS. LEEDS: Object to the form.
(18) Q. (By Mr. Aguilar) I'm not talking about Dino.
(19) MS. LEEDS: Speculation.
(20) Q. (By Mr. Aguilar) I'm not talking about Dino.
(21) In fact, Dino wouldn't be a personnel because he's an
(22) independent contractor, right?
(23) A. Yeah.
(24) Q. Okay. So AFLAC personnel, first of all.
(25) MS. LEEDS: Object to the form.

**Page 149**

(1) Q. (By Mr. Aguilar) Are you aware of any that
(2) would have visited with BISD?
(3) MS. LEEDS: Speculation.
(4) THE WITNESS: You'll have to define
(5) personnel now for me.
(6) Q. (By Mr. Aguilar) Okay. And it gets a little
(7) confusing because AFLAC works through a lot of agents
(8) and RSCs and DSCs and stuff like that, right?
(9) A. Yes.
(10) Q. Is that why you were having trouble with the
(11) definition?
(12) A. You asked me if Dino was an independent
(13) contractor. He is and I am. And then you're using
(14) the word personnel. And if they're someone other than
(15) an independent contractor, I don't know who those
(16) people would be.
(17) Q. For example, home office.
(18) A. Home office would be AFLAC employees.
(19) Q. Okay. And nobody from them ever came down to
(20) BISD to handle any problems, right?
(21) MS. LEEDS: Object to the form;
(22) speculation.
(23) THE WITNESS: That's incorrect.
(24) Q. (By Mr. Aguilar) Before December 2001.
(25) A. I don't know the date, but I know someone

**Page 150**

(1) from our corporate office went to the account.
(2) Q. For what? For what reason?
(3) A. To help them internally with billing issues
(4) and things of that nature, which had evidently been a
(5) problem for them to some extent.
(6) Q. Do you remember when that was?
(7) A. No.
(8) Q. Was it in 2001, 2000?
(9) A. I don't remember.
(10) Q. You don't remember – you don't even remember
(11) the year?
(12) A. I don't.
(13) Q. Okay. Other than that one issue, that
(14) billing issue, do you know any other time in which any
(15) AFLAC personnel, for example, from home office ever
(16) came down to BISD to handle any problems?
(17) MS. LEEDS: Objection; speculation.
(18) THE WITNESS: I can't recall any other
(19) person but the one person that I referred to.
(20) Q. (By Mr. Aguilar) Other than Mr. Chavez, do
(21) you – I think you said – I'm sorry. I forgot what
(22) you said. You said you hadn't been down to BISD to
(23) handle any problems down there –
(24) A. No.
(25) Q. – prior to December 2001?

Page 151

(1) A. Not to my recollection.
(2) Q. Did any other DSC, RSC or SSC ever go down to
(3) BISD to handle any problems prior to December 2001?
(4) MS. LEEDS: Object to the form;
(5) speculation.
(6) THE WITNESS: I can't tell you who was
(7) or who wasn't there.
(8) Q. (By Mr. Aguilar) I'm just asking for your
(9) knowledge.
(10) A. Other than Mr. Chavez.
(11) Q. Right. I'm just asking about your knowledge.
(12) In other words, if you say, I don't know of any,
(13) then – in other words, if there's none that you know
(14) about, then that's your answer, I think. That's just
(15) what I'm trying to find out.
(16) A. No, that is not my answer. My answer would
(17) be that in addition to Dino, I'm sure that several
(18) district sales coordinators and several management
(19) associates have dealt with the school district.
(20) Q. Okay. And who was the other district sales
(21) coordinator?
(22) A. I don't know. I couldn't say specifically.
(23) I could take a stab at it, but I'm not sure it would
(24) be accurate.
(25) Q. Your best estimate is who?

Page 152

(1) A. By name?
(2) Q. Yes.
(3) A. Daniel Sanchez.
(4) Q. Okay.
(5) A. Lynn Davis or Susan Lynn Davis, Dennis
(6) Escobar.
(7) Q. Are these the DSCs that were under Dino?
(8) A. Yes.
(9) Q. Under Dino as an RSC?
(10) A. Yes.
(11) Q. Okay.
(12) A. Uh-huh.
(13) Q. Anybody else who was not directly under Dino?
(14) A. Prior to?
(15) Q. 2001, December 2001.
(16) A. Not that I could say for sure.
(17) Q. Okay. Do you know how many times Dino
(18) visited with BISD personnel to handle questions,
(19) claims, problems, anything like that?
(20) A. No.
(21) Q. Okay. Practically speaking, he was the one
(22) in charge of handling all those issues, right?
(23) A. I don't know.
(24) Q. Based on your understanding as the person who
(25) got this account and who was the – basically the

Page 153

(1) servicing agent for that account, do you know who was
(2) handling all those problems – who was supposed to be
(3) handling all those problems, concerns or questions?
(4) A. I think it was handled by a committee.
(5) Q. And the committee was?
(6) A. Dino himself handled some, his staff at his
(7) office, which, to my knowledge, would have been his
(8) mother and his wife, his liaisons with our corporate
(9) office in the billing and Flex One departments, that
(10) sort of thing.
(11) Q. Okay. Now, when you were talking to
(12) Mr. Chavez during – I believe it was December of 2001
(13) on whether he was going to be staying on and to what
(14) extent he was going to be staying on in handling this
(15) account – I'm just trying to refer you to that time
(16) period of what was going on, you mentioned I think
(17) last time that, and also this time, that you were
(18) trying to help Dino keep the business, right?
(19) A. That's correct.
(20) Q. Okay. And part of that meant that, look,
(21) we're going to try to get through this difficult time
(22) period right now and then you get to take over later?
(23) Dino gets to take over later, right?
(24) A. I think – I don't think I ever said that. I
(25) think what I wrote was that if the situation changes,

Page 154

(1) then I don't see why – I see no reason Dino
(2) shouldn't, you know, be put back in. But that
(3) decision would not be mine ultimately.
(4) Q. Okay. And the sales that are made –
(5) 90-plus percent of all sales of the AFLAC products are
(6) made during the enrollment period, right?
(7) A. I can't testify to that one way or the other.
(8) There's sales that are made all year long and I'm not
(9) sure to what extent. I know that a larger volume of
(10) sales would be made during an official open enrollment
(11) than any other time.
(12) Q. And I'm talking about just BISD. Is that
(13) what you were talking about, too?
(14) A. Yeah.
(15) Q. Okay. And it's the sales of the products
(16) during that time period that sustains the agents,
(17) RSCs, DSCs, the agents throughout the year, correct?
(18) A. No.
(19) MS. LEEDS: Object to the form.
(20) Q. (By Mr. Aguilar) When they make those
(21) sales – whenever you make a sale – let's put it this
(22) way. Whenever you make a sale, that's when your
(23) percent of commission is determined – to be
(24) determined, right?
(25) A. No. Your percent of commission will be

Page 155

(1) determined prior to your sale based on your
(2) contractual agreement –
(3) Q. Right.
(4) A. – with AFLAC.
(5) Q. But depending on how much you actually sell
(6) is how much you're going to be getting off that
(7) particular sale, right?
(8) MR. STEELE: Object to form.
(9) THE WITNESS: You would – you would be
(10) getting off any sale what your contractual commission
(11) agreement was.
(12) Q. (By Mr. Aguilar) Right. And I'm not asking
(13) about the contract. I'm just saying, you know, once
(14) you make a sale that's going to determine what you're
(15) going to make?
(16) A. No. That's not what I said. It's determined
(17) before you make your sale what you're going to make.
(18) Q. I think we're talking about the same thing.
(19) I'm not talking about the contract, how it's decided
(20) what percent and all that sort of stuff. I'm just
(21) talking about, you don't make any money until you make
(22) a sale?
(23) A. That's an accurate statement.
(24) Q. Okay. That's what I was talking about. And
(25) once you make those sales, if the greater portion of

Page 156

(1) those sales are made during the enrollment period,
(2) you've still got to service the account throughout the
(3) year, right?
(4) A. Regardless of whether sales were made or not,
(5) you would service the account throughout the year.
(6) Q. Okay. Well, servicing the account is for
(7) accounts that are purchased, right? In other words,
(8) servicing the account means for the people who
(9) purchase –
(10) A. No.
(11) Q. What does it mean?
(12) A. Service defined by AFLAC is a call made in
(13) person to resolve any number of issues, which include
(14) making a sale, handling a bookkeeping matter, a claim,
(15) introduction of a new product or a general visit to
(16) discuss any issues they might have. That's AFLAC's
(17) definition of service.
(18) Q. Now, Dino had been getting – splitting
(19) commissions with the agents, the associates, and
(20) receiving 30 percent of each of their sales for the
(21) two prior years, correct, or something around
(22) 30 percent?
(23) A. The only thing that I can say with regard to
(24) that – or answer with regard to that question is that
(25) I believe the first year that I was the state sales

Page 157

(1) coordinator, Dino received some split of commission on
(2) business that was sold.
(3)    Q.    Okay. You're just not sure what that amount
(4) is, what the split was?
(5)    A.    I am sure that it was an amount that was in
(6) addition to his override commissions.
(7)    Q.    Okay. But you don't know how much it was,
(8) the split?
(9)    A.    Not right offhand. I would have to pull a
(10) record or be provided a record to confirm that.
(11)    Q.    Okay. Do you know why Dino was asking for
(12) that split?
(13)    A.    No.
(14)    Q.    And you don't know how much work Dino did in
(15) his office on a day-to-day basis to handle the
(16) account, right?
(17)    A.    Wrong. I knew.
(18)    Q.    You do know what he was doing on a day-to-day
(19) basis?
(20)    A.    Pretty much.
(21)    Q.    Because you were there?
(22)    A.    No. We talked regularly.
(23)    Q.    Okay.
(24)    A.    I had been to his office numerous times –
(25)    Q.    Okay.

Page 158

(1)    A.    – while employees came from Brownsville to
(2) his office.
(3)    Q.    So tell us, if you would, just generally,
(4) what was it that he would do on a day-to-day basis to
(5) handle the accounts.
(6)    A.    He would deal with whatever service issues
(7) came up, whether it be via telephone, fax or a phone
(8) call to – walk-in into his office. He would also be
(9) assisted by whoever was there at his office to assist
(10) him.
(11)    Q.    Okay. Did you have any concern or problem ·
(12) with Dino continuing to take a 30 percent split on
(13) sales by agents?
(14)    A.    Personally, I had no problem with it. But
(15) conceptually for Dino's sales team, I had an issue
(16) with it.
(17)    Q.    And if the sales team agreed to it, would you
(18) have any concern with it?
(19)    A.    Yes.
(20)    Q.    Okay. What was that concern?
(21)    A.    The concern – Dino's sales team was not the
(22) only sales team I was responsible for in the state,
(23) and what I like to do is make sure that everyone is
(24) following the same –
(25)    Q.    Same page, same procedure?

Page 159

(1)    A.    Exactly. And part –
(2)    MS. LEEDS:    Object to the form. Let him
(3) finish his answer.
(4)    THE WITNESS:    Part of that was that my
(5) philosophy about our business in terms of regional
(6) sales coordinator and above is that they should not be
(7) involved in personal production because they're
(8) viewed, generally speaking, by the sales force as
(9) internal competition. For instance, as a state sales
(10) coordinator, I can't sell business. I'm prohibited
(11) from doing so.
(12)    Q.    (By Mr. Aguilar) In terms of handling client
(13) complaints, questions, concerns, things like that, do
(14) you know how much Dino handled in relation or
(15) comparison to the actual agents who were doing the
(16) enrollments?
(17)    A.    I would assume that that would be consistent
(18) with what's done with any account we have regardless
(19) of size, which means the person that sold the policy
(20) typically services the policyholder with the issue.
(21)    Q.    Okay. So if you go into an enrollment,
(22) you've got an agent who's actually signing the policy,
(23) he's the one that – I forget what the term is, the
(24) person of the agent. What do you call them?
(25)    A.    Associate.

Page 160

(1)    Q.    He's the associate who's selling the policy
(2) and he's supposed to be the one who's servicing the
(3) account throughout the year, right?
(4)    A.    He should – he or she should be servicing
(5) the policies that they sold.
(6)    Q.    That they sold. Were you aware that, in
(7) fact, Dino was the one who was servicing all those
(8) accounts that were sold during the enrollment period
(9) and not the individual agents who did the enrollments?
(10)    A.    Quite the contrary. I know it to be a fact
(11) that everyone took a part in servicing the account.
(12)    Q.    Okay. And that gets back to the original
(13) question I had asked a while ago, which was, to what
(14) degree are you aware that Dino serviced those accounts
(15) versus the individual agents who sold the policies at
(16) the enrollments?
(17)    A.    I'm aware that Dino supervised the people
(18) that serviced the account and he handled more
(19) sensitive issues, which would have been higher level
(20) negotiations with board members and things of that
(21) nature.
(22)    Q.    Okay. As far as handling the day-to-day
(23) complaints that the employees might have had or
(24) concerns they might have had, can you tell us, based
(25) on your own personal knowledge, how much of that Dino

Page 161

(1) handled and how much the individual agents handled?
(2)    A.    Again, Dino was the regional sales
(3) coordinator supervising a team of servicing agents
(4) that handled that account. There were many people
(5) that worked in the Brownsville School District. I
(6) cannot tell you how many, per se, you know, to the
(7) letter. But Dino was their supervisor and he handled
(8) board meetings and issues with the board and things of
(9) that nature. And I'm certain that if somebody had a
(10) complaint and Dino picked up the phone, that he would
(11) handle the complaint as well.
(12)    MR. AGUILAR:    Objection; nonresponsive.
(13)    Q.    (By Mr. Aguilar) My question was, can you
(14) tell us, from your own personal knowledge, what the
(15) percentage was or the amount was that Dino handled of
(16) those day-to-day complaints versus from what the
(17) employees versus what the individual agents handle?
(18) Can you tell us based on your own personal knowledge?
(19)    A.    No.
(20)    Q.    I'm handing you what was previously marked as
(21) Chavez Exhibit 35. Let me give you a chance to review
(22) that, if you could.
(23)    A.    I'm familiar with the document.
(24)    Q.    This is a letter from Mr. Chavez to Mr. Amos
(25) dated December 2, 2001, correct?

Page 162

(1)    A.    Yes, sir.
(2)    A.    I'm sorry. What was the
(3) date?
(4)    MR. AGUILAR:    December 2, 2001.
(5)    Q.    (By Mr. Aguilar) If you could, go down to
(6) the third paragraph on the first page. He indicates,
(7) "In the course of my actions to preserve the business,
(8) the school's superintendent, who openly supported
(9) NPA" – and let me represent to you NPA –
(10)    A.    I know who they are.
(11)    Q.    Okay. I'm just saying, you know what the
(12) company is, National Plan Administrators?
(13)    A.    Correct.
(14)    Q.    Okay – "made a request to our state
(15) coordinator, Frank LaFemina, to have me removed from
(16) the case." And before we get too confused on that
(17) question, basically all that says is that NPA – I'm
(18) sorry, the superintendent entered – who supported
(19) NPA, made a request to you to have Dino removed.
(20)    MS. LEEDS:    Object to the form.
(21)    Q.    (By Mr. Aguilar) That's what he's saying,
(22) right? Regardless –
(23)    A.    Well, I guess he's saying what he wrote.
(24)    Q.    Regardless of what he's saying he wrote. My
(25) question is just, are you – do you recall that?

Page 163

(1)   A.   Do I recall what?
(2)   Q.   Do you recall whether the superintendent made
(3) a request to you to have you removed from the case –
(4) to have him removed from the case?
(5)   A.   I think we've made it clear 100 times that
(6) Dr. Sauceda wrote a letter indicating his desire to
(7) have Dino removed.
(8)   Q.   Okay. Did you get a copy of this letter on
(9) or about December 2?
(10)   A.   I don't know.
(11)   Q.   You just don't recall one way or the other?
(12)   A.   I said I don't know.
(13)   MS. LEEDS:   Object to the form.
(14)   Q.   (By Mr. Aguilar) I'm trying to understand
(15) what you mean by "I don't know."
(16)   A.   Exactly what I said, Arnold. I do not know.
(17)   Q.   Are you saying you just don't remember one
(18) way or the other –
(19)   A.   I'm saying I don't know.
(20)   Q.   That's as good as you can get? You just
(21) don't know?
(22)   A.   I think I don't know means I don't know. I
(23) don't know whether I got a copy of this letter or not.
(24) And that's the answer to your question.
(25)   Q.   He goes on to indicate that he was advised by

Page 164

(1) several members of the board of trustees that he had
(2) complied with all procedures. In addition, that the
(3) vote that was taken and the phone call that was made
(4) to you, your office, to award the business last Friday
(5) essentially reversed whatever the – whatever requests
(6) the superintendent made prior to the vote. Do you
(7) remember talking to somebody about that request?
(8)   A.   No.
(9)   Q.   Either Dino or Mr. Amos or anybody else at
(10) AFLAC?
(11)   A.   Dino and I may have discussed that and that's
(12) what he may be referring to, but you would have to
(13) confer with Dino to clarify that.
(14)   Q.   What action did you take after this vote was
(15) taken?
(16)   A.   My action didn't change. Dr. Sauceda asked
(17) to have Dino removed –
(18)   Q.   Okay.
(19)   A.   – and I complied with his request.
(20)   Q.   And I think you said earlier, absent
(21) information or notice from Dr. Sauceda, you weren't
(22) going to – you didn't feel you could take any other
(23) action?
(24)   A.   Exactly.
(25)   Q.   I'm handing what you I've marked as Chavez

Page 165

(1) Exhibit 38. Do you recognize that document?
(2)   A.   There were a lot of documents. I may have –
(3) may or may not have seen this. More than likely, I've
(4) seen it, but I can't say for sure.
(5)   Q.   This is a letter from Mr. Chavez addressed to
(6) Dan Amos, the president of AFLAC, dated December 4,
(7) 2001. He indicates in the third sentence, "As I
(8) reported to you yesterday" – apparently referring to
(9) the Chavez Exhibit 35 – "and feared would happen,
(10) Frank LaFemina, SSC, terminated me from my RSC
(11) position when I told him by phone that I had sent a
(12) letter to you for assistance." Do you remember
(13) talking to Mr. Chavez by phone on or about December 3?
(14)   A.   I do remember having a fairly lengthy
(15) conversation with Dino.
(16)   Q.   Do you remember telling him that he could
(17) consider himself fired as of that point?
(18)   A.   No, because I can't fire anybody. Don't have
(19) the authority to do so.
(20)   Q.   Do you remember talking to him about his
(21) continued work for AFLAC, selling AFLAC?
(22)   A.   No.
(23)   Q.   Do you remember telling him about any lawsuit
(24) he might file?
(25)   A.   No.

Page 166

(1)   Q.   Do you remember telling him that if you were
(2) brought into this lawsuit, that you would spend every
(3) last cent you had to ensure that Dino and his family
(4) have a miserable life?
(5)   A.   No.
(6)   Q.   He indicates that you had verbally threatened
(7) him and his family with physical harm. And I
(8) understand that refers to the comment that I just
(9) asked you about. He goes on to indicate, I –
(10)   A.   Could you cover that again, please?
(11)   Q.   Sure. He indicates, and I'll read, he
(12) verbally, meaning you, verbally threatened him and his
(13) family with physical harm. And I understand that that
(14) was a reference to the comment to make his life
(15) miserable. He also indicates, "I do fear for the
(16) physical safety of my family and my livelihood as an
(17) insurance professional." Now, you said you didn't
(18) remember when you received this letter either, right?
(19)   MS. LEEDS:   I need to object to the
(20) predicate.
(21)   MR. STEELE:   He doesn't know if he
(22) received it.
(23)   THE WITNESS:   I don't think I ever
(24) agreed that I received it.
(25)   Q.   (By Mr. Aguilar) Okay. Have you –

Page 167

(1)   A.   It wasn't sent to me, Arnold, and it doesn't
(2) show me as being copied.
(3)   Q.   Before this lawsuit was filed, do you
(4) remember seeing this letter?
(5)   A.   I think I'll answer the question the same
(6) way. It wasn't sent to me. I wasn't copied on it by
(7) way of – and we're talking about almost two years
(8) ago.
(9)   Q.   Okay.
(10)   A.   So I don't know.
(11)   Q.   So after this December 4 letter was sent out,
(12) Mr. Amos didn't contact you and say, hey, what's Dino
(13) talking about here; is that correct?
(14)   A.   Mr. Amos did not contact me, that is correct.
(15)   Q.   Okay. And Mr. Barnson didn't contact you and
(16) say, hey, what's Dino talking about here; is that
(17) correct?
(18)   A.   That's correct.
(19)   Q.   Okay. Do you have any other up-line
(20) supervisors that you report to?
(21)   A.   At that time?
(22)   Q.   At that time.
(23)   A.   I reported directly to Lynn Barnson.
(24)   Q.   Okay. Other than Mr. Barnson, anybody
(25) else?

Page 168

(1)   A.   At that time, I reported directly to Lynn
(2) Barnson.
(3)   Q.   I heard you the first time. I'm asking if
(4) you reported to anybody else?
(5)   A.   No.
(6)   Q.   So nobody ever approached you – let me ask
(7) you, did anybody else ever approach you and say, hey,
(8) this letter came across my desk. What's going on with
(9) this? What's Mr. Chavez talking about? Nobody else
(10) approached you on that?
(11)   A.   Yes, they did.
(12)   Q.   Who did?
(13)   A.   Jeff Willis.
(14)   Q.   Okay. And Jefferson Willis is an attorney
(15) sitting here, one of the attorneys for AFLAC, right?
(16)   A.   Yes, sir.
(17)   Q.   Okay. What did he approach you on? What did
(18) he ask you about?
(19)   MR. STEELE:   I'm going to object because
(20) that does get into attorney/client communications
(21) and, therefore, we're going to –
(22)   MR. AGUILAR:   Okay.
(23)   MR. STEELE:   – ask the question be –
(24)   Q.   (By Mr. Aguilar) When Mr. –
(25)   MR. AGUILAR:   That's fine, actually, and

Page 169

(1)  I won't even pursue that.
(2)      Q.    (By Mr. Aguilar) But I just want to make
(3)  sure that what you're talking about is the attorney/client
(4)  you in what you understood to be an attorney/client
(5)  context, right?
(6)      A.    Yes.
(7)      Q.    Okay. That's why you can't answer the
(8)  questions now, right? That's why your attorney won't
(9)  let you answer the questions now. And neither of you
(10) have to respond to that. That's just a comment I'm
(11) making, okay?
(12)     MS. LEEDS:    Object to the side bar.
(13)     MR. AGUILAR:    No. I just don't want to
(14) put them in a position where they have to respond.
(15)     Q.    (By Mr. Aguilar) Anyway –
(16)     MR. STEELE:    Hang on just a second.
(17)     MR. AGUILAR:    Sure. Let's just go off
(18) the record shortly. Okay? Buddy, is that okay with
(19) you?
(20)     MR. STEELE:    Sure.
(21)     MS. NEALLY:    Are we going off the
(22) record?
(23)     MS. LEEDS:    Yes.
(24)     MR. AGUILAR:    Yes, just for a moment.
(25)     (Off the record)

Page 170

(1)  (Exhibit No. 4
(2)  (marked for identification.
(3)      MR. STEELE:    Now that we're back on the
(4)  record, I'm going to withdraw any objection to
(5)  Mr. LaFemina testifying to the last question based
(6)  upon attorney/client privilege as I was mistaken in
(7)  assuming that Mr. Willis was providing some type of
(8)  legal counsel to Mr. LaFemina. I was wrong in that
(9)  regard. So that objection is withdrawn.
(10)     Q.    (By Mr. Aguilar) Now, I'll repeat my prior
(11) question, if I can remember it. It had something to
(12) do with – oh, I asked whether you talked to anybody
(13) else about this letter that was sent to you – I'm
(14) sorry, that was sent to Mr. Amos. And the question
(15) was whether you had also talked to, I guess,
(16) Mr. Willis and you said you did.
(17)     A.    You had asked me who I talked to.
(18)     Q.    Okay.
(19)     A.    And I had said Mr. Willis.
(20)     Q.    What did you talk to Mr. Willis about?
(21)     A.    The content of the phone conversation would
(22) have to surround the letter, but as far as details are
(23) concerned, it's a phone call that took place a
(24) year-and-a-half ago. I cannot remember the specifics.
(25)     Q.    Okay. Do you remember talking to Mr. Willis

Page 171

(1)  sometime around December 4?
(2)      A.    Sometime in December.
(3)      Q.    Okay. And it was about what Mr. Chavez had
(4)  referenced in this letter?
(5)      A.    And –
(6)      Q.    Among other things?
(7)      A.    – some other issues that revolved around
(8)  this situation, yes.
(9)      Q.    And what did you-all talk about? Do you
(10) remember anything?
(11)     A.    Quite frankly, you know, more than likely,
(12) talked about the situation with the account, which is
(13) in the record.
(14)     Q.    I mean, do you recall that's what you talked
(15) about, or are you just assuming that that's what you
(16) talked about?
(17)     A.    If Jeff and I had a conversation about Dino,
(18) it would have – it would have had to do with the
(19) Brownsville Independent School District.
(20)     Q.    That's what I would assume as well. But what
(21) I'm asking is, is that what you're saying you did talk
(22) about or are you just guessing that that's probably
(23) what you would have talked about? In other words, do
(24) you recall the actual conversation?
(25)     A.    No.

Page 172

(1)      Q.    Okay. You're just guessing that chances are,
(2)  if you did talk to him – you know you did talk to
(3)  him, chances are what the conversation probably
(4)  involved was Dino and the school district; is that
(5)  right?
(6)      A.    I want to be specific and tell you that
(7)  Mr. Willis and I did discuss the Brownsville
(8)  Independent School District and Dino Chavez during
(9)  December of 2001.
(10)     Q.    Okay. And do you remember what all you-all
(11) said?
(12)     A.    No.
(13)     Q.    Okay. That's the extent of what you do
(14) remember? In other words, what you – the extent of
(15) what you do remember is just the topic, you don't
(16) remember any of the specifics?
(17)     A.    That's correct.
(18)     Q.    Okay. Did he tell you to fire or demote
(19) Dino?
(20)     A.    No.
(21)     Q.    I'm handing you what I've marked as Exhibit
(22) No. 4. Do you recognize this document?
(23)     A.    I do.
(24)     Q.    This is basically a change in status form in
(25) which Dino is being demoted from RSC to associate,

Page 173

(1)  correct?
(2)      A.    It's a request for that demotion.
(3)      Q.    Okay. And towards the top there, it says,
(4)  "Per Jeff Willis - AFLAC," correct?
(5)      A.    It does.
(6)      Q.    And at the bottom it has your signature,
(7)  right?
(8)      A.    It does.
(9)      Q.    So was Mr. Willis – I'll ask you again. Was
(10) Mr. Willis telling you to fire or demote Dino?
(11)     A.    He was not.
(12)     Q.    Okay. Why – did you write "Per Jeff Willis"
(13) up there?
(14)     A.    I did.
(15)     Q.    Okay. Why did you write that?
(16)     A.    Because the document was meant to be sent to
(17) Jeff Willis per instructions as to what might take
(18) place in the future, and it was sent to Dino's office
(19) incorrectly.
(20)     Q.    Say that again.
(21)     A.    It was supposed to be sent to Jeff Willis.
(22)     Q.    Okay.
(23)     A.    And it was faxed to Dino's office in error.
(24) There would be no reason for this to go to Dino.
(25)     Q.    Okay. This is dated December 4, 2001, right?

Page 174

(1)      A.    That's the date on it, that's correct.
(2)      Q.    You signed a request, I recommend the
(3)  following action, demotion of Dino Chavez from RSC to
(4)  associate, right?
(5)      A.    That's correct.
(6)      Q.    Why were you recommending his demotion?
(7)      A.    Because he wouldn't comply with the
(8)  arrangement that I was trying to put together to
(9)  preserve the business in BISD and to keep him
(10) compensated and to keep Dr. Sauceda happy with AFLAC.
(11)     Q.    This was within five days after – or six
(12) days after Dr. Sauceda's letter went out. And you're
(13) saying because he didn't comply within six days of
(14) Dr. Sauceda's letter, then you felt it necessary to
(15) demote him from RSC to associate?
(16)     A.    Yes.
(17)     MS. LEEDS:    Object to the predicate.
(18)     Q.    (By Mr. Aguilar) And you have per Jeff
(19) Willis - AFLAC at the top, and you said the only
(20) reason you had written that up there was what?
(21)     A.    Because Jeff wanted to gather all of the
(22) facts before any recommendation was made by myself or
(23) anyone else to change Dino's status.
(24)     Q.    Okay.
(25)     A.    In other words, I was instructed to send this

Page 175

(1) in, but that no action would be taken on it.
(2) Normally, this would go to the vice president, and,
(3) instead, it was, you know, being held in the file
(4) until all the facts were gathered and the
(5) determination on Dino's status was arrived to by the
(6) corporate office.
(7)     Q.   So you sent -- you drafted this document and
(8) your intention was just to send it to Jeff Willis; is
(9) that right?
(10)     A.   In the event that we would have to use it in
(11) the future for some reason.
(12)     Q.   Right. In other words, you were going to
(13) send it to Jeff Willis, he was going to hold on to it
(14) until you-all completed the investigation and decided
(15) what it was that needed to be done about Dino?
(16)     A.   I don't think Jeff would be ultimately the
(17) person that would make that decision, but I can't say
(18) for sure. It was going to be held in the file until
(19) some decision was arrived at as a result of this
(20) entire situation.
(21)     Q.   And Mr. Willis had asked you to submit this
(22) document to him?
(23)     A.   I'm required to submit this document, and in
(24) the normal course of business, the document is
(25) submitted to the vice president. When I informed Jeff

Page 176

(1) I was going to recommend that Dino be terminated from
(2) regional coordinator to associate, he asked me not to
(3) do -- not to follow through and send that through --
(4) to the territory director. And instead I faxed it to
(5) what I thought was his office and somehow or another
(6) it went to Dino's office inadvertently. It was not
(7) supposed to.
(8)     MR. AGUILAR:   Objection; nonresponsive.
(9)     Q.   (By Mr. Aguilar) My question was, simply,
(10) did Mr. Willis ask you to draft this document and to
(11) send it to him?
(12)     A.   No.
(13)     Q.   Okay. Why did you do that, then?
(14)     MS. LEEDS:   Objection; asked and
(15) answered.
(16)     MR. STEELE:   Right.
(17)     Q.   (By Mr. Aguilar) Go ahead.
(18)     A.   I don't have a response.
(19)     Q.   You don't know?
(20)     A.   I don't know how to answer the question.
(21)     Q.   Was my question confusing?
(22)     MR. STEELE:   Objection; asked and
(23) answered.
(24)     THE WITNESS:   I recommended that Dino be
(25) terminated, and I sent this in to the legal department

Page 177

(1) because there was no decision.
(2)     Q.   (By Mr. Aguilar) Okay.
(3)     A.   That was -- there was no final decision as to
(4) what Dino's status would be.
(5)     Q.   Okay. So on December 4th, you were already
(6) willing and ready or prepared to recommend Dino's
(7) demotion; is that correct?
(8)     A.   I think if you look at the documents and
(9) correspondence between Dino and I, he -- he did not
(10) agree with the plan that I had put forth for
(11) Brownsville Independent School District. Therefore, I
(12) was prepared to have him step down if the company was
(13) willing to do so. Yes.
(14)     Q.   Okay. So at this point, you -- once -- by
(15) December 4th, you were ready and you were just sending
(16) this to the company for approval or something; is that
(17) right?
(18)     MS. LEEDS:   Objection; asked and
(19) answered.
(20)     MR. STEELE:   Objection; misstates the
(21) testimony.
(22)     MS. LEEDS:   He already explained what he
(23) did.
(24)     Q.   (By Mr. Aguilar) Is that right?
(25)     A.   I can't make it any more clear for you. I

Page 178

(1) have a policy to follow, whether it's Dino or anyone
(2) else, when it comes to changing someone's status.
(3) That's to submit this form.
(4)     Q.   Okay.
(5)     A.   The territory director, who would normally
(6) get it, did not entirely have the facts nor did legal
(7) nor did I for that matter. So I sent this form in so
(8) that it would be in the file in the event that it was
(9) needed because I have to sign one. It's procedure.
(10) End of the story.
(11)     Q.   So I still don't understand why you were --
(12) you had written, per Jeff Willis.
(13)     A.   Because I had a conversation with Jeff
(14) regarding Dino. And all of the documents, including
(15) this document, relative to the case were forwarded to
(16) Jeff Willis.
(17)     Q.   Okay.
(18)     MR. AGUILAR:   Let's go off the record
(19) for just a moment.
(20)     (Off the record)
(21)     MR. AGUILAR:   We're back on the record.
(22) At this point, pursuant to Mr. LaFemina's testimony, I
(23) believe Mr. Willis is going to be a witness in this
(24) case, and I'm going to have to ask him to step out of
(25) the deposition because as a witness -- or as a

Page 179

(1) disinterested witness from AFLAC or for AFLAC, I
(2) believe we're entitled to have independent witnesses
(3) testify independently and not be entitled to sit in on
(4) depositions of other witnesses. And I'm asking him to
(5) step out at this time.
(6)     MR. STEELE:   And as I told you off the
(7) record, and I'll reiterate here, as you're well aware,
(8) and it happens in every case, in federal and state
(9) court, where the corporate representative is entitled
(10) to attend a deposition and listen to the deponent's
(11) testimony. That is exactly the capacity that
(12) Mr. Willis is in here today, just as Dino Chavez is
(13) here as a party to this deposition also hearing
(14) another witness. I have no doubt in my mind it will
(15) not affect his disinterested status and that he will
(16) be able to maintain that. Hence, we are going to not
(17) accede to your request. I don't think it's proper,
(18) nor is it justified. So he will remain in this
(19) deposition. And it's up to you if you want to
(20) continue the deposition or not, but that's the
(21) position we take. So Mr. Willis will remain.
(22)     MR. AGUILAR:   One distinction with Dino
(23) is that he is a party and Jeff Willis is not a party.
(24) He's just a witness just as Mr. LaFemina is a witness.
(25)     MS. LEEDS:   He's a party representative.

Page 180

(1)     MR. STEELE:   I will tell you that, as
(2) you know, a corporation is made up of the individuals
(3) that are employed there. It is a corporate body.
(4) Mr. Willis represents that corporate body.
(5)     MR. AGUILAR:   Okay.
(6)     MR. STEELE:   AFLAC is a party here. The
(7) only way a corporation can be represented in a lawsuit
(8) is by an individual who is that corporate
(9) representative.
(10)     MR. AGUILAR:   All I'm asking you --
(11)     MR. STEELE:   That's what Mr. Willis is.
(12)     MR. AGUILAR:   Okay. If you're saying
(13) he's a corporate representative --
(14)     MR. STEELE:   For the purposes of this
(15) deposition, Mr. Willis is a corporate representative.
(16)     MR. AGUILAR:   And at this point you're
(17) not necessarily naming him as your corporate
(18) representative for trial?
(19)     MR. STEELE:   That's exactly right.
(20)     MS. LEEDS:   He is a representative of a
(21) party and has a right to be here.
(22)     Q.   (By Mr. Aguilar) I'm handing you what was
(23) previously marked as Chavez Exhibit 12.
(24)     MS. NEALLY:   Chavez 12?
(25)     MR. AGUILAR:   Yes.

Page 181

(1) Q. (By Mr. Aguilar) Do you recognize this
(2) letter? Have you seen it before today?
(3) A. I believe so.
(4) Q. Okay. This is a letter from Mr. Steele, your
(5) attorney, to Mr. Rodriguez, who is Mr. Chavez' former
(6) attorney. Do you remember when you first saw this
(7) letter?
(8) A. I would imagine it was on or about the date
(9) on the letter, which is somewhere – December 7th is
(10) the date on the letter. To answer your question
(11) specifically, I am not sure when I saw this letter.
(12) Q. Do you think it was on or about sometime
(13) around December 7th, 2001?
(14) A. I'm not sure when I got it.
(15) Q. Could it have been a month later?
(16) A. I don't know when I got it.
(17) Q. Okay. He indicates in the second paragraph,
(18) "Dr. Sauceda, by letter dated November 29, 2001,
(19) notified Mr. Chavez and AFLAC, through Frank LaFemina,
(20) its state sales coordinator, that BISD would no longer
(21) tolerate Mr. Chavez's" acting – I'm sorry, "serving
(22) as the contact with BISD on the AFLAC account. AFLAC
(23) determined that it had no option but to remove
(24) Mr. Chavez as the servicing agent on AFLAC's BISD
(25) account." Did you know – do you have any idea why

Page 182

(1) AFLAC did not fight to try to keep or act to try to
(2) keep Mr. Chavez on the account?
(3) A. No.
(4) Q. By this point, at least, it appears that the
(5) decision you had recommended had been granted. Was
(6) that your understanding as to what happened?
(7) MR. STEELE: Objection as to form. What
(8) decision are you talking about?
(9) Q. (By Mr. Aguilar) Sorry. The decision we
(10) were just talking about before on – I believe it's
(11) Exhibit 4.
(12) MS. LEEDS: It wasn't a decision.
(13) MR. STEELE: Objection; misstates the
(14) evidence.
(15) Q. (By Mr. Aguilar) I'm just trying to clarify
(16) it. A while ago we were talking about Exhibit 4, your
(17) recommendation to demote –
(18) A. May I interrupt?
(19) Q. Sure.
(20) A. Either we're going to talk about that
(21) document or this document, but I can't talk about both
(22) of them at the same time. So clearly refer to which
(23) document you would like me to address and I'll be glad
(24) to answer your question.
(25) Q. Sure. First of all, let's talk about

Page 183

(1) Exhibit 4, in which you're saying you're
(2) recommending – I'm sorry. It's right in front of
(3) you, this one.
(4) A. Thank you for your assistance.
(5) Q. – in which you're saying you're recommending
(6) the demotion of Dino from RSC to associate, right?
(7) A. That's correct.
(8) Q. Okay. That's December 4th, correct?
(9) A. That's the date on the change of status.
(10) Q. And if you look at the next document, Exhibit
(11) 12, Chavez 12 –
(12) A. Okay.
(13) Q. – that's dated December 7th.
(14) A. That's correct.
(15) Q. And by this point, it appears that AFLAC had
(16) determined that Mr. Chavez would be removed as the
(17) servicing agent.
(18) A. I don't see where you can draw that
(19) correlation.
(20) Q. It doesn't say AFLAC determined that it had
(21) no option but to remove Mr. Chavez as the servicing
(22) agent?
(23) A. I told –
(24) Q. I'm talking about Chavez 12 now.
(25) A. Okay. This is – if that's what it says.

Page 184

(1) Whatever it says here is what Mr. Steele wrote to
(2) Mr. Rodriguez.
(3) Q. So is it your understanding that at that
(4) point he had been removed as the servicing agent?
(5) A. It says here that AFLAC determined that it
(6) had no option but to remove Mr. Chavez as the
(7) servicing agent on AFLAC's BISD account. My
(8) impression is –
(9) Q. I'm talking about actuality. I'm asking what
(10) your understanding was as to what actually happened.
(11) In other words, that is what happened?
(12) A. I probably found out that that happened
(13) sometime after this was sent.
(14) Q. Okay.
(15) MS. LEEDS: Can I just get a
(16) clarification here? Are we talking about removing him
(17) as a servicing agent being the same thing as the
(18) recommendation of –
(19) THE WITNESS: They're two different
(20) issues.
(21) MS. LEEDS: Okay.
(22) Q. (By Mr. Aguilar) Okay. Now, it goes on to
(23) say, "Mr. Chavez was directed to cease further contact
(24) with BISD." Was that your understanding as well?
(25) A. I'll answer the same way as I answered your

Page 185

(1) previous question. I probably found out about this
(2) after it was done and, yes, that was my understanding,
(3) that he had been removed from the group.
(4) Q. Okay. On or about December 7th?
(5) A. Somewhere in December.
(6) Q. Okay.
(7) A. Looks like December 7th, actually, was the
(8) date.
(9) Q. Okay. So continuing on, it says here,
(10) "Mr. Chavez is an independent contractor," in the next
(11) paragraph.
(12) A. Uh-huh.
(13) Q. "He has no authority to communicate with
(14) BISD, either directly or indirectly through you" –
(15) meaning Mr. Rodriguez, the former attorney –
(16) "regarding the servicing of AFLAC's account."
(17) Correct?
(18) A. That's what it says. You read it word for
(19) word.
(20) Q. So it was your understanding – was it your
(21) understanding then, that at that point Mr. Chavez
(22) could not even approach anybody at BISD about trying
(23) to stay on the account?
(24) MS. LEEDS: Object to the form.
(25) THE WITNESS: Answer?

Page 186

(1) MS. NEALLY: Object to the form. Calls
(2) for speculation.
(3) THE WITNESS: My answer to the question
(4) is as follows, I understand and have no other standing
(5) other than the content of this document by my
(6) attorney.
(7) Q. (By Mr. Aguilar) Okay.
(8) A. Exactly what this says is what I understand.
(9) Q. Okay.
(10) A. If you would like to read it for the record,
(11) please feel free to do so.
(12) Q. He goes on to say, the very last bottom line,
(13) "The BISD account belongs to AFLAC." Right?
(14) A. That's what it says.
(15) Q. What account was it that you understood
(16) belonged to AFLAC?
(17) A. I understand that all accounts belong to
(18) AFLAC.
(19) Q. Are you talking about the particular
(20) supplemental health insurance account? Are you
(21) talking about the third party administrator account?
(22) Are you talking about the Flex One account? I'm
(23) asking you which account you understood – or accounts
(24) you understood –
(25) A. I understand that the entire account is the

Page 187

(1) property of AFLAC by contract. That's my
(2) understanding.
(3)  Q.  Every account?
(4)  A.  That's correct.
(5)  Q.  Okay.
(6)  A.  Can we go off the record? I have a question
(7) I need to ask my attorney.
(8)  Q.  Can I just ask one or two questions first?
(9) Unless it's something directed –
(10)  MR. STEELE:  If you want to ask me a
(11) question, come on.
(12)  MR. AGUILAR:  If you feel it's pressing,
(13) that's fine.
(14)  (Off the record)
(15)  Q.  (By Mr. Aguilar) If you turn to the next
(16) page on Chavez 12 still, the first new paragraph, "We
(17) must insist that you notify your client immediately to
(18) refrain from any further contact with BISD regarding
(19) the AFLAC account." Was it your understanding, at
(20) least by December 7th, that Mr. Chavez was no longer
(21) allowed to contact BISD –
(22)  MS. LEEDS:  Objection; form.
(23)  Q.  – regarding the AFLAC account? In other
(24) words, that Dino wasn't allowed to approach anybody at
(25) BISD?

Page 188

(1)  MS. LEEDS:  Object to the form.
(2)  THE WITNESS:  Well, I understand it
(3) based on this letter to be the case. I also
(4) understand it based on Dr. Sauceda's request that he
(5) didn't want Dino involved.
(6)  Q.  (By Mr. Aguilar) Okay.
(7)  A.  So, yes.
(8)  Q.  What I'm asking is, in terms of what you
(9) understood the actual – the reality was regarding the
(10) handling of the account, was it your understanding
(11) that in practice Dino, in reality, in practice, in
(12) other words, as opposed to just what somebody else
(13) might be saying in a letter that you're not sure when
(14) you received. I'm asking about if you being there or
(15) you being involved, was it your understanding that at
(16) least by December 7, Dino was not allowed to approach
(17) anybody at BISD?
(18)  MS. LEEDS:  Object to the form.
(19)  Q.  (By Mr. Aguilar) Do you understand the
(20) distinction I'm making? I can try to rephrase if you
(21) would like.
(22)  A.  I understand the distinction that you're
(23) making. My answer to the question has to be this. As
(24) far as I'm concerned, when Dr. Sauceda asked that Dino
(25) be removed, then that would be when I was aware, first

Page 189

(1) and foremost, that he was no longer going to be
(2) involved in the account. The second part of the
(3) answer would be, this letter would document the fact
(4) that AFLAC took action to comply with Dr. Sauceda's
(5) request.
(6)  Q.  Okay. A while ago when we were talking about
(7) Exhibit 4 –
(8)  A.  Uh-huh.
(9)  Q.  – you indicated you sent in the
(10) termination – Dino's termination request when he
(11) wouldn't comply with your request.
(12)  A.  Uh-huh.
(13)  Q.  Do you remember that? What was the request?
(14)  A.  It's outlined in the document marked
(15) LaFemina 2.
(16)  Q.  And what was the actual request?
(17)  A.  To follow the plan described for the upcoming
(18) enrollment, which was different than the normal plan
(19) as a result of Dr. Sauceda's request.
(20)  Q.  I'm not sure I understood that. The request
(21) was to do what?
(22)  A.  Was – I had asked Dino to follow this plan.
(23)  Q.  Okay. You're talking about –
(24)  A.  As I asked everyone else to follow that plan.
(25)  Q.  You're talking about each of these bullets in

Page 190

(1) Exhibit No. 3, then?
(2)  A.  It's LaFemina 2. And Mr. Chavez was not
(3) agreeable to that. And he made that clear to me.
(4)  Q.  Okay. And I'm looking in here, trying to
(5) see – in Exhibit 2, again, where does it say what
(6) Dino will be receiving? In other words, I know Dino
(7) automatically – it wouldn't say here, but Dino
(8) automatically gets his RSC overrides, right?
(9)  A.  He would have received – and we've covered
(10) this ground before. He would have received his RSC
(11) overrides on the people that were involved in
(12) enrolling or selling –
(13)  Q.  His team?
(14)  A.  – insurance that were covered on his team.
(15) That's correct.
(16)  Q.  Okay. And as far as splitting any business,
(17) he would be getting zero, right, according to these
(18) bullets?
(19)  A.  It doesn't address whether he would be
(20) splitting any business at all –
(21)  Q.  Okay.
(22)  A.  – because it was a foregone conclusion
(23) between he and I that regional sales coordinators
(24) didn't personally produce. And I think he –
(25)  Q.  I'm not talking about –

Page 191

(1)  A.  – he had some alternative method to deal
(2) with that –
(3)  Q.  Right. I'm talking about –
(4)  A.  – which I'm not sure of.
(5)  Q.  I'm talking about splitting business.
(6) This –
(7)  A.  It doesn't – it does not address that issue.
(8)  Q.  Okay. So based on these bullets in
(9) Exhibit 2, Dino wouldn't be getting any splits on any
(10) business, right?
(11)  A.  I didn't say that. That's a – that's a
(12) mischaracterization of my statement.
(13)  Q.  Okay. Do any of these bullets say he will be
(14) getting any splits on any business?
(15)  A.  The bullets do not indicate one way or the
(16) other whether he would or would not.
(17)  Q.  Okay. So was he going to be getting – based
(18) on this plan you had on Exhibit 2, was he going to be
(19) getting any splits on any business?
(20)  A.  As I said, it doesn't address it one way or
(21) the other.
(22)  Q.  And I'm asking you, was he, whether it's in
(23) here or not?
(24)  A.  Don't know.
(25)  Q.  Why not?

Page 192

(1)  A.  It's not addressed in here.
(2)  Q.  Okay.
(3)  A.  And he could handle that at the regional
(4) level and receive commissions somehow – some creative
(5) way if he chose to do so, I'm sure.
(6)  Q.  In other words, you were suggesting he could
(7) take it up after the enrollment?
(8)  A.  No. I'm suggesting that someone else could
(9) compensate him as a result of their production. His
(10) wife could have production turn up in her name, which
(11) is as a result of working in that group, in which Dino
(12) would have normally gotten, and, quite frankly, that
(13) may have happened. I don't know. But it's not
(14) addressed one way or the other.
(15)  Q.  Okay. And if you would look down at the
(16) sixth bullet, it talks about splitting business with
(17) Ron Levine on a 90/10 basis, 10 percent going to Ron,
(18) right?
(19)  A.  It says, all enrollers other than Ron and
(20) Scott will split business with Ron on the transmittal
(21) on a 90/10 basis with the 10 percent going to Ron.
(22)  Q.  Okay. So you're giving 10 percent to Ron,
(23) 90 percent was going to the individual enrollers,
(24) agents?
(25)  A.  That's correct.

Page 193

(1) Q. And you're also saying, Ron Levine was in
(2) charge 100 percent?
(3) A. On that bullet or are you now on another
(4) bullet?
(5) Q. Next bullet.
(6) A. Yes. That's exactly what it says.
(7) Q. Meaning, Dino would be getting zero percent?
(8) A. No.
(9) MS. LEEDS: Object to the form.
(10) Q. (By Mr. Aguilar) Okay. If Ron – I'm sorry.
(11) Like I say –
(12) A. It says, Ron is in charge 100 percent. It
(13) doesn't address – address compensation.
(14) Q. Right. Meaning, Dino is the zero percent
(15) charge is what I meant to ask.
(16) A. That's correct.
(17) Q. You said earlier you were trying to protect
(18) AFLAC's and Dino's interest, right, working through
(19) this –
(20) A. Financially.
(21) Q. Okay. And AFLAC's was obviously in keeping
(22) the business. That's how you were trying – that's
(23) what you were doing to try to keep – let me rephrase
(24) that. When you said you were trying to protect
(25) AFLAC's interest, it's by keeping the business, right,

Page 194

(1) as a general statement?
(2) A. I was trying to protect – I think what I
(3) said was I was trying to protect Dino's interest and
(4) AFLAC's interest because I had not been involved very
(5) long.
(6) Q. Okay. And AFLAC's interest that you were
(7) trying to protect would be done by keeping the
(8) business?
(9) A. Yes.
(10) Q. Okay. And you said you were trying to
(11) protect Dino's financial interest –
(12) A. Uh-huh.
(13) Q. – just right now, right?
(14) A. (Moves head up and down.)
(15) Q. And to do that, you were talking about –
(16) what you were trying to protect was Dino's being able
(17) to get RSC overrides, right?
(18) A. I was not specific. He would get –
(19) Q. As of the time of Exhibit 2, that's the only
(20) financial interest Dino was envisioned to be getting
(21) as of that time at least, right?
(22) MS. LEEDS: Object to the form.
(23) THE WITNESS: I think the form would
(24) speak for itself. It doesn't address the issue of
(25) Dino's compensation one way or the other.

Page 195

(1) Q. (By Mr. Aguilar) Okay. But your
(2) understanding, at least as of the time of writing
(3) Exhibit 2, was the only financial compensation you had
(4) in mind as of this time was the RSC overrides, right?
(5) A. No.
(6) Q. Okay. Well, it doesn't say Dino is going to
(7) be getting anything more than RSC overrides, right?
(8) A. It doesn't say that he's going to get
(9) anything less than RSC overrides either. And it
(10) doesn't exclude him from receiving other compensation
(11) as a result of sales made by someone on that team.
(12) Q. Whatever else he could set up on his own
(13) separately?
(14) A. That's what he had done in the past.
(15) Q. I'm handing you what was previously marked as
(16) Chavez Exhibit 15. This is a letter addressed to you
(17) from Daniel Sanchez. Do you recognize it?
(18) A. I do recognize it.
(19) Q. Do you recall receiving it on or about
(20) December 19 of 2001?
(21) A. I don't remember when I received it. Just
(22) like the others, it's been a long time ago. I did
(23) receive it.
(24) Q. Okay. If you look down at the fifth
(25) paragraph – actually, to put it in perspective, if

Page 196

(1) you look at the first paragraph, it says, "As
(2) requested, I am writing you this letter of intention.
(3) It is my understanding that our current regional sales
(4) coordinator, Dino Chavez, may not be in his current
(5) position for very much longer and that AFLAC wishes to
(6) know whether I will continue to serve as district
(7) sales coordinator when and if this situation arises."
(8) Just putting that in perspective now.
(9) If you look now at the fifth paragraph,
(10) I believe it was, he goes on to say, "My dilemma is
(11) simple and not simple. The associates who worked BISD
(12) on a yearly basis were happy splitting this account
(13) with Dino because there was no servicing involved
(14) throughout the year." Do you agree with that
(15) statement?
(16) A. No.
(17) Q. Why not?
(18) A. I think that Daniel in this letter is
(19) speaking for a bunch of other people.
(20) Q. Okay.
(21) A. I couldn't confirm whether or not they were
(22) happy splitting business with him or not. They may
(23) very well have been. I don't know.
(24) Q. You just don't know, okay. As far as no
(25) servicing involved throughout the year, do you know

Page 197

(1) one way or the other about that information?
(2) A. No, I don't know anything about that. I
(3) mean, it's assumed here that there was no service
(4) involved throughout the year.
(5) Q. That's what he's saying.
(6) A. I find it very difficult to believe that a
(7) 7,000 man account with a penetration rate of
(8) 60 percent wouldn't have ongoing service, which was
(9) going to be conducted by the people we discussed
(10) earlier, Dino, his office and his staff and managers
(11) and associates.
(12) Q. That's who you would expect to be doing it?
(13) A. And I would expect it went on throughout the
(14) year.
(15) Q. He goes on to say, "It would be disastrous
(16) for AFLAC to have 30 different associates throughout
(17) the Valley servicing this account." Do you agree with
(18) that or not?
(19) A. No.
(20) Q. Okay. Now, when somebody does an enrollment,
(21) basically, is it a – correct me if I'm wrong here.
(22) Is it a large group of enrollers where agents come in
(23) to sign up all the policies during a very short period
(24) of time?
(25) A. Everybody that works with AFLAC is an

Page 198

(1) independent contractor and they set up their
(2) enrollments based on what's good for themselves or
(3) what's good for the client or the culmination of both
(4) of those issues. I don't know what generally
(5) happened.
(6) Q. Let's try it this way. Large group
(7) enrollments, is that what generally happens?
(8) A. I don't know the answer. I don't know that
(9) there's a general way that things happen in terms of
(10) the enrollment. Each case is – you know, has its
(11) own fingerprints.
(12) Q. What about at BISD? Do you know?
(13) A. Never involved in the enrollment.
(14) Q. Okay. So you just wouldn't know?
(15) A. You asked specifically about BISD and the
(16) answer is, I don't know how it was handled.
(17) Q. Okay. So generally, whoever participates –
(18) an agent participates in an enrollment, whether it's a
(19) large group enrollment or just an individual
(20) enrollment, he's the one who signs up or sells that
(21) policy to the customer, right?
(22) A. All the enrollments are group enrollments,
(23) and I think you made some distinction between the two.
(24) If it's an enrollment, it's a group enrollment. It
(25) might be three employees or it could be 3,000

Page 199

(1) employees.
(2)   Q.   Okay. And in those circumstances, the
(3) individual agent who fills out the information for the
(4) potential client is the one – is the agent who sells
(5) that policy, right?
(6)   A.   Should be.
(7)   Q.   And he's the one who normally would be
(8) responsible for servicing that account, right?
(9)   A.   Servicing that policy.
(10)   Q.   That policy. I'm sorry.
(11)   A.   That policyholder, correct.
(12)   Q.   And then even if you bring agents from
(13) throughout the Valley – you might have an agent,
(14) let's say, in Mission, Texas who comes in to BISD to
(15) help do the enrollment. Even if he's an agent in
(16) Mission but he sells that particular policy at BISD,
(17) that agent in Mission would be the one primarily
(18) responsible for servicing that client, right?
(19)   A.   I believe the company would view it that way,
(20) and I would as well, yes.
(21)   Q.   Okay. If you turn the page, third paragraph,
(22) it says, "In the Brownsville area the office space in
(23) a decent building or neighborhood runs $475.00
(24) average." It goes on to talk about some other
(25) expenses involved with running his office. Do you

Page 200

(1) have any personal knowledge of what those expenses
(2) would be in Brownsville or anywhere in the Valley?
(3)   A.   I do.
(4)   Q.   Okay. The numbers that he indicates are 475
(5) average for office space; secretary working 9:00 to
(6) 5:00 runs another 210 per week, plus taxes; phone line
(7) with long distance, $100; copier lease, et cetera. Do
(8) you agree with those numbers as being reasonable
(9) expenses in the Valley?
(10)   A.   Yeah.
(11)   Q.   Okay. Is it your understanding that those
(12) are the expenses Dino incurred here in the Valley?
(13)   A.   I know Dino had expenses. I don't know to
(14) what extent his expenses were.
(15)   Q.   You agree those would be some of the
(16) reasonable expenses, though?
(17)   A.   Yes. They would be reasonable for that area.
(18)   Q.   Okay. If you go to the ultimate paragraph.
(19)   A.   I'm sorry?
(20)   Q.   If you go to the –
(21)   MR. STEELE:   Second to the last.
(22)   Q.   – second to the last paragraph, he indicates
(23) that in the last – third to the last sentence, "I am
(24) very confident to speak for most of this Region's
(25) agents when I say that we would like for Dino to

Page 201

(1) remain as our regional sales coordinator." Did you
(2) take any other action after receiving this letter to
(3) try to respond to Mr. Sanchez regarding Dino?
(4)   A.   I did not.
(5)   Q.   Okay.
(6)   MR. AGUILAR:   Let's go off the record a
(7) second.
(8)   (Off the record)
(9)   (Exhibit No. 5
(10) (marked for identification.
(11)   Q.   (By Mr. Aguilar) Okay. Let me hand you what
(12) I've marked as Exhibit 5 –
(13)   A.   Thank you.
(14)   Q.   – and ask you to review that, if you would.
(15)   MS. LEEDS:   To his deposition?
(16)   MR. AGUILAR:   Yes. Unless I indicate
(17) otherwise, it's to his deposition.
(18)   Q.   (By Mr. Aguilar) That is a memo from you
(19) to –
(20)   A.   Uh-huh.
(21)   Q.   – I believe it's Lynn Davis and Antonia
(22) Davila; is that right?
(23)   A.   There are probably some others cc'd on this,
(24) actually.
(25)   Q.   I'm sorry?

Page 202

(1)   A.   There were probably some others cc'd on this
(2) as well.
(3)   Q.   And you say that because?
(4)   A.   I have a recollection of the conversation
(5) because the conversation ended up costing myself and
(6) another person $5,200.
(7)   Q.   Why did the conversation cost you that?
(8)   A.   Because I agreed and another individual
(9) agreed to fund some portion of the expenses as it
(10) related to BISD on a one-time basis.
(11)   Q.   In other words, you agreed – who's the other
(12) person?
(13)   A.   His name was Joe – is Joe DePasqual.
(14)   Q.   You and Mr. DePasqual agreed to contribute
(15) $5,200 to go towards office expenses for somebody here
(16) in the Valley?
(17)   A.   We agreed to provide Daniel Sanchez with a
(18) combination of funds equaling $5,200 so that we would
(19) contribute $100 a week toward the cost of his office
(20) out of our pockets.
(21)   Q.   Okay. And previously, all those office
(22) expenses would have just been paid by Dino, if he –
(23) while he was the one in charge of the BISD account
(24) here?
(25)   A.   I don't know how Dino handled his personal

Page 203

(1) business in terms of pay. I don't know whether his
(2) people were paid or not. I know they were his family
(3) members. I mean, I couldn't tell you that.
(4)   Q.   But you never contributed anything to Dino –
(5) to Dino's office expenses while he was supervising
(6) this account?
(7)   A.   I've never contributed anything to anyone's
(8) office prior to that $2,600 contribution that I made
(9) to Mr. Sanchez, which was a result of the sudden
(10) change and the fact that Daniel indicated he needed
(11) some help or he couldn't proceed.
(12)   Q.   And who is Joe DePasqual?
(13)   A.   He's an AFLAC district sales coordinator.
(14)   Q.   Do you know whether he had ever contributed
(15) anything –
(16)   A.   I can't speak on behalf of Joe. You would
(17) have to ask Joe directly.
(18)   Q.   Okay.
(19)   MS. LEEDS:   How do you spell that?
(20)   THE WITNESS:   D-e-P-a-s-q-u-a-l.
(21)   Q.   (By Mr. Aguilar) Now, what you're talking
(22) about in here sounds like what we've just been talking
(23) about ourselves, the third sentence is – the third
(24) sentence is – the third indicates, "It appears as
(25) though none of the three of you are willing to help

Page 204

(1) with the costs associated with BISD." What were you
(2) talking about there?
(3)   A.   The people that were involved – certain
(4) people that were involved with BISD continually
(5) referred to this cost of doing business and that they
(6) couldn't afford to deal with it.
(7)   Q.   Is that Mr. Sanchez?
(8)   A.   He did – he did as well mention that. He
(9) was one of those people, but there were several
(10) people.
(11)   Q.   Well, this was addressed to L. Davis. Is
(12) that Lynn Davis?
(13)   A.   Yes.
(14)   Q.   Who is Lynn Davis?
(15)   A.   Lynn Davis, at the time, was a – I believe a
(16) district sales coordinator in the Valley.
(17)   Q.   And who's –
(18)   A.   Out of McAllen.
(19)   Q.   And who's Antonia Davila?
(20)   A.   She is a regional sales coordinator.
(21)   Q.   And her office is also in McAllen?
(22)   A.   Yes, it is.
(23)   Q.   Okay. And you indicate the three of you –
(24) so I see Lynn, Antonia – do you know who the third
(25) one is?

Page 205

(1)  A.    That's what I said. It went – you know, I
(2)  don't know, because there's not a third name on the –
(3)  on the e-mail.
(4)  Q.    You mentioned that Mr. Sanchez also had some
(5)  concerns. Do you think he might have been the third
(6)  person?
(7)  A.    There was – there could have been – it
(8)  could have been actually Daniel Sanchez and Lynn Davis
(9)  and – Dennis Escobar would be the third person's
(10) name, would be my guess. And Ms. Davila was copied on
(11) this.
(12) Q.    You say it could have been Mr. Sanchez or who
(13) else?
(14) A.    Sanchez, Escobar and Davis.
(15) Q.    Okay. Davis is on here.
(16) A.    Uh-huh.
(17) Q.    You're thinking it was not Antonia Davila?
(18) A.    No, it was Toni Davila as well.
(19) Q.    Okay. So there would have been – when
(20) you're talking about, it appears as though none of the
(21) three of you, it was probably four of you?
(22) A.    No. It's cc'd to Toni Davila. It's
(23) addressing the other three that I mentioned.
(24) Q.    That's what I'm saying. The three that
(25) you're talking about here would be Lynn Davis, Sanchez

Page 206

(1)  and Escobar?
(2)  A.    Correct.
(3)  Q.    Okay. And what was the concern that you had
(4)  to help with the associate – the costs associated
(5)  with BISD, what was the – what is it they were not
(6)  willing to help with?
(7)  A.    I didn't have the concern. They were the
(8)  ones that had the concern. And their concern was that
(9)  there was absorbtive costs related to handling BISD.
(10) And as you can see, my response indicates that, you
(11) know, everything they did in those accounts, they
(12) received commissions for, renewals for, stock. And if
(13) they were in management, obviously they received
(14) overrides on their personal and their team's business.
(15) And my –
(16) Q.    Okay. That's what you're talking about
(17) towards the bottom of that; is that right?
(18) A.    That's correct.
(19) Q.    Okay.
(20) A.    And that's just a cost of doing business. I
(21) have those same costs.
(22) Q.    Okay. Back when Dino was handling this
(23) account, you had never received any concerns from
(24) anybody about paying any of those costs, right?
(25) A.    I think the answer to that is Dino voiced –

Page 207

(1)  or shared with me the expenses, but I don't think he
(2)  made it in a negative light.
(3)  Q.    In other words, he might have mentioned, this
(4)  is what it's costing me, but he did not say, hey, I
(5)  expect you to cover me, or anything like that?
(6)  A.    Correct.
(7)  Q.    And I think you said the amount you agreed to
(8)  offer to compensate for those additional expenses was
(9)  about 5,200 between you and Mr. DePasqual?
(10) A.    $2,600 each, about. $100 a week is what it
(11) boiled down to for a full year.
(12) Q.    You never offered anything to Dino, right?
(13) A.    Dino never asked.
(14) Q.    And you didn't offer on your own?
(15) A.    I would never offer because it's our own
(16) responsibility as an independent contractor to pay our
(17) own expenses.
(18) Q.    Okay. I'm handing you what I've marked as
(19) Chavez Exhibit 39. Do you recognize that document?
(20) A.    I know what it is, yes.
(21) Q.    At the bottom, I don't know what that means,
(22) W3809, Frank D. LaFemina. Is 3809 your AFLAC number
(23) or something?
(24) A.    Yes.
(25) Q.    Okay. Did you get cc'd a copy of this

Page 208

(1)  document?
(2)  A.    Don't remember.
(3)  Q.    Do you remember seeing this document before
(4)  today?
(5)  A.    No.
(6)  Q.    Okay. Now, let me represent to you, then,
(7)  this appears to be a notice to Dino dated December 28,
(8)  2001, indicating a change in status effective 1-27-02,
(9)  which goes from regional sales coordinator's agreement
(10) to the associate's agreement. If you look back at the
(11) document you had signed earlier, I believe it's
(12) Exhibit 4.
(13) A.    Did you take them back from me?
(14) Q.    I didn't – I should not have.
(15) A.    Indian giver. Let's see here.
(16) MS. LEEDS:    I haven't heard that word in
(17) a long time.
(18) Q.    (By Mr. Aguilar) Right there. That one.
(19) A.    Okay.
(20) Q.    This was your memo that we had talked about
(21) earlier dated December 4, and it appears Chavez 39 is
(22) the document, I guess, formalizing the
(23) recommendations – change in status form that you had
(24) made earlier. Is that your understanding?
(25) A.    I would disagree with that completely.

Page 209

(1)  Q.    Okay. What's the – why?
(2)  A.    Because this form is –
(3)  Q.    Which one?
(4)  A.    – not valid for any reason.
(5)  Q.    Why not?
(6)  A.    It doesn't have the signature of the
(7)  territory director and vice president. Let me put it
(8)  this way. The form is useless.
(9)  Q.    Basically, Chavez 39 is doing what LaFemina
(10) Exhibit 4 was recommending?
(11) A.    No.
(12) Q.    Is Chavez 39 demoting Dino from regional
(13) sales coordinator to associate?
(14) A.    Yes. Effective January 27 of 2002.
(15) Q.    Okay. And that's the same action that you
(16) had recommended in Exhibit 4, but that goes back to
(17) December 4?
(18) A.    Document Exhibit Chavez 39 –
(19) Q.    I think you're getting a little confused.
(20) Sorry.
(21) A.    No, I'm not confused at all.
(22) I'm talking about this one.
(23) A.    This is a change in status from RSC, regional
(24) sales coordinator, to associate.
(25) Q.    You're now referring to Document 39?

Page 210

(1)  A.    The Chavez Document 39.
(2)  Q.    Right.
(3)  A.    On Exhibit No. 4, that – this is not a
(4)  result – No. 39 is not a result of form No. 4.
(5)  Q.    I'm just saying – I'm just asking,
(6)  Exhibit 4 – in Exhibit 4, you're also recommending
(7)  that Dino be demoted from RSC to associate, right?
(8)  A.    It would appear that I'm recommending that,
(9)  but nobody – no company officer has ever signed this
(10) document.
(11) Q.    Okay. Instead, Mr. Karl Douglass, second
(12) vice president, was the one who sent out this letter
(13) to Mr. Chavez giving him 30 days notice of his change
(14) in status from regional sales coordinator to
(15) associate. That's in Chavez 39, right?
(16) A.    It has Mr. Douglass' signature on it.
(17) Q.    Okay. So as of December 27, 2001, what was
(18) Dino's position?
(19) A.    Regional sales coordinator.
(20) Q.    Okay. If he was still the regional sales
(21) coordinator, why wasn't he allowed to or cooperate
(22) in the enrollments, the BISD enrollment?
(23) A.    Dr. Sauceda requested he not –
(24) Q.    Okay.
(25) A.    – be permitted on the school campuses or in

Page 211

(1) touch with the people, and that was followed by a
(2) letter from –
(3) Q. Okay.
(4) A. – an attorney representing AFLAC, which
(5) indicated the same, that we should comply.
(6) Q. You could have – and by you, I mean AFLAC –
(7) could have said, fine, kept Dino off campus, had Dino
(8) coordinating everybody, had the enrollers all go in,
(9) and done the enrollment, and they wouldn't have ever
(10) needed to see Dino on campus, right?
(11) A. That's what I tried to accomplish.
(12) Q. Okay. But that isn't what happened, right?
(13) A. That is what happened.
(14) Q. Dino was supervising all the enrollers during
(15) the enrollments?
(16) A. No, he wasn't. First of all –
(17) Q. That's what I was asking about.
(18) A. – when you say AFLAC, you have to refer to
(19) either me or AFLAC.
(20) Q. Okay.
(21) A. I am not employed by AFLAC.
(22) Q. Okay.
(23) A. So is your question, did Dino supervise it?
(24) I'm sure that Dino supervised his people –
(25) Q. Okay.

Page 212

(1) A. – from a distance. He wasn't on campus, but
(2) I'm sure he supervised his people.
(3) Q. I'm talking about supervising the entire
(4) enrollment not just his people. And I'll stipulate –
(5) A. No. It's clear – it's clear here in
(6) Document LaFemina 2 that on bullet – and I'm not sure
(7) what the bullet number is. It says here, to be clear,
(8) this year's enrollment, Ron Levine will be in charge
(9) 100 percent.
(10) Q. Okay.
(11) A. That doesn't preclude Dino from working with
(12) his people, providing he wasn't on the school
(13) property.
(14) Q. Okay. Even though Dino was still the RSC in
(15) this area.
(16) MS. LEEDS: What? What's the question?
(17) THE WITNESS: Yeah, there isn't a
(18) question.
(19) Q. (By Mr. Aguilar) The question is, as you
(20) said, in whichever bullet that was on Exhibit 2,
(21) Levine was going to be in charge of the entire
(22) enrollment even though – now I'm extending it – even
(23) though Dino was the RSC in this area at that time?
(24) A. Levine was going to be in charge of the
(25) enrollment because he was the most competent person I

Page 213

(1) had and Dino had been requested by the supervisor –
(2) by the superintendent – forgive me – to step aside.
(3) Q. Okay. Why was Dino demoted?
(4) A. The company demoted him. You would have to
(5) ask the company that.
(6) Q. You have no idea?
(7) MS. LEEDS: Object to the form.
(8) THE WITNESS: Do I have an idea? Yes, I
(9) have an idea.
(10) Q. (By Mr. Aguilar) What's your understanding
(11) as to why Dino was demoted?
(12) A. My – my impression of why Dino was demoted
(13) is because of the letter writing campaign that went on
(14) between he and members of the board and – where he
(15) indicated in so many words – and I don't have the
(16) document in front of me – that board – some board
(17) members were crooked and doing things that were not
(18) proper and so on and so forth and basically was
(19) gathering support from the rank and file against
(20) Dr. Sauceda and the board, which led to the letter
(21) that I received requesting him to be removed.
(22) (Exhibit No. 6
(23) (marked for identification.
(24) Q. (By Mr. Aguilar) I'm handing you what I've
(25) marked as Exhibit 6. It is a letter from you to

Page 214

(1) Mr. Sanchez. Do you recognize this document? It's
(2) dated September 11, 2002.
(3) A. Uh-huh.
(4) MS. NEALLY: Which exhibit was this?
(5) THE WITNESS: It's Exhibit 6.
(6) MS. LEEDS: LaFemina 6?
(7) MR. AGUILAR: LaFemina 6.
(8) MS. NEALLY: And what is it?
(9) MR. AGUILAR: I'll repeat. Hang on.
(10) THE WITNESS: Did you want to write
(11) LaFemina 6 on it?
(12) Q. (By Mr. Aguilar) She will do that later.
(13) LaFemina 6 is a memo from Mr. LaFemina to Daniel
(14) Sanchez dated September 11, 2002.
(15) A. Uh-huh.
(16) Q. It references a letter from a policyholder of
(17) BISD, and the letter that's attached as Page 2 is that
(18) letter. Why were you submitting this letter to
(19) Mr. Sanchez?
(20) A. Because the regional sales coordinator,
(21) Mr. DePasqual, submitted it to me. And I was
(22) addressing the issues as they related to the account
(23) and the policyholder.
(24) Q. Now, if we could turn to the second page
(25) first and talk about that letter a little bit.

Page 215

(1) A. Hold on one second, if you don't mind.
(2) Q. Sure.
(3) A. I would like to read the entire thing.
(4) Q. Sure.
(5) (Off the record)
(6) Q. (By Mr. Aguilar) Have you had a chance to
(7) look it over?
(8) A. Yes.
(9) Q. Okay. The second page was a letter that I
(10) guess Mr. DePasqual had received and forwarded to you;
(11) is that correct?
(12) A. Yes.
(13) Q. In that letter, it doesn't indicate who was
(14) being sent a copy or who signed the letter, but did
(15) your copy have the signature line? I don't need to
(16) know their name. I'm just wondering.
(17) A. I think that I purposely eliminated the
(18) signature so as not to create any problem for the
(19) policyholder if, in fact, one would come up.
(20) Q. Okay.
(21) A. I think what I did was just put it in the
(22) copier and put a piece of paper over the signature, if
(23) I remember correctly.
(24) Q. She talks about some complaints that she has
(25) about the handling of her AFLAC account, right?

Page 216

(1) A. Uh-huh.
(2) Q. She talks about basically some of the
(3) concerns she had or complaints she had and eventually
(4) she went and talked to Ron Levine, who answered the
(5) call and invited her to his office on Price Road. She
(6) doesn't have to go to his office even in Harlingen.
(7) A. Uh-huh.
(8) Q. There's some handwriting on the side. Is
(9) that your handwriting?
(10) A. Yes.
(11) Q. Okay. Now, if you go back to the first page,
(12) the part that you wrote, the second paragraph talks
(13) about the BISD account was never Mr. – I'm sorry –
(14) Mr. Sanchez's or Sandra's. Who's Sandra that you're
(15) talking about?
(16) A. That would be Mr. Sanchez's wife.
(17) Q. Okay. Second, BISD never funded your
(18) business operation as it relates to the AFLAC account.
(19) Is that talking about – does that continue talking
(20) about the amount you had eventually agreed to donate
(21) or contribute to the overhead for Mr. Sanchez?
(22) A. No.
(23) Q. What's it talking about?
(24) A. It is not in this – and it's not there. In
(25) some previous correspondence that I had with

**Page 217**

(1) Mr. Sanchez, I think he referred to the fact that the
(2) writing of the business which he did and his team did
(3) in the BISD helped fund this operation, or he was
(4) referring to BISD actually funding, you know, his
(5) expenses, which I knew was not the case.
(6)   Q.   Okay.
(7)   A.   And if they were funding him in any way, I
(8) had no knowledge of it.
(9)   Q.   Now, when did Ron Levine leave Brownsville?
(10) In other words, he originally had an office in
(11) Harlingen, right?
(12)   A.   It's my understanding that office is still
(13) there.
(14)   Q.   Is it his office?
(15)   A.   Yeah. It's in his name.
(16)   Q.   It's in his name. Does anybody work there?
(17)   A.   You know, I don't know the answers to those
(18) questions. I know that there's an office there and
(19) there's an office in Harlingen.
(20)   Q.   Okay. Do you know whether any employees work
(21) at that office in Brownsville?
(22)   A.   I don't think there are any employees.
(23)   Q.   Okay. When was it that the employees left or
(24) anybody who was working in that office? Let me
(25) rephrase that. Hang on.

**Page 218**

(1)   A.   I answered the question already, Arnold. I
(2) don't know what's going on with the Brownsville
(3) office. I do not know.
(4)   Q.   You know there's an office. For all you
(5) know, it may have doors that are locked all day; is
(6) that right?
(7)   A.   I can't give you any specifics. I don't know
(8) a thing about the office other than it's there.
(9)   Q.   Okay. Now, Mr. Levine got a split – a
(10) 10 percent split on all the sales from each of the
(11) agents during the BISD enrollment for 2001, right?
(12)   A.   He may or may not have. Well, we would have
(13) to – I know that he wasn't very concerned with how
(14) much money he got from the account, and so I know he
(15) didn't write much personal production and I can't
(16) testify one way or the other as to whether he took
(17) 10 percent on every transmittal that contained all of
(18) the policies. I do not know.
(19)   Q.   Okay.
(20)   A.   AFLAC would have to confirm that for us.
(21)   Q.   On your Exhibit 2, that was the – on all
(22) those bullets, one of those bullets, that's what you
(23) had – your proposal was.
(24)   A.   That's what I outlined, absolutely.
(25)   Q.   Do you know whether that outline ever got

**Page 219**

(1) accepted by the agents or by Mr. Levine or anybody
(2) else?
(3)   A.   It appeared to me that it was acceptable by
(4) some and unacceptable to some others. But overall,
(5) the objective was met and the plan was followed. Ron,
(6) at his discretion, could have told certain individuals
(7) not to put him on the transmittal. And, again, to
(8) document that, we would have to get records from
(9) AFLAC.
(10)   Q.   Okay. After the BISD enrollment, was Ron
(11) servicing those accounts primarily or were the
(12) individual agents servicing those accounts primarily?
(13)   A.   I don't know the answer to that. I would
(14) assume that the seller, which is indicated in this
(15) letter, as a matter of fact, Exhibit 6, that the
(16) seller of the policy should be responsible for the
(17) service.
(18)   Q.   Meaning the agent?
(19)   A.   Not necessarily. Could be the agent, could
(20) be the district sales coordinator. Whoever sells the
(21) policy should be responsible for the service to that
(22) policyholder.
(23)   Q.   For the most part, the agents were the ones
(24) selling those policies?
(25)   A.   District sales coordinators would sell the

**Page 220**

(1) policies equally.
(2)   Q.   Okay. So did –
(3)   A.   In some cases.
(4)   Q.   Did Mr. – and you're talking about
(5) Mr. Levine?
(6)   A.   No. He was – at that time, actually, he was
(7) a district sales coordinator. He wasn't – I know for
(8) a fact that he wasn't – and it's indicated in one of
(9) these other documents – I'm not sure which one it
(10) is – that Mr. Levine did not write hardly any
(11) personal production. And that can be documented.
(12)   Q.   Okay. During the BISD enrollment?
(13)   A.   At any time. He was just not a general
(14) personal producer.
(15) (Exhibit No. 7
(16) (marked for identification.
(17)   Q.   (By Mr. Aguilar) I'm handing you what's
(18) marked as Exhibit 7. This is a letter from
(19) Mr. Sanchez to you dated September 16, 2002. Do you
(20) recognize this letter?
(21)   A.   Yes, I do.
(22)   Q.   In this letter, if you go to the third
(23) paragraph, he's indicating, "At no time has anyone
(24) been told that BISD was funding our office. I have
(25) had to explain to a few people I simply was not able

**Page 221**

(1) to fund a full-time office on my own and that funding
(2) from AFLAC was not available." Was that part of the
(3) discussion you were having with him earlier about
(4) funding his office?
(5)   A.   I'm not sure when we had that conversation.
(6) It could have been before; as well, it could have been
(7) after. I think – never mind.
(8)   Q.   Was there some concerns after the BISD
(9) enrollment, some complaints from customers, that they
(10) were not getting good service on their accounts?
(11)   A.   I think that the only documentation I have is
(12) a handful of people that were – I'm sorry – that
(13) were concerned that they had some challenges with
(14) service.
(15)   Q.   Okay. By handful, you mean about how many?
(16) If you can, just give me a range. I don't need an
(17) exact number.
(18)   A.   Six or eight.
(19)   Q.   Okay. Were there also other – were you
(20) aware of any other phone complaints about the
(21) servicing of the accounts?
(22)   A.   Phone complaints?
(23)   Q.   Yes. Either phone or oral. In other words,
(24) you said you had –
(25)   A.   There were no complaints that came directly

**Page 222**

(1) to my office. There were some complaints that went to
(2) Mr. DePasqual's office. There were complaints that
(3) were handled by Mr. Levine's office as well, but they
(4) were minimal.
(5)   Q.   Some oral or phone complaints? In other
(6) words, you mentioned a handful of documents, six to
(7) eight, something like that.
(8)   A.   Those were just some written documents,
(9) correct.
(10)   Q.   And in addition to that, I'm asking about the
(11) oral, either phone or in person complaints, and you
(12) said there was some more of those.
(13)   A.   There was not – an insignificant amount as
(14) it relates to the size of the group and the number of
(15) policyholders.
(16)   Q.   Can you give me a range?
(17) MS. LEEDS:   Objection; asked and
(18) answered.
(19) THE WITNESS:   In terms of phone calls,
(20) you're asking me to guess. I really don't know. I
(21) know there was a minimal amount. I really couldn't
(22) put my finger on it.
(23)   Q.   (By Mr. Aguilar) Okay. Back when Dino was
(24) supervising this account, did you ever get any
(25) handwritten – or I'm sorry, any written typed

Page 223

(1) complaints about his handling of this account?
(2)    A.    Outside of the complaints that I got
(3) regarding Mr. Sanchez –
(4)    Q.    Correct.
(5)    A.    – I can't recall –
(6)    Q.    Any?
(7)    A.    – any complaints as far as the BISD account
(8) is concerned. There are other accounts that I had
(9) voiced concerns.
(10)   Q.    Okay. Not the BISD – nobody in the BISD
(11) account had ever expressed any concerns about
(12) Mr. Chavez?
(13)   A.    Not until I received the letter from
(14) Dr. Sauceda.
(15)   Q.    Okay.
(16)   A.    Not in writing, anyway.
(17)   Q.    Let me hand you what I've marked as Chavez
(18) Exhibit 36. This is a memo, it appears, from
(19) Mr. Chavez to you and others.
(20)   MR. STEELE:    Take time to read it.
(21)   THE WITNESS:    I'm familiar with it.
(22)   Q.    (By Mr. Aguilar) That's what I was going to
(23) ask you. Are you familiar with this document?
(24)   A.    I am familiar with the document.
(25)   THE WITNESS:    Am I allowed to write on

Page 224

(1) this? Or just make a –
(2)    MR. AGUILAR:    Let's not.
(3)    MR. STEELE:    Probably not.
(4)    THE WITNESS:    That would be a bad idea,
(5) okay.
(6)    Q.    (By Mr. Aguilar) Actually, I'm trying to
(7) figure out who sent this memo? Is it Mr. Chavez to
(8) you?
(9)    A.    It was – I actually sent the memo, but what
(10) you've provided here is a forward from Dino to
(11) somebody.
(12)   Q.    Okay. So this was originally a memo from you
(13) to –
(14)   A.    The people that are listed at the top, that's
(15) correct.
(16)   Q.    Including Dino, right?
(17)   A.    Yes, sir.
(18)   Q.    And this was dated December 2, 2001. Would
(19) that have been when you sent it out?
(20)   A.    I don't know. That's the date I wrote it.
(21)   Q.    Okay. It's addressed to team. And are each
(22) of those people on that list your team, the team you
(23) were talking?
(24)   A.    Yes.
(25)   Q.    Okay. It indicates I guess – it's hard to

Page 225

(1) tell where the paragraph starts. It's towards the
(2) top. "When you accept the regional contract" – do
(3) you see that?
(4)    A.    Uh-huh.
(5)    Q.    – "it is with the understanding that you are
(6) to assign all accounts both H/O" – what's H/O?
(7)    A.    That stands for home office.
(8)    Q.    – "home office and personal accounts to your
(9) staff for service and future enrollment. Under no
(10) circumstances are you ever to take a transmittal split
(11) on any of these accounts." What did you mean by that?
(12) Can you explain it?
(13)   A.    I answered that question earlier. When we
(14) have a regional sales coordinator taking split
(15) commissions, it's generally thought of that they
(16) should be on – beyond the point of personal
(17) production. And it's viewed by a great many of the
(18) sales force as their own internal competition.
(19)   Q.    Okay.
(20)   A.    And they have enough external competition.
(21) It's a negative.
(22)   Q.    Okay. It goes on to say – and I think this
(23) explains what you just said. "Regional sales
(24) coordinators will not be involved in personal
(25) production for any reason. The RSC's primary function

Page 226

(1) is recruiting and developing DSCs." That's what you
(2) were kind of just explaining, right?
(3)    A.    That's correct.
(4)    Q.    Okay. Now, this was the first year you had
(5) been involved with BISD as the state coordinator,
(6) right?
(7)    A.    Would have been the second year.
(8)    Q.    Second year, okay. The year before, 2000 for
(9) 2001 – do you understand which one I'm talking about?
(10)   A.    Yes, sir.
(11)   Q.    Okay. During that year, do you recall what
(12) split Dino was getting with his agents for the BISD
(13) enrollment?
(14)   A.    I don't know what the percentage was, but
(15) when I realized that there was business being produced
(16) in Dino's name, I was astounded.
(17)   Q.    When did you realize that?
(18)   A.    When his name showed up on a production
(19) report.
(20)   Q.    Okay. It would have been in 2000, right?
(21)   A.    It could have been at the end of 2000 or at
(22) the beginning of 2001. But, yes, somewhere in that
(23) area.
(24)   Q.    And what did you do at that point?
(25)   A.    I believe I had a conversation with Dino

Page 227

(1) regarding his personal production, because I had been
(2) brought up, and had been with AFLAC 15 years, in a
(3) system where regional sales coordinators just didn't
(4) produce and that was the accepted process.
(5)    Q.    Okay.
(6)    A.    And I had never seen an exception to that.
(7)    Q.    Okay. And did he explain to you why there
(8) was an exception, why he had it the way this went?
(9)    A.    To the best of my recollection, I think that
(10) Dino explained to me that he was taking some
(11) percentage – and again, I can't identify – to help
(12) on some of the expenses related to the account.
(13)   Q.    The servicing of the account?
(14)   A.    Correct.
(15)   Q.    Okay. And did he talk to you about the
(16) distinction between whether he was servicing the
(17) account or whether the enrollers or agents were
(18) servicing those accounts?
(19)   A.    I'm not sure that we discussed that
(20) specifically. I had my impression of how that was
(21) handled and I shared that with you earlier.
(22)   Q.    And you didn't do anything to say, no, Dino,
(23) you've got to take those out, they've got to get –
(24) the individual agents have to get full commission;
(25) RSCs do not get commissions? You didn't do that,

Page 228

(1) right?
(2)    A.    When?
(3)    Q.    In late December, 2000 or early January,
(4) 2001.
(5)    A.    As I mentioned to you, when I discovered that
(6) Dino had taken production from the account, it was
(7) after the fact.
(8)    Q.    Right.
(9)    A.    It was too late for me to do anything about
(10) it.
(11)   Q.    You couldn't – I'm sorry.
(12)   A.    And I had not addressed the issue with him
(13) individually prior to that time. So it would have
(14) been unfair of me to circumvent what he had done. But
(15) to clear it up for the future, we did have a
(16) discussion about it.
(17)   Q.    Okay. So let's just say it was by the end of
(18) January, 2001, right?
(19)   A.    That we had that discussion?
(20)   Q.    Right.
(21)   A.    We had a discussion immediately following the
(22) fact that he showed up with that production, yeah.
(23)   Q.    And I'm just trying to work on a timetable.
(24)   A.    It would be sometime after the BISD – during
(25) or after the BISD enrollment was completed in 2000 for

Page 229

(1) year 2001.
(2)   Q.   Would that have been on or before the end of
(3) January, 2000?
(4)   A.   Don't know.
(5)   Q.   You just don't have any idea?
(6)   A.   No. I have no idea.
(7)   Q.   All right. So at that point –
(8)   A.   I think I was real specific about that when
(9) it took place.
(10)   Q.   Okay. So at that point you realized that's
(11) what was going on, you felt it was not fair to Dino to
(12) go take it away from him after he had already made
(13) that arrangement, right?
(14)   A.   That's not what I said.
(15)   Q.   I'm sorry.
(16)   A.   What I said was that I had not addressed –
(17)   THE WITNESS:   Do I have to repeat
(18) myself?
(19)   Q.   (By Mr. Aguilar) Actually, I'll just ask you
(20) a different question, okay?
(21)   A.   Well, then, do you want to straighten it out
(22) for the record since you asked it twice two different
(23) ways?
(24)   Q.   No. If you don't want to answer it the
(25) second way, that's okay, too.

Page 230

(1)   MR. STEELE:   Well, you said you would
(2) ask another question. Go ahead and ask that question.
(3) Let's move on down the road.
(4)   Q.   (By Mr. Aguilar) My question is, at that
(5) point, after you had talked to Dino, around the time
(6) of the enrollment of 2000 going into 2001 – I'm just
(7) trying to put it in a timetable – at that point, you
(8) decided not to withdraw any of those splits that Dino
(9) had already done for that time period, right?
(10)   A.   I never even considered it because I was
(11) unaware of the fact that it was taking place. And
(12) Dino –
(13)   Q.   I'm talking about after the fact. I'm
(14) talking about after the –
(15)   MR. STEELE:   Let him finish the
(16) question.
(17)   THE WITNESS:   I need to go to the
(18) restroom, you-all.
(19)   MR. AGUILAR:   Okay.
(20)   (Lunch Recess)
(21)   Q.   (By Mr. Aguilar) Okay. Before we took a
(22) break, I was asking you about commission splits
(23) between the RSC and the agent. And we were talking
(24) about the time period of 2000 when the enrollment was
(25) being done for the 2001 year. You indicated you found

Page 231

(1) out that Dino had a commission split arrangement with
(2) the enrollers. Remember, that's what we were talking
(3) about just before we broke for lunch?
(4)   A.   Yes.
(5)   Q.   Okay. And you said you talked to Dino
(6) sometime around that time period of the enrollments;
(7) is that right?
(8)   A.   If that's what the record indicates.
(9)   Q.   Is that your recollection?
(10)   A.   Yeah, uh-huh.
(11)   Q.   Okay. After you talked to him about the
(12) splits and how it was worked out or whatever, did you
(13) send him any letter saying, hey, I don't approve of
(14) these splits?
(15)   A.   I don't think I sent – as a matter of fact,
(16) no, I did not send Dino a letter. But there are a set
(17) of guidelines that I run the operation by which
(18) clearly indicate that, and I believe Dino had seen
(19) those previously.
(20)   Q.   Okay.
(21)   A.   They were available for him if he had not.
(22)   Q.   Okay. Did you ever send him any – you
(23) didn't send him a letter. Did you send an e-mail or
(24) any other kind of notice saying, "Hey, these are our
(25) guidelines, no commissions are allowed," for future

Page 232

(1) enrollments?
(2)   A.   I think that he was given a copy of those
(3) guidelines when I became the state sales coordinator
(4) or sometime shortly thereafter. But there was no
(5) conversation – or no written documentation of our
(6) conversation following the time that we had it, which
(7) would have been in the time period that we talked
(8) about earlier.
(9)   Q.   Around the enrollment of 2000?
(10)   A.   At the end of the enrollment.
(11)   Q.   At the end of 2000?
(12)   A.   You bet.
(13)   Q.   There was no memo sent out, I presume, then,
(14) to the rest of the agents also saying – let me
(15) rephrase that. You also did not send any memo,
(16) letter, e-mail or anything like that to the agents
(17) saying, commission splits between agents and RSCs are
(18) not permitted, after that point either, right?
(19)   A.   Actually, the answer to that is no. I don't
(20) deal at the agent level. That is an RSC or a DSC
(21) responsibility, as opposed to mine.
(22)   Q.   Okay. Now, these – what's called the – the
(23) documents that you're talking about, what are they
(24) called?
(25)   A.   I'm not sure which documents you're referring

Page 233

(1) to.
(2)   Q.   The one you just referred to. You said Dino
(3) does – had – or a copy of some guidelines.
(4)   A.   Yeah. There are some guidelines that sort of
(5) govern the general way that we do business.
(6)   Q.   Where are those guidelines? What are they
(7) called?
(8)   A.   They're called guidelines.
(9)   Q.   Okay. If I wanted – can you get me a copy
(10) of those?
(11)   MR. STEELE:   If – are you aware of a
(12) particular set of guidelines, Frank?
(13)   THE WITNESS:   It's guidelines that I
(14) wrote from the state which I was encouraged to write
(15) by my territory director when I became the state
(16) coordinator.
(17)   MR. STEELE:   Well, can you – do you
(18) have a copy? Can you put your hands on those
(19) guidelines?
(20)   THE WITNESS:   No.
(21)   MR. STEELE:   I do not have a problem, if
(22) you can put your hands on those without much trouble,
(23) if you will get a copy to me and I'll get them over to
(24) Arnold.
(25)   Q.   (By Mr. Aguilar) Is it just like something

Page 234

(1) that you typed up yourself?
(2)   A.   Yeah.
(3)   Q.   Okay. Does it have a title at the top or
(4) something, guidelines or something?
(5)   A.   It probably says AFLAC Texas Central
(6) Guidelines.
(7)   Q.   Okay. When – how did you distribute those
(8) guidelines? Like whenever an agent get hired, does he
(9) get a copy or something?
(10)   A.   Actually, at the time that I became the state
(11) sales coordinator, or shortly thereafter, they were
(12) distributed personally from myself to the regional
(13) sales coordinators.
(14)   Q.   Okay.
(15)   A.   The associates are – and the district sales
(16) coordinators would have gotten a copy as well. They
(17) are then responsible for communicating that
(18) information to the associate level.
(19)   Q.   You would have sent them to your RSCs, who
(20) then you expected to distribute to the DSCs and to the
(21) associates?
(22)   A.   Actually, I would have given them to the RSCs
(23) and the DSCs in a total team management format, and
(24) then expected them to do their part or their
(25) responsibility, which is to communicate the

**Page 235**

(1) information to the associates.
(2)   Q.   Okay. Do you know when you distributed those
(3) guidelines?
(4)   A.   They've been distributed numerous times since
(5) I took over.
(6)   Q.   In other words, whenever a new person becomes
(7) a DSC, for example, you might at that point give them
(8) one?
(9)   A.   Yes.
(10)   Q.   Okay. Do you remember when you first
(11) distributed – in other words, when you first came in
(12) as SSC –
(13)   A.   January 1 of 2000.
(14)   Q.   So in January – in January of 2000, let's
(15) say, is that when you sent out to everybody – all the
(16) RSCs and DSCs?
(17)   A.   I think it would be shortly thereafter. It
(18) wouldn't have been – because this all happened – my
(19) promotion happened very quickly.
(20)   Q.   Say by March of 2000?
(21)   A.   Somewhere. And I would imagine in the first
(22) quarter. At the outside, the first six months.
(23)   Q.   Okay. That's when you would have distributed
(24) to everybody who at least at that point was an RSC or
(25) a DSC?

**Page 236**

(1)   A.   Yes.
(2)   Q.   Okay. And those are just guidelines for how
(3) you want the district – I'm sorry – the state to be
(4) run?
(5)   A.   Yes. They would be guidelines that sort of
(6) govern generally how we do business.
(7)   Q.   Okay. So it's not a general AFLAC policy,
(8) right, it's just your guidelines?
(9)   A.   It's the guidelines that I put in place for
(10) the state, which are, in most cases, very consistent
(11) with the company guidelines, which are also available
(12) in print.
(13)   Q.   Okay. It's not in any of the AFLAC
(14) contracts, right?
(15)   A.   Contractually, I don't think it relates to –
(16) for regional sales coordinator, anyway, anything to do
(17) with personal production. But I would have to sit
(18) down and comb through the contract.
(19)   Q.   Actually, whether it's for the associates,
(20) the DSCs, the RSCs or the SSCs, nothing in there talks
(21) about whether splits are allowed or not allowed,
(22) right?
(23)   MR. STEELE:   "In there," let's be clear.
(24) You mean in the contracts?
(25)   MR. AGUILAR:   The contracts.

**Page 237**

(1)   THE WITNESS:   You know, Arnold, I don't
(2) think so, but I would have to read the contract to be
(3) certain.
(4)   Q.   (By Mr. Aguilar) As far as splits for –
(5) splits between RSCs and agents, when you're doing
(6) group enrollments where you said your guidelines say,
(7) it's not allowed, is that something across AFLAC
(8) nationwide or is that just in your region?
(9)   A.   It's the system that I was brought up in in
(10) Texas; in other words, regional sales coordinators
(11) were not – were advised not to be involved in
(12) personal production. And that's the way that I've
(13) always understood it to be company-wide.
(14)   Q.   Oh, you've understood that's company-wide,
(15) also?
(16)   A.   Absolutely.
(17)   Q.   So do you know whether any other RSCs or DSCs
(18) split commissions with agents?
(19)   A.   I don't know for sure.
(20)   Q.   Okay. Maybe yes, maybe no; you just don't
(21) know?
(22)   A.   That's correct.
(23)   Q.   You mentioned earlier that you had gotten
(24) into some concerns previously with your supervisors
(25) because you were somewhat of a hothead. Do you

**Page 238**

(1) remember that?
(2)   A.   Don't.
(3)   Q.   Do you remember earlier today I had asked
(4) you – I forget what it was I asked you, but your
(5) response was, well, sometimes I tend to be a hothead,
(6) or something like that?
(7)   A.   I can't recall ever using that word.
(8)   MS. LEEDS:   Object to the form.
(9)   Q.   (By Mr. Aguilar) You don't recall using that
(10) word today?
(11)   A.   I don't.
(12)   Q.   Okay. Do you remember attending the
(13) national –
(14)   A.   Let me retract that statement. I don't
(15) recall ever using that word with you.
(16)   Q.   Okay. Do you recall attending the national
(17) convention in Honolulu?
(18)   A.   I do.
(19)   Q.   In October of 2001, does that sound about the
(20) right time period?
(21)   A.   I don't know when it would be, but I imagine
(22) that's probably right.
(23)   Q.   The only one you attended in Honolulu?
(24)   A.   Incorrect.
(25)   Q.   You had attended more than –

**Page 239**

(1)   A.   Several.
(2)   Q.   Okay. Do you remember attending one on or
(3) about – in or about October of 2001?
(4)   A.   Yes.
(5)   Q.   Do you remember at one point one night police
(6) or security got called to you – because of you?
(7)   MR. STEELE:   Objection.
(8)   MS. LEEDS:   Join.
(9)   Q.   (By Mr. Aguilar) Do you remember that?
(10)   THE WITNESS:   I'll be glad to answer the
(11) question.
(12)   MR. STEELE:   All right. It's up to you.
(13)   THE WITNESS:   I had an argument with my
(14) wife. The people in the room next to her called
(15) because I was a little too loud.
(16)   Q.   (By Mr. Aguilar) Okay. And at that point,
(17) Mr. Bamson and Mr. Kuechenmeister approached you in
(18) your room?
(19)   A.   That's inaccurate.
(20)   Q.   That didn't happen; they did not?
(21)   A.   They did not.
(22)   Q.   Did they approach you somewhere else?
(23)   A.   They approached me the next day to ask me
(24) what took place.
(25)   Q.   Okay. Do you remember them telling you that

**Page 240**

(1) what had happened reflected badly on AFLAC?
(2)   A.   Yes.
(3)   Q.   Do you remember them telling you, you need to
(4) either shape up or they would take action?
(5)   A.   No.
(6)   Q.   You don't remember them saying that?
(7)   A.   They never said that.
(8)   Q.   Something like that?
(9)   A.   They never said anything like that.
(10)   Q.   Okay.
(11)   A.   However, Dan Amos had something else to say.
(12)   Q.   What did he say?
(13)   A.   He said that it should never happen again.
(14)   Q.   He did not want it to ever happen again?
(15)   A.   And I agreed.
(16)   Q.   Okay. The accusation, was it just that you
(17) were yelling or was it more than that?
(18)   A.   I don't know what accusations were made, to
(19) be honest with you. Other than that I know what
(20) happened, which happened behind the closed doors of my
(21) hotel room.
(22)   Q.   In any case, you did not get fired after that
(23) incident, right?
(24)   A.   No.
(25)   Q.   They just said, I don't want to see this

Page 241

(1) happen again?
(2) A. Yes.
(3) Q. And was that both Mr. Kuechenmeister and
(4) Mr. Barnson?
(5) A. Yes, and Mr. Amos.
(6) Q. And Mr. Amos. Actually, Mr. Amos was the one
(7) who made the comment, right?
(8) A. Actually, I wrote Mr. Amos a letter of
(9) apology and he responded and asked that I not allow
(10) that to ever occur at an AFLAC event again. And I
(11) explained to him clearly that I apologize for arguing
(12) with my wife because I was probably the only one who
(13) had ever had an argument with their wife.
(14) MR. AGUILAR: Off record just a moment.
(15) (Off the record)
(16) Q. (By Mr. Aguilar) One other thing I forgot to
(17) ask about. When we took your – finished your
(18) deposition last time, I had asked you to put together
(19) growth rate comparison information. We asked you for
(20) your annual team production for each of the years you
(21) were an RSC and an SSC. You said you would have to
(22) put that together and I'll get it for you. Did you
(23) bring that with you today?
(24) A. I think that my answer was that unless I'm
(25) compelled to provide those – or actually that was my

Page 242

(1) attorney's advice. I'll turn it to over on him.
(2) MR. STEELE: Well, I – what I recall
(3) your asking him to produce was his own individual tax
(4) returns that we refused to produce.
(5) MR. AGUILAR: It was that, but that's
(6) something else.
(7) MR. STEELE: And I don't – you know, I
(8) don't know – I tell you what, put it in the form of a
(9) request – I guess you'll have to do a third party
(10) subpoena duces tecum.
(11) MR. AGUILAR: I guess what I can do is
(12) just ask the other question which is similar.
(13) Q. (By Mr. Aguilar) What I'm really asking is,
(14) did you bring anything – and I think I know what the
(15) answer is. But let me go ahead and ask the question
(16) and get it on the record.
(17) MR. STEELE: Okay. And then I'll go
(18) ahead and make any objection. And then, Frank, you
(19) can answer.
(20) THE WITNESS: You-all just let me know
(21) what the deadline is and I'll be all right here.
(22) Q. (By Mr. Aguilar) Okay. Now, getting back
(23) to – the actual question was, during the first part
(24) of your deposition, we asked about your annual team
(25) production premiums, what is was for each of the years

Page 243

(1) you were an RSC and an SSC. We asked you to bring
(2) that and I thought you said you agreed to bring that.
(3) Do you have it with you today?
(4) MR. STEELE: I'm going to object to
(5) the form of the question. It misstates facts in
(6) evidence.
(7) THE WITNESS: I did not bring –
(8) MR. STEELE: Go ahead.
(9) THE WITNESS: No, I did not bring them.
(10) Q. (By Mr. Aguilar) And the second thing is, we
(11) also asked you what your 1099 income was for each year
(12) you were an RSC and an SSC. Do you have that
(13) information?
(14) MR. STEELE: Again, we object to that.
(15) We reiterate the objection made earlier.
(16) THE WITNESS: And I do not have it with
(17) me.
(18) Q. (By Mr. Aguilar) And you did not bring that
(19) with you?
(20) A. That's correct.
(21) Q. Okay.
(22) MR. AGUILAR: I'll go ahead and pass the
(23) witness at this time.
(24) EXAMINATION
(25) QUESTIONS BY MS. NEALLY:

Page 244

(1) Q. Mr. LaFemina, my name is Elizabeth Neally.
(2) I'm the attorney that represents the Brownsville
(3) Independent School District.
(4) A. Yes, ma'am.
(5) Q. Do you understand that?
(6) A. Yes, I do.
(7) Q. We met at your earlier deposition, the first
(8) deposition, right?
(9) A. I remember.
(10) Q. I'm going to ask you a few questions and I
(11) believe – I don't want to be redundant, so bear with
(12) me.
(13) MS. NEALLY: Eileen, pull out AFL 2952.
(14) 2948 – I'm sorry – through 29 – sorry about that.
(15) 2939 to 2948 of the documents I faxed.
(16) MS. LEEDS: Okay. I've got 2948.
(17) MS. NEALLY: 2939 to 2948. It's one
(18) document.
(19) MS. LEEDS: Yes.
(20) MS. NEALLY: Okay. Is that –
(21) MR. STEELE: Hang on just a second.
(22) MS. LEEDS: I do not believe so.
(23) MR. STEELE: Do you want to staple this
(24) and make it an exhibit?
(25) MS. NEALLY: Please.

Page 245

(1) THE WITNESS: We miss you not being here
(2) personally, by the way.
(3) (Exhibit No. 8
(4) (marked for identification.
(5) MS. LEEDS: It's Exhibit 8.
(6) Q. (By Ms. Neally) Okay. This is a document
(7) that was supplied to us by your attorney in response
(8) to request for production by me. And I believe it's a
(9) reimbursement services agreement; is that right?
(10) A. That's what it's titled, ma'am, on page one,
(11) yes.
(12) Q. Okay. And on the last page, it's signed and
(13) entered into between Cheryl Moss as second vice
(14) president for AFLAC, I believe, and then Ken Lieck
(15) from the Brownsville Independent School District; is
(16) that right?
(17) A. That's what's indicated on the last page.
(18) That's correct, ma'am.
(19) Q. That's for the 1998 – well, actually, the
(20) 1999 school year, right?
(21) A. I don't know without reading the document
(22) whether it's a multiple year arrangement or an annual
(23) arrangement.
(24) Q. Take a look at that for me and let me know.
(25) A. It would take me quite a few minutes to read

Page 246

(1) this whole thing. Do you want to do that now?
(2) Q. No. Just for purposes of – can you
(3) determine from looking at the document whether it's a
(4) multiple year or just one year?
(5) A. Can we go off the record for a minute? I
(6) just need to ask Buddy a question.
(7) MS. LEEDS: Sure.
(8) Q. (By Ms. Neally) I think if you look in
(9) Section 5 –
(10) A. I was not involved in this. It was 1998. I
(11) wasn't a state sales coordinator and don't feel like
(12) I'm comfortable with it.
(13) MR. STEELE: Hang on. Let's just see –
(14) where is it, Elizabeth? Section 5?
(15) MS. NEALLY: Section 5 of the agreement.
(16) THE WITNESS: Okay. That will make it
(17) simple.
(18) MR. STEELE: Just read what it says.
(19) THE WITNESS: It says here in that
(20) section that it's – "Shall be the initial plan year
(21) commencing on the effective date hereof and thereafter
(22) the agreement will automatically renew for successive
(23) periods of 12 months. At least 30 days prior to the
(24) end of the then current term, the employer or AFLAC
(25) gives written notice to the other of its intention not

Page 247

(1) to renew the agreement," blah, blah, blah.
(2) (By Ms. Neally) Okay. But it started on
(3) December 22nd, 1998, and as far as you know, that's
(4) the first period where AFLAC was the TPA for
(5) Brownsville Independent School District; is that
(6) right?
(7) A. I hate to be what appears to be
(8) uncooperative, but I can't answer the question. I was
(9) not the state sales coordinator at the time and I do
(10) not know when it began.
(11) Q. My question just boils down to this: This
(12) was an agreement solely between the Brownsville
(13) Independent School District and AFLAC. And there's no
(14) mention of Dino Chavez in it, is there?
(15) A. That's correct, ma'am.
(16) Q. Now, will you -- okay. I believe it's your
(17) Exhibit 2.
(18) MR. STEELE: Give us a second. We're
(19) finding it. Okay.
(20) Q. (By Ms. Neally) And correct me if I'm wrong,
(21) does Exhibit 2 start off with team?
(22) A. It does. Referring to a couple of people. I
(23) use that term frequently, even when working with two
(24) people.
(25) Q. Because I'm not positive, is that --

Page 248

(1) MS. NEALLY: Eileen, would you check and
(2) tell me if this is the same document as AFL 3000?
(3) THE WITNESS: It begins with team. It's
(4) the one you have that says team and mine doesn't.
(5) MR. STEELE: Hang on just a second.
(6) MS. LEEDS: Yes.
(7) Q. (By Ms. Neally) Okay. And this was the
(8) terms of that you had outlined and you expected
(9) Mr. Chavez to follow; is that right?
(10) A. I expected Mr. Chavez and others involved,
(11) all others involved to follow this process for that
(12) particular year's enrollment.
(13) Q. And at this point in time, he's still the
(14) regional sales coordinator; is that right?
(15) A. Ma'am, I don't have a date on this form, so
(16) I'm going to assume for the sake of this conversation
(17) that that's correct.
(18) Q. The copy that I have and that was produced
(19) for me from AFL 3000 --
(20) A. Yes.
(21) Q. -- is dated 2001 -- a matter of fact 12-1-01.
(22) A. At that time, Mr. Chavez would still have
(23) been the regional sales coordinator. That's correct.
(24) Q. And the Exhibit 2 that you-all have entered
(25) into already, does that also have "Received 12-1-01?"

Page 249

(1) MR. STEELE: No.
(2) THE WITNESS: My copy does not have
(3) 12-1, but the received 12-1-01 is handwritten in.
(4) And --
(5) MR. STEELE: On AFL 3000, but not on
(6) LaFemina Exhibit 2.
(7) MS. NEALLY: Okay. Let's mark AFL 3000
(8) as Exhibit 8 then, please.
(9) MS. LEEDS: 9.
(10) MS. NEALLY: 9.
(11) (Exhibit No. 9
(12) (marked for identification.
(13) MR. STEELE: That is done.
(14) Q. (By Ms. Neally) Okay. Do you know whose
(15) writing "Received 12-1-01" is?
(16) A. I do not know for sure.
(17) Q. Who do you suspect it to be?
(18) A. It appears to me that there's a possibility
(19) it could be the handwriting of Mr. Chavez, but I can't
(20) say for certain.
(21) Q. Okay. But this is a document I got from your
(22) attorney.
(23) A. I don't know who you got it from, ma'am.
(24) Q. I'm just representing to you that it is.
(25) Does that change your opinion?

Page 250

(1) A. Does it change my opinion as to whether --
(2) Q. As to who wrote it in.
(3) A. It doesn't change my opinion as to who wrote
(4) it in. I'm answering the question as honestly as I
(5) could possibly do. I don't know for sure whose
(6) handwriting, but it may be that of Dino Chavez.
(7) Q. Okay. And, Mr. LaFemina, I'm not trying to
(8) argue with you. I just asked you if it changed your
(9) opinion. That's the only thing. I'm just trying to
(10) clarify that because I am at a little bit of a
(11) disadvantage, and I realize that's my problem, because
(12) I'm not there personally. So I'm not sure about the
(13) received 12-1-01, if you know who wrote it.
(14) A. I didn't take it as argumentative, ma'am. I
(15) just refuse to put my foot down and tell you that
(16) that's anybody's writing because I don't know whose
(17) writing it is for sure.
(18) Q. Fine. Okay. Now, as far as the terms that
(19) you outlined here, what discussions did you have with
(20) Mr. Chavez about him complying with these terms?
(21) A. We had a rather lengthy phone conversation on
(22) Saturday, I believe it was. Nonetheless, I'm not sure
(23) that's very important. But we discussed what my plan
(24) was at length over the telephone, at which time
(25) Mr. Chavez was thoroughly frustrated with me and

Page 251

(1) indicated that he did not agree with what I was trying
(2) to accomplish.
(3) Q. Was he openly insubordinate with you in
(4) saying that he would not comply with your directive?
(5) A. I don't think he was openly insubordinate
(6) with me. I think what he said to me was that I needed
(7) to be on his side, rather than anybody else's side and
(8) understand his point of view and that he was right and
(9) there was no question that he was the case. And I
(10) assumed or read into that that he did not agree with
(11) anything outlined here.
(12) Q. Okay. Did you have any additional
(13) conversations with him regarding these directives?
(14) A. I think that the additional -- the answer to
(15) that is no. The additional correspondence is the
(16) document.
(17) Q. Which document?
(18) A. LaFemina Exhibit No. 2. We discussed this on
(19) the phone and even though he was not thinking very
(20) highly of me at the time, as a result of this, I sent
(21) it out to the parties that were involved to make sure
(22) that they had something in writing as to what I
(23) thought was the best solution to satisfy the client
(24) and to help protect some of Dino's future interests.
(25) Q. Okay. And to clarify the record,

Page 252

(1) November 29th, 2001 is when you got involved regarding
(2) Dr. Sauceda's letter; is that right?
(3) A. I got involved when I got Dr. Sauceda's
(4) letter.
(5) Q. Okay. And the letter is dated November 29th?
(6) A. That's correct. His letter is dated
(7) November 29th.
(8) Q. And November 29th, 2001 was a Thursday. And
(9) I believe your earlier testimony was that you went
(10) down the next day to Brownsville; is that right?
(11) A. I don't think I ever testified to that. I
(12) think what I -- never mind. I didn't testify to that.
(13) Q. Okay. What transpired on November 30th? You
(14) spoke with Dr. Sauceda on the phone?
(15) A. It was my wife's birthday. I don't know what
(16) happened on November 30th other than the fact that I
(17) was alive and it was my wife's birthday.
(18) Q. Okay. When did you speak with Dr. Sauceda on
(19) the phone?
(20) A. I can't tell you that. It was shortly after
(21) I received the correspondence.
(22) Q. Okay. Was it the same day that you received
(23) the correspondence?
(24) A. You're asking me to remember a phone
(25) conversation that took place a year-and-a-half ago. I

Page 253

(1) can't do that. It was right in there somewhere. It
(2) was either that day, the next day or the next day. It
(3) was – It could have been any one of those times. I
(4) can't tell you for sure.
(5)    Q.    Well, the fact that it fell on either a
(6) Thursday or a Friday would indicate to you that you
(7) probably talked to him then as opposed to talking to
(8) him over the weekend unless you called him at home;
(9) isn't that right?
(10)    A.    That would be an assumption that you're
(11) making, but I don't know when I talked to him, as I
(12) mentioned to you. And I'm not being argumentative
(13) with you. I did have a conversation with him and it
(14) happened sometime nearly immediately following the
(15) receipt of the letter. The question is when I got the
(16) letter, and the answer is, it's dated the 29th, but I
(17) don't know when I got it for sure. It's in previous
(18) testimony. But, yes, we had a conversation.
(19)    Q.    You prepared the directive to your team
(20) that's Exhibit 2 on or about December 1st, 2001,
(21) correct?
(22)    A.    My LaFemina 2 does not have a date on it.
(23)    Q.    Okay. But you recall speaking to Mr. Chavez
(24) on a Saturday. That's what your earlier testimony
(25) was, correct?

Page 254

(1)    A.    I said that I believed it was a Saturday and
(2) then I followed it up by saying, "Well, it doesn't
(3) really matter what day it was."
(4)    Q.    Okay.
(5)    A.    I mean, you know, let me just say this – and
(6) if my attorney advises me otherwise, then I'll take
(7) his advice. If you're going to ask me about specific
(8) dates, I'll tell you the same thing, with all due
(9) respect, that I told Mr. Aguilar. I cannot confirm
(10) for you any date and I will not confirm for you any
(11) date unless it's a date that's on a document and it's
(12) not something that's handwritten in. I would love to
(13) help you, but I'm just – my crystal ball doesn't work
(14) real well.
(15)    MS. NEALLY:    I'm going to object to the
(16) responsiveness of the answer.
(17)    Q.    (By Ms. Neally) Okay. Now, you've said that
(18) the only conversation that you had with Mr. Chavez
(19) regarding Exhibit 2 occurred on some date afterwards,
(20) I'm assuming, right?
(21)    A.    No.
(22)    Q.    The conversation with him; is that right?
(23)    A.    Nope. No, ma'am.
(24)    Q.    Okay. Well, then tell me about the
(25) conversations you had with him, sir.

Page 255

(1)    A.    It's not the conversation issue. We did have
(2) one conversation. It took place prior to this printed
(3) directive.
(4)    Q.    Okay.
(5)    A.    Which is what I testified to previously.
(6)    Q.    Okay. After you sent the directive, did you
(7) have any additional conversations with Mr. Chavez?
(8)    A.    I do not remember.
(9)    Q.    Okay. Let me show you what we're going to
(10) mark as Exhibit 10. I don't believe it's in evidence
(11) already. And it's AFL 3001 and 3002. You can staple
(12) those, I'm sorry. And 3003. It's one document. Is
(13) that already in evidence?
(14)    A.    Yes.
(15)    MR. STEELE:    Hang on a second. Let me
(16) see if this is the complete version. It is. And give us
(17) a second. The only difference between what you faxed
(18) today to this firm with our AFL marks on it are some
(19) old facsimile information at the top. That's the only
(20) difference between Chavez 36 which is what Arnold has
(21) been referring to in his questioning, and it has the
(22) Bates labels 001231 through 1233 inclusive. It's the
(23) same document as AFL 3001 through 3003. It was –
(24) they were faxed earlier today to my office. The only
(25) exception being there's fax information at the top on

Page 256

(1) AFL 3001. It says December 4, 2001, 10:45 a.m., AFL.
(2) And there's one that says December – hard to read –
(3) it looks like it's December 3, '01, 8:15 a.m., Dino X.
(4) Chavez and then a phone number.
(5)    MS. NEALLY:    Okay.
(6)    Q.    (By Ms. Neally) This is a document that you
(7) prepared after Exhibit 2, right?
(8)    A.    There isn't a date on Exhibit 2, LaFemina 2.
(9)    Q.    Okay. Well, tell me, was it prepared before
(10) or after?
(11)    A.    I told you already – and, again, I'm not
(12) being argumentative – I can't give you dates unless
(13) we've got proof of one sitting here. I can't remember
(14) what dates things took place a year-and-a-half ago.
(15)    Q.    Mr. LaFemina, I didn't ask you what day you
(16) prepared Chavez No. 36 or what day you prepared
(17) Exhibit 2. I just asked you, do you know whether or
(18) not this document was prepared before or after
(19) Exhibit 2? And I'm talking about Chavez 36. Do you
(20) know whether or not it was prepared before or after
(21) Exhibit 2?
(22)    A.    I don't know. And that's the honest, doggone
(23) truth. I do not know.
(24)    Q.    Did you have any conversations with
(25) Mr. Chavez regarding Chavez 36?

Page 257

(1)    A.    I think I told you that the last conversation
(2) that I can recall that I had with Mr. Chavez was on a
(3) day that I thought to be a Saturday where we discussed
(4) LaFemina 2, before it was sent out.
(5)    Q.    Okay. Well –
(6)    MS. NEALLY:    Object to the
(7) responsiveness of the answer.
(8)    Q.    (By Ms. Neally) I didn't ask you about
(9) Exhibit 2. I asked you about –
(10)    MR. STEELE:    Well, that was – he was
(11) being responsive, Elizabeth. And I object to the
(12) argument. You asked, did you talk about 36 and he
(13) said the only one I can – the only conversation I can
(14) remember was talking about 2.
(15)    MS. NEALLY:    No, he didn't answer that
(16) way, Mr. Steele. Do you want to read the question
(17) back – the answer read back?
(18)    (Requested portion was read)
(19)    Q.    (By Ms. Neally) I asked him, did you ever
(20) speak with Mr. Chavez regarding Chavez 36?
(21)    A.    I don't remember. And that's the way it is.
(22) I don't remember if we had a conversation about that.
(23)    Q.    Okay. Now, I believe your earlier testimony
(24) was that when you wrote – I'm not sure of the exhibit
(25) number because I'm not there, but when you wrote the

Page 258

(1) document that has Jeff Willis at the top.
(2)    MS. NEALLY:    What document is that?
(3)    MR. STEELE:    That's LaFemina 4.
(4)    MS. NEALLY:    LaFemina 4.
(5)    MR. STEELE:    Are you talking about the
(6) change in status form?
(7)    Q.    (By Ms. Neally) At that point in time –
(8)    MR. STEELE:    Elizabeth, just so we're
(9) clear, are you talking about the change in status
(10) form?
(11)    MS. NEALLY:    Okay.
(12)    Q.    (By Ms. Neally) LaFemina 4, when you – when
(13) you prepared the change in status form, it was at that
(14) point that you were ready to recommend the termination
(15) of Mr. Chavez; is that right?
(16)    A.    No.
(17)    Q.    No?
(18)    A.    It's an internal document that I sent to be
(19) part of a file. As you can see, there is no signature
(20) in the bottom right-hand corner by the vice president
(21) and agency director. It would have to go to him if I
(22) was recommending – and be signed by him if I was
(23) recommending the termination. We're putting it in the
(24) file for future reference in the event that it needed
(25) to be used to change Mr. Chavez's status, which is

Page 259

(1) ultimately what happened.
(2) Q. Okay. And let me show you what we'll mark as
(3) Exhibit No. 10. And I don't know if this is already
(4) in evidence, AFL 2970.
(5) (Exhibit No. 10
(6) (marked for identification.
(7) THE WITNESS: We've got it.
(8) Q. (By Ms. Neally) Have you seen this document
(9) before?
(10) A. Have I? No, ma'am, I have not.
(11) Q. It's – the date line on this, where it says
(12) sent, says Tuesday, December 4, 2001, 5:23 p.m.; is
(13) that correct?
(14) A. Yes, it is.
(15) Q. Okay. And if you look at the first sentence,
(16) Mr. Chavez writes to Lynn Barnson, "As you probably
(17) know by now, Frank LaFemina has demoted back to an
(18) associate for reasons that are unclear to me." Do you
(19) know why Mr. Chavez believed that on December 4th that
(20) you had demoted him back to associate at that point?
(21) MR. STEELE: Objection; calls for
(22) speculation. Asking him to – you're asking him
(23) what – why Dino would have said that.
(24) Q. (By Ms. Neally) Do you know any reason why
(25) Mr. Chavez would have thought that – or why

Page 260

(1) Mr. Chavez would have written that?
(2) MR. STEELE: You can answer that.
(3) THE WITNESS: Yes, I do.
(4) Q. (By Ms. Neally) Why?
(5) A. The change of status form, LaFemina 4, was
(6) sent to Mr. Chavez's office by my administrator in
(7) error. And he assumed – or at least I think that he
(8) assumed that when he received this, that I was
(9) recommending his termination, when, in fact, no
(10) recommendation had been made at that time and no
(11) recommendation was made until nearly a month later.
(12) Q. Did you do anything to dispel his belief that
(13) he had been terminated as regional sales coordinator?
(14) A. I didn't even know that he believed that.
(15) This was sent – this other item, Exhibit 10, which
(16) you just entered into evidence, I have never seen
(17) prior to today. So I had no way of knowing what
(18) Mr. Chavez was thinking. And, furthermore, it wasn't
(19) until well after the fact that I found out that this
(20) form was faxed to Mr. Chavez in error.
(21) Q. Mr. Barnson didn't call you up and say,
(22) what's the deal, did you demote Chavez, when he got
(23) this letter?
(24) A. He did not.
(25) Q. Now, the document – the change in status

Page 261

(1) form is dated December 4th; isn't that right?
(2) A. It is.
(3) Q. Okay. Let me show you what's marked – what
(4) we'll mark as Exhibit 11. It's AFL 2971.
(5) (Exhibit No. 11
(6) (marked for identification.
(7) Q. (By Ms. Neally) Have you seen this document
(8) before?
(9) A. Oh, when I get it in my hands, I'll let you
(10) know. Yes, I have seen this document before.
(11) Q. Okay. And you'll notice on the sentence
(12) three – well, not sentence three, I'm sorry. On line
(13) three, first sentence –
(14) A. Yes.
(15) Q. – it says, "Frank LaFemina can't seem to
(16) understand that I want all incentive and training
(17) school fund deductions stopped immediately and a
(18) refund issued for all monies that were deducted from
(19) the moment he fired me on December 3rd, 2001 to the
(20) present."
(21) A. I see that.
(22) Q. Do you have any reasons or do you know why he
(23) believed that you fired him on December 3rd, 2001?
(24) A. I do not have the authority and have never
(25) had the authority to fire anyone; therefore, I don't

Page 262

(1) know why anyone would assume that I could fire them.
(2) Q. You never had a conversation with him where
(3) you indicated to him that he was no longer the
(4) regional sales manager, ever?
(5) A. I had a discussion with Dino which was part
(6) of the discussion regarding our conversation on
(7) LaFemina 2.
(8) Q. Okay.
(9) A. And then there's another document, which is
(10) an e-mail, not a conversation, that I sent to
(11) Mr. Chavez – I can't find it – which is LaFemina 3.
(12) Q. Right.
(13) A. Which I alluded to but was not specific in
(14) saying that if he kept going on the same path, he was
(15) going, with regard to his handling of the situation
(16) with BISD and Dr. Sauceda, that it could lead to his
(17) termination as regional sales coordinator.
(18) Q. And what did you mean by that, when you told
(19) him that if he kept going on the same path that he had
(20) been going?
(21) A. I – I felt as though by talking with
(22) Brownsville Independent School District employees and
(23) board members in a not so positive way about
(24) Dr. Sauceda and other people in some of his written
(25) communication to the rank and file of the school

Page 263

(1) district, that he should handle that in a – he should
(2) have handled that in a different way, as opposed to
(3) trying to garner the support of the employee base
(4) against the people that make the decisions.
(5) Q. Okay.
(6) A. I felt like that was inappropriate
(7) professional behavior.
(8) Q. Okay.
(9) A. And that is my opinion.
(10) Q. Did you also feel like he had – once this
(11) letter came out and you had written Exhibit 2, that he
(12) wasn't being a team player and complying with
(13) directives from his superior?
(14) A. Mr. Chavez is an independent contractor,
(15) therefore, I am not in a position to tell him what to
(16) do. I can only give him advice on what I thought was
(17) the best thing to do in this scenario, and then the
(18) choice as to whether he take the advice or not is
(19) really up to him.
(20) Q. But he was not taking your advice; is that
(21) correct?
(22) A. He indicated to me that he did not agree with
(23) my position on how we should proceed.
(24) Q. And the procedures that you outlined were
(25) more than advice. They were actual directives on,

Page 264

(1) this is how it's going to work?
(2) A. If you're referring to Document LaFemina 2,
(3) you're absolutely right.
(4) Q. Okay. And for that matter, Chavez 36 was
(5) also a directive. This is how AFLAC does business.
(6) Is that right?
(7) A. This is – Document Chavez 36 refers to my
(8) internal guidelines for Texas Central, which is, for
(9) the most part, parallel to AFLAC's way of doing
(10) business. Yes, ma'am.
(11) Q. Okay. In going back to Exhibit 2, you said
(12) in a second point – I mean, the second to the last
(13) point, "I ask all involved parties to act with the
(14) utmost professionalism and recognize the big picture.
(15) There is no time for greed or individual agendas."
(16) Now, by his not agreeing with this and not working
(17) with you and following the procedures that you had
(18) outlined were mandatory, he was not acting as a team
(19) player; isn't that correct?
(20) A. I would say that's correct, yes.
(21) Q. Okay.
(22) A. Please note, ma'am, if I may be –
(23) MR. STEELE: Let her ask the questions.
(24) That's okay, Frank.
(25) Q. (By Ms. Neally) Would it be safe to say that

Page 265

(1) if he had cooperated with the outlines that you
(2) directed to him in Chavez 36 and Exhibit 2 and things
(3) had died down and Sauceda had left in May, which is
(4) what happened, that he would have returned as the –
(5) would have continued on as the regional sales
(6) coordinator and returned to the BISD campuses?
(7)    A.    I could have wished for nothing more to
(8) happen than that.
(9)    Q.    And that's not mere conjecture. That's what
(10) in all likelihood would have happened, right?
(11)    MR. AGUILAR:    Objection; speculation.
(12)    THE WITNESS:    Quite frankly, if you'll
(13) look at LaFemina Exhibit 9, the bottom of the page, it
(14) clearly indicates that Mr. Chavez, should the
(15) situation change, would probably be reinstated to his
(16) previous responsibility with BISD.
(17)    Q.    (By Ms. Neally) And if he had gone along
(18) with Exhibit 2, he – regardless of whether he
(19) returned to BISD, he would have remained as the
(20) regional sales coordinator; is that right?
(21)    A.    Yes, ma'am. I believe that would be true.
(22) But that would have ultimately been a corporate
(23) decision and not mine. I would have recommended that
(24) be the case.
(25)    Q.    Is it safe to say that Mr. Chavez's

Page 266

(1) confrontational manner and his failure to follow
(2) Exhibit 2 caused his demotion?
(3)    MR. AGUILAR:    Objection; assuming facts
(4) not in evidence, mischaracterizing the evidence.
(5)    THE WITNESS:    Actually, I think that's
(6) incorrect.
(7)    Q.    (By Ms. Neally) Why do you believe it's
(8) incorrect?
(9)    A.    I think that what led to his termination was
(10) his – his continued campaign, whether it be verbal,
(11) written or otherwise, against the board members that
(12) he deemed to be, let's say, unethical or – I can't
(13) determine what his feelings were and I don't have the
(14) document in front of me. I think his letter – his
(15) negative letter-writing campaign and communication
(16) with BISD employees and the board led to his demotion.
(17)    Q.    Well, that led to his demotion. But I think
(18) you said earlier in your testimony with Mr. Aguilar
(19) that if he had ceased his behavior, followed Exhibit 2
(20) and let things die down, that he would have remained
(21) as the regional sales coordinator; is that right?
(22)    A.    I'm not – I don't know that I made that
(23) testimony. Can you tell me that I made that
(24) testimony? And if so, can you read it back?
(25)    Q.    No, I cannot read it back. I'm not the court

Page 267

(1) reporter. But if you would like me – that's what I
(2) recall your testimony as being.
(3)    A.    I don't think – and I could be corrected,
(4) but I don't think I testified that Dino's demotion was
(5) a result of not following this. I think I testified
(6) that the company made a decision that based on the way
(7) he was dealing with the account, that he could no
(8) longer fulfill the role of regional sales coordinator.
(9)    Q.    Okay. At that point, then, when you say that
(10) the actual termination took place, which was the end
(11) of December, I believe –
(12)    A.    The actual termination of his regional sales
(13) coordinator contract was January 27th, 2002.
(14)    (Off the record)
(15)    Q.    (By Ms. Neally) With 30-day notice, right?
(16) So it was really December 28th, 2002?
(17)    A.    No, ma'am. He was a regional sales
(18) coordinator up to, through and including January 27th,
(19) 2002.
(20)    Q.    Okay. That was long after the enrollment
(21) occurred, though, wasn't it?
(22)    A.    I'm going to assume that that's an accurate
(23) statement because I think the enrollment concluded at
(24) the end of December, but I couldn't say for sure.
(25)    Q.    What had he done between December 28th and

Page 268

(1) January 27th?
(2)    A.    I think you would probably have to ask
(3) Mr. Chavez that question.
(4)    Q.    No, I'm talking to you about what he did as a
(5) regional sales coordinator.
(6)    A.    Okay. And I'm sorry. You didn't ask me that
(7) question that way. What did he do as a regional sales
(8) coordinator?
(9)    Q.    Yes.
(10)    A.    I don't know what he did as a regional sales
(11) coordinator. Are you referring to –
(12)    Q.    Did he still have any duties with BISD during
(13) that time period, sir?
(14)    A.    Did he have duties with BISD? No, he had
(15) been removed from BISD – BISD. I'm sorry. His
(16) regional sales coordinator contract gives him 30 days
(17) beyond the time he receives the notice to remain in
(18) his current capacity. And he really doesn't have to
(19) do anything if he doesn't want to.
(20)    Q.    Right. And that was the point that I was
(21) trying to make, you know, when you started arguing
(22) with me about what happened at the end of December
(23) when he was – he may not have been removed, but
(24) that's when he was notified that he was no longer
(25) going to be the regional sales coordinator; is that

Page 269

(1) right?
(2)    A.    Just ask again one more time. I was
(3) distracted. I apologize.
(4)    MS. NEALLY:    Read it back to him,
(5) please.
(6)    (Requested portion was read)
(7)    THE WITNESS:    I'm going to restate my
(8) answer. Mr. Chavez was the regional sales coordinator
(9) for AFLAC through January 27th, 2002. Nothing else
(10) means anything. That's when his contract terminated
(11) as the regional sales coordinator.
(12)    MS. NEALLY:    Object to the
(13) responsiveness of the answer.
(14)    Q.    (By Ms. Neally) I think earlier you
(15) testified that you had let pride stand in the way on
(16) occasion.
(17)    A.    That I had? Did you say I had?
(18)    Q.    Yes.
(19)    A.    There has been numerous times in my life as a
(20) younger man that I let pride get in the way of what I
(21) would deem to be a good decision for the long-term.
(22)    Q.    Okay. Did pride get in the way when you
(23) recommended the demotion of Mr. Chavez from AFLAC?
(24)    A.    Did pride get in my way?
(25)    Q.    Yes.

Page 270

(1)    A.    No, ma'am, not at all. It was something that
(2) I didn't want to do.
(3)    Q.    When did you actually make the recommendation
(4) to demote him?
(5)    A.    I don't know the answer to that. Actually, I
(6) do know the answer to that. Can I retract? I never
(7) finally made the recommendation. The company made the
(8) determination. The form, which is in evidence,
(9) Exhibit No. 4, the change in status form, the one that
(10) I submitted for the file was never used. And I don't
(11) know who finally made the recommendation for
(12) termination of his regional sales coordinator
(13) agreement.
(14)    Q.    Were you upset with Mr. Chavez when he
(15) refused to comply with Exhibit 2?
(16)    A.    Absolutely was upset with him when he refused
(17) to comply.
(18)    MS. NEALLY:    I'll pass the witness.
(19)    EXAMINATION
(20)    QUESTIONS BY MS. LEEDS:
(21)    Q.    Mr. LaFemina, my name is Eileen Leeds and I
(22) represent Dr. Sauceda in this case. I just have a few
(23) questions for you. Do you know whether or not Dino
(24) Chavez ever went back to Dr. Sauceda to try to smooth
(25) things over and talk about what had happened to, you

Page 271

(1) know, try to get back in on his own?
(2)   A.   I do not know.
(3)   Q.   Did you ever recommend to Dino that that is
(4) something that maybe he ought to try to do?
(5)   A.   I do not.
(6)   Q.   It was obvious that there were problems
(7) between Dr. Sauceda and Mr. Chavez, correct?
(8)   A.   Yes, ma'am.
(9)   Q.   And that was reflected in the letter of
(10) November 29th?
(11)   A.   Yes.
(12)   Q.   Did you speak – well, yes, you spoke with
(13) Dr. Sauceda on or about the time that you received
(14) that letter, correct?
(15)   A.   That's correct.
(16)   Q.   Do you recall what Dr. Sauceda said to you?
(17)   A.   A little bit, but not the full content.
(18)   Q.   Okay. What do you recall?
(19)   A.   He asked me if I had received the document,
(20) and had an opportunity to review the document, and I
(21) indicated I had.
(22)   Q.   Did he tell you any of the specifics about
(23) what had led him to write the document?
(24)   A.   No, because they were clear in his written
(25) document. So that conversation was very limited. All

Page 272

(1) I can recall of the conversation was that it was
(2) actually a call to confirm that I had received and
(3) acknowledged the information and I shared with him
(4) that I had and that I would pass it on to AFLAC's
(5) legal department.
(6)   Q.   Okay. Do you recall having a conversation
(7) after that one with Dr. Sauceda in which you told
(8) Dr. Sauceda that Mr. Chavez would still be involved in
(9) some way, although not directly, in the enrollment on
(10) campus?
(11)   A.   I only had one conversation with Dr. Sauceda
(12) at this particular point in time, and that
(13) conversation went from did I receive the documents and
(14) did I review them – and I told you how I handled
(15) that – to my saying to Dr. Sauceda that I felt like
(16) there was a five-year relationship or nearly a
(17) five-year relationship that had gone very well between
(18) AFLAC and the Brownsville Independent School District
(19) and that in his letter it indicated that he wanted to
(20) terminate his – or the school district's relationship
(21) with us as the Section 125 provider and the
(22) supplemental benefits provider. And my question to
(23) him was then based on the fact that that relationship
(24) was successful the length and we had a good track
(25) record, was there anything that I could do personally

Page 273

(1) on behalf of AFLAC to salvage the relationship and we
(2) be allowed to continue as the providers of both of
(3) those services.
(4)   Q.   Okay. Do you recall ever telling Dr. Sauceda
(5) that Dino was probably going to remain making money
(6) and his response to you was, good, that it wasn't his
(7) intention that he didn't make any money; he just
(8) wanted him to stop his behavior?
(9)   A.   Sometime – and the answer to that is – I
(10) want to be sure I answer this accurately to you. I
(11) met with Dr. Sauceda personally sometime later on in
(12) the game when Ron Levine was then the regional sales
(13) coordinator.
(14)   Q.   Uh-huh.
(15)   A.   And the conversation that we had was more
(16) about where we were going with AFLAC in the future. I
(17) don't remember us discussing Dino in any way, shape or
(18) form because I was advised from my people at AFLAC
(19) that this should be an issue that I shouldn't discuss
(20) openly with anyone.
(21)   Q.   Okay. So is it – is your testimony that you
(22) do not recall Dr. Sauceda telling you that he was
(23) pleased that Dino would not be cut out financially
(24) from the entire deal?
(25)   A.   If he – if that comment was made, I

Page 274

(1) certainly don't recall it.
(2)   Q.   Okay. Is it your understanding that the
(3) letter-writing campaign occurred after Dr. Sauceda's
(4) letter?
(5)   A.   It's my understanding that there may have
(6) been some before and after.
(7)   Q.   Okay. Is the only letter that you have seen
(8) to date the one that mentions something about board
(9) members being unethical or having done something
(10) inappropriate?
(11)   A.   Quite frankly, until today, I hadn't seen
(12) any – any of those letters. And I think there's one
(13) attached somewhere.
(14)   THE WITNESS:   Isn't there, Buddy?
(15)   Q.   (By Ms. Leeds)   Yeah, I'll mark it
(16) separately.
(17)   MR. STEELE:   So far.
(18)   THE WITNESS:   So the answer to the
(19) question is, I haven't seen any of these
(20) correspondence, to my recollection.
(21)   Q.   (By Ms. Leeds)   Okay. Let me hand you what
(22) has been marked as Chavez 33 – and it may already be
(23) in evidence – and ask if that appears to be familiar
(24) at all?
(25)   A.   I can tell you that somehow or another I

Page 275

(1) believe this made it to AFLAC, and I may have been
(2) copied on it just for my review.
(3)   Q.   Okay.
(4)   A.   It seems like I've seen this before, but I
(5) can't say for sure.
(6)   Q.   I believe, if I'm not mistaken, is the
(7) one that was attached to the November 29th letter that
(8) was sent to you.
(9)   A.   That may be the case.
(10)   Q.   Okay.
(11)   A.   I said, it looks familiar, but I can't say
(12) for sure. And, of course, I don't even have that
(13) file; AFLAC has it.
(14)   Q.   In this letter, there are several comments
(15) that Mr. Chavez makes. And let me just ask you if
(16) these are the kinds of comments that, you know, would
(17) be found to be – that would be found to be
(18) appropriate by you or AFLAC vis-a-vis Mr. Chavez's
(19) relationship with BISD. And let me point you to the
(20) second sentence of the second paragraph, which is,
(21) "You have proven that good can conquer evil when
(22) enough good people get together and shout the message
(23) together." And it goes on to talk about the board
(24) members that voted for something and that there were
(25) board members that voted against, and that they should

Page 276

(1) be called to be told that they had been disrespectful
(2) to the employees. Are those the kinds of comments
(3) that AFLAC wants its vendors telling its clients?
(4)   A.   I think that because AFLAC is named on the
(5) document, I think that AFLAC would have much rather
(6) preferred that this document be pre-screened before it
(7) was sent out to anyone. And I'm almost certain that
(8) that did not take place. And so the answer is, I
(9) can't speak on AFLAC's behalf. In my opinion, my
(10) personal opinion is the letter should not have gone
(11) out unless there was advice given by someone at our
(12) corporate office that thought it was appropriate.
(13)   Q.   Okay. Well, just in terms of a seller and a
(14) client, is it good to call your client or part of your
(15) client evil?
(16)   A.   No.
(17)   Q.   Okay. And is it good to tell part of your
(18) client – or the employees of a school district, hey,
(19) call those guys that didn't vote for you and tell them
(20) they were disrespectful to you?
(21)   A.   I don't think that's appropriate professional
(22) behavior, in my opinion.
(23)   Q.   That's all I'm asking.
(24)   MR. AGUILAR:   Can we go off the record a
(25) second?

Page 277

(1)    (Off the record)
(2)    Q.    (By Ms. Leeds) Mr. LaFemina, on the second
(3)    page of that – it's actually the third page, because
(4)    the first two pages – on the second page of that
(5)    document, the last sentence of that first full
(6)    paragraph is, we believe that Ms. Linda Salazar's bold
(7)    statement that the appearance – that the appearance
(8)    that bribery and corruption is running rampant among
(9)    administration of board members may have merit. Is
(10)    that the comment that struck you and maybe AFLAC, too, .
(11)    to the best of your knowledge, as being something
(12)    that, you know, Dino shouldn't have been saying?
(13)    A.    Again, I can't speak on behalf of AFLAC. I
(14)    think that it was inappropriate for the employees of
(15)    the district to see this type of thing –
(16)    Q.    Okay.
(17)    A.    – in this format.
(18)    Q.    And is this also – taking the first
(19)    statements – from the statements on the first
(20)    paragraph, what you were referring to where it's
(21)    inappropriate for him to be rallying the rank and file
(22)    against the administration and the board?
(23)    A.    This would fall into that, yes.
(24)    Q.    Okay. And, in fact, it's the administration
(25)    and the board that selects AFLAC, correct?

Page 278

(1)    A.    I assume that that's what takes place in
(2)    Brownsville Independent School District.
(3)    Q.    Okay. Do you know of any independent
(4)    school – any school district where the employees make
(5)    the decision of who the third party administrator for
(6)    the cafeteria plan is going to be?
(7)    A.    I know where they have influence in that
(8)    decision.
(9)    Q.    Okay. But who makes the decision?
(10)    A.    The decision is typically made by the board.
(11)    Q.    Or the administration, at the least?
(12)    A.    Yes, ma'am.
(13)    Q.    Okay. And then if you look at the yellowed
(14)    sentence in that next paragraph, "Also, please be
(15)    vigilant of the fact that you are not suddenly removed
(16)    from the insurance committee you are on for unknown
(17)    reasons." Would you agree with me that that is an
(18)    insinuation that board members may be retaliated
(19)    against for supporting them?
(20)    MR. AGUILAR:    Objection; speculation.
(21)    THE WITNESS:    My answer to that question
(22)    is that I think that you're asking me to read into
(23)    what someone else is thinking. I'm not sure I can do
(24)    that accurately.
(25)    Q.    (By Ms. Leeds) Well, no, I don't want – I

Page 279

(1)    don't want you to give me your opinion as to what Dino
(2)    was thinking when he wrote this, but rather somebody
(3)    reading this, as would an insurance – campus
(4)    insurance committee member would have just read it,
(5)    without knowing what Dino was thinking.
(6)    A.    I really –
(7)    MR. AGUILAR:    Objection.
(8)    Q.    (By Ms. Leeds) Is it safe to say that that's
(9)    kind of insinuating that something may go wrong if
(10)    you're supporting me?
(11)    A.    I'm really not sure. I mean, I'm reading it
(12)    clearly with you. And I don't want to assume that it
(13)    makes an insinuation because then, again, you're
(14)    asking me to interpret how someone else reading it
(15)    would receive it.
(16)    Q.    All right, okay. Would you agree with me,
(17)    however, that that's not appropriate, to be telling
(18)    the employees of a school district to look out for
(19)    what administration might do to them?
(20)    A.    Yes.
(21)    Q.    Okay. Let me hand you what has been
(22)    marked – previously marked as Chavez 27, 28 and 32.
(23)    And I believe there are others. These are just the
(24)    ones we have here. And just ask you if you have ever
(25)    seen those documents before?

Page 280

(1)    A.    I cannot see that – say that I've ever seen
(2)    Document 27. I can't confirm that I've seen
(3)    Document – It looks like – is it 28?
(4)    Q.    Yeah.
(5)    A.    28. And I can't confirm that I've seen 32
(6)    either.
(7)    Q.    Okay. So you are not aware that these were
(8)    documents that were sent to the campus insurance
(9)    committee representatives regarding this whole issue,
(10)    are you?
(11)    A.    I think earlier what I said was that I didn't
(12)    see any of these things prior to. I may have seen one
(13)    or two of them after, but not prior to.
(14)    Q.    Okay. And that's my question. Of these
(15)    documents – you haven't seen any of these documents.
(16)    You have maybe seen the one where Linda Salazar's
(17)    comment was reiterated?
(18)    A.    Yes.
(19)    Q.    Okay. So that at the time that you
(20)    articulated to Dino Chavez that you were supporting
(21)    him 100 percent, that was based on what Dino told you
(22)    had occurred, correct?
(23)    A.    You have me a little waylaid here because I'm
(24)    not sure that I ever said I supported Dino
(25)    100 percent. I think –

Page 281

(1)    Q.    Okay. Let me rephrase that, then.
(2)    A.    Please. Because I don't want to –
(3)    Q.    You –
(4)    A.    – get into it later.
(5)    Q.    You indicated to Dino that you were
(6)    supporting him, okay, not 100 percent. But you were
(7)    in support of him and thought he had done nothing
(8)    wrong. This was early on after –
(9)    A.    Yes. I mentioned that both in the phone
(10)    conversation to Dino and in writing.
(11)    Q.    Okay. And that was based on what Dino told
(12)    you had occurred?
(13)    A.    It was based on information that Dino gave me
(14)    that I did not confirm in any way, shape or form. It
(15)    was what he told me. And, yes, I did believe him.
(16)    Q.    Okay. Did he tell you that he had written
(17)    these letters to the campus insurance committee
(18)    members?
(19)    A.    Not that I recall. Had he had – well –
(20)    Q.    That had he have is – we can all speculate
(21)    about what would have happened, right?
(22)    A.    Well, you can ask me another question.
(23)    Q.    Okay. But in any event, he was – he did not
(24)    disclose to you that all of these letters had been
(25)    going on. I mean, he was campaigning for himself with

Page 282

(1)    the campus insurance committees before Dr. Sauceda's
(2)    letter was ever written?
(3)    MR. AGUILAR:    Objection; argumentative.
(4)    Q.    (By Ms. Leeds) He did not tell me – he did
(5)    not tell you that, did he?
(6)    MR. AGUILAR:    And mischaracterizing the
(7)    evidence.
(8)    THE WITNESS:    He did not.
(9)    Q.    (By Ms. Leeds) Okay. And he didn't tell you
(10)    that he had written the board members trying to
(11)    promote himself either?
(12)    A.    I knew he was in constant contact with
(13)    certain board members based on our correspondence
(14)    prior to Dr. Sauceda's letter.
(15)    Q.    Okay.
(16)    A.    But I did not know it was in this form of
(17)    communication. If I did, I would have advised him to
(18)    stop immediately. If it had not gone out, I would
(19)    have advised him to get on the phone with me and
(20)    contact our legal department to seek advice, which is
(21)    better given by someone at that capacity.
(22)    Q.    Why would you have advised him to do that?
(23)    A.    When we're doing – and this is my
(24)    understanding after 15 years with the company, when
(25)    we're doing our job as a vendor, let's say, and there

Page 283

(1) are issues that are going to go out in writing, the
(2) company wants to be compliant and wants to pass that
(3) through our compliance department before it goes out
(4) to the public.
(5)     Q.    Would you agree with me that if it is
(6) administration and/or the board that is making a
(7) decision regarding who's going to be the cafeteria
(8) plan provider, that these types of letters do nothing
(9) to get them on your side?
(10)     MR. AGUILAR:    Objection; speculation.
(11)     THE WITNESS:    I feel as though the
(12) letters would be viewed by most prudent people as
(13) their sense of solicitation for a testimonial or
(14) something of that nature as unprofessional in nature
(15) with regard to that.
(16)     Q.    (By Ms. Leeds) Okay. Knowing that he had
(17) sent out this communication to the campus insurance
(18) committees and other communication to the board
(19) members, do you have any opinion as to whether or not
(20) Dr. Sauceda may not have been wrong?
(21)     MR. AGUILAR:    Objection; speculation.
(22)     THE WITNESS:    Ma'am, I indicated that
(23) I'm not sure I had seen any of these and I had no
(24) knowledge that they were sent out.
(25)     Q.    (By Ms. Leeds) No, I'm asking you today.

Page 284

(1)     A.    Okay.
(2)     Q.    Since you know today that these had been
(3) going on and other letters written to board members,
(4) looking back now at Dr. Sauceda's letter, does it
(5) appear to you that Dr. Sauceda was off in left field
(6) by doing what he did?
(7)     MR. AGUILAR:    Objection; speculation.
(8)     THE WITNESS:    I'm not sure what the
(9) authority is of the superintendent of school. I just
(10) know that he is the highest ranking official at the
(11) school as far as I'm concerned, and I think that his
(12) letter clearly stated that there were issues, negative
(13) issues, that Dino had created for himself and other
(14) board members. And I felt like his letter to ask Dino
(15) to be removed, based on that, was justified.
(16)     Q.    (By Ms. Leeds) Okay. And what I'm asking
(17) you is, today, knowing today what you know now, that
(18) these letters which you did not know about then –
(19) correct?
(20)     A.    That's correct.
(21)     Q.    Knowing that these letters had been sent out,
(22) that maybe Dr. Sauceda was justified in having a
(23) situation with Dino Chavez?
(24)     MR. AGUILAR:    Objection; speculation.
(25)     THE WITNESS:    He was justified in

Page 285

(1) sending a letter to AFLAC, is what he did, asking Dino
(2) to be removed based on this.
(3)     Q.    (By Ms. Leeds) Okay. And that's what I'm
(4) asking you. Based on what you have learned today, not
(5) based on what Dino Chavez told you happened back in
(6) November of 2000.
(7)     A.    Let me clarify. Both what Dino told me and
(8) what Dr. Sauceda told me truly match up in a lot of
(9) ways. And I think that because of the – whatever the
(10) issue, because of the conflict between Mr. Chavez and
(11) Dr. Sauceda, I think Dr. Sauceda, as the
(12) superintendent of schools, was justified in asking –
(13) making the request to remove Dino from the school and
(14) to terminate his relationship with AFLAC, if, in fact,
(15) he has that authority. I don't know.
(16)     Q.    Okay. Well, you said to terminate his
(17) relationship with AFLAC. Did Dr. Sauceda ask you to
(18) terminate –
(19)     A.    The letter –
(20)     Q.    – his relationship with AFLAC?
(21)     A.    The letter clearly indicates not only did he
(22) want Dino removed –
(23)     Q.    Right.
(24)     A.    – but that they would discontinue using
(25) AFLAC Section 125 services –

Page 286

(1)     Q.    Okay.
(2)     A.    – and supplemental products.
(3)     Q.    Okay. When you said his relationship with
(4) AFLAC, I thought you were talking Dino's relationship
(5) with AFLAC.
(6)     A.    No, ma'am.
(7)     Q.    Okay.
(8)     A.    I was talking about the Brownsville
(9) Independent –
(10)     Q.    BISD'S?
(11)     A.    – School District's relationship with AFLAC.
(12)     Q.    Okay. Did Dr. Sauceda ever ask you to remove
(13) Dino from or change in any way his relation – Dino's
(14) relationship with AFLAC?
(15)     A.    Did Dr. Sauceda ask me to –
(16)     Q.    Change in any manner Dino's relationship with
(17) AFLAC.
(18)     A.    Other than the fact that he had asked that he
(19) not be permitted by AFLAC to come on school property
(20) or whatever, no.
(21)     Q.    Okay. Ms. Neally asked you a little while
(22) ago about the comment you have made about in the past
(23) that you had let pride get in the way of long-term –
(24) good, long-term decisions. Is it your opinion that
(25) that's what happened in this case to Dino Chavez?

Page 287

(1)     MR. AGUILAR:    Objection; speculation.
(2)     THE WITNESS:    Absolutely.
(3)     Q.    (By Ms. Leeds) Would you agree – well, let
(4) me ask you this: Is AFLAC a company that adheres to
(5) the old adage, the client is right?
(6)     MR. AGUILAR:    Actually, I think it's the
(7) client is always right.
(8)     MS. LEEDS:    I'll take that one. The
(9) client is always right.
(10)     THE WITNESS:    I want to answer it for
(11) me, not for AFLAC.
(12)     Q.    (By Ms. Leeds) Sure.
(13)     A.    I believe the client is always right.
(14)     Q.    Okay. And would you agree with me that if
(15) you've got a situation starting with somebody that's
(16) going to be making a decision about whether or not to
(17) hire you, that's the person you sweet-talk?
(18)     A.    I would use another term other than
(19) sweet-talk. It's the person that you build a
(20) relationship with.
(21)     Q.    Okay. But you don't build it with his
(22) subordinates?
(23)     A.    That's not necessarily always true in sales
(24) and marketing. You may have to build it through
(25) subordinates in order to get the ear of the person

Page 288

(1) that ultimately is going to help you.
(2)     Q.    Okay. But would you agree with me that
(3) putting the subordinate and the decision-maker at odds
(4) is detrimental to that relationship?
(5)     MS. NEALLY:    Did you say
(6) insubordinately – did you say insubordinates?
(7)     MS. LEEDS:    No.
(8)     Q.    (By Ms. Leeds) I'm saying putting the
(9) subordinates, the employees, and the administrator,
(10) who is going to be making a decision or involved in a
(11) decision-making process at odds is counterproductive?
(12)     A.    Generally speaking, that's probably an
(13) accurate statement. I think there are times when it
(14) may work the other way, but I think they would be the
(15) exception as opposed to the rule.
(16)     Q.    You had made a comment early on in your
(17) deposition about the subordinate that once you have had an
(18) enrollment in a particular district, that the
(19) enroller's annualized premium tends to decrease over
(20) time. Can you explain that, please?
(21)     A.    I'd be glad to. When we initially enroll an
(22) account, it's typically that first enrollment where we
(23) have the absolute best support because it's a new
(24) program and the employer is, in essence, without
(25) actually writing it anywhere, sort of endorsing that

Page 289

(1) vendor, if you will. From that point forward, unless
(2) there's a merger or an acquisition, what you typically
(3) have is a certain number of employees that are
(4) leaving, being replaced by a certain number of
(5) employees being hired. So, therefore, in terms of new
(6) sales or net sales growth, you're spinning your wheels
(7) a little bit. It's like treading water, if you will.
(8)    Q.    Okay.
(9)    A.    So what can happen in that instance, based on
(10) the way we're compensated, is that if I had, for
(11) instance, the Brownsville Independent School District
(12) as my own personal account and had no other accounts,
(13) my income could steadily decline because as people
(14) terminated, I would be losing renewal income, which
(15) would only be offset by new income from new sales, if
(16) that makes sense to you.
(17)    Q.    Yes. No, I'm understanding completely. So
(18) that your – if you were looking at what Mr. Chavez
(19) would be making had he kept the account, it would not
(20) have been the same as he would have made in the first
(21) three years, most likely?
(22)    MR. AGUILAR:    Objection; speculation and
(23) mischaracterizing the evidence and failure to qualify
(24) the witness.
(25)    THE WITNESS:    Let me answer your

Page 290

(1) question this way. When Brownsville Independent
(2) School District entered into a relationship with
(3) AFLAC, there was a document signed, which is a payroll
(4) authorization form, which authorizes us to do payroll
(5) deduction and to make those deductions. And it was
(6) signed by Mr. Chavez agreeing to certain things and we
(7) would have to refer to a document to see what it was
(8) that he agreed to. From that point forward – I've
(9) lost my train of thought.
(10)    Q.    (By Ms. Leeds) What I was asking you,
(11) basically, is, I think you had –
(12)    A.    I had a good point to make.
(13)    Q.    The first year is when you make your most
(14) money, when you do your first enrollment?
(15)    A.    In terms of, you know, the actual selling of
(16) the product, you're going to get most of your
(17) participation the first time through.
(18)    Q.    Okay. And your second year, third year,
(19) fourth year, really what you're looking at is making
(20) sales to either people that did not participate in
(21) that first enrollment or new people?
(22)    A.    Yeah. Because typically the school district
(23) you don't have just a turnover. That's my personal
(24) experience.
(25)    Q.    Correct. So that is it safe to that had

Page 291

(1) Mr. Chavez continued with this account, his income –
(2) new sales income would not have been exorbitantly high
(3) in that next 2000 school year, 2000 – wait. Yeah, in
(4) the year 2002.
(5)    MR. AGUILAR:    Objection; speculation,
(6) failure to lay the proper predicate and failure to
(7) qualify the witness.
(8)    THE WITNESS:    I can only give you what
(9) 15 years of experience would dictate in any account.
(10)    Q.    (By Ms. Leeds) And let me – let me do that
(11) again.
(12)    A.    Okay. Please.
(13)    Q.    You have been – you have been working for
(14) AFLAC for 15 years, correct?
(15)    A.    Yes, ma'am.
(16)    Q.    And you are very experienced in how the
(17) cafeteria plan works and operates?
(18)    A.    Yes, ma'am.
(19)    Q.    And you are very experienced in how AFLAC
(20) operates its cafeteria plan enrollments?
(21)    A.    Yes, ma'am.
(22)    Q.    And do you have personal knowledge of how
(23) your district sales coordinators and your associates
(24) make their income regarding sales during cafeteria
(25) plan enrollments?

Page 292

(1)    A.    Yes, ma'am.
(2)    Q.    And could you please explain to us – or
(3) would you explain how the – how the length of tenure
(4) of a particular person in handling an account will
(5) decrease as compared to their first year enrollment?
(6)    MR. AGUILAR:    Objection; speculation,
(7) failure to lay the proper predicate and failure to
(8) qualify the witness.
(9)    THE WITNESS:    If I can answer by
(10) example, that's the best way I can do it. If the
(11) Brownsville Independent School District were my
(12) account and I had a fantastic enrollment initially and
(13) after that all I did was service that account, my
(14) income would go down over years and not up.
(15)    Q.    (By Ms. Leeds) Okay. And all you can do is
(16) hope for new people to come in and/or get the people
(17) that didn't enroll the first time?
(18)    A.    I think that can be assumed by someone
(19) outside of our business. All I can hope for is that
(20) nobody dies, gets sick or quits.
(21)    Q.    Leaves. Okay. So would you agree with me
(22) that Mr. Chavez's income for the year 2002 would not
(23) have compared to an initial enrollment year?
(24)    MR. AGUILAR:    Objection; speculation,
(25) failure to lay the proper predicate and failure to

Page 293

(1) qualify the witness.
(2)    THE WITNESS:    Let me be perfectly fair
(3) in all the – with the answer to this question. The
(4) Brownsville Independent School District was rather
(5) unique in that during the open enrollment period there
(6) was typically, in my short time, typically quite a bit
(7) of new business written during re-enrollment, which
(8) was rather unusual. I don't know what that's
(9) attributed to, whether it was a great many new hires
(10) or there was a situation where we didn't have the time
(11) to give before and there were people that missed out.
(12) I don't know what the reasons are. And so the correct
(13) answer to that question based on that is that
(14) Mr. Chavez, and anybody else involved with that
(15) account, their income as a result of that account
(16) would have probably remained fairly level.
(17)    Q.    (By Ms. Leeds) Okay.
(18)    A.    And because of the participation that we had
(19) during re-enrollment during my tenure with this
(20) account, their renewals would have grown, but it
(21) wouldn't have been dramatic. But it would have been
(22) much more steady than most accounts.
(23)    Q.    Okay. And there were quite a few questions
(24) asked of you about the regional sales coordinator and
(25) how they should not have personal production.

Page 294

(1)    A.    Uh-huh.
(2)    Q.    Did you recall that? And yet in this
(3) particular account, Mr. Chavez was receiving monies as
(4) if he were having personal production, correct?
(5)    A.    One year.
(6)    Q.    Only one year?
(7)    A.    Yeah. The very first year that I was the
(8) state sales coordinator, which would have been the
(9) enrollment that was conducted in the fall of 2000.
(10)    Q.    Okay. And the years after that – well, he
(11) wasn't there, right?
(12)    A.    Well, no, he was actually there for the year
(13) of 2000, the fall of 2001 enrollment going into 2002.
(14) That's when all this came up.
(15)    Q.    Oh, okay. But in any event, under your
(16) supervision, RSCs are not supposed to have personal
(17) production and I believe it's your testimony that you
(18) actually frown on the type of arrangement that Dino
(19) had had?
(20)    A.    I frowned on it simply because what we did
(21) was move it away from Dino in terms of – he kind of
(22) understood what I was trying to do there and he was
(23) quite cooperative in terms of relinquishing that. But
(24) then there are some creative ways that you can do
(25) things, which are actually appropriate.

Page 295

(1) Q. Okay.
(2) A. In this situation, the -- I believe that the
(3) new commissions that Dino was getting previously were
(4) now going to his wife. And that just, in my opinion,
(5) again, creates a scenario of nepotism amongst your
(6) sales force. And even if 90 percent of them deem it
(7) to be okay, if 10 percent deem it to be bad, it's bad.
(8) Q. Okay.
(9) A. That's my opinion, now. I want to clarify
(10) that as well.
(11) Q. Sure. If Dino had acceded to your plan,
(12) where would his income have derived from?
(13) A. Everybody seems to be confused on this.
(14) Dino, if he was -- if he went along with the plan that
(15) I lined out, okay, each and every person that was
(16) selected to handle enrollment that was coded to Dino's
(17) region, Dino would have gotten the full override
(18) commission just as if nothing had changed.
(19) Q. Okay.
(20) A. Okay? Now, on the other hand, because I had
(21) Mr. Levine assuming Mr. Chavez's responsibility, I had
(22) a catch-22 on my hands. I had a competent person
(23) willing to do the job without override compensation.
(24) Q. Right.
(25) A. Thus, I had asked to have the business split

Page 296

(1) with 90/10 so that he could be compensated because he
(2) did a ton of work. And quite frankly, he didn't take
(3) much advantage of the personal side of the
(4) compensation. There were other motives for him taking
(5) on this responsibility. There were he was looking to
(6) be promoted as well -- I didn't place it with Dino --
(7) which did not happen.
(8) Q. Right. So am I correct, then, since Dino was
(9) not supposed to have personal production, that he
(10) would have made the same amounts of money -- no?
(11) A. You didn't let me answer that --
(12) Q. I'm sorry. Go ahead.
(13) A. -- the first question fully, if I may. May
(14) I?
(15) Q. Sure.
(16) A. Because Brownsville put us under an extreme
(17) time crunch --
(18) Q. Correct.
(19) A. -- all this stuff was going on and then we
(20) ended up with about 12 to 14 working days to handle
(21) 7,000 employees --
(22) Q. Correct.
(23) A. -- which is virtually impossible to do with
(24) any level of effectiveness. So as a result, people
(25) had to be brought in from the McAllen region and

Page 297

(1) people had to be brought in even from San Antonio so
(2) that we could meet the district's time requirement.
(3) Q. Right.
(4) A. Well, now, those people, okay, were people
(5) that would not normally be writing business in that
(6) particular account, which Dino would not be
(7) compensated for because they were not coded to him.
(8) So, in fact, he would have initially lost income
(9) there. But as I mentioned earlier today, I was
(10) certain, like all school boards, that school boards
(11) would change, and if the circumstances changed we
(12) would reinstate Dino and he would go on from there.
(13) Q. Okay. But given the time period that was
(14) already ongoing, okay, that no selection had been made
(15) already -- by the end of November, there was nothing
(16) going, even if that November 29th letter had not been
(17) written, you would have still had to make the same
(18) arrangements, bring in people from other up lines, if
(19) you will, areas to the enrollment? No?
(20) A. I would not have. Mr. Chavez would have
(21) handled every bit of it. He would have made the -- in
(22) other words, we would have still had the time crunch.
(23) We would still have needed the personnel to get the
(24) job done --
(25) Q. Okay, uh-huh.

Page 298

(1) A. -- but he would have chosen the personnel,
(2) not Ron Levine. And he may have or may not have used
(3) people from San Antonio, you know. I'm sure that in
(4) every region there are competent enrollment people
(5) that are part-timers that certainly want to come out
(6) and help in a situation like this. So he would have
(7) handled that. I would not have.
(8) Q. Okay.
(9) A. That's the significant difference is that I
(10) got together with Ron Levine and picked the people
(11) that we thought would be adequate to go in there and
(12) handle this appropriately and in an effective time
(13) frame.
(14) Q. Okay. So in a nutshell, the plan that you
(15) had outlined would have provided Dino with security
(16) and would have provided him with the potential of
(17) recovering the account and he could have still gone
(18) back to Dr. Sauceda and cleaned up the problems, could
(19) he not have?
(20) MR. AGUILAR: Objection; speculation.
(21) THE WITNESS: The answer to that
(22) question jogged my memory when I lost my train of
(23) thought earlier.
(24) Q. (By Ms. Leeds) Go right ahead.
(25) A. When Dino became the servicing associate for

Page 299

(1) the Brownsville Independent School District, his -- he
(2) knows, and it's common knowledge amongst all AFLAC
(3) associates, that the company reserves the right to
(4) change the hierarchy with which that account is coded
(5) to. Worse-case scenario, I could have requested that,
(6) the company requested that and he could have gotten
(7) nothing from that point forward.
(8) Q. Right.
(9) A. And contractually -- you know, I'm not a
(10) lawyer, but --
(11) Q. Sure.
(12) A. But contractually the company getting
(13) involved would have been within their rights and
(14) that's something that Dino signed, and it's the same
(15) thing that I signed, for that matter.
(16) Q. Correct. But -- and that's when you said all
(17) accounts belong to AFLAC.
(18) A. That's correct.
(19) Q. And it's theirs to do whatever they want
(20) with?
(21) A. Right. So worse-case scenario, the only --
(22) he could have been left only standing on renewals and
(23) no future commissions or overrides if the company
(24) chose to do that or if I chose to do it. And I chose
(25) not to do that. I chose to try and keep him.

Page 300

(1) Q. And that's what I was getting at. With the
(2) plan you outlined, he could have still been -- he
(3) would have received the overrides from everything sold
(4) by his people during that period of time, and your
(5) plan basically said, hey, let things cool down and
(6) you'll get it back?
(7) A. It could be interpreted that was my
(8) intention. It doesn't say that --
(9) Q. No. And those aren't your words.
(10) A. It's quite obvious what I'm saying there and
(11) you've read that accurately.
(12) Q. Did you ever explain that to Dr. Sauceda,
(13) what your plan was?
(14) A. (Shakes head from side to side.)
(15) Q. No? She needs --
(16) MR. AGUILAR: You can grunt.
(17) THE WITNESS: No, ma'am.
(18) Q. (By Ms. Leeds) Okay.
(19) A. I apologize.
(20) Q. No problem. Were you a little surprised by
(21) the fact that everybody was complaining about the cost
(22) of doing business in Brownsville?
(23) A. Yeah.
(24) Q. I mean, isn't that part of what every one of
(25) you do?

BSA          ORAL ～D VIDEOTAPED DEPOSITION OF FRA～ D. LAFEMINA          XMAX(33/33)

Page 301

(1) A. Well, we're all independent contractors, so,
(2) therefore, we're just like business owners that owns a
(3) hardware store except we don't have the employees and
(4) inventory. So there's a cost of doing business.
(5) Q. If you had not subsidized Mr. Sanchez, do you
(6) know what would have happened? I mean, can you
(7) speculate on what would happen -- what you think would
(8) have happened?
(9) MR. AGUILAR: Objection; speculation.
(10) THE WITNESS: I actually know what would
(11) have happened. I would have had to make arrangements
(12) to hail the administration and pay for it myself and
(13) had to hire somebody to do it.
(14) Q. (By Ms. Leeds) Okay.
(15) A. And lost money on it, by the way.
(16) MS. LEEDS: I'll pass the witness.
(17) Thank you very much.
(18) FURTHER EXAMINATION
(19) QUESTIONS BY MR. AGUILAR:
(20) Q. Let me ask a few more things. You said you
(21) were surprised by the complaints about the expenses.
(22) Were you aware that basically in all the prior years
(23) Dino had been the one paying all these expenses, what
(24) you call the cost of doing business?
(25) A. It's my understanding that the reason Dino

Page 302

(1) was taking any percentage of commissions was to offset
(2) those expenses, so in reality he really wasn't paying
(3) them. He was using those commissions to pay them.
(4) That's my understanding.
(5) Q. Is it, basically, he was paying them -- the
(6) way he was paying them was through the commissions he
(7) received on the splits?
(8) A. Right. Which is probably the exception to
(9) the rule --
(10) Q. Okay.
(11) A. -- as opposed to the rule, the way we conduct
(12) business.
(13) Q. Okay. And as far as you-all's involvement
(14) with BISD, correct me if I'm wrong, but you didn't get
(15) involved in BISD's -- in BISD's enrollment and all
(16) that until after that November 29th letter, right?
(17) A. That -- no, that's correct. You don't have
(18) to change your question.
(19) Q. Same thing for Ron Levine. He didn't get
(20) involved until after that November 29th?
(21) A. I think Ron was involved before, but more as
(22) an enrollment type assistant, that sort of thing. And
(23) you would have to talk with your client to confirm it
(24) because I -- or I would have to confer with my
(25) attorney.

Page 303

(1) Q. In other words, he might have been involved
(2) in one of the prior enrollments?
(3) A. At some capacity, yes.
(4) Q. Okay. So as far as you understand, the
(5) relationship between Dino and BISD had been
(6) established -- let me rephrase that. The relationship
(7) between AFLAC and BISD had been established through
(8) the work of Dino and his staff during the prior years?
(9) A. I don't know the facts because -- again, the
(10) account was established in 1998. I was in Dallas,
(11) Texas. So I cannot tell you -- I only know bits and
(12) pieces from what other people told me and that
(13) information may or may not be accurate. It's my
(14) understanding that Mr. Chavez and others had --
(15) Q. His staff or others?
(16) A. Others and his staff had involvement in
(17) building the relationship and getting the school
(18) district as a client.
(19) Q. And what I'm really trying to get to is it
(20) just wasn't because of your prior involvement or
(21) because of Mr. Levine's specific involvement that that
(22) relationship had been established as it had?
(23) A. Absolutely not.
(24) Q. I mean, you agree with that statement?
(25) A. Yes, I do.

Page 304

(1) Q. Okay. And as a practical matter, it's that
(2) relationship that ultimately -- based on your
(3) understanding, it's that relationship that ultimately
(4) allowed for AFLAC's proposal to be approved in 2001
(5) for the 2002 year? Is that your understanding as
(6) well?
(7) A. No.
(8) Q. Okay. Why not?
(9) A. It's my opinion --
(10) Q. Okay.
(11) A. -- that we just continued an ongoing
(12) relationship that was established way back when based
(13) on the track record.
(14) Q. Okay. And the track record was established
(15) through Dino's handling of the account at least for
(16) the year that you're familiar with, the prior year?
(17) A. (Moves head up and down.)
(18) Q. Before that you can't say because you
(19) weren't -- you weren't involved?
(20) A. Exactly.
(21) Q. Okay. And leading up to that November 29,
(22) you're not aware of anything else that we haven't
(23) already talked about that would have established that
(24) relationship with that track record, right?
(25) A. No.

Page 305

(1) Q. Okay. You also indicated that you expected,
(2) as a general matter, annual enrollments decrease over
(3) time?
(4) A. Say again.
(5) Q. You indicated annual enrollments -- the
(6) growth rate decreases over time, or did I
(7) misunderstand that?
(8) A. Okay. We had trouble -- we had trouble with
(9) the language part of it is all it is.
(10) Q. Say it the way --
(11) A. During a re-enrollment, generally, as time
(12) goes on, re-enrollments are not as productive as they
(13) would be in relation to a previous year or the initial
(14) year.
(15) Q. In other words, you expect the total sales in
(16) each enrollment to decrease over time? Or is that
(17) different?
(18) A. Arnold, I already got after you about putting
(19) words in my mouth. There isn't "in other words." I
(20) gave you my words.
(21) Q. Okay.
(22) A. And please --
(23) A. I'm trying to understand it in terms of --
(24) A. And I'm trying to make it as simple as
(25) possible. Account A opens up this year. We had a

Page 306

(1) spectacular enrollment.
(2) Q. Okay.
(3) A. From that point forward, every enrollment
(4) seems to be, unless there's an acquisition or merger,
(5) generally speaking, less productive than the previous
(6) year.
(7) Q. Okay. I just didn't know whether you were
(8) saying, it was just for those people who happen to
(9) have signed up the year before or if you're talking
(10) about for everybody that signs up each year. Is there
(11) a difference --
(12) A. We're still not --
(13) Q. Is there a difference between those two?
(14) A. I do not -- I don't understand what you are
(15) trying to get at there. What I'm saying to you is
(16) that there's this body of employees --
(17) Q. Okay.
(18) A. There's 7,000 at Brownsville.
(19) Q. Okay.
(20) A. Maybe one year it's 7,100, the next year it's
(21) 69. Some percentage of them own our coverage.
(22) Q. Okay.
(23) A. As time wears on, year after year, each
(24) annual re-enrollment, generally speaking, will net
(25) less new sales than the year before.

Page 307

(1) Q. Okay.
(2) A. Thus, the productivity of the income earned
(3) is going down as opposed to previous years. And I
(4) hope that you understand that.
(5) Q. I don't know if I do or not, but I'm going to
(6) move on.
(7) MR. STEELE: He does. He just got tired
(8) of you objecting to his restating your testimony.
(9) Well done, Frank.
(10) Q. (By Mr. Aguilar) What I'm asking, because
(11) that is the general understanding you have for all
(12) your enrollments, right, the general rule of thumb?
(13) A. It's from 27 years of experience in the
(14) insurance industry and 15 years of experience with
(15) AFLAC, that that's the general rule of thumb. I also
(16) mentioned that Brownsville Independent School District
(17) is somewhat different –
(18) Q. Right. And that's what –
(19) A. – in regard to that.
(20) Q. That's what I was going to ask about.
(21) Because are you aware that from '98 to '99, there was
(22) actually a 10 percent increase?
(23) A. I wouldn't have been involved from '98 to
(24) '99, so I can't confirm that.
(25) Q. So similarly, from '99 to 2000, there was a

Page 308

(1) 10 percent increase. Are you aware of that?
(2) A. I couldn't confirm one way or the other.
(3) Q. Okay. Then from 2000 to 2001, were you aware
(4) that there was actually an 80 percent increase?
(5) A. I am aware of that.
(6) Q. Okay. So even though your general rule might
(7) be that most enrollments go down, you're aware that at
(8) BISD they're going up, at least for the year that you
(9) were involved?
(10) A. There's specific reasons attributed to that,
(11) but it's an accurate statement.
(12) Q. Okay. Thank you. You were talking about –
(13) with Ms. Leeds a while ago, you were talking about the
(14) letters that Mr. Chavez sent out – Dino sent out to
(15) the insurance committee members. Do you remember
(16) those letters?
(17) A. Yes, sir.
(18) Q. Okay. And you said you would like them –
(19) you would have liked to have seen those gone by you or
(20) somebody else at AFLAC to review before they went out,
(21) right?
(22) A. I did.
(23) Q. Okay. Would Janet Baker be an appropriate
(24) person to have sent those to to review?
(25) A. I don't think Janet Baker has anything to do

Page 309

(1) compliant-wise. I don't think that would have been an
(2) appropriate person.
(3) Q. Okay. So she – if she approved them, then
(4) you're saying your understanding is that, well, she
(5) would not have been the right person to approve them?
(6) A. She couldn't approve them is my understanding
(7) of her capacity at our headquarters.
(8) Q. And she would not have been an appropriate
(9) person at that point – even if she got them, she
(10) would not have had any duty to send them off to the
(11) proper person to get them approved, or would she?
(12) A. It would depend upon if there was a request
(13) to get that done when the letters came in. She would
(14) have certainly forwarded them to the proper people.
(15) Q. Okay. If Mr. Chavez had sent them to Janet
(16) Baker to review and she reviewed them and said, yeah,
(17) they're okay, would that be an appropriate practice?
(18) MS. LEEDS: Objection; speculation.
(19) THE WITNESS: The company procedure
(20) would be that if anyone sent them in and they skipped
(21) me, that the person in the corporate office that
(22) received them would contact me, send them to me,
(23) because before they go in for a tentative approval,
(24) they would want my feedback on them.
(25) Q. (By Mr. Aguilar) Okay. So you're saying

Page 310

(1) that they should have also been sent to you?
(2) A. Absolutely.
(3) Q. Okay. As far as whoever else Ms. Baker would
(4) or should have sent them to, do you know who else
(5) would be involved?
(6) MS. LEEDS: Object to the form of the
(7) question.
(8) THE WITNESS: It's my understanding that
(9) our lead compliance officer is a gentleman named Ron
(10) Hamby and they probably should have gone to his
(11) attention.
(12) Q. (By Mr. Aguilar) Would you have expected if
(13) Ms. Baker got them, that she would have taken them
(14) over to Mr. – what's his name?
(15) A. Ron Hamby.
(16) Q. Hamby.
(17) A. Hamby.
(18) Q. Would you have expected that she would have
(19) taken them over to Mr. Hamby before telling Dino or
(20) anybody else that approved?
(21) MR. STEELE: Objection; speculation.
(22) MS. LEEDS: Join.
(23) THE WITNESS: I know for a fact she
(24) wouldn't have done that. She would have contacted me
(25) and sent them to me and asked me to review them and

Page 311

(1) tell me – ask me what she – what I would like to do.
(2) Q. (By Mr. Aguilar) Okay. Earlier you had said
(3) you agreed with the comment the client is always
(4) right. Remember?
(5) A. In my opinion.
(6) Q. Okay. Do you know if that's AFLAC's position
(7) also?
(8) A. I'm certain that AFLAC would say that the
(9) client is probably the boss.
(10) Q. Okay. What if you feel that the client may
(11) be breaking state laws, do you still apply the axiom,
(12) the client is always right?
(13) MS. LEEDS: Objection; form.
(14) THE WITNESS: Yes, because I'm not an
(15) attorney.
(16) Q. (By Mr. Aguilar) Even though you might
(17) believe the client may be breaking a state law, you
(18) would still say, hey, I'm not an attorney, the client
(19) is always right?
(20) MS. LEEDS: Object to the form.
(21) THE WITNESS: I would say that and I
(22) would consult with somebody as well to find out what
(23) needed to be done if I had a suspicion.
(24) Q. (By Mr. Aguilar) Okay. Also, you talked –
(25) we talked earlier about you getting me a document.

Page 312

(1) A. Guidelines.
(2) Q. Guidelines, right. When do you think you
(3) could get those by? And I know you can't give me an
(4) exact date because you've got to go look.
(5) A. No. Arnold, I know exactly where they are,
(6) actually. But I'm not going to be back in my office
(7) until after Labor Day, so in the first part of
(8) September.
(9) Q. Do you think you could send them by
(10) September 7th or something?
(11) MR. STEELE: September 7th? Is that
(12) doable, Frank?
(13) THE WITNESS: If you'll just send me a
(14) reminder.
(15) Q. (By Mr. Aguilar) That will be fine. I could
(16) call your attorney by September 7th and say, have you
(17) got these things yet.
(18) A. They're easy enough to get.
(19) Q. Okay.
(20) MR. AGUILAR: With that, I'll go ahead
(21) and pass the witness.
(22) MS. NEALLY: I have no further
(23) questions.
(24) FURTHER EXAMINATION
(25) QUESTIONS BY MS. LEEDS:

Page 313

(1)     Q.    I just have one follow-up on something you
(2) said when Mr. Aguilar was talking about the fact that
(3) there were increased enrollments at BISD, and the
(4) first year you were there there was an 80 percent.
(5) You said that there were specific reasons attributed
(6) to that increase. What were they?
(7)     A.    I think you mentioned one of them earlier,
(8) and that was the fact that our advertising campaign
(9) raised great awareness more than ever so before.
(10) No. 2, Mr. Chavez had a more competent staff at that
(11) point and had hired more people throughout the course
(12) of the year and thus we had more people to handle a
(13) large number of employees. And it's my
(14) understanding – again, the previous year I wouldn't
(15) have been there, it was my understanding that we were
(16) pressed for time in that year's enrollment and thus
(17) some campuses were missed completely as a result of
(18) that. So there were obviously some people that were
(19) never seen. And the other reason would be that we've
(20) paid an awful lot of claims and so those folks that
(21) were possibly skeptical initially had talked to their
(22) fellow employees and had got the good word about AFLAC
(23) and thus chose to participate at that point in time.
(24)     Q.    Okay. Would you agree with me at some point
(25) it's going to level off?

Page 314

(1)     MR. AGUILAR:    Objection; speculation,
(2) mischaracterizing the testimony.
(3)     Q.    (By Ms. Leeds) Can't have an 80 percent
(4) increase every year?
(5)     A.    I hate to say that but that's not – that's
(6) the kind of thinking I like to use. But I will tell
(7) you that if it continued like that, it would just be
(8) totally the exception to the rule.
(9)     Q.    Okay.
(10)    A.    And I was surprised there was an 80 percent
(11) increase last year, tickled – tickled to death, but
(12) very surprised. If you take a look at – right now,
(13) we don't even have access to the account so we're not
(14) going to sell any insurance.
(15)    Q.    Right.
(16)    MS. LEEDS:    That's all I have. Thank
(17) you.
(18) FURTHER EXAMINATION
(19) QUESTIONS BY MR. AGUILAR:
(20)    Q.    I have just one other thing. One of the
(21) items you just mentioned was that you thought in 2001
(22) you were – I'm sorry, in 2000 you were pressed for
(23) time and that had to be part of the reason why –
(24)    MS. LEEDS:    It would have been '99 to
(25) 2000.

Page 315

(1)     Q.    (By Mr. Aguilar) Was it '99 to 2000?
(2)     A.    Yeah. I said I couldn't verify it because
(3) factually I wasn't there. But it's been my
(4) experience – if this will help. Since I've been in
(5) my current capacity for the company, that when it
(6) comes down to the enrollment for Brownsville ISD each
(7) year, it's an 11th hour kind of, hurry up, we've got
(8) to get it done right now. And so we just don't have
(9) adequate time.
(10)    Q.    So you're saying it was in 1999 that you felt
(11) you were pressed for time or –
(12)    A.    I wasn't there in 1999. It's been my
(13) experience – it was my understanding that's what took
(14) place in 1999. And it's been my experience that
(15) that's taken place every year since that time.
(16)    Q.    Are you aware that there was actually less
(17) time in 2001 to do the enrollments than there had been
(18) in years past?
(19)    A.    Yes, I was.
(20)    Q.    Okay. So actually even though you were
(21) pressed for time, you were even more pressed in 2001
(22) than you were in '99?
(23)    A.    Well – and I've answered and addressed that
(24) as well in terms of the fact that we had a more
(25) competent and a greater expanded sales force so, thus,

Page 316

(1) better equipped to handle that.
(2)     Q.    Okay.
(3)     MR. AGUILAR:    That's all I have.
(4)     MS. LEEDS:    That's it.
(5)     MR. STEELE:    So long, Elizabeth.
(6)     MR. AGUILAR:    Anything else, Elizabeth?
(7)     MS. NEALLY:    I'm hanging up.
(8) (DEPOSITION CONCLUDED)

Page 317

( 1)                CHANGES AND CORRECTIONS
( 2)        WITNESS NAME:  FRANK D. LaFEMINA
( 3)            DATE:  AUGUST 21, 2003
( 4) Reason Codes: (1) to clarify the record; (2) to
( 5) conform to the facts; (3) to correct a transcription
( 5) error; (4) other (please explain).
( 6) PAGE  LINE  CHANGE                    REASON CODE
( 7)
( 8)
( 9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

Page 318

( 1)                   SIGNATURE
( 2)
( 3)    I, FRANK D. LaFEMINA, have read the foregoing
( 4) deposition and hereby affix my signature that same is
( 5) true and correct, except as noted on the previous
( 6) page.
( 7)
( 8)
( 9)                  FRANK D. LaFEMINA
(10) STATE OF
(11) COUNTY OF
(12)    Before me,                  , on this day
(13) personally appears FRANK D. LaFEMINA, known to me (or
(14) proved to me under oath or through
(15)              ) (description of identity card or
(16) other document) to be the person whose name is
(17) subscribed to the foregoing instrument and
(18) acknowledged to me that they executed the same for the
(19) purposes and consideration therein expressed.
(20)    Given under my hand and seal of office this
(21)    day of          , 2003.
(22)
(23)
(24)                NOTARY PUBLIC IN AND FOR
(25)                THE STATE OF



(1)         REPORTER'S CERTIFICATE
(2)
(3)
(4)   THE STATE OF TEXAS     *
(5)   COUNTY OF TRAVIS     *
(6)
(7)        I, GERRI C. BARKER, Certified Shorthand
Reporter in and for the State of Texas, do hereby
certify that, pursuant to the agreement of counsel,
(8)  came on before me on the 21st day of August, 2003, the
following named person, FRANK D. LaFEMINA, who was
(9)  duly sworn to testify to the truth and nothing but the
truth touching and concerning the matters in
(10) controversy in this cause; that he was thereupon
carefully examined upon his oath and his examination
(11) reduced to typewriting under my supervision; and this
deposition is a true record of the testimony given by
(12) said witness.

       I further certify that I am neither
(13) attorney, nor counsel for, nor related to, nor
employed by any of the parties to the action in which
(14) this deposition is taken; and, further, that I am not
a relative nor employee of any attorney or counsel
(15) employed by the parties hereto or financially
interested in the action.
(16)      Certified to by me this the       day
of       , 2003.
(17)
(18)
(19)
        GERRI C. BARKER, TEXAS CSR 2219
(20)      Expiration Date: 12/31/03
        Firm Registration No. 241
(21)      114 West 7th Street, Suite 750
        Austin, Texas   78701
(22)      512-499-0277
(23)
(24)
(25)

BSA    ORAL ᴬᴺᴰ VIDEOTAPED DEPOSITION OF FRA～ D. LAFEMINA    Look-See(37)

**Look-See Concordance Report**

- - -

UNIQUE WORDS: **2,223**
TOTAL OCCURRENCES: **12,556**
NOISE WORDS: **384**
TOTAL WORDS IN FILE: **36,969**

- - -

SINGLE FILE CONCORDANCE

- - -

CASE SENSITIVE

- - -

INCLUDES ALL TEXT OCCURRENCES

- - -

DATES **ON**

- - -

INCLUDES PURE NUMBERS

- - -

POSSESSIVE FORMS **ON**

## – DATES –

**1-27-02** [1]
*208:8*
**6-19-02** [1]
*114:14*
**9-11-02** [1]
*114:5*
**9-16-02** [1]
*114:7*
**12-1-01** [5]
*248:21, 25; 249:3, 15; 250:13*
**12-2-01** [1]
*113:20*
**12-4-01** [2]
*113:22; 114:12*
**12-19-01** [1]
*113:23*
**12/31/03** [1]
*319:20*
**August, 2003** [2]
*110:5; 319:8*
**August 21** [1]
*115:8*
**AUGUST 21, 2003** [2]
*109:15; 317:3*
**December** [9]
*130:1; 136:2; 171:2; 185:5; 256:2; 267:11, 24; 268:22*
**December, 2000** [1]
*228:3*
**December, 2001** [5]
*148:13; 149:24; 150:25; 151:3; 152:15*
**December 1** [1]
*136:2*
**December 1st, 2001** [1]
*253:20*
**December 2** [1]
*163:9*
**December 2, 2001** [4]
*138:8; 161:25; 162:4; 224:18*
**December 2nd, 2001** [1]
*138:10*
**December 3** [2]
*165:13; 256:3*
**December 3rd, 2001** [2]
*261:19, 23*
**December 4** [1]
*167:11; 171:1; 208:21;*

*209:17*
**December 4, 2001** [5]
*135:24; 165:6; 173:25; 256:1; 259:12*
**December 4th** [5]
*177:5, 15; 183:8; 259:19; 261:1*
**December 7** [2]
*136:3; 188:16*
**December 7th** [5]
*181:9; 183:13; 185:4, 7; 187:20*
**December 7th, 2001** [1]
*181:13*
**December 19** [1]
*195:20*
**December 22nd, 1998** [1]
*247:3*
**December 27, 2001** [1]
*210:17*
**December 28, 2001** [1]
*208:7*
**December 28th** [1]
*267:25*
**December 28th, 2002** [1]
*267:16*
**December of 2001** [4]
*147:19, 22; 153:12; 172:9*
**January** [2]
*130:1; 235:14*
**January, 2000** [1]
*229:3*
**January, 2001** [2]
*228:3, 18*
**January, 2002** [1]
*130:8*
**January 1** [1]
*235:13*
**January 27** [1]
*209:14*
**January 27th** [1]
*268:1*
**January 27th, 2002** [3]
*267:13, 18; 269:9*
**January of 2000** [1]
*235:14*
**March of 2000** [1]
*235:20*
**May** [1]
*265:3*
**May 22** [1]
*115:7*
**November** [3]
*129:25; 130:12; 297:15*
**November 29** [1]
*304:21*
**November 29, 2001** [1]
*181:18*
**November 29th** [11]
*127:18; 143:7, 14, 22; 252:5, 7; 271:10; 275:7; 297:16; 302:16, 20*
**November 29th, 2001** [2]
*252:1, 8*
**November 30th** [2]
*252:13, 16*
**November of 2000** [1]
*285:6*
**November of 2001** [2]
*118:10; 130:8*
**October of 2001** [2]

*238:19; 239:3*
**September** [1]
*312:8*
**September 7th** [3]
*312:10, 11, 16*
**September 11, 2002** [2]
*214:2, 14*
**September 16, 2002** [1]
*220:19*

## – $ –

**$100** [3]
*200:7; 202:19; 207:10*
**$2,600** [2]
*203:8; 207:10*
**$475.00** [1]
*199:23*
**$5,200** [3]
*202:6, 15, 18*

## – 0 –

**001231** [1]
*255:22*
**01** [1]
*256:3*
**02** [1]
*109:7*

## – 1 –

**1** [3]
*136:2; 235:13; 317:4*
**1-27-02** [1]
*208:8*
**10** [13]
*114:11; 192:17, 21, 22; 218:10, 17; 255:10; 259:3, 5; 260:15; 295:7; 307:22; 308:1*
**100** [9]
*110:9; 111:20; 163:5; 193:2, 12; 212:9; 280:21, 25; 281:6*
**1099** [1]
*243:11*
**10:45** [1]
*256:1*
**11** [5]
*114:13; 214:2, 14; 261:4, 5*
**111** [1]
*113:4*
**112** [1]
*113:5*
**114** [1]
*319:21*
**115** [1]
*113:8*
**11:41** [1]
*110:5*
**11th** [1]
*315:7*
**12** [8]
*180:23, 24; 183:11, 24; 187:16; 246:23; 296:20*
**12-1** [1]
*249:3*
**12-1-01** [5]
*248:21, 25; 249:3, 15; 250:13*
**12-19-01** [1]
*113:23*
**12-2-01** [1]
*113:20*

**12-4-01** [2]
*113:22; 114:12*
**12/31/03** [1]
*319:20*
**1200** [1]
*111:6*
**1233** [1]
*255:22*
**125** [2]
*272:21; 285:25*
**128** [1]
*109:7*
**138** [1]
*113:19*
**14** [1]
*296:20*
**15** [7]
*117:17; 195:16; 227:2; 282:24; 291:9, 14; 307:14*
**16** [1]
*220:19*
**17** [1]
*125:21*
**172** [1]
*113:21*
**18** [3]
*113:23; 114:6; 125:17*
**19** [2]
*125:20; 195:20*
**1998** [5]
*147:17; 245:19; 246:10; 247:3; 303:10*
**1999** [4]
*245:20; 315:10, 12, 14*
**1:02** [1]
*110:6*
**1st** [1]
*253:20*

## – 2 –

**2** [48]
*109:16; 113:7; 119:22; 138:8, 14; 161:25; 162:4; 163:9; 189:15; 190:2, 5; 191:9, 18; 194:19; 195:3; 212:6, 20; 214:17; 218:21; 224:18; 247:17, 21; 248:24; 249:6; 251:18; 253:20, 22; 254:19; 256:7, 8, 17, 19, 21; 257:4, 9, 14; 262:7; 263:11; 264:2, 11; 265:2, 18; 266:2, 19; 270:15; 313:10; 317:4*
**2000** [26]
*117:18; 118:1; 150:8; 226:8, 20, 21; 228:3, 25; 229:3; 230:6, 24; 232:9, 11; 235:13, 14, 20; 285:6; 291:3; 294:9, 13; 307:25; 308:3; 314:22, 25; 315:1*
**2001** [53]
*118:10, 17; 130:8, 13; 135:24; 138:8, 10; 147:19, 22, 25; 148:13; 149:24; 150:8, 25; 151:3; 152:15; 153:12; 161:25; 162:4; 165:7; 172:9; 173:25; 181:13, 18; 195:20; 208:8; 210:17; 218:11; 224:18; 226:9, 22; 228:4, 18; 229:1; 230:6, 25; 238:19; 239:3; 248:21; 252:1,*

8; 253:20; 256:1; 259:12;
261:19, 23; 294:13; 304:4;
308:3; 314:21; 315:17, 21
**2002** [15]
118:18, 20; 130:8; 209:14;
214:2, 14; 220:19; 267:13,
16, 19; 269:9; 291:4; 292:22;
294:13; 304:5
**2003** [10]
109:15; 110:5; 115:8; 117:18;
118:2, 20; 317:3; 318:21;
319:8, 16
**201** [1]
113:23
**21** [3]
109:15; 115:8; 317:3
**210** [1]
200:6
**213** [1]
114:4
**21st** [2]
110:4; 319:8
**22** [1]
115:7
**220** [1]
114:6
**2219** [1]
319:19
**22nd** [1]
247:3
**24** [1]
113:21
**241** [1]
319:20
**243** [1]
113:8
**245** [1]
114:8
**248** [1]
114:10
**25** [1]
114:4
**259** [1]
114:11
**261** [1]
114:13
**27** [5]
209:14; 210:17; 279:22;
280:2; 307:13
**270** [1]
113:9
**27th** [4]
267:13, 18; 268:1; 269:9
**28** [4]
208:7; 279:22; 280:3, 5
**28th** [2]
267:16, 25
**29** [3]
181:18; 244:14; 304:21
**2939** [2]
244:15, 17
**2948** [4]
244:14, 15, 16, 17
**2952** [1]
244:13
**2970** [1]
259:4
**2971** [1]
261:4
**29th** [16]
127:18; 129:25; 130:12;

145, 14, 22; 252:1, 5, 7, 8;
253:16; 271:10; 275:7;
297:16; 302:16, 20
**2:47** [1]
110:6
**2nd** [1]
138:10

### – 3 –

**3** [8]
113:19; 137:24; 138:2;
165:13; 190:1; 256:3; 262:11;
317:4
**3,000** [1]
198:25
**30** [7]
156:20, 22; 158:12; 197:16;
210:13; 246:23; 268:16
**30-day** [1]
267:15
**300** [2]
110:10; 111:20
**3000** [4]
248:2, 19; 249:5, 7
**3001** [3]
255:11, 23; 256:1
**3002** [1]
255:11
**3003** [2]
255:12, 23
**301** [1]
113:9
**30th** [2]
252:13, 16
**312** [1]
113:10
**314** [1]
113:10
**317** [1]
113:12
**318** [1]
113:13
**319** [1]
113:14
**32** [2]
279:22; 280:5
**33** [1]
274:22
**35** [2]
161:21; 165:9
**3505** [1]
111:16
**36** [10]
223:18; 255:20; 256:16, 19,
25; 257:12, 20; 264:4, 7;
265:2
**38** [1]
165:1
**3809** [1]
207:22
**39** [9]
207:19; 208:21; 209:9, 12,
18, 25; 210:1, 4, 15
**3rd** [2]
261:19, 23

### – 4 –

**4** [29]
113:21; 135:24; 165:6;
167:11; 170:1; 171:1; 172:22;

173:25; 182:11, 1b, 23:1;
189:7; 208:12, 21; 209:10,
16, 17; 210:3, 4, 6; 256:1;
258:3, 4, 12; 259:12; 260:5;
270:9; 317:5
**460** [1]
111:15
**475** [1]
200:4
**4th** [5]
177:5, 15; 183:8; 259:19;
261:1

### – 5 –

**5** [9]
113:19, 23; 114:11, 13;
201:9, 12; 246:9, 14, 15
**5,200** [1]
207:9
**512-305-4734/512-305-4800**
[1]
111:21
**512-499-0277** [1]
319:22
**5:00** [1]
200:6
**5:23** [1]
259:12

### – 6 –

**6** [9]
114:4; 213:22, 25; 214:5, 6,
7, 11, 13; 219:15
**6-19-02** [1]
114:14
**60** [1]
197:8
**69** [1]
306:21

### – 7 –

**7** [6]
114:6; 125:18; 136:3; 188:16;
220:15, 18
**7,000** [3]
197:7; 296:21; 306:18
**7,100** [1]
306:20
**750** [1]
319:21
**78520** [2]
111:6, 11
**78521** [1]
111:16
**78701** [3]
110:10; 111:21; 319:21
**7th** [10]
181:9, 13; 183:13; 185:4, 7;
187:20; 312:10, 11, 16;
319:21

### – 8 –

**8** [5]
114:8, 10; 245:3, 5; 249:8
**80** [4]
308:4; 313:4; 314:3, 10
**855** [1]
111:11
**8:15** [1]

256:3

### – 9 –

**9** [7]
111:11; 114:8, 10; 249:9, 1
11; 265:13
**9-11-02** [1]
114:5
**9-16-02** [1]
114:7
**90** [2]
192:23; 295:6
**90-plus** [1]
154:5
**90/10** [3]
192:17, 21; 296:1
**956-504-1100/956-504-1408**
[1]
111:7
**956-541-1846/956-541-1893**
[1]
111:17
**956-542-5666/956-542-0016**
[1]
111:12
**98** [2]
307:21, 23
**99** [6]
307:21, 24, 25; 314:24;
315:1, 22
**9:00** [1]
200:5
**9:12** [1]
110:5

### – A –

**a.m.** [4]
110:5; 256:1, 3
**ability** [1]
137:14
**able** [5]
116:12; 131:17; 179:16;
194:16; 220:25
**above-styled** [1]
110:4
**absent** [1]
164:20
**absolute** [1]
288:23
**Absolutely** [7]
119:8; 128:14; 237:16;
270:16; 287:2; 303:23; 310:2
**absolutely** [2]
218:24; 264:3
**absorbitive** [1]
206:9
**accede** [1]
179:17
**acceded** [1]
295:11
**accept** [1]
225:2
**acceptable** [1]
219:3
**accepted** [2]
219:1; 227:4
**access** [1]
314:13
**accomplish** [3]
136:22; 211:11; 251:2

**according** [1]
190:17
**Account** [1]
305:25
**account** [112]
123:10, 14; 129:22, 23;
130:6, 18, 25; 131:1, 4, 7, 15,
18, 21; 132:1, 4, 5, 7, 11, 13,
21, 22; 133:13, 16; 135:15,
16, 17, 24; 136:7, 10, 20;
137:5; 141:13, 18, 19, 21, 25;
145:10; 147:1; 150:1; 152:25;
153:1, 15; 156:2, 5, 6, 8;
157:16; 159:18; 160:3, 11,
18; 161:4; 171:12; 181:22,
25; 182:2; 184:7; 185:16, 23;
186:13, 15, 20, 21, 22, 23,
25; 187:3, 19, 23; 188:10;
189:2; 196:12; 197:7, 17;
199:8; 202:23; 203:6; 206:23;
214:22; 215:25; 216:13, 18;
218:14; 222:24; 223:1, 7, 11;
227:12, 13, 17; 228:6; 267:7;
288:22; 289:12, 19; 291:1, 9;
292:4, 12, 13; 293:15, 20;
294:3; 297:6; 298:17; 299:4;
303:10; 304:15; 314:13
**accounts** [19]
156:7; 158:5; 160:8, 14;
186:17, 23; 206:11; 219:11,
12; 221:10, 21; 223:8; 225:6,
8, 11; 227:18; 289:12;
293:22; 299:17
**accurate** [6]
151:24; 155:23; 267:22;
288:13; 303:13; 308:11
**accurately** [1]
273:10; 278:24; 300:11
**accusation** [1]
240:16
**accusations** [1]
240:18
**acknowledged** [2]
272:3; 318:18
**acquisition** [2]
289:2; 306:4
**act** [2]
182:1; 264:13
**acting** [2]
181:21; 264:18
**ACTION** [1]
109:6
**action** [11]
164:14, 16, 23; 174:3; 175:1;
189:4; 201:2; 209:15; 240:4;
319:13, 15
**actions** [2]
123:19; 162:7
**active** [3]
131:3, 7, 15
**actual** [9]
159:15; 171:24; 188:9;
189:16; 242:23; 263:25;
267:10, 12; 290:15
**actuality** [1]
184:9
**adage** [1]
287:5
**added** [1]
115:21
**addition** [4]

**additional** [5]
207:8; 251:12, 14, 15; 255:7
**address** [7]
182:23; 190:19; 191:7, 20;
193:13; 194:24
**addressed** [13]
124:17, 19, 20, 22; 165:5;
192:1, 14; 195:16; 204:11;
224:21; 228:12; 229:16;
315:23
**addressee** [2]
121:15, 16
**addressing** [2]
205:23; 214:22
**adequate** [2]
298:11; 315:9
**adheres** [1]
287:4
**administration** [8]
147:19; 277:9, 22, 24;
278:11; 279:19; 283:6;
301:12
**administrator** [4]
186:21; 260:6; 278:5; 288:9
**Administrators** [1]
162:12
**admire** [1]
141:4
**advantage** [1]
296:3
**adversaries** [1]
140:1
**advertising** [1]
313:8
**advice** [8]
242:1; 254:7; 263:16, 18, 20,
25; 276:11; 282:20
**advised** [6]
163:25; 237:11; 273:18;
282:17, 19, 22
**advises** [1]
254:6
**affect** [2]
133:17; 179:15
**affix** [1]
318:4
**afford** [1]
204:6
**AFL** [12]
244:13; 248:2, 19; 249:5, 7;
255:11, 18, 23; 256:1; 259:4;
261:4
**AFLAC** [132]
111:18; 115:14, 23; 116:1, 3,
14; 117:2, 7, 19; 118:9, 19,
24; 123:11; 124:22; 125:3;
126:15, 19; 127:10; 133:2, 4,
14; 134:3; 135:18; 136:10;
137:2, 22; 140:17, 19, 22;
142:19; 145:1, 10; 146:25;
147:16; 148:1, 14, 24; 149:7,
18; 150:15; 154:5; 155:4;
156:12; 164:10; 165:6, 21;
168:15; 173:4; 174:10, 19;
179:1; 180:6; 181:19, 22;
182:1; 183:15, 20; 184:5;
186:13, 16, 18; 187:1, 19, 23;
189:4; 196:5; 197:16, 25;
203:13; 207:22; 211:4, 6, 18,
19, 21; 215:25; 216:19;

**addressed** 218:20; 219:9; 221:2; 227:2;
234:5; 236:7, 13; 237:7;
240:1; 241:10; 245:14;
246:24; 247:4, 13; 264:5;
269:9, 23; 272:18; 273:1, 16,
18; 275:1, 13, 18; 276:3, 4, 5;
277:10, 13, 25; 285:1, 14, 17,
20, 25; 286:4, 5, 11, 14, 17,
19; 287:4, 11; 290:3; 291:14,
19; 299:2, 17; 303:7; 307:15;
308:20; 311:8; 313:22
**AFLAC's** [16]
117:15; 141:21; 156:16;
181:24; 184:7; 185:16;
193:18, 21, 25; 194:4, 6;
264:9; 272:4; 276:9; 304:4;
311:6
**afterwards** [1]
254:19
**agency** [1]
258:21
**agendas** [1]
264:15
**agent** [23]
116:4, 18, 19; 153:1; 159:22,
24; 181:24; 183:17, 22;
184:4, 7, 17; 198:18; 199:3,
4, 13, 15, 17; 219:18, 19;
230:23; 232:20; 234:8
**agents** [28]
116:10; 149:7; 154:16, 17;
156:19; 158:13; 159:15;
160:9, 15; 161:1, 3, 17;
192:24; 197:22; 199:12;
200:25; 218:11; 219:1, 12,
23; 226:12; 227:17, 24;
232:14, 16, 17; 237:5, 18
**agree** [19]
128:15; 143:16; 177:10;
196:14; 197:17; 200:8, 15;
251:1, 10; 263:22; 278:17;
279:16; 283:5; 287:3, 14;
288:2; 292:21; 303:24;
313:24
**agreeable** [1]
190:3
**agreed** [13]
158:17; 166:24; 202:8, 9, 11,
14, 17; 207:7; 216:20;
240:15; 243:2; 290:8; 311:3
**agreeing** [2]
264:16; 290:6
**Agreement** [1]
114:9
**agreement** [12]
137:18; 155:2, 11; 208:9, 10;
245:9; 246:15, 22; 247:1, 12;
270:13; 319:7
**AGUILAR** [68]
111:4, 5; 115:5; 119:3;
120:23; 121:2, 7, 11; 122:2;
135:12; 145:6; 146:4, 7, 18;
161:12; 162:4; 168:22, 25;
169:13, 17, 24; 176:8;
178:18, 21; 179:22; 180:5,
10, 12, 16, 25; 187:12; 201:6,
16; 214:7, 9; 224:2; 230:19;
243:22; 265:11; 266:3;
276:24; 278:20; 279:7; 282:3,
6; 283:10, 21; 284:7, 24;

287:1, 6; 289:22; 291:5;
292:6, 24; 298:20; 300:16;
301:9, 19; 312:20; 314:1, 19;
316:3, 6
**Aguilar** [103]
113:8, 9, 10; 119:4; 121:21;
122:4; 124:2, 12; 125:13;
126:20; 127:1, 17; 128:22;
129:8; 133:7, 23; 134:9;
135:13; 137:23; 138:1;
141:19; 142:3, 25; 143:7, 11,
18; 144:1; 145:8; 146:23;
147:7, 15; 148:18, 20; 149:1,
6, 24; 150:20; 151:8; 154:20;
155:12; 159:12; 161:13;
162:5, 21; 163:14; 166:25;
168:24; 169:2, 15; 170:10;
174:18; 176:9, 17; 177:2, 24;
180:22; 181:1; 182:9, 15;
184:22; 186:7; 187:15; 188:6,
19; 193:10; 195:1; 201:11,
18; 203:21; 208:18; 212:19;
213:10, 24; 214:12; 215:6;
220:17; 222:23; 223:22;
224:6; 229:19; 230:4, 21;
233:25; 237:4; 238:9; 239:9,
16; 241:16; 242:13, 22;
243:10, 18; 254:9; 266:18;
307:10; 309:25; 310:12;
311:2, 16, 24; 312:15; 313:2;
315:1
**alive** [1]
252:17
**allow** [1]
241:9
**allowed** [14]
117:22; 118:20, 23; 187:21,
24; 188:16; 210:21; 223:25;
231:25; 236:21; 237:7; 273:2;
304:4
**alluded** [1]
262:13
**alternative** [1]
191:1
**amongst** [2]
295:5; 299:2
**Amos** [11]
161:24; 164:9; 165:6; 167:12,
14; 170:14; 240:11; 241:5, 6,
8
**amount** [8]
135:4; 157:3, 5; 161:15;
207:7; 216:20; 222:13, 21
**amounts** [1]
296:10
**annual** [6]
241:20; 242:24; 245:22;
305:2, 5; 306:24
**annualized** [2]
135:6; 288:19
**Answer** [1]
185:25
**answer** [58]
119:5, 20; 122:7; 124:1;
126:18; 141:16; 142:25;
147:14; 151:14, 16; 156:24;
159:3; 163:24; 167:5; 169:7,
9; 176:20; 181:10; 182:24;
184:25; 186:3; 188:23; 189:3;
198:8, 16; 206:25; 219:13;
 ...:24; ...:19; ...:...

241:24; 242:15, 19; 247:8;
251:14; 253:16; 254:16;
257:7, 15, 17; 260:2; 269:8,
13; 270:5, 6; 273:9, 10;
274:18; 276:8; 278:21;
287:10; 289:25; 292:9; 293:3,
13; 296:11; 298:21
**answered** [9]
176:15, 23; 177:19; 184:25;
216:4; 218:1; 222:18; 225:13;
315:23
**answering** [2]
122:25; 250:4
**answers** [1]
217:17
**Antonia** [4]
201:21; 204:19, 24; 205:17
**Antonio** [2]
297:1; 298:3
**Anybody** [2]
137:17; 152:13
**anybody** [18]
137:13; 147:5; 164:9; 165:18;
167:24; 168:4, 7; 170:12;
185:22; 187:24; 188:17;
206:24; 217:16, 24; 219:1;
251:7; 293:14; 310:20
**anybody's** [1]
250:16
**anyone's** [1]
203:7
**Anyway** [1]
169:15
**anyway** [3]
115:12; 223:16; 236:16
**anywhere** [2]
200:2; 288:25
**apologize** [4]
122:10; 241:11; 269:3;
300:19
**apology** [1]
241:9
**apparently** [1]
165:8
**appear** [2]
210:8; 284:5
**appearance** [2]
277:7
**APPEARANCES** [1]
111:1
**Appearances** [1]
113:4
**appeared** [1]
219:3
**appears** [11]
182:4; 183:15; 203:24;
205:20; 208:7, 21; 223:18;
247:7; 249:18; 274:23;
318:13
**apply** [2]
119:18; 311:11
**appointed** [2]
117:3; 140:24
**appreciate** [2]
146:1, 17
**approach** [6]
168:7, 17; 185:22; 187:24;
188:16; 239:22
**approached** [5]
168:6, 10; 169:3; 239:17, 23
**appropriate** [9]

27...; 276:12, 21; 279:17;
294:25; 308:23; 309:2, 8, 17
**appropriately** [1]
298:12
**approval** [2]
177:16; 309:23
**approve** [3]
231:13; 309:5, 6
**approved** [4]
304:4; 309:3, 11; 310:20
**area** [8]
131:10, 11, 15; 199:22;
200:17; 212:15, 23; 226:23
**areas** [1]
297:19
**aren't** [1]
300:9
**argue** [1]
250:8
**arguing** [2]
241:11; 268:21
**argument** [3]
239:13; 241:13; 257:12
**argumentative** [4]
250:14; 253:12; 256:12;
282:3
**arises** [1]
196:7
**ARNOLD** [2]
111:4, 5
**Arnold** [11]
120:21; 124:8; 145:17;
163:16; 167:1; 218:1; 233:24;
237:1; 255:20; 305:18; 312:5
**arrangement** [6]
174:8; 229:13; 231:1; 245:22,
23; 294:18
**arrangements** [2]
297:18; 301:11
**arrived** [2]
175:5, 19
**Artemis** [1]
111:5
**articulated** [1]
280:20
**aside** [3]
145:3, 10; 213:2
**Asking** [1]
259:22
**asking** [44]
115:18, 24; 118:18; 121:21;
125:15; 126:21; 128:24;
129:14; 141:18; 146:7, 24;
151:8, 11; 155:12; 157:11;
168:3; 171:21; 179:4; 180:10;
184:9; 186:23; 188:8, 14;
191:22; 210:5; 211:17;
222:10, 20; 230:22; 242:3,
13; 252:24; 259:22; 276:23;
278:22; 279:14; 283:25;
284:16; 285:1, 4, 12; 290:10;
307:10
**assign** [1]
225:6
**assist** [1]
158:9
**assistance** [2]
165:12; 183:4
**assistant** [1]
302:22
**assisted** [1]

158:9
**Associate** [1]
159:25
**associate** [21]
116:25; 117:6, 8, 13; 123:10;
160:1; 172:25; 174:4, 15;
176:2; 183:6; 206:4; 209:13,
24; 210:7, 15; 234:18;
259:18, 20; 298:25
**associate's** [1]
208:10
**associated** [2]
204:1; 206:4
**associates** [12]
122:8; 151:19; 156:19;
196:11; 197:11, 16; 234:15,
21; 235:1; 236:19; 291:23;
299:3
**assume** [8]
130:24; 159:17; 171:20;
219:14; 248:16; 262:1;
267:22; 278:1; 279:12
**assumed** [6]
127:21; 197:3; 251:10; 260:7,
8; 292:18
**assumes** [1]
124:9
**assuming** [5]
170:7; 171:15; 254:20; 266:3;
295:21
**assumption** [1]
253:10
**assumptive** [2]
140:10, 13
**astounded** [1]
226:16
**attached** [5]
110:12; 139:25; 214:17;
274:13; 275:7
**attachment** [1]
114:5
**attempt** [2]
134:17; 136:21
**attempts** [1]
137:9
**attend** [1]
179:10
**attended** [2]
238:23, 25
**attending** [3]
238:12, 16; 239:2
**attention** [1]
310:11
**attorney** [23]
124:20; 143:19; 168:14, 20;
169:4, 8; 170:6; 181:5, 6;
185:15; 186:6; 187:7; 211:4;
244:2; 245:7; 249:22; 254:6;
302:25; 311:15, 18; 312:16;
319:13, 14
**attorney's** [1]
242:1
**attorneys** [1]
168:15
**attributed** [3]
293:9; 308:10; 313:5
**AUGUST** [2]
109:15; 317:3
**August** [3]
110:5; 115:8; 319:8
**Austin** [3]

110:10; 111:21; 319:21
**authority** [6]
165:19; 185:13; 261:24, 25;
284:9; 285:15
**authorization** [1]
290:4
**authorizes** [1]
290:4
**automatically** [3]
190:7, 8; 246:22
**available** [4]
120:16; 221:2; 231:21;
236:11
**Avenue** [2]
110:9; 111:20
**average** [2]
199:24; 200:5
**award** [1]
164:4
**aware** [18]
130:11; 149:1; 160:6, 14, 17;
179:7; 188:25; 221:20;
233:11; 280:7; 301:22;
304:22; 307:21; 308:1, 3, 5,
7; 315:16
**awareness** [1]
313:9
**awful** [1]
313:20
**axiom** [1]
311:11

— B —

**badgering** [2]
140:17, 20
**badly** [1]
240:1
**Baker** [10]
124:11, 20, 22; 125:3, 24;
308:23, 25; 309:16; 310:3, 13
**bail** [1]
254:13
**bar** [1]
143:15; 169:12
**BARKER** [2]
110:6; 319:6, 19
**Barnson** [10]
114:12, 14; 167:15, 23, 24;
168:2; 239:17; 241:4; 259:16;
260:21
**base** [1]
263:3
**Based** [3]
128:10; 152:24; 285:4
**based** [24]
126:20; 135:21; 155:1;
160:24; 161:18; 170:5; 188:3,
4; 191:8, 17; 198:2; 267:6;
272:23; 280:21; 281:11, 13;
282:13; 284:15; 285:2, 5;
289:9; 293:13; 304:2, 12
**Basically** [2]
142:20; 209:9
**basically** [13]
125:22, 23; 145:3; 152:25;
162:17; 172:24; 197:21;
213:18; 216:2; 290:11; 300.
301:22; 302:5
**basis** [7]
157:15, 19; 158:4; 192:17,

**21;** 196:12; 202:10
**Bates** [1]
    255:22
**battle** [2]
    139:23; 140:8
**bear** [1]
    244:11
**becomes** [2]
    139:22; 235:6
**begins** [1]
    248:3
**begun** [1]
    115:7
**behalf** [6]
    126:19; 140:21; 203:16;
    273:1; 276:9; 277:13
**behavior** [4]
    263:7; 266:19; 273:8; 276:22
**behind** [1]
    240:20
**belief** [2]
    128:8; 260:12
**believe** [52]
    117:23; 118:21; 120:9, 15;
    123:5; 124:9, 10, 23; 130:12,
    13; 138:9; 139:11; 140:23;
    141:10; 142:8; 143:9; 153:12;
    156:25; 178:23; 179:2; 181:3;
    182:10; 196:10; 197:6;
    199:19; 201:21; 204:15;
    208:11; 226:25; 231:18;
    244:11, 22; 245:8, 14;
    247:16; 250:22; 252:9;
    255:10; 257:23; 265:21;
    266:7; 267:11; 275:1, 6;
    277:6; 279:23; 281:15;
    287:13; 294:17; 295:2;
    311:17
**believed** [6]
    128:1; 140:9; 254:1; 259:19;
    260:14; 261:23
**belong** [2]
    186:17; 299:17
**belonged** [1]
    186:16
**belongs** [1]
    186:13
**benefits** [1]
    272:22
**bet** [1]
    232:12
**bid** [16]
    115:22; 116:13, 14, 16;
    117:1, 2, 6, 9, 19, 21; 118:20,
    21, 23
**bids** [3]
    116:21; 117:1; 118:12
**biggest** [1]
    132:13
**billing** [3]
    150:3, 14; 153:9
**birthday** [2]
    252:15, 17
**BISD** [72]
    131:3, 14; 147:1, 15, 19, 22,
    25; 148:12; 149:2, 20;
    150:16, 22; 151:3; 152:18;
    154:12; 174:9; 181:20, 22,
    24; 184:7, 24; 185:14, 22;
    186:13; 187:18, 21, 25;
    188:17; 196:11; 198:12, 15;

199:14, 16; 202:10, 23;
204:1, 4; 206:5, 9; 210:22;
214:17; 216:13, 17; 217:3, 4;
218:11; 219:10; 220:12, 24;
221:8; 223:7, 10; 226:5, 12;
228:24, 25; 262:16; 265:6,
16, 19; 266:16; 268:12, 14,
15; 275:19; 302:14; 303:5, 7;
308:8; 313:3
**BISD'S** [1]
    286:10
**BISD's** [2]
    302:15
**bit** [9]
    120:3; 128:1; 214:25; 239:15;
    250:10; 271:17; 289:7; 293:6;
    297:21
**bits** [1]
    303:11
**blah** [3]
    247:1
**Board** [1]
    109:9
**board** [34]
    124:3, 4, 7; 126:24; 127:23;
    129:4; 139:7; 141:1; 144:9;
    160:20; 161:8; 164:1; 213:14,
    16, 20; 262:23; 266:11, 16;
    274:8; 275:23, 25; 277:9, 22,
    25; 278:10, 18; 282:10, 13;
    283:6, 18; 284:3, 14
**boards** [2]
    297:10
**Boca** [1]
    111:16
**body** [3]
    180:3, 4; 306:16
**boiled** [1]
    207:11
**boils** [1]
    247:11
**bold** [1]
    277:6
**bookkeeping** [1]
    156:14
**BOSQUE-GILBERT** [1]
    109:7
**boss** [1]
    311:9
**Boulevard** [2]
    111:6, 16
**break** [4]
    119:21; 146:16, 24; 230:22
**breaking** [2]
    311:11, 17
**bribery** [1]
    277:8
**Brief** [1]
    146:22
**broke** [1]
    231:3
**brokers** [1]
    122:9
**BROWNSVILLE** [3]
    109:2, 5; 111:8
**Brownsville** [36]
    109:9; 111:6, 11, 16; 117:20;
    131:12; 144:11; 158:1; 161:5;
    171:19; 172:7; 177:11;
    199:22; 200:2; 217:9, 21;
    218:2; 244:2; 245:15; 247:5;

12; 252:10; 262:22; 272:18;
278:2; 286:8; 289:11; 290:1;
292:11; 293:4; 296:16; 299:1;
300:22; 306:18; 307:16;
315:6
**Bryan-College** [1]
    131:13
**Buddy** [4]
    146:4; 169:18; 246:6; 274:14
**build** [4]
    135:2; 287:19, 21, 24
**building** [2]
    199:23; 303:17
**bullet** [7]
    192:16; 193:3, 4, 5; 212:6, 7,
    20
**bullets** [7]
    189:25; 190:18; 191:8, 13,
    15; 218:22
**bunch** [1]
    196:19
**business** [52]
    123:13; 127:10; 131:5; 133:2,
    15; 134:3, 10, 13, 22, 24;
    137:15; 138:17; 153:18;
    157:2; 159:5, 10; 162:7;
    164:4; 174:9; 175:24; 190:16,
    20; 191:5, 10, 14, 19; 192:16,
    20; 193:22, 25; 194:8;
    196:22; 203:1; 204:5; 206:14,
    20; 216:18; 217:2; 226:15;
    233:5; 236:6; 264:5, 10;
    292:19; 293:7; 295:25; 297:5;
    300:22; 301:2, 4, 24; 302:12

— C —

**cafeteria** [6]
    117:20; 278:6; 283:7; 291:17,
    20, 24
**call** [12]
    156:12; 158:8; 159:24; 164:3;
    170:23; 216:5; 260:21; 272:2;
    276:14, 19; 301:24; 312:16
**Calls** [1]
    186:1
**calls** [2]
    222:19; 259:21
**campaign** [5]
    213:13; 266:10, .15; 274:3;
    313:8
**campaigning** [1]
    281:25
**campus** [11]
    137:20; 145:22; 211:7, 10;
    212:1; 272:10; 279:3; 280:8;
    281:17; 282:1; 283:17
**campuses** [2]
    210:25; 265:6; 313:17
**capacities** [1]
    109:9
**capacity** [8]
    130:5; 135:10; 179:11;
    268:18; 282:21; 303:3; 309:7;
    315:5
**card** [1]
    318:15
**career** [1]
    142:16
**carefully** [1]
    319:10

**case** [19]
    122:23; 135:2; 137:10;
    139:23; 162:16; 163:3, 4;
    178:15, 24; 179:8; 188:3;
    198:10; 217:5; 240:22; 251:9;
    265:24; 270:22; 275:9;
    286:25
**cases** [2]
    220:3; 236:10
**catch-22** [4]
    141:4, 6, 7; 295:22
**categorized** [1]
    148:4
**caught** [1]
    141:3
**caused** [2]
    145:22; 266:2
**cc'd** [3]
    201:23; 202:1; 205:22;
    207:25
**cease** [1]
    184:23
**ceased** [1]
    266:19
**cent** [1]
    166:3
**Central** [12]
    111:6; 131:7, 9, 16; 132:6,
    14, 15, 19, 20; 141:14; 234:5;
    264:8
**CERTIFICATE** [1]
    319:1
**Certificate** [1]
    113:14
**Certified** [3]
    110:7; 319:6, 16
**certify** [2]
    319:7, 12
**cetera** [1]
    200:7
**challenge** [4]
    129:9, 15; 137:1
**challenges** [1]
    221:13
**chance** [4]
    120:1; 125:13; 161:21; 215:6
**chances** [2]
    172:1, 3
**CHANGE** [1]
    317:6
**Change** [2]
    113:22; 286:16
**change** [28]
    123:16; 129:19; 130:15, 22;
    164:16; 172:24; 174:23;
    183:9; 203:10; 208:8, 23;
    209:23; 210:13; 249:25;
    250:1, 3; 258:6, 9, 13, 25;
    260:5, 25; 265:15; 270:9;
    286:13; 297:11; 299:4;
    302:18
**changed** [8]
    125:5; 126:4; 127:20; 130:4,
    7; 250:8; 295:18; 297:11
**CHANGES** [1]
    317:1
**Changes** [1]
    113:12
**changes** [2]
    123:9; 153:25
**changing** [1]

*178:2*

**charge** [9]
*132:18; 152:22; 193:2, 12, 15; 202:23; 212:8, 21, 24*

**CHAVEZ** [1]
*109:3*

**Chavez** [117]
*111:24; 113:20; 114:10, 12, 14; 117:18; 118:19, 23; 120:7; 121:19; 123:10; 135:18; 138:5; 150:20; 151:10; 153:12; 161:21, 24; 164:25; 165:5, 9, 13; 168:9; 171:3; 172:8; 174:3; 179:12; 180:23, 24; 181:5, 19, 24; 182:2; 183:11, 16, 21, 24; 184:6, 23; 185:10, 21; 187:16, 20; 190:2; 195:16; 196:4; 207:19; 208:21; 209:9, 12, 18; 210:1, 13, 15; 223:12, 17, 19; 224:7; 247:14; 248:9, 10, 22; 249:19; 250:6, 20, 25; 253:23; 254:18; 255:7, 20; 256:4, 16, 19, 25; 257:2, 20; 258:15; 259:16, 19, 25; 260:1, 18, 20, 22; 262:11; 263:14; 264:4, 7; 265:2, 14; 268:3; 269:8, 23; 270:14, 24; 271:7; 272:8; 274:22; 275:15; 279:22; 280:20; 284:23; 285:5, 10; 286:25; 289:18; 290:6; 291:1; 293:14; 294:3; 297:20; 303:14; 308:14; 309:15; 313:10*

**Chavez's** [7]
*181:21; 258:25; 260:6; 265:25; 275:18; 292:22; 295:21*

**check** [2]
*135:5; 248:1*

**Cheryl** [1]
*245:13*

**Chica** [1]
*111:16*

**choice** [1]
*263:18*

**chose** [6]
*192:5; 299:24, 25; 313:23*

**chosen** [1]
*298:1*

**circumstances** [7]
*129:19; 130:4, 14, 22; 199:2; 225:10; 297:11*

**circumvent** [2]
*134:17; 228:14*

**circumvented** [1]
*137:18*

**CIVIL** [1]
*109:6*

**Civil** [1]
*110:11*

**claim** [2]
*140:3; 156:14*

**claims** [2]
*152:19; 313:20*

**clarification** [1]
*184:16*

**clarify** [10]
*120:4; 123:8; 146:8; 164:13; 182:15; 250:10; 251:25; 285:7; 295:9; 317:4*

**clean** [1]
*298:18*

**clear** [11]
*121:25; 163:5; 177:25; 190:3; 212:5, 7; 228:15; 236:23; 258:9; 271:24*

**client** [27]
*116:7; 142:19; 159:12; 168:20; 169:4; 170:6; 187:17; 198:3; 199:4, 18; 251:23; 276:14, 15, 18; 287:5, 7, 9, 13; 302:23; 303:18; 311:3, 9, 10, 12, 17, 18*

**clients** [1]
*276:3*

**closed** [1]
*240:20*

**CODE** [1]
*317:6*

**coded** [3]
*295:16; 297:7; 299:4*

**Codes** [1]
*317:4*

**Colunga** [2]
*124:23; 125:20*

**comb** [1]
*236:18*

**combination** [1]
*202:18*

**comfortable** [1]
*246:12*

**coming** [1]
*126:6*

**commencing** [1]
*246:21*

**comment** [10]
*166:8, 14; 169:10; 241:7; 273:25; 277:10; 280:17; 286:22; 288:16; 311:3*

**comments** [3]
*275:14, 16; 276:2*

**commission** [9]
*154:23, 25; 155:10; 157:1; 227:24; 230:22; 231:1; 232:17; 295:18*

**commissions** [13]
*156:19; 157:6; 192:4; 206:12; 225:15; 227:25; 231:25; 237:18; 295:3; 299:23; 302:1, 3, 6*

**committee** [7]
*153:4, 5; 278:16; 279:4; 280:9; 281:17; 308:15*

**committees** [2]
*282:1; 283:18*

**common** [1]
*299:2*

**communicate** [1]
*185:13; 234:25*

**communicating** [1]
*234:17*

**communication** [5]
*262:25; 266:15; 282:17; 283:17, 18*

**communications** [1]
*168:20*

**community** [1]
*139:24*

**company** [24]
*116:20, 22; 117:16; 135:6; 140:23; 162:12; 177:12, 16;*

*199:19; 210:9; 213   5; 236:11; 267:6; 270:7; 282:24; 283:2; 287:4; 299:3, 6, 12, 23; 309:19; 315:5*

**company's** [1]
*133:15*

**company-wide** [2]
*237:13, 14*

**compared** [2]
*292:5, 23*

**comparison** [2]
*159:15; 241:19*

**compelled** [1]
*241:25*

**compensate** [2]
*192:9; 207:8*

**compensated** [5]
*135:1; 174:10; 289:10; 296:1; 297:7*

**compensation** [8]
*128:6; 137:2; 193:13; 194:25; 195:3, 10; 295:23; 296:4*

**competent** [5]
*212:25; 295:22; 298:4; 313:10; 315:25*

**competition** [3]
*159:9; 225:18, 20*

**complaining** [1]
*300:21*

**complaint** [2]
*161:10, 11*

**complaints** [17]
*159:13; 160:23; 161:16; 215:24; 216:3; 221:9, 20, 22, 25; 222:1, 2, 5, 11; 223:1, 2, 7; 301:21*

**complete** [1]
*255:16*

**completed** [3]
*115:24; 175:14; 228:25*

**completely** [5]
*134:18; 146:12; 208:25; 289:17; 313:17*

**compliance** [2]
*283:3; 310:9*

**compliant** [1]
*283:2*

**compliant-wise** [1]
*309:1*

**complied** [4]
*134:20; 147:11; 164:2, 19*

**comply** [8]
*174:7, 13; 189:4, 11; 211:5; 251:4; 270:15, 17*

**complying** [2]
*250:20; 263:12*

**conceptually** [1]
*158:15*

**concern** [8]
*158:11, 18, 20, 21; 206:3, 7, 8*

**concerned** [7]
*127:21; 170:23; 188:24; 218:13; 221:13; 223:8; 284:11*

**concerning** [1]
*319:9*

**concerns** [10]
*153:3; 159:13; 160:24; 205:5; 206:23; 216:3; 221:8; 223:9, 11; 237:24*

**CONCLUDED** [1]
*316:8*

**concluded** [1]
*267:23*

**conclusion** [1]
*190:22*

**conclusions** [1]
*139:14*

**condone** [4]
*140:17, 19, 24; 144:24*

**conduct** [1]
*302:11*

**conducted** [2]
*197:9; 294:9*

**confer** [2]
*164:13; 302:24*

**confident** [2]
*128:2; 200:24*

**confirm** [12]
*157:10; 196:21; 218:20; 254:9, 10; 272:2; 280:2, 5; 281:14; 302:23; 307:24; 308:2*

**conflict** [2]
*137:1; 285:10*

**conform** [1]
*317:4*

**confrontation** [1]
*139:6*

**confrontational** [1]
*266:1*

**confused** [5]
*125:14; 162:16; 209:19, 21; 295:13*

**confusing** [2]
*149:7; 176:21*

**Congress** [2]
*110:9; 111:20*

**conjecture** [1]
*265:9*

**conquer** [1]
*275:21*

**consequences** [1]
*134:12*

**consider** [1]
*165:17*

**considerable** [1]
*135:4*

**consideration** [1]
*318:19*

**considered** [2]
*126:15; 230:10*

**consistent** [2]
*159:17; 236:10*

**consists** [1]
*142:18*

**constant** [1]
*282:12*

**consult** [1]
*311:22*

**consumer** [1]
*147:16*

**Cont'd** [1]
*114:1*

**contact** [10]
*167:12, 14, 15; 181:22; 184:23; 187:18, 21; 282:12; 20; 309:22*

**contacted** [1]
*310:24*

**contained** [1]

218:17

content [3]
170:21; 186:5; 271:17

context [3]
122:24, 25; 169:5

continually [1]
135:11; 204:4

continue [9]
115:6, 9; 134:23, 25; 146:14;
179:20; 196:6; 216:19; 273:2

CONTINUED [1]
115:4

Continued [1]
113:8

continued [8]
130:5; 145:19; 165:21; 265:5;
266:10; 291:1; 304:11; 314:7

Continues [1]
145:15

continuing [2]
158:12; 185:9

contract [9]
155:13, 19; 187:1; 225:2;
236:18; 237:2; 267:13;
268:16; 269:10

contractor [7]
148:22; 149:13, 15; 185:10;
198:1; 207:16; 263:14

contractors [1]
301:1

contracts [3]
236:14, 24, 25

contractual [2]
155:2, 10

Contractually [1]
236:15

contractually [2]
299:9, 12

contrary [1]
160:10

contribute [3]
202:14, 19; 216:21

contributed [3]
203:4, 7, 14

contribution [1]
203:8

controversy [3]
130:3; 139:24; 319:10

convention [1]
238:17

conversation [38]
138:6; 143:10, 12; 165:15;
170:21; 171:17, 24; 172:3;
178:13; 202:4, 5, 7; 221:5;
226:25; 232:5, 6; 248:16;
250:21; 252:25; 253:13, 18;
254:18, 22; 255:1, 2; 257:1,
13, 22; 262:2, 6, 10; 271:25;
272:1, 6, 11, 13; 273:15;
281:10

conversations [5]
136:5; 251:13; 254:25; 255:7;
256:24

cool [2]
146:16; 300:5

cooperate [1]
210:21

cooperated [1]
265:1

cooperative [1]
294:23

coordinating [1]
211:8

coordinator [51]
151:21; 157:1; 159:6, 10;
161:3; 162:15; 176:2; 181:20;
196:4, 7; 201:1; 203:13;
204:16, 20; 209:13, 24;
210:14, 19, 21; 214:20;
219:20; 220:7; 225:14; 226:5;
232:3; 233:16; 234:11;
236:16; 246:11; 247:9;
248:14, 23; 260:13; 262:17;
265:6, 20; 266:21; 267:8, 13,
18; 268:5, 8, 11, 16, 25;
269:8, 11; 270:12; 273:13;
293:24; 294:8

coordinator's [1]
208:9

coordinators [9]
151:18; 190:23; 219:25;
225:24; 227:3; 234:13, 16;
237:10; 291:23

copied [4]
167:2, 6; 205:10; 275:2

copier [1]
200:7; 215:22

copy [20]
119:23; 120:16; 122:13, 15,
22; 124:17; 163:8, 23;
207:25; 215:14, 15; 232:2;
233:3, 9, 18, 23; 234:9, 16;
248:18; 249:2

corner [1]
258:20

corporate [15]
116:15; 136:16; 150:1; 153:8;
175:6; 179:9; 180:3, 4, 8, 13,
15, 17; 265:22; 276:12;
309:21

corporation [3]
142:19; 180:2, 7

corrected [1]
267:3

CORRECTIONS [1]
317:1

Corrections [1]
113:12

correctly [1]
215:23

correlation [1]
183:19

correspondence [13]
124:6; 129:3; 136:24; 138:18;
144:9, 10; 177:9; 216:25;
251:15; 252:21, 23; 274:20;
282:13

corruption [1]
277:8

cost [8]
135:4; 202:7, 19; 204:5;
206:20; 300:21; 301:4, 24

costing [2]
202:5; 207:4

costs [5]
204:1; 206:4, 9, 21, 24

counsel [5]
145:1; 170:8; 319:7, 13, 14

counterproductive [1]
288:11

COUNTY [2]
318:11; 319:5

couple [1]
247:22

coupled [1]
139:13

course [5]
123:12; 162:7; 175:24;
275:12; 313:11

COURT [1]
109:1

court [3]
146:1; 179:9; 266:25

cover [3]
121:2; 166:10; 207:5

coverage [1]
306:21

covered [4]
148:7, 8; 190:9, 14

create [1]
215:18

created [1]
284:13

creates [1]
295:5

creative [1]
192:4; 294:24

critical [2]
145:16, 24

crooked [1]
213:17

crunch [2]
296:17; 297:22

crystal [1]
254:13

CSR [1]
319:19

culmination [1]
198:3

current [5]
196:3, 4; 246:24; 268:18;
315:5

customer [1]
198:21

customers [1]
221:9

Cut [1]
122:16

cut [1]
273:23

– D –

D-e-P-a-s-q-u-a-l [1]
203:20

Dallas [1]
303:10

Dan [2]
165:6; 240:11

dangerous [1]
141:6

Daniel [5]
114:5, 7; 152:3; 195:17;
196:18; 202:17; 203:10;
205:8; 214:13

DATE [1]
317:3

Date [1]
319:20

date [22]
135:25; 143:13, 17; 149:25;
162:3; 174:1; 181:8, 10;
183:9; 185:8; 224:20; 246:21;

248:15; 253:22; 254:10, 11,
19; 256:8; 259:11; 274:8;
312:4

dated [24]
113:20, 22, 23; 114:5, 7, 12,
14; 138:8; 161:25; 165:6;
173:25; 181:18; 183:13;
208:7, 21; 214:2, 14; 220:19;
224:18; 248:21; 252:5, 6;
253:16; 261:1

dates [4]
117:25; 254:8; 256:12, 14

Davila [1]
201:22; 204:19; 205:10, 17,
18, 22

Davis [12]
113:24; 152:5; 201:21;
204:11, 12, 14, 15; 205:8, 14,
15, 25

Day [1]
312:7

day [16]
110:4; 218:5; 239:23; 252:10,
22; 253:2; 254:3; 256:15, 16;
257:3; 318:12, 21; 319:8, 16

day-to-day [5]
157:15, 18; 158:4; 160:22;
161:16

days [7]
174:11, 12, 13; 210:13;
246:23; 268:16; 296:20

deadline [1]
242:21

deal [6]
158:6; 191:1; 204:6; 232:20;
260:22; 273:24

dealing [1]
267:7

dealt [1]
148:10; 151:19

death [1]
314:11

December [59]
130:1; 135:24; 136:2, 3;
138:8, 10; 147:19, 22;
148:13; 149:24; 150:25;
151:3; 152:15; 153:12;
161:25; 162:4; 163:9; 165:6,
13; 167:11; 171:1, 2; 172:9;
173:25; 177:5, 15; 181:9, 13;
183:8, 13; 185:4, 5, 7;
187:20; 188:16; 195:20;
208:7, 21; 209:17; 210:17;
224:18; 228:3; 247:3; 253:20;
256:1, 2, 3; 259:12, 19;
261:1, 19, 23; 267:11, 16, 24,
25; 268:22

decent [1]
199:23

decided [3]
155:19; 175:14; 230:8

decision [27]
119:7; 128:12, 16, 24;
129:10, 16; 135:21; 147:10;
154:3; 175:17, 19; 177:1, 3;
182:5, 8, 9, 12; 265:23;
267:6; 269:21; 278:5, 8, 9,
10; 283:7; 287:16; 288:10

decision-maker [1]
288:3

decision-making [1]

**288**:11

**decisions** [3]
142:15; 263:4; 286:24

**decline** [1]
289:13

**decrease** [5]
135:7; 288:19; 292:5; 305:2, 16

**decreased** [1]
135:11

**decreases** [1]
305:6

**deducted** [1]
261:18

**deduction** [1]
290:5

**deductions** [2]
261:17; 290:5

**deem** [2]
269:21; 295:6, 7

**deemed** [1]
123:19; 266:12

**DEFENDANT** [2]
111:8, 13

**define** [1]
149:4

**defined** [1]
156:12

**definition** [2]
149:11; 156:17

**degree** [2]
135:1; 160:14

**DEL** [1]
109:7

**demote** [6]
172:18; 173:10; 174:15;
182:17; 260:22; 270:4

**demoted** [8]
172:25; 210:7; 213:3, 4, 11,
12; 259:17, 20

**demoting** [1]
209:12

**demotion** [10]
173:2; 174:3, 6; 177:7; 183:6;
266:2, 16, 17; 267:4; 269:23

**Dennis** [2]
152:5; 205:9

**department** [4]
176:25; 272:5; 282:20; 283:3

**departments** [1]
153:9

**DePasqual** [6]
202:13, 14; 203:12; 207:9;
214:21; 215:10

**DePasqual's** [1]
222:2

**depend** [2]
120:20; 309:12

**depending** [1]
155:5

**depo** [1]
122:16

**deponent's** [1]
179:10

**DEPOSITION** [3]
109:13; 110:1; 316:8

**deposition** [18]
115:7; 146:20; 178:25;
179:10, 13, 19, 20; 180:15;
201:15, 17; 241:18; 242:24;
244:7, 8; 288:17; 318:4;

319: , 14

**depositions** [1]
179:4

**derived** [1]
295:12

**described** [1]
189:17

**DESCRIPTION** [2]
113:18; 114:3

**description** [1]
318:15

**desire** [1]
163:6

**desk** [1]
168:8

**details** [1]
170:22

**determination** [2]
175:5; 270:8

**determine** [3]
155:14; 246:3; 266:13

**determined** [8]
154:23, 24; 155:1, 16;
181:23; 183:16, 20; 184:5

**detrimental** [1]
123:19; 288:4

**develop** [1]
135:2

**developing** [1]
226:1

**dictate** [1]
291:9

**die** [1]
266:20

**died** [1]
265:3

**dies** [1]
292:20

**difference** [6]
116:24; 255:17, 20; 298:9;
306:11, 13

**differently** [1]
141:12

**difficult** [2]
153:21; 197:6

**dilemma** [1]
196:10

**DINO** [1]
109:3

**Dino** [235]
111:24; 113:20; 114:12, 14;
118:9; 123:3, 9, 13, 18, 21;
124:4; 125:6, 24; 126:5, 6,
12; 127:8, 19, 21; 128:4, 11,
15, 23; 129:3, 5, 9, 15, 19;
130:4, 15, 22, 25; 131:17, 18;
132:10, 11; 133:4, 17; 134:4,
13, 20, 22, 25; 135:16, 18,
23; 136:1, 9, 19, 24; 137:2, 5,
20; 138:19; 139:1, 5, 16;
140:9; 141:10, 13; 142:21;
143:3; 144:6; 145:1, 9, 21;
147:1, 6, 8; 148:16, 18, 20,
21; 149:12; 151:17; 152:7, 9,
13, 17; 153:6, 18, 23; 154:1;
156:18; 157:1, 11, 14;
158:12; 159:14; 160:7, 14,
17, 25; 161:2, 7, 10, 15;
162:19; 163:7; 164:9, 11, 13,
17; 165:15; 166:3; 167:12,
16; 171:17; 172:4, 8, 19, 25;

173:10, 24; 174:3;     :15;
176:1, 24; 177:9; 178:1, 14;
179:12, 22; 183:6; 187:24;
188:5, 11, 16, 24; 189:22;
190:6, 7; 191:9; 192:11;
193:7, 14; 194:20; 195:6;
196:4, 13; 197:10; 200:12,
13, 25; 201:3; 202:22, 25;
203:4; 206:22, 25; 207:12,
13; 208:7; 209:12; 210:7;
211:7, 10, 14, 23, 24; 212:11,
14, 23; 213:1, 3, 11, 12;
222:23; 224:10, 16; 226:12,
25; 227:10, 22; 228:6;
229:11; 230:5, 8, 12; 231:1,
5, 16, 18; 233:2; 247:14;
250:6; 256:3; 259:23; 262:5;
270:23; 271:3; 273:5, 17, 23;
277:12; 279:1, 5; 280:20, 21,
24; 281:5, 10, 11, 13; 284:13,
14, 23; 285:1, 5, 7, 13, 22;
286:13, 25; 294:18, 21;
295:3, 11, 14, 17; 296:6, 8;
297:6, 12; 298:15, 25;
299:14; 301:23, 25; 303:5, 8;
308:14; 310:19

**Dino's** [33]
127:10; 128:8; 131:20; 132:4,
21; 135:9; 141:23; 146:24;
158:15, 21; 173:18, 23;
174:23; 175:5; 176:6; 177:4,
6; 189:10; 193:18; 194:3, 11,
16, 25; 203:5; 210:18;
226:16; 251:24; 267:4; 286:4,
13, 16; 295:16; 304:15

**directed** [3]
184:23; 187:9; 265:2

**directive** [5]
251:4; 253:19; 255:3, 6;
264:5

**directives** [3]
251:13; 263:13, 25

**director** [5]
176:4; 178:5; 209:7; 233:15;
258:21

**directors** [1]
141:1

**disadvantage** [1]
250:11

**disagree** [1]
208:25

**disastrous** [1]
197:15

**disclose** [1]
281:24

**discontinue** [2]
137:21; 285:24

**discovered** [1]
228:5

**discretion** [1]
219:6

**discuss** [3]
156:16; 172:7; 273:19

**discussed** [7]
138:16; 164:11; 197:9;
227:19; 250:23; 251:18;
257:3

**discussing** [1]
273:17

**discussion** [6]
221:3; 228:16, 19, 21; 262:5,

6

**discussions** [1]
250:19

**disinterested** [2]
179:1, 15

**dispel** [1]
260:12

**dispute** [2]
128:4; 132:3

**disrespect** [1]
142:20

**disrespectful** [2]
276:1, 20

**distance** [2]
200:7; 212:1

**distinction** [5]
179:22; 188:20, 22; 198:23;
227:16

**distracted** [1]
269:3

**distribute** [2]
234:7, 20

**distributed** [5]
234:12; 235:2, 4, 11, 23

**DISTRICT** [4]
109:1, 6; 111:9

**District** [21]
109:10; 111:21; 144:12;
161:5; 171:19; 172:8; 177:11;
219:25; 244:3; 245:15; 247:5,
13; 262:22; 272:18; 278:2;
289:11; 290:2; 292:11; 293:4;
299:1; 307:16

**district** [27]
127:11; 129:5, 20; 130:23;
132:22; 134:19; 147:12;
151:18, 19, 20; 172:4; 196:1;
203:13; 204:16; 219:20;
220:7; 234:15; 236:3; 263:1;
276:18; 277:15; 278:4;
279:18; 288:18; 290:22;
291:23; 303:18

**District's** [1]
286:11

**district's** [2]
272:20; 297:2

**DIVISION** [1]
109:2

**doable** [1]
312:12

**Document** [8]
209:18, 25; 210:1; 212:6;
264:2, 7; 280:2, 3

**document** [64]
119:23; 138:2; 139:4; 161:23;
165:1; 172:22; 173:16; 175:7,
22, 23, 24; 176:10; 178:15;
182:21, 23; 183:10; 186:5;
189:3, 14; 207:19; 208:1, 3,
11, 22; 210:10; 213:16;
214:1; 219:8; 223:23, 24;
244:18; 245:6, 21; 246:3;
248:2; 249:21; 251:16, 17;
254:11; 255:12, 23; 256:6,
18; 258:1, 2, 18; 259:8;
260:25; 261:7, 10; 262:9;
266:14; 271:19, 20, 23, 25;
276:5, 6; 277:5; 290:3, 7;
311:25; 318:16

**documentation** [3]
116:1; 221:11; 232:5

documented [1]
  220:11
documents [14]
  165:2; 177:8; 178:14; 220:9;
  222:6, 8; 232:23, 25; 244:15;
  272:13; 279:25; 280:8, 15
doesn't [24]
  117:5; 12; 166:21; 167:1;
  183:20; 190:19; 191:7, 20;
  193:13; 194:24; 195:6, 8, 10;
  209:6; 212:11; 215:13; 216:6;
  248:4; 250:3; 254:2, 13;
  268:18, 19; 300:8
doggone [1]
  256:22
donate [1]
  216:20
door [1]
  146:19
doors [2]
  218:5; 240:20
doubt [2]
  139:12; 179:14
Douglass [2]
  210:11, 16
Dr [71]
  118:8, 16; 123:15, 16; 124:7;
  126:11, 13, 23; 127:5, 23;
  128:7; 130:2; 134:18, 21;
  135:22; 136:8, 19, 22, 24;
  137:19; 141:17; 144:21, 23;
  147:8; 163:6; 164:16, 21;
  174:10, 12, 14; 181:18;
  188:4, 24; 189:4, 19; 210:23;
  213:20; 223:14; 252:2, 3, 14,
  18; 262:16, 24; 270:22, 24;
  271:7, 13, 16; 272:7, 8, 11,
  15; 273:4, 11, 22; 274:3;
  282:1, 14; 283:20; 284:4, 5,
  22; 285:8, 11, 17; 286:12, 15;
  298:18; 300:12
draft [1]
  176:10
drafted [1]
  175:7
dramatic [1]
  293:21
draw [1]
  183:18
driven [1]
  141:5
DSC [7]
  116:25; 117:7, 13; 151:2;
  232:20; 235:7, 25
DSCs [9]
  149:8; 152:7; 154:17; 226:1;
  234:20, 23; 235:16; 236:20;
  237:17
duces [1]
  242:10
due [2]
  123:14; 254:8
duly [3]
  110:3; 115:2; 319:9
DUNN [1]
  109:7
duties [2]
  268:12, 14
duty [1]
  309:10

– E –

E-mail [4]
  113:20, 23; 114:12, 14
e-mail [15]
  120:4, 15, 22, 24; 127:13, 19,
  24; 138:5, 16, 21; 139:22;
  205:3; 231:23; 232:16;
  262:10
ear [1]
  287:25
earful [1]
  140:1
early [4]
  129:25; 228:3; 281:8; 288:16
earned [1]
  307:2
east [1]
  131:12
easy [1]
  312:18
effect [1]
  118:13
Effective [1]
  209:14
effective [3]
  208:8; 246:21; 298:12
effectiveness [1]
  296:24
effort [1]
  136:18
eight [2]
  221:18; 222:7
EILEEN [1]
  111:14
Eileen [3]
  244:13; 248:1; 270:21
elected [1]
  123:18
eliminated [1]
  215:17
ELIZABETH [1]
  111:10
Elizabeth [6]
  244:1; 246:14; 257:11; 258:8;
  316:5, 6
else's [1]
  251:7
EMERSON [1]
  109:8
employed [4]
  180:3; 211:21; 319:13, 15
employee [3]
  140:18; 263:3; 319:14
employees [26]
  129:4; 140:20; 149:18; 158:1;
  160:23; 161:17; 198:25;
  199:1; 217:20, 22, 23;
  262:22; 266:16; 276:2, 18;
  277:14; 278:4; 279:18; 288:9;
  289:3, 5; 296:21; 301:3;
  306:16; 313:13, 22
employer [2]
  246:24; 288:24
encouraged [1]
  233:14
End [1]
  178:10
end [13]
  130:8, 13; 139:22; 226:21;
  228:17; 229:2; 232:10, 11;

  246:24; 267:10, ∠4; 268:22;
  297:15
ended [2]
  202:5; 296:20
endorsing [1]
  288:25
enroll [1]
  288:21; 292:17
enroller's [1]
  288:19
enrollers [7]
  192:19, 23; 197:22; 211:8,
  14; 227:17; 231:2
enrolling [1]
  190:12
enrollment [57]
  154:6, 10; 156:1; 159:21;
  160:8; 189:18; 192:7; 197:20;
  198:10, 13, 18, 19, 20, 24;
  199:15; 210:22; 211:9; 212:4,
  8, 22, 25; 218:11; 219:10;
  220:12; 221:9; 225:9; 226:13;
  228:25; 230:6, 24; 232:9, 10;
  248:12; 267:20, 23; 272:9;
  288:18, 22; 290:14, 21;
  292:5, 12, 23; 293:5; 294:9,
  13; 295:16; 297:19; 298:4;
  302:15, 22; 305:16; 306:1, 3;
  313:16; 315:6
enrollments [21]
  159:16; 160:9, 16; 198:2, 7,
  22; 210:22; 211:15; 231:6;
  232:1; 237:6; 291:20, 25;
  303:2; 305:2, 5; 307:12;
  308:7; 313:3; 315:17
ensure [1]
  166:3
entered [5]
  162:18; 245:13; 248:24;
  260:16; 290:2
entitled [4]
  146:9; 179:2, 3, 9
envisioned [1]
  194:20
equaling [1]
  202:18
equally [1]
  220:1
equipped [1]
  316:1
error [4]
  173:23; 260:7, 20; 317:5
Escobar [4]
  152:6; 205:9, 14; 206:1
essence [1]
  288:24
essentially [1]
  164:5
established [7]
  303:6, 7, 10, 22; 304:12, 14,
  23
estimate [1]
  151:25
et [1]
  200:7
evasive [1]
  122:24
event [8]
  129:18; 130:21; 175:10;
  178:8; 241:10; 258:24;
  281:23; 294:15

eventually [3]
  134:4; 216:3, 20
Everybody [2]
  197:25; 295:13
everybody [8]
  118:9; 211:8; 235:15, 24;
  300:21; 306:10
evidence [14]
  124:10; 145:24; 182:14;
  243:6; 255:10, 13; 259:4;
  260:16; 266:4; 270:8; 274:23;
  282:7; 289:23
evidently [1]
  150:4
evil [2]
  275:21; 276:15
exact [2]
  221:17; 312:4
Exactly [6]
  127:6; 159:1; 163:16; 164:24;
  186:8; 304:20
exactly [6]
  121:16; 139:10; 179:11;
  180:19; 193:6; 312:5
EXAMINATION [6]
  115:4; 243:24; 270:19;
  301:18; 312:24; 314:18
Examination [6]
  113:8, 9, 10
examination [1]
  319:10
examined [1]
  319:10
example [9]
  117:5, 7; 118:8, 16; 121:22;
  149:17; 150:15; 235:7;
  292:10
except [2]
  301:3; 318:5
exception [6]
  227:6, 8; 255:25; 288:15;
  302:8; 314:8
exclude [1]
  195:10
executed [1]
  318:18
Exhibit [77]
  119:22; 125:17, 18, 20, 21;
  137:24; 138:2, 14; 161:21;
  165:1, 9; 170:1; 172:21;
  180:23; 182:11, 16; 183:1,
  10; 189:7; 190:1, 5; 191:9,
  18; 194:19; 195:3, 16; 201:9,
  12; 207:19; 208:12; 209:10,
  16, 18; 210:3, 6; 212:20;
  213:22, 25; 214:5; 218:21;
  219:15; 220:15, 18; 223:18;
  245:3, 5; 247:17, 21; 248:24;
  249:6, 8, 11; 251:18; 253:20;
  254:19; 255:10; 256:7, 8, 17,
  19, 21; 257:9; 259:3, 5;
  260:15; 261:4, 5; 263:11;
  264:11; 265:2, 13, 18; 266:2,
  19; 270:9, 15
exhibit [3]
  214:4; 244:24; 257:24
EXHIBITS [2]
  113:16; 114:1
exorbitantly [1]
  291:2
expanded [1]

315:25

**expect** [4]
197:12, 13; 207:5; 305:15

**expected** [7]
234:20, 24; 248:8, 10; 305:1;
310:12, 18

**expenses** [19]
199:25; 200:1, 9, 12, 13, 14,
16; 202:9, 15, 22; 203:5;
207:1, 8, 17; 217:5; 227:12;
301:21, 23; 302:2

**experience** [9]
142:12, 13; 290:24; 291:9;
307:13, 14; 315:4, 13, 14

**experienced** [2]
291:16, 19

**Expiration** [1]
319:20

**Explain** [1]
131:9

**explain** [13]
115:13; 123:11; 127:11;
131:5, 9; 140:4; 220:25;
225:12; 227:7; 288:20; 292:2,
3; 317:5

**explained** [4]
141:9; 177:22; 227:10;
241:11

**explaining** [1]
226:2

**explains** [1]
225:23

**express** [1]
300:12

**expressed** [2]
223:11; 318:19

**extending** [1]
212:22

**extent** [6]
120:23; 135:14, 15; 136:18;
143:11; 150:5; 153:14; 154:9;
172:13, 14; 200:14

**external** [1]
225:20

**extreme** [1]
296:16

--- F ---

**facsimile** [1]
255:19

**fact** [39]
123:24; 124:2; 126:5; 127:9,
24; 128:3; 129:6; 141:7;
148:21; 160:7, 10; 189:3;
203:10; 215:19; 217:1;
219:15; 220:8; 228:7, 22;
230:11, 13; 231:15; 248:21;
252:16; 253:5; 260:9, 19;
272:23; 277:24; 278:15;
285:14; 286:18; 288:17;
297:8; 300:21; 310:23; 313:2,
8; 315:24

**facts** [10]
124:10; 127:22; 128:2;
174:22; 175:4; 178:6; 243:5;
266:3; 303:9; 317:4

**factually** [1]
315:3

**failure** [8]
266:1; 289:23; 291:6; 292:7,

25

**fair** [2]
229:11; 293:2

**fairly** [3]
138:6; 165:14; 293:16

**fall** [1]
277:23; 294:9, 13

**familiar** [5]
161:23; 223:21, 23, 24;
274:23; 275:11; 304:16

**family** [5]
166:3, 7, 13, 16; 203:2

**fantastic** [1]
292:12

**favor** [1]
134:24

**fax** [6]
111:7, 12, 17, 21; 158:7;
255:25

**faxed** [6]
173:23; 176:4; 244:15;
255:17, 24; 260:20

**fear** [1]
166:15

**feared** [1]
165:9

**Federal** [1]
110:11

**federal** [1]
179:8

**feedback** [1]
309:24

**feel** [10]
126:15; 139:10; 146:10;
164:22; 186:11; 187:12;
246:11; 263:10; 283:11;
311:10

**feelings** [3]
127:8, 12; 266:13

**fell** [1]
253:5

**fellow** [1]
313:22

**felt** [9]
128:2; 139:1; 174:14; 229:11;
262:21; 263:6; 272:15;
284:14; 315:10

**fled** [1]
284:5

**fifth** [1]
195:24; 196:9

**fight** [1]
182:1

**figure** [1]
224:7

**file** [13]
124:18; 140:25; 165:24;
175:3, 18; 178:8; 213:19;
258:19, 24; 262:25; 270:10;
275:13; 277:21

**filed** [1]
167:3

**fills** [1]
199:3

**final** [1]
177:3

**financial** [3]
194:11, 20; 195:3

**Financially** [1]
193:20

**financially** [2]

**find** [4]
151:15; 197:6; 262:11;
311:22

**finding** [1]
247:19

**Fine** [1]
250:18

**fine** [5]
129:7; 168:25; 187:13; 211:7;
312:15

**finger** [1]
222:22

**fingerprints** [1]
198:11

**finish** [2]
159:3; 230:15

**finished** [1]
241:17

**fire** [5]
165:18; 172:18; 173:10;
261:25; 262:1

**fired** [5]
165:17; 240:22; 261:19, 23

**Firm** [1]
319:20

**firm** [1]
255:18

**First** [3]
131:6; 182:25; 211:16

**first** [54]
115:2, 16; 116:16, 18; 117:7,
11; 118:5; 120:22; 131:5;
133:13; 134:2, 9; 136:2;
137:14; 138:13; 142:18;
148:24; 156:25; 162:6; 168:3;
181:6; 187:8, 16; 188:25;
196:1; 214:25; 216:11; 226:4;
235:10, 11, 21, 22; 242:23;
244:7; 247:4; 259:15; 261:13;
277:4, 5, 18, 19; 288:22;
289:20; 290:13, 14, 17, 21;
292:5, 17; 294:7; 296:13;
312:7; 313:4

**firsthand** [1]
142:12

**FISHER** [1]
111:10

**five** [1]
174:11

**five-year** [2]
272:16, 17

**Flex** [2]
153:9; 186:22

**folks** [1]
313:20

**follow** [9]
137:10; 176:3; 178:1; 189:17,
22, 24; 248:9, 11; 266:1

**follow-up** [1]
313:1

**followed** [5]
128:7; 211:1; 219:5; 254:2;
266:19

**following** [11]
118:13, 18; 123:7; 158:24;
174:3; 228:21; 232:6; 253:14;
264:17; 267:5; 319:8

**follows** [2]
115:2; 186:4

**foot** [1]

**force** [1]
159:8; 225:18; 295:6; 315:25

**foregoing** [2]
318:3, 17

**foregone** [1]
190:22

**foremost** [7]
131:5; 133:13; 134:2, 9;
137:14; 142:18; 189:1

**forget** [3]
119:17; 159:23; 238:4

**forgive** [1]
213:2

**forgot** [2]
150:21; 241:16

**Form** [1]
113:22

**form** [59]
124:6; 125:8; 126:17, 25;
128:18; 133:6, 25; 134:8;
137:16; 141:15; 143:5;
145:13; 147:3, 4; 148:17, 25;
149:21; 151:4; 154:19; 155:8;
159:2; 162:20; 163:13;
172:24; 178:3, 7; 182:7;
185:24; 186:1; 187:22; 188:1,
18; 193:9; 194:22, 23;
208:23; 209:2, 8; 210:4;
213:7; 238:8; 242:8; 243:5;
248:15; 258:6, 10, 13; 260:5,
20; 261:1; 270:8, 9; 273:18;
281:14; 282:16; 290:4; 310:6;
311:13, 20

**formalizing** [1]
208:22

**format** [2]
234:23; 277:17

**former** [2]
181:5; 185:15

**forth** [2]
177:10; 213:18

**forward** [6]
138:17; 224:10; 289:1; 290:8;
299:7; 306:3

**forwarded** [3]
178:15; 215:10; 309:14

**found** [6]
184:12; 185:1; 230:25;
260:19; 275:17

**foundation** [1]
124:9

**four** [1]
205:21

**fourth** [2]
125:20; 290:19

**frame** [2]
130:1; 298:13

**FRANK** [9]
109:14; 110:2; 113:7; 115:1;
317:2; 318:3, 9, 13; 319:8

**Frank** [16]
113:20, 23; 114:5, 7; 135:18;
162:15; 165:10; 181:19;
207:22; 233:12; 242:18;
259:17; 261:15; 264:24;
307:9; 312:12

**frankly** [5]
171:11; 192:12; 265:12;
274:11; 296:2

**free** [1]

186:11
**frequently** [1]
247:23
**Friday** [2]
164:4; 253:6
**frighten** [1]
142:11
**front** [4]
146:1; 183:2; 213:16; 266:14
**frown** [1]
294:18
**frowned** [1]
294:20
**frustrated** [1]
250:25
**fulfill** [1]
267:8
**full** [5]
207:11; 227:24; 271:17;
277:5; 295:17
**full-time** [1]
221:1
**fully** [1]
296:13
**function** [2]
137:21; 225:25
**fund** [4]
202:9; 217:3; 221:1; 261:17
**funded** [1]
216:17
**funding** [5]
217:4, 7; 220:24; 221:1, 4
**funds** [1]
202:18
**future** [9]
135:1; 140:2; 173:18; 175:11;
225:9; 228:15; 231:25;
251:24; 258:24; 273:16;
299:23

– G –

**gain** [1]
140:16
**game** [1]
273:12
**garner** [1]
263:3
**gather** [1]
174:21
**gathered** [2]
128:3; 175:4
**gathering** [1]
213:19
**gave** [3]
119:17; 281:13; 305:20
**generated** [1]
144:13
**gentleman** [1]
310:9
**geographical** [1]
131:11
**GERRI** [3]
110:6; 319:6, 19
**gets** [8]
116:1, 13, 14; 149:6; 153:23;
160:12; 190:8; 292:20
**Give** [1]
247:18
**give** [14]
117:25; 125:13; 161:21;

.. J:7; 221:16; 222:16; 235:7;
255:16; 256:12; 263:16;
279:1; 291:8; 293:11; 312:3
**Given** [1]
318:20
**given** [6]
232:2; 234:22; 276:11;
282:21; 297:13; 319:11
**giver** [1]
208:15
**gives** [2]
246:25; 268:16
**giving** [2]
192:22; 210:13
**glad** [3]
182:23; 239:10; 288:21
**goes** [14]
163:25; 166:9; 184:22; 185:9;
186:12; 196:10; 197:15;
199:24; 208:9; 209:16;
225:22; 275:23; 283:3;
305:12
**gotten** [5]
192:12; 234:16; 237:23;
295:17; 299:6
**govern** [2]
233:5; 236:6
**grammar** [1]
133:22
**granted** [1]
182:5
**Great** [1]
115:11
**great** [3]
225:17; 293:9; 313:9
**greater** [2]
155:25; 315:25
**greed** [1]
264:15
**ground** [1]
190:10
**group** [12]
133:10; 135:5; 137:3; 185:3;
192:11; 197:22; 198:6, 19,
22, 24; 222:14; 237:6
**grown** [1]
293:20
**growth** [3]
241:19; 289:6; 305:6
**grunt** [1]
300:16
**GUERRA** [1]
111:15
**guess** [10]
139:17; 162:23; 170:15;
205:10; 208:22; 215:10;
222:20; 224:25; 242:9, 11
**guessing** [2]
171:22; 172:1
**Guidelines** [3]
234:6; 312:1, 2
**guidelines** [20]
231:17, 25; 232:3; 233:3, 4,
6, 8, 12, 13, 19; 234:4, 8;
235:3; 236:2, 5, 8, 9, 11;
237:6; 264:8
**guys** [1]
276:19

– H –

**H-2** [1]
111:5
**hadn't** [3]
120:1; 150:22; 274:11
**hall** [1]
301:12
**Hamby** [5]
310:10, 15, 16, 17, 19
**hand** [7]
138:1; 201:11; 223:17;
274:21; 279:21; 295:20;
318:20
**handful** [3]
221:12, 15; 222:6
**handing** [8]
161:20; 164:25; 172:21;
180:22; 195:15; 207:18;
213:24; 220:17
**handle** [19]
141:18; 147:24; 148:12;
149:20; 150:16, 23; 151:3;
152:18; 157:15; 158:5;
161:11, 17; 192:3; 263:1;
295:16; 296:20; 298:12;
313:12; 316:1
**handled** [20]
136:16; 141:12; 147:21;
153:4, 6; 159:14; 160:18;
161:1, 4, 7, 15; 198:16;
202:25; 222:3; 227:21; 263:2;
272:14; 297:21; 298:7
**handling** [16]
123:13; 152:22; 153:2, 3, 14;
156:14; 159:12; 160:22;
188:10; 206:9, 22; 215:25;
223:1; 262:15; 292:4; 304:15
**hands** [4]
233:18, 22; 261:9; 295:22
**handwriting** [4]
216:8, 9; 249:19; 250:6
**handwritten** [3]
222:25; 249:3; 254:12
**Hang** [7]
169:16; 214:9; 217:25;
244:21; 246:13; 248:5;
255:15
**hanging** [1]
316:7
**happening** [1]
146:2
**happens** [4]
116:6; 179:8; 198:7
**happy** [3]
174:10; 196:12, 22
**hard** [2]
224:25; 256:2
**hardly** [1]
220:10
**hardware** [1]
301:3
**Harlingen** [3]
216:6; 217:11, 19
**harm** [2]
166:7, 13
**hate** [2]
247:7; 314:5
**haven't** [4]
208:16; 274:19; 280:15;
304:22
**He's** [5]
145:19; 160:1; 179:24; 25;

203:13
**he's** [15]
125:11; 148:21; 159:23;
160:2; 162:21, 23, 24;
180:13; 195:8; 197:5; 198:20;
199:7, 15; 220:23; 248:13
**head** [4]
119:19; 194:14; 300:14;
304:17
**header** [2]
121:5, 9
**headquarters** [2]
141:22; 309:7
**health** [1]
186:20
**heard** [3]
168:3; 208:16
**hearing** [1]
179:13
**held** [2]
175:3, 18
**help** [17]
129:8, 9, 15; 135:16; 150:3;
153:18; 199:15; 203:11, 25;
206:4, 6; 227:11; 251:24;
254:13; 288:1; 298:6; 315:4
**helped** [1]
217:3
**Hence** [1]
179:16
**hereby** [2]
318:4; 319:7
**hereof** [1]
246:21
**hereto** [2]
110:12; 319:15
**hesitate** [1]
137:8
**Hey** [1]
231:24
**hey** [8]
167:12, 16; 168:7; 207:4;
231:13; 276:18; 300:5;
311:18
**hierarchy** [1]
299:4
**high** [1]
291:2
**higher** [1]
160:19
**highest** [1]
284:10
**highly** [1]
251:20
**hire** [2]
287:17; 301:13
**hired** [3]
234:8; 289:5; 313:11
**hires** [1]
293:9
**Hold** [1]
215:1
**hold** [2]
141:25; 175:13
**Home** [1]
149:18
**home** [5]
149:17; 150:15; 225:7, 8;
253:8
**honest** [2]
240:19; 256:22

**honestly** [1]
*250:4*

**Honolulu** [2]
*238:17, 23*

**honor** [3]
*136:8, 24; 137:19*

**honored** [1]
*117:11*

**hope** [3]
*292:16, 19; 307:4*

**hotel** [1]
*240:21*

**hothead** [2]
*237:25; 238:5*

**hour** [1]
*315:7*

**HUGH** [1]
*109:8*

**hundred** [1]
*120:12*

**hurry** [1]
*315:7*

**– I –**

**I'd** [2]
*127:13; 288:21*

**I've** [21]
*117:16; 125:1; 138:1; 142:14; 164:25; 165:3; 172:21; 201:12; 203:7; 207:18; 213:24; 223:17; 237:12; 244:16; 275:4; 280:1, 2, 5; 290:8; 315:4, 23*

**idea** [8]
*119:4; 181:25; 213:6, 8, 9; 224:4; 229:5, 6*

**identification** [9]
*137:25; 170:2; 201:10; 213:23; 220:16; 245:4; 249:12; 259:6; 261:6*

**identify** [1]
*227:11*

**identity** [1]
*318:15*

**ill** [1]
*111:19*

**imagine** [4]
*116:5; 181:8; 235:21; 238:21*

**immediate** [1]
*131:20*

**immediately** [7]
*129:21; 130:24; 187:17; 228:21; 253:14; 261:17; 282:18*

**important** [5]
*133:1, 4; 135:15, 17; 250:23*

**impossible** [1]
*296:23*

**impression** [3]
*184:8; 213:12; 227:20*

**improper** [2]
*119:1; 129:6*

**in-house** [1]
*116:17*

**inaccurate** [1]
*239:19*

**inadvertently** [1]
*176:6*

**inappropriate** [4]
*263:6; 274:10; 277:14, 21*

**incer** [1]
*261:16*

**incident** [1]
*240:23*

**include** [1]
*156:13*

**included** [1]
*147:6*

**inclusive** [1]
*255:22*

**income** [15]
*134:23; 135:9; 243:11; 289:13, 14, 15; 291:1, 2, 24; 292:14, 22; 293:15; 295:12; 297:8; 307:2*

**incorrect** [1]
*238:24*

**incorrect** [3]
*149:23; 266:6, 8*

**incorrectly** [1]
*173:19*

**increase** [7]
*135:8; 307:22; 308:1, 4; 313:6; 314:4, 11*

**increased** [1]
*313:3*

**incurred** [1]
*200:12*

**INDEPENDENT** [2]
*109:5; 111:8*

**independent** [20]
*109:10; 117:21; 144:11; 171:19; 172:8; 177:11; 244:3; 245:15; 247:5, 13; 262:22; 272:18; 278:2; 286:9; 289:11; 290:1; 292:11; 293:4; 299:1; 307:16*

**independent** [11]
*132:16; 148:22; 149:12, 15; 179:2; 185:10; 198:1; 207:16; 263:14; 278:3; 301:1*

**independently** [1]
*179:3*

**INDEX** [1]
*113:1*

**Indian** [1]
*208:15*

**indicate** [10]
*120:3; 123:7; 163:25; 166:9; 191:15; 201:16; 204:23; 215:13; 231:18; 253:6*

**indicated** [18]
*127:25; 189:9; 203:10; 211:5; 213:15; 219:14; 220:8; 230:25; 245:17; 251:1; 262:3; 263:22; 271:21; 272:19; 281:5; 283:22; 305:1, 5*

**indicates** [14]
*162:6; 165:7; 166:6, 11, 15; 181:17; 200:4, 22; 203:24; 206:10; 224:25; 231:8; 265:14; 285:21*

**indicating** [3]
*163:6; 208:8; 220:23*

**indication** [1]
*125:6*

**indirectly** [1]
*185:14*

**individual** [14]
*140:24; 160:9, 15; 161:1, 17; 180:8; 192:23; 198:19; 199:3;*

*202:8; 219:12; 22;     242:3; 264:15*

**individually** [1]
*228:13*

**individuals** [4]
*140:18, 20; 180:2; 219:6*

**industry** [1]
*307:14*

**influence** [2]
*144:11; 278:7*

**information** [26]
*116:2, 3, 11; 120:3, 20; 121:12; 123:7; 125:4; 126:3, 4, 7, 22; 146:11; 164:7, 21; 197:1; 199:3; 234:18; 235:1; 241:19; 243:13; 255:19, 25; 272:3; 281:13; 303:13*

**informed** [1]
*175:25*

**initial** [3]
*246:20; 292:23; 305:13*

**initially** [5]
*117:10; 288:21; 292:12; 297:8; 313:21*

**injured** [1]
*134:4*

**INSERT** [1]
*112:3*

**insignificant** [1]
*222:13*

**insinuating** [1]
*279:9*

**insinuation** [2]
*278:18; 279:13*

**insist** [1]
*187:17*

**instance** [4]
*110:3; 159:9; 289:9, 11*

**instructed** [1]
*174:25*

**instructions** [2]
*119:17; 173:17*

**instrument** [1]
*318:17*

**insubordinate** [2]
*251:3, 5*

**insubordinately** [1]
*288:6*

**insubordinates** [1]
*288:6*

**insurance** [15]
*115:21; 147:16; 166:17; 186:20; 190:14; 278:16; 279:3, 4; 280:8; 281:17; 282:1; 283:17; 307:14; 308:15; 314:14*

**intention** [5]
*175:8; 196:2; 246:25; 273:7; 300:8*

**interest** [7]
*193:18, 25; 194:3, 4, 6, 11, 20*

**interested** [1]
*319:15*

**interests** [1]
*251:24*

**interfered** [1]
*137:14*

**internal** [5]
*148:9; 159:9; 225:18; 258:18; 264:8*

**Internally** [1]
*150:3*

**International** [1]
*111:15*

**interpret** [1]
*279:14*

**interpreted** [1]
*300:7*

**interrupt** [1]
*182:18*

**interrupted** [1]
*123:14*

**interruption** [1]
*123:12*

**introduction** [1]
*156:15*

**inventory** [1]
*301:4*

**investigation** [2]
*139:18; 175:14*

**invited** [1]
*216:5*

**involved** [42]
*121:19; 123:2; 132:11; 133:9; 135:9; 140:15; 159:7; 172:4; 188:5, 15; 189:2; 190:11; 194:4; 196:13, 25; 197:4; 198:13; 199:25; 204:3, 4; 225:24; 226:5; 237:11; 246:10; 248:10, 11; 251:21; 252:1, 3; 264:13; 272:8; 288:10; 293:14; 299:13; 302:15, 20, 21; 303:1; 304:19; 307:23; 308:9; 310:5*

**involvement** [5]
*119:6; 302:13; 303:16, 20, `*

**involving** [2]
*147:22, 25*

**ISD** [1]
*315:6*

**issue** [13]
*123:2; 148:6; 150:13, 14; 158:15; 159:20; 191:7; 194:24; 228:12; 255:1; 273:19; 280:9; 285:10*

**issued** [1]
*261:18*

**issues** [15]
*148:5; 150:3; 152:22; 156:13, 16; 158:6; 160:19; 161:8; 171:7; 184:20; 198:4; 214:22; 283:1; 284:12, 13*

**item** [1]
*260:15*

**items** [1]
*314:21*

**– J –**

**Janet** [4]
*124:11; 308:23, 25; 309:15*

**January** [13]
*130:1, 8; 209:14; 228:3, 18; 229:3; 235:13, 14; 267:13, 18; 268:1; 269:9*

**Jeff** [18]
*111:24; 168:13; 171:17; 173:14, 12, 17, 21; 174:18, 1 175:8, 13, 16, 25; 178:12, 13, 16; 179:23; 258:1*

**Jefferson** [1]

168:14

**job** [12]
129:7; 131:4; 133:12, 15; 134:2, 10; 141:25; 142:17, 18; 282:25; 295:23; 297:24

**Joe** [6]
124:23; 202:13; 203:12, 16, 17

**jogged** [1]
298:22

**Join** [5]
125:10; 142:24; 146:6; 239:8; 310:22

**JR** [1]
109:8

**justification** [2]
128:10; 284:15

**justified** [4]
179:18; 284:22, 25; 285:12

— K —

**Karl** [1]
210:11

**keep** [11]
125:15; 137:1, 5; 147:1; 153:18; 174:9, 10; 182:1, 2; 193:23; 299:25

**keeping** [3]
193:21, 25; 194:7

**Ken** [1]
245:14

**kept** [4]
211:7; 262:14, 19; 289:19

**kinds** [2]
275:16; 276:2

**Knowing** [3]
139:12; 283:16; 284:21

**knowing** [3]
260:17; 279:5; 284:17

**knowledge** [14]
117:14; 147:17; 151:9, 11; 153:7; 160:25; 161:14, 18; 200:1; 217:8; 277:11; 283:24; 291:22; 299:2

**Kuechenmeister** [2]
239:17; 241:3

— L —

**L.L.P.** [4]
110:9; 111:10, 15, 20

**labels** [1]
255:22

**Labor** [1]
312:7

**LaFEMINA** [9]
109:14; 110:2; 113:7; 115:1; 317:2; 318:3, 9, 13; 319:8

**LaFemina** [43]
113:20, 23; 114:5, 7; 115:6; 119:22; 135:19; 162:15; 165:10; 170:5, 8; 179:24; 181:19; 189:15; 190:2; 207:22; 209:9; 212:6; 214:6, 7, 11, 13; 244:1; 249:6; 250:7; 251:18; 253:22; 256:8, 15; 257:4; 258:3, 4, 12; 259:17; 260:5; 261:15; 262:7, 11; 264:2; 265:13; 270:21; 277:2

**LaFemina's** [1]

178:22

**laid** [1]
124:9

**language** [1]
305:9

**Laredo** [1]
131:13

**Large** [1]
198:6

**large** [3]
197:22; 198:19; 313:13

**larger** [3]
122:3, 6; 154:9

**largest** [6]
131:3, 7, 15; 132:5, 21; 141:13

**last** [22]
115:11; 119:18, 21; 122:15; 137:7; 138:24; 153:17; 164:4; 166:3; 170:5; 186:12; 200:21, 22, 23; 241:18; 245:12, 17; 257:1; 264:12; 277:5; 314:11

**late** [3]
130:1; 228:3, 9

**LAW** [1]
111:5

**law** [1]
311:17

**laws** [1]
311:11

**lawsuit** [1]
165:23; 166:2; 167:3; 180:7

**lawyer** [1]
299:10

**lay** [3]
291:6; 292:7, 25

**lead** [6]
129:21, 23; 130:24; 131:1; 262:16; 310:9

**leading** [1]
304:21

**learned** [1]
285:4

**lease** [1]
200:7

**leave** [2]
145:24; 217:9

**Leaves** [1]
292:21

**leaves** [1]
139:12

**leaving** [3]
145:16, 17; 289:4

**LEEDS** [79]
111:14; 119:1; 125:10; 126:17, 25; 128:18; 129:1; 133:6, 20, 22; 134:8; 137:16; 141:15; 142:1, 24; 143:5, 15; 145:13; 146:6; 147:3; 148:17, 19, 25; 149:3, 21; 150:17; 151:4; 154:19; 159:2; 162:2, 20; 163:13; 166:19; 169:12, 23; 174:17; 176:14; 177:18, 22; 179:25; 180:20; 182:12; 184:15, 21; 185:24; 187:22; 188:1, 18; 193:9; 194:22; 201:15; 203:19; 208:16; 212:16; 213:7; 214:6; 222:17; 238:8; 239:8; 244:16, 19, 22; 245:5; 246:7; 248:6; 249:9; 270:20; 287:8; 288:7; 301:18;

309:18; 310:6, 22; 311:13, 20; 312:25; 314:16, 24; 316:4

**Leeds** [26]
113:9, 10; 270:21; 274:15, 21; 277:2; 278:25; 279:8; 282:4, 9; 283:16, 25; 284:16; 285:3; 287:3, 12; 288:8; 290:10; 291:10; 292:15; 293:17; 298:24; 300:18; 301:14; 308:13; 314:3

**legal** [6]
145:1; 170:8; 176:25; 178:6; 272:5; 282:20

**Lehman** [1]
125:21

**length** [3]
250:24; 272:24; 292:3

**lengthy** [3]
138:6; 165:14; 250:21

**Let's** [9]
169:17; 178:18; 198:6; 201:6; 208:15; 224:2; 230:3; 246:13; 249:7

**let's** [8]
154:21; 182:25; 199:14; 228:17; 235:14; 236:23; 266:12; 282:25

**Letter** [2]
114:5, 7

**letter** [95]
118:8, 17; 123:15; 124:14; 127:7; 130:2; 136:10, 14, 15, 17; 138:23; 143:22, 23; 144:5, 14; 161:7, 24; 163:6, 8, 23; 165:5, 12; 166:18; 167:4, 11; 168:8; 170:13, 22; 171:4; 174:12, 14; 181:2, 4, 7, 9, 10, 11, 18; 188:3, 13; 189:3; 195:16; 196:2, 18; 201:2; 210:12; 211:2; 213:13, 20, 25; 214:16, 17, 18, 25; 215:9, 13, 14; 219:15; 220:18, 20, 22; 223:13; 231:13, 16, 23; 232:16; 241:8; 252:2, 4, 5, 6; 253:15, 16; 260:23; 263:11; 266:14; 271:9, 14; 272:19; 274:4, 7; 275:7, 14; 276:10; 282:2, 14; 284:4, 12, 14; 285:1, 9, 21; 297:16; 302:16

**letter-writing** [2]
266:15; 274:3

**letters** [23]
124:3, 10, 12, 13, 21, 24; 125:2, 12, 14; 144:19, 25; 145:22; 274:12; 281:17, 24; 283:8, 12; 284:3, 18, 21; 308:14, 16; 309:13

**level** [7]
160:19; 192:4; 232:20; 234:18; 293:16; 296:24; 313:25

**Levine** [21]
117:23; 118:22; 120:7; 121:20; 123:4; 192:17; 193:1; 212:8, 21, 24; 216:4; 217:9; 218:9; 219:1; 220:5, 10; 273:12; 295:21; 298:2, 10; 302:19

**Levine's** [1]
272:3; 303:21

**liaisons** [1]
153:8

**LIDDELL** [1]
111:20

**Liddell** [1]
110:9

**Lleck** [1]
245:14

**life** [3]
166:4, 14; 269:19

**light** [1]
207:2

**liked** [1]
308:19

**likelihood** [1]
265:10

**limited** [1]
271:25

**Linda** [4]
124:22; 125:16; 277:6; 280:16

**LINE** [3]
113:18; 114:3; 317:6

**line** [5]
186:12; 200:6; 215:15; 259:11; 261:12

**lined** [1]
295:15

**lines** [2]
121:12; 297:18

**list** [3]
115:21, 23; 224:22

**listed** [1]
224:14

**listen** [2]
139:25; 179:10

**livelihood** [1]
166:16

**LOCKE** [1]
111:20

**Locke** [1]
110:9

**locked** [1]
218:5

**long-term** [4]
142:15; 269:21; 286:23, 24

**Looks** [1]
185:7

**looks** [3]
256:3; 275:11; 280:3

**loop** [1]
128:6

**losing** [3]
137:2, 3; 289:14

**lost** [7]
133:14; 139:23; 140:8; 290:9; 297:15; 298:22; 301:15

**lot** [4]
149:7; 165:2; 285:8; 313:20

**loud** [2]
119:20; 239:15

**love** [1]
254:12

**Lunch** [1]
230:20

**lunch** [1]
231:3

**Lynn** [15]
113:24; 114:12, 14; 152:5; 167:23; 168:1; 201:21; 204:13, 14, 15, 24; 205:8, 25;

259:16

## – M –

**Ma'am** [2]
248:15; 283:22

**ha'am** [21]
244:4; 245:10, 18; 247:15;
249:23; 250:14; 254:23;
259:10; 264:10, 22; 265:21;
267:17; 270:1; 271:8; 278:12;
286:6; 291:15, 18, 21; 292:1;
300:17

**machine** [1]
110:8

**maintain** [2]
133:2; 179:16

**man** [2]
197:7; 269:20

**management** [6]
122:9; 123:1; 141:1; 151:18;
206:13; 234:23

**manager** [1]
262:4

**managers** [1]
197:10

**mandatory** [1]
264:18

**manner** [3]
116:4; 266:1; 286:16

**March** [1]
235:20

**MARILYN** [1]
109:7

**mark** [5]
249:7; 255:10; 259:2; 261:4;
274:15

**marked** [27]
119:22; 125:16; 137:25;
138:1; 161:20; 164:25; 170:2;
172:21; 180:23; 189:14;
195:15; 201:10, 12; 207:18;
213:23, 25; 220:16, 18;
223:17; 245:4; 249:12; 259:6;
261:3, 6; 274:22; 279:22

**marketing** [3]
119:10, 14; 287:24

**marks** [1]
255:18

**match** [1]
285:8

**matter** [16]
117:5, 12, 14; 127:24; 129:6;
133:2; 156:14; 178:7; 219:15;
231:15; 248:21; 254:3; 264:4;
299:15; 304:1; 305:2

**matters** [1]
319:9

**May** [2]
115:7; 265:3

**McAllen** [3]
204:18, 21; 296:25

**mean** [23]
121:2; 130:17, 19; 137:11;
140:7, 19; 156:11; 163:15;
171:14; 197:3; 203:3; 211:6;
221:15; 225:11; 236:24;
254:5; 262:18; 264:12;
279:11; 281:25; 300:24;
301:6; 303:24

**Meaning** [3]

193:., 14; 219:18

**meaning** [2]
166:12; 185:15

**means** [3]
129:12, 13; 156:8; 159:19;
163:22; 207:21; 269:10

**meant** [11]
123:11; 127:3, 12; 131:6;
134:13; 139:20; 140:5, 22;
153:20; 173:16; 193:15 .

**meet** [1]
297:2

**meetings** [1]
161:8

**member** [2]
124:7; 279:4

**Members** [1]
109:9

**members** [24]
124:3, 4; 126:24; 129:4;
144:9; 160:20; 164:1; 203:3;
213:14, 17; 262:23; 266:11;
274:9; 275:24, 25; 277:9;
278:18; 281:18; 282:10, 13;
283:19; 284:3, 14; 308:15

**memo** [12]
138:11, 13, 15; 201:18;
208:20; 214:13; 223:18;
224:7, 9, 12; 232:13, 15

**memory** [1]
298:22

**mention** [2]
204:8; 247:14

**mentioned** [13]
153:16; 205:4, 23; 207:3;
222:6; 228:5; 237:23; 253:12;
281:9; 297:9; 307:16; 313:7;
314:21

**mentions** [1]
274:8

**mere** [1]
265:9

**merger** [2]
289:2; 306:4

**merit** [1]
277:9

**message** [1]
275:22

**method** [1]
191:1

**meticulous** [2]
139:14, 17

**middle** [1]
139:21

**mind** [6]
139:12; 179:14; 195:4; 215:1;
221:7; 252:12

**mine** [4]
154:3; 232:21; 248:4; 265:23

**minimal** [2]
222:4, 21

**minute** [1]
246:5

**minutes** [1]
245:25

**mischaracterization** [1]
191:12

**mischaracterizing** [4]
266:4; 282:6; 289:23; 314:2

**miserable** [2]
166:4, 15

**mislead** [1]
145:18

**misrepresenting** [1]
145:25

**miss** [1]
245:1

**missed** [2]
293:11; 313:17

**Mission** [3]
199:14, 16, 17

**misstate** [2]
145:15; 146:14

**Misstates** [1]
145:14

**misstates** [4]
142:22; 177:20; 182:13;
243:5

**mistaken** [2]
170:6; 275:6

**misunderstand** [1]
305:7

**moment** [4]
169:24; 178:19; 241:14;
261:19

**money** [9]
133:7; 135:4; 155:21; 218:14;
273:5, 7; 290:14; 296:10;
301:15

**monies** [2]
261:18; 294:3

**month** [2]
181:15; 260:11

**months** [2]
235:22; 246:23

**Moss** [1]
245:13

**mother** [1]
153:8

**motives** [1]
296:4

**mouth** [1]
305:19

**move** [3]
230:3; 294:21; 307:6

**Moves** [1]
119:19; 194:14; 304:17

**moving** [1]
138:17

**MR** [147]
111:4, 19; 115:5; 119:3;
120:21, 23; 121:1, 2, 4, 6, 7,
11, 14, 24; 122:2, 3; 124:8;
125:8, 11; 127:16; 134:5;
135:12; 142:22; 143:9, 25;
145:5, 6, 12, 14; 146:4, 7, 12,
18, 21; 147:4; 155:8; 161:12;
162:4; 166:21; 168:19, 22,
23, 25; 169:13, 16, 17, 20,
24; 170:3; 176:8, 16, 22;
177:20; 178:18, 21; 179:6,
22; 180:1, 5, 6, 10, 11, 12,
14, 16, 19, 25; 182:7, 13;
187:10, 22; 200:21; 201:6,
16; 214:7, 9; 223:20; 224:2,
3; 230:1, 15, 19; 233:11, 17,
21; 236:23, 25; 239:7, 12;
241:14; 242:2, 5, 7, 11, 17;
243:4, 8, 14, 22; 244:21, 23;
246:13, 18; 247:18; 248:5;
249:1, 5, 13; 255:15; 257:10;
258:3, 5, 8; 259:21; 260:2;

264:23; 265:11; 266:3;
274:17; 276:24; 278:20;
279:7; 282:3, 6; 283:10, 21;
284:7, 24; 287:1, 6; 289:22;
291:5; 292:6, 24; 298:20;
300:16; 301:9, 19; 307:7;
310:21; 312:11, 20; 314:1,
19; 316:3, 5, 6

**Mr** [274]
111:24; 113:8, 9, 10; 114:10;
115:6; 117:18, 23; 118:16,
19, 22, 23; 119:4; 120:7;
121:19, 20, 21; 122:4; 123:4;
124:2, 12; 125:13, 18, 20, 21;
126:20; 127:1, 17; 128:22;
129:8; 133:7, 23; 134:9;
135:13; 137:23; 138:1, 5;
141:19; 142:3, 25; 143:7, 11,
18; 144:1; 145:8; 146:23;
147:7, 15; 148:18, 20; 149:1,
6, 24; 150:20; 151:8, 10;
153:12; 154:20; 155:12;
159:12; 161:13, 24; 162:5,
21; 163:14; 164:9; 165:5, 13;
166:25; 167:12, 14, 15, 24;
168:9, 24; 169:2, 15; 170:5,
7, 8, 10, 14, 16, 19, 20, 25;
171:3; 172:7; 173:9, 10;
174:18; 175:21; 176:9, 10,
17; 177:2, 24; 178:22, 23;
179:12, 21, 24; 180:4, 11, 15,
22; 181:1, 4, 5, 19, 21, 24;
182:2, 9, 15; 183:16, 21;
184:1, 2, 6, 22, 23; 185:10,
15, 21; 186:7; 187:15, 20;
188:6, 19; 190:2; 193:10;
195:1; 201:3, 11, 18; 202:1·.
203:9, 21; 204:7; 205:4, 12;
207:9; 208:18; 210:11, 13,
16; 212:19; 213:10, 24;
214:1, 12, 13, 19, 21; 215:6,
10; 216:13, 14, 16, 21; 217:1;
218:9; 219:1; 220:4, 5, 10,
17, 19; 222:2, 3, 23; 223:3,
12, 19, 22; 224:6, 7; 229:19;
230:4, 21; 233:25; 237:4;
238:9; 239:9, 16, 17; 241:3,
4, 5, 6, 8, 16; 242:13, 22;
243:10, 18; 244:1; 248:9, 10,
22; 249:19; 250:7, 20, 25;
253:23; 254:9, 18; 255:7;
256:15, 25; 257:2, 16, 20;
258:15, 25; 259:16, 19, 25;
260:1, 6, 18, 20, 21; 262:11;
263:14; 265:14, 25; 266:18;
268:3; 269:8, 23; 270:14, 21;
271:7; 272:8; 275:15, 18;
277:2; 285:10; 289:18; 290:6;
291:1; 292:22; 293:14; 294:3;
295:21; 297:20; 301:5;
303:14, 21; 307:10; 308:14;
309:15, 25; 310:12, 14, 19;
311:2, 16, 24; 312:15; 313:2,
10; 315:1

**MS** [109]
111:10, 14; 119:1; 123:25;
125:10; 126:17, 25; 128:13;
129:1; 133:6, 20, 22; 134:8;
137:16; 141:15; 142:1, 24;
143:5, 15; 145:13; 146:6;
147:3, 13; 148:17, 19, 25;

149:3, 21; 150:17; 151:4;
154:19; 159:2; 162:2, 20;
163:13; 166:19; 169:12, 21,
23; 174:17; 176:14; 177:18,
22; 179:25; 180:20, 24;
182:12; 184:15, 21; 185:24;
186:1; 187:22; 188:1, 18;
193:9; 194:22; 201:15;
203:19; 208:16; 212:16;
213:7; 214:4, 6, 8; 222:17;
238:8; 239:8; 243:25; 244:13,
16, 17, 19, 20, 22, 25; 245:5;
246:7, 15; 248:1, 6; 249:7, 9,
10; 254:15; 256:5; 257:6, 15;
258:2, 4, 11; 269:4, 12;
270:18, 20; 287:8; 288:5, 7;
301:16; 309:18; 310:6, 22;
311:13, 20; 312:22, 25;
314:16, 24; 316:4, 7

**Ms** [57]
113:8, 9, 10; 124:20, 22;
125:3, 16, 24; 205:10; 245:6;
246:8; 247:2, 20; 248:7;
249:14; 254:17; 256:6; 257:8,
19; 258:7, 12; 259:8, 24;
260:4; 261:7; 264:25; 265:17;
266:7; 267:15; 269:14;
274:15, 21; 277:2, 6; 278:25;
279:8; 282:4, 9; 283:16, 25;
284:16; 285:3; 286:21; 287:3,
12; 288:8; 290:10; 291:10;
292:15; 293:17; 298:24;
300:18; 301:14; 308:13;
310:3, 13; 314:3

**multiple** [2]
245:22; 246:4

**myself** [7]
138:19; 140:22; 174:22;
202:5; 229:18; 234:12;
301:12

– N –

**NAME** [1]
317:2
**name** [15]
139:24; 152:1; 192:10;
202:13; 205:2, 10; 215:16;
217:15, 16; 226:16, 18;
244:1; 270:21; 310:14;
318:16
**named** [3]
276:4; 310:9; 319:8
**naming** [1]
180:17
**National** [1]
162:12
**national** [2]
238:13, 16
**nationwide** [1]
237:8
**nature** [6]
139:14; 150:4; 160:21; 161:9;
283:14
**NEALLY** [30]
111:10; 123:25; 147:13;
169:21; 180:24; 186:1; 214:4,
8; 243:25; 244:13, 17, 20, 25;
246:15; 248:1; 249:7, 10;
254:15; 256:5; 257:6, 15;
258:2, 4, 11; 269:4, 12;

270:18; 288:5; 312:22; 316:7
**Neally** [24]
113:8; 244:1; 245:6; 246:8;
247:2, 20; 248:7; 249:14;
254:17; 256:6; 257:8, 19;
258:7, 12; 259:8, 24; 260:4;
261:7; 264:25; 265:17; 266:7;
267:15; 269:14; 286:21
**needs** [1]
300:15
**negative** [4]
207:2; 225:21; 266:15;
284:12
**negotiations** [1]
160:20
**neighborhood** [1]
199:23
**nepotism** [1]
295:5
**net** [2]
289:6; 306:24
**night** [1]
239:5
**Nobody** [1]
168:9
**nobody** [5]
149:19; 168:6; 210:9; 223:10;
292:20
**NOE** [2]
109:6; 111:13
**Nonetheless** [1]
250:22
**nonresponsive** [3]
135:12; 161:12; 176:8
**Nope** [1]
254:23
**normal** [3]
123:12; 175:24; 189:18
**Normally** [1]
175:2
**normally** [4]
178:5; 192:12; 199:7; 297:5
**north** [1]
131:11
**NOTARY** [1]
318:24
**note** [1]
264:22
**noted** [1]
318:5
**notice** [8]
164:21; 208:7; 210:13;
231:24; 246:25; 261:11;
267:15; 268:17
**notified** [2]
181:19; 268:24
**notify** [1]
187:17
**November** [23]
118:10; 127:18; 129:25;
130:8, 12; 143:7, 14, 22;
181:18; 252:1, 5, 7, 8, 13, 16;
271:10; 275:7; 285:6; 297:15,
16; 302:16, 20; 304:21
**NPA** [4]
162:9, 17, 19
**number** [10]
156:13; 207:22; 212:7;
221:17; 222:14; 256:4;
257:25; 289:3, 4; 313:13
**numbered** [1]

110:4
**numbers** [2]
200:4, 8
**numerous** [3]
157:24; 235:4; 269:19
**nutshell** [1]
298:14

– O –

**oath** [2]
318:14; 319:10
**Object** [37]
123:25; 125:8; 126:17, 25;
128:18; 133:6; 134:8; 137:16;
141:15; 143:5, 15; 145:13;
147:3, 13; 148:17, 25;
149:21; 151:4; 154:19; 155:8;
159:2; 162:20; 163:13;
169:12; 174:17; 185:24;
186:1; 188:1, 18; 193:9;
194:22; 213:7; 238:8; 257:6;
269:12; 310:6; 311:20
**object** [9]
119:1; 124:8; 145:24; 166:19;
168:19; 243:4, 14; 254:15;
257:11
**objecting** [1]
307:8
**Objection** [40]
134:5; 135:12; 142:1, 22;
145:5, 12; 147:4; 150:17;
161:12; 176:8, 14, 22;
177:18, 20; 182:7, 13;
187:22; 222:17; 239:7;
259:21; 265:11; 266:3;
278:20; 279:7; 282:3; 283:10,
21; 284:7, 24; 287:1; 289:22;
291:5; 292:6, 24; 298:20;
301:9; 309:18; 310:21;
311:13; 314:1
**objection** [6]
129:1; 146:2; 170:4, 9;
242:18; 243:15
**objective** [1]
219:5
**obligations** [1]
142:20
**obvious** [3]
136:25; 271:6; 300:10
**obviously** [4]
133:1; 193:21; 206:13;
313:18
**occasion** [1]
269:16
**occur** [1]
241:10
**occurred** [6]
130:12; 254:19; 267:21;
274:3; 280:22; 281:12
**October** [3]
238:19; 239:3
**odds** [2]
288:3, 11
**offer** [3]
207:8, 14, 15
**offered** [1]
207:12
**offhand** [1]
157:9
**OFFICE** [1]

111:5
**office** [54]
123:15; 149:17, 18; 150:1,
15; 153:7, 9; 157:15, 24;
158:2, 8, 9; 164:4; 173:18,
23; 175:6; 176:5, 6; 197:10;
199:22, 25; 200:5; 202:15,
19, 21; 203:5, 8; 204:21;
216:5, 6; 217:10, 12, 14, 18,
19, 21, 24; 218:3, 4, 8;
220:24; 221:1, 4; 222:1, 2, 3;
225:7, 8; 255:24; 260:6;
276:12; 309:21; 312:6;
318:20
**officer** [2]
210:9; 310:9
**offices** [1]
110:8
**official** [3]
109:8; 154:10; 284:10
**offset** [2]
289:15; 302:1
**Oh** [4]
122:18; 237:14; 261:9;
294:15
**oh** [2]
142:5; 170:12
**Okay** [380]
116:1, 8, 18, 24; 117:5;
118:6; 119:3, 6, 13, 25;
120:8, 13, 18; 121:7; 122:20;
123:6, 24; 124:15; 125:2;
126:10, 13; 127:3, 7; 128:15;
129:8; 131:14, 17; 132:2, 9,
13, 21; 133:1, 12; 134:12;
135:20, 23; 136:9; 137:7, 23;
138:20, 23; 140:14; 141:3,
13, 23; 142:9, 17; 143:18;
144:5, 15, 17; 146:23; 147:9;
148:11, 24; 149:6, 19;
150:13; 151:20; 152:4, 11,
17, 21; 153:11, 20; 154:4, 15;
155:24; 156:6; 157:3, 7, 11,
23, 25; 158:11, 20; 159:21;
160:12, 22; 162:11, 14;
163:8; 164:18; 166:25; 167:9,
15, 19, 24; 168:14, 17, 22;
169:7, 18; 170:18, 25; 171:3;
172:1, 10, 13, 18; 173:3, 12,
15, 22, 25; 174:24; 176:13;
177:2, 5, 14; 178:4, 17;
180:5, 12; 181:4, 17; 183:8,
12, 25; 184:14, 21, 22; 185:4,
6, 9; 186:7, 9; 187:5; 188:6;
189:6, 23; 190:4, 16, 21;
191:8, 13, 17; 192:2, 15, 22;
193:10, 21; 194:6, 10; 195:1,
6, 24; 196:20; 197:20;
198:14, 17; 199:2, 21; 200:4,
11, 18; 201:5, 11; 202:21;
203:18; 204:23; 205:15, 19;
206:3, 16, 19, 22; 207:18, 25;
208:6, 19; 209:1, 15; 210:11,
17, 20, 24; 211:3, 12, 20, 22,
25; 212:10, 14; 213:3; 215:9,
20; 216:11, 17; 217:6, 20, 23;
218:9, 19; 219:10; 220:2, 12;
221:15, 19; 222:23; 223:10,
15; 224:12, 21, 25; 225:19,
22; 226:4, 11, 20; 227:5, 7,
15; 228:17; 229:10; 230:19

21; 231:5, 11, 20, 22; 232:22;
233:9; 234:3, 7, 14; 235:2,
10, 23; 236:2, 7, 13; 237:20;
238:12, 16; 239:2, 16, 25;
240:10, 16; 242:17, 22;
243:21; 244:16, 20; 245:6,
12; 246:16; 247:2, 19; 248:7;
249:7, 14, 21; 250:7, 18;
251:12, 25; 252:5, 13, 18, 22;
253:23; 254:4, 17, 24; 255:4,
6, 9; 256:5, 9; 257:5, 23;
258:11; 259:2, 15; 261:3, 11;
262:8; 263:5, 8; 264:4, 11,
21; 267:9, 20; 268:6; 269:22;
271:18; 272:6; 273:4, 21;
274:2, 7, 21; 275:3, 10;
276:13, 17; 277:16, 24;
278:3, 9, 13; 279:21; 280:7,
14, 19; 281:1, 11, 16, 23;
282:9, 15; 283:16; 284:1, 16;
285:3, 16; 286:1, 3, 7, 12, 21;
287:14, 21; 288:2; 289:8;
290:18; 291:12; 292:15, 21;
293:17, 23; 294:10; 295:1, 8,
19, 20; 297:13, 25; 298:8, 14;
300:18; 301:14; 302:10, 13;
303:4; 304:1, 8, 10, 14, 21;
305:1, 8, 21; 306:2, 7, 17, 19,
22; 307:1; 308:3, 6, 12, 18,
23; 309:3, 15, 25; 310:3;
311:2, 6, 10, 24; 312:19;
313:24; 314:9; 315:20; 316:2

**okay** [19]
125:6; 126:5; 169:11, 18;
196:24; 224:5; 226:8; 229:20,
25; 247:16; 264:24; 279:16;
281:6; 294:15; 295:7, 15;
297:4, 14; 309:17

**old** [2]
255:19; 287:5

**OLIVEIRA** [1]
111:10

**one-time** [1]
202:10

**ones** [3]
206:8; 219:23; 279:24

**ongoing** [4]
134:24; 197:8; 297:14;
304:11

**open** [2]
154:10; 293:5

**openly** [4]
162:8; 251:3, 5; 273:20

**opens** [1]
305:25

**operates** [2]
291:17, 20

**operation** [3]
216:18; 217:3; 231:17

**opinion** [15]
249:25; 250:1, 3, 9; 263:9;
276:9, 10, 22; 279:1; 283:19;
286:24; 295:4, 9; 304:9;
311:5

**opportunity** [2]
123:22; 271:20

**opposed** [8]
135:3; 188:12; 232:21; 253:7;
263:2; 288:15; 302:11; 307:3

**option** [3]
181:23; 183:21; 184:6

**ORAL** [1]
109:13; 110:1

**oral** [3]
221:23; 222:5, 11

**order** [2]
147:1; 287:25

**organization** [3]
116:20; 117:9; 123:20

**original** [1]
160:12

**originally** [3]
115:7; 217:10; 224:12

**Otis** [1]
124:22

**ought** [1]
271:4

**ourselves** [1]
203:23

**outline** [1]
218:25

**outlined** [11]
114:10; 136:23; 189:14;
218:24; 248:8; 250:19;
251:11; 263:24; 264:18;
298:15; 300:2

**outlines** [2]
138:16; 265:1

**Outside** [1]
223:2

**outside** [3]
126:14; 235:22; 292:19

**overall** [2]
140:12; 219:4

**overhead** [1]
216:21

**override** [3]
157:6; 295:17, 23

**overrides** [9]
190:8, 11; 194:17; 195:4, 7,
9; 206:14; 299:23; 300:3

**owners** [1]
301:2

**owns** [1]
301:2

**– P –**

**p.m.** [2]
110:6; 259:12

**PAGE** [5]
112:3; 113:2, 18; 114:3;
317:6

**Page** [1]
214:17

**page** [17]
120:22; 121:13; 158:25;
162:6; 187:16; 199:21;
214:24; 215:9; 216:11;
245:10, 12, 17; 265:13;
277:3, 4; 318:6

**pages** [1]
277:4

**paid** [3]
202:22; 203:2; 313:20

**paper** [1]
215:22

**paragraph** [19]
139:8; 140:14; 162:6; 181:17;
185:11; 187:16; 195:25;
196:1, 9; 199:21; 200:18, 22;
216:12; 220:23; 225:1;

**275:20; 277:6, 20; ; 5:14**

**parallel** [1]
264:9

**Part** [1]
159:4

**part** [23]
119:25; 120:2; 132:15;
140:11, 13; 153:20; 159:1;
160:11; 189:2; 216:12;
219:23; 221:2; 234:24;
242:23; 258:19; 262:5; 264:9;
276:14, 17; 300:24; 305:9;
312:7; 314:23

**part-timers** [1]
298:5

**participate** [2]
290:20; 313:23

**participates** [2]
198:17, 18

**participation** [2]
290:17; 293:18

**parties** [5]
121:13; 251:21; 264:13;
319:13, 15

**party** [9]
179:13, 23, 25; 180:6, 21;
186:21; 242:9; 278:5

**pass** [6]
243:22; 270:18; 272:4; 283:2;
301:16; 312:21

**path** [2]
262:14, 19

**pay** [4]
203:1; 207:16; 301:12; 302:3

**paying** [3]
206:24; 301:23; 302:2, 5, 6

**payroll** [2]
290:3, 4

**penetration** [1]
197:7

**people** [54]
123:1; 140:3; 144:10; 149:16;
156:8; 160:17; 161:4; 190:11;
196:19; 197:9; 203:2; 204:3,
4, 9, 10; 211:1, 24; 212:2, 4,
12; 220:25; 221:12; 224:14,
22; 239:14; 247:22, 24;
262:24; 263:4; 273:18;
275:22; 283:12; 289:13;
290:20, 21; 292:16; 293:11;
296:24; 297:1, 4, 18; 298:3,
4, 10; 300:4; 303:12; 306:8;
309:14; 313:11, 12, 18

**percent** [30]
154:5, 23, 25; 155:20;
156:20, 22; 158:12; 192:17,
21, 22, 23; 193:2, 7, 12, 14;
197:8; 212:9; 218:10, 17;
280:21, 25; 281:6; 295:6, 7;
307:22; 308:1, 4; 313:4;
314:3, 10

**percentage** [5]
161:15; 226:14; 227:11;
302:1; 306:21

**perfectly** [1]
293:2

**period** [17]
153:16, 22; 154:6, 16; 156:1;
160:8; 197:23; 230:9, 24;
231:6; 232:7; 238:20; 247:4;
268:13; 293:5; 297:13; 300:4

**periods** [1]
246:23

**permitted** [3]
210:25; 232:18; 286:19

**persistence** [1]
139:13

**person** [28]
134:19; 150:19; 152:24;
156:13; 159:19, 24; 175:17;
202:6, 12; 205:6; 212:25;
222:11; 235:6; 287:17, 19,
25; 292:4; 295:15, 22;
308:24; 309:2, 5, 9, 11, 21;
318:16; 319:8

**person's** [1]
205:9

**personal** [25]
159:7; 160:25; 161:14, 18;
200:1; 202:25; 206:14;
218:15; 220:11, 14; 225:8,
16, 24; 227:1; 236:17;
237:12; 276:10; 289:12;
290:23; 291:22; 293:25;
294:4, 16; 296:3, 9

**personality** [1]
137:1

**Personally** [1]
158:14

**personally** [10]
123:21; 133:5; 138:18;
190:24; 234:12; 245:2;
250:12; 272:25; 273:11;
318:13

**personnel** [11]
148:12, 14, 15, 21, 24; 149:5,
14; 150:15; 152:18; 297:23;
298:1

**perspective** [4]
118:5; 138:14; 195:25; 196:8

**persuade** [1]
140:15

**philosophy** [1]
159:5

**Phone** [1]
221:22

**phone** [21]
158:7; 161:10; 164:3; 165:11,
13; 170:21, 23; 200:6;
221:20, 23; 222:5, 11, 19;
250:21; 251:19; 252:14, 19,
24; 256:4; 281:9; 282:19

**physical** [3]
166:7, 13, 16

**picked** [2]
161:10; 298:10

**picture** [1]
264:14

**piece** [1]
215:22

**pieces** [1]
303:12

**place** [21]
129:11, 13, 14, 17; 131:25;
141:2; 170:23; 173:18; 229:9;
230:11; 236:9; 239:24;
252:25; 255:2; 256:14;
267:10; 276:8; 278:1; 296:(
315:14, 15

**PLAINTIFF** [1]
111:3

**Plaintiff** [1]

110:3
**Plan** [1]
162:12
**plan** [24]
117:20; 134:22; 137:9;
138:16; 177:10; 189:17, 18,
22, 24; 191:18; 219:5;
246:20; 250:23; 278:6; 283:8;
291:17, 20, 25; 295:11, 14;
298:14; 300:2, 5, 13
**player** [1]
263:12; 264:19
**Plaza** [1]
111:15
**Please** [5]
137:10; 244:25; 264:22;
281:2; 291:12
**please** [14]
127:15; 134:1; 143:2; 145:7;
147:23; 166:10; 186:11;
249:8; 269:5; 278:14; 288:20;
292:2; 305:22; 317:5
**pleased** [1]
273:23
**plus** [1]
200:6
**pockets** [1]
202:20
**point** [44]
133:10; 140:12; 141:10;
144:6; 145:21; 165:17;
177:14; 178:22; 180:16;
182:4; 183:15; 184:4; 185:21;
225:16; 226:24; 229:7, 10;
230:5, 7; 232:18; 235:7, 24;
239:5, 16; 248:13; 251:8;
258:7, 14; 259:20; 264:12,
13; 267:9; 268:20; 272:12;
275:19; 289:1; 290:8, 12;
299:7; 306:3; 309:9; 313:11,
23, 24
**police** [1]
239:5
**policies** [7]
148:7; 160:5, 15; 197:23;
218:18; 219:24; 220:1
**policy** [16]
116:16, 23; 117:8, 15;
159:19, 22; 160:1; 178:1;
198:21; 199:5, 9, 10, 16;
219:16, 21; 236:7
**policyholder** [6]
159:20; 199:11; 214:16, 23;
215:19; 219:22
**policyholders** [2]
148:10; 222:15
**population** [1]
140:18
**portion** [4]
155:25; 202:9; 257:18; 269:6
**position** [13]
127:20; 140:12; 141:4;
145:25; 146:24; 165:11;
169:14; 179:21; 196:5;
210:18; 263:15, 23; 311:6
**positive** [2]
247:25; 262:23
**possibility** [1]
249:18
**potential** [2]
199:4; 298:16

**Powers** [3]
124:23; 125:18
**powers** [2]
123:17; 126:5
**practical** [1]
304:1
**Practically** [1]
152:21
**practice** [3]
188:11; 309:17
**pre-screened** [1]
276:6
**precedent** [1]
146:15
**preclude** [1]
212:11
**predicate** [7]
119:2; 146:15; 166:20;
174:17; 291:6; 292:7, 25
**preferred** [1]
276:6
**premium** [2]
133:16; 135:7; 288:19
**premiums** [1]
242:25
**prepared** [11]
115:8; 177:6, 12; 253:19;
256:7, 9, 16, 18, 20; 258:13
**PRESENT** [1]
111:23
**present** [2]
130:14; 261:20
**preserve** [9]
131:4; 133:15; 134:3, 10, 22,
24; 137:15; 162:7; 174:9
**preserving** [2]
134:12; 138:17
**president** [7]
165:6; 175:2, 25; 209:7;
210:12; 245:14; 258:20
**pressed** [5]
313:16; 314:22; 315:11, 21
**pressing** [1]
187:12
**presume** [1]
232:13
**Pretty** [1]
157:20
**pretty** [1]
138:16
**previous** [12]
121:25; 126:11; 138:15;
185:1; 216:25; 253:17;
265:16; 305:13; 306:5; 307:3;
313:14; 318:5
**previously** [9]
161:20; 180:23; 195:15;
202:21; 231:19; 237:24;
255:5; 279:22; 295:3
**Price** [2]
111:11; 216:5
**pride** [6]
142:14; 269:15, 20, 22, 24;
286:23
**primarily** [3]
199:17; 219:11, 12
**primary** [1]
225:25
**principle** [1]
141:5
**print** [1]

236:12
**printed** [1]
255:2
**Prior** [1]
143:7, 9; 152:14
**prior** [32]
129:3, 5; 139:6; 143:6, 10,
13, 24; 144:1, 4; 147:19, 22,
25; 148:13; 150:25; 151:3;
155:1; 156:21; 164:6; 170:10;
203:8; 228:13; 246:23; 255:2;
260:17; 280:12, 13; 282:14;
301:22; 303:2, 8, 20; 304:16
**privilege** [1]
170:6
**problem** [10]
136:25; 147:22; 148:12;
150:5; 158:11, 14; 215:18;
233:21; 250:11; 300:20
**problems** [12]
147:25; 148:2, 5; 149:20;
150:16, 23; 151:3; 152:19;
153:2, 3; 271:6; 298:18
**Procedure** [1]
110:11
**procedure** [4]
115:13; 158:25; 178:9;
309:19
**procedures** [3]
164:2; 263:24; 264:17
**proceed** [2]
203:11; 263:23
**process** [3]
227:4; 248:11; 288:11
**produce** [4]
190:24; 227:4; 242:3, 4
**produced** [3]
110:2; 226:15; 248:18
**producer** [1]
220:14
**product** [2]
156:15; 290:16
**production** [20]
159:7; 192:9, 10; 218:15;
220:11; 225:17, 25; 226:18;
227:1; 228:6, 22; 236:17;
237:12; 241:20; 242:25;
245:8; 293:25; 294:4, 17;
296:9
**productive** [2]
305:12; 306:5
**productivity** [1]
307:2
**products** [3]
154:5, 15; 286:2
**professional** [5]
137:21; 142:15; 166:17;
263:7; 276:21
**professionalism** [1]
264:14
**program** [1]
288:24
**prohibited** [1]
159:10
**promote** [1]
282:11
**promoted** [1]
296:6
**promotion** [1]
235:19
**prompt** [3]

128:11, 16, 24
**proof** [1]
256:13
**proper** [8]
128:10; 179:17; 213:18;
291:6; 292:7, 25; 309:11, 14
**properly** [1]
137:10
**property** [3]
187:1; 212:13; 286:19
**proposal** [8]
115:15, 17; 116:11, 20;
117:20; 118:21; 218:23;
304:4
**proposals** [1]
116:13
**protect** [8]
193:1; 24; 194:2, 3, 7, 11,
16; 251:24
**protecting** [1]
142:18
**proved** [2]
140:11; 318:14
**proven** [1]
275:21
**provide** [2]
202:17; 241:25
**provided** [6]
120:4; 123:8; 157:10; 224:10;
298:15, 16
**provider** [3]
272:21, 22; 283:8
**providers** [1]
273:2
**providing** [2]
170:7; 212:12
**provisions** [1]
110:11
**prudent** [1]
283:12
**PUBLIC** [1]
318:24
**public** [2]
283:4
**pull** [2]
157:9; 244:13
**pulled** [1]
135:23
**purchase** [1]
156:9
**purchased** [1]
156:7
**purposely** [2]
145:17; 215:17
**purposes** [5]
180:14; 246:2; 318:19
**pursuant** [2]
110:10; 178:22; 319:7
**pursue** [1]
169:1
**pursuing** [1]
141:11
**push** [3]
145:3; 146:25; 147:5
**pushed** [1]
145:9; 147:8
**putting** [6]
145:19; 196:8; 258:23; 288:3,
8; 305:18

— Ω —

qualify [4]
  289:23; 291:7; 292:8; 293:1
quarter [1]
  235:22
question [82]
  118:4; 122:1, 7, 25; 125:9;
  126:1, 2; 127:23; 128:21, 22;
  130:25; 133:19, 23, 25;
  135:13; 141:17; 142:8; 143:1;
  145:7, 23; 146:16, 25;
  147:23; 148:7; 156:24;
  160:13; 161:13; 162:17, 25;
  163:24; 167:5; 168:23; 170:5,
  11, 14; 176:9, 20, 21; 181:10;
  182:24; 185:1; 186:3; 187:6,
  11; 188:23; 211:23; 212:16,
  18, 19; 218:1; 225:13;
  229:20; 230:2, 4, 16; 239:11;
  242:12, 15, 23; 243:5; 246:6;
  247:8, 11; 250:4; 251:9;
  253:15; 257:16; 268:3, 7;
  272:22; 274:19; 278:21;
  280:14; 281:22; 290:1; 293:3,
  13; 296:13; 298:22; 302:18;
  310:7
questioning [1]
  255:21
QUESTIONS [6]
  115:5; 243:25; 270:20;
  301:19; 312:25; 314:19
questions [17]
  145:20; 146:5, 8, 9, 10;
  152:18; 153:3; 159:13; 169:8,
  9; 187:8; 217:18; 244:10;
  264:23; 270:23; 293:23;
  312:23
quickly [1]
  235:19
quits [1]
  292:20
quotes [1]
  116:13

— R —

raised [1]
  313:9
rallying [2]
  140:25; 277:21
rampant [1]
  277:8
RANDY [1]
  109:6
range [2]
  221:16; 222:16
rank [4]
  140:25; 213:19; 262:25;
  277:21
ranking [1]
  284:10
rate [3]
  197:7; 241:19; 305:6
re-enrollment [4]
  293:7, 19; 305:11; 306:24
re-enrollments [1]
  305:12
Read [1]
  269:4
read [21]
  125:17; 166:11; 185:18;
  186:10; 215:3; 223:20; 237:2;

245:20; 246:18; 251:10;
  256:2; 257:16, 17, 18;
  266:24, 25; 269:6; 278:22;
  279:4; 300:11; 318:3
reading [4]
  245:21; 279:3, 11, 14
real [2]
  229:8; 254:14
reality [3]
  188:9, 11; 302:2
realize [2]
  226:17; 250:11
realized [4]
  122:14, 21; 226:15; 229:10
REASON [1]
  317:6
Reason [1]
  317:4
reason [12]
  123:21; 150:2; 154:1; 173:24;
  174:20; 175:11; 209:4;
  225:25; 259:24; 301:25;
  313:19; 314:23
reasonable [3]
  200:8, 16, 17
reasons [7]
  123:8; 259:18; 261:22;
  278:17; 293:12; 308:10;
  313:5
reassigned [1]
  141:21
reassume [2]
  129:21; 131:1
reassumed [1]
  129:23
recall [29]
  119:23; 124:14; 150:18;
  162:25; 163:1, 2, 11; 171:14,
  24; 195:19; 223:5; 226:11;
  238:7, 9, 15, 16; 242:2;
  253:23; 257:2; 267:2; 271:16,
  18; 272:1, 6; 273:4, 22;
  274:1; 281:19; 294:2
receipt [1]
  253:15
receive [5]
  134:23; 192:4; 195:23;
  272:13; 279:15
Received [2]
  248:25; 249:15
received [28]
  116:16; 117:11; 136:15;
  157:1; 166:18, 22, 24;
  188:14; 190:9, 10; 195:21;
  206:12, 13, 23; 213:21;
  215:10; 223:13; 249:3;
  250:13; 252:21, 22; 260:8;
  271:13, 19; 272:2; 300:3;
  302:7; 309:22
receives [1]
  268:17
receiving [7]
  144:4; 156:20; 190:6; 195:10,
  19; 201:2; 294:3
Recess [2]
  146:22; 230:20
recognize [12]
  116:16; 117:2; 138:2; 165:1;
  172:22; 181:1; 195:17, 18;
  207:19; 214:1; 220:20;
  264:14

recollection [6]
  120:7; 151:1; 202:4; 227:9;
  231:9; 274:20
recommend [5]
  174:2; 176:1; 177:6; 258:14;
  271:3
recommendation [8]
  174:22; 182:17; 184:18;
  260:10, 11; 270:3, 7, 11
recommendations [1]
  208:23
recommended [5]
  176:24; 182:5; 209:16;
  265:23; 269:23
recommending [9]
  174:6; 183:2, 5; 209:10;
  210:6, 8; 258:22, 23; 260:9
record [36]
  110:12; 121:24; 135:6;
  157:10; 169:18, 22, 25;
  170:4; 171:13; 178:18, 20,
  21; 179:7; 186:10; 187:6, 14;
  201:6, 8; 215:5; 229:22;
  231:8; 241:14, 15; 242:16;
  246:5; 251:25; 267:14;
  272:25; 276:24; 277:1;
  304:13, 14, 24; 317:4; 319:11
records [1]
  219:8
recovering [1]
  298:17
recruiting [1]
  226:1
reduced [1]
  319:11
redundant [1]
  244:11
refer [6]
  115:16; 127:13; 153:15;
  182:22; 211:18; 290:7
reference [3]
  127:8; 166:14; 258:24
REFERENCED [1]
  113:18; 114:3
referenced [2]
  138:20; 171:4
references [1]
  214:16
referred [4]
  150:19; 204:5; 217:1; 233:2
Referring [1]
  247:22
referring [14]
  121:22; 122:11; 123:1; 130:3;
  142:13; 164:12; 165:8;
  209:25; 217:4; 232:25;
  255:21; 264:2; 268:11;
  277:20
refers [2]
  166:8; 264:7
reflected [2]
  240:1; 271:9
reflecting [1]
  143:12
refrain [1]
  187:18
refund [1]
  261:18
refuse [1]
  250:15
refused [3]

242:4; 270:15, 16
regains [1]
  129:19; 130:22
regard [6]
  156:23, 24; 170:9; 262:15;
  283:15; 307:19
regarding [20]
  118:17; 120:24; 139:10;
  178:14; 185:16; 187:18, 23;
  188:9; 201:3; 223:3; 227:1;
  251:13; 252:1; 254:19;
  256:25; 257:20; 262:6; 280:9;
  283:7; 291:24
Regardless [3]
  156:4; 162:22, 24
regardless [5]
  117:3; 133:16, 17; 159:18;
  265:18
region [6]
  132:14, 22; 237:8; 295:17;
  296:25; 298:4
Region's [1]
  200:24
Regional [2]
  210:19; 225:23
regional [41]
  159:5; 161:2; 176:2; 190:23;
  192:3; 196:3; 201:1; 204:20;
  208:9; 209:12, 23; 210:14,
  20; 214:20; 225:2, 14; 227:3;
  234:12; 236:16; 237:10;
  248:14, 23; 260:13; 262:4,
  17; 265:5, 20; 266:21; 267:8,
  12, 17; 268:5, 7, 10, 16, 25;
  269:8, 11; 270:12; 273:12;
  293:24
Registration [1]
  319:20
regularly [1]
  157:22
Reimbursement [1]
  114:9
reimbursement [1]
  245:9
reinstate [1]
  297:12
reinstated [1]
  265:15
reiterate [1]
  179:7; 243:15
reiterated [1]
  280:17
relate [1]
  139:15
related [6]
  127:22; 202:10; 206:9;
  214:22; 227:12; 319:13
relates [5]
  130:18; 137:9; 216:18;
  222:14; 236:15
relation [3]
  159:14; 286:13; 305:13
relationship [29]
  129:20; 130:23; 132:12;
  134:25; 272:16, 17, 20, 23;
  273:1; 275:19; 285:14, 17,
  20; 286:3, 4, 11, 14, 16;
  287:20; 288:4; 290:2; 303:5,
  6, 17, 22; 304:2, 3, 12, 24
relative [2]
  178:15; 319:14

relinquishing [1]
294:23

remain [5]
179:18, 21; 201:1; 268:17;
273:5

remained [3]
265:19; 266:20; 293:16

Remember [2]
231:2; 311:4

remember [51]
124:5, 6; 136:1, 6; 150:6, 9,
10; 163:17; 164:7; 165:12,
14, 16, 20, 23; 166:1, 18;
167:4; 170:11, 24, 25;
171:10; 172:10, 14, 15, 16;
181:6; 189:13; 195:21; 208:2,
3; 215:23; 235:10; 238:1, 3,
12; 239:2, 5, 9, 25; 240:3, 6;
244:9; 252:24; 255:8; 256:13;
257:14, 21, 22; 273:17;
308:15

reminder [1]
312:14

removal [1]
127:10

REMOVE [1]
112:3

remove [6]
134:20; 181:23; 183:21;
184:6; 285:13; 286:12

removed [20]
123:18; 126:12; 137:20;
162:15, 19; 163:3, 4, 7;
164:17; 183:16; 184:4; 185:3;
188:25; 213:21; 268:15, 23;
278:15; 284:15; 285:2, 22

removing [1]
184:16

renew [2]
246:22; 247:1

renewal [2]
134:23; 289:14

renewals [4]
135:2; 206:12; 293:20;
299:22

renewing [1]
133:16

repeat [3]
170:10; 214:9; 229:17

rephrase [7]
146:8; 188:20; 193:23;
217:25; 232:15; 281:1; 303:6

replaced [1]
289:4

report [2]
167:20; 226:19

reported [5]
110:8; 165:8; 167:23; 168:1,
4

Reporter [2]
110:7; 319:7

reporter [1]
267:1

REPORTER'S [1]
319:1

Reporter's [1]
113:14

represent [4]
125:22; 162:9; 208:6; 270:22

representative [10]
115:21; 117:3; 137:22; 179:9;

25; 180:9, 13, 15, 18, 20

representatives [2]
145:22; 280:9

represented [1]
180:7

representing [2]
211:4; 249:24

represents [2]
180:4; 244:2

request [40]
115:14, 17, 22; 116:10, 11,
12, 13; 117:6, 19; 118:19, 22;
126:12, 14; 128:7; 134:21;
135:22; 136:8, 25; 137:8, 19;
147:11; 162:14, 19; 163:3;
164:19; 173:2; 174:2; 179:17;
188:4; 189:5, 10, 11, 13, 16,
19, 20; 242:9; 245:8; 285:13;
309:12

Requested [2]
257:18; 269:6

requested [6]
118:12; 196:2; 210:23; 213:1;
299:5, 6

requesting [3]
116:21; 127:10; 213:21

requests [1]
164:5

required [1]
175:23

requirement [1]
297:2

rescind [1]
126:11

rescinding [1]
126:13

research [3]
128:2; 139:13, 17

reserves [1]
299:3

resolve [1]
156:13

respect [1]
254:9

respond [4]
115:15; 169:10, 14; 201:3

responded [1]
241:9

response [7]
116:12; 117:10; 176:18;
206:10; 238:5; 245:7; 273:6

responsibility [6]
207:16; 232:21; 234:25;
265:16; 295:21; 296:5

responsible [6]
158:22; 199:8, 18; 219:16,
21; 234:17

responsive [1]
257:11

responsiveness [5]
124:1; 147:14; 254:16; 257:7;
269:13

rest [1]
232:14

restate [2]
128:20; 269:7

restating [1]
307:8

rested [1]
138:24

restroom [1]

230:18

result [16]
123:18; 130:2; 143:23;
175:19; 189:19; 192:9, 11;
195:11; 203:9; 210:4; 251:20;
267:5; 293:15; 296:24;
313:17

resume [1]
130:3

retaliated [1]
278:18

retract [2]
238:14; 270:6

returned [2]
265:4, 6, 19

returns [1]
242:4

reverse [1]
135:3

reversed [1]
164:5

review [9]
161:21; 201:14; 271:20;
272:14; 275:2; 308:20, 24;
309:16; 310:25

reviewed [1]
309:16

revolved [1]
171:7

RFP [2]
115:17; 116:2

RFQ [2]
115:15; 116:2

Right [27]
118:3; 121:6, 14; 143:25;
151:11; 155:3, 12; 175:12;
176:16; 186:13; 191:3;
193:14; 208:18; 210:2; 228:8,
20; 262:12; 268:20; 285:23;
295:24; 296:8; 297:3; 299:8,
21; 302:8; 307:18; 314:15

right [140]
116:4, 9; 119:15; 120:5;
122:17; 124:20; 126:16;
127:3; 129:22; 135:24; 138:8;
140:10, 16; 141:14, 20;
142:21; 146:19; 148:22;
149:8, 20; 152:22; 153:18,
22, 23; 154:6, 24; 155:7;
156:3, 7; 157:9, 16; 160:3;
162:22; 166:16; 168:15;
169:5, 8; 172:5; 173:7, 25;
174:4; 175:9; 177:17, 24;
180:19, 21; 183:2, 6; 190:8,
17; 191:10; 192:18; 193:18,
25; 194:13, 17, 21; 195:4, 7;
198:21; 199:5, 8, 18; 201:22;
206:17, 24; 207:12; 210:7,
15; 211:10, 12; 215:25;
217:11; 218:6, 11; 224:16;
226:2, 6, 20; 228:1, 18;
229:7, 13; 230:9; 231:7;
232:18; 236:8, 14, 22;
238:20, 22; 239:12; 240:23;
241:7; 242:21; 244:8; 245:9,
16, 20; 247:6; 248:9, 14;
251:8; 252:2, 10; 253:1, 9;
254:20, 22; 256:7; 258:15;
261:1; 264:3, 6; 265:10, 20;
266:21; 267:15; 269:1;
279:16; 281:21; 287:5, 7, 9,

13; 294:11; 298:24; 299:3;
302:16; 304:24; 307:12;
308:21; 309:5; 311:4, 12, 19;
312:2; 314:12; 315:8

right-hand [1]
258:20

rights [1]
299:13

Road [2]
111:11; 216:5

road [1]
230:3

Rodriguez [2]
181:5; 184:2; 185:15

ROERIG [1]
111:10

role [6]
129:21, 23; 130:24; 131:1;
145:25; 267:8

Ron [21]
192:17, 19, 20, 21, 22; 193:1,
10, 12; 212:8; 216:4; 217:9;
219:5, 10; 273:12; 298:2, 10;
302:19, 21; 310:9, 15

room [3]
239:14, 18; 240:21

RSC [26]
116:25; 117:7, 12; 151:2;
152:9; 165:10; 172:25; 174:3,
15; 183:6; 190:8, 10; 194:17;
195:4, 7, 9; 209:23; 210:7;
212:14, 23; 230:23; 232:20;
235:24; 241:21; 243:1, 12

RSC's [1]
225:25

RSCs [11]
149:8; 154:17; 227:25;
232:17; 234:19, 22; 235:16;
236:20; 237:5, 17; 294:16

rule [7]
288:15; 302:9, 11; 307:12,
15; 308:6; 314:8

Rules [1]
110:11

run [2]
231:17; 236:4

running [2]
199:25; 277:8

runs [3]
131:11; 199:23; 200:6

– S –

sacrifice [1]
134:14

safe [4]
264:25; 265:25; 279:8;
290:25

safety [1]
166:16

sake [2]
125:23; 248:16

Salazar [2]
124:22; 125:16

Salazar's [2]
277:6; 280:16

sale [6]
154:21, 22; 155:1, 7, 10, 14,
17, 22; 156:14

sales [90]
135:1, 8; 151:18, 20; 154:4,

Case 1:02-cv-00620    ORAL AND VIDEOTAPED DEPOSITION OF FRANK B. LAFEMINA    Filed in TXSD on 10/21/2003    Page 74 of 130    Book-See(56)

BSA

5, 8, 10, 15, 21; 155:25;
156:1, 4, 20, 25; 158:13, 15,
17, 21, 22; 159:6, 8, 9; 161:2;
181:20; 190:23; 195:11;
196:3, 7; 201:1; 203:13;
204:16, 20; 208:9; 209:13,
24; 210:14, 19, 20; 214:20;
218:10; 219:20, 25; 220:7;
225:14, 18, 23; 227:3; 232:3;
234:11, 13, 15; 236:16;
237:10; 246:11; 247:9;
248:14, 23; 260:13; 262:4,
17; 265:5, 20; 266:21; 267:8,
12, 17; 268:5, 7, 10, 16, 25;
269:8, 11; 270:12; 273:12;
287:23; 289:6, 15; 290:20;
291:2, 23, 24; 293:24; 294:8;
295:6; 305:15; 306:25;
315:25

**salvage** [1]
273:1

**San** [2]
297:1; 298:3

**Sanchez** [21]
114:5, 7; 152:3; 195:17;
201:3; 202:17; 203:9; 204:7;
205:4, 8, 12, 14, 25; 214:1,
14, 19; 216:21; 217:1;
220:19; 223:3; 301:5

**Sanchez's** [2]
216:14, 16

**Sandra** [1]
216:14

**Sandra's** [1]
216:14

**SAPP** [1]
111:20

**Sapp** [1]
110:9

**satisfy** [1]
251:23

**Saturday** [4]
250:22; 253:24; 254:1; 257:3

**SAUCEDA** [2]
109:6; 111:13

**Sauceda** [59]
118:8, 16; 123:15, 16; 124:7;
125:17, 19, 21; 126:11, 13,
23; 127:5, 23; 134:18, 21;
136:19, 22; 137:19; 141:17;
144:21, 23; 147:8; 163:6;
164:16, 21; 174:10; 181:18;
188:24; 210:23; 213:20;
223:14; 252:14, 18; 262:16,
24; 265:3; 270:22, 24; 271:7,
13, 16; 272:7, 8, 11, 15;
273:4, 11, 22; 283:20; 284:5,
22; 285:8, 11, 17; 286:12, 15;
298:18; 300:12

**Sauceda's** [16]
128:7; 130:2; 135:22; 136:8,
24; 174:12, 14; 188:4; 189:4,
19; 252:2, 3; 274:3; 282:1,
14; 284:4

**save** [3]
135:15, 16, 17

**saved** [1]
145:10

**saying** [45]
122:4; 123:6, 16; 124:4, 21;
127:1; 130:7, 10; 138:23;

143: , 155:13; 162:11, 21,
23, 24; 163:17, 19; 171:21;
174:13; 180:12; 183:1, 5;
188:13; 193:1; 197:5; 205:24;
210:5; 231:13, 24; 232:14,
17; 240:6; 251:4; 254:2;
262:14; 272:15; 277:12;
288:8; 300:10; 306:8, 15;
309:4, 25; 315:10

**scenario** [1]
263:17; 295:5; 299:5, 21

**SCHOOL** [2]
109:6; 111:9

**School** [21]
109:10; 117:21; 144:12;
161:5; 171:19; 172:8; 177:11;
244:3; 245:15; 247:5, 13;
262:22; 272:18; 278:2;
286:11; 289:11; 290:2;
292:11; 293:4; 299:1; 307:16

**school** [26]
127:11; 129:4; 134:19; 139:7;
147:12; 151:19; 172:4;
210:25; 212:12; 245:20;
261:17; 262:25; 272:20;
276:18; 278:4; 279:18; 284:9,
11; 285:13; 286:19; 290:22;
291:3; 297:10; 303:17

**school's** [1]
162:8

**schools** [1]
285:12

**Scott** [1]
192:20

**se** [1]
161:6

**seal** [1]
318:20

**Second** [3]
200:21; 216:17; 226:8

**second** [28]
127:7; 169:16; 181:17; 189:2;
200:22; 201:7; 210:11;
214:24; 215:1, 9; 216:12;
226:7; 229:25; 243:10;
244:21; 245:13; 247:18;
248:5; 255:15, 17; 264:12;
275:20; 276:25; 277:2, 4;
290:18

**secretary** [1]
200:5

**Section** [5]
246:9, 14, 15; 272:21; 285:25

**section** [1]
246:20

**secured** [9]
123:10; 131:18, 21; 132:1, 5,
8, 10; 133:11; 135:5

**security** [2]
239:6; 298:15

**seek** [2]
145:1; 282:20

**selected** [1]
295:16

**selection** [1]
297:14

**selects** [1]
277:25

**self-explanatory** [2]
137:12; 140:6

**sell** [4]

155:5; 159:10; 219.
314:14

**seller** [3]
219:14, 16; 276:13

**selling** [5]
160:1; 165:21; 190:12;
219:24; 290:15

**sells** [4]
198:20; 199:4, 16; 219:20

**send** [16]
115:23; 174:25; 175:8, 13;
176:3, 11; 231:13, 16, 22, 23;
232:15; 309:10, 22; 312:9, 13

**sending** [3]
144:18; 177:15; 285:1

**sense** [2]
283:13; 289:16

**sensitive** [1]
160:19

**sentence** [12]
127:8; 165:7; 200:23; 203:23,
24; 259:15; 261:11, 12, 13;
275:20; 277:5; 278:14

**sentences** [1]
137:7

**separately** [2]
195:13; 274:16

**September** [7]
214:2, 14; 220:19; 312:8, 10,
11, 16

**serve** [1]
196:6

**Service** [1]
156:12

**service** [9]
156:2, 5, 17; 158:6; 197:3, 8;
219:17, 21; 221:10, 14;
225:9; 292:13

**serviced** [2]
160:14, 18

**Services** [1]
114:9

**services** [4]
159:20; 245:9; 273:3; 285:25

**Servicing** [1]
199:9

**servicing** [27]
153:1; 156:6, 8; 160:2, 4, 7,
11; 161:3; 181:24; 183:17,
21; 184:4, 7, 17; 185:16;
196:13, 25; 197:17; 199:8,
18; 219:11, 12; 221:21;
227:13, 16, 18; 298:25

**serving** [1]
181:21

**setting** [1]
146:15

**Shakes** [1]
300:14

**shape** [3]
240:4; 273:17; 281:14

**shared** [4]
127:21; 207:1; 227:21; 272:3

**SHEET** [1]
112:3

**sheet** [1]
121:2

**Shorthand** [2]
110:7; 319:6

**shorthand** [1]
110:8

**shout** [1]
275:22

**show** [5]
124:24; 167:2; 255:9; 259:2;
261:3

**sick** [2]
146:2; 292:20

**sign** [2]
178:9; 197:23

**SIGNATURE** [1]
318:1

**Signature** [1]
113:13

**signature** [8]
173:6; 209:6; 210:16; 215:15,
18, 22; 258:19; 318:4

**signed** [11]
174:2; 208:11; 210:9; 215:14;
245:12; 258:22; 290:3, 6;
299:14, 15; 306:9

**significant** [1]
298:9

**signing** [1]
159:22

**signs** [2]
198:20; 306:10

**simple** [4]
196:11; 246:17; 305:24

**simplicity** [1]
125:23

**sir** [9]
115:10; 132:25; 162:1;
168:16; 224:17; 226:10;
254:25; 268:13; 308:17

**sit** [2]
179:3; 236:17

**sitting** [2]
168:15; 256:13

**situation** [19]
130:7, 11; 138:7; 139:2, 11;
140:2; 141:23; 153:25; 171:8,
12; 175:20; 196:7; 262:15;
265:15; 284:23; 287:15;
293:10; 295:2; 298:6

**Six** [1]
221:18

**six** [4]
174:11, 13; 222:6; 235:22

**sixth** [1]
192:16

**size** [3]
133:16; 159:19; 222:14

**skeptical** [1]
313:21

**skipped** [1]
309:20

**smooth** [1]
270:24

**sold** [8]
135:7; 157:2; 159:19; 160:5,
6, 8, 15; 300:3

**solely** [1]
247:12

**solicitation** [1]
283:13

**solution** [1]
251:23

**somebody** [13]
119:14; 148:6; 161:9; 164:7;
188:12; 197:20; 202:15;
224:11; 279:2; 287:15;

**somehow** [3]
176:5; 192:4; 274:25
**Someone** [1]
119:10
**someone** [9]
149:14, 25; 192:8; 195:11;
276:11; 278:23; 279:14;
282:21; 292:18
**someone's** [1]
178:2
**somewhat** [2]
237:25; 307:17
**Somewhere** [2]
185:5; 235:21
**somewhere** [6]
131:23; 181:9; 226:22;
239:22; 253:1; 274:13
**Sorry** [2]
182:9; 209:20
**sorry** [24]
150:21; 162:2, 18; 170:14;
181:21; 183:2; 193:10;
199:10; 200:19; 201:25;
216:13; 221:12; 222:25;
228:11; 229:15; 236:3;
244:14; 255:12; 261:12;
268:6, 15; 296:12; 314:22
**sort** [7]
142:10; 153:10; 155:20;
233:4; 236:5; 288:25; 302:22
**sound** [1]
238:19
**sounds** [1]
203:22
**south** [1]
131:12
**SOUTHERN** [1]
109:1
**space** [2]
199:22; 200:5
**speak** [9]
140:21; 194:24; 200:24;
203:16; 252:18; 257:20;
271:12; 276:9; 277:13
**speaking** [8]
142:11; 152:21; 159:8;
196:19; 253:23; 288:12;
306:5, 24
**specific** [9]
148:14; 172:6; 194:18; 229:8;
254:7; 262:13; 303:21;
308:10; 313:5
**Specifically** [1]
120:6
**specifically** [6]
119:12; 124:16; 151:22;
181:11; 198:15; 227:20
**specifics** [4]
170:24; 172:16; 218:7;
271:22
**specify** [1]
121:25
**spectacular** [1]
306:1
**speculate** [2]
281:20; 301:7
**Speculation** [2]
148:19; 149:3
**speculation** [23]
128:19; 142:1; 149:22·

**spell** [1]
203:19
**spend** [1]
166:2
**spinning** [1]
289:6
**split** [14]
157:1, 4, 8, 12; 158:12;
192:20; 218:9, 10; 225:10,
14; 226:12; 231:1; 237:18;
295:25
**splits** [12]
191:9, 14, 19; 230:8, 22;
231:12, 14; 232:17; 236:21;
237:4, 5; 302:7
**splitting** [7]
156:18; 190:16, 20; 191:5;
192:16; 196:12, 22
**spoke** [3]
138:24; 252:14; 271:12
**Square** [1]
111:5
**SSC** [6]
151:2; 165:10; 235:12;
241:21; 243:1, 12
**SSCs** [1]
236:20
**stab** [1]
151:23
**staff** [7]
153:6; 197:10; 225:9; 303:8,
15, 16; 313:10
**stand** [1]
269:15
**standing** [2]
186:4; 299:22
**stands** [1]
225:7
**staple** [2]
244:23; 255:11
**start** [2]
138:23; 247:21
**started** [4]
143:21; 247:2; 268:21
**starters** [1]
119:20
**starting** [1]
287:15
**starts** [1]
225:1
**STATE** [3]
318:10, 25; 319:4
**State** [3]
110:7; 132:23; 319:7
**state** [22]
132:15, 16, 18, 24; 156:25;
158:22; 159:9; 162:14; 179:8;
181:20; 226:5; 232:3; 233:14,
15; 234:10; 236:3, 10;
246:11; 247:9; 294:8; 311:11,
17
**stated** [3]
110:12; 139:4; 284:12
**statement** [11]
133:21; 155:23; 191:12;
194:1; 196:15; 238:14·

**150:17; 151:5; 186:2; 259:22;**
265:11; 278:20; 283:10, 21;
284:7, 24; 287:1; 289:22;
291:5; 292:6, 24; 298:20;
301:9; 309:18; 310:21; 314:1
**statements** [1]
145:16; 277:19
**STATES** [1]
109:1
**Station** [1]
131:13
**Status** [1]
113:22
**status** [18]
172:24; 174:23; 175:5; 177:4;
178:2; 179:15; 183:9; 208:8,
23; 209:23; 210:14; 258:6, 9,
13, 25; 260:5, 25; 270:9
**stay** [1]
185:23
**staying** [2]
153:13, 14
**steadily** [1]
289:13
**steady** [1]
293:22
**STEELE** [80]
111:19; 120:21; 121:1, 4, 6,
14, 24; 122:3; 124:8; 125:8,
11; 127:16; 134:5; 142:22;
143:9, 25; 145:5, 12, 14;
146:12, 21; 147:4; 155:8;
166:21; 168:19, 23; 169:16,
20; 170:3; 176:16, 22;
177:20; 179:6; 180:1, 6, 11,
14, 19; 182:7, 13; 187:10;
200:21; 223:20; 224:3; 230:1,
15; 233:11, 17, 21; 236:23;
239:7, 12; 242:2, 7, 17;
243:4, 8, 14; 244:21, 23;
246:13, 18; 247:18; 248:5;
249:1, 5, 13; 255:15; 257:10;
258:3, 5, 8; 259:21; 260:2;
264:23; 274:17; 307:7;
310:21; 312:11; 316:5
**Steele** [3]
181:4; 184:1; 257:16
**step** [7]
134:13; 136:6, 7; 177:12;
178:24; 179:5; 213:2
**stipulate** [1]
212:4
**STIPULATIONS** [1]
112:3
**Stipulations** [1]
113:5
**stock** [1]
206:12
**stop** [4]
140:4; 146:19; 273:8; 282:18
**stopped** [1]
261:17
**store** [1]
301:3
**story** [1]
178:10
**straighten** [1]
229:21
**Street** [1]
319:21
**struck** [1]
277:10
**stuff** [3]
149:8; 155:20; 206:19

**submit** [12]
116:4, 10, 12, 14, 19; 117:9,
19; 118:20, 23; 175:21, 23;
178:3
**submits** [2]
116:18; 117:6
**submitted** [10]
117:3, 19, 22; 118:9, 17, 19,
21; 175:25; 214:21; 270:10
**submitting** [3]
115:14; 116:25; 214:18
**subordinate** [1]
288:3
**subordinates** [3]
287:22, 25; 288:9
**subpoena** [1]
242:10
**subscribed** [1]
318:17
**subsidized** [1]
301:5
**successful** [1]
272:24
**successive** [1]
246:22
**sudden** [1]
203:9
**suggesting** [2]
192:6, 8
**Suite** [6]
110:10; 111:5, 11, 15, 20;
319:21
**Sunday** [1]
138:9
**superintendent** [17]
127:9; 128:9, 12, 17, 24;
134:20; 139:15; 144:13;
147:12; 162:8, 18; 163:2;
164:6; 213:2; 284:9; 285:12
**superintendent's** [2]
129:10, 16
**superior** [1]
263:13
**supervise** [1]
211:23
**supervised** [3]
160:17; 211:24; 212:2
**supervising** [5]
161:3; 203:5; 211:14; 212:3;
222:24
**supervision** [2]
294:16; 319:11
**supervisor** [3]
131:20; 161:7; 213:1
**supervisors** [1]
167:20; 237:24
**supplemental** [3]
186:20; 272:22; 286:2
**supplied** [1]
245:7
**support** [6]
127:25; 128:4; 213:19; 263:3;
281:7; 288:23
**supported** [3]
162:8, 18; 280:24
**supporting** [4]
278:19; 279:10; 280:20;
281:6
**supposed** [6]
153:2; 160:2; 173:21; 176:7;
294:16; 296:9

surprised [4]
300:20; 301:21; 314:10, 12

surround [1]
170:22

Susan [1]
152:5

suspect [1]
249:17

suspicion [1]
311:23

sustains [1]
154:16

sweet-talk [2]
287:17, 19

sworn [1]
110:3; 115:2; 319:9

sympathetic [1]
139:1

system [2]
227:3; 237:9

– T –

tabs [1]
125:16

tactic [1]
146:17

takes [1]
278:1

talk [18]
120:1; 136:21; 143:13;
170:20; 171:9, 21; 172:2;
182:20, 21, 25; 199:24;
214:25; 227:15; 257:12;
270:25; 275:23; 302:23

talked [21]
119:25; 157:22; 170:12, 15,
17; 171:12, 14, 16, 23;
208:20; 216:4; 230:5; 231:5,
11; 232:7; 253:7, 11; 304:23;
311:24, 25; 313:21

talking [82]
118:7; 119:21; 121:11; 122:5;
124:13; 125:4; 127:17;
128:13; 129:24; 130:9; 136:1;
138:11, 14, 22; 144:2;
148:18, 20; 153:11; 154:12,
13; 155:18, 19, 21, 24; 164:7;
165:13, 20; 167:7, 13, 16;
168:9; 169:3; 170:25; 182:8,
10, 16; 183:24; 184:9, 16;
186:19, 21, 22; 189:6, 23, 25;
190:25; 191:3, 5; 194:15;
203:21, 22; 204:2; 205:20,
25; 206:16; 209:22; 212:3;
216:15, 19, 23; 220:4;
224:23; 226:9; 230:13, 14,
23; 231:2; 232:23; 253:7;
256:19; 257:14; 258:5, 9;
262:21; 268:4; 286:4, 8;
306:9; 308:12, 13; 313:2

talks [5]
192:16; 215:24; 216:2, 12;
236:20

tax [1]
242:3

axes [1]
200:6

team [38]
120:5, 11, 14; 121:22, 23;
122:3, 4, 5, 6, 9, 16, 19;

12.., 129:21; 130:24;
137:20; 158:15, 17, 21, 22;
161:3; 190:13, 14; 195:11;
217:2; 224:21, 22; 234:23;
241:20; 242:24; 247:21;
248:3, 4; 253:19; 263:12;
264:18

team's [1]
206:14

tecum [1]
242:10

Telephone [1]
111:10

telephone [2]
158:7; 250:24

telling [14]
125:24; 126:3; 136:6; 165:16,
23; 166:1; 173:10; 239:25;
240:3; 273:4, 22; 276:3;
279:17; 310:19

Temple [1]
131:12

temporary [1]
123:9

tend [1]
238:5

tends [1]
288:19

tentative [1]
309:23

tenure [2]
292:3; 293:19

term [4]
159:23; 246:24; 247:23;
287:18

terminate [5]
137:13; 272:20; 285:14, 16,
18

terminated [6]
165:10; 176:1, 25; 260:13;
269:10; 289:14

termination [12]
136:10; 137:8; 189:10;
258:14, 23; 260:9; 262:17;
266:9; 267:10, 12; 270:12

Terms [1]
114:10

terms [18]
128:5, 6; 159:5, 12; 188:8;
198:9; 203:1; 222:19; 248:8;
250:18, 20; 276:13; 289:5;
290:15; 294:21, 23; 305:23;
315:24

terrible [1]
141:4

territory [4]
176:4; 178:5; 209:7; 233:15

testified [6]
115:2; 252:11; 255:5; 267:4,
5; 269:15

testify [5]
154:7; 179:3; 218:16; 252:12;
319:9

testifying [1]
170:5

testimonial [1]
283:13

testimony [20]
142:23; 145:14, 15; 146:14;
177:21; 178:22; 179:11;
252:9; 253:18, 24; 257:23;

266:18, 23, 24; 26.. ..;
273:21; 294:17; 307:8; 314:2;
319:11

TEXAS [3]
109:1; 319:4, 19

Texas [26]
110:8, 10; 111:6, 11, 16, 21;
131:4, 7, 9, 12, 16; 132:6, 14,
15, 16, 19, 20; 141:13;
199:14; 234:5; 237:10; 264:8;
303:11; 319:7, 21

Thank [8]
129:18; 146:2, 21; 183:4;
201:13; 301:17; 308:12;
314:16

theirs [1]
299:19

There's [4]
154:8; 216:8; 306:18; 308:10

there's [17]
120:12; 151:13; 198:9; 205:2;
217:18, 19; 218:4; 247:13;
249:18; 255:25; 256:2; 262:9;
274:12; 289:2; 301:4; 306:4,
16

thereafter [4]
232:4; 234:11; 235:17;
246:21

therein [1]
318:19

thereupon [1]
319:10

They're [3]
184:19; 233:8; 312:18

they're [6]
115:24; 118:12; 149:14;
159:7; 308:8; 309:17

They've [1]
235:4

they've [1]
227:23

thinking [7]
205:17; 251:19; 260:18;
278:23; 279:2, 5; 314:6

third [17]
162:6; 165:7; 186:21; 199:21;
200:23; 203:23, 24; 204:24;
205:2, 5, 9; 220:22; 242:9;
277:3; 278:5; 290:18

thorough [1]
139:16

thoroughly [1]
250:25

threatened [2]
166:6, 12

three [13]
136:4; 145:19, 20; 198:25;
203:25; 204:23; 205:21, 23,
24; 261:12, 13; 289:21

thumb [2]
307:12, 15

Thursday [2]
252:8; 253:6

tickled [2]
314:11

times [11]
147:18, 21, 24; 148:11;
152:17; 157:24; 163:5; 235:4;
253:3; 269:19; 288:13

timetable [1]
228:23; 230:7

tired [2]
145:19; 307:7

title [2]
117:4; 234:3

titled [1]
245:10

tolerate [1]
181:21

ton [1]
296:2

Toni [2]
205:18, 22

topic [1]
172:15

total [2]
234:23; 305:15

totally [1]
314:8

touch [1]
211:1

touching [1]
319:9

towards [6]
123:6; 139:21; 173:3; 202:15;
206:17; 225:1

TPA [1]
247:4

track [5]
140:10; 272:24; 304:13, 14,
24

train [2]
290:9; 298:22

training [1]
261:16

transcription [1]
317:4

transmittal [4]
192:20; 218:17; 219:7;
225:10

transpired [1]
252:13

TRAVIS [1]
319:5

treading [1]
289:7

trial [1]
180:18

trouble [7]
143:20, 23; 145:23; 149:10;
233:22; 305:8

true [10]
120:10; 123:5; 128:3; 133:20,
24; 134:6; 265:21; 287:23;
318:5; 319:11

truly [2]
133:10; 285:8

trustees [1]
164:1

truth [3]
256:23; 319:9

Tuesday [1]
259:12

turnover [1]
290:23

twice [2]
148:1; 229:22

type [4]
125:3; 126:2, 7, 22; 140:3;
170:7; 277:15; 294:18;
302:22

typed [2]

*222:25; 234:1*
**types** [1]
*283:8*
**typewriting** [1]
*319:11*
**typical** [1]
*135:6*
**Typically** [1]
*116:5*
**typically** [8]
*116:9; 159:20; 278:10;*
*288:22; 289:2; 290:22; 293:6*

**– U –**

**Uh-huh** [18]
*118:11, 15; 121:1; 138:9;*
*152:12; 185:12; 189:8, 12;*
*194:12; 201:20; 205:16;*
*214:3, 15; 216:1, 7; 225:4;*
*273:14; 294:1*
**uh-huh** [2]
*231:10; 297:25*
**ultimate** [1]
*200:18*
**ultimately** [8]
*123:9; 154:3; 175:16; 259:1;*
*265:22; 288:1; 304:2, 3*
**unacceptable** [1]
*219:4*
**unaware** [1]
*230:11*
**unbeknownst** [1]
*134:21*
**unclear** [1]
*259:18*
**uncooperative** [1]
*247:8*
**undermine** [1]
*137:9*
**understand** [22]
*122:2; 146:12; 163:14; 166:8,*
*13; 178:11; 186:4, 8, 17, 25;*
*188:2, 4, 19, 22; 226:9;*
*244:5; 251:8; 261:16; 303:4;*
*305:23; 306:14; 307:4*
**understanding** [47]
*115:20; 116:15, 22; 119:13;*
*126:21; 128:25; 129:2;*
*131:24; 132:1, 10; 141:2;*
*152:24; 182:6; 184:3, 10, 24;*
*185:2, 20, 21; 187:2, 19;*
*188:10, 15; 195:2; 196:3;*
*200:11; 208:24; 213:10;*
*217:12; 225:5; 274:2, 5;*
*282:24; 289:17; 301:25;*
*302:4; 303:14; 304:3, 5;*
*307:11; 309:4, 6; 310:8;*
*313:14, 15; 315:13*
**understood** [9]
*169:4; 186:15, 23, 24; 188:9;*
*189:20; 237:13, 14; 294:22*
**unethical** [2]
*266:12; 274:9*
**unfair** [1]
*228:14*
**unique** [1]
*293:5*
**unison** [1]
*140:23*
**UNITED** [1]

*109:1*
**unknown** [1]
*278:16*
**unprofessional** [1]
*283:14*
**unusual** [1]
*293:8*
**up-line** [1]
*167:19*
**upcoming** [1]
*189:17*
**upper** [1]
*140:25*
**upset** [3]
*144:13; 270:14, 16*
**useless** [1]
*209:8*
**utmost** [1]
*264:14*

**– V –**

**valid** [1]
*209:4*
**Valley** [10]
*121:23, 25; 122:6; 197:17;*
*199:13; 200:2, 9, 12; 202:16;*
*204:16*
**vendor** [2]
*282:25; 289:1*
**vendors** [1]
*276:3*
**verbal** [1]
*266:10*
**verbally** [3]
*166:6, 12*
**verify** [5]
*120:19; 131:19, 24; 135:25;*
*315:2*
**version** [1]
*255:16*
**versus** [3]
*117:12, 13; 160:15; 161:16,*
*17*
**Via** [1]
*111:10*
**via** [1]
*158:7*
**vice** [6]
*175:2, 25; 209:7; 210:12;*
*245:13; 258:20*
**VIDEOTAPED** [2]
*109:13; 110:1*
**view** [1]
*199:19; 251:8*
**viewed** [3]
*159:8; 225:17; 283:12*
**vigilant** [1]
*278:15*
**virtually** [1]
*296:23*
**vis-a-vis** [1]
*275:18*
**visit** [1]
*156:15*
**visited** [4]
*147:18; 148:12; 149:2;*
*152:18*
**voiced** [2]
*206:25; 223:9*
**VOLUME** [2]

*109:16; 113:7*
**volume** [1]
*154:9*
**vote** [4]
*164:3, 6, 14; 276:19*
**voted** [2]
*275:24, 25*
**VS** [1]
*109:4*

**– W –**

**W3809** [1]
*207:22*
**wait** [1]
*291:3*
**walk-in** [1]
*158:8*
**walking** [1]
*146:18*
**wanted** [4]
*174:21; 233:9; 272:19; 273:8*
**wants** [3]
*276:3; 283:2*
**war** [2]
*139:23; 140:8*
**water** [1]
*289:7*
**waylaid** [1]
*280:23*
**ways** [5]
*116:6; 145:20; 229:23; 285:9;*
*294:24*
**we'll** [2]
*259:2; 261:4*
**We're** [4]
*178:21; 247:18; 258:23;*
*306:12*
**we're** [18]
*115:6; 129:24; 130:11;*
*153:21; 155:18; 167:7;*
*168:21; 170:3; 179:2; 182:20;*
*255:9; 258:8; 282:23, 25;*
*289:10; 301:1, 2; 314:13*
**We've** [1]
*259:7*
**we've** [7]
*118:7; 163:5; 190:9; 203:22;*
*256:13; 313:19; 315:7*
**weakened** [1]
*140:12*
**wears** [1]
*306:23*
**week** [4]
*136:2; 200:6; 202:19; 207:10*
**weekend** [1]
*253:8*
**welcome** [3]
*124:25; 125:17, 19*
**weren't** [3]
*164:21; 304:19*
**West** [2]
*111:11; 319:21*
**west** [1]
*131:13*
**What's** [9]
*141:6; 142:12; 144:6; 168:8,*
*9; 209:1; 212:16; 213:10;*
*216:23*
**what's** [16]
*119:22; 148:7, 8; 159:18;*

*167:12, 16; 198:2, 3; 218:2;*
*220:17; 225:6; 232:22;*
*245:17; 260:22; 261:3;*
*310:14*
**whatsoever** [1]
*130:15*
**wheels** [1]
*289:6*
**Whenever** [1]
*154:22*
**whenever** [3]
*154:21; 234:8; 235:6*
**whichever** [1]
*116:18; 212:20*
**Who's** [1]
*216:14*
**who's** [7]
*159:22; 160:1, 2; 202:11;*
*204:17, 19; 283:7*
**Whoever** [1]
*219:20*
**whoever** [4]
*123:17; 158:9; 198:17; 310:3*
**wife** [7]
*153:8; 192:10; 216:16;*
*239:14; 241:12, 13; 295:4*
**wife's** [2]
*252:15, 17*
**WILLETTE** [1]
*111:15*
**WILLIAM** [1]
*111:19*
**willing** [8]
*134:14; 137:13; 147:2; 177:6,*
*13; 203:25; 206:6; 295:23*
**Willis** [30]
*111:24; 168:13, 14; 170:7,*
*16, 19, 20, 25; 172:7; 173:4,*
*9, 10, 12, 17, 21; 174:19;*
*175:8, 13, 21; 176:10;*
*178:12, 16, 23; 179:12, 21,*
*23; 180:4, 11, 15; 258:1*
**window** [1]
*129:24*
**wished** [1]
*265:7*
**wishes** [1]
*196:5*
**withdraw** [2]
*170:4; 230:8*
**withdrawn** [1]
*170:9*
**WITNESS** [82]
*111:18; 121:5, 9, 15; 126:18;*
*127:15; 128:20; 129:2;*
*133:21; 137:17; 141:16;*
*142:2; 143:6, 16; 147:5;*
*149:4, 23; 150:18; 151:6;*
*155:9; 159:4; 166:23; 176:24;*
*184:19; 185:25; 186:3; 188:2;*
*194:23; 203:20; 212:17;*
*213:8; 214:5, 10; 222:19;*
*223:21, 25; 224:4; 229:17;*
*230:17; 233:13, 20; 237:1;*
*239:10, 13; 242:20; 243:7, 9,*
*16; 245:1; 246:16, 19; 248:3;*
*249:2; 259:7; 260:3; 265:12;*
*266:5; 269:7; 274:14, 18;*
*278:21; 282:8; 283:11, 22;*
*284:8, 25; 287:2, 10; 289:25;*

300:17; 301:10; 309:19;
310:8, 23; 311:14, 21;
312:13; 317:2

**witness** [18]
110:2; 145:16, 18; 178:23,
25; 179:1, 14, 24; 243:23;
270:18; 289:24; 291:7; 292:8;
293:1; 301:16; 312:21;
319:12

**witnesses** [2]
179:2, 4

**won** [2]
139:23; 140:7

**won't** [3]
145:23; 169:1, 8

**wondering** [1]
215:16

**word** [9]
122:16; 149:14; 185:18, 19;
208:16; 238:7, 10, 15; 313:22

**words** [31]
116:11; 125:5; 141:9; 151:12,
13; 156:7; 171:23; 172:14;
174:25; 175:12; 184:11;
187:24; 188:12; 190:6; 192:6;
202:11; 207:3; 213:15;
217:10; 221:23; 222:6; 235:6,
11; 237:10; 297:22; 300:9;
303:1; 305:15, 19, 20

**work** [12]
132:4, 17; 157:14; 165:21;
217:16, 20; 228:23; 254:13;
264:1; 288:14; 296:2; 303:8

**worked** [5]
130:6; 132:14; 161:5; 196:11;
231:12

**working** [13]
129:19; 130:22; 132:11;
136:7; 192:11; 193:18; 200:5;
212:11; 217:24; 247:23;
264:16; 291:13; 296:20

**works** [3]
149:7; 197:25; 291:17

**Worse-case** [1]
299:5

**worse-case** [1]
299:21

**worsening** [1]
140:1

**wouldn't** [19]
123:20, 21; 136:12; 142:3, 4,
7; 148:21; 174:7; 189:11;
190:7; 191:9; 197:8; 198:14;
211:9; 235:18; 293:21;
307:23; 310:24; 313:14

**write** [8]
173:12, 15; 214:10; 218:15;
220:10; 223:25; 233:14;
271:23

**writes** [1]
259:16

**writing** [13]
195:2; 196:2; 213:13; 217:2;
223:16; 249:15; 250:16, 17;
251:22; 281:10; 283:1;
288:25; 297:5

**written** [17]
174:20; 178:12; 222:8, 25;
232:5; 246:25; 260:1; 262:24;
263:11; 266:11; 271:24;
281:16; 282:2, 10; 284:3;

293.., 297:17

**Wrong** [1]
157:17

**wrong** [26]
124:5; 125:24, 25; 128:11,
16, 23; 139:6; 140:16;
142:21; 143:3; 144:3, 7, 18,
20, 21, 22; 145:3, 9, 18;
170:8; 197:21; 247:20; 279:9;
281:8; 283:20; 302:14

**wrote** [15]
153:25; 162:23, 24; 163:6;
184:1; 216:12; 224:20;
233:14; 241:8; 250:2, 3, 13;
257:24, 25; 279:2

– Y –

**Yeah** [16]
121:4; 148:23; 154:14;
200:10; 212:17; 217:15;
231:10; 233:4; 234:2; 274:15;
280:4; 290:22; 291:3; 294:7;
300:23; 315:2

**yeah** [2]
228:22; 309:16

**year** [70]
117:18; 118:12, 13, 14, 18,
19, 20; 130:13; 133:10;
150:11; 154:8, 17; 156:3, 5,
25; 160:3; 196:14, 25; 197:4,
14; 207:11; 226:4, 7, 8, 11;
229:1; 230:25; 243:11;
245:20, 22; 246:4, 20;
290:13, 18, 19; 291:3, 4;
292:5, 22, 23; 294:5, 6, 7, 12;
304:5, 16; 305:13, 14, 25;
306:6, 9, 10, 20, 23, 25;
308:8; 313:4, 12, 14; 314:4,
11; 315:7, 15

**year's** [3]
212:8; 248:12; 313:16

**year-and-a-half** [3]
170:24; 252:25; 256:14

**yearly** [1]
196:12

**years** [21]
117:17; 133:11; 135:7, 11;
156:21; 167:7; 227:2; 241:20;
242:25; 282:24; 289:21;
291:9, 14; 292:14; 294:10;
301:22; 303:8; 307:3, 13, 14;
315:18

**yelling** [1]
240:17

**yellowed** [1]
278:13

**yesterday** [1]
165:8

**You'll** [1]
149:4

**you'll** [5]
242:9; 261:11; 265:12; 300:6;
312:13

**You've** [1]
133:22

**you've** [10]
115:24; 156:2; 159:22;
224:10; 227:23; 237:14;
254:17; 287:15; 300:11;
312:4

**You-all** [1]
242:20

**you-all** [5]
171:9; 172:10; 175:14;
230:18; 248:24

**you-all's** [1]
302:13

**younger** [1]
269:20

**yourself** [1]
234:1

– Z –

**zero** [3]
190:17; 193:7, 14

EXHIBIT "C"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ          )
                        )
VS.                     )
                        )
BROWNSVILLE INDEPENDENT )
SCHOOL DISTRICT, NOE    )     CIVIL ACTION NO.
SAUCEDA, and RANDY      )     B - 02 - 128
DUNN, MARILYN DEL       )
BOSQUE-GILBERT and HUGH )
EMERSON, JR., in their  )
Official capacities as  )
Board Members of        )
Brownsville Independent )
School District         )

*******************************************

ORAL AND VIDEOTAPED DEPOSITION OF

**LYNN GEORGE BARNSON**

SEPTEMBER 30, 2003

*******************************************

CONDENSED TRANSCRIPT AND KEYWORD INDEX



COPY

**ACUSCRIBE**
**COURT REPORTERS**

750 NORWOOD TOWER          TELEPHONE: (512) 499-0277
114 WEST 7TH STREET        TOLL-FREE: (800) 497-0277
AUSTIN, TEXAS 78701        FAX: (512) 499-0298
info@acuscribe.com         www.acuscribe.com

# STIPULATIONS

**ORAL DEPOSITION(S) OF:** _Lynn Bamson_

---

**The attorneys for all the parties present stipulate and agree to the following checked items:**

### Objections:

_____ Texas Rules of Civil Procedure.

__X__ Federal Rules of Civil Procedure.

_____ Other: _____

### Delivery for signature and changes:

The witness, or the witness's attorney, will return the signed deposition to the court reporter within _30_ days of the date of submission. If the original of the deposition is not signed, or made available, an unsigned copy may be used as though signed.

__X__ The original transcript will be submitted to the witness's attorney.

_____ The original transcript will be submitted to the witness at the following address:

_____

_____ Signature waived.

The attorney asking the first question will be responsible for the timely payment of all costs in connection with the original deposition transcript.

I hereby agree to the above and foregoing marked items and request that AcuScribe Court Reporters furnish me with the items checked below. Unless otherwise requested, I will receive copies of all exhibits. My firm and I will be responsible for the timely payment of any original or copies and/or exhibits as indicated below that I may request. I agree that if I have no prior credit arrangement with AcuScribe Court Reporters, the transcript(s) stated above may be delivered on a COD basis. If any indebtedness due and owing is not paid as agreed, the undersigned agrees to pay reasonable attorneys fees, plus all costs of collection and all other costs and expenses which may be incurred by AcuScribe Court Reporters relative to collection of the indebtedness due and owing, whether suit be instituted or not.

Executed this the _30th_ day of _September_ _2003_

_____     Attorney for: _TT_

[ ] Copy & Mini    [ ] Mini only*    [ ] No copy    [ ] CD w/E-Transcript & Exhibits*    [ ] E-Transcript* _____

**FORMAT:** [ ] ASCII*    [ ] Summation*    [ ] Amicus*    [ ] Other*    **ON**    [ ] 3 ½" Floppy  **OR**  [ ] CD-Rom

_Eileen Leeds_     Attorney for: _Noe Sauceda_

[✓] Copy & Mini    [ ] Mini only*    [ ] No copy    [ ] CD w/E-Transcript & Exhibits*    [ ] E-Transcript* _____

**FORMAT:** [ ] ASCII*    [ ] Summation*    [ ] Amicus*    [ ] Other*    **ON**    [ ] 3 ½" Floppy  **OR**  [ ] CD-Rom

*Will be charged the regular copy rate, if ordered without a copy of the transcript.

_____C. Niely_____ Attorney for: _____BISD_____

[ ] Copy & Mini   [ ] Mini only*   [ ] No copy   [ ] CD w/E-Transcript & Exhibits*   [ ] E-Transcript*_____

**FORMAT:**   [ ] ASCII*   [ ] Summation*   [ ] Amicus*   [ ] Other*   **ON**   [ ] 3 ½" Floppy   **OR** [ ] CD-Rom

_____Buddy Steele_____ Attorney for: ___AFCAC + Coitness___

[ ] Copy & Mini   [X] Mini only*   [ ] No copy   [ ] CD w/E-Transcript & Exhibits*   [ ] E-Transcript*_____

**FORMAT:**   [ ] ASCII*   [ ] Summation*   [ ] Amicus*   [ ] Other*   **ON**   [ ] 3 ½" Floppy   **OR** [ ] CD-Rom

_____ Attorney for: _____

[ ] Copy & Mini   [ ] Mini only*   [ ] No copy   [ ] CD w/E-Transcript & Exhibits*   [ ] E-Transcript*_____

**FORMAT:**   [ ] ASCII*   [ ] Summation*   [ ] Amicus*   [ ] Other*   **ON**   [ ] 3 ½" Floppy   **OR** [ ] CD-Rom

_____ Attorney for: _____

[ ] Copy & Mini   [ ] Mini only*   [ ] No copy   [ ] CD w/E-Transcript & Exhibits*   [ ] E-Transcript*_____

**FORMAT:**   [ ] ASCII*   [ ] Summation*   [ ] Amicus*   [ ] Other*   **ON**   [ ] 3 ½" Floppy   **OR** [ ] CD-Rom

_____ Attorney for: _____

[ ] Copy & Mini   [ ] Mini only*   [ ] No copy   [ ] CD w/E-Transcript & Exhibits*   [ ] E-Transcript*_____

**FORMAT:**   [ ] ASCII*   [ ] Summation*   [ ] Amicus*   [ ] Other*   **ON**   [ ] 3 ½" Floppy   **OR** [ ] CD-Rom

_____ Attorney for: _____

[ ] Copy & Mini   [ ] Mini only*   [ ] No copy   [ ] CD w/E-Transcript & Exhibits*   [ ] E-Transcript*_____

**FORMAT:**   [ ] ASCII*   [ ] Summation*   [ ] Amicus*   [ ] Other*   **ON**   [ ] 3 ½" Floppy   **OR** [ ] CD-Rom

_____ Attorney for: _____

[ ] Copy & Mini   [ ] Mini only*   [ ] No copy   [ ] CD w/E-Transcript & Exhibits*   [ ] E-Transcript*_____

**FORMAT:**   [ ] ASCII*   [ ] Summation*   [ ] Amicus*   [ ] Other*   **ON**   [ ] 3 ½" Floppy   **OR** [ ] CD-Rom

_____ Attorney for: _____

[ ] Copy & Mini   [ ] Mini only*   [ ] No copy   [ ] CD w/E-Transcript & Exhibits*   [ ] E-Transcript*_____

**FORMAT:**   [ ] ASCII*   [ ] Summation*   [ ] Amicus*   [ ] Other*   **ON**   [ ] 3 ½" Floppy   **OR** [ ] CD-Rom

*Will be charged the regular copy rate, if ordered without a copy of the transcript.

**Page 1**

```
( 1)           IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
( 2)                   BROWNSVILLE DIVISION
( 3)
   DINO X. CHAVEZ                *
( 4)                             *
   VS.                           *
( 5)                             *
   BROWNSVILLE INDEPENDENT       *
( 6) SCHOOL DISTRICT, NOE        *
   SAUCEDA, and RANDY            *  CIVIL ACTION NO.
( 7) DUNN, MARILYN DEL           *  B - 02 - 128
   BOSQUE-GILBERT and            *
( 8) HUGH EMERSON, JR.,          *
   in their official             *
( 9) capacities as Board         *
   Members of Brownsville        *
(10) Independent School          *
   District                      *
(11)
(12)   *****************************************
(13)
(14)       ORAL AND VIDEOTAPED DEPOSITION OF
(15)             LYNN GEORGE BARNSON
                 SEPTEMBER 30, 2003
(16)   *****************************************
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

**Page 2**

```
( 1)            ORAL AND VIDEOTAPED DEPOSITION OF
( 2) LYNN GEORGE BARNSON, produced as a witness at the
( 3) instance of the Plaintiff and duly sworn, was taken in
( 4) the above-styled and numbered cause on the 30th day of
( 5) September, 2003, from 10:44 a.m. to 2:06 p.m., before
( 6) GERRI C. BARKER, Certified Shorthand Reporter in and
( 7) for the State of Texas, reported by machine shorthand,
( 8) at the offices of Locke, Liddell & Sapp, L.L.P.,
( 9) 100 Congress Avenue, Suite 300, Austin, Texas,
(10) pursuant to the Federal Rules of Civil Procedure and
(11) the provisions stated on the record or attached
(12) hereto.
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

**Page 3**

```
( 1)                    APPEARANCES
( 2)
( 3)
( 4)   FOR THE PLAINTIFF:
( 5)        MR. J. ARNOLD AGUILAR
             LAW OFFICE OF J. ARNOLD AGUILAR
( 6)         Artemis Square, Suite H-2
             1200 Central Boulevard
( 7)         Brownsville, Texas  78520
             956-504-1100/956-504-1408 (fax)
( 8)
( 9A)  FOR THE DEFENDANT, BROWNSVILLE INDEPENDENT
(10)   SCHOOL DISTRICT:
             MS. ELIZABETH G. NEALLY
(11)         ROERIG, OLIVEIRA & FISHER, L.L.P.
             855 West Price Road, Suite 9
(12)         Brownsville, Texas  78520
             956-542-5666/956-542-0016 (fax)
(13)
(14)   FOR THE DEFENDANT, NOE SAUCEDA:
(15)         MS. EILEEN LEEDS
             WILLETTE & GUERRA, L.L.P.
(16)         International Plaza, Suite 460
             3505 Boca Chica Boulevard
(17)         Brownsville, Texas  78521
             956-541-1846/956-541-1893 (fax)
(18)
(19)   FOR AFLAC AND THE WITNESS:
(20)         MR. WILLIAM B. STEELE. III
             LOCKE, LIDDELL & SAPP, L.L.P.
(21)         100 Congress Avenue. Suite 300
             Austin, Texas 78701
(22)         512-305-4734/512-305-4800 (fax)
```

**Page 4**

```
( 1)
( 2)
( 3)   REMOVE THIS PAGE AND INSERT STIPULATIONS SHEET HERE
( 4)
( 5)
( 6)
( 7)
( 8)
( 9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

**Page 5**

```
( 1)                    INDEX
( 2)                                           PAGE
( 3)
( 4) Appearances...................................   3
( 5) Stipulations..................................   4
( 6)
( 7) LYNN GEORGE BARNSON
( 8)    Examination by Mr. Aguilar.................   8
          Examination by Ms. Neally..............  143
( 9)    Further Examination by Mr. Aguilar.......  155
(10)
(11) Changes and Corrections.......................  157
(12) Signature.....................................  158
(13) Reporter's Certificate........................  159
(14)
(15)                    EXHIBITS
(16)
(17) NO. DESCRIPTION            PAGE / LINE REFERENCED
(18)
(19) 1.............................        9 / 12
        First Amended Notice of Intention to
        Take the Oral and Videotaped Deposition
(20)    of Witness Lynn Barnson and Subpoena
        Duces Tecum
(21)
(22) 2.............................       29 / 22
        Texas South 1999 Business Plan
(23) 3.............................       30 / 20
        AFLAC, Dennis Escobar 2001 Business Plan
(24)
(25) 4.............................       32 / 20
        2003 Financial Analysts Briefing
```

**Page 6**

```
( 1)                 EXHIBITS (Cont'd)
( 2) NO. DESCRIPTION            PAGE / LINE REFERENCED
( 3)
( 4) 5.............................       39 / 2
        List of counties in AFLAC's Texas-Central
        region
( 5)
( 6) 6.............................       42 / 5
        Document showing amount of penetration
        in Texas-Central region
( 7)
( 8) 7.............................       69 / 17
        AFLAC New Business Transmittal,
        dated 5-18-99
( 9)
(10) 8.............................       70 / 25
        New Business Transmittal, dated 5-24-99
(11) 9.............................       83 / 18
        Letter dated 1-4-02 from Dino Chavez to
(12)    Lynn Barnson
(13) 10.............................      85 / 25
        Letter dated 1-14-02 from Jefferson
(14)    Willis to Dino Chavez
(15) 11.............................      92 / 16
        Letter dated 1-28-02 from Karl Douglass
(16)    to Dino Chavez
(17) 12.............................      96 / 7
        Dino Chavez, AFLAC Awards & Recognition -
(18)    Summary, January 1999 - February 2002
(19) 13.............................      98 / 18
        Letter dated 1-4-02 from The Travel,
(20)    Meetings & Incentives Department to
        FAME Qualifier, with attachments
(21)
(22) .............................      112 / 3
        Memorandum dated 7-29-99 from Lynn Barnson
        to Sonia Castellanos
(23)
(24)    Letter dated 9-26-00 from Lynn Barnson
```

Page 7

EXHIBITS (Cont'd)

( 1)
( 2)  NO. DESCRIPTION                        PAGE / LINE REFERENCED
( 3)
( 4)   16. .............................................  112 / 17
( 5)      Letter from Lynn Barnson to Dino Chavez
( 6)   17. .............................................  113 / 22
( 7)      Letter dated 6-15-00 from Lynn Barnson
          to Dino Chavez
( 8)   18. .............................................  114 / 23
( 9)      Letter dated 2-2-01 from Lynn Barnson
          to Dino Chavez
(10)   19. .............................................  115 / 14
(11)      Letter dated 10-29-01 from Lynn Barnson
          to Dino Chavez
(12)   20. .............................................  116 / 20
          Memorandum dated 1-25-02 from Joseph
(13)      Kuechenmeister to Dino Chavez
(14)   21. .............................................  118 / 13
          Memorandum dated 1-28-02 from Joseph
(15)      Kuechenmeister to Dino Chavez
(16)   22. .............................................  120 / 9
          Letter dated 1-6-02 from Lynn Barnson
(17)      to Dino Chavez
       23. .............................................  156 / 6
(18)      Documents tendered to counsel by
          Mr. Steele on 9-30-03
(19)
(20)
(21)
(22)
(23)
(24)
(25)

Page 8

(1)   (Exhibit No. 1
(2)   (marked for identification.
(3)
(4)   LYNN GEORGE BARNSON,
(5)   having been first duly sworn, testified as follows:
(6)
(7)   EXAMINATION
(8)   QUESTIONS BY MR. AGUILAR:
(9)      Q.   Tell us your name, please.
(10)     MR. STEELE:   Arnold, before we get
(11)  started, I just want to go on record – to get on the
(12)  record a couple of things to confirm that I have
(13)  tendered to you and other counsel a document entitled
(14)  Responses and Objections to Subpoena Duces Tecum
(15)  directed on Barnson, where we spell out our responses
(16)  to the subpoena we received – excuse me, September
(17)  18th, 2003. And, secondly, in preparing for this
(18)  deposition, I was made aware that Mr. Barnson
(19)  maintains files on all of his coordinators, including
(20)  Dino Chavez, and I have produced a set of documents
(21)  from Mr. Barnson's files on Mr. Chavez that are to
(22)  supplement BISD's request for production. In that I
(23)  had not seen these documents previously, I don't
(24)  believe they had previously been produced from AFLAC's
(25)  files in Columbus. So we're producing them today as a

Page 9

(1)   supplement to BISD's document request, so that you'll
(2)   have an opportunity, if you wanted to, to question
(3)   Mr. Barnson about this group of documents. For the
(4)   record, they're Bates labeled AFL 4140 through AFL
(5)   4196 inclusive. That's all I wanted to get on the
(6)   record before we started. Thanks.
(7)      Q.   (By Mr. Aguilar) Would you please tell us
(8)   your name?
(9)      A.   Lynn George Barnson.
(10)     Q.   Mr. Barnson, I provided your attorney with a
(11)  copy of what I've marked as Exhibit No. 1, which is a
(12)  notice of your deposition. Do you recall looking at
(13)  that document before today?
(14)     A.   I do.
(15)     Q.   As part of that document, I requested that
(16)  you provide a series of exhibits that are enclosed in
(17)  Exhibit A, numbered one through eight. Did you
(18)  provide any documents for us today in response to that
(19)  request?
(20)     A.   No, I did not.
(21)     Q.   Your attorney has told me that – I presume
(22)  Mr. Steele is your attorney?
(23)     A.   That is correct.
(24)     Q.   Your attorney has provided us today with
(25)  responses and objections to that request. Is there

Page 10

(1)   any other objection that you have at this point to
(2)   providing those – that information?
(3)      A.   Is there any other objection?
(4)      Q.   (Moves head up and down.)
(5)      A.   I just have the information –
(6)      Q.   Okay. Let me ask –
(7)      A.   – as provided by AFLAC.
(8)      Q.   Let me ask you. For example, Item No. 1
(9)   requested "True and correct copies of documents
(10)  reflecting the actual sales volume (annualized
(11)  premium) for each of the top 50 regional sales
(12)  coordinator teams in the United States for each of the
(13)  years 1997, 1998, 1999, 2000, 2001 and 2002." Is that
(14)  information available to you through your connections
(15)  to the AFLAC site – website?
(16)     A.   It is available through the AFLAC website, as
(17)  it is, I believe, for Mr. Chavez as well.
(18)     Q.   Okay. So Mr. Chavez could go on to the AFLAC
(19)  website and get all that have information himself?
(20)     A.   That's my understanding. He can get back to
(21)  2002. The other information would have to be secured
(22)  by AFLAC headquarters if they have that information.
(23)     Q.   Do you have access to that information?
(24)     A.   I do not.
(25)     Q.   Okay. By you saying – by saying back to

Page 11

(1)   2002, do you mean 2002 and 2003?
(2)      A.   2003, and then you can compare it to 2002.
(3)      Q.   Okay. But as for 2000 – rather, 1997
(4)   through 2000, you do not have access and you cannot
(5)   get access to that?
(6)      A.   I would have to do – have headquarters do
(7)   the research.
(8)      Q.   Okay. Is that something that you can have
(9)   access to, you would have access to?
(10)     A.   For me to – restate the question. You mean
(11)  as far as –
(12)     Q.   Sure. In other words, could you get on to
(13)  the AFLAC website through your protected pass code or
(14)  something –
(15)     A.   No, I could not. I could not.
(16)     Q.   – to get that information?
(17)     A.   I could not.
(18)     Q.   Okay. And the only way you would know if
(19)  they have it would be to call headquarters?
(20)     A.   I would have to request it, have headquarters
(21)  do all the research, and they may or may not have it.
(22)     Q.   Is that the same for the remainder of that –
(23)  the information?
(24)     A.   That would be correct.
(25)     Q.   Okay.

Page 12

(1)      MR. STEELE:   I guess the one exception
(2)   would be No. 8 on the stock holdings.
(3)      MR. AGUILAR:   Okay.
(4)      Q.   (By Mr. Aguilar) And you told us you didn't
(5)   have that information yourself for the other people?
(6)      A.   Right.
(7)      Q.   As for yourself, did you bring information on
(8)   your own stock holdings?
(9)      A.   I would refer to my attorney on that.
(10)     MR. STEELE:   We objected because his
(11)  privacy rights outweigh any minute relevance that this
(12)  would possibly have to the case. That's stated in our
(13)  written objections.
(14)     Q.   (By Mr. Aguilar) Based on that –
(15)     MR. STEELE:   And we would reiterate
(16)  those.
(17)     Q.   (By Mr. Aguilar) And based on that, are you
(18)  going to produce any of the information we requested
(19)  today for specifically your stock holdings?
(20)     A.   No.
(21)     Q.   Okay. That's based on the advice of your
(22)  attorney, I presume?
(23)     A.   That's correct.
(24)     Q.   Okay. Where do you currently live?
(25)     A.   I live in Sandy, Utah.

Page 13

(1)  Q.   What's that near?
(2)  A.   Salt Lake City.
(3)  Q.   Okay. How old are you?
(4)  A.   I'm 47.
(5)  Q.   Can you tell me about your educational
(6)  background?
(7)  A.   I have got -- I had two years of college.
(8)  Q.   After graduating from high school, you went
(9)  to college for two years?
(10)  A.   Uh-huh.
(11)  Q.   Where?
(12)  A.   At Southern Utah State University and Utah --
(13)  what was it called -- Utah Technical College.
(14)  Q.   Okay. Did you get a degree at Southern Utah
(15)  State University?
(16)  A.   I did not.
(17)  Q.   Did you get any other type of degree from
(18)  college -- from any college?
(19)  A.   No.
(20)  Q.   I assume, then, you never got a BBA?
(21)  A.   No.
(22)  Q.   A bachelor in business administration?
(23)  A.   No.
(24)  Q.   I assume you never got any insurance degree?
(25)  A.   I had to pass the state insurance exam.

Page 14

(1)  Q.   Okay. Which state?
(2)  A.   State of Utah.
(3)  Q.   Okay. And is that to get what we in Texas
(4)  call a Class 1 license, a license to sell life, health
(5)  and accident insurance policies?
(6)  A.   Yes.
(7)  Q.   Okay. It's the same basic type of policy --
(8)  A.   Right.
(9)  Q.   -- license as in Texas that you have in Utah,
(10)  correct?
(11)  A.   To my understanding, yes.
(12)  Q.   Other than that, though, you did not get any
(13)  other type of insurance degree from a college or a
(14)  school, per se, right?
(15)  A.   No.
(16)  Q.   Okay. Obviously, then, I presume you did not
(17)  get an MBA either?
(18)  A.   That's correct.
(19)  Q.   Okay. What insurance experience did you have
(20)  prior to starting with AFLAC?
(21)  A.   Only about three months with the company of
(22)  A.L. Williams.
(23)  Q.   What is it?
(24)  A.   A.L. Williams.
(25)  Q:   And what is that?

Page 15

(1)  A.   That was a life insurance organization.
(2)  Q.   And what did you do for them?
(3)  A.   Basically, it was a salesperson, came aboard.
(4)  I wasn't there very long and left.
(5)  Q.   Okay. What was -- what were you selling?
(6)  A.   Life insurance.
(7)  Q.   Is that it?
(8)  A.   That's it.
(9)  Q.   Any other products? Just life insurance?
(10)  A.   Yeah.
(11)  Q.   Okay. What's your current title with AFLAC?
(12)  A.   Territory vice president, West Territory.
(13)  Q.   Okay. Now, you started with AFLAC when you
(14)  were 25 years old in 1981, right?
(15)  A.   Right. February 10th, 1981.
(16)  Q.   Okay. At that point, you started as an
(17)  associate?
(18)  A.   That's correct.
(19)  Q.   Was that in Utah?
(20)  A.   That was.
(21)  Q.   What city?
(22)  A.   That was in Provo, Utah.
(23)  Q.   Now, in rising up to your current position, I
(24)  understand that you were promoted to DSC in 1981,
(25)  correct?

Page 16

(1)  A.   I believe that's the year, yes.
(2)  Q.   Okay. That was the same year that you
(3)  started as an associate, right?
(4)  A.   Correct.
(5)  Q.   Why were you promoted?
(6)  A.   Because I had exhibited the things that need
(7)  to be done at the time. I was opening new accounts
(8)  and I was also -- had some past experience in managing
(9)  people.
(10)  Q.   Okay. What was the past experience you had
(11)  in managing people?
(12)  A.   I had worked as an -- in a bricklaying
(13)  company and I had supervised other masons.
(14)  Q.   For how long did you do that?
(15)  A.   For -- the supervising or working with the
(16)  company?
(17)  Q.   The supervising.
(18)  A.   Probably about six months.
(19)  Q.   Okay. Any other prior experience supervising
(20)  people?
(21)  A.   As a missionary for the LDS church.
(22)  Q.   Okay. And what did you do to supervise
(23)  people as a missionary?
(24)  A.   I did -- I mainly had them report their
(25)  activities to me on a week-to-week basis.

Page 17

(1)  Q.   Okay. Any other supervisory positions?
(2)  A.   Prior to that, I don't recall.
(3)  Q.   Okay. Was your promotion based on the amount
(4)  of sales you had made?
(5)  A.   I think it was based on the amount of sales.
(6)  It was also based on the area that I was asked to go
(7)  on -- that's where I grew up at and they needed
(8)  somebody in that area.
(9)  Q.   In Dallas, correct?
(10)  A.   No, in southern Utah.
(11)  Q.   Okay. Was your promotion also based on the
(12)  growth in the size of your team?
(13)  A.   There was no team.
(14)  Q.   Was it based on your building a team?
(15)  A.   Yes, it was.
(16)  Q.   Okay. In other words, when you showed up,
(17)  you didn't have a team. You're the one who built up
(18)  your own team?
(19)  A.   That's correct.
(20)  Q.   Okay. What about your leadership ability? I
(21)  guess that's what you were just saying. That was also
(22)  part of it, right?
(23)  A.   Restate that for me. Help me understand
(24)  better what your question is.
(25)  Q.   Sure. What I was asking is, the reasons for

Page 18

(1)  your promotion to your DSC -- and I think you had told
(2)  us earlier one of the bases was also because of your
(3)  leadership abilities, right?
(4)  A.   I would assume that was the reason.
(5)  Q.   You were promoted within how long after
(6)  becoming an associate?
(7)  A.   I'm speculating, okay? Just to the best of
(8)  my memory, about three, four months.
(9)  Q.   Okay. And Dino was similarly promoted within
(10)  the first year after he became an associate; is that
(11)  correct?
(12)  A.   I don't know.
(13)  Q.   You just don't remember?
(14)  A.   I don't remember.
(15)  Q.   Okay. You've been his supervisor -- or you
(16)  were his -- let me rephrase that. You had been his
(17)  supervisor since he started at AFLAC, not necessarily
(18)  his direct supervisor, but one of the higher up level
(19)  supervisors, correct?
(20)  A.   That's true.
(21)  Q.   Okay. Prior to Frank LaFemina, Gene Dannelly
(22)  was Dino's direct supervisor, right?
(23)  A.   I don't know if the word is direct. I'm not
(24)  sure who his region was at the time.
(25)  Q.   Okay.

Page 19

(1)    A.    But he was in Gene Dannelly's operation in
(2)  Texas South, yes.
(3)    Q.    Okay. After four years as DSC, you got
(4)  promoted in 1985 to RSC, correct?
(5)    A.    To the best of my understanding.
(6)    Q.    Okay. What was the area you were DSC in?
(7)    A.    It was in southern Utah.
(8)    Q.    Did you stay as DSC in southern Utah for a
(9)  number of years?
(10)   A.    I don't remember the exact amount of years.
(11)   Q.    Was it for the four full years or did you
(12)  move over to the Dallas area sometime towards –
(13)  within those four years?
(14)   A.    No, I actually moved to Provo, Utah as a
(15)  district sales – I mean, as a district up there as
(16)  well.
(17)   Q.    Okay. And when did you –
(18)   A.    In that time frame.
(19)   Q.    When did you move to the Dallas/Fort Worth
(20)  area?
(21)   A.    You know, I don't remember the exact year.
(22)   Q.    Okay. Was it 19- – I'm sorry. In 1985 you
(23)  were promoted to RSC?
(24)   A.    Correct.
(25)   Q.    By then –

Page 20

(1)    A.    That's when I was moved.
(2)    Q.    Oh, I see. By then, were you already in
(3)  Dallas/Fort Worth or had you moved up at that time?
(4)    A.    I was – that's what caused the move to
(5)  Dallas/Fort Worth.
(6)    Q.    Why were you promoted to RSC?
(7)    A.    I had exhibited the things that were
(8)  necessary to be considered for a regional sales
(9)  coordinator. I was recruiting.
(10)   Q.    Okay. Basically, is it the same things that
(11)  we just talked about for the reasons that you got
(12)  promoted to DSC? In other words, was it because of
(13)  your leadership abilities, the growth in the size of
(14)  your team and your sales?
(15)   A.    Yes. And – yes, and the fact that I was
(16)  recruiting. I knew how to recruit people.
(17)   Q.    And what does that mean?
(18)   A.    That means bring them in and introduce them
(19)  to AFLAC.
(20)   Q.    Isn't that part of what is involved in
(21)  growing your team?
(22)   A.    Yeah.
(23)   Q.    Okay. While you were DSC or RSC, did you win
(24)  any awards?
(25)   A.    Yes.

Page 21

(1)    Q.    Did you win any Key Club awards?
(2)    A.    To my recollection, yes.
(3)    Q.    What is the Key Club?
(4)    A.    Key Club is an award that recognizes meeting
(5)  your quota for the year, your sales goal.
(6)    Q.    Sales of AFLAC policies?
(7)    A.    Yes.
(8)    Q.    Okay. How is that quota calculated?
(9)    A.    It varies. You know, are you referencing –
(10)  let me ask you – have you refresh – or revise that
(11)  question for me.
(12)   Q.    Okay.
(13)   A.    Are you asking me over those time frames or
(14)  now?
(15)   Q.    Let's start about – let's ask about it over
(16)  those time frames first.
(17)   A.    In those early years, the quota was set by
(18)  the manager above you based on what they needed in
(19)  that area to meet their quotas.
(20)   Q.    Okay. And now?
(21)   A.    Now, there's what they call a market
(22)  prudential index where they measure your market, what
(23)  your abilities are in that market, the number of
(24)  employees that are available to enroll, and there's a
(25)  calculation that I don't completely understand, all of

Page 22

(1)  the calculation, but then that's assigned from
(2)  headquarters.
(3)    Q.    Okay. When did that procedure change?
(4)    A.    I don't remember.
(5)    Q.    Do you remember the year?
(6)    A.    I don't.
(7)    A.    Was it before 1997?
(8)    A.    I would be speculating. I don't remember the
(9)  exact year.
(10)   Q.    Do you recall it as being something fairly
(11)  recent or fairly longstanding by now?
(12)   A.    Help me define that, when you say
(13)  longstanding.
(14)   Q.    Actually, I was going to let you define that.
(15)   A.    Number of years.
(16)   Q.    Within the past ten years?
(17)   A.    I would say it was within the last ten years,
(18)  yeah.
(19)   Q.    Okay. It's based on prior years' sales,
(20)  then?
(21)   A.    It's based on prior years' sales. Again,
(22)  it's based on the market and so forth.
(23)   Q.    I'm talking about just within the past ten
(24)  years, whenever it was changed, when the new procedure
(25)  was changed. The quota would be based on prior years'

Page 23

(1)  sales and the market, as you just explained, right?
(2)    A.    Yeah.
(3)    Q.    Okay. Did you ever get a FAME award?
(4)    A.    Yes.
(5)    Q.    Can you tell us what a FAME award is?
(6)    A.    A FAME award is something that measures your
(7)  ability to recruit and train people and get them in
(8)  the business. It also deals with reaching and, you
(9)  know, meeting and exceeding your sales numbers.
(10)   Q.    Okay. What does it stand for?
(11)   A.    Founders Award for Management Excellence.
(12)   Q.    Okay. Are you familiar with what a FAME trip
(13)  is?
(14)   A.    Yes, I am.
(15)   Q.    What is that?
(16)   A.    A trip that recognizes those individuals.
(17)   Q.    And how is that – is that basically a prize
(18)  given to the individuals who make the FAME, who get
(19)  the FAME award?
(20)   A.    Who meet FAME more than – at the time three
(21)  times in a year. Now it's four times a year.
(22)   Q.    Okay. And by FAME, that's an award that's
(23)  given per quarter; is that right?
(24)   A.    That's correct.
(25)   Q.    Okay. So at least back a few years, if you

Page 24

(1)  got three out of four quarters where you met all those
(2)  expectations under FAME, then you got to go to this
(3)  trip; is that right?
(4)    A.    That's correct.
(5)    Q.    Okay. And AFLAC paid for that trip, I
(6)  presume?
(7)    A.    That's correct.
(8)    Q.    Okay. Now it's you have to make it all four
(9)  quarters?
(10)   A.    That is correct.
(11)   Q.    Okay. And that is as of what year?
(12)   A.    I think – I'm thinking a year or two years
(13)  ago.
(14)   Q.    Okay. Now, in 1987, you got promoted to
(15)  director of metropolitan development; is that right?
(16)   A.    That's correct.
(17)   Q.    That's a position over at headquarters,
(18)  right?
(19)   A.    That is.
(20)   Q.    Why were you promoted?
(21)   A.    Because of my abilities in working in a metro
(22)  area. When I moved to Texas, I was placed in the Fort
(23)  Worth area and I was able to develop, again, a
(24)  successful team.
(25)   Q.    What was the difference between your duties

Page 25

(1) as metropolitan development as compared to as RSC?
(2)     A.    I think it varies.
(3)     Q.    Is it the same duties, only a different
(4) market, or is it different duties all together?
(5)     A.    Similar duties.
(6)     Q.    Okay.
(7)     A.    But instead of doing it on a local level, my
(8) job was to go and be more the role of a consultant and
(9) go in and help other regional sales coordinators in
(10) metropolitan areas develop their organizations.
(11)     Q.    And that was the next logical progression
(12) promotion for you with your particular abilities,
(13) correct?
(14)     A.    Not necessarily.
(15)     Q.    What else could that promotion – what else
(16) could the next promotion – logical promotion have
(17) been?
(18)     A.    To a bigger region.
(19)     Q.    Okay.
(20)     A.    The promotion could have been to a state
(21) operation. And really, to some degree, I never
(22) considered it a promotion. It was a lateral move to
(23) get more education and understand better the workings
(24) of AFLAC's headquarters.
(25)     Q.    Okay. Then in 1988, the following year, you

Page 26

(1) were made vice president, agency director, Mountain
(2) Territory, correct?
(3)     A.    That is correct.
(4)     Q.    Why were you promoted to that position?
(5)     A.    Again, I exhibited the, you know – and,
(6) again, I'm not the person doing the promoting, so it's
(7) hard for me to, you know, to give – I'm speculating
(8) on – I'm speculating on all these answers as to why
(9) people promoted me. But my understanding would be –
(10)     Q.    That's all I'm asking for.
(11)     A.    My understanding would be because of the fact
(12) that I exhibited, again, what needs to be done to
(13) develop those areas and to manage a bigger
(14) organization.
(15)     Q.    Okay. You've had to make recommendations on
(16) the promotions of other employees, correct?
(17)     MR. STEELE:    Objection to the form; use
(18) of the word employee.
(19)     Q.    (By Mr. Aguilar) Agents.
(20)     A.    Yes, I made recommendations on those that
(21) would – would be considered. Usually there was a
(22) number of individuals that were cleared for me to
(23) interview and visit with about.
(24)     Q.    The only reason for my asking is, you
(25) understand the factors that you considered when making

Page 27

(1) your recommendations or decisions on promotions,
(2) correct?
(3)     A.    Restate that, please.
(4)     Q.    Sure. Whenever you made recommendations or
(5) promotions yourself, the factors you considered in
(6) making those promotions, for example, from agent to
(7) DSC or to RSC, you're familiar with the factors that
(8) you would have at least considered, right?
(9)     A.    I would say es.
(10)     Q.    Okay. And you've been explaining those
(11) factors to us earlier so far, right?
(12)     A.    I have generalized those factors. To explain
(13) them, I would have to spend days doing that.
(14)     Q.    That's fine. I just wanted to make sure that
(15) what you've been telling us is what your understanding
(16) is as the bases for either your promotion or any
(17) agent's promotion for those particular positions; is
(18) that right?
(19)     A.    I think it varies.
(20)     Q.    Okay. But for you in particular, you've been
(21) telling us about your particular –
(22)     A.    That's correct.
(23)     Q.    – skills? Okay. So why were you promoted
(24) to agency director, Mountain Territory, to the best of
(25) your understanding?

Page 28

(1)     A.    Okay. Again, as I explained previously, and
(2) I thought I had answered that, that based on the
(3) successes that I've had in metro development.
(4)     Q.    Same factors that we've already discussed?
(5)     A.    Explain those factors again.
(6)     Q.    Sales, growth in the size of your team,
(7) leadership abilities and in this case –
(8)     A.    I don't believe that would have been the case
(9) on that because I wasn't measured in sales, et cetera.
(10) I didn't hold a quota while I was in headquarters.
(11)     Q.    By this point, it was more based on growing
(12) your team and your leadership abilities?
(13)     A.    Not – not on the headquarters one. It was
(14) based on my ability previously, prior to going into
(15) that position. It was based on my ability to grow
(16) teams, but it was also based on my ability to teach
(17) others how to grow teams.
(18)     Q.    Okay. And actually we were talking about
(19) your agency director.
(20)     A.    That's correct. And that was the reason I
(21) was promoted. Because the position at headquarters
(22) that I held in metro development, I was not measured
(23) in terms of a recruiting quota or the same way that a
(24) sales organization might be.
(25)     Q.    Okay. Then two years later, in 1990, is when

Page 29

(1) you were promoted to vice president, West Territory
(2) director, correct?
(3)     A.    That is correct.
(4)     Q.    Was that just giving you a larger area but
(5) the same duties?
(6)     A.    That is correct.
(7)     Q.    All right. Do you know why you got that
(8) promotion or larger area?
(9)     A.    I, again, would understand – again, I'm
(10) speculating on the individual that promoted me.
(11)     Q.    And I'm not asking you to speculate what
(12) anybody else is saying. I'm just asking for you to
(13) tell me what you understood the reasons were.
(14)     A.    Okay. I would think it had to do with my
(15) ability to manage an organization and build an
(16) organization.
(17)     Q.    Okay.
(18) (Exhibit No. 2
(19) (marked for identification.
(20)     Q.    (By Mr. Aguilar) I'm handing you what I've
(21) marked as Exhibit No. 2, which is a document titled
(22) Texas South 1999 Business Plan – it starts with Bates
(23) stamp No. 1469 - dated January of '99. This is a
(24) document that was prepared by – I forget who prepared
(25) it, actually - Gene Dannelly, who was Dino's prior

Page 30

(1) up-line person supervisor. I think he was the SSC at
(2) the time. As part of this plan, he indicated, on
(3) Page 1471, Item 2.2, Mission Statement, "The mission
(4) of the West Territory" – that would be the territory
(5) you were in charge of in 1999?
(6)     A.    That's correct.
(7)     Q.    – "is to establish the standard of
(8) leadership that will lead AFLAC into the future. To
(9) bring about a minimum 30 percent in new production
(10) each year and double digit increases to in-force
(11) premium," et cetera. That would have been the
(12) information that you would have provided as part of
(13) your general program for 1999, correct?
(14)     A.    That's correct.
(15) (Exhibit No. 3
(16) (marked for identification.
(17)     Q.    (By Mr. Aguilar) Let me hand you what I've
(18) marked as Exhibit No. 3, which is a document that
(19) starts at Bates stamp No. 1442. Let me represent to
(20) you that this is the business plan for 2001 prepared
(21) by Dennis Escobar. It's dated October 2000, though.
(22) There's a note on the very front that appears to be
(23) from Frank LaFemina. "Dennis, you did a very
(24) professional job on your business plan. Please review
(25) my notes and make some minor adjustments in your

Page 31

(1) numbers." If you will turn to Page 1444, at the very
(2) top, under 1-A, Mission Statement, the last sentence,
(3) Mr. Escobar apparently indicated his mission was to
(4) achieve a 12 percent increase in new production each
(5) year by exceeding MPI new accounts. Can you tell us
(6) what MPI means?
(7)     A.    It refers to market prudential index.
(8)     Q.    And what does that refer to?
(9)     A.    Their sales quotas.
(10)    Q.    Sales quotas. And then on the right side,
(11) there's a handwritten note that says, "A 25-30 percent
(12) increase is in line with state and territory
(13) objectives." Would you agree with that?
(14)    A.    I would agree with it being in line with
(15) state and territory objectives.
(16)    Q.    That's what I'm asking.
(17)    A.    But I think we have to be reminded that
(18) headquarters is the one that establishes quotas.
(19)    Q.    Okay.
(20)    A.    Those are more goals than they are their
(21) quotas.
(22)    Q.    Those are more goals than quotas?
(23)    A.    That's correct.
(24)    Q.    Okay. It's also more in line with your
(25) expectations, correct?

Page 32

(1)     A.    Yes.
(2)     Q.    Now, I had requested that you provide certain
(3) documents which your attorney objected to. One of the
(4) objections indicated, look on our AFLAC website and
(5) you can get the information. A couple of days ago we
(6) actually anticipated you may not be providing
(7) documents, so we did look at your AFLAC website.
(8)     MR. STEELE:    Objection to the side bar
(9) on that.
(10)    Q.    (By Mr. Aguilar) I was just saying that for
(11) information purposes. I don't mean to imply anything
(12) by it, just to let you know where I got this from.
(13) (Exhibit No. 4
(14) (marked for identification.
(15)    THE WITNESS:    Are we done with this
(16) document?
(17)    Q.    (By Mr. Aguilar) Yes. You can put it off to
(18) the side.
(19) I handed you what I've marked as
(20) Exhibit 4, which is titled 2003 Financial Analysts
(21) Briefing, The St. Regis, New York City. Do you
(22) recognize what a financial analyst is?
(23)    A.    I have – I do.
(24)    Q.    Have you seen documents similar to this
(25) before from AFLAC?

Page 33

(1)     A.    I have.
(2)     Q.    Okay. If you would turn to Page 50. There's
(3) a graph that indicates new annualized premium
(4) sales in millions and it shows the amount of sales
(5) that have been registered or reported by AFLAC
(6) overall, correct?
(7)     A.    I haven't read the documents, so I –
(8)     Q.    I'm just pointing you to this area. That's
(9) what that says, New Annualized Premium Sales, correct?
(10)    A.    That's my understanding.
(11)    Q.    Correct me if I'm reading this incorrectly,
(12) but for 1998, it appears that there was $482 million
(13) in sales. Let me start over. In 1998, there was
(14) $482 million in sales, which represented a
(15) 20.3 percent increase in sales for that year; is that
(16) correct? Is that the correct interpretation of what
(17) that is saying?
(18)    MR. STEELE:    Are you asking if that is
(19) what that graph says –
(20)    MR. AGUILAR:    Yes.
(21)    MR. STEELE:    – on Page 50?
(22)    MR. AGUILAR:    Yes.
(23)    THE WITNESS:    That's my understanding.
(24)    Q.    (By Mr. Aguilar) Okay. The following year,
(25) 1999, it represented $555 million in sales, which

Page 34

(1) was –
(2)     MR. STEELE:    1999.
(3)     Q.    (By Mr. Aguilar) I'm sorry, 1999.
(4)     MR. AGUILAR:    Thank you.
(5)     Q.    – in sales, which was a 15.1 percent
(6) increase, correct? That's what that says?
(7)     A.    Again, that's my understanding. I didn't put
(8) the report together, so –
(9)     Q.    Okay. This is – from what I understood,
(10) this is a document we got from AFLAC.
(11)    A.    Okay.
(12)    Q.    The following year, in 2000, sales reached
(13) $712 million, which represented a 28.3 percent
(14) increase in sales?
(15)    A.    That's my understanding. May I add something
(16) here?
(17)    Q.    If you would like, sure.
(18)    A.    You need to understand that you're asking me
(19) as a territory director to comment on company numbers
(20) rather than territorial numbers, which I'm more
(21) familiar with.
(22)    Q.    I understand. I'm not asking you to comment
(23) at all. I'm just asking you to help me interpret this
(24) document.
(25)    A.    Okay.

Page 35

(1)     Q.    The following year, in 2001, AFLAC had
(2) $919 million in sales, which represented a
(3) 29.1 percent increase, correct?
(4)     A.    That's my understanding.
(5)     Q.    And then the following year, in 2002, sales
(6) were 1,700,000,000, which represented a 16.4 percent
(7) increase in sales?
(8)     A.    That's correct.
(9)     Q.    Okay. If you would turn back to Page 43.
(10) We're just going to have to – pointing to this area,
(11) it's on the left side. Right here, I think. Yeah, at
(12) the bottom. "Our more than 258,000 payroll accounts
(13) translates into a penetration rate of less than
(14) five percent of the small business market." What's a
(15) payroll account?
(16)    A.    A payroll account is an agreement with AFLAC
(17) to offer our products to employees. There needs to be
(18) at least three employees that participate in order to
(19) do that.
(20)    Q.    Is that like a group account?
(21)    A.    I would say they're one and the same.
(22)    Q.    Okay. What is a penetration rate?
(23)    A.    A penetration rate, it's – again, you know,
(24) you're asking me to interpret someone else's
(25) information.

Page 36

(1)     Q.    I'm just asking for your understanding.
(2)     A.    But my understanding of the penetration rate
(3) is the amount of employees within an account that are
(4) participating in the product.
(5)     Q.    When it says penetration rate of less than
(6) five percent of the small business market –
(7)     A.    Then that's talking about the number of
(8) accounts that are available in a respective area.
(9)     Q.    In other words, like we're now in Austin and
(10) let's say there's 100 businesses with three or more
(11) people, a five percent penetration rate would mean
(12) you've got only five of those groups?
(13)    MR. STEELE:    I'm going to object to the
(14) form. If you're talking about, Arnold, the small
(15) business market in Austin –
(16)    MR. AGUILAR:    I'm just talking his
(17) interpretation of just this. I'm not getting accurate
(18) numbers in terms of what is actually here in Austin.
(19) Let me try to rephrase it again anyway.
(20)    MR. STEELE:    Because the small business
(21) market is defined on Page 43, but however you want to
(22) use it.
(23)    MR. AGUILAR:    Right. I'm just –
(24) however the term might be defined might make a
(25) difference later.

Page 37

(1) Q. (By Mr. Aguilar) But I'm just trying to
(2) understand what this means and what you're explaining
(3) to us. For example, let's say there was only 100
(4) small businesses in Austin that met that definition of
(5) small business.
(6) A. Okay.
(7) Q. And if you have a five percent penetration
(8) rate, that would mean five out of those 100 small
(9) businesses have AFLAC accounts.
(10) A. Again, that would be my understanding.
(11) Q. Okay. And that's what I thought it was. I
(12) just wanted to make sure I was on the same page. If
(13) you turn to Page 53, if you go to the bottom
(14) right-hand side, Penetration by Sales Territory, it's
(15) got some other graphs there. It has one – for the
(16) southwest, penetration would be 5.9 percent. Now, is
(17) the Valley – the Rio Grande Valley area within the
(18) southwest region?
(19) A. Yes.
(20) Q. Okay. So what this graph – and correct me
(21) if I'm wrong here, or based on your understanding,
(22) what this graph would show is that the total business
(23) is in the white block, which looks like it goes
(24) somewhere above the 600 number, and the little black
(25) area at the very bottom of each of those blocks would

Page 38

(1) be the amount of penetration or AFLAC accounts in that
(2) particular market, correct?
(3) A. You know, we're speculating here. I mean, I
(4) can't match it up with those numbers and then give you
(5) exact numbers.
(6) Q. And I'm not asking for an exact number. I'm
(7) just trying to figure out how to read the graph. Is
(8) that the right way to read that graph, as far as you
(9) understand?
(10) A. That would be my understanding. Again, I'm
(11) not the one that developed the graph.
(12) Q. And what it would show here – what this
(13) would reflect is that only 5.9 percent of eligible
(14) accounts in the southwest region are currently
(15) being – or currently have an AFLAC account?
(16) A. That would be my understanding.
(17) Q. Okay.
(18) (Exhibit No. 5
(19) (marked for identification.
(20) Q. (By Mr. Aguilar) Let me hand you what I
(21) marked –
(22) A. Do you want this one?
(23) Q. No, go ahead and hang on to that. Just don't
(24) lose it.
(25) A. Okay.

Page 39

(1) Q. – as Exhibit No. 5, which appears to be
(2) another AFLAC document representing breakdowns in
(3) particular businesses and accounts.
(4) A. May I – you know, can you inform me where
(5) this document came from?
(6) Q. If I remembered, I could. I know I got it at
(7) least from Mr. Chavez, but I don't remember where we
(8) got it from before that, whether it's a document
(9) either AFLAC provided us, we had a –
(10) MR. STEELE: No, I'll represent on the
(11) record that every document we have produced has been
(12) Bates labeled with an AFL prefix. This has no Bates
(13) label on it. But if it was something that comes from
(14) Mr. Chavez's file, I'd like to see it, because I
(15) haven't seen it and it should have been produced to us
(16) in response to a document production.
(17) MR. AGUILAR: Here. I've got an –
(18) MR. STEELE: I don't know where it came
(19) from.
(20) MR. AGUILAR: I've got an extra copy if
(21) you would like to look at it.
(22) MR. STEELE: Asking the witness to
(23) confirm this is an AFLAC document, I think is
(24) improper.
(25) MR. AGUILAR: Okay.

Page 40

(1) THE WITNESS: And that's what I would –
(2) that's what I would concur with, I don't see AFLAC on
(3) it. And it's got different data on here that I'm not
(4) sure where it comes from.
(5) Q. (By Mr. Aguilar) You're familiar with some
(6) counties in AFLAC's Texas Central region, correct?
(7) A. Not all of them, no.
(8) Q. You're familiar with Cameron County as a
(9) Texas Central region, correct?
(10) A. No, I'm not.
(11) Q. Okay.
(12) A. I mean, I'm sure it's one of the counties in
(13) Texas, but I don't tie it to – again, I've got local
(14) managers that deal with all of that information.
(15) Q. Okay. Well, we may be able to establish
(16) later that this is an AFLAC document, but in the
(17) meantime, let me just ask you, in terms of
(18) penetration, for example, for Cameron County, in terms
(19) of interpreting this document, the new – have you
(20) ever seen a document like this before?
(21) A. I've seen similar documents, yes.
(22) Q. AFLAC documents?
(23) A. Documents that actually we've put together.
(24) Q. Okay. By you, you mean who?
(25) A. My office.

Page 41

(1) Q. Okay.
(2) A. The stuff that I have used or my states have
(3) used or similar.
(4) Q. You didn't use –
(5) A. No, not this format, but this information.
(6) Q. Okay. So the information isn't foreign to
(7) you; you just can't certify these particular numbers?
(8) A. That's right. This doesn't look familiar to
(9) me.
(10) Q. If, for example, in Cameron County, on the
(11) number of companies with five-plus employees, there was
(12) 10,971 and the number of accounts as of April 2001 was
(13) 86, it reflects the penetration rate would have been
(14) 0.8 percent. Do you agree that that would be an
(15) accurate calculation, not necessarily telling us
(16) whether you added the numbers up. What I'm asking is,
(17) is that a proper way to determine – in other words,
(18) determine the number of accounts as of April 2001 and
(19) the number of businesses with five-plus employees and
(20) then using those figures to determine penetration?
(21) A. You know, again, if we were to look at the
(22) formula, I probably could give you more detail on
(23) that. It has the appearance that that's the correct
(24) way, but I'm not –
(25) Q. You just can't tell us for certain as far as

Page 42

(1) the numbers go?
(2) A. Right. I don't have the – I don't have the
(3) information to see what your formula is as to whether
(4) that penetration record is correct.
(5) (Exhibit No. 6
(6) (marked for identification.
(7) Q. (By Mr. Aguilar) Let me hand you what I've
(8) marked as Exhibit No. 6.
(9) A. Are you done with this one?
(10) Q. Yeah, you can put that one aside. I hand you
(11) what I've marked as Exhibit No. 6. Have you seen this
(12) document before?
(13) MR. AGUILAR: Buddy, this one also
(14) doesn't have a Bates stamp. Again, I can't represent
(15) when I got this document or from where, actually. I
(16) assume I got it from Mr. Chavez, but I just don't
(17) remember when.
(18) MR. STEELE: Just the same
(19) representation of the Bates label as to AFLAC produced
(20) documents.
(21) THE WITNESS: Have I seen this document?
(22) I have not seen this document.
(23) Q. (By Mr. Aguilar) Okay. Were you familiar
(24) with the amount of penetration in the Texas Central
(25) region?

Page 43

(1)  A.    I – yes, I have been.
(2)  Q.    Okay. Has it been generally close to
(3)  0.7 percent?
(4)  A.    I can't be specific. I mean –
(5)  Q.    You just don't recall numbers?
(6)  A.    I don't recall it. I just – you know, I
(7)  know the format and I know that I look at this
(8)  information, you know, as I go in to visit the areas,
(9)  but the exact details, I don't remember the exact
(10) detail on it.
(11) Q.    And as far as the actual penetration rate in
(12) Texas Central or even in Cameron County, can you tell
(13) us even generally your best recollection as to how
(14) much that penetration rate would have been?
(15) A.    No. No.
(16) Q.    Okay. Thank you. Going back into Exhibit
(17) No. 4. If you would turn to Page 54, top left corner,
(18) if you would read that first sentence out loud.
(19) A.    54, right here? We remain? Is that the one?
(20) Q.    (Indicating).
(21) A.    Right here. "In looking at the number of
(22) AFLAC payroll accounts as a percentage of total
(23) business by territory, you can see that we have just
(24) scratched the surface of the U.S. market."
(25) Q.    Okay. If you go down over here, I think it

Page 44

(1)  says, "We believe the U.S. market for supplemental
(2)  insurance products in the United States is vast and
(3)  underpenetrated." The second – the sentence after
(4)  refers to your Japan production. Then the next
(5)  sentence says, "The U.S. population is aging and
(6)  health care costs, deductibles and copayments are
(7)  rising. To us, that means the potential in this
(8)  market should continue to expand." Do you agree with
(9)  that?
(10) A.    I agree.
(11) Q.    If you turn to Page 66, and if you go down –
(12) actually, this continues on through Page 78. This
(13) references the management team. Can you tell us what
(14) the management team is?
(15) A.    The management of AFLAC.
(16) Q.    Okay. The board of directors, the officers,
(17) all the people in charge?
(18) A.    I don't – you know, again, I didn't put the
(19) document together, but the management team, I think
(20) would – yes, I believe it represents the officers of
(21) AFLAC.
(22) Q.    Do you recognize a lot of people in those
(23) photos and their names?
(24) A.    I recognize some of them, yes.
(25) Q.    And those are officers, directors, people in

Page 45

(1)  charge?
(2)  A.    That's correct.
(3)  Q.    Okay. I counted 54 officers in the U.S. and
(4)  32 in Japan. Does that sound about right?
(5)  A.    I don't know.
(6)  Q.    Let me just represent to you that those are
(7)  the numbers I came up with. It's either the exact
(8)  number or very close to it. Of those management team
(9)  people, can you identify any of them who are Hispanic?
(10) And feel free to take a moment to look through each
(11) one.
(12) MS. LEEDS:    I guess I need to object
(13) just to the extent of what you mean by Hispanic.
(14) Hispanic surname?
(15) Q.    (By Mr. Aguilar) Any? You can answer.
(16) A.    You know, again, I don't – I don't
(17) understand their background or nationality based on
(18) their name, but to the best of my knowledge, I don't
(19) see –
(20) Q.    Any?
(21) A.    – any that I'm aware of.
(22) Q.    Either by name or by recognition of that
(23) particular person as a Hispanic, correct?
(24) MR. STEELE:    Object to the form. You're
(25) assuming he knows whether the person has a Hispanic

Page 46

(1)  mother that would not appear in the surname.
(2)  MR. AGUILAR:    I'm just asking for any he
(3)  could recognize.
(4)  Q.    (By Mr. Aguilar) Any?
(5)  MR. STEELE:    That's a different
(6)  question.
(7)  THE WITNESS:    No, none that I know of.
(8)  Q.    (By Mr. Aguilar) Okay. Let me hand you what
(9)  I had previously marked as Errisuriz Exhibit No. 8.
(10) Have you seen that document before today?
(11) A.    Yes, I have.
(12) Q.    When did you first see it?
(13) A.    As I recall, in Atlanta – at our Atlanta
(14) meeting.
(15) Q.    This was a letter sent from Dr. Noe Sauceda
(16) at the Brownsville Independent School District
(17) addressed to Mr. Chavez on November 29, 2001, and it
(18) indicates a cc to the BISD Board of Trustees, Frank
(19) LaFemina, AFLAC's State Office, and possibly others on
(20) any other pages. But you said you first saw it at the
(21) home office in Atlanta?
(22) A.    At the Atlanta meeting, which is the RSC/SSC
(23) meeting.
(24) Q.    And when was that?
(25) A.    The first part of December, that year.

Page 47

(1)  Q.    You don't remember the date, do you?
(2)  A.    It's – I usually go in early. I can't even
(3)  remember which day it is. But it's in that – it was
(4)  in that first week or so of December.
(5)  Q.    Of 2001, right?
(6)  A.    I would assume since that's when the letter
(7)  is dated.
(8)  Q.    How did you get it? How did it come up to
(9)  you?
(10) A.    I was made aware that there was a challenge
(11) and that we would be going over the information on
(12) this.
(13) Q.    There was a what?
(14) A.    That there was a concern or a challenge.
(15) Q.    What do you mean by a challenge?
(16) A.    Just that something is not right, something
(17) that we've got to try to look at and fix.
(18) Q.    Okay.
(19) A.    Okay.
(20) Q.    Who was it you were talking to?
(21) A.    It was – you know, I don't recall. I know
(22) who I met with later, but I don't recall on this
(23) particular document or the issue.
(24) Q.    Okay.
(25) A.    I know I had received an e-mail from Dino in

Page 48

(1)  relationship to not being able to – not attending the
(2)  meeting and that's when I –
(3)  Q.    Okay. The first person that you do remember
(4)  talking to, whoever it might have been, do you
(5)  remember what you were talking about, other than just,
(6)  this is something you need to take care of?
(7)  A.    It was Janet Baker.
(8)  Q.    Do you remember what you-all talked about?
(9)  A.    Not in detail.
(10) Q.    Just the extent of what you recall is what
(11) you've already told us, just that you remember talking
(12) to her, that this is an issue that we need to take
(13) care of, and you-all moved on to the next item you-all
(14) talked about?
(15) A.    Well, it was – it was more – generally, I
(16) can tell you. It was related to the issues as it
(17) surrounds Dino and the Brownsville school district and
(18) not being able to – you know, the things that had
(19) gone on in relationship to him not getting a renewal
(20) on this.
(21) Q.    Okay.
(22) A.    Okay?
(23) Q.    Do you remember what she said?
(24) A.    As far as going through the information, she
(25) wanted to schedule a meeting with Frank LaFemina when

BSA    ORAL AND VIDEOTAPED DEPOSITION OF LYNN GEORGE BARNSON    XMAX(9/9)

Page 49

(1) he got there and myself.
(2)    Q.    When he got to the State meeting?
(3)    A.    When he got to Atlanta for the meeting, she
(4) wanted to schedule some time to go through this
(5) information.
(6)    Q.    And that meeting that you're talking about
(7) was at the beginning of December?
(8)    A.    Somewhere in that first week, yeah.
(9)    Q.    Okay. Do you remember talking to anybody
(10) else about this situation before Frank LaFemina
(11) arrived at the meeting?
(12)    A.    I don't remember.
(13)    Q.    Once Frank arrived, do you remember talking
(14) to him?
(15)    A.    I remember talking to him and Janet, telling
(16) them that we need to get together and have a
(17) discussion.
(18)    Q.    Did you have that discussion?
(19)    A.    Yes, we did.
(20)    Q.    And do you remember when that was?
(21)    A.    Sometime in the first part of the week – you
(22) know, when the meeting started, about Wednesday,
(23) Thursday. There's a time frame there when the
(24) regional managers and the state managers start to
(25) arrive and it was some time in that. I was also there

Page 50

(1) for officer meetings that I had.
(2)    Q.    Okay. What else did you-all discuss while
(3) you were there, meaning about this situation?
(4)    A.    About this situation? We discussed the fact
(5) that there was a concern that Dino had gone out and –
(6) because he didn't get the authorization that there had
(7) been even a suggestion on litigation against the
(8) school district, and that there had been some
(9) activities going on in relationship to, you know,
(10) him – again, I didn't have all the details, but they
(11) did go over it with me. And at that time I concurred
(12) with, you know, the things we should look into.
(13)    Q.    Okay. Who is it that told you about the
(14) suggestion of litigation?
(15)    A.    It came out of the information that was –
(16) that was discussed.
(17)    Q.    Was that from Mr. LaFemina?
(18)    A.    Not that I recall. It may have been – I
(19) think it was more – it came from Janet doing her
(20) briefing.
(21)    Q.    Okay. What is the significance of that?
(22)    A.    The significance probably is this, you know,
(23) as I have reviewed documents – you know, normally the
(24) procedure is when I get correspondence in my office
(25) that suggests that there is, you know, an attorney

Page 51

(1) being copied or whatever, the process that I normally
(2) use is then to forward it on to headquarters and let
(3) Janet or the legal department take over at that point
(4) and focus my attention on the growth of the sales
(5) organization. And so, you know, the information that
(6) I had received had shown me that there was a
(7) suggestion that there was litigation or the threat of
(8) litigation, I should say, in that scenario.
(9)    Q.    And that was because an attorney was being
(10) copied on the letter?
(11)    A.    Yes. That's – that's my recollection.
(12)    Q.    What action did you take in response to
(13) Errisuriz Exhibit 8, the letter from Dr. Sauceda?
(14)    A.    Again, you know, my recollection on this is,
(15) I remember seeing the letter. My recollection is I
(16) had seen it in Atlanta. And at that point, because I
(17) had been traveling – and I travel a lot – it was
(18) my – at that point, it was turned over to Janet and I
(19) had the chance to review it at that time. And my –
(20) the point is that it was – that was pretty well – I
(21) was in a position to listen and it had been turned
(22) over to someone else to start the work on. So I
(23) listened to it and, again, based on the feelings at
(24) that time, I concurred that that was the – a
(25) direction we probably should consider.

Page 52

(1)    Q.    What was the direction you should consider?
(2)    A.    The direction that I – as I recall, again, I
(3) hate to speculate, because all this time frame was
(4) happening very quickly.
(5)    Q.    I'm just asking for what you do recall.
(6)    A.    What I do recall, it was the idea at that
(7) point that we had a real concern as to why Dino was –
(8) was pursuing the account in the direction that he was
(9) pursuing it.
(10)    Q.    And so you turned it over to Ms. Baker to
(11) handle?
(12)    A.    I turned it over to Ms. Baker to handle.
(13)    Q.    One of the things that was being requested
(14) was a letter from – a letter of apology from AFLAC,
(15) right?
(16)    A.    I don't know.
(17)    Q.    If you look at the letter, in the blocked
(18) area towards the bottom, your supervisor will be
(19) advised that this administration will consider AFLAC
(20) as a future product provider under the following
(21) conditions; the first item, A, a corporate officer
(22) must personally apologize to each board member, the
(23) board as a whole and myself and my administrators
(24) publicly, right?
(25)    A.    Yeah. According to the letter, yes.

Page 53

(1)    Q.    Did you talk to Ms. Baker or anybody else
(2) about providing that letter at that point?
(3)    A.    About providing –
(4)    Q.    The letter that was being requested here, the
(5) apology letter.
(6)    A.    At that point, again, I'll restate myself,
(7) that this information had already been forwarded to
(8) headquarters and at that point I was basically a
(9) by-party on it. So the decisions that were being made
(10) as it relates to that were being made out of
(11) headquarters.
(12)    Q.    Okay. I'm handing you what I've marked as
(13) Chavez Exhibit No. 35, which is a letter from
(14) Mr. Chavez to your board president, Dan Amos, dated
(15) December 4, I believe – I'm sorry, December 2. Did
(16) you ever receive that letter?
(17)    A.    You know, I don't recall. I get a lot of
(18) letters, but I don't recall receiving that letter.
(19)    Q.    By this point, do you know whether the matter
(20) had already been turned over to AFLAC's home office or
(21) not?
(22)    A.    I don't know.
(23)    Q.    Okay.
(24)    A.    Sometimes when letters get written directly
(25) to Dan, they usually go back to marketing and there's

Page 54

(1) a little bit of time frame before, you know, they
(2) would get back to me.
(3)    Q.    Do they go – sometimes they do go back to
(4) you, though?
(5)    A.    Sometimes they do, but –
(6)    Q.    You just don't recall?
(7)    A.    I don't recall.
(8)    Q.    Okay. Do you remember talking to anybody
(9) about this letter or the information in this letter?
(10)    A.    Can you give me the specific time frame?
(11) During that time frame?
(12)    Q.    During that time frame, on or about
(13) December 2.
(14)    A.    No, I don't.
(15)    Q.    Okay.
(16)    A.    It could have – it could have been in the
(17) file, but I don't remember.
(18)    Q.    Okay.
(19)    A.    Janet went over it with everyone.
(20)    Q.    Let me ask you, when Dino started with AFLAC
(21) in 1997, I believe, were you the West Territory
(22) director by that point?
(23)    MR. STEELE:    Arnold, I'm going to
(24) object. I believe that misstates the record.
(25)    MR. AGUILAR:    Was it '98?

Page 55

(1)     MR. STEELE:    Ask Dino. I'm pretty sure
(2) it wasn't '97.
(3)     Q.    (By Mr. Aguilar) When Dino started with
(4) AFLAC -- let me rephrase it. In 1997, were you the
(5) West Territory director?
(6)     A.    Yes.
(7)     Q.    Okay. And I assume continuing on through the
(8) present day, you're still the director?
(9)     A.    No, I'm not right now. I'm still the West
(10) Territory, yes, but I'm not over this area now.
(11)     Q.    Okay. West Territory has since been split
(12) off?
(13)     A.    That's correct.
(14)     Q.    When did that happen?
(15)     A.    That happened, I think, around May of this
(16) year.
(17)     Q.    Okay. So for '97, '98, '99, 2000 and 2001,
(18) you were the West Territory director?
(19)     A.    That's correct.
(20)     Q.    During 2000, '99, and '98, Dino would do the
(21) enrollments for BISD, to your understanding, right; he
(22) was in charge of enrollment for BISD?
(23)     A.    That's my -- to the best of my knowledge.
(24)     Q.    Okay. During that time, he was splitting
(25) commissions with agents, correct?

Page 56

(1)     A.    I don't know.
(2)     Q.    Let me represent to you that he was. If he
(3) was, would you have known about it, either through
(4) Gene Dannelly or through Frank LaFemina?
(5)     A.    Probably not.
(6)     Q.    If they thought it was something that you
(7) should be concerned about, would you have expected
(8) them to notify you about it?
(9)     A.    Yes, they would have.
(10)     Q.    Okay. Were you ever notified of that?
(11)     A.    Not that I can think of.
(12)     Q.    And I understand from -- is it correct, also,
(13) that you never sent out any letter to Mr. Chavez
(14) saying it's prohibited?
(15)     A.    I don't remember.
(16)     Q.    Okay. Let me hand you what I've marked as
(17) Exhibit 38 -- I'm sorry, Chavez Exhibit 38. And I'll
(18) make a copy of this because I've highlighted a portion
(19) that I don't need to be highlighted. But do you
(20) recall seeing that letter? It's a letter dated
(21) December 4 to Mr. Amos, your president, as well.
(22)     A.    Again, I don't recall.
(23)     Q.    Okay. You don't remember talking --
(24)     A.    I'm sure it was part of the packet or -- if
(25) that's in the approximate time frame that we --

Page 57

(1)     Q.    That would have likely been part of a packet?
(2)     A.    I'm assuming. I can't assume. So the answer
(3) is, no, I don't remember seeing it.
(4)     Q.    You got a packet of documents that were all
(5) related to the Dino Chavez/BISD issue?
(6)     A.    No, I did not receive a packet of documents.
(7)     Q.    What did you receive?
(8)     A.    What I -- what happened, Janet had a file and
(9) went through the file with the three of us.
(10)     Q.    And these documents may or may not have been
(11) part of that packet?
(12)     A.    That's correct.
(13)     Q.    Okay. I'm handing you what I marked as
(14) LaFemina Exhibit 4. Do you recognize that document?
(15)     A.    I recognize the document.
(16)     Q.    Okay. This is the form that is used whenever
(17) somebody is being promoted, demoted or other actions
(18) are taken, correct?
(19)     A.    It's the form that's used when there's a
(20) recommendation that someone is to, you know, be
(21) promoted or demoted or cancelled without cause or
(22) cancellation for cause.
(23)     Q.    Okay.
(24)     A.    Or transferred to another state, whatever the
(25) scenario might be.

Page 58

(1)     Q.    And this one is signed by LaFemina at the
(2) bottom?
(3)     A.    That's correct.
(4)     Q.    Do you recognize that as his signature?
(5)     A.    It has the appearance that that's his
(6) signature.
(7)     Q.    Okay. This indicates it's a demotion of
(8) Mr. Chavez from RSC to associate, correct? Let me
(9) rephrase that.
(10)     A.    That's a recommendation.
(11)     Q.    Okay. It's dated December 4, 2001, correct?
(12)     A.    That's correct.
(13)     Q.    That's five days after Dr. Sauceda's letter,
(14) correct, dated November 29?
(15)     A.    Well, whether it's five days or not, yes,
(16) it's after.
(17)     Q.    Okay. It indicates, per Jeff Willis - AFLAC.
(18) You recognize who Jeff Willis is, correct?
(19)     A.    I do.
(20)     Q.    He's the attorney sitting here with us today,
(21) correct?
(22)     A.    That's correct.
(23)     Q.    He's AFLAC's corporate attorney, as far as
(24) you understand?
(25)     A.    He's one of AFLAC's corporate attorneys.

Page 59

(1)     Q.    Do you know why Mr. Willis or this document
(2) indicates Mr. Willis was -- or why LaFemina would have
(3) indicated, per Jeff Willis?
(4)     A.    I don't know.
(5)     Q.    In any case, this is a document that was
(6) used --
(7)     A.    I would have to speculate. I'm not going to
(8) speculate.
(9)     Q.    I don't want you to speculate. This is a
(10) document that would be used to start the process for
(11) Dino's demotion, correct?
(12)     A.    Yeah.
(13)     Q.    Okay.
(14)     A.    This is a process. Can I restate that?
(15)     Q.    Sure.
(16)     A.    This is the process that would start the
(17) process of recommending. You know, Mr. LaFemina does
(18) not have the power to demote anyone. He can only make
(19) recommendations.
(20)     Q.    And this is what starts that process?
(21)     A.    That would be the process of making that
(22) recommendation.
(23)     Q.    And this would be the process that ultimately
(24) led to the demotion, correct?
(25)     A.    It began the process.

Page 60

(1)     MS. LEEDS:    Object to form.
(2)     Q.    (By Mr. Aguilar) Okay. I'm handing you what
(3) I've marked as LaFemina Exhibit 10. This is an e-mail
(4) that was sent from Mr. Chavez to you. And it's dated
(5) December 4, 2001, and I'll just read it. "As you
(6) probably know by now, Frank LaFemina has demoted me
(7) back to an associate for reasons that are unclear to
(8) me. Without involving you in any part of it, please
(9) let me know if I should show up to the SSC/RSC annual
(10) sales meeting in Atlanta. The airline ticket is
(11) already in my possession. I very much want to remain
(12) a part of the TX-C management team, but I will abide
(13) by whatever your instructions are to me."
(14)     A.    Okay.
(15)     Q.    Do you recall receiving this document?
(16)     A.    I do recall receiving it.
(17)     Q.    So at the very least, by December 4, 2001,
(18) you were aware of what was going on with Dino?
(19)     A.    Actually, I'll rephrase that. Probably by
(20) December 5. I was en route to Atlanta and probably --
(21) you know, I won't speculate when I opened my e-mail,
(22) but I know that that was part of when I asked the
(23) question to Janet Baker, who was also in attendance at
(24) that meeting.
(25)     Q.    Okay. Had you talked to Mr. LaFemina about

Page 61

(1) Mr. Chavez prior to receiving this e-mail?
(2)    A.   I would be speculating. I don't remember.
(3)    Q.   Okay. It would have been around this time
(4) period at least that you would have talked to
(5) Mr. LaFemina, correct?
(6)    A.   Around, meaning the Atlanta meeting?
(7)    Q.   Well, within a day or two of this memo,
(8) December 4.
(9)    A.   I would think so, yes.
(10)   Q.   Okay. Now, did Mr. LaFemina get
(11) authorization or approval from you before submitting
(12) the document we just talked about, LaFemina Exhibit 4,
(13) the recommendation to demote Dino?
(14)   MS. LEEDS:   Object to the form. Go
(15) ahead.
(16)   THE WITNESS:   Say it again, then.
(17)   Q.   (By Mr. Aguilar) Sure. Did Mr. LaFemina
(18) talk to you about Exhibit LaFemina 4 prior to
(19) submitting his recommendation to demote Mr. Chavez?
(20)   A.   I don't recall.
(21)   MS. LEEDS:   Object to the form.
(22)   Q.   (By Mr. Aguilar) In other words, he didn't
(23) get permission from you to submit that document, did
(24) he?
(25)   MS. LEEDS:   Object to the form.

Page 62

(1)   THE WITNESS:   Again, restate it again
(2) for me.
(3)   Q.   (By Mr. Aguilar) Sure. What I'm asking
(4) is – we're talking still about LaFemina Exhibit 4,
(5) the recommendation for demotion. What I'm asking you
(6) is, Mr. LaFemina didn't get permission from you to
(7) submit this document before submitting it, correct?
(8)   MS. LEEDS:   Object to the form.
(9)   MR. STEELE:   You can answer.
(10)   THE WITNESS:   Okay.
(11)   Q.   (By Mr. Aguilar) The attorneys may object,
(12) but unless your attorney tells you not to answer, you
(13) can answer the question.
(14)   A.   Would you restate the question one more time
(15) and then I'll answer.
(16)   Q.   Sure. Mr. LaFemina did not talk to you about
(17) his recommendation to demote Mr. Chavez prior to
(18) submitting LaFemina Exhibit No. 4, his recommendation
(19) to demote?
(20)   MS. LEEDS:   Object to form.
(21)   THE WITNESS:   I don't remember.
(22)   Q.   (By Mr. Aguilar) He might have talked to
(23) about it?
(24)   A.   Normally, there's that process. But, you
(25) know, I – I don't remember.

Page 63

(1)   Q.   It's possible that he talked about it, you
(2) just don't remember?
(3)   A.   I was traveling at the time.
(4)   Q.   I understand.
(5)   A.   And that all happened very quickly.
(6)   Q.   Once you did get the e-mail from Mr. Chavez
(7) dated December 4, what action did you take in response
(8) to it?
(9)   Q.   Which document?
(10)   A.   LaFemina Exhibit No. 10.
(11)   A.   What action did I take on this?
(12)   Q.   Yes.
(13)   A.   I asked Janet Baker about it.
(14)   Q.   And what else?
(15)   A.   That's basically it. Then she informed me
(16) that we were going to get together and talk about it.
(17)   Q.   And have you already told us everything that
(18) you-all talked about relating to this?
(19)   A.   Relating to – to the best of my knowledge, I
(20) have.
(21)   Q.   Okay. To the best of your recollection,
(22) you've told us everything –
(23)   A.   Right.
(24)   Q.   – that you can remember? You talked to
(25) Janet Baker about relating to Dino Chavez and this

Page 64

(1) situation?
(2)    A.   To the best of my knowledge, yeah.
(3)    Q.   Okay. Why was Mr. Willis involved in the
(4) demotion?
(5)   MR. STEELE:   Objection; form. Assumes
(6) facts not in evidence.
(7)    Q.   (By Mr. Aguilar) Go ahead.
(8)    A.   Say it again, then.
(9)    Q.   Why was Mr. Willis involved in the demotion?
(10)   MR. STEELE:   Same objection.
(11)   Q.   (By Mr. Aguilar) Do you know?
(12)   A.   You know, he's our legal counsel at AFLAC.
(13)   Q.   Okay.
(14)   A.   And if there's anything, again, I would –
(15) what I would restate was that anytime there is an
(16) attorney that is copied, cc'd, or whatever on the
(17) bottom of a page, then it's been my procedure, you
(18) know, and again – let me try – can I restate this?
(19)   Q.   Sure.
(20)   A.   I don't – you know, I understand – and I'm
(21) speculating, okay?
(22)   MR. STEELE:   I'll instruct you not to
(23) speculate.
(24)   THE WITNESS:   Okay.
(25)   MR. STEELE:   You just shouldn't

Page 65

(1) speculate. If you know why –
(2)   THE WITNESS:   I don't know why. Isn't
(3) that what your question is?
(4)   Q.   (By Mr. Aguilar) My question is, why is he
(5) on there –
(6)   A.   Why is he on there? Oh, I don't know that.
(7) I don't know that.
(8)   Q.   – on LaFemina 4?
(9)   A.   Yeah. I thought you were saying – asking me
(10) about the way he got involved. On that particular
(11) item, I do not know why he was put on there.
(12)   Q.   For example, whenever – attorneys aren't
(13) involved every time somebody gets demoted, right?
(14)   A.   No.
(15)   Q.   Okay. And other than because there was an
(16) attorney at the bottom of a cc on the letter, can you
(17) think of any other reason why you felt any need to
(18) bring in an attorney?
(19)   A.   That's just a procedure that I have used for
(20) years.
(21)   Q.   Okay. Whenever there's an attorney at the
(22) bottom, you bring in an attorney?
(23)   A.   If there is what appears to be the threat of
(24) legal action, after I've reviewed it, I looked at it –
(25) I always review my information. But if there appears

Page 66

(1) to be the threat of legal action, then – or whatever,
(2) then I turn it over to someone higher than me to deal
(3) and get the information on it.
(4)   Q.   Do you recall Mr. Chavez's letter saying
(5) anything about – and you're free to look at those two
(6) exhibits, but do you recall Mr. Chavez's letter saying
(7) anything about suing AFLAC?
(8)   A.   Mr. Chavez's letters?
(9)   Q.   Yes.
(10)   A.   Okay. During that time frame or since?
(11)   Q.   If you would look at Chavez Exhibit 35 and I
(12) believe it's 38, these were the letters that were sent
(13) to Mr. Amos. At the bottom there's a name, Ted
(14) Rodriguez, Attorney at Law. And I assume that's what
(15) you were talking about. Anything in there that says
(16) Mr. Chavez was going to sue AFLAC?
(17)   A.   I don't remember without reviewing the
(18) document.
(19)   Q.   Feel free to look at it. Feel free to look
(20) at it.
(21)   A.   Would you restate the question now?
(22)   Q.   Anything in those letters that indicates to
(23) you that Mr. Chavez was considering suing AFLAC?
(24)   A.   Only the – the copy that I – of course, let
(25) me look at this one. I read the one

Page 67

(1)  Q.  And now you're looking at Exhibit 38, Chavez
(2)  38?
(3)  A.  Only the cc.
(4)  Q.  In other words, it's only because there was
(5)  an attorney named at the bottom that you believed
(6)  there was any reason to think that –
(7)  A.  Let's restate it, okay?
(8)  Q.  Sure.
(9)  A.  And make sure we're – would you reask the
(10)  question again, as pertaining to these documents?
(11)  Q.  Or any other documents you received. What
(12)  reason did you have to believe that Mr. Chavez was
(13)  going to be suing AFLAC?
(14)  A.  Okay. First of all, let me remind you that
(15)  there was a meeting where I was made aware of this
(16)  information and that not all these documents was I
(17)  privileged to see. And so at the time of that, you
(18)  know, I did not – I was not aware of anything of that
(19)  nature. I will say, you know – and I guess, again,
(20)  my attorney has suggested I don't speculate, so I'll
(21)  leave it at that.
(22)  Q.  Okay. So you can't think of any other
(23)  reason – you can't recall any other conversation or
(24)  anything anybody else told you of a reason to suspect
(25)  that Mr. Chavez might be suing AFLAC?

Page 68

(1)  MR. STEELE:  Objection; form. Misstates
(2)  the record.
(3)  THE WITNESS:  State it again.
(4)  Q.  (By Mr. Aguilar) Nothing else you can recall
(5)  of any reason that you have to understand that
(6)  Mr. Chavez might be suing AFLAC?
(7)  MR. STEELE:  At what point in time are
(8)  you talking?
(9)  Q.  (By Mr. Aguilar) During the – I guess about
(10)  through, say, December 10th, 2001.
(11)  A.  I don't know.
(12)  Q.  Nothing else that you can tell us about,
(13)  right?
(14)  A.  State it again.
(15)  Q.  Sure.
(16)  A.  Can we take a quick break?
(17)  Q.  Sure. But let's finish this question first.
(18)  MR. STEELE:  If you want to take a
(19)  break, we can take a break.
(20)  MR. AGUILAR:  But we're allowed to
(21)  finish the one question.
(22)  Q.  (By Mr. Aguilar) My question is just –
(23)  MR. STEELE:  He wants to take a break.
(24)  MR. AGUILAR:  I don't think that's –
(25)  MR. STEELE:  You can do your question

Page 69

(1)  after the break.
(2)  MR. AGUILAR:  I'd like him to be able to
(3)  answer this question first.
(4)  Q.  (By Mr. Aguilar) All I'm asking is, is there
(5)  anything else? Any other thing that you have for –
(6)  MR. STEELE:  Do you want to take a break
(7)  before – you need go to the rest room.
(8)  Q.  (By Mr. Aguilar) You can't answer the
(9)  question without going to the rest room?
(10)  MR. STEELE:  Objection. We're taking a
(11)  break. Thanks. We'll come back and answer it.
(12)  MR. AGUILAR:  Let the record reflect I
(13)  did not agree to take a break at this point.
(14)  MR. STEELE:  Let it reflect whatever it
(15)  wants.
(16)  (Brief Recess)
(17)  (Exhibit Nos. 7-8
(18)  (marked for identification.
(19)  Q.  (By Mr. Aguilar) I'm handing you what I've
(20)  marked as Exhibit No. 7. This was a document you
(21)  provided for me this morning, which was part of your
(22)  personal file on Dino while he was still an agent for
(23)  AFLAC, correct?
(24)  MS. NEALLY:  What's the Bates stamp?
(25)  MR. AGUILAR:  Bates stamp is 4156.

Page 70

(1)  THE WITNESS:  And that's 5-18 of '99?
(2)  Q.  (By Mr. Aguilar) Correct.
(3)  A.  I would assume, yes.
(4)  Q.  Okay. And if you would look at that –
(5)  that's the only copy I have right now. If you could
(6)  put it down so I could see it, also. This document
(7)  indicates that 60 percent of this business transmittal
(8)  was payable to Dino Chavez, correct?
(9)  A.  That's what that transmittal is saying, yes.
(10)  Q.  Can you tell us what that means?
(11)  A.  At the associate level, the 60 percent that
(12)  he was doing was the split of the business.
(13)  Q.  Basically, that Dino was getting paid
(14)  60 percent of that sale basically as an agent?
(15)  A.  At that time. At that time and that date in
(16)  the transmittal.
(17)  Q.  And that's dated May of 1999, correct?
(18)  A.  Right. And that's a transmittal, yes.
(19)  Q.  And by May of 1999, Dino was an RSC, correct?
(20)  A.  I don't remember.
(21)  Q.  Let me represent to you that he was.
(22)  A.  Okay.
(23)  Q.  I'm handing you also what I've marked as
(24)  Exhibit No. 8. Can you tell us – this is also a
(25)  document, AFLAC 4157, that you provided for us this

Page 71

(1)  morning and it also came out of your file, correct?
(2)  A.  I'm assuming that's the case, yes.
(3)  Q.  This document indicates that – it's dated
(4)  where is the date on here?
(5)  A.  5-24-99.
(6)  Q.  May of '99, also. And this one indicates
(7)  that Dino is getting 100 percent of that commission,
(8)  correct?
(9)  A.  Yes, this was out of my file. I don't know
(10)  the – the document. I know this is a transmittal.
(11)  I'm not sure where the document comes from. But,
(12)  yeah, it did come out of my file.
(13)  Q.  Do you have any reason to dispute that
(14)  document?
(15)  A.  Specifically disputing what?
(16)  Q.  Disputing that Dino was receiving 100 percent
(17)  of the commission on that particular sale.
(18)  Q.  Dispute that I – that it was in my file?
(19)  Q.  Right.
(20)  A.  This was in my file and it shows that Dino
(21)  was receiving 100 percent on this file, yes.
(22)  · Q.  Okay. After you got those – could you tell
(23)  us when you would have gotten those? Would that have
(24)  been sometime in 1999?
(25)  MR. STEELE:  Do you want to show the

Page 72

(1)  witness what those transmittals are attached to, the
(2)  letter?
(3)  MR. AGUILAR:  It's not necessary for my
(4)  questions.
(5)  MR. STEELE:  Bates 4153. Well, I think
(6)  it's important to put it in context.
(7)  MR. AGUILAR:  You can ask him that when
(8)  you ask him questions. For now, if I can continue.
(9)  Q.  (By Mr. Aguilar) Mr. Barnson, each of these
(10)  documents, you received them, to the best of your
(11)  understanding, in 1999, correct?
(12)  A.  To the best of my understanding.
(13)  Q.  You did not send anything to Dino afterwards
(14)  saying splits are not allowed, right?
(15)  A.  I don't know that I did. I don't remember.
(16)  Q.  Nothing you could point to us that you did
(17)  it?
(18)  A.  Nothing that I can remember.
(19)  Q.  Okay. Let me hand you what was previously
(20)  marked as Chavez Exhibit 18. This was a letter from
(21)  Mr. Willis, the attorney, to Mr. Chavez dated
(22)  December 5, 2001. Do you recall receiving a copy of
(23)  this letter? It's got you cc'd on the second page.
(24)  A.  Again, this – you know, I noted as I
(25)  reviewed this that I had been copied, but I did not

Page 73

(1) remember it.
(2)     Q.     You've seen it before today?
(3)     MS. NEALLY:     Objection.
(4)     Q.     (By Mr. Aguilar) That was a question,
(5) actually.
(6)     A.     Can I read through it?
(7)     Q.     Sure.
(8)     A.     I have seen the letter before today, yes.
(9)     Q.     Okay. Do you recall receiving it on or about
(10) December 5?
(11)     A.     I don't. Again, I was at the Atlanta meeting
(12) and this was probably part of the file that was –
(13) that we went over.
(14)     Q.     Okay. This document indicates that as of
(15) December 5, AFLAC was transferring the BISD account to
(16) headquarters and Dino was being removed as servicing
(17) agent, correct? Is that what you understand it to
(18) say?
(19)     A.     That's what my understanding is, yes.
(20)     Q.     Do you know why that was being done?
(21)     A.     It's my understanding, you know, in the
(22) conversation that – again, it's a general
(23) understanding – was that there was information in the
(24) file that Janet had that suggested that there was
(25) litigation against Brownsville school district, and

Page 74

(1) it's the – I guess it's probably one of the first
(2) times I've ever heard one of our salespeople suing an
(3) account.
(4)     Q.     Okay. At this point, Dino hadn't sued an
(5) account, right?
(6)     A.     It was the idea that there was a threat to
(7) sue an account and that was suggested –
(8)     Q.     Who told you that?
(9)     A.     – by Janet Baker.
(10)     Q.     Okay. Where did Janet get that information
(11) from?
(12)     A.     Janet Baker got it from information that was
(13) within her file at that time, and I'm sure there's –
(14) there's these letters and, you know, others that may
(15) be included. But that's the information as I
(16) understand it.
(17)     Q.     Now, Janet never spoke to Dino as far as you
(18) know, right?
(19)     A.     I – I'm not sure.
(20)     Q.     Okay. Can you tell us about any
(21) conversations she had with Mr. Chavez?
(22)     A.     I can't speak for her.
(23)     MS. LEEDS:     Object to the form;
(24) speculation.
(25)     Q.     (By Mr. Aguilar) I'm asking for what you

Page 75

(1) know about; in other words, if she told you, yes, I
(2) spoke to Mr. Chavez on December 7th. Did she ever
(3) tell you that?
(4)     A.     I don't remember.
(5)     Q.     Nothing that you can point us to, right?
(6)     A.     Nothing I can point you to.
(7)     Q.     Okay. She did talk to Frank LaFemina,
(8) though, right?
(9)     A.     Again, I'm speculating. I don't know.
(10)     Q.     While you were involved in a meeting with her
(11) at she did –
(12)     A.     Give me the time frames. That way I can –
(13) are you talking about before, after or when?
(14)     Q.     Early December 2001.
(15)     A.     Okay. So early December – okay. Give me
(16) the specifics of when in December. That week of that
(17) meeting – the week of the meeting?
(18)     Q.     Okay.
(19)     A.     Yes, she spoke with Frank LaFemina that day.
(20) Other times – again, I was traveling. I didn't know
(21) what other times.
(22)     Q.     Okay. You told me about her speaking with
(23) you, with Frank LaFemina –
(24)     A.     In that meeting.
(25)     Q.     – in that meeting. Who else?

Page 76

(1)     A.     That was who I recall.
(2)     Q.     Okay.
(3)     A.     That was the three of us.
(4)     Q.     Are you aware of her speaking to anybody else
(5) about Mr. Chavez during the first 15 days of December?
(6)     A.     Again, I would –
(7)     Q.     I'm asking only what you're aware of, not –
(8) I don't want you to speculate.
(9)     A.     No.
(10)     Q.     Okay. And you didn't tell her about any
(11) threat of litigation by Mr. Chavez, right?
(12)     A.     No, I did not.
(13)     Q.     Okay. And the only person she spoke to about
(14) this that you're aware of was Mr. LaFemina?
(15)     A.     During that meeting, at the same time I was.
(16) I don't know what conversation went on prior to.
(17)     Q.     Okay. Any other reason that you understand
(18) for AFLAC's transferring that account to headquarters
(19) and removing Mr. Chavez as servicing agent?
(20)     A.     Any other reason than –
(21)     Q.     What you've already told us.
(22)     A.     No.
(23)     Q.     Okay. Did you not want Mr. Chavez to contact
(24) Dr. Sauceda?
(25)     A.     That's a broad question. When? After the

Page 77

(1) fact, in between, before?
(2)     Q.     After receiving Dr. Sauceda's letter, did you
(3) not want – after November 29th, did you not want
(4) Mr. Chavez to contact Dr. Sauceda?
(5)     A.     I would say based on the information – in
(6) other words, Mr. Chavez is an independent contractor,
(7) okay, with AFLAC. And so it's hard for me to say, you
(8) cannot go do this. He certainly can go do what he
(9) needs to do.
(10)     Q.     You wouldn't have had any objection if he had
(11) gone and talked to Dr. Sauceda?
(12)     MR. STEELE:     You mean after he received
(13) Errisuriz 8?
(14)     MR. AGUILAR:     Anytime after December 1,
(15) 2001.
(16)     MR. STEELE:     Are you –
(17)     Q.     (By Mr. Aguilar) If he had gone anytime
(18) after December 1, 2001, if Mr. Chavez had gone to talk
(19) to Dr. Sauceda, would you have any cause for concern
(20) about that?
(21)     A.     As a manager?
(22)     Q.     Yes.
(23)     A.     I would have expected or hoped that Dino
(24) would have talked to Mr. LaFemina, who is a
(25) supervisor, or maybe even got the information and

Page 78

(1) consulted with someone as to, you know, what should we
(2) do. But, you know, the instructions of the school
(3) district, which is our client, is to, you know, do we
(4) want to back out of that, as I understand, or back
(5) away.
(6)     Q.     Okay.
(7)     A.     And so there would have been hope that that
(8) would have taken place, but he's an independent
(9) contractor.
(10)     Q.     So you would have wanted him to abide by
(11) whatever Mr. LaFemina instructed him?
(12)     A.     He's an independent contractor.
(13)     Q.     I understand.
(14)     A.     It's not so much abide and require. It's
(15) a – Mr. LaFemina can't do that. He can make
(16) suggestions. And, you know, I would have hoped that
(17) Dino would have, as in any situation, would have
(18) pulled us together and said, hey, here's the
(19) situation. What can we do about it?
(20)     Q.     Do you know whether Mr. LaFemina instructed
(21) Dino not to do that?
(22)     A.     I –
(23)     Q.     Do you know?
(24)     A.     Vaguely, I think I saw something, but I don't
(25) remember.

Page 79

(1)    Q.    Okay. What about Mr. Chavez contacting BISD
(2)    board members? Would you have any concern about him
(3)    contacting board members after December 1, 2001? I'm
(4)    just asking about whether you would have had any
(5)    concern about him doing that.
(6)    A.    Yes.
(7)    Q.    And why was that?
(8)    A.    Because I think that the account has made
(9)    itself clear where it's at at that point, and I think
(10)    that's a time that we need to back up and look at
(11)    the –
(12)    Q.    Indication?
(13)    A.    – professionalism as it relates to that
(14)    account and then see if we couldn't fix it, if we
(15)    could.
(16)    Q.    What about contacting BISD staff; same thing?
(17)    A.    You know, I mean, that's – are you asking me
(18)    from what his rights are, or are you asking me from a
(19)    management practice?
(20)    Q.    From a management supervisory practice.
(21)    A.    Okay. From management practice, I would say
(22)    back away from the account, let's see what we can do
(23)    to try to fix it; although, I know there's a short
(24)    time frame there.
(25)    Q.    Would that have also – would that be the

Page 80

(1)    same thing also for his going on to BISD property?
(2)    A.    You know, I'm not an attorney and whether
(3)    they should go on or not –
(4)    Q.    You're answering questions from what you
(5)    just – as you described, from a management practice.
(6)    A.    I would ask him not to go on the property
(7)    until we – see if we could fix it.
(8)    Q.    Now, regardless of that, you're aware
(9)    Mr. Chavez was not allowed to supervise the BISD 2001
(10)    enrollment, correct?
(11)    A.    Correct.
(12)    Q.    He was also not allowed to do any other RSC
(13)    duty after December 4, 2001, correct?
(14)    A.    That's my understanding.
(15)    A.    I'm handing you what I've marked –
(16)    Q.    Excuse me. Can – there was something in the
(17)    way you said that.
(18)    Q.    What is it?
(19)    A.    After December 4th that he was no longer
(20)    allowed? You know, I think there's a time frame
(21)    involved in the duties and responsibilities and once
(22)    that assignment sheet goes in. So I want to correct
(23)    that as far as – you know, as far as his ability to
(24)    do those duties, he has the right by contract to do
(25)    those duties until that time is exhausted.

Page 81

(1)    Q.    Well, let me talk to you about Chavez
(2)    Exhibit 39. This is a memo from Karl Douglass, second
(3)    vice president with AFLAC, to Mr. Chavez indicating,
(4)    "This letter is an official 30-day notice of the above
(5)    listed change in status," referring to the change from
(6)    Dino as an RSC to an associate, and it's dated
(7)    December 28, 2001, correct?
(8)    A.    That's right.
(9)    Q.    Do you know why there was a delay of 24 days
(10)    before Dino – before that letter was even sent out?
(11)    MR. STEELE:    What 24-day delay are you
(12)    talking about?
(13)    Q.    (By Mr. Aguilar) Between the 28th on that
(14)    letter and the 4th when Mr. Chavez was directed not
(15)    to – I'm sorry, when Mr. LaFemina submitted LaFemina
(16)    Exhibit No. 4, the recommendation for the demotion
(17)    from RSC to associate.
(18)    A.    I can tell you procedure.
(19)    Q.    Okay.
(20)    A.    The answer – I mean, the answer is, number
(21)    one, is that Mr. LaFemina can only make
(22)    recommendations and it's the right of AFLAC
(23)    headquarters to investigate, to check out, to do what
(24)    they need to before acting on any request.
(25)    Q.    Do you know what AFLAC did between December 4

Page 82

(1)    and December 28 to investigate?
(2)    A.    I don't.
(3)    Q.    Okay.
(4)    A.    I turned it over to AFLAC and they took over
(5)    from there.
(6)    Q.    Did you sign off on the demotion?
(7)    A.    I did.
(8)    Q.    When?
(9)    A.    I don't remember the exact date.
(10)    Q.    Exhibit LaFemina 4 was sent out December 4 –
(11)    or it's dated December 4.
(12)    A.    Are we done with this one?
(13)    Q.    Not yet.
(14)    A.    Okay.
(15)    Q.    And that that you were just referring to,
(16)    Chavez Exhibit 39, is dated December 28. In between
(17)    those two days, when would it have been closer, to the
(18)    4th or the 28th?
(19)    A.    As far as –
(20)    Q.    Your signing off on the demotion.
(21)    A.    You know, we're playing a guessing game here.
(22)    Q.    I'm asking –
(23)    A.    I have a lot of – I know, but I can't do –
(24)    I don't remember.
(25)    Q.    If you don't remember, that's an okay answer.

Page 83

(1)    A.    I don't remember.
(2)    Q.    Okay.
(3)    A.    I get a lot of those things.
(4)    MR. STEELE:    Arnold, if it will help
(5)    you, you've got the record that he signed.
(6)    MR. AGUILAR:    Is that the documents you
(7)    provided this morning?
(8)    MR. STEELE:    No, no, no. You had this a
(9)    long time ago.
(10)    MR. AGUILAR:    Okay.
(11)    MR. STEELE:    You've got it somewhere.
(12)    If you want to show him that, the one that he signed.
(13)    MR. AGUILAR:    I didn't bring it with me.
(14)    (Exhibit No. 9
(15)    (marked for identification.
(16)    Q.    (By Mr. Aguilar) Let me hand you what I've
(17)    marked as Exhibit No. 9, which is Bates stamped 1251.
(18)    It's a letter from Mr. Chavez to you dated January 4,
(19)    2001.
(20)    MR. STEELE:    2002.
(21)    Q.    (By Mr. Aguilar) I'm sorry, 2002.
(22)    A.    I remember this letter.
(23)    Q.    Okay. In this letter, Mr. Chavez is at the
(24)    very beginning saying he's contacting you to request
(25)    your presence at a meeting with him and his team as

Page 84

(1)    soon as possible. He goes on to say, on December 3,
(2)    2001, Frank LaFemina gave him a verbal directive of
(3)    30-day notice of his intent to terminate Mr. Chavez
(4)    from his position as RSC. What action did you take in
(5)    response to this letter?
(6)    A.    The action that I have always taken in these
(7)    situations – or most of the time, you know, was that
(8)    I would forward that on to Jeff Willis in the legal
(9)    department and let Jeff deal with the response as to
(10)    how that would be conducted.
(11)    Q.    You sent it to the lawyer and you didn't take
(12)    any further action?
(13)    A.    I reviewed it, I looked at it at that point,
(14)    that's the direction I went. And I wasn't sure of the
(15)    exact details as to the meeting, and if it was a
(16)    request for arbitration, then it needs to go through
(17)    the legal department.
(18)    Q.    I'm sorry. I didn't understand your
(19)    question – your answer. My question was, other than
(20)    sending it to the lawyer, did you take any other
(21)    action?
(22)    A.    I looked at it, reviewed it and then sent it
(23)    in, yes.
(24)    Q.    Okay. In the last paragraph, it starts off
(25)    saying "After seven years in some type of coordinator

Page 85

(1) capacity and having surpassed all company expectations
(2) as a regional sales coordinator over the last three
(3) years, I would have received more support or
(4) at least a personal phone call from a company officer.
(5) But no one has called or written to ask for my side of
(6) the story." Did you ever call him to ask him for his
(7) side of the story?
(8) A. I didn't that I recall. I don't recall.
(9) And, you know – I don't recall.
(10) Q. Do you know of anybody else who did call
(11) Mr. Chavez and ask him for his side of the story?
(12) A. I would be speculating.
(13) Q. You don't know of anybody?
(14) A. I don't remember.
(15) Q. Okay.
(16) A. Are we done with this?
(17) Q. Yes. Put it further to the left, if you
(18) would.
(19) A. How about this one? Does this one need to go
(20) over there?
(21) Q. Here. Let me try to organize it.
(22) (Exhibit No. 10
(23) (marked for identification.
(24) Q. (By Mr. Aguilar) Let me hand you what I've
(25) marked as Exhibit No. 10. This is a letter from

Page 86

(1) Mr. Willis, the lawyer, to Mr. Chavez and he starts
(2) off saying, "I am writing on behalf of Lynn Barnson,"
(3) and it's got a cc to you. Did you get a copy of this
(4) letter?
(5) A. I did.
(6) Q. You didn't send out anything separately to
(7) Dino, I think you just told us, right?
(8) A. That's correct, as I recall.
(9) Q. This letter says he acknowledges receipt of
(10) the letter that Dino had sent to you, and it goes on
(11) to say – he references a letter sent regarding the –
(12) regarding Dino's regional sales coordinator's
(13) agreement in December 2001 notifying him of the
(14) termination of that agreement. Basically, what he's
(15) saying, we terminated your position, and it doesn't
(16) say much more than that. Would you agree with that?
(17) MR. STEELE: Objection; form. The
(18) letter speaks for itself.
(19) Q. (By Mr. Aguilar) Would you agree with that?
(20) A. Restate it again.
(21) Q. Basically the letter says, we got the letter
(22) you sent to Mr. Barnson. We had previously sent you a
(23) letter saying you were being demoted; otherwise, it
(24) doesn't say anything of any substance, correct?
(25) A. I think he's responding to the letter and to

Page 87

(1) what I said when forwarding that on there. That's
(2) what I think it's doing, it's responding. I think –
(3) I think it's pretty clear, you know, what it's saying
(4) there.
(5) Q. It's saying that Dino had previously been
(6) demoted, right?
(7) A. It's saying that the 30-day notice was on its
(8) way, was in effect.
(9) Q. Okay.
(10) A. That's my understanding.
(11) Q. Before getting this document, did you get any
(12) other document or receive any other information from
(13) anybody at AFLAC indicating AFLAC wanted to hear
(14) Dino's side of the story?
(15) A. I don't recall.
(16) Q. Nothing that you can point us to?
(17) A. No, not that I can remember.
(18) Q. You never even sent Dino a letter saying –
(19) or called Dino saying, hey, I'm sorry, we just had to
(20) do this. You never even just picked up the phone
(21) said, hey, Dino –
(22) A. No, I didn't.
(23) Q. Let me hand you what was previously marked
(24) Sauceda –
(25) A. Are you through with this?

Page 88

(1) Q. That's fine. Let me hand you what we
(2) previously marked as Sauceda Exhibit 16. This is a
(3) letter sent by Ms. Baker to one of the BISD board
(4) trustees apologizing for any actions AFLAC might have
(5) taken or Dino might have taken, correct?
(6) A. I'm assuming that's what it is, yes.
(7) Q. Did you receive this or are you aware of
(8) this?
(9) A. I don't recall receiving this letter.
(10) Q. Okay. This is dated January 8, 2002, right?
(11) A. That's what it says.
(12) Q. Do you understand this letter was being sent
(13) out in response to Dr. Sauceda's letter of
(14) November 29?
(15) A. Do I understand that?
(16) Q. Yes.
(17) A. It appears that's what it was.
(18) Q. Okay. Do you know why this letter wasn't
(19) sent out on November 30th?
(20) A. I don't.
(21) Q. Do you know why it was sent out a month
(22) later – over a month later?
(23) A. I don't.
(24) Q. Let me hand you what was previously marked
(25) Sauceda Exhibit 17, Sauceda 18, Sauceda 19 and Powers

Page 89

(1) 7, four different documents. If you would, look those
(2) over. Let me represent to you that these are letters
(3) that were sent from four different BISD board members
(4) to Ms. Baker responding to her letter of January 8.
(5) Have you had a chance to see these documents before
(6) today?
(7) A. Yes, I have.
(8) Q. Do you recall –
(9) A. Let me say that I've seen some of them. I
(10) don't know that I saw all of them.
(11) Q. Okay. But you've seen some of them. You
(12) agree in each of letters basically what each of the
(13) board trustees are saying is, we didn't think
(14) Mr. Chavez did anything wrong. Would you agree with
(15) that?
(16) MR. STEELE: Objection; form. The
(17) letters speak for themselves.
(18) THE WITNESS: I'm going to, again, state
(19) the same, that the letters do explain their situation.
(20) Q. (By Mr. Aguilar) Okay. Well, Sauceda 17,
(21) the first one, the letter from Pat Lehmann, indicates,
(22) "There is no apology needed for any action that
(23) Mr. Dino Chavez might have or might not have caused."
(24) Did you understand that to mean that there's nothing
(25) that Mr. Lehmann felt was done wrong by Mr. Chavez?

Page 90

(1) A. Reading the letter, that would be my
(2) understanding with the information he had, that that's
(3) the case.
(4) Q. And the second one, Sauceda Exhibit 18, is
(5) from Ms. Linda Salazar, which indicates, "Your apology
(6) is not needed as I do not believe Mr. Chavez did
(7) anything wrong." Pretty clear, right?
(8) A. That's what it says.
(9) Q. Okay. The next one, Sauceda 19, is from
(10) Board President Joe Colunga, which indicates, "I was
(11) not aware of any negative complaints against
(12) Mr. Chavez until the letter went out from the
(13) superintendent requesting an apology to board members.
(14) I personally did not request one and apparently the
(15) conflict developed," et cetera. Any complaint you
(16) understand?
(17) A. Say it again, please.
(18) Q. Okay. Do you understand he had any complaint
(19) about what Mr. Chavez was doing?
(20) A. According to the letter, he didn't.
(21) Q. Okay. And then Powers Exhibit 7, he
(22) indicates in the fourth paragraph, "Not Mr. Chavez or
(23) any AFLAC representative owes me an apology." So you
(24) understood each of these was saying there was no need
(25) for an apology, right?

Page 91

(1)    A.    It has that appearance, yes.
(2)    Q.    Okay. After you did review these documents,
(3) what did you do?
(4)    A.    I hadn't seen these documents until recently.
(5)    Q.    Okay. Do you know if Ms. Baker ever took any
(6) action after receiving these documents?
(7)    A.    I don't know.
(8)    Q.    Do you know if anybody at AFLAC ever took any
(9) action after receiving these documents?
(10)    A.    I don't know.
(11)    Q.    Nothing that you can tell us about, right?
(12)    A.    That's correct.
(13)    Q.    You're not aware of anybody ever telling
(14) Mr. Chavez, oh, it was just a mistake, we want you to
(15) come back?
(16)    A.    It was just a mistake, we want you to come
(17) back?
(18)    Q.    Right.
(19)    A.    Not that I'm aware of.
(20)    Q.    In other words, you've got four out of seven
(21) board trustees sending you letters saying, Dr. Sauceda
(22) probably shouldn't have done that, but in any case
(23) Dino hasn't done anything wrong. Did anybody from
(24) AFLAC afterwards say, oh, I'm sorry, Dino. We can
(25) straighten all this out, come on back. We want you

Page 92

(1) back as RSC. Did anybody ever do that?
(2)    MR. STEELE:    Objection; argumentative.
(3) You can answer.
(4)    THE WITNESS:    Not that I'm aware of.
(5)    Q.    (By Mr. Aguilar) Okay. Then afterwards –
(6) (Exhibit No. 11
(7) (marked for identification.
(8)    Q.    (By Mr. Aguilar) I'm handing you what I'm
(9) marking as Exhibit No. 11.
(10)    A.    Can I – can I ask –
(11)    THE WITNESS:    Can I have just a moment
(12) with you for just a moment?
(13)    MR. STEELE:    Sure.
(14)    Q.    (By Mr. Aguilar) If I could do this real
(15) quick. It should be very quick. It shouldn't take
(16) too long. Exhibit No. 11 appears to be the exact same
(17) letter as the prior exhibit –
(18)    A.    Back here.
(19)    Q.    Do you have it?
(20)    A.    Is it in this stack? It would be right
(21) there.
(22)    Q.    Right there. I think I looked them over
(23) again for just a second. This is – it appears to be
(24) the same as Chavez 39. The only difference I saw was
(25) December 28 on 39 and – Exhibit Chavez 39 and

Page 93

(1) January 28 on Exhibit No. 11 to your depo today. But,
(2) otherwise, they're the same thing, notifying
(3) Mr. Chavez of the demotion from RSC to associate. All
(4) I was going to ask you – all I want to ask you is, do
(5) you know why that second letter went out?
(6)    A.    I have no idea.
(7)    Q.    Okay.
(8)    MR. AGUILAR:    Let's go off the record.
(9)    (Brief Recess)
(10) (Exhibit Nos. 12-14
(11) (marked for identification.
(12)    Q.    (By Mr. Aguilar) Okay.
(13)    A.    I'd like to – the reason I wanted to stop
(14) for a moment, I wanted to maybe continue on in
(15) answering the question you had asked previously
(16) about –
(17)    Q.    Tell you what, when your attorney gets the
(18) chance to ask questions – we're just going to ask you
(19) whatever –
(20)    MR. STEELE:    Was your answer complete a
(21) moment ago in response to the question regarding any
(22) action that AFLAC did or did not take concerning –
(23) after it received the four letters from the board
(24) members that Mr. Aguilar was questioning you about?
(25)    THE WITNESS:    No, it wasn't complete

Page 94

(1)    MR. STEELE:    Would you like to make a
(2) complete answer at this time?
(3)    THE WITNESS:    I would like to.
(4)    MR. STEELE:    Go ahead.
(5)    MR. AGUILAR:    Objection.
(6)    Q.    (By Mr. Aguilar) I'm not asking that
(7) question. If your attorney wants to ask you that
(8) question, he's welcome to once I pass the witness. In
(9) the meantime, I would like to be able to move on with
(10) the deposition.
(11)    MS. LEEDS:    I think he has the right to
(12) clarify an answer to a question.
(13)    MR. STEELE:    He has a right to clarify
(14) an answer at this time. I'll tell you, go ahead and
(15) do it and Arnold and I can fight over the transcript
(16) once we get there.
(17)    THE WITNESS:    Okay. The question was I
(18) think along the line of responding to it and the
(19) reasons for Dino being demoted from regional sales
(20) coordinator. I think it wasn't based off of just the
(21) responses of those individuals. It was based off the
(22) fact that there had been cited in the letter by the
(23) superintendent, the paragraph in this letter,
(24) Document – I'm not sure what the document number is.
(25)    MR. STEELE:    Errisuriz 8.

Page 95

(1)    THE WITNESS:    Okay. And it said, you
(2) know, that it was – it was citing that there had been
(3) some accusations on the part of Dino that not only put
(4) Dino in a possible libel situation but perhaps AFLAC
(5) as well. And, you know, I noted that there was
(6) attachments, which I have seen since, not at the time
(7) of the meeting, where there were accusations made.
(8) And that's just not acceptable for a regional sales
(9) coordinator of AFLAC or a coordinator to do to an
(10) account who has made a decision to do business with
(11) AFLAC and that's not the way we do business. And I
(12) wanted to make sure because that concerned me, you
(13) know. And I wanted to make that statement and put it
(14) on the record.
(15)    MR. AGUILAR:    Objection; nonresponsive.
(16)    Q.    (By Mr. Aguilar) You indicated to us that
(17) you didn't contact Dino within at least 30 days to ask
(18) whether he had even said anything, did you?
(19)    A.    I did not, not that I recall.
(20)    Q.    So as far as you know, you've got one guy
(21) over with a client saying something happened, but you
(22) never even contacted Dino to find out whether it
(23) happened; is that correct?
(24)    A.    That's correct.
(25)    Q.    Okay.

Page 96

(1)    A.    I personally didn't.
(2)    Q.    Okay. Do you know if anybody else at AFLAC
(3) did?
(4)    A.    I'm not aware.
(5)    Q.    Okay. Let's talk about what Dino has done
(6) for AFLAC. I'm handing you what I've marked as
(7) Exhibit No. 12. This is a document summary of Dino's
(8) awards and recognitions with AFLAC from January '99
(9) through February of 2002. It starts at Bates No.
(10) 1162. Starting in – well, let's start at the
(11) beginning. From the page, starting at the very back,
(12) January 1999, Texas State Convention Qualifier. What
(13) does that – do you know what that is?
(14)    A.    I'm sure it's the same convention for the
(15) State of Texas South.
(16)    Q.    Okay. How does somebody qualify to go to
(17) that state convention?
(18)    A.    Based on the criteria of that state sales
(19) coordinator.
(20)    Q.    And this would have been Mr. – I forget the
(21) RSC's name at the time.
(22)    A.    Gene –
(23)    Q.    Gene Daniels; is that right?
(24)    A.    Gene Dannelly.
(25)    Q.    Gene Dannelly. I'm sorry. And was that based

Page 97

(1) on sales, leadership, those other factors we talked
(2) about earlier?
(3)   A.   I don't remember the criteria. It varies.
(4)   Q.   In any case, you have to qualify to be able
(5) to go to that convention, correct?
(6)   A.   Not always.
(7)   Q.   Every agent is allowed to go?
(8)   A.   No, every coordinator.
(9)   Q.   Okay.
(10)  A.   Not always has to qualify; it depends. And I
(11) don't remember the criteria.
(12)  Q.   Okay. Also, Dino apparently was the fourth
(13) quarter 1998 TXS – what does TXS refer to?
(14)  A.   Texas South.
(15)  Q.   Okay – Texas South Top Associate of the
(16) Quarter. How does one become the top associate of the
(17) quarter?
(18)  A.   Through sales.
(19)  Q.   Okay. It goes on to August of '99, Texas
(20) South State Convention Qualifier. That means he
(21) qualified again to go to that convention in Las Vegas.
(22) That's another trip that AFLAC paid for, correct?
(23)  A.   That's correct.
(24)  Q.   Okay. And that's also based on sales and the
(25) other criteria by the coordinator – state

Page 98

(1) coordinator, right?
(2)   A.   That's correct.
(3)   Q.   Okay. Then in December of '99, he received
(4) the West Territory Pride Award. Do you know what that
(5) is?
(6)   A.   Read that again. I missed that one.
(7)   Q.   December of 1999 –
(8)   A.   Okay. West Territory Pride Award was based
(9) off of – you know, the criteria has varied, but it
(10) was based off of a production by the team.
(11)  Q.   Okay.
(12)  A.   You know, going into the Atlanta meeting.
(13)  Q.   Okay. Then in January 2000, the 1999
(14) Coordinator's Silver MPI Key Club award. What is
(15) that? And just for the record, in case you have a
(16) question on any of these, I'm handing you what's
(17) marked as Exhibit 13, which are those particular
(18) documents – some of the awards that Dino actually
(19) received, if you need to look at the documents to help
(20) refresh your recollection.
(21)  A.   Well, I've explained already once before what
(22) the Key Club is.
(23)  Q.   Okay. And Silver MPI means he met certain
(24) criteria –
(25)  A.   Sales criteria on an annual basis, yes.

Page 99

(1)   Q.   Following item is fourth quarter 1999, he was
(2) No. 2 RSC. That means by now he was RSC, right?
(3)   A.   Apparently.
(4)   Q.   Okay. He was the No. 2 RSC in the entire
(5) West Territory percent MPI. Does that mean he was the
(6) No. 2 in sales?
(7)   A.   No, it does not mean that.
(8)   Q.   What does it mean?
(9)   A.   It means that he was No. 2 in percent of the
(10) MPI, which I've explained already is, is you want –
(11) for lack of a better word, quota.
(12)  Q.   With respect to his particular quota?
(13)  A.   Right.
(14)  Q.   Okay. The following item is Texas South
(15) Regional Sales Coordinator of the Year. And I think
(16) that's – if you look at – in the documents I handed
(17) you, Exhibit 13 – I'm sorry.
(18)  A.   This is 13?
(19)  Q.   Right. If you turn to Page 1207, I believe
(20) it is – I'm sorry. No, that one is for the year
(21) 2000. We're still just under 1999. In 1999, he was a
(22) Regional Sales Coordinator of the Year based on
(23) percent MPI, which is that percentage of sales with
(24) respect to the quota that had been established, right?
(25)  A.   That is – it's the percentage of MPI that he

Page 100

(1) reached that year as it relates to the sales goal he
(2) was given.
(3)   Q.   Okay. Then the fourth quarter 1999, he got
(4) both the FAME award, meaning he met those criteria,
(5) plus he got – he was the No. 1 Texas South RSC based
(6) on percent MPI for the fourth quarter, correct?
(7)   A.   Based on MPI. Where are you looking again?
(8)   Q.   Fourth quarter 1999.
(9)   A.   Page –
(10)  Q.   Still back here on 1999. Fourth quarter 1999
(11) FAME award. Then he also got the No. 1 Texas South
(12) RSC based on percent MPI, and you've explained that
(13) for us, right?
(14)  A.   Right.
(15)  Q.   And then the Texas South State Convention
(16) Qualifier. Again, that's another trip he got based on
(17) his sales – sales and the other factors; is that
(18) correct?
(19)  A.   State that again, please. I'm sorry.
(20)  Q.   Sure. He also qualified for the convention
(21) in Cancun, Mexico because of his sales; in other
(22) words, he got –
(23)  A.   I can't answer that question. Again, I'll
(24) remind that you Mr. Dannelly and the team there are
(25) the ones that set the criteria.

Page 101

(1)   Q.   Okay. And the next item is he surpassed MPI
(2) 300 for the year 1999. What does that mean?
(3)   A.   You know, again, I don't have the information
(4) in front of me. But to do MPI 300, it is not
(5) 300 percent. That is actually a category of growth.
(6)   Q.   In other words, you've got MPI, which is
(7) the – a relationship between what you're actually
(8) expecting that agent to sell, right? That's the basic
(9) MPI; is that right?
(10)  A.   Based on the market potential index.
(11)  Q.   Right. And then if you go 150 MPI, what does
(12) that mean?
(13)  A.   There's a percentage of increase you have to
(14) go over that puts you in that category.
(15)  Q.   Okay. Then you've got 200 MPI and you got
(16) 250 and then you got 300.
(17)  A.   I don't have all those categories.
(18)  Q.   Okay. What are the different categories you
(19) have?
(20)  A.   I don't recall, but there's not that many.
(21)  Q.   Okay. 300 MPI, is that a pretty good deal?
(22)  A.   That's a great deal.
(23)  Q.   Okay. Going over to April 2000, first
(24) quarter 2000, he was the No. 1 Texas Central RSC based
(25) on premium increase. What does that mean? What does

Page 102

(1) that refer to?
(2)   A.   That means – you know, I'm not sure. The
(3) way its written, it could mean premium dollars
(4) increase over the previous year, it could be dollar
(5) increase. You know –
(6)   Q.   You can't tell just by looking at this?
(7)   A.   I can't, not without seeing the report.
(8)   Q.   Okay. And actually that would be in the
(9) document you have next to you, but we can move on. In
(10) July 2000, second quarter 2000, FAME award, that means
(11) he got another – qualified for a FAME award in that
(12) quarter, right?
(13)  A.   That's correct.
(14)  Q.   And then he also got the No. 1 Texas Central
(15) RSC for premium increase and then for the first half
(16) of 2000, same thing. And I think you explained to us
(17) your understanding of what – to the extent you can
(18) understand what he's talking about with the premium
(19) increase. Then in August of 2000, he again qualified
(20) to go to the national convention, this time in
(21) San Francisco, based on the same – is that based on
(22) the same factors that we looked at for the other
(23) trips?
(24)  A.   The criteria changes from year to year.
(25)  Q.   Is it basically the same, general category?

Page 103

(1)    A.    Similar.
(2)    Q.    Okay. And going back to the first page, on
(3)  the bottom, you have October 2000, the third quarter
(4)  he received a 2000 FAME award. That means he met
(5)  those – level of criteria. Tell us again what the
(6)  FAME award involves, what the criteria are.
(7)    A.    Well, the criteria is recruiting, it's
(8)  training, it falls under those categories.
(9)    Q.    Recruiting, training and sales also?
(10)    A.    Uh-huh.
(11)    Q.    Okay. Then he also, again, was the No. 1
(12)  Texas Central top RSC on recruiting and that's one of
(13)  the factors that goes into the FAME award, right?
(14)    A.    For that quarter, he was, yes.
(15)    Q.    Okay. Then in December 2000, he got the
(16)  West Territory Pride award, and I think you talked to
(17)  us earlier about that one, right?
(18)    A.    Yes, I did.
(19)    Q.    And then in January 2001, he got the 2000
(20)  Coordinator's Silver MPI Key Club award. Is that an
(21)  annual thing or a quarterly award?
(22)    A.    That's an annual award.
(23)    Q.    Okay. And that's based on his receiving or
(24)  achieving MPI over the year, right?
(25)    A.    It's based on the number, yes, for the year.

Page 104

(1)    Q.    Okay. He got – for the fourth quarter 2000
(2)  he was the No. 1 RSC in the entire West Territory
(3)  based on a percent MPI. Actually, if you look at
(4)  Page 1206 on Exhibit 13.
(5)    A.    Give me a second to look at something because
(6)  you've got – the award apparently was given out. I
(7)  thought it would be in December, but it's – okay.
(8)  206?
(9)    Q.    1206. Is that the document?
(10)    A.    Is that document wooden or is it a plaque?
(11)    Q.    Is that a plaque that he would have received?
(12)    A.    That would have been a plaque he received.
(13)    Q.    And that's got the teamwork logo –
(14)    A.    That's correct.
(15)    Q.    – at the top? Can you read what it says on
(16)  that?
(17)    A.    "Teamwork is the ability to work together
(18)  toward a common vision. The ability to direct
(19)  individual accomplishment toward organizational
(20)  objectives. It is the fuel that allows common people
(21)  to obtain uncommon results."
(22)    Q.    You were actually the one who handed
(23)  Mr. Chavez this award, weren't you?
(24)    Q.    I don't recall.
(25)    Q.    Okay. The following item, the 2000 Texas

Page 105

(1)  Central Regional Sales Coordinator of the Year based
(2)  on percent MPI. That's the following page. And
(3)  that's based on 144 percent, correct, MPI?
(4)    A.    That's what it says.
(5)    Q.    Okay. Mr. Chavez also got a fourth quarter
(6)  2000 FAME award and he was the No. 1 TX-C RSC, Texas
(7)  Central RSC for percent MPI as well, right?
(8)    A.    Texas Central?
(9)    Q.    Right.
(10)    A.    You know what? Again, that's the criteria
(11)  for that state.
(12)    Q.    Okay.
(13)    A.    I mean, if it says that. I don't know
(14)  whether that's –
(15)    Q.    When he qualified for the 2000 Texas Central
(16)  convention that was in Acapulco, Mexico, do you know
(17)  if the criteria had changed any for that?
(18)    A.    I don't know.
(19)    Q.    He also got the fourth quarter 2000 Paul S.
(20)  Amos Founders Award. Can you tell us what the
(21)  Founders Award is?
(22)    A.    That's, again, the award you receive for
(23)  FAME.
(24)    Q.    Okay. In other words, having received a
(25)  certain number of FAMEs throughout the year, at that

Page 106

(1)  point it was –
(2)    A.    You actually get a FAME award with every one
(3)  of these achievements he got.
(4)    Q.    Okay. Then in February of 2000 – I'm sorry.
(5)  Then also he surpassed the MPI 300 for the year 2000.
(6)  That's kind of a big deal there, again, right?
(7)  Surpass MPI 300 for the year 2000?
(8)    A.    Uh-huh.
(9)    Q.    Then in February 2001, he got a 2000 FAME
(10)  trip to Las Vegas. Same criteria, same basic criteria
(11)  that you used to qualify for that trip?
(12)    A.    Yeah.
(13)    Q.    In April 2001, he got – he was the No. 1
(14)  TX-C, Texas Central RSC for new accounts in the first
(15)  quarter. Then in May 2001, Texas Central RSC trip
(16)  qualifier. This time he got to go to Paradise Island
(17)  in the Bahamas. Is that the same criteria?
(18)    A.    I have no idea.
(19)    Q.    Okay. That would be the same – who sets
(20)  that criteria?
(21)    A.    The state sales coordinator and the
(22)  management team. Dino would have helped set that
(23)  criteria.
(24)    Q.    Then in August 2001, the second quarter, he
(25)  got a 2001 FAME award and he qualified to go to the

Page 107

(1)  convention in Hawaii. Again, that's criteria set by
(2)  the state agent, right?
(3)    A.    National convention? National convention is
(4)  not set by the state – it's set by the company.
(5)    Q.    How does one qualify for the national
(6)  convention?
(7)    A.    Meet the criteria as outlined.
(8)    Q.    And what was the criteria?
(9)    A.    I don't recall.
(10)    Q.    Is it based on sales, growth, employee –
(11)    A.    It's based on sales and the team. You know,
(12)  it could vary. It could have – you know, over the
(13)  years we have different criteria. As it relates,
(14)  normally, it's about sales.
(15)    Q.    Okay. How many agents or RSCs usually
(16)  qualify to go to the national convention?
(17)    A.    I don't even recall.
(18)    Q.    As a percentage, roughly, do you know?
(19)    A.    I have no idea.
(20)    Q.    Okay. Then during the second quarter, he was
(21)  No. 3 Texas Central RSC for new accounts and for
(22)  percent MPI. Kind of a big deal to get two different
(23)  categories that high, isn't it?
(24)    A.    It's – being No. 3, yeah. I mean, I'm – he
(25)  certainly earned the right to be recognized.

Page 108

(1)    Q.    Okay. In October 2001, then, Week 43, he was
(2)  the No. 11 Regional Sales Coordinator in the Entire
(3)  West Territory. Can you tell us how big the Entire
(4)  West Territory is?
(5)    MS. NEALLY:    At that time?
(6)    THE WITNESS:    At that time? Again, as a
(7)  region or as a – you're not talking about a
(8)  salesperson, you're talking about as a region at that
(9)  time?
(10)    Q.    (By Mr. Aguilar) Right.
(11)    A.    And you're talking about one week of
(12)  production?
(13)    Q.    I'm just asking how big the West Territory
(14)  is.
(15)    A.    Okay. You know – and, again, gosh, it's
(16)  varied, you know, depending on the years. We've gone
(17)  through so many expansions, it changes. And, you
(18)  know, probably – again, I'm going to speculate. I
(19)  would have to guess. I'm going to say I don't know.
(20)    Q.    You're in charge of the West
(21)  Territory, right?
(22)    A.    That is correct.
(23)    Q.    And can you tell us how big the territory is
(24)  now?
(25)    A.    Right now, I've got 64 regional sales

Page 109

(1) coordinators.
(2)    Q.    Geographically speaking.
(3)    A.    Geographically speaking, it now covers the
(4) Dakotas, Minnesota, Missouri, Iowa and brings all
(5) those states along that area over to the California
(6) line.
(7)    Q.    Okay. And back in October of 2001, was it
(8) larger or smaller?
(9)    A.    It was larger.
(10)    Q.    How much larger was it before the last prior
(11) change?
(12)    A.    It did not include the Minnesota, Missouri or
(13) the Iowa operations, but it included now all the
(14) Southwest Territory.
(15)    Q.    Okay.
(16)    A.    And minus the Arkansas operation.
(17)    Q.    And the Southwest Territory now also includes
(18) what?
(19)    A.    It includes Texas, it includes Louisiana, it
(20) includes New Mexico and Oklahoma and Arkansas now.
(21)    Q.    Okay. And back in October of 2001, that area
(22) would have been in the West Territory as well, right?
(23)    A.    That's correct.
(24)    Q.    Okay. So to be even for just one week, to be
(25) No. 1 in that entire sales area –

Page 110

(1)    A.    It would be No. 11.
(2)    Q.    I'm sorry. No. 11 in that entire sales area,
(3) it's still kind of a big deal, isn't it?
(4)    A.    Oh, it's – yeah. It's –
(5)    Q.    Something to be proud of?
(6)    A.    It is.
(7)    Q.    Okay. In November 2001, he got third quarter
(8) FAME award, and in January of 2002 he got some other
(9) awards. Actually, I want to ask you about some of
(10) those awards. Before I do that, though, let me show
(11) you what I've marked as Exhibit No. 14, which is AFLAC
(12) No. 4171. This is a document that you provided us
(13) this morning. Do you recognize it? I think it came
(14) out of your file.
(15)    A.    Uh-huh. Yeah, I recognize it.
(16)    Q.    You indicate he took over as RSC for a
(17) scratch region. What does that mean?
(18)    A.    That means an organization that may only have
(19) been made up with his district and maybe a few other
(20) things that were added in.
(21)    Q.    Basically, he was starting from ground zero?
(22)    A.    Not ground zero, but – you know, ground zero
(23) maybe as a region, but not as a structure.
(24)    Q.    Okay. In other words, the structure that –
(25) there was no structure there before, he had to

Page 111

(1) establish it?
(2)    A.    No, there was structure there. He just
(3) assumed some of the role, as I recall.
(4)    Q.    Do you remember how many agents?
(5)    A.    I don't – I don't remember.
(6)    Q.    What does it mean generally then for a – to
(7) have a scratch region?
(8)    A.    Let me state the structure. As I recall,
(9) Dino had a district, you know, but I – again, I don't
(10) want to speculate.
(11)    Q.    Okay. Tell me again, what does it mean for
(12) somebody to have a scratch region?
(13)    A.    Scratch region normally means something
(14) that's starting out.
(15)    Q.    Something that's what?
(16)    A.    They're starting out.
(17)    Q.    Okay.
(18)    A.    And the reason for the letter was to try help
(19) him so he could go to the convention. Are you done
(20) with that?
(21)    Q.    You can put that down.
(22)    A.    Okay.
(23) (Exhibit No. 15
(24) (marked for identification.
(25)    Q.    (By Mr. Aguilar) I'm handing you what's

Page 112

(1) marked Exhibit 15. This is Bates number 1202.
(2)    A.    Right.
(3)    Q.    It's a memo from you to Dino dated
(4) December 26th, 2000. This is after he reached
(5) 101.17 percent of MPI –
(6)    A.    He was –
(7)    Q.    – for Week 37 year-to-date.
(8)    A.    Actually, it was 37 year-to-date and it's
(9) actually a little card that we send out.
(10)    Q.    Okay. "Keep doing the best you know how and
(11) always strive to achieve higher goals. Your hard work
(12) is very much appreciated."
(13)    A.    That's correct.
(14) (Exhibit No. 16
(15) (marked for identification.
(16)    Q.    (By Mr. Aguilar) I'm handing you what's
(17) marked Exhibit 16, another memo you sent to Dino,
(18) "Congratulations on winning this year's Pride Award."
(19)    A.    Yeah, we talked about that.
(20)    Q.    "I am proud to have you as part of the West
(21) Territory team. Thank you for your hard work." And
(22) that's dated what? Do you remember when you sent that
(23) to him?
(24)    A.    I don't remember. We sent them out
(25) probably – I would say it was probably in late

Page 113

(1) December, early January.
(2)    Q.    Of what year?
(3)    A.    I don't know. It doesn't say.
(4)    Q.    I'm trying to see where he got –
(5)    A.    He won the Pride Award two or three times
(6) there. As I recall, we looked at that.
(7)    Q.    If you would look on Exhibit 12 and tell me
(8) the different times he won a Pride Award.
(9)    A.    He won it in '99.
(10)    Q.    What month?
(11)    A.    December.
(12)    Q.    Is it an annual –
(13)    A.    No, it's for a three or four-week period of
(14) December.
(15)    Q.    Okay.
(16)    A.    He won it in 2000. I don't see a B on that.
(17) So he won it for two years.
(18)    Q.    Okay.
(19) (Exhibit No. 17
(20) (marked for identification.
(21)    Q.    (By Mr. Aguilar) I'm handing you what I've
(22) marked as Exhibit 17. This is another letter from you
(23) to Mr. Chavez dated June 15, 2000. You indicate, "As
(24) a member of the 1999 Pride Club, you had your picture
(25) taken with Dan Amos in recognition of your

Page 114

(1) accomplishment."
(2)    A.    That's right.
(3)    Q.    Dan Amos is the president of AFLAC, correct?
(4)    A.    Chairman of the board.
(5)    Q.    Chairman of the board.
(6)    A.    CEO, chief executive officer.
(7)    Q.    "Enclosed you will find your autographed,
(8) framed picture. I wished I could present it to you in
(9) person. With the picture comes my deepest
(10) appreciation for you and the hard work that earned you
(11) this prestigious honor."
(12)    A.    That's correct.
(13)    Q.    Okay.
(14)    A.    That wasn't an additional award.
(15)    Q.    That was just –
(16)    A.    The picture that followed with an autograph
(17) of Dan Amos.
(18)    Q.    It's a particular award?
(19)    A.    Right.
(20) (Exhibit No. 18
(21) (marked for identification.
(22)    Q.    (By Mr. Aguilar) I'm handing you what I've
(23) marked as Exhibit 18. This is another memo from
(24) you – it looks like another card – dated February 2,
(25) 2001. "Enclosed is your Successories picture depicting

Page 115

(1) teamwork." I think that's the one we talked about
(2) earlier, Page 1206 –
(3)      A.    That's correct.
(4)      Q.    – Bates No. 1206.
(5)      A.    Yes.
(6)      Q.    "You earned this award for your achievement
(7) in the fourth quarter of 2000. Thank you so much for
(8) your continued accomplishments and for your
(9) friendship. It means a lot to me to have you on the
(10) West Territory team."
(11) (Exhibit No. 19
(12) (marked for identification.
(13)      Q.    (By Mr. Aguilar) I'm handing you Exhibit 19.
(14) This is another memo from you to Mr. Chavez dated
(15) October 29, 2001. "Congratulations! Week 43, you
(16) were No. 11 in the West Territory with $74,545.80."
(17) What's that referring to?
(18)      A.    That's referring to sales of his sales
(19) organization.
(20)      Q.    Is that how he was No. 11 when we were
(21) talking about it earlier?
(22)      A.    Yes.
(23)      Q.    Okay. And you told us about the area you
(24) were involved in there, right? You talked to us about
(25) what the West Territory was comprised of at that time,

Page 116

(1) to the best of your recollection, right?
(2)      A.    In terms of size.
(3)      Q.    Size, right.
(4)      A.    Yeah, we didn't give you the exact amount.
(5) You asked me about the number of state organizations.
(6)      Q.    Okay.
(7)      A.    You didn't ask me the size.
(8)      Q.    This letter is dated October 29 of 2001,
(9) right?
(10)      A.    October 29th, 2001, yes.
(11)      Q.    Okay. That would have been – if
(12) Mr. LaFemina notified Dino that he was fired on
(13) December 3, that would have been a little over a
(14) month – a little over a month after you had sent out
(15) this letter, right?
(16)      A.    That would be.
(17) (Exhibit No. 20
(18) (marked for identification.
(19)      Q.    (By Mr. Aguilar) I'm handing you what's
(20) marked as Exhibit 20. Now, this is a memo from
(21) Mr. Kuechenmeister to Mr. Chavez reflected –
(22) regarding AFLAC's Honor Club. Who is
(23) Mr. Kuechenmeister?
(24)      A.    Kuechenmeister? He is a senior vice
(25) president, director of marketing.

Page 117

(1)      Q.    Okay. It says, "This letter is in
(2) recognition of an outstanding achievement during the
(3) fourth quarter of 2001. You have qualified for
(4) AFLAC's Illustrious Honor Club – Founders Award for
(5) Management Excellence." What is that?
(6)      A.    Again, that's the qualification –
(7)      Q.    Is that the FAME?
(8)      A.    – for that quarter. That's FAME.
(9)      Q.    Okay. Now, to qualify for that, it's based
(10) at least partially on sales, correct?
(11)      A.    Partially on sales, partially on recruiting,
(12) partially on training. I think we've stated that
(13) three or four times.
(14)      Q.    So if Mr. Chavez was not allowed to get any
(15) splits during the BISD enrollment, it would have – he
(16) would have achieved the FAME award even without that
(17) calculation, right?
(18)      A.    It appears that that's the case.
(19)      Q.    This is dated January 25 of 2002, right?
(20)      A.    That's correct.
(21)      Q.    By then Dino had already been fired, right?
(22)      A.    There had been a recommendation going for
(23) that, yes.
(24)      Q.    It had been accepted by then?
(25)      A.    That's correct.

Page 118

(1)      Q.    By then, actually, you had sent him two
(2) letters saying you were being demoted from your
(3) position as RSC.
(4)      A.    I didn't send him two letters.
(5)      Q.    I'm sorry. By then –
(6)      A.    AFLAC had.
(7)      Q.    Okay. That's what I'm asking.
(8)      A.    Okay.
(9)      Q.    And by you, I meant –
(10) (Exhibit No. 21
(11) (marked for identification.
(12)      Q.    (By Mr. Aguilar) I'm handing what you've
(13) marked as Exhibit 21. Again, this is a memo from
(14) Mr. Kuechenmeister. I don't remember how you
(15) pronounced it.
(16)      A.    On the Silver Key award.
(17)      Q.    On the 2001 Silver MPI Key Club award. And
(18) what is that, again?
(19)      A.    That's receiving the annual objective.
(20)      Q.    Did that include – would that have included
(21) any – is that based on sales also?
(22)      A.    That is.
(23)      Q.    Okay. So that would not have included even
(24) any sales Dino could have made during the BISD
(25) enrollment, right?

Page 119

(1)      A.    That's correct.
(2)      Q.    This is dated January 28, 2002, right?
(3)      A.    That's correct.
(4)      Q.    And the subject is AFLAC's Honor Club. This,
(5) again, is three days after the second letter to Dino
(6) was sent out saying that he had been fired, right?
(7)      A.    That's correct. Can I clarify something
(8) here?
(9)      Q.    Sure.
(10)      A.    You know, we've gone through every award that
(11) Dino has received and, you know, I don't know that
(12) there's a question on Dino and the awards he's
(13) received. I think there's a question on condoning
(14) something such as the way he handled himself with that
(15) account. And regardless of how well he's done in the
(16) past, that's unacceptable for a coordinator to do.
(17)      MR. AGUILAR:    Objection; nonresponsive.
(18)      Q.    (By Mr. Aguilar) Now, Dino –
(19)      MR. STEELE:    It was very responsive.
(20)      MR. AGUILAR:    Objection to the side bar.
(21)      Q.    (By Mr. Aguilar) Dino was later replaced as
(22) RSC by Ron Levine, right?
(23)      A.    As I recall, yes.
(24)      Q.    He's Anglo, right?
(25)      A.    I'm assuming. I don't know.

Page 120

(1)      Q.    Okay. Do you know if he's received as many
(2) awards as Dino?
(3)      A.    I don't know that either.
(4) (Exhibit No. 22
(5) (marked for identification.
(6)      Q.    (By Mr. Aguilar) I'm handing you what I've
(7) marked as Exhibit 22.
(8)      A.    Uh-huh.
(9)      Q.    This is a separate letter you sent out to
(10) Dino dated February 6, 2002, right?
(11)      A.    Right.
(12)      Q.    This is congratulating him on the 2001 Key
(13) Club and achieving the RSC Silver. Those are the two
(14) awards I had just shown you in Exhibits –
(15)      A.    Correct.
(16)      Q.    – 20 and 21, right?
(17)      A.    That's correct.
(18)      Q.    "I appreciate your hard work, dedication and
(19) determination that made it a banner year for the West
(20) Territory and AFLAC. It takes a lot of commitment to
(21) attain this award and I am very proud of your
(22) accomplishment. I want you to know I recognize all of
(23) your efforts as part of the West Territory team. You
(24) deserve a very big thank." I presume it meant to say
(25) thanks or thank you. You go on to say, "Much success

Page 121

(1) in your future endeavors. I know I can count on you
(2) in 2002." What were you saying you can count on him
(3) in 2002 for?
(4)    A.    Dino is still an associate, isn't he? He's
(5) still on my team at that point. And, you know, he's
(6) still someone I consider a friend, regardless of all
(7) the situations. So I'm going to encourage him, I'm
(8) going to hope for the best for him and I'm going to
(9) encourage him to continue on. That's what that is
(10) saying.
(11)    Q.    Okay.
(12)    A.    I don't want – well, I think you can read
(13) into it what you want.
(14)    Q.    Now, BISD was a client of AFLAC only because
(15) of Dino's work, right?
(16)    A.    As I understand it, yes.
(17)    Q.    In other words, it was a scratch account?
(18)    A.    That's – that's – well, scratch account,
(19) whatever, it's a new account. He brought it in, as I
(20) understand it, yes.
(21)    Q.    There was no prior BISD group account before
(22) Dino?
(23)    A.    Not that I'm aware of.
(24)    Q.    Now, in –
(25)    A.    Whether there had been in previous years or

Page 122

(1) not, I don't know. I don't know that.
(2)    Q.    Okay. Were you aware that AFLAC sold about
(3) $450,000 in 2001 BISD's enrollment?
(4)    A.    I know there was a large amount. I didn't
(5) know the exact amount.
(6)    Q.    Were you aware that Dino is credited only for
(7) $120,000 in overwrites or possibly even less than
(8) that?
(9)    A.    Again, I've got state managers who runs an
(10) organization that keeps track of that. No, I don't
(11) recall that.
(12)    Q.    You agree, however, that Dino did not get any
(13) credit for the $330,000 in overwrites or any split on
(14) the $450,000 in sales?
(15)    A.    Again, I don't – I don't know. I don't
(16) recall. I don't know the situation on it. I have
(17) lots of agents and managers.
(18)    Q.    Let me represent – I'm sorry.
(19)    A.    Go ahead.
(20)    Q.    Let me represent to you that those are the
(21) numbers as we've been able to calculate them, roughly.
(22) Now, if you include that in Dino's total sales for
(23) that year, the total would be about 1.99 million, if
(24) you had included those numbers and Dino had been able
(25) to do the 2001 BISD enrollment.

Page 123

(1)    MR. STEELE:    Object to the form of the
(2) question. You're assuming facts not in evidence. If
(3) you want to state hypothetically that's what Arnold
(4) Aguilar has figured out, that's fine. But to state it
(5) as a fact, I object as to form of the question.
(6)    Q.    (By Mr. Aguilar) Now, that $450,000 in sales
(7) is only 23 percent of 1.99 million – that's just the
(8) math – let me just represent to you, okay?
(9)    A.    If that's what your calculations say, but
(10) it's not my calculation.
(11)    Q.    Now, the only complaint – have you ever
(12) received any complaint about Dino from a client other
(13) than that one letter you received from Dr. Sauceda?
(14)    A.    I think there was – and I don't recall, but
(15) I think there was something in the file that I had
(16) given to you earlier where there was something
(17) suggested, but, you know –
(18)    Q.    That was from a potential agent, wasn't it?
(19)    A.    But I don't recall any others. That's the
(20) only one that I can think of.
(21)    Q.    I think you provided us with a copy of a
(22) letter this morning that was from an agent saying that
(23) he had trouble getting ahold of Dino when he was
(24) trying to set up an appointment; is that right?
(25)    A.    I think that may be the case, yes.

Page 124

(1)    Q.    Okay. Other than that and other than the
(2) letter from Dr. Sauceda, are you aware of any other
(3) complaint you ever received about Dino's work?
(4)    A.    I wish I had that – the file because I think
(5) there was something else in there besides that. It
(6) just hits me that there was one other item.
(7)    Q.    Your attorney has handed you a letter. Does
(8) that help refresh your recollection?
(9)    A.    Yeah, there's one on December the 2nd.
(10)    Q.    Who that from?
(11)    A.    And it's – it's to Gene Dannelly and it's
(12) from Jeff Willis.
(13)    Q.    And Jeff Willis is the lawyer sitting here,
(14) right?
(15)    A.    Right, right.
(16)    Q.    Any other letters from – any other
(17) complaints that you ever recall receiving from any
(18) client, not from your lawyers? And your attorney has
(19) handed you another letter from the lawyer.
(20)    A.    It's not from a client.
(21)    Q.    Okay. Now, you've had other clients complain
(22) about other agents or RSCs, correct?
(23)    A.    That is correct.
(24)    Q.    Have you fired any of them within five days
(25) of their complaint? Can you name any that you have

Page 125

(1) fired within five days of their complaint?
(2)    MR. STEELE:    Objection; form. Assumes
(3) facts not in evidence.
(4)    THE WITNESS:    Again, without having the
(5) information in front of me, it would be hard to
(6) determine.
(7)    Q.    (By Mr. Aguilar) None that you can think of?
(8)    A.    I don't even think Dino was within five days.
(9) I think he was given by contract the 30-day notice.
(10)    Q.    You're not familiar with the conversation he
(11) had with Mr. LaFemina, right?
(12)    A.    You'll have to explain to me what that
(13) conversation –
(14)    Q.    Were you aware that Mr. LaFemina contacted
(15) Dino by phone on or about the 3rd of December and told
(16) him he was fired?
(17)    A.    No, I'm not aware of that.
(18)    Q.    Okay. In any case, can you tell us the name
(19) of any person that was fired within five days of a
(20) complaint that was received from that person – or on
(21) that person?
(22)    A.    Let me back up and answer that question
(23) again.
(24)    Q.    Which one?
(25)    A.    The one you just asked.

Page 126

(1)    THE WITNESS:    What was the question that
(2) was prior to this one?
(3)    MR. STEELE:    If you were aware of a
(4) conversation that Frank LaFemina had with Dino on
(5) December the 3rd.
(6)    THE WITNESS:    Okay. Let me – you're
(7) saying within the time frame that Frank did that,
(8) right?
(9)    Q.    (By Mr. Aguilar) I said that – let me start
(10) all over.
(11)    A.    Okay.
(12)    Q.    Were you aware that Frank LaFemina talked to
(13) Dino Chavez on or about December 3, 2001 at which time
(14) he told him that he was fired?
(15)    A.    Okay. Was I aware at that time?
(16)    Q.    No. Are you aware now that he did it at that
(17) time?
(18)    A.    I'm aware since then, but I wasn't aware at
(19) the time.
(20)    Q.    Okay.
(21)    A.    I wanted to make sure I corrected that.
(22)    Q.    Now, getting back to my other question, are
(23) you aware of any –
(24)    A.    Let's say this. I was aware that that was
(25) suggested that he said that

Page 127

(1) Q. Okay.
(2) A. Okay?
(3) Q. Are you aware of any other person that was
(4) fired within five days after the date that you
(5) received a complaint on that other agent?
(6) MR. STEELE: Objection; form. Assumes
(7) facts not in evidence.
(8) Q. (By Mr. Aguilar) None that you can think of?
(9) A. Nothing that I can think of.
(10) Q. Okay. Are you even aware of any other agent
(11) who was told that he was fired, regardless of whether
(12) the documentation had gone through, within five days
(13) of a complaint?
(14) A. You know, I think we would be speculating.
(15) Q. None that you can think of?
(16) A. None that I can think of.
(17) Q. Okay. Who's Judy Klein?
(18) A. Judy Klein was a regional sales coordinator
(19) here in Austin, Texas.
(20) Q. Why was she fired?
(21) MR. STEELE: Objection; form.
(22) THE WITNESS: Why was she fired? Is
(23) that your question?
(24) Q. (By Mr. Aguilar) Yes.
(25) A. Based on the production numbers at the time

Page 128

(1) that we had and the lack of recruiting.
(2) Q. She filed a complaint against –
(3) A. And there was a recommendation made for her.
(4) Again, a change of status.
(5) Q. She filed a complaint against you, right?
(6) A. Against AFLAC.
(7) Q. I'm sorry. Against AFLAC.
(8) A. Yeah.
(9) Q. Was that complaint resolved?
(10) A. As I understand it. I wasn't – after the
(11) legal department got involved, I was taken out of the
(12) picture. But as I understand, it was resolved.
(13) Q. What was the complaint about? What was her
(14) allegation?
(15) A. The allegation was that the numbers – well,
(16) again, I can't remember all of it because it's been a
(17) while. But as I know it was in relationship to our
(18) numbers and her numbers.
(19) Q. Okay. What was her allegation as to why she
(20) was fired?
(21) A. I don't recall.
(22) Q. We can't say, right?
(23) A. I mean, I don't – I don't recall the –
(24) Q. Okay. As it turned out – getting back to
(25) BISD, as it turned out, a majority of BISD's board of

Page 129

(1) trustees disagreed with the superintendent's letter,
(2) right?
(3) A. You know, I don't know whether it's the
(4) majority or not. I don't how many we're talking
(5) about.
(6) Q. Let me represent to you they've got seven
(7) trustees and you got letters from four, right?
(8) A. Okay.
(9) Q. So from what you understand at least a
(10) majority did disagree with the superintendent?
(11) A. Based on your information that you've
(12) provided, then it assumes that.
(13) Q. Did you ever contact anybody at BISD to
(14) check?
(15) A. You know, again, I'll remind you that we –
(16) that this information was turned over to Janet Baker.
(17) You would have to ask Janet that information.
(18) Q. Okay. So you didn't check yourself, right?
(19) A. No, I did not.
(20) Q. As it turned out, Dr. Sauceda was himself
(21) later fired by BISD within less than a year?
(22) MS. LEEDS: Object to the form.
(23) Q. (By Mr. Aguilar) Isn't that correct?
(24) MS. LEEDS: Object to the form.
(25) THE WITNESS: I don't know if it was

Page 130

(1) within a year or not. I don't know all the details.
(2) I didn't follow up with that.
(3) Q. (By Mr. Aguilar) Okay. You would not have
(4) had the BISD account except for Dino's efforts anyway,
(5) right?
(6) A. Not necessarily.
(7) MS. LEEDS: Object to the form;
(8) speculation.
(9) Q. (By Mr. Aguilar) Did somebody else tell you
(10) that they were trying to get BISD?
(11) A. No, but that doesn't mean we wouldn't have
(12) had it.
(13) Q. It's possible you could have gotten it, but
(14) at this point the only reason you did have it was
(15) because of BISD – or because of Dino?
(16) A. That's – yeah, that's what I understand.
(17) Q. And if BISD only accounted for – the sales
(18) of the enrollment of that year, if it was only 450,000
(19) out of a total of 1.99 million, that would only be
(20) 23 percent of Dino's total sales for the year, right?
(21) A. You know, I don't know. I have not done the
(22) math.
(23) Q. Okay. And as it is, you ended up losing BISD
(24) as an account the following year, right, the year
(25) after Dino was fired?

Page 131

(1) A. You know, not that I recall. I mean, I – I
(2) was under the assumption it's still there, but I have
(3) since transferred.
(4) Q. You're not the third party administrator
(5) anymore, are you?
(6) A. You know what? Again, I don't know.
(7) Q. You just don't know. Dino came up to Austin
(8) today because he sent you a number of letters and each
(9) time you sent them off to the attorney. Do you think
(10) you owe him any explanation as to why he got fired?
(11) MR. STEELE: Objection; argumentative,
(12) inappropriate and badgering the witness.
(13) Q. (By Mr. Aguilar) Go ahead and answer.
(14) MR. STEELE: And if you want to answer
(15) it, you can, but you don't have to.
(16) THE WITNESS: Okay. Let's pass.
(17) Q. (By Mr. Aguilar) You don't want to answer
(18) the question?
(19) A. No.
(20) Q. Could you please tell Dino why he was fired?
(21) MR. STEELE: Objection. Same objection.
(22) THE WITNESS: I'll pass.
(23) Q. (By Mr. Aguilar) Could you please tell the
(24) jury what you meant in your February 6, 2002 letter,
(25) that you recognized all of Dino's efforts and you

Page 132

(1) appreciated his hard work, dedication and
(2) determination?
(3) MR. STEELE: Objection; asked and
(4) answered. But you can go ahead and reiterate what you
(5) said then.
(6) THE WITNESS: May I? I do want –
(7) Q. (By Mr. Aguilar) Exhibit 23.
(8) A. I said that – in that letter that I was
(9) recognizing Dino and his accomplishments, okay? This
(10) has not been a question of Dino and what he has
(11) accomplished, okay? This has been a – this has been
(12) a situation where what he did as a coordinator was
(13) unacceptable as a coordinator dealing with the client.
(14) And for that reason, I concurred with the decision
(15) that AFLAC made as it relates to Dino Chavez. Now,
(16) does that mean that I have a problem with Dino Chavez
(17) as an individual? No. I mean, I think Dino knows
(18) that I have considered him a friend and, whether he
(19) will or not, I still consider him a friend after we
(20) walk out of this room today. But the reality is I
(21) wrote a letter that was sincere about how I felt about
(22) him as an individual and what he accomplished. I hope
(23) that clarifies that.
(24) Q. Well, I'm just wondering, what did it mean to
(25) actually appreciate somebody's work? Dino has put in

BSA         ORAL AND VIDEOTAPED DEPOSITION OF LYNN GEORGE BARNSON         XMAX(23/23)

Page 133

(1) years of his life for AFLAC, he exceeded higher – he
(2) exceeded everyone's expectations throughout the years.
(3) He has gotten numerous awards that we've gone over,
(4) he's made a lot of money for AFLAC, he's built his
(5) reputation through his work with AFLAC. And because
(6) of the complaint of one person who ultimately ended up
(7) getting fired anyway, who the board disagreed with, a
(8) client who AFLAC wouldn't have had but for Dino's
(9) efforts, because of that one thing, AFLAC fired him
(10) within less than five days, and I'm trying to find out
(11) why.
(12)    MR. STEELE:    Objection; form.
(13)    MS. LEEDS:    Objection; form.
(14)    Q.    (By Mr. Aguilar) Can you tell us why?
(15)    MR. STEELE:    Objection; form.
(16)    MS. LEEDS:    Objection; form.
(17)    MR. STEELE:    Asked and answered,
(18) argumentative, misstates the record, mischaracterizes
(19) prior testimony, and, if I haven't already said it,
(20) asked and answered.
(21)    THE WITNESS:    And, also, I would
(22) recommend that you talk to Janet Baker.
(23)    Q.    (By Mr. Aguilar) She's not here right now;
(24) you are. Can you tell us why?
(25)    A.    Then you need to bring Janet here.

Page 134

(1)    Q.    Can you tell us why?
(2)    A.    I don't know.
(3)    MR. STEELE:    It's been asked and
(4) answered.
(5)    THE WITNESS:    I was going to say, I
(6) mean –
(7)    Q.    (By Mr. Aguilar) Have you ever fired – or
(8) are you aware of anybody – I'll try to rephrase that.
(9) Have you yourself ever fired any RSC who was not
(10) Hispanic because of the complaint of a single person?
(11)    A.    Over the years – and, again, as a
(12) coordinator, you know, you have the responsibility to
(13) grow an organization and to manage performance and to
(14) look out for the best interests of AFLAC, and we
(15) represent – and to look out for the best interests of
(16) the client. And I'm sure there are situations where
(17) that has taken place.
(18)    Q.    Can you tell us when?
(19)    A.    Let me finish, okay, if I may. Okay? I'm
(20) sure there is. But I don't keep record of all the
(21) people that's been affected one way or another because
(22) I believe in my team, I want to grow. And
(23) does it happen? Yeah, it happens. Can I give you the
(24) specifics? No, I can't give you the specifics. I
(25) don't know.

Page 135

(1)    Q.    You can't name anyone that you have fired who
(2) was not Hispanic because of a complaint of a single
(3) person, can you?
(4)    A.    A complaint of a single person?
(5)    Q.    One person –
(6)    A.    I don't recall.
(7)    Q.    Okay. And what you were telling us a while
(8) ago was what your expectations would be for what AFLAC
(9) has done, right?
(10)    MR. STEELE:    Objection; form.
(11)    THE WITNESS:    What expectations?
(12)    Q.    (By Mr. Aguilar) In other words, when I
(13) asked you about naming a single agent who was not
(14) Hispanic who was fired because of a complaint of a
(15) single person, you went into an explanation as to what
(16) you would expect to see. You were really talking
(17) about AFLAC in general, right?
(18)    MR. STEELE:    Objection; form.
(19)    THE WITNESS:    Sometimes I get confused
(20) as to where you're going.
(21)    Q.    (By Mr. Aguilar) I'll rephrase it. I asked
(22) you about yourself individually and now I'm asking
(23) about AFLAC.
(24)    A.    Because you've asked this question three or
(25) four times, and I'm not sure where you're coming from

Page 136

(1) on it.
(2)    Q.    That's why I'm going to be specific now. You
(3) already told us, I think, about yourself individually.
(4) Now I'm asking about AFLAC generally. Can you tell us
(5) the name of a single person who was not Hispanic who
(6) AFLAC fired because of the complaint of a single
(7) person? Can you name one?
(8)    A.    Again, I don't – I don't know of anyone. I
(9) mean, I know –
(10)    Q.    Can you tell us –
(11)    A.    Can I get into the specifics of every
(12) individual situation? You know, I don't recall the
(13) information as it relates to him, okay? I've answered
(14) that question personally because I sign the assignment
(15) sheet that makes the recommendation, they go to
(16) headquarters, headquarters then sends them out. I
(17) don't keep the time frames. I don't keep track of
(18) that record. So the answer – in general, can I think
(19) of things generally? I could think of things
(20) generally, but I want to be specific about it and so
(21) I'm not going to – my answer is that I don't know at
(22) this point. I can't remember. Okay?
(23)    Q.    In December of 2001 and going through January
(24) and February of 2002, you were the West Territory
(25) director, right?

Page 137

(1)    A.    December of 2001 through –
(2)    A.    January and February of 2002.
(3)    A.    I was, you're right.
(4)    Q.    Okay. You were the supervisor of Frank
(5) LaFemina, correct?
(6)    A.    That is correct.
(7)    Q.    Frank LaFemina was the supervisor of Dino
(8) Chavez, right?
(9)    A.    I don't know that the word is supervisor.
(10) They were the coordinator.
(11)    Q.    Okay.
(12)    A.    Again, I'm dealing with an independent
(13) contract and I think supervisor implies that the
(14) person is an employee and they are not.
(15)    Q.    Okay. Can you tell us why it was necessary
(16) to get rid of the Mexican guy, Dino, and bring in the
(17) Anglo, Ron Levine, to supervise the enrollment
(18) contracts and take over as RSC at that time?
(19)    MR. STEELE:    Objection; argumentative.
(20) Objection; misstates facts in evidence. Objection;
(21) form. Objection – what's the word I'm looking for –
(22) emotionally charged and an improper question.
(23)    THE WITNESS:    And I'll ask you to
(24) rephrase the question. .
(25)    Q.    (By Mr. Aguilar) Why was it necessary to

Page 138

(1) fire Dino, the Mexican guy, and bring in the Anglo,
(2) Ron Levine, to supervise the enrollment contracts and
(3) take over as RSC in the beginning of December 2001?
(4)    MR. STEELE:    Objection; form.
(5) Objection; argumentative. Objection as to misstating
(6) the record. And you don't have to answer that
(7) question unless you know the answer. And it assumes a
(8) lot of facts that are misstated.
(9)    THE WITNESS:    Okay. Then I'll pass.
(10)    Q.    (By Mr. Aguilar) You were the West Territory
(11) director above the person above Dino, right?
(12)    A.    That's correct.
(13)    Q.    And you can't tell us why it was necessary,
(14) can you?
(15)    A.    Necessary to what?
(16)    Q.    To fire the Mexican guy and bring in the
(17) Anglo guy.
(18)    MR. STEELE:    Objection; argumentative.
(19) Objection; misstates the record. Objection; improper
(20) as an officer of this court.
(21)    THE WITNESS:    Can I see counsel for a
(22) moment?
(23)    MR. STEELE:    Sure.
(24)    Q.    (By Mr. Aguilar) If you can just answer the
(25) question

Page 139

(1)    A.    No, I want to see counsel.
(2)    MR. STEELE:    That's fine. Come on.
(3)    MR. AGUILAR:    All right.
(4)    (Off the record)
(5)    MR. AGUILAR:    Okay. I'll go ahead and
(6)  pass the witness.
(7)    MR. STEELE:    Did you want to answer that
(8)  last question?
(9)    THE WITNESS:    I would. I would like
(10)  to – I would like to – is there a way to have that
(11)  question asked again and – I've got the details on
(12)  it.
(13)    MR. STEELE:    She can read it back.
(14)    THE WITNESS:    Can you read that back to
(15)  me?
(16)    (Requested portion was read.)
(17)    THE WITNESS:    First of all, I want to
(18)  say that my attorney did not tell me what to say. I
(19)  only asked that I be able to answer the question. And
(20)  I will answer it this way, as I found it distasteful
(21)  to refer to your client when I considered the tone
(22)  to be a derogatory manner as the Mexican guy or the
(23)  Hispanic guy, someone that I care about and have cared
(24)  about for a lot of years. This was not about Anglo,
(25)  Mexican, Hispanic, et cetera. This was about an

Page 140

(1)  action that was not going to be – I just could not
(2)  see how – I concurred with because of the actions
(3)  that Dino had gone through on this account. This had
(4)  nothing to do with, you know, ethnic group. And I
(5)  wanted to clarify that. And I wanted to clarify on
(6)  the record that I didn't care for the tone of the
(7)  question and what it referenced.
(8)    MR. AGUILAR:    Objection; nonresponsive.
(9)    Q.    (By Mr. Aguilar) Can you tell us now why
(10)  neither you nor anybody else at AFLAC has ever gone
(11)  back to Dino and said, we want you back?
(12)    A.    Dino has not left. Dino is an associate with
(13)  AFLAC right now. He's licensed with AFLAC.
(14)    Q.    As an RSC.
(15)    A.    As an RSC? For one thing, I guess it's the
(16)  relationship to this action. For this reason, I
(17)  think no – I think that Dino has been encouraged by
(18)  me at FAME, was encouraged by me to bury the hatchet
(19)  and go on with his career and see where it takes him.
(20)  I had even suggested in a document that, you know,
(21)  there's a possibility if he couldn't get along with
(22)  Mr. LaFemina, that he could move to another state.
(23)    Q.    The answer then would be for – if he can't
(24)  get along with LaFemina, the best thing for him to do
(25)  would be to move to another state?

Page 141

(1)    A.    Well, you know, that's – that's a standard
(2)  answer that I've used over the years. It may not have
(3)  been – and I don't recall the details of that
(4)  particular situation. But I know that I – I know
(5)  that Dino has the ability to move on if he wants to.
(6)    Q.    You're aware Dino grew up in the Rio Grande
(7)  Valley, right?
(8)    A.    I am.
(9)    Q.    You're aware that's where his home is?
(10)    A.    I am – I do.
(11)    Q.    You're aware that's where his extended family
(12)  is?
(13)    A.    I – yes.
(14)    Q.    You're aware –
(15)    A.    I guess I'm aware of that. I don't know
(16)  where all his extended family is.
(17)    Q.    Are you aware that an extended family is a
(18)  very important part of the Mexican culture?
(19)    A.    I am.
(20)    Q.    Yet –
(21)    A.    As it is with any.
(22)    Q.    The suggestion you made was to move out of
(23)  state if he can't get along with LaFemina?
(24)    A.    I had said that I would find him a spot. I
(25)  think I referenced it in one of the letters. Now, you

Page 142

(1)  know, in reading back through the letter, I'm making
(2)  an assumption that that was what – it's been, what, a
(3)  year and a half ago or so since we had that
(4)  discussion.
(5)    Q.    Did you ever make any suggestion that perhaps
(6)  Mr. LaFemina should change states?
(7)    A.    No. He was my state sales coordinator in
(8)  that particular organization.
(9)    Q.    Did Mr. LaFemina ever get written up in any
(10)  way about his treatment of Dino in this matter?
(11)    A.    I'm not aware of what his treatment – all
(12)  his treatment was in this matter.
(13)    Q.    What I'm asking is, are you aware if
(14)  Mr. LaFemina was ever written up about –
(15)    A.    No.
(16)    Q.    – any of his actions involved –
(17)    A.    I don't know of any.
(18)    Q.    Let me finish my question. Are you aware of
(19)  any manner in which Mr. LaFemina was either written up
(20)  or reprimanded regarding his handling of this
(21)  situation?
(22)    A.    No.
(23)    Q.    Did you understand the term "Mexican guy" to
(24)  be derogatory?
(25)    A.    The tone sounded like that to me.

Page 143

(1)    MR. AGUILAR:    I'll pass the witness.
(2)    EXAMINATION
(3)    QUESTIONS BY MS. NEALLY:
(4)    Q.    Mr. Barnson, my name is Elizabeth Neally.
(5)  I'm the attorney for Brownsville Independent School
(6)  District.
(7)    A.    Okay.
(8)    Q.    I have a few questions for you. First of
(9)  all, let me ask you one thing that I never really
(10)  understood from your earlier testimony. Who made the
(11)  final decision to demote Mr. Chavez from RSC to
(12)  associate?
(13)    A.    It was handled by headquarters.
(14)    Q.    Who in headquarters?
(15)    A.    Janet Baker handled the situation.
(16)    Q.    So Janet Baker would have been the person to
(17)  make the ultimate decision?
(18)    A.    I'm speculating. Janet or Warren Steele, one
(19)  or the two of us.
(20)    Q.    And you're the one that actually signed off
(21)  on the form?
(22)    A.    I signed off on the form, yes.
(23)    Q.    And that was at the direction of someone else
(24)  or because you concurred with their decision?
(25)    A.    I concurred with their decision.

Page 144

(1)    Q.    And you concurred with their decision because
(2)  you believed his conduct had been unacceptable by
(3)  AFLAC standards?
(4)    A.    Yes.
(5)    Q.    Okay. Let me ask you about some documents
(6)  that were supplied to us today in response to a
(7)  request for production previously sent by the
(8)  Brownsville Independent School District. Were these
(9)  documents that you had in your personal file or that
(10)  you got from someone else?
(11)    A.    The ones that were in here?
(12)    Q.    Right.
(13)    A.    They were from my personal file.
(14)    Q.    Okay. And this was your file on Mr. Chavez?
(15)    A.    That is correct.
(16)    Q.    Okay. Let me refer you to AFL 4144
(17)  through – I think they're all in – to 4150. They
(18)  all seem to be kind of the same thing. This is a
(19)  situation that apparently occurred in December of 1997
(20)  when Dino was changed from –
(21)    MR. STEELE:    Do you mean September of
(22)  '97?
(23)    MS. NEALLY:    No. Actually, it's a fax,
(24)  December 8, 1997. There's two dates on there.
(25)    Q.    (By Ms. Neally) Do you know why –

Page 145

(1) MS. LEEDS:   The next page.
(2) Q.   (By Ms. Neally) I'm talking about 4144,
(3) there's two dates on there. One is 9-29-97 and then
(4) it says fax 12-8-97. Do you know what the
(5) circumstances were why Dino was changed from district
(6) sales coordinator to associate in 1997?
(7) A.   As it appears, if you look here, I think it
(8) was a resignation on Dino's part.
(9) Q.   Okay. And that's – that's why I referred
(10) you back to December because if you look at the date,
(11) it says 9-29-97, yet his resignation, which is
(12) attached as 4145, is December 4th, 1997. So this was
(13) not an actual demotion; this was actually a
(14) resignation?
(15) A.   I'm assuming that based on the information.
(16) I don't recall the – I don't recall whether there was
(17) any other situation that surrounded it. It appears to
(18) me that it's voluntary.
(19) Q.   Okay. The change in status form is signed by
(20) you; is that correct?
(21) A.   That is correct.
(22) Q.   And it was checked as termination without
(23) cause. You don't have a section for resignation?
(24) A.   The termination without causes, there's
(25) not – there's not a section that I'm aware of that –

Page 146

(1) with the resignation part of it.
(2) Q.   Do you know why Mr. Chavez resigned on
(3) December 4th, 1997?
(4) A.   I don't recall. No.
(5) Q.   Okay. Let me refer you to 4146. This was a
(6) letter prepared by Mr. Willis, one of AFLAC's
(7) attorneys to Gene Dannelly. What was the
(8) circumstances that arose that Mr. Willis wrote this
(9) letter?
(10) A.   You know, again, I don't recall. It's been a
(11) number of years ago. Again, when I was depositioned
(12) on this, I felt – you know, I called Mr. Willis and
(13) felt the need to bring him the file or I asked if he
(14) wanted me to bring all these files, and that's when I
(15) was told to forward it on to legal counsel here.
(16) Q.   Okay. You don't have a copy of the letter –
(17) A.   I have the letter here, yes.
(18) Q.   You've got to let me finish my question,
(19) please.
(20) A.   Okay.
(21) Q.   Okay. You don't have a copy of the letter
(22) dated November 24th, 1997 from Mr. James Black, the
(23) president of LifeRe, complaining about certain
(24) activities of Mr. Chavez?
(25) A.   You know, I don't with me and I don't –

Page 147

(1) there could be something in the file on that, but I
(2) don't know of anything.
(3) Q.   Okay.
(4) MR. STEELE:   Let me just represent that
(5) his secretary said she copied the whole file.
(6) MS. NEALLY:   Okay.
(7) MR. STEELE:   And I'll just tell you, if
(8) it's not been produced, it wasn't in there.
(9) Q.   (By Ms. Neally) You don't recall the
(10) activities by Mr. Chavez that warranted the necessity
(11) for this letter?
(12) A.   I don't.
(13) Q.   Okay. It appears to be that there was some
(14) type of allegation of some impropriety under Article
(15) 21.21 of the Texas Insurance Code that had to do with
(16) making misleading representations regarding, I guess,
(17) a competitor. And I would assume that would be
(18) LifeRe. I don't know how to pronounce it. Is that
(19) right?
(20) A.   That's what it appears that the letter is
(21) stating.
(22) Q.   But you don't have any independent memory
(23) regarding that?
(24) A.   I don't.
(25) Q.   And then on 4148, there's a letter from

Page 148

(1) Mr. Willis to Mr. Black, who is the president of
(2) LifeRe Insurance Company, which it refers again to
(3) Article 21.21 and Mr. Chavez; is that right? But you
(4) don't recall anything about that?
(5) A.   I don't.
(6) Q.   Okay. And then is it correct that Mr. Chavez
(7) stayed as an associate after December 1st, 1997 until
(8) he was promoted to RSC a year later?
(9) A.   I don't recall. I didn't have anything else
(10) in my record. I'm assuming that would be the case.
(11) Q.   Okay. Let me refer you to LaFemina No. 10,
(12) which I think is a document that's already been
(13) entered into evidence – or referred to.
(14) A.   Okay.
(15) Q.   This was an e-mail from Mr.Chavez to you
(16) dated December 4, 2001?
(17) A.   Correct.
(18) Q.   Did you ever get back to him on that about
(19) whether he should go to the SSC/RSC annual sales
(20) meeting?
(21) A.   Actually, I did not, that I recall. I,
(22) again, turned that over – I was in Atlanta already or
(23) was en route when this came. I was in Atlanta
(24) already, and I referred it to Janet Baker, who had
(25) then basically taken over the situation.

Page 149

(1) Q.   And do you know whether Mr. Chavez attended
(2) the annual meeting –
(3) A.   He did not.
(4) Q.   – in Atlanta? Okay. And then you said –
(5) you advised a little earlier that you had another
(6) conversation with Mr. Chavez where you spoke about his
(7) opportunities with AFLAC?
(8) A.   Yes.
(9) Q.   But he was never offered a job; is that
(10) right?
(11) A.   He was not.
(12) Q.   Okay. Let me refer you to LaFemina No. 2.
(13) And I have a – I think I have an extra copy of that.
(14) I know I have another one some place. Can you look –
(15) and I don't want to get on the camera, but this is the
(16) only copy of that. Down at the bottom of this – did
(17) you ever see this before today?
(18) A.   I seen it earlier this week.
(19) Q.   Okay. And it's an e-mail from – and you
(20) understand it to be an e-mail from Mr. LaFemina to the
(21) team down in the Brownsville area regarding how the
(22) account was going to be handled; is that right?
(23) A.   That was my understanding when I read it
(24) earlier. I had not seen a date – the date or
(25) anything until now.

Page 150

(1) Q.   The only thing – at the top there's a
(2) handwritten notation that says received 12-1-01; is
(3) that right? Up at the top.
(4) A.   That's what the notation is, but I was
(5) looking for something that was marked on the e-mail.
(6) Q.   At this point in time, if you look at the
(7) e-mail, it appears that Mr. Chavez was to continue as
(8) the RSC, that Frank LaFemina was going to handle the
(9) enrollment; is that right? I'm sorry. Ron Levine.
(10) Ron Levine; is that right?
(11) A.   Yes, that's what – yeah, that's what it
(12) appears.
(13) Q.   And if you look on down here at the bottom, I
(14) think that paragraph, you see support by Mr. LaFemina
(15) and Mr. Chavez in the situation, right? And in fact,
(16) he even says – excuse me for reading over your
(17) shoulder. In the event the circumstances change and
(18) Dino regains his working relationship with the
(19) district as before, then he and his team will
(20) immediately re-assume the lead role in this account;
(21) is that right?
(22) A.   That's what I'm understanding it to be, yes.
(23) Q.   Do you know what changed between December 1st
(24) and December 4th when the, when the recommendation
(25) of demotion was sent by Mr. LaFemina?

Page 151

(1)    A.    I don't know. I would be speculating.
(2)    Q.    Did you ever have a conversation with anybody
(3) about that?
(4)    A.    Only in the meeting I had in Atlanta and the
(5) concern of a litigation -- you know, a threat of
(6) litigation against one of our clients, you know, was a
(7) concern that -- one of our coordinators doing it and
(8) that was a concern.
(9)    A.    A concern that Mr. Chavez was threatening
(10) litigation against BISD?
(11)    A.    Right, or any of our clients.
(12)    Q.    Okay. Was there anything else addressed?
(13)    A.    And if anything changed, I don't know that.
(14) Change, to understand that whether Mr. LaFemina, you
(15) know, had somewhat the same responsibility I had, and
(16) that was to forward the information on in to
(17) headquarters and put it in the hands of those who
(18) helped make those decisions.
(19)    Q.    In some of the correspondence that was
(20) provided to us today, you have references to
(21) overwrites and -- and I'm looking at 4177 right now --
(22)    THE WITNESS:    That's in your stuff, I
(23) think.
(24)    Q.    -- 4176. And you say, "With approval, please
(25) extend Dino Chavez's RSC/DSC override for another

Page 152

(1) three months."
(2)    Q.    Right.
(3)    Q.    Is that something that if you're going to
(4) extend an override, that it's going to come to
(5) somebody's attention, you have to agree to do that?
(6)    A.    It's, you know, in this situation, this is
(7) most likely because Dino has been building the scratch
(8) operation, that we made an effort to assist him by
(9) allowing both the DSC and the RSC, the percentages --
(10)    MR. AGUILAR:    Hang on.
(11)    (Off the record)
(12)    MR. AGUILAR:    I'm sorry. Go ahead.
(13)    Q.    (By Ms. Neally) Okay. This was a temporary
(14) situation?
(15)    A.    It's usually done on a three-month basis and
(16) then reviewed, based on the way of the review of the
(17) district contract. If they use that district contract
(18) to develop the VP bonus; unfortunately, that's
(19) sometimes all that continued the process.
(20)    Q.    Okay.
(21)    A.    It's not done for every coordinator. It's
(22) only done in -- you know, from time to time in
(23) different places.
(24)    Q.    Okay. And it requires your authorization in
(25) order to extend it?

Page 153

(1)    A.    It requires my recommendation.
(2)    Q.    Okay.
(3)    A.    And, you know, when I -- I can't think of
(4) anywhere I've been turned down on it.
(5)    Q.    I'm sorry?
(6)    A.    I can't think of anywhere I have been turned
(7) down on it, but I --
(8)    Q.    When you've recommended that?
(9)    A.    When I've recommended it on into the, you
(10) know, licensing department.
(11)    Q.    Okay. So, for instance, in AFL 4177, it's a
(12) memo from Gene Dannelly to you dated August 27th,
(13) 1999, and he said, "I am not sure when the current
(14) exception for Dino's override at the level 30
(15) expires." What's level 30?
(16)    A.    Level 30 is the district level.
(17)    Q.    Okay. The DSC level?
(18)    A.    Uh-huh.
(19)    Q.    "But this is my request to extend his double
(20) override situation until or through October. This
(21) will have given Dino the level 30 and level 40" --
(22) Level 40 then would be the RSC?
(23)    A.    Regional sales coordinator.
(24)    Q.    -- "for one year, which is what I agreed to."
(25) So that was the compensation that was agreed to to

Page 154

(1) last for a one-year period?
(2)    A.    That's what Mr. Dannelly had requested, but
(3) you'll note that I said, we'll do it on a three-month
(4) review.
(5)    Q.    Okay. And that's why there's several letters
(6) that extend it for three months; is that right?
(7)    A.    Right. As those dates came up, then
(8) Mr. Dannelly had to give me kind of a review of how
(9) the contract or that overwrite is being used and then
(10) I would go ahead and authorize another three months.
(11)    Q.    Okay. I believe your previous testimony with
(12) Mr. Aguilar was that you were not aware that AFLAC was
(13) no longer the TPA for BISD for the year 2003.
(14)    A.    I mean, I -- again, you know, I've got local
(15) managers who manage the organization, the state sales
(16) coordinators. And I'm not aware of every single
(17) situation on every single account. One as large as
(18) this, you know, I perhaps should be, but I was not.
(19)    Q.    Okay. And were aware that even though the --
(20) were you aware that Ron Levine had been promoted to an
(21) RSC?
(22)    A.    Yes.
(23)    Q.    And even though BISD was lost as an account,
(24) that Mr. Levine retained his position as RSC? Were
(25) you aware of that?

Page 155

(1)    A.    Yeah, I'm -- yes.
(2)    MS. NEALLY:    Okay. That's all the
(3) questions I have. Thank you.
(4)    THE WITNESS:    Uh-huh.
(5)    MS. LEEDS:    I'll reserve all questions.
(6)    FURTHER EXAMINATION
(7)    QUESTIONS BY MR. AGUILAR:
(8)    Q.    Let me just ask you one other thing.
(9)    MR. STEELE:    I'm not asking any
(10) questions. I'm reserving.
(11)    Q.    (By Mr. Aguilar) You indicated the threat of
(12) litigation that from, all I could tell, you got the
(13) information either from Mr. Levine -- I'm sorry,
(14) Mr. LaFemina or the fact that Mr. Chavez's letters had
(15) the cc on it to an attorney.
(16)    MR. STEELE:    Objection; misstates the
(17) record.
(18)    Q.    (By Mr. Aguilar) Regardless, once you-all
(19) took that action against Dino, not to talk to him in
(20) any way, not to respond to him other than through the
(21) attorney, and then by firing him as RSC, do you see
(22) that he had any other alternative but to bring
(23) litigation?
(24)    MR. STEELE:    Objection.
(25)    MS. LEEDS:    Objection; form.

Page 156

(1)    MR. STEELE:    Argumentative.
(2)    THE WITNESS:    I won't answer it.
(3)    MR. AGUILAR:    I'll pass the witness.
(4)    MS. NEALLY:    Nothing further.
(5)    MR. STEELE:    That's it. You're done.
(6) (Exhibit No. 23
(7) (marked for identification.
(8)    (DEPOSITION CONCLUDED)

Page 157

```
( 1)              CHANGES AND CORRECTIONS
( 2)       WITNESS NAME:  LYNN GEORGE BARNSON
( 3)            DATE:  SEPTEMBER 30, 2003
( 4) Reason Codes: (1) to clarify the record; (2) to
         conform to the facts; (3) to correct a transcription
( 5) error; (4) other (please explain).
( 6) PAGE  LINE  CHANGE                      REASON CODE
( 7)
( 8)
( 9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

Page 158

```
( 1)                   SIGNATURE
( 2)
( 3)    I, LYNN GEORGE BARNSON, have read the foregoing
( 4) deposition and hereby affix my signature that same is
( 5) true and correct, except as noted on the previous
( 6) page.
( 7)
( 8)
( 9)             LYNN GEORGE BARNSON
(10) STATE OF
(11) COUNTY OF
(12)    Before me,                  , on this day
(13) personally appears LYNN GEORGE BARNSON, known to me
(14) (or proved to me under oath or through
(15)           ) (description of identity card or
(16) other document) to be the person whose name is
(17) subscribed to the foregoing instrument and
(18) acknowledged to me that they executed the same for the
(19) purposes and consideration therein expressed.
(20)    Given under my hand and seal of office this
(21) day of          , 2003.
(22)
(23)
(24)             NOTARY PUBLIC IN AND FOR
(25)             THE STATE OF
```

Page 159

```
( 1)            REPORTER'S CERTIFICATE
( 2)
( 3)
( 4) THE STATE OF TEXAS      *
( 5) COUNTY OF TRAVIS        *
( 6)
( 7)    I, GERRI C. BARKER, Certified Shorthand
     Reporter in and for the State of Texas, do hereby
     certify that, pursuant to the agreement of counsel,
( 8) came on before me on the 30th day of September, 2003,
     the following named person, LYNN GEORGE BARNSON, who
( 9) was duly sworn to testify to the truth and nothing but
     the truth touching and concerning the matters in
(10) controversy in this cause; that he was thereupon
     carefully examined upon his oath and his examination
(11) reduced to typewriting under my supervision; and this
     deposition is a true record of the testimony given by
(12) said witness.
         I further certify that I am neither
(13) attorney, nor counsel for, nor related to, nor
     employed by any of the parties to the action in which
(14) this deposition is taken; and, further, that I am not
     a relative nor employee of any attorney or counsel
(15) employed by the parties hereto or financially
     interested in the action.
(16)    Certified to by me this the       day
     of          , 2003.
(17)
(18)
(19)
         GERRI C. BARKER, TEXAS CSR 2219
(20)     Expiration Date:  12/31/03
         Firm Registration No. 241
(21)     114 West 7th Street, Suite 750
         Austin, Texas  78701
(22)     512-499-0277
(23)
```

**Look-See Concordance Report**

- - -

UNIQUE WORDS: 1,922
TOTAL OCCURRENCES: 9,386
NOISE WORDS: 384
TOTAL WORDS IN FILE: 26,855

- - -

SINGLE FILE CONCORDANCE

- - -

CASE SENSITIVE

- - -

INCLUDES ALL TEXT OCCURRENCES

- - -

DATES **ON**

INCLUDES PURE NUMBERS

POSSESSIVE FORMS **ON**

**– DATES –**

**1-4-02** [2]
*6:11, 19*
**1-6-02** [1]
*7:15*
**1-14-02** [1]
*6:13*
**1-25-02** [1]
*7:11*
**1-28-02** [2]
*6:15; 7:13*
**2-2-01** [1]
*7:7*
**5-18-99** [1]
*6:8*
**5-24-99** [2]
*6:10; 71:5*
**6-15-00** [1]
*7:5*
**7-29-99** [1]
*6:22*
**9-26-00** [1]
*6:24*
**9-29-97** [2]
*145:3, 11*
**9-30-03** [1]
*7:18*
**10-29-01** [1]
*7:9*
**12-1-01** [1]
*150:2*
**12-8-97** [1]
*145:4*
**12/31/03** [1]
*159:20*
**April, 2000** [1]
*101:23*
**April, 2001** [3]
*41:12, 18; 106:13*
**August** [1]
*97:19*
**August, 2001** [1]
*106:24*
**August 27th, 1999** [1]
*153:12*
**August of 2000** [1]
*102:19*
**December** [13]
*46:25; 47:4; 49:7; 75:15, 16;*

*76:5; 98:3; 104:7; 113:1, 11, 14; 125:15; 145:10*
**December, 2000** [1]
*103:15*
**December, 2001** [3]
*75:14; 86:13; 138:3*
**December 1, 2001** [3]
*77:14, 18; 79:3*
**December 1st** [1]
*150:23*
**December 1st, 1997** [1]
*148:7*
**December 2** [2]
*53:15; 54:13*
**December 3** [1]
*116:13*
**December 3, 2001** [2]
*84:1; 126:13*
**December 4** [7]
*53:15; 56:21; 61:8; 63:7; 81:25; 82:10, 11*
**December 4, 2001** [5]
*58:11; 60:5, 17; 80:13; 148:16*
**December 4th** [2]
*80:19; 150:24*
**December 4th, 1997** [2]
*145:12; 146:3*
**December 5** [3]
*60:20; 73:10, 15*
**December 5, 2001** [1]
*72:22*
**December 7th** [1]
*75:2*
**December 8, 1997** [1]
*144:24*
**December 10th, 2001** [1]
*68:10*
**December 26th, 2000** [1]
*112:4*
**December 28** [3]
*82:1, 16; 92:25*
**December 28, 2001** [1]
*81:7*
**Decemeber of 1997** [1]
*144:19*
**Decemeber of 1999** [1]
*98:7*
**Decemeber of 2001** [2]
*136:23; 137:1*
**Decemeber the 2nd** [1]
*124:9*
**Decemeber the 3rd** [1]
*126:5*
**February, 2001** [1]
*106:9*
**February, 2002** [1]
*6:18*
**February 2, 2001** [1]
*114:24*
**February 6, 2002** [2]
*120:10; 131:24*
**February 10th, 1981** [1]
*15:15*
**February of 2000** [1]
*106:4*
**February of 2002** [3]
*96:9; 136:24; 137:2*
**January** [5]
*29:23; 96:8; 113:1; 136:23; 137:2*

**January, 1999** [2]
*6:18; 96:12*
**January, 2000** [1]
*98:13*
**January, 2001** [1]
*103:19*
**January 4, 2001** [1]
*83:18*
**January 8** [1]
*89:4*
**January 8, 2002** [1]
*88:10*
**January 25** [1]
*117:19*
**January 28** [1]
*93:1*
**January 28, 2002** [1]
*119:2*
**January of 2002** [1]
*110:8*
**July, 2000** [1]
*102:10*
**June 15, 2000** [1]
*113:23*
**May** [2]
*55:15; 71:6*
**May, 2001** [1]
*106:15*
**May of 1999** [2]
*70:17, 19*
**November, 2001** [1]
*110:7*
**November 24th, 1997** [1]
*146:22*
**November 29** [2]
*58:14; 88:14*
**November 29, 2001** [1]
*46:17*
**November 29th** [1]
*77:3*
**November 30th** [1]
*88:19*
**October** [1]
*153:20*
**October, 2000** [2]
*30:21; 103:3*
**October, 2001** [1]
*108:1*
**October 29** [1]
*116:8*
**October 29, 2001** [1]
*115:15*
**October 29th, 2001** [1]
*116:10*
**October of 2001** [2]
*109:7, 21*
**September** [1]
*144:21*
**September, 2003** [2]
*2:5; 159:8*
**September 18th, 2003** [1]
*8:16*
**SEPTEMBER 30, 2003** [2]
*1:15; 157:3*

**– $ –**

**$120,000** [1]
*122:7*
**$330,000** [1]
*122:13*

**$450,000** [3]
*122:3, 14; 123:6*
**$482** [1]
*33:12, 14*
**$555** [1]
*33:25*
**$712** [1]
*34:13*
**$74,545.80** [1]
*115:16*
**$919** [1]
*35:2*

**– 0 –**

**0.7** [1]
*43:3*
**0.8** [1]
*41:14*
**02** [1]
*1:7*

**– 1 –**

**1** [18]
*5:18; 8:1; 9:11; 10:8; 14:4; 77:14, 18; 79:3; 100:5, 11; 101:24; 102:14; 103:11; 104:2; 105:6; 106:13; 109:25; 157:4*
**1,700,000,000** [1]
*35:6*
**1-14-02** [1]
*6:13*
**1-25-02** [1]
*7:11*
**1-28-02** [2]
*6:15; 7:13*
**1-4-02** [2]
*6:11, 19*
**1-6-02** [1]
*7:15*
**1-A** [1]
*31:2*
**1.99** [3]
*122:23; 123:7; 130:19*
**10** [6]
*6:13; 60:3; 63:10; 85:22, 25; 148:11*
**10,971** [1]
*41:12*
**10-29-01** [1]
*7:9*
**100** [8]
*2:9; 3:20; 36:10; 37:3, 8; 71:7, 16, 21*
**101.17** [1]
*112:5*
**10:44** [1]
*2:5*
**10th** [2]
*15:15; 68:10*
**11** [11]
*6:15, 21; 92:6, 9, 16; 93:1; 108:2; 110:1, 2; 115:16, 20*
**110** [1]
*6:21*
**112** [2]
*6:23; 7:3*
**113** [1]
*7:5*
**114** [2]

**7:7; 159:21**
**115** [1]
  *7:9*
**116** [1]
  *7:11*
**1162** [1]
  *96:10*
**118** [1]
  *7:13*
**12** [5]
  *5:18; 6:17; 31:4; 96:7; 113:7*
**12-1-01** [1]
  *150:2*
**12-14** [1]
  *93:10*
**12-8-97** [1]
  *145:4*
**12/31/03** [1]
  *159:20*
**120** [1]
  *7:15*
**1200** [1]
  *3:6*
**1202** [1]
  *112:1*
**1206** [4]
  *104:4, 9; 115:2, 4*
**1207** [1]
  *99:19*
**1251** [1]
  *83:17*
**128** [1]
  *1:7*
**13** [6]
  *6:19; 7:13; 98:17; 99:17, 18;*
  *104:4*
**14** [3]
  *6:21; 7:9; 110:11*
**143** [1]
  *5:8*
**144** [1]
  *105:3*
**1442** [1]
  *30:19*
**1444** [1]
  *31:1*
**1469** [1]
  *29:23*
**1471** [1]
  *30:3*
**15** [5]
  *6:23; 76:5; 111:23; 112:1;*
  *113:23*
**15.1** [1]
  *34:5*
**150** [1]
  *101:11*
**155** [1]
  *5:9*
**156** [1]
  *7:17*
**157** [1]
  *5:11*
**158** [1]
  *5:12*
**159** [1]
  *5:13*
**16** [5]
  *6:15; 7:3; 88:2; 112:14, 17*
**16.4** [1]
  *35:8*

**17** [7]
  *6:7; 7:3, 5; 88:25; 89:20;*
  *113:19, 22*
**18** [8]
  *6:11, 19; 7:7; 72:20; 88:25;*
  *90:4; 114:20, 23*
**18th** [1]
  *8:17*
**19** [6]
  *7:9; 19:22; 88:25; 90:9; .*
  *115:11, 13*
**1981** [3]
  *15:14, 15, 24*
**1985** [2]
  *19:4, 22*
**1987** [1]
  *24:14*
**1988** [1]
  *25:25*
**1990** [2]
  *28:25; 33:25*
**1997** [12]
  *10:13; 11:3; 22:7; 54:21;*
  *55:4; 144:19, 24; 145:6, 12;*
  *146:3, 22; 148:7*
**1998** [4]
  *10:13; 33:12, 13; 97:13*
**1999** [25]
  *5:22; 6:18; 10:13; 29:22;*
  *30:5, 13; 34:2, 3; 70:17, 19;*
  *71:24; 72:11; 96:12; 98:7, 13;*
  *99:1, 21; 100:3, 8, 10; 101:2;*
  *113:24; 153:13*
**1st** [2]
  *148:7; 150:23*

**– 2 –**

**2** [13]
  *5:21; 6:3; 29:18, 21; 53:15;*
  *54:13; 99:2, 4, 6, 9; 114:24;*
  *149:12; 157:4*
**2-2-01** [1]
  *7:7*
**2.2** [1]
  *30:3*
**20** [7]
  *5:23, 24; 7:11; 116:17, 20;*
  *120:16*
**20.3** [1]
  *33:15*
**200** [1]
  *101:15*
**2000** [32]
  *10:13; 11:3, 4; 30:21; 34:12;*
  *55:17, 20; 98:13; 99:21;*
  *101:23, 24; 102:10, 16, 19;*
  *103:3, 4, 15, 19; 104:1, 25;*
  *105:6, 15, 19; 106:4, 5, 7, 9;*
  *112:4; 113:16, 23; 115:7*
**2001** [48]
  *5:23; 10:13; 30:20; 35:1;*
  *41:12, 18; 46:17; 47:5; 55:17;*
  *58:11; 60:5, 17; 68:10; 72:22;*
  *75:14; 77:15, 18; 79:3; 80:9,*
  *13; 81:7; 83:19; 84:2; 86:13;*
  *103:19; 106:9, 13, 15, 24, 25;*
  *108:1; 109:7, 21; 110:7;*
  *114:25; 115:15; 116:8, 10;*
  *117:3; 118:17; 120:12; 122:3,*
  *25; 126:13; 136:23; 137:1;*

**138:3; 148:16**
**2002** [20]
  *6:18; 10:13, 21; 11:1, 2; 35:5;*
  *83:20, 21; 88:10; 96:9; 110:8;*
  *117:19; 119:2; 120:10; 121:2,*
  *3; 131:24; 136:24; 137:2*
**2003** [12]
  *1:15; 2:5; 5:25; 8:17; 11:1, 2;*
  *32:20; 154:13; 157:3; 158:21;*
  *159:8, 16*
**206** [1]
  *104:8*
**21** [4]
  *7:13; 118:10, 13; 120:16*
**21.21** [2]
  *147:15; 148:3*
**22** [5]
  *5:21; 7:5, 15; 120:4, 7*
**2219** [1]
  *159:19*
**23** [6]
  *7:7, 17; 123:7; 130:20; 132:7;*
  *156:6*
**24** [1]
  *81:9*
**24-day** [1]
  *81:11*
**241** [1]
  *159:20*
**24th** [1]
  *146:22*
**25** [4]
  *6:9, 13; 15:14; 117:19*
**25-30** [1]
  *31:11*
**250** [1]
  *101:16*
**258,000** [1]
  *35:12*
**26th** [1]
  *112:4*
**27th** [1]
  *153:12*
**28** [6]
  *81:7; 82:1, 16; 92:25; 93:1;*
  *119:2*
**28.3** [1]
  *34:13*
**28th** [2]
  *81:13; 82:18*
**29** [6]
  *5:21; 46:17; 58:14; 88:14;*
  *115:15; 116:8*
**29.1** [1]
  *35:3*
**29th** [2]
  *77:3; 116:10*
**2:06** [1]
  *2:5*
**2nd** [1]
  *124:9*

**– 3 –**

**3** [11]
  *5:4, 23; 6:23; 30:15, 18; 84:1;*
  *107:21, 24; 116:13; 126:13;*
  *157:4*
**30** [9]
  *1:15; 5:23; 30:9; 95:17;*
  *153:14, 15, 16, 21; 157:3*

**30-day** [4]
  *81:4; 84:3; 87:7; 125:9*
**300** [9]
  *2:9; 3:20; 101:2, 4, 5, 16, 21;*
  *106:5, 7*
**30th** [3]
  *2:4; 88:19; 159:8*
**32** [2]
  *5:24; 45:4*
**35** [2]
  *53:13; 66:11*
**3505** [1]
  *3:16*
**37** [2]
  *112:7, 8*
**38** [5]
  *56:17; 66:12; 67:1, 2*
**39** [6]
  *6:3; 81:2; 82:16; 92:24, 25*
**3rd** [2]
  *125:15; 126:5*

**– 4 –**

**4** [27]
  *5:5, 24; 32:13, 20; 43:17;*
  *53:15; 56:21; 57:14; 58:11;*
  *60:5, 17; 61:8, 12, 18; 62:4,*
  *18; 63:7; 65:8; 80:13; 81:16,*
  *25; 82:10, 11; 83:18; 148:16;*
  *157:5*
**40** [2]
  *153:21, 22*
**4140** [1]
  *9:4*
**4144** [2]
  *144:16; 145:2*
**4145** [1]
  *145:12*
**4146** [1]
  *146:5*
**4148** [1]
  *147:25*
**4150** [1]
  *144:17*
**4153** [1]
  *72:5*
**4156** [1]
  *69:25*
**4157** [1]
  *70:25*
**4171** [1]
  *110:12*
**4176** [1]
  *151:24*
**4177** [2]
  *151:21; 153:11*
**4196** [1]
  *9:5*
**42** [1]
  *6:5*
**43** [4]
  *35:9; 36:21; 108:1; 115:15*
**450,000** [1]
  *130:18*
**460** [1]
  *3:15*
**47** [1]
  *13:4*
**4th** [6]
  *80:19; 81:14; 82:18; 145:12;*

146:3; 150:24

**– 5 –**

**5** [8]
6:3, 5; 38:18; 39:1; 60:20;
72:22; 73:10, 15

**5-18** [1]
70:1

**5-18-99** [1]
6:8

**5-24-99** [2]
6:10; 71:5

**5.9** [2]
37:16; 38:13

**50** [3]
10:11; 33:2, 21

**512-305-4734/512-305-4800**
[1]
3:21

**512-499-0277** [1]
159:22

**53** [1]
37:13

**54** [3]
43:17, 19; 45:3

**– 6 –**

**6** [7]
6:5; 7:17; 42:5, 8, 11; 120:10;
131:24

**6-15-00** [1]
7:5

**60** [3]
70:7, 11, 14

**600** [1]
37:24

**64** [1]
108:25

**66** [1]
44:11

**69** [1]
6:7

**– 7 –**

**7** [5]
6:7, 17; 69:20; 89:1; 90:21

**7-29-99** [1]
6:22

**7-8** [1]
69:17

**70** [1]
6:9

**750** [1]
159:21

**78** [1]
44:12

**78520** [2]
3:6, 11

**78521** [1]
3:16

**78701** [2]
3:21; 159:21

**7th** [2]
75:2; 159:21

**– 8 –**

**8** [11]
5:8; 6:9; 12:2; 46:9; 51:13;
70:24; 77:13; 88:10; 89:4;

94:25; 144:24

**83** [1]
6:11

**85** [1]
6:13

**855** [1]
3:11

**86** [1]
41:13

**– 9 –**

**9** [6]
3:11; 5:18; 6:11; 7:15; 83:14,
17

**9-26-00** [1]
6:24

**9-29-97** [2]
145:3, 11

**9-30-03** [1]
7:18

**92** [1]
6:15

**956-504-1100/956-504-1408**
[1]
3:7

**956-541-1846/956-541-1893**
[1]
3:17

**956-542-5666/956-542-0016**
[1]
3:12

**96** [1]
6:17

**97** [3]
55:2, 17; 144:22

**98** [4]
6:19; 54:25; 55:17, 20

**99** [9]
29:23; 55:17, 20; 70:1; 71:6;
96:8; 97:19; 98:3; 113:9

**– A –**

**A.L.** [2]
14:22, 24

**a.m.** [1]
2:5

**abide** [3]
60:12; 78:10, 14

**abilities** [7]
18:3; 20:13; 21:23; 24:21;
25:12; 28:7, 12

**ability** [10]
17:20; 23:7; 28:14, 15, 16;
29:15; 80:23; 104:17, 18;
141:5

**able** [10]
24:23; 40:15; 48:1, 18; 69:2;
94:9; 97:4; 122:21, 24;
139:19

**aboard** [1]
15:3

**above-styled** [1]
2:4

**Acapulco** [1]
105:16

**acceptable** [1]
95:8

**accepted** [1]
117:24

**access** [5]

10:23; 11:4, 5, 9

**accident** [1]
14:5

**accomplished** [2]
132:11, 22

**accomplishment** [3]
104:19; 114:1; 120:22

**accomplishments** [2]
115:8; 132:9

**According** [2]
52:25; 90:20

**account** [27]
35:15, 16, 20; 36:3; 38:15;
52:8; 73:15; 74:3, 5, 7; 76:18;
79:8, 14, 22; 95:10; 119:15;
121:17, 18, 19, 21; 130:4, 24;
140:3; 149:22; 150:20;
154:17, 23

**accounted** [1]
130:17

**accounts** [13]
16:7; 31:5; 35:12; 36:8; 37:9;
38:1, 14; 39:3; 41:12, 18;
43:22; 106:14; 107:21

**accurate** [2]
36:17; 41:15

**accusations** [2]
95:3, 7

**achieve** [2]
31:4; 112:11

**achieved** [1]
117:16

**achievement** [2]
115:6; 117:2

**achievements** [1]
106:3

**achieving** [2]
103:24; 120:13

**acknowledged** [1]
158:18

**acknowledges** [1]
86:9

**acting** [1]
81:24

**ACTION** [1]
1:6

**action** [18]
51:12; 63:7, 11; 65:24; 66:1;
84:4, 6, 12, 21; 89:22; 91:6,
9; 93:22; 140:1, 16; 155:19;
159:13, 15

**actions** [4]
57:17; 88:4; 140:2; 142:16

**activities** [4]
16:25; 50:9; 146:24; 147:10

**actual** [2]
10:10; 43:11; 145:13

**add** [1]
34:15

**added** [2]
41:16; 110:20

**additional** [1]
114:14

**addressed** [2]
46:17; 151:12

**adjustments** [1]
30:25

**administration** [2]
13:22; 52:19

**administrator** [1]
131:4

**administrators** [1]
52:23

**advice** [1]
12:21

**advised** [2]
52:19; 149:5

**affected** [1]
134:21

**affix** [1]
158:4

**AFL** [5]
9:4; 39:12; 144:16; 153:11

**AFLAC** [98]
3:18; 5:23; 6:8, 17; 10:7, 15,
16, 18, 22; 11:13; 14:20;
15:11, 13; 18:17; 20:19; 21:6;
24:5; 30:8; 32:4, 7, 25; 33:5;
34:10; 35:1, 16; 37:9; 38:1,
15; 39:2, 9, 23; 40:2, 16, 22;
42:19; 43:22; 44:15, 21;
52:14, 19; 54:20; 55:4; 58:17;
64:12; 66:7, 16, 23; 67:13,
25; 68:6; 69:23; 70:25; 73:15;
77:7; 81:3, 22, 25; 82:4;
87:13; 88:4; 90:23; 91:8, 24;
93:22; 95:4, 9, 11; 96:2, 6, 8;
97:22; 110:11; 114:3; 118:6;
120:20; 121:14; 122:2; 128:6,
7; 132:15; 133:1, 4, 5, 8, 9;
134:14; 135:8, 17, 23; 136:4,
6; 140:10, 13; 144:3; 149:7;
154:12

**AFLAC's** [13]
6:4; 8:24; 25:24; 40:6; 46:19;
53:20; 58:23, 25; 76:18;
116:22; 117:4; 119:4; 146:6

**afterwards** [3]
72:13; 91:24; 92:5

**agency** [3]
26:1; 27:24; 28:19

**agent** [13]
27:6; 69:22; 70:14; 73:17;
76:19; 97:7; 101:8; 107:2;
123:18, 22; 127:5, 10; 135:13

**agent's** [1]
27:17

**Agents** [1]
26:19

**agents** [5]
55:25; 107:15; 111:4; 122:17;
124:22

**aging** [1]
44:5

**agree** [12]
31:13, 14; 41:14; 44:8, 10;
69:13; 86:16, 19; 89:12, 14;
122:12; 152:5

**agreed** [2]
153:24, 25

**agreement** [4]
35:16; 86:13, 14; 159:7

**AGUILAR** [39]
3:4, 5; 8:8; 12:3; 33:20, 22;
34:4; 36:16, 23; 39:17, 20,
25; 42:13; 46:2; 54:25; 68:20,
24; 69:2, 12, 25; 72:3, 7;
77:14; 83:6, 10, 13; 93:8;
94:5; 95:15; 119:17, 20;
139:3, 5; 140:8; 143:1;
152:10, 12; 155:7; 156:3

**Aguilar** [8]

5:8, 9; 9:7; 12:4, 14, 17;
26:19; 29:20; 30:17; 32:10,
17; 33:24; 34:3; 37:1; 38:20;
40:5; 42:7, 23; 45:15; 46:4, 8;
55:3; 60:2; 61:17, 22; 62:3,
11, 22; 64:7, 11; 65:4; 68:4,
9, 22; 69:4, 8, 19; 70:2; 72:9;
73:4; 74:25; 77:17; 81:13;
83:16, 21; 85:24; 86:19;
89:20; 92:5, 8, 14; 93:12, 24;
94:6; 95:16; 108:10; 111:25;
112:16; 113:21; 114:22;
115:13; 116:19; 118:12;
119:18, 21; 120:6; 123:4, 6;
125:7; 126:9; 127:8, 24;
129:23; 130:3, 9; 131:13, 17,
23; 132:7; 133:14, 23; 134:7;
135:12, 21; 137:25; 138:10,
24; 140:9; 154:12; 155:11, 18

**ahold** [1]
123:23
**airline** [1]
60:10
**allegation** [4]
128:14, 15, 19; 147:14
**allowed** [7]
68:20; 72:14; 80:9, 12, 20;
97:7; 117:14
**allowing** [1]
152:9
**allows** [1]
104:20
**alternative** [1]
155:22
**Amended** [1]
5:19
**Amos** [7]
53:14; 56:21; 66:13; 105:20;
113:25; 114:3, 17
**amount** [11]
6:6; 17:3, 5; 19:10; 33:4;
36:3; 38:1; 42:24; 116:4;
122:4, 5
**analyst** [1]
32:22
**Analysts** [2]
5:25; 32:20
**Anglo** [5]
119:24; 137:17; 138:1, 17;
139:24
**annual** [8]
60:9; 98:25; 103:21, 22;
113:12; 118:19; 148:19;
149:2
**Annualized** [1]
33:9
**annualized** [2]
10:10; 33:3
**answer** [34]
45:15; 57:2; 62:9, 12, 13, 15;
69:3, 8, 11; 81:20; 82:25;
84:19; 92:3; 93:20; 94:2, 12,
14, 17; 136:18, 21; 138:6, 7,
24; 139:7, 19, 20; 140:23;
141:2; 156:2
**answered** [6]
28:2; 132:1; 133:17, 20;
134:4; 136:13
**answering** [2]
60:4; 93:15

**answers** [1]
26:8
**anticipated** [1]
32:6
**anybody** [18]
29:12; 49:9; 53:1; 54:8;
67:24; 76:4; 85:10, 13; 87:13;
91:8, 13, 23; 92:1; 96:2;
129:13; 134:8; 140:10; 151:2
**anymore** [1]
131:5
**Anytime** [1]
77:14
**anytime** [2]
64:15; 77:17
**anyway** [1]
36:19; 130:4; 133:7
**anywhere** [2]
153:4, 6
**apologize** [1]
52:22
**apologizing** [1]
88:4
**apology** [7]
52:14; 53:5; 89:22; 90:5, 13,
23, 25
**Apparently** [1]
99:3
**apparently** [5]
31:3; 90:14; 97:12; 104:6;
144:19
**appear** [1]
46:1
**appearance** [3]
41:23; 58:5; 91:1
**APPEARANCES** [1]
3:1
**Appearances** [1]
5:4
**appears** [16]
30:22; 33:12; 39:1; 65:23, 25;
88:17; 92:16, 23; 117:18;
145:7, 17; 147:13, 20; 150:7,
12; 158:13
**appointment** [1]
123:24
**appreciate** [2]
120:18; 132:25
**appreciated** [2]
112:12; 132:1
**appreciation** [1]
114:10
**approval** [2]
61:11; 151:24
**approximate** [1]
56:25
**April** [4]
41:12, 18; 101:23; 106:13
**arbitration** [1]
84:16
**area** [23]
17:6, 8; 19:6, 12, 20; 21:19;
24:22, 23; 29:4, 8; 33:8;
35:10; 36:8; 37:17, 25; 52:18;
55:10; 109:5, 21, 25; 110:2;
115:23; 149:21
**areas** [3]
25:10; 26:13; 43:8
**aren't** [1]
65:12
**Argumentative** [1]

156:1
**argumentative** [6]
92:2; 131:11; 133:18; 137:19;
138:5, 18
**Arkansas** [2]
109:16, 20
**ARNOLD** [2]
3:4, 5
**Arnold** [6]
8:10; 36:14; 54:23; 83:4;
94:15; 123:3
**arose** [1]
146:8
**arrive** [1]
49:25
**arrived** [2]
49:11, 13
**Artemis** [1]
3:5
**Article** [2]
147:14; 148:3
**aside** [1]
42:10
**Asking** [1]
39:22
**asking** [34]
17:25; 21:13; 26:10, 24;
29:11, 12; 31:16; 33:18;
34:18, 22, 23; 35:24; 36:1;
38:6; 41:16; 46:2; 52:5; 62:3,
5; 65:9; 69:4; 74:25; 76:7;
79:4, 17, 18; 82:22; 94:6;
108:13; 118:7; 135:22; 136:4;
142:13; 155:9
**assigned** [1]
22:1
**assignment** [2]
80:22; 136:14
**assist** [1]
152:8
**Associate** [1]
97:15
**associate** [16]
15:17; 16:3; 18:6, 10; 58:8;
60:7; 70:11; 81:6, 17; 93:3;
97:16; 121:4; 140:12; 143:12;
145:6; 148:7
**assume** [10]
13:20, 24; 18:4; 42:16; 47:6;
55:7; 57:2; 66:14; 70:3;
147:17
**assumed** [1]
111:3
**Assumes** [3]
64:5; 125:2; 127:6
**assumes** [2]
129:12; 138:7
**assuming** [8]
45:25; 57:2; 71:2; 88:6;
119:25; 123:2; 145:15;
148:10
**assumption** [2]
131:2; 142:2
**Atlanta** [15]
46:13, 21, 22; 49:3; 51:16;
60:10, 20; 61:6; 73:11; 98:12;
148:22, 23; 149:4; 151:4
**attached** [13]
2:11; 72:1; 145:12
**attachments** [2]
6:20; 95:6

**attain** [1]
120:21
**attendance** [1]
60:23
**attended** [1]
149:1
**attending** [1]
48:1
**attention** [2]
51:4; 152:5
**Attorney** [1]
66:14
**attorney** [32]
9:10, 21, 22, 24; 12:9, 22;
32:3; 50:25; 51:9; 58:20, 23;
62:12; 64:16; 65:16, 18, 21,
22; 67:5, 20; 72:21; 80:2;
93:17; 94:7; 124:7, 18; 131:9;
139:18; 143:5; 155:15, 21;
159:13, 14
**attorneys** [4]
58:25; 62:11; 65:12; 146:7
**August** [4]
97:19; 102:19; 106:24;
153:12
**Austin** [9]
2:9; 3:21; 36:9, 15, 18; 37:4;
127:19; 131:7; 159:21
**authorization** [3]
50:6; 61:11; 152:24
**authorize** [1]
154:10
**autograph** [1]
114:16
**autographed** [1]
114:7
**available** [4]
10:14, 16; 21:24; 36:8
**Avenue** [2]
2:9; 3:20
**Award** [9]
23:11; 98:4, 8; 105:20, 21;
112:18; 113:5, 8; 117:4
**award** [33]
21:4; 23:3, 5, 6, 19, 22;
98:14; 100:4, 11; 102:10, 11;
103:4, 6, 13, 16, 20, 21, 22;
104:6, 23; 105:6, 22; 106:2,
25; 110:8; 114:14, 18; 115:6;
117:16; 118:16, 17; 119:10;
120:21
**Awards** [1]
6:17
**awards** [10]
20:24; 21:11; 96:8; 98:18;
110:9, 10; 119:12; 120:2, 14;
133:3
**aware** [48]
8:18; 45:21; 47:10; 60:18;
67:15, 18; 76:4, 7, 14; 80:8;
88:7; 90:11; 91:13, 19; 92:4;
96:4; 121:23; 122:2, 6; 124:2;
125:14, 17; 126:3, 12, 15, 16,
18, 23, 24; 127:3, 10; 134:8;
141:6, 9, 11, 14, 15, 17;
142:11, 13, 18; 145:25;
154:12, 16, 19, 20, 25

**– B –**

**bachelor** [1]

*13:22*

**background** [2]
*13:6; 45:17*
**badgering** [1]
*131:12*
**Bahamas** [1]
*106:17*
**Baker** [17]
*48:7; 52:10, 12; 53:1; 60:23;*
*63:13, 25; 74:9, 12; 88:3;*
*89:4; 91:5; 129:16; 133:22;*
*143:15, 16; 148:24*
**banner** [1]
*120:19*
**bar** [2]
*32:8; 119:20*
**BARKER** [3]
*2:6; 159:6, 19*
**BARNSON** [9]
*1:14; 2:2; 5:7; 8:4; 157:2;*
*158:3, 9, 13; 159:8*
**Barnson** [18]
*5:20; 6:12, 22, 24; 7:4, 5, 7,*
*9, 15; 8:15, 18; 9:3, 9, 10;*
*72:9; 86:2, 22; 143:4*
**Barnson's** [1]
*8:21*
**Based** [5]
*96:18; 100:7; 101:10; 127:25;*
*129:11*
**based** [46]
*12:14, 17, 21; 17:3, 5, 6, 11,*
*14; 21:18; 22:19, 21, 22, 25;*
*28:2, 11, 14, 15, 16; 37:21;*
*45:17; 51:23; 77:5; 94:20, 21;*
*96:25; 97:24; 98:8, 10; 99:22;*
*100:5, 12, 16; 101:24;*
*102:21; 103:23, 25; 104:3;*
*105:1, 3; 107:10, 11; 117:9;*
*118:21; 145:15; 152:16*
**bases** [2]
*18:2; 27:16*
**basic** [1]
*14:7; 101:8; 106:10*
**Basically** [6]
*15:3; 20:10; 70:13; 86:14, 21;*
*110:21*
**basically** [7]
*23:17; 53:8; 63:15; 70:14;*
*89:12; 102:25; 148:25*
**basis** [3]
*16:25; 98:25; 152:15*
**Bates** [14]
*9:4; 29:22; 30:19; 39:12;*
*42:14, 19; 69:24, 25; 72:5;*
*83:17; 96:9; 112:1; 115:4*
**BBA** [1]
*13:20*
**becoming** [1]
*18:6*
**behalf** [1]
*86:2*
**believe** [15]
*8:24; 10:17; 16:1; 28:8; 44:1,*
*20; 53:15; 54:21, 24; 66:12;*
*67:12; 90:6; 99:19; 134:22;*
*154:11*
**believed** [1]
*67:5; 144:2*
**besides** [1]
*124:5*

**bigger** [2]
*25:18; 26:13*
**BISD** [27]
*46:18; 55:21, 22; 57:5; 73:15;*
*79:1, 16; 80:1, 9; 88:3; 89:3;*
*117:15; 118:24; 121:14, 21;*
*122:25; 128:25; 129:13, 21;*
*130:4, 10, 15, 17, 23; 151:10;*
*154:13, 23*
**BISD's** [4]
*8:22; 9:1; 122:3; 128:25*
**bit** [1]
*54:1*
**Black** [2]
*146:22; 148:1*
**black** [1]
*37:24*
**block** [1]
*37:23*
**blocked** [1]
*52:17*
**blocks** [1]
*37:25*
**Board** [3]
*1:9; 46:18; 90:10*
**board** [16]
*44:16; 52:22, 23; 53:14; 79:2,*
*3; 88:3; 89:3, 13; 90:13;*
*91:21; 93:23; 114:4, 5;*
*128:25; 133:7*
**Boca** [1]
*3:16*
**bonus** [1]
*152:18*
**BOSQUE-GILBERT** [1]
*1:7*
**Boulevard** [2]
*3:6, 16*
**break** [8]
*68:16, 19, 23; 69:1, 6, 11, 13*
**breakdowns** [1]
*39:2*
**bricklaying** [1]
*16:12*
**Brief** [2]
*69:16; 93:9*
**Briefing** [1]
*5:25; 32:21*
**briefing** [1]
*50:20*
**brings** [1]
*109:4*
**broad** [1]
*76:25*
**BROWNSVILLE** [3]
*1:2, 5; 3:8*
**Brownsville** [10]
*1:9; 3:6, 11, 16; 46:16; 48:17;*
*73:25; 143:5; 144:8; 149:21*
**Buddy** [1]
*42:13*
**build** [1]
*29:15*
**building** [2]
*17:14; 152:7*
**built** [2]
*17:17; 133:4*
**bury** [1]
*140:18*
**Business** [5]
*5:22; 23; 6:8, 10; 90:22*

**business** [16]
*13:22; 23:8; 30:20, 24; 35:14;*
*36:6, 15, 20; 37:5, 22; 41:11;*
*43:23; 70:7, 12; 95:10, 11*
**businesses** [5]
*36:10; 37:4, 9; 39:3; 41:19*
**by-party** [1]
*53:9*

**– C –**

**calculate** [1]
*122:21*
**calculated** [1]
*21:8*
**calculation** [5]
*21:25; 22:1; 41:15; 117:17;*
*123:10*
**calculations** [1]
*123:9*
**California** [1]
*109:5*
**call** [6]
*11:19; 14:4; 21:21; 85:4, 6,*
*10*
**camera** [1]
*149:15*
**Cameron** [4]
*40:8, 18; 41:10; 43:12*
**cancellation** [1]
*57:22*
**cancelled** [1]
*57:21*
**Cancun** [1]
*100:21*
**capacities** [1]
*1:9*
**capacity** [1]
*85:1*
**card** [3]
*112:9; 114:24; 158:15*
**care** [5]
*44:6; 48:6, 13; 139:23; 140:6*
**cared** [1]
*139:23*
**career** [1]
*140:19*
**carefully** [1]
*159:10*
**case** [13]
*12:12; 28:7, 8; 59:5; 71:2;*
*90:3; 91:22; 97:4; 98:15;*
*117:18; 123:25; 125:18;*
*148:10*
**Castellanos** [1]
*6:22*
**categories** [4]
*101:17, 18; 103:8; 107:23*
**category** [3]
*101:5, 14; 102:25*
**caused** [2]
*20:4; 89:23*
**cc** [5]
*46:18; 65:16; 67:3; 86:3;*
*155:15*
**cc'd** [2]
*64:16; 72:23*
**Central** [15]
*3:6; 40:6, 9; 42:24; 43:12;*
*101:24; 102:14; 103:12;*
*105:1, 7, 8, 15; 106:14, 15;*

*107:21*
**CEO** [1]
*114:6*
**CERTIFICATE** [1]
*159:1*
**Certificate** [1]
*5:13*
**Certified** [3]
*2:6; 159:6, 16*
**certify** [3]
*41:7; 159:7, 12*
**cetera** [4]
*28:9; 30:11; 90:15; 139:25*
**Chairman** [2]
*114:4, 5*
**challenge** [3]
*47:10, 14, 15*
**chance** [3]
*51:19; 89:5; 93:18*
**CHANGE** [1]
*157:6*
**Change** [1]
*151:14*
**change** [8]
*22:3; 81:5; 109:11; 128:4;*
*142:6; 145:19; 150:17*
**changed** [7]
*22:24, 25; 105:17; 144:20;*
*145:5; 150:23; 151:13*
**CHANGES** [1]
*157:1*
**Changes** [1]
*5:11*
**changes** [2]
*102:24; 108:17*
**charge** [5]
*30:5; 44:17; 45:1; 55:22;*
*108:20*
**charged** [1]
*137:22*
**CHAVEZ** [1]
*1:3*
**Chavez** [94]
*3:24; 6:11, 14, 16, 17, 24;*
*7:4, 6, 8, 10, 12, 14; 8:20, 21;*
*10:17, 18; 39:7; 42:16; 46:17;*
*53:13, 14; 56:13, 17; 57:5;*
*58:8; 60:4; 61:1, 19; 62:17;*
*63:6, 25; 66:11, 16, 23; 67:1,*
*12, 25; 68:6; 70:8; 72:20, 21;*
*74:21; 75:2; 76:5, 11, 19, 23;*
*77:4, 6, 18; 79:1; 80:9; 81:1,*
*3, 14; 82:16; 83:18, 23; 84:3;*
*85:11; 86:1; 89:14, 23, 25;*
*90:6, 12, 19, 22; 91:14;*
*92:24, 25; 93:3; 104:23;*
*105:5; 113:23; 115:14;*
*116:21; 117:14; 126:13;*
*132:15, 16; 137:8; 143:11;*
*144:14; 146:2, 24; 147:10;*
*148:3, 6; 149:1, 6; 150:7, 15;*
*151:9*
**Chavez's** [6]
*39:14; 66:4, 6, 8; 151:25;*
*155:14*
**check** [3]
*81:23; 129:14, 18*
**checked** [1]
*145:22*
**Chica** [1]
*5:16*

**chief** [1]
*114:6*

**church** [1]
*16:21*

**circumstances** [3]
*145:5; 146:8; 150:17*

**cited** [1]
*94:22*

**citing** [1]
*95:2*

**City** [2]
*13:2; 32:21*

**city** [1]
*15:21*

**CIVIL** [1]
*1:6*

**Civil** [1]
*2:10*

**clarifies** [1]
*132:23*

**clarify** [6]
*94:12, 13; 119:7; 140:5;*
*157:4*

**Class** [1]
*14:4*

**clear** [3]
*79:9; 87:3; 90:7*

**cleared** [1]
*26:22*

**client** [10]
*78:3; 95:21; 121:14; 123:12;*
*124:18, 20; 132:13; 133:8;*
*134:16; 139:21*

**clients** [3]
*124:21; 151:6, 11*

**closer** [1]
*82:17*

**Club** [12]
*21:1, 3, 4; 98:14, 22; 103:20;*
*113:24; 116:22; 117:4;*
*118:17; 119:4; 120:13*

**CODE** [1]
*157:6*

**Code** [1]
*147:15*

**code** [1]
*11:13*

**Codes** [1]
*157:4*

**College** [1]
*13:13*

**college** [5]
*13:7, 9, 18; 14:13*

**Columbus** [1]
*8:25*

**Colunga** [1]
*90:10*

**coming** [1]
*135:25*

**comment** [2]
*34:19, 22*

**commission** [2]
*71:7, 17*

**commissions** [1]
*55:25*

**commitment** [1]
*120:20*

**common** [2]
*104:18, 20*

**Company** [1]
*146:2*

**company** [7]
*14:21; 16:13, 16; 34:19; 85:1,*
*4; 107:4*

**compare** [1]
*11:2*

**compared** [1]
*25:1*

**compensation** [1]
*153:25*

**competitor** [1]
*147:17*

**complain** [1]
*124:21*

**complaining** [1]
*146:23*

**complaint** [20]
*90:15, 18; 123:11, 12; 124:3,*
*25; 125:1, 20; 127:5, 13;*
*128:2, 5, 9, 13; 133:6;*
*134:10; 135:2, 4, 14; 136:6*

**complaints** [2]
*90:11; 124:17*

**complete** [3]
*93:20, 25; 94:2*

**completely** [1]
*21:25*

**comprised** [1]
*115:25*

**concern** [10]
*47:14; 50:5; 52:7; 77:19;*
*79:2, 5; 151:5, 7, 8, 9*

**concerned** [2]
*56:7; 95:12*

**concerning** [2]
*93:22; 159:9*

**CONCLUDED** [1]
*156:8*

**concur** [1]
*40:2*

**concurred** [7]
*50:11; 51:24; 132:14; 140:2;*
*143:24, 25; 144:1*

**conditions** [1]
*52:21*

**condoning** [1]
*119:13*

**conduct** [1]
*144:2*

**conducted** [1]
*84:10*

**confirm** [2]
*8:12; 39:23*

**conflict** [1]
*90:15*

**conform** [1]
*157:4*

**confused** [1]
*135:19*

**congratulating** [1]
*120:12*

**Congratulations** [2]
*112:18; 115:15*

**Congress** [2]
*2:9; 3:20*

**connections** [1]
*10:14*

**consider** [5]
*51:25; 52:1, 19; 121:6;*
*132:19*

**consideration** [1]
*158:19*

**considered** [8]
*20:8; 25:22; 26:21, 25; 27:5,*
*8; 132:18; 139:21*

**considering** [1]
*66:23*

**consultant** [1]
*25:8*

**consulted** [1]
*78:1*

**Cont'd** [2]
*6:1; 7:1*

**contact** [4]
*76:23; 77:4; 95:17; 129:13*

**contacted** [1]
*95:22; 125:14*

**contacting** [4]
*79:1, 3, 16; 83:24*

**context** [1]
*72:6*

**continue** [5]
*44:8; 72:8; 93:14; 121:9;*
*150:7*

**continued** [2]
*115:8; 152:19*

**continues** [1]
*44:12*

**continuing** [1]
*55:7*

**contract** [6]
*80:24; 125:9; 137:13; 152:17;*
*154:9*

**contractor** [3]
*77:6; 78:9, 12*

**contracts** [2]
*137:18; 138:2*

**controversy** [1]
*159:10*

**Convention** [3]
*96:12; 97:20; 100:15*

**convention** [13]
*96:14, 17; 97:5, 21; 100:20;*
*102:20; 105:16; 107:1, 3, 6,*
*16; 111:19*

**conversation** [8]
*67:23; 73:22; 76:16; 125:10,*
*13; 126:4; 149:6; 151:2*

**conversations** [1]
*74:21*

**Coordinator** [4]
*99:15, 22; 105:1; 108:2*

**coordinator** [22]
*10:12; 20:9; 84:25; 85:2;*
*94:20; 95:9; 96:19; 97:8, 25;*
*98:1; 106:21; 119:16; 127:18;*
*132:12, 13; 134:12; 137:10;*
*142:7; 145:6; 152:21; 153:23*

**Coordinator's** [2]
*98:14; 103:20*

**coordinator's** [1]
*86:12*

**coordinators** [5]
*8:19; 25:9; 109:1; 151:7;*
*154:16*

**copayments** [1]
*44:6*

**copied** [5]
*51:1, 10; 64:16; 72:25; 147:5*

**copies** [1]
*10:9*

**copy** [12]
*9:11; 65:20; 66:16; 66:24,*

**considered** [8]

**corner** [1]
*43:17*

**corporate** [3]
*52:21; 58:23, 25*

**corrected** [1]
*126:21*

**CORRECTIONS** [1]
*157:1*

**Corrections** [1]
*5:11*

**correspondence** [2]
*50:24; 151:19*

**costs** [1]
*44:6*

**counsel** [9]
*7:17; 8:13; 64:12; 138:21;*
*139:1; 146:15; 159:7, 13, 14*

**count** [2]
*121:1, 2*

**counted** [1]
*45:3*

**counties** [3]
*6:4; 40:6, 12*

**COUNTY** [2]
*158:11; 159:5*

**County** [4]
*40:8, 18; 41:10; 43:12*

**couple** [2]
*8:12; 32:5*

**course** [1]
*66:24*

**COURT** [1]
*1:1*

**court** [1]
*138:20*

**covers** [1]
*109:3*

**credit** [1]
*122:13*

**credited** [1]
*122:6*

**criteria** [24]
*96:18; 97:3, 11, 25; 98:9, 24,*
*25; 100:4, 25; 102:24; 103:5,*
*6, 7; 105:10, 17; 106:10, 17,*
*20, 23; 107:1, 7, 8, 13*

**CSR** [1]
*159:19*

**culture** [1]
*141:18*

**current** [3]
*15:11, 23; 153:13*

**currently** [3]
*12:24; 38:14, 15*

**– D –**

**Dakotas** [1]
*109:4*

**Dallas** [5]
*17:9; 19:12, 19; 20:3, 5*

**Dan** [5]
*53:14, 25; 113:25; 114:3, 17*

**Daniels** [1]
*96:23*

**Dannelly** [11]
*18:21; 29:25; 56:4; 96:24, 25;*
*100:24; 124:11; 146:7;*
*153:12; 154:2, 8*

**Dannelly's** [1]
19:1

**data** [1]
40:3

**DATE** [1]
157:3

**Date** [1]
159:20

**date** [8]
47:1; 70:15; 71:4; 82:9;
127:4; 145:10; 149:24

**dated** [43]
6:8, 10, 11, 13, 15, 19, 22,
24; 7:5, 7, 9, 11, 13, 15;
29:23; 30:21; 47:7; 53:14;
56:20; 58:11, 14; 60:4; 63:7;
70:17; 71:3; 72:21; 81:6;
82:11, 16; 83:18; 88:10;
112:3, 22; 113:23; 114:24;
115:14; 116:8; 117:19; 119:2;
120:10; 146:22; 148:16;
153:12

**dates** [3]
144:24; 145:3; 154:7

**day** [9]
2:4; 47:3; 55:8; 61:7; 75:19;
158:12, 21; 159:8, 16

**days** [16]
27:13; 32:5; 58:13, 15; 76:5;
81:9; 82:17; 95:17; 119:5;
124:24; 125:1, 8, 19; 127:4,
12; 133:10

**deal** [8]
40:14; 66:2; 84:9; 101:21, 22;
106:6; 107:22; 110:3

**dealing** [2]
132:13; 137:12

**deals** [1]
23:8

**December** [61]
46:25; 47:4; 49:7; 53:15;
54:13; 56:21; 58:11; 60:5, 17,
20; 61:8; 63:7; 68:10; 72:22;
73:10, 15; 75:2, 14, 15, 16;
76:5; 77:14, 18; 79:3; 80:13,
19; 81:7, 25; 82:1, 10, 11, 16;
84:1; 86:13; 92:25; 98:3, 7;
103:15; 104:7; 112:4; 113:1,
11, 14; 116:13; 124:9;
125:15; 126:5, 13; 136:23;
137:1; 138:3; 144:19, 24;
145:10, 12; 146:3; 148:7, 16;
150:23, 24

**decision** [7]
95:10; 132:14; 143:11, 17,
24, 25; 144:1

**decisions** [3]
27:1; 53:9; 151:18

**dedication** [2]
120:18; 132:1

**deductibles** [1]
44:6

**deepest** [1]
114:9

**DEFENDANT** [2]
3:8, 13

**define** [2]
22:12, 14

**defined** [2]
36:21, 24

**definition** [1]

**degree** [5]
13:14, 17, 24; 14:13; 25:21

**DEL** [1]
1:7

**delay** [2]
81:9, 11

**demote** [6]
59:18; 61:13, 19; 62:17, 19;
143:11

**demoted** [8]
57:17, 21; 60:6; 65:13; 86:23;
87:6; 94:19; 118:2

**demotion** [12]
58:7; 59:11, 24; 62:5; 64:4, 9;
81:16; 82:6, 20; 93:3; 145:13;
150:25

**Dennis** [1]
5:23; 30:21, 23

**Department** [1]
6:20

**department** [5]
51:3; 84:9, 17; 128:11;
153:10

**depending** [1]
108:16

**depends** [1]
97:10

**depicting** [1]
114:25

**depo** [1]
93:1

**DEPOSITION** [3]
1:13; 2:1; 156:8

**Deposition** [1]
5:19

**deposition** [6]
8:18; 9:12; 94:10; 158:4;
159:11, 14

**depositioned** [1]
146:11

**derogatory** [2]
139:22; 142:24

**described** [1]
80:5

**DESCRIPTION** [3]
5:17; 6:2; 7:2

**description** [1]
158:15

**deserve** [1]
120:24

**detail** [3]
41:22; 43:10; 48:9

**details** [6]
43:9; 50:10; 84:15; 130:1;
139:11; 141:3

**determination** [2]
120:19; 132:2

**determine** [4]
41:17, 18, 20; 125:6

**develop** [4]
24:23; 25:10; 26:13; 152:18

**developed** [2]
38:11; 90:15

**development** [4]
24:15; 25:1; 28:3, 22

**difference** [3]
24:25; 36:25; 92:24

**digit** [1]
30:10

**DINO** [1]

**1:3**

**Dino** [115]
3:24; 6:11, 14, 16, 17, 24;
7:4, 6, 8, 10, 12, 14, 16; 8:20;
18:9; 47:25; 48:17; 50:5;
52:7; 54:20; 55:1, 3, 20; 57:5;
60:18; 61:13; 63:25; 69:22;
70:8, 13, 19; 71:7, 16, 20;
72:13; 73:16; 74:4, 17; 77:23;
78:17, 21; 81:6, 10; 86:7, 10;
87:5, 18, 19, 21; 88:5; 89:23;
91:23, 24; 94:19; 95:3, 4, 17,
22; 96:5; 97:12; 98:18;
106:22; 111:9; 112:3, 17;
116:12; 117:21; 118:24;
119:5, 11, 12, 18, 21; 120:2,
10; 121:4, 22; 122:6, 12, 24;
123:12, 23; 125:8, 15; 126:4,
13; 130:15, 25; 131:7, 20;
132:9, 10, 15, 16, 17, 25;
137:7, 16; 138:1, 11; 140:3,
11, 12, 17; 141:5, 6; 142:10;
144:20; 145:5; 150:18;
151:25; 152:7; 153:21;
155:19

**Dino's** [15]
18:22; 29:25; 59:11; 86:12;
87:14; 96:7; 121:15; 122:22;
124:3; 130:4, 20; 131:25;
133:8; 145:8; 153:14

**direct** [4]
18:18, 22, 23; 104:18

**directed** [1]
8:15; 81:14

**direction** [6]
51:25; 52:1, 2, 8; 84:14;
143:23

**directive** [1]
84:2

**director** [13]
24:15; 26:1; 27:24; 28:19;
29:2; 34:19; 54:22; 55:5, 8,
18; 116:25; 136:25; 138:11

**directors** [2]
44:16, 25

**disagree** [1]
129:10

**disagreed** [2]
129:1; 133:7

**discuss** [1]
50:2

**discussed** [3]
28:4; 50:4, 16

**discussion** [3]
49:17, 18; 142:4

**Dispute** [1]
71:18

**dispute** [1]
71:13

**Disputing** [1]
71:16

**disputing** [1]
71:15

**distasteful** [1]
139:20

**DISTRICT** [4]
1:1, 6; 3:9

**District** [4]
1:10; 46:16; 143:6; 144:8

**district** [13]
18:15; 46:17; 50:8; 63:25;

**78:3; 110:19; 111:9; 145:5;
150:19; 152:17; 153:16**

**DIVISION** [1]
1:2

**Document** [2]
6:6; 94:24

**document** [56]
8:13; 9:1, 13, 15; 29:21, 24;
30:18; 32:16; 34:10, 24; 39:2,
5, 8, 11, 16, 23; 40:16, 19,
20; 42:12, 15, 21, 22; 44:19;
46:10; 47:23; 57:14, 15; 59:1,
5, 10; 60:15; 61:12, 23; 62:7;
63:9; 66:18; 69:20; 70:6, 25;
71:3, 10, 11, 14; 73:14;
87:11, 12; 94:24; 96:7; 102:9;
104:9, 10; 110:12; 140:20;
148:12; 158:16

**documentation** [1]
127:12

**Documents** [2]
7:17; 40:23

**documents** [32]
8:20, 23; 9:3, 18; 10:9; 32:3,
7, 24; 33:7; 40:21, 22; 42:20;
50:23; 57:4, 6, 10; 67:10, 11,
16; 72:10; 83:6; 89:1, 5; 91:2,
4, 6, 9; 98:18, 19; 99:16;
144:5, 9

**doesn't** [6]
41:8; 42:14; 86:15, 24; 113:3;
130:11

**dollar** [1]
102:4

**dollars** [1]
102:3

**double** [2]
30:10; 153:19

**Douglass** [2]
6:15; 81:2

**Dr** [13]
46:15; 51:13; 58:13; 76:24;
77:2, 4, 11, 19; 88:13; 91:21;
123:13; 124:2; 129:20

**DSC** [11]
15:24; 18:1; 19:3, 6, 8; 20:12,
23; 27:7; 151:25; 152:9;
153:17

**Duces** [2]
5:20; 8:14

**duly** [3]
2:3; 8:5; 159:9

**DUNN** [1]
1:7

**duties** [8]
24:25; 25:3, 4, 5; 29:5; 80:21,
24, 25

**duty** [1]
80:13

**– E –**

**e-mail** [10]
47:5; 60:3, 21; 61:1; 63:6;
148:15; 149:19, 20; 150:5, 7

**Early** [1]
75:14

**early** [4]
21:17; 47:2; 75:15; 113:1

**earned** [4]
107:25; 114:10; 115:6

BSA                    ORAL AND ... EOTAPED DEPOSITION OF LYNN GEO ... GE BARNSON                    Look-See(36)

education [1]
  25:23
educational [1]
  13:5
effect [1]
  87:8
effort [1]
  152:8
efforts [4]
  120:23; 130:4; 131:25; 133:9
eight [1]
  9:17
EILEEN [1]
  3:14
eligible [1]
  38:13
ELIZABETH [1]
  3:10
Elizabeth [1]
  143:4
else's [1]
  35:24
EMERSON [1]
  1:8
emotionally [1]
  137:22
employed [2]
  159:13, 15
employee [4]
  26:18; 107:10; 137:14;
  159:14
employees [7]
  21:24; 26:16; 35:17, 18; 36:3;
  41:11, 19
en [2]
  60:20; 148:23
Enclosed [2]
  114:7, 25
enclosed [1]
  9:16
encourage [2]
  121:7, 9
encouraged [2]
  140:17, 18
endeavors [1]
  121:1
ended [3]
  128:2; 130:23; 133:6
enroll [1]
  21:24
enrollment [10]
  55:22; 80:10; 117:15; 118:25;
  122:3, 25; 130:18; 137:17;
  138:2; 150:9
enrollments [1]
  55:21
entered [1]
  148:13
entitled [1]
  8:13
Errisuriz [4]
  46:9; 51:13; 77:13; 94:25
error [1]
  157:5
Escobar [3]
  5:23; 30:21; 31:3
establish [3]
  30:7; 40:15; 111:1
established [1]
  99:24
established [1]

et [4]
  28:9; 30:11; 90:15; 139:25
ethnic [1]
  140:4
event [1]
  150:17
everyone's [1]
  133:2
evidence [6]
  64:6; 123:2; 125:3; 127:7;
  137:20; 148:13
exact [13]
  19:10, 21; 22:9; 38:5, 6; 43:9;
  45:7; 82:9; 84:15; 92:16;
  116:4; 122:5
exam [1]
  13:25
EXAMINATION [3]
  8:7; 143:2; 155:6
Examination [3]
  5:8, 9
examination [1]
  159:10
examined [1]
  159:10
example [6]
  10:8; 27:6; 37:3; 40:18;
  41:10; 65:12
exceeded [1]
  133:1, 2
exceeding [2]
  23:9; 31:5
Excellence [2]
  23:11; 117:5
except [1]
  130:4; 158:5
exception [2]
  12:1; 153:14
Excuse [1]
  80:16
excuse [2]
  8:16; 150:16
executed [1]
  158:18
executive [1]
  114:6
exhausted [1]
  80:25
Exhibit [75]
  8:1; 9:11, 17; 29:18, 21;
  30:15, 18; 32:13, 20; 38:18;
  39:1; 42:5, 8, 11; 43:16; 46:9;
  51:13; 53:13; 56:17; 57:14;
  60:3; 61:12, 18; 62:4, 18;
  63:10; 66:11; 67:1; 69:17, 20;
  70:24; 72:20; 81:2, 16; 82:10,
  16; 83:14, 17; 85:22, 25;
  88:2, 25; 90:4, 21; 92:6, 9,
  16, 25; 93:1, 10; 96:7; 98:17;
  99:17; 104:4; 110:11; 111:23;
  112:1, 14, 17; 113:7, 19, 22;
  114:20, 23; 115:11, 13;
  116:17, 20; 118:10, 13;
  120:4, 7; 132:7; 156:6
exhibit [1]
  92:17
exhibited [4]
  16:6; 20:7; 26:5, 12
EXHIBITS [1]
  5:15; 6:1; 7:1

Exhibits [1]
  120:14
exhibits [2]
  9:16; 66:6
expand [1]
  44:8
expansions [1]
  108:17
expect [1]
  135:16
expectations [6]
  24:2; 31:25; 85:1; 133:2;
  135:8, 11
expected [2]
  56:7; 77:23
expecting [1]
  101:8
experience [4]
  14:19; 16:8, 10, 19
Expiration [1]
  159:20
expires [1]
  153:15
Explain [1]
  28:5
explain [4]
  27:12; 89:19; 125:12; 157:5
explained [6]
  23:1; 28:1; 98:21; 99:10;
  100:12; 102:16
explaining [2]
  27:10; 37:2
explanation [2]
  131:10; 135:15
expressed [1]
  158:19
extend [5]
  151:25; 152:4, 25; 153:19;
  154:6
extended [3]
  141:11, 16, 17
extent [3]
  45:13; 48:10; 102:17
extra [1]
  39:20; 149:13

– F –

fact [8]
  20:15; 26:11; 50:4; 77:1;
  94:22; 129:5; 150:15; 155:14
factors [11]
  26:25; 27:5, 7, 11, 12; 28:4,
  5; 97:1; 100:17; 102:22;
  103:13
facts [7]
  64:6; 123:2; 125:3; 127:7;
  137:20; 138:8; 157:4
fairly [2]
  22:10, 11
falls [1]
  103:8
FAME [27]
  6:20; 23:3, 5, 6, 12, 18, 19,
  20, 22; 24:2; 24:2; 100:4, 11;
  102:10, 11; 103:4, 6, 13;
  105:6, 23; 106:2, 9, 25;
  110:8; 117:7, 8, 16; 140:18
FAMEs [1]
  105:25
familiar [8]

23:12; 27:7; 34:21; 40:5, 8;
  41:8; 42:23; 125:10
family [3]
  141:11, 16, 17
fax [6]
  3:7, 12, 17, 21; 144:23; 145:4
February [10]
  6:18; 15:15; 96:9; 106:4, 9;
  114:24; 120:10; 131:24;
  136:24; 137:2
Federal [1]
  2:10
Feel [2]
  66:19
feel [1]
  45:10
feelings [1]
  51:23
felt [5]
  65:17; 89:25; 132:21; 146:12,
  13
fight [1]
  94:15
figure [1]
  38:7
figured [1]
  123:4
figures [1]
  41:20
file [23]
  39:14; 54:17; 57:8, 9; 69:22;
  71:1, 9, 12, 18, 20, 21; 73:12,
  24; 74:13; 110:14; 123:15;
  124:4; 144:9, 13, 14; 146:13;
  147:1, 5
filed [1]
  128:5
files [4]
  8:19, 21, 25; 146:14
filing [1]
  128:2
final [1]
  143:11
Financial [2]
  5:25; 32:20
financial [1]
  32:22
financially [1]
  159:15
find [4]
  95:22; 114:7; 133:10; 141:24
fine [4]
  27:14; 88:1; 123:4; 139:2
finish [5]
  68:17, 21; 134:19; 142:18;
  146:18
fire [2]
  138:1, 16
fired [24]
  116:12; 117:21; 119:6;
  124:24; 125:1, 16, 19;
  126:14; 127:4, 11, 20, 22;
  128:20; 129:21; 130:25;
  131:10, 20; 133:7, 9; 134:7,
  9; 135:1, 14; 136:6
firing [1]
  155:21
Firm [1]
  159:20
First [4]
  5:19; 67:14; 130:17; 143:8

**first** [21]
 8:5; 18:10; 21:16; 43:18;
 46:12, 20, 25; 47:4; 48:3;
 49:8, 21; 52:21; 68:17; 69:3;
 74:1; 76:5; 89:21; 101:23;
 102:15; 103:2; 106:14
**FISHER** [1]
 3:10
**five** [15]
 35:14; 36:6, 11, 12; 37:7, 8;
 58:13, 15; 124:24; 125:1, 8,
 19; 127:4, 12; 133:10
**five-plus** [2]
 41:11, 19
**fix** [4]
 47:17; 79:14, 23; 80:7
**focus** [1]
 51:4
**follow** [1]
 130:2
**followed** [1]
 114:16
**Following** [1]
 99:1
**following** [11]
 25:25; 33:24; 34:12; 35:1, 5;
 52:20; 99:14; 104:25; 105:2;
 130:24; 159:8
**follows** [1]
 8:5
**foregoing** [2]
 158:3, 17
**foreign** [1]
 41:6
**forget** [2]
 29:24; 96:20
**form** [36]
 26:17; 36:14; 45:24; 57:16,
 19; 60:1; 61:14, 21, 25; 62:8,
 20; 64:5; 68:1; 74:23; 86:17;
 89:16; 123:1, 5; 125:2; 127:6,
 21; 129:22, 24; 130:7;
 133:12, 13, 15, 16; 135:10,
 18; 137:21; 138:4; 143:21,
 22; 145:19; 155:25
**format** [2]
 41:5; 43:7
**formula** [2]
 41:22; 42:3
**Fort** [4]
 19:19; 20:3, 5; 24:22
**forth** [1]
 22:22
**forward** [4]
 51:2; 84:8; 146:15; 151:16
**forwarded** [1]
 53:7
**forwarding** [1]
 87:1
**found** [1]
 139:20
**Founders** [4]
 23:11; 105:20, 21; 117:4
**four** [14]
 18:8; 19:3, 11, 13; 23:21;
 24:1, 8; 89:1, 3; 91:20; 93:23;
 117:13; 129:7; 135:25
**four-week** [1]
 113:13
**Fourth** [2]
 100:8, 10

**fourth** [10]
 90:22; 97:12; 99:1; 100:3, 6;
 104:1; 105:5, 19; 115:7;
 117:3
**frame** [12]
 19:18; 49:23; 52:3; 54:1, 10,
 11, 12; 56:25; 66:10; 79:24;
 80:20; 126:7
**framed** [1]
 114:8
**frames** [4]
 21:13, 16; 75:12; 136:17
**Francisco** [1]
 102:21
**Frank** [18]
 18:21; 30:23; 46:18; 48:25;
 49:10, 13; 56:4; 60:6; 75:7,
 19, 23; 84:2; 126:4, 7, 12;
 137:4, 7; 150:8
**free** [4]
 45:10; 66:5, 19
**friend** [3]
 121:6; 132:18, 19
**friendship** [1]
 115:9
**front** [3]
 30:22; 101:4; 125:5
**fuel** [1]
 104:20
**full** [1]
 19:11
**future** [3]
 30:8; 52:20; 121:1

– G –

**game** [1]
 82:21
**gave** [1]
 84:2
**Gene** [11]
 18:21; 19:1; 29:25; 56:4;
 96:22, 23, 24, 25; 124:11;
 146:7; 153:12
**generalized** [1]
 27:12
**Geographically** [2]
 109:2, 3
**GEORGE** [9]
 1:14; 2:2; 5:7; 8:4; 157:2;
 158:3, 9, 13; 159:8
**George** [1]
 9:9
**GERRI** [3]
 2:6; 159:6, 19
**gets** [2]
 65:13; 93:17
**Give** [3]
 75:12, 15; 104:5
**give** [8]
 26:7; 38:4; 41:22; 54:10;
 116:4; 134:23, 24; 154:8
**Given** [1]
 158:20
**given** [8]
 23:18, 23; 100:2; 104:6;
 123:16; 125:9; 153:21;
 159:11
**giving** [1]
 29:4
**goal** [2]

 21:5; 100:1
**goals** [3]
 31:20, 22; 112:11
**goes** [6]
 37:23; 80:22; 84:1; 86:10;
 97:19; 103:13
**gosh** [1]
 108:15
**gotten** [3]
 71:23; 130:13; 133:3
**graduating** [1]
 13:8
**Grande** [2]
 37:17; 141:6
**graph** [7]
 33:3, 19; 37:20, 22; 38:7, 8,
 11
**graphs** [1]
 37:15
**great** [1]
 101:22
**grew** [2]
 17:7; 141:6
**ground** [3]
 110:21, 22
**group** [4]
 9:3; 35:20; 121:21; 140:4
**groups** [1]
 36:12
**grow** [4]
 28:15, 17; 134:13, 22
**growing** [2]
 20:21; 28:11
**growth** [6]
 17:12; 20:13; 28:6; 51:4;
 101:5; 107:10
**GUERRA** [1]
 3:15
**guess** [10]
 12:1; 17:21; 45:12; 67:19;
 68:9; 74:1; 108:19; 140:15;
 141:15; 147:16
**guessing** [1]
 82:21
**guy** [8]
 95:20; 137:16; 138:1, 16, 17;
 139:22, 23; 142:23

– H –

**H-2** [1]
 3:5
**hadn't** [2]
 74:4; 91:4
**half** [2]
 102:15; 142:3
**hand** [13]
 30:17; 38:20; 42:7, 10; 46:8;
 56:16; 72:19; 83:16; 85:24;
 87:23; 88:1, 24; 158:20
**handed** [5]
 32:19; 99:16; 104:22; 124:7,
 19
**handing** [18]
 29:20; 53:12; 57:13; 60:2;
 69:19; 70:23; 80:15; 92:8;
 96:6; 98:16; 111:25; 112:16;
 113:21; 114:22; 115:13;
 116:19; 118:12; 120:6
**handle** [2]
 52:11, 12; 150:8

**handled** [4]
 119:14; 143:13, 15; 149:22
**handling** [1]
 142:20
**hands** [1]
 151:17
**handwritten** [1]
 31:11; 150:2
**Hang** [1]
 152:10
**hang** [1]
 38:23
**happening** [1]
 52:4
**happens** [1]
 134:23
**hard** [8]
 26:7; 77:7; 112:11, 21;
 114:10; 120:18; 125:5; 132:1
**hasn't** [1]
 91:23
**hatchet** [1]
 140:18
**hate** [1]
 52:3
**haven't** [3]
 33:7; 39:15; 133:19
**Hawaii** [1]
 107:1
**He's** [7]
 58:20, 23, 25; 78:12; 119:24;
 121:4; 140:13
**he's** [13]
 64:12; 78:8; 83:24; 86:14, 25;
 94:8; 102:18; 119:12, 15;
 120:1; 121:5; 133:4
**head** [1]
 10:4
**headquarters** [22]
 10:22; 11:6, 19, 20; 22:2;
 24:17; 25:24; 28:10, 13, 21;
 31:18; 51:2; 53:8, 11; 73:16;
 76:18; 81:23; 136:16; 143:13,
 14; 151:17
**health** [2]
 14:4; 44:6
**hear** [1]
 87:13
**heard** [1]
 74:2
**held** [1]
 28:22
**Help** [2]
 17:23; 22:12
**help** [6]
 25:9; 34:23; 83:4; 98:19;
 111:18; 124:8
**helped** [2]
 106:22; 151:18
**here's** [1]
 78:18
**hereby** [2]
 158:4; 159:7
**hereto** [2]
 2:12; 159:15
**hey** [3]
 78:18; 87:19, 21
**high** [2]
 13:8; 107:23
**higher** [4]
 13:10; 90:2; 112:11; 133:1

**highlighted** [2]
  56:18, 19
**Hispanic** [11]
  45:9, 13, 14, 23, 25; 134:10;
  135:2, 14; 136:5; 139:23, 25
**hits** [1]
  124:6
**hold** [1]
  28:10
**holdings** [3]
  12:2, 8, 19
**home** [3]
  46:21; 53:20; 141:9
**Honor** [3]
  116:22; 117:4; 119:4
**honor** [1]
  114:11
**hope** [3]
  78:7; 121:8; 132:22
**hoped** [2]
  77:23; 78:16
**HUGH** [1]
  1:8
**hypothetically** [1]
  123:3

**– I –**

**I'd** [3]
  39:14; 69:2; 93:13
**I've** [39]
  9:11; 28:3; 29:20; 30:17;
  32:19; 39:17, 20; 40:13, 21;
  42:7, 11; 53:12; 56:16, 18;
  60:3; 65:24; 69:19; 70:23;
  74:2; 80:15; 83:16; 85:24;
  89:9; 96:6; 98:21; 99:10;
  108:25; 110:11; 113:21;
  114:22; 118:12; 120:6; 122:9;
  136:13; 139:11; 141:2; 153:4,
  9; 154:14
**idea** [1]
  52:6; 74:6; 93:6; 106:18;
  107:19
**identification** [20]
  8:2; 29:19; 30:16; 32:14;
  38:19; 42:6; 69:18; 83:15;
  85:23; 92:7; 93:11; 111:24;
  112:15; 113:20; 114:21;
  115:12; 116:18; 118:11;
  120:5; 156:7
**identify** [1]
  45:9
**identity** [1]
  158:15
**III** [1]
  3:19
**illustrious** [1]
  117:4
**immediately** [1]
  150:20
**implies** [1]
  137:13
**imply** [1]
  32:11
**important** [2]
  72:6; 141:18
**improper** [3]
  39:24; 137:22; 138:19
**impropriety** [1]
  147:14

**in-force** [1]
  30:10
**inappropriate** [1]
  131:12
**Incentives** [1]
  6:20
**include** [3]
  109:12; 118:20; 122:22
**included** [5]
  74:15; 109:13; 118:20, 23;
  122:24
**includes** [4]
  109:17, 19, 20
**inclusive** [1]
  9:5
**incorrectly** [1]
  33:11
**increase** [13]
  31:4, 12; 33:15; 34:6, 14;
  35:3, 7; 101:13, 25; 102:4, 5,
  15, 19
**increases** [1]
  30:10
**INDEPENDENT** [2]
  1:5; 3:8
**Independent** [4]
  1:10; 46:16; 143:5; 144:8
**independent** [5]
  77:6; 78:8, 12; 137:12;
  147:22
**INDEX** [1]
  5:1
**index** [3]
  21:22; 31:7; 101:10
**indicate** [2]
  110:16; 113:23
**indicated** [6]
  30:2; 31:3; 32:4; 59:3; 95:16;
  155:11
**indicates** [14]
  33:3; 46:18; 58:7, 17; 59:2;
  66:22; 70:7; 71:3, 6; 73:14;
  89:21; 90:5, 10, 22
**Indicating** [1]
  43:20
**indicating** [2]
  81:3; 87:13
**Indication** [1]
  79:12
**individual** [5]
  29:10; 104:19; 132:17, 22;
  136:12
**individually** [2]
  135:22; 136:3
**individuals** [4]
  23:16, 18; 26:22; 94:21
**inform** [1]
  39:4
**information** [48]
  10:2, 5, 14, 19, 21, 22, 23;
  11:16, 23; 12:5, 7, 18; 30:12;
  32:5, 11; 35:25; 40:14; 41:5,
  6; 42:3; 43:8; 47:11; 48:24;
  49:5; 50:15; 51:5; 53:7; 54:9;
  65:25; 66:3; 67:16; 73:23;
  74:10, 12, 15; 77:5, 25;
  87:12; 90:2; 101:3; 125:5;
  129:11, 16, 17; 136:13;
  145:15; 151:16; 155:13
**informed** [1]
  69:15

**INSERT** [1]
  4:3
**Instance** [2]
  2:3; 153:11
**instruct** [1]
  64:22
**instructed** [2]
  78:11, 20
**instructions** [2]
  60:13; 78:2
**instrument** [1]
  158:17
**Insurance** [2]
  147:15; 148:2
**insurance** [9]
  13:24, 25; 14:5, 13, 19; 15:1,
  6, 9; 44:2
**Intent** [1]
  84:3
**Intention** [1]
  5:19
**Interested** [1]
  159:15
**interests** [2]
  134:14, 15
**International** [1]
  3:15
**Interpret** [2]
  34:23; 35:24
**interpretation** [2]
  33:16; 36:17
**interpreting** [1]
  40:19
**interview** [1]
  26:23
**introduce** [1]
  20:18
**Investigate** [2]
  81:23; 82:1
**involved** [10]
  20:20; 64:3, 9; 65:10, 13;
  75:10; 80:21; 115:24; 128:11;
  142:16
**involves** [1]
  103:6
**involving** [1]
  60:8
**Iowa** [2]
  109:4, 13
**Island** [1]
  106:16
**Issue** [3]
  47:23; 48:12; 57:5
**issues** [1]
  48:16
**Item** [2]
  10:8; 30:3
**item** [8]
  48:13; 52:21; 65:11; 99:1, 14;
  101:1; 104:25; 124:6

**– J –**

**James** [1]
  146:22
**Janet** [23]
  48:7; 49:15; 50:19; 51:3, 18;
  54:19; 57:8; 60:23; 63:13, 25;
  73:24; 74:9, 10, 12, 17;
  129:16, 17; 133:22, 25;
  143:15, 16, 18; 148:24

**January** [16]
  6:18; 29:23; 83:18; 88:10;
  89:4; 93:1; 96:8, 12; 98:13;
  103:19; 110:8; 113:1; 117:19;
  119:2; 136:23; 137:2
**Japan** [2]
  44:4; 45:4
**Jeff** [8]
  3:24; 58:17, 18; 59:3; 84:8, 9;
  124:12, 13
**Jefferson** [1]
  6:13
**Job** [3]
  25:8; 30:24; 149:9
**Joe** [1]
  90:10
**Joseph** [2]
  7:11, 13
**JR** [1]
  1:8
**Judy** [2]
  127:17, 18
**July** [1]
  102:10
**June** [1]
  113:23
**jury** [1]
  131:24

**– K –**

**Karl** [2]
  6:15; 81:2
**Keep** [1]
  112:10
**keep** [3]
  134:20; 136:17
**keeps** [1]
  122:10
**Key** [9]
  21:1, 3, 4; 98:14, 22; 103:20;
  118:16, 17; 120:12
**Klein** [1]
  127:17, 18
**knowledge** [4]
  45:18; 55:23; 63:19; 64:2
**Kuechenmeister** [6]
  7:12, 14; 116:21, 23, 24;
  118:14

**– L –**

**L.L.P.** [4]
  2:8; 3:10, 15, 20
**label** [1]
  39:13; 42:19
**labeled** [2]
  9:4; 39:12
**lack** [2]
  99:11; 128:1
**LaFemina** [60]
  18:21; 30:23; 46:19; 48:25;
  49:10; 50:17; 56:4; 57:14;
  58:1; 59:2, 17; 60:3, 6, 25;
  61:5, 10, 12, 17, 18; 62:4, 6,
  16, 18; 63:10; 65:8; 75:7, 19,
  23; 76:14; 77:24; 78:11, 15,
  20; 81:15, 21; 82:10; 84:2;
  116:12; 125:11, 14; 126:4,
  12; 137:5, 7; 140:22, 24;
  141:23; 142:6, 9, 14, 19;
  148:11; 149:12, 20; 150:8;

14, 25; 151:14; 155:14
**Lake** [1]
    13:2
**large** [2]
    122:4; 154:17
**larger** [5]
    29:4, 8; 109:8, 9, 10
**Las** [2]
    97:21; 106:10
**last** [7]
    22:17; 31:2; 84:24; 85:2;
    109:10; 139:8; 154:1
**late** [1]
    112:25
**lateral** [1]
    25:22
**LAW** [1]
    3:5
**Law** [1]
    66:14
**lawyer** [5]
    84:11, 20; 86:1; 124:13, 19
**lawyers** [1]
    124:18
**LDS** [1]
    16:21
**lead** [2]
    30:8; 150:20
**leadership** [7]
    17:20; 18:3; 20:13; 28:7, 12;
    30:8; 97:1
**leave** [1]
    67:21
**LEEDS** [18]
    3:14; 45:12; 60:1; 61:14, 21,
    25; 62:8, 20; 74:23; 94:11;
    129:22, 24; 130:7; 133:13,
    16; 145:1; 155:5, 25
**legal** [8]
    51:3; 64:12; 65:24; 66:1;
    84:8, 17; 128:11; 146:15
**Lehmann** [2]
    89:21, 25
**Let's** [6]
    21:15; 67:7; 93:8; 96:5;
    126:24; 131:16
**let's** [6]
    21:15; 36:10; 37:3; 68:17;
    79:22; 96:10
**Letter** [10]
    6:11, 13, 15, 19, 24; 7:4, 5, 7,
    9, 15
**letter** [86]
    46:15; 47:6; 51:10, 13, 15;
    52:14, 17, 25; 53:2, 4, 5, 13,
    16, 18; 54:9; 56:13, 20;
    58:13; 65:16; 66:4, 6; 72:2,
    20, 23; 73:8; 77:2; 81:4, 10,
    14; 83:18, 22, 23; 84:5;
    85:25; 86:4, 9, 10, 11, 18, 21,
    23, 25; 87:18; 88:3, 9, 12, 13,
    18; 89:4, 21; 90:1, 12, 20;
    92:17; 93:5; 94:22, 23;
    111:18; 113:22; 116:8, 15;
    117:1; 119:5; 120:9; 123:13,
    22; 124:2, 7, 19; 129:1;
    131:24; 132:8, 21; 142:1;
    146:6, 9, 16, 17, 21; 147:11,
    20, 25
**letters** [20]
    53:18, 24; 66:8, 12, 22;

74:14; 89:2, 12, 17, 19;
    91:21; 93:23; 118:2, 4;
    124:16; 129:7; 131:8; 141:25;
    154:5; 155:14
**Level** [2]
    153:16, 22
**level** [10]
    18:18; 25:7; 70:11; 103:5;
    153:14, 15, 16, 17, 21
**Levine** [8]
    119:22; 137:17; 138:2; 150:9,
    10; 154:20, 24; 155:13
**libel** [1]
    95:4
**license** [3]
    14:4, 9
**licensed** [1]
    140:13
**licensing** [1]
    153:10
**LIDDELL** [1]
    3:20
**Liddell** [1]
    2:8
**Life** [1]
    15:6
**life** [4]
    14:4; 15:1, 9; 133:1
**LifeRe** [3]
    146:23; 147:18; 148:2
**Linda** [1]
    90:5
**LINE** [4]
    5:17; 6:2; 7:2; 157:6
**line** [5]
    31:12, 14, 24; 94:18; 109:6
**List** [1]
    6:4
**listed** [1]
    81:5
**listen** [1]
    51:21
**listened** [1]
    51:23
**litigation** [11]
    50:7, 14; 51:7, 8; 73:25;
    76:11; 151:5, 6, 10; 155:12,
    23
**live** [2]
    12:24, 25
**local** [3]
    25:7; 40:13; 154:14
**LOCKE** [1]
    3:20
**Locke** [1]
    2:8
**logical** [2]
    25:11, 16
**logo** [1]
    104:13
**longstanding** [2]
    22:11, 13
**looks** [2]
    37:23; 114:24
**lose** [1]
    38:24
**losing** [1]
    130:23
**lost** [1]
    154:23
lot [10]

44:22; 51:17; 53:17; 82:23;
    83:3; 115:9; 120:20; 133:4;
    138:8; 139:24
**lots** [1]
    122:17
**loud** [1]
    43:18
**Louisiana** [1]
    109:19
**LYNN** [9]
    1:14; 2:2; 5:7; 8:4; 157:2;
    158:3, 9, 13; 159:8
**Lynn** [11]
    5:20; 6:12, 22, 24; 7:4, 5, 7,
    9, 15; 9:9; 86:2

**– M –**

**machine** [1]
    2:7
**mainly** [1]
    16:24
**maintains** [1]
    8:19
**majority** [3]
    128:25; 129:4, 10
**manage** [4]
    26:13; 29:15; 134:13; 154:15
**Management** [2]
    23:11; 117:5
**management** [11]
    44:13, 14, 15, 19; 45:8;
    60:12; 79:19, 20, 21; 80:5;
    106:22
**manager** [2]
    21:18; 77:21
**managers** [6]
    40:14; 49:24; 122:9, 17;
    154:15
**managing** [2]
    16:8, 11
**manner** [2]
    139:22; 142:19
**MARILYN** [1]
    1:7
**marked** [52]
    8:2; 9:11; 29:19, 21; 30:16,
    18; 32:14, 19; 38:19, 21;
    42:6, 8, 11; 46:9; 53:12;
    56:16; 57:13; 60:3; 69:18, 20;
    70:23; 72:20; 80:15; 83:15,
    17; 85:23, 25; 87:23; 88:2,
    24; 92:7; 93:11; 96:6; 98:17;
    110:11; 111:24; 112:1, 15,
    17; 113:20, 22; 114:21, 23;
    115:12; 116:18, 20; 118:11,
    13; 120:5, 7; 150:5; 156:7
**market** [16]
    21:21, 22, 23; 22:22; 23:1;
    25:4; 31:7; 35:14; 36:6, 15,
    21; 38:2; 43:24; 44:1, 8;
    101:10
**marketing** [2]
    53:25; 116:25
**marking** [1]
    92:9
**masons** [1]
    16:13
**match** [1]
    38:4
math [2]

123:8; 130:22
**matter** [1]
    53:19; 142:10, 12
**matters** [1]
    159:9
**May** [5]
    55:15; 70:17, 19; 71:6;
    106:15
**MBA** [1]
    14:17
**mean** [39]
    11:1, 10; 19:15; 20:17; 32:11;
    36:11; 37:8; 38:3; 40:12, 24;
    43:4; 45:13; 47:15; 77:12;
    79:17; 81:20; 89:24; 99:5, 7,
    8; 101:2, 12, 25; 102:3;
    105:13; 107:24; 110:17;
    111:6, 11; 128:23; 130:11;
    131:1; 132:16, 17, 24; 134:6;
    136:9; 144:21; 154:14
**meaning** [3]
    50:3; 61:6; 100:4
**means** [15]
    20:18; 31:6; 37:2; 44:7;
    70:10; 97:20; 98:23; 99:2, 9;
    102:2, 10; 103:4; 110:18;
    111:13; 115:9
**meant** [3]
    118:9; 120:24; 131:24
**meantime** [1]
    40:17; 94:9
**measure** [1]
    21:22
**measured** [1]
    28:9, 22
**measures** [1]
    23:6
**Meet** [1]
    107:7
**meet** [2]
    21:19; 23:20
**meeting** [30]
    21:4; 23:9; 46:14, 22, 23;
    48:2, 25; 49:2, 3, 6, 11, 22;
    60:10, 24; 61:6; 67:15; 73:11;
    75:10, 17, 24, 25; 76:15;
    83:25; 84:15; 95:7; 98:12;
    148:20; 149:2; 151:4
**Meetings** [1]
    6:20
**meetings** [1]
    50:1
**member** [2]
    52:22; 113:24
**Members** [1]
    1:9
**members** [5]
    79:2, 3; 89:3; 90:13; 93:24
**memo** [9]
    61:7; 81:2; 112:3, 17; 114:23;
    115:14; 116:20; 118:13;
    153:12
**Memorandum** [1]
    6:22; 7:11, 13
**memory** [2]
    18:8; 147:22
**metro** [3]
    24:21; 28:3, 22
**metropolitan** [3]
    24:15; 25:1, 10
Mexican [1]

137:16; 138:1, 16; 139:22,
25; 141:18; 142:23
**Mexico** [3]
100:21; 105:16; 109:20
**million** [8]
33:12, 14, 25; 34:13; 35:2;
122:23; 123:7; 130:19
**millions** [1]
33:4
**minimum** [1]
30:9
**Minnesota** [2]
109:4, 12
**minor** [1]
30:25
**minus** [1]
109:16
**minute** [1]
12:11
**mischaracterizes** [1]
133:18
**misleading** [1]
147:16
**missed** [1]
98:6
**Mission** [2]
30:3; 31:2
**mission** [2]
30:3; 31:3
**missionary** [2]
16:21, 23
**Missouri** [2]
109:4, 12
**misstated** [1]
138:8
**Misstates** [1]
68:1
**misstates** [5]
54:24; 133:18; 137:20;
138:19; 155:16
**misstating** [1]
138:5
**mistake** [2]
91:14, 16
**moment** [6]
45:10; 92:11, 12; 93:14, 21;
138:22
**money** [1]
133:4
**month** [5]
88:21, 22; 113:10; 116:14
**months** [6]
14:21; 16:18; 18:8; 152:1;
154:6, 10
**morning** [5]
69:21; 71:1; 83:7; 110:13;
123:22
**mother** [1]
46:1
**Mountain** [2]
26:1; 27:24
**move** [10]
19:12, 19; 20:4; 25:22; 94:9;
102:9; 140:22, 25; 141:5, 22
**moved** [5]
19:14; 20:1, 3; 24:22; 48:13
**Moves** [1]
10:4
**MPI** [29]
31:5, 6; 98:14, 23; 99:5, 10,
23, 25; 100:6, 7, 12; 101:1, 4,

6, 9, 11, 15, 21; 103:20, 24;
104:3; 105:2, 3, 7; 106:5, 7;
107:22; 112:5; 118:17
**MR** [120]
3:4, 19; 8:8, 10; 12:1, 3, 10,
15; 26:17; 32:8; 33:18, 20,
21, 22; 34:2, 4; 36:13, 16, 20,
23; 39:10, 17, 18, 20, 22, 25;
42:13, 18; 45:24; 46:2, 5;
54:23, 25; 55:1; 62:9; 64:5,
10, 22, 25; 68:1, 7, 18, 20,
23, 24, 25; 69:2, 6, 10, 12,
14, 25; 71:25; 72:3, 5, 7;
77:12, 14, 16; 81:11; 83:4, 6,
8, 10, 11, 13, 20; 86:17;
89:16; 92:2, 13; 93:8, 20;
94:1, 4, 5, 13, 25; 95:15;
119:17, 19, 20; 123:1; 125:2;
126:3; 127:6, 21; 131:11, 14,
21; 132:3; 133:12, 15, 17;
134:3; 135:10, 18; 137:19;
138:4, 18, 23; 139:2, 3, 5, 7,
13; 140:8; 143:1; 144:21;
147:4, 7; 152:10, 12; 155:7,
9, 16, 24; 156:1, 3, 5
**Mr** [225]
3:24; 5:8, 9; 7:18; 8:18, 21;
9:3, 7, 10, 22; 10:17, 18;
12:4, 14, 17; 26:19; 29:20;
30:17; 31:3; 32:10, 17; 33:24;
34:3; 37:1; 38:20; 39:7, 14;
40:5; 42:7, 16, 23; 45:15;
46:4, 8, 17; 50:17; 53:14;
55:3; 56:13, 21; 58:8; 59:1, 2,
17; 60:2, 4, 25; 61:1, 5, 10,
17, 19, 22; 62:3, 6, 11, 16,
17, 22; 63:6; 64:3, 7, 9, 11;
65:4; 66:4, 6, 8, 13, 16, 23;
67:12, 25; 68:4, 6, 9, 22;
69:4, 8, 19; 70:2; 72:9, 21;
73:4; 74:21, 25; 75:2; 76:5,
11, 14, 19, 23; 77:4, 6, 17,
18, 24; 78:11, 15, 20; 79:1;
80:9; 81:3, 13, 14, 15, 21;
83:16, 18, 21, 23; 84:3;
85:11, 24; 86:1, 19, 22;
89:14, 20, 23, 25; 90:6, 12,
19, 22; 91:14; 92:5, 8, 14;
93:3, 12, 24; 94:6; 95:16;
96:20; 100:24; 104:23; 105:5;
108:10; 111:25; 112:16;
113:21, 23; 114:22; 115:13,
14; 116:12, 19, 21, 23;
117:14; 118:12, 14; 119:18,
21; 120:6; 123:6; 125:7, 11,
14; 126:9; 127:8, 24; 129:23;
130:3, 9; 131:13, 17, 23;
132:7; 133:14, 23; 134:7;
135:12, 21; 137:25; 138:10,
24; 140:9, 22; 142:6, 9, 14,
19; 143:4, 11; 144:14; 146:2,
6, 8, 12, 22, 24; 147:10;
148:1, 3, 6; 149:1, 6, 20;
150:7, 14, 15, 24, 25; 151:9,
14; 154:2, 8, 12, 24; 155:11,
13, 14, 18
**Mr.Chavez** [1]
148:15
**MS** [27]
3:10, 14; 45:12; 60:1; 61:14,
21, 25; 62:8, 20; 69:24; 73:3;

74:23; 94:11; 108:5; 129:22,
24; 130:7; 133:13, 16; 143:3;
144:23; 145:1; 147:6; 155:2,
5, 25; 156:4
**Ms** [12]
5:8; 52:10, 12; 53:1; 88:3;
89:4; 90:5; 91:5; 144:25;
145:2; 147:9; 152:13
**myself** [1]
49:1; 52:23; 53:6

─ N ─

**NAME** [1]
157:2
**name** [13]
8:9; 9:8; 45:18, 22; 66:13;
96:21; 124:25; 125:18; 135:1;
136:5, 7; 143:4; 158:16
**named** [2]
67:5; 159:8
**names** [1]
44:23
**naming** [1]
135:13
**National** [2]
107:3
**national** [3]
102:20; 107:5, 16
**nationality** [1]
45:17
**nature** [1]
67:19
**NEALLY** [9]
3:10; 69:24; 73:3; 108:5;
143:3; 144:23; 147:6; 155:2;
156:4
**Neally** [6]
5:8; 143:4; 144:25; 145:2;
147:9; 152:13
**necessity** [1]
147:10
**needs** [4]
26:12; 35:17; 77:9; 84:16
**negative** [1]
90:11
**NOE** [2]
1:6; 3:13
**Noe** [1]
46:15
**nonresponsive** [3]
95:15; 119:17; 140:8
**Normally** [1]
62:24
**normally** [4]
50:23; 51:1; 107:14; 111:13
**Nos** [2]
69:17; 93:10
**NOTARY** [1]
158:24
**notation** [2]
150:2, 4
**note** [3]
30:22; 31:11; 154:3
**noted** [3]
72:24; 95:5; 158:5
**notes** [1]
30:25
**Notice** [1]
5:19
**notice** [5]

9:12; 81:4; 84:3; 87:7; 125:9
**notified** [2]
56:10; 116:12
**notify** [1]
56:8
**notifying** [2]
86:13; 93:2
**November** [7]
46:17; 58:14; 77:3; 88:14, 19;
110:7; 146:22
**Number** [1]
22:15
**number** [20]
19:9; 21:23; 26:22; 36:7;
37:24; 38:6; 41:11, 12, 18,
19; 43:21; 45:8; 81:20; 94:24;
103:25; 105:25; 112:1; 116:5;
131:8; 146:11
**numbered** [2]
2:4; 9:17
**numbers** [18]
23:9; 31:1; 34:19, 20; 36:18;
38:4, 5; 41:7, 16; 42:1; 43:5;
45:7; 122:21, 24; 127:25;
128:15, 18
**numerous** [1]
133:3

─ O ─

**oath** [2]
158:14; 159:10
**Object** [12]
45:24; 60:1; 61:14, 21, 25;
62:8, 20; 74:23; 123:1;
129:22, 24; 130:7
**object** [5]
36:13; 45:12; 54:24; 62:11;
123:5
**objected** [2]
12:10; 32:3
**Objection** [39]
26:17; 32:8; 64:5; 68:1;
69:10; 73:3; 86:17; 89:16;
92:2; 94:5; 95:15; 119:17, 20;
125:2; 127:6, 21; 131:11, 21;
132:3; 133:12, 13, 15, 16;
135:10, 18; 137:19, 20, 21;
138:4, 5, 18, 19; 140:8;
155:16, 24, 25
**objection** [5]
10:1, 3; 64:10; 77:10; 131:21
**Objections** [1]
8:14
**objections** [3]
9:25; 12:13; 32:4
**objective** [1]
118:19
**objectives** [3]
31:13, 15; 104:20
**obtain** [1]
104:21
**Obviously** [1]
14:16
**occurred** [1]
144:19
**October** [9]
30:21; 103:3; 108:1; 109:7,
21; 115:15; 116:8, 10; 153:20
**offer** [1]
35:17

**offered** [1]
149:9
**OFFICE** [1]
3:5
**Office** [1]
46:19
**office** [5]
40:25; 46:21; 50:24; 53:20;
158:20
**officer** [5]
50:1; 52:21; 85:4; 114:6;
138:20
**officers** [4]
44:16, 20, 25; 45:3
**offices** [1]
2:8
**official** [2]
1:8; 81:4
**Oh** [3]
20:2; 65:6; 110:4
**oh** [2]
91:14, 24
**Okay** [300]
10:6, 18, 25; 11:3, 8, 18, 25;
12:3, 21, 24; 13:3, 14; 14:1,
3, 7, 16, 19; 15:5, 11, 13, 16;
16:2, 10, 19, 22; 17:1, 3, 11,
16, 20; 18:9, 15, 21, 25; 19:3,
6, 17, 22; 20:10, 23; 21:8, 12,
20; 22:3, 19; 23:3, 10, 12, 22,
25; 24:5, 8, 11, 14; 25:6, 19,
25; 26:15; 27:10, 20, 23;
28:1, 18, 25; 29:14, 17;
31:19, 24; 33:2, 24; 34:9, 11,
25; 35:9, 22; 37:6, 11, 20;
38:17, 25; 39:25; 40:11, 15,
24; 41:1, 6; 42:23; 43:2, 16,
25; 44:16; 45:3; 46:8; 47:18,
19, 24; 48:3, 21, 22; 49:9;
50:2, 13, 21; 53:12, 23; 54:8,
15, 18; 55:7, 11, 17, 24;
56:10, 16, 23; 57:13, 16, 23;
58:7, 11, 17; 59:13; 60:2, 14,
25; 61:3, 10; 62:10; 63:21;
64:3, 13, 24; 65:15, 21;
66:10; 67:14, 22; 70:4, 22;
71:22; 72:19; 73:9, 14; 74:4,
10, 20; 75:7, 15, 18, 22; 76:2,
10, 13, 17, 23; 78:6; 79:1, 21;
81:19; 82:3, 14; 83:2, 10, 23;
84:24; 85:15; 87:9; 88:10, 18;
89:11, 20; 90:9, 18, 21; 91:2,
5; 92:5; 93:7, 12; 94:17; 95:1,
25; 96:2, 5, 16; 97:9, 12, 15,
19, 24; 98:3, 8, 11, 13, 23;
99:4, 14; 100:3; 101:1, 15,
18, 21, 23; 102:8; 103:2, 11,
15, 23; 104:1, 25; 105:5, 12,
24; 106:4, 19; 107:15, 20;
108:1, 15, 20; 109:7, 15, 21,
24; 110:7, 24; 111:11, 17, 22;
112:10; 113:15, 18; 114:13;
115:23; 116:6, 11; 117:1, 9;
118:7, 8, 23; 120:1; 121:11;
122:2; 124:1, 21; 125:18;
126:6, 11, 15, 20; 127:1, 2,
10, 17; 128:19, 24; 129:8, 18;
130:3, 23; 131:16; 134:19;
135:7; 136:22; 137:4, 11, 15;
138:9; 139:5; 143:7; 144:5,
14, 18; 147:8, 15; 148:9, 18

20, 21; 147:3, 6, 13; 148:6,
11, 14; 149:4, 12, 19; 151:12;
152:13, 20, 24; 153:2, 11, 17;
154:5, 11, 19; 155:2
**okay** [12]
18:7; 64:21; 67:7; 75:15;
77:7; 82:25; 104:7; 123:8;
132:9, 11; 134:19; 136:13
**Oklahoma** [1]
109:20
**old** [2]
13:3; 15:14
**OLIVEIRA** [1]
3:10
**one-year** [1]
154:1
**ones** [2]
100:25; 144:11
**opened** [1]
60:21
**opening** [1]
16:7
**operation** [4]
19:1; 25:21; 109:16; 152:8
**operations** [1]
109:13
**opportunities** [1]
149:7
**opportunity** [1]
9:2
**ORAL** [2]
1:13; 2:1
**Oral** [1]
5:19
**order** [2]
35:18; 152:25
**organization** [12]
15:1; 26:14; 28:24; 29:15, 16;
51:5; 110:18; 115:19; 122:10;
134:13; 142:8; 154:15
**organizational** [1]
104:19
**organizations** [2]
25:10; 116:5
**organize** [1]
85:21
**outlined** [1]
107:7
**outstanding** [1]
117:2
**outweigh** [1]
12:11
**overall** [1]
33:6
**override** [4]
151:25; 152:4; 153:14, 20
**overwrite** [1]
154:9
**overwrites** [3]
122:7, 13; 151:21
**owe** [1]
131:10
**owes** [1]
90:23

**— P —**

**p.m.** [1]
2:5
**packet** [5]
56:24; 57:1, 4, 6, 11

**PAGE** [6]
4:3; 5:2, 17; 6:2; 7:2; 157:6
**Page** [14]
30:3; 31:1; 33:2, 21; 35:9;
36:21; 37:13; 43:17; 44:11,
12; 99:19; 100:9; 104:4;
115:2
**page** [8]
37:12; 64:17; 72:23; 96:11;
103:2; 105:2; 145:1; 158:6
**pages** [1]
46:20
**paid** [3]
24:5; 70:13; 97:22
**Paradise** [1]
106:16
**paragraph** [4]
84:24; 90:22; 94:23; 150:14
**part** [21]
9:15; 17:22; 20:20; 30:2, 12;
46:25; 49:21; 56:24; 57:1, 11;
60:8, 12, 22; 69:21; 73:12;
95:3; 112:20; 120:23; 141:18;
145:8; 146:1
**Partially** [1]
117:11
**partially** [3]
117:10, 11, 12
**participate** [1]
35:18
**participating** [1]
36:4
**parties** [2]
159:13, 15
**party** [1]
131:4
**pass** [9]
11:13; 13:25; 94:8; 131:16,
22; 138:9; 139:6; 143:1;
156:3
**Pat** [1]
89:21
**Paul** [1]
·105:19
**payable** [1]
70:8
**payroll** [4]
35:12, 15, 16; 43:22
**Penetration** [1]
37:14
**penetration** [17]
6:6; 35:13, 22, 23; 36:2, 5,
11; 37:7, 16; 38:1; 40:18;
41:13, 20; 42:4, 24; 43:11, 14
**people** [15]
12:5; 16:9, 11, 20, 23; 20:16;
23:7; 26:9; 36:11; 44:17, 22,
25; 45:9; 104:20; 134:21
**percent** [5]
30:9; 31:4, 11; 33:15; 34:5,
13; 35:3, 6, 14; 36:6, 11;
37:7, 16; 38:13; 41:14; 43:3;
70:7, 11, 14; 71:7, 16, 21;
99:5, 9, 23; 100:6, 12; 101:5;
104:3; 105:2, 3, 7; 107:22;
112:5; 123:7; 130:20
**percentage** [5]
43:22; 99:23, 25; 101:13;
107:14
**percentages** [1]
152:5

**performance** [1]
134:13
**period** [3]
61:4; 113:13; 154:1
**permission** [2]
61:23; 62:6
**person** [24]
26:6; 30:1; 45:23, 25; 48:3;
76:13; 114:9; 125:19, 20, 21;
127:3; 133:6; 134:10; 135:3,
4, 5, 15; 136:5, 7; 137:14;
138:11; 143:16; 158:16;
159:8
**personal** [2]
69:22; 85:4; 144:9, 13
**personally** [5]
52:22; 90:14; 96:1; 136:14;
158:13
**pertaining** [1]
67:10
**phone** [3]
85:4; 87:20; 125:15
**photos** [1]
44:23
**picked** [1]
87:20
**picture** [5]
113:24; 114:8, 9, 16, 25;
128:12
**place** [3]
78:8; 134:17; 149:14
**placed** [1]
24:22
**places** [1]
152:23
**plague** [1]
104:10
**PLAINTIFF** [1]
3:3
**Plaintiff** [1]
2:3
**Plan** [3]
5:22, 23; 29:22
**plan** [3]
30:2, 20, 24
**plaque** [1]
104:11, 12
**playing** [1]
82:21
**Plaza** [1]
3:15
**Please** [1]
30:24
**please** [11]
8:9; 9:7; 27:3; 60:8; 90:17;
100:19; 131:20, 23; 146:19;
151:24; 157:5
**plus** [1]
100:5
**point** [27]
10:1; 15:16; 28:11; 51:3, 16,
18, 20; 52:7; 53:2, 6, 8, 19;
54:22; 68:7; 69:13; 72:16;
74:4; 75:5, 6; 79:9; 84:13;
87:16; 106:1; 121:5; 130:14;
136:22; 150:6
**pointing** [1]
33:8; 35:10
**policies** [2]
14:5; 21:6

14:7
**population** [1]
44:5
**portion** [2]
56:18; 139:16
**position** [10]
15:23; 24:17; 26:4; 28:15, 21;
51:21; 84:4; 86:15; 118:3;
154:24
**positions** [2]
17:1; 27:17
**possession** [1]
60:11
**possibility** [1]
140:21
**potential** [3]
44:7; 101:10; 123:18
**power** [1]
59:18
**Powers** [2]
88:25; 90:21
**practice** [4]
79:19, 20, 21; 80:5
**prefix** [1]
39:12
**Premium** [1]
33:9
**premium** [7]
10:11; 30:11; 33:3; 101:25;
102:3, 15, 18
**prepared** [4]
29:24; 30:20; 146:6
**preparing** [1]
8:17
**presence** [1]
83:25
**PRESENT** [1]
3:23
**present** [2]
55:8; 114:8
**President** [1]
90:10
**president** [10]
15:12; 26:1; 29:1; 53:14;
56:21; 81:3; 114:3; 116:25;
146:23; 148:1
**prestigious** [1]
114:11
**presume** [5]
9:21; 12:22; 14:16; 24:6;
120:24
**Pretty** [1]
90:7
**pretty** [4]
51:20; 55:1; 87:3; 101:21
**previous** [4]
102:4; 121:25; 154:11; 158:5
**previously** [13]
8:23; 24; 28:1, 14; 46:9;
72:19; 86:22; 87:5, 23; 88:2,
24; 93:15; 144:7
**Price** [1]
3:11
**Pride** [7]
98:4, 8; 103:16; 112:18;
113:5, 8, 24
**Prior** [2]
17:2; 18:21
**prior** [16]
14:20; 16:19; 22:19, 21, 25;
~~28:14; 39:25; 61:4, 19, 62:17,~~

76:16; 92:17; 109:10; 121:21;
126:2; 133:19
**privacy** [1]
12:11
**privileged** [1]
67:17
**prize** [1]
23:17
**problem** [1]
132:16
**Procedure** [1]
2:10
**procedure** [6]
22:3, 24; 50:24; 64:17; 65:19;
81:18
**process** [11]
51:1; 59:10, 14, 16, 17, 20,
21, 23, 25; 62:24; 152:19
**produce** [1]
12:18
**produced** [7]
2:2; 8:20, 24; 39:11, 15;
42:19; 147:8
**producing** [1]
8:25
**product** [2]
36:4; 52:20
**production** [9]
8:22; 30:9; 31:4; 39:16; 44:4;
98:10; 108:12; 127:25; 144:7
**products** [3]
15:9; 35:17; 44:2
**professional** [1]
30:24
**professionalism** [1]
79:13
**program** [1]
30:13
**progression** [1]
25:11
**prohibited** [1]
56:14
**promoted** [20]
15:24; 16:5; 18:5, 9; 19:4, 23;
20:6, 12; 24:14, 20; 26:4, 9;
27:23; 28:21; 29:1, 10; 57:17,
21; 148:8; 154:20
**promoting** [1]
26:6
**promotion** [12]
17:3, 11; 18:1; 25:12, 15, 16,
20, 22; 27:16, 17; 29:8
**promotions** [4]
26:16; 27:1, 5, 6
**pronounce** [1]
147:18
**pronounced** [1]
118:15
**proper** [1]
41:17
**property** [2]
80:1, 6
**protected** [1]
11:13
**proud** [3]
110:5; 112:20; 120:21
**proved** [1]
158:14
**provide** [3]
9:16, 18; 32:2
~~provided [12]~~

9:10, 24; 10:7; 30:12; 39:9;
69:21; 70:25; 83:7; 110:12;
123:21; 129:12; 151:20
**provider** [1]
52:20
**providing** [4]
10:2; 32:6; 53:2, 3
**provisions** [1]
2:11
**Provo** [2]
15:22; 19:14
**prudential** [2]
21:22; 31:7
**PUBLIC** [1]
158:24
**publicly** [1]
52:24
**pulled** [1]
78:18
**purposes** [2]
32:11; 158:19
**pursuant** [2]
2:10; 159:7
**pursuing** [1]
52:8, 9
**puts** [1]
101:14

**— Q —**

**qualification** [1]
117:6
**qualified** [7]
97:21; 100:20; 102:11, 19;
105:15; 106:25; 117:3
**Qualifier** [4]
6:20; 96:12; 97:20; 100:16
**qualifier** [1]
106:16
**qualify** [7]
96:16; 97:4, 10; 106:11;
107:5, 16; 117:9
**Quarter** [1]
97:16
**quarter** [23]
23:23; 97:13, 17; 99:1; 100:3,
6, 8, 10; 100:24; 102:10, 12;
103:3, 14; 104:1; 105:5, 19;
106:15, 24; 107:20; 110:7;
115:7; 117:3, 8
**quarterly** [1]
103:21
**quarters** [2]
24:1, 9
**question** [52]
9:2; 11:10; 17:24; 21:11;
46:6; 60:23; 62:13, 14; 65:3,
4; 66:21; 67:10; 68:17, 21,
22, 25; 69:3, 9; 73:4; 76:25;
84:19; 93:15, 21; 94:7, 8, 12,
17; 98:16; 100:23; 119:12,
13; 123:2, 5; 125:22; 126:1,
22; 127:23; 131:18; 132:10;
135:24; 136:14; 137:22, 24;
138:7, 25; 139:8, 11, 19;
140:7; 142:18; 146:18
**questioning** [1]
93:24
**QUESTIONS** [3]
8:8; 143:3; 155:7
**questions** [8]

72:4, 8; 80:4; 93:18; 143:8;
155:3, 5, 10
**quick** [3]
68:16; 92:15
**quickly** [2]
52:4; 63:5
**quota** [9]
21:5, 8, 17; 22:25; 28:10, 23;
99:11, 12, 24
**quotas** [6]
21:19; 31:9, 10, 18, 21, 22

**— R —**

**RANDY** [1]
1:6
**rate** [10]
35:13, 22, 23; 36:2, 5, 11;
37:8; 41:13; 43:11, 14
**re-assume** [1]
150:20
**Read** [1]
98:6
**read** [14]
33:7; 38:7, 8; 43:18; 60:5;
66:25; 73:6; 104:15; 121:12;
139:13, 14, 16; 149:23; 158:10
**Reading** [1]
90:1
**reading** [3]
33:11; 142:1; 150:16
**real** [2]
52:7; 92:14
**reality** [1]
132:20
**reask** [1]
67:9
**REASON** [1]
157:6
**Reason** [1]
157:4
**reason** [17]
18:4; 26:24; 28:20; 65:17;
67:6, 12, 23, 24; 68:5; 71:13;
76:17, 20; 93:13; 111:18;
130:14; 132:14; 140:16
**reasons** [5]
17:25; 20:11; 29:13; 60:7;
94:19
**recall** [64]
9:12; 17:2; 22:10; 43:5, 6;
46:13; 47:21, 22; 48:10;
50:18; 52:2, 5, 6; 53:17, 18;
54:6, 7; 56:20, 22; 60:15, 16;
61:20; 66:4, 6; 67:23; 68:4;
72:22; 73:9; 76:1; 85:8, 9;
86:8; 87:15; 88:9; 89:8;
95:19; 101:20; 104:24; 107:9,
17; 111:3, 8; 113:6; 119:23;
122:11, 16; 123:14, 19;
124:17; 128:21, 23; 131:1;
135:6; 136:12; 141:3; 145:16;
146:4, 10; 147:9; 148:4, 9, 21
**receipt** [1]
86:9
**receive** [6]
53:16; 57:6, 7; 87:12; 88:7;
105:22
**received** [23]
8:16; 47:25; 51:6; 67:11;
72:10; 77:12; 85:3; 93:23;

BSA    ORAL AND VIDEOTAPED DEPOSITION OF LYNN GEORGE BARNSON    Look-See(43)

98:3, 19; 103:4; 104:11, 12;
105:24; 119:11, 13; 120:1;
123:12, 13; 124:3; 125:20;
127:5; 150:2
**receiving** [15]
53:18; 60:15, 16; 61:1; 71:16,
21; 72:22; 73:9; 77:2; 88:9;
91:6, 9; 103:23; 118:19;
124:17
**recent** [1]
22:11
**recently** [1]
91:4
**Recess** [2]
69:16; 93:9
**Recognition** [1]
6:17
**recognition** [3]
45:22; 113:25; 117:2
**recognitions** [1]
96:8
**recognize** [11]
32:22; 44:22, 24; 46:3; 57:14,
15; 58:4, 18; 110:13, 15;
120:22
**recognized** [2]
107:25; 131:25
**recognizes** [2]
21:4; 23:16
**recognizing** [1]
132:9
**recollection** [9]
21:2; 43:13; 51:11, 14, 15;
63:21; 98:20; 116:1; 124:8
**recommend** [1]
133:22
**recommendation** [14]
57:20; 58:10; 59:22; 61:13,
19; 62:5, 17, 18; 81:16;
117:22; 128:3; 136:15;
150:24; 153:1
**recommendations** [6]
26:15, 20; 27:1, 4; 59:19;
81:22
**recommended** [2]
153:8, 9
**recommending** [1]
59:17
**record** [26]
2:11; 8:11, 12; 9:4, 6; 39:11;
42:4; 54:24; 68:2; 69:12;
83:5; 93:8; 95:14; 98:15;
133:18; 134:20; 136:18;
138:6, 19; 139:4; 140:6;
148:10; 152:11; 155:17;
157:4; 159:11
**recruit** [2]
20:16; 23:7
**Recruiting** [1]
103:9
**recruiting** [7]
20:9, 16; 28:23; 103:7, 12;
117:11; 128:1
**reduced** [1]
159:11
**refer** [9]
12:9; 31:8; 97:13; 102:1;
139:21; 144:16; 146:5;
148:11; 149:12
**REFERENCED** [3]
8:17; 9:2; 4:2

**referenced** [2]
140:7; 141:25
**references** [3]
44:13; 86:11; 151:20
**referencing** [1]
21:9
**referred** [3]
145:9; 148:13, 24
**referring** [4]
81:5; 82:15; 115:17, 18
**refers** [3]
31:7; 44:4; 148:2
**reflect** [3]
38:13; 69:12, 14
**reflected** [1]
116:21
**reflecting** [1]
10:10
**reflects** [1]
41:13
**refresh** [3]
21:10; 98:20; 124:8
**regains** [1]
150:18
**regarding** [8]
86:11, 12; 93:21; 116:22;
142:20; 147:16, 23; 149:21
**Regardless** [1]
155:18
**regardless** [4]
80:8; 119:15; 121:6; 127:11
**region** [16]
6:4, 6; 18:24; 25:18; 37:18;
38:14; 40:6, 9; 42:25; 108:7,
8; 110:17, 23; 111:7, 12, 13
**Regional** [5]
99:15, 22; 105:1; 108:2;
153:23
**regional** [10]
10:11; 20:8; 25:9; 49:24;
85:2; 86:12; 94:19; 95:8;
108:25; 127:18
**Regis** [1]
32:21
**registered** [1]
33:5
**Registration** [1]
159:20
**reiterate** [2]
12:15; 132:4
**related** [3]
48:16; 57:5; 159:13
**relates** [6]
53:10; 79:13; 100:1; 107:13;
132:15; 136:13
**Relating** [1]
63:19
**relating** [2]
63:18, 25
**relationship** [7]
48:1, 19; 50:9; 101:7; 128:17;
140:16; 150:18
**relative** [1]
159:14
**relevance** [1]
12:11
**remain** [2]
43:19; 60:11
**remainder** [1]
11:22
**remember** [57]

18:13, 14; 19:10, 21; 22:4, 5,
8; 39:7; 42:14, 17; 43:9; 47:1,
3; 48:3, 5, 8, 11, 23; 49:9, 12,
13, 15, 20; 51:15; 54:8, 17;
56:15, 23; 57:3; 61:2; 62:21,
25; 63:2, 24; 66:17; 70:20;
72:15, 18; 73:1; 75:4; 78:25;
82:9, 24, 25; 83:1, 22; 85:14;
87:17; 97:3, 11; 111:4, 5;
112:22, 24; 118:14; 128:16;
136:22
**remembered** [1]
39:6
**remind** [3]
67:14; 100:24; 129:15
**reminded** [1]
31:17
**REMOVE** [1]
4:3
**removed** [1]
73:16
**removing** [1]
76:19
**renewal** [1]
48:19
**rephrase** [8]
18:16; 36:19; 55:4; 58:9;
60:19; 134:8; 135:21; 137:24
**replaced** [1]
119:21
**report** [3]
16:24; 34:8; 102:7
**reported** [2]
2:7; 33:5
**Reporter** [2]
2:6; 159:7
**REPORTER'S** [1]
159:1
**Reporter's** [1]
5:13
**represent** [12]
30:19; 39:10; 45:6; 56:2;
70:21; 89:2; 122:18, 20;
123:8; 129:6; 134:15; 147:4
**representation** [1]
42:19
**representations** [1]
147:16
**representative** [1]
90:23
**represented** [5]
33:14, 25; 34:13; 35:2, 6
**representing** [1]
39:2
**represents** [1]
44:20
**reprimanded** [1]
142:20
**reputation** [1]
133:5
**request** [11]
8:22; 9:1, 19, 25; 11:20;
81:24; 83:24; 84:16; 90:14;
144:7; 153:19
**Requested** [1]
139:16
**requested** [7]
9:15; 10:9; 12:18; 32:2;
52:13; 53:4; 154:2
**requesting** [1]
70:13

**require** [1]
78:14
**requires** [2]
152:24; 153:1
**research** [2]
11:7, 21
**reserve** [1]
155:5
**reserving** [1]
155:10
**resignation** [5]
145:8, 11, 14, 23; 146:1
**resigned** [1]
146:2
**resolved** [2]
128:9, 12
**respect** [2]
99:12, 24
**respective** [1]
36:8
**respond** [1]
155:20
**responding** [4]
86:25; 87:2; 89:4; 94:18
**response** [9]
9:18; 39:16; 51:12; 63:7;
84:5, 9; 88:13; 93:21; 144:6
**Responses** [1]
8:14
**responses** [3]
8:15; 9:25; 94:21
**responsibilities** [1]
80:21
**responsibility** [2]
134:12; 151:15
**responsive** [1]
119:19
**rest** [2]
69:7, 9
**Restate** [3]
17:23; 27:3; 86:20
**restate** [9]
11:10; 53:6; 59:14; 62:1, 14;
64:15, 18; 66:21; 67:7
**results** [1]
104:21
**retained** [1]
154:24
**review** [7]
30:24; 51:19; 65:25; 91:2;
152:16; 154:4, 8
**reviewed** [4]
50:23; 65:24; 72:25; 84:13,
22; 152:16
**reviewing** [1]
66:17
**revise** [1]
21:10
**rid** [1]
137:16
**Right** [27]
12:6; 14:8; 15:15; 35:11;
36:23; 42:2; 43:21; 63:23;
70:18; 71:19; 91:18; 92:22;
99:13, 19; 100:14; 101:11;
105:9; 108:10, 25; 112:2;
114:19; 120:11; 124:15;
142:12; 151:11; 152:2; 154:7
**right** [115]
14:14; 15:14; 16:3; 17:22;
18:9, 22; 23:1, 22; 24:2, 15;

18; 27:8, 11, 18; 29:7; 31:10;
38:8; 41:8; 43:19; 45:4; 47:5,
16; 52:15, 24; 55:9, 21;
65:13; 68:13; 70:5; 72:14;
74:5, 18; 75:5, 8; 76:11;
80:24; 81:8, 22; 86:7; 87:6;
88:10; 90:7, 25; 91:11; 92:20;
94:11, 13; 96:23; 98:1; 99:2,
24; 100:13; 101:8, 9; 102:12;
103:13, 17, 24; 105:7; 106:6;
107:2, 25; 108:21; 109:22;
114:2; 115:24; 116:1, 3, 9,
15; 117:17, 19, 21; 118:25;
119:2, 6, 22, 24; 120:10, 16;
121:15; 123:24; 124:14, 15;
125:11; 126:8; 128:5, 22;
129:2, 7, 18; 130:5, 20, 24;
133:23; 135:9, 17; 136:25;
137:3, 8; 138:11; 139:3;
140:13; 141:7; 147:19; 148:3;
149:10, 22; 150:3, 9, 10, 15,
21; 151:21; 154:6

**right-hand** [1]
37:14

**rights** [2]
12:11; 79:18

**Rio** [2]
37:17; 141:6

**rising** [2]
15:23; 44:7

**Road** [1]
3:11

**Rodriguez** [1]
66:14

**ROERIG** [1]
3:10

**role** [3]
25:8; 111:3; 150:20

**Ron** [6]
119:22; 137:17; 138:2; 150:9,
10; 154:20

**room** [3]
69:7, 9; 132:20

**roughly** [2]
107:18; 122:21

**route** [2]
60:20; 148:23

**RSC** [49]
19:4, 23; 20:6, 23; 25:1; 27:7;
46:22; 58:8; 60:9; 70:19;
80:12; 81:6, 17; 84:4; 92:1;
93:3; 99:2, 4; 100:5, 12;
101:24; 102:15; 103:12;
104:2; 105:6, 7; 106:14, 15;
107:21; 110:16; 118:3;
119:22; 120:13; 134:9;
137:18; 138:3; 140:14, 15;
143:11; 148:8, 19; 150:8;
151:25; 152:9; 153:22;
154:21, 24; 155:21

**RSC's** [1]
96:21

**RSCs** [2]
107:15; 124:22

**Rules** [1]
2:10

**runs** [1]
122:9

— S —

**Salazar** [1]
90:5

**sale** [2]
70:14; 71:17

**Sales** [10]
21:6; 28:6; 31:10; 33:9;
37:14; 98:25; 99:15, 22;
105:1; 108:2

**sales** [69]
10:10, 11; 17:4, 5; 19:15;
20:8, 14; 21:5; 22:19, 21;
23:1, 9; 25:9; 28:9, 24; 31:9;
33:4, 13, 14, 15, 25; 34:5, 12,
14; 35:2, 5, 7; 51:4; 60:10;
85:2; 86:12; 94:19; 95:8;
96:18; 97:1, 18, 24; 99:6, 23;
100:1, 17, 21; 103:9; 106:21;
107:10, 11, 14; 108:25;
109:25; 110:2; 115:18;
117:10, 11; 118:21, 24;
122:14, 22; 123:6; 127:18;
130:17, 20; 142:7; 145:6;
148:19; 153:23; 154:15

**salespeople** [1]
74:2

**salesperson** [2]
15:3; 108:8

**Salt** [1]
13:2

**San** [1]
102:21

**Sandy** [1]
12:25

**SAPP** [1]
3:20

**Sapp** [1]
2:8

**SAUCEDA** [2]
1:6; 3:13

**Sauceda** [18]
46:15; 51:13; 76:24; 77:4, 11,
19; 87:24; 88:2, 25; 89:20;
90:4, 9; 91:21; 123:13; 124:2;
129:20

**Sauceda's** [3]
58:13; 77:2; 88:13

**saying** [32]
10:25; 17:21; 29:12; 32:10;
33:17; 56:14; 65:9; 66:4, 6;
70:9; 72:14; 83:24; 84:25;
86:2, 15, 23; 87:3, 5, 7, 18,
19; 89:13; 90:24; 91:21;
95:21; 118:2; 119:6; 121:2,
10; 123:22; 126:7

**scenario** [2]
51:8; 57:25

**schedule** [2]
48:25; 49:4

**SCHOOL** [2]
1:6; 3:9

**School** [4]
1:10; 46:16; 143:5; 144:8

**school** [6]
13:8; 14:14; 48:17; 50:8;
73:25; 78:2

**Scratch** [1]
111:13

**scratch** [6]
110:17; 111:7, 12; 121:17,
18; 152:7

**se** [1]
14:14

**seal** [1]
158:20

**second** [11]
44:3; 72:23; 81:2; 90:4;
92:23; 93:5; 102:10; 104:5;
106:24; 107:20; 119:5

**secondly** [1]
8:17

**secretary** [1]
147:5

**section** [1]
145:23, 25

**secured** [1]
10:21

**sell** [2]
14:4; 101:8

**selling** [1]
15:5

**send** [4]
72:13; 86:6; 112:9; 118:4

**sending** [2]
84:20; 91:21

**sends** [1]
136:16

**senior** [1]
116:24

**sentence** [4]
31:2; 43:18; 44:3, 5

**separate** [1]
120:9

**separately** [1]
86:6

**SEPTEMBER** [2]
1:15; 157:3

**September** [4]
2:5; 8:16; 144:21; 159:8

**series** [1]
9:16

**servicing** [2]
73:16; 76:19

**sets** [1]
106:19

**seven** [3]
84:25; 91:20; 129:6

**She's** [1]
133:23

**SHEET** [1]
4:3

**sheet** [2]
80:22; 136:15

**Shorthand** [2]
2:6; 159:6

**shorthand** [1]
2:7

**shoulder** [1]
150:17

**show** [6]
37:22; 38:12; 60:9; 71:25;
83:12; 110:10

**showing** [1]
6:6

**shows** [2]
33:4; 71:20

**sign** [2]
82:6; 136:14

**SIGNATURE** [1]
158:1

**Signature** [1]

**signature** [3]
58:4, 6; 158:4

**signed** [6]
58:1; 83:5, 12; 143:20, 22;
145:19

**significance** [2]
50:21, 22

**signing** [1]
82:20

**Silver** [6]
98:14, 23; 103:20; 118:16,
17; 120:13

**sincere** [1]
132:21

**single** [9]
134:10; 135:2, 4, 13, 15;
136:5, 6; 154:16, 17

**site** [1]
10:15

**sitting** [2]
58:20; 124:13

**situation** [22]
49:10; 50:3, 4; 64:1; 78:17,
19; 89:19; 95:4; 122:16;
132:12; 136:12; 141:4;
142:21; 143:15; 144:19;
145:17; 148:25; 150:15;
152:6, 14; 153:20; 154:17

**situations** [1]
84:7; 121:7; 134:16

**six** [1]
16:18

**Size** [1]
116:3

**size** [5]
17:12; 20:13; 28:6; 116:2, 7

**skills** [1]
27:23

**smaller** [1]
109:8

**sold** [1]
122:2

**somebody** [6]
17:8; 57:17; 65:13; 96:16;
111:12; 130:9

**somebody's** [2]
132:25; 152:5

**someone** [9]
35:24; 51:22; 57:20; 66:2;
78:1; 121:6; 139:23; 143:23;
144:10

**somewhat** [1]
151:15

**Somewhere** [1]
49:8

**somewhere** [2]
37:24; 83:11

**Sonia** [1]
6:22

**sorry** [22]
19:22; 34:3; 53:15; 56:17;
81:15; 83:21; 84:18; 87:19;
91:24; 96:25; 99:17, 20;
100:19; 106:4; 110:2; 118:5;
122:18; 128:7; 150:9; 152:12;
153:5; 155:13

**sound** [1]
45:4

**sounded** [1]
142:25

**South** [11]
  5:22; 19:2; 29:22; 96:15;
  97:14, 15, 20; 99:14; 100:5,
  11, 15
**SOUTHERN** [1]
  1:1
**Southern** [2]
  13:12, 14
**southern** [3]
  17:10; 19:7, 8
**Southwest** [2]
  109:14, 17
**southwest** [3]
  37:16, 18; 38:14
**speak** [2]
  74:22; 89:17
**speaking** [4]
  75:22; 76:4; 109:2, 3
**speaks** [1]
  86:18
**specific** [4]
  43:4; 54:10; 136:2, 20
**Specifically** [1]
  71:15
**specifically** [1]
  12:19
**specifics** [4]
  75:16; 134:24; 136:11
**speculate** [12]
  29:11; 52:3; 59:7, 8, 9; 60:21;
  64:23; 65:1; 67:20; 76:8;
  108:18; 111:10
**speculating** [13]
  18:7; 22:8; 26:7, 8; 29:10;
  38:3; 61:2; 64:21; 75:9;
  85:12; 127:14; 143:18; 151:1
**speculation** [2]
  74:24; 130:8
**spell** [1]
  8:15
**spend** [1]
  27:13
**split** [3]
  55:11; 70:12; 122:13
**splits** [2]
  72:14; 117:15
**splitting** [1]
  55:24
**spoke** [5]
  74:17; 75:2, 19; 76:13; 149:6
**spot** [1]
  141:24
**Square** [1]
  3:5
**SSC** [4]
  30:1; 46:22; 60:9; 148:19
**St** [1]
  32:21
**stack** [1]
  92:20
**staff** [1]
  79:16
**stamp** [3]
  29:23; 30:19; 42:14; 69:24,
  25
**stamped** [1]
  83:17
**stand** [1]
  23:10
**standard** [2]
  [3]9:7; 1[4]1:1

**standards** [1]
  144:3
**start** [8]
  21:15; 33:13; 49:24; 51:22;
  59:10, 16; 96:10; 126:9
**started** [9]
  8:11; 9:6; 15:13, 16; 16:3;
  18:17; 49:22; 54:20; 55:3
**Starting** [1]
  96:10
**starting** [5]
  14:20; 96:11; 110:21; 111:14,
  16
**starts** [6]
  29:22; 30:19; 59:20; 84:24;
  86:1; 96:9
**STATE** [3]
  158:10, 25; 159:4
**State** [14]
  2:7; 13:12, 15; 14:2; 46:19;
  49:2; 68:3, 14; 96:12, 15;
  97:20; 100:15, 19; 159:7
**state** [25]
  13:25; 14:1; 15:20; 31:12, 15;
  49:24; 57:24; 89:18; 96:17,
  18; 97:25; 105:11; 106:21;
  107:2, 4; 111:8; 116:5; 122:9;
  123:3, 4; 140:22, 25; 141:23;
  142:7; 154:15
**stated** [3]
  2:11; 12:12; 117:12
**Statement** [2]
  30:3; 31:2
**statement** [1]
  95:13
**STATES** [1]
  1:1
**States** [2]
  10:12; 44:2
**states** [3]
  41:2; 109:5; 142:6
**stating** [1]
  147:21
**status** [3]
  81:5; 128:4; 145:19
**stay** [1]
  19:8
**stayed** [1]
  148:7
**STEELE** [82]
  3:19; 8:10; 12:1, 10, 15;
  26:17; 32:8; 33:18, 21; 34:2;
  36:13, 20; 39:10, 18, 22;
  42:18; 45:24; 46:5; 54:23;
  55:1; 62:9; 64:5, 10, 22, 25;
  68:1, 7, 18, 23, 25; 69:6, 10,
  14; 71:25; 72:5; 77:12, 16;
  81:11; 83:4, 8, 11, 20; 86:17;
  89:16; 92:2, 13; 93:20; 94:1,
  4, 13, 25; 119:19; 123:1;
  125:2; 126:3; 127:6, 21;
  131:11, 14, 21; 132:3;
  133:12, 15, 17; 134:3;
  135:10, 18; 137:19; 138:4,
  18, 23; 139:2, 7, 13; 144:21;
  147:4, 7; 155:9, 16, 24;
  156:1, 5
**Steele** [3]
  7:18; 9:22; 143:18
**STIPULATIONS** [1]
  [4:9]

**Stipulations** [1]
  5:5
**stock** [3]
  12:2, 8, 19
**stop** [1]
  93:13
**story** [4]
  85:6, 7, 11; 87:14
**straighten** [1]
  91:25
**Street** [1]
  159:21
**strive** [1]
  112:11
**structure** [5]
  110:23, 24, 25; 111:2, 8
**stuff** [2]
  41:2; 151:22
**subject** [1]
  119:4
**submit** [2]
  61:23; 62:7
**submitted** [1]
  81:15
**submitting** [4]
  61:11, 19; 62:7, 18
**Subpoena** [2]
  5:20; 8:14
**subpoena** [1]
  8:16
**subscribed** [1]
  158:17
**substance** [1]
  86:24
**success** [1]
  120:25
**successes** [1]
  28:3
**successful** [1]
  24:24
**Successories** [1]
  114:25
**sue** [2]
  66:16; 74:7
**sued** [1]
  74:4
**suggested** [6]
  67:20; 73:24; 74:7; 123:17;
  126:25; 140:20
**suggestion** [5]
  50:7, 14; 51:7; 141:22; 142:5
**suggestions** [1]
  78:16
**suggests** [1]
  50:25
**suing** [6]
  66:7, 23; 67:13, 25; 68:6;
  74:2
**Suite** [6]
  2:9; 3:5, 11, 15, 20; 159:21
**Summary** [1]
  6:18
**summary** [1]
  96:7
**superintendent** [5]
  90:13; 94:23; 129:10
**superintendent's** [1]
  129:1
**supervise** [4]
  16:22; 80:9; 137:17; 138:2
  [supervised [4]]

**Stipulations** [continued]
  16:13
**supervising** [3]
  16:15, 17, 19
**supervision** [1]
  159:11
**supervisor** [11]
  18:15, 17, 18, 22; 30:1;
  52:18; 77:25; 137:4, 7, 9, 13
**supervisors** [1]
  18:19
**supervisory** [2]
  17:1; 79:20
**supplement** [2]
  8:22; 9:1
**supplemental** [1]
  44:1
**supplied** [1]
  144:6
**support** [2]
  85:3; 150:14
**surface** [1]
  43:24
**surname** [2]
  45:14; 46:1
**Surpass** [1]
  106:7
**surpassed** [3]
  85:1; 101:1; 106:5
**surrounded** [1]
  145:17
**surrounds** [1]
  48:17
**suspect** [1]
  67:24
**sworn** [3]
  2:3; 8:5; 159:9

– T –

**takes** [2]
  120:20; 140:19
**talk** [10]
  53:1; 61:18; 62:16; 63:16;
  75:7; 77:18; 81:1; 96:5;
  133:22; 155:19
**talked** [18]
  20:11; 48:8, 14; 60:25; 61:4,
  12; 62:22; 63:1, 18, 24;
  77:11, 24; 97:1; 103:16;
  112:19; 115:1, 24; 126:12
**talking** [28]
  22:23; 28:18; 36:7, 14, 16;
  47:20; 48:4, 5, 11; 49:6, 9,
  13, 15; 54:8; 56:23; 62:4;
  66:15; 68:8; 75:13; 81:12;
  102:18; 108:7, 8, 11; 115:21;
  129:4; 135:16; 145:2
**teach** [1]
  28:16
**team** [28]
  17:12, 13, 14, 17, 18; 20:14,
  21; 24:24; 28:6, 12; 44:13,
  14, 19; 45:8; 60:12; 83:25;
  98:10; 100:24; 106:22;
  107:11; 112:21; 115:10;
  120:23; 121:5; 134:22;
  149:21; 150:19
**teams** [3]
  10:12; 28:16, 17
**Teamwork** [1]
  104:17

teamwork [2]
    104:13; 115:1
Technical [1]
    13:13
Tecum [2]
    5:20; 8:14
Ted [1]
    66:13
telling [6]
    27:15, 21; 41:15; 49:15;
    91:13; 135:7
tells [1]
    62:12
temporary [1]
    152:13
ten [3]
    22:16, 17, 23
tendered [2]
    7:17; 8:13
term [2]
    36:24; 142:23
terminate [1]
    84:3
terminated [1]
    86:15
termination [3]
    86:14; 145:22, 24
terms [5]
    28:23; 36:18; 40:17, 18;
    116:2
territorial [1]
    34:20
Territory [32]
    15:12; 26:2; 27:24; 29:1;
    30:4; 37:14; 54:21; 55:5, 10,
    11, 18; 98:4, 8; 99:5; 103:16;
    104:2; 108:3, 4, 13, 21;
    109:14, 17, 22; 112:21;
    115:10, 16, 25; 120:20, 23;
    136:24; 138:10
territory [6]
    30:4; 31:12, 15; 34:19; 43:23;
    108:23
testified [1]
    8:5
testify [1]
    159:9
testimony [4]
    133:19; 143:10; 154:11;
    159:11
TEXAS [3]
    1:1; 159:4, 19
Texas [41]
    2:7, 9; 3:6, 11, 16, 21; 5:22;
    14:3, 9; 19:2; 24:22; 29:22;
    40:6, 9, 13; 42:24; 43:12;
    96:12, 15; 97:14, 15, 19;
    99:14; 100:5, 11, 15; 101:24;
    102:14; 103:12; 104:25;
    105:6, 8, 15; 106:14, 15;
    107:21; 109:19; 127:19;
    147:15; 159:7, 21
Texas-Central [2]
    6:4, 6
Thank [5]
    34:4; 43:16; 112:21; 115:7;
    155:3
thank [2]
    120:24, 25
Thanks [2]
    9:6; 69:11

thanks [1]
    120:25
There's [5]
    30:22; 33:2; 49:23; 101:13;
    144:24
there's [26]
    21:21, 24; 31:11; 36:10;
    53:25; 57:19; 62:24; 64:14;
    65:21; 66:13; 74:13, 14;
    79:23; 80:20; 89:24; 101:20;
    119:12, 13; 124:9; 140:21;
    145:3, 24, 25; 147:25; 150:1;
    154:5
therein [1]
    158:19
thereupon [1]
    159:10
They're [1]
    111:16
they're [4]
    9:4; 35:21; 93:2; 144:17
they've [1]
    129:6
thinking [1]
    24:12
third [3]
    103:3; 110:7; 131:4
threat [7]
    51:7; 65:23; 66:1; 74:6;
    76:11; 151:5; 155:11
threatening [1]
    151:9
three [17]
    14:21; 18:8; 23:20; 24:1;
    35:18; 36:10; 57:9; 76:3;
    85:2; 113:5, 13; 117:13;
    119:5; 135:24; 152:1; 154:6,
    10
three-month [2]
    152:15; 154:3
Thursday [1]
    49:23
ticket [1]
    60:10
tie [1]
    40:13
times [9]
    23:21; 74:2; 75:20, 21; 113:5,
    8; 117:13; 135:25
title [1]
    15:11
titled [2]
    29:21; 32:20
tone [3]
    139:21; 140:6; 142:25
total [6]
    37:22; 43:22; 122:22, 23;
    130:19, 20
touching [1]
    159:9
towards [2]
    19:12; 52:18
TPA [1]
    154:13
track [2]
    122:10; 136:17
train [1]
    23:7
training [3]
    103:8, 9; 117:12
transcript [1]

94:15
transcription [1]
    157:4
transferred [2]
    57:24; 131:3
transferring [2]
    73:15; 76:18
translates [1]
    35:13
Transmittal [2]
    6:8, 10
transmittal [5]
    70:7, 9, 16, 18; 71:10
transmittals [1]
    72:1
Travel [1]
    6:19
travel [1]
    51:17
traveling [3]
    51:17; 63:3; 75:20
TRAVIS [1]
    159:5
treatment [3]
    142:10, 11, 12
trip [9]
    23:12, 16; 24:3, 5; 97:22;
    100:16; 106:10, 11, 15
trips [1]
    102:23
trouble [1]
    123:23
True [1]
    10:9
true [3]
    18:20; 158:5; 159:11
Trustees [1]
    46:18
trustees [5]
    88:4; 89:13; 91:21; 129:1, 7
truth [1]
    159:9
TX-C [3]
    60:12; 105:6; 106:14
TXS [1]
    97:13
type [5]
    13:17; 14:7, 13; 84:25;
    147:14
typewriting [1]
    159:11


– U –

U.S. [4]
    43:24; 44:1, 5; 45:3
Uh-huh [7]
    13:10; 103:10; 106:8; 110:15;
    120:8; 153:18; 155:4
ultimate [1]
    143:17
ultimately [2]
    59:23; 133:6
unacceptable [3]
    119:16; 132:13; 144:2
unclear [1]
    60:7
uncommon [1]
    104:21
underpenetrated [1]
    44:3

understand [37]
    15:24; 17:23; 21:25; 25:23;
    26:25; 29:9; 34:18, 22; 37:2;
    38:9; 45:17; 56:12; 58:24;
    63:4; 64:20; 68:5; 73:17;
    74:16; 76:17; 78:4, 13; 84:18;
    88:12, 15; 89:24; 90:16, 18;
    102:18; 121:16, 20; 128:10,
    12; 129:9; 130:16; 142:23;
    149:20; 151:14
understanding [30]
    10:20; 14:11; 19:5; 26:9, 11;
    27:15, 25; 33:10, 23; 34:7,
    15; 35:4; 36:1, 2; 37:10, 21;
    38:10, 16; 55:21; 72:11, 12;
    73:19, 21, 23; 80:14; 87:10;
    90:2; 102:17; 149:23; 150:22
understood [4]
    29:13; 34:9; 90:24; 143:10
unfortunately [1]
    152:18
UNITED [1]
    1:1
United [2]
    10:12; 44:2
University [2]
    13:12, 15
up-line [1]
    30:1
Utah [13]
    12:25; 13:12, 13, 14; 14:2, 9;
    15:19, 22; 17:10; 19:7, 8, 14


– V –

Vaguely [1]
    78:24
Valley [3]
    37:17; 141:7
varied [2]
    98:9; 108:16
varies [4]
    21:9; 25:2; 27:19; 97:3
vary [1]
    107:12
vast [1]
    44:2
Vegas [2]
    97:21; 106:10
verbal [1]
    84:2
vice [5]
    15:12; 26:1; 29:1; 81:3;
    116:24
VIDEOTAPED [2]
    1:13; 2:1
Videotaped [1]
    5:19
vision [1]
    104:18
visit [2]
    26:23; 43:8
volume [1]
    10:10
voluntary [1]
    145:18
VP [1]
    152:18
VS [1]
    1:4

## – W –

**walk** [1]
*132:20*
**wanted** [16]
*9:2, 5; 27:14; 37:12; 48:25;*
*49:4; 78:10; 87:13; 93:13, 14;*
*95:12, 13; 126:21; 140:5;*
*146:14*
**wants** [4]
*68:23; 69:15; 94:7; 141:5*
**warranted** [1]
*147:10*
**Warren** [1]
*143:18*
**We'll** [1]
*69:11*
**we'll** [1]
*154:3*
**We're** [3]
*35:10; 69:10; 99:21*
**we're** [9]
*8:25; 36:9; 38:3; 62:4; 67:9;*
*68:20; 82:21; 93:18; 129:4*
**We've** [1]
*108:16*
**we've** [7]
*28:4; 40:23; 47:17; 117:12;*
*119:10; 122:21; 133:3*
**website** [6]
*10:15, 16, 19; 11:13; 32:4, 7*
**Wednesday** [1]
*49:22*
**Week** [3]
*108:1; 112:7; 115:15*
**week** [8]
*47:4; 49:8, 21; 75:16, 17;*
*108:11; 109:24; 149:18*
**week-to-week** [1]
*16:25*
**welcome** [1]
*94:8*
**weren't** [1]
*104:23*
**West** [28]
*3:11; 15:12; 29:1; 30:4;*
*54:21; 55:5, 9, 11, 18; 98:4,*
*8; 99:5; 103:16; 104:2; 108:3,*
*4, 13, 20; 109:22; 112:20;*
*115:10, 16, 25; 120:19, 23;*
*136:24; 138:10; 159:21*
**What's** [6]
*13:1; 15:11; 35:14; 69:24;*
*115:17; 153:15*
**what's** [5]
*98:16; 111:25; 112:16;*
*116:19; 137:21*
**Whenever** [2]
*27:4; 65:21*
**whenever** [3]
*22:24; 57:16; 65:12*
**white** [1]
*37:23*
**Who's** [1]
*127:17*
**whoever** [1]
*48:4*
**WILLETTE** [1]
*3:15*
**WILLIAM** [1]
*3:19*

**Williams** [2]
*14:22, 24*
**Willis** [18]
*3:24; 6:14; 58:17, 18; 59:1, 2,*
*3; 64:3, 9; 72:21; 84:8; 86:1;*
*124:12, 13; 146:6, 8, 12;*
*148:1*
**win** [2]
*20:23; 21:1*
**winning** [1]
*112:18*
**wish** [1]
*124:4*
**wished** [1]
*114:8*
**WITNESS** [44]
*3:18; 32:15; 33:23; 40:1;*
*42:21; 46:7; 61:16; 62:1, 10,*
*21; 64:24; 65:2; 68:3; 70:1;*
*89:18; 92:4, 11; 93:25; 94:3,*
*17; 95:1; 108:6; 125:4; 126:1,*
*6; 127:22; 129:25; 131:16,*
*22; 132:6; 133:21; 134:5;*
*135:11, 19; 137:23; 138:9,*
*21; 139:9, 14, 17; 151:22;*
*155:4; 156:2; 157:2*
**Witness** [1]
*5:20*
**witness** [9]
*2:2; 39:22; 72:1; 94:8;*
*131:12; 139:6; 143:1; 156:3;*
*159:12*
**won** [5]
*113:5, 8, 9, 16, 17*
**won't** [2]
*60:21; 156:2*
**wondering** [1]
*132:24*
**wooden** [1]
*104:10*
**word** [5]
*18:23; 26:18; 99:11; 137:9,*
*21*
**words** [16]
*11:12; 17:16; 20:12; 36:9;*
*41:17; 61:22; 67:4; 75:1;*
*77:6; 91:20; 100:22; 101:6;*
*105:24; 110:24; 121:17;*
*135:12*
**work** [11]
*51:22; 104:17; 112:11, 21;*
*114:10; 120:18; 121:15;*
*124:3; 132:1, 25; 133:5*
**worked** [1]
*16:12*
**working** [3]
*16:15; 24:21; 150:18*
**workings** [1]
*25:23*
**Worth** [4]
*19:19; 20:3, 5; 24:23*
**wouldn't** [3]
*77:10; 130:11; 133:8*
**writing** [1]
*86:2*
**written** [7]
*12:13; 53:24; 85:5; 102:3;*
*142:9, 14, 19*
**wrong** [5]
*37:21; 89:14, 25; 90:7; 91:23*

*132:21; 146:8*

## – Y –

**Yeah** [16]
*15:10; 20:22; 23:2; 35:11;*
*42:10; 52:25; 59:12; 65:9;*
*106:12; 110:15; 112:19;*
*116:4; 124:9; 128:8; 134:23;*
*155:1*
**yeah** [8]
*22:18; 49:8; 64:2; 71:12;*
*107:24; 110:4; 130:16;*
*150:11*
**Year** [3]
*99:15, 22; 105:1*
**year** [45]
*16:1, 2; 18:10; 19:21; 21:5;*
*22:5, 9; 23:21; 24:11, 12;*
*25:25; 30:10; 31:5; 33:15, 24;*
*34:12; 35:1, 5; 46:25; 55:16;*
*99:20; 100:1; 101:2; 102:4,*
*24; 103:24, 25; 105:25;*
*106:5, 7; 113:2; 120:19;*
*122:23; 129:21; 130:1, 18,*
*20, 24; 142:3; 148:8; 153:24;*
*154:13*
**year's** [1]
*112:18*
**year-to-date** [2]
*112:7, 8*
**years** [33]
*10:13; 13:7, 9; 15:14; 19:3, 9,*
*10, 11, 13; 21:17; 22:15, 16,*
*17, 19, 21, 24, 25; 23:25;*
*24:12; 28:25; 65:20; 84:25;*
*85:3; 107:13; 108:16; 113:17;*
*121:25; 133:1, 2; 134:11;*
*139:24; 141:2; 146:11*
**York** [1]
*32:21*
**You'll** [1]
*125:12*
**you'll** [2]
*9:1; 154:3*
**You've** [5]
*18:15; 26:15; 73:2; 83:11;*
*146:18*
**you've** [19]
*27:10, 15, 20; 36:12; 48:11;*
*63:22; 76:21; 83:5; 89:11;*
*91:20; 95:20; 100:12; 101:6,*
*15; 104:6; 124:21; 129:11;*
*135:24; 153:8*
**you-all** [6]
*48:8, 13; 50:2; 63:18; 155:18*
**yourself** [7]
*12:5, 7; 27:5; 129:18; 134:9;*
*135:22; 136:3*

## – Z –

**zero** [3]
*110:21, 22*