United States District Court
Southern District of Texas
FILED

OCT 3 1 2003

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DINO CHAVEZ | § | |
| | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. B-02-128 |
| | § | |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, NOE SAUCEDA | § | |
| | § | |

## JOINT MOTION OF DEFENDANTS BROWNSVILLE INDEPENDENT SCHOOL DISTRICT AND NOE SAUCEDA TO EXCLUDE PLAINTIFF'S EXPERT

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW Defendants BROWNSVILLE INDEPENDENT SCHOOL DISTRICT and

NOE SAUCEDA in the above-styled and numbered cause and file this their Joint Motion to Exclude

the Plaintiff's expert, and therefore would show the Court the following:

### I.

### PRELIMINARY STATEMENT

1.        The decision of ***Daubert vs. Merrell Dow Pharmaceutical, Co.***, *509 U.S. 579, 113*

*S. Ct. 2786, L. Ed. 2d 469 (1993)* is a landmark case in which the Supreme Court addressed the

proliferation of expert testimony based on untested scientific theories or analysis that wholly ignores

fundamental principals of scientific research and methodology.  The court in ***Daubert*** stressed that

a verdict should not be based upon untested scientific concept and highlighted how easily a jury can

be misled by expert testimony lacking any foundation in accepted scientific or technological

knowledge.  Unlike ordinary witnesses an expert is permitted wide latitude to offer opinions,

including those that are not based on first hand knowledge or observation.  Because of this relaxed

evidentiary requirement of first hand knowledge there is an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline. ***Daubert****, 509 U. S. at 592*. Because juries tend to invest substantial credibility and testimony that is designated as expert testimony, regardless of its validity, the assurances that the law places on the legitimacy of the expert testimony are critical to the integrity of the legal process. *See **E.I. Du Pont De Nemours and Company, Inc. v. C. R. Robinson**, 923 S.W.2d 549, 553 (Tex. 1995); **Castello v. Chevron U.S.A.**, 97 F. Supp. 2d 780, 797 (S. D. Tex. 2000)*. The district court must serve as a gatekeeper of expert evidence to ensure that testimony is based on accepted methodology and research complying with scientific method. In this case the expert testimony that Plaintiff intends to offer is contained by Dr. Stephen M. Horner. Dr. Horner holds a Ph.D. in economics from the University of Michigan. He used to be an Adjunct Professor of Economics at Texas A&M University in Corpus Christi, Texas. He is currently employed solely as a litigant consultant. See Horner deposition, Exhibit "A", p. 15, l. 4 - p. 20, l. 3.

2.     AFLAC, through other independent agents, proceeded with the enrollment of Brownsville Independent School District employees for the Cafeteria Plan at the direction of Ron Levine in December 2001.

3.     On or about December 3, 2001, Dino Chavez was notified that he was no longer the Regional Sales Coordinator for AFLAC. According to Frank LeFemina, Dino Chavez' last day to serve as the Regional Sales Coordinator for AFLAC was January 27, 2002. See deposition of Frank LaFemina, Volume II, p. 267, l. 9-19, Exhibit "B".

4.     In 2003, Brownsville Independent School District awarded the TPA for §125 Cafeteria Plan to Arnie Olivarez for Colonial Life Insurance. As of that date AFLAC was no longer

the TPA with exclusive rights to sell products requiring payroll deductions to Brownsville Independent School District employees.

## II.

### FACS AND PROCEDURE

5.      On or about February 1, 2003, the Plaintiff retained Dr. Horner to render opinions regarding the economic damages suffered by the Plaintiff in the above cause. Defendants deposed Dr. Horner on September 5, 2003, Exhibit "A". Dr. Horner testified that he was retained to "render preliminary calculations illustrative of the magnitude of damages suffered by Mr. Chavez." See Horner deposition, Exhibit "A", p. 167, l. 22 - p. 168, l. 19.

6.      On or about May 15, 2003, Dr. Horner prepared a report related to the damages suffered by Plaintiff, Dino Chavez. The conclusions and opinions reached by Dr. Horner is that the Plaintiff has suffered lost earnings at present value totaling $5,344,463.00 as a result of actions taken by Defendants. See Exhibit "C".

7.      Additionally, Plaintiff filed a second report prepared by Dr. Horner dated September 19, 2003. He rendered opinions and calculations that Plaintiff in fact suffered "lost earning estimates at alternative growth rate assumptions" of $4,116,074, $7,229,964, or $13,264,977. See Exhibit "D". This report was prepared after the deadline imposed by the Court and after Dr. Horner's deposition. Dr. Horner offers no opinions as to causation or responsibility of the various Defendants in either of his reports. See Horner reports, Exhibits "C " and "D" and deposition of Dr. Horner, Exhibit "A".

8.      Defendants have retained the services of Dr. Donald R. House, who also holds a Ph.D. in Economics. Dr. House prepared his report for Defendants refuting Dr. Horner's opinions

and conclusions on June 25, 2003, Exhibit "E".

9.    Defendants request the exclusion of Dr. Horner's opinions and conclusions raised in his May 15, 2003 report and in his September 19, 2003 report, based on the fact that the figures that are derived from Dr. Horner are neither credible nor reliable since it was based substantially on figures supplied by the Plaintiff. No supporting documentation was supplied that would evidence that the Plaintiff has in any way provided credible evidence in order for Dr. Horner to support his opinions. Further, Dr. Horner opined that the May 15, 2003 was merely a preliminary report and as such is unreliable for the jury to be able to assess Plaintiff's losses. Further, because the report is only preliminary, any further reports or opinions rendered by this expert would be rendered far beyond the deadlines imposed by this Court and, therefore, untimely. See Court's First Amended Order dated March 26, 2003, setting deadline for Plaintiff's expert designation and report of May 15, 2003, Exhibit "F". F.R.C.P., Rule 26(a)(2)(B) and ©).

10.   F. R.C.P., Rule 26(e)(1) requires that an expert's disclosure be supplemented if there are any additions or changes to the information previously disclosed. However, Plaintiff waited until after the deposition of his expert and four months after the deadline to designate to do so. This supplemental report was not made in a timely fashion. According to the revised report, he made the changes based on testimony by Frank LaFemina. See September 19, 2003 report, Exhibit "D", "this revision is based on information provided in the testimony of Mr. Frank LaFemina on May 22, 2003 and August 21, 2003, concerning growth rates expected of Regional Sales Coordinators and others in the AFLAC sales system." No reference is made by him in his report as to when Mr. LaFemina supposedly testified as referenced by Dr. Horner. The depositions of Mr. LaFemina are attached as Exhibits "B", Volumes I and II.

11.     There is no reference to the growth rates of Regional Sales Coordinators in the second volume of depositions.  In fact, Mr. LaFemina was questioned during his first deposition, on May 22, 2003 about his expectation of Growth Rates for Regional Sales Coordinators.  He testified that he did not have a growth rate for his Regional Sales Coordinators, see Exhibit "B", Volume I, p. 38, l. 13-25.  Finally, Mr. LaFemina gave an answer of a hoped for growth rate for District Sales Coordinators between 20-30%.  See Exhibit "B", Volume I, p. 44, l. 11-18, p. 48, l.22 - p. 49, l. 6. Further, this was not a requirement, merely a goal to strive far.  See Exhibit "B", Volume I, pp. 38 - 49.  Mr. LaFemina was deposed on May 22, 2003, yet Plaintiff waited until September 19, 2003 - four (4) months later only after his deposition and the discovery deadline had passed.  Surely, this second report provided to Defendants, two weeks after his deposition is not a timely supplement and this report should be struck.

12.     An expert's report must be "detailed and complete" in order to avoid the disclosure of sketchy and vague expert information.  Preliminary reports do not satisfy the express terms of Rule 26.  F.R.C.P. 26(a) clearly requires the initial disclosure be complete and detailed.  *See* ***Bramley v. Pfizer***, *200 F.R.D. 596, 603-604, 2001 U.S. Dist. LEXIS 8130 (S.D. Tex. – Corpus Christi 2001) citing* ***Adkins Adjustment Srv. v. Vision Claim Serv.***, *2001 U.S. Dist. LEXIS 5624, 4 (N.D. Tex. 2001).*

13.     F.R.C.P. 26(a)(2)(B) states; "The [expert] report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefore; the data and other information considered by the witness in forming the opinions; [and] any exhibits to be used a summary of or support for the opinions....' See also ***Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.***, *73 F.3d 546, 571 (5th Cir. 1996);* ***Sherrod v. Lingle***, *223 F.3d 605, 612 (7th Cir. 2000).*

14.     It is proper both to strike Dr. Horner's report and prevent him from testifying due to the failure of Plaintiff to provide a final report in a timely fashion pursuant to F.R.C.P. Rule 26. A district court has broad discretion on discovery matters, including its decision to issue sanctions for discovery violations. *Sierra Club, Lone Star Chapter*, 73 F.3d at 559. *Brumley v. Pfizer, Inc.*, 200 F.R.D. 596, 603 (S.D. 2001).

## III.

## LEGAL ARGUMENTS AND AUTHORITIES

A.     The Court as a Gatekeeper

15.     The Federal Rules of Evidence, Rule 104(a) provides that the Court is the gatekeeper for the admissibility of evidence:

> Preliminary Questions concerning the qualifications of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b).

16.     The burden of proof on the party preferring an expert witness is to establish by a preponderous of the evidence the qualifications of that witness and admissibility of his testimony. *Daubert*, 509 U.S. at n.10 quoting *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987). *See also Rothfos Corp. v. M/V Nuevo Leon*, 123 F. Supp. 2d 362, 371 (S. D. Tex. 2000) and *Bennett v. PRC Public Sector, Inc.*, 931 F. Supp. 484, 490 (S. D. Tex. 1996).

17.     In *Daubert*, the Supreme Court established a two-step analysis to be used by district courts in exercising their gatekeeping function in regard to expert testimony, but only after the district court assures itself that a proffered witness is qualified as an expert. The criteria is simply that the evidence is reliable and that it is relevant t the facts at issue in the case. *See Tanner v. H.*

*Wade Westbrook*, *174 F.3d 542, 545 n.1 (5th Cir. 1999); **Watkins v. Telsmith, Inc.**, 121 F.3d 984,*

*988 (5th Cir. 1997).*

**B.**    The report must be complete

18.    Throughout Horner's deposition he has repeatedly maintained that this report is

merely preliminary and incomplete. Horner, in fact, has admitted that the figures supplied by him

would be greatly reduced once mitigation figures were addressed by House. See Horner deposition,

Exhibit "A", p. 88, l. 3 - p. 89, l. 23. Even in his September 19, 2003 he still has not allowed for

mitigation of Mr. Chavez' damages. This is not a case where Plaintiff was prevented from earning

a living due to a permanent injury. Plaintiff has testified that he went into partnership with Stephen

Andrus, Fernando de Pena and Valentin Paz in the Teacher's Agency in January 2002, the same

month he was terminated as the RSC for AFLAC. The Teacher's Agency was an established

company when Chavez stepped in as a partner. No reference or consideration were made as to these

facts.

P. 88, L.3 - P. 89, L. 9:

Q    But you haven't done the latter; you haven't done the mitigation calculation?
A    Not yet
Q    If that were done, that would change the number –
      MS. LEEDS: Second to the last page.
      MR. STEELE: Thank you.
Q    That would reduce the $5,344,463 that are your preliminary calculations about the
      present value of his commissions?
A    Whatever number – I'm going – I apologize for this. I'm going to try to help you
      even though my client might kick me. But instead of just answering no, let me say
      that what I would do is from whatever the numbers are that I will make in a final
      projection of Mr. Chavez' earnings from his position as an RSC that he had with
      AFLAC prior to these events, I would subtract my projections of what he will be able
      to do given that he is no longer in that position.
Q    Got it.

A      And that would – that is the method by which we would calculate the loss.  And if
       we started with five million and something, it would be less than that.  In order
       words, the five million where he could earn from AFLAC, that that will be reduced
       by a million or whatever it is that he would earn otherwise.

Q      And you would agree that Dino Chavez can continue to sell insurance, correct?
       MR. AGUILAR:   Objection; specificity and speculation.

A      I would agree that Mr. Chavez is capable of selling insurance as we sit here today.

19.    Dr. Horner admits that Chavez was fully capable of selling insurance and described

him as "he is a partner in an insurance agency where he is back being a partner of insurance agents

of insurance operations, selling insurance.  And one would expect that he would do better in that he

would do – then the other example that you had before as just as agent.  Horner deposition Exhibit

"A", p. 92, l. 2-7.

20.    Horner further admits once mitigation is determined the figure he opined for lost

earnings would go down substantially.   Horner deposition, Exhibit "A", p. 215, L. 18-19.

21.    Relating to mitigation and his position as an owner of the Teacher's Agency Dr.

Horner in his report dated May 15, 2003 states that relating to mitigation "we do not have complete

figures in order to do an analysis or projection of his earnings from this endeavor."  See Exhibit "D"

p. 5.  In his September 19, 2003 report he states "Although, I would expect that this operation will

eventually be successful, it is too early to prepare a reliable projection of Mr. Chavez' future earnings

from this endeavor."  See Exhibit "D".

22.    He further stated that he expected Mr. Chavez to excel in his next endeavors.  See

Horner deposition, Exhibit "A", p. 182.

23.    In his deposition, Dr. Horner describes what he needs to do to be able to mitigate his

damages.  See Dr. Horner deposition, Exhibit "A", p. 89, l. 24 - p. 91, l4.

24.     Dr. Horner specifically admits that he has not "attempted to calculate the amount of money that Dino Chavez could make from 2002 projected out 25 years" Horner deposition, Exhibit "A", p. 87, L. 5-9.  See also p. 86-88.

P. 95, L. 2 - 13:

Q       Do you believe it's reasonable to assume that Dino Chavez will be able to earn a living for the next 25 years?
A       Yes, I do.
Q       So you can expect your opinion regarding Mr. Chavez' damages of $5,344,463 to change after you have calculated Mr. Chavez' mitigation opportunities?
A       Definitely.
Q       And that would be an appropriate method in order to advise a judge or a jury regarding Mr. Chavez' damages in this case, correct?
A       Correct.

25.     Clearly the figures provided in both Horner's reports are not final without mitigation of damages and as such both the reports and therefore Dr. Horner should be struck.

26.     As such pursuant to FRCP 26, this expert should be excluded as an expert witness. See ***Brumley***, *200 FRD at 603.*

C.      The Witness Must Be Qualified As An Expert

27.     Pursuant to Rule 702, a witness may offer an expert opinion only if he or she draws on some special "knowledge, skill, experience, training, or education" to formulate that opinion. F.R.C.P. 702. The Advisory Committee Notes to Rule 702 state that Rule 702 is "broadly phrased and intended to embrace more than a narrow definition of a qualified expert."  On remand in ***Daubert v. Merrell Dow Pharmaceuticals, Inc.***, *43 F.3d 1311 (9th Cir. 1995)*, however, the Ninth Circuit held that a court may exclude an expert who does not have the appropriate experience, education or training to offer a helpful opinion with regard to issues in controversy. ***Daubert***, *43 F.3d at 1317-18.*

28.     The opinion must be an expert opinion (an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert. *Jones v. Lincoln Electric Co.*, 188 F.3d 709, 723 (7th Cir. 1999) (quoting *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991)*. In other words, in carrying out its gatekeeping function under Rule 104(a), when evaluating the qualifications of an "expert," the district judge should assure himself, before admitting expert testimony, that the expert knows where of he speaks. *Watkins*, 121 F.3d at 990-91 (quoting *Cummins v. Lyle Indus*, 93 F.3d 362 (7th Cir. 1996); *Reberger v. The Bic Corp.*, No. CIV.A.700CV005-R, 2001 WL 1143154, at *3 (N.D. Tex. Sept. 25, 2001).

29.     Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education, if any, with the subject matter of the witness' testimony. *Carroll*, 896 F.2d at 212. For example, in *Tanner*, the Fifth Circuit held that plaintiffs' expert, whose education and experience was in the fields of obstetrics and neonatology, was qualified to testify about the standard of care to be given to a baby suffering from asphyxia, but was not qualified to give expert testimony concerning the causes of cerebral palsy. *See Tanner*, 174 F.3d at 548.

30.     This Court has echoed the requirement that an expert demonstrate some special "knowledge, skill, experience, training, or education" in formulating their opinion. *See Saudi v. S/T Marine Atlantic*, 159 F. Supp.2d 512 (S.D. Tex. 2001); *Copley v. Smith & Nephew, Inc.*, No. CIV.A.H.-97-2910, 2000 WL 223404, at *1 (S.D. Tex. Feb. 2, 2000). In *Saudi*, this Court barred the testimony of plaintiff's designated expert witnesses, Dr. Salah Mahmoud and the plaintiff, himself, who both proffered testimony in the areas of lifting crane maintenance and inspection requirements. *See Saudi*, 159 F.Supp.2d at 516 and 521. In disregarding the testimony of Dr. Mahmoud, the Court

emphasized that Dr. Mahmoud was not qualified to offer opinions concerning lifting crane maintenance and/or inspection requirements given his lack of training and experience in these areas, as well as his general unawareness of the rules, regulations and industry standards governing the maintenance and inspection of lifting cranes. *See id.* Likewise, the Court excluded the expert testimony of the plaintiff based upon its finding that plaintiff's experience as master of vessels, mooring master pilot and instruction pilot did not qualify him as an expert in crane inspection and maintenance. *See id. at 517 and 521.*

31.    House is an economist as such he has no knowledge regarding an insurance agent's ability to earn a living or how much an insurance agent will make in his life time. House admits in his deposition that he is offering no opinion relating to causation or insurance. See deposition of House, Exhibit "G", p. 209, l. 6-25. House further admits that he is not holding himself out as an expert in the insurance industry. See House deposition, Exhibit "G", p. 168, l. 20 - p. 170, l. 6. However, he opines as to Plaintiff's future earnings for the next 25 years and the probability of a growth rate of 15-25% per year for 25 years. As such he is going far beyond the role of an economist in projecting future lost earnings in the insurance industries based solely on Plaintiff's assertations.

D.    The Proposed Testimony Must be Reliable

32.    After a court considers whether a witness possesses the necessary training, education or experience to offer expert testimony, it must then engage in a rigorous two-part analysis. As part of this analysis, the court must satisfy itself that the principles, reasoning and methods underlying the proposed testimony must be deemed reliable. *See **Tanner**, 174 F.3d at 546; **Curtis v. M & S Petroleum, Inc.,** 174 F.3d 661, 668 (5ᵗʰ Cir. 1999).* This means that the expert's bald assurance of validity is not enough. ***Daubert**, 43 F.3d at 1316.* Rather, the party presenting the expert must show

that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology. *Id.* Ultimately, the Court must determine nothing less than whether the expert's testimony reflects "scientific knowledge," whether his findings are "derived by the scientific method," and whether his work product amounts to "good science." ***Daubert****, 509 U.S. at 590-94.*

33.    While declining to set forth a "definitive checklist or test," the Supreme Court did list four, non-exclusive factors federal judges can consider in determining whether expert testimony is reliable:

- whether the theory or technique has been subjected to peer review and publication;

- whether the theory or technique can be and has been tested;

- the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and

- whether the theory or technique employed by the expert is generally accepted in the scientific community.

***Daubert****, 509 U.S. at 593-95.* These factors are illustrative rather than exhaustive and they are not equally applicable in every case. ***Daubert****, 43 F.3d at 1316-17.*

34.    The intent of the examination is to determine whether the analysis supporting the expert's testimony falls within the range of accepted standards governing how scientists conduct their research and reach their conclusions. *Id.* The Supreme Court's purpose in requiring that the expert's testimony be "reliable" was to make sure that when experts testify in court they adhere to the same standards of intellectual rigor that are demanded in their professional work. ***Kumho Tire Co., Ltd. v. Carmichael****, 119 S. Ct. 1167, 1176 (1999); ****Black v. Food Lion, Inc.****, 171 F.3d 308, 311*

*(5th Cir. 1999); **Watkins**, 121 F.3d at 991; **Saudi**, 159 F.Supp.2d at 515 (internal citations omitted). See also, **Munoz v. Orr**, 200 F.3d 291, 301 (5th Cir. 2000)* (trial judge was justified in rejecting the opinions of Dr. Benz, plaintiffs' expert witness, after it was determined that Dr. Benz's methods were not in accord with those of recognized experts in his field).

35.     In applying the Supreme Court's **Daubert** rulings, the courts have generally viewed expert testimony based upon research or analysis performed strictly for litigation with deep suspicion.  For instance, on remand, the Ninth Circuit examined the work product of the plaintiffs' experts to determine if they were proposing to testify about matters growing naturally out of research they had conducted independent by the litigation or whether they had developed their opinions expressly for the purposes of testifying. **Daubert**, *43 F.3d at 1317*.  The Court could not ignore the fact that a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office. ***Id***. It reasoned that experts whose findings flow from existing research are less likely to have been biased toward a particular conclusion by the promise of remuneration.  When an expert prepares reports and findings before being hired as a witness, that record will limit the degree to which he can tailor his testimony to serve a party's interests.  In the scientific community, a researcher's conclusion is subjected to normal scrutiny through peer review and publication.  That the research is accepted for publication in a reputable scientific journal after being subjected to the usual rigors of peer review is a significant indication that it is taken seriously by others, i.e., that it meets at least the minimal criteria of good science. **Daubert**, *43 F.3d at 1318, citing, Daubert, 509 U.S. at 593-95; see also **Peter W. Huber, Galileo's Revenge: Junk science in the Courtroom**, 209 (1991)* (the ultimate test of an expert's integrity is her readiness to publish and be damned).

36.     The Ninth Circuit observed that the only review of the analysis performed and conclusions reached by plaintiffs' experts was by judges and juries. The examination of a scientific study by a cadre of lawyers is not the same as its examination by others trained in the relevant field. *Daubert*, *43 F.3d at n8 (quoting, **Perry v. United States**, 755 F.2d 888, 892 (11th Cir. 1985).* As such, the Court held that where a party's experts testify solely based upon litigation generated analyses, their testimony will not be admitted unless the expert's analysis rigorously complies with the scientific method. The court further noted that despite the many years the Bendectin controversy brewed, no one in the scientific community deemed the studies by plaintiffs' experts worth of verification, refutation or even comment. It concluded with the comment that, "It's as if there were a tacit understanding within the scientific community that what's going on here is not science at all, but litigation." *Daubert*, *43 F.3d at 1318; see also, Copley, 2000 WL 223404, at *4; **Michaels v. Avitech, Inc.**, 202 F.3d 746, 753 (5th Cir. 2000).*

37.     Horner's opinions are based on facts and figures supplied by Mr. Chavez. As such his final evaluations and opinions are not reliable. See Horner deposition, Exhibit "A", p. 40, l. 2 - p. 41, l. 13. He has merely acted as a calculator and as such this is junk science.

38.     Further, the fact that the evaluations and opinions are preliminary and not final makes them unreliable and as such this report and expert should be excluded. Even in Plaintiff's revised September 19, 2003 report he still is relying on figures provided to him by the Plaintiff, who is a biased, unreliable lay witness. As Horner admits the assumption underlying the factual damages were provided by Mr. Chavez; figures for the sales were provided by Chavez; unreliable documentation was provided by Horner by the Plaintiff in the case. Plaintiff as the litigant is not a reliable source.

39. Horner claims throughout both reports and in his testimony that Plaintiff would have remained a Regional Sales Coordinator for AFLAC for 25 years which is an unreasonable assumption as confirmed by Defendants' expert Dr. Donald House and admitted to by Plaintiff's expert that there is no such guarantee. See Exhibit "A", Horner deposition, p. 184, l. 17 - 149 l. 15.

P. 185, L. 12-15:

Q    Would you agree that there are no guarantees that someone is going to be employed for 25 years in this specific position?
A    I do.

E.    The Proposed Testimony Must Be Relevant

40. Rule 702 further requires that the proffered evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." F.R.C.P. 702. This condition goes primarily to relevance. *Daubert*, 509 U.S. at 591. Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful. *Id*. citing, 3 Weinstein & Berger P702[02], pp. 702-18.

41. Rule 702's "helpfulness" standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility. *Daubert*, 509 U.S. at 592. In its analysis, the Supreme Court found insightful the Third Circuit's opinion in *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985), holding that expert testimony is relevant only if it is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute. In other words, does the proffered testimony "fit" the case, or, put another way, "does the testimony logically advance a material aspect of the case?" See *Daubert*, 509 U.S. at 591; *Bennett*, 931 F.Supp. At 500. "Fit" is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes. *Daubert*, 509 U.S. at 492.

42.    An example where the proffered evidence does not fit an issue in the case can also be seen in ***Habecker v. Clark Equip. Co.***, *36 F.3d 278 (3d Cir. 1994)*.  In ***Habecker***, the testimony of an accident investigator regarding a simulation he had performed was offered.  *See **Habecker**, 36 F.3d at 289*.  The expert's simulation of the accident at issue, however, differed from the real accident in a number of important aspects.  *See **id**. at 289-90*.  The Third Circuit found not only that the simulation was not reliable, but also that the simulation evidence did not "fit" the facts of the case.  *See **id**. at 290*.  Accordingly, the court concluded that the simulation evidence was inadmissible because it would not have assisted the jury to determine how the accident occurred. *See **id**.*

43.    The fit requirement has been imposed by this Court as well.  In ***Copley***, Judge Atlas rejected the proffered testimony on causation of plaintiff's expert in a product liability case.  Mr. Copley alleged that he was injured by the implantation of a defective internal fixation device, manufactured by the defendant, during a spinal fusion operation.  *See **Copley**, 2000 WL 223404, at *1*.  The Court observed that, in accordance with Texas law, the plaintiff had to prove not only that the defendant's product was defective, but that the defective product was the cause in fact of plaintiff's injury.  *See **id**. at *1 n.1 and *5*.  In ***Copley***, the Court concluded that the opinion of plaintiff's expert — that the implantation of defendant's device (without reference to any alleged defect) caused plaintiff's injury — failed to satisfy ***Daubert***'s relevancy requirement, and therefore, was inadmissible.  *See **id**. at *5*.

44.    Scientific evidence, even if trustworthy and reliable, has no place in the courtroom unless such evidence materially advances an issue in the case.  As set forth in greater detail below, the proffered testimony from plaintiff's experts is irrelevant, and therefore inadmissible, given that

it fails to assist the trier of fact to understand the evidence or determine any of the ultimate issues in the instant case.

45.    Here the speculative and unsupportable opinions offered by plaintiff's expert offer nothing for a jury in making a determination on a substantive issue and should be precluded.

46.    Again, the reliance of Plaintiff on an expert's incomplete, preliminary report would be unhelpful and irrelevant to prove his damages.  The figures and opinions that are incomplete do not relate to an issue or question, namely Plaintiff's damages.  Horner in his deposition admits that the figures he gave are not Plaintiff's damages.  They are merely "illustrations of Plaintiff's possible losses."  See Horner deposition, Exhibit "A", p. 167 - 168.

47.    The opinions and evaluations do not fit the facts of this case.  No consideration was made by Plaintiff's expert as to the fact that Brownsville Independent School District did not use AFLAC as the TPA after 2002. See Horner deposition, Exhibit "A", p. 172, l. 9-13, p. 173, l. 5-24. No consideration was made by the expert to Plaintiff's earnings in the past.  No consideration was made as the hard facts of this case, such as the examination of Plaintiff's income tax returns, sales of policies or other such documentation.

F.    The Testimony Of Plaintiffs' Experts Should Be Excluded Pursuant to Rule 403

48.    Finally, the testimony of plaintiff's experts should be excluded pursuant to Rule 403. Rule 403 of the Federal Rules of Procedure applies with as much force to expert opinions as it does to any other evidence. *See 1 Weinstein & Berger, Weinstein's Evidence paragraph 403(01) (Matthew Bender, 1989)*. Thus, proffered testimony which passes Rule 702 and the ***Daubert*** test may nevertheless be inadmissible under Rule 403 considerations. *See **Camp v. Lockheed Martin Corp.**, No. CIV.A.H.-97-1938, 1998 WL 966002, *4 (S.D. Tex. Dec. 29, 1998)*. Rule 403 provides:

Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the dangers of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waster of time or needless presentation of cumulative evidence.

F.R.C.P. 403.

49.     Rule 403 screens evidence whose probative value is substantially outweighed by the other considerations set forth in the Rule – prejudice, confusion, and waste of time.  Unlike Rule 702, which defines the admissibility thresholds for expert testimony, Rule 403 empowers a judge to exclude "otherwise admissible" evidence; however, it gives no discretion to admit evidence that is subject to exclusion under some other rule.  *See **Christophersen v. Allied-Signal Corp.**, 939 F.2d 1106, 1112 (5th Cir. 1991) **C. J. Clark**, concurring) (disapproved on other grounds by **Daubert**, 509 U.S. 579 (1993)).*

50.     Simply qualifying witnesses as experts carries the danger that their testimony may be accepted because of their stature as "experts" and not before of the validity of their testimony.  *See **Christophersen**, 939 F.2d at 1120 (**C.J. Clark**, concurring); see also **Camp**, 1998 WL 966002, at *2.*  Thus, where there is doubt regarding the expert's qualifications or the admissibility of his testimony, the testimony should be excluded to prevent the jury from deciding to believe the testimony, the testimony should be excluded to prevent the jury from deciding to believe the testimony for an improper reason – because he is an "expert."  *See **Porter v. Whitehall Lab, Inc.**, 791 F. Supp. 1335 (S.D. Ind. 1992), aff'd 9 F.3d 607 (7th Cir. 1993).*

51.     Here, the damages lies in a jury concluding that Plaintiff's actual damages are in the realm outlined by Horner between 4 million and 13 million based on Plaintiff containing to be an RCS for AFLAC for 25 years with no allowance for mitigation of damages, if Plaintiff's expert is allowed to testify.  When in effect, Horner has admitted that that figure is based on speculation and would be reduced with an unknown amount for mitigation.  Allowing Horner to testify gives credence to statements made by Plaintiff that are unproven and speculative, which is exactly what FRCP 403 seeks to protect.  Horner's "illustrations of possible damages of Plaintiff" is exactly the type of expert testimony that courts exclude.

**WHEREFORE, PREMISES CONSIDERED**, Defendants respectfully pray that this Motion be set for a hearing commencing on a date set by the Court, and that, upon final hearing of their Joint Motion to Exclude Plaintiff's experts, this Honorable Court will preclude Plaintiff's experts from offering testimony or evidence at the trial of this matter, and for such other relief, at law or in equity, to which Defendants may show themselves justly entitled to receive.

Respectfully submitted,

**ROERIG, OLIVEIRA & FISHER, L.L.P.**
855 West Price Road, Suite 9
Brownsville, Texas 78520
Telephone: (956) 542-5666
Facsimile: (956) 542-0016

Counsel for Defendant Brownsville Independent School District

By:_____
Elizabeth G. Neally
State Bar No. 14840400
Federal Bar No. 8044

**WILLETTE & GUERRA, L.L.P.**
International Plaza, Suite 460
3505 Boca Chica Boulevard
Brownsville, Texas 78521
Telephone: (956) 541-1846
Facsimile: (956) 541-1893

Counsel for Defendant Noe Sauceda

By: _____
     **EILEEN M. LEEDS**
     State Bar No. 00797093
     Federal Bar No. 16799
     **CHARLES WILLETTE, JR.**
     State Bar No. 21509700
     Federal Bar No. 1937

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing Defendants' Joint Motion to Exclude Plaintiff's Expert has been served on counsel of record, via certified mail, return receipt requested, as follows:

Mr. J. Arnold Aguilar
**Law Offices of J. Arnold Aguilar**
Artemis Square, Suite H-2,
1200 Central Boulevard
Brownsville, Texas 78520
Via CMRRR: 7160 3901 9848 1267 9931

Ms. Eileen Leeds
**Willette & Guerra**
3505 Boca Chica Boulevard, Suite 460
Brownsville, Texas 78521
Via CMRRR: 7160 3901 9848 1267 9924

Mr. William B. Steele, III
LOCKE, LIDDELL & SAPP
100 Congress Avenue, Suite 300
Austin, Texas 78701
Via CMRRR: 7160 3901 9848 1267 9917

on this 31st day of October, 2003.

Elizabeth G. Neally

Deposition of Stephen Horner

# EXHIBIT "A"

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DINO X. CHAVEZ | ) ( | |
| | ) ( | |
| VS. | ) ( | B-02-128 |
| | ) ( | |
| BROWNSVILLE INDEPENDENT | ) ( | |
| SCHOOL DISTRICT, NOE | ) ( | |
| SAUCEDA, MARILYN DEL | ) ( | |
| BOSQUE-GILBERT and | ) ( | |
| RANDALL DUNN | ) ( | |

---

ORAL DEPOSITION OF

STEPHEN M. HORNER, Ph.D.

SEPTEMBER 5, 2003

---

ORAL DEPOSITION OF STEPHEN M. HORNER, Ph.D., produced as a witness at the instance of the DEFENDANT AMERICAN FAMILY LIFE ASSURANCE COMPANY OF COLUMBUS, taken in the above styled and numbered cause on SEPTEMBER 5, 2003, from 8:17 a.m. to 12:43 p.m. and 2:07 p.m. to 4:29 p.m., before LOU ZUNIGA, Certified Court Reporter No. 2198, in and for the State of Texas, at the offices of J. Arnold Aguilar, 1200 Central Boulevard, Suite H-2, Brownsville, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached therein.

Page 2

APPEARANCES
FOR THE PLAINTIFFS:
 J. ARNOLD AGUILAR
 LAW OFFICES OF J. ARNOLD AGUILAR
 Artemis Square, Suite H-2
 1200 Central Boulevard
 Brownsville, Texas 78520

FOR THE DEFENDANT BROWNSVILLE INDEPENDENT
SCHOOL DISTRICT:
 ELIZABETH G. NEALLY
 ROERIG, OLIVEIRA & FISHER, L.L.P.
 855 West Price Road, Suite 9
 Brownsville, Texas 78520

FOR THE DEFENDANTS NOE SAUCEDA, MARILYN DEL
BOSQUE-GILBERT and RANDALL DUNN:

 EILEEN LEEDS
 WILLETTE & GUERRA
 3505 Boca Chica Boulevard, Suite 460
 Brownsville, Texas 78520

FOR THE DEFENDANT AMERICAN FAMILY LIFE ASSURANCE
COMPANY OF COLUMBUS:
 WILLIAM B. STEELE, III
 LOCKE, LIDDELL & SAPP
 100 Congress, Suite 300
 Austin, Texas 78701


ALSO PRESENT: DINO CHAVEZ

Page 4

1      STEPHEN M. HORNER, Ph.D.,
2  having been duly sworn, testified as follows:
3             EXAMINATION
4  BY MR. STEELE:
5      Q. Dr. Horner, my name is Buddy Steele, and I'm
6  here to take your deposition in a case styled Dino
7  Chavez versus Brownsville Independent School District,
8  Et Al. I understand you were hired as an expert
9  witness in that case; is that correct?
10     A. Yes.
11     Q. I also understand based upon some information
12 in a report that you provided that you've testified in
13 a number of other cases; is that correct?
14     A. Yes.
15     Q. Both at depositions and at trial, correct?
16     A. Yes.
17     Q. So you understand the process of the
18 deposition, I take it?
19     A. I believe so.
20     Q. Fair enough. Then I'm going to jump right in
21 and ask you some questions about yourself. I see from
22 your curriculum vitae that's attached to your report
23 that you graduated from Corpus Christi High School in
24 1966; is that correct?
25     A. Ray High School.

Page 3

1   Report dated 5-15-03                          18

2   Preliminary calculations                      39

3   Income example worksheets             44

4   Handwritten notes                             47

5   File documents                                52

6   File documents                                52

7   Response to the Stephen M. Horner report  60

8   Summary page legend                          60

9   Invoice and preliminary report              64

10  Invoice list for BISD                        131

Page 5

1      Q. Corpus Christi Ray. Fair enough. And were you
2  born and raised in Corpus?
3      A. Yes.
4      Q. And I take it that's where you now live?
5      A. Yes.
6      Q. I see you went to Cal Tech to get your
7  undergraduate degree?
8      A. Yes, sir.
9      Q. You have a BS in economics?
10     A. Yes.
11     Q. Any minors?
12     A. Probably it was physics, but it wasn't an
13 official one.
14     Q. Okay. And then did you go directly into
15 graduate school and public policy studies at the
16 University of Michigan?
17     A. No.
18     Q. What did you do between undergrad and the
19 University of Michigan?
20     A. I worked for one year at IBM.
21     Q. Doing what?
22     A. I was an administrator assistant of the
23 chairman of the board at IBM for one year in the
24 internship program.
25     Q. What does an administrative assistant do? What

Page 6

1  did you do?
2      A. That would be better because --
3      Q. What did you do?
4      A. -- my boss had six or seven. I did a number of
5  different short-term projects for the chairman of the
6  board and his office. For example, IBM had programs
7  where employees were able to make cost-saving
8  suggestions. Sometimes those were accepted and if
9  those were accepted employees were given a commission,
10 if you will, a cut of the cost savings. Sometimes
11 those ideas were rejected because they really weren't
12 cost savings or weren't implementable for one reason or
13 another and employees would appeal. And I was involved
14 in writing some opinions for the chairman, some letters
15 actually for the employees telling them why their idea
16 was not a good idea. So I was preparing draft letters
17 for the chairman. That was one of the things I did.
18     Q. What else did you do?
19     A. I spent about, let's see, a month or two in
20 their planning process, planning and budgeting process.
21 They were preparing their annual budget. It was
22 somewhat of a difficult time for IBM Corporation in
23 1970, '71, and I was -- I don't remember exactly what I
24 did, but -- it was quite a long time ago now. But I
25 remember that I was assigned to people involved in the

Page 7

1  planning process and did short-term projects for them.
2  I also was involved in another short-term project in
3  the systems development division. It was a human
4  resources project of some kind and I interviewed a
5  large number of employees.
6      Q. Did that internship/administrative assistant
7  job last one year?
8      A. Yes, sir.
9      Q. And was it then that you decided to go into
10 graduate school?
11     A. I already had the admission to graduate school
12 when I went to work for IBM. I deferred it for a year.
13     Q. Why did you decide to go into public policy
14 studies?
15     A. At one time I was very interested in public
16 management.
17     Q. Explain what public management is.
18     A. Well, at the time I thought I might want to
19 work for the Congressional Budget Office or the
20 executive office of the President of the United States
21 in budgeting/planning matters.
22     Q. Okay. And that's why you decided to go into
23 public policy studies at Michigan?
24     A. Yes, sir. That's one of the reasons. There
25 were lots of reasons.

Page 8

1      Q. And is it MPP, a master of public policy?
2      A. Yes, sir.
3      Q. And after you got that -- was that in May of
4  '73 that you obtained that degree?
5      A. Well, it could be. You have my CV there. I
6  don't remember the date anymore. I don't believe it
7  was in May of '73.
8      Q. Sometime in --
9      A. Let's see. I went there in '71. It was
10 sometime in '73. I'm not sure whether it was in May or
11 in September or in December because I had already
12 entered the Ph.D. program in economics, which is not a
13 related program, and I was doing both at the same time.
14 I'm not sure whether I completed the MPP at the same
15 time. It's a two-year program. I think I may have
16 been one semester late because I was doing that as well
17 as working full-time.
18     Q. Okay. So it could have been as late as
19 December of '73. That's not that important. What made
20 you decide to seek a Ph.D. in economics?
21     A. I was very interested in economic analysis.
22 One of the reasons I had gone to Michigan was because a
23 particular economics professor was there who taught
24 both the economics program and the public policy
25 program.

Page 9

1      Q. Who was that?
2      A. Sidney Winter.
3      Q. What piqued your interest in Professor Winter?
4      A. I had read a lot of his articles when I was an
5  undergraduate and thought they were interesting. He
6  had a different way of looking at things.
7      Q. What is he known for?
8      A. He is known for what is loosely described as
9  evolution area approaches to analysis of economic
10 systems.
11     Q. What does that mean for the layman?
12     A. Well, what it really means is it's an attempt
13 to remove economic theory or at least to loosen the
14 constraints of maximizing assumptions on economic
15 theory. Much of economic theory is based on the
16 assumption that you can determine what the best choice
17 is in a given situation and that, in fact, economic
18 actors will take that choice every time. They don't.
19 On average some people believe they do.
20          This -- part of Professor Winter's more
21 important work was involved in showing that they --
22 there were some arguments at one time, for example,
23 that competitive pressures would force people to act
24 optimally, that they would always make the right
25 decision. If they made a wrong decision, they would be

Page 10

1   eliminated from the marketplace. And he demonstrated
2   both mathematically and in computer simulations that
3   that fact is not true, that the conditions under which
4   that occur are fairly special.
5          And so it's actually fairly important. It
6   sounds kind of obscure, but it's fairly important. In
7   a nutshell that's what it's all about. He's done quite
8   a bit more in that area having to do with decision
9   making, limited information, the way people really make
10  real decisions in the real world.
11     Q. Okay. What did you do after you got your Ph.D.
12  in economics from Michigan?
13     A. I was already teaching at Wellesley College
14  when I got -- when I actually got the degree. I had
15  not quite completed my stance. Professor Winter left
16  Michigan and went to Yale right at the same time. And
17  I had been working for him as a research assistant
18  under a grant, and when he left I needed work. I had
19  been teaching but it was just part-time at Michigan
20  School of Public Health. And so I became a teacher at
21  Wellesley College, just outside of Boston, and I was a
22  lecturer I think at that time. I think that's the
23  title they give people who don't have Ph.D.s. And that
24  following summer I did my oral exam and completed the
25  dissertation that summer. And I got that degree I

Page 11

1   believe in December of '77.
2      Q. What was your dissertation about or what was
3   the title of it? What was it about?
4      A. It's a casting model of technology
5   distribution.
6      Q. Which we're all very familiar with so you don't
7   need to explain it. And I see in your resume that you
8   were an assistant professor at Wellesley from '77 to
9   '79. Were you also teaching economics to undergrads at
10  Wellesley?
11     A. Yes.
12     Q. The difference being you're no longer a
13  lecturer in title because you now have your Ph.D. so
14  you're elevated to an assistant professor; is that
15  correct?
16     A. That's correct, but I taught the same courses.
17     Q. Got it. And then I see in '79 you ended your
18  teaching career at Wellesley. What did you do then?
19     A. I moved back to Corpus Christi and went to work
20  for Oil Field Equipment Company.
21     Q. And what led you to that job?
22     A. That is a family business that was started by
23  my grandfather and business was booming in the late
24  '70s and business had been growing very fast. My dad
25  really wanted some help. And my grandfather wanted me

Page 12

1   to come back to Texas and so I did.
2      Q. What did you do for Old Field Equipment
3   Company?
4      A. Chief financial officer. I was in charge of
5   inventory control. I was in charge of credit control.
6   I did a lot of credit analysis for a time. I replaced
7   one of our store managers in Freer, Texas. I think I
8   did that while I was doing all those other duties. It
9   was a fairly lengthy period of time.
10     Q. And just sort of generally, what's the business
11  of Oil Field Equipment Company?
12     A. They are an oil field supply company. They
13  sell pipe, pipe fittings, valves, rope.
14     Q. Drill bits?
15     A. Yes, actually they do. They were -- drill bits
16  were generally purchased and then resold. They came
17  from a used tool company and they were resold. We sold
18  hard hats and water coolers. It was really kind of an
19  industrial hardware store for -- our primary customers
20  were drilling companies, drilling contractors,
21  work-over contractors, did a lot of refinery
22  construction supply. The small refineries, not the big
23  ones. The ones that were small gas plants. That's
24  primarily what they did.
25     Q. Okay. And I see you did that for ten years. I

Page 13

1   also see that during that same time period you worked
2   for Susser Petroleum Corporation, Apache Fuels, Corpus
3   Christi, Texas in '85. What did you do for them?
4      A. That was really a short-term project. It was a
5   little different from anything else, so it's listed
6   there separately. I helped them negotiate for a lease
7   renewal of a lease with the Port of Corpus Christi.
8   They occupied a fairly large amount of space in a large
9   warehouse inside the Port area that belonged to the
10  Navigation District.
11     Q. That was for Susser Petroleum?
12     A. Yes, sir.
13     Q. Okay. Because in '87 there's also an entry.
14     A. Oh, I'm confusing that. Those companies are
15  related companies.
16     Q. Meaning Corpus Christi Warehouse and Storage is
17  related to Susser Petroleum?
18     A. Yes, actually it's owned by the same people so
19  I have those confused. So the Warehouse and Storage is
20  what I just described before. The other project --
21     Q. Apache Fuels, Susser Petroleum?
22     A. Yeah, that was actually a litigation situation.
23  I wasn't hired by attorneys. I was hired by the -- by
24  Susser. It was -- and I'm not sure there was actually
25  litigation going on, but there was discussion of it and

1 it was involved with negotiations over a location on
2 Harbor Island, which is a little island basically off
3 the side of Corpus Christi Bay which is an industrial
4 site. And they were wanting to go into the business of
5 supplying crew boats and work boats that service
6 offshore oil platforms. They were wanting to supply
7 them with fuel. Apache Fuels was a fuel depot. They
8 had an agreement with one of the drilling mud
9 companies. They had kind of a fairly complicated
10 arrangement, and I was involved in -- I don't know if I
11 would call it litigation -- called it litigation or
12 whether it was litigation. It was not what I would
13 call friendly negotiations that were going on, so maybe
14 it was in litigation.
15     Q. Some adversarial relationship --
16     A. Yes.
17     Q. -- of some sort that you were helping to
18 negotiate a resolution to?
19     A. That would be a good description.
20     Q. Okay. You also show, under consulting, from
21 1985 to the present, general economic, business and
22 statistical consulting, various defense and plaintiffs'
23 attorneys; personal injury and commercial damage
24 economic evaluation. Is that -- is that what you're
25 doing now and also what you started back in 1985?

1     A. I would say so, yes, sir.
2     Q. Were you acting as an expert witness for
3 attorneys and their clients in various matters?
4     A. When I first started in '85 I was just a
5 consultant. I was working -- I did start working for
6 attorneys in '85, but I did not -- I don't know when I
7 first was named as a witness, but it wasn't for a
8 couple of years at least.
9     Q. Were you consulting with attorneys to assist
10 them in determining what they believed their clients'
11 damages were or what they -- some damage type
12 calculation?
13     A. That was one of the things I did. That was one
14 of the things I did.
15     Q. What other things?
16     A. At first I was primarily involved in analyzing
17 the reports of other financial experts of various
18 kinds. The first project I did was to analyze the
19 report of another economist.
20     Q. And assist the attorney in picking it apart,
21 basically?
22     A. Basically, that's right.
23     Q. And then thereafter did you have an opportunity
24 to analyze data and provide reports to attorneys in
25 litigation?

1     A. Yes.
2     Q. And were those reports typically related to
3 damages that were claimed to have been suffered or
4 analyzing the amount of damages claimed to have been
5 suffered by a party to a lawsuit?
6     A. That or critiquing of other experts.
7     Q. And what did you do to critique them on the
8 defense side as opposed to the plaintiff's side?
9     A. Well, a great deal of my work was defense work.
10 In fact, it was all defense work for a number of years.
11     Q. Let me ask you, the last four years there's a
12 lengthy list of cases showing dates and -- I can
13 provide you with a copy. Or Arnold is about to do it.
14          MR. STEELE: If you could, Arnold, that
15 would save us a little time.
16     Q. Can you look at this and give me an estimate of
17 how many of these cases -- first of all, let me
18 confirm. Did you consult on all of the cases in that
19 list? Up at the top left-hand corner it says
20 deposition and trial testimony?
21     A. Yes, sir.
22     Q. And just so we can know we're talking about --
23     A. I just said yes, sir, but I'm not sure what the
24 question was. I was just agreeing, that's what it
25 says.

1     Q. I'm sorry. Did you consult in all of these
2 cases?
3     A. Yes.
4     Q. Okay. And listen, I just want to make sure
5 we're -- later you may generate a different list, so I
6 want to make sure we're talking about the same one.
7 The one we're talking about that you have in front of
8 you, the top line, I believe it's dated April, it's a
9 case dated April 27th, 1999?
10     A. We have different lists.
11          MS. LEEDS: We have different lists.
12     Q. Oh, dear.
13     A. We print a new one all the time. This one is
14 not current either. This is June 30.
15     Q. I've got a -- I've got a May 11th, 2003, the
16 one in front of you. I have another one dated February
17 12th.
18          (Off the record).
19     Q. Was the February report of cases the one that
20 you probably sent Arnold Aguilar when he first
21 contacted you about serving as a consultant in this
22 case?
23     A. I would have to guess that that's true. I
24 don't remember. I would have to look at it to see
25 exactly the dates of everything.

Page 18

1    (Exhibit No. 1 marked).
2    Q. Fair enough. Take a look at what's been marked
3  as Exhibit 1.
4    A. Yes, sir.
5    Q. Can you confirm that what I have marked as
6  Exhibit 1 exclusive of the overnight copy -- the
7  overnight mailing label.
8    MR. AGUILAR: Just for clarification
9  purposes --
10    MR. STEELE: Let me go ahead and finish my
11  question.
12    Q. Can you confirm, Dr. Horner, that with the
13  exception of the mailing label on Page 1 of Exhibit 1
14  that is a copy of the expert report that you have
15  provided in the Chavez case?
16    A. Yes, but it also has a couple of other
17  attachments to it as well.
18    Q. Right. And those other attachments include
19  your curriculum vitae, your rates and on the very last
20  page -- and let's take a look at that now if we could.
21  On the very last page, that is a copy that I take it
22  you generated from your office that lists all of the
23  cases that you have consulted on in the last four
24  years, correct?
25    A. Yes, sir.

Page 19

1    Q. Now, let's just --
2    A. As of that date.
3    Q. As of that date, I understand. So you're, I
4  take it, consulting constantly and that list will
5  therefore change daily?
6    A. Well, hopefully not daily, but it does change
7  almost every month.
8    Q. Okay. So the one that's on that last page, at
9  the top of it at the very center, the date there is May
10  15, 2003, correct?
11    A. Yes, sir. It's the same as the date of the
12  report.
13    Q. Exactly. And the -- I just want you to take a
14  look at that list and tell me, please, how many of
15  those cases were you consulting for a plaintiff.
16    A. I believe on this list there's 37 of them that
17  are plaintiff. I'm not entirely certain but I think
18  there's 37 of them.
19    Q. How many total cases are there on there?
20    A. Oh, I don't know.
21    Q. We can count them. Let's not take your time
22  doing it.
23    A. Close to 60, I guess. I don't know.
24    Q. Generally, in your consulting practice, do you
25  tend to --

Page 20

1    A. By the way -- excuse me. I want to clarify
2  something in that last answer.
3    Q. Certainly.
4    A. Those are testimony. Those -- many of those,
5  both are a deposition and a trial in the same case.
6    Q. Okay.
7    A. So some of those are being double counted.
8  These are only testimony. These are not — these are
9  not cases.
10    Q. Testimony given in cases, be it at trial or in
11  deposition?
12    A. Correct.
13    Q. I count one, two, three, four, five, six,
14  seven, eight, nine, 10, 11, 12, 13, 14, 15 — 16 trial
15  testimony. Example -- of those 16 times you testified
16  in trial, how many were for plaintiffs? I guess just
17  put a mark by each plaintiff. You can just put a check
18  mark by the trial ones.
19    A. Okay. I put a little P by them.
20    Q. That's great. So 11, if I counted correctly,
21  of the cases that went to trial were for the plaintiff
22  out of all the ones that went to trial the last four
23  years?
24    A. In which I testified at trial.
25    Q. Right.

Page 21

1    A. Which is not the same as going to trial.
2    Q. Fair enough. So are you saying you gave
3  depositions in some cases that did not go to trial?
4    A. Usually that's what happens.
5    Q. Okay. Well, did you give deposition testimony
6  in some cases that went to trial but you were not
7  called to testify at trial?
8    A. Oh, yes.
9    Q. Were those as plaintiff or as defendant?
10    A. Oh, I don't know. I would have to go back and
11  look at the list again and see what they are.
12    Q. But the ones that you've marked with a P, just
13  so we're clear, on this list over the last four years,
14  are those cases in which you testified at trial on
15  behalf of the plaintiff, correct?
16    A. I believe so. I think I was able to identify
17  all of those.
18    Q. Fair enough. Give me a second so I can mark
19  mine. Dr. Horner, how many of the cases, both
20  deposition and trial testimony, on Page 4 were you
21  testifying about damages arising from a personal injury
22  of some type or wrongful death of some type?
23    A. Ask that question again, please.
24    Q. Sure. What I'm trying to get at -- what I'd
25  like to do is determine over the last four years how

Page 22

1  often you've consulted -- more importantly, how often
2  you have testified either in deposition or at trial and
3  the types of cases in which you have testified at
4  deposition or at trial.  And for our purposes I'm going
5  to divide them in two broad categories.  One we're
6  going to call commercial damages; the other one we're
7  going to call personal injury damages.  Fair enough?
8      A.  Yes.
9      Q.  And by personal injury damages I'm going to
10  lump within that single broad category damages suffered
11  when a worker is injured on the job or when a worker
12  may be killed or an individual may be killed, whether a
13  worker or otherwise, where a person is damaged because
14  they have either been injured or killed.  Fair enough?
15      A.  Okay.
16      Q.  Is that how you understand personal injury
17  damages?
18      A.  I can.  I mean, I can understand how you define
19  it -- we define personal injury in the state of Texas
20  and we have wrongful death cases.  We keep those
21  separate in our mind at least because there's different
22  rules that apply to those.
23      Q.  Okay.  Because, I take it, in wrongful death
24  cases there's no opportunity for that injured person to
25  mitigate his damages?

Page 23

1      A.  Among other differences, that's one of them.
2      Q.  But keeping that in mind, just stick with me
3  for a second on this broad category.  And then
4  commercial, we're going to talk -- are going to be all
5  other damages other than personal injury or wrongful
6  death.  Fair enough?  And tell me --
7      A.  Probably not.
8      Q.  Tell me why not.
9      A.  I probably wouldn't like that.  We have a
10  number of injuries to individuals that are wrongful
11  terminations, discrimination of various kinds that --
12  we generally separate our damages to businesses and
13  damages to the individuals as work -- as laborers or as
14  employees as opposed to what we would call commercial
15  or lost profits litigation.
16      Q.  I see.  In that case let's go with your
17  definition then.
18      A.  Okay.
19      Q.  Let's first talk about personal injury and
20  wrongful death.  On this list of cases in the last four
21  years attached to your report, how many of those
22  involve personal injury or wrongful death?
23      A.  51 of these, at least, instances of testimony
24  are either a personal injury or a wrongful death.
25      Q.  And how many of those on that same page were

Page 24

1  for wrongful termination of employment?
2      A.  I believe that is two.
3      Q.  Which ones?
4      A.  Hickey.
5      Q.  Tell me about how far down that is.
6      A.  It's near the top.
7      Q.  Case name, I see it.  Hickey, okay.
8      A.  And I believe it's Viles.  Oh, I'm sorry.  It
9  would be Doe, near the bottom.
10      Q.  That would be the client?
11      A.  Yes.
12      Q.  John Viles being the attorney?
13      A.  Yes.
14      Q.  Okay.
15      A.  22045.
16      Q.  Okay.
17      A.  I'll give you the date but this particular list
18  is cut off, so I can't read the date on the left-hand
19  side.
20      Q.  All right.
21          MS. LEEDS:  2-7-03.
22      Q.  Was that the date of the deposition?
23      A.  I can't read it so if that's -- is that the
24  date, sir?
25          MS. LEEDS:  It says 2-7-03.

Page 25

1      Q.  Let me put it this way.  Are the dates in the
2  left-hand column, if we could read them, the date you
3  gave your deposition and/or trial testimony?
4      A.  Yes, sir.
5      Q.  Okay.  Was the Hickey case District Court in
6  Nueces County -- never mind.  I just answered my
7  question.  Fair enough.
8          MR. STEELE:  Eileen, do you have the month
9  and day on the Hickey deposition?
10          MS. LEEDS:  Hickey is 9-24-99.
11          MR. STEELE:  Okay, thank you.
12      Q.  It would appear that neither of those went to
13  trial; is that correct?
14      A.  That is correct.
15      Q.  Do you know the outcome of the settlement --
16  I'm assuming those settled.  Do you think that's a safe
17  assumption?
18      A.  I don't know what the outcome of the Doe case
19  is.
20      Q.  What was the outcome of Hickey?
21      A.  It settled.
22      Q.  Were you testifying in Hickey for the plaintiff
23  or the defendant?
24      A.  Defendant.
25      Q.  In Doe were you testifying for the plaintiff or

Page 26

1  the defendant?
2     A.  Plaintiff.
3     Q.  I take it Doe has not yet gone to trial or
4  settled?
5     A.  That's my understanding.  Sometimes I'm not
6  told.
7     Q.  Got it.  Do you know the terms of the
8  settlement in Hickey?
9     A.  No.  I'm seldom told that.
10    Q.  You just know it's over and your services are
11 much appreciated but no longer needed?
12    A.  That's what they said anyway.
13    Q.  Appreciated or not.  Okay.  In the last four
14 years have you provided expert consulting services on
15 behalf of a party involved in an insurance agent's
16 commissions other than the Chavez and Andrus cases?
17    A.  Yes.
18    Q.  What case?  In the last four years now.
19    A.  Have I provided consulting?
20    Q.  Right.
21    A.  But not necessarily testimony?
22    Q.  Right.
23    A.  I think so.  I don't know the name of it, but I
24 was involved with New York Life agents.
25    Q.  And tell me about that.

Page 27

1     A.  They were -- I believe that they were
2  terminated for refusing to sell -- I don't remember the
3  exact circumstances of it anymore.  I just know that
4  they were either terminated or whether there was a
5  constructive termination.  I'm not sure what the exact
6  situation was.  But there was a dispute as to whether
7  New York Life was selling these particular policies,
8  like I say, in good faith.  Certainly the brochures
9  that were being passed around of the policies were
10 misleading, at best.
11    Q.  Who asked you to consult with them about that
12 case?  Was it New York Life or was it the dismissed
13 agents?
14    A.  The dismissed agents.
15    Q.  Were you approached by their counsel or by the
16 agents individually?
17    A.  By their counsel.
18    Q.  Okay.  What year was that?
19    A.  I really don't know.  It's been several years
20 ago.  It may not have been the last four years but it
21 may have been.  I just don't know.  I think it was but
22 I can't be certain.  Time seems to fly.
23    Q.  Based on what you told me am I correct in
24 understanding that the upshot of that consultation was
25 that you were not hired to provide testimony of any

Page 28

1  kind either at deposition or in trial with regard to
2  that New York Life case?
3     A.  No.
4     Q.  What's the upshot then?
5     A.  It settled before any of that happened.
6     Q.  In the last four years then any other cases
7  where you have been -- and what was the purpose of your
8  consultation?  Was it to do a damage model or to
9  calculate damages?
10    A.  I would describe it that way.  It's not quite
11 the same as that but pretty close.
12    Q.  How would you describe it?
13    A.  I performed some calculations showing the
14 implications of the business plan for those agents that
15 was provided to them by New York Life.
16    Q.  Okay.
17    A.  They actually provided the model.  I just
18 evaluated it.
19    Q.  "They" meaning the agents provided you the
20 model that they had received from New York Life?
21    A.  No, it was a New York Life management model
22 that they provided to their agents as part of their
23 training process, and I evaluated that particular
24 model.
25    Q.  In the last four years have you given testimony

Page 29

1  either at trial or in deposition regarding damages that
2  may have been suffered by an insurance salesman?
3     A.  Yes.
4     Q.  In what case?
5     A.  Rusteberg.
6     Q.  Towards the middle?
7     A.  Yes, sir, about 40 percent of the way from the
8  top, or 35 percent away from the top.
9     Q.  Tell me about that case.  Against Arnie
10 Olivarez and David Hall.  William Rusteberg was suing
11 Arnie Olivarez and David Hall?
12    A.  Yes, sir.
13    Q.  Tell me about that case.
14    A.  What would you like -- tell me.
15    Q.  Tell me what you did in that case.  First of
16 all, tell me the issues as you understood them.  Go
17 ahead and tell me that.
18    A.  The issues were that it was alleged that Arnie
19 Olivarez had interfered with a contract that Rusteberg
20 believed he had with whichever insurance carrier it was
21 -- and I can't remember the name of it right now.
22 Rusteberg had gotten a -- for lack of a better word,
23 I'll call it a franchise from this particular large
24 insurance company, whatever the biggest insurance
25 company in the state is.  I don't remember which one

Page 30

1 that is now but by far the largest.
2      (Off record).
3    A. Yes, this was a large company. But that was an
4 issue in the case, also. I remember relying on those
5 statistics with that insurance company. But the -- it
6 was alleged that Arnie Olivarez had been -- had done
7 several things to interfere with Mr. Rusteberg's
8 relationship with this insurance company. Mr.
9 Rusteberg had the contract in another area and on the
10 face of the contract in the other area in partnership
11 with another -- Mr. Rusteberg had been banned -- had
12 been barred from this insurance company as a result of
13 some action taken by the insurance commissioner for
14 selling a lot of policies in companies that went -- it
15 was a group plan for school districts. They were very
16 inexpensive and very popular and the company went out
17 of business. It was an unregistered company. What he
18 was doing is in violation of insurance rules. He
19 wasn't telling people and he was barred -- I think he
20 was suspended by the State regulatory authority and he
21 was essentially fired by this large insurance company.
22      He later on through a buddy of his gets
23 another franchise, another opportunity to sell policies
24 for this company, and he attempts to move into several
25 school districts in which Mr. Olivarez had very strong

Page 31

1 relationships, you can say, and he alleged that Mr.
2 Olivarez went to school board members and told them
3 about the problems that Rusteberg had had and
4 apparently he did, I think William' testimony was that
5 that actually occurred. It's a question of how
6 improper it was or it was not improper. But Mr.
7 Rusteberg lost some business, he claims, and he sued
8 Mr. Olivarez for that and Mr. David Hall. Both of them
9 were -- those were -- they are not associated but they
10 were both supposedly doing damage to Mr. Rusteberg.
11    Q. Okay. Who did you represent or who did you
12 consult with, Mr. Rusteberg, Mr. Olivarez or Mr. Hall?
13    A. Mr. Olivarez was -- his attorney was Rick
14 Oldenettel out of Houston and Mr. Oldenettel was my
15 client.
16    Q. And what was your analysis of? What were you
17 trying to analyze?
18    A. I was analyzing the damage argument that Mr.
19 Rusteberg's expert was projecting for Mr. Rusteberg.
20    Q. And tell me what you remember about your
21 analysis of his projections and his damages, your
22 analysis of it.
23    A. It was wrong.
24    Q. In greater detail, if you could.
25    A. I probably can't do much more detail than that,

Page 32

1 but it was fairly -- I just remember from the analysis
2 that Mr. Rusteberg's -- the model produced by Mr.
3 Rusteberg was not borne out by the underlying facts. I
4 believe that they projected some huge growth rates
5 which we had never seen in the past from Mr.
6 Rusteberg's business. In fact, I think Mr. Rusteberg's
7 information may have been going down at the time they
8 were -- before this action they were projecting huge
9 growth rates at that time in my recollection. But it's
10 been -- well, probably three years so I don't remember.
11 That's one of the cases where I testified in deposition,
12 and I sat around the courthouse for a very long time
13 but did not testify.
14    Q. Did it settle during trial?
15    A. It did not settle. It went to a verdict.
16    Q. But you were never called to testify as an
17 expert witness at the trial?
18    A. That may have been a mistake. Excuse me.
19    Q. The answer is that you were not called to
20 testify?
21    A. That is correct.
22    Q. Were you told why you were not called to
23 testify?
24    A. They thought they were winning.
25    Q. And what was the outcome?

Page 33

1    A. It was a significant judgment in favor of Mr.
2 Rusteberg.
3    Q. Do you know if that judgment has been appealed?
4    A. They told me that they would, but I -- but you
5 know how these things go. Sometimes they appeal and
6 then they settle before they're appealed.
7      Could we take a short break for a minute?
8 I'd like to refresh my coffee.
9    Q. Absolutely.
10      (Recess).
11    Q. Dr. Horner, before we left you had been talking
12 about some of the cases you had handled on the
13 attachment to your report, and you identified Rusteberg
14 as being one concerning insurance agents sales,
15 correct?
16    A. Yes, sir.
17    Q. Any other cases on that same sheet that
18 involved insurance agents sales?
19    A. I'm pretty sure there are no others on here.
20    Q. Would the -- what was the type -- what were the
21 kinds of policies being sold that were the subject of
22 the Rusteberg case?
23    A. Group health.
24    Q. Group health?
25    A. Yes, sir.

**Page 34**

1  Q. So they were not the same type of policies at
2  issue here; mainly supplemental insurance?
3  A. That's correct.
4  Q. Have you ever provided consulting services as
5  an expert involving -- in a case involving the sale of
6  supplemental insurance products?
7  A. Not other than this one.
8  Q. You have provided through your counsel
9  documents from your office, I believe, and I'm going to
10 go over some of those briefly. I'm not going to make
11 this an exhibit just because I want to save on volume,
12 but I believe that is an invoice that you sent Mr.
13 Aguilar, correct?
14 A. Yes.
15 Q. That first entry of February 12th, 2003 saying,
16 extended tele conference with Mr. Aguilar, do you
17 believe that was the first time you talked to Mr.
18 Aguilar about the possibility of your serving as a
19 consultant in this case?
20 A. Yes.
21 Q. No prior contact before that time about this
22 case with Mr. Aguilar, correct?
23 A. There shouldn't be.
24 Q. You can't say for sure but you don't believe
25 there was?

**Page 35**

1  A. That's right.
2  Q. Had you ever provided any consulting services
3  on behalf of Mr. Aguilar's clients in any other cases?
4  A. No.
5  Q. So this is the first time you had been hired by
6  Mr. Aguilar, correct?
7  A. Correct.
8  Q. Did he tell you how he got your name?
9  A. I don't know. I don't remember.
10 Q. Fair enough. Did you have an engagement
11 letter? Is there an engagement letter with Mr.
12 Aguilar?
13 A. No.
14 Q. Do you typically not have engagement letters?
15 A. Typically do not.
16 Q. I'm going to hand you another invoice dated
17 April 30th, 2003. At the right, not exactly the top
18 but near the top, 23023-02?
19 A. Yes, sir.
20 Q. Is that the invoice you have in front of you?
21 A. Yes, sir.
22 Q. On April 9th, 2003 there's an entry there that
23 says set up preliminary calculations. And I take it
24 you billed your time for having done that, correct?
25 A. Yes.

**Page 36**

1  Q. What preliminary calculations did you set up?
2  A. Those would have been -- probably would have
3  been duplication of the calculations that Mr. Chavez
4  had provided. I probably set those up and checked
5  those, but I couldn't tell you for certain.
6  Q. And what calculations had Mr. Chavez provided?
7  A. He had provided -- it was a very large
8  triangular-looking matrix of calculations and
9  projections of future first year premiums, commissions
10 and renewals.
11 Q. Before I mark this, did it look something like
12 that?
13 A. Yes, sir.
14 Q. Was it, in fact, those same figures? Go ahead
15 and look at that because I don't want this to be a
16 trick question.
17 A. Well, probably. It probably -- well, these
18 figures that are on here?
19 Q. Yes.
20 A. Oh, I don't know. No.
21 Q. But he had provided you something that looked
22 like that?
23 A. Yes.
24 Q. Do you still have a copy of those, what Mr.
25 Chavez provided you?

**Page 37**

1  A. Probably. But he may have sent it to me in
2  spreadsheet form. I don't know. Or he may have sent
3  it -- I don't know. I would have to look through the
4  file and see.
5  MR. AGUILAR: Buddy, do you know what he's
6  talking about?
7  MR. STEELE: I have seen another --
8  MR. AGUILAR: Right.
9  MR. STEELE: -- format.
10 MR. AGUILAR: Because there's only -- it's
11 that other one. I think there's only one other. It's
12 similar.
13 MS. NEALLY: Let him go get it for us.
14 MS. LEEDS: Is that in this packet?
15 MR. AGUILAR: It's also the Excel
16 spreadsheet that I sent you on disk.
17 MS. LEEDS: I didn't get the disk.
18 MR. AGUILAR: It was a long time ago. I
19 sent disks to everybody. Do you remember getting it?
20 A. It probably was e-mailed to me. I don't
21 remember for sure. It was either e-mailed to me or it
22 could have been sent on disk, but probably was e-mailed
23 to me. Probably an Excel file.
24 Q. But you --
25 A. I performed some additional calculations to --

Page 38

1  I actually recalculated the results using a different
2  technique, but I don't see them here. They may have
3  been something I didn't print out but I should have
4  printed them out. I'm pretty sure that the spreadsheet
5  he sent me would have been electronic.
6      Q. If you still have that on your computer back at
7  your office would you agree to print that out and send
8  it to the counsel for Mr. Chavez so he could forward
9  that to us?
10      MR. AGUILAR: Yes. I think I've already
11  given it to you. If you recall, this —
12      MR. STEELE: Let me just nip it. I have
13  no idea if you have or haven't, Arnold. I'm not saying
14  you didn't. I think it would be simpler if Dr. Horner
15  can get to it with not too much trouble.
16      MS. LEEDS: Is it in here?
17      MR. STEELE: It's not.
18      MS. LEEDS: Okay.
19      MR. STEELE: It's not in the documents
20  that Dr. Horner copied.
21      A. Okay. I am sure I have that so I can
22  definitely send that to you.
23      Q. Okay, thank you.
24      A. I will provide that to Mr. Aguilar and he will
25  — that way he will have a copy, also.

Page 39

1      Q. Right. And I'm going to show you something
2  that I think is related. I just want to try to tie
3  this up without getting too tedious and time consuming.
4  Bear with me. Now, this was a document that we
5  received from Mr. Aguilar that was represented to have
6  been from your files.
7      A. Oh, I believe that's it.
8      Q. But it's in a different format, correct?
9      A. Yes, sir. This is what I was going to print
10  out and send to you.
11      Q. Okay. Why don't we go ahead and mark that
12  Horner 2?
13      A. I believe that that is — yes, that's what I
14  was going to send you.
15      MS. LEEDS: Buddy, what group was that in?
16      MR. STEELE: The first group.
17      MS. LEEDS: The business plan?
18      MR. STEELE: It's going to be about
19  two-thirds of the way through, I believe.
20      (Exhibit No. 2 marked).
21      Q. Dr. Horner, I'm going to hand you what's been
22  marked as Horner Exhibit 2. Am I correct in stating
23  that you believe the figures shown on Exhibit 2 were
24  calculations that were provided to you by Dino Chavez?
25      A. No.

Page 40

1      Q. Tell me what Horner Exhibit 2 is, please.
2      A. These are the preliminary calculations that I
3  did to check the — what I'm describing as this
4  rectangular matrix that he sent to me. This is a
5  different method of calculation that was a lot faster
6  and easier to set up to perform the same calculation
7  that Mr. Chavez did.
8      Q. But the assumptions underlying the figures on
9  Exhibit 2 were assumptions that were provided to you by
10  Mr. Chavez, correct?
11      A. That's correct. That's what they were intended
12  to be.
13      Q. And what was your purpose in checking those
14  calculations?
15      MR. AGUILAR: Objection; vague.
16      Q. Why did you check the calculations that Dino
17  gave you?
18      MR. AGUILAR: Objection; vague.
19      A. I wanted to see if Mr. Chavez had performed his
20  calculations in the way that I thought they should be
21  — that they would be calculated in a way I thought it
22  would be appropriate to calculate them given what his
23  goal was in performing those calculations. In other
24  words, I'm not saying that I was attempting to endorse
25  the — well, let me start over. I'm not saying that

Page 41

1  very well. My purpose was basically to check his
2  calculations and to see whether, in fact, they were
3  calculated in the same way I would have done them if I
4  were attempting to use the same assumptions he was
5  using, put it that way.
6      Q. And what was your conclusion?
7      A. Yes, that his large matrix produced the same
8  results that this version produced.
9      Q. So the assumptions in his methodology — let's
10  scratch assumptions for a second. But you then agreed
11  with his methodology?
12      A. Basically agreed with his calculation
13  methodology, yes, sir.
14      Q. Did you also agree with Mr. Chavez'
15  assumptions?
16      A. Not entirely.
17      Q. Okay. Which ones did you not agree with?
18      A. Well, right off the — at the beginning he used
19  a ten percent discount rate. I believe that was the
20  rate he used when he did this calculation.
21      Q. You used something in excess of 21 percent,
22  correct?
23      A. Right, 21.5.
24      Q. I suppose if one took the time — I don't want
25  to do it today — we could look at the assumptions on

1  the Exhibit 2 and compare them to the assumptions in
2  your report to see where you varied your assumptions,
3  correct?
4      A. Yes, sir.
5      Q. But the methodology, nonetheless, is basically
6  the same in your report as it is in Exhibit 2, correct?
7      A. Well, what -- and I don't remember precisely
8  now, but there was a reason -- I can't remember what it
9  was. But there was a reason that this particular
10 calculation technique, although it was much simpler and
11 easier to set up than the one that Mr. Chavez did, it
12 would not work for the computations that I believe were
13 necessary to add to this based on talking to him -- I
14 can't remember what those computations were. But I
15 remember that his method would make it easier to vary
16 the growth rates at least. This method has -- this
17 method really assumes that the growth rates and
18 commission rates and all those other things stay the
19 same for every single year. If you change those, this
20 method starts to not be simpler, it starts to get
21 harder. And so really his method is actually better if
22 those growth rates are going to change. And so at
23 first I was hoping that I could use a simpler method
24 but it rapidly became obvious that I couldn't. But I
25 had -- but it was useful to have already verified that

1  his calculations were being done correctly.
2      Q. Okay. On your April 30th statement, after you
3  set up preliminary calculations, on April 21st you had
4  a telephone conference with Mr. Aguilar. Do you know
5  what that was about?
6      A. No. There are probably notes but I don't
7  remember what they were about. There may be notes, I
8  should say. I suspect he was telling me about the
9  report being due fairly soon because I believe the
10 report was due very soon after this.
11     Q. In your next telephone -- in your next billing
12 statement, May 16th, you have a telephone conference on
13 May 1st with Mr. Aguilar. Do you remember what that
14 was about?
15     A. No, I would not remember those telephone
16 conferences.
17     Q. Okay. Then going down the, say, May 16th
18 invoice, Dr. Horner, on May 13th you have a statement
19 in there that you reviewed the AFLAC monthly accounting
20 statements, correct?
21     A. On the 13th, yes.
22     Q. Okay. And then on May 14th you analyzed bonus
23 and quota descriptions, correct?
24     A. Yes.
25     Q. And then on that same day, the 14th, you review

1  spreadsheet. Do you know what spreadsheet you were
2  reviewing?
3      A. No. I suspect that it's the one that Mr.
4  Chavez sent to me, but I'm not certain of that. I
5  really don't -- I'm not certain.
6      Q. Okay.
7      A. I don't know. I shouldn't guess, so I don't
8  know.
9      Q. Well, I'll represent to you that you have a
10 report dated the 15th. That's Horner Exhibit 1. Do
11 you think it could have been a spreadsheet that you
12 utilized in connection with that report?
13     A. I'm sure it was.
14        (Exhibit No. 3 marked).
15     Q. Okay. I'm going to hand you what's been marked
16 as Horner Exhibit 3 and ask you to take a look at that.
17     A. Yes, sir.
18     Q. And that is -- on the first page of Horner
19 Exhibit 3, it's dated May 15th, correct?
20     A. Yes.
21     Q. Look at the second page. Is that a
22 confirmation that it was, in fact, faxed at 2:09 p.m.
23 on May 15th? Do you see it there in the middle?
24     A. Yes.
25     Q. So is it correct to assume that you faxed

1  Exhibit 3 to Mr. Aguilar on the 15th of May, the same
2  date as your report?
3      A. Yes.
4      Q. And do you believe you faxed this in response
5  to a request from Mr. Aguilar to provide, I guess, the
6  backup documents for your report? I'm just trying to
7  figure out why that would have been faxed to Mr.
8  Aguilar on the 15th.
9      A. Either he asked for it or I thought he ought to
10 have it. I couldn't tell you, you know.
11     Q. And I guess really the important part is,
12 Exhibit 3 kind of goes hand in glove with Exhibit 1,
13 your report, correct?
14     A. Yes.
15     Q. Okay. That's really what I'm getting at. So
16 this -- and if you look at Pages -- I'm not sure which
17 page they start on, but it has that same type of
18 spreadsheet that had been earlier e-mailed to you by
19 Mr. Chavez, correct?
20     A. Yes.
21     Q. Okay. But, I take it, if you look at Exhibit 3
22 you see certain assumptions that you made and it uses a
23 different discount rate and eventually comes up with a
24 different conclusion as to projected income than what
25 Mr. Chavez had calculated, correct?

Page 46

1    A. Yes.
2    Q. Did you prepare the spreadsheet on Exhibit 3 or
3  in Exhibit 3 with your software or it was software that
4  Mr. Chavez sent you, or is it common software that
5  anyone can utilize?
6    A. It's common software.
7    Q. Is that something you have on your computer
8  back in Corpus Christi?
9    A. Yes.
10   Q. Okay. Just so I understand, one can look at
11  the spreadsheet in Exhibit 3 and see each year,
12  projecting out for roughly 25 years, what you believe
13  Mr. Chavez' income would have been following these
14  assumptions and then assuming that they were actually
15  realized, correct?
16   A. If those assumptions are realized then that's
17  what this was intended to do.
18   Q. And, in fact, you've utilized the information
19  from his spreadsheet in Exhibit 3 as part of your
20  opinion in this case, correct?
21   A. Yes, sir.
22   Q. Okay. That's a very long, roundabout way of
23  proving up something very simple, but that's all I
24  wanted to do at this time. Let me ask you, what --
25  well, that's too general. I guess we're going to have

Page 47

1  to get down to specifics. You also -- we were provided
2  a copy of something -- let me just hand it to you. The
3  front page says Stocks, Bonds, Bills, et cetera. Is
4  that something that came from your files or your
5  resource materials?
6    A. Yes.
7        MR. AGUILAR: Buddy, did you want to mark
8  that?
9        MR. STEELE: Yeah.
10       MR. AGUILAR: Okay. So let's just
11  identify it for the record.
12       MR. STEELE: Yeah. I'm talking about just
13  the --
14       MR. AGUILAR: Could you read just that top
15  section?
16       THE WITNESS: Stocks, Bonds, Bills and
17  Inflation Valuation, Edition 2000 yearbook.
18   Q. Let me show you what I am going to mark as
19  Horner Exhibit 4 and ask you if this is a copy of your
20  notes of an interview that you had with Dino Chavez?
21   A. Yes.
22       (Exhibit No. 4 marked).
23   Q. Did that interview take place here in
24  Brownsville?
25   A. Yes.

Page 48

1    Q. And I see on the first page, about a third of
2  the way from the top, it says independent agent. Is
3  that what Dino told you he was?
4    A. Apparently, yes.
5    Q. So it's your understanding that he's not an
6  employee of AFLAC, correct?
7    A. I would say legally speaking he was not an
8  employee of AFLAC.
9    Q. Okay. Turn to the third page of Exhibit 4,
10  please.
11   A. Oh, let me back up. Certainly that's what he
12  is described as now. I'm not sure whether we're
13  describing what he was or is.
14   Q. You were talking about, were you not, his
15  history here with AFLAC? At least it's evident to me
16  that's what you were doing when you were talking to
17  Dino, correct?
18   A. That's what it appears to be, that's right. It
19  looks like this was at the time before this -- all the
20  incidents took place.
21   Q. Right.
22   A. That's what it looks like.
23   Q. And then on Page 3 you see down the bottom
24  half, it says BISD only. Were you talking about -- was
25  Dino telling you about the commissions or premiums that

Page 49

1  were generated from the sales of policies to the BISD
2  employees? Let me correct that. Was he telling you
3  about the annual premiums generated from policies sold
4  -- AFLAC policies sold to BISD employees?
5    A. Yes. It's from his memory.
6    Q. And this is what Dino told you, I take it?
7    A. Yes, sir.
8    Q. So at that time there were no records that he
9  had available to show you?
10   A. He didn't show them to me at this moment;
11  otherwise, I would have written those down.
12   Q. Okay. And then on Page 4, at the bottom, do
13  you see a note that says AFLAC expected (minimum
14  required) 15 percent growth a year. And if less than
15  15 percent, job at risk. Is that something Mr. Chavez
16  told you, too?
17   A. Yes.
18   Q. Did you try to verify that in any form or
19  fashion?
20   A. Yes.
21   Q. What did you do?
22   A. I asked Mr. Aguilar if he were going to take
23  any depositions of AFLAC personnel to find out what the
24  policies were regarding growth of their agents.
25   Q. And what did Mr. Aguilar tell you?

Page 50

1    A. He told me he was going to take Mr. LaFemina's
2  deposition and probably take Mr. Lynn Barnson's
3  deposition.
4    Q. And did Mr. LaFemina testify in that deposition
5  in some form or fashion that you considered verified
6  Mr. Chavez' statement?
7    A. I would say it certainly verified it at least,
8  if not, certainly -- the numbers he gave exceeded this
9  number.
10    Q. Other than Mr. LaFemina's testimony did you
11  personally do anything else to verify Mr. Chavez'
12  statement about 15 percent growth?
13    A. I don't believe so.
14    Q. And with regard to the other facts utilized in
15  your report did you rely upon Mr. Chavez to provide you
16  with those facts?
17    A. Say that again, please.
18    Q. One of the facts that you rely upon in your
19  report -- it's certainly in your report, is that --
20  because I have seen this repeated basically that AFLAC
21  expected 15 percent growth a year, okay?
22    A. Right.
23    Q. There's a number of other facts -- we're
24  complete with a number of other facts. I want to know
25  the source of those facts. Were those facts provided

Page 51

1  to you by Mr. Chavez?
2    A. Well, certainly many of them were. There may
3  have been some that came from documents that I was
4  provided either from Mr. Chavez or that came through
5  Mr. Aguilar, but some of them were things that he told
6  me.
7    Q. Okay. In those documents, I take it --
8  whatever documents you relied upon you have copied and
9  provided to Mr. Aguilar and he has provided, to your
10  understanding, all of those to us, correct?
11    A. That would be -- that's my assumption.
12    Q. So if you relied on anything in documentary
13  form we should have a copy of that, correct?
14    A. Yes, sir, I believe that's right.
15    Q. Okay. So other than the -- so the documents
16  that you relied upon and what Mr. Chavez told you are
17  the sources of the facts in your report, correct?
18    A. Other than the things that I provided
19  independently such as are in this package on which the
20  top document is labeled Stocks, Bonds, Bills and
21  Inflation.
22    Q. Okay. And I will tell you, I'll just -- I will
23  represent to you that is included in the documents that
24  Mr. Aguilar provided us.
25    MR. STEELE: I wonder if the easiest way

Page 52

1  is just to attach all the documents copied as an
2  exhibit.
3    MS. NEALLY: Yes.
4    MR. STEELE: I think that's what we're
5  rapidly coming to.
6    THE WITNESS: I would like to --
7    MS. NEALLY: Let's have it clear for the
8  record.
9    THE WITNESS: I would like to have the
10  originals back.
11    MR. STEELE: Give me one second. Because
12  we pulled these apart, I'm going to need to put them
13  together somewhat. Guys, you're going to have to trust
14  me I'm doing this right. Let's mark this No. 5.
15    (Off the record).
16    (Exhibit Nos. 5 - 6 marked).
17    Q. Dr. Horner, I'm going to hand you first what's
18  been marked Exhibit 5 and ask if you can confirm that
19  those are copies of documents from your files in the
20  Chavez case.
21    MR. AGUILAR: That first page on Exhibit 5
22  is what you provided to me.
23    MR. STEELE: No, it isn't.
24    MR. AGUILAR: That's right. I'm sorry. I
25  had it backwards. That's where you requested that

Page 53

1  information from me.
2    MR. STEELE: Right.
3    A. I'm not -- I suppose I may have this first page
4  in my file somewhere, but off the top of my head I
5  don't recognize this first page.
6    Q. Well, I will tell you your counsel represented
7  that it came from your office. There's a similar page
8  that's related solely to documents that you reviewed
9  received in the Chavez case that appears later on in
10  there or in Exhibit 6. I'll just represent that to you
11  because you kept a record of documents that you
12  reviewed.
13    A. The latter statement is certainly true. Like I
14  say, I may have this in my file. This document was --
15  may or may not have been provided by --
16    Q. Your counsel may want to clarify the first page
17  of Exhibit 5.
18    MR. AGUILAR: When Buddy requested the
19  specification we called your office. This is while you
20  were out of town waiting to testify in another case and
21  I think your secretary put that together for us.
22    Q. That's the first page of Exhibit 5, correct?
23  Take a look --
24    A. That's possible.
25    Q. Take a look at all the other pages then, see if

Page 54

1 those look like documents that you believe came from
2 your files.
3    A. I believe that all these documents came from my
4 file. Yes, they did, in fact, come from my file.
5    Q. And you're referring --
6    A. The originals of these.
7    Q. You're referring to Horner Exhibit 5, correct?
8    A. Yes, sir.
9    Q. I'm going to hand you what's been marked as
10 Horner Exhibit 6. And with the exception of the cover
11 page, which is a letter from Mr. Aguilar to counsel,
12 would you confirm that the documents in Exhibit 6 also
13 came from your files?
14    (Off the record.)
15    Q. Dr. Horner, are the documents in Exhibit 6,
16 with the exception of the cover letter from Mr.
17 Aguilar, copies of the other documents in your file
18 that you were provided or reviewed or relied upon in
19 coming up with your opinion in the Chavez case?
20    A. Exhibit 6 contains, other than the cover page,
21 copies of documents that are in my file on which I
22 relied in preparing my preliminary report and opinions
23 in this case.
24    Q. Do you have any other documents in your file on
25 the Chavez case that are not included in Exhibits 1

Page 55

1 through 6?
2    A. Yes.
3    Q. Do you have those with you today?
4    A. Yes.
5    Q. Could you show us those, please? Could you
6 pull them out?
7    MS. NEALLY: And I'm confused. We asked
8 for all the files.
9    MR. AGUILAR: You got all the documents.
10    MR. STEELE: Okay, yeah. I think I can
11 clarify it now.
12    Q. You're a very precise man and I appreciate
13 that. Does your file also include the deposition of
14 Dino Chavez?
15    A. Yes.
16    Q. Does your file also include Chavez' answers to
17 the first set of interrogatories of BISD? Go ahead and
18 look. Are those the answers to interrogatories from
19 Noe Sauceda?
20    A. Say that again.
21    Q. What are you looking at?
22    A. I'm looking at a list of records that I was
23 provided that was prepared.
24    MS. NEALLY: Can I see that document?
25    Q. I'll tell you what. Can you just hand us the

Page 56

1 file you have in your lap?
2    A. (Witness complies).
3    Q. Thank you. Look at the first page of Horner
4 Exhibit 5. Does the first page of Exhibit 5 list the
5 documents that you have in your file for Dino Chavez?
6    A. It lists the documents that were provided to me
7 by Mr. Aguilar's office in the case of Dino Chavez.
8    MS. NEALLY: Okay. Just refresh my
9 memory. Is that a document that we already have, this?
10    MR. STEELE: Yes.
11    MS. LEEDS: Yes.
12    Q. Now, do you have any documents in your files
13 for the Chavez case that are not listed in that first
14 page of Exhibit 5?
15    A. Yes.
16    Q. And what would those be?
17    A. Well, there's lots of documents that are not
18 here.
19    MR. AGUILAR: Remember, the first page of
20 Exhibit 5 is what we were not providing because you
21 should already have them, like the depo transcripts.
22    MR. STEELE: Those are listed there.
23    MR. AGUILAR: Right. That's what I'm
24 saying. That's all that's listed in here. Everything
25 else was not listed in here. Do you understand what

Page 57

1 I'm saying? In other words, you asked me to provide
2 you with copies of everything from his file. I assume
3 you don't want copies of the depo transcripts.
4    Q. Let me ask you this. Once again, looking at
5 the bottom half of the first page of Exhibit 5.
6    A. Yes, sir.
7    Q. Am I correct in understanding that this is not
8 a complete listing of all the documents in your file
9 regarding Dino Chavez?
10    A. That is correct. That is a correct statement.
11 This is not a complete listing of everything that is in
12 my file.
13    Q. Now, let me ask a follow-up. We have made as
14 exhibits to your deposition Exhibits 1 through 6,
15 correct?
16    A. Yes.
17    Q. Would Exhibits 1 through 6 include all of the
18 documents -- excuse me. Would Exhibits -- would the
19 documents listed on the first page of Exhibit 5 plus
20 copies of all the documents comprising Exhibits 1
21 through 6 to your deposition constitute all of the
22 documents in your file that you have for the Chavez
23 case?
24    A. No.
25    Q. What else do we have -- do you have that we

1  have not identified? I see notes of the LaFemina
2  deposition, for one?
3      A. That's one.
4      Q. And we haven't seen that?
5      A. That's correct.
6      Q. Why don't you pull out everything in your file
7  that you have with you on your lap that we have not
8  made copies of?
9      A. I will do my best. This is obviously somewhat
10 of a difficult process because of the way we're going
11 about this.
12     Q. If you want, we can just copy your entire file
13 again but I'm not crazy about that. Just take a
14 second. Could you hand me the rest of your files?
15 I've looked at these recently and we might be able to
16 save some time, Dr. Horner. While you're going through
17 that --
18     A. You're asking for this?
19     Q. Yes, exactly. Is this all Chavez that you just
20 handed me?
21     A. That plus what's on the table is my complete
22 file.
23         MR. AGUILAR: On Chavez?
24         THE WITNESS: On Mr. Chavez, right.
25         (Off the record.)

1      Q. Dr. Horner, I have gone through this spandex
2  folder that you handed me and it's got tabs on it,
3  discovery docs, AFLAC accounting statements 2001/2002
4  and data docs, correct?
5      A. Yes.
6      Q. And I'll represent to you that we either have
7  copies of everything in here or they appear on that
8  list of documents on the first page of Exhibit 5. So
9  I'm not even going to ask you a question about those.
10 I'm going to hand that back to you.
11     A. Thank you.
12     Q. There's also a tab I pulled out of there called
13 expert file. Do you see that?
14     A. Yes, sir.
15     Q. And in that expert file is a copy of Dr.
16 House's report which is a response to your report,
17 correct?
18     A. Yes, sir.
19     Q. And that was sent to you by Mr. Aguilar on or
20 about sometime in late June, correct?
21     A. Yes.
22     Q. And I'm going to hand you -- I'm going to have
23 to hand you the original because it's got highlighter
24 on it but you can have it back after we make a copy.
25     A. Thank you.

1      Q. And it's going to have an exhibit stamp on it.
2      A. That's okay.
3         (Exhibit No. 7 marked).
4      Q. I'm going to hand you what's marked as Horner
5  Exhibit 7. And is this a copy of the House report that
6  you designated as your work copy?
7      A. That's correct.
8      Q. And you designated your work copy because you
9  read it and wanted to mark on it, correct?
10     A. That's correct.
11     Q. And are the marginated pencil lines here on
12 Exhibit 7 your handwriting?
13     A. Yes. That's all I need for that.
14        (Exhibit No. 8 marked).
15     Q. Then I'm going to hand you what's been marked
16 as Horner Exhibit 8 and ask if that is a document that
17 -- well, I will tell you it appears in your file under
18 the data and it has a title at the top. Could you read
19 that title?
20     A. Summary Page Legend.
21     Q. For? Do you know what it's a summary page
22 legend for?
23     A. Yes.
24     Q. And what is it?
25     A. Those are the AFLAC accounting statements, I

1  believe.
2      Q. And I believe if you look in Horner 6, just so
3  we know what we are talking about, about halfway
4  through -- and these pages are not numbered. About
5  half of Horner Exhibit 6, the last half, are a
6  collection of accounting statements for two years for
7  Dino Chavez, correct?
8      A. That's correct.
9      Q. And is that --
10     A. Wait. I'm sorry. Say the last part again.
11     Q. It's --
12     A. I apologize.
13     Q. That's okay. It's a collection of accounting
14 statements regarding Dino Chavez that were produced --
15 let's say appear to be printed out from some AFLAC
16 source, correct?
17     A. Correct.
18     Q. And is Exhibit 8 the summary page legend that
19 helps a person understand these accounting statements?
20     A. That's correct.
21     Q. Thank you. Now, let's talk about your report
22 which is Horner Exhibit 1.
23        MS. LEEDS: Are you going to put in
24 evidence those files that we did not get copies of?
25        MR. STEELE: Oh, that's right. Where are

Page 62

1  those LaFemina notes?

2  Q. And let me ask you, did you find some other

3   documents, Dr. Horner, that you believe may not have

4  been copied and made an exhibit today?

5  A. Yes.

6  Q. Would you hand those to me, please?

7  A. There's also two more that I'm not certain

8  about. I thought you had asked me about a couple of

9  the invoices, but I didn't find them in 5 and 6. I

10  thought you asked me about them separately so they may

11  be in there and I just didn't find them. They're

12  definitely not in order. If they're in these documents

13  I'm not sure where they are. And those are invoices

14  two and three --

15  Q. Let's go ahead --

16  A. -- of seven.

17  Q. -- take what you have in your left hand and put

18  it in your right hand and we'll put them all together

19  and they may be duplicates.

20  A. All the invoices?

21  Q. Well, the ones that you think may not have been

22  copied and talked about and you just didn't see them.

23  Do you see what I'm saying?

24  A. Yes.

25      MR. AGUILAR: I can run a set, if you

Page 63

1  want.

2      MR. STEELE: Let's go ahead and mark --

Page 64

1  today.

2      MR. STEELE: That's fine.

3   Q. Now, just to make sure we understand

4  A. Yes, sir.

5  Q. -- we have identified Exhibits 7 and 8 as being

6  documents from your file that we had not previously

7  seen before your deposition?

8  A. I do not believe that's correct. No. 8 should

9  have been in there.

10  Q. I don't believe it was, but -- I'm not fussing

11  at you.

12  A. Okay.

13  Q. I just want to make sure we have everything.

14  A. Okay.

15  Q. That's the purpose --

16      MS. NEALLY: I'm going to start fussing.

17  So please give us all the documents, okay?

18  Q. Now, in addition to 7 and 8, I'm going to mark

19  Horner 9.

20      (Exhibit No. 9 marked).

21  A. Okay.

22  Q. Did these documents also come from your file?

23  A. Yes, they did.

24  Q. Now, can we then state on the record that

25  Exhibits 1 through 9 constitute the entirety of all the

Page 65

1  documents in your files regarding the Chavez case?

2  A. Except --

Page 66

1    A.  That's primarily it.  He did a few other things
2  is my understanding.  He did some selling directly
3  himself.  He did -- but that's not as a regional sales
4  coordinator.  Either as a regional sales coordinator or
5  as an agent -- I'm not sure in what role he was doing
6  this -- but his role was a little bit different.  My
7  understanding is that he provided some administrative
8  work that regional sales coordinators do not normally
9  do.
10   Q.  Okay.
11   A.  RSCs do not normally do that kind of
12 administrative work but he was doing some.  Whether
13 that was part of his role as being an RSC or not is
14 another story.  I don't know.  I couldn't tell you
15 that.  I think it was not ordinary so it probably
16 wasn't part of his role as an RSC.
17   Q.  And what do you understand happened to Mr.
18 Chavez that caused him to bring this lawsuit?
19   A.  My understanding is that Mr. Chavez was fired
20 as an RSC.  Mr. Chavez and his team of DSCs and agents,
21 associates were barred from selling products on campus
22 at BISD.
23   Q.  Okay.
24   A.  Those would be the primary things that caused
25 this.  That may be all of it but those are certainly

Page 67

1  the primary things.
2    Q.  And am I correct in stating you attempted to
3  analyze the data and determine the damages you believe
4  Mr. Chavez suffered as a result of that?
5    A.  What I have done at this point in time is I
6  have prepared some preliminary calculations.  I believe
7  I said they were for purposes of illustration that
8  would give some idea of the magnitude of the kind of
9  damages we would be talking about under the assumptions
10 that I was given both by Mr. Chavez and that I
11 developed based on the other material that I had.  And
12 so those illustrations -- that illustration is, in
13 fact, what is contained in that preliminary report.
14   Q.  And the preliminary report you're referring to
15 is Exhibit 1, correct?
16   A.  It's in Exhibit 1, yes, sir.
17   Q.  What is -- why is it preliminary and not final?
18   A.  There's at least two things that I don't have
19 or that I didn't have when this was done, maybe more.
20 Let me see if I can't tell you what they were.
21   Q.  All right.
22   A.  At the time this report was prepared I was
23 concerned about the projected growth rate for Mr.
24 Chavez and I was hoping to see data that would help me
25 nail that down, that would help me feel more

Page 68

1  comfortable that the growth rate is very important in
2  that a small change in the growth rate can have a
3  fairly large impact on the bottom line damages that
4  we're doing.  So that growth rate is important.  And so
5  I wanted more information from it on growth rates.
6    Q.  And what information were you hoping to gather?
7    A.  I was hoping to gather information from Mr.
8  LaFemina in particular about what kinds of growth rates
9  they were getting and expecting in his region at AFLAC,
10 for one.  I was hoping to see from Mr. LaFemina's own
11 history as a very successful -- I'm not quite sure what
12 term I'm going to use, but as a -- every term I use is
13 already used and it doesn't mean exactly what I want to
14 say.  But in his association with AFLAC he's a very
15 successful man, and I thought it would be very
16 interesting to see his history and see how well Mr.
17 LaFemina was doing as a benchmark.
18   Q.  So in your opinion Mr. LaFemina would be a good
19 benchmark for purposes of calculating Dino Chavez'
20 damages?
21   A.  I thought it would be useful.  Maybe benchmark
22 is not the right word.  Certainly a useful reference
23 point.
24   Q.  Why?
25   A.  He was a very successful agent and it appeared

Page 69

1  that, again, DSC and RSC and -- I don't know how
2  successful he is as SSC but he's certainly there.  He
3  may be a very good SSC.
4    Q.  Do you believe that Dino Chavez could have been
5  as successful as Frank LaFemina?
6    A.  I don't know whether he could or not.
7    Q.  Then why was LaFemina's results important to
8  you?
9    A.  Because it provides a concrete example.  As I'm
10 sure you have noted, these figures that are in this
11 preliminary projection show fairly -- very high growth
12 rates, and as such one would be concerned about whether
13 those growth rates are unreasonable.  And so one way to
14 look at that is to see what one successful person at
15 AFLAC has done and that's why I have asked for that.
16   Q.  Okay.  What else --
17   A.  I have not -- but, anyway, that's -- excuse me.
18   Q.  What else did you -- was there anything else
19 that you wanted to gather to help you nail down the
20 projected growth rate?
21   A.  Well, I also have hope that Mr. Barnson might
22 also shed some light on growth rate that they have been
23 experiencing at the next level up from Mr. LaFemina.
24   Q.  Okay.  What else in terms of data would you
25 like to have regarding projected growth rate?

Page 70

1    A. It would be good to know if there was such --
2 if there is or was such a 15 percent policy. I think
3 that would be useful to know. I don't know -- I think
4 that was pretty well covered, what I was looking for in
5 the way of growth rates.
6    Q. Okay.
7    A. That I had expectation of getting, let me put
8 it that way.
9    Q. Okay. Have you tried to do any independent
10 research on your own to confirm the growth rate of
11 AFLAC regional sales coordinators?
12    A. No. When you say independent on my own, you
13 mean go directly to AFLAC or some other source?
14    Q. Right.
15    A. No, I have not done that.
16    Q. And you have told us everything that you would
17 like to have seen to help you, quote, nail down that
18 growth rate, correct?
19    A. Well, I think so.
20    Q. Okay.
21    A. It's possible I have forgotten something.
22    Q. Now, was there anything else? You mentioned
23 two things, maybe more, that you didn't have that makes
24 this Exhibit 1 report preliminary as opposed to final.
25 Was there something else?

Page 71

1    A. There's some more things that are missing,
2 yes.
3    Q. What are those missing things?
4    A. Well, every month that goes by we have more
5 information on Mr. Chavez' performance and success in
6 litigating his damages outside of AFLAC. And so at the
7 time this report was done there was really almost no
8 history. There's still not a lot more but there is
9 more and I'm hoping to see more so that we can -- I
10 believe it's going to be very difficult to make a
11 projection, but I was hoping to get more information
12 anyway.
13    Q. Why would it be so difficult to make a
14 projection of what Mr. Chavez could be earning?
15    A. Because we just have months of history.
16    Q. Well, keep in mind that I believe Mr. Chavez
17 told you that he was terminated as an RSC back in
18 December of 2001, correct?
19    A. Yes.
20    Q. And you were first hired over a year later in
21 February or March of 2003, correct?
22    A. Yes.
23    Q. So he had at least 14 months. Why couldn't you
24 use at least -- and when your report came out May 15th,
25 you had I guess close to 16 months. Why couldn't you

Page 72

1 use those 16 months of Dino's income and his ability to
2 work to make projections as to how he could mitigate
3 his damages?
4    A. Because I believe that his performance during
5 that early time period does not adequately demonstrate
6 how well he's likely to do.
7    Q. Now, define for me early time period. 16
8 months?
9    A. 2002.
10    Q. So an entire year?
11    A. An entire year, yes, sir.
12    Q. In your experience in consulting with folks who
13 claim to have been damaged as opposed -- because of
14 some kind of wrongful termination of their employment,
15 have you known these employees to -- folks who are
16 self-employed -- you understand that Dino Chavez was
17 self-employed, correct?
18    A. In a legal sense he certainly was, yes, sir.
19    Q. Now, have you provided expert testimony with
20 regard to other self-employed consultants or
21 independent contractors that claim to have been
22 wrongfully terminated in some way?
23    A. I would say the answer is yes, if I understand
24 that question.
25    Q. Okay. Tell me those instances in which you

Page 73

1 have consulted with regard to independent contractors
2 or consultants, self-employed folks, who claim to have
3 been wrongfully terminated.
4    A. Well, I believe -- and I couldn't name the
5 instances but I believe I have been involved in at
6 least one or two franchise cases which I think are
7 somewhat similar in a way.
8    Q. You mean like a McDonald's franchise of some
9 sort?
10    A. Well, that would be an example, but I have not
11 done a McDonald's franchise.
12    Q. You're talking about wrongful termination of a
13 franchise business?
14    A. Of a business where we have an independent
15 contractor but they are in some important way tied to
16 some kind of sponsoring organization such as in many
17 ways I would describe Mr. Chavez as being tied to
18 AFLAC. He's an independent businessman but he's pretty
19 -- in his role as an RSC, he's very closely tied with
20 AFLAC, I think we would all agree.
21    Q. Fair enough. But those type of capital
22 requirements are a lot different than the capital
23 requirements of a salesman and/or manager, correct?
24    A. They're different, that's for sure, yes.
25    Q. A lot less, right?

Page 74

1    A. They're different.
2    Q. Okay. Do you think it's reasonable for someone
3  who -- like Mr. Chavez who claims he was fired as an
4  RSC not to work for a whole year?
5    A. Do I think it's reasonable?
6    Q. Yes. Do you think it's reasonable?
7    A. I don't really have a -- I don't have an
8  opinion. Whether it's reasonable or not would depend
9  on the circumstances. When you say did not work for a
10  whole year, you mean go home and watch television for a
11  year?
12    Q. He certainly didn't attempt to sell any
13  insurance products according to his own testimony in
14  his deposition, which I believe you've read.
15      MR. AGUILAR: Objection; mischaracterizing
16  the evidence.
17    A. I have read it. I would have to go back and
18  check to verify that that is correct. It is my
19  understanding that he may not -- that may be true.
20  That's not contrary to my memory, but I couldn't verify
21  that's what he said in his deposition.
22    Q. Okay. Well, we'll --
23      MS. NEALLY: Object to the responsiveness
24  of the answer.
25    Q. We'll get back to this idea of mitigation of

Page 75

1  his damages because I believe you address that at the
2  end of your report. Let me make sure we nail down
3  things that are missing that makes this report
4  preliminary. So you have mentioned just a minute ago
5  one thing that you wanted was more information about
6  Dino's mitigation, et cetera. What other things are
7  missing from Exhibit 1 that make it not final?
8    A. It actually is not a complete analysis of his
9  losses.
10    Q. And why is that?
11    A. Because the losses from December of 2001 are
12  actually not included here. They were -- they would
13  have to be calculated in a slightly different way and
14  they were fairly complicated and they -- it's my
15  expectation that they're not a large contributor to
16  this percentage-wise but they're not in here.
17    Q. Okay. There is, however, in here some attempt
18  to calculate the -- is there not, lost sales of
19  approximately 322,000 from his inability to enroll
20  folks at BISD in December of 2001?
21    A. I don't believe that that analysis is -- I
22  don't believe that the losses from that are included
23  here. I might be mistaken on that, but my memory is
24  that they're not. I believe they're not.
25    Q. Do they not work their way into -- well, let's

Page 76

1  just -- because it's my understanding that when you
2  look at growth of first year premiums -- on Page 3 of
3  your report, look at that chart there at the top with
4  the asterisk by 2001 where you show first-year premiums
5  at 1,990,609 and then there's an asterisk that includes
6  the 322,108 lost in 2001, correct?
7    A. Yes, sir, you're correct.
8    Q. And is that 322,108 annualized premiums that
9  you understand and estimate Dino would have shared in
10  via overrides had his team been more involved and more
11  of his team done the enrolling in December of 2001?
12    A. Overrides and commission splits, yes.
13    Q. Okay. So that would include both his personal
14  production and overrides?
15    A. And commission splits.
16    Q. Okay. And by personal production, that's, I
17  think, what we're going to be calling commission
18  splits. Is that the way you understand it?
19    A. Well, I thought his personal production would
20  be when he actually closes a sale directly himself as a
21  sales agent. I think of the splits as amounts that Mr.
22  Chavez was getting as compensation from the agents who
23  were selling BISD policies for relieving them of all
24  responsibility for administering the policies.
25    Q. Well, then, just to make sure I understand.

Page 77

1  Take a look at Exhibit A on -- in Exhibit 1. Look at
2  that first column after the month end under premiums
3  collected where it says first year. Now, first year
4  means premiums collected for policies that were new
5  sales, correct?
6    A. Yes, sir.
7    Q. And under -- there's two columns underneath
8  that, one is personal and one is override?
9    A. Yes, sir.
10    Q. Wouldn't the column on personal include those
11  commission splits that Dino got with his agents?
12    A. I think so.
13    Q. Whereas the override column would be solely
14  those commissions he got as a result of his position as
15  an RSC, correct?
16    A. Well, they have this fairly -- that may be
17  right. Certainly they should be in one of those two
18  columns and I'm not sure which is which, but I know
19  that those splits, what we're calling them, should be
20  in one or the other.
21    Q. So going back to the point about the lost
22  December sales, you certainly utilize lost December
23  sales on Page 3 in calculating or as a basis for
24  calculating your growth rate, correct?
25    A. That is correct. Yes, sir, that's correct.

Page 78

1    Q. And growth rate certainly impacts in a very
2  direct way and a large way the damages that you
3  calculated are owed to Mr. Chavez, correct?
4    A. I agree.
5    Q. So in that sense, at least indirectly, you have
6  taken into account his December losses, correct?
7    A. No, the December growth.
8    Q. But the December growth which affects 2001 as
9  compared to 2000 growth impacts your overall growth
10 rate, correct?
11   A. Yes.
12   Q. And your overall growth rate year to year
13 impacts the damages suffered by Dino Chavez, correct?
14   A. Yes.
15   Q. Therefore -- and you show also on that page a
16 growth rate -- a projected growth rate from 2001 to
17 2002 of 75.78 percent, the same growth rate of 2000 to
18 2001, correct?
19   A. Exactly. That's true.
20   Q. So you do utilize those December sales in
21 calculating growth rate, correct?
22   A. That's correct.
23   Q. So in that sense what damages he suffered as a
24 result of not participating in the December enrollment
25 are, in fact, accounted for in your growth rate for

Page 79

1  that year, correct?
2       MR. AGUILAR: Objection; vague and
3  misleading.
4    A. Wrong.
5    Q. Why not?
6    A. Because the -- okay. I think I understand the
7  question. If you were to look at the matrix of
8  calculations which exist somewhere on this table --
9    Q. Right.
10   A. -- we don't begin -- I did not begin with
11 $1,990,609, which we see for 2001 in Page 3 of 6 of
12 Exhibit 1.
13   Q. I'm going to show you what's been marked as
14 Horner Exhibit 3, I think the third page in. It's the
15 first page of that matrix. At the left-hand column is
16 year 2002, correct? Do you not project for the year
17 2002 that Dino Chavez is going to be credited with
18 $2,932,944 in annualized premium?
19   A. I'm sorry. I was distracted from it. If you
20 could ask me the question again, I would be happy to
21 answer it.
22   Q. Take a look at Exhibit 3, left-hand column,
23 year 2002.
24   A. Yes. Yes, sir.
25   Q. According to your calculations, you're

Page 80

1  projecting that Dino Chavez' annualized premium income
2  credited to him either as overrides or as personal
3  production is going to total $2,932,944, correct?
4    A. Correct, for new sales.
5    Q. For new sales?
6    A. Yes, sir.
7    Q. And to get to that number that we just stated,
8  you have to utilize your percentage of growth rate and
9  project out from that 2001 number of 1,990,609,
10 correct?
11   A. Wrong, and that's the essence.
12   Q. Okay. So you projected from what number to get
13 to your 2,932,944?
14   A. The number does not include the 322,108.
15   Q. 1,668,000?
16   A. That's correct.
17   Q. Okay. In other words, the --
18   A. Well, yes, that's correct. That's enough.
19   Q. On Page 1?
20       MR. AGUILAR: Of his report?
21   Q. Of your report, Exhibit 1. Look at Exhibit 1.
22   A. Yes, sir.
23   Q. You have a number there in the second to the
24 last line of 1,668,501 as the total annual premiums
25 subject to first year commissions, correct?

Page 81

1    A. Yes.
2    Q. And is that the total annual commissions both
3  personal and override?
4       MR. AGUILAR: Objection; specificity.
5    Q. For 2001.
6       MR. AGUILAR: Objection; specificity.
7    A. I'm not sure I understand your question.
8       MR. AGUILAR: Can I add something, Buddy?
9    Q. Okay. I'm -- let's just make sure we
10 understand. Where did you get the 1,668,501? What's
11 the source?
12   A. That number is his actual first year premiums
13 from agents or otherwise. That is -- that is what he
14 actually got and by adding -- the difference between
15 that number and the 1,990,000 that you see on Page 3 of
16 6 is 322,108.
17   Q. Okay. So 2,932,944 is 1.7578 times 1,668,000?
18   A. You got it right.
19   Q. Okay. Now, tell me, where did you get that?
20 What document did you look at to get 1,668,501? Let me
21 see if I can help you.
22   A. That would be good.
23   Q. As part of Exhibit 6, look at that, if you
24 would. I think it's near the end. It may be in the
25 middle. Look under personal and regional team.

Page 82

1    A. I'm afraid to take this apart.
2    Q. Keep flipping until you get to about the week
3 of 52, 2001.
4    A. Yes, sir. That is, in fact, the source of that
5 document -- of that figure.
6    Q. Do you know if that number includes Dino
7 Chavez' personal production or if it's strictly that
8 which is attributable to his entire region without his
9 personal production added in?
10    A. It includes his personal production because
11 he's his own RSC, if you want to use that language.
12        MS. NEALLY: Object to the responsiveness
13 of the answer.
14    Q. Looking at that same document -- and this is
15 why I'm a little confused. Flip back to the first --
16 flip back to the first of this series of documents.
17        MR. AGUILAR: I'd like to look at it for a
18 second.
19        MR. STEELE: Let me ask a question first.
20 This is my deposition.
21        MR. AGUILAR: I'd just like to --
22        MR. STEELE: If I'm going the wrong way,
23 well -- we've got limited time.
24    Q. You see there's kind of a similar spreadsheet
25 for Dino for year end 1998, correct?

Page 83

1    A. Yes.
2    Q. There's handwritten notes that says total
3 regional production produced by, I'm assuming, Dino,
4 correct, of 91,991, correct?
5    A. Yes.
6    Q. Now, then, for the same year, week 52, 1998 for
7 the same deal, it says total personal production of
8 163,522?
9    A. Yes.
10    Q. That's what's confusing to me. If the regional
11 included Dino's personal, wouldn't this 91,000 be
12 163,000 short? I can tell you it's an anomaly. Do you
13 understand why? Because if you look at the others the
14 personal production is consistently lower than --
15    A. Yes, I do understand why.
16    Q. Why? Tell me.
17    A. Because he became an RSC in 1998. So you've
18 got -- you've got just a small portion of a year in
19 1998 as an RSC and you have a whole year as a --
20    Q. Thank you.
21    A. -- as an associate.
22    Q. Okay. Fair enough. So in a sense --
23    A. That should not occur. Excuse me.
24    Q. So in -- so let me just make sure --
25        MR. STEELE: And, Dino, chime in if I'm

Page 84

1 wrong because I just want to make sure we get it
2 straight.
3    Q. For '99, the next two pages, you're going to
4 have also total regional production and total personal
5 production. Is it your understanding that Dino's
6 personal production for '99 of 149,000 plus would be
7 included in the regional production of 673,000 plus?
8    A. That is my understanding.
9    Q. And Dino is nodding his head saying that's
10 correct.
11        MR. STEELE: Thank you.
12    Q. And that would be true with each and every year
13 thereafter, correct?
14    A. I guess there could be a problem in here
15 which he was terminated in which we might have some
16 timing issue there. But in all the internal years of
17 that series, the personal production as an associate
18 should be part of the RSC production.
19    Q. Okay. Let's go back to the spreadsheet that we
20 were talking about then, and that's going to be --
21 that's going to be Exhibit 3. I want to compare --
22        MR. AGUILAR: Wait. That's a different
23 document.
24        MR. STEELE: I know.
25    Q. So the spreadsheet really is tied back to that

Page 85

1 1,668,000 as the annualized premiums. Now, were those
2 annualized premiums including both personal and
3 override for Dino Chavez 1,668,000? I believe we
4 established that it did.
5    A. Yes.
6    Q. Okay.
7    A. I believe we established that, that's correct.
8    Q. And then the spreadsheet, Exhibit 3, really
9 takes off from that point using the assumptions -- all
10 the remaining calculations are based on that 1,668,000
11 number, correct?
12    A. That's correct.
13    Q. Okay.
14    A. That's correct.
15    Q. And then from this spreadsheet, Exhibit 3, you
16 ultimately conclude, if I understand your report, by
17 bringing these various yearly incomes back to their
18 present value, you arrive at a final figure, if paid
19 today, would compensate Dino Chavez for these projected
20 losses, correct?
21    A. No.
22    Q. Why is that incorrect?
23    A. Because you used the word final. Again, this
24 was a preliminary.
25    Q. Okay. Aside from that, did I describe it

Page 86

1  correctly?
2     A. No.
3     Q. Okay. And why not?
4     A. We haven't mentioned mitigation.
5     Q. Okay. So mitigation would play a factor in
6  your calculation of damages ultimately due Mr. Chavez,
7  correct?
8     A. That is correct.
9     Q. But you have not in this report attempted to
10 calculate what amount should serve as mitigation to
11 subtract from your --
12        MS. NEALLY: $7,000 from --
13    Q. Scratch that last question. What's your final
14 opinion as the damages due, aside from mitigation,
15 understanding you haven't attempted to calculate what
16 Dino Chavez could go out and make today? We understand
17 you haven't done that, correct?
18    A. That's correct.
19    Q. And you haven't projected his increased income
20 that he's able to make outside of AFLAC, in other words,
21 other words, you haven't attempted to calculate what
22 Dino Chavez could have been making from 2002 forward
23 for 25 years, have you? It's certainly not in your
24 report, correct?
25    A. Maybe I'm not understanding the question. Ask

Page 87

1  that again, please.
2     Q. We're talking about mitigation, right?
3     A. Oh, I'm -- I'm sorry. Okay. We're talking
4  about mitigation.
5     Q. You have not attempted to calculate the amount
6  of money that Dino Chavez could make from 2002
7  projected out 25 years, correct?
8     A. I have not performed calculations like that
9  yet.
10    Q. Okay. And I believe you told us the reason,
11 because you didn't have data that you felt was reliable
12 to base those calculations on?
13    A. That is correct.
14    Q. But you do agree as an economist in appropriate
15 practice and methodology you should take that
16 mitigation into effect in coming up with what will be
17 called a final ultimate damages figure for a complaint,
18 correct?
19    A. Yes.
20    Q. The methodology being this is how much this
21 person could have lost by losing one job, but then he's
22 able to go out and get another job, may make more, may
23 make less. And you calculate what he would make from
24 that other job and it has to be subtracted from what
25 you believe he lost from the job that led to the

Page 88

1  complaint, correct?
2     A. Correct.
3     Q. But you haven't done the latter; you haven't
4  done the mitigation calculation?
5     A. Not yet.
6     Q. If that were done, that would change the
7  number --
8        MS. LEEDS: Second to the last page.
9        MR. STEELE: Thank you.
10    Q. That would reduce the $5,344,463 that are your
11 preliminary calculations about the present value of his
12 commissions?
13    A. Whatever number -- I'm going -- I apologize for
14 this. I'm going to try to help you even though my
15 client might kick me. But instead of just answering
16 no, let me say that what I would do is from whatever
17 the numbers are that I will make in a final projection
18 of Mr. Chavez' earnings from his position as an RSC
19 that he had with AFLAC prior to these events, I would
20 subtract my projections of what he will be able to do
21 given that he is no longer in that position.
22    Q. Got it.
23    A. And that would -- that is the method by which
24 we would calculate the loss. And if we started with
25 five million and something, it would be less than that.

Page 89

1  In other words, the five million where he could earn
2  from AFLAC, then that will be reduced by a million or
3  whatever it is that he would earn otherwise.
4     Q. And you would agree that Dino Chavez can
5  continue to sell insurance, correct?
6        MR. AGUILAR: Objection; specificity and
7  speculation.
8     A. I would agree that Mr. Chavez is capable of
9  selling insurance as we sit here today.
10    Q. Do you know of anything that's stopping him
11 from selling insurance as we sit here today?
12    A. I'm not sure I know what you mean by what's
13 stopping him. I really don't know what you mean by
14 what's stopping him.
15        MS. LEEDS: Preventing him.
16    Q. Do you know anything that is preventing Mr.
17 Chavez from selling insurance?
18    A. I would say I don't know of anything that is
19 preventing him from selling insurance or stopping him,
20 if that's what you mean by that word.
21    Q. Exactly. Has Mr. Chavez told you of anything
22 that would prevent him from selling insurance?
23    A. No.
24    Q. When you have prepared damage models for other
25 individuals who have lost income but are still able to

Page 90

1  continue to work, in those damage models you certainly
2  include a mitigation factor, do you not?
3     A. Usually. And maybe every time I have done it,
4  I couldn't tell you. I can't remember a time when I
5  have not done it. But I will assume that if I've been
6  able to -- if I were able to, I would do it in every
7  case.
8     Q. And can you not as an economist look at what an
9  insurance agent operating in the Valley; i.e., the
10 Brownsville area, typically makes? Could you not find
11 that kind of data?
12    A. Possibly.
13    Q. Would that be the type of data that you could
14 utilize in determining Dino Chavez' mitigation of
15 damages?
16    A. I could use that kind of data in determining
17 that. That's -- that's a possibility since that is
18 something that Mr. Chavez would, in fact, be able to
19 do.
20    Q. But you didn't do that here, did you?
21    A. No, I did not.
22    Q. Why not?
23    A. Because it's not appropriate.
24    Q. Why not?
25    A. Because Mr. Chavez is not primarily an

Page 91

1  insurance agent.
2     Q. What is Mr. Chavez primarily?
3     A. He's primarily a manager of insurance agents.
4  That's primarily what his position was at AFLAC and
5  that's what he intends to do and, furthermore, it's
6  significantly more profitable in the long run than
7  being an insurance agent. So I could do this, but it
8  would greatly overestimate the losses if I were to do
9  it that way.
10    Q. So to appropriately mitigate then, you could
11 find other managers of insurance agents, what their
12 income is, and utilize that to more appropriately
13 determine the mitigation factor for Mr. Chavez?
14    A. Possibly, although --
15       MR. AGUILAR: Objection; speculation.
16    Q. Go ahead.
17    A. Possibly. I don't know whether I could -- I
18 don't whether that information -- I believe that
19 information is probably not as easy to get. As
20 managers of insurance agents, they generally have
21 gotten that way by a path such as Mr. Chavez followed
22 at AFLAC.
23    Q. Okay.
24    A. At present he is following a somewhat different
25 path.

Page 92

1     Q. And what is he following at present?
2     A. He is a partner in an insurance agency where he
3  is back being a manager of insurance agents of
4  insurance operations, selling insurance. And one would
5  expect that he would do better in that than he would do
6  -- than the other example that you had before as just
7  as agent.
8     Q. Okay.
9     A. And possibly better than he started out
10 again in a new organization attempting to work his way
11 back up to being a manager.
12    Q. Okay. Do you have any opinion as to whether
13 Dino Chavez is prevented from working his way up in an
14 organization to become in a similar role of managing
15 other insurance agents?
16    A. I would not think that there's anything that's
17 preventing him from doing it unless there's -- unless
18 there's some kind of reputation issue that might have
19 developed from all this controversy. But other than
20 that, I can't think of anything that would prevent him
21 from doing it.
22    Q. Bottom line, however, with regard to
23 mitigation, the appropriate mitigation model in your
24 mind would be to look at what he could be making in a
25 similar role as a manager of other insurance agents; is

Page 93

1  that a fair statement?
2     A. That would be one way that -- if one had the
3  data, that would be certainly -- again, if we will, a
4  benchmark or a reference point that might be useful in
5  determining what his mitigation might be expected to
6  be. That's a possibility.
7     Q. And have you conducted any additional research
8  into Mr. Chavez' mitigation opportunities?
9     A. Yes. Well -- yes.
10    Q. And what is that?
11    A. I have discussed with Mr. Chavez his current
12 performance at The Teachers Agency and how that agency
13 is doing and how he expects that that -- how it has
14 done so far in this year in 2003 and how he expects
15 that it will do for the rest of 2003.
16    Q. And what did he tell you?
17    A. Well, my notes have become part of an exhibit.
18    Q. Is whatever he told you in those notes?
19    A. Yes, sir, I believe they are. I think they
20 are. I'm not sure. I hope so. I think what's in the
21 notes would certainly remind me of what he told me.
22 Yes, sir, it is my notes dated September 4th, 2003.
23    Q. Shown in --
24    A. Exhibit 9.
25    Q. Dated September 4th, 2003?

Page 94

1    A. Yes, sir.
2    Q. Okay. And what do they show?
3    A. Mr. Chavez informed me that their gross revenue
4  at The Teachers Agency as of yesterday, 9-4, 2003 was
5  $89,457.
6    Q. Okay.
7    A. He told me that he believed that their annual
8  overhead was roughly $250,000 per year.
9    Q. Did he tell you that he's still able and
10 contracted as an AFLAC associate and able to sell AFLAC
11 policies?
12   A. Yes.
13   Q. Did he tell you whether he is selling AFLAC
14 policies?
15   A. I believe that he is not.
16   Q. Did he tell you why?
17   A. Yes.
18   Q. What did he tell you?
19   A. Basically he told me that he felt that he could
20 do much better setting up the -- spending his time
21 setting up The Teachers Agency than attempting to sell
22 AFLAC policies as an agent.
23   Q. Okay. So that's what he's concentrating on is
24 setting up The Teachers Agency rather than selling
25 AFLAC policies?

Page 95

1    A. That's correct.
2    Q. Do you believe it's reasonable to assume that
3  Dino Chavez will be able to earn a living for the next
4  25 years?
5    A. Yes, I do.
6    Q. So can we expect your opinion regarding Mr.
7  Chavez' damages of $5,344,463 to change after you have
8  calculated Mr. Chavez' mitigation opportunities?
9    A. Definitely.
10   Q. And that would be an appropriate method in
11 order to advise a judge or a jury regarding Mr. Chavez'
12 damages in this case, correct?
13   A. Correct.
14   Q. Without mitigation, it would not be appropriate
15 to advise the judge or a jury about Mr. Chavez'
16 damages, would it?
17     MR. AGUILAR: Objection; mischaracterizing
18 the evidence.
19   A. False.
20   Q. Why not?
21   A. As long as one were careful to point out what
22 it was that one was doing, that these were not
23 necessarily damage numbers, you still could be
24 providing useful information to the court in doing the
25 projection of what one would expect him to have done.

Page 96

1    Q. With the understanding that it's going to get
2  lower once you factor in mitigation?
3    A. I think it is important that that be pointed
4  out and that's why I emphasized that you need to
5  disclose that the mitigation is not there. If you
6  don't disclose it and you somehow let that be thought
7  of as losses, that would be misleading and improper.
8    Q. Okay. Go back to Exhibit 1, please.
9    A. I don't see it. I see it now.
10   Q. If you look at the bottom of Page 1 of your
11 report, Base Earnings for 2001, we have talked about
12 where the 1,668,501 came from. Then the next sentence
13 says, according to the AFLAC monthly accounting
14 statements for 2001, Dino Chavez earned first year
15 commissions of about $78,706, plus an additional 30,478
16 in commissions from renewals on pre-existing policies.
17 Now, if you would turn to Exhibit A, 2001 commissions,
18 you see those two numbers appearing there under first
19 year and renewal, correct?
20   A. Yes, sir.
21   Q. And under commissions earned there's the two
22 columns. Under first year are personal and override
23 and when you add those two together you get the 78,705,
24 correct?
25   A. Excuse me. But the $78,000 figure, where are

Page 97

1  you seeing this? I'm trying to speed things up. I
2  don't see where that came from.
3    Q. Well, I'm trying to identify --
4    A. Oh, okay. I'm sorry. First year commissions
5  was 78,000. I see that on the first page.
6    Q. 706. And that's the same number that appears
7  on Exhibit A, correct?
8    A. Yes, sir. That's where that came from.
9    Q. It's where the add up personal and override for
10 first year commissions earned, correct?
11   A. Year.
12   Q. And then the other number at the top of Page 2,
13 the 30,478 is where you add up from Exhibit A the
14 14,089 and the 16,387 for personal and override
15 commissions on renewals, correct?
16   A. That's correct.
17   Q. Okay. So the numbers, as I understand it, on
18 Exhibit A are taken from the AFLAC monthly accounting
19 statements, correct?
20   A. Yes, sir, I believe that's true.
21   Q. All right. Now, what I don't understand is if
22 you look at Exhibit A --
23   A. Yes, sir.
24   Q. -- and you add up the premium collected first
25 year personal and override, under personal it's

**Page 98**

1  91,387.66; under override it's 1,042,569.76.
2     A. Okay.
3     Q. If you add those together you get 1,133,977.
4  I'll tell you right now I did the math.
5     A. A million what?
6     Q. 133,977.
7     A. Okay.
8     Q. That number -- why is that number different
9  from the first page of your report, that 1,668,501?
10    A. Well, you didn't put the renewals in. Oh, I'm
11 sorry. Those are first year commissions.
12    Q. And that's what -- annual premiums of the first
13 year commissions is 1,668,000.
14    A. I don't know.
15    Q. When you --
16    A. I may be able to figure that out, but right --
17 sitting right this second I do not know the answer to
18 that question.
19    Q. Fair enough. In reading your report I was
20 unable to determine where you allowed for chargebacks
21 against Dino and his team for people who didn't pay
22 even when they signed up to pay and annualized
23 projections were projected, but they actually failed to
24 pay. Did you work that into your calculations?
25    A. Yes, sir, I did.

**Page 99**

1     Q. And where did you do that?
2     A. That would be on --
3     Q. Exhibit C to Exhibit 1?
4     A. Yes, Exhibit C.
5     Q. Show me how you figured in the no pays.
6     A. In the boxed area based on the accounting
7  statements we -- they provide changes in the first year
8  policies, and it includes both people who just drop the
9  policies, people who just don't pay or people who
10 increase their policies -- because some of these
11 changes are actually -- you can see, for example, the
12 column reinstated, those are policies that have been
13 counted as lapsed but they come back in. So that's
14 what you see coming back in, the column lapse is an
15 indication of policies that got canceled or counted as
16 canceled, whether they quit paying by accident or
17 whatever and then they come back as reinstated. So
18 what we have here, all of these changes have to be
19 taken into account to figure out the net changes in
20 first year policies that were in force in the previous
21 months. So we take the policies that are in force the
22 previous month and then this report gives you how that
23 changed during the succeeding months.
24    Q. Okay, I understand that. So basically you're
25 going to lower the projections that he's going to see

**Page 100**

1  for renewal policies? Ultimately the number you use
2  here is utilized to each year lower the projected
3  growth, correct?
4     A. That's right.
5     Q. But where does it actually result in a
6  chargeback against Dino Chavez?
7     A. Well, it's used to reduce the commission rate
8  on first year policies because we -- because we find
9  that the attrition rate is about 45 percent on first
10 year policies and I used -- I multiplied that times his
11 RSC commission on first year policies and then when I
12 determined his percentage he actually gets. So I -- so
13 basically I -- the easiest way to do this -- it may not
14 be the most direct way, but it's certainly the easiest,
15 would be just to say, well, he's not really going to
16 get his full commission on all these first year
17 policies, and so by using this spreadsheet I calculated
18 how much it should be reduced and that's how I did it.
19    Q. Okay. So then that wouldn't explain I guess
20 and this may be a different question. The difference
21 between the 1,133,000, which is the sum you get from
22 Exhibit A to your report, and the 1,668,000 that
23 appears on Page 1 of your report, does it?
24    A. No, that doesn't -- that doesn't -- well, wait.
25 I don't think it does.

**Page 101**

1     Q. Okay.
2     A. I would have to -- I apologize. I'm getting a
3  little bit tired, but I don't think it does. Now, it
4  might, but I don't think it does. I would have to
5  think about that.
6     Q. Okay. You state at the top of Page 2 that,
7  "Although Mr. Chavez has lost significant income as an
8  agent, as well as an RSC, we are focused only on the
9  latter in this preliminary analysis." What did you
10 mean by that?
11    A. Well, these are only RSC commissions that were
12 calculated.
13    Q. Okay.
14    A. I didn't calculate any personal production.
15    Q. Okay.
16    A. But his personal production as it affects an
17 RSC is in here, but his personal commissions based on
18 sales for which he would get direct credit are not
19 included in here.
20    Q. But as I understand it -- so you're saying that
21 your calculations when you arrived at the $5,344,463,
22 which is on Page 4 --
23    A. Yes, sir.
24    Q. -- that's based solely upon his commissions
25 that he would have made as an RSC, correct? Is that

1 what you just told me?
2          MR. AGUILAR: Objection; mischaracterizing
3 the evidence.
4     A. Maybe I misunderstood your question.
5     Q. Well, what I'm trying to figure out is the
6 $5,344,463 on Page 4 represents basically the present
7 value of all of Dino's override commissions as opposed
8 to personal production?
9     A. That's what I believe those are, yes, sir.
10    Q. Fair enough. And that's why in the report here
11 on Page 2 you say, we are focused only on the latter in
12 this preliminary analysis; i.e., his commissions as an
13 RSC?
14    A. Yes.
15    Q. And why did you focus only on his commissions
16 as an RSC as opposed to his personal production also?
17    A. At the time I did this report -- the statement
18 may still be true. I'm not completely clear about
19 whether Mr. Chavez would continue doing personal
20 production as these -- as his RSC group grew. So that
21 is one reason why. And so if that were going to
22 attenuate over time it would be important to take that
23 attenuation into effect and not just assume it's going
24 to continue. If it were going to continue, I need to
25 put it in there. But there -- it's calculated -- the`

1 calculations were complicated. I believe that they
2 were also probably not going to be of the same
3 magnitude of the kinds we're talking about. So they
4 are a little bit less -- I mean they're less important.
5 They would add to it but they're less important. And
6 so since I was expecting to do an overall change based
7 on new growth rates, that may or may not interact with
8 those things in the same growth rate.
9     Q. Got it.
10    A. I was -- I just didn't put them in because I
11 thought that this was going to be a very complicated
12 thing that I was -- probably was going to discard as
13 soon as I got the growth rate data that I really was
14 going to use.
15    Q. Okay. So just to make sure I understand. You
16 basically assumed Dino's responsibilities will be
17 solely recruiting and training and he would essentially
18 end his personal sales or commission splits and will
19 make all of his money on overrides?
20    A. Well, it was my understanding that was a
21 possibility. And, like I said, I wasn't clear on that.
22 But if he were to do that or if he were to phase into
23 that, that would be something that he could -- or if he
24 were -- if we were going to assume he were going to
25 just stop doing that in 2002, which was not my

1 understanding. My understanding was he was going to
2 continue doing that in 2001, at least in the December
3 2001 time period. So I know he was going to continue
4 at least a little bit but I don't know when it was
5 going to stop if it was going to stop.
6     Q. But your model effectively phases that out
7 beginning in the year 2002 or 2003, correct?
8     A. 2002, I just -- it's just not there.
9     Q. It just eventually stops?
10    A. That's correct.
11    Q. Now, you also have projected expenses in coming
12 up with the net that you believe Mr. Chavez would have
13 made, correct?
14    A. Yes.
15    Q. And in your expense calculations you are
16 relying upon what Mr. Chavez has told you about his
17 office expenses, correct? And it's stated there on
18 Page 2.
19    A. Yes, sir, that's correct.
20    Q. And I believe you state that Mr. Chavez
21 projects his remaining expenses to be $59,104 would
22 have grown only with inflation in the future, correct?
23    A. Yes, sir. That's what he told me.
24    Q. So you apply an inflation factor of 3.1 percent
25 to those expenses, correct?

1     A. Yes, sir.
2     Q. On the other hand, over this same 25-year
3 period -- as a result, those expenses over the 25 years
4 at 3.1 percent in the year 2027 or whatever it is have
5 slightly more than doubled, correct?
6     A. Yes.
7     Q. Whereas at the same time, according to your
8 calculations, his revenues have increased 75 fold,
9 correct?
10    A. That's roughly correct, yes, sir.
11    Q. Do you think it is reasonable to assume that
12 with a 75 fold increase in revenue which is necessarily
13 going to be a 75 fold increase in policies he's selling
14 and I would assume a 75 fold increase in the number of
15 policies that will have to be serviced, that it's
16 reasonable to assume only doubling of his expenses?
17         MR. AGUILAR: Objection; mischaracterizing
18 the evidence and misstating facts. With that, go
19 ahead.
20    A. No.
21    Q. It's not reasonable, is it?
22    A. No. I just disagree with the question.
23    Q. Okay. Let me ask it this way.
24    A. The predicate to the question is just not right
25 so I can't answer that question.

Page 106

1    Q. Okay.
2    A. I can't agree with the first part of it.
3    Q. Do you think it's reasonable to assume that if
4  there is a 75 fold increase in revenue there will only
5  be a doubling of expenses?
6    A. Based on the information that I've been given,
7  that's not unreasonable.
8    Q. And that information comes from Mr. Chavez?
9    A. Yes, sir.
10    Q. Is there any economic theory that supports that
11  conclusion?
12    A. Well, I don't think there's any economic theory
13  that says one thing or the other about that particular
14  implication.
15    Q. If there were such large economies of scale --
16  because you're talking about massive economies of scale
17  here, correct?
18    A. 25-year stints.
19    Q. A 75 fold increase in revenue but only doubling
20  of expenses?
21    A. I think it would be fair to call that very
22  significant economies to scale. Yes, I think you
23  would. I think you would. And the reason why I'm
24  saying that -- of course, anything is obvious, but the
25  economies to scale note is perhaps a little bit

Page 107

1  debatable. I could characterize it that way, yes, sir.
2    Q. And if there were such significance economies
3  of scale achievable, wouldn't that result in a
4  consolidation of a lot of little agencies into a few
5  big insurance agencies?
6    A. No.
7    Q. Why not?
8    A. Because we're not talking about insurance
9  agencies.
10    Q. What are we talking about?
11    A. We're talking about a person who is an RSC for
12  AFLAC. He's not an insurance agency.
13    Q. Okay. Have you done any other investigation
14  into the expenses of other RSCs of AFLAC in trying to
15  determine whether your conclusion regarding Chavez'
16  projected expenses is reasonable?
17    A. Yes.
18    Q. And tell me about that.
19    A. I talked to Mr. Chavez about Mr. LaFemina's
20  operation prior to being promoted to a state sales
21  coordinator. My understanding is that Mr. LaFemina was
22  running somewhere in the order of six or $7,000,000 in
23  sales as an RSC with one administrative assistant.
24    Q. Okay. So your -- six to 7,000,000 in sales.
25  Okay. Anything else that you did to investigate

Page 108

1  whether your estimate of Chavez' projected expenses was
2  reasonable, other than what Mr. Chavez told you about
3  LaFemina's operation?
4    A. No.
5    Q. That's it, correct?
6    A. Well, I've discussed the issue with Mr. Chavez.
7  I mean, that was obviously an issue.
8    Q. And that was it? That's all that you did to
9  try to test the theory that Dino's expenses would only
10  double when his revenue increased 75 fold?
11    A. Yes, sir, that's correct.
12    Q. Did you ask Dino to compare -- did he explain
13  to you how his operation compared to Mr. LaFemina's
14  operation?
15    A. Basically, yes.
16    Q. What did he tell you?
17    A. He told me that LaFemina had some very large
18  groups that he had in Dallas, a large school district.
19  He may have the Dallas Independent School District. He
20  told me -- and he may have had more than just that one
21  very large group out there in North Texas. He told me
22  that Mr. LaFemina, however, did not do any
23  administration for any school districts.
24    Q. And that's different from Mr. Chavez'
25  operation, isn't it?

Page 109

1    A. In that one aspect Mr. Chavez did, in fact, do
2  some administrative work for one of his groups which
3  was the Brownsville.
4    Q. And that was the BISD group?
5    A. Yes, sir.
6    Q. Was that not his very largest group?
7    A. Yes, sir.
8    Q. And did he tell you how much time he spent
9  servicing that account or his staff spent servicing
10  that account?
11    A. Yes, we discussed it. It wasn't very much.
12    Q. It wasn't?
13    A. That was my understanding.
14    Q. Okay. According to what Dino told you?
15    A. Yes, sir.
16    Q. But you're assuming -- if I understand what
17  you're telling me, are you assuming that Dino will
18  continue to service the BISD account throughout this
19  25-year projection?
20    A. Not necessarily. I mean, he might be, but he
21  might not be.
22    Q. Certainly he has in the past?
23    A. Yes.
24    Q. And wouldn't your projection be more accurate
25  if you assume that he would in the future?

Page 110

1  A. I'm not sure about that.
2  Q. Why are you unsure?
3  A. I just would need to think about it some more.
4  I mean, it sounds reasonable but I'm just not sure.
5  Q. Okay. In your assessment of Dino's damages,
6  you did not take into account his expenses associated
7  with self-employment taxes, did you?
8  A. No.
9  Q. Why not?
10  A. It's not obviously appropriate.
11  Q. Why is it not obviously appropriate?
12  A. I don't know whether these taxes are
13  appropriately considered in this kind of case under the
14  law. That would be number one. I don't know.
15  Q. That's number one. Were there any other
16  reasons you didn't consider?
17  A. Yes.
18  Q. Tell me those.
19  A. Some portion of this award would have been
20  subject to -- may have been subject to self-employment
21  taxes anyway.
22  Q. You just don't know that?
23  A. I don't know that. No, that's correct. I
24  don't know that.
25  Q. And do you know whether it will be subject to

Page 111

1  income tax?
2  A. Yes, I know that it would be subject to income
3  tax.
4  Q. So in that sense it may not be appropriate to
5  take into account income taxes in your projections;
6  fair statement?
7  A. I would say it is not appropriate to take into
8  account income taxes except to the extent that probably
9  -- it would be best not to under the circumstances.
10  Q. The discount rate that you came up with, the
11  21.6 percent, the beta that you utilized is based upon
12  AFLAC's beta as a publicly-traded company in the
13  marketplace, correct?
14  A. Yes, sir, that's right.
15  Q. But, in fact, what we're talking about here is
16  Dino's position as an RSC, correct?
17  A. Yes.
18  Q. And wouldn't it be more appropriate to pick a
19  beta that's based upon, say, an independent insurance
20  agency as opposed to AFLAC the insurer itself?
21  A. I'm not sure about that. I'm not sure about
22  that. Actually, now that I think about it, the answer
23  is no.
24  Q. Why not?
25  A. Because, number one, Mr. Chavez isn't really an

Page 112

1  independent insurance agent.
2  Q. What is he?
3  A. He was an RSC at AFLAC and that's not an
4  independent insurance agent.
5  Q. But his position as an RSC at AFLAC is a much
6  riskier position than what AFLAC enjoys in the market,
7  correct?
8  A. Yes.
9  Q. Okay. So his beta should be higher, correct?
10  A. Wrong.
11  Q. Why not? Should it be lower?
12  A. It's irrelevant.
13  Q. Why?
14  A. The beta is a measure of the correlation of the
15  risk between the entity that you're trying to measure
16  and the market as a whole.
17  Q. Isn't the entity you're trying to measure Dino
18  Chavez as an RSC?
19  A. Yes, sir, that's correct.
20  Q. And you're basically using a beta for AFLAC,
21  the publicly-traded insurance company, in coming up
22  with a beta appropriate to Mr. Dino Chavez, correct?
23  A. That's correct.
24  Q. If, in fact, you're wrong about the beta and it
25  was higher, that would make your overall discount rate

Page 113

1  higher, correct?
2  A. Yes.
3  Q. And as the overall discounts rate goes up, the
4  present value of those damages goes down, correct?
5  A. Yes.
6  Q. In fact, a one percent difference in discount
7  rate can have an enormous effect on the bottom line of
8  present value, correct, when you're talking about a
9  25-year projection?
10  A. It would certainly have an effect. I'm not
11  sure about the word enormous, but it can have a
12  significant effect at least.
13  Q. So you'll give me significant, but you're not
14  sure about enormous?
15  A. Well, I would have to define it and do the
16  calculation to see whether we agreed it met the
17  criteria or not.
18  Q. But it would be significant?
19  A. It could be. I think that's the way you
20  phrased your question. It certainly could be.
21  Q. Let's talk about -- I'm getting close to being
22  done.
23  A. Okay. I was going to ask you because I would
24  like a glass of water or something if we're going to go
25  much longer.

Page 114

1  Q. I don't think so but you just stop me --
2      MR. AGUILAR: Let's go for another five
3  minutes.
4  Q. -- when you've reached the end of your rope.
5  A. Thank you.
6  Q. With regard to your growth rate that you
7  utilized in your report did you look at any other RSCs
8  within AFLAC to see if they have had such sustained
9  growth?
10 A. No.
11 Q. Have you looked at any other insurance agencies
12 selling supplemental insurance to see if they have
13 enjoyed such sustained growth rates?
14 A. No.
15 Q. Have you looked at any other insurance agency
16 no matter what they sold to see if they have sustained
17 such growth rates?
18 A. No.
19 Q. And admittedly when you look at the numbers of
20 Dino's groups there is an enormous jump in 1998 to 1999
21 from 91,673 but I think that's been explained because
22 Dino was an RSC late in the year in 1998, correct?
23 A. That's certainly a big part of it, yes, sir.
24 Yes, sir, that's correct.
25 Q. So would it be safe -- and from what I can tell

Page 115

1  from your report you pretty much discounted, if did not
2  entirely ignore, that 632 percent growth rate from '98
3  to '99 in coming up with your projected growth rate for
4  the future, correct?
5  A. Correct.
6  Q. And then from '99 to 2000 you show a 68.11
7  percent growth rate. That's awfully high, too,
8  wouldn't you say? But the numbers are what they are.
9  I'm not --
10 A. That's a good growth rate.
11 Q. That's a good growth rate. Do you know of any
12 influences in 2000 that are out of the ordinary that
13 could have affected that 68 percent growth rate?
14 A. Not as I sit here, I don't.
15 Q. Did you ask Dino what contributed to that 68
16 percent growth rate from '99 to 2000?
17 A. I don't believe I asked him in that form, no,
18 sir.
19 Q. Did you ask it in any form of Dino what
20 contributed to his sales growth from '99 to 2000?
21 A. Not specifically, no, sir.
22 Q. Did you ask him anything generally?
23 A. Yes, sir.
24 Q. Tell me about that.
25 A. I asked him why are you so successful.

Page 116

1  Q. And what did he say?
2  A. He said it's good management, professional
3  management.
4  Q. So that's your understanding as to why he
5  enjoyed that 68 percent growth rate from '99 to 2000?
6  A. That's his explanation to me.
7  Q. You have no other understanding as to why that
8  68 percent growth rate was enjoyed?
9  A. Correct.
10 Q. Same question with regard to 2000/2001. Do you
11 know of anything very unusual or out of the ordinary
12 that could have contributed to that roughly 76 percent
13 growth rate?
14 A. No.
15 Q. And we have talked about the basis -- well, how
16 did you come to the -- to assume a roughly 38 percent
17 growth rate from 2002 to 2003. Did you simply take the
18 2000 growth rate and half it?
19 A. Yes.
20 Q. Why did you pick half?
21 A. Because the 75 percent, although it was an
22 increase from the previous year, was a very high growth
23 rate. And we -- I believe that that's unsustainable
24 for any long period of time, but I don't know how long.
25 It's got to go down at some point.

Page 117

1  Q. Why is that?
2  A. Eventually Mr. Chavez would be selling premiums
3  that would be absorbing a significant portion of the
4  gross national product.
5  Q. Okay. And then you have that roughly 38
6  percent again to 18.95 percent or roughly 19 percent,
7  correct?
8  A. Yes, sir.
9  Q. And you utilize that growth rate from -- for
10 the year 2004 projected out to the year 2026?
11 A. Yes, sir.
12 Q. Why do you believe roughly a 19 percent growth
13 rate is sustainable?
14 A. Because my understanding is that AFLAC
15 management -- at the time my understanding was that
16 AFLAC management required at least a 15 percent growth
17 rate. Dino was doing well. I just halved it again in
18 this illustration, and that was fairly -- it was a
19 little bit above the minimum required and it seemed a
20 reasonable way to go rather than to come up with a --
21 yet another unusual adjustment.
22 Q. Do you have any evidence, other than what you
23 have told us about what LaFemina said in his deposition
24 and other than what Dino has told you, do you have any
25 evidence that would indicate that any other AFLAC RSC

Page 118

1  has enjoyed similar growth rates?
2      A. Well, I believe that -- and I haven't actually
3  done the calculation, but I believe that some of the
4  data that I have on the -- comparing the various top
5  RSCs in the country show fairly high growth rates.
6  LaFemina's I believe was a very high growth rate. And
7  I -- I don't remember what period of time I had the
8  data and I didn't do an exclusive calculation, as I
9  said, but it suggested very high growth rates.
10     Q. Do you know where LaFemina was either managing
11 or selling policies? Managing his agents who were
12 selling policies, do you know what his area was?
13     A. I believe it was the Dallas area.
14     Q. Do you believe the demographics of the Dallas
15 area are comparable to the demographics of the
16 Brownsville area?
17     A. Number one, I'm not sure what you mean by the
18 demographics.
19     Q. By demographics I mean population, level of
20 income, what people do for a living, that kind of
21 thing.
22     A. I would say the population -- no, the
23 population is not the same.
24     Q. Okay.
25     A. The average income is not the same.

Page 119

1      Q. Do you think those demographic characteristics
2  influence sales of insurance products?
3      A. They might very well.
4      Q. But you didn't look into that in trying to
5  determine whether LaFemina's growth should be
6  comparable to what you projected for Dino Chavez, did
7  you?
8      A. No.
9      Q. In fact, have you done any examination of the
10 Brownsville area demographics in analyzing what you
11 believe is a reasonable growth rate for Dino Chavez?
12     A. No.
13     Q. Why not?
14     A. I don't think that there's any useful
15 information to be gathered from such an investigation.
16     Q. Okay.
17         MR. AGUILAR: Why don't we take a break?
18         MR. STEELE: That's fine.
19         (Recess.)
20     Q. Dr. Horner, you've told us about LaFemina's
21 deposition testimony and what Dino Chavez told you with
22 regard to the expected 15 percent growth rate for
23 regional sales coordinators, correct?
24     A. Yes, sir.
25     Q. What other evidence, setting aside those --

Page 120

1  that oral evidence, what other evidence do you have
2  that AFLAC documents and enforces a requirement that
3  its sales coordinators maintain an average annual
4  growth rate and first year premiums of at least 15
5  percent?
6      A. I have no such document.
7      Q. Do you have any evidence of what period of time
8  such premiums are averaged to arrive at that average 15
9  percent growth rate?
10     A. No, sir.
11     Q. Do you have any evidence of what percentage of
12 regional sales coordinators of AFLAC meet that
13 requirement?
14     A. No, unless it's in some of those documents I
15 mentioned earlier, but I don't -- I don't know whether
16 I have that evidence or not. No, I guess, those I
17 don't have evidence of all of them.
18     Q. And so I take it then you would not have
19 evidence of what percentage of sales coordinators have
20 met that 15 percent growth over a period exceeding 20
21 years?
22     A. No, I don't have that. I don't think -- I'm
23 not sure that AFLAC has been doing -- well, they may
24 have but I'm not sure that's true.
25     Q. So you don't have any evidence to that effect,

Page 121

1  do you?
2      A. No. That's true. That's true. I don't have
3  any evidence to that effect. AFLAC might have it, but
4  I don't have it.
5      Q. Dr. Horner, you testified that you have done, I
6  believe, some other analyses of -- let me ask it like
7  this. In any of the other analyses that you have done
8  where you have testified in deposition or at trial,
9  employees or consultants or an independent contractor's
10 damages, in any of those instances have you in any of
11 those projected a growth of earnings at nearly 19
12 percent per year for 23 straight years?
13     A. I don't know of any.
14     Q. You would remember something like that,
15 wouldn't you?
16     A. Well, I don't know.
17     Q. Would you choose to forget something like that
18 because it's so appalling?
19         MR. AGUILAR: Objection; argumentative.
20     A. I would not choose to forget it. I might
21 forget it. I don't know.
22     Q. As we sit here today you can't think of another
23 instance in which you have projected 19 percent growth
24 and earnings for 23 straight years in any of your other
25 damage models for employees or consultants or

Page 122

1  independent contractors?
2      A. No, I can't.
3      Q. And you've already stated that you haven't
4  looked at the demographics in Brownsville in coming up
5  with your conclusions in this report, have you?
6      A. That's correct.
7      Q. Is it also safe to assume that you have not
8  looked at any projected growth rates for the
9  Brownsville area in coming up with your conclusions?
10     A. That's correct.
11     Q. In fact, you haven't looked at the demographics
12 of any of the communities within the Valley, have you?
13     A. In this case, I have not.
14     Q. That's correct, in this case.
15     A. That's correct.
16     Q. Well, just to make sure I cover all my bases,
17 have you looked at demographic statistics in your
18 analyses in other cases?
19     A. Yes.
20     Q. Tell me a little bit about that, if you would.
21     A. Well, tell me -- ask me a question, please.
22     Q. When you look at demographics, when do you look
23 at demographics in other cases?
24     A. When you have -- when you are trying to project
25 -- one of the things you're looking for is usually

Page 123

1  changes in demographics because we're normally looking
2  for changes in businesses when we're doing that. So we
3  might be looking at whether population is growing or
4  not growing. We might look at changes in income. We
5  might look at things like that in situations like that.
6  That's when I would have normally.
7      Q. And why would you do that? What instances
8  would cause you to look at those changes in
9  demographics?
10     A. Well, normally it would have to be some kind of
11 business where you felt that the overall demographics
12 of the community were relevant.
13     Q. And what businesses would those be?
14     A. Ones that sold to the general population
15 usually.
16     Q. Okay. Does -- do you understand that Dino
17 Chavez sells to the general population these
18 supplemental insurance products?
19     A. Primarily not.
20     Q. What do you understand his customer base to be?
21     A. Primarily being sold through large employers.
22     Q. Okay. And who makes up these large employers?
23     A. Generally they're either governmental agencies
24 such as school districts, counties, cities --
25     Q. Okay.

Page 124

1      A. -- would be the primary ones.
2      Q. Why is that customer base different than the
3  general population?
4      A. Well, it's not the general population.
5      Q. Who works at counties, cities and governmental
6  agencies; the general population, right?
7          MR. AGUILAR: Objection; mischaracterizing
8  the evidence.
9          MS. LEEDS: Objection to the objection.
10     Q. Dr. Horner, honestly and seriously, I'm trying
11 to understand why you didn't do any demographic studies
12 in this instance.
13     A. I did not think they would have been relevant
14 in this instance.
15     Q. Explain why you don't think they would have
16 been relevant.
17     A. They're -- I don't think -- I don't know what
18 kind of information I would have gotten from this that
19 would have been useful to me.
20     Q. Probably something that would show you 19
21 percent growth rate over 23 years is absurd, but other
22 than that --
23         MR. AGUILAR: Objection; argumentative.
24     Q. -- don't you think it would be helpful in
25 determining a projected growth rate in sales to look at

Page 125

1  the customer base to which you were selling?
2      A. Might be, yes.
3      Q. Isn't that what marketing companies try to do
4  day in and day out?
5      A. Yes.
6      Q. Don't they pay a lot of money for that kind of
7  information in order to project their customers and
8  what they think their customers want and what they
9  think their customers will buy?
10     A. Sometimes they charge a lot for it. It's
11 really part of their business.
12     Q. Absolutely. So it's important to know your
13 customer bases in projecting your sales, correct?
14     A. Yes.
15     Q. And in this case, if I understand your report
16 and what you're telling me, you have done nothing to
17 look at the projected growth in employees in any of the
18 governmental agencies, school districts or other large
19 employers whom Dino Chavez historically has served,
20 have you?
21     A. Well, I do have the statistics on the growth of
22 employees at the Brownsville Independent School
23 District.
24     Q. Okay. Do you have any statistics on the
25 projected growth of employees at BISD?

Page 126

1    A. No.
2    Q. So you have historical statistics on BISD only,
3  correct?
4    A. That's correct.
5    Q. Do you have any historical statistics on a
6  single other large employer whom Dino Chavez served?
7    A. No.
8    Q. And you have absolutely no projections on those
9  same employers into the future, do you?
10    A. That's correct.
11    Q. But the entirety of Dino Chavez' livelihood
12  certainly as projected at AFLAC is going to depend upon
13  those employers within his territory, correct,
14  depending upon his customer base?
15    A. It depends on his customer base. I'm not sure
16  that his territory is necessarily as restricted as you
17  say. My understanding is he had some sales agents
18  outside of the Rio Grande Valley.
19    Q. Did you try to determine what percentage of his
20  total regions team, those outside sales agents
21  contributed?
22    A. No.
23    Q. Was it your understanding that primarily the
24  Valley and the Brownsville area was the geographic
25  location of Dino's sales agents?

Page 127

1    A. Yes, it was.
2    Q. So that's the primary area you're talking about
3  in terms of growth, correct?
4    A. Certainly at first it would be.
5    Q. Okay. And it is important in order to project
6  sales within that area to understand as best you can
7  the projected population growth in that area, correct?
8    A. I don't know how important it is but it could
9  be useful. The kind the growth rates we're talking
10  about are much higher than the population growth rates.
11    Q. They certainly are. What about projected
12  growth in income in the geographic area? Wouldn't that
13  be important in determining what type of disposable
14  income people have to purchase supplemental insurance
15  products?
16    A. I don't know whether that would be relevant or
17  important or not.
18    Q. Why don't you know?
19    A. Because I don't know whether people who have
20  more income buy more supplemental insurance products or
21  not.
22    Q. You just don't know one way or another, do you?
23    A. No, I don't know one way or the other.
24    Q. So that's why you can't say that would be
25  important to know in coming up with your growth rates.

Page 128

1    Suffice it to say you've done nothing whatsoever in any
2  form or fashion to project demographic changes within
3  the Valley in coming up with your projected growth
4  rates for Dino Chavez?
5    A. That is correct.
6    Q. And you just don't know whether that's
7  important one way or the other?
8    A. No. I believe that's not important is what I
9  told you earlier.
10    Q. Something you can just ignore entirely in
11  coming up with your conclusions?
12    A. Yes, sir.
13    Q. Okay. Do you know the type of growth, if any,
14  Brownsville teachers are enjoying vis-a-vis their
15  salaries?
16    A. No.
17    Q. Do you know if Brownsville teachers are
18  actually getting paid more or less now than they were
19  in 2001?
20    A. No, I don't know the answer to that.
21    Q. But you would agree that BISD is one of his
22  largest accounts or was one of his largest accounts,
23  correct?
24    A. I would agree with that.
25    Q. Don't you think it's important to know whether

Page 129

1  teachers are going to have a larger salary that they
2  can utilize on buying supplemental insurance in coming
3  up with your projections?
4    A. That could be relevant, yes, sir.
5    Q. But you don't know anything about that, do you?
6    A. I haven't done -- I have no information about
7  projection of where their salaries are going.
8    Q. You don't even know where their salaries were,
9  do you?
10    A. No. That's correct.
11    Q. In coming up with your discount factor just in
12  very kind of a shorthand term, the discount factor is
13  going to take into account risks associated with
14  achieving income in the future, correct?
15    A. That's one of the things it does, yes, sir.
16    Q. And in coming up with your discount rate did
17  you try to take into account any of the political risks
18  associated with changing of school boards or other
19  boards of public entities served by Dino Chavez?
20    A. Considerations like that are one of the reasons
21  why I increased his discount rate above the amount from
22  the size considerations and from risk free rates and
23  from the AFLAC related beta adjusted discount factor.
24  So that was one of the things I was thinking about when
25  I did that.

Page 130

1    Q. So what part of the 21.6 percent discount rate
2  is associated with political risk?
3    A. I don't have a specific proportion that's
4  associated with political risk.
5    Q. Do you think you properly accounted for that
6  kind of political risk?
7    A. That's hard to know. There is, in fact, the
8  extra six percent is a fairly large additional
9  discounting on top of the 15-and-a-half percent we
10 already had.
11   Q. How did you come up with that?
12   A. That's judgment.
13   Q. Look at Exhibit D to your report, which is
14 Exhibit 1.
15   A. Yes, sir.
16   Q. What was the data source for Exhibit D?
17   A. One of the documents in the -- that's here
18 somewhere just had a shaded area in it. I don't know
19 whether we can find it rapidly or not. I could
20 probably find it in my documents that are on the floor
21 faster, unless maybe you would know where it is in
22 there.
23   Q. Take a look at your documents on the floor.
24   A. It's still not here. I don't think that it's
25 in 9.

Page 131

1    Q. Where is it?
2    A. I'm not sure. I mean, I don't know where it
3  is.
4        MS. LEEDS: D was part of that?
5        MS. NEALLY: This was the --
6        MR. STEELE: That may not have gotten
7  copied. Let's go ahead and mark it as 10.
8        (Exhibit No. 10 marked).
9    Q. I will mark it as 10 and ask you on the record,
10 is Horner Exhibit 10 the documents that form the source
11 of the data that led you to complete the calculations
12 in Exhibit D to your report?
13   A. Yes.
14   Q. Dr. Horner, according to your calculations when
15 you project Dino Chavez' income, you would have him at
16 the end of this year in 2003 making $343,000, correct?
17   A. Yes. I believe that's correct. That sounds
18 right. Let me -- I better look before I agree with
19 that but I believe that's correct. I need to find the
20 -- which exhibit is that in that you're looking at, to
21 make this a little faster.
22   Q. Exhibit 3.
23       MR. AGUILAR: Exhibit 3 to his report?
24       MR. STEELE: It would be Horner Exhibit 3.
25   A. Okay. I'm with you. For 2003 we have got

Page 132

1  $343,424, yes, sir.
2    Q. Okay. And compare it in Exhibit 5, if you
3  will. Let me find it for you to save a little time.
4  In 2001, which was the last year that Dino Chavez for
5  the full year was an RSC -- I'll represent to you he
6  says -- and I think these are his handwritten notes to
7  you, correct?
8    A. I believe that's correct, yes, sir.
9        MS. NEALLY: He says what?
10   Q. In Mr. Chavez' handwriting he shows that in
11 2001 his total income that year was about 185,000,
12 correct?
13   A. Actual gross income is what this is labeled.
14   Q. And in 2001, just AFLAC-related, his total
15 gross income he said is 143,730, right?
16   A. That's what this seems to indicate, yes, sir.
17   Q. According to your projections, just two years
18 later he's going to be net -- and this 143,730 is
19 grossing. That doesn't even take into account
20 expenses, does it?
21   A. No.
22   Q. According to your projections, just two years
23 thereafter, he's going to be netting over $343,000,
24 correct?
25   A. This is gross again.

Page 133

1    Q. Are you certain about that?
2    A. Yes, sir.
3    Q. You didn't take out expenses in coming up with
4  this spreadsheet?
5    A. Not here. This is just a calculation of the
6  gross.
7    Q. Okay.
8    A. Expenses are subtracted later.
9    Q. Okay. Fair enough. Show me -- can you show me
10 in Exhibit 5 where -- or Exhibit 3 where expenses are
11 later taken out?
12   A. Yes, sir. They're coming out -- well, it was
13 actually the first page after the cover page if yours
14 is ordered the same as mine, and yours is not ordered
15 the same as mine.
16   Q. What does the top of your page show?
17   A. It shows highlights in the upper left-hand
18 corner.
19   Q. Got it. Okay.
20       MS. LEEDS: Can I see it? Okay. I got
21 it.
22   A. Do you see the figure $325,621.60 is the
23 present value of the expenses?
24   Q. I see. So you did a separate calculation for
25 the entire 25 years to figure out what those expenses

Page 134

1  are and took it off the bottom of the present value of
2  gross income?
3      A. Yes.
4      Q. Okay. Then for comparison purposes, to make
5  sure we're saying apples to apples, let's go back to
6  that page on Exhibit 3, the next page over. So that
7  you're saying his gross -- at the end of this year,
8  2003, would 343,000 whereas just two years earlier his
9  gross was a mere 143, correct?
10     A. Yes.
11     Q. So he's managed to increase his gross by more
12 than double according to your calculations?
13     A. Yes.
14     Q. And by the year -- the five years since 2008
15 you say Dino Chavez, if he stuck with AFLAC, would be
16 making over a million dollars a year?
17     A. Based on these growth rates, that's correct.
18     Q. Okay.
19     A. Again, that's a guess, but yes.
20     Q. Again, that's gross?
21     A. Yes.
22     Q. How many folks -- to your knowledge, how many
23 folks in Brownsville gross a million dollars a year?
24     A. How many?
25     Q. Uh-huh.

Page 135

1      A. To my knowledge?
2      Q. Uh-huh.
3          MR. AGUILAR: Objection; speculation.
4      A. Yeah, I would be speculating. I really don't
5  know how many.
6      Q. Go ahead and speculate and tell me what you
7  think.
8          MR. AGUILAR: Objection; speculation.
9      Q. Do you know of a single person in Brownsville,
10 Texas right now today in September of 2003 that's
11 making gross earnings of a million bucks a year?
12     A. Should I include or leave out plaintiffs'
13 attorneys that I have --
14     Q. Other than plaintiffs' attorneys. How about
15 plaintiffs' experts?
16         MR. AGUILAR: In Brownsville?
17         MR. STEELE: Sorry. I couldn't resist.
18         (Off record.)
19     Q. Let me ask you this. Do you know of any
20 insurance agents that are making a million dollars a
21 year in gross income in Brownsville?
22         MR. AGUILAR: Objection; speculation.
23     A. I should not name any. I don't know of any.
24         THE REPORTER: I'm sorry?
25         THE WITNESS: I do not know of any.

Page 136

1      Q. All right. Let's turn to some other documents.
2  Look at Exhibit 6, please. Look at the first page
3  after Arnold's letter.
4      A. Yes.
5      Q. Is that titled Texas South 1999 Business Plan?
6      A. Yes, sir.
7      Q. And was this provided to you by Mr. Chavez?
8      A. Yes.
9      Q. It shows at the top, received August 25, 2003,
10 Is that your stamp?
11     A. Yes.
12     Q. So this would have been received very recently
13 by you after you completed your report?
14     A. Yes.
15     Q. Do you know -- did you ask for this report from
16 Dino?
17     A. No.
18     Q. Do you know why it was sent to you?
19     A. It contains information -- well, no, I don't
20 really know why it was sent to me. That's correct. I
21 do not know.
22     Q. Did you rely on any of the information in this
23 multi-page document that's clipped together as part of
24 Exhibit 6 that is called Texas South 1999 Business
25 Plan?

Page 137

1      A. No.
2          MR. AGUILAR: Assuming that he made his
3  report.
4      Q. Are you relying on anything in this Texas South
5  1999 Business Plan in arriving at your opinions that
6  you're testifying to here today?
7      A. No.
8      Q. Okay. Look at the next set of documents called
9  Comparables, Other RSCs throughout Texas. That shows a
10 receipt stamp of April 25, 2003, correct?
11     A. Yes.
12     Q. Did you rely on anything in this set of
13 documents in arriving at your opinion in your report
14 since it was received prior to your report?
15     A. This was not received -- oh, it is received --
16 excuse me. Just in the general sense that it shows
17 that RSCs are capable of producing very high gross
18 premium amounts, annual premium amounts.
19     Q. Hang on a second. You've got -- okay. Is this
20 something that was sent to you by Dino Chavez?
21     A. Well, I don't know. I don't know whether --
22 this appears to be an AFLAC produced document on the
23 inside. The cover page, I don't know who prepared
24 that.
25     Q. Look at the writing at the top where it says

Page 138

1 Top 50 RSCs - Year 2002.
2    A. Yes.
3    Q. Does that appear to be Dino's handwriting?
4    A. I couldn't tell you.
5    Q. These are RSCs from all over the country,
6 correct?
7    A. Yes.
8    Q. Not RSCs within necessarily the Brownsville
9 area, correct?
10    A. These are not RSCs in the Brownsville area.
11 That is a fact.
12    Q. Did you rely on this report, the cover page of
13 which says Top 50 RSCs and SSCs in the U.S., in coming
14 up with your opinions in your report?
15    A. As I said before, just to the extent that it
16 demonstrates that RSCs are capable of producing very
17 large -- what would seem to be very large annual
18 premium sales.
19    Q. Does it show a year-to-year comparison over a
20 period of years?
21    A. No.
22    Q. So you really couldn't tell a growth rate from
23 that, could you?
24    A. Not from this document.
25    Q. Look at the one titled Comparables, Other RSCs

Page 139

1 Throughout Texas. Was this also provided to you by
2 Dino Chavez?
3    A. Again, I couldn't tell you exactly how it came
4 to me. I believe that Dino may have gotten this
5 information originally, but I don't know whether he
6 sent it to me or whether he gave it to Mr. Aguilar and
7 it came to me. I don't know.
8    Q. Okay. But you received it April 25th, 2003?
9    A. Yes, sir, that's correct.
10    Q. Did you ask Mr. Chavez how he came to pick
11 these particular RSCs throughout Texas?
12    A. Well, I know that he picked LaFemina because of
13 who he is, but I couldn't tell you -- there's another
14 name in here -- why he picked this other person.
15    Q. Okay.
16    A. There's another -- and it looks like there's
17 still more people. There's a Franklin Davies. I'm not
18 sure -- oh, yeah. I'm sorry. Excuse me. This is
19 LaFemina. This is -- some of this data is when Mr.
20 LaFemina was an RSC.
21    Q. This is not all of the RSCs in Texas, is it?
22    A. Oh, no.
23    Q. Do you know what percentage of the RSCs this
24 represents?
25    A. A small percentage.

Page 140

1    Q. How small?
2    A. Well, I don't know how many RSCs there are.
3    Q. Under ten percent?
4    A. Oh, I'm sure.
5    Q. Do you think it's appropriate to make a
6 statistical projection that's worthy of any weight with
7 a statistical sampling of less than ten percent in
8 making comparisons for purposes of this case?
9    MR. AGUILAR: Objection; argumentative.
10    A. You would have -- could you say that again,
11 please?
12    Q. Can we agree that this represents less than ten
13 percent of the RSCs throughout Texas?
14    MR. AGUILAR: Objection; speculation.
15    A. I believe that to be true.
16    MR. AGUILAR: Give him the rest of them,
17 Buddy, so he can compare them.
18    Q. Do you think that -- do you think it's a safe
19 assumption that Mr. Chavez, in support of this case,
20 would have picked out some of the highest gross RSCs to
21 show you?
22    MR. AGUILAR: Objection; speculation,
23 mischaracterizes the evidence.
24    A. Do I think it would be what?
25    Q. Safe to assume that Mr. Chavez picked out the

Page 141

1 RSCs in Texas who have enjoyed the highest rates of
2 growth in their sales?
3    MR. AGUILAR: Objection; speculation,
4 mischaracterizing the evidence.
5    A. I believe at least one of the documents say
6 something like the top 50 so that clearly is -- that
7 documents the top 50.
8    Q. And that's throughout the entire United States?
9    A. Yes, sir, that's correct.
10    Q. Certainly Mr. Chavez in handing you that was
11 providing you just the top folks throughout the year
12 that you asked that were RSCs and SSCs, correct?
13    A. Yes, sir, that's correct.
14    Q. Do you know if these individual RSCs, this
15 handful of individual RSCs in Texas were also the top
16 -- at the top of their class?
17    MR. AGUILAR: Objection; speculation.
18    A. No, I don't know whether these were at the top
19 of their class or not.
20    Q. Did you rely on this in coming up with any of
21 your conclusions?
22    A. Only to the extent it shows very large amounts
23 of first year annualized premium sales.
24    Q. Did you ask Dino anything about these RSCs
25 shown in here, the makeup of their territories?

Page 142

1    A. We discussed LaFemina, I know. And I don't
2  remember whether we discussed the -- I know we
3  discussed them except in a lot less detail. I don't
4  remember.
5    Q. They certainly don't show up in your notes as
6  having had those discussions?
7    A. That's correct.
8    Q. And you're a pretty meticulous note taker so if
9  you had those discussions do you think they would have
10  shown up in your notes?
11    A. Not necessarily.
12    Q. LaFemina does but none of these folks do,
13  correct?
14    A. That's correct. That's right, the others do
15  not.
16    Q. BISD Employee Growth, let's take a look at the
17  next one after that.
18    A. Yes.
19    Q. This is also provided to you by Dino Chavez,
20  correct?
21    A. I know that it came either directly or
22  indirectly from him, yes.
23    Q. Either him or his counsel, right?
24    A. Yes.
25    Q. And it shows the employee growth at BISD,

Page 143

1  correct?
2    A. Yes.
3    Q. Flip over to the -- we've already looked at
4  that one. Skip that one.
5    MS. LEEDS: Personal and Regional Team?
6    THE WITNESS: That was called Comparables,
7  Other RSCs Throughout Texas.
8    MS. LEEDS: Yeah, we did that one.
9    THE WITNESS: Okay. I don't know why that
10  came back.
11    MS. LEEDS: Okay. The one we haven't done
12  is this one?
13    MR. STEELE: Exactly. Let me see if I can
14  find it. Here it is.
15    Q. Personal and Regional Team. Do you know -- let
16  me make sure we understand what this is. This is a set
17  of documents that shows Dino Chavez' personal
18  production as well as the production of those that were
19  on his team when he was an RSC for the years 1998,
20  '99, 2000, 2001, 2002, and then personal production for
21  Dino through Week 13 of 2003, correct?
22    A. Yes.
23    Q. Was this also provided to you by Mr. Chavez or
24  by his counsel?
25    A. Yes, sir.

Page 144

1    Q. Does it look like his writing also is on here?
2    MR. AGUILAR: Objection; speculation.
3    A. I really haven't -- I really do not know whose
4  writing that is.
5    Q. Do you know how many associates were being
6  supervised by Dino Chavez in 1998?
7    A. No, I certainly don't know. If it's in my
8  notes, it's in my notes, but I don't know.
9    Q. Same question as to 1999.
10    A. I don't have answers for any of the years.
11    Q. So you don't know how many associates Dino was
12  supervising for any of these years, correct?
13    A. I do not know from my memory. If I have in my
14  notes it may be here, but I don't have it in my memory.
15    Q. Do you know where any of Dino's associates for
16  any of these years were located?
17    A. Well, I believe at some point or another we
18  discussed a number of them but it seemed to me they
19  were generally in this area.
20    Q. And that's your understanding, they're
21  generally in the Brownsville area?
22    A. Yes, the lower Rio Grande Valley area was my
23  understanding. I know he had some that were outside of
24  this area as well, but I believe they were all in
25  Texas. I don't remember ever discussing any that were

Page 145

1  outside of Texas. It seems like he had a few in
2  Houston and the Dallas area but I could be wrong on
3  that.
4    Q. Would the lower Rio Grande -- if you would,
5  define the lower Rio Grande Valley area, please.
6    A. To me that would be areas from inside of --
7  this side of Rio Grande City to Brownsville and north
8  as far as Harlingen. Basically that area that would
9  include Edinburg, McAllen, you know, San Benito, Los
10  Fresnos, all those little towns like that.
11    MR. AGUILAR: Not Roma.
12    Q. Was it your understanding that -- was it your
13  understanding that the associates on Dino's team
14  covered that entire area?
15    A. No. It was my understanding that they had
16  their penetration into whatever customers they had.
17  They -- and if you said -- by cover the entire area do
18  you mean they -- actually, now that I'm trying to
19  answer the question, I find that I don't really know
20  what you mean by cover the entire area. That's the
21  problem.
22    Q. Did they make sales or sales presentations to
23  customers within that entire area?
24    A. I'm not sure. I'm not sure that they did that
25  entire area.

Page 146

1    Q.  Do you know what area more specifically Dino's
2  team made sales or sales presentations to?
3    A.  No.  I believe there was some discussion in his
4  deposition but I don't -- but I do not remember the
5  particular areas.  I believe there was some discussion
6  of different school districts.  And I believe there may
7  be some county organizations and maybe the Port of
8  Brownsville or something, but I don't remember the
9  names.
10    Q.  Okay.  Let's talk about the account statements
11  for a minute, please.
12    A.  Yes, sir.
13    Q.  The ones you have in front of you.  They're
14  also part of this Exhibit 6.
15    A.  Yes.
16    Q.  The first one I have is dated 1-31-01.  Is that
17  the first one you have on top of your stack?
18    A.  Yes.
19    Q.  I'd like to, if I can, gain an understanding of
20  it from you.  And I think I do but I'm not absolutely
21  certain.
22        MR. AGUILAR:  It's an AFLAC document.
23    Q.  Since you use these for your report and I
24  understand that you did, Exhibits A and B are taken
25  from this stack of documents, correct?  Take a look at

Page 147

1  your report.
2    A.  Yes.
3    Q.  Okay.  Why don't you turn to Exhibit A first?
4    A.  Okay.
5    Q.  And compare the line on the first page of this
6  January 31 account statement down here near the bottom.
7  It's the second line from the bottom.
8    A.  Yes, sir.
9    Q.  Do you see there's a block entitled premium
10  collected; there's a separate block entitled commission
11  earned, correct?
12    A.  Yes.
13    Q.  And that's divided -- both of these are divided
14  first year and renewal, correct?
15    A.  Yes.
16    Q.  And then first year and renewal are both then
17  subdivided into personal and override, correct?
18    A.  Yes.
19    Q.  And if you look at MTD, is it your
20  understanding that stands for month to date?
21    A.  Normally that would be and that's my
22  understanding, also.
23    Q.  And I believe if you compare that line that's
24  MTD, and I believe it is month to date, for premiums
25  collected and commissions earned, that corresponds to

Page 148

1  the line -- the figures on the line of Exhibit A in
2  your report, correct?
3    A.  That's right.
4    Q.  Now, so if I understand this account statement
5  where it says commissions earned, first year and
6  renewal, it's got personal of 2,026; override of 3,201,
7  correct?
8    A.  Right.
9    Q.  And he's got personal of 948.22 renewal and
10  override of 1,045.24, correct?
11    A.  Yes.
12    Q.  That adds up to, rough figures, over 6,000 --
13  over $7,000, correct?
14    A.  Yes.  That's what it looks like.
15    Q.  Okay.  It then over here on the right-hand
16  side, it says balance equals, a separate block,
17  $2,714.35 CR, correct?
18    A.  Yes.
19    Q.  Does that 2,714.35 represent the amount of the
20  check that Dino Chavez was paid at the end of the month
21  of January 31, 2001?
22        MR. AGUILAR:  Objection; speculation.
23    A.  I'm not certain.
24    Q.  Look below that.  It says CR equals check due.
25    A.  Yes, I see what you see.  But I'm not certain

Page 149

1  if that's the check that he actually got then, but it
2  may be.
3    Q.  Okay.
4    A.  It seemed to me that it may be what he actually
5  got because, see, that credit is a reduction of his
6  balance, I believe.  I need to think about that a
7  little bit more but I think I understand what's going
8  on here.
9    Q.  Can you explain to me what's going on here?
10  Why, if you have got almost $7,000 in commissions
11  earned for that month, Dino only gets a check for 2,700
12  bucks?  Just assume for the sake of argument that
13  that's the check that was cut to him.
14    A.  Let me see if I can recall what's going on
15  here.  When these policies are signed up, call that his
16  personal production, my understanding is that that
17  doesn't -- he gets -- he gets a commission based on the
18  personal production, but he's really only getting it in
19  the sense that they're saying we're going to owe this
20  to you.  We're going to pay you this amount.  And
21  depending on the actual collections -- these are
22  premiums collected.  It's not quite the same as the
23  cash that he's given.  There's not any -- there's not a
24  one-to-one correspondence in the timing between when he
25  earns these commissions because the customers have

Page 150

1  actually paid and when the company says he's entitled
2  to them. And so this reflects AFLAC billing BISD for
3  the employees that are enrolled and then BISD
4  collecting or paying AFLAC and then either collecting
5  before or later the withholding from the employees. My
6  understanding is that they have an account in which
7  they are in essence either given a loan or are given a
8  credit for these amounts. And if they turn out not to
9  be collected then they start adjusting this account.
10   Q. Okay.
11   A. And it's related to that, but I can't tell you
12  exactly -- I don't know -- I don't remember all the
13  details. I know that this was something that we had
14  discussed and I know it causes some timing problems
15  between the commission -- when the commission is earned
16  and when he actually gets the 1099s and when he
17  actually gets the check in hand.
18   Q. Okay.
19   A. There's advances on these commissions --
20   Q. Right.
21   A. -- that he may be paid and get a 1099 and then
22  if there's attrition they take it back out of the
23  account.
24   Q. Which would affect the 1099 the following year?
25   A. Yes.

Page 151

1   Q. For purposes of your report, though, is it
2  correct that you utilized that line that we just
3  discussed, identified as MTD or month to date, from
4  each one of these monthly accounting statements in
5  compiling your Exhibit A for 2001 and Exhibit B for
6  2002 to your report?
7   A. That's correct. By the way, it does appear
8  that there is an amount for the check issued amount.
9  On this 1-31-2001 it appears that he may have been
10  issued a check for $11,442. That's what it says. You
11  see, that's a debit to his account.
12   Q. Now, look up above there. It says balance
13  previous month of 11,442.34.
14   A. Yeah, see, he had already had that much in his
15  account.
16   Q. Okay. So you think that 2,714.35 is going to
17  be a check due the following month?
18   A. It appears that that's what he paid. He had a
19  balance forward the previous month. This says he had a
20  check issued. That's -- we would want to confirm that
21  but I believe that that's what this says.
22   Q. And that's what's confusing me. Let's turn
23  over to the next monthly statement, if you would.
24   A. Okay.
25   Q. Let's just turn it to the next one.

Page 152

1   A. Some of these are not complete.
2   Q. There's two documents here, both of them appear
3  to have been faxed somewhat?
4   A. Yes.
5   Q. The first document that's dated received May
6  12th, 2003.
7   A. Yes.
8   Q. May 18, 2003? It's similar. It shows a credit
9  of 2,714.35 and --
10   MS. LEEDS: Wait a minute, please.
11   MR. STEELE: I'm sorry.
12   MS. LEEDS: May 12th?
13   MR. STEELE: It was received May 12th,
14  2003.
15   MS. LEEDS: Oh, I'm sorry. Okay.
16   Q. Presumably was that when it was received in
17  your office?
18   A. Yes.
19   Q. Okay. But this is for the month ending
20  February 28th, 2001?
21   A. Yes, sir.
22   Q. And it shows in this same February 28th, 2001
23  statement the balance of previous month of 2,714.35,
24  correct?
25   A. That was the credit we saw in the previous

Page 153

1  month.
2   Q. And it shows in this one, too?
3   A. Remember, we thought we were taking out the
4  check.
5   Q. And then it shows check issued in this one of
6  2,714.35, correct?
7   A. Yes.
8   Q. Down here in the box on the May 28th statement
9  it shows 380.65 CR, correct?
10   A. Yes.
11   Q. For check due, right?
12   A. Yes.
13   Q. Okay. Then look at the next document. This is
14  -- appears to be a copy of a check that was cut on
15  February 24th, 2001 to Dino in the amount of $380.65,
16  correct?
17   A. This is probably a carbon copy of the --
18   Q. The check may not have been cut?
19   A. No, there's a check here but this is
20  non-negotiable. I believe this to be a carbon copy of
21  the check with the remittance advisement.
22   Q. Right, right, right. And it's dated February
23  24th, 2001 so -- and this is -- if you look at the next
24  pages it then has a detail of agent or summary as of
25  2-28-01, correct?

Page 154

1    A. Yes.
2    Q. Which presumably are similar to the pages, in
3  terms of format and what they mean, shown on that
4  previous January 31, '01 statement, correct?
5        MR. AGUILAR: Objection; speculation.
6    A. I mean, if they look the same, but I would
7  presume that they're the same if that's what you're
8  asking me. I'm not sure what --
9    Q. Right.
10    A. -- what other question -- I'm not sure if it's
11  insulting.
12    Q. None whatsoever. I'm just trying to establish
13  that the same type of information on the January 31
14  month end statement is also contained in the February
15  28th month end statement?
16    A. It appears to be, yes, sir.
17    Q. The one exception is I believe for February
18  28th is the only one in which we have a copy of what
19  appears to be a remittance advice to Dino Chavez is
20  dated February 24, 2001, correct?
21    A. I don't remember seeing any more. I just
22  remember that one.
23    Q. Okay. In here he's written a note to Frank
24  that says, "FYI, this is why it's tough to give up
25  personal production and at the same time spend more

Page 155

1  money on recruiting and office expenses and
2  administration. I am not complaining. I just wanted
3  you to be aware. Dino." And it appears to be a note
4  from Dino to Frank, correct?
5    A. Yes.
6    Q. But it looks like, in fact, if the first page
7  of the monthly accounting statement shows that 380.65
8  credit and in that same month AFLAC cuts a check or
9  direct deposits that same amount in that agent's
10  account, correct?
11    A. Apparently.
12    Q. So one could figure out a running total, could
13  one not, of what Dino was actually paid by AFLAC as his
14  commissions due by adding up all of these numbers in
15  this bottom right-hand corner where it says balance?
16        MR. AGUILAR: Objection; mischaracterizing
17  the evidence.
18    A. I'm not sure.
19    Q. You just don't know?
20    A. No, I don't know. I can see why you're
21  thinking that, but I don't know that if that, in fact,
22  covers everything that he is paid or if, in fact, he
23  always gets a check for that amount.
24    Q. I'm just trying to figure out what Dino
25  actually put in his pocket from AFLAC and whether you

Page 156

1  can determine that from these monthly accounting
2  statements?
3    A. I'm not sure.
4        MS. NEALLY: Let's take a break for lunch.
5        (Lunch recess)
6            EXAMINATION
7  BY MS. NEALLY:
8    Q. Okay. This is the continuation of your
9  deposition. Dr. Horner, my name is Elizabeth Neally,
10  I'm the attorney that represents the Brownsville
11  Independent School District. I'm going to try to
12  follow up with some questions that Mr. Steele was
13  asking you and not to be repetitive but I need a lot
14  more clarification than Mr. Steele, okay? You have
15  been -- you've been doing this consulting work for the
16  last 18 years, is that right, since 1985?
17    A. Yes.
18    Q. Okay. And in that time I'm assuming you have
19  had hundreds of cases where you have consulted; is that
20  right?
21    A. Yes.
22    Q. You don't have any knowledge about an average
23  of how many in a year or anything like that?
24    A. Yes.
25    Q. How many?

Page 157

1    A. About 100.
2    Q. 100 a year?
3    A. Roughly. It varies. Probably closer to 91,
4  92, somewhere in there if you were to average.
5  Occasionally I get 107 or so.
6    Q. Okay. So about 100 a year?
7    A. About 100 a year.
8    Q. Okay. And you also -- and that's the
9  predominant way you make your living; is that right?
10    A. Yes.
11    Q. Okay. Do you also still teach?
12    A. No.
13    Q. Okay. When did you quit teaching?
14    A. The last time I taught was in '99.
15    Q. Okay, 1999. And that was with Texas A&M?
16    A. Texas A&M.
17    Q. Okay. So since 1999 your sole source of income
18  has been from consulting in lawsuits?
19    A. My sole source of my personal earned income is
20  from consulting of various kinds, nearly all of it is
21  lawsuits but it is not 100 percent lawsuits.
22    Q. Okay. What percentage; 90 percent, 95 percent?
23    A. 96 or 97, somewhere in there. Close -- not 100
24  but not --
25    Q. Okay.

Page 158

1    A. You know, 95 percent or maybe a little higher,
2  somewhere in there.
3    Q. And that was, you said, your predominant source
4  of income; is that what --
5    A. Earned income.
6    Q. Earned income as opposed to --
7    A. Investment income.
8    Q. Okay.
9    A. My own earnings, not including my wife's income
10  or family income of any kind.
11    Q. Okay. And you don't have another business of
12  any type?
13    A. No.
14    Q. Well, you hesitated when you answered that
15  question.
16    A. Well, I was thinking about it. But I don't
17  have any other businesses.
18    Q. Okay. You don't own any other interests in any
19  other businesses?
20    A. Not right now.
21    Q. When you were teaching at A&M what type of
22  subjects were you teaching?
23    A. Micro economics.
24      MS. LEEDS: Micro?
25      THE WITNESS: Micro.

Page 159

1    Q. Okay. You had in your file and produced in
2  response to the request for disclosures what I guess
3  we'll mark as --
4    A. I don't know if it would be in there.
5    Q. It is in there. I just don't where it is. I
6  don't want to be duplicative. This isn't in the front
7  of the -- of your file. This is your rate sheet for
8  2003; is that right?
9    A. When you say this is my rate sheet for -- this
10  is the rate sheet for this particular case.
11    Q. Because this doesn't say that. This says rates
12  for cases opened after January 1st, 2003.
13    A. Yes, because it was modified from the one we
14  normally use.
15    Q. What's your normal rate?
16    A. My normal rate is the same but we don't have a
17  deposit arrangement in all cases.
18    Q. Okay. In this case you required a $3,000
19  deposit?
20    A. Yes.
21    Q. Why is that?
22    A. Because this kind of case involves a
23  significant amount of more work than the usual case.
24  It's out of town, which means that there's somewhat
25  more of a risk in this type of case that I'll end up

Page 160

1  holding the bag on the last bit of work that I do and
2  that's why I try to get a deposit to cover me in case
3  there's a problem with getting the last payment.
4    Q. Okay.
5    A. We do that in virtually all of our commercial
6  litigation.
7    Q. You require a retainer; is that what you're
8  saying?
9    A. Yes. Well, we get a retainer in all of our
10  cases but we don't require that it be replenished in
11  other cases other than commercial.
12    Q. And when you say it has to be replenished, you
13  mean that you're paid?
14    A. That I keep a $3,000 -- right.
15    Q. Okay.
16    A. In other words, when those -- those invoices
17  will ask if I have -- if the balance on hand, so to
18  speak, is -- if the credit is less than 3,000, the
19  invoices will include an amount to replenish the
20  deposit back to the $3,000 level.
21    Q. So, for instance --
22    A. So if you added all those invoices up, you're
23  going to end up with too high of a number. You have to
24  be careful about that.
25    Q. So, for instance, the invoice that's dated

Page 161

1  5-15-03 -- I'm sorry, May 16th, 2003, that shows a
2  balance due of $13,199 is really -- your services were
3  only 10,199?
4    A. I would have to see it. And the reason why I'm
5  hesitating on that one is that there were $13,000 in
6  services because I began this case with a $3,000
7  credit. So at some point that was used up and I asked
8  for another 10,000.
9    Q. Okay.
10    A. The way to find --
11    Q. The last -- as of the last bill that we were
12  provided, which is July 22nd, 2003, what were your
13  total services?
14    A. There's another one in Exhibit 9.
15    Q. Okay. Where?
16    A. Well, wherever Exhibit 9 is. Exhibit 9 was the
17  exhibit that consisted of those things that were copied
18  because they didn't exist.
19    Q. What's the total services charged?
20    A. We would have to add them up. I don't know the
21  answer to that.
22      MS. NEALLY: I think I saw a calculator.
23      THE WITNESS: One of the invoices is
24  missing. It was here earlier. I no longer have a copy
25  of this one. We may want to copy this before we're

Page 162

1    done.
2         MR. AGUILAR: Okay.
3         MS. NEALLY: Oh, I know where that is.
4    You put them clipped separately in your red -- the
5    briefcase thing you have, that thing.
6         THE WITNESS: They're separate?
7         MS. NEALLY: Yes. There is a clipped set
8    of documents with the yellow sheets. Those were the
9    ones that were copied extra.
10        THE WITNESS: You're right.
11        (Off record).
12   A. $14,681.
13   Q. And that was as of what date?
14   A. August 31st.
15   Q. Okay. And, for instance, today's deposition
16   you're charging $300 an hour; is that right?
17   A. Yes.
18   Q. Okay. Do you also charge for like travel time
19   coming down from Corpus?
20   A. Yes.
21   Q. Okay. And did you come down today or did you
22   come down yesterday?
23   A. Well, I didn't come down from Corpus at all. I
24   came over from --
25   Q. McAllen?

Page 163

1    A. -- McAllen and I did not charge this -- either
2    of these clients for that trip from McAllen. I charged
3    that as -- I charged my McAllen client one hour as a
4    return trip.
5    Q. Okay.
6    A. And I'm going to charge these clients for the
7    whole trip back.
8    Q. I think I saw a note that you were testifying
9    in another case in McAllen yesterday?
10   A. Day before.
11   Q. Day before yesterday, okay. So how much more
12   for today's -- for the charges for this deposition?
13   A. Well, we started at 8:00 and if we quit at
14   3:00, that's -- well, we're not going to quit at 3:00.
15   If we quit at 4:00, that's eight hours minus an hour
16   for lunch, that's seven hours.
17   Q. Plus the travel time back?
18   A. That's another -- ten hours, yes.
19   Q. And did you have any preparation time --
20   A. Yes.
21   Q. -- before today?
22   A. Yes.
23   Q. When was that, yesterday?
24   A. Yes, almost all yesterday.
25   Q. So another eight hours?

Page 164

1    A. Maybe more.
2    Q. So eight -- another $2,400?
3    A. If it's eight hours, yes.
4    Q. It may be more than that?
5    A. But it may have been -- but it would have been
6    split with the other case.
7    Q. Okay. Because you're here testifying on
8    another case that Mr. -- you were supposed to testify
9    in another case that Mr. Aguilar had?
10   A. Yes.
11   Q. And these are the only two cases you have with
12   him; is that right?
13   A. That's correct.
14   Q. Okay. And I am a bit confused about this
15   because I wasn't looking at the documents when you and
16   Mr. Steele were talking about completely and I didn't
17   get to see the document that we hadn't been provided
18   earlier, but did you actually read Mr. LaFemina's
19   deposition?
20   A. The first volume of it I read.
21   Q. Okay. How about Ron Levine's deposition, did
22   you read his?
23   A. I don't think so.
24   Q. Okay. And you haven't read the second volume
25   of Mr. LaFemina's deposition; is that correct?

Page 165

1    A. Correct.
2         MR. AGUILAR: I don't think we have got
3    it, have we?
4    Q. You also had in your files the documents that
5    were supplied to us today, a copy of Dr. House's
6    report; is that right?
7    A. Yes.
8    Q. Did you -- do you have any opinions related to
9    Dr. House's report?
10   A. Yes.
11   Q. What are they?
12   A. Well, I'm not sure.
13   Q. First of all, when did you get a copy? You got
14   it on June 20 --
15   A. 9th.
16   Q. 29th.
17   A. Because it's double stamped, I misread it.
18   Q. On June 29th, 2003, so you've had it for over a
19   month. Have you formulated any opinions related to the
20   report?
21   A. Yes, I'm sure I have.
22   Q. Okay. Have you been asked by plaintiff's
23   counsel to formulate any opinions?
24   A. Not -- well, not specifically.
25   Q. You have discussed with him, I assume?

Page 166

1    A. Yes.
2    Q. How many hours would you say you have spent
3  discussing it with him?
4    A. Several yesterday. I don't know.
5    Q. Okay. Do you agree or disagree?
6        MR. AGUILAR: With?
7    Q. The report or the opinions expressed in it.
8    A. Well, I disagree with a lot of it. I may agree
9  with some of it, but I'm not sure --
10   Q. Okay. Why don't we start with that much?
11   A. I'm not sure if I know how much.
12   Q. Let me start and ask -- tell me the portions of
13  it you agree with.
14       MR. AGUILAR: Objection; overly broad.
15   Q. I'm talking about the report you have in hand,
16  what portions of it do you agree with?
17       MR. AGUILAR: Are you asking him to go
18  through every sentence?
19       MS. NEALLY: At least the paragraphs.
20       MR. AGUILAR: That's the only way he's
21  going to be able to answer that question.
22   Q. Have you been asked to render any opinions at
23  the trial of this case regarding that? I mean, do you
24  have any intentions of doing so?
25   A. I don't know. I don't have any intentions.

Page 167

1    Q. Well, have you been requested to do so?
2    A. Not yet.
3    Q. Okay. Well, to the extent that it might be a
4  possibility then I would like you to please advise me
5  of what portions you agree with out of the report.
6    A. I have no opinions either way about his first
7  paragraph.
8    Q. You know what I need you to do, maybe just pull
9  out your copy out of your file so I can look at this
10  because I did not bring mine.
11       MR. AGUILAR: Which exhibit is that?
12       MS. NEALLY: 7.
13   A. I don't think I have a disagreement with
14  anything in Paragraph 2.
15   Q. Okay.
16   A. I think the language in Paragraph 3 is probably
17  misleading but it's not really very crucial to my
18  analysis so I wouldn't necessarily -- I'm not sure
19  whether I would be expressing opinions on this or not.
20  I think Mr. Chavez would probably disagree with some of
21  these things.
22   Q. Let me just ask you something. Let me ask you
23  one thing as a point of clarification before we proceed
24  with discussing this report. You earlier testified
25  that you had been asked to render preliminary

Page 168

1  calculations illustrative of the magnitude of the
2  damages suffered by Mr. Chavez; is that right?
3    A. That's certainly what I did, yes.
4    Q. Okay. And that was what you were retained to
5  do; is that right?
6    A. I was retained to perform calculations that
7  would help the trier of facts determine an appropriate
8  level of damages.
9        MS. NEALLY: I'm going to object to the
10  responsiveness of that answer.
11   Q. What you have done so far is to do preliminary
12  calculations of the magnitude of the damages, but as
13  you earlier stated, you haven't had the opportunity to
14  actually mitigate to show what the mitigation would be
15  of those damages so it's not a full figure; is that
16  right?
17   A. It's not complete.
18   Q. It's not complete?
19   A. What I have done so far is preliminary.
20   Q. Right, okay. But you were not retained to
21  render any opinions regarding the --
22       MR. AGUILAR: House's report?
23       MS. NEALLY: No, not House's report.
24   Q. -- regarding whether or not the actions taken
25  by the Brownsville Independent School District or Dr.

Page 169

1  Sauceda or AFLAC were reasonable or unreasonable,
2  right?
3    A. I don't believe I was, no.
4    Q. Okay. And you don't have any opinions right
5  now, expert opinions, related to that, do you, based on
6  your expertise?
7    A. No. I guess I might have some observations
8  about some portions of that, but by and large I don't
9  -- I wouldn't expect to be asked about that.
10   Q. One of the reasons I'm asking you these
11  questions is because in the -- in the other report that
12  you did for the other case where Mr. Aguilar retained
13  you, you actually stated in the report that -- that you
14  were not asked to investigate whether actions taken by
15  BISD and its employees were reasonable or unreasonable.
16  The same thing holds true here; is that right?
17   A. That statement is exactly right.
18   Q. Okay. And you were not asked to investigate
19  whether the economic effects being analyzed were the
20  result of actions by these defendants? That's what you
21  said in this other report?
22   A. That's correct.
23   Q. Okay.
24   A. That's what I said in the other report. I
25  don't believe I was really asked to determine whether

Page 170

1  -- who caused what in this particular case either.
2      Q.  Okay.
3      A.  If that answers the question.
4      Q.  Okay.  And you're not holding yourself out to
5  be an expert in the insurance industry; is that right?
6      A.  That is correct.
7      Q.  Okay.  So returning to Dr. House's report, we
8  were on I believe it was Paragraph 3 and you said you
9  -- that you personally didn't have any agreement or
10  disagreement?
11      A.  Well, what I said was that he's really reciting
12  facts as he knows them, and my only basis for disputing
13  any of those would be what I was told.  There's not an
14  expert issue with regard to those.
15      Q.  Okay.
16      A.  Those descriptions are not necessarily the
17  words that I would suspect that would be used by Mr.
18  Chavez in describing these and I probably wouldn't
19  either because of that.
20      Q.  Okay.  But the facts that you were told, you
21  were told by Mr. Chavez --
22      A.  That's correct.
23      Q.  -- related to this, right?
24      A.  Yes.
25      Q.  Okay.  Now, did you notice the footnotes to

Page 171

1  this report and to these facts that are being stated?
2      A.  Yes.
3      Q.  Okay.  Did you verify whether or not those
4  were, in fact, stated by Mr. Chavez in the deposition
5  as they're referred to in paragraphs -- I mean, in
6  footnotes one through six which cite the exact page and
7  line number?
8      A.  I believe that I did on the ones that I had any
9  particular concern about.  I didn't check all of them.
10      Q.  Did you find them to be right?
11      A.  I believe I found nearly all of them to be
12  right.  It seems like one of them I may not have found
13  the particular reference --
14      Q.  Okay.
15      A.  -- to the fact he was talking about.  I don't
16  remember which one it was.
17      Q.  So then how would Paragraph 3 be misleading?
18      A.  Because it's --
19      Q.  It's Mr. Chavez' own words.
20      A.  I don't believe that it is accurate to say that
21  these are Mr. Chavez' own words.
22      Q.  Okay.  Let's move on to Paragraph 4.  Do you
23  disagree or agree with that paragraph?
24      A.  I don't believe that he's still receiving
25  commissions from the sale of AFLAC policies.  I don't

Page 172

1  think there's any.  I don't think he's selling AFLAC
2  policies now.
3      Q.  You don't know whether or not he's receiving --
4      A.  He's receiving renewal premiums.
5      Q.  Right.  Receiving renewal -- and as far as you
6  know, he's not selling them to the City of Brownsville?
7      A.  Oh, I'm sorry.  I'm thinking -- that, I don't
8  know.
9      Q.  You don't know that.  Were you aware that AFLAC
10  lost its business with BISD to Colonial beginning with
11  the November to December 2002 enrollment period for
12  policies effective during 2003?
13      A.  Yes.
14          MR. AGUILAR:  Objection; assumes facts not
15  in evidence, mischaracterizes the evidence.
16      Q.  And did you know that when you wrote your
17  report?
18      A.  No.
19      Q.  You learned that after you wrote your report?
20      A.  Yes.
21      Q.  When did you learn that information?
22      A.  When I read this report, I believe.
23      Q.  That's the first time you became aware that
24  AFLAC was no longer the TPA for BISD for the 2003
25  year --

Page 173

1          MR. AGUILAR:  Objection.
2      Q.  -- beginning with the enrollment of 2002?
3          MR. AGUILAR:  Objection; mischaracterizing
4  the evidence and assumes facts not in evidence.
5      A.  I was aware that AFLAC -- well, that certain
6  persons were acting as TPA for BISD.  I wasn't sure
7  whether they were really officially the TPA for BISD,
8  and I don't believe AFLAC itself was actually the TPA
9  at BISD.  My understanding was that Ron Levine was the
10  -- was acting at one point as the TPA and I'm not sure
11  whether he really was that either.
12          MS. LEEDS:  Objection; nonresponsive.
13          MS. NEALLY:  Objection; nonresponsive.
14      A.  Maybe you should ask the question again.
15      Q.  My question was if you first learned of this
16  when you read this report, right?
17      A.  I'm not sure that this is correct, so I can't
18  say this is the first time I heard this statement
19  written.
20      Q.  Okay.  If, in fact, this is true and AFLAC lost
21  out as the TPA for the 2002 enrollment period for the
22  year 2003, does that change any of the opinions that
23  you have rendered in your report?
24      A.  No.
25      Q.  Okay.  So you disagree with that statement?

Page 174

1    A. Which statement?
2    Q. The second sentence. I'm sorry. Third
3  sentence of that paragraph.
4    A. My understanding is that there was a change in
5  the relationship between AFLAC and BISD and Colonial is
6  occupying some portion of that relationship is my
7  understanding.
8    Q. Okay. And that was your understanding based on
9  what, conversations with Mr. Chavez?
10    A. Yes.
11    Q. Okay. Mr. Chavez did not relate to you that
12  AFLAC was no longer the TPA for BISD beginning with the
13  November to December 2002 enrollment period for
14  policies effective during 2003; is that correct?
15        MR. AGUILAR: Objection; mischaracterizing
16  the evidence and assumes facts not in evidence.
17    A. No.
18    Q. That's not correct?
19    A. No.
20    Q. What's not correct?
21    A. Mr. Chavez -- my understanding of what Mr.
22  Chavez told me was something different.
23    Q. Okay.
24    A. And so I can't answer the question.
25    Q. Right.

Page 175

1    A. I can't agree with what you're asking me to
2  agree with.
3    Q. And if you read back my question, I think it's
4  going to be, isn't it true that Mr. Chavez didn't tell
5  you this; is that right?
6    A. Oh, that's true. Mr. Chavez did not tell me
7  this. That's a fact. That's true.
8    Q. He did not tell you that AFLAC was no longer
9  the TPA for BISD for the November/December 2002
10  enrollment?
11    A. Precisely, that's right. That's a fact.
12    Q. Okay. And so when you rendered your opinion
13  you didn't have -- your opinions in your report you
14  didn't have that information available to you?
15        MR. AGUILAR: Objection; vague and
16  multifarious.
17    Q. Okay. Let's move on to Paragraph 6.
18        MS. LEEDS: 5.
19    Q. I'm sorry, 5. Paragraph 5. Do you agree or
20  disagree with the statements made in this paragraph?
21    A. I disagree.
22    Q. And do you agree with all of it or just one
23  sentence of it or what?
24    A. I definitely disagree with the last sentence.
25    Q. Okay. Because you believe that he suffered

Page 176

1  permanent injury?
2    A. Yes.
3    Q. Okay. Anything else within that paragraph that
4  you disagree with?
5    A. No.
6    Q. Okay. How about Paragraph 6?
7    A. I disagree with the second sentence.
8    Q. What portion of it do you disagree with?
9    A. BISD was not a customer base assigned to Mr.
10  Chavez.
11    Q. What was it?
12    A. My understanding is that basically Mr. Chavez
13  brought that customer base to AFLAC.
14    Q. And what -- what did you base that on, your
15  conversations with Mr. Chavez?
16    A. Yes.
17    Q. And any other documentation or evidence to
18  support that statement?
19    A. Not that I can think of.
20    Q. Do you realize -- you do agree that it
21  was his primary customer base?
22        MR. AGUILAR: Objection; specificity.
23    A. I don't know what you mean by primary customer
24  base.
25    Q. His primary account.

Page 177

1        MR. AGUILAR: Objection; specificity.
2    Q. His largest account.
3    A. I would agree with that.
4    Q. Okay. And to the extent that primary and large
5  are the same you would agree it was his primary
6  account?
7    A. If they're the same, I could agree with that.
8    Q. Okay. Have you seen any -- in your file and I
9  don't recall having -- I think I did see maybe one.
10  Did you see the contract between BISD and AFLAC for the
11  TPA position?
12    A. No, I don't think -- I don't think I have a
13  copy of that in my file.
14    Q. Did you see the contract between Dino -- I mean
15  Mr. Chavez and AFLAC?
16    A. I don't think so.
17    Q. So your sole basis for saying that the account
18  wasn't assigned to Chavez is just based on your
19  conversations with Mr. Chavez; is that correct?
20    A. Yes.
21    Q. Okay. And sentence two was the only sentence
22  of that paragraph that you disagree with; is that
23  correct?
24    A. That's what I told you, yes.
25    Q. Okay. The next paragraph, Paragraph 7, what

Page 178

1 portions of that do you agree with or disagree with?
2 I'm sorry. Let's just keep it to disagree with because
3 that's what you've been saying, which portions you
4 disagree with.
5     A. I believe that in my discussions with Mr.
6 Chavez that he thinks that the language used by Mr.
7 Andrus in that portion of his deposition was not
8 precisely correct and that -- it depends on what you
9 mean by the word producing. Mr. Chavez related to me
10 that he may have 30 agents all together but that a much
11 smaller number are actually producing.
12     Q. Okay.
13     A. And that they're actually selling policies.
14     Q. And what percentage of the 30 is actually
15 selling?
16     A. I think he told -- now, I believe he told me
17 ten or it's roughly ten.
18     Q. So out of 30 only ten are producing agents?
19     A. Well, yes.
20     Q. According to Mr. Chavez?
21     A. Yes. And they're not clear what they mean.
22 They seem to be using a different language but that was
23 -- that's something that I was told.
24     Q. Any other portions of that paragraph that you
25 disagree with?

Page 179

1     A. I don't believe so.
2     Q. Okay. How about the next paragraph?
3     A. Well, it doesn't really say too much. It says
4 he disagrees so I have no comment on that.
5     Q. Okay. Any portion of -- what is that --
6 Paragraph 9, labeled No Mitigation of Damages?
7     A. If you don't mind I'm going to put numbers on
8 mine even though it was marked as an exhibit before.
9     Q. No.
10         THE WITNESS: Do you have an extra copy?
11         MR. AGUILAR: I have got an extra copy.
12     A. This is my copy.
13     Q. Oh, sure.
14     A. Is that okay? I just wanted to note on the
15 record that I was actually going to add numbers that
16 didn't exist in the --
17     Q. And, actually, I wouldn't mind having them
18 numbered anyway for the purpose of the exhibit so I'll
19 do the same.
20     A. We're on No. 9 now?
21     Q. Yes. What portions of Paragraph 9 do you
22 disagree with?
23     A. I would disagree with his characterization of
24 -- in the sentence that begins with, according to
25 Horner's most recent calculation.

Page 180

1     Q. Okay. Because you believe that Mr. Chavez will
2 -- that he has become employed and productive and will
3 be employed and productive in the next 25 years; is
4 that right?
5     A. Yes. So, strictly speaking, those calculations
6 that I performed are not really damage calculations.
7 They're a portion of what would be in a damage
8 calculation --
9     Q. Right.
10     A. -- but they're not damage calculations.
11     Q. And I think we covered that with Mr. Steele
12 that you would have to take into consideration the
13 mitigation of damages which you expect to be much
14 larger than the $7,000 figure that is put in your
15 report; is that right?
16     A. Much larger.
17     Q. Okay. Anything else in 9?
18     A. No.
19     Q. Okay. How about Paragraph 10?
20     A. In Paragraph 10, the beginning of the sentence
21 says, "It is quite probable that Chavez will excel in
22 his next endeavor," I agree with that portion of that
23 sentence. The next portion I believe would be pretty
24 speculative that, "His future earnings stream will
25 equal or exceed what he would have earned as AFLAC's

Page 181

1 RSC over the next 25 years."
2     Q. Why?
3     A. Because I believe that there is not evidence
4 that he will exceed what he would have earned as an
5 RSC.
6     Q. According to the figures that you projected in
7 your report; is that right?
8     A. I just don't see any evidence that says that
9 Mr. Chavez, as talented as we -- as I think he is, is
10 likely to exceed what he would have earned as an RSC.
11     Q. But you haven't seen any evidence to the
12 contrary either, right? So far you haven't seen any
13 evidence as far as what he would have earned?
14     A. Well, we have some -- as I said before, we have
15 some evidence that he's -- he's starting again. His
16 business is growing rapidly, but we don't have enough
17 evidence that I would say would allow me to accept the
18 very last sentence in this paragraph, which is
19 basically where Dr. House says, "There is significant
20 evidence that supports this likelihood."
21     Q. Okay. And that's based on the figures that you
22 provided us for him to -- that as an RSC he would have
23 more than doubled his income in two years?
24         MR. AGUILAR: Objection; mischaracterizing
25 the testimony.

Page 182

1    A. It is based on my --
2        MR. AGUILAR: Vague.
3    A. It is based on my projections, yes, but your
4  characterization of those projections is not correct.
5  It's not his income. It's the gross revenue --
6    Q. The gross revenue --
7    A. -- more than doubled.
8    Q. Right -- was going to double, right? The gross
9  revenue would have more than doubled in two years --
10   A. Yes.
11   Q. Based on that projection you don't see how he
12 could continue to earn that kind of money, correct?
13   A. I don't know that he could catch up to that. I
14 don't have anything that would lead me to believe that
15 there's -- that that's likely. I couldn't say it's
16 quite probable, in other words.
17   Q. But you certainly do think that Mr. Chavez
18 would excel in his next endeavors, whatever they may
19 be; is that right?
20   A. I believe he's likely to.
21   Q. Okay. How about the next paragraph, Paragraph
22 11? You don't have any reason to disagree with that;
23 it's a quote from his deposition.
24   A. No, I don't disagree with Paragraph 11.
25   Q. Okay. And starting with --

Page 183

1    A. I started 12 with, "Chavez argued."
2    Q. Okay. And that paragraph you also agree that
3  that's just a quote?
4    A. Yes.
5    Q. And then 13, do you agree that "Chavez
6  currently remains an AFLAC agent but is no longer
7  'captive'"?
8    A. Well, it kind of depends on what you mean by
9  free to sell. But I would agree with the basic idea of
10 that paragraph.
11   Q. Okay. How about Paragraph 14; which again is a
12 quote?
13   A. I have no reason to disagree with 14.
14   Q. How about 15?
15   A. I have no reason to disagree with that
16 testimony from Mr. Andrus.
17   Q. How about 16?
18   A. I don't actually disagree with that one either.
19   Q. Okay. How about 17?
20   A. That's correct.
21   Q. Okay. And how about 18?
22   A. That is not true.
23   Q. Okay. And why do you disagree with that? What
24 was your -- what did you base the assumption?
25   A. Well, for one thing we had very large growth

Page 184

1  rates in 2000 and would have had a very large growth
2  rate in 2001.
3    Q. Okay. Anything else?
4    A. At the time this report was written I didn't
5  have anything else.
6    Q. And now you have?
7    A. Now I have my understanding of what Mr.
8  LaFemina said --
9    Q. Okay.
10   A. -- in his deposition.
11   Q. Anything else?
12   A. Not that I know of.
13   Q. Okay. How about Paragraph 19?
14   A. I would say that Mr. Chavez' past success would
15 be evidence of -- that would suggest that he might have
16 the capability of meeting that requirement.
17   Q. Okay. This is on your assumption that Dino
18 Chavez was going to be an RSC for the next 25 years of
19 his life to the age of 62, okay? And this is an
20 assumption that you made based on your conversations
21 with Mr. Chavez regarding his prowess as an insurance
22 agent; is that correct?
23   A. That was also based on his performance, and my
24 understanding is there were letters of commendation
25 that he had been successful in serving AFLAC and to

Page 185

1  Brownsville Independent School District when they had
2  wanted to do so for years, that he had, in fact, put
3  together the kind of team that Dr. House relates
4  earlier in the report and that he had very high growth
5  rates.
6    Q. And, again, this is based on -- this assumption
7  of yours is based on the documentation that you have in
8  your file that we have produced and attached to the --
9  will be attached to this deposition and in your
10 conversations with Mr. Chavez; is that right?
11   A. Yes.
12   Q. Would you agree that there are no guarantees
13 that someone is going to be employed for 25 years in
14 this specific position?
15   A. I do.
16   Q. Okay. That brings us up to 20, Page 5.
17   A. I need to start numbering again. I stopped. I
18 have No. 25 starting at the bottom of the page and
19 that's a continuation and I'll start 26 with Chavez'
20 commissions. 30 is the last paragraph I have.
21   Q. Okay.
22   A. And then 31 is the very last paragraph in the
23 report.
24   Q. Okay. How about 20, do you agree or disagree
25 with Paragraph 20?

Page 186

1    A. Well, I don't know if impressed is the right
2  word, but I guess it could be. So I probably wouldn't
3  argue with that.
4    Q. Okay.
5    A. I said I didn't know whether impressed was
6  really the right word or not, but maybe it is. So I'll
7  not disagree with it.
8    Q. So you agree -- you say you agree with that?
9    A. Yes. I guess I certainly agree with that.
10    Q. All right. And No. 21, do you agree or
11  disagree with that paragraph?
12        MR. AGUILAR: Objection; specificity.
13    A. I'm sorry. Would you ask the question again?
14    Q. Let me just preface this. You earlier said
15  that you're not an insurance expert. You're not
16  holding yourself out to be an insurance expert,
17  correct?
18    A. Correct.
19    Q. Do you agree or disagree with the contents of
20  Paragraph 21?
21        MR. AGUILAR: Objection; speculation.
22        MS. LEEDS: It's kind of waived, isn't it?
23        MR. AGUILAR: No.
24    A. Well, it's kind of peculiar language. I'm not
25  really sure whether he meant to say this or not. I'm

Page 187

1  not quite sure what he means when he says that "AFLAC
2  was given exclusive rights to market AFLAC policies."
3  To me that sentence doesn't make any sense, so I don't
4  know whether to agree or disagree with it given the
5  peculiar sentence -- given the content.
6    Q. Are you familiar with what a cafeteria plan is?
7    A. Yes.
8    Q. And you're familiar with that from your
9  conversations with Mr. Chavez?
10    A. No, I have known about that for a long time.
11    Q. Okay. And do you have any knowledge about --
12  do you -- what portions of the sentence are you
13  disagreeing or agreeing with? Are you just saying it's
14  peculiarly worded or are you telling me you can't
15  disagree with it?
16    A. "AFLAC was given exclusive rights to market
17  AFLAC policies." I'm not sure what it means. It would
18  be -- it's just a very peculiar sentence, that AFLAC
19  would be given exclusive rights to market their own
20  policies. Someone else would be -- it doesn't make a
21  lot of sense to me.
22    Q. Were you aware that when they were enrolling
23  individuals in the cafeteria plan that they were given
24  exclusive access to employees to market AFLAC products?
25        MR. AGUILAR: Objection; vague.

Page 188

1    A. I was aware that Dino's folks were given the
2  right to sell these policies at Brownsville Independent
3  School District and they were the only ones who were
4  given the rights to do that.
5    Q. So you agree with that sentence?
6    A. I think it's a weird sentence so I'm not going
7  to agree with it.
8    Q. Okay. How about the next sentence?
9    A. Okay. Can we take just a very short break? I
10  need the run down the hall.
11    Q. Sure.
12        (Recess.)
13    Q. We're on Paragraph 21, Sentence 2.
14    A. I disagree with that sentence, the first part
15  of it.
16        MR. AGUILAR: Same objection; speculation
17  and basically to anything in that paragraph. Go ahead.
18    Q. Okay. And that would be based on conversations
19  with Mr. Chavez?
20    A. Yes, my understanding is that AFLAC was not
21  replacing an existing carrier.
22    Q. You didn't understand that AFLAC was replacing
23  a different carrier in 1999?
24    A. That's correct.
25    Q. What year did they come in?

Page 189

1    A. They weren't replacing an existing carrier,
2  period, to my understanding.
3    Q. Were they -- did you understand that AFLAC --
4  when do you understand that AFLAC came on board as the
5  TPA for BISD?
6        MR. AGUILAR: Objection; assuming facts
7  not in evidence and mischaracterizing the evidence.
8    A. My understanding is that AFLAC people were
9  given the right to sell AFLAC policies in 1999. I
10  believe that is correct.
11    Q. Okay.
12    A. Or is it '98? I think it was '98.
13    Q. For the '99 --
14    A. It was --
15    Q. '98 enrollment for the '99 school year -- for
16  the '99 year?
17    A. That may be right. That sounds right.
18    Q. Well, Mr. Chavez is nodding his head yes, so
19  I'm assuming that he's trying to indicate to you that
20  that's correct.
21    A. Okay. I don't have my glasses on. I can't see
22  him that well.
23    Q. What was your understanding of who the existing
24  carrier was before then?
25        MR. AGUILAR: Carrier? Objection;

Page 190

1  specificity.
2     A. My understanding is that there was not a
3  carrier that was selling this group of policies that
4  were to be replaced by AFLAC.
5     Q. In 1999?
6     A. Right.
7     Q. Okay. What did you understand -- well, do you
8  know who the TPA was the year before, in '98?
9            MR. AGUILAR: You mean '97 for the '98
10 year?
11           MS. NEALLY: Yeah.
12    A. We need to be careful about that because the
13 different people are using different numbers for the
14 same year because these are school years.
15    Q. That's right.
16    A. So there's no question as to whether we were
17 using a fiscal year ending fiscal year or a fiscal year
18 beginning fiscal year. In other words, is it '98/'99
19 school year fiscal '98 or is it fiscal '99?
20    Q. Okay. And I believe we're here now that you
21 have admonished me.
22    A. I'm not admonishing you. No, no. I'm not
23 admonishing you. I'm not admonishing you. I'm just
24 saying it's an observation that I have noted when I
25 have been talking to various people in this case, that

Page 191

1  not everyone is agreeing with the terminology. That's
2  all. That's all I'm saying.
3            MS. NEALLY: I'm going to object to the
4  responsiveness of the answer.
5            MS. LEEDS: Me, three.
6     Q. What don't you agree with in Sentence 2?
7     A. My -- I answered this before. AFLAC, according
8  to my understanding, was not replacing an existing
9  carrier, period.
10    Q. What was your understanding?
11    A. There was no existing carrier that they were
12 replacing.
13    Q. Okay. How about Paragraph -- Sentence 3?
14    A. I would agree with that.
15    Q. How about Sentence 4?
16    A. At least not for those particular products.
17    Q. How about Sentence 4?
18    A. I would agree with Sentence 4.
19    Q. How about Sentence 5?
20           MR. AGUILAR: Objection; speculation.
21    A. I just don't -- the language does not -- I
22 guess I don't really agree with that or the way it's
23 written.
24    Q. What don't you agree with?
25    A. Well, this states that, "Once existing

Page 192

1  qualified employees had switched policies from previous
2  carrier" -- so we have the same objections about
3  whether there was a previous carrier that was supplying
4  those same policies.
5     Q. Okay.
6     A. That's at least one objection. Even if that
7  were true, I would object to the notion that all those
8  who had bought such policies before would be the only
9  ones who would buy AFLAC policies, because that's the
10 implication of that sentence.
11    Q. Okay.
12    A. And even if it were true, that they were -- if
13 there was such policies that were being replaced by
14 AFLAC, there would be more employees that did not have
15 these policies than employees that did have them.
16    Q. You disagree with that or are you trying to
17 tell me that's what the case would be?
18    A. I'm trying to tell you that's what the case --
19 what the case was.
20    Q. Say that again.
21    A. Well, the essence of this -- let me try to say
22 it more clearly. The essence of this is that there are
23 more policies to be sold than just those to people who
24 already had policies from someone else even if that
25 predicate were correct.

Page 193

1     Q. And you base that on what, conversations with
2  Mr. Chavez?
3     A. Well, first of all, there's an implicit
4  assumption in that, that 100 percent of the BISD
5  employees have purchased these kinds of policies from a
6  previous carrier. If that were true then this sentence
7  would be true. But without that -- without that
8  condition to be true this sentence is false.
9     Q. Okay. There is a qualifier in this sentence,
10 correct, "would largely be determined," right? Would
11 you describe that as a qualifier?
12    A. The word largely?
13    Q. Would largely be determined; yes, largely?
14    A. Largely is a qualifier. I agree that's a
15 qualifier.
16    Q. Okay. And to the extent that -- let's -- just
17 assume with me for a minute that there was a previous
18 carrier to AFLAC for the 1998 year.
19    A. Okay.
20    Q. Okay. And even -- and once the existing
21 qualified employees determined whether or not they were
22 going to switch or they were going to stay with their
23 carrier, that's a set -- a group of employees that have
24 gone with AFLAC, right?
25    A. Yes, I can accept that description.

Page 194

1    Q. And what you're saying is that there might be
2  additional people who were not -- the result of
3  turnover within the district or new employees and
4  expanded dependent coverage; is that what you're trying
5  to say?
6    A. I don't understand your -- I don't understand
7  what you're telling me now. I'm probably not trying to
8  say that because I don't understand it.
9    Q. Okay. Paragraph 21, that last -- the last
10  sentence you disagree with based on conversations with
11  Mr. Chavez regarding the BISD population or your just
12  own independent knowledge?
13    A. Yes.
14    Q. Which was it? It's an or.
15    A. Well, if it's an or, I guess is a --
16    Q. And your independent knowledge, was that from
17  documents or just something that you surmised?
18    A. No.
19    Q. Well, what was it?
20    A. This entire line of logic assumes that the only
21  people to whom these policies could be sold would be
22  either people to whom they were all -- similar policies
23  were already sold by someone else and they switch or to
24  people who were new employees or people who were
25  expanding their coverage to their dependents. That

Page 195

1  supposition, that assumption that's implicit in this
2  statement in this logic is false.
3    Q. To the extent that that statement is being --
4  you can read that sentence like this, but when I see
5  it, it's largely determined?
6    A. That just is false.
7    Q. And that's based --
8    A. It's not even close to largely. Largely is not
9  enough of a qualifier to get approval from me on this.
10  That sentence is not just slightly wrong, it is very
11  wrong.
12    Q. And what are you basing your statement on that
13  it's false?
14    A. This will be the third time.
15    Q. That's okay. I've got time.
16    A. Okay, good. This sentence, this line of logic
17  assumes -- no, I'm telling you what this assumes.
18    Q. We know what you're -- what you're saying this
19  assumes, but what are you basing your assumption on; on
20  your conversations with -- I mean, you've never sold
21  cafeteria plans; am I right?
22    A. That's correct.
23    Q. Okay. You've never marketed AFLAC products,
24  right?
25    A. Right.

Page 196

1    Q. You've never gone into BISD or any other school
2  district and tried to sell this captive audience these
3  supplemental policies, right?
4    A. Okay. Let me -- would you like me to explain
5  this to you?
6    Q. No. I would like to finish asking my
7  questions, okay?
8    A. Excuse me.
9    Q. Okay? Because you've never done any of that, I
10  want to know why you're saying that this is false. I
11  know what you're saying this sentence assumes, but I
12  want to know what the background is, what the support
13  is for you to be able to say that this statement is
14  false. Is it based on your conversations with Mr.
15  Chavez or other information? And if it's other
16  information please tell me what that information is.
17    A. The other information -- there is other
18  information. The other information is that nowhere
19  near 100 percent of BISD employees were purchasers of
20  these three kinds of policies in the past. The
21  percentage of employees of BISD who had purchased these
22  was much lower than 100 percent.
23    Q. What was it?
24    A. Something in the order of 16 percent is my
25  understanding, somewhere in that area.

Page 197

1    Q. And based on what?
2    A. There's roughly 8,600 employees or something
3  like that or somewhere in the neighborhood of 8,000
4  employees. My understanding is that there's --
5        MR. AGUILAR: It's 6,800.
6    A. 6,800 employees. I'm sorry.
7    Q. Your attorney has corrected you; it's not
8  8,600, is it?
9    A. He's not my attorney either. But let me look
10  at the documents that we have and we can see. We have
11  some -- somewhere on the table there's a number.
12    Q. Okay. And I've seen that document.
13    A. Yes. And there's roughly one-sixth of that
14  number of employees was roughly the number of clients
15  that Dino had sold policies to, roughly 16 -- 1,200 --
16  I believe it was something like 1,200 or something like
17  that is what he told me was the number of clients that
18  they had sold -- to whom they had sold these policies.
19    Q. And that's based on information that he told
20  you, right?
21    A. I believe that that is correct or else it's in
22  -- there may be some data in here that shows the number
23  of policies. I'm not sure.
24    Q. Okay. How about the year in 1998? Did you
25  have any information regarding how many people bought

Page 198

1 supplemental policies in 1998?
2    A. No. Well, no, I don't think I did.
3    Q. And you don't know whether or not you have a
4 document that reflects how many people bought
5 supplemental policies in '99, 2000 or 2001?
6    A. I'm not sure. I would have to look at those
7 sheets and see.
8    Q. Okay.
9    A. But I know that --
10    Q. But you didn't do --
11    A. I have the strong impression that they were
12 roughly speaking about 1,200 or so policies or 1,200
13 clients, either policies or clients, that had been sold
14 to BISD under AFLAC's name for the various kinds of
15 policies they sold.
16    Q. Okay. But you didn't do any comparison for the
17 last ten years as to the number of individuals who had
18 purchased supplemental insurance at BISD?
19    A. No, I did not.
20    Q. Okay. So other than the statement from Mr.
21 Chavez or some document that shows that there were
22 approximately 16 percent of the employees who purchased
23 insurance, any other support that you have for saying
24 that the last sentence in Paragraph 21 is false?
25    A. What's the first thing? Out of the first

Page 199

1 two -- you said two things. What was the first one?
2    Q. The statement by Mr. Chavez or documentation
3 supporting your claim that there were only 16 percent
4 of the employees that purchased supplemental insurance.
5 Do you have any other support for claiming that that
6 statement is false?
7    A. Not other than logic.
8    Q. Paragraph 22. What portions of that do you
9 agree or disagree with?
10    A. I don't know what he means by "These expanded
11 sales face the full competition from other carriers."
12    Q. Okay.
13    A. I would agree with the next sentence.
14    Q. The other sentences?
15    A. No, I said the next one.
16    Q. Okay.
17    A. I'm reading -- I'm considering the third
18 sentence. The double negative of that sentence is
19 bothering me, but I suppose that strictly speaking it's
20 correct.
21    Q. Okay. How about the next sentence?
22    A. Strictly speaking I would not argue with that
23 double negative either.
24    Q. Okay. How about Paragraph 23?
25    A. Well, I generally disagree with that, of

Page 200

1 course.
2    Q. You disagree with it because you're saying that
3 your projections were unreasonably large; is that
4 right?
5    A. Yes.
6    Q. And you're disagreeing with Sentence 2 because
7 you believe you offer substantive support for your
8 projected growth rates?
9    A. Yes.
10    Q. Okay. And I think we discussed the substantive
11 support for these growth rates earlier, right?
12    A. We may have, yes.
13    Q. Well, we did, right? We talked about you based
14 it on a statement from your conversations with Mr.
15 Chavez and your review of LaFemina's deposition; is
16 that correct?
17    A. Yes, and Mr. Chavez' past history.
18    Q. Okay. Paragraph 24, you can't agree or
19 disagree with Sentence 1, right?
20    A. Yes, I have no knowledge of that. I'm not in a
21 position to disagree with any of what he's saying about
22 what he thinks he can do or not do.
23    Q. Okay. And that holds true for the entire
24 paragraph, right?
25    A. Yes. Although I guess we could discuss whether

Page 201

1 we agree that there are deficiencies or not. But
2 basically I have no objection to his saying what he's
3 saying in that.
4    Q. Okay. How about Paragraph 25?
5    A. I'm missing a page in my copy.
6    Q. 25 is at the bottom.
7    A. Yes, but I don't have the remainder of that --
8 oh, wait. I'm missing Page --
9    Q. I'm on Page 5.
10    A. I don't have 6. I don't have Page 6 here.
11    Q. Yeah, you have Page 6. You don't have Page 7.
12 It's two sentences at the bottom of Page 6 --
13    A. Mine says 5.
14    Q. Oh, I'm looking at --
15    A. Okay. By your numbering it says -- mine has 6
16 and then I go to Page 8.
17    MS. LEEDS: He's missing 7, 7 of 8.
18    MR. AGUILAR: Here's an extra copy.
19    MS. NEALLY: I think he had it earlier.
20    THE WITNESS: I had it earlier but I don't
21 know where it is.
22    Q. Okay. Basically in 25, Dr. House is
23 criticizing your analysis that the -- regarding the
24 expenses that Mr. Chavez would incur, and I believe you
25 previously indicated to Mr. Steele that you were

**Page 202**

1  defending that position and that, therefore, I'm
2  assuming you would disagree with 25?
3    A. I do disagree with Paragraph 25.
4    Q. And that's based on your belief that these
5  expenses would only increase -- would double in 25
6  years; is that right?
7    A. That's based on what Mr. Chavez told me and
8  that Dr. House's logic does not change my mind.
9    Q. Okay.
10   A. That that's -- that that might be a reasonable
11 possibility.
12   Q. Okay. Do you disagree with the last sentence,
13 the fact that, "There are many small independent
14 insurance agencies argues strongly against this
15 substantial decrease in average costs"?
16   A. I disagree with that sentence.
17   Q. Okay. And as far as 26 -- I'm sorry. And what
18 do you base the fact that you disagree with 25?
19   A. I object to the word "this" in that sentence
20 because that makes the sentence refer to Mr. Chavez'
21 business which, of course, is what Dr. House is trying
22 to describe. But he is describing a circumstance that
23 does not really apply to Mr. Chavez' business.
24   Q. Okay. And that circumstance is?
25   A. Mr. Chavez was not an independent insurance

**Page 203**

1  agency.
2    Q. Okay. He was an independent insurance
3  adjuster; is that correct?
4    A. No. He was --
5    Q. He was an independent insurance agent; is that
6  correct? Would you agree with me on that?
7    A. He was primarily not an independent insurance
8  agent.
9    Q. Have you seen the contract between him and
10 AFLAC?
11   A. I don't think so.
12   Q. Okay. Your understanding that is he was not an
13 independent insurance agent is based on your
14 conversations with Mr. Chavez and his description to
15 you as to what his role was with AFLAC; is that
16 correct?
17   A. I did not make that statement and I don't agree
18 with it.
19   Q. Okay. What is your -- what is your support for
20 stating that he was not an independent insurance agent?
21   A. He was an independent insurance -- excuse me.
22 He was primarily a regional service -- regional sales
23 coordinator.
24   Q. Okay.
25   A. He was, in fact, an agent as well.

**Page 204**

1    Q. Okay.
2    A. But that was not his primary activity.
3    Q. Would you agree that he was an independent
4  contractor of AFLAC?
5    A. Yes.
6    Q. Paragraph 26, you previously -- this had to do
7  with your failure to account for FICA taxes.
8    A. Yes. I disagree with this paragraph. Well --
9  excuse me.
10   Q. You disagree with this paragraph?
11   A. No, no, no. I don't disagree with this
12 paragraph. Excuse me. I agree with this paragraph.
13   Q. How about 27?
14   A. I disagree with the last sentence.
15   Q. Okay. Tell me what beta is.
16   A. The beta is a correlation between the rate of
17 return of a particular company and the rate of return
18 of the market as a whole.
19   Q. Okay. And you used the beta from AFLAC?
20   A. Yes.
21   Q. And that beta was derived from what?
22   A. I found several -- there's at least two sources
23 for betas data for AFLAC and I used the higher of the
24 two. One of them was from the Financial Page at
25 website Yahoo. The other was from Business Week's

**Page 205**

1  website.
2    Q. Okay. And what was the lower of the two?
3    A. I believe it was Yahoo.
4    Q. And what was the figure?
5    A. I need to look at one of the exhibits.
6      MR. AGUILAR: AFLAC's beta? That's what
7  we're looking for, right?
8      MS. NEALLY: Right, the two betas that
9  he's talking about.
10   A. The Business Week website reflects data from
11 Zacks Investment Research, Inc. Data for the beta to
12 be .89.
13   Q. Okay. What's the other one?
14   A. .75.
15   Q. Okay. And which one did you use? You used the
16 .75?
17   A. .89.
18   Q. How much difference would it have made in your
19 calculations had you used the .75? Are you talking
20 millions of dollars here, hundreds of thousands of
21 dollars?
22   A. Probably hundreds of thousands. It's a
23 significant amount.
24   Q. Okay. It would be a significant amount?
25   A. It would be significant. If I had used the

Page 206

1  Yahoo number, the Lungstrative calculation would have
2  produced significantly. I don't know how significant,
3  but it would have been -- they would have been higher
4  values if I had used the Yahoo number instead of the
5  Business Week number.
6  Q. Okay. Do you know what beta that House would
7  have thought would be more reasonable?
8  A. No, he didn't tell us.
9  Q. Okay. What other betas could you have used?
10  MR. AGUILAR: You mean what alternatives
11  are available?
12  MS. NEALLY: Right.
13  Q. I mean, you use one of AFLAC's as opposed to
14  one from an independent contractor who was an insurance
15  agent. That's the criticism in this paragraph, right?
16  A. You won't find that kind of data for
17  independent insurance agents. You might find it for
18  one of the large insurance firms like Marshall &
19  McLellan that serve as a general supplier of insurance
20  services like Marshall & McLellan or one of the other
21  real large companies, but you won't find published
22  betas for the man on the corner selling insurance.
23  Q. Could you make your own?
24  A. I suppose you could.
25  Q. What do you need to be able to make one?

Page 207

1  A. You need a series -- a fairly long series of
2  data, say -- ten years is pretty slim. I would say
3  maybe 20 years of data with history of the amount of
4  invested -- the amount of equity in the company and the
5  profits of that company. And then you would also need
6  the similar data for the stock exchange as a whole,
7  which is the way these calculations are made, to get
8  the total return.
9  MR. AGUILAR: During the same time period?
10  A. During the same time period, that's right, for
11  the same 20-year period.
12  Q. And that's something that you didn't do, you
13  just used AFLAC's?
14  A. I think AFLAC is much better, so yes.
15  Q. Okay. Paragraph 28. Do you agree?
16  A. Because of this page numbering thing, would you
17  tell me which one is the --
18  Q. Paragraph 28, Maximum Possible Damages.
19  A. Okay. That would be -- I'm going to number
20  this other one I have now. 28?
21  Q. The first sentence, I'm assuming you agree?
22  A. I don't think I have any disagreement with
23  that. I don't have any disagreement with that.
24  Q. Okay. The second sentence, do you have any
25  disagreement with that?

Page 208

1  A. Well, he probably doesn't have the opportunity
2  to market policies from any other insurance carrier.
3  Some of them probably also have exclusive sales agents
4  as well.
5  Q. Okay.
6  A. But he can sell for some others, he can.
7  Q. That he has appointments with; is that correct?
8  A. Yes.
9  Q. And then you would agree he is the owner of The
10  Teachers Agency?
11  A. He is an owner of The Teachers Agency.
12  Q. Which is the firm that can profit from his
13  skills and abilities. Do you agree with that?
14  A. Yes, I do.
15  Q. How about the last sentence?
16  A. He says, "It is unreasonable to conclude that
17  Chavez today has no ability to at least equal the
18  earnings he would have made had he remained AFLAC's RSC
19  for the years 2003 and beyond." I don't think that
20  that statement can be made, that it's unreasonable to
21  conclude that.
22  Q. Okay.
23  A. Next paragraph?
24  Q. That's based on your -- the figures that you
25  came up with in your report; is that right?

Page 209

1  A. Yes.
2  Q. Okay. How about Paragraph 29?
3  A. I don't really know when he was informed of his
4  termination. That may have been in the deposition, but
5  at this time I don't know.
6  Q. And as far as his termination as to whether or
7  not it was justified or unjustified, you're not here to
8  render any opinions on that; is that correct?
9  A. Which particular termination are you talking
10  about?
11  Q. I'm talking about his termination from AFLAC.
12  A. I wasn't asked to issue opinions on that, so I
13  don't intend to.
14  Q. Or as far as anything that had to do with BISD,
15  you're not going to render any opinions regarding that,
16  right?
17  A. Not as far as --
18  Q. Any actions?
19  A. -- positions or actions were taken by BISD.
20  I'm not going to render opinions whether those were
21  good or bad or anything else.
22  Q. Okay. How about the second sentence?
23  A. I believe that that one is correct, also.
24  Q. How about --
25  A. If he's still selling AFLAC policies to anyone

Page 210

1  else, I'm not sure whether that's true or not.
2      Q.  You're talking about the third sentence?
3      A.  Yes.
4      Q.  Okay.  You're not sure whether he's still
5  selling AFLAC products?
6      A.  I didn't think that he was, but I don't know
7  that.  I'm not certain on that.
8      Q.  How many hours have you spent speaking with Mr.
9  Chavez about this case?
10     A.  I'm not sure.  Many.  20 maybe.
11     Q.  20 hours?
12     A.  Maybe.  Many hours.  Well, I should say more
13  than ten.  I don't know.  Maybe 15, but more than ten.
14     Q.  Okay.  Somewhere between ten and 20?
15     A.  I would say that's probably right.
16     Q.  Okay.  What's the next paragraph -- I mean the
17  next sentence?  Do you agree or disagree with that?
18     A.  I would agree with that.
19     Q.  Okay.
20     A.  Paragraph 30?
21     Q.  Yes.  You don't have any reason to agree or
22  disagree with what his statements were as referred to
23  in footnotes 20 and 21?
24     A.  Correct.
25     Q.  And as far as the complaints, you don't have

Page 211

1  any information regarding that?
2      A.  No, I'm not sure I even had the complaint.
3      Q.  Okay.  How about Sentence 4?
4      A.  Is that the one that begins, "The only
5  appropriate"?
6      Q.  Right.  Do you agree that he does want to
7  mitigate the damages?
8      A.  Yes, I agree with that sentence.
9      Q.  Okay.  And the next -- the fifth sentence?
10     A.  I agree with the following sentence.  It
11  begins, "He has recently chosen" --
12     Q.  "To become a principal of The Teachers
13  Agency" --
14     A.  "And he is expected to excel."  I think that
15  was a very reasonable expectation.
16     Q.  And then the next -- the last sentence of that
17  paragraph?
18     A.  And I would disagree with that sentence.
19     Q.  Okay.  How about 31, the first sentence?
20     A.  I agree with the first sentence.
21     Q.  And the second sentence?
22     A.  I could agree with the second sentence.
23     Q.  Okay.  How about the third sentence?
24     A.  I believe that that's what he said.
25     Q.  Okay.  Did you ever see his 1099s?

Page 212

1      A.  I don't think so.
2      Q.  Have you seen his income tax returns?
3      A.  No.
4      Q.  Okay.  How about the next sentence, "Taking the
5  mid point for 2002"?
6      A.  I don't disagree with that either.
7      Q.  Okay.  How about the next sentence, "If he had
8  earned an additional 40,000"?
9          THE WITNESS:  Can I borrow your
10  calculator, please?
11     A.  I agree with that sentence.
12     Q.  And how about the next sentence, "If one
13  assumes"?
14     A.  Disagree with that sentence.
15     Q.  You agree that if he earned an additional
16  $40,000 and subtract 1,160 you get 38,840, right?
17     A.  I agree with that part of the sentence.
18     Q.  The portion that you don't agree with is what,
19  that that would be his maximum possible economic
20  damages?
21     A.  That's right.
22     Q.  Okay.  How about the last sentence?
23     A.  I disagree with the last sentence.
24     Q.  Why do you disagree with the last sentence?
25     A.  Because I think that at the very least for 2001

Page 213

1  it is not -- there is virtually no --
2      Q.  2002?
3      A.  I'm talking 2001 -- that there is -- it is
4  really not speculation that results in the estimate
5  that Mr. Chavez lost $322,000 in the first year of
6  premium sales as a result of not being able to sell at
7  BISD or he or his team in December of 2001.  And that
8  would have been -- that would have been credited to him
9  in 2001.
10         MS. NEALLY:  Objection to the
11  responsiveness of the answer.
12         MS. LEEDS:  Objection.
13     Q.  I'm asking you about this last sentence which
14  is referring to 2002 1099 reported income.  And all I'm
15  asking you is, to the extent that this sentence you
16  don't agree with because -- and that has nothing to do
17  with 2001.  He's talking about, "This figure does not
18  incorporate would-be growth 1099 reported income as
19  such a projection entails speculation."
20     A.  Your sentence doesn't -- your question doesn't
21  make any sense.  I can't answer that question.
22     Q.  Well, I haven't finished it.
23     A.  Oh, I'm sorry.
24     Q.  Okay.  So for 2002 -- strike the question
25  because you just disagree -- you disagree with the

Page 214

1  statement and you disagree with it because it doesn't
2  call for speculation; you think he made more money in
3  2002?
4      A. No.
5      Q. Okay.
6      A. He didn't make more money in 2002.
7      Q. Okay.
8      A. He made less money in 2002.
9      Q. And you've seen his income tax returns for
10  2002?
11      A. No.
12      (Off record.)
13      Q. Okay. You mentioned to Mr. Steele that there
14  were two things you didn't have -- you mentioned this
15  was a preliminary report only and there were two things
16  you didn't have. And then I got sidetracked in this
17  because you named off about four. Were there any other
18  things that you didn't have besides the projected
19  growth rate, Barnson's testimony as to whether there
20  was a 15 percent policy, and then mitigation
21  information?
22      A. I'm sorry. I lost the first part of your
23  question. I was missing those things for what purpose?
24  Remind me of what the purpose was.
25      Q. You said it was a preliminary report only.

Page 215

1      A. Okay, yes. Yes, there was something else.
2  There was -- I had not done the calculation of the
3  commissions that Mr. Chavez would get directly as an
4  agent and I had not included calculations in the
5  commissions that he lost in 2001 as a result of being
6  shut out of the December enrollment period at BISD.
7      Q. Which was $322,000?
8      A. The 322,000 was the premium -- was the total of
9  the premium -- annualized premium amount.
10      Q. Okay.
11      A. And it would be the commissions and then the
12  renewals -- subsequent renewals in the future on the
13  $322,000.
14      Q. So based on that information the figure that
15  you had given would go up?
16      MR. AGUILAR: Which figure?
17      A. Yes, that would add a small amount, actually.
18      Q. And based on the mitigation information --
19      A. It would go down substantially.
20      Q. And the information that what he earned as an
21  independent agent it would go down?
22      A. No. What he earned as an independent agent --
23  when you say -- I'm losing -- I'm not sure what you
24  mean by when --
25      Q. All I want to know is in order -- I get

Page 216

1  sidetracked, but you said, I needed two things in order
2  for this not to be preliminary?
3      A. And then I corrected myself and said actually,
4  there's more.
5      Q. Okay, right.
6      A. Okay. I did say two at first.
7      Q. Okay. So once you have the information on
8  mitigation and once you have the information on the
9  calculations for commissions as an agent and the
10  commissions -- and the commissions lost for the
11  December 2001 enrollment, then this would be a final
12  report; is that correct?
13      A. I will produce a final report.
14      Q. You could produce a final report at that point;
15  is that right? Those are the only things you're
16  lacking, correct?
17      A. Yes. I believe you did include the second
18  portion. I do not -- although it's been taken, I have
19  not seen the transcript of the second portion nor the
20  exhibits to Mr. LaFemina's deposition.
21      THE WITNESS: And I don't remember you
22  mentioning that.
23      MR. AGUILAR: There's the stuff that I
24  mentioned to explain that he could produce that would
25  give us more of that definition, the AFLAC numbers.

Page 217

1      A. But I did mention during his questioning the --
2  because he asked me, wouldn't it be nice to know what
3  all the RSCs at AFLAC were doing. And I said, yes, I
4  don't have -- he said, do you have that data? I said,
5  no, but AFLAC has it. And I would certainly believe
6  that was going to be -- could be very helpful.
7      MS. LEEDS: Objection; response.
8      MS. NEALLY: Objection; nonresponsiveness.
9      Q. When do you plan on producing a final report?
10      A. I expect that I will be able to produce one
11  certainly well before this month is out is what I'm
12  hoping.
13      MR. AGUILAR: Barnson's deposition isn't
14  set until the 25th or 29th.
15      MS. NEALLY: Objection.
16      Q. You know, I lost you when you were talking
17  about the $322,108 in lost premiums and how you haven't
18  figured that amount. Why haven't you figured that
19  amount? You've had that for a long time, right? You
20  didn't calculate the lost premium?
21      A. No, I did not calculate it.
22      Q. But you had that for a really long time, right?
23      A. Yes. I've had that -- I had the $322,108
24  figure at the time I wrote this report.
25      Q. Okay. But the bottom line of your testimony to

Page 218

1  Mr. Steele, as I understood it, is that the mitigation
2  information should reduce the amount of damages that
3  you have assessed, right?
4    A. Mitigation will -- see, I have not calculated
5  damages.
6    Q. Okay.
7    A. So the damages number would be reduced by
8  whatever the mitigation I'm able to estimate.
9    Q. I'm sorry. What was your rationale for why you
10 didn't include the effect of the $322,108?
11   A. Because that -- No. 1, that was a small portion
12 of what was lost. No. 2, it had to be handled in a
13 slightly different way because it was a partial year.
14 No. 3, because I was waiting to hopefully get more
15 reliable information on growth rates, I was going to
16 have to do -- I may have to do a substantial
17 re-calculation anyway and, therefore, I did not think
18 that it was cost effective to make relatively small
19 changes when I was going to still be making very large
20 changes in this and I would take care of those details
21 when I was making these very large changes in the
22 calculations.
23   Q. Okay. If Mr. Chavez were to return to BISD as
24 the TPA for some other carrier besides AFLAC would that
25 -- that would certainly come into play as far as

Page 219

1  mitigation of damages, right?
2    A. If he were to -- I believe that the answer is
3  not necessarily. I mean, it could have an effect. My
4  understanding is that the TPA was not actually paid to
5  be the TPA. And so being the TPA itself doesn't
6  necessarily cause any direct mitigation. I believe
7  that he was being the TPA as a -- for free as a way of
8  getting access to selling the policies.
9    Q. It comes in the play that the TPA again and he
10 had exclusive rights to sell whatever product he was
11 selling then that he would make some money off of that?
12   A. That, I agree with. If Mr. Chavez were given
13 some kind of advantageous marketing position with
14 respect to a large group like BISD, that could have an
15 effect on his ability to mitigate.
16     MS. NEALLY: I'll pass the witness.
17        EXAMINATION
18 BY MS. LEEDS:
19   Q. Dr. Horner, my name is Eileen Leeds, and I
20 represent Dr. Saucedo in this case. I have a couple of
21 questions, mostly some follow-ups. You said Mr. Chavez
22 had some expenses that were not ordinary expenses for
23 an RSC. What were those?
24   A. Mr. Chavez was doing more administrative work
25 than an RSC would normally do. My understanding is he

Page 220

1  had been doing some administrative work when he was a
2  DSC and perhaps even as an agent and had continued to
3  do that since he was still familiar with that
4  administrative position. So he did not pass those
5  responsibilities down to the people that worked with
6  him. So there were some expenses associated with that.
7    Q. Okay. How much? I believe your testimony was
8  when you were asked how much administrative work did he
9  actually do you said very little. So how much expense
10 was associated with that?
11   A. It was some position of one of his staff people
12 is my understanding was involved in doing that, that he
13 himself didn't spend a lot of time doing that
14 administrative work, but that a staff person was
15 answering questions. That was basically a lot of it,
16 changes and asking questions.
17   Q. But do you know how much?
18   A. No.
19   Q. Okay. Do you know how much money he took from
20 his agents that were selling to help defray that?
21   A. Not off the top of my head. I believe he told
22 -- I think we -- I may have the data. I'm not sure.
23 He told me that he had a 50 percent split with them the
24 first year they were doing this and the second year he
25 had a 40 percent split and the third year he had a 30

Page 221

1  percent split.
2    Q. And do you know at all whether or not that is
3  something that was permissible in the AFLAC hierarchy?
4    A. I can tell you what my understanding was, what
5  I was told.
6    Q. Okay. What were you told?
7    A. What I was told was that it was not usual and
8  that Mr. Chavez had had a discussion with Mr. LaFemina
9  as to whether he ought to be doing that or not, and
10 that he had to explain to Mr. LaFemina why, in fact, he
11 was -- why he was doing that. It was because he was
12 doing this administrative work and that the -- that he
13 was taking responsibility away from the agents and they
14 were happy to do it, and that Mr. LaFemina did not stop
15 him. I don't know that he said go ahead and do it, but
16 from my understanding he did not stop him.
17   Q. So it's your understanding that Mr. Chavez was
18 going to continue to have a number in his personal
19 production?
20   A. I thought that he would probably have a number
21 in his personal production as a result of some of the
22 splits at BISD. He wasn't -- my understanding was he
23 was not doing this at any other of the groups for which
24 he was supplying these services.
25   Q. Now, the majority of your report is based on

Page 222

1    the lack of -- or his loss of the BISD account,
2    correct?
3        A. Wrong.
4        Q. Wrong?
5        A. Wrong.
6        Q. Okay. What is it based on?
7        A. Well, the BISD total new policy enrollment in
8    2001, December 2001, I estimated based on -- I believe
9    it was Exhibit D in my report -- was about 460,000. I
10   don't remember the exact number. We can look it up.
11   But that -- of which Mr. Chavez got about $140,000
12   credit. The 322 is what was -- the credit he did not
13   get, okay? So this 464,000 or whatever it was, roughly
14   in that neighborhood, represented his BISD business
15   that he might have had in the last year if, in fact, he
16   had not been locked out for that December enrollment.
17       Q. Okay.
18       A. His total if you include the 322 would have
19   been almost $2 million, $1,990,000.
20       Q. That was not BISD, the 300?
21       A. No. It included the 300.
22       Q. The 300 was BISD?
23       A. Wait. Let me start again. Let me start again.
24   There was about 460,000 in BISD.
25       Q. Okay.

Page 223

1        A. Mr. Chavez got credit for about 140,000 of
2    that --
3        Q. I understand that.
4        A. -- for 2001. So about 320,000 he did not get
5    credit for.
6        Q. Okay. But that's still all BISD sales?
7        A. Yes. So BISD was about 460,000.
8        Q. Correct.
9        A. 464,000, something like that. Now, that
10   464,000 was a substantial chunk of Mr. Chavez'
11   business.
12       Q. Correct.
13       A. But his total bulk of business in 2001, even if
14   he had gotten -- if he had gotten the 322 that he
15   didn't get was $1,990,000. In other words, nearly $2
16   million. The two million -- the 460,600 is, roughly
17   speaking, about 23 percent of the $2 million. So about
18   77 percent of Mr. Chavez' production for AFLAC as an
19   RSC, for which he was overseeing, about 77 percent was
20   from other than BISD.
21       Q. You're saying 77 percent of what he would have
22   made in 2001 would have been made from someplace other
23   than BISD?
24       A. That is correct. That's why I'm saying that --
25   that's why I disagree with you on your earlier

Page 224

1    statement which was that BISD was the major thing that
2    we were evaluating. That is not correct.
3        Q. Okay. So is it safe to say then, even if he
4    had lost BISD, had he not lost his position with AFLAC
5    he still would have been in an excellent position to
6    make more or above, since he's already making 77
7    percent in that 2001 year?
8        A. If he had kept the position as an RSC, had lost
9    -- in other words, if the company had taken a different
10   approach, namely they kept him on as an RSC and tried
11   to find someone else to take over the BISD account or
12   gave up on the BISD account, whatever they did, and he
13   no longer got credit for it, he would have had 77
14   percent of what I have calculated for what was lost --
15   and I don't mean damages, but what was lost would not
16   have been lost.
17       Q. Okay.
18       A. Other things being equal. You assume they
19   didn't stop the growth pattern --
20       Q. I understand.
21       A. -- or those reputation problems didn't develop.
22       Q. I understand. All of those other assumptions
23   that you have in there would be related, you know, the
24   same things would have to occur, 77 percent of that
25   would be non-BISD lost earnings?

Page 225

1        A. Exactly.
2        Q. Okay. Do you have -- you know, it struck me
3    kind of curious. When you were talking about the
4    Rusteberg case, you were representing the defendants,
5    right?
6        A. I was working for the attorneys that were
7    representing the various defendants.
8        Q. Okay. So you were on the defense side?
9        A. I was hired by the defense, yes.
10       Q. Okay. But yet you knew a whole lot of bad
11   stuff that the plaintiff had done.
12       A. I was aware that there were some problems. I
13   mean, there were lots of accusations that went back and
14   forth during that case and it was hard not to know
15   about them.
16       Q. So the answer is yes, right? You knew a lot of
17   bad stuff?
18       A. Well, I had heard a lot, you know. But I don't
19   know what I knew.
20       Q. Okay. Well, when you hear it, you know it,
21   don't you?
22           MR. AGUILAR: Objection; speculation.
23       Q. I'm not asking if it's personal knowledge.
24   Hearsay still is something you know. You told us that
25   he had done these things?

Page 226

1    A. I had heard that he had done those things.
2    Q. All right. So you knew a lot of bad stuff
3  about the plaintiff. Do you know any bad stuff that
4  Mr. Chavez has done in this case to cause any of the
5  problems that we are here discussing today?
6    A. No, I don't know any bad stuff that he did.
7    Q. Okay. And I hate to ask you this again. I
8  know Ms. Neally just asked you this but I got lost.
9  Your report is preliminary and you said you needed
10  certain things to make it final. One is Mr. LaFemina's
11  deposition; one was Mr. Branson's deposition.
12       MR. AGUILAR: Barnson.
13    Q. Barnson, whatever. One was calculation of
14  mitigation of damages. And the other was?
15    A. Was there another? I'm sorry.
16    Q. Something about the projections or something.
17    A. Oh, oh, oh. There's two parts to this. One is
18  the -- the things that are needed as far as
19  documentation or information I believe you have listed.
20    Q. Okay.
21    A. Okay? But there is another thing yet that
22  needs to be done. This is what Ms. Neally asked me
23  about, which was I needed to calculate I guess two
24  things. One of them certainly is the effect of the
25  $322,000 in lost annualized premiums for the enrollment

Page 227

1  of December 2001.
2    Q. Okay. Which is what she said you've had all
3  this time, why haven't you done it before?
4    A. Right.
5    Q. Okay. What else?
6    A. And the --
7    Q. What else do you have to calculate?
8    A. I'm getting a little bit tired, but I believe
9  that I still need to calculate the splits of
10  commissions that Mr. Chavez was getting and may
11  continue to get from the BISD enrollments.
12    Q. And is that -- are those the changes you were
13  talking about that have to be made to your preliminary
14  report before it can become final? The calculations
15  are that you've got to calculate in the 322,000, the
16  splits of commissions. Any other calculations that you
17  need to change?
18    A. Well, I will be -- I'm going to be -- yes. The
19  growth rate. I'm going to use the information that I'm
20  going to get in this growth rate information to try to
21  decide what is the most appropriate kind of projection
22  to make as far as growth rates go.
23    Q. What do you expect them to say that you do not
24  already know that will change your projected growth
25  rate in this preliminary report?

Page 228

1    A. Well --
2    Q. What could they say?
3    A. Well, they could say that we don't require 15
4  percent, we require something else. We require 50
5  percent.
6    Q. Okay. Other than the 15 percent, what else?
7    A. They could talk about what kinds of rates of
8  growth they did get.
9    Q. Who gets?
10    A. Or what they expect, AFLAC.
11    Q. AFLAC? So you're going to compare Mr.
12  Chavez --
13    A. That AFLAC gets from its RSCs.
14    Q. Okay. You're going to expect Mr. Barnson to
15  talk about that?
16    A. He might.
17    Q. Okay, he might. All right. And if you don't
18  get that?
19    A. I'm hoping he will be asked about that.
20    Q. Okay. What else?
21    A. He may also provide statistical information on
22  RSCs that would be of the sort that I discussed with
23  Mr. Steele.
24    Q. And is that it, looking at what other RSCs may
25  have done and the 15 percent?

Page 229

1    A. That information could provide useful
2  information in performing these calculations, yes.
3    Q. Okay. Is there anything else that you need to
4  do to change your report from preliminary to final?
5    A. I mentioned the mitigation. That's discussed.
6    Q. Okay. Now, how are you going to do that?
7    A. Well, as I mentioned earlier, I have more
8  information now on how Mr. Chavez is doing in his
9  current endeavor.
10    Q. Okay.
11    A. And I am not sure what kind of -- again, we
12  have this issue of growth rates. I'm not sure whether
13  I'm going to be able -- I'm pretty sure I'm going to
14  have a tough time coming up with a reliably determined
15  growth rate. I may have to do some examples of
16  mitigation and show --
17    Q. The comparisons that Mr. Steele asked you?
18    A. Yes. I believe that's what he was saying --
19  what you're referring to.
20    Q. Yeah, he asked you if you had seen how other
21  agents have gone about --
22    A. Oh, no. No, no, no.
23    Q. So you're not going to look at that?
24    A. No, no, no, no, no. I'm not going to do that.
25    Q. You are comparing or you do want to compare Mr.

Page 230

1  Chavez to Mr. LaFemina? You wanted Mr. LaFemina's
2  information to be able to compare Mr. Chavez?
3      A. Yes, I thought that would be -- that might be
4  useful information.
5      Q. Okay. And Mr. Steele asked you, is Dallas
6  comparable to Brownsville?
7          MR. AGUILAR: What's the question?
8      Q. In demographics, is it comparable to
9  Brownsville in anything?
10         MR. AGUILAR: Objection.
11     Q. How many school districts are in the greater
12 Dallas area?
13     A. I'm not sure.
14     Q. How many school districts are in Brownsville?
15     A. One.
16     Q. Okay. How many counties are in the greater
17 Dallas area?
18     A. I'm not sure.
19     Q. How many counties are in Brownsville or in this
20 area?
21     A. In this area?
22     Q. Brownsville is in one county, right?
23     A. Brownsville -- the city of Brownsville is in
24 one county, sure.
25     Q. Okay. How many cities are in the greater

Page 231

1  Dallas area?
2      A. I'm not sure. Quite a few.
3      Q. How many cities are in the Brownsville area?
4      A. A few.
5      Q. There are a significant number of governmental
6  agencies and large corporations in the Dallas area as
7  compared to Brownsville; is there not?
8      A. Yes, there are.
9      Q. Okay. Is the market a lot bigger in Dallas
10 than in Brownsville for people or for agents -- I'm
11 sorry, for companies like AFLAC that only market to
12 employer groups?
13     A. Yes, there are.
14     Q. So is it still logical to compare somebody in
15 Dallas to somebody in Brownsville?
16     A. It might be -- it might be useful information.
17     Q. And Mr. Steele went over pretty well -- you
18 have done absolutely no independent research outside of
19 what Mr. Chavez has told you or given you in
20 documentation to find out if any of the assumptions
21 that you are relying upon in your report have any
22 validity outside of this little area, correct?
23         MR. AGUILAR: Objection; mischaracterizing
24 the evidence.
25     A. I really don't understand that question at all.

Page 232

1      Q. The only source of all of the facts on which
2  you are relying in this case are from Mr. Chavez or
3  documents given to you by Mr. Chavez or his attorney?
4      A. Or other documents that are here on the table
5  that have been produced.
6      Q. Other than what Mr. Chavez has given you, what
7  else do you have other than the article --
8          MS. NEALLY: The stock.
9      Q. -- the beta thing?
10     A. Well, I'm not sure, but whatever is here.
11     Q. Well, let's look for them. In fact, while
12 you're looking for those, please look for the documents
13 that you said contained the number of policies Mr.
14 Chavez sold.
15     A. No, I said it might.
16     Q. Well, I would really like to see that because I
17 want to know how many.
18         MR. AGUILAR: What's he looking for right
19 now?
20         MS. LEEDS: He's looking for documents
21 that are not -- that were not provided to him by you or
22 Mr. Chavez.
23     A. I don't believe that there is such. I don't
24 believe that there is such data.
25     Q. You mean the number of policies sold?

Page 233

1      A. Yes, I don't think it's in here. So that
2  source would have been from Mr. Chavez.
3      Q. Okay. Then that brings us to another
4  discussion.
5          MS. NEALLY: What about the documents that
6  you relied on that were not produced by Mr. Chavez or
7  his attorney?
8      Q. Outside documents.
9      A. Those would have been the data on AFLAC that
10 are in these materials including the beta, including
11 information from their financial statements.
12     Q. Okay. The beta and Yahoo stuff, I know about
13 that. You're talking about that, right, the Yahoo?
14     A. The Yahoo and the Business Week and then the
15 information that was printed from the annual reports of
16 AFLAC, which is here somewhere. There is some pages
17 out of a textbook that were produced that are in this
18 section.
19     Q. Anything else?
20     A. The other documents are AFLAC documents.
21     Q. Where did you obtain those?
22     A. The AFLAC documents?
23     Q. Uh-huh.
24     A. From Mr. Aguilar.
25     Q. I'm asking for everything other than what Mr.

1  Aguilar or Mr. Chavez has given you.
2      A.  Okay.  There's a work life table that hadn't
3  been mentioned before.
4      Q.  Okay.  Anything else?
5      A.  I don't believe so.
6      Q.  Okay.  Do you know what the mean life of
7  insurance companies such as AFLAC are?
8      A.  No.
9      Q.  Okay.  Did you look into that at all?
10     A.  No.
11     Q.  How long has AFLAC been in existence?
12     A.  I thought something like 35 years.
13     Q.  Okay.  Do you -- are there other comparable
14  businesses such as AFLAC that sell only to group
15  employers?
16     A.  There may be.  I don't know.
17     Q.  You don't know of any others?
18     A.  No.
19     Q.  Is it my understanding then that you do not
20  know if BISD employees had other supplemental insurance
21  before AFLAC got there?
22     A.  No, that's not -- that's a misinterpretation of
23  what I said.
24     Q.  Okay.  Then let's go to that report please --
25  it's Mr. House's report -- where he is talking about

1  plan prior to AFLAC.
2      MR. AGUILAR:  You're asking him that.
3  That's one thing.
4      MS. LEEDS:  Okay.
5      MS. NEALLY:  And she's asking him that.
6  What's the answer?
7      Q.  Is it your understanding, Dr. Horner -- well,
8  let me ask you this.
9      MR. AGUILAR:  Let him answer that
10  question.
11     A.  I am not sure that there was a TPA at that
12  particular time.
13     Q.  Okay.  So if AFLAC started --
14     A.  There may have -- there may have -- the
15  administration work may have been done by a BISD
16  employee at that time.
17     Q.  So in --
18     A.  I think that's my memory of what I was told.
19     Q.  Okay.  Who told you that?
20     A.  Mr. Chavez.
21     Q.  All right.  So it's your understanding that in
22  1997 for the 1998 year there was no person,
23  organization, et cetera comparable to AFLAC selling
24  supplemental policies to BISD employees for the 1998
25  school year?

1  the replacing -- okay.  I believe it was Paragraph No.
2  21.
3      A.  Okay.
4      Q.  That may be the first place it's mentioned, but
5  I know it was mentioned and discussed there about AFLAC
6  -- oh, yeah, here it is.  AFLAC was replacing an
7  existing carrier.  You took exception to that language?
8      A.  Yes, I did.
9      Q.  Okay.  Is it the word "carrier" that you took
10  exception to?  Or was it your understanding that there
11  was a void there prior to AFLAC becoming the TPA for
12  the cafeteria plan?
13     MR. AGUILAR:  Objection; vague.
14     MS. LEEDS:  What's vague about it?
15     MR. AGUILAR:  You're mixing apples and
16  oranges.  You're not talking -- you're talking about --
17  can I explain what the confusion is?
18     MS. LEEDS:  No.  Tell me what's vague
19  about my question.
20     MR. AGUILAR:  What's vague about your
21  question is you're asking about one thing and then
22  asking him if something else is what makes it not
23  there.
24     MS. LEEDS:  No, I'm asking him if his
25  understanding is that there was no TPA for a cafeteria

1      MS. NEALLY:  Not school year.  Year.
2      Q.  I mean year.
3      MR. AGUILAR:  Objection; mischaracterizing
4  the evidence.
5      Q.  Let me rephrase that.  Is it your understanding
6  then that there was no company or organization
7  comparable to AFLAC that in 1997 signed off -- enrolled
8  BISD personnel for the 1998 fiscal year?
9      A.  Your 1998 fiscal year --
10     Q.  You -- listen to my question.  1997 to the 1998
11  year.  Is it your understanding that there was nobody
12  there to do that enrollment in 1997?
13     A.  No.
14     Q.  All right.  What is your understanding; that
15  BISD did that enrollment?
16     A.  My understanding is that a BISD employee
17  coordinated that enrollment for the companies that were
18  selling supplemental insurance policies at the time.
19     Q.  Okay.  So maybe this should have said carriers?
20     A.  No.
21     Q.  All right.
22     A.  That does not solve the problem either.
23     Q.  Then what AFLAC was selling --
24     A.  This is on Page -- at the bottom.
25     Q.  Paragraph 21?

Page 238

1  A. It's the paragraph right under the table of
2  growth rates.
3  Q. AFLAC was going into an area that had already
4  had insurance companies selling supplemental policies
5  to their employees in previous years, correct?
6  A. Yes.
7  Q. Okay. So there were people that already had
8  supplemental insurance policies with other carriers
9  before AFLAC got there, right?
10  A. Yes.
11  Q. Do you know how many people employed at BISD
12  already had supplemental insurance policies when AFLAC
13  got there in 1998?
14  A. No.
15  Q. And you're saying that you think you got
16  information from Mr. Chavez that Mr. Chavez in 1998
17  sold 1,200 policies or had 1,200 clients?
18  A. I believe my -- what I was told from Mr. Chavez
19  was that there were approximately 1,200 policies sold.
20  Q. Do you know how many clients he had?
21  A. Well, actually now -- you know, I'm getting
22  tired. I'm not sure whether it was policies or clients
23  as I sit here right now.
24  Q. Okay.
25  A. It may have been clients.

Page 239

1  Q. All right.
2  A. But there was approximately 1,200 of one of
3  these or the other that were sold by AFLAC as of the
4  time Mr. Chavez left.
5  Q. As of the time he left?
6  A. He was no longer there.
7  Q. Okay. How many did he sell? How many did he
8  sell in 1998?
9  A. I don't know.
10  Q. How many did he sell in 1999?
11  A. I don't know.
12  Q. How many did he replace?
13  A. None.
14  Q. He did not replace any?
15  A. That is correct. He replaced none.
16  Q. So if somebody had their supplemental health
17  insurance with Colonial and they switched to AFLAC, he
18  didn't replace them?
19  MR. AGUILAR: Objection; mischaracterizing
20  the evidence, assuming facts not in evidence.
21  Q. Well, let me get this straight then, Dr.
22  Horner. Are you saying that all of Mr. Chavez' sales
23  were new sales?
24  A. Yes.
25  Q. And none of them -- okay. You're saying that

Page 240

1  they were new sales because they bought a brand-new
2  policy, right? Right?
3  A. That's one reason why I would call them a new
4  sale.
5  Q. Okay. The people that already had a policy
6  with a prior carrier and decided to go with AFLAC,
7  you're counting that as a new sale for AFLAC, right?
8  MR. AGUILAR: Objection; mischaracterizing
9  the evidence and assuming facts not in evidence.
10  A. Wrong.
11  Q. Okay. How many people said no, I already have
12  a supplemental health insurance policy. Thank you very
13  much?
14  MR. AGUILAR: Objection; vague,
15  multifarious.
16  A. Well, I don't think I understand --
17  Q. Let's start all over.
18  A. I wouldn't be able to answer that particular
19  question.
20  Q. Dr. Horner, let's start all over again. One of
21  the things AFLAC sells is supplemental health, right?
22  A. AFLAC sells three kinds of policies to
23  employees or did at BISD.
24  Q. Just answer my question, please.
25  MR. AGUILAR: Answer the question.

Page 241

1  A. Well, I don't know how to answer your question
2  because the language you're using is wrong.
3  Q. Excuse me. Let me do it again.
4  A. I can't -- I cannot.
5  Q. Let me do it again.
6  MS. NEALLY: I'm going to object to the
7  responsiveness of the answer. You may want to take a
8  little break so you can compose yourself.
9  THE WITNESS: I don't need to. Thank you.
10  Q. Is one of the things AFLAC sells is
11  supplemental health?
12  MR. AGUILAR: Now?
13  Q. Is one of the things AFLAC sells supplemental
14  health?
15  MR. AGUILAR: Objection; speculation.
16  A. I am not sure whether that language that's
17  called supplemental health is the best description for
18  what they were selling. So I don't know whether I
19  would want to agree with that or not. I'm sorry.
20  Q. All right. There's three things they sold?
21  A. Three.
22  Q. What are the three things?
23  A. They sold supplement for accidents.
24  Q. Okay.
25  A. If you have an accident --

Page 242

1   Q. Don't explain it. Just what are they?
2   A. Supplement for accidents, a supplement for
3   hospitalization.
4   Q. Okay.
5   A. Let me see if I can remember what the third one
6   is.
7   Q. That's fine. Let's go with those two.
8   A. There were three.
9   Q. Okay. Let's go with those two.
10  A. Okay.
11  Q. Supplemental accident, right?
12  A. Supplemental accident, right.
13  Q. Okay. Is AFLAC the only company that sells
14  supplemental accident?
15      MR. AGUILAR: At the time or now?
16  Q. Is AFLAC the only company that sells
17  supplemental accident?
18      MR. AGUILAR: Objection; speculation,
19  specificity.
20  A. No.
21  Q. Okay. Were there other companies that sold
22  supplemental accident at the time -- at which AFLAC had
23  this account, BISD?
24  A. I'm sure at the time that BISD had this account
25  there were other companies selling supplemental

Page 243

1   accident policies somewhere in the United States.
2   Q. Okay. What about at BISD before AFLAC got
3   there?
4   A. The answer is no.
5   Q. You are saying not one BISD employee had a
6   supplemental accident policy before AFLAC got there?
7   A. That is my understanding.
8   Q. That is your understanding from Mr. Chavez,
9   correct?
10  A. Yes.
11  Q. What about -- is it also your understanding
12  that not one employee at BISD had supplemental hospital
13  before AFLAC got there?
14  A. That is my understanding.
15  Q. And it's your understanding that supplemental
16  No. 3, whatever that may be --
17  A. Heart and stroke, heart attacks and stroke
18  policies.
19  Q. Okay. But there was not one person at BISD
20  that had a supplemental heart and stroke policy?
21      MR. AGUILAR: That is through BISD?
22      MS. LEEDS: I didn't say through BISD. I
23  said at BISD.
24      MR. AGUILAR: Well, you --
25      MS. LEEDS: No. Arnold -- excuse me -- if

Page 244

1   you want to object, object.
2       MR. AGUILAR: Objection; speculation and
3   multifarious.
4   Q. Is that your testimony?
5   A. My testimony is that all --
6   Q. Now that your attorney has instructed you.
7   A. All of the answers that I have given you in the
8   context of this whole line of questions has been in the
9   context of the cafeteria plans which we have been
10  discussing that were sold through -- at BISD and paid
11  for through payroll deductions. Subject to that, there
12  are only three policies and there were no competitors
13  for those policies. There were no companies that were
14  being replaced by those kinds of policies when AFLAC
15  started selling those three kinds of policies.
16  Q. And that was told to you by Mr. Chavez?
17  A. Yes.
18  Q. Were there other supplemental policies being
19  sold at BISD?
20  A. Yes.
21  Q. What were they?
22  A. My understanding, again, from Mr. Chavez is
23  that they were selling dental supplements.
24  Q. Who was selling the dental?
25  A. I don't have no idea.

Page 245

1   Q. What else?
2   A. My understanding --
3       (Off record.)
4   Q. What else were they selling?
5   A. They may have been selling cancer policies.
6   Q. Who was selling that?
7   A. I have no idea.
8   Q. Okay. What else?
9   A. I'm not sure, but there were others -- there
10  may have been others as well. Those are the only ones
11  I remember right now.
12  Q. Okay. And am I correct in understanding your
13  testimony that you do not know how many employees AFLAC
14  sold policies to in the years '98, '99 and 2000?
15  A. That's correct.
16  Q. So you do not know if in the year 2000 they had
17  sold policies to 90 percent of the population that's
18  eligible for them, do you?
19  A. My understanding from Mr. Chavez is that the
20  number of policies was somewhere in the order of 1,200
21  or something like that. And that would suggest that
22  out of a population of 6,800 or however many employees
23  there were at BISD that the market penetration was 16
24  percent or something like that.
25  Q. That was for a particular year, correct?

Page 246

1    A. No, that's total. That's how many -- that's
2 how many in force policies there were of the
3 supplemental policies that were sold by AFLAC. That
4 was my understanding.
5    Q. You told me that it was the last year?
6    A. That's accumulative.
7    Q. That's accumulative, and where does this
8 information come from?
9    A. Again, that's what Mr. --
10    Q. Mr. Chavez' mouth?
11    A. -- Chavez told me.
12    Q. Okay. So is it safe to say that your whole
13 report is based on what Mr. Chavez has told you?
14    MR. AGUILAR: Objection; mischaracterizing
15 the testimony.
16    Q. And your assumptions are based on what Mr.
17 Chavez told you? Everything that you have put in here
18 is based on facts and assumptions of Mr. Chavez -- that
19 Mr. Chavez has told you?
20    MR. AGUILAR: Objection; mischaracterizing
21 the evidence and the testimony.
22    Q. All you have done is put a formula to it?
23    MR. AGUILAR: Same objections.
24    Q. Correct?
25    A. No.

Page 247

1    MS. LEEDS: I'll pass the witness and save
2 the rest of my questions for trial.
3    MS. NEALLY: I'll reserve the rest of
4 mine.
5    MR. AGUILAR: I'll reserve all questions.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 248

1    CHANGES AND SIGNATURE PAGE
2 PAGE LINE CHANGE              REASON
3 _____
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 249

1    I, STEPHEN M. HORNER, PH.D., have read the foregoing
    deposition and hereby affix my signature that same is
2 true and correct, except as noted above.
3
4            STEPHEN M. HORNER, PH.D.
5
6
7
8 THE STATE OF TEXAS
9
    BEFORE ME, _____, on this day
10 personally appeared STEPHEN M. HORNER, PH.D., known to
    me or proved to me to be the person whose name is
11 subscribed to the foregoing instrument and acknowledged
    to me that said witness executed the same for the
12 purposes and consideration therein expressed.
13    Given under my hand and seal of office this _____
    day of _____, 2003.
14
15    _____
    Notary Public in and for the State of Texas
16
17
18
19
20
21
22
23
24
25

Page 250

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ              )(
                           )(
VS.              )( B-02-128
                           )(
BROWNSVILLE INDEPENDENT   )(
SCHOOL DISTRICT, NOE      )(
SAUCEDA, MARILYN DEL      )(
BOSQUE-GILBERT and        )(
RANDALL DUNN              )(

REPORTER'S CERTIFICATION
DEPOSITION OF STEPHEN M. HORNER, PH.D.
SEPTEMBER 5, 2003

I, LOU ZUNIGA, Certified Court Reporter in and for
the State of Texas, do hereby certify that the above
and foregoing contains a true and correct transcription
of the oral deposition of STEPHEN M. HORNER, PH.D.;

I further certify that I am neither counsel for,
related to, nor employed by any of the parties or
attorneys in the action in which this proceeding was
taken, and further that I am not financially or
otherwise interested in the outcome of the action.

Page 251

Certified to by me this _____ day of
_____, 2003.

_____
LOU ZUNIGA, Texas CSR 2198
Expiration Date: 12-31-03
Hill & Romero
10125 North 10th Street, Suite B
McAllen, Texas 78504
(956) 287-8898

## A

**abilities** 208:13
**ability** 72:1 208:17
  219:15
**able** 6:7 21:16 58:15
  86:20 87:22 88:20
  89:25 90:6,6,18 94:9
  94:10 95:3 98:16
  166:21 196:13
  206:25 213:6 217:10
  218:8 229:13 230:2
  240:18
**absolutely** 33:9 125:12
  126:8 146:20 231:18
**absorbing** 117:3
**absurd** 124:21
**accept** 181:17 193:25
**accepted** 6:8,9
**access** 187:24 219:8
**accident** 99:16 241:25
  242:11,12,14,17,22
  243:1,6
**accidents** 241:23 242:2
**account** 78:6 99:19
  109:9,10,18 110:6
  111:5,8 129:13,17
  132:19 146:10 147:6
  148:4 150:6,9,23
  151:11,15 155:10
  176:25 177:2,6,17
  204:7 222:1 224:11
  224:12 242:23,24
**accounted** 78:25 130:5
**accounting** 43:19 59:3
  60:25 61:6,13,19
  96:13 97:18 99:6
  151:4 155:7 156:1
**accounts** 128:22,22
**accumulative** 246:6,7
**accurate** 109:24 171:20
**accusations** 225:13
**achievable** 107:3
**achieving** 129:14
**acknowledged** 249:11
**act** 9:23
**acting** 15:2 173:6,10
**action** 30:13 32:8
  250:17,19
**actions** 168:24 169:14
  169:20 209:18,19
**activity** 204:2
**actors** 9:18
**actual** 81:12 132:13
  149:21
**add** 42:13 81:8 96:23
  97:9,13,24 98:3
  103:5 161:20 179:15
  215:17
**added** 82:9 160:22
**adding** 81:14 155:14

**addition** 64:18
**additional** 37:25 93:7
  96:15 130:8 194:2
  212:8,15
**address** 75:1
**adds** 148:12
**adequately** 72:5
**adjusted** 129:23
**adjuster** 203:3
**adjusting** 150:9
**adjustment** 117:21
**administering** 76:24
**administration** 108:23
  155:2 236:15
**administrative** 5:25
  66:7,12 107:23 109:2
  219:24 220:1,4,8,14
  221:12
**administrator** 5:22
**admission** 7:11
**admittedly** 114:19
**admonished** 190:21
**admonishing** 190:22,23
  190:23
**advances** 150:19
**advantageous** 219:13
**adversarial** 14:15
**advice** 154:19
**advise** 95:11,15 167:4
**advisement** 153:21
**affect** 150:24
**affix** 249:1
**AFLAC** 43:19 48:6,8
  48:15 49:4,13,23
  50:20 59:3 60:25
  61:15 65:24 68:9,14
  69:15 70:11,13 71:6
  73:18,20 86:20 88:19
  89:2 91:4,22 94:10
  94:10,13,22,25 96:13
  97:18 107:12,14
  111:20 112:3,5,6,20
  114:8 117:14,16,25
  120:2,12,23 121:3
  126:12 129:23
  134:15 137:22
  146:22 150:2,4 155:8
  155:13,25 169:1
  171:25 172:1,9,24
  173:5,8,20 174:5,12
  175:8 176:13 177:10
  177:15 183:6 184:25
  187:1,2,16,17,18,24
  188:20,22 189:3,4,8
  189:9 190:4 191:7
  192:9,14 193:18,24
  195:23 203:10,15
  204:4,19,23 207:14
  209:11,25 210:5
  216:25 217:3,5

**AFLAC's** 111:12
  180:25 198:14 205:6
  206:13 207:13
  208:18
**AFLAC-related**
  132:14
**afraid** 82:1
**age** 184:19
**agencies** 107:4,5,9
  114:11 123:23 124:6
  125:18 202:14 231:6
**agency** 92:2 93:12,12
  94:4,21,24 107:12
  111:20 114:15 203:1
  208:10,11 211:13
**agent** 48:2 66:5 68:25
  76:21 90:9 91:1,7
  92:7 94:22 101:8
  112:1,4 153:24 183:6
  184:22 203:5,8,13,20
  203:25 206:15 215:4
  215:21,22 216:9
  220:2
**agents** 26:24 27:13,14
  27:16 28:14,19,22
  33:14,18 49:24 66:20
  76:22 77:11 81:3
  91:3,11,20 92:3,15
  92:25 118:11 126:17
  126:20,25 135:20
  178:10,18 206:17
  208:3 220:20 221:13
  229:21 231:10
**agent's** 26:15 155:9
**ago** 6:24 27:20 37:18
  75:4
**agree** 38:7 41:14,17
  73:20 78:4 87:14
  89:4,8 106:2 128:21
  128:24 131:18
  140:12 166:5,8,13,16
  167:5 171:23 175:1,2
  175:19,22 176:20
  177:3,5,7 178:1
  180:22 183:2,5,9
  185:12,24 186:8,8,9
  186:10,19 187:4
  188:5,7 191:6,14,18
  191:22,24 193:14

**199:9,13 200:18**
  201:1 203:6,17 204:3
  204:12 207:15,21
  208:9,13 210:17,18
  210:21 211:6,8,10,20
  211:22 212:11,15,17
  212:18 213:16
  219:12 241:19
**agreed** 41:10,12 113:16
**agreeing** 16:24 187:13
  191:1
**agreement** 14:8 170:9
**Aguilar** 1:20 2:3,3
  17:20 18:8 34:13,16
  34:18,22 35:6,12
  37:5,8,10,15,18
  38:10,24 39:5 40:15
  40:18 43:4,13 45:1,5
  45:8 47:7,10,14
  49:22,25 51:5,9,24
  52:21,24 53:18 54:11
  54:17 55:9 56:19,23
  58:23 59:19 62:25
  63:15,19,24 65:8
  74:15 79:2 80:20
  81:4,6,8 82:17,21
  84:22 89:6 91:15
  95:17 102:2 105:17
  114:2 119:17 121:19
  124:7,23 131:23
  135:3,8,16,22 137:2
  139:6 140:9,14,16,22
  141:3,17 144:2
  145:11 146:22
  148:22 154:5 155:16
  162:2 164:9 165:2
  166:6,14,17,20
  167:11 168:22
  169:12 172:14 173:1
  173:3 174:15 175:15
  176:22 177:1 179:11
  181:24 182:2 186:12
  186:21,23 187:25
  188:16 189:6,25
  190:9 191:20 197:5
  201:18 205:6 206:10
  207:9 215:16 216:23
  217:13 225:22
  226:12 230:7,10
  231:23 232:18
  233:24 234:1 235:13
  235:15,20 236:2,9
  237:3 239:19 240:8
  240:14,25 241:12,15
  242:15,18 243:21,24
  244:2 246:14,20,23
  247:5
**Aguilar's** 35:3 56:7
**ahead** 18:10 29:17
  36:14 39:11 55:17

**62:15 63:2 91:16**
  105:19 131:7 135:6
  188:17 221:15
**AI** 4:8
**alleged** 29:18 30:6 31:1
**allow** 181:17
**allowed** 98:20
**alternatives** 206:10
**AMERICAN** 1:15 2:15
**amount** 13:8 16:4
  86:10 87:5 129:21
  148:19 149:20 151:8
  151:8 153:15 155:9
  155:23 159:23
  160:19 205:23,24
  207:3,4 215:9,17
  217:18,19 218:2
**amounts** 76:21 137:18
  137:18 141:22 150:8
**analyses** 121:6,7
  122:18
**analysis** 8:21 9:9 12:6
  31:16,21,22 32:1
  75:8,21 101:9 102:12
  167:18 201:23
**analyze** 15:18,24 31:17
  67:3
**analyzed** 43:22 169:19
**analyzing** 15:16 16:4
  31:18 119:10
**Andrus** 26:16 178:7
  183:16
**and/or** 25:3 73:23
**annual** 6:21 49:3 80:24
  81:2 94:7 98:12
  120:3 137:18 138:17
  233:15
**annualized** 76:8 79:18
  80:1 85:1,2 98:22
  141:23 215:9 226:25
**anomaly** 83:12
**answer** 20:2 32:19
  72:23 74:24 79:21
  82:13 98:17 105:25
  111:22 128:20
  145:19 161:21
  166:21 168:10
  174:24 191:4 213:11
  213:21 219:2 225:16
  236:6,9 240:18,24,25
  241:1,7 243:4
**answered** 25:6 158:14
  191:7
**answering** 88:15
  220:15
**answers** 55:16,18
  144:10 170:3 244:7
**anymore** 8:6 27:3
**anyway** 26:12 69:17
  71:12 110:21 179:18

218:17
Apache 13:2,21 14:7
apart 15:20 52:12 82:1
apologize 61:12 88:13
  101:2
appalling 121:18
apparently 31:4 48:4
  155:11
appeal 6:13 33:5
appealed 33:3,6
appear 25:12 59:7
  61:15 138:3 151:7
  152:2
APPEARANCES 2:1
appeared 68:25 249:10
appearing 96:18
appears 48:18 53:9
  60:17 97:6 100:23
  137:22 151:9,18
  153:14 154:16,19
  155:3
apples 134:5,5 235:15
apply 22:22 104:24
  202:23
appointments 208:7
appreciate 55:12
appreciated 26:11,13
approach 224:10
approached 27:15
approaches 9:9
appropriate 40:22
  87:14 90:23 92:23
  95:10,14 110:10,11
  111:4,7,18 112:22
  140:5 168:7 211:5
  227:21
appropriately 91:10,12
  110:13
approval 195:9
approximately 75:19
  198:22 238:19 239:2
April 17:8,9 35:17,22
  43:2,3 137:10 139:8
area 9:9 10:8 13:9 30:9
  30:10 90:10 99:6
  118:12,13,15,16
  119:10 122:9 126:24
  127:2,6,7,12 130:18
  138:9,10 144:19,21
  144:22,24 145:2,5,8
  145:14,17,20,23,25
  146:1 196:25 230:12
  230:17,20,21 231:1,3
  231:6,22 238:3
areas 145:6 146:5
argue 186:3 199:22
argued 183:1
argues 202:14
argument 31:18 149:12
argumentative 121:19

124:23 140:9
arguments 9:22
arising 21:21
Arnie 29:9,11,18 30:6
Arnold 1:21
  16:13,14 17:20 38:13
  63:13 65:10 243:25
Arnold's 136:3
arrangement 14:10
  159:17
arrive 85:18 120:8
arrived 101:21
arriving 137:5,13
Artemis 2:4
article 232:7
articles 9:4
aside 85:25 86:14
  119:25
asked 27:11 45:9 49:22
  55:7 57:1 62:8,10
  69:15 115:17,25
  141:12 161:7 165:22
  166:22 167:25 169:9
  169:14,18,25 209:12
  217:2 220:8 226:8,22
  228:19 229:17,20
  230:5
asking 58:18 154:8
  156:13 166:17
  169:10 175:1 196:6
  213:13,15 220:16
  225:23 233:25
  235:21,22,24 236:2,5
aspect 109:1
assessed 218:3
assessment 110:5
assigned 6:25 176:9
  177:18
assist 15:9,20
assistant 5:22,25 7:6
  10:17 11:8,14 107:23
associate 83:21 84:17
  94:10
associated 31:9 110:6
  129:13,18 130:2,4
  220:6,10
associates 66:21 144:5
  144:11,15 145:13
association 68:14
assume 44:25 57:2 90:5
  95:2 102:23 103:24
  105:11,14,16 106:3
  109:25 116:16 122:7
  140:25 149:12
  165:25 193:17
  224:18
assumed 103:16
assumes 42:17 172:14
  173:4 174:16 194:20
  195:17,17,19 196:11

212:13
assuming 25:16 46:14
  83:3 109:16,17 137:2
  156:18 189:6,19
  202:2 207:21 239:20
  240:9
assumption 9:16 25:17
  51:11 140:19 183:24
  184:17,20 185:6
  193:4 195:1,19
assumptions 9:14 40:8
  40:9 41:4,9,10,15,25
  42:1,2 45:22 46:14
  46:16 67:9 85:9
  224:22 231:20
  246:16,18
ASSURANCE 1:15
  2:15
asterisk 76:4,5
attach 52:1
attached 1:23 4:22
  23:21 185:8,9
attachment 33:13
attachments 18:17,18
attacks 243:17
attempt 9:12 74:12
  75:17
attempted 67:2 86:9,15
  86:21 87:5
attempting 40:24 41:4
  92:10 94:21
attempts 30:24
attenuate 102:22
attenuation 102:23
attorney 15:20 24:12
  31:13 156:10 197:7,9
  232:3 233:7 244:6
attorneys 13:23 14:23
  15:3,6,9,24 135:13
  135:14 225:6 250:17
attributable 82:8
attrition 100:9 150:22
audience 196:2
August 136:9 162:14
Austin 2:18
authority 30:20
available 49:9 175:14
  206:11
average 9:19 118:25
  120:3,8 156:22 157:4
  202:15
averaged 120:8
award 110:19
aware 155:3 172:9,23
  173:5 187:22 188:1
  225:12
awfully 115:7
A&M 157:15,16
  158:21
a.m 1:17

          B
B 2:17 146:24 151:5
  251:9
back 11:19 12:1 14:25
  21:10 38:6 46:8
  48:11 52:10 59:10,24
  63:20,25 65:13 71:17
  74:17,25 77:21 82:15
  82:16 84:19,25 85:17
  92:3,11 96:8 99:13
  99:14,17 134:5
  143:10 150:22
  160:20 163:7,17
  175:3 225:13
background 196:12
backup 45:6
backwards 52:25
bad 209:21 225:10,17
  226:2,3,6
bag 160:1
balance 148:16 149:6
  151:12,19 152:23
  155:15 160:17 161:2
banned 30:11
Barnson 69:21 226:12
  226:13 228:14
Barnson's 50:2 214:19
  217:13
barred 30:12,19 66:21
base 87:12 96:11
  123:20 124:2 125:1
  126:14,15 176:9,13
  176:14,21,24 183:24
  193:1 202:18
based 4:11 9:15 27:23
  42:13 67:11 85:10
  99:6 101:17,24 103:6
  106:6 111:11,19
  134:17 149:17 169:5
  174:8 177:18 181:21
  182:1,3,11 184:20,23
  185:6,7 188:18
  194:10 195:7 196:14
  197:1,19 200:13
  202:4,7 203:13
  208:24 215:14,18
  221:25 222:6,8
  246:13,16,18
bases 122:16 125:13
basic 183:9
basically 4:2 15:21,22
  41:1,12 42:5 50:20
  94:19 99:24 100:13
  102:6 103:16 108:15
  112:20 145:8 176:12
  181:19 188:17 201:2
  201:22 220:15
basing 195:12,19
basis 77:23 116:15
  170:12 177:17

Bay 14:3
Bear 39:4
becoming 235:11
began 161:6
beginning 41:18 104:7
  172:10 173:2 174:12
  180:20 190:18
begins 179:24 211:4,11
behalf 21:15 26:15
  35:3
belief 202:4
believe 4:19 8:6 9:19
  11:1 17:8 19:16
  21:16 24:2,8 27:1
  32:4 34:9,12,17,24
  39:7,13,19,23 41:19
  42:12 43:9 45:4
  46:12 50:13 51:14
  54:1,3 61:1,2 62:3
  64:8,10 67:3,6 69:4
  71:10,16 72:4 73:4,5
  74:14 75:1,21,22,24
  85:3,7 87:10,25
  91:18 93:19 94:15
  95:2 97:20 102:9
  103:1 104:12,20
  115:17 116:23
  117:12 118:2,3,6,13
  118:14 119:11 121:6
  128:8 131:17,19
  132:8 139:4 140:15
  141:5 144:17,24
  146:3,5,6 147:23,24
  149:6 151:21 153:20
  154:17 169:3,25
  170:8 171:8,11,20,24
  172:22 173:8 175:25
  178:5,16 179:1 180:1
  180:23 181:3 182:14
  182:20 189:10
  190:20 197:16,21
  200:7 201:24 205:3
  209:23 211:24
  216:17 217:5 219:2,6
  220:7,21 222:8
  226:19 227:8 229:18
  232:23,24 234:5
  235:1 238:18
believed 15:10 29:20
  94:7
belonged 13:9
benchmark 68:17,19
  68:21 93:4
Benito 145:9
best 9:16 27:10 58:9
  111:9 127:6 241:17
beta 111:11,12,19
  112:9,14,20,22,24
  129:23 204:15,16,19
  204:21 205:6,11

206:6 232:9 233:10
233:12
betas 204:23 205:8
206:9,22
better 6:2 29:22 42:21
92:5,9 94:20 131:18
207:14
beyond 208:19
big 12:22 107:5 114:23
bigger 231:9
biggest 29:24
bill 161:11
billed 35:24
billing 43:11 150:2
Bills 47:3,16 51:20
BISD 3:10 48:24 49:1,4
55:17 66:22 75:20
76:23 109:4,18
125:25 126:2 128:21
142:16,25 150:2,3
169:15 172:10,24
173:6,7,9 174:5,12
175:9 176:9 177:10
189:5 193:4 194:11
196:1,19,21 198:14
198:18 209:14,19
213:7 215:6 218:23
219:14 221:22 222:1
222:7,14,20,22,24
223:6,7,20,23 224:1
224:4,11,12 227:11
234:20 236:15,24
237:8,15,16 238:11
240:23 242:23,24
243:2,5,12,19,21,22
243:23 244:10,19
245:23
bit 10:8 66:6 101:3
103:4 104:4 106:25
117:19 122:20 149:7
160:1 164:14 227:8
bits 12:14,15
block 147:9,10 148:16
board 5:23 6:6 31:2
189:4
boards 129:18,19
boats 14:5,5
Boca 2:13
Bonds 47:3,16 51:20
bonus 43:22
booming 11:23
born 5:2
borne 32:3
borrow 212:9
BOSQUE-GILBERT
1:6 2:11 250:6
boss 6:4
Boston 10:21
bothering 199:19
bottom 24:9 48:23

49:12 57:5 68:3
92:22 96:10 113:7
134:1 147:6,7 155:15
185:18 201:6,12
217:25 237:24
bought 192:8 197:25
198:4 240:1
Boulevard 1:21 2:4,13
box 153:8
boxed 99:6
brand-new 240:1
Branson's 226:11
break 33:7 63:23,25
65:11 119:17 156:4
188:9 241:8
briefcase 162:5
briefly 34:10
bring 66:18 167:10
bringing 85:17
brings 185:16 233:3
broad 22:5,10 23:3
166:14
brochures 27:8
brought 176:13
Brownsville 1:2,5,21
2:5,6,9,14 4:7 47:24
90:10 109:3 118:16
119:10 122:4,9
125:22 126:24
128:14,17 134:23
135:9,16,21 138:8,10
144:21 145:7 146:8
156:10 168:25 172:6
185:1 188:2 230:6,9
230:14,19,22,23,23
231:3,7,10,15 250:2
250:5
BS 5:9
bucks 135:11 149:12
buddy 4:5 30:22 37:5
39:15 47:7 53:18
81:8 140:17
budget 6:21 7:19
budgeting 6:20
budgeting/planning
7:21
bulk 223:13
business 11:22,23,24
12:10 14:4,21 28:14
30:17 31:7 32:6
39:17 73:13,14
123:11 125:11 136:5
136:24 137:5 158:11
172:10 181:16
202:21,23 204:25
205:10 206:5 222:14
223:11,13 233:14
businesses 23:12 123:2
123:13 158:17,19
234:14

businessman 73:18
buy 125:9 127:20 192:9
buying 129:2
B-02-128 1:4 250:4

---
**C**
---

C 99:3,4
cafeteria 187:6,23
195:21 235:12,25
244:9
Cal 5:6
calculate 28:9 40:22
75:18 86:10,15,21
87:5,23 88:24 101:14
217:20,21 226:23
227:7,9,15
calculated 40:21 41:3
45:25 75:13 78:3
95:8 100:17 101:12
102:25 218:4 224:14
calculating 68:19 77:23
77:24 78:21
calculation 15:12 40:5
40:6 41:12,20 42:10
86:6 88:4 113:16
118:3,8 133:5,24
179:25 180:8 206:1
215:2 226:13
calculations 3:2 28:13
35:23 36:1,3,6,8
37:25 39:24 40:2,14
40:16,20,23 41:2
43:1,3 67:6 79:8,25
85:10 87:8,12 88:11
98:24 101:21 103:1
104:15 105:8 131:11
131:14 134:12 168:1
168:6,12 180:5,6,10
205:19 207:7 215:4
216:9 218:22 227:14
227:16 229:2
calculator 161:22
212:10
call 14:11,13 22:6,7
23:14 29:23 106:21
149:15 214:2 240:3
called 14:11 21:7 32:16
32:19,22 53:19 59:12
87:17 136:24 137:8
143:6 241:17
calling 76:17 77:19
campus 66:21
canceled 99:15,16
cancer 245:5
capability 184:16
capable 89:8 137:17
138:16
capital 73:21,22
captive 183:7 196:2
carbon 153:17,20

care 218:20
career 11:18
careful 95:21 160:24
190:12
carrier 29:20 188:21
188:23 189:1,24,25
190:3 191:9,11 192:2
192:3 193:6,18,23
208:2 218:24 235:7,9
240:6
carriers 199:11 237:19
238:8
case 4:6,9 17:9,22
18:15 20:5 23:16
24:7 25:5,18 26:18
27:12 28:2 29:4,9,13
29:15 30:4 33:22
34:5,19,22 46:20
52:20 53:9,20 54:19
54:23,25 56:7,13
57:23 65:1 90:7
95:12 110:13 122:13
122:14 125:15 140:8
140:19 159:10,18,22
159:23,25 160:2
161:6 163:9 164:6,8
164:9 166:23 169:12
170:1 190:25 192:17
192:18,19 210:9
219:20 225:4,14
226:4 232:2
cases 4:13 16:12,17,18
17:2,19 18:23 19:15
19:19 20:9,10,21
21:3,6,14,19 22:3,20
22:24 23:20 26:16
28:6 32:11 33:12,17
35:3 73:6 122:18,23
156:19 159:12,17
160:10,11 164:11
cash 149:23
casting 11:4
catch 182:13
categories 22:5
category 22:10 23:3
cause 1:16 123:8 219:6
226:4
caused 66:18,24 170:1
causes 150:14
center 19:9
Central 1:20 2:4
certain 19:17 27:22
36:5 44:4,5 45:22
62:7 133:1 146:21
148:23,25 173:5
210:7 226:10
certainly 20:3 27:8
48:11 50:7,8,19 51:2
53:13 66:25 68:22
69:2 72:18 74:12

77:17,22 78:1 86:23
90:1 93:3,21 100:14
109:22 113:10,20
114:23 126:12 127:4
127:11 141:10 142:5
144:7 168:3 182:17
186:9 217:5,11
218:25 226:24
**CERTIFICATION**
250:8
Certified 1:18 250:10
251:1
certify 250:11,15
cetera 47:3 75:6 236:23
chairman 5:23 6:5,14
6:17
change 19:5,6 42:19,22
68:2 88:6 95:7 103:6
173:22 174:4 202:8
227:17,24 229:4
248:2
changed 99:23
changes 99:7,11,18,19
123:1,2,4,8 128:2
218:19,20,21 220:16
227:12 248:1
changing 129:18
characteristics 119:1
characterization
179:23 182:4
characterize 107:1
charge 12:4,5 125:10
162:18 163:1,6
chargeback 100:6
chargebacks 98:20
charged 161:19 163:2
163:3
charges 163:12
charging 162:16
chart 76:3
Chavez 1:3 2:21 4:7
18:15 26:16 36:3,6
36:25 38:8 39:24
40:7,10,19 41:14
42:11 44:4 45:19,25
46:4,13 47:20 49:15
50:6,11,15 51:1,4,16
52:20 53:9 54:19,25
55:14,16 56:5,7,13
57:9,22 58:19,23,24
61:7,14 65:1,5,21
66:18,19,20 67:4,10
67:24 68:19 69:4
71:5,14,16 72:16
73:17 74:3 76:22
78:3,13 79:17 80:1
82:7 85:3,19 86:6,16
86:22 87:6 88:18
89:4,8,17,21 90:14
90:18,25 91:2,13,21

92:13 93:8,11 94:3
95:3,7,8,11,15 96:14
100:6 101:7 102:19
104:12,16,20 106:8
107:15,19 108:1,2,6
108:24 109:1 111:25
112:18,22 117:2
119:6,11,21 123:17
125:19 126:6,11
128:4 129:19 131:15
132:4,10 134:15
136:7 137:20 139:2
139:10 140:19,25
141:10 142:19
143:17,23 144:6
148:20 154:19
167:20 168:2 170:18
170:21 171:4,19,21
174:9,11,21,22 175:4
175:6 176:10,12,15
177:15,18,19 178:6,9
178:20 180:1,21
181:9 182:17 183:1,5
184:14,18,21 185:10
185:19 187:9 188:19
189:18 193:2 194:11
196:15 198:21 199:2
200:15,17 201:24
202:7,20,23,25
203:14 208:17 210:9
213:5 215:3 218:23
219:12,21,24 221:8
221:17 222:11 223:1
223:10,18 226:4
227:10 228:12 229:8
230:1,2 231:19 232:2
232:3,6,14,22 233:2
233:6 234:1 236:20
238:16,16,18 239:4
239:22 243:8 244:16
244:22 245:19
246:10,11,13,17,18
246:19 250:3
**check** 20:17 40:3,16
41:1 74:18 148:20,24
149:1,11,13 150:17
151:8,10,17,20 153:4
153:5,11,14,18,19,21
155:8,23 171:9
**checked** 36:4
**checking** 40:13
**Chica** 2:13
**Chief** 12:4
**chime** 83:25
**choice** 9:16,18
**choose** 121:17,20
**chosen** 211:11
**Christi** 4:23 5:1 11:19
13:3,7,16 14:3 46:8
**chunk** 223:10

**circumstance** 202:22
202:24
**circumstances** 27:3
74:9 111:9
**cite** 171:6
**cities** 123:24 124:5
230:25 231:3
**city** 145:7 172:6 230:23
**Civil** 1:22
**claim** 72:13,21 73:2
199:3
**claimed** 16:3,4
**claiming** 199:5
**claims** 31:7 74:3
**clarification** 18:8
156:14 167:23
**clarify** 20:1 53:16
55:11
**class** 141:16,19
**clear** 21:13 52:7 102:18
103:21 178:21
**clearly** 141:6 192:22
**client** 24:10 31:15
88:15 163:3
**clients** 15:3,10 35:3
163:2,6 197:14,17
198:13,13 238:17,20
238:22,25
**clipped** 136:23 162:4,7
**close** 19:23 28:11 71:25
113:21 157:23 195:8
**closely** 73:19
**closer** 157:3
**closes** 76:20
**coffee** 33:8
**collected** 77:3,4 97:24
147:10,25 149:22
150:9
**collecting** 150:4,4
**collection** 61:6,13
**collections** 149:21
**College** 10:13,21
**Colonial** 172:10 174:5
239:17
**COLUMBUS** 1:15
2:16
**column** 25:2 77:2,10,13
79:15,22 99:12,14
**columns** 77:7,18 96:22
**come** 12:1 54:4 64:22
99:13,17 116:16
117:20 130:11
162:21,22,23 188:25
218:25 246:8
**comes** 45:23 106:8
219:9
**comfortable** 68:1
**coming** 52:5 54:19
87:16 99:14 104:11
112:21 115:3 122:4,9

127:25 128:3,11
129:2,11,16 133:3,12
138:13 141:20
162:19 229:14
**commendation** 184:24
**comment** 179:4
**commercial** 14:23 22:6
23:4,14 160:5,11
**commission** 6:9 42:18
76:12,15,17 77:11
100:7,11,16 103:18
147:10 149:17
150:15,15
**commissioner** 30:13
**commissions** 26:16
36:9 48:25 77:14
80:25 81:2 88:12
96:15,16,17,21 97:4
97:10,15 98:11,13
101:11,17,24 102:7
102:12,15 147:25
148:5 149:10,25
150:19 155:14
171:25 185:20 215:3
215:5,11 216:9,10,10
227:10,16
**common** 46:4,6
**communities** 122:12
**community** 123:12
**companies** 12:20 13:14
13:15 14:9 30:14
125:3 206:21 231:11
234:7 237:17 238:4
242:21,25 244:13
**company** 1:15 2:16
11:20 12:3,11,12,17
29:24,25 30:3,5,8,12
30:16,17,21,24
111:12 112:21 150:1
204:17 207:4,5 224:9
237:6 242:13,16
**comparable** 118:15
119:6 230:6,8 234:13
236:23 237:7
**Comparables** 137:9
138:25 143:6
**compare** 42:1 84:21
108:12 132:2 140:17
147:5,23 228:11
229:25 230:2 231:14
**compared** 78:9 108:13
231:7
**comparing** 118:4
229:25
**comparison** 134:4
138:19 198:16
**comparisons** 140:8
229:17
**compensate** 85:19
**compensation** 76:22

**competition** 199:11
**competitive** 9:23
**competitors** 244:12
**compiling** 151:5
**complaining** 155:2
**complaint** 87:17 88:1
211:2
**complaints** 210:25
**complete** 50:24 57:8,11
58:21 75:8 131:11
152:1 168:17,18
**completed** 8:14 10:15
10:24 136:13
**completely** 102:18
164:16
**complicated** 14:9 75:14
103:1,11
**complies** 56:2
**compose** 241:8
**comprising** 57:20
**computations** 42:12,14
**computer** 10:2 38:6
46:7
**concentrating** 94:23
**concern** 171:9
**concerned** 67:23 69:12
**concerning** 33:14
**conclude** 85:16 208:16
208:21
**conclusion** 41:6 45:24
106:11 107:15
**conclusions** 122:5,9
128:11 141:21
**concrete** 69:9
**condition** 193:8
**conditions** 10:3
**conducted** 93:7
**conference** 34:16 43:4
43:12
**conferences** 43:16
**confirm** 16:18 18:5,12
52:18 54:12 70:10
151:20
**confirmation** 44:22
**confused** 13:19 55:7
82:15 164:14
**confusing** 13:14 83:10
151:22
**confusion** 235:17
**Congress** 2:18
**Congressional** 7:19
**connection** 44:12
**consider** 110:16
**consideration** 180:12
249:12
**considerations** 129:20
129:22
**considered** 50:5 110:13
**considering** 199:17
**consisted** 161:17

**consistently** 83:14
**consolidation** 107:4
**constantly** 19:4
**constitute** 57:21 64:25
**constraints** 9:14
**construction** 12:22
**constructive** 27:5
**consult** 16:18 17:1
27:11 31:12
**consultant** 15:5 17:21
34:19
**consultants** 72:20 73:2
121:9,25
**consultation** 27:24
28:8
**consulted** 18:23 22:1
73:1 156:19
**consulting** 14:20,22
15:9 19:4,15,24
26:14,19 34:4 35:2
72:12 156:15 157:18
157:20
**consuming** 39:3
**contact** 34:21
**contacted** 17:21
**contained** 67:13 154:14
232:13
**contains** 54:20 136:19
250:12
**content** 187:5
**contents** 186:19
**context** 244:8,9
**continuation** 156:8
185:19
**continue** 89:5 90:1
102:19,24,24 104:2,3
109:18 182:12
221:18 227:11
**continued** 220:2
**contract** 29:19 30:9,10
177:10,14 203:9
**contracted** 94:10
**contractor** 73:15 204:4
206:14
**contractors** 12:20,21
72:21 73:1 122:1
**contractor's** 121:9
**contrary** 74:20 181:12
**contributed** 115:15,20
116:12 126:21
**contributor** 75:15
**control** 12:5,5
**controversy** 92:19
**conversations** 174:9
176:15 177:19
184:20 185:10 187:9
188:18 193:1 194:10
195:20 196:14
200:14 203:14
**coolers** 12:18

coordinated 237:17
coordinator 65:21 66:4
  66:4 107:21 203:23
coordinators 66:8
  70:11 119:23 120:3
  120:12,19
copied 38:20 51:8 52:1
  62:4,22 63:5 131:7
  161:17 162:9
copies 52:19 54:17,21
  57:2,3,20 58:8 59:7
  61:24 63:23,24 65:12
  65:14
copy 16:13 18:6,14,21
  36:24 38:25 47:2,19
  51:13 58:12 59:15,24
  60:5,6,8 63:7,18,21
  153:14,17,20 154:18
  161:24,25 165:5,13
  167:9 177:13 179:10
  179:11,12 201:5,18
corner 16:19 133:18
  155:15 206:22
Corporation 6:22 13:2
corporations 231:6
Corpus 4:23 5:1,2
  11:19 13:2,7,16 14:3
  46:8 162:19,23
correct 4:9,13,15,24
  11:15,16 18:24 19:10
  20:12 21:15 25:13,14
  27:23 32:21 33:15
  34:3,13,22 35:6,7,24
  39:8,22 40:10,11
  41:22 42:3,6 43:20
  43:23 44:19,25 45:13
  45:19,25 46:15,20
  48:6,17 49:2 51:10
  51:13,17 53:22 54:7
  57:7,10,10,15 58:5
  59:4,17,20 60:7,9,10
  61:7,8,16,17,20 64:8
  67:2,15 70:18 71:18
  71:21 72:17 73:23
  74:18 76:6,7 77:5,15
  77:24,25,25 78:3,6
  78:10,13,18,21,22
  79:1,16 80:3,4,10,16
  80:18,25 82:25 83:4
  83:4 84:10,13 85:7
  85:11,12,14,20 86:7
  86:8,17,18,20,24
  87:7,13,18 88:1,2
  89:5 95:1,12,13
  96:19,24 97:7,10,15
  97:16,19 100:3
  101:25 104:7,10,13
  104:17,19,22,25
  105:5,9,10 106:17
  108:5,11 110:23

111:13,16 112:7,9,19
  112:22,23 113:1,4,8
  114:22,24 115:4,5
  116:9 117:7 119:23
  122:6,10,14,15
  125:13 126:3,4,10,13
  127:3,7 128:5,23
  129:10,14 131:16,17
  131:19 132:7,8,12,24
  134:9,17 136:20
  137:10 138:6,9 139:9
  141:9,12,13 142:7,13
  142:14,20 143:1,21
  144:12 146:25
  147:11,14,17 148:2,7
  148:10,13,17 151:2,7
  152:24 153:6,9,16,25
  154:4,20 155:4,10
  164:13,25 165:1
  169:22 170:6,22
  173:17 174:14,18,20
  177:19,23 178:8
  182:4,12 183:20
  184:22 186:17,18
  188:24 189:10,20
  192:25 193:10
  195:22 197:21
  199:20 200:16 203:3
  203:6,16 208:7 209:8
  209:23 210:24
  216:12,16 222:2
  223:8,12,24 224:2
  231:22 238:5 239:15
  243:9 245:12,15,25
  246:24 249:2 250:12
corrected 197:7 216:3
correctly 20:20 43:1
  86:1
correlation 112:14
  204:16
correspondence 149:24
corresponds 147:25
cost 6:10,12 218:18
costs 202:15
cost-saving 6:7
counsel 27:15,17 34:8
  38:8 53:6,16 54:11
  142:23 143:24
  165:23 250:15
count 19:21 20:13
counted 20:7,20 99:13
  99:15
counties 123:24 124:5
  230:16,19
counting 240:7
country 118:5 138:5
county 25:6 146:7
  230:22,24
couple 15:8 18:16 62:8
  219:20

course 106:24 200:1
  202:21
courses 11:16
court 1:1,19 25:5 95:24
  250:1,10
courthouse 32:12
cover 54:10,16,20
  122:16 133:13
  137:23 138:12
  145:17,20 160:2
coverage 194:4,25
covered 70:4 145:14
  180:11
covers 155:22
CR 148:17,24 153:9
crazy 58:13
credit 12:5,6 101:18
  149:5 150:8 152:8,25
  155:8 160:18 161:7
  222:12,12 223:1,5
  224:13
credited 79:17 80:2
  213:8
crew 14:5
criteria 113:17
criticism 206:15
criticizing 201:23
critique 16:7
critiquing 16:6
crucial 167:17
CSR 251:6
curious 225:3
current 17:14 93:11
  229:9
currently 183:6
curriculum 4:22 18:19
customer 123:20 124:2
  125:1,13 126:14,15
  176:9,13,21,23
customers 12:19 125:7
  125:8,9 145:16,23
  149:25
cut 6:10 24:18 149:13
  153:14,18
cuts 155:8
CV 8:5

**D**

D 130:13,16 131:4,12
  222:9
dad 11:24
daily 19:5,6
Dallas 108:18,19
  118:13,14 145:2
  230:5,12,17 231:1,6
  231:9,15
damage 14:23 15:11
  28:8 31:10,18 89:24
  90:1 95:23 121:25
  180:6,7,10

damaged 22:13 72:13
damages 15:11 16:3,4
  21:21 22:6,7,9,10,17
  22:25 23:5,12,13
  28:9 29:1 31:21 67:3
  67:9 68:3,20 71:6
  72:3 75:1 78:2,13,23
  86:6,14 87:17 90:15
  95:7,12,16 110:5
  113:4 121:10 168:2,8
  168:12,15 179:6
  180:13 207:18 211:7
  212:20 218:2,5,7
  219:1 224:15 226:14
data 15:24 59:4 60:18
  67:3,24 69:24 87:11
  90:11,13,16 93:3
  103:13 118:4,8
  130:16 131:11
  139:19 197:22
  204:23 205:10,11
  206:16 207:2,3,6
  217:4 220:22 232:24
  233:9
date 8:6 19:2,3,9,11
  24:17,18,22,24 25:2
  45:2 147:20,24 151:3
  162:13 251:7
dated 3:1 17:8,9,16
  35:16 44:10,19 93:22
  93:25 146:16 152:5
  153:22 154:20
  160:25
dates 16:12 17:25 25:1
David 29:10,11 31:8
Davies 139:17
day 25:9 43:25 125:4,4
  163:10,11 249:9,13
  251:1
deal 16:9 83:7
dear 17:12
death 21:22 22:20,23
  23:6,20,22,24
debatable 107:1
debit 151:11
December 8:11,19 11:1
  71:18 75:11,20 76:11
  77:22,22 78:6,7,8,20
  78:24 104:2 172:11
  174:13 213:7 215:6
  216:11 222:8,16
  227:1
decide 7:13 8:20
  227:21
decided 7:9,22 240:6
decision 9:25,25 10:8
decisions 10:10
decrease 202:15
deductions 244:11
defendant 1:14 2:6,15

21:9 25:23,24 26:1
defendants 2:11 169:20
  225:4,7
defending 202:1
defense 14:22 16:8,9,10
  225:8,9
deferred 7:12
deficiencies 201:1
define 22:18,19 72:7
  113:15 145:5
definitely 38:22 62:12
  95:9 175:24
definition 23:17 216:25
defray 220:20
degree 5:7 8:4 10:14,25
DEL 1:6 2:11 250:6
demographic 119:1
  122:17 124:11 128:2
demographics 118:14
  118:15,18,19 119:10
  122:4,11,22,23 123:1
  123:9,11 230:8
demonstrate 72:5
demonstrated 10:1
demonstrates 138:16
dental 244:23,24
depend 74:8 126:12
dependent 194:4
dependents 194:25
depending 126:14
  149:21
depends 126:15 178:8
  183:8
depo 56:21 57:3
deposit 159:17,19
  160:2,20
deposition 1:9,13 4:6
  4:18 16:20 20:5,11
  21:5,20 22:2,4 24:22
  25:3,9 28:1 29:1
  32:11 50:2,3,4 55:13
  57:14,21 58:2 64:7
  74:14,21 82:20
  117:23 119:21 121:8
  146:4 156:9 162:15
  163:12 164:19,21,25
  171:4 178:7 182:23
  184:10 185:9 200:15
  209:4 216:20 217:13
  226:11,11 249:1
  250:8,13
depositions 4:15 21:3
  49:23
deposits 155:9
depot 14:7
derived 204:21
describe 28:10,12
  73:17 85:25 193:11
  202:22
described 9:8 13:20

48:12
**describing** 40:3 48:13
170:18 202:22
**description** 14:19
193:25 203:14
241:17
**descriptions** 43:23
170:16
**designated** 60:6,8
**detail** 31:24,25 142:3
153:24
**details** 150:13 218:20
**determine** 9:16 21:25
67:3 91:13 98:20
107:15 119:5 126:19
156:1 168:7 169:25
**determined** 100:12
193:10,13,21 195:5
229:14
**determining** 15:10
90:14,16 93:5 124:25
127:13
**develop** 224:21
**developed** 67:11 92:19
**development** 7:3
**difference** 11:12 81:14
100:20 113:6 205:18
**differences** 23:1
**different** 6:5 9:6 13:5
17:5,10,11 22:21
38:1 39:8 40:5 45:23
45:24 66:6 73:22,24
74:1 75:13 84:22
91:24 98:8 100:20
108:24 124:2 146:6
174:22 178:22
188:23 190:13,13
218:13 224:9
**difficult** 6:22 58:10
71:10,13
**Dino** 1:3 2:21 4:6 39:24
40:16 47:20 48:3,17
48:25 49:6 55:14
56:5,7 57:9 61:7,14
65:20 68:19 69:4
72:16 76:9 77:11
78:13 79:17 80:1
82:6,25 83:3,25 84:9
85:3,19 86:16,22
87:6 89:4 90:14
92:13 95:3 96:14
98:21 100:6 108:12
109:14,17 112:17,22
114:22 115:15,19
117:17,24 119:6,11
119:21 123:16
125:19 126:6,11
128:4 129:19 131:15
132:4 134:15 136:16
137:20 139:2,4

141:24 142:19
143:17,21 144:6,11
148:20 149:11
153:15 154:19 155:3
155:4,13,24 177:14
184:17 197:15 250:3
**Dino's** 72:1 75:6 83:11
84:5 102:7 103:16
108:9 110:5 111:16
114:20 126:25 138:3
144:15 145:13 146:1
188:1
**direct** 78:2 100:14
101:18 155:9 219:6
**directly** 5:14 66:2
70:13 76:20 142:21
215:3
**disagree** 105:22 166:5
166:8 167:20 171:23
173:25 175:20,21,24
176:4,7,8 177:22
178:1,2,4,25 179:22
179:23 182:22,24
183:13,15,18,23
185:24 186:7,11,19
187:4,15 188:14
192:16 194:10 199:9
199:25 200:2,19,21
202:2,3,12,16,18
204:8,10,11,14
210:17,22 211:18
212:6,14,23,24
213:25,25 214:1
223:25
**disagreeing** 187:13
200:6
**disagreement** 167:13
170:10 207:22,23,25
**disagrees** 179:4
**discard** 103:12
**disclose** 96:5,6
**disclosures** 159:2
**discount** 41:19 45:23
111:10 112:25 113:6
129:11,12,16,21,23
130:1
**discounted** 115:1
**discounting** 130:9
**discounts** 113:3
**discovery** 59:3
**discrimination** 23:11
**discuss** 200:25
**discussed** 93:11 108:6
109:11 142:1,2,3
144:18 150:14 151:3
165:25 200:10
228:22 229:5 235:5
**discussing** 144:25
166:3 167:24 226:5
244:10

**discussion** 13:25 146:3
146:5 221:8 233:4
**discussions** 142:6,9
178:5
**disk** 37:16,17,22
**disks** 37:19
**dismissed** 27:12,14
**disposable** 127:13
**dispute** 27:6
**disputing** 170:12
**dissertation** 10:25 11:2
**distracted** 79:19
**distribution** 11:5
**district** 1:1,1,5 2:7 4:7
13:10 25:5 108:18,19
125:23 156:11
168:25 185:1 188:3
194:3 196:2 250:1,1
250:5
**districts** 30:15,25
108:23 123:24
125:18 146:6 230:11
230:14
**divide** 22:5
**divided** 147:13,13
**division** 1:2 7:3 250:2
**docs** 59:3,4
**document** 39:4 51:20
53:14 55:24 56:9
60:16 81:20 82:5,14
84:23 120:6 136:23
137:22 138:24
146:22 152:5 153:13
164:17 197:12 198:4
198:21
**documentary** 51:12
**documentation** 176:17
185:7 199:2 226:19
231:20
**documents** 3:5,6 34:9
38:19 45:6 51:3,7,8
51:15,23 52:1,19
53:8,11 54:1,3,12,15
54:17,21,24 55:9
56:5,6,12,17 57:8,18
57:19,20,22 59:8
62:3,12 63:5 64:6,17
64:22 65:1 82:16
120:2,14 130:17,20
130:23 131:10 136:1
137:8,13 141:5,7
143:17 146:25 152:2
162:8 164:15 165:4
194:17 197:10 232:3
232:4,12,20 233:5,8
233:20,20,22
**Doe** 24:9 25:18,25 26:3
**doing** 5:21 8:13,16 12:8
14:25 19:22 30:18
31:10 48:16 52:14

66:5,12 68:4,17
92:17,21 93:13 95:22
95:24 102:19 103:25
104:2 117:17 120:23
123:2 156:15 166:24
217:3 219:24 220:1
220:12,13,24 221:9
221:11,12,23 229:8
**dollars** 134:16,23
135:20 205:20,21
**double** 20:7 108:10
134:12 165:17 182:8
199:18,23 202:5
**doubled** 105:5 181:23
182:7,9
**doubling** 105:16 106:5
106:19
**Dr** 4:5 18:12 21:19
33:11 38:14,20 39:21
43:18 52:17 54:15
58:16 59:1,15 62:3
119:20 121:5 124:10
131:14 156:9 165:5,9
168:25 170:7 181:19
185:3 201:22 202:8
202:21 219:19,20
236:7 239:21 240:20
**draft** 6:16
**drill** 12:14,15
**drilling** 12:20,20 14:8
**drop** 99:8
**DSC** 69:1 220:2
**DSCs** 66:20
**due** 43:9,10 86:6,14
148:24 151:17
153:11 155:14 161:2
**duly** 4:2
**DUNN** 1:7 2:11 250:7
**duplicates** 62:19
**duplication** 36:3
**duplicative** 159:6
**duties** 12:8

**E**

**earlier** 45:18 63:6
120:15 128:9 134:8
161:24 164:18
167:24 168:13 185:4
186:14 200:11
201:19,20 223:25
229:7
**early** 72:5,7
**earn** 89:1,3 95:3
182:12
**earned** 96:14,21 97:10
147:11,25 148:5
149:11 150:15
157:19 158:5,6
180:25 181:4,10,13
212:8,15 215:20,22

**earning** 71:14
**earnings** 88:18 96:11
121:11,24 135:11
158:9 180:24 208:18
224:25
**earns** 149:25
**easier** 40:6 42:11,15
**easiest** 51:25 100:13,14
**easy** 91:19
**economic** 8:21 9:9,13
9:14,15,17 14:21,24
106:10,12 169:19
212:19
**economics** 5:9 8:12,20
8:23,24 10:12 11:9
158:23
**economies** 106:15,16
106:22,25 107:2
**economist** 15:19 87:14
90:8
**Edinburg** 145:9
**Edition** 47:17
**effect** 87:16 102:23
113:7,10,12 120:25
121:3 218:10 219:3
219:15 226:24
**effective** 172:12 174:14
218:18
**effectively** 104:6
**effects** 169:19
**eight** 20:14 163:15,25
164:2,3
**Eileen** 2:12 25:8
219:19
**either** 17:14 22:2,14
23:24 27:4 28:1 29:1
37:21 45:9 51:4 59:6
66:4 80:2 118:10
123:23 142:21,23
150:4,7 163:1 167:6
170:1,19 173:11
181:12 183:18
194:22 197:9 198:13
199:23 212:6 237:22
**electronic** 38:5
**elevated** 11:14
**eligible** 245:18
**eliminated** 10:1
**Elizabeth** 2:8 156:9
**emphasized** 96:4
**employed** 180:2,3
185:13 238:11
250:16
**employee** 48:6,8
142:16,25 236:16
237:16 243:5,12
**employees** 6:7,9,13,15
7:5 23:14 49:2,4
72:15 121:9,25
125:17,22,25 150:3,5

169:15 187:24 192:1
192:14,15 193:5,21
193:23 194:3,24
196:19,21 197:2,4,6
197:14 198:22 199:4
234:20 236:24 238:5
240:23 245:13,22
employer 126:6 231:12
employers 123:21,22
125:19 126:9,13
234:15
employment 24:1
72:14
endeavor 180:22 229:9
endeavors 182:18
ended 11:17
endorse 40:24
enforces 120:2
engagement 35:10,11
35:14
enjoyed 114:13 116:5,8
118:1 141:1
enjoying 128:14
enjoys 112:6
enormous 113:7,11,14
114:20
enroll 75:19
enrolled 150:3 237:7
enrolling 76:11 187:22
enrollment 78:24
172:11 173:2,21
174:13 175:10
189:15 215:6 216:11
222:7,16 226:25
237:12,15,17
enrollments 227:11
entails 213:19
entered 8:12
entire 58:12 72:10,11
82:8 133:25 141:8
145:14,17,20,23,25
194:20 200:23
entirely 19:17 41:16
115:2 128:10
entirety 64:25 126:11
entities 129:19
entitled 147:9,10 150:1
entity 112:15,17
entry 13:13 34:15
35:22
equal 180:25 208:17
224:18
equals 148:16,24
Equipment 11:20 12:2
12:11
equity 207:4
essence 80:11 150:7
192:21,22
essentially 30:21
103:17

establish 154:12
established 85:4,7
estimate 16:16 76:9
108:1 213:4 218:8
estimated 222:8
et 4:8 47:3 75:6 236:23
evaluated 28:18,23
evaluating 224:2
evaluation 14:24
events 88:19
eventually 45:23 104:9
117:2
everybody 37:19
evidence 61:24 74:16
95:18 102:3 105:18
117:22,25 119:25
120:1,1,7,11,16,17
120:19,25 121:3
124:8 140:23 141:4
155:17 172:15,15
173:4,4 174:16,16
176:17 181:3,8,11,13
181:15,17,20 184:15
189:7,7 231:24 237:4
239:20,20 240:9,9
246:21
evident 48:15
evolution 9:9
exact 27:3,5 171:6
222:10
exactly 6:23 17:25
19:13 35:17 58:19
68:13 78:19 89:21
139:3 143:13 150:12
169:17 225:1
exam 10:24
examination 4:3 119:9
156:6 219:17
example 3:3 6:6 9:22
20:15 69:9 73:10
92:6 99:11
examples 229:15
exceed 180:25 181:4,10
exceeded 50:8
exceeding 120:20
excel 37:15,23 180:21
182:18 211:14
excellent 224:5
exception 18:13 54:10
54:16 154:17 235:7
235:10
excess 41:21
exchange 207:6
exclusive 18:6 118:8
187:2,16,19,24 208:3
219:10
excuse 20:1 32:18
57:18 69:17 83:23
96:25 137:16 139:18
196:8 203:21 204:9

204:12 241:3 243:25
executed 249:11
executive 7:20
exhibit 18:1,3,6,13
34:11 39:20,22,23
40:1,9 42:1,6 44:10
44:14,16,19 45:1,12
45:12,21 46:2,3,11
46:19 47:19,22 48:9
52:2,16,18,21 53:10
53:17,22 54:7,10,12
54:15,20 56:4,4,14
56:20 57:5,19 59:8
60:1,3,5,12,14,16
61:5,18,22 62:4
64:20 65:18 67:15,16
70:24 75:7 77:1,1
79:12,14,22 80:21,21
81:23 84:21 85:8,15
93:17,24 96:8,17
97:7,13,18,22 99:3,3
99:4 100:22 130:13
130:14,16 131:8,10
131:12,20,22,23,24
132:2 133:10,10
134:6 136:2,24
146:14 147:3 148:1
151:5,5 161:14,16,16
161:17 167:11 179:8
179:18 222:9
exhibits 54:25 57:14,14
57:17,18,20 64:5,25
146:24 205:5 216:20
exist 79:8 161:18
179:16
existence 234:11
existing 188:21 189:1
189:23 191:8,11,25
193:20 235:7
expanded 194:4 199:10
expanding 194:25
expect 92:5 95:6,25
169:9 180:13 217:10
227:23 228:10,14
expectation 70:7 75:15
211:15
expected 49:13 50:21
93:5 119:22 211:14
expecting 68:9 103:6
expects 93:13,14
expense 104:15 220:9
expenses 104:11,17,21
104:25 105:3,16
106:5,20 107:14,16
108:1,9 110:6 132:20
133:3,8,10,23,25
155:1 201:24 202:5
219:22,22 220:6
experience 72:12
experiencing 69:23

expert 4:8 15:2 18:14
26:14 31:19 32:17
34:5 59:13,15 72:19
169:5 170:5,14
186:15,16
expertise 169:6
experts 15:17 16:6
135:15
Expiration 251:7
explain 7:17 11:7
100:19 108:12
124:15 149:9 196:4
216:24 221:10
235:17 242:1
explained 114:21
explanation 116:6
expressed 166:7 249:12
expressing 167:19
extended 34:16
extent 111:8 138:15
141:22 167:3 177:4
193:16 195:3 213:15
extra 130:8 162:9
179:10,11 201:18
e-mailed 37:20,21,22
45:18

_____

F

face 30:10 199:11
fact 9:17 10:3 16:10
32:6 36:14 41:2
44:22 46:18 54:4
67:13 78:25 82:4
90:18 109:1 111:15
112:24 113:6 119:9
122:11 130:7 138:11
155:6,21,22 171:4,15
173:20 175:7,11
185:2 202:13,18
203:25 221:10
222:15 232:11
factor 86:5 90:2 91:13
96:2 104:24 129:11
129:12,23
facts 32:3 50:14,16,18
50:23,24,25,25 51:17
105:18 168:7 170:12
170:20 171:1 172:14
173:4 174:16 189:6
232:1 239:20 240:9
246:18
failed 98:23
failure 204:7
fair 4:20 5:1 18:2 21:2
21:18 22:7,14 23:6
25:7 35:10 65:6
73:21 83:22 93:1
98:19 102:10 106:21
111:6 133:9
fairly 10:4,5,6 12:9

13:8 14:9 32:1 43:9
68:3 69:11 75:14
77:16 117:18 118:5
130:8 207:1
faith 27:8
false 95:19 193:8 195:2
195:6,13 196:10,14
198:24 199:6
familiar 11:6 187:6,8
220:3
family 1:15 2:15 11:22
158:10
far 24:5 30:1 93:14
145:8 168:11,19
172:5 181:12,13
202:17 209:6,14,17
210:25 218:25
226:18 227:22
fashion 49:19 50:5
128:2
fast 11:24
faster 40:5 130:21
131:21
favor 33:1
faxed 44:22,25 45:4,7
152:3
February 17:16,19
34:15 71:21 152:20
152:22 153:15,22
154:14,17,20
Federal 1:22
feel 67:25
felt 87:11 94:19 123:11
FICA 204:7
field 11:20 12:2,11,12
fifth 211:9
figure 45:7 82:5 85:18
87:17 96:25 98:16
99:19 102:5 133:22
133:25 155:12,24
168:15 180:14 205:4
213:17 215:14,16
217:24
figured 99:5 217:18,18
figures 36:14,18 39:23
40:8 69:10 148:1,12
181:6,21 208:24
file 3:5,6 37:4,23 53:4
53:14 54:4,4,17,21
54:24 55:13,16 56:1
56:5 57:2,8,12,22
58:6,12,22 59:13,15
60:17 64:6,22 159:1
159:7 167:9 177:8,13
185:8
files 39:6 47:4 52:19
54:2,13 55:8 56:12
58:14 61:24 65:1
165:4
final 67:17 70:24 75:7

85:18,23 86:13 87:17
88:17 216:11,13,14
217:9 226:10 227:14
229:4
**financial** 12:4 15:17
204:24 233:11
**financially** 250:18
**find** 49:23 62:2,9,11
90:10 91:11 100:8
130:19,20 131:19
132:3 143:14 145:19
161:10 171:10
206:16,17,21 224:11
231:20
**fine** 64:2 119:18 242:7
**finish** 18:10 196:6
**finished** 213:22
**fired** 30:21 66:19 74:3
**firm** 208:12
**firms** 206:18
**first** 15:4,7,16,18 16:17
17:20 23:19 29:15
34:15,17 35:5 36:9
39:16 42:23 44:18
48:1 52:17,21 53:3,5
53:16,22 55:17 56:3
56:4,13,19 57:5,19
59:8 71:20 76:2 77:2
77:3,3 79:15 80:25
81:12 82:15,16,19
96:14,18,22 97:4,5
97:10,24 98:9,11,12
99:7,20 100:8,9,11
100:16 106:2 120:4
127:4 133:13 136:2
141:23 146:16,17
147:3,5,14,16 148:5
152:5 155:6 164:20
165:13 167:6 172:23
173:15,18 188:14
193:3 198:25,25
199:1 207:21 211:19
211:20 213:5 214:22
216:6 220:24 235:4
**first-year** 76:4
**fiscal** 190:17,17,17,18
190:19,19 237:8,9
**FISHER** 2:8
**fittings** 12:13
**five** 20:13 88:25 89:1
114:2 134:14
**flip** 82:15,16 143:3
**flipping** 82:2
**floor** 130:20,23
**fly** 27:22
**focus** 102:15
**focused** 101:8 102:11
**fold** 105:8,12,13,14
106:4,19 108:10
**folder** 59:2

**folks** 72:12,15 73:2
75:20 134:22,23
141:11 142:12 188:1
**follow** 65:15,16 156:12
**followed** 91:21
**following** 10:24 46:13
91:24 92:1 150:24
151:17 211:10
**follows** 4:2
**follow-up** 57:13
**follow-ups** 219:21
**footnotes** 170:25 171:6
210:23
**force** 9:23 65:23 99:20
99:21 246:2
**foregoing** 249:1,11
250:12
**forget** 121:17,20,21
**forgotten** 70:21
**form** 37:2 49:18 50:5
51:13 115:17,19
128:2 131:10
**format** 37:9 39:8 154:3
**formula** 246:22
**formulate** 165:23
**formulated** 165:19
**forth** 225:14
**forward** 38:8 86:22
151:19
**found** 171:11,12
204:22
**four** 16:11 18:23 20:13
20:22 21:13,25 23:20
26:13,18 27:20 28:6
28:25 214:17
**franchise** 29:23 30:23
73:6,8,11,13
**Frank** 69:5 154:23
155:4
**Franklin** 139:17
**free** 129:22 183:9
219:7
**Freer** 12:7
**Fresnos** 145:10
**friendly** 14:13
**front** 17:7,16 35:20
47:3 146:13 159:6
**fuel** 14:7,7
**Fuels** 13:2,21 14:7
**full** 100:16 132:5
168:15 199:11
**full-time** 8:17
**further** 250:15,18
**furthermore** 91:5
**fussing** 64:10,16
**future** 36:9 104:22
109:25 115:4 126:9
129:14 180:24
215:12
**FYI** 154:24

---
**G**
---
**G** 2:8
**gain** 146:19
**gas** 12:23
**gather** 68:6,7 69:19
**gathered** 119:15
**general** 14:21 46:25
123:14,17 124:3,4,6
137:16 206:19
**generally** 12:10,16
19:24 23:12 91:20
115:22 123:23
144:19,21 199:25
**generate** 17:5
**generated** 18:22 49:1,3
**geographic** 126:24
127:12
**getting** 37:19 39:3
45:15 68:9 70:7
76:22 101:2 113:21
128:18 149:18 160:3
219:8 227:8,10
238:21
**give** 10:23 16:16 21:5
21:18 24:17 52:11
63:17,25 64:17 65:12
67:8 113:13 140:16
154:24 216:25
**given** 6:9 9:17 20:10
28:25 38:11 40:22
67:10 88:21 106:6
149:23 150:7,7 187:2
187:4,5,16,19,23
188:1,4 189:9 215:15
219:12 231:19 232:3
232:6 234:1 244:7
249:13
**gives** 99:22
**glass** 113:24
**glasses** 189:21
**glove** 45:12
**go** 5:14 7:9,13,22 14:4
18:10 21:3,10 23:16
29:16 33:5 34:10
36:14 37:13 39:11
55:17 62:15 63:2
70:13 74:10,17 84:19
86:16 87:22 91:16
96:8 105:18 113:24
114:2 116:25 117:20
131:7 134:5 135:6
166:17 188:17
201:16 215:15,19,21
221:15 227:22
234:24 240:6 242:7,9
**goal** 40:23
**goes** 45:12 71:4 113:3,4
**going** 4:20 13:25 14:13
21:1 22:4,6,7,9 23:4
23:4 32:7 34:9,10

35:16 39:1,9,14,18
39:21 42:22 43:17
44:15 46:25 47:18
49:22 50:1 52:12,13
52:17 54:9 58:10,16
59:9,10,22,22 60:1,4
60:15 61:23 64:16,18
65:10,11,12 68:12
71:10 76:17 77:21
79:13,17 80:3 82:22
84:3,20,21 88:13,14
96:1 99:25,25 100:15
102:21,23,24 103:2
103:11,12,14,24,24
104:1,3,5,5 105:13
113:23,24 126:12
129:1,7,13 132:18,23
149:7,9,14,19,20
151:16 156:11
160:23 163:6,14
166:21 168:9 175:4
179:7,15 182:8
184:18 185:13 188:6
191:3 193:22,22
207:19 209:15,20
217:6 218:15,19
221:18 227:18,19,20
228:11,14 229:6,13
229:13,23,24 238:3
241:6
**good** 6:16 14:19 27:8
68:18 69:3 70:1
81:22 115:10,11
116:2 195:16 209:21
**gotten** 29:22 91:21
124:18 131:6 139:4
223:14,14
**governmental** 123:23
124:5 125:18 231:5
**graduate** 5:15 7:10,11
**graduated** 4:23
**Grande** 126:18 144:22
145:4,5,7
**grandfather** 11:23,25
**grant** 10:18
**great** 16:9 20:20
**greater** 31:24 230:11
230:16,25
**greatly** 91:8
**grew** 102:20
**gross** 94:3 117:4
132:13,15,25 133:6
134:2,7,9,11,20,23
135:11,21 137:17
140:20 182:5,6,8
**grossing** 132:19
**group** 30:15 33:23,24
39:15,16 102:20
108:21 109:4,6 190:3
193:23 219:14

234:14
**groups** 108:18 109:2
114:20 221:23
231:12
**growing** 11:24 123:3,4
181:16
**grown** 104:22
**growth** 32:4,9 42:16,17
42:22 49:14,24 50:12
50:21 67:23 68:1,2,4
68:5,8 69:11,13,20
69:22,25 70:5,10,18
76:2 77:24 78:1,7,8,9
78:9,12,16,16,17,21
78:25 80:8 100:3
103:7,8,13 114:6,9
114:13,17 115:2,3,7
115:10,11,13,16,20
116:5,8,13,17,18,22
117:9,12,16 118:1,5
118:6,9 119:5,11,22
120:4,9,20 121:11,23
122:8 124:21,25
125:17,21,25 127:3,7
127:9,10,12,25 128:3
128:13 134:17
138:22 141:2 142:16
142:25 183:25 184:1
185:4 200:8,11
213:18 214:19
218:15 224:19
227:19,20,22,24
228:8 229:12,15
238:2
**guarantees** 185:12
**GUERRA** 2:13
**guess** 17:23 19:23
20:16 44:7 45:5,11
46:25 71:25 84:14
100:19 120:16
134:19 159:2 169:7
186:2,9 191:22
194:15 200:25
226:23
**Guys** 52:13

---
**H**
---
**half** 48:24 57:5 61:5,5
116:18,20
**halfway** 61:3
**hall** 29:10,11 31:8,12
188:10
**halved** 117:17
**hand** 35:16 39:21
44:15 45:12 47:2
52:17 54:9 55:25
58:14 59:10,22,23
60:4,15 62:6,17,18
105:2 150:17 160:17
166:15 249:13

handed 58:20 59:2
handful 141:15
handing 141:10
handled 33:12 218:12
handwriting 60:12
  132:10 138:3
handwritten 3:4 83:2
  132:6
Hang 137:19
happened 28:5 66:17
happens 21:14
happy 79:20 221:14
Harbor 14:2
hard 12:18 130:7
  225:14
harder 42:21
hardware 12:19
Harlingen 145:8
hate 226:7
hats 12:18
head 53:4 84:9 189:18
  220:21
health 10:20 33:23,24
  239:16 240:12,21
  241:11,14,17
hear 225:20
heard 173:18 225:18
  226:1
Hearsay 225:24
heart 243:17,17,20
help 11:25 67:24,25
  69:19 70:17 81:21
  88:14 168:7 220:20
helped 13:6
helpful 124:24 217:6
helping 14:17
helps 61:19
hesitated 158:14
hesitating 161:5
Hickey 24:4,7 25:5,9
  25:10,20,22 26:8
hierarchy 221:3
high 4:23,25 69:11
  115:7 116:22 118:5,6
  118:9 137:17 160:23
  185:4
higher 112:9,25 113:1
  127:10 158:1 204:23
  206:3
highest 140:20 141:1
highlighter 59:23
highlights 133:17
Hill 251:8
hired 4:8 13:23,23
  27:25 35:5 71:20
  225:9
historical 126:2,5
historically 125:19
history 48:15 68:11,16
  71:8,15 200:17 207:3

holding 160:1 170:4
  186:16
holds 169:16 200:23
home 74:10
honestly 124:10
hope 69:21 93:20
hopefully 19:6 218:14
hoping 42:23 67:24
  68:6,7,10 71:9,11
  217:12 228:19
Horner 1:10,13 3:7 4:1
  4:5 18:12 21:19
  33:11 38:14,20 39:12
  39:21,22 40:1 43:18
  44:10,16,18 47:19
  52:17 54:7,10,15
  56:3 58:16 59:1 60:4
  60:16 61:2,5,22 62:3
  64:19 65:17 79:14
  119:20 121:5 124:10
  131:10,14,24 156:9
  219:19 236:7 239:22
  240:20 249:1,4,10
  250:8,13
Horner's 179:25
hospital 243:12
hospitalization 242:3
hour 162:16 163:3,15
hours 163:15,16,18,25
  164:3 166:2 210:8,11
  210:12
House 60:5 181:19
  185:3 201:22 202:21
  206:6
House's 59:16 165:5,9
  168:22,23 170:7
  202:8 234:25
Houston 31:14 145:2
huge 32:4,8
human 7:3
hundreds 156:19
  205:20,22
H-2 1:21 2:4

_____

I

IBM 5:20,23 6:6,22
  7:12
idea 6:15,16 38:13 67:8
  74:25 183:9 244:25
  245:7
ideas 6:11
identified 33:13 58:1
  64:5 151:3
identify 21:16 47:11
  97:3
ignore 115:2 128:10
III 2:17
illustration 67:7,12
  117:18
illustrations 67:12

illustrative 168:1
impact 68:3
impacts 78:1,9,13
implementable 6:12
implication 106:14
  192:10
implications 28:14
implicit 193:3 195:1
important 8:19 9:21
  10:5,6 45:11 68:1,4
  69:7 73:15 96:3
  102:22 103:4,5
  125:12 127:5,8,13,17
  127:25 128:7,8,25
importantly 22:1
impressed 186:1,5
impression 198:11
improper 31:6,6 96:7
inability 75:19
incidents 48:20
include 18:18 55:13,16
  57:17 76:13 77:10
  80:14 90:2 135:12
  145:9 160:19 216:17
  218:10 222:18
included 51:23 54:25
  75:12,22 83:11 84:7
  101:19 215:4 222:21
includes 76:5 82:6,10
  99:8
including 85:2 158:9
  233:10,10
income 3:3 45:24 46:13
  72:1 80:1 86:19
  89:25 91:12 101:7
  111:1,2,5,8 118:20
  118:25 123:4 127:12
  127:14,20 129:14
  131:15 132:11,13,15
  134:2 135:21 157:17
  157:19 158:4,5,6,7,9
  158:10 181:23 182:5
  212:2 213:14,18
  214:9
incomes 85:17
incorporate 213:18
incorrect 85:22
increase 99:10 105:12
  105:13,14 106:4,19
  116:22 134:11 202:5
increased 86:19 105:8
  108:10 129:21
incur 201:24
independent 1:5 2:6
  4:7 48:2 70:9,12
  72:21 73:1,14,18
  108:19 111:19 112:1
  112:4 121:9 122:1
  125:22 156:11
  168:25 185:1 188:2

194:12,16 202:13,25
  203:2,5,7,13,20,21
  204:3 206:14,17
  215:21,22 231:18
  250:5
independently 51:19
indicate 117:25 132:16
  189:19
indicated 201:25
indication 99:15
indirectly 78:5 142:22
individual 22:12
  141:14,15
individually 27:16
individuals 23:10,13
  89:25 187:23 198:17
industrial 12:19 14:3
industry 170:5
inexpensive 30:16
inflation 47:17 51:21
  104:22,24
influence 119:2
influences 115:12
information 4:11 10:9
  32:7 46:18 53:1 68:5
  68:6,7 71:5,11 75:5
  91:18,19 95:24 106:6
  106:8 119:15 124:18
  125:7 129:6 136:19
  136:22 139:5 154:13
  172:21 175:14
  196:15,16,16,17,18
  196:18 197:19,25
  211:1 214:21 215:14
  215:18,20 216:7,8
  218:2,15 226:19
  227:19,20 228:21
  229:1,2,8 230:2,4
  231:16 233:11,15
  238:16 246:8
informed 94:3 209:3
injured 22:11,14,24
injuries 23:10
injury 14:23 21:21
  22:7,9,16,19 23:5,19
  23:22,24 176:1
inside 13:9 137:23
  145:6
instance 1:14 121:23
  124:12,14 160:21,25
  162:15
instances 23:23 72:25
  73:5 121:10 123:7
instructed 244:6
instrument 249:11
insulting 154:11
insurance 26:15 29:2
  29:20,24,24 30:5,8
  30:12,13,18,21 33:14
  33:18 34:2,6 65:23

74:13 89:5,9,11,17
  89:19,22 90:9 91:1,3
  91:7,11,20 92:2,3,4,4
  92:15,25 107:5,8,12
  111:19 112:1,4,21
  114:11,12,15 119:2
  123:18 127:14,20
  129:2 135:20 170:5
  184:21 186:15,16
  198:18,23 199:4
  202:14,25 203:2,5,7
  203:13,20,21 206:14
  206:17,18,19,22
  208:2 234:7,20
  237:18 238:4,8,12
  239:17 240:12
insurer 111:20
intend 209:13
intended 40:11 46:17
intends 91:5
intentions 166:24,25
interact 103:7
interest 9:3
interested 7:15 8:21
  250:19
interesting 9:5 68:16
interests 158:18
interfere 30:7
interfered 29:19
internal 84:16
internship 5:24
internship/administr...
  7:6
interrogatories 55:17
  55:18
interview 47:20,23
interviewed 7:4
inventory 12:5
invested 207:4
investigate 107:25
  169:14,18
investigation 107:13
  119:15
Investment 158:7
  205:11
invoice 3:9,10 34:12
  35:16,20 43:18
  160:25
invoices 62:9,13,20
  160:16,19,22 161:23
involve 23:22
involved 6:13,25 7:2
  9:21 14:1,10 15:16
  26:15,24 33:18 73:5
  76:10 220:12
involves 159:22
involving 34:5,5
irrelevant 112:12
island 14:2,2
issue 30:4 34:2 84:16

92:18 108:6,7 170:14
209:12 229:12
**issued** 151:8,10,20
153:5
**issues** 29:16,18
**i.e** 90:9 102:12

**J**

**J** 1:20 2:3,3
**January** 147:6 148:21
154:4,13 159:12
**job** 7:7 11:21 22:11
49:15 87:21,22,24,25
**John** 24:12
**judge** 95:11,15
**judgment** 33:1,3
130:12
**July** 161:12
**jump** 4:20 114:20
**June** 17:14 59:20
165:14,18
**jury** 95:11,15
**justified** 209:7

**K**

**keep** 22:20 71:16 82:2
160:14 178:2
**keeping** 23:2
**kept** 53:11 224:8,10
**kick** 88:15
**killed** 22:12,12,14
**kind** 7:4 10:6 12:18
14:9 28:1 45:12
66:11 67:8 72:14
73:16 82:24 90:11,16
92:18 110:13 118:20
123:10 124:18 125:6
127:9 129:12 130:6
158:10 159:22
182:12 183:8 185:3
186:22,24 206:16
219:13 225:3 227:21
229:11
**kinds** 15:18 23:11
33:21 68:8 103:3
157:20 193:5 196:20
198:14 228:7 240:22
244:14,15
**knew** 225:10,16,19
226:2
**know** 14:10 15:6 16:22
19:20,23 21:10 25:15
25:18 26:7,10,23
27:3,19,21 33:3,5
35:9 36:20 37:2,3,5
43:4 44:1,7,8 45:10
50:24 60:21 61:3
63:20 66:14 69:1,6
70:1,3,3 77:18 82:6
84:24 89:10,12,13,16

89:18 91:17 98:14,17
104:3,4 110:12,14,22
110:23,24,25 111:2
115:11 116:11,24
118:10,12 120:15
121:13,16,21 124:17
125:12 127:8,16,18
127:19,22,23,25
128:6,13,17,20,25
129:5,8 130:7,18,21
131:2 135:5,9,19,23
135:25 136:15,18,20
136:21 137:21,21,23
139:5,7,12,23 140:2
141:14,18 142:1,2,21
143:9,15 144:3,5,7,8
144:11,13,15,23
145:9,19 146:1
150:12,13,14 155:19
155:20,21 158:1
159:4 161:20 162:3
166:4,11,25 167:8
172:3,6,8,9,16
176:23 182:13
184:12 186:1,5 187:4
190:8 195:18 196:10
196:11,12 198:3,9
199:10 201:21 206:2
206:6 209:3,5 210:6
210:13 215:25 217:2
217:16 220:17,19
221:2,15 224:23
225:2,14,18,19,20,24
226:3,6,8 227:24
232:17 233:12 234:6
234:16,17,20 235:5
238:11,20,21 239:9
239:11 241:1,18
245:13,16
**knowledge** 134:22
135:1 156:22 187:11
194:12,16 200:20
225:23
**known** 9:7,8 72:15
187:10 249:10
**knows** 170:12

**L**

**label** 18:7,13
**labeled** 51:20 132:13
179:6
**laborers** 23:13
**lack** 29:22 222:1
**lacking** 216:16
**LaFemina** 50:4 58:1
62:1 68:8,17,18 69:5
69:23 107:21 108:17
108:22 117:23
118:10 139:12,19,20
142:1,12 184:8 221:8

221:10,14 230:1
**LaFemina's** 50:1,10
68:10 69:7 107:19
108:3,13 118:6 119:5
119:20 164:18,25
200:15 216:20
226:10 230:1
**language** 82:11 167:16
178:6,22 186:24
191:21 235:7 241:2
241:16
**lap** 56:1 58:7
**lapse** 99:14
**lapsed** 99:13
**large** 7:5 13:8,8 29:23
30:3,21 36:7 41:7
68:3 75:15 78:2
106:15 108:17,18,21
123:21,22 125:18
126:6 130:8 138:17
138:17 141:22 169:8
177:4 183:25 184:1
200:3 206:18,21
218:19,21 219:14
231:6
**largely** 193:10,12,13
193:13,14 195:5,8,8
**larger** 129:1 180:14,16
**largest** 30:1 109:6
128:22,22 177:2
**late** 8:16,18 11:23
59:20 114:22
**law** 2:3 110:14
**lawsuit** 16:5 66:18
**lawsuits** 157:18,21,21
**layman** 9:11
**lead** 182:14
**learn** 172:21
**learned** 172:19 173:15
**lease** 13:6,7
**leave** 135:12
**lecturer** 10:22 11:13
**led** 11:21 87:25 131:11
**Leeds** 2:12 17:11 24:21
24:25 25:10 37:14,17
38:16,18 39:15,17
56:11 61:23 88:8
89:15 124:9 131:4
133:20 143:5,8,11
152:10,12,15 158:24
173:12 175:18
186:22 191:5 201:17
213:12 217:7 219:18
219:19 232:20
235:14,18,24 236:4
243:22,25 247:1
**left** 10:15,18 33:11
62:17 239:4,5
**left-hand** 16:19 24:18
25:2 79:15,22 133:17

**legal** 72:18
**legally** 48:7
**legend** 3:8 60:20,22
61:18
**lengthy** 12:9 16:12
**letter** 35:11,11 54:11
54:16 136:3
**letters** 6:14,16 35:14
184:24
**let's** 6:19 8:9 18:20
19:1,21 23:16,19
41:9 47:10 52:7,14
61:15,21 62:15 63:2
63:14,22 65:17 75:25
81:9 84:19 113:21
114:2 131:7 134:5
136:1 142:16 146:10
151:22,25 156:4
171:22 175:17 178:2
193:16 232:11
234:24 240:17,20
242:7,9
**level** 69:23 118:19
160:20 168:8
**Levine** 173:9
**Levine's** 164:21
**LIDDELL** 2:7
**life** 1:15 2:15 26:24
27:7,12 28:2,15,20
28:21 184:19 234:2,6
**light** 69:22
**likelihood** 181:20
**limited** 10:9 82:23
**line** 17:8 68:3 80:24
92:22 113:7 147:5,7
147:23 148:1,1 151:2
171:7 194:20 195:16
217:25 244:8 248:2
**lines** 60:11
**list** 3:10 16:12,19 17:5
19:4,14,16 21:11,13
23:20 24:17 55:22
56:4 59:8
**listed** 13:5 56:13,22,24
56:25 57:19 226:19
**listen** 17:4 237:10
**listing** 57:8,11
**lists** 17:10,11 18:22
56:6
**litigating** 71:6
**litigation** 13:22,25
14:11,11,12,14 15:25
23:15 160:6
**little** 13:5 14:2 16:15
20:19 66:6 82:15
101:3 103:4 104:4
106:25 107:4 117:19
122:20 131:21 132:3
145:10 149:7 158:1
220:9 227:8 231:22

241:8
**live** 5:4
**livelihood** 126:11
**living** 95:3 118:20
157:9
**loan** 150:7
**located** 144:16
**location** 14:1 126:25
**LOCKE** 2:17
**locked** 222:16
**logic** 194:20 195:2,16
199:7 202:8
**logical** 231:14
**long** 6:24 32:12 37:18
46:22 91:6 95:21
116:24,24 187:10
207:1 217:19,22
234:11
**longer** 11:12 26:11
88:21 113:25 161:24
172:24 174:12 175:8
183:6 224:13 239:6
**look** 16:16 17:24 18:2
18:20 19:14 21:11
36:11,15 37:3 41:25
44:16,21 45:16,21
46:10 53:23,25 54:1
55:18 56:3 61:2
69:14 76:2,3 77:1,1
79:7,22 80:21 81:20
81:23,25 82:17 83:13
90:8 92:24 96:10
97:22 114:7,19 119:4
122:22,22 123:4,5,8
124:25 125:17
130:13,23 131:18
136:2,2 137:8,25
138:25 142:16 144:1
146:25 147:19
148:24 151:12
153:13,23 154:6
167:9 197:9 198:6
205:5 222:10 229:23
232:11,12 234:9
**looked** 36:21 58:15
114:11,15 122:4,8,11
122:17 143:3
**looking** 9:6 55:21,22
57:4 70:4 82:14
122:25 123:1,3
131:20 164:15
201:14 205:7 228:24
232:12,18,20
**looks** 48:19,22 139:16
148:14 155:6
**loosely** 9:8
**loosen** 9:13
**Los** 145:9
**losing** 87:21 215:23
**loss** 88:24 222:1

losses 75:9,11,22 78:6
85:20 91:8 96:7
lost 23:15 31:7 75:18
76:6 77:21,22 87:21
87:25 89:25 101:7
172:10 173:20 213:5
214:22 215:5 216:10
217:16,17,20 218:12
224:4,4,8,14,15,16
224:25 226:8,25
lot 9:4 12:6,21 30:14
40:5 71:8 73:22,25
107:4 125:6,10 142:3
156:13 166:8 187:21
220:13,15 225:10,16
225:18 226:2 231:9
lots 7:25 56:17 225:13
LOU 1:18 250:10
251:6
lower 83:14 96:2 99:25
100:2 112:11 144:22
145:4,5 196:22 205:2
lump 22:10
lunch 156:4,5 163:16
Lungstrative 206:1
Lynn 50:2
L.L.P 2:8

M

M 1:10,13 3:7 4:1
249:1,4,10 250:8,13
magnitude 67:8 103:3
168:1,12
mailing 18:7,13
maintain 120:3
major 224:1
majority 221:25
makeup 141:25
making 10:9 86:22
92:24 131:16 134:16
135:11,20 140:8
218:19,21 224:6
man 55:12 68:15
206:22
manage 65:22
managed 134:11
management 7:16,17
28:21 116:2,3 117:15
117:16
manager 73:23 91:3
92:3,11,25
managers 12:7 91:11
91:20
managing 92:14
118:10,11
March 71:21
marginated 60:11
MARILYN 1:6 2:11
250:6
mark 20:17,18 21:18

36:11 39:11 47:7,18
52:14 60:9 63:2,3,14
63:15 64:18 131:7,9
159:3
marked 18:1,2,5 21:12
39:20,22 44:14,15
47:22 52:16,18 54:9
60:3,4,14,15 63:9,11
64:20 79:13 131:8
179:8
market 112:6,16 187:2
187:16,19,24 204:18
208:2 231:9,11
245:23
marketed 195:23
marketing 125:3
219:13
marketplace 10:1
111:13
Marshall 206:18,20
massive 106:16
master 8:1
material 67:11
materials 47:5 233:10
math 98:4
mathematically 10:2
matrix 36:8 40:4 41:7
79:7,15
matter 114:16
matters 7:21 15:3
maximizing 9:14
maximum 207:18
212:19
McAllen 145:9 162:25
163:1,2,3,9 251:10
McDonald's 73:8,11
McLellan 206:19,20
mean 9:11 22:18 68:13
70:13 73:8 74:10
89:12,13,20 101:10
103:4 108:7 109:20
110:4 118:17,19
131:2 145:18,20
154:3,6 160:13
166:23 171:5 176:23
177:14 178:9,21
183:8 190:9 195:20
206:10,13 210:16
215:24 219:3 224:15
225:13 232:25 234:6
237:2
meaning 13:16 28:19
means 9:12 77:4
159:24 187:1,17
199:10
meant 186:25
measure 112:14,15,17
214:23
meet 120:12
meeting 184:16
members 31:2

memory 49:5 56:9
74:20 75:23 144:13
144:14 236:18
mention 217:1
mentioned 70:22 75:4
86:4 120:15 214:13
214:14 216:24 229:5
229:7 234:3 235:4,5
mentioning 216:22
mere 134:9
met 113:16 120:20
method 40:5 42:15,16
42:17,20,21,23 88:23
95:10
methodology 41:9,11
41:13 42:5 87:15,20
meticulous 142:8
Michigan 5:16,19 7:23
8:22 10:12,16,19
Micro 158:23,24,25
mid 212:5
middle 29:6 44:23
81:25
million 88:25 89:1,2
98:5 134:16,23
135:11,20 222:19
223:16,16,17
millions 205:20
mind 22:21 23:2 25:6
71:16 92:24 179:7,17
202:8
mine 21:19 133:14,15
167:10 179:8 201:13
201:15 247:4
minimum 49:13 117:19
minors 5:11
minus 163:15
minute 33:7 75:4
146:11 152:10
193:17
minutes 114:3
mischaracterizes
140:23 172:15
mischaracterizing
74:15 95:17 102:2
105:17 124:7 141:4
155:16 173:3 174:15
181:24 189:7 231:23
237:3 239:19 240:8
246:14,20
misinterpretation
234:22
misleading 27:10 79:3
96:7 167:17 171:17
misread 165:17
missing 71:1,3 75:3,7
161:24 201:5,8,17
214:23
misstating 105:18
mistake 32:18

mistaken 75:23
misunderstood 102:4
mitigate 22:25 72:2
91:10 168:14 211:7
219:15
mitigation 74:25 75:6
86:4,5,10,14 87:2,4
87:16 88:4 90:2,14
91:13 92:23,23 93:5
93:8 95:8,14 96:2,5
168:14 179:6 180:13
214:20 215:18 216:8
218:1,4,8 219:1,6
226:14 229:5,16
mixing 235:15
model 11:4 28:8,17,20
28:21,24 32:2 92:23
104:6
models 89:24 90:1
121:25
modified 159:13
moment 49:10
money 87:6 103:19
125:6 155:1 182:12
214:2,6,8 219:11
220:19
month 6:19 19:7 25:8
71:4 77:2 99:22
147:20,24 148:20
149:11 151:3,13,17
151:19 152:19,23
153:1 154:14,15
155:8 165:19 217:11
monthly 43:19 96:13
97:18 151:4,23 155:7
156:1
months 71:15,23,25
72:1,8 99:21,23
motivate 65:22
mouth 246:10
move 30:24 171:22
175:17
moved 11:19
MPP 8:1,14
MTD 147:19,24 151:3
mud 14:8
multifarious 175:16
240:15 244:3
multiplied 100:10
multi-page 136:23

N

nail 67:25 69:19 70:17
75:2
name 4:5 24:7 26:23
29:21 35:8 73:4
135:23 139:14 156:9
198:14 219:19
249:10
named 15:7 214:17

names 146:9
national 117:4
Navigation 13:10
Neally 2:8 37:13 52:3,7
55:7,24 56:8 63:4,8
63:11,17 64:16 74:23
82:12 86:12 131:5
132:9 156:4,7,9
161:22 162:3,7
166:19 167:12 168:9
168:23 173:13
190:11 191:3 201:19
205:8 206:12 213:10
217:8,15 219:16
226:8,22 232:8 233:5
236:5 237:1 241:6
247:3
near 24:6,9 35:18
81:24 147:6 196:19
nearly 121:11 157:20
171:11 223:15
necessarily 26:21 95:23
105:12 109:20
126:16 138:8 142:11
167:18 170:16 219:3
219:6
necessary 42:13
need 11:7 52:12 60:13
96:4 102:24 110:3
131:19 149:6 156:13
167:8 185:17 188:10
190:12 205:5 206:25
207:1,5 227:9,17
229:3 241:9
needed 10:18 26:11
216:1 226:9,18,23
needs 226:22
negative 199:18,23
negotiate 13:6 14:18
negotiations 14:1,13
neighborhood 197:3
222:14
neither 25:12 250:15
net 99:19 104:12
132:18
netting 132:23
never 25:6 32:5,16
195:20,23 196:1,9
new 17:13 26:24 27:7
27:12 28:2,15,20,21
77:4 80:4,5 92:10
103:7 194:3,24 222:7
239:23 240:1,3,7
nice 217:2
nine 20:14
nip 38:12
nodding 84:9 189:18
Noe 1:5 2:11 55:19
250:5
nonresponsive 173:12

173:13
nonresponsiveness
217:8
non-BISD 224:25
non-negotiable 153:20
normal 159:15,16
normally 66:8,11 123:1
123:6,10 147:21
159:14 219:25
north 108:21 145:7
251:9
Nos 52:16
Notary 249:15
note 49:13 106:25
142:8 154:23 155:3
163:8 179:14
noted 69:10 190:24
249:2
notes 3:4 43:6,7 47:20
58:1 62:1 83:2 93:17
93:18,21,22 132:6
142:5,10 144:8,8,14
notice 170:25
notion 192:7
November 172:11
174:13
November/December
175:9
Nueces 25:6
number 4:13 6:4 7:5
16:10 23:10 50:9,23
50:24 80:7,9,12,14
80:23 81:12,15 82:6
85:11 88:7,13 97:6
97:12 98:8,8 100:1
105:14 110:14,15
111:25 118:17
144:18 160:23 171:7
178:11 197:11,14,14
197:17,22 198:17
206:1,4,5 207:19
218:7 221:18,20
222:10 231:5 232:13
232:25 245:20
numbered 1:16 61:4
179:18
numbering 185:17
201:15 207:16
numbers 50:8 88:17
95:23 96:18 97:17
114:19 115:8 155:14
179:7,15 190:13
216:25
nutshell 10:7

O

object 74:23 82:12
168:9 191:3 192:7
202:19 241:6 244:1,1
objection 40:15,18

74:15 79:2 81:4,6
89:6 91:15 95:17
102:2 105:17 121:19
124:7,9,9,23 135:3,8
135:22 140:9,14,22
141:3,17 144:2
148:22 154:5 155:16
166:14 172:14 173:1
173:3,12,13 174:15
175:15 176:22 177:1
181:24 186:12,21
187:25 188:16 189:6
189:25 191:20 192:6
201:2 213:10,12
217:7,8,15 225:22
230:10 231:23
235:13 237:3 239:19
240:8,14 241:15
242:18 244:2 246:14
246:20
objections 192:2
246:23
obscure 10:6
observation 190:24
observations 169:7
obtain 233:21
obtained 8:4
obvious 42:24 106:24
obviously 58:9 108:7
110:10,11
Occasionally 157:5
occupied 13:8
occupying 174:6
occur 10:4 83:23
224:24
occurred 31:5
offer 200:7
office 6:6 7:19,20 18:22
34:9 38:7 53:7,19
56:7 104:17 152:17
155:1 249:13
officer 12:4
offices 1:20 2:3
official 5:13
officially 173:7
offshore 14:6
oh 13:14 17:12 19:20
21:8,10 24:8 36:20
39:7 48:11 61:25
87:3 97:4 98:10
137:15 139:18,22
140:4 152:15 162:3
172:7 175:6 179:13
201:8,14 213:23
226:17,17,17 229:22
235:6
oil 11:20 12:11,12 14:6
okay 5:14 7:22 8:18
10:11 12:25 13:13
14:20 17:4 19:8 20:6

20:19 21:5 22:15,23
23:18 24:7,14,16
25:5,11 26:13 27:18
28:16 31:11 38:18,21
38:23 39:11 41:17
43:2,17,22 44:6,15
45:15,21 46:10,22
47:10 48:9 49:12
50:21 51:7,15,22
55:10 56:8 60:2
61:13 63:10,12 64:12
64:14,17,21 65:9
66:10,23 69:16,24
70:6,9,20 72:25 74:2
74:22 75:17 76:13,16
79:6 80:12,17 81:9
81:17,19 83:22 84:19
85:6,13,25 86:3,5
87:3,10 91:23 92:8
92:12 94:2,6,23 96:8
97:4,17 98:2,7 99:24
100:19 101:1,6,13,15
103:15 105:23 106:1
107:13,24,25 109:14
110:5 112:9 113:23
117:5 118:24 119:16
123:16,22,25 125:24
127:5 128:13 131:25
132:2 133:7,9,19,20
134:4,18 137:8,19
139:8,15 143:9,11
146:10 147:3,4
148:15 149:3 150:10
150:18 151:16,24
152:15,19 153:13
154:23 156:8,14,18
157:6,8,11,13,15,17
157:22,25 158:8,11
158:18 159:1,18
160:4,15 161:9,15
162:2,15,18,21 163:5
163:11 164:7,14,21
164:24 165:22 166:5
166:10 167:3,15
168:4,20 169:4,18,23
170:2,4,7,15,20,25
171:3,14,22 173:20
173:25 174:8,11,23
175:12,17,25 176:3,6
176:20 177:4,8,21,25
178:12 179:2,5,14
180:1,17,19 181:21
182:21,25 183:2,11
183:19,21,23 184:3,9
184:13,17,19 185:16
185:21,24 186:4
187:11 188:8,9,18
189:11,21 190:7,20
191:13 192:5,11
193:9,16,19,20 194:9

195:15,16,23 196:4,7
196:9 197:12,24
198:8,16,20 199:12
199:16,21,24 200:10
200:18,23 201:4,15
201:22 202:9,12,17
202:24 203:2,12,19
203:24 204:1,15,19
205:2,13,15,24 206:6
206:9 207:15,19,24
208:5,22 209:2,22
210:4,14,16,19 211:3
211:9,19,23,25 212:4
212:7,22 213:24
214:5,7,13 215:1,10
216:5,6,7 217:25
218:6,23 220:7,19
221:6 222:6,13,17,25
223:6 224:3,17 225:2
225:8,10,20 226:7,20
226:21 227:2,5 228:6
228:14,17,20 229:3,6
229:10 230:5,16,25
231:9 233:3,12 234:2
234:4,6,9,13,24
235:1,3,9 236:4,13
236:19 237:19 238:7
238:24 239:7,25
240:5,11 241:24
242:4,9,10,13,21
243:2,19 245:8,12
246:12
Old 12:2
Oldenettel 31:14,14
Olivarez 29:10,11,19
30:6,25 31:2,8,12,13
OLIVEIRA 2:8
once 57:4 96:2 191:25
193:20 216:7,8
ones 12:23,23 20:18,22
21:12 24:3 41:17
62:21 65:11 123:14
124:1 146:13 162:9
171:8 188:3 192:9
245:10
one-sixth 197:13
one-to-one 149:24
opened 159:12
operating 90:9
operation 107:20 108:3
108:13,14,25
operations 92:4
opinion 46:20 54:19
68:18 74:8 86:14
92:12 95:6 137:13
175:12
opinions 6:14 54:22
137:5 138:14 165:8
165:19,23 166:7,22
167:6,19 168:21

169:4,5 173:22
175:13 209:8,12,15
209:20
opportunities 93:8
95:8
opportunity 15:23
22:24 30:23 168:13
208:1
opposed 16:8 23:14
70:24 72:13 102:7,16
111:20 158:6 206:13
optimally 9:24
oral 1:9,13 10:24 120:1
250:13
oranges 235:16
order 62:12 95:11
107:22 125:7 127:5
196:24 215:25 216:1
245:20
ordered 133:14,14
ordinary 66:15 115:12
116:11 219:22
organization 73:16
92:10,14 236:23
237:6
organizations 146:7
original 59:23 63:20
65:4
originally 139:5
originals 52:10 54:6
63:25 65:13
ought 45:9 221:9
outcome 25:15,18,20
32:25 250:19
outside 10:21 71:6
86:20 126:18,20
144:23 145:1 231:18
231:22 233:8
overall 78:9,12 103:6
112:25 113:3 123:11
overestimate 91:8
overhead 94:8
overly 166:14
overnight 18:6,7
override 77:8,13 81:3
85:3 96:22 97:9,14
97:25 98:1 102:7
147:17 148:6,10
overrides 76:10,12,14
80:2 103:19
overseeing 223:19
owe 149:19
owed 78:3
owned 13:18
owner 208:9,11

P

P 20:19 21:12
package 51:19
packet 37:14

page 3:8 18:13,20,21
  19:8 21:20 23:25
  44:18,21 45:17 47:3
  48:1,9,23 49:12
  52:21 53:3,5,7,16,22
  54:11,20 56:3,4,14
  56:19 57:5,19 59:8
  60:20,21 61:18 76:2
  77:23 78:15 79:11,14
  79:15 80:19 81:15
  88:8 96:10 97:5,12
  98:9 100:23 101:6,22
  102:6,11 104:18
  133:13,13,16 134:6,6
  136:2 137:23 138:12
  147:5 155:6 171:6
  185:16,18 201:5,8,9
  201:10,11,11,12,16
  204:24 207:16
  237:24 248:1,2
pages 45:16 53:25 61:4
  63:3 84:3 153:24
  154:2 233:16
paid 85:18 128:18
  148:20 150:1,21
  151:18 155:13,22
  160:13 219:4 244:10
paragraph 167:7,14,16
  170:8 171:17,22,23
  174:3 175:17,19,20
  176:3,6 177:22,25,25
  178:24 179:2,6,21
  180:19,20 181:18
  182:21,21,24 183:2
  183:10,11 184:13
  185:20,22,25 186:11
  186:20 188:13,17
  191:13 194:9 198:24
  199:8,24 200:18,24
  201:4 202:3 204:6,8
  204:10,12,12 206:15
  207:15,18 208:23
  209:2 210:16,20
  211:17 235:1 237:25
  238:1
paragraphs 166:19
  171:5
part 9:20 28:22 45:11
  46:19 61:10 66:13,16
  81:23 84:18 93:17
  106:2 114:23 125:11
  130:1 131:4 136:23
  146:14 188:14
  212:17 214:22
partial 218:13
participating 78:24
particular 8:23 24:17
  27:7 28:23 29:23
  42:9 68:8 106:13
  139:11 146:5 159:10

170:1 171:9,13
  191:16 204:17 209:9
  236:12 240:18
  245:25
parties 250:16
partner 92:2
partnership 30:10
parts 226:17
party 16:5 26:15
part-time 10:19
pass 219:16 220:4
  247:1
passed 27:9
path 91:21,25
pattern 224:19
pay 98:21,22,24 99:9
  125:6 149:20
paying 99:16 150:4
payment 160:3
payroll 244:11
pays 99:5
peculiar 186:24 187:5
  187:18
peculiarly 187:14
pencil 60:11
penetration 145:16
  245:23
people 6:25 9:19,23
  10:9,23 13:18 30:19
  98:21 99:8,9,9
  118:20 127:14,19
  139:17 189:8 190:13
  190:25 192:23 194:2
  194:21,22,24,24
  197:25 198:4 220:5
  220:11 231:10 238:7
  238:11 240:5,11
percent 29:7,8 41:19
  41:21 49:14,15 50:12
  50:21 70:2 78:17
  100:9 104:24 105:4
  111:11 113:6 115:2,7
  115:13,16 116:5,8,12
  116:16,21 117:6,6,6
  117:12,16 119:22
  120:5,9,20 121:12,23
  124:21 130:1,8,9
  140:3,7,13 157:21,22
  157:22 158:1 193:4
  196:19,22,24 198:22
  199:3 214:20 220:23
  220:25 221:1 223:17
  223:18,19,21 224:7
  224:14,24 228:4,5,6
  228:25 245:17,24
percentage 80:8 100:12
  120:11,19 126:19
  139:23,25 157:22
  178:14 196:21
percentage-wise 75:16

perform 40:6 168:6
performance 71:5 72:4
  93:12 184:23
performed 28:13 37:25
  40:19 87:8 180:6
performing 40:23
  229:2
period 12:9 13:1 72:5,7
  104:3 105:3 116:24
  118:7 120:7,20
  138:20 172:11
  173:21 174:13 189:2
  191:9 207:9,10,11
  215:6
permanent 176:1
permissible 221:3
person 22:13,24 61:19
  69:14 87:21 107:11
  135:9 139:14 220:14
  236:22 243:19
  249:10
personal 14:23 21:21
  22:7,9,16,19 23:5,19
  23:22,24 76:13,16,19
  77:8,10 80:2 81:3,25
  82:7,9,10 83:7,11,14
  84:4,6,17 85:2 96:22
  97:9,14,25,25 101:14
  101:16,17 102:8,16
  102:19 103:18 143:5
  143:15,17,20 147:17
  148:6,9 149:16,18
  154:25 157:19
  221:18,21 225:23
personally 50:11 170:9
  249:10
personnel 49:23 237:8
persons 173:6
Petroleum 13:2,11,17
  13:21
phase 103:22
phases 104:6
phrased 113:20
physics 5:12
Ph.D 1:10,13 4:1 8:12
  8:20 10:11 11:13
  249:1,4,10 250:8,13
Ph.D.s 10:23
pick 111:18 116:20
  139:10
picked 139:12,14
  140:20,25
picking 15:20
pipe 12:13,13
piqued 9:3
place 47:23 48:20
  235:4
plaintiff 19:15,17
  20:17,21 21:9,15
  25:22,25 26:2 225:11

226:3
plaintiffs 2:2 14:22
  20:16 135:12,14,15
plaintiff's 16:8 165:22
plan 28:14 30:15 39:17
  136:5,25 137:5 187:6
  187:23 217:9 235:12
  236:1
planning 6:20,20 7:1
plans 195:21 244:9
plants 12:23
platforms 14:6
play 86:5 218:25 219:9
please 19:14 21:23 40:1
  48:10 50:17 55:5
  62:6 64:17 65:18
  87:1 96:8 122:21
  136:2 140:11 145:5
  146:11 152:10 167:4
  196:16 212:10
  232:12 234:24
  240:24
plus 57:19 58:21 84:6,7
  96:15 163:17
pocket 155:25
point 67:5 68:23 77:21
  85:9 93:4 95:21
  116:25 144:17 161:7
  167:23 173:10 212:5
  216:14
pointed 96:3
policies 27:7,9 30:14,23
  33:21 34:1 49:1,3,4
  49:24 76:23,24 77:4
  94:11,14,22,25 96:16
  99:8,9,10,12,15,20
  99:21 100:1,8,10,11
  100:17 105:13,15
  118:11,12 149:15
  171:25 172:12,12
  174:14 178:13 187:2
  187:17,20 188:2
  189:9 190:3 192:1,4
  192:8,9,13,15,23,24
  193:5 194:21,22
  196:3,20 197:15,18
  197:23 198:1,5,12,13
  198:15 208:2 209:25
  219:8 232:13,25
  236:24 237:18 238:4
  238:8,12,17,19,22
  240:22 243:1,18
  244:12,13,14,15,18
  245:5,14,17,20 246:2
  246:3
policy 5:15 7:13,23 8:1
  8:24 70:2 214:20
  222:7 240:2,5,12
  243:6,20
political 129:17 130:2

130:4,6
popular 30:16
population 118:19,22
  118:23 123:3,14,17
  124:3,4,6 127:7,10
  194:11 245:17,22
Port 13:7,9 146:7
portion 83:18 110:19
  117:3 174:6 176:8
  178:7 179:5 180:7,22
  180:23 212:18
  216:18,19 218:11,
  portions 116:12,16
  167:5 169:8 178:1,3
  178:24 179:21
  187:12 199:8
position 77:14 88:18,21
  91:4 111:16 112:5,6
  177:11 185:14
  200:21 202:1 219:13
  220:4,11 224:4,5,8
positions 209:19
possibility 34:18 90:17
  93:6 103:21 167:4
  202:11
possible 53:24 70:21
  207:18 212:19
possibly 90:12 91:14
  91:17 92:9
practice 19:24 87:15
precise 55:12
precisely 42:7 175:11
  178:8
predicate 105:24
  192:25
predominant 157:9
  158:3
preface 186:14
preliminary 3:2,9
  35:23 36:1 40:2 43:3
  54:22 67:6,13,14,17
  69:11 70:24 75:4
  85:24 88:11 101:9
  102:12 167:25
  168:11,19 214:15,25
  216:2 226:9 227:13
  227:25 229:4
premium 79:18 80:1
  97:24 137:18,18
  138:18 141:23 147:9
  213:6 215:8,9,9
  217:20
premiums 36:9 48:25
  49:3 76:2,4,8 77:2,4
  80:24 81:12 85:1,2
  98:12 117:2 120:4,8
  147:24 149:22 172:4
  217:17 226:25
preparation 163:19
prepare 46:2

prepared 55:23 67:6
67:22 89:24 137:23
preparing 6:16,21
54:22
present 2:21 14:21
85:18 88:11 91:24
92:1 102:6 113:4,8
133:23 134:1
presentations 145:22
146:2
President 7:20
pressures 9:23
presumably 152:16
154:2
presume 154:7
pretty 28:11 33:19 38:4
70:4 73:18 115:1
142:8 180:23 207:2
229:13 231:17
prevent 89:22 92:20
prevented 92:13
preventing 89:15,16,19
92:17
previous 99:20,22
116:22 151:13,19
152:23,25 154:4
192:1,3 193:6,17
238:5
previously 64:6 201:25
204:6
pre-existing 96:16
Price 2:9
primarily 12:24 15:16
66:1 90:25 91:2,3,4
123:19,21 126:23
203:7,22
primary 12:19 66:24
67:1 124:1 127:2
176:21,23,25 177:4,5
204:2
principal 211:12
print 17:13 38:3,7 39:9
65:7
printed 38:4 61:15
65:5 233:15
prior 34:21 88:19
107:20 137:14
235:11 236:1 240:6
probable 180:21
182:16
probably 5:12 17:20
23:7,9 31:25 32:10
36:2,4,17,17 37:1,20
37:22,23 43:6 50:2
66:15 91:19 103:2,12
111:8 124:20 130:20
153:17 157:3 167:16
167:20 170:18 186:2
194:7 205:22 208:1,3
210:15 221:20

problem 84:14 145:21
160:3 237:22
problems 31:3 150:14
224:21 225:12 226:5
Procedure 1:22
proceed 167:23
proceeding 250:17
process 4:17 6:20,20
7:1 28:23 58:10
produce 216:13,14,24
217:10
produced 1:14 32:2
41:7,8 61:14 83:3
137:22 159:1 185:8
206:2 232:5 233:6,17
producing 137:17
138:16 178:9,11,18
217:9
product 117:4 219:10
production 76:14,16
76:19 80:3 82:7,9,10
83:3,7,14 84:4,5,6,7
84:17,18 101:14,16
102:8,16,20 143:18
143:18,20 149:16,18
154:25 221:19,21
223:18
productive 180:2,3
products 34:6 65:24
66:21 74:13 119:2
123:18 127:15,20
187:24 191:16
195:23 210:5
professional 116:2
professor 8:23 9:3,20
10:15 11:8,14
profit 208:12
profitable 91:6
profits 23:15 207:5
program 5:24 8:12,13
8:15,24,25
programs 6:6
project 7:2,4 13:4,20
15:18 79:16 80:9
122:24 125:7 127:5
128:2 131:15
projected 32:4 45:24
67:23 69:20,25 78:16
80:12 85:19 86:19
87:7 98:23 100:2
104:11 107:16 108:1
115:3 117:10 119:6
121:11,23 122:8
124:25 125:17,25
126:12 127:7,11
128:3 181:6 200:8
214:18 227:24
projecting 31:19 32:8
46:12 80:1 125:13
projection 69:11 71:11

71:14 88:17 95:25
109:19,24 113:9
129:7 140:6 182:11
213:19 227:21
projections 31:21 36:9
72:2 88:20 98:23
99:25 111:5 126:8
129:3 132:17,22
182:3,4 200:3 226:16
projects 6:5 7:1 104:21
promoted 107:20
properly 130:5
proportion 130:3
proved 249:10
provide 15:24 16:13
27:25 38:24 45:5
50:15 57:1 65:7 99:7
228:21 229:1
provided 4:12 18:15
26:14,19 28:15,17,19
28:22 34:4,8 35:2
36:4,6,7,21,25 39:24
40:9 47:1 50:25 51:4
51:9,9,18,24 52:2
53:15 54:18 55:23
56:6 63:6 66:7 72:19
136:7 139:1 142:19
143:23 161:12
164:17 181:22
232:21
provides 69:9
providing 56:20 95:24
141:11
proving 46:23
provisions 1:22
prowess 184:21
public 5:15 7:13,15,17
7:23 8:1,24 10:20
129:19 249:15
publicly-traded 111:12
112:21
published 206:21
pull 55:6 58:6 65:17
167:8
pulled 52:12 59:12
purchase 127:14
purchased 12:16 193:5
196:21 198:18,22
199:4
purchasers 196:19
purpose 28:7 40:13
41:1 64:15 179:18
214:23,24
purposes 18:9 22:4
67:7 68:19 134:4
140:8 151:1 249:12
pursuant 1:21
put 20:17,17,19 25:1
41:5 52:12 53:21
61:23 62:17,18 70:7

98:10 102:25 103:10
155:25 162:4 179:7
180:14 185:2 246:17
246:22
p.m 1:17,18,18 44:22

## Q

qualified 192:1 193:21
qualifier 193:9,11,14
193:15 195:9
question 16:24 18:11
21:23 25:7 31:5
36:16 59:9 72:24
79:7,20 81:7 82:19
86:13,25 98:18
100:20 102:4 105:22
105:24,25 113:20
116:10 122:21 144:9
145:19 154:10
158:15 166:21 170:3
173:14,15 174:24
175:3 186:13 190:16
213:20,21,24 214:23
230:7 231:25 235:19
235:21 236:10
237:10 240:19,24,25
241:1
questioning 217:1
questions 4:21 156:12
169:11 196:7 219:21
220:15,16 244:8
247:2,5
quit 99:16 157:13
163:13,14,15
quite 6:24 10:7,15
28:10 68:11 149:22
180:21 182:16 187:1
231:2
quota 43:23
quote 70:17 182:23
183:3,12

## R

raised 5:2
RANDALL 1:7 2:11
250:7
rapidly 42:24 52:5
130:19 181:16
rate 41:19,20 45:23
67:23 68:1,2,4 69:20
69:22,25 70:10,18
77:24 78:1,10,12,16
78:16,17,21,25 80:8
100:7,9 103:8,13
111:10 112:25 113:3
113:7 114:15,17,23
115:7,10,11,13,16
116:5,8,13,17,18,23
117:9,13,17 118:6
119:11,22 120:4,9

124:21,25 129:16,21
130:1 138:22 159:7,9
159:10,15,16 184:2
204:16,17 214:19
227:19,20,25 229:15
rates 18:19 32:4,9
42:16,17,18,22 68:5
68:8 69:12,13 70:5
103:7 114:13,17
118:1,5,9 122:8
127:9,10,25 128:4
129:22 134:17 141:1
159:11 184:1 185:5
200:8,11 218:15
227:22 228:7 229:12
238:2
rationale 218:9
Ray 4:25 5:1
reached 114:4
read 9:4 24:18,23 25:2
47:14 60:9,18 74:14
74:17 164:18,20,22
164:24 172:22
173:16 175:3 195:4
249:1
reading 98:19 199:17
real 10:10,10 206:21
realize 176:20
realized 46:15,16
really 6:11 9:12 10:9
11:25 12:18 13:4
27:19 42:17,21 44:5
45:11,15 71:7 74:7
84:25 85:8 89:13
100:15 103:13
111:25 125:11 135:4
136:20 138:22 144:3
144:3 145:19 149:18
161:2 167:17 169:25
170:11 173:7,11
179:3 180:6 186:6,25
191:22 202:23 209:3
213:4 217:22 231:25
232:16
reason 6:12 42:8,9
87:10 102:21 106:23
161:4 182:22 183:13
183:15 210:21 240:3
248:2
reasonable 74:2,5,6,8
95:2 105:11,16,21
106:3 107:16 108:2
110:4 117:20 119:11
169:1,15 202:10
206:7 211:15
reasons 7:24,25 8:22
110:16 129:20
169:10
recalculated 38:1
recall 38:11 149:14

177:9
receipt 137:10
received 28:20 39:5
  53:9 136:9,12 137:14
  137:15,15 139:8
  152:5,13,16
receiving 171:24 172:3
  172:4,5
recess 33:10 119:19
  156:5 188:12
reciting 170:11
recognize 53:5
recollection 32:9
record 1:23 17:18 30:2
  47:11 52:8,15 53:11
  54:14 58:25 64:24
  131:9 135:18 162:11
  179:15 214:12 245:3
records 49:8 55:22
recruit 65:22
recruiting 103:17
  155:1
rectangular 40:4
red 162:4
reduce 88:10 100:7
  218:2
reduced 89:2 100:18
  218:7
reduction 149:5
refer 202:20
reference 68:22 93:4
  171:13
referred 171:5 210:22
referring 54:5,7 67:14
  213:14 229:19
refineries 12:22
refinery 12:21
reflects 150:2 198:4
  205:10
refresh 33:8 56:8
refusing 27:2
regard 28:1 50:14
  72:20 73:1 92:22
  114:6 116:10 119:22
  170:14
regarding 29:1 49:24
  57:9 61:14 65:1
  69:25 95:6,11 107:15
  166:23 168:21,24
  184:21 194:11
  197:25 201:23
  209:15 211:1
region 68:9 82:8
regional 65:21 66:3,4,8
  70:11 81:25 83:3,10
  84:4,7 119:23 120:12
  143:5,15 203:22,22
regions 126:20
regulatory 30:20
reinstated 99:12,17

rejected 6:11
relate 174:11
related 8:13 13:15,17
  16:2 39:2 53:8
  129:23 150:11 165:8
  165:19 169:5 170:23
  178:9 224:23 250:16
relates 185:3
relationship 14:15 30:8
  174:5,6
relationships 31:1
relatively 218:18
relevant 123:12 124:13
  124:16 127:16 129:4
reliable 87:11 218:15
reliably 229:14
relied 51:8,12,16 54:18
  54:22 233:6
relieving 76:23
rely 50:15,18 136:22
  137:12 138:12
  141:20
relying 30:4 104:16
  137:4 231:21 232:2
remainder 201:7
remained 208:18
remaining 85:10
  104:21
remains 183:6
remember 6:23,25 8:6
  17:24 27:2 29:21,25
  30:4 31:20 32:1,10
  35:9 37:19,21 42:7,8
  42:14,15 43:7,13,15
  56:19 90:4 118:7
  121:14 142:2,4
  144:25 146:4,8
  150:12 153:3 154:21
  154:22 171:16
  216:21 222:10 242:5
  245:11
remind 93:21 214:24
remittance 153:21
  154:19
remove 9:13
render 166:22 167:25
  168:21 209:8,15,20
rendered 173:23
  175:12
renewal 13:7 96:19
  100:1 147:14,16
  148:6,9 172:4,5
renewals 36:10 96:16
  97:15 98:10 215:12
  215:12
repeated 50:20
repetitive 156:13
rephrase 237:5
replace 239:12,14,18
replaced 12:6 190:4

192:13 239:15
  244:14
replacing 188:21,22
  189:1 191:8,12 235:1
  235:6
replenish 160:19
replenished 160:10,12
report 3:1,7,9 4:12,22
  15:19 17:19 18:14
  19:12 23:21 33:13
  42:2,6 43:9,10 44:10
  44:12 45:2,6,13
  50:15,19,19 51:17
  54:22 59:16,16 60:5
  61:21 65:17 67:13,14
  67:22 70:24 71:7,24
  75:2,3 76:3 80:20,21
  85:16 86:9,24 96:11
  98:9,19 99:22 100:22
  100:23 102:10,17
  114:7 115:1 122:5
  125:15 130:13
  131:12,23 136:13,15
  137:3,13,14 138:12
  138:14 146:23 147:1
  148:2 151:1,6 165:6
  165:9,20 166:7,15
  167:5,24 168:22,23
  169:11,13,21,24
  170:7 171:1 172:17
  172:19,22 173:16,23
  175:13 180:15 181:7
  184:4 185:4,23
  208:25 214:15,25
  216:12,13,14 217:9
  217:24 221:25 222:9
  226:9 227:14,25
  229:4 231:21 234:24
  234:25 246:13
reported 213:14,18
Reporter 1:19 135:24
  250:10
REPORTER'S 250:8
reports 15:17,24 16:2
  233:15
represent 31:11 44:9
  51:23 53:10 59:6
  132:5 148:19 219:20
represented 39:5 53:6
  222:14
representing 225:4,7
represents 102:6
  139:24 140:12
  156:10
reputation 92:18
  224:21
request 45:5 159:2
requested 52:25 53:18
  167:1
require 160:7,10 228:3

228:4,4
required 49:14 117:16
  117:19 159:18
requirement 120:2,13
  184:16
requirements 73:22,23
research 10:17 70:10
  93:7 205:11 231:18
reserve 247:3,5
resist 135:17
resold 12:16,17
resolution 14:18
resource 47:5
resources 7:4
respect 219:14
response 3:7 45:4
  59:16 159:2 217:7
responsibilities 103:16
  220:5
responsibility 76:24
  221:13
responsiveness 74:23
  82:12 168:10 191:4
  213:11 241:7
rest 58:14 63:5 65:13
  93:15 140:16 247:2,3
restricted 126:16
result 30:12 67:4 77:14
  78:24 100:5 105:3
  107:3 169:20 194:2
  213:6 215:5 221:21
results 38:1 41:8 69:7
  213:4
resume 11:7
retained 168:4,6,20
  169:12
retainer 160:7,9
return 163:4 204:17,17
  207:8 218:23
returning 170:7
returns 212:2 214:9
revenue 94:3 105:12
  106:4,19 108:10
  182:5,6,9
revenues 105:8
review 43:25 200:15
reviewed 43:19 53:8,12
  54:18
reviewing 44:2
re-calculation 218:17
Rick 31:13
right 4:20 9:24 10:16
  15:22 18:18 20:25
  24:20 26:20,22 29:21
  35:1,17 37:8 39:1
  41:18,23 48:18,21
  50:22 51:14 52:14,24
  53:2 56:23 58:24
  61:25 62:18 63:6
  65:25 67:21 68:22

70:14 73:25 77:17
  79:9 81:18 87:2
  97:21 98:4,16,17
  100:4 105:24 111:14
  124:6 131:18 132:15
  135:10 136:1 142:14
  142:23 148:3,8
  150:20 153:11,22,22
  153:22 154:9 156:16
  156:20 157:9 158:20
  159:8 160:14 162:10
  162:16 164:12 165:6
  168:2,5,16,20 169:2
  169:4,16,17 170:5,23
  171:10,12 172:5
  173:16 174:25 175:5
  175:11 180:4,9,15
  181:7,12 182:8,8,19
  185:10 186:1,6,10
  188:2 189:9,17,17
  190:6,15 193:10,24
  195:21,24,25 196:3
  197:20 200:4,11,13
  200:19,24 202:6
  205:7,8 206:12,15
  207:10 208:25
  209:16 210:15 211:6
  212:16,21 216:5,15
  217:19,22 218:3
  219:1 225:5,16 226:2
  227:4 228:17 230:22
  232:18 233:13
  236:21 237:14,21
  238:1,9,23 239:1
  240:2,2,7,21 241:20
  242:11,12 245:11
rights 187:2,16,19
  188:4 219:10
right-hand 148:15
  155:15
Rio 126:18 144:22
  145:4,5,7
risk 49:15 112:15
  129:22 130:2,4,6
  159:25
riskier 112:6
risks 129:13,17
Road 2:9
ROERIG 2:8
role 65:21,22 66:5,6,13
  66:16 73:19 92:14,25
  203:15
Roma 145:11
Romero 251:8
Ron 164:21 173:9
rope 12:13 114:4
rough 148:12
roughly 46:12 94:8
  105:10 116:12,16
  117:5,6,12 157:3

178:17 197:2,13,14
197:15 198:12
222:13 223:16
roundabout 46:22
RSC 66:13,16,20 69:1
71:17 73:19 74:4
77:15 82:11 83:17,19
84:18 88:18 100:11
101:8,11,17,25
102:13,16,20 107:11
107:23 111:16 112:3
112:5,18 114:22
117:25 132:5 139:20
143:19 181:1,5,10,22
184:18 208:18
219:23,25 223:19
224:8,10
RSCs 66:11 107:14
114:7 118:5 137:9,17
138:1,5,8,10,13,16
138:25 139:11,21,23
140:2,13,20 141:1,12
141:14,15,24 143:7
217:3 228:13,22,24
rules 1:22 22:22 30:18
run 62:25 91:6 188:10
running 107:22 155:12
Rusteberg 29:5,10,19
29:22 30:9,11 31:3,7
31:10,12,19 32:3
33:2,13,22 225:4
Rusteberg's 30:7 31:19
32:2,6,6

_____
S
safe 25:16 114:25
122:7 140:18,25
224:3 246:12
sake 63:14 149:12
salaries 128:15 129:7,8
salary 129:1
sale 34:5 76:20 171:25
240:4,7
sales 33:14,18 49:1
65:21,23 66:3,4,8
70:11 75:18 76:21
77:5,22,23 78:20
80:4,5 101:18 103:18
107:20,23,24 115:20
119:2,23 120:3,12,19
124:25 125:13
126:17,20,25 127:6
138:18 141:2,23
145:22,22 146:2,2
199:11 203:22 208:3
213:6 223:6 239:22
239:23 240:1
salesman 29:2 73:23
sampling 140:7
San 145:9

SAPP 2:17
sat 32:12
Sauceda 1:6 2:11 55:19
169:1 219:20 250:6
save 16:15 34:11 58:16
132:3 247:1
savings 6:10,12
saw 152:25 161:22
163:8
saying 21:2 34:15
38:13 40:24,25 56:24
57:1 62:23 84:9
101:20 106:24 134:5
134:7 149:19 160:8
177:17 178:3 187:13
190:24 191:2 194:1
195:18 196:10,11
198:23 200:2,21
201:2,3 223:21,24
229:18 238:15
239:22,25 243:5
says 16:19,25 24:25
35:23 47:3 48:2,24
49:13 77:3 83:2,7
96:13 106:13 132:6,9
137:25 138:13 148:5
148:16,24 150:1
151:10,12,19,21
154:24 155:15
159:11 179:3 180:21
181:8,19 187:1
201:13,15 208:16
scale 106:15,16,22,25
107:3
school 1:5 2:7 4:7,23
4:25 5:15 7:10,11
10:20 30:15,25 31:2
108:18,19,23 123:24
125:18,22 129:18
146:6 156:11 168:25
185:1 188:3 189:15
190:14,19 196:1
230:11,14 236:25
237:1 250:5
scratch 41:10 86:13
seal 249:13
second 21:18 23:3
41:10 44:21 52:11
58:14 63:4 80:23
82:18 88:8 98:17
137:19 147:7 164:24
174:2 176:7 207:24
209:22 211:21,22
216:17,19 220:24
secretary 53:21
section 47:15 233:18
see 4:21 5:6 6:19 8:9
11:7,17 12:25 13:1
17:24 21:11 23:16
24:7 37:4 38:2 40:19

41:2 42:2 44:23
45:22 46:11 48:1,23
49:13 53:25 55:24
58:1 59:13 62:22,23
67:20,24 68:10,16,16
69:14 71:9 79:11
81:15,21 82:24 96:9
96:9,18 97:2,5 99:11
99:14,25 113:16
114:8,12,16 133:20
133:22,24 143:13
147:9 148:25,25
149:5,14 151:11,14
155:20 161:4 164:17
177:9,10,14 181:8
182:11 189:21 195:4
197:10 198:7 211:25
218:4 232:16 242:5
seeing 97:1 154:21
seek 8:20
seen 32:5 37:7 50:20
58:4 64:7 70:17
177:8 181:11,12
197:12 203:9 212:2
214:9 216:19 229:20
seldom 26:9
self-employed 72:16,17
72:20 73:2
self-employment 110:7
110:20
sell 12:13 27:2 30:23
65:23 74:12 89:5
94:10,21 183:9 188:2
189:9 196:2 208:6
213:6 219:10 234:14
239:7,8,10
selling 27:7 30:14 66:2
66:21 76:23 89:9,11
89:17,19,22 92:4
94:13,24 105:13
114:12 117:2 118:11
118:12 125:1 172:1,6
178:13,15 190:3
206:22 209:25 210:5
219:8,11 220:20
236:23 237:18,23
238:4 241:18 242:25
244:15,23,24 245:4,5
245:6
sells 123:17 240:21,22
semester 8:16
send 38:7,22 39:10,14
sense 72:18 78:5,23
83:22 111:4 137:16
149:19 187:3,21
213:21
sent 17:20 34:12 37:1,2
37:16,19,22 38:5
40:4 44:4 46:4 59:19

65:4 136:18,20
137:20 139:6
sentence 96:12 166:18
174:2,3 175:23,24
176:7 177:21,21
179:24 180:20,23
181:18 187:3,5,12,18
188:5,6,8,13,14
191:6,13,15,17,18,19
192:10 193:6,8,9
194:10 195:4,10,16
196:11 198:24
199:13,18,18,21
200:6,19 202:12,16
202:19,20 204:14
207:21,24 208:15
209:22 210:2,17
211:3,8,9,10,16,18
211:19,20,21,22,23
212:4,7,11,12,14,17
212:22,23,24 213:13
213:15,20
sentences 199:14
201:12
separate 22:21 23:12
133:24 147:10
148:16 162:6
separately 13:6 62:10
162:4
September 1:10,17
8:11 93:22,25 135:10
250:9
series 82:16 84:17
207:1,1
seriously 124:10
serve 86:10 206:19
served 125:19 126:6
129:19
service 14:5 109:18
203:22
serviced 105:15
services 26:10,14 34:4
35:2 161:2,6,13,19
206:20 221:24
servicing 109:9,9
serving 17:21 34:18
184:25
set 35:23 36:1,4 40:6
42:11 43:3 55:17
62:25 137:8,12
143:16 162:7 193:23
217:14
setting 94:20,21,24
119:25
settle 32:14,15 33:6
settled 25:16,21 26:4
28:5
settlement 25:15 26:8
seven 6:4 20:14 62:16
163:16

shaded 130:18
shared 76:9
shed 69:22
sheet 33:17 159:7,9,10
sheets 162:8 198:7
short 33:7 83:12 188:9
shorthand 129:12
short-term 6:5 7:1,2
13:4
show 14:20 39:1 47:18
49:9,10 55:5 63:16
69:11 76:4 78:15
79:13 94:2 99:5
115:6 118:5 124:20
133:9,9,16 138:19
140:21 142:5 168:14
229:16
showing 9:21 16:12
28:13
shown 39:23 93:23
141:25 142:10 154:3
shows 132:10 133:17
136:9 137:9,16
141:22 142:25
143:17 152:8,22
153:2,5,9 155:7
161:1 197:22 198:21
shut 215:6
side 14:3 16:8,8 24:19
145:7 148:16 225:8
sidetracked 214:16
216:1
Sidney 9:2
signature 248:1 249:1
signed 98:22 149:15
237:7
significance 107:2
significant 33:1 101:7
106:22 113:12,13,18
117:3 159:23 181:19
205:23,24,25 206:2
231:5
significantly 91:6
206:2
similar 37:12 53:7 73:7
82:24 92:14,25 118:1
152:8 154:2 194:22
207:6
simple 46:23
simpler 38:14 42:10,20
42:23
simplicity 63:14
simply 116:17
simulations 10:2
single 22:10 42:19
126:6 135:9
sir 5:8 7:8,24 8:2 13:12
15:1 16:21,23 18:4
18:25 19:11 24:24
25:4 29:7,12 33:16

33:25 35:19,21 36:13
39:9 41:13 42:4
44:17 46:21 49:7
51:14 54:8 57:6
59:14,18 64:4 67:16
72:11,18 76:7 77:6,9
77:25 79:24 80:6,22
82:4 93:19,22 94:1
96:20 97:8,20,23
98:25 101:23 102:9
104:19,23 105:1,10
106:9 107:1 108:11
109:5,7,15 111:14
112:19 114:23,24
115:18,21,23 117:8
117:11 119:24
120:10 128:12 129:4
129:15 130:15 132:1
132:8,16 133:2,12
136:6 139:9 141:9,13
143:25 146:12 147:8
152:21 154:16
sit 89:9,11 115:14
121:22 238:23
site 14:4
sitting 98:17
situation 9:17 13:22
27:6
situations 123:5
six 6:4 20:13 107:22,24
130:8 171:6
size 129:22
skills 208:13
Skip 143:4
slightly 75:13 105:5
195:10 218:13
slim 207:2
small 12:22,23 68:2
83:18 139:25 140:1
202:13 215:17
218:11,18
smaller 178:11
software 46:3,3,4,6
sold 12:17 33:21 49:3,4
114:16 123:14,21
192:23 194:21,23
195:20 197:15,18,18
198:13,15 232:14,25
238:17,19 239:3
241:20,23 242:21
244:10,19 245:14,17
246:3
sole 157:17,19 177:17
solely 53:8 77:13
101:24 103:17
solve 237:22
somebody 231:14,15
239:16
someplace 223:22
somewhat 6:22 52:13

58:9 73:7 91:24
152:3 159:24
soon 43:9,10 103:13
sorry 17:1 24:8 52:24
61:10 79:19 87:3
97:4 98:11 135:17,24
139:18 152:11,15
161:1 172:7 174:2
175:19 178:2 186:13
197:6 202:17 213:23
214:22 218:9 226:15
231:11 241:19
sort 12:10 14:17 73:9
228:22
sounds 10:6 110:4
131:17 189:17
source 50:25 61:16
70:13 81:11 82:4
130:16 131:10
157:17,19 158:3
232:1 233:2
sources 51:17 204:22
South 136:5,24 137:4
SOUTHERN 1:1 250:1
space 13:8
spandex 59:1
speak 160:18
speaking 48:7 180:5
198:12 199:19,22
210:8 223:17
special 10:4
specific 130:3 185:14
specifically 115:21
146:1 165:24
specification 53:19
specificity 81:4,6 89:6
176:22 177:1 186:12
190:1 242:19
specifics 47:1
speculate 135:6
speculating 135:4
speculation 89:7 91:15
135:3,8,22 140:14,22
141:3,17 144:2
148:22 154:5 186:21
188:16 191:20 213:4
213:19 214:2 225:22
241:15 242:18 244:2
speculative 180:24
speed 97:1
spend 154:25 220:13
spending 94:20
spent 6:19 109:8,9
166:2 210:8
split 164:6 220:23,25
221:1
splits 76:12,15,18,21
77:11,19 103:18
221:22 227:9,16
sponsoring 73:16

spreadsheet 37:2,16
38:4 44:1,1,11 45:18
46:2,11,19 65:4
82:24 84:19,25 85:8
85:15 100:17 133:4
Square 2:4
SSC 69:2,3
SSCs 138:13 141:12
stack 146:17,25
staff 109:9 220:11,14
stamp 60:1 136:10
137:10
stamped 165:17
stance 10:15
stands 147:20
start 15:5 40:25 45:17
64:16 150:9 166:10
166:12 185:17,19
222:23,23 240:17,20
started 11:22 14:25
15:4 88:24 163:13
183:1 236:13 244:15
starting 92:9 181:15
182:25 185:18
starts 42:20,20
state 1:19 22:19 29:25
30:20 64:24 101:6
104:20 107:20 249:8
249:15 250:11
stated 1:23 80:7 104:17
122:3 168:13 169:13
171:1,4
statement 43:2,12,18
50:6,12 53:13 57:10
93:1 102:17 111:6
147:6 148:4 151:23
152:23 153:8 154:4
154:14,15 155:7
169:17 173:18,25
174:1 176:18 195:2,3
195:12 196:13
198:20 199:2,6
200:14 203:17
208:20 214:1 224:1
statements 43:20 59:3
60:25 61:6,14,19
96:14 97:19 99:7
146:10 151:4 156:2
175:20 210:22
233:11
states 1:1 7:20 141:8
191:25 243:1 250:1
stating 39:22 67:2
203:20
statistical 14:22 140:6
140:7 228:21
statistics 30:5 122:17
125:21,24 126:2,5
stay 42:18 193:22
Steele 2:17 4:4,5 16:14

18:10 25:8,11 37:7,9
38:12,17,19 39:16,18
47:9,12 51:25 52:4
52:11,23 53:2 55:10
56:10,22 61:25 63:22
63:13,22 64:2 65:10
82:19,22 83:25 84:11
84:24 88:9 119:18
131:6,24 135:17
143:13 152:11,13
156:12,14 164:16
180:11 201:25
214:13 218:1 228:23
229:17 230:5 231:17
Stephen 1:10,13 3:7
4:1 249:1,4,10 250:8
250:13
stick 23:2
stints 106:18
stock 207:6 232:8
Stocks 47:3,16 51:20
stop 103:25 104:5,5
114:1 221:14,16
224:19
stopped 185:17
stopping 89:10,13,14
89:19
stops 104:9
Storage 13:16,19
store 12:7,19
story 66:14
straight 84:2 121:12,24
239:21
stream 180:24
Street 251:9
strictly 82:7 180:5
199:19,22
strike 213:24
stroke 243:17,17,20
strong 30:25 198:11
strongly 202:14
struck 225:2
stuck 134:15
studies 5:15 7:14,23
124:11
stuff 216:23 225:11,17
226:2,3,6 233:12
styled 1:16 4:6
subdivided 147:17
subject 33:21 80:25
110:20,20,25 111:2
244:11
subjects 158:22
subscribed 249:11
subsequent 215:12
substantial 202:15
218:16 223:10
substantially 215:19
substantive 200:7,10
subtract 86:11 88:20

212:16
subtracted 87:24 133:8
succeeding 99:23
success 71:5 184:14
successful 68:11,15,25
69:2,5,14 115:25
184:25
sued 31:7
suffered 16:3,5 22:10
29:2 67:4 78:13,29
168:2 175:25
Suffice 128:1
suggest 184:15 245:21
suggested 118:9
suggestions 6:8
suing 29:10
Suite 1:21 2:4,9,13,18
251:9
sum 100:21
summary 3:8 60:20,21
61:18 153:24
summer 10:24,25
supervised 144:6
supervising 144:12
supplement 65:23
241:23 242:2,2
supplemental 34:2,6
114:12 123:18
127:14,20 129:2
196:3 198:1,5,18
199:4 234:20 236:24
237:18 238:4,8,12
239:16 240:12,21
241:11,13,17 242:11
242:12,14,17,22,25
243:6,12,15,20
244:18 246:3
supplements 244:23
supplied 165:5
supplier 206:19
supply 12:12,22 14:6
supplying 14:5 192:3
221:24
support 140:19 176:18
196:12 198:23 199:5
200:7,11 203:19
supporting 199:3
supports 106:10
181:20
suppose 41:24 53:3
199:19 206:24
supposed 164:8
supposedly 31:10
supposition 195:1
sure 8:10,14 13:24
16:23 17:4,6 21:24
27:5 33:19 34:24
37:21 38:4,21 44:13
45:16 48:12 62:13
64:3,13 66:5 68:11

69:10 73:24 75:2
76:25 77:18 81:7,9
83:24 84:1 89:12
93:20 103:15 110:1,4
111:21,21 113:11,14
118:17 120:23,24
122:16 126:15 131:2
134:5 139:18 140:4
143:16 145:24,24
154:8,10 155:18
156:3 165:12,21
166:9,11 167:18
173:6,10,17 179:13
186:25 187:1,17
188:11 197:23 198:6
210:1,4,10 211:2
215:23 220:22
229:11,12,13 230:13
230:18,24 231:2
232:10 236:11
238:22 241:16
242:24 245:9
**surmised** 194:17
**suspect** 43:8 44:3
170:17
**suspended** 30:20
**Susser** 13:2,11,17,21
13:24
**sustainable** 117:13
**sustained** 114:8,13,16
**switch** 193:22 194:23
**switched** 192:1 239:17
**sworn** 4:2
**systems** 7:3 9:10

**T**

**tab** 59:12
**table** 58:21 79:8 197:11
232:4 234:2 238:1
**tabs** 59:2
**take** 4:6,18 5:4 9:18
18:2,20,21 19:4,13
19:21 22:23 26:3
33:7 35:23 44:16
45:21 47:23 49:6,22
50:1,2 51:7 53:23,25
58:13 62:17 77:1
79:22 82:1 87:15
99:21 102:22 110:6
111:5,7 116:17
119:17 120:18
129:13,17 130:23
132:19 133:3 142:16
146:25 150:22 156:4
180:12 188:9 218:20
224:11 241:7
**taken** 1:16 30:13 78:6
97:18 99:19 133:11
146:24 168:24
169:14 209:14

216:18 224:9 250:18
**taker** 142:8
**takes** 85:9
**talented** 181:9
**talk** 23:4,19 61:21
65:17 113:21 146:10
228:7,15
**talked** 34:17 62:22
96:11 107:19 116:15
200:13
**talking** 16:22 17:6,7
33:11 37:6 42:13
47:12 48:14,16,24
61:3 67:9 73:12
84:20 87:2,3 103:3
106:16 107:8,10,11
111:15 113:8 127:2,9
164:16 166:15
171:15 190:25 205:9
205:19 209:9,11
210:2 213:3,17
217:16 225:3 227:13
233:13 234:25
235:16,16
**taught** 8:23 11:16
157:14
**tax** 111:1,3 212:2 214:9
**taxes** 110:7,12,21 111:5
111:8 204:7
**teach** 157:11
**teacher** 10:20
**teachers** 93:12 94:4,21
94:24 128:14,17
129:1 208:10,11
211:12
**teaching** 10:13,19 11:9
11:18 157:13 158:21
158:22
**team** 66:20 76:10,11
81:25 98:21 126:20
143:5,15,19 145:13
146:2 185:3 213:7
**Tech** 5:6
**technique** 38:2 42:10
**technology** 11:4
**tedious** 39:3
**tele** 34:16
**telephone** 43:4,11,12
43:15
**television** 74:10
**tell** 19:14 23:6,8 24:5
26:25 29:9,13,14,15
29:16,17 31:20 35:8
36:5 40:1 45:10
49:25 51:22 53:6
55:25 60:17 66:14
67:20 72:25 81:19
83:12,16 90:4 93:16
94:9,13,16,18 98:4
107:18 108:16 109:8

110:18 114:25
115:24 122:20,21
135:6 138:4,22 139:3
139:13 150:11
166:12 175:4,6,8
192:17,18 196:16
204:15 206:8 207:17
221:4 235:18
**telling** 6:15 30:19 43:8
48:25 49:2 109:17
125:16 187:14 194:7
195:17
**ten** 12:25 41:19 140:3,7
140:12 163:18
178:17,17,18 198:17
207:2 210:13,13,14
**tend** 19:25
**term** 68:12,12 129:12
**terminated** 27:2,4
71:17 72:22 73:3
84:15
**termination** 24:1 27:5
72:14 73:12 209:4,6
209:9,11
**terminations** 23:11
**terminology** 191:1
**terms** 26:7 69:24 127:3
154:3
**territories** 141:25
**territory** 126:13,16
**test** 108:9
**testified** 4:2,12 20:15
20:24 21:14 22:2,3
32:11 121:5,8 167:24
**testify** 21:7 32:13,16,20
32:23 50:4 53:20
164:8
**testifying** 21:21 25:22
25:25 137:6 163:8
164:7
**testimony** 16:20 20:4,8
20:10,15 21:5,20
23:23 25:3 26:21
27:25 28:25 31:4
50:10 72:19 74:13
119:21 181:25
183:16 214:19
217:25 220:7 244:4,5
245:13 246:15,21
**Texas** 1:1,19,21 2:5,9
2:14,18 12:1,7 13:3
22:19 108:21 135:10
136:5,24 137:4,9
139:1,11,21 140:13
141:1,15 143:7
144:25 145:1 157:15
157:16 249:8,15
250:1,11 251:6,10
**textbook** 233:17
**thank** 25:11 38:23 56:3

59:11,25 61:21 83:20
84:11 88:9 114:5
240:12 241:9
**theory** 9:13,15,15
106:10,12 108:9
**thing** 75:5 103:12
106:13 118:21 162:5
162:5 167:23 169:16
183:25 198:25
207:16 224:1 226:21
232:9 235:21 236:3
**things** 6:17 9:6 15:13
15:14,15 30:7 33:5
42:18 51:5,18 66:1
66:24 67:1,18 70:23
71:1,3 75:3,6 97:1
103:8 122:25 123:5
129:15,24 161:17
167:21 199:1 214:14
214:15,18,23 216:1
216:15 224:18,24
225:25 226:1,10,18
226:24 240:21
241:10,13,20,22
**think** 8:15 10:22,22
12:7 19:17 21:16
25:16 26:23 27:21
30:19 31:4 32:6
37:11 38:10,14 39:2
44:11 52:4 53:21
55:10 62:21 63:14
66:15 70:2,3,19 73:6
73:20 74:2,5,6 76:17
76:21 77:12 79:6,14
81:24 92:16,20 93:19
93:20 96:3 100:25
101:3,4,5 105:11
106:3,12,21,22,23
110:3 111:22 113:19
114:1,21 119:1,14
120:2 121:22
124:13,15,17,24
125:8,9 128:25 130:5
130:24 132:6 135:7
140:5,18,18,24 142:9
146:20 149:6,7
151:16 161:22 163:8
164:23 165:2 167:13
167:16,20 172:1,1
175:3 176:19 177:9
177:12,12,16 178:16
180:11 181:9 182:17
188:6 189:12 198:2
200:10 201:19
203:11 207:14,22
208:19 210:6 211:14
212:1,25 214:2
218:17 220:22 233:1
236:18 238:15
240:16

**thinking** 129:24 155:21
158:16 172:7
**thinks** 178:6 200:22
**third** 48:1,9 79:14
174:2 195:14 199:17
210:2 211:23 220:25
242:5
**thought** 7:18 9:5 32:24
40:20,21 45:9 62:8
62:10 68:15,21 76:19
96:6 103:11 153:3
206:7 221:20 230:3
234:12
**thousands** 205:20,22
**three** 20:13 32:10
62:14 191:5 196:20
240:22 241:20,21,22
242:8 244:12,15
**tie** 39:2
**tied** 73:15,17,19 84:25
**time** 6:22,24 7:15,18
8:13,15 9:18,22
10:16,22 12:6,9 13:1
16:15 17:13 19:21
27:22 32:7,9,12
34:17,21 35:5,24
37:18 39:3 41:24
46:24 48:19 49:8
58:16 67:5,22 71:7
72:5,7 82:23 90:3,4
94:20 102:17,22
104:3 105:7 109:8
116:24 117:15 118:7
120:7 132:3 154:25
156:18 157:14
162:18 163:17,19
172:23 173:18 184:4
187:10 195:14,15
207:9,10 209:5
217:19,22,24 220:13
227:3 229:14 236:12
236:16 237:18 239:4
239:15,21,22,24
times 20:15 81:17
100:10
**timing** 84:16 149:24
150:14
**tired** 101:3 227:8
238:22
**title** 10:23 11:3,13
60:18,19
**titled** 136:5 138:25
**today** 41:25 55:3 62:4
64:1 85:19 86:16
89:9,11 121:22
135:10 137:6 162:21
163:21 165:5 208:17
226:5
**today's** 162:15 163:12
**told** 26:6,9 27:23 31:2

32:22 33:4 48:3 49:6
49:16 50:1 51:5,16
70:16 71:17 87:10
89:21 93:18,21 94:7
94:19 102:1 104:16
104:23 108:2,17,20
108:21 109:14
117:23,24 119:20,21
128:9 170:13,20,21
174:22 177:24
178:16,16,23 197:17
197:19 202:7 220:21
220:23 221:5,6,7
225:24 231:19
236:18,19 238:18
244:16 246:5,11,13
246:17,19
**tool** 12:17
**top** 16:19 17:8 19:9
24:6 29:8,8 35:17,18
47:14 48:2 51:20
53:4 60:18 76:3
97:12 101:6 118:4
130:9 133:16 136:9
137:25 138:1,13
141:6,7,11,15,16,18
146:17 220:21
**total** 19:19 80:3,24
81:2 83:2,7 84:4,4
126:20 132:11,14
155:12 161:13,19
207:8 215:8 222:7,18
223:13 246:1
**tough** 154:24 229:14
**town** 53:20 159:24
**towns** 145:10
**TPA** 172:24 173:6,7,8
173:10,24 174:12
175:9 177:11 189:5
190:8 218:24 219:4,5
219:5,7,9 235:11,25
236:11
**training** 28:23 103:17
**transcript** 216:19
**transcription** 250:12
**transcripts** 56:21 57:3
**travel** 162:18 163:17
**trial** 4:15 16:20 20:5,10
20:14,16,18,21,22,24
21:1,3,6,7,14,20 22:2
22:4 25:3,13 26:3
28:1 29:1 32:14,17
121:8 166:23 247:2
**triangular-looking**
36:8
**trick** 36:16
**tried** 70:9 196:2 224:10
**trier** 168:7
**trip** 163:2,4,7
**trouble** 38:15

**true** 10:3 17:23 53:13
74:19 78:19 84:12
97:20 102:18 120:24
121:2,2 140:15
169:16 173:20 175:4
175:6,7 183:22 192:7
192:12 193:6,7,8
200:23 210:1 249:2
250:12
**trust** 52:13
**try** 39:2 49:18 88:14
108:9 125:3 126:19
129:17 156:11 160:2
192:21 227:20
**trying** 21:24 31:17 45:6
97:1,3 102:5 107:14
112:15,17 119:4
122:24 124:10
145:18 154:12
155:24 189:19
192:16,18 194:4,7
202:21
**turn** 48:9 96:17 136:1
147:3 150:8 151:22
151:25
**turnover** 194:3
**two** 6:19 20:13 22:5
24:2 61:6 62:7,14
67:18 70:23 73:6
77:7,17 84:3 96:18
96:21,23 132:17,22
134:8 152:2 164:11
177:21 181:23 182:9
199:1,1 201:12
204:22,24 205:2,8
214:14,15 216:1,6
223:16 226:17,23
242:7,9
**two-thirds** 39:19
**two-year** 8:15
**type** 15:11 21:22,22
33:20 34:1 45:17
73:21 90:13 127:13
128:13 154:13
158:12,21 159:25
**types** 22:3
**typically** 16:2 35:14,15
90:10

**U**

**Uh-huh** 134:25 135:2
233:23
**ultimate** 87:17
**ultimately** 85:16 86:6
100:1
**unable** 98:20
**undergrad** 5:18
**undergrads** 11:9
**undergraduate** 5:7 9:5
**underlying** 32:3 40:8

**underneath** 77:7
**understand** 4:8,11,17
19:3 22:16,18 46:10
56:25 61:19 64:3
65:20 66:17 72:16,23
76:9,18,25 79:6 81:7
81:10 83:13,15 85:16
86:16 97:17,21 99:24
101:20 103:15
109:16 123:16,20
124:11 125:15 127:6
143:16 146:24 148:4
149:7 188:22 189:3,4
190:7 194:6,6,8
223:3 224:20,22
231:25 240:16
**understanding** 26:5
27:24 48:5 51:10
57:7 66:2,7,19 74:19
76:1 84:5,8 86:15,25
96:1 103:20 104:1,1
107:21 109:13 116:4
116:7 117:14,15
126:17,23 144:20,23
145:12,13,15 146:19
147:20,22 149:16
150:6 173:9 174:4,7
174:8,21 176:12
184:7,24 188:20
189:2,8,23 190:2
191:8,10 196:25
197:4 203:12 219:4
219:25 220:12 221:4
221:16,17,22 234:19
235:10,25 236:7,21
237:5,11,14,16 243:7
243:8,11,14,15
244:22 245:2,12,19
246:4
**understood** 29:16
218:1
**United** 1:1 7:20 141:8
243:1 250:1
**University** 5:16,19
**unjustified** 209:7
**unreasonable** 69:13
106:7 169:1,15
208:16,20
**unreasonably** 200:3
**unregistered** 30:17
**unsure** 110:2
**unsustainable** 116:23
**unusual** 116:11 117:21
**upper** 133:17
**upshot** 27:24 28:4
**use** 41:4 42:23 68:12,12
71:24 72:1 82:11
90:16 100:1 103:14
146:23 159:14
205:15 206:13

227:19
**useful** 42:25 68:21,22
70:3 93:4 95:24
119:14 124:19 127:9
229:1 230:4 231:16
**uses** 45:22
**usual** 159:23 221:7
**usually** 21:4 90:3
122:25 123:15
**utilize** 46:5 77:22 78:20
80:8 90:14 91:12
117:9 129:2
**utilized** 44:12 46:18
50:14 100:2 111:11
114:7 151:2
**U.S** 138:13

**V**

**vague** 40:15,18 79:2
175:15 182:2 187:25
235:13,14,18,20
240:14
**validity** 231:22
**Valley** 90:9 122:12
126:18,24 128:3
144:22 145:5
**Valuation** 47:17
**value** 85:18 88:11
102:7 113:4,8 133:23
134:1
**values** 206:4
**valves** 12:13
**varied** 42:2
**varies** 157:3
**various** 14:22 15:3,17
23:11 85:17 118:4
157:20 190:25
198:14 225:7
**vary** 42:15
**verdict** 32:15
**verified** 42:25 50:5,7
**verify** 49:11 50:11
74:18,20 171:3
**version** 41:8
**versus** 4:7
**Viles** 24:8,12
**violation** 30:18
**virtually** 160:5 213:1
**vis-a-vis** 128:14
**vitae** 4:22 18:19
**void** 235:11
**volume** 34:11 164:20
164:24
**VS** 1:4 250:4

**W**

**wait** 61:10 84:22
100:24 152:10 201:8
222:23
**waiting** 53:20 218:14

**waived** 186:22
**want** 7:18 17:4,6 19:13
20:1 34:11 36:15
39:2 41:24 47:7
50:24 53:16 57:3
58:12 63:1,15,19,25
64:13 68:13 82:11
84:1,21 125:8 151:20
159:6 161:25 196:10
196:12 211:6 215:25
229:25 232:17 241:7
241:19 244:1
**wanted** 11:25,25 40:19
46:24 60:9 63:20
68:5 69:19 75:5
155:2 179:14 185:2
230:1
**wanting** 14:4,6
**warehouse** 13:9,16,19
**wasn't** 5:12 13:23 15:7
30:19 66:16 103:21
109:11,12 164:15
173:6 177:18 209:12
221:22
**watch** 74:10
**water** 12:18 113:24
**way** 9:6 10:9 20:1 25:1
28:10 29:7 38:25
39:19 40:20,21 41:3
41:5 46:22 48:2
51:25 58:10 69:13
70:5,8 72:22 73:7,15
75:13,25 76:18 78:2
78:2 82:22 91:9,21
92:10,13 93:2 100:13
100:14 105:23 107:1
113:19 117:20
127:22,23 128:7
151:7 157:9 161:10
166:20 167:6 191:22
207:7 218:13 219:7
**ways** 73:17
**website** 204:25 205:1
205:10
**week** 82:2 83:6 143:21
205:10 206:5 233:14
**Week's** 204:25
**weight** 140:6
**weird** 188:6
**Wellesley** 10:13,21
11:8,10,18
**went** 5:6 7:12 8:9 10:16
11:19 20:21,22 21:6
25:12 30:14,16 31:2
32:15 225:13 231:17
**weren't** 6:11,12 63:6
189:1
**West** 2:9
**we'll** 62:18 74:22,25
159:3

we're 11:6 16:22 17:5,6
17:7 21:13 22:5,6
23:4 46:25 48:12
50:23 52:4 58:10
65:11,12 68:4 76:17
77:19 87:2,3 103:3
107:8,11 111:15
113:24 123:1,2 127:9
134:5 149:19,20
161:25 163:14
179:20 188:13
190:20 205:7
we've 82:23 143:3
whatsoever 128:1
154:12
whichever 29:20
wife's 158:9
WILLETTE 2:13
William 2:17 29:10
31:4
winning 32:24
Winter 9:2,3 10:15
Winter's 9:20
withholding 150:5
witness 1:14 4:9 15:2,7
32:17 47:16 52:6,9
56:2 58:24 63:7,10
135:25 143:6,9
158:25 161:23 162:6
162:10 179:10
201:20 212:9 216:21
219:16 241:9 247:1
249:11
wonder 51:25
word 29:22 68:22
85:23 89:20 113:11
178:9 186:2,6 193:12
202:19 235:9
worded 187:14
words 40:24 57:1 80:17
86:21 89:1 160:16
170:17 171:19,21
182:16 190:18
223:15 224:9
work 7:12,19 9:21
10:18 11:19 14:5
16:9,9,10 23:13
42:12 60:6,8 63:7
66:8,12 72:2 74:4,9
75:25 90:1 92:10
98:24 109:2 156:15
159:23 160:1 219:24
220:1,8,14 221:12
234:2 236:15
worked 5:20 13:1
220:5
worker 22:11,11,13
working 8:17 10:17
15:5,5 92:13 225:6
works 124:5

worksheets 3:3
work-over 12:21
world 10:10
worthy 140:6
wouldn't 23:9 77:10
83:11 100:19 107:3
109:24 111:18 115:8
121:15 127:12
167:18 169:9 170:18
179:17 186:2 217:2
240:18
would-be 213:18
writing 6:14 137:25
144:1,4
written 49:11 154:23
173:19 184:4 191:23
wrong 9:25 31:23 79:4
80:11 82:22 84:1
112:10,24 145:2
195:10,11 222:3,4,5
240:10 241:2
wrongful 21:22 22:20
22:23 23:5,10,20,22
23:24 24:1 72:14
73:12
wrongfully 72:22 73:3
wrote 172:16,19
217:24

_____
    X
_____
X 1:3 250:3
_____
    Y
_____
Yahoo 204:25 205:3
206:1,4 233:12,13,14
Yale 10:16
yeah 13:22 47:9,12
55:10 135:4 139:18
143:8 151:14 190:11
201:11 229:20 235:6
year 5:20,23 7:7,12
27:18 36:9 42:19
46:11 49:14 50:21
71:20 72:10,11 74:4
74:10,11 76:2 77:3,3
78:12,12 79:1,16,16
79:23 80:25 81:12
82:25 83:6,18,19
84:12 93:14 94:8
96:14,19,22 97:4,10
97:11,25 98:11,13
99:7,20 100:2,8,10
100:11,16 104:7
105:4 114:22 116:22
117:10,10 120:4
121:12 131:16 132:4
132:5,11 134:7,14,16
134:23 135:11,21
138:1 141:11,23
147:14,16 148:5

150:24 156:23 157:2
157:6,7 172:25
173:22 188:25
189:15,16 190:8,10
190:14,17,17,17,18
190:19 193:18
197:24 213:5 218:13
220:24,24,25 222:15
224:7 236:22,25
237:1,1,2,8,9,11
245:16,25 246:5
yearbook 47:17
yearly 85:17
years 12:25 15:8 16:10
16:11 18:24 20:23
21:13,25 23:21 26:14
26:18 27:19,20 28:6
28:25 32:10 46:12
61:6 84:16 86:23
87:7 95:4 105:3
120:21 121:12,24
124:21 132:17,22
133:25 134:8,14
138:20 143:19
144:10,12,16 156:16
180:3 181:1,23 182:9
184:18 185:2,13
190:14 198:17 202:6
207:2,3 208:19
234:12 238:5 245:14
year-to-year 138:19
yellow 162:8
yesterday 94:4 162:22
163:9,11,23,24 166:4
York 26:24 27:7,12
28:2,15,20,21

_____
    Z
_____
Zacks 205:11
ZUNIGA 1:18 250:10
251:6

_____
    $
_____
$1,990,000 222:19
223:15
$1,990,609 79:11
$11,442 151:10
$13,000 161:5
$13,199 161:2
$14,681 162:12
$140,000 222:11
$2 222:19 223:15,17
$2,400 164:2
$2,714.35 148:17
$2,932,944 79:18 80:3
$250,000 94:8
$3,000 159:18 160:14
160:20 161:6
$300 162:16
$322,000 213:5 215:7

215:13 226:25
$322,108 217:17,23
218:10
$325,621.60 133:22
$343,000 131:16
132:23
$343,424 132:1
$380.65 153:15
$40,000 212:16
$5,344,463 88:10 95:7
101:21 102:6
$59,104 104:21
$7,000 86:12 148:13
149:10 180:14
$7,000,000 107:22
$78,000 96:25
$78,706 96:15
$89,457 94:5

_____
    0
_____
01 154:4

_____
    1
_____
1 18:1,3,6,13,13 44:10
45:12 54:25 57:14,17
57:20 61:22 64:25
65:18 67:15,16 70:24
75:7 77:1 79:12
80:19,21,21 96:8,10
99:3 100:23 130:14
200:19 218:11
1st 43:13 159:12
1,042,569.76 98:1
1,045.24 148:10
1,133,000 100:21
1,133,977 98:3
1,160 212:16
1,200 197:15,16 198:12
198:12 238:17,17,19
239:2 245:20
1,668,000 80:15 81:17
85:1,3,10 98:13
100:22
1,668,501 80:24 81:10
81:20 96:12 98:9
1,990,000 81:15
1,990,609 76:5 80:9
1-31-01 146:16
1-31-2001 151:9
1.7578 81:17
10 20:14 131:7,8,9,10
180:19,20
10th 251:9
10,000 161:8
10,199 161:3
100 2:18 157:1,2,6,7,21
157:23 193:4 196:19
196:22
10125 251:9
107 157:5

1099 150:21,24 213:14
213:18
1099s 150:16 211:25
11 20:14,20 182:22,24
11th 17:15
11,442.34 151:13
12 20:14 183:1
12th 17:17 34:15 152:6
152:12,13
12-31-03 251:7
12:43 1:17
1200 1:20 2:4
13 20:14 143:21 183:5
13th 43:18,21
131 3:10
133,977 98:6
14 20:14 71:23 183:11
183:13
14th 43:22,25
14,089 97:14
140,000 223:1
143 134:9
143,730 132:15,18
149,000 84:6
15 19:10 20:14 49:14
49:15 50:12,21 70:2
117:16 119:22 120:4
120:8,20 183:14
210:13 214:20 228:3
228:6,25
15th 44:10,19,23 45:1,8
71:24
15-and-a-half 130:9
16 20:14,15 71:25 72:1
72:7 183:17 196:24
197:15 198:22 199:3
245:23
16th 43:12,17 161:1
16,387 97:14
163,000 83:12
163,522 83:8
17 183:19
18 3:1 152:8 156:16
183:21
18.95 117:6
185,000 132:11
19 117:6,12 121:11,23
124:20 184:13
1966 4:24
1970 6:23
1985 14:21,25 156:16
1997 236:22 237:7,10
237:12
1998 82:25 83:6,17,19
114:20,22 143:19
144:6 193:18 197:24
198:1 236:22,24
237:8,9,10 238:13,16
239:8
1999 17:9 114:20 136:5

136:24 137:5 144:9
157:15,17 188:23
189:9 190:5 239:10

**2**

**2** 39:12,20,22,23 40:1,9
42:1,6 97:12 101:6
102:11 104:18
167:14 188:13 191:6
200:6 218:12
**2,026** 148:6
**2,700** 149:11
**2,714.35** 148:19 151:16
152:9,23 153:6
**2,932,944** 80:13 81:17
**2-28-01** 153:25
**2-7-03** 24:21,25
**2:07** 1:18
**2:09** 44:22
**20** 120:20 165:14
185:16,24,25 207:3
210:10,11,14,23
**20-year** 207:11
**2000** 47:17 78:9,17
115:6,12,16,20 116:5
116:18 143:20 184:1
198:5 245:14,16
**2000/2001** 116:10
**2001** 71:18 75:11,20
76:4,6,11 78:8,16,18
79:11 80:9 81:5 82:3
96:11,14,17 104:2,3
128:19 132:4,11,14
143:20 148:21 151:5
152:20,22 153:15,23
154:20 184:2 198:5
212:25 213:3,7,9,17
215:5 216:11 222:8,8
223:4,13,22 224:7
227:1
**2001/2002** 59:3
**2002** 72:9 78:17 79:16
79:17,23 86:22 87:6
103:25 104:7,8
116:17 138:1 143:20
151:6 172:11 173:2
173:21 174:13 175:9
212:5 213:2,14,24
214:3,6,8,10
**2003** 1:10,17 17:15
19:10 34:15 35:17,22
71:21 93:14,15,22,25
94:4 104:7 116:17
131:16,25 134:8
135:10 136:9 137:10
139:8 143:21 152:6,8
152:14 159:8,12
161:1,12 165:18
172:12,24 173:22
174:14 208:19

249:13 250:9 251:2
**2004** 117:10
**2008** 134:14
**2026** 117:10
**2027** 105:4
**21** 41:21 186:10,20
188:13 194:9 198:24
210:23 235:2 237:25
**21st** 43:3
**21.5** 41:23
**21.6** 11:11 130:1
**2198** 1:19 251:6
**22** 199:8
**22nd** 161:12
**22045** 24:15
**23** 121:12,24 124:21
199:24 223:17
**23023-02** 35:18
**24** 154:20 200:18
**24th** 153:15,23
**25** 46:12 86:23 87:7
95:4 105:3 133:25
136:9 137:10 180:3
181:1 184:18 185:13
185:18 201:4,6,22
202:2,3,5,18
**25th** 139:8 217:14
**25-year** 105:2 106:18
109:19 113:9
**26** 185:19 202:17 204:6
**27** 204:13
**27th** 17:9
**28** 207:15,18,20
**28th** 152:20,22 153:8
154:15,18
**287-8898** 251:11
**29** 209:2
**29th** 165:16,18 217:14

**3**

**3** 44:14,16,19 45:1,12
45:21 46:2,3,11,19
48:23 76:2 77:23
79:11,14,22 81:15
84:21 85:8,15 131:22
131:23,24 133:10
134:6 167:16 170:8
171:17 191:13
218:14 243:16
**3,000** 160:18
**3,201** 148:6
**3.1** 104:24 105:4
**3:00** 163:14,14
**30** 17:14 178:10,14,18
185:20 210:20
220:25
**30th** 35:17 43:2
**30,478** 96:15 97:13
**300** 2:18 222:20,21,22
**31** 147:6 148:21 154:4

154:13 185:22
211:19
**31st** 162:14
**320,000** 223:4
**322** 222:12,18 223:14
**322,000** 75:19 215:8
227:15
**322,108** 76:6,8 80:14
81:16
**343,000** 134:8
**35** 29:8 234:12
**3505** 2:13
**37** 19:16,18
**38** 116:16 117:5
**38,840** 212:16
**380.65** 153:9 155:7
**39** 3:2

**4**

**4** 21:20 47:19,22 48:9
49:12 101:22 102:6
171:22 191:15,17,18
211:3
**4th** 93:22,25
**4:00** 163:15
**4:29** 1:18
**40** 29:7 220:25
**40,000** 212:8
**44** 3:3
**45** 100:9
**460** 2:13
**460,000** 222:9,24 223:7
223:16
**464,000** 222:13 223:9
223:10
**47** 3:4

**5**

**5** 1:10,17 52:14,16,18
52:21 53:17,22 54:7
56:4,4,14,20 57:5,19
59:8 62:9 132:2
133:10 175:18,19,19
185:16 191:19 201:9
201:13 250:9
**5-15-03** 3:1 161:1
**50** 138:1,13 141:6,7
220:23 228:4
**51** 23:23
**52** 3:5,6 82:3 83:6

**6**

**6** 52:16 53:10 54:10,12
54:15,20 55:1 57:14
57:17,21 61:2,5 62:9
79:11 81:16,23 136:2
136:24 146:14
175:17 176:6 201:10
201:10,11,12,15
**6,000** 148:12

**6,800** 197:5,6 245:22
**60** 3:7,8 19:23
**62** 184:19
**632** 115:2
**64** 3:9
**673,000** 84:7
**68** 115:13,15 116:5,8
**68.11** 115:6

**7**

**7** 60:3,5,12 64:5,18
65:12 167:12 177:25
201:11,17,17
**7,000,000** 107:24
**70s** 11:24
**706** 97:6
**71** 6:23 8:9
**73** 8:4,7,10,19
**75** 105:8,12,13,14
106:4,19 108:10
116:21 205:14,16,19
**75.78** 78:17
**76** 116:12
**77** 11:1,8 223:18,19,21
224:6,13,24
**78,000** 97:5
**78,705** 96:23
**78504** 251:10
**78520** 2:5,9,14
**78701** 2:18
**79** 11:9,17

**8**

**8** 60:14,16 61:18 64:5,8
64:18 65:12 201:16
201:17
**8,000** 197:3
**8,600** 197:2,8
**8:00** 163:13
**8:17** 1:17
**85** 13:3 15:4,6
**855** 2:9
**87** 13:13
**89** 205:12,17

**9**

**9** 2:9 64:19,20,25 65:12
93:24 130:25 161:14
161:16,16 179:6,20
179:21 180:17
**9th** 35:22 165:15
**9-24-99** 25:10
**9-4** 94:4
**90** 157:22 245:17
**91** 157:3
**91,000** 83:11
**91,387.66** 98:1
**91,673** 114:21
**91,991** 83:4
**92** 157:4

**948.22** 148:9
**95** 157:22 158:1
**956** 251:11
**96** 157:23
**97** 157:23 190:9
**98** 115:2 189:12,12,15
190:8,9,18,19 245:14
**99** 84:3,6 115:3,6,16,20
116:5 143:20 157:14
189:13,15,16 190:18
190:19 198:5 245:14

Deposition of Mr. Frank LaFemina, Volume I

# EXHIBIT "B"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ )
)
VS. )
)
BROWNSVILLE INDEPENDENT)
SCHOOL DISTRICT, NOE )
SAUCEDA, AND RANDY )    CIVIL ACTION NO.
DUNN, MARILYN DEL )       B - 02 - 128
BOSQUE-GILBERT AND )
HUGH EMERSON, JR., )
IN THEIR OFFICIAL )
CAPACITIES AS BOARD )
MEMBERS OF BROWNSVILLE )
INDEPENDENT SCHOOL )
DISTRICT )

*******************************************

ORAL AND VIDEOTAPED DEPOSITION OF

**FRANK D. LAFEMINA**

MAY 22, 2003

VOLUME 1

*******************************************

CONDENSED TRANSCRIPT AND KEYWORD INDEX



**AcuScribe**
**Court Reporters**

750 Norwood Tower          Telephone: (512) 499-0277
114 West 7th Street        Toll-Free: (800) 497-0277
Austin, Texas 78701             Fax: (512) 499-0298
info@acuscribe.com              www.acuscribe.com



# STIPULATIONS

**ORAL DEPOSITION(S) OF:** *Ron Levine*
*Frank Cafemua*

**The attorneys for all the parties present stipulate and agree to the following checked items:**

## Objections:

\_\_\_\_ Texas Rules of Civil Procedure.

✓ Federal Rules of Civil Procedure.

\_\_\_ Other: _____

## Delivery for signature and changes:

The witness, or the witness's attorney, will return the signed deposition to the court reporter within *30* ~~30~~ days of the date of submission. If the original of the deposition is not signed, or made available, an unsigned copy may be used as though signed.

✗ The original transcript will be submitted to the witness's attorney.

\_\_\_\_ The original transcript will be submitted to the witness at the following address:

_____

\_\_\_\_ Signature waived.

The attorney asking the first question will be responsible for the timely payment of all costs in connection with the original deposition transcript.

I hereby agree to the above and foregoing marked items and request that AcuScribe Court Reporters furnish me with the items checked below. Unless otherwise requested, I will receive copies of all exhibits. My firm and I will be responsible for the timely payment of any original or copies and/or exhibits as indicated below that I may request. I agree that if I have no prior credit arrangement with AcuScribe Court Reporters, the transcript(s) stated above may be delivered on a COD basis. If any indebtedness due and owing is not paid as agreed, the undersigned agrees to pay reasonable attorneys fees, plus all costs of collection and all other costs and expenses which may be incurred by AcuScribe Court Reporters relative to collection of the indebtedness due and owing, whether suit be instituted or not.

Executed this the *22nd* day of *May* , *2003*

_____ Attorney for: *BISD*

[✓ Copy & Mini [ ] Mini only* [ ] No copy [ ] CD w/E-Transcript & Exhibits* [✓ E-Transcript* *on disk*

**FORMAT:** [ ]ASCII* [ ] Summation* [ ] Amicus* [ ] Other* **ON** [ ] 3 ½" Floppy **OR** [ ] CD-Rom

_____ Attorney for: *TI*

[✓ Copy & Mini [ ] Mini only* [ ] No copy [ ] CD w/E-Transcript & Exhibits* [✓ E-Transcript* *on disk*

**FORMAT:** [ ]ASCII* [ ] Summation* [ ] Amicus* [ ] Other* **ON** [ ] 3 ½" Floppy **OR** [ ] CD-Rom

*Will be charged the regular copy rate, if ordered without a copy of the transcript.

_Melanie Moo_____     Attorney for: _Noe Sanida_____

[✓] Copy & Mini   [ ] Mini only*   [ ] No copy   [ ] CD w/E-Transcript & Exhibits*   [✓] E-Transcript* _on disk_____

**FORMAT:**   [ ]ASCII*   [ ] Summation*   [ ] Amicus*   [ ] Other*   **ON**   [ ] 3 ½" Floppy   **OR**   [ ] CD-Rom

_Buddy Steele_____     Attorney for: _AFLAC + Levine (witness)_

[✓] Copy & Mini   [ ] Mini only*   [ ] No copy   [ ] CD w/E-Transcript & Exhibits*   [ ] E-Transcript* _____

**FORMAT:**   [ ]ASCII*   [ ] Summation*   [ ] Amicus*   [ ] Other*   **ON**   [ ] 3 ½" Floppy   **OR**   [ ] CD-Rom

_____     Attorney for: _____

[ ] Copy & Mini   [ ] Mini only*   [ ] No copy   [ ] CD w/E-Transcript & Exhibits*   [ ] E-Transcript* _____

**FORMAT:**   [ ]ASCII*   [ ] Summation*   [ ] Amicus*   [ ] Other*   **ON**   [ ] 3 ½" Floppy   **OR**   [ ] CD-Rom

_____     Attorney for: _____

[ ] Copy & Mini   [ ] Mini only*   [ ] No copy   [ ] CD w/E-Transcript & Exhibits*   [ ] E-Transcript* _____

**FORMAT:**   [ ]ASCII*   [ ] Summation*   [ ] Amicus*   [ ] Other*   **ON**   [ ] 3 ½" Floppy   **OR**   [ ] CD-Rom

_____     Attorney for: _____

[ ] Copy & Mini   [ ] Mini only*   [ ] No copy   [ ] CD w/E-Transcript & Exhibits*   [ ] E-Transcript* _____

**FORMAT:**   [ ]ASCII*   [ ] Summation*   [ ] Amicus*   [ ] Other*   **ON**   [ ] 3 ½" Floppy   **OR**   [ ] CD-Rom

_____     Attorney for: _____

[ ] Copy & Mini   [ ] Mini only*   [ ] No copy   [ ] CD w/E-Transcript & Exhibits*   [ ] E-Transcript* _____

**FORMAT:**   [ ]ASCII*   [ ] Summation*   [ ] Amicus*   [ ] Other*   **ON**   [ ] 3 ½" Floppy   **OR**   [ ] CD-Rom

_____     Attorney for: _____

[ ] Copy & Mini   [ ] Mini only*   [ ] No copy   [ ] CD w/E-Transcript & Exhibits*   [ ] E-Transcript* _____

**FORMAT:**   [ ]ASCII*   [ ] Summation*   [ ] Amicus*   [ ] Other*   **ON**   [ ] 3 ½" Floppy   **OR**   [ ] CD-Rom

_____     Attorney for: _____

[ ] Copy & Mini   [ ] Mini only*   [ ] No copy   [ ] CD w/E-Transcript & Exhibits*   [ ] E-Transcript* _____

**FORMAT:**   [ ]ASCII*   [ ] Summation*   [ ] Amicus*   [ ] Other*   **ON**   [ ] 3 ½" Floppy   **OR**   [ ] CD-Rom

**\*Will be charged the regular copy rate, if ordered without a copy of the transcript.**

**Page 1**

```
              IN THE UNITED STATES DISTRICT COURT
( 1)             FOR THE SOUTHERN DISTRICT OF TEXAS
                      BROWNSVILLE DIVISION
( 2)
( 3)
     DINO X. CHAVEZ              *
( 4)                            *
     VS.                        *
( 5)                            *
     BROWNSVILLE INDEPENDENT    *
( 6) SCHOOL DISTRICT, NOE       *
     SAUCEDA, and RANDY         *  CIVIL ACTION NO.
( 7) DUNN, MARILYN DEL          *    B - 02 - 128
     BOSQUE-GILBERT and         *
( 8) HUGH EMERSON, JR .         *
     in their official          *
( 9) capacities as Board        *
     Members of Brownsville     *
(10) Independent School         *
     District                   *
(11)
(12) ********************************************
(13)          ORAL AND VIDEOTAPED DEPOSITION OF
(14)                  FRANK D. LaFEMINA
(15)                    MAY 22, 2003
(16)                      VOLUME 1
(17) ********************************************
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

**Page 2**

```
( 1)          ORAL AND VIDEOTAPED DEPOSITION OF
( 2) FRANK D. LaFEMINA, produced as a witness at the
( 3) instance of the Plaintiff and duly sworn, was taken in
( 4) the above-styled and numbered cause on the 22nd day of
( 5) May, 2003, from 2:01 p.m. to 3:56 p.m., before
( 6) GERRI C. BARKER, Certified Shorthand Reporter in and
( 7) for the State of Texas, reported by machine shorthand,
( 8) at the offices of Locke, Liddell & Sapp, L.L.P.,
( 9) 100 Congress Avenue, Suite 300, Austin, Texas 78701,
(10) pursuant to the Federal Rules of Civil Procedure and
(11) the provisions stated on the record or attached
(12) hereto
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

**Page 3**

```
( 1)                      APPEARANCES
( 2)
( 3)
     FOR THE PLAINTIFF:
( 4)
          MR. J. ARNOLD AGUILAR
( 5)      LAW OFFICE OF J. ARNOLD AGUILAR
          Artemis Square, Suite H-2
( 6)      1200 Central Boulevard
          Brownsville, Texas  78520
( 7)      956-504-1100/956-504-1408 (fax)
( 8)
     FOR THE DEFENDANT, BROWNSVILLE INDEPENDENT
( 9) SCHOOL DISTRICT:
(10)      MS. ELIZABETH G. NEALLY
          ROERIG, OLIVEIRA & FISHER, L.L.P.
(11)      855 West Price Road, Suite 9
          Brownsville, Texas  78520
(12)      956-542-5666/956-542-0016 (fax)
(13)
     FOR THE DEFENDANT, NOE SAUCEDA:
(14)
          MS. MELANIE MOORE
(15)      WILLETTE & GUERRA, L.L.P
          International Plaza, Suite 460
(16)      3505 Boca Chica Boulevard
          Brownsville, Texas  78521
(17)      956-541-1846/956-541-1893 (fax)
(18)
     FOR AFLAC AND THE WITNESS:
(19)
          MR. WILLIAM B. STEELE, III
(20)      LOCKE, LIDDELL & SAPP, L.L.P.
          100 Congress Avenue, Suite 300
(21)      Austin, Texas  78701
          512-305-4734/512-305-4800 (fax)
```

**Page 4**

```
( 1)
( 2)
( 3) REMOVE THIS PAGE AND INSERT STIPULATIONS SHEET HERE
( 4)
( 5)
( 6)
( 7)
( 8)
( 9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

**Page 5**

```
( 1)                      INDEX
( 2)                                          PAGE
( 3)
( 4) Appearances.....................          3
( 5) Stipulations....................          4
( 6)
( 7) FRANK D. LaFEMINA (VOLUME 1)
( 8)   Examination by Mr Aguilar  . ......     6
( 9)
(10) Changes and Corrections.. . .... ......  XXX
(11) Signature.......................         XXX
(12) Reporter's Certificate. . . ...... ....  XXX
(13)
(14)                   EXHIBITS
(15)
(16) NO. DESCRIPTION        PAGE / LINE REFERENCED
(17) 1...............................        56 / 11
(18)   1998 proposal for BISD Optional
        Section 125 - Cafeteria Plan
(19)
(20) 2 .............................         76 / 12
      E-mail from Mr. LaFemina
(21)
(22)
(23)
(24)
(25)
```

**Page 6**

(1) FRANK D. LaFEMINA,
(2) having been first duly sworn, testified as follows:
(3)
(4) EXAMINATION
(5) QUESTIONS BY MR. AGUILAR:
(6) Q. Would you tell us your full name?
(7) A. Frank D. LaFemina.
(8) Q. Mr. LaFemina, have you ever had your
(9) deposition taken before?
(10) A. No, sir.
(11) Q. Okay. I'm going to be asking you a number of
(12) questions today relative to a lawsuit that was filed.
(13) At any time if you don't understand the question I'm
(14) asking, if you need me to rephrase it, just ask it a
(15) different way, or you can just ask me to ask it again
(16) to make sure you do understand it, please ask me to do
(17) so so that we can be clear on that. Try not to
(18) interrupt me until I finish asking the question and
(19) I'll try not to interrupt you until you finish
(20) answering it. I'm going to ask you to listen to the
(21) question to the extent possible. If you can answer
(22) the question with yes or no, I ask that you do that.
(23) If you feel you need to explain it, I ask you to
(24) answer yes or no first and then say, can I explain it,
(25) or if I can be allowed to explain. Okay?

BSA                    ORAL AND VIDEOTAPED DEPOSITION OF FRANK LAFEMINA                    XMAX(2/2)

Page 7

(1)  A.  Yes, sir.
(2)  Q.  Also, you need to answer audibly because the
(3)  court reporter can only get down verbal responses.
(4)  She can't get down nods of the head. So even though
(5)  we do have a videotape of this, we're asking – we
(6)  need you to answer verbally so she can get a verbal
(7)  response to write down, okay?
(8)  A.  Yes, sir.
(9)  Q.  At any time you need to take a break for any
(10)  reason let us know and we can take a break also.
(11)  What's your current address?
(12)  A.  112 Bella Cima Drive.
(13)  Q.  I'm sorry? Ella?
(14)  A.  Bella, B-E-L-L-A, Cima, C-I-M-A, Drive.
(15)  Q.  C-E-M-A?
(16)  A.  C-I-M-A.
(17)  Q.  C-I-M-A Drive. And where is that?
(18)  A.  Austin.
(19)  Q.  78 –
(20)  A.  734.
(21)  Q.  What's your current work address?
(22)  A.  That would be 107 South Ranch Road 620, Suite
(23)  104, same city and zip.
(24)  Q.  Who do you work for?
(25)  A.  Myself.

Page 8

(1)  Q.  Is it just a sole proprietorship? Is it a
(2)  partnership?
(3)  A.  I'm self-employed. It's a sole
(4)  proprietorship.
(5)  Q.  Okay. Who pays the overhead, that sort of
(6)  stuff?
(7)  A.  I do.
(8)  Q.  Who pays the secretary, who pays the – how
(9)  many staff do you have?
(10)  A.  One.
(11)  Q.  Okay. And who's that?
(12)  A.  My administrator.
(13)  Q.  And what's his or her name?
(14)  A.  Cindy Acosta.
(15)  Q.  Okay. Who pays her salary?
(16)  A.  I do.
(17)  Q.  Okay. What kind of business are you in?
(18)  A.  The insurance business.
(19)  Q.  Who pays – I guess you pay all the overhead
(20)  for your office?
(21)  A.  I do.
(22)  Q.  Is Cindy an employee or is she an independent
(23)  contractor?
(24)  A.  She's an employee.
(25)  Q.  All right. What kind of insurance do you

Page 9

(1)  sell?
(2)  A.  I don't actually sell the insurance.
(3)  Q.  Okay. What do you do for the insurance
(4)  business?
(5)  A.  My title is state sales coordinator.
(6)  Q.  For whom?
(7)  A.  For AFLAC.
(8)  Q.  And what do the duties of a state sales
(9)  coordinator – I'm going to call that SSC, what do
(10)  those duties involve?
(11)  A.  To protect and promote and preserve AFLAC's
(12)  business – current business and gain future business.
(13)  Q.  Protect and promote AFLAC business?
(14)  A.  To protect, promote and preserve AFLAC's
(15)  current business and to gain future business.
(16)  Q.  Okay. What does that involve?
(17)  A.  The general supervision of the sales force.
(18)  Q.  Okay. You don't personally sell any policies
(19)  anymore, right?
(20)  A.  That's correct.
(21)  Q.  All you do is supervise the sales force under
(22)  you?
(23)  A.  That's correct.
(24)  Q.  And what region are you in? What is your
(25)  region that you supervise called?

Page 10

(1)  A.  It's called Texas Central.
(2)  Q.  What's your date of birth?
(3)  A.  1-20-54.
(4)  Q.  I've got to ask you about your background,
(5)  where you grew up mainly, just where you went to
(6)  college, the degrees you got. I can go one question
(7)  at a time or I can just let you explain that for me,
(8)  where you went to college, the degrees you got, what
(9)  they were in, the schools you went to. Can you
(10)  explain a little bit about that for us?
(11)  A.  You can ask me the questions one at a time.
(12)  That would be easier for me, actually.
(13)  Q.  Okay. Where did you go to college?
(14)  A.  I don't have a college degree.
(15)  Q.  Did you ever attend any schooling after high
(16)  school?
(17)  A.  I did pertinent to my business.
(18)  Q.  Okay. And that was through AFLAC?
(19)  A.  No.
(20)  Q.  Through other insurance groups?
(21)  A.  No.
(22)  Q.  Who was it through?
(23)  A.  Through myself.
(24)  Q.  How?
(25)  A.  Attending different seminars and things put

Page 11

(1)  on relative to our industry.
(2)  Q.  Put on by whom?
(3)  A.  Brian Tracey, Jim Rhone, Tom Hopkins, people
(4)  of that nature.
(5)  Q.  Are those AFLAC representatives?
(6)  A.  They are not.
(7)  Q.  Who are they?
(8)  A.  They're professional speakers who are experts
(9)  in our industry in terms of sales and sales managers.
(10)  Q.  You have attended public seminars that they
(11)  have put on at different times?
(12)  A.  That's correct.
(13)  Q.  Other than seminars like that, have you
(14)  attended any other post high school training?
(15)  A.  I have not, other than that which AFLAC may
(16)  have offered.
(17)  Q.  Okay. Where – did you get a high school
(18)  diploma?
(19)  A.  I did.
(20)  Q.  And where was that from?
(21)  A.  New York City.
(22)  Q.  And when was that?
(23)  A.  1971.
(24)  Q.  Okay. Since 1971, you have not attended any
(25)  college, trade school, any type of advanced degree?

Page 12

(1)  A.  I have not.
(2)  Q.  Okay. After getting out of high school, when
(3)  did you first get into the insurance business?
(4)  A.  1976.
(5)  Q.  Between '71 and '76, what type of jobs did
(6)  you have?
(7)  A.  I worked as a salesclerk in a men's clothing
(8)  store.
(9)  Q.  Anything else?
(10)  A.  No.
(11)  Q.  Okay. In '76, how did you enter the
(12)  insurance business? In other words, who did you go
(13)  work for?
(14)  A.  I was recruited by a gentleman – again,
(15)  working for myself, but recruited by another person in
(16)  the industry.
(17)  Q.  And who was that?
(18)  A.  His name was Chuck Switzer.
(19)  Q.  And what did he sell?
(20)  A.  He didn't sell anything. He was the
(21)  recruiting director for the company.
(22)  Q.  What did you sell?
(23)  A.  Life insurance.
(24)  Q.  For any particular company?
(25)  A.  Franklin Life Insurance Company.

Page 13

(1)  Q.  Anything else?
(2)  A.  Relative to that?
(3)  Q.  Yeah. When you entered – in other words,
(4)  when you entered the business selling Franklin Life
(5)  Insurance, did you sell any other policies as well,
(6)  any other type of –
(7)  A.  Not for that company, no.
(8)  Q.  How long did you do that?
(9)  A.  A couple of years.
(10) Q.  And then where did you go?
(11) A.  I worked for United Insurance Company of
(12) America.
(13) Q.  Directly for them as an employee or –
(14) A.  Same capacity.
(15) Q.  I'm sorry?
(16) A.  Same capacity, self-employed.
(17) Q.  I'm sorry. What was the company again?
(18) A.  United – United Insurance Company of
(19) America.
(20) Q.  You were an agent?
(21) A.  Correct.
(22) Q.  For how long?
(23) A.  For a few years. I couldn't say for sure.
(24) It's been so long ago.
(25) Q.  Roughly.

Page 14

(1)  A.  A couple, three years.
(2)  Q.  Then where did you go?
(3)  A.  I was a managing general agent or a general
(4)  agent, you can call that whatever you want. I did a
(5)  number of things.
(6)  Q.  With any particular company?
(7)  A.  Numerous companies.
(8)  Q.  Okay. Name the first one that you can think
(9)  of.
(10) A.  United American.
(11) Q.  And what did you do for them?
(12) A.  Sold policies.
(13) Q.  Let me put it this way. From – I guess
(14) we're up to around '80, '82, something like that.
(15) From then until you started with AFLAC, were you just
(16) working selling policies for different companies?
(17) A.  Pretty much.
(18) Q.  Okay. That would have been for – when did
(19) you start with AFLAC?
(20) A.  I believe it was November of 1988.
(21) Q.  So from '76 to '88, you sold policies for
(22) different companies?
(23) A.  Correct.
(24) Q.  United American, United Insurance Company of
(25) America, Franklin Life. Any others that pop to mind?

Page 15

(1)  A.  It would be difficult to remember the
(2)  companies.
(3)  Q.  Any that come to mind?
(4)  A.  No, none other than the ones I've already
(5)  given you.
(6)  Q.  Okay. When you started with AFLAC in '88,
(7)  what position did you start at?
(8)  A.  District sales coordinator.
(9)  Q.  Now, that's higher than the associate
(10) position, right?
(11) A.  That's correct.
(12) Q.  Why did you start off – that's a DSC, right?
(13) A.  Correct.
(14) Q.  Why did you start off as a DSC instead of an
(15) associate?
(16) A.  You would have to ask the state sales
(17) coordinator that put in the position for his reason.
(18) Q.  And that was who?
(19) A.  Frank Davies.
(20) Q.  Did you ask to – when you applied for the
(21) position, did you talk about that?
(22) A.  About the position itself? Certainly.
(23) Q.  Okay. Did you talk about whether you would
(24) be an associate or a DSC?
(25) A.  No. I was interviewed for that position.

Page 16

(1)  Q.  That was the position that was open?
(2)  A.  I don't know. You would have to ask Frank
(3)  Davies.
(4)  Q.  That was the position that you found out
(5)  about that you wanted to apply for?
(6)  A.  No. I was approached about that position.
(7)  Q.  How were you approached?
(8)  A.  By Frank Davies.
(9)  Q.  And what did he do?
(10) A.  Sat down and had an interview.
(11) Q.  Where? Lunch somewhere?
(12) A.  At his office.
(13) Q.  How did you know Frank Davies?
(14) A.  Someone recommended that I go and speak with
(15) him.
(16) Q.  To Frank?
(17) A.  Yes.
(18) Q.  So Frank calls you up and says, hey, can you
(19) come over and talk to me? I'd like to talk about a
(20) position with AFLAC – I'm sorry – working selling
(21) AFLAC?
(22) A.  Uh-huh.
(23) Q.  Something like that?
(24) A.  (Moves head up and down.)
(25) Q.  You-all talked about it, and the only

Page 17

(1)  position you were talking about at that point was DSC?
(2)  A.  That's correct.
(3)  Q.  Do you remember if he talked to you about the
(4)  associate position?
(5)  A.  He did not.
(6)  Q.  Okay. So you started in November of '88?
(7)  A.  That's correct.
(8)  Q.  And when did you start – what were your
(9)  duties when you did start?
(10) A.  Sell policies, nominate other individuals to
(11) come into the AFLAC organization.
(12) Q.  And recruit other agents?
(13) A.  That was not one of my responsibilities.
(14) Q.  Okay. What do you mean by nominate?
(15) A.  Provide certain names of people I thought
(16) would be qualified to be an associate with the
(17) company.
(18) Q.  But you didn't actually approach those people
(19) to try to convince them to come over, you just came up
(20) with names and somebody else would actually do the
(21) recruiting?
(22) A.  Yes.
(23) Q.  Okay. How long were you a DSC?
(24) A.  From the time I started with the company
(25) until, I believe, 1993 or 1994.

Page 18

(1)  Q.  From '88 through '94 or '93?
(2)  A.  Put '94 down there, but you would really have
(3)  to check the company record for accuracy.
(4)  Q.  What was – how would you get compensated as
(5)  a DSC?
(6)  A.  For the sale of insurance policies and for
(7)  the sale of insurance policies that were produced by
(8)  individuals that worked with me.
(9)  Q.  What do you mean by worked with you?
(10) A.  People that were assigned to my district
(11) team.
(12) Q.  People underneath you in your team?
(13) A.  People that were assigned to my district
(14) team.
(15) Q.  Were those people at the same level as you?
(16) Were those other DSC's?
(17) A.  No, they were associates.
(18) Q.  They were all associates. And an associate
(19) position is below a DSC position; is that correct?
(20) A.  That's correct.
(21) Q.  Okay. What percentage would you get for
(22) sales?
(23) A.  I would have to go back and check the
(24) contract at the time. I couldn't say.
(25) Q.  Okay. You don't remember – do you remember

BSA    ORAL AND VIDEOTAPED DEPOSITION OF FRANK LAFEMINA    XMAX(4/4)

Page 19

(1) roughly what the percentage was?
(2) A.    For myself?
(3) Q.    Yes.
(4) A.    On my own personal sales, on certain
(5) products, I received a 40 percent first year
(6) commission.
(7) Q.    Okay. And what about on your agents?
(8) A.    I couldn't tell without going back and
(9) reviewing the contract that was in place at that time.
(10) Q.    Do you remember the range that it was?
(11) A.    Seven or eight, nine, 10 percent. I can't
(12) say for sure.
(13) Q.    That's what I was going to say. The ranges
(14) haven't changed a lot, but they've changed some small
(15) portion of numbers since then; is that right?
(16) A.    Actually, to get the accurate information, I
(17) would have to have the contract in front of me.
(18) Q.    I understand.
(19) A.    I could not say for sure.
(20) Q.    Okay. Your understanding, though, is the
(21) range has been between seven and 10 percent, at least
(22) since '88; is that right?
(23) A.    Yes, sir.
(24) Q.    And as an RSC – I'm sorry. In 1994, what
(25) happened? Around 1994.

Page 20

(1) A.    In relation to?
(2) Q.    We've been talking about your employment and
(3) your position. You said you were a DSC through –
(4) A.    I was promoted to regional sales coordinator.
(5) Q.    Thank you. As an RSC, you were doing that
(6) from around '94 through when?
(7) A.    Through 1999, the end of '99.
(8) Q.    And what was the percent commission you
(9) received on your RSC sales, your direct sales and any
(10) associate sales below you?
(11) A.    I didn't make direct sales as a regional
(12) sales coordinator.
(13) Q.    So as RSC, you were no longer making direct
(14) sales yourself, you were only making your money off
(15) the sales of those either DSC's or associates below
(16) you?
(17) A.    That's correct.
(18) Q.    And what percentage would you get off of
(19) them?
(20) A.    That was lower than the previous percentage,
(21) but, again, I couldn't say for sure.
(22) Q.    Can you give me a range?
(23) A.    Somewhere between three and seven percent, to
(24) the best of my recollection.
(25) Q.    And then in 1999, what happened?

Page 21

(1) A.    January 1, 2000, I was promoted to state
(2) sales coordinator.
(3) Q.    And is that the position you have today?
(4) A.    That's correct.
(5) Q.    Are you doing any sales – personal sales as
(6) the SSC?
(7) A.    No, sir.
(8) Q.    And I understand, then, that your payments,
(9) commissions, would be only through the sales made by
(10) agents, associates or DSC's and possibly RSC's below
(11) you; is that correct?
(12) A.    That's correct.
(13) Q.    And what is that percentage?
(14) A.    Between – somewhere between one-and-a-half
(15) and four percent.
(16) Q.    Okay. What was the basis for each of your
(17) promotions? In other words, let's start with the
(18) first one, from DSC to RSC.
(19) A.    I would have to say that my state sales
(20) coordinator felt it appropriate to promote me at the
(21) time.
(22) Q.    Do you know how he made that decision?
(23) A.    Based on my performance, I would imagine.
(24) Q.    Does that mean sales?
(25) A.    It would mean – to me, it would mean the

Page 22

(1) growth of the operation.
(2) Q.    So based on growth, meaning your sales
(3) and the sales made by the associates below you?
(4) A.    No, that's not an accurate statement.
(5) Q.    Okay. Can you explain what part of it is not
(6) accurate?
(7) A.    There would be many responsibilities. Sales
(8) would be one of those. The development of people and
(9) development of the organization.
(10) Q.    Okay. Growth rate, sales and development of
(11) the organization?
(12) A.    Correct.
(13) Q.    Anything else?
(14) A.    That pretty much covers it.
(15) Q.    Okay. And what about moving from RSC to SSC,
(16) same?
(17) A.    Uh-huh. Yes.
(18) Q.    Okay. Can you explain what you meant by
(19) sales and development of the organization?
(20) A.    Well, sales would be the obvious.
(21) Development of the organization would be developing
(22) people within the organization that could aspire to
(23) run their own organizations at the district sales
(24) coordinator or regional sales coordinator level.
(25) Q.    Okay. What do you mean by the growth rate?

Page 23

(1) A.    I don't believe I said growth rate. I just
(2) said the word growth.
(3) Q.    What do you mean by growth?
(4) A.    Meaning the organization was one size at one
(5) time and a larger size at another time and thus more
(6) profitable and –
(7) Q.    Growth –
(8) A.    Go ahead.
(9) Q.    Growth of your group?
(10) A.    Correct.
(11) Q.    Okay. What would your sales average as a
(12) DSC?
(13) A.    I would have to go back and check the
(14) records.
(15) Q.    Do you recall generally? I don't need exact
(16) numbers.
(17) A.    I would have to check the records.
(18) Q.    Do you have those where you can access them?
(19) A.    I would have to ask the company to provide
(20) them to me.
(21) Q.    Can you do that?
(22) A.    Yes.
(23) Q.    Okay. And what we're looking for, so we're
(24) clear, is basically your sales as a DSC.
(25)    MR. STEELE:    Arnold, what's the

Page 24

(1) relevance? I'm just curious.
(2)    MR. AGUILAR:    I'll get you a letter.
(3)    MR. STEELE:    Well, I'm not sure I'm
(4) going to agree that he's going to produce them. I
(5) just don't see the relevance.
(6)    MR. AGUILAR:    I'm going to request them
(7) right now and if –
(8) Q.    (By Mr. Aguilar) I'm sorry. I forgot to ask
(9) you this. Is Mr. Steele your attorney here?
(10) A.    Yes, he is.
(11) Q.    Okay. When did you first contact him to be
(12) your attorney in this matter?
(13) A.    I don't believe I contacted him.
(14) Q.    He contacted you?
(15) A.    I believe AFLAC informed me that he would
(16) represent me in this deposition.
(17) Q.    Okay. You did not request representation;
(18) you were simply told by AFLAC that he would be
(19) representing you in this litigation?
(20) A.    That's correct.
(21) Q.    Have you had any meetings with him?
(22) A.    Yes.
(23) Q.    Can you tell me what you talked about during
(24) those meetings?
(25)    MR. STEELE:    It's privileged. I

Page 25

(1) instruct you not to respond.
(2)     Q.    (By Mr. Aguilar) Are you going to answer the
(3) question?
(4)     A.    No.
(5)     Q.    Okay. And that's based on the advice of
(6) Mr. Steele?
(7)     A.    That's correct.
(8)     MR. STEELE:    On the basis that they're
(9) privileged discussions enabling me to render advice to
(10) Mr. LaFemina as my client.
(11)     Q.    (By Mr. Aguilar) Okay. Now, I was asking
(12) for the sales average as a DSC, and you said you've
(13) got those records to where they're accessible, and I'm
(14) asking to you produce them. If your attorney has an
(15) objection to providing those later, we can discuss
(16) that later.
(17)     MR. STEELE:    I'll object as
(18) mischaracterizing the testimony. You're assuming
(19) they're accessible. I have no idea where they are.
(20) Frank thinks AFLAC may have them. And, frankly, I'm
(21) not certain that they're relevant and that we're even
(22) obligated to produce them, so I'm going to suggest
(23) that Frank reserve any obligation or agreement to
(24) produce those records based upon advice of counsel.
(25) If on further consultation we decide to produce them,

Page 26

(1) we will get them to you.
(2)     MR. AGUILAR:    Okay.
(3)     Q.    (By Mr. Aguilar) What about as an RSC, what
(4) was your average sales?
(5)     A.    I think it would be safe to assume that we
(6) should probably answer that question the exact same
(7) way.
(8)     Q.    I need to know what the answer is.
(9)     A.    We'll reserve the right to provide you that
(10) information at a later date.
(11)     MR. STEELE:    Let me try this first. I'm
(12) going to try to help him. If you can remember today
(13) as we sit here, what your sales were as an RSC, go
(14) ahead and answer, Frank. But in terms of obligating
(15) yourself to go dig up records and get the hard copy of
(16) them, I don't want to put you in that position. I
(17) think we're going to reserve that after we determine
(18) the difficulty in doing so. But if you can remember
(19) as you sit here today, please go ahead and answer
(20) Arnold's questions.
(21)     THE WITNESS:    In 1994, my regional team
(22) produced $6.3 million worth of business.
(23)     Q.    (By Mr. Aguilar) And as a result of that,
(24) how much commissions did you make?
(25)     A.    I would have to check my earnings statement

Page 27

(1) for the year. I have no idea.
(2)     Q.    Well, I think you told us a whole ago that
(3) you were getting, as RSC, three to seven percent.
(4)     A.    But you can't figure it that way.
(5)     Q.    I understand. So from that percentage and
(6) based on – you got 6.3 million that you specifically
(7) remember. And based on that number, just generally,
(8) what would your sales average be? What would your –
(9) I'm sorry, what would your earnings be from that?
(10)     A.    Again, I can't give you that information
(11) because there's multiple calculations involved.
(12)     Q.    Okay.
(13)     MR. STEELE:    Pardon me?
(14)     THE WITNESS:    There are multiple
(15) calculations involved from prior years service, that
(16) year's service, and the way the companies compensation
(17) is awarded to you.
(18)     Q.    (By Mr. Aguilar) In other words, you also
(19) get renewal commissions, which is factored in, right?
(20)     A.    That's correct.
(21)     Q.    Okay. And other payments that can affect how
(22) much you actually earn one particular year, right?
(23)     A.    I'm not sure how to answer that question
(24) because AFLAC doesn't pay me anything other than
(25) commissions.

Page 28

(1)     Q.    Okay. Well, there's overrides also. Do you
(2) get overrides?
(3)     A.    Those are – overrides are commissions.
(4)     Q.    That's what you're talking about,
(5) commissions, okay. Can you tell us roughly how much
(6) you made in 1994?
(7)     A.    I cannot.
(8)     Q.    Okay. How would we find that information?
(9)     MR. STEELE:    Let me just object as to
(10) the relevance. You're getting into privacy matters.
(11) You know, Arnold, I don't understand –
(12)     MR. AGUILAR:    That's okay. You don't
(13) have to understand. I'm entitled to ask questions as
(14) to what I think is relevant and likely to lead or may
(15) lead to discovery of admissible evidence. And it
(16) doesn't have to be directly admissible now. That's
(17) why I'm trying to ask –
(18)     MR. STEELE:    How can that lead to the
(19) discovery of admissible evidence, what Frank LaFemina
(20) made in 1994?
(21)     MR. AGUILAR:    I'll get to that.
(22)     MR. STEELE:    I will agree to it now
(23) because I'm going to say don't answer it.
(24)     Q.    (By Mr. Aguilar) And are you going to refuse
(25) to answer any – if I ask you – let me just ask you.

Page 29

(1) I need to know how much you made in 1994, and if
(2) documents exist for the breakdown, it will make it
(3) much easier. You were last an RSC in 1999, right?
(4)     A.    That's correct.
(5)     Q.    That would have been December 31 of '99,
(6) right?
(7)     A.    That's correct.
(8)     Q.    So for 1999, '98 and '97, can you tell us how
(9) much money you made as an RSC – how much money you
(10) made during the year?
(11)     MR. STEELE:    I'm going to object because
(12) it invades his privacy and that invasion far outweighs
(13) whatever minuscule, infinitesimal relevancy there
(14) possibly could be. I would like to emphasize that the
(15) court should take this up.
(16)     MR. AGUILAR:    Okay.
(17)     MR. STEELE:    So based upon that, Frank,
(18) it's up to you if you want to answer that. I'm
(19) advising you as your attorney that you don't have to.
(20)     THE WITNESS:    I can't answer the
(21) question without the information from my – either my
(22) CPA or my 1099s anyway.
(23)     Q.    (By Mr. Aguilar) Then I'm going to request
(24) copies of your '97, '98 and '99 insurance returns so I
(25) get that information. Will you agree to provide that

Page 30

(1) information for me?
(2)     A.    Only based on the advice of my attorney.
(3)     MR. STEELE:    I mean, Arnold, you're
(4) going to have to –
(5)     MR. AGUILAR:    I'll get into that. I
(6) just want to see if he will disagree otherwise.
(7)     MR. STEELE:    Until you can convince me
(8) there's a reason for him to produce it, if you want to
(9) get to that now, we can cross that river.
(10)     MR. AGUILAR:    Now, you're just
(11) instructing him not to answer based on relevance,
(12) right?
(13)     MR. STEELE:    No, not just based upon
(14) relevance. Let me restate it one more time. You're
(15) invading this man's privacy –
(16)     MR. AGUILAR:    Privacy relevant –
(17)     MR. STEELE:    – and certainly as you
(18) know from the Federal Rules as well as the State Rules
(19) in just about any lawsuit that you're involved in,
(20) that's one of the things that a court can consider in
(21) allowing discovery to go forward. And in this case,
(22) his privacy rights far outweigh whatever possible
(23) potential discoverable bases there are for what he
(24) made in those years. Okay?
(25)     MR. AGUILAR:    And that's the extent of

Page 31

(1) the basis for your instruction to him, right?
(2)    MR. STEELE:    As I can think of it right
(3) now, you bet.
(4)    Q.    (By Mr. Aguilar) And are you going to refuse
(5) to provide those documents for me at this time based
(6) on his advice?
(7)    A.    That's correct.
(8)    Q.    Okay. Now, what I need to be able to
(9) establish is how much you made as an RSC to be able to
(10) determine whether that was a lot, a little or middle.
(11)    MR. AGUILAR:    I need to know what he
(12) made for comparison purposes.
(13)    MR. STEELE:    And, again –
(14)    MR. AGUILAR:    And I could ask him –
(15)    Q.    (By Mr. Aguilar) Or I could also ask you
(16) whether you're familiar with what all agents made, but
(17) I think that's going to be even harder for you to
(18) figure out; is that correct?
(19)    A.    Precisely.
(20)    Q.    Okay. What I'm trying to figure out is what
(21) you made to be able to show for comparison purposes.
(22) Now, let me see if I've got this much. Your promotion
(23) from DSC to RSC was based, to some extent, on your
(24) sales, right?
(25)    A.    Uh-huh.

Page 32

(1)    Q.    Is that yes?
(2)    A.    Yes.
(3)    Q.    You were making good sales during those time
(4) periods – that time period?
(5)    A.    That meant my team was making good sales.
(6)    Q.    Okay. You and your team were making good
(7) sales?
(8)    A.    No, my team. I was not making sales as a
(9) regional sales coordinator.
(10)    Q.    Okay. What I asked was your promotion from
(11) DSC to RSC. As a DSC, you were making sales, right?
(12)    A.    Yes.
(13)    Q.    Okay. One more time. As – your promotion
(14) from DSC to RSC was based, to some extent, on your
(15) sales and your team's sales?
(16)    A.    Yes.
(17)    Q.    Okay. And those were doing pretty good and
(18) that was part of the basis for your promotion, I think
(19) you explained earlier?
(20)    A.    I would assume –
(21)    Q.    Okay.
(22)    A.    – that that's the case.
(23)    Q.    And then the same thing holds true for your
(24) promotion from RSC to SSC, correct?
(25)    A.    Yes.

Page 33

(1)    Q.    Okay.
(2)    A.    Except that I wasn't making any sales at that
(3) point.
(4)    Q.    Right. As an –
(5)    A.    RSC.
(6)    Q.    Can you tell us whether your sales as a DSC
(7) were high, low or average?
(8)    A.    In relation –
(9)    Q.    Let me combine it. As a DSC, including your
(10) sales and the sales of your team.
(11)    MS. NEALLY:    Objection; form.
(12)    Q.    (By Mr. Aguilar) For AFLAC. For AFLAC.
(13)    A.    You would have to ask AFLAC.
(14)    Q.    Okay. You don't know one way or the other?
(15)    A.    I have an assumption that they were fairly
(16) good.
(17)    Q.    I assume they were good and that was part of
(18) the reason you got promoted. Is that your
(19) understanding?
(20)    A.    I assume that that's the case.
(21)    Q.    That was your understanding? In other words,
(22) I'm not asking just what you assume. You had reason
(23) to assume that, I guess, is what I'm asking.
(24)    A.    If you're asking me if I did a pretty good
(25) job, the answer to that would be yes.

Page 34

(1)    Q.    Okay. And that's reflected in your sales?
(2)    A.    Some of which would be reflected in my sales.
(3)    Q.    Same thing holds true for your promotion from
(4) DSC – I'm sorry, from RSC to SSC. Did you have high
(5) sales for AFLAC? I'm not saying highest.
(6)    A.    With the exception of the fact that I had no
(7) personal sales, the team had good sales, yes.
(8)    Q.    And that also factored into your promotion?
(9)    A.    I would assume that that's the case.
(10)    Q.    And in determining how much you made and how
(11) much an RSC made, your sales would be indicative of
(12) how much an agent can sell, correct?
(13)    A.    I don't know that my –
(14)    Q.    Let me rephrase. That was a bad question.
(15) I'm sorry. One more time. The sales you made as DSC
(16) and the income you brought in as DSC before getting
(17) promoted to RSC, your sales would be at least one
(18) example of how much can be made by a DSC, correct?
(19)    MS. NEALLY:    Objection to form.
(20)    Q.    (By Mr. Aguilar) You can answer.
(21)    Occasionally some of the attorneys here will object.
(22) Unless the person who you're calling your attorney,
(23) Mr. Steele, is instructing you not to answer the
(24) question, you do have to respond to the question.
(25)    A.    I'll be glad to respond to the question.

Page 35

(1)    Q.    Thank you.
(2)    A.    I have no idea whether my sales or my team's
(3) sales would be indicative of what an agent could make
(4) at AFLAC or any other management person for that
(5) matter.
(6)    Q.    Okay. And that's one of the reasons I need
(7) to know what your sales were, because I need to be
(8) able to know whether – I need to know for comparison
(9) purposes how much an agent, either a DSC or an RSC,
(10) can make.
(11)    MS. NEALLY:    Objection; form.
(12)    MR. STEELE:    He just told you – he – I
(13) mean, he just told you he has no idea whether his
(14) sales are indicative, which I think should end the
(15) inquiry right there.
(16)    MR. AGUILAR:    I'm sure you think so, but
(17) that's not what I'm asking.
(18)    MS. NEALLY:    Arnold, you're –
(19)    MR. STEELE:    I think that's exactly what
(20) the – again, it was in response to your question.
(21) Yes, you're making it as tedious as it could possibly
(22) be and you're getting into areas that you can cover
(23) and you shouldn't redepow.
(24)    MR. AGUILAR:    Okay.
(25)    MR. STEELE:    That's my objection. Asked

Page 36

(1) and answered.
(2)    THE WITNESS:    Excuse me.
(3)    Q.    (By Mr. Aguilar) That's okay. Knowing the
(4) additional reasons now why I'm looking for this
(5) information, are you going to continue to refuse to
(6) provide that information for me?
(7)    MR. STEELE:    Objection.
(8)    MS. NEALLY:    Objection.
(9)    MR. STEELE:    Objection. Arnold, how you
(10) can mischaracterize what you're asking is just beyond
(11) me.
(12)    MR. AGUILAR:    Just say your objection.
(13)    MR. STEELE:    You can ask him – I want
(14) to get it on the record because if this is going to go
(15) up before the judge, I want to make sure it's very
(16) clear. You asked him how his sales would compare to
(17) what another agent could make, and he said, very
(18) clearly, the sales of him and his team would not be
(19) indicative of anybody else. Now, why that doesn't end
(20) it is completely beyond me. If you want to explain to
(21) the court why you're entitled to continue down this
(22) rabbit trail, have at it.
(23)    MR. AGUILAR:    Is that your objection?
(24)    MR. STEELE:    That will do for now.
(25)    MR. AGUILAR:    Okay.

Page 37

(1) Q. (By Mr. Aguilar) Knowing what I told you a
(2) while ago, are you still refusing to provide me with
(3) that information? In other words, I need your tax
(4) returns. I had asked you previously from '97 through
(5) '99. And now I'm also going to ask you for up to the
(6) present. Are you going to continue to refuse to
(7) provide me with that information based on the advice
(8) of Mr. Steele?
(9) A. I will.
(10) Q. Thank you.
(11) MR. AGUILAR: And FYI, if you-all want
(12) to talk about this some more afterwards – if – I
(13) can't get that information, I am going to have to move
(14) to compel it. But if we have to move to compel it,
(15) I'm going to move to compel it.
(16) MS. NEALLY: Objection.
(17) MR. AGUILAR: If I can finish. I'm
(18) going to need to move to compel and have it produced
(19) in Brownsville and possibly continue the deposition in
(20) Brownsville if we have to.
(21) MR. STEELE: Arnold, you can do whatever
(22) you want to do. If you move to compel anything, I'm
(23) going to ask the judge to sanction you for this
(24) ridiculous line of questioning in pursuing it. Okay?
(25) MR. AGUILAR: That's fine. I just want

Page 38

(1) to make sure it's on the record that you knew that if
(2) I have to move to compel it, that's what I'm going to
(3) be asking for.
(4) MR. STEELE: That's fine.
(5) MR. AGUILAR: Okay.
(6) MR. STEELE: And if you move to compel,
(7) I'm going to ask for sanctions. That's – after you
(8) fly up here so you can pay me those sanctions. How is
(9) that? This is silly. Let's move on. Let's take a
(10) break.
(11) MR. AGUILAR: Sure.
(12) (Brief Recess)
(13) Q. (By Mr. Aguilar) What was your average
(14) growth rate as a DSC?
(15) A. Don't know.
(16) Q. Can you give me a rough estimate?
(17) A. Not without having all the records.
(18) Q. Okay. And you would need – what records
(19) would you need to look at to figure that out?
(20) A. Number of people I started with, the number
(21) of people I ended up with before I was promoted and
(22) the total volume that occurred during that period of
(23) time.
(24) Q. How would you get that information?
(25) A. Not sure.

Page 39

(1) Q. Okay. What was your sales growth rate as a
(2) DSC?
(3) A. Don't know the answer to that.
(4) Q. How would you find that out?
(5) A. Same way.
(6) Q. The sales growth rate would really just be
(7) based on whatever your sales were from one year to
(8) another, right?
(9) A. Correct.
(10) Q. So basically all we would have to do is look
(11) at your sales from '97 to '98 to '99, whatever,
(12) right?
(13) A. Whatever period you chose to look at.
(14) Q. And AFLAC does have those records available,
(15) right?
(16) A. I can't vouch for that.
(17) Q. Could you agree to look for those records?
(18) A. If I was instructed to do so by counsel.
(19) Q. Okay. I'm requesting that you do so. Will
(20) you do that?
(21) MR. STEELE: We'll reserve.
(22) Q. (By Mr. Aguilar) Okay. Does that mean
(23) you're not agreeing to do so at this time?
(24) A. I'm following the advice of my counsel.
(25) Q. And does that mean you're not agreeing to do

Page 40

(1) so at this time?
(2) MR. STEELE: That's what it means.
(3) We'll reserve the decision on whether to produce those
(4) records that Frank has in his possession. We'll
(5) decide what to do.
(6) MR. AGUILAR: I'm going to – I am
(7) officially requesting that information, so whenever
(8) you make your decision, let me know.
(9) MR. STEELE: I'll let you know.
(10) Q. And do you have any idea
(11) when that decision is going to be made?
(12) MR. STEELE: Nope.
(13) MR. AGUILAR: Okay.
(14) Q. (By Mr. Aguilar) I'll probably have to move
(15) to compel, as discussed earlier. What about your
(16) growth rate as an RSC?
(17) A. I would have to requisition the records. The
(18) answer is the same.
(19) Q. That's what I was going to ask. Same thing.
(20) And the same thing for your sales growth rate as an
(21) RSC?
(22) A. Yes, sir.
(23) Q. Actually, you didn't have any sales growth as
(24) an RSC, did you?
(25) A. My team did.

Page 41

(1) Q. Okay. But you personally didn't have any?
(2) A. That's correct.
(3) Q. But your team did have sales – a sales
(4) growth record, right?
(5) A. We had sales growth.
(6) Q. Okay. And the same thing as an SSC, your
(7) team had sales growth?
(8) A. Yes, sir.
(9) Q. And that information, you're not agreeing to
(10) provide that to me at this time, right?
(11) A. I think we've already answered the question.
(12) Q. You answered it as to a DSC. I'm asking it
(13) as to RSC's and – I'm sorry, as to your role as an
(14) RSC and an SSC. And I presume you're refusing to
(15) provide that for me at this time as well?
(16) A. That's correct.
(17) Q. Thank you. Now what's the minimum growth rate
(18) that you expect from associates in new sales?
(19) A. None.
(20) Q. You don't expect them to sell anything?
(21) MR. STEELE: You asked for growth rate?
(22) MR. AGUILAR: Yes.
(23) Q. (By Mr. Aguilar) Okay. You don't expect any
(24) growth rate at all from the employees?
(25) A. First of all, I don't have any employees.

Page 42

(1) Secondly, I can't expect the growth rate from somebody
(2) that just started with the company –
(3) Q. Okay.
(4) A. – if they didn't have a previous growth
(5) rate.
(6) Q. Okay. Once an AFLAC associate has been with
(7) the company for at least a year, the following year,
(8) whatever his increased sales are, that would be what
(9) is called a growth rate, right?
(10) A. Their personal growth rate would be the
(11) difference in their sales from one year to the next.
(12) Q. Okay. And do you have any minimum growth
(13) rate expectations from employees – from associates?
(14) A. I do not.
(15) Q. Okay. Does AFLAC?
(16) A. They do not.
(17) Q. So they never try to promote, they never try
(18) to enforce additional sales, anything like that? They
(19) don't have any expectations?
(20) A. The people that work for the – or work with
(21) the company are independent contractors; therefore,
(22) they have no minimum production requirement.
(23) Q. Do they have a minimum production
(24) expectation?
(25) A. No.

Page 43

(1) Q. AFLAC and you simply do not expect that
(2) agents will or will not improve the following year?
(3) A. I would love to see them improve each year,
(4) but there isn't a requirement either from myself or
(5) the company.
(6) Q. And I don't know if I'm just using the wrong
(7) terminology. Not necessarily a requirement – and I
(8) don't mean it in terms of either you meet it or you
(9) get fired or you get – your contract with AFLAC is
(10) going to be broken. I don't mean it in those terms.
(11) I mean it in terms of, these are our goals.
(12) A. I think everyone has personal goals.
(13) Q. Okay. What are the personal goals you have
(14) for growth rate for associates?
(15) A. I don't.
(16) Q. You don't have any goals?
(17) A. I have goals for myself and I have goals for
(18) the organization, but I don't have goals for the
(19) associates. They make their own goals.
(20) Q. Okay. You don't have any – you don't set or
(21) tell your – let me rephrase. You don't set any goals
(22) in sales in growth rate increases for any of the
(23) associates?
(24) A. I do not.
(25) Q. In your team?

Page 44

(1) A. I do not.
(2) Q. And you never tell your associates or your
(3) DSC's or your RSC's that, this is the goal that you
(4) should shoot for in growth rate?
(5) A. The question should be clarified to be
(6) separated from associates, DSC's and RSC's. For
(7) associates, the answer is no, I don't set their goals
(8) or give them any expectations.
(9) Q. And for DSC's?
(10) A. I do.
(11) Q. And what's your DSC's expectations?
(12) A. In terms of their personal growth or their
(13) production?
(14) Q. Both.
(15) A. I would like to see them have at least a 20
(16) to 30 percent increase in their team sales every year.
(17) Q. Is that personal growth or sales?
(18) A. Sales.
(19) Q. What about personal growth?
(20) A. I encourage them to grow their team.
(21) Q. You don't say, I need you – I encourage you
(22) to hire – bring in five new associates or 10 new
(23) associates or 10 percent more associates or anything
(24) like that, right?
(25) A. Not at the district coordinator level, no.

Page 45

(1) Q. Okay. Your sales growth expectations for
(2) DSC's over the – since you've been an RSC, has that
(3) been your expectation?
(4) A. I believe my answer was that I expect a 20 to
(5) 30 percent growth rate each year.
(6) Q. Right. But what I'm asking is, have you had
(7) that same number expectation since you were an RSC?
(8) A. I think I answered the question as an RSC.
(9) When I was an RSC, my expectation was only of the DSC.
(10) Q. Okay.
(11) A. None of the associate.
(12) Q. Okay. When you were an RSC, did your DSC's
(13) meet that? Did the majority of them meet that?
(14) A. For the most part, yes.
(15) Q. In other words, that was a realistic goal –
(16) you saw that as a realistic goal?
(17) A. I did.
(18) Q. And that goal was achieved frequently?
(19) A. Sometimes; not all the times.
(20) Q. More often than not?
(21) A. That's probably an accurate statement.
(22) Q. Okay. Now, as an SSC, what growth
(23) requirements did you have for the RSC's?
(24) A. That they grow their operation at the same
(25) rate.

Page 46

(1) Q. 20 to 30 percent?
(2) A. That's correct.
(3) Q. Same questions for them. Were those
(4) expectations met?
(5) A. They have been met, yes.
(6) Q. Okay. And I understand not everyone meets
(7) them, correct?
(8) A. Correct.
(9) Q. But the great majority of them do?
(10) A. Great majority may be a little inaccurate.
(11) More do than don't.
(12) Q. Okay, good enough. Now, for the DSC's and
(13) the RSC's, is that also what AFLAC expects from them?
(14) A. AFLAC assigns them an annual quota.
(15) Q. Okay. And how does that work?
(16) A. You would have to talk with AFLAC.
(17) Q. You've had to deal with the annual quota
(18) before, right?
(19) A. It's given to me and then I assign it.
(20) Q. No, I'm not asking for the number, per se.
(21) I'm asking for the process; in other words, what do
(22) you mean by annual quota?
(23) A. A sales number for a particular – a sales
(24) number for a particular team.
(25) Q. Okay. What is an annual quota?

Page 47

(1) A. A sales agenda for a team of salespeople.
(2) Q. Okay. And how is that measured; in percent,
(3) in dollars?
(4) A. In annualized premiums.
(5) Q. Okay. So AFLAC has a quota for each team?
(6) A. Each management team, that's correct.
(7) Q. And is that a DSC, RSC or SSC management
(8) team?
(9) A. All three.
(10) Q. Okay. So for each of those, AFLAC has got
(11) its own annual quota for how much they have got to
(12) make in sales that year?
(13) A. That's correct.
(14) Q. And what happens if they don't make those
(15) sales?
(16) A. You take a look at it and reevaluate it.
(17) Q. Okay. Anything can happen? They can – they
(18) can stay on and be given a chance to try to make it up
(19) next year, they can be let go, whatever. There's a
(20) number of options that they can take, right?
(21) A. I think each situation is probably handled
(22) individually.
(23) Q. Okay. So for the – do you know what the
(24) annual quota was for DSC's?
(25) A. That would depend upon the DSC, the

Page 48

(1) demographics, what they did the prior year, how many
(2) people are on their team.
(3) Q. Okay.
(4) A. Numerous, numerous things.
(5) Q. Okay. Same thing, I presume, for the RSC's?
(6) A. Correct.
(7) Q. Were AFLAC's quotas similar to your sales
(8) growth rate expectations?
(9) A. I'm not sure I understand the question.
(10) Q. You told us earlier, for example, that you
(11) expected DSC's to have sales growth of 20 to
(12) 30 percent. I presume it wasn't somewhere between –
(13) let me rephrase that. I assume what you meant by that
(14) was, I don't expect below 20 to 30 percent. You
(15) probably said each year. Today – this year I expect
(16) 24 percent, next year I expect 27 percent, another
(17) year you might expect 21 percent, depending on a
(18) number of different factors; is that correct?
(19) A. No.
(20) Q. Or is it literally between that range is what
(21) you expected, or you expected that range?
(22) A. I believe it's possible to grow the
(23) organization 20 to 30 percent per year if some of the
(24) right things are done.
(25) Q. Okay. So you weren't – when you said that,

Page 49

(1) you weren't telling us that it was a number between
(2) the 20 and 30 each year, it was the range of 20 to 30
(3) each year?
(4) A.    (Moves head up and down.)
(5) Q.    Okay.
(6) A.    Correct.
(7) Q.    AFLAC's quotas, were they within that range
(8) – within those ranges for the people under your
(9) supervision as SSC?
(10) A.    I would have to compare each one of their
(11) previous years numbers with their quota the next year
(12) to determine that. And I don't have that information
(13) available to me.
(14) Q.    Do you remember any of those quota numbers?
(15) A.    I do not.
(16) Q.    Do you remember reviewing them and seeing
(17) that they were within your expectations?
(18) A.    It doesn't matter if they're within my
(19) expectations.
(20) Q.    Well, I understand it's not something you can
(21) control. I'm not asking that. What I'm asking is
(22) just whether their numbers were similar to your
(23) numbers.
(24) A.    Again, I would have to sit down there and
(25) look at them each year. I only do it once a year.

Page 50

(1) Q.    Okay. And then you didn't review it again
(2) after that?
(3) A.    Oh, I look at them from time to time, but
(4) it's impossible to remember them all without referring
(5) to a document.
(6) Q.    Okay. The quotas were what was expected by
(7) AFLAC, right?
(8) A.    Yes.
(9) Q.    Thank you. Before November of 2001, did you
(10) ever tell Dino his performance was poor for any
(11) reason?
(12) A.    Before November of 2001?
(13) Q.    Yes.
(14) A.    I don't know.
(15) Q.    Can you recall any time that you did?
(16) A.    I don't know. The answer is I don't know.
(17) Q.    You can't tell us one time when you do recall
(18) doing that, right?
(19) A.    I can't tell you whether I did or I didn't is
(20) the accurate answer.
(21) Q.    Do you think if you had talked to him about
(22) poor performance during that time period, any time
(23) before November of 2001, do you think you would
(24) remember it?
(25) A.    Not specifically.

Page 51

(1) Q.    Okay. Do you have any criticism of his
(2) knowledge of AFLAC policies, insurance laws or rules
(3) of the insurance industry?
(4) A.    I can only answer in terms of – ask the
(5) question once more. There were three categories.
(6) Q.    Sure. Whether you have any criticism of his
(7) knowledge of either AFLAC policies, insurance laws or
(8) insurance rules.
(9) A.    As far as AFLAC policies, I have no
(10) criticism. The other two, I have no opinion.
(11) Q.    Okay. Can you tell me what acceptable
(12) reasons are for terminating a coordinator?
(13) A.    No.
(14) Q.    Why not?
(15) A.    I don't terminate coordinators.
(16) Q.    Okay. Can you tell me any reason that you
(17) understand would be acceptable for terminating a
(18) coordinator? I know you don't do it, but I'm asking
(19) if you know any of the reasons that are acceptable.
(20) A.    I would imagine if they stole from a client,
(21) they would probably be terminated.
(22) Q.    Okay. What else?
(23) A.    I don't really know. Misrepresentation.
(24) Q.    Anything else you can think of?
(25) A.    No.

Page 52

(1) Q.    Okay. Who would know – who would know that
(2) information?
(3) A.    I imagine the corporate office would know
(4) that information.
(5) Q.    Okay. If somebody within your team was going
(6) to be terminated, who would they expect you to make a
(7) recommendation? Would AFLAC expect you to make a
(8) recommendation?
(9) A.    They might ask for my opinion.
(10) Q.    If there was a reason for their
(11) termination, let's say, for example, as an SSC, and
(12) you needed to terminate or a DSC needed to be
(13) terminated, would AFLAC expect you to give a
(14) justification?
(15) A.    I don't know the answer to that. The answer
(16) I do know is that there's a contract in place that
(17) says that either party could terminate the arrangement
(18) with a 30-day written notice. It's in the standard
(19) agent, regional, district. It's in all those
(20) contracts.
(21) Q.    Okay. Would they – have you ever given any
(22) recommendation on the termination of any AFLAC agent?
(23) A.    I have.
(24) Q.    Who? Actually, don't answer that. I
(25) probably told you –

Page 53

(1) A.    I wasn't going to answer it anyway because I
(2) would have to pull the record.
(3) Q.    Oh, I was going to say I wouldn't know the
(4) names of any particular agents unless one of them was
(5) Dino. But have you given – you said you have given
(6) recommendations for termination of agents. Have they
(7) been DSC's, RSC's, agents? Without giving me any
(8) names.
(9) A.    I imagine I've recommended the termination of
(10) an associate, a district.
(11) Q.    You can recall one associate –
(12) A.    No. I can't recall any particular associate.
(13) Q.    No, I'm not asking for the name. I'm just
(14) saying you recall an associate?
(15) A.    Uh-huh. And a district.
(16) Q.    And a what?
(17) A.    And a district.
(18) Q.    Oh, a district. A DSC?
(19) A.    Uh-huh.
(20) Q.    That's it?
(21) A.    Uh-huh.
(22) Q.    Just one of each?
(23) A.    I don't know that.
(24) Q.    And you just said there might have been more,
(25) but that's just your best recollection, that you

Page 54

(1) think there might have been one associate and one
(2) district?
(3) A.    No. I didn't give you a number. I said that
(4) in my career I have recommended the termination of an
(5) associate and a district, and it may have been one or
(6) it may have been more than one. I don't know the
(7) answer to that.
(8) Q.    That's all you can remember right now?
(9) A.    (Moves head up and down.)
(10) Q.    Any RSC's that you've ever recommended?
(11) A.    No.
(12) Q.    So I presume you didn't recommend Dino's
(13) termination?
(14) A.    I had nothing to do with Dino's termination.
(15) Q.    Do you know why Dino was terminated?
(16) A.    No.
(17) Q.    Did anybody ever talk to you about Dino's
(18) termination, anybody within AFLAC?
(19) A.    Uh-huh.
(20) Q.    Who?
(21) A.    I can't recall.
(22) Q.    You remember talking –
(23) A.    Numerous people.
(24) Q.    Okay. Your supervisors?
(25) A.    People in our home office, yes.

Page 55

(1)   Q.   Okay. But you don't recall who?
(2)   A.   Not in particular.
(3)   Q.   Do you remember what you-all talked about?
(4)   A.   That would be all the way back to December of
(5) 2001, so the answer to that is no.
(6)   Q.   All you remember is talking to some people at
(7) home office about his termination; you don't remember
(8) who you talked to or what you talked about?
(9)   A.   It's been about a year and a half ago.
(10) That's pretty accurate.
(11)   Q.   Do you remember talking to either Mr. Barnson
(12) or Mr. Kuechenmeister and telling them that Dino had
(13) threatened to sue AFLAC?
(14)   A.   I don't recall.
(15)   Q.   What happens when somebody threatens to sue
(16) AFLAC within AFLAC?
(17)   A.   I don't –
(18)   Q.   What happens within AFLAC when somebody
(19) threatens to sue?
(20)   A.   I have no idea. I've never been in that
(21) position.
(22)   Q.   So you don't know whether lines of
(23) communication are cut off or not?
(24)   A.   I have no idea. As I mentioned, I've never
(25) been in that position.

Page 56

(1)   (LaFemina Exhibit No. 1
(2)   (marked for identification.
(3)   Q.   (By Mr. Aguilar) Let me hand you what I'm
(4) marking LaFemina Exhibit 1. Do you recognize that
(5) document?
(6)   A.   I do not.
(7)   Q.   Can you look it over real quick? It's only
(8) two pages. Now do you recognize it?
(9)   A.   The answer is the same.
(10)   Q.   Okay. Let me represent to you that this is a
(11) copy of – it's a couple of pages out of the 1998
(12) proposal for BISD Optional Section 125 cafeteria plan.
(13) Item 17, if you'll look at the second page, you see
(14) that?
(15)   A.   I do.
(16)   Q.   Item 17 indicates, AFLAC nor Flex One will
(17) act as a plan administrator, plan sponsor or third
(18) party administrator. Did I read that correctly?
(19)   A.   I believe so.
(20)   Q.   You agree, therefore, AFLAC was not the third
(21) party administrator for this proposal, correct?
(22)   A.   I have no idea what AFLAC's position is in
(23) terms of anything other than what's written here.
(24)   Q.   Who would I have to talk to who would know
(25) that?

Page 57

(1)   A.   Somebody that's responsible for preparing
(2) this document or somebody in our Flex One department.
(3)   Q.   So I'd have to talk to Rashmi Jain-Hudson?
(4) Is that what you're saying?
(5)   A.   I don't know the name of that person. I
(6) would assume that whatever is written there could be
(7) interpreted by the person that's reading it in any
(8) way.
(9)   Q.   You don't have any involvement in working
(10) with Exhibit 1; is that correct?
(11)   A.   I do not.
(12)   Q.   And you don't know what any of the terms in
(13) here mean for any reason, correct?
(14)   A.   I have my own interpretation of what they
(15) mean.
(16)   Q.   Right. But you can't represent for AFLAC
(17) what any of these terms mean, right?
(18)   A.   Nor could I change them, correct.
(19)   Q.   What about Mr. Barnson? Would Mr. Barnson
(20) know that?
(21)   A.   You would have to ask Mr. Barnson. I don't
(22) know.
(23)   Q.   I may have to. Are you aware of any of the
(24) contracts entered into between AFLAC and BISD?
(25)   A.   I am only aware that there was one at one

Page 58

(1) time.
(2)   Q.   When that contract was entered, were you the
(3) SSC?
(4)   A.   No, sir.
(5)   Q.   What were you?
(6)   A.   I was a regional sales coordinator in Dallas,
(7) Texas.
(8)   Q.   So you didn't have any involvement in that
(9) agreement –
(10)   A.   I did not.
(11)   Q.   – in that contract? Okay. All you're aware
(12) of is one contract at some point, but you can't tell
(13) us what that contract was?
(14)   A.   I cannot.
(15)   Q.   Can you tell us what Flex One is?
(16)   A.   It's a trade name for a department in our
(17) corporate office.
(18)   Q.   And what is it?
(19)   A.   Flex One?
(20)   Q.   Yes. What is Flex One? It's a trade name
(21) for what?
(22)   A.   It's the department that handles all of the
(23) issues that revolve around Section 125.
(24)   Q.   Okay. What do they – what does Flex One do?
(25)   A.   You would have to ask them. I know some –

Page 59

(1)   Q.   You have no idea?
(2)   A.   I know some of what they do, but not all of
(3) what they do.
(4)   Q.   Tell me your understanding of what they do.
(5)   A.   They receive requests for plan documents,
(6) they process those plan documents, and they process
(7) other paperwork and information relative to Section
(8) 125.
(9)   Q.   What type of paperwork?
(10)   A.   There's –
(11)   Q.   Is it the reimbursement requests?
(12)   A.   There's numerous documents that are involved
(13) in that Section 125 process, so anything that would be
(14) relative to that, if it applied to AFLAC, that's what
(15) they would handle. So it would include all documents.
(16)   Q.   So if somebody wanted to submit a claim for
(17) benefits with one of the policies AFLAC – one of the
(18) AFLAC policies, Flex plan would handle that?
(19)   A.   They would not.
(20)   Q.   Okay. That's one of the things –
(21)   A.   You know, there's different – you have to be
(22) specific as to the benefits.
(23)   Q.   That's what I'm trying to find out.
(24)   A.   Well, you have to ask me the question.
(25)   Q.   I'm trying to find out what Flex One does.

Page 60

(1) And you said they handle a bunch of different types of
(2) requests – of paperwork and I'm trying to figure out
(3) what that is. Can you tell me what that is?
(4)   A.   I pretty much told you. They also – one
(5) thing I didn't tell you is that they handle
(6) reimbursement accounts. So those are claims which are
(7) non-product claims.
(8)   Q.   They handle reimbursement accounts, meaning
(9) when people submit – I'm sorry, set up those
(10) reimbursement accounts, they're kind of the trustee
(11) for that account?
(12)   A.   They can be.
(13)   Q.   Okay. And they handle payments and deposits
(14) and things like that relating to those reimbursement
(15) accounts, right?
(16)   A.   If, in fact, they're going ahead and managing
(17) the account or the trustee of the account, as you
(18) mentioned.
(19)   Q.   That's one of the things Flex One does?
(20)   A.   Yes.
(21)   Q.   What else does Flex One do?
(22)   A.   I have already told you what I know they do.
(23)   Q.   Actually, you said paperwork, but from what I
(24) understand, the only paperwork you've talked about is
(25) handling the Flex One account – I'm sorry, the

Page 61

(1) reimbursement accounts.
(2)    A.    You have to remember in my capacity, I'm not
(3) at the point of sales, so I have no knowledge of what
(4) all the documents are.
(5)    Q.    Okay. So other than the reimbursement
(6) account, handling the reimbursement account, you can't
(7) tell us any other paperwork that they actually handle,
(8) right?
(9)    A.    I think I told you that they handle and
(10) process requests for plan documents.
(11)    Q.    Requests for plan documents?
(12)    A.    Salary redirection agreements. But there's
(13) literally a dozen or more, I'm sure, documents that
(14) they handle which aren't related to the 125.
(15)    Q.    I'm just asking about the ones that you're
(16) familiar with. You said the reimbursement, right?
(17)    A.    They process reimbursement requests, yes.
(18)    Q.    They also process the – they also process
(19) the SRAs, you said?
(20)    A.    They do.
(21)    Q.    What do they do in terms –
(22)    A.    I didn't say – I didn't call them SRAs.
(23)    Q.    I thought you did.
(24)    A.    I did not.
(25)    Q.    How do they process the SRAs?

Page 62

(1)    A.    I don't know.
(2)    Q.    You don't know what they, you just know –
(3)    A.    They get them.
(4)    Q.    – they get them. And you said something
(5) about some forms?
(6)    A.    Reimbursement requests, plan document
(7) requests.
(8)    Q.    Plan document. What's a plan document
(9) request? Somebody just wants a copy of the plan
(10) document?
(11)    A.    It's to order – it's a form used to order a
(12) plan document.
(13)    Q.    Okay. They just provide that paperwork?
(14)    A.    That's correct.
(15)    Q.    It's a form?
(16)    A.    They prepare it.
(17)    Q.    Okay. So that somebody can submit – so an
(18) agent can submit a bid for a particular plan document
(19) – I'm sorry, for a particular proposal?
(20)    A.    Well, actually, I think the bid would be an
(21) inappropriate word. It's a request for a plan
(22) document so that an employer can use a pre-tax
(23) instrument in their benefit plan.
(24)    Q.    Okay. Is that after they've been awarded the
(25) plan or before they've been awarded the plan?

Page 63

(1)    A.    It may be after and it could be after.
(2)    Q.    Under what circumstances would it be before?
(3) In other words, why would – what I'm trying to
(4) understand is, plan document requests before the plan
(5) has been awarded, that's the proposed plan that is
(6) submitted through a request for quotes; is that
(7) correct?
(8)    A.    Someone may order a plan document to take out
(9) to an employer to take a look at and go over with them
(10) prior to engaging with them.
(11)    Q.    Okay. And some of the employers actually
(12) submit requests for quotes or for bids if you've got
(13) different companies that might be submitting
(14) plan proposals, right?
(15)    A.    We – we frequently receive requests for bid,
(16) yes.
(17)    Q.    And what you were – what I was asking about
(18) was sometimes – I'm sorry, the Flex One department
(19) will be the one who will provide or put together the
(20) paperwork for that proposal – for those proposals?
(21)    A.    Only as it relates to the pre-tax instrument.
(22)    Q.    Right, okay. What if you have two agents
(23) submitting – who want to submit a particular bid to a
(24) particular employer, a particular AFLAC bid? For
(25) example, let's say two agents both want to submit an

Page 64

(1) AFLAC bid for, let's say, BISD. How do you determine
(2) which one gets to submit the bid?
(3)    A.    I believe AFLAC has a policy that the first
(4) bid in is the one that's honored.
(5)    Q.    Okay. The first agent who submits the bid?
(6)    A.    Doesn't necessarily have to be an agent. I
(7) think it could be the – it's just the first one
(8) received –
(9)    Q.    Other than –
(10)    A.    – by someone from our field force.
(11)    Q.    Other than an agent, who else would it be?
(12)    A.    It could be a district coordinator, it could
(13) be a regional coordinator.
(14)    Q.    I was using the term agent because it doesn't
(15) fall into any of those categories. I'm using agent as
(16) a general term. But you're saying it could be
(17) associate, RSC, SSC, DSC?
(18)    A.    Uh-huh.
(19)    Q.    Okay. So the first one of those to submit
(20) the request is the one AFLAC will appoint to submit it
(21) for AFLAC?
(22)    A.    I believe that's the corporate policy.
(23)    Q.    Thank you. What other types of documents
(24) does a Flex One department handle?
(25)    A.    I've told you all the ones that I'm aware of.

Page 65

(1)    Q.    Plan document requests, SRAs and
(2) reimbursement procedures?
(3)    A.    Uh-huh.
(4)    Q.    Nothing else you can recall?
(5)    A.    Correct.
(6)    Q.    Prior to November 29, 2001, did you have any
(7) knowledge, information, notice that anything was going
(8) on that you needed to pay attention to in Brownsville
(9) relating to the BISD proposal?
(10)    A.    Not that I can recall.
(11)    Q.    Okay. Let me hand you what I've marked as
(12) Errisuriz Exhibit No. 8. Do you recall receiving that
(13) document?
(14)    A.    I do.
(15)    Q.    How did you get it?
(16)    A.    Overnight mail.
(17)    Q.    Do you remember when you got it?
(18)    A.    No.
(19)    Q.    I see a little faxed stamp at the top with
(20) the name Mr. LaFemina. It's got a phone number it
(21) looks like. So that must be your fax number. But I
(22) don't see any other indication. Do you recall whether
(23) you got it on the 29th or the 30th?
(24)    A.    I would not know what day I received it on.
(25)    Q.    Okay. This was a letter addressed from

Page 66

(1) Mr. Sauceda to Mr. Chavez relating to his actions as
(2) third party administrator for BISD's cafeteria plan.
(3) Did you talk to Dr. Sauceda before receiving this
(4) letter?
(5)    A.    I did not.
(6)    Q.    I'm sorry?
(7)    A.    I did not.
(8)    Q.    Okay. So by the time you did talk to him,
(9) you had already gotten this letter and reviewed it?
(10)    A.    Correct.
(11)    Q.    You don't remember if you received it in the
(12) morning, afternoon, anything?
(13)    A.    (Moves head side to side.)
(14)    Q.    But it was shortly around – on or around
(15) November 29th, is that your best recollection?
(16)    A.    I didn't recall that date. I think you
(17) mentioned the date. I know I received it. It's dated
(18) November 29th, and I know I got it overnight.
(19)    Q.    Okay.
(20)    A.    I'm not sure whether I got it next day
(21) overnight, two day overnight. I don't even know who
(22) the carrier was.
(23)    Q.    Okay. (512) 479 – it looks like 591
(24) something, is that your fax number?
(25)    A.    That may have been an old fax number at my

**Page 67**

(1) old office.
(2) Q. Does it sound familiar?
(3) A. I haven't been in that office for almost two
(4) years now.
(5) Q. Okay.
(6) A. But, yeah, it may very well have been my fax
(7) number.
(8) Q. Okay. When you received this letter, what
(9) was your first – what was your first thought as you
(10) read it?
(11) A. That we were in an unfortunate situation.
(12) Q. Did you call up Dino or Mr. Chavez to ask him
(13) about it?
(14) A. Not initially.
(15) Q. Okay. As soon as you got it, it didn't occur
(16) to you to just call Mr. Chavez and ask him what's
(17) going on?
(18) A. I don't remember the sequence of events
(19) because it's been so long ago as far as that's
(20) concerned. We may have even had a conversation
(21) immediately following me getting this letter, but I
(22) couldn't say for sure.
(23) Q. You don't remember what you would have said
(24) in that conversation?
(25) A. No, huh-uh.

**Page 68**

(1) Q. Okay. Did you take any action on receiving
(2) this letter before talking to Dr. Sauceda?
(3) A. It seems to me, to the best of my
(4) recollection, that Dr. Sauceda called me within
(5) minutes of me opening that mail. It was quick.
(6) Q. Okay. What did you-all talk about?
(7) A. The letter.
(8) Q. What did you-all say?
(9) A. I can't remember exactly what he said other
(10) than to reinforce what's already said here in the
(11) letter.
(12) Q. In other words, Dr. Sauceda was repeating the
(13) same things he said there in the letter?
(14) MS. NEALLY:   Objection; form.
(15) MS. MOORE:   Join.
(16) THE WITNESS:   Yeah, pretty much, that
(17) was the content of his side of the conversation.
(18) Q. (By Mr. Aguilar) Okay. What did you tell
(19) him?
(20) A. I asked him if there was anything that I
(21) could do to fix it to where we could continue to carry
(22) them as a client.
(23) Q. And what did he say?
(24) A. His response was that if I could assure him
(25) that Dino had nothing to do with the account and none

**Page 69**

(1) of his people had anything to do with the account and
(2) they were far away and not on school property and not
(3) involved, then he could consider it.
(4) Q. And what did you say?
(5) A. I said that I would have to look into it and
(6) get back with him.
(7) Q. Anything else?
(8) A. Huh-uh.
(9) Q. Is that pretty much the extent of that
(10) conversation?
(11) A. Pretty much.
(12) Q. What did you do after that?
(13) A. Sat down and read the entire file and tried
(14) to figure out what the best thing was to do to
(15) preserve the business.
(16) Q. Pardon me a second. You said read the entire
(17) file?
(18) A. It was 17 pages long.
(19) Q. Okay. The contents of the envelope?
(20) A. Correct.
(21) Q. Okay.
(22) A. I just read through the whole thing and, you
(23) know, initially didn't do anything but soak it in and
(24) try to figure out what I could do to preserve the
(25) account and to protect Dino.

**Page 70**

(1) Q. Okay. Did you contact Dino immediately after
(2) talking to Dr. Sauceda?
(3) A. I contacted Dino. I don't know if it was
(4) immediately following. If we're going to talk about
(5) dates, then we're going to need to go by dates on
(6) documents. Otherwise, I'm not going to know the
(7) dates.
(8) Q. Okay.
(9) A. If we have a documented date, we can use it.
(10) Q. I'm looking at November 29th still. Do you
(11) remember the date on which you talked to Dr. Sauceda?
(12) A. I do not.
(13) Q. Okay. Immediately after talking to Dr.
(14) Sauceda, did you contact Dino to ask him to explain
(15) his side of the story?
(16) A. I think you already asked me what I did
(17) immediately following and what I did was I read the
(18) entire file and tried to figure out what action I
(19) needed to take to fix it. I did not call Dino
(20) immediately.
(21) Q. Okay. After you reviewed the file, then did
(22) you call Dino and say, look, we need to talk about
(23) this?
(24) A. I believe so.
(25) Q. Okay. And when was that?

**Page 71**

(1) A. I don't know.
(2) Q. What did you-all talk about? What did
(3) you-all say to each other?
(4) A. When we had our conversation, I just – Dino
(5) kind of explained to me what his thoughts were
(6) regarding what was going on within the political
(7) structure of the school board.
(8) Q. Okay. And what did you say?
(9) A. I said that I didn't know that to be a fact,
(10) but I didn't doubt the possibility that maybe that was
(11) going on could be true.
(12) Q. Okay. Anything else?
(13) A. We probably talked about what needed to be
(14) done.
(15) Q. And what was that?
(16) A. We probably didn't come up with anything at
(17) that particular point in time because I hadn't made up
(18) my mind yet, was the right thing to do.
(19) Q. Okay. When you say we talked about what
(20) needed to be done, what were the options?
(21) A. Well, I think that – the first option is
(22) clear, that Dino needed to stay away from the district
(23) based on Dr. Sauceda's – I believe he calls it cease
(24) and desist in his letter –
(25) Q. Okay.

**Page 72**

(1) A. – which asks him – cease and desist all
(2) contact with school personnel during business hours.
(3) Campus administration will be directed to contact
(4) security if you appear on the school property.
(5) Q. The first thing was Dino needed – you were
(6) telling Dino he needed to stay away?
(7) A. Uh-huh.
(8) Q. Okay. What was the next thing?
(9) A. I can't recall.
(10) Q. I'm talking about options. You said you were
(11) reviewing the options. I'm trying to –
(12) A. I don't think I had them put together at that
(13) time or even had any idea what I was going to do at
(14) that particular time. You're asking me to remember a
(15) phone conversation that took place a year-and-a-half
(16) ago, and, quite frankly, you know, the only thing I
(17) really had on my mind was that it didn't necessarily
(18) affect me in a negative manner right then and right
(19) there, but that it might affect myself and our entire
(20) company and Dino and his entire team in the future.
(21) Q. Okay. So the first thing you were thinking
(22) about there is, look, I'm going to have to do
(23) something to save business?
(24) A. Correct. That's my job.
(25) Q. Anything else through that conversation that

Page 73

(1) you remember?
(2)    A.    No, sir, I don't.
(3)    Q.    You hung up with Dino. What did you do after
(4) that?
(5)    A.    I spoke to Dr. Sauceda one more time, and he
(6) requested that I send a representative to a meeting.
(7)    Q.    To what?
(8)    A.    To a meeting.
(9)    Q.    Okay.
(10)    A.    And I'm not sure who all was meeting. But he
(11) gave me a few specific requirements as to what he
(12) wanted.
(13)    Q.    And what were those?
(14)    A.    He wanted a competent AFLAC person that knew
(15) how to deal with the complex issues of the school
(16) district and someone that wasn't Dino or associated
(17) with Dino's team to appear at a meeting in 24 hours or
(18) less, maybe. The following day, I believe.
(19)    Q.    Did you ever tell Dr. Sauceda, look, I need
(20) to stand by Dino. If Dino did it, I have faith and
(21) confidence in him and we're going to have to stick up
(22) to what – with Dino. We're going to have to stick up
(23) for Dino and whatever the consequences are from that,
(24) we'll have to deal with them? Did you ever tell him
(25) something like that?

Page 74

(1)    A.    I would never tell any client that in that
(2) the client is, in my opinion, telling me that my
(3) people have to go or our people have to go and it's my
(4) job to preserve that business.
(5)    Q.    Okay. Even if it meant Dino loses all of his
(6) investment, his business, whatever?
(7)    A.    I think that if the company had to make a
(8) decision about moving any account because the
(9) principal parties at that account requested the person
(10) be taken off, I think that they might do that and it
(11) might be reasonable.
(12)    Q.    I'm not sure if I understood that.
(13)    A.    I can say it again.
(14)    Q.    If you would.
(15)    A.    These are – these are company clients. It's
(16) our job to obtain them and to maintain them for a long
(17) term relationship. If the principal parties of any
(18) organization that we do business with are dissatisfied
(19) with the service –
(20)    Q.    For any reason?
(21)    A.    Whatever the reason is, you know, then we
(22) need to be conscious of the customer's request and
(23) honor the request to fulfill our obligations. In this
(24) situation, what I'm saying to you is Dr. Sauceda was
(25) my boss. I don't – I don't deal with anybody but him

Page 75

(1) in this situation, and he was the one making the
(2) request and stipulated specifically that we would lose
(3) the business if we did not make the change.
(4)    Q.    And so –
(5)    A.    Which would have ultimately cost Dino an
(6) awful lot of money.
(7)    Q.    So considering all that, you decided to go
(8) with taking Dino off?
(9)    A.    Not yet, I hadn't.
(10)    Q.    Okay. Ultimately, did you?
(11)    A.    Ultimately – I'm not sure whether I did or
(12) the legal department sent him a letter and told him to
(13) adhere to this. I sent someone in Dino's place to
(14) that meeting.
(15)    Q.    Ultimately he was taken off?
(16)    A.    Yes.
(17)    Q.    And, actually, he was taken off before the
(18) 3rd of December?
(19)    A.    I don't know that –
(20)    Q.    Okay.
(21)    A.    – date-wise. I mean, I know he was taken
(22) off. I can't confirm the date.
(23)    Q.    Let's look at some of the documents that
(24) might help you remember a little better. Let me hand
(25) you what I've marked as –

Page 76

(1)    MR. STEELE:    Can I impose upon you,
(2) Arnold, for a quick break?
(3)    MR. AGUILAR:    Sure.
(4)    (Brief Recess)
(5) (Exhibit No. 2
(6) (marked for identification.
(7)    Q.    (By Mr. Aguilar) Let me hand you what I've
(8) marked as LaFemina Exhibit No. 2. Do you recognize
(9) that document?
(10)    A.    I do.
(11)    Q.    Okay. This is a memo you had sent out – an
(12) e-mail you had sent out. Do you remember when you
(13) sent it out?
(14)    A.    Again, you know, I see that it's marked here
(15) 12-1 of '01. That's not my handwriting.
(16)    Q.    No, that's a revised date.
(17)    A.    Well, if it was e-mailed, it would probably
(18) be the same day, I guess, but I can't say for sure.
(19)    Q.    Okay. Let me represent to you that it was at
(20) least received on December 1. So is it your
(21) understanding that this was likely sent out on or
(22) before December 1?
(23)    A.    Without a date, again, I don't know. That's
(24) not my handwriting.
(25)    Q.    Okay. We can work on that – get someone

Page 77

(1) else to explain. First item, first little bullet you
(2) pointed out in that was Ron Levine will be the team
(3) leader on this year's enrollment, right?
(4)    A.    Yes.
(5)    Q.    So let me represent to you that this document
(6) was received on December 1.
(7)    MR. STEELE:    By whom?
(8)    Q.    (By Mr. Aguilar) If it was received on
(9) December 1, would that have been the date by which the
(10) decision had already been made that Ron Levine would
(11) be the team leader?
(12)    A.    Obviously, according to this.
(13)    Q.    Okay. Do you recollect now, having made that
(14) decision by December 1?
(15)    A.    I can't qualify the date for you. I mean,
(16) again, you're talking about a short period of time.
(17) The decision was made that Ron would be the team
(18) leader. I can't be specific about the date.
(19)    Q.    Why was Ron made team leader?
(20)    A.    Because in terms of his competency as it
(21) relates to Section 125, flexible spending accounts,
(22) school district intricacies, 403(B)s, 457(B)s, and all
(23) of the things that might be associated with the school
(24) district's benefit plan, he was, in my opinion, the
(25) most competent person that I had and he's also highly

Page 78

(1) intelligent and has an extensive background in
(2) financial services.
(3)    Q.    Okay. Even though none of that experience
(4) was through AFLAC, it was through other companies, you
(5) still felt he was most qualified, right?
(6)    A.    For this particular issue, there's no
(7) question he was the most qualified, other than someone
(8) like Dino or someone on Dino's team who had been
(9) eliminated –
(10)    Q.    Okay. And that was –
(11)    A.    – as a result of Dr. Sauceda's letter.
(12)    Q.    And that was the second half of that
(13) question. Why wasn't – you had made the decision to
(14) have Ron be the team leader. Why was Dino not going
(15) to be the team leader?
(16)    A.    Pretty obvious.
(17)    Q.    So what we just discussed a while ago in
(18) Errisuriz Exhibit No. 8, Mr. – Dr. Sauceda's letter
(19) of November 29th?
(20)    A.    Correct.
(21)    Q.    For the matters discussed in that letter?
(22)    A.    Yep.
(23)    Q.    Okay. The third bullet there, Ron Levine
(24) will enroll his personal business and will be credited
(25) 100 percent to he and his district. If you go down to

Page 79

(1) the seventh bullet, it repeats, to be clear, on this
(2) year's enrollment, Ron Levine is in charge
(3) 100 percent. Why was everything going to be credited
(4) to Ron and his district?
(5)    A.   Everything wasn't going to be credited to Ron
(6) and his district. His personal business would be
(7) credited 100 percent to he and his district.
(8)    Q.   Okay.
(9)    A.   That would mean any business that he wrote,
(10) and he wrote very, very little bit of business.
(11)   Q.   Okay. So at first, Ron was going to be in
(12) charge of everything and the percentage that he was
(13) going to be making off the enrollment was just going
(14) to be whatever he made off of his district's
(15) enrollers?
(16)   A.   Ron was actually filling in at the capacity
(17) that Dino would normally act in. However, Ron did not
(18) have a contract that would compensate him for taking
(19) care of those responsibilities. So I gave him the
(20) latitude to personally produce in the account and keep
(21) 100 percent of his production credited to his team as
(22) a way to make up for any override he may have gotten
(23) had he been in Dino's capacity. In other words, he
(24) was doing Dino's capacity without the ability to be
(25) paid –

Page 80

(1)    Q.   Okay. And –
(2)    A.   – because he didn't have that type of
(3) contract.
(4)    Q.   So to be able to pay him, he was going to be
(5) getting – his personal business was going to be
(6) credited 100 percent to him and his district?
(7)    A.   Correct.
(8)    Q.   In other words, that was going to be his
(9) compensation for doing the enrollment?
(10)   A.   That would be part of his compensation.
(11)   Q.   What was the other part of his compensation
(12) that he was going to be getting?
(13)   A.   All of the people that were involved in the
(14) enrollment – and before you ask me, I don't know who
(15) all those people are. I would have to go back and
(16) pull records. They would take the business that they
(17) generated and put 10 percent of that business over
(18) into Ron's name.
(19)   Q.   Okay. I don't see any reference to
(20) 10 percent in here. Was that a decision that was made
(21) later?
(22)   A.   There is a reference –
(23)   Q.   Oh, there is?
(24)   A.   – in bullet No. 6, I believe. All enrollers
(25) other than Ron and Scott will split business with Ron

Page 81

(1) Levine on the transmittal on a 90/10 basis with the 10
(2) percent going to Ron. This compensation is being
(3) awarded to Ron as a result of him acting in the
(4) capacity for overall enrollment coordinator.
(5)    Q.   Okay. So Ron was going to be getting
(6) whatever he got from his own group, from his own team,
(7) 100 percent, plus he was going to be getting
(8) 10 percent of all sales commissions that were made off
(9) the enrollment; is that correct?
(10)   A.   He was going to get 100 percent of his
(11) personal sales. I don't believe it says anything
(12) about his team sales in that particular bullet, which
(13) is bullet No. 3. And then it goes on to say that he
(14) gets 10 percent off the transmittal split of the other
(15) enrollers.
(16)   Q.   And I think Ron explained to us earlier you
(17) can only have two agents split off a transmittal.
(18)   A.   That's correct.
(19)   Q.   So at this point, Dino was going to be
(20) getting zero?
(21)   A.   That's incorrect.
(22)   Q.   Okay. From all the sales that were made, not
(23) renewals, but from all the sales that were made, was
(24) Dino going to be making anything?
(25)   A.   Absolutely.

Page 82

(1)    Q.   Okay. What was he going to be making?
(2)    A.   Dino would have been making the override that
(3) was generated from people from his team that sold
(4) business even though he was not supposed to be
(5) involved at all based on Dr. Sauceda's request. And,
(6) quite frankly, as far as it's personally concerned, it
(7) doesn't affect me one way or the other who writes the
(8) business, the state is compensated regardless of who
(9) does it.
(10)   Q.   Okay. So Dino was just going to get – the
(11) only income Dino was going to get was the overrides
(12) from his agents that were participating in the
(13) enrollment?
(14)   A.   Correct.
(15)   Q.   Okay.
(16)   A.   Which is what had been the case in previous
(17) years.
(18)   Q.   And I think you told us that would be three
(19) to seven percent?
(20)   A.   Dino would have to tell you what his contract
(21) pays or contract paid at that particular point in
(22) time. But, yeah, that's probably fairly accurate.
(23)   Q.   Okay. And that's what he would have been
(24) entitled to get just as the RSC through the RSC
(25) contract?

Page 83

(1)    A.   I'm not sure he would have been entitled to
(2) get that, according to this letter. But I tried to do
(3) what was the best thing, I thought, for Dino was to
(4) allow him to still draw some compensation from the
(5) case and protect his residual income by having someone
(6) else in there. And Dr. Sauceda, quite frankly, did
(7) not know and does not know if we have 50 or 60 agents,
(8) whether they're Dino Chavez' people or someone else's
(9) people.
(10)  (Brief interruption)
(11)   Q.   Let me ask you, why were Dino's agents going
(12) to participate if Sauceda had requested that they not
(13) participate?
(14)   A.   For the simple reason that you had alluded to
(15) earlier, you know. They had participated in the past
(16) and I felt as though if they followed a certain set of
(17) guidelines, then we wouldn't create any additional
(18) perceived challenges for the account and that Dino
(19) would still receive his compensation. In other words,
(20) if I pulled Dino's people off and fully honored Dr.
(21) Sauceda's request, Dino would not have received any
(22) compensation.
(23)   Q.   Okay. Just to get some compensation to Dino?
(24)   A.   Correct.
(25)   Q.   Was it supposed to be tied to anything in

Page 84

(1) particular?
(2)    A.   I'm not sure I understand where you're going.
(3)    Q.   Was there – was anything – in other words,
(4) you explained for us earlier what the responsibilities
(5) of the RSC is and the DSC and the SSC; remember that?
(6)    A.   I don't think I explained the
(7) responsibilities of the DSC or – I mean I'm sure –
(8) as a matter of fact, I'm sure I didn't.
(9)    Q.   I think I'm mixing you up with Mr. Levine.
(10)   A.   Don't do that. He's big and tall.
(11)   Q.   He explained for us some of the
(12) responsibilities and how basically the percentages of
(13) the overrides that they get are for doing
(14) those particular duties. You agree with that?
(15)   A.   I wasn't here, so I don't know what you-all
(16) talked about.
(17)   Q.   No. Would you disagree that the overrides
(18) that the RSC's, SSC's, and the DSC's get are for doing
(19) their jobs as RSC, DSC and SSC?
(20)   A.   They should be, for the most part.
(21)   Q.   Okay. Next bullet – actually, it's part of
(22) the same, the seventh bullet, I think. The ending
(23) says, the circumstances surrounding the group requires
(24) this change. What did you mean by that?
(25)   A.   Dr. Sauceda's letter.

Page 85

(1)    Q.    That's what I figured. Okay. Next bullet,
(2) Dino Chavez will provide Ron with all the necessary
(3) information and support needed to complete this task
(4) without sacrifice in quality. What did you – what
(5) were you expecting from that? In other words, what
(6) did you expect Dino to be doing?
(7)    A.    I expected Dino to make it a turnkey
(8) operation for Ron so that Ron could do his job with
(9) the least amount of complications, which would
(10) effectively have gotten more compensation to Dino than
(11) if he had problems.
(12)    Q.    Okay.
(13)    MR. AGUILAR:    I need a short break for a
(14) moment so I can switch tapes.
(15)    (Off the record)
(16)    Q.    (By Mr. Aguilar) In return for Dino's
(17) providing this and helping make it a turnkey
(18) operation, basically Dino was going to be getting to
(19) get his RSC overrides from his team sales?
(20)    A.    Repeat the question.
(21)    Q.    Sure. I talked – we talked – you talked
(22) about what Dino would be doing – what you expected
(23) Dino to be doing in making it a turnkey operation for
(24) Mr. Levine.
(25)    A.    Uh-huh.

Page 86

(1)    Q.    And in exchange, Dino was going to be getting
(2) to allow – Dino's people were going to be allowed to
(3) sell and he was going to be getting his overrides, his
(4) RSC overrides from those sales; is that correct?
(5)    A.    Dino's people were going to be allowed to go
(6) in there and sell the business one way or the other.
(7) I was just looking to get maximum cooperation. So one
(8) didn't have anything to do with the other, or I
(9) probably would have stated that.
(10)    Q.    In other words, you just expected that of
(11) Dino because he was the RSC and he had the
(12) information, he was an AFLAC agent?
(13)    A.    No. I expected Dino to do it because Dino
(14) had a lot of money wrapped up in the account in terms
(15) of residual income and the objective was to preserve
(16) that for Dino. And by making it a smooth enrollment,
(17) we would be able to retain the business, write more
(18) business and everybody would benefit as a result.
(19)    Q.    Okay. Good enough. Go down to the second to
(20) the last bullet.
(21)    A.    Uh-huh.
(22)    Q.    The second sentence – third sentence in
(23) there, just a few days ago I was informed that we no
(24) longer were going to be the supplemental benefits
(25) provider for the district. Was that the – are you

Page 87

(1) talking about – you said, I was informed.
(2)    A.    It says right here, please accept this
(3) correspondence as my official 30-day –
(4)    Q.    You're talking about Errisuriz Exhibit 8, the
(5) Sauceda letter of November 29th, correct?
(6)    A.    Correct.
(7)    Q.    Okay. Then the next sentence, these changes,
(8) in my opinion, are the only reason we will still be
(9) able to work with BISD. Can you explain what you
(10) meant by that?
(11)    A.    Dr. Sauceda made it perfectly clear to me
(12) that if we could have a smooth enrollment and Dino
(13) wasn't involved, then we could continue to work with
(14) them on a move forward basis.
(15)    Q.    That's the only basis you had for that
(16) comment, right?
(17)    A.    Correct.
(18)    Q.    And then the next and final bullet, the
(19) Chavez region will continue to service the account
(20) from Dino's office in the same manner without
(21) interruption. What did that mean?
(22)    A.    To my understanding, Dino and his office
(23) personnel, which included his mother and his wife from
(24) time to time at that point, had been handling, I
(25) think, pretty much all of the correspondence with the

Page 88

(1) account and all of the issues relative to payroll,
(2) claims, anything to make a smooth sale.
(3)    Q.    Whenever –
(4)    A.    He worked hard on the account.
(5)    Q.    Whatever BISD – whenever a BISD employee had
(6) a complaint, a concern, a question, needed information
(7) on a policy, things like that, your understanding was
(8) that the first person they came to was Dino's office?
(9)    A.    I think that that's –
(10)    MS. NEALLY:    Objection.
(11)    THE WITNESS:    I think that they came to
(12) Dino's office before they would go anywhere else, and
(13) then they might go to the worldwide headquarters of
(14) AFLAC if, in fact, you know, they weren't either
(15) satisfied or they couldn't get ahold of Dino for some
(16) reason.
(17)    Q.    (By Mr. Aguilar) And you expected in this
(18) memo that that relationship would continue?
(19)    A.    If we were planning on preserving the
(20) business, you bet.
(21)    Q.    Okay. That's basically called servicing the
(22) account?
(23)    A.    Correct.
(24)    Q.    Now, generally, it's the agents who make the
(25) sales who service the accounts, right, primarily?

Page 89

(1)    A.    You know, those policies are pretty well laid
(2) up by regional sales coordinators, not state sales
(3) coordinators. I think Dino – and, again, I was not
(4) privy or not around at the time that this account was
(5) secured. I think Dino set this up this way and it
(6) worked for him, and so my idea was not to get in the
(7) way of progress.
(8)    Q.    Mr. Levine earlier told us that the agents
(9) are the ones primarily responsible for servicing the
(10) policies that they sell. Would you agree with that?
(11)    A.    Generally speaking, at AFLAC if you go out
(12) and open up an account, then you're responsible for
(13) that account and those people.
(14)    Q.    Okay.
(15)    A.    This account might have a little different
(16) flavor to it because of the number of employees
(17) involved.
(18)    Q.    And in this particular account, even though
(19) the agents were making sales and getting commissions
(20) from all those sales, the servicing of those accounts
(21) was all being done through Mr. Chavez – Dino?
(22)    MS. NEALLY:    Objection.
(23)    Q.    (By Mr. Aguilar) Is that correct?
(24)    MS. NEALLY:    Object to the form.
(25)    THE WITNESS:    Mr. Chavez –

Page 90

(1) Mr. Chavez – I'm just going to call him Dino. Dino
(2) would have been still receiving compensation in the
(3) form of overrides from the people that were writing
(4) business in this year's enrollment and he was still
(5) receiving a considerable amount of residual income as
(6) a result of that account being in place and my
(7) objective was to protect his residual income.
(8)    Q.    (By Mr. Aguilar) Okay.
(9)    A.    Or to at least assist with protecting his
(10) residual income.
(11)    Q.    Let me try phrasing it this way. Mr. Levine
(12) explained for us that the basic agent, the associate,
(13) is the one who generally made all the sales and they
(14) were the ones primarily responsible for servicing the
(15) clients to whom they made sales; that the DSC
(16) supervised the associates and the RSC's supervised
(17) associates and jumping a level down.
(18) far?
(19)    A.    The RSC is supervising the DSC's is accurate
(20) and the DSC's supervising the associates is accurate.
(21) I don't think in most cases the RSC is supervising the
(22) associates and jumping a level down.
(23)    Q.    Okay. And he talked to us about what the
(24) duties were – he talked about what the duties of the
(25) RSC are, which is the same for RSC's all over the

Page 91

(1) state, right?
(2) A. Yes.
(3) Q. And same thing for DSC's, same thing –
(4) A. Yes.
(5) Q. – same for all over the state?
(6) A. Yes.
(7) Q. And he explained for us that it involves, for
(8) example, RSC's training that is DSC's, making sure they're
(9) producing and doing the job, things like that, but for
(10) the most part, he did not indicate servicing of
(11) accounts or servicing of clients' concerns.
(12) A. For an RSC?
(13) Q. For an RSC.
(14) A. Typically it's not an RSC's responsibility to
(15) do that, as far as I'm concerned.
(16) Q. Okay. As far as you understand?
(17) A. As far as I'm concerned.
(18) Q. As far as people within your district?
(19) A. The way I was taught at AFLAC is, as a
(20) regional sales coordinator, my primary responsibility
(21) were things other than servicing accounts.
(22) Q. Okay.
(23) A. And I think Dino was clear that being the
(24) case, too. And I think that in most of his accounts,
(25) the agent probably did service them. This was an

Page 92

(1) account that had special circumstances.
(2) Q. And in these particular circumstances the
(3) account had something like 6,000 plus employees, about
(4) 6,500, almost 7,000 employees, correct?
(5) A. Yes.
(6) Q. And all those employees – for all those
(7) employees, Dino was going to be the primary servicing
(8) person. Is that your understanding?
(9) A. I think his office would be and I think his
(10) personnel at his office.
(11) Q. His office and staff?
(12) A. His family or otherwise would handle it.
(13) Q. His office and staff?
(14) A. Correct.
(15) Q. Which is something not normally done by most
(16) RSC's?
(17) A. Put it to you this way. If that undertaking
(18) is done, then it would be an undertaking that was
(19) chosen by the regional sales coordinator in most
(20) cases.
(21) Q. In order to finance those expenses for doing
(22) that, you and Dino had agreed in prior years that Dino
(23) would be able to get 30 percent of the sales made by
(24) all the agents during the enrollment; is that correct?
(25) A. Never.

Page 93

(1) Q. You didn't have that agreement?
(2) A. Never.
(3) Q. Okay. Was Dino getting 30 percent?
(4) A. I believe that from time to time he requested
(5) some of his associates split with him on a
(6) transmittal.
(7) Q. Okay. Let me just put it in perspective
(8) first of all. This was – we're talking 2001 first
(9) was the last year. The year before that, the 2000 for
(10) the 2001 year, you're aware that Dino was getting a
(11) 30 percent split on all sales from the enrollment?
(12) A. Dino did not report to me as a state sales
(13) coordinator at that time.
(14) Q. He didn't have to get permission from you to
(15) do that?
(16) A. I was not his state sales coordinator when
(17) the enrollment for 2000 took place.
(18) Q. Okay. So you just don't know one way or the
(19) other what he was getting?
(20) A. I have no idea.
(21) Q. You didn't check into it afterwards?
(22) A. There was no need for me to check into it
(23) until something came up in the future that would be
(24) contrary to the company's standpoint for regional
(25) sales coordinator and my standpoint for regional sales

Page 94

(1) coordinator as it relates to personal production.
(2) Q. I take it that means no?
(3) A. What it means is that it's viewed negatively
(4) by your sales force if you're involved in the sales
(5) even though you may be providing them with an
(6) opportunity to make a sale.
(7) Q. My question was just whether you checked into
(8) it.
(9) A. I did not.
(10) Q. Okay. So –
(11) A. Until after the fact.
(12) Q. You did check into it after the fact?
(13) A. I checked into it after Dino did have
(14) production as a result of that account.
(15) Q. So were you able to confirm that, yes, Dino
(16) was getting 30 percent of sales of – splitting sales
(17) 30 percent to Dino for the 2000 year?
(18) A. I can't say what year it was. But I – there
(19) was a time when Dino was receiving some percentage of
(20) split on a transmittal from the associate servicing
(21) the account.
(22) Q. And the year before, 1999, I think he
(23) actually got something like 40 percent. Does that
(24) sound familiar?
(25) A. I was not there in 1999. I couldn't confirm

Page 95

(1) it.
(2) Q. Okay. And you didn't check into that,
(3) either?
(4) A. I was not – that would not have been my
(5) responsibility.
(6) Q. I'm only asking if you checked into it.
(7) A. I did not.
(8) Q. Okay. And for the year before that, 1998,
(9) did you check into whether Dino got a 50 percent split
(10) that year?
(11) A. I did not.
(12) Q. Okay. So in terms of the split he was
(13) getting for '98, '99, 2000, or what he was intending
(14) to get for 2001, those percentage splits, do you know
(15) why he was getting that – those splits?
(16) A. He and I only discussed it one time, and I
(17) think you have a document which clearly indicates my
(18) view on regional sales coordinators taking a
(19) transmittal split. It's a view that's expressed and
(20) seen the same way by AFLAC, the company.
(21) Q. I have no idea why he was taking those
(22) splits. I can only make an assumption.
(23) Q. Okay. So you don't know – and you also
(24) don't know all the work that was involved – that Dino

Page 96

(1) was involved in in servicing those – that account,
(2) the BISD account, throughout the year?
(3) A. I can answer that question this way for you.
(4) I handled three accounts twice – or three times that
(5) size, so I'm very familiar with the workload and the
(6) cost involved in that.
(7) Q. You were the servicing agent for three
(8) accounts –
(9) A. I was responsible for accounts three times
(10) that size.
(11) Q. I'm asking about servicing those accounts.
(12) A. My people serviced it.
(13) Q. No, you personally.
(14) MS. NEALLY: Object to the argumentative
(15) nature of the question.
(16) THE WITNESS: At one time or another, I
(17) was involved in working with the account and it would
(18) probably not be deemed as service work. It would be
(19) more negotiating with the principals involved.
(20) Q. (By Mr. Aguilar) And I'm talking about
(21) when – like what I was talking about earlier,
(22) servicing the account throughout the year where
(23) employees come in, they have a concern, they have a
(24) question, all that sort of stuff. You and your office
(25) directly, did you handle any accounts with 6,000 plus

Page 97

(1) employees?
(2) A.    Not on a day-to-day basis.
(3) Q.    So you wouldn't have knowledge as to what was
(4) actually going on in Dino's office on a day-to-day
(5) basis?
(6) A.    That's incorrect. I would have full
(7) knowledge of what was going on with an account that
(8) size. And the only reason I would have –
(9) Q.    On a day-to-day basis?
(10) A.    Yeah, pretty much.
(11) Q.    And that's because?
(12) A.    Because of previous experience with accounts
(13) of a similar nature.
(14) Q.    And that experience was in what?
(15) A.    In accounts such as –
(16) Q.    Tell me what accounts. I mean – in other
(17) words, how did you get that information?
(18) MS. NEALLY:    Mr. Aguilar, please let him
(19) finish the question – his answer.
(20) THE WITNESS:    My experience –
(21) MR. STEELE:    Your experience with what?
(22) THE WITNESS:    My experience was with the
(23) City of Dallas, which had 14,000 employees; Dallas
(24) Independent School District, which has 22,000
(25) employees. And several others. The City of Fort

Page 98

(1) Worth. And the list goes on and on and on. I'm
(2) completely, keenly and uniquely aware of the workload
(3) and the costs involved in maintaining accounts of that
(4) size.
(5) Q.    (By Mr. Aguilar) I'm talking about servicing
(6) the accounts. Is that what you were talking about?
(7) A.    I'm talking about – yeah, I oversaw – to
(8) explain further, so it's clear for the record, okay?
(9) Dino did not service the account, just like I didn't
(10) service the account. Dino negotiated and met with the
(11) people and did the same things I did. His people and
(12) his staff serviced the account. From time to time, he
(13) might be seen at the account to provide support to his
(14) team, but he wasn't actually involved in going out and
(15) handling issues on a day-to-day basis with that
(16) account.
(17) Q.    That's what I was asking you about. Okay.
(18) So as far as an employee comes in to complain about
(19) the policy or about how to do something or how to file
(20) a form, Dino wasn't involved in that?
(21) A.    He may have been and he may not have been.
(22) Q.    You just don't know?
(23) A.    No, I know that he may have been and he may
(24) not have been. I know that one person couldn't handle
(25) all that service.

Page 99

(1) Q.    I'm asking about that particular work. And
(2) when you were –
(3) A.    I think I answered that.
(4) Q.    And when you were talking a while ago about
(5) handling these accounts, were you talking about doing
(6) the day-to-day work of handling clients' concerns when
(7) they came in with those concerns?
(8) A.    There were times when I had to do that, yes.
(9) Q.    Occasionally you would?
(10) A.    Yeah.
(11) Q.    I'm talking about a day-to-day basis. In
(12) other words, a while ago you said Dino didn't do that
(13) on a day-to-day basis, right?
(14) A.    My comment to you –
(15) Q.    Is that what you were talking about?
(16) A.    – to clarify is that from time to time, I'm
(17) sure that Dino did do that, but I'm certain that he
(18) didn't do it all the time.
(19) Q.    Okay.
(20) A.    Because he had help. He wouldn't have had
(21) help if he could do it all the time.
(22) Q.    Okay. I was just asking. His staff?
(23) A.    Correct.
(24) Q.    Okay. And –
(25) A.    Same thing with my staff.

Page 100

(1) Q.    When you were doing the Dallas group, which
(2) was that the City of Dallas or –
(3) A.    Both.
(4) Q.    Okay. Let's say the City of Dallas with
(5) 14,000 employees, if those employees had concerns with
(6) the terms of their policy, for example, or the terms
(7) of the cafeteria plan that they had, did they go into
(8) your office to talk to you or somebody from your staff
(9) about those concerns or did they go somewhere else?
(10) A.    We typically went to their location.
(11) Q.    Okay. But it was somebody from your office
(12) that would go out and handle all those concerns?
(13) A.    That's right.
(14) Q.    How many people did you have in your office?
(15) A.    You would have to ask at a certain day
(16) because it changes from day to day.
(17) Q.    And what I'm asking about when I say your
(18) office, I'm talking about like the office you have
(19) right now that you say you have one secretary and
(20) nobody else?
(21) A.    Uh-huh.
(22) Q.    Is that what you were talking about or were
(23) you talking about your office including all the –
(24) A.    All the people involved.
(25) Q.    – DSC's and –

Page 101

(1) A.    Uh-huh.
(2) Q.    Okay. Let me try to rephrase it so you'll
(3) understand what I'm talking about.
(4) A.    Okay.
(5) Q.    I was talking about just your office
(6) directly, like the one you have now with just you and
(7) your secretary where you're paying all the overhead.
(8) A.    Uh-huh.
(9) Q.    For example, you're not – you weren't –
(10) even when you were in Dallas, you were not paying the
(11) overhead of all the associates or the DSC's, right?
(12) A.    To manage some accounts, I did, yes.
(13) Q.    Okay. For a few accounts, you would pay
(14) what, like part of the rent, part of the lease?
(15) A.    All my printing bills for Dallas Independent
(16) School District was $20,000.
(17) Q.    Some copies, things like that. You would be
(18) reimbursed for some of those expenses, stuff like
(19) that?
(20) A.    Just the cost of doing business.
(21) Q.    I understand.
(22) A.    I wasn't reimbursed for it; it's a cost of
(23) doing business.
(24) Q.    Okay. It's part of what you paid them?
(25) A.    No, it's part of my cost of doing business to

Page 102

(1) get and keep the business.
(2) Q.    I'm just trying to figure out what it is. In
(3) other words, what you're saying is, you paid for some
(4) printing costs and things like that.
(5) A.    We all pay for all kinds of miscellaneous
(6) costs to run our business.
(7) Q.    I'm only asking what you paid for.
(8) A.    I'm telling you that.
(9) Q.    Okay. That is your answer, okay.
(10) A.    Okay.
(11) Q.    Otherwise, those associates and DSC's are
(12) not – you're not paying for their rent, for example,
(13) or their lease on their office, things like that.
(14) They're independent agents who are paying for their
(15) own, correct?
(16) A.    I can only speak for my office. I'm not sure
(17) what Dino's financial arrangement was with his people
(18) in his office.
(19) Q.    Okay. And that's what I'm talking about. So
(20) what you were telling us earlier where your group or
(21) you were overseeing the servicing of all those – that
(22) Dallas account, for example, you were talking about
(23) doing it through your immediate office with you and –
(24) how many staff did you have that walked into your
(25) doors?

**Page 103**

(1) A. Let me be perfectly clear.
(2) Q. Okay.
(3) A. So that we have a complete understanding. It
(4) is the regional sales coordinator, state sales
(5) coordinator, district sales coordinator and associates
(6) responsibility by contract to service our accounts.
(7) If there's a cost associated with servicing those
(8) accounts as independent contractors, it's also our
(9) responsibility to deal with those costs. And so
(10) everybody services the accounts to a certain extent,
(11) some to a greater extent than others. And more often
(12) than not, the people that incur the expense pay for
(13) the expense without reimbursement.
(14) Q. And what I'm talking about when I say
(15) servicing the accounts, I'm talking about dealing with
(16) the employees when they come in with concerns,
(17) et cetera, like I mentioned earlier. In terms of
(18) doing those – that part of servicing the account,
(19) that's not something that was done directly through
(20) your immediate office?
(21) A. From time to time, as I mentioned before,
(22) yes, it was.
(23) Q. But not for 6,000 employees, plus?
(24) A. For 22,000 plus.
(25) Q. Okay. So those 22,000 employees were told to

**Page 104**

(1) come into your personal office and either you or your
(2) secretary or your direct assistant was the one who
(3) would do that? And that's all I'll trying to
(4) distinguish.
(5) A. They were told –
(6) Q. I'm trying to explain.
(7) A. You don't have to explain. I understand
(8) clearly.
(9) Q. All I want to do is make sure you understand
(10) what I'm asking about because I don't want to have to
(11) come back and forth on this. All I'm asking –
(12) A. Can I answer that question?
(13) Q. Sure.
(14) A. They were instructed that if they chose to do
(15) so, they could either call my cell phone, my – they
(16) could fax the information, they could come to my
(17) office, or they could contact our headquarters through
(18) any one of several numbers that they had access to.
(19) MR. STEELE: Arnold, let's take up here.
(20) You'll have a chance to go back and read the
(21) transcript. Jeff has got to go. And that way –
(22) MR. AGUILAR: Give me about five minutes
(23) so I can just wrap up this line of questioning, okay?
(24) MR. STEELE: He's got to go to catch a
(25) cab. It takes about – it takes a while to get out

**Page 105**

(1) there in this traffic. So, Arnold, I'm sorry. This
(2) will give you the opportunity to get the transcript,
(3) read it, more clearly organize your questions so you
(4) can wrap it up in a more succinct manner, I'm sorry.
(5) We've got to stop because Jeff Willis has got to catch
(6) a plane.
(7) (DEPOSITION RECESSED)
(8)
(9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

**Page 106**

( 1) CHANGES AND CORRECTIONS
( 2) WITNESS NAME: FRANK D. LaFEMINA
( 3) DATE: MAY 22, 2003
( 4) PAGE LINE CHANGE REASON
( 5)
( 6)
( 7)
( 8)
( 9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

**Page 107**

( 1) SIGNATURE
( 2)
( 3) I, FRANK D. LaFEMINA, have read the foregoing
( 4) deposition and hereby affix my signature that same is
( 5) true and correct, except as noted on the previous
( 6) page
( 7)
( 8)
( 9) FRANK D. LaFEMINA
(10) STATE OF
(11) COUNTY OF
(12) Before me, , on this day
(13) personally appears FRANK D. LaFEMINA, known to me (or
(14) proved to me under oath or through
(15) ) (description of identity card or
(16) other document) to be the person whose name is
(17) subscribed to the foregoing instrument and
(18) acknowledged to me that they executed the same for the
(19) purposes and consideration therein expressed.
(20) Given under my hand and seal of office this
(21) day of , 2003.
(22)
(23)
(24) NOTARY PUBLIC IN AND FOR
(25) THE STATE OF

**Page 108**

( 1) REPORTER'S CERTIFICATE
( 2)
( 3)
( 4) THE STATE OF TEXAS *
( 5) COUNTY OF TRAVIS *
( 6)
I, GERRI C. BARKER, Certified Shorthand
( 7) Reporter in and for the State of Texas, do hereby
certify that, pursuant to the agreement of counsel,
( 8) came on before me on the 22nd day of May, 2003, the
following named person, FRANK D. LaFEMINA, who was
( 9) duly sworn to testify to the truth and nothing but the
truth touching and concerning the matters in
(10) controversy in this cause; that he was thereupon
carefully examined upon his oath and his examination
(11) reduced to typewriting under my supervision; and this
deposition is a true record of the testimony given by
(12) said witness.
I further certify that I am neither
(13) attorney, nor counsel for, nor related to, nor
employed by any of the parties to the action in which
(14) this deposition is taken; and, further, that I am not
a relative nor employee of any attorney or counsel
(15) employed by the parties hereto or financially
interested in the action.
(16) Certified to by me this the day
of , 2003.
(17)
(18)
(19)
GERRI C. BARKER, TEXAS CSR 2219
(20) Expiration Date: 12/31/03
Firm Registration No. 241
(21) 114 West 7th Street, Suite 750
Austin, Texas 78701
(22) 512-499-0277
(23)

**Look-See Concordance Report**

- - -

UNIQUE WORDS: **1,488**
TOTAL OCCURRENCES: **5,744**
NOISE WORDS: **384**
TOTAL WORDS IN FILE: **17,877**

- - -

SINGLE FILE CONCORDANCE

- - -

CASE SENSITIVE

- - -

INCLUDES ALL TEXT OCCURRENCES

- - -

DATES **ON**

- - -

INCLUDES PURE NUMBERS

- - -

POSSESSIVE FORMS **ON**

**– DATES –**

**1-20-54** [1]
*10:3*
**12/31/03** [1]
*108:20*
**December** [1]
*75:18*
**December 1** [5]
*76:20, 22; 77:6, 9, 14*
**December 31** [1]
*29:5*
**December of 2001** [1]
*55:4*
**January 1, 2000** [1]
*21:1*
**May, 2003** [2]
*2:5; 108:8*
**MAY 22, 2003** [2]
*1:15; 106:3*
**November** [1]
*17:6*
**November 29, 2001** [1]
*65:6*
**November 29th** [5]
*66:15, 18; 70:10; 78:19; 87:5*
**November of 1988** [1]
*14:20*
**November of 2001** [3]
*50:9, 12, 23*

**– $ –**

**$20,000** [1]
*101:16*
**$6.3** [1]
*26:22*

**– 0 –**

**01** [1]
*76:15*
**02** [1]
*1:7*

**– 1 –**

**1** [12]
*1:16; 5:7, 17; 21:1; 56:1, 4; 57:10; 76:20, 22; 77:6, 9, 14*
**1-20-54** [1]

*10:3*
**10** [9]
*19:11, 21; 44:22, 23; 80:17, 20; 81:1, 8, 14*
**100** [9]
*2:9; 3:20; 78:25; 79:3, 7, 21; 80:6; 81:7, 10*
**104** [1]
*7:23*
**107** [1]
*7:22*
**1099s** [1]
*29:22*
**11** [1]
*5:17*
**112** [1]
*7:12*
**114** [1]
*108:21*
**12** [1]
*5:19*
**12-1** [1]
*76:15*
**12/31/03** [1]
*108:20*
**1200** [1]
*3:6*
**125** [7]
*5:18; 56:12; 58:23; 59:8, 13; 61:14; 77:21*
**128** [1]
*1:7*
**14,000** [2]
*97:23; 100:5*
**17** [3]
*56:13, 16; 69:18*
**1971** [2]
*11:23, 24*
**1976** [1]
*12:4*
**1988** [1]
*14:20*
**1993** [1]
*17:25*
**1994** [7]
*17:25; 19:24, 25; 26:21; 28:6, 20; 29:1*
**1998** [3]
*5:18; 56:11; 95:8*
**1999** [6]
*20:7, 25; 29:3, 8; 94:22, 25*

**– 2 –**

**2** [3]
*5:19; 76:5, 8*
**20** [8]
*44:15; 45:4; 46:1; 48:11, 14, 23; 49:2*
**2000** [5]
*21:1; 93:9, 17; 94:17; 95:13*
**2001** [8]
*50:9, 12, 23; 55:5; 65:6; 93:8, 10; 95:14*
**2003** [6]
*1:15; 2:5; 106:3; 107:21; 108:8, 16*
**21** [1]
*48:17*
**22** [2]
*1:15; 106:3*

**22,000** [3]
*97:24; 103:24, 25*
**2219** [1]
*108:19*
**22nd** [2]
*2:4; 108:8*
**24** [2]
*48:16; 73:17*
**241** [1]
*108:20*
**27** [1]
*48:16*
**29** [1]
*65:6*
**29th** [6]
*65:23; 66:15, 18; 70:10; 78:19; 87:5*
**2:01** [1]
*2:5*

**– 3 –**

**3** [2]
*5:4; 81:13*
**30** [13]
*44:16; 45:5; 46:1; 48:12, 14, 23; 49:2; 92:23; 93:3, 11; 94:16, 17*
**30-day** [2]
*52:18; 87:3*
**300** [2]
*2:9; 3:20*
**30th** [1]
*65:23*
**31** [1]
*29:5*
**3505** [1]
*3:16*
**3:56** [1]
*2:5*
**3rd** [1]
*75:18*

**– 4 –**

**4** [1]
*5:5*
**40** [2]
*19:5; 94:23*
**403** [1]
*77:22*
**457** [1]
*77:22*
**460** [1]
*3:15*
**479** [1]
*66:23*

**– 5 –**

**50** [2]
*83:7; 95:9*
**512** [1]
*66:23*
**512-305-4734/512-305-4800** [1]
*3:21*
**512-499-0277** [1]
*108:22*
**56** [1]
*5:17*
**591** [1]

*66:23*

**– 6 –**

**6** [2]
*5:8; 80:24*
**6,000** [3]
*92:3; 96:25; 103:23*
**6,500** [1]
*92:4*
**6.3** [1]
*27:6*
**60** [1]
*83:7*
**620** [1]
*7:22*

**– 7 –**

**7,000** [1]
*92:4*
**71** [1]
*12:5*
**734** [1]
*7:20*
**750** [1]
*108:21*
**76** [4]
*5:19; 12:5, 11; 14:21*
**78** [1]
*7:19*
**78520** [2]
*3:6, 11*
**78521** [1]
*3:16*
**78701** [3]
*2:9; 3:21; 108:21*
**7th** [1]
*108:21*

**– 8 –**

**8** [3]
*65:12; 78:18; 87:4*
**80** [1]
*14:14*
**82** [1]
*14:14*
**855** [1]
*3:11*
**88** [5]
*14:21; 15:6; 17:6; 18:1; 19:22*

**– 9 –**

**9** [1]
*3:11*
**90/10** [1]
*81:1*
**93** [1]
*18:1*
**94** [3]
*18:1, 2; 20:6*
**956-504-1100/956-504-1408** [1]
*3:7*
**956-541-1846/956-541-1893** [1]
*3:17*
**956-542-5666/956-542-0016** [1]
*3:12*
**97** [4]

29:8, 24; 37:4; 39:11
**98** [4]
  29:8, 24; 39:11; 95:13
**99** [6]
  20:7; 29:5, 24; 37:5; 39:11;
  95:13

## – A –

**ability** [1]
  79:24
**able** [9]
  31:8, 9, 21; 35:8; 80:4; 86:17;
  87:9; 92:23; 94:15
**above-styled** [1]
  2:4
**Absolutely** [1]
  81:25
**accept** [1]
  87:2
**acceptable** [3]
  51:11, 17, 19
**access** [2]
  23:18; 104:18
**accessible** [2]
  25:13, 19
**according** [2]
  77:12; 83:2
**account** [40]
  60:11, 17, 25; 61:6; 68:25;
  69:1, 25; 74:8, 9; 79:20;
  83:18; 86:14; 87:19; 88:1, 4,
  22; 89:4, 12, 13, 15, 18; 90:6;
  92:1, 3; 94:14, 21; 96:1, 2,
  17, 22; 97:7; 98:9, 10, 12, 13,
  16; 102:22; 103:18
**accounts** [28]
  60:6, 8, 10, 15; 61:1; 77:21;
  88:25; 89:20; 91:11, 21, 24;
  96:4, 8, 9, 11, 25; 97:12, 15,
  16; 98:3, 6; 99:5; 101:12, 13;
  103:6, 8, 10, 15
**accuracy** [1]
  18:3
**accurate** [9]
  19:16; 22:4, 6; 45:21; 50:20;
  55:10; 82:22; 90:19, 20
**achieved** [1]
  45:18
**acknowledged** [1]
  107:18
**Acosta** [1]
  8:14
**act** [2]
  56:17; 79:17
**acting** [1]
  81:3
**ACTION** [1]
  1:6
**action** [4]
  68:1; 70:18; 108:13, 15
**actions** [1]
  66:1
**additional** [3]
  36:4; 42:18; 83:17
**address** [2]
  7:11, 21
**addressed** [1]
  65:25
**adhere** [1]
  75:13

**administration** [1]
  72:3
**administrator** [5]
  8:12; 56:17, 18, 21; 66:2
**admissible** [3]
  28:15, 16, 19
**advanced** [1]
  11:25
**advice** [7]
  25:5, 9, 24; 30:2; 31:6; 37:7;
  39:24
**advising** [1]
  29:19
**affect** [4]
  27:21; 72:18, 19; 82:7
**affix** [1]
  107:4
**AFLAC** [62]
  3:18; 9:7, 13; 10:18; 11:5, 15;
  14:15, 19; 15:6; 16:20, 21;
  17:11; 24:15, 18; 25:20;
  27:24; 33:12, 13; 34:5; 35:4;
  39:14; 42:6, 15; 43:1, 9;
  46:13, 14, 16; 47:5, 10; 50:7;
  51:2, 7, 9; 52:7, 13, 22;
  54:18; 55:13, 16, 18; 56:16,
  20; 57:16, 24; 59:14, 17, 18;
  63:24; 64:1, 3, 20, 21; 73:14;
  78:4; 86:12; 88:14; 89:11;
  91:19; 95:20
**AFLAC's** [5]
  9:11, 14; 48:7; 49:7; 56:22
**afternoon** [1]
  66:12
**afterwards** [2]
  37:12; 93:21
**agenda** [1]
  47:1
**agent** [19]
  13:20; 14:3, 4; 34:12; 35:3, 9;
  36:17; 52:19, 22; 62:18; 64:5,
  6, 11, 14, 15; 86:12; 90:12;
  91:25; 96:7
**agents** [19]
  17:12; 19:7; 21:10; 31:16;
  43:2; 53:4, 6, 7; 63:22, 25;
  81:17; 82:12; 83:7, 11; 88:24;
  89:8, 19; 92:24; 102:14
**agree** [7]
  24:4; 28:22; 29:25; 39:17;
  56:20; 84:14; 89:10
**agreed** [1]
  92:22
**agreeing** [3]
  39:23, 25; 41:9
**agreement** [4]
  25:23; 58:9; 93:1; 108:7
**agreements** [1]
  61:12
**AGUILAR** [32]
  3:4, 5; 6:5; 24:2, 6; 26:2;
  28:12, 21; 29:16; 30:5, 10,
  16, 25; 31:11, 14; 35:16, 24;
  36:12, 23, 25; 37:11, 17, 25;
  38:5, 11; 40:6, 10, 13; 41:22;
  76:3; 85:13; 104:22
**Aguilar** [30]
  5:8; 24:8; 25:2, 11; 26:3, 23;
  27:18; 28:24; 29:23; 31:4, 15;
  33:12; 34:20; 36:3; 37:1;
  38:13; 39:22; 40:14; 41:23;

56:3; 68:18; 76:7; 77:8;
85:16; 88:17; 89:23; 90:8;
96:20; 97:18; 98:5
**ahold** [1]
  88:15
**allow** [2]
  83:4; 86:2
**allowed** [3]
  6:25; 86:2, 5
**allowing** [1]
  30:21
**alluded** [1]
  83:14
**America** [3]
  13:12, 19; 14:25
**American** [2]
  14:10, 24
**amount** [2]
  85:9; 90:5
**annual** [6]
  46:14, 17, 22, 25; 47:11, 24
**annualized** [1]
  47:4
**answer** [30]
  6:21, 24; 7:2, 6; 25:2; 26:6, 8,
  14, 19; 27:23; 28:23, 25;
  29:18, 20; 30:11; 33:25;
  34:20, 23; 39:3; 40:18; 44:7;
  45:4; 50:16, 20; 51:4; 52:15,
  24; 53:1; 54:7; 55:5; 56:9;
  96:3; 97:19; 102:9; 104:12
**answered** [5]
  36:1; 41:11, 12; 45:8; 99:3
**answering** [1]
  6:20
**anybody** [4]
  36:19; 54:17, 18; 74:25
**anymore** [1]
  9:19
**anyway** [2]
  29:22; 53:1
**anywhere** [1]
  88:12
**appear** [2]
  72:4; 73:17
**APPEARANCES** [1]
  3:1
**Appearances** [1]
  5:4
**appears** [1]
  107:13
**applied** [2]
  15:20; 59:14
**apply** [1]
  16:5
**appoint** [1]
  64:20
**approach** [1]
  17:18
**approached** [2]
  16:6, 7
**appropriate** [1]
  21:20
**areas** [1]
  35:22
**aren't** [1]
  61:14
**argumentative** [1]
  96:14
**ARNOLD** [2]
  3:4, 5

**Arnold** [9]
  23:25; 28:11; 30:3; 35:18;
  36:9; 37:21; 76:2; 104:19;
  105:1
**Arnold's** [1]
  26:20
**arrangement** [2]
  52:17; 102:17
**Artemis** [1]
  3:5
**asking** [32]
  6:11, 14, 18; 7:5; 25:11, 14;
  33:22, 23, 24; 35:17; 36:10;
  38:3; 41:12; 45:6; 46:20, 21;
  49:21; 51:18; 53:13; 61:15;
  63:17; 72:14; 95:6; 96:11;
  98:17; 99:1, 22; 100:17;
  102:7; 104:10, 11
**asks** [1]
  72:1
**aspire** [1]
  22:22
**assign** [1]
  46:19
**assigned** [2]
  18:10, 13
**assigns** [1]
  46:14
**assist** [1]
  90:9
**assistant** [1]
  104:2
**associate** [18]
  15:9, 15, 24; 17:4, 16; 18:18;
  20:10; 42:6; 45:11; 53:10, 11,
  12, 14; 54:1, 5; 64:17; 90:12;
  94:20
**associated** [3]
  73:16; 77:23; 103:7
**associates** [24]
  18:17, 18; 20:15; 21:10; 22:3;
  41:18; 42:13; 43:14, 19, 23;
  44:2, 6, 7, 22, 23; 90:16, 17,
  20, 22; 93:5; 101:11; 102:11;
  103:5
**assume** [9]
  26:5; 32:20; 33:17, 20, 22,
  23; 34:9; 48:13; 57:6
**assuming** [1]
  25:18
**assumption** [2]
  33:15; 95:23
**assure** [1]
  68:24
**attached** [1]
  2:11
**attend** [1]
  10:15
**attended** [3]
  11:10, 14, 24
**Attending** [1]
  10:25
**attention** [1]
  65:8
**attorney** [8]
  24:9, 12; 25:14; 29:19; 30:2;
  34:22; 108:13, 14
**attorneys** [1]
  34:21
**audibly** [1]
  7:2

**Austin** [4]
2:9; 3:21; 7:18; 108:21

**available** [2]
39:14; 49:13

**Avenue** [2]
2:9; 3:20

**average** [6]
23:11; 25:12; 26:4; 27:8; 33:7; 38:13

**awarded** [5]
27:17; 62:24, 25; 63:5; 81:3

**aware** [6]
57:23, 25; 58:11; 64:25; 93:10; 98:2

**awful** [1]
75:6

**– B –**

**B-E-L-L-A** [1]
7:14

**background** [2]
10:4; 78:1

**BARKER** [3]
2:6; 108:6, 19

**Barnson** [4]
55:11; 57:19, 21

**Based** [1]
21:23

**based** [16]
22:2; 25:5, 24; 27:6, 7; 29:17; 30:2, 11, 13; 31:5, 23; 32:14; 37:7; 39:7; 71:23; 82:5

**bases** [1]
30:23

**basic** [1]
90:12

**basically** [5]
23:24; 39:10; 84:12; 85:18; 88:21

**basis** [13]
21:16; 25:8; 31:1; 32:18; 81:1; 87:14, 15; 97:2, 5, 9; 98:15; 99:11, 13

**believe** [16]
14:20; 17:25; 23:1; 24:13, 15; 45:4; 48:22; 56:19; 64:3, 22; 70:24; 71:23; 73:18; 80:24; 81:11; 93:4

**Bella** [2]
7:12, 14

**benefit** [3]
62:23; 77:24; 86:18

**benefits** [3]
59:17, 22; 86:24

**bet** [2]
31:3; 88:20

**bid** [9]
62:18, 20; 63:15, 23, 24; 64:1, 2, 4, 5

**bids** [1]
63:12

**bills** [1]
101:15

**birth** [1]
10:2

**BISD** [9]
5:18; 56:12; 57:24; 64:1; 65:9; 87:9; 88:5; 96:2

**BISD's** [1]
66:2

**bit** [2]
10:10; 79:10

**Board** [1]
1:9

**board** [1]
71:7

**Boca** [1]
3:16

**BOSQUE-GILBERT** [1]
1:7

**boss** [1]
74:25

**Boulevard** [2]
3:6, 16

**break** [5]
7:9, 10; 38:10; 76:2; 85:13

**breakdown** [1]
29:2

**Brian** [1]
11:3

**Brief** [3]
38:12; 76:4; 83:10

**broken** [1]
43:10

**BROWNSVILLE** [3]
1:2, 5; 3:8

**Brownsville** [7]
1:9; 3:6, 11, 16; 37:19, 20; 65:8

**bullet** [11]
77:1; 78:23; 79:1; 80:24; 81:12, 13; 84:21, 22; 85:1; 86:20; 87:18

**bunch** [1]
60:1

**business** [41]
8:17, 18; 9:4, 12, 13, 15; 10:17; 12:3, 12; 13:4; 26:22; 69:15; 72:2, 23; 74:4, 6, 18; 75:3; 78:24; 79:6, 9, 10; 80:5, 16, 17, 25; 82:4, 8; 86:6, 17, 18; 88:20; 90:4; 101:20, 23, 25; 102:1, 6

**– C –**

**C-E-M-A** [1]
7:15

**C-I-M-A** [3]
7:14, 16, 17

**cab** [1]
104:25

**Cafeteria** [1]
5:18

**cafeteria** [3]
56:12; 66:2; 100:7

**calculations** [2]
27:11, 15

**call** [9]
9:9; 14:4; 61:22; 67:12, 16; 70:19, 22; 90:1; 104:15

**calling** [1]
34:22

**calls** [2]
16:18; 71:23

**Campus** [1]
72:3

**capacities** [1]
1:9

**capacity** [7]
13:14, 16; 61:2; 79:16, 23,

24; 81:4

**card** [1]
107:15

**care** [1]
79:19

**career** [1]
54:4

**carefully** [1]
108:10

**carrier** [1]
66:22

**carry** [1]
68:21

**case** [7]
30:21; 32:22; 33:20; 34:9; 82:16; 83:5; 91:24

**cases** [2]
90:21; 92:20

**catch** [2]
104:24; 105:5

**categories** [2]
51:5; 64:15

**cease** [2]
71:23; 72:1

**cell** [1]
104:15

**Central** [2]
3:6; 10:1

**CERTIFICATE** [1]
108:1

**Certificate** [1]
5:12

**Certified** [3]
2:6; 108:6, 16

**certify** [2]
108:7, 12

**cetera** [1]
103:17

**challenges** [1]
83:18

**chance** [2]
47:18; 104:20

**CHANGE** [1]
106:4

**change** [3]
57:18; 75:3; 84:24

**changed** [2]
19:14

**CHANGES** [1]
106:1

**Changes** [1]
5:10

**changes** [2]
87:7; 100:16

**charge** [2]
79:2, 12

**CHAVEZ** [1]
1:3

**Chavez** [10]
3:24; 66:1; 67:12, 16; 83:8; 85:2; 87:19; 89:21, 25; 90:1

**check** [10]
18:3, 23; 23:13, 17; 26:25; 93:21, 22; 94:12; 95:2, 9

**checked** [2]
94:7, 13; 95:6

**Chica** [1]
3:16

**chose** [2]
39:13; 104:14

**chosen** [1]

92:19

**Chuck** [1]
12:18

**Cima** [2]
7:12, 14

**Cindy** [2]
8:14, 22

**circumstances** [4]
63:2; 84:23; 92:1, 2

**City** [5]
11:21; 97:23, 25; 100:2, 4

**city** [1]
7:23

**CIVIL** [1]
1:6

**Civil** [1]
2:10

**claim** [1]
59:16

**claims** [3]
60:6, 7; 88:2

**clarified** [1]
44:5

**clarify** [1]
99:16

**clear** [9]
6:17; 23:24; 36:16; 71:22; 79:1; 87:11; 91:23; 98:8; 103:1

**client** [5]
25:10; 51:20; 68:22; 74:1, 2

**clients** [4]
74:15; 90:15; 91:11; 99:6

**clothing** [1]
12:7

**college** [5]
10:6, 8, 13, 14; 11:25

**combine** [1]
33:9

**comment** [2]
87:16; 99:14

**commission** [2]
19:6; 20:8

**commissions** [8]
21:9; 26:24; 27:19, 25; 28:3, 5; 81:8; 89:19

**communication** [1]
55:23

**companies** [7]
14:7, 16, 22; 15:2; 27:16; 63:13; 78:4

**Company** [3]
12:25; 13:11, 18; 14:24

**company** [17]
12:21, 24; 13:7, 17; 14:6; 17:17, 24; 18:3; 23:19; 42:2, 7, 21; 43:5; 72:20; 74:7, 15; 95:20

**company's** [1]
93:24

**compare** [2]
36:16; 49:10

**comparison** [3]
31:12, 21; 35:8

**compel** [8]
37:14, 15, 18, 22; 38:2, 6; 40:15

**compensate** [1]
79:18

**compensated** [2]
18:4; 82:8

**compensation** [11]
27:16; 80:9, 10, 11; 81:2;
83:4, 19, 22, 23; 85:10; 90:2
**competency** [1]
77:20
**competent** [2]
73:14; 77:25
**complain** [1]
98:18
**complaint** [1]
88:6
**complete** [2]
85:3; 103:3
**completely** [2]
36:20; 98:2
**complex** [1]
73:15
**complications** [1]
85:9
**concern** [2]
88:6; 96:23
**concerned** [4]
67:20; 82:6; 91:15, 17
**concerning** [1]
108:9
**concerns** [7]
91:11; 99:6, 7; 100:5, 9, 12;
103:16
**confidence** [1]
73:21
**confirm** [3]
75:22; 94:15, 25
**Congress** [2]
2:9; 3:20
**conscious** [1]
74:22
**consequences** [1]
73:23
**consider** [2]
30:20; 69:3
**considerable** [1]
90:5
**consideration** [1]
107:19
**considering** [1]
75:7
**consultation** [1]
25:25
**contact** [6]
24:11; 70:1, 14; 72:2, 3;
104:17
**contacted** [3]
24:13, 14; 70:3
**content** [1]
68:17
**contents** [1]
69:19
**continue** [8]
36:5, 21; 37:6, 19; 68:21;
87:13, 19; 88:18
**contract** [15]
18:24; 19:9, 17; 43:9; 52:16;
58:2, 11, 12, 13; 79:18; 80:3;
82:20, 21, 25; 103:6
**contractor** [1]
8:23
**contractors** [2]
42:21; 103:8
**contracts** [2]
52:20; 57:24
**contrary** [1]

93:24
**control** [1]
49:21
**controversy** [1]
108:10
**conversation** [7]
67:20, 24; 68:17; 69:10; 71:4;
72:15, 25
**convince** [2]
17:19; 30:7
**cooperation** [1]
86:7
**coordinator** [27]
9:5, 9; 15:8, 17; 20:4, 12;
21:2, 20; 22:24; 32:9; 44:25;
51:12, 18; 58:6; 64:12, 13;
81:4; 91:20; 92:19; 93:13, 16,
25; 94:1; 103:4, 5
**coordinators** [4]
51:15; 89:2, 3; 95:18
**copies** [2]
29:24; 101:17
**copy** [3]
26:15; 56:11; 62:9
**corporate** [3]
52:3; 58:17; 64:22
**CORRECTIONS** [1]
106:1
**Corrections** [1]
5:10
**correctly** [1]
56:18
**correspondence** [2]
87:3, 25
**cost** [6]
75:5; 96:6; 101:20, 22, 25;
103:7
**costs** [4]
98:3; 102:4, 6; 103:9
**counsel** [6]
25:24; 39:18, 24; 108:7, 13,
14
**COUNTY** [2]
107:11; 108:5
**couple** [3]
13:9; 14:1; 56:11
**COURT** [1]
1:1
**court** [4]
7:3; 29:15; 30:20; 36:21
**cover** [1]
35:22
**covers** [1]
22:14
**CPA** [1]
29:22
**create** [1]
83:17
**credited** [6]
78:24; 79:3, 5, 7, 21; 80:6
**criticism** [1]
51:1, 6, 10
**cross** [1]
30:9
**CSR** [1]
108:19
**curious** [1]
24:1
**current** [4]
7:11, 21; 9:12, 15 -
**customer's** [1]

74:22
**cut** [1]
55:23

**– D –**

**Dallas** [9]
58:6; 97:23; 100:1, 2, 4;
101:10, 15; 102:22
**DATE** [1]
106:3
**Date** [1]
108:20
**date** [12]
10:2; 26:10; 66:16, 17; 70:9,
11; 75:22; 76:16, 23; 77:9,
15, 18
**date-wise** [1]
75:21
**dated** [1]
66:17
**dates** [3]
70:5, 7
**Davies** [4]
15:19; 16:3, 8, 13
**day** [13]
2:4; 65:24; 66:20, 21; 73:18;
76:18; 100:15, 16; 107:12,
21; 108:8, 16
**day-to-day** [7]
97:2, 4, 9; 98:15; 99:6, 11, 13
**days** [1]
86:23
**deal** [5]
46:17; 73:15, 24; 74:25;
103:9
**dealing** [1]
103:15
**December** [10]
29:5; 55:4; 75:18; 76:20, 22;
77:6, 9, 14
**decide** [2]
25:25; 40:5
**decided** [1]
75:7
**decision** [10]
21:22; 40:3, 8, 11; 74:8;
77:10, 14, 17; 78:13; 80:20
**deemed** [1]
96:18
**DEFENDANT** [2]
3:8, 13
**degree** [2]
10:14; 11:25
**degrees** [2]
10:6, 8
**DEL** [1]
1:7
**demographics** [1]
48:1
**department** [6]
57:2; 58:16, 22; 63:18; 64:24;
75:12
**depend** [1]
47:25
**depending** [1]
48:17
**DEPOSITION** [3]
1:13; 2:1; 105:7
**deposition** [6]
6:9; 24:16; 37:19; 107:4;

108:11, 14
**deposits** [1]
60:13
**DESCRIPTION** [1]
5:16
**description** [1]
107:15
**desist** [2]
71:24; 72:1
**determine** [4]
26:17; 31:10; 49:12; 64:1
**determining** [1]
34:10
**developing** [1]
22:21
**Development** [1]
22:21
**development** [4]
22:8, 9, 10, 19
**difference** [1]
42:11
**difficult** [1]
15:1
**difficulty** [1]
26:18
**dig** [1]
26:15
**DINO** [1]
1:3
**Dino** [79]
3:24; 50:10; 53:5; 54:15;
55:12; 67:12; 68:25; 69:25;
70:1, 3, 14, 19, 22; 71:4, 22;
72:5, 6, 20; 73:3, 16, 20, 22,
23; 74:5; 75:5, 8; 78:8, 14;
79:17; 81:19, 24; 82:2, 10,
11, 20; 83:3, 8, 18, 21, 23;
85:2, 6, 7, 10, 18, 22, 23;
86:1, 11, 13, 16; 87:12, 22;
88:15; 89:3, 5, 21; 90:1;
91:23; 92:7, 22; 93:3, 10, 12;
94:13, 15, 17, 19; 95:9, 25;
98:9, 10, 20; 99:12, 17
**Dino's** [18]
54:12, 14, 17; 73:17; 75:13;
78:8; 79:23, 24; 83:11, 20;
85:16; 86:2, 5; 87:20; 88:8,
12; 97:4; 102:17
**diploma** [1]
11:18
**direct** [3]
20:9, 11, 13; 104:2
**directed** [1]
72:3
**director** [1]
12:21
**disagree** [2]
30:6; 84:17
**discoverable** [1]
30:23
**discovery** [3]
28:15, 19; 30:21
**discuss** [1]
25:15
**discussed** [4]
40:15; 78:17, 21; 95:16
**discussions** [1]
25:9
**dissatisfied** [1]
74:18
**distinguish** [1]

104:4

**DISTRICT** [4]
1:1, 6; 3:9

**District** [4]
1:10; 15:8; 97:24; 101:16

**district** [23]
18:10, 13; 22:23; 44:25;
52:19; 53:10, 15, 17, 18;
54:2, 5; 64:12; 71:22; 73:16;
77:22; 78:25; 79:4, 6, 7; 80:6;
86:25; 91:18; 103:5

**district's** [2]
77:24; 79:14

**DIVISION** [1]
1:2

**document** [18]
50:5; 56:5; 57:2; 62:6, 8, 10,
12, 18, 22; 63:4, 8; 65:1, 13;
76:9; 77:5; 95:17; 107:16

**documented** [1]
70:9

**documents** [13]
29:2; 31:5; 59:5, 6, 12, 15;
61:4, 10, 11, 13; 64:23; 70:6;
75:23

**Doesn't** [1]
64:6

**doesn't** [6]
27:24; 28:16; 36:19; 49:18;
64:14; 82:7

**dollars** [1]
47:3

**doors** [1]
102:25

**doubt** [1]
71:10

**dozen** [1]
61:13

**Dr** [18]
66:3; 68:2, 4, 12; 70:2, 11,
13; 71:23; 73:5, 19; 74:24;
78:11, 18; 82:5; 83:6, 20;
84:25; 87:11

**draw** [1]
83:4

**Drive** [3]
7:12, 14, 17

**DSC** [36]
15:12, 14, 24; 17:1, 23; 18:5,
19; 20:3; 21:18; 23:12, 24;
25:12; 31:23; 32:11, 14; 33:6,
9; 34:4, 15, 16, 18; 35:9;
38:14; 39:2; 41:12; 45:9;
47:7, 25; 52:12; 53:18; 64:17;
84:5, 7, 19; 90:15

**DSC's** [22]
18:16; 20:15; 21:10; 44:3, 6,
9, 11; 45:2, 12; 46:12; 47:24;
48:11; 53:7; 84:18; 90:17, 19,
20; 91:3, 8; 100:25; 101:11;
102:11

**duly** [3]
2:3; 6:2; 108:9

**DUNN** [1]
1:7

**duties** [6]
9:8, 10; 17:9; 84:14; 90:24

— E —

**E-mail** [1]

5:20

**e-mail** [1]
76:12

**e-mailed** [1]
76:17

**earn** [1]
27:22

**earnings** [2]
26:25; 27:9

**easier** [2]
10:12; 29:3

**effectively** [1]
85:10

**eight** [1]
19:11

**eliminated** [1]
78:9

**ELIZABETH** [1]
3:10

**Ella** [1]
7:13

**else's** [1]
83:8

**EMERSON** [1]
1:8

**emphasize** [1]
29:14

**employed** [2]
108:13, 15

**employee** [6]
8:22, 24; 13:13; 88:5; 98:18;
108:14

**employees** [17]
41:24, 25; 42:13; 89:16; 92:3,
4, 6, 7; 96:23; 97:1, 23, 25;
100:5; 103:16, 23, 25

**employer** [3]
62:22; 63:9, 24

**employers** [1]
63:11

**employment** [1]
20:2

**enabling** [1]
25:9

**encourage** [2]
44:20, 21

**end** [3]
20:7; 35:14; 36:19

**ended** [1]
38:21

**ending** [1]
84:22

**enforce** [1]
42:18

**engaging** [1]
63:10

**enroll** [1]
78:24

**enrollers** [3]
79:15; 80:24; 81:15

**enrollment** [14]
77:3; 79:2, 13; 80:9, 14; 81:4,
9; 82:13; 86:16; 87:12; 90:4;
92:24; 93:11, 17

**enter** [1]
12:11

**entered** [4]
13:3, 4; 57:24; 58:2

**entitled** [4]
28:13; 36:21; 82:24; 83:1

**envelope** [1]

69:19

**Errisuriz** [3]
65:12; 78:18; 87:4

**establish** [1]
31:9

**estimate** [1]
38:16

**et** [1]
103:17

**events** [1]
67:18

**everybody** [2]
86:18; 103:10

**evidence** [2]
28:15, 19

**exact** [2]
23:15; 26:6

**exactly** [2]
35:19; 68:9

**EXAMINATION** [1]
6:4

**Examination** [1]
5:8

**examination** [1]
108:10

**examined** [1]
108:10

**example** [9]
34:18; 48:10; 52:11; 63:25;
91:8; 100:6; 101:9; 102:12,
22

**Except** [1]
33:2

**except** [1]
107:5

**exception** [1]
34:6

**exchange** [1]
86:1

**Excuse** [1]
36:2

**executed** [1]
107:18

**Exhibit** [8]
56:1, 4; 57:10; 65:12; 76:5, 8;
78:18; 87:4

**EXHIBITS** [1]
5:14

**exist** [1]
29:2

**expect** [14]
41:18, 20, 23; 42:1; 43:1;
45:4; 48:14, 15, 16, 17; 52:6,
7, 13; 85:6

**expectation** [4]
42:24; 45:3, 7, 9

**expectations** [9]
42:13, 19; 44:8, 11; 45:1;
46:4; 48:8; 49:17, 19

**expected** [9]
48:11, 21; 50:6; 85:7, 22;
86:10, 13; 88:17

**expecting** [1]
85:5

**expects** [1]
46:13

**expense** [2]
103:12, 13

**expenses** [2]
92:21; 101:18

**experience** [6]

78:3; 97:12, 14, 20, 21, 22

**experts** [1]
11:8

**Expiration** [1]
108:20

**explain** [14]
6:23, 24, 25; 10:7, 10; 22:5,
18; 36:20; 70:14; 77:1; 87:9;
98:8; 104:6, 7

**explained** [8]
32:19; 71:5; 81:16; 84:4, 6,
11; 90:12; 91:7

**expressed** [2]
95:19; 107:19

**extensive** [1]
78:1

**extent** [7]
6:21; 30:25; 31:23; 32:14;
69:9; 103:10, 11

— F —

**fact** [7]
34:6; 60:16; 71:9; 84:8;
88:14; 94:11, 12

**factored** [1]
27:19; 34:8

**factors** [1]
48:18

**fairly** [1]
33:15; 82:22

**faith** [1]
73:20

**fall** [1]
64:15

**familiar** [5]
31:16; 61:16; 67:2; 94:24;
96:5

**family** [1]
92:12

**fax** [9]
3:7, 12, 17, 21; 65:21; 66:24,
25; 67:6; 104:16

**faxed** [1]
65:19

**Federal** [2]
2:10; 30:18

**feel** [1]
6:23

**felt** [3]
21:20; 78:5; 83:16

**field** [1]
64:10

**figure** [9]
27:4; 31:18, 20; 38:19; 60:2;
69:14, 24; 70:18; 102:2

**figured** [1]
85:1

**file** [5]
69:13, 17; 70:18, 21; 98:19

**filed** [1]
6:12

**filling** [1]
79:16

**final** [1]
87:18

**finance** [1]
92:21

**financial** [2]
78:2; 102:17

**financially** [1]

108:15

**find** [4]
  28:8; 39:4; 59:23, 25
**fine** [2]
  37:25; 38:4
**finish** [4]
  6:18, 19; 37:17; 97:19
**fired** [1]
  43:9
**Firm** [1]
  108:20
**First** [2]
  41:25; 77:1
**first** [22]
  6:2, 24; 12:3; 14:8; 19:5;
  21:18; 24:11; 26:11; 64:3, 5,
  7, 19; 67:9; 71:21; 72:5, 21;
  77:1; 79:11; 88:8; 93:8
**FISHER** [1]
  3:10
**five** [2]
  44:22; 104:22
**fix** [2]
  68:21; 70:19
**flavor** [1]
  89:16
**Flex** [13]
  56:16; 57:2; 58:15, 19, 20,
  24; 59:18, 25; 60:19, 21, 25;
  63:18; 64:24
**flexible** [1]
  77:21
**fly** [1]
  38:8
**followed** [1]
  83:16
**following** [8]
  39:24; 42:7; 43:2; 67:21;
  70:4, 17; 73:18; 108:8
**follows** [1]
  6:2
**force** [4]
  9:17, 21; 64:10; 94:4
**foregoing** [2]
  107:3, 17
**forgot** [1]
  24:8
**form** [9]
  33:11; 34:19; 35:11; 62:11,
  15; 68:14; 89:24; 90:3; 98:20
**forms** [1]
  62:5
**Fort** [1]
  97:25
**forth** [1]
  104:11
**forward** [2]
  30:21; 87:14
**found** [1]
  16:4
**four** [1]
  21:15
**FRANK** [9]
  1:14; 2:2; 5:7; 6:1; 106:2;
  107:3, 9, 13; 108:8
**Frank** [13]
  6:7; 15:19; 16:2, 8, 13, 16,
  18; 25:20, 23; 26:14; 28:19;
  29:17; 40:4
**Franklin** [3]
  12:25; 13:4; 14:25

**frankly** [4]
  25:20; 72:16; 82:6; 83:6
**frequently** [2]
  45:18; 63:15
**front** [1]
  19:17
**fulfill** [1]
  74:23
**full** [2]
  6:6; 97:6
**fully** [1]
  83:20
**future** [4]
  9:12, 15; 72:20; 93:23
**FYI** [1]
  37:11

– G –

**gain** [2]
  9:12, 15
**gave** [2]
  73:11; 79:19
**generated** [2]
  80:17; 82:3
**gentleman** [1]
  12:14
**GERRI** [2]
  2:6; 108:6, 19
**gets** [2]
  64:2; 81:14
**Give** [1]
  104:22
**give** [7]
  20:22; 27:10; 38:16; 44:8;
  52:13; 54:3; 105:2
**Given** [1]
  107:20
**given** [7]
  15:5; 46:19; 47:18; 52:21;
  53:5; 108:11
**giving** [1]
  53:7
**glad** [1]
  34:25
**goal** [4]
  44:3; 45:15, 16, 18
**goals** [10]
  43:11, 12, 13, 16, 17, 18, 19,
  21; 44:7
**goes** [2]
  81:13; 98:1
**gotten** [3]
  66:9; 79:22; 85:10
**Great** [1]
  46:10
**great** [1]
  46:9
**greater** [1]
  103:11
**grew** [1]
  10:5
**group** [5]
  23:9; 81:6; 84:23; 100:1;
  102:20
**groups** [1]
  10:20
**grow** [3]
  44:20; 45:24; 48:22
**Growth** [3]
  22:10; 23:7, 9

**growth** [34]
  22:1, 2, 25; 23:1, 2, 3; 38:14;
  39:1, 6; 40:16, 20, 23; 41:4,
  5, 7, 17, 21, 24; 42:1, 4, 9,
  10, 12; 43:14, 22; 44:4, 12,
  17, 19; 45:1, 5, 22; 48:8, 11
**GUERRA** [1]
  3:15
**guess** [4]
  8:19; 14:13; 33:23; 76:18
**guidelines** [1]
  83:17

– H –

**H-2** [1]
  3:5
**hadn't** [2]
  71:17; 75:9
**half** [2]
  55:9; 78:12
**hand** [5]
  56:3; 65:11; 75:24; 76:7;
  107:20
**handle** [14]
  59:15, 18; 60:1, 5, 8, 13;
  61:7, 9, 14; 64:24; 92:12;
  96:25; 98:24; 100:12
**handled** [2]
  47:21; 96:4
**handles** [1]
  58:22
**handling** [6]
  60:25; 61:6; 87:24; 98:15;
  99:5, 6
**handwriting** [2]
  76:15, 24
**happens** [3]
  47:14; 55:15, 18
**hard** [2]
  26:15; 88:4
**harder** [1]
  31:17
**haven't** [2]
  19:14; 67:3
**He's** [2]
  84:10; 104:24
**he's** [2]
  24:4; 77:25
**head** [5]
  7:4; 16:24; 49:4; 54:9; 66:13
**headquarters** [2]
  88:13; 104:17
**help** [2]
  26:12; 75:24; 99:20, 21
**helping** [1]
  85:17
**hereby** [2]
  107:4; 108:7
**hereto** [2]
  2:12; 108:15
**hey** [1]
  16:18
**high** [6]
  10:15; 11:14, 17; 12:2; 33:7;
  34:4
**higher** [1]
  15:9
**highest** [1]
  34:5
**highly** [1]

**growth**

**77:25**
**hire** [1]
  44:22
**holds** [2]
  32:23; 34:3
**home** [2]
  54:25; 55:7
**honor** [1]
  74:23
**honored** [2]
  64:4; 83:20
**Hopkins** [1]
  11:3
**hours** [2]
  72:2; 73:17
**HUGH** [1]
  1:8
**Huh-uh** [1]
  69:8
**huh-uh** [1]
  67:25
**hung** [1]
  73:3

– I –

**I'd** [2]
  16:19; 57:3
**I've** [10]
  10:4; 15:4; 31:22; 53:9;
  55:20, 24; 64:25; 65:11;
  75:25; 76:7
**idea** [13]
  25:19; 27:1; 35:2, 13; 40:10;
  55:20, 24; 56:22; 59:1; 72:13;
  89:6; 93:20; 95:22
**identification** [2]
  56:2; 76:6
**identity** [1]
  107:15
**III** [1]
  3:19
**imagine** [4]
  21:23; 51:20; 52:3; 53:9
**immediate** [2]
  102:23; 103:20
**immediately** [1]
  70:13
**immediately** [5]
  67:21; 70:1, 4, 17, 20
**impose** [1]
  76:1
**impossible** [1]
  50:4
**improve** [1]
  43:2, 3
**inaccurate** [1]
  46:10
**inappropriate** [1]
  62:21
**include** [1]
  59:15
**included** [1]
  87:23
**income** [7]
  34:16; 82:11; 83:5; 86:15;
  90:5, 7, 10
**incorrect** [2]
  81:21; 97:6
**increase** [1]
  44:16

increased [1]
  42:8
increases [1]
  43:22
incur [1]
  103:12
INDEPENDENT [2]
  1:5; 3:8
independent [3]
  1:10; 97:24; 101:15
independent [4]
  8:22; 42:21; 102:14; 103:8
INDEX [1]
  5:1
indicate [1]
  91:10
indicates [2]
  56:16; 95:17
indication [1]
  65:22
indicative [4]
  34:11; 35:3, 14; 36:19
individually [1]
  47:22
individuals [2]
  17:10; 18:8
industry [4]
  11:1, 9; 12:16; 51:3
infinitesimal [1]
  29:13
information [25]
  19:16; 26:10; 27:10; 28:8;
  29:21, 25; 30:1; 36:5, 6; 37:3,
  7, 13; 38:24; 40:7; 41:9;
  49:12; 52:2, 4; 59:7; 65:7;
  85:3; 86:12; 88:6; 97:17;
  104:16
informed [3]
  24:15; 86:23; 87:1
initially [2]
  67:14; 69:23
inquiry [1]
  35:15
INSERT [1]
  4:3
instance [1]
  2:3
instruct [1]
  25:1
instructed [2]
  39:18; 104:14
instructing [2]
  30:11; 34:23
instruction [1]
  31:1
instrument [3]
  62:23; 63:21; 107:17
Insurance [5]
  12:25; 13:5, 11, 18; 14:24
insurance [15]
  8:18, 25; 9:2, 3; 10:20; 12:3,
  12, 23; 18:6, 7; 29:24; 51:2,
  3, 7, 8
intelligent [1]
  78:1
intending [1]
  95:13
interested [1]
  108:15
International [1]
  3:15

interpretation [1]
  57:14
interpreted [1]
  57:7
interrupt [2]
  6:18, 19
interruption [2]
  83:10; 87:21
interview [1]
  16:10
interviewed [1]
  15:25
intricacies [1]
  77:22
invades [1]
  29:12
invading [1]
  30:15
invasion [1]
  29:12
investment [1]
  74:6
involve [2]
  9:10, 16
involved [19]
  27:11, 15; 30:19; 59:12; 69:3;
  80:13; 82:5; 87:13; 89:17;
  94:4; 95:25; 96:1, 6, 17, 19;
  98:3, 14, 20; 100:24
involvement [2]
  57:9; 58:8
involves [1]
  91:7
issue [1]
  78:6
issues [4]
  58:23; 73:15; 88:1; 98:15
Item [2]
  56:13, 16
Item [1]
  77:1

— J —

Jain-Hudson [1]
  57:3
January [1]
  21:1
Jeff [3]
  3:24; 104:21; 105:5
Jim [1]
  11:3
job [6]
  33:25; 72:24; 74:4, 16; 85:8;
  91:9
jobs [2]
  12:5; 84:19
Join [1]
  68:15
JR [1]
  1:8
judge [2]
  36:15; 37:23
jumping [1]
  90:22
justification [1]
  52:14

— K —

keenly [1]
  98:2

keep [2]
  79:20; 102:1
kinds [1]
  102:5
Knowing [2]
  36:3; 37:1
knowledge [6]
  51:2, 7; 61:3; 65:7; 97:3, 7
Kuechenmeister [1]
  55:12

— L —

L.L.P. [4]
  2:8; 3:10, 15, 20
LaFEMINA [9]
  1:14; 2:2; 5:7; 6:1; 106:2;
  107:3, 9, 13; 108:8
LaFemina [9]
  5:20; 6:7, 8; 25:10; 28:19;
  56:1, 4; 65:20; 76:8
laid [1]
  89:1
larger [1]
  23:5
last [3]
  29:3; 86:20; 93:9
latitude [1]
  79:20
LAW [1]
  3:5
laws [2]
  51:2, 7
lawsuit [2]
  6:12; 30:19
lead [3]
  28:14, 15, 18
leader [6]
  77:3, 11, 18, 19; 78:14, 15
lease [2]
  101:14; 102:13
legal [1]
  75:12
Let's [4]
  38:9; 75:23; 100:4
let's [5]
  21:17; 52:11; 63:25; 64:1;
  104:19
letter [18]
  24:2; 65:25; 66:4, 9; 67:8, 21;
  68:2, 7, 11, 13; 71:24; 75:12;
  78:11, 18, 21; 83:2; 84:25;
  87:5
level [3]
  18:15; 22:24; 44:25; 90:22
Levine [9]
  77:2, 10; 78:23; 79:2; 81:1;
  84:9; 85:24; 89:8; 90:11
LIDDELL [1]
  3:20
Liddell [1]
  2:8
Life [4]
  12:23, 25; 13:4; 14:25
LINE [2]
  5:16; 106:4
line [2]
  37:24; 104:23
lines [1]
  55:22
list [1]

98:1
listen [1]
  6:20
literally [2]
  48:20; 61:13
litigation [1]
  24:19
location [1]
  100:10
LOCKE [1]
  3:20
Locke [1]
  2:8
looks [2]
  65:21; 66:23
lose [1]
  75:2
loses [1]
  74:5
lot [4]
  19:14; 31:10; 75:6; 86:14
love [1]
  43:3
low [1]
  33:7
lower [1]
  20:20
Lunch [1]
  16:11

— M —

machine [1]
  2:7
mail [2]
  65:16; 68:5
mainly [1]
  10:5
maintain [1]
  74:16
maintaining [1]
  98:3
majority [3]
  45:13; 46:9, 10
man's [1]
  30:15
manage [1]
  101:12
management [3]
  35:4; 47:6, 7
managers [1]
  11:9
managing [2]
  14:3; 60:16
manner [3]
  72:18; 87:20; 105:4
MARILYN [1]
  1:7
marked [6]
  56:2; 65:11; 75:25; 76:6, 8,
  14
marking [1]
  56:4
matter [4]
  24:12; 35:5; 49:18; 84:8
matters [3]
  28:10; 78:21; 108:9
maximum [1]
  86:7
MAY [2]
  1:15; 106:3

**May** [2]
*2:5; 108:8*
**mean** [25]
*17:14; 18:9; 21:24, 25; 22:25; 23:3; 30:3; 35:13; 39:22, 25; 43:8, 10, 11; 46:22; 57:13, 15, 17; 75:21; 77:15; 79:9; 84:7, 24; 87:21; 97:16*
**Meaning** [1]
*23:4*
**meaning** [2]
*22:2; 60:8*
**means** [3]
*40:2; 94:2, 3*
**meant** [5]
*22:18; 32:5; 48:13; 74:5; 87:10*
**measured** [1]
*47:2*
**meet** [3]
*43:8; 45:13*
**meeting** [5]
*73:6, 8, 10, 17; 75:14*
**meetings** [2]
*24:21, 24*
**meets** [1]
*46:6*
**MELANIE** [1]
*3:14*
**Members** [1]
*1:9*
**memo** [2]
*76:11; 88:18*
**men's** [1]
*12:7*
**mentioned** [5]
*55:24; 60:18; 66:17; 103:17, 21*
**middle** [1]
*31:10*
**million** [2]
*26:22; 27:6*
**mind** [4]
*14:25; 15:3; 71:18; 72:17*
**minimum** [4]
*41:17; 42:12, 22, 23*
**minuscule** [1]
*29:13*
**minutes** [2]
*68:5; 104:22*
**miscellaneous** [1]
*102:5*
**mischaracterize** [1]
*36:10*
**mischaracterizing** [1]
*25:18*
**Misrepresentation** [1]
*51:23*
**mixing** [1]
*84:9*
**moment** [1]
*85:14*
**money** [5]
*20:14; 29:9; 75:6; 86:14*
**MOORE** [2]
*3:14; 68:15*
**morning** [1]
*66:12*
**mother** [1]
*87:23*
**move** [10]
*37:13, 14, 15, 18, 22; 38:2, 6, 9; 40:14; 87:14*
**Moves** [4]
*16:24; 49:4; 54:9; 66:13*
**moving** [2]
*22:15; 74:8*
**MR** [70]
*3:4, 19; 6:5; 23:25; 24:2, 3, 6, 25; 25:8, 17; 26:2, 11; 27:13; 28:9, 12, 18, 21, 22; 29:11, 16, 17; 30:3, 5, 7, 10, 13, 16, 17, 25; 31:2, 11, 13, 14; 35:12, 16, 19, 24, 25; 36:7, 9, 12, 13, 23, 24, 25; 37:11, 17, 21, 25; 38:4, 5, 6, 11; 39:21; 40:2, 6, 9, 10, 12, 13; 41:21, 22; 76:1, 3; 77:7; 85:13; 97:21; 104:19, 22, 24*
**Mr** [57]
*3:24; 5:8, 20; 6:8; 24:8, 9; 25:2, 6, 10, 11; 26:3, 23; 27:18; 28:24; 29:23; 31:4, 15; 33:12; 34:20, 23; 36:3; 37:1, 8; 38:13; 39:22; 40:14; 41:23; 55:11, 12; 56:3; 57:19, 21; 65:20; 66:1; 67:12, 16; 68:18; 76:7; 77:8; 78:18; 84:9; 85:16, 24; 88:17; 89:8, 21, 23, 25; 90:1, 8, 11; 96:20; 97:18; 98:5*
**MS** [15]
*3:10, 14; 33:11; 34:19; 35:11, 18; 36:8; 37:16; 68:14, 15; 88:10; 89:22, 24; 96:14; 97:18*
**multiple** [2]
*27:11, 14*
**Myself** [1]
*7:25*
**myself** [6]
*10:23; 12:15; 19:2; 43:4, 17; 72:19*

––– N –––

**NAME** [1]
*106:2*
**Name** [1]
*14:8*
**name** [10]
*6:6; 8:13; 12:18; 53:13; 57:5; 58:16, 20; 65:20; 80:18; 107:16*
**named** [1]
*108:8*
**names** [4]
*17:15, 20; 53:4, 8*
**nature** [3]
*11:4; 96:15; 97:13*
**NEALLY** [13]
*3:10; 33:11; 34:19; 35:11, 18; 36:8; 37:16; 68:14; 88:10; 89:22, 24; 96:14; 97:18*
**negative** [1]
*72:18*
**negatively** [1]
*94:3*
**negotiated** [1]
*98:10*
**negotiating** [1]
*96:19*

**nine** [1]
*19:11*
**nobody** [1]
*100:20*
**nods** [1]
*7:4*
**NOE** [2]
*1:6; 3:13*
**nominate** [2]
*17:10, 14*
**non-product** [1]
*60:7*
**Nope** [1]
*40:12*
**normally** [2]
*79:17; 92:15*
**NOTARY** [1]
*107:24*
**noted** [1]
*107:5*
**notice** [2]
*52:18; 65:7*
**November** [11]
*14:20; 17:6; 50:9, 12, 23; 65:6; 66:15, 18; 70:10; 78:19; 87:5*
**Number** [1]
*38:20*
**number** [19]
*6:11; 14:5; 27:7; 38:20; 45:7; 46:20, 23, 24; 47:20; 48:18; 49:1; 54:3; 63:13; 65:20, 21; 66:24, 25; 67:7; 89:16*
**numbered** [1]
*2:4*
**numbers** [7]
*19:15; 23:16; 49:11, 14, 22, 23; 104:18*
**Numerous** [3]
*14:7; 48:4; 54:23*
**numerous** [2]
*48:4; 59:12*

––– O –––

**oath** [2]
*107:14; 108:10*
**Object** [2]
*89:24; 96:14*
**object** [4]
*25:17; 28:9; 29:11; 34:21*
**Objection** [10]
*33:11; 34:19; 35:11; 36:7, 8, 9; 37:16; 68:14; 88:10; 89:22*
**objection** [4]
*25:15; 35:25; 36:12, 23*
**objective** [2]
*86:15; 90:7*
**obligated** [1]
*25:22*
**obligating** [1]
*26:14*
**obligation** [1]
*25:23*
**obligations** [1]
*74:23*
**obtain** [1]
*74:16*
**obvious** [2]
*22:20; 78:16*
**Obviously** [1]

**77:12**
**Occasionally** [2]
*34:21; 99:9*
**occur** [1]
*67:15*
**occurred** [1]
*38:22*
**offered** [1]
*11:16*
**OFFICE** [1]
*3:5*
**office** [33]
*8:20; 16:12; 52:3; 54:25; 55:7; 58:17; 67:1, 3; 87:20, 22; 88:8, 12; 92:9, 10, 11, 13; 96:24; 97:4; 100:8, 11, 14, 18, 23; 101:5; 102:13, 16, 18, 23; 103:20; 104:1, 17; 107:20*
**offices** [1]
*2:8*
**official** [2]
*1:8; 87:3*
**officially** [1]
*40:7*
**Oh** [4]
*50:3; 53:3, 18; 80:23*
**Okay** [197]
*6:11, 25; 8:5, 11, 15, 17; 9:3, 16, 18; 10:13, 18; 11:17, 24; 12:2, 11; 14:8, 18; 15:6, 23; 17:6, 14, 23; 18:21, 25; 19:7, 20; 21:16; 22:2, 5, 10, 15, 18, 25; 23:11, 23; 24:11, 17; 25:5, 11; 26:2; 27:12, 21; 28:1, 8; 29:16; 30:24; 31:8, 20; 32:6, 10, 13, 17, 21; 33:1, 14; 34:1; 35:6, 24; 36:25; 37:24; 38:5, 18; 39:1, 19, 22; 40:13; 41:1, 6, 23; 42:3, 6, 12, 15; 43:13, 20; 45:1, 10, 12, 22; 46:6, 12, 15, 25; 47:2, 5, 10, 17, 23; 48:3, 5, 25; 49:5; 50:1, 6; 51:1, 11, 16, 22; 52:1, 5, 10, 21; 54:24; 55:1; 56:10; 58:11, 24; 59:20; 60:13; 61:5; 62:13, 17, 24; 63:11; 64:5, 19; 65:11, 25; 66:8, 19, 23; 67:5, 8, 15; 68:1, 6, 18; 69:19, 21; 70:1, 8, 13, 21, 25; 71:8, 12, 19, 25; 72:8, 21; 73:9; 74:5; 75:10, 20; 76:11, 19, 25; 77:13; 78:3, 10, 23; 79:8, 11; 80:1, 19; 81:5, 22; 82:1, 10, 15, 23; 83:23; 84:21; 85:1, 12; 86:19; 87:7; 88:21; 89:14; 90:8, 23; 91:16, 22; 93:3, 7, 18; 94:10; 95:2, 8, 12, 21, 24; 98:17; 99:19, 22, 24; 100:4, 11; 101:2, 4, 13, 24; 102:9, 10, 19; 103:2, 25*
**okay** [8]
*7:7; 28:5, 12; 36:3; 63:22; 98:8; 102:9; 104:23*
**old** [2]
*66:25; 67:1*
**OLIVEIRA** [1]
*3:10*
**one-and-a-half** [1]
*21:14*
**ones** [5]

15:4; 61:15; 64:25; 89:9; 90:14

**open** [2]
16:1; 89:12

**opening** [1]
68:5

**operation** [5]
22:1; 45:24; 85:8, 18, 23

**opinion** [5]
51:10; 52:9; 74:2; 77:24; 87:8

**opportunity** [2]
94:6; 105:2

**option** [1]
71:21

**Optional** [2]
5:18; 56:12

**options** [4]
47:20; 71:20; 72:10, 11

**ORAL** [2]
1:13; 2:1

**order** [4]
62:11; 63:8; 92:21

**organization** [10]
17:11; 22:9, 11, 19, 21, 22; 23:4; 43:18; 48:23; 74:18

**organizations** [1]
22:23

**organize** [1]
105:3

**outweigh** [1]
30:22

**outweighs** [1]
29:12

**overall** [1]
81:4

**overhead** [4]
8:5, 19; 101:7, 11

**Overnight** [1]
65:16

**overnight** [3]
66:18, 21

**override** [2]
79:22; 82:2

**overrides** [10]
28:1, 2, 3; 82:11; 84:13, 17; 85:19; 86:3, 4; 90:3

**oversaw** [1]
98:7

**overseeing** [1]
102:21

**– P –**

**p.m.** [2]
2:5

**PAGE** [4]
4:3; 5:2, 16; 106:4

**page** [2]
56:13; 107:6

**pages** [3]
56:8, 11; 69:18

**paid** [5]
79:25; 82:21; 101:24; 102:3, 7

**paperwork** [8]
59:7, 9; 60:2, 23, 24; 61:7; 62:13; 63:20

**Pardon** [2]
27:13; 69:16

**part** [14]
22:5; 32:18; 33:17; 45:14;

80:10, 11; 84:20, 21; 91:10; 101:14, 24, 25; 103:18

**participate** [2]
83:12, 13

**participated** [1]
83:15

**participating** [1]
82:12

**parties** [4]
74:9, 17; 108:13, 15

**partnership** [1]
8:2

**party** [4]
52:17; 56:18, 21; 66:2

**pay** [8]
8:19; 27:24; 38:8; 65:8; 80:4; 101:13; 102:5; 103:12

**paying** [4]
101:7, 10; 102:12, 14

**payments** [3]
21:8; 27:21; 60:13

**payroll** [1]
88:1

**pays** [6]
8:5, 8, 15, 19; 82:21

**People** [2]
18:10, 12, 13; 54:25

**people** [35]
11:3; 17:15, 18; 18:15; 22:8, 22; 38:20, 21; 42:20; 48:2; 49:8; 54:23; 55:6; 60:9; 69:1; 74:3; 80:13, 15; 82:3; 83:8, 9, 20; 86:2, 5; 89:13; 90:3; 91:18; 96:12; 98:11; 100:14, 24; 102:17; 103:12

**perceived** [1]
83:18

**percent** [38]
19:5, 11, 21; 20:8, 23; 21:15; 27:3; 44:16, 23; 45:5; 46:1; 47:2; 48:12, 14, 16, 17, 23; 78:25; 79:3, 7, 21; 80:6, 17, 20; 81:2, 7, 8, 10, 14; 82:19; 92:23; 93:3, 11; 94:16, 17, 23; 95:9

**percentage** [9]
18:21; 19:1; 20:18, 20; 21:13; 27:5; 79:12; 94:19; 95:14

**percentages** [1]
84:12

**perfectly** [2]
87:11; 103:1

**performance** [3]
21:23; 50:10, 22

**period** [5]
32:4; 38:22; 39:13; 50:22; 77:16

**periods** [1]
32:4

**permission** [1]
93:14

**person** [13]
12:15; 34:22; 35:4; 57:5, 7; 73:14; 74:9; 77:25; 88:8; 92:8; 98:24; 107:16; 108:8

**personal** [15]
19:4; 21:5; 34:7; 42:10; 43:12, 13; 44:12, 17, 19; 78:24; 79:6; 80:5; 81:11; 94:1; 104:1   -

**personally** [6]

9:18; 41:1; 79:20; 82:6; 96:13; 107:13

**personnel** [3]
72:2; 87:23; 92:10

**perspective** [1]
93:7

**pertinent** [1]
10:17

**phone** [3]
65:20; 72:15; 104:15

**phrasing** [1]
90:11

**place** [6]
19:9; 52:16; 72:15; 75:13; 90:6; 93:17

**PLAINTIFF** [1]
3:3

**Plaintiff** [1]
2:3

**Plan** [3]
5:18; 62:8; 65:1

**plan** [25]
56:12, 17; 59:5, 6, 18; 61:10, 11; 62:6, 8, 9, 12, 18, 21, 23, 25; 63:4, 5, 8, 14; 66:2; 77:24; 100:7

**plane** [1]
105:6

**planning** [1]
88:19

**Plaza** [1]
3:15

**please** [4]
6:16; 26:19; 87:2; 97:18

**plus** [5]
81:7; 92:3; 96:25; 103:23, 24

**point** [8]
17:1; 33:3; 58:12; 61:3; 71:17; 81:19; 82:21; 87:24

**pointed** [1]
77:2

**policies** [15]
9:18; 13:5; 14:12, 16, 21; 17:10; 18:6, 7; 51:2, 7, 9; 59:17, 18; 89:1, 10

**policy** [5]
64:3, 22; 88:7; 98:19; 100:6

**political** [1]
71:6

**poor** [2]
50:10, 22

**pop** [1]
14:25

**portion** [1]
19:15

**position** [20]
15:7, 10, 17, 21, 22, 25; 16:1, 4, 6, 20; 17:1, 4; 18:19; 20:3; 21:3; 26:16; 55:21, 25; 56:22

**possession** [1]
40:4

**possibility** [1]
71:10

**post** [1]
11:14

**potential** [1]
30:23

**pre-tax** [2]
62:22; 63:21

**Precisely** [1]
31:19

**premiums** [1]
47:4

**prepare** [1]
62:16

**preparing** [1]
57:1

**PRESENT** [1]
3:23

**present** [1]
37:6

**preserve** [6]
9:11, 14; 69:15, 24; 74:4; 86:15

**preserving** [1]
88:19

**presume** [4]
41:14; 48:5, 12; 54:12

**Pretty** [3]
14:17; 69:11; 78:16

**pretty** [10]
22:14; 32:17; 33:24; 55:10; 60:4; 68:16; 69:9; 87:25; 89:1; 97:10

**previous** [6]
20:20; 42:4; 49:11; 82:16; 97:12; 107:5

**previously** [1]
37:4

**Price** [1]
3:11

**primarily** [3]
88:25; 89:9; 90:14

**primary** [2]
91:20; 92:7

**principal** [2]
74:9, 17

**principals** [1]
96:19

**printing** [2]
101:15; 102:4

**Prior** [1]
65:6

**prior** [4]
27:15; 48:1; 63:10; 92:22

**Privacy** [1]
30:16

**privacy** [4]
28:10; 29:12; 30:15, 22

**privileged** [2]
24:25; 25:9

**privy** [1]
89:4

**problems** [1]
85:11

**Procedure** [1]
2:10

**procedures** [1]
65:2

**process** [9]
46:21; 59:6, 13; 61:10, 17, 18, 25

**produce** [8]
24:4; 25:14, 22, 24, 25; 30:8; 40:3; 79:20

**produced** [4]
2:2; 18:7; 26:22; 37:18

**producing** [1]
91:9

**product** [1]
90:7

**production** [6]

42:22, 23; 44:13; 79:21; 94:1,
14
**products** [1]
19:5
**professional** [1]
11:8
**profitable** [1]
23:6
**progress** [1]
89:7
**promote** [5]
9:11, 13, 14; 21:20; 42:17
**promoted** [5]
20:4; 21:1; 33:18; 34:17;
38:21
**promotion** [7]
31:22; 32:10, 13, 18, 24;
34:3, 8
**promotions** [1]
21:17
**property** [2]
69:2; 72:4
**proposal** [6]
5:18; 56:12, 21; 62:19; 63:20;
65:9
**proposals** [2]
63:14, 20
**proposed** [1]
63:5
**proprietorship** [2]
8:1, 4
**Protect** [1]
9:13
**protect** [4]
9:11, 14; 69:25; 83:5
**protecting** [1]
90:9
**proved** [1]
107:14
**Provide** [1]
17:15
**provide** [13]
23:19; 26:9; 29:25; 31:5;
36:6; 37:2, 7; 41:10, 15;
62:13; 63:19; 85:2; 98:13
**provider** [1]
86:25
**providing** [3]
25:15; 85:17; 94:5
**provisions** [1]
2:11
**PUBLIC** [1]
107:24
**public** [1]
11:10
**pull** [2]
53:2; 80:16
**pulled** [1]
83:20
**purposes** [4]
31:12, 21; 35:9; 107:19
**pursuant** [2]
2:10; 108:7
**pursuing** [1]
37:24

**– Q –**

**qualified** [3]
17:16; 78:5, 7
**qualify** [1]

77:15
**quality** [1]
85:4
**question** [30]
6:13, 18, 21, 22; 10:6; 25:3;
26:6; 27:23; 29:21; 34:14, 24,
25; 35:20; 41:11; 44:5; 45:8;
48:9; 51:5; 59:24; 78:7, 13;
85:20; 88:6; 94:7; 96:3, 15,
24; 97:19; 104:12
**questioning** [2]
37:24; 104:23
**QUESTIONS** [1]
6:5
**questions** [6]
6:12; 10:11; 26:20; 28:13;
46:3; 105:3
**quick** [3]
56:7; 68:5; 76:2
**quota** [9]
46:14, 17, 22, 25; 47:5, 11,
24; 49:11, 14
**quotas** [3]
48:7; 49:7; 50:6
**quotes** [2]
63:6, 12

**– R –**

**rabbit** [1]
36:22
**Ranch** [1]
7:22
**RANDY** [1]
1:6
**range** [7]
19:10, 21; 20:22; 48:20, 21;
49:2, 7
**ranges** [2]
19:13; 49:8
**Rashmi** [1]
57:3
**rate** [22]
22:10, 25; 23:1; 38:14; 39:1,
6; 40:16, 20; 41:17, 21, 24;
42:1, 5, 9, 10, 13; 43:14, 22;
44:4; 45:5, 25; 48:8
**read** [9]
56:18; 67:10; 69:13, 16, 22;
70:17; 104:20; 105:3; 107:3
**reading** [1]
57:7
**real** [1]
56:7
**realistic** [2]
45:15, 16
**REASON** [1]
106:4
**reason** [15]
7:10; 15:17; 30:8; 33:18, 22;
50:11; 51:16; 52:10; 57:13;
74:20, 21; 83:14; 87:8; 88:16;
97:8
**reasonable** [1]
74:11
**reasons** [3]
35:6; 36:4; 51:12, 19
**recall** [15]
23:15; 50:15, 17; 53:11, 12,
14; 54:21; 55:1, 14; 65:4, 10,
12, 22; 66:16; 72:9

**receive** [3]
59:5; 63:15; 83:19
**received** [12]
19:5; 20:9; 64:8; 65:24;
66:11, 17; 67:8; 76:16, 20;
77:6, 8; 83:21
**receiving** [6]
65:12; 66:3; 68:1; 90:2, 5;
94:19
**Recess** [2]
38:12; 76:4
**RECESSED** [1]
105:7
**recognize** [3]
56:4, 8; 76:8
**recollect** [1]
77:13
**recollection** [4]
20:24; 53:25; 66:15; 68:4
**recommend** [1]
54:12
**recommendation** [3]
52:7, 8, 22
**recommendations** [1]
53:6
**recommended** [4]
16:14; 53:9; 54:4, 10
**record** [9]
2:11; 18:3; 36:14; 38:1; 41:4;
53:2; 85:15; 98:8; 108:11
**records** [12]
23:14, 17; 25:13, 24; 26:15;
38:17, 18; 39:14, 17; 40:4,
17; 80:16
**recruit** [1]
17:12
**recruited** [2]
12:14, 15
**recruiting** [2]
12:21; 17:21
**redirection** [1]
61:12
**reduced** [1]
108:11
**reevaluate** [1]
47:16
**reference** [2]
80:19, 22
**REFERENCED** [1]
5:16
**referring** [1]
50:4
**reflected** [2]
34:1, 2
**refuse** [4]
28:24; 31:4; 36:5; 37:6
**refusing** [2]
37:2; 41:14
**regarding** [1]
71:6
**regardless** [1]
82:8
**region** [3]
9:24, 25; 87:19
**regional** [15]
20:4, 11; 22:24; 26:21; 32:9;
52:19; 58:6; 64:13; 89:2;
91:20; 92:19; 93:24, 25;
95:18; 103:4
**Registration** [1]
108:20

**reimbursed** [2]
101:18, 22
**Reimbursement** [1]
62:6
**reimbursement** [12]
59:11; 60:6, 8, 10, 14; 61:1,
5, 6, 16, 17; 65:2; 103:13
**reinforce** [1]
68:10
**related** [2]
61:14; 108:13
**relates** [3]
63:21; 77:21; 94:1
**relating** [3]
60:14; 65:9; 66:1
**relation** [2]
20:1; 33:8
**relationship** [2]
74:17; 88:18
**Relative** [1]
13:2
**relative** [6]
6:12; 11:1; 59:7, 14; 88:1;
108:14
**relevance** [5]
24:1, 5; 28:10; 30:11, 14
**relevancy** [1]
29:13
**relevant** [3]
25:21; 28:14; 30:16
**remember** [30]
15:1; 17:3; 18:25; 19:10;
26:12, 18; 27:7; 49:14, 16;
50:4, 24; 54:8, 22; 55:3, 6, 7,
11; 61:2; 65:17; 66:11; 67:18,
23; 68:9; 70:11; 72:14; 73:1;
75:24; 76:12; 84:5
**REMOVE** [1]
4:3
**render** [1]
25:9
**renewal** [1]
27:19
**renewals** [1]
81:23
**rent** [2]
101:14; 102:12
**Repeat** [1]
85:20
**repeating** [1]
68:12
**repeats** [1]
79:1
**rephrase** [5]
6:14; 34:14; 43:21; 48:13;
101:2
**replow** [1]
35:23
**report** [1]
93:12
**reported** [1]
2:7
**Reporter** [2]
2:6; 108:7
**reporter** [1]
7:3
**REPORTER'S** [1]
108:1
**Reporter's** [1]
5:12
**represent** [5]

24:16; 56:10; 57:16; 76:19;
77:5
**representation** [1]
24:17
**representative** [1]
73:6
**representatives** [1]
11:5
**representing** [1]
24:19
**request** [12]
24:6, 17; 29:23; 62:9, 21;
63:6; 64:20; 74:22, 23; 75:2;
82:5; 83:21
**requested** [4]
73:6; 74:9; 83:12; 93:4
**requesting** [2]
39:19; 40:7
**Requests** [1]
61:11
**requests** [11]
59:5, 11; 60:2; 61:10, 17;
62:6, 7; 63:4, 12, 15; 65:1
**requirement** [3]
42:22; 43:4, 7
**requirements** [2]
45:23; 73:11
**requires** [1]
84:23
**requisition** [1]
40:17
**reserve** [5]
25:23; 26:9, 17; 39:21; 40:3
**residual** [5]
83:5; 86:15; 90:5, 7, 10
**respond** [3]
25:1; 34:24, 25
**response** [3]
7:7; 35:20; 68:24
**responses** [1]
7:3
**responsibilities** [6]
17:13; 22:7; 79:19; 84:4, 7,
12
**responsibility** [5]
91:14, 20; 95:5; 103:6, 9
**responsible** [5]
57:1; 89:9, 12; 90:14; 96:9
**restate** [1]
30:14
**result** [6]
26:23; 78:11; 81:3; 86:18;
90:6; 94:14
**retain** [1]
86:17
**return** [1]
85:16
**returns** [2]
29:24; 37:4
**review** [1]
50:1
**reviewed** [2]
66:9; 70:21
**reviewing** [3]
19:9; 49:16; 72:11
**revolve** [1]
58:23
**Rhone** [1]
11:3
**ridiculous** [1]
37:24

**Right** [4]
33:4; 45:6; 57:16; 63:22
**right** [49]
8:25; 9:19; 15:10, 12; 19:15,
22; 24:7; 26:9; 27:19, 22;
29:3, 6; 30:12; 31:1, 2, 24;
32:11; 35:15; 39:8, 12, 15;
41:4, 10; 42:9; 44:24; 46:18;
47:20; 48:24; 50:7, 18; 54:8;
57:17; 60:15; 61:8, 16; 63:14;
71:18; 72:18; 77:3; 78:5;
87:2, 16; 88:25; 91:1; 99:13;
100:13, 19; 101:11
**rights** [1]
30:22
**river** [1]
30:9
**Road** [2]
3:11; 7:22
**ROERIG** [1]
3:10
**role** [1]
41:13
**Ron** [21]
77:2, 10, 17, 19; 78:14, 23;
79:2, 4, 5, 11, 16, 17; 80:25;
81:2, 3, 5, 16; 85:2, 8
**Ron's** [1]
80:18
**rough** [1]
38:16
**Roughly** [1]
13:25
**roughly** [2]
19:1; 28:5
**RSC** [44]
19:24; 20:5, 9, 13; 21:18;
22:15; 26:3, 13; 27:3; 29:3, 9;
31:9, 23; 32:11, 14, 24; 33:5;
34:4, 11, 17; 35:9; 40:16, 21,
24; 41:14; 45:2, 7, 8, 9, 12;
47:7; 64:17; 82:24; 84:5, 19;
85:19; 86:4, 11; 90:19, 21,
25; 91:12, 13
**RSC's** [15]
21:10; 41:13; 44:3, 6; 45:23;
46:13; 48:5; 53:7; 54:10;
84:18; 90:16, 25; 91:8, 14;
92:16
**Rules** [3]
2:10; 30:18
**rules** [2]
51:2, 8
**run** [2]
22:23; 102:6

———————————————
– S –
———————————————

**sacrifice** [1]
85:4
**safe** [1]
26:5
**Salary** [1]
61:12
**salary** [1]
8:15
**sale** [4]
18:6, 7; 88:2; 94:6
**Sales** [2]
22:7; 44:18
**sales** [121]

9:5, 8, 17, 21; 11:9; 15:8, 16;
18:22; 19:4; 20:4, 9, 10, 11,
12, 14, 15; 21:2, 5, 9, 19, 24;
22:2, 3, 10, 19, 20, 23, 24;
23:11, 24; 25:12; 26:4, 13;
27:8; 31:24; 32:3, 5, 7, 8, 9,
11, 15; 33:2, 6, 10; 34:1, 2, 5,
7, 11, 15, 17; 35:2, 3, 7, 14;
36:16, 18; 39:1, 6, 7, 11;
40:20, 23; 41:3, 5, 7, 18;
42:8, 11, 18; 43:22; 44:16,
17; 45:1; 46:23; 47:1, 12, 15;
48:7, 11; 58:6; 61:3; 81:8, 11,
12, 22, 23; 85:19; 86:4;
88:25; 89:2, 19, 20; 90:13,
15; 91:20; 92:19, 23; 93:11,
12, 16, 25; 94:4, 16; 95:18;
103:4, 5
**salesclerk** [1]
12:7
**salespeople** [1]
47:1
**sanction** [1]
37:23
**sanctions** [2]
38:7, 8
**SAPP** [1]
3:20
**Sapp** [1]
2:8
**Sat** [2]
16:10; 69:13
**satisfied** [1]
88:15
**SAUCEDA** [2]
1:6; 3:13
**Sauceda** [15]
66:1, 3; 68:2, 4, 12; 70:2, 11,
14; 73:5, 19; 74:24; 83:6, 12;
84:25
**Sauceda's** [6]
71:23; 78:11, 18; 82:5; 83:21;
84:25
**save** [1]
72:23
**saying** [6]
34:5; 53:14; 57:4; 64:16;
74:24; 102:3
**SCHOOL** [2]
1:6; 3:9
**School** [3]
1:10; 97:24; 101:16
**school** [12]
10:16; 11:14, 17, 25; 12:2;
69:2; 71:7; 72:2, 4; 73:15;
77:22, 23
**schooling** [1]
10:15
**schools** [1]
10:9
**Scott** [1]
80:25
**se** [1]
46:20
**seal** [1]
107:20
**second** [5]
56:13; 69:16; 78:12; 86:19,
22
**Secondly** [1]
42:1

**secretary** [4]
8:8; 100:19; 101:7; 104:2
**Section** [2]
5:18; 56:12; 58:23; 59:7, 13;
77:21
**secured** [1]
89:5
**security** [1]
72:4
**self-employed** [2]
8:3; 13:16
**Sell** [1]
17:10
**sell** [12]
9:1, 2, 18; 12:19, 20, 22;
13:5; 34:12; 41:20; 86:3, 6;
89:10
**selling** [3]
13:4; 14:16; 16:20
**seminars** [3]
10:25; 11:10, 13
**send** [1]
73:6
**sentence** [3]
86:22; 87:7
**separated** [1]
44:6
**sequence** [1]
67:18
**service** [11]
27:15, 16; 74:19; 87:19;
88:25; 91:25; 96:18; 98:9, 10,
25; 103:6
**serviced** [2]
96:12; 98:12
**services** [1]
78:2; 103:10
**servicing** [18]
88:21; 89:9, 20; 90:14; 91:10,
11, 21; 92:7; 94:20; 96:1, 7,
11, 22; 98:5; 102:21; 103:7,
15, 18
**Seven** [1]
19:11
**seven** [4]
19:21; 20:23; 27:3; 82:19
**seventh** [2]
79:1; 84:22
**She's** [1]
8:24
**SHEET** [1]
4:3
**shoot** [1]
44:4
**Shorthand** [2]
2:6; 108:6
**shorthand** [1]
2:7
**show** [1]
31:21
**SIGNATURE** [1]
107:1
**Signature** [1]
5:11
**signature** [1]
107:4
**silly** [1]
38:9
**simple** [1]
83:14
**sir** [9]

6:10; 7:1, 8; 19:23; 21:7;
40:22; 41:8; 58:4; 73:2
**sit** [3]
26:13, 19; 49:24
**situation** [4]
47:21; 67:11; 74:24; 75:1
**size** [6]
23:4, 5; 96:5, 10; 97:8; 98:4
**smooth** [3]
86:16; 87:12; 88:2
**soak** [1]
69:23
**Sold** [1]
14:12
**sold** [2]
14:21; 82:3
**sole** [2]
8:1, 3
**Somebody** [2]
57:1; 62:9
**somebody** [10]
17:20; 42:1; 52:5; 55:15, 18;
57:2; 59:16; 62:17; 100:8, 11
**Someone** [2]
16:14; 63:8
**someone** [8]
64:10; 73:16; 75:13; 76:25;
78:7, 8; 83:5, 8
**Somewhere** [1]
20:23
**somewhere** [4]
16:11; 21:14; 48:12; 100:9
**sorry** [17]
7:13; 13:15, 17; 16:20; 19:24;
24:8; 27:9; 34:4, 15; 41:13;
60:9, 25; 62:19; 63:18; 66:6;
105:1, 4
**sort** [2]
8:5; 96:24
**sound** [3]
67:2; 90:17; 94:24
**South** [1]
7:22
**SOUTHERN** [1]
1:1
**speak** [2]
16:14; 102:16
**speakers** [1]
11:8
**speaking** [1]
89:11
**special** [1]
92:1
**specific** [3]
59:22; 73:11; 77:18
**specifically** [3]
27:6; 50:25; 75:2
**spending** [1]
77:21
**split** [9]
80:25; 81:14, 17; 93:5, 11;
94:20; 95:9, 12, 19
**splits** [3]
95:14, 15, 23
**splitting** [1]
94:16
**spoke** [1]
73:5
**sponsor** [1]
56:17
**Square** [1]

3:5
**SRAs** [4]
61:19, 22, 25; 65:1
**SSC** [15]
9:9; 21:6; 22:15; 32:24; 34:4;
41:6, 14; 45:22; 47:7; 49:9;
52:11; 58:3; 64:17; 84:5, 19
**SSC's** [1]
84:18
**staff** [8]
8:9; 92:11, 13; 98:12; 99:22,
25; 100:8; 102:24
**stamp** [1]
65:19
**stand** [1]
73:20
**standard** [1]
52:18
**standpoint** [2]
93:24, 25
**start** [7]
14:19; 15:7, 12, 14; 17:8, 9;
21:17
**started** [6]
14:15; 15:6; 17:6, 24; 38:20;
42:2
**STATE** [3]
107:10, 25; 108:4
**State** [3]
2:7; 30:18; 108:7
**state** [12]
9:5, 8; 15:16; 21:1, 19; 82:8;
89:2; 91:1, 5; 93:12, 16;
103:4
**stated** [2]
2:11; 86:9
**statement** [3]
22:4; 26:25; 45:21
**STATES** [1]
1:1
**stay** [3]
47:18; 71:22; 72:6
**STEELE** [39]
3:19; 23:25; 24:3, 25; 25:8,
17; 26:11; 27:13; 28:9, 18,
22; 29:11, 17; 30:3, 7, 13, 17;
31:2, 13; 35:12, 19, 25; 36:7,
9, 13, 24; 37:21; 38:4, 6;
39:21; 40:2, 9, 12; 41:21;
76:1; 77:7; 97:21; 104:19, 24
**Steele** [4]
24:9; 25:6; 34:23; 37:8
**stick** [2]
73:21, 22
**stipulated** [1]
75:2
**STIPULATIONS** [1]
4:3
**Stipulations** [1]
5:5
**stole** [1]
51:20
**stop** [1]
105:5
**store** [1]
12:8
**story** [1]
70:15
**Street** [1]
108:21
**structure** [1]

71:7
**stuff** [3]
8:6; 96:24; 101:18
**submit** [10]
59:16; 60:9; 62:17, 18; 63:12,
23, 25; 64:2, 19, 20
**submits** [1]
64:5
**submitted** [1]
63:6
**submitting** [2]
63:13, 23
**subscribed** [1]
107:17
**succinct** [1]
105:4
**sue** [3]
55:13, 15, 19
**suggest** [1]
25:22
**Suite** [7]
2:9; 3:5, 11, 15, 20; 7:22;
108:21
**supervise** [2]
9:21, 25
**supervised** [1]
90:16
**supervising** [3]
90:19, 20, 21
**supervision** [3]
9:17; 49:9; 108:11
**supervisors** [1]
54:24
**supplemental** [1]
86:24
**support** [2]
85:3; 98:13
**supposed** [2]
82:4; 83:25
**surrounding** [1]
84:23
**switch** [1]
85:14
**Switzer** [1]
12:18
**sworn** [3]
2:3; 6:2; 108:9

**— T —**

**takes** [2]
104:25
**talk** [16]
15:21, 23; 16:19; 37:12;
46:16; 54:17; 56:24; 57:3;
66:3, 8; 68:6; 70:4, 22; 71:2;
100:8
**talked** [17]
16:25; 17:3; 24:23; 50:21;
55:3, 8; 60:24; 70:11; 71:13,
19; 84:16; 85:21; 90:23, 24
**talking** [32]
17:1; 20:2; 28:4; 54:22; 55:6,
11; 68:2; 70:2, 13; 72:10;
77:16; 87:1, 4; 93:8; 96:20,
21; 98:5, 6, 7; 99:4, 5, 11, 15;
100:18, 22, 23; 101:3, 5;
102:19, 22; 103:14, 15
**tall** [1]
84:10
**tapes** [1]

85:14
**task** [1]
85:3
**taught** [1]
91:19
**tax** [1]
37:3
**team** [38]
18:11, 12, 14; 26:21; 32:5, 6,
8; 33:10; 34:7; 36:18; 40:25;
41:3, 7; 43:25; 44:16, 20;
46:24; 47:1, 5, 6, 8; 48:2;
52:5; 72:20; 73:17; 77:2, 11,
17, 19; 78:8, 14, 15; 79:21;
81:6, 12; 82:3; 85:19; 98:14
**team's** [2]
32:15; 35:2
**tedious** [1]
35:21
**telling** [6]
49:1; 55:12; 72:6; 74:2;
102:8, 20
**term** [3]
64:14, 16; 74:17
**terminate** [3]
51:15; 52:12, 17
**terminated** [4]
51:21; 52:6, 13; 54:15
**terminating** [2]
51:12, 17
**termination** [9]
52:11, 22; 53:6, 9; 54:4, 13,
14, 18; 55:7
**terminology** [1]
43:7
**terms** [17]
11:9; 26:14; 43:8, 10, 11;
44:12; 51:4; 56:23; 57:12, 17;
61:17; 77:20; 86:14; 95:12;
100:6; 103:17
**testified** [1]
6:2
**testify** [1]
108:9
**testimony** [2]
25:18; 108:11
**TEXAS** [3]
1:1; 108:4, 19
**Texas** [10]
2:7, 9; 3:6, 11, 16, 21; 10:1;
58:7; 108:7, 21
**Thank** [6]
20:5; 35:1; 37:10; 41:17;
50:9; 64:23
**There's** [3]
47:19; 59:10, 12
**there's** [8]
27:11; 28:1; 30:8; 52:16;
59:21; 61:12; 78:6; 103:7
**therein** [1]
107:19
**thereupon** [1]
108:10
**They're** [2]
11:8; 102:14
**they're** [9]
25:8, 13, 19, 21; 49:18;
60:10, 16; 83:8; 91:8
**they've** [2]
19:14; 62:24, 25
**thinking** [1]

72:21

**third** [5]
56:17, 20; 66:2; 78:23; 86:22

**thoughts** [1]
71:5

**threatened** [1]
55:13

**threatens** [2]
55:15, 19

**three** [10]
14:1; 20:23; 27:3; 47:9; 51:5;
82:18; 96:4, 7, 9

**tied** [1]
83:25

**times** [5]
11:11; 45:19; 96:4, 9; 99:8

**title** [1]
9:5

**Tom** [1]
11:3

**total** [1]
38:22

**touching** [1]
108:9

**Tracey** [1]
11:3

**trade** [3]
11:25; 58:16, 20

**traffic** [1]
105:1

**trail** [1]
36:22

**training** [2]
11:14; 91:8

**transcript** [2]
104:21; 105:2

**transmittal** [6]
81:1, 14, 17; 93:6; 94:20;
95:19

**TRAVIS** [1]
108:5

**true** [5]
32:23; 34:3; 71:11; 107:5;
108:11

**trustee** [2]
60:10, 17

**truth** [2]
108:9

**turnkey** [3]
85:7, 17, 23

**twice** [1]
96:4

**type** [5]
11:25; 12:5; 13:6; 59:9; 80:2

**types** [2]
60:1; 64:23

**typewriting** [1]
108:11

**Typically** [1]
91:14

**typically** [1]
100:10

**– U –**

**Uh-huh** [15]
16:22; 22:17; 31:25; 53:15,
19, 21; 54:19; 64:18; 65:3;
72:7; 85:25; 86:21; 100:21;
101:1, 8

**Ultimately** [3]

**75:10, 11, 15**

**ultimately** [1]
75:5

**underneath** [1]
18:12

**understand** [19]
6:13, 16; 19:18; 21:8; 27:5;
28:11, 13; 46:6; 48:9; 49:20;
51:17; 60:24; 63:4; 84:2;
91:16; 101:3, 21; 104:7, 9

**understanding** [9]
19:20; 33:19, 21; 59:4; 76:21;
87:22; 88:7; 92:8; 103:3

**understood** [1]
74:12

**undertaking** [2]
92:17, 18

**unfortunate** [1]
67:11

**uniquely** [1]
98:2

**UNITED** [1]
1:1

**United** [6]
13:11, 18; 14:10, 24

**– V –**

**verbal** [2]
7:3, 6

**verbally** [1]
7:6

**videotape** [1]
7:5

**VIDEOTAPED** [2]
1:13; 2:1

**view** [1]
95:18, 19

**viewed** [1]
94:3

**VOLUME** [2]
1:16; 5:7

**volume** [1]
38:22

**vouch** [1]
39:16

**VS** [1]
1:4

**– W –**

**walked** [1]
102:24

**wanted** [4]
16:5; 59:16; 73:12, 14

**wants** [1]
62:9

**We'll** [4]
26:9; 39:21; 40:3, 4

**we'll** [1]
73:24

**We're** [1]
73:22

**we're** [10]
7:5; 14:14; 23:23; 25:21;
26:17; 70:4, 5; 73:21; 93:8

**We've** [2]
20:2; 105:5

**we've** [1]
41:11

**weren't** [4]
48:25; 49:1; 88:14; 101:9

**West** [2]
3:11; 108:21

**What's** [5]
7:11, 21; 10:2; 41:17; 62:8

**what's** [6]
8:13; 23:25; 44:11; 56:23;
67:16; 68:10

**Whenever** [1]
88:3

**whenever** [2]
40:7; 88:5

**who's** [1]
8:11

**wife** [1]
87:23

**WILLETTE** [1]
3:15

**WILLIAM** [1]
3:19

**Willis** [2]
3:24; 105:5

**WITNESS** [12]
3:18; 26:21; 27:14; 29:20;
36:2; 68:16; 88:11; 89:25;
96:16; 97:20, 22; 106:2

**witness** [2]
2:2; 108:12

**word** [2]
23:2; 62:21

**words** [19]
12:12; 13:3; 21:17; 27:18;
33:21; 37:3; 45:15; 46:21;
63:3; 68:12; 79:23; 80:8;
83:19; 84:3; 85:5; 86:10;
97:17; 99:12; 102:3

**work** [13]
7:21, 24; 12:13; 42:20; 46:15;
76:25; 87:9, 13; 95:25; 96:18;
99:1, 6

**worked** [6]
12:7; 13:11; 18:8, 9; 88:4;
89:6

**working** [5]
12:15; 14:16; 16:20; 57:9;
96:17

**workload** [2]
96:5; 98:2

**worldwide** [1]
88:13

**Worth** [1]
98:1

**worth** [1]
26:22

**wouldn't** [4]
53:3; 83:17; 97:3; 99:20

**wrap** [2]
104:23; 105:4

**wrapped** [1]
86:14

**write** [2]
7:7; 86:17

**writes** [1]
82:7

**writing** [1]
90:3

**written** [3]
52:18; 56:23; 57:6

**wrong** [1]
43:6

**wrote** [2]
79:9, 10

**– X –**

**XXX** [3]
5:10, 11, 12

**– Y –**

**Yeah** [4]
13:3; 68:16; 97:10; 99:10

**yeah** [3]
67:6; 82:22; 98:7

**year** [36]
19:5; 27:1, 22; 29:10; 39:7;
42:7, 11; 43:2, 3; 44:16; 45:5;
47:12, 19; 48:1, 15, 16, 17,
23; 49:2, 3, 11, 25; 55:9;
93:9, 10; 94:17, 18, 22; 95:8,
10; 96:2, 22

**year's** [4]
27:16; 77:3; 79:2; 90:4

**year-and-a-half** [1]
72:15

**years** [7]
13:9, 23; 14:1; 27:15; 30:24;
49:11; 67:4; 82:17; 92:22

**Yep** [1]
78:22

**York** [1]
11:21

**You'll** [1]
104:20

**you'll** [2]
56:13; 101:2

**You've** [1]
46:17

**you've** [5]
25:12; 45:2; 54:10; 60:24;
63:12

**You-all** [1]
16:25

**you-all** [7]
37:11; 55:3; 68:6, 8; 71:2, 3;
84:15

**yourself** [2]
20:14; 26:15

**– Z –**

**zero** [1]
81:20

**zip** [1]
7:23



Deposition of Mr. Frank LaFemina, Volume II

# EXHIBIT "B"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ                )
                             )
VS.                          )
                             )
BROWNSVILLE INDEPENDENT)
SCHOOL DISTRICT, NOE    )
SAUCEDA, AND RANDY      )    CIVIL ACTION NO.
DUNN, MARILYN DEL       )    B - 02 - 128
BOSQUE-GILBERT AND      )
HUGH EMERSON, JR.,      )
IN THEIR OFFICIAL       )
CAPACITIES AS BOARD     )
MEMBERS OF BROWNSVILLE )
INDEPENDENT SCHOOL      )
DISTRICT                )

*****************************************

ORAL AND VIDEOTAPED DEPOSITION OF

**FRANK D. LAFEMINA**

AUGUST 21, 2003

VOLUME 2

*****************************************

CONDENSED TRANSCRIPT AND KEYWORD INDEX

COPY

AcuScribe
COURT REPORTERS

750 NORWOOD TOWER          TELEPHONE: (512) 499-0277
114 WEST 7TH STREET        TOLL-FREE: (800) 497-0277
AUSTIN, TEXAS 78701        FAX: (512) 499-0298
info@acuscribe.com              www.acuscribe.com

ORAL DEPOSITION(S) OF: _Frank LaFemina_

---

The attorneys for all the parties present stipulate and agree to the following checked items:

**Objections:**

      ____ Texas Rules of Civil Procedure.

      _X_ Federal Rules of Civil Procedure.

      ____ Other: _____

**Delivery for signature and changes:**

      The witness, or the witness's attorney, will return the signed deposition to the court reporter within _30_ days of the date of submission. If the original of the deposition is not signed, or made available, an unsigned copy may be used as though signed.

      _X_ The original transcript will be submitted to the witness's attorney.

      ____ The original transcript will be submitted to the witness at the following address:

      _____

      ____ Signature waived.

---

The attorney asking the first question will be responsible for the timely payment of all costs in connection with the original deposition transcript.

I hereby agree to the above and foregoing marked items and request that AcuScribe Court Reporters furnish me with the items checked below. Unless otherwise requested, I will receive copies of all exhibits. My firm and I will be responsible for the timely payment of any original or copies and/or exhibits as indicated below that I may request. I agree that if I have no prior credit arrangement with AcuScribe Court Reporters, the transcript(s) stated above may be delivered on a COD basis. If any indebtedness due and owing is not paid as agreed, the undersigned agrees to pay reasonable attorneys fees, plus all costs of collection and all other costs and expenses which may be incurred by AcuScribe Court Reporters relative to collection of the indebtedness due and owing, whether suit be instituted or not.

Executed this the _21st_ day of _August_, _2003_

_Eileen Leeds_____ Attorney for: _____

[X] Copy & Mini  [ ] Mini only*  [ ] No copy  [ ] CD w/E-Transcript & Exhibits*  [ ] E-Transcript*_____

**FORMAT:** [ ]ASCII*  [ ] Summation*  [ ] Amicus*  [ ] Other*  **ON**  [ ] 3 ½" Floppy  **OR**  [ ] CD-Rom

_W. B. Steele_____ Attorney for: _ACLAC_

[✓] Copy & Mini  [ ] Mini only*  [ ] No copy  [ ] CD w/E-Transcript & Exhibits*  [ ] E-Transcript*_____

**FORMAT:** [ ]ASCII*  [ ] Summation*  [ ] Amicus*  [ ] Other*  **ON**  [ ] 3 ½" Floppy  **OR**  [ ] CD-Rom

*Will be charged the regular copy rate, if ordered without a copy of the transcript.

**Page 109**

```
( 1)          IN THE UNITED STATES DISTRICT COURT
( 2)         FOR THE SOUTHERN DISTRICT OF TEXAS
( 3)                 BROWNSVILLE DIVISION
( 4)  DINO X. CHAVEZ              *
( 5)  VS.                        *
( 6)  BROWNSVILLE INDEPENDENT    *
      SCHOOL DISTRICT, NOE       *  CIVIL ACTION NO
( 7)  SAUCEDA, and RANDY         *  B - 02 - 128
      DUNN, MARILYN DEL          *
( 8)  BOSQUE-GILBERT and         *
      HUGH EMERSON, JR.,         *
      in their official          *
( 9)  capacities as Board        *
      Members of Brownsville     *
(10)  Independent School         *
      District                   *
(11)
(12)  *******************************************
(13)      ORAL AND VIDEOTAPED DEPOSITION OF
(14)             FRANK D. LaFEMINA
(15)              AUGUST 21, 2003
(16)                 VOLUME 2
(17)  *******************************************
```

**Page 110**

```
( 1)          ORAL AND VIDEOTAPED DEPOSITION OF
( 2)  FRANK D. LaFEMINA, produced as a witness at the
( 3)  instance of the Plaintiff and duly sworn, was taken in
( 4)  the above-styled and numbered cause on the 21st day of
( 5)  August, 2003, from 9:12 a.m. to 11:41 a.m. and from
( 6)  1:02 p.m. to 2:47 p.m., before GERRI C. BARKER,
( 7)  Certified Shorthand Reporter in and for the State of
( 8)  Texas, reported by machine shorthand, at the offices
( 9)  of Locke, Liddell & Sapp, L.L.P., 100 Congress Avenue,
(10)  Suite 300, Austin, Texas 78701, pursuant to the
(11)  Federal Rules of Civil Procedure and the provisions
(12)  stated on the record or attached hereto
```

**Page 111**

```
( 1)               APPEARANCES
( 3)  FOR THE PLAINTIFF:
( 4)     MR. J. ARNOLD AGUILAR
         LAW OFFICE OF J. ARNOLD AGUILAR
( 5)     Artemis Square, Suite H-2
( 6)     1200 Central Boulevard
         Brownsville, Texas 78520
( 7)     956-504-1100/956-504-1408 (fax)
( 8)  FOR THE DEFENDANT, BROWNSVILLE INDEPENDENT
( 9)  SCHOOL DISTRICT:
(10)     MS. ELIZABETH G. NEALLY (Via Telephone)
         ROERIG, OLIVEIRA & FISHER, L.L.P.
(11)     855 West Price Road, Suite 9
         Brownsville, Texas 78520
(12)     956-542-5666/956-542-0016 (fax)
(13)  FOR THE DEFENDANT, NOE SAUCEDA:
(14)     MS. EILEEN LEEDS
(15)     WILLETTE & GUERRA, L.L.P
         International Plaza, Suite 460
(16)     3505 Boca Chica Boulevard
         Brownsville, Texas 78521
(17)     956-541-1846/956-541-1893 (fax)
(19)  FOR AFLAC AND THE WITNESS:
         MR. WILLIAM B. STEELE, III
(20)     LOCKE, LIDDELL & SAPP, L.L.P
         100 Congress Avenue, Suite 300
(21)     Austin, Texas 78701
         512-305-4734/512-305-4800 (fax)
```

**Page 112**

```
( 3)  REMOVE THIS PAGE AND INSERT STIPULATIONS SHEET HERE
```

**Page 113**

```
                        INDEX
                                              PAGE
Appearances . . . . . . . . . . .             111
Stipulations . . . . . . . . .  .             112

FRANK D. LaFEMINA (VOLUME 2)
   Examination (Continued) by Mr. Aguilar     115
   Examination by Ms. Neally . . . . . .      243
   Examination by Ms. Leeds                   270
   Further Examination by Mr. Aguilar         301
   Further Examination by Ms. Leeds           312
   Further Examination by Mr. Aguilar         314

Changes and Corrections . . . . . . .         317
Signature . . . . . . .                       318
Reporter's Certificate . . . . . . .          319

                      EXHIBITS

NO. DESCRIPTION           PAGE / LINE REFERENCED
3.  . . . . . . . . . . . . . . .      138 / 5
    E-mail dated 12-2-01 from Frank LaFemina
    to Dino Chavez
4.  . . . . . . . . . . . . . . .      172 / 24
    Change in Status Form, dated 12-4-01
5.  . . . . . . . . . . . . . . .      201 / 18
    E-mail dated 12-19-01 from Frank LaFemina
    to Lynn Davis
```

**Page 114**

```
                 EXHIBITS (Cont'd)
NO DESCRIPTION            PAGE / LINE REFERENCED
6.  . . . . . . . . . . . . . . .      213 / 25
    Letter dated 9-11-02 from Frank LaFemina
    to Daniel Sanchez, with attachment
7.  . . . . . . . . . . . . . . .      220 / 18
    Letter dated 9-16-02 from Daniel Sanchez
    to Frank LaFemina
8.  . . . . . . . . . . . . . . .      245 / 9
    Reimbursement Servicing Agreement
9   . . . . . . . . .                  248 / 8
    Terms outlined for Mr. Chavez
10  . . . . . . . . . . . . . .        259 / 5
    E-mail dated 12-4-01 from Dino Chavez
    to Lynn Barnson
11. . . . . . . . . . . . . . .        261 / 5
    E-mail dated 6-19-02 from Dino Chavez
    to Lynn Barnson
```

Page 121

(1)     MR. STEELE:    Uh-huh.
(2)     MR. AGUILAR:    You mean a cover sheet or
(3) something?
(4)     MR. STEELE:    Yeah.
(5)     THE WITNESS:    Just the header.
(6)     MR. STEELE:    Right.
(7)     MR. AGUILAR:    Okay. No, this is all I
(8) got.
(9)     THE WITNESS:    The header would tell us
(10) who it went to.
(11)     MR. AGUILAR:    Are you talking about
(12) those little lines of information at the very top of
(13) the page?
(14)     MR. STEELE:    Right.
(15)     THE WITNESS:    The addressee. The "sent
(16) to" addressee is not here. So I don't know exactly
(17) who it was sent to. I know that it was more than
(18) likely sent to the parties that would be directly
(19) involved here, which would be Mr. Chavez and
(20) Mr. Levine, for sure.
(21)     Q.    (By Mr. Aguilar) What I was asking, though,
(22) is when you're referring to your team, for example, in
(23) the Valley, who else would have been on your team?
(24)     MR. STEELE:    Just so the record is
(25) clear, you didn't specify the Valley in the previous

Page 122

(1) question.
(2)     MR. AGUILAR:    I understand.
(3)     MR. STEELE:    His team is much larger.
(4)     Q.    (By Mr. Aguilar) And when you're saying team
(5) here, which team would you be talking about, the
(6) Valley team or the larger team?
(7)     A.    I'm not sure how to answer the question
(8) because I have – would have associates and I would
(9) have brokers and I would have management team. So –
(10)     Q.    And I apologize.
(11)     A.    Do you want to know what I'm referring to
(12) here?
(13)     Q.    If I may, the copy I made you, I just
(14) realized I'm not even – I'm not sure where I got
(15) this. It must have been from the copy of our last
(16) depo. Cut off the word team here at the top. That's
(17) all it says right here.
(18)     A.    Oh, I had it.
(19)     A.    It says team.
(20)     A.    Okay.
(21)     Q.    That's why – I just realized that that was
(22) something you don't have on your copy. But in any
(23) case –
(24)     A.    In that context – not to be evasive in
(25) answering the question, but in that context, I would

Page 123

(1) be probably referring to the team of management people
(2) involved with this particular issue.
(3)     Q.    And that would have been just Dino and
(4) Mr. Levine?
(5)     A.    I believe that to be true.
(6)     Q.    Okay. Now, as we were saying, towards the
(7) bottom, you indicate, "The following information is
(8) being provided to clarify the reasons for these
(9) changes, which ultimately may be temporary. Dino
(10) Chavez is the associate who secured this account for
(11) AFLAC." Can you explain what you meant by that?
(12)     A.    The interruption of the normal course of
(13) business, which is when Dino had been handling this
(14) particular account all along, was interrupted due to a
(15) letter sent to my office by Dr. Sauceda. And what I'm
(16) saying by "this could change" is that if Dr. Sauceda
(17) or if the powers to be, whoever they may have been,
(18) that elected to have Dino removed as a result of his
(19) actions, which they deemed to be detrimental to their
(20) organization, if that went away, then I wouldn't have
(21) seen any reason personally that Dino wouldn't have had
(22) the opportunity to go back and do what he had been
(23) doing all along.
(24)     Q.    Okay. And in fact –
(25)     MS. NEALLY:    Object to the

Page 124

(1) responsiveness of the answer.
(2)     Q.    (By Mr. Aguilar) And in fact, you did get
(3) some letters from the board members – some of the
(4) board members saying, look, I didn't think Dino had
(5) done anything wrong. Do you remember that?
(6)     A.    I remember some of correspondence from
(7) some board member other than Dr. Sauceda.
(8)     MR. STEELE:    Arnold, let me object to
(9) the foundation that you laid. I believe that assumes
(10) facts not in evidence. I believe those letters were
(11) sent to Janet Baker.
(12)     Q.    (By Mr. Aguilar) Did you get those letters,
(13) also? Do you know which letters I'm talking about?
(14)     A.    I don't recall ever getting a letter –
(15)     Q.    Okay.
(16)     A.    – specifically, unless you have something
(17) that's addressed to me that you have a copy of in the
(18) file.
(19)     Q.    No, these were not addressed to you. Your
(20) attorney is right. They were addressed to Ms. Baker.
(21) What I'm saying is that these letters were sent to
(22) AFLAC addressed to Ms. Baker from Linda Salazar, Otis
(23) Powers, Joe Colunga, and I believe there was one
(24) other. I could show you these letters. You're
(25) welcome to look at them.

Page 125

(1)     A.    I've never seen them.
(2)     Q.    Okay. If those letters were sent to
(3) Ms. Baker or to AFLAC generally, is that the type of
(4) information that you were talking about, that if
(5) things changed, in other words, if you got the
(6) indication that it would have been okay for Dino to go
(7) back, then he could have come back?
(8)     MR. STEELE:    Object to the form of the
(9) question.
(10)     MS. LEEDS:    Join.
(11)     MR. STEELE:    He said he's never seen
(12) those letters.
(13)     Q.    (By Mr. Aguilar) Let me give you a chance to
(14) look at the letters so that you're not confused by
(15) what I'm asking about. And I'll just keep them on the
(16) tabs. That's one there from Ms. Linda Salazar marked
(17) Sauceda Exhibit 18. You're welcome to read it if you
(18) would like. This is Powers Exhibit 7 from Mr. Powers.
(19) You're welcome to look at that. This is Sauceda
(20) Exhibit 19 from Mr. Colunga. And the fourth was
(21) Sauceda Exhibit 17 from Mr. Lehman. Each of which
(22) basically say – let me just represent to you for
(23) simplicity sake, basically say that they didn't think
(24) Dino did anything wrong in telling Ms. Baker that she
(25) didn't think he did anything wrong.

Page 126

(1)     A.    And your question is?
(2)     Q.    My question is, is that the type of
(3) information that you were telling me where you just
(4) said, if things changed, if you got information that,
(5) in fact, Dino had – the powers that be were okay with
(6) Dino coming back, that he could have come back. Is
(7) that the type of information you would have been
(8) looking for?
(9)     A.    No.
(10)     Q.    Okay. What would you have been looking for?
(11)     A.    For Dr. Sauceda to rescind his previous
(12) request to have Dino removed.
(13)     Q.    Okay. Other than Dr. Sauceda rescinding that
(14) request, outside of that, you couldn't – or you don't
(15) feel AFLAC could have considered anything else; is
(16) that right?
(17)     MS. LEEDS:    Object to the form.
(18)     THE WITNESS:    I couldn't answer on
(19) behalf of AFLAC.
(20)     Q.    (By Mr. Aguilar) But that's based on your
(21) understanding? I'm just asking, your understanding
(22) would be then that's the type of information you were
(23) looking for, something from Dr. Sauceda and not
(24) necessarily from the board members?
(25)     MS. LEEDS:    Object to the form.

Page 133

(1) Q. Okay. So obviously it was very important for
(2) you and AFLAC to maintain that business no matter what
(3) it took?
(4) A. Probably more important for Dino and AFLAC
(5) than it was for me personally.
(6) MS. LEEDS: Object to form.
(7) Q. (By Mr. Aguilar) Because they got more money
(8) than you did out of it?
(9) A. Well, I had only been involved with it,
(10) truly, one year at that point in time. And the group
(11) itself had been secured for several years.
(12) Q. Okay. And you saw it as your job to make
(13) sure, first and foremost, that that account did not
(14) get lost to AFLAC?
(15) A. My job is to preserve the company's business
(16) regardless of the account size or renewing premium.
(17) Q. And regardless of how it might affect Dino,
(18) even?
(19) A. That wasn't a question.
(20) MS. LEEDS: That's true.
(21) THE WITNESS: That was a statement.
(22) MS. LEEDS: You've got good grammar.
(23) Q. (By Mr. Aguilar) The question is, is that
(24) true?
(25) A. Would you put it in the form of a question,

Page 134

(1) please?
(2) Q. Sure. You said your job, first and foremost,
(3) was to preserve the business for AFLAC even if it
(4) eventually injured Dino –
(5) MR. STEELE: Objection.
(6) Q. – isn't that true?
(7) A. No.
(8) MS. LEEDS: Object to the form.
(9) Q. (By Mr. Aguilar) It was, first and foremost,
(10) your job to preserve the business?
(11) A. That's correct.
(12) Q. Okay. And the consequences of preserving the
(13) business, if it meant Dino had to step out, then that
(14) was a sacrifice you were willing to make?
(15) A. No.
(16) Q. Well, that is what happened, isn't it?
(17) A. Actually, my attempt was to circumvent that
(18) completely. I had been asked by Dr. Sauceda, who is
(19) the only person that I knew at the school district and
(20) he was the superintendent, to remove Dino. I complied
(21) with his request, but unbeknownst to Dr. Sauceda, my
(22) plan was to, A, preserve the business so Dino would
(23) continue to receive his renewal income that was in his
(24) favor; B, preserve the business and the ongoing
(25) relationship so that Dino would continue to be

Page 135

(1) compensated at some degree for future sales that were
(2) made in that case, and build and develop his renewals,
(3) as opposed to the reverse of that, which would have
(4) cost him a considerable amount of money because when a
(5) group is secured, and you would have to check the
(6) company record, it's typical for the annualized
(7) premium that's sold to decrease over the years, not
(8) increase, even though new sales are made. And so
(9) Dino's income, had he not been involved in that
(10) capacity, which I was trying to put together, would
(11) have continually decreased over the years.
(12) MR. AGUILAR: Objection; nonresponsive.
(13) Q. (By Mr. Aguilar) My question had to do with
(14) to what extent you were going to try – to what
(15) extent it was more important to save the account than
(16) to help Dino to save the account?
(17) A. It was more important to save the account for
(18) Dino Chavez and for AFLAC than it was for Frank
(19) LaFemina.
(20) Q. Okay.
(21) A. However, the decision was made – made based
(22) on Dr. Sauceda's request.
(23) Q. Okay. However, Dino was pulled out of this
(24) account by December 4, 2001, right?
(25) A. I can't verify the date.

Page 136

(1) Q. Do you remember talking to Dino on or about
(2) December – the first week of December, December 1
(3) through December 7?
(4) A. I think we probably had two or three
(5) conversations.
(6) Q. Do you remember telling him to step out of
(7) the account, step out of working on the account?
(8) A. I asked him to honor Dr. Sauceda's request.
(9) Q. Okay. And shortly after that, Dino got a
(10) letter of termination from AFLAC on that account,
(11) didn't he?
(12) A. I wouldn't have sent it out, so I don't know.
(13) Q. You just don't know?
(14) A. If he got a letter, I don't know who sent the
(15) letter. I don't know when it was received. That
(16) would be handled by corporate. I'm sure he got a
(17) letter.
(18) Q. To what extent did you ever make any effort
(19) to go to Dr. Sauceda and say, look, we need Dino on
(20) this account? Did you ever do that?
(21) A. I never made an attempt to talk to
(22) Dr. Sauceda because what I tried to accomplish, which
(23) is outlined very clearly here and in all my
(24) correspondence to Dino, was to honor Dr. Sauceda's
(25) request – there was an obvious problem there or a

Page 137

(1) challenge or a personality conflict – and to keep
(2) Dino from losing his compensation and for AFLAC from
(3) losing the group.
(4) Q. Did you ever go to anyone else and say, look,
(5) we need to keep Dino on this account?
(6) A. I did not.
(7) Q. Okay. You go on to say, last two sentences,
(8) "I will not hesitate to request a termination of
(9) anyone who attempts to undermine my plan as it relates
(10) to this case. Please follow through properly." What
(11) did you mean by that?
(12) A. I think it's self-explanatory.
(13) Q. You were willing to terminate anybody who
(14) interfered with your ability to first and foremost
(15) preserve the business?
(16) MS. LEEDS: Object to the form.
(17) THE WITNESS: Anybody that would have
(18) circumvented the agreement that I made with
(19) Dr. Sauceda, which was to honor his request and have
(20) Dino and his team removed from the campus and
(21) discontinue any professional function with them as a
(22) representative of AFLAC.
(23) Q. (By Mr. Aguilar) Okay.
(24) (Exhibit No. 3
(25) (marked for identification.

Page 138

(1) Q. (By Mr. Aguilar) I hand you what I've marked
(2) as Exhibit 3. Do you recognize that document?
(3) A. I do.
(4) Q. Can you tell us what it is?
(5) A. It's an e-mail that I sent to Mr. Chavez
(6) after we had a fairly lengthy conversation about this
(7) entire situation.
(8) Q. It's dated December 2, 2001, right?
(9) A. Uh-huh. I believe that's Sunday,
(10) December 2nd, 2001. That's correct.
(11) Q. Is this the memo you were talking about
(12) earlier? You said you thought there was some other –
(13) something else that could put the first memo,
(14) Exhibit 2, that we were talking about, in perspective.
(15) A. No, I think that the previous memo that we
(16) discussed or e-mail pretty much outlines the plan that
(17) I had for preserving the business and moving forward.
(18) And this is correspondence which is personally from
(19) myself directly to Dino.
(20) Q. Okay. Now, you had just referenced another
(21) e-mail earlier.
(22) A. That's the one I was talking about.
(23) Q. You start off the letter saying, "I
(24) have not rested well since I last spoke to you." Can
(25) you tell us why that happened?

Page 145

(1) told Dino to seek legal counsel from AFLAC.
(2) Q. And even though you didn't see him doing
(3) anything wrong, basically you had to push him aside
(4) and –
(5) MR. STEELE: Objection.
(6) MR. AGUILAR: If I could ask my
(7) question, please.
(8) Q. (By Mr. Aguilar) Even though you didn't see
(9) him having done anything wrong, Dino had to be pushed
(10) aside so that the AFLAC account could be saved; isn't
(11) that correct?
(12) MR. STEELE: Objection.
(13) MS. LEEDS: Object to form.
(14) MR. STEELE: Misstates the testimony.
(15) Continues to misstate the testimony. Because you're
(16) leaving critical statements that this witness has
(17) made, Arnold, purposely leaving them out, trying to
(18) mislead this witness. You know that's wrong. I'm
(19) tired of putting up with it. He's continued now three
(20) different questions three different ways to say, I
(21) didn't say that. Up to a point in time when Dino sent
(22) out letters to campus representatives that he caused
(23) the trouble. Put that in your question and I won't
(24) object. But when you leave out critical evidence, and
(25) that's misrepresenting your position and your role in

Page 146

(1) front of this court. I don't appreciate it and I'm
(2) sick of it happening and that's my objection. Thank
(3) you.
(4) MR. AGUILAR: Buddy, you don't have
(5) to – just ask him the questions you want.
(6) MS. LEEDS: Join.
(7) MR. AGUILAR: And when I'm done asking
(8) him questions, you can rephrase it, have him clarify
(9) any questions as you want. For now, I'm entitled to
(10) ask him the questions as I feel. And I'm trying to
(11) get certain information from him, not from you.
(12) MR. STEELE: I completely understand
(13) what you're trying to do and it's not as you say
(14) because you continue to misstate his testimony in the
(15) precedent – in the predicate you're settling in your
(16) question. I'm going to take a break and go cool off
(17) because I don't appreciate that tactic.
(18) MR. AGUILAR: And if you're walking
(19) out the door right now, I'll go ahead and stop the
(20) deposition at this time.
(21) MR. STEELE: Thank you.
(22) (Brief Recess)
(23) Q. (By Mr. Aguilar) Okay. Before we took a
(24) break, I was asking you about Dino's position at
(25) AFLAC. My question is, if it was necessary to push

Page 147

(1) out Dino in order to keep the BISD account, were you
(2) willing to do so?
(3) MS. LEEDS: Object to form.
(4) MR. STEELE: Objection; form.
(5) THE WITNESS: I would never push anybody
(6) out, Dino included.
(7) Q. (By Mr. Aguilar) Well –
(8) A. Dr. Sauceda pushed Dino out.
(9) Q. Okay. And you just had to go along with that
(10) decision?
(11) A. I complied with the request of the
(12) superintendent of the school district.
(13) MS. NEALLY: Object to the
(14) responsiveness of the answer.
(15) Q. (By Mr. Aguilar) How long has BISD been an
(16) AFLAC insurance consumer?
(17) A. To the best of my knowledge, since 1998.
(18) Q. How many times have you visited with any of
(19) the BISD administration prior to December of 2001?
(20) A. I don't know that I ever did.
(21) Q. How many times have you ever handled any
(22) problem involving BISD prior to December of 2001?
(23) A. Ask the question again, please.
(24) Q. Sure. How many times did you ever handle any
(25) problems involving BISD prior to 2001?

Page 148

(1) A. Possibly once or twice.
(2) Q. And what kind of problems would those have
(3) been?
(4) A. I'm not sure that they would be categorized
(5) as problems, just issues.
(6) Q. Just more like an issue, like somebody has a
(7) question on one of their policies, what's covered,
(8) what's not covered?
(9) A. No, no. This would be internal. I never –
(10) I never dealt with the policyholders.
(11) Q. Okay. How many times has any other AFLAC
(12) personnel with BISD to handle any problem
(13) prior to December 2001?
(14) A. Can you be specific about the personnel?
(15) Q. Any kind of personnel. Well –
(16) A. I'm sure that Dino has.
(17) MS. LEEDS: Object to the form.
(18) Q. (By Mr. Aguilar) I'm not talking about Dino.
(19) MS. LEEDS: Speculation.
(20) Q. (By Mr. Aguilar) I'm not talking about Dino.
(21) In fact, Dino wouldn't be a personnel because he's an
(22) independent contractor, right?
(23) A. Yeah.
(24) Q. Okay. So AFLAC personnel, first of all.
(25) MS. LEEDS: Object to the form.

Page 149

(1) Q. (By Mr. Aguilar) Are you aware of any that
(2) would have visited with BISD?
(3) MS. LEEDS: Speculation.
(4) THE WITNESS: You'll have to define
(5) personnel now for me.
(6) Q. (By Mr. Aguilar) Okay. And it gets a little
(7) confusing because AFLAC works through a lot of agents
(8) and RSCs and DSCs and stuff like that, right?
(9) A. Yes.
(10) Q. Is that why you were having trouble with the
(11) definition?
(12) A. You asked me if Dino was an independent
(13) contractor. He is and I am. And then you're using
(14) the word personnel. And if they're someone other than
(15) an independent contractor, I don't know who those
(16) people would be.
(17) Q. For example, home office.
(18) A. Home office would be AFLAC employees.
(19) Q. Okay. And nobody from them ever came down to
(20) BISD to handle any problems, right?
(21) MS. LEEDS: Object to the form;
(22) speculation.
(23) THE WITNESS: That's incorrect.
(24) Q. (By Mr. Aguilar) Before December 2001.
(25) A. I don't know the date, but I know someone

Page 150

(1) from our corporate office went to the account.
(2) Q. For what? For what reason?
(3) A. To help them internally with billing issues
(4) and things of that nature, which had evidently been a
(5) problem for them to some extent.
(6) Q. Do you remember when that was?
(7) A. No.
(8) Q. Was it in 2001, 2000?
(9) A. I don't remember.
(10) Q. You don't remember – you don't even remember
(11) the year?
(12) A. I don't.
(13) Q. Okay. Other than that one issue, that
(14) billing issue, do you know any other time in which any
(15) AFLAC personnel, for example, from home office ever
(16) came down to BISD to handle any problems?
(17) MS. LEEDS: Objection; speculation.
(18) THE WITNESS: I can't recall any other
(19) person but the one person that I referred to.
(20) Q. (By Mr. Aguilar) Other than Mr. Chavez, do
(21) you – I think you said – I'm sorry. I forgot what
(22) you said. You said you hadn't been down to BISD to
(23) handle any problems down there –
(24) A. No.
(25) Q. – prior to December 2001?

Page 157

(1) coordinator, Dino received some split of commission on
(2) business that was sold.
(3)   Q.   Okay. You're just not sure what that amount
(4) is, what the split was?
(5)   A.   I am sure that it was an amount that was in
(6) addition to his override commissions.
(7)   Q.   Okay. But you don't know how much it was,
(8) the split?
(9)   A.   Not right offhand. I would have to pull a
(10) record or be provided a record to confirm that.
(11)   Q.   Okay. Do you know why Dino was asking for
(12) that split?
(13)   A.   No.
(14)   Q.   And you don't know how much work Dino did in
(15) his office on a day-to-day basis to handle the
(16) account, right?
(17)   A.   Wrong. I knew.
(18)   Q.   You do know what he was doing on a day-to-day
(19) basis?
(20)   A.   Pretty much.
(21)   Q.   Because you were there?
(22)   A.   No. We talked regularly.
(23)   Q.   Okay.
(24)   A.   I had been to his office numerous times –
(25)   Q.   Okay.

Page 158

(1)   A.   – while employees came from Brownsville to
(2) his office.
(3)   Q.   So tell us, if you would, just generally,
(4) what was it that he would do on a day-to-day basis to
(5) handle the accounts.
(6)   A.   He would deal with whatever service issues
(7) came up, whether it be via telephone, fax or a phone
(8) call to – walk-in into his office. He would also be
(9) assisted by whoever was there at his office to assist
(10) him.
(11)   Q.   Okay. Did you have any concern or problem
(12) with Dino continuing to take a 30 percent split on
(13) sales by agents?
(14)   A.   Personally, I had no problem with it. But
(15) conceptually for Dino's sales team, I had an issue
(16) with it.
(17)   Q.   And if the sales team agreed to it, would you
(18) have any concern with it?
(19)   A.   Yes.
(20)   Q.   Okay. What was that concern?
(21)   A.   The concern – Dino's sales team was not the
(22) only sales team I was responsible for in the state,
(23) and what I like to do is make sure that everyone is
(24) following the same.
(25)   Q.   Same page, same procedure?

Page 159

(1)   A.   Exactly. And part –
(2)   MS. LEEDS:   Object to the form. Let him
(3) finish his answer.
(4)   THE WITNESS:   Part of that was that my
(5) philosophy about our business in terms of regional
(6) sales coordinator and above is that they should not be
(7) involved in personal production because they're
(8) viewed, generally speaking, by the sales force as
(9) internal competition. For instance, as a state sales
(10) coordinator, I can't sell business. I'm prohibited
(11) from doing so.
(12)   Q.   (By Mr. Aguilar) In terms of handling client
(13) complaints, questions, concerns, things like that, do
(14) you know how much Dino handled in relation or
(15) comparison to the actual agents who were doing the
(16) enrollments?
(17)   A.   I would assume that that would be consistent
(18) with what's done with any account we have regardless
(19) of size, which means the person that sold the policy
(20) typically services the policyholder with the issue.
(21)   Q.   Okay. So if you go into an enrollment,
(22) you've got an agent who's actually signing the policy,
(23) he's the one that – I forget what the term is, the
(24) person of the agent. What do you call them?
(25)   A.   Associate.

Page 160

(1)   Q.   He's the associate who's selling the policy
(2) and he's supposed to be the one who's servicing the
(3) account throughout the year, right?
(4)   A.   He should – he or she should be servicing
(5) the policies that they sold.
(6)   Q.   That they sold. Were you aware that, in
(7) fact, Dino was the one who was servicing all those
(8) accounts that were sold during the enrollment period
(9) and not the individual agents who did the enrollments?
(10)   A.   Quite the contrary. I know it to be a fact
(11) that everyone took a part in servicing the account.
(12)   Q.   Okay. And that gets back to the original
(13) question I had asked a while ago, which was, to what
(14) degree are you aware that Dino serviced those accounts
(15) versus the individual agents who sold the policies at
(16) the enrollments?
(17)   A.   I'm aware that Dino supervised the people
(18) that serviced the account and he handled more
(19) sensitive issues, which would have been higher level
(20) negotiations with board members and things of that
(21) nature.
(22)   Q.   Okay. As far as handling the day-to-day
(23) complaints that the employees might have had or
(24) concerns they might have had, can you tell us, based
(25) on your own personal knowledge, how much of that Dino

Page 161

(1) handled and how much the individual agents handled?
(2)   A.   Again, Dino was the regional sales
(3) coordinator supervising a team of servicing agents
(4) that handled that account. There were many people
(5) that worked in the Brownsville School District. I
(6) cannot tell you how many, per se, you know, to the
(7) letter. But Dino was their supervisor and he handled
(8) board meetings and issues with the board and things of
(9) that nature. And I'm certain that if somebody had a
(10) complaint and Dino picked up the phone, that he would
(11) handle the complaint as well.
(12)   MR. AGUILAR:   Objection; nonresponsive.
(13)   Q.   (By Mr. Aguilar) My question was, can you
(14) tell us, from your own personal knowledge, what the
(15) percentage was or the amount was that Dino handled of
(16) those day-to-day complaints versus from what the
(17) employees versus what the individual agents handle?
(18) Can you tell us based on your own personal knowledge?
(19)   A.   No.
(20)   Q.   I'm handing you what was previously marked as
(21) Chavez Exhibit 35. Let me give you a chance to review
(22) that, if you could.
(23)   A.   I'm familiar with the document.
(24)   Q.   This is a letter from Mr. Chavez to Mr. Amos
(25) dated December 2, 2001, correct?

Page 162

(1)   A.   Yes, sir.
(2)   MS. LEEDS:   I'm sorry. What was the
(3) date?
(4)   MR. AGUILAR:   December 2, 2001.
(5)   Q.   (By Mr. Aguilar) If you could, go down to
(6) the third paragraph on the first page. He indicates,
(7) "In the course of my actions to preserve the business,
(8) the school's superintendent, who openly supported
(9) NPA" – and let me represent to you NPA –
(10)   A.   I know who they are.
(11)   Q.   Okay. I'm just saying, you know what the
(12) company is, National Plan Administrators?
(13)   A.   Correct.
(14)   Q.   Okay – "made a request to our state
(15) coordinator, Frank LaFemina, to have me removed from
(16) the case." And before we get too confused on that
(17) question, basically all that says is that NPA – I'm
(18) sorry, the superintendent entered – who supported
(19) NPA, made a request to you to have Dino removed.
(20)   MS. LEEDS:   Object to the form.
(21)   Q.   (By Mr. Aguilar) That's what he's saying,
(22) right? Regardless –
(23)   A.   Well, I guess he's saying what he wrote.
(24)   Q.   Regardless of what he's saying he wrote. My
(25) question is just, are you – do you recall that?

Page 169

(1) I won't even pursue that.
(2)     Q.    (By Mr. Aguilar) But I just want to make
(3) sure that what you're talking about is he approached
(4) you in what you understood to be an attorney/client
(5) context, right?
(6)     A.    Yes.
(7)     Q.    Okay. That's why you can't answer the
(8) questions now, right? That's why your attorney won't
(9) let you answer the questions now. And neither of you
(10) have to respond to that. That's just a comment I'm
(11) making, okay?
(12)     MS. LEEDS:    Object to the side bar.
(13)     MR. AGUILAR:    No. I just don't want to
(14) put them in a position where they have to respond.
(15)     Q.    (By Mr. Aguilar) Anyway –
(16)     MR. STEELE:    Hang on just a second.
(17)     MR. AGUILAR:    Sure. Let's just go off
(18) the record shortly. Okay? Buddy, is that okay with
(19) you?
(20)     MR. STEELE:    Sure.
(21)     MS. NEALLY:    Are we going off the
(22) record?
(23)     MS. LEEDS:    Yes.
(24)     MR. AGUILAR:    Yes, just for a moment.
(25)     (Off the record)

Page 170

(1) (Exhibit No. 4
(2) (marked for identification.
(3)     MR. STEELE:    Now that we're back on the
(4) record, I'm going to withdraw any objection to
(5) Mr. LaFemina testifying to the last question based
(6) upon attorney/client privilege as I was mistaken in
(7) assuming that Mr. Willis was providing some type of
(8) legal counsel to Mr. LaFemina. I was wrong in that
(9) regard. So that objection is withdrawn.
(10)     Q.    (By Mr. Aguilar) Now, I'll repeat my prior
(11) question, if I can remember it. It had something to
(12) do with – oh, I asked whether you talked to anybody
(13) else about this letter that was sent to you – I'm
(14) sorry, that was sent to Mr. Amos. And the question
(15) was whether you had also talked to, I guess,
(16) Mr. Willis and you said you did.
(17)     A.    You had asked me who I talked to.
(18)     Q.    Okay.
(19)     A.    And I had said Mr. Willis.
(20)     Q.    What did you talk to Mr. Willis about?
(21)     A.    The content of the phone conversation would
(22) have to surround the letter, but as far as details are
(23) concerned, it's a phone call that took place a
(24) year-and-a-half ago. I cannot remember the specifics.
(25)     Q.    Okay. Do you remember talking to Mr. Willis

Page 171

(1) sometime around December 4?
(2)     A.    Sometime in December.
(3)     Q.    Okay. And it was about what Mr. Chavez had
(4) referenced in this letter?
(5)     A.    And –
(6)     Q.    Among other things?
(7)     A.    – some other issues that revolved around
(8) this situation, yes.
(9)     Q.    And what did you-all talk about? Do you
(10) remember anything?
(11)     A.    Quite frankly, you know, more than likely,
(12) talked about the situation with the account, which is
(13) in the record.
(14)     Q.    I mean, do you recall that's what you talked
(15) about, or are you just assuming that that's what you
(16) talked about?
(17)     A.    If Jeff and I had a conversation about Dino,
(18) it would have – it would have had to do with the
(19) Brownsville Independent School District.
(20)     Q.    That's what I would assume as well. But what
(21) I'm asking is, is that what you're saying you did talk
(22) about or are you just guessing that that's probably
(23) what you would have talked about? In other words, do
(24) you recall the actual conversation?
(25)     A.    No.

Page 172

(1)     Q.    Okay. You're just guessing that chances are,
(2) if you did talk to him – you know you did talk to
(3) him, chances are what the conversation probably
(4) involved was Dino and the school district; is that
(5) right?
(6)     A.    I want to be specific and tell you that
(7) Mr. Willis and I did discuss the Brownsville
(8) Independent School District and Dino Chavez during
(9) December of 2001.
(10)     Q.    Okay. And do you remember what all you-all
(11) said?
(12)     A.    No.
(13)     Q.    Okay. That's the extent of what you do
(14) remember? In other words, what you – the extent of
(15) what you do remember is just the topic, you don't
(16) remember any of the specifics?
(17)     A.    That's correct.
(18)     Q.    Okay. Did he tell you to fire or demote
(19) Dino?
(20)     A.    No.
(21)     Q.    I'm handing you what I've marked as Exhibit
(22) No. 4. Do you recognize this document?
(23)     A.    I do.
(24)     Q.    This is basically a change in status form in
(25) which Dino is being demoted from RSC to associate,

Page 173

(1) correct?
(2)     A.    It's a request for that demotion.
(3)     Q.    Okay. And towards the top there, it says,
(4) "Per Jeff Willis - AFLAC," correct?
(5)     A.    It does.
(6)     Q.    And at the bottom it has your signature,
(7) right?
(8)     A.    It does.
(9)     Q.    So was Mr. Willis – I'll ask you again. Was
(10) Mr. Willis telling you to fire or demote Dino?
(11)     A.    He was not.
(12)     Q.    Okay. Why – did you write "Per Jeff Willis"
(13) up there?
(14)     A.    I did.
(15)     Q.    Okay. Why did you write that?
(16)     A.    Because the document was meant to be sent to
(17) Jeff Willis per instructions as to what might take
(18) place in the future, and it was sent to Dino's office
(19) incorrectly.
(20)     Q.    Say that again.
(21)     A.    It was supposed to be sent to Jeff Willis.
(22)     Q.    Okay.
(23)     A.    And it was faxed to Dino's office in error.
(24) There would be no reason for this to go to Dino.
(25)     Q.    Okay. This is dated December 4, 2001, right?

Page 174

(1)     A.    That's the date on it, that's correct.
(2)     Q.    You signed a request, I recommend the
(3) following action, demotion of Dino Chavez from RSC to
(4) associate, right?
(5)     A.    That's correct.
(6)     Q.    Why were you recommending his demotion?
(7)     A.    Because he wouldn't comply with the
(8) arrangement that I was trying to put together to
(9) preserve the business in BISD and to keep him
(10) compensated and to keep Dr. Sauceda happy with AFLAC.
(11)     Q.    This was within five days after – or six
(12) days after Dr. Sauceda's letter went out. And you're
(13) saying because he didn't comply within six days of
(14) Dr. Sauceda's letter, that you felt it necessary to
(15) demote him from RSC to associate?
(16)     A.    Yes.
(17)     MS. LEEDS:    Object to the predicate.
(18)     Q.    (By Mr. Aguilar) And you have per Jeff
(19) Willis - AFLAC at the top, and you said the only
(20) reason you had written that up there was what?
(21)     A.    Because Jeff wanted to gather all of the
(22) facts before any recommendation was made by myself or
(23) anyone else to change Dino's status.
(24)     Q.    Okay.
(25)     A.    In other words, I was instructed to send this

Page 181

(1)  Q.   (By Mr. Aguilar) Do you recognize this
(2) letter? Have you seen it before today?
(3)  A.   I believe so.
(4)  Q.   Okay. This is a letter from Mr. Steele, your
(5) attorney, to Mr. Rodriguez, who is Mr. Chavez' former
(6) attorney. Do you remember when you first saw this
(7) letter?
(8)  A.   I would imagine it was on or about the date
(9) on the letter, which is somewhere – December 7th is
(10) the date on the letter. To answer your question
(11) specifically, I am not sure when I saw this letter.
(12)  Q.   Do you think it was on or about or sometime
(13) around December 7th, 2001?
(14)  A.   I'm not sure when I got it.
(15)  Q.   Could it have been a month later?
(16)  A.   I don't know when I got it.
(17)  Q.   Okay. He indicates in the second paragraph,
(18) "Dr. Sauceda, by letter dated November 29, 2001,
(19) notified Mr. Chavez and AFLAC, through Frank LaFemina,
(20) its state sales coordinator, that BISD would no longer
(21) tolerate Mr. Chavez's" acting – I'm sorry, "serving
(22) as the contact with BISD on the AFLAC account. AFLAC
(23) determined that it had no option but to remove
(24) Mr. Chavez as the servicing agent on AFLAC's BISD
(25) account." Do you know – do you have any idea why

Page 182

(1) AFLAC did not fight to try to keep or act to try to
(2) keep Mr. Chavez on the account?
(3)  A.   No.
(4)  Q.   By this point, at least, it appears that the
(5) decision you had recommended had been granted. Was
(6) that your understanding as to what happened?
(7)  MR. STEELE:   Objection as to form. What
(8) decision are you talking about?
(9)  Q.   (By Mr. Aguilar) Sorry. The decision we
(10) were just talking about before on – I believe it's
(11) Exhibit 4.
(12)  MS. LEEDS:   It wasn't a decision.
(13)  MR. STEELE:   Objection; misstates the
(14) evidence.
(15)  Q.   (By Mr. Aguilar) I'm just trying to clarify
(16) it. A while ago we were talking about Exhibit 4, your
(17) recommendation to demote –
(18)  A.   May I interrupt?
(19)  Q.   Sure.
(20)  A.   Either we're going to talk about that
(21) document or this document, but I can't talk about both
(22) of them at the same time. So clearly refer to which
(23) document you would like me to address and I'll be glad
(24) to answer your question.
(25)  Q.   Sure. First of all, let's talk about

Page 183

(1) Exhibit 4, in which you're saying you're
(2) recommending – I'm sorry. It's right in front of
(3) you, this one.
(4)  A.   Thank you for your assistance.
(5)  Q.   – in which you're saying you're recommending
(6) the demotion of Dino from RSC to associate, right?
(7)  A.   That's correct.
(8)  Q.   Okay. That's December 4th, correct?
(9)  A.   That's the date on the change of status.
(10)  Q.   And if you look at the next document, Exhibit
(11) 12, Chavez 12 –
(12)  A.   Okay.
(13)  Q.   – that's dated December 7th.
(14)  A.   That's correct.
(15)  Q.   And by this point, it appears that AFLAC had
(16) determined that Mr. Chavez would be removed as the
(17) servicing agent.
(18)  A.   I don't see where you can draw that
(19) correlation.
(20)  Q.   It doesn't say AFLAC determined that it had
(21) no option but to remove Mr. Chavez as the servicing
(22) agent?
(23)  A.   I told –
(24)  Q.   I'm talking about Chavez 12 now.
(25)  A.   Okay. This is – if that's what it says.

Page 184

(1)  Whatever it says here is what Mr. Steele wrote to
(2) Mr. Rodriguez.
(3)  Q.   So is it your understanding that at that
(4) point he had been removed as the servicing agent?
(5)  A.   It says here that AFLAC determined that it
(6) had no option but to remove Mr. Chavez as the
(7) servicing agent on AFLAC's BISD account. My
(8) impression is –
(9)  Q.   I'm talking about actuality. I'm asking what
(10) your understanding was as to what actually happened.
(11) In other words, that is what happened?
(12)  A.   I probably found out that that happened
(13) sometime after this was sent.
(14)  Q.   Okay.
(15)  MS. LEEDS:   Can I just get a
(16) clarification here? Are we talking about removing him
(17) as a servicing agent being the same thing as the
(18) recommendation of –
(19)  THE WITNESS:   They're two different
(20) issues.
(21)  MS. LEEDS:   Okay.
(22)  Q.   (By Mr. Aguilar) Okay. Now, it goes on to
(23) say, "Mr. Chavez was directed to cease further contact
(24) with BISD." Was that your understanding as well?
(25)  A.   I'll answer the same way as I answered your

Page 185

(1) previous question. I probably found out about this
(2) after it was done and, yes, that was my understanding,
(3) that he had been removed from the group.
(4)  Q.   Okay. On or about December 7th?
(5)  A.   Somewhere in December.
(6)  Q.   Okay.
(7)  A.   Looks like December 7th, actually, was the
(8) date.
(9)  Q.   Okay. So continuing on, he goes on to say,
(10) "Mr. Chavez is an independent contractor," in the next
(11) paragraph.
(12)  A.   Uh-huh.
(13)  Q.   "He has no authority to communicate with
(14) BISD, either directly or indirectly through you" –
(15) meaning Mr. Rodriguez, the former attorney –
(16) "regarding the servicing of AFLAC's account."
(17) Correct?
(18)  A.   That's what it says. You read it word for
(19) word.
(20)  Q.   So it was your understanding – was it your
(21) understanding then, that at that point Mr. Chavez
(22) could not even approach anybody at BISD about trying
(23) to stay on the account?
(24)  MS. LEEDS:   Object to the form.
(25)  THE WITNESS:   Answer?

Page 186

(1)  MS. NEALLY:   Object to the form. Calls
(2) for speculation.
(3)  THE WITNESS:   My answer to the question
(4) is as follows, I understand and have no other standing
(5) other than the content of this document by my
(6) attorney.
(7)  Q.   (By Mr. Aguilar) Okay.
(8)  A.   Exactly what this says is what I understand.
(9)  Q.   Okay.
(10)  A.   If you would like to read it for the record,
(11) please feel free to do so.
(12)  Q.   He goes on to say, the very last bottom line,
(13) "The BISD account belongs to AFLAC." Right?
(14)  A.   That's what it says.
(15)  Q.   What account was it that you understood
(16) belonged to AFLAC?
(17)  A.   I understand that all accounts belong to
(18) AFLAC.
(19)  Q.   Are you talking about the particular
(20) supplemental health insurance account? Are you
(21) talking about the third party administrator account?
(22) Are you talking about the Flex One account? I'm
(23) asking which account you understood – or accounts
(24) you understood –
(25)  A.   I understand that the entire account is the

Page 193

(1) Q. And you're also saying, Ron Levine was in
(2) charge 100 percent?
(3) A. On that bullet or are you now on another
(4) bullet?
(5) Q. Next bullet.
(6) A. Yes. That's exactly what it says.
(7) Q. Meaning, Dino would be getting zero percent?
(8) A. No.
(9) MS. LEEDS: Object to the form.
(10) Q. (By Mr. Aguilar) Okay. If Ron – I'm sorry.
(11) Like I say –
(12) A. It says, Ron is in charge 100 percent. It
(13) doesn't address – address compensation.
(14) Q. Right. Meaning, Dino is the zero percent
(15) charge is what I meant to ask.
(16) A. That's correct.
(17) Q. You said earlier you were trying to protect
(18) AFLAC's and Dino's interest, right, working through
(19) this –
(20) A. Financially.
(21) Q. Okay. And AFLAC's was obviously in keeping
(22) the business. That's how you were trying – that's
(23) what you were doing to try to keep – let me rephrase
(24) that. When you said you were trying to protect
(25) AFLAC's interest, it's by keeping the business, right,

Page 194

(1) as a general statement?
(2) A. I was trying to protect – I think what I
(3) said was I was trying to protect Dino's interest and
(4) AFLAC's interest because I had not been involved very
(5) long.
(6) Q. Okay. And AFLAC's interest that you were
(7) trying to protect would be done by keeping the
(8) business?
(9) A. Yes.
(10) Q. Okay. And you said you were trying to
(11) protect Dino's financial interest –
(12) A. Uh-huh.
(13) Q. – just right now, right?
(14) A. (Moves head up and down.)
(15) Q. And to do that, you were talking about –
(16) what you were trying to protect was Dino's being able
(17) to get RSC overrides, right?
(18) A. I was not specific. He would get –
(19) Q. As of the time of Exhibit 2, that's the only
(20) financial interest Dino was envisioned to be getting
(21) as of that time at least, right?
(22) MS. LEEDS: Object to the form.
(23) THE WITNESS: I think the form would
(24) speak for itself. It doesn't address the issue of
(25) Dino's compensation one way or the other.

Page 195

(1) Q. (By Mr. Aguilar) Okay. But your
(2) understanding, at least as of the time of writing
(3) Exhibit 2, was the only financial compensation you had
(4) in mind as of this time was the RSC overrides, right?
(5) A. No.
(6) Q. Okay. Well, it doesn't say Dino is going to
(7) be getting anything more than RSC overrides, right?
(8) A. It doesn't say that he's going to get
(9) anything less than RSC overrides either. And it
(10) doesn't exclude him from receiving other compensation
(11) as a result of sales made by someone on that team.
(12) Q. Whatever else he could set up on his own
(13) separately?
(14) A. That's what he had done in the past.
(15) Q. I'm handing you what was previously marked as
(16) Chavez Exhibit 15. This is a letter addressed to you
(17) from Daniel Sanchez. Do you recognize it?
(18) A. I do recognize it.
(19) Q. Do you recall receiving it on or about
(20) December 19 of 2001?
(21) A. I don't remember when I received it. Just
(22) like the others, it's been a long time ago. I did
(23) receive it.
(24) Q. Okay. If you look down at the fifth
(25) paragraph – actually, to put it in perspective, if

Page 196

(1) you look at the first paragraph, it says, "As
(2) requested, I am writing you this letter of intention.
(3) It is my understanding that our current regional sales
(4) coordinator, Dino Chavez, may not be in his current
(5) position for very much longer and that AFLAC wishes to
(6) know whether I will continue to serve as district
(7) sales coordinator when and if this situation arises."
(8) Just putting that in perspective now.
(9) If you look now at the fifth paragraph,
(10) I believe it was, he goes on to say, "My dilemma is
(11) simple and not simple. The associates who worked BISD
(12) on a yearly basis were happy splitting this account
(13) with Dino because there was no servicing involved
(14) throughout the year." Do you agree with that
(15) statement?
(16) A. No.
(17) Q. Why not?
(18) A. I think that Daniel in this letter is
(19) speaking for a bunch of other people.
(20) Q. Okay.
(21) A. I couldn't confirm whether or not they were
(22) happy splitting business with him or not. They may
(23) very well have been. I don't know.
(24) Q. You just don't know, okay. As far as no
(25) servicing involved throughout the year, do you know

Page 197

(1) one way or the other about that information?
(2) A. No, I don't know anything about that. I
(3) mean, it's assumed here that there was no service
(4) involved throughout the year.
(5) Q. That's what he's saying.
(6) A. I find it very difficult to believe that a
(7) 7,000 man account with a penetration rate of
(8) 60 percent wouldn't have ongoing service, which was
(9) going to be conducted by the people we discussed
(10) earlier, Dino, his office and his staff and managers
(11) and associates.
(12) Q. That's who you would expect to be doing it?
(13) A. And I would expect it went on throughout the
(14) year.
(15) Q. He goes on to say, "It would be disastrous
(16) for AFLAC to have 30 different associates throughout
(17) the Valley servicing this account." Do you agree with
(18) that or not?
(19) A. No.
(20) Q. Okay. Now, when somebody does an enrollment,
(21) basically, is it a - correct me if I'm wrong here.
(22) Is it a large group of enrollers where agents come in
(23) to sign up all the policies during a very short period
(24) of time?
(25) A. Everybody that works with AFLAC is an

Page 198

(1) independent contractor and they set up their
(2) enrollments based on what's good for themselves or
(3) what's good for the client or the culmination of both
(4) of those issues. I don't know what generally
(5) happened.
(6) Q. Let's try it this way. Large group
(7) enrollments, is that what generally happens?
(8) A. I don't know the answer. I don't know that
(9) there's a general way that things happen in terms of
(10) the enrollment. Each case is – you know, has its
(11) own fingerprints.
(12) Q. What about at BISD? Do you know?
(13) A. Never involved in the enrollment.
(14) Q. Okay. So you just wouldn't know?
(15) A. You asked specifically about BISD and the
(16) answer is, I don't know how it was handled.
(17) Q. Okay. So generally, whoever participates –
(18) an agent participates in an enrollment, whether it's a
(19) large group enrollment or just an individual
(20) enrollment, he's the one who signs up or sells that
(21) policy to the customer, right?
(22) A. All the enrollments are group enrollments,
(23) and I think you made some distinction between the two.
(24) If it's an enrollment, it's a group enrollment. It
(25) might be three employees or it could be 3,000

Page 205

(1)    A.    That's what I said. It went – you know, I
(2) don't know, because there's not a third name on the –
(3) on the e-mail.
(4)    Q.    You mentioned that Mr. Sanchez also had some
(5) concerns. Do you think he might have been the third
(6) person?
(7)    A.    There was – there could have been – it
(8) could have been actually Daniel Sanchez and Lynn Davis
(9) and – Dennis Escobar would be the third person's
(10) name, would be my guess. And Ms. Davila was copied on
(11) this.
(12)   Q.    You say it could have been Mr. Sanchez or who
(13) else?
(14)   A.    Sanchez, Escobar and Davis.
(15)   Q.    Okay. Davis is on here.
(16)   A.    Uh-huh.
(17)   Q.    You're thinking it was not Antonia Davila?
(18)   A.    No, it was Toni Davila as well.
(19)   Q.    Okay. So there would have been – when
(20) you're talking about, it appears as though none of the
(21) three of you, it was probably four of you?
(22)   A.    No. It's cc'd to Toni Davila. It's
(23) addressing the other three that I mentioned.
(24)   Q.    That's what I'm saying. The three that
(25) you're talking about here would be Lynn Davis, Sanchez

Page 206

(1) and Escobar?
(2)    A.    Correct.
(3)    Q.    Okay. And what was the concern that you had
(4) to help with the associate – the costs associated
(5) with BISD, what was the – what is it they were not
(6) willing to help with?
(7)    A.    I didn't have the concern. They were the
(8) ones that had the concern. And their concern was that
(9) there was absorbitive costs related to handling BISD.
(10) And as you can see, my response indicates that, you
(11) know, everything they did in those accounts, they
(12) received commissions for, renewals for, stock. And if
(13) they were in management, obviously they received
(14) overrides on their personal and their team's business.
(15) And my –
(16)   Q.    Okay. That's what you're talking about
(17) towards the bottom of that; is that right?
(18)   A.    That's correct.
(19)   Q.    Okay.
(20)   A.    And that's just a cost of doing business. I
(21) have those same costs.
(22)   Q.    Okay. Back when Dino was handling this
(23) account, you had never received any concerns from
(24) anybody about paying any of those costs, right?
(25)   A.    I think the answer to that is Dino voiced –

Page 207

(1) or shared with me the expenses, but I don't think he
(2) made it in a negative light.
(3)    Q.    In other words, he might have mentioned, this
(4) is what it's costing me, but he did not say, hey, I
(5) expect you to cover me, or anything like that?
(6)    A.    Correct.
(7)    Q.    And I think you said the amount you agreed to
(8) offer to compensate for those additional expenses was
(9) about 5,200 between you and Mr. DePasqual?
(10)   A.    $2,600 each, correct. $100 a week is what it
(11) boiled down to for a full year.
(12)   Q.    You never offered anything to Dino, right?
(13)   A.    Dino never asked.
(14)   Q.    And you didn't offer on your own?
(15)   A.    I would never offer because it's our own
(16) responsibility as an independent contractor to pay our
(17) own expenses.
(18)   Q.    Okay. I'm handing you what I've marked as
(19) Chavez Exhibit 39. Do you recognize that document?
(20)   A.    I know what it is, yes.
(21)   Q.    At the bottom, I don't know what that means,
(22) W3809, Frank D. LaFemina. Is 3809 your AFLAC number
(23) or something?
(24)   A.    Yes.
(25)   Q.    Okay. Did you get cc'd a copy of this

Page 208

(1) document?
(2)    A.    Don't remember.
(3)    Q.    Do you remember seeing this document before
(4) today?
(5)    A.    No.
(6)    Q.    Okay. Now, let me represent to you, then,
(7) this appears to be a notice to Dino dated December 28,
(8) 2001, indicating a change in status effective 1-27-02,
(9) which goes from regional sales coordinator's agreement
(10) to the associate's agreement. If you look back at the
(11) document you had signed earlier, I believe it's
(12) Exhibit 4.
(13)   A.    Did you take them back from me?
(14)   A.    I didn't – I should not have.
(15)   A.    Indian giver. Let's see here.
(16)   MS. LEEDS:    I haven't heard that word in
(17) a long time.
(18)   Q.    (By Mr. Aguilar) Right there. That one.
(19)   A.    Okay.
(20)   Q.    This was your memo that we had talked about
(21) earlier dated December 4, and it appears Chavez 39 is
(22) the document, I guess, formalizing the
(23) recommendations – change in status form that you had
(24) made earlier. Is that your understanding?
(25)   A.    I would disagree with that completely.

Page 209

(1)    Q.    Okay. What's the – why?
(2)    A.    Because this form is –
(3)    Q.    Which one?
(4)    A.    – not valid for any reason.
(5)    Q.    Why not?
(6)    A.    It doesn't have the signature of the
(7) territory director and vice president. Let me put it
(8) this way. The form is useless.
(9)    Q.    Basically, Chavez 39 is doing what LaFemina
(10) Exhibit 4 was recommending?
(11)   A.    No.
(12)   Q.    Is Chavez 39 demoting Dino from regional
(13) sales coordinator to associate?
(14)   A.    Yes. Effective January 27 of 2002.
(15)   Q.    Okay. And that's the same action that you
(16) had recommended in Exhibit 4, but that goes back to
(17) December 4?
(18)   A.    Document Exhibit Chavez 39 –
(19)   Q.    I think you're getting a little confused.
(20) Sorry.
(21)   A.    No, I'm not confused at all.
(22)   A.    I'm talking about this one.
(23)   A.    This is a change in status from RSC, regional
(24) sales coordinator, to associate.
(25)   Q.    You're now referring to Document 39?

Page 210

(1)    A.    The Chavez Document 39.
(2)    Q.    Right.
(3)    A.    On Exhibit No. 4, that – this is not a
(4) result – No. 39 is not a result of form No. 4.
(5)    Q.    I'm just saying – I'm just asking,
(6) Exhibit 4 – in Exhibit 4, you're also recommending
(7) that Dino be demoted from RSC to associate, right?
(8)    A.    It would appear that I'm recommending that,
(9) but nobody – no company officer has ever signed this
(10) document.
(11)   Q.    Okay. Instead, Mr. Karl Douglass, second
(12) vice president, was the one who sent out this letter
(13) to Mr. Chavez giving him 30 days notice of his change
(14) in status from regional sales coordinator to
(15) associate. That's in Chavez 39, right?
(16)   A.    It has Mr. Douglass' signature on it.
(17)   Q.    Okay. So as of December 27, 2001, what was
(18) Dino's position?
(19)   A.    Regional sales coordinator.
(20)   Q.    Okay. If he was still the regional sales
(21) coordinator, why wasn't he allowed to do or cooperate
(22) in the enrollments, the BISD enrollment?
(23)   A.    Dr. Sauceda requested he not –
(24)   Q.    Okay.
(25)   A.    – be permitted on the school campuses or in

Page 217

(1) Mr. Sanchez, I think he referred to the fact that the
(2) writing of the business which he did and his team did
(3) in the BISD helped fund this operation, or he was
(4) referring to BISD actually funding, you know, his
(5) expenses, which I knew was not the case.
(6) Q. Okay.
(7) A. And if they were funding him in any way, I
(8) had no knowledge of it.
(9) Q. Now, when did Ron Levine leave Brownsville?
(10) In other words, he originally had an office in
(11) Harlingen, right?
(12) A. It's my understanding that office is still
(13) there.
(14) Q. Is it his office?
(15) A. Yeah. It's in his name.
(16) Q. It's in his name. Does anybody work there?
(17) A. You know, I don't know the answers to those
(18) questions. I know that there's an office there and
(19) there's an office in Harlingen.
(20) Q. Okay. Do you know whether any employees work
(21) at that office in Brownsville?
(22) A. I don't think there are any employees.
(23) Q. Okay. When was it that the employees left or
(24) anybody who was working in that office? Let me
(25) rephrase that. Hang on.

Page 218

(1) A. I answered the question already, Arnold. I
(2) don't know what's going on with the Brownsville
(3) office. I do not know.
(4) Q. You know there's an office. For all you
(5) know, it may have doors that are locked all day; is
(6) that right?
(7) A. I can't give you any specifics. I don't know
(8) a thing about the office other than it's there.
(9) Q. Okay. Now, Mr. Levine got a split – a
(10) 10 percent split on all the sales from each of the
(11) agents during the BISD enrollment for 2001, right?
(12) A. He may or may not have. Well, we would have
(13) to – I know that he wasn't very concerned with how
(14) much money he got from the account, and so I know he
(15) didn't write much personal production and I can't
(16) testify one way or the other as to whether he took
(17) 10 percent on every transmittal that contained all of
(18) the policies. I do not know.
(19) Q. Okay.
(20) A. AFLAC would have to confirm that for us.
(21) Q. On your Exhibit 2, that was the – on all
(22) those bullets, one of those bullets, that's what you
(23) had – your proposal was.
(24) A. That's what I outlined, absolutely.
(25) Q. Do you know whether that outline ever got

Page 219

(1) accepted by the agents or by Mr. Levine or anybody
(2) else?
(3) A. It appeared to me that it was acceptable by
(4) some and unacceptable to some others. But overall,
(5) the objective was met and the plan was followed. Ron,
(6) at his discretion, could have told certain individuals
(7) not to put him on the transmittal. And, again, to
(8) document that, we would have to get records from
(9) AFLAC.
(10) Q. Okay. After the BISD enrollment, was Ron
(11) servicing those accounts primarily or were the
(12) individual agents servicing those accounts primarily?
(13) A. I don't know the answer to that. I would
(14) assume that the seller, which is indicated in this
(15) letter, as a matter of fact, Exhibit 6, that the
(16) seller of the policy should be responsible for the
(17) service.
(18) Q. Meaning the agent?
(19) A. Not necessarily. Could be the agent, could
(20) be the district sales coordinator. Whoever sells the
(21) policy should be responsible for the service to that
(22) policyholder.
(23) Q. For the most part, the agents were the ones
(24) selling those policies?
(25) A. District sales coordinators would sell the

Page 220

(1) policies equally.
(2) Q. Okay. So did –
(3) A. In some cases.
(4) Q. Did Mr. – and you're talking about
(5) Mr. Levine?
(6) A. No. He was – at that time, actually, he was
(7) a district sales coordinator. He wasn't – I know for
(8) a fact that he wasn't – and it's indicated in one of
(9) these other documents – I'm not sure which one it
(10) is – that Mr. Levine did not write hardly any
(11) personal production. And that can be documented.
(12) Q. Okay. During the BISD enrollment?
(13) A. At any time. He was just not a general
(14) personal producer.
(15) (Exhibit No. 7
(16) (marked for identification.
(17) Q. (By Mr. Aguilar) I'm handing you what's
(18) marked as Exhibit 7. This is a letter from
(19) Mr. Sanchez to you dated September 16, 2002. Do you
(20) recognize this letter?
(21) A. Yes, I do.
(22) Q. In this letter, if you go to the third
(23) paragraph, he's indicating, "At no time has anyone
(24) been told that BISD was funding our office. I have
(25) had to explain to a few people I simply was not able

Page 221

(1) to fund a full-time office on my own and that funding
(2) from AFLAC was not available." Was that part of the
(3) discussion you were having with him earlier about
(4) funding his office?
(5) A. I'm not sure when we had that conversation.
(6) It could have been before; as well, it could have been
(7) after. I think – never mind.
(8) Q. Was there some concerns after the BISD
(9) enrollment, some complaints from customers, that they
(10) were not getting good service on their accounts?
(11) A. I think that the only documentation I have is
(12) a handful of people that were – I'm sorry – that
(13) were concerned that they had some challenges with
(14) service.
(15) Q. Okay. By handful, you mean about how many?
(16) If you can, just give me a range. I don't need an
(17) exact number.
(18) A. Six or eight.
(19) Q. Okay. Were there also other – were you
(20) aware of any other phone complaints about the
(21) servicing of the accounts?
(22) A. Phone complaints?
(23) Q. Yes. Either phone or oral. In other words,
(24) you said you had –
(25) A. There were no complaints that came directly

Page 222

(1) to my office. There were some complaints that went to
(2) Mr. DePasqual's office. There were complaints that
(3) were handled by Mr. Levine's office as well, but they
(4) were minimal.
(5) Q. Some oral or phone complaints? In other
(6) words, you mentioned a handful of documents, six to
(7) eight, something like that.
(8) A. Those were just some written documents,
(9) correct.
(10) Q. And in addition to that, I'm asking about the
(11) oral, either phone or in person complaints, and you
(12) said there was some more of those.
(13) A. There was not – an insignificant amount as
(14) it relates to the size of the group and the number of
(15) policyholders.
(16) Q. Can you give me a range?
(17) MS. LEEDS: Objection; asked and
(18) answered.
(19) THE WITNESS: In terms of phone calls,
(20) you're asking me to guess. I really don't know. I
(21) know there was a minimal amount. I really couldn't
(22) put my finger on it.
(23) Q. (By Mr. Aguilar) Okay. Back when Dino was
(24) supervising this account, did you ever get any
(25) handwritten – or I'm sorry, any written typed

Page 229

(1) year 2001.
(2)     Q.    Would that have been on or before the end of
(3) January, 2000?
(4)     A.    Don't know.
(5)     Q.    You just don't have any idea?
(6)     A.    No. I have no idea.
(7)     Q.    All right. So at that point --
(8)     A.    I think I was real specific about that when
(9) it took place.
(10)     Q.    Okay. So at that point you realized that's
(11) what was going on, you felt it was not fair to Dino to
(12) go take it away from him after he had already made
(13) that arrangement, right?
(14)     A.    That's not what I said.
(15)     Q.    I'm sorry.
(16)     A.    What I said was that I had not addressed --
(17)     THE WITNESS:    Do I have to repeat
(18) myself?
(19)     Q.    (By Mr. Aguilar) Actually, I'll just ask you
(20) a different question, okay?
(21)     A.    Well, then, do you want to straighten it out
(22) for the record since you asked it twice two different
(23) ways?
(24)     Q.    No. If you don't want to answer it the
(25) second way, that's okay, too.

Page 230

(1)     MR. STEELE:    Well, you said you would
(2) ask another question. Go ahead and ask that question.
(3) Let's move on down the road.
(4)     Q.    (By Mr. Aguilar) My question is, at that
(5) point, after you had talked to Dino, around the time
(6) of the enrollment of 2000 going into 2001 -- I'm just
(7) trying to put it in a timetable -- at that point, you
(8) decided not to withdraw any of those splits that Dino
(9) had already done for that time period, right?
(10)     A.    I never even considered it because I was
(11) unaware of the fact that it was taking place. And
(12) Dino --
(13)     Q.    I'm talking about after the fact. I'm
(14) talking about after the --
(15)     MR. STEELE:    Let him finish the
(16) question.
(17)     THE WITNESS:    I need to go to the
(18) restroom, you-all.
(19)     MR. AGUILAR:    Okay.
(20)     (Lunch Recess)
(21)     Q.    (By Mr. Aguilar) Okay. Before we took a
(22) break, I was asking you about commission splits
(23) between the RSC and the agent. And we were talking
(24) about the time period of 2000 when the enrollment was
(25) being done for the 2001 year. You indicated you found

Page 231

(1) out that Dino had a commission split arrangement with
(2) the enrollers. Remember, that's what we were talking
(3) about just before we broke for lunch?
(4)     A.    Yes.
(5)     Q.    Okay. And you said you talked to Dino
(6) sometime around that time period of the enrollments;
(7) is that right?
(8)     A.    If that's what the record indicates.
(9)     Q.    Is that your recollection?
(10)     A.    Yeah, uh-huh.
(11)     Q.    Okay. After you talked to him about the
(12) splits and how it was worked out or whatever, did you
(13) send him any letter saying, hey, I don't approve of
(14) these splits?
(15)     A.    I don't think I sent -- as a matter of fact,
(16) no, I did not send Dino a letter. But there are a set
(17) of guidelines that I run the operation by which
(18) clearly indicate that, and I believe Dino had seen
(19) those previously.
(20)     Q.    Okay.
(21)     A.    They were available for him if he had not.
(22)     Q.    Okay. Did you ever send him any -- you
(23) didn't send him a letter. Did you send an e-mail or
(24) any other kind of notice saying, "Hey, these are our
(25) guidelines, no commissions are allowed," for future

Page 232

(1) enrollments?
(2)     A.    I think that he was given a copy of those
(3) guidelines when I became the state sales coordinator
(4) or sometime shortly thereafter. But there was no
(5) conversation -- or no written documentation of our
(6) conversation following the time that we had it, which
(7) would have been in the time period that we talked
(8) about earlier.
(9)     Q.    Around the enrollment of 2000?
(10)     A.    At the end of the enrollment.
(11)     Q.    At the end of 2000?
(12)     A.    You bet.
(13)     Q.    There was no memo sent out, I presume, then,
(14) to the rest of the agents also saying -- let me
(15) rephrase that. You also did not send any memo,
(16) letter, e-mail or anything like that to the agents
(17) saying, commission splits between agents and RSCs are
(18) not permitted, after that point either, right?
(19)     A.    Actually, the answer to that is no. I don't
(20) deal at the agent level. That is an RSC or a DSC
(21) responsibility, as opposed to mine.
(22)     Q.    Okay. Now, these -- what's called the -- the
(23) documents that you're talking about, what are they
(24) called?
(25)     A.    I'm not sure which documents you're referring

Page 233

(1) to.
(2)     Q.    The one you just referred to. You said Dino
(3) does -- had -- or a copy of some guidelines.
(4)     A.    Yeah. There are some guidelines that sort of
(5) govern the general way that we do business.
(6)     Q.    Where are those guidelines? What are they
(7) called?
(8)     A.    They're called guidelines.
(9)     Q.    Okay. If I wanted -- can you get me a copy
(10) of those?
(11)     MR. STEELE:    If -- are you aware of a
(12) particular set of guidelines, Frank?
(13)     THE WITNESS:    It's guidelines that I
(14) wrote from the state which I was encouraged to write
(15) by my territory director when I became the state
(16) coordinator.
(17)     MR. STEELE:    Well, can you -- do you
(18) have a copy? Can you put your hands on those
(19) guidelines?
(20)     THE WITNESS:    No.
(21)     MR. STEELE:    I do not have a problem, if
(22) you can put your hands on those without much trouble,
(23) if you will get a copy to me and I'll get them over to
(24) Arnold.
(25)     Q.    (By Mr. Aguilar) Is it just like something

Page 234

(1) that you typed up yourself?
(2)     A.    Yeah.
(3)     Q.    Okay. Does it have a title at the top or
(4) something, guidelines or something?
(5)     A.    It probably says AFLAC Texas Central
(6) Guidelines.
(7)     Q.    Okay. When -- how did you distribute those
(8) guidelines? Like whenever an agent get hired, does he
(9) get a copy or something?
(10)     A.    Actually, at the time that I became the state
(11) sales coordinator, or shortly thereafter, they were
(12) distributed personally from myself to the regional
(13) sales coordinators.
(14)     Q.    Okay.
(15)     A.    The associates are -- and the district sales
(16) coordinators would have gotten a copy as well. They
(17) are then responsible for communicating that
(18) information to the associate level.
(19)     Q.    You would have sent them to your RSCs, who
(20) then you expected to distribute to the DSCs and to the
(21) associates?
(22)     A.    Actually, I would have given them to the RSCs
(23) and the DSCs in a total team management format, and
(24) then expected them to do their part or their
(25) responsibility, which is to communicate the

Page 241

(1) happen again?
(2) A. Yes.
(3) Q. And was that both Mr. Kuechenmeister and
(4) Mr. Barnson?
(5) A. Yes, and Mr. Amos.
(6) Q. And Mr. Amos. Actually, Mr. Amos was the one
(7) who made the comment, right?
(8) A. Actually, I wrote Mr. Amos a letter of
(9) apology and he responded and asked that I not allow
(10) that to ever occur at an AFLAC event again. And I
(11) explained to him clearly that I apologize for arguing
(12) with my wife because I was probably the only one who
(13) had ever had an argument with their wife.
(14) MR. AGUILAR: Off record just a moment.
(15) (Off the record)
(16) Q. (By Mr. Aguilar) One other thing I forgot to
(17) ask about. When we took your – finished your
(18) deposition last time, I had asked you to put together
(19) growth rate comparison information. We asked you for
(20) your annual team production for each of the years you
(21) were an RSC and an SSC. You said you would have to
(22) put that together and I'll get it for you. Did you
(23) bring that with you today?
(24) A. I think that my answer was that unless I'm
(25) compelled to provide those – or actually that was my

Page 242

(1) attorney's advice. I'll turn it to over on him.
(2) MR. STEELE: Well, I – what I recall
(3) your asking him to produce was his own individual tax
(4) returns that we refused to produce.
(5) MR. AGUILAR: It was that, but that's
(6) something else.
(7) MR. STEELE: And I don't – you know, I
(8) don't know – I tell you what, put it in the form of a
(9) request – I guess you'll have to do a third party
(10) subpoena duces tecum.
(11) MR. AGUILAR: I guess what I can do is
(12) just ask the other question which is similar.
(13) Q. (By Mr. Aguilar) What I'm really asking is,
(14) did you bring anything – and I think I know what the
(15) answer is. But let me go ahead and ask the question
(16) and get it on the record.
(17) MR. STEELE: Okay. And then I'll go
(18) ahead and make any objection. And then, Frank, you
(19) can answer.
(20) THE WITNESS: You-all just let me know
(21) what the deadline is and I'll be all right here.
(22) Q. (By Mr. Aguilar) Okay. Now, getting back
(23) to – the actual question was, during the first part
(24) of your deposition, we asked about your annual team
(25) production premiums, what is was for each of the years

Page 243

(1) you were an RSC and an SSC. We asked you to bring
(2) that and I thought you said you agreed to bring that.
(3) Do you have it with you today?
(4) MR. STEELE: I'm going to object to
(5) the form of the question. It misstates facts in
(6) evidence.
(7) THE WITNESS: I did not bring –
(8) MR. STEELE: Go ahead.
(9) THE WITNESS: No, I did not bring them.
(10) Q. (By Mr. Aguilar) And the second thing is, we
(11) also asked you what your 1099 income was for each year
(12) you were an RSC and SSC. Do you have that
(13) information?
(14) MR. STEELE: Again, we object to that.
(15) We reiterate the objection made earlier.
(16) THE WITNESS: And I do not have it with
(17) me.
(18) Q. (By Mr. Aguilar) And you did not bring that
(19) with you?
(20) A. That's correct.
(21) Q. Okay.
(22) MR. AGUILAR: I'll go ahead and pass the
(23) witness at this time.
(24) EXAMINATION
(25) QUESTIONS BY MS. NEALLY:

Page 244

(1) Q. Mr. LaFemina, my name is Elizabeth Neally.
(2) I'm the attorney that represents the Brownsville
(3) Independent School District.
(4) A. Yes, ma'am.
(5) Q. Do you understand that?
(6) A. Yes, I do.
(7) Q. We met at your earlier deposition, the first
(8) deposition, right?
(9) A. I remember.
(10) Q. I'm going to ask you a few questions and I
(11) believe – I don't want to be redundant, so bear with
(12) me.
(13) MS. NEALLY: Eileen, pull out AFL 2952.
(14) 2948 – I'm sorry – through 29 – sorry about that.
(15) 2939 to 2948 of the documents I faxed.
(16) MS. LEEDS: Okay. I've got 2948.
(17) MS. NEALLY: 2939 to 2948. It's one
(18) document.
(19) MS. LEEDS: Yes.
(20) MS. NEALLY: Okay. Is that –
(21) MR. STEELE: Hang on just a second.
(22) MS. LEEDS: I do not believe so.
(23) MR. STEELE: Do you want to staple this
(24) and make it an exhibit?
(25) MS. NEALLY: Please.

Page 245

(1) THE WITNESS: We miss you not being here
(2) personally, by the way.
(3) (Exhibit No. 8
(4) (marked for identification.
(5) MS. LEEDS: It's Exhibit 8.
(6) Q. (By Ms. Neally) Okay. This is a document
(7) that was supplied to us by your attorney in response
(8) to request for production by me. And I believe it's a
(9) reimbursement services agreement; is that right?
(10) A. That's what it's titled, ma'am, on page one,
(11) yes.
(12) Q. Okay. And on the last page, it's signed and
(13) entered into between Cheryl Moss as second vice
(14) president for AFLAC, I believe, and then Ken Lewis
(15) from the Brownsville Independent School District; is
(16) that right?
(17) A. That's what's indicated on the last page.
(18) That's correct, ma'am.
(19) Q. That's for the 1998 – well, actually, the
(20) 1999 school year, right?
(21) A. I don't know without reading the document
(22) whether it's a multiple year arrangement or an annual
(23) arrangement.
(24) Q. Take a look at that for me and let me know.
(25) A. It would take me quite a few minutes to read

Page 246

(1) this whole thing. Do you want to do that now?
(2) Q. No. Just for purposes of – can you
(3) determine from looking at the document whether it's a
(4) multiple year or just one year?
(5) A. Can we go off the record for a minute? I
(6) just need to ask Buddy a question.
(7) MS. LEEDS: Sure.
(8) Q. (By Ms. Neally) I think if you look in
(9) Section 5 –
(10) A. I was not involved in this. It was 1998. I
(11) wasn't a state sales coordinator and don't feel like
(12) I'm comfortable with it.
(13) MR. STEELE: Hang on. Let's just see –
(14) where is it, Elizabeth? Section 5?
(15) MS. NEALLY: Section 5 of the agreement.
(16) THE WITNESS: Okay. That will make it
(17) simple.
(18) MR. STEELE: Just read what it says.
(19) THE WITNESS: It says here in that
(20) section that it's - "Shall be the initial plan year
(21) commencing on the effective date hereof and thereafter
(22) the agreement will automatically renew for successive
(23) periods of 12 months. At least 30 days prior to the
(24) end of the then current term, the employer or AFLAC
(25) gives written notice to the other of its intention not

Page 253

(1) can't d~ tnat. It was right in there somewhere. It
(2) was either that day, the next day or the next day. It
(3) was – it could have been any one of those times. I
(4) can't tell you for sure.
(5)    Q.    Well, the fact that it fell on either a
(6) Thursday or a Friday would indicate to you that you
(7) probably talked to him then as opposed to talking to
(8) him over the weekend unless you called him at home;
(9) isn't that right?
(10)    A.    That would be an assumption that you're
(11) making, but I don't know when I talked to him, as I
(12) mentioned to you. And I'm not being argumentative
(13) with you. I did have a conversation with him and it
(14) happened sometime nearly immediately following the
(15) receipt of the letter. The question is when I got the
(16) letter, and the answer is, it's dated the 29th, but I
(17) don't know when I got it for sure. It's in previous
(18) testimony. But, yes, we had a conversation.
(19)    Q.    You prepared the directive to your team
(20) that's Exhibit 2 on or about December 1st, 2001,
(21) correct?
(22)    A.    My LaFemina 2 does not have a date on it.
(23)    Q.    Okay. But you recall speaking to Mr. Chavez
(24) on a Saturday. That's what your earlier testimony
(25) was, correct?

Page 254

(1)    A.    I said that I believed it was a Saturday and
(2) then I followed it up by saying, "Well, it doesn't
(3) really matter what day it was."
(4)    Q.    Okay.
(5)    A.    I mean, you know, let me just say this – and
(6) if my attorney advises me otherwise, then I'll take
(7) his advice. If you're going to ask me about specific
(8) dates, I'll tell you the same thing, with all due
(9) respect, that I told Mr. Aguilar. I cannot confirm
(10) for you any date and I will not confirm for you any
(11) date unless it's a date that's on a document and it's
(12) not something that's handwritten in. I would love to
(13) help you, but I'm just – my crystal ball doesn't work
(14) real well.
(15)    MS. NEALLY:    I'm going to object to the
(16) responsiveness of the answer.
(17)    Q.    (By Ms. Neally) Okay. Now, you've said that
(18) the only conversation that you had with Mr. Chavez
(19) regarding Exhibit 2 occurred on some date afterwards,
(20) I'm assuming, right?
(21)    A.    No.
(22)    Q.    The conversation with him; is that right?
(23)    A.    Nope. No, ma'am.
(24)    Q.    Okay. Well, then tell me about the
(25) conversations you had with him, sir.

Page 255

(1)    A.    It's not the conversation issue. We did have
(2) one conversation. It took place prior to this printed
(3) directive.
(4)    Q.    Okay.
(5)    A.    Which is what I testified to previously.
(6)    Q.    Okay. After you sent the directive, did you
(7) have any additional conversations with Mr. Chavez?
(8)    A.    I do not remember.
(9)    Q.    Okay. Let me show you what we're going to
(10) mark as Exhibit 10. I don't believe it's in evidence
(11) already. And it's AFL 3001 and 3002. You can staple
(12) those. I'm sorry. And 3003. It's one document. Is
(13) that already in evidence?
(14)    A.    Yes.
(15)    MR. STEELE:    Hang on a second. Let me
(16) see if it's the complete version. It is. And give us
(17) a second. The only difference between what you faxed
(18) today to this firm with our AFL marks on it are some
(19) old facsimile information at the top. That's the only
(20) difference between Chavez 36 which is what Arnold has
(21) been referring to in his questioning, and it has the
(22) Bates labels 001231 through 1233 inclusive. It's the
(23) same document as AFL 3001 through 3003. It was –
(24) they were faxed earlier today to my office. The only
(25) exception being there's fax information at the top on

Page 256

(1) AFL 3001. It says December 4, 2001, 10:45 a.m., AFL.
(2) And there's one that says December – hard to read –
(3) it looks like it's December 3, '01, 8:15 a.m., Dino X.
(4) Chavez and then a phone number.
(5)    MS. NEALLY:    Okay.
(6)    Q.    (By Ms. Neally) This is a document that you
(7) prepared after Exhibit 2, right?
(8)    A.    There isn't a date on Exhibit 2, LaFemina 2.
(9)    Q.    Okay. Well, tell me, was it prepared before
(10) or after?
(11)    A.    I told you already – and, again, I'm not
(12) being argumentative – I can't give you dates unless
(13) we've got proof of one sitting here. I can't remember
(14) what dates things took place a year-and-a-half ago.
(15)    Mr. LaFemina, I didn't ask you what day you
(16) prepared Chavez No. 36 or what day you prepared
(17) Exhibit 2. I just asked you, do you know whether or
(18) not this document was prepared before or after
(19) Exhibit 2? And I'm talking about Chavez 36. Do you
(20) know whether or not it was prepared before or after
(21) Exhibit 2?
(22)    A.    I don't know. And that's the honest, doggone
(23) truth. I do not know.
(24)    Q.    Did you have any conversations with
(25) Mr. Chavez regarding Chavez 36?

Page 257

(1)    A.    I think I told you that the last conversation
(2) that I can recall that I had with Mr. Chavez was on a
(3) day that I thought to be a Saturday where we discussed
(4) LaFemina 2, before it was sent out.
(5)    Q.    Okay. Well –
(6)    MS. NEALLY:    Object to the
(7) responsiveness of the answer.
(8)    Q.    (By Ms. Neally) I didn't ask you about
(9) Exhibit 2. I asked you about –
(10)    MR. STEELE:    Well, that was – he was
(11) being responsive, Elizabeth. And I object to the
(12) argument. You asked, did you talk about 36 and he
(13) said the only one I can – the only conversation I can
(14) remember was talking about 2.
(15)    MS. NEALLY:    No, he didn't answer that
(16) way, Mr. Steele. Do you want to read the question
(17) back – the answer read back?
(18)    (Requested portion was read)
(19)    Q.    (By Ms. Neally) I asked him, did you ever
(20) speak with Mr. Chavez regarding Chavez 36?
(21)    A.    I don't remember. And that's the way it is.
(22) I don't remember if we had a conversation about that.
(23)    Q.    Okay. Now, I believe your earlier testimony
(24) was that when you wrote – I'm not sure of the exact
(25) number because I'm not there, but when you wrote the

Page 258

(1) document that has Jeff Willis at the top.
(2)    MS. NEALLY:    What document is that?
(3)    MR. STEELE:    That's LaFemina 4.
(4)    MS. NEALLY:    LaFemina 4.
(5)    MR. STEELE:    Are you talking about the
(6) change in status form?
(7)    Q.    (By Ms. Neally) At that point in time –
(8)    MR. STEELE:    Elizabeth, just so we're
(9) clear, are you talking about the change in status
(10) form?
(11)    MS. NEALLY:    Okay.
(12)    Q.    (By Ms. Neally) LaFemina 4, when you – when
(13) you prepared the change in status form, it was at that
(14) point that you were ready to recommend the termination
(15) of Mr. Chavez; is that right?
(16)    A.    No.
(17)    Q.    No?
(18)    A.    It's an internal document that I sent to be
(19) part of a file. As you can see, there is no signature
(20) in the bottom right-hand corner by the vice president
(21) and agency director. It would have to go to him if I
(22) was recommending – and be signed by him if I was
(23) recommending the termination. We're putting it in the
(24) file for future reference in the event that it needed
(25) to be used to change Mr. Chavez's status, which is

Page 265

(1) if he had cooperated with the outlines that you
(2) directed to him in Chavez 36 and Exhibit 2 and things
(3) had died down and Sauceda had left in May, which is
(4) what happened, that he would have returned as the –
(5) he would have continued on as the regional sales
(6) coordinator and returned to the BISD campuses?
(7)     A.   I could have wished for nothing more to
(8) happen than that.
(9)     Q.   And that's not mere conjecture. That's what
(10) in all likelihood would have happened, right?
(11)    MR. AGUILAR:   Objection; speculation.
(12)    THE WITNESS:   Quite frankly, if you'll
(13) look at LaFemina Exhibit 9, the bottom of the page, it
(14) clearly indicates that Mr. Chavez, should the
(15) situation change, would probably be reinstated to his
(16) previous responsibility with BISD.
(17)    Q.   (By Ms. Neally) And if he had gone along
(18) with Exhibit 2, he – regardless of whether he
(19) returned to BISD, he would have remained as the
(20) regional sales coordinator; is that right?
(21)    A.   Yes, ma'am. I believe that would be true.
(22) But that would have ultimately have been a corporate
(23) decision and not mine. I would have recommended that
(24) be the case.
(25)    Q.   Is it safe to say that Mr. Chavez's

Page 266

(1) confrontational manner and his failure to follow
(2) Exhibit 2 caused his demotion?
(3)     MR. AGUILAR:   Objection; assuming facts
(4) not in evidence, mischaracterizing the evidence.
(5)     THE WITNESS:   Actually, I think that's
(6) incorrect.
(7)     Q.   (By Ms. Neally) Why do you believe it's
(8) incorrect?
(9)     A.   I think that what led to his termination was
(10) his – his continued campaign, whether it be verbal,
(11) written or otherwise, against the board members that
(12) he deemed to be, let's say, unethical or – I can't
(13) determine what his feelings were and I don't have the
(14) document in front of me. I think his letter – his
(15) negative letter-writing campaign and communication
(16) with BISD employees and the board led to his demotion.
(17)    Q.   Well, that led to his demotion. But I think
(18) you said earlier in your testimony with Mr. Aguilar
(19) that if he had ceased his behavior, followed Exhibit 2
(20) and let things die down, that he would have remained
(21) as the regional sales coordinator; is that right?
(22)    A.   I'm not – I don't know that I made that
(23) testimony. Can you tell me that I made that
(24) testimony? And if so, can you read it back?
(25)    Q.   No, I cannot read it back. I'm not the court

Page 267

(1) reporter. But if you would like me – that's what I
(2) recall your testimony as being.
(3)     A.   I don't think – and I could be corrected,
(4) but I don't think I testified that Dino's demotion was
(5) a result of not following this. I think I testified
(6) that the company made a decision that based on the way
(7) he was dealing with the account, that he could no
(8) longer fulfill the role of regional sales coordinator.
(9)     Q.   Okay. At that point, then, when you say that
(10) the actual termination took place, which was the end
(11) of December, I believe –
(12)    A.   The actual termination of his regional sales
(13) coordinator contract was January 27th, 2002.
(14)    (Off the record)
(15)    Q.   (By Ms. Neally) With 30-day notice, right?
(16) So it was really December 28th, 2002?
(17)    A.   No, ma'am. He was a regional sales
(18) coordinator up to, through and including January 27th,
(19) 2002.
(20)    Q.   Okay. That was long after the enrollment
(21) occurred, though, wasn't it?
(22)    A.   I'm brought to assume that that's an accurate
(23) statement because I think the enrollment concluded at
(24) the end of December, but I couldn't say for sure.
(25)    Q.   What had he done between December 28th and

Page 268

(1) January 27th?
(2)     A.   I think you would probably have to ask
(3) Mr. Chavez that question.
(4)     Q.   No, I'm talking to you about what he did as a
(5) regional sales coordinator.
(6)     A.   Okay. And I'm sorry. You didn't ask me that
(7) question that way. What did he do as a regional sales
(8) coordinator?
(9)     Q.   Yes.
(10)    A.   I don't know what he did as a regional sales
(11) coordinator. Are you referring to –
(12)    Q.   Did he still have any duties with BISD during
(13) that time period, sir?
(14)    A.   Did he have duties with BISD? No, he had
(15) been removed from BISD – BISD. I'm sorry. His
(16) regional sales coordinator contract gives him 30 days
(17) beyond the time he receives the notice to remain in
(18) his current capacity. And he really doesn't have to
(19) do anything if he doesn't want to.
(20)    Q.   Right. And that was the point that I was
(21) trying to make, you know, when you started arguing
(22) with me about what happened at the end of December
(23) when he was – he may not have been removed, but
(24) that's when he was notified that he was no longer
(25) going to be the regional sales coordinator; is that

Page 269

(1) right?
(2)     A.   Just ask again one more time. I was
(3) distracted. I apologize.
(4)     MS. NEALLY:   Read it back to him,
(5) please.
(6)     (Requested portion was read)
(7)     THE WITNESS:   I'm going to restate my
(8) answer. Mr. Chavez was the regional sales coordinator
(9) for AFLAC through January 27th, 2002. Nothing else
(10) means anything. That's when his contract terminated
(11) as the regional sales coordinator.
(12)    MS. NEALLY:   Object to the
(13) responsiveness of the answer.
(14)    Q.   (By Ms. Neally) I think earlier you
(15) testified that you had let pride stand in the way on
(16) occasion.
(17)    A.   That I had? Did you say I had?
(18)    Q.   Yes.
(19)    A.   There has been numerous times in my life as a
(20) younger man that I let pride get in the way of what I
(21) would deem to be a good decision for me long-term.
(22)    Q.   Okay. Did pride get in the way when you
(23) recommended the demotion of Mr. Chavez from AFLAC?
(24)    A.   Did pride get in my way?
(25)    Q.   Yes.

Page 270

(1)     A.   No, ma'am, not at all. It was something that
(2) I didn't want to do.
(3)     Q.   When did you actually make the recommendation
(4) to demote him?
(5)     A.   I don't know the answer to that. Actually, I
(6) do know the answer to that. Can I retract? I never
(7) finally made the recommendation. The company made the
(8) determination. The form, which is in evidence,
(9) Exhibit No. 4, the change in status form, the one that
(10) I submitted for the file was never used. And I don't
(11) know who finally made the recommendation for
(12) termination of his regional sales coordinator
(13) agreement.
(14)    Q.   Were you upset with Mr. Chavez when he
(15) refused to comply with Exhibit 2?
(16)    A.   Absolutely was upset with him when he refused
(17) to comply.
(18)    MS. NEALLY:   I'll pass the witness.
(19)    EXAMINATION
(20)    QUESTIONS BY MS. LEEDS:
(21)    Q.   Mr. LaFemina, my name is Eileen Leeds and I
(22) represent Dr. Sauceda in this case. I just have a few
(23) questions for you. Do you know whether or not Dino
(24) Chavez ever went back to Dr. Sauceda to try to smooth
(25) things over and talk about what had happened to, you

Page 277

(1)  (Off the record)
(2)  Q.  (By Ms. Leeds) Mr. LaFemina, on the second
(3)  page of that - it's actually the third page, because
(4)  the first two pages - on the second page of that
(5)  document, the last sentence of that first full
(6)  paragraph is, we believe that Ms. Linda Salazar's bold
(7)  statement that the appearance - that the appearance
(8)  that bribery and corruption is runn. g rampant among
(9)  administration of board members may have merit. Is
(10) that the comment that struck you and maybe AFLAC, too,
(11) to the best of your knowledge, as being something
(12) that, you know, Dino shouldn't have been saying?
(13) A.  Again, I can't speak on behalf of AFLAC. I
(14) think that it was inappropriate for the employees of
(15) the district to see this type of thing -
(16) Q.  Okay.
(17) A.  - in this format.
(18) Q.  And is this also - taking the first
(19) statements - from the statements on the first
(20) paragraph, what you were referring to where it's
(21) inappropriate for him to be rallying the rank and file
(22) against the administration and the board?
(23) A.  This would fall into that, yes.
(24) Q.  Okay. And, in fact, it's the administration
(25) and the board that selects AFLAC, correct?

Page 278

(1)  A.  I assume that that's what takes place in
(2)  Brownsville Independent School District.
(3)  Q.  Okay. Do you know of any independent
(4)  school - any school district where the employees make
(5)  the decision of who the third party administrator for
(6)  the cafeteria plan is going to be?
(7)  A.  I know where they have influence in that
(8)  decision.
(9)  Q.  Okay. But who makes the decision?
(10) A.  The decision is typically made by the board.
(11) Q.  Or the administration, at the least?
(12) A.  Yes, ma'am.
(13) Q.  Okay. And then if you look at the yellowed
(14) sentence in that next paragraph, "Also, please be
(15) vigilant of the fact that you are not suddenly removed
(16) from the insurance committee you are on for unknown
(17) reasons." Would you agree with me that that is an
(18) insinuation that board members may be retaliated
(19) against for supporting them?
(20) MR. AGUILAR:  Objection; speculation.
(21) THE WITNESS:  My answer to that question
(22) is that I think that you're asking me to read into
(23) what someone else is thinking. I'm not sure I can do
(24) that accurately.
(25) Q.  (By Ms. Leeds) Well, no, I don't want - I

Page 279

(1)  don't want you give me your opinion as to what Dino
(2)  was thinking when he wrote this, but rather somebody
(3)  reading this, as would an insurance - campus
(4)  insurance committee member would have just read it,
(5)  without knowing what Dino was thinking.
(6)  A.  I really -
(7)  MR. AGUILAR:  Objection.
(8)  Q.  (By Ms. Leeds) Is it safe to say that that's
(9)  kind of insinuating that something may go wrong if
(10) you're supporting me?
(11) A.  I'm really not sure. I mean, I'm reading it
(12) clearly with you. And I don't want to assume that it
(13) makes an insinuation because then, again, you're
(14) asking me to interpret how someone else reading it
(15) would receive it.
(16) Q.  All right, okay. Would you agree with me,
(17) however, that it's not appropriate, to be telling
(18) the employees of a school district to look out for
(19) what administration might do to them?
(20) A.  Yes.
(21) Q.  Okay. Let me hand you what has been
(22) marked - previously marked as Chavez 27, 28 and 32.
(23) And I believe there are others. These are just the
(24) ones we have here. And just ask you if you have ever
(25) seen those documents before?

Page 280

(1)  A.  I cannot see that - say that I've ever seen
(2)  Document 27. I can't confirm that I have seen
(3)  Document - it looks like - is it 28?
(4)  Q.  Yeah.
(5)  A.  28. And I can't confirm that I've seen 32
(6)  either.
(7)  Q.  Okay. So you are not aware that these were
(8)  documents that were sent to the campus insurance
(9)  committee representatives regarding this whole issue,
(10) are you?
(11) A.  I think earlier what I said was that I didn't
(12) see any of these things prior to. I may have seen one
(13) or two of them after, but not prior to.
(14) Q.  Okay. And that's my question. Of these
(15) documents - you haven't seen any of these documents.
(16) You may have seen the one where Linda Salazar's
(17) comment was reiterated?
(18) A.  Yes.
(19) Q.  Okay. So that at the time that you
(20) articulated to Dino Chavez that you were supporting
(21) him 100 percent, that was based on what Dino told you
(22) had occurred, correct?
(23) A.  You have me a little waylaid here because I'm
(24) not sure that I ever said I supported Dino
(25) 100 percent. I think -

Page 281

(1)  Q.  Okay. Let me rephrase that, then.
(2)  A.  Please. Because I don't want to -
(3)  Q.  You -
(4)  A.  - get into it later.
(5)  Q.  You indicated to Dino that you were
(6)  supporting him, okay, not 100 percent. But you were
(7)  in support of him and thought he had done nothing
(8)  wrong. This was early on after -
(9)  A.  Yes. I mentioned that both in the phone
(10) conversation to Dino and in writing.
(11) Q.  Okay. And that was based on what Dino told
(12) you had occurred?
(13) A.  It was based on information that Dino gave me
(14) that I did not confirm in any way, shape or form. It
(15) was what he told me. And, yes, I did believe him.
(16) Q.  Okay. Did he tell you that he had written
(17) these letters to the campus insurance committee
(18) members?
(19) A.  Not that I recall. Had he had - well -
(20) Q.  That had he have is - we can all speculate
(21) about what would have happened, right?
(22) A.  Well, you can ask me another question.
(23) Q.  Okay. But in any event, he was - he did not
(24) disclose to you that all of these letters had been
(25) going on. I mean, he was campaigning for himself with

Page 282

(1)  the campus insurance committees before Dr. Sauceda's
(2)  letter was ever written?
(3)  MR. AGUILAR:  Objection; argumentative.
(4)  Q.  (By Ms. Leeds) He did not tell me - he did
(5)  not tell you that, did he?
(6)  MR. AGUILAR:  And mischaracterizing the
(7)  evidence.
(8)  THE WITNESS:  He did not.
(9)  Q.  (By Ms. Leeds) Okay. And he didn't tell you
(10) that he had written the board members trying to
(11) promote himself either?
(12) A.  I knew he was in constant contact with
(13) certain board members based on our correspondence
(14) prior to Dr. Sauceda's letter.
(15) Q.  Okay.
(16) A.  But I did not know it was in this form of
(17) communication. If I did, I would have advised him to
(18) stop immediately. If it had not gone out, I would
(19) have advised him to get on the phone with me and
(20) contact our legal department to seek advice, which is
(21) better given by someone at that capacity.
(22) Q.  Why would you have advised him to do that?
(23) A.  When we're doing - and this is my
(24) understanding after 15 years with the company, when
(25) we're doing our job as a vendor, let's say, and there

(1) vendor, if you will. From that point forward, unless
(2) there's a merger or an acquisition, what you typically
(3) have is a certain number of employees that are
(4) leaving, being replaced by a certain number of
(5) employees being hired. So, therefore, in terms of new
(6) sales or net sales growth, you're spinning your wheels
(7) a little bit. It's like treading water, if you will.
(8)     Q.    Okay.
(9)     A.    So what can happen in that instance, based on
(10) the way we're compensated, is that if I had, for
(11) instance, the Brownsville Independent School District
(12) as my own personal account and had no other accounts,
(13) my income could steadily decline because as people
(14) terminated, I would be losing renewal income, which
(15) would only be offset by new income from new sales, if
(16) that makes sense to you.
(17)     Q.    Yes. No, I'm understanding completely. So
(18) that your – if you were looking at what Mr. Chavez
(19) would be making had he kept the account, it would not
(20) have been the same as he would have made in the first
(21) three years, most likely?
(22)     MR. AGUILAR:    Objection; speculation and
(23) mischaracterizing the evidence and failure to qualify
(24) the witness.
(25)     THE WITNESS:    Let me answer your

(1) question this way. When Brownsville Independent
(2) School District entered into a relationship with
(3) AFLAC, there was a document signed, which is a payroll
(4) authorization form, which authorizes us to do payroll
(5) deduction and to make those deductions. And it was
(6) signed by Mr. Chavez agreeing to certain things and we
(7) would have to refer to a document to see what it was
(8) that he agreed to. From that point forward – I've
(9) lost my train of thought.
(10)     Q.    (By Ms. Leeds) What I was asking you,
(11) basically, is, I think you had –
(12)     A.    I had a good point to make.
(13)     Q.    The first year is when you make your most
(14) money, when you do your first enrollment?
(15)     A.    In terms of, you know, the actual selling of
(16) the product, you're going to get most of your
(17) participation the first time through.
(18)     Q.    Okay. And your second year, third year,
(19) fourth year, really what you're looking at is making
(20) sales to either people that did not participate in
(21) that first enrollment or new people?
(22)     A.    Yeah. Because typically the school district
(23) you don't have just a turnover. That's my personal
(24) experience.
(25)     Q.    Correct. So that is it safe to that had

(1) Mr. Chavez continued with this account, his income –
(2) new sales income would not have been exorbitantly high
(3) in that next 2000 school year, 2000 – wait. Yeah, in
(4) the year 2002.
(5)     MR. AGUILAR:    Objection; speculation;
(6) failure to lay the proper predicate and failure to
(7) qualify the witness.
(8)     THE WITNESS:    I can only give you what
(9) 15 years of experience would dictate in any account.
(10)     Q.    (By Ms. Leeds) And let me – let me do that
(11) again.
(12)     A.    Okay. Please.
(13)     Q.    You have been – you have been working for
(14) AFLAC for 15 years, correct?
(15)     A.    Yes, ma'am.
(16)     Q.    And you are very experienced in how the
(17) cafeteria plan works and operates?
(18)     A.    Yes, ma'am.
(19)     Q.    And you are very experienced in how AFLAC
(20) operates its cafeteria plan enrollments?
(21)     A.    Yes, ma'am.
(22)     Q.    And do you have personal knowledge of how
(23) your district sales coordinators and your associates
(24) make their income regarding sales during cafeteria
(25) plan enrollments?

(1)     A.    Yes, ma'am.
(2)     Q.    And could you please explain to us – or
(3) would you explain how the – how the length of tenure
(4) of a particular person in handling an account will
(5) decrease as compared to their first year enrollment?
(6)     MR. AGUILAR:    Objection; speculation;
(7) failure to lay the proper predicate and failure to
(8) qualify the witness.
(9)     THE WITNESS:    If I can answer by
(10) example, that's the best way I can do it. If the
(11) Brownsville Independent School District were my
(12) account and I had a fantastic enrollment initially and
(13) after that all I did was service that account, my
(14) income would go down over years and not up.
(15)     Q.    (By Ms. Leeds) Okay. And all you can do is
(16) hope for new people to come in and/or get the people
(17) that didn't enroll the first time?
(18)     A.    I think that can be assumed by someone
(19) outside of our business. All I can hope for is that
(20) nobody dies, gets sick or quits.
(21)     Q.    Leaves. Okay. So would you agree with me
(22) that Mr. Chavez's income for the year 2002 would not
(23) have compared to an initial enrollment year?
(24)     MR. AGUILAR:    Objection; speculation;
(25) failure to lay the proper predicate and failure to

(1) qualify the witness.
(2)     THE WITNESS:    Let me be perfectly fair
(3) in all the – with the answer to this question. The
(4) Brownsville Independent School District was rather
(5) unique in that during the open enrollment period there
(6) was typically, in my short time, typically quite a bit
(7) of new business written during re-enrollment, which
(8) was rather unusual. I don't know what that's
(9) attributed to, whether it was a great many new hires
(10) or there was a situation where we didn't have the time
(11) to give before and there were people that missed out.
(12) I don't know what the reasons are. And so the correct
(13) answer to that question based on that is that
(14) Mr. Chavez, and anybody else involved with that
(15) account, their income as a result of that account
(16) would have probably remained fairly level.
(17)     Q.    (By Ms. Leeds) Okay.
(18)     A.    And because of the participation that we had
(19) during re-enrollment during my tenure with this
(20) account, their renewals would have grown, but it
(21) wouldn't have been dramatic. But it would have been
(22) much more steady than most accounts.
(23)     Q.    Okay. And there were quite a few questions
(24) asked of you about the regional sales coordinator and
(25) how they should not have personal production.

(1)     A.    Uh-huh.
(2)     Q.    Did you recall that? And yet in this
(3) particular account, Mr. Chavez was receiving monies as
(4) if he were having personal production, correct?
(5)     A.    One year.
(6)     Q.    Only one year?
(7)     A.    Yeah. The very first year that I was the
(8) state sales coordinator, which would have been the
(9) enrollment that was conducted in the fall of 2000.
(10)     Q.    Okay. And the years after that – well, he
(11) wasn't there, right?
(12)     A.    Well, no, he was actually there for the year
(13) of 2000, the fall of 2001 enrollment going into 2002.
(14) That's when all this came up.
(15)     Q.    Oh, okay. But in any event, under your
(16) supervision, RSCs are not supposed to have personal
(17) production and I believe it's your testimony that you
(18) actually frown on the type of arrangement that Dino
(19) had had?
(20)     A.    I frowned on it simply because what we did
(21) was move it away from Dino in terms of – he kind of
(22) understood what I was trying to do there and he was
(23) quite cooperative in terms of relinquishing that. But
(24) then there are some creative ways that you can do
(25) things, which are actually appropriate.

Page 301

(1) A. Well, we're all independent contractors, so,
(2) therefore, we're just like business owners that owns a
(3) hardware store except we don't have the employees and
(4) inventory. So there's a cost of doing business.
(5) Q. If you had not subsidized Mr. Sanchez, do you
(6) know what would have happened? I mean, can you
(7) speculate on what would happen – what you think would
(8) have happened?
(9) MR. AGUILAR: Objection; speculation.
(10) THE WITNESS: I actually know what would
(11) have happened. I would have had to make arrangements
(12) to hail the administration and pay for it myself and
(13) had to hire somebody to do it.
(14) Q. (By Ms. Leeds) Okay.
(15) A. And lost money on it, by the way.
(16) MS. LEEDS: I'll pass the witness.
(17) Thank you very much.
(18) FURTHER EXAMINATION
(19) QUESTIONS BY MR. AGUILAR:
(20) Q. Let me ask a few more things. You said you
(21) were surprised by the complaints about the expenses.
(22) Were you aware that basically in all the prior years
(23) Dino had been the one paying all these expenses, what
(24) you call the cost of doing business?
(25) A. It's my understanding that the reason Dino

Page 302

(1) was taking any percentage of commissions was to offset
(2) those expenses, so in reality he really wasn't paying
(3) them. He was using those commissions to pay them.
(4) That's my understanding.
(5) Q. Is it, basically, he was paying them – the
(6) way he was paying them was through the commissions he
(7) received on the splits?
(8) A. Right. Which is probably the exception to
(9) the rule –
(10) Q. Okay.
(11) A. – as opposed to the rule, the way we conduct
(12) business.
(13) Q. Okay. And as far as you-all's involvement
(14) with BISD, correct me if I'm wrong, but you didn't get
(15) involved in BISD's – in BISD's enrollment and all
(16) that until after that November 29th letter, right?
(17) A. That – no, that's correct. You don't have
(18) to change your position.
(19) Q. Same thing for Ron Levine. He didn't get
(20) involved until after that November 29th?
(21) A. I think Ron was involved before, but more as
(22) an enrollment type assistant, that sort of thing. And
(23) you would have to talk with your client to confirm it
(24) because I – or I would have to confer with my
(25) attorney.

Page 303

(1) Q. In other words, he might have been involved
(2) in one of the prior enrollments?
(3) A. At some capacity, yes.
(4) Q. Okay. So as far as you understand, the
(5) relationship between Dino and BISD had been
(6) established – let me rephrase that. The relationship
(7) between AFLAC and BISD had been established through
(8) the work of Dino and his staff during the prior years?
(9) A. I don't know the facts because – again, the
(10) account was established in 1998. I was in Dallas,
(11) Texas. So I cannot tell you – I only know bits and
(12) pieces from what other people told me and that
(13) information may or may not be accurate. It's my
(14) understanding that Mr. Chavez and others had –
(15) Q. His staff or others?
(16) A. Others and his staff had involvement in
(17) building the relationship and getting the school
(18) district as a client.
(19) Q. And what I really trying to get to is it
(20) just wasn't because of your prior involvement or
(21) because of Mr. Levine's specific involvement that that
(22) relationship had been established as it had?
(23) A. Absolutely not.
(24) Q. I mean, you agree with that statement?
(25) A. Yes, I do.

Page 304

(1) Q. Okay. And as a practical matter, it's that
(2) relationship that ultimately – based on your
(3) understanding, it's that relationship that ultimately
(4) allowed for AFLAC's proposal to be approved in 2001
(5) for the 2002 year? Is that your understanding as
(6) well?
(7) A. No.
(8) Q. Okay. Why not?
(9) A. It's my opinion –
(10) Q. Okay.
(11) A. – that we just continued an ongoing
(12) relationship that was established way back when based
(13) on the track record.
(14) Q. Okay. And the track record was established
(15) through Dino's handling of the account at least for
(16) the year that you're familiar with, the prior year?
(17) A. (Moves head up and down.)
(18) Q. Before that you can't say because you
(19) weren't – you weren't involved?
(20) A. Exactly.
(21) Q. Okay. And leading up to that November 29,
(22) you're not aware of anything else that we haven't
(23) already talked about that would have established that
(24) relationship with that track record, right?
(25) A. No.

Page 305

(1) Q. Okay. You also indicated that you expected,
(2) as a general matter, annual enrollments decrease over
(3) time?
(4) A. Say again.
(5) Q. You indicated annual enrollments – the
(6) growth rate decreases over time, or did I
(7) misunderstand that?
(8) A. Okay. We had trouble – we had trouble with
(9) the language part of it is all it is.
(10) Q. Say it the way –
(11) A. During a re-enrollment, generally, as time
(12) goes on, re-enrollments are not as productive as they
(13) would be in relation to a previous year or the initial
(14) year.
(15) Q. In other words, you expect the total sales in
(16) each enrollment to decrease over time? Or is that
(17) different?
(18) A. Arnold, I already got after you about putting
(19) words in my mouth. There isn't "in other words."I
(20) gave you my words.
(21) Q. Okay.
(22) A. And please –
(23) Q. I'm trying to understand it in terms of –
(24) A. And I'm trying to make it as simple as
(25) possible. Account A opens up this year. We had a

Page 306

(1) spectacular enrollment.
(2) Q. Okay.
(3) A. From that point forward, every enrollment
(4) seems to be, unless there's an acquisition or merger,
(5) generally speaking, less productive than the previous
(6) year.
(7) Q. Okay. I just didn't know whether you were
(8) saying, it was just for those people who happen to
(9) have signed up the year before or if you're talking
(10) about for everybody that signs up each year. Is there
(11) a difference –
(12) A. We're still not –
(13) Q. Is there a difference between those two?
(14) A. I do not – I don't understand what you are
(15) trying to get at there. What I'm saying to you is
(16) that there's this body of employees –
(17) Q. Okay.
(18) A. There's 7,000 at Brownsville.
(19) Q. Okay.
(20) A. Maybe one year it's 7,100, the next year it's
(21) 69. Some percentage of them own our coverage.
(22) Q. Okay.
(23) A. As time wears on, year after year, each
(24) annual re-enrollment, generally speaking, will net
(25) less new sales than the year before.

Page 313

(1)  Q.    I just have one follow-up on something you
(2)  said when Mr. Aguilar was talking about the fact that
(3)  there were increased enrollments at BISD, and the
(4)  first year you were there there was an 80 percent.
(5)  You said that there were specific reasons attributed
(6)  to that increase. What were they?
(7)  A.    I think you mentioned one of them earlier,
(8)  and that was the fact that our advertising campaign
(9)  raised great awareness more than ever so before.
(10) No. 2, Mr. Chavez had a more competent staff at that
(11) point and had hired more people throughout the course
(12) of the year and thus we had more people to handle a
(13) large number of employees. And it's my
(14) understanding – again, the previous year I wouldn't
(15) have been there, it was my understanding that we were
(16) pressed for time in that year's enrollment and thus
(17) some campuses were missed completely as a result of
(18) that. So there were obviously some people that were
(19) never seen. And the other reason would be that we've
(20) paid an awful lot of claims and so those folks that
(21) were possibly skeptical initially had talked to their
(22) fellow employees and had got the good word about AFLAC
(23) and thus chose to participate at that point in time.
(24) Q.    Okay. Would you agree with me at some point
(25) it's going to level off?

Page 314

(1)  MR. AGUILAR:    Objection; speculation,
(2)  mischaracterizing the testimony.
(3)  Q.    (By Ms. Leeds) Can't have an 80 percent
(4)  increase every year?
(5)  A.    I hate to say that but that's not – that's
(6)  the kind of thinking I like to use. But I will tell
(7)  you that if it continued like that, it would just be
(8)  totally the exception to the rule.
(9)  Q.    Okay.
(10) A.    And I was surprised there was an 80 percent
(11) increase last year, tickled – tickled to death, but
(12) very surprised. If you take a look at – right now,
(13) we don't even have access to the account so we're not
(14) going to sell any insurance.
(15) Q.    Right.
(16) MS. LEEDS:    That's all I have. Thank
(17) you.
(18) FURTHER EXAMINATION
(19) QUESTIONS BY MR. AGUILAR:
(20) Q.    I have just one other thing. One of the
(21) items you just mentioned was that you thought in 2001
(22) you were – I'm sorry, in 2000 you were pressed for
(23) time and that had to be part of the reason why –
(24) MS. LEEDS:    It would have been '99 to
(25) 2000.

Page 315

(1)  Q.    (By Mr. Aguilar) Was it '99 to 2000?
(2)  A.    Yeah. I said I couldn't verify it because
(3)  factually I wasn't there. But it's been my
(4)  experience – if this will help. Since I've been in
(5)  my current capacity for the company, that when it
(6)  comes down to the enrollment for Brownsville ISD each
(7)  year, it's an 11th hour kind of, hurry up, we've got
(8)  to get it done right now. And so we just don't have
(9)  adequate time.
(10) Q.    So you're saying it was in 1999 that you felt
(11) you were pressed for time or –
(12) A.    I wasn't there in 1999. It's been my
(13) experience – it was my understanding that's what took
(14) place in 1999. And it's been my experience that
(15) that's taken place every year since that time.
(16) Q.    Are you aware that there was actually less
(17) time in 2001 to do the enrollments than there had been
(18) in years past?
(19) A.    Yes, I was.
(20) Q.    Okay. So actually even though you were
(21) pressed for time, you were even more pressed in 2001
(22) than you were in '99?
(23) A.    Well – and I've answered and addressed that
(24) as well in the terms of the fact that we had a more
(25) competent and a greater expanded sales force so, thus,

Page 316

(1)  better equipped to handle that.
(2)  Q.    Okay.
(3)  MR. AGUILAR:    That's all I have.
(4)  MS. LEEDS:    That's it.
(5)  MR. STEELE:    So long, Elizabeth.
(6)  MR. AGUILAR:    Anything else, Elizabeth?
(7)  MS. NEALLY:    I'm hanging up.
(8)  (DEPOSITION CONCLUDED)

Page 317

(1)                  CHANGES AND CORRECTIONS
(2)              WITNESS NAME:  FRANK D LaFEMINA
(3)              DATE:  AUGUST 21, 2003
(4) Reason Codes: (1) to clarify the record; (2) to
    conform to the facts. (3) to correct a transcription
(5) error; (4) other (please explain)
(6) PAGE  LINE  CHANGE                        REASON CODE
(7)
(8)
(9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

Page 318

(1)                      SIGNATURE
(2)
(3)     I, FRANK D. LaFEMINA, have read the foregoing
(4) deposition and hereby affix my signature that same is
(5) true and correct, except as noted on the previous
(6) page.
(7)
(8)
(9)                      FRANK D LaFEMINA
(10) STATE OF
(11) COUNTY OF
(12)     Before me,                      , on this day
(13) personally appears FRANK D LaFEMINA, known to me (or
(14) proved to me under oath or through
(15)               ) (description of identity card or
(16) other document) to be the person whose name is
(17) subscribed to the foregoing instrument and
(18) acknowledged to me that they executed the same for the
(19) purposes and consideration therein expressed
(20)     Given under my hand and seal of office this
(21) day of              , 2003.
(22)
(23)
(24)                  NOTARY PUBLIC IN AND FOR
(25)                  THE STATE OF

Look-See Concordance Report

- - -

UNIQUE WORDS: **2,223**
TOTAL OCCURRENCES: **12,556**
NOISE WORDS: **384**
TOTAL WORDS IN FILE: **36,969**
- - -
SINGLE FILE CONCORDANCE
- - -
CASE SENSITIVE
INCLUDES ALL TEXT OCCURRENCES
- - -
DATES **ON**
- - -
INCLUDES PURE NUMBERS
- - -
POSSESSIVE FORMS **ON**

**– DATES –**

**1-27-02** [1]
*208:8*
**6-19-02** [1]
*114:14*
**9-11-02** [1]
*114:5*
**9-16-02** [1]
*114:7*
**12-1-01** [5]
*248:21, 25; 249:3, 15; 250:13*
**12-2-01** [1]
*113:20*
**12-4-01** [2]
*113:22; 114:12*
**12-19-01** [1]
*113:23*
**12/31/03** [1]
*319:20*
**August, 2003** [2]
*110:5; 319:8*
**August 21** [1]
*115:8*
**AUGUST 21, 2003** [2]
*109:15; 317:3*
**December** [9]
*130:1; 136:2; 171:2; 185:5; 256:2; 267:11, 24; 268:22*
**December, 2000** [1]
*228:3*
**December, 2001** [5]
*148:13; 149:24; 150:25; 151:3; 152:15*
**December 1** [1]
*136:2*
**December 1st, 2001** [1]
*253:20*
**December 2** [1]
*163:9*
**December 2, 2001** [4]
*138:8; 161:25; 162:4; 224:18*
**December 2nd, 2001** [1]
*138:10*
**December 3** [2]
*165:13; 256:3*
**December 3rd, 2001** [2]
*261:19, 23*
**December 4** [4]
*167:11; 171:1; 208:21;*

*209:17*
**December 4, 2001** [5]
*135:24; 165:6; 173:25; 256:1; 259:12*
**December 4th** [5]
*177:5, 15; 183:8; 259:19; 261:1*
**December 7** [2]
*136:3; 188:16*
**December 7th** [5]
*181:9; 183:13; 185:4, 7; 187:20*
**December 7th, 2001** [1]
*181:13*
**December 19** [1]
*195:20*
**December 22nd, 1998** [1]
*247:3*
**December 27, 2001** [1]
*210:17*
**December 28, 2001** [1]
*208:7*
**December 28th** [1]
*267:25*
**December 28th, 2002** [1]
*267:16*
**December of 2001** [4]
*147:19, 22; 153:12; 172:9*
**January** [2]
*130:1; 235:14*
**January, 2000** [1]
*229:3*
**January, 2001** [2]
*228:3, 18*
**January, 2002** [1]
*130:8*
**January 1** [1]
*235:13*
**January 27** [1]
*209:14*
**January 27th** [1]
*268:1*
**January 27th, 2002** [3]
*267:13, 18; 269:9*
**January of 2000** [1]
*235:14*
**March of 2000** [1]
*235:20*
**May** [1]
*265:3*
**May 22** [1]
*115:7*
**November** [3]
*129:25; 130:12; 297:15*
**November 29** [1]
*304:21*
**November 29, 2001** [1]
*181:18*
**November 29th** [11]
*127:18; 143:7, 14, 22; 252:5, 7; 271:10; 275:7; 297:16; 302:16, 20*
**November 29th, 2001** [2]
*252:1, 8*
**November 30th** [2]
*252:13, 16*
**November of 2000** [1]
*285:6*
**November of 2001** [2]
*118:10; 130:8*
**October of 2001** [2]

*238:19; 239:3*
**September** [1]
*312:8*
**September 7th** [3]
*312:10, 11, 16*
**September 11, 2002** [2]
*214:2, 14*
**September 16, 2002** [1]
*220:19*

**– $ –**

**$100** [3]
*200:7; 202:19; 207:10*
**$2,600** [2]
*203:8; 207:10*
**$475.00** [1]
*199:23*
**$5,200** [3]
*202:6, 15, 18*

**– 0 –**

**001231** [1]
*255:22*
**01** [1]
*256:3*
**02** [1]
*109:7*

**– 1 –**

**1** [3]
*136:2; 235:13; 317:4*
**1-27-02** [1]
*208:8*
**10** [13]
*114:11; 192:17, 21, 22; 218:10, 17; 255:10; 259:3, 5; 260:15; 295:7; 307:22; 308:1*
**100** [9]
*110:9; 111:20; 163:5; 193:2, 12; 212:9; 280:21, 25; 281:6*
**1099** [1]
*243:11*
**10:45** [1]
*256:1*
**11** [5]
*114:13; 214:2, 14; 261:4, 5*
**111** [1]
*113:4*
**112** [1]
*113:5*
**114** [1]
*319:21*
**115** [1]
*113:8*
**11:41** [1]
*110:5*
**11th** [1]
*315:7*
**12** [8]
*180:23, 24; 183:11, 24; 187:16; 246:23; 296:20*
**12-1** [1]
*249:3*
**12-1-01** [5]
*248:21, 25; 249:3, 15; 250:13*
**12-19-01** [1]
*113:23*
**12-2-01** [1]
*113:20*

**12-4-01** [1]
*113:22; 114:12*
**12/31/03** [1]
*319:20*
**1200** [1]
*111:6*
**1233** [1]
*255:22*
**125** [2]
*272:21; 285:25*
**128** [1]
*109:7*
**138** [1]
*113:19*
**14** [1]
*296:20*
**15** [7]
*117:17; 195:16; 227:2; 282:24; 291:9, 14; 307:14*
**16** [1]
*220:19*
**17** [1]
*125:21*
**172** [1]
*113:21*
**18** [3]
*113:23; 114:6; 125:17*
**19** [2]
*125:20; 195:20*
**1998** [5]
*147:17; 245:19; 246:10; 247:3; 303:10*
**1999** [4]
*245:20; 315:10, 12, 14*
**1:02** [1]
*110:6*
**1st** [1]
*253:20*

**– 2 –**

**2** [48]
*109:16; 113:7; 119:22; 138:8, 14; 161:25; 162:4; 163:9; 189:15; 190:2, 5; 191:9, 18; 194:19; 195:3; 212:6, 20; 214:17; 218:21; 224:18; 247:17, 21; 248:24; 249:6; 251:18; 253:20, 22; 254:19; 256:7, 8, 17, 19, 21; 257:4, 9, 14; 262:7; 263:11; 264:2, 11; 265:2, 18; 266:2, 19; 270:15; 313:10; 317:4*
**2000** [26]
*117:18; 118:1; 150:8; 226:8, 20, 21; 228:3, 25; 229:3; 230:6, 24; 232:9, 11; 235:13, 14, 20; 285:6; 291:3; 294:9, 13; 307:25; 308:3; 314:22, 25; 315:1*
**2001** [53]
*118:10, 17; 130:8, 13; 135:24; 138:8, 10; 147:19, 22, 25; 148:13; 149:24; 150:8, 25; 151:3; 152:15; 153:12; 161:25; 162:4; 165:7; 172:9; 173:25; 181:13, 18; 195:20; 208:8; 210:17; 218:11; 224:18; 226:9, 22; 228:4, 18; 229:1; 230:6, 25; 238:19; 239:3; 248:21; 252:1,*

**according** [1]
190:17

**Account** [1]
305:25

**account** [112]
123:10, 14; 129:22, 23;
130:6, 18, 25; 131:1, 4, 7, 15,
18, 21; 132:1, 4, 5, 7, 11, 13,
21, 22; 133:13, 16; 135:15,
16, 17, 24; 136:7, 10, 20;
137:5; 141:13, 18, 19, 21, 25;
145:10; 147:1; 150:1; 152:25;
153:1, 15; 156:2, 5, 6, 8;
157:16; 159:18; 160:3, 11,
18; 161:4; 171:12; 181:22,
25; 182:2; 184:7; 185:16, 23;
186:13, 15, 20, 21, 22, 23,
25; 187:3, 19, 23; 188:10;
189:2; 196:12; 197:7, 17;
199:8; 202:23; 203:6; 206:23;
214:22; 215:25; 216:13, 18;
218:14; 222:24; 223:1, 7, 11;
227:12, 13, 17; 228:6; 267:7;
288:22; 289:12, 19; 291:1, 9;
292:4, 12, 13; 293:15, 20;
294:3; 297:6; 298:17; 299:4;
303:10; 304:15; 314:13

**accounts** [19]
156:7; 158:5; 160:8, 14;
186:17, 23; 206:11; 219:11,
12; 221:10, 21; 223:8; 225:6,
8, 11; 227:18; 289:12;
293:22; 299:17

**accurate** [6]
151:24; 155:23; 267:22;
288:13; 303:13; 308:11

**accurately** [3]
273:10; 278:24; 300:11

**accusation** [1]
240:16

**accusations** [1]
240:18

**acknowledged** [2]
272:3; 318:18

**acquisition** [2]
289:2; 306:4

**act** [2]
182:1; 264:13

**acting** [2]
181:21; 264:18

**ACTION** [1]
109:6

**action** [11]
164:14, 16, 23; 174:3; 175:1;
189:4; 201:2; 209:15; 240:4;
319:13, 15

**actions** [2]
123:19; 162:7

**active** [3]
131:3, 7, 15

**actual** [9]
159:15; 171:24; 188:9;
189:16; 242:23; 263:25;
267:10, 12; 290:15

**actuality** [1]
184:9

**adage** [1]
287:5

**added** [1]
115:21

**addition** [4]

:91:17; 157:6; 164:2; 222:10

**additional** [5]
207:8; 251:12, 14, 15; 255:7

**address** [7]
182:23; 190:19; 191:7, 20;
193:13; 194:24

**addressed** [13]
124:17, 19, 20, 22; 165:5;
192:1, 14; 195:16; 204:11;
224:21; 228:12; 229:16;
315:23

**addressee** [2]
121:15, 16

**addressing** [2]
205:23; 214:22

**adequate** [2]
298:11; 315:9

**adheres** [1]
287:4

**administration** [8]
147:19; 277:9, 22, 24;
278:11; 279:19; 283:6;
301:12

**administrator** [4]
186:21; 260:6; 278:5; 288:9

**Administrators** [1]
162:12

**admire** [1]
141:4

**advantage** [1]
296:3

**adversaries** [1]
140:1

**advertising** [1]
313:8

**advice** [8]
242:1; 254:7; 263:16, 18, 20,
25; 276:11; 282:20

**advised** [6]
163:25; 237:11; 273:18;
282:17, 19, 22

**advises** [1]
254:6

**affect** [2]
133:17; 179:15

**affix** [1]
318:4

**afford** [1]
204:6

**AFL** [12]
244:13; 248:2, 19; 249:5, 7;
255:11, 18, 23; 256:1; 259:4;
261:4

**AFLAC** [132]
111:18; 115:14, 23; 116:1, 3,
14; 117:2, 7, 19; 118:9, 19,
24; 123:11; 124:22; 125:3;
126:15, 19; 127:10; 133:2, 4,
14; 134:3; 135:18; 136:10;
137:2, 22; 140:17, 19, 22;
142:19; 145:1, 10; 146:25;
147:16; 148:11, 24; 149:7,
18; 150:15; 154:5; 155:4;
156:12; 164:10; 165:6, 21;
168:15; 173:4; 174:10, 19;
179:1; 180:6; 181:19, 22;
182:1; 183:15, 20; 184:5;
186:13, 16, 18; 187:1, 19, 23;
189:4; 196:5; 197:16, 25;
203:13; 207:22; 211:4, 6, 18,
19, 21; 215:25; 216:18;

218:20; 219:9; 22.1:2; 227:2;
234:5; 236:7, 13; 237:7;
240:1; 241:10; 245:14;
246:24; 247:4, 13; 264:5;
269:9, 23; 272:18; 273:1, 16,
18; 275:1, 13, 18; 276:3, 4, 5;
277:10, 13, 25; 285:1, 14, 17,
20, 25; 286:4, 5, 11, 14, 17,
19; 287:4, 11; 290:3; 291:14,
19; 299:2, 17; 303:7; 307:15;
308:20; 311:8; 313:22

**AFLAC's** [16]
117:15; 141:21; 156:16;
181:24; 184:7; 185:16;
193:18, 21, 25; 194:4, 6;
264:9; 272:4; 276:9; 304:4;
311:6

**afterwards** [1]
254:19

**agency** [1]
258:21

**agendas** [1]
264:15

**agent** [23]
116:4, 18, 19; 153:1; 159:22,
24; 181:24; 183:17, 22;
184:4, 7, 17; 198:18; 199:3,
4, 13, 15, 17; 219:18, 19;
230:23; 232:20; 234:8

**agents** [28]
116:10; 149:7; 154:16, 17;
156:19; 158:13; 159:15;
160:9, 15; 161:1, 3, 17;
192:24; 197:22; 199:12;
200:25; 218:11; 219:1, 12,
23; 226:12; 227:17, 24;
232:14, 16, 17; 237:5, 18

**agree** [19]
128:15; 143:16; 177:10;
196:14; 197:17; 200:8, 15;
251:1, 10; 263:22; 278:17;
279:16; 283:5; 287:3, 14;
288:2; 292:21; 303:24;
313:24

**agreeable** [1]
190:3

**agreed** [13]
158:17; 166:24; 202:8, 9, 11,
14, 17; 207:7; 216:20;
240:15; 243:2; 290:8; 311:3

**agreeing** [2]
264:16; 290:6

**Agreement** [1]
114:9

**agreement** [12]
137:18; 155:2, 11; 208:9, 10;
245:9; 246:15, 22; 247:1, 12;
270:13; 319:7

**AGUILAR** [68]
111:4, 5; 115:5; 119:3;
120:23; 121:2, 7, 11; 122:2;
135:12; 145:6; 146:4, 7, 18;
161:12; 162:4; 168:22, 25;
169:13, 17, 24; 176:8;
178:18, 21; 179:22; 180:5,
10, 12, 16, 25; 187:12; 201:6,
16; 214:7, 9; 224:2; 230:19;
236:25; 241:14; 242:5, 11;
243:22; 265:11; 266:3;
276:24; 278:20; 279:7; 282:3,
6; 283:10, 21; 284:7, 24;

287:1, 6; 289:22; 291:5;
292:6, 24; 298:20; 300:16;
301:9, 19; 312:20; 314:1, 19;
316:3, 6

**Aguilar** [103]
113:8, 9, 10; 119:4; 121:21;
122:4; 124:2, 12; 125:13;
126:20; 127:1, 17; 128:22;
129:8; 133:7, 23; 134:9;
135:13; 137:23; 138:1;
141:19; 142:3, 25; 143:7, 11,
18; 144:1; 145:8; 146:23;
147:7, 15; 148:18, 20; 149:1,
6, 24; 150:20; 151:8; 154:20;
155:12; 159:12; 161:13;
162:5, 21; 163:14; 166:25;
168:24; 169:2, 15; 170:10;
174:18; 176:9, 17; 177:2, 24;
180:22; 181:1; 182:9, 15;
184:22; 186:7; 187:15; 188:6,
19; 193:10; 195:1; 201:11,
18; 203:21; 208:18; 212:19;
213:10, 24; 214:12; 215:6;
220:17; 222:23; 223:22;
224:6; 229:19; 230:4, 21;
233:25; 237:4; 238:9; 239:9,
16; 241:16; 242:13, 22;
243:10, 18; 254:9; 266:18;
307:10; 309:25; 310:12;
311:2, 16, 24; 312:15; 313:2;
315:1

**alive** [1]
252:17

**allow** [1]
241:9

**allowed** [14]
117:22; 118:20, 23; 187:21,
24; 188:16; 210:21; 223:25;
231:25; 236:21; 237:7; 273:2;
304:4

**alluded** [1]
262:13

**alternative** [1]
191:1

**amongst** [2]
295:5; 299:2

**Amos** [11]
161:24; 164:9; 165:6; 167:12,
14; 170:14; 240:11; 241:5, 6,
8

**amount** [8]
135:4; 157:3, 5; 161:15;
207:7; 216:20; 222:13, 21

**amounts** [1]
296:10

**annual** [6]
241:20; 242:24; 245:22;
305:2, 5; 306:24

**annualized** [2]
135:6; 288:19

**Answer** [1]
185:25

**answer** [58]
119:5, 20; 122:7; 124:1;
126:18; 141:16; 142:25;
147:14; 151:14, 16; 156:24;
159:3; 163:24; 167:5; 169:7,
9; 176:20; 181:10; 182:24;
184:25; 186:3; 188:23; 189:3;
198:8, 16; 206:25; 219:13;
229:24; 232:19; 239:10;

21; 196:12; 202:10
**Bates** [1]
  255:22
**battle** [2]
  139:23; 140:8
**bear** [1]
  244:11
**becomes** [2]
  139:22; 235:6
**begins** [1]
  248:3
**begun** [1]
  115:7
**behalf** [6]
  126:19; 140:21; 203:16;
  273:1; 276:9; 277:13
**behavior** [4]
  263:7; 266:19; 273:8; 276:22
**behind** [1]
  240:20
**belief** [2]
  128:8; 260:12
**believe** [52]
  117:23; 118:21; 120:9, 15;
  123:5; 124:9; 10, 23; 130:12,
  13; 138:9; 139:11; 140:23;
  141:10; 142:8; 143:9; 153:12;
  156:25; 178:23; 179:2; 181:3;
  182:10; 196:10; 197:6;
  199:19; 201:21; 204:15;
  208:11; 226:25; 231:18;
  244:11, 22; 245:8, 14;
  247:16; 250:22; 252:9;
  255:10; 257:23; 265:21;
  266:7; 267:11; 275:1, 6;
  277:6; 279:23; 281:15;
  287:13; 294:17; 295:2;
  311:17
**believed** [6]
  128:1; 140:9; 254:1; 259:19;
  260:14; 261:23
**belong** [2]
  186:17; 299:17
**belonged** [1]
  186:16
**belongs** [1]
  186:13
**benefits** [1]
  272:22
**bet** [1]
  232:12
**bid** [16]
  115:22; 116:13, 14, 16;
  117:1, 2, 6, 9, 19, 21; 118:20,
  21, 23
**bids** [3]
  116:21; 117:1; 118:12
**biggest** [1]
  132:13
**billing** [3]
  150:3, 14; 153:9
**birthday** [2]
  252:15, 17
**BISD** [8]
  131:3, 14; 147:1, 15, 19, 22,
  25; 148:12; 149:2, 20;
  150:16, 22; 151:3; 152:18;
  154:12; 174:9; 181:20, 22,
  24; 184:7, 24; 185:14, 22;
  186:13; 187:18, 21, 25;
  188:17; 196:11; 198:12, 15;

9:14, 16; 202:10, 23;
  204:1, 4; 206:5, 9; 210:22;
  214:17; 216:13, 17; 217:3, 4;
  218:11; 219:10; 220:12, 24;
  221:8; 223:7, 10; 226:5, 12;
  228:24, 25; 262:16; 265:6,
  16, 19; 266:16; 268:12, 14,
  15; 275:19; 302:14; 303:5, 7;
  308:8; 313:3
**BISD'S** [1]
  286:10
**BISD's** [2]
  302:15
**bit** [9]
  120:3; 128:1; 214:25; 239:15;
  250:10; 271:17; 289:7; 293:6;
  297:21
**bits** [1]
  303:11
**blah** [3]
  247:1
**Board** [1]
  109:9
**board** [34]
  124:3, 4, 7; 126:24; 127:23;
  129:4; 139:7; 141:1; 144:9;
  160:20; 161:8; 164:1; 213:14,
  16, 20; 262:23; 266:11, 16;
  274:8; 275:23, 25; 277:9, 22,
  25; 278:10, 18; 282:10, 13;
  283:6, 18; 284:3, 14
**boards** [2]
  297:10
**Boca** [1]
  111:16
**body** [3]
  180:3, 4; 306:16
**boiled** [1]
  207:11
**boils** [1]
  247:11
**bold** [1]
  277:6
**bookkeeping** [1]
  156:14
**BOSQUE-GILBERT** [1]
  109:7
**boss** [1]
  311:9
**Boulevard** [2]
  111:6, 16
**break** [4]
  119:21; 146:16, 24; 230:22
**breaking** [2]
  311:11, 17
**bribery** [1]
  277:8
**Brief** [1]
  146:22
**broke** [1]
  231:3
**brokers** [1]
  122:9
**BROWNSVILLE** [3]
  109:2, 5; 111:8
**Brownsville** [36]
  109:9; 111:6, 11, 16; 117:20;
  131:12; 144:11; 158:1; 161:5;
  171:19; 172:7; 177:11;
  199:22; 200:2; 217:9, 21;
  218:2; 244:2; 245:15; 247:5,

12; 252:10; 26... 2; 272:18;
  278:2; 286:8; 289:11; 290:1;
  292:11; 293:4; 296:16; 299:1;
  300:22; 306:18; 307:16;
  315:6
**Bryan-College** [1]
  131:13
**Buddy** [4]
  146:4; 169:18; 246:6; 274:14
**build** [1]
  135:2; 287:19, 21, 24
**building** [2]
  199:23; 303:17
**bullet** [7]
  192:16; 193:3, 4, 5; 212:6, 7,
  20
**bullets** [7]
  189:25; 190:18; 191:8, 13,
  15; 218:22
**bunch** [1]
  196:19
**business** [52]
  123:13; 127:10; 131:5; 133:2,
  15; 134:3, 10, 13, 22, 24;
  137:15; 138:17; 153:18;
  157:2; 159:5, 10; 162:7;
  164:4; 174:9; 175:24; 190:16,
  20; 191:5, 10, 14, 19; 192:16,
  20; 193:22, 25; 194:8;
  196:22; 203:1; 204:5; 206:14,
  20; 216:18; 217:2; 226:15;
  233:5; 236:6; 264:5, 10;
  292:19; 293:7; 295:25; 297:5;
  300:22; 301:2, 4, 24; 302:12

– C –

**cafeteria** [6]
  117:20; 278:6; 283:7; 291:17,
  20, 24
**call** [12]
  156:12; 158:8; 159:24; 164:3;
  170:23; 216:5; 260:21; 272:2;
  276:14, 19; 301:24; 312:16
**Calls** [1]
  186:1
**calls** [2]
  222:19; 259:21
**campaign** [5]
  213:13; 266:10, 15; 274:3;
  313:8
**campaigning** [1]
  281:25
**campus** [11]
  137:20; 145:22; 211:7, 10;
  212:1; 272:10; 279:3; 280:8;
  281:17; 282:1; 283:17
**campuses** [3]
  210:25; 265:6; 313:17
**capacities** [1]
  109:9
**capacity** [8]
  130:5; 135:10; 179:11;
  268:18; 282:21; 303:3; 309:7;
  315:5
**card** [1]
  318:15
**career** [1]
  142:16
**carefully** [1]
  319:10

**case** [19]
  122:23; 135:2; 137:10;
  139:23; 162:16; 163:3, 4;
  178:15, 24; 179:8; 188:3;
  198:10; 217:5; 240:22; 251:9;
  265:24; 270:22; 275:9;
  286:25
**cases** [2]
  220:3; 236:10
**catch-22** [4]
  141:4, 6, 7; 295:22
**categorized** [1]
  148:4
**caught** [1]
  141:3
**caused** [2]
  145:22; 266:2
**cc'd** [4]
  201:23; 202:1; 205:22;
  207:25
**cease** [1]
  184:23
**ceased** [1]
  266:19
**cent** [1]
  166:3
**Central** [12]
  111:6; 131:7, 9, 16; 132:6,
  14, 15, 19, 20; 141:14; 234:5;
  264:8
**CERTIFICATE** [1]
  319:1
**Certificate** [1]
  113:14
**Certified** [3]
  110:7; 319:6, 16
**certify** [2]
  319:7, 12
**cetera** [1]
  200:7
**challenge** [4]
  129:9, 15; 137:1
**challenges** [1]
  221:13
**chance** [4]
  120:1; 125:13; 161:21; 215:6
**chances** [2]
  172:1, 3
**CHANGE** [1]
  317:6
**Change** [2]
  113:22; 286:16
**change** [28]
  123:16; 129:19; 130:15, 22;
  164:16; 172:24; 174:23;
  183:9; 203:10; 208:8, 23;
  209:23; 210:13; 249:25;
  250:1, 3; 258:6, 9, 13, 25;
  260:5, 25; 265:15; 270:9;
  286:13; 297:11; 299:4;
  302:18
**changed** [8]
  125:5; 126:4; 127:20; 130:4,
  7; 250:8; 295:18; 297:11
**CHANGES** [1]
  317:1
**Changes** [1]
  113:12
**changes** [2]
  123:9; 153:25
**changing** [1]

218:17

**content** [3]
170:21; 186:5; 271:17

**context** [3]
122:24, 25; 169:5

**continually** [2]
135:11; 204:4

**continue** [9]
115:6, 9; 134:23, 25; 146:14;
179:20; 196:6; 216:19; 273:2

**CONTINUED** [1]
115:4

**Continued** [1]
113:8

**continued** [8]
130:5; 145:19; 165:21; 265:5;
266:10; 291:1; 304:11; 314:7

**Continues** [1]
145:15

**continuing** [2]
158:12; 185:9

**contract** [9]
155:13, 19; 187:1; 225:2;
236:18; 237:2; 267:13;
268:16; 269:10

**contractor** [2]
148:22; 149:13, 15; 185:10;
198:1; 207:16; 263:14

**contractors** [1]
301:1

**contracts** [3]
236:14, 24, 25

**contractual** [2]
155:2, 10

**Contractually** [1]
236:15

**contractually** [2]
299:9, 12

**contrary** [1]
160:10

**contribute** [3]
202:14, 19; 216:21

**contributed** [3]
203:4, 7, 14

**contribution** [1]
203:8

**controversy** [3]
130:3; 139:24; 319:10

**convention** [1]
238:17

**conversation** [38]
138:6; 143:10, 12; 165:15;
170:21; 171:17, 24; 172:3;
178:13; 202:4, 5, 7; 221:5;
226:25; 232:5, 6; 248:16;
250:21; 252:25; 253:13, 18;
254:18, 22; 255:1, 2; 257:1,
13, 22; 262:2, 6, 10; 271:25;
272:1, 6, 11, 13; 273:15;
281:10

**conversations** [5]
136:5; 251:13; 254:25; 255:7;
256:24

**cool** [2]
146:16; 300:5

**cooperate** [1]
210:21

**cooperated** [1]
265:1

**cooperative** [1]
294:23

**co-rdinating** [1]
211:8

**coordinator** [51]
151:21; 157:1; 159:6, 10;
161:3; 162:15; 176:2; 181:20;
196:4, 7; 201:1; 203:13;
204:16, 20; 209:13, 24;
210:14, 19, 21; 214:20;
219:20; 220:7; 225:14; 226:5;
232:3; 233:16; 234:11;
236:16; 246:11; 247:9;
248:14, 23; 260:13; 262:17;
265:6, 20; 266:21; 267:8, 13,
18; 268:5, 8, 11, 16, 25;
269:8, 11; 270:12; 273:13;
293:24; 294:8

**coordinator's** [1]
208:9

**coordinators** [9]
151:18; 190:23; 219:25;
225:24; 227:3; 234:13, 16;
237:10; 291:23

**copied** [4]
167:2, 6; 205:10; 275:2

**copier** [2]
200:7; 215:22

**copy** [20]
119:23; 120:16; 122:13, 15,
22; 124:17; 163:8, 23;
207:25; 215:14, 15; 232:2;
233:3, 9, 18, 23; 234:9, 16;
248:18; 249:2

**corner** [1]
258:20

**corporate** [15]
116:15; 136:16; 150:1; 153:8;
175:6; 179:9; 180:3, 4, 8, 13,
15, 17; 265:22; 276:12;
309:21

**corporation** [3]
142:19; 180:2, 7

**corrected** [1]
267:3

**CORRECTIONS** [1]
317:1

**Corrections** [1]
113:12

**correctly** [1]
215:23

**correlation** [1]
183:19

**correspondence** [13]
124:6; 129:3; 136:24; 138:18;
144:9, 10; 177:9; 216:25;
251:15; 252:21, 23; 274:20;
282:13

**corruption** [1]
277:8

**cost** [8]
135:4; 202:7, 19; 204:5;
206:20; 300:21; 301:4, 24

**costing** [2]
202:5; 207:4

**costs** [5]
204:1; 206:4, 9, 21, 24

**counsel** [5]
145:1; 170:8; 319:7, 13, 14

**counterproductive** [1]
288:11

**COUNTY** [2]
318:11; 319:5

**couple** [1]
247:22

**coupled** [1]
139:13

**course** [5]
123:12; 162:7; 175:24;
275:12; 313:11

**COURT** [1]
109:1

**court** [3]
146:1; 179:9; 266:25

**cover** [3]
121:2; 166:10; 207:5

**coverage** [1]
306:21

**covered** [4]
148:7, 8; 190:9, 14

**create** [1]
215:18

**created** [1]
284:13

**creates** [1]
295:5

**creative** [2]
192:4; 294:24

**critical** [2]
145:16, 24

**crooked** [1]
213:17

**crunch** [2]
296:17; 297:22

**crystal** [1]
254:13

**CSR** [1]
319:19

**culmination** [1]
198:3

**current** [5]
196:3, 4; 246:24; 268:18;
315:5

**customer** [1]
198:21

**customers** [1]
221:9

**Cut** [1]
122:16

**cut** [1]
273:23

— **D** —

**D-e-P-a-s-q-u-a-l** [1]
203:20

**Dallas** [1]
303:10

**Dan** [2]
165:6; 240:11

**dangerous** [1]
141:6

**Daniel** [9]
114:5, 7; 152:3; 195:17;
196:18; 202:17; 203:10;
205:8; 214:13

**DATE** [1]
317:3

**Date** [1]
319:20

**date** [22]
135:25; 143:13, 17; 149:25;
162:3; 174:1; 181:8, 10;
183:9; 185:8; 224:20; 246:21;

248:15; 253:22; 254:10, 11,
19; 256:8; 259:11; 274:8;
312:4

**dated** [24]
113:20, 22, 23; 114:5, 7, 12,
14; 138:8; 161:25; 165:6;
173:25; 181:18; 183:13;
208:7, 21; 214:2, 14; 220:19;
224:18; 248:21; 252:5, 6;
253:16; 261:1

**dates** [4]
117:25; 254:8; 256:12, 14

**Davila** [5]
201:22; 204:19; 205:10, 17,
18, 22

**Davis** [12]
113:24; 152:5; 201:21;
204:11, 12, 14, 15; 205:8, 14,
15, 25

**Day** [1]
312:7

**day** [16]
110:4; 218:5; 239:23; 252:10,
22; 253:2; 254:3; 256:15, 16;
257:3; 318:12, 21; 319:8, 16

**day-to-day** [5]
157:15, 18; 158:4; 160:22;
161:16

**days** [7]
174:11, 12, 13; 210:13;
246:23; 268:16; 296:20

**deadline** [1]
242:21

**deal** [6]
158:6; 191:1; 204:6; 232:20;
260:22; 273:24

**dealing** [1]
267:7

**dealt** [2]
148:10; 151:19

**death** [1]
314:11

**December** [59]
130:1; 135:24; 136:2, 3;
138:8, 10; 147:19, 22;
148:13; 149:24; 150:25;
151:3; 152:15; 153:12;
161:25; 162:4; 163:9; 165:6,
13; 167:11; 171:1, 2; 172:9;
173:25; 177:5, 15; 181:9, 13;
183:8, 13; 185:4, 5, 7;
187:20; 188:16; 195:20;
208:7, 21; 209:17; 210:17;
224:18; 228:3; 247:3; 253:20;
256:1, 2, 3; 259:12, 19;
261:1, 19, 23; 267:11, 16, 24,
25; 268:22

**decent** [1]
199:23

**decided** [3]
155:19; 175:14; 230:8

**decision** [27]
119:7; 128:12, 16, 24;
129:10, 16; 135:21; 147:10;
154:3; 175:17, 19; 177:1, 3;
182:5, 8, 9, 12; 265:23;
267:6; 269:21; 278:5, 8, 9,
10; 283:7; 287:16; 288:10

**decision-maker** [1]
288:3

**decision-making** [1]

documented [1]
220:11
documents [14]
165:2; 177:8; 178:14; 220:9;
222:6, 8; 232:23, 25; 244:15;
272:13; 279:25; 280:8, 15
doesn't [24]
117:5, 12; 166:21; 167:1;
183:20; 190:19; 191:7, 20;
193:13; 194:24; 195:6, 8, 10;
209:6; 212:11; 215:13; 216:6;
248:4; 250:3; 254:2, 13;
268:18, 19; 300:8
doggone [1]
256:22
donate [1]
216:20
door [1]
146:19
doors [2]
218:5; 240:20
doubt [2]
139:12; 179:14
Douglass [2]
210:11, 16
Dr [71]
118:8, 16; 123:15, 16; 124:7;
126:11, 13, 23; 127:5, 23;
128:7; 130:2; 134:18, 21;
135:22; 136:8, 19, 22, 24;
137:19; 141:17; 144:21, 23;
147:8; 163:6; 164:16, 21;
174:10, 12, 14; 181:18;
188:4, 24; 189:4, 19; 210:23;
213:20; 223:14; 252:2, 3, 14,
18; 262:16, 24; 270:22, 24;
271:7, 13, 16; 272:7, 8, 11,
15; 273:4, 11, 22; 274:3;
282:1, 14; 283:20; 284:4, 5,
22; 285:8, 11, 17; 286:12, 15;
298:18; 300:12
draft [1]
176:10
drafted [1]
175:7
dramatic [1]
293:21
draw [1]
183:18
driven [1]
141:5
DSC [7]
116:25; 117:7, 13; 151:2;
232:20; 235:7, 25
DSCs [9]
149:8; 152:7; 154:17; 226:1;
234:20, 23; 235:16; 236:20;
237:17
duces [1]
242:10
due [2]
123:14; 254:8
duly [3]
110:3; 115:2; 319:9
DUNN [1]
109:7
duties [2]
268:12, 14
duty [1]
309:10

– E –

E-mail [4]
113:20, 23; 114:12, 14
e-mail [15]
120:4, 15, 22, 24; 127:13, 19,
24; 138:5, 16, 21; 139:22;
205:3; 231:23; 232:16;
262:10
ear [1]
287:25
earful [1]
140:1
early [4]
129:25; 228:3; 281:8; 288:16
earned [1]
307:2
east [1]
131:12
easy [1]
312:18
effect [1]
118:13
Effective [1]
209:14
effective [3]
208:8; 246:21; 298:12
effectiveness [1]
296:24
effort [1]
136:18
eight [2]
221:18; 222:7
EILEEN [1]
111:14
Eileen [3]
244:13; 248:1; 270:21
elected [1]
123:18
eliminated [1]
215:17
ELIZABETH [1]
111:10
Elizabeth [6]
244:1; 246:14; 257:11; 258:8;
316:5, 6
else's [1]
251:7
EMERSON [1]
109:8
employed [4]
180:3; 211:21; 319:13, 15
employee [3]
140:18; 263:3; 319:14
employees [26]
129:4; 140:20; 149:18; 158:1;
160:23; 161:17; 198:25;
199:1; 217:20, 22, 23;
262:22; 266:16; 276:2, 18;
277:14; 278:4; 279:18; 288:9;
289:3, 5; 296:21; 301:3;
306:16; 313:13, 22
employer [2]
246:24; 288:24
encouraged [1]
233:14
End [1]
178:10
end [13]
130:8, 13; 139:22; 226:21;
228:17; 229:2; 232:10, 11;

246:24; 267:10, 14; 268:22;
297:15
ended [2]
202:5; 296:20
endorsing [1]
288:25
enroll [2]
288:21; 292:17
enroller's [1]
288:19
enrollers [7]
192:19, 23; 197:22; 211:8,
14; 227:17; 231:2
enrolling [1]
190:12
enrollment [57]
154:6, 10; 156:1; 159:21;
160:8; 189:18; 192:7; 197:20;
198:10, 13, 18, 19, 20, 24;
199:15; 210:22; 211:9; 212:4,
8, 22, 25; 218:11; 219:10;
220:12; 221:9; 225:9; 226:13;
228:25; 230:6, 24; 232:9, 10;
248:12; 267:20, 23; 272:9;
288:18, 22; 290:14, 21;
292:5, 12, 23; 293:5; 294:9,
13; 295:16; 297:19; 298:4;
302:15, 22; 305:16; 306:1, 3;
313:16; 315:6
enrollments [21]
159:16; 160:9, 16; 198:2, 7,
22; 210:22; 211:15; 231:6;
232:1; 237:6; 291:20, 25;
303:2; 305:2, 5; 307:12;
308:7; 313:3; 315:17
ensure [1]
166:3
entered [5]
162:18; 245:13; 248:24;
260:16; 290:2
entitled [4]
146:9; 179:2, 3, 9
envisioned [1]
194:20
equaling [1]
202:18
equally [1]
220:1
equipped [1]
316:1
error [4]
173:23; 260:7, 20; 317:5
Escobar [4]
152:6; 205:9, 14; 206:1
essence [1]
288:24
essentially [1]
164:5
established [7]
303:6, 7, 10, 22; 304:12, 14,
23
estimate [1]
151:25
et [1]
200:7
evasive [1]
122:24
event [8]
129:18; 130:21; 175:10;
178:8; 241:10; 258:24;
281:23; 294:15

eventually [3]
134:4; 216:3, 20
Everybody [2]
197:25; 295:13
everybody [6]
118:9; 211:8; 235:15, 24;
300:21; 306:10
evidence [14]
124:10; 145:24; 182:14;
243:6; 255:10, 13; 259:4;
260:16; 266:4; 270:8; 274:23;
282:7; 289:23
evidently [1]
150:4
evil [2]
275:21; 276:15
exact [2]
221:17; 312:4
Exactly [6]
127:6; 159:1; 163:16; 164:24;
186:8; 304:20
exactly [3]
121:16; 139:10; 179:11;
180:19; 193:6; 312:5
EXAMINATION [6]
115:4; 243:24; 270:19;
301:18; 312:24; 314:18
Examination [3]
113:8, 9, 10
examination [1]
319:10
examined [1]
319:10
example [9]
117:5, 7; 118:8, 16; 121:22;
149:17; 150:15; 235:7;
292:10
except [2]
301:3; 318:5
exception [4]
227:6, 8; 255:25; 288:15;
302:8; 314:8
exclude [1]
195:10
executed [1]
318:18
Exhibit [77]
119:22; 125:17, 18, 20, 21;
137:24; 138:2, 14; 161:21;
165:1, 9; 170:1; 172:21;
180:23; 182:11, 16; 183:1,
10; 189:7; 190:1, 5; 191:9,
18; 194:19; 195:3, 16; 201:9,
12; 207:19; 208:12; 209:10,
16, 18; 210:3, 6; 212:20;
213:22, 25; 214:5; 218:21;
219:15; 220:15, 18; 223:18;
245:3, 5; 247:17, 21; 248:24;
249:6, 8, 11; 251:18; 253:20;
254:19; 255:10; 256:7, 8, 17,
19, 21; 257:9; 259:3, 5;
260:15; 261:4, 5; 263:11;
264:11; 265:2, 13, 18; 266:2,
19; 270:9, 15
exhibit [3]
214:4; 244:24; 257:24
EXHIBITS [2]
113:16; 114:1
exorbitantly [1]
291:2
expanded [1]

186:11
**frequently** [1]
*247:23*
**Friday** [2]
*164:4; 253:6*
**frighten** [1]
*142:11*
**front** [4]
*146:1; 183:2; 213:16; 266:14*
**frown** [1]
*294:18*
**frowned** [1]
*294:20*
**frustrated** [1]
*250:25*
**fulfill** [1]
*267:8*
**full** [5]
*207:11; 227:24; 271:17;
277:5; 295:17*
**full-time** [1]
*221:1*
**fully** [1]
*296:13*
**function** [2]
*137:21; 225:25*
**fund** [4]
*202:9; 217:3; 221:1; 261:17*
**funded** [1]
*216:17*
**funding** [5]
*217:4, 7; 220:24; 221:1, 4*
**funds** [1]
*202:18*
**future** [11]
*135:1; 140:2; 173:18; 175:11;
225:9; 228:15; 231:25;
251:24; 258:24; 273:16;
299:23*

– G –

**gain** [1]
*140:16*
**game** [1]
*273:12*
**garner** [1]
*263:3*
**gather** [1]
*174:21*
**gathered** [2]
*128:3; 175:4*
**gathering** [1]
*213:19*
**gave** [3]
*119:17; 281:13; 305:20*
**generated** [1]
*144:13*
**gentleman** [1]
*310:9*
**geographical** [1]
*131:11*
**GERRI** [3]
*110:6; 319:6, 19*
**gets** [8]
*116:1, 13, 14; 149:6; 153:23;
160:12; 190:8; 292:20*
**Give** [1]
*247:18*
**give** [14]
*117:25; 125:13; 161:21;*

3:7; 221:16; 222:16; 235:7;
255:16; 256:12; 263:16;
279:1; 291:8; 293:11; 312:3
**Given** [1]
*318:20*
**given** [6]
*232:2; 234:22; 276:11;
282:21; 297:13; 319:11*
**giver** [1]
*208:15*
**gives** [2]
*246:25; 268:16*
**giving** [2]
*192:22; 210:13*
**glad** [3]
*182:23; 239:10; 288:21*
**goes** [14]
*163:25; 166:9; 184:22; 185:9;
186:12; 196:10; 197:15;
199:24; 208:9; 209:16;
225:22; 275:23; 283:3;
305:12*
**gotten** [5]
*192:12; 234:16; 237:23;
295:17; 299:6*
**govern** [2]
*233:5; 236:6*
**grammar** [1]
*133:22*
**granted** [1]
*182:5*
**Great** [1]
*115:11*
**great** [3]
*225:17; 293:9; 313:9*
**greater** [2]
*155:25; 315:25*
**greed** [1]
*264:15*
**ground** [1]
*190:10*
**group** [12]
*133:10; 135:5; 137:3; 185:3;
192:11; 197:22; 198:6, 19,
22, 24; 222:14; 237:6*
**grown** [1]
*293:20*
**growth** [3]
*241:19; 289:6; 305:6*
**grunt** [1]
*300:16*
**GUERRA** [1]
*111:15*
**guess** [10]
*139:17; 162:23; 170:15;
205:10; 208:22; 215:10;
222:20; 224:25; 242:9, 11*
**guessing** [2]
*171:22; 172:1*
**Guidelines** [3]
*234:6; 312:1, 2*
**guidelines** [20]
*231:17, 25; 232:3; 233:3, 4,
6, 8, 12, 13, 19; 234:4, 8;
235:3; 236:2, 5, 8, 9, 11;
237:6; 264:8*
**guys** [1]
*276:19*

– H –

**H-2** [1]
*111:5*
**hadn't** [3]
*120:1; 150:22; 274:11*
**hail** [1]
*301:12*
**Hamby** [5]
*310:10, 15, 16, 17, 19*
**hand** [7]
*138:1; 201:11; 223:17;
274:21; 279:21; 295:20;
318:20*
**handful** [3]
*221:12, 15; 222:6*
**handing** [8]
*161:20; 164:25; 172:21;
180:22; 195:15; 207:18;
213:24; 220:17*
**handle** [19]
*141:18; 147:24; 148:12;
149:20; 150:16, 23; 151:3;
152:18; 157:15; 158:5;
161:11, 17; 192:3; 263:1;
295:16; 296:20; 298:12;
313:12; 316:1*
**handled** [20]
*136:16; 141:12; 147:21;
153:4, 6; 159:14; 160:18;
161:1, 4, 7, 15; 198:16;
202:25; 222:3; 227:21; 263:2;
272:14; 297:21; 298:7*
**handling** [16]
*123:13; 152:22; 153:2, 3, 14;
156:14; 159:12; 160:22;
188:10; 206:9, 22; 215:25;
223:1; 262:15; 292:4; 304:15*
**hands** [4]
*233:18, 22; 261:9; 295:22*
**handwriting** [4]
*216:8, 9; 249:19; 250:6*
**handwritten** [3]
*222:25; 249:3; 254:12*
**Hang** [7]
*169:16; 214:9; 217:25;
244:21; 246:13; 248:5;
255:15*
**hanging** [1]
*316:7*
**happening** [1]
*146:2*
**happens** [4]
*116:6; 179:8; 198:7*
**happy** [3]
*174:10; 196:12, 22*
**hard** [2]
*224:25; 256:2*
**hardly** [1]
*220:10*
**hardware** [1]
*301:3*
**Harlingen** [3]
*216:6; 217:11, 19*
**harm** [2]
*166:7, 13*
**hate** [2]
*247:7; 314:5*
**haven't** [4]
*208:16; 274:19; 280:15;
304:22*
**He's** [5]
*145:19; 160:1; 179:24, 25;*

203:13
**he's** [15]
*125:11; 148:21; 159:23;
160:2; 162:21, 23, 24;
180:13; 195:8; 197:5; 198:20;
199:7, 15; 220:23; 248:13*
**head** [4]
*119:19; 194:14; 300:14;
304:17*
**header** [2]
*121:5, 9*
**headquarters** [2]
*141:22; 309:7*
**health** [1]
*186:20*
**heard** [2]
*168:3; 208:16*
**hearing** [1]
*179:13*
**held** [2]
*175:3, 18*
**help** [17]
*129:8, 9, 15; 135:16; 150:3;
153:18; 199:15; 203:11, 25;
206:4, 6; 227:11; 251:24;
254:13; 288:1; 298:6; 315:4*
**helped** [1]
*217:3*
**Hence** [1]
*179:16*
**hereby** [1]
*318:4; 319:7*
**hereof** [1]
*246:21*
**hereto** [2]
*110:12; 319:15*
**hesitate** [1]
*137:8*
**Hey** [1]
*231:24*
**hey** [8]
*167:12, 16; 168:7; 207:4;
231:13; 276:18; 300:5;
311:18*
**hierarchy** [1]
*299:4*
**high** [1]
*291:2*
**higher** [1]
*160:19*
**highest** [1]
*284:10*
**highly** [1]
*251:20*
**hire** [2]
*287:17; 301:13*
**hired** [3]
*234:8; 289:5; 313:11*
**hires** [1]
*293:9*
**Hold** [1]
*215:1*
**hold** [2]
*141:25; 175:13*
**Home** [1]
*149:18*
**home** [5]
*149:17; 150:15; 225:7, 8;
253:8*
**honest** [2]
*240:19; 256:22*

168:14

**job** [12]
129:7; 131:4; 133:12, 15;
134:2, 10; 141:25; 142:17,
18; 282:25; 295:23; 297:24

**Joe** [6]
124:23; 202:13; 203:12, 16,
17

**jogged** [1]
298:22

**Join** [5]
125:10; 142:24; 146:6; 239:8;
310:22

**JR** [1]
109:8

**justification** [2]
128:10; 284:15

**justified** [4]
179:18; 284:22, 25; 285:12

– K –

**Karl** [1]
210:11

**keep** [11]
125:15; 137:1, 5; 147:1;
153:18; 174:9, 10; 182:1, 2;
193:23; 299:25

**keeping** [3]
193:21, 25; 194:7

**Ken** [1]
245:14

**kept** [4]
211:7; 262:14, 19; 289:19

**kinds** [2]
275:16; 276:2

**Knowing** [3]
139:12; 283:16; 284:21

**knowing** [3]
260:17; 279:5; 284:17

**knowledge** [14]
117:14; 147:17; 151:9, 11;
153:7; 160:25; 161:14, 18;
200:1; 217:8; 277:11; 283:24;
291:22; 299:2

**Kuechenmeister** [2]
239:17; 241:3

– L –

**L.L.P.** [4]
110:9; 111:10, 15, 20

**labels** [1]
255:22

**Labor** [1]
312:7

**LaFEMINA** [9]
109:14; 110:2; 113:7; 115:1;
317:2; 318:3, 9, 13; 319:8

**LaFemina** [43]
113:20, 23; 114:5, 7; 115:6;
119:22; 135:19; 162:15;
165:10; 170:5, 8; 179:24;
181:19; 189:15; 190:2;
207:22; 209:9; 212:6; 214:6,
7, 11, 13; 244:1; 249:6;
250:7; 251:18; 253:22; 256:8,
15; 257:4; 258:3, 4, 12;
259:17; 260:5; 261:15; 262:7,
11; 264:2; 265:13; 270:21;
277:2

**LaFemina's** [1]

7:8:22

**laid** [1]
124:9

**language** [1]
305:9

**Laredo** [1]
131:13

**Large** [1]
198:6

**large** [3]
197:22; 198:19; 313:13

**larger** [3]
122:3, 6; 154:9

**largest** [6]
131:3, 7, 15; 132:5, 21;
141:13

**last** [22]
115:11; 119:18, 21; 122:15;
137:7; 138:24; 153:17; 164:4;
166:3; 170:5; 186:12; 200:21,
22, 23; 241:18; 245:12, 17;
257:1; 264:12; 277:5; 314:11

**late** [3]
130:1; 228:3, 9

**LAW** [1]
111:5

**law** [1]
311:17

**laws** [1]
311:11

**lawsuit** [4]
165:23; 166:2; 167:3; 180:7

**lawyer** [1]
299:10

**lay** [3]
291:6; 292:7, 25

**lead** [6]
129:21, 23; 130:24; 131:1;
262:16; 310:9

**leading** [1]
304:21

**learned** [1]
285:4

**lease** [1]
200:7

**leave** [2]
145:24; 217:9

**Leaves** [1]
292:21

**leaves** [1]
139:12

**leaving** [3]
145:16, 17; 289:4

**LEEDS** [79]
111:14; 119:1; 125:10;
126:17, 25; 128:18; 129:1;
133:6, 20, 22; 134:8; 137:16;
141:15; 142:1, 24; 143:5, 15;
145:13; 146:6; 147:3; 148:17,
19, 25; 149:3, 21; 150:17;
151:4; 154:19; 159:2; 162:2,
20; 163:13; 166:19; 169:12,
23; 174:17; 176:14; 177:18,
22; 179:25; 180:20; 182:12;
184:15, 21; 185:24; 187:22;
188:1, 18; 193:9; 194:22;
201:15; 203:19; 208:16;
212:16; 213:7; 214:6; 222:17;
238:8; 239:8; 244:16, 19, 22;
245:5; 246:7; 248:6; 249:9;
270:20; 287:8; 288:7; 301:16;

309:18; 310:6, 22; 311:13,
20; 312:25; 314:16, 24; 316:4

**Leeds** [26]
113:9, 10; 270:21; 274:15,
21; 277:2; 278:25; 279:8;
282:4, 9; 283:16, 25; 284:16;
285:3; 287:3, 12; 288:8;
290:10; 291:10; 292:15;
293:17; 298:24; 300:18;
301:14; 308:13; 314:3

**legal** [6]
145:1; 170:8; 176:25; 178:6;
272:5; 282:20

**Lehman** [1]
125:21

**length** [3]
250:24; 272:24; 292:3

**lengthy** [3]
138:6; 165:14; 250:21

**Let's** [9]
169:17; 178:18; 198:6; 201:6;
208:15; 224:2; 230:3; 246:13;
249:7

**let's** [8]
154:21; 182:25; 199:14;
228:17; 235:14; 236:23;
266:12; 282:25

**Letter** [2]
114:5, 7

**letter** [95]
118:8, 17; 123:15; 124:14;
127:7; 130:2; 136:10, 14, 15,
17; 138:23; 143:22, 23;
144:5, 14; 161:7, 24; 163:6,
8, 23; 165:5, 12; 166:18;
167:4, 11; 168:8; 170:13, 22;
171:4; 174:12, 14; 181:2, 4,
7, 9, 10, 11, 18; 188:3, 13;
189:3; 195:16; 196:2, 18;
201:2; 210:12; 211:2; 213:13,
20, 25; 214:16, 17, 18, 25;
215:9, 13, 14; 219:15;
220:18, 20, 22; 223:13;
231:13, 16, 23; 232:16;
241:8; 252:2, 4, 5, 6; 253:15,
16; 260:23; 263:11; 266:14;
271:9, 14; 272:19; 274:4, 7;
275:7, 14; 276:10; 282:2, 14;
284:4, 12, 14; 285:1, 19, 21;
297:16; 302:16

**letter-writing** [2]
266:15; 274:3

**letters** [23]
124:3, 10, 12, 13, 21, 24;
125:2, 12, 14; 144:19, 25;
145:22; 274:12; 281:17, 24;
283:8, 12; 284:3, 18, 21;
308:14, 16; 309:13

**level** [7]
160:19; 192:4; 232:20;
234:18; 293:16; 296:24;
313:25

**Levine** [21]
117:23; 118:22; 120:7;
121:20; 123:4; 192:17; 193:1;
212:8, 21, 24; 216:4; 217:9;
218:9; 219:1; 220:5, 10;
273:12; 295:21; 298:2, 10;
302:19

**Levine's** [2]
222:3; 303:21

**liaisons** [1]
153:8

**LIDDELL** [1]
111:20

**Liddell** [1]
110:9

**Lleck** [1]
245:14

**life** [3]
166:4, 14; 269:19

**light** [1]
207:2

**liked** [1]
308:19

**likelihood** [1]
265:10

**limited** [1]
271:25

**Linda** [3]
124:22; 125:16; 277:6;
280:16

**LINE** [3]
113:18; 114:3; 317:6

**line** [5]
186:12; 200:6; 215:15;
259:11; 261:12

**lined** [1]
295:15

**lines** [2]
121:12; 297:18

**list** [3]
115:21, 23; 224:22

**listed** [1]
224:14

**listen** [2]
139:25; 179:10

**livelihood** [1]
166:16

**LOCKE** [1]
111:20

**Locke** [1]
110:9

**locked** [1]
218:5

**long-term** [4]
142:15; 269:21; 286:23, 24

**Looks** [1]
185:7

**looks** [3]
256:3; 275:11; 280:3

**loop** [1]
128:6

**losing** [1]
137:2, 3; 289:14

**lost** [7]
133:14; 139:23; 140:8; 290:9;
297:8; 298:22; 301:15

**lot** [4]
149:7; 165:2; 285:8; 313:20

**loud** [1]
119:20; 239:15

**love** [1]
254:12

**Lunch** [1]
230:20

**lunch** [1]
231:3

**Lynn** [15]
113:24; 114:12, 14; 152:5;
167:23; 168:1; 201:21;
204:12, 14, 15, 24; 205:8, 25;

149:3, 21; 150:17; 151:4;
154:19; 159:2; 162:2, 20;
163:13; 166:19; 169:12, 21,
23; 174:17; 176:14; 177:18,
22; 179:25; 180:20, 24;
182:12; 184:15, 21; 185:24;
186:1; 187:22; 188:1, 18;
193:9; 194:22; 201:15;
203:19; 208:16; 212:16;
213:7; 214:4, 6, 8; 222:17;
238:8; 239:8; 243:25; 244:13,
16, 17, 19, 20, 22, 25; 245:5;
246:7, 15; 248:1, 6; 249:7, 9,
10; 254:15; 256:5; 257:6, 15;
258:2, 4, 11; 269:4, 12;
270:18, 20; 287:8; 288:5, 7;
301:16; 309:18; 310:6, 22;
311:13, 20; 312:22, 25;
314:16, 24; 316:4, 7

**Ms** [57]
113:8, 9, 10; 124:20, 22;
125:3, 16, 24; 205:10; 245:6;
246:8; 247:2, 20; 248:7;
249:14; 254:17; 256:6; 257:8,
19; 258:2, 7, 12; 259:8, 24;
260:4; 261:7; 264:25; 265:17;
266:7; 267:15; 269:14;
274:15, 21; 277:2, 6; 278:25;
279:8; 282:4, 9; 283:16, 25;
284:16; 285:3; 286:21; 287:3,
12; 288:8; 290:10; 291:10;
292:15; 293:17; 298:24;
300:18; 301:14; 308:13;
310:3, 13; 314:3

**multiple** [2]
245:22; 246:4
**myself** [7]
138:19; 140:22; 174:22;
202:5; 229:18; 234:12;
301:12

## – N –

**NAME** [1]
317:2
**name** [15]
139:24; 152:1; 192:10;
202:13; 205:2, 10; 215:16;
217:15, 16; 226:16, 18;
244:1; 270:21; 310:14;
318:16
**named** [3]
276:4; 310:9; 319:8
**naming** [1]
180:17
**National** [1]
162:12
**national** [2]
238:13, 16
**nationwide** [1]
237:8
**nature** [6]
139:14; 150:4; 160:21; 161:9;
283:14
**NEALLY** [30]
111:10; 123:25; 147:13;
169:21; 180:24; 186:1; 214:4,
8; 243:25; 244:13, 17, 20, 25;
246:15; 248:1; 249:7, 10;
254:15; 256:5; 257:6, 15;
258:2, 4, 11; 269:4, 12;

20:18; 288:5; 312:22; 316:7
**Neally** [24]
113:8; 244:1; 245:6; 246:8;
247:2, 20; 248:7; 249:14;
254:17; 256:6; 257:8, 19;
258:7, 12; 259:8, 24; 260:4;
261:7; 264:25; 265:17; 266:7;
267:15; 269:14; 286:21
**needs** [1]
300:15
**negative** [4]
207:2; 225:21; 266:15;
284:12
**negotiations** [1]
160:20
**neighborhood** [1]
199:23
**nepotism** [1]
295:5
**net** [2]
289:6; 306:24
**night** [1]
239:5
**Nobody** [1]
168:9
**nobody** [5]
149:19; 168:6; 210:9; 223:10;
292:20
**NOE** [2]
109:6; 111:13
**Nonetheless** [1]
250:22
**nonresponsive** [3]
135:12; 161:12; 176:8
**Nope** [1]
254:23
**normal** [3]
123:12; 175:24; 189:18
**Normally** [1]
175:2
**normally** [4]
178:5; 192:12; 199:7; 297:5
**north** [1]
131:11
**NOTARY** [1]
318:24
**note** [1]
264:22
**noted** [1]
318:5
**notice** [8]
164:21; 208:7; 210:13;
231:24; 246:25; 261:11;
267:15; 268:17
**notified** [1]
181:19; 268:24
**notify** [1]
187:17
**November** [23]
118:10; 127:18; 129:25;
130:8, 12; 143:7, 14, 22;
181:18; 252:1, 5, 7, 8, 13, 16;
271:10; 275:7; 285:6; 297:15,
16; 302:16, 20; 304:21
**NPA** [4]
162:9, 17, 19
**number** [10]
156:13; 207:22; 212:7;
221:17; 222:14; 256:4;
257:25; 289:3, 4; 313:13
**numbered** [1]

110:4
**numbers** [2]
200:4, 8
**numerous** [3]
157:24; 235:4; 269:19
**nutshell** [1]
298:14

## – O –

**oath** [2]
318:14; 319:10
**Object** [37]
123:25; 125:8; 126:17, 25;
128:18; 133:6; 134:8; 137:16;
141:15; 143:5, 15; 145:13;
147:3, 13; 148:17, 25;
149:21; 151:4; 154:19; 155:8;
159:2; 162:20; 163:13;
169:12; 174:17; 185:24;
186:1; 188:1, 18; 193:9;
194:22; 213:7; 238:8; 257:6;
269:12; 310:6; 311:20
**object** [9]
119:1; 124:8; 145:24; 166:19;
168:19; 243:4, 14; 254:15;
257:11
**objecting** [1]
307:8
**Objection** [40]
134:5; 135:12; 142:1, 22;
145:5, 12; 147:4; 150:17;
161:12; 176:8, 14, 22;
177:18, 20; 182:7, 13;
187:22; 222:17; 239:7;
259:21; 265:11; 266:3;
278:20; 279:7; 282:3; 283:10,
21; 284:7, 24; 287:1; 289:22;
291:5; 292:6, 24; 298:20;
301:9; 309:18; 310:21;
311:13; 314:1
**objection** [6]
129:1; 146:2; 170:4, 9;
242:18; 243:15
**objective** [1]
219:5
**obligations** [1]
142:20
**obvious** [3]
136:25; 271:6; 300:10
**obviously** [4]
133:1; 193:21; 206:13;
313:18
**occasion** [1]
269:16
**occur** [1]
241:10
**occurred** [6]
130:12; 254:19; 267:21;
274:3; 280:22; 281:12
**October** [2]
238:19; 239:3
**odds** [2]
288:3, 11
**offer** [3]
207:8, 14, 15
**offered** [1]
207:12
**offhand** [1]
157:9
**OFFICE** [1]

111:5
**office** [54]
123:15; 149:17, 18; 150:1,
15; 153:7, 9; 157:15, 24;
158:2, 8, 9; 164:4; 173:18,
23; 175:6; 176:5, 6; 197:10;
199:22, 25; 200:5; 202:15,
19, 21; 203:5, 8; 204:21;
216:5, 6; 217:10, 12, 14, 18,
19, 21, 24; 218:3, 4, 8;
220:24; 221:1, 4; 222:1, 2, 3;
225:7, 8; 255:24; 260:6;
276:12; 309:21; 312:6;
318:20
**officer** [2]
210:9; 310:9
**offices** [1]
110:8
**official** [3]
109:8; 154:10; 284:10
**offset** [2]
289:15; 302:1
**Oh** [4]
122:18; 237:14; 261:9;
294:15
**oh** [2]
142:5; 170:12
**Okay** [380]
116:1, 8, 18, 24; 117:5;
118:6; 119:3, 6, 13, 25;
120:8, 13, 18; 121:7; 122:20;
123:6, 24; 124:15; 125:2;
126:10, 13; 127:3, 7; 128:15;
129:8; 131:14, 17; 132:2, 9,
13, 21; 133:1, 12; 134:12;
135:20, 23; 136:9; 137:7, 23;
138:20, 23; 140:14; 141:3,
13, 23; 142:9, 17; 143:18;
144:5, 15, 17; 146:23; 147:9;
148:11, 24; 149:6, 19;
150:13; 151:20; 152:4, 11,
17, 21; 153:11, 20; 154:4, 15;
155:24; 156:6; 157:3, 7, 11,
23, 25; 158:11, 20; 159:21;
160:12, 22; 162:11, 14;
163:8; 164:18; 166:25; 167:9,
15, 19, 24; 168:14, 17, 22;
169:7, 18; 170:18, 25; 171:3;
172:1, 10, 13, 18; 173:3, 12,
15, 22, 25; 174:24; 176:13;
177:2, 5, 14; 178:4, 17;
180:5, 12; 181:4, 17; 183:8,
12, 25; 184:14, 21, 22; 185:4,
6, 9; 186:7, 9; 187:5; 188:6;
189:6, 23; 190:4, 16, 21;
191:8, 13, 17; 192:2, 15, 22;
193:10, 21; 194:6, 10; 195:1,
6, 24; 196:20; 197:20;
198:14, 17; 199:2, 21; 200:4,
11, 18; 201:5, 11; 202:21;
203:18; 204:23; 205:15, 19;
206:3, 16, 19, 22; 207:18, 25;
208:6, 19; 209:1, 15; 210:11,
17, 20, 24; 211:3, 12, 20, 22,
25; 212:10, 14; 213:3; 215:9,
20; 216:11, 17; 217:6, 20, 23;
218:9, 19; 219:10; 220:2, 12;
221:15, 19; 222:23; 223:10,
15; 224:12, 21, 25; 225:19,
22; 226:4, 11, 20; 227:5, 7,
15; 228:17; 229:10; 230:19,

110:3
**Plan** [1]
162:12
**plan** [24]
117:20; 134:22; 137:9;
138:16; 177:10; 189:17, 18,
22, 24; 191:18; 219:5;
246:20; 250:23; 278:6; 283:8;
291:17, 20, 25; 295:11, 14;
298:14; 300:2, 5, 13
**player** [2]
263:12; 264:19
**Plaza** [1]
111:15
**Please** [5]
137:10; 244:25; 264:22;
281:2; 291:12
**please** [14]
127:15; 134:1; 143:2; 145:7;
147:23; 166:10; 186:11;
249:8; 269:5; 278:14; 288:20;
292:2; 305:22; 317:5
**pleased** [1]
273:23
**plus** [1]
200:6
**pockets** [1]
202:20
**point** [44]
133:10; 140:12; 141:10;
144:6; 145:21; 165:17;
177:14; 178:22; 180:16;
182:4; 183:15; 184:4; 185:21;
225:16; 226:24; 229:7, 10;
230:5, 7; 232:18; 235:7, 24;
239:5, 16; 248:13; 251:8;
258:7, 14; 259:20; 264:12,
13; 267:9; 268:20; 272:12;
275:19; 289:1; 290:8, 12;
299:7; 306:3; 309:9; 313:11,
23, 24
**police** [1]
239:5
**policies** [7]
148:7; 160:5, 15; 197:23;
218:18; 219:24; 220:1
**policy** [16]
116:16, 23; 117:8, 15;
159:19, 22; 160:1; 178:1;
198:21; 199:5, 9, 10, 16;
219:16, 21; 236:7
**policyholder** [6]
159:20; 199:11; 214:16, 23;
215:19; 219:22
**policyholders** [2]
148:10; 222:15
**population** [1]
140:18
**portion** [4]
155:25; 202:9; 257:18; 269:6
**position** [13]
127:20; 140:12; 141:4;
145:25; 146:24; 165:11;
169:14; 179:21; 196:5;
210:18; 263:15, 23; 311:6
**positive** [2]
247:25; 262:23
**possibility** [1]
249:18
**potential** [2]
199:4; 298:16

**Powers** [3]
124:23; 125:18
**powers** [2]
123:17; 126:5
**practical** [1]
304:1
**Practically** [1]
152:21
**practice** [3]
188:11; 309:17
**pre-screened** [1]
276:6
**precedent** [1]
146:15
**preclude** [1]
212:11
**predicate** [7]
119:2; 146:15; 166:20;
174:17; 291:6; 292:7, 25
**preferred** [1]
276:6
**premium** [3]
133:16; 135:7; 288:19
**premiums** [1]
242:25
**prepared** [11]
115:8; 177:6, 12; 253:19;
256:7, 9, 16, 18, 20; 258:13
**PRESENT** [1]
111:23
**present** [2]
130:14; 261:20
**preserve** [9]
131:4; 133:15; 134:3, 10, 22,
24; 137:15; 162:7; 174:9
**preserving** [2]
134:12; 138:17
**president** [5]
165:6; 175:2, 25; 209:7;
210:12; 245:14; 258:20
**pressed** [5]
313:16; 314:22; 315:11, 21
**pressing** [1]
187:12
**presume** [1]
232:13
**Pretty** [1]
157:20
**pretty** [1]
138:16
**previous** [12]
121:25; 126:11; 138:15;
185:1; 216:25; 253:17;
265:16; 305:13; 306:5; 307:3;
313:14; 318:5
**previously** [9]
161:20; 180:23; 195:15;
202:21; 231:19; 237:24;
255:5; 279:22; 295:3
**Price** [2]
111:11; 216:5
**pride** [6]
142:14; 269:15, 20, 22, 24;
286:23
**primarily** [3]
199:17; 219:11, 12
**primary** [1]
225:25
**principle** [1]
141:5
**print** [1]

236:12
**printed** [1]
255:2
**Prior** [2]
143:7, 9; 152:14
**prior** [32]
129:3, 5; 139:6; 143:6, 10,
13, 24; 144:1, 4; 147:19, 22,
25; 148:13; 150:25; 151:3;
155:1; 156:21; 164:6; 170:10;
203:8; 228:13; 246:23; 255:2;
260:17; 280:12, 13; 282:14;
301:22; 303:2, 8, 20; 304:16
**privilege** [1]
170:6
**problem** [10]
136:25; 147:22; 148:12;
150:5; 158:11, 14; 215:18;
233:21; 250:11; 300:20
**problems** [12]
147:25; 148:2, 5; 149:20;
150:16, 23; 151:3; 152:19;
153:2, 3; 271:6; 298:18
**Procedure** [1]
110:11
**procedure** [4]
115:13; 158:25; 178:9;
309:19
**procedures** [3]
164:2; 263:24; 264:17
**proceed** [2]
203:11; 263:23
**process** [5]
227:4; 248:11; 288:11
**produce** [4]
190:24; 227:4; 242:3, 4
**produced** [3]
110:2; 226:15; 248:18
**producer** [1]
220:14
**product** [2]
156:15; 290:16
**production** [20]
159:7; 192:9, 10; 218:15;
220:11; 225:17, 25; 226:18;
227:1; 228:6, 22; 236:17;
237:12; 241:20; 242:25;
245:8; 293:25; 294:4, 17;
296:9
**productive** [2]
305:12; 306:5
**productivity** [1]
307:2
**products** [3]
154:5, 15; 286:2
**professional** [5]
137:21; 142:15; 166:17;
263:7; 276:21
**professionalism** [1]
264:14
**program** [1]
288:24
**prohibited** [1]
159:10
**promote** [1]
282:11
**promoted** [1]
296:6
**promotion** [1]
235:19
**prompt** [3]

128:11, 16, 24
**proof** [1]
258:13
**proper** [1]
128:10; 179:17; 213:18;
291:6; 292:7, 25; 309:11, 14
**properly** [1]
137:10
**property** [3]
187:1; 212:13; 286:19
**proposal** [8]
115:15, 17; 116:11, 20;
117:20; 118:21; 218:23;
304:4
**proposals** [1]
116:13
**protect** [8]
193:17, 24; 194:2, 3, 7, 11,
16; 251:24
**protecting** [1]
142:18
**proved** [2]
140:11; 318:14
**proven** [1]
275:21
**provide** [2]
202:17; 241:25
**provided** [6]
120:4; 123:8; 157:10; 224:10;
298:15, 16
**provider** [3]
272:21, 22; 283:8
**providers** [1]
273:2
**providing** [2]
170:7; 212:12
**provisions** [1]
110:11
**prudent** [1]
283:12
**PUBLIC** [1]
318:24
**public** [1]
283:4
**pull** [2]
157:9; 244:13
**pulled** [1]
135:23
**purchase** [1]
156:9
**purchased** [1]
156:7
**purposely** [2]
145:17; 215:17
**purposes** [3]
180:14; 246:2; 318:19
**pursuant** [3]
110:10; 178:22; 319:7
**pursue** [1]
169:1
**pursuing** [1]
141:11
**push** [3]
145:3; 146:25; 147:5
**pushed** [2]
145:9; 147:8
**putting** [5]
145:19; 196:8; 258:23; 288:3,
8; 305:18

— Q —

ORAL AND VIDEOTAPED DEPOSITION OF FRANK D. LAFERMAN

relinquishing [1]
294:23

remain [5]
179:18, 21; 201:1; 268:17;
273:5

remained [3]
265:19; 266:20; 293:16

Remember [2]
231:2; 311:4

remember [51]
124:5, 6; 136:1, 6; 150:6, 9,
10; 163:17; 164:7; 165:12,
14, 16, 20, 23; 166:1, 18;
167:4; 170:11, 24, 25;
171:10; 172:10, 14, 15, 16;
181:6; 189:13; 195:21; 208:2,
3; 215:23; 235:10; 238:1, 3,
12; 239:2, 5, 9, 25; 240:3, 6;
244:9; 252:24; 255:8; 256:13;
257:14, 21, 22; 273:17;
308:15

reminder [1]
312:14

removal [1]
127:10

REMOVE [1]
112:3

remove [6]
134:20; 181:23; 183:21;
184:6; 285:13; 286:12

removed [20]
123:18; 126:12; 137:20;
162:15, 19; 163:3, 4, 7;
164:17; 183:16; 184:4; 185:3;
188:25; 213:21; 268:15, 23;
278:15; 284:15; 285:2, 22

removing [1]
184:16

renew [2]
246:22; 247:1

renewal [2]
134:23; 289:14

renewals [4]
135:2; 206:12; 293:20;
299:22

renewing [1]
133:16

repeat [3]
170:10; 214:9; 229:17

rephrase [7]
146:8; 188:20; 193:23;
217:25; 232:15; 281:1; 303:6

replaced [1]
289:4

report [2]
167:20; 226:19

reported [5]
110:8; 165:8; 167:23; 168:1,
4

Reporter [2]
110:7; 319:7

reporter [1]
267:1

REPORTER'S [1]
319:1

Reporter's [1]
113:14

represent [4]
125:22; 162:9; 208:6; 270:22

representative [10]
115:21; 117:3; 137:22; 179:9,

-; 180:9, 13, 15, 18, 20

representatives [1]
145:22; 280:9

represented [1]
180:7

representing [2]
211:4; 249:24

represents [2]
180:4; 244:2

request [40]
115:14, 17, 22; 116:10, 11,
12, 13; 117:6, 19; 118:19, 22;
126:12, 14; 128:7; 134:21;
135:22; 136:8, 25; 137:8, 19;
147:11; 162:14, 19; 163:3;
164:19; 173:2; 174:2; 179:17;
188:4; 189:5, 10, 11, 13, 16,
19, 20; 242:9; 245:8; 285:13;
309:12

Requested [2]
257:18; 269:6

requested [6]
118:12; 196:2; 210:23; 213:1;
299:5, 6

requesting [3]
116:21; 127:10; 213:21

requests [1]
164:5

required [1]
175:23

requirement [1]
297:2

rescind [1]
126:11

rescinding [1]
126:13

research [3]
128:2; 139:13, 17

reserves [1]
299:3

resolve [1]
156:13

respect [1]
254:9

respond [4]
115:15; 169:10, 14; 201:3

responded [1]
241:9

response [7]
116:12; 117:10; 176:18;
206:10; 238:5; 245:7; 273:6

responsibility [6]
207:16; 232:21; 234:25;
265:16; 295:21; 296:5

responsible [5]
158:22; 199:8, 18; 219:16,
21; 234:17

responsive [1]
257:11

responsiveness [5]
124:1; 147:14; 254:16; 257:7;
269:13

rest [1]
232:14

restate [2]
128:20; 269:7

restating [1]
307:8

rested [1]
138:24

restroom [1]

230:18

result [16]
123:18; 130:2; 143:23;
175:19; 189:19; 192:9, 11;
195:11; 203:9; 210:4; 251:20;
267:5; 293:15; 296:24;
313:17

resume [1]
130:3

retaliated [1]
278:18

retract [2]
238:14; 270:6

returned [3]
265:4, 6, 19

returns [1]
242:4

reverse [1]
135:3

reversed [1]
164:5

review [9]
161:21; 201:14; 271:20;
272:14; 275:2; 308:20, 24;
309:16; 310:25

reviewed [1]
309:16

revolved [1]
171:7

RFP [2]
115:17; 116:2

RFQ [2]
115:15; 116:2

Right [27]
118:3; 121:6, 14; 143:25;
151:11; 155:3, 12; 175:12;
176:16; 186:13; 191:3;
193:14; 208:18; 210:2; 228:8,
20; 262:12; 268:20; 285:23;
295:24; 296:8; 297:3; 299:8,
21; 302:8; 307:18; 314:15

right [140]
116:4, 9; 119:15; 120:5;
122:17; 124:20; 126:16;
127:3; 129:12; 135:24; 138:8;
140:10, 16; 141:14, 20;
142:21; 146:19; 148:22;
149:8, 20; 152:22; 153:18,
22, 23; 154:6, 24; 155:7;
156:3, 7; 157:9, 16; 160:3;
162:22; 166:18; 168:15;
169:5, 8; 172:5; 173:7, 25;
174:4; 175:9; 177:17, 24;
180:19, 21; 183:2, 6; 190:8,
17; 191:10; 192:18; 193:18,
25; 194:13, 17, 21; 195:4, 7;
198:21; 199:5, 8, 18; 201:22;
206:17, 24; 207:12; 210:7,
15; 211:10, 12; 215:25;
217:11; 218:6, 11; 224:16;
226:2, 6, 20; 228:1, 18;
229:7, 13; 230:9; 231:7;
232:18; 236:8, 14, 22;
238:20, 22; 239:12; 240:23;
241:7; 242:21; 244:8; 245:9,
16, 20; 247:6; 248:9, 14;
251:8; 252:2, 10; 253:1, 9;
254:20, 22; 256:7; 258:15;
261:1; 264:3, 6; 265:10, 20;
266:21; 267:15; 269:1;
279:16; 281:21; 287:5, 7, 9,

13; 294:11; 298:24; 299:3;
302:16; 304:24; 307:12;
308:21; 309:5; 311:4, 12, 19;
312:2; 314:12; 315:8

right-hand [1]
258:20

rights [1]
299:13

Road [2]
111:1; 216:5

road [1]
230:3

Rodriguez [3]
181:5; 184:2; 185:15

ROERIG [1]
111:10

role [6]
129:21, 23; 130:24; 131:1;
145:25; 267:8

Ron [21]
192:17, 19, 20, 21, 22; 193:1,
10, 12; 212:8; 216:4; 217:9;
219:5, 10; 273:12; 298:2, 10;
302:19, 21; 310:9, 15

room [3]
239:14, 18; 240:21

RSC [26]
116:25; 117:7, 12; 151:2;
152:9; 165:10; 172:25; 174:3,
15; 183:6; 190:8, 10; 194:17;
195:4, 7, 9; 209:23; 210:7;
212:14, 23; 230:23; 232:20;
235:24; 241:21; 243:1, 12

RSC's [1]
225:25

RSCs [7]
149:8; 154:17; 227:25;
232:17; 234:19, 22; 235:16;
236:20; 237:5, 17; 294:16

rule [7]
288:15; 302:9, 11; 307:12,
15; 308:6; 314:8

Rules [1]
110:11

run [2]
231:17; 236:4

running [1]
199:25; 277:8

runs [3]
131:11; 199:23; 200:6

– S –

sacrifice [1]
134:14

safe [4]
264:25; 265:25; 279:8;
290:25

safety [1]
166:16

sake [2]
125:23; 248:16

Salazar [2]
124:22; 125:16

Salazar's [2]
277:6; 280:16

sale [9]
154:21, 22; 155:1, 7, 10, 14,
17, 22; 156:14

sales [90]
135:1, 8; 151:18, 20; 154:4,

301:13; 308:20; 311:22

**somehow** [3]
176:5; 192:4; 274:25
**Someone** [1]
119:10
**someone** [9]
149:14, 25; 192:8; 195:11;
276:11; 278:23; 279:14;
282:21; 292:18
**someone's** [1]
178:2
**somewhat** [2]
237:25; 307:17
**Somewhere** [2]
185:5; 235:21
**somewhere** [6]
131:23; 181:9; 226:22;
239:22; 253:1; 274:13
**Sorry** [1]
182:9; 209:20
**sorry** [24]
150:21; 162:2, 18; 170:14;
181:21; 183:2; 193:10;
199:10; 200:19; 201:25;
216:13; 221:12; 222:25;
228:11; 229:15; 236:3;
244:14; 255:12; 261:12;
268:6, 15; 296:12; 314:22
**sort** [7]
142:10; 153:10; 155:20;
233:4; 236:5; 288:25; 302:22
**sound** [1]
238:19
**sounds** [1]
203:22
**south** [1]
131:12
**SOUTHERN** [1]
109:1
**space** [2]
199:22; 200:5
**speak** [9]
140:21; 194:24; 200:24;
203:16; 252:18; 257:20;
271:12; 276:9; 277:13
**speaking** [8]
142:11; 152:21; 159:8;
196:19; 253:23; 288:12;
306:5, 24
**specific** [9]
148:14; 172:6; 194:18; 229:8;
254:7; 262:13; 303:21;
308:10; 313:5
**Specifically** [1]
120:6
**specifically** [6]
119:12; 124:16; 151:22;
181:11; 198:15; 227:20
**specifics** [4]
170:24; 172:16; 218:7;
271:22
**specify** [1]
121:25
**spectacular** [1]
306:1
**speculate** [2]
281:20; 301:7
**Speculation** [2]
148:19; 149:3
**speculation** [23]
128:19; 142:1; 149:22;

:0:17; 151:5; 186:2; 259:22;
265:11; 278:20; 283:10, 21;
284:7, 24; 287:1; 289:22;
291:5; 292:6, 24; 298:20;
301:9; 309:18; 310:21; 314:1
**spell** [1]
203:19
**spend** [1]
166:2
**spinning** [1]
289:6
**split** [14]
157:1, 4, 8, 12; 158:12;
192:20; 218:9, 10; 225:10,
14; 226:12; 231:1; 237:18;
295:25
**splits** [12]
191:9, 14, 19; 230:8, 22;
231:12, 14; 232:17; 236:21;
237:4, 5; 302:7
**splitting** [7]
156:18; 190:16, 20; 191:5;
192:16; 196:12, 22
**spoke** [3]
138:24; 252:14; 271:12
**Square** [1]
111:5
**SSC** [6]
151:2; 165:10; 235:12;
241:21; 243:1, 12
**SSCs** [1]
236:20
**stab** [1]
151:23
**staff** [7]
153:6; 197:10; 225:9; 303:8,
15, 16; 313:10
**stand** [1]
269:15
**standing** [2]
186:4; 299:22
**stands** [1]
225:7
**staple** [2]
244:23; 255:11
**start** [2]
138:23; 247:21
**started** [4]
143:21; 247:2; 268:21
**starters** [1]
119:20
**starting** [1]
287:15
**starts** [1]
225:1
**STATE** [3]
318:10, 25; 319:4
**State** [3]
110:7; 132:23; 319:7
**state** [22]
132:15, 16, 18, 24; 156:25;
158:22; 159:9; 162:14; 179:8;
181:20; 226:5; 232:3; 233:14,
15; 234:10; 236:3, 10;
246:11; 247:9; 294:8; 311:11,
17
**stated** [3]
110:12; 139:4; 284:12
**statement** [11]
133:21; 155:23; 191:12;
194:1; 196:15; 238:14;

267:23; 277:7, .8:13;
303:24; 308:11
**statements** [3]
145:16; 277:19
**STATES** [1]
109:1
**Station** [1]
131:13
**Status** [1]
113:22
**status** [18]
172:24; 174:23; 175:5; 177:4;
178:2; 179:15; 183:9; 208:8,
23; 209:23; 210:14; 258:6, 9,
13, 25; 260:5, 25; 270:9
**stay** [1]
185:23
**staying** [2]
153:13, 14
**steadily** [1]
289:13
**steady** [1]
293:22
**STEELE** [80]
111:19; 120:21; 121:1, 4, 6,
14, 24; 122:3; 124:8; 125:8,
11; 127:16; 134:5; 142:22;
143:9, 25; 145:5, 12, 14;
146:12, 21; 147:4; 155:8;
166:21; 168:19, 23; 169:16,
20; 170:3; 176:16, 22;
177:20; 179:6; 180:1, 6, 11,
14, 19; 182:7, 13; 187:10;
200:21; 223:20; 224:3; 230:1,
15; 233:11, 17, 21; 236:23;
239:7, 12; 242:2, 7, 17;
243:4, 8, 14; 244:21, 23;
246:13, 18; 247:18; 248:5;
249:1, 5, 13; 255:15; 257:10;
258:3, 5, 8; 259:21; 260:2;
264:23; 274:17; 307:7;
310:21; 312:11; 316:5
**Steele** [3]
181:4; 184:1; 257:16
**step** [7]
134:13; 136:6, 7; 177:12;
178:24; 179:5; 213:2
**stipulate** [1]
212:4
**STIPULATIONS** [1]
112:3
**Stipulations** [1]
113:5
**stock** [1]
206:12
**stop** [4]
140:4; 146:19; 273:8; 282:18
**stopped** [1]
261:17
**store** [1]
301:3
**story** [1]
178:10
**straighten** [1]
229:21
**Street** [1]
319:21
**struck** [1]
277:10
**stuff** [3]
149:8; 155:20; 296:19

**submit** [12]
116:4, 10, 12, 14, 19; 117:9,
19; 118:20, 23; 175:21, 23;
178:3
**submits** [2]
116:18; 117:6
**submitted** [10]
117:3, 19, 22; 118:9, 17, 19,
21; 175:25; 214:21; 270:10
**submitting** [3]
115:14; 116:25; 214:18
**subordinate** [1]
288:3
**subordinates** [3]
287:22, 25; 288:9
**subpoena** [1]
242:10
**subscribed** [1]
318:17
**subsidized** [1]
301:5
**successful** [1]
272:24
**successive** [1]
246:22
**sudden** [1]
203:9
**suggesting** [2]
192:6, 8
**Suite** [6]
110:10; 111:5, 11, 15, 20;
319:21
**Sunday** [1]
138:9
**superintendent** [17]
127:9; 128:9, 12, 17, 24;
134:20; 139:15; 144:13;
147:12; 162:8, 18; 163:2;
164:6; 213:2; 284:9; 285:12
**superintendent's** [1]
129:10, 16
**superior** [1]
263:13
**supervise** [1]
211:23
**supervised** [3]
160:17; 211:24; 212:2
**supervising** [5]
161:3; 203:5; 211:14; 212:3;
222:24
**supervision** [2]
294:16; 319:11
**supervisor** [3]
131:20; 161:7; 213:1
**supervisors** [2]
167:20; 237:24
**supplemental** [3]
186:20; 272:22; 286:2
**supplied** [1]
245:7
**support** [6]
127:25; 128:4; 213:19; 263:3;
281:7; 288:23
**supported** [3]
162:8, 18; 280:24
**supporting** [5]
278:19; 279:10; 280:20;
281:6
**supposed** [6]
153:2; 160:2; 173:21; 176:7;
294:16; 296:9

222:25; 234:1

**types** [1]
283:8

**typewriting** [1]
319:11

**typical** [1]
135:6

**Typically** [1]
116:5

**typically** [8]
116:9; 159:20; 278:10;
288:22; 289:2; 290:2; 293:6

— U —

**Uh-huh** [18]
118:11, 15; 121:1; 138:9;
152:12; 185:12; 189:8, 12;
194:12; 201:20; 205:16;
214:3, 15; 216:1, 7; 225:4;
273:14; 294:1

**uh-huh** [2]
231:10; 297:25

**ultimate** [1]
200:18

**ultimately** [8]
123:9; 154:3; 175:16; 259:1;
265:22; 288:1; 304:2, 3

**unacceptable** [1]
219:4

**unaware** [1]
230:11

**unbeknownst** [1]
134:21

**unclear** [1]
259:18

**uncooperative** [1]
247:8

**undermine** [1]
137:9

**understand** [22]
122:2; 146:12; 163:14; 166:8,
13; 178:11; 186:4, 8, 17, 25;
188:2, 4, 19, 22; 226:9;
244:5; 251:8; 261:16; 303:4;
305:23; 306:14; 307:4

**understanding** [47]
115:20; 116:15, 22; 119:13;
126:21; 128:25; 129:2;
131:24; 132:1, 10; 141:2;
152:24; 182:6; 184:3, 10, 24;
185:2, 20, 21; 187:2, 19;
188:10, 15; 195:2; 196:3;
200:11; 208:24; 213:10;
217:12; 225:5; 274:2, 5;
282:24; 289:17; 301:25;
302:4; 303:14; 304:3, 5;
307:11; 309:4, 6; 310:8;
313:14, 15; 315:13

**understood** [9]
169:4; 186:15, 23, 24; 188:9;
189:20; 237:13, 14; 294:22

**unethical** [2]
266:12; 274:9

**unfair** [1]
228:14

**unique** [1]
293:5

**unison** [1]
140:23

**UNITED** [1]

159:1

**unknown** [1]
278:16

**unprofessional** [1]
283:14

**unusual** [1]
293:8

**up-line** [1]
167:19

**upcoming** [1]
189:17

**upper** [1]
140:25

**upset** [3]
144:13; 270:14, 16

**useless** [1]
209:8

**utmost** [1]
264:14

— V —

**valid** [1]
209:4

**Valley** [10]
121:23, 25; 122:6; 197:17;
199:13; 200:2, 9, 12; 202:16;
204:16

**vendor** [2]
282:25; 289:1

**vendors** [1]
276:3

**verbal** [1]
266:10

**verbally** [3]
166:6, 12

**verify** [5]
120:19; 131:19, 24; 135:25;
315:2

**version** [1]
255:16

**versus** [4]
117:12, 13; 160:15; 161:16,
17

**Via** [1]
111:10

**via** [1]
158:7

**vice** [6]
175:2, 25; 209:7; 210:12;
245:13; 258:20

**VIDEOTAPED** [2]
109:13; 110:1

**view** [1]
199:19; 251:8

**viewed** [3]
159:8; 225:17; 283:12

**vigilant** [1]
278:15

**virtually** [1]
296:23

**vis-a-vis** [1]
275:18

**visit** [1]
156:15

**visited** [4]
147:18; 148:12; 149:2;
152:18

**voiced** [2]
206:25; 223:9

**VOLUME** [2]

109:16; 113:7

**volume** [1]
154:9

**vote** [4]
164:3, 6, 14; 276:19

**voted** [2]
275:24, 25

**VS** [1]
109:4

— W —

**W3809** [1]
207:22

**wait** [1]
291:3

**walk-in** [1]
158:8

**walking** [1]
146:18

**wanted** [4]
174:21; 233:9; 272:19; 273:8

**wants** [3]
276:3; 283:2

**war** [2]
139:23; 140:8

**water** [1]
289:7

**waylaid** [1]
280:23

**ways** [5]
116:6; 145:20; 229:23; 285:9;
294:24

**we'll** [2]
259:2; 261:4

**We're** [4]
178:21; 247:18; 258:23;
306:12

**we're** [15]
115:6; 129:24; 130:11;
153:21; 155:18; 167:7;
168:21; 170:3; 179:2; 182:20;
255:9; 258:8; 282:23, 25;
289:10; 301:1, 2; 314:13

**We've** [1]
259:7

**we've** [7]
118:7; 163:5; 190:9; 203:22;
256:13; 313:19; 315:7

**weakened** [1]
140:12

**wears** [1]
306:23

**week** [4]
136:2; 200:6; 202:19; 207:10

**weekend** [1]
253:8

**welcome** [3]
124:25; 125:17, 19

**weren't** [3]
164:21; 304:19

**West** [1]
111:11; 319:21

**west** [1]
131:13

**What's** [9]
141:6; 142:12; 144:6; 168:8,
9; 209:1; 212:16; 213:10;
216:23

**what's** [16]
119:22; 148:7, 8; 159:18;

167:12, 16; 198:2, 3; 218:2;
220:17; 225:6; 232:22;
245:17; 260:22; 261:3;
310:14

**whatsoever** [1]
130:15

**wheels** [1]
289:6

**Whenever** [1]
154:22

**whenever** [3]
154:21; 234:8; 235:6

**whichever** [2]
116:18; 212:20

**Who's** [1]
216:14

**who's** [4]
159:22; 160:1, 2; 202:11;
204:17, 19; 283:7

**Whoever** [1]
219:20

**whoever** [4]
123:17; 158:9; 198:17; 310:3

**wife** [5]
153:8; 192:10; 216:16;
239:14; 241:12, 13; 295:4

**wife's** [2]
252:15, 17

**WILLETTE** [1]
111:15

**WILLIAM** [1]
111:19

**willing** [8]
134:14; 137:13; 147:2; 177:6,
13; 203:25; 206:6; 295:23

**Willis** [30]
111:24; 168:13, 14; 170:7,
16, 19, 20, 25; 172:7; 173:4,
9, 10, 12, 17, 21; 174:19;
175:8, 13, 21; 176:10;
178:12, 16, 23; 179:12, 21,
23; 180:4, 11, 15; 258:1

**window** [1]
129:24

**wished** [1]
265:7

**wishes** [1]
196:5

**withdraw** [2]
170:4; 230:8

**withdrawn** [1]
170:9

**WITNESS** [82]
111:18; 121:5, 9, 15; 126:18;
127:15; 128:20; 129:2;
133:21; 137:17; 141:16;
142:2; 143:6, 16; 147:5;
149:4, 23; 150:18; 151:6;
155:9; 159:4; 166:23; 176:24;
184:19; 185:25; 186:3; 188:2;
194:23; 203:20; 212:17;
213:8; 214:5, 10; 222:19;
223:21, 25; 224:4; 229:17;
230:17; 233:13, 20; 237:1;
239:10, 13; 242:20; 243:7, 9,
16; 245:1; 246:16, 19; 248:3;
249:2; 259:7; 260:3; 265:12;
266:5; 269:7; 274:14, 18;
278:21; 282:8; 283:11, 22;
284:8, 25; 287:2, 10; 289:25;
291:8; 292:9; 293:2; 298:21;

Stephen M. Horner report of May 15, 2003

# EXHIBIT "C"

STEPHEN M. HORNER, Ph.D.
P.O. Box 2685
Corpus Christi, Texas 78403
361/883-1686


May 15, 2003


Mr. Arnold Aguilar
1200 Central Blvd, Suite H-2
Brownsville, TX 78520

Re:     Dino X. Chavez v Brownsville Independent School District, Noe Sauceda, Marilyn del
        Bosque-Gilbert and Randall Dunn; In the United States District Court for the Southern
        District of Texas, Brownsville Division

Dear Mr. Aguilar,

        This letter presents preliminary results of an analysis of the economic value that was lost
by Mr. Dino Chavez as a result of not being allowed to sell supplemental insurance policies at
the Brownsville Independent School District, resulting in the subsequent loss of his position as a
Regional Sales Coordinator for AFLAC, Inc., in early 2002. See graph in attachment 1.

        As can be seen from the graph, Mr. Chavez's Regional Sales Coordinator ("RSC") sales
were growing rapidly until 2002. Mr. Chavez acted as both an agent and RSC for AFLAC. His
compensation from AFLAC was through a complex commission and bonus system, that included
varying rates for first year sales, renewals, different products and ages of customers, as well as
bonuses for meeting quotas and other targets. He received separate commissions as an agent and
as a RSC. Mr. Chavez's earned commission compensation in 2001 and 2002 are summarized in
attached Exhibits A and B, taken from "AFLAC Monthly Accounting Statements."

Duration of Analysis

        Mr. Chavez was 37 years old at the time of the events in 2002 central to this analysis. A
male, age 37, with a bachelor's degree, would have a worklife expectancy of approximately 26
years. (See Skoog and Ciecka (2001), Table 5) The current analysis includes losses from 2002
through 2026, a twenty-five year period. There are risks associated with any business endeavor
not continuing, or not continuing at projected rates. Such considerations are normally
incorporated through the application of a risk-adjusted discount rate, which is discussed below.

Base Earnings from 2001

        In 2001, Mr. Chavez and his agents wrote new business with annualized premiums
totaling $1,649,603. Including conversions of older policies, the total annual premiums subject
to first year commissions was $1,668,501. According to the AFLAC Monthly Accounting
Statements for 2001, Dino Chavez earned first year commissions of about $78,706 on this

Chavez v. Noe Saucer.
Page 2 of 6

business, plus an additional $30,478 in commissions from renewals of preexisting policies. Although Mr. Chavez has lost significant income as an agent, as well as a RSC, we are focused only on the latter in this preliminary analysis. Mr. Chavez's commissions as RSC were about $64,827 for first year premiums, and $16,388 for renewals. In addition, Mr. Chavez receives additional compensation in the form of stock bonuses, of 0.70% of first year policies for which a 13th month payment is received, as well as a performance bonus. Based on 2002 performance, we note that approximately 45.15% of 1st year policies lapsed during the year. We assume this would continue, and include only 55.85% of the 0.70% of first year premiums in our projections. (See Exhibit C, Attrition Analysis.) Policies that have already renewed, that is passed their 13th month without cancellation, had an annual attrition rate of about 14.40%. Thus, we assume that 45.15% of first year policy premiums will produce no revenue in subsequent years, and 14.40% of renewed policies will cancel in subsequent years. In February 2001, Mr. Chavez received a check for $18,623, which was about 1.66% of his year 2000 first year annualized premiums sold by Mr. Chavez and his team of agents. Based on his 2001 performance, Mr. Chavez earned an additional performance bonus check, paid in February 2002 of about $27,439, or about 1.66% of the first year annualized premiums. (For ease in computation in this preliminary report, we include these performance bonuses with the year in which they are earned.) As a subtraction from commissions on first year premiums, RSCs were required to contribute 0.50% to the Manager's Incentive Fund, effectively reducing the commission on first year premiums from about 8.2% to about 7.7%. Although these contributions are deducted as expenses, we have used them to reduce the revenue simplicity in calculations. These average rates for commissions and bonuses are assumed to continue. Other AFLAC incentive programs are ignored in this preliminary analysis. Mr. Chavez reports that his operation was fully staffed by 2001, when his other expenses were about $67,475 less the $8,371 he was required to contribute to the Incentive Fund. He projects that his remaining expenses of $59,104 would have grown only with inflation in the future. We assume this to be about 3.1% per year, based on the same period of data as will be used for discounting. See Ibbotson (2000), page 14.


Earnings for 2002 through 2026

        As noted earlier, Mr. Chavez's AFLAC business as an RSC was growing rapidly. Mr. Chavez indicates that the primary enrollment period for the Brownsville ISD was in December 2001, but that he had already been given 30 days notice of his termination as RSC. AFLAC brought in approximately two dozen agents that were on the "teams" of other RSCs in South Texas, resulting in a large portion of this business being credited to RSCs other than Mr. Chavez. Based on AFLAC documents provided by Mr. Chavez, we have estimated that approximately $322,108 in annualized new business was missed in December 2001. (See Exhibit D) The following table shows the growth of that business from 1998 through 2001, including this adjustment:

| Growth of 1ˢᵗ Year Premiums | | |
|---|---|---|
| Year | 1ˢᵗ Year Premiums | Growth |
| 1998 | $91,991 | n.a. |
| 1999 | $673,640 | 632.29% |
| 2000 | $1,132,423 | 68.11% |
| 2001* | $1,990,609 | 75.78% |

*Includes $322,108 lost in December 2001

Growth rates of this magnitude cannot be sustained for 25 years, and this is a relatively short history upon which to make a projection. Nevertheless, there is no indication of a deceleration in the growth. For purposes of illustration in this preliminary report, we assume that the year 2001 growth rate of 75.78% continues for one additional year, then the rate of growth falls to half that rate in 2003 to about 37.89%, and half again in 2004 to about 18.95%. Mr. Chavez has reported that AFLAC management requires an average growth rate of at least 15% from its sales coordinators. Thus, for the purpose of illustration in this preliminary report, we assume that the decline in growth rates will continue through 2004, with growth stabilizing at about 18.95% per year. These rates are shown below, with the projected rates shown in italics:

| Year | Actual or Projected Growth |
|---|---|
| 1999 | 626.74% |
| 2000 | 67.33% |
| 2001 | 75.78% |
| *2002* | *75.78%* |
| *2003* | *37.89%* |
| *2004* | *18.95%* |
| *2004-2026* | *18.95%* |

*Note: Growth figures for 2002 through 2026 are projections.*

Case 1:02-cv-00128 Document 75 Filed in TXSD on 10/31/2003 Page 186 of 294
Chavez v. Noe Sauceda, et al.
Page 4 of 6

## Discounting for the Time Value of Money and Risk

One purpose of this report is to present a single figure that represents the economic value of the opportunity lost by Mr. Chavez as a result of his insurance team being prevented from selling his insurance products at BISD and his subsequent termination as RSC for AFLAC. Since this lost economic value would have taken place over a long period of time, it is necessary to take account of the fact that cash flows in different years do not have the same economic value, and thus cannot properly be added together. There are two primary reasons for this. The first reason is that dollar amounts in the future have lower value than they do in the present because present amounts, if invested, will grow larger with time. Thus, a smaller sum in the present will be required to replace a given future amount. Discounting by the time value of money converts future values to present values.

The second reason that cash flows in different years do not have the same value is that later amounts, due to the possible intervention of unforeseen events, are subject to increasing risk of not being realized. Thus, future projected amounts should be corrected for their increasing risk as they are further in the future. This is done through the use of a risk-adjusted discount rate. Discussion of this process is described in finance texts, such as in Chapter 2 of Brealey and Myers (1991), as well as other texts in the valuation literature, such as Ibbotson (2000). The estimation of a risk-adjusted discount rate can be accomplished in several ways. The most commonly used is the risk-adjusted form of the "capital asset pricing model" or "CAPM." This is discussed in sources such as Ibbotson (2000) and Pratt (1998), Chapter 9.

For the CAPM approach, we rely on data provided by Ibbotson (2000), Table 5, page 120. The risk-free rate based on 20-year government bonds would be about 5.21%, and the equity risk premium for the NYSE (New York Stock Exchange) from the same source would be about 7.13%. The equity risk premium would be multiplied by a "beta" expressing the general non-diversifiable or systematic risk that relates the particular market to the market as a whole. In this case, the beta for AFLAC would be appropriate to capture the response of this segment of the insurance industry to economic fluctuations in the general market. According to Business Week data from May 14, 2003, the beta for AFLAC is about 0.89, reflecting relatively low relative systematic risk. This is multiplied by the 7.13% risk adjustment for the market at a whole, for an adjustment of 6.35% to the risk-free rate. In addition, we add a size-related premium, noting that the adjustment for the smallest NYSE size category is about 3.95%, but the smallest NYSE company is much larger than Mr. Chavez's operation. We add an additional 6.0% for the small size of Mr. Chavez company, and other company-specific risk considerations, such as Mr. Chavez dependence on a primary supplier of insurance and early dependence on one large customer base. There is some danger in over-adjusting with additional risk factors, as many small companies share some of these risks. This results in a risk-adjusted discount rate of about 21.5%.

## Present Value of Lost Earnings

Based on the above preliminary calculations, the present value of the commissions and performance bonuses, less expenses, lost by Mr. Chavez would be about $5,344,463.

Chavez v. Noe Sauceda et al.
Page 5 of 6

Mitigation Earnings

To the extent that Mr. Chavez's termination from his position as Regional Sales
Coordinator at AFLAC opens other opportunities for him, the net earnings from these additional
pursuits should be subtracted from the present value of lost earnings estimated above. Mr.
Chavez has indicated that he joined The Teachers' Agency in early 2002, becoming an owner.
His 1099 from that operation indicated earnings of $7,000. We do not have complete figures in
order to do an analysis or projection of his earnings from this endeavor.

Please feel free to call me if you have any questions. Thank you very much for this
opportunity to be of service.

Sincerely,

Stephen M. Horner, Ph.D.

Chavez v. Noe Sauceda et al.
Page 6 of 6

## Bibliography

Brealey, Richard A., and Stewart C. Myers, *Principles of Corporate Finance,* Fourth Edition. New York: McGraw-Hill, 1991.

Ibbotson Associates: *Stocks, Bonds, Bills, and Inflation: Valuation Edition 2000 Yearbook.* Chicago: Ibbotson Associates, 2000.

Skoog, Gary R., and James E. Ciecka: "The Markov (Increment-Decrement) Model of Labor Force Activity: Extended Tables of Central Tendency, Variation, and Probability Intervals," *Journal of Legal Economics,* Spring/Summer 2001, pp. 23-87.

Pratt, Shannon P.: *Cost of Capital: Estimation and Applications.* New York: John Wiley & Sons, 1998.



Attachment 1

Exhibit A
AFLAC Commissions     2001

Monthly Accounting Statements

| Month End | Premium Collected | | | | Commission Earned | | | | Commission Earned | | | |
| | 1st Year | | Renewal | | 1st Year | | Renewal | | 1st Year | | Renewal | |
| | Personal | Override | Personal | Override | Personal | Override | Personal | Override | Personal | Override | Personal | Override |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/31/2001 | 9,629.47 | 62,238.28 | 15,390.12 | 39,979.90 | 2,026.66 | 3,201.67 | 948.22 | 1,045.24 | 21.05% | 5.14% | 6.16% | 2.61% |
| 2/28/2001 | 242.33 | 45,665.29 | 8,373.20 | 25,750.37 | (439.23) | 2,676.55 | 390.42 | 621.86 | -181.25% | 5.83% | 6.13% | 2.41% |
| 3/31/2001 | 17,674.43 | 133,049.83 | 39,185.97 | 101,433.02 | 1,782.57 | 5,434.18 | 2,363.30 | 2,253.85 | 10.14% | 4.08% | 6.03% | 2.22% |
| 4/30/2001 | 8,366.81 | 74,804.11 | 19,175.05 | 54,194.26 | 1,375.93 | 4,181.80 | 1,122.91 | 1,207.18 | 16.45% | 5.58% | 5.86% | 2.23% |
| 5/31/2001 | 7,760.23 | 65,332.29 | 18,613.09 | 57,723.75 | 1,167.74 | 5,173.94 | 1,091.98 | 1,253.59 | 15.05% | 7.92% | 5.80% | 2.17% |
| 6/30/2001 | 8,151.66 | 103,928.16 | 22,389.08 | 69,179.40 | 1,295.74 | 8,290.95 | 1,332.91 | 1,515.08 | 15.90% | 7.98% | 5.96% | 2.19% |
| 7/31/2001 | 1,950.38 | 59,290.38 | 7,534.38 | 37,410.00 | 233.73 | 2,018.46 | 470.64 | 898.34 | 11.98% | 3.40% | 6.25% | 2.40% |
| 8/31/2001 | 6,934.81 | 84,405.81 | 19,145.21 | 82,609.64 | 1,148.49 | 3,519.90 | 1,127.08 | 1,345.58 | 16.53% | 4.17% | 5.89% | 2.15% |
| 9/30/2001 | 11,968.81 | 113,299.74 | 32,413.62 | 95,187.42 | 1,622.45 | 11,274.17 | 1,871.09 | 2,008.05 | 13.56% | 9.95% | 5.77% | 2.11% |
| 10/31/2001 | 5,711.72 | 81,572.51 | 17,316.46 | 57,735.27 | 963.00 | 6,160.18 | 1,046.15 | 1,165.26 | 16.86% | 6.33% | 6.04% | 2.05% |
| 11/30/2001 | 7,240.62 | 95,003.69 | 18,082.10 | 84,741.20 | 906.77 | 3,988.60 | 1,045.24 | 1,377.66 | 12.52% | 4.20% | 5.78% | 2.13% |
| 12/31/2001 | 5,856.39 | 123,858.67 | 20,955.99 | 82,643.39 | 1,797.30 | 9,908.41 | 1,279.79 | 1,876.30 | 30.69% | 8.01% | 6.11% | 2.03% |
| Total 2001 | 91,387.66 | 1,042,699.76 | 238,753.45 | 748,587.62 | 13,879.15 | 84,826.81 | 14,089.71 | 16,387.99 | 15.19% | 6.22% | 5.95% | 2.19% |

1st Year     78,705.98
Renewal     30,477.70

Totals:

Exhibit B
AFLAC Commissions    2002

Monthly Accounting Statements

| Month End | Premium Collected | | | | Commission Earned | | | | Commission Earned | | | |
| | 1st Year | | Renewal | | 1st Year | | Renewal | | 1st Year | | Renewal | |
| | Personal | Override | Personal | Override | Personal | Override | Personal | Override | Personal | Override | Personal | Override |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/31/2002 | 5,893.89 | 107,498.16 | 23,392.70 | 88,336.48 | 775.39 | 4,866.76 | 1,374.03 | 1,823.30 | 13.16% | 4.55% | 6.87% | 2.06% |
| 2/28/2002 | 842.60 | 94,965.31 | 9,064.74 | 64,329.57 | 332.37 | 1,179.89 | 632.19 | 1,315.75 | 39.45% | 1.24% | 6.97% | 2.05% |
| 3/31/2002 | 1,688.09 | 117,067.75 | 28,069.35 | 106,815.43 | 281.72 | 1,941.65 | 1,454.76 | 2,031.03 | 16.71% | 1.66% | 6.58% | 1.90% |
| 4/30/2002 | 745.88 | 101,689.88 | 37,636.90 | 131,744.76 | (180.68) | 1,867.18 | 1,979.69 | 2,461.60 | -24.22% | 1.84% | 5.26% | 1.87% |
| 5/31/2002 | 307.23 | 66,966.72 | 4,042.56 | 54,308.50 | (2.80) | 925.16 | 258.30 | 1,056.45 | -0.91% | 1.38% | 6.39% | 1.95% |
| 6/30/2002 | 1,489.12 | 121,397.60 | 46,423.19 | 170,996.92 | 365.73 | 2,674.72 | 2,444.30 | 3,212.65 | 24.56% | 2.20% | 6.38% | 1.88% |
| 7/31/2002 | 677.27 | 68,771.65 | 22,039.13 | 108,349.99 | 74.98 | 1,211.80 | 1,195.28 | 2,005.75 | 11.07% | 1.76% | 5.42% | 1.89% |
| 8/31/2002 | 734.57 | 62,263.62 | 22,283.20 | 107,228.28 | 433.50 | 1,080.59 | 1,221.58 | 2,023.57 | 59.01% | 1.74% | 5.48% | 1.89% |
| 9/30/2002 | 872.23 | 59,145.12 | 22,835.08 | 126,249.05 | 65.01 | 1,238.71 | 1,261.57 | 2,346.63 | 7.45% | 2.22% | 5.60% | 1.86% |
| 10/31/2002 | 1,006.12 | 41,977.64 | 23,584.54 | 117,681.77 | 3,149.18 | 734.66 | 1,286.05 | 2,199.65 | 313.00% | 1.75% | 5.46% | 1.87% |
| 11/30/2002 | 646.84 | 32,481.49 | 21,124.84 | 118,179.68 | 147.21 | 521.44 | 1,123.21 | 2,117.82 | 22.78% | 1.61% | 5.31% | 1.81% |
| 12/31/2002 | 2,248.69 | 33,028.01 | 24,766.35 | 169,907.66 | 2.48 | 724.10 | 1,360.37 | 2,912.32 | 0.11% | 2.19% | 5.49% | 1.82% |
| Total 2002 | 17,149.53 | 906,253.34 | 282,372.48 | 1,350,730.09 | 5,444.05 | 19,036.55 | 15,591.23 | 25,506.52 | 31.74% | 2.10% | 5.62% | 1.89% |

Exhibit C
Attrition Analysis

| | 1st Year Prev Mo In Force | New Issued | Conversions | Reinstated | Lapsed | Duration Changes | In Force EOM | Conversions Reinstated less lapsed | Percent attrition | Renewals Prev Mo In Force | New Issues | Conversions | Reinstated | Lapsed | Duration Changes | In Force EOM | Conversions Reinstated less lapsed | Price at attrition |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/31/2001 | 1,207,811 | 63,497 | 348 | 2,263 | (28,483) | (17,916) | 1,204,122 | (25,871) | -1.64% | 273,708 | - | 1,008 | 166 | (4,102) | 17,915 | 288,684 | (2,937) | -1.3% |
| 2/28/2001 | 1,260,122 | 76,233 | 216 | 3,075 | (46,452) | (32,790) | 1,264,404 | (43,161) | -3.35% | 288,684 | - | 18 | 931 | (3,142) | 32,760 | 313,281 | (8,198) | -2.3% |
| 3/31/2001 | 1,280,404 | 111,067 | (60) | 3,341 | (33,741) | (204,267) | 1,148,744 | (30,440) | -2.34% | 313,281 | - | - | 1,232 | (3,939) | 204,267 | 514,831 | (2,707) | -0.8% |
| 4/30/2001 | 1,188,744 | 82,834 | (118) | 3,543 | (31,304) | (15,093) | 1,208,855 | (27,530) | -2.35% | 514,831 | - | 312 | 388 | (6,690) | 15,093 | 523,918 | (6,011) | -1.1% |
| 5/31/2001 | 1,208,855 | 139,842 | 284 | 3,508 | (29,849) | (22,392) | 1,294,646 | (26,259) | -2.03% | 523,918 | - | 34 | 598 | (2,845) | 22,392 | 544,290 | (2,016) | -0.9% |
| 6/30/2001 | 1,298,646 | 206,522 | 465 | 1,448 | (153,706) | (22,845) | 1,339,888 | (151,805) | -11.66% | 544,290 | - | 134 | 2,785 | (15,541) | 22,545 | 559,183 | (10,872) | -1.7 |
| 7/31/2001 | 1,330,648 | 70,910 | (3,316) | 3,318 | (65,498) | (33,151) | 1,301,133 | (65,494) | -4.92% | 559,183 | - | 3,896 | 2,107 | (4,837) | 33,161 | 580,782 | 1,488 | 0.0 |
| 8/31/2001 | 1,303,133 | 79,759 | 84 | 1,579 | (33,986) | (25,171) | 1,325,358 | (32,303) | -2.46% | 580,782 | - | 212 | 1,144 | (6,705) | 25,171 | 610,514 | (5,439) | -0.9 |
| 9/30/2001 | 1,325,358 | 270,985 | 862 | 3,690 | (44,480) | (35,621) | 1,528,934 | (40,208) | -3.04% | 610,514 | - | 500 | 931 | (8,572) | 35,621 | 638,694 | (7,144) | -1.1% |
| 10/31/2001 | 1,528,934 | 179,035 | 1,785 | 1,651 | (51,036) | (27,804) | 1,833,387 | (47,599) | -3.11% | 638,694 | - | 879 | 844 | (7,943) | 27,804 | 680,278 | (8,220) | -0.9% |
| 11/30/2001 | 1,833,387 | 112,108 | 300 | 3,204 | (61,764) | (38,773) | 1,848,532 | (58,260) | -3.57% | 680,278 | - | - | 1,389 | (19,736) | 38,773 | 680,701 | (18,350) | -2.7% |
| 12/31/2001 | 1,848,532 | 249,830 | - | 6,971 | (74,377) | (32,170) | 1,744,577 | (67,406) | -4.06% | 680,701 | - | - | 4,412 | (10,543) | 82,170 | 755,749 | (6,131) | -0.9% |
| Avg In force | 1,357,560 | | 1,170 | 36,138 | (562,355) | | | (512,846) | -45.16% | Avg In force 616,336 | | 7,096 | 18,846 | (98,285) | | | (74,345) | -14.1% |

BISD December Enrollment Estimation
Exhibit D

U2181

| Date | | Ninthly | |
|------|------|------|------|
| | 1/11/2002 | $6,425.40 | |
| | 12/11/2001 | 2,685.98 | |
| Difference | | 3,739.42 | |
| periods | | 9.00 | |
| Annual | | 33,654.78 | |

AG986

| | | Bi-weekly then Monthly | |
|------|------|------|------|
| | 4/23/2002 | 5,598.50 | |
| New | | - | |
| Difference | | 5,598.50 | |
| periods | | 12.00 | |
| | | 67,182.00 | |

L5864

| | | Monthly | |
|------|------|------|------|
| | 2/11/2002 | 75,148.42 | |
| | 11/1/2001 | 44,826.88 | |
| Difference | | 30,321.54 | |
| periods | | 12.00 | |
| | | 363,858.48 | |

| Total Annual New Business | 484,695.26 |
|------|------|

Less credit given to Chavez:

| Week 52 Mktg Total | 1,668,501.00 |
|------|------|
| Week 50 Mktg Total | 1,525,914.00 |
| Increase | 142,587.00 |

If assume no credit for no other accounts,
rather 100% from BISD

| Lost | $322,108.26 |
|------|------|

Stephen M. Horner report of September 19, 2003

# EXHIBIT "D"

STEPHEN M. HORNER, Ph.D.
P.O. Box 2685
Corpus Christi, Texas 78403
361/883-1686


September 19, 2003


Mr. Arnold Aguilar
1200 Central Blvd, Suite H-2
Brownsville, TX 78520

Re:    Dino X. Chavez v Brownsville Independent School District, Noe Sauceda, Marilyn del
       Bosque-Gilbert and Randall Dunn; In the United States District Court for the Southern
       District of Texas, Brownsville Division

Dear Mr. Aguilar,

       This letter presents revised results of my analysis of the economic value that was lost by
Mr. Dino Chavez as a result of not being allowed to sell supplemental insurance policies at the
Brownsville Independent School District, resulting in the subsequent loss of his position as a
Regional Sales Coordinator for AFLAC, Inc., in early 2002. This revision is based on
information provided in the testimony of Mr. Frank La Femina on May 22, 2003 and August 21,
2003, concerning growth rates expected of Regional Sales Coordinators and others in the
AFLAC sales system.

       As can be seen from the graph, Mr. Chavez's Regional Sales Coordinator ("RSC") sales
were growing rapidly until 2002. (See graph in attachment 1.) Mr. Chavez acted as both an
agent and RSC for AFLAC. His compensation from AFLAC was through a complex
commission and bonus system, that included varying rates for first year sales, renewals, different
products and ages of customers, as well as bonuses for meeting quotas and other targets. He
received separate commissions as an agent and as a RSC. Mr. Chavez's earned commission
compensation in 2001 and 2002 are summarized in attached Exhibits A and B, taken from
"AFLAC Monthly Accounting Statements."

       Duration of Analysis

       Mr. Chavez was 37 years old at the time of the events in 2002 central to this analysis. A
male, age 37, with a bachelor's degree, would have a worklife expectancy of approximately 26
years. (See Skoog and Ciecka (2001), Table 5)  The current analysis includes losses from 2002
through 2026, a twenty-five year period. There are risks associated with any business endeavor
not continuing, or not continuing at projected rates. Such considerations are normally
incorporated through the application of a risk-adjusted discount rate, which is discussed below.

       Base Earnings from 2001

       In 2001, Mr. Chavez and his agents wrote new business with annualized premiums
totaling $1,649,603. Including conversions of older policies, the total annual premiums subject

Chavez v. Noe Sauceda et al.
Page 2 of 6

to first year commissions was $1,668,501. Based on AFLAC documents provided by Mr. Chavez, we have estimated that approximately $322,108 in annualized new business at B.I.S.D. was missed by Mr. Chavez in December 2001, out of about $464,695 sold in 2001 to B.I.S.D. employees. This implies that the total annualized premiums credited to Mr. Chavez in 2001 would have been $1,668,501 + $322,108 = $1,990,609. Thus, the $464,695 in new B.I.S.D. business for 2001 would have represented about 23% of Mr. Chavez's 2001 new annualized AFLAC premiums.

According to the AFLAC Monthly Accounting Statements for 2001, Dino Chavez earned first year commissions of about $78,706 on this business, plus an additional $30,478 in commissions from renewals of preexisting policies. Although Mr. Chavez has lost significant income as an agent, as well as an RSC, we are focused only on the latter in this analysis. Mr. Chavez's commissions as RSC were about $64,827 for first year premiums, and $16,388 for renewals. In addition, Mr. Chavez receives additional compensation in the form of stock bonuses, of 0.70% of first year policies for which a 13th month payment is received, as well as a performance bonus. Based on 2002 performance, we note that approximately 45.15% of 1st year policies lapsed during the year. We assume this would continue, and include only 55.85% of the 0.70% of first year premiums in our projections. (See Exhibit C, Attrition Analysis.) Policies that have already renewed, that is, passed their 13th month without cancellation, had an annual attrition rate of about 14.40%. Thus, we assume that 45.15% of first year policy premiums will produce no revenue in subsequent years, and 14.40% of renewed policies will cancel in subsequent years. In February 2001, Mr. Chavez received a check for $18,623, which was about 1.66% of his year 2000 first year annualized premiums sold by Mr. Chavez and his team of agents. Based on his 2001 performance, Mr. Chavez earned an additional performance bonus check, paid in February 2002 of about $27,439, or about 1.66% of the first year annualized premiums. (For ease in computation, we include these performance bonuses with the year in which they are earned.) As a subtraction from commissions on first year premiums, RSCs were required to contribute 0.50% to the Manager's Incentive Fund, effectively reducing the commission on first year premiums from about 8.2% to about 7.7%. Although these contributions are deducted as expenses, we have used them to reduce the revenue simplicity in calculations. These average rates for commissions and bonuses are assumed to continue. Other AFLAC incentive programs are ignored in this analysis. Mr. Chavez reports that his operation was fully staffed by 2001, when his other expenses were about $67,475 less the $8,371 he was required to contribute to the Incentive Fund. He projects that his remaining expenses of $59,104 would have grown only with inflation in the future. We assume this to be about 3.1% per year, based on the same period of data as will be used for discounting. See Ibbotson (2000), page 14.

Earnings for 2002 through 2026

As noted earlier, Mr. Chavez's AFLAC business as an RSC was growing rapidly. Mr. Chavez indicates that the primary enrollment period for the Brownsville ISD was in December 2001, but that he had already been given 30 days notice of his termination as RSC. AFLAC brought in approximately two dozen agents that were on the "teams" of other RSCs in South Texas, resulting in a large portion of this business being credited to RSCs other than Mr. Chavez. Based on AFLAC documents provided by Mr. Chavez, we have estimated that approximately

Chavez v. Noe Sauceda et al.
Page 3 of 6

$322,108 in annualized new business was missed in December 2001. (See Exhibit D) The following table shows the growth of that business from 1998 through 2001, including this adjustment:

| Growth of 1st Year Premiums | | |
|---|---|---|
| Year | 1st Year Premiums | Growth |
| 1998 | $91,991 | n.a. |
| 1999 | $673,640 | 632.29% |
| 2000 | $1,132,423 | 68.11% |
| 2001* | $1,990,609 | 75.78% |

*Includes $322,108 lost in December 2001

Growth rates of this magnitude cannot be sustained for 25 years, and this is a relatively short history upon which to make a projection. Nevertheless, there is no indication of a deceleration in the growth. Mr. Frank La Femina, a State Sales Coordinator for AFLAC, in deposition testimony, indicates that he wanted to see "at least 20% to 30% increase" from DSC's and RSCs every year. These growth rates are significantly less than those achieved by Mr. Chavez, but may be more realistic long-term expectations. Thus, we perform three sets of calculations, assuming 20%, 25% and 30% sales growth rates from 2002 onwards.

<u>Discounting for the Time Value of Money and Risk</u>

The losses incurred by Mr. Chavez as a result of his insurance team being prevented from selling his insurance products at BISD and his subsequent termination as RSC for AFLAC would have taken place over a long period of time. It is necessary to take account of the fact that cash flows in different years do not have the same economic value, and thus cannot properly be added together. There are two primary reasons for this. The first reason is that dollar amounts in the future have lower value than they do in the present because present amounts, if invested, will grow larger with time. Thus, a smaller sum in the present will be required to replace a given future amount. Discounting by the time value of money converts future values to present values.

The second reason that cash flows in different years do not have the same value is that later amounts, due to the possible intervention of unforeseen events, are subject to increasing risk of not being realized. Thus, future projected amounts should be corrected for their increasing risk as they are further in the future. This is done through the use of a risk-adjusted discount rate. Discussion of this process is described in finance texts, such as in Chapter 2 of Brealey and Myers (1991), as well as other texts in the valuation literature, such as Ibbotson (2000). The estimation of a risk-adjusted discount rate can be accomplished in several ways. The most commonly used is the risk-adjusted form of the "capital asset pricing model" or "CAPM." This is discussed in sources such as Ibbotson (2000) and Pratt (1998), Chapter 9.

Chavez v. Noe Sauceda et al.
Page 4 of 6

For the CAPM approach, we rely on data provided by Ibbotson (2000), Table 5, page120. The risk-free rate based on 20-year government bonds would be about 5.21%, and the equity risk premium for the NYSE (New York Stock Exchange) from the same source would be about 7.13%. The equity risk premium would be multiplied by a "beta" expressing the general non-diversifiable or systematic risk that relates the particular market to the market as a whole. In this case, the beta for AFLAC would be appropriate to capture the response of this segment of the insurance industry to economic fluctuations in the general market. According to Business Week data from May 14, 2003, the beta for AFLAC is about 0.89, reflecting relatively low relative systematic risk. This is multiplied by the 7.13% risk adjustment for the market at a whole, for an adjustment of 6.35% to the risk-free rate. In addition, we add a size-related premium, noting that the adjustment for the smallest NYSE size category is about 3.95%, but the smallest NYSE company is much larger than Mr. Chavez's operation. We add an additional 6.0% for the small size of Mr. Chavez company, and other company-specific risk considerations, such as Mr. Chavez dependence on a primary supplier of insurance and early dependence on one large customer base. There is some danger in over-adjusting with additional risk factors, as many small companies share some of these risks. This results in a risk-adjusted discount rate of about 21.5%.

Present Value of Lost Earnings

Based on the above calculations, with three different long-term growth rates, the present value of the commissions and performance bonuses, less expenses, lost by Mr. Chavez would be as shown in the following table:

| Lost Earnings Estimates at Alternative Growth Rate Assumptions | | | |
|---|---|---|---|
| Assumed Growth Rate after 2001 | Present Value of Lost RSC Commissions | Present Value of Expenses | Present Value of Lost Net Earnings |
| 20% | $4,441,696 | $325,622 | $4,116,074 |
| 25% | $7,555,586 | $325,622 | $7,229,964 |
| 30% | $13,590,599 | $325,622 | $13,264,977 |

In Exhibits E through G, the projected year-by-year commissions lost are shown, as well as the present value of cumulative net losses through each year.

Mitigation Earnings

To the extent that Mr. Chavez's termination from his position as Regional Sales Coordinator at AFLAC opens other opportunities for him, the present value of net earnings from these additional pursuits should be subtracted from the present value of lost earnings estimated

Chavez v. Noe Sauceda et al.
Page 5 of 6

above. Mr. Chavez has indicated that he joined The Teachers' Agency in early 2002, becoming
an owner. His 1099 from that operation indicated earnings of $7,000. According to Mr. Chavez,
The Teachers' Agency continues to operate at a loss. Although I would expect that this operation
will eventually be successful, it is too early to prepare a reliable projection of Mr. Chavez's
future earnings from this endeavor.

        Please feel free to call me if you have any questions. Thank you very much for this
opportunity to be of service.

                Sincerely,

                Stephen M. Horner, Ph.D.

Chavez v. Noe Sauceda et al.
Page 6 of 6

Bibliography

Brealey, Richard A., and Stewart C. Myers, *Principles of Corporate Finance*, Fourth Edition. New York: McGraw-Hill, 1991.

Ibbotson Associates: *Stocks, Bonds, Bills, and Inflation: Valuation Edition 2000 Yearbook*. Chicago: Ibbotson Associates, 2000.

Skoog, Gary R., and James E. Ciecka: "The Markov (Increment-Decrement) Model of Labor Force Activity: Extended Tables of Central Tendency, Variation, and Probability Intervals," *Journal of Legal Economics*, Spring/Summer 2001, pp. 23-87.

Pratt, Shannon P.: *Cost of Capital: Estimation and Applications*. New York: John Wiley & Sons, 1998.



**Annual Premiums**

Attachment 1

SEP-19-2003 02:40P FROM:AGUILAR LAW OFC 856 584 1408    TO:5420816PPP2502    P:10/36

Exhibit A
AFLAC Commissions    2001

Monthly Accounting Statements

| | Premium Collected | | | | Commission Earned | | | | Commission Earned | | | |
| | 1st Year | | Renewal | | 1st Year | | Renewal | | 1st Year | | Renewal | |
| Month End | Personal | Override | Personal | Override | Personal | Override | Personal | Override | Personal | Override | Personal | Override |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/31/2001 | 9,629.47 | 82,238.28 | 16,380.32 | 39,979.90 | 2,026.66 | 3,201.67 | 948.22 | 1,046.24 | 21.05% | 5.14% | 6.16% | 2.61% |
| 2/28/2001 | 242.33 | 45,885.29 | 6,373.20 | 26,760.37 | (439.23) | 2,676.65 | 390.42 | 621.86 | -181.25% | 5.83% | 6.13% | 2.41% |
| 3/31/2001 | 17,574.43 | 133,040.83 | 39,185.97 | 101,433.02 | 1,782.67 | 5,434.18 | 2,363.30 | 2,253.85 | 10.14% | 4.08% | 6.03% | 2.22% |
| 4/30/2001 | 8,368.81 | 74,904.11 | 19,176.05 | 54,194.26 | 1,375.93 | 4,181.80 | 1,122.91 | 1,207.18 | 16.45% | 5.58% | 5.86% | 2.23% |
| 5/31/2001 | 7,760.23 | 85,332.29 | 18,813.09 | 57,723.76 | 1,167.74 | 5,173.94 | 1,091.96 | 1,263.59 | 15.05% | 7.92% | 5.80% | 2.17% |
| 6/30/2001 | 8,151.66 | 103,928.16 | 22,369.06 | 69,179.40 | 1,295.74 | 8,290.95 | 1,332.91 | 1,515.08 | 15.90% | 7.98% | 5.98% | 2.19% |
| 7/31/2001 | 1,950.38 | 59,290.38 | 7,534.38 | 37,410.00 | 233.73 | 2,016.46 | 470.64 | 898.34 | 11.98% | 6.25% | 5.89% | 2.40% |
| 8/31/2001 | 6,934.81 | 84,406.81 | 19,146.21 | 62,609.64 | 1,146.49 | 3,519.90 | 1,127.08 | 1,345.58 | 18.53% | 4.17% | 5.89% | 2.16% |
| 8/30/2001 | 11,968.81 | 113,299.74 | 32,413.62 | 95,187.42 | 1,622.46 | 11,274.17 | 1,871.09 | 2,008.05 | 13.56% | 9.95% | 6.77% | 2.11% |
| 10/31/2001 | 5,711.72 | 81,572.51 | 17,316.46 | 57,736.27 | 983.00 | 5,160.18 | 1,046.16 | 1,185.26 | 16.86% | 8.33% | 6.04% | 2.05% |
| 11/30/2001 | 7,240.62 | 95,003.69 | 18,082.10 | 64,741.20 | 906.77 | 3,988.60 | 1,045.24 | 1,377.66 | 12.52% | 4.20% | 5.78% | 2.13% |
| 12/31/2001 | 5,856.39 | 123,668.67 | 20,956.99 | 82,643.39 | 1,787.30 | 9,908.41 | 1,279.79 | 1,675.30 | 30.69% | 8.01% | 6.11% | 2.03% |
| Total 2001 | 91,387.66 | 1,042,569.76 | 238,763.45 | 748,587.62 | 13,679.15 | 64,826.81 | 14,088.71 | 16,387.99 | 15.19% | 6.22% | 5.95% | 2.19% |

Totals:

| 1st Year | Renewal |
|---|---|
| 78,705.96 | 30,477.70 |

Exhibit B
AFLAC Commissions          2002

Monthly Accounting Statements

| Month End | Premium Collected | | | | Commission Earned | | | | Commission Earned | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1st Year | | Renewal | | 1st Year | | Renewal | | 1st Year | | Renewal | |
| | Personal | Override | Personal | Override | Personal | Override | Personal | Override | Personal | Override | Personal | Override |
| 1/31/2002 | 5,803.89 | 107,498.15 | 23,392.70 | 88,336.48 | 775.39 | 4,886.76 | 1,374.03 | 1,823.30 | 13.16% | 4.55% | 5.87% | 2.06% |
| 2/28/2002 | 842.60 | 94,965.31 | 9,064.74 | 64,329.57 | 332.37 | 1,179.89 | 632.19 | 1,315.75 | 39.45% | 1.24% | 6.97% | 2.05% |
| 3/31/2002 | 1,686.09 | 117,067.75 | 26,059.35 | 106,815.43 | 281.72 | 1,941.65 | 1,464.76 | 2,031.03 | 18.71% | 1.66% | 5.58% | 1.90% |
| 4/30/2002 | 746.88 | 101,689.88 | 37,836.90 | 131,744.76 | (180.68) | 1,867.18 | 1,979.69 | 2,461.60 | -24.22% | 1.84% | 5.26% | 1.87% |
| 5/31/2002 | 307.23 | 86,966.72 | 4,042.56 | 54,308.50 | (2.80) | 925.16 | 268.30 | 1,056.45 | -0.91% | 1.38% | 6.39% | 1.95% |
| 6/30/2002 | 1,489.12 | 121,397.80 | 45,423.19 | 170,998.92 | 365.73 | 2,674.72 | 2,444.30 | 3,212.65 | 24.56% | 2.20% | 5.38% | 1.88% |
| 7/31/2002 | 677.27 | 68,771.86 | 22,039.13 | 106,349.99 | 74.96 | 1,211.60 | 1,195.28 | 2,005.75 | 11.07% | 1.76% | 5.42% | 1.89% |
| 8/31/2002 | 734.57 | 62,263.62 | 22,283.20 | 107,228.28 | 433.50 | 1,080.59 | 1,221.58 | 2,023.67 | 59.01% | 1.74% | 5.48% | 1.89% |
| 9/30/2002 | 872.23 | 58,145.12 | 22,935.08 | 126,249.05 | 66.01 | 1,288.71 | 1,261.57 | 2,346.63 | 7.45% | 2.22% | 5.50% | 1.86% |
| 10/31/2002 | 1,006.12 | 41,977.64 | 23,584.64 | 117,681.77 | 3,149.18 | 734.55 | 1,288.95 | 2,199.65 | 313.00% | 1.76% | 5.46% | 1.87% |
| 11/30/2002 | 645.84 | 32,481.49 | 21,124.64 | 116,779.68 | 147.21 | 521.44 | 1,122.21 | 2,117.82 | 22.79% | 1.61% | 5.31% | 1.81% |
| 12/31/2002 | 2,248.69 | 33,028.01 | 24,786.35 | 159,907.66 | 2.46 | 724.10 | 1,360.37 | 2,912.32 | 0.11% | 2.19% | 5.49% | 1.82% |
| Total 2002 | 17,149.53 | 906,263.34 | 282,372.48 | 1,350,730.09 | 5,444.05 | 19,036.55 | 15,591.23 | 25,506.52 | 31.74% | 2.10% | 6.52% | 1.89% |

Exhibit C
Attrition Analysis

**1st Year**

| Date | Prev Mo In Force | New Issues | Conversions | Reinstated | Lapsed | Duration Changes | In Force EOM | Conversions Reinstated less lapsed | Percent attrition |
|---|---|---|---|---|---|---|---|---|---|
| 1/31/2001 | 1,267,911 | 83,497 | 849 | 2,283 | (26,483) | (17,915) | 1,290,122 | (23,371) | -1.84% |
| 2/28/2001 | 1,290,122 | 75,233 | 216 | 3,075 | (48,452) | (32,790) | 1,290,404 | (43,161) | -3.35% |
| 3/31/2001 | 1,290,404 | 111,057 | (60) | 3,341 | (33,741) | (204,267) | 1,166,744 | (30,460) | -2.36% |
| 4/30/2001 | 1,166,744 | 82,534 | (119) | 3,893 | (31,304) | (15,083) | 1,208,655 | (27,530) | -2.36% |
| 5/31/2001 | 1,208,855 | 139,842 | 294 | 3,506 | (29,049) | (22,382) | 1,298,646 | (25,259) | -2.08% |
| 6/30/2001 | 1,208,646 | 206,572 | 455 | 1,448 | (153,708) | (22,546) | 1,330,868 | (151,805) | -11.69% |
| 7/31/2001 | 1,330,868 | 70,910 | (3,316) | 3,316 | | (33,151) | 1,303,133 | (30,694) | -4.92% |
| 8/31/2001 | 1,303,133 | 78,739 | 84 | 1,579 | (33,996) | (25,171) | 1,325,398 | (32,303) | -2.48% |
| 9/30/2001 | 1,325,398 | 279,365 | 692 | 3,890 | (44,680) | (35,521) | 1,528,934 | (46,298) | -3.04% |
| 10/31/2001 | 1,528,934 | 179,636 | 1,745 | 1,651 | (51,035) | (27,604) | 1,833,367 | (47,599) | -3.11% |
| 11/30/2001 | 1,833,367 | 112,198 | 300 | 3,204 | (61,764) | (38,773) | 1,648,532 | (58,260) | -3.57% |
| 12/31/2001 | 1,648,532 | 248,630 | - | 6,971 | (74,377) | (82,179) | 1,749,577 | (67,406) | -4.09% |
| Avg in force | 1,357,560 | | 1,170 | 38,139 | (552,255) | | | (612,346) | -45.15% |

**Renewals**

| Date | Prev Mo In Force | New Issues | Conversions | Reinstated | Lapsed | Duration Changes | In Force EOM | Conversions Reinstated less lapsed | Percent attrition |
|---|---|---|---|---|---|---|---|---|---|
| 1/31/2001 | 273,705 | | 1,009 | 156 | (4,102) | 17,915 | 288,684 | (2,937) | -1.07% |
| 2/28/2001 | 288,684 | | 18 | 931 | (9,142) | 32,790 | 313,281 | (8,193) | -2.84% |
| 3/31/2001 | 313,281 | | - | - | (3,939) | 204,257 | 514,831 | (2,707) | -0.86% |
| 4/30/2001 | 514,831 | | 312 | 1,232 | (8,691) | 15,093 | 523,913 | (6,011) | -1.17% |
| 5/31/2001 | 523,913 | | 34 | 368 | (2,846) | 22,392 | 544,290 | (2,015) | -0.38% |
| 6/30/2001 | 544,290 | | 134 | 688 | (13,541) | 22,545 | 556,189 | (10,872) | -1.96% |
| 7/31/2001 | 556,189 | | 3,998 | 2,739 | (4,637) | 33,151 | 590,782 | 1,48 | 0.26% |
| 8/31/2001 | 590,782 | | 212 | 2,107 | (6,785) | 25,171 | 810,514 | (5,439) | -0.92% |
| 9/30/2001 | 810,514 | | 600 | 1,144 | (8,572) | 35,521 | 838,894 | (7,141) | -1.17% |
| 10/31/2001 | 838,894 | | 879 | 931 | (7,943) | 27,604 | 860,278 | (9,220) | -0.97% |
| 11/30/2001 | 860,278 | | - | 844 | (18,789) | 38,773 | 860,701 | (18,350) | -2.78% |
| 12/31/2001 | 860,701 | | - | 4,612 | (10,543) | 82,179 | 736,749 | (6,191) | -0.80% |
| Avg in force | 618,338 | | 7,098 | 16,645 | (98,299) | | | (74,348) | -14.40% |

BISD December Enrollment Estimation
Exhibit D

| | | | |
|---|---|---|---|
| U2181 | | | |
| Date | | Ninthly | |
| | 1/11/2002 | | $6,425.40 |
| | 12/11/2001 | | 2,685.98 |
| Difference | | | 3,739.42 |
| periods | | | 9.00 |
| Annual | | | 33,654.78 |
| AG986 | | Bi-weekly then Monthly | |
| | 4/23/2002 | | 5,598.50 |
| New | | | - |
| Difference | | | 5,598.50 |
| periods | | | 12.00 |
| | | | 67,182.00 |
| L5864 | | Monthly | |
| | 2/11/2002 | | 75,148.42 |
| | 11/1/2001 | | 44,826.88 |
| Difference | | | 30,321.54 |
| periods | | | 12.00 |
| | | | 363,858.48 |
| Total Annual New Business | | | 464,695.26 |
| as percent of Chavez total (below) | | | 23.34% |
| Less credit given to Chavez: | | | |
| Week 52 Mktg Total | | | 1,868,501.00 |
| Week 50 Mktg Total | | | 1,525,914.00 |
| Increase | | | 142,587.00 |
| If assume no credit for no other accounts, rather 100% from BISD | | | |
| Lost | | | $322,108.26 |
| Projected 2001 Annualized Premiums | | | $1,990,609.26 |

Exhibit E

## Year-by-Year Projections of RSC Commissions Lost
### at a long-term sales growth rate of 20.00%

| Year | Number | Lost Commissions | Present Value | Cumulative Pres. Value | Less Cumulative Expenses Present Value | Present Value Cumulative Net Loss |
|---|---|---|---|---|---|---|
| 2002 | 1.00 | $ 185,460 | $ 152,835 | $ 152,835 | $ 50,151 | $ 102,484 |
| 2003 | 2.00 | $ 246,756 | $ 168,493 | $ 321,127 | $ 92,705 | $ 228,422 |
| 2004 | 3.00 | $ 320,938 | $ 178,809 | $ 500,036 | $ 128,613 | $ 371,223 |
| 2005 | 4.00 | $ 404,327 | $ 185,501 | $ 685,537 | $ 159,451 | $ 526,086 |
| 2006 | 5.00 | $ 501,628 | $ 190,408 | $ 874,945 | $ 185,448 | $ 689,497 |
| 2007 | 6.00 | $ 616,023 | $ 191,433 | $ 1,066,378 | $ 207,508 | $ 858,871 |
| 2008 | 7.00 | $ 751,271 | $ 192,141 | $ 1,258,520 | $ 226,225 | $ 1,032,294 |
| 2009 | 8.00 | $ 911,834 | $ 191,930 | $ 1,450,449 | $ 242,108 | $ 1,208,342 |
| 2010 | 9.00 | $ 1,103,026 | $ 191,090 | $ 1,641,530 | $ 255,584 | $ 1,385,946 |
| 2011 | 10.00 | $ 1,331,185 | $ 189,789 | $ 1,831,319 | $ 267,019 | $ 1,564,300 |
| 2012 | 11.00 | $ 1,603,888 | $ 188,196 | $ 2,019,515 | $ 276,722 | $ 1,742,793 |
| 2013 | 12.00 | $ 1,930,200 | $ 186,399 | $ 2,205,914 | $ 284,955 | $ 1,920,959 |
| 2014 | 13.00 | $ 2,320,976 | $ 184,485 | $ 2,390,379 | $ 291,941 | $ 2,098,438 |
| 2015 | 14.00 | $ 2,789,229 | $ 182,445 | $ 2,572,824 | $ 297,888 | $ 2,274,955 |
| 2016 | 15.00 | $ 3,350,547 | $ 180,371 | $ 2,753,194 | $ 302,898 | $ 2,450,296 |
| 2017 | 16.00 | $ 4,023,628 | $ 178,267 | $ 2,931,461 | $ 307,166 | $ 2,624,295 |
| 2018 | 17.00 | $ 4,830,897 | $ 176,151 | $ 3,107,612 | $ 310,787 | $ 2,796,825 |
| 2019 | 18.00 | $ 5,799,254 | $ 174,033 | $ 3,281,646 | $ 313,860 | $ 2,967,785 |
| 2020 | 19.00 | $ 6,960,969 | $ 171,923 | $ 3,453,568 | $ 316,468 | $ 3,137,101 |
| 2021 | 20.00 | $ 8,354,758 | $ 169,825 | $ 3,623,393 | $ 318,680 | $ 3,304,713 |
| 2022 | 21.00 | $ 10,027,075 | $ 167,743 | $ 3,791,136 | $ 320,567 | $ 3,470,579 |
| 2023 | 22.00 | $ 12,033,659 | $ 165,680 | $ 3,956,817 | $ 322,150 | $ 3,634,667 |
| 2024 | 23.00 | $ 14,441,392 | $ 163,639 | $ 4,120,455 | $ 323,502 | $ 3,796,954 |
| 2025 | 24.00 | $ 17,330,527 | $ 161,619 | $ 4,282,074 | $ 324,648 | $ 3,957,428 |
| 2026 | 25.00 | $ 20,797,366 | $ 159,622 | $ 4,441,696 | $ 325,622 | $ 4,116,074 |

Exhibit F

## Year-by-Year Projections of RSC Commissions Lost
### at a long-term sales growth rate of 25.00%

| Year | Number | Lost Commissions | Present Value | Cumulative Pres. Value | Less Cumulative Expenses Present Value | Present Value Cumulative Net Loss |
|---|---|---|---|---|---|---|
| 2002 | 1.00 | $ 193,187 | $ 158,995 | $ 158,995 | $ 50,151 | $ 108,844 |
| 2003 | 2.00 | $ 268,760 | $ 182,056 | $ 341,050 | $ 92,705 | $ 248,345 |
| 2004 | 3.00 | $ 359,341 | $ 200,317 | $ 541,387 | $ 128,813 | $ 412,554 |
| 2005 | 4.00 | $ 489,177 | $ 215,254 | $ 756,620 | $ 159,451 | $ 597,169 |
| 2006 | 5.00 | $ 603,593 | $ 227,909 | $ 984,529 | $ 185,448 | $ 799,081 |
| 2007 | 6.00 | $ 769,146 | $ 239,017 | $ 1,223,546 | $ 207,508 | $ 1,016,038 |
| 2008 | 7.00 | $ 973,978 | $ 249,099 | $ 1,472,645 | $ 226,225 | $ 1,246,420 |
| 2009 | 8.00 | $ 1,228,210 | $ 258,523 | $ 1,731,169 | $ 242,109 | $ 1,489,061 |
| 2010 | 9.00 | $ 1,544,455 | $ 267,550 | $ 1,998,719 | $ 255,584 | $ 1,743,135 |
| 2011 | 10.00 | $ 1,938,438 | $ 276,366 | $ 2,275,085 | $ 267,019 | $ 2,008,066 |
| 2012 | 11.00 | $ 2,429,783 | $ 285,105 | $ 2,560,190 | $ 276,722 | $ 2,283,468 |
| 2013 | 12.00 | $ 3,042,994 | $ 293,861 | $ 2,854,050 | $ 284,955 | $ 2,569,096 |
| 2014 | 13.00 | $ 3,806,677 | $ 302,704 | $ 3,156,754 | $ 291,941 | $ 2,864,813 |
| 2015 | 14.00 | $ 4,765,071 | $ 311,685 | $ 3,468,439 | $ 297,868 | $ 3,170,571 |
| 2016 | 15.00 | $ 5,959,995 | $ 320,843 | $ 3,789,283 | $ 302,898 | $ 3,486,385 |
| 2017 | 16.00 | $ 7,453,040 | $ 330,208 | $ 4,119,490 | $ 307,166 | $ 3,812,324 |
| 2018 | 17.00 | $ 9,318,950 | $ 339,800 | $ 4,459,291 | $ 310,787 | $ 4,148,503 |
| 2019 | 18.00 | $ 11,650,985 | $ 349,641 | $ 4,808,931 | $ 313,860 | $ 4,495,071 |
| 2020 | 19.00 | $ 14,565,636 | $ 359,744 | $ 5,168,675 | $ 316,468 | $ 4,852,207 |
| 2021 | 20.00 | $ 18,208,707 | $ 370,123 | $ 5,538,798 | $ 318,680 | $ 5,220,118 |
| 2022 | 21.00 | $ 22,762,306 | $ 380,791 | $ 5,919,589 | $ 320,557 | $ 5,599,032 |
| 2023 | 22.00 | $ 28,454,100 | $ 391,759 | $ 6,311,347 | $ 322,150 | $ 5,989,197 |
| 2024 | 23.00 | $ 35,568,668 | $ 403,037 | $ 6,714,384 | $ 323,502 | $ 6,390,883 |
| 2025 | 24.00 | $ 44,461,727 | $ 414,636 | $ 7,129,020 | $ 324,648 | $ 6,804,371 |
| 2026 | 25.00 | $ 55,577,922 | $ 426,566 | $ 7,555,586 | $ 325,622 | $ 7,229,964 |

Exhibit G

## Year-by-Year Projections of RSC Commissions Lost at a long-term sales growth rate of 30.00%

| Year | Number | Lost Commissions | Present Value | Cumulative Pres. Value | Less Cumulative Expenses Present Value | Present Value Cumulative Net Loss |
|---|---|---|---|---|---|---|
| 2002 | 1.00 | $ 200,915 | $ 165,354 | $ 165,354 | $ 50,151 | $ 115,203 |
| 2003 | 2.00 | $ 289,877 | $ 196,142 | $ 361,497 | $ 92,705 | $ 288,792 |
| 2004 | 3.00 | $ 400,751 | $ 223,401 | $ 584,897 | $ 128,813 | $ 456,084 |
| 2005 | 4.00 | $ 541,777 | $ 248,562 | $ 833,459 | $ 159,451 | $ 674,008 |
| 2006 | 5.00 | $ 722,116 | $ 272,661 | $ 1,106,120 | $ 185,448 | $ 920,672 |
| 2007 | 6.00 | $ 953,992 | $ 296,459 | $ 1,402,579 | $ 207,508 | $ 1,195,072 |
| 2008 | 7.00 | $ 1,253,237 | $ 320,521 | $ 1,723,100 | $ 226,225 | $ 1,496,875 |
| 2009 | 8.00 | $ 1,640,376 | $ 345,279 | $ 2,068,379 | $ 242,108 | $ 1,826,272 |
| 2010 | 9.00 | $ 2,142,048 | $ 371,073 | $ 2,439,452 | $ 255,584 | $ 2,183,868 |
| 2011 | 10.00 | $ 2,792,846 | $ 398,181 | $ 2,837,633 | $ 267,019 | $ 2,570,614 |
| 2012 | 11.00 | $ 3,637,705 | $ 426,639 | $ 3,264,473 | $ 276,722 | $ 2,987,751 |
| 2013 | 12.00 | $ 4,735,012 | $ 457,258 | $ 3,721,731 | $ 284,955 | $ 3,436,776 |
| 2014 | 13.00 | $ 6,160,049 | $ 489,632 | $ 4,211,363 | $ 291,941 | $ 3,919,422 |
| 2015 | 14.00 | $ 8,013,237 | $ 524,149 | $ 4,735,512 | $ 297,868 | $ 4,437,643 |
| 2016 | 15.00 | $ 10,420,969 | $ 560,994 | $ 5,296,506 | $ 302,898 | $ 4,993,608 |
| 2017 | 16.00 | $ 13,550,479 | $ 600,355 | $ 5,896,861 | $ 307,166 | $ 5,589,695 |
| 2018 | 17.00 | $ 17,616,379 | $ 642,426 | $ 6,539,287 | $ 310,787 | $ 6,228,499 |
| 2019 | 18.00 | $ 22,906,251 | $ 687,408 | $ 7,226,694 | $ 313,860 | $ 6,912,834 |
| 2020 | 19.00 | $ 29,780,146 | $ 735,513 | $ 7,962,208 | $ 316,468 | $ 7,645,740 |
| 2021 | 20.00 | $ 38,715,918 | $ 786,967 | $ 8,749,175 | $ 318,680 | $ 8,430,495 |
| 2022 | 21.00 | $ 50,332,173 | $ 842,008 | $ 9,591,182 | $ 320,557 | $ 9,270,625 |
| 2023 | 22.00 | $ 65,433,091 | $ 900,889 | $ 10,492,071 | $ 322,150 | $ 10,169,921 |
| 2024 | 23.00 | $ 85,064,103 | $ 963,881 | $ 11,455,952 | $ 323,502 | $ 11,132,450 |
| 2025 | 24.00 | $ 110,584,262 | $ 1,031,273 | $ 12,487,225 | $ 324,648 | $ 12,162,576 |
| 2026 | 25.00 | $ 143,760,335 | $ 1,103,374 | $ 13,590,599 | $ 325,622 | $ 13,264,977 |

# RSC INCOME EXAMPLE WORKSHEET - Supplemental Sales

| | 2002 | Income | 2003 | Income | 2004 | Income | 2005 | Income |
|---|---|---|---|---|---|---|---|---|
| NEW SALES | 2,557,792 | | 3,364,130 | | 4,373,389 | | 5,685,379 | |
| 1st Yr - Commissions | | 200,915 | | 261,188 | | 339,546 | | 441,410 |
| Yr 1 - Renewals | | | 1,418,404 | | 1,865,225 | | 2,398,793 | |
| Commissions | | | | 28,398 | | 36,905 | | 47,976 |
| Yr 2 - Renewals | | | | | 1,215,010 | | 1,579,513 | |
| Commissions | | | | | | 24,300 | | 31,590 |
| Yr 3 - Renewals | | | | | | | 1,040,048 | |
| Commissions | | | | | | | | 20,801 |
| Yr 4 - Renewals | | | | | | | | |
| Commissions | | | | | | | | |
| Yr 5 - Renewals | | | | | | | | |
| Commissions | | | | | | | | |
| Yr 6 - Renewals | | | | | | | | |
| Commissions | | | | | | | | |
| Yr 7 - Renewals | | | | | | | | |
| Commissions | | | | | | | | |
| Yr 8 - Renewals | | | | | | | | |
| Commissions | | | | | | | | |
| Yr 9 - Renewals | | | | | | | | |
| Commissions | | | | | | | | |
| Yr 10 - Renewals | | | | | | | | |
| Commissions | | | | | | | | |
| Yr 11 - Renewals | | | | | | | | |
| Commissions | | | | | | | | |
| Yr 12 - Renewals | | | | | | | | |
| Commissions | | | | | | | | |
| Yr 13 - Renewals | | | | | | | | |
| Commissions | | | | | | | | |
| Yr 14 - Renewals | | | | | | | | |
| Commissions | | | | | | | | |
| Yr 15 - Renewals | | | | | | | | |
| Commissions | | | | | | | | |
| Yr 16 - Renewals | | | | | | | | |
| Commissions | | | | | | | | |
| Yr 17 - Renewals | | | | | | | | |
| Commissions | | | | | | | | |
| Yr 18 - Renewals | | | | | | | | |
| Commissions | | | | | | | | |
| Yr 19 - Renewals | | | | | | | | |
| Commissions | | | | | | | | |
| Yr 20 - Renewals | | | | | | | | |
| Commissions | | | | | | | | |
| Yr 21 - Renewals | | | | | | | | |
| Commissions | | | | | | | | |
| Yr 22 - Renewals | | | | | | | | |
| Commissions | | | | | | | | |
| Yr 23 - Renewals | | | | | | | | |
| Commissions | | | | | | | | |
| Yr 24 - Renewals | | | | | | | | |
| Commissions | | | | | | | | |

| Total Income | 200,815 | | 289,577 | | 400,761 | | 541,777 |
|---|---|---|---|---|---|---|---|
| Growth Rate In Total Income | | 44.13% | | 38.39% | | 35.18% | |

Page 2 of 20

| HIGHLIGHTS | | | |
|---|---|---|---|
| 34,703,583 | Annual renewal income as of year 25 | | |
| 16,177,351 | Real renewal, yr 25, inflation at | 3.1% | |
| 521,850,344 | Total 25 years ("hash" total only, no economic meaning) | | |
| $13,590,599 | Present Value at | 21.506% | |
| | Annual expenses | $ 59,104.00 | |
| $325,621.50 | Expenses P.V. at | 17.852% | N.D.R. |
| | Assumed inflation | 3.100% | |
| $13,264,977.08 | Present Value | | |

## Calculation of Discount Rate

### Size-Adjusted CAPM method

| | | |
|---|---|---|
| Risk-Free | 5.210% | SBBI for NYSE, 2000 Valuation Yearbook |
| Equity Risk premium | 7.13% | SBBI for NYSE, 2000 Valuation Yearbook |
| AFLAC Beta | 75.00% | Yahoo Finance |
| AFLAC Beta | 89.00% | Business week |
| Higher Beta | 89.00% | Business week |
| Beta x Equity Risk | 6.35% | |
| Size-Premium | 3.95% | 10th decile NYSE, SBBI for NYSE, 2000 Valuation Yearbook |
| Company "add'l size | 6.00% | |
| TOTAL | 21.506% | |

| | Year | Growth |
|---|---|---|
| Actual | 2000 | 67.33% |
| Actual | 2001 | 75.78% |
| Projection | 2002 | 30.00% |
| Projection | 2003 | 30.00% |
| Projection | 2004 | 30.00% |
| Projection | Future | 30.00% |

Lafemina testimony: 20% to 30%

Exhibit

**Year-by-Year Projections of RSC Commissions Lost**
**at a long-term sales growth rate of    30.00%**

| ASSUMPTIONS | |
|---|---|
| 45.15% | Attrition Rate for First Year |
| 14.40% | Attrition Rate for Subsequen |
| 7.76% | First Year Commission Rate |
| 2% | Renewal Years Commission |
| see below | New Sales Growth Rate ( 57.7% avg |
| $1,990,809 | New Sales In 2001 (BASE) |
| 21.506% | Discount rate |

| | Year | Growth |
|---|---|---|
| Actual | 2000 | 67.33% |
| Actual | 2001 | 75.78% |
| Projection | 2002 | 30.00% |
| Projection | 2003 | 30.00% |
| Projection | 2004 | 30.00% |
| Projection | Future | 30.00% |

Lafemina tes

| Year | Number | Lost Commissions | Present Value | Cumulative Pres. Value | Less Cumulative Expenses Present Value | Present Value Cumulative Net Loss |
|---|---|---|---|---|---|---|
| 2002 | 1.00 | $ 200,915 | $ 165,354 | $ 165,354 | $ 50,151 | $ 115,203 |
| 2003 | 2.00 | $ 289,577 | $ 196,142 | $ 361,497 | $ 92,705 | $ 268,792 |
| 2004 | 3.00 | $ 400,751 | $ 223,401 | $ 584,897 | $ 128,813 | $ 456,084 |
| 2005 | 4.00 | $ 541,777 | $ 248,562 | $ 833,459 | $ 159,451 | $ 456,084 |
| 2006 | 5.00 | $ 722,116 | $ 272,661 | $ 1,106,120 | $ 185,448 | $ 674,008 |
| 2007 | 6.00 | $ 953,992 | $ 296,458 | $ 1,402,579 | $ 207,508 | $ 920,672 |
| 2008 | 7.00 | $ 1,253,237 | $ 320,521 | $ 1,723,100 | $ 226,225 | $ 1,195,072 |
| 2009 | 8.00 | $ 1,640,376 | $ 345,279 | $ 2,068,379 | $ 242,108 | $ 1,496,875 |
| 2010 | 9.00 | $ 2,142,048 | $ 371,073 | $ 2,439,452 | $ 255,584 | $ 1,826,272 |
| 2011 | 10.00 | $ 2,792,846 | $ 398,181 | $ 2,837,633 | $ 267,019 | $ 2,183,868 |
| 2012 | 11.00 | $ 3,637,705 | $ 426,839 | $ 3,264,473 | $ 276,722 | $ 2,570,614 |
| 2013 | 12.00 | $ 4,735,012 | $ 457,258 | $ 3,721,731 | $ 284,995 | $ 2,987,751 |
| 2014 | 13.00 | $ 6,160,649 | $ 489,632 | $ 4,211,363 | $ 291,941 | $ 3,436,776 |
| 2015 | 14.00 | $ 8,013,237 | $ 524,149 | $ 4,735,512 | $ 297,888 | $ 3,919,422 |
| 2016 | 15.00 | $ 10,420,969 | $ 560,994 | $ 5,296,506 | $ 302,898 | $ 4,437,643 |
| 2017 | 16.00 | $ 13,550,479 | $ 600,355 | $ 5,896,861 | $ 307,166 | $ 4,993,608 |
| 2018 | 17.00 | $ 17,618,379 | $ 642,426 | $ 6,539,287 | $ 310,787 | $ 5,589,695 |
| 2019 | 18.00 | $ 22,906,251 | $ 687,408 | $ 7,226,694 | $ 313,660 | $ 6,228,499 |
| 2020 | 19.00 | $ 29,780,148 | $ 735,513 | $ 7,962,208 | $ 318,488 | $ 6,912,834 |
| 2021 | 20.00 | $ 38,715,918 | $ 786,967 | $ 8,749,175 | $ 318,680 | $ 7,645,740 |
| 2022 | 21.00 | $ 50,332,173 | $ 842,008 | $ 9,591,182 | $ 320,557 | $ 8,430,495 |
| 2023 | 22.00 | $ 65,433,091 | $ 900,889 | $ 10,492,071 | $ 322,150 | $ 9,270,025 |
| 2024 | 23.00 | $ 85,064,103 | $ 963,881 | $ 11,455,952 | $ 323,502 | $ 10,169,921 |
| 2025 | 24.00 | $ 110,584,262 | $ 1,031,273 | $ 12,487,225 | $ 324,648 | $ 11,132,450 |
| 2026 | 25.00 | $ 143,760,335 | $ 1,103,374 | $ 13,590,599 | $ 325,622 | $ 12,162,576 |

| 2006 | Income | 2007 | Income | 2008 | Income | 2009 | Income | 2010 | Income | 2011 | Income |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 7,390,993 | 573,833 | 9,806,291 | 745,983 | 12,490,778 | 969,778 | 16,239,011 | 1,260,711 | 21,109,415 | 1,638,924 | 27,442,239 | 2,130,602 |
| 3,118,430 | 62,369 | 4,053,960 | 81,079 | 5,270,147 | 105,403 | 6,851,192 | 137,024 | 8,906,549 | 178,131 | 11,578,514 | 231,570 |
| 2,053,367 | 41,067 | 2,669,376 | 53,388 | 3,470,189 | 69,404 | 4,511,246 | 90,225 | 5,864,620 | 117,292 | 7,624,006 | 152,480 |
| 1,352,083 | 27,041 | 1,757,682 | 35,154 | 2,284,986 | 45,700 | 2,970,482 | 59,410 | 3,861,627 | 77,233 | 5,020,116 | 100,402 |
| 890,281 | 17,806 | 1,157,366 | 23,147 | 1,504,576 | 30,092 | 1,855,948 | 39,119 | 2,542,733 | 50,855 | 3,305,553 | 66,111 |
| | | 762,081 | 15,242 | 990,705 | 19,814 | 1,287,917 | 25,758 | 1,874,292 | 33,486 | 2,176,579 | 43,532 |
| | | | | 652,341 | 13,047 | 848,044 | 16,961 | 1,102,457 | 22,048 | 1,433,194 | 28,664 |
| | | | | | | 558,404 | 11,168 | 725,925 | 14,519 | 943,703 | 18,874 |
| | | | | | | | | 477,994 | 9,560 | 621,392 | 12,428 |
| | | | | | | | | | | 409,163 | 8,183 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2,792,846 | 30.38% | 2,142,048 | 30.58% | 1,640,378 | 30.89% | 1,253,237 | 31.37% | 953,992 | 32.11% | 722,118 | 33.29% |

nt Renewals

t Rate

t rate for 1999 - 2001)

a includes 1st year rate, stock bonus and RSC performance bonus, less Manager's Incentive Fund contribution of 0.5%

stimony: 20% to 30%

|  | Rate | Portion | Effective |
|---|---|---|---|
| 1st yr | 6.22% | 100.00% | 6.22% |
| Stock bonus | 0.70% | 54.85% | 0.38% |
| RSC Performance Bonus | 1.66% | 100.00% | 1.66% |
| Manager's Incentive Fund Contrib. | 1.66% | 100.00% | -0.50% |
| TOTAL |  |  | 7.76% |

SEP-19-2003 04:16P FROM:AGUILAR LAW OFC 956 504 1408   TO:5420016PP2582   P:24/36

| 2012 | Income | 2013 | Income | 2014 | Income | 2015 | Income | 2016 | Income |
|---|---|---|---|---|---|---|---|---|---|
| 35,874,911 | 2,769,782 | 46,317,384 | 3,600,717 | 60,280,599 | 4,660,932 | 78,377,779 | 6,085,212 | 101,891,113 | 7,910,775 |
| 15,052,068 | 301,041 | 19,567,889 | 391,354 | 25,437,985 | 508,760 | 33,069,394 | 681,368 | 42,990,212 | 859,804 |
| 9,911,208 | 198,224 | 12,894,570 | 257,691 | 16,749,941 | 334,998 | 21,774,924 | 435,498 | 28,307,401 | 566,148 |
| 6,526,149 | 130,523 | 8,483,994 | 169,680 | 11,029,192 | 220,584 | 14,337,950 | 286,759 | 18,639,335 | 372,787 |
| 4,297,218 | 85,944 | 5,586,384 | 111,728 | 7,262,299 | 145,246 | 9,440,989 | 188,820 | 12,273,285 | 245,466 |
| 2,829,553 | 56,591 | 3,678,419 | 73,568 | 4,781,944 | 95,539 | 6,216,528 | 124,331 | 8,081,486 | 161,630 |
| 1,863,162 | 37,263 | 2,422,097 | 48,442 | 3,148,727 | 62,975 | 4,093,344 | 81,867 | 5,321,348 | 106,427 |
| 1,226,814 | 24,636 | 1,594,858 | 31,897 | 2,073,316 | 41,466 | 2,695,310 | 53,906 | 3,503,903 | 70,070 |
| 807,810 | 16,156 | 1,050,153 | 21,003 | 1,365,198 | 27,304 | 1,774,758 | 35,495 | 2,307,185 | 46,144 |
| 531,912 | 10,638 | 691,485 | 13,830 | 898,931 | 17,979 | 1,168,610 | 23,372 | 1,519,193 | 30,384 |
| 350,243 | 7,005 | 455,316 | 9,106 | 591,811 | 11,838 | 769,485 | 15,390 | 1,000,330 | 20,007 |
| | | 299,808 | 5,998 | 389,751 | 7,795 | 506,676 | 10,134 | 658,679 | 13,174 |
| | | | | 256,536 | 5,133 | 333,627 | 6,673 | 433,715 | 8,674 |
| | | | | | | 219,680 | 4,394 | 285,584 | 5,712 |
| | | | | | | | | 188,046 | 3,781 |

| | | |
|---|---|---|
| 10,420,809 | | |
| | 30.05% | |
| 8,013,237 | | |
| | 30.07% | |
| 8,160,649 | | |
| | 30.11% | |
| 4,735,012 | | |
| | 30.16% | |
| 3,617,705 | | |
| | 30.25% | |

SEP-19-2003 05:18P FROM:AGUILAR LAW OFC 956 504 1408        TO:5420016PPP2582        P:27 36



Page 11 of 20



| 2017 | Income | 2018 | Income | 2019 | Income | 2020 | Income | 2021 | Income | 2022 | Income | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 132,458,446 | 10,284,008 | 172,195,980 | 13,359,210 | 223,854,774 | 17,379,973 | 291,011,207 | 22,593,965 | 378,314,569 | 29,372,154 | 491,809,939 | 38,483,800 | 639,381,621 |
| 55,887,275 | 1,117,746 | 72,653,458 | 1,453,069 | 94,449,495 | 1,888,990 | 122,784,344 | 2,455,887 | 159,619,647 | 3,192,393 | 207,505,541 | 4,150,111 | 269,767,203 |
| 38,799,621 | 735,992 | 47,839,508 | 956,790 | 62,191,380 | 1,243,827 | 80,848,768 | 1,616,975 | 105,103,398 | 2,102,068 | 136,634,418 | 2,732,688 | 177,624,743 |
| 24,231,135 | 484,623 | 31,500,476 | 630,010 | 40,950,619 | 819,012 | 53,235,804 | 1,064,716 | 69,206,545 | 1,384,131 | 89,968,509 | 1,799,370 | 116,959,062 |
| 15,955,271 | 319,105 | 20,741,852 | 414,837 | 26,984,407 | 539,288 | 35,053,729 | 701,075 | 45,569,848 | 911,397 | 59,240,803 | 1,184,816 | 77,013,044 |
| 10,505,932 | 210,119 | 13,657,712 | 273,154 | 17,755,025 | 355,101 | 23,081,533 | 461,631 | 30,005,992 | 600,120 | 39,007,790 | 780,156 | 50,710,127 |
| 6,917,752 | 138,355 | 8,993,078 | 179,862 | 11,691,001 | 233,820 | 15,198,301 | 303,966 | 19,757,782 | 395,156 | 25,685,130 | 513,703 | 33,390,668 |
| 4,555,074 | 91,101 | 5,921,596 | 118,432 | 7,698,076 | 153,961 | 10,007,497 | 200,150 | 13,009,746 | 260,195 | 16,912,670 | 338,253 | 21,986,471 |
| 2,995,341 | 59,987 | 3,899,143 | 77,983 | 5,068,886 | 101,378 | 6,589,552 | 131,791 | 8,566,417 | 171,328 | 11,136,343 | 222,727 | 14,477,245 |
| 1,974,951 | 39,499 | 2,567,436 | 51,349 | 3,337,667 | 66,763 | 4,338,986 | 86,779 | 5,640,656 | 112,813 | 7,332,859 | 146,657 | 9,532,709 |
| 1,300,429 | 26,008 | 1,690,558 | 33,811 | 2,197,725 | 43,955 | 2,857,043 | 57,141 | 3,714,155 | 74,283 | 4,828,402 | 96,568 | 6,276,922 |
| 856,282 | 17,126 | 1,113,167 | 22,263 | 1,447,117 | 28,942 | 1,881,253 | 37,625 | 2,445,628 | 48,913 | 3,179,317 | 63,586 | 4,133,112 |
| 563,829 | 11,277 | 732,978 | 14,660 | 952,871 | 19,057 | 1,238,732 | 24,775 | 1,610,352 | 32,207 | 2,093,458 | 41,869 | 2,721,495 |
| 371,280 | 7,425 | 482,638 | 9,653 | 627,429 | 12,549 | 815,658 | 16,313 | 1,060,385 | 21,207 | 1,378,482 | 27,569 | 1,792,000 |
| 244,460 | 4,889 | 317,798 | 6,356 | 413,138 | 8,263 | 537,079 | 10,742 | 688,203 | 13,964 | 907,664 | 18,153 | 1,179,963 |
| 160,988 | 3,219 | 209,258 | 4,185 | 272,035 | 5,441 | 353,648 | 7,073 | 459,740 | 9,195 | 597,662 | 11,953 | 776,960 |
| | | 137,788 | 2,756 | 179,125 | 3,582 | 232,862 | 4,657 | 302,721 | 6,054 | 393,537 | 7,871 | 511,598 |
| | | | | 117,947 | 2,359 | 153,331 | 3,087 | 199,330 | 3,987 | 259,129 | 5,183 | 336,868 |
| | | | | | | 100,962 | 2,019 | 131,251 | 2,625 | 170,627 | 3,413 | 221,815 |
| | | | | | | | | 86,424 | 1,728 | 112,351 | 2,247 | 146,056 |
| | | | | | | | | | | 73,979 | 1,480 | 96,172 |
| | | | | | | | | | | | | 63,326 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 30.03% | 13,550,479 | 30.02% | 17,618,379 | 30.01% | 22,806,251 | 30.01% |
| 29,780,148 | 30.01% | 38,715,818 | 30.00% | 50,332,173 | | 30.00% |

| Income | 2024 | Income | 2025 | Income | 2026 | Income | TOTAL |
|---|---|---|---|---|---|---|---|
| 49,638,940 | 831,157,109 | 64,530,622 | 1,080,504,240 | 83,889,809 | 1,404,695,512 | 109,056,752 | 6,070,214,578 |
| 6,395,144 | 350,694,364 | 7,013,687 | 455,889,674 | 9,117,783 | 592,656,678 | 11,853,132 | |
| 3,552,495 | 230,912,166 | 4,618,243 | 300,185,816 | 6,003,716 | 390,241,561 | 7,804,831 | |
| 2,339,181 | 152,046,780 | 3,040,936 | 197,660,814 | 3,953,216 | 256,959,058 | 5,139,181 | |
| 1,540,261 | 100,416,957 | 2,002,339 | 130,152,044 | 2,603,041 | 169,197,657 | 3,383,953 | |
| 1,014,203 | 65,923,185 | 1,319,463 | 85,700,115 | 1,714,002 | 111,410,149 | 2,228,203 | |
| 667,813 | 43,407,869 | 868,157 | 56,430,230 | 1,128,605 | 73,359,288 | 1,467,186 | |
| 439,729 | 28,582,412 | 571,648 | 37,157,136 | 743,143 | 48,304,276 | 966,086 | |
| 289,545 | 18,820,419 | 376,408 | 24,466,945 | 489,331 | 31,806,508 | 636,130 | |
| 190,854 | 12,392,522 | 247,850 | 16,110,279 | 322,206 | 20,943,362 | 418,867 | |
| 126,538 | 8,159,999 | 163,200 | 10,607,999 | 212,160 | 13,790,399 | 275,808 | |
| 82,662 | 5,373,046 | 107,461 | 6,984,959 | 139,699 | 9,080,447 | 181,609 | |
| 54,430 | 3,537,944 | 70,766 | 4,599,327 | 91,987 | 5,979,125 | 119,583 | |
| 35,840 | 2,329,600 | 46,592 | 3,028,480 | 60,570 | 3,937,024 | 78,740 | |
| 23,599 | 1,533,852 | 30,679 | 1,994,138 | 39,883 | 2,592,379 | 51,848 | |
| 15,539 | 1,010,048 | 20,201 | 1,313,083 | 26,261 | 1,706,982 | 34,140 | |
| 10,232 | 665,078 | 13,302 | 864,601 | 17,292 | 1,123,982 | 22,480 | |
| 6,737 | 437,928 | 8,769 | 569,307 | 11,386 | 740,099 | 14,802 | |
| 4,436 | 288,359 | 5,767 | 374,867 | 7,497 | 487,327 | 9,747 | |
| 2,921 | 189,873 | 3,797 | 246,835 | 4,937 | 320,888 | 6,418 | |
| 1,923 | 125,024 | 2,500 | 162,532 | 3,251 | 211,291 | 4,226 | |
| 1,267 | 82,324 | 1,646 | 107,021 | 2,140 | 139,127 | 2,783 | |
| | 54,207 | 1,084 | 70,469 | 1,409 | 91,610 | 1,832 | |
| | | | 46,401 | 928 | 60,322 | 1,206 | |
| | | | | | 39,719 | 794 | |

| | | | |
|---|---|---|---|
| 65,433,091 | 85,064,103 | 110,584,262 | 143,760,335 | 621,650,344 |
| | 30.00% | 30.00% | 30.00% | |



Dr. House Report of June 25, 2003

# EXHIBIT "E"

A Response to the Stephen M. Horner Report of May 15, 2003
*Chavez v. Brownsville ISD, et al*

I have been asked by legal counsel to respond to the May 15, 2003 report of
Stephen M. Horner (Horner), regarding Dino X. Chavez's (Chavez) alleged loss of
earnings caused by his termination as an AFLAC Regional Sales Coordinator (RSC). My
opinions at this time are necessarily preliminary since information which I have requested
is still being assembled, and I anticipate receiving additional opinions and explanations
from Horner.

**Background**

Chavez received a bachelor's degree from the University of Texas at Austin and an MBA
from the University of North Texas. He received his license to sell insurance in Texas in
1994. He began work as an independent insurance agent upon receiving his license and
began as an independent agent for AFLAC on October 3, 1994.[1] About December 1994,
Chavez became district manager for AFLAC.[2]

AFLAC was awarded the privilege of marketing insurance coverage to Brownsville
Independent School District (BISD) employees in the fall of 1998 (to begin January
1999). Chavez assembled a group of agents to assist his in servicing the BISD account
beginning with about 20 agents in 1998.[3] About November 1998 he was promoted to
RSC with agents under his management.[4] Chavez was terminated as RSC in early
January 2002, after a 30-day notice was issued December 3, 2001.[5] Between 1998 and
2001, BISD represented a decreasing share of 1st year premiums among AFLAC agents
under his management.[6]

Today, he remains an independent agent of AFLAC and receives commissions from the
sale of AFLAC policies as well as commissions from the sale of other insurance carriers'
policies. AFLAC continues servicing policies issued to employees of the BISD. AFLAC
lost its relationship with BISD to Colonial, beginning with the November to December
2002 enrollment period for policies effective during 2003.

During the years in which Chavez serves as AFLAC's RSC, he operated as a sole
proprietor and incurred business expenses. Due to his termination as RSC of AFLAC,
Chavez has allegedly suffered economic damages. There is no evidence that would
indicate that Chavez has suffered permanent injury.

---

[1] Dino X. Chavez Deposition, March 4, 2003, Page 7, Line 20 through Page 14, Line 20.
[2] Chavez Deposition, March 19, 2003, Page 92, Lines 22-24.
[3] Chavez Deposition, March 4, 2003, Page 49, Line 19 through Page 50, Line 2.
[4] Chavez Deposition, March 4, 2003, Page 23, Line 21 through Page 24, Line 5.
[5] Chavez Deposition, March 4, 2003, Page 113, Lines 14-16.
[6] Chavez Deposition, March 19, 2003, Page 94, Line 6 through Page 95, Line 18.

As RSC, Chavez earned commissions for his own sales of policies and policy renewals and for policies sold by agents under his management and policy renewals. The BISD was the primary customer base assigned to Chavez, although Chavez and his agents sold AFLAC products to several other employee groups.[7] By 2001, AFLAC's 1st year premiums represented less than half of all AFLAC 1st year premiums from sales of Chavez and agents under his management.

Chavez currently owns 40% of the outstanding stock in The Teachers' Agency, Incorporated, which is an independent insurance agency located in Brownsville, TX.[8] He became a partner in the predecessor partnership in January or February 2002.[9] Other partners include Valentin Paz, Fernando de Pena, and Stephen Andrus. This firm has approximately 10 managers and 30 "producing" agents. Chavez serves as the specialist in offering cafeteria plans to employee groups. Clients include Brownsville Community Health Clinic and the City of Brownsville.[10] Until leaving AFLAC as RSC, Chavez was "captive," being unable to represent policies of any other company.[11]

**Stephen Horner's Report**

Horner's report attempts to quantify alleged economic damages related to Chavez's termination as AFLAC's RSC. His preliminary estimate of damages equals $5,344,463. This figure, however, is unreasonable for several important reasons, several of which are described below.

*No Mitigation of Damages*

Chavez was terminated as an AFLAC RSC at the age of 37. Horner attempts to quantify Chavez's lost earnings as AFLAC's RSC over 25 years. As presented, Horner's damage model assumes that Chavez would have remained AFLAC's RSC for 25 additional years. According to Horner's most recent calculation of alleged damages, Chavez will remain unemployed and unproductive for the next 25 years. Horner acknowledges the fact that one should consider Chavez's future employment and to quantify future earnings in an alternative position or occupation, but, at present, he presents no off-setting future earnings. According to Horner,

---

[7] In 1998, for example, Chavez named the Brownsville Zoo, Luke Fruia Motors, Don Johnson Motors, and Brownsville Community Health Center among others. In 1999, he added the City of Brownsville. Chavez Deposition, March 4, 2003, Page 21, Line 12 through Page 22, Line 9.

[8] See Stephen M. Andrus Deposition, February 27, 2003, Page 135, Lines 1-3.

[9] Andrus Deposition, February 27, 2003, Page 139, Lines 3-6.

[10] According to the Stephen M Andrus Deposition, February 27, 2003, Page 130, Lines 21-22, Chavez had landed these two cafeteria plans before joining The Teachers' Agency.

[11] Andrus Deposition, February 27, 2003, Page 140, Lines 11-18 and Page 152, Lines 20-24.

2

"We do not have complete figures in order to do an analysis or projection of his earnings..."[12]

With no quantification of these off-setting earnings, Horner has not presented a reasonable measure of alleged economic damages. It is not reasonable to assume that Chavez would remain unemployed for the next 25 years, and Horner admits that Chavez received earnings in 2002 as owner of The Teachers' Agency. It is quite probable that Chavez will excel in his next endeavor and his future earnings stream will equal or exceed what he would have earned as AFLAC's RSC over the next 25 years. There is significant evidence that supports this likelihood.

Chavez has been quite successful in assembling supporting agents, numbering up to 120, in a relatively short period of time. According to Chavez:

> " Q     These 100 to 120 people, where were they located?
>   A     Throughout the Valley.
>   Q     And when you say "Valley," what do you mean by that?
>   A     Throughout Brownsville, Harlingen, Donna, Weslaco, McAllen, Edinburg, Lyford. I think I had maybe a few agents also up in the Houston area that also reported to me."[13]

Chavez argued that the majority of these 120 agents were

> "...recruited by me, were either interviewed by me, recruited by me, and brought and contracted with AFLAC through me."[14]

Chavez currently remains an AFLAC agent but is no longer "captive."[15] This means that he is free to sell AFLAC policies but can also sell policies of any competing insurance carrier. Chavez can now offer an expanded portfolio of products to employee groups.

Chavez has accumulated substantial skills and has joined The Teachers' Agency as a principal in early 2002. Stephen Andrus, in his deposition, agrees with this assessment of Chavez:

> " Q     All right. So what did you need Dino Chavez for?
>   A     What did I need Dino Chavez for"

---

[12] Horner Report, May 15, 2003, p. 5.
[13] Chavez Deposition, March 4, 2003, Page 56, Lines 17-25.
[14] Chavez Deposition, March 4, 2003, Page 57, Lines 5-7. Chavez continued to explain that he recruited "...100 out of 120" of these agents, in contrast to being assigned agents by AFLAC. See also Page 58, Line 5.
[15] As an AFLAC RSC, Chavez could not market other insurance carriers' products. As an AFLAC agent, Chavez is free to market other insurance carriers' products.

Q    Right.
A    I felt he was a wonderful addition to the Teachers' Agency."[16]

Chavez is currently one of four principals in The Teachers' Agency but owns 40% of its stock.[17] His relatively large percentage share of ownership in this firm is explained by the fact that he is viewed as "...being the most skilled individual in South Texas with cafeteria plan knowledge."[18]

Given Chavez's skills acquired as AFLAC's RSC and his contacts with potential clients and agents, it is probable that Chavez will excel over the next 25 years. It is possible that his earnings as a non-captive AFLAC agent will exceed what he would have earned as a captive AFLAC agent. Under this condition, Chavez would appropriately have incurred no economic damages.[19]

*Sales Saturation and Competition*

Horner assumes that 1st year premiums from sales of policies among agents under his management would have increased at the following annual rates:

| Year | Rate |
|------|------|
| 2001 | 75.78% |
| 2002 | 75.78% |
| 2003 | 37.89% |
| 2004 | 18.95% |
| 2004-2026 | 18.95% |

Horner's only justification of this assumption is based upon an alleged AFLAC requirement that an RSC must have an annual growth rate in 1st year premiums of at least 15%.

There is no evidence that would suggest that Chavez would have remained an AFLAC RSC by qualifying each year under the alleged 15% requirement. The existence of such a requirement is no assurance that Chavez had the capability of meeting this requirement. This is not sufficient evidence to prove that Chavez had the energies, skills, and talents to achieve this goal for the next 25 years. This is merely an unsupportable assumption.

---

[16] Stephen Andrus Deposition, February 27, 2003, Page 161, Lines 5-10.
[17] Andrus Deposition, February 27, 2003, Page 135, Line 3.
[18] Andrus Deposition, February 27, 2003, Page 163, Lines 12-14.
[19] Horner's calculations of alleged lost earnings as an AFLAC RSC include only those commissions received from sales of other agents. Presumably, his approach is based upon either of two assumptions: 1) his commissions on his own sales of policies and their renewals are minimal and can be ignored, or 2) he is expected to earn at least what he would have earned from his own sales of policies in another endeavor. Unfortunately, an appropriate explanation is missing in his report.

Presumably, Homer is impressed with the annual rates of growth in Chavez's 1st year premiums between 1998 and 2001. These historical rates of growth are as follows:

| Year | Rate |
|------|------|
| 1999 | 632.29% |
| 2000 | 68.11% |
| 2001 | 75.78% |

These are relatively large annual rates of growth, but AFLAC was given exclusive rights to market AFLAC policies to qualified employees of the BISD. AFLAC was replacing an existing carrier, so impressively large growth rates would be expected in the initial years. During the years in which AFLAC was provided the exclusive rights to BISD qualified employees, Chavez and his agents faced no direct competition from other carriers for sales to BISD employees. Rapid rates of increase in 1st year premiums would be expected during the first years of the BISD engagement. However, once existing qualified employees had switched policies from the previous carrier to AFLAC, annual rates of growth of 1st year premiums among BISD employees would largely be determined by qualified employee turnover and expanded dependent coverage.

Chavez and agents under his management expanded sales to other qualified groups of employees, and these expanded sales faced the full competition from other carriers. This expansion is further testimony to the Chavez's capability to expand sales beyond the bounds of BISD. There is no evidence that these expanded sales could not have been achieved had Chavez and his agents been marketing products from competing insurance carriers. Moreover, there is no evidence that would prove that Chavez and his agents could not equal or exceed Homer's projected sales through representation of other insurance carriers' products.

Based upon these facts, Homer's projections of growth of policies over the 2002 through 2025 appear unreasonably large. Homer has offered no substantive support for these projected growth rates.

## Replication of the Horner Results and Deficiencies

At this time, I have been unable to replicate Homer's calculations due to incomplete explanations of his methods. Without replication of his calculations, I cannot offer final opinions and conclusions. Additional opinions and conclusions will be offered when additional explanation is provided. However, I can discuss several deficiencies in his existing calculations, beyond what has been discussed above.

### Economies of Scale

Homer projects sales commissions, bonuses, and agency expenses through 2025. According to my calculations, 1st year premiums are to increase from a 2002 base of $3.5

million to a 2026 value of $260.9 million. During the same time period, agency expenses are to increase from a 2002 base of $59,104 to a 2026 expense value of only $122,977. Agency expenses slightly more than double while 1st year sales increase 75 fold. This necessarily projects a substantial decrease in average costs. With such economies of scale in the industry, one would not expect but a few independent insurance agencies in the entire US. The fact that there are many small independent insurance agencies argues strongly against this substantial decrease in average costs.

*Self Employment Tax*

Chavez's commissions and bonuses were paid into his sole proprietorship. His personal earnings were presumably subject to FICA taxes. As a sole proprietor, he had to pay self employment taxes. Horner has failed to account for these taxes.

*Discount rate*

Horner selects a discount rate of 21.5% using the CAPM model. He uses the "beta" from AFLAC to reflect the non-diversifiable risk facing Chavez. It is important to note that Chavez is an independent insurance agent—not a major insurance carrier. It is quite likely that Horner has greatly understated the beta to be applied to Chavez's future earnings.

**Maximum Possible Damages**

The alleged economic injury to Chavez did not cause any known impairment to his abilities as an insurance agent. He remains an AFLAC agent and has the opportunity to market policies from any other insurance carrier. He is an owner of The Teachers' Agency which is a firm that can profit from Chavez's skills and abilities. It is unreasonable to conclude that today Chavez has no ability to at least equal the earnings he would have made had he remained AFLAC's RSC for the years 2003 and beyond.

Chavez was informed of his termination on December 4, 2001. At that time, Chavez had the opportunity to immediately begin his alternative career path. Chavez became a partner in The Teachers' Agency in January or February 2002 and continued to receive AFLAC commissions on renewals on existing policies and commissions on 1st year premiums for new AFLAC policies. He did, however, lose the opportunity to earn 1st year premiums commissions as AFLAC's RSC for 2002 sales to BISD and to other employee groups.

Chavez testified that he "… was really devastated by what happened to me."[20] He further testified that during 2002, "I didn't do very much of anything…"[21] Yet, the Complaint does not even suggest that Chavez suffered any lasting mental or physical

[20] Chavez Deposition, March 4, 2003, Page 95. Lines 5-10.
[21] Chavez Deposition, March 4, 2003, Page 68, Lines 10-14.

injury. The only appropriate economic injury to consider would be the present value of lost earnings under the requirement that Chavez must mitigate these damages by pursuing his next best alternative career path. He has recently chosen to become a principal with The Teachers' Agency, and he is expected to excel, given his skills and experience in this industry. There is no evidence that would suggest that in 2003 he will not equal or exceed his would-be expected earnings as AFLAC's RSC.

There may be a reasonable argument that Chavez could not have immediately recovered from his announced dismissal as RSC in December of 2001. If in fact he could not fully recover from a loss of earnings, one can compare his 2001 earnings with his actual 2002 earnings with the assumption that in 2002 he should have at least equaled his 2001 earnings. Chavez testified in his deposition that his 1099's for 2001 totaled about $185,000 and for 2002 totaled about $140,000 to $150,000.[22] Taking the midpoint for 2002, Chavez experienced a decrease in 1099-reported income of $40,000 in 2002. If he had earned an additional $40,000 in 2002, he would have paid an additional $1,160 in self-employment taxes.[23] If one assumes that Chavez experienced a decrease in 1099-reported income in 2002 as a result of the actions of the named defendants, his maximum possible economic damages would equal $38,840. This figure does not incorporate would-be growth in 1099-reported income as such a projection entails speculation.

Donald R. House

June 25, 2003

---

[22] Chavez Deposition, March 4, 2003, Page 93, Lines 2-11.
[23] The $1,160 is based upon the 2002 Self-Employment Tax rate of 2.9% on the incremental income.

Court Order of March 26, 2003

# EXHIBIT "F"

46

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
ENTERED

MAR 2 6 2003

Michael N. Milby, Clerk of Court
By Deputy Clerk

| | | |
|---|---|---|
| DINO CHAVEZ | § | |
| | § | CIVIL ACTION NO. B-02-128 |
| vs. | § | |
| | § | |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT et al. | § | |

## AMENDED SCHEDULING ORDER

1.    Trial: Estimated time to try: 7-8 days.                    Jury Trial

2.    New parties must be joined by:                            _____N/A_____
       *Furnish a copy of this scheduling order to new parties.*

3.    The plaintiff's experts will be named with a report furnished by:    MAY 15, 2003

4.    The defendants' experts must be named with a report furnished by:   JUNE 12 2003
       within 30 days of the deposition of the plaintiff's expert.

5.    Discovery must be completed by:                          JULY 14, 2003
       *Counsel may agree to continue discovery beyond the deadline, but there will be no intervention by the court.*
       *No continuance will be granted because of information acquired in post-deadline discovery.*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*The Court will provide these dates\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

6.    Dispositive Motions will be filed by:                    8/12/03

7.    Joint pretrial order is due:                             11/20/03

8.    Docket Call and final pretrial conference is set for 1:30 p.m. on:    12/4/03

9.    Jury Selection is set for 9:00 a.m. on:                  12/8/03
       *(This case will remain on standby until tried)*

SIGNED FOR ENTRY this 26ᵗʰ day of *March*, 2003.

Hilda Tagle

cc:    J. Arnold Aguilar
        Eileen Leeds
        Elizabeth G. Neally
        C. Brian Cassidy

Deposition of Donald House

# EXHIBIT "G"

ORAL DEPOSITION OF DONALD HOUSE

Page 1

```
 1
 2
 3              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 4                    BROWNSVILLE DIVISION
 5
 6
 7   DINO X. CHAVEZ                    )
                                       )
 8                                     )
     VS.                               )    CIVIL ACTION NO. B-02-128
 9                                     )
     BROWNSVILLE INDEPENDENT           )
10   SCHOOL DISTRICT, NOE SAUCEDA,     )
     and RANDY DUNN, MARILYN DEL       )
11   BOSQUE-GILBERT and HUGH           )
     EMERSON, JR., in their official)
12   capacities as Board Members       )
     of Brownsville Independent        )
13   School District                   )
14
15
16   ************************************************************
17         ORAL DEPOSITION OF DONALD REED HOUSE
18                  SEPTEMBER 23, 2003
19   ************************************************************
20
21        ORAL DEPOSITION of DONALD REED HOUSE, produced as a
     witness at the instance of the Plaintiff, and duly sworn,
22   was taken in the above-styled and numbered cause on the 23rd
     day of September, 2003, from 8:46 a.m. to 4:26 p.m., before
23   Jessica Renee Pena, CSR in and for the State of Texas,
     reported by machine shorthand, at the offices of Locke,
24   Liddell & Sapp, 600 Travis, Suite 3400, Houston, Texas
     77002, pursuant to the Federal Rules of Civil Procedure.
25
```

ORAL DEPOSITION OF DONALD HOUSE

Page 6

1  case we would also tender those same objections that
2  Mr. Steele has filed in the Chavez case to apply to the
3  Andrus case.
4          MR. AGUILAR: With regard to the deposition
5  notice that I sent you for the Andrus case?
6          MS. LEEDS: Correct.
7                  EXAMINATION
8  BY MR. ARNOLD AGUILAR:
9      Q   Okay. Tell us your name, please.
10     A   Donald Reed House, R-e-e-d.
11     Q   Mr. House, you understand we're here to take your
12  deposition today relative to a lawsuit filed by Mr. Chavez
13  and a separate lawsuit filed by Mr. Andrus and some others
14  relating to their participation in either the Section 125
15  cafeteria plan at Brownsville I.S.D. or the Section 403(b)
16  tax deferred annuity program also at B.I.S.D.?
17     A   That's my understanding.
18     Q   And you've been retained here today by the
19  defendants in this case to testify in that matter, right --
20  in those matters, right?
21     A   That's my understanding.
22     Q   Okay. Where -- where do you reside?
23     A   I reside in College Station, Texas, 1008 Shady
24  Drive.
25     Q   Okay. How are you normally provided? In other

Page 7

1  words, I understand you work for a company called RRC, is
2  it?
3      A   RRC, Incorporated.
4      Q   What is RRC?
5      A   It's a research consulting firm.
6      Q   Okay. And what does that mean? What is a
7  research consulting firm?
8      A   It's a firm staffed by professionals in economics,
9  finance, and statistics that conducts research and
10  litigation support and survey research --
11     Q   And what kind of research --
12     A   -- for a variety of clients.
13     Q   And what kind of research is that?
14     A   Economic research largely. That's the -- that's
15  the umbrella under which all of our research is done.
16     Q   All of your expertise, then, is in economic --
17  economic analysis; is that right?
18     A   Economic analysis and statistical analysis.
19     Q   Okay. How were you retained in the Dino Chavez
20  case?
21     A   How am I retained?
22     Q   How were you retained?
23     A   Well, I received a call and talked -- the nature
24  of the case was discussed.
25     Q   From whom? You received a call from whom?

Page 8

1      A   Buddy Steele.
2      Q   Okay.
3      A   And we had some discussion about the nature of the
4  case.
5      Q   What did he tell you?
6      A   I don't recall specifically. It was some time
7  ago.
8      Q   Okay. When was it?
9      A   I do not recall.
10     Q   Do you have it in your records?
11     A   I do not have it in my records.
12     Q   Do you have it in your billing records?
13     A   I do not have it in my billing records.
14     Q   Okay. The first billing record you sent out, I
15  believe, is dated July 10; is that correct?
16     A   Do I have a copy of those, or do you have the only
17  copy?
18     Q   I would hope you do.
19     A   Yes. July 10th.
20     Q   Okay. That record doesn't reflect when you
21  actually first started doing any work, right?
22     A   That's correct.
23     Q   Okay. And you don't have any independent
24  recollection as to when that was either?
25     A   No.

Page 9

1      Q   You don't remember -- this is dated July -- if it
2  was in July, June, May, April?
3      A   Well, this is an invoice that is marked June,
4  2003.
5      Q   Okay.
6      A   And I don't know if this includes time in May or
7  April or earlier.
8      Q   You just have no independent recollection as to
9  when you first received that call from Mr. Steele?
10     A   I do not.
11     Q   When is the first call you received from either
12  Ms. Leeds or Ms. Neally?
13     A   I don't know.
14         MS. NEALLY: On this case?
15     Q   (By Mr. Aguilar) On this case.
16     A   I don't remember.
17     Q   Okay. Sometime after Mr. Steele's call?
18     A   Yes.
19     Q   Okay. When Mr. Steele called you, you said you
20  don't remember what y'all talked about, just that he
21  discussed the case a little bit?
22     A   I don't remember the particulars. He did discuss
23  the case.
24     Q   Okay. And you don't remember what he said about
25  the case?

3 (Pages 6 to 9)

ORAL DEPOSITION OF DONALD HOUSE

Page 14

1    A   This was prepared sometime on or before May 22nd.
2    Q   Okay. To reflect the documents that you had just
3    received?
4    A   To continually reflect documents and log them in
5    as we received documents.
6    Q   Okay. The documents that were sent to you by
7    Mr. Steele -- or who sent you those documents?
8    A   I received documents from Buddy Steele, Elizabeth
9    Neally; and we assembled some of these documents ourselves.
10   Q   Okay. Do they indicate on that document from whom
11   you received them?
12   A   Yes.
13   Q   Okay. Good. Do you remember the next
14   conversation you had with Mr. Steele or with either
15   Ms. Neally or Ms. Leeds?
16   A   I do not remember the time of the next
17   conversation or the specifics of those conversations.
18   Q   Do you recall the time or the specifics of any
19   conversations you had with either Mr. Steele, Ms. Neally, or
20   Ms. Leeds?
21   A   I vaguely remember some of the content of
22   conversations, but I don't recall the dates of those
23   conversations.
24   Q   And in terms of the content of those
25   conversations, I assume you don't remember the exact

Page 15

1    specifics, right?
2    A   I remember some specifics.
3    Q   Okay. Can -- can you tell me what you do remember
4    about those conversations?
5    A   I do remember that --
6    Q   And with whom they were.
7    A   -- Buddy Steele told me that the Horner report was
8    being produced and that I would receive it shortly.
9    Q   Okay.
10   A   That some documents were going to be sent to me,
11   that there was an update in the Horner report, that some
12   documents were going to be faxed to me. Those are what I
13   recall.
14   Q   That's about the extent of it?
15   A   Yes.
16   Q   As you were working on the report, at different
17   times did you speak with either Mr. Steele, Ms. Leeds, or
18   Ms. Neally?
19   A   Yes. I recall conversations with the three of
20   them.
21   Q   And in those conversations I presume you discussed
22   what you were finding or what your analyses were showing,
23   things like that?
24   A   No. It had more to do with materials being sent
25   to me.

Page 16

1    Q   Okay. Did you ever talk to them about what you
2    were finding, information you were finding, determinations
3    you were making, anything like that?
4    A   Not that I recall. I remember discussing the
5    contents of my report at one point.
6    Q   With whom?
7    A   With Buddy Steele, and I think Elizabeth Neally as
8    well.
9    Q   Okay. And you also spoke with them yesterday,
10   correct?
11   A   Yes.
12   Q   Okay. What did you talk about yesterday?
13   A   When?
14   Q   What.
15   A   Where we were going to eat, the schedule
16   for today, what to do with the boxes; and we could go on
17   about the menu.
18   Q   Did you talk about what the deposition would
19   likely entail?
20   A   That it probably would be over today, that they
21   would be the Chavez deposition and the Andrus, et al.,
22   deposition, in that sequence.
23   Q   Actually what I'm asking about, did you talk about
24   Mr. Chavez' claims, your report in Mr. Chavez' case, things
25   like that?

Page 17

1    A   No.
2    Q   It was just a social visit. Y'all didn't talk
3    about the case itself?
4    A   I don't recall conversations about the substance
5    of the case at all.
6    Q   Okay. Let me ask you about the Andrus case. When
7    were you first contacted to assist in that case?
8    A   I do not recall.
9    Q   Okay. Do you recall the month?
10   A   No.
11   Q   Was it within the past 30 days or 60 days? Was it
12   after -- was it after May 1?
13   A   When you say "first contacted about the case,"
14   exactly what do you mean?
15   Q   I mean, when were you first contacted to assist
16   one of the defendants in providing testimony relative to the
17   case? In other words --
18   A   I do not remember.
19   Q   In other words, I'm not asking you whether during
20   one of the conversations that you're talking about, the
21   Chavez case, that some conversation might have drifted over
22   to the Andrus case. No. What I'm talking about is when
23   were you first contacted to have your services retained for
24   the Andrus case and if you can just give me a rough time
25   schedule?

5 (Pages 14 to 17)

ORAL DEPOSITION OF DONALD HOUSE

Page 22

1   Q   Anything else that you -- you understood you were
2   asked to do?
3   A   **Not specifically. I don't recall any other**
4   **specific instructions.**
5   Q   Okay.
6   A   **There may be some, but I don't recall any others.**
7   Q   Okay. And my understanding is also that you were
8   retained to testify to the economic analysis in the Andrus
9   case?
10  A   **I believe I was asked to respond to the Horner**
11  **report.**
12  Q   The economic -- in other words, to respond to --
13  let me rephrase.
14      You were asked to make an economic analysis
15  response to the Horner report? In other words, you're not
16  doing any other kind of analysis?
17  A   **I'd say that's fair.**
18  Q   Okay. And that's where your area of expertise is?
19  A   **Economics and statistics and finance.**
20  Q   Okay. I'm handing you what I've marked as
21  Deposition Exhibit 1, which is the deposition -- the notice
22  for your deposition here today. Now, you received that
23  before today, correct?
24  A   I did.
25  Q   And you had a chance to look that over, correct?

Page 23

1   A   I did.
2   Q   And just for summary purposes, what I tried doing
3   in the request -- duces tecum was to ask you to provide
4   basically everything in your file, on your computers,
5   everywhere you could possibly have it, that you reviewed,
6   looked at, evaluated, et cetera, relating to the Chavez
7   case. Did you get a chance to review that report?
8   A   Well, this -- this --
9   Q   I'm sorry. That --
10      MR. STEELE: Object to form.
11  Q   (By Mr. Aguilar) -- that deposition notice.
12  A   **This request goes well beyond your description.**
13  Q   Okay. My question is: Did you get a chance to
14  review it?
15  A   I did.
16  Q   Okay. Now, considering that, did you provide us
17  today with, as I mentioned, everything in your file,
18  everything you've reviewed, evaluated, considered, et
19  cetera?
20      MR. STEELE: Relative to the Chavez case.
21      MR. AGUILAR: Relative to the Chavez case,
22  correct.
23  A   I believe that to be the case.
24  Q   (By Mr. Aguilar) Okay. And I think we -- that's
25  what all these documents up here are today, correct?

Page 24

1   A   **That is correct. And the files that are contained**
2   **on the CD ROM.**
3       MR. STEELE: And let the record reflect that
4   Arnold spent approximately 20 to 25 minutes going over those
5   to confirm that that's the case and that there were a few
6   documents that Dr. House brought with him that Arnold did
7   not believe he had copies of, and those copies were also
8   made.
9       MR. AGUILAR: I think that's accurate.
10  Q   (By Mr. Aguilar) I'm marking as House Exhibit 3 a
11  CD that you provided for us this morning titled "RRC, Inc.,
12  Chavez files, 9/22/03."
13      MR. STEELE: Arnold, can you play it with a
14  sticker on the disk itself? Do you want to put it on the --
15      MR. AGUILAR: Let me go ahead and just put it
16  on the cover. I think you could, but I'll go ahead and put
17  it on the cover. It might get caught, though -- you're
18  right -- after a while.
19      (Exhibit No. 3 was marked.)
20      MR. AGUILAR: And for the record, we have an
21  agreement that I'll be able to be the custodian of this
22  document.
23      MR. STEELE: We have that --
24      MR. AGUILAR: In other words, we're not going
25  to give it to the court reporter to make copies or anything.

Page 25

1       MR. STEELE: That's certainly okay with me,
2   if it's okay with you-all?
3       MS. NEALLY: I don't care.
4       MR. STEELE: I'm going to ask Dr. House to
5   provide me a copy of that same disk; and if y'all would like
6   one, just give me a call. I'll get it to you. Go ahead.
7       (Exhibit No. 4 was marked.)
8   Q   (By Mr. Aguilar) I'm handing you what I've marked
9   as House Exhibit 4. This is a response to the Stephen M.
10  Horner report of May 15th, 2003. You've received
11  Dr. Horner's updated report since writing this report,
12  correct?
13      MR. STEELE: And by "this report," let the
14  record reflect you're referring to Exhibit 3.
15      MR. AGUILAR: Exhibit 4.
16      MR. STEELE: Exhibit 4. Okay.
17  A   That's correct.
18  Q   (By Mr. Aguilar) Okay. You have not had an
19  opportunity yet to write any response to Dr. Horner's
20  updated report of September 19, though, correct?
21  A   That's correct.
22  Q   Okay. So, from now on I'm going to be asking you
23  about this; and if there's any portions that you'd like to
24  modify at this time, we can talk about it after -- we can
25  talk about it at the appropriate time. Okay?

7 (Pages 22 to 25)

ORAL DEPOSITION OF DONALD HOUSE

Page 30

1    MR. AGUILAR: If it's done.
2    MS. NEALLY: Right.
3    A    If I do an updated report, I will provide it to
4    legal counsel.
5    Q    (By Mr. Aguilar) Okay. Good deal. I've handed
6    you what I've marked as Exhibit 4. If you would, go back to
7    the -- well, the pages aren't quite numbered; but if I may,
8    I'm going to start with the middle with the page marked
9    "RRC, billing rates for personnel."
10    A    Yes.
11    Q    Your rate on the Chavez case is 375 an hour?
12    A    That is the rate at which RRC bills my time.
13    Q    Do you bill differently?
14    A    I don't bill at all.
15    Q    Okay. In other words, who sends out the bills?
16    RRC, not you?
17    A    RRC.
18    Q    Not you?
19    A    I do not send out bills.
20    Q    What is -- you told us earlier what RRC is; but
21    what's your ownership interest in RRC, if any?
22    A    I have a 50 percent ownership in the corporation.
23    Q    Who owns the rest of RRC?
24    A    Dr. Clifford Fry.
25    Q    He owns the other 50 percent?

Page 31

1    A    That is correct.
2    Q    Each of the other people on that list are
3    associates, or what would you call them?
4    A    No. All of those people are not associates.
5    Q    What are they?
6    A    Well, they vary. Dr. Saving is chairman of the
7    board and an employee.
8    Q    He's just an employee, though?
9    MS. LEEDS: Object to the form.
10    A    He is an employee and chairman of the board.
11    Q    (By Mr. Aguilar) And doesn't own any stock in RRC?
12    He's just --
13    A    He does not.
14    Q    He's just paid on an hourly basis for his own
15    services?
16    MS. LEEDS: Object to the form.
17    A    He is -- he is paid for his services.
18    Q    (By Mr. Aguilar) Okay. And how is he paid?
19    A    We write a check, and we pay him.
20    Q    On what basis is he paid, salary, hourly?
21    A    We pay him on the basis of his hourly work.
22    Q    Okay. He bills at 500 an hour -- I'm sorry. RRC
23    bills for him at 500 an hour?
24    A    That is correct.
25    Q    And how much does he get out of that?

Page 32

1    MR. STEELE: I'm going to object to the
2    relevance. I don't see where this is leading and how it has
3    any -- did Dr. Saving have any role to play in any of the
4    work done in the Chavez or Andrus case?
5    THE WITNESS: No.
6    MR. STEELE: Arnold, we're wasting a lot of
7    time.
8    Q    (By Mr. Aguilar) Go ahead.
9    A    I don't know exactly how to answer that. I don't
10    know of the fringe benefits that Dr. Saving is paid.
11    Q    I'm just asking about if he's paid on an hourly
12    basis. In other words, if he bills -- if he submits bills
13    for three hours of work, how much would he get paid for each
14    hour or for the three-hour time period, however y'all work?
15    I'm just trying to ask.
16    A    I don't know the answer to that.
17    Q    How would you -- you're co-owner of the company.
18    You don't know how he's paid, or is it just that my question
19    is too weird?
20    MS. LEEDS: Object to the form,
21    argumentative.
22    A    I do not know the rate at which he is paid. I
23    don't know his -- the hourly payment that he receives.
24    Q    (By Mr. Aguilar) Let me back this up a little bit.
25    Is he paid on a salary or based on the number of hours he

Page 33

1    actually submits bills for?
2    MS. LEEDS: Object to the form, asked and
3    answered.
4    A    He is paid on an hourly basis.
5    Q    (By Mr. Aguilar) Okay. You just don't know that
6    exact hourly amount?
7    A    I do not know the exact hourly amount.
8    Q    Can you tell me roughly what it is, the -- a
9    range?
10    MS. LEEDS: Object to the form, speculation.
11    A    It would be between 400 and $500 an hour.
12    Q    (By Mr. Aguilar) Okay. When you send out bills,
13    however -- or when you submit bills for your time, how are
14    you paid?
15    A    I don't submit bills for my time.
16    Q    When you submit your time, who do you give it to?
17    A    I give it to Jerrie Curry.
18    Q    Okay. And then how are you paid?
19    A    I am paid on a salary basis.
20    Q    Okay. How is your salary determined?
21    A    My salary is -- was determined a number of years
22    back, and it's been the same probably for ten years.
23    Q    Okay. Is it just a portion of the total amount
24    that comes into RRC, or is it -- or do you get a salary per
25    month plus the amount that comes into RRC or a payment per

9 (Pages 30 to 33)

ORAL DEPOSITION OF DONALD HOUSE

Page 38

1    Q   Is this everything you've billed so far?
2    A   To my knowledge, yes.
3    Q   And by "you" I mean RRC.
4    A   Correct.
5    Q   Now, you don't show the amount of hours that you
6    spent on any of these -- oh, there it is.  Okay.
7        Would you add up the total amounts that
8    you've billed so far?
9    A   I don't, no.
10   Q   I said if you would do that for me, please.
11   A   Okay.
12   Q   And what's the total?
13   A   I get $22,505.57, but I may have made an error.
14   Q   I was getting thrown off a little bit because in
15   the July statement you show 20,000 past due; and then you
16   get to the August statement, which is the one dated
17   September 5 -- the letter dated September 5.  The August
18   statement shows the total amount past due is now 8,000.  Was
19   part of it paid and part of it not?
20   A   That would be my inference.
21   Q   Okay.  Well, was -- what I was going to ask is --
22   or does -- does that reflect part of a new bill that is
23   not in here?
24   A   This is a compilation, as I understand it, of all
25   of the bills.

Page 39

1    Q   Through August of 2003?
2    A   Through August of 2003, yes.
3    Q   Okay.  Do you know how much time you've put in in
4    September so far, not including your time during this
5    deposition?
6        MS. LEEDS: For Chavez?
7    Q   (By Mr. Aguilar) For Chavez.
8    A   I don't know exactly.  I would say probably around
9    ten hours.
10   Q   On the second page of -- continuing on 4 where I'd
11   left off.
12   A   Well, we had turned to a table.
13   Q   If you turn to the page right after that.
14   A   Yes.
15   Q   Thank you.  "RRC billing policies and terms of
16   engagement."
17   A   Yes.
18   Q   You indicate a 5,000-dollar retainer.  Did you
19   waive that in this case?
20   A   Yes.
21   Q   In the Dino Chavez case?
22   A   Yes.
23   Q   Did you waive the 5,000-dollar retainer in the
24   Andrus case as well?
25   A   I don't know.

Page 40

1    Q   How would you find out?
2    A   I would look at the Andrus bills and try to draw
3    an inference there.
4    Q   Okay.  Why did you waive the retainer?
5    A   In the Chavez case we had worked for the law firm
6    before.
7    Q   Okay.  I'll get to that after a while.  Any other
8    reason?
9    A   No.
10   Q   You had worked for them before about how many
11   times?
12   A   Once.
13   Q   And you felt they were good on paying their bills.
14   You didn't have to worry about a retainer?
15   A   I think that's essentially correct.
16   Q   Any other reason?
17   A   No.  That's a -- it's strictly a financial
18   decision.
19   Q   Okay.  And have you to date been paid the 22,505
20   on the Andrus bills?
21   A   I don't know.
22   Q   How would you find out?
23   A   I would have to ask Jerrie Curry.
24   Q   Any reason -- I was going to ask any reason to
25   believe you haven't yet; but considering they were

Page 41

1    delinquent on some of your -- like on your August and July
2    statement, maybe that's not a fair question to ask.
3        MS. LEEDS: Objection, form.
4    Q   (By Mr. Aguilar) If you turn the page, this is
5    your resume, your CV, correct?
6    A   That is correct.
7    Q   I understand you got your B.A. and Ph.D. from
8    Texas A&M?
9    A   That's correct.
10   Q   Both in economics?
11   A   That's correct.
12   Q   Did you receive -- did you do a minor when you
13   were at Texas A&M?
14   A   Yes.
15   Q   Undergraduate?
16   A   Yes.
17   Q   What was your minor in?
18   A   History.
19   Q   Is this your most current CV?
20   A   No.
21   Q   Okay.  What's modified?  What's been changed about
22   your CV?
23   A   I think --
24   Q   I think you provided us with something.
25   A   Yes.  I brought an updated copy.  There is an

11 (Pages 38 to 41)

ORAL DEPOSITION OF DONALD HOUSE

Page 46

1    Q   Okay.  Anything else?
2    A   Can I review my resume just for a moment?
3    Q   Sure.  And actually it might be easier if we kind
4    of did it together because I was going to ask you which of
5    those cases did you do that on, which I assume is what you
6    were going to do.  And I think you started -- which page is
7    that?
8            MR. STEELE:  I'm going to object to the form
9    to the extent your question presumes that the cases he was
10   talking about also appear on his resume.
11   Q   (By Mr. Aguilar) You did tell us that your resume
12   includes all of the cases on which you've been retained
13   and/or testified, right?
14   A   That is correct; but some of these are projects,
15   research projects, and have nothing to do with litigation at
16   all.
17   Q   That you may not have listed on here?
18   A   That I may not have listed on here.
19   Q   Okay.  Tell us about the ones you did list on
20   here.
21   A   For the American Dental Association I built a --
22   Q   Which page?
23   A   This is on page 1.  There may be a better
24   description elsewhere.
25   Q   That's okay.  What did you do?

Page 47

1    A   All right.  If you go to page 15 -- and I'm
2    looking at Exhibit 6.  If we go up to the sixth item from
3    the bottom, "Estimation of the cost of dental care for
4    eligible populations," I built an economic model for the
5    American Dental Association to estimate claims expenses --
6    Q   Okay.
7    A   -- associated with the different types of coverage
8    to different types of populations or the characteristics of
9    populations.
10   Q   Okay.  What else?
11   A   The -- also on page 15, if you go up two items
12   above that, that is an ongoing study -- well, basically it's
13   finished; but there is still work that is being done on
14   it -- where I looked at the rates of reimbursement for
15   dentists for different procedures and the size of the
16   discounts that existed under participating contracts --
17   Q   Okay.
18   A   -- and how they related with carrier
19   concentration.
20   Q   Okay.  Which one else?
21   A   Go to the second item from the top --
22   Q   Okay.
23   A   -- on page 15.  That was a study that I did for
24   the American Medical Association, and I also did it for the
25   Department of Health and Human Services.  So, I did two

Page 48

1    separate studies and, also, for the Texas -- Texas Medical
2    Association where I examined the impact -- or the -- the
3    changes in liability insurance coverage for physicians, the
4    cycles that they went through; and I developed a measure of
5    a cost index for the coverage of liability insurance for
6    physicians for Medicare.
7    Q   That had to do with the cost of liability
8    insurance?
9    A   It had to do with the cost of liability insurance
10   and the demand for liability insurance, the way in which
11   physicians were responding to premium price increases.
12   Q   Okay.
13   A   The extent to which they were changing the size of
14   the coverage in response to premium increases.
15   Q   Okay.
16   A   And an analysis of those premiums across insurance
17   companies.
18   Q   Okay.
19   A   I did a survey of carriers and the prices of
20   certain types of policies as well as looking at the total
21   amount paid among physicians.
22   Q   Okay.  What else?  Which one else?
23   A   I did a study -- a partial study for -- I don't
24   know exactly how to respond to this because my name has not
25   been disclosed in an ongoing case.

Page 49

1            MR. STEELE:  Would it impact some privacy
2    requirements or confidentiality requirements, Dr. House?
3    Q   (By Mr. Aguilar) Hang on.  Is it part of a case?
4    Is it part of a lawsuit?
5    A   It's part of a lawsuit.
6    Q   Okay.
7            MR. AGUILAR:  If it's part of a lawsuit and
8    he's just being retained as a consultant at this point, I
9    think you're right.  It would involve privacy considerations
10   because they have the right to keep you confidential.
11   Q   (By Mr. Aguilar) However, let me just ask you
12   generally.  What type of case is it?
13           MR. STEELE:  That's fine.
14   A   It's a case involving the market for life
15   insurance coverage and the types of policies that were
16   written, the sales of those policies, the profitability of
17   those policies, the types of changes in the premiums and
18   notifications of those premiums, the loss ratios.
19   Q   (By Mr. Aguilar) Okay.
20   A   It is -- well, I better not say.
21   Q   That's okay.  Were you retained by the plaintiff
22   or defendant in that case?
23   A   I was retained by the defendant.
24   Q   Okay.  Any others that are not on here?
25   A   Yes.  I was retained by an insurance company that

13 (Pages 46 to 49)

ORAL DEPOSITION OF DONALD HOUSE

Page 54

1  you'd rather do it this other way, that's fine.
2      A   I'm on a roll here.
3      Q   That's okay.
4      A   On page 3 if you go five -- five points up, I
5  testified before the Senate joint -- House and Senate joint
6  committee on the impact of tort reform on liability
7  insurance for physicians.
8      Q   And I presume you were retained by the physicians?
9      A   I was retained by the Texas Medical Association.
10  That involved an estimation of the impact of various types
11  of tort reform on premiums, medical liability insurance
12  premiums.
13      Q   That's October 25, 1986?
14      A   Correct.
15      Q   Anything else on page 3?
16      A   No. I'm on page 4 now.
17      Q   Nothing on page 4?
18      A   No. On page 5 I was retained by a group to
19  explain the impact of a new senate rule on workers'
20  compensation insurance.
21      Q   Which item?
22      A   This is the second complete item from the top.
23      Q   State board rate hearing, November 19?
24      A   I testified in a public hearing about the impact
25  of a particular senate bill on the market for worker's

Page 55

1  compensation insurance.
2      Q   Anything else on page 5?
3      A   Not that I see. I'm on page 6 now.
4      Q   Nothing on page 6?
5      A   Nothing on page 6.
6      Q   Nothing on page 7?
7      A   Nothing on 7. I'm on page 8.
8          Nothing on 8. I'm on 9.
9      Q   Nothing on 9 -- I'm sorry -- 10?
10     A   I'm -- no. I'm on page 11 now. I'm moving way
11  ahead. On page 12 we did a contract on --
12      Q   Which item?
13      A   All right. This is under "Department of Labor"
14  Contract No. 99-8-1886-04-32. We did a contract there where
15  we were looking at -- actually the next one is involved in
16  that as well -- the impact of unemployment insurance.
17      Q   Well, let's do the first -- the other one first,
18  finish off the other one first. What did you do?
19      A   Both of them are really the same problem -- the
20  subject matter where we were looking at changes in the
21  unemployment insurance programs on the employment and growth
22  during a recession.
23      Q   Okay. Anything else on page 12?
24      A   Let me see here.
25      Q   Nothing else on page 12?

Page 56

1      A   No, not that I recall.
2      Q   All right. Now -- nothing else in your report?
3  No other references in your report?
4          MR. STEELE: You mean his resume?
5      Q   (By Mr. Aguilar) I'm sorry. Your resume.
6          MR. AGUILAR: Thank you.
7      A   No. And I'm trying to recall another couple of
8  items that are -- that are relevant. I -- it is escaping me
9  now but it may come to me before the end of this deposition
10  but there are two other items that I'm trying to get a
11  handle on that is just fading away.
12      Q   (By Mr. Aguilar) Do you recall generally what
13  they're about?
14      A   It was looking at insurance -- competing insurance
15  companies and looking at -- okay. All right. It's coming.
16  I can't speak much about it; but it has to do with the
17  profitability of certain forms of health insurance and the
18  reimbursement rates being paid to -- to hospitals and entry
19  and exit of competing carriers in the market, the
20  development of networks, the extent to which those networks
21  are used as barriers to entry.
22      Q   To insurance companies?
23      A   To insurance companies. The definition of
24  relevant markets, both product and geographic boundaries.
25      Q   Okay.

Page 57

1      A   The practice of premium determination, the changes
2  in reserves over time among competing firms.
3      Q   Okay. Anything else you can think of?
4      A   There -- there may be one other, but that -- that
5  is all that I can remember at the moment.
6      Q   Okay.
7      A   Wait. I think you have to also include the
8  analysis of Medicaid and Medicare expenditures.
9      Q   Is that on here?
10     A   Yes. It's under one of the projects that I'm
11  doing. We talked about it just in the fact that it's a new
12  entry, but I have not talked about it in the context of your
13  question. This is an examination of the impact of the
14  provision of mobile assistant devices on claims.
15      Q   Is that the Government hearing or the case
16  involving market for life insurance coverage or the Lloyd's
17  case?
18     A   No, no, no. It is The Scooter Store project --
19     Q   Okay.
20     A   -- where we're looking at claims expenses by
21  individuals, by characteristics of the individuals, and by
22  region, the approval practices used within D mark regions
23  both for those that survive and those that die.
24      Q   What does that have to do with insurance again?
25     A   Looking at claims expenses. Medicare is an

15 (Pages 54 to 57)

ORAL DEPOSITION OF DONALD HOUSE

Page 62

1 physicians in 1987, the second item from the top?
2   A   Yes.
3   Q   Cost and demand -- cost and demand changes in
4 liability insurance coverage, you were evaluating the
5 economic aspects of the cost and demand changes, correct,
6 among other things?
7   A   I was looking at the determinants of premium
8 changes.
9   Q   You were making an economic analysis?
10   A   That's correct.
11   Q   Okay.  You were not making, for example, a
12 comparison of -- of what particular types of liability
13 insurance are available?
14   A   What do you mean by "types"?
15   Q   In other words, your role in that case was not to
16 determine what the state department of insurance provides
17 for different types of insurance policies, for example?
18         MR. STEELE:  Objection as to form.
19   A   I --
20   Q   (By Mr. Aguilar) Do you understand my question?
21   A   No, I do not.
22   Q   Okay.  Your role was to evaluate -- to make an
23 economic analysis in that case?
24   A   Well, it wasn't a -- it wasn't a legal case,
25 No. 1.  No. 2, it was an evaluation of the determinants of

Page 63

1 premiums and the demand for coverage, how the demand for
2 coverage changed with respect to changes in the premiums and
3 the loss ratios of competing firms in the industry.
4   Q   And that was an economic analysis, wasn't it?
5   A   Yes.
6   Q   Okay.  It wasn't a comparison of two insurance
7 policies, for example, where you're saying this insurance
8 policy is different from this insurance policy based on
9 these factors, for example?
10   A   It was in -- in some senses.  Some of the
11 insurance policies were policies that would pick up the tail
12 of a distribution.  Some of them were claims-made type
13 policies.  So, it was inclusive of an analysis of the
14 different types of policies that were presented on the
15 marketplace and the types of policies that were being
16 demanded in the marketplace.
17   Q   And the -- the information on the different types
18 of policies, where did you get that from?
19   A   From the insurance carriers.
20   Q   In other words, you --
21   A   From the -- I'm trying to remember.
22   Q   Could I sum it up in saying from the people who
23 retained you?
24   A   No.
25   Q   Okay.  As well as independent research, separate?

Page 64

1   A   Independent research separately, yes.  The people
2 that retained me gave me information on the side of the
3 buyer but very little on the side of the insurance --
4 competing insurance carriers.
5   Q   So, you went out and you checked on what the other
6 information was out there?
7   A   I gathered information external to what was
8 provided by the client.
9   Q   Okay.  In terms of the insurance -- I'm sorry --
10 information that you gathered relating to different types of
11 insurance matters as opposed to economic matters.  Do you
12 understand the distinction I'm making?
13   A   No, I do not.
14   Q   Okay.  In terms of -- maybe if we used a different
15 example, I may be able to make my question a little bit more
16 clear.
17         MR. STEELE:  Arnold, do you mind me asking
18 where you're going with this?
19         MR. AGUILAR:  I'll get there.
20   Q   (By Mr. Aguilar) Okay.  If you look at page 2, the
21 bottom, Pennsylvania Dental Association v. Pennsylvania Blue
22 Shield.
23   A   Yes.
24   Q   You were retained by Pennsylvania Blue Shield,
25 right?

Page 65

1   A   Correct.
2   Q   You examined records regarding pricing,
3 reimbursement rates, loss ratios, matters like that, right?
4   A   That's correct.
5   Q   That was an economic analysis, right?
6   A   That's correct.
7   Q   Okay.  You were not reviewing the reasonableness
8 of one type of insurance policy versus another type of
9 insurance policy; is that correct?  And I'm not talking
10 about financially.  I'm talking about in terms of whether
11 one policy might provide more coverage under certain
12 circumstances, things like that.
13   A   Yes, I was.
14   Q   Okay.  And what -- to what extent were you doing
15 that?
16   A   Looking at the -- at the policies in terms of both
17 limits, in terms of services being covered, the premiums
18 associated with that, the demand response to changes in
19 that, the existence of -- of competition in the market, the
20 nature of the policies that are -- were being provided in
21 competition, the extent to which they were involved in
22 managed care, the extent to which the insurance companies
23 were conducting audits and reviews of providers.  I could go
24 on.
25   Q   Okay.  That's good enough.  And where did you get

17 (Pages 62 to 65)

Page 70

1 cafeteria plan itself?
2    A   Again, I'm not sure exactly how to respond to
3 that.  I -- some of the projects that I have mentioned
4 clearly involve products that are commonly found in
5 cafeteria plans.
6    Q   That's not what I'm asking about.  In other words,
7 some of these might have involved a cancer plan or more
8 importantly a dental plan.  I presume a number of cafeteria
9 plans have dental plans as part of the cafeteria line, but
10 I'm not asking about the specific products.  I'm asking
11 about a cafeteria plan.  Did any of these cases involve
12 testimony relating to a cafeteria plan?
13    A   Not a cafeteria plan, but some have involved the
14 demand for insurance where the premiums are tax deferred.
15    Q   Okay.  Why don't we just identify those?
16    A   All right.  There was another project that I did
17 not mention and I'm not sure that it's on here but I
18 estimated the impact of the change in the tax deductibility
19 of dental insurance premiums.
20    Q   Okay.  That's an individual product?
21    A   Yes.
22    Q   And I'm not asking about individual products.  I'm
23 asking about testimony relating to the cafeteria plan
24 itself, how the plan is set up, what products are going to
25 go into the plan, things like that.

Page 71

1    A   All right.
2    Q   Anything relating to the establishment or working
3 of the plan itself.
4    A   As far as the administration of a plan, I don't
5 recall specific work having to do with the administration of
6 a single plan.
7    Q   Okay.
8    A   My work has to do with the impact of the existence
9 of those plans and the consumer response to them.
10    Q   Okay.  Are you familiar with which policies were
11 included in the Brownsville Independent School District's
12 Section 125 cafeteria plan?
13    MS. LEEDS:  Object to the form.
14    A   I have familiarity with some of the products that
15 were in the plan but not all.
16    Q   (By Mr. Aguilar) What I meant -- tell me which
17 products you understood were part of the cafeteria plan.
18    MS. LEEDS:  Object to the form.  What year
19 are you talking about?
20    MR. AGUILAR:  2001.
21    A   I understand -- my understanding, and I could be
22 wrong -- my understanding is dental is in there, cancer
23 insurance is in there, dismemberment coverage is in there at
24 times.
25    Q   (By Mr. Aguilar) I'm talking about the ones that

Page 72

1 were actually in the --
2    MR. STEELE:  That's what he's telling you.
3    Q   (By Mr. Aguilar) You said dismemberment is in
4 there at times.  I just want to make sure we're talking
5 about what you understood what was in the B.I.S.D. policy --
6 I'm sorry -- plan in 2001?
7    A   This is my best estimate of what was in it.
8    Q   You've named three already.
9    A   I believe there may have been some supplemental
10 life insurance.
11    Q   Anything else?
12    A   And those are the ones that come to mind.
13    Q   Nothing else that you recall?
14    A   Nothing that I -- nothing that comes to mind other
15 than those.
16    Q   Anything else in any of your dockets that would --
17 I'm sorry -- documents that would help you recall -- that
18 you recall looking at?
19    A   There may be some further explanations in
20 deposition testimony.
21    Q   But nothing that you recall right now?
22    A   I cannot point to a page that would give me that.
23    Q   Okay.  That's fine.  Of these legal, legislative,
24 and regulatory testimony consulting, can you tell us which
25 of those involve 403(b) tax deferred annuities?  Do you

Page 73

1 know what I mean by --
2    A   Yes.
3    Q   Can you tell us what a 403(b) tax deferred annuity
4 is first, please?
5    A   Well, I know what a tax deferred annuity is.  I'm
6 not that conversant on the legislation that enabled that.  I
7 do not recall.
8    Q   I'm sorry.  First, the last question on the table
9 was:  Tell us what a tax deferred annuity is.
10    MS. LEEDS:  Object to form.  Let him finish
11 his answer, please.
12    MR. AGUILAR:  He was switching over to
13 another -- to my first question.  I was trying to keep it
14 straight.
15    MS. LEEDS:  He still gets to finish his
16 answer.
17    A   Well, a tax deferred annuity is part of a family
18 of insurance products where employees can shelter some
19 income and have it tax deferred.  They can do it in term
20 insurance, full-life insurance, annuities, and other
21 insurance products.  Annuities is just one of the products
22 that is often available where you get preferential tax
23 treatment; that is, you can take a portion of your income,
24 put it in the form of tax deferred annuities, and buy that
25 insurance product —

ORAL DEPOSITION OF DONALD HOUSE

Page 78

1  provides?
2       MS. LEEDS:  The language of 403(b)?
3       MR. AGUILAR:  Yes.
4   A  I am not here today to give you that language, no.
5   Q  (By Mr. Aguilar) Okay.  Or testimony relating to
6  that language?
7       MS. LEEDS:  Object to the form to the extent
8  that that's covered in the Andrus case.
9       MR. STEELE:  And it's been asked and
10  answered, Arnold, and I can't understand why we're beating
11  this horse when you've got lots of ground to cover and you
12  know I've got to leave early today.  So, I just don't get it
13  other than -- well, I'm not sure why.
14   A  I can testify as to the impact of tax deference on
15  the demand for products, annuities and other products that
16  are often included in cafeteria plans.  I am not prepared to
17  provide any testimony as to the exact language in the tax
18  code that has carved out the tax deference for annuities or
19  for the insurance products that are often included in
20  cafeteria plans.
21   Q  (By Mr. Aguilar) Good.  Thanks.
22       MR. STEELE:  Let's take a break.
23       (Brief recess from 10:29 a.m. to 10:40 a.m.)
24   Q  (By Mr. Aguilar) You had told us earlier -- again,
25  looking at Exhibit 6 -- you had told us earlier that you

Page 79

1  were retained by Mr. Steele because you had done prior work
2  for his office?
3   A  Yes.
4   Q  How many different cases have you done prior work
5  for either Mr. Steele or his office?
6   A  Only one for his office.
7   Q  Okay.  What about for another office with Locke,
8  Liddell?
9   A  That's what I'm talking about.  This was the
10  Dallas office of Locke, Liddell.
11   Q  Okay.  Never before for Mr. Steele particularly?
12   A  No.
13   Q  Okay.  What case was that?
14   A  The Blanchard case.
15   Q  On page?
16       MR. STEELE:  Look at 9.
17   A  Page 9.  It would be the -- one, two, three --
18  fourth item.
19   Q  (By Mr. Aguilar) And in that one who were you
20  representing?
21   A  Blanchard.
22   Q  The plaintiff?
23   A  Yes.
24   Q  What were you obtained to do?
25   A  To determine whether Heritage was fairly pricing

Page 80

1  rare coins.
2   Q  What was the case about?
3   A  The case was about an exclusive -- or a -- a
4  contract that Blanchard had with Heritage where Blanchard
5  would purchase 95 percent of its rare coins from Heritage
6  and the contract required fair pricing, pricing by Heritage
7  that was no higher than they would charge any of their other
8  customers and I was hired to examine the pricing and
9  determine if, in fact, their pricing met those conditions.
10   Q  And what did you conclude?
11   A  That they did not meet those conditions.
12   Q  Because?
13   A  Heritage was charging Blanchard above market
14  prices for the rare coins.
15   Q  Okay.  Any other cases?
16       MR. STEELE:  That --
17   Q  (By Mr. Aguilar) That you've been retained by
18  Mr. Steele or anybody else at his firm?
19       MS. LEEDS:  Object to the form, asked and
20  answered.
21   A  Not -- not that I recall.
22   Q  (By Mr. Aguilar) And I think you told us there are
23  no other cases in which you've been retained by either
24  Ms. Neally or Ms. Leeds before?
25   A  I have not been retained by either of those

Page 81

1  attorneys before.
2   Q  Before your involvement in either the Chavez or
3  the Andrus case?
4   A  That is correct.
5   Q  And the same answer is true, I presume, for their
6  firms -- Roerig, Oliveira & Fisher and Willette & Guerra?
7   A  To the best of my knowledge.
8   Q  On page 14 --
9   A  Uh-huh.
10   Q  -- the top item, "Report of Donald R. House and
11  Thomas R. Saving," what is that, "In Defense of Third Party
12  Complaint as Amended"?
13   A  Yes.
14   Q  What is that?
15   A  This is a suit that was filed by Pennsylvania
16  Dental Association against Pennsylvania Blue Shield.
17   Q  And who were you retained by?
18   A  Pennsylvania Blue Shield.
19   Q  That was the defendant, right?
20   A  That's correct.  Well, both ways.  They were
21  plaintiff and defense.
22   Q  You said that earlier, but I thought it was for a
23  different case.
24   A  There was a counter-claim.  Pennsylvania Dental
25  Association had a monopolization claim -- or a monopsony

Page 94

1     MR. AGUILAR: And it's fine with me if you
2 want to put a whole bunch of them on one page. I don't need
3 them -- a separate page for each one.
4     Q   (By Mr. Aguilar) He refers to "The other,
5 large" -- "larger report shows commissions Dino earned from
6 the B.I.S.D. account since its inception."  Do you know what
7 he was referring to there?  Is that also in this binder?
8     A   I would have to look at the other binders.  It
9 possibly is Binder No. 4.
10     MR. STEELE: Is it a binder or --
11     THE WITNESS: Well, let me look.
12     MR. STEELE: Is that the 1099s?
13     MR. AGUILAR: Go off the record.
14     (Brief recess from 11:05 a.m. to 11:06 a.m.)
15     Q   (By Mr. Aguilar) I was asking you about the other
16 larger report showing commissions Dino earned from the
17 B.I.S.D. account since its inception.  Were you able to
18 determine which documents that's referring to?
19     A   My best estimate is that those other documents are
20 also contained in Binder 3.
21     Q   Okay.  Did you rely on any of those documents in
22 writing your report?
23     A   No.
24     Q   And Binder 3 that we were talking about is AFL
25 documents 1715 through 2158, right?

Page 95

1     A   That is correct.
2     Q   Okay.  You go on in Exhibit 10 to talk about
3 Dino's tax returns from '97 through 2000; is that correct?
4     A   That's correct.
5     Q   That's all that was included to the best of your
6 recollection or understanding in the documents attached to
7 Exhibit 10?
8     A   That's correct.
9     (Exhibit No. 11 was marked.)
10     Q   (By Mr. Aguilar) I'm handing you what I've marked
11 as House Exhibit 11.  This is a letter Mr. Steele sent you
12 dated June 10 including documents Bates labeled AFL 2159
13 through AFL 2182, which were faxed earlier.  Can you tell
14 us -- can you tell us what those documents are?
15     A   I would have to look at Binder No. 5 to be able to
16 answer that question.
17     Q   Do you have it there in front of you?
18     A   Let's see.  Here is 5.
19     Q   What are those documents?  Mr. Steele indicates
20 they are summaries of commissions paid to all AFLAC agents
21 including Dino Chavez for policies written under the
22 B.I.S.D. group numbers during the month of December, 2001?
23     A   Correct.
24     Q   Is that what you understand them to be?
25     A   That's what I understand them to be.

Page 96

1     Q   How were you -- were you able to use these for
2 writing your report?
3     A   I have not used these to date, no.
4     Q   Why not?
5     A   In responding to the Horner report, I did not find
6 it necessary to use this document to date.  I may find it
7 necessary to use it at a later time; but in responding to
8 the Horner report, I did not choose to use it.
9     Q   Okay.  Were the records incomplete?
10     A   I cannot make that judgment.
11     Q   Well, why not?
12     A   I have not --
13     Q   Do you have any reason to believe they are
14 incomplete?
15     A   I have no reason to believe they are incomplete,
16 no.
17     Q   Okay.  Did you have any reason to believe they're
18 not accurate?
19     A   I have no reason to believe that they are not
20 accurate.
21     Q   Why is it that you chose not to use them for your
22 report?
23     A   I did not have felt -- I did not feel that I had
24 all of the information from Horner.
25     Q   Okay.

Page 97

1     A   And as such, I could not go back and take his
2 documents to verify some of his figures; and I did not
3 choose to go back and use some of these source documents to
4 try to verify Horner's figures.
5     Q   You could have used these documents to try to
6 verify Horner's figures?
7     A   I could have used that step; but I thought the
8 more efficient step was to -- would be to begin with the
9 Horner documents, which I did not have.
10     Q   And which documents are you talking about?
11     A   All of his working documents, which supposedly
12 will be exhibits to his deposition; but I don't know that.
13     Q   Have you --
14     A   His working papers and the compilation of all the
15 information he used to prepare his reports.
16     Q   Okay.  Have you been reprovided with that yet?
17     A   No.
18     Q   Okay.  Either you or your office?
19     A   No.
20     Q   Okay.  But at this point you simply chose not to
21 utilize that information for your report?
22     A   Because I cannot know the sources from -- that
23 Horner used for his report, I felt it more efficient to get
24 his papers first.
25     Q   Okay.  Did you make any -- did you ever make any

25 (Pages 94 to 97)

ORAL DEPOSITION OF DONALD HOUSE

Page 102

1  equation to -- let me rephrase that.
2        Did Horner use the proper calculation to
3  determine discount rate in the Chavez report?
4        MR. STEELE: Objection, form.
5    A  No.
6    Q  (By Mr. Aguilar) Okay. Why not?
7    A  He did not use the -- a relevant measure of the
8  beta for the industry in which he was examining.
9    Q  And for which do you believe -- you say his beta
10  was wrong?
11    A  His beta is from the wrong industry.
12    Q  Okay. He used a beta from starting at AFLAC in
13  general, right?
14    A  He used a beta from AFLAC --
15    Q  Okay.
16    A  -- as a provider of insurance policies.
17    Q  Okay. Which beta should he have used?
18    A  He should have used the beta for insurance agents.
19  I think he would argue that it should be the beta for
20  regional sales coordinators. That may or may not be the
21  case. I'm not sure that I agree with that.
22    Q  Okay. You believe that the proper beta should
23  have been independent insurance agents or insurance agents
24  from a particular company or from -- from what?
25    A  I think the beta should be measured by those

Page 103

1  people who sell insurance policies and manage agents that
2  sell insurance policies, the downstream industry rather than
3  the upstream industry.
4    Q  All agents that sell policies?
5    A  All agents that sell policies, yes. There is an
6  industry of insurance agents that sell policies --
7    Q  Okay.
8    A  -- that service policies and train and manage
9  insurance agents.
10    Q  Are you talking --
11    A  That is the industry that I'm talking about.
12    Q  Okay. Are you talking about independent agents or
13  captive agents or both or something else?
14    A  I would say -- if I were to calculate a beta, I
15  would use both.
16    Q  A combination of independent agents and captive
17  agents?
18    A  I would.
19    Q  Okay. And you understand before, while Dino was
20  still with AFLAC, he was a captive agent, right?
21    A  He was a captive agent for a period of years after
22  he became the regional sales coordinator.
23    Q  Okay. Do you know what AFLAC's policies are for
24  its agents with respect to whether they're encouraged or
25  discouraged from selling other policies?

Page 104

1        MR. STEELE: And I'm going to object to
2  form --
3        MS. LEEDS: Object to form.
4        MR. STEELE: -- and let me make sure you
5  understand why, and I want to be helpful. By "agent" do you
6  mean first level of sales associates?
7        MR. AGUILAR: I'm sorry. Yes. Sales
8  associates.
9    Q  (By Mr. Aguilar) I'll distinguish because he made
10  a good point. There's different hierarchy at AFLAC, right?
11    A  Right.
12    Q  You've got initial associates, bottom-line agents?
13    A  Yes.
14    Q  Then you've got DSCs, RSCs, SSCs; and then you've
15  got regional directors?
16    A  Correct.
17    Q  And then you've got others beyond that, but I'm
18  talking about just the associates. Okay?
19    A  All right. And your question is: Does AFLAC have
20  a policy to discourage --
21    Q  Yes.
22    A  -- that level of agents from selling competing
23  products?
24    Q  Yes.
25    A  I do not know what their policies are with regard

Page 105

1  to encouraging. I am aware that the agents at that level
2  are able and can without violating AFLAC conditions sell
3  policies or products from other companies.
4    Q  By "AFLAC conditions" you're talking about what?
5    A  Whether they can be a representative of AFLAC;
6  that is, to sell AFLAC policies.
7    Q  Are you talking about the contract between AFLAC
8  and its associates?
9    A  Yes.
10    Q  Have you read that?
11    A  No.
12    Q  Okay. So, you don't know what that actually says
13  as to what they can and cannot sell?
14    A  No; but I am -- I'm drawing the inference that a
15  person can sell, at that level, AFLAC policies as well as
16  policies of other companies.
17    Q  Okay. And what's the basis for that?
18    A  Deposition testimony.
19    Q  Whose?
20    A  This would be Chavez, Andrus.
21    Q  Okay. Getting back to my actual -- my original
22  question, which was: Do you know what AFLAC's policy is on
23  whether -- on discouraging or encouraging or allowing
24  associates to sell other than AFLAC policies?
25        MS. LEEDS: Object to the form, asked and

27 (Pages 102 to 105)

ORAL DEPOSITION OF DONALD HOUSE

Page 110

1  opinion on — on that debate.
2      Q   Okay.
3      A   But I don't know where these additional components
4  come from.
5      Q   Okay. And on the company component, do you -- are
6  you saying that it shouldn't be there, it should be there
7  but a different number, or something else?
8      A   I think if I knew more about where it came from --
9      Q   Okay.
10     A   — I could give you a better description of -- of
11  my opinion on it. I do not know where it came from.
12     Q   Okay. At this point you can't tell us whether it
13  belongs there or not?
14     A   Given the fact that I don't know what it is, no.
15     Q   Okay. If you had been asked to determine the
16  discount rate, would you have included a No. 4 company, a
17  component for the company?
18     A   I don't know.
19     Q   What information would you need to know to decide?
20     A   Well, I'm not sure. I have a general explanation
21  from the Horner report about the company -- the company
22  component. It -- it does not strike a cord with me; but it
23  might if I knew where it came from, how it was calculated.
24  So, the fact that it is thrown in there just as a number --
25     Q   Threw you off?

Page 111

1      A   -- without any explanation, merely a label --
2      Q   Okay.
3      A   -- I really can't fully respond.
4      Q   Okay. So, if you were calculating discount rate,
5  it's something that -- you can't understand where it came
6  from, right?
7      A   I have not drawn any useful information from the
8  Horner --
9      Q   Okay.
10     A   -- reports to be able to testify where it came
11  from --
12     Q   Okay.
13     A   -- or how it was calculated.
14     Q   So, if you were calculating it -- getting back to
15  my original question. If you were calculating discount,
16  would you have included a company component?
17     A   I don't know.
18     Q   Why not?
19     A   I have not been asked to calculate a discount
20  rate. So, I don't know. I have not gone through that
21  process.
22     Q   In the appropriate economic analysis -- in an
23  appropriate economic analysis should the company -- do you
24  believe the company component should be included?
25     A   I have never used one before.

Page 112

1      Q   Okay. You have never used one?
2      A   But that doesn't say I wouldn't be encouraged in
3  this case to do so if I understood how it's being used.
4      Q   Okay. What about size component? Have you ever
5  used one before?
6      A   I have used size component before, yes.
7      Q   Okay. What are the arguments for and against a
8  size component?
9      A   The size component is basically a component of
10  additional risk because a firm is relatively small. The
11  theory is that small companies tend to be more risky than
12  the larger companies. That's the center of the debate. Not
13  all agree with that.
14     Q   With whether you should include it at all?
15     A   No. Whether the riskiness of the investment is
16  directly dependent upon the size of the company.
17     Q   And as a result of that, some include it; and some
18  don't?
19     A   Some include it, and some don't.
20     Q   Okay. Have you -- when you've made calculations
21  involving discount rates, have you always used it?
22     A   No.
23     Q   Have you never used it?
24     A   I have --
25     Q   And that's a weird question. Let me rephrase it.

Page 113

1      A   I can't answer that.
2      Q   Do you understand what I'm asking? What I'm
3  asking: Have you used it all the time? And the second
4  question is, now: Have you used it -- you say, "I never use
5  it"; and I think you told us earlier that's not the case
6  either, right?
7      A   I have used it, and I have had projects for which
8  I did not have a size component.
9      Q   In other words, there's -- sometimes you use it
10  and sometimes you don't and you have to determine based on
11  the individual circumstances?
12     A   Well, all the literature would agree if you have a
13  very large company, you would not use it.
14     Q   Right. But in -- when you have small companies,
15  do you always use it?
16     A   I have used it for small companies in the past
17  given the conditions that existed. I have had — but that's
18  not always true. I have had a small company in which I did
19  not use it.
20     Q   And what were the circumstances when you did not
21  use it?
22     A   This was a company that had a 60-year history
23  where its profitability was very, very stable. Its sales
24  were very, very stable. It was not of the size that one
25  would automatically exclude a, quote, size component. So,

29 (Pages 110 to 113)

ORAL DEPOSITION OF DONALD HOUSE

Page 118

1    A    With regard to the Chavez case --
2    Q    Yes.
3    A    -- or the Andrus case?
4    Q    Chavez.
5    A    No.
6    Q    With regard to the Andrus case, what's the
7    difference?
8    A    Well, it was a different way of compiling discount
9    rate altogether.
10    Q    Okay. We'll talk about that when we get to
11    Andrus.
12          MS. NEALLY:  Did you ever make it clear when
13    you were separating?
14          MR. STEELE:  Yeah, he did.
15    Q    (By Mr. Aguilar) Going back to I guess it's
16    Exhibit 6. That's your report. I'm sorry. Exhibit 4.
17    A    Well, I'm not doing a very good job here. Here it
18    is. I've got Exhibit 4.
19    Q    That's your report, right?
20    A    This is my report on Horner -- my response to
21    Horner's first report.
22    Q    In the first paragraph you indicate "information
23    which I've requested is still being assembled."
24    A    Yes.
25    Q    Has that been assembled yet?

Page 119

1    A    No.
2    Q    What -- what information are you talking about?
3    A    I have asked for all of the supporting information
4    that Horner used, and I have not received all of that.
5    Q    Anything else?
6    A    Those are the specifics that I requested.
7    Q    And you plan on -- you hope to get that for what
8    purpose?
9    A    I want to review Horner's work.
10    Q    For what purpose?
11    A    For forming an opinion.
12          I might also add in response to that question
13    that Horner's reports always are -- in both instances
14    indicate that a final opinion has not yet been rendered.
15    Q    Is that unusual?
16    A    Well, I don't know.  I -- I don't really survey
17    these things.
18    Q    In the experience you've had, is that unusual?
19    A    In my experience an expert usually forms an -- and
20    has an opinion that is set forth.
21    Q    Okay. You say --
22    A    That is subject to change; but in my understanding
23    of what Horner has done, he has not yet formed an opinion.
24    Q    Okay. And part of the basis for that is because
25    he said he was still waiting to get additional documents

Page 120

1    himself, right?
2    A    No. As I recall -- well, if I quote from his --
3    from his May 15th report, he concludes, "We do not have
4    complete figures in order to do an analysis or projection of
5    his earnings from this endeavor."
6    Q    Okay.
7    A    So, perhaps you're right, that he has not yet
8    assembled all of the information that he wants.
9    Q    Okay. And actually your report also says in that
10    first paragraph "My opinions at this time are necessarily
11    preliminary" since you were also trying to gather
12    information?
13    A    Well, I don't have Horner's opinion. So, yes,
14    mine necessarily is preliminary. He hasn't finished his
15    work.
16    Q    Okay. Going to the third paragraph of your report
17    on the third line down, you indicate "Chavez assembled a
18    group of agents to assist" -- I think that's supposed to be
19    him -- "in servicing the B.I.S.D. beginning with about 20
20    agents in 1998."
21    A    Correct.
22    Q    Where did you get that information from?
23    A    From the Chavez deposition.
24    Q    Do you know whether he was -- they were going to
25    be assisting him in servicing the account or doing the

Page 121

1    enrollment?
2    A    I'd have to review that testimony. I do not
3    recall.
4    Q    Based on your review of the testimony, your --
5    based on your review of Mr. Chavez's testimony, your
6    understanding is that it was just for servicing the entire
7    account, though?
8    A    I do not -- I am not testifying that that's the
9    exclusive way these agents are being used.
10    Q    I'm asking about that sentence you wrote.
11    A    Right. And it doesn't -- it is not used -- it is
12    not written to be an exclusive condition.
13    Q    Okay. Would it -- what you said is that he's --
14    he's got these agents to service the account, not to do the
15    enrollments, right?
16    A    I am not coming to that conclusion, no.
17    Q    Okay. "He assembled a group of agents to assist
18    him in servicing the account."
19    A    Correct.
20    Q    It doesn't say anything about enrollment, right?
21    A    Right. It does not say anything about enrollment.
22    Q    Okay.
23    A    That's the point.
24    Q    The next sentence, "About November of '98, he was
25    promoted to RSC with agents under his management." What did

31 (Pages 118 to 121)

ORAL DEPOSITION OF DONALD HOUSE

Page 126

1  sales come under a regional sales coordinator wherever they
2  may be.
3      Q   Okay.  Who got the B.I.S.D. account?
4          MS. LEEDS:  What do you mean "got"?
5      Q   (By Mr. Aguilar) Who originally acquired the
6  B.I.S.D. account for AFLAC?
7      A   I don't know.
8      Q   Okay.  Your understanding is somebody else had it
9  before Dino?
10         MS. LEEDS:  Objection, asked and answered.
11         MS. NEALLY:  Objection, asked and answered.
12     A   Chavez, as I understand, was an AFLAC agent --
13     Q   (By Mr. Aguilar) Okay.
14     A   -- at the time of the -- the award of the right to
15  market these type policies to B.I.S.D. employees. I'm
16  confused with -- with the way you phrase the question.
17     Q   Let me rephrase it.  Somebody has to go into
18  B.I.S.D. and place the account onto the cafeteria plan,
19  right?
20         MS. LEEDS:  Object to the form.
21     Q   (By Mr. Aguilar) Or arrange to have it placed onto
22  the cafeteria plan, right?
23     A   B.I.S.D. awards that account, as I understand it,
24  to a particular vendor.
25     Q   Okay.  Who was it --

Page 127

1      A   It was awarded to AFLAC.
2      Q   Okay.  And when it was first awarded to AFLAC, do
3  you know through whose efforts it was awarded to AFLAC?
4      A   I do not know that, no.
5      Q   Okay.
6      A   I cannot testify as to what person or persons were
7  totally responsible for that.
8      Q   So, if that was Dino, would your statement there
9  be correct?
10     A   All right.  Remind me which statement we're
11  talking about.
12     Q   Second sentence.
13     A   Second sentence.  The second sentence really
14  doesn't address who was responsible -- "who" being singular
15  or plural -- of getting B.I.S.D. to choose AFLAC as their
16  vendor.
17     Q   Okay.  So --
18     A   It doesn't address that at all.
19     Q   It's just talking about regardless of who actually
20  got the account -- I'm trying to figure out -- what you're
21  saying here is the B.I.S.D. customer base assigned --
22  B.I.S.D. was the primary customer base assigned to Chavez.
23  I'm trying to understand what you mean by the customer base
24  was assigned to Chavez.  What customer base are you talking
25  about?

Page 128

1      A   B.I.S.D. employees.
2      Q   Okay.
3      A   As I understand it, B.I.S.D. awarded AFLAC the
4  right -- the exclusive right to market those type products
5  to B.I.S.D. employees.  Chavez was regional sales
6  coordinator.  Therefore, it fell under his domain.
7      Q   Okay.  And you're thinking -- your understanding
8  is that it was assigned based on somebody else's work, or
9  you're saying it doesn't matter?
10     A   I'm not opining as to who was responsible.
11     Q   Okay.  So, it could have been that Chavez got that
12  customer base; and it wasn't actually assigned to him?  Let
13  me try to rephrase that question.
14         MR. STEELE:  Objection as to form.
15     Q   (By Mr. Aguilar) Actually I think you've probably
16  explained it as well as you could how the customer base was
17  assigned to Chavez.  Do you agree with that?
18     A   I've done my best.
19     Q   Okay.  You go on to say "By 2001 AFLAC's
20  first-year premiums represented less than half of all of
21  AFLAC's first-year premiums from sales of Chavez and agents
22  under his management."  What does that mean?
23     A   I think there is a typo there.
24     Q   Okay.  Just made a little mistake there?
25     A   Yes.

Page 129

1      Q   Which one?
2      A   I think the first use of AFLAC is B.I.S.D.
3      Q   That should have been B.I.S.D.?
4      A   Yes.
5      Q   Okay.  And every now and then you make errors in
6  typing or little things you might have just overlooked like
7  that.  That's part of why you might want to do an updated
8  report, right?
9      A   That -- that would be one reason, yes.
10     Q   Okay.  So, you meant to say by 2001 B.I.S.D.'s
11  first-year premiums; and the rest is the same, right?
12     A   Correct.
13     Q   What does that mean?
14     A   It simply means that in terms of the total
15  premiums paid to AFLAC, the B.I.S.D. component represented
16  less than half of the total for 2001.
17     Q   Relating to Chavez and his agents?
18     A   Yes.
19     Q   Okay.  You're only talking about Chavez and his
20  agents, right?
21     A   That's correct.
22     Q   You're not talking about AFLAC in general?
23     A   No.
24     Q   In the next paragraph you indicate "Partners
25  include Valentin Paz, Fernando de Pena, and Stephen Andrus.

33 (Pages 126 to 129)

ORAL DEPOSITION OF DONALD HOUSE

Page 134

1    Q   Okay.
2    A   And from that you subtract expected and actual
3    earnings.
4    Q   Okay.  What's the starting point?  Do you look at
5    his history?
6    A   It depends.  There are some times you do.
7    Sometimes you don't.
8    Q   Under what circumstances do you?
9    A   For someone that is in business that has a
10   history.
11   Q   That has an established business, a history, you
12   look at that established business, the history, what they've
13   been earning.  That's your starting point, right?
14   A   As a component, yes.
15   Q   As a component?
16   A   Yes.
17   Q   What if they haven't been working, for example a
18   guy right out of college?
19        MR. STEELE:  Let me just stop you for a
20   second.  Are we asking a damage model of someone who has
21   lost their job?
22        MR. AGUILAR:  No.
23   Q   (By Mr. Aguilar) I'm asking for, just generally
24   speaking, how it is you calculate lost earnings; and I'm
25   asking about different factors that go into the equation.

Page 135

1    You told us that the starting point generally is to look at
2    the history of what they've earned in the past, right?
3    A   For those people that have a history, that is a
4    component.
5    Q   Okay.  For those people who do not have a history,
6    what's your first step?
7    A   For those that do not have a history, you have to
8    understand, one, why; two, you look at the growth path of
9    businesses in the same industry under the same economic
10   conditions.  You look at cohorts as best can be
11   determined -- that is, businesses -- that are similar.
12   Q   Okay.
13   A   That is, the same composition, the same customer
14   base, the same geographic location, the same point in time,
15   same product mix, same pricing, similar composition of
16   staff.
17   Q   Okay.
18   A   Characteristics of staff, such as experience, et
19   cetera.
20   Q   Okay.
21   A   And other characteristics of the industry that
22   must be taken into account.
23   Q   Okay.  So, for a person who's just out of college
24   who's got a degree in insurance and he says, "I want to be
25   an insurance agent." Let's say he's involved in an auto

Page 136

1    accident the day he gets out of college.  What is your
2    starting point for him?
3    A   What is a "degree in insurance"?
4        MS. LEEDS:  Object to the form.  There is no
5    degree in insurance.
6    Q   (By Mr. Aguilar) It doesn't matter.  It doesn't
7    matter.  My point being that you've got somebody who goes to
8    school for a specific program -- a degree in insurance,
9    let's say -- let's say you get some kind of degree that
10   says -- that teaches you all about -- better yet, let's say
11   it's a BBA.  How's that, a Bachelor of Business
12   Administration?  Okay?
13   A   Okay.
14   Q   And they graduate from college; and the day they
15   get out of college, you know, they've been saying they want
16   to go into insurance, go sell insurance.  The day they get
17   out of college, they're injured in an auto accident.  They
18   can't work anymore.  What's the starting point for that
19   person?
20   A   The starting point is to identify their cohorts.
21   Q   Okay.  And who is that?  Other college students
22   who?
23   A   Other college students that come out of college
24   with similar degrees at the same age that go into that
25   particular line of work.

Page 137

1    Q   Okay.
2    A   You look at their income stream and their path
3    beginning at that point in time and taking into account
4    other complicating factors such as region of the country,
5    the type of policies being written or sold, the pricing, all
6    of the other -- other factors that would be unique that
7    would adjust that age-earning curve.
8    Q   Okay.  And have you ever testified in any case
9    that you can start with some earnings amount starting point
10   like you just talked about?  In any other case, have you
11   ever testified to that?
12        MR. STEELE:  Objection, form.
13   A   I have testified on lost earnings.
14   Q   (By Mr. Aguilar) That's not what I'm asking about.
15   I'm asking about have you ever testified to that particular
16   model where you've got somebody who just came out of
17   college, for example, and did not have any work history of
18   his own to establish lost earnings in the past?
19        MS. LEEDS:  Object to form.
20   Q   (By Mr. Aguilar) And testified that they still
21   have an anticipated amount of lost earnings in the future.
22   Have you ever testified in favor of that?
23        MS. LEEDS:  Object to form.
24   A   Yes.
25   Q   (By Mr. Aguilar) Okay.  What case was that?

35 (Pages 134 to 137)

ORAL DEPOSITION OF DONALD HOUSE

Page 142

1          MS. LEEDS:  Object to the form.
2     Q   (By Mr. Aguilar) In other words, what agencies or
3   what outside sources would you look at for comparison?
4     A   I don't think within Brownsville you would have
5   enough -- a sufficient sample --
6     Q   Okay.
7     A   -- with which to make that computation. You would
8   need a larger sample of insurance agents' returns and then
9   identify the geographic areas in which you have recorded
10  those, look at the nature of those geographic areas and make
11  a correction or an adjustment on the basis of that.
12    Q   What would be an accurate enough geographic area?
13    A   Well, you would need multiple geographic areas. I
14  don't know what you mean by "an accurate geographic area."
15    Q   It was your word. You said you look at a larger
16  geographic area, and I'm wondering which geographic area are
17  you talking about?
18    A   I would use multiple geographic areas.
19    Q   Including?
20    A   As many as I could.
21    Q   Specifically which ones?
22    A   Well, it's going to be governed by the nature of
23  the data. I mean, you would like the returns to every
24  insurance -- independent insurance agent in the United
25  States by location.

Page 143

1     Q   So, in order to --
2     A   Give me -- give me 250,000 of them all over the
3   United States, that would be the best data set I could make
4   use of.
5     Q   Okay. And if you couldn't get that, what would
6   you rely on?
7     A   I would rely upon a smaller sample.
8     Q   Okay.
9     A   Let's say you have available the insurance agents
10  from the southeast United States and the south central
11  United States. You'd make use of that.
12    Q   What I'm asking is:  What would be a sufficient
13  enough sample to use?
14    A   You don't know unless you know the volatility of
15  those returns. So, I can't tell you until I look at the
16  data whether you -- the size of the sample that you need to
17  make an accurate statement is conditioned on the standard
18  deviation or the standard error of your income strength.
19    Q   Until you determine what is actually out there,
20  what is available, you can't say -- you can't tell us now
21  what -- how -- you can't tell us at this point how much of
22  an area would be a sufficient enough sample?
23          MS. LEEDS:  Object to the form.
24    A   How much of an area, or how many observations?
25    Q   (By Mr. Aguilar) What do you mean by

Page 144

1   "observations"?
2     A   How many independent agents are you sampling.
3     Q   Okay. That.
4     A   I don't know. I would have to look at the nature
5   of the data I have conducted. With such a study you can --
6   you could. With preliminary evidence you could probably
7   come to that conclusion, but I have not conducted that
8   study.
9     Q   But you haven't done that?  Okay.
10          I presume the same information applies to
11  mitigation information?
12    A   It does.
13    Q   Okay. Basically everything you've told us in
14  evaluating the determination and how to establish an agent's
15  lost sales based on his history in the past would also apply
16  equally to evaluating his mitigation efforts for the future?
17    A   That's correct. You would identify the industry
18  in which they would go into, and then look at the expected
19  returns from those endeavors.
20    Q   Okay. Have you done that for Mr. Chavez?
21    A   No. I have not been asked to.
22    Q   Do you plan to do that at this point?
23    A   I have no plans to do that right now.
24    Q   So, in order to adequately determine mitigation
25  for Mr. Chavez, what do you believe we should have to look

Page 145

1   at?
2     A   You have to construct the scenario of what
3   Mr. Chavez --
4     Q   I mean, specifically what do we have to look at?
5     A   -- is going to earn both in the present and the
6   future.
7     Q   Okay.
8     A   And you need to look at the returns for insurance
9   agents of his experience, of his age, and his geographic
10  location.
11    Q   And by "geographic location" do you mean
12  Brownsville? Do you mean the Rio Grande Valley? What?
13    A   I would say the South Texas area. He was active
14  in -- in selling policies well beyond the city of
15  Brownsville.
16    Q   Okay.
17    A   So, I would look at South Texas, maybe all of
18  Texas. There's no particular requirement that he -- that
19  you limit your search there if the returns are higher in
20  Austin or Dallas. To mitigate expenses there is some
21  requirement for him to go wherever the market is best.
22    Q   At this point you can't tell us whether South
23  Texas is enough or whether you'd need to look at all of
24  Texas?
25    A   I have not looked at that to be able to give you

37 (Pages 142 to 145)

ORAL DEPOSITION OF DONALD HOUSE

Page 150

1    A   It would be the earnings.
2    Q   Earnings returns. Basically the 1040 returns. Is
3  that what you meant, or are you talking about the insurance
4  company's information?
5    A   I'm looking at their income.
6    Q   Okay. Their income. I'm going to change
7  "returns" to "income." Is that what you meant?
8    A   Okay. That would be fine.
9    Q   How do you get that?
10   A   There are a variety of ways. And you keep saying
11  South Texas and Texas, recall that my ideal is all over the
12  entire United States.
13   Q   Right.
14   A   Those records are certainly available from the
15  insurance companies.
16   Q   Which -- all the insurance companies?
17   A   Insurance companies keep records on what they pay
18  their agents.
19   Q   So, basically you're suggesting, at least as a
20  starting point, to get every insurance company that does
21  business in South Texas or the state of Texas for income for
22  cafeteria type agents?
23   A   And the United States.
24   Q   And the United States?
25   A   I would start with the United States and try to

Page 151

1  see what is available and also do surveys.
2    Q   Every insurance company in the nation?
3    A   You -- let me -- let me be careful here, and
4  clear. I'm not saying that you must have all of this data
5  to do an examination of earnings to determine mitigation
6  returns or what would Mr. Chavez receive as an income in
7  mitigating his alleged damages. What we're talking about
8  here is the ideal study. The ideal study hasn't been done.
9  The ideal study may not -- one may not be able to do the
10  ideal study. What we're listing here are all of the
11  characteristics of the ideal study.
12   Q   I'm just asking what you believe would be
13  sufficient --
14       MS. LEEDS: Objection, speculation.
15   Q   (By Mr. Aguilar) -- to be able to determine --
16   A   I do not know at this point what would be
17  sufficient because I haven't conducted the study.
18   Q   Until you actually start getting the information,
19  you won't know how much is sufficient, right?
20       MS. LEEDS: Object to the form.
21   A   I would only be projecting what I think I'm going
22  to find.
23   Q   (By Mr. Aguilar) Okay. So, you'd be -- you'd want
24  to get the information from the insurance companies; and
25  ideally you'd want to get the insurance -- the information

Page 152

1  from every insurance company in the United States, right?
2    A   Ideally I would, yes; and if I have my dream
3  study, that's what would be in it.
4    Q   Okay. And how do you get the names of all the
5  agents, or are you just asking generally every cafeteria
6  type agent?
7    A   A number would be fine. I don't have to meet
8  them.
9    Q   I'm sorry?
10   A   A number would be fine. I don't need to meet
11  them.
12   Q   What do you mean by -- I don't understand your
13  answer.
14   A   I don't need their names.
15   Q   Okay. That's what I mean. What I'm asking is:
16  How do you get the information from the insurance company?
17  Do you need their names or do you just send them a letter
18  saying, "Hi. I'd like to get all the information that you
19  have" or do you have to know -- in order to get -- actually
20  get the information from the insurance companies, do you
21  have to know the names of the insurance agents?
22       MS. LEEDS: Objection, asked and answered.
23   A   I don't need to know their names. I need their
24  records, and I would ask for the records of all their
25  insurance agents --

Page 153

1    Q   (By Mr. Aguilar) Okay.
2    A   -- that are specialists at this particular line of
3  business.
4    Q   Okay.
5    A   And they would give me a number -- an employee
6  number and an agent number.
7    Q   Okay.
8    A   And they would give me the history of their
9  returns or their commissions, and I would be able to
10  assemble that. I would know their location.
11   Q   Okay.
12   A   They may give me their ZIP code. I would then be
13  able to pull together the demographic information.
14   Q   Okay.
15   A   If I had all of the -- all of the information from
16  all the carriers, I would know the number of competing
17  brands in the area; and I would use that to ultimately
18  calculate the factors that affect the annual incomes of
19  these people.
20   Q   Okay.
21   A   And from that I can project --
22   Q   Okay.
23   A   -- what the expected income of Mr. Chavez would
24  be.
25   Q   Okay. And in Texas how many insurance companies

39 (Pages 150 to 153)

ORAL DEPOSITION OF DONALD HOUSE

Page 158

1    A   — and identifying —
2    Q   Other than the items you've already mentioned, if
3  you can't do any of those, what would you do?
4    A   Okay.  Now we're down to you can't do any of
5  those?
6    Q   Right.
7    A   Then next we'd try to identify an association that
8  has as members insurance agents.
9    Q   Cafeteria agents, you mean?
10    A   Well, any insurance agents.  Usually you have
11  associations of people that are doing similar things and
12  then oftentimes the membership itself will give you some
13  characteristics of their members and it may well be the case
14  that you can find people —
15    Q   Okay.
16    A   -- that specialize in that particular area.
17    Q   In other words, try to go through an association
18  to find out who the cafeteria agents are?
19    A   Yes.
20    Q   Okay.  And if you can't do that, then what would
21  you do?
22    A   There are firms that collect this kind of
23  information.  Robert Morris Associates is one of them.
24  There are other consulting firms that collect information on
25  small businesses.  I would go to those speciality firms and

Page 159

1  buy the data.
2    Q   What type of data do they sell?
3    A   Robert Morris Associates is one company that
4  retains and examines end-of-year accounting reports by
5  industry, and one of the industries is insurance agents.
6    Q   Do you know if they narrow it down to cafeteria
7  agents?
8    A   Well, you would have to go to them to see what
9  unpublished data they have.  That would be a source to go
10  to.
11    Q   Okay.
12    A   And there are other speciality firms that do that
13  as well.
14    Q   Okay.
15    A   I don't know the names of all of them.  I've never
16  tried to identify all of them.
17    Q   They're just those --
18    A   But there will be firms that specialize in
19  analyzing those kinds of businesses.
20    Q   Robert Morris type associations or firms?
21    A   Well, not -- not just Robert Morris Associate type
22  firms.  There will be -- there will be others, and you just
23  have to find them.
24    Q   Okay.  And if you can't do that, then what would
25  you do?

Page 160

1    A   I don't know.  I haven't done the study.  So, I
2  haven't thought all the steps through.
3    Q   Nothing else you can think of right now?
4    A   Not off the top of my head.  Those would be the
5  steps that I would go through initially, but —
6    Q   And if you didn't -- go ahead.
7    A   But that's — there will be additional steps
8  beyond that, but you have to be into the study to really
9  have thought that through and come up with a complete list.
10    Q   Okay.  If you haven't done any of those things,
11  how would you determine what appropriate mitigation should
12  be?
13    A   I don't —
14    Q   Can you?
15    A   I think I've answered that question.
16    Q   I said if you haven't done those.
17    A   We have listed a number of steps.
18    Q   I know.  What I'm saying is if you don't do those
19  steps.
20    A   If I could not accomplish any of those steps,
21  there would be additional steps that I would take that I
22  cannot list for you today.
23    Q   Nothing you can think of right now?
24    A   No.  I would have to be into the study to come up
25  with those ideas —

Page 161

1    Q   Okay.
2    A   — and do some research —
3    Q   Okay.
4    A   -- or look in the literature to see what people
5  have written about it, what data sets they have used.
6    Q   Okay.
7    A   There may well be lots of data sets.  Oh, one
8  other would be the current population survey.  They may well
9  identify —
10    Q   Is that the name of an organization --
11    A   It's —
12    Q   -- or publication?
13    A   It is a data set that is maintained by the Bureau
14  of the Census, which is the — I think the 5 percent sample
15  where they do a 5 percent sample of households in the United
16  States; and they give you information about your profession.
17  You may be able to get some information on independent
18  insurance agents from that standpoint.  It's just another
19  data set that comes to mind.
20    Q   Okay.
21    A   There may be others, but part of the search would
22  be looking at the literature and identifying people who have
23  done studies on incomes of insurance agents and identifying
24  what data sets they've used.  Sometimes they will identify
25  public use data sets and sometimes they have proprietary

41 (Pages 158 to 161)

ORAL DEPOSITION OF DONALD HOUSE

Page 166

1 owner. He's got alternatives. He doesn't appear to be
2 destitute -- to become destitute, and what did you say about
3 positive earnings?
4    A    That I don't believe that his future earnings will
5 be zero.
6    Q    You just believe he'll have future earnings?
7    A    Yes. That's in contrast to the opinion of
8 Mr. Horner at this point.
9    Q    Anything else?
10         MR. AGUILAR: Objection, nonresponsive.
11   Q    (By Mr. Aguilar) Anything else?
12   A    Those are the points that come to mind, but I
13 think they're important points.
14   Q    Okay. From that information you can't tell us the
15 amount that he will earn over the next 25 years, right?
16   A    I have not conducted a study to determine that.
17   Q    I'm just asking whether you can or cannot.
18   A    As I sit here --
19   Q    If the reason is because you haven't done the
20 study, that's fine; but I'm just asking "yes" or "no," can
21 you?
22        MS. LEEDS: Object to the form, speculation.
23   A    I cannot give you a number today. I believe I
24 have the capability of doing it. I have not done it.
25   Q    (By Mr. Aguilar) Your testimony today is that you

Page 167

1 believe he will have earnings in the future --
2    A    I do --
3    Q    -- correct?
4    A    -- believe he will have earnings in the future,
5 yes.
6    Q    But you can't tell us today how much those
7 earnings will be?
8    A    I have not conducted a study to give you a
9 quantification of those earnings. I cannot give you that
10 today.
11   Q    Thank you.
12        If Mr. Chavez was hurt in an auto accident
13 today, what amount of lost earnings would you be able to
14 testify from the evidence you've been presented that he has
15 in lost earnings?
16        MS. LEEDS: Object to the form.
17        MS. NEALLY: Objection, form.
18        MR. STEELE: Objection, form, relevancy.
19   A    Let me see if I understand --
20   Q    (By Mr. Aguilar) From his new business.
21   A    If he were in an accident --
22   Q    Today.
23   A    -- today, the question is what would be the
24 quantification of his future earnings?
25   Q    From his new business.

Page 168

1    A    From The Teachers' Agency?
2    Q    Yes.
3         MS. LEEDS: How bad was the accident?
4    A    There -- there are all kinds of reasons --
5    Q    (By Mr. Aguilar) Assuming he can't work anymore,
6 to answer Ms. Leeds' question.
7    A    He is permanently disabled?
8    Q    Let's say he has a permanent injury -- permanent
9 disabled injury, can't ever work again.
10   A    He can't ever work again, and your question is
11 limited to what income he would have earned for the rest of
12 his life at The Teachers' Agency?
13   Q    Yes.
14   A    I do not know --
15   Q    Okay.
16   A    -- because I do not know that he will remain at
17 The Teachers' Agency for the rest of his life.
18   Q    Okay. Can you tell us what Dino's anticipated
19 income will be from The Teachers' Agency for the next 25
20 years?
21   A    No; but in calculating the mitigation of damages,
22 I would not have asked that question anyhow.
23        MR. AGUILAR: Objection, nonresponsive after
24 "no."
25   Q    (By Mr. Aguilar) You agree that his business, The

Page 169

1 Teachers' Agency, is still unestablished, right?
2    A    My understanding is that The Teachers' Agency is
3 an established company to date.
4    Q    Unestablished in terms of economically
5 unestablished, not yet established.
6    A    I don't understand your question.
7    Q    You indicated that one business that was a
8 small business that you used, you did not include -- what
9 was it, size or the other factor -- I think it was size in
10 your calculation. Do you remember that?
11   A    Yes.
12   Q    Why was it? I think you said because that was a
13 long established business?
14   A    It had a history of 60 years.
15   Q    Okay. Do you agree Dino's business, The Teachers'
16 Agency, does not have a 60-year established reputation,
17 correct?
18   A    That's correct.
19   Q    And for that matter, it -- how long has it been in
20 existence?
21   A    As best I recall, one to two years.
22   Q    Okay. And do you understand that that business is
23 not established in the same way that that other company was
24 that had been in business for a long time?
25   A    Well, they're in different industries. They

43 (Pages 166 to 169)

ORAL DEPOSITION OF DONALD HOUSE

Page 174

1  taught you how to determine who's a skilled Section 125
2  cafeteria plan person and someone who is not?
3      MS. LEEDS: Object to the form.
4      A   No.
5      Q   (By Mr. Aguilar) Okay. You go on to say, "It is
6  quite probable that his future earnings stream will equal or
7  exceed what he would have earned as AFLAC's RSC over the
8  next 25 years. There is significant evidence that supports
9  this likelihood." What's the evidence that supports the
10 likelihood that Mr. Chavez is going to be earning what he
11 was earning as RSC's -- I'm sorry -- AFLAC's RSC?
12     A   The evidence that the insurance -- that the market
13 for insurance agents is competitive. That if indeed he has
14 the skills that would convince AFLAC to make him a regional
15 sales coordinator, that AFLAC is not the only employer of
16 people with those skills. The market for insurance is very
17 competitive and if indeed he has that skill set, he will be
18 in demand for other carriers that have products that are
19 competing in that same market and if indeed he has those
20 skills and the testimony suggested is he will have
21 alternatives.
22     Q   Okay.
23     A   The evidence does not suggest that AFLAC pays
24 premiums above all other companies for people with those
25 skills. Therefore, since it is a competitive market, one

Page 175

1  would expect that he would be able to replace that income
2  stream having that skill set in the market for insurance
3  agents; and I see no evidence that would suggest that he is
4  incapacitated. No evidence that would suggest that the
5  market is so non-competitive that AFLAC is the only company
6  in America that would find his skills so valuable --
7      Q   I think you already said that.
8      A   -- to pay him the earnings that he's received to
9  date.
10     MR. STEELE: You just don't like that answer,
11 do you, Arnold?
12     MR. AGUILAR: No. He just said the same
13 thing twice. I'm just trying to make a list and I want to
14 make sure I include everything but he doesn't need to
15 repeat.
16     MR. STEELE: Let's follow that with our
17 questioning, too, if we could.
18     Q   (By Mr. Aguilar) Anything else?
19     A   No.
20     Q   What I caught, you said the evidence that he's
21 going to earn the same as he would have earned as an AFLAC
22 RSC is it's a competitive market; basically if he was able
23 to convince AFLAC, he should be able to get hired by some
24 other company on the same basis of his skills that he used
25 to convince AFLAC in the first place; no evidence that AFLAC

Page 176

1  doesn't pay the same as all others in the business; and he's
2  not incapacitated. Did I leave out anything?
3      A   Well, you have mischaracterized --
4      Q   Which one?
5      A   -- the import of my comment.
6      Q   I don't mean to do that. I mean, I'm just trying
7  to --
8      MR. STEELE: Just stop repeating it, and
9  let's move on.
10     MR. AGUILAR: Thank you, Buddy.
11     A   The import of my statement is not that he would be
12 able to go and convince others to hire him. That is not it.
13 The market is very competitive, and firms such as AFLAC are
14 constantly looking for skilled agents.
15     Q   (By Mr. Aguilar) Okay.
16     A   That he could be able -- or would be able to
17 present his credentials with his experience --
18     Q   Okay.
19     A   -- and there are companies that would find him
20 valuable to them --
21     Q   Okay.
22     A   -- and pay him a competitive return --
23     Q   Okay.
24     A   -- just as AFLAC was doing.
25     Q   Okay. Anything else?

Page 177

1      A   No.
2      Q   Turning to page 4, second paragraph: "It is
3  possible that his earnings" -- referring to Mr. Chavez --
4  "as a non-captive AFLAC agent will exceed what he would have
5  earned as a captive AFLAC agent."
6      A   Uh-huh.
7      Q   And again, is the basis for your saying that the
8  same thing you just told us?
9      A   Correct.
10     Q   Other than that, nothing else?
11     A   Correct. The market is competitive. Those with
12 skills get paid in the marketplace.
13     Q   Do you think it's possible that his earnings as a
14 non-captive AFLAC agent will not exceed what he would have
15 earned as a captive AFLAC agent? Is that possible, also?
16     MS. LEEDS: Objection, speculation.
17     A   By your question you're suggesting that there were
18 premiums paid in the marketplace for him as a captive agent.
19 The question is: If he's not a captive agent, is it
20 possible that they be less than that? It is possible, but
21 he could also be captive for another company.
22     Q   (By Mr. Aguilar) Okay. He could be captive for
23 another company; and even if he's captive for another
24 company, it's possible that his earnings would be less as
25 well? That's possible?

45 (Pages 174 to 177)

ORAL DEPOSITION OF DONALD HOUSE

Page 182

1  what the long run growth rates are. You go to any start-up
2  business in any industry and look at the first three years
3  of sales growth; and if you take that and that's all you
4  have and you use that to predict what the long term growth
5  rate of that company would be, it would not be a good
6  predictor.
7     Q   Okay. So, your understanding is that the growth
8  rate of every business during the start-up point is always
9  large; and that it just decreases after that?
10       MR. STEELE: Objection, form.
11    A   Of those that survive, yes. There may be some
12  exceptions.
13    Q   (By Mr. Aguilar) Can you tell us when Mr. Chavez'
14  growth rate was expected to decrease if he had stayed at
15  AFLAC?
16    A   Well, I have not projected what those earnings
17  would be.
18    Q   You just don't --
19    A   Mr. Horner has.
20    Q   Okay. You just --
21    A   Mr. Horner is testifying that it's going to remain
22  very high at almost 19 percent per year, and I'm questioning
23  that.
24    Q   Okay. And you just don't know to be able to tell
25  us what it actually would be because you have not made those

Page 183

1  calculations?
2     A   I am of the opinion that those are unreasonable.
3     Q   Okay. And what would be reasonable?
4     A   They would be less than 19 percent.
5     Q   What amount would be reasonable?
6     A   I have not conducted an investigation to give you
7  my best estimate of that number. I have not done that.
8     Q   Okay. You can't tell --
9     A   But I am reflecting on what Mr. Horner is
10  testifying to.
11    Q   You can't tell us what would be reasonable.
12  You're just saying Horner's is not reasonable?
13    A   I'm saying 19 percent and above is unreasonable.
14    Q   Going on to the next paragraph, "There is no
15  evidence that would suggest that Chavez would have remained
16  an AFLAC RSC by qualifying each year under the alleged
17  15 percent requirement." Now, you agree that Mr. Chavez is
18  very skilled, right?
19    A   The testimony suggests that yes, he is skilled.
20    Q   Okay. Actually you saw that testimony of the
21  same. His partner thought he was one of the most skilled
22  125 agents in South Texas, right?
23    A   That's correct.
24    Q   Any basis to believe he would not be able to make
25  15 percent every year?

Page 184

1     A   Saturation.
2     Q   Now, you indicated that Mr. Chavez is -- you
3  already saw Mr. Chavez's growth being greater out of
4  B.I.S.D. than inside of B.I.S.D., right?
5     A   Correct.
6     Q   And you also understand that Mr. Chavez was not
7  strictly limited to just the South Texas area, that he was
8  actually expanding out to the Austin and Houston areas as
9  well, right?
10    A   My inference was that that was not his target.
11    Q   Okay. You understood he was doing that, though,
12  right?
13    A   I understand that he had some agents that were
14  located there.
15    Q   Okay.
16    A   But that was not his targeted area.
17    Q   And if -- you understood that there's no
18  restrictions within AFLAC where he had to stay just in the
19  Rio Grande Valley, right?
20    A   I don't know the territorial --
21    Q   You don't know?
22    A   -- restrictions that AFLAC imposes.
23    Q   Okay.
24    A   My inference was that he had intended upon
25  concentrating his efforts in South Texas as an AFLAC RSC.

Page 185

1     Q   So, if there are no restrictions like that, how
2  would saturation play?
3     A   If there are no restrictions, if he could go
4  anywhere, then saturation would not play.
5     Q   Okay. So, any other basis or evidence that you
6  have to believe that Mr. Chavez would not qualify each year
7  under the 15 percent requirement?
8     A   No. Just that, that there is ultimately going to
9  be saturation among his groups of employers in South Texas;
10  and the 15 percent per year is an unreasonable number to
11  carry for 25 years.
12       MR. AGUILAR: Objection, nonresponsive after
13  "no."
14    Q   (By Mr. Aguilar) You go on to say, two sentences
15  down, "This is not sufficient evidence to prove that Chavez
16  had the energies, skills, and talents to achieve this goal
17  for the next 25 years." What's that based on?
18    A   I'm sorry. I've lost exactly where you are.
19    Q   Bottom of page 4.
20    A   Okay. Got it. I'm with you. I'm just trying to
21  read it in context.
22    Q   Sorry.
23    A   Okay.
24    Q   What was that based on?
25    A   Based upon the inference that there is sales

47 (Pages 182 to 185)

DSI Reporting Services, Inc.
713-554-0080

ORAL DEPOSITION OF DONALD HOUSE

Page 190

1    Q   And if you go to --
2    A   Mr. Horner, on his page -- and I don't know if
3    it's paginated.
4    Q   4.
5    A   Page 4. If you look on page 4 of his report, he
6    has a table that shows the present value of low -- lost net
7    earnings, as an economist. He has calculated those under
8    the assumption that there are zero earnings in mitigated
9    damages, zero. So, when he puts forth this particular table
10   as a present value of lost net earnings, as an economist,
11   they stand as a measure of lost earnings.
12   Q   Okay.
13   A   And as a measure of lost earnings, you properly
14   account for the mitigation of those earnings as well; so,
15   the implied mitigation is zero.
16   Q   If you'll look at the first sentence under
17   "mitigation earnings," it says, "To the extent that
18   Mr. Chavez' termination from his position as regional sales
19   coordinator at AFLAC opens other opportunities for him, the
20   present value of net earnings from these additional pursuits
21   should be subtracted from the present value of lost earnings
22   estimated above." That means that you should take into
23   account mitigation earnings, correct?
24   A   That is -- that is what he is saying.
25   Q   Okay. He goes on to say -- the last sentence in

Page 191

1    that paragraph -- "Although I would expect that this
2    operation" -- meaning his new position -- "will eventually
3    be successful, it is too early to prepare a reliable
4    projection of Mr. Chavez' future earnings from this
5    endeavor." You disagree with that comment?
6    A   I -- I don't understand --
7    Q   You don't understand it?
8    A   No. Let me answer it. I do not understand what
9    Mr. Horner has and has not accomplished because I haven't
10   seen his working papers.
11   Q   Okay. And what you're looking at is some of those
12   factors that we talked about earlier on the scenario that
13   you'd want to look at where we talked about income from
14   agents like Mr. Chavez in this area and across the United
15   States, that discussion we were having earlier?
16   A   No, not exactly. I'm saying Mr. Horner cannot
17   provide any estimate of economic damages unless there is a
18   calculation of the mitigation of earnings.
19   Q   You're saying -- sorry. I didn't mean to
20   interrupt.
21   A   So, from this standpoint Mr. Horner has provided
22   no opinion, although he has provided estimates of the
23   present value of lost earnings.
24   Q   I get it. You're just saying because he did not
25   consider mitigation, he shouldn't have submitted anything in

Page 192

1    the report, something like that?
2    A   I'm saying that this is a partial compilation; but
3    it is presented as the present value of lost earnings, which
4    it is not.
5        MR. STEELE: Is this a good time to take a
6    break to pass out lunch, Arnold?
7        MR. AGUILAR: Yeah. Let's go off the record.
8        (Lunch recess from 1:20 p.m. to 1:50 p.m.)
9    Q   (By Mr. Aguilar) Continuing at page 5 of your
10   report, the first new paragraph, you indicate "AFLAC was
11   given exclusive rights to market AFLAC policies to qualified
12   employees of B.I.S.D." What did you mean by that?
13   A   As I understand it, no other vendor was given the
14   rights to go on the campus and offer these tax deferred
15   products.
16   Q   Do you know who was offering a dental policy at
17   B.I.S.D.? I mean, if there was one.
18   A   I understood that there was one, but I do not
19   know.
20   Q   I mean, was it AFLAC or somebody else?
21   A   I do not know the answer to that.
22   Q   I'm trying to understand what you mean by that.
23   In other words, when you say it was given exclusive rights
24   to market AFLAC policies, do you mean only AFLAC was given
25   rights to AFLAC -- I'm sorry -- to market all policies?

Page 193

1    A   No.
2    Q   Okay.
3    A   Those type policies; that is, the cafeteria
4    policies.
5    Q   Okay. All the -- all the policies on the
6    cafeteria plan, only AFLAC policies were included on that
7    plan?
8    A   No. Well, that may be true. I don't know that to
9    be true.
10   Q   What's your understanding?
11   A   My understanding is that only AFLAC was approved
12   as the vendor to supply those products.
13   Q   All of the products in the cafeteria plan?
14   A   All of the products in the cafeteria plan,
15   although I'm not sure that they had to be all AFLAC
16   policies.
17   Q   Okay. But you understood that -- what's the
18   difference?
19   A   If part of the cafeteria plan AFLAC did not carry
20   a particular product that the employees had, that it might
21   have been possible for -- and I don't know this to be the
22   case -- might have been possible for AFLAC to -- to also
23   provide another vendor's product to complete the gamut of
24   those -- say, if dental is one of them that employees wanted
25   in that cafeteria plan, AFLAC didn't have a dental policy.

49 (Pages 190 to 193)

ORAL DEPOSITION OF DONALD HOUSE

Page 198

1    A    In the sense it applies to the cafeteria plans.
2    Where you first introduce cafeteria plans, there are usually
3    rapid growth rates as people who want those policies enroll.
4    Q    Okay.
5    A    The percentage increases are large.
6    Q    How long would you expect those percentage
7    increases to remain large?
8    A    It depends upon the turnover of employees.
9    Q    At B.I.S.D.?
10    A    I would -- I do not have an answer for that at
11    this point. I would have to look more carefully at turnover
12    rates --
13    Q    Okay.
14    A    -- and numbers of policies sold.
15    Q    You go on to indicate "Once existing qualified
16    employees had switched policies from the previous carrier to
17    AFLAC, annual rates of first year premiums among B.I.S.D.
18    employees would largely be determined by qualified employee
19    turnover and expanded dependent coverage."
20    A    Right.
21    Q    It sounds like what you're saying is after that
22    first year, you'd expect it to start going down?
23    A    After the -- after you have grown up your growth
24    curve, you will hit a plateau; and then further growth is
25    dependent upon that, yes. It may take more than a year to

Page 199

1    get there.
2    Q    How long would you expect it to take?
3    A    I don't know. I haven't investigated that. It
4    could be multiple years.
5    Q    Okay. You don't have any insurance experience
6    yourself for making any sales in insurance products to be
7    able to determine how long that procedure or period would
8    last, right?
9    A    I have not investigated that, how long that period
10    would take in this particular instance.
11    Q    Okay. Now, what you're talking about here is
12    annual rates of growth of first year premiums --
13    A    Uh-huh.
14    Q    -- would largely be determined by qualified
15    employee turnover and expanded dependent coverage. It
16    sounds like what you're saying -- and correct me if I'm
17    wrong. It sounds like what you're saying is after the first
18    year, after that, you'd maybe be looking at -- rates of
19    growth would be based on employee turnover and expanded
20    dependent coverage. Did I interpret that right?
21    A    No.
22    Q    Okay. Tell me what -- what's wrong about that
23    interpretation.
24    A    There is a period of time -- it may be multiple
25    years until you reach that plateau where growth rates are

Page 200

1    then determined by employee turnover and expanded dependent
2    coverage.
3    Q    Why is it you refer to growth of first year
4    premiums?
5    A    Because those are the new policies that you're
6    selling.
7    Q    Okay.
8    A    That is, that is where the most rapid growth comes
9    as people come and pay their first year premiums, not
10    renewals but first year premiums.
11    Q    Wouldn't that happen in the first year that the --
12    AFLAC came in?
13    A    No, not necessarily.
14    Q    Wouldn't first year premiums be from the first
15    year that AFLAC came in? That's what I'm trying to ask.
16    A    No. When -- when an employee comes in and buys
17    the cafeteria plan -- it may be after two or three years
18    that AFLAC is there -- that would be their first year
19    premium.
20    Q    Right. But that has to do with the employee --
21    the second part of the sentence, the employee turnover and
22    expanded dependent coverage?
23    A    No. The point is it doesn't. The first year you
24    may get 8 percent of your employees that sign up for the
25    cafeteria plan. The next year you may have another 8

Page 201

1    percent that do it. That second 8 percent are paying first
2    year premiums.
3    Q    Oh. What you're saying is whenever everybody
4    first buys their policy, after that, the number of those
5    same people buying their policies goes down?
6    A    No. After you get your -- what we would call the
7    expected penetration of employees -- that is, let's say,
8    with significant marketing efforts -- you may achieve
9    28 percent of the employees sign up for this particular
10    plan.
11    Q    It's called a thorough market penetration. Just a
12    term. I know it's not one of your terms of art or anything,
13    but just so we understand generally. Are you talking about
14    something like thorough market --
15    A    Well, that's your term, not mine.
16        MS. NEALLY: Objection, form.
17    Q    (By Mr. Aguilar) Right.
18    A    I'm saying there will be some level of penetration
19    that you would expect from marketing plans, and generally
20    you would not expect to achieve that in the first year, that
21    it may take three, it may take four years to reach that
22    level of penetration. Let's say -- assume 28 percent of the
23    employees are going to buy that particular fringe benefit.
24    So, after that, any growth is going to be determined by
25    employee turnover and expanded dependent coverage. You're

51 (Pages 198 to 201)

ORAL DEPOSITION OF DONALD HOUSE

Page 206

1  sold play into that factor or not?
2      MS. LEEDS: Objection, form.
3      Q   (By Mr. Aguilar) In other words, you're saying you
4  don't think they could -- Mr. Chavez could be expected to
5  continue to grow at 19 percent, right?
6      A   That is my testimony.
7      Q   Okay. Is it just a matter of what number he
8  starts at, or is it because ultimately his numbers will go
9  too high?
10     MS. LEEDS: Object to the form.
11     A   At very small levels of sales, 19 percent growth
12  rate is not unexpected. When you're at $4 million of sales,
13  19 percent growth rate is difficult to achieve. At
14  $25 million in sales, 19 percent growth rate for a group
15  such as that is even more difficult to achieve because of
16  interbrand competition.
17     Q   (By Mr. Aguilar) Okay. Are you aware how much
18  AFLAC agents are selling today, how much sales they have per
19  year?
20     MS. NEALLY: Objection, form.
21     Q   (By Mr. Aguilar) Did you check into that? Do you
22  understand my question?
23     A   I understand your question. No, I have not looked
24  at total sales or sales per agent for AFLAC.
25     Q   That doesn't matter for purposes of this

Page 207

1  conclusion?
2      A   No. The question is: How does that grow over
3  time? That particular statistic would not land any useful
4  evidence for -- of that.
5      Q   Okay. You go on to say "Horner has offered no
6  substantive report for these projected growth rates." You
7  saw in his September 19th report that he did at least rely
8  on the testimony of Mr. La Femina, right?
9      A   Yes.
10     Q   Do you disagree with that as a reasonable basis?
11     MS. NEALLY: Objection, form.
12     A   I have no -- I have no opinion of that. I haven't
13  seen that information at all.
14     Q   (By Mr. Aguilar) You saw his report?
15     A   I have seen his report, but I haven't seen the
16  underlying evidence.
17     Q   Mr. La Femina's information, you mean?
18     A   That's correct.
19     Q   If you go down into the next section at the very
20  bottom of the page talking about economies of scale, are you
21  saying economies of scale do apply to captive agents? We
22  talked a little bit about this earlier.
23     A   I'm saying I'm not sure the extent to which
24  economies of scale exist. The economies of scale that are
25  portrayed here look unreasonable.

Page 208

1      Q   Do you have economies of scale for captive agents?
2      A   I'm sure there are economies of scale over a
3  range, but one doesn't know over what range those economies
4  of scale take -- take place.
5      Q   And you didn't calculate that either?
6      A   No. I have not done a study of the extent of
7  economies of scale but the conclusion reached here on the
8  part of -- of Horner is that there are substantial economies
9  of scale over an extremely large volume and I question that
10  because the implication of that is that the small,
11  independent insurance agency will not be able to compete
12  with the very large ones because over this range independent
13  insurance agencies at -- that have sales up of over $260
14  million are more efficient than anyone else and the
15  efficiency continues to gain. So, the implication of this
16  is that there will be relatively few insurance agencies in
17  the United States because of economies of scale.
18     Q   Based on the economies of scale argument?
19     A   Yes. And casually I find that's not to be the
20  case.
21     Q   Okay. You haven't specifically investigated that.
22  It's just your understanding that that's not the case?
23     A   I'm saying that that particular implication offers
24  a prediction that is in contrast with casual observation.
25     Q   And you agree Dino would not be able to sell his

Page 209

1  AFLAC position, right?
2      MS. NEALLY: Objection, form.
3      A   I don't understand your question.
4      Q   (By Mr. Aguilar) Dino wasn't, per se, an
5  independent agent?
6      A   He was a captive agent for AFLAC.
7      Q   And he would not be able to sell his captive
8  agency, right? There's not a market for captive agencies?
9      MS. NEALLY: Objection, form.
10     A   I don't know that.
11     Q   (By Mr. Aguilar) As a captive agent, who
12  determines the positioning of the employees? Doesn't the
13  employer or the captor?
14     MR. STEELE: Objection, form.
15     A   If I am a captive insurance agent, meaning that I
16  have an agreement that I will sell no other policies but
17  this particular brand of policies, I can hire and fire
18  people at will, is my understanding.
19     Q   (By Mr. Aguilar) As part of your agency?
20     A   Yes.
21     Q   But you can't sell your agency to somebody else?
22  Let's say, for example, you're a New York Life captive
23  agent. You're some high-up in the bureaucracy of New York
24  Life, and you've got certain responsibilities. You can't go
25  out to John Doe on the street who happens to have an

53 (Pages 206 to 209)

ORAL DEPOSITION OF DONALD HOUSE

Page 214

1    Q   I asked you the reasons for your concerns about
2  why he's using the AFLAC beta. We discussed it. I'm just
3  asking did we already discuss all the reasons for your
4  concerns about why he should not be using the beta from
5  AFLAC?
6    A   I believe so. It's the wrong industry.
7    Q   For an AFLAC agent you're saying that the proper
8  beta should have been -- let me ask you: For an AFLAC agent
9  are you saying that the proper beta would have been a
10  combination of AFLAC's beta and the insurance industry as a
11  whole? I'm sorry. I forgot what you said. What was the
12  proper beta?
13    A   The proper beta for insurance agents at those
14  levels among all of the firms, that's what I would use.
15  Now, if, in fact, you have enough financials from AFLAC
16  regional sales coordinators, if you had enough with which to
17  measure a beta, I would find that acceptable as well.
18        MR. AGUILAR:  Read back the first part of the
19  answer.
20        THE COURT REPORTER:  "The proper beta for
21  insurance agents at those levels among all of the firms,
22  that's what I would use."
23    Q   (By Mr. Aguilar) Okay. I lost your answer in
24  there somewhere. Let me ask it again. The proper beta --
25  you're saying the proper beta should be what?

Page 215

1    A   The proper beta would be the beta measured from
2  returns among insurance agents at his level across carriers.
3  If you had sufficient numbers of returns from which to
4  measure a beta among AFLAC regional sales coordinators, I
5  would accept that as well.
6    Q   Okay. The measure of agents -- of other agents
7  would be other agents at his level?
8    A   At his level.
9    Q   At other companies where the agents are captive as
10  well as agents where they are not captive?
11    A   Well, probably at his level they're all captive.
12    Q   So, it would have to be at other captive agent
13  companies?
14    A   That's correct.
15    Q   And you're saying the average of everyone's
16  beta -- I'm sorry -- every other company -- every company's
17  beta would be a better beta than just using AFLAC's beta?
18    A   No. If you had sufficient numbers --
19    Q   If you had sufficient numbers of those?
20    A   -- you could -- I would find that the beta
21  measured from returns or financial statements among AFLAC
22  regional sales coordinators would be sufficient.
23    Q   As well?
24    A   As well.
25    Q   I'm still asking about the first part. The first

Page 216

1  part was looking at other companies that have captive agents
2  at Dino's level and you're saying if you have sufficient
3  numbers of those, you would compare those all along with
4  AFLAC's to get the beta and that would be your first choice?
5    A   That would be my first choice because I don't
6  think you have enough data with AFLAC regional sales
7  coordinators with which to do it. You might.
8    Q   You go on in the next paragraph, "Maximum possible
9  damages."
10    A   Yes.
11    Q   By that you mean this is the most Dino will ever
12  lose, right?
13    A   This is the most one can reasonably conclude that
14  he lost.
15    Q   Based on the information you've looked at so far?
16    A   Based upon the information that I have looked at
17  thus far.
18    Q   In that first paragraph you say, "It is
19  unreasonable to conclude that today Chavez has no ability to
20  at least equal the earnings he would have made had he
21  remained AFLAC's RSC for the years 2003 and beyond."
22    A   Correct.
23    Q   And that's based on what you've told us earlier,
24  which primarily has to do with Dino is a good, safe agent?
25    A   That he has the skills and there are other

Page 217

1  companies that would want his skills as well and pay him a
2  competitive wage or set up the conditions for competitively
3  determined commissions.
4    Q   Now, just because you're skilled or a good agent
5  doesn't, of course, guarantee that you're actually going to
6  be successful, right?
7        MS. NEALLY:  Objection, form.
8    A   Well, that's -- that's almost circular reasoning.
9  If you're skilled and a good agent, does that not imply that
10  you're good at sales or management of people who are good at
11  sales.
12    Q   (By Mr. Aguilar) Is that -- is that your response?
13    A   Well, I'm asking the question. You asked the
14  question about is it -- and my inference on your question,
15  as I understood your question, is if you find someone that
16  is skilled and is a good insurance agent, do they have to
17  have good sales?
18    A   No. I said does it prove -- does it establish
19  that they are going to be successful?
20        MS. LEEDS:  Object to the form, speculation.
21    Q   (By Mr. Aguilar) In other words, what you're
22  saying is right now Dino is a good agent, right?
23    A   Right.
24    Q   You're saying that from what you've been able to
25  see he's been very successful in being able to make sales,

55 (Pages 214 to 217)

ORAL DEPOSITION OF DONALD HOUSE

Page 222

1  commissions as AFLAC's RSC for 2002 sales to B.I.S.D. and to
2  other employee groups." As a result of losing that
3  opportunity he, at least, lost something; isn't that
4  correct?
5    A  He is required to change jobs.
6    Q  Okay.
7      MR. AGUILAR: Objection, nonresponsive.
8    Q  (By Mr. Aguilar) He did lose first year premium
9  commissions from the B.I.S.D. enrollment immediately,
10 correct?
11     MS. LEEDS: Object to the form.
12   A  He did lose those particular commissions; however,
13 he -- in return he was given the time --
14   Q  (By Mr. Aguilar) What time?
15   A  -- the time of not making those sales of going out
16 and engaging in other endeavors such as his work in --
17   Q  Like a day off? Is that what you're talking
18 about?
19     MS. NEALLY: Object to the form.
20     MR. STEELE: Don't interrupt. Let him
21 finish.
22   A  Such as his work in investments in The Teachers'
23 Agency.
24   Q  (By Mr. Aguilar) Okay. You're talking about like
25 a day off or something?

Page 223

1      MS. NEALLY: Objection.
2    A  No. I'm --
3    Q  (By Mr. Aguilar) So, he can go work somewhere
4  else; and he didn't have to work here? Is that what you're
5  saying?
6    A  No.
7    Q  Okay. What are you saying?
8    A  I'm saying that when released from the regional
9  sales coordinator position, he was released from the
10 responsibilities that are associated with that. That frees
11 up time for him to engage in other endeavors.
12   Q  Okay.
13   A  And he has that to gain.
14   Q  Okay. Let's talk just about December of 2001.
15 You understand that he was let go about December 3, right?
16     MS. NEALLY: Objection.
17   A  No.
18   Q  (By Mr. Aguilar) When did you understand he was
19 let go?
20   A  Sometime in January.
21   Q  When do you understand he was notified he was no
22 longer going to be RSC?
23   A  My understanding is that he was notified in
24 December.
25   Q  When in December?

Page 224

1    A  His testimony is early in December.
2    Q  Do you remember anybody else's testimony?
3    A  That's all that I have read about the topic.
4    Q  Do you remember seeing in writing that he was
5  notified that he was being released by Mr. La Femina on or
6  about December 3?
7    A  I have not been provided those documents.
8    Q  Okay.
9    A  But I -- according to his testimony, it was early
10 December that he was notified with a 30-day notice.
11   Q  What was Dino's role as RSC when it came to doing
12 the cafeteria plan enrollment in December, 2001? What did
13 he have to do? What was his job? What were his job duties?
14   A  In December of 2001?
15   Q  Yes. No. Let me rephrase that. Normally what
16 would his job duties have been to oversee the enrollment --
17     MS. NEALLY: Objection, form.
18   Q  (By Mr. Aguilar) -- for December, 2001?
19   A  I can't testify to every detail.
20   Q  Tell me some.
21   A  I haven't examined all of the details of what he
22 would be responsible for. In general --
23   Q  Just tell me your general understanding.
24     MR. STEELE: Quit interrupting.
25   A  In general as a regional sales coordinator with

Page 225

1  that particular task that he would be responsible for the
2  sales of policies over the -- during the enrollment period
3  for B.I.S.D.
4    Q  (By Mr. Aguilar) And what would he do?
5    A  I do not know what he would do from day to day.
6  I'm not --
7    Q  Generally can you tell me?
8    A  I'm not in his shoes, but that would be his
9  responsibility of overseeing the sales and enrollment of
10 those plans and the management of the agents that were
11 engaged in that.
12   Q  Do you have any idea or any knowledge of the
13 specifics of what that would actually involve, what he would
14 actually do?
15   A  No. I -- that is not my area of expertise.
16   Q  So, you don't know how much work it would have
17 involved for him to oversee the enrollment, correct?
18   A  I do not know the task and specific details that
19 he would be involved in in -- in arranging for the sales and
20 signing up employees during the enrollment period.
21   Q  So, you also don't know whether he could have
22 done -- he could have overseen the enrollment while at the
23 same time doing whatever other tasks he might have wanted in
24 seeking other work outside of B.I.S.D.?
25     MR. STEELE: Objection, form.

57 (Pages 222 to 225)

ORAL DEPOSITION OF DONALD HOUSE

Page 230

```
 1  December of 2001?
 2     A   There are ways of mitigating the present value of
 3  that loss, yes. Absolutely.
 4     Q   No, no. Just -- first just mitigating that loss?
 5     A   That's what I'm saying.
 6     Q   That's what you're talking about?
 7     A   You can mitigate that loss. You may not do it in
 8  December.
 9     Q   Okay.
10     A   But if you invest in -- time in another endeavor
11  that is more profitable, you can more than mitigate that
12  loss.
13     Q   Such as? What else could Dino --
14     A   Such as going into another -- another firm, going
15  with another carrier, expanding your market opportunities.
16  A number of things can generate higher income streams that
17  can more than compensate --
18     Q   So, are you saying --
19     A   -- for the loss in December.
20     Q   So, are you saying Dino should have immediately
21  when he got -- immediately when he got terminated in
22  December, 2001 where he was prevented from participating in
23  that enrollment that he should have immediately gone out and
24  tried getting a job somewhere else to be able to try to
25  mitigate?
```

Page 231

```
 1     A   I really am not one that can use the word
 2  "should."
 3     Q   Okay.
 4     A   I'm saying that opportunities are in the
 5  marketplace --
 6     Q   Could?
 7     A   -- for people to mitigate their damages; and I
 8  saw, according to the record, that there was no barrier for
 9  him to mitigate those damages, whether it required him to
10  seek his next best alternative within a week, within a
11  month, within a year. I don't know.
12     Q   You're saying he could have gone out and done
13  other things to make up for those losses because he's such a
14  skilled agent?
15     A   I'm saying that there are possibilities out there
16  that could yield a total mitigation of those damages, yes.
17     Q   And in December, 2001 you think there was enough
18  opportunities out there that Dino could have mitigated -- or
19  should have mitigated all of the damages he lost by not
20  being allowed to participate in the enrollment? Is that
21  what you're saying?
22     A   I'm not saying that he would be required to find
23  something in December to mitigate December damages or lost
24  commissions.
25     Q   I'm trying to figure out just --
```

Page 232

```
 1     A   I'm saying that in time there are market
 2  opportunities to make up and more than make up for those
 3  losses in December of 2001.
 4     Q   So, you're saying in the future he might be able
 5  to make up enough money, let's say, in February or March or
 6  something to where it would make up for not being able to
 7  have made the money in December that he lost?
 8     A   Correct. To more than make up.
 9     Q   But as far as making up that money in December,
10  are you aware of any other avenue in which he could have
11  made up those losses in December?
12     A   I don't know. As I understand it, he was still an
13  employee of AFLAC in December.
14     Q   None that you're aware of then?
15     A   I don't know as an employee of AFLAC whether he
16  had the opportunity to engage in other employment in the
17  month of December. I don't know that.
18     Q   So, you're just not aware of any other employment
19  opportunities at AFLAC he would have had available?
20     A   In December, no.
21     Q   Okay. And you still believe that Dino did not
22  actually lose anything from not being able to engage -- I'm
23  sorry -- participate in the 2001 enrollment?
24     A   I'm saying that there is the possibility that he
25  lost, but the maximum has been quantified in my report.
```

Page 233

```
 1     Q   And how much is the -- how much is the maximum
 2  that he lost from not being able to participate in that
 3  enrollment?
 4     A   $38,840.
 5     Q   That's the most he would have lost --
 6     A   Yes.
 7     Q   -- from not being able to participate in that
 8  enrollment?
 9     A   Yes.
10     Q   No matter what happens it can't possibly be more?
11         MS. LEEDS: Object to the form.
12         MS. NEALLY: Objection, form.
13     A   Well, I mean, if we talk about some rather
14  unreasonable possibilities, he could have been run over by a
15  car and disabled and never work again. That is possible;
16  and there -- if we knew that, if today he is being run over
17  as we speak, I would adjust this number.
18     Q   (By Mr. Aguilar) Okay. And that's the total
19  amount he could have possibly lost forever as far as you
20  understand it today?
21         MR. STEELE: Objection, form.
22         MS. NEALLY: Objection, form.
23         MR. STEELE: Asked and answered.
24     Q   (By Mr. Aguilar) In other words, not just -- not
25  just from the December sales; but from everything. That's
```

59 (Pages 230 to 233)

ORAL DEPOSITION OF DONALD HOUSE

Page 238

1    A    Yes.
2    Q    Was that from his tax returns?
3    A    I don't know.  It's his testimony that the sum of
4    his 1099s in 2001 equalled 185,000.
5    Q    Okay.  And you didn't ask or understand or gain an
6    understanding, or you didn't read anywhere as to where that
7    information was coming from?
8    A    All I had was the deposition testimony.
9    Q    Do you remember if the deposition testimony said
10   it was from his tax returns?
11   A    I do not remember that context.
12   Q    If you go on to the next sentence, "Chavez
13   testified in his deposition that his 1099s for 2001 totaled
14   about 185."  Does that refresh your recollection?
15             MR. STEELE:  Objection, form.
16   A    I think that's just what I said.
17   Q    (By Mr. Aguilar) Okay.  Well, I was asking --
18   A    Maybe I'm -- maybe I'm missing your question.
19   Q    Yeah.  What I was asking you is where you got the
20   information to establish Dino's income for his 2001 -- for
21   2001?
22   A    From his deposition testimony.
23   Q    And his deposition testimony, I was asking you, he
24   was saying that was from his tax returns or his 1099s?
25   A    And I said I don't remember.  I don't know if that

Page 239

1    was part of his deposition testimony or not; that is, his
2    1099s were from his tax return.  I assume that he knew the
3    total of his 1099s.
4    Q    The reason I'm asking you is because you say in
5    the next sentence he testified in his deposition that his
6    1099s for 2001 totaled about 185?
7    A    Correct.
8    Q    So, in that -- it sounds like you're saying two
9    different things; and tell me why I'm --
10   A    I hope I'm not.  I'm -- I'm completely missing
11   your question.
12   Q    Okay.  Let me try it one more time.
13             MS. LEEDS:  The document speaks for itself.
14             MR. AGUILAR:  Thank you, Eileen.
15             MS. LEEDS:  You're welcome.
16   Q    (By Mr. Aguilar) You understood Dino's earnings
17   for 2001 were about 185,000, right?
18   A    From 1099s.
19   Q    From 1099s.  Thank you.
20   A    Right.
21   Q    When was that money actually earned?
22             MS. LEEDS:  Object to the form.
23             MS. NEALLY:  Object to the form.
24   A    I'm not sure exactly what you mean.  What I'm
25   referring to is what he was paid.

Page 240

1    Q    (By Mr. Aguilar) What he was paid during 2001?
2    A    Yeah.
3    Q    Okay.
4    A    And the earnings could be during 2001, and it
5    could be prior to 2001 if some payments were delayed.
6    Q    Are you familiar with renewal commissions?
7    A    Yes.
8    Q    What are they?
9    A    Those are commissions you make on policies that
10   are renewed.
11   Q    And you're familiar also with some delayed
12   payments, right?
13   A    Yes.
14   Q    For example, if a sale is made in December of
15   2001, you may not get paid until January of 2002 --
16   A    Correct.
17   Q    -- or February or March, et cetera, right?
18   A    Or until the premium is made.
19   Q    But all the work to actually make the sale is done
20   in 2001?
21   A    Correct.
22   Q    Okay.  So, as far as when the money was actually
23   earned, you can't tell us just by looking at his 1099s,
24   right?
25   A    I cannot.

Page 241

1    Q    Okay.  So, for example, he might have earned
2    $50,000 in 2001; but he didn't receive it until 2002?
3    A    That's possible.
4    Q    And he would have still been able to recover or
5    receive that money in 2002 even if he hadn't done a lick of
6    work in 2002?
7    A    That's possible if all of his income of his 1099s
8    were for work in December.
9    Q    Right.  And I'm not trying to get -- I'm not
10   trying to talk about specifics on December or January or
11   whatever.  I'm just saying that you can't tell just by
12   looking at the 1099 forms as to whether it was from a sale
13   that was made in that particular year, correct?
14   A    I understand your point, that some of the 1099
15   income from 2002 could have been for work performed in
16   December of 2001.  I understand that point.
17   Q    Okay.
18   A    And that -- yes --
19   Q    And you agree with that, right?
20   A    -- that is possible.
21   Q    You agree with that, right?
22   A    Yes, that is possible, that some of that income
23   could have been for work performed in December of 2001.
24   Q    And you did distinguish between how much of it was
25   based on sales made in 2001 and how much of it was sales

61 (Pages 238 to 241)

ORAL DEPOSITION OF DONALD HOUSE

Page 246

1 as -- what exhibit is that -- 13?
2    A  Exhibit 13.
3    Q  Which is a copy of Dr. Horner's report. Just the
4 report itself is marked as 13. The attachments to it are
5 behind it.
6       MS. LEEDS:  Is that the September report?
7       MR. AGUILAR:  This is the September 19, 2003
8 report.
9    Q  (By Mr. Aguilar) Let me know if you need to refer
10 to the -- have you had a chance to review this report yet?
11       MS. NEALLY:  Objection, form, asked and
12 answered.
13    A  I have glanced over it to look for changes in his
14 opinions.
15    Q  (By Mr. Aguilar) Okay.
16    A  I have not had time to look at his attachments. I
17 have not had time to replicate his results.
18    Q  Okay. Then hand me the attachments at the back.
19 Unclip it. Hand me the attachments. I'll leave these here.
20 If you need to look at them, let me know; but since you
21 haven't really had a chance to look at these, I'm going to
22 avoid marking this if I can.
23       Meanwhile, looking at Exhibit 13, which is
24 the actual report, I'm going to ask you some questions about
25 that. I notice you have a copy of that report in your file;

Page 247

1 but it also is not really marked up either, right?  I think
2 you have a couple of scratches in it or something; but the
3 copy that was in your file, the September 19th report, you
4 didn't really make any notes in that report, did you?
5    A  This is an old one. I don't know that I have the
6 copy.
7    Q  Let's see if we can find that. Look in your file.
8    A  All I have here is his first report.
9       MR. AGUILAR:  Is this yours, Buddy?
10       MR. STEELE:  Uh-huh. That's mine.
11    Q  (By Mr. Aguilar) It might be in that stuff over
12 there.
13    A  No. I didn't -- that's all Andrus over there.
14 Yes, that's it. I think I have some little arrows and
15 circles.
16    Q  So, if that will help you understand whatever
17 we're testifying to, go ahead and look at yours -- your --
18 the copy that was in your file. The first paragraph I need
19 you to basically just tell me what you disagree with or what
20 you don't have any evidence or knowledge of. Okay?
21    A  I have no knowledge of the testimony of
22 Mr. La Femina.
23    Q  La Femina?
24    A  La Femina.
25    Q  You haven't seen his deposition testimony?

Page 248

1    A  No. So, I really can't say anything about that
2 particular testimony because I haven't read it nor have I
3 looked at any of the exhibits or papers associated with
4 that --
5    Q  As it is --
6    A  -- testimony.
7    Q  As it is, those two sentences are just his
8 representation that this is what he's basing his revision
9 and report on, correct?
10    A  Correct.
11    Q  Okay. The next paragraph, do you disagree with
12 the first sentence?
13    A  The first sentence -- this Attachment 1 --
14    Q  Regardless of the graphs, you read that
15 "Mr. Chavez' regional sales coordinator sales were growing
16 rapidly until 2002"?
17    A  Yes, I see that he wrote that.
18    Q  Okay. I mean, do you agree with that statement?
19    A  I would say it's increasing.
20    Q  Okay.
21    A  Whether the word "rapidly" belongs there or not, I
22 would say I'm not so sure. It is a beginning position, and
23 there should be high rates of growth whether that is viewed
24 as rapidly or not. I don't know.
25    Q  You might pick a different adverb?

Page 249

1    A  I might.
2    Q  The next sentence, "Mr. Chavez acted as both an
3 agent and RSC for AFLAC." You agree with that, right?
4    A  Yes.
5    Q  Do you agree with the rest of the paragraph until
6 the last sentence?
7    A  I cannot offer any opinion as to whether those
8 statements are correct or not.
9    Q  You agree that Mr. Chavez was receiving
10 compensation through commission -- through a commission and
11 bonus system, correct?
12    A  Well, that's what is stated.
13    Q  Well, you don't know?
14    A  Well, I have not done an independent
15 verification --
16    Q  Okay.
17    A  -- of -- of how his compensation was accumulated
18 and how much was -- if any, was paid in the form of
19 bonuses --
20    Q  You're aware that he --
21    A  -- or other and whether they related to quotas or
22 targets. So, I really have no opinion on that.
23    Q  Okay.
24    A  I am aware that he was compensated.
25    Q  "At varying rates for first year sales, renewals,

63 (Pages 246 to 249)

ORAL DEPOSITION OF DONALD HOUSE

Page 254

1    A   I have not been able to verify that those are
2   correct numbers.
3    Q   Okay. "This implies that the total annualized
4   premiums credited to Mr. Chavez in 2001 would have been" --
5   and it sets out some numbers there. You haven't been able
6   to check either of those numbers, correct? Right?
7    A   I cannot verify that those are accurate numbers.
8    Q   Okay. And going on, "Thus, the $464,695 in new
9   B.I.S.D. business for 2001 would have represented about 23
10  percent of Mr. Chavez' 2001 new annualized AFLAC premiums."
11  You haven't checked that either, right?
12   A   I have not been able to verify that that statement
13  is accurate.
14   Q   Did you check the math?
15   A   I have not found the records with which to check
16  the math.
17   Q   No. I'm talking --
18   A   In terms of this?
19   Q   In terms of that information.
20   A   Is that 23 percent?
21   Q   Correct.
22   A   I assume it is. I did not make the calculation.
23   Q   Okay. No reason to disagree with it at this point
24  at least?
25   A   No.

Page 255

1    Q   Next paragraph, the first sentence, "According to
2   the AFLAC monthly accounting statements for 2001, Dino
3   Chavez earned first year commissions of about $78,706 on
4   this business, plus an additional $30,478 in income as an
5   agent, as well as an RSC." In that part so far, you haven't
6   checked on that, right?
7    A   I have not been able to verify that those are
8   accurate numbers.
9    Q   Okay. "We are focused only on the latter in this
10  analysis." That's just his statement, right? That's what
11  he says he is focused on?
12   A   Yes. That is just a statement.
13   Q   "Mr. Chavez' commissions as RSC were about $64,827
14  for first year premiums." Have you checked that?
15   A   I have not been able to verify that that is an
16  accurate number.
17   Q   Okay. And $16,388 for renewals, have you checked
18  that?
19   A   I have not been able to determine that that is an
20  accurate number.
21   Q   Okay. "In addition, Mr. Chavez receives
22  additional compensation in the form of stock bonuses" -- and
23  it goes on to describe how they're paid. Did you check
24  that?
25   A   I have no evidence with which to check that.

Page 256

1    Q   Okay. "Based on 2002 performance, we note that
2   approximately 45.15 percent of first year policies lapsed
3   during the year." Have you been able to check that?
4    A   I have not been able to check that out.
5    Q   He -- he goes on to explain "We assume this would
6   continue and include only 55.85 percent of the .70 percent
7   of first year premiums in our projections"; and he
8   references Exhibit C, attrition analysis. Have you checked
9   that?
10   A   I do not have Exhibit C, I don't believe. Wait.
11  I think I do, and I was not able to replicate Exhibit C.
12   Q   Okay. What does that mean?
13   A   It means that I cannot testify as to whether those
14  numbers are accurately presented or not.
15   Q   Okay. "Policies that have already renewed -- that
16  is, passed their 13 months without cancellation -- had an
17  annual attrition rate of about 14.40 percent." Have you
18  been able to clarify or check that?
19   A   I have not.
20   Q   He goes on to say some assumptions he makes on
21  first year policy premiums will produce no revenue in
22  subsequent years and will cancel in subsequent years. Have
23  you done any analysis or evaluation to make that
24  determination?
25   A   Well, this is just an assumption based upon the

Page 257

1   evidence that he has already presented.
2    Q   Okay.
3    A   So, I've already commented on those numbers.
4    Q   Right. And as far as his math, have you
5   compared -- have you checked that?
6    A   I have not been able to replicate those numbers.
7    Q   Okay. Because you don't have the documentation
8   behind it?
9    A   Correct.
10   Q   Okay. Continuing, "In February, 2001 Mr. Chavez
11  received a check for $18,623." Have you been able to check
12  that?
13   A   No.
14   Q   He goes on to say that's about 1.66 percent of his
15  year 2000 first annualized premiums sold by Mr. Chavez and
16  his team of agents. Have you been able to check that?
17   A   No.
18   Q   He goes on to say "Based on his 2001 performance,
19  Mr. Chavez earned an additional performance bonus check,
20  paid in February, 2002, of about $27,439." That is in your
21  documentation, right? I think you did --
22   A   It may be. I have not --
23   Q   You have just not checked?
24   A   I have not been able to check that.
25   Q   That's just something you didn't look at, if it

65 (Pages 254 to 257)

Page 262

1  for the next 26 years.
2      Q   Okay.  Do you agree or disagree with that?
3      A   That's not --
4      Q   Unreasonable?
5      A   No, no.  That's not the common way that we project
6  rates of inflation.
7      Q   How do you project rates of inflation?
8      A   I look at monetary policy that has existed over
9  the past 10 or 12 years and I don't go and pick out the
10 rates of inflation since World War II or the Great
11 Depression -- prior to the Great Depression and that's what
12 the Ibbotson book uses.  We've had substantial changes in
13 monetary policy that probably will continue in the future
14 which suggests that you don't go back and pick up historical
15 rates over long periods of time and use that as the basis of
16 your projection in the future.
17     Q   Are you saying Ibbotson generally goes back to
18 World War II for averaging out?
19     A   Ibbotson goes back to, I think, 1926.
20     Q   Okay.  And on page 14, at least, you're not sure
21 at this point because you don't have it in front of you
22 whether that's, in fact, what he's doing or whether he's
23 using only the period of time for the data that they've been
24 looking at here, the past three years or something?
25     A   I know he's not doing that.

Page 263

1      Q   Okay.  And you know that because?
2      A   Ibbotson doesn't publish that.
3      Q   Okay.
4      A   Or at least I'm not aware of, on that page,
5  Ibbotson giving a rate of inflation and calculating equity
6  premiums only on three years of historical data.
7      Q   The next section, "Earnings for 2002 through
8  2026."
9          "As noted earlier, Mr. Chavez' AFLAC business
10 as an RSC was growing rapidly."  Do you agree with that?
11 Actually you disagreed with the adverb?
12     A   I disagreed with the term "rapidly."  I think to
13 use that term one needs to compare the growth of other
14 businesses and then determine whether this business was
15 faster than the average.
16     Q   And you didn't -- you just don't have any
17 knowledge?
18     A   I don't have any knowledge as to how this one
19 compares with other insurance businesses similar to this in
20 their first few years of growth.
21     Q   "Mr. Chavez indicates that the primary enrollment
22 period for the Brownsville I.S.D. was in December, 2001."
23 Do you agree with that?
24     A   That's my understanding.
25     Q   "But that he had already been given 30 days'

Page 264

1  notice of his termination as an RSC."  Did you understand
2  that one way or another?
3      A   I understand that he -- according to his
4  testimony, in early December he was given that 30-day
5  notice.
6      Q   "AFLAC brought in approximately two dozen agents
7  that were on the teams of other RSCs in South Texas."  Were
8  you aware of that?  Would you agree or disagree with that?
9      A   I don't have a basis by which I can agree or
10 disagree with that.
11     Q   "Resulting in a large portion of this business
12 being credited to" -- let me start it again.
13         "Resulting in a large portion of this
14 business being credited to RSCs other than Mr. Chavez."  Do
15 you agree or disagree with that?
16     A   I have no basis to agree or disagree.
17     Q   Have you looked at Mr. Chavez' depo?
18     A   I have looked at his deposition.
19     Q   And you don't remember him testifying about that?
20     A   I don't know whether I can agree with that
21 statement even with -- with his conclusion.
22     Q   And why is that?
23     A   Well, I would have to ask myself was he in a
24 position to know what teams were credited and what teams
25 were not credited.  I don't know.  Maybe he is --

Page 265

1      Q   Let me put it this way.  First of all, do you
2  remember Mr. Chavez saying that?
3      A   I do not remember him saying that.
4      Q   Okay.  That's the first step.  You're not even
5  sure.  You just don't remember one way or the other whether
6  Mr. Chavez actually said that, for the first point.  And the
7  second -- is that correct?
8      A   The second point is --
9      Q   Well, first the first point.  That's correct,
10 right?
11     A   I do not remember him specifically addressing this
12 in a deposition.  He may well have.
13     Q   And the second --
14     A   The second question is if I am to draw the proper
15 conclusion, I have to ask myself is he in the position to
16 know the answer to that.
17     Q   And do you have any reason to doubt that he's in
18 the position to know that at this point?
19     A   I -- when people are terminated and the duties of
20 that particular person are being taken up in particular
21 ways, it's often not the case that they're told exactly how
22 things are being done.
23     Q   Okay.  I'm just -- do you know?
24     A   I'm just raising the question.  I do not know who
25 has the authority in making this statement.

67 (Pages 262 to 265)

ORAL DEPOSITION OF DONALD HOUSE

Page 270

1    Q   Do you plan on doing that? Do you plan on
2   checking to confirm?
3    A   Once I get his work papers and see the sources of
4   the information from which he's going, then I think I can
5   begin a final effort to try to replicate these results; but
6   I have been unable to, especially without his papers.
7    Q   It goes on to say "Growth rates of this magnitude
8   cannot be sustained for 25 years, and this is a relatively
9   short history upon which to make a projection." Do you
10  agree with that?
11   A   Yes.
12   Q   "Nevertheless, there is no indication of a
13  deceleration in the growth." Do you agree with that?
14   A   I would agree that with the figures that he has
15  presented, there is deceleration in the rate of growth.
16   Q   Okay. And how is that? Tell me where the
17  deceleration is.
18   A   Well, you begin with 632 percent annual growth
19  rate. You drop to 68 percent annual growth rate. You drop
20  again to 75 or 76 percent annual growth rate. That is
21  deceleration.
22   Q   You decelerate from 632 down to 68, and then you
23  actually accelerate to 75?
24   A   You're actually accelerating to 75; but if you
25  look at the whole period there, there's deceleration.

Page 271

1    Q   He goes on to say "Mr. Frank La Femina, a state
2   sales coordinator for AFLAC, in deposition testimony
3   indicates that he wanted to see, quote, at least 20 to 30
4   percent increase from DSCs and RSCs every year." You
5   haven't read Mr. La Femina's deposition, correct?
6    A   That is correct.
7    Q   So, you don't know whether he says that or not?
8    A   That is correct. And I don't know the foundation
9   from which that statement is made.
10   Q   He goes on to say "These growth rates are
11  significantly less than those achieved by Mr. Chavez but may
12  be more realistic long-term expectations." That's just his
13  opinion, right?
14   A   I do not know.
15   Q   Okay. Let me put it this way: First of all, the
16  growth rates are less than those achieved by Mr. Chavez thus
17  far, correct, in the graph above?
18   A   The 20 percent and 30 percent as long run growth
19  rates are not compared to anything; that is, we don't have
20  comparable growth rates over long periods of time with which
21  to compare it. The 20 percent and 30 percent are less than
22  any other growth rates that are presented in that box.
23   Q   Thank you. "These growth rates are significantly
24  less than those achieved by Mr. Chavez." Do you agree with
25  that, the 20 and 30 percent are significantly less than

Page 272

1   those achieved by Mr. Chavez?
2    A   If, in fact, those growth rates that are presented
3   in the box are accurate, yes.
4    Q   "But may be more realistic long term
5   expectations." Do you agree with that?
6    A   I don't know if I would put it that way. More
7   realistic, I would say 20 and 30 percent is more realistic
8   than 632. 20 percent and 30 percent is more realistic than
9   76. So, I suppose I am agreeing with that statement.
10   Q   Okay. "Thus, we perform three sets of
11  calculations assuming 20 percent, 25 percent, and 30 percent
12  sales growth rates from 2002 onwards." That's just a
13  statement of fact?
14   A   That is a statement of fact.
15   Q   Continuing, "Discounting for the Time Value of
16  Money and Risk." He says, "The losses incurred by
17  Mr. Chavez as a result of his insurance team being prevented
18  from selling his insurance products at B.I.S.D. and his
19  subsequent termination as RSC for AFLAC would have taken
20  place over a long period of time." Do you agree with that
21  or not?
22   A   I'm not sure if I do. This says "the losses
23  incurred." If, by that term, the losses only refer to
24  decreases in income as an RSC for AFLAC and selling
25  insurance to B.I.S.D., I would agree with that statement.

Page 273

1   If this is talking about the net economic losses associated
2   with this case, I would not agree.
3    Q   That's based on the testimony you provided earlier
4   about Mr. Chavez being able to make up any losses?
5    A   Right. The mitigation.
6    Q   He goes on, "It is necessary to take account of
7   the fact that cash flows in different years do not have the
8   same economic value and, thus, cannot be properly added
9   together." Do you agree with that?
10   A   I would say the same present economic value or the
11  economic present value. I would add an adjective there.
12  The rest of the statement I agree with.
13   Q   Okay. "There are two primary reasons for this."
14  Just a statement.
15       "The first reason is that dollar amounts in
16  the future have lower value than they do in the present
17  because present amounts, if invested, will grow larger with
18  time." Do you agree with that?
19   A   I agree with that statement.
20   Q   "Thus, a smaller sum in the present will be
21  required to replace a given future amount." Do you agree
22  with that?
23   A   In general I agree with that if they're positive.
24   Q   "Discounting by the time value of money converts
25  future values to present values." Do you agree with that?

69 (Pages 270 to 273)

ORAL DEPOSITION OF DONALD HOUSE

Page 278

1  measurement of beta to --
2     Q   (By Mr. Aguilar) To give an opinion?
3     A   -- to say that that is the appropriate one for
4  AFLAC or not.
5     Q   Okay. "Reflecting relatively low relative
6  systematic risk." Do you agree .89 reflects a relatively
7  low relative systematic risk?
8     A   Anything under one, yes.
9     Q   Okay. "This is multiplied by the 7.13 percent
10 risk adjustment for the market as a whole"; is that correct?
11    A   Correct. You take the beta and multiply it times
12 the market risk.
13    Q   Okay. "For an adjustment of 6.35 percent to the
14 risk-free rate." Agree with that?
15    A   .89 times 7.13. I think that is correct.
16    Q   "In addition, we add a size-related premium noting
17 that the adjustment for the smallest NYSE size category is
18 about 3.95." Do you agree with the addition of the
19 size-related premium?
20    A   Well, we discussed that earlier in the deposition,
21 as I stated, in cases similar to this where you had very,
22 very, very, very small companies that I have used size risk
23 premium adjustments.
24    Q   Okay.
25    A   Remember this size -- the smallest size is a very,

Page 279

1  very large business.
2     Q   We talked earlier about the size adjustment?
3     A   Yes.
4     Q   We already covered all that, right, your concerns
5  about using size?
6     A   My concerns about using size. My concerns about
7  using size in this case.
8     Q   Okay. If you're going to add -- let me move on,
9  though. "The adjustment for the smallest NYSE size category
10 is about 3.95." Would you agree or disagree with that?
11    A   I would have to verify it; but one of my concerns
12 is the fact that when you're collecting a size adjustment
13 from the New York Stock Exchange, you're looking at
14 companies that are many, many, many times larger than the
15 company of Mr. Chavez; and we do not have a gradient that
16 would indicate what the size beta would be for companies as
17 small as Mr. Chavez excepting the fact that there is a
18 gradient.
19    Q   That's the next part of the sentence, right? The
20 next part of the sentence, "The smallest NYSE company is
21 much larger than Mr. Chavez' operation."
22    A   Yes.
23    Q   Okay. That's what you were just trying to
24 explain. What I was just asking about whether -- is whether
25 you have any basis or knowledge to agree or disagree about

Page 280

1  the 3.9 percent -- 3.95 percent being the adjustment for the
2  smallest NYSE size category. Do you have any knowledge to
3  be able to tell us "yes" or "no" that is accurate?
4     A   Well, the 3.95 percent would just be a number that
5  you would get from Ibbotson. I assume that he read that
6  correctly. I don't know that, but I assume that he did.
7     Q   Okay. He goes on, "We add an additional 6.0
8  percent for the small size of Mr. Chavez' company." He's
9  just saying that's what he did, right?
10    A   That was what he did.
11    Q   You disagree with whether he should have done
12 that?
13    A   I -- if you're doing a size adjustment and you're
14 comparing the 3.95 percent small category size with that of
15 Mr. Chavez' operation, you're struck by the fact that there
16 is a huge difference in size. I can understand the theory
17 of making an additional adjustment for the tiny size of
18 Mr. Chavez' company compared to the smallest category in the
19 New York Stock Exchange relevant to the 3.95 percent.
20 Whether the 6 percent is the right number or not, I don't
21 know.
22    Q   You just don't know?
23    A   I have not seen Mr. Horner's work papers that
24 would justify that 6 percent is the correct number or
25 whether he just made it up.

Page 281

1     Q   "And other company-specific risk considerations."
2     A   The other company-specific risk considerations
3  is -- I think we talked about this earlier. I do not know
4  what he means by that.
5     Q   Okay. "Such as Mr. Chavez' dependence on a
6  primary supplier of insurance and early dependence on one
7  large customer base." Do you agree that he did have a
8  primary supplier of insurance and one large customer base,
9  right?
10    A   I would agree with the point that your risk is
11 much higher if those are the conditions.
12    Q   Okay.
13    A   I'm not aware of any definitive evidence that
14 would suggest what the size of that adjustment would be.
15    Q   Okay. "There is some danger in over-adjusting
16 with additional risk factors" -- do you agree with that?
17 Let me finish -- I got to finish reading it -- "as many
18 small companies share some of these risks." Do you agree
19 with that?
20    A   I'm not sure that I agree with that.
21    Q   Okay.
22    A   I don't know what he means by "sharing the risk,"
23 that is, small companies tend to share that risk. I don't
24 know what he means by that.
25    Q   Okay. He goes on to say, "This results in a

71 (Pages 278 to 281)

ORAL DEPOSITION OF DONALD HOUSE

Page 286

1    Q    (By Mr. Aguilar) I'm handing you what's marked as
2 House 15, which is the first page of a number of other
3 documents that apparently -- that appear to be from AFLAC
4 that were provided to us. Can you tell us what Exhibit 15
5 is as well as the documents behind -- the rest -- they
6 appear to be similar type documents?
7    A    Let me see. I personally have not reviewed
8 documents such as this.
9    Q    So, you don't know --
10    A    That's not to say I haven't received them, but I
11 haven't personally reviewed documents of this type.
12    Q    Those were part of your file. Let me represent to
13 you that that was what you provided me as part of your file.
14    A    May be the case. I personally have not reviewed
15 these documents.
16    Q    You don't have any knowledge as to what the
17 importance or relevance of any of that information would be,
18 do you?
19    A    I offer no opinion on it.
20         (Exhibit No. 16 was marked.)
21    Q    (By Mr. Aguilar) Let me hand you what I've marked
22 as House Exhibit 16, which is in similar format, the first
23 page of about three or four pages that were provided to me
24 by your office. If you could, tell me what that document
25 is.

Page 287

1    A    This, too, I have not reviewed and not relied
2 upon. So, I really can't tell you anything about it.
3    Q    Okay. No idea what that's about or what it's for?
4    A    I have not gained an understanding of this
5 document.
6         (Exhibit No. 17 was marked.)
7    Q    (By Mr. Aguilar) I marked page -- sorry -- House
8 Exhibit 17 and I'm handing you the documents to which -- the
9 other documents to which they were attached and I'm going to
10 ask you if you can tell me what those documents are?
11    A    These are some documents that I had requested to
12 look at turnover, the number of employees and turnover of
13 employees in the Brownsville Independent School District.
14 This gives you the number of employees by work code.
15    Q    And what does that -- what were you able to
16 determine from reviewing that?
17    A    Well, I can't really say that I have come to a
18 final conclusion on this. I wanted to see the turnover rate
19 of employees; and I see the turnover rate here, I would say,
20 is very modest.
21    Q    Is very what?
22    A    Modest.
23    Q    Compared to the total number of employees at
24 B.I.S.D.?
25    A    Compared to turnovers that I have seen in other

Page 288

1 industries.
2    Q    Now, the page I'm showing you is just in certain
3 departments, right?
4    A    Yes. But there are 8800 employees here. Well,
5 with the new ones, there are --
6    Q    Where does it say that?
7    A    8,808 employees, existing employees. New
8 employees are 837. You terminated 554 during the period of
9 time.
10    Q    And are you aware of how many employees there are
11 at B.I.S.D. overall?
12    A    I was under the understanding that this is, in
13 fact, it; but I may be incorrect.
14    Q    You're aware that there's -- I don't remember what
15 the number is now.
16         MS. LEEDS: Approximately 6800.
17    Q    (By Mr. Aguilar) 6800?
18    A    This says 8800. They may be including some
19 categories that perhaps is not in that -- not in that
20 category, but this is in the ballpark.
21    Q    Okay. I'm showing you some other documents that
22 were from -- pardon me?
23    A    Just noting that if you -- if you noted these work
24 categories, it does not give you the numbers for all
25 categories. It gives you a total of 8800, but it only gives

Page 289

1 you the distribution across these of -- this is just page 3.
2 That's why. You gave me the -- only one page. Well, this
3 is probably the last page. Yeah. Well, that was
4 sufficient. Basically what we wanted to look at was this
5 bottom line here of the turnover, 8800 employees. 837 or
6 about less than 10 percent are new employees. So, we had
7 asked for this bottom line to get the turnover rather than
8 the distribution across all categories.
9    Q    And what were you able to determine from that?
10    A    Modest turnover.
11    Q    Okay. Anything else?
12    A    No.
13    Q    Did you reference that any in your report?
14    A    No.
15    . Q    Okay. Also, there's another document dated
16 June 13. I didn't mark this one. It looks to be -- is that
17 the same, kind of more of a breakdown?
18    A    Let me see.
19    Q    A breakdown for that information. It's from a
20 letter dated June 13 from Ms. Neally's office.
21    A    Yeah. This appears to be the first three pages of
22 that -- where you have employees by school.
23    Q    More of a breakdown for that same information in
24 Exhibit 17; is that correct?
25    A    Well, this then has the teachers and where they

73 (Pages 286 to 289)

ORAL DEPOSITION OF DONALD HOUSE

Page 294

1    Q   Look at the bottom right-hand corner.
2    A   Yes. I see that, May 12th.
3    Q   2003?
4    A   Correct. But they could be picking this up on the
5    quarterly representations. So, my original point was this
6    was the last complete fiscal year; but it may not be. It
7    could be the rolling last four quarters.
8    Q   Okay. Turning to page 4, "Current EPS Estimates,"
9    what does that mean? Estimated -- what does EPS stand for?
10   A   Give me a minute.
11   Q   Is that estimated price per share?
12   A   I don't -- it has escaped me. I cannot give you
13   an answer.
14   Q   If you look at mean estimate --
15   A   I think it's earnings per share.
16   Q   Earnings per share. Go to that page, again,
17   please. I think you went too far.
18   A   Yeah.
19   Q   EPS, estimated dollars per share, right?
20   A   Earnings per share.
21   Q   Earnings per share. It goes through the different
22   numbers. Down here it talks about next five years'
23   growth -- that 15, is that their estimated --
24   A   That is Zacks estimated.
25   Q   -- estimated growth?

Page 295

1    A   Uh-huh.
2    Q   15 percent for the following year?
3    A   That is their estimate for the next five-year
4    growth.
5    Q   Okay. For five years?
6    A   Yes.
7    Q   And the high estimate is going to be 17?
8    A   High is 17. Low is 13.
9    Q   13. Okay.
10   A   So, this is coming from an investment research
11   company.
12   Q   If you turn the page, please. It says, "EPS
13   Growth Rates, Company." That meaning -- at the very top.
14   A   Yes.
15   Q   For the last five years' percent -- what's the
16   percentage it shows for AFLAC Company?
17   A   Percent growth.
18   Q   Percent growth is how much?
19   A   For the company it's 17.8 percent annual growth
20   rate over the last five years in earnings per share.
21   Q   Okay. And then 03/02, meaning March of 2002; is
22   that right?
23   A   That's the third quarter '02. This is fourth
24   quarter '02.
25   Q   Okay. From the third quarter of 2002, what was

Page 296

1    the growth rate?
2    A   18.2 percent.
3    Q   And that's actual, right?
4    A   That is actual. I assume it is actual.
5    Q   And for the fourth quarter of 2003, it was?
6    A   13.7 percent.
7    Q   And for the next -- I'm sorry. Going to the
8    beginning of this line, basically their calculation over the
9    last five years was 17.8 percent actual, right?
10   A   Yes. That appears to be the case.
11   Q   And their anticipation for the next five years
12   is --
13   A   15.1 percent.
14   Q   -- 15.1 percent. Okay.
15       MR. AGUILAR: I'll pass the witness.
16       MS. LEEDS: I'll reserve all questions for
17   the time of trial.
18       Ms. Neally will reserve all questions for the
19   time of trial.
20       MR. STEELE: AFLAC will reserve all questions
21   until the time of trial.
22       (Whereupon the deposition concluded at
23   4:26 p.m.)
24
25

Page 297

1
2
3                CHANGES AND SIGNATURE
4    PAGE    LINE      CHANGE            REASON
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____

75 (Pages 294 to 297)

ORAL DEPOSITION OF DONALD HOUSE

**A**

abilities 187:2
ability 132:5 173:17,18
   216:19 218:15,16
able 24:21 26:16 27:15
   28:17 60:17,19 64:15
   66:1,12 67:11 76:21
   87:19 88:12 90:5
   91:20,21 94:17 95:15
   96:1 105:2 111:10
   124:17 130:21 131:6
   140:22 141:2 145:25
   146:17,22 151:9,15
   153:9,13 154:21
   161:17 167:13
   172:14,24 173:15
   175:1,22,23 176:12
   176:16,16 178:13
   180:23 182:24
   183:24 186:13,16
   199:7 208:11,25
   209:7 211:11 212:15
   217:24,25 218:1,1,2
   219:9 221:1 227:18
   227:18 229:18
   230:24 232:4,6,22
   233:2,7 241:4 243:16
   244:19 245:5,7 250:8
   253:19 254:1,5,12
   255:7,15,19 256:3,4
   256:11,18 257:6,11
   257:16,24 258:5
   260:17 268:9,14,17
   268:21,22,23 269:1,3
   269:20 273:4 280:3
   282:13 287:15 289:9
   291:4,5,16 292:5
above-styled 1:22
Absolutely 133:15
   230:3
accelerate 270:23
accelerating 270:24
accept 215:5 277:24
acceptable 214:17
accident 136:1,17
   139:23 167:12,21
   168:3
accomplish 160:20
   226:15
accomplished 191:9
   226:14 274:23
account 94:6,17 120:25
   121:7,14,18 125:1,20
   126:3,6,18,23 127:20
   135:22 137:3 190:14
   190:23 273:6

accountant 178:15,16
accounting 159:4 178:9
   178:12 255:2
accounts 156:23
accrued 35:21
accumulated 249:17
accurate 24:9 68:5,6
   96:18,20 101:25
   107:7,10,13 142:12
   142:14 143:17 162:8
   187:21 250:19 254:7
   254:13 255:8,16,20
   268:8,12 272:3
   275:19 280:3
accurately 26:8 256:14
accuse 228:12
achieve 185:16 187:14
   188:16 201:8,20
   206:13,15
achieved 203:20,22
   205:11 271:11,16,24
   272:1
acquire 173:10 188:4
acquired 126:5 172:7
   173:12
acquisition 172:7
acted 249:2
action 1:8 299:11,14
active 145:13
actively 234:25
activities 42:2
actual 105:21 134:2
   141:20 180:17
   237:13,17 246:24
   296:3,4,4,9
actuaries 66:5
add 38:7 77:16 101:6
   119:12 273:11
   278:16 279:8 280:7
   282:3
added 42:13 109:3,4
   273:8 282:6
addition 36:18,19,19
   68:7,12 255:21
   278:16,18
additional 42:1,2,4,22
   68:1 83:21 86:8
   110:3 112:10 119:25
   160:7,21 190:20
   255:4,22 257:19
   260:2 280:7,17
   281:16 283:14
additions 42:20
address 93:22 127:14
   127:18 171:1
addressing 265:11

adds 282:4
add-ons 101:6
adequately 28:17
   144:24
adjective 273:11
adjust 137:7 156:2
   233:17 252:14
adjusted 235:16 252:18
   253:3
adjusting 252:11
adjustment 142:11
   268:4 278:10,13,17
   279:2,9,12 280:1,13
   280:17 281:14
adjustments 278:23
administration 71:4,5
   136:12
administrative 196:5
administrator 196:17
   196:18,22
adverb 248:25 263:11
affect 68:22 130:12,13
   153:18
affirm 251:7
affix 298:3
AFL 94:24 95:12,13
   98:1 290:7
AFLAC 2:14 3:23 4:7
   5:5 90:18 95:20
   102:12,14 103:20
   104:10,19 105:2,4,5
   105:6,7,15,24 107:6
   122:9,12,20,23 126:6
   126:12 127:1,2,3,15
   128:3 129:2,15,22
   130:21 174:14,15,23
   175:5,21,23,25,25
   176:13,24 177:4,5,14
   177:15 179:23
   180:15 182:15
   183:16 184:18,22,25
   186:2,6,8 188:9
   190:19 192:10,11,20
   192:24,24,25 193:6
   193:11,15,19,22,25
   194:1,9,10,22 195:13
   197:1,2,9 198:17
   200:12,15,18 204:6
   206:18,24 209:1,6
   210:15 212:15,19
   213:15,18 214:2,5,7
   214:8,15 215:4,21
   216:6 219:25 220:4
   226:19 227:19 228:4
   228:4 229:18 232:13
   232:15,19 234:16

249:3 253:20 254:10
   255:2 259:19 260:8
   263:9 264:6 266:15
   266:18 267:18 271:2
   272:19,24 276:16
   277:1,20 278:4
   283:12 286:3 290:6
   290:20 292:8,21
   293:1 295:16 296:20
AFLAC's 5:8 103:23
   105:22 106:10
   128:19,21 171:7
   174:7,11 214:10
   215:17 216:4,21
   222:1 237:2 277:2,6
   277:9 293:11
AFL1715 91:7
AFL1716 92:19,25
AFL2158 91:9
afternoon 83:14
age 136:24 145:9
   148:23 172:5,6 251:4
agencies 58:12,14,17
   142:2 208:13,16
   209:8 211:11,13
agency 168:1,12,17,19
   169:1,2,16 170:13,17
   170:19,25 171:2
   208:11 209:8,19,21
   210:22 222:23 235:2
   283:22 284:7,12,15
   284:18 285:3,4
agent 4:7,10 87:20,21
   88:8 91:17 98:10
   103:20,21 104:5
   106:6,7,7 126:12
   130:24 131:16,23
   132:1,7,10 135:25
   142:24 146:12 152:6
   153:6 156:22 177:4,5
   177:14,15,18,19
   179:23 186:8 187:3,4
   187:20 188:9 202:21
   204:2,3 206:24 209:5
   209:6,11,15,23
   210:21 214:7,8
   215:12 216:24 217:4
   217:9,16,22 218:3,7
   228:4,4 231:14 249:3
   250:11 255:5 261:9
   261:10 291:1
agents 44:23 58:10
   95:20 102:18,23,23
   103:1,4,5,6,9,12,13
   103:16,17,24 104:12
   104:22 105:1 107:18

107:18 120:18,20
   121:9,14,17,25 122:4
   122:7,9,12,18,19,20
   122:23 123:1,23,24
   125:9,10 128:21
   129:17,20 130:2,9,16
   130:18 132:5 141:25
   142:8 143:9 144:3,2
   145:9 146:4,6,15,19
   147:2,7 148:1,2,4,10
   149:20,21 150:18,22
   152:5,21,25 155:9,11
   155:16 156:18,20,22
   157:6,11,20 158:8,9
   158:10,18 159:5,7
   161:18,23 162:4
   171:9 173:13 174:13
   175:3 176:14 183:22
   184:13 186:6,14,15
   191:14 203:1,20,24
   204:4,10 206:18
   207:21 208:1 214:13
   214:21 215:2,6,6,7,9
   215:10 216:1 225:10
   227:11 229:18 242:9
   253:10 257:16 264:6
   267:2,5 290:20
agent's 144:14
ages 250:1,2
age-earning 137:7
ago 8:7 74:11
agree 29:19 37:8
   102:21 112:13
   113:12 128:17
   140:18 147:14
   168:25 169:15 172:9
   183:17 208:25 218:4
   241:19,21 248:18
   249:3,5,9 250:11,23
   251:4,19,22 252:3,4
   252:22 259:11,23
   260:17 261:18 262:2
   263:10,23 264:8,9,15
   264:16,20 266:8,9
   268:7 270:10,13,14
   271:24 272:5,20,25
   273:2,9,12,18,19,21
   273:23,25 274:6,7,10
   274:11,13,14,17,23
   275:1,8 276:7,8,18
   278:6,14,18 279:10
   279:25 281:7,10,16
   281:18,20 282:2,5,20
   282:21,24,25 283:16
   283:17,22 284:4,24
   285:5,9

ORAL DEPOSITION OF DONALD HOUSE

Page 3

173:6 189:22 205:21
212:21 214:3 215:25
217:13 235:18 236:4
238:17,19,23 239:4
266:25 267:1,4,5
279:24
aspects 61:10,10,11
62:5 67:8
assemble 153:10
assembled 14:9 89:24
118:23,25 120:8,17
121:17 122:18
285:16
asset 275:1
assets 108:20
assign 125:4
assigned 124:25 125:1
127:21,22,24 128:8
128:12,17 290:1
assist 17:7,15 21:8
120:18 121:17
assistant 42:19 57:14
assisting 120:25
associate 84:6 159:21
associated 47:7 65:18
223:10 248:3 251:17
252:12 253:1 273:1
associates 31:3,4 83:6
98:2 104:6,8,12,18
105:8,24 158:23
159:3 267:10
association 18:25 46:21
47:5,24 48:2 52:1
53:22 54:9 64:21
81:16,25 82:3 158:7
158:17
associations 158:11
159:20
assume 14:25 29:19
46:5 116:17 201:22
229:15 239:2 251:3
254:22 256:5 261:12
261:20 268:11
275:20 276:20 280:5
280:6 296:4
assumed 259:11 282:15
assumes 261:3
assuming 168:5 259:12
272:11 285:3
assumption 90:17
91:10,12,13,15,23
179:21 180:14,23
190:8 256:25 259:13
261:14
assumptions 256:20
283:1

attached 29:11 95:6
147:8 250:15 266:16
287:9
Attachment 248:13
attachments 246:4,16
246:18,19
attack 156:17,20
attacks 156:16
attain 205:9
attempted 163:6 164:5
attended 44:9,13
attest 259:3
attorney 138:14 299:9
299:12
attorneys 29:21 81:1
138:13 139:9,24,25
140:2
attributed 172:6
attrition 256:8,17
audits 65:23
August 27:22,25 28:5
37:23 38:16,17 39:1
39:2 41:1
Austin 2:16 145:20
184:8
authorities 68:17
authority 123:2 211:12
265:25 298:10
auto 135:25 136:17
167:12
automatically 113:25
available 20:16 26:24
62:13 66:13 73:22
125:10 143:9,20
150:14 151:1 157:20
195:10,20 232:19
258:6 300:9
avenue 232:10
average 35:3,11 108:19
131:3,13,15,20,21,25
132:12 215:15
259:10 263:15
averages 34:25
averaging 262:18
avoid 246:22
award 74:20 126:14
awarded 125:4,6 127:1
127:2,3 128:3
awards 126:23
aware 105:1 206:17
226:13,14 227:1,2,3
227:6,9,13 232:10,14
232:18 234:4 249:20
249:24 263:4 264:8
281:13 288:10,14
awhile 154:14

A&M 41:8,13 43:20
a.m 1:22 78:23,23
94:14,14

_____
B
_____

B 100:22 101:17
250:15
Bachelor 136:11
bachelor's 251:4,8
back 30:6 32:24 33:22
35:24 50:24 51:18
53:6 58:5 59:11
61:20 97:1,3 105:21
111:14 114:22
118:15 132:13
138:23 180:9,12
214:18 220:6,13
243:7,7 244:10
245:15 246:18
251:23 262:14,17,19
283:5 290:13 293:19
background 5:14,17
18:7
bad 168:3
ballpark 275:24 288:20
bank 245:3,7
Bar 236:8
barrier 231:8
barriers 56:21
base 124:25 125:8
127:21,22,23,24
128:12,16 135:14
253:9 281:7,8
based 32:25 35:10,12
63:8 66:13 83:21,23
98:1 113:10 121:4,5
128:8 144:15 156:2
178:9 179:21 180:14
180:17 185:17,24,25
199:19 202:2,18,18
202:22,23 204:1,16
204:18 208:18
216:15,16,23 219:8
221:1,5 236:5 237:2
241:25 244:16
245:18 253:20 256:1
256:25 257:18
261:13 267:18 273:3
275:21 282:8
basic 4:8 67:16
basically 23:4 47:12
67:20 112:9 144:13
150:2,19 175:22
204:2 247:19 289:4
296:8
basing 248:8

basis 31:14,20,21 32:12
33:4,19 105:17
115:21,25 119:24
124:6 142:11 164:20
164:21 171:15
175:24 177:7 180:22
180:25 181:15,22
183:24 185:5 204:7
205:1 207:10 211:10
242:4,6 259:16
260:14,19 262:15
264:9,16 279:25
284:5
Bates 90:21,23 91:5,7,9
95:12 98:9 290:9,10
BBA 136:11
beating 78:10
Becoming 283:23
beginning 120:19
137:3 248:22 296:8
behalf 58:13 74:2
believe 8:15 11:3 13:6
20:20,23 21:25 22:10
23:23 24:7 37:21
40:25 42:4 43:14,14
43:18 44:18 72:9
86:5 89:22 93:7
96:13,15,17,19 102:9
102:22 106:23,25
111:24 138:20
144:25 151:12 156:4
163:25 166:4,6,23
167:1,4 173:3,17
180:11 183:24 185:6
186:11,18 194:18,21
203:23 210:18 214:6
228:11 229:6 232:21
237:20 244:9 256:10
268:16 277:6 283:24
believing 205:1
belongs 110:13 248:21
benefit 156:21 157:7
201:23 202:17
benefits 32:10 43:13
195:11,20 196:15
best 21:1,3 72:7 81:7
89:1,4 94:19 95:5
128:18 135:10
139:22 143:3 145:21
146:5 154:25 156:15
169:21 171:1 183:7
231:10 234:2
beta 101:18,19 102:8,9
102:11,12,14,17,18
102:19,22,25 103:14
106:23,25 107:6,23

116:6,8 213:14,18,23
214:2,4,8,9,10,12,13
214:17,20,24,25
215:1,1,4,16,17,17
215:17,20 216:4
276:11,14,16 277:1,2
277:6,9,11,20 278:1
278:11 279:16
betas 277:5
better 44:25 46:23
49:20 110:10 136:10
138:10 215:17
beyond 23:12 104:17
145:14 160:8 216:21
245:2
biased 252:16,19
bid 50:1,2,3,4,4,6,12,15
bill 30:13,14 34:13,13
35:1,1,2,10 38:22
54:25
billed 34:14 38:1,8
billing 8:12,13,14 30:9
37:21 39:15
billings 35:23 36:21,21
billion 293:10,12,13
bills 30:12,15,19 31:22
31:23 32:12,12 33:1
33:12,13,15 35:6
37:22 38:25 40:2,13
binder 91:1,4,13,25
94:7,9,10,20,24
95:15 98:13 99:15
binders 94:8
Binger 84:7,11 87:8
89:16 92:13
birth 251:2
bit 9:21 10:22 32:24
35:4 38:14 64:15
207:22 243:7,8
251:23
Blaine 84:7,11 87:8
89:15,16,17 92:13
Blanchard 79:14,21
80:4,4,13
blank 58:25
Blue 52:2,5,11 64:21
64:24 66:4,11 67:10
81:16,18 82:1,1,19
board 1:12 31:7,10
54:23
Boards 19:1
Boca 2:12
Boddicker 53:21
bonds 275:22 276:4
bonus 249:11 257:19
bonuses 212:25 249:19

43:16 63:2
changes 3:9 42:20 43:8
43:15,18 48:3 49:17
52:19,25 55:20 57:1
62:3,5,8 63:2 65:18
246:13 262:12 297:3
300:10,12
changing 48:13
Chapter 274:16 275:4
characteristic 202:9
characteristics 45:25
47:8 50:5 57:21
74:21 135:18,21
151:11 158:13
charge 80:7 147:9
195:12
charging 80:13
Chavez 1:7 3:21 4:4
6:2,12 7:19 11:22
12:20 16:21,24,24
17:21 18:24 19:20,21
23:6,20,21 24:12
30:11 32:4 37:13,22
39:6,7,21 40:5 43:1
81:2 83:6 84:23
86:25 87:20 88:4,5,7
89:8 95:21 100:19
101:6,7,11,12,14,24
102:3 105:20 114:19
118:1,4 120:17,23
122:18 123:23 124:3
125:1,2 126:12
127:22,24 128:5,11
128:17,21 129:17,19
130:21 132:24
133:17 144:20,25
145:3 146:10 147:12
148:4 151:6 153:23
163:15,25 164:22,25
167:12 170:24 171:5
171:12 172:12,15,16
172:24 173:20
174:10 177:3 179:12
179:20 180:18,23
182:13 183:15,17
184:2,6 185:6,15
187:2 189:3 190:18
191:4,14 203:1,20,24
204:10 206:4 212:2
216:19 218:19
219:23 221:13,24
227:12 234:4,6,10
236:16 237:1 238:12
248:15 249:2,9
253:10,21,23 254:4
254:10 255:3,13,21

257:10,15,19 260:3
260:11,25 263:9,21
264:14,17 265:2,6
266:7,13,17 267:19
271:11,16,24 272:1
272:17 273:4 279:15
279:17,21 280:8,15
280:18 281:5 282:11
283:11,21 284:14,16
284:17 285:8 290:20
Chavez's 121:5 184:3
186:13 234:20
check 31:19 147:22
206:21 236:17,18
254:6,14,15 255:23
255:25 256:3,4,18
257:11,11,16,19,24
258:17 292:22
checked 64:5 76:18,19
76:20 116:18 147:20
250:5 253:14,15,18
253:24 254:11 255:6
255:14,17 256:8
257:5,23
checking 270:2
Chica 2:12
choice 216:4,5
choose 96:8 97:3 114:1
127:15
chooses 69:15
chose 96:21 97:20
chosen 116:4
circles 247:15
circular 217:8
circumstances 61:17
65:12 113:11,20
134:8
cities 155:16
city 145:14
Civil 1:8,24
claim 81:25 82:1,2
claims 16:24 45:10,23
47:5 52:18,22 57:14
57:20,25 66:5
claims-made 63:12
clarification 236:14
clarify 133:13 147:6
256:18
class 44:15
classes 43:21 44:5
clear 13:8,14 64:16
85:13 118:12 151:4
clearer 10:22
clearly 5:22 70:4
148:25 195:16 196:1
client 64:8

clients 7:12
Clifford 30:24
clock 107:10
close 61:1 269:7,11,22
code 75:13,21,23 76:2
76:5,12,25 78:18
153:12 287:14
codes 75:14,16
cohorts 135:10 136:20
coins 80:1,5,14
collect 158:22,24
collected 196:13
collecting 279:12
collection 173:13
college 6:23 134:18
135:23 136:1,14,15
136:17,21,23,23
137:17
Colonial 234:16
combination 103:16
214:10
combined 84:21 107:17
come 27:18 29:18
51:15 56:9 58:3,4
72:12 110:4 114:25
115:6 117:18 122:9
122:19 126:1 132:13
136:23 140:9 144:7
148:15 149:13 160:9
160:24 162:6,8
163:13 166:12
170:22 200:9 268:19
269:11,22 287:17
291:22
comes 33:24,25 72:14
115:1 116:5,16
161:19 200:8,16
269:5
comfortable 45:14
coming 56:15 116:15
116:17 121:16 238:7
295:10
commensurate 165:21
comment 176:5 191:5
284:17
commented 257:3
comments 269:10
commission 58:21
227:22 228:3 242:19
243:2 249:10,10
258:23 259:14
commissions 3:23 4:10
87:11,23 89:8,14,14
91:17 94:5,16 95:20
98:10 122:25 153:9
212:25 217:3 222:1,9

222:12 227:11,14
231:24 240:6,9
243:25 250:11
253:17 255:3,13
258:15 259:10 267:3
267:5,9,11,15 282:10
283:3 284:6 290:19
committee 54:6
common 21:19 197:22
212:7 252:25 259:25
262:5
commonly 70:4 274:25
companies 44:24 45:11
45:18 48:17 56:15,22
56:23 60:1,4,23,25
65:22 105:3,16
112:11,12 113:14,16
114:20 150:15,16,17
151:24 152:20
153:25 154:7 155:3
155:15 157:2,3,4,6,9
157:15 162:4 174:24
176:19 211:12,19
212:5,10 215:9,13
216:1 217:1 278:22
279:14,16 281:18,23
company 7:1 32:17
35:1,2,5,6,9,11,25
42:16 45:19 49:25
60:9,9,10,11 66:24
66:25 67:23 102:24
109:4,10 110:5,16,17
110:21,21 111:16,23
111:24 112:16
113:13,18,22 114:4,5
114:6 130:23 150:20
151:2 152:1,16 159:3
165:12,14,25 169:3
169:23 175:5,24
177:21,23,24 181:23
182:5 188:11 197:7
210:13 212:3 215:16
279:15,20 280:8,18
295:11,13,16,19
company's 150:4
215:16
company-specific
281:1,2
comparable 271:20
compare 66:13 131:9
186:13,20 216:3
226:2 237:12,16
263:13 271:21 283:5
compared 140:23
186:15 257:5 271:19
280:18 287:23,25

compares 263:19
comparing 226:4
280:14
comparison 62:12 63:6
131:22 142:3 154:22
226:2
compensate 230:17
compensated 249:24
compensation 35:19,20
54:20 55:1 249:10,17
255:22
compete 208:11
competing 56:14,19
57:2 63:3 64:4
104:22 106:9 153:16
174:19 203:5,10,21
212:8,8
competition 45:14
65:19,21 186:1,5
203:3 204:19 205:7
206:16
competitive 171:10
174:13,17,25 175:22
176:13,22 177:11
186:10 217:2
competitively 217:2
compilation 12:13,14
12:17,19 13:3,4
38:24 87:11 89:8
91:22 97:14 192:2
285:14
compilations 91:16
compile 68:2
compiling 118:8
Complaint 81:12
complete 54:22 120:4
156:9 160:9 193:23
290:2,16 294:6
completed 27:14 43:9
290:15
completely 26:19 28:21
239:10 269:5
complicated 85:5
complicating 137:4
component 109:4,4,13
109:15,16 110:5,17
110:22 111:16,24
112:4,6,8,9,9 113:8
113:25 114:12,18
129:15 130:10
134:14,15 135:4
components 110:3
282:3
composition 135:13,15
computation 142:7
258:11

ORAL DEPOSITION OF DONALD HOUSE

289:15,20
dates 14:22 42:5 43:16 85:23 86:6 285:15
day 1:22 107:11 136:1 136:14,16 222:17,25 225:5,5 298:10 299:15 300:16
days 17:11,11 227:1,4 235:24 263:25 300:8
de 129:25
dead 139:6
deal 30:5
dealing 44:13
debate 109:15,24 110:1 112:12
decelerate 270:22
deceleration 270:13,15 270:17,21,25
December 95:22 223:14,15,24,25 224:1,6,10,12,14,18 226:9,20,21,24 228:6 228:9,16 229:8 230:1 230:8,19,22 231:17 231:23,23 232:3,7,9 232:11,13,17,20 233:25 240:14 241:8 241:10,16,23 242:19 242:23 243:2,7,11,17 244:1 245:6 263:22 264:4 266:18 267:20 290:22
decide 110:19
decision 40:18
decrease 182:14
decreases 182:9 272:24
decreasing 122:22 123:3,16
deducted 259:4
deductibility 70:18
deductible 51:10
deductions 4:11 291:15 291:23
defendant 2:6,10,14 5:5 49:22,23 52:9 53:4,5,14,23 58:22 58:25 59:15 60:18 81:19 82:20
defendants 6:19 17:16 53:19
defense 52:12 81:11,21
deference 77:12 78:14 78:18
deferred 6:16 69:16 70:14 72:25 73:3,5,9 73:17,19,24 74:6

77:4,19,21 192:14 195:11 202:16
definition 56:23
definitive 281:13 291:19
definitively 292:2
degree 135:24 136:3,5 136:8,9 178:8,14,18 179:5 219:6,7 220:24 220:25 221:7 251:4,8
degrees 136:24
DEL 1:10
delayed 240:5,11 242:23
deletions 42:21
delinquent 41:1
demand 48:10 51:8 62:3,3,5 63:1,1 65:18 70:14 77:14,22 78:15 174:18
demanded 63:16
demographic 153:13
demographics 148:25 149:1 156:2
dental 46:21 47:3,5 50:9,10,15 51:8,9,25 52:1 53:22 64:21 70:8,9,19 71:22 81:16,24 82:2 138:2 192:16 193:24,25
dentist 139:13,19
dentists 47:15
department 47:25 55:13 62:16 67:14
departments 288:3
depend 34:12 35:22
dependence 281:5,6
dependent 112:16 198:19,25 199:15,20 200:1,22 201:25
dependents 50:1,16
depending 211:14
depends 134:6 198:8 234:14
depo 13:1 84:15 154:13 264:17
deposit 10:10,14
deposition 1:17,21 3:15 3:21 5:9,15,20 6:4,12 16:18,21,22 22:21,21 22:22 23:11 26:20,23 27:3,5,8,10 28:21,22 28:24,25 29:3,8 39:5 56:9 72:20 82:7,9 83:6 85:17 86:11,15 97:12 105:18 120:23

130:3 165:12 171:17 171:18,19 172:2
173:22 189:10
235:13 236:2,13 237:21 238:8,9,13,22 238:23 239:1,5 242:2 244:13 245:2 247:25 264:18 265:12 266:2 266:4,13,16 271:2,5 278:20 283:24 296:22 298:3
depositions 3:22 86:2 194:4
Depression 262:11,11
describe 255:23
described 132:17 155:2 155:10 274:15
describing 61:5
description 3:14 4:3 23:12 46:24 110:10 148:3
destitute 165:19 166:2 166:2
detail 224:19
detailed 76:17
details 98:9 196:5 224:21 225:18 226:14 227:16
determinants 62:7,25 67:7
determination 26:14 57:1 67:3 83:25 84:4 90:7 92:3 144:14 146:17 256:24 258:20 259:17 277:3
determinations 16:2 268:15,17
determine 34:19,20 62:16 79:25 80:9 94:18 102:3 110:15 113:10 131:6 141:3,8 143:19 144:24 146:16 151:5,15 160:11 166:16 172:14,24 173:4,8 174:1 178:14 197:19 199:7 211:11,18 219:6 220:23 221:6 237:14,19,22 242:4 244:16 255:19 258:21 263:14 287:16 289:9 290:16 291:5,5 292:5
determined 33:20,21 34:21 35:18 135:11 172:1 198:18 199:14

200:1 201:24 217:3 229:15
determines 209:12
determining 132:4 133:22,23 172:16
develop 219:15
developed 48:4
development 56:20
deviation 143:18
devices 42:19 57:14
die 57:23
difference 118:7 130:5 193:18 259:2 280:16
differences 149:16 156:2 172:6 252:25
different 15:16 37:22 44:4,6 47:7,8,15 52:7 60:9,10 62:17 63:8 63:14,17 64:10,14 67:3,19 69:1,17,20 69:21 79:4 81:23 104:10 106:17 110:7 114:18 115:4,17,19 116:2 117:17 118:8 130:4 134:25 141:21 156:16 162:5 169:25 170:1 180:1 234:19 239:9 248:25 250:1,2 253:2 269:5 273:7 274:3 277:12 282:9 291:24 292:6 294:21
differentiate 173:23
differently 30:13 99:12
differing 202:6
difficult 206:13,15
diminished 228:24
Dino 1:7 7:19 11:22 12:20 37:13 39:21 43:1 94:5,16 95:21 103:19 123:14 125:15,20 126:9 127:8 171:11 172:3 208:25 209:4 212:14 216:11,24 217:22 226:12,16 227:17,18 228:3,18,23 229:13 229:16,23 230:13,20 231:18 232:21 234:1 255:2 266:1 290:20
Dino's 95:3 107:5 123:20 168:18 169:15 171:12 172:3 216:2 224:11 228:19 235:13 237:3 238:20 239:16 291:1
direct 243:25

direction 108:2 122:2 292:12
directly 68:1 93:20 99:3 100:2 112:16
directors 104:15
disability 124:20 218:18
disabled 124:23 164:25 165:1,5,6,24 168:7,9 233:15
disagree 108:24 109:18 109:21,23 114:12 115:3,14 116:10 191:5 207:10 247:19 248:11 254:23 260:12 261:18 262:2 264:8,10,15,16 266:10 268:7 279:10 279:25 280:11 282:2 285:9
disagreed 108:22 263:11,12
disagreeing 260:20,21
disagreement 276:21
disclose 51:16
disclosed 48:25
discount 100:9 101:2,8 101:15 102:3 110:16 111:4,15,19 112:21 118:8 251:22 252:2,7 252:10,11,14,17,22 252:23,24 253:3,6 274:13,22 282:1
discounting 261:14 272:15 273:24
discounts 47:16
discourage 104:20 106:5
discouraged 103:25
discouragement 106:11
discouraging 105:23
discuss 9:22 214:3
discussed 7:24 9:21 15:21 214:2 275:3,8 276:21 278:20
discusses 124:8
discussing 16:4
discussion 8:3 84:19 191:15 274:15
disk 11:18,20 24:14 25:5 98:4
dismemberment 71:23 72:3
distinction 64:12
distinguish 104:9

ORAL DEPOSITION OF DONALD HOUSE

Page 9

244:4 245:6 263:21
266:21,25 267:12
**enrollments** 121:15
267:16
**entail** 16:19
**entire** 10:23 99:13
121:6 150:12 155:22
**entries** 92:20 93:2
**entry** 42:1,13 43:12
56:18,21 57:12 92:23
**EP** 108:13,15,16
116:12 117:15
**EPS** 294:8,9,19 295:12
**equal** 171:6 174:6
204:10 216:20
219:23 237:1 268:17
**equalled** 238:4
**equally** 144:16
**equals** 100:22 101:15
**equation** 101:1,3 102:1
108:21,23,23,24,25
109:3,6 134:25
**Equations** 4:4
**equities** 108:19
**equity** 101:20 108:16
108:17,17 116:13
263:5 276:5,10
**error** 38:13 143:18
**errors** 129:5
**escaped** 294:12
**escaping** 56:8
**especially** 235:5 270:6
**essentially** 40:15 261:3
**establish** 137:18
140:22 144:14
217:18 237:7 238:20
**established** 134:11,12
140:4,11,20 141:15
169:3,5,13,16,23
170:2,3,6
**establishment** 71:2
**estimate** 21:1,3 45:23
47:5 60:13,20 61:3
72:7 89:4 94:19
116:8 132:15 162:8
163:2,6,14 183:7
191:17 234:2,10
294:14 295:3,7
**estimated** 45:10 70:18
190:22 253:21
267:19 283:15 294:9
294:11,19,23,24,25
**estimates** 191:22 277:4
294:8
**estimating** 51:9 52:21
52:24

**estimation** 47:3 54:10
274:22
**et** 16:21 21:5 23:6,18
101:8 135:18 139:14
187:17 240:17
**evaluate** 62:22 83:16
83:20 132:11 171:15
187:4
**evaluated** 23:6,18
26:19
**evaluating** 21:9 62:4
144:14,16
**evaluation** 62:25 67:11
171:21 172:19 187:8
256:23
**evaluations** 67:17,22
68:13,25 170:23
**events** 250:24 274:5
**eventually** 191:2
**everybody** 201:3
**everyone's** 215:15
**evidence** 19:14 124:2
124:22 144:6 164:21
167:14 171:8,9
172:14 174:8,9,12,23
175:3,4,20,25 178:10
181:3 183:15 185:5
185:15 187:13
203:19,21,23 204:9
204:12 207:4,16
236:25 237:7 245:18
247:20 251:2 255:25
257:1 258:19 261:8
281:13
**exact** 14:25 33:6,7
78:17 92:17 138:1
269:7,12
**exactly** 17:14 32:9 39:8
44:22 48:24 69:6
70:2 77:10 132:6
138:4 185:18 191:16
211:9 239:24 265:21
267:8 292:3
**examination** 3:7 6:7
57:13 151:5 172:11
211:15
**examine** 42:18 50:3
67:2 80:8 242:6
**examined** 45:7,10,11
45:11 48:2 65:2 74:7
172:5 210:20 224:21
245:18
**examines** 159:4
**examining** 52:4 66:6
102:8

**example** 36:9 53:21
58:20 61:19 62:11,17
63:7,9 64:15 87:20
87:25 98:22,22
134:17 137:17
209:22 212:14
240:14 241:1 242:19
267:5 269:4
**exceed** 171:6 174:7
177:4,14 179:22
204:10 237:1
**exceedingly** 188:8
**excel** 11:11 171:5,13
187:16
**excepting** 279:17
**exception** 114:7
**exceptions** 182:12
**excess** 35:24 36:1,4,6,9
36:11,12,16
**Exchange** 276:6 279:13
280:19
**exclude** 113:25
**excluding** 260:7
**exclusive** 80:3 121:9,12
128:4 192:11,23
197:7 210:10,11
**exclusively** 58:14 61:18
**excuse** 164:20
**executives** 66:4
**exempt** 69:18
**exhibit** 3:12 4:1 5:1,10
5:12 22:21 24:10,19
25:7,9,14,15,16 26:3
26:4,5,8 30:6 36:22
37:19,21 42:7,9 47:2
59:4,5 61:6,21 78:25
83:2,4 84:8,25 85:2,6
85:10,11,16,19,20,23
86:4,8,9,14,23 87:1,3
89:22,25 90:13,15,16
92:17,20,22 93:2,6
95:2,7,9,11 99:7
100:5,7 117:24
118:16,16,18 245:24
246:1,2,23 256:8,10
256:11 285:11,25
286:4,20,22 287:6,8
289:24 290:3,5
291:10 292:18,20
**exhibits** 26:22 27:4,6
28:20 29:10,11 97:12
248:3 250:15 283:2
**exist** 207:24
**existed** 47:16 113:17
261:24 262:8
**existence** 65:19 71:8

169:20 170:10
172:10
**existing** 165:11 194:9
194:12,18 198:15
210:13 288:7
**exit** 56:19
**expanded** 198:19
199:15,19 200:1,22
201:25 203:1,2,19
**expanding** 184:8
230:15
**expansion** 205:3
**expect** 175:1 186:4
191:1 198:6,22 199:2
201:19,20 205:9
219:22,24 227:18
284:22
**expectancy** 251:5
**expectation** 171:2
218:13 267:7
**expectations** 271:12
272:5
**expected** 134:2 144:18
153:23 170:18,24
182:14 197:14 201:7
206:4 227:17 228:18
229:13 237:2 252:8
252:12,14,15 275:25
**expecting** 229:3,16
284:25
**expenditures** 42:19
51:11 57:8
**expenses** 45:10,23 47:5
57:20,25 69:19
145:20 259:5 260:15
260:22 261:4 282:10
**experience** 77:11
119:18,19 135:18
145:9 147:1 148:10
165:22 176:17 199:5
202:19,21,22,23
**expert** 21:5 44:20 45:2
45:3,5 119:19
**expertise** 7:16 22:18
45:12 171:25 172:4
186:13 211:11
225:15
**expert's** 236:22
**Expiration** 299:22
300:21
**explain** 54:19 67:20
88:12 122:24 218:1
256:5 279:24
**explained** 128:16
213:17,18
**explanation** 110:20

111:1 149:16
**explanations** 72:19
**expressing** 276:11
**extent** 15:14 29:24 46:9
48:13 51:16 56:20
58:10 65:14,21,22
78:7 106:5 190:17
207:23 208:6 236:2
283:11
**external** 64:7
**extremely** 208:9

─────────

**F**

**faced** 203:3
**fact** 10:25 57:11 74:8
77:21 80:9 88:5
107:10 110:14,24
123:5 165:11 214:15
237:11 259:24 260:7
262:22 272:2,13,14
273:7 279:12,17
280:15 288:13
**factor** 34:16 114:16
133:23 148:15 169:9
205:18 206:1
**factors** 26:13 45:24
63:9 131:22 132:3,10
134:25 137:4,6
148:18,19,21 149:12
149:13,15 153:18
191:12 281:16
**facts** 20:18 204:17,17
204:19,21 242:3
**fading** 56:11
**fair** 22:17 41:2 66:14
80:6 162:21
**fairly** 79:25
**fall** 170:20,21
**familiar** 71:10 74:4
75:4,6,8,18 76:3,8
146:8 240:6,11 275:4
275:6,23 277:1
**familiarity** 71:14
**family** 73:17
**far** 38:1,8 39:4 45:1
71:4 74:21 107:5
114:11,11,20 139:16
141:20 170:12,20
178:10 186:25 197:1
216:15,17 218:5
219:9,17 220:9,14
221:2,6 227:5 232:9
233:19 236:15
240:22 255:5 257:4
271:17 294:17
**faster** 263:15

ORAL DEPOSITION OF DONALD HOUSE

163:16 173:13
192:11,13,23,24
197:7 222:13 236:19
263:25 264:4 266:17
268:12 273:21 299:8
300:12
gives 86:14 287:14
288:25,25
giving 263:5
glanced 246:13
go 16:16 24:15,16 25:6
30:6 32:8 47:1,2,11
47:21 50:20,21 51:7
51:23 54:4 58:6,7,18
65:23 66:11 67:22
69:5 70:25 82:8
84:17 89:7 91:2
94:13 95:2 97:1,3
114:17 115:10,22
126:17 128:19
130:14,20 133:23
134:25 136:16,16,24
138:5 141:3,7,11,16
144:18 145:21
149:12 154:16,18
158:17,25 159:8,9
160:5,6 164:4 171:4
174:5 176:12 182:1
185:3,14 190:1 192:7
192:14 194:9 197:12
197:12 198:15
202:25 203:8,18
204:9,14,16,23 206:8
207:5,19 209:24
213:4,22 216:8 223:3
223:15,19 237:9
238:12 244:10,12
245:15 247:17 251:9
262:9,14 266:15
269:18 277:4,13
283:5 294:16
goal 66:17 185:16
187:15 188:16
goes 12:20 23:12 35:24
52:10 69:15 84:21,22
98:14 136:7 190:25
201:5 218:5 226:15
255:23 256:5,20
257:14,18 258:7,11
258:22 262:17,19
266:6 269:19 270:7
271:1,10 273:6 280:7
281:25 283:21
284:22 285:7 293:19
294:21
going 5:14 12:21 15:10

15:12 16:15 24:4,24
25:4,22 29:24 30:8
32:1 38:21 40:24
46:4,6,8 51:18 53:9
53:10,21 59:16 60:25
64:18 66:9 70:24
74:3 84:22 85:1,2,5
88:22 91:14 99:23
104:1 118:15 120:16
120:24 124:1 142:22
145:5 147:7 150:6
151:21 154:13,15
155:9 157:17,24
170:4 171:11,13
174:10 175:21
179:25 182:21
183:14 185:8 187:16
188:24 196:11
198:22 201:23,24
202:1 212:23 217:5
217:19 220:6 221:23
222:15 223:22
227:12 228:5 230:14
230:14 235:21
246:21,24 252:10
253:9 254:8 259:14
261:25 266:19
267:18 270:4 277:11
279:8 283:17 287:9
295:7 296:7
good 14:13 29:19 30:5
40:13 65:25 78:21
90:20 104:10 118:17
182:5 192:5 204:2
216:24 217:4,9,10,10
217:16,17,22 218:3,7
gotten 212:3 242:19
290:24
governed 142:22
government 50:1,3,17
57:15 275:22
graceful 125:3
gradient 279:15,18
graduate 136:14
Grande 145:12 148:5
149:21 184:19
graph 271:17
graphs 248:14
Great 262:10,11
greater 184:3 282:17
ground 78:11
group 4:8 54:18 87:21
95:22 107:21 120:18
121:17 205:8,8,11
206:14 290:21
groups 4:10 76:12

91:19 131:6 146:23
156:20 185:9 202:7
203:2,12 204:21
222:2
grow 206:5 207:2
273:17
growing 58:11 248:15
261:4 263:10
grown 198:23 260:23
282:9
growth 55:21 135:8
180:1,1,3,6,15,17,24
181:5,7,8,9,12,14,19
181:20,24 182:1,3,4
182:7,14 184:3 186:4
187:25 188:5,22
198:3,23,24 199:12
199:19,25 200:3,8
201:24 202:1 205:10
205:23 206:11,13,14
207:6 220:2 248:23
261:5 263:13,20
268:3,12 270:7,13,15
270:18,19,20 271:10
271:16,18,20,22,23
272:2,12 282:15
294:23,25 295:4,13
295:17,18,19 296:1
guarantee 217:5
Guerra 2:11 81:6
guess 19:6 58:6 60:22
60:22 83:19 88:13
118:15 284:15
guy 134:18 139:6
188:23

_____

**H**

half 34:22 35:4 36:2,3
128:20 129:16
hand 83:3 187:19,20
188:1 246:18,19
286:21
handed 30:5 84:8
90:15 245:25
handing 22:20 25:8
37:20 42:8 85:15
87:2 90:14 95:10
100:6 285:12 286:1
287:8 290:4,5 291:11
292:19
handle 56:11
handling 125:14,20
202:20,21
hands 12:1 189:13
Hang 42:3 49:3 292:22
happen 147:7 178:9,19

179:6,7,8,9,11
200:11 219:8 220:25
221:7
happened 107:23
245:16
happens 61:14 131:21
209:25 233:10
HARRIS 299:3 300:3
hate 133:14
head 160:4 162:9
health 47:25 56:17
heard 196:16,18
hearing 50:11,15,17
54:23,24 57:15 86:16
hearings 85:18 86:11
help 72:17 87:9 247:16
292:3
helpful 18:2 104:5
Henderson 138:12
Heritage 79:25 80:4,5
80:6,13
Hey 210:1
he'll 93:17 166:6
Hi 152:18 212:15
hierarchy 104:10
high 182:22 206:9
248:23 295:7,8
higher 80:7 108:9,11
123:6 145:19 210:1
230:16 281:11
highly 107:16 108:4
high-up 209:23
hire 176:12 209:17
hired 10:3 80:8 175:23
historical 114:2 141:5
141:6 262:14 263:6
historically 34:17,18
35:19 218:17
history 41:18 50:4
113:22 134:5,10,11
134:12 135:2,3,5,7
137:17 139:20,21
140:20 141:15
144:15 153:8 169:14
170:1 173:15 270:9
hit 198:24
HMO 67:6
holding 45:2 108:19,20
hope 8:18 119:7 181:1
239:10
Horner 3:21 4:5 15:7
15:11 21:4,16 22:10
22:15 25:10 28:21,25
29:8 83:6 96:5,8,24
97:9,23 100:10 101:3
101:11 102:2 108:25

109:2,3 110:21 111:8
116:7 117:18 118:20
119:4,23 133:3,16
166:8 179:25 181:4,6
182:19,21 183:9
187:24 189:2,10
190:2 191:9,16,21
207:5 208:8 213:20
220:4 244:25
Horner's 3:18 21:20,22
25:11,19 26:6,9,16
27:3 28:2,7,11,18
97:4,6 101:22,23
114:12 118:21 119:9
119:13 120:13
132:15,24 180:13,17
183:12 204:11,23
246:3 280:23
horrendous 252:16
horse 78:11
hospitals 56:18
hour 30:11 31:22,23
32:14 33:11 34:1
hourly 31:14,20,21
32:11,23 33:4,6,7
hours 32:13,25 34:13
34:14 37:4 38:5 39:9
House 1:17,21 3:6,20
3:24,25 4:6 5:2,9
6:10,11 13:13 24:6
24:10 25:4,9 26:8
49:2 54:5 81:10 83:4
95:11 189:11 285:13
286:2,22 287:7
291:12 298:3,7,10
households 161:15
Houston 1:24 184:8
299:24 300:23
How's 136:11
huge 280:16
HUGH 1:11
Huh 234:13
Human 47:25
hurt 167:12
hurts 19:15

_____

**I**

Ibbotson 114:25 115:1
115:2,10,15,22,25
116:5,15,16,17,19,24
116:25 117:1,9,10,11
261:17,22 262:12,17
262:19 263:2,5
274:20 275:3,5,9,12
276:2 280:5
idea 225:12 277:19

**investigation** 183:6 250:6
**investment** 4:12 66:7 112:15 235:3 295:10
**investments** 222:22 235:4,6
**invoice** 9:3
**Invoices** 3:19
**involve** 49:9 70:4,11 225:13
**involved** 52:15 54:10 55:15 58:9 65:21 69:4,22,24 70:7,13 72:25 74:12,12 132:4 135:25 139:10 225:17,19 226:10,12
**involvement** 81:2 266:20
**involves** 132:5
**involving** 44:6 45:18 49:14 52:14 57:16 112:21 139:13
**item** 47:2,21 51:3 54:21 54:22 55:12 58:21 61:24 62:1 79:18 81:10
**items** 4:6 47:11 51:4,7 51:24 56:8,10 58:19 158:2 162:5,6
**I.S.D** 4:9 6:15 263:22

**J**
**J** 2:4
**January** 10:19 223:20 240:15 241:10 242:24
**Jerrie** 33:17 40:23
**Jessica** 1:23 299:6,21 300:20
**job** 118:17 134:21 212:3 224:13,13,16 230:24
**jobs** 222:5
**John** 209:25
**Join** 211:21 242:12
**joined** 283:22
**joint** 54:5,5
**JR** 1:11
**judgment** 96:10 260:14
**July** 8:15,19 9:1,2 37:23 38:15 41:1
**jump** 292:9
**June** 9:2,3 10:18,18 19:23,25 20:1 27:21 28:3 95:12 289:16,20
**jury** 236:3

**justification** 180:14,17
**justify** 280:24

**K**
**keep** 49:10 73:13 150:10,17 170:4 196:5
**keeping** 196:14 284:6
**Kelly-Moore** 43:6
**kept** 109:14
**killed** 138:2 139:14,23
**kind** 7:11,13 22:16 29:4,4 46:3 50:7,7 68:24 136:9 146:4,6 146:12,15 158:22 188:22 212:21 228:21 289:17
**kinds** 159:19 168:4 188:6
**Kluett** 139:14
**knew** 110:8,23 233:16 239:2
**know** 9:6,13 10:14,15 10:20 13:2 20:3,11 26:11,12 28:20 32:9 32:10,16,18,22,23 33:5,7 39:3,8,25 40:21 48:24 51:15 60:2,15,15 66:12 69:10 73:1,5 75:1,3 75:11 76:6,7 77:6 78:12 83:10,11 84:3 88:11,17 90:4,21 91:13 92:12 93:11 94:6 97:12,22 99:17 103:23 104:25 105:12,22 106:5,10 106:16,16 107:3,5,24 107:25 108:2,10 109:9,9,14 110:3,11 110:14,18,19 111:17 111:20 114:14 116:23 117:20 119:16 120:24 122:13 126:7 127:3,4 130:15 136:15 142:14 143:14,14 144:4 146:12 148:1,6 148:8,14,20 151:16 151:19 152:19,21,23 153:10,16 154:3,5,9 154:10 157:13 159:6 159:15 160:1,18 162:20 164:6,12 168:14,16 170:4,20 171:11,18 181:17,19

181:21 182:24 184:20,21 186:9 190:2 192:16,19,21 193:8,21 194:1,11,11 194:16,19,19,24 195:6 196:19,21 199:3 201:12 203:7 203:15 204:15 205:11,13,20 208:3 209:10 210:15,17,24 210:25 212:2,13,17 225:5,16,18,21 226:10,21 227:24 231:11 232:12,15,17 236:15 237:23 238:3 238:25 245:22 246:9 246:20 247:5 248:24 249:13 253:13 258:2 259:12 262:25 263:1 264:20,24,25 265:16 265:18,23,24 266:8,9 266:19,24 267:2,10 268:22 271:7,8,14 272:6 277:17,18,23 277:25 280:6,21,22 281:3,22,24 285:22 286:9 290:7,16 292:15,17 293:3,4
**knowledge** 19:2 38:2 81:7 172:18 187:5 211:24 212:1 225:12 247:20,21 263:17,18 267:13,15 277:20 279:25 280:2 286:16
**knowledgeable** 172:17

**L**
**La** 207:8,17 224:5 247:22,23,24 271:1,5
**label** 111:1
**labeled** 95:12 98:9
**Labor** 55:13
**lack** 44:25
**land** 207:3
**language** 76:4,24 78:2 78:4,6,17
**lapsed** 256:2
**large** 94:5 113:13 181:12,25 182:9 198:5,7 204:24 205:2 208:9,12 252:20 264:11,13 266:6 279:1 281:7,8
**largely** 7:14 198:18 199:14
**larger** 94:5,16 112:12

142:8,15 273:17 279:14,21
**Late** 83:14
**latest** 27:23
**law** 2:4 40:5
**lawsuit** 6:12,13 49:4,5 49:7 50:13,14 82:13 82:17
**lead** 219:18 220:9
**leading** 32:2
**leave** 58:25 78:12 176:2 246:19
**leaving** 68:22 130:20
**led** 86:15
**Leeds** 2:10 5:13,23,25 6:6 9:12 14:15,20 15:17 26:10,15 31:9 31:16 32:20 33:2,10 35:13 37:11 39:6 41:3 45:4 71:13,18 73:10,15 77:5,9 78:2 78:7 80:19,24 104:3 105:25 107:8,19 109:20 126:4,10,20 130:6 133:10,14,15 136:4 137:19,23 142:1 143:23 149:3,6 149:8 151:14,20 152:22 154:2 162:22 164:1,7,14,23 166:22 167:16 168:3,6 174:3 177:16 178:11,20 179:7,10 186:19 197:4 205:14,19 206:2,10 210:9 211:7 211:21 217:20 218:10,12 219:19 220:10 221:11 222:11 233:11 239:13,15,22 242:12 243:5 244:24 246:6 288:16 296:16
**left** 39:11 59:7,8 87:21 100:18 101:5 171:3 285:22
**legal** 30:4 62:24 69:3 69:23 72:23
**legislation** 73:6 75:6,10 75:20
**legislative** 69:3,23 72:23
**lemonade** 181:10,11
**length** 5:11 20:11
**lesser** 218:15
**letter** 3:24,25 18:25 38:17 90:16 95:11

98:22 152:17 289:20
**let's** 50:24 55:17 78:22 84:17 85:13 95:18 101:7 135:25 136:9,9 136:10 143:9 154:16 154:18 168:8 175:16 176:9 189:19 192:7 201:7,22 209:22 212:3 219:20 220:15 223:14 229:15,15, 232:5 247:7 260:5 293:18
**level** 104:6,22 105:1,15 173:24 201:18,22 215:2,7,8,11 216:2 259:14
**levels** 106:17 173:23 206:11 214:14,21 267:8
**liability** 48:3,5,7,9,10 51:5 54:6,11 61:25 62:4,12
**liar** 228:12
**license** 210:1,22
**licensed** 154:1
**licensure** 52:20
**lick** 241:5
**Liddell** 1:24 2:15 3:19 79:8,10
**life** 49:14 57:16 72:10 168:12,17 189:4 209:22,24 210:2 212:4,14,16 251:5
**likelihood** 174:9,10
**limb** 251:9
**limit** 145:19
**limitations** 76:7,8,11
**limited** 75:2 76:6 138:22 139:20 168:11 184:7 202:8 202:12,13 204:6
**limiting** 269:10
**limits** 65:17
**line** 66:25 69:15 70:9 88:5 120:17 132:23 136:25 153:2 155:8 173:14 289:5,7 296:8 297:4
**lines** 197:12
**list** 4:6,9 12:10 31:2 43:3,15 46:19 53:12 58:7 60:16 69:2,5 89:9 122:17,18 138:21,25 160:9,22 163:17 175:13 203:8
**listed** 36:22 42:2,5,22

149:13 161:19
166:12 213:21
mine 120:14 201:15
247:10
minor 41:12,17
minute 294:10
minutes 24:4
mischaracterized
176:3
mislead 236:2
misled 133:14
misrepresentation
229:4
missed 212:11 253:22
267:20
missing 238:18 239:10
mistake 128:24
mitigate 145:20 229:25
230:7,11,25 231:7,9
231:23
mitigated 190:8 229:24
231:18,19
mitigating 151:7 230:2
230:4
mitigation 132:21
139:7 144:11,16,24
146:18 151:5 154:22
160:11 162:8 163:1,7
163:14,23 168:21
178:23 190:14,15,17
190:23 191:18,25
219:23 231:16 234:3
273:5 283:10,20
mix 135:15
mobile 42:19 57:14
model 47:4 134:20
137:16 252:17 275:1
models 45:23
modest 287:20,22
289:10
modified 41:21
modify 25:24 26:8
moment 10:13 46:2
57:5 66:9 164:18
monetary 262:8,13
money 36:20 69:16
181:11 232:5,7,9
239:21 240:22 241:5
245:7 253:1 266:20
266:24 272:16
273:24 277:14
moneys 253:2
monopolization 81:25
monopsony 81:25
month 10:17 17:9
33:25 34:4,11 35:6,7

35:17,21,21,23 95:22
98:11 231:11 232:17
290:21 293:5
monthly 255:2
months 35:1,2,18 116:4
256:16 293:16
morning 11:19 24:11
42:10 83:1 87:4
100:11,12
Morris 158:23 159:3
159:20,21
move 51:23 176:9
279:8
moving 55:10 86:24
multiple 142:13,18
199:4,24
multiplied 276:11
278:9 282:6
multiply 278:11
Myers 274:16

_____ N _____

N 2:1 299:23 300:22
name 5:4 6:9 48:24
89:15 122:13 138:1
161:10 163:19
194:24
named 72:8 138:19
names 152:4,14,17,21
152:23 159:15
266:25 267:4
narrow 159:6
narrowed 155:24
nation 151:2
nature 7:23 8:3 50:4
65:20 142:10,22
144:4
Neally 2:7 5:24 9:12,14
12:21 13:11 14:9,15
14:19 15:18 16:7
18:14,22 19:8,12,19
20:13 25:3 27:24
28:23 29:1,24 30:2
80:24 85:12 118:12
126:11 149:9 154:12
154:15,18 163:3
164:2 167:17 172:20
201:16 205:15
206:20 207:11 209:2
209:9 210:5 217:7
219:13 220:17 221:8
222:19 223:1,16
224:17 227:21
229:20 233:12,22
234:11 235:23
236:14,18,21 239:23

242:11,21 243:4
246:11 269:8 277:21
296:18
Neally's 289:20
necessarily 69:25
120:10,14 200:13
202:5,8 234:12,23,24
251:23 252:23
necessary 96:6,7 273:6
need 26:13 27:13 28:17
29:14 53:10,12 66:12
66:12 93:10 94:2
110:19 114:8 115:22
142:8,13 143:16
145:8,23 146:3
152:10,14,17,23,23
156:4 175:14 178:13
246:9,20 247:18
277:23 290:22 291:5
291:7 292:3
needs 263:13
negotiate 37:3
neither 299:9
net 190:6,10,20 234:21
273:1 282:16 283:4
283:13
network 50:6
networks 56:20,20
never 79:11 111:25
112:1,23 113:4
159:15 189:3 213:21
233:15 277:4,14
Nevertheless 270:12
new 38:22 42:12,25
54:19 57:11 167:20
167:25 191:2 192:10
200:5 209:22,23
210:2 212:4,14,16
250:3 253:10,22
254:8,10 267:20
276:5 279:13 280:19
288:5,7 289:6
niche 146:25 147:3
night 117:8
NOE 1:10 2:10
Nolte 139:14
nondiversifiable
276:11
nonresponsive 133:8
166:10 168:23
172:22 185:12
188:12 220:5 222:7
non-AFLAC 221:21
non-Bates 98:15,16
non-captive 177:4,14
non-competitive 175:5

normal 211:18
normally 6:25 224:15
251:21,25 252:21
253:3 277:12
Nos 5:1
NOTARY 298:15
notations 61:6
note 256:1
noted 263:9 288:23
298:4
notes 3:21 83:5,8,16,21
83:23,23 84:6,25
247:4
notice 3:15 6:5 22:21
23:11 224:10 246:25
264:1,5 266:18
notifications 49:18
notified 223:21,23
224:5,10 227:1 300:7
300:9
noting 278:16 285:15
288:23
November 54:23
121:24
number 3:14 4:3 32:25
33:21 34:17,23,24
66:6 70:8 88:8 91:5,9
91:17 107:3 110:7,24
115:3,7,8,9 116:22
123:14 130:11
141:14 152:7,10
153:5,6,6,16 160:17
166:23 183:7 185:10
201:4 206:7 229:14
229:16 230:16
233:17 244:9 252:9
253:19 255:16,20
258:5 269:5,6,7
280:4,20,24 286:2
287:12,14,23 288:15
290:13 291:1,25
292:10,17
numbered 1:22 30:7
99:11
numbers 45:1 90:21,23
95:22 100:18 101:9
101:11 116:1 117:17
130:4,12 180:10,13
198:14 206:8 215:3
215:18,19 216:3
227:15 228:21
252:13,16 254:2,5,6
254:7 255:8 256:14
257:3,6 268:8,11
269:25 282:14,24,25
283:7,8,9 288:24

290:9,10,21 294:22
Nuts 276:19
NYSE 276:5 278:17
279:9,20 280:2

_____ O _____

Oak 299:23 300:22
object 12:21 23:10
26:10,15 31:9,16
32:1,20 33:2,10 34:8
34:9 35:13 37:11
46:8 71:13,18 73:10
77:5,9 78:7 80:19
104:1,3 105:25 107:8
107:19 126:20
133:11 136:4 137:19
137:23 140:14 142:1
143:23 149:9 151:20
154:2 163:3 164:7,14
164:23 166:22
167:16 173:2 174:3
178:20 179:10 197:4
205:19 206:10
217:20 218:12
219:19 220:10
221:11 222:11,19
228:5 233:11 239:22
239:23 244:24 269:8
objecting 260:19
objection 5:8 18:24
34:3 41:3 44:17 45:4
61:15 62:18 68:4,9
76:10 102:4 109:20
123:18 126:10,11
128:14 130:6 131:8
133:5,8,10,11 137:12
151:14 152:22 164:1
164:2 166:10 167:17
167:18 168:23
172:20,22 177:16
178:11 182:10
185:12 186:19 187:6
188:12 201:16
205:14,15 206:2,20
207:11 209:2,9,14
210:5,7,23 211:7,8
211:20 212:18
213:21 217:7 219:13
220:5 221:8 222:7
223:1,16 224:17
225:25 227:21
229:20 233:12,21,22
234:11 238:15
242:11,21 243:4,5
246:11
objections 3:16 6:1

286:23 289:21 290:1
paginated 190:3
paid 31:14,17,18,20
32:10,11,13,18,22,25
33:4,14,18,19 34:2
34:17 35:17 37:10
38:19 40:19 48:21
56:18 74:2 87:24
89:8,13,14,14 91:17
95:20 123:12 129:15
177:12,18 186:4
196:13 212:25 219:2
219:2,5 239:25 240:1
240:15 242:24
249:18 250:5 255:23
257:20 290:19
Paint 43:6
paper 282:25,25
papers 97:14,24 191:10
248:3 270:3,6 280:23
paperwork 196:6,12
244:19
paragraph 118:22
120:10,16 124:1
129:24 132:14,20
171:4 177:2 179:25
183:14 191:1 192:10
202:25 204:16
212:23 213:12,14
216:8,18 221:23
237:10 247:18
248:11 249:5 253:9
255:1 274:2
paramount 165:9
pardon 288:22
part 5:14 18:9 21:15
36:24,25 38:19,19,22
49:3,4,5,7 66:23 67:2
70:9 71:17 73:17
75:13,20,23 76:2,5
76:12 84:1 98:12,20
101:1,5 114:9 119:24
129:7 132:3 141:10
149:14 161:21 165:4
165:11,24 180:24
189:12 193:19
195:19,20 200:21
208:8 209:19 211:4
211:10 214:18
215:25 216:1 239:1
243:15 252:3,9 255:5
279:19,20 286:12,13
partial 48:23 192:2
participate 52:13
231:20 232:23 233:2
233:7 245:6

participated 292:7
participating 47:16
66:23 230:22
participation 6:14
particular 35:23 44:4
54:25 61:16 62:12
74:4 88:20 91:19
92:16,19 102:24
109:13 126:24 132:6
132:7 136:25 137:15
141:21 145:18 147:1
147:3,7 149:17,17
153:2 155:8,18
158:16 173:9,14
187:10 190:9 193:20
196:20 199:10 201:9
201:23 203:15 205:8
207:3 208:23 209:17
211:14 213:12
222:12 225:1 241:13
244:23 248:2 265:20
265:20 266:10
267:15 268:11
276:12
particularly 79:11
particulars 9:22 10:1
parties 299:10
partner 34:19 35:9,20
36:7,8 183:21
Partners 129:24
parts 68:11
Party 81:11
pass 192:6 296:15
passed 256:16
path 135:8 137:2
pay 31:19,21 150:17
175:8 176:1,22 200:9
213:5,10 217:1
277:13
paying 40:13 201:1
213:13
payment 32:23 33:25
242:7,18 253:2
payments 240:5,12
242:9,23 243:1
payroll 4:11 195:20
196:2,6 291:14,15,23
pays 174:23
Paz 129:25
Pena 1:23 129:25 299:6
299:21 300:20
penetration 45:20
201:7,11,18,22
Pennsylvania 51:25
52:1,2,5,11 64:21,21
64:24 66:4 67:15

81:15,16,18,24 82:1
82:1,2,19
people 31:2,4 36:22
63:22 64:1 68:16
103:1 109:17,21
135:3,5 141:16 147:3
147:11 149:16
153:19 158:11,14
161:4,22 165:22
173:16,16,24 174:16
174:24 196:1,9 198:3
200:9 201:5 204:4
209:18 217:10 218:2
218:8 231:7 265:19
291:25 292:6
percent 30:22,25 53:18
53:19 59:14,15 60:23
60:23,24,25 80:5
161:14,15 165:14,25
180:3,6,16,23 182:22
183:4,13,17,25 185:7
185:10 186:3 187:25
188:5,16 200:24
201:1,1,9,22 205:3,4
205:9 206:5,11,13,14
227:12,19 228:3,15
228:19,20,24 229:7
229:14,16,16,18
254:10,20 256:2,6,6
256:17 257:14 258:8
258:16,23,24 259:2,3
261:6,13,16 270:18
270:19,20 271:4,18
271:18,21,21,25
272:7,8,8,11,11,11
275:22 276:7 278:9
278:13 280:1,1,4,8
280:14,19,20,24
282:1,4,16 284:2
289:6 295:2,15,17,18
295:19 296:2,6,9,13
296:14
percentage 60:13
123:15,17 181:24
198:5,6 268:12
295:16
percentages 180:20
perform 272:10
performance 256:1
257:18,19 258:12
282:10
performed 100:9
241:15,23
performing 170:4,5
period 32:14 88:9
103:21 138:22 180:4

181:16,17 196:3,4
199:7,9,24 225:2,20
251:15 261:13
262:23 263:22
270:25 272:20
277:17 288:8 293:15
periodicals 68:16
periods 262:15 271:20
277:12
permanent 124:3,9,10
168:8,8
permanently 168:7
permission 210:14
person 13:12 105:15
127:6 135:23 136:19
140:20 141:1 147:9
147:17 172:17,19
173:4 174:2 194:24
218:19 265:20
personal 202:19 213:1
213:8
personally 286:7,11,14
personnel 30:9 50:2,16
persons 127:6
person's 133:22 195:14
perspective 228:18
phone 10:6 157:17
299:24 300:23
phrase 126:16
physical 124:13,14
physically 124:17
physicians 48:3,6,11,21
54:7,8 62:1
Ph.D 41:7
pick 63:11 205:8
229:15 248:25 262:9
262:14
picking 293:24,25
294:4
place 126:18 147:4
175:25 208:4 272:20
placed 126:21
plaintiff 1:21 2:3 5:7
49:21 52:9,12,13
53:4,13,17,18 58:22
58:25 59:15 60:6,7,9
60:17 79:22 81:21
82:20
plaintiffs 59:25
plan 6:15 44:16 69:5,10
69:13,13,25 70:1,7,8
70:11,12,13,23,24,25
71:3,4,6,12,15,17
72:6 76:9 119:7
126:18,22 144:22
147:8,10 157:3

172:17,19 174:2
193:6,7,13,14,19,25
194:13,23 195:3,5,7
195:9 196:2,22 197:8
200:17,25 201:10
202:9 224:12 270:1,1
plane 59:19
planning 5:17
plans 26:2 44:3 69:24
70:5,9,9 71:9 76:15
76:21 77:2 78:16,20
144:23 146:23
147:15,18 173:1,7
194:22 197:20,21,22
197:23,25 198:1,2
201:19 202:5,10,20
202:21 203:11,12
225:10
plateau 198:24 199:25
play 24:13 32:3 170:23
185:2,4 205:18 206:1
Plaza 2:11
please 6:9 38:10 59:5
73:4,11 87:6 236:18
294:17 295:12
plug 149:8
plural 100:21 127:15
plus 33:25 34:1 100:22
100:22 101:8,17
109:3 255:4
point 10:22 16:5 19:25
20:20 26:7 27:17
28:16 49:8 72:22
84:22 85:12 90:20
97:20 98:6,24 104:10
110:12 115:15
117:14 121:23 134:4
134:13 135:1,14
136:2,7,18,20 137:3
137:9 140:23 141:3,4
143:21 144:22
145:22 148:16
150:20 151:16 163:1
163:12,13,19 164:20
166:8 178:4 179:1,4
179:16 182:8 198:11
200:23 221:18
241:14,16 243:1
254:23 262:21 265:6
265:8,9,18 281:10
282:21 291:18
292:11,13,14 293:15
294:5
pointing 236:12
points 54:4 166:12,13
204:20 253:2

ORAL DEPOSITION OF DONALD HOUSE

purchase 75:1 76:8
  80:5 132:6
purchased 292:7,16
purpose 19:13 119:8
  119:10
purposes 23:2 59:11
  84:20 154:22 206:25
pursuant 1:24
pursuits 190:20 283:14
put 12:1 24:14,15,16
  29:6 39:3 68:3 73:24
  93:5,5 94:2 164:24
  187:16 245:3,7 252:9
  265:1 271:15 272:6
  282:24 284:10
puts 190:9
putting 114:10 228:17
p.m 1:22 154:19,19
  156:12,12 192:8,8
  245:23,23 296:23

_____ Q _____

qualified 187:20,21
  192:11 198:15,18
  199:14 203:2 204:2,4
  218:25
qualifies 75:1
qualify 140:10 185:6
  250:6
qualifying 183:16
quantifiable 140:12,21
  141:2
quantification 163:21
  167:9,24 179:16
  221:20 266:11
quantified 178:23
  232:25
quantify 220:1,2
  259:25 260:1 268:9
quantities 45:12
quarter 295:23,24,25
  296:5
quarterly 293:24 294:5
quarters 294:7
quest 211:15
question 5:13,16 10:14
  12:22 13:13 23:13
  32:18 35:10,14 41:2
  46:9 53:10,24 57:13
  62:20 64:15 73:8,13
  77:11,15 86:19 95:16
  99:23 104:19 105:22
  106:2 111:15 112:25
  113:4 115:16,21
  116:1 119:12 126:16
  128:13 132:8 139:18

139:19 140:25
  160:15 163:4 167:23
  168:6,10,22 169:6
  173:3,8 177:17,19
  178:3,18,21 188:13
  194:25 206:22,23
  207:2 208:9 209:3
  210:20 211:2,3
  212:11,12,13 217:13
  217:14,14,15 218:10
  220:7,12,14,17,18,21
  221:15 226:7,8
  234:18 235:18,21,21
  236:5 238:18 239:11
  252:22 260:10 261:2
  265:14,24 268:21
questioned 261:1
questioning 175:17
  182:22
questions 5:18 178:25
  246:24 296:16,18,20
quicker 18:9
quickly 83:15 292:9
Quit 224:24
quite 30:7 171:4,10,12
  174:6 260:10
quotas 249:21
quote 90:17 113:25
  120:2 271:3

_____ R _____

R 2:1 81:10,11
race 148:23
raising 265:24
RANDY 1:10
range 33:9 208:3,3,12
rapid 197:13 198:3
  200:8 202:1 235:3
rapidly 248:16,21,24
  263:10,12
rare 80:1,5,14
rate 30:11,12 32:22
  35:10 54:23 101:2,8
  101:15,16 102:3
  110:16 111:4,20
  114:24,25 115:16
  116:3 118:9 180:2,16
  180:18,24 181:5,14
  182:5,8,14 186:4
  187:25 188:5 205:10
  206:12,13,14 251:22
  252:2,7,10,11,14,17
  252:20,22,23,24
  253:4,6,7 256:17
  261:5,23,25 263:5
  270:15,19,19,20

274:13,22 275:21
  276:3 278:14 282:1
  282:15 287:18,19
  295:20 296:1
rates 30:9 47:14 52:6
  56:18 65:3 100:9
  112:21 115:4 180:1,3
  181:7,8,9,13,19,20
  182:1 197:13 198:3
  198:12,17 199:12,18
  199:25 202:1 205:23
  207:6 248:23 249:25
  251:19 259:10,14
  262:6,7,10,15 270:7
  271:10,16,19,20,22
  271:23 272:2,12
  282:9 295:13
ratios 49:18 52:7 63:3
  65:3
raw 68:18,18
Rd 2:8
reach 180:23 199:25
  201:21 204:20
reached 208:7
read 27:8,9 28:22 76:2
  83:6,17 101:9 105:10
  171:18 185:21
  204:18 214:18 220:6
  221:6 224:3 238:6
  248:2,14 271:5 280:5
  290:23 293:3,4 298:3
reading 194:4 266:12
  281:17
realistic 271:12 272:4,7
  272:7,8
realize 29:2
realized 274:6
really 26:23 35:14
  55:19 82:4 84:2
  111:3 119:16 124:8
  127:13 130:12,13
  160:8 210:19 218:20
  227:23,25 231:1
  246:21 247:1,4 248:1
  249:22 269:1 287:2
  287:17
realm 171:24 172:4
reason 29:13,14 40:8
  40:16,24,24 96:13,15
  96:17,19 114:1
  115:14 129:9 166:19
  210:18 213:12
  228:19 239:4 244:23
  254:23 260:12
  265:17 273:15 274:2
  297:4

reasonable 109:17,19
  109:21,22 165:19
  178:8,14,18,24 179:5
  183:3,5,11,12 207:10
  221:6 259:13,20
reasonableness 65:7
reasonably 114:19
  216:13
reasoning 217:8
reasons 27:12,17,18
  29:18 98:18 132:17
  168:4 213:18 214:1,3
  253:6 273:13 276:21
  276:23 300:12
recall 8:6,9 10:1 14:18
  14:22 15:13,19 16:4
  17:4,8,9 20:5,15,22
  21:2,4 22:3,6 44:7,12
  56:1,7,12 71:5 72:13
  72:17,18,21 73:7
  80:21 84:13 106:18
  106:22 114:5 116:21
  116:21 117:3 120:2
  121:3 139:22 140:6
  150:11 169:21 229:2
  266:5
receipt 253:1
receive 10:9 15:8 34:4
  34:7 41:12 84:12
  88:23 151:6 241:2,5
  250:10 284:10
received 4:6 7:23,25
  9:9,11 10:13 12:2,10
  12:13 14:3,5,8,11
  19:22 22:22 25:10
  27:3,5,6,20 28:7 29:7
  29:8 83:11,21,24
  84:16 89:2 119:4
  175:8 242:9 257:11
  267:3,8,11,15 285:16
  285:17,21 286:10
receives 32:23 255:21
receiving 20:8 249:9
recess 78:23 94:14
  154:19 156:12 192:8
  245:23
recession 55:22
recite 76:4
reciting 300:12
recognize 84:10
recollect 98:5
recollection 8:24 9:8
  20:4 21:1 95:6
  238:14
reconsideration 50:12
  50:15

record 5:6 8:14,20 13:4
  13:8 18:23 24:3,20
  25:14 60:21 84:17,19
  84:24 85:14 94:13
  124:23 154:17,18
  192:7 218:14,21
  229:9,11 231:8 236:7
  245:22 299:8,12
recorded 142:9
records 8:10,11,12,13
  45:10,19,19 52:4
  65:2 96:9 99:1
  150:14,17 152:24,24
  236:16 244:10
  254:15 258:6
recover 237:12 241:4
rectify 253:19
redact 19:17
Redacted 19:7,8
reduce 259:5
reducing 258:22
Reed 1:17,21 3:6 5:2
  6:10 298:3,7,10
refer 18:1 90:23,24
  200:3 246:9 272:23
reference 18:25 19:2,3
  75:11,14,16 132:15
  289:13
referenced 19:14,20
references 56:3 98:8
  236:22 256:8 283:2
referred 85:7
referring 19:2 25:14
  90:21 91:3 92:11
  94:7,18 177:3 204:22
  239:25
refers 91:6 92:10 94:4
  196:19
refine 156:18
reflect 5:6 8:20 14:2,4
  24:3 25:14 38:22
  84:25 109:13 252:13
  269:6 283:1 293:11
reflected 234:21
reflecting 13:4 59:2
  183:9 278:5
reflects 87:22 278:6
reform 54:6,11
refresh 100:14 238:14
regard 6:4 104:25
  106:11 118:1,6
  172:25
regarding 65:2
regardless 127:19
  245:4 248:14
region 57:22 137:4

ORAL DEPOSITION OF DONALD HOUSE

72:21 75:23 76:16
81:19 87:19 88:9
94:25 98:15,16
100:19,20 102:13
103:20 104:10,11,19
106:15 107:15 111:6
113:6,14 116:7,10,19
118:19 120:1,7
121:11,15,20,21
124:4,7 126:14,19,22
127:10 128:4,4 129:8
129:11,20 130:24
131:7 132:7,18
134:13,18 135:2
140:13 141:12,20
144:23 146:10,13
147:21,24 149:3
150:13 151:19 152:1
154:22 157:9,25
158:6 160:3,23
162:11,17 164:13
165:5 166:15 169:1
170:6,14 172:4 178:6
178:9,19 179:15
180:4,10,13 183:18
183:22 184:4,9,12,19
186:14,17 187:5
194:11 195:9,10
196:24 197:16,17
198:20 199:8,20
200:20 201:17
203:16 204:7 206:5
207:8 209:1,8 210:3
210:4 211:17 216:12
217:6,22,22,23 218:3
218:4,11,25 219:6,12
220:20,24 223:15
226:6,10 228:21,25
229:23 235:21 237:4
237:18,25 239:17,20
240:12,17,24 241:9
241:19,21 242:1,5,20
243:9,23 244:6,14
245:7 247:1 249:3
250:9 251:15 253:5
253:25 254:6,11
255:6,10 257:4,21
259:1,1 260:4,25
261:1,18 265:10
267:21 271:13 273:5
275:13,16,19 276:2
276:21 279:4,19
280:9,20 281:9
282:12,20 283:6
288:3 290:10,25
291:2,6 294:19

295:22 296:3,9
rights 192:11,14,23,25
197:7
right-hand 294:1
Rio 145:12 148:5
149:21 184:19
risk 101:16 112:10
114:23,24 115:4,16
116:3 252:12,15
272:16 274:5,9 276:5
276:10,12 278:6,7,10
278:12,22 281:1,2,10
281:16,22,23
riskiness 112:15
risks 251:17 253:1
281:18
risky 108:20 112:11
risk-adjusted 251:22
252:1,22 253:3
274:12,22,25 282:1
risk-free 275:21 276:3
278:14
Road 299:23 300:22
Robert 158:23 159:3
159:20,21
Roerig 2:7 81:6
role 21:14,15,21 32:3
52:18 62:15,22
195:14,22 224:11
226:17
roles 195:24
roll 54:2
rolling 294:7
ROM 11:18,20 24:2
room 18:2
rough 17:24
roughly 33:8 37:7
RRC 3:19 7:1,3,4
24:11 30:9,12,16,17
30:20,21,23 31:11,22
33:24,25 36:20,21
38:3 39:15
RSC 121:25 122:4,20
125:17,20,21 130:21
171:7 174:7,11
175:22 180:15
183:16 184:25 188:9
212:4,15,16,19
216:21 222:1 223:22
224:11 237:2 243:11
249:3 250:11 255:5
255:13 263:10 264:1
266:18 272:19,24
RSCs 104:14 258:16
264:7,14 266:7
267:11,15 271:4

RSC's 174:11
rule 19:5 54:19 114:6,9
133:21 210:21
ruled 157:16
Rules 1:24 139:2
run 182:1 233:14,16
271:18
R-e-e-d 6:10
R0981 87:20

S

s 2:1 129:10 195:1
safe 216:24
salary 31:20 32:25
33:19,20,21,24 34:1
35:17 36:18,19
sale 240:14,19 241:12
sales 44:2 45:19 49:16
102:20 103:22 104:6
104:7 106:14 113:23
122:6 123:5,8,16,17
125:7,11,13,16 126:1
126:1 128:5,21
144:15 174:15 182:3
185:25 186:2,5
188:22 190:18 199:6
202:6,19,23 203:1,3
203:19 204:11
205:10,17,25 206:11
206:12,14,18,24,24
208:13 212:6,6
214:16 215:4,22
216:6 217:10,11,17
217:25 218:16
219:25 220:3 221:21
222:1,15 223:9
224:25 225:2,9,19
229:19 233:25
241:25,25 243:16,17
244:3,17 245:10,11
248:15,15 249:25
260:9 261:5 267:2,9
267:11 271:2 272:12
283:12 293:5,7,11
salesman 202:23
sample 142:5,8 143:7
143:13,16,22 161:14
161:15
sampling 144:2
Sapp 1:24 2:15 3:19
satisfactory 34:23
saturation 184:1 185:2
185:4,9 186:1,5
204:20
SAUCEDA 1:10 2:10
save 59:17 98:3

Saving 31:6 32:3,10
81:11
saw 117:2,3 183:20
184:3 207:7,14 231:8
saying 12:25 13:10,15
63:7,22 74:10 101:25
110:6 115:24 124:15
124:16 125:14
127:21 128:9 136:15
140:17,19 149:22
150:10 151:4 152:18
160:18 162:18,19,21
162:24 163:15
173:12,17,23 177:7
180:13 181:6,8
183:12,13 187:13,19
187:21,23 188:4
189:2 190:24 191:16
191:19,24 192:2
198:21 199:16,17
201:3,18 206:3
207:21,23 208:23
211:17 214:7,9,25
215:15 216:2 217:22
217:24 223:5 228:9
228:13,18,19 230:5
230:18,20 231:4,12
231:15,21,22 232:1,4
232:24 238:24 239:8
241:11 252:20 253:5
260:24 261:16
262:17 265:2,3 269:4
280:9 282:19
says 105:12 120:9
122:4 135:24 136:10
187:24 190:17
255:11 261:6 268:2
271:7 272:16,22
282:8 288:18 293:5
295:12
scale 131:1,2,3,6,14,16
131:20,21,25 132:1,9
207:20,21,24,24
208:1,2,4,7,9,17,18
261:4,7
scales 132:4
scenario 145:2 191:12
schedule 16:15 17:25
school 1:10,13 2:9 19:1
71:11 136:8 287:13
289:22
schooling 44:5
Scooter 42:13 43:9
57:18
scope 211:16
scratches 247:2

screen 155:19 156:7
157:22
screening 157:11
se 209:4
search 145:19 161:21
second 26:25 37:23
39:10 47:21 54:22
62:1 84:18 113:3
124:24 127:12,13,13
134:20 154:17 157:2
157:5,11,16 177:2
200:21 201:1 203:10
237:10 265:7,8,13,14
274:2 292:22
section 6:14,15 44:3,16
69:4 71:12 75:5,9,16
75:22 76:9,15,21
77:2 172:25,25 174:1
207:19 263:7
sections 75:25
see 18:20 32:2 42:25
55:3,24 61:1 95:18
98:13 124:22 131:21
151:1 159:8 161:4
165:4,18 167:19
175:3 179:2 187:10
217:25 218:2,17,17
218:18,21 219:9
221:1 247:7 248:17
270:3 271:3 286:7
287:18,19 289:18
293:18 294:2
seeing 224:4
seek 231:10
seeking 225:24
seen 170:12 178:10
180:18 191:10
207:13,15,15 218:14
218:16 219:17 220:8
227:14 236:21
247:25 251:2 280:23
287:25
segment 276:17
segments 245:14
selection 195:10
self-employment
212:24 213:4,6,9
sell 103:1,2,4,5,6 105:2
105:6,13,15,24 106:8
106:12 124:18
136:16 146:22 159:2
204:5 208:25 209:7
209:16,21 210:2,13
210:22 211:13
226:18
selling 103:25 104:22

DSI Reporting Services, Inc.
713-554-0080

150:25 151:18
163:20 181:23,24
198:22 264:12
started 8:21 46:6 74:10
107:6 228:23
starting 58:6,18 67:24
102:12 134:4,13
135:1 136:2,18,20
137:9 140:23 141:3,4
150:20
starts 180:13 197:13
206:8
start-up 181:4,23
182:1,8
state 1:23 18:23 53:22
54:23 62:16 148:7
150:21 155:21,23,25
236:8 271:1 298:8,16
299:4,7 300:4
stated 59:14 249:12
278:21
statement 38:15,16,18
41:2 127:8,10 140:18
143:17 176:11
187:22 196:24,25
204:7 219:21 220:16
248:18 250:7,14
251:15,16 252:23
254:12 255:10,12
258:13 259:6,8,21
264:21 265:25
266:10 271:9 272:9
272:13,14,23 273:12
273:14,19 282:19
284:20 300:11
statements 215:21
249:8 255:2
States 1:3 142:25 143:3
143:10,11 150:12,23
150:24,25 152:1
154:4 155:22,24
156:1 161:16 191:15
208:17
Station 6:23
statistic 207:3
statistical 7:18
statistics 7:9 22:19
stay 184:18
stayed 182:14 219:24
220:3
Steele 2:14 3:24,25 5:4
5:4 6:2 8:1 9:9,19
12:4 13:5,6,12,17,20
14:7,8,14,19 15:7,17
16:7 18:5,10 19:7
20:7,9,10 23:10,20

24:3,13,23 25:1,4,13
25:16 32:1,6 34:3,8
36:18 44:17 46:8
49:1,13 56:4 59:10
59:14 61:15 62:18
64:17 68:4,9 72:2
76:10,23 78:9,22
79:1,5,11,16 80:16
80:18 84:24 85:3,8
86:22 90:16,20 93:17
93:19,24 94:10,12
95:11,19 98:24 99:2
99:14 100:1 102:4
104:1,4 106:13
108:13 118:14
123:18,21 128:14
131:8 134:19 137:12
138:6,9,21 139:1
140:14 149:22
156:10 164:3 167:18
173:2 175:10,16
176:8 182:10 187:6
189:9,14 192:5
209:14 210:7,23
211:8,20 212:18
213:20 222:20
224:24 225:25 228:5
228:10,15,22 229:1,6
233:21,23 234:14,16
235:12,18,25 236:6
236:11 238:15
245:20 247:10
251:12 290:18
296:20
Steele's 9:17
step 67:22 97:7,8 135:6
265:4
Stephen 4:5 25:9
129:25
steps 68:15,23 160:2,5
160:7,17,19,20,21
Steven 27:19 37:16
sticker 24:14
stickie 85:6
stickies 92:4,9 93:3,11
93:12,13
Stipulations 3:3
stock 31:11 255:22
276:6 279:13 280:19
stop 27:1 51:13 134:19
176:8
Store 42:14 43:10
57:18
straight 73:14
strategies 66:8
stream 137:2 139:5

171:6 174:6 175:2
streams 230:16 235:7
street 209:25
strength 143:18
strictly 40:17 184:7
strike 110:22 213:21
string 74:19
struck 280:15
structure 227:22
student 138:2
students 136:21,23
studied 92:2 154:3
227:16,22
studies 48:1 161:23
study 47:12,23 48:23
48:23 51:8 144:5,8
151:8,8,9,10,11,17
152:3 160:1,8,24
162:12 164:11,19
166:16,20 167:8
173:20 178:5 208:6
219:10,15,22 220:1,2
221:12,16,19,22
stuff 247:11
subcontract 194:1
subject 55:20 119:22
213:2,9 253:17 274:5
submit 33:13,15,16
34:14
submits 32:12 33:1
submitted 83:10 89:18
191:25
submitting 35:11 90:8
subpoena 3:16 5:8
Subscribed 298:9
299:15 300:16
subsequent 256:22,22
272:19
substance 17:4 300:11
substantial 208:8
262:12
substantive 207:6
subtract 134:2 283:19
subtracted 190:21
283:14
subtraction 258:15,25
successful 172:15
188:9 191:3 217:6,19
217:25 218:6,20
284:23 285:1,3,4,6
successfully 170:4,5,14
suffered 124:3
sufficient 89:6 142:5
143:12,22 151:13,17
151:19 181:18
185:15 187:13

203:23 215:3,18,19
215:22 216:2 289:4
suggest 174:23 175:3,4
183:15 213:10
218:14 237:1,7
281:14
suggested 162:7,25
174:20
suggesting 150:19
177:17
suggestion 18:5 59:10
146:19
suggests 183:19 262:14
suit 81:15
Suite 1:24 2:8,11,15
299:23 300:22
sum 34:22 37:4 63:22
74:19 238:3 269:9
273:20
summaries 95:20
250:15 290:19
summarizations
250:21
summarize 66:16
summarizing 90:1
summary 4:10,11
20:18,21 23:2 66:14
68:24 84:11,14 92:11
supervising 226:17
supervision 122:2
123:1 125:9,9
supplement 83:25
supplemental 72:9
300:5
supplementary 28:11
supplier 210:12 281:6
281:8
supply 193:12
support 7:10 218:21
supporting 119:3
236:23
supports 174:8,9
suppose 272:9
supposed 120:18
supposedly 97:11
supposition 194:5,7
sure 10:13 12:23 18:15
44:22 46:3 53:25
59:23 68:22 69:6
70:2,17 72:4 77:7,10
78:13 85:13 87:19
89:11 90:9 99:22
102:21 104:4 109:12
110:20 116:2,3
131:18 175:14
193:15 196:6,10

207:23 208:2 211:9
212:13 239:24
242:14 248:22
262:20 265:5 268:25
272:22 281:20 292:4
survey 7:10 48:19
119:16 154:6 155:4
155:11,19 156:9,14
156:17 161:8 162:3,4
surveys 151:1 155:14
155:17
survive 57:23 92:6
182:11
sustained 270:8
switched 198:16
switching 73:12 85:13
sworn 1:21 5:3 298:9
299:15 300:16
system 249:11
systematic 276:12
278:6,7

_____

T

tab 92:16
table 39:12 73:8 114:17
190:6,9 268:3,7
275:15,18 282:11
tables 114:20
tactics 236:12
tail 63:11
take 5:22 6:11 43:20
73:23 78:22 85:5
93:24 97:1 132:5
138:5 160:21 182:3
186:2 190:22 192:5
198:25 199:2,10
201:21,21 208:4,4
273:6 276:3 278:11
284:12
taken 1:22 44:9 83:5
100:19 135:22
226:25 227:6 265:20
272:19 299:11
talents 185:16 186:14
187:14
talk 16:1,12,18,23 17:2
25:24,25 89:15,17
95:2 101:7 118:10
132:20 170:6 186:6
213:14 223:14
233:13 241:10
talked 7:23 9:20 20:21
57:11,12 116:6
130:23 137:10
191:12,13 207:22
213:24 279:2 281:3

ORAL DEPOSITION OF DONALD HOUSE

Page 25

291:1
tomorrow 170:20,21
top 47:21 54:22 61:24
  62:1 81:10 87:20
  100:19 124:24 160:4
  162:9 295:13
topic 224:3
tort 54:6,11
total 33:23 34:22 35:20
  35:23 36:5 37:4 38:7
  38:12,18 48:20 67:12
  88:9 89:7,9 92:25
  101:4 109:1 123:2,7
  123:8 129:14,16
  206:24 231:16
  233:18 235:14 239:3
  252:6 253:17 254:3
  287:23 288:25
  291:14,15,23 293:7
totaled 238:13 239:6
  244:13
totaling 253:11
totality 235:14
totally 106:20 127:7
  188:9
totals 89:25
trace 114:14
Trade 58:21
train 103:8
training 43:23,25
  148:12,12 172:8,8
  173:11,25 186:16,18
  187:4,7 211:18,22
transcript 299:8 300:9
transfer 212:16 284:11
transferrable 212:20
Travis 1:24
treatment 73:23
tremendous 261:4,6
trial 21:19,22,23 82:7,8
  85:18 86:2,11,15
  296:17,19,21
tribunal 50:17
tried 23:2 159:16
  171:23 172:21
  230:24 283:7
trouble 138:4
truck 52:21
trucking 52:14,19,25
true 81:5 113:18 193:8
  193:9 252:11 258:18
  258:21 298:3 299:8
truth 116:20
try 40:2 67:25 69:8
  97:4,5 99:4 124:17
  128:13 141:8 150:25

156:21 158:7,17
  179:4 220:18 230:24
  239:12 270:5 292:22
trying 18:8 32:15 34:1
  56:7,10 61:2 63:21
  73:13 82:4 88:13
  120:11 127:20,23
  138:1 147:11 155:6
  157:7 173:3,8 175:13
  176:6 185:20 189:13
  192:22 200:15
  203:11 226:18
  231:25 241:9,10
  279:23
turn 39:13 41:4 148:20
  180:2 295:12
turned 39:12
Turning 124:24 163:20
  177:2 236:24 275:11
  294:8
turnover 198:8,11,19
  199:15,19 200:1,21
  201:25 212:9 287:12
  287:12,18,19 289:5,7
  289:10
turnovers 287:25
turns 10:12
twice 107:11 175:13
two 5:19 47:11,25 51:7
  51:24 56:10 63:6
  79:17 90:17 115:17
  116:1,1 135:8 140:6
  155:14 156:16 165:9
  169:21 185:14
  197:12 200:17
  203:18 204:21
  226:22 239:8 248:7
  253:6 264:6 273:13
  290:1 293:22,23
type 45:24 49:12 63:12
  65:8,8 68:25 69:13
  69:15 124:20 126:15
  128:4 137:5 146:23
  148:4 149:14,21
  150:22 152:6 156:21
  159:2,20,21 193:3
  202:17 286:6,11
  291:15,24
types 47:7,8 48:20
  49:15,17 54:10 62:12
  62:14,17 63:14,15,17
  64:10 67:3 69:7
  202:6
typing 129:6
typo 128:23

---
|  U  |
---
Uh-huh 81:9 84:9 87:5
  92:8 177:6 199:13
  213:3 247:10 295:1
ultimate 66:17 68:21
ultimately 66:25 90:5
  153:17 185:8 205:25
  206:8
umbrella 7:15 69:7
  125:12
unable 130:22 156:13
  173:13,15,23 270:6
  283:8,8
unclear 89:12
Unclip 246:19
Undergraduate 41:15
underlying 207:16
undersigned 298:9
understand 6:11 7:1
  10:2,5 21:21 34:1
  35:14 38:24 41:7
  58:20 60:21 61:2
  62:20 64:12 67:19
  69:2 71:21 75:22
  78:10 83:18 88:13
  93:5 95:24,25 103:19
  104:5 106:7,19 111:5
  113:2 125:7 126:12
  126:23 127:23 128:3
  132:8 135:8 140:25
  152:12 165:15
  167:19 169:6,22
  180:18,20,24 184:6
  184:13 189:2 191:6,7
  191:8 192:13,22
  194:25 195:4,15
  197:2 201:13 205:21
  206:22,23 209:3
  213:8 223:15,18,21
  226:23 227:17
  229:17,21 232:12
  233:20 235:1 238:5
  241:14,16 242:14
  247:16 264:1,3
  280:16 291:14,18
understanding 6:17,21
  10:4 22:7 71:21,22
  74:8 89:1 95:6 106:4
  107:14 119:22 121:6
  122:11 125:19,22,23
  125:25 126:8 128:7
  155:7 169:2 182:7
  186:10 193:10,11
  197:6,10 208:22
  209:18 212:5,19
  223:23 224:23 227:8

228:2,23 229:8,11
  238:6 243:15 263:24
  267:6,8 284:6 287:4
  288:12
understood 21:11,13
  21:15 22:1 71:17
  72:5 112:3 184:11,17
  192:18 193:17
  194:17 195:8 197:2
  217:15 228:6,10
  239:16
underway 42:16
unemployed 132:25
  133:18
unemployment 55:16
  55:21
unestablished 169:1,4
  169:5
unexpected 206:12
unforeseen 274:5
unique 137:6 197:20
  197:21,23
United 1:3 142:24
  143:3,10,11 150:12
  150:23,24,25 152:1
  154:4 155:22,24
  156:1 161:15 191:14
  208:17
unproductive 132:25
  133:18
unpublished 68:18
  159:9
unqualified 172:9
unreasonable 132:16
  183:2,13 185:10
  188:8 205:5,6,11
  207:25 216:19
  233:14 262:4
unreasonably 204:24
  205:2
unsure 89:23
unusual 119:15,18
update 15:11 26:2,4
  27:13 29:15
updated 25:11,20 28:8
  30:3 41:25 42:9
  129:7
upstream 103:3
use 5:19 67:21 74:18
  88:15 89:1,5,10,12
  90:6 91:20,21 96:1,6
  96:7,8,21 97:3 98:17
  102:2,7 103:15 113:4
  113:9,13,15,19,21
  114:1,7,8 125:4
  129:2 141:3,6 142:18

143:4,11,13 153:17
  161:25 182:4 214:14
  214:22 231:1 252:16
  260:1 262:15 263:13
  274:12
useful 111:7 181:14,25
  207:3
usefulness 74:18
uses 262:12
usually 68:17 69:13
  119:19 158:10
  181:20 198:2
utilize 97:21
utilizing 236:12
U.S 156:5,6 162:3

---
|  V  |
---
v 53:21 64:21
vaguely 14:21
Valentin 129:25
Valley 145:12 148:5
  149:21 184:19
valuable 175:6 176:20
valuation 274:19
value 111:12 138:3
  139:5 190:6,10,20,21
  191:23 192:3 230:2
  252:11,13 272:15
  273:8,10,11,16,24
  274:3 282:7,9,16
  283:4,13,15
values 252:8,14,15
  253:1 273:25,25
variety 7:12 45:17,24
  150:10
various 54:10
vary 31:6 35:21
varying 249:25
vein 237:6
vendor 126:24 127:16
  192:13 193:12
  203:11
vendor's 193:23
verification 249:15
verified 261:19
verify 97:2,4,6 244:11
  254:1,7,12 255:7,15
  279:11 284:20
versus 52:1 65:8
  138:12 139:14
viable 163:17
viewed 131:2 248:23
violating 105:2
virtue 88:4
visit 17:2
volatility 143:14

242:25 243:24 284:3 284:9,10,13
**1099s** 94:12 234:17 235:14,15 238:4,13 238:24 239:2,3,6,18 239:19 240:23 241:7 244:13
**11** 3:25 19:5 42:24 43:6 43:7 55:10 95:9,11 99:7
**11:05** 94:14
**11:06** 94:14
**12** 4:4 35:18 37:23 55:11,23,25 100:5,7 117:24 262:9 293:5 293:16
**12th** 294:2
**12,000** 34:11
**12-month** 293:7,20
**12/01** 92:10
**12/31/03** 299:22 300:21
**12:21** 154:19
**12:26** 154:19
**12:28** 156:12
**12:32** 156:12
**120** 275:15,19
**1200** 2:4
**125** 6:14 44:3,16 69:4 71:12 75:22 76:1,9 76:15 172:25 174:1 183:22 186:14 187:2
**125(b)** 172:25
**13** 4:5 245:24 246:1,2,4 246:23 256:16 289:16,20 295:8,9
**13.7** 296:6
**14** 4:6 28:8 51:2,17,20 81:8 262:20 276:25 277:16 285:11,13
**14th** 277:25
**14.40** 256:17
**140** 244:13
**15** 4:7 43:10,12 47:1,11 47:23 50:25 61:20,24 180:16,23 183:17,25 185:7,10 186:3 188:16 205:3 285:25 286:2,4 294:23 295:2
**15th** 25:10 120:3 189:18
**15.1** 296:13,14
**150,000** 244:14
**16** 4:8 286:20,22
**16th** 19:23,25 20:1
**17** 4:9 287:6,8 289:24 295:7,8

**17.8** 295:19 296:9
**1715** 94:25
**1716** 92:21
**18** 4:10 290:3,5
**18.2** 296:2
**185** 238:14 239:6 243:22
**185,000** 238:4 239:17 242:15
**19** 4:11 25:20 26:7 54:23 182:22 183:4 183:13 187:25 188:5 189:6,23 205:4,9 206:5,11,13,14 246:7 261:6 291:10,12
**19th** 189:10,25 207:7 247:3
**1926** 262:19
**1978** 58:21
**1986** 54:13
**1987** 62:1
**1989** 138:12
**1991** 274:17
**1998** 120:20 122:21 268:10,25 269:4,15 275:4,6
**1999** 180:3

**_____ 2 _____**

**2** 3:4,16 5:1,10,12 51:23 53:6,7 58:7,19 62:25 64:20 124:24 139:16 274:16
**20** 4:12 24:4 120:19 271:3,18,21,25 272:7 272:8,11 282:16 292:18,20
**20,000** 38:15
**20-year** 275:21
**2000** 95:3 180:6 181:7 257:15 268:25 269:19,21,22 275:4
**2001** 71:20 72:6 74:5 95:22 122:21 123:6 128:19 129:10,16 180:7 181:7 223:14 224:12,14,18 226:2,4 226:5,9,20,21,24 227:5 228:7,8,9,16 229:1,3,8 230:1,22 231:17 232:3,23 234:7 237:12,16,19 237:20 238:4,13,20 238:21 239:6,17 240:1,4,5,15,20 241:2,16,23,25

242:16,20,23 243:2,7 243:18,24 244:1,17 245:3,6 250:25 253:10,10,23,23 254:4,9,10 255:2 257:10,18 260:12 263:22 266:19,22 267:12,21 268:4,10 268:23 269:20 290:22
**2002** 222:1 226:3 234:5 234:7,8,15,20,21 235:5,14 237:13,14 237:17 240:15 241:2 241:5,6,15 242:1,24 244:2,13 245:1,3,12 245:14 248:16 251:14 256:1 257:20 263:7 266:21,22,23 272:12 283:22 295:21,25
**2003** 1:18,22 9:4 10:18 25:10 37:24 39:1,2 216:21 237:1 245:2 246:7 276:25 277:16 277:16,19,22,25 294:3 296:5 298:10 299:16 300:17
**2006** 251:14
**2026** 263:8
**21.5** 282:1,4
**2158** 94:25
**2159** 95:12 98:1 290:6 290:10
**2182** 95:13 98:1,14 290:11
**22nd** 12:2 14:1
**22,505** 40:19
**23** 1:18 254:9,20
**23rd** 1:22
**24** 3:17
**245** 4:5
**25** 3:18 24:4 54:13 130:7 132:25 133:18 163:25 164:13,22 166:15 168:19 171:7 174:8 181:5,14 185:11,17 186:3 187:15 188:1,17 205:4,10 270:8 272:11
**25-year** 251:14
**250,000** 143:2
**26** 251:5 262:1
**28** 201:9,22
**28,000** 37:8

**285** 4:6,7
**286** 4:8,9
**289** 4:10
**290** 4:11
**292** 4:12
**297** 3:9
**299** 3:10

**_____ 3 _____**

**3** 3:17 24:10,19 25:14 54:4,15 87:15 91:1,4 91:13 94:20,24 163:20 223:15 224:6 269:10 289:1
**3.1** 261:13,16
**3.9** 280:1
**3.95** 278:18 279:10 280:1,4,14,19
**3:01** 245:23
**3:16** 245:23
**30** 17:11 27:21 60:23 60:25 130:1,7 227:1 227:4,12,19 228:3,15 228:19,20,24 229:3,7 229:13,16,16,18 263:25 271:3,18,21 271:25 272:7,8,11 300:8
**30th** 28:3
**30,000** 37:8
**30-day** 224:10 264:4
**300** 2:15 3:11
**3400** 1:24
**3505** 2:12
**37** 3:19 250:24 251:4
**375** 30:11
**38,000** 234:1
**38,840** 235:9 245:17

**_____ 4 _____**

**4** 3:18 25:7,9,15,16 26:3,4,5,8 30:6 36:22 39:10 54:16,17 94:9 110:16 118:16,18 138:9,12 177:2 180:9 180:12 185:19 190:4 190:5,5 275:11 294:8
**4:26** 1:22 296:23
**40** 165:14,25 228:24 284:2
**400** 33:11
**403(b)** 6:15 44:15 72:25 73:3 74:6,24 74:25 75:1,5,9,11,19 76:21 77:2,4,25 78:2
**403(b)s** 44:2 74:12

77:17,24
**42** 3:20
**425** 299:23 300:22
**45** 53:19 59:15
**45.15** 256:2
**460** 2:11

**_____ 5 _____**

**5** 3:7,15,16,19 37:19,21 37:23 38:17,17 54;18 55:2 87:15 95:15,18 98:13,17 99:11,12,13 99:15 161:14,15 180:21 192:9 258:16 259:2 275:15,18
**5,000-dollar** 39:18,23
**5.2** 115:6,15 117:4,5
**5.21** 275:22
**50** 30:22,25 227:12,19 228:3,15,19,20,24 229:3,14
**500** 31:22,23
**512)305-4734** 2:16
**55** 53:18 59:14
**55.85** 256:6
**554** 288:8

**_____ 6 _____**

**6** 3:20 42:7,9 47:2 55:3 55:4,5 59:4,5 61:6,22 61:23 78:25 85:20 86:4,9 118:16 280:20 280:24
**6.0** 280:7
**6.35** 278:13
**60** 17:11 169:14
**60-year** 113:22 169:16
**600** 1:24
**632** 180:3 270:18,22 272:8
**68** 270:19,22
**68.11** 180:6
**6800** 288:16,17
**693** 293:10,13

**_____ 7 _____**

**7** 3:21 55:6,7 83:2,4 236:24
**7.0** 117:2
**7.13** 116:16 117:2 276:7 278:9,15
**7.7** 258:24
**70** 60:23,24 256:6
**700** 293:14
**701** 299:23 300:22
**713)554-0080** 299:24