IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

OCT 3 1 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| DINO X. CHAVEZ | § | |
| | § | |
| VS. | § | |
| | § | CIVIL ACTION NO. |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, NOE SAUCEDA, | § | B - 02 - 128 |
| and RANDY DUNN, MARILYN DEL | § | |
| BOSQUE-GILBERT and HUGH EMERSON, | § | |
| JR., in their official capacities as Board | § | |
| Members of Brownsville Independent | § | |
| School District | § | |

## PLAINTIFF'S MOTION TO EXCLUDE
## TESTIMONY OF DONALD R. HOUSE

TO THE HONORABLE U. S. DISTRICT COURT:

COMES NOW **DINO CHAVEZ**, Plaintiff herein, and files this his Motion to Exclude
Testimony of Donald R. House, pursuant to Federal Rule of Evidence 104(a), and as grounds
therefore would respectfully show this Court the following:

### I.

### SUMMARY

Donald R. House, Ph.D. should be precluded from offering testimony in this case
because he is not qualified to render an opinion on the damages in this suit, because his
opinions are not relevant to any issue in this lawsuit, and because he does not have any
scientific, technical or other specialized knowledge to assist the trier of fact to understand the
evidence or determine a fact in issue. Although he has no education or training in the
insurance industry, he relies on nothing more than his own speculation to establish the basis for

his conclusions.   Essentially, he states his assumptions without basis, then jumps to his conclusions using circular reasoning.  Without a basis from a witness with § 125 Cafeteria Plan Services experience, any opinions or conclusions he may provide do not meet the requirements established by the Supreme Court and the Fifth Circuit, and they should therefore not be allowed.

## II.

## FACTUAL BACKGROUND

**DINO CHAVEZ** seeks damages for Defendants' violation of his right to freedom of speech through the First Amendment to United States Constitution.  (Pl.'s First Amend. Original Compl. ¶ 17-18.)  The damages in this litigation stem from Defendants' actions in retaliating against the Plaintiff because of written and spoken comments and for other state law violations.  Plaintiff has timely proffered his expert, Stephen Horner, Ph.D., on the damages suffered as a result of the constitutional and state law violations.  In response, Defendants have presented Donald R. House, Ph.D., to provide testimony in this case.   Dr. House testified at his deposition that Defendants had hired him to respond to Dr. Stephen Horner, Ph.D.'s report and trial testimony.  *See* **Exhibit A**, affidavit of J. Arnold Aguilar with attached **Exhibit A-1**, deposition testimony of Donald R. House, Ph.D. ("House depo.") at pp. 21:14 – 22:11.

House's self-proclaimed expertise is in economics, statistics and finance.  *See* **Exhibit A-1**, House depo. at p. 22:7-19.  House agreed he has no education or training as an insurance agent and has received no schooling in insurance matters, including specifically the qualification and sale of § 125 Cafeteria Plan Services at issue in this case.  *See* **Exhibit A-1**, House depo. at p. 43:20-22 (no undergraduate classes on insurance); p. 44:1-18 (no seminars or courses in insurance or specifically on § 125 Cafeteria Plan Services).  House is an economist.  *See* **Exhibit A-2**, House depo. at p.

80:22-24. Plaintiff will show that because House is not qualified to render opinions on insurance matters, and because he does not rely on the testimony of any other insurance agent or expert to establish the basis for his assumptions, he is derivatively not qualified to render an opinion on damages and his opinions are speculation, irrelevant and unreliable.

## III.

### HOUSE'S OPINIONS ARE NOT RELEVANT

Under Federal Rule of Evidence 702, a person may testify if that person has "scientific, technical or other specialized knowledge that will assist the trier of fact to understand the evidence or to determine a fact in issue..." Fed. R. Ev. 702. Implicit in the rule is that the subject matter at issue, and on which the proffered expert is expected to testify, must be beyond the common knowledge of the average layman. Defendants have collectively proffered Donald R. House, Ph.D., to offer his opinions in this case.

House produced a report, and his deposition was taken on September 23, 2003. In his report, House stated that

> "Given Chavez's skills acquired as AFLAC's RSC [Regional Sales Coordinator] and his contracts with potential clients and agents, it is probable that Chavez will excel over the next 25 years. It is possible that his earnings as a non-captive AFLAC agent will exceed what he would have earned as a captive AFLAC agent. Under this condition, Chavez would appropriately have incurred no economic damages."

In other words, House says nothing more than Mr. Chavez's future earnings may exceed what he earned at AFLAC, or they may not. If his future earnings exceed his AFLAC earnings, Mr. Chavez would have incurred no damages. If they do not, then he would have incurred damages. While sounding like economic testimony, this is nothing more than establishing a self-proving syllogism. The premise establishes the conclusion.

House testified at his deposition that he formed his opinion on Mr. Chavez's exceptional skills from a reading of Mr. Chavez's deposition testimony. *See* **Exhibit A-1**, House depo. at p 171:3-23. He concluded that due to Mr. Chavez's skills and experience he "would be able to present his credentials with his experience and there are companies that would find him valuable to them and pay him a competitive salary just as AFLAC was doing." His opinions and conclusions contained in his report stem from that foundational premise, i.e., due to Mr. Chavez's skills, he should have no difficulty in finding another position in his field with either comparable or increased compensation. This opinion relies on circular reasoning and nothing more than its own assumptions to reach its conclusion.

House's conclusions assume that because Mr. Chavez was such a skilled and intelligent insurance agent when he was with AFLAC, House is certain Mr. Chavez will have no trouble doing just as well anywhere else. House provides no empirical basis on which to establish this conclusion, however, and he instead jumps from Chavez's past work history to his future anticipated production, without considering the 1 ½ years of actual experience in between or providing any empirical basis for establishing non-AFLAC earnings. Although the jury may conclude Mr. Chavez "will do just as well anywhere else," House's opinions do not provide any economic or other empirical basis to assist in that determination, and instead invades the jury's province of determining whether such an extrapolation is reasonable or not. This extrapolation offers no relevant or sound testimony within House's area of economic expertise. As more fully discussed below, House's conclusions based on that first premise are unreliable because he has no insurance experience on which to establish a basis, and his opinions are thus inadmissible because they invade the province of the jury.

**IV.**

**HOUSE'S TESTIMONY UNRELIABLE**

House concluded that Mr. Chavez has not suffered any economic damages. *See* **Exhibit A-1,** House depo. at p. 179:19-24. House, however, has presumed his conclusion – no economic damages – and has used circular reasoning to bolster that conclusion because he has no evidentiary foundation for that conclusion. House's conclusion, therefore, amounts to mere speculation. House testified that he did not rely on AFLAC documents in formulating his opinions in this case. *See* **Exhibit A-1,** House depo. at pp. 87:1 – 88:21 (did not rely on AFLAC documents provided to him on Mr. Chavez's cafeteria policies sold to BISD employees from which commissions were calculated and paid); pp. 90:14 – 95:1 (did not rely on AFLAC documents bates stamped AFL 1715 to AFL 2158 showing assumption reports on compilations of commissions paid to agents including Mr. Chavez); and pp. 95:10 – 96:3 (did not rely on AFLAC provided documents bates stamped AFL 2195 to AFL 2182, which are summaries of commissions paid to AFLAC agents, including Mr. Chavez, during the month of December 2001). Thus, he made no determination of what Mr. Chavez's actual earnings and the growth rate of those earnings at AFLAC were before his termination.

House also concluded that an annual 19% expected growth rate in Mr. Chavez's insurance sales was unrealistic, despite the fact that AFLAC's own State Sales Coordinator (formerly Mr. Chavez's AFLAC Supervisor) expected all AFLAC Regional Sales Coordinators (one of whom was Mr. Chavez) to achieve at least a 20% to 30% growth rate, and more often than not those expectations were realized. *See* **Exhibit A-1,** House depo. at pp. 204:9 – 206:24 (growth rate); and p. 271:1-25 (LaFemina testimony); and **Exhibit A,** Affidavit of J. Arnold Aguilar with attached **Exhibit A-3,** Deposition of Frank LaFemina ("LaFemina depo.") at pp. 44:11 – 49:6. Although

Mr. LaFemina is an AFLAC State Sales Coordinator, House did not rely on Mr. LaFemina's testimony, because Mr. LaFemina's 20% to 30% growth rate expectations, which most AFLAC Regional Sales Coordinators met, do not fit with House's conclusions. *See* **Exhibit A-1**, House depo. at pp. 247:16 – 248:6 (no knowledge of testimony); **Exhibit A-3**, LaFemina depo. at pp. 45:22 – 46:11. House did not rely on AFLAC's own documentary evidence of what Mr. Chavez actually earned, nor did he rely on AFLAC's own expectations about what Mr. Chavez was expected to earn in the future, because that information would be counter to his own assumptions and conclusions. Instead, he relied on his own conjecture and speculation. In short, he guessed. Guessing is not the type of specialized knowledge that will help the trier of fact, and therefore House's opinions are not relevant or reliable.

## V.

## HOUSE IS NOT QUALIFIED

In *Kumho Tire Company Ltd. v. Carmichael*, the United States Supreme Court held that the basic gatekeeping obligation found in Federal Rule of Evidence 702 applies to all expert testimony. 526 U.S.137, 147 (1999). Under Rule 702, therefore, a court "must conduct a preliminary inquiry to insure that the testimony [of an expert] is both relevant and reliable." *Vargas v. Lee*, 317 F.3d 498, 500 (5th Cir. 2003). Under Rule 702, an expert may testify if that person has specialized knowledge that will assist trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Ev. 702; *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 275 (5th Cir. 1998)(en banc). As the Fifth Circuit has stated, the word "knowledge" in Rule 702 "cannotes more than subjective belief or unsupported speculation." *Moore*, 151 F.3d at 275. House does not have the "knowledge," as that word is contemplated under Rule 702, to establish a basis and thereafter render an opinion on the specific types of damages alleged by Plaintiff in this case, i.e., damages stemming

from the loss of income resulting from Defendants' retaliation against Plaintiff for exercising his First Amendment rights and violation of state laws.

House is not a licensed insurance agent. *See* **Exhibit A-2**, House depo. at p. 80:22-24; *see also* **Exhibit B**, House Curriculum Vitae. He did not even know what a degree in insurance is. *See* **Exhibit A-1**, House depo. at pp. 135:23 – 136:3. Although House has been hired as an economist for the insurance industry, the research he has conducted does not give him the requisite "knowledge" to render an opinion on § 125 Cafeteria Plan Services matters in this case. *See* **Exhibit A-1**, House depo. at p. 42:12-19 (The Scooter Store - examined the impact of the provision of some mobile assistant devices on Medicare expenditures); pp. 46:19 – 47:9 (American Dental Association - built an economic model to estimate claims expenses associated of different types of coverage to different types of populations or characteristics of populations); pp. 47:11 – 48:21 (American Medical Association, Department of Health and Human Services, and Texas Medical Association - examined physicians' responses to medical malpractice insurance increases by surveying carriers and prices of certain types of policies); p. 49:11-23 (case involving the market for life insurance coverage and the types of policies written, the sales, profitability and the types of changes of those policies, and the premiums and notifications of those premiums and loss ratios); pp. 49:25 – 50:9 (hired by insurance company that requested reconsideration of bid lost for dental coverage for all dependants of military personnel); p. 51:3-5 (American Medical Association - impact study on pricing of malpractice liability insurance); p. 51:6-11 (impact study and demand for dental insurance looking at deductible and co-pay requirements); p. 52:1-15 (Pennsylvania Blue Shield - examining records of insurance company for pricing, reimbursement rates, profitability of different coverages, the size of reserves, and lost ratios); pp. 52:17 – 53:3 (Lloyd's of London – estimating the financial impact on the reinsurance market for changes to trucking regulations); p.

54:4-20 (Texas Medical Association – impact of tort reform on medical malpractice premiums); and p. 55:13-22 (Department of Labor - impact of unemployment insurance programs on employment and growth during a recession).

House agreed that he is not familiar with § 125 Cafeteria Plan Services. *See* **Exhibit A-1,** House depo. pp. 75:22 – 76:25. His experience in the insurance industry stems from researching other consumer (physicians, dentists, other insurance companies) demand and the impact different variables (tort reform, new trucking laws, pricing, deferred taxes) may have on that demand. *See* **Exhibit A-2,** House depo. at p. 80:22-24 ("I have never been an insurance agent. I have been an economist that has examined markets and the competitive nature of markets."). Although he may have researched physician, dentist and other insurance markets, he has not previously researched § 125 Cafeteria Plan markets, and he has no training or experience to offer an opinion on § 125 Cafeteria Plans. *See* **Exhibit A-1,** House depo. at pp. 172:23 – 174:4 (no specialized training on how to determine who is a skilled § 125 person and who is not).

In spite of this lack of training or expertise, House was willing to testify and conclude, for example, that Mr. Chavez suffered "no economic damages." *See* **Exhibit A-1,** House depo. at p. 179:19-24. He did not look at Mr. Chavez's growth rates or working papers from prior years to compare, however, in order to determine what would be reasonable; nor did he look at the documents relied upon by Dr. Horner that were also provided to House by AFLAC, one of the Defendants who hired him. His only basis for concluding that Mr. Chavez suffered "no economic damages," and that a "19% and above [annual growth rate] is unreasonable" (**Exhibit A-1,** House depo. at p. 179:19-24 (no economic damages) and pp. 182:21 – 183:13 (19% growth rate)), therefore, is his own speculation, since he has no independent insurance training or education to determine whether this growth rate is or is not reasonable, and he did not review Mr. Chavez's own

personal history as established in the AFLAC documents provided or through independent research in the § 125 Cafeteria Plan Services industry.

House's proffered testimony and opinions in this case are analogous to a medical malpractice attorney attempting to offer expert testimony as to whether a surgeon performed surgery negligently. Although a medical malpractice attorney may have experience in researching and critically analyzing the medical field, after having conducted research through review of industry journals or on the internet and having consulted other medical experts, as House claims to have done, it does not follow that he has the requisite knowledge under Rule 702 to render an expert opinion on whether a surgeon performed surgery correctly. Just as the medical malpractice attorney would not have the expertise to testify on medical negligence without any medical training and instead based only on research, so too does House not have the expertise to testify on § 125 Cafeteria Plan Services matters without any insurance training or education.

House's testimony is even one step removed from this example, because he did not even conduct research into the § 125 Cafeteria Plan Services industry. Although House may have done research for the insurance industry generally, having researched either through literature, on the Internet or in reviewing publications in the insurance industry on marketing issues, he does not have specific experience, training or education on sales and premium growth rates, he is not an insurance agent, he has no knowledge of how § 125 Cafeteria Plan Services operate, and he has no knowledge of how insurance agents actually earn commissions and make their money. Without the requisite knowledge to establish the basis of his opinions, those opinions are no more than unsupported "subjective belief or speculation." *Moore*, 151 F.3d at 275. Because there is no adequate "fit" between House's experience and training and the opinions he offers in this case, his opinions are

unreliable and inadmissible. *See Moore*, 151 F.3d at 276 & 278-79. Thus, this Court should exclude House's testimony in this case.

WHEREFORE, PREMISES CONSIDERED, Plaintiff **DINO CHAVEZ**, prays that the Court set this matter for consideration in a gatekeeper hearing under Federal Rule of Evidence 104(a), and following such hearing to GRANT Plaintiff's motion and exclude the testimony of Donald R. House and for such other and further relief, at law and in equity, to which Plaintiff **DINO CHAVEZ** may be entitled.

Signed on this the 31st day of October, 2003.

Respectfully submitted,

**LAW OFFICE**
**J. ARNOLD AGUILAR**
Artemis Square, Suite H-2
1200 Central Boulevard
Brownsville, Texas 78520
Telephone    : (956) 504-1100
Facsimile    : (956) 504-1408

By: _____
J. Arnold Aguilar
State Bar No. 00936270
Federal Adm. No. 6822

John J. Jordan, Jr.
State Bar No. 00796852
Federal Adm. No. 21304

Attorneys for Plaintiff,
DINO CHAVEZ

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing **PLAINTIFF'S MOTION TO EXCLUDE TESTIMONY OF DONALD R. HOUSE** has on this the 31st day of October, 2003, been forwarded via certified mail, return receipt to:

Ms. Elizabeth G. Neally
ROERIG, OLIVEIRA & FISHER, L.L.P.
855 W. Price Rd., Suite 9
Brownsville, TX 78520

Ms. Eileen M. Leeds
WILLETTE & GUERRA, L.L.P.
International Plaza, Suite 460
3505 Boca Chica Boulevard
Brownsville, TX 78521

Mr. William B. Steele, III
LOCKE, LIDDELL & SAPP, L.L.P.
100 Congress Avenue, Suite 300
Austin, TX 78701

J. Arnold Aguilar
John J. Jordan, Jr.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DINO X. CHAVEZ | § | |
| | § | |
| VS. | § | |
| | § | CIVIL ACTION NO. |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, NOE SAUCEDA, | § | B - 02 - 128 |
| and RANDY DUNN, MARILYN DEL | § | |
| BOSQUE-GILBERT and HUGH EMERSON, | § | |
| JR., in their official capacities as Board | § | |
| Members of Brownsville Independent | § | |
| School District | § | |

## ORDER SETTING HEARING

On this _____ day of _____, 2003, came on to be considered **Plaintiff's Motion to Exclude Testimony of Donald R. House** on the above styled and numbered cause.

IT IS THEREFORE ORDERED that **a gatekeeper hearing under F.R.C.P. 104(a) to exclude testimony of Donald R. House** be and the same is hereby set for hearing on the _____ day of _____, 2003, at _____ o'clock _____.m.

SIGNED FOR ENTRY this _____ day of _____, 2003.

_____
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ                          §
                                        §
        VS.                             §
                                        §        CIVIL ACTION NO.
BROWNSVILLE INDEPENDENT                 §
SCHOOL DISTRICT, NOE SAUCEDA,           §        B - 02 - 128
and RANDY DUNN, MARILYN DEL             §
BOSQUE-GILBERT and HUGH EMERSON,        §
JR., in their official capacities as Board §
Members of Brownsville Independent      §
School District                         §

---

## ORDER GRANTING PLAINTIFF' MOTION
## TO EXCLUDE TESTIMONY OF DONALD R. HOUSE

---

On this date came on to be heard **Plaintiff's Motion to Exclude Testimony of Donald R. House** filed in the above styled and numbered cause. The Court, having reviewed the file and record in this case, as well as having heard the argument of counsel and the testimony of witnesses herein, is of the opinion that Plaintiff's Motion to Exclude Testimony of Donald R. House should be **GRANTED**;

IT IS THEREFORE ORDERED that Plaintiff's motion be and is hereby **GRANTED**;

IT IS FURTHER ORDERED that Donald R. House, Ph.D. is excluded from testifying in this case.

DONE at Brownsville, Cameron County, Texas, on this the _____ day of

_____, 2003.

_____
U.S. DISTRICT JUDGE

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ                              §
                                            §
        VS.                                 §
                                            §        CIVIL ACTION NO.
BROWNSVILLE INDEPENDENT                     §
SCHOOL DISTRICT, NOE SAUCEDA,               §        B - 02 - 128
and RANDY DUNN, MARILYN DEL                 §
BOSQUE-GILBERT and HUGH EMERSON,            §
JR., in their official capacities as Board  §
Members of Brownsville Independent          §
School District                             §

---

## AFFIDAVIT OF J. ARNOLD AGUILAR

---

STATE OF TEXAS                   §
                                 §
COUNTY OF CAMERON                §

BEFORE ME, the undersigned official, on this day appeared **J. ARNOLD AGUILAR**, who is personally known to me, and first being duly sworn according to law upon his oath deposes and says:

"My name is J. Arnold Aguilar, I am over 18 years of age, I have never been convicted of a crime, and I am fully competent to make this affidavit. I have personal knowledge of the facts stated herein, and they are all true and correct.

As the attorney for Plaintiffs, CIVIL ACTION NO. B - 02 – 128 in the Southern District of Texas, Brownsville Division, I attended the deposition of Donald R. House, Ph.D. and state that the excerpts from these transcripts of the deposition testimony attached are true copies of the testimony given by Donald House, Ph.D. House's deposition testimony was taken on September 23, 2003, and House's deposition was continued on October 3, 2003. Because each deposition is separately paginated, the deposition of House taken on September 23 is designated **Exhibit A-1**; the deposition taken on of House taken on October 3 is designated as **Exhibit A-2**.

I also attended the deposition of Frank LaFemina, and state that the excerpts from these transcripts of the deposition testimony attached as **Exhibit A-3** are true copies of the testimony given by Frank LaFemina.  LaFemina's deposition testimony was taken on May 22, 2003, and LaFemina's deposition was continued on August 21, 2003.

Further affiant sayeth naught."

J. Arnold Aguilar

SUBSCRIBED AND SWORN TO BEFORE ME on the 31st day of October, 2003, to certify which witness my hand and official seal.



NOTARY PUBLIC IN AND FOR THE STATE OF TEXAS

My commission Expires:

03 - 27 - 07

# EXHIBIT A-1

Page 1

```
 1
 2
 3                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE SOUTHERN DISTRICT OF TEXAS
 4                         BROWNSVILLE DIVISION
 5
 6
 7   DINO X. CHAVEZ                    )
                                      )
 8                                    )
     VS.                              )   CIVIL ACTION NO. B-02-128
 9                                    )
     BROWNSVILLE INDEPENDENT          )
10   SCHOOL DISTRICT, NOE SAUCEDA,    )
     and RANDY DUNN, MARILYN DEL      )
11   BOSQUE-GILBERT and HUGH          )
     EMERSON, JR., in their official )
12   capacities as Board Members      )
     of Brownsville Independent       )
13   School District                  )
14
15
16   ************************************************************
17            ORAL DEPOSITION OF DONALD REED HOUSE
18                    SEPTEMBER 23, 2003
19   ************************************************************
20
21        ORAL DEPOSITION of DONALD REED HOUSE, produced as a
     witness at the instance of the Plaintiff, and duly sworn,
22   was taken in the above-styled and numbered cause on the 23rd
     day of September, 2003, from 8:46 a.m. to 4:26 p.m., before
23   Jessica Renee Pena, CSR in and for the State of Texas,
     reported by machine shorthand, at the offices of Locke,
24   Liddell & Sapp, 600 Travis, Suite 3400, Houston, Texas
     77002, pursuant to the Federal Rules of Civil Procedure.
25
```

Page 18

1    A   Well, I can refer to a document that is in this
2  room that would be helpful.
3    Q   What is it?
4    A   It would be the log file of the Andrus case.
5        MR. STEELE:  Can I make a suggestion that we
6  do that in the Andrus, and you can get into his professional
7  background and such?
8        MR. AGUILAR:  I'm just trying to -- this
9  introductory part flows a lot quicker doing it this way.
10       MR. STEELE:  According to whom?
11       MR. AGUILAR:  I think this is it.
12       THE WITNESS:  No.  That's not the log.
13   Q   (By Mr. Aguilar) What is the log?
14       MS. NEALLY:  He wanted the log for Andrus.
15       MR. AGUILAR:  I'm not sure what you're
16  talking about.
17   A   It would be a similar document like this but with
18  respect to the log -- the Andrus case.  I think it would be
19  in those boxes.
20   Q   (By Mr. Aguilar) Let me see that.
21   A   It would give me a date and --
22       MS. NEALLY:  And I would like to -- for the
23  record to state that there's a -- I'd like to make an
24  objection on the log in both Chavez and Andrus.  There's a
25  reference to a letter that was sent to the Texas Association

Page 19

1  of School Boards that was sent inadvertently by my office
2  without my knowledge.  Since there is a reference -- it
3  could be a reference to insurance contained within that, and
4  it's a document that was inadvertently sent.  We will have a
5  Rule 11 agreement that that document will not be used; and I
6  also would request that it would -- well, I guess --
7        MR. STEELE:  Redacted.
8        MS. NEALLY:  Yeah.  Redacted from the log
9  because it should not have been in your file.
10       MR. AGUILAR:  I don't have a problem with not
11  using it.  I just don't think --
12       MS. NEALLY:  And I don't even think for the
13  purpose of my concern -- which is that the insurance be
14  referenced -- it doesn't evidence that in that -- in the
15  log.  So, I don't think it hurts in the log.
16       MR. AGUILAR:  Just because it's a document
17  that he's actually reviewed, I don't think you could redact
18  it.
19       MS. NEALLY:  Yeah.  I don't have a problem
20  with that.  It's referenced in Chavez, and it isn't even
21  used in Chavez.
22   A   Well, the first documents that I received were
23  June 16th.
24   Q   (By Mr. Aguilar) Okay.
25   A   So, it would be a point in time before June 16th.

Page 20

1    Q   By that do you mean shortly before June 16th or
2  long before?
3    A   I don't know.
4    Q   You just have no recollection?
5    A   I do not recall.
6    Q   How did you first get retained in the Andrus case?
7    A   I was told about the Andrus case from Buddy Steele
8  and was told that I may be receiving a call, which I did.
9    Q   Shortly after your conversation with Mr. Steele?
10   A   It was after the conversation with Mr. Steele.  I
11  do not know the length of time between that and the call.
12   Q   And who is it that contacted you?
13   A   Elizabeth Neally.
14   Q   And do you remember what she said?
15   A   I recall just an introduction about the case and
16  asking if I were interested and available to work on the
17  case.
18   Q   And did she give you a summary of what the facts
19  were about?
20   A   At that point in time, I don't believe she did.  I
21  think she talked about it generally but not a summary.
22   Q   And do you recall what it was she asked you to do?
23   A   I believe in -- I'm speculating here -- that she
24  told me --
25   Q   I'd rather you didn't speculate, you just provide

Page 2

1  us with your best estimate or recollection of what you do
2  recall.
3    A   All right.  Let me give you my best estimate.  As
4  I recall, the conversation indicated that Mr. Horner, also,
5  was providing an expert report in the Andrus, et al., case
6  and that that document -- that is, his first report -- would
7  be sent to me as soon as it was produced.
8    Q   And was the request being made for you to assist
9  them in evaluating that report?
10   A   Yes.
11   Q   Okay.  Is that what you understood your duty here
12  is?
13   A   I understood --
14   Q   Your role here is.
15   A   I understood that my role, in part, was to respond
16  to the Horner reports.
17   Q   And what else?
18   A   I have not been given specific instructions, but
19  it is common that I would be responding in trial to
20  Mr. Horner's testimony and perhaps testimony of others.
21   Q   Okay.  So, you understand your role here is to
22  respond to Mr. Horner's report and to his trial testimony?
23   A   And to his trial testimony, if asked.
24   Q   If asked.
25   A   I don't believe I have been asked yet.

6 (Pages 18 to 21)

ORAL DEPOSITION OF DONALD HOUSE

Page 22

1   Q   Anything else that you -- you understood you were
2   asked to do?
3   A   Not specifically. I don't recall any other
4   specific instructions.
5   Q   Okay.
6   A   There may be some, but I don't recall any others.
7   Q   Okay. And my understanding is also that you were
8   retained to testify to the economic analysis in the Andrus
9   case?
10  A   I believe I was asked to respond to the Horner
11  report.
12  Q   The economic -- in other words, to respond to --
13  let me rephrase.
14      You were asked to make an economic analysis
15  response to the Horner report? In other words, you're not
16  doing any other kind of analysis?
17  A   I'd say that's fair.
18  Q   Okay. And that's where your area of expertise is?
19  A   Economics and statistics and finance.
20  Q   Okay. I'm handing you what I've marked as
21  Deposition Exhibit 1, which is the deposition -- the notice
22  for your deposition here today. Now, you received that
23  before today, correct?
24  A   I did.
25  Q   And you had a chance to look that over, correct?

Page 23

1   A   I did.
2   Q   And just for summary purposes, what I tried doing
3   in the request -- duces tecum was to ask you to provide
4   basically everything in your file, on your computers,
5   everywhere you could possibly have it, that you reviewed,
6   looked at, evaluated, et cetera, relating to the Chavez
7   case. Did you get a chance to review that report?
8   A   Well, this -- this --
9   Q   I'm sorry. That --
10      MR. STEELE: Object to form.
11  Q   (By Mr. Aguilar) -- that deposition notice.
12  A   This request goes well beyond your description.
13  Q   Okay. My question is: Did you get a chance to
14  review it?
15  A   I did.
16  Q   Okay. Now, considering that, did you provide us
17  today with, as I mentioned, everything in your file,
18  everything you've reviewed, evaluated, considered, et
19  cetera?
20      MR. STEELE: Relative to the Chavez case.
21      MR. AGUILAR: Relative to the Chavez case,
22  correct.
23  A   I believe that to be the case.
24  Q   (By Mr. Aguilar) Okay. And I think we -- that's
25  what all these documents up here are today, correct?

Page 24

1   A   That is correct. And the files that are contained
2   on the CD ROM.
3       MR. STEELE: And let the record reflect that
4   Arnold spent approximately 20 to 25 minutes going over those
5   to confirm that that's the case and that there were a few
6   documents that Dr. House brought with him that Arnold did
7   not believe he had copies of, and those copies were also
8   made.
9       MR. AGUILAR: I think that's accurate.
10  Q   (By Mr. Aguilar) I'm marking as House Exhibit 3 a
11  CD that you provided for us this morning titled "RRC, Inc.,
12  Chavez files, 9/22/03."
13      MR. STEELE: Arnold, can you play it with a
14  sticker on the disk itself? Do you want to put it on the --
15      MR. AGUILAR: Let me go ahead and just put it
16  on the cover. I think you could, but I'll go ahead and put
17  it on the cover. It might get caught, though -- you're
18  right -- after a while.
19      (Exhibit No. 3 was marked.)
20      MR. AGUILAR: And for the record, we have an
21  agreement that I'll be able to be the custodian of this
22  document.
23      MR. STEELE: We have that --
24      MR. AGUILAR: In other words, we're not going
25  to give it to the court reporter to make copies or anything.

Page 25

1       MR. STEELE: That's certainly okay with me,
2   if it's okay with you-all?
3       MS. NEALLY: I don't care.
4       MR. STEELE: I'm going to ask Dr. House to
5   provide me a copy of that same disk; and if y'all would like
6   one, just give me a call. I'll get it to you. Go ahead.
7       (Exhibit No. 4 was marked.)
8   Q   (By Mr. Aguilar) I'm handing you what I've marked
9   as House Exhibit 4. This is a response to the Stephen M.
10  Horner report of May 15th, 2003. You've received
11  Dr. Horner's updated report since writing this report,
12  correct?
13      MR. STEELE: And by "this report," let the
14  record reflect you're referring to Exhibit 3.
15      MR. AGUILAR: Exhibit 4.
16      MR. STEELE: Exhibit 4. Okay.
17  A   That's correct.
18  Q   (By Mr. Aguilar) Okay. You have not had an
19  opportunity yet to write any response to Dr. Horner's
20  updated report of September 19, though, correct?
21  A   That's correct.
22  Q   Okay. So, from now on I'm going to be asking you
23  about this; and if there's any portions that you'd like to
24  modify at this time, we can talk about it after -- we can
25  talk about it at the appropriate time. Okay?

7 (Pages 22 to 25)

Page 42

1  additional entry under "consulting and other professional
2  activities." There are some additional cases listed.
3    Q  Hang on.
4    A  And I believe there is an additional report that
5  is listed, and I think there are some dates that are
6  changed.
7      (Exhibit No. 6 was marked.)
8    Q  (By Mr. Aguilar) I'm handing you what I've marked
9  as Exhibit 6, which is a copy of the updated resume that you
10  provided us this morning; is that correct?
11   A  That's correct.
12   Q  Can you tell us again what the new portions are?
13   A  On page 1 I have added an entry called The Scooter
14  Store.
15   Q  And what is that?
16   A  That's a project that is underway for a company.
17   Q  Project to do what?
18   A  To examine the impact of the provision of some
19  mobile assistant devices on Medicare expenditures.
20   Q  Okay. What other changes or additions or
21  deletions?
22   A  There are some additional cases that are listed.
23   Q  On page?
24   A  On page 10 and 11.
25   Q  And which ones are those? The one new one I see

Page 43

1  at the bottom of page 10, Dino X. Chavez.
2    A  That is correct.
3    Q  Now, this is in the list of cases on which you've
4  been retained or testified?
5    A  I have been retained and/or testified. The
6  Andrus -- on page 11 the Andrus case and Kelly-Moore Paint
7  on page 11.
8    Q  Any others? Any other changes?
9    A  The report that was completed for The Scooter
10  Store is listed on page 15.
11   Q  Which one is that?
12   A  It is the last entry on page 15.
13   Q  Okay. "Cost and benefits"?
14   A  And I believe -- I believe those are the major
15  changes. I think I went through some of the list of cases
16  and changed some dates.
17   Q  Okay.
18   A  But I believe those are the only changes that were
19  made.
20   Q  Okay. When you were at A&M, did you ever take any
21  classes in insurance?
22   A  No.
23   Q  Have you ever had any training in the insurance
24  field?
25   A  What do you mean by "training," and what do you

Page 44

1  mean by "insurance field"?
2    Q  Either sales of insurance, annuities, 403(b)s,
3  Section 125 cafeteria plans. Other than economic analyses
4  of different particular products or something like that,
5  have you ever had any schooling -- gone to any classes
6  involving how different insurance products work?
7    A  I don't recall a course --
8    Q  Okay.
9    A  -- that I have attended or taken --
10   Q  Any seminars?
11   A  -- on insurance.
12     I don't recall a seminar that I would have
13  attended dealing specifically with insurance.
14   Q  Okay. And that includes any seminar, course,
15  class, or anything like that relating to either 403(b)
16  products or Section 125 cafeteria plan products?
17     MR. STEELE: Objection as to form.
18   A  I believe that to be the case.
19   Q  (By Mr. Aguilar) Okay. You're not representing
20  yourself to be any -- an expert on any insurance matters; is
21  that correct?
22   A  I'm not sure exactly what that means.
23   Q  How insurance policies work; how insurance agents
24  work; how insurance companies work aside from just the
25  economic analysis of, for lack of a better term, crunching

Page 4

1  numbers. As far as how the insurance industry works, you're
2  not an expert in that area? You're not holding yourself out
3  to be an expert in that area, right?
4      MS. LEEDS: Objection, form.
5    A  I am -- I'm offering myself as an economic expert.
6    Q  (By Mr. Aguilar) Okay.
7    A  And I have examined markets --
8    Q  Okay.
9    A  -- for insurance policies. I have calculated and
10  estimated claims expenses. I have examined the records of
11  insurance companies, examined their pricing, examined their
12  quantities. So, I do have some expertise to offer about
13  insurance markets, the products, the pricing, the
14  profitability, the competition. So, I -- I feel comfortable
15  in that arena.
16   Q  How have you done that? Under what context?
17   A  A variety of contexts. I have had some litigation
18  cases involving insurance companies where I was asked to
19  analyze the records within the company, sales records,
20  pricing, volumes, market penetration --
21   Q  Okay.
22   A  -- contracts, policies. I have been asked to
23  build economic models to estimate claims expenses under a
24  variety of factors, including the type of coverage, the
25  characteristics of the populations to be covered.

12 (Pages 42 to 45)

Page 170

1 certainly have a different history.
2    Q   And what you mean by "established" -- what we're
3 talking about "established" in this context is a business
4 that, you know, is going to keep performing successfully as
5 opposed to not performing successfully. That's what we're
6 talking about when we talk about established, right?
7    A   That's not the way I was using it.
8    Q   How were you using it?
9    A   An ongoing business.
10    Q   Just a business in existence?
11    A   Yes.
12    Q   And you can't tell from what you've seen so far
13 whether Mr. -- whether The Teachers' Agency will continue to
14 operate financially successfully, right?
15    A   I have not made a projection --
16    Q   You have --
17    A   -- as to the profitability of The Teachers' Agency
18 or its expected tenure.
19    Q   Okay. It could be that The Teachers' Agency could
20 fall apart tomorrow as far as you know?
21    A   It could fall apart tomorrow.
22    Q   Okay. And that didn't -- that didn't come into
23 play in your evaluations for your report, correct?
24    A   My opinion is that Mr. Chavez is expected to earn
25 income, whether it be from The Teachers' Agency or his next

Page 171

1 best alternative. I did not address whether The Teachers'
2 Agency has an expectation of a short or a long ahead of it.
3    Q   In your report -- continuing where we left off in
4 that paragraph -- you go on to say, "It is quite probable
5 that Chavez will excel in his next endeavor and his future
6 earnings stream will equal or exceed what he would have
7 earned as AFLAC's RSC over the next 25 years." What
8 evidence did you have to make that conclusion?
9    A   The evidence that the market for insurance agents
10 is quite competitive.
11    Q   How did you know Dino was going to -- what made
12 you say that it's quite probable that Dino's -- Mr. Chavez
13 is going to excel?
14    A   Because he's skilled.
15    Q   Okay. And what basis do you have to evaluate
16 whether he's skilled or not?
17    A   Deposition testimony.
18    Q   Okay. All you know is you read the deposition
19 testimony, and somebody in the deposition said he's skilled?
20    A   Yes.
21    Q   But you don't have any independent evaluation as
22 to say whether he is not?
23    A   I have not tried.
24    Q   Okay. And that's outside of your realm of
25 expertise?

Page 172

1    A   I have not interviewed and determined whether he
2 has skills or not. I'm relying upon deposition testimony.
3    Q   And it's outside Dino's -- whether Dino is skilled
4 or not is outside your realm of expertise, right?
5    A   Economists have examined age earning cycles and
6 attributed differences in age earning cycles to skills -- to
7 the acquisition of skills, whether they're acquired by
8 formal training, education, or on-the-job training. So, I
9 would not agree that I'm unqualified to identify the
10 existence or the measurement of skills in some instances. I
11 have not done an independent examination of the skill set of
12 Mr. Chavez.
13    Q   Here's what I'm asking: I'm not asking whether
14 you've been able to look at the evidence to determine
15 whether Mr. Chavez has been successful. What I'm asking is:
16 In terms of determining whether Mr. Chavez is a
17 knowledgeable and skilled cafeteria plan person, you don't
18 have the knowledge of what it requires to be a skilled
19 cafeteria plan person to make that evaluation, do you?
20        MS. NEALLY:  Objection, form.
21    A   I've not tried to look into that.
22        MR. AGUILAR:  Objection, nonresponsive.
23    Q   (By Mr. Aguilar) I'm just asking whether you have
24 the skills to be able to determine whether Mr. Chavez is
25 skilled with regard to Section 125(b) -- the Section 125

Page 173

1 plans?
2        MR. STEELE:  I object to the interruption. I
3 believe he was trying to answer your question.
4    A   To determine whether a person is skilled in any
5 endeavor or not --
6    Q   (By Mr. Aguilar) I'm only asking about cafeteria
7 plans.
8    A   I'm trying to answer your question. To determine
9 whether someone is skilled in any particular endeavor, one
10 looks at the way in which they acquire skills, whether it's
11 formal; whether it is OJT, on-the-job training; or in what
12 other way one has acquired those skills. I'm not saying
13 that I would be unable if given a collection of agents that
14 have this particular line of specialization and I have their
15 history to be able -- to be unable to say these sets of
16 people are less skilled than these sets of people. I'm not
17 saying I do not have the ability to do that. I believe I do
18 have the ability to do that.
19    Q   Do you --
20    A   I have not looked at Mr. Chavez in such a study.
21    Q   Do you --
22    A   I am relying upon deposition testimony to do that,
23 but I'm not saying I am unable to differentiate skill levels
24 of people with that level of specialization.
25    Q   Do you have any specialized training that has

44 (Pages 170 to 173)

ORAL DEPOSITION OF DONALD HOUSE

Page 178

1    A   It's possible that they will be less. It is
2    possible that they will be more, and that's an important
3    question that hasn't been answered.
4        Q   And you can't answer it at this point?
5        A   I have not conducted the study to answer it.
6        Q   That means "no," right?
7        A   That means "no."
8        Q   You can't say to any reasonable degree of
9    accounting certainty what will happen, right, based on the
10   documentation and evidence you've seen so far?
11           MS. LEEDS:  Objection to the form.
12       A   What is "accounting certainty"?
13       Q   (By Mr. Aguilar) Whatever you need to be able to
14   determine to a reasonable degree of certainty as an
15   accountant --
16       A   I'm not an accountant.
17       Q   I'm sorry -- as an economist. Sorry. Fold the
18   question. You can't say to any reasonable degree of
19   economic certainty what will happen in the future, right?
20           MS. LEEDS:  Object to the form. Nobody can.
21       A   I have not formed an opinion on that question.
22       Q   (By Mr. Aguilar) Okay.
23       A   I mean, I have not quantified what the mitigation
24   earnings would be. I think one can provide reasonable
25   certainty on such questions. Many have in the past.

Page 179

1        Q   At this point --
2        A   I don't see this as a -- as a condition in which
3    that would be prevented.
4        Q   Okay. Let me try and ask it then. At this point
5    can you say to any reasonable degree of economic certainty
6    what will happen?
7            MS. LEEDS:  What will happen, or what could
8    happen?
9            MR. AGUILAR:  What will happen.
10           MS. LEEDS:  Object to the form, speculation
11   as to "what will happen."
12       A   I offer the opinion that Mr. Chavez will have
13   future earnings.
14       Q   (By Mr. Aguilar) Other than that you can't be more
15   specific, right?
16       A   At this point I cannot give you a quantification
17   of those earnings, but I have the opinion that he will have
18   future earnings.
19       Q   Okay. The next sentence, "Under this condition,
20   Chavez would appropriately have incurred no economic
21   damages." Is that based on the assumption that he will
22   earn -- his future earnings will exceed what he would have
23   earned as a captive AFLAC agent?
24       A   Correct.
25       Q   Going to the next paragraph, Dr. Horner is talking

Page 180

1    about growth rates in the different years. The growth
2    rate -- if you turn the page, I think it shows what the
3    specific growth rates were. For 1999 it was 632 percent.
4    That was following an initialization period, right?
5        A   Correct.
6        Q   Then in 2000 it was 68.11 percent growth; and then
7    in 2001 it was 75.78, correct?
8        A   Correct.
9        Q   Continuing back over here on page 4 -- those
10   numbers were calculated correctly, right?
11       A   I believe they were.
12       Q   Okay. Continuing back over here on page 4, he
13   starts saying -- right after those numbers -- "Horner's only
14   justification of this assumption is based upon an alleged
15   AFLAC requirement that an RSC must have an annual growth
16   rate of" -- "in first year premiums of at least 15 percent."
17   Horner's justification was also based on the actual growth
18   rates seen by Mr. Chavez. Did you understand that to be the
19   case?
20       A   I understand that he reviewed the percentages that
21   are found on page 5.
22       Q   Do you think that was the basis, also, for his
23   assumption of Mr. Chavez being able to reach 15 percent
24   growth rate? Did you understand that that was part of the
25   basis?

Page 181

1        A   I hope not.
2        Q   Why not?
3        A   I mean, you only have three years of evidence in a
4    start-up endeavor. What Mr. Horner is talking about is an
5    annual growth rate for 25 years.
6        Q   Okay. So, you're saying Dr. Horner should not
7    have even looked at his growth rates for 2000 or 2001?
8        A   I'm saying that those growth rates are
9    interesting, but I can generate those growth rates by
10   selling lemonade.
11       Q   And how much money do you make selling lemonade?
12       A   Very little but I can give you very large growth
13   rates but it doesn't have anything to do with the annual
14   growth rate over the next 25 years. It is not a useful
15   basis or foundation for prediction.
16       Q   Because it's too short a period of time?
17       A   Too short a period of time, and we know that --
18       Q   How long would be sufficient?
19       A   And we know that the early growth rates are
20   usually not indicative of future growth rates.
21       Q   And how do you know that?
22       A   Because of the basis, the foundation, on which
23   you're calculating an early start or a start-up company.
24   That the percentage growth when you start from zero are
25   generally very large, and they aren't useful predictors of

46 (Pages 178 to 181)

Page 86

1     A   The resume does not.
2     Q   Was each of the depositions, trial testimony, and
3 arbitration testimony, was each of those cases already
4 listed in Exhibit 6?
5     A   I believe they are.
6     Q   Okay. In other words, other than the dates on
7 which you actually provided the testimony, there is no
8 additional information on Exhibit 8 that is not already on
9 Exhibit 6?
10     A   Other than the indication of what was provided in
11 deposition, trial, and arbitration hearings. That's not so
12 indicated in the resume.
13     Q   Other than what was provided?
14     A   Exhibit 8 gives you a listing of where -- of what
15 cases led to deposition testimony, trial testimony, and
16 arbitration hearing testimony, but the resume does not
17 provide that information.
18     Q   Anything else that the resume does not provide?
19     A   No. Wait. I'm sorry. Your question was: Is
20 there anything else the resume provides?
21     Q   That the resume does not provide.
22       MR. STEELE: That --
23     A   That isn't included in Exhibit 8, no.
24       MR. AGUILAR: We're now moving just onto the
25 Chavez case.

Page 87

1       (Exhibit No. 9 was marked.)
2     Q   (By Mr. Aguilar) I'm handing you what I've marked
3 as Exhibit 9. Is it a document you've provided for us this
4 morning as well?
5     A   Uh-huh.
6     Q   Tell us what this is, please.
7     A   This is a document that was prepared by either
8 Blaine Binger or Creston Interreiden.
9       THE WITNESS: I'll help you later.
10     Q   (By Mr. Aguilar) And what is it?
11     A   This is a compilation of commissions and premiums
12 that were obtained from some of the documents that I have
13 brought with me.
14     Q   Which documents?
15     A   They are in Folder No. 5, Folder No. 3.
16     Q   Okay. And what was done to get the information on
17 these documents -- on this document? I'm sorry.
18     A   I would have to review the document itself to be
19 able to answer that. Right now I'm not sure.
20     Q   For example, Chavez Agent R0981 at the very top
21 left, for the Agent Group AG986 it includes 10,597.66. Can
22 you tell us what that reflects?
23     A   These are annual premiums for which commissions
24 are paid.
25     Q   Okay. For example, that 10,597.66, that is the

Page 88

1 annual premium for what?
2     A   For cafeteria policies that were sold to B.I.S.D.
3 employees.
4     Q   All policies sold by Mr. Chavez or by -- by virtue
5 of the fact that it's on the line for Chavez and not others,
6 I presume that means that's for the policies sold by
7 Mr. Chavez?
8     A   As identified by that agent number, yes.
9     Q   Right. Is that a total over a certain period of
10 time, or is that just for one year?
11     A   I do not know. I would have to review the
12 document to be able to explain that.
13     Q   Okay. I guess what I'm trying to understand is
14 what information did you get off of this document?
15     A   I did not use this document.
16     Q   You have not -- when did you get this document?
17     A   I don't know.
18     Q   Have you reviewed it before?
19     A   I have casually looked over it. It was not a
20 particular document that I used in the preparation of my
21 report.
22     Q   Okay. That's what I was going to ask. Did you
23 receive this after the preparation of your report?
24     A   I would doubt it. I would -- but I can't -- I
25 can't testify to that.

Page 89

1     Q   Okay. Best of your understanding, you did not use
2 it for your report; but you probably received it before
3 filing your report?
4     A   That would be my best estimate.
5     Q   Why didn't you use it?
6     A   At the time I did not think I had sufficient
7 information to go into these documents and get a total
8 compilation of commissions paid to Mr. Chavez. So, I was
9 not yet confident that this was a total, inclusive list.
10     Q   You weren't -- you didn't use it because you
11 weren't sure if this included everything?
12     A   I was -- I did not use it because I was unclear as
13 to whether this included all of the annual premiums paid for
14 which commissions were paid and the commissions paid.
15     Q   Did you talk to Mr. -- what was his name? Blaine?
16     A   Either Blaine Binger or Creston Interreiden.
17     Q   Creston. You didn't talk to Blaine or Creston
18 after they submitted this to you?
19     A   I did.
20     Q   And what did they tell you?
21     A   Well, they went through those documents that are
22 identified on Exhibit 9, but at the time -- and I believe
23 it's still the case -- we're unsure whether those
24 documents -- or all of the documents that must be assembled
25 to give you the totals as identified in this exhibit.

23 (Pages 86 to 89)

Page 90

1   Q   Okay. So, they were just summarizing what they
2   did have?
3   A   That's correct.
4   Q   You didn't know whether it was everything or
5   whether you could ultimately even find everything to be able
6   to make -- to use this information?
7   A   I have not made that determination.
8   Q   At the time of submitting your report, you weren't
9   sure about that; and that's why you didn't rely on this for
10  your report?
11  A   That's correct.
12  Q   Okay.
13       (Exhibit No. 10 was marked.)
14  Q   (By Mr. Aguilar) I'm handing you what I've marked
15  as Exhibit 10 and actually -- wait. I've handed you what's
16  been marked as Exhibit 10. It's a letter from Mr. Steele to
17  you enclosing two, quote, assumption reports prepared by
18  AFLAC.
19  A   Yes.
20  Q   And I think Mr. Steele made a good point of
21  referring to the Bates stamp numbers so we can know which
22  documents you're talking about. Can you tell me -- this one
23  doesn't refer to the Bates stamp numbers, though. Can you
24  tell me which documents these refer to?
25  A   I would -- I would have to find this as the cover

Page 91

1   sheet in a binder. I think it's No. 3.
2   Q   Yeah. Here you go.
3   A   It is referring to the information contained in
4   Binder 3.
5   Q   And can you tell me what Bates stamp number that
6   refers to?
7   A   The first Bates stamp is AFL1715.
8   Q   Through?
9   A   The last Bates stamp number, AFL2158.
10  Q   What are the assumption reports that he's talking
11  about?
12  A   Well, the assumption reports are contained in this
13  Binder 3. I don't know a lot about the assumption reports.
14  Q   Actually what I was going to ask you: What are
15  assumption reports?
16  A   Well, they appear to be compilations of
17  commissions that were paid by agent number --
18  Q   Okay.
19  A   -- for particular groups of employees.
20  Q   Were you able to gather or use any of the -- let
21  me rephrase that. Were you able to use any of the
22  information in those compilation -- I'm sorry -- those
23  assumption reports for writing your report?
24  A   I have not used the information contained in this
25  binder to date.

Page 92

1   Q   And why not?
2   A   I have not studied it carefully enough to make
3   that determination.
4   Q   Okay. You have a bunch of yellow stickies on
5   here -- are you okay?
6   A   I will survive. I promise you.
7   Q   The first one is here.
8   A   Uh-huh.
9   Q   It's got a bunch of yellow stickies here. It
10  looks like the first one refers to AG986, B.I.S.D. 12/01
11  summary. Can you tell us what that's referring to? Well,
12  actually, do you know who wrote that, first?
13  A   That would either be Blaine Binger or Creston
14  Interreiden.
15  Q   Okay.
16  A   If you look at that particular tab and look at
17  Exhibit 9, you'll find that exact dollar amount --
18  Q   Okay.
19  A   -- that is listed on that particular page, AFL1716
20  and one of the entries in Exhibit 9.
21  Q   Okay. Can you tell us again what on page 1716 is
22  on Exhibit 9?
23  A   If you look at the entry --
24  Q   Which one?
25  A   -- on AFL1716, you have a total of 10,597.66.

Page 9

1   Q   Okay.
2   A   That is one of the entries on Exhibit 9.
3   Q   The remainder of those yellow stickies, were they
4   also -- are they also the information that is -- that was
5   put into -- from what you understand -- what was put into
6   Exhibit 9?
7   A   I believe that to be --
8   Q   Okay.
9   A   -- the case.
10       MR. AGUILAR: If I could, Buddy, I don't need
11  all those yellow stickies but if you -- I know you offered
12  to give me all the yellow stickies but if I could just get a
13  copy of all the yellow stickies.
14  Q   (By Mr. Aguilar) If you could just -- if you could
15  just do that later and send it to my office.
16  A   Okay.
17  Q   Actually send it to Mr. Steele, and he'll send it
18  to my office.
19       MR. STEELE: I don't have a problem with you
20  sending it directly to Arnold Aguilar and send me a copy
21  when you send him one.
22       THE WITNESS: Well, I don't have his address.
23  So, I think I'll send it --
24       MR. STEELE: Just do it to me, and I'll take
25  care of it. That's fine.

24 (Pages 90 to 93)

ORAL DEPOSITION OF DONALD HOUSE

Page 94

1      MR. AGUILAR: And it's fine with me if you
2   want to put a whole bunch of them on one page. I don't need
3   them -- a separate page for each one.
4      Q   (By Mr. Aguilar) He refers to "The other,
5   large" -- "larger report shows commissions Dino earned from
6   the B.I.S.D. account since its inception." Do you know what
7   he was referring to there? Is that also in this binder?
8      A   I would have to look at the other binders. It
9   possibly is Binder No. 4.
10      MR. STEELE: Is it a binder or --
11      THE WITNESS: Well, let me look.
12      MR. STEELE: Is that the 1099s?
13      MR. AGUILAR: Go off the record.
14      (Brief recess from 11:05 a.m. to 11:06 a.m.)
15      Q   (By Mr. Aguilar) I was asking you about the other
16   larger report showing commissions Dino earned from the
17   B.I.S.D. account since its inception. Were you able to
18   determine which documents that's referring to?
19      A   My best estimate is that those other documents are
20   also contained in Binder 3.
21      Q   Okay. Did you rely on any of those documents in
22   writing your report?
23      A   No.
24      Q   And Binder 3 that we were talking about is AFL
25   documents 1715 through 2158, right?

Page 95

1      A   That is correct.
2      Q   Okay. You go on in Exhibit 10 to talk about
3   Dino's tax returns from '97 through 2000; is that correct?
4      A   That's correct.
5      Q   That's all that was included to the best of your
6   recollection or understanding in the documents attached to
7   Exhibit 10?
8      A   That's correct.
9      (Exhibit No. 11 was marked.)
10      Q   (By Mr. Aguilar) I'm handing you what I've marked
11   as House Exhibit 11. This is a letter Mr. Steele sent you
12   dated June 10 including documents Bates labeled AFL 2159
13   through AFL 2182, which were faxed earlier. Can you tell
14   us -- can you tell us what those documents are?
15      A   I would have to look at Binder No. 5 to be able to
16   answer that question.
17      Q   Do you have it there in front of you?
18      A   Let's see. Here is 5.
19      Q   What are those documents? Mr. Steele indicates
20   they are summaries of commissions paid to all AFLAC agents
21   including Dino Chavez for policies written under the
22   B.I.S.D. group numbers during the month of December, 2001?
23      A   Correct.
24      Q   Is that what you understand them to be?
25      A   That's what I understand them to be.

Page 96

1      Q   How were you -- were you able to use these for
2   writing your report?
3      A   I have not used these to date, no.
4      Q   Why not?
5      A   In responding to the Horner report, I did not find
6   it necessary to use this document to date. I may find it
7   necessary to use it at a later time; but in responding to
8   the Horner report, I did not choose to use it.
9      Q   Okay. Were the records incomplete?
10      A   I cannot make that judgment.
11      Q   Well, why not?
12      A   I have not --
13      Q   Do you have any reason to believe they are
14   incomplete?
15      A   I have no reason to believe they are incomplete,
16   no.
17      Q   Okay. Did you have any reason to believe they're
18   not accurate?
19      A   I have no reason to believe that they are not
20   accurate.
21      Q   Why is it that you chose not to use them for your
22   report?
23      A   I did not have felt -- I did not feel that I had
24   all of the information from Horner.
25      Q   Okay.

Page 97

1      A   And as such, I could not go back and take his
2   documents to verify some of his figures; and I did not
3   choose to go back and use some of these source documents to
4   try to verify Horner's figures.
5      Q   You could have used these documents to try to
6   verify Horner's figures?
7      A   I could have used that step; but I thought the
8   more efficient step was to -- would be to begin with the
9   Horner documents, which I did not have.
10      Q   And which documents are you talking about?
11      A   All of his working documents, which supposedly
12   will be exhibits to his deposition; but I don't know that.
13      Q   Have you --
14      A   His working papers and the compilation of all the
15   information he used to prepare his reports.
16      Q   Okay. Have you been reprovided with that yet?
17      A   No.
18      Q   Okay. Either you or your office?
19      A   No.
20      Q   Okay. But at this point you simply chose not to
21   utilize that information for your report?
22      A   Because I cannot know the sources from -- that
23   Horner used for his report, I felt it more efficient to get
24   his papers first.
25      Q   Okay. Did you make any -- did you ever make any

25 (Pages 94 to 97)

ORAL DEPOSITION OF DONALD HOUSE

Page 202

1 not going to find those rapid growth rates after that.
2     Q  And that's based on your review of insurance
3 matters in general?
4     A  Yes.
5     Q  Not necessarily by your review of cafeteria plans?
6     A  It's my review of sales of differing types of
7 policies that are offered to employee groups, not
8 necessarily limited to those products that are in this
9 cafeteria plan; but it would be characteristic of those.
10     Q  And it's not specific to cafeteria plans in
11 general?
12     A  It is not limited to that —
13     Q  Limited?
14     A  — in general. That's correct.
15     Q  Okay.
16     A  It's — it applies to any tax deferred fringe
17 benefit insurance type product.
18     Q  And it's not based on — it's not based on any
19 personal experience that you might have in sales or in
20 handling the cafeteria plans themselves because you don't
21 have experience in handling cafeteria plans as an agent?
22     A  It is not based upon my experience as an insurance
23 salesman. It is based upon my experience of analyzing sales
24 of insurance policies.
25     Q  Okay. You go on in the next paragraph to say

Page 203

1 "Chavez and agents under his management expanded sales to
2 other qualified groups of employees, and these expanded
3 sales faced the full competition from other carriers." What
4 other carriers?
5     A  Other carriers that were providing competing
6 products.
7     Q  Do you know who they were?
8     A  I do not have a list of them; but when they go to
9 other employers, they don't have the protection that they
10 had with B.I.S.D. on the second year. They're competing
11 with all plans and trying to be the vendor for the cafeteria
12 plans for other employee groups.
13     Q  Are you talking about B.I.S.D. or off B.I.S.D.?
14     A  Off B.I.S.D.
15     Q  Okay. And you don't know who those particular
16 carriers were, right?
17     A  No. There are many.
18     Q  You go on, two sentences down, "There is no
19 evidence that these expanded sales could not have been
20 achieved had Chavez and his agents been marketing products
21 from competing insurance carriers." Is there any evidence
22 that it could have been achieved?
23     A  I think there's sufficient evidence to believe
24 that Chavez and his agents could be selling other branded
25 products.

Page 204

1     Q  And is that based on what you were telling us
2 earlier about basically he's a good agent, he's a qualified
3 agent?
4     A  He and his people are qualified agents and can
5 sell insurance policies, and they are — those skills are
6 not limited to AFLAC policies.
7     Q  And that's the basis for that statement, right?
8     A  Yes.
9     Q  You go on to say "There's no evidence that would
10 prove that Chavez and his agents could not equal or exceed
11 Horner's projected sales through the representation of other
12 insurance carriers' products." There's no evidence that
13 he — that would prove that he could, either, correct?
14     A  It could go either way, and that's important to
15 know.
16     Q  You go on to say in the next paragraph "Based upon
17 these facts." What facts are you talking about?
18     A  Well, let me read the rest of the sentence. Based
19 on the facts that there is competition in the marketplace,
20 that there are points at which you reach saturation within
21 employee groups. Those are the two important facts that I'm
22 referring to.
23     Q  You go on to say that "Horner's projections appear
24 unreasonably large."
25     A  Yes.

Page 20

1     Q  And what's the basis for believing they are
2 unreasonably large?
3     A  That a continued expansion of 15 percent — well,
4 in this case 19 percent per year for 25 years is
5 unreasonable.
6     Q  And why is that unreasonable again?
7     A  Because there is competition in the marketplace
8 that if you pick any particular insurance group or group of
9 employees and expect them to attain a 19 percent annual
10 growth rate in the sales for the next 25 years, it's
11 unreasonable. I don't know that any group has ever achieved
12 that.
13     Q  Okay. You just don't know one way or the other?
14     MS. LEEDS: Objection, form.
15     MS. NEALLY: Objection, form.
16     A  No.
17     Q  (By Mr. Aguilar) Does the amount of sales that
18 would end up being sold play a factor?
19     MS. LEEDS: Object to the form.
20     A  The amount of — I don't know that I — I
21 understand what you're asking.
22     Q  (By Mr. Aguilar) In other words, you're talking
23 about growth rates?
24     A  Yes.
25     Q  Does the amount of sales that would ultimately be

52 (Pages 202 to 205)

ORAL DEPOSITION OF DONALD HOUSE

Page 206

1  sold play into that factor or not?
2        MS. LEEDS: Objection, form.
3    Q   (By Mr. Aguilar) In other words, you're saying you
4  don't think they could -- Mr. Chavez could be expected to
5  continue to grow at 19 percent, right?
6    A   That is my testimony.
7    Q   Okay. Is it just a matter of what number he
8  starts at, or is it because ultimately his numbers will go
9  too high?
10       MS. LEEDS: Object to the form.
11   A   At very small levels of sales, 19 percent growth
12  rate is not unexpected. When you're at $4 million of sales,
13  19 percent growth rate is difficult to achieve. At
14  $25 million in sales, 19 percent growth rate for a group
15  such as that is even more difficult to achieve because of
16  interbrand competition.
17   Q   (By Mr. Aguilar) Okay. Are you aware how much
18  AFLAC agents are selling today, how much sales they have per
19  year?
20       MS. NEALLY: Objection, form.
21   Q   (By Mr. Aguilar) Did you check into that? Do you
22  understand my question?
23   A   I understand your question. No, I have not looked
24  at total sales or sales per agent for AFLAC.
25   Q   That doesn't matter for purposes of this

Page 207

1  conclusion?
2    A   No. The question is: How does that grow over
3  time? That particular statistic would not land any useful
4  evidence for -- of that.
5    Q   Okay. You go on to say "Horner has offered no
6  substantive report for these projected growth rates." You
7  saw in his September 19th report that he did at least rely
8  on the testimony of Mr. La Femina, right?
9    A   Yes.
10   Q   Do you disagree with that as a reasonable basis?
11       MS. NEALLY: Objection, form.
12   A   I have no -- I have no opinion of that. I haven't
13  seen that information at all.
14   Q   (By Mr. Aguilar) You saw his report?
15   A   I have seen his report, but I haven't seen the
16  underlying evidence.
17   Q   Mr. La Femina's information, you mean?
18   A   That's correct.
19   Q   If you go down into the next section at the very
20  bottom of the page talking about economies of scale, are you
21  saying economies of scale do apply to captive agents? We
22  talked a little bit about this earlier.
23   A   I'm saying I'm not sure the extent to which
24  economies of scale exist. The economies of scale that are
25  portrayed here look unreasonable.

Page 208

1    Q   Do you have economies of scale for captive agents?
2    A   I'm sure there are economies of scale over a
3  range, but one doesn't know over what range those economies
4  of scale take -- take place.
5    Q   And you didn't calculate that either?
6    A   No. I have not done a study of the extent of
7  economies of scale but the conclusion reached here on the
8  part of -- of Horner is that there are substantial economies
9  of scale over an extremely large volume and I question that
10  because the implication of that is that the small,
11  independent insurance agency will not be able to compete
12  with the very large ones because over this range independent
13  insurance agencies at -- that have sales up of over $260
14  million are more efficient than anyone else and the
15  efficiency continues to gain. So, the implication of this
16  is that there will be relatively few insurance agencies in
17  the United States because of economies of scale.
18   Q   Based on the economies of scale argument?
19   A   Yes. And casually I find that's not to be the
20  case.
21   Q   Okay. You haven't specifically investigated that.
22  It's just your understanding that that's not the case?
23   A   I'm saying that that particular implication offers
24  a prediction that is in contrast with casual observation.
25   Q   And you agree Dino would not be able to sell his

Page 209

1  AFLAC position, right?
2        MS. NEALLY: Objection, form.
3    A   I don't understand your question.
4    Q   (By Mr. Aguilar) Dino wasn't, per se, an
5  independent agent?
6    A   He was a captive agent for AFLAC.
7    Q   And he would not be able to sell his captive
8  agency, right? There's not a market for captive agencies?
9        MS. NEALLY: Objection, form.
10   A   I don't know that.
11   Q   (By Mr. Aguilar) As a captive agent, who
12  determines the positioning of the employees? Doesn't the
13  employer or the captor?
14       MR. STEELE: Objection, form.
15   A   If I am a captive insurance agent, meaning that I
16  have an agreement that I will sell no other policies but
17  this particular brand of policies, I can hire and fire
18  people at will, is my understanding.
19   Q   (By Mr. Aguilar) As part of your agency?
20   A   Yes.
21   Q   But you can't sell your agency to somebody else?
22  Let's say, for example, you're a New York Life captive
23  agent. You're some high-up in the bureaucracy of New York
24  Life, and you've got certain responsibilities. You can't go
25  out to John Doe on the street who happens to have an

53 (Pages 206 to 209)

ORAL DEPOSITION OF DONALD HOUSE

Page 270

1  Q  Do you plan on doing that? Do you plan on
2  checking to confirm?
3  A  Once I get his work papers and see the sources of
4  the information from which he's going, then I think I can
5  begin a final effort to try to replicate these results; but
6  I have been unable to, especially without his papers.
7  Q  It goes on to say "Growth rates of this magnitude
8  cannot be sustained for 25 years, and this is a relatively
9  short history upon which to make a projection." Do you
10  agree with that?
11  A  Yes.
12  Q  "Nevertheless, there is no indication of a
13  deceleration in the growth." Do you agree with that?
14  A  I would agree that with the figures that he has
15  presented, there is deceleration in the rate of growth.
16  Q  Okay. And how is that? Tell me where the
17  deceleration is.
18  A  Well, you begin with 632 percent annual growth
19  rate. You drop to 68 percent annual growth rate. You drop
20  again to 75 or 76 percent annual growth rate. That is
21  deceleration.
22  Q  You decelerate from 632 down to 68, and then you
23  actually accelerate to 75?
24  A  You're actually accelerating to 75; but if you
25  look at the whole period there, there's deceleration.

Page 271

1  Q  He goes on to say "Mr. Frank La Femina, a state
2  sales coordinator for AFLAC, in deposition testimony
3  indicates that he wanted to see, quote, at least 20 to 30
4  percent increase from DSCs and RSCs every year." You
5  haven't read Mr. La Femina's deposition, correct?
6  A  That is correct.
7  Q  So, you don't know whether he says that or not?
8  A  That is correct. And I don't know the foundation
9  from which that statement is made.
10  Q  He goes on to say "These growth rates are
11  significantly less than those achieved by Mr. Chavez but may
12  be more realistic long-term expectations." That's just his
13  opinion, right?
14  A  I do not know.
15  Q  Okay. Let me put it this way: First of all, the
16  growth rates are less than those achieved by Mr. Chavez thus
17  far, correct, in the graph above?
18  A  The 20 percent and 30 percent as long run growth
19  rates are not compared to anything; that is, we don't have
20  comparable growth rates over long periods of time with which
21  to compare it. The 20 percent and 30 percent are less than
22  any other growth rates that are presented in that box.
23  Q  Thank you. "These growth rates are significantly
24  less than those achieved by Mr. Chavez." Do you agree with
25  that, the 20 and 30 percent are significantly less than

Page 272

1  those achieved by Mr. Chavez?
2  A  If, in fact, those growth rates that are presented
3  in the box are accurate, yes.
4  Q  "But may be more realistic long term
5  expectations." Do you agree with that?
6  A  I don't know if I would put it that way. More
7  realistic, I would say 20 and 30 percent is more realistic
8  than 632. 20 percent and 30 percent is more realistic than
9  76. So, I suppose I am agreeing with that statement.
10  Q  Okay. "Thus, we perform three sets of
11  calculations assuming 20 percent, 25 percent, and 30 percent
12  sales growth rates from 2002 onwards." That's just a
13  statement of fact?
14  A  That is a statement of fact.
15  Q  Continuing, "Discounting for the Time Value of
16  Money and Risk." He says, "The losses incurred by
17  Mr. Chavez as a result of his insurance team being prevented
18  from selling his insurance products at B.I.S.D. and his
19  subsequent termination as RSC for AFLAC would have taken
20  place over a long period of time." Do you agree with that
21  or not?
22  A  I'm not sure if I do. This says "the losses
23  incurred." If, by that term, the losses only refer to
24  decreases in income as an RSC for AFLAC and selling
25  insurance to B.I.S.D., I would agree with that statement.

Page 273

1  If this is talking about the net economic losses associated
2  with this case, I would not agree.
3  Q  That's based on the testimony you provided earlier
4  about Mr. Chavez being able to make up any losses?
5  A  Right. The mitigation.
6  Q  He goes on, "It is necessary to take account of
7  the fact that cash flows in different years do not have the
8  same economic value and, thus, cannot be properly added
9  together." Do you agree with that?
10  A  I would say the same present economic value or the
11  economic present value. I would add an adjective there.
12  The rest of the statement I agree with.
13  Q  Okay. "There are two primary reasons for this."
14  Just a statement.
15  "The first reason is that dollar amounts in
16  the future have lower value than they do in the present
17  because present amounts, if invested, will grow larger with
18  time." Do you agree with that?
19  A  I agree with that statement.
20  Q  "Thus, a smaller sum in the present will be
21  required to replace a given future amount." Do you agree
22  with that?
23  A  In general I agree with that if they're positive.
24  Q  "Discounting by the time value of money converts
25  future values to present values." Do you agree with that?

ORAL DEPOSITION OF DONALD HOUSE

Page 246

1  as -- what exhibit is that -- 13?
2      A   Exhibit 13.
3      Q   Which is a copy of Dr. Horner's report. Just the
4  report itself is marked as 13. The attachments to it are
5  behind it.
6          MS. LEEDS: Is that the September report?
7          MR. AGUILAR: This is the September 19, 2003
8  report.
9      Q   (By Mr. Aguilar) Let me know if you need to refer
10  to the -- have you had a chance to review this report yet?
11         MS. NEALLY: Objection, form, asked and
12  answered.
13     A   I have glanced over it to look for changes in his
14  opinions.
15     Q   (By Mr. Aguilar) Okay.
16     A   I have not had time to look at his attachments. I
17  have not had time to replicate his results.
18     Q   Okay. Then hand me the attachments at the back.
19  Unclip it. Hand me the attachments. I'll leave these here.
20  If you need to look at them, let me know; but since you
21  haven't really had a chance to look at these, I'm going to
22  avoid marking this if I can.
23         Meanwhile, looking at Exhibit 13, which is
24  the actual report, I'm going to ask you some questions about
25  that. I notice you have a copy of that report in your file;

Page 247

1  but it also is not really marked up either, right? I think
2  you have a couple of scratches in it or something; but the
3  copy that was in your file, the September 19th report, you
4  didn't really make any notes in that report, did you?
5      A   This is an old one. I don't know that I have the
6  copy.
7      Q   Let's see if we can find that. Look in your file.
8      A   All I have here is his first report.
9          MR. AGUILAR: Is this yours, Buddy?
10         MR. STEELE: Uh-huh. That's mine.
11     Q   (By Mr. Aguilar) It might be in that stuff over
12  there.
13     A   No. I didn't -- that's all Andrus over there.
14  Yes, that's it. I think I have some little arrows and
15  circles.
16     Q   So, if that will help you understand whatever
17  we're testifying to, go ahead and look at yours -- your --
18  the copy that was in your file. The first paragraph I need
19  you to basically just tell me what you disagree with or what
20  you don't have any evidence or knowledge of. Okay?
21     A   I have no knowledge of the testimony of
22  Mr. La Femina.
23     Q   La Femina?
24     A   La Femina.
25     Q   You haven't seen his deposition testimony?

Page 248

1      A   No. So, I really can't say anything about that
2  particular testimony because I haven't read it nor have I
3  looked at any of the exhibits or papers associated with
4  that --
5      Q   As it is --
6      A   -- testimony.
7      Q   As it is, those two sentences are just his
8  representation that this is what he's basing his revision
9  and report on, correct?
10     A   Correct.
11     Q   Okay. The next paragraph, do you disagree with
12  the first sentence?
13     A   The first sentence -- this Attachment 1 --
14     Q   Regardless of the graphs, you read that
15  "Mr. Chavez' regional sales coordinator sales were growing
16  rapidly until 2002"?
17     A   Yes, I see that he wrote that.
18     Q   Okay. I mean, do you agree with that statement?
19     A   I would say it's increasing.
20     Q   Okay.
21     A   Whether the word "rapidly" belongs there or not, I
22  would say I'm not so sure. It is a beginning position, and
23  there should be high rates of growth whether that is viewed
24  as rapidly or not. I don't know.
25     Q   You might pick a different adverb?

Page 249

1      A   I might.
2      Q   The next sentence, "Mr. Chavez acted as both an
3  agent and RSC for AFLAC." You agree with that, right?
4      A   Yes.
5      Q   Do you agree with the rest of the paragraph until
6  the last sentence?
7      A   I cannot offer any opinion as to whether those
8  statements are correct or not.
9      Q   You agree that Mr. Chavez was receiving
10  compensation through commission -- through a commission and
11  bonus system, correct?
12     A   Well, that's what is stated.
13     Q   Well, you don't know?
14     A   Well, I have not done an independent
15  verification --
16     Q   Okay.
17     A   -- of -- of how his compensation was accumulated
18  and how much was -- if any, was paid in the form of
19  bonuses --
20     Q   You're aware that he --
21     A   -- or other and whether they related to quotas or
22  targets. So, I really have no opinion on that.
23     Q   Okay.
24     A   I am aware that he was compensated.
25     Q   "At varying rates for first year sales, renewals,

63 (Pages 246 to 249)

ORAL DEPOSITION OF DONALD HOUSE

Page 134

1    Q   Okay.
2    A   And from that you subtract expected and actual
3  earnings.
4    Q   Okay. What's the starting point? Do you look at
5  his history?
6    A   It depends. There are some times you do.
7  Sometimes you don't.
8    Q   Under what circumstances do you?
9    A   For someone that is in business that has a
10  history.
11    Q   That has an established business, a history, you
12  look at that established business, the history, what they've
13  been earning. That's your starting point, right?
14    A   As a component, yes.
15    Q   As a component?
16    A   Yes.
17    Q   What if they haven't been working, for example a
18  guy right out of college?
19        MR. STEELE: Let me just stop you for a
20  second. Are we asking a damage model of someone who has
21  lost their job?
22        MR. AGUILAR: No.
23    Q   (By Mr. Aguilar) I'm asking for, just generally
24  speaking, how it is you calculate lost earnings; and I'm
25  asking about different factors that go into the equation.

Page 135

1  You told us that the starting point generally is to look at
2  the history of what they've earned in the past, right?
3    A   For those people that have a history, that is a
4  component.
5    Q   Okay. For those people who do not have a history,
6  what's your first step?
7    A   For those that do not have a history, you have to
8  understand, one, why; two, you look at the growth path of
9  businesses in the same industry under the same economic
10  conditions. You look at cohorts as best can be
11  determined -- that is, businesses -- that are similar.
12    Q   Okay.
13    A   That is, the same composition, the same customer
14  base, the same geographic location, the same point in time,
15  same product mix, same pricing, similar composition of
16  staff.
17    Q   Okay.
18    A   Characteristics of staff, such as experience, et
19  cetera.
20    Q   Okay.
21    A   And other characteristics of the industry that
22  must be taken into account.
23    Q   Okay. So, for a person who's just out of college
24  who's got a degree in insurance and he says, "I want to be
25  an insurance agent." Let's say he's involved in an auto

Page 136

1  accident the day he gets out of college. What is your
2  starting point for him?
3    A   What is a "degree in insurance"?
4        MS. LEEDS: Object to the form. There is no
5  degree in insurance.
6    Q   (By Mr. Aguilar) It doesn't matter. It doesn't
7  matter. My point being that you've got somebody who goes to
8  school for a specific program -- a degree in insurance,
9  let's say -- let's say you get some kind of degree that
10  says -- that teaches you all about -- better yet, let's say
11  it's a BBA. How's that, a Bachelor of Business
12  Administration? Okay?
13    A   Okay.
14    Q   And they graduate from college; and the day they
15  get out of college, you know, they've been saying they want
16  to go into insurance, go sell insurance. The day they get
17  out of college, they're injured in an auto accident. They
18  can't work anymore. What's the starting point for that
19  person?
20    A   The starting point is to identify their cohorts.
21    Q   Okay. And who is that? Other college students
22  who?
23    A   Other college students that come out of college
24  with similar degrees at the same age that go into that
25  particular line of work.

Page 137

1    Q   Okay.
2    A   You look at their income stream and their path
3  beginning at that point in time and taking into account
4  other complicating factors such as region of the country,
5  the type of policies being written or sold, the pricing, all
6  of the other -- other factors that would be unique that
7  would adjust that age-earning curve.
8    Q   Okay. And have you ever testified in any case
9  that you can start with some earnings amount starting point
10  like you just talked about? In any other case, have you
11  ever testified to that?
12        MR. STEELE: Objection, form.
13    A   I have testified on lost earnings.
14    Q   (By Mr. Aguilar) That's not what I'm asking about.
15  I'm asking about have you ever testified to that particular
16  model where you've got somebody who just came out of
17  college, for example, and did not have any work history of
18  his own to establish lost earnings in the past?
19        MS. LEEDS: Object to form.
20    Q   (By Mr. Aguilar) And testified that they still
21  have an anticipated amount of lost earnings in the future.
22  Have you ever testified in favor of that?
23        MS. LEEDS: Object to form.
24    A   Yes.
25    Q   (By Mr. Aguilar) Okay. What case was that?

35 (Pages 134 to 137)

Page 42

1  additional entry under "consulting and other professional
2  activities." There are some additional cases listed.
3      Q  Hang on.
4      A  And I believe there is an additional report that
5  is listed, and I think there are some dates that are
6  changed.
7          (Exhibit No. 6 was marked.)
8      Q  (By Mr. Aguilar) I'm handing you what I've marked
9  as Exhibit 6, which is a copy of the updated resume that you
10 provided us this morning; is that correct?
11     A  That's correct.
12     Q  Can you tell us again what the new portions are?
13     A  On page 1 I have added an entry called The Scooter
14 Store.
15     Q  And what is that?
16     A  That's a project that is underway for a company.
17     Q  Project to do what?
18     A  To examine the impact of the provision of some
19 mobile assistant devices on Medicare expenditures.
20     Q  Okay. What other changes or additions or
21 deletions?
22     A  There are some additional cases that are listed.
23     Q  On page?
24     A  On page 10 and 11.
25     Q  And which ones are those? The one new one I see

Page 43

1  at the bottom of page 10, Dino X. Chavez.
2      A  That is correct.
3      Q  Now, this is in the list of cases on which you've
4  been retained or testified?
5      A  I have been retained and/or testified. The
6  Andrus -- on page 11 the Andrus case and Kelly-Moore Paint
7  on page 11.
8      Q  Any others? Any other changes?
9      A  The report that was completed for The Scooter
10 Store is listed on page 15.
11     Q  Which one is that?
12     A  It is the last entry on page 15.
13     Q  Okay. "Cost and benefits"?
14     A  And I believe -- I believe those are the major
15 changes. I think I went through some of the list of cases
16 and changed some dates.
17     Q  Okay.
18     A  But I believe those are the only changes that were
19 made.
20     Q  Okay. When you were at A&M, did you ever take any
21 classes in insurance?
22     A  No.
23     Q  Have you ever had any training in the insurance
24 field?
25     A  What do you mean by "training," and what do you

Page 44

1  mean by "insurance field"?
2      Q  Either sales of insurance, annuities, 403(b)s,
3  Section 125 cafeteria plans. Other than economic analyses
4  of different particular products or something like that,
5  have you ever had any schooling -- gone to any classes
6  involving how different insurance products work?
7      A  I don't recall a course --
8      Q  Okay.
9      A  -- that I have attended or taken --
10     Q  Any seminars?
11     A  -- on insurance.
12         I don't recall a seminar that I would have
13 attended dealing specifically with insurance.
14     Q  Okay. And that includes any seminar, course,
15 class, or anything like that relating to either 403(b)
16 products or Section 125 cafeteria plan products?
17         MR. STEELE: Objection as to form.
18     A  I believe that to be the case.
19     Q  (By Mr. Aguilar) Okay. You're not representing
20 yourself to be any -- an expert on any insurance matters; is
21 that correct?
22     A  I'm not sure exactly what that means.
23     Q  How does insurance work; how insurance agents
24 work; how insurance companies work aside from just the
25 economic analysis of, for lack of a better term, crunching

Page 4

1  numbers. As far as how the insurance industry works, you're
2  not an expert in that area? You're not holding yourself out
3  to be an expert in that area, right?
4          MS. LEEDS: Objection, form.
5      A  I am -- I'm offering myself as an economic expert.
6      Q  (By Mr. Aguilar) Okay.
7      A  And I have examined markets --
8      Q  Okay.
9      A  -- for insurance policies. I have calculated and
10 estimated claims expenses. I have examined the records of
11 insurance companies, examined their pricing, examined their
12 quantities. So, I do have some expertise to offer about
13 insurance markets, the products, the pricing, the
14 profitability, the competition. So, I -- I feel comfortable
15 in that arena.
16     Q  How have you done that? Under what context?
17     A  A variety of contexts. I have had some litigation
18 cases involving insurance companies where I was asked to
19 analyze the records within the company, sales records,
20 pricing, volumes, market penetration --
21     Q  Okay.
22     A  -- contracts, policies. I have been asked to
23 build economic models to estimate claims expenses under a
24 variety of factors, including the type of coverage, the
25 characteristics of the populations to be covered.

12 (Pages 42 to 45)

 ORAL DEPOSITION OF DONALD HOUSE

Page 46

1    Q   Okay. Anything else?
2    A   Can I review my resume just for a moment?
3    Q   Sure. And actually it might be easier if we kind
4  of did it together because I was going to ask you which of
5  those cases did you do that on, which I assume is what you
6  were going to do. And I think you started -- which page is
7  that?
8        MR. STEELE: I'm going to object to the form
9  to the extent your question presumes that the cases he was
10  talking about also appear on his resume.
11    Q   (By Mr. Aguilar) You did tell us that your resume
12  includes all of the cases on which you've been retained
13  and/or testified, right?
14    A   That is correct; but some of these are projects,
15  research projects, and have nothing to do with litigation at
16  all.
17    Q   That you may not have listed on here?
18    A   That I may not have listed on here.
19    Q   Okay. Tell us about the ones you did list on
20  here.
21    A   For the American Dental Association I built a --
22    Q   Which page?
23    A   This is on page 1. There may be a better
24  description elsewhere.
25    Q   That's okay. What did you do?

Page 47

1    A   All right. If you go to page 15 -- and I'm
2  looking at Exhibit 6. If we go up to the sixth item from
3  the bottom, "Estimation of the cost of dental care for
4  eligible populations," I built an economic model for the
5  American Dental Association to estimate claims expenses --
6    Q   Okay.
7    A   -- associated with the different types of coverage
8  to different types of populations or the characteristics of
9  populations.
10    Q   Okay. What else?
11    A   The -- also on page 15, if you go up two items
12  above that, that is an ongoing study -- well, basically it's
13  finished; but there is still work that is being done on
14  it -- where I looked at the rates of reimbursement for
15  dentists for different procedures and the size of the
16  discounts that existed under participating contracts --
17    Q   Okay.
18    A   -- and how they related with carrier
19  concentration.
20    Q   Okay. Which one else?
21    A   Go to the second item from the top --
22    Q   Okay.
23    A   -- on page 15. That was a study that I did for
24  the American Medical Association, and I also did it for the
25  Department of Health and Human Services. So, I did two

Page 48

1  separate studies and, also, for the Texas -- Texas Medical
2  Association where I examined the impact -- or the -- the
3  changes in liability insurance coverage for physicians, the
4  cycles that they went through; and I developed a measure of
5  a cost index for the coverage of liability insurance for
6  physicians for Medicare.
7    Q   That had to do with the cost of liability
8  insurance?
9    A   It had to do with the cost of liability insurance
10  and the demand for liability insurance, the way in which
11  physicians were responding to premium price increases.
12    Q   Okay.
13    A   The extent to which they were changing the size of
14  the coverage in response to premium increases.
15    Q   Okay.
16    A   And an analysis of those premiums across insurance
17  companies.
18    Q   Okay.
19    A   I did a survey of carriers and the prices of
20  certain types of policies as well as looking at the total
21  amount paid among physicians.
22    Q   Okay. What else? Which one else?
23    A   I did a study -- a partial study for -- I don't
24  know exactly how to respond to this because my name has not
25  been disclosed in an ongoing case.

Page 49

1        MR. STEELE: Would it impact some privacy
2  requirements or confidentiality requirements, Dr. House?
3    Q   (By Mr. Aguilar) Hang on. Is it part of a case?
4  Is it part of a lawsuit?
5    A   It's part of a lawsuit.
6    Q   Okay.
7        MR. AGUILAR: If it's part of a lawsuit and
8  he's just being retained as a consultant at this point, I
9  think you're right. It would involve privacy considerations
10  because they have the right to keep you confidential.
11    Q   (By Mr. Aguilar) However, let me just ask you
12  generally. What type of case is it?
13        MR. STEELE: That's fine.
14    A   It's a case involving the market for life
15  insurance coverage and the types of policies that were
16  written, the sales of those policies, the profitability of
17  those policies, the types of changes in the premiums and
18  notifications of those premiums, the loss ratios.
19    Q   (By Mr. Aguilar) Okay.
20    A   It is -- well, I better not say.
21    Q   That's okay. Were you retained by the plaintiff
22  or defendant in that case?
23    A   I was retained by the defendant.
24    Q   Okay. Any others that are not on here?
25    A   Yes. I was retained by an insurance company that

13 (Pages 46 to 49)

Page 50

1  had bid on a Government contract for coverage of dependents
2  of military personnel. They had made the bid to the
3  Government and lost the bid; and I was asked to examine the
4  nature of the bid, the history of the bid, the
5  characteristics of the market that would be served in the
6  bid, the pricing, the size of the network.
7      Q   What kind of -- I'm sorry. What kind of policy
8  does that have to do with?
9      A   This is dental insurance.
10     Q   Dental insurance.
11     A   And I testified before a hearing asking for
12  reconsideration of the bid.
13     Q   Okay. Is that a lawsuit, also?
14     A   No. It was not a lawsuit at all. It was just a
15  hearing about a reconsideration of a bid for dental coverage
16  for all dependents of military personnel.
17     Q   A hearing before a Government tribunal?
18     A   Yes.
19     Q   Okay. Any others that are not on here?
20     A   Yes. Let me go through here.
21     Q   Do you want to go through the ones that are on
22  here first and then --
23     A   Well, some of them remind me of others.
24     Q   Okay. Let's just continue back into the document.
25  Any others that are on page 15?

Page 51

1      A   No.
2      Q   On page 14?
3      A   The malpractice insurance item, which is three
4  items up, is another report that I did for the AMA on the
5  pricing of malpractice liability insurance.
6      Q   Okay. Which others?
7      A   If we go up one, two, three, four, six items up, I
8  did a study of the impact of dental insurance on the demand
9  for dental care estimating the response to -- to coverage
10  both in terms of the deductible and the copay requirements,
11  the impact on expenditures.
12     Q   Okay. Which others?
13     A   Let me -- let me stop. Well, let me -- let me do
14  it this way. I'll continue on. There are a couple of
15  others that come to mind, but they're not -- I don't know
16  the extent to which I can disclose all of them.
17     Q   We're still on page 14?
18     A   Yes. All right. Let me -- I'm going back to
19  page 1.
20     Q   Did you finish with 14?
21     A   I did.
22     Q   Okay.
23     A   All right. On page 2, if we go down -- or move up
24  two items from the bottom.
25     Q   Pennsylvania Dental?

Page 52

1      A   Pennsylvania Dental Association versus
2  Pennsylvania Blue Shield.
3      Q   Okay.
4      A   There I was examining the -- the records of
5  Pennsylvania Blue Shield, looking at the pricing, the
6  reimbursement rates and the premiums, the profitability of
7  different coverages, the size of reserves, loss ratios.
8      Q   Okay. And were you being retained by the
9  plaintiff or the defendant?
10     A   I was -- it goes both ways. I was retained by
11  Pennsylvania Blue Shield, and I worked for them on the
12  defense. But they were also plaintiff, but I did not
13  participate in the plaintiff case. There was another case
14  involving insurance for carriers -- trucking carriers, and
15  it involved the reinsurance market.
16     Q   Is that in this?
17     A   No. It's Lloyd's of London where I gave -- I was
18  in a consulting role on the impact of claims with respect to
19  changes in the regulation of -- of trucking freight. There
20  was a change in the licensure or the credentialing of
21  carriers -- truck carriers, and I was estimating the impact
22  of that change on claims and the impact on the reinsurance
23  market. And that was for Lloyd's of London.
24     Q   You said you were estimating the impact of what?
25     A   Changes in trucking regulations.

Page 5

1      Q   What impact? Financial impact?
2      A   The financial impact on the reinsurance market.
3      Q   Okay. And in that case were you retained by the
4  plaintiff or the defendant?
5      A   I was retained by the defendant.
6      Q   Okay. Are we back onto page 2?
7      A   I'm on page 2.
8      Q   Any others? I tell you what, it might be easier
9  while we're going down these because there's another
10  question that I was going to have to ask anyway is -- I need
11  to ask on those cases on which you've been retained that are
12  on your list, I need to ask which of those were for the
13  plaintiff and which of those you were retained by the
14  defendant.
15     A   Well, okay.
16     Q   If you can mark for us -- were any of them for the
17  plaintiff?
18     A   It works out to be about 55 percent are plaintiff,
19  45 percent are defendants.
20     Q   Okay. Can you mark for us which ones -- as you're
21  going down, which ones -- for example, Boddicker v. Arizona
22  State Dental Association. I presume you were retained by the
23  defendant?
24     A   I can, but can I finish your previous question?
25     Q   Sure. I thought this would be easier; but if

ORAL DEPOSITION OF DONALD HOUSE

Page 54

1  you'd rather do it this other way, that's fine.
2      A   I'm on a roll here.
3      Q   That's okay.
4      A   On page 3 if you go five -- five points up, I
5  testified before the Senate joint -- House and Senate joint
6  committee on the impact of tort reform on liability
7  insurance for physicians.
8      Q   And I presume you were retained by the physicians?
9      A   I was retained by the Texas Medical Association.
10 That involved an estimation of the impact of various types
11 of tort reform on premiums, medical liability insurance
12 premiums.
13     Q   That's October 25, 1986?
14     A   Correct.
15     Q   Anything else on page 3?
16     A   No. I'm on page 4 now.
17     Q   Nothing on page 4?
18     A   No. On page 5 I was retained by a group to
19 explain the impact of a new senate rule on workers'
20 compensation insurance.
21     Q   Which item?
22     A   This is the second complete item from the top.
23 State board rate hearing, November 19?
24     A   I testified in a public hearing about the impact
25 of a particular senate bill on the market for worker's

Page 55

1  compensation insurance.
2      Q   Anything else on page 5?
3      A   Not that I see. I'm on page 6 now.
4      Q   Nothing on page 6?
5      A   Nothing on page 6.
6      Q   Nothing on page 7?
7      A   Nothing on 7. I'm on page 8.
8          Nothing on 8. I'm on 9.
9      Q   Nothing on 9 -- I'm sorry -- 10?
10     A   I'm -- no. I'm on page 11 now. I'm moving way
11 ahead. On page 12 we did a contract on --
12     Q   Which item?
13     A   All right. This is under "Department of Labor"
14 Contract No. 99-8-1886-04-32. We did a contract there where
15 we were looking at -- actually the next one is involved in
16 that as well -- the impact of unemployment insurance.
17     Q   Well, let's do the first -- the other one first,
18 finish off the other one first. What did you do?
19     A   Both of them are really the same problem -- the
20 subject matter where we were looking at changes in the
21 unemployment insurance programs on the employment and growth
22 during a recession.
23     Q   Okay. Anything else on page 12?
24     A   Let me see here.
25     Q   Nothing else on page 12?

Page 56

1      A   No, not that I recall.
2      Q   All right. Now -- nothing else in your report?
3  No other references in your report?
4          MR. STEELE: You mean his resume?
5      Q   (By Mr. Aguilar) I'm sorry. Your resume.
6          MR. AGUILAR: Thank you.
7      A   No. And I'm trying to recall another couple of
8  items that are -- that are relevant. I -- it is escaping me
9  now but it may come to me before the end of this deposition
10 but there are two other items that I'm trying to get a
11 handle on that is just fading away.
12     Q   (By Mr. Aguilar) Do you recall generally what
13 they're about?
14     A   It was looking at insurance -- competing insurance
15 companies and looking at -- okay. All right. It's coming.
16 I can't speak much about it; but it has to do with the
17 profitability of certain forms of health insurance and the
18 reimbursement rates being paid to -- to hospitals and entry
19 and exit of competing carriers in the market, the
20 development of networks, the extent to which those networks
21 are used as barriers to entry.
22     Q   To insurance companies?
23     A   To insurance companies. The definition of
24 relevant markets, both product and geographic boundaries.
25     Q   Okay.

Page 57

1      A   The practice of premium determination, the changes
2  in reserves over time among competing firms.
3      Q   Okay. Anything else you can think of?
4      A   There -- there may be one other, but that -- that
5  is all that I can remember at the moment.
6      Q   Okay.
7      A   Wait. I think you have to also include the
8  analysis of Medicaid and Medicare expenditures.
9      Q   Is that on here?
10     A   Yes. It's under one of the projects that I'm
11 doing. We talked about it just in the fact that it's a new
12 entry, but I have not talked about it in the context of your
13 question. This is an examination of the impact of the
14 provision of mobile assistant devices on claims.
15     Q   Is that the Government hearing or the case
16 involving market for life insurance coverage or the Lloyd's
17 case?
18     A   No, no, no. It is The Scooter Store project --
19     Q   Okay.
20     A   -- where we're looking at claims expenses by
21 individuals, by characteristics of the individuals, and by
22 region, the approval practices used within D mark regions
23 both for those that survive and those that die.
24     Q   What does that have to do with insurance again?
25     A   Looking at claims expenses. Medicare is an

15 (Pages 54 to 57)

Page 74

1    Q   (By Mr. Aguilar) Okay.
2    A   -- without the amount that is paid on your behalf
3  going on your W-2.
4    Q   Are you familiar with the particular annuities
5  that were allowed to be sold at B.I.S.D. during 2001, tax
6  deferred annuities under 403(b)?
7    A   I have not examined the specific products. I just
8  have a general understanding that they were, in fact,
9  annuities.
10   Q   Okay. And you started saying earlier, a little
11 while ago, about which of these cases in which you've been
12 involved involved 403(b)s.
13   A   I do not have a specific project that would --
14 that would look only at annuities.
15   Q   Do any of the projects look at annuities at all?
16   A   I have looked at annuities on several occasions in
17 the market for annuities. I have been asked from time to
18 time about the usefulness of the use of annuities to replace
19 an income string in contrast to a lump sum in a damage
20 award. So, I have testified on annuities, what they do and
21 their characteristics on several occasions; but as far as a
22 specific research project in looking at annuities, no.
23   Q   Okay. And nothing on no -- nothing on -- one more
24 time. Nothing specifically on 403(b) annuities.
25   A   Nothing specific on 403(b) annuities.

Page 75

1    Q   Do you know who qualifies to purchase a 403(b)
2  annuity, whether it's limited at all?
3    A   I do not know.
4    Q   Do you -- are you familiar with any of the terms
5  or restrictions of Section 403(b)?
6    A   I am not familiar with that legislation. So, no,
7  I have not reviewed that yet.
8    Q   And obviously you're not familiar with the terms
9  of Section 403(b)?
10   A   I have not reviewed that legislation.
11   Q   Okay. Do you know what 403(b) is even a reference
12 to?
13   A   Well, it is part of the tax code.
14   Q   It's a reference to the tax codes?
15   A   Yes.
16   Q   Reference to a section of the tax codes?
17   A   Yes.
18   Q   You're just not familiar with any of the specifics
19 on 403(b)?
20   A   I have not reviewed that legislation, that part of
21 the tax code, no.
22   Q   What about Section 125? You understand that's
23 also part of the tax code, right?
24   A   Yes.
25   Q   Okay. Have you reviewed any of the sections of

Page 76

1  125?
2    A   I have not read that part of the tax code.
3    Q   So, you're not familiar with any of its terms?
4    A   I cannot recite any of the language in that -- in
5  that part of the tax code.
6    Q   And do you know who that's limited to? In other
7  words, do you know what the limitations are or were? Are
8  you familiar with the limitations of who can purchase a
9  Section 125 cafeteria plan product?
10       MR. STEELE: Objection, form.
11   A   I have not reviewed the limitations as to how that
12 part of the tax code applies to certain employee groups. I
13 have not reviewed that.
14   Q   (By Mr. Aguilar) You're not here to provide any
15 testimony on the specifics of Section 125 cafeteria plans,
16 right?
17   A   I cannot give you a detailed response today.
18   Q   Okay. You haven't checked into any of that?
19   A   I have not yet checked into that, no.
20   Q   You haven't checked into any of the specifics to
21 be able to testify to the workings of Section 403(b) plans
22 either; is that correct?
23       MR. STEELE: Asked and answered.
24   A   I have not reviewed the specific language of that
25 tax code.

Page 7

1    Q   (By Mr. Aguilar) You're not here to testify to the
2  specifics of Section 403(b) plans -- programs? Let me
3  rephrase that. You are not here to testify to the specifics
4  of any 403(b) tax deferred annuity program or requirements?
5       MS. LEEDS: Object to the form.
6    Q   (By Mr. Aguilar) I know you said you haven't
7  reviewed any, but I just want to make sure you're not here
8  to testify about any of it?
9       MS. LEEDS: Object to form.
10   A   I'm not sure exactly how to respond to that
11 question. I have experience in looking at the impact of
12 tax -- tax deference --
13   Q   I'm talking --
14   A   -- on the demand for insurance products; and if
15 that is within the gamut of your question, I would have to
16 add that.
17   Q   No. I'm talking about 403(b)s.
18   A   On the annuity side, again, that also is tax
19 deferred. I would answer in the same way.
20   Q   Which is?
21   A   That the fact that it is tax deferred affects the
22 demand for those products, and I can offer testimony on
23 that.
24   Q   Other than that, on the specifics of 403(b)s,
25 you're not here to testify to the specifics of what 403(b)

Page 170

1  certainly have a different history.
2      Q  And what you mean by "established" -- what we're
3  talking about "established" in this context is a business
4  that, you know, is going to keep performing successfully as
5  opposed to not performing successfully. That's what we're
6  talking about when we talk about established, right?
7      A  That's not the way I was using it.
8      Q  How were you using it?
9      A  An ongoing business.
10     Q  Just a business in existence?
11     A  Yes.
12     Q  And you can't tell from what you've seen so far
13  whether Mr. -- whether The Teachers' Agency will continue to
14  operate financially successfully, right?
15     A  I have not made a projection --
16     Q  You have --
17     A  -- as to the profitability of The Teachers' Agency
18  or its expected tenure.
19     Q  Okay. It could be that The Teachers' Agency could
20  fall apart tomorrow as far as you know?
21     A  It could fall apart tomorrow.
22     Q  Okay. And that didn't -- that didn't come into
23  play in your evaluations for your report, correct?
24     A  My opinion is that Mr. Chavez is expected to earn
25  income, whether it be from The Teachers' Agency or his next

Page 171

1  best alternative. I did not address whether The Teachers'
2  Agency has an expectation of a short or a long ahead of it.
3      Q  In your report -- continuing where we left off in
4  that paragraph -- you go on to say, "It is quite probable
5  that Chavez will excel in his next endeavor and his future
6  earnings stream will equal or exceed what he would have
7  earned as AFLAC's RSC over the next 25 years." What
8  evidence did you have to make that conclusion?
9      A  The evidence that the market for insurance agents
10  is quite competitive.
11     Q  How did you know Dino was going to -- what made
12  you say that it's quite probable that Dino's -- Mr. Chavez
13  is going to excel?
14     A  Because he's skilled.
15     Q  Okay. And what basis do you have to evaluate
16  whether he's skilled or not?
17     A  Deposition testimony.
18     Q  Okay. All you know is you read the deposition
19  testimony, and somebody in the deposition said he's skilled?
20     A  Yes.
21     Q  But you don't have any independent evaluation as
22  to say whether he is not?
23     A  I have not tried.
24     Q  Okay. And that's outside of your realm of
25  expertise?

Page 172

1      A  I have not interviewed and determined whether he
2  has skills or not. I'm relying upon deposition testimony.
3      Q  And it's outside Dino's -- whether Dino is skilled
4  or not is outside your realm of expertise, right?
5      A  Economists have examined age earning cycles and
6  attributed differences in age earning cycles to skills -- to
7  the acquisition of skills, whether they're acquired by
8  formal training, education, or on-the-job training. So, I
9  would not agree that I'm unqualified to identify the
10  existence or the measurement of skills in some instances. I
11  have not done an independent examination of the skill set of
12  Mr. Chavez.
13     Q  Here's what I'm asking: I'm not asking whether
14  you've been able to look at the evidence to determine
15  whether Mr. Chavez has been successful. What I'm asking is:
16  In terms of determining whether Mr. Chavez is a
17  knowledgeable and skilled cafeteria plan person, you don't
18  have the knowledge of what it requires to be a skilled
19  cafeteria plan person to make that evaluation, do you?
20         MS. NEALLY: Objection, form.
21     A  I've not tried to look into that.
22         MR. AGUILAR: Objection, nonresponsive.
23     Q  (By Mr. Aguilar) I'm just asking whether you have
24  the skills to be able to determine whether Mr. Chavez is
25  skilled with regard to Section 125(b) -- the Section 125

Page 173

1  plans?
2         MR. STEELE: I object to the interruption. I
3  believe he was trying to answer your question.
4      A  To determine whether a person is skilled in any
5  endeavor or not --
6      Q  (By Mr. Aguilar) I'm only asking about cafeteria
7  plans.
8      A  I'm trying to answer your question. To determine
9  whether someone is skilled in any particular endeavor, one
10  looks at the way in which they acquire skills, whether it's
11  formal; whether it is OJT, on-the-job training; or in what
12  other way one has acquired those skills. I'm not saying
13  that I would be unable if given a collection of agents that
14  have this particular line of specialization and I have their
15  history to be able -- to be unable to say these sets of
16  people are less skilled than these sets of people. I'm not
17  saying I do not have the ability to do that. I believe I do
18  have the ability to do that.
19     Q  Do you --
20     A  I have not looked at Mr. Chavez in such a study.
21     Q  Do you --
22     A  I am relying upon deposition testimony to do that,
23  but I'm not saying I am unable to differentiate skill levels
24  of people with that level of specialization.
25     Q  Do you have any specialized training that has

DSI Reporting Services, Inc.
713-554-0080

Page 174

1  taught you how to determine who's a skilled Section 125
2  cafeteria plan person and someone who is not?
3         MS. LEEDS: Object to the form.
4      A  No.
5      Q  (By Mr. Aguilar) Okay. You go on to say, "It is
6  quite probable that his future earnings stream will equal or
7  exceed what he would have earned as AFLAC's RSC over the
8  next 25 years. There is significant evidence that supports
9  this likelihood." What's the evidence that supports the
10  likelihood that Mr. Chavez is going to be earning what he
11  was earning as RSC's -- I'm sorry -- AFLAC's RSC?
12     A  The evidence that the insurance -- that the market
13  for insurance agents is competitive. That if indeed he has
14  the skills that would convince AFLAC to make him a regional
15  sales coordinator, that AFLAC is not the only employer of
16  people with those skills. The market for insurance is so
17  competitive and if indeed he has that skill set, he will be
18  in demand for other carriers that have products that are
19  competing in that same market and if indeed he has those
20  skills and the testimony suggested is he will have
21  alternatives.
22     Q  Okay.
23     A  The evidence does not suggest that AFLAC pays
24  premiums above all other companies for people with those
25  skills. Therefore, since it is a competitive market, one

Page 175

1  would expect that he would be able to replace that income
2  stream having that skill set in the market for insurance
3  agents; and I see no evidence that would suggest that he is
4  incapacitated. No evidence that would suggest that the
5  market is so non-competitive that AFLAC is the only company
6  in America that would find his skills so valuable --
7      Q  I think you already said that.
8      A  -- to pay him the earnings that he's received to
9  date.
10         MR. STEELE: You just don't like that answer,
11  do you, Arnold?
12         MR. AGUILAR: No. He just said the same
13  thing twice. I'm just trying to make a list and I want to
14  make sure I include everything but he doesn't need to
15  repeat.
16         MR. STEELE: Let's follow that with our
17  questioning, too, if we could.
18     Q  (By Mr. Aguilar) Anything else?
19     A  No.
20     Q  What I caught, you said the evidence that he's
21  going to earn the same as he would have earned as an AFLAC
22  RSC is it's a competitive market; basically if he was able
23  to convince AFLAC, he should be able to get hired by some
24  other company on the same basis of his skills that he used
25  to convince AFLAC in the first place; no evidence that AFLAC

Page 176

1  doesn't pay the same as all others in the business; and he's
2  not incapacitated. Did I leave out anything?
3      A  Well, you have mischaracterized --
4      Q  Which one?
5      A  -- the import of my comment.
6      Q  I don't mean to do that. I mean, I'm just trying
7  to --
8         MR. STEELE: Just stop repeating it, and
9  let's move on.
10         MR. AGUILAR: Thank you, Buddy.
11     A  The import of my statement is not that he would be
12  able to go and convince others to hire him. That is not it.
13  The market is very competitive, and firms such as AFLAC are
14  constantly looking for skilled agents.
15     Q  (By Mr. Aguilar) Okay.
16     A  That he could be able -- or would be able to
17  present his credentials with his experience --
18     Q  Okay.
19     A  -- and there are companies that would find him
20  valuable to them --
21     Q  Okay.
22     A  -- and pay him a competitive return --
23     Q  Okay.
24     A  -- just as AFLAC was doing.
25     Q  Okay. Anything else?

Page 177

1      A  No.
2      Q  Turning to page 4, second paragraph: "It is
3  possible that his earnings" -- referring to Mr. Chavez --
4  "as a non-captive AFLAC agent will exceed what he would have
5  earned as a captive AFLAC agent."
6      A  Uh-huh.
7      Q  And again, is the basis for your saying that the
8  same thing you just told us?
9      A  Correct.
10     Q  Other than that, nothing else?
11     A  Correct. The market is competitive. Those with
12  skills get paid in the marketplace.
13     Q  Do you think it's possible that his earnings as a
14  non-captive AFLAC agent will not exceed what he would have
15  earned as a captive AFLAC agent? Is that possible, also?
16         MS. LEEDS: Objection, speculation.
17     A  By your question you're suggesting that there were
18  premiums paid in the marketplace for him as a captive agent.
19  The question is: If he's not a captive agent, is it
20  possible that they be less than that? It is possible, but
21  he could also be captive for another company.
22     Q  (By Mr. Aguilar) Okay. He could be captive for
23  another company; and even if he's captive for another
24  company, it's possible that his earnings would be less as
25  well? That's possible?

45 (Pages 174 to 177)

ORAL DEPOSITION OF DONALD HOUSE

Page 178

1    A   It's possible that they will be less. It is
2  possible that they will be more, and that's an important
3  question that hasn't been answered.
4    Q   And you can't answer it at this point?
5    A   I have not conducted the study to answer it.
6    Q   That means "no," right?
7    A   That means "no."
8    Q   You can't say to any reasonable degree of
9  accounting certainty what will happen, right, based on the
10  documentation and evidence you've seen so far?
11         MS. LEEDS:  Objection to the form.
12    A   What is "accounting certainty"?
13    Q   (By Mr. Aguilar) Whatever you need to be able to
14  determine to a reasonable degree of certainty as an
15  accountant --
16    A   I'm not an accountant.
17    Q   I'm sorry -- as an economist.  Sorry.  Fold the
18  question.  You can't say to any reasonable degree of
19  economic certainty what will happen in the future, right?
20         MS. LEEDS:  Object to the form.  Nobody can.
21    A   I have not formed an opinion on that question.
22    Q   (By Mr. Aguilar) Okay.
23    A   I mean, I have not quantified what the mitigation
24  earnings would be.  I think one can provide reasonable
25  certainty on such questions.  Many have in the past.

Page 179

1    Q   At this point --
2    A   I don't see this as a -- as a condition in which
3  that would be prevented.
4    Q   Okay.  Let me try and ask it then.  At this point
5  can you say to any reasonable degree of economic certainty
6  what will happen?
7         MS. LEEDS:  What will happen, or what could
8  happen?
9         MR. AGUILAR:  What will happen.
10         MS. LEEDS:  Object to the form, speculation
11  as to "what will happen."
12    A   I offer the opinion that Mr. Chavez will have
13  future earnings.
14    Q   (By Mr. Aguilar) Other than that you can't be more
15  specific, right?
16    A   At this point I cannot give you a quantification
17  of those earnings, but I have the opinion that he will have
18  future earnings.
19    Q   Okay.  The next sentence, "Under this condition,
20  Chavez would appropriately have incurred no economic
21  damages."  Is that based on the assumption that he will
22  earn -- his future earnings will exceed what he would have
23  earned as a captive AFLAC agent?
24    A   Correct.
25    Q   Going to the next paragraph, Dr. Horner is talking

Page 180

1  about growth rates in the different years.  The growth
2  rate -- if you turn the page, I think it shows what the
3  specific growth rates were.  For 1999 it was 632 percent.
4  That was following an initialization period, right?
5    A   Correct.
6    Q   Then in 2000 it was 68.11 percent growth; and then
7  in 2001 it was 75.78, correct?
8    A   Correct.
9    Q   Continuing back over here on page 4 -- those
10  numbers were calculated correctly, right?
11    A   I believe they were.
12    Q   Okay.  Continuing back over here on page 4, he
13  starts saying -- right after those numbers -- "Horner's only
14  justification of this assumption is based upon an alleged
15  AFLAC requirement that an RSC must have an annual growth
16  rate of" -- "in first year premiums of at least 15 percent."
17  Horner's justification was also based on the actual growth
18  rate seen by Mr. Chavez.  Did you understand that to be the
19  case?
20    A   I understand that he reviewed the percentages that
21  are found on page 5.
22    Q   Do you think that was the basis, also, for his
23  assumption of Mr. Chavez being able to reach 15 percent
24  growth rate?  Did you understand that that was part of the
25  basis?

Page 181

1    A   I hope not.
2    Q   Why not?
3    A   I mean, you only have three years of evidence in a
4  start-up endeavor.  What Mr. Horner is talking about is an
5  annual growth rate for 25 years.
6    Q   Okay.  So, you're saying Dr. Horner should not
7  have even looked at his growth rates for 2000 or 2001?
8    A   I'm saying that those growth rates are
9  interesting, but I can generate those growth rates by
10  selling lemonade.
11    Q   And how much money do you make selling lemonade?
12    A   Very little but I can give you very large growth
13  rates but it doesn't have anything to do with the annual
14  growth rate over the next 25 years.  It is not a useful
15  basis or foundation for prediction.
16    Q   Because it's too short a period of time?
17    A   Too short a period of time, and we know that --
18    Q   How long would be sufficient?
19    A   And we know that the early growth rates are
20  usually not indicative of future growth rates.
21    Q   And how do you know that?
22    A   Because of the basis, the foundation, on which
23  you're calculating an early start or a start-up company.
24  That the percentage growth when you start from zero are
25  generally very large, and they aren't useful predictors of

46 (Pages 178 to 181)

ORAL DEPOSITION OF DONALD HOUSE

Page 182

1  what the long run growth rates are. You go to any start-up
2  business in any industry and look at the first three years
3  of sales growth; and if you take that and that's all you
4  have and you use that to predict what the long term growth
5  rate of that company would be, it would not be a good
6  predictor.
7      Q   Okay. So, your understanding is that the growth
8  rate of every business during the start-up point is always
9  large; and that it just decreases after that?
10         MR. STEELE: Objection, form.
11     A   Of those that survive, yes. There may be some
12  exceptions.
13     Q   (By Mr. Aguilar) Can you tell us when Mr. Chavez'
14  growth rate was expected to decrease if he had stayed at
15  AFLAC?
16     A   Well, I have not projected what those earnings
17  would be.
18     Q   You just don't --
19     A   Mr. Horner has.
20     Q   Okay. You just --
21     A   Mr. Horner is testifying that it's going to remain
22  very high at almost 19 percent per year, and I'm questioning
23  that.
24     Q   Okay. And you just don't know to be able to tell
25  us what it actually would be because you have not made those

Page 183

1  calculations?
2      A   I am of the opinion that those are unreasonable.
3      Q   Okay. And what would be reasonable?
4      A   They would be less than 19 percent.
5      Q   What amount would be reasonable?
6      A   I have not conducted an investigation to give you
7  my best estimate of that number. I have not done that.
8      Q   Okay. You can't tell --
9      A   But I am reflecting on what Mr. Horner is
10  testifying to.
11     Q   You can't tell us what would be reasonable.
12  You're just saying Horner's is not reasonable?
13     A   I'm saying 19 percent and above is unreasonable.
14     Q   Going on to the next paragraph, "There is no
15  evidence that would suggest that Chavez would have remained
16  an AFLAC RSC by qualifying each year under the alleged
17  15 percent requirement." Now, you agree that Mr. Chavez is
18  very skilled, right?
19     A   The testimony suggests that yes, he is skilled.
20     Q   Okay. Actually you saw that testimony of the
21  same. His partner thought he was one of the most skilled
22  125 agents in South Texas, right?
23     A   That's correct.
24     Q   Any basis to believe he would not be able to make
25  15 percent every year?

Page 184

1      A   Saturation.
2      Q   Now, you indicated that Mr. Chavez is -- you
3  already saw Mr. Chavez's growth being greater out of
4  B.I.S.D. than inside of B.I.S.D., right?
5      A   Correct.
6      Q   And you also understand that Mr. Chavez was not
7  strictly limited to just the South Texas area, that he was
8  actually expanding out to the Austin and Houston areas as
9  well, right?
10     A   My inference was that that was not his target.
11     Q   Okay. You understood he was doing that, though,
12  right?
13     A   I understand that he had some agents that were
14  located there.
15     Q   Okay.
16     A   But that was not his targeted area.
17     Q   And if -- you understood that there's no
18  restrictions within AFLAC where he had to stay just in the
19  Rio Grande Valley, right?
20     A   I don't know the territorial --
21     Q   You don't know?
22     A   -- restrictions that AFLAC imposes.
23     Q   Okay.
24     A   My inference was that he had intended upon
25  concentrating his efforts in South Texas as an AFLAC RSC.

Page 185

1      Q   So, if there are no restrictions like that, how
2  would saturation play?
3      A   If there are no restrictions, if he could go
4  anywhere, then saturation would not play.
5      Q   Okay. So, any other basis or evidence that you
6  have to believe that Mr. Chavez would not qualify each year
7  under the 15 percent requirement?
8      A   No. Just that, that there is ultimately going to
9  be saturation among his groups of employers in South Texas;
10  and the 15 percent per year is an unreasonable number to
11  carry for 25 years.
12         MR. AGUILAR: Objection, nonresponsive after
13  "no."
14     Q   (By Mr. Aguilar) You go on to say, two sentences
15  down, "This is not sufficient evidence to prove that Chavez
16  had the energies, skills, and talents to achieve this goal
17  for the next 25 years." What's that based on?
18     A   I'm sorry. I've lost exactly where you are.
19     Q   Bottom of page 4.
20     A   Okay. Got it. I'm with you. I'm just trying to
21  read it in context.
22     Q   Sorry.
23     A   Okay.
24     Q   What was that based on?
25     A   Based upon the inference that there is sales

47 (Pages 182 to 185)

ORAL DEPOSITION OF DONALD HOUSE

Page 299

1

2

3    COUNTY OF HARRIS

4    STATE OF TEXAS

5                    REPORTER'S CERTIFICATION

6          I, Jessica Renee Pena, Certified Shorthand Reporter in

7    and for the State of Texas, hereby certify that this

8    transcript is a true record of the testimony given.

9          I further certify that I am neither attorney nor

10   counsel for, related to, nor employed by any of the parties

11   to the action in which this testimony was taken.  Further, I

12   am not a relative or employee of any attorney of record in

13   this cause, nor do I have a financial interest in the

14   action.

15         Subscribed and sworn to on this the _____ day of

16   _____, 2003.

17

18

19

20

21                    _____

                      Jessica Renee Pena, CSR

22                    Certification No. 7160

                      Expiration Date:  12/31/03

23                    DSI Reporting Services, Inc.

                      701 N. Post Oak Road, Suite 425

24                    Houston, Texas 77024

                      Phone:    (713)554-0080

25                    Fax:      (713)554-0085

# EXHIBIT A-2

1    IN THE UNITED STATES DISTRICT COURT

     FOR THE SOUTHERN DISTRICT OF TEXAS

2      BROWNSVILLE DIVISION

3 STEPHEN M. ANDRUS,   ) (

 FERNANDO DE PENA,   ) (

4 VALENTIN PAZ and ANDRUS ) (

 & PAZ, A Partnership  ) (

5         ) (

 VS.        ) ( B-02-143

6         ) (

 BROWNSVILLE INDEPENDENT ) (

7 SCHOOL DISTRICT, NOE  ) (

 SAUCEDA, and EDDIE   ) (

8 ERRISURIZ, JR.    ) (

9 _____

10

      ORAL DEPOSITION OF

11    DONALD R. HOUSE, Ph.D.

     OCTOBER 3, 2003

12

13 _____

14   ORAL DEPOSITION OF DONALD R. HOUSE, Ph.D.,

15 produced as a witness at the instance of the

16 PLAINTIFFS, taken in the above styled and numbered

17 cause on OCTOBER 3, 2003, from 9:27 a.m. to 1:21 p.m.

18 and 2:23 p.m. and 2:35 p.m., before LOU ZUNIGA,

19 Certified Court Reporter No. 2198, in and for the State

20 of Texas, at the offices of Roerig, Oliveira & Fisher,

21 L.L.P., 855 West Price Road, Suite 9, Brownsville,

22 Texas, pursuant to the Federal Rules of Civil Procedure

23 and the provisions stated on the record or attached

24 therein.

25

1   premiums equaling $51 million plus.  Is that

2   reasonable?

3        A.  I don't think it's reasonable, no.

4        Q.  And what basis do you have for that conclusion?

5        A.  I believe that is a very, very large amount of

6   total premiums paid for sales of four people.

7        Q.  Any other basis that you have for believing

8   that's not reasonable?

9        A.  Yes, that it's a highly competitive

10  marketplace.

11       Q.  Okay.

12       A.  That this is a huge amount of premiums to be

13  paid by a fixed group of employees, and I don't think

14  it reflects the competitive nature of the marketplace.

15       Q.  Okay.  You've never been involved in the

16  competitive nature yourself of that marketplace, right?

17            MS. LEEDS:  Object to the form.

18       Q.  I thought you said you didn't -- you never sold

19  an insurance policy?

20       A.  I have never been --

21            MS. LEEDS:  Objection; asked and answered.

22       A.  I have never been an insurance agent.  I have

23  been an economist that has examined markets and the

24  competitive nature of markets.

25       Q.  You go on to say, "This likely exceeds the

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,           ) (

FERNANDO DE PENA,            ) (

VALENTIN PAZ and ANDRUS      ) (

& PAZ, A Partnership         ) (

                             ) (

VS.                          ) (   B-02-143

                             ) (

BROWNSVILLE INDEPENDENT      ) (

SCHOOL DISTRICT, NOE         ) (

SAUCEDA, and EDDIE           ) (

ERRISURIZ, JR.               ) (

REPORTER'S CERTIFICATION

DEPOSITION OF DONALD R. HOUSE, Ph.D.

October 3, 2003

     I, LOU ZUNIGA, Certified Court Reporter in and for
the State of Texas, do hereby certify that the above
and foregoing contains a true and correct transcription
of the oral deposition of DONALD R. HOUSE, Ph.D.;


     I further certify that I am neither counsel for,
related to, nor employed by any of the parties or
attorneys in the action in which this proceeding was
taken, and further that I am not financially or
otherwise interested in the outcome of the action.

Page 184

Certified to by me this _____ day of
October , 2003.


LOU ZUNIGA, Texas CSR 2198

Expiration Date: 12-31-03

Hill & Romero

10125 North 10th Street, Suite B

McAllen, Texas   78504

(956) 287-8898

# EXHIBIT A-3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ            )
                          )
VS.                       )
                          )
BROWNSVILLE INDEPENDENT)
SCHOOL DISTRICT, NOE      )
SAUCEDA, AND RANDY        )    CIVIL ACTION NO.
DUNN, MARILYN DEL         )      B - 02 - 128
BOSQUE-GILBERT AND        )
HUGH EMERSON, JR.,        )
IN THEIR OFFICIAL         )
CAPACITIES AS BOARD       )
MEMBERS OF BROWNSVILLE )
INDEPENDENT SCHOOL        )
DISTRICT                  )

*******************************************

ORAL AND VIDEOTAPED DEPOSITION OF

**FRANK D. LAFEMINA**

MAY 22, 2003

VOLUME 1

*******************************************

CONDENSED TRANSCRIPT AND KEYWORD INDEX



**AcuScribe**
**Court Reporters**

750 NORWOOD TOWER
114 WEST 7TH STREET
AUSTIN, TEXAS 78701
info@acuscribe.com

TELEPHONE: (512) 499-0277
TOLL-FREE: (800) 497-0277
FAX: (512) 499-0298
www.acuscribe.com

**Page 1**

```
( 1)            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
( 2)               BROWNSVILLE DIVISION
( 3)
    DINO X. CHAVEZ                    *
( 4)                                  *
    VS.                               *
( 5)                                  *
    BROWNSVILLE INDEPENDENT           *
( 6) SCHOOL DISTRICT, NOE            *
    SAUCEDA, and RANDY              *  CIVIL ACTION NO.
( 7) DUNN, MARILYN DEL              *    B - 02 - 128
    BOSQUE-GILBERT and              *
( 8) HUGH EMERSON, JR.,             *
    in their official               *
( 9) capacities as Board            *
    Members of Brownsville          *
(10) Independent School             *
    District                        *
(11)
(12)        *******************************************
(13)          ORAL AND VIDEOTAPED DEPOSITION OF
(14)                 FRANK D. LaFEMINA
(15)                   MAY 22, 2003
(16)                    VOLUME 1
(17)        *******************************************
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

**Page 2**

```
( 1)            ORAL AND VIDEOTAPED DEPOSITION OF
( 2) FRANK D. LaFEMINA, produced as a witness at the
( 3) instance of the Plaintiff and duly sworn, taken in
( 4) the above-styled and numbered cause on the 22nd day of
( 5) May, 2003, from 2:01 p.m. to 3:56 p.m., before
( 6) GERRI C. BARKER, Certified Shorthand Reporter in and
( 7) for the State of Texas, reported by machine shorthand,
( 8) at the offices of Locke, Liddell & Sapp, L.L.P.,
( 9) 100 Congress Avenue, Suite 300, Austin, Texas 78701,
(10) pursuant to the Federal Rules of Civil Procedure and
(11) the provisions stated on the record or attached
(12) hereto.
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

**Page 3**

```
( 1)                   APPEARANCES
( 2)
( 3)
    FOR THE PLAINTIFF:
( 4)
        MR. J. ARNOLD AGUILAR
( 5)    LAW OFFICE OF J. ARNOLD AGUILAR
        Artemis Square, Suite H-2
( 6)    1200 Central Boulevard
        Brownsville, Texas 78520
( 7)    956-504-1100/956-504-1408 (fax)
( 8)
    FOR THE DEFENDANT, BROWNSVILLE INDEPENDENT
( 9)   SCHOOL DISTRICT
        MS. ELIZABETH G. NEALLY
(10)    ROERIG, OLIVEIRA & FISHER, L.L.P.
        855 West Price Road, Suite 9
(11)    Brownsville, Texas 78520
        956-542-5666/956-542-0016 (fax)
(12)
(13)
    FOR THE DEFENDANT, NOE SAUCEDA.
(14)
        MS. MELANIE MOORE
(15)    WILLETTE & GUERRA, L.L.P.
        International Plaza, Suite 460
(16)    3505 Boca Chica Boulevard
        Brownsville, Texas 78521
(17)    956-541-1846/956-541-1893 (fax)
(18)
    FOR AFLAC AND THE WITNESS:
(19)
        MR. WILLIAM B. STEELE, III
(20)    LOCKE, LIDDELL & SAPP, L.L.P.
        100 Congress Avenue, Suite 300
(21)    Austin, Texas  78701
        512-305-4734/512-305-4800 (fax)
(22)
```

**Page 4**

```
( 1)
( 2)
( 3)   REMOVE THIS PAGE AND INSERT STIPULATIONS SHEET HERE
( 4)
( 5)
( 6)
( 7)
( 8)
( 9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

**Page 5**

```
( 1)                      INDEX
( 2)                                             PAGE
( 3)
( 4) Appearances.............................     3
( 5) Stipulations............................     4
( 6)
( 7) FRANK D. LaFEMINA (VOLUME 1)
( 8)    Examination by Mr. Aguilar...........     6
( 9)
(10) Changes and Corrections.................    XXX
(11) Signature...............................    XXX
(12) Reporter's Certificate..................    XXX
(13)
(14)                    EXHIBITS
(15)
(16) NO. DESCRIPTION           PAGE / LINE REFERENCED
(17)
     1...............................    56 / 11
(18)     1998 proposal for BISD Optional
            Section 125 - Cafeteria Plan
(19)
     2...............................    76 / 12
(20)     E-mail from Mr. LaFemina
(21)
(22)
(23)
(24)
(25)
```

**Page 6**

```
(1)   FRANK D. LaFEMINA,
(2)   having been first duly sworn, testified as follows:
(3)
(4)   EXAMINATION
(5)   QUESTIONS BY MR. AGUILAR:
(6)      Q.   Would you tell us your full name?
(7)      A.   Frank D. LaFemina.
(8)      Q.   Mr. LaFemina, have you ever had your
(9)   deposition taken before?
(10)     A.   No, sir.
(11)     Q.   Okay. I'm going to be asking you a number of
(12)  questions today relative to a lawsuit that was filed.
(13)  At any time if you don't understand the question I'm
(14)  asking, if you need me to rephrase it, just ask it a
(15)  different way, or you can just ask me to ask it again
(16)  to make sure you do understand it, please ask me to do
(17)  so so that we can be clear on that. Try not to
(18)  interrupt me until I finish asking the question and
(19)  I'll try not to interrupt you until you finish
(20)  answering it. I'm going to ask you to listen to the
(21)  question to the extent possible. If you can answer
(22)  the question with yes or no, I ask that you do that.
(23)  If you feel you need to explain it, I ask you to
(24)  answer yes or no first and then say, can I explain it,
(25)  or if I can be allowed to explain. Okay?
```

Page 43

(1)  Q.   AFLAC and you simply do not expect that
(2)  agents will or will not improve the following year?
(3)  A.   I would love to see them improve each year,
(4)  but there isn't a requirement either from myself or
(5)  the company.
(6)  Q.   And I don't know if I'm just using the wrong
(7)  terminology. Not necessarily a requirement – and I
(8)  don't mean it in terms of either you meet it or you
(9)  get fired or you get – your contract with AFLAC is
(10) going to be broken. I don't mean it in those terms.
(11) I mean it in terms of, these are our goals.
(12) A.   I think everyone has personal goals.
(13) Q.   Okay. What are the personal goals you have
(14) for growth rate for associates?
(15) A.   I don't.
(16) Q.   You don't have any goals?
(17) A.   I have goals for myself and I have goals for
(18) the organization, but I don't have goals for the
(19) associates. They make their own goals.
(20) Q.   Okay. You don't have any – you don't set or
(21) tell your – let me rephrase. You don't set any goals
(22) in sales in growth rate increases for any of the
(23) associates?
(24) A.   I do not.
(25) Q.   In your team?

Page 44

(1)  A.   I do not.
(2)  Q.   And you never tell your associates or your
(3)  DSC's or your RSC's that, this is the goal that you
(4)  should shoot for in growth rate?
(5)  A.   The question should be clarified to be
(6)  separated from associates, DSC's and RSC's. For
(7)  associates, the answer is no, I don't set their goals
(8)  or give them any expectations.
(9)  Q.   And for DSC's?
(10) A.   I do.
(11) Q.   And what's your DSC's expectations?
(12) A.   In terms of their personal growth or their
(13) production?
(14) Q.   Both.
(15) A.   I would like to see them have at least a 20
(16) to 30 percent increase in their team sales every year.
(17) Q.   Is that personal growth or sales?
(18) A.   Sales.
(19) Q.   What about personal growth?
(20) A.   I encourage them to grow their team.
(21) Q.   You don't say, I need you – I encourage you
(22) to hire – or bring in five new associates or 10 new
(23) associates or 10 percent more associates or anything
(24) like that, right?
(25) A.   Not at the district coordinator level, no.

Page 45

(1)  Q.   Okay. Your sales growth expectations for
(2)  DSC's over the – since you've been an RSC, has that
(3)  been your expectation?
(4)  A.   I believe my answer was that I expect a 20 to
(5)  30 percent growth rate each year.
(6)  Q.   Right. But what I'm asking is, have you had
(7)  that same number expectation since you were an RSC?
(8)  A.   I think I answered the question as an RSC.
(9)  When I was an RSC, my expectation was only of the DSC.
(10) Q.   Okay.
(11) A.   None of the associate.
(12) Q.   Okay. When you were an RSC, did your DSC's
(13) meet that? Did the majority of them meet that?
(14) A.   For the most part, yes.
(15) Q.   In other words, that was a realistic goal –
(16) you saw that as a realistic goal?
(17) A.   I did.
(18) Q.   And that goal was achieved frequently?
(19) A.   Sometimes; not all the times.
(20) Q.   More often than not?
(21) A.   That's probably an accurate statement.
(22) Q.   Okay. Now, as an SSC, what growth
(23) requirements did you have for the RSC's?
(24) A.   That they grow their operation at the same
(25) rate.

Page 46

(1)  Q.   20 to 30 percent?
(2)  A.   That's correct.
(3)  Q.   Same expectations for them. Were those
(4)  expectations met?
(5)  A.   They have been met, yes.
(6)  Q.   Okay. And I understand not everyone meets
(7)  them, correct?
(8)  A.   Correct.
(9)  Q.   But the great majority of them do?
(10) A.   Great majority may be a little inaccurate.
(11) More do than don't.
(12) Q.   Okay, good enough. Now, for the DSC's and
(13) the RSC's, is that also what AFLAC expects from them?
(14) A.   AFLAC assigns them an annual quota.
(15) Q.   Okay. And how does that work?
(16) A.   You would have to talk with AFLAC.
(17) Q.   You've had to deal with the annual quota
(18) before, right?
(19) A.   It's given to me and then I assign it.
(20) Q.   No, I'm not asking for the number, per se.
(21) I'm asking for the process; in other words, what do
(22) you mean by annual quota?
(23) A.   A sales number for a particular – a sales
(24) number for a particular team.
(25) Q.   Okay. What is an annual quota?

Page 47

(1)  A.   A sales agenda for a team of salespeople.
(2)  Q.   Okay. And how is that measured; in percent,
(3)  in dollars?
(4)  A.   In annualized premiums.
(5)  Q.   Okay. So AFLAC has a quota for each team?
(6)  A.   Each management team, that's correct.
(7)  Q.   And is that a DSC, RSC or SSC management
(8)  team?
(9)  A.   All three.
(10) Q.   Okay. So for each of those, AFLAC has got
(11) its own annual quota for how much they have got to
(12) make in sales that year?
(13) A.   That's correct.
(14) Q.   And what happens if they don't make those
(15) sales?
(16) A.   You take a look at it and reevaluate it.
(17) Q.   Okay. Anything can happen? They can – they
(18) can stay on and be given a chance to try to make it up
(19) next year, they can be let go, whatever. There's a
(20) number of options that they can take, right?
(21) A.   I think each situation is probably handled
(22) individually.
(23) Q.   Okay. So for the – do you know what the
(24) annual quota was for DSC's?
(25) A.   That would depend upon the DSC, the

Page 48

(1)  demographics, what they did the prior year, how many
(2)  people are on their team.
(3)  Q.   Okay.
(4)  A.   Numerous, numerous things.
(5)  Q.   Okay. Same thing, I presume, for the RSC's?
(6)  A.   Correct.
(7)  Q.   Were AFLAC's quotas similar to your sales
(8)  growth rate expectations?
(9)  A.   I'm not sure I understand the question.
(10) Q.   You told us earlier, for example, that you
(11) expected DSC's to have sales growth of 20 to
(12) 30 percent. I presume it wasn't somewhere between –
(13) let me rephrase that. I assume what you meant by that
(14) was, I don't expect below 20 to 30 percent. You
(15) probably said each year. Today – this year I expect
(16) 24 percent, next year I expect 27 percent, another
(17) year you might expect 21 percent, depending on a
(18) number of different factors; is that correct?
(19) A.   No.
(20) Q.   Or is it literally between that range is what
(21) you expected, or you expected that range?
(22) A.   I believe it's possible to grow the
(23) organization 20 to 30 percent per year if some of the
(24) right things are done.
(25) Q.   Okay. So you weren't – when you said that,

Page 49

(1) you weren't telling us that it was a number between
(2) the 20 and 30 each year, it was the range of 20 to 30
(3) each year?
(4)    A.    (Moves head up and down.)
(5)    Q.    Okay.
(6)    A.    Correct.
(7)    Q.    AFLAC's quotas, were they within that range
(8) ~ within those ranges for the people under your
(9) supervision as SSC?
(10)    A.    I would have to compare each one of their
(11) previous years numbers with their quota the next year
(12) to determine that. And I don't have that information
(13) available to me.
(14)    Q.    Do you remember any of those quota numbers?
(15)    A.    I do not.
(16)    Q.    Do you remember reviewing them and seeing
(17) that they were within your expectations?
(18)    A.    It doesn't matter if they're within my
(19) expectations.
(20)    Q.    Well, I understand it's not something you can
(21) control. I'm not asking that. What I'm asking is
(22) just whether their numbers were similar to your
(23) numbers.
(24)    A.    Again, I would have to sit down there and
(25) look at them each year. I only do it once a year.

Page 50

(1)    Q.    Okay. And then you didn't review it again
(2) after that?
(3)    A.    Oh, I look at them from time to time, but
(4) it's impossible to remember them all without referring
(5) to a document.
(6)    Q.    Okay. The quotas were what was expected by
(7) AFLAC, right?
(8)    A.    Yes.
(9)    Q.    Thank you. Before November of 2001, did you
(10) ever tell Dino his performance was poor for any
(11) reason?
(12)    A.    Before November of 2001?
(13)    Q.    Yes.
(14)    A.    I don't know.
(15)    Q.    Can you recall any time that you did?
(16)    A.    I don't know. The answer is I don't know.
(17)    Q.    You can't tell us one time when you do recall
(18) doing that, right?
(19)    A.    I can't tell you whether I did or I didn't is
(20) the accurate answer.
(21)    Q.    Do you think if you had talked to him about
(22) poor performance during that time period, any time
(23) before November of 2001, do you think you would
(24) remember it?
(25)    A.    Not specifically.

Page 51

(1)    Q.    Okay. Do you have any criticism of his
(2) knowledge of AFLAC policies, insurance laws or rules
(3) of the insurance industry?
(4)    A.    I can only answer in terms of ~ ask the
(5) question once more. There were three categories.
(6)    Q.    Sure. Whether you have any criticism of his
(7) knowledge of either AFLAC policies, insurance laws or
(8) insurance rules.
(9)    A.    As far as AFLAC policies, I have no
(10) criticism. The other two, I have no opinion.
(11)    Q.    Okay. Can you tell me what acceptable
(12) reasons are for terminating a coordinator?
(13)    A.    No.
(14)    Q.    Why not?
(15)    A.    I don't terminate coordinators.
(16)    Q.    Okay. Can you tell me any reason that you
(17) understand would be acceptable for terminating a
(18) coordinator? I know you don't do it, but I'm asking
(19) if you know any of the reasons that are acceptable.
(20)    A.    I would imagine if they stole from a client,
(21) they would probably be terminated.
(22)    Q.    Okay. What else?
(23)    A.    I don't really know. Misrepresentation.
(24)    Q.    Anything else you can think of?
(25)    A.    No.

Page 52

(1)    Q.    Okay. Who would know ~ who would know that
(2) information?
(3)    A.    I imagine the corporate office would know
(4) that information.
(5)    Q.    Okay. If somebody within your team was going
(6) to be terminated, would they expect you to make a
(7) recommendation? Would AFLAC expect you to make a
(8) recommendation?
(9)    A.    They might ask for my opinion.
(10)    Q.    Okay. If there was a reason for their
(11) termination, let's say, for example, as an SSC, and
(12) you needed to terminate or a DSC needed to be
(13) terminated, would AFLAC expect you to give a
(14) justification?
(15)    A.    I don't know the answer to that. The answer
(16) I do know is that there's a contract in place that
(17) says that either party could terminate the arrangement
(18) with a 30-day written notice. It's in the standard
(19) agent, regional, district. It's in all those
(20) contracts.
(21)    Q.    Okay. Would they – have you ever given any
(22) recommendation on the termination of any AFLAC agent?
(23)    A.    I have.
(24)    Q.    Who? Actually, don't answer that. I
(25) probably told you –

Page 53

(1)    A.    I wasn't going to answer it anyway because I
(2) would have to pull the record.
(3)    Q.    Oh, I was going to say I wouldn't know the
(4) names of any particular agents unless one of them was
(5) Dino. But have you given – you said you have given
(6) recommendations for termination of agents. Have they
(7) been DSC's, RSC's, agents? Without giving me any
(8) names.
(9)    A.    I imagine I've recommended the termination of
(10) an associate, a district.
(11)    Q.    You can recall one associate –
(12)    A.    No. I can't recall any particular associate.
(13)    Q.    No, I'm not asking for the name. I'm just
(14) saying you recall an associate?
(15)    A.    Uh-huh. And a district.
(16)    Q.    And a what?
(17)    A.    And a district.
(18)    Q.    Oh, a district. A DSC?
(19)    A.    Uh-huh.
(20)    Q.    That's it?
(21)    A.    Uh-huh.
(22)    Q.    Just one of each?
(23)    A.    I don't know that.
(24)    Q.    And you just said there might have been more,
(25) but that's just your best recollection, that you

Page 54

(1) think there might have been one associate and one
(2) district?
(3)    A.    No. I didn't give you a number. I said that
(4) in my career I have recommended the termination of an
(5) associate and a district, and it may have been one or
(6) it may have been more than one. I don't know the
(7) answer to that.
(8)    Q.    That's all you can remember right now?
(9)    A.    (Moves head up and down.)
(10)    Q.    Any RSC's that you've ever recommended?
(11)    A.    No.
(12)    Q.    So I presume you didn't recommend Dino's
(13) termination?
(14)    A.    I had nothing to do with Dino's termination.
(15)    Q.    Do you know why Dino was terminated?
(16)    A.    No.
(17)    Q.    Did anybody ever talk to you about Dino's
(18) termination, anybody within AFLAC?
(19)    A.    Uh-huh.
(20)    Q.    Who?
(21)    A.    I can't recall.
(22)    Q.    You remember talking –
(23)    A.    Numerous people.
(24)    Q.    Okay. Your supervisors?
(25)    A.    People in our home office, yes.

1                    **REPORTER'S CERTIFICATE**

2

3

4  THE STATE OF TEXAS        *

5  COUNTY OF TRAVIS          *

6

7          I, GERRI C. BARKER, Certified Shorthand
   Reporter in and for the State of Texas, do hereby
   certify that, pursuant to the agreement of counsel,

8  came on before me on the 22nd day of May, 2003, the
   following named person, FRANK D. LaFEMINA, who was

9  duly sworn to testify to the truth and nothing but the
   truth touching and concerning the matters in

10 controversy in this cause; that he was thereupon
   carefully examined upon his oath and his examination

11 reduced to typewriting under my supervision; and this
   deposition is a true record of the testimony given by

12 said witness.
           I further certify that I am neither

13 attorney, nor counsel for, nor related to, nor
   employed by any of the parties to the action in which

14 this deposition is taken; and, further, that I am not
   a relative nor employee of any attorney or counsel

15 employed by the parties hereto or financially
   interested in the action.

16          Certified to by me this the ____9th____ day
   of _____June_____, 2003.

17

18

19          _Gerri C. Barker_____

20 GERRI C. BARKER, TEXAS CSR 2219
   Expiration Date: 12/31/03
   Firm Registration No. 241

21 114 West 7th Street, Suite 750
   Austin, Texas  78701

22 512-499-0277

23

24

25

# EXHIBIT B

# DONALD R. HOUSE

**POSITION:**

President
RRC, Inc.
3833 Texas Avenue, Suite 285
Bryan, Texas 77802
(979) 846-4713
FAX (979) 260-9636
e-mail: dhouse@rrc-inc.com

**EDUCATION:**

Ph.D., (Economics) Texas A&M University, 1973
B.A., (Economics) Texas A&M University, 1969

**EXPERIENCE:**

President, RRC, Inc. 1989-present
Executive Vice President, RRC, Inc. 1979-1989
Senior Economist, Bureau of Economic Research and Statistics, American Dental Association,
    Chicago, Ill., September, 1976-August 1979
Visiting Assistant Professor of Economics, Texas A&M University, College Station, Texas
    (appointment: September 1977 through May 1978)
Assistant Professor of Economics, Auburn University, Auburn, Alabama, September 1973-
    August 1976

**CONSULTING AND OTHER PROFESSIONAL ACTIVITIES:**

US West Communications, 1993-1996
Texas Mine and Reclamation Association, 1994-1995
Transcontinental Pipe Line Company, 1987-1991
American Dental Association, 1979-present
Ohio Hospital Association, 1986-1993
*ADA News*, 1988-present
Pawnee Industries, 1990-1991
American Association of Dental Schools, 1987-1991
American Medical Association, 1985-89
*Journal of the American Dental Association*, 1977-89
Texas A&M University Medical School, Senior Lecturer, 1986
Texas Medical Association, Economic Consultant, 1986-87
U.S. Postal Service, 1972-74, 1985

University of Texas School of Dentistry, Visiting Lecturer, 1979-83
National Science Foundation, 1982
American Association of Oral and Maxillofacial Surgeons, Manpower Consultant, 1980-81
National Center for Health Services Research, U.S. Department of Health and Human Services,
    1980-81
Office of Human Development Services, Region III, Department of H.E.W., 1979-81
Health Resources Administration, Department of H.E.W., 1976-79
Mathematica Policy Research, Inc., 1979-80
School of Dentistry, University of Colorado, 1977-78
Surgeon General for Dental Services, U.S. Air Force, 1977-78
School of Dentistry, University of California at Los Angeles, 1978
Alabama Energy Management Board, 1974


# LEGAL CONSULTING AND LEGISLATIVE TESTIMONY:

*Boddicker v. Arizona State Dental Association*, 1977.

*Phillippe v. Browning Arms Company and Fabrique Nationale*, 1978.

Federal Trade Commission, San Francisco Office, ADA's response to *Intent to Regulate the
    Dentistry*, 1978

*Applied Digital Technology, Inc. v. Lockheed Electronics Company, Inc.*, 1982.

*Baxter v. Browning Arms Company and Fabrique Nationale*, U.S. District Court, Little Rock,
    Arkansas, 1982.

*Harper v. The Liggett Group, Inc., et al.*, 19th Judicial District Court, State of Louisiana, 1982.

*Gage v. Flanigan, et al.,* Case No. 77-19171CG, Circuit Court of the 17th Judicial Circuit, in and
    for Broward County, Florida, Civil Division, 1982-1983.

*Nolte, et al., v. Khett, et al.,* 147th Judicial Court of Travis County, Texas, 1983.

*Potter v. Deloitte, Haskins & Sells, et al.,* No. 82-CI-0310, Fayette Circuit Court, Civil Branch,
    Sixth Division, Kentucky, 1983-1984.

*Secretary of Labor v. Delco Products,* Division of General Motors Corporation, OSHRC Docket
    No. 78-5476, 1983.

*Simuflight Training International, Inc. and the Singer Company v. Flightsafety, Inc.,* Civil
    Action 3-82-0633-D, U.S. District Court, 1983-84.

*Pennsylvania Dental Association v. Pennsylvania Blue Shield,* Civil Action 81-1187, U.S. District
    Court, 1983-1984.

*Band Instruments, Etc. v. Brook Mays Music Company, et al.,* Civil Action 83-0334-D, U.S.
    District Court, Houston, Texas, 1984-85.

*Preston Oil Company v. Transcontinental Gas Pipe Corporation*, 19th Judicial District Court, Parish of East Baton Rouge, Louisiana, 1986.

*MDL-417 in re Marine Construction Antitrust Litigation*, Brown & Root Corporation, 1981-86.

*MDL-296, Cement and Antitrust Litigation*, Attorney General's Office, State of California, 1983-1991.

*David Morse v. Amherst Wilder Foundation, et al.*, for Grose, Von Holtum, Sieben & Schmidt, Ltd., Minneapolis, Minn., 1985-86.

*Cotton Brothers Baking Co., Inc. v. Industrial Risk Insurers*, Civil Action 83-0150-A, U.S. District Court, New Orleans, Louisiana, 1982-1989.

*MDL-150, Petroleum Products Antitrust Litigation*, Attorney General's Office, State of California, 1978-1992.

*Texaco, Inc. v. Franchise Tax Board*, Case No. 49923YSD and *Mobil Oil Corporation v. Franchise Tax Board*, Case No. 723-8635F, for Franchise Tax Board, State of California, April 1985-1987.

*Nelson v. Trinity, et al.*, for McGee, Hankla, Backes & Wheeler, Ltd., Minot, N.D., February 1986-July 1986.

*Louis Alford, et al., v. Transcontinental Gas*, Civil Action No. H86-0124CR U.S. District Court for the Southern District of Mississippi, January 1987-April 1988.

*International Travel Arrangers v. Northwest Airlines, et al*, U.S. District Court, Minnesota, Third Division, May 1987-April 1991.

*ETSI Pipeline Project v. Burlington Northern, Inc., et al*, Civil Action No. B-84-979CA, U.S. District Court for Eastern District of Texas, Beaumont Division, November 1986-1989.

*State of Texas*, House/Senate Joint Committee on Liability Insurance and Tort Law and Procedure, October 25, 1986.

*State of Texas*, Senate Finance Committee, March 6, 1987.

*State of Texas*, Select Committee on Tax Equity, October 15, 1987.

*Phototron Corporation v. Eastman Kodak Company, Fuqua Industries, Inc., and Colorcraft Corporation*, U.S. District Court, Northern District of Texas, Fort Worth Division, Case No. CA48791OF, December 1987-1991.

*Montford R. Fischer, et al. v. NWA, Inc., et al.*, Civil Action No. 3-87-106, U.S. District Court, District of Minnesota, Third Division, December 1987-1990.

*Enstar, et al. v. Transcontinental Gas Pipe Line*, Case Number 318, 300, District Court, Parish of East Baton Rouge, Louisiana, February, 1988-May, 1988.

*Moore v. McKewon & Wetrich*, Civil Action No. 2601-0586, District Court, Wapello County Iowa, May, 1987-May 1988.

*Bonnie Jacobs and Kevin Grosz, v. Anderson Building Company, Herman Eggers, and Inclinator Company of America, and Herman Eggers v. Dakota Academy for the Arts*, Civil No. 38643, District Court, South Central Judicial District, State of North Dakota, County of Burleigh, February 1988-March 1989.

*Yamaha International Corporation and Yamaha Electronics Corporation, USA vs. ABC International Traders, Inc.*, Civil Action No. 86-7892 RSLW (TX), United States District Court, Central District of California, July 1988-April 1993.

*Healthco International, Inc., Plaintiff, v. A-Dec, Inc. and Patterson Dental Company, Defendants*, Civil Action No. 87-0235-S, United States District Court, District of Massachusetts, December 1988-July 1989.

*Tube Alloy Corporation v. Homco International, Inc.*, United States District Court for the Eastern District of Louisiana, Civil Action No. 85-5829, Section "K," Magistrate, July 1989-October 1989.

*N.J. Oliver, R.B. Parker and TSO of Meyerland v. S.J. Rogers and N.J. Rogers Individually and D/B/A Texas State Optical; Texas State Optical, Inc. Pearle Health Services, Inc., Pearle Vision Center, and Pearle Vision Center, Inc.*, Cause No. 86-35290, in District Court in Harris County, Texas, 270th Judicial District, December 1988-April 1990.

*Caudle v. Henderson*, State District Court, Augusta, Georgia, 1989.

*Topaz Electronics v. United States Fire Insurance Company*, Civil Action No. A-88-95, United States District Court, Laredo Division, October 1989-May 1993.

*Bieniarz v. Pasadena Hospital Association, et al.*, Superior Court of the State of California for the County of Los Angeles, Case No. C639346, February 1990-July 1991.

*Gulf States Utilities v. Southern Company Services, Inc., et al.*, Docket Nos. EL86-53-001 and EL86-57-001, United States of America, Federal Energy Regulatory Commission, November 1989-June 1990.

*Claude Cimino, et al. v. Raymark Industries, Inc., et al.*, Civil Action No. B-86-0456-CA, U.S. District Court, Eastern District of Texas, Beaumont Division, January 1990-October 1990.

*The Dow Chemical Company and Dow Pipeline Company v. Miller Pipeline Service Corporation*, Civil Action No. H-88-905, U.S. District Court, Southern District of Texas, Houston Division, December 1989-February 1992.

*Pawnee Industries, Inc., and Impact Extrusion Corp. v. Spartech Corporation, Alchem Plastics Corporation, Alchem Plastics, Inc., Rockwood Computer Corp., Lawrence M. Powers, Bradley, B. Buechler, Carroll E. Taylor, Johnnie Sepulvado, and William Phillips,*

Donald R. House                                                                                 Page 4

Defendants, Docket No. 48-119672-89, District Court Tarrant County, Texas, 48th Judicial District, January 1990-December 1991.

*Malone Service Company, et al. v. Gulf Coast Waste Disposal Authority, et al.*, Civil Action No. H-87-2403, U.S. District Court, Southern District of Texas, Houston Division, October 1990-1992.

*State Board of Insurance, Texas, Public Rate Hearing on Workers' Compensation Insurance*, November 19, 1990.

*California Chiropractic Association, A California Corporation, Plaintiff, v. CNA Insurance Companies, MGIC Indemnity Corporation, American Casualty Company, and DOES 1-50, inclusive, Defendants, and Related Cross-Action,* Case No. C 579 326, Superior Court of the State of California for the County of Los Angeles, July 1990-October 1990.

*Brochsteins, Inc. v. Whittaker Corporation,* Civil Action No. H-88-2634, U. S. District Court, Southern District of Texas, Houston Division, September 1990-1992.

*Wells American Corporation, a Maryland Corporation v. Ziff-Davis Publishing Co.,* Civil Action No. 3:89-2181-16, U.S. District Court for the District of South Carolina, Columbia Division, October 1990-December 1990.

*Transcontinental Gas Pipeline Corporation v. 118 Acres of Land, More or Less, in St. James Parish, Louisiana, Riley F. Boudreaux, et al., and all unknown Landowners,* Civil Action No. 89-0251, Section D, Magistrate & U.S. District Court, Eastern District of Louisiana, July 1990-September 1990.

*Capitol Federal Savings Bank, et al v. McCuen, et al,* Cause No. CL1128-0187, U.S. District Court, Southern District of Iowa, November 1990-November 1991.

*Videocipher v. Satellite Earth Stations East,* Civil Action No. CV88-2815, U.S. District Court, Western District of Louisiana, 1990-1991.

*FDIC v. American Casualty Company,* Civil Action No. C90-265-G, District of Wyoming, 1991.

*Greater Rockford Energy, et al v. Shell Oil, et al,* Civil Action No. 90-3119, Central District of Illinois, September 1990-March 1992.

*T. R. Coleman, et al v. Cannon Oil, et al,* Civil Action No. 90-T-414-S, Middle District of Alabama, May 1990-May 1992.

*Sanex Corporation v. A&M Pet Products, Inc., Dennis A. Markel, and Anan A. Anabtawi,* No. 88-37870 in the District Court of Harris County, Texas, 295 Judicial District, January 1991-May 1991.

*CPI Plastics of Texas, Inc., Saratoga Holdings, Inc., and William M. White, Jr. v. Shintech, Incorporated, Viking Investments, Inc., Pipe Acquisition Corp., and W. David Tidholm, Trustee,* Cause No. 90-059690, in the 295th Judicial District of Harris County, Texas, June 1991-April 1993.

Donald R. House                                                                                          Page 5

*TRW, Inc. v. Bird Machine Company, Inc, et al*, Civil Action No. 89-1870, U. S. District Count, Southern District of Texas, August 1991-April 1992.

*White & Sons Pipeline Construction, Inc. v. Natural Gas Pipeline Company of America*, C.A. No. H-90-3580, in the United States District Court, Southern District of Texas, Houston Division, October 1991-1992.

*Continental Casualty Co. v. Banner & Associates, Inc.*, No. 91 CV 0290-B, in the United States District Court for the District of Wyoming, July 1992-August 1992.

*Hayday, Inc., d/b/a CTWP, a Texas corporation, Copy Duplicating Products, Inc., a Texas corporation and Metroplex Information Systems, Inc., d/b/a MIS, a Texas corporation, v. North American Philips Corporation and N. V. Philips Gloeilampenfabrieken*, Civil Action No. 2-92CV030, in the United States District Court for the Eastern District of Texas, Marshall Division, July 1992-July 1993.

*John Swanson, George Swanson, and George E. Swanson Enterprises (PTY) Ltd., v. Schlumberger Technology Corporation d/b/a Sedco Forex, Schlumberger Limited, Inc., Sedco, Inc., British Petroleum Co., BP Minerals International, Ltd., African Selection Trust Exploration (PTY) Ltd., and DeBeers Consolidated Mines, Ltd.*, Case No. 92-10825, in the District Court of Harris County, Texas, 281st Judicial District, January 1993-June 1993.

*American Casualty v. First Franklin Financial, Inc., et al.*, Case No. A92-CA925, in the United States District Court for the Western District of Texas, Austin Division, April 1993-July 1993.

*W. Silver Investment & Holding, Inc. d/b/a W. Silber Recycling, v. Chemetco, Inc., Concorde Trading Company, Border Trading Company, Inc., d/b/a El Paso Border Trading Company, and Triangle Metallurgical, Inc., d/b/a Tri-Paso*, Case No. 91-14152, in the District Court of El Paso County, Texas, 34th District Court, September 1992-present.

*Pennington Investment Corporation, d/b/a University Book Store and Spirit Shop v. Baylor University and Follett College Stores Corp.*, Case No. 92-4023-3, 74th Judicial District, McLennan County, Texas, 1993-1995.

*Rufus Winsor v. Homeowners Federal Savings & Loan Association, Albert H. Holgerson, Jr., Mark N. Temkin, Bernard D. Grossman, Marshall J. Derby, Dan H. Fenn, Jr., Paul Kazarosian, Richard B. Slifka, Jay L. Fialkow, Morris I. Goldberg, Myron J. Goodstein, Peter Brown, Martin H. Heck, Mitchell S. Ross and Bear, Sterns & Co., Inc.* Civil Action No. 89-2507-MC, United States District Court for the District of Massachusetts, 1993-1995.

*Michael Gas Marketing Company v. Florida Gas Transmission Company, Enron Gas Marketing Company, Enron Corporation, Northern Gas Transmission Company, and Matagorda Offshore Pipeline System, a Joint Venture*, C. A. No. G-93-148, in the United States District Court for the Southern District of Texas, Galveston Division, November 1993-1995.

*L.A. Pipe Line Construction Co., Inc. v. Conoco Inc. v. United States Fidelity & Guaranty Company of Maryland;* C.A. No. 3:92-0612; (U.S.D.C. W. Va.), 1993.

> *Gary Hendricks and Linda Hendricks, husband and wife, v. Scientia Corporation, a Texas Corporation, Petrolon, Inc., a Texas Corporation, Richard Liming and Jane Doe Liming, and their marital Community,* Civil Action No. C01-604Z, in the United States District Court for the Western District of Washington, Seattle Division. Also *JoAnn and Elzie Priest and d/b/a J. & E. Slick 50 v. Petrolon, Inc., et al.,* February 1994-1996.

*Master Plumbing Contractors, et al. v. Ferguson Enterprises, Inc., Morrison Supply Company, R. C. Smith Plumbing Co., Inc., and Moore Supply Company,* also *Circle Plumbing Company, Sally Ann Wilkerson, Elkins Plumbing, Inc., and Kenneth Mikels v. Ferguson Enterprises, Inc., Morrison Supply Company, R. C. Smith Plumbing Co., Inc. and Moore Supply Company,* Case No. 92-036478 in the District Court of Harris County, Texas, 157th Judicial District, 1994-1995.

Analysis of Lignite Industry's Impact on the Texas Economy for Texas Mining and Reclamation Association, 1994-1995.

*Houston Northwest Orthopaedic Sport Medicine Center vs. William David McChesney, M.D. vs. Husam Bahrani, Husam Bahrani, M.D., P.A., Louis Harman, III, M.D., Louis Harman, III, M.D., P.A. and Houston Northwest Orthopaedic Sport Medicine Center;* Cause No. 93-061150, in the 280th District Court of Harris County, Texas, 1994-1995.

*John J. Mathewson and Patricia Lou Mathewson, his wife vs. Lloyd Eldo Register IV and Auto Owners Insurance Company,* Case No. 94 02650, Sec. 0, in the Circuit Court of the Thirteenth Judicial Circuit of Florida, in and for Hillsborough County, February 1995-1996.

*Dwight E. Walters, Jr., d/b/a Computer Maintenance Service and C.M.E.S. Corp., as successor to Dwight E. Walters, Jr., d/b/a Computer Maintenance Service,* Plaintiffs, v. *International Business Machines Corporation a/k/a IBM and William H. Childers and Robert Bernsen,* Defendants, Case No. 89-5303-G in the District Court of Nueces County, Texas, 319th Judicial District, 1994.

*TCA Building Company vs. Northwestern Resources Company, et al.,* Cause No. 93-265, in the United States District Court for the Southern District of Texas, Galveston Division, 1994.

*Lazy Oil, Inc., John B. Andreassi and Thomas A. Miller Oil Co. on behalf of themselves and all others similarly situated,* Plaintiffs, v. *Witco Corporation; Quaker State Corporation; Quaker State Oil Refining Corp.; Pennzoil Company; and Pennzoil Products Company,* Defendants, Civil Action No. ERIE 94-110E, in the United States District Court for the Western District of Pennsylvania, 1994 - 1998.

*Memorial Hospital Foundation - Palestine, Inc., et al. v. Robert Charron, et al.;* No. 6:94CV902, In the United States District Court for the Eastern District of Texas, Tyler Division, June 1995-September 1996.

*Tri-Tronics, Inc. v. D. T. Systems, Inc.,* a Texas Corporation; *Glendale Pet Shop, and Pro Pet-Vet Supplies,* Civil No. CIV 94-0445 PHX PGR, United States District Court, District of Arizona, 1995.

*Resolution Trust Corporation vs. Kenneth R. Fiala, et al.,* Case No. 4:93CV2613 ELF, in the United States District Court for the Eastern District of Missouri, Eastern Division, 1995.

*Donald R. Rector, et al. v. Carrington, Coleman, Sloman & Blumenthal, et al.,* Cause No. 462,714-B, in the United States District Court, Travis County, Texas, 261st Judicial District., October 1992-December 1993.

*Laurence E. Wolf, M.D., et al. v. Dow Corning Corporation, et al.,*Case No. 92-60186, in the District Court of Harris County, Texas, 113th Judicial District, December 1995-1998.

*Fortune Production Company, et al., v. Conoco Inc.,* Cause No. 94-022041, 113th Texas District Court, Houston, Texas. 1996.

*Larry Sloan v. American Plant Food Corporation,* Case No. 93-0194, in the District Court of Harrison County, Texas, 71st Judicial District, 1996.

*The McMahon Foundation and Jay Tom Poyner, et al. v. Amerada HessCorporation, et al.,*Civil Action No. H-96-1155, U.S. District Court, Houston, Texas, 1996 - 1999.

*Core-Vent and Niznick v. Dentsply International, Inc.,* Arbitration: No. 14 199 00226 94 C/J, Harrisburg, Pennsylvania,1996 - 1999.

*Carl Engwall, et al,. v. Amerada Hess Corporation, et al.,* Case No. CV-95-322, Fifth Judicial District Court, County of Chaves, State of New Mexico, 1996-1999.

*Bill L. Lowe, et al., vs. Chevron U.S.A., Inc., et* al., Case No. 977154, County of San Francisco, Superior Court of the State of California, 1997.

*Herbert A. Slater and Duplex Electrical Supply Corp., vs. Charles W. Schwing,* Case No. 17-168-0033-96, American Arbitration Association, Garden City, New York, 1997.

*Few Ready Mix Concrete Co. v. Transit Mix Concrete & Material Co., et al.,* Case No. 9:96-CV-86, U.S. District Court for the Eastern District of Texas, Lufkin Division, 1996-1998.

*Michael Johnson, et al, v. Cook Ft. Worth Children's Medical Center, et. al, ,* In the District Court of Tarrant County, Texas 348th Judicial District, Cause No. 348-160611-95, 1997.

*Spectators' Communication Network, Inc. v. NEC America, K-Mart Corporation, PGA Tour, Inc., American Golf Sponsors, G.R. Stevenson and Anheuser-Busch Incorporated,* United States Federal Court, Northern District of Texas, Civil Action No. 3-95CV2390-P, 1997-present.

*Freddie B. Hood and Wanda Hood vs. Teddy Glenn Ottinger, Allied Bruce Terminix Company,et al.,* 29th Judicial District Court, Parish of Red River, State of Louisiana, No. 30,710, 1997.

*David Kraenzle, et al. v. Young Dental Manufacturing Company, Inc.,* In The Circuit Court Of The City Of St. Louis, State Of Missouri, Cause No. 972-07809, 1998.

*United States Government and CO₂ Claims Coalition, LLC a Colorado limited liability company, vs. Shell Oil Company, Shell Western E & P, Inc., Mobil Producing Texas and New Mexico, Inc., and Cortez Pipeline Company,* United States District Court, District of Colorado Case No. 96-Z-2451, 1998-present.

*The Procter & Gamble Company v. Amway Corporation, et al.* United States District Court For The Southern District Of Texas, Houston Division, Civil Action No. H-97-2384, 1998-present.

*Blanchard and Company, Inc. v. Heritage Capital Corporation,* USDC, ND Texas, Dallas Division, Cause No. 3-97-CV-0690-H, 1998-1999.

*Allied Sales & Service Co., Inc. vs. Global Industrial Technologies, Inc., et al.,* U.S. District Court for the Southern District of Alabama Southern Division, Case Number: CV-97-0017-CB-M, 1998-present.

*ISP Mineral Products, Inc. a Delaware corporation, v. GS Roofing Products Company, Inc., a New York corporation,* In the United States District Court For The Northern District Of Texas, Dallas Division, Cause No. 3-97-CV-2326-R, 1999 - 2000.

*Jim Price, et al, v. The Las Colinas Association, et al,* In the District Court of Dallas County, Texas K-192nd Judicial District Cause No. 97-05904-H, 1998 - 1999.

*W.A.W. Van Limburg Stirum, et al., v. Raymond J. Whalen, et al.,* In the United States District Court Northern District of New York, Civil No. 90-CV-1279, 1999.

*Amway Corporation, Plaintiff, v. The Procter &Gamble Co., et al, Defendants,* In the United States of America, United States District Court, For The Western District of Michigan Southern Division, Case No. 1:98cv 726, 1999 - present.

*Raul J. Guerra, Jr., et al, v. Texaco Exploration and Production, Inc., Texaco Trading and Transportation, Inc., Texaco Pipeline, Inc., Texaco, Inc. and Four Star Oil and Gas Company, Defendants,* In The United States District Court For The Southern District Of Texas Corpus Christi Division, Civil Action No. M-98-037, 1999 - present.

*Fisher Scientific International, Inc., Procurenet, Inc. and Sourcesys, Inc. v. Cataloging Solutions, Inc. Dewayne Barton, Kirsten Cloward, Scot Cloward, Jeff Cloward, Denny Foust, and Shelly Foust,* In the District Court of Montgomery County, Texas; 9th Judicial District Court, Cause No. 2000-00-03-01501-CV, 2000.

*Ivoclar North America, Inc. v. Dentsply International, Inc.,* In the United States District Count for Southern District of New York; Civil Action No. 98 CIV 3812, 2000 - present.

*Laminates Unlimited, Inc. v. Tarkett, Inc.,* In the District Court of Harris County, Texas, 295th Judicial District, Cause No. 98-23205, 2000.

Donald R. House                                                                            Page 9

*B. C. Zeigler Companies, Inc. vs. Merrill Lynch, Pierce, Fenner & Smith, Inc., et al,* NASD, Arbitration Case No. 99-04183, Denver, Colorado, 1999 - 2000.

*Driltech, Inc. v. Tenam, et al,* District Court, Dallas County, Texas, 101st Judicial District, No. DV00-00476-E, 2000.

*Gloria Scott, et al. v. The American Tobacco Company, et al.* Case No. 96-8461, Civil District Court, Parish of Orleans, State of Louisiana, June, 2000 - present.

*Jamie Ragan, et al, v. United States of America,* United States District Court, Eastern District of Texas, Texarkana Division, Case No. 599CV093, 2000.

*Bettah Beach Productions, Inc. v. Park Board of Trustees of the City of Galveston, Texas v. The Law Firm of McLeod, Alexander, Powel & Apffel, P.C.;* In the United states District Court for the Southern District of Texas - Galveston Division,.Cause No. G-98-619, 2000.

*Universal Broadcasting of New York, Inc. v. Putbrese, Hunsaker & Trent, P.C. et al.* Superior Court of New Jersey Bergen County; Law Division Docket No.: BER-L-9443-97, 1999-2000.

*Reeder Simco GMC, Inc. v. Volvo GM Heavy Truck Corporation n/k/a Volvo Trucks North America, Inc.,* U.S.D.C., Western District of Arkansas, Fort Smith Division, Case No: 00-2031, 2001 - present.

*Retractable Technologies Inc. vs. Becton Dickinson & Company; Tyco International (U.S.), Inc.; VHA, Inc.; The Community Hospital; and Sweeny Community Hospital,* In the District Court of Brazoria County, Texas, 239th Judicial District, Cause No. 5333*JG98. 1998 - present.

*IDM Software, Inc. v. Sanders & McDermott, PLLC, John V. Daly, Esq. and Patricia M. Weathersby, Esq.,* The State of New Hampshire, Rockingham, SS., Superior Court; Case Number 01-C-0600. 2002 - present.

*Novus International, Inc., Novus International Holdings, L.L.C. and Novus International, L.L.L.P., Plaintiffs* v. *Union Carbide Corporation, Defendant;* In the United States District Court for the Southern District of Texas, Houston Division; Civil Action No. H-01 4445. 2002 - present.

*McKesson Medical-Surgical, Inc. v. A. T. Kearney, Inc.,* In the United States District Court, Eastern District of Virginia, Richmond Division, Case No. 3:02CV801. 2003 - present.

## GOVERNMENT CONTRACTS:

*Internal Revenue Service, Analysis and Studies Division*

Contract No. TIR-94-0016
Performance Potential Model

*Department of Health, Education, and Welfare -*

    Contract No. 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
        The Economic Relationship Between Dentist's Income
        and Time Supplied

    Contract No. 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
        Study of the Effect of Physician Supply on the Supply,
        Mix and Cost of Health Services

*Department of Health and Human Services -*

    Contract No. 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
        Employment of Recent Dental School Graduates:
        Phase II

    Contract No. 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
        A Forecasting Model of the Health Care Sector

    Contract No. 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
        Education and Career Patterns of Black Dentists

*Federal Trade Commission -*

    Contract No. L0450
        Deregulation - Rate Bureaus & Motor Carrier
        Regulation

    Contract No. L0797
        Business Strategy Models: An Economic Analysis

    Contract No. H-6766
        Reciprocity in Dentistry: A Review of Dental Practice
        Acts, Laws, and Regulation

*Institute for Defense Analysis -*

    Contract No. MDA903-79-C-0202
        Study of Impacts of Demand Surges Upon the Critical
        Materials Industries

*US Air Force -*

    Contract No. F33615-80-C-0021
        Development of an Air Force National Skills Market
        Model

Donald R. House                                   Page 11

Contract No. F41689-81-C-0063
Analysis of Assignment Preferences Impact Upon
Retention of Enlisted Personnel in the Air Force

Contract No. F49642-82-0254
Enlisted Prior Service Market Analysis Study

*Department of Labor -*

Contract No. 99-8-1886-04-32
State Unemployment Insurance Programs

Contract No. 99-0-1866-29-4
The Impact of Unemployment Insurance on the United
States Economy During the 1974-1975 Recession

*Office of the Assistant Secretary of Defense -*

Contract No. F41800-84-MA388
DPAS Bonus Support Module Prototype

Contract No. MDA903-85-C-0321
DPAS Bonus Support Module

## OTHER CONTRACTS:

Nebraska Book Company
General Telephone Company of the Southwest
Leviathan Corporation
Manufacturers Hanover Futures
Manufacturers Hanover Trust
Southwestern Bell Telephone
American Hospital Association
Dentsply, International
Metrica, Inc.
Metropolitan Chicago Healthcare Council
Texas Dental Association
Texas Hospital Association
Research Triangle Institute
U.S. Postal Service
Chicago Dental Society
Healthco International, Inc.
W.R. Grace and Company
Texas Society of Certified Public Accountants
DRI/McGraw-Hill
The SCOOTER Store

Donald R. House                                                    Page 12

## BOOK:

"Economic Damages," in *Litigating Spinal Cord Injuries,* Mark R. Kosieradzki, comp., New York, Wiley, 1995, pp. 191-205.

## SELECTED PUBLICATIONS:

"The Distribution of Publication Successes Within and Among 'Top' Economics Departments: A Disaggregated View of Recent Evidence," (with J.H. Yeager), *Economic Inquiry,* Vol. 16, October 1978.

"A Full-Price Approach to the Dental Care Market: Applications for Price Determinations," *Journal of Health, Politics, Policy and Law,* Vol. 5, Winter 1981, pp. 593-607.

"Occupational Choice and Labor Supply Decisions: The Case of the Licensed Dentist," *Modeling Techniques and Applications in Dentistry,* Department of Health and Human Services, Publication No. (HRA) 81-8, 1981, pp. 45-55.

"A Theory of Physician Behavior with Supplier-Induced Demand," (with R. Anderson and M. Ormiston), *Southern Economic Journal,* Vol. 48, July 1981. Reprinted in *The Economics of Location,* edited by Melvin L. Greenhut.

"The Role of Patient Time in the Pricing of Dental Services: The Fee-Provider Density Relation Explained," (with A.S. DeVany and T.R. Saving), *Southern Economic Journal,* January 1983.

"Economic Issues in the Defense of Directors and Officers of Financial Institutions," (with Clifford L. Fry), *Banking Law Journal,* Vol. 110, No. 6, Nov.-Dec. 1993, pp. 542-557.

## SELECTED REPORTS:

*A Study of the Economic Relationship Between Dentists' Income and Time Supplied* (Project Principal Investigator), HEW, 1977-78, American Dental Association.

*Labor Substitution and the Economics of the Delivery of Dental Services* (Project Participant), HEW, 1977-78, Resources Research Corporation.

*Study of the Effect of Physician Supply on the Supply, Mix and Cost of Health Services* (Project Director, Co-Principal Investigator), HEW, 1979-80, Resources Research Corporation.

*Development of an Air Force National Skills Market Model,* with T.R. Saving, B.M. Stone, Interim Report, Air Force Human Resources Laboratory, Brooks Air Force Base, Texas, September 1982.

*Multifactor Productivity and the United States Postal Service, 1979-1983,* (Project Director), U.S. Postal Service, 1984.

Donald R. House                                                                                 Page 13

*Report of Donald R. House and Thomas R. Saving of RRC, Inc. in Defense of Third Party Complaint as Amended,* Pennsylvania Dental Association v. Pennsylvania Blue Shield, 1983-84.

*An Examination of Volatility Among Foreign Exchange Rates,* (Project Director), Manufacturers Hanover Trust Company, 1984.

*SEAD, A Computerized Data Extraction Routine,* (Project Director), RRC, Inc., 1984.

*The Impact of Changes in the Price of Cement on the Highway Construction Industry,* (Principle Investigator and Project Director), Attorney General for the State of California, 1984.

*Forecasts of Health Care Prices and Expenditures, 1985-1995,* (Principle Investigator and Project Director), American Medical Association, 1985.

*The Impact of Dental Prepayment on the Demand for Dental Care,* (Principle Investigator and Project Director), Research Triangle Institute, 1985.

*Productivity in the Postal Service, A Comparison Among Three Indexes,* (Project Director), United States Postal Service, 1985.

*Envelope, A Computer Program for Macroeconomic Computer Program Modeling,* (Project Director), RRC, Inc., 1985.

*Medical Malpractice Liability Insurance: A Closer Look,* (Principle Investigator and Project Director), American Medical Association, 1986.

*Expected Life and Worklife for Physicians,* (Project Director), American Medical Association, 1986.

*The Economic Impact of New Taxes on Services in Texas,* (Project Director and Co-Principle Investigator), The Consulting Engineers Council of Texas, et al., 1987.

*The Impact of Telephone Pricing and Competition on the Texas Economy,* (Co-Principle Investigator), Southwestern Bell, 1987.

*Professional Liability Insurance for Physicians: A Quality Constant Measure of Price Changes,* (Principle Investigator and Project Director), American Medical Association, 1987.

*Productivity Measurement and the United States Postal Service,* for the United States Postal Service, 1984.

*The Economic Impact of New Taxes on Services in Texas,* (Project Director and Principle Investigator), Texas Society of Certified Public Accountants, et al., 1990.

*The Pricing of Subscriber Lists and Related Information* (Project Director and Principle Investigator), U S WEST Communications, Inc., 1993.

*The Economics of Structural Separation from the Perspective of Economic Efficiency,* (Project Director and Co-Author), U S WEST Communications, Inc., 1995.

Donald R. House                                                              Page 14