*77*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United S───── ─ ─── Court
Southern ──── ── ── of Texas
FILED

OCT 3 1 2003

Michael N. Milby
Clerk of Court

| | |
|---|---|
| DINO CHAVEZ, §<br>    Plaintiff, §<br> §<br>vs. §<br> §<br> §<br>BROWNSVILLE INDEPENDENT §<br>SCHOOL DISTRICT and NOE SAUCEDA, §<br>    Defendants, §<br>----------------------------------------------------- §<br>BROWNSVILLE INDEPENDENT SCHOOL §<br>DISTRICT, §<br>    Third-Party Plaintiff, §<br> §<br> §<br>vs. §<br> §<br> §<br>AMERICAN FAMILY LIFE ASSURANCE §<br>COMPANY OF COLUMBUS (AFLAC), §<br>    Third-Party Defendant. § | CIVIL ACTION NO. B-02-128 |

**THIRD-PARTY DEFENDANT AFLAC'S
DAUBERT OBJECTIONS TO TESTIMONY OF PLAINTIFF'S
EXPERT STEPHEN M. HORNER, AND BRIEF IN SUPPORT**

Third-Party Defendant American Family Life Assurance Company of Columbus ("AFLAC") files this its "Daubert Objections to the Testimony of Plaintiff's Expert Stephen M. Horner ("Horner"), and Brief in Support," and would ask that the testimony of Mr. Horner be appropriately stricken or limited:

**I.
SUMMARY OF THE ARGUMENT**

This Motion seeks to strike or limit the testimony of Plaintiff's designated expert witness Stephen M. Horner. Horner's "preliminary" report is attached to Plaintiff's Disclosure of Expert submitted in this case. A true and correct copy of his report is attached hereto as Exhibit "A." The deposition of Horner has been taken. At deposition Horner continued to rely on his Exhibit "A" preliminary report.

Horner's report purports to provide "preliminary results of an analysis of the economic value that was lost by Mr. Dino Chavez as a result of not being allowed to sell supplemental insurance policies at the Brownsville Independent School District, resulting in the subsequent loss of his position as a Regional Sales Coordinator ("RSC") for AFLAC, Inc., in early 2002." (Exhibit A at p. 1). Horner's opinions are inadmissible under *Daubert* because: 1) they rely on the calculation of a growth rate that Horner is not qualified to make and cannot reliably determine; 2) they rely on unverified, unreliable, and irrelevant assumptions regarding Chavez's future expenses; and 3) Horner is not qualified to and fails to account for Plaintiff's duty to mitigate damages.

## II.
## FACTS

Horner provides the following "opinion" with regard to Plaintiff's economic losses at page 4 of his report:

> Based on the above preliminary calculations, the present value of the commissions and performance bonuses, less expenses, lost by Mr. Chavez would be about $5,344,463.

(Exhibit A at p. 4.) At first glance, this appears to be an opinion that Chavez would have suffered over $5,000,000 in economic losses. But at deposition it became clear that these numbers are sheer speculation. In fact, Horner admitted that these numbers were merely "illustrative" and intended to give "some idea of the kind of damages" allegedly suffered by Chavez. (Exhibit B at p. 67.)

First, in conducting his calculations of Plaintiff's economic damages, Horner additionally offers an opinion with regard to an entirely separate area: the growth rate that Plaintiff Chavez's business as an RSC would have enjoyed had Plaintiff continued to serve in that position for the next twenty-five years. (Exhibit A at pp. 2-3.) Horner's damage calculations are highly dependent on the calculation of this growth rate. Indeed, Horner admits that "the growth rate is



very important in that a small change in the growth rate can have a fairly large impact on the bottom line damages that we're doing.  So that growth rate is important."  (Exhibit B at p. 68.) But here Horner is not an expert.

Horner's background is not and has never been in the insurance industry.  (Exhibit B at pp. 4-15.)  At deposition he testified that in the past four years, of the approximately four hundred cases on which he has consulted, he has only worked on four cases (including this case) involving either insurance agents' commissions or damages that may have been suffered by insurance salesmen  (Exhibit B at pp. 26-33, 156-57.)[1]  Horner also admits that this case is the first case he has ever worked on involving the sale of supplemental insurance policies.  (Exhibit B at p. 34.)  In fact, Horner admits that he does not hold himself out as an expert in the insurance industry.  (Exhibit B at p. 170.)

Despite the fact that his background does not qualify him to provide a reliable assessment of the growth rate to be applied to Plaintiff's business, Horner did no independent research to verify the incredible growth rates he projected and applied in calculating Chavez's alleged economic damages.[2]  (Exhibit B at pp. 70, 114-16, 119-20, 122-29.)  Instead, Horner looked to: 1) the growth rates of Frank LaFemina, 2) AFLAC's expectations at the time of Chavez's termination as District Sales Coordinator for projected growth rates in the next year, and 3) Chavez's growth rates for 1998-2001, the years after Chavez was given the job of RSC.  (Exhibit B at pp. 68-70.)

Horner gives no reliable basis to think that these factors will adequately or reliably predict Chavez's future growth rate.  Indeed, there are multiple reasons to think that these factors

---

[1]   True and correct copies of excerpts of the deposition testimony of Stephen M. Horner, taken on September 5, 2003, are attached hereto as Exhibit B.

[2]   Horner projected that Chavez's business would grow by 75.78% in 2002, 37.89% in 2003, and 18.95% from 2004-2026. (Exhibit A at p. 3.)

are not reasonable predictors of Chavez's future growth rate. First, Frank LaFemina is a highly successful State Sales Coordinator in AFLAC whose growth rates were established in Dallas, a much larger market with a different demographic from the Brownsville area in which Chavez worked. (Exhibit B at pp. 117-119, 230-31.) In addition, Horner admits that he does not know if Chavez could have ever been as successful as LaFemina. (Exhibit B at p. 69.) Second, Horner does not take into account the fact that the growth rates AFLAC projected in 2001 may not be realistic growth rates for future years with different market conditions. In fact, Horner did not even consider any evidence of what percentage of RSCs at AFLAC met that projection. (Exhibit B at pp. 120-21.) Third, Horner himself admits that Chavez's historical growth rate could not continue, stating that it was "unsustainable for any long period of time, but I don't know how long. It's got to go down at some point...[e]ventually Mr. Chavez would be selling premiums that would be absorbing a significant portion of the gross national product." (Exhibit B at pp. 116-117.)

Recognizing that he must decrease Chavez's projected growth rate from his historical growth rates, Horner simply halved Chavez's 2002 growth rate to project the 2003 growth rate and halved it again to predict the growth rate for 2004-2026. (Exhibit A at p. 3; Exhibit B at p. 117.) Horner admits that he can think of no other instance in which he has projected a nearly 19% growth rate for 23 straight years, either by an independent contractor, employee, or consultant. (Exhibit B at pp. 121-22.) Horner gives no justifiable basis for this methodology or any reason to think that his projected growth rates are reasonable. Perhaps this is why he admits that "I'm pretty sure I'm going to have a tough time coming up with a reliably determined growth rate." (Exhibit B at p. 229.)

Horner's opinion is further based on the "opinion" that, although Horner predicts a 75% growth in Chavez's business, Chavez's expenses will increase only with inflation. (Exhibit A at

4

p. 2; Exhibit B at pp. 104-08.)    Horner based this assumption solely on: 1) Chavez's representation that the expenses would not increase more than inflation, 2) a comparison to Frank LaFemina's expenses as an RSC, 3) and unverified assumptions regarding "economies of scale." (Exhibit B at pp. 105-08.)    He did nothing to independently verify whether these assumptions were accurate. (Exhibit B at p. 108.)    Indeed, he did not even take into account that Chavez's expenses could not be accurately compared to other RSCs because Chavez did significantly more administrative work than other RSCs. (Exhibit B at p. 219-20.)

Horner's calculations are flawed not only because they are based on an unreasonable and unjustifiable growth rate as well as an unverified assumption about expenses, but also because they fail to take into account Chavez's duty to mitigate his damages. (*See* Exhibit A; Exhibit B at pp. 87-88.)    It is inappropriate to offer an opinion to any future damages (or to perform any such calculation) when all Horner apparently has done is do a "running" calculation (itself flawed) of how much money Plaintiff was making at the time he stopped working for AFLAC and apply a growth rate to Plaintiff's earnings from his work for AFLAC (also flawed).    Such a calculation can in no way be used to say that twenty-five years later Plaintiff would have suffered economic losses in excess of $5,0000,000.    Indeed, Horner admits that mitigation should be taken into account in determining Chavez's economic damages. (Exhibit B at pp. 87-88, 95.)    Horner states that he did not account for Chavez's duty to mitigate damages because he does not have enough evidence of Chavez's earning potential in the business he joined in early 2002 to accurately assess his mitigation potential. (Exhibit A at p. 5; Exhibit B at pp. 71-72, 87, 216.)

At his deposition, Horner still characterized his report and calculations as "preliminary." (Exhibit B at pp. 67, 214-17.)    In fact, he asserted that he hoped to have a final report complete as of the end of September. (*See* Exhibit B at p. 217.)    To date, Horner has not produced such a

5

"final" report. Indeed, he has no basis for a reasonable expectation that the calculations in his "final" report will be any more reliable or justifiable than those in his "preliminary" report. This entire testimony should be thrown out.

## III.
## ISSUES TO BE RULED UPON BY THE COURT

AFLAC respectfully requests that this Court find: 1) that Plaintiff's expert Horner is not qualified to testify as to the proper growth rates to project to calculate the income Chavez would have received had he continued as an RSC for AFLAC, and 2) that Horner's testimony does not meet the reliability standards necessary for admissibility under *Daubert* and Rule 702 of the Federal Rules of Evidence.

As with any evidence offered by a party, the burden of proving admissibility is on the proponent of expert testimony. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc) (stating that the party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable.")

The trial court is given broad discretion in determining whether to admit or exclude expert testimony. *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) (holding the abuse of discretion standard is to be applied in reviewing a district court's decision to admit or exclude expert testimony). The trial court is also granted broad discretion to decide the manner of determining whether a proffered expert's testimony is reliable. *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 135, 152 (1999) ("The trial court must have the same kind of latitude in deciding *how* to test an expert's reliability ... as it enjoys when it decides *whether or not* an expert's relevant testimony is reliable."). In this case, Plaintiff cannot establish the requisite evidentiary foundation of reliability under Rule 702. Accordingly, the Court should exclude Horner's testimony as inadmissible.

## IV.
## ARGUMENT AND AUTHORITIES

This Court of course has faced multiple Daubert challenges before and it is probably unnecessary to recite the general law in any detail. However, as a precautionary measure, AFLAC provides the Court the relevant standards.

In short, the United States Supreme Court has charged the district court with the responsibility of acting as an evidentiary gatekeeper in screening "expert" opinion testimony. *See* Fed. R. Evid. 702; *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 149 (1999); *Daubert,* 509 U.S. at 590. The Court's gatekeeping obligation "applies not only to testimony based on 'scientific' knowledge but also to testimony based on 'technical' and 'other specialized' knowledge." *Kuhmo,* 526 U.S. at 141. Central to the Court's gate-keeping function is the Court's obligation "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Black v. Food Lion, Inc.*, 171 F.3d 308, 311 (5th Cir. 1999)(citing *Daubert, supra); Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

Not every principle outlined in *Daubert* will necessarily apply to expert testimony; however, "the district court's preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid is no less important." *Black*, 171 F.3d at 311; *Daubert*, 509 U.S. at 592-93. The *Daubert* inquiry is two-pronged: (1) the district court must examine whether the expert testimony is reliable; and (2) the district court must assess whether the proffered testimony is relevant to the facts of the case for which the expert is being asked to testify. *Daubert,* 509 U.S. at 590 (1993). Expert testimony may not be admitted unless it meets *Daubert*'s standards of both reliability and relevancy, which standards apply equally to

professional and experienced-based expert testimony. *Kumho*, 526 U.S. at 149; *Black*, 171 F.3d at 311.

The Court's analysis under the reliability prong of *Daubert* must focus on the methodology employed by an expert in reaching his conclusions. *See id.* at 591. To be admissible, "an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation." *Id.* Opinion testimony that is the product of "junk science" is inherently unreliable, and therefore inadmissible. *See id.*

The United States Supreme Court has articulated four non-exclusive factors that district court judges may employ in guiding an analysis of the reliability of an expert's methodology. These factors include: whether the expert's theory or technique is capable of being, and has been, tested by the scientific method; whether the theory or technique has been subjected to peer review and publication; the potential and known rate of error of a particular technique, as well as the existence and maintenance of standards controlling the technique's operation; and whether the theory or technique is generally accepted in the relevant scientific field. *See id.* at 593-94; *Moore*, 151 F.3d at 275. These factors are intended to be flexible, and are not to be applied with talismanic rigidity. *See Kumho*, 526 U.S. at 141. Indeed, the district court is free to evaluate other factors that may shed light on the question of whether a particular theory or technique is reliably rooted in a scientifically valid methodology. *See id.* at 142.[3] The flexibility inherent in this inquiry, however, should "not be misunderstood to grant open season on the admission of expert testimony by permitting courts discretion to disavow the *Daubert* factors." *Black v. Food Line, Inc.*, 171 F.3d 308, 311 (5th Cir. 1999). Rather, the Court should ordinarily begin its

---

[3]    The Supreme Court has noted that in requiring that the subject of an expert's testimony be "'scientific knowledge': [t]he adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation. The term 'applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds.'" *Moore*, 151 F.3d at 275 (citing *Daubert*, 509 U.S. at 589-90).

reliability inquiry by examining the four factors enunciated by the Supreme Court in *Daubert*. *See id.* at 312.

By contrast, an analysis under the relevancy prong of *Daubert* turns upon the expert's application of the data to the existing facts of a particular case. *See Daubert*, 509 U.S. at 591. Under Rule of Evidence 702, expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." *See* Fed. R. Evid. 702. This requirement goes squarely to the relevance of the expert's opinion, being described as relating to the "fit" between the expert's opinion and the facts of the case. *See Daubert*, 509 U.S. at 591. An expert's opinion fails to "fit" the facts of a particular case, and therefore must be deemed irrelevant, when either the analytic gap between the data and the expert's conclusions are too great, or when the expert's factual assumptions are divorced from the actual facts of the case. *See id.*; *General Electric Company v. Joiner*, 522 U.S. 136, 146 (1997). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to the existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146; *see also Kelley v. American Heyer-Schulte Corp.*, 957 F. Supp. 873, 879 (W.D. Tex. 1997) (Prado, J.) (holding inadmissible expert analysis which was based on data that was "unpublished, not generally accepted, and [which] contains within it a *priori* assumption that introduces an unknown and potentially devastating amount of error.").

A.   **The Economic Damages Analysis is Unreliable, Irrelevant, and Based Upon Speculative Opinions Regarding Growth Rates that Horner is Not Qualified to Make.**

Horner's analysis projecting lost earnings into the future is entirely speculative and without basis. As is discussed in more detail previously, Horner employed no generally accepted methodology to project the growth rate to apply to Chavez's lost earnings. He has not and cannot point to any basis for his methodology that meets a single one of the four factors

9

suggested by *Daubert* to determine whether an expert's proffered testimony is reliable. Expert testimony based on unreliable data or assumptions does not meet the standard of reliability required by *Daubert* and Rule 702. *See, e.g., Copley v. Smith & Nephew, Inc.*, No. Civ. A.H.-97-2910, 2000 WL 223404 at *5 (S.D. Tex. 2000) (excluding expert testimony based on inadequate data).

Furthermore, it is improper for Horner to attempt to base his growth projections on unverified growth predictions from a third-party − in particular, those of AFLAC and Frank LaFemina. *See ID Security Sys. Canada, Inc. v. Checkpoint Sys., Inc.*, 249 F. Supp. 2d 622 (E.D. Pa. 2003); *Otis v. Doctor's Assocs., Inc.*, No. 94 C 4227, 1998 WL 673595 at *4 (N.D. Ill. 1998) (excluding expert testimony based on unverified sales projections). In *Security Systems*, the court recognized that, although Rule 703 allows an expert to base his opinions on facts or data of others if of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, an expert may not simply rely on a party's sales projections without performing some independent research to validate the accuracy of those projections. 249 F. Supp. 2d at pp. 695. Similarly, in *Otis*, the court excluded expert testimony of lost profits where the expert simply based his calculations on sales projections contained in the franchise agreement, without even verifying that the sales projections had any basis in fact or market reality. *Otis*, 1998 WL 673595 at *4. The court pointed out that the "expert" has not demonstrated that other franchises in the market consistently maintained the projected sales figures or that the franchise could grow as projected in the relevant market. *Id.* As pointed out above, Horner's assumptions and testimony suffer from these exact same deficiencies − and should be excluded just as the expert testimony was excluded in *Otis* and *Security Systems*.

In determining whether Horner's proffered testimony is reliable, the Court does not require certainty, but the testimony must "demonstrate that the opinions offered are more than

10

speculation." *Price v. National R.R. Passenger Corp.*, No. A-00-CA-304 JRN, 2000 WL 33349816 at *2 (W.D. Tex. 2000). Horner's testimony does not rise above the level of speculation, as he admits in stating that he will have a difficult time coming up with a "reliably determined growth rate." (Exhibit B at p. 229.)

Horner's growth rate predictions also fail under *Daubert's* relevancy prong. Horner bolsters the growth rate predictions by comparing them to those of Frank LaFemina. However, he fails to show any support for this comparison. The facts show not only that LaFemina was an RSC in an entirely different market (Dallas, rather than Chavez's Brownsville market), but also that there is no reason to predict that Chavez could or would be as successful as LaFemina. In addition, Horner has failed to demonstrate why a comparison to a single other RSC's growth rate would be more relevant than a comparison to the growth rates of a representative sample of RSCs.

The Court should not allow Horner to testify regarding the proper growth rate to project not only because his conclusions are unreliable and irrelevant, but also because he is not qualified to make his conclusions in the first place. Rule 702 requires that a witness possess the requisite "knowledge, skill, experience, training, or education" to qualify to give expert testimony. Fed. R. Evid. 702. As discussed above, Horner does not hold himself out as an expert in the insurance industry and has had minimal experience with cases involving the commissions earned by insurance agents. Plaintiff has failed to satisfy his burden to show how Horner is qualified to project the proper growth rate to apply to Chavez's lost business.

**B.    Horner's Testimony Regarding Expenses is Inadmissible**

Horner's opinion regarding economic damages is similarly flawed in its reliance on unscientific and unverifiable assumptions regarding the future expenses that Chavez would have incurred had he continued as an RSC for AFLAC. Again, Horner identifies no verifiable

methodology upon which he has based his opinion and has done no independent analysis to verify his assumptions. He relies on assumptions made by Chavez, irrelevant comparisons to LaFemina's expenses (which he admits are not comparable), and assumptions regarding economies of scale. Expert testimony of future operating costs and expenses based solely on assumptions of economies of scale and the expert's professional experience is not admissible. *See JMJ Enterp., Inc. v. Via Veneto Italian Ice, Inc.*, No. Civ. A. 97-CV-0652, 1998 WL 175888 at *9-10 (E.D. Pa. 1998) (finding that absent evidence and calculations to support the opinion, testimony regarding projected expenses was inadmissible).

**C.    The Economic Damages Analysis is Inadmissible Because it Does Not Account for Plaintiff's Duty to Mitigate Damages and Horner is not Qualified to Account for Mitigation**

Horner's economic damages analysis is inadmissible because it fails to account for Chavez's legal duty to mitigate his damages. Horner himself admits that, for his damages calculations to accurately predict Chavez's economic damages, he must account for Chavez's duty to mitigate. Horner promises a "final" report, but has not provided one. He has offered no explanation of why he could not perform the mitigation calculations before his deposition was taken and failed to produce a final report before the deadline for challenges to the admissibility of his testimony – despite the passage of deadlines for expert reports.

Horner's deposition testimony explaining this omission is that he needs more data regarding Chavez's earnings in his new business. However, he provides no explanation as to why one or two more months of time will provide him with enough data to create a reliable prediction of Chavez's future earning potential. His focus on the need for more time to pass clearly indicates that his calculations (if ever made) will be based solely on projections from Chavez's actual earnings in his new business – not on any independent study or analysis of Chavez's future business prospects. This should not be allowed.



It is clear that such speculative proposed testimony, proffered by one not an expert in the field, is inadmissible. Even before *Daubert*, the Fifth Circuit in *Eymard v. Pan Am. World Airways (In re Air Crash Disaster)*, 795 F.2d 1230, 1233-35 (5th Cir. 1986), threw out expert testimony regarding future loss income as too speculative where the expert assumed a salary increase of 8% per year without considering future market saturation issues, future market conditions, or future choices the Plaintiff might make to avoid work-related health or stress problems later in his career. *Id.* Horner's projected numbers (if they are ever presented) will be even more speculative than those in *Eymard*, as he has done <u>no</u> work to determine if they are justified.

Horner should not be allowed to testify at all regarding the proper amount to deduct for Chavez's future earning potential and the amount of damages to deduct for his duty to mitigate. Horner admits that he is not an expert in the industry and has not qualified himself as an expert in labor markets generally. *See also Douglass v. Delta Air Lines*, 709 F. Supp. 745, 756-57 (W.D. Tex. 1989) (rejecting testimony by an expert witness on lost earnings in part because of its unreliability and in part because the expert had no expertise in area of executive compensation or personal advancement and therefore was not qualified to talk about the decedent's potential career paths).

## V.
## CONCLUSION

Horner's testimony should be excluded because it fails to meet any of the requirements of *Daubert*. It is based on unreliable methodology, speculative, and irrelevant to the facts of the case. In addition, although Plaintiff contends that Horner is a fully qualified expert on economic damages, his testimony clearly shows that he is not qualified to provide expert opinions regarding growth rates and earning potential in the insurance industry. It appears that Plaintiff

hired a general-purpose damages expert and is trying to shoehorn him into a position as an insurance expert. This cannot be allowed.

WHEREFORE, PREMISES CONSIDERED, Third-Party Defendant AFLAC respectfully prays that Mr. Horner not be allowed to testify regarding Chavez's economic damages.

Respectfully submitted,

William B. Steele III, Attorney In Charge
So. Dist. No. 8019
State Bar No. 19107400
Of Counsel:
LOCKE LIDDELL & SAPP LLP
100 Congress Ave., Suite 300
Austin, Texas 78701
(512) 305-4700
(512) 305-4800 (Fax)

Valorie C. Glass
So. Dist. No. 15303
State Bar No. 00784135
Of Counsel:
ATLAS & HALL, L.L.P.
P.O. Box 3725
McAllen, Texas 78502
(956) 682-5501
(956) 686-6109 (Fax)

**ATTORNEYS FOR THIRD-PARTY
DEFENDANT AMERICAN FAMILY LIFE
ASSURANCE COMPANY OF COLUMBUS**



## CERTIFICATE OF SERVICE

I hereby certify by my signature below that a true and correct copy of the above and foregoing has been served via certified mail, return receipt requested, on this 31st day of October, 2003, to all counsel of record listed below:

J. Arnold Aguilar
Artemis Square, Suite H-2
1200 Central Boulevard
Brownsville, Texas  78520

Elizabeth G. Neally
Roerig, Oliveira & Fisher, LLP
855 West Price Road, Suite 9

Brownsville, Texas  78520

Eileen Leeds
Willette & Guerra
3505 Boca Chica Boulevard.
Suite 460
Brownsville, Texas  78521

_____  by permission
William B. Steele III

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DINO X. CHAVEZ | § | |
| | § | |
| VS. | § | |
| | § | CIVIL ACTION NO. |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, NOE SAUCEDA, | § | B - 02 - 128 |
| and RANDY DUNN, MARILYN DEL | § | |
| BOSQUE-GILBERT and HUGH EMERSON, | § | |
| JR., in their official capacities as Board | § | |
| Members of Brownsville Independent | § | |
| School District | § | |

---

## PLAINTIFF'S DISCLOSURE OF EXPERT

---

TO THE HONORABLE U. S. DISTRICT COURT:

COMES NOW **DINO X. CHAVEZ**, Plaintiff in the above-styled and numbered cause and issues the following Disclosure of Expert.

### I.

(1)    Dr. Stephen Horner, Economist
       615 North Upper Broadway, Suite 1600
       Corpus Christi, TX  78477
       (361) 883-1686
       (361) 883-1694 FAX


(2)    See attached report.

V:\FP\PRETRIAL\258-02.EXP                                        PAGE 1

# EXHIBIT A

Signed on this the 15th day of May, 2003.

Respectfully submitted,

**LAW OFFICE
J. ARNOLD AGUILAR**
Artemis Square, Suite H-2
1200 Central Boulevard
Brownsville, Texas 78520
Telephone    :   (956) 504-1100
Facsimile    :   (956) 504-1408

By:    _____
J. Arnold Aguilar
State Bar No. 00936270
Federal Adm. No. 6822

**Attorney for Plaintiff,
DINO X. CHAVEZ**

V:\FP\PRETRIAL\258-02.EXP                                        PAGE 2

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing **PLAINTIFF'S DISCLOSURE OF EXPERT** has on this the 15th day of May, 2003, been forwarded via certified mail, return receipt requested to:

Ms. Elizabeth G. Neally
ROERIG, OLIVEIRA & FISHER, L.L.P.
855 W. Price Rd., Suite 9
Brownsville, TX 78520

Ms. Eileen M. Leeds
WILLETTE & GUERRA, L.L.P.
International Plaza, Suite 460
3505 Boca Chica Boulevard
Brownsville, TX 78521

Mr. William B. Steele, III
LOCKE, LIDDELL & SAPP, L.L.P.
100 Congress Avenue, Suite 300
Austin, TX  78701

(J) Arnold Aguilar

STEPHEN M. HORNER, Ph.D.
P.O. Box 2685
Corpus Christi, Texas 78403
361/883-1686


May 15, 2003


Mr. Arnold Aguilar
1200 Central Blvd, Suite H-2
Brownsville, TX 78520

Re:   Dino X. Chavez v Brownsville Independent School District, Noe Sauceda, Marilyn del
      Bosque-Gilbert and Randall Dunn; In the United States District Court for the Southern
      District of Texas, Brownsville Division

Dear Mr. Aguilar,

        This letter presents preliminary results of an analysis of the economic value that was lost
by Mr. Dino Chavez as a result of not being allowed to sell supplemental insurance policies at
the Brownsville Independent School District, resulting in the subsequent loss of his position as a
Regional Sales Coordinator for AFLAC, Inc., in early 2002. See graph in attachment 1.

        As can be seen from the graph, Mr. Chavez's Regional Sales Coordinator ("RSC") sales
were growing rapidly until 2002. Mr. Chavez acted as both an agent and RSC for AFLAC. His
compensation from AFLAC was through a complex commission and bonus system, that included
varying rates for first year sales, renewals, different products and ages of customers, as well as
bonuses for meeting quotas and other targets. He received separate commissions as an agent and
as a RSC. Mr. Chavez's earned commission compensation in 2001 and 2002 are summarized in
attached Exhibits A and B, taken from "AFLAC Monthly Accounting Statements."

Duration of Analysis

        Mr. Chavez was 37 years old at the time of the events in 2002 central to this analysis. A
male, age 37, with a bachelor's degree, would have a worklife expectancy of approximately 26
years. (See Skoog and Ciecka (2001), Table 5) The current analysis includes losses from 2002
through 2026, a twenty-five year period. There are risks associated with any business endeavor
not continuing, or not continuing at projected rates. Such considerations are normally
incorporated through the application of a risk-adjusted discount rate, which is discussed below.

Base Earnings from 2001

        In 2001, Mr. Chavez and his agents wrote new business with annualized premiums
totaling $1,649,603. Including conversions of older policies, the total annual premiums subject
to first year commissions was $1,668,501. According to the AFLAC Monthly Accounting
Statements for 2001, Dino Chavez earned first year commissions of about $78,706 on this

business, plus an additional $30,478 in commissions from renewals of preexisting policies. Although Mr. Chavez has lost significant income as an agent, as well as a RSC, we are focused only on the latter in this preliminary analysis. Mr. Chavez's commissions as RSC were about $64,827 for first year premiums, and $16,388 for renewals. In addition, Mr. Chavez receives additional compensation in the form of stock bonuses, of 0.70% of first year policies for which a 13th month payment is received, as well as a performance bonus. Based on 2002 performance, we note that approximately 45.15% of 1st year policies lapsed during the year. We assume this would continue, and include only 55.85% of the 0.70% of first year premiums in our projections. (See Exhibit C, Attrition Analysis.) Policies that have already renewed, that is passed their 13th month without cancellation, had an annual attrition rate of about 14.40%. Thus, we assume that 45.15% of first year policy premiums will produce no revenue in subsequent years, and 14.40% of renewed policies will cancel in subsequent years. In February 2001, Mr. Chavez received a check for $18,623, which was about 1.66% of his year 2000 first year annualized premiums sold by Mr. Chavez and his team of agents. Based on his 2001 performance, Mr. Chavez earned an additional performance bonus check, paid in February 2002 of about $27,439, or about 1.66% of the first year annualized premiums. (For ease in computation in this preliminary report, we include these performance bonuses with the year in which they are earned.) As a subtraction from commissions on first year premiums, RSCs were required to contribute 0.50% to the Manager's Incentive Fund, effectively reducing the commission on first year premiums from about 8.2% to about 7.7%. Although these contributions are deducted as expenses, we have used them to reduce the revenue simplicity in calculations. These average rates for commissions and bonuses are assumed to continue. Other AFLAC incentive programs are ignored in this preliminary analysis. Mr. Chavez reports that his operation was fully staffed by 2001, when his other expenses were about $67,475 less the $8,371 he was required to contribute to the Incentive Fund. He projects that his remaining expenses of $59,104 would have grown only with inflation in the future. We assume this to be about 3.1% per year, based on the same period of data as will be used for discounting. See Ibbotson (2000), page 14.


### Earnings for 2002 through 2026

As noted earlier, Mr. Chavez's AFLAC business as an RSC was growing rapidly. Mr. Chavez indicates that the primary enrollment period for the Brownsville ISD was in December 2001, but that he had already been given 30 days notice of his termination as RSC. AFLAC brought in approximately two dozen agents that were on the "teams" of other RSCs in South Texas, resulting in a large portion of this business being credited to RSCs other than Mr. Chavez. Based on AFLAC documents provided by Mr. Chavez, we have estimated that approximately $322,108 in annualized new business was missed in December 2001. (See Exhibit D) The following table shows the growth of that business from 1998 through 2001, including this adjustment:

Charter or Nag Records at

Page 3 of 6

| Growth of 1st Year Premiums | | |
|---|---|---|
| Year | 1st Year Premiums | Growth |
| 1998 | $91,991 | n.a. |
| 1999 | $673,640 | 632.29% |
| 2000 | $1,132,423 | 68.11% |
| 2001* | $1,990,609 | 75.78% |

*Includes $322,108 lost in December 2001

Growth rates of this magnitude cannot be sustained for 25 years, and this is a relatively short history upon which to make a projection. Nevertheless, there is no indication of a deceleration in the growth. For purposes of illustration in this preliminary report, we assume that the year 2001 growth rate of 75.78% continues for one additional year, then the rate of growth falls to half that rate in 2003 to about 37.89%, and half again in 2004 to about 18.95%. Mr. Chavez has reported that AFLAC management requires an average growth rate of at least 15% from its sales coordinators. Thus, for the purpose of illustration in this preliminary report, we assume that the decline in growth rates will continue through 2004, with growth stabilizing at about 18.95% per year. These rates are shown below, with the projected rates shown in italics:

| Year | Actual or Projected Growth |
|---|---|
| 1999 | 626.74% |
| 2000 | 67.33% |
| 2001 | 75.78% |
| 2002 | 75.78% |
| 2003 | 37.89% |
| 2004 | 18.95% |
| 2004-2026 | 18.95% |

Note: Growth figures for 2002 through 2026 are projections.

Chavez v. Noe Sauceda et [...]
Page 4 of 6

### Discounting for the Time Value of Money and Risk

One purpose of this report is to present a single figure that represents the economic value of the opportunity lost by Mr. Chavez as a result of his insurance team being prevented from selling his insurance products at BISD and his subsequent termination as RSC for AFLAC. Since this lost economic value would have taken place over a long period of time, it is necessary to take account of the fact that cash flows in different years do not have the same economic value, and thus cannot properly be added together. There are two primary reasons for this. The first reason is that dollar amounts in the future have lower value than they do in the present because present amounts, if invested, will grow larger with time. Thus, a smaller sum in the present will be required to replace a given future amount. Discounting by the time value of money converts future values to present values.

The second reason that cash flows in different years do not have the same value is that later amounts, due to the possible intervention of unforeseen events, are subject to increasing risk of not being realized. Thus, future projected amounts should be corrected for their increasing risk as they are further in the future. This is done through the use of a risk-adjusted discount rate. Discussion of this process is described in finance texts, such as in Chapter 2 of Brealey and Myers (1991), as well as other texts in the valuation literature, such as Ibbotson (2000). The estimation of a risk-adjusted discount rate can be accomplished in several ways. The most commonly used is the risk-adjusted form of the "capital asset pricing model" or "CAPM." This is discussed in sources such as Ibbotson (2000) and Pratt (1998), Chapter 9.

For the CAPM approach, we rely on data provided by Ibbotson (2000), Table 5, page 120. The risk-free rate based on 20-year government bonds would be about 5.21%, and the equity risk premium for the NYSE (New York Stock Exchange) from the same source would be about 7.13%. The equity risk premium would be multiplied by a "beta" expressing the general non-diversifiable or systematic risk that relates the particular market to the market as a whole. In this case, the beta for AFLAC would be appropriate to capture the response of this segment of the insurance industry to economic fluctuations in the general market. According to Business Week data from May 14, 2003, the beta for AFLAC is about 0.89, reflecting relatively low relative systematic risk. This is multiplied by the 7.13% risk adjustment for the market at a whole, for an adjustment of 6.35% to the risk-free rate. In addition, we add a size-related premium, noting that the adjustment for the smallest NYSE size category is about 3.95%, but the smallest NYSE company is much larger than Mr. Chavez's operation. We add an additional 6.0% for the small size of Mr. Chavez company, and other company-specific risk considerations, such as Mr. Chavez dependence on a primary supplier of insurance and early dependence on one large customer base. There is some danger in over-adjusting with additional risk factors, as many small companies share some of these risks. This results in a risk-adjusted discount rate of about 21.5%.

### Present Value of Lost Earnings

Based on the above preliminary calculations, the present value of the commissions and performance bonuses, less expenses, lost by Mr. Chavez would be about $5,344,463.

Chavez v. Noe Sauceda et al.
Page 5 of 6

Mitigation Earnings

To the extent that Mr. Chavez's termination from his position as Regional Sales Coordinator at AFLAC opens other opportunities for him, the net earnings from these additional pursuits should be subtracted from the present value of lost earnings estimated above. Mr. Chavez has indicated that he joined The Teachers' Agency in early 2002, becoming an owner. His 1099 from that operation indicated earnings of $7,000. We do not have complete figures in order to do an analysis or projection of his earnings from this endeavor.

Please feel free to call me if you have any questions. Thank you very much for this opportunity to be of service.

Sincerely,

Stephen M. Horner, Ph.D.

Chavez v. Noe Sauceda et al.
Page 6 of 6

## Bibliography

Brealey, Richard A., and Stewart C. Myers, *Principles of Corporate Finance*, Fourth Edition. New York: McGraw-Hill, 1991.

Ibbotson Associates: *Stocks, Bonds, Bills, and Inflation: Valuation Edition 2000 Yearbook*. Chicago: Ibbotson Associates, 2000.

Skoog, Gary R., and James E. Ciecka: "The Markov (Increment-Decrement) Model of Labor Force Activity: Extended Tables of Central Tendency, Variation, and Probability Intervals," *Journal of Legal Economics*, Spring/Summer 2001, pp. 23-87.

Pratt, Shannon P.: *Cost of Capital: Estimation and Applications*. New York: John Wiley & Sons, 1998.



Attachment 1

Exhibit A
AFLAC Commissions          2001

Monthly Accounting Statements

| Month End | Premium Collected | | | | Commission Earned | | | | Commission Earned | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1st Year | | Renewal | | 1st Year | | Renewal | | 1st Year | | | | Renewal | | | |
| | Personal | Override | Personal | Override | Personal | Override | Personal | Override | Personal | Override | Personal | Override | | | | |
| 1/31/2001 | 9,629.47 | 62,256.26 | 16,390.32 | 39,976.90 | 2,026.66 | 3,201.67 | 946.22 | 1,045.24 | 21.05% | 5.14% | 6.16% | 2.61% | | | | |
| 2/28/2001 | 242.33 | 45,865.29 | 6,373.20 | 25,750.37 | (439.23) | 2,676.65 | 380.43 | 621.66 | -181.25% | 5.83% | 6.13% | 2.41% | | | | |
| 3/31/2001 | 17,574.43 | 133,049.83 | 39,185.97 | 101,433.02 | 1,782.57 | 5,434.18 | 2,363.30 | 2,253.86 | 10.14% | 4.08% | 6.03% | 2.22% | | | | |
| 4/30/2001 | 8,366.61 | 74,804.11 | 19,176.05 | 64,194.28 | 1,375.93 | 4,181.60 | 1,122.91 | 1,207.18 | 16.45% | 5.65% | 5.86% | 2.23% | | | | |
| 5/31/2001 | 7,760.23 | 65,332.29 | 18,613.09 | 57,723.75 | 1,167.74 | 5,173.94 | 1,091.98 | 1,253.69 | 15.05% | 7.92% | 6.80% | 2.17% | | | | |
| 6/30/2001 | 8,151.66 | 103,923.16 | 22,389.06 | 69,178.40 | 1,266.74 | 8,290.95 | 1,332.91 | 1,516.08 | 15.90% | 7.98% | 6.04% | 2.19% | | | | |
| 7/31/2001 | 1,950.38 | 59,290.38 | 7,584.38 | 37,410.00 | 233.73 | 2,018.46 | 470.64 | 698.34 | 11.96% | 3.40% | 6.25% | 2.40% | | | | |
| 8/31/2001 | 6,834.61 | 84,406.61 | 19,145.21 | 82,606.84 | 1,146.49 | 3,519.90 | 1,127.06 | 1,345.56 | 16.53% | 4.17% | 6.89% | 2.15% | | | | |
| 9/30/2001 | 11,968.81 | 113,399.74 | 32,413.62 | 95,187.42 | 1,632.45 | 11,274.17 | 1,971.09 | 2,009.05 | 13.56% | 9.95% | 5.77% | 2.11% | | | | |
| 10/31/2001 | 5,711.72 | 81,572.61 | 17,316.45 | 57,733.27 | 943.00 | 5,160.18 | 1,045.15 | 1,186.26 | 16.56% | 6.33% | 6.04% | 2.05% | | | | |
| 11/30/2001 | 7,240.62 | 95,003.69 | 18,082.10 | 64,741.20 | 946.77 | 3,988.60 | 1,045.24 | 1,377.68 | 12.52% | 4.20% | 6.78% | 2.13% | | | | |
| 12/31/2001 | 5,656.30 | 123,556.57 | 20,955.69 | 82,643.39 | 1,707.30 | 9,906.41 | 1,279.79 | 1,676.30 | 30.99% | 8.01% | 6.11% | 2.03% | | | | |
| Total 2001 | 91,357.66 | 1,042,559.76 | 236,763.45 | 748,697.62 | 13,576.16 | 64,826.61 | 14,069.77 | 16,387.59 | 16.19% | 6.22% | 5.96% | 2.19% | | | | |

Totals:                78,705.96

1st Year
Renewal          30,477.70

Exhibit B
AFLAC Commissions          2002

Monthly Accounting Statements

| Month End | Premium Collected | | | | Commission Earned | | | | Commission Earned | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1st Year | | Renewal | | 1st Year | | Renewal | | 1st Year | | Renewal | |
| | Personal | Override | Personal | Override | Personal | Override | Personal | Override | Personal | Override | Personal | Override |
| 1/31/2002 | 5,893.89 | 107,498.15 | 23,342.70 | 84,336.48 | 775.39 | 4,886.76 | 1,374.03 | 1,823.30 | 13.16% | 4.55% | 5.87% | 2.03% |
| 2/28/2002 | 842.80 | 94,465.31 | 9,084.74 | 84,329.67 | 332.37 | 1,179.89 | 832.19 | 1,316.75 | 39.45% | 1.24% | 9.17% | 2.05% |
| 3/31/2002 | 1,888.09 | 117,497.75 | 28,059.35 | 100,415.43 | 261.72 | 1,941.65 | 1,456.76 | 2,031.03 | 16.71% | 1.66% | 6.08% | 1.40% |
| 4/30/2002 | 745.88 | 101,869.88 | 37,636.90 | 131,744.76 | (180.69) | 1,867.18 | 1,970.90 | 2,451.80 | -24.22% | 1.84% | 5.26% | 1.87% |
| 5/31/2002 | 307.23 | 66,866.72 | 4,042.55 | 64,306.50 | (2.80) | 925.16 | 258.30 | 1,056.45 | -0.91% | 1.38% | 6.39% | 1.95% |
| 6/30/2002 | 1,499.12 | 121,397.50 | 46,423.19 | 170,898.82 | 365.73 | 2,874.72 | 2,444.30 | 3,212.86 | 24.39% | 2.20% | 6.38% | 1.88% |
| 7/31/2002 | 677.27 | 68,771.65 | 22,038.13 | 106,349.59 | 74.98 | 1,211.80 | 1,195.28 | 2,005.76 | 11.07% | 1.76% | 5.42% | 1.89% |
| 8/31/2002 | 734.57 | 62,353.62 | 22,283.20 | 107,228.28 | 433.50 | 1,080.59 | 1,221.68 | 2,023.67 | 59.01% | 1.74% | 5.48% | 1.89% |
| 9/30/2002 | 872.23 | 58,145.12 | 22,935.08 | 126,269.05 | 65.01 | 1,288.71 | 1,261.57 | 2,346.63 | 7.45% | 2.22% | 5.80% | 1.86% |
| 10/31/2002 | 1,006.12 | 41,977.64 | 23,564.64 | 117,651.77 | 3,149.18 | 734.56 | 1,266.95 | 2,199.66 | 313.00% | 1.75% | 5.45% | 1.87% |
| 11/30/2002 | 645.84 | 32,461.49 | 21,124.84 | 118,179.68 | 147.21 | 521.44 | 1,122.21 | 2,117.62 | 22.79% | 1.61% | 5.51% | 1.51% |
| 12/31/2002 | 2,246.69 | 33,928.01 | 24,780.36 | 159,907.65 | 2.48 | 724.10 | 1,350.37 | 2,912.32 | 0.11% | 2.19% | 5.49% | 1.82% |
| Total 2002 | 17,149.53 | 906,353.34 | 282,372.46 | 1,350,780.09 | 5,444.05 | 19,036.66 | 15,561.23 | 26,506.62 | 31.74% | 2.10% | 5.52% | 1.89% |

Exhibit C
Attrition Analysis

| | 1st Year Prev Mo In Force | New Issues | Conversions | Reinstated | Lapsed | Duration Changes | In Force EOM | Conversions Reinstated less lapsed | Percent attrition |
|---|---|---|---|---|---|---|---|---|---|
| 1/31/2001 | 1,247,911 | 63,467 | 640 | 2,283 | (36,483) | (17,519) | 1,286,122 | (33,571) | -1.64% |
| 2/28/2001 | 1,280,122 | 76,235 | 218 | 3,078 | (40,453) | (32,700) | 1,298,404 | (44,161) | -3.36% |
| 3/31/2001 | 1,290,404 | 111,067 | (60) | 3,561 | (36,141) | (204,387) | 1,198,744 | (34,480) | -2.33% |
| 4/30/2001 | 1,198,744 | 82,836 | (116) | 3,563 | (31,534) | (16,008) | 1,236,685 | (27,390) | -2.02% |
| 5/31/2001 | 1,238,685 | 158,642 | 284 | 3,030 | (36,040) | (22,382) | 1,238,846 | (35,390) | -2.02% |
| 6/30/2001 | 1,240,846 | 208,522 | 465 | 1,446 | (163,700) | (22,545) | 1,301,188 | (181,400) | -11.63% |
| 7/31/2001 | 1,300,849 | 70,940 | (3,316) | 3,318 | (36,404) | (33,151) | 1,325,390 | (65,404) | -4.82% |
| 8/31/2001 | 1,303,133 | 78,728 | 64 | 1,578 | (33,988) | (36,171) | 1,525,264 | (32,306) | -2.44% |
| 9/30/2001 | 1,325,948 | 270,865 | 662 | 3,666 | (44,490) | (36,821) | 1,525,264 | (40,998) | -3.04% |
| 10/31/2001 | 1,523,484 | 179,638 | 1,765 | 1,461 | (51,486) | (27,604) | 1,835,367 | (47,692) | -3.11% |
| 11/30/2001 | 1,833,367 | 112,109 | 300 | 3,234 | (61,240) | (38,773) | 1,840,582 | (65,340) | -3.57% |
| 12/31/2001 | 1,840,830 | 348,830 | | 6,971 | (74,577) | (82,178) | 1,742,577 | (67,406) | -1.92% |
| Avg In force | 1,357,380 | | 1,170 | 36,139 | (982,356) | | | (612,446) | -45.15% |

| | Renewable Prev Mo In Force | New Issues | Convers'ns | Reinstated | Lapsed | Duration Changes | In Force EOM | Conversions Reinstated less lapsed | Percent attrition |
|---|---|---|---|---|---|---|---|---|---|
| 1/31/2001 | 220,709 | | 1,009 | 166 | (1,102) | 17,915 | 238,896 | (2,027) | -1.07% |
| 2/28/2001 | 258,894 | | 19 | 831 | (3,143) | 32,790 | 313,281 | (6,189) | -2.54% |
| 3/31/2001 | 313,281 | | 1,232 | (3,050) | 204,367 | 514,431 | (2,701) | -0.86% |
| 4/30/2001 | 344,581 | | 312 | 388 | (5,867) | 15,063 | 523,518 | (6,011) | -1.17% |
| 5/31/2001 | 523,518 | | 54 | 658 | (2,643) | 22,382 | 544,290 | (3,016) | -0.36% |
| 6/30/2001 | 544,290 | | 184 | 2,786 | (18,541) | 22,545 | 550,783 | (10,072) | -1.98% |
| 7/31/2001 | 550,783 | | 3,998 | 2,407 | (4,587) | 53,151 | 610,514 | 1,458 | 0.29% |
| 8/31/2001 | 610,514 | | 212 | 1,444 | (3,796) | 28,171 | 610,514 | (5,439) | -0.92% |
| 9/30/2001 | 610,514 | | 500 | 851 | (3,572) | 35,821 | 636,804 | (7,141) | -1.17% |
| 10/31/2001 | 636,804 | | 878 | 844 | (7,943) | 27,604 | 660,278 | (9,320) | -0.37% |
| 11/30/2001 | 660,278 | | | 1,359 | (16,736) | 38,773 | 660,701 | (18,563) | -2.79% |
| 12/31/2001 | 660,701 | | | 4,412 | (40,543) | 82,178 | 705,748 | (9,151) | -0.92% |
| Avg In force | 610,338 | | 7,098 | 19,648 | (84,380) | | | (74,346) | -14.40% |

**BISD December Enrollment Estimation**
**Exhibit D**

| U2181 | | | |
|---|---|---|---|
| Date | | Ninthly | |
| | 1/11/2002 | | $6,425.40 |
| | 12/11/2001 | | 2,685.98 |
| | | | 3,739.42 |
| Difference | | | |
| periods | | | 9.00 |
| Annual | | | 33,654.78 |

| AG988 | | | |
|---|---|---|---|
| | 4/23/2002 | Bi-weekly then Monthly | 5,598.50 |
| New | | | - |
| Difference | | | 5,598.50 |
| periods | | | 12.00 |
| | | | 67,182.00 |

| L5864 | | | |
|---|---|---|---|
| | 2/11/2002 | Monthly | 75,148.42 |
| | 11/1/2001 | | 44,826.88 |
| Difference | | | 30,321.54 |
| periods | | | 12.00 |
| | | | 363,858.48 |

| Total Annual New Business | | | 464,695.26 |
|---|---|---|---|

| Less credit given to Chavez: | | | |
|---|---|---|---|
| Week 52 Mktg Total | | | 1,968,501.00 |
| Week 50 Mktg Total | | | 1,825,914.00 |
| Increase | | | 142,587.00 |

| If assume no credit for no other accounts, rather 100% from BISD | | | |
|---|---|---|---|
| Lost | | | $322,108.26 |

**STEPHEN M. HORNER, PH.D.**
ECONOMIC, BUSINESS & STATISTICAL CONSULTING
P.O. Box 2685
CORPUS CHRISTI, TEXAS 78403

361-883-1686
Fax: 361-883-1694

Effective January 1, 2003

### Rates for Cases Opened After January 1, 2003*

### Retainer in Chavez vs. Brownsville I.S.D., et al:

$3,000.00

Retainer will be applied to final balance at case closure only.  Charges for professional
services and expenses will be billed monthly.  The client is expected to pay monthly
invoices promptly.  We reserve the right to cease work in this matter if unpaid accrued
charges exceed the retainer.

### Hourly Rate for Stephen M. Horner, Ph.D.:

$300.00 per hour

### Research Assistant's Services:

$110.00 per hour

Expenses:  Billed at cost.

*Once opened, rates for each case are fixed until January 1 of the calendar year in which
the case would have been open three years.

### Tax I.D. Number 74-2575880

STEPHEN M. HORNER, PH.D.
Economic, Business & Statistical Consulting
P.O. Box 2685
Corpus Christi, Texas 78403
361/883-1686

## CURRICULUM VITAE

## EDUCATION
Ph.D., Economics, The University of Michigan, Ann Arbor, Michigan, 1977
M.P.P., Public Policy Studies, The University of Michigan, Ann Arbor, Michigan, 1973
B.Sc., Economics, California Institute of Technology, Pasadena, California, 1970
Graduated, W.B. Ray High School, Corpus Christi, Texas, 1966

## CONSULTING
| | |
|---|---|
| 1985-Present | General Economic, Business and Statistical Consulting, Various Defense and Plaintiff's Attorneys; Personal Injury and Commercial Damage Economic Evaluation |
| 1987 | Corpus Christi Warehouse and Storage, Corpus Christi, Texas; Lease Negotiation Support |
| 1985 | Susser Petroleum Corporation, Apache Fuels, Corpus Christi, Texas |
| 1978 | Urban Systems, Inc., Cambridge, Massachusetts |
| 1976 | City of Ann Arbor Cablecasting Commission, Ann Arbor, Michigan |

## EMPLOYMENT
| | |
|---|---|
| 1999 | Adjunct Professor of Economics, Texas A&M University, Corpus Christi, Texas |
| 1979-1989 | Executive Vice President, Oil Field Equipment Co., Corpus Christi, Texas |
| 1977-1979 | Assistant Professor of Economics, Wellesley College, Wellesley, MA. |
| 1976-1977 | Lecturer in Economics, Wellesley College, Wellesley, MA. |
| 1975 | Lecturer, School of Public Health, The University of Michigan, Ann Arbor, MI |
| 1974-1975 | Teaching Assistant, School of Public Health, The University of Michigan, Ann Arbor, Michigan |
| 1972-1975 | Research Assistant, The Institute of Public Policy Studies, The University of Michigan, Ann Arbor, Michigan |
| 1971 | Teaching Assistant, Industrial Engineering, School of Engineering, The University of Michigan, Ann Arbor, Michigan |
| 1970-1971 | Special Administrative Assistant to the Chairman of the Board, International Business Machines Corporation, IBM Internship Program, Armonk, New York |

## PROFESSIONAL ASSOCIATIONS
National Association of Forensic Economics, (President 2003-2004, Western Vice-President, 1992 - 1996)
  *Journal of Forensic Economics*, (Board of Editors, 1996-2000)
American Economic Association
American Statistical Association
Western Economic Association International

## PUBLICATIONS
"The Valuation of Earning Capacity: Definition, Measurement and Evidence" in *Journal of Forensic Economics*, 1999, 12(1), 13-32.
"Reference Guide for Valuing Economic Loss in Personal Injury, Wrongful Death and Survival Actions," with Thomas R. Ireland and James D. Rodgers, in *Expert Economic Testimony: Reference Guides for Judges and Attorneys*, by Thomas R. Ireland, Stephen M. Horner, James D. Rodgers, Patrick A. Gaughan, Robert R. Trout and Michael J. Piette. Tucson, AZ: Lawyers & Judges Publishing Company, 1998.
Review of Gamboa, Jr., A. M. (1995): *The New Worklife Expectancy Tables*, in *Journal of Applied Rehabilitation Counseling*, Volume 27, Number 3, Fall 1996, page 67

**Last 4 years:**

| Date | Deposition & Trial Testimony | Case Number | Case Name | Attorney Name | Court | Cause Number | Style of Case |
|------|------------------------------|-------------|-----------|---------------|-------|--------------|---------------|

Stephen M. Horner, Ph.D.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

DINO X. CHAVEZ              ) (
                           ) (
VS.                        ) (   B-02-128
                           ) (
BROWNSVILLE INDEPENDENT    ) (
SCHOOL DISTRICT, NOE       ) (
SAUCEDA, MARILYN DEL       ) (
BOSQUE-GILBERT and         ) (
RANDALL DUNN               ) (

---

ORAL DEPOSITION OF

STEPHEN M. HORNER, Ph.D.

SEPTEMBER 5, 2003

---

ORAL DEPOSITION OF STEPHEN M. HORNER, Ph.D.,
produced as a witness at the instance of the DEFENDANT
AMERICAN FAMILY LIFE ASSURANCE COMPANY OF COLUMBUS,
taken in the above styled and numbered cause on
SEPTEMBER 5, 2003, from 8:17 a.m. to 12:43 p.m. and
2:07 p.m. to 4:29 p.m., before LOU ZUNIGA, Certified
Court Reporter No. 2198, in and for the State of Texas,
at the offices of J. Arnold Aguilar, 1200 Central
Boulevard, Suite H-2, Brownsville, Texas, pursuant to
the Federal Rules of Civil Procedure and the provisions
stated on the record or attached therein.

# EXHIBIT B



Page 4

1                    STEPHEN M. HORNER, Ph.D.,

2    having been duly sworn, testified as follows:

3                         EXAMINATION

4    BY MR. STEELE:

5        Q.  Dr. Horner, my name is Buddy Steele, and I'm

6    here to take your deposition in a case styled Dino

7    Chavez versus Brownsville Independent School District,

8    Et Al.  I understand you were hired as an expert

9    witness in that case; is that correct?

10       A.  Yes.

11       Q.  I also understand based upon some information

12   in a report that you provided that you've testified in

13   a number of other cases; is that correct?

14       A.  Yes.

15       Q.  Both at depositions and at trial, correct?

16       A.  Yes.

17       Q.  So you understand the process of the

18   deposition, I take it?

19       A.  I believe so.

20       Q.  Fair enough.  Then I'm going to jump right in

21   and ask you some questions about yourself.  I see from

22   your curriculum vitae that's attached to your report

23   that you graduated from Corpus Christi High School in

24   1966; is that correct?

25       A.  Ray High School.

Page 26

1    the defendant?

2        A.  Plaintiff.

3        Q.  I take it Doe has not yet gone to trial or

4    settled?

5        A.  That's my understanding.  Sometimes I'm not

6    told.

7        Q.  Got it.  Do you know the terms of the

8    settlement in Hickey?

9        A.  No.  I'm seldom told that.

10       Q.  You just know it's over and your services are

11   much appreciated but no longer needed?

12       A.  That's what they said anyway.

13       Q.  Appreciated or not.  Okay.  In the last four

14   years have you provided expert consulting services on

15   behalf of a party involved in an insurance agent's

16   commissions other than the Chavez and Andrus cases?

17       A.  Yes.

18       Q.  What case?  In the last four years now.

19       A.  Have I provided consulting?

20       Q.  Right.

21       A.  But not necessarily testimony?

22       Q.  Right.

23       A.  I think so.  I don't know the name of it, but I

24   was involved with New York Life agents.

25       Q.  And tell me about that.

Page 27

1      A.   They were -- I believe that they were

2   terminated for refusing to sell -- I don't remember the

3   exact circumstances of it anymore.  I just know that

4   they were either terminated or whether there was a

5   constructive termination.  I'm not sure what the exact

6   situation was.  But there was a dispute as to whether

7   New York Life was selling these particular policies,

8   like I say, in good faith.  Certainly the brochures

9   that were being passed around of the policies were

10  misleading, at best.

11     Q.   Who asked you to consult with them about that

12  case?  Was it New York Life or was it the dismissed

13  agents?

14     A.   The dismissed agents.

15     Q.   Were you approached by their counsel or by the

16  agents individually?

17     A.   By their counsel.

18     Q.   Okay.  What year was that?

19     A.   I really don't know.  It's been several years

20  ago.  It may not have been the last four years but it

21  may have been.  I just don't know.  I think it was but

22  I can't be certain.  Time seems to fly.

23     Q.   Based on what you told me am I correct in

24  understanding that the upshot of that consultation was

25  that you were not hired to provide testimony of any

1    kind either at deposition or in trial with regard to

2    that New York Life case?

3        A.   No.

4        Q.   What's the upshot then?

5        A.   It settled before any of that happened.

6        Q.   In the last four years then any other cases

7    where you have been -- and what was the purpose of your

8    consultation?  Was it to do a damage model or to

9    calculate damages?

10       A.   I would describe it that way.  It's not quite

11   the same as that but pretty close.

12       Q.   How would you describe it?

13       A.   I performed some calculations showing the

14   implications of the business plan for those agents that

15   was provided to them by New York Life.

16       Q.   Okay.

17       A.   They actually provided the model.  I just

18   evaluated it.

19       Q.   "They" meaning the agents provided you the

20   model that they had received from New York Life?

21       A.   No, it was a New York Life management model

22   that they provided to their agents as part of their

23   training process, and I evaluated that particular

24   model.

25       Q.   In the last four years have you given testimony


1    either at trial or in deposition regarding damages that

2    may have been suffered by an insurance salesman?

3         A.   Yes.

4         Q.   In what case?

5         A.   Rusteberg.

6         Q.   Towards the middle?

7         A.   Yes, sir, about 40 percent of the way from the

8    top, or 35 percent away from the top.

9         Q.   Tell me about that case.  Against Arnie

10   Olivarez and David Hall.  William Rusteberg was suing

11   Arnie Olivarez and David Hall?

12        A.   Yes, sir.

13        Q.   Tell me about that case.

14        A.   What would you like -- tell me.

15        Q.   Tell me what you did in that case.  First of

16   all, tell me the issues as you understood them.  Go

17   ahead and tell me that.

18        A.   The issues were that it was alleged that Arnie

19   Olivarez had interfered with a contract that Rusteberg

20   believed he had with whichever insurance carrier it was

21   -- and I can't remember the name of it right now.

22   Rusteberg had gotten a -- for lack of a better word,

23   I'll call it a franchise from this particular large

24   insurance company, whatever the biggest insurance

25   company in the state is.  I don't remember which one

Page 30

1    that is now but by far the largest.

2                   (Off record).

3         A.   Yes, this was a large company.   But that was an

4    issue in the case, also.   I remember relying on those

5    statistics with that insurance company.   But the -- it

6    was alleged that Arnie Olivarez had been -- had done

7    several things to interfere with Mr. Rusteberg's

8    relationship with this insurance company.   Mr.

9    Rusteberg had the contract in another area and on the

10   face of the contract in the other area in partnership

11   with another -- Mr. Rusteberg had been banned -- had

12   been barred from this insurance company as a result of

13   some action taken by the insurance commissioner for

14   selling a lot of policies in companies that went -- it

15   was a group plan for school districts.   They were very

16   inexpensive and very popular and the company went out

17   of business.   It was an unregistered company.   What he

18   was doing is in violation of insurance rules.   He

19   wasn't telling people and he was barred -- I think he

20   was suspended by the State regulatory authority and he

21   was essentially fired by this large insurance company.

22                   He later on through a buddy of his gets

23   another franchise, another opportunity to sell policies

24   for this company, and he attempts to move into several

25   school districts in which Mr. Olivarez had very strong

Page 31

1   relationships, you can say, and he alleged that Mr.

2   Olivarez went to school board members and told them

3   about the problems that Rusteberg had had and

4   apparently he did, I think William' testimony was that

5   that actually occurred.  It's a question of how

6   improper it was or it was not improper.  But Mr.

7   Rusteberg lost some business, he claims, and he sued

8   Mr. Olivarez for that and Mr. David Hall.  Both of them

9   were -- those were -- they are not associated but they

10  were both supposedly doing damage to Mr. Rusteberg.

11      Q.  Okay.  Who did you represent or who did you

12  consult with, Mr. Rusteberg, Mr. Olivarez or Mr. Hall?

13      A.  Mr. Olivarez was -- his attorney was Rick

14  Oldenettel out of Houston and Mr. Oldenettel was my

15  client.

16      Q.  And what was your analysis of?  What were you

17  trying to analyze?

18      A.  I was analyzing the damage argument that Mr.

19  Rusteberg's expert was projecting for Mr. Rusteberg.

20      Q.  And tell me what you remember about your

21  analysis of his projections and his damages, your

22  analysis of it.

23      A.  It was wrong.

24      Q.  In greater detail, if you could.

25      A.  I probably can't do much more detail than that,

1    but it was fairly -- I just remember from the analysis

2    that Mr. Rusteberg's -- the model produced by Mr.

3    Rusteberg was not borne out by the underlying facts.    I

4    believe that they projected some huge growth rates

5    which we had never seen in the past from Mr.

6    Rusteberg's business.    In fact, I think Mr. Rusteberg's

7    information may have been going down at the time they

8    were -- before this action they were projecting huge

9    growth rates at that time is my recollection.    But it's

10    been -- well, probably three years so I don't remember.

11    That's one of the cases where I testified in deposition

12    and I sat around the courthouse for a very long time

13    but did not testify.

14         Q.   Did it settle during trial?

15         A.   It did not settle.   It went to a verdict.

16         Q.   But you were never called to testify as an

17    expert witness at the trial?

18         A.   That may have been a mistake.   Excuse me.

19         Q.   The answer is that you were not called to

20    testify?

21         A.   That is correct.

22         Q.   Were you told why you were not called to

23    testify?

24         A.   They thought they were winning.

25         Q.   And what was the outcome?

1     A.   It was a significant judgment in favor of Mr.

2   Rusteberg.

3     Q.   Do you know if that judgment has been appealed?

4     A.   They told me that they would, but I -- but you

5   know how these things go.   Sometimes they appeal and

6   then they settle before they're appealed.

7          Could we take a short break for a minute?

8   I'd like to refresh my coffee.

9     Q.   Absolutely.

10         (Recess).

11    Q.   Dr. Horner, before we left you had been talking

12  about some of the cases you had handled on the

13  attachment to your report, and you identified Rusteberg

14  as being one concerning insurance agents sales,

15  correct?

16    A.   Yes, sir.

17    Q.   Any other cases on that same sheet that

18  involved insurance agents sales?

19    A.   I'm pretty sure there are no others on here.

20    Q.   Would the -- what was the type -- what were the

21  kinds of policies being sold that were the subject of

22  the Rusteberg case?

23    A.   Group health.

24    Q.   Group health?

25    A.   Yes, sir.

Case 1:02-cv-00128   Document 77   Filed in TXSD on 10/30/2003   Page 45 of 89

Page 34

1    Q.   So they were not the same type of policies at

2  issue here; mainly supplemental insurance?

3    A.   That's correct.

4    Q.   Have you ever provided consulting services as

5  an expert involving -- in a case involving the sale of

6  supplemental insurance products?

7    A.   Not other than this one.

8    Q.   You have provided through your counsel

9  documents from your office, I believe, and I'm going to

10  go over some of those briefly.  I'm not going to make

11  this an exhibit just because I want to save on volume,

12  but I believe that is an invoice that you sent Mr.

13  Aguilar, correct?

14    A.   Yes.

15    Q.   That first entry of February 12th, 2003 saying,

16  extended tele conference with Mr. Aguilar, do you

17  believe that was the first time you talked to Mr.

18  Aguilar about the possibility of your serving as a

19  consultant in this case?

20    A.   Yes.

21    Q.   No prior contact before that time about this

22  case with Mr. Aguilar, correct?

23    A.   There shouldn't be.

24    Q.   You can't say for sure but you don't believe

25  there was?

1    the primary things.

2        Q.   And am I correct in stating you attempted to

3    analyze the data and determine the damages you believe

4    Mr. Chavez suffered as a result of that?

5        A.   What I have done at this point in time is I

6    have prepared some preliminary calculations.  I believe

7    I said they were for purposes of illustration that

8    would give some idea of the magnitude of the kind of

9    damages we would be talking about under the assumptions

10   that I was given both by Mr. Chavez and that I

11   developed based on the other material that I had.  And

12   so those illustrations -- that illustration is, in

13   fact, what is contained in that preliminary report.

14       Q.   And the preliminary report you're referring to

15   is Exhibit 1, correct?

16       A.   It's in Exhibit 1, yes, sir.

17       Q.   What is -- why is it preliminary and not final?

18       A.   There's at least two things that I don't have

19   or that I didn't have when this was done, maybe more.

20   Let me see if I can't tell you what they were.

21       Q.   All right.

22       A.   At the time this report was prepared I was

23   concerned about the projected growth rate for Mr.

24   Chavez and I was hoping to see data that would help me

25   nail that down, that would help me feel more

Page 68

1   comfortable that the growth rate is very important in

2   that a small change in the growth rate can have a

3   fairly large impact on the bottom line damages that

4   we're doing.  So that growth rate is important.  And so

5   I wanted more information from it on growth rates.

6       Q.  And what information were you hoping to gather?

7       A.  I was hoping to gather information from Mr.

8   LaFemina in particular about what kinds of growth rates

9   they were getting and expecting in his region at AFLAC,

10  for one.  I was hoping to see from Mr. LaFemina's own

11  history as a very successful -- I'm not quite sure what

12  term I'm going to use, but as a -- every term I use is

13  already used and it doesn't mean exactly what I want to

14  say.  But in his association with AFLAC he's a very

15  successful man, and I thought it would be very

16  interesting to see his history and see how well Mr.

17  LaFemina was doing as a benchmark.

18      Q.  So in your opinion Mr. LaFemina would be a good

19  benchmark for purposes of calculating Dino Chavez'

20  damages?

21      A.  I thought it would be useful.  Maybe benchmark

22  is not the right word.  Certainly a useful reference

23  point.

24      Q.  Why?

25      A.  He was a very successful agent and it appeared

1  that, again, DSC and RSC and -- I don't know how

2  successful he is as SSC but he's certainly there.  He

3  may be a very good SSC.

4      Q.  Do you believe that Dino Chavez could have been

5  as successful as Frank LaFemina?

6      A.  I don't know whether he could or not.

7      Q.  Then why was LaFemina's results important to

8  you?

9      A.  Because it provides a concrete example.  As I'm

10  sure you have noted, these figures that are in this

11  preliminary projection show fairly -- very high growth

12  rates, and as such one would be concerned about whether

13  those growth rates are unreasonable.  And so one way to

14  look at that is to see what one successful person at

15  AFLAC has done and that's why I have asked for that.

16      Q.  Okay.  What else --

17      A.  I have not -- but, anyway, that's -- excuse me.

18      Q.  What else did you -- was there anything else

19  that you wanted to gather to help you nail down the

20  projected growth rate?

21      A.  Well, I also have hope that Mr. Barnson might

22  also shed some light on growth rate that they have been

23  experiencing at the next level up from Mr. LaFemina.

24      Q.  Okay.  What else in terms of data would you

25  like to have regarding projected growth rate?

Page 70

1        A.   It would be good to know if there was such --

2   if there is or was such a 15 percent policy.  I think

3   that would be useful to know.  I don't know -- I think

4   that was pretty well covered, what I was looking for in

5   the way of growth rates.

6        Q.   Okay.

7        A.   That I had expectation of getting, let me put

8   it that way.

9        Q.   Okay.  Have you tried to do any independent

10  research on your own to confirm the growth rate of

11  AFLAC regional sales coordinators?

12       A.   No.  When you say independent on my own, you

13  mean go directly to AFLAC or some other source?

14       Q.   Right.

15       A.   No, I have not done that.

16       Q.   And you have told us everything that you would

17  like to have seen to help you, quote, nail down that

18  growth rate, correct?

19       A.   Well, I think so.

20       Q.   Okay.

21       A.   It's possible I have forgotten something.

22       Q.   Now, was there anything else?  You mentioned

23  two things, maybe more, that you didn't have that makes

24  this Exhibit 1 report preliminary as opposed to final.

25  Was there something else?

1      A.   There's some more things that are missing,

2    yes.

3      Q.   What are those missing things?

4      A.   Well, every month that goes by we have more

5    information on Mr. Chavez' performance and success in

6    litigating his damages outside of AFLAC.  And so at the

7    time this report was done there was really almost no

8    history.  There's still not a lot more but there is

9    more and I'm hoping to see more so that we can -- I

10   believe it's going to be very difficult to make a

11   projection, but I was hoping to get more information

12   anyway.

13     Q.   Why would it be so difficult to make a

14   projection of what Mr. Chavez could be earning?

15     A.   Because we just have months of history.

16     Q.   Well, keep in mind that I believe Mr. Chavez

17   told you that he was terminated as an RSC back in

18   December of 2001, correct?

19     A.   Yes.

20     Q.   And you were first hired over a year later in

21   February or March of 2003, correct?

22     A.   Yes.

23     Q.   So he had at least 14 months.  Why couldn't you

24   use at least -- and when your report came out May 15th,

25   you had I guess close to 16 months.  Why couldn't you

Page 72

1   use those 16 months of Dino's income and his ability to

2   work to make projections as to how he could mitigate

3   his damages?

4       A.  Because I believe that his performance during

5   that early time period does not adequately demonstrate

6   how well he's likely to do.

7       Q.  Now, define for me early time period.  16

8   months?

9       A.  2002.

10      Q.  So an entire year?

11      A.  An entire year, yes, sir.

12      Q.  In your experience in consulting with folks who

13  claim to have been damaged as opposed -- because of

14  some kind of wrongful termination of their employment,

15  have you known these employees to -- folks who are

16  self-employed -- you understand that Dino Chavez was

17  self-employed, correct?

18      A.  In a legal sense he certainly was, yes, sir.

19      Q.  Now, have you provided expert testimony with

20  regard to other self-employed consultants or

21  independent contractors that claim to have been

22  wrongfully terminated in some way?

23      A.  I would say the answer is yes, if I understand

24  that question.

25      Q.  Okay.  Tell me those instances in which you

1  that again, please.

2      Q.  We're talking about mitigation, right?

3      A.  Oh, I'm -- I'm sorry.  Okay.  We're talking

4  about mitigation.

5      Q.  You have not attempted to calculate the amount

6  of money that Dino Chavez could make from 2002

7  projected out 25 years, correct?

8      A.  I have not performed calculations like that

9  yet.

10     Q.  Okay.  And I believe you told us the reason,

11  because you didn't have data that you felt was reliable

12  to base those calculations on?

13     A.  That is correct.

14     Q.  But you do agree as an economist in appropriate

15  practice and methodology you should take that

16  mitigation into effect in coming up with what will be

17  called a final ultimate damages figure for a complaint,

18  correct?

19     A.  Yes.

20     Q.  The methodology being this is how much this

21  person could have lost by losing one job, but then he's

22  able to go out and get another job, may make more, may

23  make less.  And you calculate what he would make from

24  that other job and it has to be subtracted from what

25  you believe he lost from the job that led to the

Page 88

1   complaint, correct?

2        A.   Correct.

3        Q.   But you haven't done the latter; you haven't

4   done the mitigation calculation?

5        A.   Not yet.

6        Q.   If that were done, that would change the

7   number --

8                  MS. LEEDS:   Second to the last page.

9                  MR. STEELE:   Thank you.

10       Q.   That would reduce the $5,344,463 that are your

11   preliminary calculations about the present value of his

12   commissions?

13       A.   Whatever number -- I'm going -- I apologize for

14   this.   I'm going to try to help you even though my

15   client might kick me.   But instead of just answering

16   no, let me say that what I would do is from whatever

17   the numbers are that I will make in a final projection

18   of Mr. Chavez' earnings from his position as an RSC

19   that he had with AFLAC prior to these events, I would

20   subtract my projections of what he will be able to do

21   given that he is no longer in that position.

22       Q.   Got it.

23       A.   And that would -- that is the method by which

24   we would calculate the loss.   And if we started with

25   five million and something, it would be less than that.

1      A.   That's correct.

2      Q.   Do you believe it's reasonable to assume that

3  Dino Chavez will be able to earn a living for the next

4  25 years?

5      A.   Yes, I do.

6      Q.   So can we expect your opinion regarding Mr.

7  Chavez' damages of $5,344,463 to change after you have

8  calculated Mr. Chavez' mitigation opportunities?

9      A.   Definitely.

10      Q.   And that would be an appropriate method in

11  order to advise a judge or a jury regarding Mr. Chavez'

12  damages in this case, correct?

13      A.   Correct.

14      Q.   Without mitigation, it would not be appropriate

15  to advise the judge or a jury about Mr. Chavez'

16  damages, would it?

17            MR. AGUILAR:   Objection; mischaracterizing

18  the evidence.

19      A.   False.

20      Q.   Why not?

21      A.   As long as one were careful to point out what

22  it was that one was doing, that these were not

23  necessarily damage numbers, you still could be

24  providing useful information to the court in doing the

25  projection of what one would expect him to have done.

1    understanding.  My understanding was he was going to

2    continue doing that in 2001, at least in the December

3    2001 time period.  So I know he was going to continue

4    at least a little bit but I don't know when it was

5    going to stop if it was going to stop.

6        Q.  But your model effectively phases that out

7    beginning in the year 2002 or 2003, correct?

8        A.  2002, I just -- it's just not there.

9        Q.  It just eventually stops?

10       A.  That's correct.

11       Q.  Now, you also have projected expenses in coming

12   up with the net that you believe Mr. Chavez would have

13   made, correct?

14       A.  Yes.

15       Q.  And in your expense calculations you are

16   relying upon what Mr. Chavez has told you about his

17   office expenses, correct?  And it's stated there on

18   Page 2.

19       A.  Yes, sir, that's correct.

20       Q.  And I believe you state that Mr. Chavez

21   projects his remaining expenses to be $59,104 would

22   have grown only with inflation in the future, correct?

23       A.  Yes, sir.  That's what he told me.

24       Q.  So you apply an inflation factor of 3.1 percent

25   to those expenses, correct?

Page 105

1      A.   Yes, sir.

2      Q.   On the other hand, over this same 25-year

3  period -- as a result, those expenses over the 25 years

4  at 3.1 percent in the year 2027 or whatever it is have

5  slightly more than doubled, correct?

6      A.   Yes.

7      Q.   Whereas at the same time, according to your

8  calculations, his revenues have increased 75 fold,

9  correct?

10     A.   That's roughly correct, yes, sir.

11     Q.   Do you think it is reasonable to assume that

12  with a 75 fold increase in revenue which is necessarily

13  going to be a 75 fold increase in policies he's selling

14  and I would assume a 75 fold increase in the number of

15  policies that will have to be serviced, that it's

16  reasonable to assume only doubling of his expenses?

17          MR. AGUILAR:  Objection; mischaracterizing

18  the evidence and misstating facts.  With that, go

19  ahead.

20     A.   No.

21     Q.   It's not reasonable, is it?

22     A.   No.  I just disagree with the question.

23     Q.   Okay.  Let me ask it this way.

24     A.   The predicate to the question is just not right

25  so I can't answer that question.

Page 106

1    Q.   Okay.

2    A.   I can't agree with the first part of it.

3    Q.   Do you think it's reasonable to assume that if

4  there is a 75 fold increase in revenue there will only

5  be a doubling of expenses?

6    A.   Based on the information that I've been given,

7  that's not unreasonable.

8    Q.   And that information comes from Mr. Chavez?

9    A.   Yes, sir.

10    Q.   Is there any economic theory that supports that

11  conclusion?

12    A.   Well, I don't think there's any economic theory

13  that says one thing or the other about that particular

14  implication.

15    Q.   If there were such large economies of scale --

16  because you're talking about massive economies of scale

17  here, correct?

18    A.   25-year stints.

19    Q.   A 75 fold increase in revenue but only doubling

20  of expenses?

21    A.   I think it would be fair to call that very

22  significant economies to scale.  Yes, I think you

23  would.  I think you would.  And the reason why I'm

24  saying that -- of course, anything is obvious, but the

25  economies to scale note is perhaps a little bit

Page 107

1    debatable.  I could characterize it that way, yes, sir.

2        Q.  And if there were such significance economies

3    of scale achievable, wouldn't that result in a

4    consolidation of a lot of little agencies into a few

5    big insurance agencies?

6        A.  No.

7        Q.  Why not?

8        A.  Because we're not talking about insurance

9    agencies.

10       Q.  What are we talking about?

11       A.  We're talking about a person who is an RSC for

12   AFLAC.  He's not an insurance agency.

13       Q.  Okay.  Have you done any other investigation

14   into the expenses of other RSCs of AFLAC in trying to

15   determine whether your conclusion regarding Chavez'

16   projected expenses is reasonable?

17       A.  Yes.

18       Q.  And tell me about that.

19       A.  I talked to Mr. Chavez about Mr. LaFemina's

20   operation prior to being promoted to a state sales

21   coordinator.  My understanding is that Mr. LaFemina was

22   running somewhere in the order of six or $7,000,000 in

23   sales as an RSC with one administrative assistant.

24       Q.  Okay.  So your -- six to 7,000,000 in sales.

25   Okay.  Anything else that you did to investigate

Page 108

1    whether your estimate of Chavez' projected expenses was

2    reasonable, other than what Mr. Chavez told you about

3    LaFemina's operation?

4         A.  No.

5         Q.  That's it, correct?

6         A.  Well, I've discussed the issue with Mr. Chavez.

7    I mean, that was obviously an issue.

8         Q.  And that was it?  That's all that you did to

9    try to test the theory that Dino's expenses would only

10   double when his revenue increased 75 fold?

11        A.  Yes, sir, that's correct.

12        Q.  Did you ask Dino to compare -- did he explain

13   to you how his operation compared to Mr. LaFemina's

14   operation?

15        A.  Basically, yes.

16        Q.  What did he tell you?

17        A.  He told me that LaFemina had some very large

18   groups that he had in Dallas, a large school district.

19   He may have the Dallas Independent School District.  He

20   told me -- and he may have had more than just that one

21   very large group out there in North Texas.  He told me

22   that Mr. LaFemina, however, did not do any

23   administration for any school districts.

24        Q.  And that's different from Mr. Chavez'

25   operation, isn't it?

Page 114

1      Q.   I don't think so but you just stop me --

2           MR. AGUILAR:   Let's go for another five

3      minutes.

4      Q.   -- when you've reached the end of your rope.

5      A.   Thank you.

6      Q.   With regard to your growth rate that you

7      utilized in your report did you look at any other RSCs

8      within AFLAC to see if they have had such sustained

9      growth?

10     A.   No.

11     Q.   Have you looked at any other insurance agencies

12     selling supplemental insurance to see if they have

13     enjoyed such sustained growth rates?

14     A.   No.

15     Q.   Have you looked at any other insurance agency

16     no matter what they sold to see if they have sustained

17     such growth rates?

18     A.   No.

19     Q.   And admittedly when you look at the numbers of

20     Dino's groups there is an enormous jump in 1998 to 1999

21     from 91,673 but I think that's been explained because

22     Dino was an RSC late in the year in 1998, correct?

23     A.   That's certainly a big part of it, yes, sir.

24     Yes, sir, that's correct.

25     Q.   So would it be safe -- and from what I can tell

Page 115

1    from your report you pretty much discounted, if did not

2    entirely ignore, that 632 percent growth rate from '98

3    to '99 in coming up with your projected growth rate for

4    the future, correct?

5        A.   Correct.

6        Q.   And then from '99 to 2000 you show a 68.11

7    percent growth rate.  That's awfully high, too,

8    wouldn't you say?  But the numbers are what they are.

9    I'm not --

10       A.   That's a good growth rate.

11       Q.   That's a good growth rate.  Do you know of any

12   influences in 2000 that are out of the ordinary that

13   could have affected that 68 percent growth rate?

14       A.   Not as I sit here, I don't.

15       Q.   Did you ask Dino what contributed to that 68

16   percent growth rate from '99 to 2000?

17       A.   I don't believe I asked him in that form, no,

18   sir.

19       Q.   Did you ask it in any form of Dino what

20   contributed to his sales growth from '99 to 2000?

21       A.   Not specifically, no, sir.

22       Q.   Did you ask him anything generally?

23       A.   Yes, sir.

24       Q.   Tell me about that.

25       A.   I asked him why are you so successful.

Page 116

1       Q.   And what did he say?

2       A.   He said it's good management, professional

3    management.

4       Q.   So that's your understanding as to why he

5    enjoyed that 68 percent growth rate from '99 to 2000?

6       A.   That's his explanation to me.

7       Q.   You have no other understanding as to why that

8    68 percent growth rate was enjoyed?

9       A.   Correct.

10      Q.   Same question with regard to 2000/2001.  Do you

11   know of anything very unusual or out of the ordinary

12   that could have contributed to that roughly 76 percent

13   growth rate?

14      A.   No.

15      Q.   And we have talked about the basis -- well, how

16   did you come to the -- to assume a roughly 38 percent

17   growth rate from 2002 to 2003.  Did you simply take the

18   2000 growth rate and half it?

19      A.   Yes.

20      Q.   Why did you pick half?

21      A.   Because the 75 percent, although it was an

22   increase from the previous year, was a very high growth

23   rate.  And we -- I believe that that's unsustainable

24   for any long period of time, but I don't know how long.

25   It's got to go down at some point.

Page 117

1    Q.  Why is that?

2    A.  Eventually Mr. Chavez would be selling premiums

3    that would be absorbing a significant portion of the

4    gross national product.

5    Q.  Okay.  And then you have that roughly 38

6    percent again to 18.95 percent or roughly 19 percent,

7    correct?

8    A.  Yes, sir.

9    Q.  And you utilize that growth rate from -- for

10   the year 2004 projected out to the year 2026?

11   A.  Yes, sir.

12   Q.  Why do you believe roughly a 19 percent growth

13   rate is sustainable?

14   A.  Because my understanding is that AFLAC

15   management -- at the time my understanding was that

16   AFLAC management required at least a 15 percent growth

17   rate.  Dino was doing well.  I just halved it again in

18   this illustration, and that was fairly -- it was a

19   little bit above the minimum required and it seemed a

20   reasonable way to go rather than to come up with a --

21   yet another unusual adjustment.

22   Q.  Do you have any evidence, other than what you

23   have told us about what LaFemina said in his deposition

24   and other than what Dino has told you, do you have any

25   evidence that would indicate that any other AFLAC RSC

Page 118

1    has enjoyed similar growth rates?

2        A.   Well, I believe that -- and I haven't actually

3    done the calculation, but I believe that some of the

4    data that I have on the -- comparing the various top

5    RSCs in the country show fairly high growth rates.

6    LaFemina's I believe was a very high growth rate.  And

7    I -- I don't remember what period of time I had the

8    data and I didn't do an exclusive calculation, as I

9    said, but it suggested very high growth rates.

10       Q.   Do you know where LaFemina was either managing

11   or selling policies?  Managing his agents who were

12   selling policies, do you know what his area was?

13       A.   I believe it was the Dallas area.

14       Q.   Do you believe the demographics of the Dallas

15   area are comparable to the demographics of the

16   Brownsville area?

17       A.   Number one, I'm not sure what you mean by the

18   demographics.

19       Q.   By demographics I mean population, level of

20   income, what people do for a living, that kind of

21   thing.

22       A.   I would say the population -- no, the

23   population is not the same.

24       Q.   Okay.

25       A.   The average income is not the same.

1     Q.  Do you think those demographic characteristics

2  influence sales of insurance products?

3     A.  They might very well.

4     Q.  But you didn't look into that in trying to

5  determine whether LaFemina's growth should be

6  comparable to what you projected for Dino Chavez, did

7  you?

8     A.  No.

9     Q.  In fact, have you done any examination of the

10  Brownsville area demographics in analyzing what you

11  believe is a reasonable growth rate for Dino Chavez?

12     A.  No.

13     Q.  Why not?

14     A.  I don't think that there's any useful

15  information to be gathered from such an investigation.

16     Q.  Okay.

17            MR. AGUILAR:  Why don't we take a break?

18            MR. STEELE:  That's fine.

19            (Recess).

20     Q.  Dr. Horner, you've told us about LaFemina's

21  deposition testimony and what Dino Chavez told you with

22  regard to the expected 15 percent growth rate for

23  regional sales coordinators, correct?

24     A.  Yes, sir.

25     Q.  What other evidence, setting aside those --

1    that oral evidence, what other evidence do you have

2    that AFLAC documents and enforces a requirement that

3    its sales coordinators maintain an average annual

4    growth rate and first year premiums of at least 15

5    percent?

6        A.  I have no such document.

7        Q.  Do you have any evidence of what period of time

8    such premiums are averaged to arrive at that average 15

9    percent growth rate?

10       A.  No, sir.

11       Q.  Do you have any evidence of what percentage of

12   regional sales coordinators of AFLAC meet that

13   requirement?

14       A.  No, unless it's in some of those documents I

15   mentioned earlier, but I don't -- I don't know whether

16   I have that evidence or not.  No, I guess, those I

17   don't have evidence of all of them.

18       Q.  And so I take it then you would not have

19   evidence of what percentage of sales coordinators have

20   met that 15 percent growth over a period exceeding 20

21   years?

22       A.  No, I don't have that.  I don't think -- I'm

23   not sure that AFLAC has been doing -- well, they may

24   have but I'm not sure that's true.

25       Q.  So you don't have any evidence to that effect,

Page 121

1    do you?

2        A.   No.   That's true.   That's true.   I don't have

3    any evidence to that effect.   AFLAC might have it, but

4    I don't have it.

5        Q.   Dr. Horner, you testified that you have done, I

6    believe, some other analyses of -- let me ask it like

7    this.   In any of the other analyses that you have done

8    where you have testified in deposition or at trial,

9    employees or consultants or an independent contractor's

10   damages, in any of those instances have you in any of

11   those projected a growth of earnings at nearly 19

12   percent per year for 23 straight years?

13       A.   I don't know of any.

14       Q.   You would remember something like that,

15   wouldn't you?

16       A.   Well, I don't know.

17       Q.   Would you choose to forget something like that

18   because it's so appalling?

19            MR. AGUILAR:   Objection; argumentative.

20       A.   I would not choose to forget it.   I might

21   forget it.   I don't know.

22       Q.   As we sit here today you can't think of another

23   instance in which you have projected 19 percent growth

24   and earnings for 23 straight years in any of your other

25   damage models for employees or consultants or

Page 122

1    independent contractors?

2        A.  No, I can't.

3        Q.  And you've already stated that you haven't

4    looked at the demographics in Brownsville in coming up

5    with your conclusions in this report, have you?

6        A.  That's correct.

7        Q.  Is it also safe to assume that you have not

8    looked at any projected growth rates for the

9    Brownsville area in coming up with your conclusions?

10       A.  That's correct.

11       Q.  In fact, you haven't looked at the demographics

12   of any of the communities within the Valley, have you?

13       A.  In this case, I have not.

14       Q.  That's correct, in this case.

15       A.  That's correct.

16       Q.  Well, just to make sure I cover all my bases,

17   have you looked at demographic statistics in your

18   analyses in other cases?

19       A.  Yes.

20       Q.  Tell me a little bit about that, if you would.

21       A.  Well, tell me -- ask me a question, please.

22       Q.  When you look at demographics, when do you look

23   at demographics in other cases?

24       A.  When you have -- when you are trying to project

25   -- one of the things you're looking for is usually

1    changes in demographics because we're normally looking

2    for changes in businesses when we're doing that.  So we

3    might be looking at whether population is growing or

4    not growing.  We might look at changes in income.  We

5    might look at things like that in situations like that.

6    That's when I would have normally.

7         Q.  And why would you do that?  What instances

8    would cause you to look at those changes in

9    demographics?

10        A.  Well, normally it would have to be some kind of

11   business where you felt that the overall demographics

12   of the community were relevant.

13        Q.  And what businesses would those be?

14        A.  Ones that sold to the general population

15   usually.

16        Q.  Okay.  Does -- do you understand that Dino

17   Chavez sells to the general population these

18   supplemental insurance products?

19        A.  Primarily not.

20        Q.  What do you understand his customer base to be?

21        A.  Primarily being sold through large employers.

22        Q.  Okay.  And who makes up these large employers?

23        A.  Generally they're either governmental agencies

24   such as school districts, counties, cities --

25        Q.  Okay.

Page 124

1      A.   -- would be the primary ones.

2      Q.   Why is that customer base different than the

3   general population?

4      A.   Well, it's not the general population.

5      Q.   Who works at counties, cities and governmental

6   agencies; the general population, right?

7           MR. AGUILAR:  Objection; mischaracterizing

8   the evidence.

9           MS. LEEDS:  Objection to the objection.

10     Q.   Dr. Horner, honestly and seriously, I'm trying

11   to understand why you didn't do any demographic studies

12   in this instance.

13     A.   I did not think they would have been relevant

14   in this instance.

15     Q.   Explain why you don't think they would have

16   been relevant.

17     A.   They're -- I don't think -- I don't know what

18   kind of information I would have gotten from this that

19   would have been useful to me.

20     Q.   Probably something that would show you 19

21   percent growth rate over 23 years is absurd, but other

22   than that --

23           MR. AGUILAR:  Objection; argumentative.

24     Q.   -- don't you think it would be helpful in

25   determining a projected growth rate in sales to look at

Page 125

1   the customer base to which you were selling?

2       A.  Might be, yes.

3       Q.  Isn't that what marketing companies try to do

4   day in and day out?

5       A.  Yes.

6       Q.  Don't they pay a lot of money for that kind of

7   information in order to project their customers and

8   what they think their customers want and what they

9   think their customers will buy?

10      A.  Sometimes they charge a lot for it.  It's

11  really part of their business.

12      Q.  Absolutely.  So it's important to know your

13  customer bases in projecting your sales, correct?

14      A.  Yes.

15      Q.  And in this case, if I understand your report

16  and what you're telling me, you have done nothing to

17  look at the projected growth in employees in any of the

18  governmental agencies, school districts or other large

19  employers whom Dino Chavez historically has served,

20  have you?

21      A.  Well, I do have the statistics on the growth of

22  employees at the Brownsville Independent School

23  District.

24      Q.  Okay.  Do you have any statistics on the

25  projected growth of employees at BISD?

Page 126

1      A.   No.

2      Q.   So you have historical statistics on BISD only,

3 correct?

4      A.   That's correct.

5      Q.   Do you have any historical statistics on a

6 single other large employer whom Dino Chavez served?

7      A.   No.

8      Q.   And you have absolutely no projections on those

9 same employers into the future, do you?

10     A.   That's correct.

11     Q.   But the entirety of Dino Chavez' livelihood

12 certainly as projected at AFLAC is going to depend upon

13 those employers within his territory, correct,

14 depending upon his customer base?

15     A.   It depends on his customer base.  I'm not sure

16 that his territory is necessarily as restricted as you

17 say.  My understanding is he had some sales agents

18 outside of the Rio Grande Valley.

19     Q.   Did you try to determine what percentage of his

20 total regions team, those outside sales agents

21 contributed?

22     A.   No.

23     Q.   Was it your understanding that primarily the

24 Valley and the Brownsville area was the geographic

25 location of Dino's sales agents?

Page 127

1     A.   Yes, it was.

2     Q.   So that's the primary area you're talking about

3  in terms of growth, correct?

4     A.   Certainly at first it would be.

5     Q.   Okay.  And it is important in order to project

6  sales within that area to understand as best you can

7  the projected population growth in that area, correct?

8     A.   I don't know how important it is but it could

9  be useful.  The kind the growth rates we're talking

10  about are much higher than the population growth rates.

11     Q.   They certainly are.  What about projected

12  growth in income in the geographic area?  Wouldn't that

13  be important in determining what type of disposable

14  income people have to purchase supplemental insurance

15  products?

16     A.   I don't know whether that would be relevant or

17  important or not.

18     Q.   Why don't you know?

19     A.   Because I don't know whether people who have

20  more income buy more supplemental insurance products or

21  not.

22     Q.   You just don't know one way or another, do you?

23     A.   No, I don't know one way or the other.

24     Q.   So that's why you can't say that would be

25  important to know in coming up with your growth rates.

Page 128

1    Suffice it to say you've done nothing whatsoever in any

2    form or fashion to project demographic changes within

3    the Valley in coming up with your projected growth

4    rates for Dino Chavez?

5        A.   That is correct.

6        Q.   And you just don't know whether that's

7    important one way or the other?

8        A.   No.  I believe that's not important is what I

9    told you earlier.

10       Q.   Something you can just ignore entirely in

11   coming up with your conclusions?

12       A.   Yes, sir.

13       Q.   Okay.  Do you know the type of growth, if any,

14   Brownsville teachers are enjoying vis-a-vis their

15   salaries?

16       A.   No.

17       Q.   Do you know if Brownsville teachers are

18   actually getting paid more or less now than they were

19   in 2001?

20       A.   No, I don't know the answer to that.

21       Q.   But you would agree that BISD is one of his

22   largest accounts or was one of his largest accounts,

23   correct?

24       A.   I would agree with that.

25       Q.   Don't you think it's important to know whether

Page 129

1    teachers are going to have a larger salary that they

2    can utilize on buying supplemental insurance in coming

3    up with your projections?

4         A.   That could be relevant, yes, sir.

5         Q.   But you don't know anything about that, do you?

6         A.   I haven't done -- I have no information about

7    projection of where their salaries are going.

8         Q.   You don't even know where their salaries were,

9    do you?

10        A.   No.   That's correct.

11        Q.   In coming up with your discount factor just in

12   very kind of a shorthand term, the discount factor is

13   going to take into account risks associated with

14   achieving income in the future, correct?

15        A.   That's one of the things it does, yes, sir.

16        Q.   And in coming up with your discount rate did

17   you try to take into account any of the political risks

18   associated with changing of school boards or other

19   boards of public entities served by Dino Chavez?

20        A.   Considerations like that are one of the reasons

21   why I increased his discount rate above the amount from

22   the size considerations and from risk free rates and

23   from the AFLAC related beta adjusted discount factor.

24   So that was one of the things I was thinking about when

25   I did that.

Page 156

1  can determine that from these monthly accounting

2  statements?

3      A.  I'm not sure.

4          MS. NEALLY:  Let's take a break for lunch.

5          (Lunch recess)

6              EXAMINATION

7  BY MS. NEALLY:

8      Q.  Okay.  This is the continuation of your

9  deposition.  Dr. Horner, my name is Elizabeth Neally.

10  I'm the attorney that represents the Brownsville

11  Independent School District.  I'm going to try to

12  follow up with some questions that Mr. Steele was

13  asking you and not to be repetitive but I need a lot

14  more clarification than Mr. Steele, okay?  You have

15  been -- you've been doing this consulting work for the

16  last 18 years, is that right, since 1985?

17      A.  Yes.

18      Q.  Okay.  And in that time I'm assuming you have

19  had hundreds of cases where you have consulted; is that

20  right?

21      A.  Yes.

22      Q.  You don't have any knowledge about an average

23  of how many in a year or anything like that?

24      A.  Yes.

25      Q.  How many?

1       A.   About 100.

2       Q.   100 a year?

3       A.   Roughly.  It varies.  Probably closer to 91,

4  92, somewhere in there if you were to average.

5  Occasionally I get 107 or so.

6       Q.   Okay.  So about 100 a year?

7       A.   About 100 a year.

8       Q.   Okay.  And you also -- and that's the

9  predominant way you make your living; is that right?

10      A.   Yes.

11      Q.   Okay.  Do you also still teach?

12      A.   No.

13      Q.   Okay.  When did you quit teaching?

14      A.   The last time I taught was in '99.

15      Q.   Okay, 1999.  And that was with Texas A&M?

16      A.   Texas A&M.

17      Q.   Okay.  So since 1999 your sole source of income

18  has been from consulting in lawsuits?

19      A.   My sole source of my personal earned income is

20  from consulting of various kinds, nearly all of it is

21  lawsuits but it is not 100 percent lawsuits.

22      Q.   Okay.  What percentage; 90 percent, 95 percent?

23      A.   96 or 97, somewhere in there.  Close -- not 100

24  but not --

25      Q.   Okay.

Page 170

1    -- who caused what in this particular case either.

2        Q.  Okay.

3        A.  If that answers the question.

4        Q.  Okay.  And you're not holding yourself out to

5    be an expert in the insurance industry; is that right?

6        A.  That is correct.

7        Q.  Okay.  So returning to Dr. House's report, we

8    were on I believe it was Paragraph 3 and you said you

9    -- that you personally didn't have any agreement or

10   disagreement?

11       A.  Well, what I said was that he's really reciting

12   facts as he knows them, and my only basis for disputing

13   any of those would be what I was told.  There's not an

14   expert issue with regard to those.

15       Q.  Okay.

16       A.  Those descriptions are not necessarily the

17   words that I would suspect that would be used by Mr.

18   Chavez in describing these and I probably wouldn't

19   either because of that.

20       Q.  Okay.  But the facts that you were told, you

21   were told by Mr. Chavez --

22       A.  That's correct.

23       Q.  -- related to this, right?

24       A.  Yes.

25       Q.  Okay.  Now, did you notice the footnotes to

Page 214

1   statement and you disagree with it because it doesn't

2   call for speculation; you think he made more money in

3   2002?

4        A.   No.

5        Q.   Okay.

6        A.   He didn't make more money in 2002.

7        Q.   Okay.

8        A.   He made less money in 2002.

9        Q.   And you've seen his income tax returns for

10  2002?

11       A.   No.

12            (Off record).

13       Q.   Okay.  You mentioned to Mr. Steele that there

14  were two things you didn't have -- you mentioned this

15  was a preliminary report only and there were two things

16  you didn't have.  And then I got sidetracked in this

17  because you named off about four.  Were there any other

18  things that you didn't have besides the projected

19  growth rate, Barnson's testimony as to whether there

20  was a 15 percent policy, and then mitigation

21  information?

22       A.   I'm sorry.  I lost the first part of your

23  question.  I was missing those things for what purpose?

24  Remind me of what the purpose was.

25       Q.   You said it was a preliminary report only.

1       A.   Okay, yes.   Yes, there was something else.

2   There was -- I had not done the calculation of the

3   commissions that Mr. Chavez would get directly as an

4   agent and I had not included calculations in the

5   commissions that he lost in 2001 as a result of being

6   shut out of the December enrollment period at BISD.

7       Q.   Which was $322,000?

8       A.   The 322,000 was the premium -- was the total of

9   the premium -- annualized premium amount.

10      Q.   Okay.

11      A.   And it would be the commissions and then the

12  renewals -- subsequent renewals in the future on the

13  $322,000.

14      Q.   So based on that information the figure that

15  you had given would go up?

16            MR. AGUILAR:   Which figure?

17      A.   Yes, that would add a small amount, actually.

18      Q.   And based on the mitigation information --

19      A.   It would go down substantially.

20      Q.   And the information that what he earned as an

21  independent agent it would go down?

22      A.   No.   What he earned as an independent agent --

23  when you say -- I'm losing -- I'm not sure what you

24  mean by when --

25      Q.   All I want to know is in order -- I get

Page 216

1   sidetracked, but you said, I needed two things in order

2   for this not to be preliminary?

3       A.   And then I corrected myself and said actually,

4   there's more.

5       Q.   Okay, right.

6       A.   Okay.  I did say two at first.

7       Q.   Okay.  So once you have the information on

8   mitigation and once you have the information on the

9   calculations for commissions as an agent and the

10  commissions -- and the commissions lost for the

11  December 2001 enrollment, then this would be a final

12  report; is that correct?

13      A.   I will produce a final report.

14      Q.   You could produce a final report at that point;

15  is that right?  Those are the only things you're

16  lacking, correct?

17      A.   Yes.  I believe you did include the second

18  portion.  I do not -- although it's been taken, I have

19  not seen the transcript of the second portion nor the

20  exhibits to Mr. LaFemina's deposition.

21           THE WITNESS:  And I don't remember you

22  mentioning that.

23           MR. AGUILAR:  There's the stuff that I

24  mentioned to explain that he could produce that would

25  give us more of that definition, the AFLAC numbers.

Page 217

1        A.   But I did mention during his questioning the --

2    because he asked me, wouldn't it be nice to know what

3    all the RSCs at AFLAC were doing.  And I said, yes, I

4    don't have -- he said, do you have that data?  I said,

5    no, but AFLAC has it.  And I would certainly believe

6    that was going to be -- could be very helpful.

7              MS. LEEDS:  Objection; response.

8              MS. NEALLY:  Objection; nonresponsiveness.

9        Q.   When do you plan on producing a final report?

10       A.   I expect that I will be able to produce one

11   certainly well before this month is out is what I'm

12   hoping.

13             MR. AGUILAR:  Barnson's deposition isn't

14   set until the 25th or 29th.

15             MS. NEALLY:  Objection.

16       Q.   You know, I lost you when you were talking

17   about the $322,108 in lost premiums and how you haven't

18   figured that amount.  Why haven't you figured that

19   amount?  You've had that for a long time, right?  You

20   didn't calculate the lost premium?

21       A.   No, I did not calculate it.

22       Q.   But you had that for a really long time, right?

23       A.   Yes.  I've had that -- I had the $322,108

24   figure at the time I wrote this report.

25       Q.   Okay.  But the bottom line of your testimony to

Page 219

1   mitigation of damages, right?

2       A.  If he were to -- I believe that the answer is

3   not necessarily.  I mean, it could have an effect.  My

4   understanding is that the TPA was not actually paid to

5   be the TPA.  And so being the TPA itself doesn't

6   necessarily cause any direct mitigation.  I believe

7   that he was being the TPA as a -- for free as a way of

8   getting access to selling the policies.

9       Q.  It comes in the play that the TPA again and he

10  had exclusive rights to sell whatever product he was

11  selling then that he would make some money off of that?

12      A.  That, I agree with.  If Mr. Chavez were given

13  some kind of advantageous marketing position with

14  respect to a large group like BISD, that could have an

15  effect on his ability to mitigate.

16              MS. NEALLY:  I'll pass the witness.

17                    EXAMINATION

18  BY MS. LEEDS:

19      Q.  Dr. Horner, my name is Eileen Leeds, and I

20  represent Dr. Sauceda in this case.  I have a couple of

21  questions, mostly some follow-ups.  You said Mr. Chavez

22  had some expenses that were not ordinary expenses for

23  an RSC.  What were those?

24      A.  Mr. Chavez was doing more administrative work

25  than an RSC would normally do.  My understanding is he

Page 220

1    had been doing some administrative work when he was a

2    DSC and perhaps even as an agent and had continued to

3    do that since he was still familiar with that

4    administrative position.  So he did not pass those

5    responsibilities down to the people that worked with

6    him.  So there were some expenses associated with that.

7        Q.  Okay.  How much?  I believe your testimony was

8    when you were asked how much administrative work did he

9    actually do you said very little.  So how much expense

10   was associated with that?

11       A.  It was some position of one of his staff people

12   is my understanding was involved in doing that, that he

13   himself didn't spend a lot of time doing that

14   administrative work, but that a staff person was

15   answering questions.  That was basically a lot of it,

16   changes and asking questions.

17       Q.  But do you know how much?

18       A.  No.

19       Q.  Okay.  Do you know how much money he took from

20   his agents that were selling to help defray that?

21       A.  Not off the top of my head.  I believe he told

22   -- I think we -- I may have the data.  I'm not sure.

23   He told me that he had a 50 percent split with them the

24   first year they were doing this and the second year he

25   had a 40 percent split and the third year he had a 30

Page 229

1    A.   That information could provide useful

2    information in performing these calculations, yes.

3    Q.   Okay.  Is there anything else that you need to

4    do to change your report from preliminary to final?

5    A.   I mentioned the mitigation.  That's discussed.

6    Q.   Okay.  Now, how are you going to do that?

7    A.   Well, as I mentioned earlier, I have more

8    information now on how Mr. Chavez is doing in his

9    current endeavor.

10    Q.   Okay.

11    A.   And I am not sure what kind of -- again, we

12    have this issue of growth rates.  I'm not sure whether

13    I'm going to be able -- I'm pretty sure I'm going to

14    have a tough time coming up with a reliably determined

15    growth rate.  I may have to do some examples of

16    mitigation and show --

17    Q.   The comparisons that Mr. Steele asked you?

18    A.   Yes.  I believe that's what he was saying --

19    what you're referring to.

20    Q.   Yeah, he asked you if you had seen how other

21    agents have gone about --

22    A.   Oh, no.  No, no, no.

23    Q.   So you're not going to look at that?

24    A.   No, no, no, no, no.  I'm not going to do that.

25    Q.   You are comparing or you do want to compare Mr.

Page 230

1    Chavez to Mr. LaFemina?  You wanted Mr. LaFemina's

2    information to be able to compare Mr. Chavez?

3         A.  Yes, I thought that would be -- that might be

4    useful information.

5         Q.  Okay.  And Mr. Steele asked you, is Dallas

6    comparable to Brownsville?

7              MR. AGUILAR:  What's the question?

8         Q.  In demographics, is it comparable to

9    Brownsville in anything?

10             MR. AGUILAR:  Objection.

11        Q.  How many school districts are in the greater

12   Dallas area?

13        A.  I'm not sure.

14        Q.  How many school districts are in Brownsville?

15        A.  One.

16        Q.  Okay.  How many counties are in the greater

17   Dallas area?

18        A.  I'm not sure.

19        Q.  How many counties are in Brownsville or in this

20   area?

21        A.  In this area?

22        Q.  Brownsville is in one county, right?

23        A.  Brownsville -- the city of Brownsville is in

24   one county, sure.

25        Q.  Okay.  How many cities are in the greater

Page 231

1    Dallas area?

2        A.   I'm not sure.   Quite a few.

3        Q.   How many cities are in the Brownsville area?

4        A.   A few.

5        Q.   There are a significant number of governmental

6    agencies and large corporations in the Dallas area as

7    compared to Brownsville; is there not?

8        A.   Yes, there are.

9        Q.   Okay.  Is the market a lot bigger in Dallas

10   than in Brownsville for people or for agents -- I'm

11   sorry, for companies like AFLAC that only market to

12   employer groups?

13       A.   Yes, there are.

14       Q.   So is it still logical to compare somebody in

15   Dallas to somebody in Brownsville?

16       A.   It might be -- it might be useful information.

17       Q.   And Mr. Steele went over pretty well -- you

18   have done absolutely no independent research outside of

19   what Mr. Chavez has told you or given you in

20   documentation to find out if any of the assumptions

21   that you are relying upon in your report have any

22   validity outside of this little area, correct?

23              MR. AGUILAR:  Objection; mischaracterizing

24   the evidence.

25       A.   I really don't understand that question at all.

Page 250

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

DINO X. CHAVEZ                    ) (
                                  ) (
VS.                               ) (   B-02-128
                                  ) (
BROWNSVILLE INDEPENDENT           ) (
SCHOOL DISTRICT, NOE              ) (
SAUCEDA, MARILYN DEL              ) (
BOSQUE-GILBERT and                ) (
RANDALL DUNN                      ) (

REPORTER'S CERTIFICATION

DEPOSITION OF STEPHEN M. HORNER, PH.D.

SEPTEMBER 5, 2003

I, LOU ZUNIGA, Certified Court Reporter in and for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of the oral deposition of STEPHEN M. HORNER, PH.D.;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Page 251

Certified to by me this __17__ day of
__September__, 2003.

LOU ZUNIGA, Texas CSR 2198

Expiration Date: 12-31-03

Hill & Romero

10125 North 10th Street, Suite B

McAllen, Texas  78504

(956) 287-8898