*78*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

NOV 0 4 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| DINO X. CHAVEZ | § | |
| | § | |
| VS. | § | |
| | § | **CIVIL ACTION NO.** |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, NOE SAUCEDA, | § | **B - 02 - 128** |
| and RANDY DUNN, MARILYN DEL | § | |
| BOSQUE-GILBERT and HUGH EMERSON, | § | |
| JR., in their official capacities as Board | § | |
| Members of Brownsville Independent | § | |
| School District | § | |

---

## PLAINTIFF'S RESPONSE TO DEFENDANT SAUCEDA'S
## MOTION FOR SUMMARY JUDGMENT

---

TO THE HONORABLE U.S. DISTRICT COURT:

COMES NOW **DINO X. CHAVEZ**, Plaintiff herein, and files this his Response to Defendant Noe Sauceda's Motion for Summary Judgment, and for such Response would respectfully show unto the Court the following:

### I.

### SUMMARY OF RESPONSE

Defendant Noe Sauceda alleges that he is entitled to qualified immunity on Plaintiff's First Amendment Free Speech claim because Plaintiff has not met the elements necessary to establish such a claim. Sauceda admits, and even argues, however, that he was correct to insist on Plaintiff's termination from AFALC because of letters and spoken comments Mr. Chavez had made questioning the legality and financial responsibility of Sauceda's recommendations to appoint

National Plan Administrators as the Third Party Administrator of Brownsville Independent School District's §125 Cafeteria Plan.    Sauceda appears to argue instead that Mr. Chavez's reports of potential legal violations and financial irresponsibility were not protected by the First Amendment.    Those written and spoken comments were protected, however, and Sauceda is liable because of his deliberate indifference to Chavez's constitutional rights that were clearly established.

Similarly, Sauceda's claim to professional immunity under the Texas Education Code is also without merit because he has not established his affirmative defense of professional immunity from Plaintiff's state law claims.  In particular, Sauceda has not established how he had discretion within the scope of his duties to tortiously or intentionally interfere with Chavez's employment relationship with AFLAC, to make material misrepresentations as to constitute a fraud on Plaintiff, BISD employees and the community in general, to intentionally inflict emotional distress on Plaintiff Chavez, to libel or slander Chavez by accusing him of "unprofessional" and "unethical" conduct, both in writing and verbally, or to contact Plaintiff's supervisor Frank LaFemina to insist on Chavez's removal from handling the BISD Cafeteria Plan or from BISD in general in retaliation for reporting Defendant's apparently illegal and financially irresponsible proposals.

At the time of the matters described herein, Plaintiff Dino X. Chavez was an agent for Third Party Defendant American Family Life Assurance Company of Columbus (hereinafter AFLAC), having risen from the position of Associate to District Coordinator, to Regional Sales Coordinator (hereinafter RSC).  In 1998, Plaintiff Chavez submitted a proposal to provide Third Party Administrator services in response to Defendant Brownsville Independent School District's

(hereinafter BISD) Request for Proposals (RFP) to provide Third Party Administrator (hereinafter TPA) services for their §125 Cafeteria Plan.  Plaintiff Chavez was awarded that proposal and he became the *de facto* TPA.

One of the reasons Mr. Chavez was recommended for and appointed *de facto* TPA was because his proposal provided that he would not charge for the TPA services, whereas his predecessor had been charging in excess of $30,000.00 per year in fees.  Mr. Chavez agreed to waive all fees in exchange for being allowed to add at least one AFLAC product to the Cafeteria Plan menu.  Based on BISD's history, therefore, the "value" of this position was in excess of $30,000.00 per year.  Plaintiff Chavez continued in this role for approximately three (3) years, until the arrival of Defendant Noe Sauceda.

Once Defendant Sauceda arrived as Superintendent and CEO of Defendant BISD, he began efforts to direct the TPA bid award to a particular company, National Plan Administrators (hereinafter NPA).  He did this first by attempting to re-design the Request for Qualifications (RFQ) in a manner that would most favor NPA.  When it appeared that attempt would not work, he then used his authority to attempt to directly appoint NPA as Defendants' TPA, in order that Insurance Associates of the Valley could be appointed "agent of record."  Plaintiff Chavez thereupon notified Defendant BISD of the illegality of Defendant Sauceda's proposal, including the Texas Attorney General's opinion that Defendant's proposed appointment of an 'agent of record' was illegal, and emphasized that selection of NPA as the TPA would be financially irresponsible, since NPA's proposal charged fees, while Plaintiff's proposal did not.  Content on taking whatever action was necessary to appoint NPA as the TPA, Defendant Sauceda even allowed NPA to modify their bid proposal after the close of the bid submission date, a process

that even Defendants admit was improper. When those efforts still failed, Defendant Sauceda sent Plaintiff Chavez a letter on November 29, 2001, terminating him as the Third Party Administrator, rejecting his bid for the coming year, and prohibiting him from being on school district property or contacting school personnel during school business hours. In order to assure that action would be taken against Plaintiff by his supervisors at AFLAC, a copy of that letter was also submitted to Plaintiff's supervisor, Frank LaFemina, in order to have him take other actions to prevent Plaintiff from making and enforcing contracts for the provision of AFLAC insurance products.

The actions taken by Defendant were in retaliation for Plaintiff's exercise of his right to free speech. As a result of those actions, Plaintiff Chavez was not allowed to go onto BISD property, to participate in the BISD Insurance Committee meeting at which the determination was to be made on the appointment of a TPA, or to continue to sell AFLAC products to BISD employees. Plaintiff Chavez was also not allowed to participate in the 2001 enrollment, from which he customarily made a significant portion of his income, and he was ultimately terminated from his position as Regional Sales Coordinator. Because of Defendant's termination letter, Mr. Chavez has not returned to any BISD campus since November 29, 2001. Each of these actions resulted directly from Defendant's letter of November 29, 2001, and Defendant Sauceda's conversations with Plaintiff's supervisor, Frank LaFemina. As a result, Plaintiff Chavez remains terminated from his Regional Sales Coordinator position with AFLAC, and he is still barred from all BISD campuses.

# II.

# FACTUAL BACKGROUND

Dino X. Chavez began working with AFLAC as an Associate in or about September 1994. **Exhibit-1**, Affidavit of Dino X. Chavez (hereinafter Chavez Affidavit). His talents were quickly recognized, and by December of the same year he was promoted to District Sales Coordinator (hereinafter DSC). **Id.** He continued in that position until November 1998, when he was promoted to the position of Regional Sales Coordinator (hereinafter RSC), a position he held until his summary termination resulting from Defendant's actions, in December 2001. **Id.** Even after Mr. Chavez's termination, he continued to receive awards and considerable praise for his actions as RSC. **Id.** Mr. Chavez's specialty involved the supervision of group insurance plans. **Id.**

A "Cafeteria Plan" is a program established by large employers to provide an opportunity for employees to purchase certain insurance policies, and pay for them with pre-tax dollars, pursuant to Internal Revenue Code §125. **Id.**; **Exhibit-50**, 1998 TPA Recommendation. Prior to 1998, BISD provided a health plan for all of its employees, and allowed them to purchase group term life insurance, dental insurance, or cancer insurance, or to contribute to medical reimbursement or dependent/child care plans as part of the Cafeteria Plan "menu". **Exhibit-2**. BISD 1998 Request for Proposals (RFP), Appendix A, Appendix A. The group term life insurance and dental insurance policies were each provided by a different insurance carrier. **Exhibit-1**, Chavez Affidavit. During the enrollment process, agents of each insurance carrier present their products to BISD employees for purchase. **Id.** All carriers offering their products on BISD's Cafeteria Plan are allowed to offer sales during the enrollment process, not only the

TPA. **Id**.

Prior to 1998, NPA was the TPA, and had been charging in excess of $30,000.00 per year for its services as TPA. **Exhibit-2**, BISD 1998 RFP, Appendix A, Appendix A, Summary Plan Description, ¶1; Exhibit-3, NPA 1997 Cafeteria Plan Proposal. NPA's 1997 proposal reflected a $5.00 annual enrollment fee per employee, in addition to monthly fees per participant. **Exhibit-3**, NPA 1997 Cafeteria Plan Proposal, p.4. During the 1997-98 school year, BISD had 6,141 employees. **Exhibit-2**, 1998 RFP, table 4.1. NPA's enrollment fee alone, therefore, was $30,705.00. Although Plaintiff has attempted to recover this information from Defendant BISD, that Defendant either could not locate it or refused to do so. **Exhibit-6**, Deposition of Kenneth Lieck (hereinafter Lieck Depo), page (p.) 80, line (l.) 12 – p.82, l.11.

When Mr. Chavez first submitted a RFP bid to provide TPA services in 1998, his proposal provided that no fees would be charged, so long as at least one (1) AFLAC product was made available on payroll deduction. **Exhibit-1**, Chavez Affidavit; **Exhibit-5**, Cafeteria Plan Proposals of 9/16/98. Mr. Chavez was able to submit that proposal based on the faith and belief that he would be able to sell enough AFLAC policies to be able to justify the work necessary to fulfill the role *de facto* TPA. **Exhibit-1**, Chavez Affidavit. Mr. Chavez's proposal was thereafter adopted by Defendant BISD, and he was named the *de facto* TPA for the Cafeteria Plan for the 1999 calendar year, based partly on his agreement not to charge any TPA fees. **Id**.; **Exhibit-50**, 1998 TPA Recommendation. Once he began selling his AFLAC products to BISD employees, Mr. Chavez was able to realize the value of this position was at least $30,000.00 per year. **Id.** Although Defendants may challenge whether Mr. Chavez was the *de facto* TPA, Defendants agree that BISD was not the TPA, and AFLAC insisted in the proposal that it was

also not the TPA. **Exhibit-7**, Deposition of Noe Sauceda of 4/9/03 (hereinafter Sauceda Depo I),
p.140, l.24 - p.145, l.12; **Exhibit-6**, Lieck Depo, p.71, l.2 – p.73, l.18; **Exhibit-8**, Portions of
AFLAC/Chavez 1998 Cafeteria Plan proposal, item no. 17. AFLAC continued to deny that it
was the TPA for succeeding years as well, and instead asserted that Mr. Chavez would provide
the services of the TPA. **Exhibit-9**, Portions of AFLAC/Chavez 2001 Cafeteria Plan proposal,
pp.AFL0009 (item no. 10), AFL0010 (item nos. 11 & 12), AFL0019 (item no. 14), AFL0022-
23 (item no. 7), AFL0028 (item no. 14) and AFL0049 (item no. 17). Because BISD was not the
TPA, and AFLAC was not the TPA and Mr. Chavez was doing most of the work of the TPA, he
was the *de facto* TPA.

Defendant Sauceda started working with BISD in April 2001 as a consultant, after which
he continued as Superintendent and CEO. **Exhibit-7**, Sauceda Depo I, p.47, l.23 - p.48, l.23;
p.173, ll.10-11; p.176, ll.15-20. As Sauceda explained, "I am responsible for every decision
administratively in the district ...." **Exhibit-39**, Deposition of Noe Sauceda of 6/17/03
(hereinafter Sauceda Depo II), p.187, ll.2-3. Thereafter, BISD issued its Request for
Qualifications (RFQ) for a TPA to administer the Cafeteria Plan as well as the Tax Deferred
Annuity Program, rather than a Request for Proposals (RFP) as had been done in prior years.
**Exhibit-10**, 2001 RFQ for TPA. The "name" of that RFQ was subsequently changed twice.
**Exhibit-11**, 8/14/01 RFQ Name Change; **Exhibit-12,** 8/15/01 RFQ Name Change. Otherwise,
the terms of the RFQ remained unchanged, including the tentative award date of September 18,
2001. **Exhibit-10**, 2001 RFQ for TPA, p.1, no.3.

Once the award date passed without any decision on the appointment of a TPA, Mr.
Chavez became concerned that something untoward might be going on. **Exhibit-1**, Chavez

Affidavit. Unbeknownst to Plaintiff, during this time Defendant Sauceda had attempted to bribe at least one board member to vote a certain way or approve of what he did a certain way. **Exhibit-14**, Powers Depo, p.145, l.5 – p.146, l.9. After that effort failed, Defendant Sauceda began trying to go around the Board Trustees. **Id**. At that time, Board Trustees were also beginning to question the relationship between Defendant Sauceda and Board Attorney Jeff Roerig, including Mr. Roerig's ability to provide unbiased advice. As a result, Board Trustee Pat Lehmann submitted a letter to Board President Colunga on September 7th, complaining of "Mr. Roerig's intent...to chastise, frighten, incite and threaten both, Mr. Powers and me." **Exhibit-13**, Lehmann memo of 9/7/01. Board Trustee Powers agreed with that characterization as well. **Exhibit-14**, Deposition of Herman Otis Powers, Jr. (hereinafter Powers Depo), p.39, l.1 - p.40, l.16. Mr. Lehmann further provided his "opinion that both Mr. Roerig and Dr. Sauceda were taking a premeditated and biased approach without fully understanding the complete picture on [the] issue" and complained of the "fact that this contract was `shoved down our throats' and being recommended to Alford Insurance at the last minute of the last hour and which required an amended correction by the Superintendent...." **Exhibit-13**, Lehmann Memo of 9/7/01, p.1. **Exhibit-14**, Powers Depo, p.41, ll.5-18.

These Board Trustees similarly were concerned that attorney Roerig was attempting to promote his own firm to be retained as counsel for the district and may have acted with Defendant Sauceda "in a collusive state and may have attempted to mislead" them. **Exhibit-13**, Lehmann Memo of 9/7/01, p.2; **Exhibit-14,** Powers Depo, p.45, l.9 - p.46, l.15. Board President Joe Colunga subsequently issued a letter the following year on a separate matter indicating "Mr. Roerig's actions [gave him] great concern in whether he is ethically fulfilling his

role as counsel for BISD or rather is more interested in maintaining his contract and pushing what appears to be [Defendant Sauceda's] private agenda." **Exhibit-15**, Colunga Letter of 2/13/02. Trustee Powers similarly had a "concern that Mr. Roerig might be providing opinions that were overly restrictive just so they could allow Dr. Sauceda to do what he wanted in certain circumstances." **Exhibit-14**, Powers Depo, p.105, 1.22 - p.107, 1.11. Board President Colunga also discussed two possible bases for attorney Roerig's bias: The first is that only the Superintendent could decide on whether to allow Roerig's firm to spend more than 130 hours per month on legal work, and the second was the addition of language in the board attorney contract that the "law firm's acceptance is conditioned on it being the exclusive lawyer for the traditional board lawyer fees" without his knowledge. **Exhibit-16**, Deposition of Joe Colunga III (hereinafter Colunga Depo), p.57, 1.22 - p.62, 1.8. *See also*, **Exhibit-17**, BISD Attorney Contract. That second issue was raised and discussed during the November 13[th] Board Meeting, at which some board members apparently felt Defendant Sauceda and attorney Roerig had improperly modified the Board Attorney contract without their approval. **Exhibit-25**, Excerpts from BISD Board Meeting Minutes of 11/13/01, pp.10-13.

By October 30, 2001, a TPA had still not been selected. On that date, the Board Insurance Committee held a meeting at which agents were allowed to discuss the proposals they had submitted for providing TPA services. **Exhibit-18**, Insurance Committee Meeting Minutes of 10/30/01. At that meeting, Mr. Chavez accurately explained that his proposal did not include any fees. **Id.**, p.2. Contrary to his bid proposal, the agent for NPA indicated that his administration of the Cafeteria Plan "would be at no cost to the District or to the employee...." **Id.**, p.9. Although NPA's bid provided that it would waive the $5.00 per employee enrollment

fee "[i]f Insurance Associates of the Valley are selected as agent of record," and other plans either remain in effect or are selected, "[t]he administration fee [of] $.50 per participant per month," "an annual fee of $75.00 for completion of Form 5500," and "Dependent/Child Care and/or Medical Reimbursement - The fee for administration is $3.00 per participant, per month" would remain.  **Exhibit-19**, NPA 2001 Cafeteria Plan Proposal, p.4.  The public recognized this at the meeting, when they explained "National Plan Administrators according to the figures if they have a monthly Flexible Spending Account fee of $3.00 plus all the other fees will generate an access (sic) of about $80,000.00 paid by the district or by the employee, AFLAC has no fees, and the Third Party Administrator."  **Exhibit-18**, p.12.

Immediately thereafter, Defendant Sauceda attended the Special Called Board Meeting, at which he attempted to have NPA appointed as the TPA for the §403(b) and §403(b)(7) Tax Deferred Annuity Program.  **Exhibit-20**, Special Called Board Meeting of 10/30/01, p.7.  At that meeting, Board Trustees expressed concerns on "whether or not the teachers had any input in this process, why are the meetings being held at 4:00 o'clock p.m., is there a deadline on this item, what is the rush," and other matters.  **Id.**, p.8.  As a result, that decision was tabled.  **Id. Exhibit-19**, selected portions of NPA 2001 Cafeteria Plan Proposal, p.4.

During or shortly after the October 30th Board Meeting, Mr. Chavez learned that BISD representatives had compiled a Cafeteria Plan Comparison chart, which misrepresented the TPA proposal he had submitted.  **Exhibit-1,** Chavez Affidavit; **Exhibit-21**, Cafeteria Plan Comparison Chart.  Board Member Dunn had apparently had this Chart during the Insurance Committee Meeting, since he incorrectly indicated to Mr. Chavez "[y]ou show a fee of $450.00."  **Exhibit-18**, Insurance Committee Meeting Minutes of 10/30/01, p.2.  Mr. Chavez had to correct Mr.

Dunn that in fact no such fees were being charged by him or AFLAC. **Id.** The Chart reflects a "Set up fee (Implementation Fee)" of $450, in addition to a "Monthly Fee Per Participant (Flexible Spending Account)" of $3.00 and "Postage" fees of "Cost," all of which were incorrect because neither he nor AFLAC charged any such fees. **Exhibit-21**, Cafeteria Plan Comparision Chart, p.2. **Exhibit-1**, Chavez Affidavit. The Chart also reflected other incorrect information on Mr. Chavez's proposal. **Exhibit-21,** Cafeteria Plan Comparison Chart, pp.2-3. When Defendant Sauceda was asked during the November 20th Board meeting who had prepared the Chart that he provided to Board Trustees at the meeting, he responded that it had been prepared by members of his staff, at his direction. **Exhibit-1**, Chavez Affidavit.

Because of the misrepresentations made in the Cafeteria Plan Comparison Chart, Mr. Chavez felt it necessary to submit a memo to the BISD Insurance Committee Campus Representatives on November 9th correcting those misrepresentations and re-emphasizing that his proposal would not charge any fees, while his competitors' did. **Exhibit-22**, Chavez Memo of 11/9/01. Mr. Chavez also expressed a concern that appointment of a TPA for the Tax Sheltered Annuity Program could effectively limit employees' annuity "choices to only those annuities offered by or through the chosen annuity administrator." **Id.,** p.2. Board President Colunga agreed it would be appropriate for Mr. Chavez to notify the Board and insurance committee representatives of potential legal violations, and there was no policy that prohibited vendors or citizens from sending letters to board members or insurance committee members. **Exhibit-16**, Colunga Depo, p.122, 1.17 – p.124, 1.23. Board Trustee Powers similarly agreed Mr. Chavez's memos were not inappropriate. **Exhibit-14**, Powers Depo, p.78, 1.12 – p.79, 1.12. Although these were factors that affected Mr. Chavez in his business relations, they were also factors that

were of public interest, particularly to BISD employees, and particularly where Defendant Sauceda and his staff were publishing inaccurate and misleading statements about the proposals that had been submitted. On November 12th, Mr. Chavez submitted another memo to the Insurance Committee Campus Representatives, notifying them that the decision on the selection of the TPA had been postponed from the November 13th scheduled meeting, and emphasizing the need for a TPA to be selected immediately. **Exhibit-23**, Chavez Memo of 11/12/01. This was now almost two months after the originally scheduled Tentative Award Date of September 18th. **Exhibit-10,** 2001 RFQ, p.1, no.3.

Because of some of these concerns, Mr. Chavez chose to attend and speak at the November 13th BISD Board of Trustees Meeting. At that meeting, Mr. Chavez emphasized the need for accountability to the public and the need to protect BISD employees. **Exhibit-24,** Selected Public Audience Excerpts of 11/13/01 BISD Board of Trustees Meeting, p.23. No explanation was provided, however, as to any need or reason for delaying the determination of the selection of the TPA, however. **Exhibit-25**, Excerpts from the BISD Board Meeting Minutes of 11/13/01, pp.2-3.

Thereafter, the agenda for the next Board Meeting was scheduled for November 20th. **Exhibit-26,** BISD Board Meeting Agenda of 11/20/01. Item 24 on that agenda included a recommendation to appoint NPA as the TPA to administer BISD's Cafeteria Plan, "Agent/Agency to solicit the individual products available." **Id.**, p.4. This was notwithstanding the fact that the Employee Insurance Committee Meeting had previously been set for a later date, November 27th. **Exhibit-27**, Dr. Lopez Memo of 11/5/01. As a result, Mr. Chavez sent another memo to the Insurance Committee Campus Representatives on November 19th, repeating some of

the concerns in his prior memo of November 12th, and including a new concern that "[i]f NPA/Insurance Associates of the Valley is chosen, all supplemental choices will have to go through them, thereby eliminating all local agents that currently provide their services to the District." **Exhibit-28**, Chavez Memo of 11/19/01. This concern affected not only Mr. Chavez's business, but also all other local agents that provided their services to BISD and all employees that had purchased policies from those other agents as well.

Mr. Chavez's concerns about the appointment of NPA was significant because NPA was proposing that Insurance Associates of the Valley be appointed as BISD's "agent of record." **Exhibit-19**, NPA 2001 Cafeteria Plan Proposal, p.4. The term "agent of record" is a term of art in the insurance industry, and connotes being the sole insurance representatives for a business entity or employer relating to one or more insurance policies. **Exhibit-1**, Chavez Affidavit. If Insurance Associates of the Valley were to be appointed as "agent of record," it would be entitled to recover a commission on the sale of every insurance policy sold to employees of BISD. **Id**. This would require all of the agents currently selling policies within the Plan to pay to Insurance Associates of the Valley all of their commissions, and if Insurance Associates of the Valley was not appointed to represent a particular insurance company, that company would not be authorized to sell policies under the Cafeteria Plan or at BISD. **Id**. *See also*, Tex.Ins.Code Article 21.02 (Vernon Supp. 2003*); Parrish v. Washington Nat'l Ins. Co.,* 421 S.W.2d 117 (Tex.Civ.App.- Ft. Worth 1967, writ ref'd n.r.e.).

The authority of school districts to designate agents or brokers of record to purchase insurance as BISD was attempting to do through the appointment of Insurance Associates of the Valley had been previously discussed by the Texas Attorney General. *See* **Exhibit-29**, Op. Tex.

Att'y Gen. No. JC-0205 (2000). As that Opinion concluded, a "district may not use a designated broker of record to purchase insurance contracts with premiums of an aggregate value of $10,000 or more for each 12-month period." **Id.**, p.5. That Opinion also referenced Texas Education Code §44.031(a), which provides that "all school district contracts ... valued at $25,000 or more in the aggregate for each 12-month period shall be made by the method, of the following methods, that provide the best value for the district ...." *See also*, **Exhibit-49**, BISD Policy CH (LEGAL). Those options included competitive bidding, but did not allow for appointment by a Superintendent. TEX. EDUC. CODE §44.031(a); **Exhibit-49**, BISD Policy CH (LEGAL). As the Attorney General explained,

> [w]e understand that an insurance agent will be affiliated with a limited number of insurance companies. For this reason, a designated broker of record will not be able to solicit rates on the district's behalf from all possible insurance companies for a particular policy. Because the use of a designated broker of record will necessarily limit the number of companies from which the district may purchase insurance, it may foreclose the district's access to the most advantageous rates and terms.

**Exhibit-29**, AG Opinion No. JC-0205, pp.1-2. Similarly, IRS regulations applicable in 2001 provided that school districts could elect to have their employees receive the benefits of tax deferred purchases of annuity contracts pursuant to I.R.C. §403(b) either through the form of an "arrangement" or a formalized "summary plan description;" otherwise, their "involvement in the Plan is strictly limited to providing a list of insurance carriers to employees and executing salary reduction agreements." **Exhibit-30**, IRS Plan Examination Guidelines Handbook, No. 7.7.1, §13.1.1.1(2).

Plaintiff Chavez also questioned the financial soundness of appointing NPA as the TPA because NPA's bid proposal included a $5.00 per employee enrollment fee (which would be

waived "[i]f Insurance Associates of the Valley are selected as the agent of record"), in addition to an "administration fee [of] $.50 per participant per month," "an annual fee of $75.00 for completion of Form 5500," and a "Dependent/Child Care and/or Medical Reimbursement ... fee for administration [of] $3.00 per participant, per month ...." **Exhibit-19**, NPA 2001 Cafeteria Plan Proposal, p.4. AFLAC's proposal, on the other hand, provided that no fees would be charged. **Exhibit-18**, Insurance Commission Meeting Minutes of 10/30/01, p.2. Defendant Sauceda never explained why NPA's services would have been preferable to those of Mr. Chavez and AFLAC, even though Chavez had been the *de facto* TPA for the 3 prior years, had been doing a good job and had a total of only 3 – 5 minor complaints during that time. *See* **Exhibit-6**, Lieck Depo, p.84, 1.2 – p.85, 1.7; **Exhibit-16**, Colunga Depo, p.42, 1.11 – p.43, 1.2; **Exhibit-45**, Colunga Letter of 2/6/02.

Based on these understandings, Mr. Chavez attended the BISD Board Meeting on November 20, 2001, at which he spoke during the Public Audience section of the meeting. **Exhibit-31**, Excerpts from BISD Board Meeting of 11/20/01. Like other speakers at that meeting, Mr. Chavez emphasized the public interest to the district and its employees in not having to pay additional fees to a TPA, as NPA was proposing, while Chavez's proposal did not include any fees. **Id.** He referenced the Texas Attorney General's Opinion JC-0205 in stating that "[g]ranting an Agent of Record designation to an insurance agent or agency is illegal when the value of the contract is more than $10,000.00. Moreover, granting an individual Agent-of-Record letter for the purpose of soliciting optional retirement investments or annuities is also illegal." **Id.**, p.43. He went on to explain that awarding the TPA bid to NPA "would be illegal, as their proposal calls for an agent- of-record designation." **Id.**, pp.43-44. He also quoted the

Attorney General Opinion for the statement that "[b]ecause the use of a designated broker of record will necessarily limit the number of companies from which the District may purchase insurance, it may foreclose the District's access to the most advantageous rates and terms." **Id.,** p.45. At this meeting, he also provided a copy of a flyer setting out these concerns to each of the Board Trustees. *See* **Exhibit-32**, "Why AFLAC?" flyer.

The Board Meeting then progressed with other business until reaching item 24, action to take on Defendant Sauceda's recommendation to appoint NPA as the TPA for the Cafeteria Plan. **Exhibit-33,** Sauceda Recommendation; **Exhibit-34,** BISD Board Meeting Minutes of 11/20/01. Although the minutes do not detail the actual discussion that took place, the discussion of that item took over one hour. **Exhibit-1**, Chavez Affidaivt. During the discussion of the appointment of the TPA, many of the concerns raised by Mr. Chavez were discussed, including the added cost to the district of appointing NPA, and the legality of appointing Insurance Associates of the Valley as the "agent of record." **Exhibit-1**, Chavez Affidavit. In an attempt to override the concern about the fees that were to be charged by NPA, Defendant Sauceda and Board Attorney Roerig presented a letter from NPA dated November 20th, agreeing to waive "any and all fees associated with the Cafeteria Plan ... if National Plan Administrators is selected as the Cafeteria Plan administrator and Insurance Associates of the Valley is selected as the agency to provide *all* of the ancillary products." **Exhibit-35**, NPA letter of 11/20/01 (emphasis added).

The agreement to waive all fees is obviously a modification of their original bid, which provided for general administration fees, an annual fee, and Dependent/Child Care and/or Medical Reimbursement fees, even if the enrollment fee were to be waived. **Exhibit-19**, NPA

2001 Cafeteria Plan Proposal, p.4.  Defendants, including Sauceda, agreed that bid proposals cannot be changed for one without re-opening the entire bid process for everyone, and he had no discretion to do so.    **Exhibit-7,** Sauceda Depo I, p.133, 1.23 – p.135, 1.6; **Exhibit-14,** Powers Depo, p.9, 1.25 – p.11, 1.13; **Exhibit-6,** Lieck Depo, p.30, ll.10-23.   The original RFQ provided, however, that "[s]ealed RFQ's will be received by [BISD]... *until* Thursday, Sep. 6, 2001, 1:30 pm, Central Daylight Time (CDT)."   **Exhibit-10,** 2001 RFQ for TPA (emphasis added).    In spite of these restrictions, Defendant Sauceda, with the assistance of Attorney Roerig, continued to promote the selection of NPA as the TPA at that meeting, with the modifications to their bid proposal.   **Exhibit-1,** Chavez Affidavit.   Although some Board Trustees also questioned the legality of appointing NPA or Insurance Associates of the Valley as the "agent of record" for the District as set out in the Cafeteria Plan Comparison, no adequate response was provided by Sauceda.  **Id.; Exhibit-21,** Cafeteria Plan Comparison Chart, p.2.  At the conclusion of this discussion, the Motion to Appoint NPA as the TPA failed.   **Exhibit-34,** BISD Board Meeting Minutes of 11/20/01, p.9.  Some board members then recommended that the Employee Insurance Committee meet to make a recommendation as to who they would prefer to have appointed as the TPA, and provide that input at the Board's next meeting.   **Exhibit-1,** Chavez Affidavit.   That Employee Insurance Committee meeting was later scheduled for November 29th.

Interestingly, the minutes do not reflect any reference to the presentation made by Joey Lopez on behalf of NPA just before the conclusion of the meeting, although he spoke for over ten minutes and he did not sign up to speak during the Public Audience section of the meeting. **Exhibit-1,** Chavez Affidavit; **Exhibit-37,** Public Audience Sign-In Sheet of 11/20/01.  BISD

policies provide that "only those persons (on this [Public Audience Sign-In Sheet] list) who request to speak shall be heard. The speaker shall limit remarks to 5 minutes." **Exhibit-36**, BISD Policies BED(e), p.1. Mr. Lopez, however, was not even on the Public Audience Sign-In Sheet. **Exhibit-37,** Public Audience Sign-In Sheet of 11/20/01. Curiously, the videotape of the Board Meeting of November 20th has "disappeared," although Defendant Sauceda explained that the original was supposed to be kept in the Superintendent's office and it would be illegal to destroy or dispose of that tape.  **Exhibit-38,** Certification of Board Secretary; **Exhibit-39**, Sauceda Depo II, p.40, l.18 – p.42, l.3. Defendant Sauceda has not explained how he or the Board had any "discretion" to allow Mr. Lopez to make a presentation outside of a properly noticed agenda item or outside of the "Public Audience" section of the meeting, since Mr. Lopez did not even sign up to speak at the meeting.

When Mr. Lopez spoke to the BISD Board, he promoted the benefits of his company, NPA, and asked the Board to reconsider its earlier decision and instead appoint NPA as the TPA. **Exhibit-1**, Chavez Affidavit. Although there is no reference whatsoever in the minutes to Mr. Lopez speaking during that meeting, he spoke for over ten minutes in asking the Board to reconsider its decision not to appoint NPA as the TPA. **Id.** Mr. Lopez was allowed to speak for over ten minutes, outside of the Public Audience section, on a matter not posted on the agenda (reconsideration of TPA decision), although Mr. Chavez was limited to speaking only 2 minutes, and only during the Public Audience portion. **Id.**

After Defendant Sauceda's efforts to appoint NPA as the TPA through Board action failed, he enlisted the assistance of attorney Roerig to issue a legal opinion indicating board approval was not necessary for the selection of a TPA. **Exhibit-40**, Opinion Letter of 11/29/01.

Attorney Roerig acknowledged that contracts with the value of over $25,000, and contracts for the purchase of personal property valued at over $10,000, must be submitted to the bid process. **Id.** He concluded that because the modified proposal submitted by NPA agreed to waive all fees, the cost to the district was $0.00 and Defendant Sauceda could therefore appoint whoever he wanted.

Like his earlier and subsequent opinions, attorney Roerig appeared to be "more interested in maintaining his contract and pushing what appears to be [Defendant Sauceda's] private agenda," and "providing opinions that were overly restrictive just so they could allow Dr. Sauceda to do what he wanted in certain circumstances." **Exhibit-15**, Colunga letter of 2/13/02; **Exhibit-14**, Powers Depo, p.105, l.22 – p.107, l.11. As set out above, the "value" of the TPA position was in excess of $30,000 per year, since that is what Mr. Chavez's predecessor, NPA, had been charging the district. **Exhibit-3**, NPA 1997 Cafeteria Plan Proposal, p.4.; **Exhibit-2**, 1998 RFP, Table 4.1. In retaliation for Plaintiff Chavez's comments and letters, Defendant Sauceda also referenced a separate letter of the same date to Plaintiff Chavez, indicating that he would be rejecting his TPA proposal and would instead allow only two other companies to present their proposals at the Employee Insurance Committee meeting. **Exhibit-40**, Opinion Letter of 11/29/01.

On November 29th, individually and on behalf of BISD, Defendant Sauceda sent Plaintiff Chavez a letter providing the following:

Dear Mr. Chavez,

Please accept this correspondence as my official 30-day notice of our intent to non-renew *your services as our Third Party Administrator* for our Cafeteria Plan. I must also inform you that **your proposal** for renewal of the contract has been rejected as allowed under BISD Policy CH (Legal) and CH (Local).

Your continuous inappropriate correspondence is troublesome since appropriate channels were not followed. I consider the content of your letters and your conduct as unprofessional, unethical, and against expected customer-service provider relations. I am directing you to cease and desist all contact with school personnel during school business hours. Campus administration will be directed to contact security services if you or any of your associates are found to be on school-district property.

I must caution you that the content of the memos you disseminated to BISD staff are, in my opinion, both slanderous and libelous and can place both you and your corporation (AFLAC) in a legally liable situation. I will be contacting Mr. Frank LaFemina in the Austin Office and expressing to him my disappointment with your treatment of my Board and staff since it is obvious that you are not working in the best interest of BISD, your client.

Your supervisors will be advised that this administration will consider AFLAC as a future product provider under the following conditions:

a.    A corporate officer must personally apologize to each board member, the board as a whole, myself, and my administrators publicly.

b.    A written assurance that appropriate, ethical conduct will be exercised in the future by any and all AFLAC representatives wishing to serve BISD.

c.    Provided that the products are of the best quality, service and price.

Noe Sauceda
Superintendent of Schools

**Exhibit-41**, Termination letter of 11/29/01 (emphasis added).    Defendant Sauceda also sent a copy of this letter to Mr. Chavez's supervisor, Frank LaFemina, and the AFLAC State Office. **Exhibit-39**, Sauceda Depo II, p.53, l.20 – p.54, l.2.    Sauceda thereafter contacted Mr. LaFemina to discuss the matters described in the letter.    **Id.,** p.89, l.15 – p.90, l.12.    As he explained further

And so I was hoping that Mr. Lafemina wouldn't be happy to hear that BISD would never do business with AFLAC, because that's not what we wanted. We want these types of vendors to service our teachers. And so I was just expressing to him my disappointment that a nationally-known company, a company that had served us very well, would allow for this type of treatment of the school district.

**Id.**, p.93, l.19 – p.94, l.1. There should be no question that the termination letter of November 29th and the follow up conversations Defendant Sauceda had with Mr. Chavez's supervisors, were in direct response to, or retaliation for, Mr. Chavez's submitting letters and speaking to the Board of Trustees during the public input sections of Board Meetings regarding the legality of Defendants' actions and their responsibility to the District and its employees to avoid paying unnecessary fees.

Because of the restrictions enumerated in Sauceda's termination letter, Mr. Chavez was not allowed to attend the Employee Insurance Meeting on November 29th, and he has not been able to return to any BISD campus for fear of being arrested by campus security services. **Exhibit-1**, Chavez Affidavit; **Exhibit-41**, Termination Letter of 11/29/01. As a result of the work Mr. Chavez had done as *de facto* TPA and on behalf of AFLAC, the employees voted overwhelmingly to select Mr. Chavez's AFLAC bid as the TPA, with 44 votes for AFLAC, 1 vote for NPA, and 0 votes for First Financial. **Exhibits-42 & 43,** Employee Insurance Meeting Minutes of 11/29/01. As Board Trustee Salazar explained, the "teacher's insurance committee voted 44 – 1 to keep AFLAC. In my opinion, this overwhelming show of support for AFLAC is the result of Mr. Chavez's excellent service and the continued dedication he personally has provided to our employees in the past." **Exhibit-47,** Salazar Letter of 1/22/02.

Thereafter, Mr. Chavez continued to speak with his supervisor, Frank LaFemina, to discuss his continuing work with AFLAC. As a direct result of Defendant's termination letter of

November 29th, however, on or about December 3rd, four (4) days after Defendant's letter, Mr. LaFeminia notified Mr. Chavez that he was being terminated from the position of Regional Sales Coordinator. **Exhibit-1**, Chavez Affidavit. Approximately one month later, on January 8, 2002, an AFLAC agent eventually sent the letter of apology requested by Defendant in the termination letter of November 29th. **Exhibit-44**, Janet Baker letter of 1/8/02; **Exhibit-41**, Termination Letter of 11/29/01. Board President Colunga and Trustees Lehmann, Salazar, and Powers all responded to that letter indicating Mr. Chavez had done nothing wrong. **Exhibit-45**, Colunga Letter of 2/6/02; **Exhibit-46,** Lehmann Letter of 1/15/02; **Exhibit-47**, Salazar Letter of 1/22/02; **Exhibit-48**, Powers Letter of 1/16/02. Although Ms. Salazar asked that Mr. Chavez be reinstated to his former position, no such action was ever taken. **Exhibit-47**, Salazar Letter of 1/22/02. As a result, Mr. Chavez remained terminated and barred from appearing on any BISD campus through Defendants' November 29th letter, in retaliation for writing and speaking about Defendants' legal violations and financial irresponsibility.

## III.

## ARGUMENT AND AUTHORITIES

Plaintiff's remaining causes of action against Defendant Noe Sauceda are for violation of his right to freedom of speech, protected through the First Amendment to the U.S. Constitution, for which Plaintiff complains pursuant to 42 U.S.C. §1983, tortious and intentional interference with his business relationships with AFLAC, fraud, malice, intentional infliction of emotional distress, libel and slander, as well as for punitive damages based on Defendant's malice and fraud. Because Defendant Sauceda only seeks summary judgment based on his claim of entitlement to qualified immunity from Plaintiff's federal claims and professional immunity from

Plaintiff's state law claims, Plaintiff Chavez will respond only to those assertions of immunity herein.

**A.      Qualified Immunity Under 42 U.S.C. §1983**

To establish that Defendant Sauceda is not entitled to qualified immunity, Plaintiff must satisfy a three-pronged test.  First, he must allege facts that assert a violation of a constitutional right.  *Hare v. City of Corinth*, 135 F.3d 320, 325 (5th Cir. 1998).  Second, he must show that this right was clearly established at the time of the Defendant's actions.  *Eugene v. Alief Indep. Sch. Dist.*, 65 F.3d 1299, 1305 (5th Cir. 1995).  Third, even if Defendant's conduct infringed upon a constitutional right, Plaintiff must show that the Defendant's conduct was not objectively reasonable.  *Gutierrez v. City of San Antonio*, 139 F.3d 441, 445 (5th Cir. 1998).  Because it is unclear which element or elements Defendant is challenging, each element will be discussed individually.

**1.  Violation of Constitutional Right to Free Speech**

Plaintiff Chavez alleges a cause of action for violation of his right to free speech resulting from his submitting memos of November 9, 12, and 19, 2001, as well as the corrected Cafeteria Plan Comparison Chart, the "Why AFLAC?" flyer and his spoken comments to Defendant BISD's Board of Trustees on November 13 and 20, 2001, as a result of which Defendant Sauceda retaliated against him by summarily terminating him as BISD's TPA, rejecting his proposal for renewal of his TPA agreement, and excluding him from any contact with school personnel during school business hours, all of which resulted in AFLAC's termination of Plaintiff from his Regional Sales Coordinator position.  **Exhibit-22,** Chavez Memo of 11/9/01; **Exhibit-23,** Chavez Memo of 11/12/01; **Exhibit-28,** Chavez Memo of 11/19/01; **Exhibit-21,** Cafeteria Plan

Comparison Chart; **Exhibit-32**, "Why AFLAC?" Flyer; **Exhibit-24**, BISD Meeting Excerpts of 11/13/01; **Exhibit-31**, BISD Meeting Excerpts of 11/20/01; and, **Exhibit-41**, Termination Letter of 11/29/01.

There should be no question that Defendant Sauceda's letter to Chavez terminating him from his position of *de facto* TPA, disqualifying his proposal to act as TPA for the following year, prohibiting him from contacting school personnel during school business hours or from being on school-district property, as well as his subsequent conversations with Chavez's supervisor to assure Chavez would be removed from his position at AFLAC, were in retaliation for Chavez's written and spoken comments to the BISD Board of Trustees, its Employee Insurance Committee and others. Defendant Sauceda appears to agree as much, when he argues "[h]is decision was prompted by Mr. Chavez unfounded accusations of Board members and the administration ...." Defendant Noe Sauceda's Mtn for Summ. Jdgmt, p.6, ¶1. Sauceda does not claim that he did not terminate and take action against Mr. Chavez because of his written and spoken comments; to the contrary, he argues instead that Chavez's written and spoken comments *justified* his termination. Sauceda apparently overlooks the right of individuals to question and criticize public officials and administrators in the performance of their duties.

Plaintiff legitimately reported that Defendant's attempts to appoint Insurance Associates of the Valley "agent of record" is contrary to a Texas Attorney General opinion. **Exhibit-31**, Excerpts from BISD Board Meeting of 11/20/01; **Exhibit-32**, "Why AFLAC?" Flyer. As Opinion No. JC-0205 (2000) explains, "[b]ecause the use of a designated broker of record will necessarily limit the number of companies from which the district may purchase insurance, it may foreclose the district's access to the most advantageous rates and terms." **Exhibit-29**,

Opinion No. JC-0205, pp.2.

> [B]ecause use of a designated broker of record is not authorized by [Education
> Code] sections 44.031 and 44.033, a [public school] district may not use a
> designated broker of record to purchase insurance contracts with premiums with
> an aggregate yearly value of $10,000 or more.  A district must use one of the
> methods listed in section 44.031 if purchasing insurance contracts with
> premiums of $25,000 or more in the aggregate for each twelve-month period.

**Id.**, p.5.  Texas Education Code §44.031(a) also requires contracts "valued at $25,000 or more"

to be made by the method "that provides the best value for the district," including competitive

bids, and not including independent selection by a superintendent.

Plaintiff Chavez also questioned the financial responsibility of appointing NPA as the

TPA because NPA's bid proposal included a $5.00 per employee enrollment fee (which would be

waived "[i]f Insurance Associates of the Valley are selected as the agent of record"), in addition

to an "administration fee [of] $.50 per participant per month," "an annual fee of $75.00 for

completion of Form 5500," and a "Dependent/Child Care and/or Medical Reimbursement ... fee

for administration [of] $3.00 per participant, per month ...."  **Exhibit-19**, NPA 2001 Cafeteria

Plan Proposal, p.4.  AFLAC's proposal, on the other hand, provided that  no fees would be

charged.  **Exhibit-18**, Insurance Commission Meeting Minutes of 10/30/01, p.2

Similarly, Plaintiff Chavez's comments also called into question Defendant Sauceda's

apparent attempts to circumvent the open bidding requirements established by state law by

allowing NPA to modify its bid after the posted closing date, which was also a matter of public

concern.  The fact that Mr. Chavez was being directly affected by Defendant's  apparently illegal

actions does not minimize the fact that he was making a complaint of public interest.  The public

has an interest in knowing that, regardless of who is actually selected, the proper procedures are

followed in selecting an appropriate bidder and in following state law regarding agents of record.

Simply because Plaintiff had a personal interest in Defendant's apparently illegal acts does not mean that the public did not also have an interest.

After Plaintiff Chavez reported the legal impediments to the appointment of an "agent of record," and the financial irresponsibility of appointing NPA in particular, to Defendant BISD's Board of Trustees and its insurance committee, and because of those reports, Defendant Sauceda disqualified Plaintiff Chavez from bidding on the Cafeteria Plan. His sole reason for doing so was in retaliation for Mr. Chavez's reports that Defendant Sauceda was attempting to take action that was apparently contrary to the law. Although Attorney General opinions "do not carry the force of law, they are entitled to be given considerable weight in determining the proper construction of statutes." *City of Houston v. Southern Pacific Transp. Co.*, 504 S.W.2d 554, 557 (Tex.App.- Houston [14th Dist.] 1974, writ ref'd n.r.e.).

The speech about which Plaintiff Chavez complained specifically involved Defendant's attempts to violate the public trust. There should be no question that a public employee's violation of the public trust by illegally appointing an agent of record to attempt to funnel funds to that agent, by making financially irresponsible decisions to appoint that agent, and by violating state and local bidding requirements in order to appoint that agent, is a matter of public interest. Where an employee or citizen speaks on matters that are of concern to the public in general, that speech will be protected, even if that person has some personal interest in the matter on which they complain. For example, in determining that a teacher has a right to speak on issues of public importance, even where that speech is critical of the manner in which the Board of Education handled previous proposals to raise revenue for schools, an issue that would have directly affected the teacher's personal interest, the Supreme Court concluded in *Pickering* that

courts should strive "to arrive at a balance between the interest of the [speaker], as a citizen in commenting upon matters of public concern, and the interest of the State, as an employer in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Educ. of Township High School Dist.* 205, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734-35, 20 L.Ed.2d 811 (1968).

As the Supreme Court has held, even where a public citizen has no "right" to a valuable government benefit, and though the government may have a number of valid reasons for denying him that benefit, the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially his interests in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech, his exercise of that freedom would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command directly.'" *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972), *quoting Speiser v. Randall*, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958). The First Amendment protects speech "not only [from] direct limitations … but also [from] adverse government action against individual[s] because of [their] speech," which would include denying public benefits to Plaintiff or punishing him because of his speech. *Colson v. Grohman*, 174 F.3d 498, 508 (5th Cir. 1999). Interpreting the facts in the light most favorable to Plaintiff, there should be no question that Defendant's actions were intended to punish Plaintiff because of his protected speech. These facts establish Defendant Sauceda's violation of Plaintiff's First Amendment right to free speech.

## 2. Plaintiff's Right to Free Speech Was Clearly Established

As set out above, the law applicable under the First Amendment established that a public citizen is protected from adverse government action because of his speech, and that law was clearly established at the time of Defendant Sauceda's actions. Because Plaintiff was not a public employee, the clearly established law provided that Plaintiff was entitled to even more protection than would be granted to public employees. The First Amendment free speech analysis applicable to public employees differs from the analysis applicable to third parties or the public in general. As the courts set out in *Pickering* and in *Blackburn*, "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968); *Blackburn v. City of Marshall*, 42 F.3d 925, 931-32 (5th Cir. 1995). It was for that reason that those courts confirmed that the *Pickering* balancing test should apply only to public employees. The test developed in *Pickering* was designed to apply to a public employee, a teacher, who was commenting on matters of public concern relating to the State, her employer, and required the balancing of her right to speak on matters of public interest with the State's need to promote the efficiency of the services it performs through its employees. *Pickering v. Board of Education*, 391 U.S. at 568-69, 88 S.Ct. 1734-35. The Supreme Court acknowledged, however, that the same test would not apply "were [Plaintiff] a member of the general public...." **Id.**

On the other hand, the Supreme Court in *Perry* and the Fifth Circuit in *Blackburn* both concluded that the First Amendment analysis applicable to an independent contractor, such as the Plaintiff herein, is the more generalized question of whether Defendants acted or denied a benefit

to Plaintiff because of his "constitutionally protected speech or associations...." *Perry v. Sindermann*, 408 U.S. at 597, 92 S.Ct. at 2697 (untenured teacher); *Blackburn v. City of Marshall*, 42 F.3d at 933 (independent owner of towing and wrecker service business alleging facts similar to Plaintiff herein) ("we conclude that the relationship between [Plaintiff] and Defendants does not rise to the level of even a quasi-employment relationship like that in the medical staff privileges cases. Accordingly, we hold that the facts of this case are not sufficiently analogous to the employment cases to warrant the direct and full application of *Pickering* and *Connick*.") There has been no allegation made by either Plaintiff or any Defendant or Third Party Defendant that Plaintiff was a public employee. To the contrary, Defendants appear to contend that Plaintiff had no due process rights because he was not a public employee. Accordingly, because Plaintiff was not a public employee, but was instead an independent contractor, the *Perry* standard should apply, rather than the *Pickering* balancing test.

If this Court is to consider the *Pickering/Connick* line of cases applicable, however, at the very least the speech made by Mr. Chavez would be considered "mixed speech." Mr. Chavez's letters to Defendant BISD and its insurance committee notified them of potential criminal wrongdoing in taking the actions proposed by Defendant Sauceda, as in *Teague*, as well as the added financial irresponsibility of taking that action, so he was clearly speaking upon matters of public concern. *Teague v. City of Flower Mound*, 179 F.3d 377 (5th Cir. 1999). The fact that Plaintiff had a private interest in these matters as well does not detract from the public nature of those concerns, and Chavez certainly was not speaking only "as an employee upon matters only of personal interest...." *Id.* at 380. Because the concerns of criminal wrongdoing and financial irresponsibility by Defendants would clearly be matters of public

concern, at the very least this would be a "mixed speech" case.

It is only "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters of personal interest," that an employee is not extended First Amendment protection. *Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form and context of a given statement, as revealed by the whole record." *Id.*, 461 U.S. at 148, 103 S.Ct. at 1690. The Supreme Court in *Connick* found no public interest in Myers' speech, partially because Myers, unlike Mr. Chavez, did not "seek to bring to light actual or potential wrongdoing or breach of public trust on the part of [defendant] and others." *Id.*, 461 U.S. at 148, 103 S.Ct. at 1691.

As the Supreme Court more recently held, there is "no reason to believe that proper application of the *Pickering* balancing test cannot accommodate the difference between employees and independent contractors." *Board of County Commissioners v. Umbehr*, 518 U.S. 668, 678, 116 S.Ct. 2342, 2349, 135 L.Ed.2d 843 (1996). Regardless, Defendant appears to agree that the *Pickering* analysis need not apply in this circumstance, because he asserts only that to establish liability, "[t]he Plaintiff must ... show that a) that (sic) the speech or conduct was constitutionally protected, and b) that it was a motivating factor in the action taken against him." Defendant Noe Sauceda's Mtn. for Summ. Jdgmt., p.6, ¶2, *citing Alcorn v. Vaksman*, 877 S.W.2d 390 (Tex.App.- Houston [1st Dist.] 1994, writ denied), *citing Mt. Healthy City Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

Whether evaluated under the *Perry / Blackburn* analysis or under the *Pickering / Connick* "mixed speech" analysis, assuming the facts in the light most favorable to Plaintiff, the

law was clearly established that Defendant Sauceda may not retaliate against an independent

contractor such as Plaintiff Chavez for exercising his First Amendment rights. *O'Hare Truck*

*Service, Inc. v. City of Northlake,* 518 U.S. 712, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996).

Defendant did not have an "absolute right to enforce a patronage scheme,...as a means of

retaining control over independent contractors,...and satisfying governmental officials' concerns

about reliability...." *Id.* 518 U.S. at 726, 116 S.Ct. at 2361.

### 3. Sauceda's Conduct Was Not Objectively Reasonable

The third element requires Plaintiff Chavez only to allege and provide evidence

that Sauceda's actions were not objectively reasonable, *i.e.*, that he criticized Defendants

and Sauceda terminated and retaliated against him because of his criticism. That, Plaintiff

has done, and by arguing he was justified in terminating Plaintiff because of his written

and spoken comments, Defendant Sauceda appears to concede as much. Sauceda argues

instead that he was justified in taking action against Plaintiff Chavez because he was

"insinuating that the administration was not acting in the best interest of the employees,"

and "implying that Board members and the administration were breaking the law."

Defendant Noe Sauceda's Mtn for Summ. Jdgmt, p.3, ¶2. Sauceda appears to urge the

fact issue of whether he was deliberately indifferent to Chavez's right to free speech, yet

he provides no evidence that his actions were objectively reasonable.

In recognizing "the right of independent government contractors not to be terminated for

exercising their First Amendment rights," the Supreme Court has provided that a Plaintiff in Mr.

Chavez's position

must show that the termination of his contract was motivated by his speech on a matter of public concern, an initial showing that requires him to prove more than the mere fact that he criticized [Sauceda] before [he] terminated [Chavez]. If he can make that showing, [Sauceda] will have a valid defense if [he] can show, by a preponderance of the evidence, that, in light of [his] knowledge, perceptions, and policies at the time of the termination, [Sauceda] would have terminated the contract regardless of Chavez's speech. [citation omitted]   [Sauceda] will also prevail if he can persuade the District Court that [BISD's] legitimate interests as contractor, deferentially viewed, outweighed the free speech interests at stake.

*Id.*, 518 U.S. at 685, 116 S.Ct. at 685-86, *citing Mt. Healthy City Bd. of Ed  v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).   Defendant fails to mention that the third element for qualified immunity only requires Plaintiff to provide evidence that Defendant's conduct was unreasonable, which he has done.   Once this burden is discharged, the burden of proof shifts to Defendant to show the same decision would have been made even in the absence of the protected speech.   *Mt. Healthy City School District Bd. of Educ. v. Doyle*, 429 U.S. at 487, 97 S.Ct. at 576.

As set out above, Plaintiff has provided evidence that Defendant's actions against Plaintiff were in retaliation for the legitimate exercise of his free speech rights, guaranteed by the First Amendment to the U.S. Constitution.   Defendant, on the other hand, has provided no explanation to establish the objective reasonableness of his decision to terminate Plaintiff as the TPA, disqualify his proposal to continue as TPA, prohibit his entry onto school district property, or to prohibit his contact with school personnel during school business hours.   He refers only generally to Plaintiff's "unfounded" accusations and "unprofessional" behavior, yet he fails to establish what accusations were "unfounded" or what behavior was "unprofessional," or why it was necessary to terminate Chavez, to disqualify his proposal, to prohibit his contact with school personnel

or to prohibit his entry onto school property. Defendant Noe Sauceda's Mtn. for Summ. Judgmt., p.6, ¶1.

Although Plaintiff Chavez was questioning the legal and financial basis for appointing NPA as the TPA, Defendant Sauceda never explained why it was necessary to terminate and disqualify his services, or to prohibit any contact with BISD personnel or campuses, or even why NPA's services would have been preferable to those of Mr. Chavez and AFLAC, particularly in light of the fact that Chavez had been the TPA for the 3 prior years, had been doing a good job and had a total of only 3 – 5 minor complaints during that time. *See* **Exhibit-6**, Lieck Depo, p.84, 1.2 – p.85, 1.7; **Exhibit-16**, Colunga Depo, p.42, 1.11 – p.43, 1.2; **Exhibit-45**, Colunga Letter of 2/6/02. As Board Trustee Salazar explained, the "teacher's insurance committee voted 44 – 1 to keep AFLAC. In my opinion, this overwhelming show of support for AFLAC is the result of Mr. Chavez's excellent service and the continued dedication he personally has provided to our employees in the past." **Exhibit-47,** Salazar Letter of 1/22/02. Plaintiff Chavez rightfully pointed out, therefore, that it was financially irresponsible to appoint NPA, who would be charging the District considerable fees, rather than himself and AFLAC, which charged no fees and had a history of "excellent service and ... continued dedication" to BISD employees.

Defendant Sauceda has also not yet explained his rationale for seeking to appoint Insurance Associates of the Valley as "agent of record," or for circumventing the open bidding requirements by allowing NPA to modify its bid after the posted closing date. *See* **Exhibit-10**, 2001 RFQ for TPA, p.1, ¶1; **Exhibit-19**, NPA 2001 Cafeteria Plan Proposal, p.4; **Exhibit-35**, NPA letter of November 20, 2001. In seeking to appoint Insurance Associates of the Valley the only thing that seems to be apparent is that Defendant Sauceda was attempting to funnel a portion

of insurance premiums to Insurance Associates of the Valley for policies he had never previously sold.  Previously, NPA had only sold a cancer policy through Hartford Insurance Company to BISD employees.  **Exhibit-A**, Chavez Affidavit.  Defendant Sauceda's attempts to appoint NPA and Insurance Associates of the Valley for what appears to be an illegal or improper purpose, is a matter of significant interest to the public in general, yet he has failed to provide any reason for wanting to do so that would be in the best interests of the District.

Sauceda did not take the action he did because he was upset that Chavez had made unfair accusations or had behaved badly; had that been the case, he would have taken action before the Nov. 20th Board Meeting.  Sauceda was upset that Chavez's legitimate reports of possible legal violations in appointing Insurance Associates of the Valley as the agent of record, and financially irresponsible actions in appointing NPA as the TPA had already stymied his ability to have them appointed on or before November 20th.  It was for that reason that Sauceda sent the November 29th Termination Letter to Chavez and his supervisor, prior to the Employee Insurance Committee Meeting that evening, to prevent Chavez from again standing in the way of Sauceda's desired appointments.

Although Plaintiff Chavez had legitimate reasons for questioning the appointment of NPA, to date Defendant Sauceda has still provided no explanation as to why he believed NPA's services were superior to those of Plaintiff Chavez and AFLAC, or how he could justify circumventing the open bidding requirements by allowing NPA to modify its bid after the deadline.  Similarly, he has failed to explain why it was necessary or even reasonable to terminate and disqualify Chavez as TPA, or to prohibit his contact with BISD employees and campuses.  As a result, Sauceda has provided no evidence to establish that his actions were

objectively reasonable, or that he would have taken these same actions regardless of Chavez's speech. *See Board of County Commissioners v. Umbehr*, 518 W.S. at 685, 116 S.Ct. at 685-86.

**D.    Individual Immunity for State Claims**

Defendant Sauceda also alleges he is entitled to immunity pursuant to Texas Education Code §22.051. That section provides only that "[a] professional employee of a school district is not personally liable for any act...that involves the exercise of judgment or discretion on the part of the employee...." As set out herein, Defendant Sauceda has not established how he had discretion within the scope of his duties to tortiously or intentionally interfere with Plaintiff Chavez's employment relationship with AFLAC, to make material misrepresentations as to constitute a fraud on Plaintiff, BISD employees and the community in general to intentionally inflict emotional distress on Plaintiff Chavez, to libel or slander Plaintiff Chavez by accusing him of "unprofessional" and "unethical" conduct, both in writing and verbally, or to contact Plaintiff's supervisor Frank LaFemina to insist on Chavez's removal from handling the BISD Cafeteria Plan or from BISD in general for reporting Defendant's apparent illegal and financially irresponsible proposals.

A claim to immunity under Texas Education Code §22.051 is an affirmative defense, which Defendant Sauceda is required to conclusively establish as a matter of law. *Gonzalez v. Ison-Newsome*, 68 S.W.3d 2, 4 (Tex.App.- Dallas 1999, pet. denied w.o.j. sub nom. *Collins v. Ison-Newsome*, 73 S.W.3d 178 (Tex. 2001); *Foster v. Estrada*, 974 S.W.2d 751, 752-53 (Tex.App.- San Antonio 1998, pet. denied). Defendant Sauceda does not submit any evidence, however, that would establish his actions were taken as part of his discretionary duties. Although

it is Sauceda's burden to establish this element as part of his affirmative defense of immunity, he has failed to provide any evidence that could establish that the acts described above were in fact discretionary, and Plaintiff continues to deny that they in fact were.

As set out above, Defendant Sauceda submitted a letter to Plaintiff Chavez terminating him as BISD's TPA, rejecting his proposal for renewal of his TPA agreement, excluding him from any contact with school personnel during school business hours, prohibiting him from appearing on any school campus, and he contacted Plaintiff's supervisor, Frank LaFemina, to discuss Plaintiff's continued employment and exclusion from BISD in any manner. **Exhibit-41**, Termination Letter of 11/29/01; **Exhibit-51**, Deposition of Frank D. LaFemina (hereinafter LaFemina Depo), p.68, l.1 – p.69, l.3. Sauceda has provided no evidence that would "establish as a matter of law that the complained-of acts were incident to or within the scope of [his] employment ...." *Gonzalez v. Ison-Newsome*, 68 S.W.3d at 6. Nor did he provide any evidence that his "acts were in furtherance of [BISD's] business and accomplished an objective for which [he] was employed." *Id.* As a result, he has submitted no evidence that could "demonstrate how or why the disputed actions or omissions should be legally characterized as involving the exercise of judgment or discretion." *Myers v. Doe*, 52 S.W.3d 391, 398 (Tex.App.- Fort Worth 2001, pet. denied). *See also, Foster v. Estrada*, 974 S.W.2d at 753.

The parties differ as to whether Defendant Sauceda's acts were discretionary or ministerial. At the very least, Plaintiff Chavez denies the allegations made by Defendant Sauceda in his November 29th letter that he submitted to Chavez, Chavez's supervisor Frank LaFemina, and the BISD Board of Trustees. **Exhibit-41**, Termination Letter of 11/29/01. Plaintiff asserts that Sauceda instead manufactured those allegations. "Manufacturing evidence ... is not within

the parameters of any imaginable discretion granted by the Texas statute." *Morris v. Dearborne*, 181 F.3d 657, 675 (5ᵗʰ Cir. 1999). Because the parties differ on whether the acts of Defendant Sauceda were discretionary or ministerial, and because Defendant Sauceda has provided no summary judgment evidence that would conclusively establish his affirmative defense that his acts were discretionary, a fact issue remains and Defendant's motion for professional immunity pursuant to Texas Education Code §22.051 should be denied. *See Gonzalez v. Ison-Newsome*, 68 S.W.3d at 5.

## IV.

## CONCLUSION

Defendant NOE SAUCEDA is liable for his actions in terminating Plaintiff Chavez as the *de facto* TPA, disqualifying his proposal to continue as *de facto* TPA, prohibiting him from being on any school district property, prohibiting any contact with school personnel during school business hours and contacting Plaintiff's supervisor to assure action would be taken against him. Defendant is liable for these actions because they were taken in retaliation for Mr. Chavez having made written and spoken comments that were constitutionally protected, or at the very least, fact issues remain on what the Defendant's basis was for taking these actions.

WHEREFORE, PREMISES CONSIDERED, PLAINTIFF **DINO X. CHAVEZ** would respectfully request that upon consideration of Defendant Noe Sauceda's Motion for Summary Judgment that such motion be DENIED in its entirety, and that this action be allowed to proceed to trial and judgment, and that Plaintiff be granted such other and further relief to which he may show himself to be justly entitled, whether general or special, at law and in equity.

Signed on this the 3rd day of November, 2003.

Respectfully submitted,

**LAW OFFICE**
**J. ARNOLD AGUILAR**
Artemis Square, Suite H-2
1200 Central Boulevard
Brownsville, Texas 78520
Telephone     : (956) 504-1100
Facsimile     : (956) 504-1408

By: _____
J. Arnold Aguilar
State Bar No. 00936270
Federal Adm. No. 6822

Attorney for Plaintiff,
DINO X. CHAVEZ

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing **PLAINTIFF'S RESPONSE TO DEFENDANT SAUCEDA'S MOTION FOR SUMMARY JUDGMENT** has on this the 4th day of November, 2003, been forwarded via certified mail, return receipt requested to:

Ms. Eileen M. Leeds
WILLETTE & GUERRA, L.L.P.
International Plaza, Suite 460
3505 Boca Chica Boulevard
Brownsville, TX 78521

Ms. Elizabeth G. Neally
ROERIG, OLIVEIRA & FISHER, L.L.P.
855 W. Price Rd., Suite 9
Brownsville, TX 78520

Mr. William B. Steele, III
LOCKE, LIDDELL & SAPP, L.L.P.
100 Congress Avenue, Suite 300
Austin, TX 78701

J. Arnold Aguilar

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

DINO X. CHAVEZ                              §
                                           §
    VS.                 §
                                           §       **CIVIL ACTION NO.**
BROWNSVILLE INDEPENDENT                     §
SCHOOL DISTRICT, NOE SAUCEDA,               §       **B - 02 - 128**
and RANDY DUNN, MARILYN DEL                 §
BOSQUE-GILBERT and HUGH EMERSON,            §
JR., in their official capacities as Board  §
Members of Brownsville Independent          §
School District                            §

---

## ORDER DENYING DEFENDANT SAUCEDA'S
## MOTION FOR SUMMARY JUDGMENT

---

On the _____ day of _____, 2003, this cause came for hearing

**Defendant Noe Sauceda's Motion for Summary Judgment.**

After hearing the argument of counsel thereon, the Court is of the opinion that

Defendant's Motion for Summary Judgment should be DENIED;

IT IS THEREFORE ORDERED, ADJUDGED and DECREED that Defendant's Motion

for Summary Judgment is DENIED.

SIGNED on this the _____ day of _____, 2003.


_____
U.S. DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ                              §
                                           §
      VS.                                  §
                                           §        CIVIL ACTION NO.
BROWNSVILLE INDEPENDENT                     §
SCHOOL DISTRICT, NOE SAUCEDA,               §        B - 02 - 128
and RANDY DUNN, MARILYN DEL                 §
BOSQUE-GILBERT and HUGH EMERSON,           §
JR., in their official capacities as Board  §
Members of Brownsville Independent          §
School District                            §

## AFFIDAVIT OF J. ARNOLD AGUILAR

STATE OF TEXAS                             §
                                           §
COUNTY OF CAMERON                          §

BEFORE ME, the undersigned official, on this day appeared J. ARNOLD AGUILAR, who is personally known to me, and first being duly sworn according to law upon his oath deposes and says:

My name is J. Arnold Aguilar, I am over 18 years of age, I have never been convicted of a crime, and I am fully competent to make this affidavit. I have personal knowledge of the facts state herein, and they are all true and correct.

As the attorney for Plaintiff in Civil Action No. B-02-128, pending in the United States District Court for the Southern District of Texas, Brownsville Division, I attended the following depositions:

(1)    Kenneth J. Lieck on September 19, 2003.  The excerpts attached hereto as Exhibit-6 were taken from the transcript of Kenneth J. Lieck's deposition testimony and are true records of the testimony provided by Kenneth J. Lieck.

(2)    Defendant Noe Sauceda (Volume I) on April 9, 2003.  The excerpts attached hereto as Exhibit-7 were taken from the transcript of Noe Sauceda's deposition testimony and are true records of the testimony provided by Noe Sauceda.

(3)    Herman Otis Powers, Jr. May 29, 2003.  The excerpts attached hereto as Exhibit-14 were taken from the transcript of Herman Otis Powers, Jr.'s deposition testimony and are true records of the testimony provided by Herman Otis Powers, Jr.

(4)    Joe Colunga, III on August 20, 2003.  The excerpts attached hereto as Exhibit-16 were taken from the transcript of Joe Colunga, III's deposition testimony and are true records of the testimony provided by Joe Colunga, III.

(5)    Defendant Noe Sauceda (Volume II) on June 17, 2003.  The excerpts attached hereto as Exhibit-39 were taken from the transcript of Noe Sauceda's deposition testimony and are true records of the testimony provided by Noe Sauceda.

(6)    Frank D. LaFemina on May 22, 2003.  The excerpts attached hereto as Exhibit-51 were taken from the transcript of Frank D. LaFemina's deposition testimony and are true records of the testimony provided by Frank D. LaFemina.


The above and foregoing is true and correct based on my personal knowledge.


_____
J. Arnold Aguilar


SUBSCRIBED AND SWORN TO BEFORE ME on the 3rd day of November, 2003, to certify which witness my hand and official seal.


_____
Notary Public, State of Texas

My Commission Expires:

03-27-07

AFFIDAVIT OF J. ARNOLD AGUILAR                                    PAGE 2 OF 2

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DINO X. CHAVEZ | § | |
| | § | |
| VS. | § | |
| | § | CIVIL ACTION NO. |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, NOE SAUCEDA, | § | B - 02 - 128 |
| and RANDY DUNN, MARILYN DEL | § | |
| BOSQUE-GILBERT and HUGH EMERSON, | § | |
| JR., in their official capacities as Board | § | |
| Members of Brownsville Independent | § | |
| School District | § | |

---

## INDEX OF EXHIBITS

---

Exhibit-1    Dino X. Chavez Affdavit

Exhibit-2    1998 RFP

Exhibit-3    NPA 1997 Cafeteria Plan Proposal

Exhibit-4    "Budget" Insurance Group Flyer

Exhibit-5    Cafeteria Plan Proposals comparison of 9/16/98

Exhibit-6    Excerpts from Kenneth Lieck's Deposition

Exhibit-7    Excerpts from Noe Sauceda's Deposition (Volume I)

Exhibit-8    AFLAC/Chavez 1998 Cafeteria Plan proposal

Exhibit-9    AFLAC/Chavez 2001 Cafeteria Plan proposal

Exhibit-10    2001 RFQ for TPA

Exhibit-11    8/14/01 RFQ change

Exhibit-12    8/15/01 RFQ change

Exhibit-13    Pat Lehmann's memo of 9/7/01

Exhibit-14    Excerpts from Herman Otis Powers' Deposition

Exhibit-15    Joe Colunga's letter of 12/13/02

Exhibit-16    Excerpts from Joe Colunga's Deposition

Exhibit-17    BISD Attorney Contract

Exhibit-18    Insurance Commission Meeting Minutes of 10/30/01

Exhibit-19    NPA 2001 Cafeteria Plan Proposal

Exhibit-20    Special Called Board Meeting of 10/30/01

Exhibit-21    Cafeteria Plan Comparison Chart

Exhibit-22    Dino X. Chavez's memo of 11/9/01

Exhibit-23    Dino X. Chavez's memo of 11/12/01

Exhibit-24    BISD Meeting excerpts of 11/13/01

Exhibit-25    Excerpts from BISD Board Meeting Minutes of 11/13/01

Exhibit-26    BISD Board Meeting Agenda of 11/20/01

Exhibit-27    Dr. Lopez's memo of 11/5/01

Exhibit-28    Dino X. Chavez's memo of 11/19/01

Exhibit-29    Attorney General's Opinion No. JC-0205

Exhibit-30    IRS Guidelines 7.7.1, §13.1.1.1

Exhibit-31    Excerpts from BISD Board Meeting of 11/20/01

Exhibit-32    "Why AFLAC?" Flyer

Exhibit-33    Recommendation to Appoint NPA as TPA

Exhibit-34    BISD Board Meeting Minutes of 11/20/01

Exhibit-35    NPA letter of 11/20/01

Exhibit-36    BISD Policies BED(E)

Exhibit-37    Public Audience Sign-In Sheet of 11/20/01

Exhibit-38    Certification of Board Secretary

Exhibit-39    Excerpts from Noe Sauceda's Deposition (Volume II)

Exhibit-40    Opinion Letter of 11/29/01

Exhibit-41    Termination Letter of 11/29/01

Exhibi-42    Employee Insurance Commission Meeting Minutes of 11/29/01

Exhibit-43    Employee Insurance Commission Meeting Minutes of 11/29/01

Exhibit-44    Janet Baker's Letter of 1/8/02

Exhibit-45    Joe Colunga's Letter of 2/6/02

Exhibit-46    Pat Lehmann's Letter of 1/15/02

Exhibit-47    Linda Salazar's Letter of 1/22/02

Exhibit-48    Otis Powers' Letter of 1/16/02

Exhibit-49    BISD Policy CH (LEGAL)

Exhibit-50    1998 TPA Recommendation

Exhibit-51    Excerpts from Frank D. LaFemina's Deposition

# EXHIBIT-1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DINO X. CHAVEZ | § | |
| | § | |
| VS. | § | |
| | § | CIVIL ACTION NO. |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, NOE SAUCEDA, | § | B - 02 - 128 |
| and RANDY DUNN, MARILYN DEL | § | |
| BOSQUE-GILBERT and HUGH EMERSON, | § | |
| JR., in their official capacities as Board | § | |
| Members of Brownsville Independent | § | |
| School District | § | |

---

## AFFIDAVIT OF DINO X. CHAVEZ

---

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF CAMERON | § |

BEFORE ME, the undersigned official, on this day appeared **DINO X. CHAVEZ**, who is personally known to me, and first being duly sworn according to law upon his oath deposes and says:

1. My name is Dino X. Chavez, I am over 18 years of age, and I am fully competent to make this affidavit. I graduated from the University of Texas with a B.B.A. in Real Estate in 1988 and from the University of North Texas with a M.B.A. in Finance in 1990. I have been in the insurance business since May 1994, when I got my Group I Health & Life insurance license. I have been an independent insurance agent since that time, working within the AFLAC structure. I have worked with all facets of the health and life insurance fields, and I have extensive experience in the requirements, terms and procedures relating to health and life insurance policies, including the recruitment of agents and building of management teams for the growth of sales, in the business sector.

2. I began working with AFLAC as an Associate in or about September 1994. By December of the same year I was promoted to District Sales Coordinator. I continued in that position until November 1998, when I was promoted to the position of Regional Sales Coordinator, a position I held until my summary termination resulting from Defendants' actions, on December 3, 2001.

3. Even after my termination, I continued to receive awards and considerable praise for my actions as Regional Sales Coordinator. My specialty involved the supervision of insurance plans sold at the worksite.

4. A "Cafeteria Plan" is a program established by employers to provide an opportunity for employees to purchase certain insurance policies, and pay for them with pre-tax dollars, pursuant to Internal Revenue Code §125. In 1998, the group term life insurance and dental insurance policies on the BISD Cafeteria Plan were each provided by a different insurance carrier. During the Cafeteria Plan enrollment process, agents of each insurance carrier present their products to BISD employees for purchase. All carriers offering their products on BISD's Cafeteria Plan are allowed to offer sales during the enrollment process, not only the TPA.

5. Based on understanding and belief, prior to 1998, NPA was the TPA, and had been charging in excess of $30,000.00 per year for its services as TPA.

6. Based on my review of the documents submitted by NPA, their enrollment fee in 1998 alone was $5.00 per employee, and they also charged additional fees for handling the accounts based on the number of participants.

7. I first submitted a RFP bid to provide TPA services in 1998, and my proposal provided that no fees would be charged, so long as at least one (1) AFLAC product was made available on payroll deduction.

8. I was able to submit that proposal based on the faith and belief that I would be able to sell enough AFLAC policies to be able to justify the work necessary to fulfill the role of *de facto* TPA.

9. My proposal was thereafter adopted by Defendant BISD, and I was named the *de facto* TPA for the Cafeteria Plan for the 1999 calendar year. Once I began selling my AFLAC products to BISD employees, I was able to realize the value of this position was at least $30,000.00 per year.

10. Once the award date passed without any decision on the appointment of a TPA, I became concerned that something untoward might be going on.

11. During or shortly after the October 30th Board Meeting, I learned that Sauceda's staff had compiled a Cafeteria Plan Comparison chart, at his direction, which misrepresented the TPA proposal I had submitted. This Chart reflected a "Set up fee (Implementation Fee)" of $450, in addition to a "Monthly Fee Per Participant (Flexible Spending Account)" of $3.00 and "Postage" fees of "Cost," all of which were incorrect because neither I nor AFLAC charged any such fees.

12. The term "agent of record" is a term of art in the insurance industry, and connotes being the sole insurance representative for a business entity or employer relating to one or more insurance policies.

13. If Insurance Associates of the Valley were to be appointed as "agent of record," they would be entitled to recover a commission on the sale of every insurance policy sold to employees of BISD, which would require all of the agents currently selling policies within BISD to pay to Insurance Associates of the Valley all of their commissions, and if Insurance Associates of the Valley was not appointed to represent a particular insurance company, that company would not be authorized to sell policies under the Cafeteria Plan or at BISD. Prior to November 2001, during the 1999, 2000 and 2001 policy years, NPA only provided a Cancer Policy through Hartford Insurance Company as part of the BISD Cafeteria Plan.

14. I attended the Board Meeting on November 20, 2001. It first progressed with other business until reaching item 24, action to take on Defendant Sauceda's recommendation to appoint NPA as the TPA for the Cafeteria Plan. Although the minutes do not detail the actual discussion that took place, the discussion on that item took over one hour.

15. During the discussion of the appointment of the TPA, many of the concerns raised by me were discussed, including the added cost to the district of appointing NPA, and the legality of appointing Insurance Associates of the Valley as the "agent of record." When Defendant Sauceda was asked during the November 20th Board meeting who had prepared the Comparison Chart that he provided to Board Trustees at the meeting, he responded that it had been prepared by members of his staff, at his direction.

16. In spite of restrictions prohibiting the modification of bid proposals, Defendant Sauceda and Attorney Roerig proffered an NPA bid change and continued to promote the selection of NPA as the TPA at the November 20th meeting with that bid change.

17. Although Board Trustees also questioned the legality of appointing Insurance Associates of the Valley as the "agent of record" for the District as set out in the Cafeteria Plan Comparison, no adequate response was ever provided during the meeting.

18. Some board members recommended that the Employee Insurance Committee meet to make a recommendation as to who they would prefer to have appointed as the TPA, and provide that input at the Board's next meeting. After the close of discussion on item 24, but before the end of the November 20th meeting, Joey Lopez made a presentation on behalf of NPA. Although he spoke for over ten minutes, he did not sign up to speak during the Public Audience section of the meeting. When Mr. Lopez spoke to the Board, he promoted the benefits of his company, NPA, and asked the Board to reconsider its earlier decision and instead appoint NPA as the TPA. Although there is no reference whatsoever in the minutes to Mr. Lopez speaking during that meeting, he spoke for over ten minutes in asking the Board to reconsider its decision not to appoint NPA as the TPA. Mr. Lopez was allowed to speak for over ten minutes, outside of the Public Audience section, on a matter not posted on the agenda (reconsideration of TPA decision), although I was limited to speaking only 2 minutes, and only during the Public Audience portion.

19. On November 29, 2001, I received the Termination Letter from Defendants Sauceda and BISD terminating my services as Third Party Administrator, rejecting my proposal to renew my services as *de facto* TPA, prohibiting my contact with school personnel during school business hours, prohibiting my presence on school-district property, and accusing me of unprofessional, unethical, and against expected customer-service provider relations. Each of those allegations were false and manufactured in order to justify my exclusion from BISD, and to facilitate Sauceda's appointment of Insurance Associates of the Valley as BISD's agent of record and NPA as BISD's TPA. Because of the restrictions enumerated in Sauceda's termination letter, I was not allowed to attend the Employee Insurance Committee Meeting on November 29th in order to respond to Sauceda's unfounded allegations, nor have I been able to return to any BISD campus since that day, nor have I done so.

20. Thereafter, I continued to speak with my supervisor, Frank LaFemina, to discuss my continuing work with AFLAC. As a direct result of Defendants' termination letter of November 29th, on or about December 3rd, Mr. LaFeminia notified me that I was being terminated from the position of Regional Sales Coordinator.

21. Sauceda did not have discretion within the scope of his duties to tortiously or intentionally interfere with my business relationship with AFLAC to fraudulently or with malice mislead me, BISD employees or the public in general about his attempts to appoint NPA as TPA or Insurance Associates of the Valley as BISD's agent of record, or to intentionally inflict emotional distress on me.

The above and foregoing is true and correct based on my personal knowledge.

Dino X. Chavez

SUBSCRIBED AND SWORN TO BEFORE ME on this the 4th day of November, 2003, to certify which witness my hand and official seal.



Notary Public, State of Texas

My Commission Expires:

03-27-07

# EXHIBIT-2

### BROWNSVILLE INDEPENDENT SCHOOL DISTRICT
### PURCHASING DEPARTMENT

### OPTIONAL SECTION-125 - CAFETERIA PLAN
### PROPOSAL NO. 131-98

Sealed proposals will be received by the Brownsville Independent School District at the office of **MR. KENNETH LIECK, ADMINISTRATOR OF PURCHASING, 1900 PRICE RD., BROWNSVILLE, TEXAS 78521-2417 (956) 548-8361** for **OPTIONAL SECTION 125 - CAFETERIA PLAN.** The proposals will be received until **Thursday, Apr 30, 1998, 2:00 pm,** Central Standard Time (CST). Interested proposers may obtain specifications and information for proposing at the **B.I.S.D. Purchasing Department.**

1. **PROPOSAL OPENING:** Proposers are invited to attend the proposal opening at the office of the Director of Purchasing on **Thursday, Apr 30, 1998, at 2:35 pm,** Central Standard Time (CST) at which time the proposals will be opened. Proposers presence is not mandatory.

2. **PROPOSAL SUBMISSION:** Proposals should be submitted on this form and continued on any attached list(s) of proposal items and submitted in Brownsville I.S.D. proposal envelopes. Each proposal shall be placed in a separate envelope, sealed and properly identified with the proposal title, proposal number and date to be opened. The District will not be held responsible for missing, lost or late mail. Brownsville Independent School District will not accept any facsimile on sealed proposals.

3. **TENTATIVE AWARD DATE:** Jun 2, 1998.

4. **REPRESENTATIVE:** The successful vendor agrees to send a personal representative with binding authority for the company to the district upon request to make adjustments and/or assist with coordination of all transactions as needed.

5. **SIGNING OF PROPOSAL:** Failure to manually sign proposal will disqualify it. Person signing proposal should show title or authority to bind their firm to a contract.

6. **EEOC GUIDELINES:** During the performance of this contract, the contractor agrees not to discriminate against any employee or applicant for employment because of race, color, national origin, age, religion, gender, marital or veteran status, or handicapping condition.

7. The Brownsville Independent School District has the right to reject or rebid if only one bid/proposal is received by "submission date" or extend the submission date by two (2) weeks.

The Brownsville Independent School District reserves the right to reject any/or all proposals and to make awards as they may appear to be advantageous to the School District, to hold proposal for 60 days from submission date with out action, and to waive all formalities in proposing.  The proposer must indicate "all or none" in the proposal if the above-stated condition is not acceptable.

**Vendor must provide Federal Identification Number and/or Social Security Number in order to be considered as a qualified vendor.**

The Proposal for the <u>**OPTIONAL SECTION 125 - CAFETERIA PLAN**</u> shall be delivered to the Brownsville Independent School District, Brownsville, Texas 78520. A contract for the **OPTIONAL SECTION 125 - CAFETERIA PLAN** will be placed into effect after final approval by the Board of Trustees.

**Mr. Kenneth Lieck**
**Administrator of Purchasing**
**Brownsville Independent School District**                              bdrqprop

**BROWNSVILLE INDEPENDENT SCHOOL DISTRICT**
**PURCHASING DEPARTMENT**

**1900 E. PRICE RD. BROWNSVILLE TX. 78521**
**TELEPHONE NUMBER (956) 548-8361**
**TELEFAX NUMBER (956) 548-8367**

**PROPOSAL NUMBER 131-98**

**OPTIONAL SECTION 125 - CAFETERIA PLAN**

**CHECK LIST**

**PLEASE MAKE SURE THAT YOU HAVE DONE THE FOLLOWING:**

**1. YOU MUST SIGN THE LAST PAGE** _____

**2. YOU MUST INCLUDE INSURANCE WITH THE
PROPOSAL (IF REQUIRED)!** ____ YES ____NO

**3. YOU MUST INCLUDE ANY SAMPLES THAT ARE REQUIRED?** ____YES ____ NO

**4. YOU MUST INCLUDE ANY STATE CERTIFICATE OR LICENSE
WITH THE PROPOSAL (IF REQUIRED)?** ____ YES ____ NO

**5. YOU MUST VERIFY UNIT PRICE TO TOTAL PRICE?** ____ YES ____ NO

**6. IF YOUR COMPANY IS NOT BIDDING ON THIS BID/PROPOSAL, PLEASE STATE
THE REASON.**

_____

_____

_____

**Please return this page with your proposal**

PAGE __3__ OF __4__

**BROWNSVILLE INDEPENDENT SCHOOL DISTRICT**
**PURCHASING DEPARTMENT**

**1900 E. PRICE RD. BROWNSVILLE TX. 78521**
**TELEPHONE NUMBER (956) 548-8361**
**TELEFAX NUMBER (956) 548-8367**

## PROPOSAL NUMBER 131-98

## OPTIONAL SECTION 125 - CAFETERIA PLAN

The undersigned proposer, by signing and executing this proposal, certifies and represents to the Brownsville Independent School District that proposer has not offered, conferred or agreed to confer any pecuniary benefit, as defined by |1.07(a)(6) of the Texas Penal Code, or any other thing of value, as consideration for the receipt of information or any special treatment or advantage relating to this proposal; the proposer also certifies and represents that the proposer has not offered, conferred or agreed to confer any pecuniary benefit or other thing of value as consideration for the recipient's decision, opinion, recommendation, vote or other exercise of discretion concerning this proposal; the proposer certifies and represents that proposer has neither coerced nor attempted to influence the exercise of discretion by any offer, trustee, agent or employee of the Brownsville Independent School District concerning this proposal on the basis of any consideration not authorized by law; the proposer also certifies and represents that proposer has not received any information not available to other bidders so as to give the undersigned a preferential advantage with respect to this proposal; the proposer further certifies and represents that proposer has not violated any state, federal, or local law, regulation or ordinance relating to bribery, improper influence, collusion or the like and that proposer will not in the future offer, confer, or agree to confer any pecuniary benefit or other thing of value of any officer, trustee, agent or employee of the Brownsville Independent School District in return for the person having exercised their person's official discretion, power or duty with respect to this proposal; the proposer certifies and represents that it has not now and will not in the future offer, confer, or agree to confer a pecuniary benefit or other thing of value to any officer, trustee, agent, or employee of the Brownsville Independent School District in connection with information regarding this proposal, the submission of this proposal, the award of this proposal or the performance, delivery or sale pursuant to this proposal.

I have read all of the specifications and general proposal requirements and do hereby certify that all items submitted meet specifications.

COMPANY: _____

AGENT NAME: _____

AGENT SIGNATURE:_____

ADDRESS: _____

CITY: _____

STATE: _____ ZIP CODE:_____

TELEPHONE: _____ TELEFAX :_____

FEDERAL ID#: _____AND/OR SOCIAL SECURITY #: _____

DEVIATIONS FROM SPECIFICATIONS IF ANY :

_____

_____

_____

_____

PAGE __4__ OF __4__

# REQUEST
# FOR
# PROPOSALS

---

## Optional Section 125~Cafeterial Plan
## Proposal No.  131-98

## BISD Employee Voluntary Insurance Committee
### 1900 E. PRICE ROAD, BROWNSVILLE, TEXAS  78521

# TABLE OF CONTENTS

1.1  General Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Acceptance of Proposals; Guaranteed Rates; Submission of Proposals; Order of Responses; Information Provided to Insurers; Term of Contract and Renewal;*

2.1  Qualifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*State licensed; School District References; Errors & Omission; Best Rating;*

3.1  Questionnaire . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*General Questions for Proposers*

4.1  Request for Insurance Proposals ~ Information . . . . . . . . . . . . . . . . . . . . . . . 5

*General Information for Proposers*

5.1  Request for Insurance Proposals ~ Specifications for Coverage . . . . . . . . . . . . . . . 6

*Current Schedule of Benefits; Term rates*

6.1  Insurance Proposal Response Form  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Response Format;*

7.1  Certification Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Appendix A: Current Schedule of Benefits
Appendix B: Current Billing Information
Appendix C: Group Census
Appendix D: Loss Information

## 1.1  GENERAL INFORMATION

### 1.1.1  Acceptance of Proposals

The BISD Employee Voluntary Insurance Committee (Committee) retains the right to reject all proposals submitted.  The Committee is not required to select the proposal with the lowest bid, but shall take into consideration other factors such as ability to service the contract, retention charges, past experience, financial stability, and other relevant criteria.  The Committee reserves the right to accept any proposal deemed advantageous to the District Employees.

### 1.1.2.  Guaranteed Rates

All contract terms and rates shall be guaranteed for 12 months beginning January 1, 1999.  However, the Committee reserves the right to accept a rate guarantee of more than 12 months with the option to extend the contract for insurance if it is in the best interest of the District Employees.

### 1.1.3  Submission of Proposals and Due Date

The requested sealed proposals must be submitted no later than 2:00 p.m., on April 30, 1998.

Please mail three copies of the sealed proposals to:

KENNETH J. LIECK
ADMINISTRATOR FOR PURCHASING
BROWNSVILLE INDEPENDENT SCHOOL DISTRICT
1900 PRICE ROAD, SUITE 107
BROWNSVILLE, TEXAS  78521

### 1.1.4.  Order of Responses

The company shall reference its proposal in the same order as provided in the specifications.  Any company seeking to provide or underwrite insured programs for the District Employees must respond to appropriate sections of these specifications and must meet all conditions or standards listed in these specifications.

### 1.1.5  Information Provided to Insurers

Information regarding current benefits, group census, monthly billing and number of participants, are provided for you in these specifications.

### 1.1.6  Term of Contract and Extension/Renewal Rights

The term of the contract for insurance shall be for not less than one year, subject to earlier termination as provided by law and by the terms of the contract.  In addition, unless otherwise specified in the proposal, the award of this proposal shall include the right at the option of the

Committee, and contingent upon the agreement by both parties, to any change in premium costs or benefits, to renew and extend this contract on a year-to-year basis as may be permitted by applicable law and Board Policy, and as may be found to be in the best interests of the District Employees; provided, that the maximum term of this contract and all renewals there off shall be not more than three years before such contract must again be offered for competitive proposals.

## 2.1 QUALIFICATIONS

### 2.1.1 Qualifications of Companies and Agents Submitting Proposals

1. All companies and agents submitting proposals must be licensed by the State of Texas and have a demonstrated level of good performance with school districts in Texas. *Please enclose a list of school district references with your proposal.*

2. The agent must have an errors and omissions policy with a minimum limit of $1,000,000. *Please enclose a copy of your errors and omissions policy or a certificate of insurnace with your proposal.*

3. The company must be recommended in the latest edition of Best's Life Insurance Reports with a general policyholder's rating of A- or better. *The agent must furnish the Best's policyholder rating for each company with which coverage is being quoted.*

4. A Lloyds Company shall be acceptable if it is an entity controlled or reinsured by a company with a financial rating of A- or better. *Enclose rating with your proposal.*

5. The agent and company must have a willingness to commit to specified levels of performance for service and quality.

6. The company and agent must provide sufficient telephone service, preferably toll-free and local service, to handle inquiries directly from plan participants as well as school district business officials.

7. The company must have the capability to provide loss run reports on a monthly basis and/or upon request by the school district.

8. The company must have an organization that has demonstrated the ability to deliver cost-effective service and efficient claims processing. *Claims shall be processed within 14 working days.*

9. The company must have a sufficient number of claims representatives including bilingual staff who are available during normal working hours for claims processing and insurance verification. *The district will not verify claims or be involved in the filing of claims except to provide the necessary forms.*

10. The company must provide group insurance plans eligible for Section 125: Cafeteria Plans. The company must provide legal opinion that the Insurance Plans being proposed is eligible for Section 125: Cafeteria Plan and is in compliance with IRS Regulations and Rules. *Participation*

*will be voluntary, and premiums will be paid by employees through payroll deductions.*

11. The company must provide group plans structured to meet COBRA guidelines if applicable.

12. The successful company will honor the original effective date of coverage for current plan participants and the number of years satisfied under the plan.

13. *No pre-existing condition exclusions* shall apply to participants insured for 12 months or more under the current plan.

14. The successful company will conduct one initial enrollment and one annual enrollment thereafter.

15. The enrollment process will include, but is not limited to, scheduling appointments by campus or department, completing enrollment applications, mailing ID cards and insurance certificate booklets *directly* to insured employees, and providing employee summary reports for payroll deductions.

16. All qualified organizations submitting proposals will exclude "actively at work" restrictions.

17. The successful company will provide brochures, certificate of insurance booklets, and insurance ID cards at the company's expense.

18. If broker commissions/fees are paid, the qualified organization submitting the proposal (s) must disclose the following:

  a. Name of agency and address;

  b. Name of agent/broker;

  c. Broker's fee whether flat fee or percentage of premium.

  d. Total sum of commissions/fees paid to each broker.

  If the above referenced disclosure is not applicable, please indicate the proposal is quoted on a no-commission basis.

3

## 4.1 REQUEST FOR INSURANCE PROPOSALS
## PROPOSAL INFORMATION

**General Information**

**BISD Enrollment:**

| | |
|---|---|
| Kinder, Elementary, & Junior High Students | 29,530 |
| High School Students | 11,092 |
| Total Enrollment as of November 7, 1998: | 40,622 |

**BISD Campuses:**
Five (5) High Schools
Nine (9) Middle Schools
Twenty-eight (28) Elementary Schools
Three (3) Alternative Centers

**Stadium Gross Sales:** $220,500

**BISD Payroll:**
1997-98 Gross Payroll: $170,000,000 (Annualized)
Number of Full-time Employees:

| | |
|---|---|
| Professional Personnel: | 3,348 |
| Para-Professional: | 1,573 |
| Auxiliary: | 1,220 |
| Total Employees | 6,141 |

**Additional Information Provided:**

Appendix A: Current Schedule of Benefits
Appendix B: Current Billing Information
Appendix C: Group Census
Appendix D: Loss Information

5

## 5.1  REQUEST FOR INSURANCE PROPOSALS
## SPECIFICATIONS FOR COVERAGE

See Appendix A: Current Schedule of Benefits

6

# APPENDIX A

## Current Schedule of Benefits

# BROWNSVILLE

*Independent School District*



# Flexible Benefit

# 'Cafeteria' Plan

*1998 Plan Year Enrollment* 

Form No. BISD - 12/97

# SUMMARY PLAN DESCRIPTION
## Important Facts About the Plan

## Who administers the Plan?

The Plan is administered by National Plan Administrators, Inc. on the basis of the Plan year. You may contact your Employer if you have any questions or need any additional information.

## Why was the cafeteria plan established?

Your Employer has established a cafeteria plan (the "Plan") for its employees in which you can have a major hand in selecting employee benefits that will best fit your individual needs. Your Employer recognizes that not everyone's needs are the same, and that those needs may change over a period of time. By reducing your pay for eligible benefits under the Plan, you will be paying for these benefits with non-taxed dollars.

## How does the Plan operate?

This employee's cafeteria plan is paid for entirely by you but with monies that have never been taxed. Before each Plan anniversary date, you will be permitted to irrevocably elect to contribute any portion of your salary. The amounts you contribute (which are not taxed) can be used by you to purchase certain benefits offered by the Plan. (See Appendix A).

The legal document that governs the operation of this Plan is located in the central administration office and is available for your review during regular office hours.

## What is covered by the Plan?

As a participant in the Plan, you will have the right to choose among a number of employee benefits (the "Benefits"). Brownsville I.S.D. will determine which benefits will be offered under the Plan each Plan year. Benefits may be nontaxable or taxable to you. There will be full withholding of federal taxes from your wages for the taxable benefits chosen. You may choose from benefits offered under the Plan. Benefits under the Plan are explained in more detail under Appendix A.

You must meet certain qualifications and requirements for coverage under some of the individual benefits offered by the Plan. Ask the Plan Administrator if you have any questions about the benefits available under the Plan.

## Who receives legal papers?

The person responsible for receiving any legal papers for the Plan is the Plan Administrator.

## How long will the Plan last?

Your employer expects to continue the Plan indefinitely. However, your employer has the right to modify or discontinue the Plan at any time.

## What is taxed under the Plan?

Any election by a participant to take cash, in lieu of other Benefits, will be taxed. Also, the amount of insurance premium paid to provide group term life insurance in excess of Fifty Thousand Dollars of coverage is taxable income to the participant.

## What is not taxed under the Plan?

Benefits eligible for employee payment with before-tax dollars are premium costs for: medical insurance, dental insurance and/or dues, cancer insurance, group term life insurance up to $50,000, and dependent/child care to $5,000 annually.

# PARTICIPATION & ELIGIBILITY

## What does participation mean?

A participant is a member of the Plan and is entitled to share in the benefits provided under the Plan by your Employer.

## When do I become a participant?

You become a participant on the first entry date of the Plan year after you have completed the eligibility requirements stated below.

Participation in the Plan is entirely voluntary. It is up to you to choose whether or not to participate in the Plan.

## What are the eligibility requirements?

You are eligible to participate under the Plan immediately upon employment and for the first 31 days.

## When do I become ineligible to continue in the Plan?

Participation in the Plan ceases upon death, termination of employment, failure to meet eligibility requirements, termination of the Plan, retirement, and failure to pay contributions required during any period in which you are on a leave of absence.

CONTRIBUTIONS DURING THE PLAN YEAR ACCUMULATE ONLY TO THE EXTENT THAT YOU HAVE BEEN EMPLOYED BY THE EMPLOYER FOR THAT PLAN YEAR. For instance, if after one month into the Plan year you terminate your employment, you will have the right to only the employer contribution made to the Plan on your behalf for that month.

# CONTRIBUTIONS

## Who makes contributions to the Plan?

You have the option to reduce your income and select the benefits to be provided by your Employer. You actually agree to have your salary reduced to save taxes. Your employer agrees to provide the benefits you have selected.

If you enter into a salary reduction agreement, your salary will be reduced once you have decided to participate in the Plan and have agreed to a reduction in your salary. You will not be

able to change your election for the duration of the Plan year, except in certain circumstances described in a later section.

## Am I required to make contributions to the Plan?

No, you are not required to contribute, however, you will not be entitled to any benefits under this Plan unless you elect to participate _and_ you enter into a salary reduction agreement.

## LIMITATIONS OF COVERAGE

Selections are for the Plan year and must be made prior to the beginning of the Plan year. Once the selections are made, they are irrevocable for the remainder of the Plan year (Plan Year is January through December) unless there is a relevant change in your family status, such as marriage, divorce, death of spouse or dependent, birth or adoption of a child, or termination of employment of you or your spouse.

The Plan Administrator will assist you in determining a relevant change in your family status. The maximum allowed salary reduction in the Plan is 50% of your gross compensation.

## APPENDIX A:

## BENEFITS OFFERED UNDER THE PLAN

## HEALTH AND HOSPITALIZATION

The health and hospitalization insurance benefit covers premiums for accident, health, and hospitalization insurance obtained for you through your Employer.

## GROUP TERM LIFE INSURANCE

The group term life insurance benefit covers premiums for group term life insurance which you purchase through your Employer.

Note that if the total amount of your group term life insurance coverage exceeds Fifty Thousand Dollars ($50,000), a portion of the paid premiums will be taxable to you.

## DENTAL PLANS

The dental plan benefit covers premiums or dues for the dental plan(s) which you purchase through your Employer.

## MEDICAL REIMBURSMENT

The medical expense reimbursement program covers amounts of out-of-pocket medical expenses not covered by insurance for you and your dependents.

## DEPENDENT/CHILD CARE

The dependent/child care benefit covers reimbursable expenses that qualify under Section 129 of the Internal Revenue Code. The maximum benefit is $5,000 per calendar year.

## APPENDIX B:

## YOUR RIGHTS

As a participant in this Plan, you are entitled to certain rights and protections. The Plan provides that all Plan participants shall be entitled to:

1. Examine, without charge, at the Plan Administrator's office and at other specified locations, such as worksites and union halls, all Plan documents, including insurance contracts, collective bargaining agreements and copies of all documents filed by the Plan with the U.S. Department of Labor, such as detailed annual reports and Plan descriptions.

2. Obtain copies of all Plan documents and other Plan information upon written request to the Plan Administrator. The Plan Administrator may make a reasonable charge for the copies.

In addition to creating rights for Plan participants, there are certain duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries.

No one, including your employer, your unions, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a benefit or exercising your rights .

If your claim for a benefit is denied in whole or in part, you must receive a written explanation of the reason for the denial. You have the right to have the Plan Administrator review and reconsider your claim.

There are steps you can take to enforce the above rights; for instance, if you request materials from the Plan and do not receive them within thirty (30) days, you may file suit in a federal court. In such a case, the court may require the Plan Administrator to provide the materials and to pay you up to One Hundred Dollars ($100.00) each day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Administrator.

If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court. If it should happen the Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court..

The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous. If you have any questions about your Plan, you should contact the Plan Administrator

If you have any questions about this statement, or about your rights, you should contact the nearest Area Office of the U.S. Labor-Management Services Administration, Department of Labor.

# APPENDIX B

## Current Billing Information

**Brownsville ISD**
**Monthly Billing for**
**Optional Section 125~Cafeteria Plan**

| Carrier: First Financial Administrators, Inc. | |
|---|---|
| Payroll for June 1997 | |
| Number of Participants | Monthly Gross Amount |
| 1954 | $11,391.29 |
| | |
| | |

# EXHIBIT-3

# Benefit Administration Solutions

## Especially Prepared For:

# Brownsville ISD



Presented by:

**David Allen**
**National Plan Administrators, Inc.**
**1101 Capital of Texas Hwy. Bldg. E, Suite 100**
**Austin, Texas 78746**
**(800) 880-2776**

# Section 125 "Cafeteria" Plan Administration

**INTRODUCTION**

Congress passed a law which allowed employers to set up cafeteria or flexible plans. The purpose of the plans was to allow employees to pay for certain benefits, like dependent/child care, unreimbursed medical expenses, and insurance premiums with before tax dollars.

The government actually placed its seal of approval on a great way for the average taxpayer to save taxes! Under a full cafeteria plan, wages contributed by employees for employer sponsored benefit plans are not subject to federal, social security, or state taxes. The result is the employee's net take home pay increases by the amount of their tax savings.

The savings can range between a couple hundred dollars a year to a thousand, depending on the employee's contributions.

**PLAN ADMINISTRATION**

National Plan Administrators, Inc. provides administration service for employers. NPA becomes the legal and liable third party administrator.

NPA assists the employer in the design of their particular plan and provides a turn-key administration service.

**SERVICES PROVIDED**

**Adoption Resolution.** NPA provides an adoption resolution for the governing body to formally begin a cafeteria plan.

**Plan Document.** NPA prepares the plan document for the employer based on the plan design that the employer elects.

**Department of Labor.** NPA prepares the notification and forwards it to the Department of Labor.

**Summary Plan Description**. NPA prepares the Summary Plan Description and provides a copy to all employees.

**Enrollment.** NPA provides an enrollment booklet for each employee which includes:
> Summary Plan Description
> Tax Rate Tables
> List of Qualified Expenses
> Child Care Credit Illustration
> Tax Savings Worksheet
> Illustration of Tax Benefit
> Benefit Election Form

**Discrimination.** NPA provides the discrimination testing to insure that the plan is in compliance with all applicable laws.

**IRS Report.** NPA prepares the annual filing of the 5500 report form to the Internal Revenue Service.

---

*National Plan Administrators, Inc.*
*1101 Capital of Texas Hwy. South, Bldg. E, Suite 100*
*Austin, Texas 78746*
*(800) 880-2776*



Successful cafeteria plans are those that the employee and the employee have real benefits as well as perceived benefits. One element that seems to be prevalent in all successful plans is excellent communication.

## ENROLLMENT

You must have good communication at enrollment, employees must understand how the plan works and all of the benefits available. Monthly communication to participants of flexible spending accounts is a must; participants must know how their account stands at all times to have a successful plan.

NPA has designed enrollment materials (booklets/videos) that explain the cafeteria plan. Insurance representatives or enrollers explain the insurance benefits.

Participants in the flexible spending accounts (medical reimbursement and/or dependent/child care) are provided a monthly statement detailing contributions, claims, and funds in their account.

The enrollment of the plan is coordinated with the desires of the employer. Typically, the cafeteria plan is enrolled by the insurance agent(s) who represents the insurance carriers that are providing benefits to the employees. Other enrollment scenarios are available. NPA counsels with the employer regarding the employer's objectives and designs an enrollment method that will function best for them.

NPA provides all of the materials as well as audio/visual aids as part of the base service.

## SPECIAL SERVICES

NPA provides many specialized services for employers and employees depending on the needs. Pre-printed enrollment forms that have each employee's deductions can be provided. The employer would provide NPA with the deduction information for each employee in order to pre-print the forms.

Whenever possible, NPA will transfer information to employer in an electronic format. This is extremely helpful to large employers for making payroll changes. NPA may be able to eliminate the data entry by the payroll department.

## REIMBURSEMENT PROCESSING

NPA processes claims on a monthly basis. Claim forms are furnished to each participant by the 4th day of the first plan month. A cutoff date is established that is acceptable to the employer. This should be a date between the 15th and 22nd of the month.

Claims are submitted to NPA. All claims will be processed on the cutoff date. NPA prepares the reimbursement check and new claim form for each participant. They are delivered to the employer for signature and distribution with the payroll checks. This process allows for a minimal disruption in the cash flow of the employees.

There is no minimum dollar amount. Maximum dollar amount is equal to the current month allocation plus prior unused accumulation for the dependent/child care account. The maximum for the medical reimbursement account is the total amount for the plan year. Since we process monthly at the time funds are available, there is no disruption to employee cash flow for fixed expenses. The monthly personalized claim form keeps the communication lines open and therefore less confusion and frustration.

---

*National Plan Administrators, Inc.*
*1101 Capital of Texas Hwy. South, Bldg. E, Suite 100*
*Austin, Texas 78746*
*(800) 880-2776*



NPA believes that control of funds by the employer is the proper approach. Check stock on the account is provided to NPA without signature authority. NPA's function would be to merely carry out the administration functions including record keeping and check processing.

**SPECIAL NOTE**

NPA has designed a system that allows the reimbursement and salary reduction to take place at the same time. All IRS regulations regarding written evidence are maintained. This insures a minimum disruption in cash flow for the employees. Child care participation would be significantly reduced if cash flow were affected.

**CONFIDENTIALITY**

During the time that information which identifies an individual covered by a plan is in the administrator's custody or control, the administrator shall take all reasonable precautions to prevent disclosure or use of the information for a purpose unrelated to administration of the plan.

The administrator shall disclose information described only:

1) in response to a court order;
2) for an examination conducted by the commissioner of insurance;
3) for an audit or investigation conducted under the Employee Retirement Income Security Act of 1974;
4) to or at the request of the insurer or plan sponsor; or
5) with the written consent of the identified individual or his or her legal representative.

Trade secrets, including the identity and addresses of policyholders and certificate holders, are confidential, except the insurance commissioner may use that information in a proceeding instituted against the administrator. The plan sponsor is entitled to a continuing access to these books and records sufficient to permit the insurer, plan, plan sponsor to fulfill contractual obligations to insureds and plan participants.

**FEES**

**Premium Conversion** - The fee per enrollment and administration will be as follows: $5.00 Annual enrollment fee per employee, plus $.50 per month per participant. The fee will be waived if product(s) administered by National Plan Administrators, Inc. are chosen.

**Dependent/Child Care and/or Medical Reimbursement** - The fee for administration is $2.50 per participant, per month.

**REFERENCES**

A partial list of references include:

| | | |
|---|---|---|
| Austin ISD | Scott Wyatt | (512)414-2295 |
| Rio Grande City ISD | Letty Lopez | (210)716-6727 |
| Roma ISD | Cecelia Barrera | (210)849-1377 |
| Waco ISD | Elaine Botello | (817)755-9547 |
| San Antonio ISD | Linda Comeaux | (210)299-5578 |

*National Plan Administrators, Inc.*
*1101 Capital of Texas Hwy. South, Bldg. E, Suite 100*
*Austin, Texas 78746*
*(800) 880-2776*



# EXHIBIT-4

# "BUDGET" Insurance Group
*1934 Central Blvd.  *  Brownsville, Texas 78520*
*Phone (956)982-3998  *  Fax (956)982-0931*

## Why should you choose **AFLAC / "BUDGET" Insurance Group** to be your Section 125 Cafeteria Plan Administrator ?

AFLAC will waive all fees you are currently paying for this service.  Employees currently pay close to **$30,000** annually.  In exchange, AFLAC would like to make available an optional and voluntary insurance plan that is currently not being offered to district employees.

IN ADDITION ----

1)  We are **LOCAL.**  You do not have to patronize Austin, Dallas, or even McAllen.  You can keep your business here in Brownsville.  Because we are local, we will not be in a hurry to finish - we do not have the same overhead expenses that out-of-town agents may have such as hotel, airfare, rental cars, food, etc...  We will give each employee the time and courtesy they deserve.

2)  We are **FREE.**  You do not have to throw away thousands of dollars for a service that we can provide free of charge.

3)  We are **CONVENIENT.**  Our local agency has its doors open daily to handle any questions or claims in person.

4)  We are the most **EXPERIENCED**.  AFLAC has over 42,377 active Section 125 plans ranging in size from 3 employees to 18,000 employees.

5)  The purchase of an AFLAC product is strictly **OPTIONAL AND VOLUNTARY**.  There are no minimum quotas that have to be met.

6)  We are **BILINGUAL.**  AFLAC maintains a dedicated Spanish 1-800 number.  In addition, AFLAC also has all cafeteria plan paperwork available in both English and Spanish.

PLEASE REMEMBER ----- YOUR VOTE DOES COUNT !!!!
VOTE FOR AFLAC / "BUDGET" Insurance Group

*"At BUDGET, the price is our specialty, but - it's the SERVICE after the sale that really counts !"*

# EXHIBIT-5

## Brownsville ISD Section 125 Cafeteria Plan Proposals
### NOTES - September 16, 1998

**AFLAC** - Columbus, GA  1-800-992-3522
    Local Agent - Dino X Chavez, MBA   982-3998
    Local office - "BUDGET" Insurance Group   1934 Central Blvd.  Brownsville, TX
    Annual Fee - None*
    <u>Monthly rates per participant:</u>
        Insurance premium only - None ($0)
        Flexible Spending Accounts - None ($0)
    * At least one product must be made available on payroll deduction.
    Recommended Products - Accident Expense Plan and/or Hospital Plan
    Minimum Participation - None
    Form 5500 - Free preparation
    Bilingual - yes, including documentation and 1-800 number
    Company Rating - A+ (AM Best);  AA (Standard & Poor's 1997)
    "National Underwriters" Company Ranking - # 1
    Experience - 42,377 active Section 125 cafe accounts

**Boone-Chapman** - Austin, TX
    Local Agent - None
    Service Representative - Sherry Warren   Austin
    Set-up Fee - $1,000*
    <u>Monthly rates per participant:</u>
        Insurance premium only - $1.00
        Medical account - $2.50
        Dependent account - $2.50
    * Fee does not include discrimination testing or form 5500 filing
    Minimum participation - 750 employees
    Company Rating - N/A
    "National Underwriters" Company Ranking - N/A

**Cafeteria Plan Solutions** - Plano, TX  1-800-833-4028
    Local agent - Gilbert Ortiz   Brownsville
    Annual Fee - $250*
    <u>Monthly rates per participant:</u>
        Medical / Dependent Care accounts - $2.00
    * Does not include form 5500
    Company Rating - N/A
    "National Underwriters" Company Ranking - N/A
    Experience - In existence since 1992 only

**Colonial Life & Accident** - South Carolina
    Local Agent - None
    Agent - Frank Humada, Jr    San Antonio  (210)340-6800
    Third Party Administrator - Benefit America
    Annual Fee - $550*
    Monthly rates per participant:
        Basic Service - $3.35
        Full Service - $4.10
    Mailing Fees - $6.00 per year per participant
    Form 5500 preparation - $150 per year
    * Products must be offered
    Company Rating - A+ (AM Best);  AA (Standard & Poor's 1997)
    "National Underwriters" Company Ranking - #4

**Fringe Benefits Management** - Tallahassee, FL   1-800-872-0345
    Local Agent - None
    Agent - Lorraine Ritch
    Agent - Cecile Russell    Austin,TX
    Monthly rates:
    Base - $565 per month
        plus, $.31 per participant
        plus, $1.96 per Flexible Spending Account
    Company Rating - N/A
    "National Underwriters" Company Ranking - N/A

**Great American Reserve** - Carmel, IN   1-800-824-2726    1-800-876-9070 Sam Rieger
    Local Agent - None
    Agent - Dennis Carruth    McAllen, TX   682-1023
    Fees - None*
    * Must offer one or more GARCO products:
        Dental, Disability, Cancer, Term Life, Hospital Income, Accident
    Company Rating - A (AM Best);  BBBq (Standard & Poor's 1997)
    "National Underwriters" Company Ranking - not in top 100

**LifeRe Insurance Co.** - San Antonio, TX    1-800-747-1024
    Local Agent - None
    Contact - Don Josephson
    Monthly rates:
        Set-up Fee - $2.00 per month per employee
        Insurance premium only - $1.00
        Flexible Spending Acct - $2.50
    Minimum - $750 per year
    Company Rating - None (AM Best);  BBBq (Standard & Poor's 1997)
    "National Underwriters" Company Ranking - not in top 100

**National Plan Administrators** - Austin, TX    1-800-880-2776
    Local Agent - None
    Agent - John Little   Harlingen,TX
    Enrollment Fees - $5.00 per employee plus additonal $5.00 for FSA accounts*
    <u>Monthly rates per participant:</u>
        Insurance premium only - $.50
        Flexible spending accounts - $2.50
    *  Enrollment fees <u>only</u> may be waived if products are offered
    Form 5500 preparation - yes
    Company Rating - N/A
    "National Underwriters" Company Ranking - N/A

**National Support Services** - Dallas, TX    1-888-671-6771
    Agent - Ray Ellason
    Fee - None*
    * National Teacher Associates optional cancer plan must be offered
    Company Rating - N/A
    "National Underwriters" Company Ranking - N/A

# EXHIBIT-6

1          IN THE UNITED STATES DISTRICT COURT

           FOR THE SOUTHERN DISTRICT OF TEXAS

2                 BROWNSVILLE DIVISION

3   STEPHEN M. ANDRUS,           )(

    FERNANDO DE PENA,            )(

4   VALENTIN PAZ and ANDRUS      )(

    & PAZ, A Partnership         )(

5                                )(

    VS.                          )(   B-02-143

6                                )(

    BROWNSVILLE INDEPENDENT      )(

7   SCHOOL DISTRICT, NOE         )(

    SAUCEDA, and EDDIE           )(

8   ERRISURIZ, JR.               )(

9   _____

10

                    ORAL DEPOSITION OF

11                  KENNETH J. LIECK

                  SEPTEMBER 19, 2003

12

13  _____

14          ORAL DEPOSITION OF KENNETH J. LIECK, produced

15  as a witness at the instance of the PLAINTIFFS, taken

16  in the above styled and numbered cause on SEPTEMBER 19,

17  2003, from 1:08 p.m. to 3:53 p.m. before LOU ZUNIGA,

18  Certified Court Reporter No. 2198, in and for the State

19  of Texas, at the Brownsville Independent School

20  District Administration Building, 1900 East Price Road,

21  Brownsville, Texas, pursuant to the Federal Rules of

22  Civil Procedure and the provisions stated on the record

23  or attached therein.

24

25

HILL & ROMERO
CERTIFIED COURT REPORTERS

COPY

Page 30

1    the right document.  Can I see that?  Yeah.  This is          13:45

2    the specific request for quotes that BISD sent out            13:45

3    relating to the Section 125 cafeteria plan and the tax        13:45

4    sheltered annuity third party administrator, correct?         13:45

5              MS. LEEDS:  Object to the form.                     13:45

6         A.  This is the RFQ for TPAs for the cafeteria plan      13:45

7    or Section 125 plan and the administration of the tax         13:45

8    deferred annuities and custodial plan under 403(B),           13:46

9    403(B)(7).                                                     13:46

10        Q.  Okay.  If you look at page one, the RFQ will be       13:46

11   received -- in the first paragraph, indicates the RFQs        13:46

12   will be received until Thursday, September 6th, 2001,         13:46

13   1:30 p.m.?                                                     13:46

14        A.  Uh-huh.                                               13:46

15        Q.  What's the significance of that date?  In other      13:46

16   words, what does that mean?                                   13:46

17        A.  Well, that they will be received up until 1:30       13:46

18   of that specific date, and this was Thursday, 6th of          13:46

19   September 2001.                                                13:46

20        Q.  And at that point the -- at that point the bid       13:46

21   cannot be changed, I presume; is that correct?               13:46

22        A.  Cannot accept or any changes be made to the          13:46

23   proposals.                                                     13:46

24        Q.  This particular proposal, did you have any role      13:46

25   in putting it together?                                        13:46

| | | |
|---|---|---|
| 1 | has to be made available to everyone. | 14:47 |
| 2 | Q.  Okay.  Now, on the Section 125 cafeteria plan, | 14:47 |
| 3 | prior to 2001, who was the third party administrator? | 14:47 |
| 4 | I think you said earlier AFLAC? | 14:47 |
| 5 | A.  Say it again. | 14:47 |
| 6 | Q.  Sure.  Prior to 2001, the third party | 14:47 |
| 7 | administrator at BISD -- | 14:48 |
| 8 | A.  Yes. | 14:48 |
| 9 | Q.  -- for the Section 125 cafeteria plan was | 14:48 |
| 10 | AFLAC, right? | 14:48 |
| 11 | A.  Correct. | 14:48 |
| 12 | Q.  And the person doing all the work here in | 14:48 |
| 13 | Brownsville, as far as you understood, was who? | 14:48 |
| 14 | MS. NEALLY:  Object to the form of the | 14:48 |
| 15 | question. | 14:48 |
| 16 | MS. LEEDS:  Join. | 14:48 |
| 17 | A.  Mr. Chavez. | 14:48 |
| 18 | Q.  Okay.  Dino Chavez? | 14:48 |
| 19 | A.  That's correct. | 14:48 |
| 20 | Q.  Okay.  So whenever there were any problems, any | 14:48 |
| 21 | service questions, any other issues, who was it that | 14:48 |
| 22 | would handle those? | 14:48 |
| 23 | MS. LEEDS:  Objection; speculation. | 14:48 |
| 24 | MS. NEALLY:  Objection; calls for | 14:48 |
| 25 | speculation. | 14:48 |

| | | |
|---|---|---|
| 1 | A.  On the district's side or on the other side? | 14:48 |
| 2 | Q.  Well, let's do both first.  First on the | 14:48 |
| 3 | district's side. | 14:48 |
| 4 | MS. LEEDS:  Both first?  Let's do one at a | 14:48 |
| 5 | time. | 14:48 |
| 6 | MR. AGUILAR:  Thank you, Eileen. | 14:48 |
| 7 | MS. LEEDS:  You're welcome. | 14:48 |
| 8 | Q.  First of all, on the district's side.  If an | 14:48 |
| 9 | employee came to you and said, look, I've got a | 14:48 |
| 10 | question on my policy or I have got to file a claim, or | 14:48 |
| 11 | something along those lines, if they came to you, what | 14:48 |
| 12 | would you do? | 14:48 |
| 13 | A.  I would call Dino. | 14:49 |
| 14 | Q.  Okay.  So basically your role was -- | 14:49 |
| 15 | A.  Or anybody on his staff at that time, whoever | 14:49 |
| 16 | it was. | 14:49 |
| 17 | Q.  In other words, whenever there was any | 14:49 |
| 18 | questions, comments, concerns, issues, basically you | 14:49 |
| 19 | just sent them straight over to Dino or somebody at his | 14:49 |
| 20 | office, right? | 14:49 |
| 21 | A.  That's correct. | 14:49 |
| 22 | Q.  Were you his primary point of contact here at | 14:49 |
| 23 | BISD? | 14:49 |
| 24 | MS. LEEDS:  Objection; form. | 14:49 |
| 25 | Q.  In other words, when Dino had to talk to | 14:49 |

HILL & ROMERO
CERTIFIED COURT REPORTERS

Page 73

```
 1   somebody here at BISD about the --              14:49

 2       A.  Prior to August 2001?                   14:49

 3       Q.  Yes.                                     14:49

 4       A.  Yes.                                     14:49

 5       Q.  Okay.  Now, what about the particular agents  14:49

 6   themselves; in other words -- let me back it up a  14:49

 7   little bit.  Actually, let me finish the second part of  14:49

 8   the question I was asking earlier.               14:49

 9           MS. LEEDS:  Object to the form of the   14:49

10   question.                                        14:49

11       Q.  The second part, what you said first.  Do you  14:49

12   mean here at BISD or outside?  Now let me ask about the  14:49

13   outside part, where somebody came in with a question,  14:50

14   concern, whatever, outside of BISD, did you understand  14:50

15   they went straight to Dino?                      14:50

16           MS. NEALLY:  Object to the form of the  14:50

17   question.                                        14:50

18       A.  The outside was Dino.                    14:50

19       Q.  Dino was the outside, okay.  Let me go ahead  14:50

20   and continue where I was.  As far as how the third  14:50

21   party -- I'm sorry, the Section 125 cafeteria plan  14:50

22   works, you could I guess say at some point the  14:50

23   employees are starting when they're doing their  14:50

24   enrollments, right?                              14:50

25       A.  That's correct.                          14:50
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

Page 80

| | | |
|---|---|---|
| 1 | they were charging a fee -- if they weren't selling any | 14:57 |
| 2 | products, then most likely they were charging a fee to | 14:57 |
| 3 | the district -- | 14:57 |
| 4 | Q.  I think they were -- | 14:57 |
| 5 | A.  -- and employees so much per month per | 14:57 |
| 6 | whatever. | 14:57 |
| 7 | Q.  Okay.  I think they were selling a cancer | 14:57 |
| 8 | product. | 14:57 |
| 9 | MS. LEEDS:  Object to the form. | 14:57 |
| 10 | MS. NEALLY:  Object to the form. | 14:57 |
| 11 | A.  I don't recall. | 14:57 |
| 12 | Q.  Okay.  Anyway, what my question comes down to | 14:57 |
| 13 | is, do you recall whether Dino's predecessor was | 14:57 |
| 14 | charging fees to the district? | 14:57 |
| 15 | MS. NEALLY:  Objection to the form; asked | 14:57 |
| 16 | and answered. | 14:57 |
| 17 | MS. LEEDS:  Join. | 14:57 |
| 18 | A.  I'll have to go back and look at the contract | 14:57 |
| 19 | but I do think they were charging a fee. | 14:57 |
| 20 | Q.  Okay. | 14:57 |
| 21 | A.  How much, I don't know. | 14:57 |
| 22 | Q.  Do you have that information in your office? | 14:57 |
| 23 | A.  No, I don't. | 14:57 |
| 24 | Q.  Where would it be? | 14:57 |
| 25 | A.  Probably at the warehouse. | 14:57 |

1    Q.  Okay.  How difficult would it be to find that    14:57

2  answer?    14:57

3    A.  Oh, not very.  I could probably get my hands on    14:57

4  it.    14:57

5    Q.  Can you agree to look for that?  What I'm    14:57

6  trying to find out is just how much they charged.    14:57

7        MS. NEALLY:  No, he can't agree to look    14:58

8  for that.  We'll examine it and determine whether or    14:58

9  not it's available.    14:58

10        MR. AGUILAR:  He told us where it's    14:58

11  available.  Why would you not agree to turn it over?    14:58

12        MS. LEEDS:  You can get it from NPA.    14:58

13        MS. NEALLY:  We're beyond discovery    14:58

14  deadlines.    14:58

15        MR. AGUILAR:  I've been trying to get this    14:58

16  for months, Elizabeth.    14:58

17        MS. NEALLY:  To the extent it has been    14:58

18  readily available, it has been looked for already by    14:58

19  the school district and has not been found.    14:58

20        MR. AGUILAR:  If you can't find it, that's    14:58

21  a different matter.    14:58

22        MS. NEALLY:  Yeah.    14:58

23    Q.  If you can tell me -- you have an idea where it    14:58

24  might be.  If you tell me you can't find it --    14:58

25    A.  I'm assuming it's at the warehouse.  I don't    14:58

Page 82

1    know.                                                    14:58

2        Q.  But if you tell me you can't find it, that's a   14:58

3    different matter.                                         14:58

4        A.  Well, to go to my office right now, no, I        14:58

5    couldn't find it.                                         14:58

6        Q.  Do you agree to look for it?                      14:58

7            MS. LEEDS:  You don't have to do anything.       14:58

8        Q.  Will you agree to look for it?                    14:58

9            MS. NEALLY:  You're not compelled to go          14:58

10   look for it.                                              14:58

11       A.  I don't have the time to go look for it.         14:58

12       Q.  Okay.  I'll probably have to file a separate     14:58

13   motion and we can take it from there.                     14:58

14       A.  That's fine, Counsel.                             14:59

15       Q.  Getting back to the original question I was      14:59

16   actually asking you.  When people came in to ask you      14:59

17   about issues or concerns regarding a cancer policy,       14:59

18   supplemental health policies, I think it's accident and  15:00

19   something else, I forget, the dental policies, things     15:00

20   like that, to whom would you refer them?                  15:00

21       A.  To the appropriate insurance company.            15:00

22       Q.  Okay.  And to the extent any of those were       15:00

23   AFLAC companies, who would you refer -- AFLAC policies,   15:00

24   who would you refer them to?                              15:00

25       A.  To Mr. Chavez.                                    15:00

Page 84

| | | |
|---|---|---|
| 1 | whatever. | 15:01 |
| 2 | Q.  Anyway, did you ever -- do you recall any | 15:01 |
| 3 | complaints anyone ever made about Dino's services? | 15:01 |
| 4 | A.  Yes. | 15:01 |
| 5 | Q.  Okay.  What were those complaints? | 15:01 |
| 6 | A.  I can't get ahold of him.  That was mostly it. | 15:01 |
| 7 | I can't get ahold of Mr. Chavez. | 15:01 |
| 8 | Q.  Was it that they're talking to somebody else at | 15:01 |
| 9 | the office and can't get ahold of him or can't get | 15:01 |
| 10 | ahold of anybody at the office? | 15:01 |
| 11 | A.  I think at one time -- correct me if I'm wrong, | 15:01 |
| 12 | I think he moved offices and we ran into a little -- | 15:01 |
| 13 | Q.  Let me try to rephrase it.  Prior to August of | 15:01 |
| 14 | 2001, is that the time period you're talking about or | 15:02 |
| 15 | is it afterwards? | 15:02 |
| 16 | A.  Prior to. | 15:02 |
| 17 | Q.  Okay.  Prior to August 2001, you said you got | 15:02 |
| 18 | some complaints that they couldn't get ahold of him and | 15:02 |
| 19 | what else? | 15:02 |
| 20 | A.  That was about it.  There weren't that many. | 15:02 |
| 21 | Q.  I was going to say, about how many complaints | 15:02 |
| 22 | were there? | 15:02 |
| 23 | A.  It could have been maybe three to five, | 15:02 |
| 24 | something like that. | 15:02 |
| 25 | Q.  Total? | 15:02 |

Page 85

```
 1        A.   Total.                                           15:02

 2        Q.   During the three years that he was doing the     15:02

 3   work as the TPA?                                           15:02

 4        A.   That's my best estimate.                         15:02

 5        Q.   Okay.  Were you satisfied with his work?         15:02

 6             MS. NEALLY:  Object to the form.                 15:02

 7        A.   I didn't have any problem at all.                15:02

 8        Q.   Okay.  Now, if the bid said they're charging     15:02

 9   fees on the closing date and if the bid is later           15:03

10   changed to delete the fees, would that be proper?          15:03

11             MS. LEEDS:  Object to the form.                  15:03

12        A.   Say it again.                                    15:03

13        Q.   Okay.  I'll tell you what, let me hand you what  15:03

14   is marked Exhibit 2.  This is part of the bid that was     15:03

15   submitted by NPA -- if you see at the bottom there it      15:03

16   says September 5, 2001, okay?  Do you see it there?        15:03

17             MS. NEALLY:  Where?                              15:03

18             MR. AGUILAR:  What I said, it's Exhibit 2.       15:03

19             MR. SALDANA:  Lieck 2.                           15:03

20        A.   There's an exhibit --                            15:03

21        Q.   Lieck 2.  September 5, 2001, do you see that?    15:03

22        A.   Yes, sir.                                        15:03

23        Q.   Okay.  If you turn the page -- the pages aren't  15:03

24   numbered so I can't tell you what number it is but         15:04

25   under the topic, Fees, it indicates --                     15:04
```

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,          ) (

FERNANDO DE PENA,           ) (

VALENTIN PAZ and ANDRUS     ) (

& PAZ, A Partnership        ) (

                            ) (

VS.                         ) (   B-02-143

                            ) (

BROWNSVILLE INDEPENDENT      ) (

SCHOOL DISTRICT, NOE         ) (

SAUCEDA, and EDDIE           ) (

ERRISURIZ, JR.               ) (

REPORTER'S CERTIFICATION

DEPOSITION OF KENNETH J. LIECK

September 19, 2003

   I, LOU ZUNIGA, Certified Court Reporter in and for
the State of Texas, do hereby certify that the above
and foregoing contains a true and correct transcription
of the oral deposition of KENNETH J. LIECK;


   I further certify that I am neither counsel for,
related to, nor employed by any of the parties or
attorneys in the action in which this proceeding was
taken, and further that I am not financially or
otherwise interested in the outcome of the action.



HILL & ROMERO

CERTIFIED COURT REPORTERS

Certified to by me this _32_ day of
_October_, 2003.



_____

LOU ZUNIGA, Texas CSR 2198

Expiration Date: 12-31-03

Hill & Romero

10125 North 10th Street, Suite B

McAllen, Texas  78504

(956) 287-8898




HILL & ROMERO

CERTIFIED COURT REPORTERS

# EXHIBIT-7

                    IN THE UNITED STATES DISTRICT
              FOR THE SOUTHERN DISTRICT OF TEXAS
                       BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,           ) (
FERNANDO DE PENA,            ) (
VALENTIN PAZ and ANDRUS      ) (
& PAZ, A Partnership         ) (
                             ) (
VS.                          ) (   B-02-143
                             ) (
BROWNSVILLE INDEPENDENT      ) (
SCHOOL DISTRICT, NOE         ) (
SAUCEDA, and EDDIE           ) (
ERRISURIZ, JR.               ) (
*****************************************************
                    IN THE UNITED STATES DISTRICT
              FOR THE SOUTHERN DISTRICT OF TEXAS
                       BROWNSVILLE DIVISION

DINO X. CHAVEZ               ) (
                             ) (
VS.                          ) (   CIVIL ACTION NO. B-02-128
                             ) (
BROWNSVILLE INDEPENDENT      ) (
SCHOOL DISTRICT, NOE         ) (
SAUCEDA, MARILYN DEL         ) (
BOSQUE-GILBERT and           ) (
RANDALL DUNN                 ) (

_____

                  ORAL AND VIDEOTAPED DEPOSITION OF
                          NOE SAUCEDA
                        APRIL 9, 2003

_____




                      HILL & ROMERO
               CERTIFIED COURT REPORTERS



1    A.   Well, it wasn't a consultant job.  It was a

2    superintendent's job.  But what I told them is, look,

3    I'm not going to leave the district just overnight.  I

4    mean, there were things to do in San Antonio also.  And

5    I wanted to, however, come in and start meeting the

6    staff and trying to find out where the holes were that

7    needed to be filled and stuff like that.  And so I

8    asked them, is there -- would you-all consider me

9    coming in a few days before my official contract day

10   and they agreed to that.

11    Q.   When was your San Antonio contract time period?

12    A.   It ran through 2000 and --

13    Q.   From when to when?

14    A.   I'm going to say June of 2000 to May of 2004.

15    Q.   2004?

16    A.   Yes, sir.  It was a three-year -- 2003.  I'm

17   sorry.

18    Q.   It was a three-year contract?

19    A.   That is correct.

20    Q.   Okay.  And it -- I presume you mean June 1

21   through May 31?

22    A.   That's correct.

23    Q.   Okay.  So during the time that -- when you

24   finally got hired by BISD to be its superintendent was

25   in the middle of the San Antonio superintendent's

 1   contract so you had to break the San Antonio contract?

 2       A.   That is correct.

 3       Q.   And what was the breaking date for the San

 4   Antonio contract?

 5       A.   Well, my resignation date.  I don't recall what

 6   date it was.  It probably would have been sometime in

 7   May.

 8       Q.   Effective sometime in May?

 9       A.   Yes, sir.

10       Q.   The school year would end towards the end of

11   May, right?

12       A.   That is correct.

13       Q.   Would it have been sometime towards the end of

14   May?

15       A.   Yeah, because I was at the graduation.  So it

16   may have been the first part of June.

17       Q.   Okay.  And at what point did you start actually

18   working for BISD?

19       A.   On the consultant format, it was in April.

20       Q.   Do you remember the date?

21       A.   No, sir.

22       Q.   Of 2001, right?

23       A.   Yes.

24       Q.   How did you get hired as a consultant?

25                MS. LEEDS:  Object to the form; asked and

1      Q.  My question was going to be, do you know who
2  put this together?

3      A.  Probably my purchasing administrator.

4      Q.  Who would be responsible for the final draft,
5  you or your administrator?

6      A.  The administrator.  In this case it would have
7  been probably Mr. Muniz because he was in charge of
8  purchasing.

9      Q.  Did you review it before it went out?

10     A.  No.  I've never seen that.

11     Q.  Okay.  So what he's asking for, you have no
12  idea about?  In other words --

13     A.  I certainly didn't --

14            MS. LEEDS:  Object to the form.

15     A.  -- talk to anybody about all these
16  specifications.

17     Q.  Can you tell us what this is, the form is?

18     A.  It's a document, if I understand it correctly,
19  that anybody who is interested in bidding for the
20  project would use this document to determine what was
21  the district looking for and whether they would be
22  eligible for bidding.

23     Q.  Okay.  And basically this is just a request for
24  proposals or request for quotes?

25     A.  That is correct.

1     Q.   Okay.  Meaning, submit your bids -- everybody

2     submit your bids by a certain date and we'll consider

3     them, right?

4     A.   Yes, sir.

5     Q.   What was the date that they were supposed to be

6     received by?

7     A.   September 6th.

8     Q.   And what's the significance of September 6 in

9     this case 1:30 p.m.?

10    A.   That's --

11    Q.   I don't mean what's significant about -- or

12    what happened on September 6?

13    A.   It's the day after Cinco de Mayo.

14    Q.   Actually, it's the day after Cinco de

15    Septiembre, but you were close.  What's the

16    significance of once the deadline -- what's the

17    significance of that being a deadline; in other words,

18    that's when all the bids have to be in?

19    A.   Yeah, anything received after that would not be

20    considered.

21    Q.   Under normal bidding rules they're not

22    considered?  You cannot consider any bids or bid

23    changes after September 6th?

24    A.   Unless you change it for every one.

25    Q.   Right, okay.  Unless you reopen the bidding

Page 135

```
1    process?

2        A.  No, just change it.  You can change the

3    deadline as long as --

4        Q.  Oh, the deadline, right.

5        A.  As long as everybody knows that it's been

6    changed, that's fine.

7        Q.  Then I'm looking at Page 3, if you turn to that

8    page.

9        A.  Yes, sir.

10       Q.  And it talks about the scope and intent?

11       A.  Uh-huh.

12       Q.  Go ahead and read that first paragraph if you

13   would.

14       A.  The Brownsville Independent School District --

15       Q.  You don't have to read it out loud.

16       A.  Okay.  Yeah, I've read it.

17       Q.  Okay.  Did you review this page or this scope

18   and intent section before this went out?

19       A.  No, sir.

20       Q.  So Mr. Muniz should have put all this

21   information together and submitted it and you didn't

22   even check off on it?

23       A.  That's his job.

24       Q.  Okay.  That means yes, right?

25       A.  Yes.
```

1       Q.  Do you remember signing any contracts like

2    that?

3       A.  No, sir.

4       Q.  Do you know anybody else that signed a contract

5    like that?

6       A.  No, sir.

7       Q.  Let me try putting it this way.  Who did you

8    understand the third party administrator was?

9              MS. LEEDS:  Object to the form; asked and

10   answered.

11      A.  AFLAC was one of the people bidding, that they

12   had the current contract.

13      Q.  Was it BISD?  Was the third party --

14             MS. LEEDS:  He just answered the question.

15      Q.  If you would, please, was BISD the third party

16   administrator?

17      A.  For?

18      Q.  The cafeteria plan.  I'm just talking about the

19   cafeteria plan that had been in existence --

20             MS. NEALLY:  Was BISD --

21      Q.  -- the Section 125?

22             MR. AGUILAR:  If I could just ask the

23   questions.

24      Q.  Was BISD the third party administrator or the

25   third party administrator -- let me rephrase it.  Was

1    BISD the third party administrator for the Section 125

2    cafeteria plan?

3        A.  I don't know how you're using TPA.  I can tell

4    you that the law requires that BISD provide that

5    service.

6        Q.  Provide somebody to do it?

7        A.  Yes.

8        Q.  Okay.  My question is just --

9        A.  And if you weren't doing it --

10       Q.  That's what my question was.

11       A.  We had the luxury of having a company that

12   said, hey, guys, there's no sense in tying up your

13   staff doing this paperwork.

14       Q.  That's fine.

15       A.  We'll do it for you and guess what, we're not

16   going to charge you.

17       Q.  Okay.  I'm just trying to confirm that it was

18   not BISD, right?

19       A.  We were not doing it ourselves.

20       Q.  Okay.  BISD --

21           MS. LEEDS:  Object to the form; asked and

22   answered.  He has already said it was AFLAC.

23       Q.  BISD was not the third party administrator,

24   right?

25           MS. NEALLY:  Object; asked and answered.

```
 1       A.   I don't think they can be.

 2       Q.   I'm just asking if it was or not.

 3       A.   It was impossible for them to be a third

 4  party --

 5       Q.   That means no, right?

 6       A.   -- because they're the second party, right?

 7       Q.   That means no, right?

 8       A.   No.

 9       Q.   That means no?

10       A.   That's correct.

11       Q.   Okay.  Let me represent to you that AFLAC has

12  also said that it was not the third party

13  administrator.

14       A.   Okay.

15       Q.   The only person left with --

16            MS. NEALLY:  Object to the form of the

17  question.

18            MR. AGUILAR:  You can object.

19       Q.   The only person left doing all that work at

20  least in Brownsville was Dino Chavez, right?

21            MS. LEEDS:  Object to the form.

22            MR. STEELE:  When did AFLAC say that?  I

23  object.

24            MS. LEEDS:  It mischaracterizes the

25  evidence.
```

1          MR. AGUILAR:  Hang on a second.  If

2     you-all want to make your objections, feel free to.

3     But if I can continue asking my questions with you-all

4     -- without you-all interrupting.

5          MS. LEEDS:  This is a hypothetical.

6     A.   And I thought it was the duck.  But my mistake.

7     Q.   Are you finished?

8     A.   Yes.

9     Q.   Okay.  The enrollments each year were

10    supervised by who -- well, actually, you weren't there

11    before July of 2001 so you don't know who did it

12    before, right?

13    A.   That is correct.

14    Q.   Okay.  You can't tell us who was doing any of

15    the work of the third party administrator for BISD,

16    right?

17    A.   No, sir, I cannot.

18    Q.   Okay.  So in terms of handling -- well,

19    actually you can tell us for a certain period of time.

20    You were there from July through December of 2001?

21    A.   Yes, sir.

22    Q.   At that time employees -- what does the third

23    party administrator actually do, do you know?

24    A.   No, sir.

25    Q.   Okay.  So whatever the specific duties of the

 1    third party administrator are or what they were doing,

 2    you wouldn't be able to tell us?

 3         A.   And I couldn't tell you who was doing it.

 4         Q.   And that's what I'm saying.  So for that reason

 5    you can't tell us who was actually doing the actual

 6    work, right?

 7         A.   No, sir, that's correct.

 8         Q.   Okay.  I was asking you a while ago about the

 9    specific third party administrator contract.

10         A.   Yes, sir.

11         Q.   I'm trying to figure out what actual document

12    you're talking about.

13              MS. LEEDS:  Object to the form.

14         Q.   Do you know which document that is, what it's

15    called?

16         A.   Well, if you recall, my involvement with this

17    whole process was because there was a red flag

18    internally that somebody -- I don't know who,

19    purchasing or finance said, the annual date of this

20    contract is coming up, we need to go out and bid.

21         Q.   Okay.

22         A.   So there's an assumption there, first of all,

23    that there's a requirement to bid and that there was a

24    contract.  I never saw it.

25         Q.   That's what I'm asking.  I'm not -- I

1    understand all that other stuff.  What I'm asking about

2    is what document are you talking about?

3         A.  I never --

4              MS. LEEDS:  Object to the form.

5         A.  I don't recall seeing one.

6              MS. LEEDS:  He never said there was a

7    document.

8         Q.  Okay.  So there wasn't any actual document as a

9    contract, you just understood -- as far as you --

10        A.  I --

11        Q.  -- but you assumed that there was.

12        A.  I never saw one or I don't recall seeing one.

13        Q.  That's what it is.  You assumed there was a

14   document because you saw these deadlines coming up?

15        A.  Yes.

16        Q.  But you never actually saw a document that was

17   a contract?

18        A.  I do not recall seeing one.

19        Q.  Right.  That's what I'm trying to get at.

20        A.  Okay.

21        Q.  And actually you understood Mr. Chavez was the

22   third party administrator, didn't you?

23             MR. STEELE:  Objection.

24             MS. LEEDS:  Object; form.

25             MS. NEALLY:  Objection to the form.

Page 173

1    of Insurance regulates and approves insurance companies

2    to do business in the State, so why does BISD need to

3    pay a TPA to select what the Texas Department of

4    Insurance has already done.  I read -- I read that

5    correctly, right?

6        A.   That's what it says.

7        Q.   Okay.  Now, you didn't have any particular

8    insurance experience or understanding on what the TDI

9    does or not, right?

10       A.   To the extent that it was necessary for me to

11   perform as a CEO, I knew what I needed to know.

12            MR. AGUILAR:  Objection; nonresponsive.

13       Q.   My question just has to do with -- I think I

14   asked you earlier, you didn't have any insurance

15   experience you said and -- as far as requirements or

16   regulations of the Texas Department of Insurance, you

17   just weren't personally familiar with those?

18       A.   As they related to my ability to perform, I was

19   aware.

20       Q.   Explain what you mean by that, please.

21       A.   If there was something that said I couldn't do

22   something in my job as superintendent because the law

23   says you can't do it, then the source of that law if

24   it's the insurance people would have to be something I

25   need to know about.

1    criteria.

2        Q.  That's not my question.  My question is what

3    you could regulate?

4        A.  I could regulate --

5        Q.  Anyway you wanted?

6        A.  -- anybody coming in to the property of BISD.

7        Q.  Okay.  So your understanding was that you can

8    pick whoever you wanted to come in and solicit tax

9    sheltered annuities on BISD campuses?

10               MS. LEEDS:  Object to the form.

11       A.  That's not what I said.

12       Q.  That's what I'm asking.  Is that what you

13   meant?

14       A.  Could you ask it again?

15       Q.  Sure.  My question is, did you understand that

16   you could determine, you could control whichever agents

17   you chose could come on to BISD campuses to solicit tax

18   sheltered annuity products?

19       A.  That is within the authority of the CEO, yes,

20   sir.

21       Q.  Is that what you believed?

22       A.  Yes, sir.

23       Q.  Okay.  So if you decided, I'm going to pick

24   these three particular agents to come in and solicit

25   and nobody else, you could do that?

Page 248

IN THE UNITED STATES DISTRICT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,           ) (
FERNANDO DE PENA,            ) (
VALENTIN PAZ and ANDRUS      ) (
& PAZ, A Partnership         ) (
                             ) (
VS.                          ) (   B-02-143
                             ) (
BROWNSVILLE INDEPENDENT      ) (
SCHOOL DISTRICT, NOE         ) (
SAUCEDA, and EDDIE           ) (
ERRISURIZ, JR.               ) (

*********************************************************

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ               ) (
                             ) (
VS.                          ) (   B-02-128
                             ) (
BROWNSVILLE INDEPENDENT      ) (
SCHOOL DISTRICT, NOE         ) (
SAUCEDA, MARILYN DEL         ) (
BOSQUE-GILBERT and           ) (
RANDALL DUNN                 ) (

REPORTER'S CERTIFICATION
DEPOSITION OF NOE SAUCEDA
APRIL 9, 2003


    I, LOU ZUNIGA, Certified Court Reporter in and for
the State of Texas, do hereby certify that the above
and foregoing contains a true and correct transcription
of the oral deposition of NOE SAUCEDA;


HILL & ROMERO
CERTIFIED COURT REPORTERS

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this ___6___ day of _____May_____, 2003.

_____

LOU ZUNIGA, Texas CSR 2198

Expiration Date: 12-31-03

Hill & Romero

5415 North McColl, Suite 107

McAllen, Texas  78504

(956) 994-8898

HILL & ROMERO

CERTIFIED COURT REPORTERS

# EXHIBIT-8

# AFLAC®
## *Assurance*

*Proposal Prepared*
*For*
**BROWNSVILLE INDEPENDENT SCHOOL DISTRICT**

*Optional Section 125 - Cafeteria Plan -  Proposal #131-98*

| | |
|---|---|
| SUBMITTED BY: | AFLAC (American Family Life Assurance Company of Columbus GA) |
| AUTHORIZING OFFICER: | Rashmi Jain-Hudson Second Vice President Marketing Administration |
| LOCAL CONTACT: | Mr. Dino X. Chavez 1934 Central Boulevard Brownsville, Texas   78520 956-982-3998 |
| DATE: | April 21, 1998 |



Cafemina
EXHIBIT NO. 1
3/30/03
G. Barker



**Insuring Over 40 Million**
**People Worldwide**

*The products and services outlined in this proposal will be valid for a period of 90 days,*
*subject to availability of insurance policies currently being marketed.*

10. Will you provide a conversion policy?  If so, explain.

This question is not applicable to our FLEX ONE® program.

11. Does your plan coordinate benefits?  Explain.

This question is not applicable to our FLEX ONE® program.

12. Does your quote include a waiver of premium?

This question is not applicable to our FLEX ONE® program.

13. Will all *new* full-time employees qualify for full coverage automatically or will they be subject to underwriting conditions?

This question is not applicable to our FLEX ONE® program.

14. Will all *active* non-participant employees qualify for coverage automatically or will they be subject to underwriting conditions?

This question is not applicable to our FLEX ONE® program.

15. Will the initial enrollment period for new employees be 30 or 60 days?

The initial enrollment of the District would require 30 to 60 days.  New employees would be enrolled based on the District's instructions.

16. Will your company accept a "no loss" "no gain" rollover of active participants.

This question is not applicable to our FLEX ONE® program.

17. Will company offer third party administration for all products?

AFLAC nor FLEX ONE® will act as a plan administrator, plan sponsor, or third-party administrator.  FLEX ONE® is a plan service provider only.   There is not a minimum participation requirement for our FLEX ONE® services; however, we would require that the District offer one or more of our supplemental health insurance plans to its employees through payroll deduction.  All of AFLAC's policies with the exception of our long-term care, home health care, 10-year term, Medicare supplement, Platinum and Assurance cancer policies, or cancer plans that contain a return of premium rider (only if the rider is purchased) qualify for inclusion under a Section 125 Cafeteria Plan.

18. Other benefits that have not been expressed on current plan.

*Insuring Over 40 Million
People Worldwide*

# EXHIBIT-9

*Proposal Prepared*

*For*

*BROWNSVILLE INDEPENDENT*
*SCHOOL DISTRICT*

|  |  |
|---|---|
| SUBMITTED BY: | AFLAC (American Family Life Assurance Company of Columbus GA) |
| AUTHORIZED BY: | Michele Weed<br>Director<br>Marketing Administration |
| LOCAL CONTACT: | Dino X. Chavez<br>905 E. Los Ebanos, Suite A<br>Brownsville, TX 78520<br>(956) 982-3998 |
| DATE: | August 31, 2001 |

**AFL 0002**

*The products and services outlined in this proposal will be valid for a period of 90 days,*

Calls are received from policyholders, payroll accounts and associates from all 50 states and other various U.S. territories. Call center specialists are available Monday through Friday at the numbers and hours listed below:

**Customer Service**
1-800-992-3522    8 A.M. to 8 P.M. EST Monday through Friday

**Hispanic Customer Service**
1-800-742-3522    8 A.M. to 6 P.M. EST Monday through Friday

**Claims Customer Service Fax Number**
1-877-442-3522

AFLAC's FLEX ONE® Department also offers an Interactive Voice Response (IVR) System (1-800-353-9487) to assist you and your employees with cafeteria plan information. The IVR allows flexible spending account participants to choose reimbursement information, balance/election information, reimbursement request forms, or to talk to a customer service representative. An employer can use the IVR to request a 5500 questionnaire, a nondiscrimination testing packet, plan year information (latest plan year), or to talk to a customer service representative. The IVR is available Monday through Friday from 6:00 A.M. to mid-night Eastern Time and most Saturdays from 8:30 A.M. to 5:00 P.M. Eastern time.

10. **Provide BISD with a staff that is easily accessible.**

Your local AFLAC associate will service your account during the initial enrollment, during each subsequent plan year and when any new employees are hired during the plan year. He will schedule meetings in accordance with your specifications. In addition, he will be available to Brownsville Independent School District if any questions arise.

AFLAC's FLEX ONE® Department offers an Interactive Voice Response (IVR) System (1-800-353-9487) to assist you and your employees with cafeteria plan information. The IVR allows flexible spending account participants to choose reimbursement information, balance/election information, reimbursement request forms, or to talk to a customer service representative. An employer can use the IVR to request a 5500 questionnaire, a nondiscrimination testing packet, plan year information (latest plan year), or to talk to a customer service representative. The IVR is available Monday through Friday from 6:00 A.M. to mid-night Eastern time and Saturdays from 8:30 A.M. to 5:00 P.M. Eastern time.

AFLAC's Customer Call Center is the point-of-contact for our external customers. The department is made up of highly trained professionals that utilize seven (7) centralized toll-free numbers and a large comprehensive

**AFL 0009**

database to handle customer requests and inquiries. The primary goal of the call center is to provide customers with the information they need at the point of call.

Calls are received from policyholders, payroll accounts and associates from all 50 states and other various U.S. territories. Call center specialists are available at the numbers and hours listed below:

**Customer Service**
1-800-992-3522    8 A.M. to 8 P.M. EST Monday through Friday

**Hispanic Customer Service**
1-800-742-3522    8 A.M. to 6 P.M. EST Monday through Friday

**Claims Customer Service Fax Number**
1-877-442-3522

**11. Cooperate and consult with the BISD's Insurance Committee on plan operation.**

Neither AFLAC nor FLEX ONE® will act as a plan administrator or a plan sponsor of your cafeteria plan. Brownsville Independent School District, as plan administrator and plan sponsor, is responsible for keeping the cafeteria plan in compliance.

**12. Assist Administration in determining that District policy is adhered to in product distribution.**

Neither AFLAC nor FLEX ONE® will act as a plan administrator or a plan sponsor of your cafeteria plan. Brownsville Independent School District, as plan administrator and plan sponsor, is responsible for keeping the cafeteria plan in compliance.

The supplemental insurance products offered will be chosen by Brownsville Independent School District when establishing the program.

**13. Assume responsibility for all needed forms and documents.**

AFLAC will provide brochures, payroll stuffers and other awareness materials at no cost to Brownsville Independent School District for AFLAC's supplemental insurance products and FLEX ONE® program. Sample enrollment and administrative materials are located in Section 5 of the proposal.

FLEX ONE® Administration will issue sample plan documents to assist with the implementation of a Section 125 cafeteria plan. The employer will receive a documents packet which contains an Adoption Agreement, Resolution, Summary Plan Description, Reimbursement Services Agreement (RSA),

**AFL 0010**

## Deviations and Clarifications

- FLEX ONE® is licensed to provide cafeteria plan services in the state of Texas. AFLAC is not a TPA.

- Neither AFLAC nor FLEX ONE® will act as a plan administrator or a plan sponsor of your cafeteria plan. The employer, as plan administrator and plan sponsor, is responsible for keeping the cafeteria plan in compliance.

- AFLAC does not offer 403(b) services.

- AFLAC Administrative Services FLEX ONE® offers a premium billing service through an alliance with Paylogix. This service, often referred to as Single-Point Billing, is offered through AFLAC in conjunction with AFLAC products. This service is available for all AFLAC payroll accounts with 50 or more employees. This service allows the account to issue one check for all premiums deducted. Paylogix will reconcile the different carrier and provider invoices, and then the appropriate funds will be distributed to each provider on behalf of the employer.

- Brownsville Independent School District is currently approved to have the flexible spending account service fees waived. This approval is valid for a three-year period beginning January 1, 2000, and ending December 31, 2003. In addition, AFLAC guarantees the premiums being offered on our Voluntary Indemnity product (series A-43000), the Personal Recovery Plus product (series A-70000) and Personal Accident Expense product (series A-33000) for a three-year period beginning January 1, 2000, and ending December 31, 2003.

- Brownsville Independent School District is currently approved for AFLAC's FastForward service. With FastForward, FLEX ONE® will advance sufficient funds to reimburse eligible unreimbursed medical claims up to $2,400 per participant. This valuable service will reimburse employees up to their full annual election without the District having to first front the money.

- If you are offering our FLEX ONE® Cafeteria Plan program services with flexible spending accounts, you must sign a Reimbursement Services Agreement. The initial term of this agreement shall be the initial plan year commencing on the effective date hereof, thereafter, this agreement will automatically renew for successive periods of twelve (12) months unless, at least thirty (30) days prior to the end of the then current term, the employer or AFLAC gives written notice to the other of its intention not to renew the agreement.

- Our Reimbursement Services Agreement contains our standard hold harmless language with respect to the FSA services we are proposing. In addition to this agreement, AFLAC agrees to hold you harmless from any claims arising against you due to any disagreements between your employees and our company with respect to the coverage provided under our insurance policies issued to your employees except for any misconduct or negligence committed by you or any of your employees.

**AFL 0012**

11.    The company must provide group plans structured to meet COBRA guidelines, if applicable.

AFLAC's policies are individually issued rather than a group policy or self-funded plan and are guaranteed renewable and portable.

**With reference to our FLEX ONE® program, the obligations detailed under the Comprehensive Budget Reconciliation Act (COBRA), as they relate to continuation of health care coverage, are placed on the employer. AFLAC does not accept the responsibility for notification to eligible employees and dependents. Our FLEX ONE® Administration/Compliance Department will assist with general questions that arise during the cafeteria plan year.**

**For more information on COBRA please refer to Section 7.**

12.    The successful company will honor the original effective date of coverage for current    plan participants and the number of years satisfied under the plan.

**AFLAC products require that all applicants answer the underwriting questions listed on the application.**

13.    *No pre-existing condition exclusions* shall apply to participants insured for 12 months    or more under the current plan.

**The First-Occurrence Benefit is not payable for: (1) any internal cancer diagnosed or treated before the Effective Date of this policy and subsequent recurrence, extension or metastatic spread of such internal cancer that is diagnosed or treated after the Effective Date of this policy; (2) cancer diagnosed during this policy's 30-day waiting period; (3) the diagnosis of skin cancer or melanomas classified as Clark's Levels I and II. Any covered person who has had a previous diagnosis of cancer will NOT be eligible for a First-Occurrence Benefit under this policy for a recurrence, extension or metastatic spread of that same cancer.**

**Please refer to Section 4 for more information on this product to determine the underwriting requirements for that plan.**

14.    The successful company will conduct one initial enrollment and one annual enrollment thereafter.

**AFLAC associate, Dino Chavez, will service your account during the initial enrollment, during each subsequent plan year and when any new employees are hired during the plan year. Your AFLAC associate, Dino Chavez, will schedule meetings in accordance with your specifications.**

15.    The enrollment process will include, but is not limited to, scheduling appointments by campus or department, completing enrollment applications, mailing ID cards and insurance certificate booklets *directly* to insured employees, and providing employee summary reports for payroll deductions.

**AFL 0019**

3.    Provide the address of the claims office from which you propose to administer claims.    How long has this designated claim office been in operation?

All claims are processed at the AFLAC Worldwide Headquarters in Columbus, GA.

AFLAC (American Family Life Assurance Company of Columbus, Georgia)
Worldwide Headquarters
1932 Wynnton Road
Columbus, Georgia 31999

Claims have been paid from this location since inception.

4.    Please verify that bi-lingual claim personnel will be available to plan participants who    call your office for customer service.

AFLAC's Customer Call Center (1-800-742-3522) does provide Hispanic Customer Service from 8:00 A.M. to 6:00 P.M. Eastern Standard Time.

5.    What is the turn-around time for claims at the designated claim office location?  Please    indicate if claims are paid monthly or bi-monthly.

The goal of our Claims Department is to pay accident and health claims within 4 days and to pay life claims within 3-10 working days of receipt of all necessary information.  This monumental challenge is almost always met.

Our record of prompt, satisfactory claims service is excellent.  A poll conducted by Opinion Research Corporation shows that 9 out of 10 AFLAC claimants agree that we paid their claims fairly and promptly, and they would recommend our products to others (September 1997).

Completed claim forms along with the necessary information can be forwarded to local associates for handling or submitted directly to our worldwide headquarters by fax or mail.  Once the information is received it is referred to the claims auditor responsible for auditing claims within that state.  This individual will review the claim and process benefits in accordance with the policy contract.  Once this process is complete, the check is mailed to the policyholder or service provider the next business day.

6.    Describe your procedures for handling appeals of denied or disputed claims?

Appeals of denied or disputed claims are forwarded to a claims supervisor for review.  The supervisor determines whether claims were paid or denied in accordance with the policy contract.  Should the supervisor feel that additional information such as medical records is required, the additional information is requested from the policyholder, service provider or physician.

AFLAC has a Claims Review Board which is comprised of headquarters management, staff nurses and a local physician.  These individuals meet regularly to review disputed claims and make a determination regarding additional benefits.

7.    Will you conduct meetings as requested by the District?

**AFL 0022**

Your AFLAC associate, Dino Chavez, will schedule meetings in accordance with your specifications.

8.   How soon will you give notice of renewal rates?

If there is a change in our fee structure, AFLAC notifies payroll accounts 75 days in advance of a rate increase. Policyholders are notified 45 days in advance.

9.   How do you determine pre-existing conditions?

The First-Occurrence Benefit is not payable for: (1) any internal cancer diagnosed or treated before the Effective Date of this policy and subsequent recurrence, extension or metastatic spread of such internal cancer that is diagnosed or treated after the Effective Date of this policy; (2) cancer diagnosed during this policy's 30-day waiting period; (3) the diagnosis of skin cancer or melanomas classified as Clark's Levels I and II. Any covered person who has had a previous diagnosis of cancer will NOT be eligible for a First-Occurrence Benefit under this policy for a recurrence, extension or metastatic spread of that same cancer.

10.   Will you provide a conversion policy? If so, explain.

Yes this product does offer a conversion policy.

A covered person whose dependency has terminated and who desires to continue coverage as a Named Insured under a separate policy may do so by notifying AFLAC of the request in writing. The dependent will have the right to apply for a cancer policy without evidence of insurability and without interruption in coverage, provided AFLAC receives written notification of the request prior to 31 days after the anniversary date of this policy following the date he or she is no longer considered a dependent.

Please refer to the Specimen Policies in Section 4 for more information about this product.

11.   Does your plan coordinate benefits? Explain.

AFLAC does not coordinate benefits. We pay in addition to any other insurance the policyholder may have.

12.   Does your quote include a waiver of premium?

Yes. If you, due to having internal cancer , are completely unable to do all of the usual and customary duties of your occupation [if you are not employed: are completely unable to perform two or more of the Activities of Daily Living (ADLs) without the assistance of another person] for a period of 90 continuous days, AFLAC will waive, from month to month, any premiums falling due during your continued inability. For premiums to be waived, AFLAC will require an employer's statement (if applicable) and a physician's statement of your inability to perform said duties or activities, and may each month thereafter require a physician's statement that total inability continues.

Please refer to Section 4 for more information on this product.

AFL 0023

13.    *No pre-existing condition exclusions* shall apply to participants insured for 12 months    or more under the current plan.

> **Yes.  Please refer to Section 4 for information on this product to determine the underwriting requirements for that plan.**

14.    The successful company will conduct one initial enrollment and one annual enrollment thereafter.

> **AFLAC associate, Dino Chavez, will service your account during the initial enrollment, during each subsequent plan year and when any new employees are hired during the plan year. Your AFLAC associate, Dino Chavez, will schedule meetings in accordance with your specifications.**

15.    The enrollment process will include, but is not limited to, scheduling appointments by campus or department, completing enrollment applications, mailing ID cards and insurance certificate booklets *directly* to insured employees, and providing employee summary reports for payroll deductions.

> **We believe education is the key to ensuring employee understanding and participation in benefit programs.  Therefore, AFLAC will provide brochures and payroll stuffers at no cost to Brownsville Independent School District.**

> **Your local AFLAC associates will give a brief presentation (approximately 30 minutes) to the employees explaining the program and the enrollment process. They will then review existing benefits with each employee to enhance your employees awareness of their benefits and provide further information about our policies.**

> **If an employee chooses to purchase an AFLAC policy, proper applications are completed and sent to AFLAC. A Payroll Deduction Authorization card is also completed, and a copy given to the employer's payroll department.**

> **When a new employee meets their eligibility requirements, your local AFLAC associate will be available to educate them about AFLAC policies and complete the necessary applications. The AFLAC associate can provide forms for use by your payroll department in requesting new employee service.**

16.    All qualified organizations submitting proposals will exclude "actively at work" restrictions.

> **AFLAC policies should be reviewed individually to determine it they include "actively at work" as a policy provision. Please refer to 4 for the Specimen policy.**

17.    The successful company will provide brochures, certificate of insurance booklets, and insurance ID cards at the company's expense.

> **AFLAC will provide all standard, awareness and enrollment materials and services free of charge. AFLAC does not provide ID cards with its policies.**

**AFL 0028**

18.   If broker commissions/fees are paid, the qualified organization submitting    proposals must disclose the following:

    a.      Name of agency and address;

    b.      Name of agent/broker;

    c.      Broker's fee whether flat fee or percentage of premium;

    d.      Total sum of commissions/fees paid to each broker.

       If the above referenced disclosure is not applicable, please indicate that the proposal is    quoted on a no-commission basis.

**Dino Chavez**
**1934 Central Blvd.**
**Brownsville, TX 78520**

**AFLAC associates are compensated by the sale of our supplemental insurance plans. This method of compensation gives employees the ability to have a degree of control in planning their benefits, paying for certain benefits with pretax dollars and enhancing their benefits. Our supplemental products are designed to help pay those out-of-pocket expenses not normally covered under primary health insurance.**

**Commissions may be paid up to five levels of management.**

- Compensation Z associates (comm'ns) are what is used to pay 4 sveg accts.

- (RSC overrides pd 4?)
    - How many RSC's do you know who svc a 6000+ member acct solely on their RSC overrides.

- So how was Dino supposed to ~~finan~~ finance sveg accts if didn't get any ~~ones~~ splits from assoc's comm'ns?

**AFL 0029**

13.    Will all *new* full-time employees qualify for full coverage automatically or will they be    subject    to underwriting conditions?

This question is not applicable to our FLEX ONE® program.

14.    Will all *active* non-participant employees qualify for coverage automatically or will    they be subject to underwriting conditions?

This question is not applicable to our FLEX ONE® program.

15.    Will the initial enrollment period for new employees be 30 or 60 days?

The initial enrollment of the District would require 30 to 60 days. New    employees    would    be enrolled based on the District's instructions.

16.    Will your company accept a "no loss" "no gain" rollover of active participants.

This question is not applicable to our FLEX ONE® program.

17.    Will company offer third party administration for all products?

A.    Fee for 125 Plan
B.    Proposal for all Products and TPA Administrator
C.    Provide a list of approved Companies and Products

AFLAC nor FLEX ONE® will act as a plan administrator, plan sponsor, or third-party administrator. FLEX ONE® is a plan service provider only.    There    is    not    a    minimum participation requirement for our FLEX ONE® services; however, we would require that the District offer one or more of our supplemental health insurance plans to its employees through payroll deduction. All of AFLAC's policies with the exception of our long-term care, home health care, 10-year term, Medicare supplement, Platinum and Assurance cancer policies, or cancer plans that contain a return of premium rider (only if the rider is purchased) qualify for inclusion under a Section 125 Cafeteria Plan.

18.    Other benefits that have not been expressed on current plan.

This question is not applicable to our FLEX ONE® program. Please refer to    Section 4, FLEX ONE® Overview, for additional information on our program.

AFLAC Worldwide Headquarters has agreed to waive its FLEX ONE® fees for Brownsville ISD. If there should be any change in this agreement, AFLAC would notify the District 30 days prior to the change.

AFL 0049

## AFLAC Product Summaries

To participate in our FLEX ONE® program, we require that an account offer one or more of our supplemental health insurance plans to its employees through payroll deduction.

**AFL 0050**

BROWNSVILLE INDEPENDENT SCHOOL DISTRICT
PURCHASING DEPARTMENT

012-02
REQUEST FOR QUALIFICATIONS (RFQ'S) FOR TPA TO ADMINISTER BISD'S
CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES

Sealed RFQ'S will be received by the Brownsville Independent School District at the office of **MR. KENNETH LIECK, ADMINISTRATOR OF PURCHASING, 1900 PRICE RD., BROWNSVILLE, TEXAS 78521-2417 (956) 548-8361** for **REQUEST FOR QUALIFICATION (RFQ'S) FOR TPA TO ADMINISTER BISD'S CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES**. The RFQ'S will be received until **Thursday, Sep 6, 2001, 1:30 pm**, Central Daylight Time (CDT). Interested proposers may obtain specifications and information for proposing at the **B.I.S.D. Purchasing Department.**

1. **RFQ OPENING**: Proposers are invited to attend the RFQ opening at the office of the Director of Purchasing on **Thursday, Sep 6, 2001, at 1:45 pm,** Central Daylight Time (CDT) at which time the RFQ'S will be opened. Proposers presence is not mandatory.

2. **RFQ SUBMISSION**: RFQ'S should be submitted on this form and continued on any attached list(s) of RFQ items and submitted in Brownsville I.S.D. RFQ envelopes. Each RFQ shall be placed in a separate envelope, sealed and properly identified with the RFQ title, RFQ number and date to be opened. The District will not be held responsible for missing, lost or late mail. Brownsville Independent School District will not accept any facsimile on sealed RFQ'S.

3. **TENTATIVE AWARD DATE:** Sep 18, 2001.

4. **REPRESENTATIVE:** The successful vendor agrees to send a personal representative with binding authority for the company to the district upon request to make adjustments and/or assist with coordination of all transactions as needed.

5. **SIGNING OF RFQ:** Failure to manually sign RFQ will disqualify it. Person signing RFQ should show title or authority to bind their firm to a contract.

6. **EEOC GUIDELINES:** During the performance of this contract, the contractor agrees not to discriminate against any employee or applicant for employment because of race, color, national origin, age, religion, gender, marital or veteran status, or handicapping condition.

7. The Brownsville Independent School District has the right to reject or rebid if only one bid/RFQ is received by "submission date" or extend the submission date by two (2) weeks.

EXHIBIT NO. 1
4-7-03
Hill & Romero

PAGE _____ OF _____

.01003

The Brownsville Independent School District reserves the right to reject any/or all RFQ'S and to make awards as they may appear to be advantageous to the School District, to hold RFQ for 60 days from submission date with out action, and to waive all formalities in proposing. The proposer must indicate "all or none" in the RFQ if the above-stated condition is not acceptable.

Vendor must provide Federal Identification Number and/or Social Security Number in order to be considered as a qualified vendor.

The RFQ for the TPA TO ADMINISTER BISD'S CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES shall be delivered to the Brownsville Independent School District, Brownsville, Texas 78520. A contract for the TPA TO ADMINISTER BISD'S CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES will be placed into effect after final approval by the Board of Trustees.

Mr. Kenneth Lieck
Administrator of Purchasing
Brownsville Independent School District                        RFQINV

01004

BROWNSVILLE INDEPENDENT SCHOOL DISTRICT


REQUEST FOR QUALIFICATIONS
THIRD PARTY ADMINISTRATOR


## I. SCOPE AND INTENT

The Brownsville Independent School District, here after referred to as BISD, desires to solicit qualified agents/agency to prepare and solicit request for qualifications for Third Party Administrators to administer BISD's Cafeteria Plan (IRC Section 125) and administer the tax deferred annuity, custodial plan under Section 403b and 403(b)(7) deferred compensation plans and custodial plans.

The purpose of this Request for Qualifications (RFQ) is to evaluate respondents experience relative to the stated plans. Strict adherence to the points outlined in the RFQ is necessary.

It is the intent of BISD to transfer the responsibility to the Agent/Agency to solicit the individual products available under Section 125 and present such products to the BISD employee insurance committee for selection of carriers.

## II. FACTS AND STATISTICS

At present, BISD operates      elementary schools, seven middle schools and five high schools. This District employs approximately 6200 employees.


## III. TERMS OF SERVICE

The cafeteria plan commences on January 1, it is expected to have the agent/agency thirty days before that. The agreement may be either terminated by either party thereto at the end of the initial three year provided by written notice to this effect sent to the other party at least sixty (60) days prior to the end of the initial one year period. Automatic periods of renewal and extension shall continue until either party thereto gives the other written notice of termination of the agreement and in such event the agreement shall terminate ninety (90) days after such notice has been sent to the other party.

IV. SCOPE OF SERVICES REQUIRED

    A.  Cafeteria Plan

        1.  Work directly with District staff and Insurance Committee to design and/or maintain a Cafeteria Plan

        2.  Make arrangements to meet all legal requirements of IRC Section 125.

        3.  Educate BISD employees on concept of Cafeteria Plan.

        4.  Be responsible for enrollment of employees on all campuses.

        5.  Provide up-to-date information to employees

        6.  Assist in processing of all claims.

        7.  Investigate delays on properly submitted claims.

        8.  Enroll and in-service

        9.  Assist Administration with resolution of employee problems as they arise.

      10. Provide BISD with a staff that is easily accessible.

      11. Cooperate and consult with the BISD's Insurance Committee on plan operation.

      12. Assist Administration in determining that District policy is adhered to in product distribution.

      13. Assume responsibility for all needed forms and documents.

      14. Assist in the development of a program which will best serve the employees needs.

    B.  Evaluation and Selection

        1.  Each proposal will be reviewed and evaluated on the basis of the following criteria:

            a.  Assessment of the firm's experience and expertise as T.P.A. of Cafeteria Plans, Section 403(b) and 403(b)(7).

            b.  Availability of the firm's key personnel to meet with BISD personnel and to respond promptly to requests for information and/or analysis, often on short notice.

            c.  Ability of the individuals to communicate information clearly and concisely, both orally and in writing.

001066

BROWNSVILLE INDEPENDENT SCHOOL DISTRICT

TERMS AND CONDITIONS

1. The school district reserves the right to accept or reject any and or all offers or any part thereof, and to waive any or all formalities. The competency and responsibility of all offers shall be taken into consideration in the awarding of the contract for this proposal. If the offerors are unknown to the school district, or their competency questioned, it shall be understood that they will, upon request, file with the school district reliable data and reference for investigation as it deems necessary to determine the ability of the efferor to provide the contents of this proposal. Acceptance is to be confirmed by purchase order issued by BISD.

2. The school district reserves the right to revise and amend the specifications prior to the date set for the opening. Such revisions or amendments, if any, will be announced by agenda or amendments to these specifications. Copies of these agenda so issued will be furnished to all prospective offerors.

3. Offer sheets, specifications and necessary information are attached or may be obtained as stated on the RFP advertisement sheet.

4. All contract obligations shall prevail for at least 90 days after the effective date of the contract. After such period, for the protection of both parties, this contract may be cancelled in whole or impart by either party, giving 60 days prior notice, in writing to the other party. Such notice by the contractor shall in no way be construed as taking away the right of the District to cancel for unsatisfactory performance or other due cause.

5. Any deviation from the specifications set forth herein must be clearly pointed out; other; otherwise it will be considered that services offered are in strict compliance with these specifications and the successful offeror will be held responsible thereof. Deviations shall be explained in detail.

6. Offerors are to furnish all information requested and in the spaces provided on the Request for Proposal Form. Further, as may be specified elsewhere, each offeror must submit descriptive literature and complete specifications covering the services requested. Reference to literature submitted previously does not satisfy this provision. Offers not in compliance with these requirements will be subject to rejection.

7. Neither the contract nor payments may be assigned except by the written approval of the BISD Board of Trustees.

8. The contractor agrees to protect the District from claims involving infringement of patents or copyrights.

9. The Third Party Administrator must be in compliance with all local, state and federal laws that govern third party administrators with regard to Sections 125.403(b) and 403(b)(7) or any of the pertinent laws. Also must comply with any changes to these sections while this contract is enforce.

001007

**BROWNSVILLE INDEPENDENT SCHOOL DISTRICT**
**PURCHASING DEPARTMENT**

1900 E. PRICE RD. BROWNSVILLE TX. 78521
TELEPHONE NUMBER (956) 548-8361
TELEFAX NUMBER (956) 548-8367

RFQ NUMBER 012-02

REQUEST FOR QUALIFICATIONS (RFQ'S) FOR TPA TO ADMINSTER BISD'S
CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES

CHECK LIST

## PLEASE MAKE SURE THAT YOU HAVE DONE THE FOLLOWING:

1. YOU MUST SIGN THE LAST PAGE                    ___YES ___NO

2. YOU MUST INCLUDE INSURANCE WITH THE
   RFQ (IF REQUIRED)!                            ___YES ___NO

3. YOU MUST INCLUDE ANY SAMPLES THAT ARE REQUIRED?    ___YES ___NO

4. YOU MUST INCLUDE ANY STATE CERTIFICATE OR LICENSE
   WITH THE RFQ (IF REQUIRED)?                   ___YES ___NO

5. YOU MUST VERIFY UNIT PRICE TO TOTAL PRICE?    ___YES ___NO

6. IF YOUR COMPANY IS NOT BIDDING ON THIS BID/RFQ, PLEASE STATE
   THE REASON.

_____

_____

_____

**Please return this page with your rfq**

PAGE 6 OF 7                    01.008

# BROWNSVILLE INDEPENDENT SCHOOL DISTRICT
## PURCHASING DEPARTMENT

### 1900 E. PRICE RD. BROWNSVILLE TX. 78521
### TELEPHONE NUMBER  (956) 548-8361
### TELEFAX  NUMBER  (956) 548-8367

### RFQ NUMBER 012-02

### REQUEST FOR QUALIFICATIONS (RFQ'S) FOR TPA TO ADMINSTER BISD'S CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES

The undersigned proposer, by signing and executing this RFQ, certifies and represents to the Brownsville Independent School District that proposer has not offered, conferred or agreed to confer any pecuniary benefit, as defined by |1.07(a)(6) of the Texas Penal Code, or any other thing of value, as consideration for the receipt of information or any special treatment or advantage relating to this RFQ; the proposer also certifies and represents that the proposer has not offered, conferred or agreed to confer any pecuniary benefit or other thing of value as consideration for the recipient's decision, opinion, recommendation, vote or other exercise of discretion concerning this RFQ; the proposer certifies and represents that proposer has neither coerced nor attempted to influence the exercise of discretion by any offer, trustee, agent or employee of the Brownsville Independent School District concerning this RFQ on the basis of any consideration not authorized by law; the proposer also certifies and represents that proposer has not received any information not available to other bidders so as to give the undersigned a preferential advantage with respect to this RFQ; the proposer further certifies and represents that proposer has not violated any state, federal, or local law, regulation or ordinance relating to bribery, improper influence, collusion or the like and that proposer will not in the future offer, confer, or agree to confer any pecuniary benefit or other thing of value of any officer, trustee, agent or employee of the Brownsville Independent School District in return for the person having exercised their person's official discretion, power or duty with respect to this RFQ; the proposer certifies and represents that it has not now and will not in the future offer, confer, or agree to confer a pecuniary benefit or other thing of value to any officer, trustee, agent, or employee of the Brownsville Independent School District in connection with information regarding this RFQ, the submission of this RFQ, the award of this RFQ or the performance, delivery or sale pursuant to this RFQ.

I have read all of the specifications and general RFQ requirements and do hereby certify that all items submitted meet specifications.

COMPANY: _____

AGENT NAME: _____

AGENT SIGNATURE: _____

ADDRESS: _____

CITY: _____

STATE: _____  ZIP CODE: _____

TELEPHONE: _____  TELEFAX : _____

FEDERAL ID#: _____  AND/OR SOCIAL SECURITY #: _____

DEVIATIONS FROM SPECIFICATIONS IF ANY :

_____

_____

_____

_____

PAGE _7_ OF _7_

# EXHIBIT-11



# Brownsville Independent School District

## Purchasing Department, Rm. #101

1900 E. Price Road, Brownsville, Texas 78521

(956) 548-8361   Fax (956) 548-8367

Kenneth J. Lieck
Administrator

August 14, 2001

TO:    ALL VENDORS

Subject: "Addendum #1 for RFQ # 012-02, REQUEST FOR QUALIFICATION (RFQ'S)
         FOR TPA TO ADMINISTER BISD'S CAFETERIA PLAN (SECTION 125) AND
         TAX DEFERRED ANNUTIES

Dear Sirs:

PLEASE BE ADVISED OF THE FOLLOWING CHANGE(S):

1.   The NAME OF THE RFQ HAS BEEN CHANGED TO THE NEW TITLE LISTED BELOW:

     FROM:   REQUEST FOR QUALIFICATIONS (RFQ'S) FOR TPA TO ADMINISTER
             BISD'S CAFETERIA PLAN (SECTION 125) AND TAX DEFERRED ANNUTIES

     TO:     REQUEST FOR QUALIFICATIONS (RFQ'S) FOR TPA TO ADMINISTER
             BISD'S CAFETERIA PLAN (SECTION 125) AND/OR TAX DEFERRED
             ANNUTIES

The signature of the company agent, for the acknowledgement of this
addendum, shall be required in order to be considered in the final
evaluation and award of this rfq.

I hereby acknowledge receipt of Addendum #1, rfq 012-02, REQUEST FOR
QUALIFICATION (RFQ'S) FOR TPA TO ADMINISTER BISD'S CAFETERIA PLAN
(SECTION 125) AND TAX DEFERRED ANNUTIES.

Company: _____

Agent Name: _____

Agent Signature: _____

Address: _____

City: _____ State: _____ Zip: _____

If you have any further questions about the rfq, call 956-548-8361.

Kenneth J. Lieck
Administrator of Purchasing

add01202

"The Brownsville Independent School District is an Equal Opportunity Employer, M/F/H"

Errisuriz
EXHIBIT NO. 2
4-7-03
Hill & Romero

# EXHIBIT-12

Purchasing Department, Rm. #107
1900 E. Price Road, Brownsville, Texas    21
(956) 548-8361   Fax (956) 548-8367

Kenneth J. Lieck
Administrator

August 15, 2001

TO:   ALL VENDORS

Subject: "Addendum #2 for RFQ # 012-02, REQUEST FOR QUALIFICATION (RFQ'S)
         FOR TPA TO ADMINISTER BISD'S CAFETERIA PLAN (SECTION 125) AND
         TAX DEFERRED ANNUTIES

Dear Sirs:

**PLEASE BE ADVISED OF THE FOLLOWING CHANGE(S):**

1.   The NAME OF THE RFQ HAS BEEN CHANGED TO THE NEW TITLE LISTED BELOW:

     FROM:  REQUEST FOR QUALIFICATIONS (RFQ'S) FOR TPA TO ADMINISTER
            BISD'S CAFETERIA PLAN (SECTION 125) AND/OR TAX DEFERRED
            ANNUTIES

     TO:    REQUEST FOR QUALIFICATIONS (RFQ'S) FOR TPA TO ADMINISTER
            BISD'S CAFETERIA PLAN (SECTION 125) AND/OR TAX DEFERRED
            ANNUTIES AND ALL OTHER ALTERNATIVES WILL BE CONSIDERED

The signature of the company agent, for the acknowledgement of this
addendum, shall be required in order to be considered in the final
evaluation and award of this rfq.

I hereby acknowledge receipt of Addendum #2, rfq 012-02, REQUEST FOR
QUALIFICATION (RFQ'S) FOR TPA TO ADMINISTER BISD'S CAFETERIA PLAN
(SECTION 125) AND TAX DEFERRED ANNUTIES.

Company: _____

Agent Name: _____

Agent Signature: _____

Address: _____

City: _____ State: _____ Zip: _____

If you have any further questions about the rfq, call 956-548-8361.

Kenneth J. Lieck
Administrator of Purchasing

dd01202

"The Brownsville Independent School District is an Equal Opportunity Employer, M/F/H"

Errisuriz
EXHIBIT NO. 3
4-7-03
Hill & Romero

# EXHIBIT-13

# Memo

**To:**        Mr. Joe Colunga, BISD School Board President

**From:**      Pat Lehmann, Board Member

**Subject:**   CONVERSATION WITH JEFF ALFORD, DR. NOE SAUCEDA AND JEFF
               ROERIG ON AUGUST 30, 2001

**Date:**      September 7, 2001

This letter serves as my personal account of the conversation that I had with Jeff Alford of Alford
Insurance concerning BISD's participation in the Worker's Compensation risk pool and
subsequent conversation with Dr. Noe Sauceda and Jeff Roerig.

My conversation with Mr. Alford took place on August 30, 2001 and it concerned the contracting
of Mr. Martin Villafranca by Edwards Risk Management to serve as Loss Control Agent for the
District. It was brought to my attention that Edwards Risk Management was intending to
contract with Mr. Martin Villafrance for loss prevention services (see attachment). Upon
requesting proof of such an arrangement (see attachment), I subsequently had a conversation with
Mr. Jeff Alford concerning various aspects of the insurance program and Edwards Risk
Management's intent to utilize Mr. Villafranca's services.

On August 30, 2001, Dr. Sauceda called me at approximately 5:15 p.m. and said that he wanted
to talk to Mr. Otis Powers and me concerning a "letter". This conversation was thirty minutes
prior to the board meeting that was scheduled for that day. At this meeting, Mr. Roerig presented
me with a letter from Mr. Jeff Alford (see attachment) and told me that this was "serious" and
that I should not be talking to vendors nor should I associate with them for any reason, especially
if the conversation might be about business. At this point Dr. Sauceda reiterated the same
remarks that were made by the attorney, Mr. Roerig. .

Mr. Powers and I objected to the content of the letter and to its implications.

It was made clear to me at this meeting that Mr. Roerig's intent was to chastize, frighten, incite,
and threaten both, Mr. Powers and me. It was apparent to me that Mr. Roerig was trying to
insinuate that our conduct had been improper and contained elements of governance. When we
attempted to explain our position, Mr. Roerig surmised that "I am only the messenger","don't
shoot the messenger". It was further made apparent to me and it is my opinion that both Mr.
Roerig and Dr. Sauceda were taking a premeditated and biased approach without fully
understanding the complete picture on this issue. The mere fact that this contract was "shoved
down our throats" and being recommended to Alford Insurance at the last minute of the last
hour and which required an amended correction by the Superintendent, in my opinion gave me

and possibly others on the board not only the right, but the responsibility to question important elements that are vital to a Worker's Compensation Plan, especially if the district's role is to be one of "Self-insurance" as described in Chapter 504 of the Texas Labor Code, "Workers' Compensation Insurance Coverage for Employees of Political Subdivisions." In addition, I took the liberty of contacting the Texas Workers' Compensation Commission (Self insurance Division) I was advised that there is no statutory rule or law that prohibits a public entity in recommending a particular loss control consulting firm or claims administrator. I also called the Texas Department of Insurance (Workers' Compensation Division), they also addressed that there is nothing statutorily prohibiting a public entity from recommending a particular loss control consulting firm or claims administrator. As you are well aware of, I as a board member have a fiduciary responsibility to the taxpayers of this community to ensure that their best interests are being protected. To give nearly seven million dollars (7,000,000.00) to a pool that is one year old concerns me. I believe that a local claims administrator/loss control consulting firm would attempt to reduce our exposure (as pass history has indicated) and ensure that there is a reduction of injuries and that the claims are adequate being investigated.

For the record, loss prevention services, agent of record, risk management, reinsurance carrier, risk pool, self-insurance, pool size, district's risk exposure and cost were some of the elements and issues that were being question and raised by several board members. Due to the fact that this insurance proposal was given to the board at the last minute to adopt, it was apparent that the administration was not fully prepared to answer some of the questions or concerns that some board members had. Example: 1) The initial excessive down payment of 1.9 million dollars that Edwards Risk Management was asking, was raised at a conference meeting with Mr. Colunga, Dr. Sauceda, Mr. Dunn, Mr. Errisuriz and members of Alford Insurance and Edwards Risk Management, which took place at 2:00 p.m, on August 27, 2001, in Dr. Sauceda's conference room. The answer that the Administrative staff gave me, was that two (2) million dollars were paid up front for the Workers' Compensation Plan last year. Information from our current carrier (see attachment) who is represented by Mr. J. Cavazos, indicated, that BISD was billed in twelve (12) equal installments for premiums. This information does not coincide with, the Administration's previous statement. I confronted Mr. Errisuriz on this issue and he apologized and told me that he had been given erroneous information by his staff. 2) The board was led to believe that 20 employers would participate in the pool, when later it was learned that only 10 employers were to participate. 3) Alford Insurance made the declaration that this pool was insured by Employers Reinsurance Group to insure the guaranteed stop loss. Upon requesting such proof, there was no commitment letter by the carrier. This posed a tremendous risk to BISD at the time this proposal was being recommended. 4) During the August 21, 2001, school board meeting, Mr. Alford made the assertion that approximately $275,000.00 would be spent for loss control services to make the program successful, meeting the state insurance standards for this purpose by 3% or more. In my conversation with Mr. Edwards, I asked for a breakdown of the initial $1.9 million (see attachment). The amount that was assigned for Loss Control was $120,000.00, short changing BISD by over $155,000.00. When I asked Mr. Alford of this short fall, he stated that both the $60,366.00 (total of $120,732.00) for drug testing and employee safety equipment could be put into loss control services. 5) Mr. Alford was asked at the board

meeting if the district could name its own loss control agent or agents for that matter, Mr. Alford responded in the affirmative.

In my opinion, both Dr. Sauceda and Mr. Roerig should have used discretion on this matter. I resent the repeated comments and innuendo made by Mr. Roerig referring to board members as criminals and that board members should hire criminal attorneys for "your own sake". I take exception to the fact that Mr. Roerig, was quick to pass judgement by siding with a vendor's point of view without first learning facts and forgetting that there is always two sides to every story. If I am not mistaken, Mr. Roerig is contracted by the board of trustees to serve the interest of board members and the district as a whole. Mr. Roerig must not forget that not long ago he and or members of his firm engaged in the following:

- Mr. Roerig's attempt to solicit for a contract by personally handing me a prospectus outside the confines of a regularly scheduled board meeting or having members of his law firm solicit me on his behalf for such a contract.

- Mr. Roerig allowing a motion at a regularly scheduled meeting to be amended to favor him and the firm he represents, when Mr. Roerig knows that his recommendation may not be proper and may be perceived to be unethical and not necessarily in the best interest of the district. Such action could be construed as a conflict of interest on his part.

In closing, I am truly disappointed at the actions of Mr. Roerig, who at minimum owes me an apology and should seriously consider removing himself as the BISD board attorney. As for Dr. Sauceda, he is quickly demonstrating to this board member that he may be leading this district in an adverse direction and is not making a whole hearted effort to act in good faith. It appears to me that he may have instructed Mr. Alford to lodge a concern, in writing against me and this troubles me immensely. I hope that I am wrong, but I sense that Dr. Sauceda and Mr. Roerig may have acted in a collusive state and may have attempted to mislead this school board member. **Dr. Sauceda should not forget that communication is essential to stable superintendent/board relations and lack of discourse leads to mistrust and doubt.**

Sincerely,

Pat Lehmann

cc: Dr. Noe Sauceda
    Mr. Jeff Roerig
    Board Members

# EXHIBIT-14

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,              ) (
FERNANDO DE PENA,               ) (
VALENTIN PAZ and ANDRUS         ) (
& PAZ, A Partnership            ) (
                                ) (
VS.                             ) (   B-02-143
                                ) (
BROWNSVILLE INDEPENDENT         ) (
SCHOOL DISTRICT, NOE            ) (
SAUCEDA, and EDDIE              ) (
ERRISURIZ, JR.                  ) (

*********************************************************

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ                  ) (
                                ) (
VS.                             ) (   B-02-128
                                ) (
BROWNSVILLE INDEPENDENT         ) (
SCHOOL DISTRICT, NOE            ) (
SAUCEDA, MARILYN DEL            ) (
BOSQUE-GILBERT and              ) (
RANDALL DUNN                    ) (

---

ORAL AND VIDEOTAPED DEPOSITION OF
HERMAN OTIS POWERS, JR.
MAY 29, 2003

---

HILL & ROMERO
CERTIFIED COURT REPORTERS



9

09:22  1    document?

09:22  2         A.   Oh, yes.  This is a bid document, yes, sir.

09:22  3         Q.   This particular bid document was for the RF --

09:22  4    could you tell us what this bid document was for?

09:22  5         A.   Well, according to this, this is an RFQ --

09:22  6         Q.   Which is?

09:22  7         A.   -- for a -- request for qualifications for a

09:22  8    third party administrator to handle the cafeteria plan

09:23  9    125 --

09:23  10        Q.   Okay.

09:23  11        A.   -- and tax deferred annuities.

09:23  12        Q.   Okay.  Now, from your understanding, was BISD

09:23  13   going to be the third party administrator --

09:23  14        A.   No.

09:23  15        Q.   -- in looking at that?

09:23  16        A.   No.  No.  You have to hire somebody to do the

09:23  17   TPA.

09:23  18        Q.   Is it pretty clear to you that what BISD is

09:23  19   asking is for people to submit bids or proposals for

09:23  20   somebody else --

09:23  21        A.   Right.

09:23  22        Q.   -- to be the third party administrator, not

09:23  23   BISD?

09:23  24        A.   Correct.

09:23  25        Q.   Okay.  This particular TPA request provided I

HILL & ROMERO
CERTIFIED COURT REPORTERS

09:23  1  believe on the -- starting on the fifth line in the

09:23  2  first paragraph, the RFQs will be received until

09:23  3  Thursday, September 6th, 1:30 p.m.  What does that

09:23  4  mean?

09:23  5      A.  They're filing the procurement.  That means

09:23  6  that's the final time, date.

09:23  7      Q.  And to put it in perspective, when somebody

09:23  8  submits a bid by -- in this case the failing to submit

09:23  9  your bid or proposal would be September 6th of 2001; is

09:23  10  that right?

09:23  11      A.  If that's what is required, yes.

09:23  12      Q.  And is that what it looks to you like it's

09:23  13  requiring?

09:24  14      A.  Yes.

09:24  15      Q.  Okay.  If bids are going to be -- if bids are

09:24  16  going to be changed after September 6th, are there any

09:24  17  rules relating to how they can be changed?

09:24  18      A.  I'm not an attorney, but I'm assuming they

09:24  19  would have to do an amendment to the RFQ --

09:24  20      Q.  Okay.

09:24  21      A.  -- to assess the qualifications before they can

09:24  22  allow bids.

09:24  23      Q.  Okay.

09:24  24      A.  Because I'm not an attorney or nor was I an

09:24  25  administrator who follows these things.

09:24  1      Q.  Okay.  I'm just asking for your understanding.

09:24  2      A.  Right.

09:24  3      Q.  So if they changed it -- if somebody wanted to

09:24  4   change the bidding allowances, would those, your

09:24  5   understanding -- would your understanding be that the

09:24  6   procedure would be to allow everybody who submitted a

09:24  7   bid to modify theirs as well?

09:24  8      A.  Correct.

09:24  9             MS. LEEDS:  Object to the form.

09:24 10      Q.  And did you understand, based on this document

09:24 11   at least, September 6th would have been the deadline to

09:24 12   file all bids?

09:24 13      A.  Yes, sir.

09:24 14      Q.  Okay.  If you turn to the third page where it

09:25 15   talks about scope and intent, this document, the first

09:25 16   paragraph is talking about what they're actually

09:25 17   requesting information on, right?

09:25 18      A.  Uh-huh, yes.

09:25 19      Q.  And it includes both the BISD cafeteria plan,

09:25 20   which is Section 125, and the tax deferred annuity

09:25 21   program under 403(B) and 403(B)(7).

09:25 22      A.  Yes.

09:25 23      Q.  Is that right?

09:25 24      A.  Yes, sir.

09:25 25      Q.  Had you been familiar with prior RFQs for the

                         HILL & ROMERO
                    CERTIFIED COURT REPORTERS

```
10:18  1            (Exhibit No. 4 marked).

10:19  2       Q.  I'm handing you what I marked as Powers Exhibit

10:19  3   4.  Do you recognize that document?

10:19  4       A.  Yes, from Mr. Lehmann.

10:19  5       Q.  This is a memo from Mr. Lehmann to Board

10:19  6   President Colunga.  Do you recall what brought this up?

10:19  7       A.  It --

10:19  8       Q.  Let me ask you first, have you reviewed this

10:19  9   before today?  Have you ever seen this document?

10:19 10       A.  Yeah, I've seen this document.  Yes.  All the

10:19 11   board members received it.

10:19 12       Q.  Okay.  And what was the concern Mr. Lehmann

10:19 13   had?

10:19 14       A.  The same concerns I had on that conversation

10:19 15   that was held with Noe Sauceda and Jeff Roerig.  And

10:19 16   his letter is self-explanatory.

10:19 17       Q.  Okay.  He indicated Mr. Roerig presented him

10:19 18   with a letter from Mr. Alford --

10:19 19       A.  Yes.

10:19 20       Q.  -- which is -- it's the attachment, but I'm not

10:19 21   sure what the attachment was, telling him this was

10:20 22   serious and that he should not be talking to vendors

10:20 23   nor should he associate with them for any reason,

10:20 24   especially if the conversation might be about business.

10:20 25   Dr. Sauceda reiterated the same remarks that were made
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

10:20  1    by the attorney, Mr. Roerig.  And you -- it indicates

10:20  2    that you and Mr. Lehmann objected to the content of the

10:20  3    letter and to its implications.

10:20  4        A.   Correct.

10:20  5        Q.   What was your objection?

10:20  6        A.   Because administration had -- Alford called

10:20  7    Pat, Mr. Lehmann, because we house in the same place

10:20  8    and I was there.  And when we had questions, they're

10:20  9    the ones who had the vendors call us in regards to that

10:20 10    contract.

10:20 11        Q.   Okay.  He indicated Mr. Roerig's -- in the last

10:20 12    paragraph on the first page.  It was made clear to me

10:20 13    at this meeting that Mr. Roerig's intent was to

10:20 14    chastise, frighten, incite and threaten both him and

10:20 15    you.  Did you get that impression as well?

10:20 16        A.   Yes.

10:20 17        Q.   What did you understand the rationale or the

10:20 18    reason was for that?

10:20 19             MS. LEEDS:  Object to the form.

10:21 20             MR. SALDANA:  Objection to the form.

10:21 21        Q.   In other words, why were they doing that?

10:21 22             MS. LEEDS:  Object to the form.

10:21 23             MR. SALDANA:  Objection; calls for

10:21 24    speculation.

10:21 25        A.   They -- personally, I mean, I think once you

10:21 1    question Dr. Sauceda -- to me it was just a mere

10:21 2    attempt to start a paper trail where he was trying to

10:21 3    get board governance instead of us just going over the

10:21 4    agenda and doing what's right.

10:21 5        Q.  He goes on to say in that paragraph, it was

10:21 6    further made apparent to me and it is my opinion that

10:21 7    both Mr. Roerig and Dr. Sauceda were taking a

10:21 8    premeditated and biased approach without fully

10:21 9    understanding the complete picture on this issue.  Did

10:21 10   you get that impression as well?

10:21 11       A.  Yes.  I agree on that.

10:21 12       Q.  He continues, the mere fact this contract was,

10:21 13   quote, shoved down our throats, close quote, and being

10:21 14   recommended to Alford at the last minute of the last

10:21 15   hour which required amended correction by the

10:22 16   superintendent.  Did you get that impression as well?

10:22 17           MS. LEEDS:  Object to the form.

10:22 18       A.  Yes.

10:22 19       Q.  On the next page, the first paragraph, it says,

10:22 20   second sentence, I resent the repeated comments and

10:22 21   innuedos made by Mr. Roerig in front of the board

10:22 22   members as criminals and that board members should hire

10:22 23   criminal attorneys for, quote, your own sake.  Do you

10:22 24   recall him making that comment?

10:22 25       A.  Yes.

10:25 1      Q.  Okay.  Did he ever do the same to you?

10:25 2      A.  Yes.

10:25 3      Q.  What did he do?

10:25 4              MS. LEEDS:  Object to the form.

10:25 5      A.  He gave us a prospectus like resume.  He gave

10:25 6   us his resume.

10:25 7      Q.  The firm resume?

10:25 8      A.  Yeah.

10:25 9      Q.  Did you feel that he was attempting to promote

10:25 10  his own firm for being -- to be retained as counsel for

10:25 11  the district?

10:25 12     A.  Oh, yes.

10:25 13             MS. LEEDS:  Object to the form.

10:25 14     Q.  The second item was, Roerig allowing a motion

10:25 15  at a regularly scheduled meeting to be amended to favor

10:25 16  him and the firm he represents when Mr. Roerig knows

10:25 17  that his recommendation may not be proper and may be

10:25 18  perceived to be unethical and not necessarily in the

10:25 19  best interest of the district.  Such action could be

10:25 20  construed as a conflict of interest on his part.  Were

10:25 21  you familiar with what happened at that meeting?

10:26 22     A.  Yes.

10:26 23     Q.  Do you agree with that characterization?

10:26 24             MS. LEEDS:  Object to the form.

10:26 25     A.  Yes.

10:26  1      Q.  Did you also feel that he might have had a

10:26  2  conflict of interest in making that recommendation?

10:26  3          MS. LEEDS:  Object to the form.

10:26  4          MR. SALDANA:  Join.

10:26  5      A.  Yes.

10:26  6      Q.  Okay.  The letter goes on to say, second to the

10:26  7  last sentence, I hope that I am wrong but I sense that

10:26  8  Dr. Sauceda and Mr. Roerig may have acted in a

10:26  9  collusive state and may have attempted to mislead the

10:26 10  school board member.  Did you sense the same?

10:26 11          MS. LEEDS:  Object to the form.

10:26 12          MR. SALDANA:  Join.

10:26 13      A.  Yes.

10:26 14      Q.  I'm sorry?

10:26 15      A.  Yes.

10:26 16          (Exhibit No. 5 marked).

10:26 17      Q.  I'm handing you what I'm marking as Powers

10:26 18  Exhibit 5.  This is a letter dated September 13th of

10:27 19  2001 addressed to Mr. Lehmann.  Did you ever see this

10:27 20  document before today?

10:27 21      A.  Yes.

10:27 22      Q.  This document appears to be a response to Mr.

10:27 23  Lehmann's concerns?

10:27 24      A.  Correct.

10:27 25      Q.  Did Mr. Roerig also provide you with a copy?

11:01  1    letter was in response to Dr. Sauceda's November 29th

11:01  2    letter?

11:01  3        A.  Yes.

11:01  4        Q.  And then you were writing her, Powers Exhibit

11:01  5    7?

11:01  6        A.  Right.

11:01  7        Q.  Which was a response to her letter?

11:01  8        A.  Correct.

11:01  9        Q.  Okay.  Did you think Dr. -- I'm sorry, Mr.

11:02  10   Chavez had done anything wrong up to that point?

11:02  11       A.  No, sir.

11:02  12       Q.  Okay.  Dr. Sauceda is mentioning in his letter

11:02  13   -- the November 29th letter that he's non-renewing Mr.

11:02  14   Chavez' services as the TPA for the cafeteria plan, and

11:02  15   under his authority he's rejecting his proposal for the

11:02  16   next year's contract.  Do you understand that?

11:02  17       A.  Yes, sir.

11:02  18       Q.  Okay.  He references continuous inappropriate

11:02  19   correspondence.  Are you aware of any inappropriate

11:02  20   correspondence?

11:02  21       A.  No, sir.

11:02  22           MS. LEEDS:  Object to the form.

11:02  23       Q.  Now, Mr. Chavez did send some letters to you

11:02  24   and to others that you're aware of, right?

11:02  25       A.  Yes, yes.

11:02 1     Q.   He sent some letters to you?

11:02 2     A.   Yes.

11:02 3     Q.   He might have also sent some letters to others;

11:02 4   you may or may not have reviewed them?

11:02 5     A.   Correct.

11:02 6     Q.   The letters he sent to you, were any of those

11:02 7   inappropriate?

11:02 8             MS. LEEDS:  Object to the form.

11:02 9     A.   No.

11:02 10    Q.   Did you have any complaint or concern that he

11:03 11  shouldn't be sending those letters to you?

11:03 12    A.   No.

11:03 13    Q.   If he sent letters to the insurance committee

11:03 14  members complaining about a possible legal violation,

11:03 15  do you have any concerns with him doing that?

11:03 16            MS. LEEDS:  Object to the form.

11:03 17            MR. SALDANA:  Join.

11:03 18    A.   I don't know if he did that or not.

11:03 19    Q.   If he had done that, would you have any

11:03 20  complaint or concern about doing that?

11:03 21           MR. SALDANA:  Object to the form --

11:03 22           MS. LEEDS:  Join.

11:03 23           MR. SALDANA:  -- especially without Mr.

11:03 24  Powers having the opportunity to see the reference

11:03 25  correspondence that you're talking to.  It would be

11:29  1              MS. NEALLY:  Objection; form.

11:29  2              MS. LEEDS:  Object to the form.

11:29  3      A.  Mr. Colunga felt Dunn was too involved.  That's

11:29  4  what I was told, so other than that --

11:29  5      Q.  Okay.  Do you know what the relationship was

11:29  6  between Mr. Dunn and Elizabeth Parra?

11:29  7              MS. LEEDS:  Object to the form.

11:30  8              MS. NEALLY:  Objection; form, relevancy.

11:30  9      A.  A friend.

11:30 10      Q.  In other words, do you know whether they were

11:30 11  living together?

11:30 12              MS. LEEDS:  Object to the form.

11:30 13      A.  For a fact, no.

11:30 14      Q.  Okay.  You heard that, but you just don't know

11:30 15  personally?

11:30 16      A.  No, not personally.

11:30 17      Q.  Okay.  But you have heard that?

11:30 18      A.  Yes, but I don't know personally.

11:30 19      Q.  Okay.

11:30 20      A.  But I heard it.

11:30 21              (Exhibit No. 12 marked).

11:30 22      Q.  I'm handing you what I'm marking as Powers 12.

11:30 23  Do you recognize that document?

11:30 24      A.  Yes, sir.

11:30 25      Q.  This was a memo from Mr. Colunga to

HILL & ROMERO
CERTIFIED COURT REPORTERS

11:30  1    Dr. Sauceda?

11:30  2        A.  Yes, sir.

11:30  3        Q.  Apparently responding to a memo from Mr. Roerig

11:30  4    about the appointment of you as chair of the insurance

11:30  5    committee.

11:30  6            MS. NEALLY:  Objection; form.  And I'm

11:30  7    also going to raise the objection here again,

11:30  8    understanding that we're not waiving any

11:31  9    attorney/client privilege.

11:31  10       Q.  And I believe -- what did you understand him to

11:31  11   be saying in this letter?

11:31  12           MS. LEEDS:  Object to the form.  The

11:31  13   document speaks for itself.

11:31  14       A.  I think it's within his authority --

11:31  15       Q.  Okay.

11:31  16       A.  -- to replace the chair with me.

11:31  17       Q.  In other words, he was sticking to his position

11:31  18   to appoint you as chair, right?

11:31  19       A.  Yes, sir.

11:31  20       Q.  He makes a comment in here, the second

11:31  21   paragraph, second sentence, "Mr. Roerig's actions give

11:31  22   me great concern in whether he is ethically fulfilling

11:31  23   his role as counsel for BISD or rather is more

11:31  24   interested in maintaining his contract and pushing what

11:31  25   appears to be your private agenda."  Did you have a

11:31  1    similar concern?

11:31  2                    MS. LEEDS:  Object to the form.

11:31  3                    MS. NEALLY:  Objection; form.

11:31  4        A.  We had some rough times during that year, yes.

11:31  5        Q.  Did you have a concern that Mr. Roerig might be

11:31  6    providing opinions that were overly restrictive just so

11:32  7    they could allow Dr. Sauceda to do what he wanted in

11:32  8    certain circumstances?

11:32  9                    MS. LEEDS:  Object to the form.

11:32  10                   MS. NEALLY:  Objection; form.

11:32  11       A.  Yes.

11:32  12       Q.  In the second page, the first sentence starts,

11:32  13   "The reasons for my comments above derive from

11:32  14   information received from TEA."  You talked to us

11:32  15   earlier about the report you made to TEA.  Did you talk

11:32  16   to Mr. Colunga about any report or comments he had

11:32  17   received from -- rather, the information he received

11:32  18   from TEA?

11:32  19       A.  In regards to changing the chair?

11:32  20       Q.  In other words, are those two related, those

11:32  21   two things I'm talking about?  In other words, you had

11:32  22   previously gone to TEA, right?

11:32  23       A.  Right.

11:32  24       Q.  And he's talking about -- the reasons for his

11:32  25   comments derived from information he received from TEA.

IN THE UNITED STATES DISTRICT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STEPHEN M. ANDRUS, | ) ( | |
| FERNANDO DE PENA, | ) ( | |
| VALENTIN PAZ and ANDRUS | ) ( | |
| & PAZ, A Partnership | ) ( | |
| | ) ( | |
| VS. | ) ( | B-02-143 |
| | ) ( | |
| BROWNSVILLE INDEPENDENT | ) ( | |
| SCHOOL DISTRICT, NOE | ) ( | |
| SAUCEDA, and EDDIE | ) ( | |
| ERRISURIZ, JR. | ) ( | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DINO X. CHAVEZ | ) ( | |
| | ) ( | |
| VS. | ) ( | B-02-128 |
| | ) ( | |
| BROWNSVILLE INDEPENDENT | ) ( | |
| SCHOOL DISTRICT, NOE | ) ( | |
| SAUCEDA, MARILYN DEL | ) ( | |
| BOSQUE-GILBERT and | ) ( | |
| RANDALL DUNN | ) ( | |

REPORTER'S CERTIFICATION
DEPOSITION OF HERMAN OTIS POWERS, JR.
May 29, 2003

I, LOU ZUNIGA, Certified Court Reporter in and for

the State of Texas, do hereby certify that the above

and foregoing contains a true and correct transcription

of the oral deposition of HERMAN OTIS POWERS, JR.;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this *17th* day of *June*, 2003.


LOU ZUNIGA, Texas CSR 2198
Expiration Date: 12-31-03
Hill & Romero
5415 North McColl, Suite 107
McAllen, Texas  78504
(956) 994-8898

# EXHIBIT-15

February 13, 2002

Dr. Noe Sauceda
1900 East Price Road
Brownsville, Texas 78521

RE: Insurance Committee Chairmanship
School Counsel's Opinion Letter.

Dear Dr. Sauceda,

I am in receipt of the opinion letter solicited by you from Mr. Jeffrey Roerig, counsel for BISD. With all due respect to Mr. Roerig, my decision to replace the current chair stands. I also took the opportunity to research local and legal policy, and additionally received input from TEA and TASB. There is no prohibition of my actions anywhere in policy or at law. Local policy BDAB gives the Board President the power to appoint all committees. BDAB (legal) additionally, does not limit the President's power in any way but rather expressly states that the powers of the President are not limited to the laundry list provided. BDB (local) provides only for the appointment of standing committees and for dissolution of same as a matter of policy. Nowhere in BDB (local) does there exist any criteria for removal of chairs or members, or criteria for appointment of chairs or members or number of members of a committee. An objective reading of BDB (local) can at best be called silent on the issue at hand.

Please be advised Mr. Roerig's opinion is extremely narrow and obviously concocted as he fails to adequately address other relevant issues (discussed below) and presents his opinion adversarially as opposed to advisory. Mr. Roerig's actions give me great concern in whether he is ethically fulfilling his role as counsel for BISD or rather is more interested in maintaining his contract and pushing what appears to be your private agenda. I can only hope that you will remind Mr. Roerig that he has not been elected by the citizens of Brownsville. Mr. Roerig's contract is not only for the representation of the superintendent or a few select board members that he is politically involved with, but rather for the entire entity of BISD. Mr. Roerig's function is strictly an advisory staff function and he has no line or chain of command authority either for the board or administration.



BISD does not discriminate on basis of race, color, sex to...

BISD 00141

Dr. Noe Sauceda
February 13, 2002
Page -2-

---

The reason for my comments above derive from information received from TEA. The Agency, upon inquiry expressed concern that this opinion letter was solicited by you and not by a board member. The agency stated that the matter of standing committees is strictly within the province of the Board and its members and that the Superintendent is not a part of that process. Please see § 11.151(b) and (d) of the Texas Education Code. The Agency advised that you should not be inappropriately spending district money obtaining expensive legal opinions over matters that are not subject to your authority or supervision.

As to the removal of Mr. Dunn as insurance chair, this was done not by caprice or fiat; rather it was a result of a deliberate decision by me that the best interests of the District are no longer being served by Mr. Dunn remaining as chair. Among other matters, it has come to my attention that the individual that is the TASB medical insurance plan representative is also a current consultant paid by the District. This is an egregious conflict of interest that Mr. Dunn failed to reveal to myself or other board members. Furthermore, your refusal to go out for bids coupled with Mr. Dunn's insistence that the TASB plan be railroaded through gives me concerns that you and Mr. Dunn have violated BDB (legal). It appears that you and Mr. Dunn have been conducting meetings with insurance representatives, both in Brownsville and out of town, and closing deals without benefit of notice, hearing, and board approval as required by BDB (legal). These actions have deprived the employees of BISD of any opportunity to express their concerns and desires regarding our medical insurance coverage. This is not in the best interest of the district or in the spirit of open government as BDB (legal) requires.

Therefore, be further advised that I am requesting that you, Mr. Roerig, or any other member of administration refrain from any further interference in matters that you have no authority at law or by policy. Any further interference by you in the Board's internal affairs shall immediately be reported to TEA for further investigation.

BISD 00142

Dr. Noe Sauceda
February 13, 2002
Page -3-

_____

Your prompt compliance with my request is strongly urged.

Sincerely,

*Joe Colunga*

Joe Colunga
Board President - BISD

JC

xc:    Linda Salazar
       Hugh Emerson
       Marilyn Del Bosque-Gilbert
       Randy Dunn
       Pat Lehman
       Otis Powers

BISD 06143

# EXHIBIT-16

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

```
STEPHEN M. ANDRUS,          )(
FERNANDO DE PENA,           )(
VALENTIN PAZ and ANDRUS     )(
& PAZ, A Partnership        )(
                            )(
VS.                         )(    B-02-143
                            )(
BROWNSVILLE INDEPENDENT      )(
SCHOOL DISTRICT, NOE        )(
SAUCEDA, and EDDIE          )(
ERRISURIZ, JR.              )(
```

*********************************************************

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

```
DINO X. CHAVEZ              )(
                           )(
VS.                        )(    B-02-128
                           )(
BROWNSVILLE INDEPENDENT      )(
SCHOOL DISTRICT, NOE        )(
SAUCEDA, MARILYN DEL        )(
BOSQUE-GILBERT and          )(
RANDALL DUNN               )(
```

---

ORAL AND VIDEOTAPED DEPOSITION OF
JOE COLUNGA, III
AUGUST 20, 2003

---

HILL & ROMERO
CERTIFIED COURT REPORTERS



09:51  1      Q.  Okay.  Let me go ahead and continue with

09:51  2  Sauceda Exhibit 16.  This is a letter from Ms. Baker to

09:51  3  -- addressed to Mr. Lehmann dated January 8, 2002

09:51  4  writing to apologize for any negative action that may

09:51  5  have been caused by the AFLAC representative Dino

09:51  6  Chavez.  Did you get a copy of this letter, also?

09:52  7      A.  This particular letter, no.

09:52  8      Q.  Okay.  Did you get another one that said pretty

09:52  9  much the same thing?

09:52  10     A.  Right, addressed to me.

09:52  11     Q.  Okay.  I'm handing you what had previously been

09:52  12  marked Sauceda Exhibit 19.  And is that the response

09:52  13  you wrote to the copy of the letter similar to Sauceda

09:52  14  Exhibit 16 that you received?

09:52  15     A.  Yes.

09:52  16     Q.  You indicate in the second paragraph, "I was

09:52  17  not aware of any negative complaints against Mr.

09:52  18  Chavez."  Had you ever heard any prior to -- what is

09:52  19  the date of this letter, February 6th, 2002.  Had you

09:52  20  ever heard any negative complaints about Mr. Chavez'

09:52  21  actions in servicing any of these AFLAC accounts or any

09:52  22  other accounts as TPA?

09:52  23     A.  No.

09:52  24     Q.  Okay.  Nobody ever complained to you saying,

09:52  25  look, Mr. Chavez is doing a terrible job.  I can't

HILL & ROMERO
CERTIFIED COURT REPORTERS

09:52  1    believe you still have him.  Anything like that, right?

09:52  2        A.  That's correct.

09:53  3        Q.  Okay.  You go on to say, "until the letter went

09:53  4    out from the superintendent requesting an apology to

09:53  5    board members."  I personally did not request one.

09:53  6    Does that mean you didn't request any apology?

09:53  7        A.  Well, going back to the letter from

09:53  8    Dr. Sauceda.

09:53  9        Q.  Dr. Sauceda's letter of November 29th?

09:53  10       A.  It indicated that it was calling for an apology

09:53  11   to each board member.

09:53  12       Q.  That's in that blocked section, first letter A,

09:53  13   that says, "A corporate officer must personally

09:53  14   apologize to each board member, the board as a whole,

09:53  15   myself and my administrators publicly."

09:53  16       A.  Right.

09:53  17       Q.  In other words, he was asking for that from I

09:53  18   guess Mr. Chavez or somebody from AFLAC?

09:53  19       A.  Right.

09:53  20           MS. NEALLY:  Object to the form of the

09:53  21   letter -- the form of the question.  The letter speaks

09:53  22   for itself.

09:53  23       Q.  Is that what you were responding to --

09:53  24           MS. NEALLY:  Calls for speculation.

09:53  25       Q.  -- in the part I just read, "I personally did

HILL & ROMERO
CERTIFIED COURT REPORTERS

10:13 1   wanted to maintain his contract?

10:13 2             MS. NEALLY:  Object to the form of the

10:13 3   question.

10:13 4             MS. LEEDS:  Join; speculation.

10:13 5        A.  Not so much in terms of a contract.  I didn't

10:13 6   think it was appropriate -- an appropriate role for the

10:13 7   board attorney to --

10:14 8        Q.  To be taking?

10:14 9        A.  Right.  Because of the -- the question of

10:14 10  whether it's a board attorney or is it an attorney for

10:14 11  administration.

10:14 12       Q.  Board attorney or superintendent's attorney?

10:14 13       A.  Yes.

10:14 14       Q.  Okay.  And you also indicated you thought he

10:14 15  was pushing what appears to be Dr. Sauceda's private

10:14 16  agenda.  What was that referring to?

10:14 17       A.  It's just a broad term to indicate those areas

10:14 18  that he did not communicate with the board about it as

10:14 19  far as plans or goals.  If there was anything that we

10:14 20  weren't aware of as a board, then it would be a part of

10:15 21  his own private agenda.

10:15 22       Q.  Okay.  I'm handing you what has been marked as

10:15 23  Powers Exhibit 13.  This is the contract -- employment

10:15 24  contract between Roerig, Oliveira & Fisher and

10:15 25  Brownsville ISD.  Do you recognize that document as

HILL & ROMERO
CERTIFIED COURT REPORTERS

10:15  1    that?

10:15  2        A.  Yes.

10:15  3        Q.  Now, if you look at the first page, the very

10:15  4    last sentence indicates -- no, actually Paragraph 3

10:15  5    indicates that basically the attorney and

10:15  6    superintendent work on a certain number of hours in a

10:15  7    calendar month.  The very last sentence indicates that

10:16  8    only the superintendent can authorize further legal

10:16  9    services after that limit is reached.

10:16  10       A.  Yes.

10:16  11       Q.  Was that your understanding of the

10:16  12   authorization basis?

10:16  13       A.  Yes.

10:16  14       Q.  In other words, they're supposed only spend 130

10:16  15   hours a month, but if they have to spend more than that

10:16  16   it's up to the superintendent to make that decision?

10:16  17       A.  Correct.

10:16  18       Q.  If you turn to the next page, there's some

10:16  19   handwritten language.  After Dr. Sauceda's signature,

10:16  20   there's some handwritten language.  Were you familiar

10:16  21   with that handwritten language?

10:16  22       A.  I had seen it as the final copy that was signed

10:16  23   by the superintendent and the attorney, but it was --

10:17  24   you know, it was something that was inserted there

10:17  25   without my being aware of it.

HILL & ROMERO
CERTIFIED COURT REPORTERS

10:17  1    Q.   That's what I was going to ask.   Were you aware

10:17  2    that that language had been inserted there when this --

10:17  3    A.   No.

10:17  4    Q.   -- document was originally given to you?

10:17  5            MS. NEALLY:   Objection; asked and

10:17  6    answered.

10:17  7    Q.   I'm sorry.   You didn't answer -- I didn't hear.

10:17  8    A.   I was not aware.

10:17  9            MS. NEALLY:   He said -- yeah.

10:17  10   Q.   And the language appears to say, "Law firm's

10:17  11   acceptance is conditioned on it being the exclusive

10:17  12   lawyer for the traditional board lawyer fees."   Is that

10:17  13   right?

10:17  14   A.   I believe that says fees.

10:17  15   Q.   Can you explain what that means?

10:17  16           MS. NEALLY:   I'm going to object to the

10:17  17   extent that the last word is not clear.

10:17  18           MS. LEEDS:   Calls for speculation.

10:17  19           MS. NEALLY:   And I object to the extent it

10:17  20   calls for speculation.   He's already said he didn't see

10:17  21   it.

10:18  22   A.   I couldn't answer one way or the other

10:18  23   because --

10:18  24   Q.   Okay.   Well, let me ask --

10:18  25   A.   -- the words come from the -- you know, the

HILL & ROMERO
CERTIFIED COURT REPORTERS

10:18  1    party that inserted it.

10:18  2        Q.  Right.  In other words, you weren't aware of

10:18  3    that language being in the contract between the

10:18  4    district and the attorneys, right?

10:18  5        A.  Right.

10:18  6            MS. NEALLY:  Objection; asked and

10:18  7    answered.

10:18  8        Q.  As far as the language, the exclusive lawyer

10:18  9    for the traditional board lawyer fees, do you know what

10:18  10   that language means?  In other words, what does it mean

10:18  11   to the exclusive lawyer for BISD, for starters?

10:18  12           MS. LEEDS:  Objection; calls for

10:18  13   speculation.

10:18  14           MR. AGUILAR:  I hope it doesn't.

10:18  15           MS. LEEDS:  Well, as to what the writer

10:18  16   meant.

10:18  17           MR. AGUILAR:  No, I'm asking for the

10:18  18   attorney.

10:18  19           MS. NEALLY:  To the extent that calls for

10:18  20   a legal conclusion --

10:18  21           MS. LEEDS:  As to what the writer meant.

10:18  22           MS. NEALLY:  -- and speculation, I object

10:18  23   to the question.

10:18  24       Q.  You can answer.

10:18  25           MR. AGUILAR:  If you two each want to look

10:18  1    at a copy, I have got an extra one here so that you can

10:19  2    be looking at one, too.

10:19  3        Q.  What does it mean to be the exclusive lawyer?

10:19  4    In other words, let me try to break it down this way.

10:19  5    You've got a number of -- you've got the official board

10:19  6    lawyer, right?

10:19  7        A.  Yes.

10:19  8        Q.  Okay.  Oftentimes that board lawyer may need to

10:19  9    contract or may have specific items that he can

10:19 10    contract out to different people, different other

10:19 11    lawyers, right?

10:19 12        A.  Uh-huh.

10:19 13        Q.  Or he can do that job himself, right?

10:19 14        A.  Right.

10:19 15        Q.  If you're the exclusive lawyer for the

10:19 16    district, do you understand that to mean that basically

10:19 17    no other lawyers would be hired?

10:19 18              MS. NEALLY:  Objection; calls for

10:19 19    speculation.

10:19 20              MS. LEEDS:  Join.

10:19 21              MS. NEALLY:  He's already said he does --

10:19 22    he's not seen --

10:19 23        Q.  I'm just asking what the term means.  What do

10:19 24    you understand the term to mean?

10:19 25              MS. LEEDS:  Well, I need to object again

HILL & ROMERO
CERTIFIED COURT REPORTERS

10:19 1  because the term was written by another author so it's

10:19 2  speculation.

10:19 3      Q.  You can go ahead.

10:20 4      A.  That would be the -- the assumption is --

10:20 5      Q.  Okay.

10:20 6      A.  -- to be exclusively for the board's --

10:20 7      Q.  Okay.

10:20 8      A.  -- lawyer relationship.

10:20 9      Q.  Okay.

10:20 10     A.  But as far as what impact it would have in

10:20 11 other relationships with attorneys, it is not clear

10:20 12 based on that language.

10:20 13     Q.  Okay.  Turning to Page 2 of Powers 12.  This is

10:20 14 Powers 12, your letter to Dr. Sauceda, February 13th.

10:20 15 The first sentence indicates, "The reason for my

10:20 16 comments above derive from information received from

10:20 17 TEA."  Did you do a report to TEA?

10:20 18     A.  I had just communication with TEA, a phone --

10:20 19 phone communication.

10:21 20     Q.  You called up TEA?

10:21 21     A.  Yes.

10:21 22     Q.  And what did they tell you?

10:21 23     A.  It's in reference to the authority of the board

10:21 24 president and the authority with committees.

10:21 25     Q.  Basically -- basically did they tell you that

HILL & ROMERO
CERTIFIED COURT REPORTERS

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,               )(
FERNANDO DE PENA,                )(
VALENTIN PAZ and ANDRUS          )(
& PAZ, A Partnership             )(
                                 )(
VS.                              )(    B-02-143
                                 )(
BROWNSVILLE INDEPENDENT          )(
SCHOOL DISTRICT, NOE             )(
SAUCEDA, and EDDIE               )(
ERRISURIZ, JR.                   )(

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ                   )(
                                 )(
VS.                              )(    B-02-128
                                 )(
BROWNSVILLE INDEPENDENT          )(
SCHOOL DISTRICT, NOE             )(
SAUCEDA, MARILYN DEL             )(
BOSQUE-GILBERT and               )(
RANDALL DUNN                     )(

REPORTER'S CERTIFICATION
DEPOSITION OF JOE COLUNGA, III
August 20, 2003

I, LOU ZUNIGA, Certified Court Reporter in and for

the State of Texas, do hereby certify that the above

and foregoing contains a true and correct transcription

of the oral deposition of JOE COLUNGA, III;

HILL & ROMERO
CERTIFIED COURT REPORTERS

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this _2_ day of _September_, 2003.

_____
LOU ZUNIGA, Texas CSR 2190
Expiration Date: 12-31-03
Hill & Romero
10125 North 10th Street, Suite B
McAllen, Texas  78504
(956) 287-8898

HILL & ROMERO
CERTIFIED COURT REPORTERS

# EXHIBIT-17

THE STATE OF TEXAS    *
COUNTY OF CAMERON    *        EMPLOYMENT CONTRACT

This contract is entered into by and between the firm of ROERIG, OLIVEIRA &
FISHER, L.L.P., (hereinafter referred to as "Attorney"), of Brownsville, Cameron County,
Texas, and BROWNSVILLE INDEPENDENT SCHOOL DISTRICT, (hereinafter referred to
as "Client"
).

## WITNESSETH

That Client is in need of general legal advice and representation for the Brownsville
Independent School District.

1.  That Attorney will represent Client by advising and counseling, investigating the laws
and the facts at the direction of the Board of Trustees and Superintendent for a term of one year
from September 1, 2001 to  August 31, 2002

2.  In consideration of the services rendered and to be rendered to the Client by Attorney,
the Client agrees to pay the sum of $115.00 an hour.

3.  It is further agreed that attorney will notify the Superintendent of the hours expended
on behalf of Client on a weekly basis on each Friday afternoon and that the Superintendent will
be specifically advised of when the number of hours of legal services utilized in a calendar month
reaches 130 hours.  Only the Superintendent can authorize further legal services after that limit
is reached.

Employment Contract
contract - legal fees

**1 of 2**

BISD
6061
----



Powers
EXHIBIT NO. 13
5-29-03
Hill & Romero

Petitionein
EXHIBIT NO. 47
Peggy Bryant

4.  The parties hereto further agree that the above legal charge does not include any expenses for private investigators, long distance telephone charges, photocopying, facsimile transmissions, experts, witnesses, Court reporter transcripts, travel expenses for Attorney and investigators, court fees or court costs, bail bonds, scientific tests, photographs, witness expenses, or other expenses Attorney considers necessary for the proper representation of Client which shall be reimbursed to the attorney by the District or advanced by the District to the vendor in addition to the legal services fees.

5.  The parties hereto further agree that Attorney makes no promises, assurances, or guarantees to Client as to the outcome of any matter upon which it renders advice.

6.  Client hereby acknowledges that Client has carefully read this entire agreement, that Client fully understands and agrees to abide by all the terms, conditions, and obligations of this agreement, and that Client has received a true and correct copy of said agreement.

.SIGNED AND AGREED on this _22nd_ day of August, 2001.

BROWNSVILLE INDEPENDENT
SCHOOL DISTRICT

By: _____
Noe Sauceda
Superintendent of Schools

*Law firm's acceptance is conditioned on its being the exclusive lawyer for the traditional board Jackwyerfault*

ROERIG, OLIVEIRA & FISHER, L.L.P.

By: _____
Jeffrey D. Roerig

855 W. Price Road, Suite 9
Brownsville, Texas 78520
Telephone: (956) 542-5666
Facsimile:  (956) 542-0016

Employment Contract
contract - legal fees

2 of 2

BISD
6062
----

# EXHIBIT-18

Insurance Committee Meeting
October 30, 2001
4:00 P.M.

PAGE 1

**MEMBERS PRESENT:**     Randy Dunn, **Chair**
Herman Otis Powers, Jr., Committee Member
Pat Lehmann, Board Member
Marilyn Gilbert, Board Member
Linda Salazar, Board Member

**ALSO PRESENT:**     Dr. Noe Sauceda, Superintendent
Jesus Muniz, Chief Financial Officer
Johnny Pineda, Assistant Superintendent for Operations

**COMMITTEE'S GOAL:**   To review and discuss the Brownsville Independent School District
Cafeteria Plan (Section 125) and/or Tax-Deferred Annuities TPA.

**1. Meeting Called to Order – 4:00 p.m.**

**2. Administration's Introductory Remarks.**

Mr. Dunn – Dr. Sauceda.

Dr. Sauceda – Yes, sir, Mr. Chairman and members of the Committee at this time we are going to go ahead and begin with the agenda. Dr. Dunn what we are doing here is that we have asked each of the vendors who submitted a proposal for either TPA for the Cafeteria Plan or TPA for the Tax Deferred Annuities or vendors who submitted for both to present in the order as shown. I do have information that FlexBen Corporation has indicated that they will not be able to present today. So that is the fourth bullet we will drop. And before we start the presentations Mr. Dunn, I would like to make a comment. I know that I have heard a couple of people here refer to the other Insurance Committee Meeting just for clarification sake the other meeting that is going on is a committee of staff that has existed in BISD for many years but my understanding that recently over the last year or so that committee had not really been utilized. So in anticipation in this decision that we are going to discuss tonight we begin activating that staff committee meeting. Essentially what that staff committee will do is that it will work with the Third Party Administrator and Administration. As we review our current voluntary insurance programs and if we through the committee think that changes need to be made then that will trigger the response to begin looking at the products that we offer our staff. And so they are two very distinct groups. Our meeting today is a committee of the Board for Insurance. I did want to go on record that Mr. Dunn, and I know that you and I have talked, that the Administration's goal here is that we do not want to delay the decision here so that we get an enrollment issue coming out of this. The contract for our current TPA runs to the end of December. And if we are fortunate enough that the Board would support a recommendation today. Then that TPA or those TPA's will be able to use all of November and all of December to begin the enrollment process. So that the staff is not inconvenience and therefore the transition from now vendor to the one we will be working with will be as smooth as possible. And so with that introduction, Mr. Dunn we are ready to begin the presentations at your direction.

Mr. Dunn – We have five presenting.

Dr. Sauceda – We have five that is correct.

Mr. Dunn – Ten minutes each.



EXHIBIT NO. 4
6-17-03
Hill & Romero

nsurance Committee Meeting
### October 30, 2001
### 4:00 P.M.

## PAGE 2

Dr. Sauceda – Yes, sir.

Mr. Dunn – Who is the first one?

**3. Presentation of RFQ #012–02 regarding TPA to Administer BISD's Cafeteria Plan (Section 125) and/or Tax Deferred Annuities.**

Dr. Sauceda – Our first would be AFLAC. At this time, I will call on Mr. Dino Chavez to being the presentation.

## A. AFLAC:

Dr. Sauceda – And as the presenters present would you for the benefit of the Board and the audience you all submitted proposals for Cafeteria Plan and the Annuities or just the Cafeteria Plan?

Mr. Chavez – The proposal that we submitted was for Cafeteria Plan services, which is the same that we have had for the past three years. Just for the record my name is Dino Chavez. Thank you for giving me this opportunity to present today. I was born and raised in Brownsville. My office is located in Brownsville. At this time Mr. Chavez begins the presentation and gives a little background information on the following: No charge for Cafeteria Plan Services; Product participation is voluntary; A+ Rating; National Prestige/Highest Possible Ranking; Most Experienced; New employees enrolled year-round; Spanish Services/Materials; Price Stability; Superior Cafeteria Services; and Local agents, local office, and local service. It was a 10-minute presentation. After his presentation he asked the committee members if they had any questions.

Mr. Dunn – You show a fee of $450.00.

Mr. Chavez – That is not correct.

Mr. Dunn – Okay.

Mr. Chavez – No. We have zero fees and you are hearing it from my mouth right here. We normally charge a set of fees and we normally charge per person fees. All fees have been waived for the last three years and will continue to be waived. All fees what so ever.

Mr. Dunn – No fees what so ever.

Mr. Chavez – No fee what so ever. Zero fees. And that is in the proposal.

Mr. Dunn – Dr. Sauceda.

Dr. Sauceda – Just out of curiosity I understand the no fee and I certainly like that. So where does a company like AFLAC's when there isn't a fee to the district, I guess that is what you mean, that the district is not being charged.

Mr. Chavez – Correct.

Dr. Sauceda – How does a company like yourself (AFLAC) make their money?

Mr. Chavez – There are no fees to the district and there are no fees to the employees. There are zero fees. Let me say it again. There are no fees. We make our money just like any other insurance company does by

## Insurance Committee Meeting
### October 30, 2001
### 4:00 P.M.

#### PAGE 3

selling our product. And if you recall when I first started talking I mentioned that we sell three products to BISD employees currently. Our accident policy, our heart attack/stroke policy, and our VIP, which is our hospital indemnity policy. That is where we make our monies by selling our products.

Dr. Sauceda – Now, the accident was that one of the ones you mentioned that the premium was going up?

Mr. Chavez – No. Again, do not be misunderstood. Our fees for our products are not increasing, our benefits are not changing, and the fees that we charge for the Cafeteria Plan are not changing what so ever.

Dr. Sauceda – Maybe it was disability that you mentioned. There was one that you mentioned.

Mr. Chavez – What I did mentioned is that over the last five years just about every provider that provides benefits to BISD their rates have changed. Just for the record, we do not do the dental, the cancer, the disability, and life insurance that are currently available to BISD employees. We have those available to us but we do not have the contract for that so we do not offer those products.

Dr. Sauceda – Right.

Mr. Chavez – When you hear about people complaining about disability, or life, or dental, or whatever it is not us. That is not our product.

Dr. Sauceda – So, as a Third Party Administrator working for the district your proposal would propose to manage just those three insurances.

Mr. Chavez – It would continue to be to manage whatever you ask us to do so. Currently, all you allow us to offer are the three products that we sell and our cafeteria plan services that we provide. That is all we do. If you like to entertain the notion of expanding that to offer our full set of products I would love to do that. But that is your call.

Dr. Sauceda – Okay.

Mr. Dunn – No charge for anything what so ever.

Mr. Chavez – That is correct Mr. Dunn.

Dr. Sauceda – Even for all the products.

Mr. Chavez – The products that we sell if a person wants to purchase a product of course they have to pay for the product. But there are no changes in the prices for…

Dr. Sauceda – Fees.

Mr. Chavez – Correct.

Ms. Gilbert – What are some of the other products that your company has available?

Mr. Chavez – We do offer a Cancer Plan as a matter of fact we were the enervators of the Cancer Plan in the 50's. We sell more cancer plans than anybody in America does. And that is basically our number one product, our cancer plan. We do not offer that to district employees currently. We offer a dental plan that we just began offering just recently over the past eight, nine, or ten months that we just invented. So our dental plan is also something. Life Insurance is also what we offer and we also offer disability. However, the disability that we offer is not exactly the same as the disability that you have now. The disability product

### nsurance Committee Meeting
### October 30, 2001
### 4:00 P.M.

## PAGE 4

that you have now is a group disability product, which means there is x amount of participation is required. Ours is an individual disability product, which means that if you should leave employment you can take the product with you. No change in price and no change in benefit. It stays with you wherever you go. That is the difference between what you have now and what we have to offer.

Ms. Gilbert – Do you offer any tax shelter annuities?

Mr. Chavez – No we do not. We work with several individuals. There is one individual that I would like to recognize right now and this is Steve Andrews. He is the principal/owner of Teachers' Agency here in town. He basically handles the annuities. And some of these people are currently licensed with us as AFLAC agents as well. And so anything that involves annuities I basically deferred to Steve although he does not legally work with me.

Dr. Sauceda – One of the things that we talked about before the meeting was the flex spending account. Could you tell me just a little bit of what is that and if that is an option that we have with you guys.

Mr. Chavez – The flexible spending accounts refer to two pockets of money that an employee can put away money for. One is medical reimbursement for instance, if an employee predicts they will be spending $500.00, $1,000.00, or $1,500.00 at some point in the next calendar year they can tell us please reduce my pay by x amount of dollars and they put this in a kiddy. BISD reduces it from their pay. They send us a check. We put it in the kiddy for them. When they incur a claim for something that was not paid for by a medical provider. Like a deductible or a co-pay. We will reimburse them that money tax-free. And the whole purpose for it is to circumvent the taxes. The second part of a FSA or Flexible Spending Account is dependent care. Somebody has child care that they want to put money away for. They can also do that. That is something that we have been doing for the last three years as well.

Dr. Sauceda – So it is an option.

Mr. Chavez – Correct. And the fronting of funds let me just reiterate that again that was part of my presentation here. Fronting of funds is important because it allows employees to get paid faster without them having to wait for the district to release funds to us. And if you agree to that employees would love you for it.

Dr. Sauceda – I think we are headed that way because of the change from the State in a year. But along those lines just for clarification under the flexible spending account our employees want to participate there is also no fee.

Mr. Chavez – No fee what so ever. Right.

Dr. Sauceda – Now, just one quick question. I know that we have another presentation Mr. Dunn, if I could ask real quickly who fills out or who must fill out a form 5500?

Mr. Chavez – We do that.

Dr. Sauceda – But each individual employee does that?

Mr. Chavez – No. The 450-500 is something that each employer collectively completes for their cafeteria plan. The agreement that we have with you all is if you all will send us the information we will prepare 450-500 and have it available to you for your signature to submit to the IRS. So we do all that work as well.

Insurance Committee Meeting
October 30, 2001
4:00 P.M.

PAGE 5

Dr. Sauceda – But it is one form not every employee.

Mr. Chavez – That is correct.

Dr. Sauceda – Okay.

Mr. Dunn – We just send you the bulk information?

Mr. Chavez – Yes. We send you a survey and you complete the survey with important information that we need to be completed. And once it is completed we prepare that again free of charge.

Mr. Dunn – Thank you Mr. Chavez.

Mr. Chavez – Thank you very much.

**(MR. POWERS LEAVES THE MEETING – 4:15 P.M.)**

**(MS. GILBERT LEAVES THE MEETING – 4:20 P.M.)**

**B. BENEFIT ALLIANCE, INC.:**

Mr. Dunn – Gentlemen, proceed.

Mr. Martinec – My name is Jeff Martinec with Benefit Alliance, Inc., and this is Denis Peterson. We are a company with Maria Hall and Jerry Briones out of Brownsville with All-State. He asked Mr. Peterson to continue with the presentation. Thank you for giving me this opportunity to present today. At this time Mr. Peterson begins the presentation and gives a little background information on the following: Experience and philosophy, mission statement; Enrollment and communications support; internet enrollment solutions; Flex Benefit Administrators Section 125 Plan; American Heritage Life Company; American Heritage Life Voluntary Plans – accident plan, group voluntary cancer plan, heart/stroke plan, term life insurance, and universal life insurance; Why voluntary benefits; and RFQ checklist and signature page. It was a 10-minute presentation. After his presentation he asked the committee members if they had any questions.

**(MS. SALAZAR COMES IN – 4:25 P.M.)**

Mr. Dunn – Are you responsible for enrolling BISD employees at the campuses?

Mr. Peterson – Oh, yes, sir.

Mr. Dunn – Okay. You have a $125.00 set-up fee?

Mr. Peterson – No. There should be no set-up fee.

**(MR. LEHMANN COMES IN – 4:30 P.M.)**

Dr. Sauceda – As a Third Party Administrator what I am looking at or looking for is somebody that can provide an objective review and objective management of products we provide our staff. First of all that our quality products but there is a lot of companies out there that have products to sell. And the challenge for BISD is if we are going to open our doors to our employees we want to make sure there is some quality control. And so that is kind of where we are approaching is but you started off the conversation with a product that is specifically All-State. And so when you have a unique product then if somebody were to

### Insurance Committee Meeting
### October 30, 2001
### 4:00 P.M.

### PAGE 6

come to BISD and say this is the best thing out there, it is the only thing out there that is an easy one to buy. Would All-State and this might not be a fair question but I am going to ask it, if All-State through Benefit Alliance were to get this contract and there was a product out there that All-State provided that was also provided by AFLAC (lack of a better example) would you all be able to say if that other product were better hey BISD for your employees this product a non-All-State product is really what is better for your district employees. Or would you even feel that is appropriate for a TPA to be able to say?

Mr. Peterson – Well, I guess the best way for me to answer that is that we are a brokerage firm as well. So, we are going to go to the market and we are going to put the best product that we feel we will act on a consulting basis as well. So, you know there are a lot of carriers out there that are developing new products on a daily basis. And you know maybe AFLAC has something that I do not know of or Hartford, or x,y,z, or whatever. So, I am not up here to tell you one is better than the other. What I am telling you is that Benefit Alliance does their homework. We would not have the cases that we have today and have the volume of business on a national bases running through a cost center in Tulsa, Okalahoma if we were not at the forefront.

Dr. Sauceda – So essentially if there was a product out there that was competing with an All-State product and you guys had the contract is it within realm of possibilities that you all would recommend the non-All-State product.

Mr. Peterson – Oh, yes, sir.

Dr. Sauceda – Okay.

Mr. Peterson – Yes, sir we would. We are a brokerage firm. So, we are not tied to any carrier. If you all would have gone out for bid on disability it would have been another carrier all together.

Mr. Dunn – Ms. Salazar.

Ms. Salazar – No, I do not have any questions.

Mr. Dunn – Mr. Lehmann.

Mr. Lehmann – No.

Mr. Dunn – Thank you sir.

Mr. Peterson – Thank you very much.

## C. First Financial Administrators, Inc.,:

Mr. Dunn – Gentleman, proceed.

Mr. Banks – My name is Doug Banks with First Financial Administrators, Inc. Thank you for giving me this opportunity to present today. At this time Mr. Peterson begins the presentation and gives a little background information on the following: Best Benefits; Best Services, Communication, Responsive, Responsible, Trust; Administration; and Compliance It was a 10-minute presentation. After his presentation he asked the committee members if they had any questions.

Mr. Dunn – Is there any charge what-so-ever to the employee other than for the product?

Insurance Committee Meeting
October 30, 2001
4:00 P.M.

PAGE 7

Mr. Banks – As the outline in the blue handout suggested there is no charge to the district. When the district selects the insurance company for the insurance plan to represent the district's benefits the district will assign the commissions of that company to First Financial Capital Corporation and that is how we get paid not from the 403's or anything else. Did that answer your question?

Mr. Dunn – Dr. Sauceda.

Dr. Sauceda – Yes. You mentioned that the district will select carriers.

Mr. Banks – That is correct.

Dr. Sauceda – Do you bring if selected with you products already selected with you to recommend to the district?

Mr. Banks – I am not sure I understand your question.

Dr. Sauceda – For example, AFLAC, do you come to the district saying you must…

Mr. Banks – Okay. Category of the product for example disability, group life, dental, vision, things of that nature, do I have a specific company?

Dr. Sauceda – Right.

Mr. Banks – No, we do not. I am also the person who does the majority of the shopping in our part of the world for the company. There are several companies out there that at various points in time are more aggressive with their underwriting and more aggressive with the rating systems. My job is to put the companies together that are A or better rated to show you what they do and show you what they do not do. Tell you what they cost and let you pick them and go from there.

Dr. Sauceda – So, an AFLAC product or an All-State product, or an x product would be an option but it is not one that you come to us already.

Mr. Banks – We do not come to one with you at all.

Dr. Sauceda – Okay.

Mr. Dunn – Ms. Salazar.

Ms. Salazar – No questions.

Mr. Dunn – Mr. Lehmann.

Mr. Lehmann – No questions.

Mr. Dunn – Thank you sir.

Mr. Banks – Thank you very much.

**D. FlexBen Corporation:**

Company indicated to Administration that they would not be able to make the presentation tonight.

**Insurance Committee Meeting**
**October 30, 2001**
**4:00 P.M.**

### PAGE 8

**E. Flex Source/One Source Business Concepts:**

Mr. Dunn – Gentleman, proceed.

Mr. Salazar – My name is Joe Salazar with Flex Source/One Source Business Concepts. Thank you for giving me this opportunity to present today. At this time Mr. Salazar begins the presentation and gives a little background information on the following: Cafeteria Plan Administration; Tax Sheltered Annuity Administration; Deferred Compensation Administration; One Source Billing; Communications; and Voluntary Employee Benefits. It was a 10-minute presentation. After his presentation he asked the committee members if they had any questions.

Mr. Dunn – On one of the pages here is says all services for administration, communication, and enrollment are available on a no fee basis as long as the following are applicable: all voluntary products made available to employees are exclusively through Colonial Life & Accident do you want to exclusivity?

Mr. Salazar – That is originally what we usually do with the school districts that we have. We will be exclusive on the supplemental benefits.

Mr. Dunn – So there will be a fee if we do not give you exclusivity?

Mr. Salazar – On Flex Source there is this is negotiable. The President of Flex Source and myself will negotiate with one another as far as let's say you give us the Cancer and the Life. Will I will just negotiate with Flex Source and we will just work it out that way. It is negotiable.

Mr. Dunn – My question to you is there any charge for the products that might be offered other than the product itself? Is there any charge to the employee or to the District?

Mr. Salazar – On the products?

Dr. Dunn – Only on the products.

Mr. Salazar – The products will be paid by the employees.

Mr. Dunn – Right. Any other charge?

Mr. Salazar – No.

Mr. Dunn – Dr. Sauceda.

Dr. Sauceda – I think your question answered my question.

Mr. Dunn – Thank you sir.

Mr. Salazar – Thank you very much.

**(MS. GILBERT RETURNS TO THE MEETING – 4:55 P.M.)**

**F. National Plan Administrators:**

Mr. Dunn – Gentleman, proceed.

Mr. Olivares – My name is Arnie Olivares and I own a company by the name of …Associates of the Valley. Thank you for giving me this opportunity to present today. In partnership we work with a TPA out of Austin

### Insurance Committee Meeting
### October 30, 2001
### 4:00 P.M.

#### PAGE 9

by the name of National Plan Administrators. National Plan Administrators is one of a few TPA's or administrators that administers a total package from Section 125 to 403(b), 457 to Flexible Spending, and of course Section 125. At this time Mr. Olivares introduces his staff and George Shull with National Plan Administrators, to the Board members and the administration. He asked Mr. Shull to give a brief presentation on the Cafeteria Plan. He begins the presentation and gives a little background information on the Cafeteria Plan. It was a 10-minute presentation. After his presentation he asked the committee members if they had any questions.

Mr. Dunn – Do you have an enrollment fee?

Mr. Shull – We do have an enrollment fee. Yes. And that enrollment fee is determined on whether or not the agent is involved on the product side. On the 403(b) side the fee is a $1.00 per participant per month. And that includes not only your compliance problems, your policing of your 403(b), but also a one check billing service. In other words, you send us one check you probably have 60 to 80 vendors we make those disbursements to the different vendors. It is very likely that TRS is going to go to an electronic format. They are going to require that these money be sent electronically with backup material we are set-up to handle that.

Dr. Sauceda – And this fee is to who on the 403(b)?

Mr. Shull – On the 403(b) we are going to charge $1.00 per participant now that is either passed on to the individual or the district pays it. I would say that we only have two districts now that the fee is passed on to the individual that is about out of 200.

Dr. Sauceda – So, if the district said we do not want the employee to pay any fees is that possible?

Mr. Shull – Yes, sir.

Mr. Dunn – If the district says we do not want to pay any fees or the employee pay any fees?

Mr. Shull – Is that possible? Someone is going to pay the fee.

Mr. Dunn – Okay.

Mr. Shull – We have to get paid for what we do.

Dr. Sauceda – Now, is that on both sides the Cafeteria and also on the 403(b)?

Mr. Shull – On the Cafeteria Plan we presently administer your Cancer coverage. If we are selected as the administrator on the Cafeteria Plan and then continue with the product in place then that enrollment fee would be waived. I am going to defer to the agent on this case, Arnie.

Dr. Sauceda – So, to compare apples to apples and on the Cafeteria side your service would be at no cost to the district or to the employee which is similar to what we have now.

Mr. Shull – Right.

Dr. Sauceda – The fee that you are talking about is on the 403(b) side.

Mr. Shull – That is correct.

Dr. Sauceda – Where currently the district does not have a Third Party Administrator.

Insurance Committee Meeting
October 30, 2001
4:00 P.M.

PAGE 10

Mr. Shull – Right. We also in our proposal showed a fee for administration of Cafeteria Plan only.

Dr. Sauceda – Okay.

Ms. Gilbert – I noticed here that you have an annual audit per participant of $1.00 also is that per month?

Mr. Shull – No. Once a year we run an audit to see if your plan is in compliance. What you run into is MEA's are not as important as they used to be but they are guidelines for us. But what happens is that you will have a principal for example is making $60,000.00 a year. They sign up under a 403(b) and about three months into the school year they say look I cannot take this anymore. I am going back to teaching and I am not going to be a principal and their income drops from $60,000.00 to $40,000.00 they are out of compliance. When an audit will do is that it will allow us to pick up on that difference and get them back into compliance. But that audit is once a year.

Ms. Gilbert – Once a year for $1.00 versus the other one for the tax shelter annuity is per month so it will be $12.00 per year times the number of employees that enrolled in that. Participants served.

Mr. Shull – And again, the distinction that you need to make is that it includes the one check service. There are a lot of companies that will provide…they check your MEA calculations and that is it. What we do is not only check the MEA calculations whole harmless agreements the one check system all of that is included in that $1.00.

Dr. Sauceda – Just for clarification sake, I know that your proposal had a combination approach and then a single just the Cafeteria option. If I hear you correctly, the Cafeteria option is at no charge to the district or the employee.

Mr. Shull – Right.

Dr. Sauceda – On the 403(b) side the fees that we are talking about do you have anyway of comparing those to what the standard is out there? Is that typically the rate,or?

Mr. Shull – Well yes. It depends if you are doing an MEA calculation only you will see a lot of these for $0.75. If you get into the MEA calculation and the whole harmless agreements and the one check billing service then you are looking at $1.00…I have seen some as high as $2.25.

Dr. Sauceda – So, if we do not have a TPA doing that side of it now the district would not know what the fee is because right now then the employee would be paying it.

Mr. Shull – Right. Like we say, we have San Antonio ISD the individual employee pays the fee. I think we have one other account. I think there is about two where the teacher or the employee pays the fee. The others are pick-up by the district.

Mr. Dunn – Mr. Lehmann.

Mr. Lehmann –Just for the record, Dr. Sauceda, what is it that we are looking at? Is it something different than what we already have?

Dr. Sauceda – Well, we are looking for something that we have on the Cafeteria side and then we are also looking at the feasibility of a new Third Party Administrator to do our tax shelter annuities side. Currently, it is kind of a free for all for lack of a better word. We have gotten letters and concerns from our staff that some of the products and I am just learning this as we go but there are surrender fees for example that are

# Insurance Committee Meeting
## October 30, 2001
## 4:00 P.M.

### PAGE 11

pretty high 30 percent of whatever the product is. That there are companies and vendors out there that they make their money on the front end of a sale. And so if they can encourage the employee to switch from one product to another then every event results in a 30 percent surrender charge. So, some of our staff are getting hit pretty hard. It is an unregulated market for BISD right now. And we are pretty busy in insurance and it is very tempting to leave it unregulated. I think that our philosophy is that even if it is going to create another headache for us that maybe if we put it under a vendor who was then working under administration that we can begin to regulate and provide a quality control dimension. Right now we do not have that in BISD. I would like to add it. I know that there are changes down the pipe. Where I believe the State will come up with criteria including surrender charges that if vendors do not meet these criteria's they will not be allowed to deal with...

Mr. Shull – They are going to limit the commission they have earned and they are going to restrict the surrender charges. That is part of the new Senate Bill. That is coming out.

Dr. Sauceda – Right. So, there is going to be some control coming in this part of the insurance business. Right now there isn't any and between now and January I would not mind coming to the Board with a recommendation to provide some kind of control where there isn't any right now. So the Cafeteria Plan we are doing already and the contract is over on December 31st. And so we wanted to bring a recommendation now so we can begin the enrollment process. And we are also bringing to you the Third Party Administrator for the tax shelter annuities. And I believe this firm submitted a proposal to do both.

Mr. Shull – We can do either or both.

Ms. Gilbert – And you just answered my question. So you would be willing to do one or the other. For example if we just wanted your services as the tax shelter annuities versus the new products.

Mr. Shull – That is right.

Ms. Gilbert – Alright. Dr. Sauceda, what would be the benefit of keeping it all into one administrator versus into separating.

Dr. Sauceda – From my prospective management it is a lot easier to manage one firm than it is to manage two. And again, from my experience if a vendor has more writing on a plate then they are going to be more responsive to the district. For example if the threat of poor quality is loosing one contract will that is pretty much of a threat but if they stand to loose two then it is that much more attention getting. And so, it is easier to manage and it makes the value of the relationship greater and therefore responsiveness by the vendor to the district should also increase.

Ms. Gilbert – And also, I believe you have mentioned earlier that the 403(b) who would still have the option for the employees to continue the plans they currently have or go with an outside vendor that is approved qualified vendor by the school district. Is that still correct?

Dr. Sauceda – Absolutely. My understanding is that the law says we must make any product payroll deduction available to all employees for any product whether they get it on our side or do it out of our sight. So, if we were to do this employees will still have the option to maintain their current product and do payroll deduction. Employees will also if they choose to go to a company outside BISD that charges 50 percent surrender charges they can do that and we will allow them to do payroll deduction. We have to do it. So that would continue.

# Insurance Committee Meeting
## October 30, 2001
## 4:00 P.M.

### PAGE 12

Ms. Gilbert – So just for the employees sake that they would be allowed if they do not feel comfortable with the current provider or they have somebody else like you mentioned there were surrender fees that they would have to do unless they continue with those plans. They would be able to do so. So it would not affect any of those employees. We are not forcing anybody to come into the 403(b).

Dr. Sauceda – No.

Ms. Gilbert – Or they do not have to participant if they do now want to.

Mr. Shull – The only thing that IRS is that they just want to make sure that everyone is aware that they can come. That they can participant in the 403(b). That is the most important thing getting the information out to the employees that you can participate. There is no requirement that you have to participate.

Ms. Gilbert – I might have missed this but do you also sell life insurance in some of your other products? I came a little bit late so I did not hear.

Mr. Shull – No. Again, we are an administrator. We pay claims for the Hartford. We issue their policies. We do everything an insurance company does. We get paid an administrative fee by the company because we do it cheaper. That is the bottom line. If they could do it themselves and make money at it and not charge as much as we do they would do it.

Dr. Sauceda – And I just wanted to clarify Ms. Gilbert, that on the tax shelter annuity side I guess it would be equivalent to the Good Housekeeping Seal of approval. Right now because we let them in into our district unregulated but we do let them in. People could say that BISD is putting our seal of approval and there is no quality control. And so what this is going to allow us to do is if we are going to put our seal of approval if we are going to allow these people access to our staff then there will be some minimum criteria that will provide additional protection to our employees. So, that we do not have some of the shady business that potentially could go on.

Mr. Shull – The way that we like to phrase it is that you are the sheriff and we are the deputies. You tell us how you want it set-up and then we will do it that way.

Ms. Gilbert – Thank you.

Mr. Shull – Thank you very much.

Mr. Dunn – At this time, I will allow five minutes for Public Input.

### 4. Public Input regarding items reviewed and discussed.

**George Borrego, Elizabeth Johnson, Beto Medrano, and Steve Andrews** –Spoke on the following: the National Plan Administrators according to the figures if they have a monthly Flexible Spending Account fee of $3.00 plus all the other fees will generate an access of about $80,000.00 paid by the district or by the employee, AFLAC has no fees, and the Third Party Administrator.

### 5. Adjournment – 5:25 p.m.

# EXHIBIT-19

Benefit Administration Solutions

Especially Prepared For:

# BROWNSVILLE ISD



**Presented by:**

Insurance Associates of the Valley
521 South Sunshine Strip
Harlingen, Texas 78550
(800) 750-0490
9/5/01
*This proposal is valid for 90 days.*

956-423-7668

The administrator shall disclose information described only:

1) in response to a court order;
2) for an examination conducted by the commissioner;
3) for an audit or investigation conducted under the Employee Retirement Income Security Act of 1974;
4) to or at the request of the insurer or plan sponsor; or
5) with the written consent of the identified individual or his or her legal representative. Trade secrets, including the identity and addresses of policyholders and certificate holders, are confidential, except the insurance commissioner may use that information in a proceeding instituted against the administrator. The plan sponsor is entitled to continuous access to these books and records sufficient to permit the relevant parties to fulfill contractual obligations to insureds and plan participants.

**FEES**

If the District allows a limited enrollment period, then the fee for TSA Administration will be $1.00 per participant per processing with a minimum of $100.

There will also be an annual audit of $1.00 per participant.

**CONFLICT OF INTEREST**

Neither NPA nor any affiliate of NPA receives any compensation for the sale of TSA's. We are an administrative company only. In our opinion, selling TSA products and administering the same would be a major conflict of interest.

**REFERENCES**

| DISTRICT | CONTACT | PHONE |
|---|---|---|
| Austin ISD<br>Austin, Texas | Scott Wyatt | (512) 414-2295 |
| Carrollton - Farmers Branch ISD<br>Carrollton, Texas | Janet Truitt | (972) 323-5718 |
| Irving ISD<br>Irving, Texas | Christine Rushing | (972) 273-6099 |
| San Antonio ISD<br>San Antonio, Texas | Linda Comeaux | (210) 299-5578 |
| United ISD<br>United, Texas | Robert Chapa | (956) 717-6390 |

*National Plan Administrators, Inc.*
*1101 Capital of Texas Hwy. South, Bldg. E, Suite 100*
*Austin, Texas 78746*
*(800) 880-2776*



# Section 125 "Cafeteria" Plan Administration

**INTRODUCTION**

Congress passed a law which allowed employers to set up cafeteria or flexible plans. The purpose of the plans was to allow employees to pay for certain benefits, like dependent/child care, unreimbursed medical expenses, and insurance premiums with before tax dollars.

The government actually placed its seal of approval on a great way for the average taxpayer to save taxes! Under a full cafeteria plan, wages contributed by employees for employer sponsored benefit plans are not subject to federal, social security, or state taxes. The result is the employee's net take home pay increases by the amount of their tax savings.

The savings can range between a couple hundred dollars a year to a thousand, depending on the employee's contributions.

**PLAN ADMINISTRATION**

National Plan Administrators, Inc. provides administration service for employers. NPA becomes the legal and liable third party administrator.

NPA assists the employer in the design of their particular plan and provides a turn-key administration service.

**SERVICES PROVIDED**

**Adoption Resolution.** NPA provides an adoption resolution for the governing body to formally begin a cafeteria plan.

**Plan Document.** NPA prepares the plan document for the employer based on the plan design that the employer elects.

**Department of Labor.** NPA prepares the notification and forwards it to the Department of Labor.

**Summary Plan Description .** NPA prepares the Summary Plan Description and provides a copy to all employees.

**Enrollment.** NPA provides an enrollment booklet for each employee which includes:
>                Summary Plan Description
>                Tax Rate Tables
>                List of Qualified Expenses
>                Child Care Credit Illustration
>                Tax Savings Worksheet
>                Illustration of Tax Benefit
>                Benefit Election Form

**Discrimination.** NPA provides the discrimination testing to insure that the plan is in compliance with all applicable laws.

**IRS Report.** NPA prepares the annual filing of the 5500 report form to the Internal Revenue Service.

---

*National Plan Administrators, Inc.*
*1101 Capital of Texas Hwy. South, Bldg. E, Suite 100*
*Austin, Texas 78746*
*(800) 880-2776*



NPA believes that control of funds by the employer is the proper approach. Check stock on the account is provided to NPA without signature authority. NPA's function would be to merely carry out the administration functions including record keeping and check processing.

**SPECIAL NOTE**

NPA has designed a system that allows the reimbursement and salary reduction to take place at the same time. All IRS regulations regarding written evidence are maintained. This insures a minimum disruption in cash flow for the employees. Child care participation would be significantly reduced if cash flow were affected.

**CONFIDENTIALITY**

During the time that information which identifies an individual covered by a plan is in the administrator's custody or control, the administrator shall take all reasonable precautions to prevent disclosure or use of the information for a purpose unrelated to administration of the plan.

The administrator shall disclose information described only:

1) in response to a court order;
2) for an examination conducted by the commissioner of insurance;
3) for an audit or investigation conducted under the Employee Retirement Income Security Act of 1974;
4) to or at the request of the insurer or plan sponsor; or
5) with the written consent of the identified individual or his or her legal representative.

Trade secrets, including the identity and addresses of policyholders and certificate holders, are confidential, except the insurance commissioner may use that information in a proceeding instituted against the administrator. The plan sponsor is entitled to a continuing access to these books and records sufficient to permit the insurer, plan, plan sponsor to fulfill contractual obligations to insureds and plan participants.

**FEES**

**Premium Only Plan** – The administration fee is $ .50 per participant per month. The enrollment fee is an additional $5.00 per total employees. If Insurance Associates of the Valley are selected as agent of record, and the Hartford Cancer remains in effect, and the School District selects the Accident, Heart/ Stroke, and Disability Plans the enrollment fee will be waived to the Employer. There will also be an annual fee of $75.00 for completion of Form 5500.

**Dependent/Child Care and/or Medical Reimbursement** - The fee for administration is $3.00 per participant, per month.

The agent on the Proposal is responsible for all enrollments. We have enrollers available on a per diem or commission split basis.

**REFERENCES**

A partial list of references include:

| | | |
|---|---|---|
| Austin ISD | Scott Wyatt | (512)414-2295 |
| Irving ISD | Christine Rushing | (972)273-6079 |

*National Plan Administrators, Inc.*
*1101 Capital of Texas Hwy. South, Bldg. E, Suite 100*
*Austin, Texas 78746*



# EXHIBIT-20

STATE OF TEXAS

COUNTY OF CAMERON

BE IT REMEMBERED, that on the 30th day of October, 2001, the Board of Trustees of the

Brownsville Independent School District met in a Special Called Board Meeting at the Administration

Building, 1900 Price Road, Brownsville, Texas, for the purpose of transacting any and all business that

came before the Board and with the following to wit:

PRESENT:

| | |
|---|---|
| Joe Colunga | President of the Board |
| Linda Salazar | Vice – President of the Board |
| Hugh Emerson, Jr. | Secretary of the Board |
| Marilyn del Bosque-Gilbert | Assistant Secretary of the Board |
| Randy Dunn | Member |
| Pat Lehmann | Member |
| Herman Otis Powers, Jr. | Member |

ABSENT:

None

ALSO PRESENT:

| | |
|---|---|
| Dr. Noe Sauceda | Superintendent of Schools |
| Jeff Roerig | Attorney for the Board |

ALSO ABSENT:

| | |
|---|---|
| Elizabeth Neally | Attorney for the Board |

Sauceda
EXHIBIT NO. 5
67703
Hill & Romero

WHEREUPON, a quorum being present and it appearing before the Board, it is hereby so

found that notice of this Special Called Board Meeting has been duly given in the manner and for the

length of time as prescribed by law. The meeting was called to order and declared ready for the

transaction of business with the following to wit:

    I.  **Meeting called to order** by President Colunga.

    II.  **Moment of Silence**.

    III.  **Pledge of Allegiance** led by Mr. Emerson and repeated in unison.

    IV.  **Roll Call** by President Colunga.

    **V.**  Motion was made by Mr. Dunn, seconded by Mr. Emerson, for approving the agenda of the Special Called Board Meeting of October 30, 2001, as presented by Administration.

President Colunga stated, "I had to raise the question regarding the point of order to legal counsel. Referring to policy on the preparation of agendas the Board President must approve the final agenda. This particular agenda was prepared without my final approval. Second, I as President requested this meeting for the evaluation of the Superintendent. And my agenda item has been amended without my consent. My agenda item should have been phrased Evaluation of Superintendent and by policy it is the Formative Conference not the Summative. Therefore, I object to the amended agenda item without my consent. Furthermore, I have not seen the agenda item and request to see if it met the timeline. I am requesting a ruling by legal counsel at this time to determine what language stands for agenda item #A4. Mr. Roerig".

Superintendent Sauceda stated, "And if I can Mr. President, just for the record, this meeting was called by yourself as policy says it can only be done. And both the topic of discussing the meeting of November 6, 2001, and the item on the Superintendent's Evaluation were items presented to the Superintendent by Board members. It has been previous practice. We followed the exact same procedures, Mr. Colunga".

Mr. Powers stated, "Mr. Colunga, I would like to have legal interpretation because on Policy BE it does state that the Superintendent shall prepare the agenda for all Board meetings, before the official agenda is posted for any meeting, the Superintendent shall consult the Board President to ensure that

the agenda and the topics included meet with the President's approval. And his data was never submitted in. What Board member requested the terms of Superintendent's contract if there is no written explanation in here"?

Superintendent Sauceda responded, "Mr. President and members of the Board the item on the consideration of rescheduling the meeting was presented by Ms. del Bosque in writing and the item on the Superintendent's Evaluation was presented by Mr. Randy Dunn in writing within the time periods".

Mr. Emerson stated, "Since this item was posted, Mr. Superintendent, 72 hours ago was that correct"?

Superintendent Sauceda responded, "Yes, sir".

Mr. Emerson stated, "May I ask counsel that perhaps we should jut take a vote on this agenda as presented".

Mr. Powers stated, "But, I think we should have legal interpretation before we do something that is wrong".

Mr. Emerson stated, "No, subject to all this legal answering and all that. I am also asking as well, Mr. Powers with your consent".

Jeff Roerig, Legal Counsel, responded, "The policies that provide for preparation of the agenda have the language that has been recited and immediately after that is a paragraph says that any Board member has the right to place an item on the agenda and that shall be presented at the next meeting as long as it is submitted in a timely fashion. A timely fashion is defined, we have consistently defined that to mean that if it is late it can be put off for a week. If there is something that needs to be staffed in a legal sense or have some other staff member work on it before it is presented then it can be put off for a week. But, absent those considerations if something is submitted by any Board member it shall be placed on the next agenda".

Mr. Powers stated, "But point of order, Mr. Colunga, Board President, there is no backup to

State that it was submitted in writing. And how does one submitted in writing overturn the Board President's request?

Mr. Roerig responded, "There is never any backup on the agenda to support the agenda preparation".

Mr. Powers stated, "Yes. When it is on Board yes there is sir. We have to submit it in writing and then it is prepared on back of the agenda".

Mr. Roerig responded, "It was submitted in writing and it is what has been represented to the Board".

Superintendent Sauceda stated, "The Board members are here. They can acknowledge that they submitted the request in writing".

Mr. Dunn stated, "I think that goes without saying that I did submitted in writing".

Ms. Gilbert stated, "I submitted my agenda in writing prior to the preparation of the Board meeting and a copy to Mr. Colunga on it and Dr. Sauceda".

Mr. Emerson stated, "As well as myself. I will not be able to attend the November 6, 2001, Board Meeting. Should the Board wish to meet without me that will be fine. But, I wanted to put everybody on notice just in case it would create a problem. But, never-the-less having that these answers appear to be answered I **Call the Question**".

President Colunga stated, "Going back to the agenda item as stated or at least Evaluation of Superintendent, if a Board member submits that originally and that is amended by another Board member if you are following Rules of Order then there has to be some sort of consent there to amend the agenda item. And that was my objection that I was not notified of any change prior to posting. So, at this time I would like to request from Dr. Sauceda that from now on I would like to require signatures on the final agenda as verification that it has been checked by both of us prior to posting".

Superintendent Sauceda responded, "Mr. Chair, we will write up the pages to local policy and present those to the Committee".

Ms. Gilbert stated, "Please include that in the next Policy Committee Meeting that way we will address them and bring it before the Board for recommendation and the First and Second Readings".

Superintendent Sauceda responded, "We will".

Mr. Dunn stated, "For the record, Mr. Colunga, was your request submitted in writing"?

President Colunga responded, "No, but I called the Special Called Board Meeting in consultation with the Superintendent".

Mr. Emerson **Calls the Question.**

**THE FOLLOWING VOTE WAS RECORDED:**

**YEA:**      Mr. Colunga, Ms. Salazar, Mr. Emerson, Ms. del Bosque-Gilbert, Mr. Dunn

Mr. Lehmann

**NAY:**      Mr. Powers **(Mr. Powers stated, "I will go on record that I object to the wording of Item #A4. I am going to go on record that I voted against item #A4 since it was never approved by the Board President and never seen by the Board President".**

**ABSTAIN:**   None

**MOTION CARRIED.**

## VI. CONSENT AGENDA

**GENERAL FUNCTION:**

**A1.** After discussion, motion was **amended** by Mr. Dunn, seconded by Mr. Emerson, and unanimously carried, for approval of the following **General Function Item #A1: Amend the motion to cancel the November 6, 2001, Board Meeting and reschedule to November 13, 2001.**

**Consideration and possible action to cancel or re-schedule the** Regularly Scheduled Board Meeting of November 6, 2001.

Superintendent Sauceda stated, "Mr. President, after visiting with various Board members about this issue the Administration feels comfortable that if we had a choice between a cancellation or a rescheduling our recommendation would be that we cancel the meeting of November 6, 2001, and that we have the Regularly Scheduled Board Meeting of November 20, 2001, and that would be adequate to meet the needs of the District".

Discussion among the Board members and the Administration regarding changing the board meetings that have been already scheduled according to policy, quorum is needed to have the meeting, three members can be absent, interest versus personal conflicts, irresponsible if board member did not notify colleagues of absence from meeting, within policy to cancel, both meetings in November can be consolidated to one meeting,

**THE FOLLOWING VOTE WAS RECORDED:**

**YEA:**       Mr. Colunga, Ms. Salazar, Mr. Emerson, Ms. del Bosque-Gilbert, and Mr. Dunn

**NAY:**       Mr. Lehmann and Mr. Powers

**ABSTAIN:**   None

**MOTION CARRIED.**

(HANDOUT ADDED TO OFFICIAL MINUTES)

**A2.** After discussion, motion was made by Ms. Salazar, seconded by Mr. Dunn, for approval of the following **General Function Item #A2** as presented by Administration:

**Approval to accept the Margaret M. Clark Aquatic Center** as substantially complete.

Superintendent Sauceda stated that a walk-through had been scheduled and several board members toured the facility on Saturday. He also mentioned that there was the floor issue but that it had been repaired. He mentioned that he had received a copy of a letter addressed to Marianella Franklin, with Kell Munoz Architects from William Thomas with KBE of North America stating that an extended warranty and a maintenance agreement are available for the floor. He stated that with this

information he felt confident that the Aquatic Center could be accepted as substantially complete. So therefore, Administration was recommending that the Board consider accepting the facility as substantially complete depending the punch list completion".

Discussion continues among the Board Members and the Administration regarding the cleanliness of building, definition of what substantially complete means, plenty of legal ability to finish building, and why such a rush to accept building.

**Ms. Salazar withdraws the motion.**

Motion was made by Mr. Powers, seconded by Mr. Lehmann, and unanimously carried, for approval to **table** the following **General Function Item #A2** until the next regularly Board Meeting.

### (HANDOUT ADDED TO OFFICIAL MINUTES)

**B. BIDS/PROPOSALS/PURCHASES:**

**3.** Motion was made by Mr. Emerson, seconded by Mr. Dunn, and unanimously carried, for discussion of the following **General Function Item #B3** as presented by the Administration:

**Discussion and possible action to award agent/agency** to provide Third Party Administrator's to administer BISD's Cafeteria Plan (IRC Section 125) and administer the tax deferred annuity, custodial plan under Section 403b and 403(b)(7) deferred compensation plans and custodial plans. Agent/Agency to provide ancillary products for employees.

Superintendent Sauceda stated, "Mr. President, at this time, Administration would like to split this up in two. And with regards to the Cafeteria Plan we are not ready to make a recommendation. So, we would like to table that part of it and bring back to the Board at a later date. But we do have a recommendation for the Third Party Administrator for the tax deferred annuity custodial plan under Section 403b and 403(b)(7) deferred compensation plans and custodial plans. Currently, we do not have a Third Party Administrator. Administration would like to recommend National Plan Administrator for this Third Party Administrator".

Discussion among the Board members and the Administration as to whether or not the teachers had any input in this process, why are the meetings being held at 4:00 p.m., is there a deadline on this item, what is the rush, who is the Third Party Administrator right now, vendors who might be extorting monies by changing W2 form be reported to the State Department of Insurance in Austin, who will be held liable if Administration messes up, and if TPA gets a contract what is the district's responsibility.

Mr. Emerson **calls for the Question.**

After discussion, motion was made by Ms. Salazar, seconded by Mr. Powers and unanimously carried for approval to **table General Function Item #B3 – Cafeteria Plan (IRC Section 125), and Section 403(b), and Section 403(b)(7).**

### (HANDOUT ADDED TO OFFICIAL MINUTES)

**CLOSED MEETING:** Motion was made by Mr. Emerson, seconded by Mr. Powers, and unanimously carried for approval of the following **Personnel Matters Items: #A13** as recommended by Administration:                                                                    **6:20 P.M.**

**(BOARD RECONVENES AFTER CLOSED MEETING AND THE FOLLOWING ACTION WAS TAKEN)**                                                                              **9:56 P.M.**

**4.** After discussion, motion was made by Mr. Emerson, seconded by Mr. Dunn, for approval of the following **Closed Meeting: (Personnel Matter) Item #A4 – Motion was made that upon a satisfactory, very satisfactory, review of the Superintendent move to have a $10,000.00 additional increase to the Superintendent's Salary.**

**Evaluation of Superintendent,** consideration and possible action regarding terms of Superintendent Contract.

Mr. Powers stated, "I think that the timing is off and we have to look at everything within our budget and our sources. I think it is ill advised at this time inappropriate place to do this".

Mr. Emerson stated, "I do agree that it is ill timing because we should of gone ahead and given

him at least what McAllen was paying their Superintendent of $165,000.00. And this $160,000.00 is still deficient and it is ill timing because it should have been retroactive. And I do agree with you Mr. Powers".

Ms. Gilbert stated, "I would like for Dr. Sauceda to also know that he is doing an outstanding job since I have been here on the board. I have seen a lot of changes. I have seen a lot of the different administrators give a lot of good feedback. There are going to be people unhappy but there are also going to be a lot of happy people out there. And I know that there are a lot of grievances that would of otherwise gone to the Board if there had not been equity adjustments on there. At this time, I feel sorry for not offering more but we feel that a $10,000.00 is the least to give you in the same ballpark with McAllen I.S.D. would be the appropriate".

Mr. Emerson stated, "Mr. Colunga, again I would like to tell him that this evaluation is to reaffirm the mandate given to him initially of his superb performance as Superintendent. And again this $160,000.00 is still deficient for the largest school district in Region One. McAllen, which is a much smaller school district they are paying their Superintendent higher than we are paying our Superintendent. And this is something that we need to revisit again".

Mr. Powers stated, "Mr. Colunga, I would like to say for the record also since I have been on the Board on a Formative Evaluation we have never done a pay increase nor a contract extension, which we are not doing on that part, that the proper place and procedure will be after a year evaluation and under the Summative Evaluation, which will be held in March. And I agree if everything is where it is suppose to be then yes I agree yes, I will concur that we look at a pay increase and a contract extension. But everything has its time and place. And I feel after four months we are generally jumping the gun".

Ms. Gilbert stated, "Mr. Colunga, One of the things that we did and during the Budget process we did not look into the Superintendent's salary. We provided everybody else an equity adjustment

and a lot of the administrators were adjusted to be brought into par. At this time, I believe that we are just trying to bring him back to par with the rest of the Superintendents. San Antonio I.S.D. Superintendent, I saw some of the figures they were well over $200,000.00 with the same amount of students and employees that we have for our district. So, I think that a $10,000.00 for the Valley and like I said, I wish it would be more. But at this time, I think…you one".

Mr. Emerson stated, "I think we are well within peer because although this is a lower economic area compared to the rest of the State. McAllen I.S.D. has set precedent and it is still at the bottom of the Superintendent's student population over 40,000. This will still remain being at the bottom of the list".

Mr. Lehmann stated, "Just for the record, I would concur with Mr. Powers that the proper time for this type of an evaluation and salary should be at the Summative Evaluation. I was not part of the hiring for the Superintendent at the time. I think that we have a few Board members here that did hire him and they felt that salary was adequate at the time. Granted that there is a discrepancy with districts this size but just for the record I was under the impression we were just going to evaluate and discuss performance and not increase his salary or extent his contract. I think that the appropriate time is at the Summative Evaluation, which is I guess in March or April. And I just want that for the record".

Mr. Dunn stated, "Dr. Sauceda, this should be indicative of the support this Board has for you. We expect you to continue the good work you are doing and we give you our 100 percent support".

Mr. Powers stated, "I think that this Board is supportive of Dr. Sauceda 100 percent but there is a time and place for pay raises".

Ms. Salazar stated, "Dr. Sauceda, you have really done a very good job. As a matter of fact on the evaluation when we came up with the totals I probably missed by 20 or 22. It was real close. I know that when we hired you we had $150,00.00 and we looked at other schools because we did. And I do not know what happened. We probably messed up on your salary there at the time, but we all

agreed other Board members that were not there but we need to send a message to everyone that we are supporting you and I am supporting you 100 percent. And I wish that I could say more but I cannot right now. In six months we will be back and I am hoping that you do not let us down. I am hoping that the Board members here when we go out in the public protect you because that is the way that I feel we are the leaders and should work together. So, that is what I had to say".

Mr. Emerson stated, "Dr. Sauceda, you are the Instructional Leader of this District. You are the Chief Executive Officer of this District. The Board has given you a mandate for your staff and the public to understand and to know. And Dr. Sauceda, we thank you and we want you to continue to make us proud".

Ms. Gilbert stated, "One of the things that I would like to see is hopefully that we may be able to have the next Superintendent of the Year. I hate to say that Harlingen has had one and maybe it is time for Brownsville to have one. And maybe we can. Also with this Board we can also be Board of the Year. And I know that we are going to be having several Team Building Sessions and with that in mind I hope that our goal is being to having you Superintendent of the Year and the Board of the Year can be accomplished".

Mr. Powers stated, "I agree with Ms. Salazar over there that yes we are all 100 percent behind Dr. Sauceda, his entire staff, and the faculty. We are here together as a team of eight and everything has its time and place. And a raise is not the reason why we are not going to work together. We are still going to work together with it or without it. This is what we have to do. Mr. Emerson is correct about doing what is right for this District but there is a time and place".

President Colunga stated, "Let me just say that I also believe in following the traditional schedule for consideration of review of salary and making adjustments according to the Formative at this time and the Summative is Spring. I was originally intending the evaluation to be addressing the review of the Formative Evaluation".

President Colunga **Calls the Question.**

After discussion motion was **amended** by Mr. Emerson, seconded by Mr. Dunn for the following amended motion: **To increase salary by $10,000.00 and to have the effective date as of October 30, 2001, and proration thereof.**

### THE FOLLOWING VOTE WAS RECORDED:

**YEA:**      Ms. Salazar, Mr. Emerson, Ms. del Bosque-Gilbert, and Mr. Dunn

**NAY:**      Mr. Colunga, Mr. Lehmann and Mr. Powers

**ABSTAIN:**  None

**MOTION CARRIED.**

### (DOCUMENTATION ADDED TO OFFICIAL MINUTES)

**B. Consultation with ATTORNEY:**

**5. NO ACTION IS REQUIRED.**

Consultation with attorney regarding pending or threatened litigation matters.

**C. Real Property:**

**6. NO ACTION IS REQUIRED.**

Discussion of possible acquisition or sale of Real Property.

### (DOCUMENTATION ADDED TO OFFICIAL MINUTES)

### XI.  CORRESPONDENCE AND INFORMATION

**A. Committee Reports/Appointments:**

**B. Correspondence:**

**C. Suggestions for Future Meeting Agendas:**

### ANNOUNCEMENT(S)

**1 Next scheduled Board Meeting** to be held on **Tuesday, November 13, 2001,** at the Administration Building at 5:30 p.m.

Special Called Board Meeting
October 30, 2001
Page 13

## ADJOURNMENT – 10:08 p.m.

There being no further business appearing before the Board, the meeting was adjourned.

APPROVED BY:

_____
PRESIDENT OF THE BOARD

ATTESTED BY:

_____
SECRETARY OF THE BOARD

# EXHIBIT-21

# CAFETERIA PLAN COMPARISON



Errisuriz
EXHIBIT NO. 5
4-7-03
Hill & Romero

001053

| FEES | AFLAC | Benefit Alliance | 1st Financial Administrators | Flex-Ben Corp | Flex Source/Inc Sourc Bus Corp | National Plan Administrator |
|---|---|---|---|---|---|---|
| • Set up fee (Implementation Fee) | +N/C  $450 | $125 | N/C | $500 | ** | ** |
| • Documentation Design Fee | N/C | N/C | N/C | $250 | N/C | N/C |
| • Enrollment Fee | N/C | N/C | N/C | N/C | N/C | $5.00*** |
| • Employee Enrollment Kit | N/C | N/C | N/C | $1.00 | ** | N/C |
| • Monthly Fee per Participant (Flexible Spending Account) | +N/C  $3.00 | $3.75 | * | $3.35 | ** | $3.00 |
| • Monthly IRS Maintenance and Compliance Fee | N/C | N/C | * | N/C | ** | N/C |
| • Verbal Communications (In-service) | N/C | N/C | * | $50/hr. | ** | N/C |
| • Telephone | +N/C  Cost | N/C | * | Cost | ** | N/C |
| • Postage | Cost | Cost | * | Cost | ** | N/C |
| • Copies | N/C | N/C | * | Cost | ** | $75.00 |
| • Mileage | N/C | N/C | * | Cost | ** | .50/PP/PM |
| • Preparation of Annual IRS Form 5500 | N/C | N/C | * | $150 | ** | ? |
| • Premium Only ---- | N/C | N/C | * | N/C | ** | - |
| • Flexible Bank Account (Control of Funds) | +YES  ? | Fee Based | * | ? | ** | ? |
| • Renewal Fees | +N/C  - | - | * | $200 | ** | - |
| • Tax Sheltered Annuity Administration (TSA) (per participant) | +N/A  - | - | - | - | - | $1.00 |
| • Annual Audit per participant | +N/A  - | - | - | - | - | $1.00 |

## LEGEND

AFLAC is BISD's current product vendor.

? = Unknown   N/C = No Charge

\* = No fees are charged if their marketing company, First Financial Capital Corporation. is selected to provide and market the tax qualified and other financial products to employees. The carriers remunerate Fist Financial Capital, who, in turn, reimburses First Financial Administrators for services to the District.

** = No fees are charged if their marketing company, Colonial Life & Accident. is selected to provide and market the tax qualified and other financial products to employees.
Flex Source would therefore be compensated from the sale of these products.

*** = The enrollment fee will be waived if Insurance Associates of the Valley are selected as agent of record, and the Hartford Cancer remains in effect. and the School District selects the Accident, Heart/Stroke, and Disability Plans.

+ There are no fees associated with AFLAC's cafeteria plan services.  BISD does not pay a fee.  Employees do not pay a fee.  We have three years of experience at BISD as proof.

+ Flexible Spending Account (FSA) contributions are held in a BISD bank account.  Any and all funds may be removed at anytime at the request of BISD.  AFLAC has check writing authority in this bank account only for the purpose of reimbursing employee's FSA claims.  BISD maintains full control over all funds.

+ AFLAC is not involved in the sale or administration of annuities.

001059

| Criteria for Cafeteria Plan.... | AFLAC | Benefit Alliance | Ist Financial Administrators | FlexBen Corp | Flex Source/One Source Bus Corp | National Plan Administrator |
|---|---|---|---|---|---|---|
| 1. Work directly with BISD design & maintain a Cafeteria Plan. | Yes | Yes | Yes | Yes | Yes | Yes |
| 2. Make arrangements to meet all Legal requirements of IRC section 125. | Yes | Yes | Yes | Yes | ? | Yes |
| 3. Educate BISD on Cafeteria Plan. | Yes | Yes | Yes | Yes | ? | Yes |
| 4. Responsible for enrolling all employees at all BISD sites (campuses). | Yes |  | Yes | No | Yes | Yes |
| 5. Keep employees informed on latest news (In-service). | Yes | Yes | Yes | Yes | ? | Yes |
| 6. Assists in processing all claims. | Yes | Yes | Yes | Yes | ? | Yes |
| 7. Investigate delays on processing of claims. | Yes | Yes | Yes | Yes | ? | Yes |
| 8. Assists Administration with resolution of employee problems as they arise. | Yes | Yes | Yes | Yes | ? | Yes |
| 9. Provides BISD with a staff that is accessible | Yes | No | No | No | ? | Yes |
| 10. Cooperate & consult with BISD's Insurance Committee on plan operation.  + YES | No→Yes | Yes | Yes | Yes | ? | Yes |
| 11. Assist Administration in determining that District policy is adhered to in product distribution. + No Yes | No→Yes | Yes | Yes | Yes | ? | Yes |
| 12. Assume responsibility for all needed forms & document. | Yes | Yes | Yes | Yes | Yes | Yes |
| 13. Assist in the development of a program, which will best serve the Employee's needs. + YES | No→Yes | Yes | Yes | Yes | ? | Yes |
| **Evaluation & Selection...** | | | | | | |
| • Firm's experience   50 Yrs. | (NOT A TPA) | 30 Years | 33 Years | ? | ? | 27 Years |
| • Expertise as TPA of 403(B) -403(B)(7) | | Yes | Yes | ? | | Yes |
| • Availability & Accessibility of firm's Key personnel to meet with BISD on short notice &  (Brownsville office) | Yes LOCAL AGENT | No | Yes Weslaco | Yes | ? | Yes LOCAL AGENT |
| • To respond quickly to inquiry. | | | | | | |
| • Ability to communicate info clearly and concisely  • Orally &  • In writing. | Yes | Yes | Yes | Yes | Yes | Yes |

+ No other Cafeteria Plan Services provider has provided the level of service that we have at BISD. No one comes close. Our local office bears the burden of all paperwork, annual enrollments, and total customer satisfaction. In addition, we also handle the daily phone calls and the weekly paperwork for employees who wish to make changes or have questions.

+ We will gladly work with the employee or board insurance committee members to insure total customer satisfaction.

+ AFLAC's business is to provide advice and services as they pertain to Section 125 Cafeteria Planning. We have advised the district over the past three years on legal and administrative issues. As proof, we recently advised BISD that they should allow employees the opportunity to make changes to their elections due to the tremendous increase in the group health insurance premium.

# EXHIBIT-22

# *AFLAC*

**RIO GRANDE VALLEY REGIONAL SALES OFFICE**
*905 Los Ebanos Blvd., Suite A  *  Brownsville, Texas 78520*
*Phone (956)982-3998  *  Fax (956)982-0931*

## FAX TRANSMISSION

Date:  November 9, 2001                          Pages:  6  (including cover page)

Time:  Friday Morning / Early Afternoon          From:  Dino X Chavez

## URGENT
## ——Please deliver immediately ——

To:   **BISD Insurance Committee Campus Representative**

RE:   SECTION 125 CAFETERIA PLAN PROPOSAL

MESSAGE:

**Your board members are about to make a decision that may be detrimental to you and your pocketbooks.  Please read our attached memorandum.  Your input is needed!!**

EXHIBIT NO. 27
*Chavez*
3-19-03
Hill & Romero

**If you do not receive the number of pages listed above, please notify us immediately.**

The information contained in this facsimile is privileged and confidential information intended for the use of the addressee listed above. If you are neither the intended recipient nor the employee or agent responsible for the delivery of this message, you are hereby notified that any disclosure, copying, distribution, or taking of any action in reliance on the contents of the telecopied information is strictly prohibited. If you receive this fax in error, please notify us immediately by telephone to arrange for the return of the original document. Thank you.

001053

*AFLAC - Named the # 1 insurance company in the world by Forbes magazine and the # 1 insurance company to work for by Fortune magazine. January 1999; with over 178,000 accounts worldwide, also recognized as # 1 at workplace marketing.*

# *AFLAC*

*Rio Grande Valley Regional Sales Office*
*905 E Los Ebanos Blvd, Ste A  *  Brownsville, Texas  78520*
*Phone (956)982-3998  *  Fax (956)982-0931*

## \*\*\*\*\*\*\*\*\*\*URGENT\*\*\*\*\*\*\*\*\*\*

November 9, 2001
Re:  IRS Section 125 Cafeteria Plan Services Proposal

Dear **Insurance Committee Campus Representative,**

Here we go again!!  Some of your elected board members and hired administrators are about to make an insurance decision that could be detrimental to you.  **The change in the group health coverage that was made recently was made without your approval and was made to the detriment of your pocketbooks. This may be about to happen again!**  There have been several misrepresentations of the truth said and written about us recently.  This is our attempt to set the record straight directly with the people who should have control over the say so of employee benefits - employees.  Attached, are cafeteria plan comparison charts that were handed out to board members and administration to help decide on the matter.  They were prepared without our knowledge or consultation and are very inaccurate.  Those of you who have dealt with us for the past three years know better.  We have penciled in our corrections for your review.

As your campus's representative, please be aware and make others aware that a decision concerning the Section 125 Cafeteria Plan Services and Annuity Administration is tentatively scheduled to be made at the next school board meeting on November 13, 2001.  Please let your fellow employees know that their opinions should be heard.  For your information, there are several key advantages in keeping us as your Section 125 Cafeteria Plan Services provider:

1)  **There is no one larger, more experienced, or more recognized at what we do!**  AFLAC has assisted over 70,000 employers nationwide in establishing a section 125 flexible benefits plan for their employees.  In addition, we are the world's largest provider of guaranteed-renewable supplemental health insurance plans, insuring over 40 million people worldwide.  Moreover, AFLAC has provided the district with this service for the past three years.  We have a proven track record of thousands of satisfied BISD employees.  Our voluntary products (accident, specified health event, and hospital indemnity) have increased the amount of voluntary choices for employees that were not available on payroll deduction before our time.

2)  **Over the last three years, we have saved BISD employees well over $90,000**  AFLAC will continue to provide all cafeteria plan services at **no charge** to the district or it's employees, as long as we can continue to offer our **voluntary** supplemental insurance products (accident, specified health event, and hospital indemnity).   Before our time, BISD employees spent well over $30,000 annually for this service.

3)  **One of the biggest advantages is that our office is local.**  Employees walk in the door every day for service and / or questions.  They do not have to deal with 1-800 numbers or with agents that are

001054

times dealing with insurance ma    s over the phone and prefer in-person    ntact. <u>To our knowledge, no other cafeteria plan proposal has a Brownsville office.</u>

4) <u>Other cafeteria plan service providers process claims monthly or, at best, semi-monthly. Not AFLAC! We process claims daily. People have said we are the fastest in the industry.</u> We want to insure that you get access to your money immediately. Additionally, please be aware that back in February 2001, we offered the district the option to have us "front funds" to employees who need their flexible spending account money before the district actually writes us a check for the deduction they subtract from their pay. Much to our dismay, the decision to accept this benefit for employees at absolutely no cost has been not been made and is still pending on someone's desk. <u>If we are chosen to continue, we will do everything possible to insure that the district accepts this fronting of funds proposition so that employees can have access to their money even quicker.</u> To our knowledge, no other proposal contains this type of provision.

5) We do not offer annuities and therefore we do not offer annuity administration. <u>However, some experts in this field have informed us that the district's proposition to suddenly have an annuity administrator after not having one for the last several years may have an adverse effect on you by limiting your choices to only those annuities offered by or through the chosen annuity administrator.</u> In addition, if for some reason you are still given a choice, the chosen annuity administrator can make it cumbersome for you to purchase annuities from the open market. Moreover, employees will have to begin paying an additional monthly and/or annual fee to have an annuity administrator, thereby reducing their "real" rate-of-return. Our opinion is that the district's current system of open choice is not broken. Implementing an annuity administrator would not be smart from an employee's perspective.

6) <u>Lastly, the premiums for our voluntary products and for our free cafeteria plan services have remained unchanged for the last three years, making us the most stable company BISD has dealt with in recent memory.</u> Over the last five years, every insurance provider the district has dealt with has raised their rates or diminished their benefits in some form or fashion. <u>AFLAC has not and will not. Moreover, if the district is willing to accept our contract, we are willing to guarantee no changes in fees or prices for an additional two years.</u>

The choice is yours, but all in all, continuing with AFLAC will offer employees the best possible value and the best possible service. In addition, you will keep business in Brownsville and continue saving money. No other provider has contacted you directly to attempt to keep you informed. No other provider values your business and your friendship as much as we do! Please call me with any questions. Thank you for your support and consideration.

Sincerely,

Dino X Chavez, MBA
Regional Sales Coordinator

**PS - It has been said and witnessed that there is power in numbers !!!!**

001055

# EXHIBIT-23

# *AFLAC*

*Rio Grande Valley Regional Sales Office*
*905 E Los Ebanos Blvd, Ste A * Brownsville, Texas 78520*
*Phone (956)982-3998 * Fax (956)982-0931*

**\*\*\*\*\*\*\*\*\*\*URGENT\*\*\*\*\*\*\*\*\*\*\***

November 12, 2001
Re:  IRS Section 125 Cafeteria Plan Services Proposal  -  *UPDATE*

Dear **Insurance Committee Campus Representative,**

On Friday of last week, we faxed you notification that a decision on the matter was tentatively scheduled to made at the school board meeting on Tuesday, November 13, 2001.  We have just learned that the item was removed from the agenda.  We do thank you for the dozens of calls we received in support of *AFLAC* and our continued relationship with BISD.  However, our concern now is that a decision on the matter has once again been postponed.  **If a cafeteria plan services provider is not officially chosen immediately, employees will be forced to make cafeteria plan decisions with little or no notice, similar to what happened recently with the group health coverage.  Employees deserve better !!**

As your campus's representative, please be aware and make others aware that a decision concerning the Section 125 Cafeteria Plan Services and Annuity Administration is yet to be made and that their opinions on the matter deserve to be heard.

Please be reminded that continuing with *AFLAC* will offer employees the best possible value and the best possible service.  In addition, you will keep business in Brownsville and continue saving employees money.  No other provider has contacted you directly to attempt to keep you informed.  No other provider values your business and your friendship as much as we do!  Please call me with any questions.  Thank you for your support and consideration.

Sincerely,

Dino X Chavez, *MBA*
Regional Sales Coordinator

Chavez
EXHIBIT NO. 38
3/19-03
Hill & Romero

*AFLAC* – Named: the # 1 insurance company in the world by *Forbes Global* magazine, Jan.1999;
*one of the best overall companies to work for three years in a row by* Fortune *magazine, Jan.1999, 2000, & 2001;*
*one of America's Most Admired companies by* Fortune *magazine, Feb.2001;*
*one of the 100 best places to work for Latinos by* Hispanic *magazine, Apr.2001;*
*with over 178,000 accounts worldwide, also recognized as # 1 at workplace marketing by* National Underwriters

001062

# EXHIBIT-24

VII.  PUBLIC AUDIENCE

November 13, 2001

(a).  SPARKY ESPARZA:

      Mr. Esparza:  Mr. President, then my time was cut to two minutes?

      MR. CHAIRMAN:  In order to accommodate all of the --

      Mr. Esparza:  May I present this as a  whole, and so it can be printed in public audience.  This is the second time I've been cut, if not the third, and I appreciate everybody that is speaking.  But let me start a little bit and then I just present the whole thing.

      First of all, Dr. Sauceda, Mr. President, members of the Board and those present and not present.  I pray that peace my abound in the world and lives be spared in any sphere of conflict.  Please, Board members, stand united as one, but respect differences of office.  Remember the plight of my soldiers off the field as they struggle with their paycheck insurance.

      In all fairness to the superintendent, I have been to his office many a time just before 5:00 p.m., and he was engaged in long meetings while his faithful secretaries were executing their duties.  This is truly dedication.

      I, for one, have faith in our young students from all schools, that they too shall continue in the spirit of patriotism and build a wall of strength and unity.  But

business administration, I would recommend you to be
assistant to Dr. ? Garcia at the College, but I won't do it
now. Thank you very much.

 MR. CHAIRMAN:  Next Dino Chavez, Cafeteria Plan.


(h).  DINO CHAVEZ:

 It's kind of hard to follow that gentleman.

 My name is Dino Chavez, I live here in
Brownsville, I work in Brownsville, I office in Brownsville,
I went to school in Brownsville.  I'm ashamed at the extreme
politics that goes on at the Board level.  It goes on at the
administration level, and it's all to the detriment of
employees.  Employees are the people who pay taxes, who live
in our community, who elected you to your positions.  Your
duty is to them.

 As a taxpayer of this community, I'd like to
make everybody aware and set the record straight of just a
few important facts that are currently going on with the
insurance.

 In August you-all went out for proposals on the
Cafeteria Plan.  I met with someone, not anyone in
particular, who told me that the only reason they were going
out for Cafeteria Plan is that they were dissatisfied with
the disability carrier.  When I spoke to that individual
that I had nothing to do with the disability carrier for the

22

District, he said "Well, sorry, that's my fault, I must have made a mistake."

I asked him why is it that you-guys are going out for proposals on the Cafeteria Plan and nothing else? He really couldn't answer my question. At the end of August, beginning of September, proposals were submitted for consideration. At the end of September the group health insurance policy was changed. Employees were given two days to make a very important decision in their lives.

At that time, as your Cafeteria Plan administrator, we recommended about a week and a half of these mini enrollments so that we could document the changes that happened as they relate to Section 125.

Guess what. We were told "You got two days, and we want you to set up here in the office here in the administration building. We don't want you to go to all the campuses." So all the phone calls that I received were misplaced with anger toward me, because it's nothing that I did.

On October 30th, 60 days after the proposals were in your hands, you finally had an insurance committee meeting to hear presentations from the various vendors, including ourselves. This meeting was held, co-incidentally, at the same time that the employees insurance committee was also called to meet. Somebody said

"divide and conquer."  I don't know if there's any truth to that.

      MR. CHAIRMAN:  You have 30 seconds.

      MR. CHAVEZ:  They didn't get to hear our presentation, the employees I'm talking about.  The decision on the matter was tabled and scheduled to be made at this meeting.  Once again the decision has been postponed and pulled off the agenda by someone.  I'd like to know who that someone is.  I think everybody deserves to know who that someone is.

      In the interest of accountability, the public deserves to know.  And finally, I'm not addressing this to any particular person, but as the head of our insurance committee, whoever that might be, I ask you to please be expeditious in making this decision.  Employees are the people who are going to be suffering.  That's all.

      MR. CHAIRMAN:  Stephen Andrus, Letter of Intro for 403(b) solicitation.

(i).  STEPHEN M. ANDRUS:

      For the record, my name is Stephen Andrus, I'm the owner and general manager of Teachers Agency of Texas, owner/general manager of Marketing 101 Insurance Services of California, owner/general manager of Teachers Agency of Western Wyoming, and registered representative of MacMar Investment Corporation.

# EXHIBIT-25

STATE OF TEXAS

COUNTY OF CAMERON

BE IT REMEMBERED, that on the 13th day of November, 2001, the Board of Trustees of the

Brownsville Independent School District met in a Rescheduled Regular Board Meeting at the

Administration Building, 1900 Price Road, Brownsville, Texas, for the purpose of transacting any and

all business that came before the Board and with the following to wit:

PRESENT:

| | |
|---|---|
| Joe Colunga | President of the Board |
| Linda Salazar | Vice – President of the Board |
| Hugh Emerson, Jr. | Secretary of the Board |
| Marilyn del Bosque-Gilbert | Assistant Secretary of the Board |
| Randy Dunn | Member |
| Pat Lehmann | Member |
| Herman Otis Powers, Jr. | Member |

ABSENT:

None

ALSO PRESENT:

| | |
|---|---|
| Dr. Noe Sauceda | Superintendent of Schools |
| Jeff Roerig | Attorney for the Board |
| Elizabeth Neally | Attorney for the Board |

ALSO ABSENT:

None

WHEREUPON, a quorum being present and it appearing before the Board, it is hereby so

found that notice of this Rescheduled Regular Board Meeting has been duly given in the manner and for

the length of time as prescribed by law. The meeting was called to order and declared ready for the

Rescheduled Regular Board Meeting
November 13, 2001
Page 2

transaction of business with the following to wit:

    **I.**  **Meeting called to order by President Colunga.**

    **II. Moment of Silence.**

    **III. Presentation of Colors** by the Rivera High School Air Force Junior ROTC Color Guard.

    **IV. Pledge of Allegiance** led by Ms. Linda Salazar and repeated in unison.

    **VI.**  Motion was made by Mr. Emerson, seconded by Mr. Dunn, and unanimously carried to approve the agenda of the Rescheduled Regular Board Meeting of November 13, 2001, with the following corrections:  Under **Item #VII** – the minutes are to be deleted from the agenda; under **General Function:  Item #F46** – is to be deleted from the agenda; and under **Closed Meeting (Personnel Matters):  Item #A53** – pages #393, and #394 are to be deleted from the agenda; and **Items #A62 and #A63** – pages #461 and #463 are to be replaced.

    Mr. Lehmann stated, "Mr. President, I want clarification, I visited with you on Thursday concerning the agenda.  I noticed that Item #47 has been deleted from the original draft and changes have been made to #49 of the proposed posted agenda and an insertion of Item #64.  Could I have clarification on that"?

    President Colunga asked Mr. Lehmann to described the items that were numbered items in the original.

    Mr. Lehmann stated, "When we visited with the Superintendent, can you let us know what happened to Item #47 on the original draft?: Did we delete anything"?

    Superintendent Sauceda responded, "No, sir.  The only thing that I have before me is the agenda that you received in your packet".

    Mr. Lehmann stated, "The one that I visited with the Board President #47 – Recommending awarding RFQ 12-02 to TPA to administer Cafeteria Plan that has been deleted".

    Superintendent Sauceda responded, "Yes, sir that was taken off to be considered at a future

Rescheduled Regular Board Meeting
November 13, 2001
Page 3

Meeting".

Mr. Lehmann stated, "Number 49 of the current agenda – that on the original draft said to reject now we are recommending to award"?

Superintendent Sauceda responded, "That is correct".

Mr. Lehmann stated, "Item #64 – did not show on the proposed draft on Thursday. Mr. Colunga you approved that, right. That particular agenda draft"?

President Colunga responded, "That is correct".

Mr. Lehmann stated, "Item #64 has been inserted have you approved these changes"?

President Colunga responded, "The only one was the original draft that was approved".

Mr. Lehmann stated, "Just for the record, I want to make that statement".

Mr. Powers stated, "Mr. Colunga, on the Special Called Board Meeting on October 30, 2001, we had an item that was suppose to be tabled for the next board meeting. The one on the recommended approval to accept the Margaret Clark Aquatic Center. Is there a reason why it is not on the agenda"?

Superintendent Sauceda responded, "Yea, we were not ready to move on that sir".

## VIII. SUPERINTENDENT'S REPORT

**CONFERENCE ITEMS:**

**A. CONFERENCE PRESENTATIONS:**

**1. Presentation on status of clean-up on the Mold Issues at Besteiro Middle School and Aiken Elementary School:**

Superintendent Sauceda stated, "I will call on Mr. Pineda, Assistant Superintendent for Operations, to lead the discussion. This is related to the clean up that is on going at Besteiro Middle School and Aiken Elementary. We have an update for you and we do have an action item related to a previous approved item". At this time, he asked Mr. Pineda to begin the presentation.

Mr. Pineda stated "As you may recall, a couple of weeks back we discussed the mold situation

to structure our presentation.  That is a good question if we can have those in advance and we can include them in our presentation".

Mr. Powers stated, "November 20[th] , to be on there as I specified them?"

## (HANDOUT ADDED TO OFFICIAL MINUTES)

**5.  Review of terms of contract previously approved by Board for Legal Services:**

Superintendent Sauceda  stated that he would call on Mr. Joe Colunga, Board President, to make the presentation.

President Colunga stated, "In review of the terms of contract that had been previously approved by the Board.  The contract had originally been presented to me for approval of what the Board had approved it.  And I had not signed the contract due to no timelines.  But it never came back to me.  Then later I had seen a copy of the finalized contract that did not have my signature on it.  It had your signature and the attorney's signature.  So, I was wanting to know what the process was and how Administration handles contract that are approved by the Board"?

Superintendent Sauceda responded, "Yes, sir.  The contract that was signed by the attorney and me was the contract that was approved by the Board.  And, if any directions are specified by the Board in terms of modification then certainly those are taken into consideration.  But, I signed that contract because you all approved it.  I cannot sign it if you all do not approve it".

President Colunga stated, "Who represents the Board on contracts that are approved by the Board"?

Superintendent Sauceda responded, "If you all approve it.  I can sign it.  I cannot sign it if the Board does not approve it.  So, I represent the Board".

President Colunga stated, "Why was the original calling for my signature then it was redone to eliminate that signature"?

Superintendent Sauceda responded, "Good question, Mr. Colunga.  All I can say is that we may

need to, if you recall under the Board Team Building Training, we do have an item that we are working on. One of which is operating procedures for the Board and we can certainly include an item as to what should occur from contracts that are approved. But just for the record, in districts that I have been Superintendent before the President or the Superintendent could sign contracts. And, I believe that is consistent with the law".

Mr. Lehmann stated, "Just for clarification, counsel, is that proper for the Superintendent to sign the contract without the Board President"?

Jeff Roerig, Legal Counsel, responded, "Superintendent can sign contracts for the Board. He does it every week".

Mr. Lehmann stated, "Okay. On the original contract that was proposed your name, the Board President's name, and the Superintendent's name was on it. They faxed me a copy and the Board President's name was deleted and there was an incursion. Who made that incursion since it was not initialed"?

Mr. Roerig responded, "I am not sure what you are referring to. If you can show me I can give you that answer"?

Mr. Lehmann stated, "Do you have a copy of the current contract"?

Superintendent Sauceda responded, "No, sir. Not with me"?

Mr. Dunn stated, "Mr. President, my question to Mr. Roerig, the law states when the school board or the school district has a Chief Executive Officer who is that Chief Executive Officer"?

Mr. Roerig responded, "The Superintendent".

Mr. Powers stated, "We need a ruling on a legal interpretation because if we vote on a contract and then the contract is amended should it have to come back to the Board to get amended"?

Mr. Roerig responded, "No. The contract was not amended. Let me explain. The contract was signed by BISD by Dr. Noe Sauceda. And then down here for the acceptance by the law firm I wrote

by the acceptance "Law firm's acceptance is conditional on its being exclusive lawyer for the traditional Board lawyer functions and signed it. That is conditioning my acceptance. That is not part of the contract. That is a condition of acceptance".

Mr. Powers stated, "So, if we vote on a contract and the Board President's signature is required on the Board attorney and we voted on it and then it is deleted and then the Superintendent signs and then there is an incursion that does not require to bring it back to the Board"?

Mr. Roerig responded, "There is nothing that has changed on there. I do not remember...Board President's signature...it is not required".

Superintendent Sauceda stated, "This is fixed very easily. If the Board wishes that on legal services contracts that only the Board President can sign then we will just put it in policy and that will take care of it. Right now the policy is silent and as CEO I can sign the contracts. The contract was not changed. But we can certainly through the Policy Committee if you all would like we can address that. We can address through the Operating Procedures Manual that is in development. The point here is and I like to use...examples: If the Board approved it and the President for whatever reason chose not to sign it, it does not negates the Board's action. The signature just verifies that the official action of the Board is reflected on that document. And so we should not get hung up on who signed it. The formal approval of the document was made by the Board and by my signing it or the Board President signing it does not change the essence of the contract".

President Colunga stated, "I just wanted to raise that question to inform my colleagues, fellow Board members of the process in dealing with contracts and the Board President's experience in dealing with that particular contract. So that they are at least aware of the approval that had been not signed by the President but had been amended in terms of the contract became different then what the Board saw at the meeting. I just wanted to point that out".

Mr. Powers stated, "Dr. Sauceda, with all due respect, did you notify the Board President of the

change"?

Superintendent Sauceda responded, "I believe that in the Operating Procedures if the Board wishes me to notify the President on every contract that I sign then we can do it. But, I tell you it is going to take a lot of the President's time and a lot of my time. But, we will do it".

Mr. Powers stated, "No, we are not asking that question. We are asking about the Board Attorney. That is the question we are asking. Did you notify Mr. Colunga of the change"?

Superintendent Sauceda responded, "No".

Mr. Dunn stated, "Mr. Roerig, was there a change in the contract or changing the contract language"?

Mr. Roerig responded, "No. There is not change in the contract. Yes, just the signature…

Mr. Lehmann stated, "No, I just need clarification. There is no initial as to who inserted this piece of language. This is a legal document. We just want clarification. I was surprised".

Mr. Roerig responded, "I wrote that. I wrote that above my signature conditioning my acceptance. What it is, is a volume discount". He explains the volume discounts that are provided in order to keep the cost to the District and the cost to the taxpayers down.

Mr. Lehmann stated, " My question would be. Would it have been prudent to have the Board as a whole, as a body, witness or agree to that change.

Discussion continues among the Board members and the attorney as to whether or not it would be prudent to bring the item back for approval and any changes to any documents the Board should be made aware.

### (HANDOUT ADDED TO OFFICIAL MINUTES)

### 6. Discussion of Board Attorney Role:

Superintendent Sauceda stated that he would call on Mr. Joe Colunga, Board President, to make the presentation.

# EXHIBIT-26

 # Brownsville Independent School District

## Board Of Trustees
## Regular Board Meeting

November 20, 2001
5:30 p.m.

Administration Building
1900 Price Road
Brownsville, Texas 78521-2417

# AGENDA

I.   **Meeting Called to Order.**

II.  **Moment of Silence.**

III. **Presentation of Colors by the Rivera High School AFJ ROTC.**

IV.  **Pledge of Allegiance.**

V.   **Roll Call:**

___ Joe Colunga, President                     ___ Dr. Noe Sauceda, Superintendent
___ Linda Salazar, Vice-President              ___ Jeff Roerig, Attorney
___ Hugh Emerson, Jr., Secretary               ___ Elizabeth Neally, Attorney
___ Marilyn del Bosque Gilbert, Assistant Secretary
___ Randy Dunn, Member
___ Pat Lehmann, Member
___ Herman Otis Powers, Jr., Member

VI.  **Recommend approving the agenda of the Regular Board Meeting of November 20, 2001, with any deletions.**

Motion _____    Second _____    Vote _____

VII. **Superintendent's Report.**

   **A.  Conference Presentation:**

      1. TEA Division of Migrant Education Campus and District Recognitions.

1

001081

B.  Conference Study Items:

    2.  Second Reading of Update 65 (Local Policies). .

C.  Standing Board Agenda Items:

    3.  Board Calendar.

## VIII. Public Audience

If you wish to address the Board of Trustees during the Public Audience portion of today's meeting, please print your name below. According to BISD Policy BED (Local), only those persons (on the list) who request to speak shall be heard. The speaker shall limit remarks to five minutes. The Board shall allot no more than 30 minutes for the Public Audience portion of the meeting. Complaints and concerns for which other resolution channels are provided shall be directed through those channels. These complaints include complaints on the following subjects: employee complaints, termination of employment, student complaints, removal to alternative education program, and expulsion. If the Board President determines that a person has not attempted to resolve a matter administratively, the person shall be directed to the appropriate policy for attempted resolution before bringing the matter to the Board. Complaints against specific employees or officers of BISD shall be heard in Closed Meeting, as authorized by the Texas Government Code Title 5 – Section: 551.074 (1) and (2). If your topic concerns complaints against specific employees or officers, please note this on the sign-up sheet. You must make your points on issues in a constructive and courteous fashion pursuant to Robert's Rules of Order.

**Closed Meeting: as pursuant to the Texas Government Code Section: 551.071, 551.072, 551.074, 551.075, 551.082, 551.083, and 551.084.**

    4.  Level III Grievance  (Jose G. Lamas - #001 – 01/02)

    5.  Complaint #001/2001-2002 – Catalina Presas Garcia

    6.  Parent Complaint #002/2001-2002 – Robert Uresti

        **(Board Reconvenes after Closed Meeting)**

    7.  Board Action on Level III Grievance (Jose G. Lamas - #001 – 01/02)

## IX.  Consent Agenda.

**General Function:**

2

001082

A. Recommend approval of the following General Fund on Items:

8. Recommend approval and adoption of Update 65 (Local Policies): BDB, BE, BJCF, CCG, CE, CFD, DEA, DFBB, DGBA, DGBA (Exhibit), DH, DHB, EJ, FD, FDA, FFAA, FFAB (Exhibit), FFAD (Exhibit), FL, FL (Exhibit), FM, FNA, FNCL, FNG and GF.

9. Recommend approval to accept the Margaret M. Clark Aquatic Center as substantially complete.

10. Recommend approval to accept the Porter High School Classroom Wing Addition as substantially complete.

11. Recommend approval to reclassify the 226 day Special Assignment position — ITV Studio Manager from a Pay Grade Level 2 to a Pay Grade Level 4.

12. Recommend approval to amend the Manual Trades and the Classified Personnel Calendars to provide Manual Trades and Classified Personnel employees with paid holidays on Friday, November 23, 2001 (Thanksgiving Holiday) and Monday, December 24, 2001 (Christmas Holiday).

13. Discussion and possible action to request RFQ's for Board legal services.

**B. Recommend approval of the following Payments:**

14. Recommend approval to pay the Buck Group $46,360.00 to be paid from Local Maintenance Funds.

**C. Recommend approval of the following Budget Amendments:**

15. Recommend approval of Budget Amendment #067 in the amount of $6,395.00 for Fund 384 – After School Initiative for Cummings Middle School. (Additional Funding)

16. Recommend approval of Budget Amendment #068 in the amount of $26,424.00 from Fund 199 – Local Maintenance Fund – Office Lease Agreements. (Fund Balance)

17. Recommend approval of Budget Amendment #069 in the amount of $78,972.00 from Fund 199 – Local Maintenance Fund – Office Lease Agreements. (Fund Balance)

18. Recommend approval of Budget Amendment #070 in the amount of $414,500.00 from Fund 199 – Local Maintenance Fund – Classified Employee Extra Days for fiscal year 2001-2002. (Fund Balance)

19. Recommend approval of Budget Amendment #072 in the amount of $14,000.00 from fund 199 – Local Maintenance Fund – Lopez High School Intercom. (Fund Balance)

**D.  Recommend approval of the following Agreements/Contracts:**

20. Recommend approval of Information Design annual renewal of software maintenance agreement in the amount not to exceed $29,450.00 from Local Maintenance Funds for the 2001-2002 school year.

21. Recommend approval of Pentamation annual renewal of software maintenance agreement in the amount not to exceed $59,278.67 from Local Maintenance Funds for the 2001-2002 school year.

22. Recommend approval to enter into contractual agreement with the City of Brownsville, Brownsville, Texas, in the amount not to exceed $89,764.50 for the Prevention Efforts Advancing Character Education (P.E.A.C.E.) Program for fifth grade students district-wide from budgeted State Compensatory Education Funds for the 2001-2002 school year. Services to be rendered subject to the District's needs and funding.

**E.  Bids/Proposals/Purchases Approval:**

**Recommend awarding and/or rejecting the following Bids:**

23. Recommend awarding Bid #010-02 for Request to Lease Office Space for School District Administrative Offices in the amount not to exceed $78,972.00 to Millan Development, LLC Brownsville, Texas, and to Paseo Plaza L.P., Brownsville, Texas. Services to be provided subject to the District's needs and funding.

24. Recommend approval to award RFQ #012-02 to National Plan Administrators/Insurance Associates of the Valley for Third Party Administrators to administer BISD's Cafeteria Plan (IRC Section 125) and administer the tax deferred annuity, custodial plan under section 403b and 403(b)(7) deferred compensation plan and custodial plans. Agent/Agency to solicit the individual products available.

25. Recommend awarding Bid #019-02 for the purchase of Playground Equipment for several schools in the amount not to exceed $30,923.29 to Gametime, New Braunfels, Texas, and to Park Place Recreation Designs, LTD., San Antonio, Texas. Items to be purchased subject to the District's needs and funding.

4

001079

26. Recommend awarding Bid #021-02 for Carpeting Materials and Installation district-wide in the amount not to exceed $125,000.00 to Diaz Floors & Interiors, Pharr, Texas. Items and services to be purchased subject to the District's needs and funding. (Annual Bid)

27. Recommend awarding Proposal #033-02 for Charter Bus Services district-wide in the amount not to exceed $75,000.00. Item #2 to Champion Tours, Rancho Viejo, Texas, items #3, #4, and #5 to Valley Transit Company, Harlingen, Texas, and items #3 and #5 to Surftran, Harlingen, Texas. Services to be provided subject to the District's needs and funding. (Annual Bid)

28. Recommend awarding Bid #195-01 for Air Door Curtains for School Cafeterias district-wide in the amount not to exceed $47,462.00 to SepCo Restaurant Supply Inc., Harlingen, Texas. Items to be purchased subject to the District's needs and funding.

X.   **Closed Meeting: as pursuant to the Texas Government Code Section: 551.071, 551.072, 551.074, 551.075, 551.082, 551.083, and 551.084**

A.   **Personnel Matters:**

29. Recommend approval of **Contractual** Professional Personnel for the 2001-2002 school year – ~~Teachers~~ subject to receipt of all outstanding documentation.

30. Recommend approval of **Non-Contractual** Professional Personnel for the 2001-2002 school year – **Human Resource Coordinator** subject to receipt of all outstanding documentation.

31. Board Self-Evaluation.

B.   **Consultation with Attorney:**

32. Consultation with attorney regarding pending or threatened litigation matters.

C.   **Real Property:**

33. Discussion of possible acquisition or sale of Real Property.

**(Board Reconvenes after Closed Meeting)**

29. – 30. Recommend approval on personnel matters discussed in Closed Meeting.

Motion _____ Second _____ Vote _____

5

001084

32. Recommend approval on litigation matters discussed in Closed Meeting.

Motion _____ Second _____ Vote _____

33. Recommend approval of acquisition or sale of Real Property discussed in Closed Meeting.

Motion _____ Second _____ Vote _____

**XI.**  **Correspondence and Information.**

**Committee Reports/Appointments.**

**Correspondence.**

**Suggestions for Future Meeting Agendas.**

**Announcement(s)**

**Regular Board Meeting** scheduled to be held on **Tuesday, December 4, 2001,** at the Administration Building at 5:30 p.m.

**Adjournment**

001085    6

# EXHIBIT-27

1900 Price Road Brownsville, Texas 78521-2417 (956) 548-8060 Fax (956) 548-8010

Noe Sauceda, Ph.D.
*Superintendent of Schools*

TO: _

FOR YOUR:
☒ INFORMATION
☐ SIGNATURE
☐ OTHER

PLEASE:
☒ HANDLE
☐ SEE ME

**To:** Assistant Superintendents

Area Superintendents

Principals

Employee Insurance Committee Members

**From:** Dr. Leonel Lopez

Administrator for Insurance & Safety Department

**Date:** 11/05/01

**Re:** Employee Insurance Committee Meeting / Submission of Questions

DATE:.

*Please make plans to attend. Place info in fall print*

---

Our next Employee Insurance Committee meeting will take place:

**Date: November 27, 2001 Tuesday**

**Time: 4:30 p.m. through 6:00 p.m.**

**Location: BISD Administration Building (Board Room)**

Refreshments and snacks will be provided. There will be sign-in sheets.

Questions (In regards to Insurance topics) maybe submitted to the Human Resources department via fax (982-3883). The deadline for the submission is **Monday November 12, 2001.**

Should you have any questions please contact our office at 548-8061. Thank you for your cooperation.

*Note the 11/05/01 date; recommendation was made prior to meeting even after meeting had been scheduled.*

**Xc:** Dr. Noe Sauceda, Superintendent

Mr. Eddie Errisuriz, Assistant Superintendent

Ms. Drue Brown, Public Information Office Administrator



Lopez
EXHIBIT NO. 20
3-26-03
Hill & Romero

001052

BISD does not discriminate on basis of race, color, national origin...

# EXHIBIT-28

# *AFLAC*

*RIO GRANDE VALLEY REGIONAL SALES OFFICE*
*905 Los Ebanos Blvd., Suite A * Brownsville, Texas 78520*
*Phone (956)982-3998 * Fax (956)982-0931*

## FAX TRANSMISSION

Date:  November 19, 2001                          Pages: 5  (including cover page)

From:  Dino X Chavez

## URGENT
## ------Please deliver immediately ------

To:    **BISD Insurance Committee Campus Representative**

RE:    **SECTION 125 CAFETERIA PLAN PROPOSAL**

MESSAGE:

This is part of our continuing effort to keep you informed of the facts.  Please call me with any questions.  A decision on the matter is scheduled to be made at the school board meeting on Tuesday, November 20, 2001.

> Chavez
> **EXHIBIT NO.** 32
> 3-19-03
> Hill & Romero

**If you do not receive the number of pages listed above, please notify us immediately.**

The information contained in this facsimile is privileged and confidential information intended for the use of the addressee listed above.  If you are neither the intended recipient nor the employee or agent responsible for the delivery of this message, you are hereby notified that any disclosure, copying, distribution, or taking of any action in reliance on the contents of the telecopied information is strictly prohibited.  If you receive this fax in error, please notify us immediately by telephone to arrange for the return of the original document.  Thank you.

001076

*AFLAC - Named the # 1 insurance company in the world by Forbes magazine and the # 1 insurance company to work for by Fortune magazine; with over 178,000 accounts worldwide, also recognized as # 1 at workplace marketing.*

# *AFLAC*

*Rio Grande Valley Regional Sales Office*
*905 E Los Ebanos Blvd, Ste A  *  Brownsville, Texas  78520*
*Phone (956)982-3998  *  Fax (956)982-0931*

## **\*\*\*\*\*\*\*\*\*\*URGENT\*\*\*\*\*\*\*\*\*\*\***

November 19, 2001
Re:  IRS Section 125 Cafeteria Plan Services Proposal

Dear **Insurance Committee Campus Representative**,

As was communicated to you by fax on November 9, BISD is about to make an insurance decision that could be detrimental to you.  **The change in the group health coverage that was made recently was made without your approval and was made to the detriment of your pocketbooks. This may be about to happen again!**

Attached, for your review, is a partial copy of the agenda for the next school board meeting scheduled for Tuesday, November 20, 2001.  Please see Item #24, "Recommend approval to award RFQ #012-02 to National Plan Administrators / Insurance Associates of the Valley for Third Party Administrators to administer BISD's Cafeteria Plan (IRC Section 125) and administer the tax deferred annuity, custodial plan under section 403b and 403(b)(7) deferred compensation plan and custodial plans.  Agent / Agency to solicit the individual products available."  **If this item is approved, it will definitely not be in the best interest of employees.**

As your campus's representative, please be aware and make others aware that their opinions need to be heard before it is too late.  For your information, there are several key differences between the AFLAC and the National Plan Administrators' (NPA) proposals:

1)  **AFLAC has provided the district with cafeteria plan services for the past three years.  We have a proven track record of thousands of satisfied BISD employees.**  Our voluntary products (accident, specified health event, and hospital indemnity) have increased the amount of voluntary choices for employees that were not available on payroll deduction before our time.  We have no desire to take over **all** employee benefits, unless that is what the insurance committee wants.  **If NPA / Insurance Associates of the Valley is chosen, all supplemental choices will have to go through them, thereby eliminating all local agents that currently provide their services to the district.**

2)  **Over the last three years, we have saved BISD employees well over $90,000.**  AFLAC will continue to provide all cafeteria plan services at **no charge** to the district or its employees, as long as we can continue to offer our **voluntary** supplemental insurance products (accident, specified health event, and hospital indemnity).  **If NPA is chosen, collectively, BISD employees will be assessed nearly $30,000 in fees annually for cafeteria plan services.  In addition, BISD employees could be assessed an additional $20,000 in enrollment fees.**  This does not make sense at all.

3)  **AFLAC maintains a local regional office in Brownsville.**  Employees currently walk in the door every day for service and / or questions.  They do not have to deal with 1-800 numbers or with agents that are hardly accessible from out-of-town offices.  This is especially critical for employees who have a

001077

Insurance Associates of the V~~~y's office is in Harlingen. Employ~~ will have to drive out-of-town if they want to see someone face-to-face.

4) **AFLAC processes claims daily. People have said we are the fastest in the industry.** We want to insure that you get access to your money immediately. Additionally, please be aware that back in February 2001, we offered the district the option to have us "front funds" to employees who need their flexible spending account money before the district actually writes us a check for the deduction they subtract from their pay. Much to our dismay, the decision to accept this benefit for employees at absolutely no cost has not been made and is still pending on someone's desk. If we are chosen to continue, we will do everything possible to insure that the district accepts this "fronting of funds" proposition so that employees can have access to their money even quicker. **To the best of our knowledge, NPA processes claims monthly. Please see the attachment copied from the NPA website.**

5) We do not offer annuities and therefore we do not offer annuity administration. **However, some experts in this field have informed us that the district's proposition to suddenly have an annuity administrator after not having one for the last several years may have an adverse effect on you by limiting your choices to only those annuities offered by or through the chosen annuity administrator.** In addition, if for some reason you are still given a choice, the chosen annuity administrator can make it cumbersome for you to purchase annuities from the open market. Moreover, employees will have to begin paying an additional monthly and/or annual fee to have an annuity administrator, thereby reducing their "real" rate-of-return. By our estimates, this would cost employees nearly $39,000 in fees annually in addition to the cafeteria plan fees outlined in #2 above.

6) **Lastly, the premiums for our voluntary products and for our free cafeteria plan services have remained unchanged for the last three years, making us the most stable company BISD has dealt with in recent memory.** Over the last five years, every insurance provider the district has dealt with has raised their rates or diminished their benefits in some form or fashion. AFLAC has not and will not. Moreover, if the district is willing to accept our contract, we are willing to guarantee no changes in fees or prices for an additional two years. **As an example, we have been notified that the district's cancer plan offered by Hartford through Insurance Associates of the Valley will undergo a rate increase this year.**

The choice should be yours. Make your opinions heard. AFLAC's proposal offers employees the best service at the best possible price. Accepting the NPA / Insurance Associates of the Valley proposal will force employees to drive out of town for service on top of paying nearly $50,000 in cafeteria plan fees plus nearly $39,000 in annuity fees. Keeping AFLAC means no fees whatsoever and local attention to your needs. Once again, no other provider has contacted you directly to attempt to keep you informed. No other provider values your business and your friendship as much as we do! Please call me with any questions. Thank you for your support and consideration.

Sincerely,

Dino X Chavez, MBA
Regional Sales Coordinator

001078

# EXHIBIT-29



Office of the Attorney General - State of Texas
John Cornyn

April 4, 2000

| The Honorable Troy Fraser<br>Co-Chair, Committee on Redistricting<br>Texas State Senate<br>P.O. Box 12068<br>Austin, Texas 78711-2068 | Opinion No. JC-0205<br><br>Re: Whether a junior college district may procure insurance using a designated broker of record (RQ-0135-JC) |
|---|---|

Dear Senator Fraser:

You ask about the authority of a junior college district to procure insurance using a designated broker of record. We conclude that a junior college district may not use a designated broker of record to purchase insurance contracts with premiums of an aggregate value of $10,000 or more for each twelve-month period. *See* Tex. Educ. Code Ann. §§ 44.031, 44.033 (Vernon Supp. 2000). A junior college district that expends less than $10,000, in the aggregate, on insurance premiums for each twelve-month period may use a designated broker of record to purchase insurance contracts, but the district's board of trustees should ensure that use of a designated broker of record is in the district's best interest and select a designated broker of record in a manner it determines is consistent with good business management. The district must also ensure that it purchases insurance according to a method that is in the district's best interest and that is consistent with good business management.

Before turning to your query, we wish to clarify the scope of this opinion. You ask: "Given all the choices an institution of higher education has to procure insurance (Education Code 44.031), is using a designated broker of record legitimate?" Letter from Honorable Troy Fraser, Texas State Senate, to Honorable John Cornyn, Texas Attorney General (Oct. 29, 1999) (on file with Opinion Committee) [hereinafter "Request Letter"]. The term "institution of higher education" could include both state universities and junior colleges. *See* Tex. Educ. Code Ann. § 61.003(8) (Vernon Supp. 2000) (defining "institution of higher education"). However, we limit our analysis to junior colleges. We do so because section 44.031 of the Education Code applies to school districts and junior college districts and does not apply to other institutions of higher education. *See id.* §§ 44.031, .0311. In addition, the request letter states that you submit the query on behalf of an insurance agent whose interest in these issues results from his unsuccessful attempt to bid to provide insurance to Tarrant County College, a junior college, *see id.* § 130.201. *See* Request Letter at 1. We also note that the letter states that the insurance agent "is concerned that institutions are using the broker of record to eliminate minority bidders." *Id.* at 1. Because you have not asked any particular questions in this regard, we do not address this issue.

Your letter does not provide details about the relationship between a junior college district and a "designated broker of record." We assume you refer to a situation where the junior college district arranges to purchase insurance through a single insurance agent who then obtains bids or proposals from insurance companies on the junior college district's behalf. We assume that the broker is licensed as may be required by the Insurance Code. *See, e.g.,* Tex. Ins. Code Ann. arts. 21.07-1, 21.07-2, 21.14, 21.14-1 (Vernon 1981 & Supp. 2000). We also gather that the insurance companies from whom the junior college district purchases insurance pay the agent a commission and that the agent is not compensated by the junior college district.

We understand that an insurance agent will be affiliated with a limited number of insurance companies. For this reason, a designated broker of record will not be able to solicit rates on the

district's behalf fre... all possible insurance companies for a particu... . policy. Because the use of a designated broker of record will necessarily limit the number of companies from which the district may purchase insurance, it may foreclose the district's access to the most advantageous rates and terms.

Before answering your questions, we briefly review the unique legal status of junior college districts and the Education Code provisions regarding junior college district purchases, including purchases of insurance contracts. Under the Education Code, "The board of trustees of junior college districts shall be governed in the establishment, management and control of the junior college by the general law governing the establishment, management and control of independent school districts insofar as the general law is applicable." Tex. Educ. Code Ann. § 130.084 (Vernon 1991). For this reason, junior college districts are governed by many of the same statutes that govern school districts.

In the absence of specific statutory requirements and limitations, school and junior college district boards of trustees are granted broad authority to manage the affairs of their districts. *See id.* § 11.151(b) (Vernon 1996) ("The trustees as a body corporate have the exclusive power and duty to govern and oversee the management of the public schools of the district."). School district purchases of a certain monetary value are governed by the detailed provisions of subchapter B of chapter 44 of the Education Code, including section 44.031 of the Education Code mentioned in your request. In 1996, this office concluded that a junior college district was subject to subchapter B. *See* Tex. Att'y Gen. Op. No. DM-387 (1996) at 3-4. The Seventy-sixth Legislature recently confirmed this conclusion by enacting section 44.0311 of the Education Code, which expressly provides that subchapter B applies to junior college districts. *See* Tex. Educ. Code Ann. § 44.0311(a) (Vernon Supp. 2000) (enacted by Act of May 28, 1999, 76th Leg., R.S., ch. 1225, § 2, sec. 44.0311, 1999 Tex. Gen. Laws 4257, 4258-59). Thus, for purposes of subchapter B "'board of trustees' includes the governing board of a junior college district." *Id.* § 44.0311(b).

For purposes of section 44.031 and other provisions in subchapter B, a contract to purchase insurance is not a contract for professional services, but rather a contract to purchase personal property subject to generally applicable purchasing procedures. *See* Tex. Att'y Gen. Op. No. DM-347 (1995) at 5-7 (concluding a contract to purchase insurance was a contract to purchase personal property subject to statutory predecessor to section 44.031 of the Education Code, former Education Code, section 21.901) (overruling Tex. Att'y Gen. Op. Nos. MW-494 (1982), MW-342 (1981)); *see also* Tex. Att'y Gen. Op. No. DM-418 (1996) at 5 ("[S]ection 44.031 does not affect our conclusion in Attorney General Opinion DM-347 that a contract for the purchase of insurance is not a contract for professional services. . . . Under section 44.031 of the Education Code, a school board must award all contracts not for professional services, produce, or vehicle fuel in accordance with subsection (a), so long as the value of the contract exceeds $24,999.99 in the aggregate for a twelve-month period."). Thus, although the subchapter B purchasing provisions, as a general matter, do not apply to contracts for personal services, we need not consider that exception here. *See* Tex. Educ. Code Ann. § 44.031(f) (Vernon Supp. 2000) ("This section does not apply to a contract for professional services rendered, including services of an architect, attorney, or fiscal agent. A school district may, at its option, contract for professional services rendered by a financial consultant or a technology consultant in the manner provided by Section 2254.003, Government Code, in lieu of the methods provided by this section.").

Like purchases of most items, the procedures applicable to the purchase of insurance will depend upon the aggregate value of the school or junior college district's insurance contract premiums in a twelve-month period. Section 44.031, which applies to purchases valued at $25,000 or more in the aggregate for each twelve-month period, lists several purchasing methods and requires a district to use the method that provides the best value:

(a) Except as provided by this subchapter, all school district contracts, except contracts for the purchase of produce or vehicle fuel, valued at $25,000 or more in the aggregate for each 12-month period shall be made by the method, of the following methods, that provides the best value for the district:

(1) competitive bidding;

(2) competitive sealed proposals;

(3) a request for proposals, for services other than construction services;

(4) a catalogue purchase as provided by Subchapter B, Chapter 2157, Government Code;

(5) an interlocal contract;

(6) a design/build contract;

(7) a contract to construct, rehabilitate, alter, or repair facilities that involves using a construction manager; or

(8) a job order contract for the minor construction, repair, rehabilitation, or alteration of a facility.

*Id.* § 44.031(a). A district may also consider several subjective factors:

(b) Except as provided by this subchapter, in determining to whom to award a contract, the district may consider:

(1) the purchase price;

(2) the reputation of the vendor and of the vendor's goods or services;

(3) the quality of the vendor's goods or services;

(4) the extent to which the goods or services meet the district's needs;

(5) the vendor's past relationship with the district;

(6) the impact on the ability of the district to comply with laws and rules relating to historically underutilized businesses;

(7) the total long-term cost to the district to acquire the vendor's goods or services; and

(8) any other relevant factor that a private business entity would consider in selecting a vendor.

*Id.* § 44.031(b); *see also R.G.V. Vending v. Weslaco Indep. Sch. Dist.,* 995 S.W.2d 897, 899-900 (Tex. App.-Corpus Christi 1999, no pet.) ("[T]he criteria listed in section 44.031(b) are the only criteria that may be considered by the district in its decision to award the contract. The use of permissive language in the statute indicates that a school district has the discretion to apply one, some, or all of those criteria. The school district may not, however, completely ignore the listed criteria."). Section 44.031 authorizes a district board of trustees to "adopt rules and procedures for the acquisition of goods or services." Tex. Educ. Code Ann. § 44.031(d) (Vernon Supp. 2000).

Again, section 44.031 applies only to purchases valued at $25,000 or more in the aggregate for each twelve-month period. Another statute, section 44.033, governs purchases of personal property with a value of at least $10,000 but less than $25,000, in the aggregate, for a twelve-month period. *See* Tex. Att'y Gen. Op. No. DM-418 (1996) at 7 (noting that section 44.033 of the Education Code applies to purchases of insurance). This provision requires a district to purchase those items either in accordance with section 44.031(a) and (b) or according to

special procedures. *See* Tex. Educ. Code Ann. § 44.033(a) (Vernon Supp. 2000) ("A school district shall purchase personal property as provided by this section if the value of the items is at least $10,000 but less than $25,000, in the aggregate, for a 12-month period. In the alternative, the school district may purchase those items in accordance with Sections 44.031 (a) and (b)."). The special procedures set forth in section 44.033 include publishing notice, creating a vendor list, and obtaining price quotations from at least three vendors. *See id* § 44.033(b), (c).

The phrase "in the aggregate," as it is used in sections 44.031 and 44.033, requires a district "cumulatively to value contracts for like products that a school district normally would purchase together." Tex. Att'y Gen. Op. No. DM-418 (1996) at 9. Whether a district must aggregate premiums paid on different types of insurance coverages:

> may depend upon the local market; . . . the types of coverage involved, the size or location of the school district, and other factors that we are unable to predict. Possibly, one school district would normally contract to purchase certain products together, while another school district normally would not contract to purchase the same products together.

*Id.*

Finally, contracts with a value of less than $10,000, in the aggregate, for a twelve-month period are not subject to chapter 44, subchapter B. In the absence of statutory limitations on purchasing, school district trustees "'are required merely to act faithfully and in the exercise of their best judgment so as to best serve the interest of their district.'" *Gaynor Constr. Co. v. Board of Trustees, Ector County Indep. Sch. Dist.*, 233 S.W.2d 472, 478 (Tex. Civ. App.-El Paso 1950, writ ref'd) (citing Tex. Att'y Gen. Op. No. O-525 (1939)); *see also Stapleton v. Trussell*, 196 S.W. 269, 270 (Tex. Civ. App.-Fort Worth 1917, no writ). Thus, if contracts have an aggregate yearly value of less than $10,000, a district has the discretion to determine how it will make the purchases. A district may opt to make such purchases using the competitive procedures set out in sections 44.031 and 44.033 if its board of trustees determines that good business management requires it. *See* Tex. Att'y Gen. Op. No. DM-347 (1995) at 6-7 (noting that school district may use competitive bidding to make purchases valued at less than statutory cap if school board determines that good business management requires it); *see also Patten v. Concho County*, 196 S.W.2d 833, 835 (Tex. Civ. App.-Austin 1946, no writ) (although not required to make particular purchase through competitive bidding, commissioners court in its discretion may utilize such procedure if it determines "good business management" requires it).

We now turn to your specific questions. First, you ask whether a junior college district's purchase of insurance through a designated broker of record is legitimate under section 44.031 of the Education Code. We conclude that chapter 44, subchapter B of the Education Code does not permit the use of a designated broker of record for insurance contract purchases subject to its provisions.

Section 44.031 and its sister statute, section 44.033, establish a list of permissible purchasing methods for contracts over a certain aggregate yearly value. Since chapter 44, subchapter B was first enacted in 1995, the list of permissible methods has become increasingly comprehensive and now includes methods that involve the services of an individual. For example, section 44.031 now includes as a purchasing method use of "a contract to construct, rehabilitate, alter, or repair facilities that involves using a construction manager." Tex. Educ. Code Ann. § 44.031(a)(7) (Vernon Supp. 2000). Sections 44.037 and 44.038 set forth specific procedures for using a construction manager. We believe that, like use of a construction manager, use of a designated broker of record to purchase insurance is a purchasing method that must be expressly authorized.

Furthermore, as we have noted, a designated broker of record will have affiliations with a limited number of insurance companies. As a result, use of a designated broker of record will necessarily limit a district's access to all available rates and terms and might foreclose the district's access to the most advantageous rates and terms. This is contrary to the purpose of the subchapter B competitive purchasing procedures, which is to ensure that districts obtain the

best value. *See* .... § 44.031(a) (charging districts with selecting ...e method that provides the "best value for the district"). In addition, of the eight purchasing methods authorized by section 44.031(a), competitive bidding, competitive sealed proposals, and a request for proposals appear to be most suited to insurance contract purchases. Even if a district were to instruct a designated broker of record to solicit terms and rates using one of these methods, the district would not have used the method in its truest, most complete form. For this reason, we believe that the legislature must expressly authorize use of designated brokers of record, as it has done in the context of certain municipal insurance purchases. *See* Tex. Loc. Gov't Code Ann. § 252.024 (Vernon 1999) (providing that municipal competitive purchasing requirements do not "prevent a municipality from selecting a licensed insurance broker as the sole broker of record to obtain proposals and coverages for excess or surplus insurance").

In sum, because use of a designated broker of record is not authorized by sections 44.031 and 44.033, a junior college district may not use a designated broker of record to purchase insurance contracts with premiums with an aggregate yearly value of $10,000 or more. A district must use one of the methods listed in section 44.031 if purchasing insurance contracts with premiums of $25,000 or more in the aggregate for each twelve month period. It must comply with section 44.033 if purchasing insurance contracts with premiums of at least $10,000 but less than $25,000, in the aggregate, for a twelve-month period. *See* Tex. Educ. Code Ann. §§ 44.031, .033 (Vernon Supp. 2000). Again, the phrase "in the aggregate," as it is used in sections 44.031 and 44.033, requires a district "cumulatively to value contracts for like products that a school district normally would purchase together." Tex. Att'y Gen. Op. No. DM-418 (1996) at 9. Whether a district must aggregate premiums paid on different types of insurance coverages will depend upon a number of factors and is beyond the purview of this office. *See id.*

For purchases of insurance contracts with premiums with an aggregate yearly value of less than $10,000, districts have greater, but not unfettered, discretion. Given that use of a designated broker of record will automatically limit the insurance companies available to a district, each junior college district board of trustees is obligated to consider whether use of a designated broker of record is in its district's best interest. *See Gaynor Constr.*, 233 S.W.2d at 478. Other options may provide a district with more advantageous rates and terms. Because a district does not compensate a designated broker of record, the selection of a designated broker is not governed by section 44.031 or 44.033. However, should the board decide that use of a designated broker of record is in the district's best interest, the board should also consider whether good business management requires selection of a designated broker of record according to a competitive process borrowed from chapter 44, subchapter B or of its own design. *See* Tex. Att'y Gen. Op. No. DM-347 (1995) at 6-7.

Your second question is as follows: "If an institution of higher education uses competitive bidding to hire a designated broker of record[,] is the broker then required to use competitive bidding to procure insurance?" Request Letter at 1. Given our conclusion that a district is not authorized to use a designated broker of record for purchases subject to sections 44.031 and 44.033, we address this question only with respect to purchases of insurance contracts with premiums with an aggregate yearly value of less than $10,000. We do not believe that the method a district uses to select a designated broker of record dictates the method used to purchase insurance. We also stress that it is the district, rather than the broker, that actually purchases insurance from insurance companies. A junior college district that uses a designated broker of record must work with the agent to ensure that the district purchases insurance according to a method that is in the district's best interest and is consistent with good business management.

## SUMMARY

A junior college district may not use a designated broker of record to purchase insurance contracts with premiums of an aggregate value of $10,000 or more for each twelve month period. *See* Tex. Educ. Code Ann. §§ 44.031, 44.033 (Vernon Supp. 2000).

A junior college district that expends less than $10,000, in the aggregate, on insurance

premiums for eac. .welve-month period may use a designated bro. of record to purchase insurance contracts, but the district's board of trustees should ensure that use of a designated broker of record is in the district's best interest and select a designated broker of record in a manner it determines is consistent with good business management. The district must also ensure that it purchases insurance according to a method that is in the district's best interest and is consistent with good business management.

Yours very truly,

JOHN CORNYN
Attorney General of Texas

ANDY TAYLOR
First Assistant Attorney General

CLARK KENT ERVIN
Deputy Attorney General - General Counsel

ELIZABETH ROBINSON
Chair, Opinion Committee

Mary R. Crouter
Assistant Attorney General - Opinion Committee

POST OFFICE BOX 12548, AUSTIN, TEXAS 78711-2548 TEL: (512) 463-2100 WEB: WWW.OAG.STATE.TX.US
*An Equal Employment Opportunity Employer*

Home | Opinions

# EXHIBIT-30

# Internal Revenue Service
DEPARTMENT OF THE TREASURY

The Digital Daily



-Home > Tax Professionals

Internal Re

Forms Finder

Search Help

Contents
. e-file Providers
Enrolled Agents
Enrolled Actuaries

Resources
e-file
Forms and Publications
Where to File
Contact My Local Office
FAQs
Taxpayer Advocate

Tax Pro News
Tax Pro Events
Subscription Services
IRS Resources
Tax Issues
More Topics . .

# Part 7
# Employee Plans and Exempt Organizations

# Chapter 7
# Employee Plans Guidelines

# Section 1
# Introduction

## Contents

- 7.7.1 Introduction
  - 7.7.1.1 Overview
  - 7.7.1.2 EP Examination Guidelines Handbook
  - 7.7.1.3 Actuarial Matters
    - 7.7.1.3.1 Actuarial Assistance
    - 7.7.1.3.2 Requests for Waiver of Minimum Funding Standard

## 7.7.1.1  (04/20/99)
## Overview

1. Guidance is provided on technical issues that EP examiners will encounter durin examination of a Form 5500, Annual Return/Report of an Employee Benefit Pla (including Forms 5500C, 5500CR, 5500EZ) or Form 5330, Return of Excise Ta Related to Pension and Profit Sharing Plans. These guidelines are also helpful to specialists reviewing determinations matters.
   - A. IRM 7.7, Section 2, Plan Terminations, provides detailed guidance that r to both the determinations and examinations programs. This material wa formerly provided in IRM 7753, Plan Terminations Handbook.
   - B. Topics covered in IRM 7.7.1, Examination Guidelines Handbook, provid in depth discussion of a range of issues relating to an employee plan, incl general plan qualification issues and actuarial issues such as deductibility contributions and minimum funding.
2. The issues are addressed in a comprehensive manner and provide a technical discussion and techniques for processing and/or examining each issue.
   - A. Topics relating to determination matters are referred to as "Processing St
   - B. Topics relating to an examination of a 5500 series form or Form 5330 are referred to as "Examination Steps."
3. The guidelines address issues for which there is an established principle of law, where the answer is clear or reasonably certain. This applies generally where regulations or other published guidance has been issued. Where applicable, a top will indicate whether it has been updated for a specific law or new legislation.

Guidance on these and additional topics will be added to, updated and expanded necessary.

4. The guidance is for reference and use by EP personnel including specialists, actu reviewers on the Technical/Review Staff and appropriate supervisory and manag personnel. They may also be used as training aids for new personnel.

5. To ensure a uniform approach when examining employee plans matters and for general techniques on conducting an examination, refer to the following:
   o IRM 7.6, EP/EO Examination Procedures
   o IRM 7.6.1, EP Examination Procedures Handbook
   o IRM Part IV, Examination function

   **NOTE:**
   For purposes of this Manual, reference to EP specialist includes examine: (agents) and tax law specialists (where applicable).

## 7.7.1.2 (04/20/99)
## EP Examination Guidelines Handbook

1. In IRM 7.7.1, guidance is provided on specific technical topics of particular inter relating to qualified retirement plans. These guidelines are for the use of all EP examiners in the examination of plans and their related trusts with respect to pen profit-sharing, stock bonus, and other arrangements within the jurisdiction of employee plans.

2. The issues are addressed in a comprehensive manner and provide a technical discussion and suggestions for examining each issue, labeled Examination Steps Where applicable, a topic will indicate whether it has been updated for a specific or new legislation. Guidance on these and additional topics will be added to, upd and expanded when necessary.

## 7.7.1.3 (04/20/99)
## Actuarial Matters

1. Issues relating to actuarial matters generally involve the minimum funding stand or deductible limits. The guidance provided under these guidelines do not cover problem that could arise in an examination. However, the examiner is in no way limited to raising questions relating to only those problems identified.

2. Examples of issues that may arise during an examination, include:
   A. Employers who maintain both a defined benefit plan and a profit-sharing stock bonus plan. In this instance, the special deduction limitations in IR( (a)(7) apply.
   B. Multiemployer plans, which are subject to many special rules in the fund areas. Guidance provided on multiemployer plans will be placed in IRM when it is finalized.

3. One particular problem that occurs in a multiemployer plan is that the negotiated contribution may not be fully deductible. Deductible limits are determined from actuarial valuation. Additional rules which apply particularly to multiemployer p include--
   A. IRC 418 through 418C, the reorganization status and adjustments to the minimum funding requirements.
   B. Reg. 1.412(c)(1)-2, the shortfall funding method.
   C. IRC 413(b)(5), (6) and (7), the allocation of deductions and the IRC 497 excise tax liability among participating employers.

## 7.7.1.3.1 (04/20/99)
## Actuarial Assistance

1. The Assistant Commissioner (EP/EO), is responsible for providing actuarial assi to all Service components, the Office of Chief Counsel, the Treasury Departmen other government agencies.
   A. Actuaries in the EP Division provide actuarial assistance on questions rel to employee plans matters, i.e., pensions, profit-sharing plans and other programs.
   B. Actuaries may also provide assistance to government units outside of the Employee Plans areas.

2. Assistance will be provided in response to actuarial questions relating to the foll

issues:
  A.  tax treatment of pension, profit-sharing, stock bonus, annuity, life insuran accident and health plans;
  B.  tax treatment of other benefit and compensation plans and contracts;
  C.  taxation of life insurance companies;
  D.  determination of unstated interest on certain deferred payments; and
  E.  valuation of life estates, remainder interest, contingent assurances, series payments and actuarial interests in trusts.

3.  Assistance is also furnished to the Office of Chief Counsel and the Justice Depar (through the Office of Chief Counsel) in the development and presentation of ac issues for trial or pre-trial settlement, and may include securing or providing exp witnesses in case of litigation.

4.  Requests for assistance submitted by the field that relate to a specific case must l submitted under established procedures for requesting technical advice. See Rev 99-6, 1999-1, I.R.B. 187 (revised annually).

5.  Telephone Contact. EP specialists and examiners are encouraged to contact an a with actuarial funding and deduction questions resulting from employee plans actuarial examinations. Actuaries are located in each of the Key District Offices (KDOs) (field actuary) and the National Office (Headquarters (HQ)). Or, EP specialist's who have received actuarial training may also be available to answer questions.

### 7.7.1.3.2 (04/20/99)
### Requests for Waiver of Minimum Funding Standard

1.  Delegation Order No. 159, as revised, authorizes the Assistant Commissioner (E and the Director, EP Division, to approve under IRC 412(d) a waiver of the mini funding standards and to perform the corresponding duties with respect to minim funding under ERISA 303. Currently, Rev. Proc. 94-41 sets forth the procedure i requesting a waiver.
  A.  When a waiver is granted for a money purchase pension plan, the plan m need to be amended to take such waiver into account. See Rev. Rul. 78-2 1978-1 C.B. 125, which discusses plan amendments.
  B.  For procedures with respect to a money purchase pension plan for reques waiver of the minimum funding standard account and requesting a determination letter on any plan amendment required for the waiver, see Proc. 94-41, 1994-1 C.B. 711 and section 15 of Rev. Proc. 99-6.

---

Internal Revenue  Part 7 Employee Plans and Exempt Organizations Chap.     (04/: 
Manual             7 Employee Plans Guidelines Sec. 1 Introduction

---

IRS Privacy and Security Policy | Contact Us | ©2001 IRS.gov

IRM 7.7.1
Employee Plans Examination Guidelines Handbook

Chapter 13
403(b) PLANS

13.1
Overview

(1)   Guidance  is  provided  on  how  to  examine  a  plan
described  in  Internal  Revenue  Code  ₃  403(b)  (a  "403(b)
plan").

!   13.1 defines  a  403(b)  plan  and  provides  a  technical
overview and historical background of 403(b) plans.

!   13.2 discusses  the  types  of  employers  eligible  to
maintain a 403(b) plan.

!   13.3 describes the various funding vehicles for 403(b)
plans.

!   13.4 addresses  the  requirements  of  salary  reduction
contributions.

!   13.5 addresses  the  contribution  limits  applicable  to
403(b) plans.

!   13.6 discusses the applicable nondiscrimination rules.

!   13.7 - 9 address distributions from a 403(b) plan.

!   13.10 provides  a  list  of  possible  defects  in  a  403(b)
plan  or  annuity  contract  and  resulting  tax
consequences.

!   13.11 is a glossary of terms.

(2)   These  guidelines  address  only  employee  plans  issues
and  are  intended  to  assist  the  employee  plans  specialist  in
examining a plan.

!   Given  the  highly  technical  requirements  of  403(b)
plans,  the  agent  may  need  to  consult  the  Code  and
federal Income Tax Regulations for further development
of  a  particular  issue.   Accordingly,  cites  are
provided where appropriate.

!   They  are  designed  to  help  the  examiner  key  in  on  the
issues that should be raised in a particular plan.  It
is  not  expected  that  every  issue  raised  in  the
guidelines  will  be  relevant  or  should  be  raised  in
every examination.

!   The  techniques  identified  may  be  modified  based  on  the
actual examination issues encountered.

! Given the purpose of these guidelines, they cannot be, nor are they intended to be, a precedential or comprehensive statement of the legal position of the Service on the issues covered.

! They are not to be relied on or cited as authority by taxpayers.

! They are subject to change in accordance with future developments in the law.

**13.1.1
Technical
Overview**

(1) Historical background and regulatory framework of 403(b) plans.

a. Section 403(b) was first added to the Code in 1958.

b. In 1964, pre-ERISA regulations were issued detailing some of the basic statutory provisions of ₃ 403(b). These regulations were later amended as new provisions were added to ₃ 403(b).

c. Final regulations were issued under ₃ 415 in 1980.

d. In addition, there are recently issued proposed regulations pertaining to the minimum distribution requirements and final regulations regarding **direct rollovers**. (**Bold** font indicates the term or phrase is defined in the Glossary). Currently, there are no nondiscrimination regulations under ₃ 403(b).

**13.1.1.1
General
Requirements**

(1) Dating back to 1958, a 403(b) plan was less in the nature of a plan than an arrangement under which an employer purchased an individual **annuity contract** on behalf of an employee from an insurance company. With the enactment of the Tax Reform Act of 1986 ("TRA '86") and subsequent legislation, 403(b) plans became more like qualified retirement plans. For the first time, 403(b) plans or the **annuity contracts** thereunder must:

a. Comply with certain nondiscrimination and coverage rules (including ₃₃ 401(a)(4), 401(m) and 410(b)),

b. Ensure that **elective deferrals** do not exceed the ₃ 402(g) limit,

c. Conform to the minimum distribution rules of ₃ 403(b)(10), and

d. Provide a participant with a meaningful opportunity to elect a **direct rollover** to another **eligible retirement plan**.

(2)  403(b) plans take a wide variety of forms.  Even where a 403(b) plan takes the form of an arrangement rather than a plan, it is nevertheless subject to all of the requirements of ₃ 403(b).

**EXAMPLE 1:**  The employees of Public School District Y participate in a 403(b) plan ("Plan").  Employer's involvement in the Plan is strictly limited to providing a list of insurance carriers to employees and executing **salary reduction agreements.**  The Plan is not described in a basic or summary plan description (SPD).

**EXAMPLE 2:**  Employer is an organization described in ₃ 501(c)(3) and exempt from tax under ₃ 501(a).  Employer maintains a 403(b) plan for its employees.  The 403(b) plan consists of a lengthy plan document, and employees are informed of plan features through annual SPDs.

(3)  A 403(b) plan is always subject to Title II (relating to the Code) but may not be subject to Title I, the Labor Title of ERISA.

**EXAMPLE 3:**  Assume the same facts as in Example 1.  While the Plan may not be an "employee benefit plan" under Department of Labor (DOL) Reg. ₃ 2510.3-2(f), the Plan is nevertheless subject to Code requirements.

## 13.1.1.2 General Characteristics

(1)  A 403(b) plan is a retirement plan under which a public school or an organization described under ₃ 501(c)(3) and exempt from tax under ₃ 501(a) purchases **annuity contracts** or contributes to **custodial accounts** for its employees.  It also includes a **retirement income account** under which contributions are made by or on behalf of certain ministers.  Section 403(b) plans are exempt from the requirements applicable to qualified annuity plans under ₃ 403(a) and are governed by their own separate requirements under ₃ 403(b).  Section 403(b) plans are also known as:

! 403(b) arrangements
! tax-sheltered annuities
! tax-deferred annuities
! **annuity contracts**

NOTE:  Throughout these Guidelines, the term **"annuity contracts"** encompasses **custodial accounts** and **retirement income accounts** unless otherwise specified.

(2)  Contributions to a 403(b) plan may consist of

# EXHIBIT-31

under the bribery statute that reads as follows.  A trustee
shall not knowingly offer, confer on any or benefit --  I
believe that a trustee received a commission from a land
sold us by a real estate company for which the trustee
works.  I find this action to be ? and I believe that the
trustee should pay that money back to the school district.
I do not make any money off this district, especially if I
can run this platform.  Thank you.


                       PUBLIC AUDIENCE
                     NOVEMBER 20, 2001


PAT SCHUMACHER, RE:   INSURANCE AT LOPEZ CAMPUS
          Good evening, Mr. Colunga, Board members, Dr.
Sauceda, administrators and other people in the audience.  I
am here tonight to represent the Lopez High School staff.  I
have been elected to represent them in matters dealing with
insurance.
          At issue is the proposal on tonight's agenda to
change the Cafeteria plan to NPA.  According to the
information available to me, this new plan would increase
out-of-pocket expenses to the employees at a minimum of
$5.00 enrollment and $3.00 monthly to administer the plan.
          Time after time school district employees have
stood at this podium asking for our insurance cost to not be

motivator, a people person.  It's very, very, very important in order for a school to run right.

Thank you.

MR. CHAIRMAN:  Thank you.  Next Dino Chavez, subject Cafeteria Plan.


DINO CHAVEZ:  RE:  CAFETERIA PLAN

Board members, my name is Dino Chavez, I represent Aflac.  We are the District's current Cafeteria Plan administrator.  Our office is here in Brownsville, all live in Brownsville, our agents are Brownsville and Valley agents.

I'm here tonight to explain to you five reasons why you should choose Aflac.  Legality, which is the most important one.  I'm not an attorney, and I don't claim to be, but according to the Texas Attorney General's Office in their legal opinions dated May 8th, 1987 and April 4th, 2000, Granting an Agent of Record designation to an insurance agent or agency is illegal when the value of the contract is more than $10,000.00.  Moreover, granting an individual an Agent-of-Record letter for the purpose of soliciting optional retirement investments or annuities is also illegal.

Approving agenda item number 24, that reads "Recommend approval to award RFQ No. 012-02 to National Plan

Administrators, Insurance Associates of the Valley, would be illegal, as their proposal calls for an agent-of-record designation.

MR. CHAIRMAN: One minute remaining.

Number 2, cost. All of Aflac's Cafeteria Plan services are totally free of charge to the District and to its employees. We've already saved the District employees over $90,000.00 in the last three years. NPA's proposal would cost employees over $30,000.00 in annual Cafeteria fees, plus over $32,000.00 in enrollment fees, plus another $39,000 in annuity fees. Cumulatively, employees would be forced to pay approximately $101,000.00 in first-year fees alone for something that we provide totally free of charge.

Service. Claims turnaround. Our FSA claims are processed daily, and have a turnaround time of 24 to 48 hours. In addition, as we proposed in February of 2001, we can front funds to BISD employees so that they do not have to wait for the District to write us a check before they can request reimbursement for un-reimbursed medical claims.

According to NPA's proposal, they process claims monthly. Employees will be forced to wait much longer for their FSA claim reimbursements.

Number 4, flexibility. We do not require specificity for all the District's supplemental products, as was rumored. We will place under the Cafeteria Plan

45

whichever products or companies are chosen by the District's insurance committee.

   MR. CHAIRMAN:  You have about ten seconds.

   MR. CHAVEZ:  NPA, Insurance Associates of the Valley, requires an Agent-of-Record letter.  As per the opinions issued by the Texas Attorney General's Office dated April 4th, 2000, I quote, "Because the use of a designated broker of record will necessarily limit the number of companies from which the District may purchase insurance, it may foreclose the District's access to the most advantageous rates and returns."

   And lastly, number 5, local agents, local office and local service.  Employees currently will walk in our door daily for service and questions.  They do not have to deal with telephone numbers or agents that are hardly accessible from out-of-town offices.  Many employees who have a hard time dealing with insurance matters over the phone prefer in-person contact.

   NPA Insurance Associates of the Valley do not have a Brownsville office.  Employees who need service would need to drive to Harlingen.

   Thank you.

   MR. CHAIRMAN:  Next, Adriana Chavez?  Daniel Sanchez, Guillermo Morin?  Pat Hammes, insurance.

# EXHIBIT-32

# WHY *AFLAC* ?

## 1) LEGALITY

    * According to the Texas Attorney General's Office in their legal opinions dated May 8, 1987 and April 4, 2000, granting an agent of record designation to an insurance agent or agency is illegal when the value of the contract is more than $10,000. Moreover, granting an individual an agent of record letter for the purpose of soliciting optional retirement investments or annuities is also illegal. Approving agenda Item #24 that reads, "Recommend approval to award RFQ#012-02 to National Plan Administrators / Insurance Associates of the Valley..." would be illegal as there proposal calls for an agent of record designation.

## 2) COST

    * All of AFLAC's cafeteria plan services are totally free of charge to the district and to its employees. We have already saved district employees over $90,000 during the last three years.

    * NPA's proposal would cost employees over $30,000 in annual cafeteria fees, plus over $32,000 in enrollment fees, plus another $39,000 in annual annuity fees. Cumulatively, employees will be forced to pay approximately $101,000 in first year fees alone for something that we provide totally free of charge.

## 3) SERVICE

    * CLAIMS TURNAROUND: FSA claims are processed <u>daily</u> and have a <u>turnaround time of 24 - 48 hours</u>. In addition, as we proposed in February 2001, we can "front funds" to BISD employees, so that they do not have to wait for the district to write us a check before they can request reimbursement for unreimbursed medical claims.

    * According to NPA's proposal, they process claims <u>monthly</u>. Employees will be forced to wait much longer for their FSA claim reimbursements.

## 4) FLEXIBILITY

    * We do not require exclusivity for all the district's supplemental products. We will place under the cafeteria plan whichever products or companies are chosen by the district's insurance committee.

    * NPA / Insurance Associates of the Valley requires an agent of record letter. As per the opinion issued by the Texas Attorney General's office dated April 4, 2000, "because the use of a designated broker of record will necessarily limit the number of companies from which the district may purchase insurance, it may foreclose the district's access to the most advantageous rates and terms."

## 5) <u>LOCAL</u> AGENTS, <u>LOCAL</u> OFFICE, <u>LOCAL</u> SERVICE

    * Employees currently walk in the door daily for service and questions. They do not have to deal with telephone numbers or agents that are hardly accessible from out-of-town offices. <u>Many employees who have a hard time dealing with insurance matters over the phone prefer in-person contact.</u>

    * NPA / Insurance Associates of the Valley do not have a Brownsville office. Employees who need service would need to drive to Harlingen.

# EXHIBIT-33

# Brownsville Independent School District

**Agenda Category:**  Bids/Proposals/Purchases     **Board of Education Meeting:**  11/20/01

**Item Title:**  RFQ #012-02 TPA to  Administer          __X__  **Action**
BISD's Cafeteria Plan (Section 125)        _____  **Information**
and/or Tax Deferred Annuities          _____  **Discussion**

**Board Goal #** _____       **Objective #** _____

---

## BACKGROUND:

A total of six (6) proposals were submitted.  Upon review and receipt of additional requested information (included as additional background information), Administration recommends approval to award RFQ #012-02 TPA to administer BISD's Cafeteria Plan (IRC Section 125) and/or tax deferred annuities.

## FISCAL IMPLICATIO
N/A

## RECOMMENDATION
Recommend approval to av
Valley for Third Party A
administer the tax defen
compensation plan and cust

*Was not approved on 11/20/01*

ciates of t
n 125) a
7) deferr
le.

Approved for Submission to Board of Education:

---

Submitted by:  Administrator/Program Adm.

---

Recommended by:  Area Supt./Assistant Supt.

Dr. Noe Sauceda, Superintendent of S

---

Approved by:  Area Supt./Assistant Supt.

## When Necessary, Additional Background May Follow This.

# Brownsville Independent School District

**Agenda Category:** Bids/Proposals/Purchases

**Board of Education Meeting:** 11/20/01

**Item Title:** RFQ #012-02 TPA to Administer
BISD's Cafeteria Plan (Section 125)
and/or Tax Deferred Annuities

_____X_____ Action
_____ Information
_____ Discussion

**Board Goal #** _____   **Objective #** _____

---

## BACKGROUND:

A total of six (6) proposals were submitted. Upon review and receipt of additional information (included as additional background information), Administration recommends approval to award RFQ #012-02 TPA to administer BISD's Cafeteria Plan (IRC Section 125) and/or tax deferred annuities.

## FISCAL IMPLICATIONS:

N/A

## RECOMMENDATION:

Recommend approval to award RFQ #012-02 to National Plan Administrators/Insurance Associates of the Valley for Third Party Administrators to administer BISD's Cafeteria Plan (IRC Section 125) and administer the tax deferred annuity, custodial plan under section 403b and 403(b)(7) deferred compensation plan and custodial plans. Agent/Agency to solicit the individual products available.

---

Submitted by: Administrator/Program Adm.

Recommended by: Area Supt./Assistant Supt.

Approved by: Area Supt./Assistant Supt.

Approved for Submission to Board of Education:

Dr. Noe Sauceda, Superintendent of Schools

**When Necessary, Additional Background May Follow This.**

i11

# EXHIBIT-34

**STATE OF TEXAS**

**COUNTY OF CAMERON**

    **BE IT REMEMBERED,** that on the 20th day of November, 2001, the Board of Trustees of the

Brownsville Independent School District met in a Regular Board Meeting at the Administration

Building, 1900 Price Road, Brownsville, Texas, for the purpose of transacting any and all business that

came before the Board and with the following to wit:

    **WHEREUPON,** a quorum being present and it appearing before the Board, it is hereby so

found that notice of this Regular Board Meeting has been duly given in the manner and for the length of

time as prescribed by law.  The meeting was called to order and declared ready for the transaction of

business with the following to wit:

**AGENDA ITEMS WERE PRESENTED/APPROVED OUT OF SEQUENCE, THERFORE,**

**THE MINUTES HAVE BEEN TYPED IN THE ORDER THEY WERE PRESENTED.**

    **I.**    **Meeting called to order** by Board President, Joe Colunga at 5:30 p.m.

    **II.**    **Moment of Silence.**

    **III.**    **Presentation of Colors** by the Rivera High School Air Force Junior ROTC Color Guard.

    **IV.**    **Pledge of Allegiance** led by Mr. Randy Dunn and repeated in unison.

    **V.**    **Roll Call:**

**PRESENT:**

| | |
|---|---|
| Joe Colunga | President of the Board |
| Linda Salazar | Vice – President of the Board |
| Hugh Emerson, Jr. | Secretary of the Board (arrived at 6:15 p.m.) |
| Marilyn del Bosque Gilbert | Assistant Secretary of the Board |

Powers
EXHIBIT NO. 19
5-29-03
Hill & Romero

Regu. Board Meeting Minutes
November 20, 2001
Page 2

| | |
|---|---|
| Randy Dunn | Member |
| Pat Lehmann | Member |
| Herman Otis Powers, Jr. | Member |

**ABSENT:**

None

**ALSO PRESENT:**

| | |
|---|---|
| Dr. Noe Sauceda | Superintendent of Schools |
| Jeff Roerig | Attorney for the Board |
| Chris Guerra-Lozano | Attorney for the Board |

**ALSO ABSENT:**

None

VI.    **Approval of the agenda of the Regular Board Meeting of November 20, 2001, with any deletions.**

**Motion** was made by Mr. Dunn, seconded by Ms. Salazar, and unanimously carried to approve the agenda of the Regular Board Meeting of November 20, 2001, with the following corrections:  Under **General Function:**  Pages #075A through #075G are to be included as part of the agenda; and page #087A is also to be included as part of the agenda; and an Addendum to the Agenda.

VII.    **SUPERINTENDENT'S REPORT**

A. **CONFERENCE PRESENTATIONS**

1. **TEA Division of Migrant Education Campus and District Recognitions:**

   • Dr. Sauceda asked Mary Jo Monfils, Assistant Superintendent, to make the introduction for this presentation.    Ms. Monfils introduced Mary Helen Garza,

Regu... Board Meeting Minutes
November 20, 2001
Page 3

Program Administration for Federal Programs, to make the presentation. She stated that migrant students have met or exceeded state accountability standards in the areas of Texas Assessment of Academic Skills (TAAS) and dropout rate and have met or exceeded the State's goal for identification and recruitment of migrant students. BISD has received awards in the following categories: Promising Campuses, Acknowledged Campuses, Excelling Campuses, Exceptional Campuses, Migrant Identification and Recruitment–All State District Team. The following schools were recognized: Pace High School, Clearwater and Morningside Elementary Schools were presented with an Exceptional Campus Award. Additionally, Lopez and Rivera High Schools, Oliveira Middle School, Aiken, Del Castillo and Palm Grove Elementary Schools received Excelling Campus Awards. Hanna High School, Stell Middle School, Benavides, Canales, Egly, Garden Park, Gonzalez, and Yturria Elementary Schools were recognized with Promising Campus Awards. Hudson, Longoria, Putegnat, Resaca, and Villa Nueva Elementary Schools achieved Acknowledged status. Plaques were presented to each school.

**B. CONFERENCE STUDY ITEMS**

**2. Second Reading Board Policy Update 65 (Local Policies):**

- Superintendent Sauceda stated that at this time the Policy Committee Meeting had reviewed the policies and that the policies had already been submitted to the Board

  for First Reading and no changes had been made.

**(HANDOUT ADDED TO OFFICIAL MINUTES)**

**C. STANDING BOARD AGENDA ITEMS**

**3. Board Calendars:**

- Calendars were presented to the Board members for their information. Superintendent Sauceda reminded the Board members of the upcoming scheduled meetings and events in which the Board members would be participating.

### (CALENDARS ADDED TO OFFICIAL MINUTES)

### VIII. PUBLIC AUDIENCE

- **Pat Schumacher,** Re: Lopez Campus
- **Sparky Esparza,** Re: Few Words
- **Catalina Garcia,** Re: Red Ribbon
- **Dagoberto Barrera,** Re: Proposed State Income Tax
- **Gloria Zapata,** Re: New Middle School
- **Dino Chavez,** Re: Cafeteria Plan
- **Pat Hammes,** Re: Insurance
- **Francisco Sifuentes,** Re: Few Concerns

### (PUBLIC AUDIENCE SIGN–UP SHEET ADDED TO OFFICIAL MINUTES AND ATTACHMENTS)

**CLOSED MEETING:**                                              6:30 P.M.

4. Level III Grievance (Jose G. Lamas – #001–01/02).

5. Complaint #001/2001-2002 – Catalina Presas Garcia

6. Parent Complaint #002/2001-2002 – Robert Uresti.

### (BOARD RECONVENES AFTER CLOSED MEETING)

7. **Motion** was made by Mr. Emerson, seconded by Mr. Dunn, to uphold the Level II Grievance. **Board Action on Level III Grievance – (Jose G. Lamas –#001–01/02).**

**THE FOLLOWING VOTE WAS RECORDED:**

YEA:       Mr. Colunga, Ms. Salazar, Mr. Emerson, Ms. Gilbert, Mr. Dunn, and

Mr. Lehmann

NAY:       Mr. Powers

ABSTAIN:   None

MOTION CARRIED.


## IX.    CONSENT AGENDA

**GENERAL FUNCTION:**

**APPROVED CONSENT AGENDA ITEMS:**

President Colunga stated that he had received a list from his colleagues indicating that there was

no need for discussion or deliberation on the following agenda items:

**Motion** was made by Mr. Emerson, seconded by Mr. Dunn, and unanimously carried, for

approval of the following: **General Function: Items #A8–10; Budget Amendments: Item #C15;**

**Agreements/Contracts: Items #D20–21; Bids/Proposals/Purchases: #E25–27,** as presented by

Administration.

**A. Approval of the following General Function Items:**

8. Approval and adoption of Update 65 (Local Policies): BDB, BE, BJCF, CCG, CE, CFD, DEA, DFBB, DGBA, DGBA (Exhibit), DH, DHB, EJ, FD, FDA, FFAA, FFAB (Exhibit), FFAD (Exhibit), FL, FL (Exhibit), FM, FNA, FNCL, FNG and GF.

9. Approval to accept the Margaret M. Clark Aquatic Center as substantially complete.

10. Approval to accept the Porter High School Classroom Wing Addition as substantially complete.

**C. Approval of the following Budget Amendments:**

15. Approval of Budget Amendment #067 in the amount of $6,395.00 for Fund 384 – After School Initiative for Cummings Middle School. (Additional Funding)

**D. Recommend approval of the following Agreements/Contracts:**

Regular Board Meeting Minutes
November 20, 2001
Page 6

20. Approval of Information Design annual renewal of software maintenance agreement in the amount not to exceed $29,450.00 from Local Maintenance Funds for the 2001-2002 school year.

21. Approval of Pentamation annual renewal of software maintenance agreement in the amount not to exceed $59,278.67 from Local Maintenance Funds for the 2001-2002 school year.

**E.    Bids/Proposals/Purchases Approval:**

**Recommend awarding and/or rejecting the following Bids:**

25. Awarded Bid #019-02 for the purchase of Playground Equipment for several schools in the amount not to exceed $30,923.29 to Gametime, New Braunfels, Texas, and to Park Place Recreation Designs, LTD., San Antonio, Texas. Items to be purchased subject to the District's needs and funding.

26. Awarded Bid #021-02 for Carpeting Materials and Installation district-wide in the amount not to exceed $125,000.00 to Diaz Floors & Interiors, Pharr, Texas. Items and services to be purchased subject to the District's needs and funding. (Annual Bid)

27. Awarded Proposal #033-02 for Charter Bus Services district-wide in the amount not to exceed $75,000.00. Item #2 to Champion Tours, Rancho Viejo, Texas, items #3, #4, and #5 to Valley Transit Company, Harlingen, Texas, and items #3 and #5 to Surftran, Harlingen, Texas. Services to be provided subject to the District's needs and funding. (Annual Bid)

## INDIVIDUAL ITEMS FOR CONSIDERATION AND APPROVAL:

**A.    Recommend approval of the following General Function Items:**

11. Approval to reclassify the 226 day Special Assignment position – ITV Studio Manager from a Pay Grade Level 2 to a Pay Grade Level 4.

After discussion, **motion** was made by Mr. Emerson, seconded by Mr. Dunn,

## THE FOLLOWING VOTE WAS RECORDED:

**YEA:**        Mr. Colunga, Mr. Emerson, Ms. Gilbert, Mr. Dunn, and Mr. Lehmann,

**NAY:**        Ms. Salazar and Mr. Powers

**ABSTAIN:**    None

**MOTION CARRIED.**

Regu    Board Meeting Minutes
November 20, 2001
Page 7

12. Approval to amend the Manual Trades and the Classified Personnel Calendars to provide Manual Trades and Classified Personnel employees with paid holidays on Friday, November 23, 2001 (Thanksgiving Holiday) and Monday, December 24, 2001 (Christmas Holiday).

   After discussion, Mr. Emerson called the question, **motion** was made by Mr. Emerson, seconded by Mr. Dunn, and unanimously carried.

13. Discussion and possible action to request RFQ's for Board legal services.

   Motion was made by Mr. Powers, seconded by Ms. Salazar, after discussion, **Mr. Powers withdrew his motion.** It was determined that a committee would be appointed by the Board President in order to develop the criteria.


**B.  Recommend approval of the following Payments:**

13. Approval to pay the Buck Group $46,360.00 to be paid from Local Maintenance Funds.

   Motion was made by Ms. Salazar, seconded by Mr. Emerson, Mr. Emerson briefly stepped out of the Board Room, and did not return for the vote

**THE FOLLOWING VOTE WAS RECORDED:**


**YEA:**              Mr. Colunga, Ms. Salazar, Ms. Gilbert, Mr. Dunn, and Mr. Powers

**ABSENT VOTE:**    Mr. Emerson

**MOTION CARRIED.**


**Emergency Agenda Items: (Addendum)**

1. Discussion, consideration, and possible action on the Longevity Stipends for Certified Employees on Teacher Salary Schedule.

2. Approval of Budget Amendment #072 in the amount as discussed, recommended, and approved by Board of Trustees, from Fund 199 – Local Maintenance Fund – Longevity Adjustment for Employees on Teacher Pay Scale for fiscal year 2001-2002. (Fund Balance)

   After discussion, **motion** was by Mr. Powers, seconded by Mr. Dunn, and unanimously carried to approve the Emergency Agenda Items.

   The stipends approved were as follows:
   * 6-10 years, $200.00
   * 11-15 years, $300.00

- 16-20 years, $400.00
- 20 + years,  $800.00

C.  **Recommend approval of the following Budget Amendments:**

16.  Approval of Budget Amendment #068 in the amount of $26,424.00 from Fund 199 – Local Maintenance Fund – Office Lease Agreements. (Fund Balance)

After discussion, **motion** was made by Ms. Salazar, seconded by Mr. Dunn, and unanimously carried.

17.  Approval of Budget Amendment #069 in the amount of $78,972.00 from Fund 199 – Local Maintenance Fund – Office Lease Agreements. (Fund Balance)

After discussion, **motion** was by Mr. Emerson, seconded by Mr. Powers, and unanimously carried.

18.  Approval of Budget Amendment #070 in the amount of $414,500.00 from Fund 199 – Local Maintenance Fund – Classified Employee Extra Days for fiscal year 2001-2002. (Fund Balance)

After discussion, **motion** was by Mr. Emerson, seconded by Ms. Salazar, and unanimously carried.

19.  Approval of Budget Amendment #072 in the amount of $14,000.00 from fund 199 – Local Maintenance Fund – Lopez High School Intercom. (Fund Balance)

After discussion, **motion** was by Mr. Emerson, seconded by Mr. Dunn, and unanimously carried.

D.  **Recommend approval of the following Agreements/Contracts:**

22.  Approval to enter into contractual agreement with the City of Brownsville, Brownsville, Texas, in the amount not to exceed $89,764.50 for the Prevention Efforts Advancing Character Education (P.E.A.C.E.) Program for fifth grade students district-wide from budgeted State Compensatory Education Funds for the 2001-2002 school year. Services to be rendered subject to the District's needs and funding.

**Motion** was by Mr. Dunn, seconded by Mr. Powers,

**THE FOLLOWING VOTE WAS RECORDED:**

YEA:        Mr. Colunga, Ms. Salazar, Mr. Emerson, Mr. Dunn, Mr. Lehmann and Mr. Powers

ABSTAINED:  Ms. del Bosque Gilbert

MOTION CARRIED.

E.  Bids/Proposals/Purchases Approval:

Recommend awarding and/or rejecting the following Bids:

23.  Awarded Bid #010-02 for Request to Lease Office Space for School
District Administrative Offices in the amount not to exceed $78,972.00 to Millan
Development, LLC Brownsville, Texas, and to Paseo Plaza L.P., Brownsville,
Texas.  Services to be provided subject to the District's needs and funding.

Motion was by Mr. Dunn, seconded by Mr. Emerson,

THE FOLLOWING VOTE WAS RECORDED:

YEA:        Mr. Colunga, Ms. Salazar, Mr. Emerson, Ms. del Bosque Gilbert,
Mr. Dunn and Mr. Lehmann

NAY:        Mr. Powers

MOTION CARRIED.

24.  Approval to award RFQ #012-02 to National Plan Administrators/Insurance
Associates of the Valley for Third Party Administrators to administer BISD's
Cafeteria Plan (IRC Section 125) and administer the tax deferred annuity, custodial
plan under section 403b and 403(b)(7) deferred compensation plan and custodial
plans.  Agent/Agency to solicit the individual products available.

After discussion, motion was made by Mr. Dunn, seconded by Ms. Salazar,

THE FOLLOWING VOTE WAS RECORDED:

YEA:        Ms. del Bosque Gilbert, Mr. Dunn and Mr. Emerson

NAY:        Mr. Lehmann, Mr. Powers and Ms. Salazar

ABSTAINED:  Mr. Colunga

MOTION FAILS.

28.  Awarded Bid #195-01 for Air Door Curtains for School Cafeterias
district-wide in the amount not to exceed $47,462.00 to SepCo Restaurant Supply
Inc., Harlingen, Texas.  Items to be purchased subject to the District's needs and

**Regular Board Meeting Minutes**
**November 20, 2001**
**Page 10**

funding.

After discussion, **motion** was made by Ms. Salazar, seconded by Mr. Powers, and unanimously carried.

**X.    CLOSED MEETING:**                                             **9:17 P.M.**

**BOARD RECONVENED AFTER CLOSED MEETING AND THE**
**FOLLOWING ACTION WAS TAKEN**                                   **10:29 P.M.**

Motion was made by Mr. Powers, seconded by Mr. Dunn, and unanimously carried for approval of the following **Personnel Matters:  Items A # 29 & 30, subject to any outstanding documentation.**

29.  Approval of **Contractual** Professional Personnel for the 2001-2002 school year – **Teachers** subject to receipt of all outstanding documentation. (Carla M. Cabrera, 2nd/Garden Park Elementary, Ana M. Reyes-Garcia, 1st/Del Castillo Elementary, Clint Hoverson, Texas History/Lucio Middle, Alma C. Munoz, Kindergarten/Gonzalez Elementary, Oscar Omar Perez, Math/Stell Middle, John D. Williams, Special Education/Egly Elementary, and Ramon B. Zuniga, 3rd Southmost Elementary)

30.  Approval of **Non-Contractual** Professional Personnel for the 2001-2002 school year – **Human Resource Coordinator** subject to receipt of all outstanding documentation. (Maria Teresa Mendez)

31.  Board Self-Evaluation.

**B.    Consultation with Attorney:**

32.  Consultation with attorney regarding pending or threatened litigation matters.

Motion was made by Mr. Powers, seconded by Mr. Dunn,

**THE FOLLOWING VOTE WAS RECORDED:**

**YEA:**            Mr. Colunga, Ms. Salazar, Mr. Dunn, Mr. Lehmann and Mr. Powers

**ABSTAINED:**  Mr. Emerson and Ms. del Bosque Gilbert
                         (Mr. Emerson and Ms. del Bosque Gilbert did not deliberate)

**MOTION CARRIED.**

**C.    Real Property:**

33.    Discussion of possible acquisition or sale of Real Property.

**NO ACTION.**


**(ALL SUPPORTING DOCUMENTS ADDED TO OFFICIAL MINUTES)**

**(AUDIO/VIDEO TAPES OF THE OPEN MEETING AND THE WRITTEN CERTIFIED**

**AGENDA OF THE CLOSED MEETING ARE ON FILE)**


**XI.  Correspondence and Information:**

Superintendent Sauceda provided the Board members with correspondence and information.

**ADJOURNMENT – 10:53 P.M.**

**There being no further business appearing before the Board, the meeting was adjourned.**


**APPROVED BY:**                              _____
                                                    **PRESIDENT OF THE BOARD**



**ATTESTED BY:**                              _____
                                                    **SECRETARY OF THE BOARD**

# EXHIBIT-35

# INSURANCE ASSOCIATES
## OF THE VALLEY

521 SOUTH 77 SUNSHINE STRIP
HARLINGEN, TEXAS 78550
(956) 423-0490
FAX: (956) 423-7668
TOLL FREE: 1-800-750-0490

ARNIE OLIVAREZ

November 20, 2001

Brownsville ISD
1900 Price Rd.
Brownsville, TX 78521

To Whom It May Concern:

This letter is to confirm that any and all fees associated with the cafeteria plan will be waived if National Plan Administrators is selected as the cafeteria plan administrator and Insurance Associates of the Valley is selected as the agency to provide all of the ancillary products

If you have any questions you may contact me at 800-750-0490.

Sincerely,

Dayna Olivarez
Vice President

001094



AUTO · HOME         LIFE · BUSINESS

# EXHIBIT-36

Brownsville ISD - BED(E) - Public Participation   Page 1 of 4

Brownsville ISD
031901

BOARD MEETINGS:                                                                BED
PUBLIC PARTICIPATION                                                     (EXHIBIT)

---

The following documents are located in this exhibit:

Exhibit A:   Public Audience Sign-In Sheet - 1 page

Exhibit B:   Board Meeting Open Forum Procedure - 1 page

---

**EXHIBIT A**

BOARD OF TRUSTEES REGULAR MEETING

PUBLIC AUDIENCE SIGN-IN SHEET

If you wish to address the Board of Trustees during the public audience portion of today's meeting, please print your name below.

According to District policy BED(LOCAL), only those persons (on this list) who request to speak shall be heard.  The speaker shall limit remarks to five minutes. The Board shall allot no more than 30 minutes for the public audience portion of the meeting.

Complaints and concerns for which other resolution channels are provided shall be directed through those channels.  These complaints include complaints on the following subjects:  employee complaints, termination of employment, career ladder appeals, student complaints, removal to alternative education program, and expulsion.

If the Board President determines that a person has not attempted to resolve a matter administratively, the person shall be directed to the appropriate policy for attempted resolution before bringing the matter to the Board.

Complaints against specific employees or officers of the District shall be heard in closed session, as authorized by the Texas Open Meetings Act, Article 6252-17, Section 2(g).  If your topic concerns complaints against specific employees or officers, please note this on the sign-up sheet.  Your concern will be addressed at

the next meeting's executive session.

You must make your points on issues in a constructive and courteous fashion pursuant to Robert's Rules of Order.

| | Name | Subject to be discussed |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |

**EXHIBIT B**

### BOARD MEETING OPEN FORUM PROCEDURE

### PRESIDING OFFICER

The next item on our agenda is the public comment period.  This is the time for citizens, staff, or students to provide their comments to the Board.  Statements and questions from the audience will not be permitted during other portions of the meetings, so please let us hear from you now if you have comments to present.

To have your comments heard tonight, your name and the subject matter of your comments must appear on the sign-in sheet, which is located in the rear of the meeting room.

Each speaker will be limited to five minutes to complete his or her comments.  With all due courtesy, I will strictly enforce that time limit.

If a group of people want to be heard on the same topic, the Board asks that they designate a spokesperson to avoid needless repetition.  The Board has adopted rules to preclude the abuse of open forum by, for example, anyone uselessly repeating the same comment or complaint meeting after meeting.

Those wishing to speak should know that the public comment section of the meeting has been subdivided into two parts-one for hearing general comments and the other for hearing comments about employees or officers.

When all general comments are completed we will proceed with the meeting.  During the executive session portion of the meeting we will hear complaints against employees or officers from those who signed up to make such complaints at the last meeting.  If you sign up to make complaints about individual officers or employees tonight, you will be heard at the next meeting.

All participants must understand that if your comment, in my judgment, constitutes a complaint against an employee or officer, I will interrupt and ask you to wait until you can make your comments in closed session of the next meeting.

The Board's purpose for entering into closed session to hear employee complaints is to protect you from potential liability for publicly making slanderous or defamatory statements that affect the professional or personal reputation of a district employee or officer.  Hearing complaints in closed session also protects the privacy rights of the individual about whom you are complaining.  Exceptions to this procedure will be made only if the employee or officer against whom the complaint is made requests that the complaint be made in open session.

GENERAL COMMENTS PORTION OF THE MEETING

PRESIDING OFFICER

With those cautions in mind, we will now be glad to hear the general comments.

[Name], you are first.  Remember you have five minutes to present your comments.

# EXHIBIT-37


# BOARD OF TRUSTEES

# Regular Board Meeting

## November 20, 2001

### PUBLIC AUDIENCE SIGN-IN SHEET

If you wish to address the Board of Trustees during the Public Audience portion of today's meeting, please print your name below.

According to BISD Policy BED (Local), only those person (on this list) who request to speak shall be heard. The speaker shall limit remarks to five minutes. The Board shall allot no more than 30 minutes for the Public Audience portion of the meeting. Complaints and concerns for which other resolution channels are provided shall be directed through those channels. These complaints include complaints on the following subjects: employee complaints, termination of employment, student complaints, removal to alternative education program, and expulsion. If the Board President determines that a person has not attempted to resolve a matter administratively, the person shall be directed to the appropriate policy for attempted resolution before bringing the matter to the Board. Complaints against specific employees or offices of BISD shall be heard in Closed Meeting, as authorized by the Texas Government Code Title 5-Section: 551.074 (1) and (2). If your topic concerns complaints against specific employees or officers, please note this on the sign-up sheet. You must make your points on issues in a constructive and courteous fashion pursuant to Robert's Rules of Order.

| | NAME | SUBJECT TO BE DISCUSSED |
|---|---|---|
| 1. | Pat Schumacher | Insurance, - Lopez Campus |
| 2. | Isabel Bouxvialo X | Parent |
| 3. | Carlos & Maria J. Loeva X | Parents of Carlos & Janette |
| 4. | Norma A. Guzman X | |
| 5. | Sparky | A few words: |
| 6. | Catalina Garcia | Red Ribbon |
| 7. | Dagoberto Barrera | Propose State Income Tax |
| 8. | Gloria Zapata | New middle School |
| 9. | Dino Chavez | Cafeteria Plan |
| 10. | Adriana Chavez | " " |
| 11. | Daniel Sanchez | " " |
| 12. | Guillermo Morin | " " |
| 13. | Kit Hammes | For Insurance |
| 14. | | |
| 15. | Abel Mora | |
| 16. | Mr. Sifuentes | |
| 17. | | |
| 18. | | |
| 19. | | |
| 20. | | |

# EXHIBIT-38



# Brownsville Independent School District

### 1900 Price Road – Suite 307   Brownsville, Texas 78521-2417    (956) 548-8000    Fax: (956) 548-8019

*Johnny I. Pineda*
*Interim Superintendent*

## Certified Copy of Board Minutes

STATE OF TEXAS            §

**COUNTY OF CAMERON**   §

On this __16ᵗʰ__ day of __January, 2003,__ I certify that the attached documents, are true, exact, complete, and unaltered photocopies made by me of the Brownsville Independent School District's Board Minutes, held in my custody as the Secretary to the Board of Trustees.

> Minutes of the Regular Board Meeting of November 13, 2002
> Minutes of the Regular Board Meeting of November 20, 2002
> Agendas of the Regular Board Meeting of November 13, 2002
> Agendas of the Regular Board Meeting of November 20, 2003
> Video Tape of the  Regular Board Meeting of November 13, 2002
> CD Audio Tapes of the Regular Board Meeting of November 13, 2002
> CD Audio Tapes of the Regular Board Meeting of November 20, 2002

**NOTE:**    I could not find the video tape of the Regular Board Meeting of November 20, 2002.

Norma Lee Ortiz
Secretary to the Board of Trustees

Sauceda
EXHIBIT NO. 6
6-17-03
Hill & Romero

*BISD does not discriminate on basis of race, color, national origin, sex, religion,*
*age or disability in employment or provision of services, programs or activities.*

# EXHIBIT-39

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,        ) (
FERNANDO DE PENA,         ) (
VALENTIN PAZ and ANDRUS   ) (
& PAZ, A Partnership      ) (
                          ) (
VS.                       ) (   B-02-143
                          ) (
BROWNSVILLE INDEPENDENT   ) (
SCHOOL DISTRICT, NOE      ) (
SAUCEDA, and EDDIE        ) (
ERRISURIZ, JR.            ) (

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

IN THE UNITED STATES DISTRICT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ            ) (
                         ) (
VS.                      ) (   CIVIL ACTION NO. B-02-128
                         ) (
BROWNSVILLE INDEPENDENT   ) (
SCHOOL DISTRICT, NOE      ) (
SAUCEDA, MARILYN DEL      ) (
BOSQUE-GILBERT and        ) (
RANDALL DUNN              ) (

_____

ORAL AND VIDEOTAPED DEPOSITION OF
NOE SAUCEDA
VOLUME 2
JUNE 17, 2003

_____

COPY

1    MS. LEEDS:  I guess I just need to object

2    and ask if you mind if we clarify the record because I

3    believe earlier when you were asking -- oh, no, my

4    mistake.  Were you saying it was a specially called

5    meeting on October 30th?

6        MR. AGUILAR:  I believe it was, actually.

7    It's right here.  Insurance committee meeting.

8        MS. LEEDS:  Insurance committee.

9        MR. AGUILAR:  No, it's --

10    MS. LEEDS:  You called -- you talked about

11    a specially called board meeting.

12        MR. AGUILAR:  Sorry, it's the one I

13    haven't made a copy of yet.

14    MS. LEEDS:  Oh, okay.

15        MR. AGUILAR:  Special called board

16    meeting.

17        MS. LEEDS:  I saw regular there.  Okay.

18    Q.  Any idea how the -- how or why the videotape of

19    November 20th disappeared?

20    A.  It would be very unusual for it to be gone.

21    Q.  How often or how frequently do you-all or did

22    you-all dispose of videotapes?

23    A.  It's illegal to dispose of tapes.

24    Q.  At all?

25    A.  This is the official record of the board

1    meeting and so it must be kept intact and so all

2    originals are kept in the superintendent's office.  And

3    so if I had to predict, I would say that Norma is

4    working for you guys and is saying that the tape is

5    missing so that you couldn't unprove your story.

6         Q.  Okay.  But those are supposed to be kept in the

7    superintendent's office?

8         A.  The board secretary keeps track of them.

9         Q.  What about the videotape versus audiotape?  In

10   other words, do you have some kind of -- or did you

11   have some kind of policy for, well, you keep the

12   videotapes for a while but then you're going to destroy

13   them because you've got the audiotape.  Any policy like

14   that?

15        A.  The original board meeting video would never be

16   destroyed.

17        Q.  Okay.  As long as you were superintendent at

18   least?

19        A.  No, sir.

20        Q.  Ever?

21        A.  That's the way it is.

22        Q.  Okay.  In other words, neither you nor anybody

23   else would have any authority, as far as you

24   understand, to destroy or lose that videotape of the

25   November 20th meeting?

1      A.   That is correct.  And I'm not the attorney here

2    but I think there's a legal requirement that that be

3    kept that way.

4               MS. NEALLY:  And object to the extent it

5    calls for a legal conclusion.

6      Q.   I'm handing you what's marked Sauceda 7, which

7    is a copy of the board meeting minutes of December 4th.

8    Those are the minutes that were provided to me.  What

9    I'd like you to do is take a moment to look through

10   those minutes and what I'm trying to find in there,

11   which I couldn't understand or I couldn't find, it

12   might be just because I don't know how to read these

13   very well.  I'm looking for where the board or anybody

14   else voted on or approved hiring anybody as third party

15   administrator for either the cafeteria plan or the

16   403(B) annuities plan.  And if you'd like, we can go

17   off the record for a while or we can just wait right

18   here.

19     A.   It doesn't matter to me.

20              MS. NEALLY:  I'm going to object to the

21   extent this assumes facts not in evidence.

22              (Off the record).

23     A.   Yeah, there's no indication that any --

24     Q.   Okay.

25     A.   -- any action was taken.

1    To whom did you hand-deliver it?

2        A.   Yeah.   I don't know who -- whoever typed it put

3    that in.   I don't know who they would have

4    hand-delivered it to.   I'm assuming maybe Mr. Dino.

5        Q.   This is your signature at the bottom, right?

6        A.   Yes.

7        Q.   Okay.   Do you know who typed it?   Do you recall

8    who typed it?

9        A.   No, I don't.

10       Q.   Okay.   It has CC but it doesn't have the

11   initials down there usually where it would say who the

12   typist is.   Do you have any recollection at all who

13   would have typed it?

14            MS. LEEDS:   Objection; asked and answered.

15       A.   No, sir.

16       Q.   Okay.   It's addressed to Mr. Chavez and it's

17   got CC copies to the BISD Board of Trustees, Frank

18   LaFemina, AFLAC State Office, correct?

19       A.   Yes, sir.

20       Q.   Did you send a copy to each of those other

21   parties, BISD Board of Trustees and Frank LaFemina and

22   the AFLAC State Office?

23       A.   My staff would have.

24       Q.   Okay.   You would have just directed your staff

25   to send it to everybody listed?

1    A.  Yeah, whoever typed it would have known to do

2    it.

3    Q.  Okay.  Included attachments, correspondence

4    from Dino Chavez, Section 125 cafeteria plan proposal,

5    Policies CH (Legal and Local).  Can you tell us what

6    was included -- what it's referring to as Section 125

7    cafeteria plan proposal?

8    A.  I don't recall.  It might be the proposal he

9    submitted.

10   Q.  Okay.  The proposals are usually about an inch

11   thick, aren't they?

12   A.  It would vary.  Some are one page.

13   Q.  Okay.  And you just don't recall how long his

14   proposal was?

15   A.  No, sir.

16        MS. LEEDS:  I need to object.  It doesn't

17   say sending a proposal.  It says correspondence from.

18        MR. AGUILAR:  If you look at the word

19   before correspondence which is attachments.

20        MS. LEEDS:  Yeah, correspondence from Dino

21   Chavez, Section 125 cafeteria plan proposal.

22   Q.  What did you understand that to be?  What were

23   you sending?  Were you sending the entire proposal or

24   correspondence regarding the proposal?

25   A.  I don't recall specifically.

1     Q.  Explain.  Just briefly explain.

2     A.  I am responsible for every decision

3  administratively in the district, but I don't make them

4  all.  I choose to delegate by just necessity who is

5  going to make certain decisions, personnel, insurance,

6  maintenance and so on.  Ultimately, I'm held

7  accountable for their decisions.

8     Q.  So who is the one who actually made the

9  decision to restrict agents coming in to BISD campuses?

10    A.  It would have been my staff.

11    Q.  Okay.  That would have been Mr. Errisuriz?

12    A.  Well, he put it -- he has the say.

13    Q.  His department?

14    A.  His department.

15    Q.  Okay.  So ultimately he's at the top of his

16  department so he would be the one ultimately

17  responsible for making that -- he would have been the

18  one to make that decision and I think you said earlier

19  in conjunction in talking to you --

20    A.  Yeah.

21    Q.  -- but he's really the one who made that

22  decision?

23    A.  Yeah, and this one may have also involved the

24  finance department because --

25    Q.  Mr. Muniz?

```
            IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
                    BROWNSVILLE DIVISION
STEPHEN M. ANDRUS,           )(
FERNANDO DE PENA,            )(
VALENTIN PAZ and ANDRUS      )(
& PAZ, A Partnership         )(
                             )(
VS.                          )(   B-02-143
                             )(
BROWNSVILLE INDEPENDENT      )(
SCHOOL DISTRICT, NOE         )(
SAUCEDA, and EDDIE           )(
ERRISURIZ, JR.               )(
```

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

```
            IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
                    BROWNSVILLE DIVISION
DINO X. CHAVEZ               )(
                             )(
VS.                          )(   B-02-128
                             )(
BROWNSVILLE INDEPENDENT      )(
SCHOOL DISTRICT, NOE         )(
SAUCEDA, MARILYN DEL         )(
BOSQUE-GILBERT and           )(
RANDALL DUNN                 )(
```

               REPORTER'S CERTIFICATION
              DEPOSITION OF NOE SAUCEDA
                     VOLUME 2
                  JUNE 17, 2003

     I, LOU ZUNIGA, Certified Court Reporter in and for
the State of Texas, do hereby certify that the above
and foregoing contains a true and correct transcription
of the oral deposition of NOE SAUCEDA;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this __30__ day of _____June_____, 2003.

_____

LOU ZUNIGA, Texas CSR 2198

Expiration Date: 12-31-03

Hill & Romero

5415 North McColl, Suite 107

McAllen, Texas  78504

(956) 994-8898

# EXHIBIT-40

# Brownsville Independent School District

1900 Price Road   Brownsville, Texas 78521-2417   (956) 548-8000   Fax: (956) 548-8019

*Noe Sauceda, Ph.D.*
*Superintendent of Schools*

TO: Board of Trustees

FROM: Dr. Noe Sauceda

RE: Cafeteria Plan TPA

DATE: November 29, 2001



Powers
EXHIBIT NO. 6
5-29-03
Hill & Romero

Attached please find a copy of a memo from Jeff Roerig containing a legal opinion about whether board approval is necessary for the selection of the Third Party Administrator (TPA). As you can see, board approval is not necessary since the District is not paying for the service.

I am concerned about the fact that the Board was not able to reach a decision on administration's recommendation for a provider. The concern is primarily related to timing. We must enroll over 6500 employees before December 21 or the employee's paychecks will be affected negatively. I know all of you agree that this is not acceptable.

I have decided to use my authority to select a provider so that the provider may begin enrolling immediately. We have been assured by two of the vendors that if a decision is made by Friday, November 30, all employees can get enrolled before the Christmas break.

In order to comply with the Board's wishes to have the teacher insurance committee an opportunity to provide input into the selection of a provider, I will ask two companies to make presentations to the committee at today's meeting. The provider with the greatest vote will be selected.

I have also attached a letter from me to Mr. Dino Chavez indicating to him that AFLAC's proposal for the TPA has been rejected as provided under BISD policy for unethical and unprofessional conduct.

If you are in need of additional information regarding this or any other issue please contact me. Thank you.

Attachments: Correspondence from Jeff Roerig, Re: Cafeteria Plan and Related Plans
Correspondence to Dino Chavez

*"The Brownsville Independent School District is an Equal Opportunity Employer, M/W/D/V"*

sent to
board
8/2

**BISD 00146**

ROERIG, OLIVEIRA & FISHER, L.L.P.
ATTORNEYS AT LAW

Jeffrey D. Roerig*
Rene O. Oliveira
W. Michael Fisher
Ricardo Morado
Crisanta Guerra Lozano
Elizabeth G. Neally
Victor V. Vicinaiz*
David G. Oliveira

*Board Certified -
   Personal Injury Trial Law
   Texas Board of Legal Specialization
*Board Certified -
   Civil Trial Law
   Texas Board of Legal Specialization

Cameron County Office
855 West Price Road - Suite 9
Brownsville, Texas 78520-8786
Tel. 956 542-5666    Fax 956 542-0016

Hidalgo County Office
606 East Dove
McAllen, Texas 78504
Tel. 956 631-6049    Fax 956 631-8141

Adolph Guerra, Jr.*
D. Alan Erwin, Jr.
Michael A. Zanca*
D. Wilkes Alexander, A.I.A.
Rosemary Conrad-Sandoval*
Lucila Alvarado*
Jesus Quezada, Jr.
Adrian R. Martinez*

Liza M. Vasquez*

November 27, 2001

File No.:
21,948

Dr. Noe Sauceda                                    *Via Facsimile [956] 982-3787*
Superintendent
Brownsville Independent School District
1900 Price Road
Brownsville, Texas    78521

Re:    Cafeteria Plan and Related Plans

Dear Dr. Sauceda:

Today you requested a legal opinion regarding the level of formality required before the District enters into a contract with an administrator of its cafeteria plan and related plans, when a plan administrator can be procured at no cost to the District.

The State law provides what has to be done for all contracts valued at over $25,000.00, and contracts for the purchase of personal property valued at between $10,000.00 and $25,000.00. Smaller contracts are not the subject of State law. See CH (LEGAL) and Texas Education Code 44.031.

Brownsville Independent School District board policy delegates to the Superintendent "the authority to determine the method of purchase in accordance with CH (LEGAL), and to make budgeted purchases. However, any purchase that costs or aggregates to a cost of $10,000.00 or more, shall require board approval before a transaction may take place."

In the case of the agent for the cafeteria plan and related plans, the purchase will not cost or aggregate $10,000.00, so board approval is not required before a transaction may take place.

Dr. Noe Saúceda
November 27, 2001
Page 2

The administration chose to select an administrator by using the request for qualifications method. The Superintendent is authorized to enter a contract with the vendor it determines to be the most qualified and negotiate a fair and reasonable price, as long as that fair and reasonable price does not exceed $10,000.00. In this case, I understand that the aggregate cost over the course of the year will be nothing.

In summary, the State law is silent on formalities required for the selection of an administrator of the cafeteria plan and related plans, unless the value of the contract would exceed $25,000.00 in a year. Brownsville Independent School District policy CH (LOCAL) grants to the Superintendent the right to make purchases that do not total $10,000.00.

Therefore, the Superintendent of the Brownsville Independent School District can legally select and enter into a contract with the administrator of a cafeteria plan and related plans at no cost to the District without board approval.

Very truly yours,

ROERIG, OLIVEIRA & FISHER, L.L.P.

Jeffrey D. Roerig

JDR/rom

BISD 00148

# EXHIBIT-41

# Brownsville Independent School District

1900 Price Road    Brownsville, Texas 78521-2417    (956) 548-8000    Fax: (956) 548-8019

*Noe Sauceda, Ph.D.*
*Superintendent of Schools*

FAXED
512/479-

17 pages
956/548-8017

HAND DELIVERED

November 29, 2001

Dino Chavez, MBA
Regional Sales Coordinator
905 Los Ebanos Blvd., Suite A
Brownsville, Texas 78520

Dear Mr. Chavez,

Please accept this correspondence as my official 30-day notice of our intent to non-renew your services as our Third Party Administrator for our Cafeteria plan. I must also inform you that your proposal for renewal of the contract has been rejected as allowed under BISD Policy CH (Legal) and CH (Local).

Your continuous inappropriate correspondence is troublesome since appropriate channels were not followed. I consider the content of your letters and your conduct as unprofessional, unethical, and against expected customer-service provider relations. I am directing you to cease and desist all contact with school personnel during school business hours. Campus administration will be directed to contact security services if you or any of your associates are found to be on school-district property.

I must caution you that the content of the memos you disseminated to BISD staff are, in my opinion, both slanderous and libelous and can place both you and your corporation (AFLAC) in a legally liable situation. I will be contacting Mr. Frank Lafemina in the Austin Office and expressing to him my disappointment with your treatment of my Board and staff since it is obvious that you are not working in the best interest of BISD, your client.

Your supervisors will be advised that this administration will consider AFLAC as a future product provider under the following conditions:

  a. A corporate officer must personally apologize to each board member, the board as a whole, myself, and my administrators publicly.
  b. A written assurance that appropriate, ethical conduct will be exercised in the future by any and all AFLAC representatives wishing to serve BISD.
  c. Provided that the products are of the best quality, service and price.

Sincerely,

Noe Sauceda, Ph.D.
Superintendent of Schools

Attachments:    Correspondence from Dino Chavez, Section 125 Cafeteria Plan Proposal
                Policies CH (Legal and Local)

cc:    BISD Board of Trustees
       Frank Lafemina (via facsimile: 512/479-5968)
       AFLAC State Office
       1801 LaVaca, Suite 108
       Austin, Texas 78701

EXHIBIT NO. 8
4-1-03
Hill & Romero

*"The Brownsville Independent School District is an Equal Opportunity Employer. M/W/D/V"*

# EXHIBIT-42

Minutes of the Board / Employee Insurance Committee Meeting
November 29, 2001

Meeting called to order by Acting Committee Chairman, Randy Dunn at 5:30 P.M.

**PRESENT:**

| | |
|---|---|
| Linda Salazar | Vice President |
| Hugh Emerson | Secretary |
| Randy Dunn | Member |
| Otis Powers | Member |
| Pat Lehman | Member |

**ABSENT:**

| | |
|---|---|
| Joe Colunga | President |
| Marilyn del Bosque-Gilbert | Assistant Secretary |

Levine
EXHIBIT NO. 2
5/22/03
G. Barker

Acting Committee Chairman Randy Dunn gave the floor to Dr. Noe Sauceda, Superintendent of Schools for the Brownsville Independent School District.

Dr. Sauceda welcomed the committee members and the staff in attendance. He indicated that their goal today was to address 2 items; specifically the:

- Cafeteria Plan Administrator
- Employee Health Insurance Plan

Dr. Sauceda stated that they were requesting direction on what the employees wanted regarding these 2 items and that the administration was concerned about the timing and the enrollment process involved. Dr. Sauceda stated that the expectation of this Board was for administration to seek and use feedback obtained from the campus committee representatives to determine who the Third Party Administrator would be.

Dr. Sauceda stated that although previously an Insurance Committee meeting and an Employee Insurance Committee meeting was held at different locations, this being a unique case, required administration to combine the two meetings. In the future, they would be scheduled individually.

Dr. Noe Sauceda announced that administration had selected 3 local companies to provide the audience with a presentation of the products and services their company had available to offer. Each representative would be given 10 minutes for the presentation and an additional 5 minutes for a question and answer session. Dr. Sauceda explained to those present that the campus principals were challenged by him during a recent Principals meeting, whereby they were to send the best, brightest individual from their campus to represent them and make decisions on their behalf. He informed the principals that during the meeting, each representative would be given a ballot and would be asked

1

to select one of the three providers who made a presentation. The first part of this meeting pertains to the TPA Cafeteria Plan and requires the representative to rank each provider, who would then be asked 2 questions. The one who could answer "yes" to both, would be the TPA for the district. The 2 questions were:

- Can you provide products with no charge to the employees and the district?
- Can you begin enrollment process before the Christmas break?

If the representative responded "no" to any of these questions, they will move on to the next provider. Ballots will be verified to ensure authenticity (designated campus committee member) and will be tallied.

The second part of the ballot was for administration to share an option with the employees on Health Insurance and they were informed that the ballot was to be returned to Mr. Errisuriz by the following Wednesday. Again, administration would have the ballots checked for authenticity and tallied. Once this is completed a decision will be made. The choices on the ballot were:

- Don't change (leave as is)
- Change (support administrations recommendation)

Dr. Noe Sauceda announced that they were ready for the first part of the meeting which included presentation by the insurance representatives, and they would be made in alphabetical order.

AFLAC representative Ron Levine stated that:

- they handle 4 million customer service calls yearly
- they have been the provider free of charge to BISD for the last 3 years
- they have saved BISD $90M over last 3 years
- other companies competitive with price/not service
- their funds are processed daily; claims within 48 hours
- have state of the art enrollment system
- are prepared to handle enrollment within 3 weeks
- have detailed census info available instantly

Mr. Levine completed his presentation and no questions were asked by the audience.

Dr. Sauceda called on the next insurance representative;

1st **Financial** representative Doug Banks; Juan Gonzalez, Associate stated:

- 36% of Texas districts contracted
- they have 8M+ employees

2

- they have been in business since 1968
- they have local offices in Weslaco, Texas
- they have branch offices Texas – Louisiana
- they have the ability to handle enrollment electronically
- their services are free of charge to BISD and Employees

Mr. Banks completed his presentation and the following questions were asked by the audience:

- free of charge at this time?  No longer charge a fee, previously did charge.
- office in Brownsville?   Office in Weslaco.  Handouts were provided to the audience.
- turnaround on flexible spending accounts?  Processed within 48 hours
- previous provider in 1996/97; @ renewal, why not renewed?  Company did not submit a bid.
- why? RFP wanted to continue with a fee and they didn't want to charge.
- number of enrollers available? 60 salaried
- mechanism in place for feedback? Yes, 800#'s available, phone, fax, cell and customer service representatives available.   Mr. Gonzalez will be available on a daily basis and all questions will be answered by a representative.
- turnaround? Claims processed in 48 hours
- by check? Yes
- % of claims? Not available
- able to continue with program currently in place? Currently 200 vendors; local vendors will not get commissions.
- website? Yes
- 6,700 employees – 1 ½ weeks to process enrollment

Recommend going with:

- Option I (better)
- Option II (not the better option in his opinion)
- fronting of funds; flexible spending accounts
- unreimbursed amounts on medical and dependent care only applies to medical reimbursable by law
- willing to be 403(b) only? No – administrator
- what do they offer that AFLAC doesn't?

Dr. Sauceda called on the third representative:

**National Plan Administrators (NPA)/Insurance Associates of the Valley,** George Shaw TPA

- enrollment; found paper copy is what people want

3

- medical reimbursements not being taken advantage of appropriately due to not being explained properly
- enrollment can be completed within specified time
- 403(b) administrator charge fee – they do not sell them, only administer them, conflict of interest
- willing to work with district, AETNA maybe 1 of the companies
- Arnie Olivarez provides products, service and information locally.
- 800 #
- customer service representative specifically assigned to BISD
- daily access
- 200+ districts served
- enrollment by salaried staff
- certified well versed employees
- no conflict with 403(b)
- independent agent

Questions from audience;

- How many school districts do you serve? In the state; 200, in the valley; 5- provide service to San Benito, Rio Grande City, Edinburg, PSJA
- August 2000 problem in San Benito? Mr. Olivarez explained that in San Benito, the disagreement was with the Superintendent and they were hired as consultants, not providing health insurance services.
- other complaints? Enrollment not timely; claims processed in their own office.
- tax sheltered 456 or 403's? will not sell, only administer. No fee because commission will be made on product sold.
- will you go out and secure the best product for the employees? Yes, that why we're independent agents.
- what can you do that the others cannot? Not competing on 403b & 457's. They are local and can service the accounts.
- average turnaround time reimbursement claims? Up to school district; daily, weekly, etc.
- what about different vendors commissions? They will try to secure the best ones available.
- how man enrollers? 15-20 will enroll current employees and explain how to save
- 125 or 403 or all? All, expenses are in 403 & 457. no cost only for 403b) 1.00 per participant per month. School district would be asked to pay.

Acting Chairperson Randy Dunn asked AFLAC, 1st Financial and NPA about charges. AFLAC and 1st Financial stated no charge. NPA on 403b) $1.00 per employee per month.

Acting Chairperson Randy Dunn asked ALFAC, cost for employee or district for services: No hidden costs to district or employees.

4

Board member Pat Lehman asked who will select/vote, the board?  Dr. Sauceda responded, No, the committees vote will determine the selection.

Representative from Central Middle School indicated that all were qualified, competitive service; but AFLAC already doing a good job.

**Part II** of November 29, 2001 Board/Employee Insurance Committee Meeting

Acting Chairperson Randy Dunn instructed Dr Lopez to place all ballots collected in the envelope and give it to Linda Salazar, she will be present for the count with Superintendent.   Dr. Sauceda to the committee representatives, remember that in order for the ballot to count, it needs to have the campus name or department and representative name.  Linda Salazar asked Dr. Sauceda to please explain why we are waiting until tomorrow and not counting tonight so people could know what happened tonight.. Dr. Sauceda responded that it was an excellent question, and reminded them that each campus has only 1 representative, a handful of representatives did not match to the campus representative names. We will first tally the ballots, match with list, and if necessary, call the principals to verify that in fact the person who voted had the authority to represent them. We want to make sure that every campus has one vote,. For verification, we want to be real accurate. Dr Sauceda to Linda Salazar, I think it's a good idea that the board presented to administration, and so because the committee has so much authority we want to provide some validity to the process. Otis Power, why can't we look at the totals just to have an idea where were headed, let me tell you why, if we have to check list of employees, I'm on the committee, I have never seen whose on the committee. Give them a count now for safety purposes, Mr. Colunga should be there too. Dr Sauceda, Mr. Chair, we talked about that, but we have no way of knowing 100% for 1, the challenge will be easy, the challenge is going to be close, don't want to pull an election like last time, months before we know who won, we don't want to get anybody's hopes up, plus more importantly, remember, the tally will not get this done, presenters no offense, but they came up and talked to us. Before I have Ms. Salazar or Randy Dunn publicly make any representation that the company said this, if not in writing, it did not happen. I want to have it in writing before I present it. If company one says yes and refuses to put in writing, then we will not go there. It's not as easy as a tally or as verifying.  If not available in writing, then we won't present it. By noon, we will present to all representatives the official tally for preliminary contract until legal reviews it. I would love to do it today Mr. Dunn, but per our discussion, I agreed that this is the best approach.  Mr. Dunn requested that Dr. Sauceda include a copy of letter of agreement. Dr. Sauceda, commented will do. Otis Powers, to Randy Dunn, I want to comment, unless he was in other discussions I have not been in any discussion, not involved in any discussion as an insurance committee member, I should have been involved. Letter sent to AFLAC, I had no knowledge of it. My name should not be on the letter. I do not want apology, nothing against AFLAC. Inappropriate of Dr. Sauceda, he should not include board members without their knowledge.  I spoke to the board attorney, we should not be on letter to AFLAC without knowing, I need to be more involved as a committee member in major decisions instead of only one or two people. Hugh Emerson stated, I respect

honored colleagues here and respect Otis Powers comments but we are talking about 2 things, 1 being potential litigation so perhaps need to save it for executive session in a board meeting. Randy Dunn to Otis Powers, the comments are so noted. Randy Dunn to Dr. Sauceda, please clarify. Dr. Sauceda stated, I agree with Hugh Emerson that content of memo sent to Otis Powers should be discussed in executive session. Otis Powers to Randy Dunn, our attorney suggested that I go on record . Randy Dunn, so noted. Randy Dunn indicated that we needed to move forward. Linda Salazar stated that she wanted to hear from the audience if o.k. to wait on ballots until tomorrow. The audience stated No. Linda Salazar stated I want to be able to sleep tonight. Randy Dunn announced that the floor would be open for 10 minutes.

Speaker # 1    **Pat Schumacher**  I want to say that I am pleased that you recognize that my principal chose someone of intelligence to be on this committee. I want to also say to you that my vote reflected the campus wishes. My campus does not trust you and I want to say that what I would like to see it that when this vote is taken that some of the insurance committees from the schools be there to see what it is. Randy Dunn asked, Pat would you like to be there? Ms. Schumacher responded, I would love to be there. Dr Sauceda., she'll be there.

Speaker # 2    **Beto Medrano** thanked the board for the opportunity to express their concerns. He thinks that the superintendent is a fair and honest person and he also stated that he was in agreement to allow Pat Schumacher only to be present at the count. Nobody better than Pat Schumacher, that's all we need as far as honesty, loyalty. Randy Dunn, acclamation.

Speaker # 3    **(unidentified)** Dr. Sauceda made a statement that we need it in writing that that are not going to charge us, they are here now, why cant they put it in writing now, we are witness to the presentations. Randy Dunn responded that we need it in writing on company stationary.

Speaker #    **Francisco Sifuentes** Randy Dunn noted to Mr. Sifuentes that this is for what we are doing now. I want to point out that anytime there's a mistake on the part of a committee, the whole board will be blamed.

Randy Dunn directed Dr. Sauceda to proceed. Dr. Sauceda indicated that next was a topic related to Health Insurance. He requested that the committee members review the current program and as they review the new option being presented, that they take into consideration that districts and organizations throughout the state, also are suffering with rate increases. He mentioned that he had an invitation to go to diocese of Brownsville, who is struggling and also expecting insurance rates to go very high. They wanted to know what we were doing about this. Insurance is a sticky situation. I have included an article from Corpus Christi ISD, as they are demographically similar to us. For their employees school district contributes $90.00 as compared to what BISD contributes somewhere around $ 270.00. Our board almost triples the contribution and Dr. Sauceda wanted to take the opportunity to thank the board for caring about the employees. Dr.

Sauceda noted that with the new option, the timing last year was not good for looking at options, and the Insurance Committee decided to look for other alternatives for district employees and the fact that the cost was going to go up, we got mixed up. The process did not create higher rates and it's not fair to board or to committee to blame them. The insurance rates would have gone tremendously up whether the board and committee had directed administration to look or not to look at other alternatives, just the reality that the rates are higher for all of us, not the process. Administration took your direction seriously to look for better plan, the right time to look is now. Administration has looked and found a possibility here. We have a plan that Mr. Errisuriz, Mr. Muniz and Dr. Lopez will present, challenge is, can we provide better plan, better coverage, less cost. We think this fits what you want. If so, we want to bring it to you, if directed to look into further, we will come to board and ask for their indulgence to support the administration. I apologize to staff for clumsiness, having as a result, bringing that backlash to you. We will continue to come to committee and staff, and if approved, we will bring it to the board. Currently contract cycle is October 1st – September 31st. Due to budget/finance process, it is probably better to have cycle run from January 1st – December 31st. Enrollment process is cumbersome, too much going on in the summer. Right now, timing is good too, if new renewal cycle approved. Randy Dunn noted that the biggest reasons to change cycle is that now we do not have option to meet with members in June or July, whereas in January, we can present plans to you, while you're still in school and you will have an opportunity to ask questions and give input. Dr. Sauceda called on Mr Errisuriz to present;

Mr Errisuriz: Thank you Dr Sauceda, Mr. Chair, board members, please refer to your manilla folder, 2 packets, 3rd party administrator and medical health insurance information. Dr. Sauceda referred to article from Corpus Christi ISD and how much they contribute as opposed to what our district contributes. We are fortunate that the board continued to fund the amount contributed by the district as promised for the employees. Our board is diligent about looking for other options. Mr. Errisuriz reviewed the information provided pertaining to current and proposed employee medical health insurance plans and compared the two plans, pointing out all the positive details which clearly offer noticeable advantages and potential savings to district employees. It was also noted that the district would continue to use the same provider, ETHIX, local network of about 100 physicians available would also provide beneficial resources as well. Mr. Errisuriz explained that the last part of the package is a ballot to be completed and returned to him after the information was reviewed.

Dr. Sauceda, entertain questions? Randy Dunn, questions from the board first.

Questions:
Otis Powers stated that it looks great and asked if this would be self funded? Yes. Per E. Errisuriz, employee owned. Was this on last bid, this plan? No sir. Otis Powers, provide more information

Randy Dunn asked: are they providing this for anyone else. E, Errisuriz, yes, across the state. The money we save, the district holds onto it. Randy Dunn noted that the money saved will remain here to stabilize the fund to protect employee benefits. Hugh Emerson stated that he thinks the staff and everyone agrees that they need more money in their pockets. Situations with older children, retirement age, etc., we need to cover insurance and improve the benefits we offer. Dr. Sauceda noted that we would have the ability to make the plan work to our advantage and address the needs immediately. Linda Salazar glad to see this, commended Randy Dunn, Otis Powers, and she wants to see involvement of teachers and employees. Everyone needs to be happy with the plan and have good insurance for everyone. Mr. Errisuriz noted that Mr. Muniz, Dr. Lopez, Dr. Sauceda and he with the support of the board, have worked very hard to research this information. Mr. Muniz and Mr. Errisuriz have found that the current provider could increase our rates with a 30 day notice and they also found that many employees do not use the free coverage available to them because they have better coverage through their spouses. The district has been paying $2MM for coverage not being utilized. Mr. Lehman asked who would be the TPA. No one has been contacted, only visited with one for compiling information. Dr. Sauceda stated that none of the previous ones presented earlier. Pat Lehman, who is proposing this plan? Dr. Sauceda stated that the plan was doable and proposed by the staff. Pat Lehman, design of plans also inhouse? Yes. Pat Lehman, I think this is good, only concern is with reinsurance, aggregate stop loss to protect ourselves. Randy Dunn, goal was to bring the plan to the committee, show what we can do, what is out there.

Questions from the audience limited to 25 minutes:

**Pat Schumacher** very happy to see what was presented. Campus will ask about:

- hospital $200 deductible - is it additional to $500 we have now and is it for each visit. Mr. Muniz, $200 proposed plan, our plan will show information. We can change it.
- Lab I benefits – where is this? Lab I is a company. Place where people will go? Yes and they are local.
- If in January, will deductibles be charged again? Dr. Sauceda, because this is our plan, we could look at options, February 1st. Pat Schumacher stated that she believes her campus will be in agreement.

**Jill Graves;**
- Network? Nationwide or just statewide? nationwide
- where is the state plan? District has to offer it. Dr. Sauceda, if the law states that, we will have it. It is our plan, but state plan will be pricey.
- What dental plan? What dentists? Delta Dental, LifeRe. Previously we had problems with getting dental service. We have had self funded plans, wonderful until money depleted. Be careful with dependent coverage and emergency room coverage if self funded. BISD has had self funded plans and we need to be careful with this. Dr. Sauceda reminded everyone that this is not a commitment until it is

8

brought to the board, a lot of discussion remains to take place. The district has the option of designing the plan they want.

**Beto Medrano** echoed what Pat Schumacher stated, all campuses feel the same. We need to work together, school board, staff and administration, insurance committee members. Feels strongly that it will be brought back and go with it. Thanked Otis Powers for longevity stipend and all the board members.

**Central Middle School representative** concern/anxious about the ballots, wants unofficial count given to them today. Linda Salazar agreed, and asked Randy Dunn to allow the count to begin now. Concern by superintendent, agrees with written request but representatives made verbal oral contract and they could be sued if they do not honor it. Randy Dunn asked if they would not hold them to the count, she said no, I won't. Randy Dunn proposed that the ballots be locked in police department safe, audience not in agreement. Central M.S. representative explained that it wasn't that she didn't trust them, but just anxious. Dr. Sauceda stressed that potential legal issue with one of the providers, if that provider came out to be #1, we would not be able to say for sure, by 10:00 AM tomorrow, we will know. Randy Dunn announced that the count would be held tonight.

**Jill Graves**
- Primecore- work with them
- Self funded, been there, done that-anyone here that was here back then?
- indemnity insurance committee?
- final plan to committee before going to board? Dr. Sauceda stated that committee will be helping develop the plan to be presented to the board. Hugh Emerson wants superior or better than we have now.
- Re-enrollment? Yes

Randy Dunn to Dr. Sauceda, at any time, will employees be without health insurance? No

**Patrick Hammes**
- Suggested meeting Monday afternoon to review/discuss results prior to returning ballot on Wednesday December 4th? Dr. Sauceda suggested that if feeling is overwhelming about satisfaction with what we have, then no sense to have so many meetings. It depends on outcome of input received.
- It is true that administrations has a different insurance plan than the teachers? No, everybody has the same plan.

- George Borrego

Although not on the insurance committee due to potential conflict of interest because he represents several insurance companies, would like to serve on the committee, not as a member, due to expertise, would be beneficial.

**Elizabeth Johnson**

9

- Will the insurance committee help choose administrator for plan? The committee will be there at every step. All issues will be reviewed with the committee as the plan is being developed. Years ago, the committee wanted to look at hospitals, etc.during monthly meetings, wellness plan, preventive plan. Look into things that are costing and driving the rates up.

**Cromack Representative**
- Preventive services suggest that we include colonoscopy and rectoscopy, flu shots, diptheria, tetanus, etc.

**Mariano (Bean) Ayala**
- Here as a concerned citizen. By getting the teachers and all employees involved you are being productive. Thank you for the efforts and input.

Dr. Sauceda, next meeting on Monday December 3rd. Information will be provided once available regarding where and when the meeting will be scheduled. –

Randy Dunn took a moment to address each of the people there. Insurance is a very serious matter. Your interests are foremost, second only to our children. Thank you for your commitment and for being here tonight.

At 8:45 PM, Pat Schumacher, Linda Salazar conducted unofficial ballot count in the Executive Conference Room. The results are as follows:

| | |
|---|---|
| AFLAC | 44 |
| NPA | 1 |
| 1st Financial | 0 |

Once completed, Linda Salazar entered the board room and announced that it was unofficial, but it looks like AFLAC will remain; enrollment will begin immediately. By 10:00 AM on Friday, Dr. Sauceda will know officially.

10

# EXHIBIT-43

*11-30-01*

To:  Central Middle School Colleagues
Re:  School Board/Insurance Committee Meeting

To everybody's surprise, the meeting started off right away with Mr.
Sauceda's announcement that 3 insurance companies were to make 15 minute
presentations and would answer questions pertaining to their services.  The
meeting was open to the public.  The insurance committee representatives
were given packets with information that included a ballot to vote for a
Cafeteria Plan Provider and information on another health insurance provider
that appears to be less expensive for employees and offers better healthcare.
Attached is the information we were given to share with our schools.  There
will be another school board/insurance representative meeting next week
where we will exchange thoughts pertaining to this new health insurance.  We
will inform the board as to whether our schools want them to look into this
insurance company in more detail, or whether we want to keep what we have,
or if we want them to continue gathering information on other insurance
possibilities.

The presenters were:

1) Ron Laydeen from AFLAC- He told me that he was called upon at the
last minute to make this presentation for AFLAC.  No one asked him any
questions after his short presentation.

I found out that Dino Chavez had been asked, by Mr. Sauceda, to
remove himself as BISD AFLAC representative, alleging unprofessional and
unethical conduct stemming from memos he had sent BISD staff.  In these
memos, Mr. Chavez shared the fact that incorrect information about AFLAC
was being given to the public and that another insurance company (NPA) was
being mysteriously promoted, and that there could possibly be a "conflict of
interest" pertaining to this insurance company.

During the meeting, Mr. Powers (board member) announced that he
had spoken to his lawyer and had been advised to make the following
information a matter of public record-----Powers stated that he had NO part
in the letter that Mr. Sauceda had sent to AFLAC about Dino Chavez.
Sauceda had demanded that Chavez apologize to each board member and
Powers said that he, in no way, expected any type of apology from Mr.
Chavez.  Powers continued to comment that Mr. Sauceda had no right to
write such a letter and include the board members names on this letter.  He
expressed outrage and disgust that Mr. Sauceda had abused his power by
writing this letter. (Most audience members were shocked at his comments
because they were not aware of the contents of this letter.  I have a copy of



this letter but it will not be included in the insurance information I have attached for you.)

2) **Doug Bank from First Financial**- He was an excellent speaker but made the mistake of commenting, "We will not be charging any fees *at this time*." Several questions referenced this comment, and it was downhill all the way after that.

3) **Two gentleman were from NPA Insurance Associates of the Valley**- They were very informative but could not convince the audience that they were the best choice. They were the only one of the three that charged a fee ($1 per month per employee for annuities).

There were a lot of questions from the audience addressed to the 2 providers that spoke after AFLAC. Many were confused because all the providers seemed to have the same answers and offered the same quality of service. So, before the election began, I approached the podium and commented, "My name is Marta Barrera and I represent my colleagues at Central Middle School. While all the presenters proved to be good speakers, very knowledgeable and highly competitive, my colleagues have always been aware that AFLAC has never had any complaints about the quality of their service. And so my colleagues want to say, 'If it ain't broke, why fix it'?" The audience clapped and seemed to highly agree with me.

Mr. Sauceda stated that whom ever would be elected, would have to guarantee two things: provide services with no charge to either employee or district and would have to be able to begin enrollment A.S.A.P., to be completed before the holidays.

After the ballot election, Sauceda said that the results would be announced the following day. Many were very disappointed and complained that the ballots should be counted right then and there. Many expressed distrust that the board members would be counting the ballots themselves. After much uneasiness and discomfort, Mr. Sauceda proceeded with the presentation on health insurance. Mr. Errisuriz explained the new plan in detail. Please review the copies I have provided you. Next week I will be asking for your input as to whether you like the new plan better than what we now have.

Once again, the floor was open for questions from the audience about health insurance. Yours truly approached the podium again and said, "I commend the board's efforts in pursuing the possibility of a "better" health

insurance coverage for the BISD employees. However, I think I speak for most of the audience when I say that I am feeling "very anxious" about the outcome of the ballots collected earlier and would like to once again request an 'unofficial' ballot count at the end of the health insurance question session." Everybody clapped and agreed. Ms. Linda Salazar commented that she, too, would like to proceed in counting the ballots because she "would sleep better" knowing that it had been taken care of. And so, after a few more comments, the ballots were counted in a back room. When the ballot counters came out to announce the winner, Mr. Sauceda followed behind them. AFLAC was announced the winner. Everybody yelled with much content when hearing the count (44/1/0). Mr. Sauceda then commented that the count had been "official" and that the company could start enrollment tomorrow.

Before adjourning for the evening, Mr. Dunn walked away from his position at the board table, approached the audience and stood in front of them to comment. He stated "in so many words", that he was very impressed that we had all made the effort to attend this meeting. He commented that working together, so much can be accomplished. He emphasized that we were all here for the CHILDREN. He spoke very eloquently.

Marta Barrera<br>
C M S Representative

# EXHIBIT-44

Janet P. Baker, ACS
Vice President
Marketing Services

January 8, 2002

Pat Lehmann
Brownsville Independent School District
1900 Price Road
Brownsville, TX 78521

Dear Ms. Lahmann:

At the request of Dr. Noe Sauceda, Superintendent of BISD, I am writing to personally apologize to you for any negative action that may have been caused by the AFLAC representative Dino Chavez.

We sincerely regret this most unfortunate situation. AFLAC's ability to provide the best possible service to our clients is extremely important. Thank you for being highly supportive of our program over the years and providing the opportunity for BISD employees to elect AFLAC's coverage.

Best Regards,

Janet P. Baker

JPB/ch



American Family Life Assurance Company of Columbus (AFLAC)
Worldwide Headquarters: 1932 Wynnton Road • Columbus, Georgia 31999-0001
Phone: 706/660-7297 • Fax: 706/317-6121 • e-mail: jbaker@aflac.com

# EXHIBIT-45

Subject: Letter of apology
From: Joe Colunga <JColunga@utb1.utb.edu>
Date: Wed, 06 Feb 2002  :45:19 -0600
To: jbaker@aflac.com

Dear Ms. Baker,

Thank you for the letter of  January 8 which was an apology for AFLAC
representative Dino Chavez.
I was not aware of any negative complaints against Mr. Chavez until the letter went
out from the superintendent requesting an apology to board members. I personally
did not request one and apparently the conflict developed between administration
and the representative during the selection process of a TPA.

I also regret that any conflict that developed led to his dismissal. His previous
record of servicing AFLAC in past years had brought no complaints as far as I know.


I appreciate your concerns about providing the best possible service and will
continue to support  your program in the future.

Sincerely,


Joe Colunga
BISD Board President



# EXHIBIT-46

**BOARD OF TRUSTEES**

Joe Colunga
*President*

Linda Salazar
*Vice-President*

Hugh Emerson, Jr.
*Secretary*

Marilyn del Bosque Gilbert
*Assistant Secretary*

Randy Dunn
*Member*

Pat Lehmann
*Member*

man Otis Powers, Jr.
*ember*

Dr. Noe Sauceda
*Superintendent of Schools*

January 15, 2002

Ms. Janet P. Baker, ACS
AFLAC
1932 Wynnton Road
Columbus, GA 31999

Dear Ms. Baker:

Thank you for your letter dated January 8, 2002, concerning Mr. Dino Chavez.

First of all, I am male and not female. Your first mistake.

Second of all, there is no apology needed, on my part, for any action that Mr. Dino Chavez might have or might not have caused. Your second mistake.

Third mistake of all, AFLAC's dismissal of Mr. Chavez.

Now you understand my position on this matter.

Sincerely,

Pat Lehmann
Board Member, BISD

P.S. You also misspelled my name, it's Lehmann not Lahmann.

Sauceda
EXHIBIT NO. 17
6-17-03
Hill & Romero

*BISD does not dicriminate on basis of race, color, national origin, sex, religion, age or disability in emploment or provision of services, programs or activities.*

# EXHIBIT-47

**BOARD OF TRUSTEES**

Joe Colunga
*President*

Linda Salazar
*Vice-President*

Hugh Emerson, Jr.
*Secretary*

Marilyn del Bosque Gilbert
*Assistant Secretary*

Randy Dunn
*Member*

Pat Lehmann
*Member*

...man Otis Powers, Jr.
...ember

Dr. Noe Sauceda
*Superintendent of Schools*

1900 Price Road, Suite 307   Brownsville, Texas 78521

Janet P. Baker, ACS
Vice President - Marketing Services
AFLAC
1932 Wynnton Rd.
Columbus, GA  31999

January 22, 2002

Dear Ms. Baker,

Thank you for your letter dated January 8, 2002 concerning Dino Chavez.  Your apology is not needed as I do not believe Mr. Chavez did anything wrong.  On the contrary, I believe his actions were appropriate and justified.  Please be aware that Superintendent Sauceda's dismissal of Mr. Chavez was done without the board of trustee's approval or knowledge.  Dr. Sauceda inappropriately took this action on his own.  I am not in agreement with this action and would like Mr. Chavez reinstated to the position he maintained with our district.

As a matter of record, our teacher's insurance committee voted 44-1 to keep AFLAC.  In my opinion, this overwhelming show of support for AFLAC is the result of Mr. Chavez's excellent service and the continued dedication he personally has provided to our employees in the past.

Sincerely,

Linda Salazar
Vice President,
BISD Board of Trustees

Sauceda
EXHIBIT NO. 18
6-17-03
Hill & Romero

*BISD does not dicriminate on basis of race, color, national origin, sex, religion, age or disability in emploment or provision of services, programs or activities*

# EXHIBIT-48

Case 1:02-cv-00128   Document   Filed in TXSD on 07/25/2005   Page   of

# Brownsville Independent School District

1900 Price Road   Suite 307   Brownsville, Texas 78521-2411   (956) 548-8011   Fax (956) 548-8019

**BOARD OF TRUSTEES**

**Joe Colunga**
*President*

**Linda Salazar**
*Vice-President*

**Hugh Emerson, Jr.**
*Secretary*

**Marilyn del Bosque Gilbert**
*Assistant Secretary*

**Randy Dunn**
*Member*

**Pat Lehmann**
*Member*

**Herman Otis Powers, Jr.**
*Member*

**Dr. Noe Sauceda**
*Superintendent of Schools*

January 16, 2002

Ms. Janet P. Baker, ACS
AFLAC
1932 Wynnton Road
Columbus, GA 31999

Dear Ms. Baker:

I am in receipt of your letter dated January 8, 2002.

Please be informed that Dr. Sauceda took action without my knowledge.

Upon learning of Dr. Sauceda's premature action taken against Mr. Dino Chavez, I personally contacted Mr. Frank Lafemina, AFLAC State Office, and expressed my disagreement with Dr. Sauceda's behavior.

Not Mr. Chavez or any AFLAC representative owes me an apology. On the contrary, Dr. Sauceda owes Mr. Chavez an apology.

I have served the district for the past five years and have known Mr. Chavez for the past three years, and I have known him to be professional, courteous, and an excellent AFLAC agent in representing the school district.

Respectfully submitted,

Herman Otis Powers, Jr.
Board Member, BISD

*Powers*
EXHIBIT NO. 7
5-29-03
Hill & Romero

*BISD does not dicriminate on basis of race, color, national origin, sex, religion, age or disability in emploment or provision of services, programs or activities.*

# EXHIBIT-49

Brownsville ISD
031901

PURCHASING AND ACQUISITION

CH
(LEGAL)

**BOARD AUTHORITY**

The Board may adopt rules and procedures for the acquisition of goods and services. *Education Code 44.031(d)*

**DELEGATION OF AUTHORITY**

The Board may delegate its authority regarding an action authorized or required to be taken by the District by Education Code Chapter 44, Subchapter B to a designated person, representative, or committee.

The Board may not delegate the authority to act regarding an action authorized or required to be taken by the Board by Education Code Chapter 44, Subchapter B.

*Education Code 44.0312*

**INJUNCTION**

A court may enjoin performance of a contract made in violation of Education Code Chapter 44, Subchapter B. A county attorney, district attorney, criminal district attorney, citizen of the county in which the District is located, or any interested party may bring an action for an injunction. A party who prevails in an action brought under this subsection is entitled to reasonable attorney's fees as approved by the court. *Education Code 44.032(f)*

**PURCHASES VALUED AT OR ABOVE $25,000**

All District contracts, except contracts for the purchase of produce or vehicle fuel, valued at $25,000 or more in the aggregate for each 12-month period, shall be made by the method that provides the best value for the District:

1. Competitive bidding.
2. Competitive sealed proposals.
3. A request for proposals for services other than construction services.
4. A catalog purchase as provided by Government Code Chapter 2157, Subchapter B.
5. An interlocal contract.
6. The reverse auction procedure as defined by Government Code 2155.062 (d).

---

*Note:* Regarding construction of school facilities, see CV generally; CVA for competitive bidding; CVB for competitive sealed proposals; CVC for design/build contracts; CVD, CVE for contracts using a construction manager; and CVF for job order contracts for minor repairs/alterations.

---

*Education Code 44.031(a)*

In awarding a contract, the District may consider:



EXHIBIT
F-3

FACTORS

1. Purchase price.
2. The reputation of the vendor and of the vendor's goods and services.
3. The quality of the vendor's goods or services.
4. The extent to which the goods or services meet the District's needs.
5. The vendor's past relationship with the District.
6. The impact on the ability of the District to comply with laws relating to historically underutilized businesses.
7. The total long-term cost to the District to acquire the goods or services.
8. Any other relevant factor specifically listed in the request for bids or proposals.

*Education Code 44.031(b)*

The factors listed above are the only criteria that may be considered by the District in its decision to award a contract. The District may apply one, some, or all of the criteria, but it may not completely ignore them. *R.G.V. Vending v. Weslaco Indep. Sch. Dist., 995 S.W.2d 897 (Tex. App.-Corpus Christi 1999, no pet.).*

NOTICE PUBLICATION

Notice of when and where bids or proposals or the responses to a request for qualifications will be received and opened shall be published in the county where the District's central administrative office is located, once a week for at least two weeks prior to deadline for receiving bids, proposals, or responses to a request for qualifications. If there is no newspaper in that county, the advertising shall be published in a newspaper in the county nearest the county seat of the county in which the District's central administrative office is located. In a two-step procurement process, the time and place where the second-step bids, proposals, or responses will be received are not required to be published separately. *Education Code 44.031(g)*

PERSONAL PROPERTY PURCHASES VALUED $10,000 TO $25,000

When the District seeks to purchase personal property of a value of at least $10,000 but less than $25,000, in the aggregate, for a 12-month period, the District may either purchase those items in accordance with Education Code 44.031(a) and (b) described above or follow the vendor list procedures described below. *Education Code 44.033(a)*

NOTICE

For each 12-month period, the District shall publish a notice in two successive issues of any newspaper of general circulation in the county in which the school is located. If there is no newspaper in the county in which the school is located, the advertising shall be published in a newspaper in the county nearest the county seat of the county in which the school is located, specifying the categories of personal property to be purchased and soliciting the names, addresses, and telephone numbers of vendors that are interested in supplying any of the categories to the District. *Education Code 44.033(b)*

VENDOR LIST

For each category, the District shall create a vendor list consisting of each vendor that responds to the published notice and any additional vendors the District elects to include. Before the District makes a purchase from a category of personal property, it must obtain written or telephone price quotations from at least three vendors from the list for that category. If fewer than three vendors are on the list, the District shall contact each vendor. Whenever possible, telephone quotes should be confirmed in writing by mail or facsimile. The bidding records

shall be retained with the District's competitive bid records and are subject to audit. Purchases shall be made from the lowest responsible bidder. *Education Code 44.033(b),(c)*

**PRODUCE OR FUEL PURCHASES**

When the District purchases produce or fuel valued at $10,000 or more in the aggregate, for a 12-month period, the District must either purchase those items in accordance with Education Code 44.031(a) and (b) described above or follow the vendor list procedures described immediately above. *Education Code 44.033(a), (d)*

**PROFESSIONAL SERVICES**

The purchasing requirements of Education Code Section 44.031 do not apply to a contract for professional services rendered, including the services of an architect, attorney, or fiscal agent.

The District may contract for professional services rendered by a financial consultant or a technology consultant in the manner provided by Government Code 2254.003, in lieu of the methods provided by Education Code 44.031.

*Education Code 44.031(f)*

Competitive bids shall not be solicited for professional services of any licensed or registered certified public accountant, architect, landscape architect, land surveyor, physician, optometrist, professional engineer, state-certified or state-licensed real estate appraiser, or registered nurse. Contracts for these professional services shall be made on the basis of demonstrated competence and qualifications to perform the services and for a fair and reasonable price. *Gov't Code 2254.002, 2254.003(a)* [See also CV (LEGAL)]

**EMERGENCY DAMAGE OR DESTRUCTION**

If school equipment, a school facility, or a part of a school facility or personal property is destroyed or severely damaged or, as a result of an unforeseen catastrophe or emergency, undergoes major operational or structural failure, and the Board determines that the delay posed by the methods provided for in Education Code 44.031 would prevent or substantially impair the conduct of classes or other essential school activities, then contracts for the replacement or repair of the equipment, school facility, or the part of the school facility may be made by methods other than those required by Education Code 44.031. *Education Code 44.031(h)*

**COMPUTERS**

The District may acquire computers and computer-related equipment, including computer software, through the Texas Building and Procurement Commission (BPC) under contracts with the BPC in accordance with Government Code Chapter 2157. *Education Code 44.031(i)*

**SOLE SOURCE**

Compliance with Education Code 44.031 is not required for purchases that are available from only one source, including:

1. An item for which competition is precluded because of a patent, copyright, secret process, or monopoly.
2. A film, manuscript, or book.
3. A utility service, including electricity, gas, or water.
4. A captive replacement part or component for equipment.

The sole source exception shall not apply to mainframe data processing equipment and peripheral attachments with a single-item purchase price in excess

of $15,000.

*Education Code 44.031(j),(k)*

IMPERMISSIBLE
PRACTICES

A Trustee, employee, or agent shall not, with criminal negligence, make or authorize separate, sequential, or component purchases to avoid the purchasing requirements set out in Education Code 44.031. An officer or employee shall not knowingly violate Education Code 44.031 in any other manner.

"Component purchases" means purchases of the component parts of an item that in normal purchasing practices would be made in one purchase. "Separate purchases" means purchases, made separately, of items that in normal purchasing practices would be made in one purchase. "Sequential purchases" means purchases, over a period, of items that in normal purchasing practices would be made in one purchase.

Violation of this provision is a Class B misdemeanor and an offense involving moral turpitude, conviction of which shall result in removal from office or dismissal from employment. A Trustee who is convicted of a violation of this provision is considered to have committed official misconduct and for four years after the date of final conviction, the removed person is ineligible to be appointed or elected to public office in Texas, is ineligible to be employed by or act as an agent for the state or a political subdivision, and is ineligible to receive any compensation through a contract with the state or a political subdivision. [See BBC(LEGAL)]

*Education Code 44.032*

INSURANCE

A contract for the purchase of insurance is a contract for the purchase of personal property and shall be made in accordance with Education Code 44.031 or 44.033. *Education Code 44.031, 44.033; Atty. Gen. Op. DM-347 (1995)*

MULTIYEAR
CONTRACTS

The District may execute an insurance contract for a period longer than 12 months, if the contract contains either or both of the provisions described at COMMITMENT OF CURRENT REVENUE, below. If the District executes a multiyear insurance contract, it need not advertise for insurance vendors until the 12-month period during which the District will be executing a new insurance contract. *Atty. Gen. Op. DM-418 (1996)*

COMPETITIVE
BIDDING

If the District receives two or more bids from responsible bidders that are identical, in nature and amount, as the lowest and best bids, it shall select only one bidder from the identical bids.

If only one of the bidders submitting identical bids is a resident of the District, that bidder shall be selected. If two or more such bidders are residents of the District, one shall be selected by the casting of lots. In all other cases, one of the identical bids shall be selected by the casting of lots.

The Board shall prescribe the manner of casting lots and shall be present when the lots are cast. All qualified bidders or their representatives may be present at the casting of lots.

*Local Gov't Code 271.901*

| | |
|---|---|
| REVERSE AUCTION | Districts that use the reverse auction procedure must include in the procedure a notice provision and other provisions necessary to produce a method of purchasing that is advantageous to the District and fair to vendors. *Local Gov't Code 271.906(b)* |

Reverse auction procedure means:

1. A real-time bidding process usually lasting less than one hour and taking place at a previously scheduled time and Internet location, in which multiple suppliers, anonymous to each other, submit bids to provide the designated goods or services; or
2. A bidding process usually lasting less than two weeks and taking place during a previously scheduled period and at a previously scheduled Internet location, in which multiple suppliers, anonymous to each other, submit bids to provide the designated goods or services.

*Gov't Code 2155.062(d)*

| | |
|---|---|
| OUT-OF-STATE BIDDERS | The Board shall not award a contract for general construction, improvements, services, or public works projects or for purchase of supplies, materials, or equipment to a bidder whose principal place of business is not in this state, unless the nonresident underbids the lowest bid submitted by a responsible resident bidder by an amount that is not less than the amount by which a resident bidder would be required to underbid a nonresident bidder to obtain a comparable contract in the state in which the nonresident's principal place of business is located. *Gov't Code 2252.001, 2252.002* |

This requirement shall not apply to a contract involving federal funds. The District shall rely on information published by the BPC in evaluating the bids of a nonresident bidder. *Gov't Code 2252.003, 2252.004*

| | |
|---|---|
| INTERLOCAL AGREEMENTS | To increase efficiency and effectiveness, the District may contract or agree with other local governments and with state agencies, including the BPC, to perform some of its purchasing functions. *Gov't Code 791.001, 791.011* |

The District may agree with another local government, including a nonprofit corporation that is created and operated to provide one or more governmental functions and services, or with the state or a state agency, including the BPC, to purchase goods and services reasonably required for the installation, operation, or maintenance of the goods. Such an agreement may not, however, apply to services provided by firefighters, police officers, or emergency medication personnel.

Districts that purchase goods and services by agreement with another local government or with the state or state agency satisfy the requirement to seek competitive bids for the purchase of goods and services.

*Gov't Code 791.025(b),(c); Atty. Gen. Op. JC-37 (1999)*

| | |
|---|---|
| STATE PURCHASING | Purchasing services performed for the District by the BPC shall include: |

| | |
|---|---|
| PROGRAM | 1. The extension of state contract prices to the District when the BPC considers it feasible. |
| | 2. Solicitation of bids on items desired by the District if the solicitation is considered feasible by the BPC and is desired by the District. |
| | 3. Provision of information and technical assistance to the District about the purchasing program. |

The BPC may charge the District its actual costs in providing purchasing services.

*Local Gov't Code 271.082*

**DISTRICT REQUIREMENTS**    The District may participate in the purchasing program, including participation in purchases that use the reverse auction procedure, by filing with the BPC a resolution adopted by the Board requesting that the District be allowed to participate on a voluntary basis, to the extent the BPC deems feasible, and stating that the Board shall:

1. Designate an official to act for the District in all matters relating to the program, including the purchase of items from the vendor under any contract.
2. Direct the decisions of its representative.
3. Be responsible for:
    a. Submitting requisitions to the commission under contract(s) and for payment directly to the vendor; and
    b. Electronically sending purchase orders directly to vendors, or complying with procedures governing a reverse auction purchase, and electronically sending the BPC reports on actual purchases.
4. Be responsible for the vendor's compliance with all conditions of delivery and quality of the purchased item.

A purchase made through participation in this program meets any state requirement to seek competitive bids for the purchase of the item.

**ELECTRONIC MARKETPLACE**    If the District has the ability to electronically send purchase orders and information, it may participate in the Department of Information Resources' electronic procurement system, as described in Government Code Chapter 2177.

*Local Gov't Code 271.083*

**MULTIPLE AWARD CONTRACT SCHEDULE**    The BPC shall develop a schedule of multiple award contracts that have been previously awarded using a competitive process by the federal government or any other governmental entity in any state.

The District may purchase goods or services directly from a vendor under a contract listed on a schedule. An authorized purchase satisfies any requirement of state law relating to competitive bids or proposals and satisfies any applicable requirements of Government Code 2157 (catalog purchase method).

The price listed for a good or service under a multiple award contract is a maximum price. The District may negotiate a lower price for goods or services under a contract listed on a schedule.

*Gov't Code 2155, Subchapter I*

**COOPERATIVE PURCHASING PROGRAM**

The District may participate in a cooperative purchasing program with another local government or a local cooperative organization. If the District does so, it may sign an agreement with another participating local government or a local cooperative stating that the District will:

1. Designate a person to act on behalf of the District in all matters relating to the program.
2. Make payments to another participating local government or local cooperative organization or directly under a contract, as provided in the agreement.
3. Be responsible for the vendor's compliance.

If the District participates in a cooperative purchasing program, it satisfies any law requiring it to seek competitive bids.

*Local Gov't Code 271.102; Atty. Gen. Op. JC-37 (1999)*

**COMMITMENT OF CURRENT REVENUE**

A contract for the acquisition, including lease, of real or personal property is a commitment of the District's current revenue only, provided the contract contains either or both of the following provisions:

1. Retains to the Board the continuing right to terminate the contract at the expiration of each budget period during the term of the contract.
2. Is conditioned on a best efforts attempt by the Board to obtain and appropriate funds for payment of the contract.

*Local Gov't Code 271.903*

**ENERGY OR WATER CONSERVATION MEASURES**

The District may contract for energy or water conservation measures. Such a contract shall be let according to the procedures established for professional services by Government Code 2254.004. *Education Code 44.901* [See policy CL (LEGAL) for legal requirements pertaining to such contracts]

**RECYCLED PRODUCTS**

The District shall give preference in purchasing to products made of recycled materials if the products meet applicable specifications as to quantity and quality. The District shall regularly review and revise its purchasing procedures and specifications for purchase of goods, supplies, equipment, and materials in order to:

1. Eliminate procedures and specifications that explicitly discriminate against products made of recycled materials.
2. Encourage the use of products made of recycled materials.
3. Ensure to the maximum extent economically feasible that the District purchase products that may be recycled when they have served their intended use.

The District may seek an exemption from compliance if it has a population of less than 5,000 within its geographic boundaries and demonstrates to the Water Commission that compliance would work a hardship on the District.

*Health and Safety Code 361.426*

| AGRICULTURAL PRODUCTS | If the cost and quality are equal, the District shall give preference in purchasing to agricultural products, including textiles and other similar products, that are produced, processed, or grown in Texas. "Processed" means canning, freezing, drying, juicing, preserving, or any other act that changes the form of a good from its natural state to another form. If Texas agricultural products are not equal in cost and quality to other agricultural products, the District shall give preference in purchasing to agricultural products produced, processed, or grown in the United States, if the cost and quality of the U.S. and foreign products are equal. |
|---|---|

The District may not adopt product purchasing specifications that unnecessarily exclude agricultural products produced, processed, or grown in Texas.

| VEGETATION FOR LANDSCAPING | If cost is equal and the quality is not inferior, the District shall give preference to Texas vegetation when it purchases vegetation for landscaping purposes. |
|---|---|

*Education Code 44.042*

| BUS PURCHASE OR LEASE | Each contract proposed for the purchase or lease of one or more school buses, including a lease with an option to purchase, shall be submitted to competitive bidding when the contract is valued at $20,000 or more. *Education Code 44.031 (l)* [See CNB] |
|---|---|

| CRIMINAL HISTORY | Before entering into a contract with the District, a person or business must give notice to the District if the person or an owner or operator of the business has been convicted of a felony. The District may terminate a contract with a person or business if the District determines that the person or business failed to give such notice or misrepresented the conduct resulting in the conviction. The District must compensate the person for services performed before the contract terminated. *Education Code 44.034* |
|---|---|

The District may obtain criminal history record information that relates to an employee of or applicant for employment by a person that contracts with the District to provide services if:

1. The employee or applicant has or will have continuing duties related to the contracted services; and
2. The duties are or will be performed on school property or at another location where students are regularly present.

*Education Code 22.083(b)*

| RIGHT TO WORK | While engaged in procuring goods and services or awarding a contract, the District: |
|---|---|

1. May not consider whether a vendor is a member of or has another relationship with any organization; and
2. Shall ensure that its bid specifications and any subsequent contract or other agreement do not deny or diminish the right of a person to work because of the person's membership or other relationship status with respect to any organization.

*Education Code 44.043*

| | |
|---|---|
| LOBBYING RESTRICTION: TOBACCO EDUCATION GRANT FUNDS | The District may not spend grant funds it receives from the Permanent Fund for Tobacco Education and Enforcement to pay: |

1. Lobbying expenses incurred by the District;
2. A person or entity that is required under Government Code Chapter 305 to register as a lobbyist with the Texas Ethics Commission.
3. Any partner, employee, employer, relative, contractor, consultant, or related entity of a person or entity of a registered lobbyist (as described in item 2);
4. A person or entity who has been hired to represent associations or other entities for the purpose of affecting the outcome of legislation, agency rules, ordinances, or other government policies.

*Gov't Code 403.1067*

DATE ISSUED: 09/04/2001
UPDATE 66
CH(H)-P

This online presentation of your district's policy is an electronic representation of TASB's record of the district's currently adopted policy manual. It does not reflect updating activities in progress. The official, authoritative manual is available for inspection in the office of the Superintendent. [See BF (LOCAL) for further information.]

# EXHIBIT-50

# Brownsville Independent School District

**Agenda Category: Bid/Proposals/Purchases**       Board of Education Meeting:  __11/03/98__

ITEM TITLE: Proposal #131-98 Third Party        _____X_____ **ACTION**
Administrator (TPA) for Section 125:      _____**INFORMATION**
Cafeteria Plan                _____**DISCUSSION**
=================================================

# BACKGROUND:

On an annual basis, BISD solicits proposals for the Optional Section 125: Cafeteria Plan.  As authorized by the Internal Revenue Code 125, a Cafeteria Plan is a benefit plan established by an employer which allows employees to choose from a menu of qualified benefits with the employees cost of selected benefit(s) paid on a pre-tax basis.  Therefore, the Administration recommends AFLAC Assurance Co., to administer the Section 125: Cafeteria Plan.  The recommendation is based on the following:  (1) A.M. Best Rating; A+ (2) No cost to the employees if AFLAC is allowed to offer AFLAC products during enrollment.  The employees are not required to purchase said products in order to participate in the Cafeteria Plan at no cost.  (3) Direct deposit provided.  (4) Claim and reimbursement timeline processing.

# FISCAL IMPLICATIONS:

N/A

# RECOMMENDATION:

Recommend awarding Proposal #131-98 to AFLAC Assurance Co., Columbus, GA. for the Third Party Administrator (TPA) to administer the Section 125: Cafeteria Plan.  (Annual Proposal).

=================================================
                          Approved for Submission to Board of Education:

**Submitted by:** _____

**Recommended by:** _____       **G. Wallace Jackson, Superintendent of Schools**

_____     _____
**Area Administrator    Deputy Supt.  for Human Resources**

WHEN NECESSARY, ADDITIONAL BACKGROUND MAY FOLLOW THIS

# EXHIBIT-51

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ                )
                             )
VS.                          )
                             )
BROWNSVILLE INDEPENDENT)
SCHOOL DISTRICT, NOE   )
SAUCEDA, AND RANDY     )   CIVIL ACTION NO.
DUNN, MARILYN DEL      )    B - 02 - 128
BOSQUE-GILBERT AND     )
HUGH EMERSON, JR.,     )
IN THEIR OFFICIAL      )
CAPACITIES AS BOARD    )
MEMBERS OF BROWNSVILLE )
INDEPENDENT SCHOOL     )
DISTRICT               )

*******************************************

ORAL AND VIDEOTAPED DEPOSITION OF

**FRANK D. LAFEMINA**

MAY 22, 2003

VOLUME 1

*******************************************



**COPY**

# AcuScribe
## Court Reporters

750 Norwood Tower
114 West 7th Street
Austin, Texas 78701
info@acuscribe.com

Telephone: (512) 499-0277
Toll-Free: (800) 497-0277
Fax: (512) 499-0298
www.acuscribe.com

03:08 PM 1      Q.    Okay.  Did you take any action on receiving

2    this letter before talking to Dr. Sauceda?

3      A.    It seems to me, to the best of my

4    recollection, that Dr. Sauceda called me within

03:09 PM 5    minutes of me opening the mail.  It was quick.

6      Q.    Okay.  What did you-all talk about?

7      A.    The letter.

8      Q.    What did you-all say?

9      A.    I can't remember exactly what he said other

03:09 PM 10   than to reinforce what's already said here in the

11   letter.

12     Q.    In other words, Dr. Sauceda was repeating the

13   same things he said there in the letter?

14            MS. NEALLY:  Objection; form.

03:09 PM 15           MS. MOORE:  Join.

16            THE WITNESS:  Yeah, pretty much, that

17   was the content of his side of the conversation.

18     Q.    (By Mr. Aguilar)  Okay.  What did you tell

19   him?

03:09 PM 20     A.    I asked him if there was anything that I

21   could do to fix it to where we could continue to carry

22   them as a client.

23     Q.    And what did he say?

24     A.    His response was that if I could assure him

03:09 PM 25   that Dino had nothing to do with the account and none

03:09 PM 1    of his people had anything to do with the account and

2    they were far away and not on school property and not

3    involved, then he could consider it.

4        Q.    And what did you say?

03:10 PM 5        A.    I said that I would have to look into it and

6    get back with him.

7        Q.    Anything else?

8        A.    Huh-uh.

9        Q.    Is that pretty much the extent of that

03:10 PM 10   conversation?

11       A.    Pretty much.

12       Q.    What did you do after that?

13       A.    Sat down and read the entire file and tried

14   to figure out what the best thing was to do to

03:10 PM 15   preserve the business.

16       Q.    Pardon me a second.  You said read the entire

17   file?

18       A.    It was 17 pages long.

19       Q.    Okay.  The contents of the envelope?

03:10 PM 20       A.    Correct.

21       Q.    Okay.

22       A.    I just read through the whole thing and, you

23   know, initially didn't do anything but soak it in and

24   try to figure out what I could do to preserve the

03:10 PM 25   account and to protect Dino.

## REPORTER'S CERTIFICATE

THE STATE OF TEXAS          *

COUNTY OF TRAVIS          *

     I, GERRI C. BARKER, Certified Shorthand Reporter in and for the State of Texas, do hereby certify that, pursuant to the agreement of counsel, came on before me on the 22nd day of May, 2003, the following named person, FRANK D. LaFEMINA, who was duly sworn to testify to the truth and nothing but the truth touching and concerning the matters in controversy in this cause; that he was thereupon carefully examined upon his oath and his examination reduced to typewriting under my supervision; and this deposition is a true record of the testimony given by said witness.

     I further certify that I am neither attorney, nor counsel for, nor related to, nor employed by any of the parties to the action in which this deposition is taken; and, further, that I am not a relative nor employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

     Certified to by me this the _____9th_____ day of _____June_____, 2003.


_Gerri C. Barker_
GERRI C. BARKER, TEXAS CSR 2219
Expiration Date:  12/31/03
Firm Registration No. 241
114 West 7th Street, Suite 750
Austin, Texas  78701
512-499-0277