United States District Court
Southern District of Texas
FILED

NOV 1 9 2003

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO CHAVEZ                          §
                                     §
vs.                                  §        CIVIL ACTION NO. B-02-128
                                     §
BROWNSVILLE INDEPENDENT              §
SCHOOL DISTRICT, NOE SAUCEDA         §

---

**DEFENDANT BROWNSVILLE INDEPENDENT SCHOOL DISTRICT'S
REPLY AND OBJECTION
TO PLAINTIFF'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT**

---

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, BROWNSVILLE INDEPENDENT SCHOOL DISTRICT, ["BISD"] one

of the Defendants in the above-styled and numbered cause and files and serves this its REPLY and

OBJECTION to Plaintiff's Response to Motion for Summary Judgment.

I.

OBJECTION TO DINO CHAVEZ' AFFIDAVIT

In Plaintiff's Response to Defendant's Motion for Summary Judgment he files 16 pages of

"facts" to support his arguments. Defendant would show that many of the "facts" are without

foundation or are solely based on the subjective statements supplied in Plaintiff's affidavit, Exhibit

1 to Plaintiff's Response.

For instance, in paragraph 5 of his affidavit and on page 5 of his Factual Background, the

"facts" stated by Plaintiff that the prior TPA charged $30,000 for their services and Mr. Chavez'

referral to himself as the "de facto" TPA are without foundation. During discovery Plaintiff

repeatedly tried to prove these points without success. Plaintiff now states these claims as "facts" in his Response and refers only to his biased affidavit to prove them.

In paragraph 11, he states that a chart was prepared by BISD, which is contrary to testimony provided by Dr. Sauceda, Exhibit "W to Defendant's Motion for Summary Judgment, Volume II, p. 29, l. 13 - p. 30, l. 4; Deposition of Eddie Errisuriz, Jr., Exhibit "1"herein, p. 196, l. 1 - p. 201, l. 16; p. 216, l. 3 - p. 217, l. 18, who denied knowing who prepared the chart, but thought it was from a vendor; and Deposition of Ken Lieck, Exhibit "2" herein, p. 103, l. 18-25.

Plaintiff states in paragraph 19 of his affidavit that he has not returned to the BISD campus. This is misleading because he has gone repeatedly to BISD's administration building both when he solicited the bid as TPA for the 2003 enrollment on behalf of the Teacher's Agency and to attend depositions in this case. His statement that his termination from AFLAC was a "direct result" of Dr. Sauceda's letter is also a subjective opinion and misleading when reviewing the testimony of Frank LaFemina referred to herein, concerning why Plaintiff was demoted.

Defendant specifically requests that the following portions of Plaintiff's affidavit be stricken: 1, 5, 6, 8, 9, 11, 12, 12, 14, 15, 16, 17, 18, 19, and 20.

Defendant objects to Plaintiff's affidavit as self serving, unreliable, unsupported by facts and misleading to the Court.

On page 6-8 of the Response and the affidavit paragraph 16, Plaintiff calls into question the relationship between Jeff Roerig and Dr. Sauceda which has no bearing or relevancy to the claims by Mr. Chavez and is done solely for harassment and to create a diversion from the case at hand. See also Plaintiff's Exhibits 13, 14, 15 which further relate to irrelevant matters and are submitted by Plaintiff for the purpose of harassment and intimidation. Just as when Mr. Chavez initially sued

Randy Dunn and Marilyn Del Bosque Gilbert, in their individual and official capacity and later withdrew and then reasserted his pleadings against them, he is now trying to divert the Court from the relevant facts at issue and to intimidate this firm.

While written affidavits can be used as summary judgment proof, they must state admissible facts. See *__Lujan v. National Wildlife Fed'n__*, *497 U.S. 871, 888, 110 S. Ct. 3177, 3188 (1990).* Bare allegations of fact, ultimate or conclusory facts, improbable speculation inferences, unsubstantiated assertions, and legal conclusions do not constitute admissible facts. *__Marshall v. East Carroll Parish__* *__Hosp. Serv. Dist.__*, *134 F.3d 319, 324 (5th Cir. 1998)*, *__TIG Ins. Co. V. Sedgwick Jones__*, *276 F.3d 754, 759 (5th Cir. 2002).*

A party's self serving, unsupported affidavit is not competent summary judgment evidence. *__Hinsley v. Boudloche__*, *201 F.3d 638 (5th Cir. 2000).*

## II.

## CONTESTED FACTS

The Plaintiff erroneously represented in the final paragraph of his summary of response that the fact that Mr. Chavez was not allowed to participate in the 2001 enrollment constitutes evidence of an accepted custom and policy of Defendant BISD. He concludes by stating "had these actions been anything other than the accepted custom and policy of Defendant BISD, then Defendant would have taken action to withdraw the directives included in the November 29th letter and allowed Mr Chavez to return on to BISD property and act as third party administrator, but no such action was ever taken." This logic is fatally flawed; the fact that no action was taken does not mean that there was a policy or custom in place. Plaintiff's attempt to jump to this conclusion is not supported by caselaw or the facts.

Plaintiff argues that there was testimony from fact witnesses that it was appropriate for Mr. Chavez to send correspondence to Board members and insurance committee members. However, when questioning the various witnesses, Plaintiff's counsel failed to inform them that this was during a time period when bids were being considered by the Board and Insurance Committee. As was noted in Defendant's Motion for Summary Judgment, Kenneth Lieck testified that the competitive bidding proposals specifically provided that efforts by the vendors to coerce a vote would have been improper. See Defendant's Motion for Summary Judgment, Exhibit "D", paragraphs 36, 37, 41 and 42 and Exhibit "D", Affidavit of Kenneth Lieck and deposition of Kenneth Lieck attached as Exhibit "1" p. 100, l. 4 - p. 103, l. 11.

Plaintiff argues that his public audience comments constituted free speech in that they addressed concerns of the public. However, as was demonstrated in the excerpt of the meeting transcript that was provided to the Court in Defendant's Motion for Summary Judgment, Exhibits "L" and "M", Plaintiff primarily was concerned about his livelihood and made only general complaints about any matters of arguable public concern.

Plaintiff further misrepresents the facts in his conclusions, including his conclusion that Jeff Roerig acted improperly in rendering an opinion attached as Exhibit 40 to Plaintiff's Response. Defendant objects to the inclusion of these references to Mr. Roerig's motives or interest because they are sheer speculation and, are made with the sole intent of harassment.

Erroneously stated as fact was Plaintiff's assertion that the value of the TPA position was in excess of $30,000 per year. AFLAC served as TPA at no cost to the District. NPA had agreed to serve as TPA at no cost to the District. The letter from Jeff Roerig indicated that the TPA for the year 2003 was anticipated to be at no cost to the District. Plaintiff's attempt to place some type of

arbitrary worth on this contract when it in fact it was zero is an erroneous, unsupported and misleading assertion of fact by the Plaintiff.

The Plaintiff erroneously represented on page 19 that Dr. Sauceda was speaking plurally on behalf of the Defendant BISD as well as his own behalf. Testimony from the Trustees has been undisputed that none of the Trustees knew about Dr. Sauceda's letter prior to its issuance. In fact on page 20 of his reply, the Plaintiff quotes Board Trustee Salazar as saying "this Teacher's Insurance Commission voted 44 to 1 to keep AFLAC. In my opinion this overwhelming show of support for AFLAC is the result of Mr. Chavez' excellent service and the continued dedication he personally has provided to our employees in the past." Plaintiff's Exhibit 47. This statement cited clearly supports BISD's position that there was no approval of the letter sent on November 29th and that it was not issued at the direction of policy or the District's policymaker. Plaintiff then cites in his response on pp. 20 and 21 references from the letters from the School District Trustees indicating their support for Mr. Chavez. It defies logic to argue that Dr. Sauceda was speaking with the express authority of these same Board members with respect to his actions as to the Plaintiff.

A.    PLAINTIFF'S 42 USC §1983 ANALYSIS

Plaintiff correctly states the standard of review for determining whether the Defendant BISD has violated 42 USC §1983 and thus can be accountable to Plaintiff. "Plaintiff must prove that 1) the local government or official promulgated a policy; 2) a decision displayed "deliberate indifference" and proved the government's culpability; and 3) the policy decision lead to the particular injury." *Citing **Foust v. Thigpen**, 317 F.3d 849, 861 (5th Cir. 2002).* This is Plaintiff's burden. Plaintiff has been unable to prove that there was any policy pursuant to which the injury occurred or that any decision of the Board established deliberate indifference necessary to prove the

School District's culpability.

Plaintiff's sole basis for his 42 USC §1983 claim is that Defendant Sauceda executed policy when he sent the termination letter to Mr. Chavez. The Plaintiff relies on Exhibit 41, which is the letter of November 29, 2001. This letter references a decision by Dr. Sauceda not to renew AFLAC's services as a third party administrator for a Cafeteria Plan. However, it is undisputed that AFLAC remained as a third party administrator for the Cafeteria Plan and that it was AFLAC's decision not allow Mr. Chavez to do the enrollment.

Plaintiff relies on the language in the letter which references policy CH Legal and CH Local, attached to Plaintiff's Reply as Exhibit 49 (Leed) and attached to Defendant's Motion for Summary Judgment as Exhibit "F-3" and "F-4", as the basis for his argument that Sauceda was implementing policy. Nowhere in these policies is there any requirement to give 30 days' notice to terminate a vendor's services as third party administrator for Cafeteria Plan nor any reference to the ability of the superintendent to make the decision. In fact, these policies merely reflect the purchasing acquisition policies for the School District and are silent as to the termination of services and any necessity to give notice. The only decisions delegated by the Trustees in this policy are the decisions to determine the method of bidding and to make purchases under $10,000.

As previously addressed in Defendant's Motion for Summary Judgment, the Board of Trustees and the School District cannot be bound by the actions of a superintendent unless he is implementing policy that is authorized by the Board of Trustees. Plaintiff indicates that he complained to both the Board and to Sauceda with no results. In fact, the public comments that he made to the Board were made prior to the letter of November 29, 2001. Furthermore, the vote by the insurance committee that reinstated AFLAC as TPA for 2002 would appear to have negated the

effect of the November 29, 2001 letter. The Board was not aware of the fact that AFLAC, not BISD, had replaced Mr. Chavez as the Regional Sales Director until much later. At the time the Board became aware of this action by AFLAC, four of the seven board members tried to remedy the situation by writing to AFLAC showing their support for Plaintiff. See Plaintiff's Reply. Regardless, AFLAC removed Mr. Chavez by December 4, 2001 and any action that could have been taken by the Board would have been moot. See Defendant's Motion for Summary Judgment, Exhibits "H", "I", "J" and "K".

In fact, Dr. Sauceda testified that he was not aware that AFLAC had demoted Mr. Chavez and that he had been told by Frank Levine that Mr. Chavez would remain with AFLAC. See Defendant's Motion for Summary Judgment, paragraph 51, and deposition of Dr. Sauceda, Exhibit "W" [Volume II] to Defendant's Motion for Summary Judgment, p. 94 and p. 100, l. 10 - p. 102, l. 22.

P. 100, L. 10 - P. 101, L. 7:

Q    Okay. What else did you-all discuss?
A    I believe, again, without the specifics, Mr. LaFemina said that he could have another gentleman do the enrolling, to come on the site. And he mentioned that Mr. Chavez would continue to manage the account but that the day-to-day hands-on would be by somebody else, and I don't know if it was somebody else in the office or whatever. And I don't know how he made the comment but something to the effect that Mr. Chavez and his family had been handling the account for some time now and they have been doing a great job and we want to continue with them. Would that be a problem? And I said, I'm glad to hear that. That is my preference that the Chavezes – I mean, this was not a thing about Mr. Chavez and – I didn't take it personally. It was just inappropriate vendor behavior. And so when I learned that the company was going to continue to work with Mr. Chavez, but that the people they were going to send were going to be told, hey, look, a vendor related a specific way with the customer and we're not going to allow you to behave inappropriately, then I was satisfied and then we went forward with the details fo how to do the enrollment.

Plaintiff argues that by failing to act the Board of Trustees acquiesed to the decision by Dr. Sauceda to write and send the November 29, 2001 letter. This unfounded conclusion is contrary to the summary judgment proof discussed in this reply and in Plaintiff's Response. See the letters from the Trustees to AFLAC indicating their support of Mr. Chavez and also referred to in Defendant's Motion for Summary Judgment, Exhibits "H", "I", "J", and "K", correspondence from Otis Powers, Linda Salazar, Pat Lehman and Joe Colunga to AFLAC representatives. These letters reflect approval by the Trustees of Mr. Chavez and demonstrate that this was done without their authority or approval. In Exhibit "H", Otis Powers wrote, "Please be informed that Dr. Sauceda took action without my knowledge." "Upon learning of Dr. Sauceda's premature action taken against Mr. Dino Chavez, I personally contacted Mr. Frank LaFemina, AFLAC State Office, and expressed my disagreement with Dr. Sauceda's behavior." "Not Mr. Chavez or any AFLAC representative owes one an apology. On the contrary, Dr. Sauceda owes Mr. Chavez an apology." In Exhibit "I", Linda Salazar wrote, "Please be aware that Superintendent Sauceda's dismissal of Mr. Chavez was done without the Board of Trustees' approval or knowledge." In Exhibit "J", Pat Lehman wrote, "Third mistake of all, AFLAC's dismissal of Mr. Chavez." In Exhibit "K", Joe Colunga wrote, and confirmed that he did not request an apology from Mr. Chavez or AFLAC.

Assuming, arguendo, that the Board had acquiesed to the superintendent's decision, there is still no evidence of a policy pursuant to which the Plaintiff's rights were violated. As addressed in BISD's Motion for Summary Judgment, Mr. Chavez did not avail himself of the grievance procedures set out in BISD policy, which would have allowed the Trustees to remedy his concerns.

Texas law is clear that final policy-making authority lies in an independent school district's Board of Trustees. See Texas Education Code, §2301 and ***Jett v. Dallas Independent School***

*District,* 7 F.3d 1241, 1245 (5th Cir. Tex. 1993 after remand). *See also **Pena v. Rio Grande City Consolidated Independent School,*** 616 S.W.2d 658 (Tex. Civ. App. – Eastland 1991) and ***Hinojosa v. State,*** 648 S.W.2d 380 (Tex. App. – Austin 1983). Plaintiff asserts in his reply that "whether Sauceda or the Board of Trustees was the final policy maker, however, is irrelevant because Plaintiff Chavez complained to both, and no action was taken to reflect that the actions of Defendant Sauceda were not official policy of Defendant BISD after these complaints." This is simply not the standard and is a mis-statement of law.

In ***Rivera v. Houston Independent School District,*** 2003 U.S. App. LEXIS 22853 (5th Cir. November 7, 2003) the plaintiffs sued a principal and the Board of Trustees. Pursuant to Tex. Education Code § 11.151(b) the court noted that Texas law unequivocally delegates to the Board "the exclusive power and duty to govern and oversee the management of the public schools of the district." The policies of the District do not and cannot delegate the ability to make policy to any employee or agent. Plaintiff has introduced no evidence or authority indicating any delegation of this responsibility to any employee of the District.

The superintendent's testimony that he administers the day to day affairs of the District is not in conflict with the fact that the Board of Trustees is the policy maker. Dr. Sauceda cannot make policy. He can only administer policy. There simply is no policy pursuant to which the Brownsville Independent School District deprived Mr. Chavez of a constitutional right.

Plaintiff relies on the case of ***Grandstaff v. City of Borger,*** 767 S.W.2d 161, 169 (5th Cir. 1985). As was stated in ***Borger*** "there is no respondeat superior liability of a municipality for the negligence, gross or ordinary of an officer. There must be (1) a policy (2) of the city's policy maker (3) that caused (4) the plaintiff to be subjected to a deprivation of constitutional right. "***Borger,*** 767

*F.2d at 169 quoting **Monell v. Dept. of Social Services**, 436 U.S. 658, 98 SCT 2018, 56 L. Ed.2d 611 (1978)*. **Borger** involves a city, not a school district. The City did not deny that the police chief was its sole policy maker. **Borger** is clearly distinguishable because under both Texas common law and statutes, it is clear that only the Board of Trustees of an independent school district can establish policy.

The Board of Trustees never made any policies concerning the situation involving Mr. Chavez. Plaintiff has not provided such policy to the Court for review. As was stated in ***Piotrowsky v. City of Houston***, 237 F.3d 567, ***Grandstaff v. City of Borger*** is often misread as suggesting that municipal liability may be imposed for individual unconstitutional acts of lower level employees. The court in **Borger** affirmed municipal liability only because the police chief's actions essentially ratified the officer's use of excessive force. This is distinguishable from the case at hand. As evidenced by the letters from the Trustees to AFLAC, the Board of Trustees never ratified the decision of Dr. Sauceda. No effort was made by Mr. Chavez to grieve the situation to the Trustees through the grievance procedures that were set out in Defendant's Motion for Summary Judgment. As indicated in Plaintiff's Response, Plaintiff was demoted by AFLAC from Regional Sales Coordinator on December 4, 2003. There is no evidence to suggest that the Board of Trustees were involved with that action. In ***Piotrowsky v. City of Houston***, 237 F.3d 567, 578 (5th Cir. 2001) cert cen. 534 U.S. 820, 122 S. Ct. 53 (2001), the Court stated that isolated unconstitutional actions by municipal employees will almost never trigger liability. As the court recognized, there must be both municipal culpability and causation. Culpability requires the involvement of a municipal policy maker and affirmative municipal action. Here Plaintiff complains of inaction and no involvement by the Board. The court concluded in **Piotrowsky** that for a custom to trigger §1983 liability one

must show: "a persistent, wide spread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common in well settled as to constitute a custom that fairly represents municipal policy.... Actions of offices or employees of a municipality do not render the municipality liable under §1983 unless they execute official policy as above defined." *Piotrowsky* 237 F.2d at 579 citing ***Bryan County***, 520 U.S. at 405-07, 117 STT at 1387. Here the Plaintiff has pointed to a single isolated incident by Sauceda to raise his claims of offending policy or custom. **Piotrowsky** makes clear that an isolated incident is generally insufficient to establish §1983 responsibility on the municipality for an employee's actions.

In ***Shins v. College Station Independent School District***, 967 F.3d 783 (5th Cir. 1996), the court indicated that §1983 imposes liability for violations of rights protected under the constitution, not for violations of duties of care arising out of tort law. A constitutional violation does not occur every time someone feels that they have been wronged or treated unfairly. ***Shins*** 96 F.3d at 786.

B.    PLAINTIFF'S FIRST AMENDMENT FREEDOM OF SPEECH ANALYSIS

Defendant would assert that because Plaintiff cannot show violation of 42 USC §1983 the First Amendment analysis raised by him is moot. However, Defendant argued that the Pickering balancing test applies and as such an analysis needs to be made as to whether or Mr. Chavez' speech involved matters of public concern.

There is no dispute that Mr. Chavez was an independent contractor for AFLAC in November, 2001. There is no dispute that there was a contract in force between the School District and AFLAC for 2001 and that AFLAC was a bidder for the 2002 TPA contract. As such Mr. Chavez should be considered as an independent contractor with BISD. There is a consistent line of cases in the Fifth Circuit holding that the Pickering balance test applies to independent contractors. See ***Copsey v.***

*Swearingen*, 36 F.3d 1336, 1344 (5ᵗʰ Cir. 1994), **Caine v. Hardy**, 943 F.2d 1406, 1415-16 (5ᵗʰ Cir. 1991).

As was previously indicated in Defendant's Motion for Summary Judgment, Chavez' letters to BISD Trustees and the insurance committee were not widely distributed to members of the public and were limited to BISD employees. Plaintiff claims on page 28 of his Reply that the letter "notified them of potential criminal wrongdoings in taking the actions proposed by Defendant Sauceda." The letters which are attached to Defendant's Motion for Summary Judgment as Exhibits "N", "O", "P", and "Q", absolutely do not identify any criminal wrongdoings; rather, they assert innuendo and sarcasm. For instance, Plaintiff's allegation that "good conquers evil" certainly does not identify anyone as committing a criminal act. It merely strains his relationship with the superintendent of schools and seems clearly inappropriate of a vendor soliciting business from a school district. Plaintiff's speeches to the Board of Trustees similarly were about AFLAC and who was the best company for the job. This is not a matter of public concern but simply a concern of the Plaintiff that his income be protected. See Exhibits "L" and "M" to Defendant's Motion for Summary Judgment.

For the reasons set out in the Motion for Summary Judgment, Plaintiff cannot show that his speech was of public concern or that any action of Defendant was a motivating factor for the action of Plaintiff's employer. BISD did not demote Plaintiff, that was done by AFLAC. The testimony by Frank LaFemina indicates that Mr Chavez' demotion was not the direct result of Dr. Sauceda's letter, but rather because Mr. Chavez would not follow the directions of LaFemina relating to the 2002 enrollment for BISD. See Deposition of LaFemina, Motion for Summary Judgment, Exhibit "V", p. 263, L. 11 - p. 265, l. 24; p. 174, l. 2-10.

See also Defendant's Motion for Summary Judgment, paragraphs 49, 50 and 51.

P. 174, L. 6 - 10:

Q     Why were you recommending his demotion?
A     Because he wouldn't comply with the arrangement that I was trying to put together to preserve the business in BISD and to keep him compensated and to keep Dr. Sauceda happy with AFLAC.

## C.    PLAINTIFF'S ANALYSIS THAT FACT ISSUES REMAIN

Plaintiff maintains that Defendant has provided no explanation for Dr. Sauceda's letter written on November 29, 2001. See Plaintiff's Response, page 32. Apparently Plaintiff failed to read Defendant's Motion for Summary Judgment which quoted Dr. Sauceda's testimony that he made his decision based on the improper conduct by Mr. Chavez as a vendor in contacting Trustees and insurance committee members and based on his unprofessional and unethical actions in making unfounded generalizations. See Defendant's Motion for Summary Judgment, paragraphs 41 - 49. See also Exhibit "W" to Defendant's Motion for Summary Judgment, Volume II of Noe Sauceda's deposition pp. 58-89. The School District's position is that Plaintiff violated the bid proposal certification by trying to influence votes for his company. See Defendant's Motion for Summary Judgment, paragraph 42, Exhibit "D" - "1", "2" and "3" and deposition excerpts of Kenneth Lieck referred to herein. Mr. Chavez was attempting to influence or coerce the exercise of discretion by Trustees and employee of BISD contrary to the mandate of the Requests for Quotes. See his correspondence to Trustees and employees, Exhibits "N", "O", "P" and "Q".

In his public audience speech to the Trustees on November 13, 2001, Plaintiff merely whines about the fact that the District decided to seek bids for TPA's and the delay in a decision being made and the notice to him about a meeting. See Exhibit "L".

In his public speech to the Trustees on November 20, 2001, he makes it clear that he is present on behalf of AFLAC. "I represent AFLAC." See Exhibit "M". In complaining about his competition, National Plan Administrator, and in mis-stating the actions of the District, Plaintiff is making no public speech, but merely acting to protect his own interests.

Mr. Chavez provided as exhibits his public audience comments. A review of the statements makes it clear that this speech was a sales pitch by Mr. Chavez on behalf of AFLAC.

Mr. Chavez misrepresents as a fact that there was a recommendation made by Dr. Sauceda to appoint NPA as the agent of record for BISD which would have been illegal. The actual recommendation made by the administration on November 20, 2001 was as follows: "Recommended approval to award RFQ No. 012-02 to National Plan Administrators/Insurance Associates of Valley for third party administrators to administer BISD's Cafeteria Plan (IRC §125) and administer the Tax Deferred Annuity, Custodial Plan under §403b and 403(b)©) Deferred Compensation Plan and Custodial Plans. Agents/Agency to solicit the individual products available." Nowhere in this recommendation does it indicate that NPA was to serve as an agent of record. Further, Dr. Sauceda's testimony relating to the appointment of an agent of record indicates that Dr. Sauceda was fully aware that agents of record were illegal and he made no recommendation for an agent of records. See Defendant's Motion for Summary Judgment, Exhibit "W", Volume II, p. 21, l. 9 - p. 23, l.25 and p. 31, l. 6-17 and Deposition of Noe Sauceda, Vol I, Exhibit "3" herein, p. 240, l. 7-p.245, l. 17.

Subjective beliefs by the Plaintiff are not proper summary judgment evidence. Claims of illegal acts that are unsubstantiated are not considered valid exercises of First Amendment Speech. "Intentional or reckless falsehoods enjoys no constitutional protection." Speech that is used for political ends does not automatically bring it under the protective mantle of the Constitution. ***Colson***

*v. Graham*, 124 F.3d 498, 507 (5th Cir. 1999).

Plaintiff's Response to Defendant BISD's Motion for Summary Judgment fails to refer the court to a policy or custom adopted by the BISD Board of Trustees that would create liability under 42 USC §1983. Without such policy or custom, Plaintiff cannot proceed with this lawsuit against the Brownsville Independent School District and the District's Motion for Summary Judgment should be granted.

**WHEREFORE, PREMISES CONSIDERED**, Defendant BROWNSVILLE INDEPENDENT SCHOOL DISTRICT prays that Defendant's Objections to Plaintiff's Response be upheld, that Defendant's Motion for Summary Judgment be granted, and for such other and further relief to which Defendant may be entitled, either at law or in equity.

Respectfully submitted,

**ROERIG, OLIVEIRA & FISHER, LLP**
855 West Price Road, Suite 9
Brownsville, Texas 78550
Telephone: (956) 542-5666
Facsimile: (956) 542-0016

Counsel for Defendant, Brownsville Independent School District

By: _____

Elizabeth G. Neally
State Bar No. 14840400
Federal ID No. 8044
Ricardo Morado
State Bar No. 14417250
Federal ID No. 1213

<u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that a true and correct copy of the foregoing **Defendant BISD's Reply and Objection to Plaintiff's Responses to Motion for Summary Judgment** has been served via United States Postal Service, Certified Mail, Return Receipt Requested, to all Counsel of Record, as follows:

ATTORNEYS FOR PLAINTIFF:
Mr. J. Arnold Aguilar
**Law Office of J. Arnold Aguilar**
Artemis Square, Suite H-2
1200 Central Boulevard
Brownsville, Texas 78520
Via CM/RRR:  7160 3901 9848 1267 9801

ATTORNEYS FOR DEFENDANT NOE SAUCEDA:
Ms. Eileen Leeds
**Willette & Guerra**
3505 Boca Chica Boulevard, Suite 460
Brownsville, Texas 78521
Via CM/RRR:  7160 3901 9848 1267 9818

ATTORNEYS FOR AFLAC, THIRD-PARTY DEFENDANT:
Mr. William B. Steele, III
LOCKE, LIDDELL & SAPP
100 Congress Avenue, Suite 300
Austin, Texas 78701
Via CM/RRR:  7160 3901 9848 1267 9825

on this 19th  day of November, 2003.

Elizabeth G. Neally
Ricardo Morado

STATE OF TEXAS      §
                         §     AFFIDAVIT OF *ELIZABETH G. NEALLY*

COUNTY OF CAMERON   §

**BEFORE ME**, the undersigned authority, personally appeared ELIZABETH G. NEALLY,

who, being by me duly sworn, deposed as follows:

1. "My name is Elizabeth G. Neally. I am over the age of 18 years of age, I

am of sound mind and I am fully competent to make this affidavit. I have personal

knowledge of the facts herein, and they are true and correct."

2. "As the attorney for Brownsville Independent School District, Defendant,

Civil Action No. B-02-18, pending in the United States District Court for the

Southern District of Texas, Brownsville Division, I attended the following

depositions:

(1)    Deposition of Eddie Errisuriz, Jr. on April 7, 2003. The excerpts attached hereto as Exhibit "1" were taken from the transcript of Eddie Errisuriz, Jr.'s deposition testimony and are true records of the testimony provided by Eddie Errisuriz, Jr. These pages were not included in any other exhibits previously provided to the Court."

(2)    Deposition of Kenneth Lieck on September 19, 2003. The excerpts attached hereto as Exhibit "2" were taken from the transcript of Kenneth Lieck's deposition testimony and are true records of the testimony provided by Kenneth Lieck. These pages were not included in any other exhibits previously provided to the Court."

(3)    Deposition of Noe Sauceda, Volume I, on April 9, 2003. The excerpts attached hereto as Exhibit "3" were taken from the transcript of Noe Sauceda's deposition testimony and are true records of the testimony provided by Noe Sauceda. These pages were not included in any other exhibits previously provided to the Court."

23028 - Affidavit of EGN

"The above and foregoing is true and correct based on my personal knowledge."



Elizabeth G. Neally

**SWORN TO AND SUBSCRIBED** before me on this _18th_ day of _November_, 2003, by Elizabeth G. Neally to certify which witness my hand and seal of office.

> VIRGINIA ESPINOSA
> MY COMMISSION EXPIRES
> February 10, 2004

NOTARY PUBLIC, STATE OF TEXAS

23028 - Affidavit of EGN

Excerpts from the Deposition of Eduardo Errisuriz, Jr.

EXHIBIT "1"

```
                IN THE UNITED STATES DISTRICT
                 SOUTHERN DISTRICT OF TEXAS
                    BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,          )(
FERNANDO DE PENA,           )(
VALENTIN PAZ and ANDRUS     )(
& PAZ, A Partnership        )(
                            )(
VS.                         )(   B-02-143
                            )(
BROWNSVILLE INDEPENDENT      )(
SCHOOL DISTRICT, NOE        )(
SAUCEDA, and EDDIE          )(
ERRISURIZ, JR.              )(
```

*************************************************************

```
                IN THE UNITED STATES DISTRICT
                 SOUTHERN DISTRICT OF TEXAS
                    BROWNSVILLE DIVISION

DINO X. CHAVEZ              )(
                           )(
VS.                        )(   B-02-128
                           )(
BROWNSVILLE INDEPENDENT     )(
SCHOOL DISTRICT, NOE       )(
SAUCEDA, MARILYN DEL       )(
BOSQUE-GILBERT and         )(
RANDALL DUNN               )(
```

---

ORAL AND VIDEOTAPED DEPOSITION OF
EDUARDO ERRISURIZ, JR.
APRIL 7, 2003

---

HILL & ROMERO
CERTIFIED COURT REPORTERS



16:47 1   Sauceda mentioning the employees' comments at that

16:47 2   meeting?

16:47 3       A.  I don't recall.

16:47 4       Q.  Let me hand you what I'm marking as Exhibit 5.

16:47 5           (Exhibit No. 5 marked).

16:47 6       Q.  Do you recall seeing that document before?

16:47 7       A.  I recall the ugly cover, yes.

16:47 8       Q.  What did the cover actually look like?

16:47 9       A.  It was -- this is pretty --

16:47 10      Q.  Was it all black and white?

16:47 11      A.  Yeah, I think it was.  It was a pretty ugly

16:47 12  piece of work.

16:47 13      Q.  Who put this together?

16:47 14      A.  I personally do not know who.

16:48 15      Q.  You didn't?

16:48 16      A.  Of course not.  I didn't put this together.

16:48 17      Q.  I thought one of our witnesses said you had.

16:48 18      A.  Well, they're mistaken.  I mean, this is pretty

16:48 19  ugly.

16:48 20      Q.  You would not claim this?

16:48 21      A.  You should see some of the work as far as

16:48 22  presentations and stuff.  First of all, I do Power

16:48 23  Point presentations most of the time.  This looks like

16:48 24  a print shop, kind of the old print design 64K

16:48 25  Commodore computer stuff.

16:48  1    Q.  You're holding back.  What do you really think?

16:48  2    A.  I'm telling you.  This is Mickey Mouse.

16:48  3    Q.  I understand.

16:48  4    A.  Okay.  Anyway --

16:48  5    Q.  Do you know who put this information together?

16:48  6    A.  Honestly I don't, but I recall seeing this at

16:48  7    one of those meetings and I don't know if it was at a

16:48  8    meeting -- I want to say it was the meeting where all

16:48  9    those people got a chance to speak or present, but I

16:48  10   don't know who did.  I'm not sure.

16:48  11   Q.  What kind of meeting, a board meeting or an

16:48  12   insurance?

16:49  13   A.  I think it was an insurance committee meeting.

16:49  14   Q.  Do you remember?

16:49  15   A.  That's a best estimate.

16:49  16   Q.  Do you remember Dr. Sauceda presenting this to

16:49  17   all the board members at the November 20th meeting?

16:49  18   A.  I don't recall that.

16:49  19   Q.  Okay.  It may or may not have happened, you

16:49  20   just don't remember one way or the other?

16:49  21   A.  You know, to the best of my knowledge, this is

16:49  22   not one of our documents.

16:49  23   Q.  That's all I'm saying; he drafted it?

16:49  24   A.  Right.  But what I'm saying is I don't know

16:49  25   whether he would present something that we didn't

16:49  1    draft.

16:49  2        Q.  Okay.  He did present a packet of materials to

16:49  3    the board members on this issue at that November 20th

16:49  4    meeting, right?

16:49  5        A.  I don't recall.

16:49  6        Q.  Okay.  I've reviewed the tape from that meeting

16:49  7    and I thought I remembered them making reference to

16:49  8    certain documents that were provided.

16:49  9        A.  Right.

16:49  10       Q.  If he had provided a packet, would you have

16:49  11   been given a copy of that; maybe yes, maybe no?

16:50  12       A.  Not necessarily.  There were a lot of times

16:50  13   when board members would get additional handouts or

16:50  14   packets from people that were speaking at the podium or

16:50  15   presenters.

16:50  16       Q.  Okay.  Did you have a chance to review the

16:50  17   National Plan Administrator proposal, the NPA proposal?

16:50  18   Or RFQ I guess is what it would be.

16:50  19       A.  I think Mr. Muniz primarily was the one that

16:50  20   reviewed the proposals, but I can't recall that I even

16:50  21   -- even saw the proposals.

16:50  22       Q.  There's one, two, three --

16:50  23       A.  I know that I did review the health stuff.

16:50  24   That was like -- yeah, that was like a major thing

16:50  25   early on.

HILL & ROMERO
CERTIFIED COURT REPORTERS

16:50  1      Q.  Undertaking?

16:50  2      A.  Right.  But I didn't spend near as much time on

16:50  3    the cafeteria plan and the annuities as the health

16:51  4    insurance.

16:51  5      Q.  There are six groups, companies, organizations

16:51  6    that are compared on this document.  Do you recall more

16:51  7    than six groups submitting RFQs?

16:51  8      A.  I don't recall.

16:51  9      Q.  You don't recall one way or the other?

16:51  10     A.  No, but I do recall the names of these

16:51  11   companies.

16:51  12     Q.  Okay.  The reason I was asking is because

16:51  13   earlier you said you submitted that November 12th

16:51  14   letter to everybody that submitted an RFQ.  And this

16:51  15   indicates to me that with this comparison there was

16:51  16   only six groups that sent in an RFQ, but what I'm

16:51  17   trying to ask is if you remember if there was more than

16:51  18   just these six?

16:51  19     A.  I don't recall.

16:51  20     Q.  So before today do you recall seeing this

16:51  21   document before?

16:51  22     A.  At that -- at one of those meetings.

16:51  23     Q.  At one of the insurance meetings or --

16:51  24     A.  Again, I would -- I think I answered that.  I

16:51  25   think the best estimate I have would be the insurance

16:51  1    committee meeting.

16:51  2        Q.  Okay.  But you don't know who put this

16:51  3    together?

16:51  4        A.  No.  And as a matter of fact, there's agent of

16:52  5    record.  We don't use that.

16:52  6        Q.  Okay.  So you don't know who would have put

16:52  7    together the information or where they would have

16:52  8    gotten the information?

16:52  9        A.  Right.  And then you have got all these amounts

16:52  10   here that whoever prepared this apparently has all --

16:52  11       Q.  Scratched them out?

16:52  12       A.  Well, no.  Somebody scratched them out to say,

16:52  13   well, that's not right, that's not right, I'm assuming,

16:52  14   N/C -- well, N/C is no charge.

16:52  15       Q.  Hang on.  Let me represent to you that where it

16:52  16   says N/C meaning no charge and slashes on here and the

16:52  17   underlinings were not done in the original document.

16:52  18   Similarly or also the part that's in bold at the bottom

16:52  19   was also not done in the original document.  Does that

16:52  20   make a difference for you in terms of whether you've

16:52  21   seen this document before?

16:52  22       A.  No.  No, I had seen this.  I recall seeing

16:52  23   this.  And I believe it was passed out at one of those

16:53  24   meetings that I mentioned earlier.

16:53  25       Q.  And do you remember talking to anybody talking

16:53  1    about the particulars that are mentioned in here?

16:53  2        A.  Not that I recall, no.

16:53  3        Q.  I forgot what you said.  Did you say you did

16:53  4    see the RFQ for NPA that was submitted?

16:53  5            MS. LEEDS:  He said he did not.

16:53  6        A.  I don't recall seeing those RFPs -- or RFQs.

16:53  7        Q.  Okay.  You couldn't tell us --

16:53  8        A.  No.

16:53  9        Q.  -- what the terms were or whatever?

16:53 10        A.  No.  I was just noticing AFLAC.

16:53 11        Q.  At that meeting were you able to determine who

16:53 12    put Exhibit 5 together?

16:53 13        A.  No.  I just assumed it was one of the vendors.

16:53 14        Q.  Okay.

16:53 15        A.  One of those people that were doing

16:53 16    presentations.

16:54 17        Q.  Now, you would attend the superintendent

16:54 18    breakfast meetings in the board room, right, the

16:54 19    monthly meetings?

16:54 20        A.  Always a lot of fun.  Yes.

16:54 21        Q.  What happened at those meetings?

16:54 22        A.  Besides employees wanting a free-for-all?

16:54 23        Q.  Yeah.  Generally.

16:54 24        A.  There are general questions that are brought up

16:54 25    allegedly, I say, or --

17:12  1   off the record for a second?

17:16  2            (Off the record).

17:16  3        Q.  Looking again at this cafeteria plan

17:16  4   comparison, are you sure you didn't put that together?

17:16  5        A.  I know I didn't put that together.

17:16  6        Q.  Let me represent to you that Dr. Sauceda said

17:16  7   at the November 20th board meeting that you did.

17:16  8            MS. LEEDS:  Object to the form.

17:16  9        Q.  If he said that, would he have been misstating

17:16 10   the truth?

17:17 11        A.  I think he was probably misinformed.

17:17 12        Q.  Okay.  That was about the time that all that

17:17 13   was going on.

17:17 14        A.  All what?

17:17 15        Q.  All the issues regarding cafeteria plan,

17:17 16   particularly the comparison.

17:17 17        A.  Okay.

17:17 18        Q.  Do you know who would have misinformed him of

17:17 19   that?

17:17 20        A.  I have no idea.

17:17 21        Q.  Okay.  In any case if he said that, that would

17:17 22   not have been true?

17:17 23        A.  Right, it would not have been true.

17:17 24        Q.  If he said that you were the one that either

17:17 25   drafted or assisted in drafting that document, Exhibit

17:17  1   No. 5, that would not have been true?

17:17  2        A.   That would not have been true.

17:17  3        Q.   Okay.

17:17  4        A.   No.  And I'm looking at some of the stuff like

17:17  5   copies and verbal communications and service.

17:17  6        Q.   Would some of the information possibly have

17:17  7   come from you?

17:17  8        A.   No.  The only thing that I can think of is that

17:17  9   some of the information might be contained in the RFQs.

17:17 10        Q.   But that didn't come from you?

17:17 11        A.   No.

17:17 12        Q.   And in terms of -- you didn't sit down with

17:18 13   somebody else while they were putting this together,

17:18 14   right?

17:18 15        A.   No.

17:18 16        Q.   Or you didn't meet with somebody else in a

17:18 17   manner in which they were putting this together, right?

17:18 18        A.   No.

17:18 19        Q.   Are you familiar with what a cafeteria plan

17:18 20   enrollment is?

17:18 21        A.   I'm pretty sure it's like the medical health

17:18 22   insurance enrollment.

17:18 23        Q.   Can you describe just generally what it is?

17:18 24        A.   Well, they have got to give employees an

17:18 25   opportunity to indicate which products they might be

IN THE UNITED STATES DISTRICT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,          ) (
FERNANDO DE PENA,           ) (
VALENTIN PAZ and ANDRUS     ) (
& PAZ, A Partnership        ) (
                            ) (
VS.                         ) (   B-02-143
                            ) (
BROWNSVILLE INDEPENDENT      ) (
SCHOOL DISTRICT, NOE        ) (
SAUCEDA, and EDDIE          ) (
ERRISURIZ, JR.              ) (

**********************************************************

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ              ) (
                           ) (
VS.                        ) (   B-02-128
                           ) (
BROWNSVILLE INDEPENDENT     ) (
SCHOOL DISTRICT, NOE       ) (
SAUCEDA, MARILYN DEL       ) (
BOSQUE-GILBERT and         ) (
RANDALL DUNN               ) (

REPORTER'S CERTIFICATION
DEPOSITION OF EDUARDO ERRISURIZ, JR.
APRIL 7, 2003

I, LOU ZUNIGA, Certified Court Reporter in and for

the State of Texas, do hereby certify that the above

and foregoing contains a true and correct transcription

of the oral deposition of EDUARDO ERRISURIZ, JR.;

HILL & ROMERO
CERTIFIED COURT REPORTERS

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this ___/___ day of _____May_____, 2003.

_____
LOU ZUNIGA, Texas CSR 2198
Expiration Date: 12-31-03
Hill & Romero
5415 North McColl, Suite 107
McAllen, Texas  78504
(956) 994-8898

Excerpts from the Deposition of Kenneth Lieck

EXHIBIT "2"

Page 1

1                IN THE UNITED STATES DISTRICT COURT

                FOR THE SOUTHERN DISTRICT OF TEXAS

2                      BROWNSVILLE DIVISION

3    STEPHEN M. ANDRUS,           ) (

     FERNANDO DE PENA,            ) (

4    VALENTIN PAZ and ANDRUS      ) (

     & PAZ, A Partnership         ) (

5                                 ) (

     VS.                          ) (  B-02-143

6                                 ) (

     BROWNSVILLE INDEPENDENT      ) (

7    SCHOOL DISTRICT, NOE         ) (

     SAUCEDA, and EDDIE           ) (

8    ERRISURIZ, JR.               ) (

9    _____

10

                         ORAL DEPOSITION OF

11                       KENNETH J. LIECK

                         SEPTEMBER 19, 2003

12

13   _____

14        ORAL DEPOSITION OF KENNETH J. LIECK, produced

15   as a witness at the instance of the PLAINTIFFS, taken

16   in the above styled and numbered cause on SEPTEMBER 19,

17   2003, from 1:08 p.m. to 3:53 p.m. before LOU ZUNIGA,

18   Certified Court Reporter No. 2198, in and for the State

19   of Texas, at the Brownsville Independent School

20   District Administration Building, 1900 East Price Road,

21   Brownsville, Texas, pursuant to the Federal Rules of

22   Civil Procedure and the provisions stated on the record

23   or attached therein.

24

25

COPY

Page 100

1   what you understood I've been talking about, right?   15:19

2        A.   Yes.   15:19

3             MS. NEALLY:   Object to the form.   15:19

4        Q.   So in terms of whether the agents can contact   15:19

5   the board members, is it also authorized for them to   15:19

6   send letters to the board members addressed here at   15:19

7   BISD?   15:19

8        A.   I don't know whether they can or not.   15:19

9             MS. NEALLY:   Object to the form.   15:19

10       A.   I have nothing to do with the mail system or   15:19

11   that process at all.   I don't know whether they do that   15:19

12   or not.   15:19

13       Q.   And actually I'm not asking so much about the   15:19

14   mail system.   15:19

15       A.   Whether they have the authority to do that or   15:19

16   not, I don't know.   15:19

17       Q.   Okay.   I'm not asking about the mail system.   15:19

18   I'm asking about any restrictions that you're aware of   15:19

19   through the insurance department that say they can or   15:19

20   cannot do certain things?   15:20

21             MS. NEALLY:   Object to the form.   15:20

22             MS. LEEDS:   Object to the form.   15:20

23       Q.   In other words, if it's not allowed, can you   15:20

24   tell me any rule or regulation that prohibits it?   15:20

25             MS. NEALLY:   Object to the form.   15:20

Page 101

1      MS. LEEDS:  Join.                              15:20

2      A.   There is a form -- and I'm trying to remember    15:20

3  the impact language -- having to do with --         15:20

4      Q.   You can generalize if you want.            15:20

5      A.   There's some language in there.  I'm trying to   15:20

6  remember the name of the form.  I don't know if it's --   15:20

7  or they won't contact board members or some language.    15:20

8  I would have to go back and look at it.  Do you have a    15:20

9  copy of the specs or something there?               15:20

10     Q.   Here.  Are you talking about one of these?   15:20

11     A.   I don't think it's in this one.  There's some   15:21

12  language in this form here.                         15:21

13     Q.   You're talking about Lopez Exhibit 19, which is  15:21

14  also Errisuriz Exhibit 1, right?                    15:21

15     A.   I don't know which one this is, Counselor.   15:21

16  This is Errisuriz 1.                                15:21

17     Q.   Okay.  And can you read to me the language you   15:21

18  were talking about?                                 15:21

19     A.   There's another form, too, but, anyway -- the    15:21

20  proposer certifies -- and it's about a fourth of the    15:21

21  way down in the middle of the line, one, two, three,    15:21

22  four, five, six.  Are you there?                    15:22

23     Q.   I just want you to read it.                 15:22

24     A.   "The proposer certifies and represents that   15:22

25  proposer has neither coerced nor attempted to influence  15:22

Page 102

1    the exercise of discretion by any offer, trustee, agent    15:22

2    or employee of the Brownsville Independent School    15:22

3    District concerning this RFQ on the basis of any    15:22

4    consideration not authorized by law."    15:22

5        Q.   Okay.  Anything else?    15:22

6        A.   Hold on a second.   "The proposer also certifies    15:22

7    and represents that the proposer has not received any    15:22

8    information not available to other bidders.  Proposer    15:22

9    has not violated any state, federal or local law,    15:22

10    regulation or ordinance relating to bribery, improper    15:22

11    influence, collusion or the like and that proproser    15:22

12    will not in the future offer, confer or agree to confer    15:23

13    any pecuniary benefit or other thing of value of any    15:23

14    officer, trustee, agent or employee of the Brownsville    15:23

15    Independent School District in return for the person    15:23

16    having exercised the person's official discretion,    15:23

17    power or duty with respect to this RFQ."    15:23

18        Q.   Okay.  What do you understand that to mean?    15:23

19        A.   Well, putting it bluntly, whoever is proposing    15:23

20    is to stay away from or not offer or --    15:23

21        Q.   Not attempt?    15:23

22        A.   -- or coerce anyone to influence their bid.    15:23

23        Q.   In other words, not attempt to bribe anybody?    15:23

24            MS. LEEDS:   Object to the form.    15:23

25            MS. NEALLY:   Object to the form of the    15:23

Page 103

| | | |
|---|---|---|
| 1 | question. That's not what he said. | 15:23 |
| 2 | Q. Do you agree with that? | 15:23 |
| 3 | MS. LEEDS: Object to the form. | 15:23 |
| 4 | A. Not to the bribe, I don't. | 15:24 |
| 5 | Q. It actually says right here. | 15:24 |
| 6 | A. It also says other things, too. But, you know, | 15:24 |
| 7 | basically it says, vendors, stay away. If you want to | 15:24 |
| 8 | come in with your proposal, do so, but don't go around | 15:24 |
| 9 | and try to influence either administrators or the board | 15:24 |
| 10 | of trustees to go your way. | 15:24 |
| 11 | Q. That's what you understand it to say? | 15:24 |
| 12 | A. Uh-huh. | 15:24 |
| 13 | Q. Okay. Other than that, is there anything else? | 15:24 |
| 14 | A. I don't know, Counselor. I would have to go | 15:24 |
| 15 | back and look. I think that's the -- | 15:24 |
| 16 | Q. That's the main one? | 15:24 |
| 17 | A. The main one I was thinking about. | 15:24 |
| 18 | Q. Errisuriz Exhibit 5, if you would look that | 15:25 |
| 19 | over. | 15:25 |
| 20 | A. I've never seen it before. | 15:25 |
| 21 | Q. Well, that was going to be my question. My | 15:25 |
| 22 | question was, actually, did you draft or put this thing | 15:25 |
| 23 | together or in any way contribute to putting this | 15:25 |
| 24 | information together? | 15:25 |
| 25 | A. No, I did not. | 15:25 |

Page 104

1      Q.   Okay.  Have you ever seen it before today?      15:25

2      A.   No, sir.                                        15:25

3      Q.   Okay.                                           15:25

4           MR. AGUILAR:  Let's take a short break.         15:25

5           (Brief recess).                                 15:45

6      Q.   Were you a member of the insurance committee    15:45

7  you were talking about earlier?                          15:46

8           MS. NEALLY:  Object to the response -- to       15:46

9  the form of the question.                                15:46

10     Q.   Go ahead.                                       15:46

11     A.   No.                                             15:46

12     Q.   Okay.  When --                                  15:46

13     A.   Wait, wait, wait.                               15:46

14          MS. NEALLY:  Object to the extent that          15:46

15  there's no --                                           15:46

16     A.   What year are we talking about?                 15:46

17     Q.   Let's go back to when you were still director   15:46

18  of insurance.  I'm sorry.  Let me rephrase that.  When  15:46

19  you were still in charge --                             15:46

20     A.   Overseeing.                                     15:46

21     Q.   Overseeing the insurance department, were you   15:46

22  on the insurance committee?                             15:46

23          MS. LEEDS:  Which one?                          15:46

24     Q.   Any insurance committee.                        15:46

25     A.   I was a member, yes.                            15:46

Page 113

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

| | |
|---|---|
| STEPHEN M. ANDRUS, | ) ( |
| FERNANDO DE PENA, | ) ( |
| VALENTIN PAZ and ANDRUS | ) ( |
| & PAZ, A Partnership | ) ( |
| | ) ( |
| VS. | ) (  B-02-143 |
| | ) ( |
| BROWNSVILLE INDEPENDENT | ) ( |
| SCHOOL DISTRICT, NOE | ) ( |
| SAUCEDA, and EDDIE | ) ( |
| ERRISURIZ, JR. | ) ( |

REPORTER'S CERTIFICATION

DEPOSITION OF KENNETH J. LIECK

September 19, 2003

I, LOU ZUNIGA, Certified Court Reporter in and for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of the oral deposition of KENNETH J. LIECK;


I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.


HILL & ROMERO

CERTIFIED COURT REPORTERS

Page 114

Certified to by me this 3rd day of
October , 2003.


LOU ZUNIGA, Texas CSR 2198

Expiration Date: 12-31-03

Hill & Romero

10125 North 10th Street, Suite B

McAllen, Texas   78504

(956) 287-8898


HILL & ROMERO

CERTIFIED COURT REPORTERS

Excerpts from the Deposition of Noe Sauceda, Volume I

# EXHIBIT "3"

Page 1

IN THE UNITED STATES DISTRICT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,          )(
FERNANDO DE PENA,           )(
VALENTIN PAZ and ANDRUS     )(
& PAZ, A Partnership        )(
                            )(
VS.                         )(   B-02-143
                            )(
BROWNSVILLE INDEPENDENT     )(
SCHOOL DISTRICT, NOE        )(
SAUCEDA, and EDDIE          )(
ERRISURIZ, JR.              )(
*****************************************************

IN THE UNITED STATES DISTRICT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ              )(
                           )(
VS.                        )(   CIVIL ACTION NO. B-02-128
                           )(
BROWNSVILLE INDEPENDENT     )(
SCHOOL DISTRICT, NOE        )(
SAUCEDA, MARILYN DEL        )(
BOSQUE-GILBERT and          )(
RANDALL DUNN                )(

---

ORAL AND VIDEOTAPED DEPOSITION OF
NOE SAUCEDA
APRIL 9, 2003

---

HILL & ROMERO
CERTIFIED COURT REPORTERS



1    Q.  And up here it says Office of the Attorney

2  General, State of Texas, John Cornyn?

3    A.  That's right.

4    Q.  Okay.  Let's try it again now.  Do you remember

5  talking to anybody about this attorney general opinion?

6    A.  No, sir.

7    Q.  Okay.  Do you remember talking to anybody about

8  using a designated broker of record to purchase

9  insurance contracts that are in excess of $10,000 or

10  more?

11    A.  I believe I had that conversation with counsel

12  in Edgewood.

13    Q.  Okay.  When was that?

14    A.  Between May of 2000 and June of 2001, somewhere

15  in there.

16    Q.  I'm sorry?

17    A.  Between 2000 and 2001 that I was in Edgewood.

18    Q.  And you don't remember when -- I mean what

19  month or anything?

20    A.  No, sir.

21    Q.  And what do you recall that -- what was the

22  reason for that conversation?

23    A.  I believe Edgewood had an agent of record and

24  the individual wanted to get renewed and -- it may have

25  been right around the time of this opinion.  Does it

1  have a date of the opinion?  Oh, well, then it would

2  have been right around there that it was determined

3  that it was not -- that it wasn't legal.

4      Q.  Okay.  And as a result Edgewood did not get the

5  agent of record?

6      A.  Well, they made it legal.  I don't know what

7  Pito Flores kept representing the district, but I don't

8  know.

9      Q.  What's his name, Beto?

10     A.  Pito.

11     Q.  Agapito?

12     A.  I know him.  It might be Agapito, but it may

13  not be.  I don't know.

14     Q.  Okay.  Pito Flores?

15     A.  Yes, sir.

16     Q.  And what kind of agent was he?

17     A.  He represented the district.  And I'm trying to

18  think of the details and I guess that I should read it,

19  but I'll refresh my memory, but I thought the problem

20  with having an agent of record is that it circumvented

21  the bidding process because the agent itself did the

22  bidding.  And so what they did in Edgewood is, they

23  said, look, you can help us correlate, compile, develop

24  specs but the district is going to do the request for

25  proposals and we're going to follow the district

Page 242

1    process for selecting the recommendation and not the

2    agent's process which may have complied with the law or

3    may not have complied.

4              MR. AGUILAR:  Can we go off the record

5    just a second?

6              (Off the record).

7    Q.  We were talking earlier about the authority --

8    the agent of record and when you had to bid things out,

9    remember that just before the break?

10   A.  To bid things out?

11   Q.  Let me rephrase it.  Just before the break we

12   were talking about Pineda Exhibit 2?

13   A.  Yes, sir.

14   Q.  Okay.  And I asked you about where you learned

15   about agent of record and we talked about Pito Flores

16   and Edgewood, right?

17   A.  Yes, sir.

18   Q.  Okay.  Earlier in the deposition you had been

19   talking about when items had to be bidded out?

20   A.  Yes.

21   Q.  And you talked about the $25,000 limit?

22   A.  Yes.

23   Q.  Or minimum.

24   A.  Purchases.

25   Q.  Purchases.  This memo or this exhibit, Pineda

Page 243

1   2, talks about a designated broker of record, $10,000

2   or more, right?

3       A.   That's what it says.

4       Q.   Do you understand there's a difference between

5   a broker of record and an agent of record?

6       A.   I understand that you cannot delegate the

7   authority to purchase according to State law to anyone

8   other than the school district or in this case the

9   junior college.

10              MR. AGUILAR:   Objection; nonresponsive.

11      Q.   My question just has to do with the difference

12  between a broker of record and an agent of record.   Do

13  you understand any difference?

14      A.   I don't treat them separately.

15      Q.   Okay.   So your understanding is they're about

16  the same, they're the same thing, different name for

17  the same thing?

18      A.   Well, actually, that's not correct.

19      Q.   Okay.   What's the difference?

20      A.   I haven't analyzed a difference.

21      Q.   Oh, okay.   I see what you're saying.   In other

22  words, you haven't thought about it?

23      A.   That's correct.

24      Q.   Okay.   On your understanding thus however --

25  have you heard the term broker of record before?

1        A.   I think I've heard it.

2        Q.   Okay.  And obviously you've heard the term

3    agent of record?

4        A.   Yes.

5        Q.   Your understanding thus far was that they were

6    the same?

7        A.   No.  My understanding was -- I cannot delegate

8    purchasing responsibility to somebody outside of the

9    district.

10       Q.   To either of them?

11       A.   To anyone.  You can call it artist of record,

12   whatever you call it.

13       Q.   What did you think a broker of record was?

14       A.   I didn't.

15       Q.   Okay.  You said you had heard the term before?

16       A.   Yes.

17       Q.   Okay.  When you heard it, what did you

18   understand the term to refer to?

19       A.   I don't know.  I mean, is it synonymous?  I

20   mean, is that a big --

21       Q.   I'm just trying to --

22       A.   -- secret?  Tell me if it's the same.  I would

23   be real happy if it was the same.

24       Q.   I'm just trying to get your understanding as to

25   what you understood at that time.

Page 245

1       A.   I don't know.  I don't know.

2       Q.   Okay.  So in terms of what they could do and

3  what the restrictions are, how did you make the

4  determination -- you talked to us earlier about the

5  information you got from Edgewood district's attorneys?

6       A.   Yes, sir.

7       Q.   Did you have any additional information to lead

8  you to determine when you can get an agent of record

9  and when you could not?

10      A.   You just can't?

11      Q.   No, I'm just asking if you talked to anybody

12  else about it --

13      A.   No.

14      Q.   -- or however else you got the information?

15      A.   After the Edgewood case it became one of those

16  fundamental things that we just don't do.

17      Q.   Okay.  And you didn't talk to -- you didn't

18  review any additional information or materials to get

19  that understanding, correct?

20      A.   Thank goodness, we don't have to.

21      Q.   Okay.

22           MR. AGUILAR:  Let me go ahead and recess

23  at this time.

24           (Deposition recessed)

25

                    IN THE UNITED STATES DISTRICT
                FOR THE SOUTHERN DISTRICT OF TEXAS
                        BROWNSVILLE DIVISION

STEPHEN M. ANDRUS,           ) (
FERNANDO DE PENA,            ) (
VALENTIN PAZ and ANDRUS     ) (
& PAZ, A Partnership         ) (
                             ) (
VS.                          ) (   B-02-143
                             ) (
BROWNSVILLE INDEPENDENT      ) (
SCHOOL DISTRICT, NOE         ) (
SAUCEDA, and EDDIE           ) (
ERRISURIZ, JR.               ) (
*****************************************************

                    IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
                        BROWNSVILLE DIVISION

DINO X. CHAVEZ               ) (
                             ) (
VS.                          ) (   B-02-128
                             ) (
BROWNSVILLE INDEPENDENT      ) (
SCHOOL DISTRICT, NOE         ) (
SAUCEDA, MARILYN DEL         ) (
BOSQUE-GILBERT and           ) (
RANDALL DUNN                 ) (


                    REPORTER'S CERTIFICATION
                    DEPOSITION OF NOE SAUCEDA
                         APRIL 9, 2003


    I, LOU ZUNIGA, Certified Court Reporter in and for
the State of Texas, do hereby certify that the above
and foregoing contains a true and correct transcription
of the oral deposition of NOE SAUCEDA;


                    HILL & ROMERO
                CERTIFIED COURT REPORTERS

Page 249

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this ___6___ day of ___May___, 2003.

_____

LOU ZUNIGA, Texas CSR 2198

Expiration Date: 12-31-03

Hill & Romero

5415 North McColl, Suite 107

McAllen, Texas  78504

(956) 994-8898

HILL & ROMERO

CERTIFIED COURT REPORTERS