

United States District Court
Southern District of Texas
FILED

NOV 2 5 2003

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

DINO X. CHAVEZ                              §
                                           §
VS.                                        §
                                           §         CIVIL ACTION NO.
BROWNSVILLE INDEPENDENT                     §
SCHOOL DISTRICT, NOE SAUCEDA,               §         B - 02 - 128
and RANDY DUNN, MARILYN DEL                 §
BOSQUE-GILBERT and HUGH EMERSON,            §
JR., in their official capacities as Board §
Members of Brownsville Independent          §
School District                            §

---

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTIONS TO EXCLUDE PLAINTIFF'S EXPERT

---

TO THE HONORABLE U.S. DISTRICT COURT:

COME NOW **DINO X. CHAVEZ**, Plaintiff herein, and files this his Response to Third-Party Defendant AFLAC's ***Daubert*** Objections to Testimony of Plaintiff's Expert Stephen M. Horner. Plaintiff also files his response to the Joint Motion of Defendants Brownsville Independent School District and Noe Sauceda to Exclude Plaintiff's Expert, and for such combined response would respectfully show the Court the following:

### I.

### <u>SUMMARY</u>

Defendants have challenged expert Stephen M. Horner, Ph.D., criticizing Dr. Horner's reliance on information and data ultimately provided by AFLAC and its representatives. Plaintiff will show that Defendants challenge the weight and credibility of Dr. Horner's opinions, which are

the province of the jury, rather than the admissibility of his opinions. This Court should therefore deny Defendants' motions.

## II.

The Fifth Circuit has held that "[t]he *Daubert* analysis should not supplant trial on the merits." *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002). As the United States Supreme Court held in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [even] shaky but admissible evidence." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596, 113 S.Ct. 2786, 2798 (1993). Defendants are attempting to avoid cross examination at trial and evaluation of trial on the merits, based on their incorrect assumption that Dr. Horner's reliance on AFLAC documents and testimony from AFLAC representatives for certain underlying data would not be the type of information that is sufficiently reliable to be used by an economist. Defendants challenge the weight that should be accorded to Dr. Horner's opinions, however, rather than the admissibility of those opinions. The explicit and implicit bases for Defendants' challenge to Dr. Horner's opinions in this case stem from Dr. Horner's reliance for some of his opinions on certain information obtained through his review of AFLAC documents and testimony of AFLAC representatives.

## 1.    Dr. Horner's Opinions are Reliable

Dr. Horner received his doctoral degree in economics from the University of Michigan in 1977. *See* Affidavit of Stephen M. Horner ("Horner Aff."), attached and incorporated as **Exhibit A.** He has considerable experience in the field, has served on the editorial board of the *Journal of Forensic Economics*, has performed peer review for that journal and the *Litigation Economics*

*Review*, and has published numerous articles and co-authored a book on the evaluation of economic losses. *See* **Exhibit A**, Horner Aff.   To formulate his opinions in this case Dr. Horner relied on (1) his education and training as an economist, (2) general business and economic principles, (3) treatises and published information normally relied on by economists rendering opinions on lost economic opportunities, (4) on certain information and data compiled from documents provided by, and interviews with, Dino X. Chavez; and (5) AFLAC documents and the testimony of AFLAC representatives. *See* **Exhibit A**, Horner Aff. and attached report. Dr. Horner's reliance on the amalgam of the above five general categories is reasonable and reliable in that he, as an economist, and other economists in the field, can and do utilize that same amalgam of experience, training, information and raw data to formulate opinions on lost economic opportunities. *See* **Exhibit A**, Horner Aff.

Additionally, the Fifth Circuit has recognized that an expert witness, like Dr. Horner in this case, can rely on his experience and training as an economist, on general business and economic principles, and on other information and data, even if that information and data would otherwise be inadmissible hearsay.   *See* ***Mathis***, 302 F.3d at 460 (expert's reliance on general business and economic principles to satisfy ***Daubert*** factors was reliable); ***Pipitone v. Biomatrix, Inc.***, 288 F.3d 239, 246-47 (5th Cir. 2002) (expert's reliance on his training and experience, his first hand observations of and conversations with Plaintiff, and review of published treatises to formulate opinions in case was reliable).

Once Dr. Horner had formulated his opinions, based on information from and interviews with Plaintiff Chavez, as well as from testimony and documents referenced in the depositions of AFLAC's State Sales Coordinator Frank LaFemina, those opinions were reinforced and corroborated through AFLAC's 2003 Financial Analysts Briefing and through the deposition of

AFLAC Vice President Lynn Barnson.  *See* **Exhibit A**, Horner Aff.; *see also* **Exhibit B**, Affidavit of J. Arnold Aguilar with attached **Exhibit B-3**, excerpts from AFLAC's 2003 Financial Analysts Briefing ("Briefing") and **Exhibit B-1**, deposition excerpts of Lynn George Barnson ("Barnson depo."). AFLAC's "career sales force is made up of independent sales associates and sales coordinators who manage a defined geographic area." *See* **Exhibit B-3**, Briefing at p. 50. In 2003, AFLAC changed it sales organization by increasing the number of territories from 5 to 7. *See* **Exhibit B-3**, Briefing at p. 52. Texas is now in the Southwest Territory. *See* **Exhibit B-1**, Barnson depo. at p. 109:17-20. Prior to the 2003 division, Texas was in the West Territory, which was a much larger territory. *See* **Exhibit B-1**, Barnson depo. at pp. 108:1 - 109:6. In 1999 and 2001, Mr. Barnson confirmed that **AFLAC expected** at least a 20% - 30% annual increase in new production by their Regional Sales Coordinators. *See* **Exhibit B-1**, Barnson depo. at pp. 29:20 - 32:1. The 20% - 30% increase was established by AFLAC and was what Mr. Barnson expected of the RSCs in his Territory (West).

It appears that one of AFLAC's explanations for this expectation was a low "penetration rate" in the U.S. and the Texas market. *See* **Exhibit B-3**, Briefing at pp. 43, 53, and 54; *see* also **Exhibit B-1**, Barnson depo. at pp. 35:22 – 38:17 (explaining penetration rate). The lower the "penetration rate," the greater the potential for sales and growth in that area. **Exhibit B-1**, Barnson depo. at p. 37:1–10. Because the Southwest Region, which includes the Rio Grande Valley, had a 5.9% penetration rate in 2003, that left 94.1% of businesses in this region available for sales and growth in succeeding years. *See* **Exhibit B-1**, Barnson depo. at pp. 37:11 – 38:16; **Exhibit B-3**, Briefing at p. 53. This in turn would justify AFLAC's expected growth rates and history of growth. In 2003, AFLAC believes that "the U.S. market for supplemental insurance products in the United States is [still] vast and under penetrated" and that the "potential in this

market should continue to expand." *See* **Exhibit B-3**, Briefing at p. 54.  Mr. Barnson agreed

with this statement. *See* **Exhibit B-1**, Barnson depo. at p. 44:1-10.



LaFemina's testimony, and on Mr. Chavez's own history of growth (which actually exceeded the

Dr. Horner initially utilized AFLAC documents to calculate Mr. Chavez' base earnings for the year 2001. *See* **Exhibit A**, Horner Aff. and attached September 19, 2003 report. After reviewing the documents and after discussing those documents with Mr. Chavez, Dr. Horner re-calculated and re-calibrated those results to conform them to generally-accepted economic practice, and AFLAC Vice-President Barnson later corroborated those results. *See* **Exhibit A**, Horner Aff. Defendants now attempt to confuse the difference between an expert relying on other witnesses' testimony for his analysis and conclusions, and an expert who testifies about information on which he is not an expert or relying on improper methodology. Dr. Horner is allowed to rely on AFLAC documents and the testimony of Lynn George Barnson, currently AFLAC's Territory Vice President, West Territory, and Frank D. LaFemina, currently AFLAC's State Sales Coordinator, for AFLAC's 20% - 30% expected annual sales growth rate for an AFLAC Regional Sales Coordinator ("RSC"), the position Dino X. Chavez held. *See* **Exhibit B-1**, Barnson depo. at p. 15:11-12 (current AFLAC title) and pp. 29:20 – 32:1 (AFLAC and Barnson expected 25-30% annual growth rates in sales); *see* also **Exhibit B-2**, deposition excerpts of Frank D. LaFemina ("LaFemina depo.") at p. 9:5-7 (AFLAC job title) and at pp. 45:22 – 46:5 (20% - 30% expected RSC annual growth rate for sales). The growth rates are based, therefore, on data and information provided by AFLAC itself, and not on the subjective or speculative assumptions of Dr. Horner. *See **Texas A&M Research Found. v. Magna Transp. Co.***, 338 F.3d 394, 403 (5th Cir. 2003)(businessman's compilation of damages based on data and information of business was reliable).

Dr. Horner relied on the information obtained from Defendants, witnesses and Mr. Chavez, and he then applied his expertise in economic analysis to calculate the lost business opportunities of Plaintiff, while bringing the calculations into current value, which is what an economist does.  *See* **Exhibit A**, Horner Aff.  Defendants do not challenge Horner's methodology, only his reliance on AFLAC documents, testimony of AFLAC's Vice President, West Territory, its State (Texas) Sales Coordinator and Dino Chavez.  Defendants provided business records containing the underlying data and information used by Dr. Horner to formulate his opinions. Criticisms of the analysis of the underlying data and information and Dr. Horner's reliance on the same are challenges to the weight a jury should accord to Dr. Horner's testimony, not on whether his testimony itself is admissible.

Defendants also attempted to challenge Dr. Horner's calculation of Plaintiff's expected overhead costs.  In evaluating Mr. Chavez's overhead costs, Dr. Horner reasonably relied on Mr. Chavez's representations, as well as on the testimony of his supervisor, Frank LaFemina.  Within the AFLAC organization Frank LaFemina was also an independent captive agent, who supervised Mr. Chavez.  *See* **Exhibit B-1**, Barnson depo. at pp. 136:23 – 137:14.  Even as AFLAC's State Sales Coordinator, Mr. LaFemina operated a similar sole-proprietorship, and he has only one employee, an administrator.  *See* **Exhibit B-2**, LaFemina depo. at pp. 8:1 – 9:7.  Like Mr. Chavez, Mr. LaFemina pays for his own overhead. *See* **Exhibit B-2**, LaFemina depo. at p. 8:19-21.  Mr. LaFemina testified that he was also familiar with the overhead for an AFLAC representative in the Brownsville area, and he testified about those expenses.  *See* **Exhibit B-2**, LaFemina depo. at pp. 199:21 – 207:17.  AFLAC expected Mr. Chavez to pay for his own expenses, which he did.  *See* **Exhibit B-2**, LaFemina depo. at p. 207:3-16.  Mr. LaFemina explained what those expenses included, and he explained that he incurs similar expenses

himself.  Even were Mr. Chavez to have been promoted to Mr. LaFemina's position, it is reasonable to assume Mr. Chavez would have at least an administrator and similar overhead costs.  Dr. Horner, therefore, reasonably based his opinions on Mr. Chavez' representations of his overhead costs. *See* **Exhibit A,** Horner Aff.  Defendants' disagreement on the determination of future expenses Mr. Chavez might incur is in reality a challenge to the weight a jury should apportion to Dr. Horner's opinions, not to the admissibility of those opinions.

Defendants similarly challenge Dr. Horner's opinions on the mitigation of Plaintiff's damages.  As Dr. Horner stated in his affidavit, reliable projections of Mr. Chavez' future business prospects cannot be made, and would be mere speculation.  *See* **Exhibit A**, Horner Aff. and attached reports.  As Dr. Horner explained, "[s]ince insurance sales is generally conducted through independent businesses, rather than employees, there is huge variation in their sales and income figures, and such data would be unreliable.  Furthermore, Mr. Chavez's past success at AFLAC suggests that Mr. Chavez has a significant probability of doing much better than the average insurance salesperson or manager, even if there were data on which such projections might be made, but no reliable determination can be made at this time." *See* **Exhibit A**, Horner Aff. at p. 4.  Defendants' proffered expert, Donald R. House, has disagreed.  Defendants challenge to Dr. Horner's mitigation testimony again challenges only the weight a jury should accord this testimony (i.e., whether the jury should agree with Dr. Horner that mitigation of damages would be speculative because of the paucity of data on which to rely, or with Dr. House that some value for that mitigation could be applied even though no reliable data could be gathered to establish a reliable mitigation figure), rather than to the admissibility of Dr. Horner's opinions themselves.  Thus, this Court should deny Defendants' motions.

2.    **Dr. Horner's Testimony is Relevant**

Under Federal Rule of Evidence 702, Dr. Horner is allowed to review testimony and evaluate the long term economic impact of Plaintiff's termination as a captive AFLAC Regional Sales Coordinator. Dr. Horner's testimony will aid the trier of fact in determining the extent of Plaintiff's economic losses. Because Plaintiff's compensation was not based on a simple hourly pay scale, but rather through commissions, Dr. Horner's expertise is necessary to apply the appropriate methodology to determine what the current value of the long term economic damages are to the Plaintiff. Defendants' actions had long-range effects, and Dr. Horner's testimony and opinions will assist the trier of fact in evaluating those long-range effects. Dr. Horner's testimony and opinions are therefore relevant to an issue in the case. Thus, this Court should deny Defendants' motions.

WHEREFORE, PREMISES CONSIDERED, Plaintiff **DINO X. CHAVEZ**, would respectfully request that upon consideration of Plaintiff's Response to Defendants' Motions To Exclude Plaintiff's Expert, that this matter be allowed to proceed accordingly, and that Plaintiff be GRANTED such other and further relief to which he may show himself to be justly entitled, whether general or special, at law and in equity.

Signed on this the 24th day of November, 2003.

Respectfully submitted,

**LAW OFFICE**
**J. ARNOLD AGUILAR**
Artemis Square, Suite H-2
1200 Central Boulevard
Brownsville, Texas 78520
Telephone    : (956) 504-1100
Facsimile    : (956) 504-1408

By:

J. Arnold Aguilar
State Bar No. 00936270
Federal Adm. No. 6822

John J. Jordan, Jr.
State Bar No. 0096852
Federal Adm. No. 21304

Attorneys for Plaintiff,
DINO X. CHAVEZ

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTIONS TO EXCLUDE PLAINTIFF'S EXPERT** has on this the 25th day of November, 2003, been forwarded via certified mail, return receipt requested to:

Ms. Elizabeth G. Neally
ROERIG, OLIVEIRA & FISHER, L.L.P.
855 W. Price Rd., Suite 9
Brownsville, TX 78520

Ms. Eileen M. Leeds
WILLETTE & GUERRA, L.L.P.
International Plaza, Suite 460
3505 Boca Chica Boulevard
Brownsville, TX 78521

Mr. William B. Steele, III
LOCKE, LIDDELL & SAPP, L.L.P.
100 Congress Avenue, Suite 300
Austin, TX 78701

J. Arnold Aguilar
John J. Jordan, Jr.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DINO X. CHAVEZ | § | |
| | § | |
| VS. | § | |
| | § | CIVIL ACTION NO. |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, NOE SAUCEDA, | § | B - 02 - 128 |
| and RANDY DUNN, MARILYN DEL | § | |
| BOSQUE-GILBERT and HUGH EMERSON, | § | |
| JR., in their official capacities as Board | § | |
| Members of Brownsville Independent | § | |
| School District | § | |

## ORDER DENYING DEFENDANTS' MOTIONS
## TO EXCLUDE PLAINTIFF'S EXPERT

On this date came on to be heard **Joint Motion of Defendants Brownsville Independent School District and Noe Sauceda to Exclude Plaintiff's Expert** and **Third-Party Defendant AFLAC's Daubert Objections to Testimony of Plaintiff's Expert Stephen M. Horner, and Brief in Support** and Plaintiff's Response to same filed in the above styled and numbered cause. The Court having reviewed the file and record in this case, as well as having heard the argument of counsel and the testimony of witnesses herein, is of the opinion that the **Joint Motion of Defendants Brownsville Independent School District and Noe Sauceda to Exclude Plaintiff's Expert** and **Third-Party Defendant AFLAC's Daubert Objections to Testimony of Plaintiff's Expert Stephen M. Horner, and Brief in Support** should be **DENIED**;

IT IS THEREFORE ORDERED that **Joint Motion of Defendants Brownsville Independent School District and Noe Sauceda to Exclude Plaintiff's Expert** and **Third-Party Defendant AFLAC's Daubert Objections to Testimony of Plaintiff's Expert Stephen M. Horner, and Brief in Support** be and are hereby **DENIED**;

DONE at Brownsville, Cameron County, Texas, on this the _____ day of _____, 2003.

_____   .
U.S. DISTRICT JUDGE

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DINO CHAVEZ, *Plaintiff* | Э | |
| | Э | CIVIL ACTION NO. |
| VS. | Э | |
| | Э | B - 02 - 128 |
| BROWNSVILLE INDEPENDENT | Э | |
| SCHOOL DISTRICT, | Э | |
| *Third Party Plaintiff,* | Э | |
| | Э | |
| Vs. | Э | |
| | Э | |
| AMERICAN FAMILY LIFE ASSURANCE | Э | |
| COMPANY OF COLUMUS (AFLAC) | Э | |
| . | Э | |

## AFFIDAVIT OF STEPHEN M. HORNER, Ph.D.

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF NUECES | § |

BEFORE ME, the undersigned official, on this day appeared **STEPHEN M. HORNER, Ph.D.,** who is personally known to me, and first being duly sworn according to law upon his oath deposes and says:

"My name is Stephen M. Horner, Ph.D. I am over 18 years of age. I have never been convicted of a crime, and I am fully competent to make this affidavit. I have personal knowledge of the facts stated herein, and they are all true and correct.

I am self-employed as an economic consultant in Corpus Christi, Texas. I was awarded a Bachelor's degree in economics from the California Institute of Technology in 1970, a Master's Degree in Public Policy from the University of Michigan in 1973, and a Ph.D. in economics from the University of Michigan in 1977. My Ph.D. fields of study were primarily economic theory and industrial organization.

I have ten years of experience as an owner and manager of companies involved in industrial sales. I have taught economics as an Adjunct Professor of Economics at Texas A & M University and as an Assistant Professor of Economics at Wellesley College, in Wellesley, Massachusetts. My teaching included Microeconomic Theory, Industrial Organization, Econometrics and Mathematical Economics.

I have worked as an economic consultant for over 17 years, consulting in over 1,100 cases with attorneys working for both plaintiffs and defendants. I have authored articles relating to matters of forensic economics which have been published in respected journals and made numerous presentations on this subject at professional conferences.

I served on the Board of Editors for the *Journal of Forensic Economics,* and perform peer review for both that journal and the *Litigation Economics Review.* In addition, I have written published articles and, as a co-author, a book, regarding the evaluation of economic losses.

I have attached a copy of my current *curriculum vitae.*

I have been retained by Plaintiff in this case to provide analyses that would help the trier of fact determine the economic value of Plaintiff's lost opportunities as a result of not being allowed to sell insurance products to staff members of Brownsville Independent School District and being terminated from his position as Regional Sales Coordinator with AFLAC, Inc. I was not retained to investigate whether the actions taken by Brownsville Independent School District, or AFLAC, Inc., were reasonable or unreasonable.

My opinions are based on my experience and training as an economist. To formulate my opinions in this case, I primarily drew upon general business and economic principles. I also relied on the following

> Deposition of Dino X. Chavez 3/4/2003
> Notes from conference with Dino X. Chavez 4/1/2003
> Plaintiff's Answers to Defendant's First Set of Interrogatories
> Plaintiff's Answers/Responses to Defendant Noe Sauceda's First Set of Interrogatories, Requests for Production and Request for Admissions
> Report prepared by Donald R. House, 6/25/03
> Texas South 1999 Business Plan
> Comparables (Top 50 RSCs & SSCs in the US)
> Comparables (Other RSCs throughout Texas)
> Personal & Regional Team (Production for 1998-2003)
> BISD Employee Growth
> Third Party Defendant American Family Life Assurance Company of Columbus's Rule 26(a)(2) Disclosure
> Deposition of Frank D. Lafemina, 5/22/03, Volume 1
> Deposition of Frank D. Lafemina, 8/21/03, Volume 2
> Documents discussed in deposition of Lynn Barnson, 9/30/03
> Deposition of Lynn George Barnson, 9/30/03

The general business and economic principles on which I relied, the documents that I reviewed and the information that was provided by Mr. Dino Chavez are the types of facts and data that are reasonably relied on by economists in forming opinions or inferences on lost profits, lost wages and lost earning capacity.

Page 2 of 6

Motion by AFLAC, Inc.

In a motion submitted by William B. Steele III on behalf of Third Party Defendant AFLAC, Inc., three arguments (see page 2) for the exclusion of my testimony are advanced:

1. AFLAC alleges that I am (a) "not qualified to make" and (b) "cannot reliably determine" growth rates for Mr. Chavez's sales commissions.

2. AFLAC alleges that my calculations "rely on unverified, unreliable, and irrelevant assumptions concerning Mr. Chavez's future expenses."

3. AFLAC alleges that I am "not qualified to and fail to account for Mr. Chavez's duty to mitigate damages."

The motion by AFLAC addresses my preliminary report only, and appears to ignore my supplementary and final report of September 19, 2003. The later report contains refined calculations, particularly growth rate projections, that are based on information from AFLAC affiliates that was not available earlier.

Each of these allegations are considered below:

1. Determination of Future Growth Rates
   AFLAC alleges that I am (a) "not qualified to make" and (b) "cannot reliably determine" growth rates for Mr. Chavez's sales commissions.

   a. Qualifications

AFLAC alleges that I am not qualified to make projections of growth rates. Projections of future values of economic variables is within the province of economics. Future growth rates are economic variables that fall within the province of economic forecasting. I do have experience in this field, having taught economic forecasting ("econometrics") at the college level. Although I have experience with the analysis of insurance agent earnings from other cases, specific knowledge of insurance industry parameters need not necessarily be possessed by the forecaster, if such information is obtained from other sources. Nevertheless, in this particular case, the assumed growth rates were not based upon my own forecasting, but rather were based on the expectations of the AFLAC sales hierarchy, and corroborated by Mr. Chavez's own historical growth rates.

   b. Ability to Determine Growth Rates

As acknowledged by AFLAC, in my consideration of future growth projections, I relied upon Mr. Dino Chavez's own sales growth history, Mr. Dino Chavez's representations, the testimony of Mr. Frank LaFemina, who was Mr. Chavez's supervisor, and the testimony of Mr. Lynn Barnson, who is Mr. LaFemina's supervisor.

Mr. Chavez's own historical growth rates of 67.3% in 2000, and 75.8% in 2001 were greatly in excess of the rates I projected, but nonetheless provided reassurance that, based upon his familiarity with AFLAC, Mr. LaFemina's growth rate range of 20% to 30% was not unreasonable.

Mr. Barnson's testimony corroborated Mr. Lafemina's range, and appears to be at least partly based on the expectations from AFLAC headquarters. My calculations, with results provided in a table on page 4 of my September 19, 2003 report, were based on 20%, 25% and 30% growth rate projections, the low, middle and high values from Mr. LaFemina's range. Since these calculations were for very long-term periods, Exhibits E through G of that report provided year-by-year projected earnings levels that could be used for estimation purposes for shorter time periods.

2.   Determination of Future Expenses
AFLAC alleges that my calculations "rely on unverified, unreliable, and irrelevant assumptions concerning Mr. Chavez's future expenses."

AFLAC objects to my assumption that Mr. Chavez's future expenses growing with inflation, as Mr. Chavez's revenue increases at a much greater rate. My assumption was based on Mr. Chavez's representations that his commission growth as a Regional Sales Coordinator would not require an increase in staff or other expense items, primarily because his growth comes through the recruiting of District Sales Coordinators ("DSCs"). Since the DSCs are not employees of Mr. Chavez and must pay their own expenses, there is no theoretical reason to reject Mr. Chavez's representation that his expenses would grow at rates higher than inflation. Although Mr. Chavez did significantly more administrative work than other Regional Sales Coordinators, my understanding was that this administrative work was only for the Brownsville Independent School District, which represented a diminishing percentage of his efforts. Although there are economies of scale implications of the information provided to me, no direct "assumptions of economies of scale" were made or relied upon, contrary to the allegations of AFLAC's motion.

3.   Mitigation of Damages
AFLAC alleges that I am "not qualified to and fail to account for Mr. Chavez's duty to mitigate damages."

AFLAC states that my analysis does not account for Mr. Chavez's mitigation of damages since his termination as a Regional Sales Coordinator for AFLAC. Although the evidence shows that Mr. Chavez has continued his career in insurance sales management through a company organized by himself and business associates, this company is an "unestablished business enterprise" for which reliable projections cannot be made at this time, without resorting to speculation. AFLAC suggests that some "independent study or analysis of [Mr.] Chavez's future business prospects" should have been conducted. Reliable projections of this sort also cannot be made for Mr. Chavez. Since insurance sales is generally conducted through independent businesses, rather than employees, there is huge variation in their sales and income figures, and such data would be unreliable. Furthermore, Mr. Chavez's past success at AFLAC suggests that Mr. Chavez has a significant probability of doing much better than the average insurance salesperson or manager, even if there were data on which such projections might be made, but no reliable determination can be made at this time.

Motion by Brownsville Independent School District and Noe Sauceda

In a motion submitted by Roerig, Oliveira & Fisher, L.L.P., on behalf of defendants Brownsville Independent School District ("BISD") and Noe Sauceda ("Defendants") three arguments for exclusion of my testimony are advanced:

1.   Timeliness of Report Prepared September 19, 2003. (See paragraph 14.)

2.   Reports Do Not Address Mitigation of Losses. (See paragraph 21. This is the same objection raised by AFLAC, Inc., in the second part of number 3, above.)

3.   Defendants allege that I am not qualified to render the opinions I have given in this matter. (See paragraph 31.)

These issues are considered individually below:

1.   Timeliness of Report Prepared September 19, 2003. (See paragraph 14.)

Defendants BISD and Sauceda argue that my report of September 19, 2003 was prepared beyond the deadline established by this court. I cannot speak to the legal issues raised. However, my second report was a refinement of my earlier report, largely based on information from Mr. LaFemina's deposition. Volume one of this deposition was received five working days before my own deposition of September 5, 2003. At that deposition, I had been pointed out that the preliminary report would be revised based on Mr. LaFemina's deposition testimony. The second volume of Mr. LaFemina's deposition (taken August 21, 2003) was received September 15, 2003, ten days after my own deposition. Four days after receiving this second volume, I prepared my September 19, 2003 final report in this matter, which contained no new theory, and contained virtually the same calculations, although based on information from Mr. LaFemina's deposition.

2.   Reports Do Not Address Mitigation of Losses. (See paragraph 21.)

This issue was addressed in the response to the same objection raised by AFLAC, Inc., in the second part of number 3, above. Although the evidence shows that Mr. Chavez has continued his career in insurance sales management through a company organized by himself and business associates, this company is an "unestablished business enterprise" for which reliable projections cannot be made at this time, without resorting to speculation. AFLAC suggests that some "independent study or analysis of [Mr.] Chavez's future business prospects" should have been conducted. Reliable projections of this sort also cannot be made for Mr. Chavez. Since insurance sales is generally conducted through independent businesses, rather than employees, there is huge variation in their sales and income figures, and such data would be unreliable. Furthermore, Mr. Chavez's past success at AFLAC suggests that Mr. Chavez has a significant probability of doing much better than the average insurance salesperson or manager, even if there were data on which such projections might be made, but no reliable determination can be made at this time.

3.    <u>Qualifications to Render Opinions (See paragraph 31.)</u>

BISD's argument is more general than that of AFLAC. It appears to be a blanket denial that I have any relevant expertise in the current matter, because I am not an expert in the insurance industry. The primary knowledge required in an analysis of future losses is in forecasting of future economic values, and in the discounting of future losses into present value terms, based on information relevant to the particular individual. Based on such knowledge, it is quite common for an economist to render opinions on the earning capacity of individuals that work in industries for which the economist has no prior specific knowledge or experience, provided that necessary and relevant information regarding the individual's economic circumstance has been obtained. Generally, these projections are based on historical quantitative economic information. The analysis of such information is within the expertise of many economists. In the past 17 years, I have provided expert opinions in such matters hundreds of times, in both Federal and state courts. In cases where future lost profits are alleged, such as the present case, the analyst should also have knowledge of the particular risk-adjusted discounting techniques used in such cases. Although I do have limited experience in cases involving insurance agents, such prior knowledge is not necessary, particularly when there are alternative sources of such industry-specific information, as disclosed in my reports in this matter.

A true and correct copy of my September 19, 2003 written report in this case is attached to this affidavit.

Further affiant sayeth naught."



Stephen M. Horner, Ph.D.

SUBSCRIBED AND SWORN TO BEFORE ME on the 19th day of November, 2003, to certify which witness my hand and official seal.

NOTARY PUBLIC IN AND FOR THE
STATE OF TEXAS

SANDRA L. PIERSON
Notary Public, State of Texas
My Commission Expires
February 17, 2006

My commission Expires:

2/17/06

Page 6 of 6

STEPHEN M. HORNER, PH.D.
Economic, Business & Statistical Consulting
P.O. Box 2685
Corpus Christi, Texas 78403
361/883-1686

CURRICULUM VITAE

## EDUCATION

Ph.D., Economics, The University of Michigan, Ann Arbor, Michigan, 1977
M.P.P., Public Policy Studies, The University of Michigan, Ann Arbor, Michigan, 1973
B.Sc., Economics, California Institute of Technology, Pasadena, California, 1970
Graduated, W.B. Ray High School, Corpus Christi, Texas, 1966

## CONSULTING

| | |
|---|---|
| 1985-Present | General Economic, Business and Statistical Consulting, Various Defense and Plaintiff's Attorneys; Personal Injury and Commercial Damage Economic Evaluation |
| 1987 | Corpus Christi Warehouse and Storage, Corpus Christi, Texas; Lease Negotiation Support |
| 1985 | Susser Petroleum Corporation, Apache Fuels, Corpus Christi, Texas |
| 1978 | Urban Systems, Inc., Cambridge, Massachusetts |
| 1976 | City of Ann Arbor Cablecasting Commission, Ann Arbor, Michigan |

## EMPLOYMENT

| | |
|---|---|
| 1999 | Adjunct Professor of Economics, Texas A&M University, Corpus Christi, Texas |
| 1979-1989 | Executive Vice President, Oil Field Equipment Co., Corpus Christi, Texas |
| 1977-1979 | Assistant Professor of Economics, Wellesley College, Wellesley, MA. |
| 1976-1977 | Lecturer in Economics, Wellesley College, Wellesley, MA. |
| 1975 | Lecturer, School of Public Health, The University of Michigan, Ann Arbor, MI |
| 1974-1975 | Teaching Assistant, School of Public Health, The University of Michigan, Ann Arbor, Michigan |
| 1972-1975 | Research Assistant, The Institute of Public Policy Studies, The University of Michigan, Ann Arbor, Michigan |
| 1971 | Teaching Assistant, Industrial Engineering, School of Engineering, The University of Michigan, Ann Arbor, Michigan |
| 1970-1971 | Special Administrative Assistant to the Chairman of the Board, International Business Machines Corporation, IBM Internship Program, Armonk, New York |

## PROFESSIONAL ASSOCIATIONS

National Association of Forensic Economics, (President 2003-2004, Western Vice-President, 1992 - 1996)
    *Journal of Forensic Economics*, (Board of Editors, 1996-2000)
American Economic Association
American Statistical Association
Western Economic Association International

## PUBLICATIONS

"The Valuation of Earning Capacity: Definition, Measurement and Evidence" in *Journal of Forensic Economics,* 1999, 12(1), 13-32.
"Reference Guide for Valuing Economic Loss in Personal Injury, Wrongful Death and Survival Actions," with Thomas R. Ireland and James D. Rodgers, in *Expert Economic Testimony: Reference Guides for Judges and Attorneys*, by Thomas R. Ireland, Stephen M. Horner, James D. Rodgers, Patrick A. Gaughan, Robert R. Trout and Michael J. Piette. Tucson, AZ: Lawyers & Judges Publishing Company, 1998.
Review of Gamboa, Jr., A. M. (1995): *The New Worklife Expectancy Tables*, in *Journal of Applied Rehabilitation Counseling,* Volume 27, Number 3, Fall 1996, page 67

# STEPHEN M. HORNER, Ph.D.
P.O. Box 2685
Corpus Christi, Texas 78403
361/883-1686

September 19, 2003

Mr. Arnold Aguilar
1200 Central Blvd, Suite H-2
Brownsville, TX 78520

Re:    Dino X. Chavez v Brownsville Independent School District, Noe Sauceda, Marilyn del
       Bosque-Gilbert and Randall Dunn; In the United States District Court for the Southern
       District of Texas, Brownsville Division

Dear Mr. Aguilar,

       This letter presents revised results of my analysis of the economic value that was lost by
Mr. Dino Chavez as a result of not being allowed to sell supplemental insurance policies at the
Brownsville Independent School District, resulting in the subsequent loss of his position as a
Regional Sales Coordinator for AFLAC, Inc., in early 2002. This revision is based on
information provided in the testimony of Mr. Frank La Femina on May 22, 2003 and August 21,
2003, concerning growth rates expected of Regional Sales Coordinators and others in the
AFLAC sales system.

       As can be seen from the graph, Mr. Chavez's Regional Sales Coordinator ("RSC") sales
were growing rapidly until 2002. (See graph in attachment 1.) Mr. Chavez acted as both an
agent and RSC for AFLAC. His compensation from AFLAC was through a complex
commission and bonus system, that included varying rates for first year sales, renewals, different
products and ages of customers, as well as bonuses for meeting quotas and other targets. He
received separate commissions as an agent and as a RSC. Mr. Chavez's earned commission
compensation in 2001 and 2002 are summarized in attached Exhibits A and B, taken from
"AFLAC Monthly Accounting Statements."

## Duration of Analysis

       Mr. Chavez was 37 years old at the time of the events in 2002 central to this analysis. A
male, age 37, with a bachelor's degree, would have a worklife expectancy of approximately 26
years. (See Skoog and Ciecka (2001), Table 5) The current analysis includes losses from 2002
through 2026, a twenty-five year period. There are risks associated with any business endeavor
not continuing, or not continuing at projected rates. Such considerations are normally
incorporated through the application of a risk-adjusted discount rate, which is discussed below.

## Base Earnings from 2001

       In 2001, Mr. Chavez and his agents wrote new business with annualized premiums
totaling $1,649,603. Including conversions of older policies, the total annual premiums subject

to first year commissions was $1,668,501. Based on AFLAC documents provided by Mr. Chavez, we have estimated that approximately $322,108 in annualized new business at B.I.S.D. was missed by Mr. Chavez in December 2001, out of about $464,695 sold in 2001 to B.I.S.D. employees. This implies that the total annualized premiums credited to Mr. Chavez in 2001 would have been $1,668,501 + $322,108 = $1,990,609. Thus, the $464,695 in new B.I.S.D. business for 2001 would have represented about 23% of Mr. Chavez's 2001 new annualized AFLAC premiums.

According to the AFLAC Monthly Accounting Statements for 2001, Dino Chavez earned first year commissions of about $78,706 on this business, plus an additional $30,478 in commissions from renewals of preexisting policies. Although Mr. Chavez has lost significant income as an agent, as well as an RSC, we are focused only on the latter in this analysis. Mr. Chavez's commissions as RSC were about $64,827 for first year premiums, and $16,388 for renewals. In addition, Mr. Chavez receives additional compensation in the form of stock bonuses, of 0.70% of first year policies for which a 13th month payment is received, as well as a performance bonus. Based on 2002 performance, we note that approximately 45.15% of 1st year policies lapsed during the year. We assume this would continue, and include only 55.85% of the 0.70% of first year premiums in our projections. (See Exhibit C, Attrition Analysis.) Policies that have already renewed, that is, passed their 13th month without cancellation, had an annual attrition rate of about 14.40%. Thus, we assume that 45.15% of first year policy premiums will produce no revenue in subsequent years, and 14.40% of renewed policies will cancel in subsequent years. In February 2001, Mr. Chavez received a check for $18,623, which was about 1.66% of his year 2000 first year annualized premiums sold by Mr. Chavez and his team of agents. Based on his 2001 performance, Mr. Chavez earned an additional performance bonus check, paid in February 2002 of about $27,439, or about 1.66% of the first year annualized premiums. (For ease in computation, we include these performance bonuses with the year in which they are earned.) As a subtraction from commissions on first year premiums, RSCs were required to contribute 0.50% to the Manager's Incentive Fund, effectively reducing the commission on first year premiums from about 8.2% to about 7.7%. Although these contributions are deducted as expenses, we have used them to reduce the revenue simplicity in calculations. These average rates for commissions and bonuses are assumed to continue. Other AFLAC incentive programs are ignored in this analysis. Mr. Chavez reports that his operation was fully staffed by 2001, when his other expenses were about $67,475 less the $8,371 he was required to contribute to the Incentive Fund. He projects that his remaining expenses of $59,104 would have grown only with inflation in the future. We assume this to be about 3.1% per year, based on the same period of data as will be used for discounting. See Ibbotson (2000), page 14.

Earnings for 2002 through 2026

As noted earlier, Mr. Chavez's AFLAC business as an RSC was growing rapidly. Mr. Chavez indicates that the primary enrollment period for the Brownsville ISD was in December 2001, but that he had already been given 30 days notice of his termination as RSC. AFLAC brought in approximately two dozen agents that were on the "teams" of other RSCs in South Texas, resulting in a large portion of this business being credited to RSCs other than Mr. Chavez. Based on AFLAC documents provided by Mr. Chavez, we have estimated that approximately

Chavez v. Noe Sauceda et al.
Page 3 of 6

$322,108 in annualized new business was missed in December 2001. (See Exhibit D) The following table shows the growth of that business from 1998 through 2001, including this adjustment:

| Growth of 1st Year Premiums | | |
|---|---|---|
| Year | 1st Year Premiums | Growth |
| 1998 | $91,991 | n.a. |
| 1999 | $673,640 | 632.29% |
| 2000 | $1,132,423 | 68.11% |
| 2001* | $1,990,609 | 75.78% |

*Includes $322,108 lost in December 2001

   Growth rates of this magnitude cannot be sustained for 25 years, and this is a relatively short history upon which to make a projection. Nevertheless, there is no indication of a deceleration in the growth. Mr. Frank La Femina, a State Sales Coordinator for AFLAC, in deposition testimony, indicates that he wanted to see "at least 20% to 30% increase" from DSC's and RSCs every year. These growth rates are significantly less than those achieved by Mr. Chavez, but may be more realistic long-term expectations. Thus, we perform three sets of calculations, assuming 20%, 25% and 30% sales growth rates from 2002 onwards.

<u>Discounting for the Time Value of Money and Risk</u>

   The losses incurred by Mr. Chavez as a result of his insurance team being prevented from selling his insurance products at BISD and his subsequent termination as RSC for AFLAC would have taken place over a long period of time. It is necessary to take account of the fact that cash flows in different years do not have the same economic value, and thus cannot properly be added together. There are two primary reasons for this. The first reason is that dollar amounts in the future have lower value than they do in the present because present amounts, if invested, will grow larger with time. Thus, a smaller sum in the present will be required to replace a given future amount. Discounting by the time value of money converts future values to present values.

   The second reason that cash flows in different years do not have the same value is that later amounts, due to the possible intervention of unforeseen events, are subject to increasing risk of not being realized. Thus, future projected amounts should be corrected for their increasing risk as they are further in the future. This is done through the use of a risk-adjusted discount rate. Discussion of this process is described in finance texts, such as in Chapter 2 of Brealey and Myers (1991), as well as other texts in the valuation literature, such as Ibbotson (2000). The estimation of a risk-adjusted discount rate can be accomplished in several ways. The most commonly used is the risk-adjusted form of the "capital asset pricing model" or "CAPM." This is discussed in sources such as Ibbotson (2000) and Pratt (1998), Chapter 9.

Chavez v. Noe Sauceda et al.
Page 4 of 6

For the CAPM approach, we rely on data provided by Ibbotson (2000), Table 5, page120. The risk-free rate based on 20-year government bonds would be about 5.21%, and the equity risk premium for the NYSE (New York Stock Exchange) from the same source would be about 7.13%. The equity risk premium would be multiplied by a "beta" expressing the general non-diversifiable or systematic risk that relates the particular market to the market as a whole. In this case, the beta for AFLAC would be appropriate to capture the response of this segment of the insurance industry to economic fluctuations in the general market. According to Business Week data from May 14, 2003, the beta for AFLAC is about 0.89, reflecting relatively low relative systematic risk. This is multiplied by the 7.13% risk adjustment for the market at a whole, for an



the adjustment for the smallest NYSE size category is about 3.95%, but the smallest NYSE company is much larger than Mr. Chavez's operation. We add an additional 6.0% for the small size of Mr. Chavez company, and other company-specific risk considerations, such as Mr. Chavez dependence on a primary supplier of insurance and early dependence on one large

Chavez v. Noe Sauceda et al.
Page 5 of 6

above. Mr. Chavez has indicated that he joined The Teachers' Agency in early 2002, becoming an owner. His 1099 from that operation indicated earnings of $7,000. According to Mr. Chavez, The Teachers' Agency continues to operate at a loss. Although I would expect that this operation will eventually be successful, it is too early to prepare a reliable projection of Mr. Chavez's future earnings from this endeavor.

Please feel free to call me if you have any questions. Thank you very much for this opportunity to be of service.

Sincerely,

Stephen M. Horner, Ph.D.

Chavez v. Noe Sauceda et al.
Page 6 of 6

Bibliography

Brealey, Richard A., and Stewart C. Myers, *Principles of Corporate Finance*, Fourth Edition. New York: McGraw-Hill, 1991.

Ibbotson Associates: *Stocks, Bonds, Bills, and Inflation: Valuation Edition 2000 Yearbook.* Chicago: Ibbotson Associates, 2000.

Skoog, Gary R., and James E. Ciecka: "The Markov (Increment-Decrement) Model of Labor Force Activity: Extended Tables of Central Tendency, Variation, and Probability Intervals," *Journal of Legal Economics*, Spring/Summer 2001, pp. 23-87.

Pratt, Shannon P.: *Cost of Capital: Estimation and Applications.* New York: John Wiley & Sons, 1998.



Attachment 1

Annual Premiums

Exhibit A
AFLAC Commissions        2001

Monthly Accounting Statements

| Month End | Premium Collected | | | | Commission Earned | | | | Commission Earned | | | |
| | 1st Year | | Renewal | | 1st Year | | Renewal | | 1st Year | | Renewal | |
| | Personal | Override | Personal | Override | Personal | Override | Personal | Override | Personal | Override | Personal | Override |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/31/2001 | 9,629.47 | 62,238.28 | 15,390.32 | 39,979.90 | 2,026.66 | 3,201.67 | 948.22 | 1,045.24 | 21.05% | 5.14% | 6.16% | 2.61% |
| 2/28/2001 | 242.33 | 45,885.29 | 6,373.20 | 25,750.37 | (439.23) | 2,676.55 | 390.42 | 621.86 | -181.25% | 5.83% | 6.13% | 2.41% |
| 3/31/2001 | 17,574.43 | 133,049.83 | 39,185.97 | 101,433.02 | 1,782.57 | 5,434.18 | 2,363.30 | 2,253.85 | 10.14% | 4.08% | 6.03% | 2.22% |
| 4/30/2001 | 8,366.81 | 74,904.11 | 19,175.05 | 54,194.26 | 1,375.93 | 4,181.80 | 1,122.91 | 1,207.18 | 16.45% | 5.58% | 5.86% | 2.23% |
| 5/31/2001 | 7,760.23 | 65,332.29 | 18,813.09 | 57,723.75 | 1,167.74 | 5,173.94 | 1,091.96 | 1,253.59 | 15.05% | 7.92% | 5.80% | 2.17% |
| 6/30/2001 | 8,151.66 | 103,928.16 | 22,369.06 | 69,179.40 | 1,295.74 | 8,290.95 | 1,332.91 | 1,515.08 | 15.90% | 7.98% | 5.96% | 2.19% |
| 7/31/2001 | 1,950.38 | 59,290.38 | 7,534.38 | 37,410.00 | 233.73 | 2,016.46 | 470.64 | 898.34 | 11.98% | 3.40% | 6.25% | 2.40% |
| 8/31/2001 | 6,934.81 | 84,406.81 | 19,145.21 | 62,609.64 | 1,146.49 | 3,519.90 | 1,127.08 | 1,345.58 | 16.53% | 4.17% | 5.89% | 2.15% |
| 9/30/2001 | 11,968.81 | 113,299.74 | 32,413.62 | 95,187.42 | 1,622.45 | 11,274.17 | 1,871.09 | 2,009.05 | 13.56% | 9.95% | 5.77% | 2.11% |
| 10/31/2001 | 5,711.72 | 81,572.51 | 17,315.46 | 57,735.27 | 963.00 | 5,160.18 | 1,046.15 | 1,185.26 | 16.86% | 6.33% | 6.04% | 2.05% |
| 11/30/2001 | 7,240.62 | 95,003.69 | 18,082.10 | 64,741.20 | 906.77 | 3,988.60 | 1,045.24 | 1,377.66 | 12.52% | 4.20% | 5.78% | 2.13% |
| 12/31/2001 | 5,856.39 | 123,658.67 | 20,955.99 | 82,643.39 | 1,797.30 | 9,908.41 | 1,279.79 | 1,675.30 | 30.69% | 8.01% | 6.11% | 2.03% |
| Total 2001 | 91,387.66 | 1,042,569.76 | 236,753.45 | 748,587.62 | 13,879.15 | 64,826.81 | 14,089.71 | 16,387.99 | 15.19% | 6.22% | 5.95% | 2.19% |

Totals:
1st Year   78,705.96
Renewal   30,477.70

Exhibit B
AFLAC Commissions    2002

Monthly Accounting Statements

| Month End | Premium Collected | | | | Commission Earned | | | | Commission Earned | | | |
| | 1st Year | | Renewal | | 1st Year | | Renewal | | 1st Year | | Renewal | |
| | Personal | Override | Personal | Override | Personal | Override | Personal | Override | Personal | Override | Personal | Override |
| 1/31/2002 | 5,893.89 | 107,498.15 | 23,392.70 | 88,336.48 | 775.39 | 4,886.76 | 1,374.03 | 1,823.30 | 13.16% | 4.55% | 5.87% | 2.06% |
| 2/28/2002 | 842.60 | 94,965.31 | 9,064.74 | 64,329.57 | 332.37 | 1,179.89 | 632.19 | 1,315.75 | 39.45% | 1.24% | 6.97% | 2.05% |
| 3/31/2002 | 1,666.09 | 117,067.75 | 26,059.35 | 106,815.43 | 281.72 | 1,941.65 | 1,454.76 | 2,031.03 | 16.91% | 1.66% | 5.58% | 1.90% |
| 4/30/2002 | 745.88 | 101,689.88 | 37,636.90 | 131,744.76 | (180.68) | 1,867.18 | 1,979.69 | 2,461.60 | -24.22% | 1.84% | 5.26% | 1.87% |
| 5/31/2002 | 307.23 | 66,966.72 | 4,042.56 | 54,308.50 | (2.80) | 925.16 | 258.30 | 1,056.45 | -0.91% | 1.38% | 6.39% | 1.95% |
| 6/30/2002 | 1,489.12 | 121,397.80 | 45,423.19 | 170,998.92 | 365.73 | 2,674.72 | 2,444.30 | 3,212.65 | 24.56% | 2.20% | 5.38% | 1.88% |
| 7/31/2002 | 677.27 | 68,771.85 | 22,039.13 | 106,349.99 | 74.96 | 1,211.80 | 1,195.28 | 2,005.75 | 11.07% | 1.76% | 5.42% | 1.89% |
| 8/31/2002 | 734.57 | 62,263.62 | 22,283.20 | 107,228.28 | 433.50 | 1,080.59 | 1,221.58 | 2,023.57 | 59.01% | 1.74% | 5.48% | 1.89% |
| 9/30/2002 | 872.23 | 58,145.12 | 22,935.08 | 126,249.05 | 65.01 | 1,288.71 | 1,261.57 | 2,346.63 | 7.45% | 2.22% | 5.50% | 1.86% |
| 10/31/2002 | 1,006.12 | 41,977.64 | 23,584.64 | 117,681.77 | 3,149.18 | 734.55 | 1,286.95 | 2,199.65 | 313.00% | 1.75% | 5.46% | 1.87% |
| 11/30/2002 | 645.84 | 32,481.49 | 21,124.64 | 116,779.68 | 147.21 | 521.44 | 1,122.21 | 2,117.82 | 22.79% | 1.61% | 5.31% | 1.81% |
| 12/31/2002 | 2,248.69 | 33,028.01 | 24,786.35 | 159,907.66 | 2.46 | 724.10 | 1,360.37 | 2,912.32 | 0.11% | 2.19% | 5.49% | 1.82% |
| Total 2002 | 17,149.53 | 906,253.34 | 282,372.48 | 1,350,730.09 | 5,444.05 | 19,036.55 | 15,591.23 | 25,506.52 | 31.74% | 2.10% | 5.52% | 1.89% |

Exhibit C

Attrition Analysis

| | 1st Year | | | | | | | | | Renewals | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Prev Mo In Force | New Issues | Conversions | Reinstated | Lapsed | Duration Changes | In Force EOM | Conversions less Reinstated lapsed | Percent attrition | Prev Mo In Force | New issues | Conversions | Reinstated | Lapsed | Duration Changes | In Force EOM | Conversions less Reinstated lapsed | Percent attrition |
| 1/31/2001 | 1,267,911 | 63,497 | 849 | 2,263 | (26,483) | (17,915) | 1,290,122 | (23,371) | -1.84% | 273,706 | - | 1,009 | 156 | (4,102) | 17,915 | 288,684 | (2,937) | -1.07% |
| 2/28/2001 | 1,290,122 | 76,233 | 216 | 3,075 | (46,452) | (32,790) | 1,290,404 | (43,161) | -3.35% | 288,684 | - | 18 | 931 | (9,142) | 32,790 | 313,281 | (8,193) | -2.84% |
| 3/31/2001 | 1,290,404 | 111,057 | (60) | 3,341 | (33,741) | (204,257) | 1,166,744 | (30,460) | -2.36% | 313,281 | - | - | 1,232 | (3,939) | 204,257 | 514,831 | (2,707) | -0.86% |
| 4/30/2001 | 1,166,744 | 82,534 | (119) | 3,883 | (31,304) | (15,093) | 1,206,655 | (27,530) | -2.36% | 514,831 | - | 312 | 368 | (6,691) | 15,093 | 523,913 | (6,011) | -1.17% |
| 5/31/2001 | 1,206,655 | 139,642 | 284 | 3,506 | (29,049) | (22,392) | 1,298,646 | (25,259) | -2.09% | 523,913 | - | 34 | 596 | (2,645) | 22,392 | 544,290 | (2,015) | -0.38% |
| 6/30/2001 | 1,298,646 | 206,572 | 455 | 3,318 | (153,708) | (22,545) | 1,330,868 | (151,805) | -11.69% | 544,290 | - | 134 | 2,735 | (13,541) | 22,545 | 556,163 | (10,672) | -1.96% |
| 7/31/2001 | 1,330,868 | 70,910 | (3,316) | 1,448 | (65,496) | (33,151) | 1,303,133 | (65,494) | -4.92% | 556,163 | - | 3,998 | 2,107 | (4,637) | 33,151 | 590,782 | 1,468 | 0.26% |
| 8/31/2001 | 1,303,133 | 79,739 | 84 | 1,579 | (33,966) | (25,171) | 1,325,398 | (32,303) | -2.48% | 590,782 | - | 212 | 1,144 | (6,795) | 25,171 | 610,514 | (5,439) | -0.92% |
| 9/30/2001 | 1,325,398 | 279,355 | 692 | 3,890 | (44,880) | (35,521) | 1,528,934 | (40,298) | -3.04% | 610,514 | - | 500 | 931 | (8,572) | 35,521 | 638,894 | (7,141) | -1.17% |
| 10/31/2001 | 1,528,934 | 179,638 | 1,785 | 1,651 | (51,035) | (27,604) | 1,633,387 | (47,599) | -3.11% | 638,894 | - | 879 | 844 | (7,943) | 27,604 | 660,278 | (6,220) | -0.97% |
| 11/30/2001 | 1,633,387 | 112,198 | 300 | 3,204 | (61,764) | (38,773) | 1,648,532 | (58,260) | -3.57% | 660,278 | - | - | 1,389 | (19,739) | 38,773 | 680,701 | (18,350) | -2.78% |
| 12/31/2001 | 1,648,532 | 249,630 | - | 6,971 | (74,377) | (82,179) | 1,748,577 | (67,406) | -4.09% | 680,701 | - | - | 4,412 | (10,543) | 82,179 | 758,749 | (6,131) | -0.90% |
| Avg in force | 1,357,560 | | 1,170 | 38,139 | (652,255) | | | (612,946) | -45.15% | 516,336 | | 7,096 | 16,845 | (98,289) | | | (74,348) | -14.40% |

BISD December Enrollment Estimation
Exhibit D

| U2181 | | Ninthly | |
|---|---|---|---|
| Date | | | |
| | 1/11/2002 | | $6,425.40 |
| | 12/11/2001 | | 2,685.98 |
| Difference | | | 3,739.42 |
| periods | | | 9.00 |
| Annual | | | 33,654.78 |

| AG986 | | Bi-weekly then Monthly | |
|---|---|---|---|
| | 4/23/2002 | | 5,598.50 |
| New | | | - |
| Difference | | | 5,598.50 |
| periods | | | 12.00 |
| | | | 67,182.00 |

| L5864 | | Monthly | |
|---|---|---|---|
| | 2/11/2002 | | 75,148.42 |
| | 11/1/2001 | | 44,826.88 |
| Difference | | | 30,321.54 |
| periods | | | 12.00 |
| | | | 363,858.48 |

| Total Annual New Business | 464,695.26 |
|---|---|
| as percent of Chavez total (below) | 23.34% |

| Less credit given to Chavez: | |
|---|---|
| Week 52 Mktg Total | 1,668,501.00 |
| Week 50 Mktg Total | 1,525,914.00 |
| Increase | 142,587.00 |

| If assume no credit for no other accounts, rather 100% from BISD | |
|---|---|
| Lost | $322,108.26 |

| Projected 2001 Annualized Premiums | $1,990,609.26 |
|---|---|

Exhibit E

## Year-by-Year Projections of RSC Commissions Lost
### at a long-term sales growth rate of 20.00%

| Year | Number | Lost Commissions | Present Value | Cumulative Pres. Value | Less Cumulative Expenses Present Value | Present Value Cumulative Net Loss |
|---|---|---|---|---|---|---|
| 2002 | 1.00 | $ 185,460 | $ 152,635 | $ 152,635 | $ 50,151 | $ 102,484 |
| 2003 | 2.00 | $ 248,756 | $ 168,493 | $ 321,127 | $ 92,705 | $ 228,422 |
| 2004 | 3.00 | $ 320,938 | $ 178,909 | $ 500,036 | $ 128,813 | $ 371,223 |
| 2005 | 4.00 | $ 404,327 | $ 185,501 | $ 685,537 | $ 159,451 | $ 526,086 |
| 2006 | 5.00 | $ 501,628 | $ 189,408 | $ 874,945 | $ 185,448 | $ 689,497 |
| 2007 | 6.00 | $ 616,023 | $ 191,433 | $ 1,066,378 | $ 207,508 | $ 858,871 |
| 2008 | 7.00 | $ 751,271 | $ 192,141 | $ 1,258,520 | $ 226,225 | $ 1,032,294 |
| 2009 | 8.00 | $ 911,834 | $ 191,930 | $ 1,450,449 | $ 242,108 | $ 1,208,342 |
| 2010 | 9.00 | $ 1,103,026 | $ 191,080 | $ 1,641,530 | $ 255,584 | $ 1,385,946 |
| 2011 | 10.00 | $ 1,331,185 | $ 189,789 | $ 1,831,319 | $ 267,019 | $ 1,564,300 |
| 2012 | 11.00 | $ 1,603,888 | $ 188,196 | $ 2,019,515 | $ 276,722 | $ 1,742,793 |
| 2013 | 12.00 | $ 1,930,200 | $ 186,399 | $ 2,205,914 | $ 284,955 | $ 1,920,959 |
| 2014 | 13.00 | $ 2,320,978 | $ 184,465 | $ 2,390,379 | $ 291,941 | $ 2,098,438 |
| 2015 | 14.00 | $ 2,789,229 | $ 182,445 | $ 2,572,824 | $ 297,868 | $ 2,274,955 |
| 2016 | 15.00 | $ 3,350,547 | $ 180,371 | $ 2,753,194 | $ 302,898 | $ 2,450,296 |
| 2017 | 16.00 | $ 4,023,628 | $ 178,267 | $ 2,931,461 | $ 307,166 | $ 2,624,295 |
| 2018 | 17.00 | $ 4,830,897 | $ 176,151 | $ 3,107,612 | $ 310,787 | $ 2,796,825 |
| 2019 | 18.00 | $ 5,799,254 | $ 174,033 | $ 3,281,646 | $ 313,860 | $ 2,967,785 |
| 2020 | 19.00 | $ 6,960,969 | $ 171,923 | $ 3,453,568 | $ 316,468 | $ 3,137,101 |
| 2021 | 20.00 | $ 8,354,758 | $ 169,825 | $ 3,623,393 | $ 318,680 | $ 3,304,713 |
| 2022 | 21.00 | $ 10,027,075 | $ 167,743 | $ 3,791,136 | $ 320,557 | $ 3,470,579 |
| 2023 | 22.00 | $ 12,033,659 | $ 165,680 | $ 3,956,817 | $ 322,150 | $ 3,634,667 |
| 2024 | 23.00 | $ 14,441,392 | $ 163,639 | $ 4,120,455 | $ 323,502 | $ 3,796,954 |
| 2025 | 24.00 | $ 17,330,527 | $ 161,619 | $ 4,282,074 | $ 324,648 | $ 3,957,426 |
| 2026 | 25.00 | $ 20,797,366 | $ 159,622 | $ 4,441,696 | $ 325,622 | $ 4,116,074 |

*Exhibit F*

## Year-by-Year Projections of RSC Commissions Lost at a long-term sales growth rate of 25.00%

| Year | Number | Lost Commissions | Present Value | Cumulative Pres. Value | Less Cumulative Expenses Present Value | Present Value Cumulative Net Loss |
|------|--------|------------------|---------------|------------------------|----------------------------------------|-----------------------------------|
| 2002 | 1.00 | $ 193,187 | $ 158,995 | $ 158,995 | $ 50,151 | $ 108,844 |
| 2003 | 2.00 | $ 268,780 | $ 182,056 | $ 341,050 | $ 92,705 | $ 248,345 |
| 2004 | 3.00 | $ 359,341 | $ 200,317 | $ 541,367 | $ 128,813 | $ 412,554 |
| 2005 | 4.00 | $ 469,177 | $ 215,254 | $ 756,620 | $ 159,451 | $ 597,169 |
| 2006 | 5.00 | $ 603,593 | $ 227,909 | $ 984,529 | $ 185,448 | $ 799,081 |
| 2007 | 6.00 | $ 769,146 | $ 239,017 | $ 1,223,546 | $ 207,508 | $ 1,016,038 |
| 2008 | 7.00 | $ 973,978 | $ 249,099 | $ 1,472,645 | $ 226,225 | $ 1,246,420 |
| 2009 | 8.00 | $ 1,228,210 | $ 258,523 | $ 1,731,169 | $ 242,108 | $ 1,489,061 |
| 2010 | 9.00 | $ 1,544,455 | $ 267,550 | $ 1,998,719 | $ 255,584 | $ 1,743,135 |
| 2011 | 10.00 | $ 1,938,438 | $ 276,366 | $ 2,275,085 | $ 267,019 | $ 2,008,066 |
| 2012 | 11.00 | $ 2,429,783 | $ 285,105 | $ 2,560,190 | $ 276,722 | $ 2,283,468 |
| 2013 | 12.00 | $ 3,042,994 | $ 293,861 | $ 2,854,050 | $ 284,955 | $ 2,569,096 |
| 2014 | 13.00 | $ 3,808,677 | $ 302,704 | $ 3,156,754 | $ 291,941 | $ 2,864,813 |
| 2015 | 14.00 | $ 4,765,071 | $ 311,685 | $ 3,468,439 | $ 297,868 | $ 3,170,571 |
| 2016 | 15.00 | $ 5,959,955 | $ 320,843 | $ 3,789,283 | $ 302,898 | $ 3,466,385 |
| 2017 | 16.00 | $ 7,453,040 | $ 330,208 | $ 4,119,490 | $ 307,166 | $ 3,812,324 |
| 2018 | 17.00 | $ 9,318,950 | $ 339,800 | $ 4,459,291 | $ 310,787 | $ 4,148,503 |
| 2019 | 18.00 | $ 11,650,955 | $ 349,641 | $ 4,808,931 | $ 313,860 | $ 4,495,071 |
| 2020 | 19.00 | $ 14,565,636 | $ 359,744 | $ 5,168,675 | $ 316,468 | $ 4,852,207 |
| 2021 | 20.00 | $ 18,208,707 | $ 370,123 | $ 5,538,798 | $ 318,680 | $ 5,220,118 |
| 2022 | 21.00 | $ 22,762,306 | $ 380,791 | $ 5,919,589 | $ 320,557 | $ 5,599,032 |
| 2023 | 22.00 | $ 28,454,100 | $ 391,759 | $ 6,311,347 | $ 322,150 | $ 5,989,197 |
| 2024 | 23.00 | $ 35,568,668 | $ 403,037 | $ 6,714,384 | $ 323,502 | $ 6,390,883 |
| 2025 | 24.00 | $ 44,461,727 | $ 414,636 | $ 7,129,020 | $ 324,648 | $ 6,804,371 |
| 2026 | 25.00 | $ 55,577,922 | $ 426,566 | $ 7,555,586 | $ 325,622 | $ 7,229,964 |

*Exhibit G*

## Year-by-Year Projections of RSC Commissions Lost at a long-term sales growth rate of 30.00%

| Year | Number | Lost Commissions | Present Value | Cumulative Pres. Value | Less Cumulative Expenses Present Value | Present Value Cumulative Net Loss |
|---|---|---|---|---|---|---|
| 2002 | 1.00 | $ 200,915 | $ 165,354 | $ 165,354 | $ 50,151 | $ 115,203 |
| 2003 | 2.00 | $ 289,577 | $ 196,142 | $ 361,497 | $ 92,705 | $ 268,792 |
| 2004 | 3.00 | $ 400,751 | $ 223,401 | $ 584,897 | $ 128,813 | $ 456,084 |
| 2005 | 4.00 | $ 541,777 | $ 248,562 | $ 833,459 | $ 159,451 | $ 674,008 |
| 2006 | 5.00 | $ 722,116 | $ 272,661 | $ 1,106,120 | $ 185,448 | $ 920,672 |
| 2007 | 6.00 | $ 953,992 | $ 296,459 | $ 1,402,579 | $ 207,508 | $ 1,195,072 |
| 2008 | 7.00 | $ 1,253,237 | $ 320,521 | $ 1,723,100 | $ 226,225 | $ 1,496,875 |
| 2009 | 8.00 | $ 1,640,376 | $ 345,279 | $ 2,068,379 | $ 242,108 | $ 1,826,272 |
| 2010 | 9.00 | $ 2,142,048 | $ 371,073 | $ 2,439,452 | $ 255,584 | $ 2,183,868 |
| 2011 | 10.00 | $ 2,792,846 | $ 398,181 | $ 2,837,633 | $ 267,019 | $ 2,570,614 |
| 2012 | 11.00 | $ 3,637,705 | $ 426,839 | $ 3,264,473 | $ 276,722 | $ 2,987,751 |
| 2013 | 12.00 | $ 4,735,012 | $ 457,258 | $ 3,721,731 | $ 284,955 | $ 3,436,776 |
| 2014 | 13.00 | $ 6,160,649 | $ 489,632 | $ 4,211,363 | $ 291,941 | $ 3,919,422 |
| 2015 | 14.00 | $ 8,013,237 | $ 524,149 | $ 4,735,512 | $ 297,868 | $ 4,437,643 |
| 2016 | 15.00 | $ 10,420,969 | $ 560,994 | $ 5,296,506 | $ 302,898 | $ 4,993,608 |
| 2017 | 16.00 | $ 13,550,479 | $ 600,355 | $ 5,896,861 | $ 307,166 | $ 5,589,695 |
| 2018 | 17.00 | $ 17,618,379 | $ 642,426 | $ 6,539,287 | $ 310,787 | $ 6,228,499 |
| 2019 | 18.00 | $ 22,906,251 | $ 687,408 | $ 7,226,694 | $ 313,860 | $ 6,912,834 |
| 2020 | 19.00 | $ 29,780,146 | $ 735,513 | $ 7,962,208 | $ 316,468 | $ 7,645,740 |
| 2021 | 20.00 | $ 38,715,918 | $ 786,967 | $ 8,749,175 | $ 318,680 | $ 8,430,495 |
| 2022 | 21.00 | $ 50,332,173 | $ 842,008 | $ 9,591,182 | $ 320,557 | $ 9,270,625 |
| 2023 | 22.00 | $ 65,433,091 | $ 900,889 | $ 10,492,071 | $ 322,150 | $ 10,169,921 |
| 2024 | 23.00 | $ 85,064,103 | $ 963,881 | $ 11,455,952 | $ 323,502 | $ 11,132,450 |
| 2025 | 24.00 | $ 110,584,262 | $ 1,031,273 | $ 12,487,225 | $ 324,648 | $ 12,162,576 |
| 2026 | 25.00 | $ 143,760,335 | $ 1,103,374 | $ 13,590,599 | $ 325,622 | $ 13,264,977 |

# RSC INCOME EXAMPLE WORKSHEET - Supplemental Sales

| | 2002 Income | 2003 Income | 2004 Income | 2005 Income |
|---|---|---|---|---|
| NEW SALES | 2,587,792 | 3,364,130 | 4,373,369 | 5,685,379 |
| 1st Yr - Commissions | 200,915 | 261,189 | 339,546 | 441,410 |
| Yr-1 - Renewals | | 1,419,404 | 1,845,225 | 2,398,793 |
| Commissions | | 28,388 | 36,905 | 47,976 |
| Yr-2 - Renewals | | | 1,215,010 | 1,579,513 |
| Commissions | | | 24,300 | 31,590 |
| Yr-3 - Renewals | | | | 1,040,048 |
| Commissions | | | | 20,801 |
| Yr-4 - Renewals | | | | |
| Commissions | | | | |
| Yr-5 - Renewals | | | | |
| Commissions | | | | |
| Yr-6 - Renewals | | | | |
| Commissions | | | | |
| Yr-7 - Renewals | | | | |
| Commissions | | | | |
| Yr-8 - Renewals | | | | |
| Commissions | | | | |
| Yr-9 - Renewals | | | | |
| Commissions | | | | |
| Yr-10 - Renewals | | | | |
| Commissions | | | | |
| Yr-11 - Renewals | | | | |
| Commissions | | | | |
| Yr-12 - Renewals | | | | |
| Commissions | | | | |
| Yr-13 - Renewals | | | | |
| Commissions | | | | |
| Yr-14 - Renewals | | | | |
| Commissions | | | | |
| Yr-15 - Renewals | | | | |
| Commissions | | | | |
| Yr-16 - Renewals | | | | |
| Commissions | | | | |
| Yr-17 - Renewals | | | | |
| Commissions | | | | |
| Yr-18 - Renewals | | | | |
| Commissions | | | | |
| Yr-19 - Renewals | | | | |
| Commissions | | | | |
| Yr-20 - Renewals | | | | |
| Commissions | | | | |
| Yr-21 - Renewals | | | | |
| Commissions | | | | |
| Yr-22 - Renewals | | | | |
| Commissions | | | | |
| Yr-23 - Renewals | | | | |
| Commissions | | | | |
| Yr-24 - Renewals | | | | |
| Commissions | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Total Income | | | 200,915 | | 289,577 | | 400,751 | | 541,777 |
| Growth Rate in Total Income | | | 44.13% | | 38.39% | | 35.19% | | |

## HIGHLIGHTS

| | | | |
|---|---|---|---|
| Annual renewal income as of year 25 | 34,703,583 | | |
| Real renewal, yr 25, inflation at | 16,177,361 | 3.1% | |
| Total 25 years ("hash" total only, no economic meaning) | 621,650,344 | | |
| Present Value at | 21.506% | $13,590,599 | |
| Annual expenses | $ 59,104.00 | | |
| Expenses P.V. at | 17.852% | N.D.R. | $325,621.60 |
| Assumed inflation | 3.100% | | |
| Present Value | | | $13,264,977.08 | TOTAL |

## Calculation of Discount Rate

**Size- Adjusted CAPM method**

| | | |
|---|---|---|
| Risk-Free | 5.210% | SBBI for NYSE, 2000 Valuation Yearbook |
| Equity Risk premium | 7.13% | SBBI for NYSE, 2000 Valuation Yearbook |
| AFLAC Beta | 75.00% | Yahoo Finance |
| AFLAC Beta | 89.00% | Business week |
| Higher Beta | 89.00% | Business week |
| Beta x Equity Risk | 6.35% | |
| Size-Premium | 3.95% | 10th decile NYSE, SBBI for NYSE, 2000 Valuation Yearbook |
| Company +add'l size | 6.00% | |
| TOTAL | 21.506% | |

## ASSUMPTIONS

| | | |
|---|---|---|
| Attrition Rate for First Year | 45.15% | |
| Attrition Rate for Subsequen | 14.40% | |
| First Year Commission Rate | 7.76% | |
| Renewal Years Commission | 2% | |
| New Sales Growth Rate ( 57.7% avg | see below | |
| New Sales in 2001 (BASE) | $1,990,609 | |
| Discount rate | 21.506% | |

| | Year | Growth | Lafemina tes |
|---|---|---|---|
| Actual | 2000 | 67.33% | |
| Actual | 2001 | 75.78% | |
| Projection | 2002 | 30.00% | |
| Projection | 2003 | 30.00% | |
| Projection | 2004 | 30.00% | |
| Projection | Future | 30.00% | |

| | Year | Growth | |
|---|---|---|---|
| Actual | 2000 | 67.33% | |
| Actual | 2001 | 75.78% | |
| Projection | 2002 | 30.00% | |
| Projection | 2003 | 30.00% | |
| Projection | 2004 | 30.00% | |
| Projection | Future | 30.00% | Lafemina testimony: 20% to 30% |

**Exhibit**

Year-by-Year Projections of RSC Commissions Lost
at a long-term sales growth rate of  30.00%

| Year | Number | Lost Commissions | Present Value | Cumulative Pres. Value | Less Cumulative Expenses Present Value | Present Value Cumulative Net Loss |
|---|---|---|---|---|---|---|
| 2002 | 1.00 | $ 200,915 | $ 165,354 | $ 165,354 | $ 50,151 | $ 115,203 |
| 2003 | 2.00 | $ 289,577 | $ 196,142 | $ 361,497 | $ 92,705 | $ 268,792 |
| 2004 | 3.00 | $ 400,751 | $ 223,401 | $ 584,897 | $ 128,813 | $ 456,084 |
| 2005 | 4.00 | $ 541,777 | $ 248,562 | $ 833,459 | $ 159,451 | $ 674,008 |
| 2006 | 5.00 | $ 722,116 | $ 272,661 | $ 1,106,120 | $ 185,448 | $ 920,672 |
| 2007 | 6.00 | $ 953,992 | $ 296,459 | $ 1,402,579 | $ 207,508 | $ 1,195,072 |
| 2008 | 7.00 | $ 1,253,237 | $ 320,521 | $ 1,723,100 | $ 226,225 | $ 1,496,875 |
| 2009 | 8.00 | $ 1,640,376 | $ 345,279 | $ 2,068,379 | $ 242,108 | $ 1,826,272 |
| 2010 | 9.00 | $ 2,142,048 | $ 371,073 | $ 2,439,452 | $ 255,584 | $ 2,183,868 |
| 2011 | 10.00 | $ 2,792,846 | $ 398,181 | $ 2,837,633 | $ 267,019 | $ 2,570,614 |
| 2012 | 11.00 | $ 3,637,705 | $ 426,839 | $ 3,264,473 | $ 276,722 | $ 2,987,751 |
| 2013 | 12.00 | $ 4,735,012 | $ 457,258 | $ 3,721,731 | $ 284,955 | $ 3,436,776 |
| 2014 | 13.00 | $ 6,160,649 | $ 489,632 | $ 4,211,363 | $ 291,941 | $ 3,919,422 |
| 2015 | 14.00 | $ 8,013,237 | $ 524,149 | $ 4,735,512 | $ 297,868 | $ 4,437,643 |
| 2016 | 15.00 | $ 10,420,969 | $ 560,994 | $ 5,296,506 | $ 302,898 | $ 4,993,608 |
| 2017 | 16.00 | $ 13,550,479 | $ 600,355 | $ 5,896,861 | $ 307,166 | $ 5,589,695 |
| 2018 | 17.00 | $ 17,618,379 | $ 642,426 | $ 6,539,287 | $ 310,787 | $ 6,228,499 |
| 2019 | 18.00 | $ 22,906,251 | $ 687,408 | $ 7,226,694 | $ 313,860 | $ 6,912,834 |
| 2020 | 19.00 | $ 29,780,146 | $ 735,513 | $ 7,962,208 | $ 316,468 | $ 7,645,740 |
| 2021 | 20.00 | $ 38,715,918 | $ 786,967 | $ 8,749,175 | $ 318,680 | $ 8,430,495 |
| 2022 | 21.00 | $ 50,332,173 | $ 842,008 | $ 9,591,182 | $ 320,557 | $ 9,270,625 |
| 2023 | 22.00 | $ 65,433,091 | $ 900,889 | $ 10,492,071 | $ 322,150 | $ 10,169,921 |
| 2024 | 23.00 | $ 85,064,103 | $ 963,881 | $ 11,455,952 | $ 323,502 | $ 11,132,450 |
| 2025 | 24.00 | $ 110,584,262 | $ 1,031,273 | $ 12,487,225 | $ 324,648 | $ 12,162,576 |
| 2026 | 25.00 | $ 143,760,335 | $ 1,103,374 | $ 13,590,599 | $ 325,622 | $ 13,264,977 |

| 2006 | Income | 2007 | Income | 2008 | Income | 2009 | Income |
|---|---|---|---|---|---|---|---|
| 7,390,993 | 573,833 | 9,608,291 | 745,983 | 12,490,778 | 963,778 | 16,238,011 | 1,260,71 |
| 3,118,430 | 62,369 | 4,053,960 | 81,079 | 5,270,147 | 105,403 | 6,851,192 | 137,02 |
| 2,053,367 | 41,067 | 2,669,376 | 53,388 | 3,470,189 | 69,404 | 4,511,246 | 90,22 |
| 1,352,063 | 27,041 | 1,757,682 | 35,154 | 2,284,986 | 45,700 | 2,970,482 | 59,41 |
| 890,281 | 17,806 | 1,157,366 | 23,147 | 1,504,576 | 30,092 | 1,955,948 | 39,19 |
| | | 762,081 | 15,242 | 990,705 | 19,814 | 1,287,917 | 25,75 |
| | | | | 652,341 | 13,047 | 848,044 | 16,96 |
| | | | | | | 558,404 | 11,15 |



| | |
|---|---|
| 33.29% | |
| | 722,116 |
| 32.11% | |
| | 953,992 |
| 31.37% | |
| | 1,253,237 |
| 30.89% | |
| | 1,640,376 |
| 30.58% | |
| | 2,142,048 |
| 30.38% | |
| | 2,792,846 |

nt Renewals

e, includes 1st year rate, stock bonus and RSC performance bonus, less Manager's Incentive Fund contribution of 0.5%

1 Rate

e rate for 1999 - 2001)

stimony: 20% to 30%

|  | Rate | Portion | Effective |
|---|---|---|---|
| 1st yr | 6.22% | 100.00% | 6.22% |
| Stock bonus | 0.70% | 54.85% | 0.38% |
| RSC Performance Bonus | 1.66% | 100.00% | 1.66% |
| Manager's Incentive Fund Contrib. |  | 100.00% | -0.50% |
| TOTAL |  |  | 7.76% |



| 2012 | Income | 2013 | Income | 2014 | Income | 2015 | Income | 2016 | Income |
|---|---|---|---|---|---|---|---|---|---|
| 35,674,911 | 2,769,782 | 46,377,384 | 3,600,717 | 60,290,599 | 4,680,932 | 78,377,779 | 6,085,212 | 101,891,113 | 7,910,775 |
| 15,052,068 | 301,041 | 19,567,689 | 391,354 | 25,437,995 | 508,760 | 33,069,394 | 661,388 | 42,990,212 | 859,804 |
| 9,911,208 | 198,224 | 12,884,570 | 257,691 | 16,749,941 | 334,999 | 21,774,924 | 435,498 | 28,307,401 | 566,148 |
| 6,526,149 | 130,523 | 8,483,994 | 169,680 | 11,029,192 | 220,584 | 14,337,950 | 286,759 | 18,639,335 | 372,787 |
| 4,297,218 | 85,944 | 5,586,384 | 111,728 | 7,262,299 | 145,246 | 9,440,989 | 188,820 | 12,273,285 | 245,466 |
| 2,829,553 | 56,591 | 3,678,419 | 73,568 | 4,781,944 | 95,639 | 6,216,528 | 124,331 | 8,081,486 | 161,630 |
| 1,863,152 | 37,263 | 2,422,097 | 48,442 | 3,148,727 | 62,975 | 4,093,344 | 81,867 | 5,321,348 | 106,427 |
| 1,226,814 | 24,536 | 1,594,858 | 31,897 | 2,073,315 | 41,466 | 2,695,310 | 53,906 | 3,503,903 | 70,078 |
| 807,810 | 16,156 | 1,050,153 | 21,003 | 1,365,198 | 27,304 | 1,774,758 | 35,495 | 2,307,185 | 46,144 |
| 531,912 | 10,638 | 691,485 | 13,830 | 898,931 | 17,979 | 1,168,610 | 23,372 | 1,519,193 | 30,384 |
| 350,243 | 7,005 | 455,316 | 9,106 | 591,911 | 11,838 | 769,485 | 15,390 | 1,000,330 | 20,007 |
| | | 299,808 | 5,996 | 389,751 | 7,795 | 506,676 | 10,134 | 658,679 | 13,174 |
| | | | | 256,636 | 5,133 | 333,627 | 6,673 | 433,715 | 8,674 |
| | | | | | | 219,680 | 4,394 | 285,584 | 5,712 |
| | | | | | | | | 188,046 | 3,761 |

| | | |
|---|---|---|
| 30.25% | | 3,637,705 |
| 30.16% | | 4,735,012 |
| 30.11% | | 6,160,649 |
| 30.07% | | 8,013,237 |
| 30.05% | | 10,420,969 |





| 2017 | Income | 2018 | Income | 2019 | Income | 2020 |
|---|---|---|---|---|---|---|
| 132,458,446 | | 172,195,980 | | 223,854,774 | | 291,011,2 |
| | 10,284,008 | | 13,369,210 | | 17,379,973 | |
| 55,887,275 | | 72,653,458 | | 94,449,495 | | 122,784,3 |
| | 1,717,746 | | 1,453,069 | | 1,888,990 | |
| 36,799,621 | | 47,839,508 | | 62,191,360 | | 80,848,7 |
| | 735,992 | | 956,790 | | 1,243,827 | |
| 24,231,135 | | 31,500,476 | | 40,950,619 | | 53,235,8 |
| | 484,623 | | 630,010 | | 819,012 | |
| 15,955,271 | | 20,741,852 | | 26,964,407 | | 35,053,7 |
| | 319,105 | | 414,837 | | 539,288 | |
| 10,505,932 | | 13,657,712 | | 17,755,025 | | 23,081,5 |
| | 210,119 | | 273,154 | | 355,101 | |
| 6,917,752 | | 8,993,078 | | 11,691,001 | | 15,198,3 |
| | 138,355 | | 179,862 | | 233,820 | |
| 4,555,074 | | 5,921,596 | | 7,698,075 | | 10,007,4 |
| | 91,101 | | 118,432 | | 153,961 | |
| 2,999,341 | | 3,899,143 | | 5,068,886 | | 6,589,5 |
| | 59,987 | | 77,983 | | 101,378 | |
| 1,974,951 | | 2,567,436 | | 3,337,667 | | 4,338,9 |
| | 39,499 | | 51,349 | | 66,753 | |
| 1,300,429 | | 1,690,558 | | 2,197,725 | | 2,857,0 |
| | 26,009 | | 33,811 | | 43,955 | |
| 856,282 | | 1,113,167 | | 1,447,117 | | 1,881,2 |
| | 17,126 | | 22,263 | | 28,942 | |
| 563,829 | | 732,978 | | 952,871 | | 1,238,7 |
| | 11,277 | | 14,660 | | 19,057 | |
| 371,260 | | 482,638 | | 627,429 | | 815,6 |
| | 7,425 | | 9,653 | | 12,549 | |
| 244,460 | | 317,798 | | 413,138 | | 537,0 |
| | 4,889 | | 6,356 | | 8,263 | |
| 160,968 | | 209,258 | | 272,035 | | 353,6 |
| | 3,219 | | 4,185 | | 5,441 | |
| | | 137,788 | | 179,125 | | 232,8 |
| | | | 2,756 | | 3,582 | |
| | | | | 117,947 | | 153,3 |
| | | | | | 2,359 | |
| | | | | | | 100,9 |

| | | |
|---|---|---|
| 30.03% | 13,550,479 | |
| 30.02% | 17,618,379 | |
| 30.01% | 22,906,251 | |
| 30.01% | 29,780,146 | |
| 30.01% | 38,715,918 | |
| 30.00% | 50,332,173 | |
| 30.00% | | |



| Income | 2024 | Income | 2025 | Income | 2026 | Income | TOTAL |
|---|---|---|---|---|---|---|---|
| 49,638,940 | 831,157,108 | 64,530,622 | 1,080,504,240 | 83,889,809 | 1,404,655,512 | 109,056,752 | 6,078,214,578 |
| 5,395,144 | 350,684,364 | 7,013,687 | 455,889,674 | 9,117,793 | 592,656,576 | 11,853,132 | |
| 3,552,495 | 230,912,166 | 4,618,243 | 300,185,816 | 6,003,716 | 390,241,561 | 7,804,831 | |
| 2,339,181 | 152,046,780 | 3,040,936 | 197,660,814 | 3,953,216 | 256,959,058 | 5,139,181 | |
| 1,540,261 | 100,116,957 | 2,002,339 | 130,152,044 | 2,603,041 | 169,197,657 | 3,383,953 | |
| 1,014,203 | 65,923,165 | 1,318,463 | 85,700,115 | 1,714,002 | 111,410,149 | 2,228,203 | |
| 667,813 | 43,407,869 | 868,157 | 56,430,230 | 1,128,605 | 73,359,298 | 1,467,186 | |
| 439,729 | 28,582,412 | 571,648 | 37,157,136 | 743,143 | 48,304,276 | 966,086 | |
| 289,545 | 18,820,419 | 376,408 | 24,466,545 | 489,331 | 31,806,508 | 636,130 | |
| 190,654 | 12,392,522 | 247,850 | 16,110,279 | 322,206 | 20,943,362 | 418,867 | |
| 125,538 | 8,159,999 | 163,200 | 10,607,999 | 212,160 | 13,790,399 | 275,808 | |
| 82,662 | 5,373,046 | 107,461 | 6,984,959 | 139,699 | 9,080,447 | 181,609 | |
| 54,430 | 3,537,944 | 70,759 | 4,599,327 | 91,987 | 5,979,125 | 119,583 | |
| 35,840 | 2,329,600 | 46,592 | 3,028,480 | 60,570 | 3,937,024 | 78,740 | |
| 23,599 | 1,533,952 | 30,679 | 1,994,138 | 39,883 | 2,592,379 | 51,848 | |
| 15,539 | 1,010,048 | 20,201 | 1,313,063 | 26,261 | 1,706,982 | 34,140 | |
| 10,232 | 665,078 | 13,302 | 864,601 | 17,292 | 1,123,982 | 22,480 | |
| 6,737 | 437,928 | 8,759 | 569,307 | 11,386 | 740,099 | 14,802 | |
| 4,436 | 288,359 | 5,767 | 374,867 | 7,497 | 487,327 | 9,747 | |
| 2,921 | 189,873 | 3,797 | 246,835 | 4,937 | 320,886 | 6,418 | |
| 1,923 | 125,024 | 2,500 | 162,532 | 3,251 | 211,291 | 4,226 | |
| 1,267 | 82,324 | 1,646 | 107,021 | 2,140 | 139,127 | 2,783 | |
| | 54,207 | 1,084 | 70,469 | 1,409 | 91,610 | 1,832 | |
| | | | 46,401 | 928 | 60,322 | 1,206 | |
| | | | | | 39,719 | 794 | |

| | |
|---|---|
| 65,433,091 | |
| | 30.00% |
| 85,064,103 | |
| | 30.00% |
| 110,584,262 | |
| | 30.00% |
| 143,760,335 | |
| 621,650,344 | |





# RSC INCOME EXAMPLE WORKSHEET - Supplemental Sales

| | 2002 | 2003 | Income | 2004 | Income | 2005 | Income |
|---|---|---|---|---|---|---|---|
| NEW SALES | 2,488,262 | 3,110,327 | | 3,887,909 | | 4,859,886 | |
| 1st Yr - Commissions | 193,187 | | 241,484 | | 301,855 | | 377,319 |
| Yr 1 - Renewals | | 1,364,811 | | 1,706,014 | | 2,132,518 | |
| Commissions | | | 27,296 | | 34,120 | | 42,650 |
| Yr 2 - Renewals | | | | 1,168,279 | | 1,460,348 | |
| Commissions | | | | | 23,366 | | 29,207 |
| Yr 3 - Renewals | | | | | | 1,000,047 | |
| Commissions | | | | | | | 20,001 |
| Yr 4 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 5 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 6 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 7 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 8 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 9 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 10 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 11 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 12 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 13 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 14 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 15 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 16 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 17 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 18 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 19 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 20 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 21 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 22 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 23 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 24 - Renewals | | | | | | | |
| Commissions | | | | | | | |

BACK uP
To
Exhibit F
25%

| | | | | | | |
|---|---|---|---|---|---|---|
| Total Income | 193,187 | | 268,780 | | 359,341 | | 469,177 |
| Growth Rate in Total Income | | 39.13% | | 33.69% | | 30.57% | |

**HIGHLIGHTS**

| | | |
|---|---|---|
| 14,668,902 | Annual renewal income as of year 25 | |
| 6,838,030 | Real renewal, yr 25, inflation at | 3.1% |
| 276,376,796 | Total 25 years ("hash" total only, no economic meaning) | |
| $7,555,586 | Present Value at | 21.506% |
| | Annual expenses | $ 59,104.00 |
| $325,621.60 | Expenses P.V. at | 17.852% N.D.R. |
| | Assumed inflation | 3.100% |
| $7,229,964.05 | Present Value | |

**ASSUMPTIONS**

| | |
|---|---|
| 45.15% | Attrition Rate for First Year |
| 14.40% | Attrition Rate for Subsequen |
| 7.76% | First Year Commission Rate |
| 2% | Renewal Years Commission |
| see below | New Sales Growth Rate (57.7% avg |
| $1,990,609 | New Sales in 2001 (BASE) |
| 21.506% | Discount rate |

| | Year | Growth | |
|---|---|---|---|
| Actual | 2000 | 67.33% | |
| Actual | 2001 | 75.78% | |
| Projection | 2002 | 25.00% | |
| Projection | 2003 | 25.00% | |
| Projection | 2004 | 25.00% | |
| Projection | Future | 25.00% | Lafemina tes |

**Calculation of Discount Rate**

Size-Adjusted CAPM method

| | | |
|---|---|---|
| Risk-Free | 5.210% | SBBI for NYSE, 2000 Valuation Yearbook |
| Equity Risk premium | 7.13% | SBBI for NYSE, 2000 Valuation Yearbook |
| AFLAC Beta | 75.00% | Yahoo Finance |
| AFLAC Beta | 89.00% | Business week |
| Higher Beta | 89.00% | Business week |
| Beta x Equity Risk | 6.35% | |
| Size-Premium | 3.95% | 10th decile NYSE, SBBI for NYSE, 2000 Valuation Yearbook |
| Company +add'l size | 6.00% | |
| TOTAL | 21.506% | |

| | Year | Growth | |
|---|---|---|---|
| Actual | 2000 | 67.33% | |
| Actual | 2001 | 75.78% | |
| Projection | 2002 | 25.00% | |
| Projection | 2003 | 25.00% | |
| Projection | 2004 | 25.00% | |
| Projection | Future | 25.00% | Lafemina testimony: 20% to 30% |

*Exhibit F*     Year-by-Year Projections of RSC Commissions Lost
at a long-term sales growth rate of   25.00%

| Year | Number | Lost Commissions | Present Value | Cumulative Pres. Value | Less Cumulative Expenses Present Value | Present Value Cumulative Net Loss |
|------|--------|------------------|---------------|------------------------|----------------------------------------|-----------------------------------|
| 2002 | 1.00 | $ 193,187 | $ 158,995 | $ 158,995 | $ 50,151 | $ 108,844 |
| 2003 | 2.00 | $ 268,780 | $ 182,056 | $ 341,050 | $ 92,705 | $ 248,345 |
| 2004 | 3.00 | $ 359,341 | $ 200,317 | $ 541,367 | $ 128,813 | $ 412,554 |
| 2005 | 4.00 | $ 469,177 | $ 215,254 | $ 756,620 | $ 159,451 | $ 597,169 |
| 2006 | 5.00 | $ 603,593 | $ 227,909 | $ 984,529 | $ 185,448 | $ 799,081 |
| 2007 | 6.00 | $ 769,146 | $ 239,017 | $ 1,223,546 | $ 207,508 | $ 1,016,038 |
| 2008 | 7.00 | $ 973,978 | $ 249,099 | $ 1,472,645 | $ 226,225 | $ 1,246,420 |
| 2009 | 8.00 | $ 1,228,210 | $ 258,523 | $ 1,731,169 | $ 242,108 | $ 1,489,061 |
| 2010 | 9.00 | $ 1,544,455 | $ 267,550 | $ 1,998,719 | $ 255,584 | $ 1,743,135 |
| 2011 | 10.00 | $ 1,938,438 | $ 276,366 | $ 2,275,085 | $ 267,019 | $ 2,008,066 |
| 2012 | 11.00 | $ 2,429,783 | $ 285,105 | $ 2,560,190 | $ 276,722 | $ 2,283,468 |
| 2013 | 12.00 | $ 3,042,994 | $ 293,861 | $ 2,854,050 | $ 284,955 | $ 2,569,096 |
| 2014 | 13.00 | $ 3,808,677 | $ 302,704 | $ 3,156,754 | $ 291,941 | $ 2,864,813 |
| 2015 | 14.00 | $ 4,765,071 | $ 311,685 | $ 3,468,439 | $ 297,868 | $ 3,170,571 |
| 2016 | 15.00 | $ 5,959,955 | $ 320,843 | $ 3,789,283 | $ 302,898 | $ 3,486,385 |
| 2017 | 16.00 | $ 7,453,040 | $ 330,208 | $ 4,119,490 | $ 307,166 | $ 3,812,324 |
| 2018 | 17.00 | $ 9,318,950 | $ 339,800 | $ 4,459,291 | $ 310,787 | $ 4,148,503 |
| 2019 | 18.00 | $ 11,650,955 | $ 349,641 | $ 4,808,931 | $ 313,860 | $ 4,495,071 |
| 2020 | 19.00 | $ 14,565,636 | $ 359,744 | $ 5,168,675 | $ 316,468 | $ 4,852,207 |
| 2021 | 20.00 | $ 18,208,707 | $ 370,123 | $ 5,538,798 | $ 318,680 | $ 5,220,118 |
| 2022 | 21.00 | $ 22,762,306 | $ 380,791 | $ 5,919,589 | $ 320,557 | $ 5,599,032 |
| 2023 | 22.00 | $ 28,454,100 | $ 391,759 | $ 6,311,347 | $ 322,150 | $ 5,989,197 |
| 2024 | 23.00 | $ 35,568,668 | $ 403,037 | $ 6,714,384 | $ 323,502 | $ 6,390,883 |
| 2025 | 24.00 | $ 44,461,727 | $ 414,636 | $ 7,129,020 | $ 324,648 | $ 6,804,371 |
| 2026 | 25.00 | $ 55,577,922 | $ 426,566 | $ 7,555,586 | $ 325,622 | $ 7,229,964 |

| 2006 | Income | 2007 | Income | 2008 | Income | 2009 | Income | 2010 | Income | 2011 | Income |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6,074,857 | 471,649 | 7,593,572 | 589,561 | 9,491,965 | 736,951 | 11,864,956 | 921,189 | 14,831,195 | 1,151,487 | 18,538,993 | 1,439,358 |
| 2,665,647 | 53,313 | 3,332,059 | 66,641 | 4,165,074 | 83,301 | 5,206,343 | 104,127 | 6,507,928 | 130,159 | 8,134,910 | 162,698 |
| 1,825,435 | 36,509 | 2,281,794 | 45,636 | 2,852,243 | 57,045 | 3,565,303 | 71,306 | 4,456,629 | 89,133 | 5,570,787 | 111,416 |
| 1,250,058 | 25,001 | 1,562,573 | 31,251 | 1,953,216 | 39,064 | 2,441,520 | 48,830 | 3,051,900 | 61,038 | 3,814,875 | 76,297 |
| 856,040 | 17,121 | 1,070,050 | 21,401 | 1,337,562 | 26,751 | 1,671,953 | 33,439 | 2,089,941 | 41,799 | 2,612,426 | 52,249 |
| | | 732,770 | 14,655 | 915,963 | 18,319 | 1,144,953 | 22,899 | 1,431,192 | 28,624 | 1,788,989 | 35,780 |
| | | | | 627,251 | 12,545 | 784,064 | 15,681 | 980,080 | 19,602 | 1,225,100 | 24,502 |
| | | | | | | 536,927 | 10,739 | 671,159 | 13,423 | 838,948 | 16,779 |
| | | | | | | | | 459,610 | 9,192 | 574,512 | 11,490 |
| | | | | | | | | | | 393,426 | 7,869 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 28.65% | 603,593 | 27.43% | 769,146 | 26.63% | 973,978 | 26.10% |

| | | | | |
|---|---|---|---|---|
| 1,226,210 | 25.75% | 1,544,455 | 25.51% | 1,938,438 |

nt Renewals

~, Includes 1st year rate, stock bonus and RSC performance bonus, less Manager's Incentive Fund contribution of 0.5%

n Rate

g rate for 1999 - 2001)

stimony: 20% to 30%

|  | Rate | Portion | Effective |
|---|---|---|---|
| 1st yr | 6.22% | 100.00% | 6.22% |
| Stock bonus | 0.70% | 54.85% | 0.38% |
| RSC Performance Bonus | 1.66% | 100.00% | 1.66% |
| Manager's Incentive Fund Contrib. |  | 100.00% | -0.50% |
| TOTAL |  |  | 7.76% |



| 2012 | Income | 2013 | Income | 2014 | Income | 2015 | Income | 2016 | Income |
|---|---|---|---|---|---|---|---|---|---|
| 23,173,742 | 1,799,198 | 28,967,177 | 2,248,997 | 36,208,972 | 2,811,246 | 45,261,214 | 3,514,058 | 56,576,518 | 4,392,573 |
| 10,168,638 | 203,373 | 12,710,797 | 254,216 | 15,888,497 | 317,770 | 19,860,621 | 397,212 | 24,825,776 | 496,516 |
| 6,963,483 | 139,270 | 8,704,354 | 174,087 | 10,880,443 | 217,609 | 13,600,553 | 272,011 | 17,000,691 | 340,014 |
| 4,768,593 | 95,372 | 5,960,742 | 119,215 | 7,450,927 | 149,019 | 9,313,659 | 186,273 | 11,642,074 | 232,841 |
| 3,265,533 | 65,311 | 4,081,916 | 81,638 | 5,102,395 | 102,048 | 6,377,994 | 127,560 | 7,972,492 | 159,450 |
| 2,236,237 | 44,725 | 2,795,296 | 55,906 | 3,494,120 | 69,882 | 4,367,650 | 87,353 | 5,459,562 | 109,191 |
| 1,531,375 | 30,627 | 1,914,219 | 38,284 | 2,392,773 | 47,855 | 2,990,967 | 59,819 | 3,738,708 | 74,774 |
| 1,048,686 | 20,974 | 1,310,857 | 26,217 | 1,638,571 | 32,771 | 2,048,214 | 40,964 | 2,560,268 | 51,205 |
| 718,140 | 14,363 | 897,675 | 17,953 | 1,122,094 | 22,442 | 1,402,617 | 28,052 | 1,753,271 | 35,065 |
| 491,782 | 9,836 | 614,728 | 12,295 | 768,410 | 15,368 | 960,512 | 19,210 | 1,200,640 | 24,013 |
| 336,772 | 6,735 | 420,966 | 8,419 | 526,207 | 10,524 | 657,759 | 13,155 | 822,198 | 16,444 |
|  |  | 288,277 | 5,766 | 360,347 | 7,207 | 450,433 | 9,009 | 563,041 | 11,261 |
|  |  |  |  | 246,765 | 4,935 | 308,457 | 6,169 | 385,571 | 7,711 |
|  |  |  |  |  |  | 211,231 | 4,225 | 264,039 | 5,281 |
|  |  |  |  |  |  |  |  | 180,814 | 3,616 |

| | 2,429,783 | 25.24% | 3,042,994 | 25.16% | 3,808,677 | 25.11% | 4,765,071 | 25.08% | 5,959,955 |
|---|---|---|---|---|---|---|---|---|---|
| 25.35% | | | | | | | | | |





| 2017 | Income | 2018 | Income | 2019 | Income | 2020 | Income | 2021 | Income | 2022 | Income | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 70,720,647 | 5,490,716 | 88,400,809 | 6,863,395 | 110,501,012 | 8,579,243 | 138,126,265 | 10,724,054 | 172,657,831 | 13,405,068 | 215,822,288 | 16,756,335 | 269,777,861 |
| 31,032,220 | 620,644 | 38,790,275 | 775,806 | 48,487,844 | 969,757 | 60,609,805 | 1,212,196 | 75,762,256 | 1,515,245 | 94,702,820 | 1,894,056 | 118,378,525 |
| 21,250,864 | 425,017 | 26,563,580 | 531,272 | 33,204,476 | 664,090 | 41,505,594 | 830,112 | 51,881,993 | 1,037,640 | 64,852,491 | 1,297,050 | 81,065,614 |
| 14,552,592 | 291,052 | 18,190,740 | 363,815 | 22,738,425 | 454,768 | 28,423,031 | 568,461 | 35,528,789 | 710,576 | 44,410,986 | 888,220 | 55,513,733 |
| 9,965,615 | 199,312 | 12,457,019 | 249,140 | 15,571,273 | 311,425 | 19,464,092 | 389,282 | 24,330,115 | 486,602 | 30,412,643 | 608,253 | 38,015,804 |
| 6,824,453 | 136,489 | 8,530,566 | 170,611 | 10,663,208 | 213,264 | 13,329,010 | 266,580 | 16,661,262 | 333,225 | 20,826,578 | 416,532 | 26,033,223 |
| 4,673,385 | 93,468 | 5,841,732 | 116,835 | 7,302,165 | 146,043 | 9,127,706 | 182,554 | 11,409,633 | 228,193 | 14,262,041 | 285,241 | 17,827,551 |
| 3,200,334 | 64,007 | 4,000,418 | 80,008 | 5,000,522 | 100,010 | 6,250,653 | 125,013 | 7,813,316 | 156,266 | 9,766,645 | 195,333 | 12,208,307 |
| 2,191,689 | 43,832 | 2,739,486 | 54,790 | 3,424,358 | 68,487 | 4,280,447 | 85,609 | 5,350,559 | 107,011 | 6,688,199 | 133,764 | 8,360,249 |
| 1,500,800 | 30,016 | 1,876,000 | 37,520 | 2,345,000 | 46,900 | 2,931,250 | 58,625 | 3,664,063 | 73,281 | 4,580,079 | 91,602 | 5,725,098 |
| 1,027,748 | 20,555 | 1,284,685 | 25,694 | 1,605,856 | 32,117 | 2,007,320 | 40,146 | 2,509,150 | 50,183 | 3,136,438 | 62,729 | 3,920,547 |
| 703,802 | 14,076 | 879,752 | 17,595 | 1,099,690 | 21,994 | 1,374,613 | 27,492 | 1,718,266 | 34,365 | 2,147,833 | 42,957 | 2,684,791 |
| 481,963 | 9,639 | 602,454 | 12,049 | 753,068 | 15,061 | 941,335 | 18,827 | 1,176,669 | 23,533 | 1,470,836 | 29,417 | 1,838,545 |
| 330,049 | 6,601 | 412,561 | 8,251 | 515,701 | 10,314 | 644,626 | 12,893 | 805,783 | 16,116 | 1,007,228 | 20,145 | 1,259,035 |
| 226,017 | 4,520 | 282,522 | 5,650 | 353,152 | 7,063 | 441,440 | 8,829 | 551,800 | 11,036 | 689,750 | 13,795 | 862,187 |
| 154,777 | 3,096 | 193,471 | 3,869 | 241,838 | 4,837 | 302,298 | 6,046 | 377,873 | 7,557 | 472,341 | 9,447 | 590,426 |
|  |  | 132,489 | 2,650 | 165,611 | 3,312 | 207,014 | 4,140 | 258,767 | 5,175 | 323,459 | 6,469 | 404,324 |
|  |  |  |  | 113,410 | 2,268 | 141,763 | 2,835 | 177,204 | 3,544 | 221,505 | 4,430 | 276,881 |
|  |  |  |  |  |  | 97,079 | 1,942 | 121,349 | 2,427 | 151,686 | 3,034 | 189,608 |
|  |  |  |  |  |  |  |  | 83,100 | 1,662 | 103,875 | 2,077 | 129,844 |
|  |  |  |  |  |  |  |  |  |  | 71,134 | 1,423 | 88,917 |
|  |  |  |  |  |  |  |  |  |  |  |  | 60,890 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 25.05% | 7,453,040 | 25.04% | 9,318,950 | 25.02% | 11,650,955 | 25.02% | 14,565,636 | 25.01% | 18,208,707 | 25.01% | 22,762,306 | 25.01% |





| Income | 2024 | Income | 2025 | Income | 2026 | Income | TOTAL |
|---|---|---|---|---|---|---|---|
| 20,945,418 | 337,222,326 | 26,181,773 | 421,527,907 | 32,727,216 | 526,909,884 | 40,909,020 | 2,624,596,373 |
| 2,367,571 | 147,973,157 | 2,959,463 | 184,966,446 | 3,699,329 | 231,208,057 | 4,624,161 | |
| 1,621,312 | 101,332,018 | 2,026,640 | 126,665,022 | 2,533,300 | 158,331,277 | 3,166,626 | |
| 1,110,275 | 69,392,166 | 1,387,843 | 86,740,207 | 1,734,804 | 108,425,259 | 2,168,505 | |
| 760,316 | 47,519,755 | 950,395 | 59,399,694 | 1,187,994 | 74,249,617 | 1,484,992 | |
| 520,664 | 32,541,528 | 650,831 | 40,676,910 | 813,538 | 50,846,138 | 1,016,923 | |
| 356,551 | 22,284,439 | 445,689 | 27,855,548 | 557,111 | 34,819,435 | 696,389 | |
| 244,166 | 15,260,384 | 305,208 | 19,075,479 | 381,510 | 23,844,349 | 476,887 | |
| 167,205 | 10,450,311 | 209,006 | 13,062,888 | 261,258 | 16,328,610 | 326,572 | |
| 114,502 | 7,156,373 | 143,127 | 8,945,466 | 178,909 | 11,181,832 | 223,637 | |
| 78,411 | 4,900,684 | 98,014 | 6,125,855 | 122,517 | 7,657,319 | 153,146 | |
| 53,696 | 3,355,988 | 67,120 | 4,194,986 | 83,900 | 5,243,732 | 104,875 | |
| 36,771 | 2,298,181 | 45,964 | 2,872,726 | 57,455 | 3,590,908 | 71,818 | |
| 25,181 | 1,573,794 | 31,476 | 1,967,243 | 39,345 | 2,459,054 | 49,181 | |
| 17,244 | 1,077,734 | 21,555 | 1,347,168 | 26,943 | 1,683,960 | 33,679 | |
| 11,809 | 738,032 | 14,761 | 922,541 | 18,451 | 1,153,176 | 23,064 | |
| 8,086 | 505,405 | 10,108 | 631,756 | 12,635 | 789,695 | 15,794 | |
| 5,538 | 346,101 | 6,922 | 432,626 | 8,653 | 540,783 | 10,816 | |
| 3,792 | 237,010 | 4,740 | 296,263 | 5,925 | 370,328 | 7,407 | |
| 2,597 | 162,304 | 3,246 | 202,881 | 4,058 | 253,601 | 5,072 | |
| 1,778 | 111,146 | 2,223 | 138,933 | 2,779 | 173,666 | 3,473 | |
| 1,218 | 76,113 | 1,522 | 95,141 | 1,903 | 118,926 | 2,379 | |
| | 52,122 | 1,042 | 65,153 | 1,303 | 81,441 | 1,629 | |
| | | | 44,616 | 892 | 55,771 | 1,115 | |
| | | | | | 38,192 | 764 | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 28,454,100 | | 35,568,668 | | 44,461,727 | | 55,577,922 | 276,376,796 |
| | 25.00% | | 25.00% | | 25.00% | | |





# RSC INCOME EXAMPLE WORKSHEET - Supplemental Sales

| | 2002 | 2003 | Income | 2004 | Income | 2005 | Income |
|---|---|---|---|---|---|---|---|
| NEW SALES | 2,388,731 | 2,866,477 | | 3,439,773 | | 4,127,727 | |
| 1st Yr - Commissions | 185,460 | | 222,552 | | 267,062 | | 320,475 |
| Yr 1 - Renewals | | 1,310,219 | | 1,572,263 | | 1,886,715 | |
| Commissions | | | 26,204 | | 31,445 | | 37,734 |
| Yr 2 - Renewals | | | | 1,121,547 | | 1,345,857 | |
| Commissions | | | | | 22,431 | | 26,917 |
| Yr 3 - Renewals | | | | | | 960,045 | |
| Commissions | | | | | | | 19,201 |
| Yr 4 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 5 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 6 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 7 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 8 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 9 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 10 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 11 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 12 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 13 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 14 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 15 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 16 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 17 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 18 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 19 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 20 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 21 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 22 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 23 - Renewals | | | | | | | |
| Commissions | | | | | | | |
| Yr 24 - Renewals | | | | | | | |
| Commissions | | | | | | | |

Back up
To Exhibit E
20%

| | 185,460 | 34.13% | 248,756 | 29.02% | 320,938 | 25.98% | 404,327 |
|---|---|---|---|---|---|---|---|
| Total Income | | | | | | | |
| Growth Rate In Total Income | | | | | | | |

| HIGHLIGHTS | | |
|---|---|---|
| Annual renewal income as of year 25 | 6,053,889 | |
| Real renewal, yr 25, inflation at | 2,822,070 | 3.1% |
| Total 25 years ("hasti" total only, no economic meaning) | 122,968,816 | |
| Present Value at 21.506% | 4,441,696 | |
| Annual expenses | $ | 59,104.00 |
| Expenses P.V. at 17.852% | $325,621.60 | N.D.R. |
| Assumed inflation 3.100% | | |
| Present Value | 4,116,074.32 | |

| ASSUMPTIONS | |
|---|---|
| Attrition Rate for First Year | 45.15% |
| Attrition Rate for Subsequent | 14.40% |
| First Year Commission Rate | 7.76% |
| Renewal Years Commission | 2% |
| New Sales Growth Rate ( 57.7% avg | see below |
| New Sales in 2001 (BASE) | $1,990,609 |
| Discount rate | 21.506% |

| | Year | Growth | |
|---|---|---|---|
| Actual | 2000 | 67.33% | |
| Actual | 2001 | 75.78% | |
| Projection | 2002 | 20.00% | |
| Projection | 2003 | 20.00% | |
| Projection | 2004 | 20.00% | |
| Projection | Future | 20.00% | Lafemina tes |

## Calculation of Discount Rate

### Size- Adjusted CAPM method

| | | |
|---|---|---|
| Risk-Free | 5.210% | SBBI for NYSE, 2000 Valuation Yearbook |
| Equity Risk premium | 7.13% | SBBI for NYSE, 2000 Valuation Yearbook |
| AFLAC Beta | 75.00% | Yahoo Finance |
| AFLAC Beta | 89.00% | Business week |
| Higher Beta | 89.00% | Business week |
| Beta x Equity Risk | 6.35% | |
| Size-Premium | 3.95% | 10th decile NYSE, SBBI for NYSE, 2000 Valuation Yearbook |
| Company +add'l size | 6.00% | |
| TOTAL | 21.506% | |

| | Year | Growth | |
|---|---|---|---|
| Actual | 2000 | 67.33% | |
| Actual | 2001 | 75.78% | |
| Projection | 2002 | 20.00% | |
| Projection | 2003 | 20.00% | |
| Projection | 2004 | 20.00% | |
| Projection | Future | 20.00% | Lafemina testimony: 20% to 30% |

*Exhibit E*

**Year-by-Year Projections of RSC Commissions Lost**
**at a long-term sales growth rate of   20.00%**

| Year | Number | Lost Commissions | Present Value | Cumulative Pres. Value | Less Cumulative Expenses Present Value | Present Value Cumulative Net Loss |
|------|--------|------------------|---------------|------------------------|----------------------------------------|-----------------------------------|
| 2002 | 1.00 | $ 185,460 | $ 152,635 | $ 152,635 | $ 50,151 | $ 102,484 |
| 2003 | 2.00 | $ 248,756 | $ 168,493 | $ 321,127 | $ 92,705 | $ 228,422 |
| 2004 | 3.00 | $ 320,938 | $ 178,909 | $ 500,036 | $ 128,813 | $ 371,223 |
| 2005 | 4.00 | $ 404,327 | $ 185,501 | $ 685,537 | $ 159,451 | $ 526,086 |
| 2006 | 5.00 | $ 501,628 | $ 189,408 | $ 874,945 | $ 185,448 | $ 689,497 |
| 2007 | 6.00 | $ 616,023 | $ 191,433 | $ 1,066,378 | $ 207,508 | $ 858,871 |
| 2008 | 7.00 | $ 751,271 | $ 192,141 | $ 1,258,520 | $ 226,225 | $ 1,032,294 |
| 2009 | 8.00 | $ 911,834 | $ 191,930 | $ 1,450,449 | $ 242,108 | $ 1,208,342 |
| 2010 | 9.00 | $ 1,103,026 | $ 191,080 | $ 1,641,530 | $ 255,584 | $ 1,385,946 |
| 2011 | 10.00 | $ 1,331,185 | $ 189,789 | $ 1,831,319 | $ 267,019 | $ 1,564,300 |
| 2012 | 11.00 | $ 1,603,888 | $ 188,196 | $ 2,019,515 | $ 276,722 | $ 1,742,793 |
| 2013 | 12.00 | $ 1,930,200 | $ 186,399 | $ 2,205,914 | $ 284,955 | $ 1,920,959 |
| 2014 | 13.00 | $ 2,320,978 | $ 184,465 | $ 2,390,379 | $ 291,941 | $ 2,098,438 |
| 2015 | 14.00 | $ 2,789,229 | $ 182,445 | $ 2,572,824 | $ 297,868 | $ 2,274,955 |
| 2016 | 15.00 | $ 3,350,547 | $ 180,371 | $ 2,753,194 | $ 302,898 | $ 2,450,296 |
| 2017 | 16.00 | $ 4,023,628 | $ 178,267 | $ 2,931,461 | $ 307,166 | $ 2,624,295 |
| 2018 | 17.00 | $ 4,830,897 | $ 176,151 | $ 3,107,612 | $ 310,787 | $ 2,796,825 |
| 2019 | 18.00 | $ 5,799,254 | $ 174,033 | $ 3,281,646 | $ 313,860 | $ 2,967,785 |
| 2020 | 19.00 | $ 6,960,969 | $ 171,923 | $ 3,453,568 | $ 316,468 | $ 3,137,101 |
| 2021 | 20.00 | $ 8,354,758 | $ 169,825 | $ 3,623,393 | $ 318,680 | $ 3,304,713 |
| 2022 | 21.00 | $ 10,027,075 | $ 167,743 | $ 3,791,136 | $ 320,557 | $ 3,470,579 |
| 2023 | 22.00 | $ 12,033,659 | $ 165,680 | $ 3,956,817 | $ 322,150 | $ 3,634,667 |
| 2024 | 23.00 | $ 14,441,392 | $ 163,639 | $ 4,120,455 | $ 323,502 | $ 3,796,954 |
| 2025 | 24.00 | $ 17,330,527 | $ 161,619 | $ 4,282,074 | $ 324,648 | $ 3,957,426 |
| 2026 | 25.00 | $ 20,797,366 | $ 159,622 | $ 4,441,696 | $ 325,622 | $ 4,116,074 |

| 2006 | Income | 2007 | Income | 2008 | Income | 2009 | Income | 2010 | Income | 2011 | Income |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 4,953,273 | 384,570 | 5,943,927 | 461,484 | 7,132,713 | 553,780 | 8,559,255 | 664,536 | 10,271,107 | 797,444 | 12,325,328 | 956,932 |
| 2,264,058 | 45,281 | 2,716,870 | 54,337 | 3,260,244 | 65,205 | 3,912,293 | 78,246 | 4,694,752 | 93,895 | 5,633,702 | 112,674 |
| 1,615,028 | 32,301 | 1,938,034 | 38,761 | 2,325,641 | 46,513 | 2,790,769 | 55,815 | 3,348,923 | 66,978 | 4,018,707 | 80,374 |
| 1,152,054 | 23,041 | 1,382,464 | 27,649 | 1,658,957 | 33,179 | 1,990,749 | 39,815 | 2,388,898 | 47,778 | 2,866,678 | 57,334 |
| 821,798 | 16,436 | 986,158 | 19,723 | 1,183,389 | 23,668 | 1,420,067 | 28,401 | 1,704,081 | 34,082 | 2,044,897 | 40,898 |
|  |  | 703,459 | 14,069 | 844,151 | 16,883 | 1,012,981 | 20,260 | 1,215,578 | 24,312 | 1,458,693 | 29,174 |
|  |  |  |  | 602,161 | 12,043 | 722,593 | 14,452 | 867,112 | 17,342 | 1,040,534 | 20,811 |
|  |  |  |  |  |  | 515,450 | 10,309 | 618,540 | 12,371 | 742,248 | 14,845 |
|  |  |  |  |  |  |  |  | 441,225 | 8,825 | 529,470 | 10,589 |
|  |  |  |  |  |  |  |  |  |  | 377,689 | 7,554 |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1,331,185 | | 20.68% | | 1,103,026 | | 20.97% | | 911,834 | | 21.37% | | 751,271 | |
| | | | | | | | | | | | | | |
| 21.95% | | 616,023 | | 22.80% | | 501,628 | | 24.07% | | | | | |



| | | | Effective | 6.22% | 0.38% | 1.66% | -0.50% | 7.76% | | | | | | | | | | | | | | | | | | | | | | | | |



| 2012 | Income | 2013 | Income | 2014 | Income | 2015 | Income | 2016 | Income |
|---|---|---|---|---|---|---|---|---|---|
| 14,790,393 | 1,148,319 | 17,748,472 | 1,377,983 | 21,298,167 | 1,653,579 | 25,557,800 | 1,984,295 | 30,669,360 | 2,381,154 |
| 6,760,442 | 135,209 | 8,112,531 | 162,251 | 9,735,037 | 194,701 | 11,682,044 | 233,641 | 14,018,453 | 280,369 |
| 4,822,449 | 96,449 | 5,786,939 | 115,739 | 6,944,326 | 138,887 | 8,333,192 | 166,664 | 9,999,830 | 199,997 |
| 3,440,014 | 68,800 | 4,128,016 | 82,560 | 4,953,619 | 99,072 | 5,944,343 | 118,887 | 7,133,212 | 142,664 |
| 2,453,876 | 49,078 | 2,944,652 | 58,893 | 3,533,582 | 70,672 | 4,240,298 | 84,806 | 5,088,358 | 101,767 |
| 1,750,432 | 35,009 | 2,100,518 | 42,010 | 2,520,622 | 50,412 | 3,024,746 | 60,495 | 3,629,695 | 72,594 |
| 1,248,641 | 24,973 | 1,498,370 | 29,967 | 1,798,044 | 35,961 | 2,157,652 | 43,153 | 2,589,183 | 51,784 |
| 890,697 | 17,814 | 1,068,837 | 21,377 | 1,282,604 | 25,652 | 1,539,125 | 30,783 | 1,846,950 | 36,939 |
| 635,364 | 12,707 | 762,437 | 15,249 | 914,924 | 18,298 | 1,097,909 | 21,958 | 1,317,491 | 26,350 |
| 453,226 | 9,065 | 543,872 | 10,877 | 652,646 | 13,053 | 783,175 | 15,664 | 939,810 | 18,796 |
| 323,302 | 6,466 | 387,962 | 7,759 | 465,554 | 9,311 | 558,665 | 11,173 | 670,398 | 13,408 |
|  |  | 276,746 | 5,535 | 332,095 | 6,642 | 398,514 | 7,970 | 478,217 | 9,564 |
|  |  |  |  | 236,895 | 4,738 | 284,274 | 5,685 | 341,128 | 6,823 |
|  |  |  |  |  |  | 202,782 | 4,056 | 243,338 | 4,867 |
|  |  |  |  |  |  |  |  | 173,581 | 3,472 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 20.49% | 1,603,888 | 20.35% | 1,930,200 | 20.25% | 2,320,978 | 20.17% | 2,789,229 | 20.12% | 3,350,547 |





| 2017 | Income | 2018 | Income | 2019 | Income | 2020 | Income | 2021 | Income | 2022 | Income | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 36,803,232 | 2,857,385 | 44,163,878 | 3,428,861 | 52,996,654 | 4,114,634 | 63,595,985 | 4,937,560 | 76,315,181 | 5,925,073 | 91,578,218 | 7,110,087 | 109,893,861 |
| 16,822,144 | 336,443 | 20,186,573 | 403,731 | 24,223,887 | 484,478 | 29,068,665 | 581,373 | 34,882,398 | 697,648 | 41,858,877 | 837,178 | 50,230,652 |
| 11,999,796 | 239,996 | 14,399,755 | 287,995 | 17,279,706 | 345,594 | 20,735,647 | 414,713 | 24,882,777 | 497,656 | 29,859,332 | 597,187 | 35,831,199 |
| 8,559,854 | 171,197 | 10,271,825 | 205,437 | 12,326,190 | 246,524 | 14,791,428 | 295,829 | 17,749,714 | 354,994 | 21,299,657 | 425,993 | 25,559,588 |
| 6,106,030 | 122,121 | 7,327,235 | 146,545 | 8,792,682 | 175,854 | 10,551,219 | 211,024 | 12,661,463 | 253,229 | 15,193,755 | 303,875 | 18,232,506 |
| 4,355,634 | 87,113 | 5,226,761 | 104,535 | 6,272,114 | 125,442 | 7,526,536 | 150,531 | 9,031,843 | 180,637 | 10,838,212 | 216,764 | 13,005,855 |
| 3,107,019 | 62,140 | 3,728,423 | 74,568 | 4,474,108 | 89,482 | 5,368,929 | 107,379 | 6,442,715 | 128,854 | 7,731,258 | 154,625 | 9,277,510 |
| 2,216,340 | 44,327 | 2,659,608 | 53,192 | 3,191,530 | 63,831 | 3,829,836 | 76,597 | 4,595,803 | 91,916 | 5,514,964 | 110,299 | 6,617,957 |
| 1,580,989 | 31,620 | 1,897,187 | 37,944 | 2,276,625 | 45,532 | 2,731,950 | 54,639 | 3,278,340 | 65,567 | 3,934,008 | 78,680 | 4,720,809 |
| 1,127,772 | 22,555 | 1,353,327 | 27,067 | 1,623,992 | 32,480 | 1,948,791 | 38,976 | 2,338,549 | 46,771 | 2,806,259 | 56,125 | 3,367,511 |
| 804,478 | 16,090 | 965,373 | 19,307 | 1,158,448 | 23,169 | 1,390,137 | 27,803 | 1,668,165 | 33,363 | 2,001,798 | 40,036 | 2,402,158 |
| 573,861 | 11,477 | 688,633 | 13,773 | 826,359 | 16,527 | 991,631 | 19,833 | 1,189,958 | 23,799 | 1,427,949 | 28,559 | 1,713,539 |
| 409,354 | 8,187 | 491,225 | 9,824 | 589,470 | 11,789 | 707,364 | 14,147 | 848,836 | 16,977 | 1,018,604 | 20,372 | 1,222,325 |
| 292,006 | 5,840 | 350,407 | 7,008 | 420,488 | 8,410 | 504,586 | 10,092 | 605,503 | 12,110 | 726,604 | 14,532 | 871,925 |
| 208,298 | 4,166 | 249,957 | 4,999 | 299,948 | 5,999 | 359,938 | 7,199 | 431,926 | 8,639 | 518,311 | 10,366 | 621,973 |
| 148,586 | 2,972 | 178,303 | 3,566 | 213,963 | 4,279 | 256,756 | 5,135 | 308,107 | 6,162 | 369,728 | 7,395 | 443,674 |
| | | 127,189 | 2,544 | 152,627 | 3,053 | 183,153 | 3,663 | 219,783 | 4,396 | 263,740 | 5,275 | 316,488 |
| | | | | 108,874 | 2,177 | 130,649 | 2,613 | 156,779 | 3,136 | 188,134 | 3,763 | 225,761 |
| | | | | | | 93,196 | 1,864 | 111,835 | 2,237 | 134,202 | 2,684 | 161,043 |
| | | | | | | | | 79,776 | 1,596 | 95,731 | 1,915 | 114,877 |
| | | | | | | | | | | 68,288 | 1,366 | 81,946 |
| | | | | | | | | | | | | 58,455 |

| | | |
|---|---|---|
| | 4,023,628 | 20.09% |
| 20.06% | 4,830,897 | |
| 20.05% | 5,799,254 | |
| 20.03% | 6,960,969 | |
| 20.02% | 8,354,758 | |
| 20.02% | 10,027,075 | |
| 20.01% | | |



| Income | 2024 | Income | 2025 | Income | 2026 | Income | TOTAL |
|---|---|---|---|---|---|---|---|
| 8,532,104 | 131,872,633 | 10,238,525 | 158,247,160 | 12,286,230 | 189,896,592 | 14,743,476 | 1,127,435,898 |
| 1,004,613 | 60,276,783 | 1,205,536 | 72,332,139 | 1,446,643 | 86,798,567 | 1,735,971 | |
| 716,624 | 42,997,438 | 859,949 | 51,596,926 | 1,031,939 | 61,916,311 | 1,238,326 | |
| 511,192 | 30,671,506 | 613,430 | 36,805,807 | 736,116 | 44,166,969 | 883,339 | |
| 364,650 | 21,879,008 | 437,580 | 26,254,809 | 525,096 | 31,505,771 | 630,115 | |
| 260,117 | 15,607,025 | 312,141 | 18,728,431 | 374,569 | 22,474,117 | 449,482 | |
| 185,550 | 11,133,012 | 222,660 | 13,359,614 | 267,192 | 16,031,537 | 320,631 | |
| 132,359 | 7,941,548 | 158,831 | 9,529,858 | 190,597 | 11,435,829 | 228,717 | |
| 94,416 | 5,664,971 | 113,299 | 6,797,965 | 135,959 | 8,157,558 | 163,151 | |
| 67,350 | 4,041,013 | 80,820 | 4,849,215 | 96,984 | 5,819,058 | 116,381 | |
| 48,043 | 2,882,589 | 57,652 | 3,459,107 | 69,182 | 4,150,928 | 83,019 | |
| 34,271 | 2,056,247 | 41,125 | 2,467,496 | 49,350 | 2,960,995 | 59,220 | |
| 24,446 | 1,466,789 | 29,336 | 1,760,147 | 35,203 | 2,112,177 | 42,244 | |
| 17,438 | 1,046,310 | 20,926 | 1,255,572 | 25,111 | 1,506,686 | 30,134 | |
| 12,439 | 746,368 | 14,927 | 895,641 | 17,913 | 1,074,769 | 21,495 | |
| 8,873 | 532,409 | 10,648 | 638,891 | 12,778 | 766,669 | 15,333 | |
| 6,330 | 379,785 | 7,596 | 455,742 | 9,115 | 546,890 | 10,938 | |
| 4,515 | 270,913 | 5,418 | 325,096 | 6,502 | 390,115 | 7,802 | |
| 3,221 | 193,252 | 3,865 | 231,902 | 4,638 | 278,282 | 5,566 | |
| 2,298 | 137,853 | 2,757 | 165,423 | 3,308 | 198,508 | 3,970 | |
| 1,639 | 98,335 | 1,967 | 118,002 | 2,360 | 141,602 | 2,832 | |
| 1,169 | 70,146 | 1,403 | 84,175 | 1,683 | 101,010 | 2,020 | |
| | 50,037 | 1,001 | 60,045 | 1,201 | 72,054 | 1,441 | |
| | | | 42,832 | 857 | 51,398 | 1,028 | |
| | | | | | 36,664 | 733 | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 12,033,659 | | 14,441,392 | | 17,330,527 | | 20,797,366 | 122,968,816 |
| | 20.01% | | 20.01% | | 20.00% | | |





# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DINO X. CHAVEZ | § | |
| | § | |
| VS. | § | |
| | § | CIVIL ACTION NO. |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, NOE SAUCEDA, | § | B - 02 - 128 |
| and RANDY DUNN, MARILYN DEL | § | |
| BOSQUE-GILBERT and HUGH EMERSON, | § | |
| JR., in their official capacities as Board | § | |
| Members of Brownsville Independent | § | |
| School District | § | |

## AFFIDAVIT OF J. ARNOLD AGUILAR

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF CAMERON | § |

BEFORE ME, the undersigned official, on this day appeared **J. ARNOLD AGUILAR**, who is personally known to me, and first being duly sworn according to law upon his oath deposes and says:

"My name is J. Arnold Aguilar, I am over 18 years of age, I have never been convicted of a crime, and I am fully competent to make this affidavit. I have personal knowledge of the facts stated herein, and they are all true and correct.

As the attorney for Plaintiffs, CIVIL ACTION NO. B - 02 – 128 in the Southern District of Texas, Brownsville Division, I attended the deposition the deposition of Lynn George Barnson, designated as **Exhibit B-1**, and the deposition of Frank LaFemina, designated as **Exhibit B-2**, and state that the excerpts from these transcripts of the deposition testimonies attached are true copies of the testimonies given by Frank LaFemina and Lynn George Barnson. Additionally, attached as **Exhibit B-3** are true and correct copies of excerpts from AFLAC, Inc.'s 2003 Financial Analysts Briefing, which was attached as Exhibit 4 to the deposition of Lynn Barnson.

Further affiant sayeth naught."

J. Arnold Aguilar

SUBSCRIBED AND SWORN TO BEFORE ME on the _____ day of November, 2003, to certify which witness my hand and official seal.



NOTARY PUBLIC IN AND FOR THE
STATE OF TEXAS

My commission Expires:

7 - 26 - 2005

# EXHIBIT B-1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3
       DINO X. CHAVEZ              *
 4                                 *
       VS.                         *
 5                                 *
       BROWNSVILLE INDEPENDENT     *
 6     SCHOOL DISTRICT, NOE        *
       SAUCEDA, and RANDY          *   CIVIL ACTION NO.
 7     DUNN, MARILYN DEL           *    B - 02 - 128
       BOSQUE-GILBERT and          *
 8     HUGH EMERSON, JR.,          *
       in their official           *
 9     capacities as Board         *
       Members of Brownsville      *
10     Independent School          *
       District                    *
11

12         ********************************************

13             ORAL AND VIDEOTAPED DEPOSITION OF

14                 LYNN GEORGE BARNSON

15                  SEPTEMBER 30, 2003

16         ********************************************

17

18

19

20

21

22

23

24

25
```

```
 1              ORAL AND VIDEOTAPED DEPOSITION OF

 2   LYNN GEORGE BARNSON, produced as a witness at the

 3   instance of the Plaintiff and duly sworn, was taken in

 4   the above-styled and numbered cause on the 30th day of

 5   September, 2003, from 10:44 a.m. to 2:06 p.m., before

 6   GERRI C. BARKER, Certified Shorthand Reporter in and

 7   for the State of Texas, reported by machine shorthand,

 8   at the offices of Locke, Liddell & Sapp, L.L.P.,

 9   100 Congress Avenue, Suite 300, Austin, Texas,

10   pursuant to the Federal Rules of Civil Procedure and

11   the provisions stated on the record or attached

12   hereto.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

(1)  Q.  What's that near?
(2)  A.  Salt Lake City.
(3)  Q.  Okay. How old are you?
(4)  A.  I'm 47.
(5)  Q.  Can you tell me about your educational
(6)  background?
(7)  A.  I have got – I had two years of college.
(8)  Q.  After graduating from high school, you went
(9)  to college for two years?
(10)  A.  Uh-huh.
(11)  Q.  Where?
(12)  A.  At Southern Utah State University and Utah –
(13)  what was it called – Utah Technical College.

(1)  A.  I believe that's the year, yes.
(2)  Q.  Okay. That was the same year that you
(3)  started as an associate, right?
(4)  A.  Correct.
(5)  Q.  Why were you promoted?
(6)  A.  Because I had exhibited the things that need
(7)  to be done at the time. I was opening new accounts
(8)  and I was also – had some past experience in managing
(9)  people.
(10)  Q.  Okay. What was the past experience you had
(11)  in managing people?
(12)  A.  I had worked as an – in a bricklaying
(13)  company and I had supervised other masons.

Page 19

(1)  A.   But he was in Gene Dannelly's operation in
(2)  Texas South, yes.
(3)  Q.   Okay. After four years as DSC, you got
(4)  promoted in 1985 to RSC, correct?
(5)  A.   To the best of my understanding.
(6)  Q.   Okay. What was the area you were DSC in?
(7)  A.   It was in southern Utah.
(8)  Q.   Did you stay as DSC in southern Utah for a
(9)  number of years?
(10) A.   I don't remember the exact amount of years.
(11) Q.   Was it for the four full years or did you
(12) move over to the Dallas area sometime towards –
(13) within those four years?
(14) A.   No, I actually moved to Provo, Utah as a
(15) district sales – I mean, as a district up there as
(16) well.
(17) Q.   Okay. And when did you –
(18) A.   In that time frame.
(19) Q.   When did you move to the Dallas/Fort Worth
(20) area?
(21) A.   You know, I don't remember the exact year.
(22) Q.   Okay. Was it 19– – I'm sorry. In 1985 you
(23) were promoted to RSC?
(24) A.   Correct.
(25) Q.   By then –

Page 20

(1)  A.   That's when I was moved.
(2)  Q.   Oh, I see. By then, were you already in
(3)  Dallas/Fort Worth or had you moved up at that time?
(4)  A.   I was – that's what caused the move to
(5)  Dallas/Fort Worth.
(6)  Q.   Why were you promoted to RSC?
(7)  A.   I had exhibited the things that were
(8)  necessary to be considered for a regional sales
(9)  coordinator. I was recruiting.
(10) Q.   Okay. Basically, is it the same things that
(11) we just talked about for the reasons that you got
(12) promoted to DSC? In other words, was it because of
(13) your leadership abilities, the growth in the size of
(14) your team and your sales?
(15) A.   Yes. And – yes, and the fact that I was
(16) recruiting. I knew how to recruit people.
(17) Q.   And what does that mean?
(18) A.   That means bring them in and introduce them
(19) to AFLAC.
(20) Q.   Isn't that part of what is involved in
(21) growing your team?
(22) A.   Yeah.
(23) Q.   Okay. While you were DSC or RSC, did you win
(24) any awards?
(25) A.   Yes.

Page 21

(1)  Q.   Did you win any Key Club awards?
(2)  A.   To my recollection, yes.
(3)  Q.   What is the Key Club?
(4)  A.   Key Club is an award that recognizes meeting
(5)  your quota for the year, your sales goal.
(6)  Q.   Sales of AFLAC policies?
(7)  A.   Yes.
(8)  Q.   Okay. How is that quota calculated?
(9)  A.   It varies. You know, are you referencing –
(10) let me ask you – have you refresh – or revise the
(11) question for me.
(12) Q.   Okay.
(13) A.   Are you asking me over those time frames or
(14) now?
(15) Q.   Let's start about – let's ask about it over
(16) those time frames first.
(17) A.   In those early years, the quota was set by
(18) the manager above you based on what they needed in
(19) that area to meet their quotas.
(20) Q.   Okay. And now?
(21) A.   Now, there's what they call a market
(22) prudential index where they measure your market, what
(23) your abilities are in that market, the number of
(24) employees that are available to enroll, and there's a
(25) calculation that I don't completely understand, all of

Page 22

(1)  the calculation, but then that's assigned from
(2)  headquarters.
(3)  Q.   Okay. When did that procedure change?
(4)  A.   I don't remember.
(5)  Q.   Do you remember the year?
(6)  A.   I don't.
(7)  Q.   Was it before 1997?
(8)  A.   I would be speculating. I don't remember the
(9)  exact year.
(10) Q.   Do you recall it as being something fairly
(11) recent or fairly longstanding by now?
(12) A.   Help me define that, when you say
(13) longstanding.
(14) Q.   Actually, I was going to let you define that.
(15) A.   Number of years.
(16) Q.   Within the past ten years?
(17) A.   I would say it was within the last ten years,
(18) yeah.
(19) Q.   Okay. It's based on prior years' sales,
(20) then?
(21) A.   It's based on prior years' sales. Again,
(22) it's based on the market and so forth.
(23) Q.   I'm talking about just within the past ten
(24) years, whenever it was changed, when the new procedure
(25) was changed. The quota would be based on prior years'

Page 23

(1)  sales and the market, as you just explained, right?
(2)  A.   Yeah.
(3)  Q.   Okay. Did you ever get a FAME award?
(4)  A.   Yes.
(5)  Q.   Can you tell us what a FAME award is?
(6)  A.   A FAME award is something that measures your
(7)  ability to recruit and train people and get them in
(8)  the business. It also deals with reaching and, you
(9)  know, meeting and exceeding your sales numbers.
(10) Q.   Okay. What does it stand for?
(11) A.   Founders Award for Management Excellence.
(12) Q.   Okay. Are you familiar with what a FAME trip
(13) is?
(14) A.   Yes, I am.
(15) Q.   What is that?
(16) A.   A trip that recognizes those individuals.
(17) Q.   And how is that – is that basically a prize
(18) given to the individuals who make the FAME, who get
(19) the FAME award?
(20) A.   Who meet FAME more than – at the time three
(21) times in a year. Now it's four times a year.
(22) Q.   Okay. And by FAME, that's an award that's
(23) given per quarter; is that right?
(24) A.   That's correct.
(25) Q.   Okay. So at least back a few years, if you

Page 24

(1)  got three out of four quarters where you met all those
(2)  expectations under FAME, then you got to go to this
(3)  trip; is that right?
(4)  A.   That's correct.
(5)  Q.   Okay. And AFLAC paid for that trip, I
(6)  presume?
(7)  A.   That's correct.
(8)  Q.   Okay. Now it's you have to make it all four
(9)  quarters?
(10) A.   That is correct.
(11) Q.   Okay. And that is as of what year?
(12) A.   I think – I'm thinking a year or two years
(13) ago.
(14) Q.   Okay. Now, in 1987, you got promoted to
(15) director of metropolitan development; is that right?
(16) A.   That's correct.
(17) Q.   That's a position over at headquarters,
(18) right?
(19) A.   That is.
(20) Q.   Why were you promoted?
(21) A.   Because of my abilities in working in a metro
(22) area. When I moved to Texas, I was placed in the Fort
(23) Worth area and I was able to develop, again, a
(24) successful team.
(25) Q.   What was the difference between your duties

**Page 25**

(1) as metropolitan development as compared to as RSC?
(2)    A.    I think it varies.
(3)    Q.    Is it the same duties, only a different
(4) market, or is it different duties all together?
(5)    A.    Similar duties.
(6)    Q.    Okay.
(7)    A.    But instead of doing it on a local level, my
(8) job was to go and be more the role of a consultant and
(9) go in and help other regional sales coordinators in
(10) metropolitan areas develop their organizations.
(11)    Q.    And that was the next logical progression
(12) promotion for you with your particular abilities,
(13) correct?
(14)    A.    Not necessarily.
(15)    Q.    What else could that promotion – what else
(16) could the next promotion – logical promotion have
(17) been?
(18)    A.    To a bigger region.
(19)    Q.    Okay.
(20)    A.    The promotion could have been to a state
(21) operation. And really, to some degree, I never
(22) considered it a promotion. It was a lateral move to
(23) get more education and understand better the workings
(24) of AFLAC's headquarters.
(25)    Q.    Okay. Then in 1988, the following year, you

**Page 26**

(1) were made vice president, agency director, Mountain
(2) Territory, correct?
(3)    A.    That is correct.
(4)    Q.    Why were you promoted to that position?
(5)    A.    Again, I exhibited the, you know – and,
(6) again, I'm not the person doing the promoting, so it's
(7) hard for me to, you know, to give – I'm speculating
(8) on – I'm speculating on all these answers as to why
(9) people promoted me. But my understanding would be –
(10)    Q.    That's all I'm asking for.
(11)    A.    My understanding would be because of the fact
(12) that I exhibited, again, what needs to be done to
(13) develop those areas and to manage a bigger
(14) organization.
(15)    Q.    Okay. You've had to make recommendations on
(16) the promotions of other employees, correct?
(17)    MR. STEELE:    Objection to the form; use
(18) of the word employee.
(19)    Q.    (By Mr. Aguilar) Agents.
(20)    A.    Yes, I made recommendations on those that
(21) would – would be considered. Usually there was a
(22) number of individuals that were cleared for me to
(23) interview and visit with about.
(24)    Q.    The only reason for my asking is, you
(25) understand the factors that you considered when making

**Page 27**

(1) your recommendations or decisions on promotions,
(2) correct?
(3)    A.    Restate that, please.
(4)    Q.    Sure. Whenever you made recommendations or
(5) promotions yourself, the factors you considered in
(6) making those promotions, for example, from agent to
(7) DSC or to RSC, you're familiar with the factors that
(8) you would have at least considered, right?
(9)    A.    I would say yes.
(10)    Q.    Okay. And you've been explaining those
(11) factors to us earlier so far, right?
(12)    A.    I have generalized those factors. To explain
(13) them, I would have to spend days doing that.
(14)    Q.    That's fine. I just wanted to make sure that
(15) what you've been telling us is what your understanding
(16) is as the bases for either your promotion or any
(17) agent's promotion for those particular positions; is
(18) that right?
(19)    A.    I think it varies.
(20)    Q.    Okay. But for you in particular, you've been
(21) telling us about your particular –
(22)    A.    That's correct.
(23)    Q.    – skills? Okay. So why were you promoted
(24) to agency director, Mountain Territory, to the best of
(25) your understanding?

**Page 28**

(1)    A.    Okay. Again, as I explained previously, and
(2) I thought I had answered that, that based on the
(3) successes that I've had in metro development.
(4)    Q.    Same factors that we've already discussed?
(5)    A.    Explain those factors again.
(6)    Q.    Sales, growth in the size of your team,
(7) leadership abilities and in this case –
(8)    A.    I don't believe that would have been the case
(9) on that because I wasn't measured in sales, et cetera.
(10) I didn't hold a quota while I was in headquarters.
(11)    Q.    By this point, it was more based on growing
(12) your team and your leadership abilities?
(13)    A.    Not – not on the headquarters one. It was
(14) based on my ability previously, prior to going into
(15) that position. It was based on my ability to grow
(16) teams, but it was also based on my ability to teach
(17) others how to grow teams.
(18)    Q.    Okay. And actually we were talking about
(19) your agency director.
(20)    A.    That's correct. And that was the reason I
(21) was promoted. Because the position at headquarters
(22) that I held in metro development, I was not measured
(23) in terms of a recruiting quota or the same way that a
(24) sales organization might be.
(25)    Q.    Okay. Then two years later, in 1990, is when

**Page 29**

(1) you were promoted to vice president, West Territory
(2) director, correct?
(3)    A.    That is correct.
(4)    Q.    Was that just giving you a larger area but
(5) the same duties?
(6)    A.    That is correct.
(7)    Q.    All right. Do you know why you got that
(8) promotion or larger area?
(9)    A.    I, again, would understand – again, I'm
(10) speculating on the individual that promoted me.
(11)    Q.    And I'm not asking you to speculate what
(12) anybody else is saying. I'm just asking for you to
(13) tell me what you understood the reasons were.
(14)    A.    Okay. I would think it had to do with my
(15) ability to manage an organization and build an
(16) organization.
(17)    Q.    Okay.
(18) (Exhibit No. 2
(19) (marked for identification.
(20)    Q.    (By Mr. Aguilar) I'm handing you what I've
(21) marked as Exhibit No. 2, which is a document titled
(22) Texas South 1999 Business Plan – it starts with Bates
(23) stamp No. 1469 – dated January of '99. This is a
(24) document that was prepared by – I forget who prepared
(25) it, actually – Gene Dannelly, who was Dino's prior

**Page 30**

(1) up-line person supervisor. I think he was the SSC at
(2) the time. As part of this plan, he indicated, on
(3) Page 1471, Item 2.2, Mission Statement, "The mission
(4) of the West Territory" – that would be the territory
(5) you were in charge of in 1999?
(6)    A.    That's correct.
(7)    Q.    – "is to establish the standard of
(8) leadership that will lead AFLAC into the future. To
(9) bring about a minimum 30 percent in new production
(10) each year and double digit increases to in-force
(11) premium," et cetera. That would have been the
(12) information that you would have provided as part of
(13) your general program for 1999, correct?
(14)    A.    That's correct.
(15) (Exhibit No. 3
(16) (marked for identification.
(17)    Q.    (By Mr. Aguilar) Let me hand you what I've
(18) marked as Exhibit No. 3, which is a document that
(19) starts at Bates stamp No. 1442. Let me represent to
(20) you that this is the business plan for 2001 prepared
(21) by Dennis Escobar. It's dated October 2000, though.
(22) There's a note on the very front that appears to be
(23) from Frank LaFemina. "Dennis, you did a very
(24) professional job on your business plan. Please review
(25) my notes and make some minor adjustments in your

**Page 31**

(1) numbers." If you will turn to Page 1444, at the very
(2) top, under 1-A, Mission Statement, the last sentence,
(3) Mr. Escobar apparently indicated his mission was to
(4) achieve a 12 percent increase in new production each
(5) year by exceeding MPI new accounts. Can you tell us
(6) what MPI means?
(7) **A. It refers to market prudential index.**
(8) Q. And what does that refer to?
(9) **A. Their sales quotas.**
(10) Q. Sales quotas. And then on the right side,
(11) there's a handwritten note that says, "A 25-30 percent
(12) increase is in line with state and territory
(13) objectives." Would you agree with that?
(14) **A. I would agree with it being in line with**
(15) **state and territory objectives.**
(16) Q. That's what I'm asking.
(17) **A. But I think we have to be reminded that**
(18) **headquarters is the one that establishes quotas.**
(19) Q. Okay.
(20) **A. Those are more goals than they are their**
(21) **quotas.**
(22) Q. Those are more goals than quotas?
(23) **A. That's correct.**
(24) Q. Okay. It's also more in line with your
(25) expectations, correct?

**Page 32**

(1) **A. Yes.**
(2) Q. Now, I had requested that you provide certain
(3) documents which your attorney objected to. One of the
(4) objections indicated, look on our AFLAC website and
(5) you can get the information. A couple of days ago we
(6) actually anticipated you may not be providing
(7) documents, so we did look at your AFLAC website.
(8) MR. STEELE:    Objection to the side bar
(9) on that.
(10) Q. (By Mr. Aguilar) I was just saying that for
(11) information purposes. I don't mean to imply anything
(12) by it, just to let you know where I got this from.
(13) (Exhibit No. 4
(14) (marked for identification.
(15) THE WITNESS:    Are we done with this
(16) document?
(17) Q. (By Mr. Aguilar) Yes. You can put it off to
(18) the side.
(19) I handed you what I've marked as
(20) Exhibit 4, which is titled 2003 Financial Analysts
(21) Briefing, The St. Regis, New York City. Do you
(22) recognize what a financial analyst is?
(23) **A. I have – I do.**
(24) Q. Have you seen documents similar to this
(25) before from AFLAC?

**Page 33**

(1) **A. I have.**
(2) Q. Okay. If you would turn to Page 50. There's
(3) a graph there that indicates new annualized premium
(4) sales in millions and it shows the amount of sales
(5) that have been registered or reported by AFLAC
(6) overall, correct?
(7) **A. I haven't read the documents, so I –**
(8) Q. I'm just pointing you to this area. That's
(9) what that says, New Annualized Premium Sales, correct?
(10) **A. That's my understanding.**
(11) Q. Correct me if I'm reading this incorrectly,
(12) but for 1998, it appears that there was $482 million
(13) in sales. Let me start over. In 1998, there was
(14) $482 million in sales, which represented a
(15) 20.3 percent increase in sales for that year; is that
(16) correct? Is that the correct interpretation of what
(17) that is saying?
(18) MR. STEELE:    Are you asking if that is
(19) what that graph says –
(20) MR. AGUILAR:    Yes.
(21) MR. STEELE:    – on Page 50?
(22) MR. AGUILAR:    Yes.
(23) THE WITNESS:    That's my understanding.
(24) Q. (By Mr. Aguilar) Okay. The following year,
(25) 1990, it represented $555 million in sales, which

**Page 34**

(1) was –
(2) MR. STEELE:    1999.
(3) Q. (By Mr. Aguilar) I'm sorry, 1999.
(4) MR. AGUILAR:    Thank you.
(5) Q. – in sales, which was a 15.1 percent
(6) increase, correct? That's what that says?
(7) **A. Again, that's my understanding. I didn't put**
(8) **the report together, so –**
(9) Q. Okay. This is – from what I understood,
(10) this is a document we got from AFLAC.
(11) **A. Okay.**
(12) Q. The following year, in 2000, sales reached
(13) $712 million, which represented a 28.3 percent
(14) increase in sales?
(15) **A. That's my understanding. May I add something**
(16) **here?**
(17) Q. If you would like, sure.
(18) **A. You need to understand that you're asking me**
(19) **as a territory director to comment on company numbers**
(20) **rather than territorial numbers, which I'm more**
(21) **familiar with.**
(22) Q. I understand. I'm not asking you to comment
(23) at all. I'm just asking you to help me interpret this
(24) document.
(25) **A. Okay.**

**Page 35**

(1) Q. The following year, in 2001, AFLAC had
(2) $919 million in sales, which represented a
(3) 29.1 percent increase, correct?
(4) **A. That's my understanding.**
(5) Q. And then the following year, in 2002, sales
(6) were 1,700,000,000, which represented a 16.4 percent
(7) increase in sales?
(8) **A. That's correct.**
(9) Q. Okay. If you would turn back to Page 43.
(10) We're just going to have to – pointing to this area,
(11) it's on the left side. Right here, I think. Yeah, at
(12) the bottom. "Our more than 258,000 payroll accounts
(13) translates into a penetration rate of less than
(14) five percent of the small business market." What's a
(15) payroll account?
(16) **A. A payroll account is an agreement with AFLAC**
(17) **to offer our products to employees. There needs to be**
(18) **at least three employees that participate in order to**
(19) **do that.**
(20) Q. Is that like a group account?
(21) **A. I would say they're one and the same.**
(22) Q. Okay. What is a penetration rate?
(23) **A. A penetration rate, it's – again, you know,**
(24) **you're asking me to interpret someone else's**
(25) **information.**

**Page 36**

(1) Q. I'm just asking for your understanding.
(2) **A. But my understanding of the penetration rate**
(3) **is the amount of employees within an account that are**
(4) **participating in the product.**
(5) Q. When it says penetration rate of less than
(6) five percent of the small business market –
(7) **A. Then that's talking about the number of**
(8) **accounts that are available in a respective area.**
(9) Q. In other words, like we're now in Austin and
(10) let's say there's 100 businesses with three or more
(11) people, a five percent penetration rate would mean
(12) you've got only five of those groups?
(13) MR. STEELE:    I'm going to object to the
(14) form. If you're talking about, Arnold, the small
(15) business market in Austin –
(16) MR. AGUILAR:    I'm just talking his
(17) interpretation of just this. I'm not getting accurate
(18) numbers in terms of what is actually here in Austin.
(19) Let me try to rephrase it again anyway.
(20) MR. STEELE:    Because the small business
(21) market is defined on Page 43, but however you want to
(22) use it.
(23) MR. AGUILAR:    Right. I'm just –
(24) however the term might be defined might make a
(25) difference later.

Page 37

(1) Q. (By Mr. Aguilar) But I'm just trying to
(2) understand what this means and what you're explaining
(3) to us. For example, let's say there was only 100
(4) small businesses in Austin that met that definition of
(5) small business.
(6) A. Okay.
(7) Q. And if you have a five percent penetration
(8) rate, that would mean five out of those 100 small
(9) businesses have AFLAC accounts.
(10) A. Again, that would be my understanding.
(11) Q. Okay. And that's what I thought it was. I
(12) just wanted to make sure I was on the same page. If
(13) you turn to Page 53, if you go to the bottom
(14) right-hand side, Penetration by Sales Territory, it's
(15) got some other graphs there. It has one – for the
(16) southwest, penetration would be 5.9 percent. Now, is
(17) the Valley – the Rio Grande Valley area within the
(18) southwest region?
(19) A. Yes.
(20) Q. Okay. So what this graph – and correct me
(21) if I'm wrong here, or based on your understanding,
(22) what this graph would show is that the total business
(23) is in the white block, which looks like it goes
(24) somewhere above the 600 number, and the little black
(25) area at the very bottom of each of those blocks would

Page 38

(1) be the amount of penetration or AFLAC accounts in that
(2) particular market, correct?
(3) A. You know, you're speculating here. I mean, I
(4) can't match it up with those numbers and then give you
(5) exact numbers.
(6) Q. And I'm not asking for an exact number. I'm
(7) just trying to figure out how to read this graph. Is
(8) that the right way to read that graph, as far as you
(9) understand?
(10) A. That would be my understanding. Again, I'm
(11) not the one that developed the graph.
(12) Q. And what it would show here – what this
(13) would reflect is that only 5.9 percent of eligible
(14) accounts in the southwest region are currently
(15) being – or currently have an AFLAC account?
(16) A. That would be my understanding.
(17) Q. Okay.
(18) (Exhibit No. 5
(19) (marked for identification.
(20) Q. (By Mr. Aguilar) Let me hand you what I
(21) marked –
(22) A. Do you want this one?
(23) Q. No, go ahead and hang on to that. Just don't
(24) lose it.
(25) A. Okay.

Page 39

(1) Q. – as Exhibit No. 5, which appears to be
(2) another AFLAC document representing breakdowns in
(3) particular businesses and accounts.
(4) A. May I – you know, can you inform me where
(5) this document came from?
(6) Q. If I remembered, I could. I know I got it at
(7) least from Mr. Chavez, but I don't remember where we
(8) got it from before that, whether it's a document
(9) either AFLAC provided us, we had –
(10) MR. STEELE: No, I'll represent on the
(11) record that every document we have produced has been
(12) Bates labeled with an AFL prefix. This has no Bates
(13) label on it. But if it was something that comes from
(14) Mr. Chavez's file, I'd like to see it, because I
(15) haven't seen it and it should have been produced to us
(16) in response to a document production.
(17) MR. AGUILAR: Here. I've got an –
(18) MR. STEELE: I don't know where it came
(19) from.
(20) MR. AGUILAR: I've got an extra copy if
(21) you would like to look at it.
(22) MR. STEELE: Asking the witness to
(23) confirm this is an AFLAC document, I think is
(24) improper.
(25) MR. AGUILAR: Okay.

Page 40

(1) THE WITNESS: And that's what I would –
(2) that's what I would concur with, I don't see AFLAC on
(3) it. And it's got different data on here that I'm not
(4) sure where it comes from.
(5) Q. (By Mr. Aguilar) You're familiar with some
(6) counties in AFLAC's Texas Central region, correct?
(7) A. Not all of them, no.
(8) Q. You're familiar with Cameron County as a
(9) Texas Central region, correct?
(10) A. No, I'm not.
(11) Q. Okay.
(12) A. I mean, I'm sure it's one of the counties in
(13) Texas, but I don't tie it to – again, I've got local
(14) managers that deal with all of that information.
(15) Q. Okay. Well, we may be able to establish
(16) later that this is an AFLAC document, but in the
(17) meantime, let me just ask you, in terms of
(18) penetration, for example, for Cameron County, in terms
(19) of interpreting this document, the new – have you
(20) ever seen a document like this before?
(21) A. I've seen similar documents, yes.
(22) Q. AFLAC documents?
(23) A. Documents that actually we've put together.
(24) Q. Okay. By you, you mean who?
(25) A. My office.

Page 41

(1) Q. Okay.
(2) A. The stuff that I have used or my states have
(3) used or similar.
(4) Q. You didn't use –
(5) A. No, not this format, but this information.
(6) Q. Okay. So the information isn't foreign to
(7) you; you just can't certify these particular numbers?
(8) A. That's right. This doesn't look familiar to
(9) me.
(10) Q. If, for example, in Cameron County, on the
(11) number of business with five-plus employees, there was
(12) 10,971 and the number of accounts as of April 2001 was
(13) 86, it reflects the penetration rate would have been
(14) 0.8 percent. Do you agree that that would be an
(15) accurate calculation, not necessarily telling us
(16) whether you added the numbers up. What I'm asking is,
(17) is that a proper way to determine – in other words,
(18) determine the number of accounts as of April 2001 and
(19) the number of businesses with five-plus employees and
(20) then using those figures to determine penetration?
(21) A. You know, again, if we were to look at the
(22) formula, I probably could give you more detail on
(23) that. It has the appearance that that's the correct
(24) way, but I'm not –
(25) Q. You just can't tell us for certain as far as

Page 42

(1) the numbers go?
(2) A. Right. I don't have the – I don't have the
(3) information to see what your formula is as to whether
(4) that penetration record is correct.
(5) (Exhibit No. 6
(6) (marked for identification.
(7) Q. (By Mr. Aguilar) Let me hand you what I've
(8) marked as Exhibit No. 6.
(9) A. Are you done with this one?
(10) Q. Yeah, you can put that one aside. I hand you
(11) what I've marked as Exhibit No. 6. Have you seen this
(12) document before?
(13) MR. AGUILAR: Buddy, this one also
(14) doesn't have a Bates stamp. Again, I can't remember
(15) when I got this document or from where, actually. I
(16) assume I got it from Mr. Chavez, but I just don't
(17) remember when.
(18) MR. STEELE: Just the same
(19) representation of the Bates label as to AFLAC produced
(20) documents.
(21) THE WITNESS: Have I seen this document?
(22) I have not seen this document.
(23) Q. (By Mr. Aguilar) Okay. Were you familiar
(24) with the amount of penetration in the Texas Central
(25) region?

Page 43

(1)  A.   I – yes, I have been.
(2)  Q.   Okay. Has it been generally close to
(3)  0.7 percent?
(4)  A.   I can't be specific. I mean –
(5)  Q.   You just don't recall numbers?
(6)  A.   I don't recall it. I just – you know, I
(7)  know the format and I know that I look at this
(8)  information, you know, as I go in to visit the areas,
(9)  but the exact details, I don't remember the exact
(10) detail on it.
(11) Q.   And as far as the actual penetration rate in
(12) Texas Central or even in Cameron County, can you tell
(13) us even generally your best recollection as to how
(14) much that penetration rate would have been?
(15) A.   No. No.
(16) Q.   Okay. Thank you. Going back into Exhibit
(17) No. 4. If you would turn to Page 54, top left corner,
(18) if you would read that first sentence out loud.
(19) A.   54, right here? We remain? Is that the one?
(20) Q.   (Indicating).
(21) A.   Right here. "In looking at the number of
(22) AFLAC payroll accounts as a percentage of total
(23) business by territory, you can see that we have just
(24) scratched the surface of the U.S. market."
(25) Q.   Okay. If you go down over here, I think it

Page 44

(1)  says, "We believe the U.S. market for supplemental
(2)  insurance products in the United States is vast and
(3)  underpenetrated." The second – the sentence after
(4)  refers to your Japan production. Then the next
(5)  sentence says, "The U.S. population is aging and
(6)  health care costs, deductibles and copayments are
(7)  rising. To us, that means the potential in this
(8)  market should continue to expand." Do you agree with
(9)  that?
(10) A.   I agree.
(11) Q.   If you turn to Page 66, and if you go down –
(12) actually, this continues on through Page 78. This
(13) references the management team. Can you tell us what
(14) the management team is?
(15) A.   The management of AFLAC.
(16) Q.   Okay. The board of directors, the officers,
(17) all the people in charge?
(18) A.   I don't – you know, again, I didn't put the
(19) document together, but the management team, I think
(20) would – yes, I believe it represents the officers of
(21) AFLAC.
(22) Q.   Do you recognize a lot of people in those
(23) photos and their names?
(24) A.   I recognize some of them, yes.
(25) Q.   And those are officers, directors, people in

Page 45

(1)  charge?
(2)  A.   That's correct.
(3)  Q.   Okay. I counted 54 officers in the U.S. and
(4)  32 in Japan. Does that sound about right?
(5)  A.   I don't know.
(6)  Q.   Let me just represent to you that those are
(7)  the numbers I came up with. It's either the exact
(8)  number or very close to it. Of those management team
(9)  people, can you identify any of them who are Hispanic?
(10) And feel free to take a moment to look through each
(11) one.
(12) MS. LEEDS:   I guess I need to object
(13) just to the extent of what you mean by Hispanic.
(14) Hispanic surname?
(15) Q.   (By Mr. Aguilar) Any? You can answer.
(16) A.   You know, again, I don't – I don't
(17) understand their background or nationality based on
(18) their name, but to the best of my knowledge, I don't
(19) see –
(20) Q.   Any?
(21) A.   – any that I'm aware of.
(22) Q.   – Either by name or by recognition of that
(23) particular person as a Hispanic, correct?
(24) MR. STEELE:   Object to the form. You're
(25) assuming he knows whether the person has a Hispanic

Page 46

(1)  mother that would not appear in the surname.
(2)  MR. AGUILAR:   I'm just asking for any he
(3)  could recognize.
(4)  Q.   (By Mr. Aguilar) Any?
(5)  MR. STEELE:   That's a different
(6)  question.
(7)  THE WITNESS:   No, none that I know of.
(8)  Q.   (By Mr. Aguilar) Okay. Let me hand you what
(9)  I had previously marked as Errisuriz Exhibit No. 8.
(10) Have you seen that document before today?
(11) A.   Yes, I have.
(12) Q.   When did you first see it?
(13) A.   As I recall, in Atlanta – at our Atlanta
(14) meeting.
(15) Q.   This was a letter sent from Dr. Noe Sauceda
(16) at the Brownsville Independent School District
(17) addressed to Mr. Chavez on November 29, 2001, and it
(18) indicates a cc to the BISD Board of Trustees, Frank
(19) LaFemina, AFLAC's State Office, and possibly others on
(20) any other pages. But you said you first saw it at the
(21) home office in Atlanta?
(22) A.   At the Atlanta meeting, which is the RSC/SSC
(23) meeting.
(24) Q.   And when was that?
(25) A.   The first part of December, that year.

Page 47

(1)  Q.   You don't remember the date, do you?
(2)  A.   It's – I usually go in early. I can't even
(3)  remember which day it is. But it's in that – it was
(4)  in that first week or so of December.
(5)  Q.   Of 2001, right?
(6)  A.   I would assume since that's when the letter
(7)  is dated.
(8)  Q.   How did you get it? How did it come up to
(9)  you?
(10) A.   I was made aware that there was a challenge
(11) and that we would be going over the information on
(12) this.
(13) Q.   There was a what?
(14) A.   That there was a concern or a challenge.
(15) Q.   What do you mean by a challenge?
(16) A.   Just that something is not right, something
(17) that we've got to try to look at and fix.
(18) Q.   Okay.
(19) A.   Okay.
(20) Q.   Who was it you were talking to?
(21) A.   It was – you know, I don't recall. I know
(22) who I met with later, but I don't recall on this
(23) particular document and the issue.
(24) Q.   Okay.
(25) A.   I know I had received an e-mail from Dino in

Page 48

(1)  relationship to not being able to – not attending the
(2)  meeting and that's when I –
(3)  Q.   Okay. The first person that you do remember
(4)  talking to, whoever it might have been, do you
(5)  remember what you were talking about, other than just,
(6)  this is something we need to take care of?
(7)  A.   It was Janet Baker.
(8)  Q.   Do you remember what you-all talked about?
(9)  A.   Not in detail.
(10) Q.   Just the extent of what you recall is what
(11) you've already told us, just that you remember talking
(12) to her, that this is an issue that we need to take
(13) care of, and you-all moved on to the next item you-all
(14) talked about?
(15) A.   Well, it was – it was more – generally, I
(16) can tell you. It was related to the issues as it
(17) surrounds Dino and the Brownsville school district
(18) and not being able to – you know, the things that had
(19) gone on in relationship to him not getting a renewal
(20) on this.
(21) Q.   Okay.
(22) A.   Okay?
(23) Q.   Do you remember what she said?
(24) A.   As far as going through the information, she
(25) wanted to schedule a meeting with Frank LaFemina when

Page 103

(1)  A.   Similar.
(2)  Q.   Okay. And going back to the first page, on
(3)  the bottom, you have October 2000, the third quarter
(4)  he received a 2000 FAME award. That means he met
(5)  those – level of criteria. Tell us again what the
(6)  FAME award involves, what the criteria are.
(7)  A.   Well, the criteria is recruiting, it's
(8)  training, it falls under those categories.
(9)  Q.   Recruiting, training and sales also?
(10) A.   Uh-huh.
(11) Q.   Okay. Then he also, again, was the No. 1
(12) Texas Central top RSC on recruiting and that's one of
(13) the factors that goes into the FAME award, right?
(14) A.   For that quarter, he was, yes.
(15) Q.   Okay. Then in December 2000, he got the
(16) West Territory Pride award, and I think you talked to
(17) us earlier about that one, right?
(18) A.   Yes, I did.
(19) Q.   And then in January 2001, he got the 2000
(20) Coordinator's Silver MPI Key Club award. Is that an
(21) annual thing or a quarterly award?
(22) A.   That's an annual award.
(23) Q.   Okay. And that's based on his receiving or
(24) achieving MPI over the year, right?
(25) A.   It's based on the number, yes, for the year.

Page 104

(1)  Q.   Okay. He got – for the fourth quarter 2000
(2)  he was the No. 1 RSC in the entire West Territory
(3)  based on a percent MPI. Actually, if you look at
(4)  Page 1206 on Exhibit 13.
(5)  A.   Give me a second to look at something because
(6)  you've got – the award apparently was given out. I
(7)  thought it would be in December, but it's – okay.
(8)  206?
(9)  Q.   1206. Is that the document?
(10) A.   Is that document wooden or is it a plaque?
(11) Q.   Is that a plaque that he would have received?
(12) A.   That would have been a plaque he received.
(13) Q.   And that's got the teamwork logo –
(14) A.   That's correct.
(15) Q.   – at the top? Can you read what it says on
(16) that?
(17) A.   "Teamwork is the ability to work together
(18) toward a common vision. The ability to direct
(19) individual accomplishment toward organizational
(20) objectives. It is the fuel that allows common people
(21) to obtain uncommon results."
(22) Q.   You were actually the one who handed
(23) Mr. Chavez this award, weren't you?
(24) A.   I don't recall.
(25) Q.   Okay. The following item, the 2000 Texas

Page 105

(1)  Central Regional Sales Coordinator of the Year based
(2)  on percent MPI. That's the following page. And
(3)  that's based on 144 percent, correct, MPI?
(4)  A.   That's what it says.
(5)  Q.   Okay. Mr. Chavez also got a fourth quarter
(6)  2000 FAME award and he was the No. 1 TX-C RSC, Texas
(7)  Central RSC for percent MPI as well, right?
(8)  A.   Texas Central?
(9)  Q.   Right.
(10) A.   You know what? Again, that's the criteria
(11) for that state.
(12) Q.   Okay.
(13) A.   I mean, if it says that. I don't know
(14) whether that's –
(15) Q.   When he qualified for the 2000 Texas Central
(16) convention that was in Acapulco, Mexico, do you know
(17) if the criteria had changed any for that?
(18) A.   I don't know.
(19) Q.   He also got the fourth quarter 2000 Paul S.
(20) Amos Founders Award. Can you tell us what the
(21) Founders Award is?
(22) A.   That's, again, the award you receive for
(23) FAME.
(24) Q.   Okay. In other words, having received a
(25) certain number of FAMEs throughout the year, at that

Page 106

(1)  point it was –
(2)  A.   You actually get a FAME award with every one
(3)  of these achievements that he got.
(4)  Q.   Okay. Then in February of 2000 – I'm sorry.
(5)  Then also he surpassed the MPI 300 for the year 2000.
(6)  That's kind of a big deal there, again, right?
(7)  Surpass MPI 300 for the year 2000?
(8)  A.   Uh-huh.
(9)  Q.   Then in February 2001, he got a 2000 FAME
(10) trip to Las Vegas. Same criteria, same basic criteria
(11) that you used to qualify for that trip?
(12) A.   Yeah.
(13) Q.   In April 2001, he got – he was the No. 1
(14) TX-C, Texas Central RSC for new accounts in the first
(15) quarter. Then in May 2001, Texas Central RSC trip
(16) qualifier. This time he got to go to Paradise Island
(17) in the Bahamas. Is that the same criteria?
(18) A.   I have no idea.
(19) Q.   Okay. That would be the same – who sets
(20) that criteria?
(21) A.   The state sales coordinator and the
(22) management team. Dino would have helped set that
(23) criteria.
(24) Q.   Then in August 2001, the second quarter, he
(25) got a 2001 FAME award and he qualified to go to the

Page 107

(1)  convention in Hawaii. Again, that's criteria set by
(2)  the state agent, right?
(3)  A.   National convention? National convention is
(4)  not set by the state – it's set by the company.
(5)  Q.   How does one qualify for the national
(6)  convention?
(7)  A.   Meet the criteria as outlined.
(8)  Q.   And what was the criteria?
(9)  A.   I don't recall.
(10) Q.   Is it based on sales, growth, employee –
(11) A.   It's based on sales and the team. You know,
(12) it could vary. It could have – you know, over the
(13) years we have different criteria. As it relates,
(14) normally, it's about sales.
(15) Q.   Okay. How many agents or RSCs usually
(16) qualify to go to the national convention?
(17) A.   I don't even recall.
(18) Q.   As a percentage, roughly, do you know?
(19) A.   I have no idea.
(20) Q.   Okay. Then during the second quarter, he was
(21) No. 3 Texas Central RSC for new accounts and for
(22) percent MPI. Kind of a big deal to get two different
(23) categories that high, isn't it?
(24) A.   It's – being No. 3, yeah. I mean, I'm –
(25) he certainly earned the right to be recognized.

Page 108

(1)  Q.   Okay. In October 2001, then, Week 43, he was
(2)  the No. 11 Regional Sales Coordinator in the Entire
(3)  West Territory. Can you tell us how big the Entire
(4)  West Territory is?
(5)  MS. NEALLY:   At that time?
(6)  THE WITNESS:   At that time? Again, as a
(7)  region or as a – you're not talking about a
(8)  salesperson, you're talking about as a region at that
(9)  time?
(10) Q.   (By Mr. Aguilar)   Right.
(11) A.   And we're talking about one week of
(12) production?
(13) Q.   I'm just asking how big the West Territory
(14) is.
(15) A.   Okay. You know – and, again, gosh, it's
(16) varied, you know, depending on the years. We've gone
(17) through so many expansions. It changes. And, you
(18) know, probably – again, I'm going to speculate. I
(19) would have to guess. I'm going to say I don't know.
(20) Q.   Okay. You're in charge of the West
(21) Territory, right?
(22) A.   That is correct.
(23) Q.   And can you tell us how big the territory is
(24) now?
(25) A.   Right now, I've got 64 regional sales

Page 109

(1) coordinators.
(2)    Q.    Geographically speaking.
(3)    A.    Geographically speaking, it now covers the
(4) Dakotas, Minnesota, Missouri, Iowa and brings all
(5) those states along that area over to the California
(6) line.
(7)    Q.    Okay. And back in October of 2001, was it
(8) larger or smaller?
(9)    A.    It was larger.
(10)    Q.    How much larger was it before the last prior
(11) change?
(12)    A.    It did not include the Minnesota, Missouri or
(13) the Iowa operations, but it included now all the
(14) Southwest Territory.
(15)    Q.    Okay.
(16)    A.    And minus the Arkansas operation.
(17)    Q.    And the Southwest Territory now also includes
(18) what?
(19)    A.    It includes Texas, it includes Louisiana, it
(20) includes New Mexico and Oklahoma and Arkansas now.
(21)    Q.    Okay. And back in October of 2001, that area
(22) would have been in the West Territory as well, right?
(23)    A.    That's correct.
(24)    Q.    Okay. So to be even for just one week, to be
(25) No. 1 in that entire sales area –

Page 110

(1)    A.    It would be No. 11.
(2)    Q.    I'm sorry. No. 11 in that entire sales area,
(3) it's still kind of a big deal, isn't it?
(4)    A.    Oh, it's – yeah. It's –
(5)    Q.    Something to be proud of?
(6)    A.    It is.
(7)    Q.    Okay. In November 2001, he got third quarter
(8) FAME award, and in January of 2002 he got some other
(9) awards. Actually, I want to ask you about some of
(10) those awards. Before I do that, though, let me show
(11) you what I've marked as Exhibit No. 14, which is AFLAC
(12) No. 4171. This is a document that you provided us
(13) this morning. Do you recognize it? I think it came
(14) out of your file.
(15)    A.    Uh-huh. Yeah, I recognize it.
(16)    Q.    You indicate he took over as RSC for a
(17) scratch region. What does that mean?
(18)    A.    That means an organization that may only have
(19) been made up with his district and maybe a few other
(20) things that were added in.
(21)    Q.    Basically, he was starting from ground zero?
(22)    A.    Not ground zero, but – you know, ground zero
(23) maybe as a region, but not as a structure.
(24)    Q.    Okay. In other words, the structure that –
(25) there was no structure there before, he had to

Page 111

(1) establish it?
(2)    A.    No, there was structure there. He just
(3) assumed some of the role, as I recall.
(4)    Q.    Do you remember how many agents?
(5)    A.    I don't – I don't remember.
(6)    Q.    What does it mean generally then for a – to
(7) have a scratch region?
(8)    A.    Let me state the structure. As I recall,
(9) Dino had a district, you know, but I – again, I don't
(10) want to speculate.
(11)    Q.    Okay. Tell me again, what does it mean for
(12) somebody to have a scratch region?
(13)    A.    Scratch region normally means something
(14) that's starting out.
(15)    Q.    Something that's what?
(16)    A.    They're starting out.
(17)    Q.    Okay.
(18)    A.    And the reason for the letter was to try help
(19) him so he could go to the convention. Are you done
(20) with that?
(21)    Q.    You can put that down.
(22)    A.    Okay.
(23) (Exhibit No. 15
(24) marked for identification.
(25)    Q.    (By Mr. Aguilar) I'm handing you what's

Page 112

(1) marked Exhibit 15. This is Bates number 1202.
(2)    A.    Right.
(3)    Q.    It's a memo from you to Dino dated
(4) December 26th, 2000. This is after he reached
(5) 101.17 percent of MPI –
(6)    A.    He was –
(7)    Q.    – for Week 37 year-to-date.
(8)    A.    Actually, it was 37 year-to-date and it's
(9) actually a little card that we send out.
(10)    Q.    Okay. "Keep doing the best you know how and
(11) always strive to achieve higher goals. Your hard work
(12) is very much appreciated."
(13)    A.    That's correct.
(14) (Exhibit No. 16
(15) (marked for identification.
(16)    Q.    (By Mr. Aguilar) I'm handing you what's
(17) marked Exhibit 16, another memo you sent to Dino,
(18) "Congratulations on winning this year's Pride Award."
(19)    A.    Yeah, we talked about that.
(20)    Q.    "I am proud to have you as part of the West
(21) Territory team. Thank you for your hard work." And
(22) that's dated what? Do you remember when you sent that
(23) to him?
(24)    A.    I don't remember. We sent them out
(25) probably – I would say it was probably in late

Page 113

(1) December, early January.
(2)    Q.    Of what year?
(3)    A.    I don't know. It doesn't say.
(4)    Q.    I'm trying to see where he got –
(5)    A.    He won the Pride Award two or three times
(6) there. As I recall, we looked at that.
(7)    Q.    If you would look on Exhibit 12 and tell me
(8) the different times he won a Pride Award.
(9)    A.    He won it in '99.
(10)    Q.    What month?
(11)    A.    December.
(12)    Q.    Is it an annual –
(13)    A.    No, it's for a three or four-week period of
(14) December.
(15)    Q.    Okay.
(16)    A.    He won it in 2000. I don't see a B on that.
(17) So he won it for two years.
(18)    Q.    Okay.
(19) (Exhibit No. 17
(20) (marked for identification.
(21)    Q.    (By Mr. Aguilar) I'm handing you what I've
(22) marked as Exhibit 17. This is another letter from you
(23) to Mr. Chavez dated June 15, 2000. You indicate, "As
(24) a member of the 1999 Pride Club, you had your picture
(25) taken with Dan Amos in recognition of your

Page 114

(1) accomplishment."
(2)    A.    That's right.
(3)    Q.    Dan Amos is the president of AFLAC, correct?
(4)    A.    Chairman of the board.
(5)    Q.    Chairman of the board.
(6)    A.    CEO, chief executive officer.
(7)    Q.    "Enclosed you will find your autographed,
(8) framed picture. I wished I could present it to you in
(9) person. With the picture comes my deepest
(10) appreciation for you and the hard work that earned you
(11) this prestigious honor."
(12)    A.    That's correct.
(13)    Q.    Okay.
(14)    A.    That wasn't an additional award.
(15)    Q.    That was just –
(16)    A.    The picture that followed with an autograph
(17) of Dan Amos.
(18)    Q.    It's a particular award?
(19)    A.    Right.
(20) (Exhibit No. 18
(21) (marked for identification.
(22)    Q.    (By Mr. Aguilar) I'm handing you what I've
(23) marked as Exhibit 18. This is another memo from
(24) you – it looks like another card – dated February 2,
(25) 2001, "Enclosed is your Successories picture depicting

Page 121

(1) in your future endeavors. I know I can count on you
(2) in 2002." What were you saying you can count on him
(3) in 2002 for?
(4)    A.    Dino is still an associate, isn't he? He's
(5) still on my team at that point. And, you know, he's
(6) still someone I consider a friend, regardless of all
(7) the situations. So I'm going to encourage him, I'm
(8) going to hope for the best for him and I'm going to
(9) encourage him to continue on. That's what that is
(10) saying.
(11)    Q.    Okay.
(12)    A.    I don't want – well, I think you can read
(13) into it what you want.
(14)    Q.    Now, BISD was a client of AFLAC only because
(15) of Dino's work, right?
(16)    A.    As I understand it, yes.
(17)    Q.    In other words, it was a scratch account?
(18)    A.    That's – that's – well, scratch account,
(19) whatever, it's a new account. He brought it in, as I
(20) understand it, yes.
(21)    Q.    There was no prior BISD group account before
(22) Dino?
(23)    A.    Not that I'm aware of.
(24)    Q.    Now, in –
(25)    A.    Whether there had been in previous years or

Page 122

(1) not, I don't know. I don't know that.
(2)    Q.    Okay. Were you aware that AFLAC sold about
(3) $450,000 in 2001 BISD's enrollment?
(4)    A.    I know there was a large amount. I didn't
(5) know the exact amount.
(6)    Q.    Were you aware that Dino is credited only for
(7) $120,000 in overwrites or possibly even less than
(8) that?
(9)    A.    Again, I've got state managers who runs an
(10) organization that keeps track of that. No, I don't
(11) recall that.
(12)    Q.    You agree, however, that Dino did not get any
(13) credit for the $330,000 in overwrites or any split on
(14) the $450,000 in sales?
(15)    A.    Again, I don't – I don't know. I don't
(16) recall. I don't know the situation on it. I have
(17) lots of agents and managers.
(18)    Q.    Let me represent – I'm sorry.
(19)    A.    Go ahead.
(20)    Q.    Let me represent to you that those are the
(21) numbers as we've been able to calculate them, roughly.
(22) Now, if you include that in Dino's total sales for
(23) that year, the total would be about 1.99 million, if
(24) you had included those numbers and Dino had been able
(25) to do the 2001 BISD enrollment.

Page 123

(1)    MR. STEELE:    Object to the form of the
(2) question. You're assuming facts not in evidence. If
(3) you want to state hypothetically that's what Arnold
(4) Aguilar has figured out, that's fine. But to state it
(5) as a fact, I object as to form of the question.
(6)    Q.    (By Mr. Aguilar) Now, that $450,000 in sales
(7) is only 23 percent of 1.99 million – that's just the
(8) math – let me just represent to you, okay?
(9)    A.    If that's what your calculations say, but
(10) it's not my calculation.
(11)    Q.    Now, the only complaint – have you ever
(12) received any complaint about Dino from a client other
(13) than that one letter you received from Dr. Sauceda?
(14)    A.    I think there was – and I don't recall, but
(15) I think there was something in the file that I had
(16) given to you earlier where there was something
(17) suggested, but, you know –
(18)    Q.    That was from a potential agent, wasn't it?
(19)    A.    But I don't recall any others. That's the
(20) only one that I can think of.
(21)    Q.    I think you provided us with a copy of a
(22) letter this morning that was from an agent saying that
(23) he had trouble getting ahold of Dino when he was
(24) trying to set up an appointment; is that right?
(25)    A.    I think that may be the case, yes.

Page 124

(1)    Q.    Okay. Other than that and other than the
(2) letter from Dr. Sauceda, are you aware of any other
(3) complaint you ever received about Dino's work?
(4)    A.    I wish I had that – the file because I think
(5) there was something else in there besides that. It
(6) just hits me that there was one other item.
(7)    Q.    Your attorney has handed you a letter. Does
(8) that help refresh your recollection?
(9)    A.    Yeah, there's one on December the 2nd.
(10)    Q.    Who that from?
(11)    A.    And it's – it's to Gene Dannelly and it's
(12) from Jeff Willis.
(13)    Q.    And Jeff Willis is the lawyer sitting here,
(14) right?
(15)    A.    Right, right.
(16)    Q.    Any other letters from – any other
(17) complaints that you ever recall receiving from any
(18) client, not from your lawyers? And your attorney has
(19) handed you another letter from the lawyer.
(20)    A.    It's not from a client.
(21)    Q.    Okay. Now, you've had other clients complain
(22) about other agents or RSCs, correct?
(23)    A.    That is correct.
(24)    Q.    Have you fired any of them within five days
(25) of their complaint? Can you name any that you have

Page 125

(1) fired within five days of their complaint?
(2)    MR. STEELE:    Objection; form. Assumes
(3) facts not in evidence.
(4)    THE WITNESS:    Again, without having the
(5) information in front of me, it would be hard to
(6) determine.
(7)    Q.    (By Mr. Aguilar) None that you can think of?
(8)    A.    I don't even think Dino was within five days.
(9) I think he was given by contract the 30-day notice.
(10)    Q.    You're not familiar with the conversation he
(11) had with Mr. LaFemina, right?
(12)    A.    You'll have to explain to me what that
(13) conversation –
(14)    Q.    Were you aware that Mr. LaFemina contacted
(15) Dino by phone on or about the 3rd of December and told
(16) him he was fired?
(17)    A.    No, I'm not aware of that.
(18)    Q.    Okay. In any case, can you tell us the name
(19) of any person that was fired within five days of a
(20) complaint that was received from that person – or on
(21) that person?
(22)    A.    Let me back up and answer that question
(23) again.
(24)    Q.    Which one?
(25)    A.    The one you just asked.

Page 126

(1)    THE WITNESS:    What was the question that
(2) was prior to this one?
(3)    MR. STEELE:    If you were aware of a
(4) conversation that Frank LaFemina had with Dino on
(5) December the 3rd.
(6)    THE WITNESS:    Okay. Let me – you're
(7) saying within the time frame that Frank did that,
(8) right?
(9)    Q.    (By Mr. Aguilar) I said that – let me start
(10) all over.
(11)    A.    Okay.
(12)    Q.    Were you aware that Frank LaFemina talked to
(13) Dino Chavez on or about December 3, 2001 at which time
(14) he told him that he was fired?
(15)    A.    Okay. Was I aware at that time?
(16)    Q.    No. Are you aware now that he did it at that
(17) time?
(18)    A.    I'm aware since then, but I wasn't aware at
(19) the time.
(20)    Q.    Okay.
(21)    A.    I wanted to make sure I corrected that.
(22)    Q.    Now, getting back to my other question, are
(23) you aware of any –
(24)    A.    Let's say this. I was aware that that was
(25) suggested that he said that.

BSA    ORAL AND VIDEOTAPED DEPOSITION OF LYNN GEORGE BARNSON    XMAX(23/23)

Page 133

(1) years of his life for AFLAC, he exceeded higher – he
(2) exceeded everyone's expectations throughout the years.
(3) He has gotten numerous awards that we've gone over,
(4) he's made a lot of money for AFLAC, he's built his
(5) reputation through his work with AFLAC. And because
(6) of the complaint of one person who ultimately ended up
(7) getting fired anyway, who the board disagreed with, a
(8) client who AFLAC wouldn't have had but for Dino's
(9) efforts, because of that one thing, AFLAC fired him
(10) within less than five days, and I'm trying to find out
(11) why.
(12)    MR. STEELE:    Objection; form.
(13)    MS. LEEDS:    Objection; form.
(14)    Q.    (By Mr. Aguilar) Can you tell us why?
(15)    MR. STEELE:    Objection; form.
(16)    MS. LEEDS:    Objection; form.
(17)    MR. STEELE:    Asked and answered,
(18) argumentative, misstates the record, mischaracterizes
(19) prior testimony, and, if I haven't already said it,
(20) asked and answered.
(21)    THE WITNESS:    And, also, I would
(22) recommend that you talk to Janet Baker.
(23)    Q.    (By Mr. Aguilar) She's not here right now;
(24) you are. Can you tell us why?
(25)    A.    Then you need to bring Janet here.

Page 134

(1)    Q.    Can you tell us why?
(2)    A.    I don't know.
(3)    MR. STEELE:    It's been asked and
(4) answered.
(5)    THE WITNESS:    I was going to say, I
(6) mean –
(7)    Q.    (By Mr. Aguilar) Have you ever fired – or
(8) are you aware of anybody – I'll try to rephrase this.
(9) Have you yourself ever fired any RSC who was not
(10) Hispanic because of the complaint of a single person?
(11)    A.    Over the years – and, again, as a
(12) coordinator, you know, you have the responsibility to
(13) grow an organization and to manage performance and to
(14) look out for the best interests of AFLAC, and we
(15) represent – and to look out for the best interests of
(16) the client. And I'm sure there are situations where
(17) that has taken place.
(18)    Q.    Can you tell us when?
(19)    A.    Let me finish, okay, if I may. Okay? I'm
(20) sure there is. But I don't keep record of all the
(21) people that's been affected one way or another because
(22) I believe in my team, I want my team to grow. And
(23) does it happen? Yeah, it happens. Can I give you the
(24) specifics? No, I can't give you the specifics. I
(25) don't know.

Page 135

(1)    Q.    You can't name anyone that you have fired who
(2) was not Hispanic because of a complaint of a single
(3) person, can you?
(4)    A.    A complaint of a single person?
(5)    Q.    One person –
(6)    A.    I don't recall.
(7)    Q.    Okay. And what you were telling us while
(8) ago was what your expectations would be for what AFLAC
(9) has done, right?
(10)    MR. STEELE:    Objection; form.
(11)    THE WITNESS:    What expectations?
(12)    Q.    (By Mr. Aguilar) In other words, when I
(13) asked you about naming a single agent who was not
(14) Hispanic who was fired because of a complaint of a
(15) single person, you went into an explanation as to what
(16) you would expect to see. You were really talking
(17) about AFLAC in general, right?
(18)    MR. STEELE:    Objection; form.
(19)    THE WITNESS:    Sometimes I get confused
(20) as to where you're going.
(21)    Q.    (By Mr. Aguilar) I'll rephrase it. I asked
(22) you about yourself individually and now I'm asking
(23) about AFLAC.
(24)    A.    Because you've asked this question three or
(25) four times, and I'm not sure where you're coming from

Page 136

(1) on it.
(2)    Q.    That's why I'm going to be specific now. You
(3) already told us, I think, about yourself individually.
(4) Now I'm asking about AFLAC generally. Can you tell us
(5) the name of a single person who was not Hispanic who
(6) AFLAC fired because of the complaint of a single
(7) person? Can you name one?
(8)    A.    Again, I don't – I don't know of anyone. I
(9) mean, I know –
(10)    Q.    Can you tell us –
(11)    A.    Can I get into the specifics of every
(12) individual situation? You know, I don't recall the
(13) information as it relates to him, okay? I've assigned
(14) that question personally because I sign the assignment
(15) sheet that makes the recommendation, they go to
(16) headquarters, headquarters then sends them out. I
(17) don't keep the time frames. I don't keep track of
(18) that record. So the answer – in general, can I think
(19) of things generally? I could think of things
(20) generally, but I want to be specific about it and so
(21) I'm not going to – my answer is that I don't know at
(22) this point. I can't remember. Okay?
(23)    Q.    In December of 2001 and going through January
(24) and February of 2002, you were the West Territory
(25) director, right?

Page 137

(1)    A.    December of 2001 through –
(2)    Q.    January and February of 2002.
(3)    A.    I was, you're right.
(4)    Q.    Okay. You were the supervisor of Frank
(5) LaFemina, correct?
(6)    A.    That is correct.
(7)    Q.    Frank LaFemina was the supervisor of Dino
(8) Chavez, right?
(9)    A.    I don't know that the word is supervisor.
(10) They were the coordinator.
(11)    Q.    Okay.
(12)    A.    Again, I'm dealing with an independent
(13) contract and I think supervisor implies that the
(14) person is an employee and they are not.
(15)    Q.    Okay. Can you tell us why it was necessary
(16) to get rid of the Mexican guy, Dino, and bring in the
(17) Anglo, Ron Levine, to supervise the enrollment
(18) contracts and take over as RSC at that time?
(19)    MR. STEELE:    Objection; argumentative.
(20) Objection; misstates facts in evidence. Objection;
(21) form. Objection – what's the word I'm looking for –
(22) emotionally charged and an improper question.
(23)    THE WITNESS:    And I'll ask you to
(24) rephrase the question.
(25)    Q.    (By Mr. Aguilar) Why was it necessary to

Page 138

(1) fire Dino, the Mexican guy, and bring in the Anglo,
(2) Ron Levine, to supervise the enrollment contracts and
(3) take over as RSC in the beginning of December 2001?
(4)    MR. STEELE:    Objection; form.
(5) Objection; argumentative. Objection as to misstating
(6) the record. And you don't have to answer that
(7) question unless you know the answer. And it assumes a
(8) lot of facts that are misstated.
(9)    THE WITNESS:    Okay. Then I'll pass.
(10)    Q.    (By Mr. Aguilar) You were the West Territory
(11) director above the person above Dino, right?
(12)    A.    That's correct.
(13)    Q.    And you can't tell us why it was necessary,
(14) can you?
(15)    A.    Necessary to what?
(16)    Q.    To fire the Mexican guy and bring in the
(17) Anglo guy.
(18)    MR. STEELE:    Objection; argumentative.
(19) Objection; misstates the record. Objection; improper
(20) as an officer of this court.
(21)    THE WITNESS:    Can I see counsel for a
(22) moment?
(23)    MR. STEELE:    Sure.
(24)    Q.    (By Mr. Aguilar) If you can just answer the
(25) question.

# REPORTER'S CERTIFICATE

THE STATE OF TEXAS        *

COUNTY OF TRAVIS          *

I, GERRI C. BARKER, Certified Shorthand Reporter in and for the State of Texas, do hereby certify that, pursuant to the agreement of counsel, came on before me on the 30th day of September, 2003, the following named person, LYNN GEORGE BARNSON, who was duly sworn to testify to the truth and nothing but the truth touching and concerning the matters in controversy in this cause; that he was thereupon carefully examined upon his oath and his examination reduced to typewriting under my supervision; and this deposition is a true record of the testimony given by said witness.

I further certify that I am neither attorney, nor counsel for, nor related to, nor employed by any of the parties to the action in which this deposition is taken; and, further, that I am not a relative nor employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

Certified to by me this the ___13___ day of ___October___, 2003.


_____
GERRI C. BARKER, TEXAS CSR 2219
Expiration Date:  12/31/03
Firm Registration No. 241
114 West 7th Street, Suite 750
Austin, Texas  78701
512-499-0277

# EXHIBIT B-2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION


DINO X. CHAVEZ              *
                           *
VS.                        *
                           *
BROWNSVILLE INDEPENDENT *
SCHOOL DISTRICT, NOE       *
SAUCEDA, and RANDY         *   CIVIL ACTION NO.
DUNN, MARILYN DEL          *     B - 02 - 128
BOSQUE-GILBERT and         *
HUGH EMERSON, JR.,         *
in their official         *
capacities as Board       *
Members of Brownsville    *
Independent School        *
District                  *


**********************************************

ORAL AND VIDEOTAPED DEPOSITION OF

FRANK D. LaFEMINA

MAY 22, 2003

VOLUME 1

**********************************************

1 **ORAL AND VIDEOTAPED DEPOSITION OF**

2 **FRANK D. LaFEMINA,** produced as a witness at the

3 instance of the Plaintiff and duly sworn, was taken in

4 the above-styled and numbered cause on the 22nd day of

5 May, 2003, from 2:01 p.m. to 3:56 p.m., before

6 GERRI C. BARKER, Certified Shorthand Reporter in and

7 for the State of Texas, reported by machine shorthand,

8 at the offices of Locke, Liddell & Sapp, L.L.P.,

9 100 Congress Avenue, Suite 300, Austin, Texas 78701,

10 pursuant to the Federal Rules of Civil Procedure and

11 the provisions stated on the record or attached

12 hereto.

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 7

(1)  A.  Yes, sir.
(2)  Q.  Also, you need to answer audibly because the
(3)  court reporter can only get down verbal responses.
(4)  She can't get down nods of the head. So even though
(5)  we do have a videotape of this, we're asking – we
(6)  need you to answer verbally so she can get a verbal
(7)  response to write down, okay?
(8)  A.  Yes, sir.
(9)  Q.  At any time you need to take a break for any
(10) reason let us know and we can take a break also.
(11) What's your current address?
(12) A.  112 Bella Cima Drive.
(13) Q.  I'm sorry? Ella?
(14) A.  Bella, B-E-L-L-A, Cima, C-I-M-A, Drive.
(15) Q.  C-E-M-A?
(16) A.  C-I-M-A.
(17) Q.  C-I-M-A Drive. And where is that?
(18) A.  Austin.
(19) Q.  78 –
(20) A.  734.
(21) Q.  What's your current work address?
(22) A.  That would be 107 South Ranch Road 620, Suite
(23) 104, same city and zip.
(24) Q.  Who do you work for?
(25) A.  Myself.

Page 8

(1)  Q.  Is it just a sole proprietorship? Is it a
(2)  partnership?
(3)  A.  I'm self-employed. It's a sole
(4)  proprietorship.
(5)  Q.  Okay. Who pays the overhead, that sort of
(6)  stuff?
(7)  A.  I do.
(8)  Q.  Who pays the secretary, who pays the – how
(9)  many staff do you have?
(10) A.  One.
(11) Q.  Okay. And who's that?
(12) A.  My administrator.
(13) Q.  And what's his or her name?
(14) A.  Cindy Acosta.
(15) Q.  Okay. Who pays her salary?
(16) A.  I do.
(17) Q.  Okay. What kind of business are you in?
(18) A.  The insurance business.
(19) Q.  Who pays – I guess you pay all the overhead
(20) for your office?
(21) A.  I do.
(22) Q.  Is Cindy an employee or is she an independent
(23) contractor?
(24) A.  She's an employee.
(25) Q.  All right. What kind of insurance do you

Page 9

(1)  sell?
(2)  A.  I don't actually sell the insurance.
(3)  Q.  Okay. What do you do for the insurance
(4)  business?
(5)  A.  My title is state sales coordinator.
(6)  Q.  For whom?
(7)  A.  For AFLAC.
(8)  Q.  And what do the duties of a state sales
(9)  coordinator – I'm going to call that SSC, what do
(10) those duties involve?
(11) A.  To protect and promote and preserve AFLAC's
(12) business – current business and gain future business.
(13) Q.  Protect and promote AFLAC business?
(14) A.  To protect, promote and preserve AFLAC's
(15) current business and to gain future business.
(16) Q.  Okay. What does that involve?
(17) A.  The general supervision of the sales force.
(18) Q.  Okay. You don't personally sell any policies
(19) anymore, right?
(20) A.  That's correct.
(21) Q.  All you do is supervise the sales force under
(22) you?
(23) A.  That's correct.
(24) Q.  And what region are you in? What is your
(25) region that you supervise called?

Page 10

(1)  A.  It's called Texas Central.
(2)  Q.  What's your date of birth?
(3)  A.  1-20-54.
(4)  Q.  I've got to ask you about your background,
(5)  where you grew up mainly, just where you went to
(6)  college, the degrees you got. I can go one question
(7)  at a time or I can just let you explain that for me,
(8)  where you went to college, the degrees you got, what
(9)  they were in, the schools you went to. Can you
(10) explain a little bit about that for us?
(11) A.  You can ask me the questions one at a time.
(12) That would be easier for me, actually.
(13) Q.  Okay. Where did you go to college?
(14) A.  I don't have a college degree.
(15) Q.  Did you ever attend any schooling after high
(16) school?
(17) A.  I did pertinent to my business.
(18) Q.  Okay. And that was through AFLAC?
(19) A.  No.
(20) Q.  Through other insurance groups?
(21) A.  No.
(22) Q.  Who was it through?
(23) A.  Through myself.
(24) Q.  How?
(25) A.  Attending different seminars and things put

Page 11

(1)  on relative to our industry.
(2)  Q.  Put on by whom?
(3)  A.  Brian Tracey, Jim Rhone, Tom Hopkins, people
(4)  of that nature.
(5)  Q.  Are those AFLAC representatives?
(6)  A.  They are not.
(7)  Q.  Who are they?
(8)  A.  They're professional speakers who are experts
(9)  in our industry in terms of sales and sales managers.
(10) Q.  You have attended public seminars that they
(11) have put on at different times?
(12) A.  That's correct.
(13) Q.  Other than seminars like that, have you
(14) attended any other post high school training?
(15) A.  I have not, other than that which AFLAC may
(16) have offered.
(17) Q.  Okay. Where – did you get a high school
(18) diploma?
(19) A.  I did.
(20) Q.  And where was that from?
(21) A.  New York City.
(22) Q.  And when was that?
(23) A.  1971.
(24) Q.  Okay. Since 1971, you have not attended any
(25) college, trade school, any type of advanced degree?

Page 12

(1)  A.  I have not.
(2)  Q.  Okay. After getting out of high school, when
(3)  did you first get into the insurance business?
(4)  A.  1976.
(5)  Q.  Between '71 and '76, what type of jobs did
(6)  you have?
(7)  A.  I worked as a salesclerk in a men's clothing
(8)  store.
(9)  Q.  Anything else?
(10) A.  No.
(11) Q.  Okay. In '76, how did you enter the
(12) insurance business? In other words, who did you go
(13) work for?
(14) A.  I was recruited by a gentleman – again,
(15) working for myself, but recruited by another person in
(16) the industry.
(17) Q.  And who was that?
(18) A.  His name was Chuck Switzer.
(19) Q.  And what did he sell?
(20) A.  He didn't sell anything. He was the
(21) recruiting director for the company.
(22) Q.  What did you sell?
(23) A.  Life insurance.
(24) Q.  For any particular company?
(25) A.  Franklin Life Insurance Company.

Page 43

(1)  Q.    AFLAC and you simply do not expect that
(2)  agents will or will not improve the following year?
(3)  A.    I would love to see them improve each year,
(4)  but there isn't a requirement either from myself or
(5)  the company.
(6)  Q.    And I don't know if I'm just using the wrong
(7)  terminology. Not necessarily a requirement – and I
(8)  don't mean it in terms of either you meet it or you
(9)  get fired or you get – your contract with AFLAC is
(10) going to be broken. I don't mean it in those terms.
(11) I mean it in terms of, these are our goals.
(12) A.    I think everyone has personal goals.
(13) Q.    Okay. What are the personal goals you have
(14) for growth rate for associates?
(15) A.    I don't.
(16) Q.    You don't have any goals?
(17) A.    I have goals for myself and I have goals for
(18) the organization, but I don't have goals for the
(19) associates. They make their own goals.
(20) Q.    Okay. You don't have any – you don't set or
(21) tell your – let me rephrase. You don't set any goals
(22) in sales in growth rate increases for any of the
(23) associates?
(24) A.    I do not.
(25) Q.    In your team?

Page 44

(1)  A.    I do not.
(2)  Q.    And you never tell your associates or your
(3)  DSC's or your RSC's that, this is the goal that you
(4)  should shoot for in growth rate?
(5)  A.    The question should be clarified to be
(6)  separated from associates, DSC's and RSC's. For
(7)  associates, the answer is no, I don't set their goals
(8)  or give them any expectations.
(9)  Q.    And for DSC's?
(10) A.    I do.
(11) Q.    And what's your DSC's expectations?
(12) A.    In terms of their personal growth or their
(13) production?
(14) Q.    Both.
(15) A.    I would like to see them have at least a 20
(16) to 30 percent increase in their team sales every year.
(17) Q.    Is that personal growth or sales?
(18) A.    Sales.
(19) Q.    What about personal growth?
(20) A.    I encourage them to grow their team.
(21) Q.    You don't say, I need you – I encourage you
(22) to hire – or bring in five new associates or 10 new
(23) associates or 10 percent more associates or anything
(24) like that, right?
(25) A.    Not at the district coordinator level, no.

Page 45

(1)  Q.    Okay. Your sales growth expectations for
(2)  DSC's over the – since you've been an RSC, has that
(3)  been your expectation?
(4)  A.    I believe my answer was that I expect a 20 to
(5)  30 percent growth rate each year.
(6)  Q.    Right. But what I'm asking is, have you had
(7)  that same number expectation since you were an RSC?
(8)  A.    I think I answered the question as an RSC.
(9)  When I was an RSC, my expectation was only of the DSC.
(10) Q.    Okay.
(11) A.    None of the associate.
(12) Q.    Okay. When you were an RSC, did your DSC's
(13) meet that? Did the majority of them meet that?
(14) A.    For the most part, yes.
(15) Q.    In other words, that was a realistic goal –
(16) you saw that as a realistic goal?
(17) A.    I did.
(18) Q.    And that goal was achieved frequently?
(19) A.    Sometimes; not all the times.
(20) Q.    More often than not?
(21) A.    That's probably not accurate statement.
(22) Q.    Okay. Now, as an SSC, what growth
(23) requirements did you have for the RSC's?
(24) A.    That they grow their operation at the same
(25) rate.

Page 46

(1)  Q.    20 to 30 percent?
(2)  A.    That's correct.
(3)  Q.    Same questions for them. Were those
(4)  expectations met?
(5)  A.    They have been met, yes.
(6)  Q.    Okay. And I understand not everyone meets
(7)  them, correct?
(8)  A.    Correct.
(9)  Q.    But the great majority of them do?
(10) A.    Great majority may be a little inaccurate.
(11) More do than don't.
(12) Q.    Okay, good enough. Now, for the DSC's and
(13) the RSC's, is that also what AFLAC expects from them?
(14) A.    AFLAC assigns them an annual quota.
(15) Q.    Okay. And how does that work?
(16) A.    You would have to talk with AFLAC.
(17) Q.    You've had to deal with the annual quota
(18) before, right?
(19) A.    It's given to me and then I assign it.
(20) Q.    No, I'm not asking for the number, per se.
(21) I'm asking for the process; in other words, what do
(22) you mean by annual quota?
(23) A.    A sales number for a particular – a sales
(24) number for a particular team.
(25) Q.    Okay. What is an annual quota?

Page 47

(1)  A.    A sales agenda for a team of salespeople.
(2)  Q.    Okay. And how is that measured; in percent,
(3)  in dollars?
(4)  A.    In annualized premiums.
(5)  Q.    Okay. So AFLAC has a quota for each team?
(6)  A.    Each management team, that's correct.
(7)  Q.    And is that a DSC, RSC or SSC management
(8)  team?
(9)  A.    All three.
(10) Q.    Okay. So for each of those, AFLAC has got
(11) its own annual quota for how much they have got to
(12) make in sales that year?
(13) A.    That's correct.
(14) Q.    And what happens if they don't make those
(15) sales?
(16) A.    You take a look at it and reevaluate it.
(17) Q.    Okay. Anything can happen? They can – they
(18) can stay on and be given a chance to try to make it up
(19) next year, they can be let go, whatever. There's a
(20) number of options that they can take, right?
(21) A.    I think each situation is probably handled
(22) individually.
(23) Q.    Okay. So for the – do you know what the
(24) annual quota was for DSC's?
(25) A.    That would depend upon the DSC, the

Page 48

(1)  demographics, what they did the prior year, how many
(2)  people are on their team.
(3)  Q.    Okay.
(4)  A.    Numerous, numerous things.
(5)  Q.    Okay. Same thing, I presume, for the RSC's?
(6)  A.    Correct.
(7)  Q.    Were AFLAC's quotas similar to your sales
(8)  growth rate expectations?
(9)  A.    I'm not sure I understand the question.
(10) Q.    You told us earlier, for example, that you
(11) expected DSC's to have sales growth of 20 to
(12) 30 percent. I presume it wasn't somewhere between –
(13) let me rephrase that. I assume what you meant by that
(14) was, I don't expect below 20 to 30 percent. You
(15) probably said each year. Today – this year I expect
(16) 24 percent, next year I expect 27 percent, another
(17) year you might expect 21 percent, depending on a
(18) number of different factors; is that correct?
(19) A.    No.
(20) Q.    Or is it literally between that range is what
(21) you expected, or you expected that range?
(22) A.    I believe it's possible to grow the
(23) organization 20 to 30 percent per year if some of the
(24) right things are done.
(25) Q.    Okay. So you weren't – when you said that,

1    **REPORTER'S CERTIFICATE**

2

3

4    THE STATE OF TEXAS        *

5    COUNTY OF TRAVIS          *

6
            I, GERRI C. BARKER, Certified Shorthand
7    Reporter in and for the State of Texas, do hereby
     certify that, pursuant to the agreement of counsel,
8    came on before me on the 22nd day of May, 2003, the
     following named person, FRANK D. LaFEMINA, who was
9    duly sworn to testify to the truth and nothing but the
     truth touching and concerning the matters in
10   controversy in this cause; that he was thereupon
     carefully examined upon his oath and his examination
11   reduced to typewriting under my supervision; and this
     deposition is a true record of the testimony given by
12   said witness.
            I further certify that I am neither
13   attorney, nor counsel for, nor related to, nor
     employed by any of the parties to the action in which
14   this deposition is taken; and, further, that I am not
     a relative nor employee of any attorney or counsel
15   employed by the parties hereto or financially
     interested in the action.
16           Certified to by me this the _____ 9th day
     of _____ June _____, 2003.
17

18

19           *Gerri C. Barker*
     GERRI C. BARKER, TEXAS CSR 2219
20   Expiration Date:  12/31/03
     Firm Registration No. 241
21   114 West 7th Street, Suite 750
     Austin, Texas  78701
22   512-499-0277

23

24

25

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF TEXAS
2       BROWNSVILLE DIVISION

3

DINO X. CHAVEZ     *
4             *
VS.         *
5             *
BROWNSVILLE INDEPENDENT *
6 SCHOOL DISTRICT, NOE  *
SAUCEDA, and RANDY   * CIVIL ACTION NO.
7 DUNN, MARILYN DEL   *  B - 02 - 128
BOSQUE-GILBERT and   *
8 HUGH EMERSON, JR.,   *
in their official   *
9 capacities as Board  *
Members of Brownsville *
10 Independent School   *
District       *

11

12  ***********************************************

13    ORAL AND VIDEOTAPED DEPOSITION OF

14       FRANK D. LaFEMINA

15       AUGUST 21, 2003

16         VOLUME 2

17  ***********************************************

18

19

20

21

22

23

24

25

1          **ORAL AND VIDEOTAPED DEPOSITION OF**

2    **FRANK D. LaFEMINA**, produced as a witness at the

3    instance of the Plaintiff and duly sworn, was taken in

4    the above-styled and numbered cause on the 21st day of

5    August, 2003, from 9:12 a.m. to 11:41 a.m. and from

6    1:02 p.m. to 2:47 p.m., before GERRI C. BARKER,

7    Certified Shorthand Reporter in and for the State of

8    Texas, reported by machine shorthand, at the offices

9    of Locke, Liddell & Sapp, L.L.P., 100 Congress Avenue,

10   Suite 300, Austin, Texas 78701, pursuant to the

11   Federal Rules of Civil Procedure and the provisions

12   stated on the record or attached hereto.

13

14

15

16

17

18

19

20

21

22

23

24

25

BSA    ORAL AND VIDEOTAPED DEPOSITION OF FRAN ... LAFEMINA    XMAX(16/16)

Page 199

(1) employees.
(2) Q.   Okay. And in those circumstances, the
(3) individual agent who fills out the information for the
(4) potential client is the one – is the agent who sells
(5) that policy, right?
(6) A.   Should be.
(7) Q.   And he's the one who normally would be
(8) responsible for servicing that account, right?
(9) A.   Servicing that policy.
(10) Q.   That policy. I'm sorry.
(11) A.   That policyholder, correct.
(12) Q.   And then even if you bring agents from
(13) throughout the Valley – you might have an agent,
(14) let's say, in Mission, Texas who comes in to BISD to
(15) help do the enrollment. Even if he's an agent in
(16) Mission but he sells that particular policy at BISD,
(17) that agent in Mission would be the one primarily
(18) responsible for servicing that client, right?
(19) A.   I believe the company would view it that way,
(20) and I would as well, yes.
(21) Q.   Okay. If you turn the page, third paragraph,
(22) it says, "In the Brownsville area the office space in
(23) a decent building or neighborhood runs $475.00
(24) average." It goes on to talk about some other
(25) expenses involved with running his office. Do you

Page 200

(1) have any personal knowledge of what those expenses
(2) would be in Brownsville or anywhere in the Valley?
(3) A.   I do.
(4) Q.   Okay. The numbers that he indicates are 475
(5) average for office space; secretary working 9:00 to
(6) 5:00 runs another 210 per week, plus taxes; phone line
(7) with long distance, $100; copier lease, et cetera. Do
(8) you agree with those numbers as being reasonable
(9) expenses in the Valley?
(10) A.   Yeah.
(11) Q.   Okay. Is it your understanding that those
(12) are the expenses Dino incurred here in the Valley?
(13) A.   I know Dino had expenses. I don't know to
(14) what extent his expenses were.
(15) Q.   You agree those would be some of the
(16) reasonable expenses, though?
(17) A.   Yes. They would be reasonable for that area.
(18) Q.   Okay. If you go to the ultimate paragraph.
(19) A.   I'm sorry?
(20) Q.   If you go to the –
(21) MR. STEELE:   Second to the last.
(22) Q.   – second to the last paragraph, he indicates
(23) that in the last – third to the last sentence, "I am
(24) very confident to speak for most of this Region's
(25) agents when I say that we would like for Dino to

Page 201

(1) remain as our regional sales coordinator." Did you
(2) take any other action after receiving this letter to
(3) try to respond to Mr. Sanchez regarding Dino?
(4) A.   I did not.
(5) Q.   Okay.
(6) MR. AGUILAR:   Let's go off the record a
(7) second.
(8) (Off the record)
(9) (Exhibit No. 5
(10) (marked for identification.
(11) Q.   (By Mr. Aguilar) Okay. Let me hand you what
(12) I've marked as Exhibit 5 –
(13) A.   Thank you.
(14) Q.   – and ask you to review that, if you would.
(15) MS. LEEDS:   To his deposition?
(16) MR. AGUILAR:   Yes. Unless I indicate
(17) otherwise, it's to his deposition.
(18) Q.   (By Mr. Aguilar) That is a memo from you
(19) to –
(20) A.   Uh-huh.
(21) Q.   – I believe it's Lynn Davis and Antonia
(22) Davila; is that right?
(23) A.   There are probably some others cc'd on this,
(24) actually.
(25) Q.   I'm sorry?

Page 202

(1) A.   There were probably some others cc'd on this
(2) as well.
(3) Q.   And you say that because?
(4) A.   I have a recollection of the conversation
(5) because the conversation ended up costing myself and
(6) another person $5,200.
(7) Q.   Why did the conversation cost you that?
(8) A.   Because I agreed and another individual
(9) agreed to fund some portion of the expenses as it
(10) related to BISD on a one-time basis.
(11) Q.   In other words, you agreed – who's the other
(12) person?
(13) A.   His name was Joe – is Joe DePasqual.
(14) Q.   You and Mr. DePasqual agreed to contribute
(15) $5,200 to go towards office expenses for somebody here
(16) in the Valley?
(17) A.   We agreed to provide Daniel Sanchez with a
(18) combination of funds equaling $5,200 so that we would
(19) contribute $100 a week toward the cost of his office
(20) out of our pockets.
(21) Q.   Okay. And previously, all those office
(22) expenses would have just been paid by Dino, if he –
(23) while he was the one in charge of the BISD account
(24) here?
(25) A.   I don't know how Dino handled his personal

Page 203

(1) business in terms of pay. I don't know whether his
(2) people were paid or not. I know they were his family
(3) members. I mean, I couldn't tell you that.
(4) Q.   But you never contributed anything to Dino –
(5) to Dino's office expenses while he was supervising
(6) this account?
(7) A.   I've never contributed anything to anyone's
(8) office prior to that $2,600 contribution that I made
(9) to Mr. Sanchez, which was a result of the sudden
(10) change and the fact that Daniel indicated he needed
(11) some help or he couldn't proceed.
(12) Q.   And who is Joe DePasqual?
(13) A.   He's an AFLAC district sales coordinator.
(14) Q.   Do you know whether he had ever contributed
(15) anything –
(16) A.   I can't speak on behalf of Joe. You would
(17) have to ask Joe directly.
(18) Q.   Okay.
(19) MS. LEEDS:   How do you spell that?
(20) THE WITNESS:   D-e-P-a-s-q-u-a-l.
(21) Q.   (By Mr. Aguilar) Now, what you're talking
(22) about in here sounds like what we've just been talking
(23) about ourselves, the third sentence is – the third
(24) sentence is – the third indicates, "It appears as
(25) though none of the three of you are willing to help

Page 204

(1) with the costs associated with BISD." What were you
(2) talking about there?
(3) A.   The people that were involved – certain
(4) people that were involved with BISD continually
(5) referred to this cost of doing business and that they
(6) couldn't afford to deal with it.
(7) Q.   Is that Mr. Sanchez?
(8) A.   He did – he did as well mention that. He
(9) was one of those people, but there were several
(10) people.
(11) Q.   Well, this was addressed to L. Davis. Is
(12) that Lynn Davis?
(13) A.   Yes.
(14) Q.   Who is Lynn Davis?
(15) A.   Lynn Davis, at the time, was a – I believe a
(16) district sales coordinator in the Valley.
(17) Q.   And who's –
(18) A.   Out of McAllen.
(19) Q.   And who's Antonia Davila?
(20) A.   She is a regional sales coordinator.
(21) Q.   And her office is also in McAllen?
(22) A.   Yes, it is.
(23) Q.   Okay. And you indicate the three of you –
(24) so I see Lynn, Antonia – do you know who the third
(25) one is?

Page 205

(1)    A.    That's what I said. It went – you know, I
(2)    don't know, because there's not a third name on the –
(3)    on the e-mail.
(4)    Q.    You mentioned that Mr. Sanchez also had some
(5)    concerns. Do you think he might have been the third
(6)    person?
(7)    A.    There was – there could have been – it
(8)    could have been actually Daniel Sanchez and Lynn Davis
(9)    and – Dennis Escobar would be the third person's
(10)   name, would be my guess. And Ms. Davila was copied on
(11)   this.
(12)   Q.    You say it could have been Mr. Sanchez or who
(13)   else?
(14)   A.    Sanchez, Escobar and Davis.
(15)   Q.    Okay. Davis is on here.
(16)   A.    Uh-huh.
(17)   Q.    You're thinking it was not Antonia Davila?
(18)   A.    No, it was Toni Davila as well.
(19)   Q.    Okay. So there would have been – when
(20)   you're talking about, it appears as though none of the
(21)   three of you, it was probably four of you?
(22)   A.    No. It's cc'd to Toni Davila. It's
(23)   addressing the other three that I mentioned.
(24)   Q.    That's what I'm saying. The three that
(25)   you're talking about here would be Lynn Davis, Sanchez

Page 206

(1)    and Escobar?
(2)    A.    Correct.
(3)    Q.    Okay. And what was the concern that you had
(4)    to help with the associate – the costs associated
(5)    with BISD, what was the – what is it they were not
(6)    willing to help with?
(7)    A.    I didn't have the concern. They were the
(8)    ones that had the concern. And their concern was that
(9)    there was absorbtive costs related to handling BISD.
(10)   And as you can see, my response indicates that, you
(11)   know, everything they did in those accounts, they
(12)   received commissions for, renewals for, stock. And if
(13)   they were in management, obviously they received
(14)   overrides on their personal and their team's business.
(15)   And my –
(16)   Q.    Okay. That's what you're talking about
(17)   towards the bottom of that; is that right?
(18)   A.    That's correct.
(19)   Q.    Okay.
(20)   A.    And that's just a cost of doing business. I
(21)   have those same costs.
(22)   Q.    Okay. Back when Dino was handling this
(23)   account, you had never received any concerns from
(24)   anybody about paying any of those costs, right?
(25)   A.    I think the answer to that is Dino voiced –

Page 207

(1)    or shared with me the expenses, but I don't think he
(2)    made it in a negative light.
(3)    Q.    In other words, he might have mentioned, this
(4)    is what it's costing me, but he did not say, hey, I
(5)    expect you to cover me, or anything like that?
(6)    A.    Correct.
(7)    Q.    And I think you said the amount you agreed to
(8)    offer to compensate for those additional expenses was
(9)    about 5,200 between you and Mr. DePasqual?
(10)   A.    $2,600 each, correct. $100 a week is what it
(11)   boiled down to for a full year.
(12)   Q.    You never offered anything to Dino, right?
(13)   A.    Dino never asked.
(14)   Q.    And you didn't offer on your own?
(15)   A.    I would never offer because it's our own
(16)   responsibility as an independent contractor to pay our
(17)   own expenses.
(18)   Q.    Okay. I'm handing you what I've marked as
(19)   Chavez Exhibit 39. Do you recognize that document?
(20)   A.    I know what it is, yes.
(21)   Q.    At the bottom, I don't know what that means,
(22)   W3809, Frank D. LaFemina. Is 3809 your AFLAC number
(23)   or something?
(24)   A.    Yes.
(25)   Q.    Okay. Did you get cc'd a copy of this

Page 208

(1)    document?
(2)    A.    Don't remember.
(3)    Q.    Do you remember seeing this document before
(4)    today?
(5)    A.    No.
(6)    Q.    Okay. Now, let me represent to you, then,
(7)    this appears to be a notice to Dino dated December 28,
(8)    2001, indicating a change in status effective 1-27-02,
(9)    which goes from regional sales coordinator's agreement
(10)   to the associate's agreement. If you look back at the
(11)   document you had signed earlier, I believe it's
(12)   Exhibit 4.
(13)   A.    Did you take them back from me?
(14)   Q.    I didn't – I should not have.
(15)   A.    Indian giver. Let's see here.
(16)   MS. LEEDS:    I haven't heard that word in
(17)   a long time.
(18)   Q.    (By Mr. Aguilar) Right there. That one.
(19)   A.    Okay.
(20)   Q.    This was your memo that we had talked about
(21)   earlier dated December 4, and it appears Chavez 39 is
(22)   the document, I guess, formalizing the
(23)   recommendations – change in status form that you had
(24)   made earlier. Is that your understanding?
(25)   A.    I would disagree with that completely.

Page 209

(1)    Q.    Okay. What's the – why?
(2)    A.    Because this form is –
(3)    Q.    Which one?
(4)    A.    – not valid for any reason.
(5)    Q.    Why not?
(6)    A.    It doesn't have the signature of the
(7)    territory director and vice president. Let me put it
(8)    this way. The form is useless.
(9)    Q.    Basically, Chavez 39 is doing what LaFemina
(10)   Exhibit 4 was recommending?
(11)   A.    No.
(12)   Q.    Is Chavez 39 demoting Dino from regional
(13)   sales coordinator to associate?
(14)   A.    Yes. Effective January 27 of 2002.
(15)   Q.    Okay. And that's the same action that you
(16)   had recommended in Exhibit 4, but that goes back to
(17)   December 4?
(18)   A.    Document Exhibit Chavez 39 –
(19)   Q.    I think you're getting a little confused.
(20)   Sorry.
(21)   A.    No, I'm not confused at all.
(22)   Q.    I'm talking about this one.
(23)   A.    This is a change in status from RSC, regional
(24)   sales coordinator, to associate.
(25)   Q.    You're now referring to Document 39?

Page 210

(1)    A.    The Chavez Document 39.
(2)    Q.    Right.
(3)    A.    On Exhibit No. 4, that – this is not a
(4)    result – No. 39 is not a result of form No. 4.
(5)    Q.    I'm just saying – I'm just asking,
(6)    Exhibit 4 – in Exhibit 4, you're also recommending
(7)    that Dino be demoted from RSC to associate, right?
(8)    A.    It would appear that I'm recommending that,
(9)    but nobody – no company officer has ever signed this
(10)   document.
(11)   Q.    Okay. Instead, Mr. Karl Douglass, second
(12)   vice president, was the one who sent out this letter
(13)   to Mr. Chavez giving him 30 days notice of his change
(14)   in status from regional sales coordinator to
(15)   associate. That's in Chavez 39, right?
(16)   A.    It has Mr. Douglass' signature on it.
(17)   Q.    Okay. So as of December 27, 2001, what was
(18)   Dino's position?
(19)   A.    Regional sales coordinator.
(20)   Q.    Why was he still the regional sales
(21)   coordinator, why wasn't he allowed to do or cooperate
(22)   in the enrollments, the BISD enrollment?
(23)   A.    Dr. Sauceda requested he not –
(24)   Q.    Okay.
(25)   A.    – be permitted on the school campuses or in

1          **REPORTER'S CERTIFICATE**

2

3

4  THE STATE OF TEXAS        *

5  COUNTY OF TRAVIS          *

6

7          I, GERRI C. BARKER, Certified Shorthand
   Reporter in and for the State of Texas, do hereby
   certify that, pursuant to the agreement of counsel,
8  came on before me on the 21st day of August, 2003, the
   following named person, FRANK D. LaFEMINA, who was
9  duly sworn to testify to the truth and nothing but the
   truth touching and concerning the matters in
10 controversy in this cause; that he was thereupon
   carefully examined upon his oath and his examination
11 reduced to typewriting under my supervision; and this
   deposition is a true record of the testimony given by
12 said witness.
           I further certify that I am neither
13 attorney, nor counsel for, nor related to, nor
   employed by any of the parties to the action in which
14 this deposition is taken; and, further, that I am not
   a relative nor employee of any attorney or counsel
15 employed by the parties hereto or financially
   interested in the action.
16         Certified to by me this the __8__ day
   of _September_____, 2003.
17

18

19       _Gerri C. Barker_____
         GERRI C. BARKER, TEXAS CSR 2219
20       Expiration Date:  12/31/03
         Firm Registration No. 241
21       114 West 7th Street, Suite 750
         Austin, Texas  78701
22       512-499-0277

23

24

25

**ACUSCRIBE COURT REPORTERS**
**800-497-0277**

# EXHIBIT B-3



2003 Financial Analysts Briefing ★ The St. Regis ★ New York City

# About This Book

This book primarily contains presentations on AFLAC that were given at the company's 2003 Financial Analysts Briefing held at The St. Regis hotel in New York. All are intended to provide a comprehensive discussion and analysis of AFLAC's operations. The information contained in the presentations was based on conditions that existed at the time the material was presented. Circumstances may have changed materially since those presentations were made. The company undertakes no obligation to update the presentations.

The enclosed information was prepared as a supplement to the company's annual and quarterly reports, 10-K's and 10-Q's. This book does not include footnotes to the financial statements and certain items that appear in reports or registration statements filed with the Securities and Exchange Commission. We believe the information presented in this book was accurate at the time of the presentations, but its accuracy cannot be guaranteed.

## Forward-Looking Information

The Private Securities Litigation Reform Act of 1995 provides a "safe harbor" to encourage companies to provide prospective information, so long as those informational statements are identified as forward-looking and are accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those discussed. We desire to take advantage of these provisions. This document contains cautionary statements identifying important factors that could cause actual results to differ materially from those projected herein, and in any other statements made by company officials in oral discussions with the financial community and contained in documents filed with the Securities and Exchange Commission (SEC). Forward-looking statements are not based on historical information and relate to future operations, strategies, financial results or other developments. Furthermore, forward-looking information is subject to numerous assumptions, risks, and uncertainties. In particular, statements containing words such as "expect," "anticipate," "believe," "goal," "objective," "may," "should," "estimate," "intends," "projects," or similar words as well as specific projections of future results, generally qualify as forward-looking. AFLAC undertakes no obligation to update such forward-looking statements.

We caution readers that the following factors, in addition to other factors mentioned from time to time in our reports filed with the SEC, could cause actual results to differ materially from those contemplated by the forward-looking statements: legislative and regulatory developments; assessments for insurance company insolvencies; competitive conditions in the United States and Japan; new product development; ability to attract and retain qualified sales associates; ability to repatriate profits from Japan; changes in U.S. and/or Japanese tax laws or accounting requirements; credit and other risks associated with AFLAC's investment activities; significant changes in interest rates; fluctuations in foreign currency rates; deviations in actual experience from pricing and reserving assumptions; level and outcome of litigation; downgrades in the company's credit rating; changes in rating agency policies or practices; subsidiary's ability to pay dividends to parent company, and general economic conditions in the United States and Japan.

# Table of Contents

## Section I

A Strategic Overview of AFLAC..................................................................Daniel P. Amos.................................. 2
AFLAC Incorporated Overview ...............................................................Kriss Cloninger III............................ 5
AFLAC Market Performance ...................................................................Kenneth S. Janke Jr. .......................10

## Section II                    AFLAC Japan

Japan's Insurance Marketplace ..............................................................Hidefumi Matsui...............................11
Introduction to AFLAC Japan.................................................................Charles D. Lake II ............................15
AFLAC Japan Marketing.........................................................................Atsushi Yagai....................................20
AFLAC Japan Investments......................................................................Joseph W. Smith Jr. ........................30
AFLAC Japan Financial Results .............................................................Allan O'Bryant ..................................35

## Section III                   AFLAC U.S.

Introduction to AFLAC U.S. ....................................................................Akitoshi Kan .....................................42
AFLAC's Branding Initiatives ..................................................................Kathelen V. Spencer .......................45
AFLAC U.S. Marketing.............................................................................Joseph P. Kuechenmeister .............49
Field Force Development .........................................................................Warren B. Steele II..........................54
AFLAC U.S. Investments .........................................................................Mary Ellen Keim...............................57
AFLAC U.S. Financial Results ................................................................Ralph A. Rogers Jr. .........................60

## Section IV                    Other Information

The Management Team .................................................................................................................................66
Index of Tables and Charts...........................................................................................................................79

## The Small Business Market
(2000)

| Size of Firm | Number of Firms (000) | Number of Employees (000) | % of Total Employees |
|---|---|---|---|
| 0 - 19 Workers | 5,035 | 20,587 | 18.0% |
| 20 - 99 Workers | 516 | 20,277 | 17.8 |
| 100 - 499 Workers | 84 | 16,260 | 14.3 |
| Total | 5,635 | 57,124 | 50.1% |

Source: U.S. Census Bureau Tabulations by Enterprise Size, 2000

Data from the Small Business Administration indicates that there are more than 5.6 million businesses with fewer than 500 workers, which represents more than 99% of employers in the United States. Small businesses, which the SBA defines as those with fewer than 500 workers, account for 50% of the total private workers in the United States. That's AFLAC's primary market. Our more than 258,000 payroll accounts translates into a penetration rate of less than 5% of the small-business market.

### The Competition

- Aegon
- Allstate
- AIG
- Aon
- Conseco
- National Travelers
- Protective Life
- Torchmark
- UnumProvident
- Several regional carriers

We are certainly not the only company to recognize the potential of selling supplemental insurance in the United States. Actually, we have competed with many companies since we pioneered the supplemental insurance market many years ago. Most of our competition is in governmental accounts and larger private sector accounts. That competition tends to come from the several regional carriers we compete with throughout the country. Because our products are supplemental, voluntary and indemnity in nature, the concept is different from benefits that employees might be offered by group carriers such as group health, life or disability.

### AFLAC U.S. Accomplishments
(1999 = 100)



As this chart shows, we have produced explosive growth during the last three years. Since the end of 1999, we have increased total new annualized premium sales by 93%, while premium income rose 64% and policies in force increased by 47%. I saw similar momentum when I was with AFLAC Japan in the 1980s. To illustrate how rapid our recent growth has been, we increased the number of policies in force by one million in 2002. In the mid-1990s, it took us five years – from 1993 to 1998 – for us to increase our policies in force by one million.

To keep up with this growth, we have relied heavily on technology. And it could be argued that our most important piece of technology is SmartApp.

### SmartApp Advantages

**To AFLAC U.S. -**
- Reduces data entry labor
- Eliminates need for paper applications
- Reduces pended business
- Accelerates policy issuance

**To the sales associate -**
- Enhances professional enrollment
- Eliminates paper transmittal forms
- Provides immediate commissions

SmartApp is a laptop-based point-of-sale device that allows our sales associates to enroll their customers electronically. In 2002, we processed 84% of all new payroll business using SmartApp. Of that amount, 54% was jet-issued, meaning that no human intervention was needed to process the application and send out the policies. We benefit from SmartApp because it greatly reduces the labor required to process new business. It also saves on printing costs by eliminating the need for paper applications. Furthermore, SmartApp reduces the time and effort needed to correct pended business.

SmartApp makes for a much more professional presentation and enrollment process for our sales force. It eliminates the need to complete paper transmittal forms required for the computation of commissions. And, we can pay commissions to our sales force very quickly. With a jet-issued policy, we can direct-deposit commissions within 48 hours of receiving the application. Because of SmartApp, only 8% of the 1,900 employees in our policy service and administration area work in the new business area.

The use of SmartApp with jet issue is what we call a straight-through process. We will be extending straight-through processing, which is a transaction process that is handled by technology only, to all of the administrative and policy service areas. Our goal is to develop processes and technology so that the vast majority of our transactions do not require human intervention.

sales were strong again in the first quarter of this year, rising 64.3%. In addition to developing new products, we continually evaluate our existing policies and revise them when necessary to ensure they provide the best value in the marketplace. As you will hear from Warren, we are enhancing three of our top-selling products this year.

### New Sales Product Mix



Legend:
- Acc/Disab
- Cancer
- HIP
- STD
- Int. Care
- Life
- Med Sup
- L-T Care
- Spec. Event
- Dental

(1992, 2001, 2002)

Product broadening has significantly changed our mix of new sales. For instance, more than 56% of our new business came from cancer expense insurance in 1987, which was about the time we initiated our product expansion strategy. By 1992 cancer insurance accounted for less than one-third of our new business; accident/disability, hospital indemnity and Medicare supplement had emerged as significant sales contributors. Although we no longer sell Medicare supplement, hospital indemnity continues to sell very well. And accident/disability insurance has been our best-selling product for nine consecutive years. The accident/disability product category became our number one product in terms of in force premiums in 2000. At the same time, our supplemental life plans, specified event and fixed-benefit dental coverage, have significantly impacted our mix even though they have only been sold for a short time.

### New Annualized Premium Sales
(In Millions)



| | 1998 | 1999 | 2000 | 2001 | 2002 | 3/02 | 3/03 |
|---|---|---|---|---|---|---|---|
| $ | $482 | $555 | $712 | $919 | $1,070 | $236 | $256 |
| % Inc. | 20.3 | 15.1 | 28.3 | 29.1 | 16.4 | 16.4 | 8.8 |

By appealing to a broader group of consumers, we are convinced that our product broadening strategy is one of the reasons that our sales have grown rapidly over the last several years. In fact, total new annualized premium sales in the United States compounded at 17.7% annually for the five years prior to the emergence of the AFLAC duck. And we saw even faster growth rates following our introduction of the AFLAC duck in 2000. In the last three years, our new sales have grown at a compound rate of 24.5% annually. As you know, our first quarter sales rose 8.8% to $256 million. Although these sales results were below our expectations, we were encouraged to see that several of our top producing states posted very strong gains.

### Top Producing States
(First Quarter 2003)

| Sales Ranking | | Sales (Millions) | Percentage Increase |
|---|---|---|---|
| 1 | Texas | $22 | 4.1% |
| 2 | Florida | 20 | 23.4 |
| 3 | California | 18 | 17.7 |
| 4 | Georgia | 13 | 6.1 |
| 5 | North Carolina | 11 | 1.1 |
| 6 | Michigan | 10 | (2.8) |
| 7 | Pennsylvania | 10 | 23.1 |
| 8 | Ohio | 9 | (1.5) |
| 9 | Illinois | 9 | 30.0 |
| 10 | New York | 8 | 6.0 |

Florida, which is our number two producing state, had a 23% increase for the quarter. California, our number three state, produced an 18% increase. Pennsylvania, our number seven state, rose 23%. And Illinois, our ninth state, generated a 30% increase. Our top 10 states account for about 50% of total company sales. At the same time, nine smaller states had sales increases ranging from 11% to 40% in the quarter.

With so many states doing very well in the first quarter, we are convinced that there was no fundamental change in our market. The need for our products has not decreased. And we have not seen any change in the competitive landscape. Nor do we believe there was negative impact from continued weakness in the U.S. economy, or the uncertainties related to the war. Rather, we believe there are other factors that impacted the states that had modest growth or sales declines.

One reason for the slower sales is likely related to product broadening. We are in the process of rolling out our new accident plan. As you will hear from Warren, states with the new plan posted a double-digit increase in accident sales in the first quarter, while those without the new plan had a sales decline. We have also had a significant number of field management promotions in the quarter. Ultimately, coordinator expansion strengthens our recruiting, training and production capabilities. However, training these coordinators takes away from their own training of new associates and production time.

Another aspect of coordinator expansion is the concept of expanding our field management by splitting states into smaller state organizations. In the short term, sales sometimes slow as the new state coordinator builds his or her organization. However, our past experience clearly shows that following the split, sales tend to do very well. The primary reason for splitting a state is that the area simply becomes too large for one person to manage. By increasing the number of state organizations, we have much better management capability. Let me talk about our field management and distribution in a little more detail.

We believe one of our greatest competitive advantages in the United States is our distribution. Our career sales force is made up of independent sales associates and sales coordinators who manage defined geographic areas. Nationally, we have more than 55,300 licensed AFLAC sales associates and coordinators who market our insurance products.

## New Sales Territory Structure
(Effective May 3, 2003)



The most significant change we have made to our U.S. sales organization is the division of the United States into new sales territories. Effective May 3rd, we increased the number of territories from five to seven. The average population of each of the seven territories is approximately 42 million people. And while this change may lead to some sales disruption in the short run, we know it will help strengthen our distribution in the quarters and years ahead.

### Field Force Organization



Reporting to our territory directors are state sales coordinators, who supervise activities in large, geographically defined sales areas that may include a state, a portion of a state or combined states. Regional coordinators are primarily responsible for recruiting new sales force members and for assisting with training. District sales coordinators train and direct producing associates. They are also required to achieve personal and district production goals.

As I alluded to earlier, expanding our sales management is not new to AFLAC. In fact, we have steadily increased the number of coordinators for several years. And we expect coordinator expansion to continue in the years ahead. In fact, by the year 2010, we will likely see a 30% increase in the number of state sales coordinators. We also expect to see the number of regional coordinators nearly double and for the number of district coordinators to rise by about 125% over that same time.

### Sales Management Expansion

| | 1990 | Today |
|---|---|---|
| Territories | 3 | 7 |
| States | 38 | 71 |
| Regions | 213 | 461 |
| Districts | 832 | 2,191 |
| Associates | 15,000 | 52,633 |
| Premium in force (millions) | $605 | $2,731 |

As the number state, regional and district coordinators, and sales associates have increased, so has our business. Since the end of 1990, annualized premiums in force have grown by more than 350%. And our sales have increased from $152 million in 1990 to more than $1 billion last year. By continuing to increase the number of coordinators in the field, we expect to see steady and strong sales growth. We expect this in part because increasing sales management will also lead to increased recruiting, which is a very important activity for maintaining these strong rates of growth.

### Recruiting Programs

- Internet recruiting
- Advertising
- Conferences and trade shows
- Referrals

As I mentioned, regional sales coordinators have the primary responsibility for recruiting. Their recruiting activities and the production from those new recruits impact their compensation.

The Internet is one of the vehicles that we use to support the recruiting efforts of our field force. Our relationship with careerbuilder.com for instance has been very effective. Through this website, our regions can place recruiting ads in a variety of local and national sites that are all tied to careerbuilder.com. The response from our field has been phenomenal. In 2002, 12.4% of our recruits came from the Internet, compared with 7% in 2001.

Advertising and sponsoring trade shows and conferences are also effective means for recruiting. For example, we advertise in trade publications and sponsor conferences for the National Association of Health Underwriters, the National Association of Independent Financial Advisors, and the Independent Insurance Agent Association. We also advertise in Life Insurance Selling, Broker World and National Underwriter.

Still, 21% of all of our recruits in 2002 came from referrals from other AFLAC associates. To encourage referrals from existing associates, we pay a bonus to an associate who refers someone to AFLAC. That bonus is a percentage of the premiums written by the recruit in his or her first year with AFLAC.

### Agent Recruiting

| | Recruited Agents | Writing Agents |
|---|---|---|
| 1998* | 10,647 | 18,119 |
| 1999* | 12,932 | 20,096 |
| 2000 | 14,133 | 25,004 |
| 2001 | 18,029 | 29,259 |
| 2002 | 22,581 | 36,356 |
| | | |
| 3/02 | 6,047 | 21,700 |
| 3/03 | 6,378 | 24,485 |
| *Excludes AFLAC New York | | |

All of these recruiting programs have been effective at building our sales force. In 2002 we recruited more than 22,500 new associates, which was 25.2% higher than our recruiting in 2001. During the first quarter of 2003, we recruited more than 6,300 new associates, which was on

top of the 36.1% increase in the [ ] quarter of 2002. We hope to increase recruiting by abou. 10% to 15% this year.

## Agent Compensation

- **First-year and renewal commissions**
- **Stock bonus**
- **Conventions and awards**

To attract sales associates, AFLAC offers its sales force flexible commissions, renewal commissions, a stock bonus plan, contests and awards, management opportunities and much more. The first year commission to the writing agent is 35% to 40%, and we pay renewal commissions of 7% as long as the policy remains in force. Through AFLAC's stock bonus program, our field representatives receive stock distributions based on their production and persistency. They also have the opportunity to qualify for a variety of honor clubs and awards at the local, state and national levels.

### Number of Producing Sales Associates
(Monthly Average)



| | 1998 | 1999 | 2000 | 2001 | 2002 | 3/03 |
|---|---|---|---|---|---|---|
| % Inc. | 7.3 | 11.2 | 22.1 | 21.5 | 21.4 | 12.4 |

Over the last five years, we have produced steady growth in the average number of sales associates producing business monthly. The average number of monthly producers accelerated in 2000 following the introduction of the AFLAC duck and it continued at a very rapid pace through the end of last year. Through March of this year, more than 24,400 agents produced business for us. It's interesting that about 77% of our sales force indicated that they sell only AFLAC products. More than 64% have sold AFLAC products for fewer than three years.

## Associate Training

- **State Sales School**
- **SmartApp training**
- **Flex and Section 125**
- **Product training**
- **Enrollment certification**
- **Employee Benefits Communication (EBC)**
- **Advanced automation**

With the size of our sales force growing at a rapid rate over the last several years, training has become an even more crucial element to our business. We have several training programs, including a state sales school, which is conducted by each state operation with some assistance from AFLAC's headquarters. We offer a SmartApp class to help associates become proficient users of our laptop enrollment management system. We also have a Flex course to provide associates with knowledge of Section

125 of the IRS ( .e. We have product training classes that are usually reserved for new product introductions. Enrollment certification focuses on the associate's role in interacting with a multi-location payroll account. We also have a course that teaches employee benefits communication for accounts that ask us to communicate all of their benefits to their employees. And we have an advanced automation course, which covers the more complex issues of SmartApp, such as census loading, data extraction, and troubleshooting. In addition to these classroom based training opportunities, we also emphasize field training for new associates.

We remain very optimistic about the outlook for sales growth. The need for our products is increasing, and we are focused on continued expansion of our distribution system to meet that growing need. Additionally, we have a good understanding of the market and its potential.

### In-Force Data by Territory
(As of 4/30/03)

| | Total Pop. (In Mil.) | Premiums In Force (In Mil.) | Premiums In Force Per Capita |
|---|---|---|---|
| **South** | 40 | $ 568 | $14.11 |
| **North** | 51 | 507 | 9.90 |
| **West** | 29 | 282 | 9.84 |
| **Southwest** | 34 | 398 | 11.63 |
| **East** | 27 | 358 | 13.16 |
| **Pacific** | 49 | 314 | 6.46 |
| **Northeast** | 61 | 309 | 5.09 |
| **Total** | 291 | $2,736 | $ 9.42 |

Looking at in-force data based on our new sales territories, you can see that our business is generally still dominated by the South Territory. It has the highest premium in force, although it has the fourth largest population base among our territories. Even though we have made significant strides in California recently, the Pacific Territory still lags behind our national average in terms of premiums in force or on a per capita basis. And the Northeast Territory, with a population of 61 million people, is virtually untapped using these per-capita measures. In fact, if we increase our national per capita averages to those of the South Territory, we would have more than $4.1 billion of premiums in force.

### Penetration by Sales Territory
(In Thousands)



| Penetration | North 4.3% | Northeast 2.4% | West 7.0% | South 6.2% | Pacific 3.4% | Southwest 5.9% | East 7.4% |
|---|---|---|---|---|---|---|---|

Source: U.S. Census Bureau Tabulations by Enterprise Size, 2000

In looking at the number of AFLAC payroll accounts as a percentage of total businesses by territory, you can see that we have just scratched the surface of the U.S. market. The Northeast territory has a penetration rate of just 2.4%, while the Pacific territory is at 3.4%. Even in the most penetrated areas of the country, the West and the East territories, there are nearly one million businesses that our sales force can approach.

## AFLAC's Market Potential
### (In Millions)

|  | Total Pop. | Total Workers* |
|---|---|---|
| South | 40 | 16 |
| North | 51 | 24 |
| West | 29 | 13 |
| Southwest | 34 | 14 |
| East | 27 | 12 |
| Pacific | 49 | 20 |
| Northeast | 61 | 27 |
| Total | 291 | 126 |

*2002 data

Since we principally market to employees at the worksite, it's probably more accurate to speak of the total number of people in the labor force rather than the total U.S. population. As you can see, there is still a sizable potential market on this basis. Our potential market comprises tens of millions of American workers, compared with the more than 8 million policies we currently have in force, with a number of those policies owned by the same individual.

## AFLAC U.S. Objectives for Growth

- **Continue to focus core efforts on small account market**
- **Penetrate high population centers**
- **Open new and larger accounts through:**
  - **Broadened product line**
  - **Enhanced distribution system**
  - **Expanded payroll services**

We remain excited about the future potential for the U.S. market. Although we are disappointed with our sales growth for the first quarter of this year, we view the slowdown as temporary. As we roll out new products, and as the benefits of our improved sales infrastructure take hold, we believe our sales growth will improve. For the full year, our revised objective is to increase total new annualized premium sales 10% to 15%. To achieve our sales objective for this year and beyond, we will continue to focus our primary marketing efforts on the small-business market. However, we will also work toward opening larger accounts and penetrating large population centers. We believe we will be successful by broadening our product line, enhancing our distribution and expanding payroll services.

We believe the U.S. market for supplemental insurance products in the United States is vast and underpenetrated. Looking ahead, we believe the same trends that are impacting demand for our products in Japan will continue in the United States as well. The U.S. population is aging and health care costs, deductibles and copayments are rising. To us, that means the potential in this market should continue to expand. And we believe we have the right products, people and strategies to tap into that market potential.

---

# Product Development
## Warren B. Steele II
### Senior Vice President; Assistant Director of Marketing

I this presentation, I will discuss the AFLAC U.S. product development process, including our current activities, recent successes, and future plans.

## Product Development Process

- **Track information from field force**
- **Internet survey of field force**
- **Concept paper for executive management**
- **Field focus group**

In terms of our product development process, we continually review product information gathered from our field force, secondary research and field force focus groups. This helps us determine the product lines that we need revise and the new product lines that we need to consider for future development. When we have an idea of the most popular concepts for revision or new development, we conduct an Internet survey of field force members to verify their product preferences. Once we identify the product, we develop a concept paper outlining what we expect to accomplish by developing that product. That paper is then presented to executive management for approval before we proceed. Once approval is given, we form a focus group of 12 field force representatives. We select these representatives from across the country to ensure they have diverse backgrounds, and we ask them to give input into the proposed product. We also invite representatives from our Actuarial, Claims, Underwriting and Compliance departments to share in the discussion so there can be direct interaction on issues and ideas among our field force and areas of the company responsible for developing the product.

The product development area of the Marketing Department is responsible for chairing and facilitating the entire development process. Based on the field focus