United States District Court
Southern District of Texas
FILED

DEC 1 1 2003

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DINO CHAVEZ | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. B-02-128 |
| | § | |
| BROWNSVILLE INDEPENDENT SCHOOL DISTRICT, and NOE SAUCEDA, | § | |
| ------------------------------------------------- | § | |
| BROWNSVILLE INDEPENDENT SCHOOL DISTRICT, Third-Party Plaintiff, | § | |
| vs. | § | |
| AMERICAN FAMILY LIFE INSURANCE COMPANY OF COLUMBUS (AFLAC), Third-Party Defendant. | § | |

### DEFENDANTS' REPLY AND OBJECTION TO PLAINTIFFS' RESPONSE TO DEFENDANTS' JOINT MOTION TO EXCLUDE PLAINTIFFS' EXPERT

**NOW COME,** The BROWNSVILLE INDEPENDENT SCHOOL DISTRICT (BISD), and NOE SAUCEDA, Defendants herein, and respectfully file their Reply and Objection to Plaintiff's Response to Defendants' Joint Motion to Exclude Plaintiff's Expert and would show the Court the following:

**I.**

Plaintiff indicates in Section I of his Response that Defendants criticize Dr. Horner's reliance on information and data ultimately provided by AFLAC and its representatives. Defendants would

show that should the Court examine the documents upon which Dr. Horner based his opinions they would find that there is little supporting documents regarding Mr. Chavez' estimate of what his lost profits would be and that all of Dr. Horner's opinions are based on conjuncture that Plaintiff would continue to work for AFLAC for 25 years at a growth rate of 15-25% a year provided by Mr. Chavez. Dr. Horner did not examine income tax records of the Plaintiff. Dr. Horner did not examine the actual commission statements of Mr. Chavez. He simply took the word of Mr. Chavez as to what his lost commissions would be and then re-calculated the figures. Plaintiff's summary for the basis of Defendants' challenge is over simplified and misleading.

Plaintiff cites little case law to support his position. Nowhere is the case law does the Fifth Circuit indicate that opinions based on the subjective speculation by Plaintiff is relevant or reliable. It is neither good general business nor good economic principals to reach conclusions based on such flimsy support.

In ***Pipitone v. Biomatrix, Inc.***, 288 F.3d 239, 245-47 (5*th* Cir. 2002) relied on by Plaintiff, on page 3 of his Reply, the expert was providing expert testimony on a scientific issue. Likewise in ***Mathis v. Exxon Corp.***, 302 F.3d 448, 461 (5*th* Cir. 2002) relied on by Plaintiff also is a consideration of an expert's ability to testify on scientific matters.

This is not a case where Plaintiff's pain level is at issue or some other subjective causation matter. This is a case of loss of profits for five months in 2000-2001, which could have easily been supported based on a review of past and future year earnings.

The Court held in **Pipitone** that it was proper to allow admission of expert testimony where it is based on the expert's specialized knowledge, training, experience, and first-hand observation while supported by "solid evidence" in the scientific community. Nowhere does it say it is okay to

give opinions based on unsupported facts.

## II.

Plaintiff indicates that Dr. Horner's opinions are reliable because Dr. Horner holds a doctoral degree in economics from the University of Michigan. He also indicates that he has a considerable experience in the field of economics. Dr. Horner freely admits he was not retained to issue opinions on insurance matters, yet by giving total damages for Plaintiff, he is misleading a jury that said underlying calculations are reasonable and probable.

Defendants also challenge Dr. Horner's opinions on a mitigation of Plaintiff's damages. Dr. Horner as stated in his September 19, 2003 report that Dino Chavez' total earnings were a mere $7,000.00 for mitigation purposes. Yet he also admits that he fully expects a man of Dino Chavez' stature and experience to be successful in selling insurance. Even so, he estimates that Chavez had potential earnings in the millions and does not give any opinion as to how much Chavez would earn over the next 25 years selling non-AFLAC insurance. This is not a case where Plaintiff was disabled for life. There is nothing to keep Plaintiff from selling insurance and, in fact, since being demoted by AFLAC, he has continued to sell AFLAC insurance and became a partner with the Teacher's Agency. As such, he has undoubtedly earned more than $7,000.00 since 2001. See excerpts of deposition testimony of Dino Chavez, Exhibit "A" hereto, pp. 83 - 92. In fact on page 92 he testified his earnings would have been approximately $140,000-$150,000 for 2002.

Horner's figures are sheer speculation of what Chavez might possibly earn if all the stars are aligned and he has a growth rate of sales of 15-25% for 25 years. There is absolutely nothing in Horner's files to support this projection and as such it would only mislead and confuse a jury. Dr. Horner is not qualified to render such an opinion since he has no information regarding insurance

businesses except for that information that is provided to him by the Plaintiff. He admits in his deposition that he is not an expert on the insurance industry. See Horner's deposition, Exhibit "A" to Joint Motion of Defendants Brownsville Independent School District and Noe Sauceda to Exclude Plaintiff's Expert.

### III.

Defendants further object to the affidavit supplied by Stephen Horner as self serving and contradicting prior deposition testimony. Stephen Horner in his affidavit indicates on paragraph 3 that he has taught Economics as Adjunct Professor of Economics at Texas A & M and as an Assistant Professor of Economics at Wellsly College in Massachusetts. In fact, his curriculum vitae correctly indicates that in 1999 was the one and only year that he taught as an Adjunct Professor at Texas A & M University, Corpus Christi, Texas. Prior to that he taught from 1976 to 1977 at Wellsly College in Massachusetts. However, like his affidavit this paragraph is misleading the Court that he has extensive experience as a teacher in economics.

Further, his paragraph 3 indicates that he was involved in industrial sales. He sold oil products, which has nothing to do with the subject matter of Mr. Chavez' lawsuit.

Dr. Horner lists on page 2, paragraph 4 of his affidavit the information that he looked at in order to render opinions regarding this case. Nowhere in this information is there any supporting documents for the opinions he renders regarding the "economic value of Plaintiff's lost opportunities as a result of not being allowed to sell insurance products to staff members of Brownsville Independent School District."

Had Mr. Chavez provided him with commission statements that would have reflected the amount of lost sales after 2001 and compared this information to his sales in 1999 and 2000, then

he would have had a basis for this information. Or, in the alternative, had he looked at the income tax records provided by the Plaintiff and compared 2001 and 2002 tax records to 1999 or 2000 tax records this again would have been an alternate way for him to be able to make this determination. However, he did nothing of this kind and merely relied on statements by Mr. Chavez as to what the Plaintiff potentially lost.

Defendants therefore object to Horner's affidavit as incompetent evidence based on unfounded allegations unsubstantiated and improbable speculation and inferences. See **_Marshall v. East Carroll Parish Hosp. Serv. Dist._**, *134 F.3d 319, 324 (5th Cir. 1998)*. Further, to the extent Horner's statements in Section 3, page 4 contradict his deposition testimony, this section should be stricken from his affidavit. **_Buttrey v. General Signal Corp._**, *68 F.3d 1488, (1493 (2nd Cir. 1995)*.

**WHEREFORE, PREMISES CONSIDERED**, Defendants BROWNSVILLE INDEPENDENT SCHOOL DISTRICT and NOE SAUCEDA pray that Dr. Horner be excluded from testifying as to the damages of the Plaintiff in this case and that Defendants' Joint Motion to Exclude Plaintiffs' Expert be Granted and for such other and further relief to which Defendants may be entitled, either at law or in equity.

Respectfully submitted,

**ROERIG, OLIVEIRA & FISHER, LLP**
855 West Price Road, Suite 9
Brownsville, Texas 78550
Telephone: (956) 542-5666
Facsimile: (956) 542-0016

Counsel for Defendant Brownsville Independent School District

By: _____
　　Elizabeth G. Neally
　　State Bar No. 14840400
　　Federal Bar No. 8044
　　Ricardo Morado
　　State Bar No. 14417250
　　Federal ID No. 1213


**WILLETTE & GUERRA, L.L.P.**
International Plaza, Suite 460
3505 Boca Chica Boulevard
Brownsville, Texas 78521
Telephone: (956) 541-1846
Facsimile: (956) 541-1893

Counsel for Defendants Noe Sauceda and Eddie Errisuriz, Jr.

By: _____
　　Eileen M. Leeds
　　State Bar No. 00791093
　　Federal Bar No. 16799
　　Charles Willette, Jr.
　　State Bar No. 21509700
　　Federal Bar No. 1937

CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing *Defendants' Reply to Plaintiffs' Response to Defendants' Joint Motion to Exclude Plaintiffs' Expert* has been served upon counsel of record via Certified Mail, Return Receipt Requested, on this __11st__ day of December, 2003, to wit:

Mr. J. Arnold Aguilar
**Law Offices of J. Arnold Aguilar**
Artemis Square, Suite H-2,
1200 Central Boulevard
Brownsville, Texas 78520
Via CMRRR:  7160 3901 9848 1267 9658

Ms. Eileen Leeds
Mr. Charles V. Willette, Jr.
**Willette & Guerra**
3505 Boca Chica Boulevard, Suite 460
Brownsville, Texas 78521
Via CMRRR:  7160 3901 9848 1267 9665

Mr. William B. Steele, III
**LOCKE, LIDDELL & SAPP**
100 Congress Avenue, Suite 300
Austin, Texas 78701
Via CMRRR:  7160 3901 9848 1267 9672

_____
Elizabeth G. Neally
Ricardo Morado

| | |
|---|---|
| STATE OF TEXAS § | |
| § | AFFIDAVIT OF *ELIZABETH G. NEALLY* |
| COUNTY OF CAMERON § | |

**BEFORE ME**, the undersigned authority, personally appeared ELIZABETH G. NEALLY, who, being by me duly sworn, deposed as follows:

1. "My name is Elizabeth G. Neally. I am over the age of 18 years of age, I am of sound mind and I am fully competent to make this affidavit. I have personal knowledge of the facts herein, and they are true and correct."

2. "As the attorney for Brownsville Independent School District, Defendant, Civil Action No. B-02-128, pending in the United States District Court for the Southern District of Texas, Brownsville Division, I attended the following deposition:

> Deposition of Dino Chavez on March 4, 2003. The excerpts attached hereto as Exhibit "A" were taken from the transcript of Dino Chavez' deposition testimony and are true records of the testimony provided by Dino Chavez. These pages were not included in any other exhibits previously provided to the Court."

"The above and foregoing is true and correct based on my personal knowledge."

_____
Elizabeth G. Neally

**SWORN TO AND SUBSCRIBED** before me on this 11th day of December, 2003, by Elizabeth G. Neally to certify which witness my hand and seal of office.

VIRGINIA ESPINOSA
MY COMMISSION EXPIRES
February 10, 2004

_____
NOTARY PUBLIC, STATE OF TEXAS

23028 - Affidavit of EGN

Excerpts of the Deposition of Dino Chavez, March 4, 2003
- Pages 83 - 92

# EXHIBIT "A"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| DINO X. CHAVEZ | )( |
| | )( |
| VS. | )(  B-02-128 |
| | )( |
| BROWNSVILLE INDEPENDENT | )( |
| SCHOOL DISTRICT, NOE | )( |
| SAUCEDA, MARILYN DEL | )( |
| BOSQUE-GILBERT and | )( |
| RANDALL DUNN | )( |

ORAL DEPOSITION OF
DINO X. CHAVEZ
MARCH 4, 2003

ORAL DEPOSITION OF DINO X. CHAVEZ, produced as a witness at the instance of the DEFENDANT, taken in the above styled and numbered cause on MARCH 4, 2003, from 9:17 a.m. to 12:16 p.m. to 1:46 p.m. to 5:03 p.m. before LOU ZUNIGA, Certified Court Reporter No. 2198, in and for the State of Texas, at the offices of J. Arnold Aguilar, 1200 Central Boulevard, Suite H-2, Brownsville, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached therein.

HILL & ROMERO
CERTIFIED COURT REPORTERS



## Page 81

1 for that.
2 Q. Okay. Prior to becoming the regional manager
3 in, you said, 1998, were you a district manager?
4 A. Yes, I was.
5 Q. Okay. When were you a district manager?
6 A. I was a district manager -- I joined -- I
7 joined AFLAC in '94.
8 Q. As an agent?
9 A. As an agent. And I was made a district manager
10 just shortly thereafter. So I became a district
11 manager with them sometime in probably November of '94,
12 and I joined them probably in September of '94. So
13 shortly thereafter, I mean, just one or two months into
14 it, with no experience whatsoever, I became a district
15 manager with them.
16 Q. At which point you were able to get bonuses at
17 the end of the year?
18 A. I believe at that time they didn't have bonuses
19 for district managers when I first joined. I don't
20 think the bonus system was something that came into
21 play, I think, until I became a regional manager. I
22 think that's when the company began doing that.
23 Q. Okay. When you were removed as regional
24 manager, you went down to just being an agent again
25 or an assistant manager?

## Page 82

1 A. An agent.
2 Q. And that took place in January of 2002?
3 A. Actually, I got fired on December 3rd of 2001.
4 Q. Okay. What type of bonuses did you receive
5 with AFLAC?
6 A. I don't understand your question.
7 Q. Okay. Well --
8 A. Are you referring to the amount?
9 Q. Right.
10 A. My bonus that I received for production in
11 2001, which was given to me in February of 2002, was --
12 I believe it was about 28,000.
13 Q. That was your end of the year?
14 A. That was my end of the year bonus.
15 Q. And tell me about the stock that you own in the
16 company. Right?
17 A. Yes.
18 Q. How much stock do you own in the company?
19 A. Currently, I probably own somewhere in the
20 neighborhood of about 70 to 80,000.
21 MR. STEELE: Dollars or shares?
22 THE WITNESS: Dollars.
23 Q. Have you sold any?
24 A. No.
25 Q. Okay. How much did you own in '99?

## Page 83

1 A. I do. know.
2 Q. How about when you left AFLAC in December 3rd,
3 2001?
4 MR. AGUILAR: Object to form; vague.
5 Q. How much stock did you own?
6 A. Again, I apologize. I don't -- I don't know.
7 Q. Has it increased?
8 A. A little bit.
9 Q. Okay. Has it increased, you know, ten percent?
10 A. Less than ten percent it's increased.
11 Q. Okay. And you are still an agent with AFLAC,
12 so you haven't got any bonuses since the end of the
13 year for 2001; is that correct?
14 A. The bonus that I mentioned to you was for 2001.
15 Q. I know. So since the end of the year 2001,
16 have you got any bonuses from AFLAC?
17 A. No.
18 Q. Have you received any additional stock from
19 AFLAC?
20 A. Yes.
21 Q. How much?
22 A. I don't know.
23 Q. Have you continued to receive renewals?
24 A. Yes.
25 Q. How much did you earn in renewals from AFLAC

## Page 84

1 for 2002?
2 A. I don't know.
3 Q. How would we find that out?
4 A. Through AFLAC. You'd have to ask them.
5 Q. Well, don't you get --
6 MS. LEEDS: Commissions.
7 Q. -- commissions from them, some kind of
8 statement from them?
9 A. We get a statement. And I would have to
10 research it to be able to give you that answer.
11 Q. And what would I -- what would you call that
12 document, a commission statement?
13 A. Yes.
14 Q. What would you call -- how do you become aware
15 that you are getting stock benefits?
16 A. It's also on the commission statement.
17 Q. It's on the commission statement?
18 A. Yes, ma'am.
19 Q. Any other -- okay. For instance, you said you
20 still sell AFLAC to Brownsville -- the City of
21 Brownsville, is that right, AFLAC products?
22 A. Yes.
23 Q. So would that also show up on your commission
24 statement or on something else?
25 A. It should show up on the commission statement,

**Page 85**

1  yes.
2  Q. How much did you get -- how much commissions
3  did you get from the City of Brownsville last year,
4  2002?
5  A. For this previous enrollment that we just
6  completed -- we completed an enrollment, I believe, in
7  October of 2002. I probably received maybe $5,000.
8  Q. Okay. And you said you just did another one?
9  A. That's the one that we just did in October of
10  2002, that we completed in October of 2002.
11  Q. How often does the City of Brownsville do
12  enrollments?
13  A. Once a year.
14  Q. For how long?
15  A. Again, it's just about a two-week period,
16  similar to the school district.
17  Q. Okay.
18      MS. LEEDS: I'm sorry. Is that 5,000 in
19  stock?
20      THE WITNESS: No. That was in
21  commissions. And that was in first year commissions,
22  not renewals.
23  Q. How much do you get in renewals from the City
24  of Brownsville?
25  A. Same thing. You would have to do the math. I

HILL & ROMERO
CERTIFIED COURT REPORTERS

**Page 87**

1  1099s?
2  A. No, ma'am. Honestly, I couldn't tell you. I
3  could get that for you, but I don't know that off the
4  top of my head.
5  Q. How could you get that for me?
6  A. Through my accountant, I'm assuming.
7  Q. Okay. So you could request your 1099s for the
8  past years?
9  A. I'm assuming that my accountant has a record of
10  that.
11  Q. How many 1099s do you think you got for 2001?
12  A. Maybe ten.
13  Q. How about for 2000, similar amount?
14  A. Yeah. I would say generally about the same.
15  Q. Okay. And how about 2002? How many 1099s did
16  you get?
17  A. For 2002, maybe five.
18  Q. What would the five be for 2002?
19  A. I'm sorry. I just don't remember what those
20  are. I can remember receiving some, but I haven't met
21  with my accountant yet this year so I don't know.
22  Q. What companies did you sell predominantly for
23  in 2002?
24  A. I sold for -- there was a company called Best,
25  and it's on that report there that you're looking at.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**Page 86**

1  couldn't tell you off the top of my head, but --
2  Q. It would show up on your commission statement?
3  A. It should.
4  Q. How often do you get commission statements?
5  A. Once a month.
6  Q. Do you get a summary at the end of the year?
7  A. We get a 1099 at the end of the year.
8  Q. What was your 1099 for last year from AFLAC?
9  A. I think it was something like 120,000.
10  Q. That would be for the 2002 year?
11  A. Yes, ma'am.
12  Q. How about for 2001? What was your 1099 from
13  AFLAC?
14  A. I don't remember.
15      MS. LEEDS: Was that 1099 just from AFLAC,
16  the 120?
17      THE WITNESS: Yes.
18  Q. Who else did you get 1099s for in 2001?
19  A. There were other insurance companies that I
20  also had contracts with, and that -- I couldn't name
21  them to you, but you have a copy of something I saw
22  right there in front of you that showed you some of the
23  other companies that I'm appointed with.
24  Q. Okay. If I give you this, would it help
25  refresh your memory as to which one of them you got

HILL & ROMERO
CERTIFIED COURT REPORTERS

**Page 88**

1  Q. Okay. And I will be glad to give this to you
2  if it will help refresh your memory.
3  A. It might.
4  Q. We'll mark that as Exhibit 1. That's a list of
5  the appointments that you presently hold; is that
6  correct?
7  A. Yes, ma'am.
8  Q. And I think it's dated February of 2003?
9  A. 2-28-2003. It's public information on the TDI
10  website.
11  Q. Right.
12  A. Allianz, I know that I got some money from
13  them. That's Allianz Life. I did mention already Best
14  Life and Health. I did receive some commission from
15  them. I think I did receive some commission from Old
16  Line Life.
17  Q. Line?
18  A. Old Line Life. I believe I received some
19  commission from Prudential. I received some commission
20  from State Mutual. And I believe that's all from this
21  list. I also received commissions from a couple of
22  people that I do business with, and that is the agency
23  that I work with now, which is The Teachers' Agency.
24  And so they wrote me a 1099 check.
25  Q. Okay.

HILL & ROMERO
CERTIFIED COURT REPORTERS

## Page 89

```
01:48  1      A.  And I also work with a ge    .nan that I
01:48  2   mentioned before.  His name is Raul Viada.
01:48  3      Q.  Your uncle?
01:48  4      A.  No.  That's not my uncle.
01:48  5      Q.  Who is Viada?
01:48  6      A.  Raul Viada, which is an agent that I mentioned
01:48  7   to you earlier as --
01:48  8      Q.  Out of Brownsville?
01:48  9      A.  Brownsville.  And we do some business together,
01:48 10   and he writes me a check.  So he gives me a 1099 at the
01:48 11   end of the year.
01:48 12      Q.  Okay.
01:48 13      A.  And that's probably about it.
01:48 14      Q.  What would you say your earnings were for 2002?
01:48 15      A.  I couldn't tell you, ma'am.  Honestly, I
01:48 16   couldn't tell you.
01:48 17      Q.  Okay.  You said you got a 1099 for about
01:48 18   120,000 from AFLAC?
01:48 19      A.  Uh-huh.
01:48 20      Q.  Is that yes?
01:48 21      A.  Yes.
01:48 22      Q.  How about from Teachers' Agency?  What was your
01:48 23   1099?
01:48 24      A.  I think it was about $7,000.
01:49 25      Q.  Okay.  And you said you get one from Raul
```

## Page 90

```
1:49   1   Viada?
01:49  2      A.  Uh-huh.
01:49  3      Q.  Is that yes?
01:49  4      A.  I haven't received it from him yet.
01:49  5      Q.  What do you sell for him?
01:49  6      A.  I don't sell for him.  We -- we have some
01:49  7   groups that we do together, and the commissions need to
01:49  8   be paid to somebody.  And so instead of the commissions
01:49  9   being paid to me, they get paid to him, and then he
01:49 10   pays me my share.  And we handle the groups together.
01:49 11      Q.  What are the groups that you do together?
01:49 12      A.  For instance, just some that come to mind is
01:49 13   like the Donna Housing Authority.
01:49 14      Q.  And are you doing a TPA cafeteria plan, or are
01:49 15   you just supplemental health?
01:49 16      A.  No, just the group health.
01:49 17      Q.  Group health.
01:49 18      A.  Group health insurance.
01:49 19      Q.  With whom?
01:49 20      A.  With Raul Viada.
01:49 21      Q.  What company?
01:49 22      A.  What company?  I believe it's Aetna.
01:49 23      Q.  Okay.  And you said Donna Housing.  What other
01:50 24   groups?
   50 25      A.  Brownsville Community Health Center.  I know
```

## Page 91

```
01:50  1   that we shai  .at group.  And there's another one.
01:50  2   It's called Interlube.  They are a company out of the
01:50  3   port.  I know there's maybe two or three more.  I just
01:50  4   can't remember them.
01:50  5      Q.  Okay.  Of these other companies that you named,
01:50  6   Best Life, what percentage of your income from 2002
01:50  7   came from sales commissions from them, approximately?
01:50  8      A.  My 1099 from them was probably in the
01:50  9   neighborhood of $5,000.
01:51 10      Q.  Okay.  How about Allianz?
01:51 11      A.  Allianz, again, was probably -- probably about
01:51 12   another $5,000.
01:51 13      Q.  How about Old Line?
01:51 14      A.  Less than $500.
01:51 15      Q.  Prudential?
01:51 16      A.  Prudential was probably maybe 1,000 to 2,000.
01:51 17      Q.  State Mutual?
01:51 18      A.  State Mutual, probably about -- maybe $1,500.
01:51 19      Q.  And how about -- going back to Raul Viada, can
01:51 20   you guess what your 1099 will be in the neighborhood
01:51 21   of?
01:51 22      A.  In the neighborhood of maybe -- it's going to
01:52 23   be somewhere between ten and 15,000.
01:52 24      Q.  Okay.  Of the 120,000 1099 you got from AFLAC,
01:52 25   how much of that was new sales and how much of that was
```

## Page 92

```
01:52  1   renewals?
01:52  2      A.  For what year?
01:52  3      Q.  2002.
01:52  4      A.  2002?  I would say new sales was just the City
01:52  5   of Brownsville, which I mentioned earlier.  I think I
01:52  6   said about 5,000 maybe.
01:52  7      Q.  Okay.  And the remaining 115 was for
01:52  8   non-renewals -- I mean renewals?
01:52  9      A.  For renewals, yes, ma'am.
01:52 10      Q.  Okay.  So your earnings for 2002, based on what
01:52 11   you told me, would be approximately 140 to 150,000,
01:53 12   would you say?
01:53 13      A.  That's probably about right.
01:53 14      Q.  Okay.
01:53 15          MS. NEALLY:  I think now is a good time to
01:53 16   take a break and decide whether or not we want to let
01:53 17   these people continue with this line.
01:53 18          MR. AGUILAR:  No.  I'd prefer to just go
01:53 19   ahead and -- I mean, we can take a break, but I would
01:53 20   prefer instead of hopping back and forth like that that
01:53 21   you go ahead and complete all of your questioning.
01:53 22          MS. NEALLY:  Okay.
01:53 23          MR. STEELE:  That's fine.
01:53 24          MR. AGUILAR:  Do you want to take a break?
01:53 25          MS. NEALLY:  Yes.
```

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| DINO X. CHAVEZ | )( |
| | )( |
| VS. | )(  B-02-128 |
| | )( |
| BROWNSVILLE INDEPENDENT | )( |
| SCHOOL DISTRICT, NOE | )( |
| SAUCEDA, MARILYN DEL | )( |
| BOSQUE-GILBERT and | )( |
| RANDALL DUNN | )( |

REPORTER'S CERTIFICATION
DEPOSITION OF DINO X. CHAVEZ
MARCH 4, 2003

I, LOU ZUNIGA, Certified Court Reporter in and for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of the oral deposition of DINO X. CHAVEZ;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

HILL & ROMERO
CERTIFIED COURT REPORTERS

Certified to by me this 11th day of March, 2003.

LOU ZUNIGA, Texas CSR 2198
Expiration Date: 12-31-03
Hill & Romero
5415 North McColl, Suite 107
McAllen, Texas  78504
(956) 994-8898