

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
ENTERED

SEP 0 3 2004

Michael N. Milby, Clerk of Court
By Deputy Clerk _Maria_

| | | |
|---|---|---|
| DINO CHAVEZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-02-128 |
| | § | |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT AND NOE | § | |
| SAUCEDA, | § | |
| | § | |
| Defendants. | § | |

## ORDER

BE IT REMEMBERED, that on September 3, 2004, the Court issued the following memorandum opinion in support of the Court's previous ruling in which it granted Defendants Noe Sauceda and Brownsville Independent School District's Motions for Summary Judgment.  *See* Court's Order [Dkt. No. 92].

## I. Factual Background

Plaintiff, Dino Chavez, brought a claim against the Brownsville Independent School District ("BISD") and Noe Sauceda, the Superintendent of BISD, under 42 U.S.C. § 1983 for the deprivation of his due process rights under the Fourteenth Amendment and his free speech rights under the First Amendment of the United States Constitution.  At the time the incidents in this complaint arose, Plaintiff was an insurance sales agent representing American Family Life Assurance Company of Columbus ("AFLAC").  In 2001 BISD issued a Request for Qualifications ("RFQ"),for a Third Party Administrator ("TPA") to service its optional Section 125 Cafeteria Plan.[1]

---

[1]According to the Texas Department of Insurance, Cafeteria Plans "provide school districts with valuable benefits, saving both the district and its employees significant amounts on taxes. Under a Cafeteria Plan, employees can extend their purchasing power by buying benefits with pretax dollars rather than 'after' tax dollars. The contributions made by an employee through salary reduction are not subject to federal or local income taxation or social

*See* Pl's Response to Defendant Noe Sauceda's Motion for Summary Judgment, at p. 6 & Exs. 10, 11, 12 [Dkt. No. 78]. In response to BISD's request, Plaintiff submitted an AFLAC proposal to BISD's Insurance Committee to become the TPA for the Cafeteria Plan.[2] It is undisputed that Plaintiff was not an employee or independent contractor of BISD, but was instead an independent contractor of AFLAC. *See* Defendant BISD's Motion for Summary Judgment, Ex. B (Regional Sales Coordinator Agreement). Plaintiff claims his bid was, in essence, a bid to provide enrollment services to BISD employees and to provide administrative services for the processing of the employees' insurance policies. Plaintiff would earn commission from the AFLAC insurance policies he sold directly to the employees.

The present dispute arose when, after coordinating the employees' Cafeteria Plan enrollment from 1998 through 2001, Plaintiff Chavez and AFLAC were notified by the then-Superintendent of BISD, Noe Sauceda, that Plaintiff would no longer be allowed to present AFLAC's bid to the Insurance Committee, or to continue coordinating enrollments or servicing the Cafeteria Plan.[3] *See* Pl's Response to Defendant Noe Sauceda's Motion for Summary Judgment, Exs. 1, 5. At that time, AFLAC's bid was pending along with bids from other insurance companies including, National Plan Administrators ("NPA"). Plaintiff attended and spoke at several BISD Board of Trustees Meetings concerning the Cafeteria Plan and the bidding process.

---

contributions by the employee or the district." Section 125 refers to one of the Internal Revenue Code Sections creating what the Internal Revenue Service ("IRS") refers to as "Cafeteria Plans." Among the coverage included in these plans, and at issue in this case, are group health, dental, term life, and medical coverage.
http://www.tdi.state.tx.us/consumer/sdguide/assign.html#coverage.

[2]In the first RFQ, BISD also sought bids for one TPA to administer both the Cafeteria Plan and the section 403(b) Tax Deferred Annuity Program. The RFQ was eventually changed to request providers for either of these products or for both.

[3]Plaintiff contends he personally was the de facto TPA for the 1999 calendar year through 2001. Defendants contend that after Plaintiff submitted a proposal in 1998, AFLAC became the TPA for the Cafeteria Plan. This factual controversy, if one exists, is immaterial to the Court's free speech analysis. It is undisputed that Plaintiff had a long standing relationship with BISD as an insurance agent representing AFLAC and conducting enrollment services for BISD's Cafeteria Plan.

*See id.*, Exs. 24, 25, 26. Additionally, Plaintiff submitted numerous memoranda and letters to members of the Insurance Committee expressing Plaintiff's position concerning AFLAC's bid, and urging Board members to vote for AFLAC. *See id.*, Exs. 22, 23, 24, 28. On October 30, 2001, the Board Insurance Committee held a meeting in which Plaintiff and other insurance agents were allowed to discuss their proposals. *See id.*, Ex. 18 (Minutes of 10/30/01 meeting).

On November 29, 2001, Defendant Sauceda sent a letter to Plaintiff in which Sauceda explained to Plaintiff that unless another representative agent from AFLAC replaced Plaintiff, AFLAC's proposal would not be reviewed by the Insurance Committee. Mr. Sauceda cited unprofessional and unethical conduct and "continuous inappropriate correspondence" as the reason for his removal. *See* Plaintiff's Response to Defendant Noe Sauceda's Motion for Summary Judgment, Ex. 41. Along with other proposals, AFLAC's bid for insurance services was placed on the Insurance Committee's agenda for the November 29, 2001, meeting. During this Insurance Committee meeting another AFLAC representative gave a brief presentation in support of AFLAC's proposal. The Committee accepted AFLAC's proposal by a vote of 44-1 in AFLAC's favor. *See id.*, Exs. 42, 43. As a result of Defendant Sauceda's letter to Plaintiff limiting Plaintiff's access to BISD property, Plaintiff did not attend the Employee Insurance meeting on November 29, 2001. *See id.*, Ex. 1.

At some point after receiving the November 29, 2001, letter from Defendant Sauceda, Plaintiff was terminated from the Sales Coordinator position with AFLAC. According to Plaintiff's affidavit, he contends the termination was the direct result of Sauceda's letter to AFLAC, and the termination occurred on December 3, 2001. *See id.* Ex. 1. There is conflicting testimony, however, as to whether this termination was in fact the result of Sauceda's letter to AFLAC, or whether the termination occurred approximately one month later as a result of Plaintiff's continued correspondence with BISD Board members. *See* Defendant BISD's Motion for Summary Judgment, Ex. U (Deposition of Frank LaFemina, pp. 136-37; 165; 189; 176; 258; 260; 262; 266-67; 270;

3

289).[4]

## II. **Procedural History and Plaintiff's Claims**

Plaintiff alleged that despite the fact that he had written the Cafeteria Plan proposal and had conducted previous insurance enrollment services for BISD employees, he was deprived of the opportunity to actually present the proposal at the November 29, 2001, Board meeting and was not allowed to begin enrollment after the acceptance of AFLAC's bid. Plaintiff originally argued his due process rights under the Fourteenth Amendment were violated when he was deprived of the opportunity to fully participate in the bidding process. The Court previously dismissed Plaintiff's due process claim against Defendants BISD and Noe Sauceda. The Court's order was based on a finding "that Plaintiff [had] not demonstrated that a property interest exists for insurance service providers who are neither employed by BISD nor bound by contract to BISD." Court's Jan. 14, 2003, Order, at p. 6. In essence, Plaintiff was denied the privilege of continuing his relationship with BISD and, in the process, forging business relationships with the employees by his administration of their insurance policy plans. Plaintiff was not, however, denied a property interest nor were his due process rights violated. Despite the fact that Plaintiff had previously administered the insurance policy plans for BISD employees, the Court determined he had no more than a "unilateral expectation" that he could continue to submit proposals and serve BISD employees. *See Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972); *see also Blackburn v. City of Marshall*, 42 F.3d 925, 936-37 (5th Cir. 1995)

---

[4]Because Plaintiff's First Amendment retaliation claim fails on the second prong –whether his speech was on a matter of public concern–resolving the apparent factual dispute concerning when and under what circumstances Plaintiff was terminated as AFLAC's Regional Sales Coordinator is not necessary to the Court's analysis. Additionally, regardless of AFLAC's actions regarding Plaintiff's employment, Plaintiff claims BISD retaliated against him by discontinuing Plaintiff's servicing of the Cafeteria Plan and removing Plaintiff personally from the bidding process. A wide range of actions may constitute an adverse employment action. *See, e.g., Rutan v. Republican Party*, 497 U.S. 62, 75 (1990); *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 720 (1996) (terminating a commercial relationship with an independent contractor because his speech constituted an adverse employment action in the First Amendment political association context); *Colson v. Grohman*, 174 F.3d 498, 510 (5th Cir. 1999).

(holding that owner of wrecker service failed to allege a property interest in remaining on city's and county's rotating on-call list for accident wrecker service).

Soon after the Court granted in part Defendants' Motions to Dismiss, Plaintiff filed a Motion for Reconsideration of the Court's dismissal of his due process claims [Dkt. No. 33]. Plaintiff argued he "in fact did have a protected property and liberty interest in following his chosen profession and in holding specific private employment." Pl's Motion for Reconsideration, at p. 2. The Court denied Plaintiff's Motion for Reconsideration, similarly holding as a matter of law Plaintiff had not established a property interest. Plaintiff did not contend that BISD's refusal to consider bids advanced by Plaintiff as the representative of AFLAC completely prevented him from seeking employment as an independent insurance agent. Instead, in his Motion for Reconsideration Plaintiff argued his "chosen profession included selling AFLAC products to BISD employees." Pl's Reply to Defendants' Response, at p. 4 [Dkt. No. 44]. BISD did not license insurance agents, nor did it perform a gate-keeping role in the insurance industry. BISD did not prevent Plaintiff from working as an insurance agent, but only from representing AFLAC and selling its products to BISD employees. As a result, the Court denied Plaintiff's Motion for Reconsideration of his due process claim.

Plaintiff additionally argued his constitutional right to free speech under the First Amendment was violated when he was refused the opportunity to present the proposal in retaliation for publicly admonishing BISD for what he believed was BISD's attempt to appoint an "agent of record to provide all ancillary available insurance policies and products for BISD employees." Plaintiff opined "it [was] illegal to appoint an agent of record according to information located on the Texas Attorney General's website." Plaintiff references several instances of speech, including four memoranda Plaintiff sent to the Insurance Committee and two instances in which Plaintiff spoke at a public audience meeting. Each of these instances of speech will be discussed in turn. After partial dismissal, only Plaintiff's Free Speech Retaliation claim and state tort claims remain.

### III. Standard for Summary Judgment

Summary judgment shall be granted if the record, taken as a whole, "together

with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Factual controversies, if any exist, are resolved in favor of the nonmoving party. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). *See also Hunt v. Cromartie*, 526 U.S. 541, 552 (1999). The party making a summary judgment motion has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings and discovery documents that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) ("the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case"). *See also Colson v. Grohman,* 174 F.3d 498, 506 (5th Cir.1999). Although the party moving for summary judgment must "demonstrate the absence of a genuine issue of material fact," *Celotex Corp.*, 477 U.S. at  323, the party "need not negate the elements of the nonmovant's case." *Little*, 37 F.3d at 1075 (citing *Celotex,* 477 U.S. at 323).

If the moving party meets this burden, the non-movant then must designate specific facts, beyond the pleadings, showing there is a genuine issue for trial. See Fed. R. Civ. P. 56(e). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Little*, 37 F.3d at 1071 (citing *Celotex*, 477 U.S. at 325). "Unsubstantiated assertions" or "mere allegations or denials" will not adequately cast doubt on material facts at issue. *See id.* (citing *Hopper v. Frank*, 16 F.3d 92 (5th Cir. 1994); *see also* Fed. R. Civ. P. 56(e). Likewise, the nonmovant must present more than a mere "scintilla" of evidence. *See Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1086 (5th Cir. 1994). The evidence must be viewed in the light most favorable to the nonmovant. *See Whelan v. Winchester Prod. Co.*, 319 F.3d 225, 228 (5th Cir. 2003); *Walker v. Thompson*, 214 F.3d 615, 624 (5th Cir. 2000). Summary judgment should be granted "when the nonmoving party fails to meet its burden to come forward with facts and law demonstrating a basis for recovery that would support a jury verdict." *Little*, 37 F.3d at 1071.

### IV. Legal Framework for Claims Under § 1983 and Qualified Immunity

Defendant Sauceda claims he is entitled to qualified immunity. The qualified

6

immunity defense is available to individual municipal officials, but not to municipalities. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 113 S.Ct. 1160, 1162, 122 L.Ed.2d 517, 523 (1993). Qualified immunity shields government officials from civil liability for damages based on the performance of their discretionary functions if the acts were objectively reasonable in light of then clearly established law. *See Thompson v. Upshur County*, 245 F.3d 447, 456 (5th Cir. 2001).

"To state a claim under § 1983, a plaintiff must (1) allege a violation of a right secured by the Constitution of laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000).

> [Q]ualified immunity shields a state official from personal liability for damages under 42 U.S.C. § 1983 when the official's exercise of discretionary authority results in a violation of an individual's federal constitutional or statutory rights, unless at the time and under the circumstances of the challenged conduct all reasonable officials would have realized that it was proscribed by the federal law on which the suit was founded.

*Palmer v. Johnson*, 193 F.3d 346, 351 (5th Cir. 1999) (citations omitted). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *See Austin v. Johnson*, 328 F.3d 204, 207 (5th Cir. 2003) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)).

The test for qualified immunity necessitates a two-part or "bifurcated" test of (1) whether the plaintiff has alleged a violation of a clearly established constitutional right; and if so (2) whether the defendant's conduct was objectively unreasonable in light of the clearly established law at the time of the incident. *See Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001). Stated differently, the initial question is whether "taken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.CT. 2151, 150 L.Ed.2d 272 (2001). The plaintiff must demonstrate the official's wrong doing violated "clearly established" law and the "contours of the right must be sufficiently clear that a reasonable official would

7

understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Acts are "objectively reasonable" unless *all* reasonable officials under the same circumstances would have known the conduct violated the Constitution or federal law. *See Thompson*, 245 F.3d at 457. Qualified immunity allows officials to take reasonable but incorrect actions that constitute a constitutional violation. *See Glenn v. City of Tyler*, 242 F.3d 307, 312 (5th Cir. 2001). The defense of qualified immunity protects "'all but the plainly incompetent or those who knowingly violate the law.'" *Austin*, 193 F.3d at 207 (quoting *Wooley v. City of Baton Rouge*, 211 F.3d 913, 918-19 (5th Cir. 2000)).

## V. Plaintiff's Free Speech Retaliation Claim

A public employee's claim against his employer for a First Amendment retaliation violation has four elements: (1) an adverse employment decision; (2) speech involving a matter of public concern; (3) a balancing of the Plaintiff's interest in commenting on matters of public concern, which must outweigh the Defendant employer's interest in promoting efficiency in the workplace; and (4) an adverse employment action *motivated* by the Plaintiff's speech. *See Teague v. City of Flower Mound, Tex*, 179 F.3d 377, 380 (5th Cir. 1999) (citations omitted). On the other hand, to establish a First Amendment claim against an ordinary citizen, Plaintiff must show proof on three elements: (1) Plaintiff engaged in constitutionally protected activity; (2) "the defendants' actions caused [Plaintiff] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the defendants' adverse actions were substantially motivated against the plaintiff['s] exercise of constitutionally protected conduct." *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002).

### A. Public Employee or Ordinary Citizen?

The parties in this case disagree on which First Amendment analysis should apply. Defendants argue the *Pickering* test should apply in which the State's interest, as an employer, in maintaining efficiency and regulating the speech of employees should be balanced with the employee's interest as a citizen in commenting upon matters of public concern. *See Pickering v. Board of Ed.*, 391 U.S. 563, 568 (1968) (establishing the analytical approach to "governmental employee" cases and holding

8

teacher's First Amendment rights were violated when teacher criticized board of education's budget decisions).  Conversely, Plaintiff argues the "ordinary citizen" analysis should apply to his First Amendment retaliation claim.

The Supreme Court has clearly held that the *Pickering* balancing test used to analyze a public employee's First Amendment retaliation claims applies with equal force to an independent contractor who alleges a First Amendment violation against the government.  *See, e.g., Board of County Commissioners v. Umbehr*, 518 U.S. 668, 677-78 (1996); *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 720-24 (1996).  In this case, however, Plaintiff was not an independent contractor of BISD. Rather, he was an independent insurance sales agent authorized by AFLAC to provide Third Party Administrator services for Defendant BISD's § 125 Cafeteria Plan.  *See* Pl's Response to Defendant Sauceda's Motion for Summary Judgment, at pp. 2-3.  The Court must determine, therefore, whether "the relationship between [BISD] and [Plaintiff] falls on the "'governmental employee' end of the *Umbehr* spectrum[, which] turns on whether the relationship is sufficiently 'analogous to an employment relationship.'" *Kinney v. Weaver*, 367 F.3d 337, 2004 WL 811724, at *18 (5th Cir. Apr. 15, 2004) (reh'g en banc) (quoting *Blackburn v. City of Marshall*, 42 F.3d 925, 932 (5th Cir. 1995)).

In this case, Plaintiff's relationship with BISD was more akin to that of a governmental employee for First Amendment purposes.  By Plaintiff's own evidence in the form of letters and memoranda sent to BISD's Insurance Committee, for over three years Plaintiff had a long standing relationship with BISD as a provider of cafeteria plan services.  *See* Pl's Response to Sauceda's Summary Judgment, at Ex. 22 (Pl's Nov. 9, 2001, letter to the Insurance Committee Campus Representative regarding the IRS Section 125 Cafeteria Plain Services Proposal).  Plaintiff's relationship with BISD is far more developed and entwined with the governmental entity than in those cases where courts have applied the ordinary citizen test.  For example, the Fifth Circuit determined a wrecker service owner's relationship to police officials who revoked permission to sue the police radio frequency after the owner spoke about the police department's contracting procedures was not similar enough to a public employee relationship to

9

warrant application of the *Pickering/Connick* analysis. *Blackburn*, 42 F.3d at 930, 934. Similarly, Plaintiff's relationship with BISD exceeds the parameters of a newspaper's connection to county officials who stopped placing legal notices in the newspaper after the newspaper published editorials that criticized the county board and board members. *See North Miss. Communications, Inc. v. Jones*, 792 F.2d 1330, 1337 (5th Cir. 1986). In both *Blackburn* and *North Mississippi Communications*, the Fifth Circuit applied the ordinary citizen standard applied to the First Amendment retaliation claim.

In the present case, BISD has a governmental interest in regulating vendors' and representatives' access to BISD campuses and in ensuring TPAs and providers of the Cafeteria plan follow bidding procedures and maintain a certain quality of service for BISD employees. *See* Pl's Response to Sauceda's Motion for Summary Judgment, Ex. Ex. 10 (2001 Request for Qualifications for Third Party Administrator); *See also id*, Ex. 9 (AFLAC's 2001 Proposal) (BISD's RFQ indicates the basis for its decision may rest on variety of factors, including competency, and BISD reserves the right to revise or amend the specifications for the RFQ). Plaintiff and AFLAC certainly fell into the category of providers that BISD had an interest in overseeing. Plaintiff, as AFLAC's insurance representative, submitted a Cafeteria Plan Proposal in 2001, as it had done in 1998.

The Court is satisfied that BISD has a relevant interest in overseeing the bidding process associated with selection of a TPA, such that the *Pickering* public employee analysis is appropriate in this First Amendment retaliation claim. *See, e.g., Kinney*, 2004 WL 811724, at *19-20 (holding instructors who trained police officers at police academy were sufficiently analogous to public employees of certain police officials for First Amendment analysis). *Cf. Copsey v. Swearingen*, 36 F.3d 1336, 1344 (5th Cir. 1994) (applying *Pickering/Connick* analysis to license holder); *Caine v. Hardy*, 943 F.2d 1406, 1415-16 (5th Cir. 1991) (using the *Pickering/Conick* analysis in context of surgeon with clinical privileges at a hospital at which he was not employed); *Davis v. West Community Hosp.*, 755 F.2d 455, 461 (5th Cir. 1985) (same).

**B. Public Employee Analysis: Was Speech on a Matter of Public Concern?**

Speech and expressive conduct relating to personal matters and not matters of

10

public concern are not protected by the First Amendment. *See Connick v. Meyers*, 461 U.S. 138, 146 (1983). As a public employee, Plaintiff must establish four elements to prevail on a First Amendment retaliation claim: (1) Plaintiff must suffer an adverse employment action; (2) Plaintiff must establish that the speech involved a matter of public concern; (3) Plaintiff must establish that the speaker's interest in commenting on matters of public concern outweigh any interest the employer has in promoting efficiency; and (4) Plaintiff must demonstrate the speech motivated or precipitated the employer's adverse action. *See Teague v. City of Flower Mound, Texas*, 179 F.3d 377, 380 (5th Cir. 1999); *Harris v. Victoria Indep. Sch. Dist.*, 168 F.3d 216, 220 (5th Cir. 1999).

Because the Court ultimately finds Plaintiff has not presented evidence in support of the second prong of the retaliation claim—whether his speech was on a matter of public concern, and thus was entitled to First Amendment protection—the Court will not address the remaining prongs necessary to demonstrate a retaliation claim.

Whether the speech involved a matter of public concern and whether the employee's interest as a citizen in commenting on the matters of public concern outweighed the interest of the state as an employer are legal questions determined by the Court. *See Connick*, 461 U.S. at 147-48, n.7; *Teague*, 179 F.3d at 380. Factual disputes concerning whether Plaintiff's protected speech was a motivating factor in the adverse employment decision is left to the jury to resolve. *Branton v. City of Dallas*, 272 F.3d 730, 739 (5th Cir. 2001) (citing *Gardetto v. Mason*, 100 F.3d 803, 811 (10th Cir. 1996)).

Matters of public concern are those that can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146. Speech that addresses mainly a personal employment dispute and is a matter of general concern is not considered speech on a matter of public concern. *See, e.g., Connick*, 461 U.S. at 148 n.8; *Terrell v. Univ. of Tex. Sys. Police*, 792 F.2d 1360, 1362 (5th Cir. 1986). The Fifth Circuit has used two tests, sometimes together, to analyze whether speech is properly categorized as relating to a matter of public concern. *See Kennedy v. Tangipahoa Parish Library Bd. of Control*, 224 F.3d 359, 366 (5th Cir. 2000).

11

Both tests originate from *Connick v. Meyers*. The first test is the "content-form-context test: '[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole court record.'" *Kennedy*, 224 F.3d at 366 (quoting *Connick*, 461 U.S. at 147-48); *see also Tompkins v. Vickers*, 26 F.3d 603, 606 (5th Cir. 1994)). The second test is called the "citizen-employee test: 'when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters *only* of personal interest,'" the speech is not considered to involve matters of public concern. *Id.* (quoting *Connick*, 461 U.S. at 147); *see also Schultea v. Wood*, 27 F.3d 1112, 1120 (5th Cir. 1994), *superceded on other grounds by*, 47 F.3d 1427 (5th Cir. 1995)). "In cases involving mixed speech, [courts] are bound to consider the *Connick* factors of content, context, and form, and determine whether the speech is public or private based on these factors." *Teague*, 179 F.3d at 382. Thus, the Courts must "decide whether the speech at issue . . . was made *primarily* in the plaintiff's role as citizen or primarily in his role as employee." *Terrell*, 792 F.2d at 1362. In this test, the role of context and form are elevated over content. "[The] focus [is] on the hat worn by the employee when speaking rather than upon the 'importance' of the issue." *Gillum v. City of Kerrville*, 3 F.3d 117, 121 (5th Cir. 1993).

Generally, the reporting of official misconduct is protected speech under the First Amendment because it involves matters of public concern. "There is perhaps no subset of matters of public concern more important than bringing official misconduct to light." *Davis v. Ector County, Texas*, 40 F.3d 777, 782 (5th Cir. 1994). Additionally, the Fifth Circuit has held, "the disclosure of misbehavior by public officials is a matter of public interest and therefore deserves constitutional protection, especially when it concerns the operation of a police department." *Brawner v. City of Richardson, Tex.*, 855 F.2d 187, 192 (5th Cir. 1988). In *Davis*, an investigator for a drug task force sent a letter to the County Commissioner's Court in which he detailed his wife's allegations of sexual harassment and alerted the Court to a potential cover-up. *See* 40 F.3d at 780-81. The Fifth Circuit determined the "letter squarely [fell] within *Brawner's* ambit: it address[ed] the misbehavior of public officials (the sexual harassment of public

12

employees) and disclos[ed] the possibility of an official coverup." *Id.* at 782. The content of Davis's letter certainly addressed a matter of public concern, and Davis wrote the letter in his capacity as a citizen and not as a public employee, thus satisfying the content, context, and form test. In *Brawner*, the Fifth Circuit also determined the speech involved a matter of public concern when a patrol officer informed the President of the Combined Law Enforcement Agency of Texas ("CLEAT") of allegations of police misconduct, and CLEAT's attorney wrote a letter to the City Manager on behalf of Brawner, which contained allegations of possible police misconduct. *Brawner*, 855 F.2d at 191.

"The fact that the Plaintiffs cho[o]se to file internal grievances rather than publicize their complaints is not dispositive." *Benningfield v. City of Houston*, 157 F.3d 369, 375 (5th Cir. 1998) (holding police misconduct was matter of public concern where plaintiffs filed complaints and followed internal grievance procedures). Similarly, in an earlier pronouncement, the Court found the speech involved a matter of public concern where a sergeant with a university health center's police force filed a written report detailing incidents of sexual misconduct. *Wilson v. UT Health Center*, 973 F.2d 1263 (5th Cir. 1992); *see also Harris v. Victoria Indep. Sch. Dist.*, 168 F.3d 216, 222 (5th Cir. 1999) (holding speech involved a matter of public concern because the teachers "spoke . . . as elected representatives of the faculty . . . in compliance with their duties" when they served on a committee formed to create and implement an improvement plan for the high school); *Thompson v. City of Starkville, Mississippi*, 901 F.2d 456 (5th Cir. 1990) (holding police officer who filed written grievance concerning, among other issues, unethical conduct of police officers who had received promotions spoke on matters of public concern).

Conversely, there are several instances where the Fifth Circuit determined the speech was not a matter of public concern. For example, in *Terrell v. University of Tex. Sys. Police*, the Court determined that a personal notebook diary was not speech on a matter of public concern because Terrell made no effort to communicate it to the public. 792 F.2d 1360, 1363 (5th Cir. 1986). In *Gillum v. City of Kerrville*, the Court focused "on the hat worn by the employee when speaking rather than the 'importance' of the issue

13

[to] reflect[ ] the reality that at some level of generality almost all speech of state employees is of public concern[.]" 3 F.3d 117, 121 (5th Cir. 1993). The Court determined that whether the police chief had smoked dope with a woman who had a criminal record was of public concern. *Id.* But, Gillum's speech was not directed at ferreting out the police chief's misconduct. Rather, Gillum was responding to the fact that the internal affairs investigation would proceed without further participation by him. Only then did Gillum declare that he would not compromise his badge, and he quit. *Id.* The Court did not explicitly conduct a content-context-form test, but instead determined that although corruption was certainly a matter of public concern, Gillum had spoken "as an employee embroiled in a personal employment dispute,"–that is, whether he would personally have a continued role in the investigation. *Id.* Finally, in *Teague v. City of Flower Mound, Texas*, the Fifth Circuit held two police officers had not demonstrated their speech was on a matter of public concern when they filed a grievance against the chief of police because their focus was primarily on clearing their own names and not on attacking internal misconduct. 179 F.3d 377,382 (5th Cir. 1999).

The "existence of an element of personal interest on the part of an employee in the speech does not prevent finding that the speech as a whole raises issues of public concern." *Kennedy*, 224 F.3d at 366. Furthermore, "[t]he private nature of the statement does not . . . vitiate the status of the statement as addressing a matter of public concern." *Thompson*, 901 F.2d at 467 (quotations omitted). "A holding to the contrary would mean that loyal employees seeking to rectify problems would lose constitutional protection for attempting to correct problems inhouse." *Id.*

The Fifth Circuit recently canvassed a large number of mixed speech cases and determined:

> First, the content of the speech may relate to the public concern if it does not involve solely personal matters or strictly a discussion of management policies that is only interesting to the public by virtue of the manager's status as an arm of the government. . . If releasing the speech to the public would inform the populace of more than the fact of an employee's employment grievance, the content of the speech may be public in nature . . . Second, speech need not be made to the public, . . . but it may relate to the public concern if it is made against the backdrop of public debate . . . And third, the speech cannot be made

14

in furtherance of a personal employer-employee dispute if it is to relate to the public concern.

*Kennedy*, 224 F.3d at 372.  Finally, in order for speech to be considered a matter of public concern, the speech must be identified with a degree of precision, explaining "when [the] statement or statements were made, to whom they were made, whether they were oral or written, and the content of those statements." *Foley v. University of Houston*, 355 F.3d 333, 342 (5th Cir. 2003).

In this case, Plaintiff argues, "[t]he speech about which Plaintiff Chavez complained specifically involved Defendant's attempts to violate the public trust." Pl's Response to Defendant Sauceda's Motion for Summary Judgment, at p. 26. Plaintiff additionally argues the following examples of his speech were made on matters of public concern: "Plaintiff legitimately reported that Defendant's attempt to appoint Insurance Associates of the Valley 'agent of record' is contrary to a Texas Attorney General opinion;" Plaintiff "questioned the financial responsibility of appointing NPA as the TPA because NPA's bid proposal included a $5.00 per employee enrollment fee"; and "Plaintiff Chavez's comments also called into question Defendant Sauceda's apparent attempts to circumvent the open bidding requirements established by state law by allowing NPA to modify its bid after the posted closing date." Pl's Response, at pp. 24-25.  Plaintiff argues "[t]he public has an interest in knowing, that regardless of who is actually selected [as TPA], the proper procedures are followed in selecting an appropriate bidder and in following state law regarding agents of record. *Id.* at 25. Plaintiff cites several specific instances of speech based on which he alleges Defendants retaliated against him.  The alleged speech on a matter of public concern will be addressed below.  Plaintiff provides little argument that specifically addresses each letter, memo, or flyer he wrote or verbal speech he made at Board meetings. The Court reviews each instance of alleged speech on a matter of public concern.

### C. Plaintiff's Memos to the Insurance Committee

1. November 9, 2001, Memo from Plaintiff to Insurance Committee Campus Representative Regarding IRS Section 125 Cafeteria Plan Services Proposal: *See* Pl's Response to Sauceda's Summary Judgment Motion, Ex. 22

Whether Sauceda or BISD broke the law or would break the law if it appointed an agent of record is possibly of public concern, "but that was not [Plaintiff's] focus. Instead [Plaintiff] disputed his role [and the role of AFLAC]" in the Board's selection of a TPA. *Gillum*, 3 F.3d at 121. Plaintiff raised the potential illegality of NPA's appointment only in relation to its impact on AFLAC's continued status as the administrator servicing the Cafeteria Plan. Plaintiff wrote the November 9, 2001, letter in his capacity as the Regional Sales Coordinator for AFLAC. The overwhelming goal and focus of the letter was to entice and convince Insurance Committee members and employees to vote to "continue [ ] with AFLAC" because AFLAC "will offer employees the best possible value and the best possible service." The letter does not contain the words legal or illegal, or any derivative of these words. Nor does Plaintiff reference an agent of record in this letter. In fact, of the nine paragraphs contained in the letter, only the introductory paragraph references the overarching issues of choosing insurance. Plaintiff states:

> Here we go again!! Some of your elected board members and hired administrators are about to make an insurance decision that could be detrimental to you. **The change in the group health coverage that was made recently was made without your approval and was made to the detriment of your pocketbooks. This may be about to happen again!** There have been several misrepresentations of the truth said and written about us recently. This is our attempt to set the record straight directly with the people who should have control over the say so of employee benefits - employees. Attached, are cafeteria plan comparison charts that were handed out to board members and administration to help decide on the matter. They were prepared without our knowledge or consultation and are very inaccurate. Those of you who have dealt with us for the past three years know better. We have penciled in our corrections for your review.

*Id.*(emphasis in original). Remaining portions of the letter simply recount the ways in which AFLAC can provide better services to BISD employees over other providers.

16

Plaintiff does not focus on corruption or wrong-doing. Indeed, he does not even assert that decisions made without the insurance committee's or employee's approval violated any provision of law or policy. Instead, he focuses on the impact any changes in servicing of the cafeteria plan or representations about this servicing would have on AFLAC's continued service to BISD employees. Plaintiff clearly wears his insurance agent hat, in which he makes a pitch for AFLAC, rather than focusing on ferreting out abuses in the bidding process or otherwise informing the public of matters truly of public concern. The statement cited above, if released to the general public, would not enlighten them as to wrongdoing or corruption at BISD. Indeed, presumably every pitch made by an insurance agent could be considered to touch a matter of public concern because all agents will believe their services and products are better than the competitors, and as such better serve the needs of employees of BISD and derivatively the general public. But, "the mere fact that the topic of the [Plaintiff's] speech was one in which the public might or would have had a great interest is little moment." *Terrell*, 792 F.2d at 1362. The Court instead must determine whether the speech was made primarily in the Plaintiff's role as citizen or employee. *Id.* Plaintiff wrote the letter as an agent seeking TPA status for BISD and not as a general citizen, and inserting "a scintilla of speech regarding a matter of public concern would make a federal case out of a wholly private matter fueled by private, non-public matters." *See, e.g., Teague*, 179 F.3d at 382; *Bradshaw v. Pittsburg Indep. Sch. Dist.*, 207 F.3d 814, 817 (5th Cir. 2000). The content of Plaintiff's November 9, 2001 letter is not on a matter of public concern.

The form of Plaintiff's letter further supports the Court's finding that Plaintiff drafted the letter in his capacity as an insurance agent rather than a public citizen. He signed the letter as a Regional Sales Coordinator and the letter was on AFLAC letterhead. *See Bradshaw*, 207 F.3d at 817 (stating similar facts supported a finding that the speech was not on a matter of public concern). Finally, although not

17

dispositive, Plaintiff did not publish his letter to the general public,[5] and the letter presupposed a familiarity with the topic because Plaintiff only generally references earlier events impacting the Cafeteria Plan and the related bidding process. The content, form, and context of this letter suggests Plaintiff was speaking on a matter of personal and not public concern.

> 2. November 12, 2001, Memo from Plaintiff to Insurance Committee Campus Representative Regarding IRS Section 125 Cafeteria Plan Services Proposal - UPDATE : *See* Pl's Response to Sauceda's Summary Judgment Motion, Ex. 23

Plaintiff's second memo provides an update to the insurance committee campus representative in which Plaintiff urges the quick resolution of appointing a cafeteria plan services provider so that "employees will not be forced to make cafeteria plan decisions with little or no notice, similar to what happened recently with the group health coverage." Plaintiff, however, "reminds" the insurance committee representative that "continuing with AFLAC will offer employees the best possible value and the best possible service." Plaintiff again writes the memo in his capacity as an AFLAC Sales Coordinator. His purpose, focus, and goal are to garner support for AFLAC's eventual award of TPA status. He signs the memo as the Regional Sales Coordinator, and the memo is on AFLAC letter head. The content, context, and form of Plaintiff's speech is on a matter of personal concern – his desire to be awarded the bid for administrator of cafeteria plan services.

> 3. November 19, 2001, Memo from Plaintiff to Insurance Committee Campus Representative Regarding IRS Section 125 Cafeteria Plan Services Proposal: *See* Pl's Response to Sauceda's Summary Judgment Motion, Ex. 28

The November 19, 2001, memo is largely a verbatim replica of Plaintiff's

---

[5]The letters Plaintiff sent to the Insurance Committee Campus Representative requests that the representative distribute and disseminate information contained in the letter to BISD employees who would be affected by the bidding for TPA. Nevertheless, the information Plaintiff seeks to deliver simply addresses the benefit of selecting AFLAC to administer the cafeteria plan.

November 9, 2001 memo. However, Plaintiff additionally references the school board meeting's agenda item, entitled "Recommend approval to award RFQ #012-02 to National Plan Adminstrators/Insurance Associates of the Valley for Third Party Administrators to administer BISD's Cafeteria Plan . . ." Again, Plaintiff's focus in this memo is to garner support for his proposal, as an agent representing AFLAC. There is no mention of illegalities or misconduct, and Plaintiff clearly writes this memo in his capacity as a Sales Coordinator for AFLAC on company letterhead. For these reasons, and those discussed in relation to the November 9, 2001 memo, the Court finds this memo is not speech on a matter of public concern.

> 4. Plaintiff's "Corrected Cafeteria Plan Comparison Chart,"[6] and "Why AFLAC?" Flyer, Pl's Response to Sauceda's Summary Judgment Motion, Exs. 21 & 32

The Cafeteria Plan Comparison chart is referenced in Plaintiff's November 9, 2001 memo. Plaintiff states in this memo that the attached "cafeteria plan comparison charts . . . were handed out to board members and administration to help decide the matter. They were prepared without our knowledge or consultation and are very inaccurate. Those of you who have dealt with us for the past three years know better. We have penciled in our corrections for your review." According to Plaintiff's November 9, 2001, memo, the corrected cafeteria plan was prepared by Plaintiff to correct perceived inaccuracies. Plaintiff created the corrected chart in response to the on-going bidding process, and his attempt to rectify inaccuracies was made in the course of his participation in the bidding process as the AFLAC representative.

It is inescapable that the chart was directed at Insurance Committee Board members in an effort to secure AFLAC and Plaintiff as the continuing administrator of BISD's cafeteria plan. In fact, the chart contains language promoting AFLAC as the best provider: "No other Cafeteria Plan Services provider has provided the level of

---

[6]Although there is a factual dispute between the parties concerning who authored the original comparison chart, Plaintiff contends without dispute that he inserted hand written corrections to the original comparison sheet. The Court understands Plaintiff to be claiming a First Amendment retaliation claim in relation to his corrected comparison sheet.

19

service that we have at BISD. No one comes close." The tone of the chart is therefore private in form. The chart contains no reference to corruption, wrong-doing, illegalities, or any other theme that would appeal to the general public. Finally, the chart was delivered to the Insurance Committee and was not published or presented in a manner that was likely to reach the public. The content, context, and form of this chart is predominantly a personal communication representing the interests of the Plaintiff and AFLAC rather than one relating to matters of public concern.

The Court reaches the same conclusion for the "Why AFLAC?" flyer. The one page flyer has five numbered paragraphs, four of which address the benefit of choosing AFLAC as the services provider over NPA. Only paragraph one, entitled "Legality," references a Texas Attorney General legal opinion concerning an agent of record. The form and context of this flyer again focus on a personal issue –that is, the approval of AFLAC as the continued Cafeteria Plan Services provider. The flyer, therefore, does not primarily relate to a matter of public concern.

The Court reviews the previous communications by focusing "on the hat worn by [Plaintiff] when speaking rather than upon the 'importance' of the issue[s to] reflect the reality that at some level of generality almost all speech of state employees is of public concern." *Gillum*, 3 F.3d at 121. The form and context of Plaintiff's speech indicate he was speaking in his role as agent, or employee for the purpose of First Amendment analysis, and not as a private citizen. All memos, charts, and flyers were made in Plaintiff's professional capacity in the performance of his duties as an independent insurance agent attempting to secure AFLAC as the service provider for the Cafeteria Plan. Furthermore, as to form, the memos, charts, and flyers were not published, aired, or considered in any "widespread debate in the community." *Finch v. Fort Bend Indep. Sch. Dist.*, 333 F.3d 555, 564 (5th Cir. 2003) (holding principal who drafted a proposal on education and presented it to her immediate supervisor and to the school district's executive cabinet and discussed it with the school board had not demonstrated the proposal was related to a national debate over school choice, and as such the speech was not on a matter of public concern). Thus, considering the content, context, and form of Plaintiff's speech as a whole, the Court concludes the above instances of

20

speech were not clearly entitled to First Amendment protection as a matter of public concern.

### 5. BISD Meeting Excerpts - November 13, 2001, Plaintiff's Response to Defendant Sauceda's Motion for Summary Judgment, Ex. 24

Plaintiff presents an excerpt from the public audience portion of the November 13, 2001, BISD Board of Trustees meeting. Plaintiff introduces himself by name and indicates that "as a taxpayer of [the] community, [he'd] like to make everybody aware and set the record straight of just a few important facts that are currently going on with the insurance. " Ex. 24, at p. 21. Plaintiff then recounts the recent process in which AFLAC and others presented proposals on the Cafeteria Plan. Plaintiff discusses recommendations he made as the Cafeteria Plan administrator, and he retells the Board's response to these recommendations. Moreover, Plaintiff explains to the Board that employees did not hear Plaintiff's presentation at an insurance committee meeting in which "various vendors, including [AFLAC]" were scheduled to make presentations. Plaintiff asked the Board to divulge who "tabled" the matter and why the decision was again postponed and "pulled off the agenda by someone." Plaintiff requested that the Board make an expeditious decision concerning the proposals for Cafeteria Plan administrator because employees will suffer from any delay.

Plaintiff raised the above issues at a Board of Trustees meeting in which the Cafeteria Plan was scheduled to be on the agenda. Plaintiff's tone and recounting of the manner in which angry employees approached him as the current Cafeteria Plan Service provider representing AFLAC is more akin to the ranting of a disgruntled employee attempting to draw attention to his proposal because he believes his proposal offers employees the best option. Although the Fifth Circuit has explained that often cases "involve a hint of personal 'employee' considerations" in First Amendment cases, Plaintiff's speech is predominantly referencing his discontent with the fact that representatives, including himself, have not been heard on the agenda and the Cafeteria Plan had been removed from the agenda twice. *Moore v. City of Kilgore, Tex.*, 877 F.2d 364, 371-72 (5th Cir. 1989). Theoretically, the public might be interested in the bidding process at BISD and expeditious decisions that determine who the

administrator of the Cafeteria Plan will be.  Plaintiff, however, references almost
exclusively his experiences as a representative of AFLAC.  For example, Plaintiff
states,

> At the end of August, beginning of September, proposals were submitted for
> consideration.  At the end of September the group health insurance policy was
> changed.  Employees were given two days to make a very important decision in
> their lives.

> At that time, as your Cafeteria Plan administrator, we recommended about a
> week and a half of these mini enrollments so that we could document the
> changes that happened as they relate to Section 125.

> Guess what. [sic]  We were told "you got two days, and we want you to set up
> here in the office here in the administration building.  We don't want you to go to
> all the campuses."  So all the phone calls that I received were misplaced anger
> toward me, because it's nothing that I did.

*Id.* at 22.  Aside from referencing "extreme politics that goes on at the Board level,"
Plaintiff does not speak of corruption, wrong-doing per se, or some other issue beyond
these topics that is connected to "widespread debate in the community."  *Finch*, 333
F.3d at 563.[7]  Because education is generally an interest of the public, virtually any
issue affecting the administration of insurance plans for BISD employees could on
some level appeal to the public because it involves a school district.  But, this is not the
First Amendment standard for determining whether the speech was on a  matter of
public concern.  Based on the hat Plaintiff was wearing when he made the speech at
the Board of Trustee's meeting, the context of the speech made in his capacity as an
administrator representing AFLAC, the form of his speech at a BISD Trustee meeting in
which the Cafeteria Plan was being discussed, the fact that his speech was not in
response to public debate on the topic, and the content of the speech, the Court finds
that Plaintiff's November 13, 2001, speech was not primarily on a matter of public

---

[7]For the sake of clarity, the Court is not suggesting Plaintiff's speech can only touch
upon a matter of public concern if it entails official wrong-doing or corruption.  *See Harris v.
Victoria Indep. Sch. Dist.*, 168 F.3d 216, 222 (5th Cir. 1999) (holding that speech relating to a
principal's failure to follow certain improvement plans was among speech that constituted a
matter of a public concern).

concern.

### 6. BISD Meeting Excerpts - November 20, 2001, Plaintiff's Response to Defendant Sauceda's Motion for Summary Judgment, Ex. 31

Again, Plaintiff speaks during the public audience portion of a Board of Trustee's meeting–this time, on November 20. Plaintiff clearly represents AFLAC as the District's current Cafeteria Plan administrator. He states, "I'm here tonight to explain to you five reasons why you should choose AFLAC. Legality, which is the most important one. . . Granting an Agent of Record designation to an insurance agent or agency is illegal when the value of the contract is more than $10,000.00." Plaintiff further urges the Board to vote against agenda item 24, which recommended approval to award the RFQ to National Plan Administrators, Insurance Associates of the Valley, and which Plaintiff contends would be illegal "as their proposal calls for an agent-of-record designation." Ex. 31, at pp. 43-44. Plaintiff's remaining speech addresses issues such as cost, service record, flexibility, and locality of the agents –all presented in an effort to urge the Board's support of AFLAC as a continuing service provider.

Plaintiff's speech at the November 20, 2001 meeting touched on both matters of public and private concern because Plaintiff references the potential illegality of awarding an agent of record,[8] while promoting AFLAC's proposal to become BISD's TPA for the Cafeteria Plan. Fifth Circuit law tells us that matters of illegality and

---

[8]The Court notes that although Plaintiff has submitted into evidence a copy of the Attorney General's opinion, which forms the basis of Plaintiff's complaint, neither party has briefed the issue of whether this decision applies to the bidding process at issue in this case. The Attorney General's decision is not binding and the decision references a "broker of record" and not an "agent of record." Neither party presented argument as to what, if any difference, there is between the two as it would apply to the present case in the context of a public school's bidding process to appoint a Third Party Administrator to service its Cafeteria Plan. Moreover, the evidence demonstrates that NPA's proposal contained a brief reference to the possible assignment of agent of record status to Insurance Associates of the Valley. The evidence does not show that BISD was directly promoting the award of an agent of record. Nevertheless, as even instances of perceived wrongdoing may be considered matters of public concern in certain circumstances, the Court does not rest its decision on whether the Attorney General opinion Plaintiff cites would definitively bar BISD from appointing an agent of record to administer the Cafeteria Plan. See Denton, 136 F.3d at 1043 (explaining "[n]either the accuracy of the speech, nor the motivation of the speaker, plays a role in determining whether the expression involves a matter of public concern.").

misconduct are matters of public concern, while speech addressing one's employment is a private matter. *See Teague*, 179 F.3d at 381 & n.2 (citing *Wilson v. UT Health Ctr.*, 973 F.2d 1263, 1269-70 (5th Cir. 1992); *Gillum*, 3 F.3d at 120-21) (other citations omitted). As the Court has already done, in order to determine whether this mixed speech was made *primarily* on a matter of public concern, the Court must balance the three *Connick* factors of content, context, and form as they apply to the entire situation. *See Connick*, 461 U.S. at 147-48; *Moore v. City of Kilgore*, 877 F.2d 364 (5th Cir. 1989); *Terrell v. University of Tex. Sys. Police*, 792 F.2d 1360 (5th Cir. 1989). Although Plaintiff's motivation in speaking is of no moment in the Court's First Amendment analysis, the Court should assess Plaintiff's position as the speaker–that is, "the hat worn by the employee when speaking rather than [focus] upon the 'importance' of the issue." *Gillum*, 3 F.3d at 121.

Although the Court has not found any cases with considerably similar facts, it draws on several cases.[9] In *Hartman v. Board of Trustees*, the Seventh Circuit held the Plaintiff's speech was not on a matter of public concern because "'the overriding reason for the speech,' as determined by its content, form, and context, appear[ed] to have been related to the speaker's personal interests as an employee." 4 F.3d 465, 471-72 (7th Cir. 1993), quoted in *Teague*, 179 F.3d at 383 & n.5; *see also Gardetto v. Mason*, 100 F.3d 803, 813 (10th Cir. 1996) (taking motivation of speaker into consideration in First Amendment retaliation analysis). Careful not to focus on motive in this circuit, but rather on the "hat worn by Plaintiff," the Court finds the holding of *Teague* to be instructive where the Fifth Circuit found the focus of the plaintiffs' speech was "primarily

---

[9]Although also in the context of a teacher speaking before a school board committee, the facts of the present case differ from the circumstances in *Harris v. Victoria Independent School District*. In *Harris*, the Fifth Circuit found school teachers spoke on a matter of public concern at a school board meeting when they advised the school superintendent that they did not believe the principal was following the school's improvement plan. *See Harris*, 168 F.3d at 222. The teachers in *Harris*, unlike Plaintiff here, spoke as elected representatives of the faculty in response to the administration's request that the teachers address a committee about the school's progress. The Court in *Harris* stated the outcome "might have been different had the Plaintiffs not been committee members reporting the views of the faculty at large to the administration." *Id.* at 222 n.10.

on clearing their names–not on rooting out police corruption *per se.*" *Teague*, 179 F.3d at 383. As such, the speech was not on a matter of public concern. Similarly, the Fifth Circuit in *Gillum*, in which a plaintiff was fired after speaking to his supervisors about corruption, found the plaintiff did not state a retaliation claim because he spoke primarily in his role as an employee. 3 F.3d at 120. Finally, the analysis in *Bradshaw* is also helpful. In *Bradshaw*, the plaintiff sent three memoranda to a school board that addressed the principal's contract and criticized school board members' actions regarding the renewal of the principal's contract. Some of Bradshaw's comments responded to certain accusations made against her. The Fifth Circuit determined that the communications overall sought a "buy-out" of Bradshaw's contract, and that her speech was primarily that of a disgruntled employee and not an ordinary citizen. *Bradshaw*, 207 F.3d at 818. The memoranda were written in an "effort to protect her name and her job." *Id.*

Plaintiff's predominant, if not sole focus in speaking at the BISD Board meeting, was to solicit the Board's vote for AFLAC as TPA. Along with presenting other reasons to vote for AFLAC, Plaintiff raised the specter of illegality. Thus, the hat Plaintiff wore when speaking was that of an AFLAC representative attempting to drum up business by securing TPA status. *Id.* at 121. Plaintiff's focus was not on the "'importance' of the issue" of possible illegality concerning NPA's proposal. *Id.* Plaintiff's interest in his speech went beyond the interest of an ordinary citizen. As demonstrated by the myriad of memos and letters in evidence requesting that specific board members vote for AFLAC and memos updating Board members on the upcoming vote for TPA, Plaintiff was involved in an on-going campaign to win for AFLAC the bid for TPA of the Cafeteria Plan. Although not exactly an "on-going personal dispute," the evidence shows Plaintiff was engaged in an on-going campaign that predominantly dictated the focus of his speech. Indeed, Plaintiff's comment's about the legality of appointing an agent of record were vocalized because the recommendation to approve NPA's proposal was set on the agenda, and Plaintiff was attempting to block approval so that the Board would instead choose AFLAC. The approval of NPA's proposal had a direct impact on Plaintiff and AFLAC that went far beyond the impact this decision would have on any

25

other employee, independent contractor, or other person affiliated with BISD. The content of Plaintiff's speech in this case weighs in favor of it being on a matter of personal concern.

The Court makes a similar conclusion regarding the context and form of Plaintiff's speech as a matter mostly of personal concern. The issue of NPA's proposal and the possible illegality of appointing an agent of record was not made against a backdrop of widespread debate in the community. *See Tompkins*, 26 F.3d at 603, 607; *see also Finch*, 333 F.3d at 564 (holding principal's proposals arose in the context of "follow-up to a meeting among . . . principals in the" school district and not in the context of an education debate). Although Plaintiff presents some evidence that certain Board members may have had concerns about Sauceda's performance, Plaintiff's speech did not mention indiscretions of any Board member, including the superintendent. Rather, Plaintiff's speech focused entirely on listing the reasons why AFLAC was a more suitable choice for TPA, which encompassed the agent of record issue. Plaintiff was not rooting out information of general concern to the public. Finally, Plaintiff addressed the Board as an AFLAC representative and current TPA. After weighing the content, context, and form of Plaintiff's speech, on the whole, the Court finds he did not speak on a matter of public concern.

### D.  Is Defendant Noe Sauceda Entitled to Qualified Immunity?

Defendant argues that even if the Court determines Plaintiff's speech was protected speech under the First Amendment, he nonetheless is entitled to qualified immunity because his conduct was objectively reasonable. *See Harlow*, 457 U.S. at 818. Having completed the first step of the qualified analysis–that is, whether Plaintiff has presented a valid claim for First Amendment retaliation and determining he has not, the Court need not address the Defendant's remaining qualified immunity arguments. Defendant Sauceda was entitled to qualified immunity on Plaintiff's free speech retaliation claim.

## VI. BISD's Liability Under Section 1983[10]

Liability for municipalities and entities such as county governments may attach under 42 U.S.C. § 1983 only if the plaintiff demonstrates a deprivation of a constitutional right that was inflicted pursuant to an official policy or custom. *See Board of the County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 403 (1997); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986). Counties and independent school boards are contemplated as "municipalities" for the purpose of section 1983 liability. Municipal liability requires proof of "1) a policymaker; 2) an official policy; 3) and a violation of constitutional rights whose 'moving force' is the policy or custom." *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247 (2003) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)).

Municipalities cannot be liable for acts of its employees under a respondeat superior theory. *See Pembaur*, 475 U.S. at 477. *See also Monell v. New York City Dept. of Soc. Serv.*, 436 U.S. 658, 694 (1978). However, a municipality may be liable for the actions of those municipal or county officials who have "final policy making authority." *Praprotnik*, 485 U.S. at 124. State law governs whether a particular official has final policy making authority. *Id. See also Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737 (1989).

The Court notes that because it has found that no constitutional violation was committed against Plaintiff, it need not address whether Sauceda was in fact a final policymaker for BISD. Nevertheless, the Court briefly explains that even if Plaintiff presented evidence of a valid First Amendment claim, Plaintiff has failed to show Sauceda was a final policymaker or that an official policy exists, which was the moving force behind the constitutional violation.

---

[10]Defendant BISD raises the issue of Equal Protection in its Motion for Summary Judgment. Not only are Plaintiff's Equal Protection allegations skeletal at best, Plaintiff also does not respond to Defendant's Equal Protection arguments. The Court presumes Plaintiff does not wish to pursue an Equal Protection claim.

## A. Was Defendant Noe Sauceda a Final Policy Maker for BISD?

Plaintiff alleges Defendant BISD is "liable for the actions of Defendant Noe Sauceda as its CEO/Superintendent of Schools and its policymaker in the area of approval and disqualification of Third Party Administrators for the § 125 Cafeteria Plan, as asserted by Defendants and their legal counsel, Jeff Roerig, and thereafter adopted by Defendant BISD's Board of Trustees, as well as in the area of authority to exclude Plaintiff from having contact with school personel during school business hours." Pl's Response to Defendant BISD's Motion for Summary Judgment, at p. 21 [Dkt. No. 73].

Final policy makers are usually empowered by the state to "define objectives and choose the means of achieving them" without supervision by other government officials. *Colle v. Brazos County, Tex.*, 981 F.2d 237, 244 (5th Cir. 1993). Courts have distinguished between final *decision making* authority in a given area versus final *policy making* authority. *See Jett*, 7 F.3d at 1246; *Rivera,* 349 F.3d at 244 (noting the district court made such a distinction); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986). Final policy making may be granted either by legislative enactment or the official body that has final policy making authority may delegate such authority. *See Pembaur*, 475 U.S. at 483. "'[A] federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it.'" *Rivera*, 349 F.3d at 248 (quoting *Praprotnik*, 485 U.S. at 126).

The Texas Education Code delegates to the Board of Trustees "the exclusive power and duty to govern and oversee the management of the public schools of the district." Tex. Educ. Code § 11.151(b).[11] Plaintiff asserts the Board delegated the policymaking authority relating to the appointment of a TPA to Defendant Sauceda. Plaintiff cites BISD Policy CH (Legal) and CH (local) as evidence that Sauceda had authority to "determine what an appropriate basis for disqualifications would be." Pl's Response, at p. 24.

---

[11]"The trustees as a body corporate have the exclusive power and duty to govern and oversee the management of the public schools of the district. All powers and duties not specifically delegated by statute to the agency or to the State Board of Education are reserved for the trustees, and the agency may not substitute its judgment for the lawful exercise of those powers and duties by the trustees." Tex. Educ. Code § 11.151(b).

28

There is nothing contained within the policies Plaintiff provides indicating the Board has actually delegated to Sauceda final policymaking "in the area of approval and disqualification of Third Party Administrators for the § 125 Cafeteria Plan . . . [and] in the area of authority to exclude Plaintiff from having contact with school personnel during school business hours." Pl's Response, at p. 21. The policies cited by Plaintiff are just that: policies stating "The Board may delegate its authority regarding an action authorized or required to be taken by the District by Education Code Chapter 44, Subchapter B to a designated person, representative, or committee." Pl's Response, Ex. 49, at p. 1. Plaintiff cites to no authority that the Board of Trustees specifically delegated policymaking authority in this area to Superintendent Sauceda. Additionally, Plaintiff's assertion that Sauceda explained that he has final policymaking authority in this area is inaccurate. Sauceda stated, "I am responsible for every decision administratively in the district." *Id.* at Ex. 39 (Sauceda Deposition II, p. 187. As the Fifth Circuit has many times explained, final policymaking authority is not synonymous with final decisionmaking authority. *See Jett*, 7 F.3d at 1246 (holding superintendent who had final decisionmaking power concerning employee transfers did not have final policymaking authority); *Rivera*, 349 F.3d at 244; *see also Praprotnik*, 485 U.S. at 127; *Pembaur*, 475 U.S. at 480-81. Furthermore, Plaintiff cites no evidence that Sauceda's decisions were made without being subjected to review by the Board. Indeed, it is clear from evidence Plaintiff cites that Superintendent Sauceda made recommendations to the Board regarding the approval of proposals for selecting a TPA. *See* Pl's Response, Ex. 20, at p. 7 (Special Called Board Meeting, October 30, 2001) (Sauceda made a recommendation concerning the appointment of NPA as the TPA). The Court finds, therefore, that Plaintiff has cited no evidence indicating the BISD Board delegated policymaking authority to Sauceda.

### B. Has Plaintiff identified a Policy?

In order to maintain an action against BISD, Plaintiff must identify a policy connected to BISD, and show his injuries resulted from the application of the policy. *Bennett v. City Slidell*, 735 F.2d 861 (5th Cir.1984) (en banc) (per curiam), *cert. denied*, 472 U.S. 1016 (1985). Finally, Plaintiff must establish that BISD's deliberate conduct

29

was the "moving force behind the injury alleged," which necessitates proof of a direct causal link between BISD's action and the deprivation of Plaintiff's constitutionally protected rights. *Bryan County*, 520 U.S. at 404.

The Fifth Circuit has identified official policy as either:

1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the [district] . . . or by an official to whom the [district] ha[s] delegated policy-making authority; or
2. A persistent, widespread practice of [district] officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the district or to an official to whom that body had delegated policy-making authority.

*Eugene v. Alief Indep. Sch. Dist.*, 65 F.3d 1299, 1304 (5th Cir. 1995) (changes in original).

Plaintiff has presented no evidence that a policy exists that was the moving force behind Plaintiff's constitutional claim of free speech retaliation. Even if Plaintiff's speech was determined to be on a matter of public concern, Plaintiff has failed to demonstrate that the Board's alleged ratification of Superintendent's action when he notified Plaintiff of his intent to not renew Plaintiff's services actually constituted a policy that was the moving force behind the constitutional violations. Without this showing, BISD cannot be liable for any constitutional violations that occurred.

### VII. Supplemental Jurisdiction Over State Claims

Pursuant to 28 U.S.C. § 1367(a) the Court exercises its supplemental jurisdiction over the accompanying state claims in this case. Having issued summary judgment only days before the case was scheduled for final pretrial conference, the Court determined it was appropriate to exercise supplemental jurisdiction even in light of the Fifth Circuit's general rule that district court's should decline to exercise supplemental jurisdiction once all federal claims are dismissed. Noting this rule is neither "mandatory nor absolute," the Court determined the fast approaching trial date mitigated in favor of retaining the case and disposing of the state claims. *See Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 351 & n.7 (1988); *see also Parker & Parsley Petroleum Co. v. BJ-*

*Titan Serv. Co.*, 972 F.2d 580, 585 (5ᵗʰ Cir. 1992). Additionally, no reasons compelled the Court to decline jurisdiction. *See* 28 U.S.C. § 1367(c).

## VIII.  Professional Immunity under the Texas Education Code for State Claims

Defendant Sauceda claims he has professional immunity against suit for the state tort claims brought against him in his individual capacity.  Under the Texas Education Code, Section 22.051[12] provides immunity for professional employees of a school district.  Section 22.051(a) states,

> A professional employee of a school district is not personally liable for any act that is incident to or within the scope of the duties of the employee's position of employment and that involves the exercise of judgment or discretion on the part of the employee, except in circumstances in which a professional employee uses excessive force in the discipline of students or negligence resulting in bodily injury to students.

Tex. Educ. Code Ann. § 22.051(a).  Defendant Sauceda is entitled to summary judgment based on immunity if he conclusively proves he was a professional employee; his actions were incident to or within the scope of his duties; and his duties involved the exercise of discretion.  Plaintiff does not contest, nor could he, that Sauceda was a professional employee of BISD.  *See* Tex. Educ. Code Ann. § 22.051(c)(1).  Nor does Plaintiff argue this case involves the use of excessive force of students.  Instead, Plaintiff alleges Superintendent Sauceda acted "on a matter on which he did not have discretion, in such a manner as to constitute slander, tortious interference with a business relationship, and intentional infliction of emotional distress."

### A.  Within the Scope of Employment

Plaintiff mistakenly frames the scope of employment issue when he states:

> Defendant Sauceda has not established how he had discretion within the scope of his duties to tortiously or intentionally interfere with Plaintiff Chavez's employment relationship with AFLAC, to make material misrepresentations as to constitute a fraud on Plaintiff, BISD employees and the community in general, to

---

[12]The parties filed the current case before a non-substantive renumbering occurred in the Texas Education Code in 2003.  Former section 22.051(a) is now section 22.0511(a). *Compare* Tex. Educ. Code Ann. § 22.0511(a) (Vernon Supp. 2004) *with* Act of May 27, 1995, 74ᵗʰ Leg., R.S., ch. 260, § 1, 1995 Tex. Gen. Laws 2207, 2283.  The Court will refer to the statute as "section 22.051(a)."

31

intentionally inflict emotional distress on Plaintiff Chavez, to libel or slander Plaintiff Chavez by accusing him of "unprofessional" and "unethical" conduct, both in writing and verbally, or to contact Plaintiff's supervisor Frank LaFemina to insist on Chavez's removal from handling the BISD Cafeteria Plan or from BISD in general for reporting Defendant's apparent illegal and financially irresponsible proposals.

PI's Response to Defendant Sauceda's Motion for Summary Judgment, at p. 36. "Whether one is acting within the scope of h[is] employment depends on whether the general act from which the injury arose was in furtherance of the employer's business and the objective for which the employee was employed." *Kobza v. Kutac*, 109 S.W.3d 89, 94 (Tex. App. –Austin, 2003, review denied) (citations omitted).

> For example, if some injury arises from the failure of a teacher to create and post a disciplinary plan, immunity is not dependent upon whether the acts of creating and posting the plan are discretionary or ministerial. Rather, those acts are a part of the overall concept of discipline, and whether the teacher is entitled to immunity depends upon whether the overall responsibility to maintain discipline is discretionary or ministerial. Therefore, our focus should be on whether [Plaintiff] was performing a discretionary function, ***not on whether he had discretion to do an allegedly wrongful act while discharging that function.***

*Deaver v. Bridges*, 47 S.W.3d 549, 553-54 (Tex. App.–San Antonio 2000, reh'g overruled) (citations omitted) (emphasis added). Were the scope of employment element to be framed as Plaintiff presents it, no professional employee would ever be immune from liability under the Texas Education Code because any allegation of an intentional tort would necessarily lead to the conclusion that an employee acted beyond the scope of his employment. This result was not the intention behind professional immunity. In this case the issue is not whether Superintendent Sauceda had discretion to commit intentional torts against Plaintiff. Instead, the question is whether it is within the scope of Superintendent Sauceda's employment to oversee access of service providers to BISD campuses or to withdraw or reject Plaintiff's authorization to continue administering BISD's Cafeteria Plan.[13]

---

[13] Although factually distinguishable, the Fifth Circuit has determined that termination and contract renewal decisions generally and employee evaluations are duties that require the exercise of a school supervisor's judgment and discretion. *See Jones v. Houston Indep. Sch.*

32

There is evidence in the record demonstrating Sauceda acted within the scope of his employment when he limited Plaintiff's access to BISD campuses and rejected his proposal for allegedly unprofessional and unethical conduct as part of his oversight and management of BISD. Sauceda's November 29, 2001, letter indicated the letter was to serve as his "official 30-day notice of [their] intent to non-renew [Plaintiff's] services as [their] Third Party Administrator for [their] Cafeteria plan. Sauceda additionally stated, "I must also inform you that your proposal for renewal of the contract has been rejected as allowed under BISD Policy CH (Legal) and CH (Local). *See* Defendants' Motion for Summary Judgment, Ex. S & F-4. The Board's Purchasing and Acquisition policy manual, CH (Local), states, "[t]he District may reject any and all bids." *Id.* at Ex. F-4. Additionally, the RFQ for BISD's Cafeteria Plan outlines the terms and conditions for submitting proposals and the school's selection: "The school district reserves the right to accept or reject any and all offers or any part thereof, and to waive any or all formalities." Defendant BISD's Motion for Summary Judgment, Ex. D, at p. 5. Additionally, Sauceda states in his deposition that he was "responsible for every decision administratively in the district. . ." Pl's Response to Defendant Sauceda's Motion for Summary Judgment, Ex. 39 (Deposition of Noe Sauceda, at p. 187). Sauceda discussed instances in the past in which he determined whether certain agents and vendors would be allowed access to BISD campuses. It is clear from Sauceda's testimony, that access to BISD campuses falls under the umbrella of "administrative" decisions for which he is responsible. *See* Defendant BISD's Motion for Summary Judgment, Ex. W (Deposition of Noe Sauceda, at pp. 185-87. Finally, the

---

*Dist.,* 979 F.2d 1004, 1007 (5th Cir.1992) (principal's memorandum to school district administrator relating to a teacher's alleged misbehavior toward students was written within the scope of the principal's duties); *Hix v. Tuloso-Midway Indep. Sch. Dist.,* 489 S.W.2d 706, 712 (Tex.Civ.App.--Corpus Christi 1972, writ ref'd n.r.e.) (a nonrenewal recommendation for a teacher was within the scope of a school superintendent's duties); *Russell v. Edgewood Indep. Sch. Dist.,* 406 S.W.2d 249, 252 (Tex.Civ.App.--San Antonio 1966, writ ref'd n.r.e.) (the discharge of a teacher was within the scope of a school superintendent's duties); *see also Martinez v. Hardy,* 864 S.W.2d 767, 772-73 (Tex.App.-- Houston [14th Dist.] 1993, no writ) (the performance evaluation of a file clerk was within the scope of a supervisor's duties).

letter he wrote was clearly written in his capacity as the superintendent. The letter was on official letterhead paper and cites the reasons, whether correct or incorrect, for his decision to not renew Plaintiff's services.

Pursuant to the Education Code, a superintendent's duties include: "assuming administrative responsibility and leadership for the planning, operation, supervision, and evaluation of the education programs, services, and facilities of the district . . . ." Tex. Ed. Code § 11.201(d)(1). Additionally, a superintendent "manag[es] the day-to-day operations of the district as its administrative manager," id. § 11.201(d)(5), "develop[s] or caus[es] to be developed appropriate administrative regulations to implement policies established by the board of trustees," id.§ 11.201(d)(8), and "prepar[es] recommendations for policies to be adopted by the board of trustees and oversee[s] the implementation of adopted policies." Id. § 11.201(d)(7).

Even if the employer, or the Board in this instance, fails to authorize expressly the general act of overseeing vendor or representative access to the BISD campuses or rejecting bid proposals, or if the employee negligently performs the act, the employee may still be able to claim immunity under the Education Code. See Kobza, 109 S.W.3d at 93 (citing Williams v. Chatman, 17 S.W.3d 694, 699 (Tex. App. –Amarillo 1999, pet. denied)). Section 22.051 provides immunity for acts that are either incident to or within the scope of the employee's duties. Determining who has access to BISD campuses and excluding those agents or vendors whom he believes to have conducted themselves inappropriately falls within the scope of the Superintendent's employment duties. Finally, even if Superintendent Sauceda exercised poor judgment in the way he handled what in his opinion amounted to "continuous inappropriate correspondence" on Plaintiff's part, such judgment does not mandate a finding that Sauceda acted outside the scope of his duties. See, e.g., Kobza, 109 S.W.3d at 94. Cf. Chesshir v. Sharp, 19 S.W.3d 502, 505 (Tex. App. –Amarillo 2000, no pet.) (discharging duties negligently will not strip an employee of immunity under section 22.051). The Court finds Sauceda was acting within the scope of his duties.

### B. Discretionary or Ministerial Act

Defendant Sauceda argues his acts were discretionary in nature. Plaintiff

34

disagrees, stating, "[a]t the very least, Plaintiff Chavez denies the allegations made by Defendant Sauceda in his November 29[th] letter that he submitted to Chavez, Chavez's supervisor Frank LaFemina, and the BISD Board of Trustees.  Plaintiff asserts that Sauceda instead manufactured those allegations. . ."  Pl's Response to Defendant Sauceda's Motion for Summary Judgment, at p. 37.  Plaintiff argues a fact issue remains concerning whether Sauceda's actions were ministerial or discretionary in nature because Defendant Sauceda has not conclusively established the acts were discretionary.

An act is discretionary if it requires personal deliberation, decision, and judgment. *Harris County v. Ochoa,* 881 S.W.2d 884, 887 (Tex.-App.–Houston [14[th] Dist.] 1994, writ denied).  "Ministerial acts are those '[w]here the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment . . . ."  *City of Lancaster v. Chambers*, 883 S.W.2d 650, 654 (Tex. 1994).  A government official is not entitled to immunity if the act is ministerial. *Downing v. Brown*, 935 S.W.2d 112, 114 (Tex. 1996).  Acts are discretionary if they involve personal deliberation about the "manner or means of performance," and require the actor to "invoke [his] own judgment." *Kobza*, 109 S.W.3d at 95 (citing *Downing*, 935 S.W.2d at 114).

There is ample evidence in the record to support the fact that Sauceda's decisions concerning access to BISD campuses and the termination of BISD's relationship with Plaintiff and AFLAC were discretionary decisions.  Indeed, the letter Sauceda sent Plaintiff was tailored to address Sauceda's perceptions concerning Plaintiff's misconduct.  The letter set forth explicit conditions that if met would enable to AFLAC to participate in the upcoming bidding process.  In light of evidence in the record that Sauceda made administrative and employee-related decisions in the district, which included determinations concerning access to BISD campuses, Plaintiff could easily have submitted BISD policies and rules, if any existed, concerning insurance representatives, the revocation of solicitation privileges, or any other rules relevant to Sauceda's actions in this case.   Instead, Plaintiff attacks the content of Sauceda's letter, and provides no evidence that Sauceda's duties were ministerial instead of

35

discretionary. Plaintiff denies Sauceda's allegations that Plaintiff acted unprofessionally or unethically, but Plaintiff does not present evidence that Sauceda violated a specific rule that would have rendered Sauceda's actions ministerial in nature, rather than discretionary. A large bulk of Plaintiff's arguments generally in his response focus on Sauceda's alleged efforts to circumvent the bidding process and award NPA the TPA bid. The allegations and citations to testimony of Board members do not present evidence that Sauceda's actions were anything but discretionary. Nor does the fact that Board members expressed their disapproval of Sauceda's action upon learning of Sauceda's letter to Plaintiff and Sauceda's subsequent correspondence with Frank LaFemina demonstrate Sauceda's actions were ministerial. Indeed, the Board does not say, for example, that Sauceda violated certain policies or rules that would render his actions ministerial. Instead, the Board members disagree with Sauceda's decision to discontinue BISD's relationship with Plaintiff. *See* Defendant BISD's Motion for Summary Judgment, Ex. S (Sauceda's November 29, 2001, letter to Plaintiff]. As long as Sauceda's mistakes under state law involved discretionary decisions, Sauceda will be protected by immunity under the Education Code. The Court finds that Sauceda's decisions were discretionary, and Sauceda is entitled to professional immunity under the Texas Education Code.

## IX. Conclusion

The Court, therefore **GRANTS** Defendants Sauceda and BISD's Motions for Summary Judgment on all federal and state law claims.

DONE at Brownsville, Texas, this 3rd day of September, 2004.

Hilda G. Tagle
United States District Judge

36